**Hearing Date and Time: November 29, 2012 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline: November 26, 2012 at 4:00 p.m. (Prevailing Eastern Time)**

Dennis F. Dunne
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

David S. Cohen
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------- x
                                          :
In re:                                    :            Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :            08-13555 (JMP)
                                          :
                  Debtors.                :            (Jointly Administered)
                                          :
----------------------------------------------------------- x
```

**REPLY OF (I) INDIVIDUAL MEMBERS OF**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND**
**(II) INDENTURE TRUSTEES IN FURTHER SUPPORT OF OMNIBUS APPLICATION**
**PURSUANT TO SECTION 1129(a)(4), OR, ALTERNATIVELY, SECTIONS 503(b)(3)(D)**
**AND 503(b)(4) OF BANKRUPTCY CODE FOR PAYMENT OF**
**FEES AND REIMBURSEMENT OF EXPENSES**

The Bank of New York Mellon ("BNYM"), Elliott Management Corp. ("Elliott"),

Mizuho Corporate Bank, Ltd. ("Mizuho"), Metropolitan Life Insurance Co. ("Metlife"), Shinsei

Bank, Limited, U.S. Bank National Association ("US Bank"), The Vanguard Group

("Vanguard"), and Wilmington Trust Company ("Wilmington Trust"), each in its capacity as a
current or former member (in such capacities, the "Committee Members") of the Official
Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.
("LBHI") and the other above-captioned debtors (together with LBHI, the "Debtors"); and
Wilmington Trust, BNYM, and US Bank, each in its capacity as indenture trustee for various
notes issued by LBHI (in such capacities, the "Indenture Trustees" and, together with the
Committee Members, the "Applicants"), hereby submit this reply (the "Reply") to (a) the
Omnibus Objection of the United States Trustee to Creditors' Applications for Reimbursement
of Professional Fees and Expenses (the "UST Objection") [Docket No. 25394] and (b) the Fee
Committee's Limited Objection to the Omnibus Application of (i) Individual Members of
Official Committee of Unsecured Creditors and (ii) Indenture Trustees Pursuant to Section
1129(a)(4), or, Alternatively, Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for
Payment of Fees and Reimbursement of Expenses (the "Fee Committee Objection") [Docket No.
25384].  In response to the UST Objection[1] and in further support of the Omnibus Application of
(i) Individual members of Official Committee of Unsecured Creditors and (ii) Indenture Trustees
Pursuant to Section 1129(a)(4), or, Alternatively, Sections 503(b)(3)(D) and 503(b)(4) of
Bankruptcy Code For Payment of Fees and Reimbursement Of Expenses (the "Application")
[Docket Nos. 24762 and 24881], the Applicants state as follows:

## REPLY

1.    In light of the unprecedented size and complexity of the Debtors' chapter
11 cases and the corresponding burdens that these cases have imposed on the Applicants, and in
recognition of the massive effort expended by the Applicants in developing, refining and

---

[1]    The Fee Committee Objection is more limited and simply asserts that the Court should not approve the
Application until the fee committee appointed in these cases (the "Fee Committee") has had a chance to
review it for reasonableness.

securing creditor support for the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated August 31, 2011 (the "Plan") [Docket No. 19627], the Debtors included a provision for payment of the professional fees and expenses incurred by the Applicants during the pendency of these cases (the "Fee Payment Provision"). (See Plan at § 6.7.)

2.       Creditors in all classes entitled to vote voted overwhelmingly in favor of the Plan, which included the Fee Payment Provision, and this Court confirmed the Plan on December 6, 2011 [Docket No. 23023].

3.       Notwithstanding the Applicants' efforts throughout these cases and the recognition of those efforts by the Debtors and the vast majority of creditors, the United States Trustee for Region 2 (the "U.S. Trustee") has objected to both the Fee Payment Provision and the Application.  In her objection, the U.S. Trustee argues that the Court should find (i) the Fee Payment Provision impermissible and, instead, upon application of the "substantial contribution" standard of section 503(b) of the Bankruptcy Code, the Applicants' efforts insufficient; (ii) that the Applicants' fees and expenses are not reasonable under section 1129(a)(4) of the Bankruptcy Code; and (iii) that the Applicants' reliance on In re Adelphia, 441 B.R. 6 (Bankr. S.D.N.Y. 2010), is misplaced.

4.       Contrary to the U.S. Trustee's assertions, the Fee Payment Provision was properly included in the Plan, and the Application is therefore subject only to the reasonableness review under section 1129(a)(4) of the Bankruptcy Code.  Under section 1129(a)(4) and this Court's Adelphia decision, which is directly on point, the fees and expenses sought by the Applicants are plainly reasonable.  The U.S. Trustee's contentions to the contrary are in error, and accordingly the Application should be granted.

**A. The Application Is Governed by Section 1129(a)(4) and Therefore is Subject Only to Review for Reasonableness**

5.      As a general rule, parties are free to include any economic terms in a consensual plan of reorganization as long as those terms do not "run afoul of the requirements of section 1129, or other provisions of the [Bankruptcy] Code . . . ." In re Adelphia Commc'ns Corp., 368 B.R. 140, 259 n.264 (Bankr. S.D.N.Y. 2007); see also 11 U.S.C. § 1123(b)(6) (permitting a plan proponent to include in a plan "any" provision that is "appropriate" and "not inconsistent with the applicable provisions" of the Bankruptcy Code).

6.      Provisions governing "payments" made "in connection with [a] plan and incident to [a] case," such as those to be made under the Fee Payment Provision, are governed by section 1129(a)(4) of the Bankruptcy Code.  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) requires only that such payments be "approved by, or . . . subject to the approval of, the court as reasonable." Id.[2]

7.      Because the payments sought in the Application are explicitly provided for by the Plan, they are subject only to the reasonableness standard of section 1129(a)(4) of the Bankruptcy Code.  The Applicants are not seeking to recoup their fees and expenses over the objections of the Debtors or the other participants in the plan process.  On the contrary, they seek payments for the sustained and effective efforts on behalf of the estates that were clearly contemplated by all parties when votes were cast in favor of the Plan, and the Plan was confirmed.

---

[2]      The full text of section 1129(a)(4) of the Bankruptcy Code provides that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).

8.      Notwithstanding these facts, the U.S. Trustee insists that section 503(b) of the Bankruptcy Code, which authorizes payment of fees and expenses upon a showing that the applicant made a "substantial contribution" to a bankruptcy case, is most apposite here.  In urging the Court to apply section 503(b), the U.S. Trustee relies upon the canon of statutory construction that a specific statutory provision usually governs a general one.  (See UST Objection at 13.)

9.      Contrary to the U.S. Trustee's contention, however, section 503(b) simply does not apply to applications for payment of fees and expenses provided for in a chapter 11 plan.[3]  Although both section 1129(a)(4) and section 503(b) address the general subject of payment of fees and expenses, the critical distinction is that section 1129(a)(4) addresses payments *that are voluntarily provided for in a plan* as part of a larger settlement or transaction, while section 503(b), which makes no mention of plan authorization, provides a mechanism by which a creditor may *compel* the payment of its fees over a debtor's objection.  See In re Adelphia Commc'ns Corp., 441 B.R. 6, 9 (Bankr. S.D.N.Y. 2010) (finding that section 1129(a)(4) permits payment of "reasonable fees" where, as here, "the provision for fees is an element of a chapter 11 reorganization plan"); see also id. at 12-13 (distinguishing such provisions from applications governed by section 503(b), which are "nonconsensual in nature" because, "[b]y their terms, they do not require the assent or agreement of the debtor, chapter 11 trustee, or any other party in the case to qualify for payment"); cf. In re Adelphia Commc'ns Corp., 285 B.R. 127, 142 (Bankr. S.D.N.Y. 2002) ("there should be consistency within this judicial district (even when the decisions of other judges in this district are not, strictly speaking,

---

[3]      For this reason, the U.S. Trustee's argument that section 503(b)(3)(F) does not authorize payment of committee members' expenses under section 503(b), although correct, is irrelevant.  (See UST Objection at 23-24.)  As explained in the Application and herein, the Application is governed by the Plan and section 1129(a)(4) of the Bankruptcy Code, not section 503(b).

binding)"). This distinction between voluntary payments under section 1129(a)(4) and

involuntary payments under section 503(b) explains the differing standards applied and the

reason that the standard applied to applications under section 1129(a)(4) is lower.

10.     Further, under the very canon of statutory construction cited by the U.S.

Trustee, because section 1129(a)(4) directly addresses the payment of fees provided for in a plan,

it controls – as it most specifically applies to the relief sought by the Application. Moreover, the

other statutory canon upon which the U.S. Trustee seeks to rely—that "a statutory provision

should not be construed so as to render any other provision of the statute superfluous"—also

favors granting the Application. (UST Objection at 13 (citing Turner v. Rogers, 131 S. Ct. 2507,

2522 (2011)).) As the Adelphia court explained, application of the section 503(b) standard to

fees and expenses contemplated by a consensual plan would render section 1129(a)(4)'s

reasonableness requirement a nullity, because if section 503(b) were "the only source for

authority to pay legal fees under a plan . . ., there would be no need to impose the reasonableness

requirement twice. Applying section 503(b) in accordance with its terms would already have

skinned the cat." 441 B.R. at 13.

11.     In an attempt to avoid the clear import of Adelphia, the U.S. Trustee

attempts to limit that opinion to its specific facts,[4] arguing that under Adelphia a court may

approve an application for fees and expenses under section 1129(a)(4), rather than section

---

[4]     Notably, the U.S. Trustee does not contest the central principle of Adelphia that an application for fees and
expenses under a plan provision contemplating such payment can be approved under section 1129(a)(4)
alone, without reference to section 503(b). Indeed, nowhere does the U.S. Trustee argue that Adelphia was
wrongly decided; rather, she argues only that Adelphia's holding should not be applied to the facts of this
case. (See UST Objection at 16-17.) Thus, the U.S. Trustee has conceded that, at least under some
circumstances, an application for fees and expenses can be granted under section 1129(a)(4) and not under
section 503(b). See EM Ltd. v. Republic of Argentina, No. 03 Civ. 2507 (TPG) , 2009 WL 2568433, at *7
(S.D.N.Y. Aug. 18, 2009) ("BNA does not address this argument, and may therefore be deemed to have
conceded it."); Starkey v. Somers Cent. Sch. Dist., No. 02 Civ. 2455 (SCR), 2008 WL 5378123, at *6
(S.D.N.Y. Dec. 23, 2008) ("Plaintiff makes no response to this argument in her reply brief, and so must be
deemed to have conceded the point . . . ."), aff'd, 389 F. App'x 38 (2d Cir. 2010).

503(b), only when the applicants are not members of "an official committee."  (See UST

Objection at 16-17 (asserting that the "[m]ost notabl[e]" factual distinction between Adelphia

and these cases is that "the fee requests considered in Adelphia were lodged by members of 14

ad hoc committees of noteholders and individual unsecured creditors, none of whom were

members of an official committee").)  Nothing in section 1129(a)(4) or section 503(b)—or in any

other provision of the Bankruptcy Code—provides any basis for the U.S. Trustee's apparent

belief that the governing standard depends upon the type of committee of which the applicant is a

member.  Nor does the U.S. Trustee cite any authority that could support such a conclusion.

12.     Indeed, *the U.S. Trustee herself* has acquiesced in section 1129(a)(4)

reasonableness review – and *only* such review – of a similar plan provision in the Tribune case,

belying her insistence now that such a provision is impermissible as a matter of law.  In re

Tribune Co., the U.S. Trustee objected to an early plan of reorganization on the ground that (as

relevant here) it did not provide for reasonableness review of fee payments to committee

members pursuant to section 1129(a)(4).  See In re Tribune Co., Case No. 08-13141 (KJC), U.S.

Tr. Obj. to 2d Am. Joint Plan dated Feb. 15, 2011 ([Docket No. 7980]), attached hereto as

Exhibit D, at 9 ¶ 23 ("Section 9.1 of the . . . Plan contains provisions related to the payment of

fee and expense claims of certain creditor groups, including a number of the . . . Plan Proponents.

*These fee and expense claims are subject to approval under a reasonableness standard as a*

*confirmation requirement*.  See 11 U.S.C. § 1129(a)(4)." (emphasis added)).[5]  After the plan

was revised to provide for section 1129(a)(4) reasonableness (but not substantial-contribution)

---

[5]     Although the U.S. Trustee suggested in her Tribune objection that "[t]he fee and expense provisions *may*
also be subject to approval under a substantial contribution standard," id. (emphasis added), she did not
argue that the plan should be revised to reflect, or that the Court should apply, such a standard.  Rather, she
contended only that the plan could not be confirmed without "provisions for the Court, or parties in interest,
including the U.S. Trustee, to test the *reasonableness* of those fees and expenses."  Id. (emphasis added).

review of such payments, the U.S. Trustee made no objection to the revised plan, which the

bankruptcy court confirmed on July 23, 2012.[6]

13.    Given that the text of the Bankruptcy Code, the <u>Adelphia</u> decision, and

even the U.S. Trustee's own past positions all support the application of section 1129(a)(4) to

plan provisions for the payment of committee member fees, it is unsurprising that this Court

(among others) has approved numerous plans authorizing such payments under section

1129(a)(4).  <u>See, e.g.</u>, <u>In re Great Atlantic & Pacific Tea Co.</u> ("<u>A&P</u>"), Case No. 10-24549

(RDD), Confirmation Order dated Feb. 28, 2012 ([Docket No. 3477], attached hereto as Exhibit

E, at 30-31 ¶ 58 ("Payments made or to be made by the Debtors for services or for costs and

expenses in or in connection with the Chapter 11 Cases . . ., including the professional fee

expense amounts owed . . . as provided by Article II.A of the Plan, have been approved by, or are

subject to the approval of, the Bankruptcy Court as reasonable.  Accordingly, the requirements of

section 1129(a)(4) of the Bankruptcy Code are satisfied."); <u>A&P</u> First Amended Joint Plan of

Reorganization [Docket No. 3477-1], attached hereto as Exhibit F, at 21 ¶ II.A ("Reasonable and

documented fees and expenses incurred by members of the Creditors' Committee during the

pendency of the Chapter 11 Cases in their capacities as members of the Creditors' Committee

shall be Allowed Administrative Claims in an aggregate amount not to exceed $378,500.00."); <u>In

re Refco</u> ("<u>Refco</u>"), Case No. 05-60006 (RDD), Confirmation Order dated Dec. 15, 2006

---

[6]    <u>See also</u> <u>In re Washington Mutual, Inc.</u>, Case No. 08-12229 (MFW), Order Confirming 7th Am. Joint Plan
dated Feb. 23, 2012 ([Docket No. 9759]), attached hereto as Exhibit L, at 38 ¶ OO ("the Plan provides that
fees and expenses of . . . certain creditors' professionals listed in Section 41.18 of the Plan must be
approved by the court *as reasonable* before being paid by the Debtors" (emphasis added)); <u>id.</u> at 112 ¶ 78
(providing for submission of claims for committee members' professionals' "*reasonable* fees and
expenses" (emphasis added) and reserving parties' rights to object thereto); <u>In re Spansion Inc.</u>, Case No.
09-10690 (KJC) Debtors' Second Amended Joint Plan of Reorganization Date April 7, 2010 (As
Amended), attached hereto as Exhibit M, at 80 §13.5 ("The Professionals retained by…the members [of the
Creditor's Committee] shall be entitled to assert claims for *reasonable* fees for services rendered and
expenses incurred in connection with the consummation of the Plan….).  The U.S. Trustee did not object to
the foregoing provisions of the <u>Washington Mutual</u> or the <u>Spansion</u> plan.

[Docket No. 3971], attached hereto as Exhibit G, at 13 ¶ N ("Any payment made or to be made . . . for services or for costs and expenses in or in connection with the Chapter 11 cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code."); Refco Modified Joint Chapter 11 Plan [Docket No. 3948], attached hereto as Exhibit H, at 19 ¶ 1.217 (providing for payment of fees to the Senior Subordinated Note Indenture Trustee, who served on the unsecured creditors' committee in Refco and, in that capacity, incurred a portion of the fees to be paid under the fee-payment provision); In re Enron ("Enron"), Case No. 01-16034 (AJG), Supplemental Modified Fifth Amended Join Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, attached hereto as Exhibit I, at 25 ¶ 1.159 (providing for payment of reasonable attorney's fees and expenses incurred by indenture trustees); id. at 96 ¶ 32.15 (providing for payment of such fees without the need for court approval upon the agreement of the debtors and the creditors' committee, and upon a finding of reasonableness in the absence of such agreement); accord In re Trans World Airlines, Inc., 185 B.R. 302, 314 (E.D. Mo. 1995) (approving, under section 1129(a)(4), plan provision authorizing payment of fees and expenses incurred by indenture trustees).

14.    Further, contrary to the U.S. Trustee's contention that the nature of the committee determines the standard applicable to a fee-payment provision, the Adelphia court made plain that its ruling was premised on *the consensual nature of the plan*, not the incidental fact that the applicants in that case were members of ad hoc, rather than official, committees. See 441 B.R. at 13 ("the textual structure of section 1129(a)(4) . . . . expressly *contemplates* that payments may be made in connection with a reorganization plan—*presumably, consensually*—by a debtor, plan proponent, issuer of securities, or acquiror of property.  Section 1129(a)(4) then

10

requires that any such payments must be approved by the court as reasonable, or that they be subject to such a review" (second emphasis added)); contrast id. at 12 ("these provisions [of section 503(b)] are ***nonconsensual in nature***" (emphasis added)).[7]

15.    Perhaps recognizing the futility of her argument that the nature of the committee is the determinative factor, the U.S. Trustee goes on to argue that the Fee Payment Provision cannot be characterized as consensual within the meaning of Adelphia because (a) the Applicants were not involved in the disputes that they helped to settle and (b) the Plan preserves parties' rights to object to the contemplated payment applications.  (UST Objection at 19-21.) Neither of these purported distinctions, however, supports a finding that the Fee Payment Provision is nonconsensual under Adelphia.

16.    First, the U.S. Trustee asserts that the payments in Adelphia were permitted as part of the plan settlement to quell inter-creditor strife, whereas the Applicants in these cases should receive no such favorable treatment, because they worked together to develop a joint Plan that was overwhelmingly approved by the creditor body and generally minimized inter-creditor disputes that could have cost the Debtors' estates hundreds of millions of dollars to litigate.  The Committee Members were uniquely situated to assess each of the issues impacting the Debtors by virtue of their involvement in every aspect of these cases.  As the only parties with access to non-public information, the Committee Members acquired a comprehensive knowledge of the Debtors' asset base and claims pool, as well as a global perspective on the key value drivers and the dynamics of achievable compromises.  Accordingly, as one of the two

---

[7]    In light of this central holding of Adelphia, the U.S. Trustee's statement that "[t]he Applicants cite no reported decision whereby a court awarded the fees and expenses of committee members under Section 1129(a)(4)" (UST Objection at 15) is puzzling.  (But see UST Objection at 15 ("***there exists one reported decision***, namely, [Adelphia], wherein the bankruptcy court awarded fees and expenses to ad hoc committee members and other unsecured creditors under Section 1129(a)(4)" (emphasis added) (footnote omitted)).)

principal fiduciaries in these cases, the Committee served as a proxy for all unsecured creditors during plan negotiations to ensure that the Plan was fair and equitable to all of the diverse constituents in these cases.  Cf. In re Winn-Dixie Stores, Inc. (Case No. 05-03817) Findings of Fact and Conclusions of Law (Nov. 16, 2006) [Docket No. 12618], attached hereto as Exhibit J, at 12 (overruling objection of certain unsecured creditors to settlement embodied in plan, because settlement was result of negotiations with debtors and creditors' committee, which, due to its diverse membership and fiduciary duties, negotiated on behalf of all unsecured creditors).  In essence, the U.S. Trustee argues that because the Applicants helped to broker a historic compromise—assisting in the resolution of disputes that at one point gave rise to three competing plans, thereby settling the largest, and possibly most complex, bankruptcy cases ever filed in the United States with *one* objection to confirmation that was later withdrawn—they should be denied payment of the fees and expenses that they incurred in so doing.  Such a ruling could only incentivize parties to litigate every possible issue in order to secure payment commitments through hostage-taking, rather than to work toward settlement and consensus-building.  Public policy militates against such a counterproductive result.  See, e.g., In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (recognizing the "general public policy favoring settlements"); Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) (recognizing the "general rule that settlements are favored and . . . encouraged").

17.    Nor is the Fee Payment Provision rendered nonconsensual by the reservation language in the Order confirming the Plan (which was included at the U.S. Trustee's request).  In fact, although the U.S. Trustee neglects to acknowledge it, the plan in Adelphia contained a similar provision allowing objections to the payment claims authorized thereunder, and the Adelphia court expressly stated in its confirmation decision that it was reserving

judgment on whether the Bankruptcy Code authorizes the payment of individual creditors' fees

and expenses under a plan provision authorizing such payments.  See 441 B.R. at 11-12 & n.11.

Nonetheless, the Adelphia court ultimately concluded that the reservation provision did not

vitiate the consensual nature of the provision for the payment of fees and that payments under

that provision were subject only to reasonableness review under section 1129(a)(4).  The Plan

provision at issue here is substantively indistinguishable from that of Adelphia, and the U.S.

Trustee's argument in these cases is identical to the one that was rejected by the Adelphia court.

Accordingly, here as in Adelphia, the Court should review the Fee Payment Provision under the

reasonableness standard of section 1129(a)(4).[8]

18.    In sum, the plain language of section 1129(a)(4), the applicable canons of

construction, Adelphia, and the U.S. Trustee's position in similar cases – all establish that the

Application is subject only to review for reasonableness.

## B.  The Applicants' Fees are Reasonable under Section 1129(a)(4)

19.    Section 1129(a)(4) permits a court to approve an application for fees and

expenses as reasonable if the requested payment "is reasonable in relation to other costs incurred

---

[8]    The Tribune plan likewise includes a reservation permitting the U.S. Trustee to object to committee members' fee claims – under section 1129(a)(4)'s reasonableness standard.  See In re Tribune Co., Case No. 08-13141 (KJC), Fourth Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A., As Modified July 19, 2012 ([Docket No. 12072-2]), attached hereto as Exhibit K, at 78-79 § 9.1.3 ("If . . . the United States Trustee disputes in writing the reasonableness of any amounts due under any such statements, the applicable parties will attempt in good faith to resolve any such dispute.  If the applicable parties are unable to resolve the dispute, any such party may . . . seek review of the reasonableness of the disputed amounts by the Bankruptcy Court pursuant to section 1129(a)(4) of the Bankruptcy Code . . . .").  As noted above, the U.S. Trustee did not object to this provision – or any other provision – of the Tribune plan, as amended.

The U.S. Trustee's failure to object to the Tribune plan is particularly telling in light of the fact that that plan contemplated only the payment of fees incurred by committee members in the course of their committee service – in contrast to the Plan, which also provides for fees incurred by some of the Committee Members in their capacities as Indenture Trustees – and that the fees contemplated by the Tribune plan constituted a larger percentage of the total amount at issue than do the fees sought by Applicants (though the amounts in both cases are de minimis in relation to the total values of the respective estates).

in the case, reasonable in relation to other cases, or reasonable in relation to the fee structure of the individual or entity requesting payment." In re Congoleum Corp., No. 03-51524, 2010 WL 1850182, at *5 (D.N.J. May 7, 2010); see also 7 Collier on Bankruptcy ¶ 1129.02[4] (15th ed. rev.).  Because the Application meets all of these disjunctive requirements, it is appropriate under section 1129(a)(4) and should be granted.

### i.   Section 1129(a)(4) Standard

20.   As the Adelphia opinion makes clear, reasonableness under section 1129(a)(4) must be determined based on the facts of the specific case.  See 441 B.R. at 19.  Here, as in Adelphia, "[t]hat context, of course, is a determination by the Debtors, which [the] creditors and equity ratified by their plan acceptances, to pay the reasonable costs" of the Applicants.  Id. Indeed, the only meaningful difference between these cases and Adelphia is that, in Adelphia, the applicants were "nonfiduciary creditors trying to increase their personal recoveries on their claims," whereas here the Applicants are Committee members that devoted their efforts—with uncommon success and under unusually difficult circumstances—to maximizing recovery for the estates.

21.   In Adelphia, the court concluded that the applicants could recover their fees and expenses because the ratified and confirmed plan contemplated such an outcome, subject only to what the court termed "Economy Concerns," such as "overworking a matter or running up excessive disbursements," and "Behavioral Concerns," such as "outrageous" litigation conduct that "went beyond the bounds of ordinary negotiation and advocacy."  Id. at 19-20.  With the exception of claims giving rise to Economy or Behavioral Concerns, the Adelphia court concluded that the applicants' fees and expenses were recoverable under the plan. Thus, under the section 1129(a)(4) reasonableness standard, as applied in Adelphia, the

Applicants plainly are entitled to their fees and expenses incurred in maximizing recovery for the estates, except to the extent that any of the claimed fees and expenses were incurred frivolously or vexatiously.

### ii.    Section 330 Is Inapplicable

22.    The U.S. Trustee does not argue—nor could she—that the Applicants have sought to inflate their fees or incur unnecessary costs.  Rather, the U.S. Trustee asserts, without foundation, that the <u>Adelphia</u> court really meant to subject the reasonableness determination to the requirements of section 330 of the Bankruptcy Code[9]—despite the fact that the <u>Adelphia</u> decision does not mention section 330 and, as even the U.S. Trustee concedes (albeit in a footnote), section 330 is patently inapplicable here.  (<u>See</u> UST Objection at 27 (asserting that the <u>Adelphia</u> court "implied," by citing the Economy and Behavioral concerns, that the section 330 requirements should be applied); <u>id.</u> n.5 (acknowledging that "11 U.S.C. § 330, by its terms, applies only to retained professionals").)

23.    The U.S. Trustee then embarks on a prolonged examination (<u>see</u> UST Objection at 28-31) of the standards governing applications under section 330 and the United States Trustee Fee Guidelines (the "<u>UST Guidelines</u>"), none of which is relevant to the Application.  (<u>See</u> UST Guidelines (a)(1) ("The Bankruptcy Reform Act of 1994 amended the responsibilities of the United States Trustees under 28 U.S.C. § 586(a)(3)(A) to provide that, whenever they deem appropriate, United States Trustees will review applications for compensation and reimbursement of expenses ***under § 330 of the Bankruptcy Code***." (emphasis added)).)

---

[9]    Section 330 provides that a court may award "reasonable compensation for actual, necessary services" and "reimbursement for actual and necessary expenses" to a "professional person ***employed under section 327 or 1103***."  11 U.S.C. § 330(a)(1)(A)-(B) (emphasis added).

24.     Simply put, the professionals retained by the Applicants were not retained pursuant to sections 327 or 328 of the Bankruptcy Code and therefore the Applicants are not required to comply with section 330 of the Bankruptcy Code or the UST Guidelines.  Rather, this Court need only determine whether the amounts sought by the Application are "reasonable in relation to other costs incurred in the case, reasonable in relation to other cases, or reasonable in relation to the fee structure of the individual or entity requesting payment."  <u>Congoleum</u>, 2010 WL 1850182, at *5.

### iii.  The Application Satisfies the <u>Congoleum</u> Standard

25.     The Application meets all three of the disjunctive standards in the <u>Congoleum</u> test.  The fees and expenses sought by the Applicants are reasonable in relation to other costs in these cases: $26 million in fees and expenses pales in comparison to the $800 million awarded to the retained professionals through May 2011 (<u>see</u> UST Objection at 15) and anticipated distributions to unsecured creditors, the first of which totaled approximately $22.5 billion.  The fees and expenses requested are also reasonable in that the hourly rates of the Applicants' professionals are consistent with their respective rates in other bankruptcy and non-bankruptcy matters.  Finally, the fees and expenses requested are adequately documented in the same manner that the applicable professionals use to document their fees and expenses in other matters.

26.     Even if more were necessary, the record in these cases plainly demonstrates that the Applicants' fees and expenses are well within the reasonableness standard provided in section 1129(a)(4).  <u>See</u> Declaration of John K. Suckow, as President and Chief Executive Officer of Lehman Brothers Holdings Inc., in Support of the Omnibus Application of Individual Members of Official Committee of Unsecured Creditors and Indenture Trustees for

16

Payment of Fees and Expenses ("Suckow Declaration"), attached hereto as Exhibit C, at ¶¶ 6-8

("the fees and expenses requested in the Application are reasonable in the circumstances of these

extraordinary cases and their very successful administrations and resolution").  As evidenced by

the declarations appended to the Application, and as explained in greater detail in the

supplemental declarations of Noel P. Purcell (the "Purcell Declaration") and Julie J. Becker (the

"Becker Declaration"), attached hereto as Exhibits A and B, respectively,[10] the Committee has

worked side-by-side with the Debtors since the commencement of these cases (i) in connection

with the administration of the Debtors' estates, assisting in the identification and preservation of

assets and reconciliation of claims against the estates; (ii) in connection with the management of

the Debtors' assets pending their ultimate disposition, through various subcommittees

established with respect to each discrete asset class; and (iii) to promote Plan confirmation by

---

[10] The U.S. Trustee has wrongly alleged that "[a]ll of the [initial d]eclarations in support of the Applications are identical, but for the name of the Applicant and the names of their professionals."  (UST Objection at 22.)  That assertion is simply untrue.  While the Committee Members experienced many of the same events by virtue of the fact that they served on the same Committee, each of the initial declarations is nonetheless distinct, highlighting each Applicant's specific role in these cases.

The U.S. Trustee also states that "[a]ll of the [initial d]eclarations . . . list the same summary of Committee achievements in these cases."  (Id. at 23.)  This assertion, too, is wrong.  By way of example, the Declaration of John Guiliano in support of the BNYM Application sets forth numerous achievements not included in the Declaration of Edward P. Gilbert in support of Shinsei's Application, including the (i) Sale to Barclays; (ii) Bank of America Litigation; (iii) Swedbank Litigation; (iv) Sale of Innkeepers; (v) Disposition of Archstone; and (vi) Development of Plan.  While the initial declarations may, as a general matter, contain certain overlapping information, to assert as the U.S. Trustee does that they "list the same summary of Committee achievements" is inaccurate.

In any event, to the extent that the UST Objection is premised on a supposed lack of particularity in the initial declarations, the supplemental Purcell and Becker Declarations more than suffice to address any such concern.  These supplemental declarations explain in great detail when and how often the various subcommittees convened, what they discussed, the outcomes of their analyses and negotiations, and the resulting benefits to the Debtors' estates.  And while, again, these declarations overlap somewhat in the events that they describe, due to the fact that the declarants' service on the same Committee, they are far from identical.  The Purcell Declaration, for example, includes extensive detail on the functioning of the Real Estate Subcommittee (see Purcell Declaration ¶¶ 50-62), whereas Wilmington Trust was not a member of that subcommittee and thus the Becker Declaration does not discuss it.

On the facts set forth in the initial and supplemental declarations, the fees and expenses sought by the Applicants are self-evidently reasonable.

being instrumental in resolving disputes concerning, <u>inter</u> <u>alia</u>, substantive consolidation, treatment of intercompany claims, foreign affiliate claims and competing plans of reorganization. (<u>See</u> Purcell Declaration ¶ 5; Becker Declaration ¶ 5; Suckow Declaration ¶ 7.)  In the course of these activities, the Applicants and their professionals participated in hundreds of meetings and devoted thousands of hours to the operation, evaluation, and liquidation of the Debtors' businesses and properties.  (<u>See</u> Purcell Declaration ¶ 20; Becker Declaration ¶ 20.)

27.    Significantly, the Committee was instrumental in developing a chapter 11 plan construct that was fair and equitable to all of the diverse constituents in these cases and assuring that the Plan garnered the support of the vast majority of the Debtors' creditors.  (<u>See</u> Purcell Declaration ¶¶ 8-15; Becker Declaration ¶¶ 8-15.)  To ensure that this construct was preserved, the Committee actively participated in the negotiation of the various settlements reflected in the Plan, and many of its comments and recommendations with respect to these settlements were integrated into the Plan.  (<u>See</u> Purcell Declaration ¶¶ 9-11, 14-15; Becker Declaration ¶¶ 9-11, 14-15.)

28.    Because the Committee's view was that immediate sales at potentially greatly reduced prices were not appropriate and that the Debtors' assets should be held and managed by the estates until economic conditions made monetization more attractive, in the months after Lehman's chapter 11 filings the Committee Members formed various subcommittees to work with the Debtors' management team in carrying out this "hold and manage" strategy.  (<u>See</u> Purcell Declaration ¶ 7; Becker Declaration ¶ 7.)  As part of this process, the Committee Members worked with the Debtors to value the available assets, develop marketing plans and ultimately orchestrate the disposition of such assets through either private or court-approved sales.  (<u>See</u> Purcell Declaration ¶ 7; Becker Declaration ¶ 7.)  The disposition of

assets occurred pursuant to various formal and informal protocols established in these cases that provided for Committee oversight and approval rights for certain transactions through the various subcommittees.  (See Purcell Declaration ¶ 7; Becker Declaration ¶ 7.)  The protocols, among other things, made it possible for the Debtors to consummate transactions under certain threshold amounts without Court approval, and thus with greater expedition and efficiency.  (See Purcell Declaration ¶ 7; Becker Declaration ¶ 7.)

29.    The Committee was able to facilitate these transactions and to mediate Plan disputes because its membership was diverse, holding claims against a number of the Debtors and thus able to address in a motivated, informed way disputes affecting various classes of creditors.  (See Purcell Declaration ¶¶ 21-22; Becker Declaration ¶¶ 21-22.)  With the exception of Wilmington Trust, which, as an indenture trustee, holds senior unsecured claims against LBHI, each current Committee Member holds claims against one or more of the subsidiary Debtors:  Metlife filed claims against Lehman Brothers Special Financing Inc. ("LBSF") and LBHI; Vanguard filed claims against LBSF, Lehman Brothers Commodity Services Inc. and LBHI; Mizuho filed claims against LBSF and LBHI; BNYM, as an indenture trustee, filed claims against LBHI and LBSF; US Bank, as an indenture trustee, filed claims against LBHI and LBSF; and Elliott filed claims against LBHI, LBSF, Lehman Commercial Paper Inc. and Lehman Brothers Commercial Corp.  (See Purcell Declaration ¶ 22; Becker Declaration ¶ 22.)

30.    This diversity of interests among the Committee Members was one of the factors that led the U.S. Trustee to decline a request to appoint additional subsidiary Debtor creditor committees in April 2009, finding that the Committee adequately represented the interests of each Debtor's unsecured creditors.  (See Letter from Diana G. Adams, Esq., United

States Trustee, Office Of the United States Trustee for Region 2, to Martin J. Bienenstock, Esq.,

Dewey & LeBoeuf LLP, and Jeffrey S. Sabin, Esq., Bingham McCutchen LLP (Apr. 29, 2009).)

This same multiplicity of viewpoints made the Committee an invaluable facilitator of the Plan

process.  (See Purcell Declaration ¶ 23; Becker Declaration ¶ 23.)  It was able to navigate among

the demands of the various constituencies, and through round-the-clock efforts, foster the

consensus that gave rise to the compromises that ultimately made the Plan possible.  (See Purcell

Declaration ¶ 23; Becker Declaration ¶ 23.)  By representing different unsecured constituents in

the manifold and extremely large debtor cases, the Committee performed the tasks of several

committees, and thus saved the estates the incremental costs associated with multiple official

committees.

      31.     The Committee Members would not have been able to undertake these

responsibilities without the assistance of individual counsel, notwithstanding the counsel

provided to the Committee by its retained professionals.  While the Applicants unquestionably

are sophisticated creditors, none of the Applicants possessed the expertise required to address all

of the complex issues that arose in these cases without significant input from its own

professionals.  Resolution of many of these issues involved spirited and sometimes contentious

debates in which the respective positions of different Committee Members were informed by the

legal and ethical analyses of their individual counsel.

      32.     The Applicants are diverse entities with different sensitivities to tax,

securities, finance and other issues affecting the Debtors' estates.  Moreover, given the varied

and distinct constituencies represented by the Committee, it was eminently reasonable—indeed,

critical—for its members to rely on their own counsel to supplement the advice of Committee

counsel.  Hence, each of the Committee Members and the Indenture Trustees has relied on its

own counsel for assistance in reviewing and evaluating the hundreds of transactions, pleadings

and strategic issues that the Committee addressed in the discharge of its fiduciary duties to all

creditors.  This ability to consult separate counsel permitted each Committee Member to better

understand the particular perspectives of the various creditors and, thus, to advance the ability of

the Committee to do its work efficiently and effectively.  (See Purcell Declaration ¶¶ 24-25;

Becker Declaration ¶¶ 24-25.)

33.    Moreover, the Indenture Trustees were faced with the unique challenge of

balancing their fiduciary duties to both their constituent bondholders and the Debtors' unsecured

creditors.  The Indenture Trustees would not have been able to navigate these two regimes

without the advice and guidance of individual counsel.

34.    Neither the Debtors nor their creditors would have been well-served by a

Committee whose members failed to independently evaluate the proposals offered by the

Debtors, their counsel and the Committee's professionals.  Indeed, it was the Committee

Members' duty as fiduciaries to think critically about those proposals and to inform themselves,

with the help of their own professionals, regarding each matter at issue.  With the advice and

support of their individual counsel, the Committee Members were able to independently evaluate

the advice of the Committee's professionals, with the result that the value of the Debtors' estates

was significantly increased.  (See Becker Declaration ¶ 26.)

35.     It was in recognition of the Committee's unique role in, and substantial

contribution to, the Plan process that the Debtors included the Fee Payment Provision in all three

versions of the Plan.  (See Purcell Declaration ¶ 21; Becker Declaration ¶ 21.)  The Committee

first discussed the possibility of including in the initial plan a provision for payment of the

Committee Members' professional fees during a March 3, 2010 meeting at which the Committee

evaluated alternatives to certain of the concepts included in the initial plan term sheet proposed by the Debtors. (<u>See</u> Purcell Declaration ¶ 11; Becker Declaration ¶ 11.) The following day, the Committee Co-Chairs, their individual counsel, and the Committee's advisors held a conference call during which the Committee's advisors agreed to discuss a possible fee payment provision with the Debtors. (<u>See</u> Purcell Declaration ¶ 12; Becker Declaration ¶ 12.) During a conference call held the same day, the full Committee agreed that its advisors should discuss inclusion of the proposed payment provision, in addition to conveying the Committee's comments to the term sheet. (<u>See</u> Purcell Declaration ¶ 12; Becker Declaration ¶ 12.)

36.     During a March 8, 2010 meeting with the Debtors and their counsel, the Committee's advisors shared the Committee's comments to the term sheet and proposed the inclusion in the initial plan of a provision for the payment of the Committee Members' and Indenture Trustees' professional fees. (<u>See</u> Purcell Declaration ¶ 13; Becker Declaration ¶ 13.) During a Committee call held later that day, the Committee's advisors informed the Committee that the Debtors had agreed to consider including the proposed provision. (<u>See</u> Purcell Declaration ¶ 13; Becker Declaration ¶ 13.)

37.     In calls among the Co-Chairs and the Committee on March 11, 2010, the Committee resolved to continue to discuss with the Debtors its comments to the initial plan, including those regarding the payment of the Committee Members' and Indenture Trustees' professional fees. (<u>See</u> Purcell Declaration ¶ 14; Becker Declaration ¶ 14.)

38.     In discussions held over the next four days among the Co-Chairs, the Committee's advisors, the Debtors and their counsel, the Debtors agreed to include certain of the Committee's modifications to the initial plan including, in light of the Committee's intensive efforts and substantial contributions to the formulation of the initial plan, the payment of the

22

Committee Members' and Indenture Trustees' professional fees. (See Purcell Declaration ¶ 15; Becker Declaration ¶ 15.) On March 15, 2010, the initial plan was filed. (See Purcell Declaration ¶ 15; Becker Declaration ¶ 15.)

39.     The Committee continued its active involvement in the months following the filing of the initial plan, acting as a referee among the parties as they evaluated various competing proposed plans. (See Purcell Declaration ¶¶ 16-19; Becker Declaration ¶¶ 16-19.) The Committee's sustained and effective efforts ultimately achieved consensus among the parties and facilitated confirmation of the Plan. (See Purcell Declaration ¶¶ 19-20; Becker Declaration ¶¶ 19-20; Suckow Declaration ¶ 7.)

40.     The Applicants' contributions to the preservation and management of the Debtors' assets yielded additional substantial benefits to the estates. For example, the Loan Book Subcommittee, which met at least fifty (50) times since its inception, was tasked with assisting in the management of the Debtors' loan book portfolio valued at $2.3 billion as of June 30, 2011. (See Purcell Declaration ¶ 38; Becker Declaration ¶ 39.) The Loan Book Subcommittee reviewed each month's loan activity, evaluated transactions proposed by the Debtors and, where appropriate, approved those transactions. (See Purcell Declaration ¶¶ 37-44; Becker Declaration ¶¶ 38-45.)

41.     The Real Estate Subcommittee, which assisted in managing the Debtors' real-estate portfolio valued at $14.9 billion after re-underwriting in December 2008, met in excess of 200 times. (See Purcell Declaration ¶¶ 50-52.) The efforts of the Real Estate Subcommittee had resulted in a return of more than $2 billion to the estates as of June 2011, and are ultimately expected to yield a net recovery of more than $10 billion. (See id. ¶ 52.)

42.    The Derivatives Subcommittee, which is responsible for analyzing the Debtors' portfolio of more than 900,000 derivatives transactions, held at least 160 telephone conferences and spent at least 150 hours conferring with the Committee, in addition to many more hours spent analyzing particular transactions and issues.  (See id. ¶¶ 27-28; Becker Declaration ¶¶ 28-29.)  The Derivatives Subcommittee was instrumental in negotiating the development of, and obtaining approval for, alternative dispute resolution procedures that have enabled the recovery of more than $1 billion of value for the estates.  (See Purcell Declaration ¶ 33; Becker Declaration ¶ 34.)  The ultimate value expected to be recovered for the estates on account of the Debtors' derivatives portfolio, using protocols designed and implemented with the assistance of the Derivatives Subcommittee, is more than $17 billion.  (See Purcell Declaration ¶ 36; Becker Declaration ¶ 37.)

43.    The Tax Subcommittee, since August 2009, assisted in negotiating settlements with state and federal authorities resulting in a more than $1 billion reduction in the Debtors' tax liabilities.  (See Purcell Declaration ¶ 49; Becker Declaration ¶ 50.)

**iv.  Payment of In-House Counsel Fees Is Appropriate**

44.    As to the request for payment of fees and expenses incurred by the Applicants' in-house counsel, although the U.S. Trustee complains that the Application cites no decision in which a court awarded such payments to individual members of a creditors' committee, the U.S. Trustee herself fails to cite any authority for the proposition that such fees may not be paid.  And for good reason—the case law overwhelmingly supports the proposition that in-house counsel fees may be paid in instances where, as here, in-house counsel act not as a liaison between the client and outside counsel but instead as the client's sole legal counsel.  See, e.g., Milgard Tempering, Inc. v. Selas Corp. of Am., 761 F.2d 553, 557-58 (9th Cir. 1985)

(stating that fees should be permitted to in-house counsel of nonlegal organization so long as counsel actively participated in the matter); Textor v. Bd. of Regents, 711 F.2d 1387, 1396-97 (7th Cir. 1983) (permitting attorneys' fees for salaried in-house counsel of universities); cf. In re Tarkio College, 195 B.R. 424, 430 (Bankr. W.D. Mo. 1996) ("An oversecured creditor is not barred from recovering in-house counsel fees if fees are authorized by contract, and if the creditor can demonstrate that the fees were reasonable, actual, and necessary.").

45.    Thus, because the Application meets all three prongs of the Congoleum standard for reasonableness under section 1129(a)(4)—though any one of the three would be sufficient—and because the record before the Court establishes beyond doubt that the Applicants' expenses are reasonable, the UST Objection should be overruled and the Application granted.

## CONCLUSION

WHEREFORE, each Applicant respectfully requests that the Court (i) overrule

the UST Objection and the Fee Committee Objection; (ii) authorize and direct the Debtors to pay

the fees and expenses incurred by the Applicants from September 15, 2008 through and

including December 31, 2011; and (iii) grant such other and further relief as is just and proper.

Dated:  New York, New York
   November 15, 2012

        MILBANK, TWEED, HADLEY & M$^c$CLOY LLP

        By: /s/ Dennis F. Dunne_____
        Dennis F. Dunne
        Evan R. Fleck
        1 Chase Manhattan Plaza
        New York, NY  10005
        Telephone: (212) 530-5000
        Facsimile: (212) 530-5219

        David S. Cohen
        1850 K Street N.W., Suite 1100
        Washington, DC 20006
        Telephone: (202) 835-7500
        Facsimile: (202) 835-7586

        Counsel for the Official Committee of Unsecured
        Creditors of Lehman Brothers Holdings Inc., et al.

## Exhibit A

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

<u>**SUPPLEMENTAL DECLARATION OF NOEL P. PURCELL IN SUPPORT
OF OMNIBUS APPLICATION OF INDIVIDUAL MEMBERS OF OFFICIAL
COMMITTEE OF UNSECURED CREDITORS AND INDENTURE TRUSTEES
PURSUANT TO SECTION 1129(a)(4) OR, ALTERNATIVELY, SECTIONS
503(b)(D)(3) AND 503(b)(4) OF THE BANKRUPTCY CODE, FOR PAYMENT OF
FEES AND REIMBURSEMENT OF EXPENSES**</u>

NOEL P. PURCELL declares under penalty of perjury, pursuant to 28

U.S.C. § 1746, as follows:

1.      I represent Mizuho Corporate Bank, Ltd. ("<u>Mizuho</u>"),[1] in its

capacity as a member of the Official Committee (the "<u>Committee</u>") of Unsecured

Creditors of Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliate debtors

(collectively, the "<u>Debtors</u>") appointed in these chapter 11 cases (the "<u>Chapter 11</u>

<u>Cases</u>").  Except as otherwise provided herein, the facts set forth in this supplemental

declaration are based upon my personal knowledge.  I am competent to testify to these

facts.

2.      I make this supplemental declaration in further support of the

Omnibus Application of Individual Members of Official Committee of Unsecured

Creditors and Indenture Trustees Pursuant to Section 1129(a)(4) or, Alternatively,

---

[1]      I am employed as a Senior Vice President of Mizuho Corporate Bank (USA), which operates co-extensively with Mizuho, and I have legal signing authority at both entities.

Sections 503(b)(D)(3) and 503(b)(4) of the Bankruptcy Code for Payment of Fees and

Expenses (the "Application").

3.        As I explained in my initial declaration, in addition to its service as

a Committee Co-Chair, member of the Director Selection Committee, and member of the

EMTN Valuation Working Group, Mizuho served as a member of the Loan Book

Subcommittee, the Tax Subcommittee, the Real Estate Subcommittee, the Derivatives

Subcommittee, the Bank Regulatory Subcommittee, and the Fee Subcommittee.[2]

4.        I set forth below details regarding Mizuho's service on these

various subcommittees, the membership of the subcommittees, their work and the

circumstances under which the Debtors came to include in the Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan")

a provision specifically requiring the Debtors to pay the reasonable fees and costs

incurred by Committee members.

**A.        The Committee and Lehman's Asset Classes**

5.        Since the inception of these cases, the Committee has worked side-

by-side with the Debtors (i) in the administration of the Debtors' estates, assisting in the

identification and preservation of assets and reconciliation of claims against the estates;

(ii) in the management of the Debtors' assets pending their ultimate disposition, through

various subcommittees established with respect to each of the discrete asset classes of the

Debtors; and (iii) to promote Plan confirmation by resolving disputes concerning, inter

---

[2]        Mizuho is also a member of the post-Effective Date Litigation Subcommittee, the other members
of which are Elliott Management Corp.; U.S. Bank National Association; and Wilmington Trust
Company.

alia, substantive consolidation, the treatment of intercompany claims, foreign affiliate claims and competing plans of reorganization.

6.      Because the Debtors' were not planned chapter 11 filings, the first order of business after the commencement of the Chapter 11 Cases was to take inventory of the assets that remained after the sale of Lehman's broker-dealer business to Barclays Capital Inc. (the "Barclays Sale").  The Barclays Sale meant not only the loss of personnel but the fracturing of Lehman's internal accounting system.  In the first few months of these cases, the Committee members dedicated extraordinary effort to the process of identifying assets and ensuring that they were protected from seizure or material depreciation in value while a global strategy was formulated for their management.

7.      The Committee's view was that immediate sales at potentially greatly reduced prices were not appropriate and that a substantial portion of the Debtors' assets should be held and managed by the estates until economic conditions made monetization more attractive.  Thus, in the months after Lehman's chapter 11 filings, the Committee members formed various subcommittees to work with the Debtors' management teams in carrying out this "hold and manage" strategy, as more fully detailed below.  As part of this process, the Committee worked with the Debtors to value the available assets, develop marketing plans and ultimately orchestrate the disposition of such assets through either private or Court-approved sales.  The disposition of assets occurred pursuant to various formal and informal protocols established between the Debtors and the Committee that provided for Committee oversight and approval rights for certain transactions through the various subcommittees.  The protocols, among other

things, made it possible for the Debtors to consummate transactions under certain

threshold amounts without Court approval, and thus with greater expedition and

efficiency.  As a result, the Committee has since its formation been involved in every

aspect of the Chapter 11 Cases.

**B.**      **Lehman Plan and Committee Member Fee Provision**

8.      In addition to its work with the estates regarding asset preservation

and disposition, the Committee conducted its own research and analysis of various issues

that would impact any plan of reorganization filed in these cases, including substantive

consolidation, intercompany claims re-characterization and the enforceability of

guarantees.  The knowledge and perspective that the Committee gained from this work

permitted the Committee not only to serve as an intermediary among the various creditor

groups and the Debtors but also to have a meaningful role in the development of the

reallocation concept that was incorporated into the Plan.

9.      Recognizing that substantive consolidation would be a critical

issue for any creditor in the Chapter 11 Cases, the Committee's advisors conducted an in-

depth substantive consolidation analysis, which yielded a detailed white paper report that

was presented to the Committee during December 2009.  Based on this analysis, the

Committee members participated in extensive discussions concerning appropriate

compromises of the substantive consolidation issues in these cases.

10.     Because the period in which the Debtors alone could file a plan of

reorganization was to expire in March 2010, the Committee began to focus on Plan

concepts in late 2009.  In January 2010, a "POR Working Group" was formed, consisting

of the Committee Co-Chairs and their advisors.  The POR Working Group met

4

approximately once a week with the Debtors and their counsel, Weil, Gotshal & Manges

LLP ("Weil"), to discuss the structure of the Debtors' initial plan of reorganization (the

"Initial Plan").  During this time, the Committee also met at least weekly to discuss its

own views concerning the Initial Plan and evaluate various recovery scenarios in

connection therewith.

        11.     As part of the POR Working Group's meetings with the Debtors,

the Debtors provided the Committee in late February 2010 with a term sheet for the

Initial Plan (the "Term Sheet").  On March 3, 2010, the Committee met in person to

discuss its comments to the Term Sheet, including additional concepts that it sought to be

incorporated into the Initial Plan.  It was also at this meeting that the Committee members

first discussed the possibility of including in the Initial Plan a provision for the payment

of the Committee members' professional fees.

        12.     During a March 4, 2010 conference call among Committee Co-

Chair Julie J. Becker, myself, our individual counsel, and the Committee's senior legal

and financial advisors, Dennis F. Dunne of Milbank, Tweed, Hadley & McCloy LLP

("Milbank") and P. Eric Siegert of Houlihan Lokey Howard & Zukin Capital, Inc.

("Houlihan"), I proposed that the Debtors include in the Initial Plan a provision for the

payment of the Committee members' professional fees.  Julie Becker and I asked that our

advisors introduce the concept to the Debtors on our behalf.  In a conference call held by

the full Committee later that day, the Committee agreed that when its advisors

communicated with the Debtors to convey the Committee's comments to the Term Sheet,

the advisors should discuss inclusion of a provision for the payment of the Committee

members' professional fees.

13.     During a March 8, 2010 meeting among the Committee's financial and legal advisors, the Debtors and Weil, Milbank and Houlihan shared the Committee's comments to the Term Sheet and also proposed the inclusion in the Initial Plan of a provision for the payment of the Committee members' professional fees.  During a Committee call held later that day, Milbank and Houlihan informed the Committee that the Debtors had agreed to consider including the proposed provision.

14.     In calls among the Co-Chairs and the Committee on March 11, 2010, the Committee resolved to continue to discuss with the Debtors its comments to the Initial Plan, including those regarding corporate governance and the payment of the Committee members' professional fees.

15.     In discussions held over the next four days among Milbank, Weil, the Co-Chairs and the Debtors, the Debtors agreed to include certain of the Committee's modifications to the Initial Plan, including payment of the Committee members' professional fees.  On March 15, 2010, the Initial Plan was filed.

16.     After the filing of the Initial Plan, the Committee continued to devote significant time and effort to plan matters.  The Committee and its advisors met with numerous ad hoc creditor groups and also continued discussions with the Debtors regarding the economic terms of the Initial Plan, including the settlement of substantive consolidation, the treatment of guarantee claims and the treatment of the Debtors' foreign affiliate claims.

17.     All of this work led the Committee and its advisors to develop an alternative construct for the Plan that called for the reallocation of recoveries otherwise anticipated under the Plan to settle substantive consolidation issues.  This concept was

embodied in a term sheet developed by the Committee's advisors, refined in discussions with the Committee in October 2010, and shared with the Debtors in November 2010, which became the basis for certain aspects of the first amended plan (the "First Amended Plan") filed on January 25, 2011.

18.     The First Amended Plan garnered significant attention, including from the creditor groups that had previously reached out to the Debtors and the Committee.  The continuing disagreement among creditor groups concerning substantive consolidation eventually led to the filing of two competing plans, one of which was predicated on the complete substantive consolidation of the Debtors' estates and the other of which was predicated on the complete deconsolidation of these same estates.

19.     In an attempt to bridge the gap between these competing plans, the Debtors called an "all hands" meeting in June 2011, which took place over the course of three days and included countless phone calls, informal meetings and discussions.  The Committee participated in these discussions, and sought to identify areas of consensus and motivate the parties to reach agreement.  The final agreements that flowed from these meetings were embodied in the second amended plan (the "Second Amended Plan"), which was filed on June 30, 2011, and, as subsequently amended (the "Third Amended Plan"), thereafter confirmed.  The Second and Third Amended Plan, like the Initial Plan, contained a provision providing for the payment of the Committee members' legal fees (the "Committee Member Fee Provision").

20.     All told, the Committee has devoted at least 223 meetings and more than 400 hours to the analysis and resolution of the issues described above, with the result that the Plan was confirmed with nearly unanimous creditor approval.

C.    **Rationale for Committee Member Fee Provision**

21.    As set forth above, the Debtors agreed to include the Committee

Member Fee Provision in all three versions of the Plan in recognition of the unique role

the Committee played with respect to the Plan process and the substantial contribution

that it made to the success of that process.  The Committee was able to mediate Plan

disputes in these cases because its membership was diverse, holding claims against a

number of the Debtors and thus able to address in a motivated, informed way disputes

affecting various classes of creditors.

22.    Indeed, the diversity of the Committee's membership, and its

extensive involvement in the negotiation and resolution of issues ranging across the

Debtors' capital structure, had initially obviated any need to appoint additional

committees in connection with the cases of particular Debtors, thereby saving the estates

millions of dollars in potential additional fees.  With the exception of Wilmington Trust

Company ("Wilmington Trust"), which, as an indenture trustee, holds senior unsecured

claims against LBHI, the Committee members each hold claims against one or more of

the subsidiary Debtors:  The Metropolitan Life Insurance Company ("Metlife") filed

claims against Lehman Brothers Special Financing Inc. ("LBSF") and LBHI; The

Vanguard Group ("Vanguard") filed claims against LBSF, Lehman Brothers Commodity

Services Inc. and LBHI; Mizuho filed claims against LBSF and LBHI; The Bank of New

York Mellon ("BNYM"), as an indenture trustee, filed claims against LBHI and LBSF;

U.S. Bank National Association ("US Bank"), as an indenture trustee, filed claims against

LBHI and LBSF; and Elliott Management Corp. ("Elliott") filed claims against LBHI,

LBSF, Lehman Commercial Paper Inc. ("LCPI") and Lehman Brothers Commercial

Corp. This diversity of interests among the Committee members was one of the factors that led the United States Trustee to decline a request to appoint additional subsidiary Debtor creditor committees in April 2009, finding that the Committee adequately represented the interests of each of the Debtors' unsecured creditors.[3]

23.    This same multiplicity of viewpoints made the Committee an invaluable facilitator of the Plan process. It was able to navigate among the demands of the various constituencies and, through round-the-clock efforts working side-by-side with the Debtors, foster the consensus that gave rise to the Plan compromises. Under such circumstances, the Debtors deemed it entirely appropriate to pay the reasonable legal fees incurred by the Committee members in undertaking these Plan facilitation efforts.

24.    The Committee members necessarily incurred these fees in representing the diverse interests of the creditors of all of the Debtors in these cases, whose businesses were highly sophisticated and ranged from complex derivatives trades to multi-billion-dollar real-estate transactions and broker-dealer activities subject to global regulatory oversight. No one at Mizuho possessed the expertise required to address all of these issues without input from Mizuho's outside professionals, on whom Mizuho relied extensively throughout its three and a half years of service on the Committee.

25.    Mizuho's outside counsel analyzed materials received from the Debtors; reviewed and commented on analyses and recommendation memoranda prepared by the Committee's counsel and advisors; solicited the input of colleagues with expertise regarding the many types of transactions that the Committee was tasked with

---

[3]        See Letter from Diana G. Adams, Esq., United States Trustee, Office Of the United States Trustee Region 2/Southern District of New York, to Martin J. Bienenstock, Esq., Dewey & LeBoeuf LLP, and Jeffrey S. Sabin, Esq., Bingham McCutchen LLP (Apr. 29, 2009).

evaluating; attended meetings of the Committee, the subcommittees, the Co-Chairs and

the Debtors to discuss plan and other significant issues; assisted in responding to

discovery requests and in connection with my deposition as a Committee member;

worked with the Committee's advisors and other Committee members in assessing

probability of success on various legal issues, such as substantive consolidation and

enforceability of guarantees, and in considering various recovery scenarios; and played a

significant role in advancing proposals for consensual resolution of inter-creditor

disputes.  All of these services were critical to Mizuho's ability to effectively represent

the unsecured creditors of all Debtors and to contribute to the ultimate confirmation of

the Plan.

D.    **The Derivatives Subcommittee**

26.    The Derivatives Subcommittee is comprised of five (5) members:

BNYM; Elliott; US Bank; Wilmington Trust; and Mizuho.

27.    The Derivatives Subcommittee has been responsible for analyzing

the Debtors' portfolio of more than 900,000 derivatives transactions.  After performing

analyses of a specific transaction or group of transactions, the Derivatives Subcommittee

then made recommendations to the Committee regarding either termination and

settlement or assumption and assignment of such transactions.  In particular, the

Derivatives Subcommittee considered many of the larger and more complex transactions.

In certain cases, members performed independent analyses or participated in negotiations

with the estates or counterparties in an effort to assess or arrive at reasonable settlements

for the benefit of unsecured creditors of the Debtors' estates.

28.     Since its creation in November 2008 and the approval of its transaction-review procedures in December 2008, the Derivatives Subcommittee has held at least 160 telephone conferences and has spent approximately 150 hours with the Committee to discuss issues related to the Debtors' derivatives portfolio.  Members of the Subcommittee have spent many additional hours reviewing materials prepared in connection with matters under consideration by the Derivatives Subcommittee during their regular conference calls.  The members of the Derivatives Subcommittee have also held in-person meetings, with the Debtors and among themselves, to address global issues affecting the derivatives portfolio.

29.     Generally, during the conference calls and meetings, the Derivatives Subcommittee has:

a.      Considered recommendations for the settlement of derivatives contracts;

b.      Developed and evaluated strategies to monetize complicated derivatives transactions for the benefit of unsecured creditors of each of the Debtors' estates; and

c.      Reconciled derivatives claims brought against the Debtors' estates.

30.     The Derivatives Subcommittee has worked on a wide variety of issues related to the derivatives portfolio.  For instance, the Subcommittee evaluated the need for, modified and ultimately supported the implementation of an incentive compensation program for the employees who administer the Debtors' derivatives portfolio.  Bearing in mind that the Committee's principal goal was to maximize

11

recoveries to the Debtors' unsecured creditors, the Derivatives Subcommittee negotiated

with the Debtors, year-to-year, to ensure that each annual iteration of the Debtors'

incentive plan embodied a properly targeted program that provided appropriate incentives

to the Debtors' derivatives professionals.  The Derivatives Subcommittee analyzed the

proposed programs in detail, including suggested benchmarks, targets and metrics that

would tie success in asset recovery and claims mitigations efforts appropriately to the

size of any incentive payments.  The derivatives incentive plans also provided the

Committee with considerable oversight authority, which the Committee and the

Derivatives Subcommittee exercised to ensure that the incentive plans were implemented

in a manner that balanced stated objectives with a particular view to minimizing the

Debtors' administrative costs.

   31. The Derivatives Subcommittee developed, considered and

evaluated strategies to monetize complicated derivatives transactions fairly, consistently

and in a manner that would obtain the greatest value for the benefit of unsecured creditors

of each of the Debtors' estates.  For example, among other things, the Derivatives

Subcommittee has considered the following:

   a. Settlements implicating complicated issues of law under

the Bankruptcy Code or the U.K. Insolvency Act 1986;

   b. Settlements involving multiple counterparties and/or

counterparties from multiple jurisdictions;

   c. Settlements involving multiple funds of investment

managers; and

d.      Creative structures for consensual assumption and assignment of live derivative transactions, such as novations to special purpose vehicles wrapped by participating third-party institutions in an effort to preserve viable credit ratings.

32.      Derivatives Subcommittee members also negotiated with the Debtors regarding procedures for the purchase and sale of notes issued by certain special purpose vehicle ("SPV") counterparties that are party to transactions with certain Debtors, and also worked with the Debtors to seek approval of such procedures from the Bankruptcy Court.  Specifically, the Debtors had entered into prepetition derivative or loan agreements with SPV counterparties, which then issued notes or securities to third parties—in many cases secured by applicable SPVs' interests in the derivative contracts or other collateral.  Several times, the Debtors faced allegations that their rights to payment under the relevant derivative contracts were subordinated as a result of purported events of default.  The notes purchase and sale procedures have provided an effective alternative means for the Debtors to resolve their disputes with SPV counterparties or otherwise maximize their recoveries on the related derivative contracts while minimizing the time, cost and risk associated with litigation.

33.      Further, Derivatives Subcommittee members negotiated with the Debtors to arrive at, and worked with the Debtors to seek approval from the Bankruptcy Court for, (i) procedures for alternative dispute resolution ("ADR") relating to affirmative claims of the Debtors under derivatives contracts, as well as (ii) special procedures for ADR relating to affirmative claims of the Debtors under derivatives contracts with SPV counterparties.  In particular, resolution of many of the derivative contracts subject to the

13

ADR and SPV ADR procedures have involved similar issues regarding the appropriateness of setoff, termination, valuation and computation of termination payments, and notice.  The ADR process, collectively, has enabled the recovery of over $1 billion of value for the benefit of the Debtors' unsecured creditors and saved countless dollars and hours by avoiding the need for trial of adversary proceedings or other litigation.  The SPV ADR process has extended those benefits to contracts with SPV counterparties.  Additionally, the Derivatives Subcommittee worked with the Debtors to establish streamlined procedures for ADRs relating to affirmative claims of the Debtors valued at less than $1 million.

34.     The Derivatives Subcommittee also assisted in the formulation of the Big Bank derivatives settlement framework (the "Framework"), which has been one of the largest work streams related to the Lehman derivatives portfolio.  The calculation of settlement amounts for the allowance of Big Bank claims pursuant to the Framework was heavily vetted by the Derivatives Subcommittee.  The Framework ultimately led to acceptance by the Big Banks of significant reductions in the amounts of their filed derivatives claims.  Moreover, the acceptance of the Framework, along with the Big Banks' Plan support agreements, ultimately allowed for the broader acceptance of the Plan, in the form confirmed in December 2011.

35.     The Derivatives Subcommittee also participated in the litigation and settlement of various derivatives-related claims.  Illustrative of such litigation is the complex cross-border litigation with BNY and Perpetual pertaining to the Debtors' derivative contracts with SPV counterparties, many of which terminated their derivative contracts with the estates as a result of LBHI's or LBSF's chapter 11 filing.  As noted

above, certain SPV counterparties alleged that the Debtors' rights to payment under the

relevant derivative contracts were subordinated as a result of bankruptcy events of

default.   In the <u>Perpetual</u> proceedings, UK courts held that payment priority provisions in

the underlying documents—the so-called "flip" clauses, which provided for the shifting

of priorities upon a Lehman event of default—were enforceable in an insolvency context,

but the U.S. Bankruptcy Court in its <u>BNY</u> decision declined to extend comity to the UK

courts' rulings, holding that (i) the flip provision was unenforceable pursuant to the <u>ipso</u>

<u>facto</u> provisions of the Bankruptcy Code, and not safe-harbored; and (ii) LBSF had a

valuable property interest in the underlying contracts as of its petition date.  The <u>BNY</u>

decision has provided a favorable resolution of issues pertaining to the flip clause with

regards to a number of U.S.-law SPV derivative contracts.

36.     In sum, as of March 31, 2011, the Derivatives Subcommittee had

assisted the Debtors in reconciling 99% of their derivatives contracts, valuing 99% of

their derivatives contracts and settling 58.5% of their derivatives contracts.  As of

January 1, 2012, such settlements had brought more than $12.2 billion into the Debtors'

estates, with a total projected recovery from the derivatives portfolio of more than $17

billion.

**E.     The Loan Book Subcommittee**

37.     The Loan Book Subcommittee, formerly known as the Loan/Bank

Book Subcommittee, was comprised of three (3) members:  Elliott; Wilmington Trust;

and Mizuho.

38.     The Loan Book Subcommittee assisted in the management of the

Debtors' loan book portfolio, which was comprised of $3.1 billion in funded assets with a

market value of $2.3 billion as of June 30, 2011.  Specifically, the Loan Book

Subcommittee reviewed each month's loan activity throughout 2009, 2010 and 2011,

pursuant to a Court-approved review and approval protocol.  It also met frequently—at

least 50 times—to analyze specific potential courses of action for matters related to the

Debtors' bank and loan books.

    39.  In 2008 and 2009, the Loan Book Subcommittee convened to

analyze objections, proposed settlements, ancillary motions and other issues concerning

the Debtors' motions of November 14 and December 15, 2008, to assume or reject trade

confirmations to purchase or sell interests in loans; the restructuring of Education Media

Publishing Group Limited, a highly leveraged publishing company; defaulting lender

provisions within certain credit agreements involving a debtor as a lender, including

provisions concerning the Glimcher Properties, Owens Illinois, TXU, SL Green, HD

Supply, and Dupont; the Debtors' motion for procedures to assign and restructure loans;

and the financing and trades issues involving GE Corporate Financial Services, Inc.

("GE") and the Fusion entities.  In relation to these matters, the Subcommittee posed

follow-up questions to the Committee regarding, among other things, the draft GE/LCPI

Intercreditor Agreement relating to the HM Receivables Co., LLC receivables

securitization facility, and in particular LCPI's rights, if any (including any step-in

rights), to restrict GE from unilaterally acting against and liquidating the collateral.

    40.  The Loan Book Subcommittee continued to take a very active role

in 2010 and 2011.  The Loan Book Subcommittee convened frequently in 2010 to discuss

a proposed settlement of the GE/Fusion matter; the asset purchase agreement with

Lehman Brothers Bankhaus, AG ("Bankhaus"); a proposed settlement between LCPI and

Pentwater Capital Management, LP, regarding a dispute over obligations regarding a $3

million term loan to Visteon Corporation; the FairPoint Communications Term Loan A

restructuring; and the Debtors' global disposition strategy.  In addition to these meetings,

the Loan Book Subcommittee reviewed and recommended that the Committee approve a

proposal for an organized wind-down of certain LBHI European subsidiaries, including

ELQ Hypotheken B.V. and related companies.  The Subcommittee also convened to

discuss a proposal to pay down a Metlife loan related to FairPoint Communications, as to

which the Debtors sought and ultimately received the Subcommittee's consent.

   41. The Subcommittee also met in 2010 to discuss strategic

considerations for the Debtors' loan portfolio, including the Debtors' request for (and the

Subcommittee's eventual grant of) approval, pursuant to the governance protocol, of the

proposed recapitalization of Libro Securitizadora de Creditos Financeiros, a Brazilian

non-debtor LBHI subsidiary owned by LBSF and LB I Group, Inc.  The Debtors also

submitted to the Subcommittee a report disclosing the details of corporate loan

transactions that occurred in March 2010, for the Subcommittee's review pursuant to the

Court-approved governance protocol.

   42. Further, the Loan Book Subcommittee held at least four (4)

meetings in 2010 to analyze the Debtors' top funded loans and funded loans under $5

million, as well as a supplemental loan analysis regarding Pine CCS, Ltd., in addition to

meetings to discuss ongoing negotiations with Bankhaus regarding a possible purchase of

mezzanine notes within Spruce CCS, Ltd. ("Spruce") and Verano CCS, Ltd. ("Verano")

as part of a global settlement; Spruce and Verano collateral values; various collateralized

loan obligation structures; unfunded loan commitments; potential and completed loan

17

sales; a tracing analysis update; and an analysis of the restructuring of Tribune Company, as to which Lehman was a lender.

43.    During 2011, the Debtors consulted the Loan Book Subcommittee with regard to a proposed amendment to the original 2009 Bankhaus settlement, which the Subcommittee ultimately approved.  The Loan Book Subcommittee also held a meeting to discuss certain transactions involving notes issued by Greystone CDO 2006-3; an open trade involving AXA Mezzanine II SA, Sicar and MD Mezzanine SA, Sicar; and a Norton Gold Fields Limited transaction.

44.    In addition, the Debtors sought, and ultimately received, the Loan Book Subcommittee's approval of a proposed settlement regarding the termination of the First Data loan commitment, one of LCPI's largest remaining loan commitments.  With respect to the Debtors' remaining loan positions, the Loan Book Subcommittee held meetings to discuss a proposed collateralized loan obligation structure.  The Subcommittee's analysis of alternative asset-management options ultimately led to the execution of the Asset Management Agreement with WCAS Fraser Sullivan Investment Management, LLC, which should allow the Debtors to more quickly monetize one of their largest assets: LBHI's commercial-loan portfolio.  Finally, in late 2011, the Debtors sought, and ultimately received, the Loan Book Subcommittee's approval of a proposed termination of the securitization structure involving Spruce.

F.    **The Tax Subcommittee**

45.    The Tax Subcommittee was comprised of four (4) members: Elliott; Mizuho; US Bank; and Wilmington Trust.  Since its inception in August 2009, the Tax Subcommittee held at least 13 telephone conferences, as well as one (1) in-person

18

meeting, with counsel for the Committee, to discuss issues related to the Debtors' tax-related obligations, assets and liabilities.

46. Generally, the topics of the calls and the meeting included:

a. Tax issues related to the disposition of certain assets, including Aurora Bank, FSB ("Aurora"), and Woodlands Commercial Bank ("Woodlands");

b. The tax consequences of real estate mortgage investment conduits held by Lehman Brothers Inc. ("LBI") and the proposed transfer thereof;

c. The Debtors' ruling request to the Internal Revenue Service ("IRS") regarding cancellation of debt income;

d. The allocation of tax liability among the members of the Lehman Tax Group for which LBHI served as parent;

e. The Debtors' federal, state and local tax exposure and potential refund claims;

f. The motion and subsequent order to restrict trading of the Debtors' equity and debt claims;

g. The impact of receipt of government program funds on use of the Debtors' net operating losses;

h. The potential impact on the Debtors' estates of tax provisions in proposed legislation; and

i. The retention of tax-litigation consultants.

47. During various calls and meetings held in 2009, 2010 and 2011, the Tax Subcommittee analyzed numerous discrete tax issues facing the Debtors' estates.

19

For instance, the Tax Subcommittee reviewed the ongoing IRS audit of the Debtors'

estates, including with respect to foreign tax credit claims, such as the voucher trade and

stock loan transactions.  On several occasions, the Tax Subcommittee also reviewed the

Debtors' tax issues on a global basis.  For instance, in November 2010, the Tax

Subcommittee convened an in-person meeting to discuss the state of all tax issues facing

the Debtors, including the structuring of the Plan to avoid cancellation of debt income,

staffing and scope of the Debtors' tax department, tax savings achieved through the

numerous settlements, and prospective tax planning and cash realization strategies.

48.     The Tax Committee also convened to analyze the tax implications

of the transfer of interests in real estate mortgage investment conduits held by LBI and

the Debtors' proposed settlement with the administrator of a UK Lehman affiliate

regarding the allocation of tax credits due from the UK taxing authority.

49.     In addition to analyzing the tax implications of real estate

mortgage investment conduits held by LBI, the Tax Subcommittee also analyzed the

settlement agreement reached between LBHI and the New York State Department of

Taxation and Finance, resolving the claims filed by the State.  The Tax Subcommittee

also performed a thorough review of the federal, state and local tax implications of the

proposed plans of reorganization of the Debtors' estates, thereby providing the full

Committee with a more complete understanding of the practical effects of the various

proposed plans.  The Tax Subcommittee also assisted in the negotiation and mediation of

issues with the IRS and state and local taxing authorities, which yielded the settlement

with the State of New York and the partial settlement with the IRS and resulted in a more

than $1 billion reduction in the Debtors' tax liability.  The Tax Subcommittee further

assisted in the Committee's review of issues and development of a strategy in connection

with the Stock Loan litigation, which is currently pending in the District Court and in

which the Committee has intervened.

## G.    The Real Estate Subcommittee

50.    The Real Estate Subcommittee was comprised of four (4)

members: Elliott; US Bank; Vanguard; and Mizuho.  It met weekly (or more often) over

the course of the three and a half (3.5) years of the Chapter 11 Cases—in excess of 200

meetings.

51.    The Real Estate Subcommittee reviewed and made

recommendations to the full Committee with regard to numerous issues related to the

Debtors' real estate holdings, including certain affiliates of SCC Acquisitions, Inc., a

collection of large-scale residential real estate projects in California that are jointly

administered chapter 11 debtors in the bankruptcy court for the Central District of

California (collectively "SunCal"); Archstone-Smith Trust, a publicly traded real estate

investment trust ("Archstone"); the Starman joint venture ("Starman"), which, together

with Starwood capital, owned more than 20 hotels in Europe; Heritage Fields, a

residential development property located in Irvine, California; Mountain House LLC, a

residential development in northern California as to which Lehman was a lender;

Excalibur, a collection of European commercial real estate assets; Intrawest Resorts

("Intrawest"), a major ski resort operator to which Lehman had been a lender; 200 Fifth

Avenue, a large office building in New York City securing significant loans from

Lehman; Canyon Ranch, a residential condominium and spa property in Miami, Florida;

Ballpark, LLC ("Ballpark"), which comprises seven (7) contiguous land parcels in

Washington, D.C., securing loans from Lehman; High Street Capital Fund L.P.; Hilton, the international hotel operation to which Lehman was a lender; Innkeepers USA Trust ("Innkeepers"), which comprises 71 hotel properties located throughout the United States securing loans from, among others, Lehman entities; Ritz Carlton Kapalua ("Kapalua"), a resort property in Maui, Hawaii, with respect to which Lehman was a lender; Moonlight Basin, a small ski resort in Montana, to which Lehman was a lender; One Federal Plaza; the real estate assets underlying the structure vehicle known as Restructured Asset Certificates with Enhanced Return ("RACERS"); an office portfolio located in Rosslyn, Virginia, with respect to which Lehman was both a lender and equity investor; 695 E. Main Street, an office property in Stamford, Connecticut; 1107 Broadway, a condo development project in New York City with respect to which Lehman was a lender; Canary Wharf, the office building in London which formerly served as Lehman's UK headquarters; Meridien Montparnasse, a hotel property in Paris, France, and part of the Starman portfolio; 25/45 Broad Street, a condo development in New York City upon which Lehman foreclosed; 100 East Ocean Boulevard, a development site in Long Beach, California; 425 Park, an office building in New York City as to which Lehman held a leasehold interest; Eola Capital Portfolio; Hamilton–Praedium, a Lehman borrower owning several apartment complexes in northern Manhattan; Hyatt Regency Cincinnati, a hotel to which Lehman was a lender; LCOR, a real-estate investment and development company focusing on public/private development of private residential and commercial property; and TPG-Austin Portfolio Holdings LLC ("TPG Austin"), a Lehman borrower owning an office building portfolio in Austin, Texas, among many others.

52.     The Real Estate Subcommittee assisted the Debtors in managing their diverse portfolio of real estate assets, which was valued at $24.672 billion as of the petition date and at $14.898 billion in December 2008, after a review and re-underwriting of the portfolio.  The unwinding of these positions had resulted in a return of $2.085 billion in cash to the estates as of June 30, 2011, and the Debtors project a total net recovery of $10.2 billion from the liquidation of the real estate portfolio.

53.     The Real Estate Subcommittee developed protocols including:

a.      The Global Real Estate Protocol and Real Estate Disposition Protocol, under which, if the estimated recovery amount was greater than $25 million but less than or equal to $100 million, the Debtors provided to the Committee a summary of the proposed real estate loan transaction or real estate disposition transaction, whereupon the Committee had ten (10) business days to object to the transaction;

b.      The Foreclosure SPE Protocol, under which, if the value of a residential portfolio or commercial property sale was greater than or equal to $10 million but less than $25 million, the Debtors provided to the Committee a summary of the sale, whereupon the Committee had ten (10) business days to object to the sale;

c.      The Discounted Payoff Protocol, under which, if the mark-to-market carrying value of a commercial real estate loan was greater than or equal to $10 million but less than $25 million, the Debtors provided to the Committee a summary of the proposed real-estate loan transaction, whereupon the Committee had ten (10) business days to object to the discounted payoff of loan modification; and

d.      The De Minimis Asset Sale Protocol, under which, if the book value or sale price of REO property was greater than $850,000 but less than $2

million, the Debtors filed a sale notice and served the sale notice on the interested parties (including the Committee), whereupon the interested parties had ten (10) calendar days to object to the sale.

54.     Like all of the other protocols approved in the Chapter 11 Cases, these protocols permitted the Debtors to consummate sometimes time-sensitive transactions with only Committee approval, and no need for Court approval, thereby improving the pace and efficiency of their restructuring efforts.

55.     Since its inception, the Real Estate Subcommittee closely monitored and analyzed developments regarding each of the Debtors' significant properties.  Beginning in late 2008, less than a month after its inception, the Subcommittee held meetings regarding Archstone; SunCal; the Debtors' private equity real-estate holdings; recent fundings; and pending motions, including motions filed by Brookfield Properties One WFC Co. LLC, which is part of Brookfield Financial Properties L.P.; Superior Pipelines, Inc., a company that provided labor, services, materials and equipment to certain of the SunCal properties; Abraham Kamber & Company LLC, the equity owner of 1407 Broadway and a Lehman borrower; Tuxedo Reserve Owner LLC and Tuxedo TPA Owner LLC ("Tuxedo"), a residential developer in suburban New York that was a Lehman borrower; discussions with Central Pacific Bank, Deutsche Hypothekenbank (Aktiengesellschaft) and Lundesbank Baden-Wurttemberg regarding the Kapalua property; as well as hundreds of other proposed transactions.

56.     The Subcommittee also met on many occasions throughout this period to discuss pending deals, the real estate asset book, fundings and motions pending

24

in the Bankruptcy Court related to the real estate portfolio.  Specifically, and by way of illustration, the Subcommittee held meetings regarding, among other issues, the TPG Austin restructuring; the funding of the TS Atlanta property, an office property in Atlanta, Georgia; ProLogis Dermody, a Lehman borrower that owned a nationwide portfolio of warehouses; the Lehman Brothers Real Estate III group of private equity funds through which Lehman had interests in a number of real estate assets; fundings with respect to real estate assets to be made in 2009; the funding of building improvements at 1407 Broadway; additional financing sought by iStar Financial ("iStar"), which owned, among other assets, a movie studio in Culver City, California; potential stabilization funding for West Bay, a condominium project in Florida as to which Lehman was a lender; Boot Ranch Development, L.P. ("Boot Ranch"), the owner of a luxury golf community in Texas, to which Lehman was a lender; the GAGFAH property, a German real estate development property with respect to which Lehman was a lender; negotiations regarding repayment of a loan with respect to Turnberry Town Square, a mixed use development in Las Vegas, Nevada; the assumption or rejection of a project loan in connection with the Big Isle in Hawaii; WLB Mark Mezzanine LLC, a condominium development in San Diego as to which Lehman was a lender; a report on the UK real estate portfolio; asset updates regarding Vaughan Place, Inc., a luxury residential rental project in Washington, D.C., to which Lehman was a lender; a corporate loan facility for the Adam's Mark regional hotel chain; the European real estate portfolio; Broadway Partners Real Estate Fund III, L.P. ("Broadway Partners III"), a Lehman joint-venture partner with respect to a number of office building assets; Tuxedo; a proposed Lehman Brothers Real Estate Mezzanine Partners II capital call/subscription facility

extension; a proposed foreclosure action concerning 1107 Broadway; the Strathallan Hotel in Rochester, New York as to which Lehman was a lender; Loft 44 and La Madre, New York City condominium development projects as to which Lehman was a lender; 816 Congress, an office building in Austin, Texas (part of the TPG Austin portfolio), as to which Lehman was a lender; a further paydown of the Starman facility; the proposed Canyon Ranch seller-financing program; the 25/45 Broad Street foreclosure action; the Loft 44 and La Madre DPOs; the State Street loan swap; LB Rose Ranch LLC ("LB Rose"), an affiliated debtor of LBHI with real estate holdings in Utah; Tishman Speyer D.C., Lehman's joint-venture partner with respect to several assets, including Archstone; and pending motions, including motions relating to Riverside Office 321-329, LLC ("Riverside"), an office property in Westport, Connecticut, as to which Lehman was a lender; the Real Estate Disposition Protocol; the SPE Transfer Protocol; and the Discounted Payoff Protocol.

57.     During the second half of 2009, the Real Estate Subcommittee held frequent meetings to discuss Broadway Partners III; the Starman portfolio and a restructuring proposal thereof; Moonlight Basin; Innkeepers; Kojaian, a joint-venture partner of Lehman with respect to a number of real estate assets; summary asset updates regarding Heritage Fields and Valencia Business Center ("Valencia"), a warehouse project in Fullerton, California, as to which Lehman was a lender; pending motions, including the Real Estate Disposition Protocol, SPE Transfer Protocol and Discounted Payoff Protocol motions, and motions regarding Laurel Cove Development LLC ("Laurel Cove"), the owner of a condominium project in Georgia as to which Lehman was a lender; Gencom, a joint venture partner of Lehman with respect to a number of real estate

assets; Bankhaus, Lehman's German affiliate and a co-lender with many of the U.S.

Debtors with respect to real estate investments; TKG StorageMart Partners, LP ("Storage

Mart"), the owner of a collection of storage facilities in New York City as to which

Lehman was a lender; a proposed recapitalization transaction with respect to Vaughan

Place; the Tishman Speyer D.C. portfolio, with respect to which Lehman was a co-lender

and co-investor; 46th Street Mezzanine, LLC ("46th Street"), the owner of a

condominium project in New York City as to which Lehman was a mezzanine lender;

Vegas Grand/Swenson, a multifamily residential property in Las Vegas as to which

Lehman was a lender; the retention application for CB Richard Ellis, Inc., to represent the

Debtors in their re-letting of office space at their corporate headquarters; 200 Fifth

Avenue; a variance analysis report; Carillon-Canyon Ranch; Sienna/La Reserve, a

multifamily development project in Georgia as which Lehman was a lender; and the

Watergate Hotel in Washington, D.C., as to which Lehman was a lender.

58.    The Real Estate Subcommittee also held meetings regarding

Sienna/La Reserve negotiations; Residential Capital LLC ("ResCap"), GMAC's

mortgage unit; LBREM; the Starman real estate portfolio; Intrawest; Vegas

Grand/Swenson; StorageMart; 200 Fifth Avenue; Gencom; Coeur Défense, an office

complex in Paris, France, as to which Lehman was both a lender and equity investor; a

proposed settlement with respect to SunCal Pool 1, a subset of the assets at issue in the

SunCal chapter 11 cases; the Danske Bank deficiency claim; the Tishman Speyer default;

the proposed Starman purchase and sale agreement; variance analysis updates; pending

motions, including the motion regarding a real estate surety bond facility; Sun and Moon,

a mixed use development project in Marseilles, France, as to which Lehman was both a

lender and an equity investor; the request for approval of a $2.7 million advance for

Excalibur, an SPV holding dozens of European real estate investments as to which

Lehman was a lender; the seller financing program for Canyon Ranch; Mountain House;

200 Fifth Avenue; Tishman Speyer D.C.; a motion seeking a statutory tax lien sale of

property owned by LB Rose, to which the Subcommittee determined not to object; a

motion regarding Montelucia Hotel, to which the Subcommittee determined not to object;

the Aurora loan settlement; a proposal by Intrawest to extend a $1.47 billion term loan; a

proposed restructuring of debt of the Hotel Eden, a Starman property in Rome, Italy; 46th

Street; a proposed debt restructure concerning the Related Companies, L.P.; SunCal; an

offer to purchase Lehman's equity interest in Whiteface Lodge, a resort property in the

Adirondacks in upstate New York; Fortezza, an Italian financing facility with respect to

office properties in Italy in which Lehman participated; a proposed restructuring of a

corporate loan to LBREM II, to which the Subcommittee tentatively determined not to

object; de minimis transactions; PAMI's public/private partnerships; a proposed advance

regarding Heritage Fields; Valencia; Canyon Ranch; a proposed global settlement

regarding Fenway, a special purpose vehicle holding a number of Lehman real estate

investments; the proposed appointment of a receiver for Moonlight Basin; NYLO Hotels,

LLC, a start-up hotel chain as to which Lehman was a lender; a 200 Fifth Avenue

recovery analysis; a proposed two-part $20 million advance regarding Heritage Fields, to

which the Subcommittee agreed; bonus payments for employees of LBREP III PP GP

LLC ("LBREP") and LBREM, to which the Subcommittee agreed; the Lehman DIP

proposal and final DIP order regarding Moonlight Basin, to which the Subcommittee

agreed; 95 E. Main Street; Innkeepers; a proposed $9 million capital call regarding 425

Park Avenue; a proposed project elevation restructuring, to which the Subcommittee

agreed; and the Debtors' proposed protective advance of $3.2 million regarding Culver

Studios, to which the Subcommittee agreed.

        59.     The Real Estate Subcommittee continued to meet frequently

throughout 2010 regarding pending deals and motions related to the real estate portfolio.

Specifically, in early 2010, the Real Estate Subcommittee held meetings regarding the

valuation of Culver Studios and the proposal to buy out an iStar loan; the status of the

Canyon Ranch deal; a possible equity buyout of Interstate Hotels, in which Lehman held

an interest in the credit facility; the current version of the Intrawest term sheet and

upcoming foreclosure sale; a proposed global settlement between Lehman and Lyon

Management; a proposal for a settlement with Scout regarding five (5) properties; the

Starman portfolio; the 695 E. Main Street settlement motion; a report on an amendment

to the de minimis asset sale protocol; the Laurel Cove stay motion; SunCal Pool 1;

Excalibur; Culver Studios and the ongoing negotiations with iStar; a proposed Coeur

Défense debt-equity swap; the Intrawest negotiations with Fortress; the restructuring of

the Hilton Hotels Corporation/The Blackstone Group portfolio; proposals regarding

Heritage Fields; the Rosslyn portfolio; 200 Fifth Avenue; Project Trois, a Lehman joint-

venture with Broadway Properties relating to office buildings in Boston; a proposed

settlement regarding 340 Madison, a property in New York City with respect to which

Lehman was lender on a loan repoed to State Street Bank; the continuing SunCal

negotiations; real estate valuation issues addressed in the Examiner's Report; a potential

foreclosure sale of Emerald Dunes, a Florida condominium facility and golf course as to

which Lehman was a lender; Ritz Philadelphia, a hotel/condominium project as to which

Lehman was a lender; Archstone; Fenway; New West Michigan, consisting of two adjacent industrial properties in Michigan as to which Lehman was a lender; Boot Ranch; Kapalua; Fontainebleu, a retail/hotel development in Las Vegas as to which Lehman was a lender; Starman–Eden; City Lofts, a multifamily residential project in the UK as to which Lehman was a lender; Starman's Monte Carlo hotel property; Gables Marquis LLC, a Florida retail/condominium project as to which Lehman was a lender; a proposed sale of Aliffe House, a London office building; Tishman Speyer D.C.; 25/45 Broad Street; Innkeepers; and real estate protocol negotiations.  The Real Estate Subcommittee also held meetings to discuss the Subcommittee's inquiries regarding the Archstone leveraged buyout, as well as four (4) lawsuits brought by former owners of Class A-1 Common Units of Archstone; Innkeepers and developments regarding the proposed equity sale; and pending motions regarding real estate assets.

60.     In late 2010, the Real Estate Subcommittee held meetings regarding Archstone; Innkeepers; Boot Ranch; Heritage Fields; Moonlight Basin; 695 E. Main Street; SunCal Palmdale; the SunCal Pool 1 settlement; Kapalua; Ventana, a hotel in Big Sur, California, as to which Lehman was a mezzanine lender; the upcoming Moonlight Basin summary-judgment trial; the Project Trois restructuring and swap discussions; a foreign-hedging-transactions motion with real estate implications; SASCO; 607 Hudson, a condominium development in New York City as to which Lehman was a lender; Condor, a European hotel investment vehicle in which Lehman held an interest; Villa Venetia, a multifamily development in Venice, California, as to which Lehman was a lender; and 25/45 Broad Street.

61.     In early 2011, the Real Estate Subcommittee held meetings regarding SunCal Pool 1; 425 Park Avenue; a follow-up on the June 2010 re-underwriting of the real estate portfolio; Innkeepers; the Swedbank settlement; Boot Ranch; 25-45 Broad Street; the SunCal mediation; Kapalua; Canyon Ranch; the Moonlight Basin settlement negotiations; the Culver Studios mediation; the Northlands, a residential development asset in Colorado as to which Lehman was a lender; the Lehman's overall residential land development portfolio; the New York multifamily market; Ballenger Avenue, a condominium project in Maryland as to which Lehman was a lender and one of four (4) development properties in the PAMI Public Private III Portfolio; a Rosslyn portfolio analysis; Hamilton Praedium; and overall asset management alternatives for the entire real estate portfolio going forward.  During this time, the Subcommittee approved Lehman's entry into a proposed commitment letter among Lehman ALI, Five Mile Capital and certain Innkeepers subsidiaries regarding the auction for the assets of Innkeepers, as well as the Debtors' request to credit bid for the Hamilton Praedium Mezzanine loan.

62.     During the second half of 2011, the Real Estate Subcommittee held meetings regarding the Debtors' most recent underwriting of the commercial real estate portfolio and the Committee's advisors' validation thereof; the process undertaken to seek out joint venture partners with respect to Lehman's residential land portfolio (the "Land JV Process"); the Innkeepers confirmation hearing; Gencom's interest in Kapalua; Archstone; Rosslyn; 200 Fifth Avenue; TPG Austin; State Street; the Ballpark portfolio; Starman; Excalibur; ProLogis; the restructuring of the Calvino Zwinger facility relating to a portfolio of office and telecommunication facility assets in Italy in which Lehman

had an equity interest; the sale of Municipal Corrections Facility; SunCal; LCOR; 695 E.

Main Street; Hamilton Praedium; and Innkeepers.  The Real Estate Subcommittee also

held meetings regarding the SunCal proceedings and confirmation hearing; the Land JV

Process' prospective offers for parts of the Archstone portfolio; a letter of intent

regarding 64 of the Innkeepers' Debtors' hotels; the status of an outstanding first-lien

note held by Lehman; a draft settlement agreement between the Debtors and Danske

Bank; the Debtors' motion for approval of the SunCal settlement; the Archstone sale

process; sales process for the LCOR platform and associated unencumbered assets; and a

425 Park Avenue capital call, which the Subcommittee approved.

**H.     The Bank Regulatory Subcommittee**

63.     The Bank Regulatory Subcommittee was comprised of four (4)

members: Vanguard; Wilmington Trust; Aegon USA Investment Management, LLC; and

Mizuho.  It met at least five (5) times in 2009 to evaluate the issues surrounding

Woodlands and Aurora (together, the "Banks"), which are wholly-owned subsidiaries of

LBHI and were overseen by the Office of Thrift Supervision (the "OTS") and the Federal

Deposit Insurance Company (the "FDIC" and, together with the OTS, the "Regulators").

Specifically, the Subcommittee endeavored, since the inception of the Chapter 11 Cases,

to improve the capital levels at the Banks to satisfy regulatory requirements, avoid

potential seizures and liquidations by the Regulators and facilitate the resumption of

depository functions at the Banks to preserve and maximize value.

64.     Due to a number of factors, capital levels at each of the Banks had

dropped below levels generally considered adequate by the Regulators.  As a result, the

Regulators indicated that, unless LBHI took action to support the capital levels at the

Banks, the Regulators would seize the Banks and liquidate their respective assets. Because the Committee agreed with the Debtors that significant value could be recovered if the Banks' capital and liquidity issues could be successfully addressed, the Committee supported the Debtors' efforts to preserve value at the Banks.

65.     In connection with those efforts, the Subcommittee expended significant time in analyzing the potential value to the Debtors' estates of making capital infusions into the Banks, including in connection with motions filed by the Debtors seeking authority to (i) make a cash infusion into Aurora (the "Cash Infusion Motion") and (ii) enter into a master repurchase agreement with Aurora (the "MRA Motion") to improve Aurora's capital positions to levels that the Regulators would find acceptable. The Cash Infusion Motion and the MRA Motion were approved by the Court on March 13, 2009, and March 31, 2009, respectively.

66.     In addition, the Subcommittee analyzed supplemental motions filed by the Debtors seeking (i) to make an additional cash infusion of $50 million into Aurora, dated June 23, 2009 (the "Supplemental Infusion Motion"), and (ii) to enter into (a) an amended master repurchase agreement with Aurora and (b) a secured bridge financing facility with Aurora's wholly owned subsidiary, Aurora Loan Services, LLC, dated July 16, 2009 (the "Financing Motion").  The Supplemental Infusion Motion and the Financing Motion were approved by the Court on June 29, 2009, and August 5, 2009, respectively.

67.     Finally, on November 25, 2009, the Debtors filed a motion (the "Supplemental Contribution Motion") seeking authorization to invest an additional $100 million into Aurora to account for a miscalculation in the valuation of a portfolio of

mortgage servicing rights ("MSR Portfolio") previously contributed to Aurora by LBHI

and the continued effect of fair value accounting on Aurora's capital.  The Subcommittee

analyzed the Supplemental Contribution Motion and numerous issues regarding the MSR

Portfolio, including valuation concerns.  On December 17, 2009, the Court issued an

order granting the relief requested in the Supplemental Contribution Motion.

68.    In addition to its work in connection with the capital contributions,

the Subcommittee undertook extensive efforts to ensure that the Banks were being

properly managed to maximize their value for the Debtors' estates and creditors.  To that

end, the Subcommittee, among other things, (i) prepared for meetings with the OTS to

discuss the alternatives for Aurora, (ii) helped to develop and formulate a business plan

submitted to the OTS, incorporating constraints requested by the Regulators to facilitate

the resumption of banking and lending operations for the Banks, (iii) analyzed, assisted in

the development and researched the implications of the terms of a proposed settlement

agreement with the Regulators to resolve a dispute arising out of a certain master forward

agreement between LBHI and Aurora, (iv) reviewed Aurora's plans to sell its student

loan portfolio, (v) researched precedent involving thrifts and defenses to claims brought

by the Regulators regarding capital maintenance commitments of holdings companies

under section 365(o) of the Bankruptcy Code, and (vi) discussed with the Debtors

restructuring strategies for the Banks and approaches to resolving disputes with the

Regulators.

69.    The Subcommittee also worked closely with the Debtors and their

advisors on the settlements with the Debtors and the Banks to secure the Regulators'

approval to resume normal profit-generating banking and lending operations.  On

September 23, 2010, the Court approved the Debtors' entry into such settlements (the

"Settlement Agreements"), which were executed on November 30, 2010.  The

Subcommittee understood that the best way to realize maximum value from LBHI's

investment in the Banks was, as contemplated by the Settlement Agreements, to infuse

additional capital into the Banks (by means of cash and other consideration) to maintain

the Banks' capital levels and thereby achieve the lifting of substantially all of the

regulatory restrictions currently imposed on their operations.  The Settlement Agreements

resolved substantially all outstanding issues among the Debtors, the Banks and the

Regulators, and permitted LBHI to realize the value of its equity interests in the Banks by

facilitating an orderly wind-down plan with respect to Woodlands and permitting Aurora

to expand its business operations and effectuate a business plan intended to position it for

sale as a going concern.

## I.        The Fee Subcommittee

70.     The Fee Subcommittee was, at various times during the Chapter 11

Cases, comprised of four (4) members: Vanguard; Metlife; Wilmington Trust; and

Mizuho.

71.     The Fee Subcommittee's mandate was to work with the Committee

designee on the Fee Committee (Wilmington Trust, initially, and then Mizuho) in shaping

the policies and practices adopted by the Fee Committee. The Fee Subcommittee

established a monthly protocol for the submission of budgets by the professionals

retained in these cases and participated in various chambers conferences with the retained

professionals in these cases to settle certain outstanding issues identified in the Fee

Committee reports pertaining to the retained professionals' various interim fee applications, and was successful in settling certain of those issues.

72.     The Fee Subcommittee helped to formulate a revised protocol for the review of fee statements and applications by the Fee Committee, and assisted in the transition of the new independent chair of the Fee Committee.  Finally, the Fee Subcommittee worked with the Committee's Fee Committee designee on the arduous task of reviewing the fee applications that were subject to the Fee Committee's oversight.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this *12th* day of November, 2012.

_____
Noel P. Purcell

**<u>Exhibit B</u>**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF JULIE J. BECKER IN SUPPORT OF OMNIBUS APPLICATION OF INDIVIDUAL MEMBERS OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND INDENTURE TRUSTEES PURSUANT TO SECTION 1129(a)(4) OR, ALTERNATIVELY, SECTIONS 503(b)(D)(3) AND 503(b)(4) OF THE BANKRUPTCY CODE, FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES**

JULIE J. BECKER declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am employed as a Vice President in the Corporate Client Services Group of Wilmington Trust, N.A., an affiliate of Wilmington Trust Company ("<u>Wilmington Trust</u>"), a member of the Official Committee (the "<u>Committee</u>") of Unsecured Creditors of Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliate debtors (collectively, the "<u>Debtors</u>") appointed in these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), and serve as Wilmington Trust's representative on the Committee.  Except as otherwise provided herein, the facts set forth in this supplemental declaration are based upon my personal knowledge.  I am competent to testify to these facts.

2.  I make this supplemental declaration in further support of the Omnibus Application of Individual Members of Official Committee of Unsecured Creditors and Indenture Trustees Pursuant to Section 1129(a)(4) or, Alternatively, Sections 503(b)(D)(3) and 503(b)(4) of the Bankruptcy Code for Payment of Fees and Expenses (the "<u>Application</u>").

3.      As explained in my initial declaration, in addition to its service as a Committee Co-Chair, an indenture trustee, and a member of the EMTN Valuation Working Group and the Plan Discovery Working Group, Wilmington Trust served as a member of the Derivatives Subcommittee, the Loan Book Subcommittee, the Tax Subcommittee, the Fee Subcommittee and the Bank Regulatory Subcommittee.[1]

4.      I set forth below details regarding Wilmington Trust's service on these subcommittees, the membership of the subcommittees, their work and the circumstances under which the Debtors came to include in the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan") a provision specifically requiring the Debtors to pay the reasonable fees and costs incurred by Committee members.

**A.      The Committee and Lehman's Asset Classes**

5.      Since the inception of these cases, the Committee has worked side-by-side with the Debtors (i) in the administration of the Debtors' estates, assisting in the identification and preservation of assets and reconciliation of claims against the estates; (ii) in the management of the Debtors' assets pending their ultimate disposition, through various subcommittees established with respect to each of the discrete asset classes of the Debtors; and (iii) to promote Plan confirmation by resolving disputes concerning, inter alia, substantive consolidation, the treatment of intercompany claims, foreign affiliate claims and competing plans of reorganization.

---

[1]      Wilmington Trust is also a member of the post-Effective Date Litigation Subcommittee, the other members of which are Elliott Management Corp.; Mizuho Corporate Bank, Ltd.; and U.S. Bank National Association.

2

6.      Because the Debtors' were not planned chapter 11 filings, the first order of business after the commencement of the Chapter 11 Cases was to take inventory of the assets that remained after the sale of Lehman's broker-dealer business to Barclays Capital Inc. (the "Barclays Sale").  The Barclays Sale meant not only the loss of personnel but the fracturing of Lehman's internal accounting system.  In the first few months of these cases, the Committee members dedicated extraordinary effort to the process of identifying assets and ensuring that they were protected from seizure or material depreciation in value while a global strategy was formulated for their management.

7.      The Committee's view was that immediate sales at potentially greatly reduced prices were not appropriate and that a substantial portion of the Debtors' assets should be held and managed by the estates until economic conditions made monetization more attractive.  Thus, in the months after Lehman's chapter 11 filings, the Committee members formed various subcommittees to work with the Debtors' management teams in carrying out this "hold and manage" strategy, as more fully detailed below.  As part of this process, the Committee worked with the Debtors to value the available assets, develop marketing plans and ultimately orchestrate the disposition of such assets through either private or Court-approved sales.  The disposition of assets occurred pursuant to various formal and informal protocols established between the Debtors and the Committee that provided for Committee oversight and approval rights for certain transactions through the various subcommittees.  The protocols, among other things, made it possible for the Debtors to consummate transactions under certain threshold amounts without Court approval, and thus with greater expedition and

3

efficiency.  As a result, the Committee has since its formation been involved in every

aspect of the Chapter 11 Cases.

**B.**      **Lehman Plan and Committee Member Fee Provision**

8.      In addition to its work with the estates regarding asset preservation

and disposition, the Committee conducted its own research and analysis of various issues

that would impact any plan of reorganization filed in these cases, including substantive

consolidation, intercompany claims re-characterization and the enforceability of

guarantees.  The knowledge and perspective that the Committee gained from this work

permitted the Committee not only to serve as an intermediary among the various creditor

groups and the Debtors but also to have a meaningful role in the development of the

reallocation concept that was incorporated into the Plan.

9.      Recognizing that substantive consolidation would be a critical

issue for any creditor in the Chapter 11 Cases, the Committee's advisors conducted an in-

depth substantive consolidation analysis, which yielded a detailed white paper report that

was presented to the Committee during December 2009.  Based on this analysis, the

Committee members participated in extensive discussions concerning appropriate

compromises of the substantive consolidation issues in these cases.

10.      Because the period in which the Debtors alone could file a plan of

reorganization was to expire in March 2010, the Committee began to focus on Plan

concepts in late 2009.  In January 2010, a "POR Working Group" was formed, consisting

of the Committee Co-Chairs and their advisors.  The POR Working Group met

approximately once a week with the Debtors and their counsel, Weil, Gotshal & Manges

LLP ("Weil"), to discuss the structure of the Debtors' initial plan of reorganization (the

4

"Initial Plan").  During this time, the Committee also met at least weekly to discuss its

own views concerning the Initial Plan and evaluate various recovery scenarios in

connection therewith.

　　　　　11.　　As part of the POR Working Group's meetings with the Debtors,

the Debtors provided the Committee in late February 2010 with a term sheet for the

Initial Plan (the "Term Sheet").  On March 3, 2010, the Committee met in person to

discuss its comments to the Term Sheet, including additional concepts that it sought to be

incorporated into the Initial Plan.  It was also at this meeting that the Committee members

first discussed the possibility of including in the Initial Plan a provision for the payment

of the Committee members' professional fees.

　　　　　12.　　During a March 4, 2010 conference call among Committee Co-

Chair Noel P. Purcell, myself, our individual counsel, and the Committee's senior legal

and financial advisors, Dennis F. Dunne of Milbank, Tweed, Hadley & McCloy LLP

("Milbank") and P. Eric Siegert of Houlihan Lokey Howard & Zukin Capital, Inc.

("Houlihan"), Noel Purcell proposed that the Debtors include in the Initial Plan a

provision for the payment of the Committee members' professional fees.  Noel Purcell

and I asked that our advisors introduce the concept to the Debtors on our behalf.  In a

conference call held by the full Committee later that day, the Committee agreed that

when its advisors communicated with the Debtors to convey the Committee's comments

to the Term Sheet, the advisors should discuss inclusion of a provision for the payment of

the Committee members' professional fees.

　　　　　13.　　During a March 8, 2010 meeting among the Committee's financial

and legal advisors, the Debtors and Weil, Milbank and Houlihan shared the Committee's

comments to the Term Sheet and also proposed the inclusion in the Initial Plan of a

provision for the payment of the Committee members' professional fees.  During a

Committee call held later that day, Milbank and Houlihan informed the Committee that

the Debtors had agreed to consider including the proposed provision.

14.    In calls among the Co-Chairs and the Committee on March 11,

2010, the Committee resolved to continue to discuss with the Debtors its comments to the

Initial Plan, including those regarding corporate governance and the payment of the

Committee members' professional fees.

15.    In discussions held over the next four days among Milbank, Weil,

the Co-Chairs and the Debtors, the Debtors agreed to include certain of the Committee's

modifications to the Initial Plan, including payment of the Committee members'

professional fees.  On March 15, 2010, the Initial Plan was filed.

16.    After the filing of the Initial Plan, the Committee continued to

devote significant time and effort to plan matters.  The Committee and its advisors met

with numerous ad hoc creditor groups and also continued discussions with the Debtors

regarding the economic terms of the Initial Plan, including the settlement of substantive

consolidation, the treatment of guarantee claims and the treatment of the Debtors' foreign

affiliate claims.

17.    All of this work led the Committee and its advisors to develop an

alternative construct for the Plan that called for the reallocation of recoveries otherwise

anticipated under the Plan to settle substantive consolidation issues.  This concept was

embodied in a term sheet developed by the Committee's advisors, refined in discussions

with the Committee in October 2010, and shared with the Debtors in November 2010,

which became the basis for certain aspects of the first amended plan (the "First Amended Plan") filed on January 25, 2011.

18.     The First Amended Plan garnered significant attention, including from the creditor groups that had previously reached out to the Debtors and the Committee.  The continuing disagreement among creditor groups concerning substantive consolidation eventually led to the filing of two competing plans, one of which was predicated on the complete substantive consolidation of the Debtors' estates and the other of which was predicated on the complete deconsolidation of these same estates.

19.     In an attempt to bridge the gap between these competing plans, the Debtors called an "all hands" meeting in June 2011, which took place over the course of three days and included countless phone calls, informal meetings and discussions.  The Committee participated in these discussions, and sought to identify areas of consensus and motivate the parties to reach agreement.  The final agreements that flowed from these meetings were embodied in the second amended plan (the "Second Amended Plan"), which was filed on June 30, 2011, and, as subsequently amended (the "Third Amended Plan"), thereafter confirmed.  The Second and Third Amended Plan, like the Initial Plan, contained a provision providing for the payment of the Committee members' legal fees (the "Committee Member Fee Provision").

20.     All told, the Committee has devoted at least 223 meetings and more than 400 hours to the analysis and resolution of the issues described above, with the result that the Plan was confirmed with nearly unanimous creditor approval.

C.        **Rationale for Committee Member Fee Provision**

21.        As set forth above, the Debtors agreed to include the Committee

Member Fee Provision in all three versions of the Plan in recognition of the unique role

the Committee played with respect to the Plan process and the substantial contribution

that it made to the success of that process.  The Committee was able to mediate Plan

disputes in these cases because its membership was diverse, holding claims against a

number of the Debtors and thus able to address in a motivated, informed way disputes

affecting various classes of creditors.

22.        Indeed, the diversity of the Committee's membership, and its

extensive involvement in the negotiation and resolution of issues ranging across the

Debtors' capital structure, had initially obviated any need to appoint additional

committees in connection with the cases of particular Debtors, thereby saving the estates

millions of dollars in potential additional fees.  With the exception of Wilmington Trust,

which, as an indenture trustee, holds senior unsecured claims against LBHI, the

Committee members each hold claims against one or more of the subsidiary Debtors:

The Metropolitan Life Insurance Company ("Metlife") filed claims against Lehman

Brothers Special Financing Inc. ("LBSF") and LBHI; The Vanguard Group ("Vanguard")

filed claims against LBSF, Lehman Brothers Commodity Services Inc. and LBHI;

Mizuho Corporate Bank, Ltd. ("Mizuho") filed claims against LBSF and LBHI; The

Bank of New York Mellon ("BNYM"), as an indenture trustee, filed claims against LBHI

and LBSF; U.S. Bank National Association ("US Bank"), as an indenture trustee, filed

claims against LBHI and LBSF; and Elliott Management Corp. ("Elliott") filed claims

against LBHI, LBSF, Lehman Commercial Paper Inc. ("LCPI") and Lehman Brothers

Commercial Corp.  This diversity of interests among the Committee members was one of

the factors that led the United States Trustee to decline a request to appoint additional

subsidiary Debtor creditor committees in April 2009, finding that the Committee

adequately represented the interests of each of the Debtors' unsecured creditors.[2]

23.    This same multiplicity of viewpoints made the Committee an

invaluable facilitator of the Plan process.  It was able to navigate among the demands of

the various constituencies and, through round-the-clock efforts working side-by-side with

the Debtors, foster the consensus that gave rise to the Plan compromises.  Under such

circumstances, the Debtors deemed it entirely appropriate to pay the reasonable legal fees

incurred by the Committee members in undertaking these Plan facilitation efforts.

24.    The Committee members necessarily incurred these fees in

representing the diverse interests of the creditors of all of the Debtors in these cases,

whose businesses were highly sophisticated and ranged from complex derivatives trades

to multi-billion-dollar real-estate transactions and broker-dealer activities subject to

global regulatory oversight.  No one at Wilmington Trust possessed the expertise

required to address all of these issues without input from Wilmington Trust's outside

professionals, on whom Wilmington Trust relied extensively throughout its three and a

half years of service on the Committee.

25.    Wilmington Trust's outside counsel analyzed materials received

from the Debtors; reviewed and commented on analyses and recommendation

memoranda prepared by the Committee's counsel and advisors; solicited the input of

colleagues with expertise regarding the many types of transactions that the Committee

---

[2]    See Letter from Diana G. Adams, Esq., United States Trustee, Office Of the United States Trustee
Region 2/Southern District of New York, to Martin J. Bienenstock, Esq., Dewey & LeBoeuf LLP,
and Jeffrey S. Sabin, Esq., Bingham McCutchen LLP (Apr. 29, 2009).

was tasked with evaluating; attended meetings of the Committee, the subcommittees, the

Co-Chairs and the Debtors to discuss plan and other significant issues; assisted in

responding to discovery requests and in connection with my deposition as a Committee

member; worked with the Committee's advisors and other Committee members in

assessing probability of success on various legal issues, such as substantive consolidation

and enforceability of guarantees, and in considering various recovery scenarios; and

played a significant role in advancing proposals for consensual resolution of inter-

creditor disputes.  All of these services were critical to Wilmington Trust's ability to

effectively represent the unsecured creditors of all Debtors, to serve as an indenture

trustee and to contribute to the ultimate confirmation of the Plan.

26.     Neither the Debtors nor their creditors would have been well

served by a Committee whose members failed to independently evaluate the proposals

offered by the Debtors, their counsel and the Committee's professionals.  Indeed, it was

the Committee members' duty as fiduciaries to think critically about those proposals and

to inform themselves, with the help of their own professionals, regarding each matter at

issue.  With the advice and support of their individual counsel, the Committee members

were able to independently evaluate the advice of the Committee's professionals, with the

result that the value of the Debtors' estates was significantly increased.

D.      **The Derivatives Subcommittee**

27.     The Derivatives Subcommittee is comprised of five (5) members:

BNYM; Elliott; US Bank; Wilmington Trust; and Mizuho.

28.     The Derivatives Subcommittee has been responsible for analyzing

the Debtors' portfolio of more than 900,000 derivatives transactions.  After performing

analyses of a specific transaction or group of transactions, the Derivatives Subcommittee

then made recommendations to the Committee regarding either termination and

settlement or assumption and assignment of such transactions.  In particular, the

Derivatives Subcommittee considered many of the larger and more complex transactions.

In certain cases, members performed independent analyses or participated in negotiations

with the estates or counterparties in an effort to assess or arrive at reasonable settlements

for the benefit of unsecured creditors of the Debtors' estates.

29.    Since its creation in November 2008 and the approval of its

transaction-review procedures in December 2008, the Derivatives Subcommittee has held

at least 160 telephone conferences and has spent approximately 150 hours with the

Committee to discuss issues related to the Debtors' derivatives portfolio.  Members of the

Subcommittee have spent many additional hours reviewing materials prepared in

connection with matters under consideration by the Derivatives Subcommittee during

their regular conference calls.  The members of the Derivatives Subcommittee have also

held in-person meetings, with the Debtors and among themselves, to address global

issues affecting the derivatives portfolio.

30.    Generally, during the conference calls and meetings, the

Derivatives Subcommittee has:

a.    Considered recommendations for the settlement of

derivatives contracts;

b.    Developed and evaluated strategies to monetize

complicated derivatives transactions for the benefit of unsecured creditors of each of the

Debtors' estates; and

11

c.      Reconciled derivatives claims brought against the Debtors'

estates.

31.      The Derivatives Subcommittee has worked on a wide variety of

issues related to the derivatives portfolio.  For instance, the Subcommittee evaluated the

need for, modified and ultimately supported the implementation of an incentive

compensation program for the employees who administer the Debtors' derivatives

portfolio.  Bearing in mind that the Committee's principal goal was to maximize

recoveries to the Debtors' unsecured creditors, the Derivatives Subcommittee negotiated

with the Debtors, year-to-year, to ensure that each annual iteration of the Debtors'

incentive plan embodied a properly targeted program that provided appropriate incentives

to the Debtors' derivatives professionals.  The Derivatives Subcommittee analyzed the

proposed programs in detail, including suggested benchmarks, targets and metrics that

would tie success in asset recovery and claims mitigations efforts appropriately to the

size of any incentive payments.  The derivatives incentive plans also provided the

Committee with considerable oversight authority, which the Committee and the

Derivatives Subcommittee exercised to ensure that the incentive plans were implemented

in a manner that balanced stated objectives with a particular view to minimizing the

Debtors' administrative costs.

32.      The Derivatives Subcommittee developed, considered and

evaluated strategies to monetize complicated derivatives transactions fairly, consistently

and in a manner that would obtain the greatest value for the benefit of unsecured creditors

of each of the Debtors' estates.  For example, among other things, the Derivatives

Subcommittee has considered the following:

12

a.      Settlements implicating complicated issues of law under the Bankruptcy Code or the U.K. Insolvency Act 1986;

b.      Settlements involving multiple counterparties and/or counterparties from multiple jurisdictions;

c.      Settlements involving multiple funds of investment managers; and

d.      Creative structures for consensual assumption and assignment of live derivative transactions, such as novations to special purpose vehicles wrapped by participating third-party institutions in an effort to preserve viable credit ratings.

33.      Derivatives Subcommittee members also negotiated with the Debtors regarding procedures for the purchase and sale of notes issued by certain special purpose vehicle ("SPV") counterparties that are party to transactions with certain Debtors, and also worked with the Debtors to seek approval of such procedures from the Bankruptcy Court.  Specifically, the Debtors had entered into prepetition derivative or loan agreements with SPV counterparties, which then issued notes or securities to third parties—in many cases secured by applicable SPVs' interests in the derivative contracts or other collateral.  Several times, the Debtors faced allegations that their rights to payment under the relevant derivative contracts were subordinated as a result of purported events of default.  The notes purchase and sale procedures have provided an effective alternative means for the Debtors to resolve their disputes with SPV counterparties or otherwise maximize their recoveries on the related derivative contracts while minimizing the time, cost and risk associated with litigation.

13

34.     Further, Derivatives Subcommittee members negotiated with the Debtors to arrive at, and worked with the Debtors to seek approval from the Bankruptcy Court for, (i) procedures for alternative dispute resolution ("ADR") relating to affirmative claims of the Debtors under derivatives contracts, as well as (ii) special procedures for ADR relating to affirmative claims of the Debtors under derivatives contracts with SPV counterparties.  In particular, resolution of many of the derivative contracts subject to the ADR and SPV ADR procedures have involved similar issues regarding the appropriateness of setoff, termination, valuation and computation of termination payments, and notice.  The ADR process, collectively, has enabled the recovery of over $1 billion of value for the benefit of the Debtors' unsecured creditors and saved countless dollars and hours by avoiding the need for trial of adversary proceedings or other litigation.  The SPV ADR process has extended those benefits to contracts with SPV counterparties.  Additionally, the Derivatives Subcommittee worked with the Debtors to establish streamlined procedures for ADRs relating to affirmative claims of the Debtors valued at less than $1 million.

35.     The Derivatives Subcommittee also assisted in the formulation of the Big Bank derivatives settlement framework (the "Framework"), which has been one of the largest work streams related to the Lehman derivatives portfolio.  The calculation of settlement amounts for the allowance of Big Bank claims pursuant to the Framework was heavily vetted by the Derivatives Subcommittee.  The Framework ultimately led to acceptance by the Big Banks of significant reductions in the amounts of their filed derivatives claims.  Moreover, the acceptance of the Framework, along with the Big

14

Banks' Plan support agreements, ultimately allowed for the broader acceptance of the Plan, in the form confirmed in December 2011.

36.    The Derivatives Subcommittee also participated in the litigation and settlement of various derivatives-related claims.  Illustrative of such litigation is the complex cross-border litigation with BNY and Perpetual pertaining to the Debtors' derivative contracts with SPV counterparties, many of which terminated their derivative contracts with the estates as a result of LBHI's or LBSF's chapter 11 filing.  As noted above, certain SPV counterparties alleged that the Debtors' rights to payment under the relevant derivative contracts were subordinated as a result of bankruptcy events of default.  In the Perpetual proceedings, UK courts held that payment priority provisions in the underlying documents—the so-called "flip" clauses, which provided for the shifting of priorities upon a Lehman event of default—were enforceable in an insolvency context, but the U.S. Bankruptcy Court in its BNY decision declined to extend comity to the UK courts' rulings, holding that (i) the flip provision was unenforceable pursuant to the ipso facto provisions of the Bankruptcy Code, and not safe-harbored; and (ii) LBSF had a valuable property interest in the underlying contracts as of its petition date.  The BNY decision has provided a favorable resolution of issues pertaining to the flip clause with regards to a number of U.S.-law SPV derivative contracts.

37.    In sum, as of March 31, 2011, the Derivatives Subcommittee had assisted the Debtors in reconciling 99% of their derivatives contracts, valuing 99% of their derivatives contracts and settling 58.5% of their derivatives contracts.  As of January 1, 2012, such settlements had brought more than $12.2 billion into the Debtors'

estates, with a total projected recovery from the derivatives portfolio of more than $17

billion.

**E.**    **The Loan Book Subcommittee**

38.    The Loan Book Subcommittee, formerly known as the Loan/Bank

Book Subcommittee, was comprised of three (3) members: Elliott; Wilmington Trust;

and Mizuho.

39.    The Loan Book Subcommittee assisted in the management of the

Debtors' loan book portfolio, which was comprised of $3.1 billion in funded assets with a

market value of $2.3 billion as of June 30, 2011.  Specifically, the Loan Book

Subcommittee reviewed each month's loan activity throughout 2009, 2010 and 2011,

pursuant to a Court-approved review and approval protocol.  It also met frequently—at

least 50 times—to analyze specific potential courses of action for matters related to the

Debtors' bank and loan books.

40.    In 2008 and 2009, the Loan Book Subcommittee convened to

analyze objections, proposed settlements, ancillary motions and other issues concerning

the Debtors' motions of November 14 and December 15, 2008, to assume or reject trade

confirmations to purchase or sell interests in loans; the restructuring of Education Media

Publishing Group Limited, a highly leveraged publishing company; defaulting lender

provisions within certain credit agreements involving a debtor as a lender, including

provisions concerning the Glimcher Properties, Owens Illinois, TXU, SL Green, HD

Supply, and Dupont; the Debtors' motion for procedures to assign and restructure loans;

and the financing and trades issues involving GE Corporate Financial Services, Inc.

("GE") and the Fusion entities.  In relation to these matters, the Subcommittee posed

follow-up questions to the Committee regarding, among other things, the draft GE/LCPI

Intercreditor Agreement relating to the HM Receivables Co., LLC receivables

securitization facility, and in particular LCPI's rights, if any (including any step-in

rights), to restrict GE from unilaterally acting against and liquidating the collateral.

41.    The Loan Book Subcommittee continued to take a very active role

in 2010 and 2011.  The Loan Book Subcommittee convened frequently in 2010 to discuss

a proposed settlement of the GE/Fusion matter; the asset purchase agreement with

Lehman Brothers Bankhaus, AG ("Bankhaus"); a proposed settlement between LCPI and

Pentwater Capital Management, LP, regarding a dispute over obligations regarding a $3

million term loan to Visteon Corporation; the FairPoint Communications Term Loan A

restructuring; and the Debtors' global disposition strategy.  In addition to these meetings,

the Loan Book Subcommittee reviewed and recommended that the Committee approve a

proposal for an organized wind-down of certain LBHI European subsidiaries, including

ELQ Hypotheken B.V. and related companies.  The Subcommittee also convened to

discuss a proposal to pay down a Metlife loan related to FairPoint Communications, as to

which the Debtors sought and ultimately received the Subcommittee's consent.

42.    The Subcommittee also met in 2010 to discuss strategic

considerations for the Debtors' loan portfolio, including the Debtors' request for (and the

Subcommittee's eventual grant of) approval, pursuant to the governance protocol, of the

proposed recapitalization of Libro Securitizadora de Creditos Financeiros, a Brazilian

non-debtor LBHI subsidiary owned by LBSF and LB I Group, Inc.  The Debtors also

submitted to the Subcommittee a report disclosing the details of corporate loan

transactions that occurred in March 2010, for the Subcommittee's review pursuant to the Court-approved governance protocol.

43.    Further, the Loan Book Subcommittee held at least four (4) meetings in 2010 to analyze the Debtors' top funded loans and funded loans under $5 million, as well as a supplemental loan analysis regarding Pine CCS, Ltd., in addition to meetings to discuss ongoing negotiations with Bankhaus regarding a possible purchase of mezzanine notes within Spruce CCS, Ltd. ("Spruce") and Verano CCS, Ltd. ("Verano") as part of a global settlement; Spruce and Verano collateral values; various collateralized loan obligation structures; unfunded loan commitments; potential and completed loan sales; a tracing analysis update; and an analysis of the restructuring of Tribune Company, as to which Lehman was a lender.

44.    During 2011, the Debtors consulted the Loan Book Subcommittee with regard to a proposed amendment to the original 2009 Bankhaus settlement, which the Subcommittee ultimately approved. The Loan Book Subcommittee also held a meeting to discuss certain transactions involving notes issued by Greystone CDO 2006-3; an open trade involving AXA Mezzanine II SA, Sicar and MD Mezzanine SA, Sicar; and a Norton Gold Fields Limited transaction.

45.    In addition, the Debtors sought, and ultimately received, the Loan Book Subcommittee's approval of a proposed settlement regarding the termination of the First Data loan commitment, one of LCPI's largest remaining loan commitments. With respect to the Debtors' remaining loan positions, the Loan Book Subcommittee held meetings to discuss a proposed collateralized loan obligation structure. The Subcommittee's analysis of alternative asset-management options ultimately led to the

execution of the Asset Management Agreement with WCAS Fraser Sullivan Investment

Management, LLC, which should allow the Debtors to more quickly monetize one of

their largest assets: LBHI's commercial-loan portfolio.  Finally, in late 2011, the Debtors

sought, and ultimately received, the Loan Book Subcommittee's approval of a proposed

termination of the securitization structure involving Spruce.

**F.**     **The Tax Subcommittee**

46.     The Tax Subcommittee was comprised of four (4) members:

Elliott; Mizuho; US Bank; and Wilmington Trust.  Since its inception in August 2009, the

Tax Subcommittee held at least 13 telephone conferences, as well as one (1) in-person

meeting, with counsel for the Committee, to discuss issues related to the Debtors' tax-

related obligations, assets and liabilities.

47.     Generally, the topics of the calls and the meeting included:

a.     Tax issues related to the disposition of certain assets,

including Aurora Bank, FSB ("Aurora") and Woodlands Commercial Bank

("Woodlands");

b.     The tax consequences of real estate mortgage investment

conduits held by Lehman Brothers Inc. ("LBI") and the proposed transfer thereof;

c.     The Debtors' ruling request to the Internal Revenue Service

("IRS") regarding cancellation of debt income;

d.     The allocation of tax liability among the members of the

Lehman Tax Group for which LBHI served as parent;

e.     The Debtors' federal, state and local tax exposure and

potential refund claims;

f. The motion and subsequent order to restrict trading of the Debtors' equity and debt claims;

g. The impact of receipt of government program funds on use of the Debtors' net operating losses;

h. The potential impact on the Debtors' estates of tax provisions in proposed legislation; and

i. The retention of tax-litigation consultants.

48. During various calls and meetings held in 2009, 2010 and 2011, the Tax Subcommittee analyzed numerous discrete tax issues facing the Debtors' estates. For instance, the Tax Subcommittee reviewed the ongoing IRS audit of the Debtors' estates, including with respect to foreign tax credit claims, such as the voucher trade and stock loan transactions. On several occasions, the Tax Subcommittee also reviewed the Debtors' tax issues on a global basis. For instance, in November 2010, the Tax Subcommittee convened an in-person meeting to discuss the state of all tax issues facing the Debtors, including the structuring of the Plan to avoid cancellation of debt income, staffing and scope of the Debtors' tax department, tax savings achieved through the numerous settlements, and prospective tax planning and cash realization strategies.

49. The Tax Committee also convened to analyze the tax implications of the transfer of interests in real-estate mortgage investment conduits held by LBI and the Debtors' proposed settlement with the administrator of a UK Lehman affiliate regarding the allocation of tax credits due from the UK taxing authority.

50. In addition to analyzing the tax implications of real estate mortgage investment conduits held by LBI, the Tax Subcommittee also analyzed the

20

settlement agreement reached between LBHI and the New York State Department of

Taxation and Finance, resolving the claims filed by the State. The Tax Subcommittee

also performed a thorough review of the federal, state and local tax implications of the

proposed plans of reorganization of the Debtors' estates, thereby providing the full

Committee with a more complete understanding of the practical effects of the various

proposed plans.  The Tax Subcommittee also assisted in the negotiation and mediation of

issues with the IRS and state and local taxing authorities, which yielded the settlement

with the State of New York and the partial settlement with the IRS and resulted in a more

than $1 billion reduction in the Debtors' tax liability.  The Tax Subcommittee further

assisted in the Committee's review of issues and development of a strategy in connection

with the Stock Loan litigation, which is currently pending in the District Court and in

which the Committee has intervened.

## G.    The Fee Subcommittee

51.    The Fee Subcommittee was, at various times during the Chapter 11

Cases, comprised of four (4) members: Vanguard; Metlife; Wilmington Trust; and

Mizuho.

52.    The Fee Subcommittee's mandate was to work with the Committee

designee on the Fee Committee (Wilmington Trust, initially, and then Mizuho) in shaping

the policies and practices adopted by the Fee Committee. The Fee Subcommittee

established a monthly protocol for the submission of budgets by the professionals

retained in these cases and participated in various chambers conferences with the retained

professionals in these cases to settle certain outstanding issues identified in the Fee

Committee reports pertaining to the retained professionals' various interim fee applications, and was successful in settling certain of those issues.

53.    The Fee Subcommittee helped to formulate a revised protocol for the review of fee statements and applications by the Fee Committee, and assisted in the transition of the new independent chair of the Fee Committee.  Finally, the Fee Subcommittee worked with the Committee's Fee Committee designee on the arduous task of reviewing the fee applications that were subject to the Fee Committee's oversight.

**H.    The Bank Regulatory Subcommittee**

54.    The Bank Regulatory Subcommittee was comprised of four (4) members: Vanguard; Wilmington Trust; Aegon USA Investment Management, LLC; and Mizuho.  It met at least five (5) times in 2009 to evaluate the issues surrounding Woodlands and Aurora (together, the "Banks"), which are wholly owned subsidiaries of LBHI and were overseen by the Office of Thrift Supervision (the "OTS") and the Federal Deposit Insurance Company (the "FDIC" and, together with the OTS, the "Regulators"). Specifically, the Subcommittee endeavored, since the inception of the Chapter 11 Cases, to improve the capital levels at the Banks to satisfy regulatory requirements, avoid potential seizures and liquidations by the Regulators and facilitate the resumption of depository functions at the Banks to preserve and maximize value.

55.    Due to a number of factors, capital levels at each of the Banks had dropped below levels generally considered adequate by the Regulators.  As a result, the Regulators indicated that, unless LBHI took action to support the capital levels at the Banks, the Regulators would seize the Banks and liquidate their respective assets. Because the Committee agreed with the Debtors that significant value could be recovered

if the Banks' capital and liquidity issues could be successfully addressed, the Committee

supported the Debtors' efforts to preserve value at the Banks.

56.      In connection with those efforts, the Subcommittee expended

significant time in analyzing the potential value to the Debtors' estates of making capital

infusions into the Banks, including in connection with motions filed by the Debtors

seeking authority to (i) make a cash infusion into Aurora (the "Cash Infusion Motion")

and (ii) enter into a master repurchase agreement with Aurora (the "MRA Motion") to

improve Aurora's capital positions to levels that the Regulators would find acceptable.

The Cash Infusion Motion and the MRA Motion were approved by the Court on March

13, 2009, and March 31, 2009, respectively.

57.      In addition, the Subcommittee analyzed supplemental motions

filed by the Debtors seeking (i) to make an additional cash infusion of $50 million into

Aurora, dated June 23, 2009 (the "Supplemental Infusion Motion"), and (ii) to enter into

(a) an amended master repurchase agreement with Aurora and (b) a secured bridge

financing facility with Aurora's wholly owned subsidiary, Aurora Loan Services, LLC,

dated July 16, 2009 (the "Financing Motion").  The Supplemental Infusion Motion and

the Financing Motion were approved by the Court on June 29, 2009, and August 5, 2009,

respectively.

58.      Finally, on November 25, 2009, the Debtors filed a motion (the

"Supplemental Contribution Motion") seeking authorization to invest an additional $100

million into Aurora to account for a miscalculation in the valuation of a portfolio of

mortgage servicing rights (the "MSR Portfolio") previously contributed to Aurora by

LBHI and the continued effect of fair value accounting on Aurora's capital.  The

Subcommittee analyzed the Supplemental Contribution Motion and numerous issues

regarding the MSR Portfolio, including valuation concerns.  On December 17, 2009, the

Court issued an order granting the relief requested in the Supplemental Contribution

Motion.

59.    In addition to its work in connection with the capital contributions,

the Subcommittee undertook extensive efforts to ensure that the Banks were being

properly managed to maximize their value for the Debtors' estates and creditors.  To that

end, the Subcommittee, among other things, (i) prepared for meetings with the OTS to

discuss the alternatives for Aurora, (ii) helped to develop and formulate a business plan

submitted to the OTS, incorporating constraints requested by the Regulators to facilitate

the resumption of banking and lending operations for the Banks, (iii) analyzed, assisted in

the development and researched the implications of the terms of a proposed settlement

agreement with the Regulators to resolve a dispute arising out of a certain master forward

agreement between LBHI and Aurora, (iv) reviewed Aurora's plans to sell its student

loan portfolio, (v) researched precedent involving thrifts and defenses to claims brought

by the Regulators regarding capital maintenance commitments of holdings companies

under section 365(o) of the Bankruptcy Code, and (vi) discussed with the Debtors

restructuring strategies for the Banks and approaches to resolving disputes with the

Regulators.

60.    The Subcommittee also worked closely with the Debtors and their

advisors on the settlements with the Debtors and the Banks to secure the Regulators'

approval to resume normal profit-generating banking and lending operations.  On

September 23, 2010, the Court approved the Debtors' entry into such settlements (the

"Settlement Agreements"), which were executed on November 30, 2010. The

Subcommittee understood that the best way to realize maximum value from LBHI's

investment in the Banks was, as contemplated by the Settlement Agreements, to infuse

additional capital into the Banks (by means of cash and other consideration) to maintain

the Banks' capital levels and thereby achieve the lifting of substantially all of the

regulatory restrictions currently imposed on their operations. The Settlement Agreements

resolved substantially all outstanding issues among the Debtors, the Banks and the

Regulators, and permitted LBHI to realize the value of its equity interests in the Banks by

facilitating an orderly wind-down plan with respect to Woodlands and permitting Aurora

to expand its business operations and effectuate a business plan intended to position it for

sale as a going concern.

I declare under penalty of perjury that the foregoing is true and correct to

the best of my knowledge.

Executed this ⎽⎽ day of November, 2012.

Julie I. Becker

**<u>Exhibit C</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                                                     :        **Chapter 11 Case No.**
                                                          :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.,*   :        **08-13555 (JMP)**
                                                          :
                                    **Debtors.**          :        **(Jointly Administered)**

-------------------------------------------------------------x

### DECLARATION OF JOHN K. SUCKOW, AS PRESIDENT AND CHIEF EXECUTIVE OFFICER OF LEHMAN BROTHERS HOLDINGS INC., IN SUPPORT OF THE OMNIBUS APPLICATION OF INDIVIDUAL MEMBERS OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND INDENTURE TRUSTEES FOR PAYMENT OF FEES AND EXPENSES

John K. Suckow makes this declaration pursuant to 28 U.S.C. § 1746, and states:

1.       I am the President and Chief Executive Officer of Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator") and a Managing Director with Alvarez & Marsal North America, LLC ("A&M"), an international restructuring advisory services firm.

2.       A&M was engaged by the above-referenced debtors (the "Debtors") following the commencement of a chapter 11 case by LBHI on September 15, 2008. I have been a member of the A&M senior management team for the Debtors since A&M's engagement by LBHI to manage the Debtors in September 2008. In April 2009, I was appointed President and Chief Operating Officer of LBHI. Upon the Effective Date of the Debtors' Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), I was appointed Chief Executive Officer of LBHI. Since the Effective Date, A&M and I have continued to provide services on behalf of the Debtors' businesses and the continued administration of the chapter 11 cases in accordance with the confirmed Plan.

3.       I submit this declaration on behalf of the Plan Administrator in connection with the Omnibus Application of (i) Individual Members of the Official Committee of

Unsecured Creditors and (ii) Indenture Trustees Pursuant to Section 1129(a)(4), or, alternatively, Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for Payment of Fees and Reimbursement of Expenses (the "Application"). Unless otherwise stated herein, the facts set forth in this declaration are based upon my personal knowledge or the personal knowledge of employees of the Debtors or A&M who report to me. If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

4.    The Plan that was accepted by over 95% of impaired claimants who voted was confirmed by order dated December 6, 2011 (the "Confirmation Order"). The Plan became effective on March 6, 2012 (the "Effective Date"), and upon the Effective Date, LBHI became the Plan Administrator for each of the Debtors.

5.    Section 6.7 of the Plan provides for the payment of the "reasonable fees and expenses (including attorneys fees)" incurred by the members of the Official Committee of Unsecured Creditors appointed in these cases (the "Creditors' Committee") and certain indenture trustees (together with the individual members of the Creditors' Committee, the "Applicants"). Paragraph 74 of the Confirmation Order required that the payment of such fees and expenses be subject to Court approval upon application with reasonable notice and opportunity to object by all parties in interest.

6.    At a status conference held in February 2012, the Court requested that the Debtors assess the reasonableness of any fees and expenses requested pursuant to the Plan. At that time, the Debtors informed the Court that they had not yet completed the review of the requested fees and expenses.

7.    The Applicants, and, in particular, the Creditors Committee's co-chairs (Mizuho Corporate Bank, Ltd. and Wilmington Trust Company) and their counsel, made

2

important, substantial, and material contributions to the administration and successful resolution

of the chapter 11 cases. We have reviewed the Application and the supporting documentation

provided in connection therewith as to the reasonableness of the fees and expenses requested.

       8.     Subject to the respective Applicant's compliance with statutory and

applicable rules as well as the United States Trustee's guidelines for applications for fees and

expenses, and subject to receiving any additional support from Greenberg Traurig, LLP for a

portion of their total fees and expenses of $1,362,497.46, I submit that the fees and expenses

requested in the Application are reasonable in the circumstances of these extraordinary cases and

their very successful administrations and resolution.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry,

the foregoing is true and correct.

Dated: November 13, 2012
       New York, New York

                                    John K. Suckow
                                    Chief Executive Officer

US_ACTIVE:\44063621\5\58399.0011

**<u>Exhibit D</u>**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TRIBUNE COMPANY, *et al.*,[1] | : | Case No. 08-13141 (KJC) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | **Hearing Date: March 7-11, 2011** |
| | : | **Objection Deadline: February 15, 2011** |
| | : | |
| | : | **Re: Docket No. 7801** |

**UNITED STATES TRUSTEE'S OBJECTION TO SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO GORDON & CO., L.P., AND JP MORGAN CHASE BANK, N.A.**

In support of her objection (the "Objection") to the Second Amended Joint Plan of

Reorganization for Tribune Company and Its Subsidiaries (the "DCL Plan") proposed by the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Tribune Company (0355); 435 Production Company (8655); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago National League Ball Club n/k/a Tribune CNLBC, LLC (0347); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo., Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC; KIAH, Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); new River Center Maintenance Association, Inc. (5621); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Brook Productions, Inc. (2598); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, Inc. (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc. (1088); Tribune California Properties, Inc. (1629); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); WPIX, Inc. (0191); and WTXX Inc. (1268). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo

Gordon & Co., L.P., and JP Morgan Chase Bank, N.A. (collectively referred to as the "DCL Plan

Proponents"), Roberta A. DeAngelis, the United States Trustee for Region 3 ("U.S. Trustee"), by

and through her undersigned counsel, states as follows:

## Introduction

1.    This Court has jurisdiction to hear the above-referenced Objection.

2.    Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with the administrative

oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  This duty is part of the U.S. Trustee's overarching responsibility to enforce

the bankruptcy laws as written by Congress and interpreted by the courts.  *See United States Trustee

v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.*), 33 F.3d 294, 295-96 (3d Cir. 1994)

(noting that UST has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere

pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th

Cir. 1990) (describing the UST as a "watchdog").

3.    Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to be heard with regard

to the above-referenced Objection.

## Background

4.    On December 8, 2008 (the "Petition Date"), the Debtors[2] filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District

of Delaware (the "Court").  The Debtors continue to operate their business and manage their

---

[2]    All capitalized terms not defined herein shall have the meaning ascribed to them in the DCL
Plan.

2

properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On December 18, 2008, the U.S. Trustee appointed the official committee of unsecured creditors in this case (the "Committee").

6.      The DCL Plan is a joint plan of reorganization filed by the DCL Plan Proponents.

7.      One other plan of reorganization is currently on file and set for a confirmation hearing at the same time as the DCL Plan.  That plan has been filed by a noteholder group made up of Aurelius Capital Management, L.P., Wilmington Trust Company, Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas.

### Preliminary Statement

8.      A chapter 11 plan may not be confirmed unless the Court can find that the plan complies with the provisions of 11 U.S.C. § 1129 (a).  A plan proponent bears the burden of proof with respect to each and every element of 11 U.S.C. § 1129 (a).  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).   As discussed below, the DCL Plan is not confirmable because it contains certain release provisions that are contrary to applicable law in this District.

### Basis for Objection

***Relevant Release and Exculpation Provisions in the DCL Plan***

9.      Sections 11.2.1 (Releases by Debtors and Estates) and 11.2.2 (Releases by Holders of Claims and Interests) of the DCL Plan contain the prepetition release provisions.  Section 11.5 of the DCL Plan is the Exculpation Clause, which purportedly relates to a release of certain conduct on a postpetition basis[3].  The parties for whom these provisions are in favor of are defined as

---

[3] Because of the lengthy and complex nature of the Release and Exculpation provisions, the U.S. Trustee does not recite these specific plan provisions in the Objection.  The DCL Plan should be reviewed to see these provisions in their entirety.

3

Released Parties and Related Persons.

10.     Section 1.1.197 of the Plan defines "Released Parties" as:

each of (a) the Debtors, their non-Debtor Affiliates, including the Subsidiary Non-Debtors, and the Reorganized Debtors; (b) the current and former Senior Lenders in all capacities except their capacities, if any, as (i) Step Two Selling Stockholders, (ii) Non-Settling Step Two Payees, and (iii) Advisors; (c) the current and former Bridge Lenders, each in all capacities except their capacities, if any, as (i) Step Two Selling Stockholders, (ii) Non-Settling Step Two Payees, and (iii) Advisors; (d) the Step Two Payees in all capacities except their capacities, if any, as (i) Step Two Selling Stockholders and (ii) Advisors; (e) each of the following, solely in their capacities as such: (i) the Creditors' Committee, (ii) the present and former members of the Creditors' Committee, (iii) the Senior Loan Agent, the Bridge Loan Agent and the Former Bridge Loan Agent, (iv) the Step One Selling Stockholders, (v) the Proponents, and (vi) the Released Step Two Stockholder Parties; (f) Related Persons of Released Parties listed in clause (a) of this paragraph to the extent a claim arises from the Related Person's relationship to one of the foregoing "Released Parties" listed in clause (a) and is not a LBO-Related Cause of Action, and (f) Related Persons of Persons listed in clauses (b), (c), (d) and (e) of this paragraph and is released against the party as to which they are a Related Person. Notwithstanding anything to the contrary in this definition, none of the following, solely in their capacities as such, shall be Released Parties with respect to LBO-Related Causes of Action or Morgan Stanley Claims: (a) Related Persons of the Debtors, (b) Advisors, (c) Step Two Selling Stockholders (with the exception of Released Step Two Stockholder Parties), (d) MSCS, (e) Non-Settling Step Two Payees, (f) EGI-TRB LLC, (g) Samuel Zell, and (h) Valuation Research Corporation.

11.     Section 1.1.188 of the Plan defines "Related Persons" as:

with respect to an Person, such Person's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former members, partners, shareholders, equity-holders, officers, directors, employees, managers, trustees, trust beneficiaries, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, or other representatives, nominees or investment managers, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, trustees, trust beneficiaries, shareholders, partners, employees, members and professionals).

## *Section 11.2.1 - Releases by Debtors and Estates*

12.     The provision of the DCL Plan titled Releases by Debtors and Estates (referred herein

as the "Debtor Releases") calls for the release of claims by the Debtors and the Debtors' bankruptcy

estates against various non-Debtors, i.e., the Released Parties.  This Court in *In re Zenith Electronics*

*Corp.*, 241 B.R. 92 (Bankr. D. Del 1999)*, adopted a five part test enunciated in *Master Mortgage*

*Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) to determine whether a release by a debtor

of a third party as part of a plan of reorganization is permissible.  These factors are:

> "...(1) an identity of interest between the debtor and the third party...; (2) substantial
> contribution by the non-debtor of assets to the reorganization; (3) the essential nature
> of the injunction to the reorganization to the extent that, without the injunction, there
> is little likelihood of success; (4) an agreement by a substantial majority of creditors
> to support the injunction, specifically if the impacted class or classes
> 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment
> of all or substantially all of the claims of the class or classes affected by the
> injunction." *Id.* at 937.

13.     As articulated by this Court in *Zenith*, the party who is receiving the benefit of the

release must have provided a substantial contribution to the reorganization.  The court in *In re*

*Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), examined a similar provision

and tested its applicability as to each party to be affected by the provision.  For example, the attempt

in *Genesis* to release the debtor's post-petition management was rejected, the Court stating: "As to

the debtor's management personnel here, there is no showing that the individual releases have made

a substantial contribution of assets to the reorganization."  *Id* at 606.

14.     The Debtor Releases in the DCL Plan, which are very extensive and contemplate

releases of the oft-discussed LBO-Related Causes of Action, are subject to review under the factors

articulated in *Zenith* and *Master Mortgage*.  The DCL Plan Proponents must justify the validity of

the Debtor Releases for each and every party that is listed in the definition of Released Parties or

Related Persons[4]. The *Zenith*/*Master Mortgage* factors must be satisfied in their entirety for the Debtor Releases to be approved. *See In re Washington Mutual, Inc.*, 2011 WL 57111, *24 (Bankr. D. Del. 2011); *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).

15.     In particular, the Debtor Releases in favor of the Debtors' Related Persons, including current and former officers, directors and professionals are problematic. It has not been demonstrated that current and former officers, directors, and professionals provided a substantial contribution of assets to the reorganization. As Judge Walrath recently ruled in *Washington Mutual*, there was no basis to approve a release to either current or former officers, directors and professionals of the Debtors because the *Zenith/Master Mortgage* factors have not been met, including no evidence of a substantial contribution of assets to the reorganization. *See In re Washington Mutual, Inc.*, 2011 WL 57111, *28. The same rationale applies in this case and without evidence to support that the *Zenith* and *Master Mortgage* factors have been met, it is axiomatic that the releases cannot be approved. *See Genesis*, 266 B.R. at 606; *In re Exide Technologies*, 303 B.R. 48, 73-74 (Bank. D. Del. 2003) (both cases finding director and officer releases impermissible under the *Zenith* standard).

16.     Again, it should be emphasized that the DCL Plan Proponents must meet the relevant standard for each of the Released Parties and Related Persons. Because an evidentiary predicate is necessary to approve the Debtor Releases, the U.S. Trustee reserves argument on the Debtor Releases granted to all other parties until the record at the confirmation hearing is closed.

---

[4] As recited herein, the definitions of Released Parties and Related Persons, who are the beneficiaries of the Debtor Releases, contain a multitude of individual and categories of persons and entities.

### Section 11.2.2 - Releases by Holders of Claims and Interests

17.    The provision titled Releases by Holders of Claims and Interests (the "Third-Party Releases") is a release of claims by non-Debtors (in this instance claimants and interest holders) against Debtors and non-Debtors.  In *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit noted that a permanent injunction in favor of non-debtors is a "rare thing" that should not be considered absent a showing of exceptional circumstances in which certain key factors are present.  The Third Circuit determined that fairness requires a showing that sufficient consideration was given to creditors whose claims were to be released and that such consideration renders the plan feasible.  *Id*. at 213-214.  The Third Circuit noted that the success of the plan must be based on the releases, and that there be an identity of interest between the debtor and the non-debtor so that the debtor would likely bear the cost of the litigation against the non-debtor.  *Id* at 216.

18.    To the extent that the Third-Party Releases are truly consensual and a creditor or interest holders voluntarily agrees to grant the release (by being granted the opportunity to opt out of the release, the U.S. Trustee does not object to the Third-Party Releases.  The U.S. Trustee does reserve her rights pending the presentation of the evidence at the confirmation hearing.

### Section 11.5 - Exculpation

19.    The Exculpation clause of the DCL Plan is subject to the Third Circuit's decision in *PWS Holding Corp*, 228 F.3d 224  (3d Cir. 2000).  A typical exculpation clause is meant to insulate liability for postpetition conduct of estate fiduciaries, except gross negligence and willful misconduct.

20.    In *PWS*, the Third Circuit examined the question of whether limited exculpation for official committee members and professionals retained by the debtors was appropriate.  The Third Circuit ruled that the exculpation was appropriate because the provision at issue correctly stated the

7

standard of liability for fiduciaries including official committee members and debtor professionals.

 *See also In re Coram Healthcare Corp*., 315 B.R. 321, 337 (Bankr. D. Del. 2004) (stating that

"[third party release provisions against Trustee, Equity Committee and their respective agents and

professionals] are not permissible except to the extent they are limited to post-petition activity which

does not constitute gross negligence or willful misconduct.").

21.     The *PWS* decision does not contemplate the use of an exculpation clause to insulate

prepetition conduct.  As such, the Exculpation Clause should be narrowly defined to include only

postpetition actions.  The Exculpation Clause in the DCL Plan does not contain an express

distinction for postpetition conduct.  Moreover, the Exculpation Clause as drafted could be construed

to insulate prepetition conduct that may otherwise not be released under a release provision in the

DCL Plan.  For instance, Related Persons are exculpated from liability for any act or omission in

connection with, relating to, or arising out of the "management or operation of the Debtors".

Because of the broad definition of Related Persons, including all current and former officers and

directors, and the absence of a distinction between pre- and postpetition conduct, it could be

construed that the Exculpation Clause acts a release of prepetition conduct, which otherwise would

not be permitted.

22.     The beneficiaries of the Exculpation Clause contain persons and entities that are not

estate fiduciaries, therefore not entitled to exculpation under the *PWS* standard.  As stated in

*Washington Mutual* when assessing that exculpation clause against the *PWS* standard, an

"exculpation clause must be limited to the fiduciaries who have served during the chapter 11

proceedings: estate professionals, the Committee and their members, and the Debtors' directors and

officers.  *See In re Washington Mutual, Inc.*, 2011 WL 57111, *29.

***Miscellaneous Provisions of the DCL Plan***

8

23.    Section 9.1 of the DCL Plan contains provisions related to the payment of fee and expense claims of certain creditor groups, including a number of the DCL Plan Proponents.  These fee and expense claims are subject to approval under a reasonableness standard as a confirmation requirement.  *See* 11 U.S.C. § 1129(a)(4).  The fee and expense provisions may also be subject to approval under a substantial contribution standard.  *See* 11 U.S.C. § 503(b)(4).  The DCL Plan contains no provisions for the Court, or parties in interest, including the U.S. Trustee, to test the reasonableness of those fees and expenses.  Without such provisions, the DCL Plan cannot be confirmed.

24.    Section 15.7 of the DCL Plan sets forth the statutory requirement that all fees payable pursuant to 28 U.S.C. § 1930 will be paid on the Effective Date.  While that provision is proper, the DCL Plan contains no provision addressing the requirement to file post-confirmation reports and pay post-confirmation fees until all cases are closed, converted or dismissed.

WHEREFORE the U.S. Trustee requests that this Court sustain the Objection and issue an order granting such relief as this Court deems appropriate, fair and just.

Respectfully submitted,

**ROBERTA A. DEANGELIS**
**United States Trustee**

By:   */s/ David M. Klauder*
     David M. Klauder, Esquire
     Trial Attorney
     J. Caleb Boggs Federal Building
     844 King Street, Suite 2207, Lockbox 35
     Wilmington, DE 19801
     (302) 573-6491
     (302) 573-6497 (Fax)

Dated: February 15, 2011

**<u>Exhibit E</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|                                              |     |                      |
| -------------------------------------------- | --- | -------------------- |
|                                              | )   |                      |
| In re:                                       | )   | Chapter 11           |
|                                              | )   |                      |
| THE GREAT ATLANTIC & PACIFIC TEA             | )   | No. 10-24549 (RDD)   |
| COMPANY, INC., *et al.*,                     | )   |                      |
|                                              | )   |                      |
| Debtors.                                     | )   | Jointly Administered |
|                                              | )   |                      |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

The Great Atlantic & Pacific Tea Company, Inc. ("***A&P***") and certain of its affiliates, as

debtors and debtors in possession (collectively, the "***Debtors***"),[1] having:

    a.    commenced these chapter 11 cases (collectively, the "***Chapter 11 Cases***") on December 12, 2010 (the "***Commencement Date***") by filing voluntary petitions for relief under the Bankruptcy Code;[2]

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc. (1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599). The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

[2]    Unless otherwise noted, capitalized terms not defined in the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* (the "***Confirmation Order***"), shall have the meanings ascribed to them in the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated February 17, 2012 [Docket No. 3417] (as may be subsequently modified, supplemented, and amended, from time to time (Continued…)

K&E 21784620

b.      continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.      filed, on November 14, 2011, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 2868] and the *Debtors' Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 2867], which plan and related documents were subsequently modified as set forth herein;

d.      filed, on November 30, 2011, the *Debtors' Motion for Entry of an Order Approving: (A) the Adequacy of the Debtors' Disclosure Statement; (B) the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan; (C) the Form of Various Ballots and Notices in Connection Therewith; and (D) the Scheduling of Certain Dates with Respect Thereto* [Docket No. 2929] (the "**Solicitation Procedures Motion**");

e.      filed, on November 30, 2011, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 2927] and the *Debtors' Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 2925], which plan and related documents were subsequently modified as set forth herein;

f.      filed, on November 30, 2011, Exhibit C (Reorganized Debtors' Financial Projections) and Exhibit D (Liquidation Analysis) to the *Debtors' Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 2934];

g.      filed, on December 11, 2011, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3025] and the *Debtors' Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3023], which plan and related documents were subsequently modified as set forth herein;

h.      filed, on December 14, 2011, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3042] and the *Debtors' Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3041], which plan and related documents were subsequently modified as set forth herein;

i.      filed, on December 19, 2011, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3063], and the

---

time in accordance with the terms thereof, the "**Plan**"). The rules of interpretation set forth in Article I.A of the Plan shall apply to the Confirmation Order.

2

*Debtors' Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3061] (as modified, the "**Disclosure Statement**");

j.    distributed solicitation materials, on or before December 23, 2011, to holders of Claims entitled to vote on the Plan, contract and lease counterparties, and parties in interest, consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the *Order Approving (A) the Adequacy of the Debtors' Disclosure Statement, (B) the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (C) the Form of Various Ballots and Notices in Connection Therewith and (D) the Scheduling of Certain Dates with Respect Thereto*, entered on December 19, 2011 [Docket No. 3066] (the "**Solicitation Procedures Order**"), which Solicitation Procedures Order also approved, among other things, solicitation procedures and related notices, forms, ballots, and master ballots (collectively, the "**Solicitation Packages**") as evidenced by the *Affidavit of Service of Alison M. Tearnen Schepper re: Solicitation Packages* [Docket No. 3110] (the "**Solicitation Affidavit**");

k.    published, on December 27, 2011, notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**") in the Wall Street Journal and USA Today to provide notice to creditors who are unknown or not reasonably ascertainable by the Debtors and creditors whose identities are known but whose addresses are unknown by the Debtors, as evidenced by the *Verification of Publication* by Toussaint Hutchinson from USA Today [Docket No. 3098] and *Affidavit of Publication* by Ken Long from the Wall Street Journal [Docket No. 3125] (the "**Publication Affidavits**");

l.    filed the following exhibits to the Plan Supplement, (i) on January 14, 2012, the Summary of Terms for the Replacement Second Lien Notes [Docket No. 3170], (ii) on January 19, 2012, Exhibit A (Exit Facility Term Sheet), Exhibit B (Form of Management Services Agreement) and Exhibit C (Form of Replacement Second Lien Notes Indenture) [Docket No. 3190], (iii) on January 23, 2012, Exhibit D (List of Executory Contracts and Unexpired Leases to be Assumed) [Docket No. 3219], (iv) on January 27, 2012, Exhibit E (Composition of New Board), Exhibit F (Bylaws) and Exhibit G (Certificate of Incorporation) [Docket No. 3301], (v) on February 1, 2012, Exhibit H-1 (Description of Restructuring Transactions: ScripCo Transactions) and Exhibit H-2 (Description of Restructuring Transactions:   Formation of Real Estate Subsidiary and Assignment of Nonresidential Real Property Leases) [Docket No. 3317], (vi) on February 3, 2012, Exhibit I (Form of Indenture for New Second Lien Notes), Exhibit J (Form of Indenture for New Convertible Third Lien Notes), and Exhibit K (Form of Agreement of Investment Warrants) [Docket No. 3347], (vii) on February 4, 2012, Exhibit H-3 (UFCW Locals' Side Letter with Respect to ScripCo Restructuring Transactions), Exhibit H-4 (1199SEIU United Health Care Workers East Side Letter with Respect to ScripCo Restructuring Transactions) [Docket No. 3358], Amended Exhibit D (Amended and Revised List of Executory Contracts

3

and Unexpired Leases to be Assumed), Exhibit D-1 (Comparison of the Amended and Revised List of Executory Contracts and Unexpired Leases to be Assumed against List Filed on January 23, 2012), Exhibit L (Executory Contracts and Unexpired Leases to be Rejected), and Exhibit M (Retained Causes of Action) [Docket No. 3359], (viii) on February 9, 2012, Amended Exhibit H-3 (Amended UFCW Locals' Side Letter with Respect to ScripCo Restructuring Transactions) and Exhibit H-3(A) (Blackline of Amended UFCW Locals' Side Letter with Respect to ScripCo Restructuring Transactions) [Docket No. 3394], (ix) on February 16, 2012, Exhibit A-1 (Form of Term Loan Credit Agreement), Exhibit A-2 (Form of ABL Credit Agreement), and Exhibit A-3 (Form of Intercreditor Agreement) [Docket No. 3406], (x) on February 23, 2012, Amended Exhibit D (Amended and Revised List of Executory Contracts and Unexpired Leases to be Assumed), Exhibit D-1 (Comparison of the Amended and Revised List of Executory Contracts and Unexpired Leases to be Assumed), Amended Exhibit L (Executory Contracts and Unexpired Leases to be Rejected), and Exhibit L-1 (Comparison of Amended and Revised List of Executory Contracts and Unexpired Leases to be Assumed Against List Filed on February 4, 2012) [Docket No. 3442], and (xi) on February 26, 2012, Exhibit N (Officers of Reorganized A&P) [Docket No. 3460], (together with all other agreements, documents, and instruments at any time executed and/or delivered in connection with or related thereto, ancillary or otherwise, and all exhibits, attachments, and schedules referred to therein, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced, and/or supplemented from time to time pursuant to the Plan, collectively, the "***Plan Supplement***");[3]

m.  filed, on January 26, 2012 the *Notice of Intent to Seek Authority to Grant Liens on the Debtors' Assets, Including Leasehold Mortgages, to Secure Exit Financing Pursuant to Confirmation Order* [Docket No. 3285] (the "***Leasehold Mortgage Notice***");

n.  filed, on January 30, 2012 the *Certification of Alison M. Tearnen Schepper Pursuant to Local Bankruptcy Rule 3018-1(a) with respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3308] (the "***Voting Certification***" and as amended by the *Amended Certification of Alison M. Tearnen Schepper Pursuant to Local Bankruptcy Rule 3018-1(a) with respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3374], the "***Amended Voting Certification***"); and

---

[3]  To the extent that forms of documents have been filed in connection with the Plan, the documents actually executed and delivered will be substantially in the form of such filed documents.

4

o.   filed, (i) on January 31, 2012, *Debtors' Memorandum of Law and Omnibus Reply in Support of the Settlement and Compromise of Claims and Causes of Action Arising From or Related to the Substantive Consolidation of Their Chapter 11 Estates Pursuant to Their Joint Plan of Reorganization* [Docket No. 3313] (the "**Substantive Consolidation Settlement Brief**") and the *Declaration of Frederic F. Brace in Support of the Debtors' Settlement and Compromise of Claims and Causes of Action Arising From or Related to the Substantive Consolidation of the Debtors' Chapter 11 Estates Pursuant to Their Joint Plan of Reorganization* attached as <u>**Exhibit A**</u> to the Substantive Consolidation Settlement Brief (the "**Declaration in Support of the Substantive Consolidation Settlement**"), (ii) on February 4, 2012, *Debtors' Memorandum of Law and Omnibus Reply in Support of Confirmation of the Debtors' Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3354] (the "**Plan Confirmation Brief**") (iii) on February 4, 2012 the (A) *Declaration of Frederic F. Brace in Support of Confirmation of the Debtors' Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3355] (the "**Brace Declaration**"), (B) *Declaration of Stephen Goldstein in Support of Confirmation of the Debtors' Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3356] (the "**Goldstein Declaration**"), and (C) *Declaration of James M. Lukenda in Support of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3357] (the "**Lukenda Declaration**"), and (iv) on February 22, 2012, the (A) *Supplemental Declaration of Frederic F. Brace in Support of Confirmation of the Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3432] (the "**Supplemental Brace Declaration**"), (B) *Supplemental Declaration of Stephen Goldstein in Support of Confirmation of the Debtors' Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3433] (the "**Supplemental Goldstein Declaration**"), (C) *Declaration of Tyler Cowan in Support of Confirmation of the Debtors' First Amended Join Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3434] (the "**Cowan Declaration**"), and (D) *Declaration of Ray C. Schrock in Support of Confirmation of the Debtors' First Amended Joint Plan Pursuant to Chapter 11 of the United States Bankruptcy Code* (the "**Schrock Declaration**"), (collectively, with the Declaration in Support of the Substantive Consolidation Settlement, the "**Declarations in Support of Confirmation**");

p.   filed, on February 4, 2012, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3351];

q.   filed, on February 16, 2012, the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3402];

r.   filed on February 16, 2012, (A) the *Debtors Motion for Entry of an Order (I) Approving Notice of Plan Modifications and Continued Confirmation Hearing, (II) Providing That the Debtors Are Not Required to Re-Solicit Creditors on Account of Such Modifications, (III) Fixing a Confirmation Hearing Date and an*

5

*Objection Deadline for the Debtors' Plan Modifications, (IV) Approving Amendments to Their Securities Purchase Agreements, and (V) Granting Related Relief* [Docket No. 3405] (the "**Plan Modifications Motion**") and (B) the *Motion to Shorten the Notice Period for the Plan Modification Motion* [Docket No. 3404];

s.    filed, on February 17, 2012, the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3417];

t.    filed, on February 20, 2012, the *Affidavit of Service of Melissa Loomis Regarding Notice of Plan Modifications* [Docket No. 3421]; and

u.    filed, on February 22, 2012, the *Notice of Filing of Amended Unsecured Creditor Contingent Recovery Pool Exhibit* [Docket No. 3431].

The Bankruptcy Court having:

a.    entered the Solicitation Procedures Order on December 20, 2011 [Docket No. 3066];

b.    entered an Order approving the Plan Modification Motion on February 17, 2012 [Docket No. 3420], (the "**Plan Modifications Order**") the notice of plan modifications attached thereto as Exhibit 1 (the "**Plan Modifications Notice**");

c.    set February 6 and 7, 2012 at 10:00 a.m. prevailing Eastern Time, respectively, as the date and time for the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code and continued the Confirmation Hearing on February 27, 2012 at 11:00 a.m. prevailing Eastern Time;

d.    reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Substantive Consolidation Settlement Brief, the Plan Confirmation Brief, the Declarations in Support of Confirmation, the Voting Certification, the Amended Voting Certification, the Plan Modifications Motion, and all other filed pleadings, exhibits, statements, affidavits, declarations, and comments regarding Confirmation of the Plan, including all objections, statements, and reservations of rights made with respect thereto;

e.    held the Confirmation Hearing and heard the statements, arguments, and objections made by counsel concerning Confirmation of the Plan;

f.    considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation of the Plan;

g.    overruled, for the reasons stated in the Court's bench rulings on the record of the Confirmation Hearing on February 6, 2012 and February 27, 2012 (which, with the findings and conclusions stated herein, constitute the Court's findings of fact

6

and conclusions of law), any and all objections to the Plan and Confirmation thereof and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated; and

h.      taken judicial notice of the papers and pleadings filed in these Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Bankruptcy Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all Entities affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact, conclusions of law, and orders:

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

IT IS HEREBY DETERMINED, FOUND, AND CONCLUDED THAT:

**A.      <u>Jurisdiction and Venue</u>**

1.      On the Commencement Date, the Debtors commenced these Chapter 11 Cases. Venue in the Bankruptcy Court was proper as of the Commencement Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be proper during these Chapter 11 Cases.  Confirmation of the Plan is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) upon which the Court may issue a final order.  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

7

**B.      Eligibility for Relief**

2.      The Debtors were and are Entities eligible for relief under section 109 of the Bankruptcy Code.

**C.      Commencement and Joint Administration of the Chapter 11 Cases**

3.      Beginning on the Commencement Date, each of the Debtors commenced a case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  By prior order of the Bankruptcy Court, these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [Docket No. 68].  The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

**D.      Judicial Notice**

4.      The Bankruptcy Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of these Chapter 11 Cases, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases.  Any resolutions of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference, and any unresolved objections, statements and reservations of rights are hereby overruled on the merits.

**E.      Transmittal and Mailing of Solicitation Materials; Notice**

5.      Due, adequate, and sufficient notice of the Plan (including the Debtor Release, Third Party Release, Exculpation Provisions, and Injunction Provisions (each as defined below) contained therein), the Plan Modifications Notice, and all transactions consummated pursuant thereto, the Disclosure Statement, and the Confirmation Hearing, together with all deadlines for

8

voting on or objecting to Confirmation of the Plan, has been given to known holders of Claims and Interests in compliance with the Solicitation Procedures Order and Bankruptcy Rules 2002(b), 3017(d), (e), and (f), as evidenced by the Solicitation Affidavit. The Solicitation Packages and all other materials relating in any way to the solicitation process, the Plan or the transactions consummated pursuant thereto (including notice of the filing of the Plan Supplement, Cure notices and Leasehold Mortgage Notice) were transmitted and served in substantial compliance with the Solicitation Procedures Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York (the "*Local Rules*"), the Debtors' solicitation and voting procedures (the "*Solicitation and Voting Procedures*"), and all other applicable rules, laws, regulations, and orders of the Court. Additionally, in accordance with the Solicitation Procedures Order, the Debtors published the Confirmation Hearing Notice in the publications listed in the Publication Affidavits. In accordance with the Plan Modifications Order, the Debtors provided due, adequate and sufficient notice of the Plan Modifications through the service of the Plan Modifications Notice. Because such transmittal and service were adequate and sufficient, no other or further notice is necessary or shall be required in connection with Confirmation of the Plan or consummation of any transaction pursuant thereto, including the issuance of securities pursuant to the Securities Purchase Agreements, the incurrence of indebtedness and obligations pursuant to the Exit Facility, and the Exit Pledge, the Second Lien Pledge and the Convertible Third Lien Pledge and the Restructuring Transactions (in each case as defined below).

**F.    Adequacy of Solicitation**

6.    The Debtors, with the assistance of the Claims Agent, distributed Solicitation Packages to all holders of Claims entitled to vote to accept or reject the Plan, and sufficient time

9

was prescribed for such holders of Claims to vote to accept or reject the Plan in substantial compliance with the Solicitation Procedures Order and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation and Voting Procedures, and all other applicable rules, laws, and regulations.  Additionally, the Debtors, with the assistance of the Claims Agent, provided (a) a CD-ROM of the Disclosure Statement Order (including all exhibits thereto) and the Disclosure Statement (including all exhibits thereto) to the Office of the United States Trustee for the Southern District of New York (the "*U.S. Trustee*"), the Office of the United States Attorney for the Southern District of New York (the "*U.S. Attorney*"), counsel for the Investors, counsel for Wilmington Trust as indenture trustee for the Debtors' prepetition unsecured notes, counsel for Wells Fargo Bank, N.A. as successor trustee and collateral agent for the Debtors' prepetition secured notes; counsel for the administrative agent for the Debtors' postpetition secured lenders, counsel to the Creditors' Committee, the Internal Revenue Service, the Securities and Exchange Commission, and all those persons and Entities that have formally requested notice, pursuant to Bankruptcy Rule 2002 and the Local Rules.  Further, the Debtors, with the assistance of the Claims Agent, filed and served, on January 26, 2012, the Leasehold Mortgage Notice with which the Debtors provided notice of their intent to seek to grant mortgages, Liens or security interests as part of the Exit Pledge, the Second Lien Pledge and the Convertible Third Lien Pledge.  Transmittal and service were adequate and sufficient, and no further notice is or shall be required.  In addition, in compliance with the Solicitation Procedures Order, holders of Claims or Interests in Classes that were not entitled to vote to accept or reject the Plan were provided with certain non-voting materials approved by the Bankruptcy Court in the Solicitation Procedures Order.  Pursuant to the Solicitation Procedures Order, the Debtors were excused from distributing Solicitation Packages

K&E 21784620

to those Entities at addresses from which Disclosure Statement Hearing notices were returned as undeliverable by the United States Postal Service unless the Debtors received accurate addresses for such Entities not less than ten days before the Solicitation Date, and failure to distribute Solicitation Packages to such Entities does not constitute inadequate notice of the Confirmation Hearing or the Voting Deadline, or a violation of Bankruptcy Rule 3017(d). The procedures used to distribute Solicitation Packages to holders of Claims and Interests, notice given pursuant to the Leasehold Mortgage Notice in connection with the Exit Pledge, the Second Lien Pledge and the Convertible Third Lien Pledge, and notice given pursuant to the Plan Modifications Order, were fair, and the distribution thereof was conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations.

**G.    Voting Certification**

7.    All procedures used to tabulate the Ballots and the Master Ballots (each as defined in the Solicitation Procedures Motion) were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations.

8.    As set forth in the Plan, only holders of Claims in Classes A and K (collectively, the "***Voting Classes***") are Impaired and were eligible to vote on the Plan pursuant to section 1126 of the Bankruptcy Code. Holders of Claims in Classes B, C, and D are Unimpaired (collectively, the "***Presumed Accepting Classes***") and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, were not entitled to vote to accept or reject the Plan. Holders of Claims in Classes E, F, G, H, I, J, and L, Intercompany Claims in Class M, Interests in A&P in Class N, Intercompany Interests in Class O, and Subordinated Claims in Class P (collectively, the "***Deemed Rejecting Classes***") are

11

deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.      As evidenced by the Amended Voting Certification, Classes A and K voted to accept the Plan, without counting the votes of insiders.

10.     Based on the foregoing, and as evidenced by the Amended Voting Certification, at least one Impaired Class of Claims (excluding the acceptance by any insiders of any of the Debtors) has voted to accept the Plan in accordance with the requirements of section 1129(a)(10) of the Bankruptcy Code.

**H.    Plan Supplement**

11.     On January 14, 2012 [Docket No. 3170], as supplemented on January 19, 2012 [Docket No. 3190], January 23, 2012 [Docket No. 3219], January 27, 2012 [Docket No. 3301], February 1, 2012 [Docket No. 3317], February 3, 2012 [Docket No. 3347], February 4, 2012 [Docket Nos. 3358 & 3359], February 9, 2012 [Docket No. 3394], February 16, 2012 [Docket No. 3406], and February 26, 2012 [Docket No. 3460],  the Debtors filed the Plan Supplement with the Bankruptcy Court and served notice of such filing on the 2002 List and Master Service List.[4]  The documents contained in the Plan Supplement are integral to, form a part of and are incorporated by reference into the Plan as if set forth in full in the Plan.  The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents constitutes good and proper notice in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Procedures Order, and no other or further notice is or shall be

---

[4]   "2002 List" and "Master Service List" are defined in the *Order Establishing Certain Notice, Case Management and Administrative Procedures* [Docket No. 75].

required.  The Debtors reserve their right and are authorized, subject to approval of the Investors

to the extent provided by the Plan and the Securities Purchase Agreements, to modify the Plan

Supplement prior to the Effective Date in accordance with the terms of the Plan.

## I.   Plan Modifications

12.   The modifications to the Plan (as reflected in the *Notices of Filing of Blackline of Plan of Reorganization* [Docket Nos. 3403 & 3418] and as may have been subsequently modified and supplemented, from time to time, the "***Plan Modifications***"), and as supported in the *Declaration of Frederic F. Brace in Support of the Plan Modification Motion* [Docket No. 3405], are fair and reasonable and in the best interests of the creditors in accordance with section 1123(b)(3) of the Bankruptcy Code.  Specifically, replacing the $40 million cash pool for unsecured creditor recoveries with the Unsecured Creditor Contingent Recovery Pool (which may be created pursuant to the terms and conditions set forth in **Exhibit 2** attached hereto) (a) provides liquidity necessary for the Debtors' to consummate their reorganization, (b) allows the Debtors to obtain the Exit Facility and the Investors' $490 million capital commitment,  and (c) is a sound exercise of the Debtors' business judgment that provides the Debtors a feasible path to exit under the severe financial and time constraints of these chapter 11 cases.

## J.   Bankruptcy Rule 3016

13.   The Plan is dated and identifies the Entities submitting and filing it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement satisfied Bankruptcy Rule 3016(b).

K&E 21784620

## K.    Burden of Proof

14.    The Debtors have met their burden of proving that the Plan complies with each necessary element of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence.[5]  Further, each witness who testified on behalf of the Debtors at or in connection with the Confirmation Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

## L.    Compliance with the Requirements of Section 1129 of the Bankruptcy Code

15.    The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

### (a)    Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code

16.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

### (a)    Sections 1122 and 1123(a)(1)—Proper Classification

17.    The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into sixteen Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative and Professional Claims, DIP Facility Claims, and Priority Tax Claims, which are addressed in Article II of the Plan, and which are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).  Valid business,

---

[5]    The Debtors have not met their burden of proving section 1129(a)(8), the satisfaction of which is excused because the Debtors have met their burden of proving that the Plan complies with each applicable element of section 1129(b) of the Bankruptcy Code by a preponderance of the evidence.

14

factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not done for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among holders of Claims or Interests.

18.     In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only, respectively, Claims and Interests that are substantially similar to the other Claims and Interests within that Class.  Accordingly, the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code have been satisfied.[6]

### (b)     Section 1123(a)(2)—Specification of Unimpaired Classes

19.     Article III of the Plan specifies that Claims in Classes B, C, and D are Unimpaired under the Plan.  Accordingly, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

### (c)     Section 1123(a)(3)—Specification of Treatment of Impaired Classes

20.     Article III of the Plan specifies the treatment of each Impaired Class under the Plan, including Classes A, E, F, G, H, I, J, K, L, M, N, O, and P.  Accordingly, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

### (d)     Section 1123(a)(4)—No Discrimination

21.     Article III of the Plan provides the same treatment and opportunity for each Claim or Interest within a particular Class unless the holder of a particular Claim or Interest has agreed

---

[6]     The Plan does not contain a class of Claims consisting only of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves are reasonable and necessary for administrative convenience; therefore, section 1122(b) of the Bankruptcy Code is inapplicable.

15

to a less favorable treatment with respect to such Claim or Interest. The Plan, therefore, satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### (e)    Section 1123(a)(5)—Adequate Means for Plan Implementation

22.    The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means for the Plan's implementation, including: (a) the use of proceeds from the New Money Commitment, the Exit Facility and other funds held by the Debtors on the Effective Date; (b) the general settlement of Claims and Interests and controversies resolved pursuant to the Plan, (c) the issuance of NewCo Equity by Reorganized A&P to the Investors in consideration for the New Equity Investment; (d) the expected exemption from any applicable federal and state securities laws (including blue sky laws), registration pursuant to section 1145 of the Bankruptcy Code and Section 4(2) of the Securities Act and other requirements of the offering, issuance, and distribution of any Securities pursuant to the Plan; (e) the vesting of assets in the Reorganized Debtors; (f) the cancellation of notes, instruments, certificates and other documents pursuant to the Plan; (g) the reinstatement of Intercompany Claims and Intercompany Interests; (h) the issuance of new securities; (i) the authority to consummate post-Confirmation property sales; (j) the general authority for all corporate action necessary to effectuate the Plan; (k) the authority of the Debtors and Reorganized Debtors to amend their corporate governance documents; (l) the authority of the Reorganized Debtors to execute documents and take actions necessary or appropriate to implement the terms of the Plan and the Securities Purchase Agreements; (m) the exemption from taxes of transfers of property under the Plan pursuant to section 1146(a) of the Bankruptcy Code; (n) the appointment of officers and directors of the Reorganized Debtors; (o) the creation or continuation of compensation, pensions and benefits programs; (p) the authority of the Debtors and the Reorganized Debtors to transfer funds between and among themselves; (q) the

16

preservation of the Debtors' Causes of Action; (r) the waiver of Avoidance Actions, as set forth

in Article IV.S of the Plan; (s) the consummation of the Restructuring Transactions, including,

among others, (i) the issuance of common stock of Reorganized A&P to NewCo, (ii) the sale and

transfer of pharmaceutical prescriptions and pharmacies of the Debtors (the

"***Pharmacy/Prescription Sale Transaction***") as described in more detail in Exhibit H-1 of the

Plan Supplement (Description of Restructuring Transactions:  ScripCo Transactions) [Docket

No. 3317], and (iii) the formation of the Real Estate Subsidiary and the assignment of the

Debtors' real property leases to such Real Estate Subsidiary as described in more detail in

Exhibit H-2 (Description of Restructuring Transactions:  Formation of Real Estate Subsidiary

and Assignment of Nonresidential Real Property Leases) [Docket No. 3317], (t) the continuation

of the corporate existence of the Reorganized Debtors; (u) the reporting for all federal income

tax purposes; (v) the entry into the Management Services Agreement of Reorganized A&P or

one of its Affiliates and The Yucaipa Companies, LLC; (w) the return to the Reorganized

Debtors of all adequate assurance deposits provided by the Debtors to utility providers; (x) the

release and/or modification of Liens on the Debtors' assets (other than Liens to be created as set

forth in the Plan in connection with the Debtors' restructuring); and (y) the grant of mortgages,

Liens and security interests in connection with the Exit Facility, the New Second Lien Notes and

the New Convertible Third Lien Notes.  Accordingly, the requirements of section 1123(a)(5) of

the Bankruptcy Code have been satisfied.

### (f)        Section 1123(a)(6)—Voting Power of Equity Securities

23.    The Amended and Restated Certificate of Incorporation of NewCo contained in

Exhibit G of the Plan Supplement, and the charter of Reorganized A&P and each other Debtor,

prohibits the issuance of non-voting securities to the extent required by section 1123(a)(6) of the

17

Bankruptcy Code.  The Plan, therefore, satisfies the requirements of section 1123(a)(6) of the

Bankruptcy Code.

### (g)    Section 1123(a)(7)—Selection of Officers and Directors

24.    The identity and affiliations of the initial New Board have been disclosed prior to

the Confirmation Hearing in the Plan Supplement.  The New Board shall be reconstituted to

consist of seven (7) directors (or such larger number of directors as may be determined by the

Investors in their discretion), of whom at least five (5) directors shall be persons designated by

the Investors, one (1) person shall be designated by the UFCW (who (x) shall be an independent

director and a grocery industry expert, and (y) shall not serve on behalf of, or take directions

from, the UFCW) (the "**UFCW Board Designee**"), and one (1) person shall be the Chief

Executive Officer of the Reorganized Debtors.  The selection of the initial directors and officers

of each of the Reorganized Debtors was, is, and will be consistent with the interests of holders of

Claims and Interests and public policy.  Accordingly, the requirements of section 1123(a)(7) of

the Bankruptcy Code have been satisfied.[7]  The Reorganized A&P Charter and the Reorganized

A&P Bylaws, or one or more other controlling corporate governance documents or agreements

relating to NewCo, shall provide that the UFCW Board Designee shall serve on the New Board

for the term of the Modified Collective Bargaining Agreements with the UFCW Locals on terms

substantially consistent with the terms set forth on **Exhibit 1** attached hereto.  As set forth on

**Exhibit E** to the Plan Supplement, Mr. Lou Giraurdo is the initial UFCW Board Designee.

---

[7]    None of the Debtors is an individual; consequently, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

18

(h)    **Section 1123(b)—Discretionary Contents of the Plan**

25.    Section 1123(b) of the Bankruptcy Code provides that a plan of reorganization may include various discretionary provisions.  As set forth below, the discretionary provisions of the Plan comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, section 1123(b) of the Bankruptcy Code is satisfied.

i.    **Section 1123(b)(1)–(2)—Claims, Executory Contracts and Unexpired Leases**

26.    Article III of the Plan impairs or leaves Unimpaired, as the case may be, each Class of Claims and Interests, and Article V of the Plan provides that all of the Debtors' Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date except any Executory Contract or Unexpired Lease (a) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement, (b) previously assumed or rejected by the Debtors during the Chapter 11 Cases, (c) which is the subject of a separate motion to assume or reject pending as of the Effective Date, (d) which is an Intercompany Contract, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Final Order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement, or (e) which is otherwise assumed pursuant to the terms in the Plan.

27.    This Confirmation Order constitutes an order of the Court under sections 365 and 1123(b) of the Bankruptcy Code approving the assumptions, assumptions and assignments, or rejections described above and set forth within the Plan and Plan Supplement.  The Debtors have provided sufficient notice to each non-Debtor counter-party to the Executory Contracts and Unexpired Leases of the assumptions, assumptions and assignments or rejections described in

19

the Plan and the Plan Supplement. The Debtors have also provided adequate assurance of future performance with respect to any applicable assumption, as that term is used in section 365 of the Bankruptcy Code.

> ii.    **Section 1123(b)(3)—Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action**

28.    **Compromise and Settlement**. Pursuant to sections 105, 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of such Claims, Interests, and controversies (including the Substantive Consolidation Settlement), as well as a finding by the Bankruptcy Court that such compromise and settlement of such Claims and Interests embodied in the Plan is in the best interests of the Debtors, the Estates, and all holders of Claims and Interests, is fair, equitable, and reasonable, and is a sound exercise of the Debtors' business judgment. The settlement and compromise of Claims and Interests is the product of arm's length negotiations and is approved pursuant to Bankruptcy Rule 9019.

29.    In reaching an ultimate decision on substantive fairness, the Court considered the following factors:  (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; (e) the nature

and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's length bargaining.

30.     **Substantive Consolidation Settlement**.    The Substantive Consolidation Settlement is fair and reasonable and in the best interests of the Debtors' Estates in accordance with Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code.  All creditors will benefit from the settlement and compromise of substantive consolidation as provided by the Debtors' Plan.  The Substantive Consolidation Settlement precludes potential complex and protracted litigation.  The Substantive Consolidation Settlement was the result of arm's-length, good faith negotiations with the Creditors' Committee and is a sound exercise of the Debtors' business judgment.

31.     The Substantive Consolidation Settlement reflects the Debtors' prepetition business reality.  The Debtors' prepetition affairs were operationally and financially intertwined. Prior to 2009, the Debtors did not maintain separate financial statements but instead only maintained records on a consolidated basis.  In 2009, the Debtors created initial legal entity balance sheets that were developed on the available records and required significant estimates on assets, liabilities, and intercompany balances.  These initial legal entity balance sheets were never audited. After these initial legal entity balance sheets were created, the Debtors' prepetition accounting system did not track the particular transactions between individual entities but rather maintained a single "intercompany balance" line item for each legal entity, which line item aggregated all intercompany transactions arising for each Debtor regardless of the particular counterparty.  Therefore, the Debtors' prepetition books and records provide no ready basis to determine deconsolidated balance sheets.  Nor were the Debtors' intercompany activities, including the allocation of corporate overhead and expenses, governed by formal operating

21

agreements or service contracts. Instead, corporate overhead and similar expenses were a function of accounting policies implemented and revised by the Debtors' centralized financial and accounting teams. Disentangling these books and records would have been costly and time-consuming, and likely would have delayed the Debtors' ability to emerge from bankruptcy. These efforts also may have proved futile because they would have relied on the unaudited initial legal entity balance sheets developed in 2009.

32.     The Debtors also transacted business with their creditors as a consolidated enterprise in the ordinary course of business, and their creditors did not rely on the separate identity of any one Debtor except as properly taken into account in the Substantive Consolidation Settlement. The Debtors considered several factors in making this determination, including: (a) most of the Debtors' major vendor contracts were entered into only with A&P (b) the marketing relationships and merchandising programs were negotiated and developed with A&P and not individual Debtors; (c) the Debtors issued financial statements on a "consolidated only" basis; (d) substantially all cash disbursements were from A&P-owned bank accounts; and (e) regardless of the legal entity, the Debtors typically used the same letterhead, business cards, and check forms for business purposes.

33.     The Debtors also recognized that certain creditors could raise objections because they may have relied on the corporate separateness of particular Debtors when electing to extend credit to particular entities or may otherwise hold claims against multiple Debtor entities. Specifically, holders of Allowed Guaranteed Landlord Claims bargained for recourse against both an operating Debtor and A&P, through a guarantee. The Debtors also recognized that holders of Allowed Pension Withdrawal Claims could have asserted that substantive consolidation unfairly limited their recoveries because their Claims are entitled to recoveries on a

22

joint and several basis against each of the Debtors pursuant to the Employee Retirement Income Security Act of 1974 (as amended, "*ERISA*") and PBGC regulations.

34.    The Debtors also recognized that the costs of litigating issues related to the substantive consolidation of the Debtors' Estates was prohibitively time-consuming and expensive.  The substantive consolidation analysis is fact-intensive and could take several months of discovery and many more weeks of evidentiary hearings and related litigation.  These costs would harm the Debtors' Estates both by adding to the costs of administering these Chapter 11 Cases and by prolonging the time before the Debtors would be able to emerge from bankruptcy.

35.    The Debtors therefore negotiated with the Creditors' Committee to settle and compromise the disputes related to the substantive consolidation of the Debtors' Estates.  This Substantive Consolidation Settlement was the result of arm's-length, good faith negotiations, and was based upon both the Debtors' and the Creditors' Committee's analysis of the merits of the substantive consolidation issues.  The Substantive Consolidation Settlement avoids costly, time-consuming, and uncertain litigation to substantively consolidate the Debtors' Estates—which the Debtors believe could have been vigorously disputed by various parties in these Chapter 11 Cases.

36.    The Substantive Consolidation Settlement represents a proper determination of the partial substantive consolidation of the Debtors' assets and liabilities, for the reasons stated herein and by the Court in its bench rulings at the Confirmation Hearing.

37.    For the foregoing reasons, the Substantive Consolidation Settlement is fair and equitable and in the best interests of the Debtors' Estates and the Debtors' assets and liabilities should be partially substantively consolidated as provided in the Plan.

38.     **Debtor Release**.  The releases and discharges of Claims and Causes of Action by the Debtors described in Article VIII.D of the Plan (the "***Debtor Release***") pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a sound exercise of the Debtors' business judgment, are in the best interests of the Estates' various constituencies, are a necessary and important aspect of the Plan, and are critically important to the success of the Debtors' Plan.  The Debtor Release is reasonable and acceptable.  The Released Parties provided good and valuable consideration in exchange for the Debtor Release, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan.

39.     Each of the Released Parties afforded value to the Debtors and their Estates and aided in the reorganization process.  The Released Parties played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure (and, in the case of the Investors, are also contributing to the Plan in the form of the New Money Commitment).  Moreover, the Plan reflects the settlement and resolution of several complex issues, and the releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan.  Indeed, the release provisions in the Plan were a critical component of, and gating item for, the Debtors' ability to consummate the Securities Purchase Agreements in order to effectuate a plan of reorganization that maximizes recoveries to the Debtors' creditors and affords the Debtors the opportunity to restructure their businesses to compete effectively post-emergence.

40.     The Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, (b) a good faith settlement and compromise of the claims

24

released by the Debtor Release; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (f) appropriately narrow in scope given that it expressly excludes any causes of actions arising from acts or omissions that constitute gross negligence or willful misconduct; and (g) a bar to any of the Debtors or the Reorganized Debtors, or any party claiming by or through the Debtors or Reorganized Debtors, asserting any claim, debt, liability or cause of action released by the Debtor Release against any of the Released Parties.

41.    **Third Party Release**.  The releases of Claims and Causes of Action by holders of Claims and Interests described in Article VIII.E of the Plan (the "***Third Party Release***") are an important and necessary aspect of the Plan.  The Third Party Release is reasonable and acceptable.

42.    In consideration for the respective support (financial and otherwise) that the Released Parties have provided in connection with the Plan and the Debtors' reorganization, the Released Parties have required that the Third Party Release be included in the Plan.

43.    With respect to the Investors, the Debtors have proven that the Securities Purchase Agreements are the backbone of the Plan, without which (i) the Debtors' restructuring goals and emergence would have been unobtainable, (ii) the Plan, which provides the Debtors with their only clear path to emergence from bankruptcy, would not be confirmable or feasible, and (iii) the recoveries for many parties in interest in these cases would fail to exist.  Thus, these facts justify the approval of the Third Party Release for the Investors.  Consistent with this Court's Order approving the Debtors entry into the Securities Purchase Agreements, entered on December 6, 2011 [Docket No. 2962], the terms of the Securities Purchase Agreements are

25

(a) fair and equitable to the Debtors and the Investors, (b) were negotiated at arm's length, and in good faith by and among the Debtors, the Investors and their respective professional advisors, and (c) provide value to, are beneficial to and are necessary to preserve the Debtors' Estates, and are otherwise in the best interests of the Debtors, their Estates, shareholders, creditors, and all parties in interest. The securities issued pursuant to the Securities Purchase Agreements and the terms thereof are (x) fair and reasonable and are approved, and (y) essential elements of the Plan, and entry into and consummation of the transactions contemplated by the Securities Purchase Agreements is in the best interests of the Debtors, their Estates, and the holders of Claims and Interests in all respects. The securities to be issued pursuant to the Securities Purchase Agreements will be valid, binding and enforceable and are not in conflict with any applicable laws.

44.    The Third Party Release is:    (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by the Releasing Parties; (c) in the best interests of the Debtors and their Estates and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after notice and opportunity for hearing; (f) appropriately narrow in scope given that it expressly excludes any causes of actions that the Releasing Parties may have against any party arising out of or relating to any act or omission of a Released Party that constitutes gross negligence or willful misconduct and as otherwise limited in the Plan and herein; and (g) a bar to any of the Releasing Parties asserting any Claim, debt, liability or cause of action released by the Third Party Release against any of the Released Parties.

45.    The Third Party Release is an integral part of and critically important to the success of the Plan. Like the Debtor Release, the Third Party Release facilitated constructive

26

participation in both the Debtors' Plan and the restructuring process generally. Moreover, like the Debtor Release, the Third Party Release embodies the settlement of certain Claims with the Debtors' primary stakeholders and further reflects and implements the concessions made in the Securities Purchase Agreements.

46.    Further, such Third Party Release is appropriate because it is provided only by holders of Claims who vote to accept the Plan. As the Plan provides, a creditor gives a Third Party Release only if such creditor affirmatively votes in favor of the Plan. Creditors thus had a full opportunity to approve or disapprove the Third Party Release, thus, the Third Party Releases contained in the Plan are consensual in nature.

47.    Notwithstanding anything to the contrary in the Plan or the Confirmation Order, a creditor in a Deemed Rejecting Class who voted to accept the Plan prior to the entry of the Plan Modifications Order shall not be a Releasing Party on account of its previous accepting vote where such creditor is deemed to reject the Plan.

48.    **Exculpation**. The exculpation provisions set forth in Article VIII.G of the Plan (the "***Exculpation Provisions***") were proposed in good faith and are essential to the Plan. The Exculpation Provisions are appropriately tailored to protect the Exculpated Parties from inappropriate litigation and are hereby approved. The Exculpation Provisions shall have no effect on the liability of any Entity that is determined in a Final Order to have constituted gross negligence or willful misconduct.

49.    **Injunction**. The injunction provisions set forth in Article VIII.H of the Plan (the "***Injunction Provisions***") are essential to the Plan and are necessary to preserve and enforce the Debtor Release, the Third Party Release, and the Exculpation Provisions in Article VIII of the Plan, and are narrowly tailored to achieve that purpose.

27

50.     Each of the Debtor Release, the Third Party Release, the Exculpation Provision, and the Injunction Provisions set forth in the Plan:  (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, the Estates, and their creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors; and (f) is narrowly tailored and consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the Debtor Release, the Third Party Release, the Exculpation Provisions, and the Injunction Provisions contained in Article VIII of the Plan.

51.     **No Successor Liability**.  None of the Investors, the Reorganized Debtors and their Affiliates, or the Issuer (as defined in the Securities Purchase Agreements), NewCo (as defined herein) or ScripCo (as defined in the Plan Supplement Exhibit H-1 (Description of Restructuring Transactions:  ScripCo Transactions)), will assume, nor be deemed to assume, or in any way be responsible for, any successor liability or similar liability, with respect to the Debtors or the Debtors' operations, that are not expressly assumed or reinstated in connection with the Plan.

52.     **Preservation of Claims and Causes of Action**.  Article IV.R of the Plan appropriately provides for the preservation of the Debtors' Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding the Causes of Action

28

in the Plan are appropriate and are in the best interests of the Debtors, the Estates, and holders of Claims and Interests.

**(b)    Section 1129(a)(2)—Compliance of the Debtors with the Applicable Provisions of the Bankruptcy Code**

53.    The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.

54.    The Debtors and their respective present and former members, officers, directors, partners, employees, representatives, advisors, attorneys, professionals, affiliates, and agents solicited and tabulated votes on the Plan after the Bankruptcy Court approved the adequacy of the Disclosure Statement pursuant to Section 1125(b) of the Bankruptcy Code, and have formulated and solicited the Plan and Disclosure Statement fairly, in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Solicitation Procedures Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws, and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation Provisions and Injunction Provisions.

55.    The Debtors and their respective present and former members, officers, directors, partners, employees, representatives, advisors, attorneys, professionals, affiliates, and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not (and on account of such distributions, will not be) liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of

29

acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

    (c)    **Section 1129(a)(3)—Proposal of the Plan in Good Faith**

56.    The Debtors have proposed the Plan in good faith and not by any means forbidden by law. In so determining, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process to leading its formulation. The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement and the hearing thereon, the record of the Confirmation Hearing, and other proceedings held in the Chapter 11 Cases.

57.    The Plan is the product of extensive, good faith, arm's length negotiations between the Debtors and certain of their principal constituencies, including the Investors, holders of Second Lien Notes, and the Creditors' Committee. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of holders of Claims and Interests. Consistent with the overriding purpose of chapter 11, the Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied. Without limiting the foregoing, the Plan's classification and voting provisions are in good faith for purposes of section 1129(a)(2) of the Bankruptcy Code.

    (d)    **Section 1129(a)(4)—Bankruptcy Court Approval of Certain Payments as Reasonable**

58.    Payments made or to be made by the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and

30

incident to the Chapter 11 Cases, including the professional fee expense amounts owed pursuant to the Union Settlement Agreements as provided by Article II.A of the Plan, have been approved by, or are subject to the approval of, the Bankruptcy Court as reasonable.  Accordingly, the requirements of section 1129(a)(4) of the Bankruptcy Code are satisfied.

**(e)      Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders, and Consistency of Management Proposals with the Interests of Creditors and Public Policy**

59.      The Debtors have disclosed, in the Plan Supplement, the identity and affiliations of the individuals proposed to serve as the directors and officers of NewCo and the Reorganized Debtors, to the extent known, and the identity and nature of any compensation for any insider who will be employed or retained by the Reorganized Debtors.  The appointment of the remaining officers, if any, and the compensation of all of the Reorganized Debtors' directors will be consistent with each Reorganized Debtor's applicable constituent documents, as amended from time to time.  The proposed directors and officers for NewCo and the Reorganized Debtors are qualified, and the appointments to, or continuance in, such offices by the proposed directors and officers is consistent with the interests of holders of Claims and Interests and with public policy.  Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

**(f)      Section 1129(a)(6)—Approval of Rate Changes**

60.      The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission.  Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

**(g)      Section 1129(a)(7)—Best Interest of Creditors Test**

61.      Each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of

31

the Effective Date, that is not less than the amount that such holder would receive or retain if the

Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

62.    The liquidation analysis attached as Exhibit D to the Disclosure Statement (the

"*Liquidation Analysis*") and the other evidence related thereto in support of the Plan that was

proffered or adduced at or prior to, or in declarations in connection with, the Confirmation

Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or

evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate

methodologies and assumptions; (c) have not been controverted by other evidence; and

(d) establish that holders of Allowed Claims and Interests in every Class will recover property of

a value, as of the Effective Date, that is not less than the amount such holder would receive if the

Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

Accordingly, the Debtors have satisfied the requirements of section 1129(a)(7) of the

Bankruptcy Code.

**(h)    Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired
Classes; Acceptance of the Plan by Each Impaired Class**

63.    Classes B, C, and D are Unimpaired Classes of Claims, each of which are

conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

As set forth in the Amended Voting Certification, Classes A and K have voted to accept the Plan

and Classes E, F, G, H, I, J, L, M, N, O, and P are deemed to reject the Plan pursuant to section

1126(g) of the Bankruptcy Code.

64.    Because Classes E, F, G, H, I, J, L, M, N, O, and P are deemed to reject the Plan,

the Debtors seek Confirmation under section 1129(b), rather than section 1129(a)(8) of the

Bankruptcy Code.  Thus, although section 1129(a)(8) of the Bankruptcy Code has not been

satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan

32

does not discriminate unfairly and is fair and equitable with respect to each of the Deemed Rejecting Classes and, thus, satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

    **(i)**    **Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

65.    The Treatment of Allowed Administrative and Allowed Professional Claims, Allowed DIP Facility Claims, and Allowed Priority Tax Claims under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code. Accordingly, the requirements of section 1129(a)(9) are satisfied.

    **(j)**    **Section 1129(a)(10)—Acceptance by at Least One Impaired Class**

66.    As set forth in the Amended Voting Certification, Classes A and K voted to accept the Plan, without counting the votes of insiders. As such, there is at least one Class of Claims that is Impaired under the Plan that has accepted the Plan without including any acceptance of the Plan by insiders. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code.

    **(k)**    **Section 1129(a)(11)—Feasibility of the Plan**

67.    The evidence supporting the Plan proffered or adduced by the Debtors at, or prior to, or in declarations filed in connection with, the Confirmation Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan except as provided in the Plan; and (e) establishes that the Reorganized

K&E 21784620

Debtors will have sufficient funds available to meet their obligations under the Plan. Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been satisfied.

      **(l)**      **Section 1129(a)(12)—Payment of Bankruptcy Fees**

68.      Article XI.F of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid prior to the closing of these Chapter 11 Cases when due or as soon thereafter as practicable. Accordingly, the Debtors have satisfied the requirements of section 1129(a)(12) of the Bankruptcy Code.

      **(m)**      **Section 1129(a)(13)—Retiree Benefits**

69.      Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for "retiree benefits" (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to section 1114 of the Bankruptcy Code. Article IV.P of the Plan provides that, on and after the Effective Date (other than as set forth in Article IV.P.2), all retiree benefits shall continue to be paid in accordance with applicable law. Accordingly, the requirements of section 1129(a)(13) of the Bankruptcy Code have been satisfied.

      **(n)**      **Sections 1129(a)(14), (15) and (16)—Non-Applicability of Certain Sections**

70.      The Debtors do not owe any domestic support obligations, are not individuals, and are business corporations. Therefore, sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

      **(o)**      **Section 1129(b)—Confirmation of the Plan Over Non-Acceptance of Impaired Classes**

71.      The Plan may be confirmed  pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the requirements of section 1128(a)(8) have not been met because the

34

Debtors have demonstrated by a preponderance of the evidence that (a) the Plan satisfies all of the other requirements of section 1129(a) of the Bankruptcy Code, (b) Classes A and K have voted to accept the Plan, and (c) the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the Deemed Rejecting Classes.

72.    The discrimination in treatment among Classes I and J, and Classes E, F, G, H, and L under the Plan is not "unfair" because (a) there are reasonable, legitimate, and equitable reasons for the enhanced contingent recovery that may be provided to Classes I and J under the Plan and the amount of such contingent recoveries were determined in the context of the Substantive Consolidation Settlement, (b) the disparate treatment is necessary to achieve a successful reorganization and consummate the Plan, (c) the Debtors have acted in good faith in determining to provide for additional contingent recoveries to the holders of Classes I and J Claims compared to the contingent recoveries to Classes E, F, G, H, and L and (d) the discrimination is reasonably proportional to the rationale therefor, including the net benefits to the Debtors, their Estates, and the reorganized enterprise post-emergence, as set forth on the record.

73.    The Plan is "fair and equitable" with respect to Classes E, F, G, H, I, J, L, M, N, O, and P because no junior Class of Claims or Interests will receive or retain any property under the Plan on account of such Claims or Interests in light of, among other things, the Plan's substantive consolidation provisions and the Court's findings of fact as to the actual, substantive lack of any retained value on account of such junior Claims or Interests.

74.    The evidence supporting the Plan proffered or adduced by the Debtors at, or prior to, or in declarations filed in connection with, the Confirmation Hearing regarding the Debtors' classification and treatment of Claims and Interests:  (a) is reasonable, persuasive, credible, and

35

accurate; (b) utilizes reasonable and appropriate methodologies and assumptions; and (c) has not been controverted by other credible evidence.

75.     The Plan, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.  After the entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Deemed Rejecting Classes.

**(p)     Section 1129(c)—Only One Plan**

76.     Other than the Plan (including previous versions thereof), no other plan has been filed in these Chapter 11 Cases.  Accordingly, the Debtors have satisfied the requirements of section 1129(c) of the Bankruptcy Code.

**(q)     Section 1129(d)—Principal Purpose of the Plan Is Not the Avoidance of Taxes**

77.     No governmental unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not such avoidance.  Accordingly, the Debtors have satisfied the requirements of section 1129(d) of the Bankruptcy Code.

**(r)     Section 1129(e)—Small Business Case**

78.     None of these Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

**M.     <u>Satisfaction of Confirmation Requirements</u>**

79.     Based upon the foregoing, all other filed pleadings, documents exhibits, statements, declarations, and affidavits filed in connection with Confirmation of the Plan and all

36

evidence and arguments made, proffered, or adduced at the Confirmation Hearing, the Plan

satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**N.**     **Implementation of Other Necessary Documents and Agreements**

80.     All documents and agreements necessary to implement the Plan are essential

elements of the Plan and entry into and consummation of the transactions contemplated by each

such  document  and  agreement,  including  the  Restructuring  Transactions  and  the

Pharmacy/Prescription Sale Transaction, is in the best interests of the Debtors, the Estates, and

the  holders  of  Claims  and  Interests,  and  shall,  upon  completion  and  execution  of  the

documentation be valid, binding and enforceable and not in conflict with any federal, state or

local law.   The Debtors have exercised reasonable business judgment in determining which

agreements to enter into and have provided sufficient and adequate notice of such documents and

agreements.   The terms and conditions of such documents and agreements have been negotiated

in good faith, at arm's length, are fair and reasonable, and are reaffirmed and approved.

**O.**     **Good Faith**

81.     Based on the record in the Chapter 11 Cases, (a) the Debtors and their non-Debtor

affiliates; (b) the DIP Facility Administrative Agent and the DIP Facility Lenders; (c) the

Investors; (d) the Creditors' Committee; (e) the Unions; (f) the lenders under the Exit Facility

and the lead arrangers for the Exit Facility (such lead arrangers, the "***Lead Arrangers***"); (g) the

Second Lien Trustee and the Consenting Noteholders; and (h) with respect to each of the

foregoing  Entities  in  clauses  (a) through  (g),  such  Entities'  current  or  former  parents,

subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, employees,

members, managers, partners agents, financial and other advisors, attorneys, accountants,

professionals, investments bankers, consultants, representatives, and other Professionals have

acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in

compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all their respective activities relating to the Plan, including any action or inaction in connection with their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation Provisions.

82.    In particular, the Investors, who are established and well-regarded in the Debtors' industry, have acted and entered into the documents effectuating the Debtors' restructuring pursuant to the Plan (including the Restructuring Transactions), including the Securities Purchase Agreements, in good faith and will be deemed to continue to act in good faith if they (i) proceed to consummate the Plan and the Debtors' restructuring (including, in the discretion of the Debtors and the Investors, the Restructuring Transactions) pursuant thereto, and (ii) take the actions authorized and directed by the Confirmation Order.  The Investors fairly and reasonably negotiated the transactions effectuating the Debtors' restructuring, including the Restructuring Transactions, and the transactions contemplated in the Securities Purchase Agreements, at arm's length with the Debtors, and the resulting terms of the agreements, including the fee structure, are in the best interests of the Estates.  The Creditors' Committee actively participated in these negotiations, conducted extensive discovery, and confirmed the good faith and sound business judgment underlying the Restructuring Transactions.  The Restructuring Transactions are not tainted by self-dealing.   No insider is receiving any undue consideration pursuant to the Securities Purchase Agreements or the Plan.  Neither the Securities Purchase Agreements nor the Plan enable the Investors to purchase equity in the Reorganized Debtors on account of their current position in the Debtors' capital structure.

### P.    Executory Contracts and Unexpired Leases

83.    The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of their Executory Contracts and Unexpired Leases as set forth in Article V of the Plan, the Plan Supplement, the Confirmation Order or otherwise. Each assumption or rejection of any Executory Contract or Unexpired Lease in accordance with Article V of the Plan, the Plan Supplement, the Confirmation Order or otherwise, shall be legal, valid and binding upon: the Reorganized Debtors (if such Executory Contract or Unexpired Lease is assumed) and all non-Debtor Entities party to such Executory Contract or Unexpired Lease, all to the same extent as if such assumption or rejection had been authorized and effectuated pursuant to a separate order of the Bankruptcy Court that was entered pursuant to section 365 of the Bankruptcy Code prior to Confirmation.  The Debtors have satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption, assumption and assignment, and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan.  The Debtors have provided sufficient notice to each non-Debtor counter-party to the Executory Contracts and Unexpired Leases of the assumptions, assumptions and assignments or rejections described in the Plan and the Plan Supplement.  The Debtors have also provided adequate assurance of future performance, as that term is used in section 365 of the Bankruptcy Code, with respect to the assumption of any Executory Contract or Unexpired Lease that is to be assumed pursuant to the Plan.

84.    Subject to unresolved Cure or Assumption objections filed prior to the Cure Objection Deadline or other applicable deadline pursuant to the Plan, the Debtors have Cured or provided "adequate assurance" of Cure of any default existing or occurring prior to the date of entry of the Confirmation Order under any of the assumed Executory Contracts and Unexpired Leases, and provided compensation or "adequate assurance" of compensation to any party for

39

10-24549-rdd    Doc 3477    Filed 02/15/12    Entered 02/28/12 09:07:54    Main Document
Pg 143 of 995

any actual pecuniary loss to such party resulting from a default existing or occurring prior to the date of entry of the Confirmation Order under any of the assumed Executory Contracts or Unexpired Leases.  Upon payment of any Cure established pursuant to Article V of the Plan, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have cured any defaults that must be cured in order to permit any Debtor or Reorganized Debtor, as applicable, to assume any Executory Contract or Unexpired Lease to be assumed pursuant to the Plan.

**Q.**    **Exemption from Transfer Taxes**

85.    All transfer instruments made or delivered by the Debtors or their affiliates (including ScripCo) in relation to their restructuring pursuant to the Plan, including any transfer instruments made or delivered in relation to the Restructuring Transactions (including the Pharmacy/Prescription Sale Transaction) after entry of the Confirmation Order will be transfers under, or in contemplation of, the Plan.  Accordingly, such transfers are appropriately not subject to any transfer tax, stamp tax, mortgage tax, recording tax, or similar tax.

**R.**    **Disclosure:  Agreements and Other Documents**

86.    The Debtors have disclosed all material facts regarding: (a) the adoption of the Reorganized A&P Charter and the Reorganized A&P Bylaws; (b) the selection of the members of the New Board and certain new officers for the applicable Reorganized Debtors; (c) the Reorganized Debtors' obligations under the Exit Facility, the New Second Lien Notes, the New Convertible Third Lien Notes, the Investment Warrants, the Management Services Agreement, the Securities Purchase Agreements, and the Plan Support Agreement; (d) the sources and distribution of Cash under the Plan; (e) the terms and issuance of the NewCo Equity; (f) the cancellation of the obligations under the DIP Facility, the 1991 Indenture, the 2007 Indenture, the Second Lien Indenture, the Second Lien Notes, the Convertible Notes, the 9.125% Senior Notes, and the Quarterly Interest Bonds; (g) the adoption, execution and delivery of all contracts,

40

leases, instruments, securities, releases, indentures, and other agreements related to any of the foregoing; (h) the Plan Modifications; (i) the Unsecured Creditor Contingent Recovery Pool (if any); and (j) the adoption, execution, and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Reorganized Debtors including the Restructuring Transactions such as the Pharmacy/Prescription Sale Transaction.

## S.    Approval of the Exit Facility

87.    The Exit Facility is an essential element of the Plan, and entry into the Exit Facility is in the best interests of the Debtors, the Estates, and all holders of Claims.  The Debtors have exercised reasonable business judgment in determining to enter into the Exit Facility and have provided sufficient and adequate notice of the material terms of the Exit Facility.  The terms and conditions of the Exit Facility, including, the pledge of the Debtors' leasehold interests to secure the Exit Facility, are fair and reasonable, and the Exit Facility has been negotiated in good faith and at arm's length.  The Debtors and the Reorganized Debtors are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates relating thereto and incur and perform their obligations thereunder.

## T.    Approval of the New Securities / Restructuring Transactions

88.    The Restructuring Transactions, including the Securities Purchase Agreements, are in the best interests of the Debtors and their creditors.  The Securities Purchase Agreements provided the Debtors with their best chance of attracting competing bidders for the benefit of their Estates and creditors.  The Debtors appropriately exercised their business judgment in securing the Investors' commitment, which provided assurance to the Debtors of the sale of their business at a reasonable price, and encouraged competing offers from interested bidders.  Any party who was interested in making an investment in the Debtors had ample opportunity to do so

41

during the pendency of the Chapter 11 Cases, before and after the Debtors entered into the Securities Purchase Agreements. No other party submitted other offers at any time.

89.    The Securities Purchase Agreements are a critical component of the Plan because without them, the Debtors would not have any assurance of the sale of their business at fair value, would have no funding to pay the claims of their creditors, and ultimately would have no ability to reorganize.

90.    The Debtors (and/or NewCo as applicable) are authorized, without further approval of the Bankruptcy Court or any other party, to authorize, issue and distribute, pursuant to the Plan and the Securities Purchase Agreements, the New Second Lien Notes, the New Convertible Third Lien Notes, the NewCo Equity, the Investment Warrants, the new common stock of Reorganized A&P and any other Securities to be authorized, issued and distributed pursuant to the Plan and Securities Purchase Agreements. The Debtors or the Reorganized Debtors, as the case may be (and/or NewCo, as applicable), are authorized to execute and deliver all documentation relating to the issuance of the aforementioned Securities and the Restructuring Transactions, including the Pharmacy/Prescription Sale Transaction, and are authorized to engage in such further transactions as are determined by the Debtors (or the Reorganized Debtors) and the Investors to be necessary in the furtherance of the Plan or the Securities Purchase Agreements.

91.    The approval of the Restructuring Transactions described in Exhibit H-2 of the Plan Supplement will not impair, limit, prejudice, or alter in any way the rights of either the Debtors, the Reorganized Debtors, any of the Union Locals, benefit funds (if any), or any of the employees employed at any the Transferred Stores with respect to any of the Modified Collective Bargaining Agreements. Each of the Debtors, the Reorganized Debtors, the Union Locals,

42

relevant benefit funds (if any) and any of the employees employed at any of the Transferred Stores may enforce their respective Modified Collective Bargaining Agreement in the same manner as they could have done so had the Restructuring Transactions described in Exhibit H-2 of the Plan Supplement never taken place, the Debtors and the Reorganized Debtors not conceding that all of these parties would have the rights to enforce the Modified Collective Bargaining Agreements and reserving its rights to object to any efforts to do so.

**U.**    **Conditions Precedent to Effective Date**

92.    Each of the conditions precedent to the Effective Date, as set forth in Article IX.A. of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied, *provided*, *however*, that no waiver of the conditions precedent to the Effective Date shall have occurred without the consent of the Investors.

**V.**    **Retention of Jurisdiction**

93.    The Bankruptcy Court properly may retain jurisdiction over the matters set forth in Article X and other applicable provisions of the Plan.

\* \* \* \* \* \* \* \*

**ORDER**

Based on the foregoing, it is hereby ORDERED:

**A.**    **Order**

94.    All requirements for Confirmation of the Plan have been satisfied.  The Plan is confirmed in its entirety pursuant to section 1129 of the Bankruptcy Code.  A copy of the confirmed Plan is attached hereto as **Exhibit 3**.  The terms of the Plan and the Plan Supplement (as it may be amended from time to time in accordance with the Plan) are incorporated by reference into, and are an integral part of, this Order.

43

## B.    Objections

95.    All objections to Confirmation of the Plan have been resolved, withdrawn, waived, or settled by the Debtors prior to the entry of the Confirmation Order.  To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been resolved, withdrawn, waived, or settled prior to entry of the Confirmation Order, are not cured by the relief granted herein, or otherwise resolved as stated on the record of the Confirmation Hearing, they are hereby overruled on their merits.

## C.    Findings of Fact and Conclusions of Law

96.    The findings of fact and the conclusions of law set forth herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014.  To the extent any of the following constitute findings of fact or conclusions of law, they are adopted as such.  All findings of facts and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to the Confirmation are incorporated herein to the extent not inconsistent herewith.  To the extent any of the prior findings of fact or conclusions of law constitute an order of this Bankruptcy Court, they are adopted as such.

## D.    Rules of Construction

97.    The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Confirmation Order.

## E.    Confirmation of the Plan

98.    The Plan and Plan Supplement (as such may be expressly amended by this Confirmation Order or in accordance with the Plan) and each of their provisions are confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto,

44

and all documents and agreements related thereto (including all exhibits and attachments thereto and documents referred to in such papers), and the execution, delivery, and performance thereof, are authorized and approved as finalized, executed, and delivered.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights (subject to approval by the Investors, to the extent provided by the Plan and the Securities Purchase Agreements, and in consultation with the Creditors' Committee, the Second Lien Trustee, and the administrative agent under the Exit Facility (to the extent provided by the credit agreements governing the Exit Facility)) to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan and in all cases, in accordance with the terms and conditions of the Securities Purchase Agreements and the Exit Facility.  As set forth in the Plan, once finalized and executed, the documents comprising the Plan Supplement and all other documents contemplated by the Plan shall, as applicable, constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.

99.    The terms of the Plan, the Plan Supplement, and exhibits thereto are incorporated by reference into, and are an integral part of, the Confirmation Order.  The terms of the Plan, the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date.

45

## F.     Solicitation and Notice

100.     Notice of the Confirmation Hearing complied with the terms of the Solicitation Procedures Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The solicitation of votes on the Plan and the Solicitation Packages complied with the Solicitation and Voting Procedures, were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and were in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  The notice provided pursuant to the Leasehold Mortgage Notice in connection with the grant of mortgages, Liens, and security interests pursuant to the Exit Pledge, the Second Lien Pledge, and the Convertible Third Lien Pledge was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and other applicable law.

## G.     References to Plan Provisions

101.     The failure specifically to include or to refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in the Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed and any related documents be approved in their entirety.

## H.     Plan Classification Controlling

102.     The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not

46

necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding on the Debtors and the Reorganized Debtors except for voting purposes.

## I.    Immediate Binding Effect

103.    Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether holders of such Claims or Interests were entitled to vote, voted to accept or reject the Plan, or are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan or Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

## J.    Substantive Consolidation

104.    As a result of the Substantive Consolidation Settlement, except as otherwise provided in the Plan (including any exhibits or supplements thereto), and only for purposes of voting and distributions under the Plan:  (a) the separate Chapter 11 Cases of the Debtors shall be consolidated into the case of A&P as a single consolidated case; (b) all property of the Estate of each Debtor shall be deemed to be property of the consolidated Estates; (c) all Claims against each Estate shall be deemed to be Claims against the consolidated Estates, any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Proof of Claim filed against the consolidated Estates, and all duplicate Proofs of Claim filed on account of a Claim

47

representing a single liability shall be deemed expunged; (d) no distributions under the Plan shall

be made on account of Intercompany Claims or Intercompany Interests; (e) Allowed Claims

based on joint and several liability shall be deemed satisfied by a single distribution as if the

Claim were held solely against one Debtor Entity; (f) except as provided in the Plan with respect

to the treatment of Guaranteed Landlord Claims and Pension Withdrawal Claims, all Claims

based upon pre-petition unsecured guarantees by one Debtor in favor of any other of the Debtors

or other basis of co-Debtor liability shall be eliminated (other than guarantees existing under

assumed Executory Contracts or Unexpired Leases), and no distributions under the Plan shall be

made on account of Claims based upon such guarantees or other basis of co-Debtor liability; and

(g) for purposes of determining the availability of the right of setoff under section 553 of the

Bankruptcy Code, the Debtors shall be treated as one consolidated entity so that, subject to the

other provisions of section 553 of the Bankruptcy Code, pre-petition debts due to any of the

Debtors may be set off against the pre-petition debts of any other of the Debtors.

105.    The Plan shall not result in the merger or otherwise affect the separate legal

existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

The Plan structure shall not (a) impair the validity or enforceability of guarantees that exist under

or with respect to assumed Executory Contracts or Unexpired Leases; (b) affect valid,

enforceable, and unavoidable Liens that would not otherwise be terminated under the Plan,

except for Liens that secure a Claim that is eliminated by virtue of the Plan structure and Liens

against collateral that are extinguished by virtue of such Plan structure; (c) have the effect of

creating a Claim in a Class different from the Class in which a Claim would have been placed in

the absence of such structure; or (d) affect the obligation of each of the Reorganized Debtors,

pursuant to section 1930 of Title 28 of the United States Code, to pay quarterly fees to the Office

of the United States Trustee until such time as each particular Debtor's case is closed.

106.    As set forth in the Plan, on the Effective Date, and in exchange for the rights

provided under the Plan to each holder of an Allowed Class E, F, G, H, I, J and L Claim, each

respective Allowed Class E, F, G, H, I, J and L Claim shall be discharged.  Further, the terms of

the Unsecured Creditor Contingent Recovery Pool, as set forth on **Exhibit 2** attached hereto, are

hereby approved in their entirety and will hereafter replace the terms of the Unsecured Creditor

Contingent Recovery Pool previously set forth in the Plan (or pursuant to the Plan

Modifications).  The rights set forth in the Unsecured Creditor Contingent Recovery Pool (if

any) shall terminate pursuant to the terms set forth on **Exhibit 2** attached hereto.

## K.    **Cancellation of Notes, Instruments, Certificates and Other Documents**

107.    On the Effective Date, except as otherwise specifically provided for in the Plan or

the Securities Purchase Agreements (and except for (x) such Certificates, notes, or other

instruments or documents evidencing indebtedness or obligations of the Debtors that are

specifically Reinstated pursuant to the Plan, and (y) the common stock held by Lehman Brothers

International (Europe) ("***LBIE***") that LBIE borrowed from A&P pursuant to that certain share

lending agreement between A&P and LBIE, dated December 12, 2007, solely to the extent and

for such time as is necessary for the Reorganized Debtors in their sole and absolute discretion to

enforce their claims or causes of action against LBIE on account of such share lending

agreement but for no other purpose (provided, however, that such common stock held by LBIE

shall be automatically cancelled (without any further action of the Reorganized Debtors or any

other party) upon resolution or allowance of the LBIE claim and that, pending such automatic

cancellation, the common stock held by LBIE shall be held in form only and shall not entitle any

holder thereof to any voting, distribution or other rights of shareholders): (a) the obligations of

49

the Debtors under the DIP Facility, the 1991 Indenture, the 2007 Indenture, the Second Lien

Indenture, the Convertible Notes, the 9.125% Senior Notes, the Quarterly Interest Bonds and the

Second Lien Notes and any other Certificate, share, note, bond, indenture, purchase right, or

other instrument or document directly or indirectly evidencing or creating any indebtedness or

obligation of or ownership interest, equity or profits interest in the Debtors or any warrants,

options or other securities exercisable or exchangeable for, or convertible into, debt, equity,

ownership or profits interests in the Debtors giving rise to any Claim or Interest, and any options,

or other securities exercisable or exchangeable for, or convertible into Interests or equity of the

Debtors, shall be cancelled as to the Debtors; (b) the obligations of the Debtors under the DIP

Facility, the 1991 Indenture, the 2007 Indenture, the Second Lien Indenture, the Convertible

Notes, the 9.125% Senior Notes, the Quarterly Interest Bonds and the Second Lien Notes shall

be fully released, settled, and compromised as to the Debtors and the non-Debtor Affiliates, and

the Reorganized Debtors shall not have any continuing obligations thereunder except as

otherwise provided in the Plan; and (c) the obligations of the Debtors, the Reorganized Debtors

and the non-Debtor Affiliates, pursuant, relating, or pertaining to any agreements, indentures,

certificates of designation, bylaws, or certificate or articles of incorporation or similar documents

governing any shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants,

or other instruments or documents evidencing or creating any indebtedness or obligation of the

Debtors shall be fully released, settled, and compromised; provided, however, that

notwithstanding Consummation of the Plan or the occurrence of the Effective Date, any

indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue

in effect solely for purposes of (1) allowing holders to receive distributions under the Plan, and

50

(2) allowing and preserving the rights of the DIP Facility Administrative Agent, Second Lien Trustee, and Wilmington Trust, as provided in Articles IV and VII of the Plan.

## L.    **Approval of Exit Facility**

108.    The Exit Facility is hereby approved.  The Debtors and the Reorganized Debtors, as the case may be, are hereby authorized to enter into and execute the Exit Facility, including any and all amendments and modifications thereto and any other agreements, instruments, Certificates, or documents related thereto, and are hereby authorized to enter into and to consummate any and all transactions contemplated thereby.

109.    The Liens contemplated by and related to the Exit Facility are valid, binding and enforceable Liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the Exit Facility.  The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to or in connection with the Exit Facility are granted in good faith as an inducement to the lenders thereunder to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the intercreditor agreement and other definitive documentation executed in connection with the Exit Facility.

110.    The Reorganized Debtors and the persons and Entities granted Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

51

K&E 21784620

111.    To the extent that any holder of a Claim secured by a Lien (regardless of whether such Lien was properly perfected or whether there is any economic value to such Lien or whether such Claim is a Secured Claim) that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors or any agent under the Exit Facility, and the Debtors, the Reorganized Debtors and any agent under the Exit Facility are authorized to file or record any necessary documents or take any other necessary steps, that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests, in each case all costs and expenses in connection therewith to be paid by the Debtors or the Reorganized Debtors.

112.    Any provision in any of the Debtors' leases that purports to require the consent of the lessor thereunder in order for the applicable loan party to mortgage, pledge or collaterally assign such leases (or to restrict, prohibit or void any such mortgage, pledge or collateral assignment) is hereby (and as additionally set forth in paragraph 117 of this Confirmation Order) invalidated for the sole and limited purpose of allowing the Debtors' leasehold interests to be included in the collateral security of the Exit Facility.  The collateral agent for the Exit Facility shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date (the "***Exit Pledge***").  For the avoidance of doubt, (i) it is expressly understood that, other than with respect to the Exit Pledge, nothing herein or in the Plan shall broaden or limit any rights of the collateral agent or Exit Facility lenders (whether arising under the applicable leases or applicable law, including, but not limited to and solely by way of example, any right to cure defaults, exercise remedies or

52

compel delivery of notices from lessors) or of the lessors, in each case with respect to the Debtors' leasehold interests and (ii) to the extent any lessor under any of the Debtors' leases has not objected to the relief set forth herein or has withdrawn its objection or indicated its assent on the record at the Confirmation Hearing, such lessor shall be deemed to have consented to the Exit Pledge (as described above and including clause (i)).

113.    Notwithstanding anything to the contrary in this Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the loan documentation executed in connection with the Exit Facility or any rights or remedies related thereto.

## M.    New Securities

114.    In accordance with the terms of Article IV.J of the Plan, the Reorganized Debtors and/or NewCo shall authorize, issue and distribute, pursuant to the Plan and the Securities Purchase Agreements, the New Second Lien Notes, the New Convertible Third Lien Notes, the NewCo Equity, the Investment Warrants, the new common stock of Reorganized A&P and any other Securities to be authorized, issued and distributed pursuant to the Plan and Securities Purchase Agreements, and the Debtors and the Reorganized Debtors as the case may be shall be authorized to execute and deliver all documentation related thereto.    Upon execution and delivery by the Debtors or Reorganized Debtors, as applicable, of the foregoing documents, or issuance of the Securities related thereto, as the case may be, such documents and Securities shall be deemed validly executed and delivered and deemed to constitute valid, binding and enforceable agreements and obligations of the Reorganized Debtors and are not in conflict with any applicable laws.    Upon issuance, the NewCo Equity and the new common stock of Reorganized A&P issued to NewCo, including without limitation, any capital stock of Reorganized A&P or NewCo shall be deemed pursuant to this Order, duly authorized, validly

53

issued, fully paid and non-assessable under all applicable laws. In addition, any capital stock issued pursuant to, including by way of conversion or exercise, the Investment Warrants, the New Second Lien Notes, the New Convertible Third Lien Notes, and any documents related thereto, are hereby deemed duly authorized, and, upon issuance, are deemed validly issued, fully-paid and non-assessable under all applicable laws.

115.    The Liens contemplated by and related to the New Second Lien Notes and the New Convertible Third Lien Notes, are valid, binding and enforceable Liens on the collateral specified in the relevant agreements executed by the Reorganized Debtors in connection with the New Second Lien Notes and the New Convertible Third Lien Notes. The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to or in connection with the New Second Lien Notes and the New Convertible Third Lien Notes, are granted in good faith as an inducement to the holders of such notes to extend credit thereunder and shall be, and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, and the priorities of such Liens and security interests shall be as set forth in the intercreditor agreements and other definitive documentation executed in connection with the New Second Lien Notes and the New Convertible Third Lien Notes.

116.    The Reorganized Debtors and the persons and entities granted Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests in connection with the New Second Lien Notes and New Convertible Third Lien Notes under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and this Order, and will thereafter cooperate

54

to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such mortgages, Liens and security interests to third parties.

117.    Any provision in any of the Debtors' leases that purports to require the consent of the lessor thereunder in order for the applicable loan party to mortgage, pledge or collaterally assign such leases (or to restrict, prohibit or void any such mortgage, pledge or collateral assignment) is hereby (and as additionally set forth in paragraph 112 of this Confirmation Order) invalidated for the sole and limited purpose of allowing the Debtors' leasehold interests to be included in the collateral security of the New Second Lien Notes and New Convertible Third Lien Notes.  The collateral agent for the New Second Lien Notes and New Convertible Third Lien Notes shall be granted Liens on the collateral, including all of the Debtors' leasehold interests, which Liens shall be deemed perfected and effective as of the Effective Date (collectively, the "*Second Lien Pledge*" or the "*Convertible Third Lien Pledge*," respectively). For the avoidance of doubt, (i) it is expressly understood that, other than with respect to the Second Lien Pledge and the Convertible Third Lien Pledge, nothing herein or in the Plan shall broaden or limit any rights of the collateral agent or holders of the New Second Lien Notes or the New Convertible Third Lien Notes (in each case, whether arising under the applicable leases or applicable law, including, but not limited to and solely by way of example, any right to cure defaults, exercise remedies or compel delivery of notices from lessors) or of the lessors, in each case with respect to the Debtors' leasehold interests and (ii) to the extent any lessor under any of the Debtors' leases has not objected to the relief set forth herein or has withdrawn its objection or indicated its assent on the record at the Confirmation Hearing, such lessor shall be deemed to have consented to the Second Lien Pledge and the Convertible Third Lien Pledge (as described above and including clause (i)).

55

118.    Notwithstanding anything to the contrary in this Order or the Plan the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the documentation executed in connection with the New Second Lien Notes and New Convertible Third Lien Notes or any rights or remedies related thereto.

## N.    Registration Exemptions

119.    The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act and applicable state securities laws, and no other non-bankruptcy law applies to the solicitation.

120.    The offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein are deemed exempt from applicable federal and state securities laws (including blue sky laws), registration and other requirements, including but not limited to, the registration and prospectus delivery requirements of section 5 of the Securities Act, pursuant to section 1145 of the Bankruptcy Code and/or section 4(2) of the Securities Act, or another available exemption from registration under the Securities Act, as applicable.  In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan, any distribution from the Unsecured Creditor Contingent Recovery Pool (if any), or any and all settlement agreements incorporated therein will be transferable under the Securities Act by the recipients thereof, subject to (1) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the Reorganized A&P Charter and the Securities Purchase Agreements and (2) any other applicable regulatory and legal requirements.

## O.    Treatment of Executory Contracts and Unexpired Leases

121.    The Executory Contract and Unexpired Lease provisions of Article V of the Plan shall be, and hereby are, approved in their entirety and, accordingly, any anti-assignment

56

provisions in any Executory Contracts and Unexpired Leases assumed by the Debtors on or before the Effective Date shall be deemed invalid for purposes of assumption and assignment pursuant to section 365 of the Bankruptcy Code, including  assignment of any assumed Executory Contract and/or Unexpired Lease to any Affiliate of the Debtors on or prior to the Effective Date.  Upon payment of any Cure established pursuant to Article V of the Plan, the Debtors or Reorganized Debtors, as applicable, shall be deemed to have cured any defaults that must be cured in order to permit any Debtor or Reorganized Debtor, as applicable, to assume any Executory Contract or Unexpired Lease to be assumed pursuant to the Plan.  All Executory Contracts and Unexpired Leases rejected by the Debtors prior to, or as of the date of entry of, the Confirmation Order will not be continuing obligations of the Debtors or the Reorganized Debtors, nor will the Investors be liable in their individual capacities for any obligations under any assumed Executory Contract or Unexpired Lease.  No non-Debtor party to any assumed Executory Contract or Unexpired Lease shall be permitted to, as a result of the Debtors' restructuring pursuant to the Plan or any Debtor's failure to perform any obligation under any assumed Executory Contract or Unexpired Lease in connection therewith:  (a) cancel or terminate such assumed Executory Contract or Unexpired Lease; or (b) declare a default, claim that additional fees or other payments are due, increase or modify rights, benefits or obligations, or accelerate any obligation under such assumed Executory Contract or Unexpired Lease.

122.    The Plan Supplement will contain a schedule of "Rejected Executory Contracts and Unexpired Leases," as may be amended from time to time with the consent, as provided in the Securities Purchase Agreements, of the Investors; provided, however, that any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed in the schedule of "Assumed Executory Contracts

57

and Unexpired Leases" will be rejected on the Effective Date, notwithstanding its omission from the schedule of "Rejected Executory Contracts and Unexpired Leases." The Modified Collective Bargaining Agreements and the Other Collective Bargaining Agreements shall be assumed as provided by Article V.B.3 of the Plan.

123.    Notwithstanding anything to the contrary in the Plan, in the event that any license granted to the Debtors by a Governmental Unit, which is in effect immediately prior to the Effective Date, is considered an Executory Contract, such license shall be deemed assumed under the Plan.

## P.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

124.    The Claims resolution procedures contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.

## Q.    Provisions Governing Distributions

125.    The distribution provisions of Article VII of the Plan shall be, and hereby are, approved in their entirety. Except as otherwise set forth in the Plan, the Reorganized Debtors shall make all distributions required under the Plan.

## R.    Vesting of Assets in the Reorganized Debtors

126.    Except as specifically or expressly provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property of the Debtors' Estates, all of the Debtors' Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, interests, charges, liabilities and other encumbrances or security interests of any kind or nature, except for: (a) Liens, if any, that may be specifically granted to secure the Exit Facility, the New Second Lien Notes and the New Convertible Third Lien Notes, and if applicable, the Other Secured Claims; and (b) Liens that constitute assumed liabilities of the

58

Debtors.   On and after the Effective Date, except as otherwise provided in the Plan, each

Reorganized Debtor may operate its business and may use, acquire, or dispose of property and

compromise or settle any Claims, Interests, or Causes of Action without supervision or approval

by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy

Rules.

**S.      Discharge of Debtors**

127.    Pursuant to Article VIII.A of the Plan and section 1141(d) of the Bankruptcy

Code, except as otherwise provided in the Plan and effective as of the Effective Date:  (a) the

rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for

and in complete satisfaction, discharge, and release of all Claims and Interests of any nature

whatsoever, including any interest accrued on such Claims from and after the Commencement

Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all

holders of Claims and Interests, notwithstanding whether any such holders were entitled to vote,

failed to vote to on the Plan, voted to accept the Plan, voted to reject the Plan or were deemed to

have accepted or rejected the Plan; (c) all Claims and Interests shall be satisfied, discharged, and

released in full, and the Debtors' liability with respect thereto shall be extinguished completely,

including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and

(d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the

Reorganized Debtors, their successors and assigns, and their assets and properties any other

Claims or Interests based upon any documents, instruments, or any act or omission, transaction,

or other activity of any kind or nature that occurred prior to the Effective Date.

**T.      Subordinated Claims**

128.    Pursuant to Article VIII.B of the Plan, the allowance, classification, and treatment

of all Allowed Claims and Interests and the respective distributions and treatments under the

K&E 21784620

Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise, and any such rights shall be settled, compromised, and released pursuant to the Plan. Specifically, pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

**U.**    **Compromise and Settlement of Claims and Controversies**

129.    Pursuant to sections 105, 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan, including the Substantive Consolidation Settlement, constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The Court hereby approves the compromise or settlement of all such Claims, Interests, and controversies pursuant to the Plan (including the Substantive Consolidation Settlement) and such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 105, 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and their Estates and Causes of Action held by them against other Entities.

## V.    Settlement, Release, Injunction and Related Provisions

130.    The following releases, injunction, exculpation and related provisions set forth in

Article VIII of the Plan are hereby approved and authorized in their entirety:

### (a)    Releases by the Debtors

131.    The Debtor Release provisions set forth in Article VIII.D of the Plan are hereby

approved.  The Exit Lenders,  the lead arrangers, and the agents under the Exit Facility (each in

their capacity as such) are deemed "Released Parties" for the purposes of the Debtor Release

provided by Article VIII.D of the Plan, but not for the purposes of the Third Party Release

provided by Article VIII.E of the Plan.

### (b)    Releases by Holders of Claims and Other Releasing Parties

132.    The Third Party Release provisions set forth in Article VIII.E of the Plan are

hereby approved; *provided*, *that*, the proviso at the end of the first sentence of the first paragraph

of the Third Party Release provisions shall be amended as follows (for the avoidance of doubt,

the remainder of the Third Party Release provisions are hereby approved as set forth in Article

VIII.E of the Plan):

a. **PROVIDED, HOWEVER, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO RELEASE CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A RELEASING PARTY OR A PARTY RELEASING UNDER THIS THIRD PARTY RELEASE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY OR LIABILITIES OF ANY RELEASING PARTY; (2) ARISING UNDER THE SECURITIES PURCHASE AGREEMENTS OR THE PLAN SUPPORT AGREEMENT; (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; (4) AGAINST A PROFESSIONAL WITH RESPECT TO SUCH PROFESSIONAL'S FINAL FEE APPLICATION OR ACCRUED PROFESSIONAL COMPENSATION CLAIMS IN THESE CHAPTER 11 CASES; OR (5) UNRELATED TO THE CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES DESCRIBED IN THIS PARAGRAPH.**

61

133.    Holders of Claims or Interests, as applicable, in the Deemed Rejecting Classes shall not be bound by the Third Party Release provisions contained in Article VIII.E of the Plan, solely in their capacities as holders of a Claim or Interest in the Deemed Rejecting Classes.

**(c)    Waiver of Statutory Limitations on Releases**

134.    The Waiver of Statutory Limitations on Releases provisions set forth in Article VIII.F of the Plan are hereby approved.

**(d)    Exculpation**

135.    The Exculpation Provisions set forth in Article VIII.G of the Plan are hereby approved.  The Exit Lenders,  the lead arrangers, and the agents under the Exit Facility (each in their capacity as such) are deemed "Exculpated Parties" for the purposes of the exculpation provided by Article VIII.G of the Plan.  Notwithstanding anything in the Plan or the Confirmation Order, nothing in the Exculpation Provisions set forth in Article VIII.G of the Plan shall (a) exculpate any Professional retained in these Chapter 11 Cases (the "***Retained Professionals***") from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires acts determined by a Final Order or (b) limit the liability of the Retained Professionals to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 §1200.8 Rule 1.8(h)(1) (2009); *provided*, *that*, any party seeking to bring a claim related to the liabilities described in clauses (a) or (b) of this paragraph must first seek relief from this Court prior to bringing such a claim.

**(e)    Injunction**

136.    The Injunction Provisions set forth in Article VIII.H of the Plan are hereby approved.

## W.    Release of Liens

137.    Pursuant to Article VIII.L of the Plan, except as otherwise provided in the Plan or the Plan Supplement or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, charges, encumbrances, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## X.    Preservation of Causes of Action

138.    The provisions of the Plan Supplement related to the Debtors' Causes of Action are hereby approved in their entirety.  Subject to the Debtor Release and the Third Party Release set forth in, respectively, Article VIII.D and Article VIII.E of the Plan and the waiver in Article IV.S, unless any of the Debtors' Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Debtors' Causes of Action, whether arising before or after the Commencement Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle their Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any of the Debtors' Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all of their available**

63

**Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all of their Causes of Action against any Entity, except as otherwise expressly provided in the Plan or a Final Order.** Unless any of the Debtors' Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

139.     Further, subject to the releases set forth in Article VIII.D and Article VIII.E of the Plan and the waiver in Article IV.S of the Plan, the Reorganized Debtors reserve and shall retain the foregoing Debtors' Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtors as of the Effective Date. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

## Y.    Restructuring Transactions

140.     On or prior to the Effective Date, the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent, the administrative agent under the Exit

Facility, and the Second Lien Trustee) or the Reorganized Debtors may enter into such transactions, execute and deliver such agreements, instruments and other documents, and take any actions as may be necessary or appropriate to effect a restructuring of their respective businesses or a restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein, with the consent of the Investors. The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, asset sales, liquidations, or other corporate transactions as may be determined by the Debtors (in consultation with the Creditors' Committee, the DIP Facility Administrative Agent, the Second Lien Trustee and the administrative agent under the Exit Facility) or the Reorganized Debtors, as applicable, and the Investors, to be necessary or appropriate to implement the transactions provided for in the Securities Purchase Agreements. None of the Restructuring Transactions contemplated herein or in the Securities Purchase Agreements shall constitute a change of control under any agreement, contract or document of the Debtors or Reorganized Debtors, as applicable. Subject to the Securities Purchase Agreements, the actions to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Securities Purchase Agreements, and the Exit Facility and that satisfy the requirements of applicable law and any other terms to which the relevant entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Securities

65

Purchase Agreements, and the Exit Facility and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (d) pledging, granting of Liens or security interests over, assuming or guarantying obligations or taking such similar actions as may be necessary to preserve the rights and collateral interests of the secured creditors of the Debtors and their subsidiaries at all times prior to the effectiveness and consummation of the Plan; (e) the creation of a new holding company, as provided in the Securities Purchase Agreements, or other changes to the organizational structure of the Debtors or the Reorganized Debtors, as applicable, as determined by the Debtors or the Reorganized Debtors, as applicable, and the Investors (in consultation with the DIP Facility Administrative Agent, the administrative agent under the Exit Facility, and the Second Lien Trustee); and (f) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions or that are otherwise provided for in the Plan, the Securities Purchase Agreements or the Exit Facility.

141.    In addition, the Debtors and the Reorganized Debtors (as applicable) are hereby authorized to engage in any and all other transactions necessary to consummate the Debtors' restructuring pursuant to the Plan, including the Restructuring Transactions and the Pharmacy/Prescription Sale Transaction, as applicable, as determined by the Debtors or the Reorganized Debtors and the Investors (in consultation with the DIP Facility Administrative Agent, the administrative agent under the Exit Facility, and the Second Lien Trustee) to be necessary in the furtherance of the Plan or the Securities Purchase Agreements or the Exit

66

Facility.  The Debtors and the Reorganized Debtors (as applicable) shall be authorized to execute and deliver all documentation related thereto.

142.    Pursuant to Amendment No. 1 to Amended and Restated Securities Purchase Agreements (the "***SPA Amendment***"), which the Court approved in the Plan Modifications Order [Docket No. 3420], the Amendment to the C&S Agreement, attached as Exhibit D to the SPA Amendment, is hereby approved.

143.    The Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any State or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

## Z.    Authorization of the Pharmacy/Prescription Sale Transaction

144.    The Pharmacy/Prescription Sale Transaction, as set forth on Plan Supplement Exhibit H-1 (Description of Restructuring Transactions: ScripCo Transactions), is hereby approved and authorized in its entirety, to be implemented and consummated in the Debtors' and Reorganized Debtors' discretion (subject to the approval of the Investors to the extent provided by the Plan and the Securities Purchase Agreements), including the issuance by Reorganized A&P of new common stock to NewCo. Each and every federal, state and local government agency is directed to continue or renew all pharmacy licenses and other regulatory approvals, consents, licenses and permits of any kind for the surviving parties of the Restructuring Transactions.

67

**AA.    Compensation, Pensions and Benefits Programs**

    **(a)    Management Equity Incentive Program**

145.    The Management Equity Incentive Program provisions set forth in Article IV.P.1 of the Plan are hereby approved.

    **(b)    Employee and Retiree Benefits**

146.    The Employee and Retiree Benefits provisions set forth in IV.P.2 of the Plan are hereby approved.

    **(c)    Pensions**

147.    The Pensions provisions set forth in IV.P.3 of the Plan are hereby approved.

    **(d)    Workers' Compensation Programs**

148.    The Workers' Compensation Programs provisions set forth in IV.P.4 of the Plan are hereby approved.

**BB.    Allowance and Payment of Certain Administrative Claims**

    **(a)    Administrative Claims**

149.    The Administrative Claims provisions set forth in Article II.A of the Plan are hereby approved.

    **(b)    Professional Claims**

150.    The Professional Claims provisions set forth in Article II.B of the Plan are hereby approved.

    **(c)    DIP Facility Claims**

151.    The DIP Facility Claims provisions set forth in Article II.C of the Plan are hereby approved.

68

(d)     **Priority Tax Claims**

152.    The Priority Tax Claims provisions set forth in Article II.D of the Plan are hereby approved.

(e)     **Filing Deadlines**

153.    The deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to (i) Professional Claims, which shall be subject to the provisions of Article II.B of the Plan (i.e., all final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Confirmation Date; and after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court); (ii) Transaction Expenses and the Break-Up Fee, which shall be allowed as provided by the Securities Purchase Agreements and approved by the Securities Purchase Agreements Order; or (iii) the Administrative Claims of the Second Lien Trustee and its attorneys and advisors, which shall be Allowed to the extent provided by Article II.A of the Plan.  Any Holder of an Administrative Claim that is required to file and serve a request for payment of such Administrative Claim and that does not file and serve such a request within the time established herein **will be forever barred from asserting such Administrative Claim against any of the Debtors or their respective property and such Administrative Claim will be deemed discharged as of the Effective Date.**

## CC.    Section 1146(a) Exemption

154.    Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage

recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment (including any state, municipality, or country), and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  For the avoidance of doubt, the foregoing exemption includes sales and use taxes or any similar government assessment.  Such exemption specifically applies, without limitation, to (a) the Restructuring Transactions (including the Pharmacy/Prescription Sale Transaction, as applicable); (b) the creation of any mortgage, deed of trust, Lien or other security interest (including as part of the Exit Pledge, the New Second Lien Pledge, and the New Convertible Third Lien Pledge; (c) the making or assignment of any lease or sublease; (d) the issuance and/or distribution of NewCo Equity, any Replacement Second Lien Notes, the New Second Lien Notes, the New Convertible Third Lien Notes, the Investment Warrants and any other securities of the Debtors or the Reorganized Debtors; (e) transactions and advances contemplated by the Exit Facility, the New Second Lien Notes and the New Convertible Third Lien Notes; (f) the making or delivery of any deed, bill of sale, assignment agreement or other instrument of transfer under, in furtherance of or in connection with the Plan, the Securities Purchase Agreements, the Exit Facility or the Restructuring Transactions, including: (i) any merger agreements; (ii) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (iii) deeds; (iv) bills of sale; or (g) assignment executed in connection with the Exit Facility, the New Second Lien Notes or the New Convertible Third Lien Notes, or any Restructuring Transaction occurring pursuant to the Plan or the Securities Purchase Agreements.

K&E 21784620

## DD.    Retention of Jurisdiction

155.    Notwithstanding the entry of the Confirmation Order and the occurrence of the

Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising

out of, or related to, the Chapter 11 Cases, the Plan and the Confirmation Order pursuant to

sections 105(a) and 1142 of the Bankruptcy Code, including, jurisdiction over those matters set

forth in Article X of the Plan.

## EE.    Notice of Subsequent Pleadings

156.    Except as otherwise may be provided in the Plan or herein, notice of all

subsequent pleadings in the Chapter 11 Cases after the Effective Date shall be limited to the

following parties:  (a) the Reorganized Debtors and their counsel; (b) the United States Trustee;

(c) the administrative agent(s) for the Exit Facility; (d) the Investors; and (e) any party known to

be directly affected by the relief sought therein.

## FF.    Other Essential Documents and Agreements

157.    The Reorganized A&P Charter, the Reorganized A&P Bylaws, the New Second

Lien Notes, the New Convertible Third Lien Notes, the Investment Warrants, the Management

Services Agreement, the Securities Purchase Agreements, the Plan Support Agreement, the Exit

Facility, and any other agreements, instruments, certificates, or documents related thereto and the

transactions contemplated by each of the foregoing are approved in their entirety and, upon

execution and delivery of the agreements and documents relating thereto by the applicable

parties, such documents shall be in full force and effect and valid, binding, and enforceable in

accordance with their terms without the need for any further notice to or action, order, or

approval of this Bankruptcy Court, or other act or action under applicable law, regulation, order,

or rule.  The Debtors, and after the Effective Date, the Reorganized Debtors (and their affiliates,

including NewCo from and after the Effective Date), are authorized, without further approval of

this Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments, securities, and Certificates relating to such agreements and perform their obligations thereunder, including, pay all fees and expenses due thereunder or in connection therewith.

158.    The Debtors or Reorganized Debtors, as applicable, and upon request all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, including any filings with the Secretary of State (or comparable official) of any jurisdiction that the Debtors may deem reasonably necessary or appropriate.

## GG.    Return of Deposits

159.    Notwithstanding anything to the contrary in the Plan or in an order previously entered by the Bankruptcy Court, unless the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or Reorganized Debtors, with the reasonable consent of the Investors and the administrative agent under the Exit Facility, otherwise agree, all adequate assurance deposits provided by the Debtors to utility providers pursuant to the *Order Determining Adequate Assurance of Payment for Future Utility Services* [Docket No. 503] shall be returned to the Reorganized Debtors within ten (10) Business Days of the Effective Date.

## HH.    Governing Law

160.    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as

72

otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to Debtors or Reorganized Debtors (and their affiliates, including NewCo from and after the Effective Date), as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor or other entity, as applicable.

## II.    **Ownership and Control**

161.    The consummation of the Plan shall not, unless the Debtors expressly agree otherwise in writing, constitute a change of ownership or change in control, as such terms are used in any statute, regulation, contract, or agreement (including any Executory Contracts or Unexpired Leases assumed by the Debtors pursuant to the Plan or otherwise and any agreements related to employment, severance, termination agreements, insurance agreements, or collective bargaining agreements) in effect on the Effective Date and to which any of the Debtors is a party.

## JJ.    **Effectiveness of All Actions**

162.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of this Bankruptcy Court, or further action by the respective officers, directors, managers, members, or stockholders of the Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, members, or stockholders.

## KK.    **Approval of Consents and Authorization to Take Acts Necessary to Implement Plan**

163.    Pursuant to section 1142(b) of the Bankruptcy Code, section 303 of the Delaware General Corporation Law, and any comparable provision of the business corporation laws of any other state, on the Effective Date, a newly organized Delaware corporation to be owned by the

73

Investors ("*NewCo*") will be formed and each of the Debtors, the Reorganized Debtors and NewCo hereby is authorized and empowered to take such actions and to perform such acts as may be necessary, desirable, or appropriate to comply with or implement the Plan, the Plan Supplement, the Reorganized A&P Charter, the Reorganized A&P Bylaws, the New Second Lien Notes, the New Convertible Third Lien Notes, the Investment Warrants, the Management Services Agreement, the Securities Purchase Agreements, the Plan Support Agreement, the Exit Facility, the Exit Pledge, the New Second Lien Pledge, the Convertible Third Lien Pledge, any other Plan documents and the provisions of this Confirmation Order, including the election or appointment, as the case may be, of the New Board as contemplated in the Plan and the issuance by Reorganized A&P of new common stock to NewCo, and all documents, instruments, securities, and agreements related thereto and all annexes, exhibits, and schedules appended thereto, and the obligations thereunder shall constitute legal, valid, binding, and authorized obligations of each of the respective parties thereto, enforceable in accordance with their terms without the need for any stockholder or board of directors' approval. Each of the Debtors, the Reorganized Debtors and NewCo hereby is authorized and empowered to take such actions, to perform all acts, to make, execute, and deliver all instruments and documents, and to pay all fees and expenses as set forth in the documents relating to the Plan and including, the Plan Supplement, the Reorganized A&P Charter, the Reorganized A&P Bylaws, the New Second Lien Notes, the New Convertible Third Lien Notes, the Investment Warrants, the Management Services Agreement, the Securities Purchase Agreements, the Plan Support Agreement, the Exit Facility, any other Plan documents, and the provisions of this Confirmation Order, including documents relating to the election or appointment, as the case may be, of directors and officers of the New Board as contemplated in the Plan, and all documents, instruments, securities, and

K&E 21784620

agreements related thereto and all annexes, exhibits, and schedules appended thereto and that may be required or necessary for its performance thereunder without the need for any stockholder or board of directors' approval.  As of the Effective Date, the appropriate officers of the Reorganized Debtors and NewCo and members of the New Board are authorized and empowered to issue, execute, deliver, file, or record the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors and NewCo.  Subject to the terms of this Confirmation Order, each of the Debtors, the Reorganized Debtors, NewCo, and the officers and directors thereof are authorized to take any such actions without further corporate action or action of the directors or stockholders of the Debtors, the Reorganized Debtors or NewCo.  On the Effective Date, or as soon thereafter as is practicable, NewCo shall be organized as a Delaware corporation (if not previously organized) and shall file the Reorganized A&P Charter (and shall thereafter have all of the rights and privileges of a Reorganized Debtor for purposes of implementing the transactions contemplated in the Plan and Plan Supplement, including the Restructuring Transactions), and the Reorganized Debtors shall file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

164.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan, including the incorporation of NewCo as a Delaware corporation pursuant to the Plan, and any documents, instruments, agreements, any amendments or modifications thereto and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, the

75

Confirmation Order, and any documents, instruments, securities, agreements and any amendments or modifications thereto.

165.    Any requirements for notices, approvals or consents relating to (i) any transfer by the Debtors, Reorganized Debtors or ScripCo (as applicable) of any of their assets, (ii) any change of ownership, change in control or change of the officers or directors of the Debtors, Reorganized Debtors or ScripCo (as applicable) or (iii) any of the Restructuring Transactions (including, without limitation, the ScripCo Transactions set forth in Plan Supplement Exhibit H-1 filed with the Bankruptcy Court on or about February 1, 2012 [Docket No. 3317]) that would otherwise be applicable under any state or local law, rule or regulation (or required by any other governmental authority) shall be superseded by this Confirmation Order and are hereby waived, including, without limitation, any notice to, or approval or consent required from, the New York State Board of Pharmacy or any comparable agency of any other state in which the Debtors, Reorganized Debtors or ScripCo (as applicable) do business.

**LL.    The New Board**

166.    The identity and affiliations of the initial New Board have been disclosed prior to the Confirmation Hearing in the Plan Supplement.  The New Board shall be reconstituted to consist of seven (7) directors (or such larger number of directors as may be determined by the Investors in their discretion), of whom at least five (5) directors shall be persons designated by the Investors, one (1) person shall be the UFCW Board Designee, and one (1) person shall be the Chief Executive Officer of the Reorganized Debtors.  The Reorganized A&P Charter and the Reorganized A&P Bylaws, or one or more other controlling corporate governance documents or agreements relating to NewCo, shall provide that the UFCW Board Designee shall serve on the New Board for the term of the Modified Collective Bargaining Agreements with the UFCW Locals on terms substantially consistent with the terms set forth on **Exhibit 1** attached hereto.

76

As set forth on **Exhibit E** to the Plan Supplement, Mr. Lou Giraurdo is the initial UFCW Board

Designee.

**MM.    Modifications or Amendments**

167.    Except as otherwise specifically provided in the Plan, and subject to the Securities

Purchase Agreements, the Plan Support Agreement, the Exit Facility, and the satisfaction or

waiver of conditions precedent to the Effective Date, the Debtors reserve the right to modify the

Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not

resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in

section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on

modifications set forth in the Plan, each of the Debtors expressly reserves its rights to revoke or

withdraw or to alter, amend, or modify materially the Plan with respect to such Debtor, one or

more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the

Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or

reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in

such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such

modification or supplement shall be considered a modification of the Plan and shall be made in

accordance with Article XI.B of the Plan.  Entry of the Confirmation Order means that all

modifications or amendments to the Plan since the solicitation thereof are approved pursuant to

section 1127 of the Bankruptcy Code and do not require additional disclosure or resolicitation

under Bankruptcy Rule 3019.

**NN.    Effect of Plan and Confirmation Order on Union Settlements**

168.    Nothing in the Plan or the Confirmation Order shall override the provisions of the

Union Settlement Agreements or other Bankruptcy Court-approved settlements entered into by

the Debtors and the UFCW, the UFCW Local Unions, or the SEIU, as amended by any side letters agreed upon prior to entry of the Confirmation Order.

## OO.    Effect of Conflict Between Plan and Confirmation Order

169.    If there is any direct conflict or ambiguity between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

## PP.    Payment of Statutory Fees

170.    All fees payable pursuant to 28 U.S.C. § 1930(a), as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

## QQ.    Payment of Remaining Transaction Fees

171.    Any and all outstanding Initial Transaction Expenses or Transaction Expenses (each as defined in the Securities Purchase Agreements), or unpaid fees and expenses of the Investors and the professional advisors for the Investors, will be paid in full in Cash on the Effective Date, as provided in the Securities Purchase Agreements, and thereafter in the ordinary and usual course of normal day to day operations of the businesses of the Debtors consistent with past practice, pursuant to the Securities Purchase Agreements.

## RR.    Final DIP Order

172.    Notwithstanding anything to the contrary herein, the Final DIP Order and all terms therein shall remain in full force and effect until the occurrence of the Effective Date.

## SS.    Dissolution of Creditors' Committee

173.    On the Effective Date, the Creditors' Committee shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases; provided, however, that the Creditors'

Committee shall be deemed to remain in existence solely with respect to the final fee applications filed in connection with Article II.B of the Plan and the Creditors' Committee shall have the right to be heard on all issues relating to such final fee applications.

## TT.    Reservation of Rights

174.    Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

## UU.    Successors and Assigns

175.    The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## VV.    No Successors In Interest

176.    Except as to obligations expressly assumed pursuant to the Plan, the Reorganized Debtors shall not be deemed to be successors to the Debtors, and shall not assume, nor be deemed to assume, or in any way be responsible for, any successor liability or similar liability with respect to the Debtors or the Debtors' operations that are not expressly assumed or reinstated in connection with the Plan.  None of the Investors (or any other funds affiliated or under common management with the Investors, or any of their respective general or limited partners, members, investment advisors, managers, officers, directors, employees or representatives), the Issuer, NewCo or ScripCo shall be deemed to be successors to the Debtors

79

or Reorganized Debtors, and shall not assume, nor be deemed to assume, or in any way be responsible for, any successor liability or similar liability with respect to the Debtors, the Reorganized Debtors or their operations.

**WW.  Notice of Entry of the Confirmation Order.**

177.    In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve a notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with notice of the Confirmation Hearing; *provided*, *however*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors served the notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

178.    To supplement the notice described in the preceding sentence, within twenty (20) days of the date of the Confirmation Order the Debtors shall publish notice of entry of the Confirmation Order on one occasion in the national editions of *The Wall Street Journal* and *USA Today*.  Mailing and publication of the notice of entry of the Confirmation Order in the time and manner set forth in this paragraph shall be good, adequate and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020, and no further notice is necessary.

179.    The notice of Confirmation shall have the effect of an order of the Bankruptcy Court, shall constitute sufficient notice of the entry of the Confirmation Order to such filing and recording officers, and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

80

## XX.    Injunctions and Automatic Stay

180.    Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

181.    This Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, Interests, Causes of Action, obligations, suits, judgments, damages, demands, debts, rights, or liabilities released, exculpated or enjoined pursuant to the Plan.

## YY.    Nonseverability of Plan Provisions Upon Confirmation

182.    Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the Plan, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent), the Investors and the administrative agent under the Exit Facility (to the extent provided by the credit agreements governing the Exit Facility); and (c) nonseverable and mutually dependent.

## ZZ.    Waiver or Estoppel

183.    Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Plan Supplement, the Disclosure Statement, or papers filed with this Bankruptcy Court

81

prior to the Confirmation Date, or as applicable, on or before a bar date established by the Plan or by order of the Bankruptcy Court.

## AAA.  **Authorization to Consummate**

184.    The Debtors are authorized to consummate the Plan on any business day selected by the Debtors after the entry of the Confirmation Order, subject to satisfaction or waiver (by the required parties) of the conditions precedent to the Effective Date set forth in Article IX of the Plan.

## BBB.  **Effect of Non-Occurrence of Conditions to the Effective Date**

185.    Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A of the Plan have been satisfied or waived (as set forth in Article X.B of the Plan).  If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests or Causes of Action; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.  For the avoidance of doubt, if the Effective Date does not occur, all releases, waivers, exculpations or injunctions provided in the Plan and authorized by this Confirmation Order shall be deemed null and void.

## CCC.  **Waiver of Bankruptcy Rule 3020(e)**

186.    Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, the 14-day stay provided under Bankruptcy Rule 3020(e) is waived and the Confirmation Order shall be effective and enforceable immediately upon entry and deemed binding upon the Debtors, the Reorganized Debtors and any and all holders of Claims or Interests (irrespective of whether holders of such Claims or Interests are deemed to have accepted the Plan), all entities that are

82

parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**DDD.  Reservation of Rights With Respect to Assignment of Staten Island Lease**

187.    Notwithstanding any contrary language herein or in the Plan, all rights of the Debtors, the Reorganized Debtors and Vornado Forest Plaza L.L.C. (the "*Landlord*") as set forth in that certain stipulation for an extension of time to assume or reject the real property lease for the property located at 2040 Forest Avenue, Staten Island, NY  (Store #027-3812) (the "*Staten Island Lease*") dated January 30, 2012 (the "*Stipulation*") are reserved.  As provided in the Stipulation, the Debtors, or Reorganized Debtors, are authorized to assume and assign the Staten Island Lease subject to the resolution of the Landlord's objection [Docket No. 2319], and all parties agree that any litigation on such assumption and assignment may be timely litigated following the Confirmation Hearing and shall not be affected by the passage of the Effective Date. Notwithstanding any language to the contrary herein or in the Plan, the Debtors, the Reorganized Debtors and the Landlord shall have and retain the right to request a ruling from the Bankruptcy Court to resolve the Landlord's objection to the assumption and assignment of the Staten Island Lease and such ruling shall be deemed timely by all parties, regardless if such hearing and ruling occurs after the Effective Date.  If the Court does not enter a final, non-appealable order assuming and/or assigning the Staten Island Lease at the conclusion of the litigation referenced in this paragraph, or the Debtors or the Reorganized Debtors elect to not prosecute (to be evidenced in writing by the Reorganized Debtors) their pending motion to assume and/or assign the Staten Island Lease, the Staten Island Lease shall be deemed automatically rejected and terminated without further court order and neither the Debtors nor the Reorganized Debtors shall have any rights, interest and title to the Staten Island Lease or the

premises. The Landlord shall have the right to file a notice with the Court specifying the date of such rejection and termination. If the Staten Island Lease is rejected or terminated or otherwise deemed rejected or terminated, the Landlord's sole remedy against the Debtors or Reorganized Debtors on account of such rejection shall be limited to a general unsecured lease rejection damages claim (General Unsecured Claim treatment in Class K of the Plan) in the Chapter 11 Cases.

### EEE. <u>Resolution of United States of America's Objection</u>

188.   Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any claim of the United States of America, its agencies, departments, or agents (collectively, the "***United States***"), other than a claim against any of the Debtors or Reorganized Debtors that arose on or before the Confirmation Date; (2) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (3) any valid right of setoff or recoupment of the United States against any of the Debtors; or (4) any liability of the Debtors or Reorganized Debtors, respectively, under environmental law to any governmental unit because of such entity's ownership or operation of property, in the case of the Debtors, beginning on the Confirmation Date and through and including the Effective Date, and in the case of the Reorganized Debtors, on and after the Effective Date. For the avoidance of doubt, nothing in this paragraph shall modify the effect of Article II.A of the Plan regarding the Administrative Claims Bar Date to the extent otherwise applicable.

189.   Moreover, nothing in the Confirmation Order or the Plan shall release or exculpate any non-debtor, including any Released Parties, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties, nor shall anything in this

84

Confirmation Order or the Plan enjoin the United States from bringing any claim, suit, action or other proceeding against the Released Parties for any liability whatsoever; provided, however, that the foregoing sentence shall not (a) limit the scope of discharge granted to the Debtors or Reorganized Debtors under sections 524 and 1141 of the Bankruptcy Code or (b) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

190.    As to the United States, nothing in the Plan or Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Reorganized Debtors are entitled to under the Bankruptcy Code, if any.  The discharge, release and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to entry of the Confirmation Order, pursuing any police or regulatory action.

191.    Notwithstanding anything in the Plan otherwise, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following three treatments on account of such Claim (the particular treatment ultimately determined or agreed-to by the Debtors or Reorganized Debtors, as applicable, being subject to the Investors' reasonable consent):  (a) Cash, payable by the Debtors on the Effective Date, in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an amount agreed to by the Debtor or Reorganized Debtor (on the Effective Date), as applicable, and such holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the option of the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date), Cash in the aggregate amount of such Allowed Priority Tax Claim payable in quarterly installment payments, with interest at a rate

85

determined in accordance with section 511 of the Bankruptcy Code and section 6621(a)(2) of the Internal Revenue Code, over a period not more than five years after the Commencement Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, provided that such Allowed Priority Tax Claims of the United States shall be treated in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); provided further, that the Debtors or Reorganized Debtors, as applicable, shall provide the administrative agent under the Exit Facility reasonable prior notice of any payment to be made pursuant to clause (a) or (b) of this sentence.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date) and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**FFF.    Resolution of State of Michigan, Department of Treasury Objection**

192.    Notwithstanding any language in the Plan to the contrary or any finding of fact contained hereunder that the terms of the Plan comply with the required provisions of the Bankruptcy Code:  (i) the rights of State of Michigan, Department of Treasury (the "Michigan Treasury") as a holder of Priority Tax Claim(s) and Administrative Claim(s) against the Debtors, including entitlement to interest payments at the applicable rate as provided under 11 U.S.C. §511, shall be as provided for under the Bankruptcy Code and applicable non-bankruptcy state law; (ii) the Michigan Treasury shall also have the right to pursue the Debtors' corporate officers and certain responsible persons of the Debtors as determined under Michigan state law or as subsequently agreed to by the Reorganized Debtors and the Michigan Treasury in writing; (iii) the Michigan Treasury shall be permitted to amend their timely filed proofs of claim for a

86

period of 90 days after all tax returns are filed and processed by Michigan Treasury and, for all assessments currently under audit, for a period of 90 days after all audits are complete pursuant to Michigan law; (iv) the Michigan Treasury's timely filed proofs of claim are allowed unless objected to; (v) the Reorganized Debtors deadline to object to any proofs of claim filed by the Michigan Treasury shall be 120 days following the 90 days in which Michigan Treasury is permitted to amend their proofs of claim, unless otherwise agreed to by the parties in writing; (vi) to the extent the Reorganized Debtors seek to make installment payments on such Priority Tax Claims, the Debtors shall make equal installment payments beginning the day after the 120 days during which the Reorganized Debtors have to object to such Priority Tax Claim(s), or if an objection is made, the day after such Priority Tax Claim(s) is allowed by a Final Order of the Bankruptcy Court, and shall continue every 90 days on such Priority Tax Claims, such that the Priority Tax Claims are paid in full within five years of the Petition date, as provided under 11 U.S.C. § 1129(a)(9)(C)(ii).

**GGG. Resolution of Pine Grove Plaza Limited Partnership Objection**

193.    Nothing in the Plan or this Confirmation Order shall limit the rights of Pine Grove Plaza Limited Partnership ("***Pine Grove***") or the Reorganized Debtors to the $189,042.16 held in escrow by the Huron Title Company (the "***Escrowed Funds***") in connection with the state court proceedings pending in the Michigan Court of Appeals. Both the Reorganized Debtors and Pine Grove retain their rights to the Escrowed Funds including any state court rights of appeal relating to the preliminary injunction ordered by the St. Clair County Circuit Court. All of the rights of both the Reorganized Debtors and Pine Grove are fully reserved, including all defenses and potential actions, on account of the Escrowed Funds.

K&E 21784620

### HHH.  **Resolution of Amended Claim-Related Objections**

194.    Notwithstanding Article VI.F and VI.G and the Plan, the following parties shall be permitted to amend their otherwise timely filed Proofs of Claim for six months after the Effective Date: DDR Duval Village, L.P., DDRM Harundale Plaza, LLC, DDRM West Falls Plaza, LLC, Equity One, Inc., Basser-Kaufman 228, LLC, Basser-Kaufman 340, LLC, North Babylon Associates, Basser-Kaufman Co. of Brentwood, Hayes-Kaufman Newington Associates, Basser-Kaufman of Matawan, LLC, Basser-Kaufman of Centereach, LLC, Marlboro Plaza Associates, LLC, Basser-Kaufman 224, LLC, BDG Larkfield Associates, Mass One, LLC, Plainfield Associates, Regency Centers, L.P., U.S. Retail Partners, LLC, Macquarie CountryWide-Regency II, LLC, Woodbridge Plaza, LLC, Regency Realty Group, Inc., Brixmor Properties Group, The Hutensky Group, Federal Realty Investment Trust, Alecta Real Estate Investments, LLC, DLC Management Corp., Nellis Corporation, Inland US Management, LLC, Inland Western Bethlehem Saucon Valley DST.   After six months after the Effective Date, such parties must seek authorization from the Reorganized Debtors (which shall not be unreasonably withheld) or the Bankruptcy Court before further amending their claims.

### III.    **Resolution of Cure-Related Objections**

195.    For the avoidance of doubt, nothing herein or in the Plan shall release or discharge any unresolved Cure disputes or pending cure objections filed by parties to Executory Contracts and Unexpired Leases that have been previously assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

### JJJ.    **Resolution of Recoupment-Related Objections**

196.    Notwithstanding Article VIII.H or Article VIII.K of the Plan, all rights of recoupment and set-off shall be preserved, subject to the Bankruptcy Code and applicable state law, for the following holders of any pre-petition or post-petition claims:  Manoa Associates, M.

K&E 21784620

Plaza, L.P., Bradhurst Development Company, LLC, DDR Duval Village, L.P., DDRM Harundale Plaza, LLC, DDRM West Falls Plaza, LLC, Equity One, Inc., Basser-Kaufman 228, LLC, Basser-Kaufman 340, LLC, North Babylon Associates, Basser-Kaufman Co. of Brentwood, Hayes-Kaufman Newington Associates, Basser-Kaufman of Matawan, LLC, Basser-Kaufman of Centereach, LLC, Marlboro Plaza Associates, LLC, Basser-Kaufman 224, LLC, BDG Larkfield Associates, Mass One, LLC, Plainfield Associates, Regency Centers, L.P., U.S. Retail Partners, LLC, Macquarie CountryWide-Regency II, LLC, Woodbridge Plaza, LLC, Regency Realty Group, Inc., Brixmor Properties Group, The Hutensky Group, Federal Realty Investment Trust, Alecta Real Estate Investments, LLC, DLC Management Corp., Nellis Corporation, Closter-Grocery, LLC, GVD Commercial Properties, Inc., Greenwich Grocery Owners, LLC, Kenilworth-Grocery, LLC, GVD Commercial Properties, Inc., New Canaan-Grocery, LLC, Southhampton Grocery Owners, LLC, Benenson Howard Beach, LLC, Benenson Belle Harbor, LLC, 400 N Center St Co. LLC, 592 Ft. Washington Avenue Co. LLC, 555 S.W. 4th Ave Co LLC, Allied Jackson Heights, LLC, CBP Enterprises and such parties shall not be subject to any performance or notification requirements set forth in Article VIII.K of the Plan.

**KKK. Resolution of Lease Rejection-Related Objections**

197.    Notwithstanding the provisions of the Plan, the Debtors shall not seek to reject after the Confirmation Date the following leases that were previously assumed, as amended in certain instances, by Order of the Bankruptcy Court:

| Lease Counterparty | Property Location |
|---|---|
| CJAM Associates, LLC | 2730 Arthur Kill Road, Staten Island, NY |
| ASN 50th Street LLC | 250 West 50th Street (810-28 Eighth Avenue), New York, NY |
| Rosmar Holding Company, L.P. | 155 Islip Avenue, Islip, New York |
| Old Bridge Plaza Associates, LLC | 1043 Highway #9, Old Bridge, NJ |
| F.I. Associates | 1245 61 Street, Brooklyn, NY |

| Lease Counterparty | Property Location |
|---|---|
| Harwill Homes, Inc. | 330 Connecticut Avenue, Nowarlk, CT |
| Howell Friendship Real Estate Corp. | 4578 Route 9, Howell, NJ |
| Bernard's Plaza Associates LLC | 403 King George, Basking Ridge, NJ |
| Federal Realty Investment Trust | 64 Brick Plaza / 10 Chambers Bridge Road, Bricktown, NJ |
| FLV Greenlawn Plaza , LP C/O Federal Realty Investment Trust | 777 Pulaski Road, Greenlawn, NY |
| Federal Realty Investment Trust | 830-890 Walt Whitman Rd., Melville (Huntington), NY |
| Federal Realty Investment Trust | 1157 Rt. 46 East Parsippany, NJ |
| Brixmor Property Group | 1060 Raritan Road, Clark, NJ |
| Brixmor Property Group | 1757 Central Park Avenue, Yonkers, NY |
| Brixmor Property Group | 7162 Ridge Avenue, Philadelphia, PA |
| Brixmor Property Group | 1930 Rt. 88, Bricktown, NJ |
| Brixmor Property Group | 805 Mamaroneck, Mamaroneck, NY |
| Brixmor Property Group | 405 Nesconset, East Setauket, NY |
| Brixmor Property Group | 829 Route 82, Hopewell Junction (Fishkill), NY |
| Alecta Real Estate Investments, LLC | 2335 New Hyde Park, New Hyde Park, NY |
| DLC Management Corp. | Rt 6 and Miller Road Mahopac, NY |
| Manoa Shopping Center Associates, L.P. | 1305 Westchester Pike, Havertown, PA |
| M. Plaza, L.P. | 452, West 43rd Street, New York, NY |
| Bradhurst Development Company, LLC | 145th Street and Bradhurst Avenue, New York, NY |
| Allied Jackson Heights, LLC | 75-55, 31st Avenue, Jackson Heights, NY |
| Equity One, Inc. | 1175 Third Avenue, New York, NY |
| Basser-Kaufman 228, LLC | 531 Montauk Highway, West Babylon, NY |
| Basser-Kaufman 340, LLC | 336 North Broadway, Jericho, NY |
| North Babylon Associates C/O Basser-Kaufman | 1251 Deer Park Avenue, North Babylon, NY |
| Basser-Kaufman Co. of Brentwood | 101 Wick Rd. Brentwood, NY |
| Hayes-Kaufman Newington Associates | 40 Fenn Rd., Newington, CT |
| Basser-Kaufman of Matawan, LLC | 325 Rt. 35, Cliffwood, NJ |
| Mass One, LLC C/O Philips International | 5508 Sunrise Highway, Massapequa, NY |
| BDG Larkfield Associates | 5010-5032 Jericho Turnpike, E. Northport, NY |
| Woodbridge Plaza, LLC | 1600 St. Georges Avenue Avenel, NJ |
| DDRM West Falls Plaza, LLC | 1730 Route 46 Woodland Park, NJ |
| CBP Enterprises | 4160 Monument Road, Philadelphia, PA |
| Harrison Shopping Center, LLC | 355 Halstead Ave., Harrison, NY |

90

### LLL.    Resolution of Lease Pledge-Related Objections

198.    Except as expressly provided in paragraphs 112 and 117 of the Confirmation Order, nothing in the Plan or the Confirmation Order shall affect the rights of a party to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to a final order or pursuant to the terms of the Plan with respect to any obligations under such Executory Contract or Unexpired Lease.

### MMM.    Resolution of E. Windsor LLC Objection

199.    Notwithstanding anything in the Plan to the contrary, any claims asserted by E. Windsor, LLC ("*E. Windsor*") arising from the Debtors' rejection of that certain nonresidential real property lease for Store Number 70404, located at 501 Princeton Road #1, Hightstown, NJ, including Proof of Claim No. 6122 and Proof of Claim No. 6416, shall be consolidated as a single claim pursuant to the Substantive Consolidation Settlement (collectively, the "*Consolidated E. Windsor Claim*"), and the Consolidated E. Windsor Claim shall be classified as a Guaranteed Landlord Claim (Class I); provided that the Substantive Consolidation Settlement shall be without prejudice to (x) E. Windsor's rights to argue that the Consolidated E. Windsor Claim is not subject to the damages cap imposed by section 502(b)(6) of the Bankruptcy Code or (y) the Debtors' rights to argue that the Consolidated E. Windsor Claim is subject to the damages cap imposed by section 502(b)(6) of the Bankruptcy Code; provided further that if the Substantive Consolidation Settlement is not approved or the Debtors are not otherwise substantively consolidated, (xx) E. Windsor shall retain all rights to assert separate claims against each applicable Debtor's estate and (yy) the Debtors shall retain all rights to object to such claims.

91

### NNN.  Resolution of Chartis Objection

200.    In consideration of the provisions set forth in this paragraph and in reliance upon section IV.P.4 of the Plan relating to workers compensation agreements, those Chartis companies that filed an objection to the Plan (collectively, "***Chartis***") hereby withdraw their objection [Docket No. 3250] with prejudice.  Nothing in the Plan or the Confirmation Order shall impair or prejudice any of the following:  (a) any rights granted to Chartis in the Chartis Assumption Order [Docket No. 2374]; (b) any right of recoupment that Chartis may have; and (c) Chartis' right to request or require arbitration of any disputes between Chartis and the Debtors or the Reorganized Debtors, provided that Chartis has a right to arbitration pursuant to the applicable agreement between Chartis and the Debtors or the Reorganized Debtors.  Further, Article IV.P.4 of the Plan shall be operative with respect to any part of a proof of claim filed by Chartis only to the extent such part of a proof of claim relates to workers compensation insurance.

### OOO.  Resolution of Amoroso's Objection

201.    Notwithstanding anything to the contrary in the Plan (including Articles V.S, VI.F and VII.E), the Plan Supplement, the Confirmation Order and/or the transactions contemplated thereby, or the acceptance by Amoroso's Baking Company ("***Amoroso's***") of any distribution pursuant to the Plan, neither the Debtors, the Reorganized Debtors, the Debtors' bankruptcy estates nor any party acting on their behalf may assert section 502(d) of the Bankruptcy Code and/or otherwise utilize Avoidance Actions, whether through setoff and/or recoupment rights or otherwise, to disallow and/or avoid making payment in full of any Administrative Claims to which Amoroso's may be entitled including but not limited to Amoroso's Administrative Claims (a) under section 503(b)(9) of the Bankruptcy Code filed against Food Basics, Inc., Pathmark Stores, Inc. and Super Fresh Food Markets, Inc. in the amount of $8,681.53, $53,110.23 and $26,152.04, respectively; and (b) based on amounts incurred by the Debtors in the ordinary

92

course of business after the Petition Date, if any; provided, that, the Debtors' and Reorganized

Debtors' rights to object on any other grounds to any Claims of Amoroso's are fully reserved.

**PPP.    Resolution of Securities Class Action Litigants Objection**

202.    Notwithstanding anything in the Plan or in the Confirmation Order to the

contrary, nothing in the Plan or the Confirmation Order, except for the Third-Party Release in

Article VIII.E of the Plan, shall discharge, release or enjoin claims, or the prosecution of claims

asserted in the Securities Class Action Lawsuit (as defined in the Disclosure Statement), against

non-Debtors, or limit the rights of any non-Debtor parties in connection with any settlement, or

enforcement of any settlement or judgment, obtained in the Securities Class Action Lawsuit

against non-Debtors, including without limitation to the extent of available insurance coverage

and proceeds under any directors and officers insurance for the benefit of the non-Debtor

defendants in such litigation.

203.    Nothing in the Plan or the Confirmation Order shall affect any otherwise

applicable law or rule requiring the Debtors, the Reorganized Debtors and any transferee, and

any of their successors or assigns to provide for an adequate protocol for the preservation of the

Debtors' records or documents in connection with the Securities Class Action Lawsuit.

204.    Notwithstanding anything to the contrary contained in the Plan, the Disclosure

Statement or the Confirmation Order, if a holder of a Claim voted to accept the Plan as a member

of a Class other than a Deemed Rejecting Class, such holder will be bound by the Third Party

Release provisions contained in Article VIII.E of the Plan solely in its capacity as a holder of a

Claim voting to accept the Plan.

**QQQ.    Resolution of McKesson Objection**

205.    Notwithstanding any provision in the Plan to the contrary, (i) proofs of claim #'s

44, 49 and 50 (collectively, the "McKesson Claims") filed by McKesson Corporation, McKesson

93

Pharmacy Systems LLC and McKesson Specialty Care Distribution Joint Venture LP (collectively, "McKesson") against the Debtors shall be presumed to be allowed claims, subject to the right of the Debtors or Reorganized Debtors to object to such claims in the future on any grounds and prior to any distribution on account of such claims, (ii) McKesson reserves the right to assert, and the Debtors and Reorganized Debtors reserve the right to dispute postpetition interest in connection with the McKesson Claims, (iii) subject to any release exchanged between McKesson and the Debtors and operative immediately following the Effective Date of the Plan, McKesson reserves any rights it may have under the applicable agreements underlying the McKesson Claims to assert setoff and recoupment rights against the Debtors and (iv) the undisputed portion of the McKesson Claims entitled to administrative status pursuant to 11 U.S.C. § 503(b)(9), which amount totals Twenty Three Million Two Hundred Thousand Thirty Four Thousand Six Hundred Dollars and Eight-Five Cents ($23,234,607.85), shall be paid on or within five days after the Effective Date.

**RRR.  Resolution of Inland Objection**

206.    Articles VII.B.2(b) and VII.C.6.b(ii) of the Plan shall not apply to any proofs of claim filed by Inland US Management, LLC or Inland Western Bethlehem Saucon Valley DST.

**SSS.  Armstrong Claim**

207.    The claim set forth on Proof of Claim No. 8363 filed by Armstrong Sutton Plaza, LLC shall be an allowed Class L General Unsecured Claim in the amount of $3,125,608.10.  The claim set forth on Proof of Claim No. 8405 filed by AC I Carmel LLC shall be an allowed Class L General Unsecured Claim in the amount of $1,623,463.96.  The allowed amount of the claims filed by AC I Sterling Heights, LLC ("*Armstrong*") pursuant to Proofs of Claim No. 1594 and 1597 (the "*Consolidated Armstrong Claim*") shall be determined by a good faith reconciliation of the Consolidated Armstrong Claim undertaken by Armstrong and the Debtors (the

94

"*Armstrong Reconciliation*"); <u>provided</u> <u>that</u> (x) the Armstrong Reconciliation shall be completed 30 days following entry of this order unless otherwise agreed-to by the Debtors and Armstrong, (y) if the Debtors and Armstrong cannot agree on the reconciled amount of the Armstrong Claims following the Armstrong Reconciliation, the amount of the Armstrong Claims shall be determined by the Court after notice and a hearing, and (z) the Consolidated Armstrong Claim shall be treated as a single Class L General Unsecured Claim, which shall be without prejudice to (xx) Armstrong's rights to argue that the Consolidated Armstrong Claim is not subject to the damages cap imposed by section 502(b)(6) of the Bankruptcy Code or (yy) the Debtors' rights to argue that the Consolidated Armstrong Claim is subject to the damages cap imposed by section 502(b)(6) of the Bankruptcy Code.

### TTT. <u>Resolution of GHI and Local 863 Pension Plan Objections</u>

208.    The Debtors, Grocery Haulers, Inc. ("*GHI*") and the trustees of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America Local 863 Pension Plan (the "*Local 863 Pension Plan*") hereby stipulate and agree, which agreement, via this Confirmation Order shall constitute an Order of the Bankruptcy Court, as follows:

a.     The Debtors consent to GHI being removed as a "Non-Affiliated Participating Employer" of, the Pathmark Stores, Inc. Pension Plan ("*Pathmark Pension Plan*") (as such term is defined in the Pathmark Pension Plan), effective February 28, 2012 ("*Participation Termination Date*"). Upon the Debtors' receipt of an instrument evidencing proper corporate action by GHI to so remove itself effective on the Participation Termination Date, the Debtors shall direct the sponsor of the Pathmark Pension Plan to prepare any amendments to such plan as the sponsor determines is necessary to reflect such removal.

b.     GHI acknowledges and agrees that, on May 2, 2011 (the "*Benefit Cessation Date*"), it had terminated the employment of all employees of GHI who were otherwise eligible to accrue benefits under the Pathmark Pension Plan pursuant to the terms of the letter agreement dated August 29, 2008 between GHI and A&P (the "*2008 Letter Agreement*") regarding the transfer of assets and liabilities from the Local 863 Pension Plan to the Pathmark Pension Plan and the Spinoff and Withdrawal Liability Agreement, dated August 31, 2008, by and among the trustees of the Local 863 Pension Plan, A&P, and GHI ("*Spin-Off Agreement*"),

95

such that, after the Benefit Cessation Date, no GHI employee was accruing (or entitled to accrue) a benefit under the Pathmark Pension Plan, including pursuant to the 2008 Letter Agreement or the Spin-Off Agreement.

c.    The Debtors shall not seek payment from GHI or the Local 863 Pension Plan to fund any benefits that (a) eligible GHI employees accrued under the Pathmark Pension Plan prior to the Benefit Cessation Date or (b) were, prior to the Benefit Cessation Date, transferred to the Pathmark Pension Plan from the Local 863 Pension Plan pursuant to the Spin-Off Agreement and the 2008 Letter Agreement. Similarly neither the Debtors nor the Reorganized Debtors shall (nor shall they direct the Pathmark Pension Plan to) seek payment from GHI for other contributions to the Pathmark Pension Plan, any premiums under 29 U.S.C. 1306, any penalties related to such contributions or premiums, or any pension plan termination liabilities.

d.    GHI and the Local 863 Pension Plan shall not seek payment from the Debtors or the Reorganized Debtors for or with respect to any pension benefits accrued by any current or former employees of GHI.

e.    The following agreements are hereby rejected as of February 28, 2012:  (a) the 2008 Letter Agreement; and (b) the Spin-Off Agreement.

f.    Pursuant to Articles IV.P.3 and I.A.11 of the Plan, as of the Effective Date, the Reorganized Debtors shall continue the Pathmark Pension Plan in accordance with, and subject to, its terms, ERISA and the Internal Revenue Code, and the Reorganized Debtors shall preserve all of their rights under the terms of the Pathmark Pension Plan and the law.

g.    Absent termination of the Pathmark Plan in accordance with ERISA, the Debtors will make any missed contributions (plus applicable interest) to the Pathmark Pension Plan prior to or on the Effective Date.

h.    Notwithstanding the foregoing, GHI acknowledges and agrees that (i) GHI will take action to remove itself as a Non-Affiliated Participating Employer in the Pathmark Pension Plan effective February 28, 2012, (ii) GHI has not, since the Benefit Cessation Date, hired or re-hired any employees that might be eligible to accrue benefits under the Pathmark Pension Plan, pursuant to the 2008 Letter Agreement, the Spin-Off Agreement or otherwise, and (iii) GHI will not, until on or after March 1, 2012, hire or re-hire any employees that might be eligible to accrue benefits under the Pathmark Pension Plan, pursuant to the 2008 Letter Agreement, the Spin-Off Agreement or otherwise.

i.    The Debtors and GHI reserve their rights with respect to the allowance, amount and priority of GHI's claims filed against the Debtors.

K&E 21784620

**UUU.  Resolution of Local 1262 Pension Fund Objection**

209.    The Debtors and the Trustees of the UFCW Local 1262 and Employers Pension

Fund ("*Local 1262 Pension Fund*") hereby stipulate and agree, which agreement, via this

Confirmation Order shall constitute an Order of the Bankruptcy Court, as follows:

a.    The Debtors agree that Local 1262 Pension Fund's partial withdrawal claim
reflected in Proof of Claim Nos. 5641; 5648; 5654; 5657; 5664; 5666; 5671;
5678; 5682; 5687; 5690; 5693; 5696; 5699; 5703; 5708; 5721; 5725; 5727; 5730;
5733; 5734; 5735; 5737; 5739; 5742; 5746; 5747; 5752; 5756; 5758; 5761; 5764;
5765; 5769; 5778; 5782; 5787; 5789; 5793; 5795; 5803; 5806; 5807; 5809; 5812;
5815; 5820; 5822; 5825; 5827; 5829; and 5838, shall be deemed an Allowed
Class J Pension Withdrawal Claim (with no administrative claim component) in
the amount of $13,922,966, and such Allowed Class J Pension Withdrawal Claim
shall be entitled to the enhanced treatment given to Holders of Allowed Pension
Withdrawal Claims that vote to accept the Plan pursuant to the Substantive
Consolidation Settlement.

b.    Local 1262 Pension Fund's delinquent contribution claim reflected in Proof of
Claim No. 5715, is not included in paragraph "b.", and the parties reserve their
respective rights regarding such claim, including but not limited to the Debtors'
and Reorganized Debtors' rights to seek to disallow such claim and to object to
such claim on any grounds.

c.    The Debtors and Local 1262 Pension Fund reserve their rights regarding whether
any pre-emergence events may have given rise to a "claim" pursuant to the
Bankruptcy Code for withdrawal liability that are subject to discharge.

d.    Local 1262 Pension Fund's rights are completely preserved with respect to
arguing that Article VIII in the Plan and the corresponding provisions in the
Confirmation Order  do not apply as a matter of law to any other withdrawal
liability relating to the Local 1262 Pension Fund other than the one for which
Local 1262 Pension Fund sent the Debtors a demand for payment, including the
legal standard for determining whether such withdrawal liability is a "claim"
under section 101(5) of the Bankruptcy Code.

e.    The Debtors' and Reorganized Debtors' rights to argue that Article VIII in the
Plan and the corresponding provisions in the Confirmation Order do apply to any
such withdrawal liability, including the legal standard for determining whether
such withdrawal liability is a claim under section 101(5) of the Bankruptcy Code,
also are completely preserved.

f.    In the event of a dispute occurring, after entry of the Confirmation Order, over
Article VIII in the Plan and the corresponding provisions in the Confirmation
Order between Local 1262 Pension Fund the Debtors and Reorganized Debtors,

97

the parties' rights with respect to the appropriate jurisdiction for hearing such a matter also are reserved.

### VVV.  **Resolution of Smithfield Packing Objection**

210.    Notwithstanding any provision in the Plan or the Confirmation Order to the contrary, in full and final satisfaction of proofs of claim number 554 and 8169, The Smithfield Packing Company, Incorporated shall have an allowed administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code against the Debtors in the amount of $342,934.47, which shall be paid on or within 14 days after the Effective Date.

### WWW.      **Resolution of Barbarone Objection**

211.    In resolution of the objection of the Estate of Sophie Barbarone (the "***Barbarone Estate***"), the Barbarone Estate expressly reserves any and all rights it may have with respect to (a) that certain judgment, dated April 19, 2010 (the "***Judgment***"), the Barbarone Estate has obtained against the Debtors in the action pending in the Supreme Court of Westchester County bearing the Index No. 11414/008, including, without limitation, any and all rights and remedies the Barbarone Estate may have under applicable state law to enforce the Judgment on or after the Effective Date; and (b) the lien the Barbarone Estate has on the Debtors' interests in real property located in Westchester County, New York (the "***Westchester Properties***"), as a result of the Judgment.  Likewise, the Debtors and Reorganized Debtors, as applicable, reserve all of their rights with respect to the Judgment, including, without limitation, any right the Debtors or the Reorganized Debtors may have to pursue the appeal of the Judgment.  The lien shall be deemed to be a first priority lien, subject only to any liens that existed prior to the Judgment, and any rights the Debtors may have to contest the Judgment in state court.  Notwithstanding anything to the contrary, the Barbarone Estate will not take any action to enforce the Judgment until the Effective Date of the Debtors' Plan.

## XXX.    **Resolution of State of New Jersey, Division of Taxation Objection**

212.    Notwithstanding any language in the Plan to the contrary or any finding of fact contained hereunder that the terms of the Plan comply with the required provisions of the Bankruptcy Code: (i) the rights of State of New Jersey, Division of Taxation (the "*NJ Division*") as a holder of Priority Tax Claim(s) against the Debtors, including entitlement to interest payments at the applicable rate as provided under 11 U.S.C. §511, shall be as provided for under the Bankruptcy Code and applicable non-bankruptcy state law; (ii) the NJ Division's timely filed proofs of claim are allowed unless objected to within 180 days of the Effective Date or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court; and (iii) to the extent the Reorganized Debtors seek to make installment payments on the NJ Division's Priority Tax Claims, the Debtors shall make equal quarterly installment payments on such Priority Tax Claims, such that the Priority Tax Claims are paid in full within five years of the Petition date, as provided under 11 U.S.C. § 1129(a)(9)(C)(ii).

## YYY.    **Miscellaneous**

213.    Nothing contained in the Plan or the Confirmation Order shall affect Ahold U.S.A., Inc.'s, The Stop & Shop Supermarket Company LLC's, and Giant Food LLC's rights under section 502(j) of the Bankruptcy Code.

214.    For the avoidance of doubt, the Debtors are assuming the Modified Collective Bargaining Agreement between the Debtors and United Food and Commercial Workers International Union Local 27 ("*Local 27*") as further modified by the Side Letter of Agreement, dated January 31, 2012, between the Debtors and Local 27.

215.    The objection [Docket No. 3359] (the "*CVS Objection*") to the Plan filed by Woodward Detroit CVS, LLC ("*CVS*") is resolved by the assumption of the BLS Operating Agreement (as defined in the CVS Objection) and the assumption and reaffirmation of the A&P

99

Guaranty (as defined in the CVS Objection) as of the Effective Date.  Notwithstanding anything

to the contrary contained in the Plan or this Confirmation Order, and following the Effective

Date, A&P's obligations under the A&P Guaranty shall remain in full force and effect and shall

not be discharged, and the Injunction Provisions shall not apply to the A&P Guaranty or the

rights of CVS, and its successors and assigns, thereunder.

## ZZZ.  **Final Order**

216.    This Confirmation Order is a final order.


Dated:  February 27, 2012                    /s/Robert D. Drain
      White Plains, New York          United States Bankruptcy Judge

K&E 21784620

10-13555-mg    Doc 3477    Filed 02/25/12    Entered 02/25/12 09:07:54    Main Document
Pg 204 of 1094

# Exhibit 1

[UFCW Board Designee]

1

<u>**Corporate Governance/UFCW Board Designee**</u>[1]

The following provisions will be in effect for so long as the UFCW shall be entitled to have a UFCW Board Designee serve on the New Board.

At any annual or special meeting of stockholders of Reorganized A&P at which directors of Reorganized A&P are to be elected following the Effective Date (and at which the seat held by the UFCW Board Designee is subject to election), Reorganized A&P shall renominate the UFCW Board Designee, or nominate another individual designated by the UFCW to be the UFCW Board Designee, to be elected to the New Board, and shall use its reasonable best efforts to cause such person to be elected to such position (it being understood that efforts consistent with, and no less extensive than, in all material respects, the efforts used by Reorganized A&P to solicit proxies in favor of the election of the rest of the director nominees of the A&P  Board shall be deemed reasonable best efforts).

The UFCW shall notify Reorganized A&P of its proposed UFCW Board Designee to the New Board, in writing, with respect to any subsequent annual meeting of stockholders, no later than 60 days prior to the first anniversary of the mailing of the proxy statement related to the previous year's annual meeting of stockholders, together with all information concerning such nominee reasonably requested by Reorganized A&P.

In the event of the death, disability, disqualification, resignation, removal or failure to be elected of the UFCW Board Designee, the New Board will promptly elect to the New Board a replacement individual designated by the UFCW to fill the resulting vacancy, which individual shall then be deemed the UFCW Board Designee.  The UFCW Board Designee will have the same powers, rights and duties as the other members of the New Board, and Reorganized A&P will indemnify the UFCW Board Designee to the same extent it provides indemnification to other members of the A&P Board, including the provision of directors and officers liability insurance.

Nothing herein or in the Reorganized A&P Bylaws or in the Reorganized A&P Charter shall be require or be deemed to require that the UFCW, Reorganized A&P, or any affiliate thereof, act or be in violation of any applicable provision of law, legal duty or requirement or stock exchange or stock market rule.

The Reorganized A&P Charter and Reorganized A&P Bylaws shall provide that if, at any time, a publicly-held parent company of A&P were to be formed (the "***Parent Company***"), the rights of the UFCW to appoint a UFCW Board Designee to the New Board pursuant to the Reorganized A&P Charter and the Reorganized A&P Bylaws, and the corresponding obligations of A&P

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* to which this Corporate Governance/UFCW Board Designee Summary is attached as **Exhibit 1**.

thereunder, will apply, *mutatis mutandis*, to the right of the UFCW  to appoint a UFCW director
to the board of directors of the Parent Company and the corresponding obligations of the Parent
Company.

3

**Exhibit 2**

**Unsecured Creditor Contingent Recovery Pool**[1]

Any consideration that may be distributable to holders of Unsecured Claims in Classes E, F, G, H, I, J and L from the Unsecured Creditor Contingent Recovery Pool shall be provided solely as set forth herein.  Within one hundred twenty (120) days of the closing of a transaction involving the sale for Cash of all or substantially all of the assets or common stock of Reorganized A&P or its newly formed holding company (the "Sale Transaction") that is consummated no later than the fifth (5th) anniversary of the Effective Date, Reorganized A&P shall distribute Pro Rata, to record holders (as of the Distribution Record Date) of Allowed Unsecured Claims in Classes E, F, G, H, I, J and L, Cash in an amount as follows:

(a) $10 million, if the net Cash proceeds of the Sale Transaction distributable to the then existing equity holders of Reorganized A&P or its parent holding company on account of their equity interests (excluding any contingent consideration) (such net Cash amount, the "Equity Proceeds") equal or exceed $800 million, but are less than $1.1 billion;

(b) $20 million, if the Equity Proceeds equal or exceed $1.1 billion, but are less than $1.3 billion;

(c) $30 million, if the Equity Proceeds equal or exceed $1.3 billion, but are less than $1.5 billion; and

(d) $40 million, if the Equity Proceeds equal or exceed $1.5 billion (each of the payments in (a) through (d), a "Contingent Payment" and, collectively, the "Contingent Payments").

In determining the amount of Equity Proceeds of a Sale Transaction: (i) such Equity Proceeds shall be determined net of (A) any amounts payable or distributable to equity holders of Reorganized A&P or its parent holding company with respect to any equity securities issued after the Effective Date (other than equity securities issued upon conversion of New Convertible Third Lien Notes), (B) the value of any business acquired by Reorganized A&P or its parent holding company after the Effective Date (with such value to be determined in good faith by the board of Reorganized A&P or such parent holding company), (C) any costs and expenses incurred by or for the account of such equity holders in connection with the Sale Transaction, and (D) the amount, if any, of the Contingent Payment, and (ii) amounts distributable with respect to the New Convertible Third Lien Notes in connection with a Sale Transaction shall be

---

[1]     Capitalized terms used but not defined herein shall have the meanings set forth in the *Debtors' First Amended Joint Plain of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, filed on February 17, 2012 [Docket No. 3417].

treated as a distribution with respect to equity interests only to the extent the aggregate amount distributable on account of the New Convertible Third Lien Notes exceeds the total principal amount of, and accrued interest on, the then-outstanding New Convertible Third Lien Notes.

The right of record holders (as of the Distribution Record Date) of Allowed Unsecured Claims in Classes E, F, G, H, I, J and L, to receive a Contingent Payment will be non-transferable and will be extinguished without any payment on the fifth (5th) anniversary of the Effective Date, or earlier upon (i) a Sale Transaction where the level of Equity Proceeds triggering a Contingent Payment is not achieved, or is achieved and a Contingent Payment is paid, (ii) a liquidity transaction other than a Sale Transaction, including, but not limited to, an initial public offering of common stock or a leveraged recapitalization, or (iii) a change of control that does not involve a Sale Transaction, including a change of control in which Cash represents less than 90% of the total consideration payable to the then existing equity holders of Reorganized A&P or its parent holding company on account of their equity interests.

The funding and payment of the Unsecured Creditor Contingent Recovery Pool shall be obligations solely of Reorganized A&P and not of any subsidiary, affiliate or equity holder of Reorganized A&P or any other person or entity.

The Bankruptcy Court shall retain exclusive jurisdiction over all disputes related to the Contingent Payments, even after the closing of the Chapter 11 Cases, and any such disputes shall be heard solely in the Bankruptcy Court. Any party receiving a Contingent Payment agrees to submit to the venue and jurisdiction of the Bankruptcy Court and the entry of binding Final Orders by the Bankruptcy Court.

**<u>Exhibit F</u>**

James H.M. Sprayregen, P.C.
Paul M. Basta
Ray C. Schrock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

- and -

James J. Mazza, Jr.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone       (312) 862-2000
Facsimile:       (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,[1] | ) ) | Case No. 10-24549 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Dated:  February 17, 2012

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  The Great Atlantic & Pacific Tea Company, Inc. (0974); 2008 Broadway, Inc. (0986); AAL Realty Corporation (3152); Adbrett Corporation (5661); Amsterdam Trucking Corporation (1165); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Bergen Street Pathmark, Inc. (1604); Best Cellars DC Inc. (2895); Best Cellars Inc. (9550); Best Cellars Licensing Corp. (2896); Best Cellars Massachusetts, Inc. (8624); Best Cellars VA Inc. (1720); Bev, Ltd. (9046); Borman's Inc. (9761); Bridge Stuart, Inc. (8652); Clay-Park Realty Co., Inc. (0902); Compass Foods, Inc. (0653); East Brunswick Stuart, LLC (9149); Farmer Jack's of Ohio, Inc. (5542); Food Basics, Inc.(1210); Gramatan Foodtown Corp. (5549); Grape Finds At DuPont, Inc. (9455); Grape Finds Licensing Corp. (7091); Grapefinds, Inc. (4053); Greenlawn Land Development Corp. (7062); Hopelawn Property I, Inc. (6590); Kohl's Food Stores, Inc. (2508); Kwik Save Inc. (8636); Lancaster Pike Stuart, LLC (9158); LBRO Realty, Inc. (1125); Lo-Lo Discount Stores, Inc. (8662); Mac Dade Boulevard Stuart, LLC (9155); McLean Avenue Plaza Corp. (5227); Milik Service Company, LLC (0668); Montvale Holdings, Inc. (6664); North Jersey Properties, Inc. VI (6586); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge, LLC (5965); SEG Stores, Inc. (4940); Shopwell, Inc. (3304); Shopwell, Inc. (1281); Spring Lane Produce Corp. (5080); Super Fresh/Sav-A-Center, Inc. (0228); Super Fresh Food Markets, Inc. (2491); Super Market Service Corp. (5014); Super Plus Food Warehouse, Inc. (9532); Supermarkets Oil Company, Inc. (4367); The Food Emporium, Inc. (3242); The Old Wine Emporium of Westport, Inc. (0724); The South Dakota Great Atlantic & Pacific Tea Company, Inc (4647); Tradewell Foods of Conn., Inc. (5748); Upper Darby Stuart, LLC (9153); and Waldbaum, Inc. (8599).  The location of the Debtors' corporate headquarters is Two Paragon Drive, Montvale, New Jersey 07645.

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................................................1

**Article I. DEFINED TERMS AND RULES OF INTERPRETATION ....................................1**
    A.    Defined Terms ...........................................................................1
    B.    Rules of Interpretation ................................................................18

**Article II. ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, DIP**
**FACILITY CLAIMS, PRIORITY TAX CLAIMS AND UNITED STATES**
**TRUSTEE STATUTORY FEES ................................................................19**
    A.    Administrative Claims..................................................................19
    B.    Professional Claims ....................................................................21
    C.    DIP Facility Claims.....................................................................22
    D.    Priority Tax Claims.....................................................................22

**Article III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND**
**INTERESTS ........................................................................................22**
    A.    Substantive Consolidation Settlement ...........................................22
    B.    Classification of Claims and Interests............................................24
    C.    Treatment of Classes of Claims and Interests...................................25
    D.    Special Provision Governing Vote Tabulation ..................................32
    E.    Special Provision Governing Unimpaired Claims...............................33

**Article IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ...............................33**
    A.    Use of Proceeds from New Money Commitment and Exit Facility .....................33
    B.    General Settlement of Claims and Interests......................................33
    C.    NewCo Equity............................................................................33
    D.    Registration Exemptions...............................................................33
    E.    Vesting of Assets in the Reorganized Debtors ...................................34
    F.    Cancellation of Notes, Instruments, Certificates and Other Documents ..............34
    G.    Reinstatement of Intercompany Claims and Interests ..........................35
    H.    Issuance of New Securities; Execution of Plan Documents ...................35
    I.    Post-Confirmation Property Sales...................................................35
    J.    Corporate Action.......................................................................35
    K.    Certificate of Incorporation and Bylaws..........................................36
    L.    Effectuating Documents, Further Transactions ..................................36
    M.    Section 1146(a) Exemption..........................................................36
    N.    Directors and Officers of Reorganized A&P ......................................37
    O.    Officers and Directors of Reorganized Debtors Other Than Reorganized
        A&P .......................................................................................37
    P.    Compensation, Pensions and Benefits Programs.................................37
    Q.    Intercompany Account Settlement..................................................38
    R.    Preservation of Rights of Action....................................................39
    S.    Avoidance Actions.....................................................................39

i

| | | |
|---|---|---|
| T. | Restructuring Transactions | 40 |
| U. | Corporate Existence | 41 |
| V. | Tax Reporting Matters | 41 |
| W. | Management Services Agreement | 41 |
| X. | Adequate Assurance Deposits | 41 |

**Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................................41**

| | | |
|---|---|---|
| A. | Rejection of Executory Contracts and Unexpired Leases | 41 |
| B. | Assumption of Executory Contracts and Unexpired Leases | 42 |
| C. | Indemnification Obligations | 44 |
| D. | Insurance Policies | 44 |
| E. | Objections to Assumption of Executory Contracts and Unexpired Leases Including Cure of Defaults | 44 |
| F. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 46 |
| G. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 46 |
| H. | Contracts, Intercompany Contracts, and Leases Entered Into After the Commencement Date | 47 |
| I. | Reservation of Rights | 47 |

**Article VI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS ........................................................................................47**

| | | |
|---|---|---|
| A. | Allowance of Claims and Interests | 47 |
| B. | Claims and Interests Administration Responsibilities | 48 |
| C. | Estimation of Claims and Interests | 48 |
| D. | Expungement or Adjustment to Paid, Satisfied, or Superseded Claims and Interests | 48 |
| E. | No Interest | 48 |
| F. | **DISALLOWANCE OF CLAIMS OR INTERESTS** | 49 |
| G. | Amendments to Claims | 49 |
| H. | No Distributions Pending Allowance | 49 |
| I. | Distributions After Allowance | 49 |
| J. | Disputed Claims Reserve | 50 |
| K. | Distributions Following Resolution of All Claims | 50 |

**Article VII. PROVISIONS GOVERNING DISTRIBUTIONS ........................................50**

| | | |
|---|---|---|
| A. | Distributions on Account of Claims Allowed as of the Effective Date | 50 |
| B. | Distributions on Account of Claims Allowed After the Effective Date | 52 |
| C. | Delivery of Distributions | 53 |
| D. | Claims Paid or Payable by Third Parties | 55 |
| E. | Setoffs | 56 |
| F. | Allocation Between Principal and Accrued Interest | 56 |

**Article VIII. EFFECT OF CONFIRMATION OF THE PLAN ........................................57**

| | | |
|---|---|---|
| A. | **DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS** | 57 |
| B. | Subordinated Claims | 57 |

**TABLE OF CONTENTS (cont'd)**

C.    Compromise and Settlement of Claims and Controversies ....................................57
D.    **RELEASES BY THE DEBTORS** ........................................................................58
E.    **RELEASES BY HOLDERS OF CLAIMS** ...........................................................59
F.    **WAIVER OF STATUTORY LIMITATIONS ON RELEASES** ....................62
G.    **EXCULPATION** ..................................................................................................62
H.    **INJUNCTION** .......................................................................................................63
I.    Protection Against Discriminatory Treatment ......................................................64
J.    Indemnification ....................................................................................................64
K.    Recoupment ..........................................................................................................65
L.    Release of Liens....................................................................................................65
M.    Reimbursement or Contribution ...........................................................................65

**Article IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN............65**
A.    Conditions Precedent to the Effective Date ..........................................................65
B.    Waiver of Conditions Precedent ...........................................................................66
C.    Effect of Non-Occurrence of Conditions to Consummation ................................67

**Article X. RETENTION OF JURISDICTION** ....................................................................**67**

**Article XI. MISCELLANEOUS PROVISIONS** ...................................................................**69**
A.    No Stay of Confirmation Order .............................................................................69
B.    Modification of Plan .............................................................................................69
C.    Revocation or Withdrawal of Plan ........................................................................70
D.    Confirmation of the Plan.......................................................................................70
E.    Additional Documents ..........................................................................................70
F.    Payment of Statutory Fees ....................................................................................71
G.    Dissolution of Creditors' Committee....................................................................71
H.    Reservation of Rights............................................................................................71
I.    Successors and Assigns.........................................................................................71
J.    Service of Documents ...........................................................................................71
K.    **TERM OF INJUNCTIONS OR STAYS**...........................................................72
L.    Entire Agreement ..................................................................................................73
M.    Plan Supplement Exhibits.....................................................................................73
N.    Severability ...........................................................................................................73

**INTRODUCTION**[2]

The Great Atlantic & Pacific Tea Company, Inc. and the other Debtors in the above-captioned Chapter 11 Cases jointly propose the following Plan. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of potential litigation regarding certain issues, including, without limitation, the substantive consolidation of the Debtors' estates and the resolution of outstanding Claims against, and Interests in, the Debtors. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III hereof shall be deemed to apply to all Debtors, unless otherwise specified. Reference is made to the Disclosure Statement (as defined herein), distributed contemporaneously herewith, and all exhibits to the Disclosure Statement. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, will govern, provided, that in the event of any inconsistency between this Plan and the Securities Purchase Agreements, the relevant provision of the Securities Purchase Agreements, as it relates to such inconsistency, will govern.

Nothing in the Disclosure Statement, this Plan, the Plan Supplement or the exhibits attached thereto shall be modified, amended or supplemented without the express consent of the Investors. Notwithstanding anything in the Plan to the contrary, any decision, option, consent right or election (including with respect to Claims and distributions on Claims) shall be subject to the consent of the Investors, including but not limited to any decision to Reinstate a Claim or Interest.

## ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

A.    Defined Terms

1.    5.125% Convertible Notes:    The 5.125% convertible senior notes, with an aggregate face amount of $165,000,000, due in 2011 and issued pursuant to the 2007 Indenture.

2.    5.125% Convertible Note Claims:    Any and all Claims arising under the 5.125% Convertible Notes or the 2007 Indenture with respect to the 5.125% Convertible Notes.

3.    6.75% Convertible Notes: The 6.75% convertible senior notes, with an aggregate face amount of $255,000,000, due in 2012 and issued pursuant to the 2007 Indenture.

4.    6.75% Convertible Note Claims:    Any and all Claims arising under the 6.75% Convertible Notes or the 2007 Indenture with respect to the 6.75% Convertible Notes.

5.    9.125% Senior Notes:    The 9.125% senior notes, with an aggregate face amount of $12,840,000, due in 2011 and issued pursuant to the 1991 Indenture.

---

[2]    Capitalized terms used in this Introduction are defined in ARTICLE I herein.

6.  <u>9.125% Senior Note Claims</u>:  Any and all Claims arising under the 9.125% Senior Notes or the 1991 Indenture with respect to the 9.125% Senior Notes.

7.  <u>1991 Indenture</u>:  That certain indenture dated as of January 1, 1991, as amended, supplemented, or modified from time to time, by and between A&P, as issuer, and Wilmington Trust.

8.  <u>2007 Indenture</u>:  That certain indenture dated as of December 18, 2007, as amended, supplemented, or modified from time to time, by and between A&P, as issuer, and Wilmington Trust.

9.  <u>A&P</u>:  The Great Atlantic & Pacific Tea Company, Inc., a Maryland corporation.

10.  <u>A&P Pension Claims</u>:  Any and all Claims against the Debtors asserted by or on behalf of the PBGC or any other Person in respect of the A&P Pension Plans.

11.  <u>A&P Pension Plans</u>:  (a) The Great Atlantic & Pacific Tea Company, Inc. Pension Plan; (b) the Pathmark Stores, Inc. Pension Plan; (c) the New York-New Jersey Amalgamated Pension Plan for A&P Employees; and (d) the Delaware County Dairies, Inc. Hourly Employees' Pension Plan.

12.  <u>Administrative Claim</u>:  A Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Claims; (c) the reasonable fees and expenses of the Notes Trustee and Second Lien Trustee incurred in connection with the Chapter 11 Cases; (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code; (e) the Transaction Expenses of the Investors (as set forth in the Securities Purchase Agreements); (f) the Break-Up Fee, to the extent triggered and due pursuant to the Securities Purchase Agreements and as approved by the Securities Purchase Agreements Order; and (g) all claims approved as administrative claims pursuant to an order of the Bankruptcy Court.

13.  <u>Administrative Claims Bar Date</u>:  The deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to (i) Professional Claims, which shall be subject to the provisions of Article II.B herein; or (ii) Transaction Expenses and the Break-Up Fee, which shall be allowed as provided by the Securities Purchase Agreements and approved by the Securities Purchase Agreements Order.

14.  <u>Affiliate</u>:  As defined in section 101(2) of the Bankruptcy Code and as it pertains to the Debtors or Reorganized Debtors, as applicable.

15.  <u>Allowed</u>:  Except as otherwise provided herein and subject to Article VI.A:  (a) a Claim or Interest that is (i) listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, or (ii) evidenced by a valid Proof of Claim, filed by the applicable Bar Date and not subject to the Debtors or Reorganized Debtors right to file an

objection to such Proof of Claim, or (b) a Claim that is Allowed pursuant to the Plan or any stipulation approved by, or Final Order of, the Bankruptcy Court.

16.    <u>Avoidance Actions</u>:  Any and all avoidance, recovery or subordination actions or remedies that may be brought on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 550, 551, 552, or 553 of the Bankruptcy Code.

17.    <u>Bankruptcy Code</u>:  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended from time to time.

18.    <u>Bankruptcy Court</u>:  The United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or order of a district court pursuant to section 157(a) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

19.    <u>Bankruptcy Rules</u>:  The Federal Rules of Bankruptcy Procedure as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

20.    <u>Bar Date</u>:  (a) June 17, 2011; or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing Claims.

21.    <u>Break-Up Fee</u>:  As defined in the Securities Purchase Agreements and as approved by the Securities Purchase Agreements Order.

22.    <u>Business Day</u>:  Any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

23.    <u>Cash</u>:  Legal tender of the United States of America or the equivalent thereof.

24.    <u>Causes of Action</u>:  Any and all Claims, actions, causes of action, choses in action, suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including those of the Debtors, the debtors in possession, and/or the Estates), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or instituted after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

25.    <u>Certificate</u>:  Any instrument evidencing a Claim or an Interest.

26.    <u>Chapter 11 Cases</u>:  The jointly administered chapter 11 cases commenced by the Debtors, with case numbers 10-24548 through 10-24601, and styled *In re The Great Atlantic &*

*Pacific Tea Company, Inc., et al.*, Case No. 10-24549 (RDD), which are currently pending before the Bankruptcy Court.

27.    Claim:  As defined in section 101(5) of the Bankruptcy Code.

28.    Claims Agent:  Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (877) 660-6625, retained as the Debtors' claims agent by order dated December 28, 2010, entitled *Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent for Debtors* [Docket No. 207]; the Debtors anticipate requesting authority to retain Kurtzman Carson Consultants LLC as their solicitation agent at or prior to the Disclosure Statement Hearing.

29.    Claims Register:  The official register of Claims maintained by the Claims Agent.

30.    Class:  A category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

31.    Commencement Date:  December 12, 2010.

32.    Confirmation:  The entry of the Confirmation Order on the docket of the Chapter 11 Cases.

33.    Confirmation Date:  The date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34.    Confirmation Hearing:  The hearing before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code on the motion for entry of the Confirmation Order.

35.    Confirmation Order:  The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall include the provisions described on Exhibit D to the Securities Purchase Agreements and otherwise be in form and substance acceptable to the Investors.

36.    Consenting Noteholders:  So long as the Plan Support Agreement has not been terminated, those certain holders of the Second Lien Note Claims that have executed the Plan Support Agreement or have agreed to be bound thereby by executing a Joinder Agreement (as defined therein).

37.    Consummation:  The occurrence of the Effective Date.

38.    Convertible Notes:  The 5.125% Convertible Notes and 6.75% Convertible Notes.

39.    Convertible Notes Claims:  The 5.125% Convertible Note Claims and the 6.75% Convertible Note Claims.

40.    Creditors' Committee:  The official committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code by the United States Trustee for the Southern

District of New York on December 21, 2010, as amended on June 3, 2011 and as it may be reconstituted from time to time.

41.    Cure:  A Claim against the Debtors for the payment of Cash, or the distribution of other property (all as the Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a default by the Debtors pursuant to section 365 of the Bankruptcy Code and in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

42.    Cure Objection Deadline:  The deadline for filing objections to a proposed Cure, which shall be the earlier of: (a) 30 days after the Effective Date or (b) 30 days after the assumption of the applicable Executory Contract or Unexpired Lease upon approval of the Confirmation Order, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease.

43.    Debtor Release:  As defined in Article VIII.D.

44.    Debtors:  Each of the following Entities, collectively:  The Great Atlantic & Pacific Tea Company, Inc.; 2008 Broadway, Inc.; AAL Realty Corporation; Adbrett Corporation; Amsterdam Trucking Corporation; APW Supermarket Corporation; APW Supermarkets, Inc.; Bergen Street Pathmark, Inc.; Best Cellars DC Inc.; Best Cellars Inc.; Best Cellars Licensing Corp; Best Cellars Massachusetts, Inc.; Best Cellars VA Inc.; Bev, Ltd.; Borman's Inc.; Bridge Stuart, Inc.; Clay-Park Realty Co., Inc.; Compass Foods, Inc.; East Brunswick Stuart, LLC; Farmer Jack's of Ohio, Inc.; Food Basics, Inc.; Gramatan Foodtown Corp.; Grape Finds At DuPont, Inc.; Grape Finds Licensing Corp.; Grapefinds, Inc.; Greenlawn Land Development Corp.; Hopelawn Property I, Inc.; Kohl's Food Stores, Inc.; Kwik Save Inc.; Lancaster Pike Stuart, LLC; LBRO Realty, Inc.; Lo-Lo Discount Stores, Inc.; Mac Dade Boulevard Stuart, LLC; McLean Avenue Plaza Corp.; Milik Service Company, LLC; Montvale Holdings, Inc.; North Jersey Properties, Inc. VI; Onpoint, Inc.; Pathmark Stores, Inc.; Plainbridge, LLC; SEG Stores, Inc.; Shopwell, Inc.; Shopwell, Inc.; Spring Lane Produce Corp.; Super Fresh/Sav-A-Center, Inc.; Super Fresh Food Markets, Inc.; Super Market Service Corp.; Super Plus Food Warehouse, Inc.; Supermarkets Oil Company, Inc.; The Food Emporium, Inc.; The Old Wine Emporium of Westport, Inc.; The South Dakota Great Atlantic & Pacific Tea Company, Inc.; Tradewell Foods of Conn., Inc.; Upper Darby Stuart, LLC; and Waldbaum, Inc.

45.    DIP Facility:  The debtor in possession financing facility approved by the Final DIP Order and established pursuant to the DIP Facility Credit Agreement.

46.    DIP Facility Administrative Agent:   JPMorgan Chase Bank, N.A., or its successor, in its capacity as administrative agent and collateral agent under the DIP Facility.

47.    DIP Facility Claims:  Any Claim derived from, or based upon, the DIP Facility.

48.    DIP Facility Credit Agreement:   That certain Third Amended and Restated Superpriority Debtor-in-Possession Credit Agreement, dated January 13, 2011, as amended,

supplemented, or modified from time to time, between A&P and each subsidiary of A&P party thereto, as borrowers, the lenders party thereto, and the DIP Facility Administrative Agent.

49.     <u>DIP Facility Lenders</u>:  The lenders under the DIP Facility.

50.     <u>Disclosure Statement</u>:   The disclosure statement for the Plan, as amended, supplemented or modified from time to time (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent), in form and substance reasonably acceptable to the Investors, including all exhibits and schedules thereto, and as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

51.     <u>Disclosure Statement Hearing</u>:  The hearing before the Bankruptcy Court on the motion for approval of the Disclosure Statement and related solicitation procedures and exhibits.

52.     <u>Disputed Claim</u>:  Any Claim or Interest that is not yet Allowed.

53.     <u>Disputed Claims Reserve</u>:   An appropriate reserve, to be determined by the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent and with the reasonable consent of the Investors) or the Reorganized Debtors, unless otherwise ordered by the Bankruptcy Court, for distributions on account of Disputed Claims (other than Disputed Claims in Classes E, F, G, H, I, J and L) that are subsequently Allowed after the Effective Date.

54.     <u>Distribution Agent</u>:  The Reorganized Debtors or the Entity or Entities selected by the Reorganized Debtors on or after the Effective Date, as applicable, to make or to facilitate distributions pursuant to the Plan.

55.     <u>Distribution Date</u>:   Any of the Initial Distribution Date or the Periodic Distribution Dates.

56.     <u>Distribution Record Date</u>:  The date for determining which holders of Allowed Claims are eligible to receive distributions hereunder, which shall be (a) ten Business Days after entry of the Confirmation Order or (b) such other date as designated in a Bankruptcy Court order.

57.     <u>Effective Date</u>:  The date that is the first Business Day after the Confirmation Date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the Effective Date set forth in the Plan or in the Securities Purchase Agreements have been satisfied or waived.

58.     <u>Entity</u>:  As defined in section 101(15) of the Bankruptcy Code.

59.     <u>Equity Security</u>:  As defined in section 101(16) of the Bankruptcy Code.

60.     <u>Estate</u>:  The bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

61.     <u>Exculpated Claim</u>: As defined in Article VIII.G.

62.    <u>Exculpated Party</u>:  Each of the following in its capacity as such:  (a) the Debtors and their Affiliates; (b) the Reorganized Debtors and their Affiliates; (c) the DIP Facility Lenders and the DIP Facility Administrative Agent; (d) the Investors; (e) the Second Lien Trustee; (f) the Notes Trustee; (g) the Prepetition Credit Facility Lenders and Prepetition Credit Facility Administrative Agent; (h) UFCW; (i) UFCW Local Unions; (j) Liberty Harbor; (k) Mount Kellett; (l) Yucaipa; (m) the Consenting Noteholders; (n) to the extent the Second Lien Trustee does not take any action, including initiating any legal proceedings, materially inconsistent with the substance of the Plan Support Agreement or that materially interferes with the consummation of the matters contemplated by the Plan Support Agreement, the Second Lien Trustee; (o) with respect to each of the foregoing Entities in clauses (a) through (n), such Entities' successors and assigns; (p) the Creditors' Committee and the members thereof, and (q) with respect to each of the foregoing Entities in clauses (a) through (p), such Entities' parents, subsidiaries, affiliates, officers, directors, principals, partners, members, managers, employees, agents, professionals, financial and other advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (whether current or former).

63.    <u>Executory Contract</u>:  A contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    <u>Exit Facility</u>:  A financing facility to be entered into by the Reorganized Debtors on the Effective Date with terms and provisions substantially similar to those contained in **Exhibit C** to the Securities Purchase Agreements Amendment No. 1, with such changes as are reasonably acceptable to the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) and the Investors, which shall be secured by a first priority lien on substantially all of the Reorganized Debtors' assets as provided in the Securities Purchase Agreements.

65.    <u>Final Decree</u>:  The decree contemplated under Bankruptcy Rule 3022.

66.    <u>Final DIP Order</u>:  The *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364*, entered by the Bankruptcy Court on January 11, 2011 [Docket No. 479].

67.    <u>Final Order</u>:  An order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal,

petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

68.    <u>General Unsecured Claim</u>:    Any Claim, other than Administrative Claims, Professional Claims, DIP Facility Claims, Priority Tax Claims, Prepetition Credit Facility Claims, Second Lien Note Claims, Secured Tax Claims, Other Secured Claims, Other Priority Claims, Convertible Notes Claims, 9.125% Senior Note Claims, Quarterly Interest Bond Claims, Trade Claims, Guaranteed Landlord Claims, Union Claims, Intercompany Claims and Subordinated Claims.

69.    <u>Governmental Unit</u>:  As defined in section 101(27) of the Bankruptcy Code.

70.    <u>Guaranteed Landlord Claims</u>:  Any and all Claims arising from or related to the rejection of nonresidential real property leases pursuant to section 365 of the Bankruptcy Code against any of the following operating-entity Debtors as a primary obligor:    (a) APW Supermarkets, Inc.; (b) Best Cellars, Inc.; (c) Bev Ltd.; (d) Food Basics, Inc.; (e) Pathmark Stores, Inc.; (f) Shopwell, Inc.; (g) Super Fresh Food Markets, Inc.; (h) The Old Wine Emporium of Westport, Inc.; (i) Tradewell Foods Of Conn., Inc.; and (j) Waldbaum, Inc., and A&P as a guarantor (or secondary obligor) <u>provided</u>, <u>further</u>, <u>that</u>, pursuant to the Substantive Consolidation Settlement described in Article III.A herein, such primary obligor and guarantor (or secondary obligor) Claims related to the same lease rejection shall be combined into a single Guaranteed Landlord Claim for the purposes of voting and distributions under the Plan.

71.    <u>Impaired</u>:  With respect to any Class of Claims or Interests, a Claim or Interest that is not Unimpaired.

72.    <u>Indemnification Obligation</u>:  A Debtor's obligation under an Executory Contract, a corporate or other document, a postpetition agreement, through the Plan, or otherwise, including as set forth in the Securities Purchase Agreements, to indemnify any Person, including directors, officers, attorneys, other professionals and agents, or employees of the Debtors who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtors' respective articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

73.    <u>Indenture Claims</u>:  Any and all Claims arising pursuant to the Convertible Notes Claims, 9.125% Senior Note Claims and Quarterly Interest Bond Claims, in accordance with the respective Notes Indentures.

74.    <u>Initial Distribution Date</u>:  The date occurring, as soon as reasonably practicable, after the Effective Date when distributions under the Plan shall commence, other than distributions (if any) for Allowed Claims in Classes E, F, G, H, I, J and L.

75.    <u>Intercompany Claim</u>:  A Claim by a Debtor against another Debtor or a Claim by an Affiliate of the Debtors against a Debtor.

76.    <u>Intercompany Contract</u>:  A contract between two or more Debtors or a contract between one or more Affiliates and one or more Debtors.

77.    <u>Intercompany Interest</u>:  An Interest held by a Debtor in another Debtor or an Affiliate other than A&P.

78.    <u>Interest</u>:  Any Equity Security of a Debtor existing immediately prior to the Effective Date.

79.    <u>Interim Compensation Order</u>:  The *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered by the Bankruptcy Court on January 12, 2011 [Docket No. 505].

80.    <u>Investment Warrants</u>: Those certain warrants to be acquired by Yucaipa American Alliance Fund II, LP, Yucaipa American Alliance (Parallel) Fund II, LP and their permitted transferees in connection with its purchase of NewCo Equity and New Convertible Third Lien Notes, pursuant to the terms of the Securities Purchase Agreements.

81.    <u>Investors</u>:  Each of (a) Liberty Harbor, (ii) Yucaipa American Alliance Fund II, LP and Yucaipa American Alliance (Parallel) Fund II, LP, and (iii) Mount Kellett, and in each case any affiliates of each of the foregoing that are signatories to the Securities Purchase Agreements, and their respective permitted transferees.

82.    <u>IRS</u>:  Internal Revenue Service.

83.    <u>Liberty Harbor</u>: The Liberty Harbor business unit of Goldman Sachs Asset Management, L.P. and its affiliated funds.

84.    <u>Lien</u>:  As defined in section 101(37) of the Bankruptcy Code.

85.    <u>Management Equity Incentive Program</u>:  A post-Effective Date compensation program in accordance with the terms and conditions set forth in the "Management Equity Incentive Program," to be attached as an **Exhibit** to the Plan Supplement.

86.    <u>Management Services Agreement</u>:  A management services agreement to be entered into by Reorganized A&P or one of its Affiliates (as agreed among Yucaipa, Liberty Harbor, Mount Kellett and the Debtors or Reorganized Debtors, as applicable) and The Yucaipa Companies, LLC on the Effective Date in the form to be attached as an **Exhibit** to the Plan Supplement which shall be on terms and conditions acceptable to Yucaipa, Liberty Harbor and Mount Kellett.

87.    <u>Modified Collective Bargaining Agreements</u>:  Those collective bargaining agreements as modified pursuant to the Union Settlement Agreements.

88.    <u>Mount Kellett</u>: Mount Kellett Capital Management LP and its affiliated funds.

89.    <u>Multiemployer Pension Plan</u>:  Any multiemployer plan as defined in section 3(37) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), 29 U.S.C. §1002(3)(37), in which the Debtors are or were a contributing employer.

90.    <u>New Board</u>:  The initial board of directors of Reorganized A&P, which shall as of the Effective Date consist of members selected in accordance with the Securities Purchase Agreements and, to the extent known, shall be identified in the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code.

91.    <u>New Convertible Third Lien Notes</u>:  Notes issued by Reorganized A&P and guaranteed by every other Reorganized Debtor, of which an aggregate principal amount of $210.0 million shall be purchased by the Investors on the Effective Date on the terms and conditions set forth in the Securities Purchase Agreements, which notes shall include the terms set forth in Exhibit C to the Securities Purchase Agreements (and such other terms that are satisfactory to the Investors).

92.    <u>NewCo Equity</u>:  The authorized shares of common stock of Reorganized A&P, par value $0.01 per share.

93.    <u>New Equity Investment</u>:  The NewCo Equity issued by Reorganized A&P to the Investors on the Effective Date for an aggregate purchase price of $80.0 million, which shall be purchased by the Investors pursuant to the terms of the Securities Purchase Agreements and shall include the terms set forth in the Securities Purchase Agreements (and such other terms that are satisfactory to the Investors).

94.    <u>New Money Commitment</u>:  The obligation of the Investors severally and not jointly, to purchase, or cause one or more of their affiliates to purchase, on the Effective Date, certain of the New Second Lien Notes, certain of the New Convertible Third Lien Notes, and the New Equity Investment on the terms and conditions set forth in the Securities Purchase Agreements and Securities Purchase Agreements Order.

95.    <u>New Second Lien Notes</u>:  Notes issued by Reorganized A&P and guaranteed by every other Reorganized Debtor of which an aggregate principal amount of up to $210.0 million (inclusive of a 5% original issue discount) shall be purchased by the Investors on the Effective Date on the terms and conditions set forth in the Securities Purchase Agreements, which notes shall include the terms set forth in Exhibit B to the Securities Purchase Agreements (and such other terms that are satisfactory to the Investors).

96.    <u>Notes Indentures</u>:  Collectively, the 1991 Indenture and the 2007 Indenture.

97.    <u>Notes Trustee</u>:  Wilmington Trust, or its successor, in its capacity as successor trustee under the Notes Indentures.

98.    <u>Other Collective Bargaining Agreements</u>:  The following collective bargaining agreements:  (a) Collective Bargaining Agreement, dated October 16, 2005, between Food Basics, Inc. and Union Local 464 UFCW, as amended by the Memorandum of Agreement between the parties dated October 15, 2010; (b) Collective Bargaining Agreement, dated April 30, 2006, between Food Basics, Inc. and Union Local 338 RWDSU/UFCW; and (c) Collective

Bargaining Agreement, dated September 24, 2006, between Food Basics, Inc. and Union Local 1776 UFCW.

99.    Other Priority Claim:  Any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

100.    Other Secured Claim:  Any Secured Claim, including PACA Claims, other than (a) DIP Facility Claim, (b) Prepetition Credit Facility Claim, (c) Second Lien Note Claim, or (d) Secured Tax Claim.

101.    PACA Claims:  Any and all Claims against the Debtors entitled to priority or secured status pursuant to the Perishable Agricultural Commodities Act, provided that, to have an Allowed PACA Claim, holders of such Claims shall have properly preserved their rights pursuant to the Perishable Agricultural Commodities Act.

102.    PBGC:  The Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation, created by ERISA, to administer the mandatory pension plan termination insurance program established under Title IV of ERISA.

103.    Pension Withdrawal Claims:  Any and all Claims against the Debtors arising from the Debtors' complete or partial withdrawal from any Multiemployer Pension Plans related to actions or events occurring prior to the Effective Date, including:  (a) Amalgamated Meat Cutters and Retail Food Store Employees Union Local 342 Pension Fund; (b) Central States, Southeast and Southwest Areas Pension Fund; (c) Retail, Wholesale and Department Store International Union and Industry Benefit and Pension Funds; (d) UFCW Local 1262 and Employees Pension Fund; (e) UFCW and Participating Food Industry Employers Tri-State Pension Fund; and (f) Food Employers Labor Relations Association and United Food and Commercial Workers Pension Fund.

104.    Periodic Distribution Date:  Unless otherwise ordered by the Bankruptcy Court, and other than with respect to distributions (if any) for Allowed Claims in Classes E, F, G, H, I, J and L, the first business day that is 90 days after the Initial Distribution Date, and for the first year thereafter, the first business day that is 90 days after the immediately preceding Periodic Distribution Date.

105.    Person:  As defined in section 101(41) of the Bankruptcy Code.

106.    Plan:  This chapter 11 plan of reorganization, as it may be altered, amended, modified, or supplemented from time to time (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent), in accordance with the terms set forth herein and in the Securities Purchase Agreements, including the Plan Supplement and all exhibits, supplements, appendices, and schedules, and which shall be in form and substance reasonably acceptable to the Investors.

107.    Plan Supplement:  The supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court no later than five days prior to the objection deadline to the Confirmation Hearing or as otherwise provided herein, or as such filing deadlines may be extended by the Debtors, provided, that, the

Debtors shall file a notice with the Bankruptcy Court of any such extension(s), and such supplement(s) shall be in form and substance reasonably acceptable to the Investors (as to the form and substance each of which the Debtors shall have consulted with the Creditors' Committee and the DIP Facility Administrative Agent), and which shall include, but not be limited to: (i) a listing of the members of the New Board, to the extent known; (ii) the term sheet and/or the indenture and form of New Second Lien Notes (and related ancillary documents), provided, that, the form of indenture and form of the New Second Lien Notes (but not the related ancillary documents) shall be filed prior to the objection deadline for the Confirmation Hearing and such forms may be amended (1) prior to the Effective Date (x) with the mutual consent of the Debtors and the Investors or (y) as Investors deem reasonably necessary in connection with or to facilitate the Exit Financing and (2) after the Effective Date in accordance with the terms of such documents; (iii) the term sheet and/or the indenture and form of New Convertible Third Lien Notes (and related ancillary documents), provided, that, the form of indenture and form of the New Convertible Third Lien Notes (but not the related ancillary documents) shall be filed prior to the objection deadline for the Confirmation Hearing and such forms may be amended (1) prior to the Effective Date (x) with the mutual consent of the Debtors and the Investors or (y) as Investors deem reasonably necessary in connection with or to facilitate the Exit Financing and (2) after the Effective Date in accordance with the terms of such documents; (iv) if Replacement Second Lien Notes are to be issued pursuant to the Plan, the term sheet and/or the indenture and form of Replacement Second Lien Notes (and related ancillary documents), as applicable, provided, that, the form of indenture and form of the Replacement Second Lien Notes (but not the related ancillary documents) shall be filed no later than ten days before the objection deadline for the Confirmation Hearing and such forms may be amended (1) prior to the Effective Date (x) with the mutual consent of the Debtors and the Investors or (y) as Investors deem reasonably necessary in connection with or to facilitate the Exit Financing and (2) after the Effective Date in accordance with the terms of such documents; (v) a form warrant agreement for the Investment Warrants, provided, that, the form of the Investment Warrants (but not the related ancillary documents) shall be filed prior to the objection deadline for the Confirmation Hearing and such forms may be amended (1) prior to the Effective Date (x) with the mutual consent of the Debtors and the Investors or (y) as Investors deem reasonably necessary in connection with or to facilitate the Exit Financing and (2) after the Effective Date in accordance with the terms of such documents; (vi) the Reorganized A&P Charter; (vii) the Reorganized A&P Bylaws; (viii) a term sheet for the Exit Facility; (ix) a term sheet for the Management Equity Incentive Program; (x) drafts or term sheets of any new employment agreements; (xi) a list of Executory Contracts and Unexpired Leases to be assumed or rejected (with related notices), and as may be amended by the Debtors prior to the Effective Date; (xii) a list of retained Causes of Action; (xiii) the Management Services Agreement.

108.   Plan Support Agreement:   That certain Plan Support Agreement dated as of December 12, 2011 and filed as **Exhibit B** to the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into a Plan Support Agreement with Certain Holders of the Debtors' Second Lien Notes* [Docket No. 3028].

109.   Plan Support Agreement Order: The *Order Authorizing the Debtors to Enter into a Plan Support Agreement with Certain Holders of the Debtors' Second Lien Notes* [Docket No. 3060] entered by the Bankruptcy Court on December 19, 2011.

110. <u>Prepetition Credit Agreement</u>:    That certain Amended and Restated Credit Agreement dated as of December 27, 2007 as amended, supplemented, or amended and restated from time to time by and between the Debtors, the Prepetition Credit Facility Agent, and the Prepetition Credit Facility Lenders.

111. <u>Prepetition Credit Facility Agent</u>:    Bank of America, N.A., in its capacity as administrative agent under the Prepetition Credit Agreement.

112. <u>Prepetition Credit Facility Claims</u>:    Any and all claims arising under the Prepetition Credit Agreement.

113. <u>Prepetition Credit Facility Lenders</u>:    Those lenders and issuing banks party to the Prepetition Credit Agreement from time to time, each in their capacities as such.

114. <u>Priority Claim</u>:    Collectively, Priority Tax Claims and Other Priority Claims.

115. <u>Priority Tax Claim</u>:    Any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

116. <u>Professional</u>:    An Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

117. <u>Professional Claims</u>:    A Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

118. <u>Professional Compensation</u>:    All accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date to the extent any such fees and expenses have not been paid and regardless of whether a fee application has been filed for such fees and expenses.    To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Professional Compensation.

119. <u>Professional Fee Escrow Account</u>:    An interest-bearing account to be funded upon the Effective Date in an amount equal to professional fees that are estimated to be accrued but unpaid by the Debtors or Reorganized Debtors as of the Effective Date; the terms and conditions (not including the Professional Fee Reserve Amount) of the Professional Fee Escrow Account shall be otherwise acceptable to the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent), Reorganized Debtors and the Investors.

120. <u>Professional Fee Reserve Amount</u>:    Professional Compensation through the Effective Date as estimated, subject to the Debtors' reasonable discretion, in accordance with Article II.B.3 herein.

121.    <u>Proof of Claim</u>:  A proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

122.    <u>Pro Rata</u>:  The proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in that particular Class bear to the aggregate amount of Allowed Claims in that Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, <u>provided</u>, <u>that</u>, with regard to the holders of Unsecured Claims and their recoveries, if any, from the Unsecured Creditor Contingent Recovery Pool Pro Rata shall take into account any incremental recoveries for parties that receive the benefit of the Substantive Consolidation Settlement.

123.    <u>Quarterly Interest Bond Claims</u>:  Any and all Claims arising under the Quarterly Interest Bonds or the 1991 Indenture with respect to the Quarterly Interest Bonds.

124.    <u>Quarterly Interest Bonds</u>:  The 9.375% quarterly interest bonds, with an aggregate face amount of $200,000,000, due in 2039 and issued pursuant to the 1991 Indenture.

125.    <u>Reinstate or Reinstated</u>:  Has the meaning pursuant to all applicable sections of the Bankruptcy Code.

126.    <u>Released Party</u>:  Each of the following in its capacity as such, and only in its capacity as such: (a) the Debtors' and the Reorganized Debtors' current and former affiliates, subsidiaries, officers, directors, principals, partners, members, managers, employees, agents, financial and other advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals; (b) the DIP Facility Lenders and the DIP Facility Administrative Agent; (c) the Investors; (d) the Creditors' Committee and the members thereof; (e) Tengelmann; (f) Yucaipa; (g) Liberty Harbor; (h) Mount Kellett; (i) UFCW; (j) UFCW Local Unions; (k) the Consenting Noteholders; (l) to the extent the Second Lien Trustee does not take any action, including initiating any legal proceedings, materially inconsistent with the substance of the Plan Support Agreement or that materially interferes with the consummation of the matters contemplated by the Plan Support Agreement, the Second Lien Trustee; and (m) with respect to each of the foregoing Entities in clauses (b) through (l), their respective current and former parents, affiliates, subsidiaries, officers, directors, principals, employees, members, managers, agents, partners, professionals, financial and other advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in their capacities as such.

127.    <u>Releasing Party</u>:  Each of the following in its capacity as such:  (a) the Debtors and the Reorganized Debtors (and all parties claiming derivatively or through the Debtors); (b) the DIP Facility Lenders and the DIP Facility Administrative Agent; (c) the Investors; (d) the Creditors' Committee and the members thereof; and (e) each holder of a Claim voting to accept the Plan.

128.    <u>Reorganized A&P</u>:  The Great Atlantic & Pacific Tea Company, Inc., or any successor thereto by merger, consolidation, or otherwise, including any holding company created as part of the Restructuring Transactions that holds, directly or indirectly, substantially all of the assets of the Reorganized Debtors, on or after the Effective Date.

129.    <u>Reorganized A&P Bylaws</u>:  The bylaws of Reorganized A&P, substantially in the form contained in the Plan Supplement.

130.    <u>Reorganized A&P Charter</u>:  The amended and restated certificate of incorporation of Reorganized A&P, substantially in the form contained in the Plan Supplement.

131.    <u>Reorganized Debtors</u>:  The Debtors, in each case, or any successor thereto by merger, consolidation, or otherwise, on or after the Effective Date.

132.    <u>Replacement Second Lien Notes</u>:  Notes that may be issued by the Debtors or Reorganized Debtors on terms, to be disclosed no later than ten days before the objection deadline for the Confirmation Hearing, to be attached as an **Exhibit** to the Plan Supplement and as otherwise acceptable to the Investors.

133.    <u>Restructuring Transactions</u>:  Those certain transactions described in Article IV.T, including the sale and issuance of the NewCo Equity, the New Second Lien Notes and the New Convertible Third Lien Notes pursuant to the Securities Purchase Agreements.

134.    <u>Sale Transaction</u>:  A transaction (in accordance with the terms set forth on **Exhibit B** annexed hereto) involving the sale for Cash of all or substantially all of the assets or common stock of Reorganized A&P and consummated within five years from the Effective Date, which may result in the creation of the Unsecured Creditor Contingent Recovery Pool.

135.    <u>Schedules</u>:  The schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the Bankruptcy Rules.

136.    <u>Second Lien Cash Pool</u>:  Cash in an amount equal to the Second Lien Note Claims Allowed pursuant to Article III.C.1.b hereof.

137.    <u>Second Lien Indenture</u>:  That certain indenture dated as of August 4, 2009, as amended, supplemented, or modified from time to time, by and between by and between the Debtors and the Second Lien Trustee.

138.    <u>Second Lien Note Claims</u>:  Any and all claims arising under the Second Lien Notes or the Second Lien Indenture.

139.    <u>Second Lien Notes</u>:  The 11.375% senior second lien notes due 2015 issued pursuant to the Second Lien Indenture.

140.    <u>Second Lien Professional Fee Cap</u>:  As defined in Article II.A.

141.    <u>Second Lien Trustee</u>:  Wells Fargo Bank, National Association, in its capacity as successor trustee and collateral agent under the Second Lien Indenture.

142.    <u>Secured Claim</u>:  A Claim: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

143.    <u>Secured Tax Claim</u>:  Any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

144.    <u>Securities Act</u>:  The Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

145.    <u>Securities Purchase Agreements</u>:  Those certain amended and restated agreements dated as of November 3, 2011, as amended pursuant to the Securities Purchase Agreements Amendment No. 1, and as may be further amended by the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) and the Investors in accordance with their terms, between the Debtors and the Investors documenting the New Money Commitment and attached (a) to the Securities Purchase Agreements Order and (b) as an **Exhibit** to the Plan Supplement.

146.    <u>Securities Purchase Agreements Amendment No. 1</u>:  That certain amendment to the Securities Purchase Agreements dated February 16, 2012 and attached as **Exhibit 2** to the *Order (I) Approving Notice of Plan Modifications and Continued Confirmation Hearing, (II) Providing that the Debtors are Not Required to Re-Solicit Creditors on Account of Such Modifications, (III) Fixing a Confirmation Hearing Date and an Objection Deadline for the Debtors' Plan Modifications, (IV) Approving Amendments to Their Securities Purchase Agreements and (V) Granting Related Relief* entered by the Bankruptcy Court on February __, 2012 [Docket No. __].

147.    <u>Securities Purchase Agreements Order</u>:  The *Order Authorizing The Debtors To (A) Enter Into Certain Securities Purchase Agreements For A $490 Million New Capital Investment And (B) Pay Certain Fees In Connection Therewith, Each To Support Debtors' Plan Of Reorganization* [Docket No. 2962] entered by the Bankruptcy Court on December 6, 2011.

148.    <u>Security</u>:  As defined in section 2(a)(1) of the Securities Act, which as provided herein, shall include (i) the NewCo Equity, the New Second Lien Notes, the New Convertible Third Lien Notes and the Investment Warrants issued on the terms and conditions set forth therein and as provided in the Securities Purchase Agreements (and as approved by the Securities Purchase Agreements Order) and (ii) the Replacement Second Lien Notes, if issued pursuant to the Plan.

149.    <u>SEIU</u>:  The Service Employees International Union.

150.    <u>SEIU Local Union</u>:  SEIU local union 1199.

151.    <u>Servicer</u>:  An indenture trustee, agent, servicer, or other authorized representative of holders of Claims or Interests recognized by the Debtors.

152.    <u>Settlement Procedures Order</u>:  The *Order Authorizing and Approving Procedures for Settling Certain Claims and Causes of Action Brought by or Against the Debtors* entered by the Bankruptcy Court on March 10, 2011 [Docket No. 1002].

153.    <u>Solicitation Procedures Order</u>:  The *Order Approving:  (A) The Adequacy Of The Debtors' Disclosure Statement; (B) The Solicitation And Notice Procedures With Respect To Confirmation Of The Debtors' Proposed Chapter 11 Plan; (C) The Form Of Various Ballots And Notices In Connection Therewith; And (D) The Scheduling Of Certain Dates With Respect Thereto* [Docket No. 3066] entered by the Bankruptcy Court on December 20, 2011.

154.    <u>Subordinated Claim</u>:  (a) any Claim against the Debtors arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim; or (b) any Claim that is subordinated, pursuant to Section 510 of the Bankruptcy Code or otherwise, by a Final Order.

155.    <u>Substantive Consolidation Settlement</u>:  The compromise and settlement of substantive consolidation issues, as described in Article III.A herein.

156.    <u>Tengelmann</u>:  Tengelmann Warenhandelsgesellschaft KG, a partnership organized under the laws of the Federal Republic of Germany, and its affiliates.

157.    <u>Third Party Release</u>:  As defined in Article VIII.E.

158.    <u>Trade Claims</u>:  All Claims held by Trade Creditors against the Debtors; <u>provided that</u>, Trade Claims shall not include Administrative Claims.

159.    <u>Trade Creditors</u>:  All trade creditors who will have ongoing go-forward business relationships with the Reorganized Debtors as of and after the Effective Date.

160.    <u>Transaction Expenses</u>:  As defined in the Securities Purchase Agreements and as approved by the Securities Purchase Agreements Order.

161.    <u>UFCW</u>:  The United Food and Commercial Workers.

162.    <u>UFCW Local Unions</u>:  The following local unions affiliated with the UFCW:  27; 100R; 152; 338; 342; 371; 464A; 1034; 1245; 1262; 1360; 1500; and 1776.

163.    <u>Unclaimed Distribution</u>:  Any distribution under the Plan on account of an Allowed Claim to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

164.    <u>Unexpired Lease</u>:  A lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

165.    <u>Unimpaired</u>:  With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

166.   <u>Union Claims</u>:  Any and all Claims against the Debtors held by parties subject to the Union Settlement Agreements and the Modified Collective Bargaining Agreements and related term sheets.

167.   <u>Union Settlement Agreements</u>:  The Union Protections in Term Sheets attached as **Exhibit A** hereto.

168.   <u>United States Trustee</u>:  The United States Trustee for the Southern District of New York.

169.   <u>Unsecured Claims</u>:  Collectively, Convertible Notes Claims, 9.125% Senior Note Claims, Quarterly Interest Bond Claims, Trade Claims, Guaranteed Landlord Claims, Pension Withdrawal Claims and General Unsecured Claims.

170.   <u>Unsecured Creditor Contingent Recovery Pool</u>:  Contingent consideration that may become distributable, as set forth more fully on **Exhibit B** annexed hereto, solely in the event of a Sale Transaction meeting certain criteria, to holders of Allowed Unsecured Claims in Classes E, F, G, H, I, J and L and pursuant to the Substantive Consolidation Settlement.

171.   <u>Voting Deadline</u>:  That date which shall be the final date by which a holder of a Claim may vote to accept or reject the Plan, which date is set forth in the Solicitation Procedures Order.

172.   <u>Voting Record Date</u>:  That date for determining which holders of Claims and Interests are entitled to vote to accept or reject the Plan, which date is set forth in the Solicitation Procedures Order.

173.   <u>Wilmington Trust</u>: Wilmington Trust Company, N.A., in its capacity as indenture trustee under the 1991 Indenture and the 2007 Indenture, as applicable.

174.   <u>Yucaipa</u>: The Yucaipa Companies, LLC and their affiliated funds, including Yucaipa American Alliance Fund II, LP and Yucaipa American Alliance (Parallel) Fund II, LP.

B.   <u>Rules of Interpretation</u>

1.   For purposes of the Plan:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) unless otherwise specified herein, any reference to the term "including" herein shall mean "including without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; and (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

2.      The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

3.      Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS AND UNITED STATES TRUSTEE STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III herein.

A.      <u>Administrative Claims</u>

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than of a Professional Claim), including any Allowed Administrative Claim of the Notes Trustee or Second Lien Trustee, will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) on the Effective Date, or as soon as practicable thereafter, (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Commencement Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the holders of such Allowed Administrative Claims, (4) for any amounts owed pursuant to the Securities Purchase Agreements, in accordance with the Securities Purchase Agreements or as allowed pursuant to the Securities Purchase Agreements Order or (5) for any professional fee and expense amounts owed pursuant to the Union Settlement Agreements, in accordance with the Union Settlement Agreements, not to exceed $2.75 million pursuant to the terms thereof. For the avoidance of doubt, all reasonable fees and expenses that are submitted to the Debtors and the Creditors' Committee of the Notes Trustee (and its counsel, agents, and advisors) that are provided for under the Notes Indentures, as applicable, shall be

paid in full in Cash on the Effective Date, or as soon as practicable thereafter, without a reduction to the recoveries of applicable holders of Allowed Claims only if Classes E, F and G (defined below) each vote in favor of the Plan.

Additionally, the reasonable and documented fees and expenses of (a) the Second Lien Trustee and Seward & Kissell LLP in its capacity as counsel to the Second Lien Trustee, and (b) Brown Rudnick LLP and Miller Buckfire & Co. LLC in their capacities as advisors to the Second Lien Trustee and/or the Ad Hoc Consortium (as defined in the Plan Support Agreement, and as applicable) submitted to the Debtors (subject to redaction to preserve attorney-client privilege) shall be Administrative Claims Allowed against the Debtors' estates payable on the Effective Date in an aggregate amount not to exceed $1,800,000.00 plus any fees and expenses payable by the Debtors pursuant to Paragraph 15(e)(ii) of the Final DIP Order that remain unpaid as of the Effective Date (the "Second Lien Professional Fee Cap"); provided that the foregoing shall not in any way limit, waive, or modify (x) the rights of the Second Lien Trustee and its attorneys, professionals, and advisors to seek payment and/or reimbursement of fees, costs, and expenses pursuant to the Second Lien Indenture, including any such fees, costs, and expenses exceeding the Second Lien Professional Fee Cap or (y) any party's ability to contest any such additional fees or expenses sought under clause (x) hereof; provided further that the foregoing shall not limit nor be deemed to limit fees and expenses payable by the Debtors pursuant to Paragraph 15(e)(ii) of the Final DIP Order). For the avoidance of doubt, the fees and expenses payable pursuant to this paragraph: (i) shall not be subject to a request for payment of Administrative Claims (other than with respect to fees and expenses requested pursuant to clause (x) of this paragraph) and (ii) shall not reduce the recoveries of the holders of Allowed Second Lien Note Claims (other than through the Second Lien Trustee's exercise of its charging lien under Section 7.07 of the Second Lien Indenture in accordance with Article VII.A.3 hereof).

Except as otherwise provided in this Article II.A, unless previously filed, requests for payment of Administrative Claims (other than requests for the payment of Transaction Expenses, which shall be governed pursuant to the terms of the Securities Purchase Agreements and the Securities Purchase Agreements Order) must be filed and served on the Reorganized Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, stopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property and Estates and such Administrative Claims shall be deemed discharged as of the Effective Date. For the avoidance of doubt, the payment of the Break-Up Fee and any Transaction Expenses shall be governed by the Securities Purchase Agreements and the Securities Purchase Agreements Order.

The UFCW Local Unions, on behalf of the employees represented by the UFCW Local Unions, shall accrue and shall be entitled to an Allowed Administrative Claim in the amount of the actual cash savings provided to the Debtors under the Modified Collective Bargaining Agreements from the effective date of the Union Settlement Agreements through Confirmation, as provided in the Union Settlement Agreements. Any such Administrative Claim will be capped at a maximum of $18 million based on cash savings provided in the fourth calendar quarter of 2011 and $7 million based on cash savings provided in the first calendar quarter of

2012, it being understood that if the cash savings during the fourth calendar quarter of 2011 are less than $18 million, any excess will be added to the $7 million cap for the first calendar quarter of 2012. If the actual cash savings provided to the Company under the Modified Collective Bargaining Agreements between the effective date of the Union Settlement Agreements and Confirmation exceeds the amounts of the caps described above, any excess savings shall be treated as an Allowed Administrative Claim that is subordinated in priority and (to the extent relevant) payment timing to any other Allowed Administrative Claims in the Chapter 11 Cases. In any event, any such Allowed Administrative Claim shall be waived, extinguished, and forever discharged upon Confirmation of a Plan which contemplates the continued operation of a chain of grocery stores, by either the Company or a buyer through a plan-related sale that is otherwise consistent with the Union Settlement Agreements.

Reasonable and documented fees and expenses incurred by members of the Creditors' Committee during the pendency of the Chapter 11 Cases in their capacities as members of the Creditors' Committee shall be Allowed Administrative Claims in an aggregate amount not to exceed $378,500.00.

B.    Professional Claims

1.    Final Fee Applications. All final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Confirmation Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

2.    Professional Fee Escrow Account. In accordance with Article II.B.3 hereof, on the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Except as provided in the last sentence of this paragraph, such funds shall not be considered property of the estates of the Debtors or Reorganized Debtors, as applicable. The amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account within 10 days after such Claims are Allowed by a Final Order. When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

3.    Professional Fee Reserve Amount. To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall provide good faith estimates of their Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than 10 days prior to the Confirmation Hearing, provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

4.      <u>Post-Effective Date Fees and Expenses</u>.    Except as otherwise specifically
provided in the Plan, from and after the Effective Date, the Debtors or the Reorganized Debtors,
as applicable, shall, without any further notice to or action, order, or approval of the Bankruptcy
Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to
implementation and Consummation incurred by the Debtors or Reorganized Debtors, as
applicable.  Upon the Effective Date, any requirement that Professionals comply with sections
327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in
seeking retention or compensation for services rendered after such date shall terminate, and the
Reorganized Debtors may employ and pay any Professional in the ordinary course of business
without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      <u>DIP Facility Claims</u>

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to a less
favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in
exchange for each and every Allowed DIP Facility Claim, each such Allowed Claim shall be
paid in full in Cash on the Effective Date, or as soon as practicable thereafter, provided such
payments shall be distributed to the DIP Facility Administrative Agent on behalf of holders of
such Allowed Claims.

D.      <u>Priority Tax Claims</u>

With the reasonable consent of the Investors, each holder of an Allowed Priority Tax
Claim due and payable on or before the Effective Date shall receive one of the following
treatments on account of such Claim (1) Cash, payable by the Debtors on the Effective Date, in
an amount equal to the amount of such Allowed Priority Tax Claim, (2) Cash in an amount
agreed to by the Debtor or Reorganized Debtor (on the Effective Date), as applicable, and such
holder, <u>provided</u>, <u>however</u>, that such parties may further agree for the payment of such Allowed
Priority Tax Claim to occur at a later date, or (3) at the option of the Debtors (on the Effective
Date) or the Reorganized Debtors (after the Effective Date), Cash in the aggregate amount of
such Allowed Priority Tax Claim payable in installment payments over a period not more than
five years after the Commencement Date pursuant to section 1129(a)(9)(C) of the Bankruptcy
Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date,
such Claim shall be paid in full in Cash in accordance with the terms of any agreement between
the Debtors (on the Effective Date) or the Reorganized Debtors (after the Effective Date) and the
holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in
the ordinary course of business.

# ARTICLE III.

# CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.      <u>Substantive Consolidation Settlement</u>

1.      <u>Issues Subject to Compromise</u>:  The Plan proposes, and its terms embody, a
compromise and settlement of intercreditor issues relating to whether the liabilities and
properties of the Debtors should be substantively consolidated for purposes of voting and

distributions under the Plan. These issues include: (a) whether the elements necessary to obtain an order of substantive consolidation are satisfied in the Chapter 11 Case; (b) the value of the Debtors' Estates on an individual and a consolidated basis, and the proper method of determining such value; (c) whether the Estate of each Debtor should be treated separately for purposes of making payments to holders of Claims; (d) whether it is possible to attribute particular Claims asserted in the Chapter 11 Case to a specific Debtor; (e) the value to be accorded to guarantees issued by one Debtor in favor of another Debtor; (f) the strength of the relative rights and positions of the different Classes of unsecured Claims with respect to disputes over substantive consolidation; (g) other issues having to do with the rights of certain Estates, Claims, or Classes of Claims vis-à-vis other Estates, Claims, or Classes of Claims; and (h) the amount and priority of Intercompany Claims and the potential voidability of certain intercompany transfers.

       2.    <u>Effect of Substantive Consolidation Settlement</u>:  Pursuant to the Substantive Consolidation Settlement embodied in the Plan, holders of Allowed Unsecured Claims will receive their Pro Rata share of any Unsecured Creditor Contingent Recovery Pool. The Debtors believe that the substantive consolidation of the Debtors may adversely impact holders of Allowed (Class I) Guaranteed Landlord Claims and Allowed (Class J) Pension Withdrawal Claims because such holders may be entitled to a recovery from multiple operating Debtors on account of their Allowed (Class I) Guaranteed Landlord Claims and Allowed (Class J) Pension Withdrawal Claims. Therefore, in order to provide an equitable distribution to holders of Allowed Pension Withdrawal Claims and holders of Allowed Guaranteed Landlord Claims who vote to approve the Plan, in consultation with the Creditors' Committee and the DIP Facility Administrative Agent, the Plan and Substantive Consolidation Settlement provide for an enhanced recovery to these holders as provided in Article III.C.9.b and Article III.C.10.b. The terms of the Substantive Consolidation Settlement shall not be changed without the consent of the Investors (such consent shall not be unreasonably withheld or delayed in the case of a change that is not adverse to the Investors), and any change shall be made in consultation with the Creditors' Committee and the DIP Facility Administrative Agent.

       As a result of the Substantive Consolidation Settlement, except as otherwise provided herein (including any exhibits or supplements hereto), and only for purposes of voting and distributions under the Plan: (a) the separate Chapter 11 Cases of the Debtors will be consolidated into the case of A&P as a single consolidated case; (b) all property of the Estate of each Debtor will be deemed to be property of the consolidated Estates; (c) all Claims against each Estate will be deemed to be Claims against the consolidated Estates, any Proof of Claim filed against one or more of the Debtors will be deemed to be a single Proof of Claim filed against the consolidated Estates, and all duplicate Proofs of Claim filed on account of a Claim representing a single liability) will be deemed expunged; (d) no distributions under the Plan will be made on account of Intercompany Claims or Intercompany Interests; (e) Allowed Claims based on joint and several liability shall be deemed satisfied by a single distribution as if the Claim were held solely against one Debtor Entity; (f) except as provided in the Plan with respect to the treatment of Guaranteed Landlord Claims and Pension Withdrawal Claims, all Claims based upon pre-petition unsecured guarantees by one Debtor in favor of any other of the Debtors or other basis of co-Debtor liability will be eliminated (other than guarantees existing under assumed Executory Contracts or Unexpired Leases), and no distributions under the Plan will be made on account of Claims based upon such guarantees or other basis of co-Debtor liability; and

(g) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors will be treated as one consolidated entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, pre-petition debts due to any of the Debtors may be set off against the pre-petition debts of any other of the Debtors.

The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.  The compromise plan structure will not (a) impair the validity or enforceability of guarantees that exist under or with respect to assumed Executory Contracts or Unexpired Leases; (b) affect valid, enforceable, and unavoidable Liens that would not otherwise be terminated under the Plan, except for Liens that secure a Claim that is eliminated by virtue of the plan structure and Liens against collateral that are extinguished by virtue of such plan structure; (c) have the effect of creating a Claim in a Class different from the Class in which a Claim would have been placed in the absence of such structure; or (d) affect the obligation of each of the Reorganized Debtors, pursuant to section 1930 of Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee until such time as each particular Debtor's case is closed.

3.    Approval of Substantive Consolidation Settlement:  The Plan is deemed to be a motion under sections 105, 363 and 1123 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules for approval of the compromise and settlement of the issues described above. The confirmation of the Plan shall constitute approval of this motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions approving the compromise and settlement as fair and equitable and within the bounds of reasonableness.  The Debtors reserve their rights, with the consent of the Investors (such consent shall not be unreasonably withheld or delayed in the case of a decision by the Debtors or Reorganized Debtors that is not adverse to the Investors), to substantively consolidate the estates, in full, outside of the terms of Substantive Consolidation Settlement.

B.    Classification of Claims and Interests

The Plan constitutes a separate plan of reorganization for each Debtor; provided, however, that the classifications, recoveries and voting rights set forth below reflect the Substantive Consolidation Settlement described above.  Except for the Claims addressed in Article II above, all Claims and Interests are classified in the Classes set forth below pursuant to section 1122 of the Bankruptcy Code.  As set forth above, in accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Professional Claims, DIP Facility Claims or Priority Tax Claims.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of voting and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.    Class Identification:  Below is a chart assigning each Class a letter for purposes of identifying each separate Class.

08-13555-mg    Doc 3247-1    Filed 02/26/12    Entered 02/26/12 09:07:34    Main Document
Plan (Refer to: 3) Pg 29 of 94
10-14549-mg    Doc 3472-1    Filed 10/15/12    Entered 10/15/12 18:46:28    1st Amended
Pg 238 of 1094    Pg 29 of 94

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| A | Second Lien Note Claims | Impaired/Unimpaired | Entitled to Vote/Conclusively Presumed to Accept |
| B | Secured Tax Claims | Unimpaired | Conclusively Presumed to Accept |
| C | Other Secured Claims | Unimpaired | Conclusively Presumed to Accept |
| D | Other Priority Claims | Unimpaired | Conclusively Presumed to Accept |
| E | Convertible Notes Claims | Impaired | Deemed to Reject |
| F | 9.125% Senior Note Claims | Impaired | Deemed to Reject |
| G | Quarterly Interest Bond Claims | Impaired | Deemed to Reject |
| H | Trade Claims | Impaired | Deemed to Reject |
| I | Guaranteed Landlord Claims | Impaired | Deemed to Reject |
| J | Pension Withdrawal Claims | Impaired | Deemed to Reject |
| K | Union Claims | Impaired | Entitled to Vote |
| L | General Unsecured Claims | Impaired | Deemed to Reject |
| M | Intercompany Claims | Impaired/Unimpaired | Deemed to Reject/ Conclusively Presumed to Accept |
| N | Interests in A&P | Impaired | Deemed to Reject |
| O | Intercompany Interests | Impaired/Unimpaired | Deemed to Reject/ Conclusively Presumed to Accept |
| P | Subordinated Claims | Impaired | Deemed to Reject |

C.    Treatment of Classes of Claims and Interests

1.    Class A — Second Lien Note Claims

a.    *Classification*:  Class A consists of all Second Lien Note Claims.

b.    *Allowance*:  Second Lien Note Claims shall be Allowed in the aggregate amount of $309,660,000.00; provided the Allowed aggregate Second Lien Note Claims shall (x) increase by $108,785.00 for each day that the Effective Date occurs after March 1, 2012 and (y) decrease by $108,785.00 for each day that the Effective Date occurs before March 1, 2012. For the avoidance of doubt, Second Lien Note Claims Allowed pursuant to this Article III.C.1.b excludes and shall not include any Applicable Premium (as defined in the Second Lien Indenture), makewhole premium, prepayment penalty, or similar Claim arising under or related to the Second Lien Indenture or the Second Lien Notes.

25

10-14549-mg    Doc 3472-1    Filed 02/28/12    Entered 02/28/12 09:07:34    1st Amended
Plan (Redlined)    Pg 239 of 1094

    c.    *Treatment*:  Except to the extent that a holder of an Allowed Class A Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class A Claim, each such holder of an Allowed Class A Claim shall receive:

        (i)    **If Class A votes to accept the Plan or is presumed to have accepted the Plan**: Cash distributed on the Effective Date in an amount equal to such Holder's Pro Rata portion of the Second Lien Cash Pool.

        (ii)    **If Class A votes to reject the Plan**: At the holder's election, (A) Cash distributed on the Effective Date in an amount equal to such holder's Pro Rata portion of the Second Lien Cash Pool (without any reduction on account of the Allowed amount of any Second Lien Note Claims that are satisfied with Replacement Second Lien Notes), or (B) Replacement Second Lien Notes with a present value equal to the Allowed amount of such holder's Second Lien Note Claim (which may include any makewhole claim, prepayment penalty, or Applicable Premium Allowed by the Bankruptcy Court, if any, in addition to Second Lien Note Claims Allowed pursuant to Article III.C.1.b hereof).[3]

    d.    *Voting*:  Class A is Impaired and holders of Allowed Class A Claims may vote to accept or reject the Plan; provided that the Debtors reserve the right to assert the treatment provided to holders of Second Lien Note Claims under this Article III.C.1 renders holders of Second Lien Note Claims Unimpaired.

2.    <u>Class B — Secured Tax Claims</u>

    a.    *Classification*:  Class B consists of all Secured Tax Claims.

    b.    *Treatment*:  Except to the extent that a holder of an Allowed Class B Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class B Claim, each such holder of an Allowed Class B Claim shall receive, at the option of the Debtors or the Reorganized Debtors (with the reasonable consent of the Investors), as applicable:

        (i)    Cash on the Initial Distribution Date, or as soon as practicable thereafter, in an amount equal to such Allowed Class B Claim; or

---

[3]    Any holder of Second Lien Note Claims failing to timely submit a duly completed ballot and election form making an election with respect to Article III.C.1.c(ii) shall be deemed to have elected to receive the treatment provided by Article III.C.1.c(ii)(A) hereof.

(ii)    commencing on the Initial Distribution Date, or as soon as
practicable thereafter, and continuing over a period not exceeding
five years from the Commencement Date, equal semi-annual Cash
payments in an aggregate amount equal to such Allowed Class B
Claim, together with interest at the applicable non-default contract
rate under non-bankruptcy law, subject to the option of the Debtors
or the Reorganized Debtors to prepay the entire amount of such
Allowed Claim during such time period.

c.    *Voting*:  Class B is Unimpaired, and the holders of Allowed Class B Claims
are conclusively presumed to have accepted the Plan pursuant to section
1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class B
Claims are not entitled to vote to accept or reject the Plan.

3.    Class C — Other Secured Claims

a.    *Classification*:  Class C consists of all Other Secured Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class C Claim
agrees to a less favorable treatment, in full and final satisfaction,
settlement, release, and discharge of and in exchange for each and every
Allowed Class C Claim, each such holder of an Allowed Class C Claim
shall, at the option of the Debtors or the Reorganized Debtors, as
applicable, and the Investors:

(i)    have its Allowed Class C Claim Reinstated and rendered
Unimpaired in accordance with section 1124(2) of the Bankruptcy
Code, notwithstanding any contractual provision or applicable non-
bankruptcy law that entitles the holder of an Allowed Class C
Claim to demand or receive payment of such Allowed Class C
Claim prior to the stated maturity of such Allowed Class C Claim
from and after the occurrence of a default; or

(ii)    receive Cash in an amount equal to such Allowed Class C Claim,
including any interest on such Allowed Class C Claim required to
be paid pursuant to section 506(b) of the Bankruptcy Code, on the
later of the Initial Distribution Date and the date such Allowed
Class C Claim becomes an Allowed Class C Claim, or as soon as
practicable thereafter; or

(iii)    receive the collateral securing its Allowed Class C Claim.

c.    *Voting*:  Class C is Unimpaired, and holders of Allowed Class C Claims are
conclusively presumed to have accepted the Plan pursuant to section
1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class C
Claims are not entitled to vote to accept or reject the Plan.

4.      Class D — Other Priority Claims

     a.      *Classification*:  Class D consists of all Other Priority Claims.

     b.      *Treatment*:  Except to the extent that a holder of an Allowed Class D Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class D Claim, each such holder of an Allowed Class D Claim shall have its Allowed Class D Claim paid in full in Cash on the later of (i) the Initial Distribution Date, or as soon as practicable thereafter and (ii) the date such Class D Claim becomes Allowed, or as soon as practicable thereafter.

     c.      *Voting*:  Class D is Unimpaired, and holders of Allowed Class D Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class D Claims are not entitled to vote to accept or reject the Plan.

5.      Class E — Convertible Notes Claims

     a.      *Classification*:  Class E consists of all Convertible Note Claims.

     b.      *Treatment*:  Except to the extent that a holder of an Allowed Class E Claim and the Reorganized Debtors agree to a less favorable treatment, each holder of an Allowed Class E Claim that was a holder of such Claim as of the Distribution Record Date shall receive, on or before the 120th day following the consummation of a Sale Transaction (if any), a distribution equal to its Pro Rata portion of the Unsecured Creditor Contingent Recovery Pool, if any.  On the Effective Date, and in exchange for the rights provided under this paragraph to each holder of an Allowed Class E Claim, each Allowed Class E Claim shall be discharged.

     c.      *Voting*:  Class E is Impaired and holders of Allowed Class E Claims are deemed to have rejected the Plan.

6.      Class F — 9.125% Senior Note Claims

     a.      *Classification*:  Class F consists of all 9.125% Senior Note Claims.

     b.      *Treatment*:  Except to the extent that a holder of an Allowed Class F Claim and the Reorganized Debtors agree to a less favorable treatment, each holder of an Allowed Class F Claim that was a holder of such Claim as of the Distribution Record Date shall receive, on or before the 120th day following the consummation of a Sale Transaction (if any), a distribution equal to its Pro Rata portion of the Unsecured Creditor Contingent Recovery Pool, if any.  On the Effective Date, and in exchange for the rights provided under this paragraph to each holder of an Allowed Class F Claim, each Allowed Class F Claim shall be discharged.

c.    *Voting*:  Class F is Impaired and holders of Allowed Class F Claims are deemed to have rejected the Plan.

7.    <u>Class G — Quarterly Interest Bond Claims</u>

a.    *Classification*:  Class G consists of all Quarterly Interest Bond Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class G Claim and the Reorganized Debtors agree to a less favorable treatment, each holder of an Allowed Class G Claim that was a holder of such Claim as of the Distribution Record Date shall receive, on or before the 120th day following the consummation of a Sale Transaction (if any), a distribution equal to its Pro Rata portion of the Unsecured Creditor Contingent Recovery Pool, if any.  On the Effective Date, and in exchange for the rights provided under this paragraph to each holder of an Allowed Class G Claim, each Allowed Class G Claim shall be discharged.

c.    *Voting*:  Class G is Impaired and holders of Allowed Class G Claims are deemed to have rejected the Plan.

8.    <u>Class H — Trade Claims</u>

a.    *Classification*:  Class H consists of all Trade Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class H Claim and the Reorganized Debtors agree to a less favorable treatment, each holder of an Allowed Class H Claim that was a holder of such Claim as of the Distribution Record Date shall receive, on or before the 120th day following the consummation of a Sale Transaction (if any), a distribution equal to its Pro Rata portion of the Unsecured Creditor Contingent Recovery Pool, if any.  On the Effective Date, and in exchange for the rights provided under this paragraph to each holder of an Allowed Class H Claim, each Allowed Class H Claim shall be discharged.

c.    *Voting*:  Class H is Impaired and holders of Allowed Class H Claims are deemed to have rejected the Plan.

9.    <u>Class I — Guaranteed Landlord Claims</u>

a.    *Classification*:  Class I consists of all Guaranteed Landlord Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class I Claim and the Reorganized Debtors agree to a less favorable treatment, each holder of an Allowed Class I Claim that was a holder of such Claim as of the Distribution Record Date shall receive, on or before the 120th day following the consummation of a Sale Transaction (if any), a distribution from the Unsecured Creditor Contingent Recovery Pool, if any, such that the applicable holder's aggregate recovery for its Allowed Class I Claim is

equal to the product of (x) its Pro Rata portion of the Unsecured Creditor Contingent Recovery Pool (if any, as adjusted for Pro Rata calculations) and (y) 1.46. On the Effective Date, and in exchange for the rights provided under this paragraph to each holder of an Allowed Class I Claim, each Allowed Class I Claim shall be discharged.

    c.    *Voting*: Class I is Impaired and holders of Allowed Class I Claims are deemed to have rejected the Plan.

10.    <u>Class J — Pension Withdrawal Claims</u>

    a.    *Classification*: Class J consists of all Pension Withdrawal Claims.

    b.    *Treatment*: Except to the extent that a holder of an Allowed Class J Claim and the Reorganized Debtors agree to a less favorable treatment, each holder of an Allowed Class J Claim that was a holder of such Claim as of the Distribution Record Date shall receive, on or before the 120th day following the consummation of a Sale Transaction (if any), a distribution from any Unsecured Creditor Contingent Recovery Pool such that the applicable holder's aggregate recovery for its Allowed Class J Claim is equal to the product of (x) its Pro Rata portion of the Unsecured Creditor Contingent Recovery Pool (if any, as adjusted for Pro Rata calculations) and (y) 2.35. On the Effective Date, and in exchange for the rights provided under this paragraph to each holder of an Allowed Class J Claim, each Allowed Class J Claim shall be discharged.

    c.    *Voting*: Class J is Impaired and holders of Allowed Class J Claims are deemed to have rejected the Plan.

11.    <u>Class K — Union Claims</u>

    a.    *Classification*: Class K consists of all Union Claims.

    b.    *Treatment*: Except to the extent that a holder of an Allowed Class K Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class K Claim, each holder of an Allowed Class K Claim shall receive the consideration set forth in the Union Settlement Agreements.

    c.    *Voting*: Class K is Impaired and holders of Allowed Class K Claims are entitled to vote to accept or reject the Plan.

12.    <u>Class L — General Unsecured Claims</u>

    a.    *Classification*: Class L consists of all General Unsecured Claims.

    b.    *Treatment*: Except to the extent that a holder of an Allowed Class L Claim and the Reorganized Debtors agree to a less favorable treatment, each

08-13555-mg    Doc 3472-1    Filed 02/28/12    Entered 02/28/12 09:07:34    Main Document
Plan (Refer to of 3)    Pg 35 of 94
10-14549-reg    Doc 3472-1    Filed 10/15/12    Entered 10/15/12 18:46:34    1st Amended
Pg 244 of 1094    Pg 35 of 94

holder of an Allowed Class L Claim that was a holder of such Claim as of the Distribution Record Date shall receive, on or before the 120th day following the consummation of a Sale Transaction (if any), a distribution equal to its Pro Rata portion of the Unsecured Creditor Contingent Recovery Pool, if any. On the Effective Date, and in exchange for the rights provided under this paragraph to each holder of an Allowed Class L Claim, each Allowed Class L Claim shall be discharged.

c.     *Voting*:  Class L is Impaired and holders of Allowed Class L Claims are deemed to have rejected the Plan.

13.    <u>Class M — Intercompany Claims</u>

a.     *Classification*:  Class M consists of all Intercompany Claims.

b.     *Treatment*:   Subject to the provisions of Article IV.T ("Restructuring Transactions"), holders of Allowed Class M Intercompany Claims shall not receive any distributions on account of such Allowed Class M Intercompany Claims; <u>provided</u>, <u>however</u>, the Debtors and Reorganized Debtors reserve the right to Reinstate any or all Allowed Class M Intercompany Claims on or after the Effective Date in accordance with section 1124 of the Bankruptcy Code and such Reinstated Intercompany Claims, including Intercompany Claims against non-Debtor affiliates, shall vest in the applicable Reorganized Debtor or its successor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and interests.

c.     *Voting*:   Class M is Impaired, and holders of Allowed Class M Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code, unless Allowed Class M Intercompany Claims are Reinstated, in which case the holders of Allowed Class M Intercompany Claims are Unimpaired and are conclusively presumed to accept the Plan.

14.    <u>Class N — Interests in A&P</u>

a.     *Classification*:  Class N consists of all Interests in A&P.

b.     *Treatment*:  Holders of Allowed Class N Interests shall not receive any distributions on account of such Allowed Class N Interests.  On the Effective Date, all Class N Interests shall be canceled and extinguished.

c.     *Voting*:  Class N is Impaired, and holders of Allowed Class N Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Allowed Class N Interests are not entitled to vote to accept or reject the Plan.

15.    <u>Class O — Intercompany Interests</u>

     a.    *Classification*:  Class O consists of all Intercompany Interests.

     b.    *Treatment*:   Subject to the provisions of Article IV.T ("Restructuring Transactions"), holders of Allowed Class O Intercompany Interests shall not receive any distributions on account of such Allowed Class O Intercompany Interests; <u>provided</u>, <u>however</u>, the Debtors and the Reorganized Debtors reserve the right to Reinstate any or all Allowed Class O Intercompany Interests on or after the Effective Date in accordance with section 1124 of the Bankruptcy Code and such Reinstated Intercompany Interests, including Intercompany Interests in non-Debtor affiliates, shall vest in the applicable Reorganized Debtor or its successor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and interests.

     c.    *Voting*:   Class O is Impaired, and holders of Allowed Class O Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, unless Class O Intercompany Interests are Reinstated, in which case the holders of Allowed Class O Intercompany Interests are Unimpaired and are conclusively presumed to accept the Plan.

16.    <u>Class P — Subordinated Claims</u>

     a.    *Classification*:  Class P consists of all Subordinated Claims.

     b.    *Treatment*:   Holders of Allowed Class P Claims shall not receive any distributions on account of such Allowed Class P Claims.  On the Effective Date, all Class P Claims shall be discharged.

     c.    *Voting*:   Class P is Impaired and holders of Allowed Class P Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Allowed Class P Claims are not entitled to vote to accept or reject the Plan.

D.    <u>Special Provision Governing Vote Tabulation</u>

Except as otherwise provided in the Disclosure Statement and the motion to approve the Disclosure Statement and its related exhibits:  (i) if no holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims in such Class; and (ii) any Class of Claims that does not have a holder of an Allowed Claim or Interest or a Claim temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against the holder of any such Unimpaired Claim.

# ARTICLE IV.

# PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.    Use of Proceeds from New Money Commitment and Exit Facility

Unless otherwise provided in the Plan or the Securities Purchase Agreements, the Debtors and Reorganized Debtors, as applicable, shall use the proceeds received from the New Money Commitment, together with proceeds from the Exit Facility and other funds held by the Debtors on the Effective Date, (i) to make cash distributions required by the Plan, (ii) to pay Transaction Expenses not previously paid, (iii) to pay other expenses of the Chapter 11 Cases, to the extent so ordered by the Bankruptcy Court, and (iv) for general corporate purposes.

B.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

C.    NewCo Equity

The issuance of the NewCo Equity by Reorganized A&P to the Investors on the Effective Date in consideration for the New Equity Investment is authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized A&P, as applicable.  Pursuant to the Plan, the issuance and distribution by Reorganized A&P on or after the Effective Date of shares of NewCo Equity to the Investors in consideration for the New Equity Investment (to the extent practicable, directly, or else through a Distribution Agent) to satisfy the Debtors' obligations under the Securities Purchase Agreements, subject to dilution by the Management Equity Incentive Program and/or other agreement or as otherwise provided by the Securities Purchase Agreements, is hereby authorized.  All of the shares of NewCo Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  On the Effective Date, each of Reorganized A&P and the other Reorganized Debtors shall be a private company.  As such, the Reorganized Debtors will not list the NewCo Equity on a national securities exchange as of the Effective Date.

D.    Registration Exemptions

The offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein are expected to be exempt from applicable federal

and state securities laws (including blue sky laws), registration and other requirements, including but not limited to, the registration and prospectus delivery requirements of section 5 of the Securities Act, pursuant to section 4(2) of the Securities Act, or another available exemption from registration under the Securities Act, as applicable. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan or any and all settlement agreements incorporated therein will be transferable under the Securities Act by the recipients thereof, subject to (1) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the Reorganized A&P Charter and the Securities Purchase Agreements and (2) any other applicable regulatory and legal requirements.

E.      Vesting of Assets in the Reorganized Debtors

Except as specifically or expressly provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property of the Debtors' Estates, all of the Debtors' Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, that may be specifically granted to secure the Exit Facility, the New Second Lien Notes and the New Convertible Third Lien Notes, and if applicable, the Replacement Second Lien Notes and the Other Secured Claims). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      Cancellation of Notes, Instruments, Certificates and Other Documents

On the Effective Date, except as otherwise specifically provided for in the Plan or the Securities Purchase Agreements (and except for such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan): (1) the obligations of the Debtors under the DIP Facility, the 1991 Indenture, the 2007 Indenture, the Second Lien Indenture, the Convertible Notes, the 9.125% Senior Notes, the Quarterly Interest Bonds and the Second Lien Notes and any other Certificate, share, note, bond, indenture, purchase right, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity or profits interest in the Debtors or any warrants, options or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership or profits interests in the Debtors giving rise to any Claim or Interest, and any options, or other securities exercisable or exchangeable for, or convertible into Interests or equity of the Debtors, shall be cancelled as to the Debtors; (2) the obligations of the Debtors under the DIP Facility, the 1991 Indenture, the 2007 Indenture, the Second Lien Indenture, the Convertible Notes, the 9.125% Senior Notes, the Quarterly Interest Bonds and the Second Lien Notes shall be fully released, settled, and compromised as to the Debtors and the non-Debtor Affiliates, and the Reorganized Debtors shall not have any continuing obligations thereunder except as otherwise provided in the Plan; and (3) the obligations of the Debtors, the Reorganized Debtors and the non-Debtor Affiliates, pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing any shares, Certificates,

notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; provided, however, that notwithstanding Consummation or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (1) allowing holders to receive distributions under the Plan, (2) allowing and preserving the rights of the DIP Facility Administrative Agent, Second Lien Trustee, and Wilmington Trust, as provided in Article VII herein.

G.      Reinstatement of Intercompany Claims and Interests

In the event that the Debtors elect to Reinstate Intercompany Claims or Intercompany Interests pursuant to Article III.C.13 or Article III.C.15, respectively, each Reorganized Debtor shall, without the need for any further corporate act or other action under any applicable law, regulation, order or rule, issue authorized new Equity Securities to the Reorganized Debtor that was that Debtor's or non-Debtor Affiliate's corporate parent prior to the Effective Date so that each Reorganized Debtor will retain its 100% ownership of its pre-Commencement Date subsidiaries.  The foregoing may be modified by the Debtors and the Investors at any time.

H.      Issuance of New Securities; Execution of Plan Documents

Except as otherwise provided in the Plan or the Securities Purchase Agreements, the Reorganized Debtors shall issue on the Effective Date all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan and the Securities Purchase Agreements (as approved by the Securities Purchase Agreements Order).

I.      Post-Confirmation Property Sales

To the extent the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or Reorganized Debtors, as applicable, purchase or sell any property after the Confirmation Date and prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, may elect to purchase or sell such property pursuant to sections 363, 1123(a)(5)(D), 1141(c), and 1146(a) of the Bankruptcy Code.

J.      Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Debtors or the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be deemed authorized, approved and ratified without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, holders of Claims or Interests, directors, managers or officers of the Debtors, the Reorganized Debtors, or the Investors, or any other Entity or Person, as applicable.  Such actions include (1) the adoption and filing of the Reorganized A&P Charter and the adoption of the Reorganized A&P Bylaws, (2) the appointment of the New Board, (3) the adoption and implementation of the Management Equity Incentive Program, (4) the adoption of severance agreements (as applicable) without action by the New Board as, and to the extent, provided in section 1.11 of the Securities Purchase Agreements, (5) entering into the Management Services Agreement, (6) the authorization,

issuance and distribution pursuant to the Plan and the Securities Purchase Agreements of the New Second Lien Notes, the New Convertible Third Lien Notes, the NewCo Equity, the Investment Warrants and any other Securities to be authorized, issued and distributed pursuant to the Plan and Securities Purchase Agreements, and (7) the consummation and implementation of the Exit Financing.

K.    **Certificate of Incorporation and Bylaws**

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors (other than A&P) shall be amended in a form as may be required to be consistent with the provisions of the Plan, the Securities Purchase Agreements and the Bankruptcy Code, and shall be in form and substance acceptable to the Investors.  The certificate of incorporation and bylaws of A&P shall be as contained in the Plan Supplement and as acceptable to the Investors.  The Reorganized A&P Charter will, among other things, (1) authorize the issuance of the shares of NewCo Equity; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

After the Effective Date, each Reorganized Debtor may amend and restate its certificate of incorporation and other constituent documents as permitted by the laws of its respective state, province, or country of formation and its respective charter and bylaws.

L.    **Effectuating Documents, Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities Purchase Agreements and the Securities issued pursuant thereto in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan or the Securities Purchase Agreements.

M.    **Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the Restructuring Transactions; (2) the creation of any mortgage, deed of trust, Lien or other security interest; (3) the making or assignment of any lease or sublease; (4) the issuance and/or distribution of NewCo Equity, any Replacement Second Lien Notes, the New Second Lien Notes, the New Convertible Third Lien Notes, the Investment Warrants and any other securities

of the Debtors or the Reorganized Debtors; or (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan or the Securities Purchase Agreements, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; or (e) assignment executed in connection with any Restructuring Transaction occurring pursuant to the Plan or the Securities Purchase Agreements.

N.    Directors and Officers of Reorganized A&P

On the Effective Date, the term of the current members of the board of directors of A&P shall expire, and the New Board shall be appointed pursuant to the Securities Purchase Agreements. On and after the Effective Date, each director or officer of Reorganized A&P shall serve pursuant to the terms of the Reorganized A&P Charter, the Reorganized A&P Bylaws, or other constituent documents, the Management Services Agreement, as applicable, and applicable state corporation law. Pursuant to the terms of the Securities Purchase Agreements and the Union Settlement Agreements, the New Board shall be reconstituted to consist of seven directors (or such larger number of directors as may be determined by the Investors in their discretion), of whom at least five directors shall be persons designated by the Investors, one person shall be a person designated by the UFCW (who (x) shall be an independent director and a grocery industry expert, and (y) shall not serve on behalf of, or take directions from, the UFCW), and one person shall be the Chief Executive Officer of the Reorganized Debtors. The Reorganized A&P Bylaws and the Reorganized A&P Charter shall provide that the New Board shall be divided into three classes serving staggered three-year terms. Pursuant to the Securities Purchase Agreements, on or before the Confirmation Hearing, the Investors may provide for employment offers for the Executive Management Team (as defined in the Securities Purchase Agreements).

O.    Officers and Directors of Reorganized Debtors Other Than Reorganized A&P

Unless otherwise provided in the Debtors' disclosure pursuant to section 1129(a)(5) of the Bankruptcy Code, the officers of each of the Reorganized Debtors, other than Reorganized A&P, shall continue to serve in their current capacities after the Effective Date. The classification and composition of the boards of directors of the Reorganized Debtors other than Reorganized A&P shall be consistent with their respective new certificates of incorporation and bylaws, if any. Each such director or officer shall serve from and after the Effective Date pursuant to the terms of the applicable certificate of incorporation, bylaws, other constituent documents, and applicable state corporation law.

P.    Compensation, Pensions and Benefits Programs

1.    Management Equity Incentive Program. The Management Equity Incentive Program for Reorganized A&P shall become effective on the Effective Date without need for further corporate action as contemplated by the Securities Purchase Agreements.

2.    Employee and Retiree Benefits. Except with respect to any equity based awards, rejected employment agreements and any other rejected benefit or compensation plans, and subject to the terms and conditions of the Securities Purchase Agreements and the Union Settlement Agreements, on and after the Effective Date, the Reorganized Debtors may (1) honor,

in the ordinary course of business, any contracts, agreements, policies, programs, and plans for compensation, including bonus compensation, health care benefits, disability benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Commencement Date; provided, however, that the Debtors' or Reorganized Debtors' performance pursuant to any employment agreement that is not a rejected employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, Reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan; provided, further that any such assumed plans and obligation shall be subject to modification in accordance with their terms.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans, nor shall Confirmation of the Plan and/or Consummation of the Restructuring Transactions constitute a change of control under any such contracts, agreements, policies, programs, and plans.

3.    Pensions.  As of the Effective Date, the Reorganized Debtors shall continue the A&P Pension Plans in accordance with, and subject to, their terms, ERISA, and the Internal Revenue Code, and shall preserve all of their rights thereunder.  The A&P Pension Claims and all Proofs of Claims filed on account thereof shall be deemed withdrawn as of the Effective Date without any further action of the Debtors, the Reorganized Debtors or the PBGC, and without any further action, order, or approval of the Bankruptcy Court.

4.    Workers' Compensation Programs.  As of the Effective Date, except as set forth in the Securities Purchase Agreements and Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans; provided, further, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

Q.    Intercompany Account Settlement

The Debtors and the Reorganized Debtors, and their respective Affiliates, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers

will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

R.    Preservation of Rights of Action

Subject to the releases set forth in Article VIII.D and Article VIII.E below and waiver in Article IV.S, unless any of the Debtors' Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Debtors' Causes of Action, whether arising before or after the Commencement Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any of the Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all of their available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all of their Causes of Action against any Entity, except as otherwise expressly provided in the Plan or a Final Order.**  Unless any of the Debtors' Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Further, subject to the releases set forth in Article VIII.D and Article VIII.E below, the Reorganized Debtors reserve and shall retain the foregoing Debtors' Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

S.    Avoidance Actions

The Debtors and Reorganized Debtors waive all Avoidance Actions, provided, however, that any Avoidance Action against an Entity that asserts a Secured Tax Claim, Other Secured Claim, Other Priority Claim or any Administrative Claim that arises outside the ordinary course of the Debtors' business (which, for the avoidance of doubt, shall not include Claims entitled to

administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code), against the Debtors is expressly preserved solely for the purposes of resolving Disputed Claims pursuant to Article VI, provided, further, that notwithstanding anything herein, any Avoidance Action that was commenced against an Entity by the Debtors prior to December 31, 2010 is expressly preserved.

T.    Restructuring Transactions

On or prior to the Effective Date, the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or the Reorganized Debtors may enter into such transactions, execute and deliver such agreements, instruments and other documents, and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein, with the consent of the Investors. The Restructuring Transactions may include one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, asset sales, liquidations, or other corporate transactions as may be determined by the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or the Reorganized Debtors, as applicable, and the Investors, to be necessary or appropriate to implement the transactions provided for in the Securities Purchase Agreements.  None of the Restructuring Transactions contemplated herein or in the Securities Purchase Agreements shall constitute a change of control under any agreement, contract or document of the Debtors or Reorganized Debtors, as applicable.  Subject to the Securities Purchase Agreements, the actions to effect the Restructuring Transactions may include:    (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Securities Purchase Agreements and that satisfy the requirements of applicable law and any other terms to which the relevant entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Securities Purchase Agreements and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) pledging, granting of liens or security interests over, assuming or guarantying obligations or taking such similar actions as may be necessary to preserve the rights and collateral interests of the secured creditors of the Debtors and their subsidiaries at all times prior to the effectiveness and consummation of the Plan; (5) the creation of a new holding company, as provided in the Securities Purchase Agreements, or other changes to the organizational structure of the Debtors or the Reorganized Debtors, as applicable, as determined by the Debtors or the Reorganized Debtors, as applicable, and the Investors; and (6) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions or that are otherwise provided for in the Securities Purchase Agreements.

U.      Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended pursuant to the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable state, provincial, or federal law), *provided*, *however*, that the Investors may elect to have a new holding company formed pursuant to the Securities Purchase Agreements.

V.      Tax Reporting Matters

All parties (including the Reorganized Debtors and holders of Claims and Interests) shall report for all federal income tax purposes in a manner consistent with the Plan.

W.      Management Services Agreement

On the Effective Date, and pursuant to the terms of the Securities Purchase Agreements, Reorganized A&P or one of its Affiliates (as agreed among Yucaipa, Liberty Harbor, Mount Kellett and the Debtors or Reorganized Debtors, as applicable) shall enter into the Management Services Agreement with The Yucaipa Companies, LLC.

X.      Adequate Assurance Deposits

Notwithstanding anything to the contrary in the Plan or in an order previously entered by the Bankruptcy Court, unless the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or Reorganized Debtors, with the reasonable consent of the Investors, otherwise agree, all adequate assurance deposits provided by the Debtors to utility providers pursuant to the *Order Determining Adequate Assurance of Payment for Future Utility Services* [Docket No. 503] shall be returned to the Reorganized Debtors within 10 business days of the Effective Date.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein and pursuant to the terms and conditions of the Securities Purchase Agreements, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired

Lease: (1) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date (including retroactively), which order becomes a Final Order after the Effective Date; (3) is the subject of a motion to assume or reject pending as of the Effective Date; (4) is an Intercompany Contract, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Final Order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; or (5) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.  All Executory Contracts and Unexpired Leases rejected by the Debtors on or prior to the Effective Date will not be continuing obligations of the Debtors or Reorganized Debtors.

Further, the Plan Supplement will contain a schedule of "Rejected Executory Contracts and Unexpired Leases," as may be amended from time to time with the consent, as provided in the Securities Purchase Agreements, of the Investors; provided, however, that any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed in the schedule of "Assumed Executory Contracts and Unexpired Leases" will be rejected on the Effective Date, notwithstanding its exclusion from the schedule of "Rejected Executory Contracts and Unexpired Leases".

B.    Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein and pursuant to the terms and conditions of the Securities Purchase Agreements, in addition to those Executory Contracts and Unexpired Leases previously assumed by the Debtors pursuant to a Final Order (and not otherwise subsequently rejected prior to the Effective Date), the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) shall assume all of the Executory Contracts and Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," as may be amended from time to time, in the Plan Supplement and otherwise identified for assumption pursuant to Article V.A above.  With respect to each such Executory Contract and Unexpired Lease listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code; however, parties shall not be precluded from filing objections to the Debtors' proposed Cure by the Cure Objection Deadline.

1.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors shall include all modifications, amendments,

supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder; provided, however, that any anti-assignment provision in any assumed Executory Contract and/or Unexpired Lease shall be deemed invalid for the purposes of assumption and/or assignment pursuant to section 365 of the Bankruptcy Code in these Chapter 11 Cases, including assignment of any assumed Executory Contract and/or Unexpired Lease to any affiliate of the Debtors or Reorganized Debtors on or prior to the Effective Date.[4] Confirmation of the Plan and Consummation of the Restructuring Transactions shall not constitute a change of control under any Unexpired Lease or Executory Contract assumed by the Debtors on or prior to the Effective Date.  Any assignment by the Reorganized Debtors of an Executory Contract or Unexpired Lease after the Effective Date shall be governed by the terms of the Executory Contract or Unexpired Lease and applicable non-bankruptcy law.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

2.    <u>Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed</u>.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cures, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

3.    <u>Assumption of Modified Collective Bargaining Agreements</u>.  Unless previously assumed by the Debtors, on the Effective Date, the Debtors, pursuant to section 365 of the Bankruptcy Code, shall assume (a) the Modified Collective Bargaining Agreements as provided in the Union Settlement Agreements and as approved by the Bankruptcy Court and (b) the Other Collective Bargaining Agreements.  Notwithstanding any other provision of this Plan, the cure obligations, if any, related to the assumption of each of the Modified Collective Bargaining Agreements and the Other Collective Bargaining Agreements, shall be satisfied by the Reorganized Debtors by payment, in the ordinary course, of all obligations arising under the Modified Collective Bargaining Agreements and any of the Other Collective Bargaining Agreements, including grievance settlements and arbitration awards subject to the Union Settlement Agreements and related documents and side letters.  All Proofs of Claim filed by the UFCW, the UFCW Local Unions, the SEIU and the SEIU Local Union for amounts due under any collective bargaining agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein.

---

[4]    The Debtors and Reorganized Debtors will take all necessary steps to comply with state liquor, pharmacy and food sales laws and regulations.

C.    <u>Indemnification Obligations</u>

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall assume and be deemed to have assumed the Indemnification Obligations as of and on the Effective Date other than any Indemnification Obligation that was previously rejected by the Debtors pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject filed by the Debtors that was pending as of the Effective Date; <u>provided</u> <u>that</u> the Reorganized Debtors shall assume and be deemed to have assumed Indemnification Obligations for a former director or officer that was not employed by, engaged by, or serving in such capacity for the Debtors at any time following November 1, 2010 only if the Debtor Release provided under Article VIII.D hereof is approved by the Bankruptcy Court with respect to such former director or officer; <u>provided</u> <u>further</u> <u>that</u> Indemnification Obligations assumed or deemed assumed by the Reorganized Debtors pursuant to this Article V.C shall not be limited to obligations arising from or related to claims settled or released pursuant to the Debtor Release.  Each Indemnification Obligation that is assumed or deemed assumed pursuant to this Article V.C shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way (whether by the Plan, a Restructuring Transaction, or otherwise), and shall be Unimpaired and unaffected, irrespective of when such obligation arose.

D.    <u>Insurance Policies</u>

Each insurance policy shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is included in the schedule of "Rejected Executory Contracts and Unexpired Leases" contained in the Plan Supplement.  Notwithstanding anything to the contrary in the Plan or the Plan Supplement (including any other provision that purports to be preemptory or supervening), nothing in the Plan or the Plan Supplement shall in any way operate to, or have the effect of, impairing the legal, equitable or contractual rights of the Debtors' insurers, if any, in any respect or the rights of the Debtors or any other party against the Debtors' insurers or in respect of any insurance of the Debtors.  The rights of the Debtors and the Debtors' insurers vis-à-vis one another shall be determined under their respective insurance policies and any related agreements with the Debtors, if any, subject to the rights of the Debtors to assume any such policy or agreement in accordance with this provision.

E.    <u>Objections to Assumption of Executory Contracts and Unexpired Leases Including Cure of Defaults</u>

With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) shall designate a proposed Cure, however, the assumption of such Executory Contracts or Unexpired Leases shall not be conditioned upon the disposition of all issues with respect to Cure.[5]  Such Cure shall be

---

[5]    For the avoidance of doubt, the Debtors' assumption of the Executory Contracts and Unexpired Leases, pursuant to the Confirmation Order, shall occur as of the Effective Date despite any pending or unresolved objections to such assumptions based on Cure grounds.

satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. Nothing herein or in the Confirmation Order shall impact any unresolved Cure disputes or pending Cure objections filed by parties to Executory Contracts and Unexpired Leases that have been previously assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

Five days prior to the objection deadline for the Confirmation Hearing, and subsequently as needed pursuant to the amendment of the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall file with the Bankruptcy Court and serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (1) list the applicable Cure, if any, (2) describe the procedures for filing objections to the proposed assumption or Cure, and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Except with respect to Executory Contracts and Unexpired Leases in which the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors (*i.e.*, Cure objections) must be filed with the Claims and Solicitation Agent on or before the Cure Objection Deadline. In addition, any non-Cure objection to the assumption of an Executory Contract or Unexpired Lease, to be deemed timely, must be filed with the Bankruptcy Court within fourteen days of receipt of the applicable notice of proposed assumption. To the extent counterparties file timely non-Cure objections to the assumption of any Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan, and such disputes are not consensually resolved by the parties, such assumption shall be subject to entry of a Final Order approving such assumption, provided, that, such assumption will occur retroactively, at the discretion of the Debtors or Reorganized Debtors, to the Effective Date if approved by the Bankruptcy Court. Timely raised Cure and non-Cure objections to assumption may be litigated after the Effective Date.

Any request for payment of Cure that is not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such

Cure and any related issues.  If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease and associated Cure will be deemed to have consented to such assumption and Cure.  The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption, or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

F.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

G.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court no later than 30 days after the later of the Effective Date or the effective date of rejection. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed.

H.    <u>Contracts, Intercompany Contracts, and Leases Entered Into After the Commencement Date</u>

Contracts, Intercompany Contracts, and leases entered into after the Commencement Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

I.    <u>Reservation of Rights</u>

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is any objection filed to the rejection of an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, shall have 45 days after entry of a Final Order resolving such objection to alter their treatment of such contract or lease.

## ARTICLE VI.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.    <u>Allowance of Claims and Interests</u>

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article IV.R above.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until (i) the Debtors or Reorganized Debtors, as applicable, agree that such Claim is Allowed, <u>provided</u>, <u>however</u>, the Debtors shall not (I) Allow or settle, or (II) seek to Allow or settle, in either case any Administrative Claim or Priority Claim in excess of $250,000 arising outside the ordinary course of business without the Investors' consent, which consent shall not be unreasonably withheld or delayed; <u>provided</u>, <u>that</u> (w) each of the Investors shall be deemed a Negative Notice Party (as defined in the Settlement Procedures Order); (x) each of the Investors shall have standing to object to a settlement of a Claim proposed pursuant to the Settlement Procedures Order; (y) each of the Investors shall have the same consultation and information rights provided to the Creditors' Committee and counsel for the DIP Facility Administrative Agent pursuant to paragraph 2(g) of the Settlement Procedures Order with respect to proposed settlements of Third-Party Claims and Debtors' Claims (each as defined in the Settlement Procedures Order) and (z) the Debtors shall not propose a settlement of an Administrative Claim or a Priority Claim outside the ordinary course of business in excess of $250,000 pursuant to Paragraph 2(d) of the Settlement Procedures Order without the Investors' prior written consent (which consent shall not be unreasonably withheld or delayed), or (ii) such Claim is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

B.    Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan or the Securities Purchase Agreements, after the Effective Date, the Reorganized Debtors shall have the sole authority (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests, (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    Estimation of Claims and Interests

Before or after the Effective Date, the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.    Expungement or Adjustment to Paid, Satisfied, or Superseded Claims and Interests

Any Claim or Interest that has been paid, satisfied, or superseded, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    No Interest

Unless otherwise specifically provided for in the Plan (including with respect to the Allowed amount of any Claims hereunder), required under applicable bankruptcy law, or agreed to by the Debtors, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a holder of a Claim, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.   **DISALLOWANCE OF CLAIMS OR INTERESTS**

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS SHALL NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

All Secured Tax Claims, Other Secured Claims, Other Priority Claims and Administrative Claims arising outside the ordinary course of the Debtors' business (which, for the avoidance of doubt, shall not include Claims entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code), of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.   Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, provided, that, after the Effective Date, holders of Allowed and Disputed Claims in Classes E, F, G, H, I, J and L may provide updated notice and address information for distribution purposes to the Claims Agent.

H.   No Distributions Pending Allowance

If an objection to a Claim or portion thereof is filed prior to the Effective Date, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim.

I.   Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions, if any, shall be made to the holder of such Allowed Claim; however, the timing of such distributions(s) shall be at the sole reasonable discretion of the Debtors or Reorganized Debtors, and otherwise in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim the distribution, if

any, to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

J.        Disputed Claims Reserve

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall deposit in the Disputed Claims Reserve any and all assets or Cash, as determined by the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or Reorganized Debtors, that would likely have been distributed to the holders of all applicable Disputed Claims (other than Disputed Claims that would otherwise, if Allowed, be Allowed Claims in Classes E, F, G, H, I, J and L) as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be (a) the lesser of (i) the asserted amount of each Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim or as provided by the parties to the Debtors as further information with respect to the Proof of Claim, or (if no Proof of Claim was filed) scheduled by the Debtors, and (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court, or (b) the amount otherwise agreed to by the Debtors, the Creditors' Committee, the Investors and the holder of such Disputed Claim for reserve purposes.

To the extent the Reorganized Debtors have not fully resolved the Disputed Claims in Classes E, F, G, H, I, J and L by the occurrence (if at all) of a Sale Transaction and triggering of the Unsecured Creditor Contingent Recovery Pool (if any), the Reorganized Debtors shall create a disputed claims reserve substantially similar to the mechanism described in the paragraph above for the benefit of holders of Claims in Classes E, F, G, H, I, J and L.

K.        Distributions Following Resolution of All Claims

When all Disputed Claims are resolved and either become Allowed or are disallowed by Final Order, to the extent assets remain in the Disputed Claims Reserve after all holders of Disputed Claims (other than Disputed Claims that would otherwise, if Allowed, be Allowed Claims in Classes E, F, G, H, I, J and L) that have become Allowed and have been paid the full amount they are entitled to pursuant to the treatment set forth for the appropriate Class under the Plan, then that excess shall be distributed to the Reorganized Debtors for Pro Rata distributions on account of any Allowed Claims in Classes other than Classes E, F, G, H, I, J and L.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.        Distributions on Account of Claims Allowed as of the Effective Date

1.        Delivery of Distributions in General.  Except as otherwise provided in the Plan or the Securities Purchase Agreements, a Final Order, or as otherwise agreed to by the relevant parties on the Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; provided, however, that (a) Allowed

Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (b) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Commencement Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

2.      <u>Delivery of Distributions on account of DIP Facility Claims</u>.  The DIP Facility Administrative Agent:  (a) shall be deemed to be the holder of all DIP Facility Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of Allowed DIP Facility Claims to or on behalf of the DIP Facility Administrative Agent; (b) shall hold or direct such distributions for the benefit of the holders of Allowed DIP Facility Claims, as applicable; and (c) shall arrange to deliver such distributions to or on behalf of such holders of Allowed DIP Facility Claims; <u>provided</u>, <u>however</u>, the DIP Facility Administrative Agent shall retain all rights as administrative agent under the DIP Facility Credit Agreement in connection with delivery of distributions to DIP Facility Lenders; and <u>provided</u> <u>further</u>, <u>however</u>, that the Debtors' obligations to make distributions in accordance with Article II.C shall be deemed satisfied upon delivery of distributions to the DIP Facility Administrative Agent.

3.      <u>Delivery of Distributions on account of the Second Lien Note Claims</u>.  The Second Lien Trustee:  (a) shall be deemed to be the holder of the Second Lien Note Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such Allowed Second Lien Note Claims to the Second Lien Trustee or on behalf of the Second Lien Trustee, provided that the Second Lien Trustee has given its prior written consent to the Distribution Agent to make such distributions; (b) shall hold or direct such distributions for the benefit of the holders of the Allowed Second Lien Note Claims, as applicable; and (c) shall arrange to deliver such distributions to or on behalf of the holders of the Allowed Second Lien Note Claims; <u>provided</u>, <u>however</u>, the Second Lien Trustee shall retain all rights as trustee under the Second Lien Indenture in connection with (i) delivering distributions to the holders of Allowed Second Lien Note Claims in accordance with the Plan and the Second Lien Indenture, (ii) permitting the Second Lien Trustee to exercise its charging lien under Section 7.07 of the Second Lien Indenture and (iii)  allowing the Second Lien Trustee to appear in the Chapter 11 Cases after the Effective Date with respect to issues related to distributions.  For the avoidance of doubt, the Second Lien Trustee shall only be required to act to make distributions in accordance with the terms of the Plan.  The Debtors' obligations to make distributions in accordance with Article III.C.1 above, including with respect to distributions due on the Effective Date pursuant to the Plan Support Agreement, shall be deemed satisfied upon delivery of distributions to the Second Lien Trustee or, if consent of the Second Lien Trustee is given as provided above, to the Distribution Agent on behalf of the Second Lien Trustee, as provided for herein.

4.      <u>Delivery of Distributions on account of Indenture Claims</u>.  Wilmington Trust as indenture trustee for the Notes Indentures:  (a) shall be deemed to be the holder of all Indenture Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of Allowed Indenture Claims to or on behalf of Wilmington Trust; (b) shall hold or direct such distributions for the benefit of the holders of the Allowed Indenture Claims, as applicable; (c) shall arrange to deliver such distributions to or on behalf of the holders of the Allowed Indenture Claims; <u>provided</u>, <u>however</u>, Wilmington Trust shall retain all rights as the indenture trustee for the Convertible Notes, 9.125% Senior Notes and Quarterly Interest Bonds under the Notes Indentures in connection with delivery of distributions; and <u>provided</u> <u>further</u>, <u>however</u>, that the Debtors' obligations to make distributions in accordance with Article III.C.5, Article III.C.6 and Article III.C.7 shall be deemed satisfied upon delivery of distributions to Wilmington Trust.

B.      <u>Distributions on Account of Claims Allowed After the Effective Date</u>

1.      <u>Payments and Distributions on Disputed Claims</u>.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties (including the Debtors, the Reorganized Debtors and/or the Investors, as applicable), distributions under the Plan on account of Disputed Claims (other than Disputed Claims in Classes E, F, G, H, I, J and L) that become Allowed after the Effective Date shall be made on the Periodic Distribution Date; <u>provided</u>, <u>however</u>, that (a) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Claims that are Priority Tax Claims or Secured Tax Claims that become Allowed Priority Tax Claims or Allowed Secured Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

2.      <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties (including the Debtors, the Reorganized Debtors and/or the Investors, as applicable), (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to holders of Allowed Claims included in the applicable Class; <u>provided</u>, <u>however</u>, that no interest shall be paid on account of such Allowed Claims

52

unless required under applicable bankruptcy law or specifically provided for in the Plan (including with respect to the Allowed amount of any Claims hereunder).

C.    Delivery of Distributions

1.    Record Date for Distributions.  On the Distribution Record Date, the Claims Register shall be closed and when making distributions on or after the Effective Date, the Distribution Agent shall be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Distribution Process.  Except as otherwise provided herein, the Distribution Agent shall make, on and after the Effective Date, all distributions to holders of Allowed Claims required under the Plan, except that distributions to holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement. Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims shall be made, on or after the Effective Date, to holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate:  (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (c) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004 if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; (d) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

3.    Accrual of Dividends and Other Rights.  For purposes of determining the accrual of dividends or other rights after the Effective Date, the NewCo Equity shall be deemed issued as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; provided however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after the issuance of NewCo Equity actually take place.

4.    Compliance Matters.  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

     5.    <u>Foreign Currency Exchange Rate</u>.  Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Monday, December 13, 2010 as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal, National Edition*, on Monday, December 13, 2010.

     6.    <u>Fractional, De Minimis, Undeliverable, and Unclaimed Distributions</u>.

     a.    <u>Fractional Distributions</u>.  Notwithstanding any other provision of the Plan to the contrary, the Distribution Agent shall not be required to make distributions or payments of fractions of dollars.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

     b.    <u>De Minimis Distributions</u>.  Neither the Distribution Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $250,000, or (ii) the amount to be distributed to the specific holder of an Allowed Claim on the particular Periodic Distribution Date does not constitute a final distribution to such holder.  The Distribution Agent need not make any distribution on account of an Allowed Claim to a specific holder if such distribution on such Allowed Claim is less than $25.00.

     c.    <u>Undeliverable Distributions</u>.  If any distribution to a holder of an Allowed Claim is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Distribution Agent is notified in writing of such holder's then-current address, at which time all currently due missed distributions shall be made to such holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VII.C.6.d below, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

     d.    <u>Reversion</u>.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed

property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is NewCo Equity, shall be deemed cancelled. Upon such revesting, the Claim of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

7. __Surrender of Cancelled Instruments or Securities__. Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding that a holder of a Certificate will be deemed to have surrendered such Certificate, regardless of any actual surrender, the deemed surrender of a Certificate shall have the same effect as if such holder had actually surrendered such Certificate (including but not limited to the discharge of such holder's Claim pursuant to the Plan), and such holder shall be deemed to have relinquished all rights, Claims and interests with respect to such Certificate. Notwithstanding the foregoing paragraph, this Article VII.C.7 shall not apply to any Claims Reinstated pursuant to the terms of the Plan.

8. __Lost, Stolen, Mutilated, or Destroyed Debt Securities__. Any holder of Allowed Claims evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate, and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such holder as a holder of an Allowed Claim. Upon compliance with this procedure by a holder of an Allowed Claim evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

D. __Claims Paid or Payable by Third Parties__

1. __Claims Paid by Third Parties__. The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a holder of a Claim receives a

distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.     <u>Claims Payable by Insurance Carriers</u>.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     <u>Applicability of Insurance Policies</u>.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

E.     <u>Setoffs</u>

Except as otherwise expressly provided for in the Plan or a Final Order of the Bankruptcy Code, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided</u>, <u>however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder. In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has timely filed a Proof of Claim with the Bankruptcy Court preserving such setoff.

F.     <u>Allocation Between Principal and Accrued Interest</u>

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the

principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any permitted pursuant to the Plan, accrued through the Effective Date.

## ARTICLE VIII.

## EFFECT OF CONFIRMATION OF THE PLAN

A.  **DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN AND EFFECTIVE AS OF THE EFFECTIVE DATE:  (1) THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON SUCH CLAIMS FROM AND AFTER THE COMMENCEMENT DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES; (2) THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS, NOTWITHSTANDING WHETHER ANY SUCH HOLDERS FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, VOTED TO ACCEPT THE PLAN OR VOTED TO REJECT THE PLAN; (3) ALL CLAIMS AND INTERESTS SHALL BE SATISFIED, DISCHARGED, AND RELEASED IN FULL, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE; AND (4) ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, THEIR SUCCESSORS AND ASSIGNS, AND THEIR ASSETS AND PROPERTIES ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED PRIOR TO THE EFFECTIVE DATE.**

B.  Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise, and any such rights shall be settled, compromised, and released pursuant to the Plan. Specifically, pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

C.  Compromise and Settlement of Claims and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any

distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement, including the Substantive Consolidation Settlement, is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

D.    **RELEASES BY THE DEBTORS**

**NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AND PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE SETTLEMENT, RELEASE, AND COMPROMISE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDIENT IMPLEMENTATION OF THE RESTRUCTURING TRANSACTIONS CONTEMPLATED HEREBY, EACH OF THE DEBTORS, THE REORGANIZED DEBTORS AND THE DEBTORS' ESTATES (INCLUDING ALL PARTIES CLAIMING DERIVATIVELY OR THROUGH THE DEBTOR OR THE REORGANIZED DEBTORS OR THEIR ESTATES) OR THEIR AFFILIATES DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH RELEASED PARTY AND THEIR RESPECTIVE PROPERTY (THE "DEBTOR RELEASE") FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, RIGHTS OF SETOFF, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS) WHETHER KNOWN OR UNKNOWN, MATURED OR UNMATURED, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, EQUITY OR OTHERWISE, WHETHER FOR TORT, CONTRACT VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE SECURITIES PURCHASE AGREEMENTS, THE PLAN SUPPORT AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE ISSUANCE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR, ANY RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER**

11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE PLAN SUPPORT AGREEMENT, THE SECURITIES PURCHASE AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR ANY OF THEIR ESTATES; **PROVIDED,** **HOWEVER,** THAT THE FOREGOING DEBTOR RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR LIABILITIES OF ANY DEBTOR: (1) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTORS, INCLUDING UNDER THE SECURITIES PURCHASE AGREEMENTS, THE PLAN SUPPORT AGREEMENT OR THE EXIT FACILITY; (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; OR (3) CONSTITUTING INTERCOMPANY CLAIMS THAT ARE REINSTATED PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE REORGANIZED DEBTORS HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST ANY PARTY (INCLUDING, BUT NOT LIMITED TO, A RELEASED PARTY) ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE REORGANIZED DEBTORS ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

E.    **RELEASES BY HOLDERS OF CLAIMS**

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND AS OF THE EFFECTIVE DATE, THE

RELEASING PARTIES DISCHARGE AND RELEASE (AND EACH ENTITY SO DISCHARGED AND RELEASED SHALL BE DEEMED DISCHARGED AND RELEASED BY THE RELEASING PARTIES) (THE "<u>THIRD PARTY RELEASE</u>") THE REORGANIZED DEBTORS, THEIR ESTATES, THEIR RESPECTIVE PROPERTY, AND THE RELEASED PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE RELEASING PARTY, WHETHER KNOWN OR UNKNOWN, MATURED OR UNMATURED, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATION OF FEDERAL OR STATE SECURITIES LAW OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, THE SECURITIES PURCHASE AGREEMENTS, THE PLAN SUPPORT AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE CHAPTER 11 CASES, THE ISSUANCE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR, ANY RELEASED PARTIES, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT, THE PLAN SUPPORT AGREEMENT, THE SECURITIES PURCHASE AGREEMENTS, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING THOSE THAT ANY OF THE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ITSELF, THE DEBTORS OR ANY OF THEIR ESTATES; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO RELEASE CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, REMEDIES, CAUSES OF ACTION, AND LIABILITIES OF ANY RELEASING PARTY: (1) AGAINST A RELEASING PARTY OR A PARTY RELEASING UNDER THIS THIRD PARTY RELEASE ARISING FROM ANY CONTRACTUAL OBLIGATIONS OWED TO THE RELEASING PARTY OR LIABILITIES OF ANY RELEASING PARTY; (2) ARISING UNDER THE SECURITIES PURCHASE AGREEMENTS OR THE PLAN SUPPORT AGREEMENT; (3) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS; OR (4) AGAINST A PROFESSIONAL WITH RESPECT TO SUCH PROFESSIONAL'S FINAL FEE APPLICATION OR ACCRUED PROFESSIONAL COMPENSATION CLAIMS IN THESE CHAPTER 11 CASES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY (1) POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY

UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, OR (2) CLAIMS ARISING UNDER THE SECURITIES PURCHASE AGREEMENTS.  FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL IN ANY WAY AFFECT THE OPERATION OF ARTICLE VIII.A OF THE PLAN, PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY CODE.

NOTWITHSTANDING ANYTHING IN THE PLAN, NO PERSON SHALL BE DISCHARGED, RELEASED, OR RELIEVED FROM ANY LIABILITY ARISING UNDER ERISA OR THE INTERNAL REVENUE CODE SOLELY WITH RESPECT TO THE A&P PENSION PLANS AS A RESULT OF THE DEBTORS' REORGANIZATION PROCEEDINGS OR CONFIRMATION OF THE PLAN.  NOR SHALL THE PENSION BENEFIT GUARANTY CORPORATION, THE A&P PENSION PLANS, OR ANY OTHER PERSON BE ENJOINED OR PRECLUDED FROM ENFORCING ANY LIABILITY ARISING UNDER ERISA OR THE INTERNAL REVENUE CODE SOLELY WITH RESPECT TO THE A&P PENSION PLANS AS A RESULT OF THE DEBTORS' REORGANIZATION PROCEEDINGS, THE PLAN'S PROVISIONS OR THE PLAN'S CONFIRMATION.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE REORGANIZED DEBTORS HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST ANY PARTY (INCLUDING, BUT NOT LIMITED TO, A RELEASED PARTY) ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, EACH AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASING PARTIES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

## F.    WAIVER OF STATUTORY LIMITATIONS ON RELEASES

EACH OF THE RELEASING PARTIES IN EACH OF THE RELEASES CONTAINED IN ARTICLE VIII.D AND ARTICLE VIII.E ABOVE EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, THEY HAVE CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING, WITHOUT LIMITATION, THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542.    THE RELEASES CONTAINED IN ARTICLE VIII.D AND ARTICLE VIII.E ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

## G.    EXCULPATION

THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING OR EFFECTING THE EFFECTIVE DATE OF THE PLAN, THE DISCLOSURE STATEMENT, THE SECURITIES PURCHASE AGREEMENTS, THE PLAN SUPPORT AGREEMENT, THE RESTRUCTURING TRANSACTIONS, THE ISSUANCE AND/OR DISTRIBUTION OF NEWCO EQUITY, THE NEW SECOND LIEN NOTES, THE REPLACEMENT SECOND LIEN NOTES, IF APPLICABLE, THE NEW CONVERTIBLE THIRD LIEN NOTES, THE INVESTMENT WARRANTS OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PRE-PETITION OR POST-PETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE PLAN OR THE RESTRUCTURING OF THE DEBTORS (COLLECTIVELY, "EXCULPATED CLAIMS"); PROVIDED, THAT THE FOREGOING PROVISIONS OF THIS EXCULPATION SHALL HAVE NO EFFECT ON (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR (B) THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS

NEGLIGENCE OR WILLFUL MISCONDUCT; **PROVIDED**, **FURTHER**, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN; **PROVIDED FURTHER**, THAT THE FOREGOING "**EXCULPATION**" SHALL NOT APPLY TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, EXCEPT FOR ACTS OR OMISSIONS OF RELEASING PARTIES.

H.    **INJUNCTION**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D HEREOF; (3) HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.E; (4) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G HEREOF, INCLUDING EXCULPATED CLAIMS (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE VIII.E); OR (5) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTIONS OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE REORGANIZED DEBTOR, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF

SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY
OBLIGATION DUE FROM THE DEBTORS, THE REORGANIZED DEBTORS, OR
ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR
ESTATES OF THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY
SO RELEASED OR EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH
OR WITH RESPECT TO ANY SUCH RELEASED, SETTLED, COMPROMISED, OR
EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION OR LIABILITIES
UNLESS SUCH HOLDER HAS FILED A TIMELY PROOF OF CLAIM WITH THE
BANKRUPTCY COURT PRESERVING SUCH RIGHT OF SETOFF PURSUANT TO
SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (E)
COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER
PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED
DEBTORS, THE INVESTORS OR ANY ENTITY SO RELEASED OR EXCULPATED
(OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE REORGANIZED
DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED) ON
ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH
RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS,
CAUSES OF ACTION, OR LIABILITIES RELEASED, SETTLED OR
COMPROMISED PURSUANT TO THE PLAN; **PROVIDED THAT** NOTHING
CONTAINED HEREIN SHALL PRECLUDE AN ENTITY FROM OBTAINING
BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT
TO THE TERMS OF THE PLAN; **PROVIDED, FURTHER, THAT** NOTHING
CONTAINED HEREIN SHALL BE CONSTRUED TO PREVENT ANY ENTITY
FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION
ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO
THE EXTENT PERMITTED BY LAW.

I.      Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the
United States Constitution, no Governmental Unit shall discriminate against the Reorganized
Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or
other similar grant to, condition such a grant to, discriminate with respect to such a grant against,
the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been
associated, solely because one of the Debtors has been a debtor under chapter 11, has been
insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but
before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in
the Chapter 11 Cases.

J.      Indemnification

Notwithstanding anything in the Plan to the contrary, all indemnification provisions
currently in place (whether in the Securities Purchase Agreements, by-laws, certificates of
incorporation, articles of limited partnership, board resolutions, contracts, or otherwise) for the
directors, officers, employees, attorneys, other professionals, and agents of the Debtors that
served in such capacity from and after the Commencement Date and such directors' and officers'

respective affiliates, shall be reinstated (or assumed, as the case may be), and shall survive effectiveness of the Plan.

K.    Recoupment

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

L.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

M.    Reimbursement or Contribution

If a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code is (i) disallowed by the Bankruptcy Court or (ii) contingent as of the Effective Date, then such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

# ARTICLE IX.

# CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B hereof:

1.    the Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors and the Investors, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code and such order shall be in full force and effect and shall have become a Final Order;

2.    the Confirmation Order: (i) shall be entered by the Bankruptcy Court on or before March 30, 2012 (as such date may be extended with the consent of the Debtors and the Investors, which consent shall not be unreasonably withheld or delayed); (ii) shall include the provisions in

Exhibit D to the Securities Purchase Agreements and otherwise be in form and substance acceptable to the Investors; and (iii) shall be in full force and effect and, unless waived by the Investors, shall have become a Final Order;

3.      the Plan and Plan Supplement, including any amendments, modifications, or supplements thereto, shall be in form and substance reasonably acceptable to the Investors and shall not have been modified without the consent of the Investors (such consent not to have been unreasonably withheld in the case of a modification that is not adverse to the Investors);

4.      the Transaction Expenses (as defined and provided in the Securities Purchase Agreements), to the extent not previously paid, shall be paid concurrently with the Effective Date in Cash in accordance with the terms of the Securities Purchase Agreements as approved by the Securities Purchase Agreements Order;

5.      the Commitment Fee shall be paid concurrently with the Effective Date to Liberty Harbor and Mount Kellett, as provided in the Securities Purchase Agreements;

6.      the Debtors shall have obtained an Exit Facility on terms as provided in the Securities Purchase Agreements and the Plan, and on terms and conditions reasonably acceptable to the Investors, and all conditions precedent to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof and the closing of the Exit Facility shall occur concurrently with the Effective Date;

7.      with respect to all actions, documents, Certificates, and agreements necessary to implement the Plan (a) all conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements, (b) such documents, Certificates and agreements shall have been tendered for delivery, (c) to the extent required, such documents, Certificates and agreements shall have been filed with and approved by any applicable Governmental Units in accordance with applicable laws, and (d) such actions, documents, Certificates and agreements shall have been effected or executed;

8.      the Cash payable pursuant to Article III.C.1.c shall be distributed on the Effective Date as provided herein;

9.      all conditions to the effectiveness of the Securities Purchase Agreements shall have been satisfied or waived in accordance with the terms thereof; and

10.     all other "Conditions to Investors' Obligations at Closing" identified in section 5.1 of the Securities Purchase Agreements shall have been satisfied or waived by the Investors in accordance with the terms thereof.

B.      Waiver of Conditions Precedent

Subject to the terms of the Securities Purchase Agreements, the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) and the Investors may jointly waive any of the conditions to the Effective Date set forth in Article IX.A, other than the condition set forth in Article IX.A.8 (unless consented to by the Consenting Noteholders in accordance with the Plan Support Agreement) at any time without any notice to other parties in

interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

C.    Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan; provided, however, that from and after the Effective Date, the payment of the fees and expenses of any professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court review or approval;

3.    resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement, after the Effective Date, pursuant to Article V, of the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action of the Debtors or brought by or against the Reorganized Debtors;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of all contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases;

13.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, exculpation, injunctions, and other provisions contained in Article VIII above and enter such orders as may be necessary or appropriate to implement such releases, exculpation, injunctions, and other provisions;

15.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Article VII.D.1 above;

16.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

17.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release,

indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

18.        enter an order or Final Decree concluding or closing the Chapter 11 Cases;

19.        consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.        determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.        hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

24.        hear and determine matters related to the Securities Purchase Agreements and related agreements;

25.        except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

26.        enforce all orders previously entered by the Bankruptcy Court; and

27.        hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

A.      <u>No Stay of Confirmation Order</u>

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d) and 7062.

B.      <u>Modification of Plan</u>

Subject to the limitations contained in the Plan and the terms and conditions of the Securities Purchase Agreements: (1) the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the

Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

C.    Revocation or Withdrawal of Plan

The Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) reserve the right, subject to, and in accordance with, the terms and conditions of each of the Securities Purchase Agreements and the Securities Purchase Agreements Order, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation, Consummation or the Effective Date does not occur, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects, and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

D.    Confirmation of the Plan

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

E.    Additional Documents

On or before the Effective Date and subject to the terms and conditions of the Securities Purchase Agreements, the Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) with the consent of the Investors (such consent shall not be unreasonably withheld or delayed) may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Securities Purchase Agreements. The Debtors (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent), with the consent of the Investors (such consent shall not be unreasonably withheld or delayed), or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan and the Securities Purchase Agreements.

F.      <u>Payment of Statutory Fees</u>

All fees payable pursuant to 28 U.S.C. §1930(a), as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

G.      <u>Dissolution of Creditors' Committee</u>

On the Effective Date, the Creditors' Committee shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that the Creditors' Committee shall be deemed to remain in existence solely with respect to the final fee applications filed in connection with Article II.B and the Creditors' Committee shall have the right to be heard on all issues relating to such final fee applications.

H.      <u>Reservation of Rights</u>

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

I.      <u>Successors and Assigns</u>

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

J.      <u>Service of Documents</u>

1.      After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to the Debtors |
|---|---|
| The Great Atlantic & Pacific Tea Company, Inc.<br>2 Paragon Drive<br>Montvale, NJ 07645<br>Attn.:  Christopher W. McGarry, General<br>        Counsel | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn.:  James H.M. Sprayregen, P.C.<br>        Paul M. Basta, Esq.<br>        Ray C. Schrock, Esq.<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Attn.:  James J. Mazza, Jr., Esq. |
| **Counsel to the Creditors' Committee** | **Counsel to the Convertible Noteholders** |
| Milbank, Tweed, Hadley & McCloy LLP<br>1 Chase Manhattan Plaza<br>New York, NY 10005<br>Attn.:  Dennis F. Dunne, Esq.<br>        Matthew S. Barr, Esq.<br>        Abhilash M. Raval, Esq<br>        Michael E. Comerford, Esq. | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038<br>Attn.:  Kristopher M. Hansen, Esq.<br>        Jayme T. Goldstein, Esq. |
| **Counsel to the Second Lien Trustee** | **Counsel to DIP Facility Lenders** |
| Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036<br>Attn:  Edward S. Weisfelner, Esq.<br>       Daniel J. Saval, Esq. | Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, NY 10017<br>Attn.:  Donald S. Bernstein, Esq.<br>        Marshall S. Huebner |
| **United States Trustee** | **Counsel to Yucaipa** |
| Office of the United States Trustee<br>U.S. Department of Justice<br>33 Whitehall Street, 21st Floor<br>Attn.:  Susan Golden, Esq.<br>        Richard Morrissey, Esq. | Latham & Watkins LLP<br>355 S. Grand Ave<br>Los Angeles, CA 90071<br>Attn:  Robert Klyman, Esq. |

K.    **TERM OF INJUNCTIONS OR STAYS**

UNLESS OTHERWISE PROVIDED IN THE PLAN OR IN THE
CONFIRMATION ORDER, ALL INJUNCTIONS OR STAYS IN EFFECT IN THE
CHAPTER 11 CASES PURSUANT TO SECTIONS 105 OR 362 OF THE BANKRUPTCY

**CODE OR ANY ORDER OF THE BANKRUPTCY COURT, AND EXISTING ON THE CONFIRMATION DATE (EXCLUDING ANY INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER) SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE. ALL INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THEIR TERMS.**

L.    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects (other than the Securities Purchase Agreements), all of which have become merged and integrated into the Plan.

Notwithstanding anything to the contrary in the Plan (including any amendments, supplements, or modifications to the Plan) or the Confirmation Order (and any amendments, supplements, or modifications thereto) or an affirmative vote to accept the Plan submitted by any Investor, nothing contained in the Plan (including any amendments, supplements, or modifications thereto) shall diminish, reduce or negatively impact the rights of the Investors under the Securities Purchase Agreements.

M.    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://www.kccllc.net/APTEA or the Bankruptcy Court's website at www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

N.    Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted (subject to the reasonable consent of the Investors). Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation (subject to the reasonable consent of the Investors). The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not

be deleted or modified without the Debtors' consent (in consultation with the Creditors' Committee and the DIP Facility Administrative Agent) and the consent of the Investors, and (3) nonseverable and mutually dependent.

*The remainder of this page is intentionally left blank.*

Montvale, New Jersey
Dated:  February 17, 2012

**THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.**
(For itself and all other Debtors)

By:      /s/  *Frederic F. Brace*

Name:   Frederic F. Brace

Title:    Chief Financial Officer, Chief Administrative Officer, and Chief
         Restructuring Officer

## Exhibit A

**Union Protections in Term Sheets**

## A&P/UFCW/LOCAL UNIONS

## UNION PROTECTIONS IN TERM SHEETS

The parties, United Food and Commercial Workers International Union ("UFCW"), its affiliated local unions 27, 100R, 152, 338, 342, 371, 464A, 1034, 1245, 1262, 1360, 1500, and 1776 (each individually a "Local Union" and collectively the "Local Unions"), along with The Great Atlantic and Pacific Tea Company, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Company" and collectively with UFCW and the Local Unions the "Parties"), agree that these provisions will accompany and be incorporated into the term sheets for all modifications of collective bargaining agreements between the Company and the Local Unions, contingent on agreements between the Company and the Local Unions that are acceptable to the Company and each Local Union.

### 1.    Conditions to Effectiveness of Modified Collective Bargaining Agreements

(a)    ***Effective Date***.  The Effective Date of the revised agreements (the "Effective Date") shall be two business days following the later of: (i) ratification of all modified collective bargaining agreements ("modified CBAs") by the Local Unions, as appropriate; and (ii) approval of the Bankruptcy Court of the modified CBAs between the Company and each Local Union.  If the Bankruptcy Court's order approving the modified CBAs is appealed, the modifications shall remain in place until and unless the order approving the modified CBAs is reversed, in which case the parties shall revert to the positions that they were in prior to the Effective Date.  In the event that the Bankruptcy Court's order approving the modified CBAs is reversed on appeal, the Local Unions on behalf of the employees represented by the Local Unions will be entitled to a stipulated, approved, and allowed administrative claim for all savings provided during the period between the Effective Date and any reversal, subject to the cap described in Paragraph 2(b) below.  If the actual cash savings provided to the Company under the amended CBAs between the Effective Date and reversal exceeds the amounts of the caps described in Paragraph 2(b) below, any excess savings shall be treated as a stipulated, approved, and allowed administrative claim that is subordinated in priority and (to the extent relevant) payment timing to any other administrative expense claims allowed in the Company's Chapter 11 cases.

(b)    ***Term***.  Each of the modified CBAs shall be in effect for a period of 5 years beginning on the Effective Date (the "Term").

(c)    ***Bankruptcy Court Approval***.  The Company will immediately and without condition seek Bankruptcy Court approval of the amended CBAs.  The Company will give UFCW counsel advance notice of and an opportunity to comment on all pleadings filed in connection with such approval and will consider in good faith all such comments.  The Company will support approval of the modified CBAs without condition and will use its best efforts to obtain the support of the Official Committee of Unsecured Creditors and other key constituencies in the Company's Chapter 11 cases of the amended CBAs.

(d)      ***Conditions on Any Further Requests for Concessions During Chapter
11 Cases***.  The Parties all agree that the modifications to each of the CBAs (the "CBA
Modifications") were agreed to by UFCW and each of its affiliated Local Unions in
furtherance of the Company's efforts to successfully reorganize under Chapter 11 of the
United States Bankruptcy Code.  The modified CBAs will be binding on any Chapter 11
trustee appointed in these cases, or any other entity operating with the equivalent
authority to a chapter 11 trustee.  The Parties further agree that:

(i)      The CBA Modifications: (1) are based on the most complete and
reliable information available to the Company; (2) permit the Company to avoid
irreparable harm and provide for necessary modifications to the CBAs that are
necessary, fair, and equitable in order to permit the successful reorganization of
the Company; (3) the balance of equities favors the Company entering into the
CBA Modifications and subject to Section 1(d)(iii) below, adhering to the CBA
Modifications.

(ii)      The Company agrees that neither the Company nor any Company
affiliate will file or support any motion pursuant to 11 U.S.C. Sections 1113 or
1113(e), seeking rejection or modification of, or relief or interim relief from, the
CBAs and CBA Modifications, during the course of its Chapter 11 cases, and the
Company and its affiliates specifically waive the right to file or support such a
Motion, except that the Company reserves the right to file or support such a
motion if it can demonstrate that there has been a material and substantial change
in the Company's business situation such that the Company cannot continue as a
going concern without each of the additional concessions requested by the
Company.

(iii)      Should the Company file or support a motion invoking the
exception provided in Section 1(d)(ii) above, all requirements and provisions of
11 U.S.C. § 1113 shall remain applicable to the motion and, in addition, if the
Company attempts to invoke Section 1(d)(ii) above within the first 60 days
following Bankruptcy Court approval of the CBA modifications, the Company
agrees that it will have to demonstrate that the additional concessions requested
are essential to the continuation of the Company's business, or in order to avoid
irreparable damage to the Company's estates.  The UFCW and the Local Unions
reserve the right to object to any such motion and nothing in this Agreement shall
be a construed as an agreement by the UFCW or any Local Union to such motion
or modifications or relief.

(e)      This agreement and the modified CBAs are contingent on the Company's
securing savings from Local 1199 (SEIU) which, in the Company's good faith discretion,
are approximately equivalent, taking into account the relative size of the groups
represented by Local 1199 on the one hand, and the Local Unions on the other hand, as
they relate to the Company.

## 2. Further Union Protections During (And In Some Cases After) The Company's Chapter 11 Cases

(a) *Information Sharing*. The Company agrees that, beginning on the effective date of the modified CBAs and extending throughout the term of the modified collective bargaining agreements, subject to appropriate confidentiality agreements, it will make reasonable and appropriate information on the projected and actual performance of its business available to UFCW international officers and their legal and financial advisors, and to the officers and legal and financial advisors of its affiliated Local Unions, at reasonable intervals. The information shared between the Company and the UFCW/individual Local Unions, subject to appropriate confidentiality restrictions, shall include the following:

(i) *Sharing of Business Information*. The Company will share with officers for UFCW international: (1) a copy of its business plan/cash flow forecasts and, if modifications are made to the business plan, any such modifications to the business plan/cash flow forecasts, within a reasonable time after any revised plans are complete; (2) a copy of any overall and/or store-by-store capital expenditure plan for the Company within a reasonable time after such capital expenditure plan is complete (including but not limited to the McKinsey study, within a reasonable time period of its completion); (3) a copy of any bankruptcy-related exit financing proposals received from third parties, subject to the consent of the party or parties providing the proposal(s); and (4) information on the EBITDA performance of the Company, as a whole, and on a store-by-store basis, on a quarterly basis, within forty-five (45) days of the conclusion of each quarter.

(ii) *Sharing Of Information With Respect To Future Mergers, Acquisitions, Store Openings, Store Closures*. Subject to entry into a confidentiality agreement acceptable to the Company, the Company will provide the earliest practicable and reasonable advance notice to officers of UFCW and the presidents of the Local Unions of any upcoming mergers, acquisitions, store openings, or store closures. This information shall be provided on a confidential basis and UFCW and the Local Union presidents shall not share the information with anyone other than their own financial and legal advisors.

(b) *Savings During Chapter 11 Cases Due To Modifications*. The Local Unions on behalf of the employees represented by the Local Unions shall accrue and shall be entitled to a stipulated, approved, and allowed administrative claim in the amount of the actual cash savings provided to the Company under the amended CBAs from the effective date of the CBA Modifications through the confirmation of a plan of reorganization. The Local Unions and UFCW agree that any administrative expense claim provided under this paragraph will be capped at a maximum of $18 million based on cash savings provided in the fourth quarter of calendar 2011 and $7 million based on cash savings provided in the first quarter of calendar 2012, it being understood that if the cash savings during the fourth quarter of calendar 2011 are less than $18 million, any excess will be added to the $7 million cap for the first quarter of 2012. If the actual cash

3

savings provided to the Company under the amended CBAs between the Effective Date and confirmation exceeds the amounts of the caps described above, any excess savings shall be treated as a stipulated, approved, and allowed administrative claim that is subordinated in priority and (to the extent relevant) payment timing to any other administrative expense claims allowed in the Company's Chapter 11 cases. In any event, any administrative claim shall be waived, extinguished, and forever discharged upon confirmation of any plan of reorganization in the Company's Chapter 11 cases which contemplates the continued operation of a chain of grocery stores, by either the Company or a buyer through a plan-related sale that is otherwise consistent with this agreement.

(c)     ***Events of Default***.  The UFCW shall have the option to declare the CBA Modifications in default and terminated within 10 days of:

(i)     The entry of an unstayed order authorizing the sale of substantially all of the Debtors' assets pursuant to 11 U.S.C. § 363—provided however, it shall not be an event of default if the successful buyer of the company purchases the company through a credit bid and assumes the modified CBAs;

(ii)     The DIP loan being accelerated;

(iii)     Appointment of a Chapter 11 trustee for the Company's estates; or

(iv)     Conversion of the Company's cases to Chapter 7.

(d)     ***Negotiation of the Company's Proposed Plan of Reorganization and Disclosure Statement***.

(i)     ***Consistency With Local Union Agreements.***  The Company will not propose a plan of reorganization that is in any material way inconsistent with the terms of the modified CBAs, inclusive of the provisions described herein. The Company's proposed plan of reorganization will incorporate, in full, the agreements between UFCW, its Local Unions, and the Company reflected in these term sheets and the modified CBAs.

(ii)     ***Information Sharing***.  The Company agrees to provide legal counsel to UFCW and the Local Unions with an advance draft of, and an opportunity to comment upon, any plan of reorganization that the Company may propose, and the disclosure statement that would be sent along with any such plan of reorganization.  The Company will provide its drafts of the proposed plan of reorganization and disclosure statement to counsel for the UFCW as promptly as possible prior to its filing.

(iii)     ***Most Favored Constituent Status in Plan Discussions***.  The Company agrees to consider in good faith any comments to any proposed plan of reorganization and/or disclosure statement made by UFCW and the Local Unions, including its proposed capital structure, board structure, by-laws and financing, and to consider the UFCW's views on these topics as thoroughly as they will consider the views of any other constituency in these Chapter 11 cases, including

4

but not limited to a proposed plan sponsor or equity investor, the Official
Committee of Unsecured Creditors, holders of the Company's Second Lien debt,
holders of the Company's convertible bonds, or any other constituency.

**3.    Plan Terms**

The Company, the UFCW, and the Local Unions agree that in addition to the obligations
in Paragraph 2(d)(1) above, any plan of reorganization proposed in the Company's Chapter 11
cases (inclusive of the disclosure statement and other plan-related documents), or otherwise
supported by the Company, will contain at least the following terms:

(a)    ***Assumption of Modified Agreements***.  The modified CBAs will be
assumed pursuant to 11 U.S.C. § 365 under a plan of reorganization.[1]

(b)    ***Capital Infusion***.  Any plan of reorganization proposed by the Company
will include an appropriate capital infusion sufficient, when combined with the cash flow
in the business plan that is reflected in and related to the final disclosure statement
approved by the Bankruptcy Court (the "Business Plan"), to enable the Company to make
the capital investments in its stores that are envisioned by the Business Plan.

(c)    ***Minimum Liquidity***.  Any plan of reorganization proposed by the
Company will provide that upon emergence from chapter 11, the Company shall have at
least $200 million in total combined cash, cash equivalents, and borrowing availability
under any credit facility, it being understood that any undrawn revolver capacity is
considered to be available and part of the $200 million in liquidity.

(d)    ***Release and Exculpation***.  Any plan of reorganization will include
customary release and exculpation clauses that will be at least as comprehensive for
UFCW, the Local Unions, and each of their current or former members, officers,
committee members, employees, advisors, attorneys, accountants, actuaries, investment
bankers, consultants, agents and other representatives (the "UFCW Exculpated Parties"),
as it is for the Company and its officers, directors, and advisors.  The Company will
propose in its plan of reorganization that the UFCW Exculpated Parties be released and
exculpated from any and all claims related to the Company's bankruptcy cases; the
formulation, preparation, negotiation, dissemination, implementation, administration,
confirmation or consummation of the modified CBAs, the disclosure statement
concerning the plan of reorganization or the plan itself, or any other agreement of
document created, modified, amended, terminated or entered into in connection with
either the plan of reorganization or any agreement between the Company, the UFCW, or
the Local Unions.  Upon request of the UFCW or a Local Union, the Company will
appear and intervene, or, if intervention is not authorized, file an amicus brief (if
permitted to do so), asserting and defending the application of these exculpation
provisions in any relevant proceeding relating to the application of these exculpation
provisions to the UFCW or a Local Union.

---

[1]    For the sake of clarity, this does ***not*** include the assumption of any withdrawal liabilities associated with any
defined benefit multi-employer pension plan.

(e)    ***Professional Fee and Expense Recovery***.  If the Effective Date takes place and the CBA Modifications are still in place as of confirmation of a plan of reorganization, the Company will pay the reasonable fees and expenses charged to UFCW by Cohen, Weiss & Simon LLP ("CWS") and Glanzer & Co ("Glanzer"), as specified below in connection with the review, design, negotiation, approval, and ratification of each amended CBA, as well as any other aspects of the Company's Chapter 11 cases in which the UFCW and the Company's positions were not adverse. The amount and payment dates are as follows:

***Effective date of POR***

CWS                        up to $750,000

Glanzer                    $2,000,000

These fees and expenses shall constitute a stipulated, approved, and allowed administrative expense paid on the effective date of the plan.  These fees and expenses are not subject to the limitations of Paragraph 2(b) above.

(f)    ***Board Seat***.  The Company shall propose as part of its Plan that the Board of Directors of the reorganized company shall, for the Term, include one member designated by the UFCW.  The mechanism for the UFCW's designation of a director shall be agreed to by the UFCW and the Company.

(g)    ***UFCW/Local Union Support***.  So long as the Company's proposed plan of reorganization is materially consistent with the terms of the modified CBAs (inclusive of the provisions herein), the UFCW and each Local Union agree that they will support any request by the Company to extend the exclusivity period provided in the Bankruptcy Code made by the Company, as well as the Company's proposed plan of reorganization, by arguing in support of such motions, including by filing a written pleading articulating their support for such motions; provided, however, that: (1) this paragraph shall not obligate the UFCW or any Local Union to support any liquidating plan; and (2) this paragraph does not affect the UFCW's fiduciary obligations as a member of the Official Committee of Unsecured Creditors ("OCUC") when acting in its capacity as a member of the OCUC.

**4.    Pre-Confirmation Sale Processes (If Any).**  In the event that prior to the confirmation of a plan of reorganization or pursuant to a plan of reorganization (and, in the case of Subsection (a) below, during any bankruptcy or other judicially-supervised sale process during the Term), the Company initiates a marketing process to sell stores to a third party, the Company agrees that it will do so in compliance with the provisions below:

(a)    ***Procedural Protections—All Sales.***  If the Company elects or is required to sell any stores to third parties between the Effective Date and the confirmation of a plan of reorganization (or pursuant to a plan of reorganization), the Company agrees that:

(i)    while the bidding procedures and processes used by the Company may be different for future sales, they will be no less favorable to the UFCW and

6

Local Unions as the bidding procedures approved by the Bankruptcy Court in connection with the sale of the Southern Stores, taking into consideration any differences between the assets being sold;

(ii)       the Company will consult with the UFCW and affected Local Unions regarding the bidding procedures before proposing them, and will consult with the UFCW and affected Local Unions regarding the following materials before they are provided to potential third-party purchasers:  confidentiality agreements, information packages, process letters, preliminary bidding instructions, management presentations, due diligence room links, rules and procedures, data information requests, and final bidding procedures;

(iii)       at the request of the UFCW and affected Local Unions, the Company will facilitate an introduction of any specific prospective bidder identified by the UFCW and/or affected Local Unions; and

(iv)       while the Company believes that it must accept the highest and best bid in any sales context, it understands that the UFCW and the Local Unions believes that any buyer must accept and assume the modified CBAs as part of any purchase, and the Company agrees to take the positions of the UFCW and the Local Unions, and potential buyers' willingness to assume the modified CBAs as part of any purchase, into account in determining what bid represents the highest and best offer.  For the avoidance of doubt, the Parties agree that the Company can take non-economic factors into account in determining which bid is the higher and better bid.

(b)       ***Additional Procedural Protections—Sales Of 75+ Grocery Stores***.  If the Company files a motion for authority to sell more than 75 stores at any one time, or sells stores during the Term (other than liquor stores) in lots of less than 75 which  collectively amount to 75 prior to or as part of a plan of reorganization, the Company agrees that:

(i)       the Company will promptly advise the UFCW in writing of its election and will grant the UFCW the right to organize a transaction to bid for such stores (by itself or with a third-party partner or partners) and, to the extent practicable, shall provide the UFCW with at least 30 days to organize and present a bid prior to choosing a buyer or stalking horse;

(ii)       the Company will provide the UFCW, subject to appropriate confidentiality restrictions, with information reasonably necessary for due diligence purposes so that the UFCW may determine whether it wishes to pursue a transaction, and the UFCW may share this information with a third-party partner or partners subject to confidentiality restrictions set by the Company;

(iii)       the Company shall promptly notify the UFCW of the schedule and/or timetable for consideration by the Company of any possible transaction and shall provide the UFCW with the same time provided by the schedule and/or timetable given to other interested parties to submit an offer for the stores;

7

(iv)     the Company will give the UFCW (alone or in combination with a third-party partner or partners) the opportunity to bid for a position as the stalking horse in any such sale/marketing process, it being understood that such opportunity is not exclusive to the UFCW (with or without a third party partner or partners), but that (with the exception of paragraph 4(b)(i) above, the UFCW shall be treated comparably to any other potential stalking horses; and

(v)     the Company agrees to grant the UFCW seven (7) days to advise the Company whether or not it intends to pursue the rights set forth in Paragraph 4(b)(i)-(iv) above and, during this time period, will not enter into any stalking horse agreement or other contract regarding the stores that are subject to the bidding process with another party.

(c)     ***Substantive Protections for Sales of 75+ Stores (If Any)***.  In any sale process initiated by the Company between the effective date of the modifications in this Agreement and the Company's emergence from Chapter 11 protection, or as part of a plan of reorganization, the Company agrees to provide the UFCW with the following substantive protections:

(i)     ***Stalking Horse Option—If UFCW Bids***.  In the event that the UFCW submits an offer pursuant to Section 4(b) above, the Company shall not be under any obligation to accept such offer; provided, however, that, the Company may not enter into an agreement with regard to the stores covered by the bidding procedures with an entity other than UFCW unless that transaction is higher and better than the UFCW bid.  The Company may only deem a proposed transaction superior to the UFCW bid if its Board of Directors determines in its sole discretion that such transaction is more favorable to the Company and its stakeholders.  If the UFCW-led bid is, in pure economic terms, higher than an alternative bid, there will be a rebuttable presumption that the UFCW-led bid is the higher and better bid, and the burden will be on the Company to demonstrate that its chosen bid is in fact the higher and better bid.  For the avoidance of doubt, the Parties agree that the Company can take non-economic factors into account in determining which bid is the higher and better bid.

(ii)     ***Status of Modifications In Any Future Sales Of 75+ Stores***.  The Company agrees that if it sells more than seventy-five (75) stores to a single buyer between the effective date of the modifications to this agreement and the Company's emergence from Chapter 11 protection, as part of a Section 363 sale or a plan of reorganization, the UFCW and its affected Local Unions may, at their option, elect to terminate the modifications to their collective bargaining agreements described in this Agreement in their entirety.  The Company agrees to inform any potential buyer of more than seventy-five (75) stores of this provision and to involve the UFCW and the affected Local Unions in any such transaction that may cause the provision to be invoked.  The UFCW and its affected Local Unions must inform the Company within seven (7) days of receiving notice of the Company's intent to sell 75+ stores if it will elect to terminate the modifications described in this Agreement.  If the UFCW and the affected Local Unions elect to

invoke the provisions of this paragraph, the Company may immediately or at any time thereafter invoke its rights under 11 U.S.C. § 1113 and section 1(d) of this agreement shall be null and void.

(d)    Neither the provisions of Paragraph 4 nor any other portion of this Agreement (except, if applicable, the severance provision in Paragraph 5 below) shall apply to store closures.

5.    **Severance.**  At the option of each Local Union this severance provision will be included in the modified CBA with respect to any store closures that occur during the Term.  If a Local Union elects within 10 days of the Effective Date to opt-in to this paid Severance Program (the "Severance Program"), it will consist of the following terms:

(a)    *Definitions*.  For purposes of Section 5, these definitions shall apply:

(i)    "Eligible Full-Time Associate" shall mean an associate who; (a) is a member a Local Union, (b) is classified as full-time by the Company on or about the date of the store closure; (c) is laid off, or forfeits a contractual right to bump to another store, as a result of store closings and (d) is no longer employed by the Company due to a store closing.

(ii)    "Eligible Part-Time Associate" shall mean an associate who (a) is a member of a Local Union, (b) was classified as part-time by the Company and (c) is no longer employed by the Company due to a store closing.

(b)    *Severance Terms*.  In the event of a store closing during the term of the CBA Modifications:

(i)    Each Eligible Full-Time Associate shall receive; (a) a severance benefit in the amount of one (1) week of base pay for each two (2) full years of service (from his or her most recent hire date), up to a maximum of four (4) weeks base pay (the "Severance Cap"); and (b) three (3) months of continued Health & Welfare contributions by the Company at the current rate as of the date of the store closing.  The Severance Cap described above shall be extended to a maximum of 18 weeks pay for Eligible Full-Time Associates with more than 25 years of continuous service to the Company, and a maximum of 9 weeks pay for Eligible Full-Time Associates with between 15 and 25 years of continuous service to the Company.

(ii)    Each Eligible Part-Time Associate shall receive; (a) a severance benefit in the amount of one (1) week of base pay (based on his or her average hours worked in the prior year) for each four (4) full years of service (from his or her most recent hire date), up to a maximum of four (4) weeks base pay, and (b) two (2) months of continued health & welfare contributions by the Company at the current rate as of the date of the store closing.

(iii)    All severance payments will be made in weekly installments on the Company's regular pay dates, and will be subject to applicable state/federal tax withholding and union dues.

(iv)    Each Eligible Full-Time Associate and Eligible Part-Time Associate  shall receive a payment for accrued but unused vacation time, personal days, and sick entitlements  for the calendar year in which the severance takes place, if such a payment is required by the particular collective bargaining agreement between the Company and the Local Union of which the associate is a member, or is otherwise required by applicable state law.

(v)    The severance benefits and continued health & welfare contributions outlined in Section 5(b)(i), (ii), and (iv) (if any) above are conditioned upon and subject to the Company's receipt of a Confidential Employment Separation and Release Agreement ("Release Agreement") fully executed (and notarized) by the Eligible Associate in a form that is satisfactory to the Company and the applicable Local Union.  By executing the Release Agreement, the Eligible Associate forfeits any and all recall rights.

(vi)    The Company will not contest any application for unemployment benefits filed by any Eligible Full-Time Associate or any Eligible Part-Time Associate.

(vii)    The Company agrees to provide positive reference to severed associates in their attempts to obtain new employment upon request of the associate or a potential future employer.  If the Company in good faith does not feel it can provide a positive reference, it shall provide a neutral reference that provides no more information than the employee's dates of employment.

(c)    ***Certain Limitations on Severance Program***

(i)    The Severance Program described in this Section 5 shall not apply to any associate who, upon a sale of the store in which he or she works to a third party, obtains a job with the buyer.

(ii)    The Parties agree that the Severance Program is the entirety of effects bargaining of any layoff or store closing with respect to any issue that is covered directly or indirectly by this Agreement.

**6.    Post-Emergence Protections**

(a)    ***Capital Expenditures***.  The Company shall spend a minimum of $100 million on an average annual basis on capital improvements for its stores in calendar years 2012-2015.  If the Company does not spend at least $100 million in any specific year beginning in 2012, the UFCW shall be entitled to request, and the Company shall provide, a specific, reasonable plan by which the Company will meet the average annual spending commitment.  Provided, however, that the Company shall in all circumstances

spend a minimum of $45 million on capital improvements for its stores in any calendar year.

(b)    ***Store Sales***.  The Company agrees that for any store sales during the Term, even those occurring after the effective date of a plan of reorganization, it will:

(i)    consult with the UFCW and the affected Local Unions regarding any confidentiality agreements, information packages, process letters, management presentations, due diligence room links, sales procedures, and data information requests, before they are provided to any prospective purchasers;

(ii)    identify to the UFCW and the affected Local Unions any *bona fide* prospective buyers and facilitate an introduction of UFCW to any specific prospective buyer identified by the UFCW; and

(iii)    in the event that the Company initiates a marketing process to sell stores during the Term, or receives an offer to buy stores during the Term, the Company will involve the UFCW and affected Local Unions in any such process and give the UFCW (alone or in combination with a third party bidder) the opportunity to bid on the stores that the Company puts up for sale.

(c)    ***Successorship***.  At the option of each Local Union, the Company agrees that the following successorship provisions will be added to the applicable modified CBA, and would be binding on grocery store sales in batches of either; (1) 25 or more stores, regardless of the location or jurisdiction of such stores, within a 30 day period; or (2) 5 or more stores employing members of any single Local Union, to one or more operators that take place between the effective date of a plan of reorganization and the end of the Term, provided, however, that if a single Local Union represents employees at less than 50 of the Company's stores, this successorship provision (if added) would apply to sales of any store(s):

(i)    This Agreement shall be binding on all signatories thereto, and their successors and assigns, whether such status is created by sale, lease, assignment, merger, joint venture or any other type of transfer, in whole or in part, of the store(s) covered by this Agreement during the term thereof.

(ii)    Any such sales shall not take place without the Company securing the written agreement of a successor to: (1) assume the applicable collective bargaining agreement(s) covering bargaining unit employees at the stores to be sold, inclusive of the CBA Modifications; and (2) offer comparable employment opportunities subject to the terms of the applicable collective bargaining agreement(s) (including the CBA Modifications) to substantially all of the Company's then-current employees working at the respective stores to be sold, recognizing their accrued seniority for all relevant purposes *vis a vis* other employees of the Company.

(iii)    At least 7 days prior to the closing of any such transaction, the Company agrees to provide the UFCW and the president of any affected Local

Union, subject to entry into a confidentiality agreement acceptable to the
Company, with: (1) the successor or assignee's name; (2) the date and location of
the closing; and (3) proof of the buyer's agreement to assume the applicable
collective bargaining agreements, inclusive of the CBA Modifications and other
obligations referred to above.

(d)    ***Change in Control***.  The Parties agree that if during the Term there is a
merger, share exchange, consolidation, or sale or disposition of all or substantially all of
the assets of the Company (a "Change in Control"), such a Change in Control will trigger
a partial reopener of this agreement and the modified CBAs with respect to working
conditions.

(e)    ***Potential Partial Reopener***.  The Parties may each reopen the modified
CBAs in 2014, but solely to address the impact of the Patient Protection and Affordable
care Act ("PACA") and any directly related successor legislation, regulations, or any
amendments thereto (if any).

**7.    Success Sharing.**  The Company will create and implement a profit-sharing plan
to share the "upside" of its reorganization with its associates.  Specifically, on an annual basis
during the Term, the Company will create a pool of 5% of any EBITDA generated that is over
and above that projected in the Business Plan, if there is any EBITDA generated that is over and
above that projected in the Business Plan, for sharing with its UFCW and SEIU partners.  The
Company, the UFCW, and the Local Unions will negotiate in good faith the terms of the sharing
and the distribution of any payments among associates affiliated with the Local Unions.

**8.    Buyout**.  The UFCW, Local Unions, and the Company will meet and confer over
the terms of an employee buy-out.

9.    **Enforcement.**  During the pendency of the Company's bankruptcy cases, the
Parties agree that notwithstanding the arbitration provisions of the applicable collective
bargaining agreements, the provisions of this agreement, with the exception of Paragraph 5
hereof, may be enforced by the Bankruptcy Court solely.  After the effective date of a plan of
reorganization, the Parties agree that any disputes arising under the provisions of the CBA
Modifications will be governed pursuant to the grievance and arbitration provisions of each
CBA**.**

12

**<u>Exhibit B</u>**

**Unsecured Creditor Contingent Recovery Pool**

## Unsecured Creditor Contingent Recovery Pool[1]

Any consideration to be provided to holders of Unsecured Claims in Classes E, F, G, H, I, J and L from the Unsecured Creditor Contingent Recovery Pool shall be distributed and provided solely as set forth herein.  Within 120 days of the closing of a transaction involving the sale for Cash of all or substantially all of the assets or common stock of Reorganized A&P or its newly formed holding company (the "Sale Transaction") that is consummated within 5 years from the Effective Date, Reorganized A&P shall distribute Pro Rata, to record holders (as of the Distribution Record Date) of Allowed Unsecured Claims in Classes E, F, G, H, I, J and L, Cash in an amount as follows:

(a) $10 million, if the net Cash proceeds of the Sale Transaction distributable to the then existing equity holders of Reorganized A&P or its parent holding company on account of their equity interests (excluding any contingent consideration) (the "Equity Proceeds") equal or exceed $800 million, but are less than $1.1 billion;

(b) $20 million, if the Equity Proceeds equal or exceed $1.1 billion, but are less than $1.3 billion;

(c) $30 million, if the Equity Proceeds equal or exceed $1.3 billion, but are less than $1.5 billion; and

(d) $40 million, if the Equity Proceeds equal or exceed $1.5 billion (each of the payments in (a) through (d), a "Contingent Payment" and, collectively, the "Contingent Payments").

The right to receive a Contingent Payment will be non-transferable and will be extinguished without any payment on the fifth anniversary of the Effective Date, or earlier upon (i) a Sale Transaction where the level of Equity Proceeds triggering a Contingent Payment is not achieved, or is achieved and a Contingent Payment is paid, (ii) a liquidity transaction other than a Sale Transaction, including, but not limited to, an initial public offering of common stock or a leveraged recapitalization or (iii) a change of control that does not involve a Sale Transaction.

The Bankruptcy Court shall retain exclusive jurisdiction over all disputes related to the Contingent Payments, even after the closing of the Chapter 11 Cases, and any such disputes shall be heard solely in the Bankruptcy Court.  Any party receiving a Contingent Payment agrees to submit to the venue and jurisdiction of the Bankruptcy Court and the entry of binding Final Orders by the Bankruptcy Court.

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.

## Exhibit G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

In re:                            :       Chapter 11
                                    :

Refco Inc., et al.,             :       Case No. 05-60006 (RDD)
                                    :

                    Debtors.    :       (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE
MODIFIED JOINT CHAPTER 11 PLAN OF REFCO INC. AND CERTAIN OF ITS
DIRECT AND INDIRECT SUBSIDIARIES**

WHEREAS, (i) Refco Inc. ("Refco" or the "Company") and certain of its

subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"),[1] (ii) the Official Committee of Unsecured Creditors of Refco Inc.,

et al. (the "Creditors' Committee"), (iii) the Additional Committee of Unsecured Creditors of

Refco Inc., et al. (the "Additional Committee" and, together with the Creditors' Committee, the

"Committees"), and (iv) Marc S. Kirschner, the chapter 11 trustee for Refco Capital Markets, Ltd.

(the "RCM Trustee" and, collectively with the Debtors and the Committees, the "Plan

Proponents") filed the Disclosure Statement With Respect to the Joint Chapter 11 Plan of Refco

Inc. and Certain of Its Direct and Indirect Subsidiaries dated as of October 20, 2006 (the

---

[1]    The following entities are Debtors in these Chapter 11 Cases: Bersec International LLC; Kroeck & Associates,
LLC; Lind-Waldock Securities LLC; Marshall Metals, LLC; New Refco Group Ltd., LLC; Refco
Administration, LLC; Refco Capital Holdings, LLC; Refco Capital LLC; Refco Capital Management, LLC.;
Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial, LLC; Refco Fixed Assets Management, LLC;
Refco F/X Associates, LLC; Refco Global Capital Management LLC; Refco Global Finance Limited; Refco
Global Futures, LLC; Refco Global Holdings, LLC; Refco Group Ltd., LLC; Refco Inc.; Refco Information
Services, LLC; Refco Managed Futures, LLC; Refco Mortgage Securities, LLC; Refco Regulated Companies,
LLC; Summit Management, LLC; and Westminster-Refco Management LLC.  Refco Capital Markets, Ltd. is a
debtor in these chapter 11 cases, and is included within the definition of "Debtor" in this Order, but not a
debtor-in-possession.

"Disclosure Statement")[2] and the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries dated as of October 20, 2006, as modified by the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries dated December 4, 2006 (as subsequently amended, modified or supplemented, the "Plan"); and

WHEREAS, following the hearing to approve the Disclosure Statement held on October 16, 2006 (the "Disclosure Statement Hearing"), the Court entered an Order Under 11 U.S.C. §§ 105, 502, 1125, 1126 and 1128 and Fed. R. Bankr. P. 2002, 3003, 3107, 3018 and 3020 (A) Scheduling Hearing on Confirmation of Plan; (B) Establishing Deadlines and Procedures for (I) Filing Objections to Confirmation of Plan, (II) Claim Objections, and (III) Temporary Allowance of Claims for Voting Purposes; (C) Determining Treatment of Certain Unliquidated, Contingent or Disputed Claims for Notice, Voting and Distribution Purposes; (D) Setting Record Date; (E) Approving (I) Solicitation Packages and Procedures for Distribution, (II) Form of Notice of Hearing on Confirmation and Related Matters, and (III) Forms of Ballots; (F) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (G) Granting Related Relief (the "Disclosure Statement Order"); and

WHEREAS, the Plan Proponents filed on December 12, 2006, the Certification of Jane Sullivan With Respect to the Tabulation of Votes on the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Sullivan Certification") and the Certification of Brian Osborne of Omni Management Group, LLC With Respect to the Tabulation of Votes on the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and

---

[2]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Exhibit A. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order (defined below), but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

Indirect Subsidiaries (the "Osborne Certification", and together with the Sullivan Certification, the "Voting Certifications"); and

WHEREAS, the Court established December 15, 2006 at 10:00 a.m. (Eastern Time) as the date and time of the hearing pursuant to section 1129 of the Bankruptcy Code to consider Confirmation of the Plan (the "Confirmation Hearing"); and

WHEREAS, affidavits of service have been executed by and filed with the Court (the "Affidavits of Service"), with respect to the mailing of a notice of the Confirmation Hearing and the other solicitation materials in respect of the Plan in accordance with the Disclosure Statement Order; and

WHEREAS, affidavits of publication have been filed with the Court (the "Affidavits of Publication") with respect to the publication of the notice of the Confirmation Hearing in the national and global editions of <u>USA Today</u>, <u>The Wall Street Journal</u>, <u>The Financial Times</u>, and the national edition of <u>The New York Times</u>, the <u>Times of London</u>, and the <u>Singapore Straits Times</u>; and

WHEREAS, the Plan Proponents caused the Disclosure Statement, and the appropriate form of Ballot (the Disclosure Statement, the Plan and the Ballot, collectively, the "Solicitation Materials") to be distributed to the Holders of the following Claims to solicit votes to accept or reject the Plan: (i) with respect to the Contributing Debtors, Class 4 Senior Subordinated Note Claims, Class 5(a) Contributing Debtors General Unsecured Claims, Class 5(b) Related Claims and Class 6 RCM Intercompany Claims, (ii) with respect to FXA, Class 4 FXA Senior Subordinated Note Claims, Class 5(a) FXA General Unsecured Claims, Class 5(b) Related Claims and Class 6 FXA Convenience Claims, and (iii) with respect to RCM, Class 3 RCM FX/Unsecured Claims, Class 4 RCM Securities Customer Claims, Class 5 RCM Leuthold

Metal Claims, Class 6 RCM FX/Unsecured Convenience Claims, Class 7 RCM Securities

Customer Convenience Claims and Class 8 Related Claims against RCM (collectively, the

"Holders of Impaired Claims"); and

WHEREAS, the Plan Proponents filed with the Court certain exhibits to the Plan

on November 27, 2006 (as subsequently amended, modified or supplemented, the "Exhibits")

WHEREAS, 16 objections to Confirmation of the Plan (the "Objections") were

filed and served; and

WHEREAS, the Plan Proponents filed the Memorandum of Plan Proponents in

Support of Confirmation of the Modified Joint Chapter 11 Plan of Refco, Inc. and Certain of Its

Subsidiaries (the "Memorandum") on December 11, 2006; and

WHEREAS, the Confirmation Hearing was held on December 15, 2006 at 10:00

a.m. (Eastern Time); and

WHEREAS, based upon the legal authority set forth in the Memorandum and the

record of the Confirmation Hearing, including the Court's bench rulings the Objections that have

not been consensually resolved are overruled on the merits pursuant to this order (the

"Confirmation Order").

NOW, THEREFORE, the Court having reviewed the Plan, the Disclosure

Statement, the Disclosure Statement Order, the Voting Certifications and the December 14, 2006

Supplement thereto )the "Supplement"), the Affidavits of Service, the Affidavits of Publication,

the Objections, the Memorandum and the other papers before the Court in connection with the

confirmation of the Plan; the Court having heard the statements of counsel in support of

Confirmation at the Confirmation Hearing, as reflected in the record at the Confirmation Hearing;

and the Court having considered all testimony presented and evidence admitted at the

4

Confirmation Hearing and the representations by the parties on the record with respect to certain settlements, clarifications and non-material modifications of the Plan; the Court having taken judicial notice of the papers and pleadings on file in these Chapter 11 Cases; and the Court finding that (i) notice of the Confirmation Hearing and the opportunity of any party in interest to object to Confirmation were adequate and appropriate, in accordance with Bankruptcy Rule 2002(b) and the Disclosure Statement Order, as to all parties to be affected by the Plan and the transactions contemplated thereby and (ii) the legal and factual bases set forth at the Confirmation Hearing and as set forth in this Confirmation Order establish just cause for the relief granted herein; the Court hereby makes the following Findings of Fact, Conclusions of Law and Order.[3]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a))</u>.  This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.    <u>Plan Modification</u>.  On December 4, 2006, the Plan Proponents filed a modification (the "Modification") to the Plan and served such Modification on the master service list, the Bankruptcy Rule 2002 service list and all parties that filed an Objection to the Disclosure

---

[3]    Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

Statement and/or the Plan.  The Modification does not materially adversely affect or change the

treatment of any Holders of Claims or Interests.  Accordingly, pursuant to Bankruptcy Rule 3019,

the Modification does not require additional disclosure under section 1125 of the Bankruptcy

Code or re-solicitation of acceptances or rejections under section 1126 of the Bankruptcy Code,

nor does the Modification require that Holders of Claims or Interests be afforded an opportunity

to change previously cast acceptances or rejections of the Plan.  Disclosure of the Modification

in the filing and service on December 4, 2006 and in the record at the Confirmation Hearing

constitutes due and sufficient notice thereof under the circumstances of the Chapter 11 Cases.

C.    Judicial Notice.  This Court takes judicial notice of the docket of the

Chapter 11 Cases maintained by the Clerk of the Court, including, without limitation, all

pleadings and other documents filed, all orders entered, and evidence and argument made,

proffered or adduced at, the hearings held before the Court during the pendency of the Chapter

11 Cases.

D.    Burden of Proof.  The Plan Proponents have met their burden of proving

the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the

evidence.

E.    Transmittal and Mailing of Materials; Notice.  The Solicitation Materials

were transmitted and served upon all interested parties in compliance with the Disclosure

Statement Order and in compliance with the Bankruptcy Rules, and such transmittal and service

was adequate and sufficient.  Notice of the Confirmation Hearing and all deadlines in the

Disclosure Statement Order was given in compliance with the Bankruptcy Rules and the

Disclosure Statement Order and was good and sufficient notice in accordance with Bankruptcy

Rules 2002(b) and 3020(b)(2), and no other or further notice is required.  Votes for acceptance or rejection of the Plan were solicited in good faith, after transmittal of a disclosure statement containing adequate information, and otherwise in compliance with Bankruptcy Code sections 1125 and 1126 and Bankruptcy Rules 3017 and 3018.

F.    <u>Impaired Classes Voting to Accept the Plan</u>.  As evidenced by the Voting Certifications and suplement, which certified both the method and results of the voting, Classes 4, 5 and 6 of each of the Contributing Debtors, FXA Classes 4 and 6 and RCM Classes 3, 4, 5, 6, 7, and 8 are each impaired and have each voted to accept the Plan pursuant to the requirements of sections 1124 and 1126 of the Bankruptcy Code.  Thus, at least one impaired class of Claims has voted to accept the Plan in respect of each Debtor.

G.    <u>Classes Deemed To Accept the Plan</u>.  Classes 1, 2 and 3 of each of the Contributing Debtors and FXA as well as RCM Classes 1 and 2 are not impaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

H.    <u>Classes Voting to Reject the Plan or Deemed to Reject the Plan</u>.  Holders of Class 7 Subordinated Claims against one or more of the Contributing Debtors and Class 8 Old Equity Interests, Holders of Class 7 FXA Subordinated Claims against FXA and Holders of Class 9 RCM Subordinated Claims against RCM are deemed to have rejected the Plan (the "Rejecting Classes") pursuant to section 1126(g) of the Bankruptcy Code because such Holders are not entitled to receive or retain any Distribution or property under the Plan on account of such Claims or Interests.  Holders of FXA Class 5(a) Claims voted to reject the Plan (while the numerosity requirement of section 1126(c) was satisfied, the requirement that at least two-thirds in voting amount of allowed claims in a class vote to accept the Plan was not satisfied).

7

I. <u>Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The

Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section

1129(a)(1) of the Bankruptcy Code.

(i) <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In

addition to Administrative Claims and Priority Tax Claims, which need not be classified,

the Plan designates separate Classes of Claims and Interests for each of the twenty-seven

(27) Debtors, with such Debtors categorized into one of three (3) groups, including the

Contributing Debtors, FXA and RCM.[4]  The Claims and Interests placed in each Class

are substantially similar to other Claims and Interests, as the case may be, in each such

Class.  Valid business, factual and legal reasons exist for separately classifying the

various Classes of Claims and Interests created under the Plan, and such Classes do not

unfairly discriminate between Holders of Claims and Interests.  Thus, the Plan satisfies

sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii) <u>Specify Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.

Articles II and III of the Plan specify that the following classes are unimpaired under the

Plan—Contributing Debtors Classes 1, 2, and 3; FXA Classes 1, 2 and 3; and RCM

Classes 1 and 2—thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(iii) <u>Specify Treatment of Impaired Classes (11 U.S.C. §</u>

<u>1123(a)(3))</u>.  Articles II and III of the Plan designate the following classes as impaired

under the Plan—Contributing Debtors Classes 4, 5(a), 5(b), 6, 7 and 8;  FXA Classes 4,

5(a), 5(b), 6 and 7;  RCM Classes 3, 4, 5, 6, 7, 8 and 9—and specify the treatment of

---

[4] In addition, the Plan creates sub-Classes corresponding to each of the Contributing Debtors for Class 4 Senior
Subordinated Note Claims, Class 5(a) General Unsecured Claims and Class 5(b) Related Claims.

Claims and Interests in those Classes, thereby satisfying section 1123(a)(3) of the

Bankruptcy Code.

(iv)    No Discrimination (11 U.S.C. § 1123(a)(4)).  The Plan

provides for the same treatment by the Debtors for each Claim or Interest in each

respective Class unless the Holder of a particular Claim or Interest has agreed to a less

favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the

Bankruptcy Code.

(v)    Implementation of Plan (11 U.S.C. § 1123(a)(5)).   Article V

of the Plan, entitled "Means for Implementation of the Plan," sets forth numerous

provisions to facilitate implementation of the Plan, including, but not limited to, (i) the

continued corporate existence and dissolution of the Reorganized Debtors, (ii) the filing

of corporate governance documents that will govern the Reorganized Debtors after the

Effective Date; (iii) the designation of directors, managers and officers of the

Reorganized Debtors; (iv) the designation of the Plan Administrator pursuant to section

5.5 of the Plan and the Plan Administrator Agreement; (v) the administration of post-

Confirmation RCM; (vi) the creation of a Litigation Trust pursuant to the Litigation Trust

Agreement; (vii) the creation of a Private Actions Trust in accordance with the terms set

forth in the Private Actions Trust Agreement; (viii) the preservation of certain rights of

action by the Reorganized Debtors; (ix) the dissolution of the Committees and creation of

a Plan Committee; (x) the role of the Fee Committee subsequent to the Confirmation

Date; (xi) the cancellation of existing securities and agreements;  (xii) ensuring that the

Plan will not impair the Examiner's investigation and the filing of the Examiner's report

in accordance with the provisions of the Examiner Order and the additional directions

given by this Court at the June 21, 2006 hearing; and (xiii) the sources of Cash available

for Plan Distribution.  The Plan provides adequate and proper means for its

implementation, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

(vi)        Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).

Section 5.3 of the Plan provides that the corporate governance documents of Reorganized

Refco and Reorganized FXA, inter alia, shall be restated to prohibit the issuance of non-

voting equity securities to the extent required by the Bankruptcy Code.  In addition, to the

extent the Plan Administrator decides it necessary, the corporate governance documents

of the Affiliate Debtors that will continue in existence following the Effective Date

pending the wind up of their businesses shall be restated to prohibit the issuance of non-

voting equity securities to the extent required by the Bankruptcy Code.  The form of each

restated corporate governance document attached as Exhibit C to the Plan includes a

provision prohibiting the issuance of non-voting equity securities.  Thus, the

requirements of section 1123(a)(6) of the Bankruptcy Code are satisfied.

(vii)        Selection of Officers, Directors and the Trustee (11 U.S.C. §
1123(a)(7)).  Pursuant to Section 5.4 of the Plan, the Plan Administrator shall serve as the

sole officer and director or manager of the Reorganized Debtors and the RCM Trustee

shall serve as the sole representative of RCM.  This manner of selection satisfies section

1123(a)(7) of the Bankruptcy Code because the Plan Administrator will be appointed by

the Joint Sub-Committee comprised of the Committee and the Additional Committee and

the RCM Trustee was appointed pursuant to a March 22, 2006 order issued by this Court

authorizing the appointment of one disinterested person as a Chapter 11 trustee for the

Estate of RCM.  The RCM Trustee is to wind down the RCM Estate in accordance with

the terms and conditions set forth in the RCM Settlement Agreement.  Thus, the Plan is

consistent with the interests of creditors and equity security holders and with public

policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

(viii)    Additional Plan Provisions (11 U.S.C. § 1123(b)).  The

Plan's permissive provisions are appropriate, authorized by section 1123(b) of the

Bankruptcy Code, and not inconsistent with the applicable provisions of the Bankruptcy

Code.

(ix)    RCM's Chapter 11 Case (11 U.S.C. § 1112).  The Court has

ruled that RCM's case should proceed under subchapter III of chapter 7 of the

Bankruptcy Code, although the Court has deferred the effect of that ruling, permitting

RCM to remain in chapter 11 proceedings.  In deferring the ruling, the Court found that

RCM's case presents unusual circumstances within the meaning of Bankruptcy Code

section 1112(b), which have permitted RCM's case not to be converted to chapter 7.

Further, the Court directed that RCM work toward a global chapter 11 plan of

reorganization with the other Debtors.  Accordingly, RCM's inclusion in the Plan,

whether as a chapter 11 Plan Proponent, or as a chapter 7 party in interest to the

settlements embodied in the Plan, is in compliance with the Bankruptcy Code.

J.    Compliance with Bankruptcy Rule 3016.  The Plan is dated and identifies

the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the

Disclosure Statement with the Court satisfies Bankruptcy Rule 3016(b).  The Plan describes in

specific and conspicuous language all acts to be enjoined under the Plan and identifies all entities

that are subject to the injunctions set forth in Article X of the Plan in accordance with

Bankruptcy Rule 3016(c).

K.      <u>Compliance with Bankruptcy Rule 3018</u>.  The solicitation of votes to

accept or reject the Plan satisfies Bankruptcy Rule 3018.  The Solicitation Materials, including

the Plan, were transmitted to all creditors entitled to vote on the Plan (<u>i.e.</u>, Holders of Impaired

Claims, other than those in Classes deemed to reject the Plan pursuant to section 1126(g) of the

Bankruptcy Code), sufficient time was prescribed for such creditors to accept or reject the Plan,

and the Solicitation Materials and related solicitation procedures comply with section 1126 of the

Bankruptcy Code, thereby satisfying the requirements of Bankruptcy Rule 3018.

L.      <u>Plan Proponents' Compliance with Bankruptcy Code (11 U.S.C. §
1129(a)(2))</u>.  The Plan Proponents have complied with the applicable provisions of the

Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.  Specifically:

(i)      Each of the Debtors is a proper debtor under section 109 of

the Bankruptcy Code.  As set forth above, the Court has ruled that RCM's case should

proceed under subchapter III of chapter 7 of the Bankruptcy Code, although the Court has

deferred the effect of that ruling, permitting RCM to remain in chapter 11 proceedings.

In deferring the ruling, the Court found that RCM's case presents unusual circumstances

within the meaning of Bankruptcy Code section 1112(b), which have permitted RCM's

case not to be converted to chapter 7.  Further, the Court directed that RCM work toward

a global chapter 11 plan of reorganization with the other Debtors.  Accordingly, RCM,

whether as a chapter 11 Plan Proponent, or as a chapter 7 party in interest to the

settlements embodied in the Plan, is in compliance with the Bankruptcy Code.

(ii)      The Plan Proponents have complied with applicable

provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders

of the Court.

12

(iii)    The Plan Proponents have complied with the applicable
provisions of the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement
Order in transmitting the Plan, the Disclosure Statement, the Ballots and related
documents and notices and in soliciting and tabulating votes on the Plan.

M.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Plan
Proponents have proposed the Plan in good faith and not by any means forbidden by law, thereby
satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been
proposed in good faith, this Court has examined the totality of the circumstances surrounding the
formulation of the Plan.  The Plan provides for the liquidation and distribution of the Debtors'
assets and the wind-down of the Debtors' corporate affairs.  The Plan Proponents involved
various creditor constituencies throughout the Plan formulation process.  Key Settlements
reached with the RCM Trustee, the Committees, the Ad Hoc Equity Committee, the Secured
Lender Agent, the Indenture Trustee and certain Holders of Secured Lender Claims and Senior
Subordinated Note Claims have paved the way for the Plan, which will enable maximum
distributions to all of the Debtors' creditors, without the cost and delay of litigation.

N.    <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>.
Any payment made or to be made by the Plan Proponents, the Debtors or by a person issuing
securities or acquiring property under the Plan, for services or for costs and expenses in or in
connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter
11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby
satisfying section 1129(a)(4) of the Bankruptcy Code.

O.    <u>Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5))</u>.  The Plan
complies with section 1129(a)(5) of the Bankruptcy Code.  Pursuant to Section 5.4 of the Plan,

13

the Plan Administrator shall serve as the sole officer and director or manager of the Reorganized

Debtors and the RCM Trustee shall serve as the sole representative of RCM.  This manner of

selection satisfies section 1123(a)(7) of the Bankruptcy Code because the Plan Administrator

was appointed by the Joint Sub-Committee comprised of the Committee and the Additional

Committee and the RCM Trustee was appointed by order of this Court.  The RCM Trustee is to

wind down the RCM Estate in accordance with the terms and conditions set forth in the RCM

Settlement Agreement.  The appointment to, or continuance in, such offices of all such persons is

consistent with the interests of Holders of Claims against and Interests in the Debtors and with

public policy.  No insider is proposed to serve as an officer or director of the Reorganized

Debtors.

     P.  <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>.  After confirmation of the Plan,

the Debtors' businesses will not involve rates established or approved by, or otherwise subject to,

any governmental regulatory commission.  Thus, section 1129(a)(6) of the Bankruptcy Code is

not applicable in these Chapter 11 Cases.

     Q.  <u>Best Interests Test (11 U.S.C. § 1129(a)(7))</u>.  The Plan satisfies section

1129(a)(7) of the Bankruptcy Code.  The liquidation analysis attached as Exhibit B to the

Disclosure Statement and other evidence proffered or adduced at the Confirmation Hearing (a)

are persuasive and credible, (b) have not been controverted by competent evidence and (c)

establish that each Holder of an Impaired Claim or Interest either has accepted the Plan or will

receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of

the Effective Date, that is not less than the amount that such Holder would receive or retain if the

Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

14

R.      Acceptance or Rejection by Certain Classes (11 U.S.C. § 1129(a)(8)).

Classes 1, 2 and 3 of each of the Contributing Debtors and FXA and RCM Classes 1 and 2 are

Unimpaired by the Plan and, thus, are conclusively presumed to have accepted the Plan under

section 1126(f) of the Bankruptcy Code.  Classes 4, 5, and 6 of each of the Contributing Debtors,

FXA Classes 4 and 6, and RCM Classes 3, 4, 5, 6, 7, and 8 have voted to accept the Plan in

accordance with sections 1126(c) and (d) of the Bankruptcy Code.  FXA Class 5(a) voted to

reject the Plan.  As set forth above, the Rejecting Classes are deemed to reject the Plan and,

therefore, the Debtors were not required to solicit votes to accept or reject the Plan from Holders

of Claims or Interests in such Classes.  Although section 1129(a)(8) has not been satisfied with

respect to FXA Class 5(a) and the Rejecting Classes, the Plan is confirmable because the Plan

satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes.  As set forth in the

Voting Certifications, the percentages of Holders of Claims in Classes entitled to vote that voted

to accept the Plan are attached hereto as Exhibit C.

S.      Treatment of Administrative, Priority and Tax Claims (11 U.S.C. §
1129(a)(9)).  The treatment of Administrative Claims, Priority Tax Claims and Non-Tax Priority

Claims pursuant to Sections 3.1, 3.2 and 3.3 of the Plan satisfies the requirements of sections

1129(a)(9)(A), (B) and (C) of the Bankruptcy Code.

T.      Acceptance By Impaired Class (11 U.S.C. § 1129(a)(10)).  Classes 4, 5,

and 6 of each of the Contributing Debtors, FXA Classes 4 and 6, and RCM Classes 3, 4, 5, 6, 7,

and 8 are Impaired Classes of Claims that have voted to accept the Plan with respect to all of the

Debtors, and, to the Debtors' knowledge, do not contain insiders whose votes have been counted.

Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code that at least one Class

of Claims against or Interests in the Debtors that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider, has been satisfied.

U.    <u>Feasibility (11 U.S.C. § 1129(a)(11))</u>.    The Plan provides for the liquidation of the Debtors' remaining assets and a distribution of Cash to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan.  The Plan also provides for the payment in full of all Allowed Administrative Expenses.  Therefore, the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

V.    <u>Payment of Fees (11 U.S.C. § 1129(a)(12))</u>.    All fees payable under section 1930 of title 28, United States Code, as determined by this Court, have been paid or will be paid on the Effective Date pursuant to Section 12.4 of the Plan, thus satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

W.    <u>Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>.    All retiree benefits will be treated as executory contracts that are subject to rejection pursuant to section 7.1 of the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code).  Thus, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

X.    <u>Principal Purpose (11 U.S.C. § 1129(d))</u>.    The principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e <u>et</u> <u>seq.</u>), and no governmental unit has objected to the Confirmation of the Plan on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

Y.    <u>No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b))</u>.

Holders of Claims and Interests in the Rejecting Classes are Impaired and deemed to have

rejected the Plan.  The Plan Proponents presented uncontroverted evidence at the Confirmation

Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to the

Rejecting Classes as required by the "cramdown" requirements of section 1129(b)(1) of the

Bankruptcy Code.  Thus, the Plan may be confirmed notwithstanding the Debtors' failure to

satisfy section 1129(a)(8) of the Bankruptcy Code.  Upon Confirmation and the occurrence of

the Effective Date, the Plan shall be binding upon the members of  the Rejecting Classes and

FXA Class 5(a).

Z.    <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>.  Based on the record before

the Court in these Chapter 11 Cases, the Plan Proponents and each of their respective directors,

officers, employees, shareholders, members, agents, advisors, accountants, investment bankers,

consultants, attorneys, and other representatives have acted in good faith within the meaning of

section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the

Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities

relating to the solicitation of acceptances of the Plan and their participation in the activities

described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by

section 1125(e) of the Bankruptcy Code and the exculpation and injunctive provisions set forth

in Article X of the Plan.

AA.    <u>No Objection to Assumed Contracts and Leases</u>.  No non-Debtor party to

any executory contract or unexpired lease to be assumed pursuant to Article VII of the Plan has

objected to the assumption thereof or any such objections have been withdrawn.

17

BB.   <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the
requirements for confirmation set forth in section 1129 of the Bankruptcy Code and the
conditions to confirmation set forth in section 9.1 of the Plan.

CC.   <u>Retention of Jurisdiction</u>.  Subject to the provisions of this Order, the
Court may properly retain jurisdiction over the matters set forth in Article XI of the Plan and/or
section 1142 of the Bankruptcy Code.

DD.   <u>Rule 9019 Settlements; Releases and Discharges</u>.  The Plan is premised on
a series of interdependent settlements and compromises (each, a "Settlement" and, collectively,
the "Settlements") of various debtor-creditor, inter-debtor, and inter-creditor disputes (each, a
"Dispute" and, collectively, the "Disputes").  The Settlements among the Debtors, the RCM
Trustee, the Committees, the Ad Hoc Equity Committee, the Secured Lender Agent, the
Indenture Trustee, certain Holders of Secured Lender Claims and Senior Subordinated Note
Claims, certain customers of RCM, and other creditors of RCM and the Debtors (collectively,
the "Settlement Negotiation Parties") and their respective financial and legal professionals are
reflected in the relative recoveries of the various creditor groups under the Plan and are designed
to achieve a global, consensual resolution of these Chapter 11 Cases.  The Disputes being
resolved by the Settlements are adequately described in Article II of the Disclosure Statement,
the Memorandum and by the testimony adduced at the Confirmation Hearing.  Pursuant to
Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided
under the Plan, the Settlements constitute good faith compromises and settlements of all disputes
among the Settlement Negotiation Parties.  The proposed recoveries reflect a fair and reasonable
allocation of the aggregate value of the Debtors, and the recoveries provided to Holders of
Claims of the Contributing Debtors, RCM and FXA under the Plan are substantially higher than

18

the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements, based on the assets and liabilities of the Contributing Debtors, RCM and FXA on a stand-alone basis.  In addition, the releases and discharges described in Article X of the Plan constitute good faith compromises and settlements of the matters covered thereby.  Such compromises and settlements are made in exchange for consideration and are in the best interest of the Holders of Claims and Interests, are within the range of possible litigation outcomes, are fair, equitable, reasonable and are integral elements of the restructuring and resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the release, indemnification and exculpation provisions set forth in the Plan:

(i)      falls within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), (b) and (d);

(ii)      is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code;

(iii)      is an integral element of the Settlements embodied in the Plan;

(iv)      confers material benefit on, and is in the best interest of, the Debtors, their Estates and creditors;

(v)      is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation and reorganization to the extent provided in the Plan; and

(vi)      is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

EE.    The failure to effect the release, indemnification and exculpation

provisions of the Plan would seriously impair the Debtors' ability to confirm the Plan.

Accordingly, the compromises and settlements embodied in the release, discharge,

indemnification and exculpation provisions described in Article X of the Plan are approved.

FF.    The administration of the RCM Estate in accordance with the Plan and the

RCM Settlement Agreement by the RCM Trustee, whether in chapter 11 or chapter 7, is

consistent with the requirements of Bankruptcy Code section 748.

GG.    The Plan is, as to the RCM Estate, consistent with the requirements of

Bankruptcy Code sections 726 and 752, taking into account the settlements contained in the

RCM Settlement Agreement.

## DECREES

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    Solicitation Procedures.  Votes for the acceptance or rejection of the Plan

were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy

Code, Bankruptcy Rules 3017 and 3018, all other applicable provisions of the Bankruptcy Code

and all other rules, laws and regulations, and the solicitation procedures and solicitation are

hereby approved.

2.    Confirmation.  The Plan, attached hereto as Exhibit A, is approved and

confirmed under section 1129 of the Bankruptcy Code.  The terms of the Plan are incorporated

by reference into and are an integral part of this Confirmation Order.

3.    Objections.  All Objections that have not been withdrawn, waived or

settled are overruled on the merits.

20

4.     Provisions of Plan and Order Non-Severable and Mutually Dependent.

The provisions of the Plan and this Confirmation Order, including the findings of fact and

conclusions of law set forth herein, are non-severable and mutually dependent.

5.     Claims Bar Dates for Administrative Claims.  As set forth in Section 12.3

of the Plan, unless previously paid prior to the Confirmation Date, all requests for payment of

Administrative Claims against all Debtors and RCM that were not previously filed pursuant to

prior orders of the Court must be filed no later than thirty (30) days after the Effective Date or be

forever barred.  The Reorganized Debtors and the RCM Trustee shall have until the

Administrative Claims Objection Deadline to object to such claims.

6.     Plan Classification Controlling.  The classifications of Claims and Interests

for purposes of the Distributions to be made under the Plan shall be governed solely by the terms

of the Plan.

7.     Binding Effect.  The Plan, and all compromises and settlements

contemplated thereby or incorporated by reference therein, shall be binding upon and inure to the

benefit of the Debtors, all present and former Holders of Claims and Interests, and their

respective successors and assigns, including, but not limited to, the Reorganized Debtors and any

Chapter 7 trustee appointed to administer any of the Estates.  If the Chapter 11 Case of RCM is

converted to a case under Chapter 7 of the Bankruptcy Code, all aspects of the Plan relating to

RCM, including all settlements, compromises and releases, shall nonetheless be and remain

binding with full force and effect as a settlement between the RCM Chapter 7 estate and the

estates of the Debtors enforceable among the Debtors' estates and against all parties in interest in

the Chapter 11 Cases.  The Effective Date shall constitute the effective date of the settlement

between the RCM Chapter 7 estate and the Estates of other Debtors.  The conversion of the RCM

Chapter 11 Case prior the Effective Date shall not impair the Effective Date occurring with

respect to the other Debtors.  Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code

and the provisions of this Confirmation Order, the Plan, and all Plan related documents shall

apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

8.      No Revesting of Assets (11 U.S.C. § 1141(b) and (c)).  Other than as set

forth herein, or in the Litigation Trust Agreement, the remaining property of the respective

Estates, other than the Contributed Claims, which shall be transferred to and vest in the

Litigation Trust, shall not revest in the Debtors or RCM on or following the Confirmation Date

or Effective Date, but shall remain property of the respective Estates and continue to be subject

to the jurisdiction of the Court until distributed to Holders of Allowed Claims in accordance with

the provisions of the Plan, this Confirmation Order and the RCM Settlement Agreement.  From

and after the Effective Date, all such property shall be distributed in accordance with the

provisions of the Plan, this Confirmation Order and the RCM Settlement Agreement, without

further order of the Court (except as specifically required).  For the avoidance of doubt, the

Debtors' or RCM's insurance policies shall remain property of their respective Estates in

accordance with section 5.9 of the Plan, and shall not be subject to the rejection provisions of

section 7.1 of the Plan.

9.      Merger of Subsidiaries into Refco Inc.  In the event that, after the Effective

Date, the Plan Administrator determines that it is appropriate, each of the Affiliate Debtors shall

be dissolved or merged with and into Refco Inc., with Refco Inc. as the surviving entity.

Notwithstanding anything to the contrary in section 5.1 of the Plan, any mergers in fact of each

of the Affiliate Debtors, other than FXA, with and into Refco Inc. referenced in such section

shall occur no earlier than the Effective Date.  Upon the occurrence of any such merger, the Plan

Administrator, on behalf of the Reorganized Debtors, shall file all appropriate and required

documentation with applicable state governmental agencies to reflect the occurrence of such

mergers.

          10.    <u>Continued Corporate Existence and Dissolution of Reorganized Debtors</u>.

FXA and, until they are wound up and potentially merged with and into Refco Inc. pursuant to

section 5.1 of the Plan, the Affiliate Debtors shall continue to exist as Reorganized Refco,

Reorganized FXA and/or the applicable Reorganized Affiliate Debtor, respectively, after the

Effective Date pursuant to the certificate of incorporation, certificate of formation or other

corporate governance document, as applicable, and by-laws, operating agreement or other

corporate governance document in effect prior to the Effective Date, except to the extent that

such corporate governance documents are amended under the Plan, for the limited purposes of

liquidating all of the assets of each of the Estates, and making Distributions in accordance with

the Plan.  As soon as practicable after the Plan Administrator, liquidates or otherwise disposes of

assets of the Estates of the Reorganized Debtors and makes the final Distribution under the Plan,

the Plan Administrator shall, at the expense of the Estates of the Reorganized Debtors and in

consultation with the Plan Committee, (i) provide for the retention and storage of the books,

records, and files that shall have been delivered to or created by the Plan Administrator until

such time as all such books, records, and files are no longer required to be retained under

applicable law (except for those books, records and files turned over to the Litigation Trustee in

accordance with the terms of the Litigation Trust Agreement), and file a certificate informing the

Court of the location at which such books, records, and files are being stored, (ii) file a

certification stating that the Plan Administrator has liquidated or otherwise disposed of the assets

of the Estates of the Reorganized Debtors and made a final Distribution under the Plan, (iii) file

the necessary paperwork with the applicable office of the secretary of state to effectuate the

dissolution of the Reorganized Debtors in accordance with the laws of the applicable state, and

(iv) resign as the sole officer, manager or director, as applicable, of the Reorganized Debtors.

Upon the filing of the certificates described in sub-section (ii) of the preceding sentence, the

Reorganized Debtors shall be deemed dissolved for all purposes without the necessity for any

other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be

made in connection therewith.  The RCM Trustee shall have sole discretion with respect to

determining the timing and manner of dissolution of Post-Confirmation RCM in accordance with

the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

11.    Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).  On

the Effective Date, all executory contracts or unexpired leases of the Debtors shall be deemed

rejected in accordance with, and subject to, the provisions and requirements of sections 365 and

1123 of the Bankruptcy Code, except those executory contracts and unexpired leases that (i)

previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (ii)

previously shall have expired or terminated pursuant to its own terms before the Effective Date,

(iii) are the subject of a pending motion to assume or reject on the Confirmation Date, or (iv) are

identified in Exhibit D to the Plan as a contract or lease to be assumed.  Entry of the

Confirmation Order by the Court shall constitute approval of such rejections and assumptions

pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

12.    Effectuating Documents and Further Transactions.  Pursuant to the Plan,

the Plan Administrator on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of

Post-Confirmation RCM, shall be authorized to execute, deliver, file, or record such documents,

instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.     Corporate Action.  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, members, directors or managers of one or more of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM are incorporated or formed without any requirement of further action by the stockholders, members, directors or managers, as applicable, of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM.

14.     Plan Documents.  There being no objections to any of the Plan Documents contemplated by the Plan, and any amendments, modifications and supplements thereto, and all documents and agreements introduced therein or contemplated by the Plan (including all exhibits and attachments thereto and documents referred to therein) the execution, delivery and performance thereof by the Reorganized Debtors are authorized and approved, without need for further corporate action or further order or authorization of the Court.  The Debtors and the Reorganized Debtors, as appropriate, are authorized and empowered to make any and all modifications to any Exhibits that may be agreed to by the parties thereto and are consistent with the Plan.

15.     No Discharge of Claims; Injunction.  Pursuant to section 10.4 of the Plan, Confirmation shall not discharge Claims against the Contributing Debtors, FXA and RCM; *provided*, *however*, that no Holder of a Claim against or Interest in any Contributing Debtor,

FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other

Distribution from, or seek recourse against the Estates of any Contributing Debtor,  FXA or

RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their

respective properties, except as expressly provided in the Plan.  Accordingly, except as otherwise

provided in the Plan, from and after the Confirmation Date all Persons who have held, hold, or

may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from

taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM,

the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or

any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined

from taking any of the following actions against any of the Contributing Debtors, FXA, RCM,

the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims

or Interests: (A) commencing or continuing, in any manner or in any place, any action or other

proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment,

award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D)

commencing or continuing, in any manner or in any place, any action that does not comply with

or is inconsistent with the provisions of the Plan; *provided*, *however*, that (x) nothing contained

in the Plan shall preclude such Persons from exercising their rights pursuant to and consistent

with the terms of the Plan and (y) the preliminary injunction of actions against the Contributing

Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property

(if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized

Debtors and Post-Confirmation RCM and completion of the winding up of their affairs.

Notwithstanding anything to the contrary set forth in the Plan, creditors' rights of setoff and

recoupment are preserved, and the injunctions referenced in sections 10.4 and 10.5 of the Plan

shall not enjoin the valid exercise of such rights of setoff and recoupment.  By accepting

Distributions pursuant to the Plan, each Holder of an Allowed Claim or Allowed Interest shall be

deemed to have specifically consented to the injunctions set forth in Article X of the Plan.

16.     Cancellation of Securities, Instruments, and Agreements Evidencing

Claims and Interests.  With the exception of the equity interests of any Refco Entity held by any

Debtor, RCM or Non-Debtor Affiliate pending wind-up and dissolution of such entities pursuant

to this Plan, on the Effective Date and concurrently with the applicable Distributions made

pursuant to Article V of the Plan, the promissory notes, share certificates (including treasury

stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls,

rights, puts, awards, commitments, or any other agreements of any character to acquire such

Interests shall be deemed canceled and of no further force and effect, without any further act or

action under any applicable agreement, law, regulation, order, or rule, and the obligations of the

Debtors or RCM under the notes, share certificates, and other agreements and instruments

governing such Claims and Interests shall be discharged; *provided*, *however*, that the Senior

Subordinated Notes Indenture shall continue in effect solely for the purposes of allowing the

Senior Note Indenture Trustee to enforce the indemnity provisions of the Senior Subordinated

Note Indenture on account of the Senior Subordinated Note Indenture Trustee's service on the

Plan Committee, to effectuate the Distributions to be made on account of Senior Subordinated

Note Claims under the Plan and, to the extent necessary, enforce the Senior Subordinated Note

Indenture Trustee Charging Lien, after which point the Senior Subordinated Note Indenture shall

be cancelled and discharged.  The Holders of or parties to such canceled notes, share certificates,

and other agreements and instruments shall have no rights arising from or relating to such notes,

share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan.

17.    <u>Exemption from Certain Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer, or in connection with, the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer tax, or other similar tax.

18.    <u>Final Fee Applications</u>.  All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date shall file and serve on the Reorganized Debtors and counsel for the Reorganized Debtors and on the RCM Trustee and his counsel an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, the RCM Trustee and his counsel, and the requesting Professional or other entity no later than thirty (30) days (or such other period as may be allowed by order of the Court) after the date on which the applicable request for compensation or reimbursement was served.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327, 328, 330, 331 or 1103 of the Bankruptcy Code in seeking retention or

28

compensation for services rendered after such date shall terminate.  Professional Fee Claims

relating to fees and expenses incurred after the Effective Date shall be paid in the ordinary course

of business.

19.    Professional Fee Claims Escrow Account.  On the Effective Date, the

Reorganized Debtors and Post-Confirmation RCM (or the RCM Trustee in the event that the

RCM Chapter 11 Case previously has been converted to a case under subchapter III of chapter 7)

shall fund a segregated bank account consisting of 110% of (x) the amount of any holdbacks on

previously billed and paid amounts, *provided*, *however*, that the 10% holdback of fees pursuant

to the December 7, 2006 Order Granting Professionals' Applications for Allowance of Interim

Compensation and Reimbursement of Expenses (June 1, 2006 Through September 30, 2006) is

hereby released and may be remitted to the following Professionals: (i) Bingham McCutchen

LLP, (ii) FTI Consulting, Inc., (iii) Houlihan Lokey Howard & Zukin Capital, Inc., (iv) Kasowitz,

Benson, Torres & Friedman LLP, (v) Milbank, Tweed, Hadley & McCloy LLP, and (vi)

Skadden, Arps, Slate, Meagher & Flom LLP and (y) the amount of estimated additional fees and

expenses expected to be incurred by each Professional through the Effective Date in accordance

with section 12.3(c) of the Plan.  Amounts held in such segregated account shall be used by the

Reorganized Debtors and Post-Confirmation RCM (or the RCM Trustee in the event of

conversion) to pay amounts not previously paid by the Reorganized Debtors and Post-

Confirmation RCM (or the RCM Trustee in the event of conversion) and subsequently allowed

by the Court following compliance with the interim compensation procedures established by the

Court in these Chapter 11 Cases and/or a hearing on the Professionals' final fee applications.

When all Professional Fee Claims have been paid in full, amounts remaining in the segregated

account, if any, shall be returned to the Reorganized Debtors and Post-Confirmation RCM (or

the RCM Trustee in the event of conversion) .

20.    <u>Termination of Injunctions and Automatic Stay</u>.  Pursuant to Section 10.5

of the Plan, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or

362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall

remain in full force and effect until all of the property of the Estates of the Contributing Debtors,

FXA, the Reorganized Debtors and Post-Confirmation RCM have been distributed in accordance

with the terms of the Plan or any Plan Document, and the Estate of Post-Confirmation RCM

shall have been fully administered and the RCM Trustee discharged from his duties, or as soon

after the Effective Date that the Plan Administrator may determine that it is appropriate for each

of the Affiliate Debtors to be merged with and into Refco Inc., with Refco Inc. as the surviving

entity;  *provided*, *however*, that any injunction that by its terms is permanent or otherwise is

intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant

to order of the Court), shall be continued without modification, notwithstanding anything to the

contrary contained in the Plan.

21.    <u>Injunction</u>.  Except as otherwise expressly provided in the Plan, this

Confirmation Order, or a separate order of this Court, the injunctions set forth in Section 10.4 of

the Plan are approved.

22.    <u>Settlements, Compromises and Releases</u>.  All Settlements of Disputes

embodied in the Plan, are approved as fair, equitable, reasonable and in the best interests of the

Debtors, the Reorganized Debtors and their Estates, and creditors and interest holders, and shall

be, and hereby are, effective and binding on all persons and entities who may have had standing

to assert such claims or causes of action, and no person or entity shall possess such standing to

assert such claims or causes of action after the Effective Date.  Pursuant to section 1123(b)(3)(A)

of the Bankruptcy Code and Bankruptcy Rule 9019(a) the settlements, compromises, releases,

discharges, exculpations, and injunctions set forth in the Plan, including, but not limited to, the

releases set forth in Section 10.2 of the Plan and implemented by this Confirmation Order shall

be, and hereby are, approved as fair, equitable, reasonable and in the best interests of the Debtors,

the Reorganized Debtors and their estates, creditors and interest holders.

      23.   <u>Litigation Trust</u>.  The Litigation Trust shall be established for pursuit of the

Contributed Claims and shall become effective on the Effective Date as set forth in Section 5.7

of the Plan and in accordance with the terms and conditions set forth in more detail in the

Litigation Trust Agreement.  On the Effective Date, the Contributed Claims, held by the Debtors

and RCM on behalf of the Litigation Trust Beneficiaries shall be transferred to the Litigation

Trust in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust

Beneficiaries.  Upon transfer of the Contributed Claims to the Litigation Trust, except as

otherwise provided in the Litigation Trust Agreement, the Debtors, RCM, the Reorganized

Debtors, Post-Confirmation RCM and the Plan Administrator shall have no interest in or with

respect to the Contributed Claims or the Litigation Trust; *provided*, *however*, that,

notwithstanding such transfer to the Litigation Trust, such claims shall not be merged into a

single entity but shall be deemed asserted on behalf of each applicable Estate holding such claim

immediately prior to contribution, and shall remain separate and distinct from other Estates in

connection with the prosecution thereof.  Pursuant to section 1123(b)(3) of the Bankruptcy Code

and in accordance with section 5.7(a) of the Plan, Marc S. Kirschner is hereby appointed the

Litigation Trustee as a representative of each of the Estates, and the Litigation Trustee shall be

deemed the successor-in-interest to each of the Contributing Debtors, FXA, and the RCM

31

Trustee, a "similar official duly appointed with respect to the Company," and/or a "comparable authority of the Company," for purposes of any applicable directors and officers insurance policy, including, without limitation, with respect to (i) the Exclusion F to the Directors, Officers and Corporate Liability Insurance Policy issued to Refco Inc. by U.S. Specialty Insurance Company (Policy No. 24-MGU-05-A10821) (the "U.S. Specialty Policy"), together with the excess policies that follow form to the U.S. Specialty Policy issued by Lexington Insurance Company (Policy No. 1620294), Axis Reinsurance Company (Policy No. RNN 506300), Allied World Assurance Company (U.S.), Inc. (Policy No. AW0418197), and Arch Insurance Company (Policy No. 24-MGU-05-A10821); and (ii) Exclusion G to the Management Liability and Company Reimbursement Insurance Policy issued to Refco Inc. by XL Specialty Insurance Company (Policy No. ELU091406-06).  The terms of the Litigation Trust Agreement are hereby approved.

24.    <u>Private Actions Trust</u>.  The Private Actions Trust shall become effective on the Effective Date as set forth in section 5.8 of the Plan and in accordance with the terms and conditions set forth in more detail in the Private Actions Trust Agreement to hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates.  The appointment of Marc S. Kirschner as Private Actions Trustee is hereby approved.  The terms of the Private Actions Trust Agreement are hereby approved.

25.    <u>Plan Administrator; Plan Administrator Agreement</u>.  Pursuant to section 5.5.(a) of the Plan, the Joint Sub-Committee has designated RJM, LLC, a New Jersey limited liability company, as Plan Administrator.  The appointment of RJM, LLC as Plan Administrator is hereby approved.  The Plan Administrator shall serve until resignation or discharge and the

appointment of a successor Plan Administrator.  The terms of the Plan Administrator Agreement are hereby approved.

26.    <u>Non-Occurrence of Effective Date</u>.  If the Effective Date has not occurred within the time period provided in Section 9.2 of the Plan, the Plan Proponents reserve all rights to seek an order from the Court directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan, other than those contained in the RCM Settlement Agreement, be null and void.  In the event that the Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of 60 days after the date the Confirmation Order is vacated, without prejudice to further extensions.

27.    <u>Authorization to Consummate Plan</u>.  Notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry and the Debtors are authorized to consummate the Plan immediately after entry of this Confirmation Order in accordance with Section 9.2 of the Plan.

28.    <u>Notice of Entry of Confirmation Order and the Effective Date</u>.  Within five (5) Business Days of the Effective Date, the Debtors shall serve a notice (the "Confirmation and Effective Date Notice") in substantially the form attached hereto as <u>Exhibit B</u> (the form of which is hereby approved), pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all parties that received notice of the Confirmation Hearing; *provided*, *however*, that the Debtors or the Reorganized Debtors shall be obligated to serve the Confirmation Notice only on the record holders of Claims or Interests as of the Confirmation Date.  The Debtors shall also publish the Confirmation and Effective Date Notice in the national and global editions of <u>USA Today</u>, <u>The</u>

33

<u>Wall Street Journal</u>, <u>The Financial Times</u>, and the national edition of <u>The New York Times</u>, the <u>Times of London</u>, and the <u>Singapore Straits Times</u>.

29.    <u>Continuation of RCM Settlement Agreement</u>.  Neither any term or provision of the Plan, nor any failure of such Plan to proceed or be confirmed or consummated, nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the RCM Settlement Agreement, which will at all times operate and be binding in accordance with its terms.

30.    <u>Continuation of Early Payment Order</u>.  Neither any term or provision of the Plan or the Confirmation Order, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the Early Payment Order, which will at all times operate and be binding in accordance with its terms.

31.    <u>Voting Deadline and Procedures for Tabulation of Votes</u>.  Any Ballot received after the Voting Deadline, to the extent otherwise valid under the Disclosure Statement Order, shall be effective to effect any applicable Ballot elections.

32.    <u>Contributing Non-Debtor Affiliate Trigger Date</u>.  For the avoidance of doubt, the term "positive Cash" contained in section 1.62 of the Plan shall mean, as to each Non-Debtor Affiliate, an amount not less than 90% of the amount projected to be received from such Non-Debtor Affiliate in the Houlihan Contributing Debtor Projections, which projections were prepared in accordance with section 9.1(f) of the Plan.

33.    <u>Old Equity Interest Forms</u>.

(a)    The Private Actions Trust Election for Holders of Old Common Stock of Refco Inc. (the "Common Stock Election Form") and the Private Actions Trust Election

34

for Holders of Certain Subordinated Claims (the "Subordinated Claim Election Form" and,

together with the Common Stock Election Form, the "Old Equity Interest Forms"), substantially

in the forms attached to the Plan as Exhibit M, are hereby approved.

(b)     The Common Stock Election Form and the Plan (with exhibits F and

G only) shall be mailed, within ten business days after entry of this Order, to (i) each holder of

record of Refco Inc. common stock as of December 20, 2006; and (ii) each broker, commercial

bank, transfer agent, trust company, dealer or other intermediary or nominee (each, a "Nominee")

identified by Financial Balloting Group as an entity through which beneficial owners indirectly

hold Refco Inc. common stock.

(c)     The Subordinated Claim Election Form and the Plan (with exhibits

F and G only) shall be mailed, within ten business days after entry of this Order, to (i) each

holder of a timely-filed claim in the Refco Inc. chapter 11 case arising from rescission of a

purchase or sale of Refco Inc. common stock, for damages arising from the purchase of sale of

such stock, or for reimbursement or contribution allowable under section 502 of the Bankruptcy

Code on account of such claim (all such holders, the "Subordinated Claimants"), at the address

listed on such holder's claim, and (ii) the lead plaintiffs (the "Lead Plaintiffs") and their counsel

in the securities class action styled In re Refco Inc. Securities Litigation, Case No. 05 Civ. 8626

(GEL) (S.D.N.Y.).

(d)     The record date for purposes of determining creditors entitled (i) to

receive the Subordinated Claim Election Form and related materials; (ii) to make the Private

Actions Trust Election; and (iii) to receive distributions, if any, on account of such election, shall

be December 8, 2006 (the "Subordinated Claim Record Date").  While the Common Stock

Election Form shall be mailed to holders of record as of December 20, 2006, there shall be no

35

record date for determining holders of Refco Inc. common stock entitled to make the Private

Actions Trust Election.

(e)     If a holder's Private Action Trust Election is not received by

Financial Balloting Group (for holders of section 510(b) subordinated claims) or effectuated

through the electronic delivery of Old Equity Interests to the account established for that purpose

(for holders of Refco Inc. common stock) on or before 5:00 p.m. Eastern Time on January 30,

2007, such holder's Private Actions Trust Election shall not count or be effective.

34.     Resolution of Certain Director and Officer Indemnification Objections.

(a)     In accordance with section 6.4 of the Plan, timely filed Claims

arising in favor of present or former officers or directors under contract, statute, or entity

governance documents of any of the Debtors, by reason of such officer or director actually being

an officer or director of a Debtor, (collectively, "Officer and Director Claims") shall be entitled

to be asserted against the estate of each and every such Debtor to the same extent as provided for

under applicable law.  To the extent that an officer or director has a Claim against more than one

Debtor based on the foregoing sentence, each such Claim, shall, without regard to their multiple

or counterpart nature, be allowed or disallowed and shall be entitled to such payment as is

provided for in their respective class of claims, until the underlying liability is fully satisfied.

(b)     Further, nothing in the Plan or Confirmation Order shall permit

Officer and Director Claims to be treated as Subordinated Claims or otherwise subordinated,

except in the manner and to the extent the Bankruptcy Code and Rules and decisional law,

including applicable nonbankruptcy law (both substantive and procedural), would otherwise

allow absent the particular provisions of this Plan.  Neither the Plan nor the Confirmation Order

makes any finding as to whether any Officer and Director Claims are subject to subordination

36

and there are no pending actions to subordinate any of the Officer and Director Claims.  To the extent that any such action is commenced, nothing in either the Plan or the Confirmation Order shall affect the rights of the Plan Proponents or any other party in interest to object to or seek subordination of such claims or the rights and defenses of the directors and officers in opposing such subordination actions, it being the intent of the parties that such rights and defenses are expressly preserved.

(c)     Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order, including, but not limited to, the injunction provisions, shall be construed to prevent present or former directors and officers of the debtors from seeking and obtaining coverage and payments from insurance policies of Refco Inc. or from insurance policies of any other Refco Entity, including, but not limited to, in the case of such directors or officers who have previously commenced such litigation, by litigation against relevant insurance companies, nor to prevent insurance companies from making such payments. Nothing in the previous sentence, however, shall be construed to grant relief (retrospective or prospective) from any stay or injunction that is not contained in the Plan to permit the directors and officers of the debtors from seeking and obtaining coverage and payments from insurance policies of Refco Inc. or from insurance policies of other Refco Entities.

(d)     Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order constitutes a judgment or finding as to the appropriateness of the Private Actions Trust or Trustee acting as a plaintiff in any given action which the Trust or Trustee may bring, nor does it constitute a judgment or finding as to the personal or subject matter jurisdiction of any court in which such an action may be brought, all standing and jurisdictional defenses of defendants to such actions being hereby expressly

37

preserved; *provided*, *however*, that, to the extent any Private Actions may not be maintained by the Private Actions Trust or Trustee, such actions shall revert to the grantors of such Non-Estate Refco Claims.

    35.  <u>Resolution of Objections of New York Financial and Hillier Capital Management</u>.

      (a)  On the Effective Date, RCM shall transfer to the FXA Estate the sum of $2.0 million.

      (b)  The Plan Administrator shall form a committee of FXA customers who did not do business with FXA in Japan (the "Non-Japan FXA Customer Committee") to oversee and direct the litigation involving FXA assets in Japan.  New York Financial shall serve as the chair of the committee and Hillier Capital Management shall be appointed to the committee as a member.  The Non-Japan FXA Customer Committee shall have consent rights with respect to any settlement regarding the litigation involving FXA assets in Japan. Furthermore, all reasonable expenses born in connection with the role of chair of the Non-Japan FXA Customer Committee shall be born by the FXA Estate.

      (c)  Upon the later of the Effective Date or the presentment of a statement indicating the amount of such Claim, New York Financial LLC and Hillier Capital Management shall be granted an Allowed Administrative Expense Claim against the FXA Estate pursuant to section 503(b) of the Bankruptcy Code in an aggregate collective amount not to exceed $200,000.

    36.  <u>Resolution of Objections of West Loop Associates, LLC</u>.

(a)    Pursuant to an order entered on the date hereof in the chapter 7 case of Refco LLC, West Loop Associates, LLC ("West Loop")  shall be paid the sum of $3.75 million in cash by Refco LLC on or before the Effective Date.

(b)    West Loop shall release all claims against the Debtors and against Refco LLC.  In addition, West Loop shall be barred from bringing any action against any third party as to the potential matters set forth in Exhibit K of the Plan, *provided*, *however*, that West Loop shall expressly retain all rights to bring actions against the following:  Mark Goodman & Associates, 550 West Jackson Associates Limited Liability Company, Mark Goodman, Phillip R. Bennett, Santo Maggio, and Grant Thornton.

(c)    West Loop shall have an Allowed Claim against RGL in the amount of $20 million, but such Claim shall be satisfied in full by distribution of the Litigation Trust Interests allocable to such Claim; *provided, however*, any and all Litigation Trust Interests distributable on account of such Allowed Claim shall be deemed to have been assigned  by West Loop to the Contributing Debtors for distribution to Holders of Allowed Contributing Debtors General Unsecured Claims.

(d)    The Contributing Debtors shall transfer $1.875 million from Contributing Debtors Cash Distribution to the RCM Trustee for addition to the RCM Cash Distribution.

37.    <u>Retention of Jurisdiction</u>.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the

39

Plan and the RCM Settlement Agreement to the fullest extent permitted by law, including, but

not limited to, the matters set forth in Article XI of the Plan.

38.    <u>Resolution of Securities Plaintiff's Objection</u>.

(a)    Nothing contained in the Plan or any Order confirming the Plan

shall be deemed to release, enjoin or bar any claims, or the prosecution of any claims, asserted or

to be asserted in the Securities Litigation, entitled In re Refco Securities Litigation, Case No. 05

civ 8626 (SDNY), by or on behalf of the Lead Plaintiffs as defined therein or putative class

members therein, against (i) any of the Secured Lender Releasees that acted as an underwriter,

book running manager or initial purchaser in connection with the underwriting, offering,

distribution, or sale of the 9% Senior Subordinated Notes due 2012 issued by certain of the

Debtors or of any equity securities of Refco Inc., with respect to any act or failure to act by any

such Secured Lender Releasee, in its capacity as underwriter, book running manager or initial

purchaser, in connection with the underwriting, offering, distribution, or sale of the 9% Senior

Subordinated Notes due 2012 issued by certain of the Debtors or of any equity securities of

Refco, Inc. and (ii) such other non-Debtor defendants, who are named or to be named in the

Securities Litigation, including, without limitation, certain of the Debtor's non-Debtor affiliates,

current or former officers and directors, underwriters, audit committee members, Thomas H. Lee

Partners affiliates, Grant Thornton and BAWAG, but not including the Released Parties (other

than in such capacities as described in (i) above), the Contributing Non-Debtor Affiliates

identified on Exhibit L to the Modified Plan, as of December 4, 2006, and the Contributing Non-

Debtor Affiliate Management identified in Schedule 1.56 of the Modified Plan, as of December 5,

2006, to the extent that the Lead Plaintiffs or the putative class members receive a distribution

under the Modified Plan.  To the extent either Exhibit L or Schedule 1.56 is modified subsequent

40

to December 4 or 5, 2006, respectively, Lead Plaintiffs and the Plan Proponents reserve their

rights with respect to the release afforded to any additional Contributing Non-Debtor Affiliates

or Contributing Non-Debtor Affiliate Management under the Modified Plan or any amendments

thereto.

(b)    Notwithstanding anything in the Plan or this Confirmation Order to

the Contrary, in making the Private Actions Trust Election, the transfer of (i) Non-Estate Refco

Claims or (ii) the proceeds of any Class Action Claims by any of the plaintiffs in the Securities

Litigation described in paragraph 38(a) hereof shall not include the transfer of any recovery

received by such plaintiffs in any pending action against BAWAG.

39.    <u>Resolution of Objection of the FXCM Parties.</u>

(a)    Nothing in the Plan, including Article 10 of the Plan, shall impair

the right of FXCM Sellers (as defined in that certain Limited Objection of the FXCM Parties to

Confirmation of Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect

Subsidiaries (docket no. 3649) (the "FXCM Objection")) from arguing that they are entitled to an

equitable remedy of rescission of RGL's purchase of the FXCM Equity Stake (as defined in the

FXCM Objection); *provided, however,* any action seeking such a remedy will be heard by this

Court unless this Court has permitted the FXCM Sellers to bring such an action in a different

forum.

40.    <u>Extension of Certain Plan Provisions to RCM Trustee</u>.  The provisions set

forth on <u>Exhibit D</u> hereto shall govern and pertain in the RCM Trustee's administration of Post-

Confirmation RCM and the RCM Estate in the event that RCM's Chapter 11 Case is not

converted to a chapter 7.

41.    <u>BAWAG Allocation Order and BAWAG Proceeds</u>.  The BAWAG Allocation Order, as defined in the Plan, includes this Order.  The Debtors are hereby authorized to utilize the BAWAG Proceeds in accordance with the Plan and the BAWAG Allocation Order after giving effect to this Order and, specifically, the BAWAG Proceeds may be used to pay the obligations owing to RCM under the Cash Management Advance Agreement dated as of October 16, 2006, and to implement the other Distributions contemplated in the Plan.  In addition, without altering the deemed allocation of BAWAG Proceeds set forth in the Plan, for purposes of making Cash Distributions, the BAWAG Contingent Proceeds shall be used to satisfy the Senior Subordinated Note Distribution to the extent such funds are available to the Estates prior to the payment in full of the Senior Subordinated Note Distribution.

42.    <u>Exemption from Securities Laws</u>.  The exemption from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer, issuance, exchange or transfer of a security provided for in the Plan, including, without limitation, the distribution and subsequent transfer of Litigation Trust Interests and Private Actions Trust Interests, or registration or licensing of an issuer of, underwriter of, or broker dealer in, such security is authorized by section 1145 of the Bankruptcy Code and shall apply to the extent set forth in the Plan.

43.    <u>References to Plan Provisions</u>.  The failure to specifically include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.

44.     <u>Confirmation Order Controlling</u>.  To the extent of any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and conditions contained in the Confirmation Order shall govern.

45.     <u>Applicable Non-Bankruptcy Law</u>.  Pursuant to section 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

Dated: New York, New York
        December <u>15</u>, 2006

/s/Robert D. Drain_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

## MODIFIED JOINT CHAPTER 11 PLAN OF REFCO INC. AND CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES

[Intentionally Omitted]

[Filed with the Bankruptcy Court on December 14, 2006]

## EXHIBIT B

## FORM OF CONFIRMATION AND EFFECTIVE DATE NOTICE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                  :        Chapter 11
                                                        :
Refco Inc., et al.,[5]                                  :        Case No. 05-60006 (RDD)
                                                        :
                            Debtors.                    :        (Jointly Administered)
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### NOTICE OF (A) ENTRY OF ORDER CONFIRMING THE MODIFIED JOINT PLAN OF REORGANIZATION OF REFCO, INC. AND ITS DIRECT AND INDIRECT SUBSIDIARIES, (B) OCCURRENCE OF EFFECTIVE DATE, AND (C) BAR DATE FOR FILING CLAIMS

1.        **Confirmation of the Plan.**  On December ___, 2006, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered its Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Refco Inc. and Certain Of Its Direct and Indirect Subsidiaries (the "Confirmation Order").  Unless otherwise defined herein, capitalized terms used in this Notice shall have the meaning ascribed to such terms in the Joint Chapter 11 Plan of Refco Inc. and Certain Of Its Direct and Indirect Subsidiaries dated October 20, 2006, as modified by the Modified Joint Chapter 11 Plan of Refco Inc. and Certain Of Its Direct and Indirect Subsidiaries dated December 4, 2006 (together the "Plan").  Copies of the Confirmation Order and Plan are available upon written request to the claims agent at Omni Management Group, LLC, 16161 Ventura Boulevard, PMB 607, Encino, CA 91436 (Attn: Nova Lachman).  The documents may also be examined by any party-in-interest between the hours of 8:30 A.M. and 5:00 P.M. EST, Monday through Friday, at the Office of the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408.  These documents are also available from the Bankruptcy Court's website at http://www.nysb.uscourts.gov (a PACER account is required).

---

[5]    The following entities are Debtors in these Chapter 11 Cases: Bersec International LLC; Kroeck & Associates, LLC; Lind-Waldock Securities LLC; Marshall Metals, LLC; New Refco Group Ltd., LLC; Refco Administration, LLC; Refco Capital Holdings, LLC; Refco Capital LLC; Refco Capital Management, LLC.; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial, LLC; Refco Fixed Assets Management, LLC; Refco F/X Associates, LLC; Refco Global Capital Management LLC; Refco Global Finance Limited; Refco Global Futures, LLC; Refco Global Holdings, LLC; Refco Group Ltd., LLC; Refco Inc.; Refco Information Services, LLC; Refco Managed Futures, LLC; Refco Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summit Management, LLC; and Westminster-Refco Management LLC.  Refco Capital Markets, Ltd. is a debtor in these chapter 11 cases, but not a debtor-in-possession.

2.    **Effective Date.**  The conditions to consummation of the Plan set forth in Article IX of the Plan were satisfied (or waived) on December ___, 2006.  Thus in accordance with the terms of the Plan, the Plan became effective on December ___, 2006 (the "Effective Date").  All references in the Plan and the Confirmation Order to the Effective Date are to December ___, 2006.

3.    **Bar Dates**

(a)    **Administrative Claims Bar Date.**  "Administrative Claim(s)" are defined in Section 1.8 of the Plan.  In accordance with Section 12.3 of the Plan, all Administrative Claims, unless paid prior to the Confirmation Date, shall be filed with the Bankruptcy Court, and served on each of (i) the undersigned counsel to the Debtors, (ii) counsel to the Creditors Committee: Milbank, Tweed, Hadley, & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005 (Attn: Luc A. Despins, Esq., Susheel Kirpalani, Esq., and Dennis C. O'Donnell, Esq.), (iii) counsel to the Additional Committee: Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, NY 10019 (Attn: David S. Rosner, Esq., Andrew K. Glenn, Esq., and Jeffrey R. Gleit, Esq.), and (iv) counsel to the RCM Trustee: Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022 (Attn: Tina L. Brozman, Esq., Timothy B. DeSieno, Esq., and Mark W. Deveno, Esq.) (collectively "Notice Parties"), so as to be actually received no later than thirty (30) days after the Effective Date, , unless otherwise ordered by the Bankruptcy Court (the "Administrative Claims Bar Date").  Any request not timely filed and served for payment of an Administrative Claim shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim by the Administrative Claims Objection Deadline (which, pursuant to Section 1.7 of the Plan, is currently (a) the later of (i) sixty (60) days after the Effective Date or (ii) thirty (30) days after the filing of such Administrative Claim, or (b) such other date specified in the Plan or ordered by the Bankruptcy Court, but which deadline may be extended), such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

(b)    **Deadline for Submitting Professional Fee and Substantial Contribution Claims.**  In accordance with Section 12.3(b) of the Plan, all Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered before the Effective Date shall file an application for allowance of compensation and reimbursement of expenses with the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10036-6522, and serve on the Notice Parties, as defined above in paragraph 3(a), so as to be received no later than sixty (60) days after the Effective Date, or ___, 2006.  Objections to applications of Professional and other entities for compensation and reimbursement of expenses must be filed with the Bankruptcy Court no later than thirty (30) days (or such other period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for compensation or reimbursement was served.

(c)    **Bar Date for Proofs of Claim Relating to Rejected Executory Contracts Or Unexpired Leases.**  Pursuant to Section 7.1 of the Plan and the Confirmation Order, the Confirmation Order shall constitute an order under section 365(a) and 1123 of the Bankruptcy Code approving the rejection or assumption, as applicable, of all prepetition executory contracts and unexpired leases to which any Debtor is a party unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) are the subject of a pending motion to assume or reject on the Confirmation Date, or (d) are identified in Exhibit D of the Plan as a contract or lease to be

46

assumed. If the rejection of an executory contract or unexpired lease pursuant to section 7.1 of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Reorganized Debtors, the Plan Administrator, or their respective successors or properties unless a proof of Claim is filed and served on the Reorganized debtors and counsel for the Reorganized Debtors within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

4.    **Releases by Debtors and RCM.**  As of the Effective Date, for good and valuable consideration, the Debtors and RCM (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, RCM, Post-Confirmation RCM, the Chapter 11 Cases, this Plan, the Disclosure Statement or the RCM Settlement Agreement and that could have been asserted by or on behalf of the Debtors, RCM,  their Estates, the Reorganized Debtors or Post-Confirmation RCM, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in any such case, against the Released Parties.  For the avoidance of doubt, Released/Subordinated Claims shall include any and all claims and causes of action against the Released Parties, acting in such capacity, arising from or relating to (w) the Debtors' and RCM's centralized cash management system and intercompany transfers other than the RCM Intercompany Claim and Intercompany Claims with respect to Non-Debtor Affiliates, (x) the leveraged recapitalization in August 2004, (y) the initial public offering, and any related transactions effectuated in August 2005/September 2005, and (z) any transfer or payment made in respect of the Credit Agreement or the Senior Subordinated Note Indenture, including any redemption of Senior Subordinated Notes, which shall include any Claim or cause of action arising therefrom pursuant to sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

5.    **Releases by Holders of Claims and Interests in Respect of Released Parties.**  On the Effective Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities (other than the right to enforce Released Parties' obligations under the Plan, the Confirmation Order, and the contracts, instruments, releases, agreements, and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, RCM the Chapter 11 Cases, the Plan, or the Disclosure Statement, in any such case, against the Released Parties.

6.    **Releases and Subordination by Holders of Claims and Interests in Respect of Contributing-Non-Debtor Affiliates and Contributing Non-Debtor Affiliate Management.**  On each Contributing Non-Debtor Affiliate Trigger Date, each Holder of an Impaired Claim, including, but not limited to, any Holder of an Impaired Claim against RCM that receives a Distribution under the Plan in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation

RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to (a) subordinate all claims of the type described in section 10.2(b) of the Plan against the applicable Contributing Non-Debtor Affiliate to all other existing claims against and equity interests in such Contributing Non-Debtor Affiliate, and (b) release all claims of the type described in section 10.2(b) of the Plan against parties who are Contributing Non-Debtor Affiliate Management of such Contributing Non-Debtor Affiliate; *provided, however*, that the RCM Trustee, with the consent of the Plan Committee, may deem any subordination referenced in section 10.2(c) of the Plan to be a "release" of claims (and may request the Bankruptcy Court to enter an Order confirming the same) to the extent the RCM Trustee determines such a release necessary to ensuring that the applicable Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash to the Contributing Debtors and RCM or, if insufficient Cash will be available for Distribution to RCM and the Contributing Debtors, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors.

7.     **Qualifying Plan Releases.**  In order to obtain for the estates of the Debtors the full benefits of the Early Payment Order, including the final allowance of Secured Lender Indemnification Claims at zero for purposes of the Chapter 11 Cases pursuant to paragraph 9(a) and (b) of the Early Payment Order, all Secured Lender Released Claims, unless previously made effective under the Early Payment Order, shall be fully, finally and forever released on the Effective Date.  For the avoidance of doubt, the releases provided under this section 10.2(d) of the Plan shall be interpreted such that their scope will satisfy the requirements under the Early Payment Order for the Plan to be a Qualifying Plan thereunder.

8.     **Releases by Recipients of BAWAG Proceeds.**  On the Effective Date, or in the case of Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims, the later of the Effective Date and the date at which an RCM Related Claim Subordination Form is provided (i) each Holder of a Secured Lender Claim, (ii) each Holder, that has not affirmatively exercised its option to be excluded from any Distribution of BAWAG Proceeds prior to the Voting Deadline, of (A) a Senior Subordinated Note Claim, or (B) a Contributing Debtors General Unsecured Claim, or (iii) each Holder, that has provided an RCM Related Claim Subordination form electing to receive RCM BAWAG Proceeds, of (A) an RCM Securities Customer Claim or (B) an RCM FX/Unsecured Claim, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities against BAWAG, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way arising from or relating to Refco or the RGHI Entities (each as defined in the BAWAG Settlement), and any transactions involving such parties, including, but not limited to, claims or actions arising from or related to (a) the allegations set forth in the Complaint and the Counterclaim (each as defined in the BAWAG Settlement), (b) the allegations set forth in the Adversary Proceeding (as defined in the BAWAG Settlement), or (c) any allegations that could have been made by any of the Refco Parties (as defined in the BAWAG Settlement); *provided however*, that pursuant to the Securities Class Action Stipulation, any Holder of a Claim or Interest against the Debtors, that is also a member of the securities class action class described in the Securities Class Action Stipulation may, assuming approval of the Securities Class Action Stipulation (and the settlement contained therein), elect to receive BAWAG Proceeds without releasing BAWAG of its Securities Class Action claims as set forth in this paragraph.

9.     **Injunction Related to Releases.**  The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities

released pursuant to the Plan or the Early Payment Order, including, but not limited to, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released in section 10.2 of the Plan.  For the avoidance of doubt, neither the Litigation Trust nor the Private Actions Trust shall bring any action to recover on any Released/Subordinated Claims.  Notwithstanding any provision contained herein or any provision in any documents incorporating or implementing in any manner the Plan to the contrary, nothing in the Plan or the transactions approved thereby is intended to or shall release any non debtor of any liabilities or obligations to the United States of America or its agencies or subdivisions (the "United States"), nor shall it enjoin or bar any claim by the United States against any Non-Debtor Affiliate.

       10.    **Exculpation and Limitation of Liability**.  To the maximum extent permitted by the Bankruptcy Code and applicable law, none of the (a) Debtors, (b) RCM, (c) the Reorganized Debtors, (d) the Plan Administrator, (e) any professionals retained by the Debtors or the RCM Trustee pursuant to an order of the Bankruptcy Court, (f) the Committees (including any present and former members thereof), (g) the RCM Trustee, (h) the parties to the RCM Settlement Agreement and the Plan Support Agreement (in such capacities), (i) the Post-Petition Management, (j) Post-Confirmation RCM, (k) the chapter 7 trustee appointed in Refco LLC's chapter 7 case, (l) AlixPartners, (m) the members of the Portfolio Management Advisory Committee and the Plan, Negotiation, and Litigation Advisory Committee, in each case, established under the RCM Settlement Agreement and in each case acting in such capacities, (n) the Ad Hoc Equity Committee, (o) the Ad Hoc Committee of  Senior Subordinated Note Holders. (p) the Senior Subordinated Note Indenture Trustee in its role of effectuating Distributions to Holders of Senior Subordinated Notes nor (q) any of their respective representatives, agents, officers, directors, employees, advisors, or attorneys shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the RCM Settlement Agreement or, if on or prior to the Effective Date, RCM's Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7, related to, or arising out of, the chapter 7 case, formulating, negotiating, or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

       11.    **No Discharge of Claims; Injunction.**  Pursuant to section 10.4 of the Plan, Confirmation shall not discharge Claims against the Contributing Debtors, FXA and RCM; *provided*, *however*, that no Holder of a Claim against or Interest in any Contributing Debtor,  FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against the Estates of any Contributing Debtor, FXA or RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their respective properties, except as expressly provided in the Plan.  Accordingly, except as otherwise provided in the Plan, from and after the Confirmation Date all Persons who have held, hold, or may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM, the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined from taking any of the following actions against any of the Contributing Debtors, FXA, RCM, the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D) commencing or continuing, in any manner or in any place, any action that does not comply with or is

inconsistent with the provisions of the Plan; provided, however, that (x) nothing contained in the Plan shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan and (y) the preliminary injunction of actions against the Contributing Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property (if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized Debtors and Post-Confirmation RCM and completion of the winding up of their affairs.  Notwithstanding anything to the contrary set forth in the Plan, creditors' rights of setoff and recoupment are preserved, and the injunctions referenced in sections 10.4 and 10.5 of the Plan shall not enjoin the valid exercise of such rights of setoff and recoupment.  By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in Article X of the Plan.

Dated:  December ___, 2006
      New York, New York

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | KASOWITZ, BENSON, TORRES & FRIEDMAN LLP |
| By:  /s/  J. Gregory St. Clair | By:  /s/  David S. Rosner |
| J. Gregory Milmoe (JGM 0919) | David S. Rosner (DR 4214) |
| Sally McDonald Henry (SMH 0839) | Andrew K. Glenn (AG 9934) |
| J. Gregory St. Clair (GS 8344) | Jeffrey R. Gleit (JG 8710) |
| Four Times Square | 1633 Broadway |
| New York, New York 10036 | New York, New York 10019 |
|  (212) 735-3000 | (212) 506-1700 |
| Counsel for Refco Inc., et al., Debtors and Debtors-In-Possession | Counsel for the Additional Committee of Unsecured Creditors of Refco Inc., et al. |
| MILBANK, TWEED, HADLEY & McCLOY LLP | BINGHAM MCCUTCHEN LLP |
| By:  /s/  Susheel Kirpalani | By:  /s/  Tina L. Brozman |
| Luc A. Despins (LD 5141) | Tina L. Brozman (TB 0845) |
| Susheel Kirpalani (SK 8926) | Timothy B. DeSieno (TD 4316) |
| Dennis C. O'Donnell (DO 3648) | Mark Deveno (MD 8708) |
| 1 Chase Manhattan Plaza | Helder P. Pereira (HP 0408) |
| New York, New York 10005 | 399 Park Avenue |
|  (212) 530-5000 | New York, NY 10022 |
| | (212) 705-7000 |
| Counsel to the Official Committee of Unsecured Creditors of Refco Inc., et al. | Counsel for the Chapter 11 Trustee for Refco Capital Markets Ltd. |

**EXHIBIT C**

| CONTRIBUTING DEBTORS | | |
|---|---|---|
| Classes Entitled to Vote | Percentage Accepting (Dollar Amount) | Percentage Accepting (Number of Claims) |
| Contributing Debtors Class 4 | 100.00% (289,095,000) | 100.00% (54) |
| Contributing Debtors Class 5(a).01. – Bersec International LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).02 – Kroeck & Associates, LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).03 – Lind-Waldock Securities LLC | 98.54% (204,806,982.70) | 85.71% (6) |
| Contributing Debtors Class 5(a).04 – Marshall Metals, LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).05 – New Refco Group Ltd., LLC | 99.51% (204,806,982.70) | 75.00% (6) |
| Contributing Debtors Class 5(a).06 – Refco Administration, LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).07 – Refco Capital Holdings, LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).08 – Refco Capital Management, LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).09 – Refco Capital LLC | 100.00% (205,930,983.35) | 96.97% (32) |
| Contributing Debtors Class 5(a).10 – Refco Capital Trading LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).11 – Refco Finance Inc. | 99.99% (204,806,982.70) | 85.71% (6) |
| Contributing Debtors Class 5(a).12 – Refco Financial, LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).13 – Refco Fixed Assets Management, LLC | 100.00% (204,833,460.05) | 100.00% (8) |
| Contributing Debtors Class 5(a).14 – Refco Global Capital Management LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).15 – Refco Global Finance Limited | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).16 – Refco Global Futures, LLC | 100.00% (206,575,302.8) | 87.50% (7) |
| Contributing Debtors Class 5(a).17 – Refco Global Holdings, LLC | 100.00% (204,806,982.70) | 100.00% (6) |
| Contributing Debtors Class 5(a).18 – Refco Group Ltd., LLC | 83.60% (401,000,914.52) | 89.29% (25) |

| | | |
|---|---|---|
| Contributing Debtors | 99.54% | 95.74% |
| Class 5(a).19 – Refco Inc. | (214,353,400.45) | (135) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(a).20 – Refco Information Services, LLC | (204,806,982.70) | (6) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(a).21 – Refco Managed Futures, LLC | (204,806,982.70) | (6) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(a).22 – Refco Mortgage Securities, LLC | (204,806,982.70) | (6) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(a).23 – Refco Regulated Companies, LLC | (204,806,982.70) | (6) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(a).24 – Summit Management, LLC | (204,806,982.70) | (6) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(a).25 – Westminster-Refco Management LLC | (204,806,982.70) | (6) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).01. – Bersec International LLC | (671,223,449.97) | (6) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).02 – Kroeck & Associates, LLC | (614,679,244.57) | (60) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).03 – Lind-Waldock Securities LLC | (658,497,215.80) | (59) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).04 – Marshall Metals, LLC | (671,223,449.97)) | (61) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).05 – New Refco Group Ltd., LLC | (671,223,449.97)) | (61) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).06 – Refco Administration, LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).07 – Refco Capital Holdings, LLC | (671,223,449.97) | (61) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).08 – Refco Capital Management, LLC | (671,223,449.97) | (61) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).09 – Refco Capital LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).10 – Refco Capital Trading LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).11 – Refco Finance Inc. | (671,223,449.97) | (61) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).12 – Refco Financial, LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).13 – Refco Fixed Assets Management, LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).14 – Refco Global Capital Management LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100.00% |
| Class 5(b).15 – Refco Global Finance Limited | (643,894,837.97) | (62) |
| Contributing Debtors | 100.00% | 100% |
| Class 5(b).16 – Refco Global Futures, LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100% |
| Class 5(b).17 – Refco Global Holdings, LLC | (671,223,449.97) | (62) |
| Contributing Debtors | 100.00% | 100% |
| Class 5(b).18 – Refco Group Ltd., LLC | (671,223,449.97) | (64) |

| | | |
|---|---|---|
| Contributing Debtors<br>Class 5(b).19 – Refco Inc. | 100.00%<br>(671,223,449.97) | 100.00%<br>(62) |
| Contributing Debtors<br>Class 5(b).20 – Refco Information Services, LLC | 100.00%<br>(671,223,449.97) | 100%<br>(62) |
| Contributing Debtors<br>Class 5(b).21 – Refco Managed Futures, LLC | 100.00%<br>(658,497,215.80) | 100.00%<br>(60) |
| Contributing Debtors<br>Class 5(b).22 – Refco Mortgage Securities, LLC | 100.00%<br>(671,223,449.97) | 100%<br>(61) |
| Contributing Debtors<br>Class 5(b).23 – Refco Regulated Companies, LLC | 100.00%<br>(669,672,867.59) | 100.00%<br>(60) |
| Contributing Debtors<br>Class 5(b).24 – Summit Management, LLC | 100.00%<br>(671,223,449.97) | 100%<br>(62) |
| Contributing Debtors<br>Class 5(b).25 – Westminster-Refco Management LLC | 100.00%<br>(655,229,287.01) | 100.00%<br>(59) |
| Contributing Debtors<br>Class 6 | 100.00%<br>(2,278,164,695.00) | 100.00%<br>(1) |

## FXA

| Classes Entitled to Vote | Percentage Accepting (Dollar Amount) | Percentage Accepting (Number of Claims) |
|---|---|---|
| FXA<br>Class 5(a) | 37.71%<br>(15,864,395.55) | 42.80%<br>(113) |
| FXA<br>Class 5(b) | 100.00%<br>(671,223,449.97) | 100.00%<br>(62) |
| FXA<br>Class 6 | 86.27%<br>(4,377,017.29) | 87.74%<br>(1,524) |

## RCM

| Classes Entitled to Vote | Percentage Accepting (Dollar Amount) | Percentage Accepting (Number of Claims) |
|---|---|---|
| RCM<br>Class 3 | 99.63%<br>(767,634,691.58) | 88.44%<br>(130) |
| RCM<br>Class 4 | 99.10%<br>(2,333,477,363.99) | 98.53%<br>(134) |
| RCM<br>Class 5 | 100.00%<br>(17,106,620.40) | 100.00%<br>(2) |
| RCM<br>Class 6 | 94.55%<br>(609,106.46) | 94.87%<br>(222) |
| RCM<br>Class 7 | 100.00%<br>(116,024.25) | 100.00%<br>(34) |
| RCM<br>Class 8 | 100.00%<br>(0.00) | 100.00%<br>(1) |

# EXHIBIT D

(a)  *RCM Trustee Administration Agreement.*  Prior to or on the Effective Date, the RCM Estate shall execute an RCM Administration Agreement in substantially the form of Exhibit E to the Plan (i.e., the Plan Administrator Agreement), revised as appropriate, with the RCM Trustee. Any nonmaterial modifications to the RCM Administration Agreement by RCM prior to the Effective Date are hereby ratified. The RCM Administration Agreement will contain provisions permitting the amendment or modification of the RCM Administration Agreement necessary to implement the provisions of this Plan.

(b)  *Compensation Of The RCM Trustee for Wind-Down.*  The RCM Trustee shall be compensated for all wind-down services from the RCM Wind-Down Reserve pursuant to the terms and conditions of the RCM Administration Agreement. Any professionals retained by the RCM Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve. The payment of the reasonable fees and expenses of the RCM Trustee and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided*, *however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(c)  *Indemnification.*  RCM shall indemnify and hold harmless (i) the RCM Trustee (in its capacity as such and as officer, director or manager, as applicable of RCM), (ii) such individuals as may serve as officers, directors or managers, as applicable of RCM, if any, and (iii) the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the RCM Trustee, in their capacities as such (the "RCM Administrative Professionals") (collectively, the "Indemnified Parties"), from and against, and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to RCM or the implementation or administration of the Plan or RCM Administration Agreement. To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Indemnified Party in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefor) out of the RCM Wind-Down Reserve or any insurance purchased using the RCM Wind-Down Reserve. The indemnification provisions of the RCM Administration Agreement shall remain available to and be binding upon any former RCM Trustee or the estate of any decedent RCM Trustee and shall survive the termination of the RCM Administration Agreement.

(d)  *Insurance.*  The RCM Trustee shall be authorized to obtain and pay for out of the RCM Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, and RCM, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of

RCM or its Estate and (ii) the liabilities, duties, and obligations of the RCM Trustee and its agents, representatives, employees, or independent contractors under the RCM Administration Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the RCM Trustee, remain in effect for a reasonable period (not to exceed seven years) after the termination of the RCM Administration Agreement.

(e)      *Tax Reporting and Compliance*.  The RCM Trustee is hereby authorized, on behalf of RCM, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of RCM for all taxable periods ending after the Petition Date through, and including, the Effective Date. .

(f)      *Resolution of Disputed Claims*.  The RCM Trustee shall have the authority to object to and settle Disputed Claims against the RCM Estate in the same manner as set forth in section 5.5(h) of the Plan, *provided*, *however*, that reference to the Plan Committee in section 5.5(h)(ii) shall not apply to the RCM Trustee.

**<u>Exhibit H</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :        Chapter 11
                                          :
Refco Inc., *et al.*,                     :        Case No. 05-60006 (RDD)
                                          :
                        Debtors.          :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MODIFIED JOINT CHAPTER 11 PLAN OF REFCO INC. AND
CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES**

J. Gregory Milmoe                          Tina L. Brozman
Sally McDonald Henry                       Timothy B. DeSieno
J. Gregory St. Clair                       Mark W. Deveno
SKADDEN, ARPS, SLATE, MEAGHER              BINGHAM McCUTCHEN LLP
     & FLOM LLP                            399 Park Avenue
Four Times Square                          New York, NY 10022
New York, New York 10036-6522              (212) 705-7000
(212) 735-3000
                                           Attorneys for Marc S. Kirschner, the Chapter 11 Trustee
Attorneys for Refco Inc., *et al.*         for Refco Capital Markets, Ltd.


Luc A. Despins                             David S. Rosner
Susheel Kirpalani                          Andrew K. Glenn
Dennis C. O'Donnell                        Jeffrey R. Gleit
MILBANK, TWEED, HADLEY & McCLOY LLP        KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
One Chase Manhattan Plaza                  1633 Broadway
New York, New York 10005                   New York, New York 10019
(212) 530-5000                             (212) 506-1700

Attorneys for the Official Committee of Unsecured       Attorneys for the Additional Committee of Unsecured
Creditors of Refco Inc., *et al.*                       Creditors of Refco Inc., *et al.*


Dated:   New York, New York
         December 14, 2006

## TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION .................................................................. 1
1.1     *Additional Committee* ............................................................................................ 1
1.2     *Additional RCM Claim* ........................................................................................... 1
1.3     *Ad Hoc Committee of Senior Subordinated Note Holders* ........................................... 1
1.4     *Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses* ................ 1
1.5     *Ad Hoc Equity Committee* ...................................................................................... 2
1.6     *Ad Hoc Equity Committee Fees and Expenses* ......................................................... 2
1.7     *Adjusted Contributing Debtors Distributive Assets* .................................................... 2
1.8     *Administrative Claim* ............................................................................................ 2
1.9     *Administrative/Priority Claims Reserve* .................................................................... 2
1.10    *Administrative Claims Adjustment* ........................................................................... 2
1.11    *Administrative Claims Objection Deadline* ................................................................ 2
1.12    *Administrative Professionals* ................................................................................. 2
1.13    *Affiliate Debtor(s)* ................................................................................................ 2
1.14    *AlixPartners* ....................................................................................................... 3
1.15    *Allotted Administrative Claims* ............................................................................... 3
1.16    *Allowed* ............................................................................................................. 3
1.17    *"Allowed ... Claim"* .............................................................................................. 3
1.18    *Asset Schedule* ................................................................................................... 3
1.19    *Ballot* ................................................................................................................ 3
1.20    *Bankruptcy Code* ................................................................................................ 3
1.21    *Bankruptcy Court* ................................................................................................ 3
1.22    *Bankruptcy Rules* ................................................................................................ 3
1.23    *Bar Date* ............................................................................................................ 3
1.24    *BAWAG* .............................................................................................................. 3
1.25    *BAWAG Allocation Order* ...................................................................................... 3
1.26    *BAWAG Contingent Proceeds* ............................................................................... 4
1.27    *BAWAG Guaranteed Proceeds* .............................................................................. 4
1.28    *BAWAG Proceeds* ............................................................................................... 4
1.29    *BAWAG Settlement* .............................................................................................. 4
1.30    *Business Day* ...................................................................................................... 4
1.31    *Capstone* ........................................................................................................... 4
1.32    *Cargill* ............................................................................................................... 4
1.33    *Cargill Administrative Claim* .................................................................................. 4
1.34    *Cash* .................................................................................................................. 4
1.35    *Cash-Out Option Agreement* ................................................................................. 4
1.36    *Chapter 11 Case(s)* ............................................................................................. 4
1.37    *Claim* ................................................................................................................. 4
1.38    *Claims Distribution Account* .................................................................................. 4
1.39    *Claims Objection Deadline* .................................................................................... 4
1.40    *Class* ................................................................................................................. 5
1.41    *Class Actions Claims* ........................................................................................... 5
1.42    *Combined Recoveries* .......................................................................................... 5
1.43    *Committees* ........................................................................................................ 5
1.44    *Confirmation* ...................................................................................................... 5
1.45    *Confirmation Date* ............................................................................................... 5
1.46    *Confirmation Hearing* .......................................................................................... 5
1.47    *Confirmation Order* ............................................................................................. 5
1.48    *Contributed Claims* ............................................................................................. 5
1.49    *Contributed Claims Recoveries* .............................................................................. 5

i

| | | |
|---|---|---|
| 1.50 | *Contributing Debtors* | 5 |
| 1.51 | *Contributing Debtors BAWAG Proceeds* | 5 |
| 1.52 | *Contributing Debtors Cash Distribution* | 5 |
| 1.53 | *Contributing Debtors Distributive Assets* | 5 |
| 1.54 | *Contributing Debtors Effective Date Claims* | 6 |
| 1.55 | *Contributing Debtors General Unsecured BAWAG Proceeds* | 6 |
| 1.56 | *Contributing Debtors General Unsecured Claim* | 6 |
| 1.57 | *Contributing Debtors General Unsecured Distribution* | 6 |
| 1.58 | *Contributing Debtors Post-Effective Date Claims* | 6 |
| 1.59 | *Contributing Debtors Projection* | 6 |
| 1.60 | *Contributing Non-Debtor Affiliate* | 6 |
| 1.61 | *Contributing Non-Debtor Affiliate Management* | 6 |
| 1.62 | *Contributing Non-Debtor Affiliate Trigger Date* | 6 |
| 1.63 | *Convenience Claims* | 7 |
| 1.64 | *Credit Agreement* | 7 |
| 1.65 | *Creditors' Committee* | 7 |
| 1.66 | *Debtor* | 7 |
| 1.67 | *Debtors* | 7 |
| 1.68 | *Disbursing Agent* | 7 |
| 1.69 | *Disclosure Statement* | 7 |
| 1.70 | *Disputed Claim* | 7 |
| 1.71 | *"Disputed ... Claim"* | 7 |
| 1.72 | *Disputed Claim Amount* | 7 |
| 1.73 | *Disputed Claims Reserve* | 7 |
| 1.74 | *Distribution* | 7 |
| 1.75 | *Distribution Date* | 7 |
| 1.76 | *Distribution Record Date* | 8 |
| 1.77 | *Early Payment Order* | 8 |
| 1.78 | *Effective Date* | 8 |
| 1.79 | *Effective Beneficiaries* | 8 |
| 1.80 | *Employee Benefit Plans* | 8 |
| 1.81 | *ERISA* | 8 |
| 1.82 | *Estate(s)* | 8 |
| 1.83 | *Estimated Unsatisfied Credit Agreement Claims* | 8 |
| 1.84 | *Examiner* | 8 |
| 1.85 | *Examiner Order* | 8 |
| 1.86 | *Excess Priority Claims* | 8 |
| 1.87 | *Exhibit* | 8 |
| 1.88 | *Exhibit Filing Date* | 8 |
| 1.89 | *Fee Committee* | 8 |
| 1.90 | *Final Order* | 8 |
| 1.91 | *FXA* | 9 |
| 1.92 | *FXA Cash Accounts* | 9 |
| 1.93 | *FXA Convenience Claims* | 9 |
| 1.94 | *FXA Distributive Assets* | 9 |
| 1.95 | *FXA General Unsecured Claim* | 9 |
| 1.96 | *FXA General Unsecured Claim Distribution* | 9 |
| 1.97 | *FXCM* | 9 |
| 1.98 | *FXCM Committee* | 9 |
| 1.99 | *General Unsecured Claim* | 9 |
| 1.100 | *Holder* | 9 |
| 1.101 | *Houlihan* | 9 |
| 1.102 | *Impaired* | 9 |
| 1.103 | *Intercompany Claim* | 10 |
| 1.104 | *Interest* | 10 |

ii

| | | |
|---|---|---|
| 1.105 | *IPO Underwriter Claims Recovery* | 10 |
| 1.106 | *JPMC Fees and Expenses* | 10 |
| 1.107 | *Joinder Parties* | 10 |
| 1.108 | *Joint Sub-Committee* | 10 |
| 1.109 | *KK Japan* | 10 |
| 1.110 | *Leuthold* | 10 |
| 1.111 | *Lien* | 10 |
| 1.112 | *Litigation Claims* | 10 |
| 1.113 | *Litigation Trust* | 10 |
| 1.114 | *Litigation Trust Agreement* | 10 |
| 1.115 | *Litigation Trust Beneficiaries* | 10 |
| 1.116 | *Litigation Trust Committee* | 11 |
| 1.117 | *Litigation Trustee* | 11 |
| 1.118 | *Litigation Trust Interests* | 11 |
| 1.119 | *Loan Documents* | 11 |
| 1.120 | *Loans* | 11 |
| 1.121 | *MAC Contributing Debtors Assets* | 11 |
| 1.122 | *MAC RCM Assets* | 11 |
| 1.123 | *MCG Members* | 11 |
| 1.124 | *Master Ballot* | 11 |
| 1.125 | *Non-Debtor Affiliates* | 11 |
| 1.126 | *Non-Estate Refco Claims* | 12 |
| 1.127 | *Non-Tax Priority Claim* | 12 |
| 1.128 | *Old Equity Interests* | 12 |
| 1.129 | *Other Related Claim* | 12 |
| 1.130 | *Other Secured Claim* | 12 |
| 1.131 | *Person* | 12 |
| 1.132 | *Petition Date* | 12 |
| 1.133 | *Plan* | 12 |
| 1.134 | *Plan Administrator* | 12 |
| 1.135 | *Plan Administrator Agreement* | 13 |
| 1.136 | *Plan Committee* | 13 |
| 1.137 | *Plan Document* | 13 |
| 1.138 | *Plan Filing Date* | 13 |
| 1.139 | *Plan Proponents* | 13 |
| 1.140 | *Plan Support Agreement* | 13 |
| 1.141 | *Post-Confirmation RCM* | 13 |
| 1.142 | *Post-Petition Management* | 13 |
| 1.143 | *Pre-Conversion Administrative Claim Amount* | 13 |
| 1.144 | *Priority Claims* | 13 |
| 1.145 | *Priority Tax Claim* | 13 |
| 1.146 | *Private Actions Trust* | 13 |
| 1.147 | *Private Actions Trust Agreement* | 13 |
| 1.148 | *Private Actions Trust Election* | 13 |
| 1.149 | *Private Actions Trustee* | 13 |
| 1.150 | *Professional* | 14 |
| 1.151 | *Professional Fee Claim* | 14 |
| 1.152 | *Pro Rata* | 14 |
| 1.153 | *Qualifying Plan* | 14 |
| 1.154 | *Quarterly Distribution Date* | 14 |
| 1.155 | *RCM* | 14 |
| 1.156 | *RCM Administrative/Priority Claims Reserve* | 14 |
| 1.157 | *RCM Administrative Professional* | 14 |
| 1.158 | *RCM Advance* | 14 |
| 1.159 | *RCM BAWAG Proceeds* | 14 |

1.160    *RCM Cash Distribution* ........................................................................................ 14
1.161    *RCM Difference* .................................................................................................. 14
1.162    *RCM Claims Distribution Account* ...................................................................... 15
1.163    *RCM Distribution Reserve* .................................................................................. 15
1.164    *RCM Excess Priority Claims* ............................................................................... 15
1.165    *RCM FX/Unsecured Claims* ................................................................................ 15
1.166    *RCM FX/Unsecured Claims Distribution* ........................................................... 15
1.167    *RCM FX/Unsecured Convenience Claims* ........................................................... 15
1.168    *RCM Implied Deficiency Claim* ........................................................................... 15
1.169    *RCM Intercompany Claims* ................................................................................. 15
1.170    *RCM Intercompany Claim Distribution* .............................................................. 15
1.171    *RCM Leuthold Metals Claim* ............................................................................... 15
1.172    *RCM Leuthold Metals Claim Distribution* .......................................................... 15
1.173    *RCM Projection* .................................................................................................. 15
1.174    *RCM Related Claims* ........................................................................................... 15
1.175    *RCM Related Claim Subordination Form* ........................................................... 16
1.176    *RCM Reserves* .................................................................................................... 16
1.177    *RCM Rights Distribution* .................................................................................... 16
1.178    *RCM Securities Customer Claims* ....................................................................... 16
1.179    *RCM Securities Customer Convenience Claims* .................................................. 16
1.180    *RCM Securities Customer Claims Distribution* ................................................... 16
1.181    *RCM Settlement Agreement* ................................................................................ 16
1.182    *RCM Substantial Contribution Fees* ................................................................... 16
1.183    *RCM Trustee* ...................................................................................................... 17
1.184    *RCM Unclaimed Distribution Reserve* ............................................................... 17
1.185    *RCM Wind-Down Reserve* ................................................................................... 17
1.186    *Reinstated* .......................................................................................................... 17
1.187    *Refco Entities* ..................................................................................................... 17
1.188    *Related Claims* .................................................................................................... 17
1.189    *Released/Subordinated Claims* ........................................................................... 17
1.190    *Released Parties* ................................................................................................. 17
1.191    *Reorganized Debtors* .......................................................................................... 17
1.192    *Reorganized FXA* ............................................................................................... 17
1.193    *Reorganized Refco* ............................................................................................. 17
1.194    *Reserves* ............................................................................................................ 17
1.195    *Restated Corporate Governance Documents* ...................................................... 17
1.196    *Retained Causes of Action* ................................................................................. 17
1.197    *RGL* ................................................................................................................... 18
1.198    *RGL FXCM Distribution* .................................................................................... 18
1.199    *Rogers Funds* ..................................................................................................... 18
1.200    *Scheduled* ........................................................................................................... 18
1.201    *Schedules* ........................................................................................................... 18
1.202    *Secured Lender(s)* ............................................................................................... 18
1.203    *Secured Lender Agent* ........................................................................................ 18
1.204    *Secured Lender BAWAG Proceeds* ..................................................................... 18
1.205    *Secured Lender Claims* ....................................................................................... 18
1.206    *Secured Lender Indemnification Claims* ............................................................. 18
1.207    *Secured Lender Payment Date* ............................................................................ 18
1.208    *Secured Lender Released Claims* ........................................................................ 18
1.209    *Secured Lender Releasee* .................................................................................... 19
1.210    *Secured Lender's Collateral* ............................................................................... 19
1.211    *Securities Class Action Stipulation* ..................................................................... 19
1.212    *Senior Subordinated Note Allocation* ................................................................. 19
1.213    *Senior Subordinated Note Claims* ....................................................................... 19
1.214    *Senior Subordinated Note Holder BAWAG Proceeds* ......................................... 19

iv

**1.215**   *Senior Subordinated Note Holder Distribution* ...................................................................19
**1.216**   *Senior Subordinated Note Holder Fee Distribution* ...........................................................19
**1.217**   *Senior Subordinated Note Indenture* ..................................................................................19
**1.218**   *Senior Subordinated Note Indenture Trustee* .....................................................................20
**1.219**   *Senior Subordinated Note Indenture Trustee Charging Lien* ..............................................20
**1.220**   *Senior Subordinated Note Indenture Trustee Fees* ............................................................20
**1.221**   *Senior Subordinated Notes* .................................................................................................20
**1.222**   *Specified Difference* ...........................................................................................................20
**1.223**   *Subordinated Claim* ...........................................................................................................20
**1.224**   *Subsidiary Claims and Interests* ........................................................................................20
**1.225**   *Tranche A Litigation Trust Interests* ..................................................................................20
**1.226**   *Tranche B Litigation Trust Interests* ..................................................................................20
**1.227**   *Unclaimed Distribution Reserve* ........................................................................................20
**1.228**   *Unclassified Claims* ............................................................................................................20
**1.229**   *Unimpaired* .........................................................................................................................20
**1.230**   *Voting Deadline* ..................................................................................................................21
**1.231**   *Voting Record Date* .............................................................................................................21
**1.232**   *VR* .......................................................................................................................................21
**1.233**   *VR/Leuthold Guarantee Claims* .........................................................................................21
**1.234**   *Wind-Down Reserves* ..........................................................................................................21

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ............................................21
**2.1**   *Introduction* ........................................................................................................................21
**2.2**   *Classification of Claims and Interests of the Contributing Debtors*...................................22
**2.3**   *Classification of Claims of FXA* .........................................................................................23
**2.4**   *Classification of Claims of RCM* ........................................................................................23

ARTICLE III TREATMENT OF CLAIMS AND INTERESTS.....................................................24
**3.1**   *Treatment of Claims and Interests of the Contributing Debtors* .........................................24
**3.2**   *Treatment of Claims of FXA* ...............................................................................................26
**3.3**   *Treatment of Claims of RCM* ..............................................................................................28
**3.4**   *Allowed Claims and Interests* .............................................................................................30
**3.5**   *Alternative Treatment* .........................................................................................................30
**3.6**   *Limitation on Recoveries* ....................................................................................................30
**3.7**   *Special Provision Regarding Unimpaired Claims*..............................................................30
**3.8**   *Claims and Interests of Non-Debtor Affiliates* ...................................................................30
**3.9**   *Classification and Treatment of Intercompany Claims* ......................................................31
**3.10**   *Claims of Debtors against RCM* .........................................................................................31

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ................................................31
**4.1**   *Classes Entitled To Vote* .....................................................................................................31
**4.2**   *Acceptance By Impaired Classes* ........................................................................................31
**4.3**   *Presumed Acceptance by Unimpaired Classes* ...................................................................31
**4.4**   *Classes Deemed to Reject the Plan* .....................................................................................31
**4.5**   *Summary of Classes Voting on the Plan* .............................................................................31
**4.6**   *Elimination Of Classes* .......................................................................................................31
**4.7**   *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code* ..................................31

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ..............................................32
**5.1**   *Merger Of Subsidiaries Into Refco Inc.* .............................................................................32
**5.2**   *Continued Corporate Existence And Dissolution Of Reorganized Debtors*........................32
**5.3**   *Corporate Governance Documentation* ...............................................................................32
**5.4**   *Directors, Managers And Officers; Effectuating Documents; Further Transactions*...........33
**5.5**   *The Plan Administrator* .......................................................................................................33
**5.6**   *Administration of Post-Confirmation RCM* .......................................................................35

| 5.7 | *Litigation Trust* | 36 |
|---|---|---|
| 5.8 | *Private Actions Trust* | 38 |
| 5.9 | *No Revesting of Assets* | 39 |
| 5.10 | *Preservation of Rights of Action; Settlement of Litigation* | 39 |
| 5.11 | *The Committees and the Plan Committee* | 40 |
| 5.12 | *Fee Committee* | 41 |
| 5.13 | *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests* | 41 |
| 5.14 | *Sources of Cash for Plan Distributions* | 42 |
| 5.15 | *Risk Sharing in Respect of Cargill Administrative Claim* | 42 |
| 5.16 | *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims* | 42 |
| 5.17 | *Additional RCM Claim* | 43 |
| 5.18 | *Contributing Debtors BAWAG Proceeds* | 43 |
| 5.19 | *Exemption from Transfer Taxes* | 43 |
| 5.20 | *RCM Settlement Agreement and Conversion* | 44 |
| 5.21 | *Allowance of VR/Leuthold Guarantee Claims* | 44 |
| 5.22 | *Wind-Up of Non-Debtor Affiliates* | 44 |
| 5.23 | *FXCM* | 44 |
| 5.24 | *Examiner* | 45 |
| 5.25 | *Transfer of Tranche B Litigation Trust Interests* | 45 |
| ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS | | 45 |
| 6.1 | *RCM Rights Distribution* | 45 |
| 6.2 | *Distributions for Claims Allowed as of the Effective Date* | 45 |
| 6.3 | *Distributions of Proceeds of the Litigation Trust* | 45 |
| 6.4 | *Single Distribution* | 45 |
| 6.5 | *Accounts; Escrows; Reserves for the Reorganized Debtors* | 46 |
| 6.6 | *Accounts; Escrows; Reserves for the Post-Confirmation RCM* | 47 |
| 6.7 | *Interest and Penalties on Claims* | 49 |
| 6.8 | *Distributions by Disbursing Agent and RCM Trustee* | 49 |
| 6.9 | *Delivery of Distributions and Undeliverable or Unclaimed Distributions* | 49 |
| 6.10 | *Record Date for Distributions* | 50 |
| 6.11 | *Distributions to Holders of Senior Subordinated Note Claims* | 50 |
| 6.12 | *Senior Subordinated Notes Indenture Trustee as Claim Holder* | 51 |
| 6.13 | *Allocation of Plan Distributions Between Principal and Interest* | 51 |
| 6.14 | *Means of Cash Payment* | 51 |
| 6.15 | *Withholding and Reporting Requirements* | 51 |
| 6.16 | *Setoffs* | 51 |
| 6.17 | *Fractional Dollars* | 51 |
| 6.18 | *Release of Liens* | 51 |
| ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 52 |
| 7.1 | *Rejected Contracts and Leases* | 52 |
| 7.2 | *Bar to Rejection Damages* | 52 |
| 7.3 | *Assumed and Assigned Contracts and Leases* | 52 |
| 7.4 | *Compensation and Benefit Programs* | 52 |
| 7.5 | *Treatment of RCM Executory Contracts and Unexpired Leases* | 52 |
| ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS | | 52 |
| 8.1 | *Objection Deadline; Prosecution of Objections* | 52 |
| 8.2 | *No Distributions Pending Allowance* | 53 |
| 8.3 | *Distributions After Allowance* | 53 |

ARTICLE IX CONFIRMATION AND CONSUMMATION OF THE PLAN ...............................................53
    9.1    *Conditions to Confirmation* ........................................................................53
    9.2    *Conditions to Effective Date* ......................................................................54
    9.3    *Waiver of Conditions* .................................................................................54
    9.4    *Consequences of Non-Occurrence of Effective Date* ................................54

ARTICLE X EFFECT OF PLAN CONFIRMATION ...............................................................................55
    10.1    *Binding Effect* ...........................................................................................55
    10.2    *Releases* .....................................................................................................55
    10.3    *Exculpation and Limitation of Liability* ...................................................57
    10.4    *No Discharge of Claims; Injunction* .........................................................57
    10.5    *Term of Bankruptcy Injunction or Stays* ..................................................58
    10.6    *Continuation of Forex Adversary* ..............................................................58

ARTICLE XI RETENTION OF JURISDICTION ....................................................................................58
    11.1    *Exclusive Jurisdiction of the Bankruptcy Court* ......................................58

ARTICLE XII MISCELLANEOUS PROVISIONS ..................................................................................60
    12.1    *Effectuating Documents and Further Transactions* ..................................60
    12.2    *Corporate Action* .......................................................................................60
    12.3    *Bar Dates for Certain Claims* ....................................................................60
    12.4    *Payment of Statutory Fees* .........................................................................61
    12.5    *Amendment or Modification of the Plan* ...................................................61
    12.6    *Severability of Plan Provisions* .................................................................61
    12.7    *Successors and Assigns* ..............................................................................62
    12.8    *Revocation, Withdrawal, or Non-Consummation* .....................................62
    12.9    *Notice* .........................................................................................................62
    12.10    *Governing Law* ..........................................................................................63
    12.11    *Tax Reporting and Compliance* .................................................................63
    12.12    *Filing of Additional Documents* .................................................................63
    12.13    *Limit on Precedential Effect* ......................................................................63
    12.14    *Claims Preserved Pending Consummation* ................................................63
    12.15    *Continuation of RCM Settlement Agreement* ...........................................63
    12.16    *Continuation of Early Payment Order* .......................................................64

<u>EXHIBITS</u>

| | |
|---|---|
| EXHIBIT A | LISTING OF AFFILIATE DEBTORS |
| EXHIBIT B | RCM SETTLEMENT AGREEMENT |
| EXHIBIT C | RESTATED CORPORATE GOVERNANCE DOCUMENTS |
| EXHIBIT D | EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED |
| EXHIBIT E | PLAN ADMINISTRATOR AGREEMENT |
| EXHIBIT F | LITIGATION TRUST AGREEMENT |
| EXHIBIT G | PRIVATE ACTIONS TRUST AGREEMENT |
| EXHIBIT H | ASSET SCHEDULE |
| EXHIBIT I | EARLY PAYMENT ORDER |
| EXHIBIT J | BYLAWS OF FXCM COMMITTEE |
| EXHIBIT K | NON-EXCLUSIVE LIST OF RETAINED CAUSES OF ACTION |
| EXHIBIT L | LISTING OF CONTRIBUTING NON-DEBTOR AFFILIATES |
| EXHIBIT M | PRIVATE ACTIONS TRUST ELECTION |

<u>SCHEDULES</u>

SCHEDULE 1.56          LIST OF CONTRIBUTING NON-DEBTOR AFFILIATE MANAGEMENT

SCHEDULE 2.2(c)        SUB-CLASSES OF CLAIMS AGAINST THE CONTRIBUTING DEBTORS

## INTRODUCTION

Refco Inc. and certain of its direct and indirect subsidiaries identified on the annexed Exhibit A along with co-Plan Proponents Marc S. Kirschner, the chapter 11 trustee of the Estate of Refco Capital Markets, Ltd., the Official Committee of Unsecured Creditors of Refco Inc., *et al.*, and the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* propose the following joint chapter 11 plan that contemplates the disposition of the Debtors' assets and the resolution of the outstanding Claims against and Interests in the Debtors and RCM.  This Plan does not contemplate the disposition of assets or the resolution of Claims against and Interests in Refco, LLC as such Claims and Interests are being addressed separately in conjunction with the administration of the Refco, LLC chapter 7 case.  In addition, although the Plan outlines certain aspects of the disposition of the assets of RCM and the votes by certain creditors of RCM will be solicited, the Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code.  Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases.  In the event of such a conversion to chapter 7, this Plan shall constitute a settlement and compromise between the RCM Estate and the Debtors' Estates and among the Estates of the various Debtors and certain creditors, for which approval is sought simultaneously with the confirmation of this Plan.  Furthermore, the Plan incorporates the terms of the Early Payment Order, a copy of which is attached hereto as Exhibit I.  To the extent that the provisions herein, or in the Confirmation Order, differ from the terms of the Early Payment Order with respect to the treatment of the Secured Lenders, the terms of the Early Payment Order shall govern.  Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business, properties, and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms*.  As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**1.1**      ***Additional Committee*** means the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by notice on August 3, 2006 (and as amended from time to time).

**1.2**      ***Additional RCM Claim*** means the additional Claim of RCM, if any, as more fully set forth in section 5.17 hereof.

**1.3**      ***Ad Hoc Committee of Senior Subordinated Note Holders*** means that certain *ad hoc* committee of Holders of Senior Subordinated Notes.

**1.4**      ***Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses*** means fees and expenses of counsel to the ad hoc committee of Holders of Senior Subordinated Notes subject to application pursuant to section 503(b) of the Bankruptcy Code, to which the parties to the Plan Support Agreement, other than the Debtors, may not object and (ii) the Debtors, in the event that they do object to such application, may object solely with respect to the reasonableness, compensability and allocation of the fees and expenses incurred.

**1.5**    ***Ad Hoc Equity Committee*** means that certain *ad hoc* committee of equity interest holders of Refco Inc.

**1.6**    ***Ad Hoc Equity Committee Fees and Expenses*** means up to $1.5 million in professional fees and expenses incurred by the Ad Hoc Equity Committee during the pendency of the Chapter 11 Cases.

**1.7**    ***Adjusted Contributing Debtors Distributive Assets*** means the Contributing Debtors Distributive Assets after reduction for the payment of the RCM Excess Priority Claim.

**1.8**    ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without duplication: (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors and RCM (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and premises) and Claims of governmental units for taxes (including tax audit Claims related to tax years commencing after the Petition Date, but excluding Claims relating to tax periods, or portions thereof, ending on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred after the Petition Date and prior to the Effective Date; (c) the amounts contributed to the Wind-Down Reserve; (d) all fees and charges assessed against the Estates under 28 U.S.C. § 1930; (e) the Senior Subordinated Note Indenture Trustee Fees, (f) the JPMC Fees and Expenses, (g) the substantial contribution claims represented by the RCM Substantial Contribution Fees, the Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses and the Ad Hoc Equity Committee Fees and Expenses, to the extent allowed by the Bankruptcy Court; (h) any amounts due to RCM for the RCM Advance and (i) all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court. In the event that the Chapter 11 Case of RCM is converted to a case administered under chapter 7, an Allowed Claim against RCM or its Estate of the type described above in respect of administering the RCM case in chapter 7 shall be included in the definition of Administrative Claim.

**1.9**    ***Administrative/Priority Claims Reserve*** means the Reserve account(s) to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the Distribution to Holders of Administrative and Allowed Priority Claims against FXA and the Contributing Debtors.

**1.10**    ***Administrative Claims Adjustment*** means an adjustment whereby the amount of the RCM Cash Distribution shall be reduced by the Pre-Conversion Administrative Claim Amount, if any. For the avoidance of doubt, while the Administrative Claims Adjustment, if any, shall affect the timing and accounts from which Distributions in respect of Allowed Administrative Claims are made, such adjustment shall not affect the ultimate allocation of Administrative Claims as set forth in section 5.16 of this Plan.

**1.11**    ***Administrative Claims Objection Deadline*** means the last day for filing an objection to any request for the payment of an Allowed Administrative Claim, which shall be (a) the later of (i) 60 days after the Effective Date or (ii) 30 days after the filing of such Administrative Claim or (b) such other date specified in this Plan or ordered by the Bankruptcy Court. The filing of a motion to extend the Administrative Claims Objection Deadline shall automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, or if approved by the Bankruptcy Court and reversed on appeal, the Administrative Claims Objection Deadline shall be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Administrative Claims Objection Deadline.

**1.12**    ***Administrative Professionals*** means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the Plan Administrator (in their capacities as such).

**1.13**    ***Affiliate Debtor(s)*** means, individually or collectively, the debtors and debtors-in-possession identified on Exhibit A annexed hereto.

1.14    *AlixPartners* means collectively, AlixPartners LLC and its affiliate, AP Services, LLC.

1.15    *Allotted Administrative Claims* means Allowed Administrative Claims accrued against RCM or the Contributing Debtors from the Petition Date through the Effective Date, but excluding (A) Allowed Administrative Claims paid prior to August 31, 2006, (B) rent and other ordinary operating expenses of the Debtors or RCM, (C) fees and commissions of the RCM Trustee,  (D) repayment of the RCM Advance, and (E) the JPMC Fees and Expenses.

1.16    *Allowed* means (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) that was incurred by the Debtors or RCM in the ordinary course of business during  the Chapter 11 Cases; *provided, however,* that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; or (b) when used with respect to a Claim other than an Administrative Claim, such Claim against a Debtor or RCM or any portion thereof (i) that has been allowed by a Final Order of the Bankruptcy Court, (ii) as to which, on or by the Effective Date, (w) no proof of claim has been filed with the Bankruptcy Court and (x) the liquidated and noncontingent amount of which is Scheduled, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, (iii) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (y) no objection to its allowance has been filed by the Claims Objection Deadline or the Administrative Claims Objection Deadline (as applicable), or within any period specified by the Bankruptcy Code or an order of the Bankruptcy Court, or (x) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan.

1.17    *"Allowed ... Claim"* means an Allowed Claim of the particular type or Class described.

1.18    *Asset Schedule* means the schedule prepared by Houlihan to describe the estimated value of assets of the Debtors as of August 31, 2006, attached hereto as <u>Exhibit H</u>.

1.19    *Ballot* means each of the ballot forms distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

1.20    *Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter amended (if such amendment applies to the Debtors and RCM).

1.21    *Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

1.22    *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

1.23    *Bar Date* means the deadline established by the Bankruptcy Court by order dated March 27, 2006, for filing proofs of Claim in the Chapter 11 Cases.

1.24    *BAWAG* means the BAWAG Parties as such term is defined in paragraph 4(a) of the Stipulation and Order of Settlement entered by the Bankruptcy Court on July 6, 2006 (Docket No. 2348).

1.25    *BAWAG Allocation Order* means one or more orders of the Bankruptcy Court approving the allocation of the BAWAG Proceeds, which may include the Confirmation Order.

**1.26**    ***BAWAG Contingent Proceeds*** means an amount, if any, whether or not monetized prior to the Effective Date, of the BAWAG Proceeds up to $150,000,000 to be paid pursuant to the BAWAG Settlement upon a sale or recapitalization as set forth in the BAWAG Settlement within two (2) years of the date of approval of the BAWAG Settlement.

**1.27**    ***BAWAG Guaranteed Proceeds*** means that portion of the BAWAG Proceeds equal to a guaranteed amount of $506,250,000 in Cash paid pursuant to the BAWAG Settlement.

**1.28**    ***BAWAG Proceeds*** means the sum of (a) the BAWAG Guaranteed Proceeds plus (b) the BAWAG Contingent Proceeds, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement.

**1.29**    ***BAWAG Settlement*** means the settlement stipulation among the Creditors Committee, BAWAG, and the Refco Entities as approved by the Bankruptcy Court by an order entered on July 6, 2006.  A copy of the BAWAG Settlement is annexed as an Exhibit to the Disclosure Statement.

**1.30**    ***Business Day*** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.31**    ***Capstone*** means Capstone Advisory Group, LLC.

**1.32**    ***Cargill*** means Cargill, Incorporated and any of Cargill, Incorporated's affiliates who filed proofs of claim in any of the Chapter 11 Cases.

**1.33**    ***Cargill Administrative Claim*** means an Administrative Claim of Cargill, if any, against the Contributing Debtors.

**1.34**    ***Cash*** means legal tender of the United States of America and equivalents thereof.

**1.35**    ***Cash-Out Option Agreement*** means the agreement, if any, between one or more third parties and the Holders of Litigation Trust Interests to be executed as of the Effective Date establishing the terms and conditions by which third parties may purchase Litigation Trust Interests from such Holders, the form of which Cash-Out Option Agreement will be attached as an exhibit to the Litigation Trust Agreement.

**1.36**    ***Chapter 11 Case(s)*** means (a) when used with reference to a particular Debtor or RCM, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to the Debtors and RCM, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors and RCM in the Bankruptcy Court.

**1.37**    ***Claim*** means a "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.38**    ***Claims Distribution Account*** means the account established and maintained by the Reorganized Debtors from which Distributions to Holders of Allowed Claims against the Contributing Debtors or FXA shall be made and from which reserves on behalf of the Reorganized Debtors will be funded for the benefit of Holders of Disputed Claims.

**1.39**    ***Claims Objection Deadline*** means the last day for filing objections to Claims against the Debtors and RCM, which day shall be (a) the later of (i) 90 days after the Effective Date or (ii) 60 days after the filing of a proof of claim for, or request for payment of, such Claim or (b) such other date as the Bankruptcy Court may order.  The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion.  In the event that such motion to extend the Claims Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Claims Objection Deadline.

1.40    *Class* means a category of Holders of Claims or Interests, as described in Article II hereof.

1.41    *Class Actions Claims* means (i) claims for violation of securities laws arising under and pursuant to Section 10(b) and 20(a) of the Securities Exchange Act of 1934 that currently are being asserted in the class action styled In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, 06-CIV 643 (GEL) (S.D.N.Y.) (the "Brokerage Customer Securities Litigation"), (ii) claims asserted in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, and (iii) other claims currently being asserted in class actions relating to the Debtors and RCM, if any.

1.42    *Combined Recoveries* means the aggregate of Contributed Claims Recoveries and recoveries obtained by the Private Actions Trust, net of the costs of administration of the Private Actions Trust, including, but not limited to, fees associated with the litigation of the Non-Estate Refco Claims.

1.43    *Committees* means, collectively, the Creditors' Committee and the Additional Committee.

1.44    *Confirmation* means the confirmation of the Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

1.45    *Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.46    *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.47    *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.48    *Contributed Claims* means any and all Litigation Claims of the Debtors, RCM or their Estates (including claims being pursued by the Committees on behalf of the Debtors), which shall be contributed by the Debtors, RCM and their Estates to the Litigation Trust and, to the extent of any election, or deemed election, by Holders of RCM Related Claims to exchange and subordinate such Claims in accordance with section 6.6(c) of this Plan, such RCM Related Claims shall be deemed to remain unpaid liabilities of the Debtors and their Estates immediately prior to the contribution of Litigation Claims to the Litigation Trust. The term Contributed Claims shall specifically exclude the Released/Subordinated Claims.

1.49    *Contributed Claims Recoveries* means any recoveries obtained on account of the Contributed Claims net of the costs of administration of the Litigation Trust, including, but not limited to, fees associated with the litigation of the Contributed Claims.

1.50    *Contributing Debtors* means the Debtors excluding FXA.

1.51    *Contributing Debtors BAWAG Proceeds* means that portion of the BAWAG Proceeds that compose the Secured Lender BAWAG Proceeds, the Senior Subordinated Note Holder BAWAG Proceeds and the Contributing Debtors General Unsecured BAWAG Proceeds.

1.52    *Contributing Debtors Cash Distribution* means $94 million of Cash, which amount shall be adjusted, upwards or downwards, by an amount equal to the Specified Difference.

1.53    *Contributing Debtors Distributive Assets* means the assets of the Contributing Debtors after the payment of the Contributing Debtors Effective Date Claims, Allowed Other Secured Claims against the Contributing Debtors, Allowed Secured Lender Claims against the Contributing Debtors, the Senior Subordinated Note Holder Distribution, the Senior Subordinated Note Holder Fee Distribution (each to the extent payable under the Plan) and the funding of any required reserves (provided that upon the release of any funds from reserves for

payment of the Contributing Debtors General Unsecured Distribution or RCM Intercompany Claim Distribution, such released funds shall be counted as Contributing Debtors Distributive Assets). The term Contributing Debtors Distributive Assets shall include the assets of the Contributing Debtors reflected on the Asset Schedule and, without duplication, to the extent not inconsistent with the Asset Schedule, (i) any amounts paid to the Contributing Debtors or RCM on or after September 1, 2006, (ii) the BAWAG Proceeds, and (iii) any amounts paid to the Contributing Debtors or RCM from Non-Debtor Affiliates on or after September 1, 2006 (except to the extent any such amounts have been deemed "Assets in Place" or "Additional Property," as defined in the RCM Settlement Agreement, by applicable Court Orders); *provided, however*, that any amounts paid by direct or indirect subsidiaries of RCM on or after September 1, 2006 shall not constitute Contributing Debtors Distributive Assets. The term Contributing Debtors Distributive Assets shall not include any value in respect of the RGL FXCM Distribution nor any interest in Contributed Claims.

1.54    ***Contributing Debtors Effective Date Claims*** means Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims and Allowed Administrative Claims accrued through and including the Effective Date, each to the extent required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan.

1.55    ***Contributing Debtors General Unsecured BAWAG Proceeds*** means (i) $56,250,000 of the BAWAG Guaranteed Proceeds and (ii) a portion of the BAWAG Contingent Proceeds allocable to the Contributing Debtors Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases offered by the BAWAG Settlement, Holders of Allowed Contributing Debtors General Unsecured Claims.

1.56    ***Contributing Debtors General Unsecured Claim*** means a General Unsecured Claim against a Contributing Debtor.

1.57    ***Contributing Debtors General Unsecured Distribution*** means a Distribution from the Contributing Debtors Distributive Assets equal to (A) the Contributing Debtors Cash Distribution after reduction for the payment of the Allowed Contributing Debtors Post-Effective Date Claims plus (B) 50% of the RGL FXCM Distribution; *provided, however*, the amount of such Distribution under (A) and (B) shall not exceed 40% of the Allowed Contributing Debtors General Unsecured Claims. The Contributing Debtors General Unsecured Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

1.58    ***Contributing Debtors Post-Effective Date Claims*** means Administrative Claims accrued after the Effective Date by the Contributing Debtors, which are required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan (including amounts, if any, in respect of repaying the RCM Advance).

1.59    ***Contributing Debtors Projection*** means a projection of the Cash or value to be available from the MAC Contributing Debtors Assets for Distribution in respect of the Contributing Debtors Cash Distribution.

1.60    ***Contributing Non-Debtor Affiliate*** means the Non-Debtor Affiliates listed on <u>Exhibit L</u> hereto who are reasonably expected to contribute assets to or release Claims against the Debtors or RCM pursuant to the provisions of this Plan, including, but not limited to, section 5.22.

1.61    ***Contributing Non-Debtor Affiliate Management*** means the directors and officers of certain foreign Contributing Non-Debtor Affiliates, a list of which officers and directors is set forth on Schedule 1.56 hereto.

1.62    ***Contributing Non-Debtor Affiliate Trigger Date*** means, with respect to any Contributing Non-Debtor Affiliate, the earlier of (i) the date at which such Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash (consistent with its books and records and claims pending against it) to the Contributing Debtors and RCM or, if insufficient Cash will be available (consistent with the Contributing Non-Debtor Affiliate's books and records and claims pending against it) for Distribution to the Contributing Debtors and RCM, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors, or, if such events occur

prior to the Effective Date, the Effective Date or (ii) a date determined by the RCM Trustee, with the consent of the Plan Committee, on notice to the Bankruptcy Court, as necessary to accomplish the purposes of clause (i) of this definition.

   **1.63**   ***Convenience Claims*** means collectively FXA Convenience Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims.

   **1.64**   ***Credit Agreement*** means the credit agreement, dated August 5, 2004 (as amended), among RGL as successor by merger to Refco Finance Holdings LLC, New Refco Group Ltd, LLC, the Secured Lender Agent and the Secured Lenders party thereto.

   **1.65**   ***Creditors' Committee*** means the Official Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on October 28, 2006, as reconstituted on March 29, 2006, July 21, 2006 and August 3, 2006 (and as amended from time to time).

   **1.66**   ***Debtor*** means any of Refco Inc. or the Affiliate Debtors in its individual capacity.

   **1.67**   ***Debtors*** means, collectively, Refco Inc. and all of the Affiliate Debtors.

   **1.68**   ***Disbursing Agent*** means, solely in its capacity as agent to effectuate Distributions on behalf of FXA and the Contributing Debtors pursuant to the Plan, the Plan Administrator or such other entity as may be designated by the Plan Proponents and appointed by the Bankruptcy Court as set forth in the Confirmation Order. For the avoidance of doubt, the RCM Trustee shall act as the Disbursing Agent for Post-Confirmation RCM.

   **1.69**   ***Disclosure Statement*** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, distributed contemporaneously herewith in accordance with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018, as it may be amended or supplemented from time to time.

   **1.70**   ***Disputed Claim*** means any Claim other than an Allowed Claim.

   **1.71**   ***"Disputed ... Claim"*** means a Disputed Claim of the type described.

   **1.72**   ***Disputed Claim Amount*** means (a) with respect to a contingent or unliquidated Claim, zero or the amount estimated by the Bankruptcy Court prior to the initial Distribution Date, for purposes of allowance, reserves or Distributions in respect of such Claim in accordance with section 502(c) of the Bankruptcy Code or (b) with respect to any Disputed Claim that is not contingent or unliquidated, the amount set forth in a timely filed proof of claim; *provided*, *however*, that for purposes of establishing the Disputed Claims Reserve, the Disputed Claim Amount shall not exceed an amount equal to the applicable deductible or self-retention portion plus any uninsured amount in respect of Disputed Claims that are covered by insurance.

   **1.73**   ***Disputed Claims Reserve*** means the reserve of Contributing Debtors Distributive Assets and FXA Distributive Assets established and maintained by the Reorganized Debtors for Holders of Disputed Claims; *provided, however*, that any reserve from Contributing Debtors Distributive Assets shall be a reserve from amounts to be paid on the Contributing Debtors Unsecured Claim Distribution and shall not result in a reserve against amounts to be paid on the RCM Cash Distribution in accordance with section 6.6(b) of this Plan.

   **1.74**   ***Distribution*** means any distribution pursuant to the Plan to the Holders of Allowed Claims.

   **1.75**   ***Distribution Date*** means the Effective Date (subject to section 6.2 hereof) or any Quarterly Distribution Date.

1.76     **_Distribution Record Date_** means, with respect to all Claims other than Senior Subordinated Note Claims, initially the Voting Deadline (unless a different date is agreed to by the Plan Proponents and filed with the Bankruptcy Court) and thereafter, 45 days prior to each scheduled Distribution Date.

1.77     **_Early Payment Order_** means the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement of Controversies and Disputes Among the Debtors, the RCM Trustee, the Secured Lenders, and Certain Other Parties dated September 27, 2006 (Docket No. 2958) attached hereto as <u>Exhibit I</u>.

1.78     **_Effective Date_** means the Business Day this Plan becomes effective as provided in Article IX hereof.

1.79     **_Effective Beneficiaries_** means (i) the Litigation Trust Beneficiaries (other than RCM) and (ii) the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that benefit from RCM's beneficial interest in the Litigation Trust.

1.80     **_Employee Benefit Plans_** means those "employee benefit plans" (as defined in Section 3(3) of ERISA (whether or not such plan is subject to ERISA)), other material plans, policies, programs, practice, agreements, and understandings or arrangements maintained, sponsored, or contributed to for the benefit of current or former employees of the Debtors.

1.81     **_ERISA_** shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

1.82     **_Estate(s)_** means, individually, the estate of any of the Debtors or RCM and, collectively, the estates of all of the Debtors and RCM created under section 541 of the Bankruptcy Code.

1.83     **_Estimated Unsatisfied Credit Agreement Claims_** has the meaning ascribed to such term in the Early Payment Order.

1.84     **_Examiner_** means Joshua R. Hochberg, the examiner appointed by United States Trustee pursuant to 11 U.S.C. § 1104(c)(2) and approved by the Bankruptcy Court in accordance with the Examiner Order.

1.85     **_Examiner Order_** means the Order Granting the Motion of the United States Trustee for the Appointment of an Examiner entered on March 16, 2006 (Docket No. 1487).

1.86     **_Excess Priority Claims_** means that portion of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims against the Contributing Debtors and RCM, or their respective Estates, accrued through the Effective Date that exceed $180 million in the aggregate, excluding any amounts paid as of August 31, 2006, as more particularly set forth in section 5.16 of this Plan.

1.87     **_Exhibit_** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

1.88     **_Exhibit Filing Date_** means the date on which Exhibits to the Plan shall be filed with the Bankruptcy Court and posted on the refcodocket.com website, which date shall be at least ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice to parties-in-interest.

1.89     **_Fee Committee_** means the committee established by the Bankruptcy Court pursuant to the order entered on July 24, 2006 (Docket No. 2482).

1.90     **_Final Order_** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment

thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Bankruptcy Rules or any analogous rule may be, but has not been filed shall not cause an order not to be a Final Order.

      **1.91**    *FXA* means Refco F/X Associates, LLC.

      **1.92**    *FXA Cash Accounts* means the Cash accounts of FXA listed in the Schedules of FXA, which consist of the following accounts at the bank and with the account numbers designated herein: (i) Fleet Bank of New York, acct: 9421286511; (ii) Fleet Bank of New York, acct: 9421286589; (iii) Fleet Bank of New York, acct: 9421286693; (iv) Fleet Bank of New York, acct: 9421286896; (v) Fleet Bank of New York, acct: 9489924815; (vi) HK and Shanghai Banking Corp., acct: 009-030925-001; and (vii) Wachovia Bank, N.A., acct: 200017918646.

      **1.93**    *FXA Convenience Claims* means any FXA General Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the FXA General Unsecured Claim to $10,000 on the applicable Ballot; *provided*, *however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to FXA Convenience Claims shall be limited to $5 million. To the extent that the amount of FXA General Unsecured Claims electing to receive a FXA Convenience Claim exceeds $5 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $5 million cap is reached.

      **1.94**    *FXA Distributive Assets* means (i) the FXA Cash Accounts, allocated as agreed or otherwise resolved between FXA and KK Japan, plus (ii) proceeds, if any, of the sale of the customer list of FXA.

      **1.95**    *FXA General Unsecured Claim* means a General Unsecured Claim against FXA.

      **1.96**    *FXA General Unsecured Claim Distribution* means a Distribution from the FXA Distributive Assets after the payment of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Priority Tax Claims, Allowed Other Secured Claims and Allowed Secured Lender Claims against FXA, and less any amounts paid to the Holders of Allowed FXA Convenience Claims. The FXA General Unsecured Claim Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

      **1.97**    *FXCM* means Forex Capital Markets, LLC.

      **1.98**    *FXCM Committee* means a five person committee composed of the RCM Trustee and four creditors of either RCM or the Contributing Debtors (and chaired by the RCM Trustee) formed to coordinate on all matters relating to the disposition or distribution of RGL's 35% interest in FXCM.

      **1.99**    *General Unsecured Claim* means a Claim that is not an Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Other Secured Claim, Secured Lender Claim, Senior Subordinated Note Claim, RCM Intercompany Claim, FXA Convenience Claim, RCM Securities Customer Claim, RCM Leuthold Metals Claim, RCM Securities Customer Convenience Claim, RCM FX/Unsecured Convenience Claim, Subordinated Claim or Old Equity Interest.

      **1.100**    *Holder* means an entity holding a Claim or Interest and, with respect to Senior Subordinated Note Claims, the beneficial holder of the Senior Subordinated Notes.

      **1.101**    *Houlihan* means Houlihan Lokey Howard & Zukin Capital Advisors, Inc.

      **1.102**    *Impaired* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

     **1.103**    ***Intercompany Claim*** means any Claim held by a Refco Entity against any other Refco Entity, including any intercompany book entries reflecting obligations owed by one Refco Entity with respect to any other Refco Entity.

     **1.104**    ***Interest*** means the legal, equitable, contractual, and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor or RCM, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor.

     **1.105**    ***IPO Underwriter Claims Recovery*** means any recovery from a claim brought by the Litigation Trust against an underwriter in connection with the initial public offering of Refco Inc., net of the fees and expenses incurred in pursuing such recovery.

     **1.106**    ***JPMC Fees and Expenses*** means the reasonable fees and expenses of JPMorgan Chase Bank, N.A., agreed to by RCM as part of that certain settlement between RCM and JPMorgan Chase Bank, N.A., approved by the Bankruptcy Court on [December 12, 2006 (docket no. _____)].

     **1.107**    ***Joinder Parties*** has the meaning set forth in the RCM Settlement Agreement.

     **1.108**    ***Joint Sub-Committee*** means the joint sub-committee comprised of the Committee and the Additional Committee pursuant to a stipulation and protocol approved by order of the Bankruptcy Court, dated August 17, 2006 (Docket No. 2711).

     **1.109**    ***KK Japan*** means RefcoFX Japan KK.

     **1.110**    ***Leuthold*** means, collectively, Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.

     **1.111**    ***Lien*** shall mean any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

     **1.112**    ***Litigation Claims*** means the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or RCM may hold against any Person (after netting cross margin obligations, if applicable, to the extent required under the cross margining arrangement or to the extent determined necessary by the applicable Debtor or RCM) excluding the Released/Subordinated Claims and also excluding, with respect to RCM, any claims, rights of action, suits, or proceedings (A) pursuant to sections 547, 749 and to the extent a recovery is predicated on such sections, section 550 of the Bankruptcy Code, (B) to recover Assets in Place as defined in the RCM Settlement Agreement or (C) against RCM customers and creditors arising from trading or other ordinary course business transactions or contracts with RCM, including loan and deposit transactions; *provided, however*, that the claims commenced and settled by the Creditors' Committee against SPhinX Managed Futures Fund, LLC, and BAWAG shall not constitute Litigation Claims.

     **1.113**    ***Litigation Trust*** means the trust established on the Effective Date to hold the Litigation Claims.

     **1.114**    ***Litigation Trust Agreement*** means the agreement to be executed as of the Effective Date establishing the Litigation Trust pursuant to the Plan attached as Exhibit F hereto.

     **1.115**    ***Litigation Trust Beneficiaries*** means the Estate of RCM, Holders of Allowed Contributing Debtors General Unsecured Claims, Holders of Allowed FXA General Unsecured Claims, Holders of Allowed Contributing Debtors Subordinated Claims, Holders of Allowed Old Equity Interests and the Disputed Claims Reserve.

**1.116**   *Litigation Trust Committee* means the Committee established pursuant to section 5.7(d) of this Plan to participate in management of the Litigation Trust.

**1.117**   *Litigation Trustee* means the Person appointed pursuant to section 5.7(a) of the Plan to act as trustee of and administer the Litigation Trust and identified on or before the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Private Actions Trustee.

**1.118**   *Litigation Trust Interests* means the beneficial interests in the Litigation Trust.

**1.119**   *Loan Documents* has the meaning ascribed to such term in the Early Payment Order.

**1.120**   *Loans* has the meaning ascribed to such term in the Early Payment Order.

**1.121**   *MAC Contributing Debtors Assets* means (x) the estimated value of the sum of  the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds), less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the RCM Cash Distribution (without reduction for the Administrative Claims Adjustment), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan, provided that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.122**   *MAC RCM Assets* means (x) the estimated value of the sum of (A)  the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds) less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the Contributing Debtors Cash Distribution (without adjustment for the Contributing Debtors Post-Effective Date Claims), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan; *provided, however,* that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.123**   *MCG Members* has the meaning set forth in the RCM Settlement Agreement.

**1.124**   *Master Ballot* means the ballot distributed to brokers, nominees or other agents for Holders of the Senior Subordinated Notes to record the votes of the beneficial Holders of Senior Subordinated Notes.

**1.125**   *Non-Debtor Affiliates* means Refco LLC, Refco Canada Finance Inc., Refco Commodity Management Inc., Refco Administrative Services Inc.,  Refco Securities LLC, Refco Clearing LLC, Refco EasySolutions LLC, RefcoFund Management LLC, Haut Commodities LLC, Refco Local Divisions LLC, RefcoFund Holdings LLC, Refco Alternative Investments LLC, Refco Trading Services LLC,  Refco Securities Ltd. (in liquidation), Refco Energy (UK) Ltd., Refco Ltd., Westminster Clearing Ltd., Refco Trading Services Ltd., Refco Trading Services (UK) Ltd., Refco Equity Derivatives Ltd., Refco Europe Ltd., Refco Overseas Ltd., Refco East Services Ltd. (in liquidation), Just Commodity Inc., Just (Dalian) Trading Co Ltd., Refco Capital Singapore Pte Ltd, Refco India Pvt Ltd, Refco Singapore Pte Ltd, Refco Investment Services Pte Ltd, Refco Forex Ltd (in liquidation), Refco Securities SA, Refco Trading Services (Gibraltar) Ltd., Refco Capital Markets International Ltd, Refco Capital Markets International Services Ltd, ACM Advanced Currency Markets SA, C.I. Investor Services, Limited. East Client Svc. Ltd., Eastern Refco (L) Labaun, Easylink Limited, Easyscreen Employee Services Limited, Easyscreen Ltd.. Easyscreen Trustees Limited, Forex Capital Markets, L.L.C., Forex Trading, L.L.C., Greenwich Europe Limited, Greenwich SA (Pty) Limited, Hanmag Refco Futures Corp, Just Commodity Pte. Ltd., Just Commodity Software Solutions Pte. Ltd., Kaf-Refco Futures (Malaysia), Lind-Waldock Financial Partners LLC, MacFutures, Mactechonologies Ltd, Market Educational Institute, LLC, MCC Futures Management L.P., Partners Capital Investment Group, LLC, Polaris-Refco Futures Co Ltd, Refco Canada Co., Refco Capital India Private Ltd.,

Refco Carlton Ltd, Refco Commodity India PVT Ltd., Refco Futures, AG (Zurich), Refco Futures GMbH (Hamburg), Refco Hong Kong Ltd., Refco International Investment Svc. Ltd., Refco Japan, Ltd., Refco Overseas Suisse SA, Refco Resources Ltd., Refco Sify Securities (India) Ltd, Refco Trading Services (Australia) PTY Ltd, S&P Managed Futures Index Fund, L.P., Sino Refco Investments Limited Partnership, Sino Refco Investments LLC, SN Bank Ltd, Sphinx Managed Futures Index Fund, L.P., Trafalgar Commodities Ltd, Wells Limited and Westminster-Refco Holding Company, LLC.

1.126    **Non-Estate Refco Claims** means non-estate causes of action arising from any matter involving any Refco Entity including, without limitation, causes of action against: (i) all current and former officers, directors or employees of the Refco Entities; (ii) all persons or entities that conducted transactions with the Refco Entities; and (iii) all persons or entities that provided services to the Refco Entities, including, without limitation, all attorneys, accountants, financial advisors and parties providing services to the Refco Entities in connection with the public issuance of debt or equity, including, without limitation, all underwriters; *provided, however,* Non-Estate Refco Claims shall exclude (i) contract claims against third parties and (ii) Class Action Claims.

1.127    **Non-Tax Priority Claim** means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

1.128    **Old Equity Interests** means the common stock of Refco Inc. outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of common stock of Refco Inc. or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

1.129    **Other Related Claim** means, other than an RCM Related Claim, any Claim or cause of action of any Holder of an Impaired Claim against RCM or any Debtor arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against its primary Debtor obligor or RCM; *provided, however*, that the term Other Related Claim shall not include any Claim, based on a contractual guarantee or other direct contractual undertaking, against RCM or any Debtor that is not such Holder's primary Debtor obligor.

1.130    **Other Secured Claim** means a Claim (other than an Administrative Claim or Secured Lender Claim) that is secured by a lien on property in which a Debtor's Estate or RCM's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.131    **Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

1.132    **Petition Date** means, with respect to a Debtor or RCM, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

1.133    **Plan** means this chapter 11 plan, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.134    **Plan Administrator** means the person designated pursuant to section 5.5 hereof prior to the Confirmation Date and approved by the Bankruptcy Court pursuant to the Confirmation Order to administer the Plan on behalf of the Contributing Debtors and FXA in accordance with the terms of the Plan and the Plan Administrator Agreement and to take such other actions as may be authorized under the Plan Administrator Agreement, and any successor thereto.

1.135    *Plan Administrator Agreement* means the agreement between and among the Contributing Debtors and the Plan Administrator specifying the rights, duties, and responsibilities of and to be performed by the Plan Administrator under the Plan, in substantially the same form as the agreement attached to the Plan as <u>Exhibit E</u>.

1.136    *Plan Committee* means the committee as appointed pursuant to section 5.11(b) hereof as of the Effective Date, which will supervise and direct the Plan Administrator, to monitor implementation of the Plan, and to take such other actions and have such other rights as are set forth in the Plan, all as described in Article V of this Plan.

1.137    *Plan Document* means the Plan, together with any contract, instrument, release, or other agreement or document entered into in connection with Plan.

1.138    *Plan Filing Date* means September 14, 2006.

1.139    *Plan Proponents* means the Debtors, the RCM Trustee and the Committees.

1.140    *Plan Support Agreement* means that certain agreement among the RCM Trustee, certain Non-Debtor Affiliates, the Committees, certain individual customers and creditors of RCM and the Debtors, and the chapter 7 trustee for Refco, LLC, in his capacity as chapter 7 trustee for Refco, LLC, filed with the Bankruptcy Court on September 15, 2006 (Docket No. 2861).

1.141    *Post-Confirmation RCM* means the estate of RCM on and after the entry of the Confirmation Order as administered by the RCM Trustee.

1.142    *Post-Petition Management* means AlixPartners and Harrison J. Goldin, Goldin Associates, LLC, and any directors appointed to the board of directors of Refco Inc. subsequent to Mr. Goldin's appointment as Chief Executive Officer of Refco Inc. on January 25, 2006.

1.143    *Pre-Conversion Administrative Claim Amount* means, if determined necessary by the RCM Trustee*,* any amount deposited by the Contributing Debtors into a reserve for the benefit of Holders of Administrative Claims against RCM arising or accruing prior to the date of conversion, if any, of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (including RCM Substantial Contribution Fees). The Pre-Conversion Administrative Claim Amount shall in no case exceed an amount equal to (i) $60 million plus (ii) the RCM Excess Priority Claims that RCM is responsible for bearing pursuant to section 5.16 of this Plan.

1.144    *Priority Claims* means, collectively, all Priority Tax Claims and Non-Tax Priority Claims.

1.145    *Priority Tax Claim* means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.146    *Private Actions Trust* means the trust established on the Effective Date pursuant to section 5.8 of the Plan to hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates.

1.147    *Private Actions Trust Agreement* means the agreement to be executed as of the Effective Date establishing the Private Actions Trust pursuant to the Plan attached as <u>Exhibit G</u> hereto.

1.148    *Private Actions Trust Election* means, in respect of a Holder of an Allowed Old Equity Interest, the agreement of such Holder to assign and contribute such Holder's Non-Estate Refco Claims, and the proceeds of Class Action Claims to the Private Actions Trust, which election shall be evidenced by the submission of the election form attached hereto as <u>Exhibit M</u>.

1.149    *Private Actions Trustee* means the Person appointed pursuant to the Private Actions Trust Agreement of the Plan to act as trustee of and administer the Private Actions Trust and identified on or before

the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Litigation Trustee.

1.150    ***Professional*** means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.151    ***Professional Fee Claim*** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.

1.152    ***Pro Rata*** means, with respect to Claims or Interests (i) within the same Class or sub-Class, the proportion that a Claim or Interest bears to the sum of all Claims or Interests, as the case may be, within such Class or sub-Class, and (ii) among all Classes, the proportion that a Class of Claims or Interests bears to the sum of all Claims or Interests, as the case may be; *provided, however*, that for purposes of distributing Litigation Trust Interests, Pro Rata share shall exclude Convenience Claims.

1.153    ***Qualifying Plan*** has the meaning ascribed to such term in the Early Payment Order.

1.154    ***Quarterly Distribution Date*** means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however*, that if the Effective Date is within 30 days of the end of a calendar quarter, the first Quarterly Distribution Date shall be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

1.155    ***RCM*** means Refco Capital Markets, Ltd.

1.156    ***RCM Administrative/Priority Claims Reserve*** means the Reserve account(s) to be established and maintained by the RCM Trustee, on behalf of Post-Confirmation RCM, to fund the Distribution to Holders of Administrative and Priority Claims against RCM.

1.157    ***RCM Administrative Professional*** means any professional employed in the RCM Chapter 11 Case pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise.

1.158    ***RCM Advance*** means a post-petition advance, if any, by RCM to or for the benefit of one or more of the Contributing Debtors in the amount of up to $115 million.

1.159    ***RCM BAWAG Proceeds*** means (i) $200,000,000.00 of the BAWAG Guaranteed Proceeds (whether directly allocated to RCM or recovered by RCM on account of its RCM Intercompany Claim), and (ii) a portion of the BAWAG Contingent Proceeds allocable to payment of the RCM Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases required by the BAWAG Settlement, Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims.

1.160    ***RCM Cash Distribution*** means the sum of (i) $460 million of Cash (inclusive of RCM BAWAG Proceeds) payable from Contributing Debtor Distributive Assets, which amount shall be adjusted upwards or downwards, by an amount equal to the Specified Difference plus (ii) payment to RCM of any amounts available from the Contributing Debtors General Unsecured Distribution, to the extent that such amounts are not paid to Holders of Allowed Contributing Debtors General Unsecured Claims as a result of recoveries for Holders of Allowed Contributing Debtors General Unsecured Claims (from Contributing Debtors Distributive Assets and the RGL FXCM Distribution) having reached 40%; *provided, however*, such Distribution shall be subject to the Administrative Claims Adjustment.

1.161    ***RCM Difference*** means the amount by which the Allowed amount of any RCM FX/Unsecured Claim filed by Cargill is reduced by  allowance of the Cargill Administrative Claim.

**1.162**  ***RCM Claims Distribution Account*** means the account established and maintained by the Post-Confirmation RCM from which Distributions to Holders of Allowed Claims against RCM shall be made and from which reserves on behalf of RCM will be funded.

**1.163**  ***RCM Distribution Reserve*** means the reserve established by the Plan Administrator or RCM, as the case may be, to hold that portion of the RCM Cash Distribution and that portion of the RGL FXCM Distribution applicable to Holders of a right to demand an applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, but who have not tendered an RCM Related Claim Subordination Form.

**1.164**  ***RCM Excess Priority Claims*** means that portion of Excess Priority Claims that are to be borne by RCM pursuant to section 5.16 of this Plan.

**1.165**  ***RCM FX/Unsecured Claims*** has the meaning given to the term "FX/Unsecured Claim" in the RCM Settlement Agreement.

**1.166**  ***RCM FX/Unsecured Claims Distribution*** means the Distribution for Holders of RCM FX/Unsecured Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM FX/ Unsecured Convenience Claims.

**1.167**  ***RCM FX/Unsecured Convenience Claims*** means any RCM FX/Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM FX/Unsecured Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM FX/ Unsecured Convenience Claims shall be limited to $1.458 million.  To the extent that the amount of RCM FX/Unsecured Claims reducing and electing treatment of such Claims as RCM FX/Unsecured Convenience Claims exceeds $1.458 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $1.458 million cap is reached.

**1.168**  ***RCM Implied Deficiency Claim*** has the meaning given to the term "Implied Deficiency Claim" in §8(b) of the RCM Settlement Agreement.

**1.169**  ***RCM Intercompany Claims*** means Claims of RCM against one or more of the Debtors. Unless and until Allowed in a definitive amount, for purposes of calculations herein, the RCM Intercompany Claims shall be deemed to be in an amount that is no less than the amount necessary to cause all Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims to receive payment in full.

**1.170**  ***RCM Intercompany Claim Distribution*** means the sum of (i) the RCM Rights Distribution, (ii) the Additional RCM Claim, (iii) 50% of the RGL FXCM Distribution, (iv) the RCM BAWAG Proceeds and (v) the allocable share of the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

**1.171**  ***RCM Leuthold Metals Claim*** has the meaning given to the term "Leuthold Metals Claim" in the RCM Settlement Agreement.

**1.172**  ***RCM Leuthold Metals Claim Distribution*** means the Distribution for Holders of RCM Leuthold Metals Claims set forth in the RCM Settlement Agreement.

**1.173**  ***RCM Projection*** means a projection of the Cash or value to be available from the MAC RCM Assets for Distribution in respect of the RCM Cash Distribution and the Additional RCM Claim.

**1.174**  ***RCM Related Claims*** means any Claim or cause of action of any Holder of an Impaired Claim against the Debtors and Non-Debtor Affiliates arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against RCM; *provided, however*, that the term RCM Related Claim shall not include any Claim of a Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim against any Contributing Debtor or FXA based on contractual guarantees or other direct contractual undertakings.

**1.175    *RCM Related Claim Subordination Form*** means, in respect of a Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim, either (i) a ballot cast by such Holder in respect of the Plan whereby the Holder has elected (by means of not affirmatively opting out of such election) to (A) assign such Holder's RCM Related Claims against the Debtors, if any, to the Litigation Trust; (B) affirming its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate will be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing claims against and equity interests in the applicable Contributing Non-Debtor Affiliate (and that such RCM Related Claim may be deemed released upon the determination of the RCM Trustee, with the consent of the Plan Committee, in accordance with section 10.2(c) of the Plan); (C) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any; and (D) receive such Holder's applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution or (ii) any agreement, in a form satisfactory to the Plan Administrator, by which such Holder agrees to do the forgoing.  For the avoidance of doubt, any ballot properly cast by the Voting Deadline and satisfying the conditions above shall be deemed to have been "provided" to the RCM Trustee and the Plan Administrator for purposes of section 6.6(c) of this Plan.

**1.176    *RCM Reserves*** means (A) the RCM Disputed Claims Reserve, (B) the RCM Administrative/Priority Reserve, (C) the RCM Wind-Down Reserve, (D) the RCM Unclaimed Distribution Reserve, and (E) any other reserves required to be established by the RCM Trustee under the RCM Settlement Agreement.

**1.177    *RCM Rights Distribution*** means the transfer to the RCM Trustee, as part of the RCM Intercompany Claims Distribution, of rights which will allow each Holder of an Allowed RCM Securities Customers Claim on account of its RCM Implied Deficiency Claim and each Holder of an Allowed RCM FX/Unsecured Claim to make a demand for payment from the Plan Administrator or RCM, as the case may be, for such Holder's Pro-Rata share of the RCM Distribution Reserve to the extent that such Holder satisfies the conditions set forth in section 6.6(c) of this Plan.

**1.178    *RCM Securities Customer Claims*** has the meaning given to the term "Securities Customer Claims" in the RCM Settlement Agreement.

**1.179    *RCM Securities Customer Convenience Claims*** means any RCM Securities Customer Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM Securities Customer Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM Securities Customer Convenience Claims shall be limited to $0.333 million.  To the extent that the amount of RCM Securities Customer Convenience Claims reducing and electing treatment of such Claims as RCM Securities Customer Convenience Claims exceeds $0.333 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $0.333 million cap is reached.

**1.180    *RCM Securities Customer Claims Distribution*** means the Distribution for Holders of RCM Securities Customer Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM Securities Customer Convenience Claims.

**1.181    *RCM Settlement Agreement*** means, collectively, (i) the settlement agreement dated as of June 29, 2006 by and among the RCM Trustee and certain creditors of RCM and (ii) the Joinder Agreement dated as of July 20, 2006 between the RCM Trustee and the Rogers Funds, in each case as amended (copies of which are attached hereto as Exhibit B).

**1.182    *RCM Substantial Contribution Fees*** means the approximate amount of $4.3 million constituting the substantial contribution Claim of the MCG Members and the Joinder Parties under sections 503(b)(3)(d), 507(a)(2) and 752(a) of the Bankruptcy Code as set forth in the RCM Settlement Agreement.

**1.183**    ***RCM Trustee*** means Marc S. Kirschner, the chapter 11 trustee appointed in the RCM Chapter 11 Case in connection with the March 22, 2006 order issued by the Bankruptcy Court authorizing appointment of one disinterested person as Chapter 11 trustee for the Estate of RCM.  The term includes any successor chapter 11 trustee or, if the RCM Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7 of the Bankruptcy Code, the chapter 7 trustee.

**1.184**    ***RCM Unclaimed Distribution Reserve*** means the reserve or reserves established in respect of unclaimed Distributions for RCM pursuant to Article VI of the Plan.

**1.185**    ***RCM Wind-Down Reserve*** means a reserve, if determined necessary by the RCM Trustee, of up to $15 million from the Cash or value available for the RCM Cash Distribution, with the amount of such RCM Wind-Down Reserve to be subject to downward adjustment from time to time by the RCM Trustee, to the extent the RCM Trustee determines that RCM's wind-down expenses after the Effective Date will be less than $15 million.

**1.186**    ***Reinstated*** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, and (iii) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

**1.187**    ***Refco Entities*** means the Debtors, RCM and the Non-Debtor Affiliates.

**1.188**    ***Related Claims*** means any RCM Related Claim or Other Related Claim.

**1.189**    ***Released/Subordinated Claims*** means the claims or causes of actions described in sections 10.2(a), (b), (c) and (d) of the Plan or claims or causes of action that have been otherwise released or waived pursuant to an order of the Bankruptcy Court (including, without limitation, the Early Payment Order).

**1.190**    ***Released Parties*** means, acting in such capacity, (i) the Post-Petition Management, (ii) the Secured Lender Releasees, (iii) the Senior Subordinated Note Indenture Trustee, its directors, officers, and employees (all in such capacity) and (iv) present and former holders of the Senior Subordinated Notes in their capacity as Holders of the Senior Subordinated Notes.

**1.191**    ***Reorganized Affiliate Debtor*** means any Affiliate Debtor on and after the Effective Date.

**1.192**    ***Reorganized Debtors*** means Reorganized Refco, Reorganized FXA and any Reorganized Affiliate Debtor.

**1.193**    ***Reorganized FXA*** means FXA on and after the Effective Date.

**1.194**    ***Reorganized Refco*** means Refco Inc. on and after the Effective Date.

**1.195**    ***Reserves*** means, collectively, the Disputed Claims Reserve, Unclaimed Distribution Reserve, Administrative/Priority Claims Reserve and the RCM Reserves (if held by the Plan Administrator, rather than the RCM Trustee) and the Wind-Down Reserve.

**1.196**    ***Restated Corporate Governance Documents*** means the restated corporate governance documents of the Reorganized Debtors in substantially the form attached to this Plan as <u>Exhibit C</u>.

**1.197**    ***Retained Causes of Action*** means all of the Debtors' and RCM's claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds,

bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments against any party, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, and regardless of whether arising in law, equity or under or pursuant to Chapter 5 of the Bankruptcy Code, including, but not limited to, the Litigation Claims.  A non-exclusive list of the Retained Causes of Action is set forth on Exhibit K attached hereto.

      **1.198**    ***RGL*** means Refco Group Limited LLC.

      **1.199**    ***RGL FXCM Distribution*** means RGL's 35% interest in FXCM, which for purposes of the cap on Distributions to Holders of Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets and the RGL FXCM Distribution shall have a value equal to (i) if liquidated prior to the Effective Date, the value obtained through liquidation and (ii) if not liquidated prior to the Effective Date, a deemed value of $90 million.

      **1.200**    ***Rogers Funds*** means Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund, L.P.

      **1.201**    ***Scheduled*** means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

      **1.202**    ***Schedules*** means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs filed by the Debtors or RCM pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rules, as such schedules have been or may be further modified, amended, or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

      **1.203**    ***Secured Lender(s)*** has the meaning assigned to the term "Lender(s)" in the Early Payment Order.

      **1.204**    ***Secured Lender Agent*** has the meaning assigned to the term "Agent" in the Early Payment Order.

      **1.205**    ***Secured Lender BAWAG Proceeds*** means $100 million of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed exclusively offered to pay and accepted by the Holders of Allowed Secured Lender Claims.

      **1.206**    ***Secured Lender Claims*** has the meaning assigned to the term "Secured Claim" in the Early Payment Order.

      **1.207**    ***Secured Lender Indemnification Claims*** means any and all Estimated Unsatisfied Credit Agreement Claims and all other claims of the Secured Lender Agent and/or the Secured Lenders of the type specified in paragraph 9(b) of the Early Payment Order.

      **1.208**    ***Secured Lender Payment Date*** has the meaning assigned to the term "Payment Date" in the Early Payment Order.

      **1.209**    ***Secured Lender Released Claims*** means any and all actual or potential demands, claims, causes of action (including, without limitation, derivative causes of action), suits, assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity (including, without limitation, actions seeking to recharacterize, avoid, subordinate, set aside or disallow the liens or claims of any Secured Lender Releasee, or seeking turnover of property, damages or any other affirmative recovery from any Secured Lender Releasee, including, without limitation, any claim for contribution), whether asserted or unasserted, known or unknown, foreseen or unforeseen, pending or anticipated, arising under the Bankruptcy Code or under otherwise applicable law, that any Person ever had, now has or hereafter may have (whether by assignment or otherwise) based in whole or in part upon any act or failure to act by any of the Secured Lender Releasees, on or prior to the Secured Lender Payment Date, in contemplation of the execution of the Loan Documents, in connection

with the execution of the Loan Documents or the making or repayment of the Loans, or in connection with any transactions directly or indirectly related or connected in any way to the Loan Documents, the Secured Lender's Collateral, the use of proceeds of Loans made under the Loan Documents, or any other transactions related to or in connection with any of the foregoing.

1.210    **Secured Lender Releasee** has the meaning assigned to the term "Lender Releasee" in the Early Payment Order.

1.211    **Secured Lender's Collateral** has the meaning assigned to the term "Collateral" in the Early Payment Order.

1.212    **Securities Class Action Stipulation** means that certain Stipulation and Agreement of Settlement entered into on September 7, 2006 between BAWAG and the lead plaintiffs in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, or any future settlement between the parties as contemplated therein.

1.213    **Senior Subordinated Note Allocation** means an allocation of the Senior Subordinated Note Holder Fee Distribution on account of the Senior Subordinated Note Indenture Trustee Fees and Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses, which allocation shall be agreed upon between the Senior Subordinated Note Indenture Trustee and the Senior Subordinated Note Ad Hoc Committee. Any amount of Senior Subordinated Note Indenture Trustee Fees not paid on account of such allocation may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

1.214    **Senior Subordinated Note Claims** means all Claims of any kind arising from or related to the Senior Subordinated Notes, and including, without limitation, any Claims arising from any guarantees under the Senior Subordinated Note Indenture, which Claims shall be Allowed Claims in the amount of $397,413,324.50.

1.215    **Senior Subordinated Note Holder BAWAG Proceeds** means $150,000,000 of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for releases required in the BAWAG Settlement, Holders of Allowed Senior Subordinated Note Claims.

1.216    **Senior Subordinated Note Holder Distribution** means $331,522,195.30, which, pursuant to the compromises and settlements contained in this Plan document, constitutes 83.42% of the outstanding balance of principal and prepetition interest of the Senior Subordinated Note Claims. Such Distribution shall be paid to the Senior Subordinated Note Indenture Trustee on the Effective Date to the extent of available Cash after taking into account the funding of the Administrative/Priority Claims Reserve, with any balance paid from time to time to the Senior Subordinate Note Indenture Trustee from available Cash with interest accruing, beginning January 1, 2007, on the unpaid balance at the same rate of interest that Refco LLC earns on its invested Cash and cash equivalents, payable from the Senior Subordinated Note Holder BAWAG Proceeds and, to the extent of any deficiencies, the Contributing Debtors Distributive Assets.

1.217    **Senior Subordinated Note Holder Fee Distribution** means an amount up to $6.0 million of the (i) Senior Subordinated Note Indenture Trustee Fees, and (ii) the Allowed Senior Subordinated Note Ad Hoc Committee Fees and Expenses. Such Distribution shall be paid on the Effective Date from the Contributing Debtors Distributive Assets to the Senior Subordinated Note Indenture Trustee and counsel to the Senior Subordinated Note ad hoc committee, subject to the Senior Subordinated Note Allocation. For the avoidance of doubt, any portion of the Senior Subordinated Note Indenture Trustee Fees not paid by the Senior Subordinated Note Holder Fee Distribution may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

1.218    **Senior Subordinated Note Indenture** means the indenture dated as of August 5, 2004, among Refco Finance Holdings LLC (now known as Refco Group Ltd., LLC) and Refco Finance Inc., as issuers, and Wells Fargo Bank, National Association, as indenture trustee, relating to the Senior Subordinated Notes, as it may be amended, supplemented, or modified from time to time.

**1.219** *Senior Subordinated Note Indenture Trustee* means Wells Fargo Bank, National Association, the indenture trustee under the Senior Subordinated Note Indenture, or any successor thereto.

**1.220** *Senior Subordinated Note Indenture Trustee Charging Lien* means any Lien or other priority in payment or right available to the Senior Subordinated Note Indenture Trustee pursuant to the Senior Subordinated Note Indenture or otherwise available to the Senior Subordinate Note Indenture Trustee under applicable law, for the payment of Senior Subordinated Note Indenture Trustee Fees.

**1.221** *Senior Subordinated Note Indenture Trustee Fees* means the fees, costs, expenses and indemnity claims of the Senior Subordinated Note Indenture Trustee and the fees and expenses of its counsel and financial advisor.

**1.222** *Senior Subordinated Notes* means the 9% Senior Subordinated Notes due 2012 issued by RGL and Refco Finance Inc. under the Senior Subordinated Note Indenture and guaranteed by certain of the Debtors.

**1.223** *Specified Difference* means 50% of the difference (positive or negative) between the value of the Adjusted Contributing Debtors Distributive Assets and $554 million (in making such calculation the Adjusted Contributing Debtors Distributive Assets shall not be subject to the Administrative Claims Adjustment); *provided, however*, that once the portion of the Contributing Debtors General Unsecured Distribution has reached 40% exclusive of the value of the Tranche A Litigation Trust Interests, 100% of the remainder of the positive difference shall be added to the RCM Cash Distribution.  For the avoidance of doubt, any BAWAG Proceeds received pursuant to the BAWAG Settlement, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement, shall be included in the calculation of Adjusted Contributing Debtors Distributive Assets.

**1.224** *Subordinated Claim* means any Claim which (i) is subordinated pursuant to section 510(c) of the Bankruptcy Code, (ii) arising from recision of a purchase or sale of a debt security of the Debtors, for damages arising from the purchase or sale of such debt security, or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such Claims, or  (iii) is a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code or otherwise.

**1.225** *Subsidiary Claims and Interests* means Claim against or an Interest in any of the Refco Entities held by any other Refco Entity other than the RCM Intercompany Claims.

**1.226** *Tranche A Litigation Trust Interests* means the Litigation Trust Interests distributed to (i) the RCM Estate, (ii) Holders of Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lender Claims or, the Senior Subordinated Note Claims) and (iii) the Holders of FXA General Unsecured Claims (which for the sake of clarity, shall not include FXA Convenience Class Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims) in accordance with section 5.7(c) hereof.

**1.227** *Tranche B Litigation Trust Interests* means interests in the Litigation Trust given by the beneficiaries of the Tranche A Litigation Trust Interests to Holders of Allowed Old Equity Interests that have made the Private Actions Trust Election and consisting of 3% of the first $500 million of Combined Recoveries, 7.5% of the Combined Recoveries greater than $500 million and 15% of the Combined Recoveries greater than $1 billion, as set forth in section 5.7(c) hereof.

**1.228** *Unclaimed Distribution Reserve* means the reserve or reserves established in respect of unclaimed Distributions for FXA and the Contributing Debtors pursuant to Article VI of the Plan.

**1.229** *Unclassified Claims* means Administrative Claims and Priority Tax Claims

**1.230** *Unimpaired* means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.231** *Voting Deadline* means [●], 2006 at [●] p.m. (prevailing Eastern Time).

**1.232** *Voting Record Date* means [●].

**1.233** *VR* means, collectively, VR Global Partners, L.P. and its affiliates.

**1.234** *VR/Leuthold Guarantee Claims* means the Claims against RGL arising from (i) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Capital Group Ltd., (ii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Argentina Recovery Fund, Ltd., (iii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Global Partners, L.P., and (iv) that certain guarantee agreement, dated September 1, 2005 between Refco Group Ltd., LLC and Leuthold Funds, Inc. and (v) any other documents, agreements or transactions in any way related to (i) through (iv) above.

**1.235** *Wind-Down Reserves* means the reserve accounts to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the administration of this Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals.

*Rules Of Interpretation And Computation Of Time.* For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to sections and articles are references to sections and articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any Distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits.* All Exhibits to the Plan are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036-6522 (Attn. David R. Hurst, Esq.), counsel to the Debtors or by downloading such Exhibits from the Bankruptcy Court's website at http://www.nysb.uscourts.gov (registration required), the Refco website at http://www.refcoinc.com or http://www.refcodocket.com. To the extent any Exhibit is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of this Plan shall control; *provided, however,* in all relevant cases, to the extent this Plan is inconsistent with the RCM Settlement Agreement, the RCM Settlement Agreement shall control.

# ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

**2.1** *Introduction*.

Plan - 21

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors and RCM. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below, have not been classified and are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

This Plan is premised on a consensual pooling of assets and liabilities by the Contributing Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases, including the Debtors, the RCM Trustee, the Committees, the Secured Lenders and certain of the Holders of Senior Subordinated Notes. If for any reason the Bankruptcy Court determines that such compromises and settlements, as embodied herein, should not be implemented as set forth herein, the Plan Proponents may elect to seek confirmation of the Plan on the basis of complete or partial substantive consolidation or on a Debtor by Debtor basis identifying sub-Classes of each of the listed Classes of Claims of the Contributing Debtors for each Contributing Debtor.

**The provisions set forth below also describe the classification of RCM Claims and Interests, but the provisions applicable to the RCM Claims and Interests are qualified in their entirety by reference to the RCM Settlement Agreement with respect to the Claims against RCM. To the extent that the summary below conflicts with the provisions of the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code shall govern. This Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of Claims between the Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan.**

The provisions set forth below also describe the classification of Secured Lender Claims, but the provisions applicable to the Secured Lender Claims are qualified in their entirety by reference to the Early Payment Order.

### 2.2    *Classification of Claims and Interests of the Contributing Debtors*.

(a)    *Unclassified Claims – Contributing Debtors* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)    *Unimpaired Classes of Claims – Contributing Debtors* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)      *Impaired Classes of Claims – Contributing Debtors* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - General Unsecured Claims.

Class 5(b) - Related Claims

Class 6 - RCM Intercompany Claims.

Class 7 - Subordinated Claims.

Each of Classes 4 and 5 shall contain sub-Classes corresponding to each of the Contributing Debtors.  A schedule of such sub-Classes is attached hereto as Schedule 2.2(c).

(d)      *Impaired Classes of Interests – Contributing Debtors*  (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 8 - Old Equity Interests.

**2.3**    ***Classification of Claims of FXA***.

(a)      *Unclassified Claims – FXA* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)      *Unimpaired Classes of Claims – FXA* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - FXA Non-Tax Priority Claims.

Class 2 - FXA Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)      *Impaired Classes of Claims – FXA* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - FXA General Unsecured Claims.

Class 5(b) - Related Claims.

Class 6 - FXA Convenience Claims.

Class 7 - FXA Subordinated Claims.

**2.4**    ***Classification of Claims of RCM***.

(a)    *Unclassified Claims – RCM* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)    *Unimpaired Classes of Claims – RCM* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

(c)    *Impaired Classes of Claims – RCM* (Classes 3, 4, 5, 6, 7 and 8 are entitled to vote on the Plan; Class 9 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 3 - RCM FX/Unsecured Claims.

Class 4 - RCM Securities Customer Claims.

Class 5 - RCM Leuthold Metals Claims.

Class 6 - RCM FX/Unsecured Convenience Claims.

Class 7 - RCM Securities Customer Convenience Claims.

Class 8 - Related Claims.

Class 9 - RCM Subordinated Claims.

## ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

3.1    ***Treatment of Claims and Interests of the Contributing Debtors***.

(a)    *Unclassified Claims – Contributing Debtors*

(i)    *Administrative Claims.*  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim against the Contributing Debtors, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan. Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by a Contributing Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the Contributing Debtors or the Plan Administrator.  Subsection (b) of the second sentence in this section 3.1(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)    *Priority Tax Claims*. On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the Contributing Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim against the Contributing Debtors, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Contributing Debtors or the Plan Administrator and such Holder shall have agreed upon in writing.  Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)    *Unimpaired Classes of Claims – Contributing Debtors.*

(i)    *Class 1 - Non-Tax Priority Claims.*  On (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim against the Contributing Debtors, each Holder of an Allowed Class 1 Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)    *Class 2 - Other Secured Claims.*  On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against the Contributing Debtors shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii)    *Class 3 - Secured Lender Claims.*  The Secured Lender Claims against the Contributing Debtors shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash.  In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c)    *Impaired Classes of Claims – Contributing Debtors.*

(i)    *Class 4 - Senior Subordinated Note Claims.*  On the Effective Date, each Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors shall receive, to the extent not previously paid, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Senior Subordinated Note Claim and any and all Claims against the Refco Entities, its Pro Rata share of the Senior Subordinated Note Holder Distribution (subject to the Senior Subordinated Note Indenture Trustee Charging Lien); and the Debtors shall pay the Senior Subordinated Note Holder Fee Distribution; *provided, however*, to the extent that a Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors elects to not receive the Senior Subordinated Note Holder BAWAG Proceeds, such Holder's Distribution shall consist of its Pro Rata share of the Senior Subordinated Note Holder Distribution less such Holder's portion of the Senior Subordinated Note Holder BAWAG Proceeds.

(ii)    *Class 5(a) - Contributing Debtors General Unsecured Claims*.  Subject to section 6.4 of this Plan, on the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), each Holder of an Allowed Class 5(a) Contributing Debtors General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Contributing Debtors General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of  the Contributing Debtors General Unsecured Distribution; *provided, however*, to the extent that a Holder of an Allowed Class 5(a) General Unsecured Claim against the Contributing Debtors elects to not receive the Contributing Debtors General Unsecured BAWAG Proceeds, if any, such Holder's Distribution shall consist of its Pro Rata share of the Contributing Debtors General Unsecured Distribution less such Holder's portion of the Contributing Debtors General Unsecured BAWAG Proceeds.

(iii)    *Class 5(b) - Related Claims*.  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against any Contributing Debtor shall be subordinated and shall receive no Distribution from the Contributing Debtors Distributive Assets unless and until such time as all Holders of Allowed Contributing Debtors General Unsecured Claims and Allowed RCM Intercompany Claims have been paid in full; *provided*, *however*, that any Holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

(iv)    *Class 6 - RCM Intercompany Claims*.  On the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), the RCM Trustee, on behalf of RCM, shall receive the RCM Intercompany Claim Distribution.

(v)    *Class 7 - Subordinated Claims*.  No Holder of a Class 7 Subordinated Claim against the Contributing Debtors shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

(d)    *Impaired Classes of Interests – Contributing Debtors.*

(i)    *Class 8 - Old Equity Interests*.  No Holder of a Class 8 Old Equity Interest shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 8 Old Equity Interest; *provide, however,* that Holders of Class 8 Old Equity Interests have been given certain rights to participate in the Litigation Trust and the Private Actions Trust as set forth in section 5.25 hereof.

**3.2    Treatment of Claims of FXA**.

(a)    *Unclassified Claims – FXA.*

(i)    *Administrative Claims*.  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Administrative Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by FXA in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and FXA or the Plan Administrator. Subsection (b) of the second sentence in this section 3.2(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)    *Priority Tax Claims*.  On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of FXA, each Holder of an Allowed Priority Tax Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which FXA or the Plan Administrator and such Holder shall have agreed upon in writing.  Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)    *Unimpaired Classes of Claims – FXA*.

(i)    *Class 1 - FXA Non-Tax Priority Claims*.  On (a) the Effective Date if such Non-Tax Priority Claim against FXA is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against FXA shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Class 1 FXA Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Class 1 FXA Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)    *Class 2 - FXA Other Secured Claims*.  On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 2 Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Class 2 Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Class 2 Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Class 2 Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii)    *Class 3 - FXA Secured Lender Claims*.  The Secured Lender Claims against FXA shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims against FXA, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash.  In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c)    *Impaired Classes of Claims – FXA*.

(i)    *Class 4 - FXA Senior Subordinated Note Claims*.  On the Effective Date, based on the agreements and settlement set forth in this Plan, each Holder of an Allowed Class 4 FXA Senior Subordinated Note Claim shall waive its share of the FXA General Unsecured Claims Distribution in return for the releases set forth in sections 10.2(a) and (b) of the Plan.

(ii)    *Class 5(a) - FXA General Unsecured Claims*.  On the Effective Date, each Holder of an Allowed Class 5(a) FXA General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 5(a) FXA General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the FXA General Unsecured Claim Distribution.

(iii)    *Class 5(b) –Related Claims*.  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against FXA shall be subordinated and shall receive no Distribution from the FXA Distributive Assets unless and until such time as all Holders of Allowed FXA

Plan - 27

General Unsecured Claims have been paid in full; *provided*, *however*, that any holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

(iv)    *Class 6 - FXA Convenience Claims*.  On the Effective Date, each Holder of an Allowed Class 6 FXA Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 FXA Convenience Claim, Cash equal to 40% of its Allowed Class 6 FXA Convenience Claim.  Holders of Allowed Class 6 FXA Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v)    *Class 7 - FXA Subordinated Claims*.  No Holder of a Class 7 Subordinated Claim against FXA shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

**3.3    *Treatment of Claims of RCM*.**

**The following section is a summary of the treatment of RCM Claims set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.  This Plan summary of the treatment of RCM Claims is qualified in its entirety by reference to the RCM Settlement Agreement.  To the extent that the summary treatment below conflicts with the treatment afforded in the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement shall govern the treatment of RCM Claims.**

(a)    *Unclassified Claims – RCM*.

(i)    *Administrative Claim*.  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by RCM in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the RCM Trustee.  Subsection (b) of the second sentence in this section 3.3(a)(i) of the Plan shall not be construed to avoid relieving the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)    *Priority Tax Claims*.  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the RCM Trustee, each Holder of an Allowed Priority Tax Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the RCM Trustee and such Holder shall have agreed upon in writing.  Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)    *Unimpaired Classes of Claims – RCM.*

(i)    *Class 1 - RCM Non-Tax Priority Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim against RCM on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against RCM shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)    *Class 2 - RCM Other Secured Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(c)    *Impaired Classes of Claims – RCM.*

(i)    *Class 3 - RCM FX/Unsecured Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 3 RCM FX/Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM FX/Unsecured Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM FX/Unsecured Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(ii)    *Class 4 - RCM Securities Customer Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 4 RCM Securities Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Securities Customer Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM Securities Customer Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(iii)    *Class 5 - RCM Leuthold Metals Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 5 RCM Leuthold Metals Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Leuthold Metals Claim, its Pro Rata share of the RCM Leuthold Metals Claim Distribution.

(iv)    *Class 6 – RCM FX/Unsecured Convenience Claims.*  On the Effective Date, each Holder of an Allowed Class 6 RCM FX/Unsecured Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 RCM FX/Unsecured Convenience Claim, Cash equal to 60% of its Allowed Class 6 RCM FX/Unsecured Convenience Claim.  Holders of Allowed Class 6 RCM FX/Unsecured Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v)    *Class 7 – RCM Securities Customer Convenience Claims*.  On the Effective Date, each Holder of an Allowed Class 7 RCM Securities Customer Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 7 RCM Securities Customer Convenience Claim, Cash equal to 100% of its Allowed Class 7 RCM Securities Customer Convenience Claim.  Holders of Allowed Class 7 RCM Securities Customer Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(vi)    *Class 8 - Related Claims*.  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 8 Other Related Claim against RCM shall be subordinated and shall receive no Distribution from RCM unless and until such time as all Holders of Allowed RCM FX/Unsecured Claims, Allowed RCM Securities Customer Claims and Allowed RCM Leuthold Metals Claims have been paid in full.

(vii)    *Class 9 - RCM Subordinated Claims*.  No Holder of a Class 6 Subordinated Claim against RCM  shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 9 RCM Subordinated Claim.  On the Effective Date, all Class 9 RCM Subordinated Claims shall be cancelled and extinguished.

**3.4**    ***Allowed Claims and Interests***.  Except as provided in the Early Payment Order, notwithstanding any provision herein to the contrary, the Disbursing Agent, on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall make Distributions only to Holders of Allowed Claims and Interests. A Holder of a Disputed Claim or Disputed Interest shall receive only a Distribution on account thereof when and to the extent that its Disputed Claim or Disputed Interest becomes an Allowed Claim or an Allowed Interest, as applicable.

**3.5**    ***Alternative Treatment***.  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the Distribution or treatment to which it is entitled hereunder, any other less favorable Distribution or treatment to which it, the Plan Proponents and FXA (in respect of FXA),  the Plan Administrator (in respect of the Contributing Debtors) or the RCM Trustee (in respect of RCM) may agree in writing.

**3.6**    ***Limitation on Recoveries***.  Notwithstanding anything contained herein to the contrary but subject to interest on Claims set forth in section 5.7 of the Plan, in the event that each Holder of an Allowed Claim in any Class of Claims is to receive Distributions in excess of one hundred percent (100%) of each Holder's Allowed Claim in such Class, then, any amounts remaining to be distributed to such Holders in excess of one hundred percent (100%) shall be redistributed to Holders of Allowed Claims or Interests immediately junior to such class as set forth in Article III of this Plan and shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Claims or Interests, including, without limitation, the RCM Settlement Agreement and the Bankruptcy Code.

**3.7**    ***Special Provision Regarding Unimpaired Claims***.  Except as otherwise provided in this Plan, the RCM Settlement Agreement or a Final Order of the Bankruptcy Court (including, without limitation, the Early Payment Order), nothing shall affect the Debtors', RCM's, the Reorganized Debtors' or Post-Confirmation RCM's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, setoffs against, or recoupments of Unimpaired Claims.

**3.8**    ***Claims and Interests of Non-Debtor Affiliates***.  Claims of Non-Debtor Affiliates (other than those of Refco LLC) against the Debtors or RCM , unless otherwise resolved prior to the Effective Date, shall be released and receive no Distribution under the Plan; *provided, however*, that, notwithstanding such release of Claims, the Contributing Debtors, RCM and the Non-Debtor Affiliates may, but are not obligated to, treat such Claims as though they survive solely for purposes of entering into netting or similar arrangements between the Contributing Debtors, RCM and one or more Non-Debtor Affiliates.  Interests of Non-Debtor Affiliates shall be treated in accordance with the provisions of this Plan, including, but not limited to, sections 5.1 and 5.22 below.

**3.9**        ***Classification and Treatment of Intercompany Claims***.  Except as provided herein, Intercompany Claims among the Debtors or RCM are deemed to be resolved and satisfied by the provisions of and in accordance with this Plan.  Notwithstanding the compromises and settlements set forth herein**,** each such Intercompany Claim shall be deemed to be an unsatisfied liability of each of the Debtors and RCM immediately prior to their contribution of Contributed Claims to the Litigation Trust.

**3.10**        ***Claims of Debtors against RCM***.  Notwithstanding anything in this Plan to the contrary, Claims against RCM held by any other Debtor will receive no Distribution consistent with the settlement among RCM and the Debtors contained in and implemented by this Plan.

# ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1**        ***Classes Entitled To Vote***.  Each Impaired Class of Claims of the Contributing Debtors, FXA or RCM  that is entitled to receive or retain property or any interest in property under the Plan  is entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote.  Holders of Claims and Interests in Classes that are not entitled to receive or retain any property under the Plan are presumed to have rejected the Plan and such Holders  are also not entitled to vote.

**4.2**        ***Acceptance By Impaired Classes***.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code or any insider.

**4.3**        ***Presumed Acceptance by Unimpaired Classes***.  Classes 1, 2 and 3 of each of the Contributing Debtors and FXA and RCM Classes 1 and 2 are Unimpaired by this Plan.  Under section 1126(f) of the Bankruptcy Code, Holders of such Claims or Interests are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims or Interests will not be solicited.

**4.4**        ***Classes Deemed to Reject the Plan***.  Classes 7 and 8 of the Contributing Debtors, FXA Class 7 and RCM Class 9 are deemed to reject the Plan and, therefore, votes to accept or reject the Plan will not be solicited from Holders of Claims or Interests in such Classes.

**4.5**        ***Summary of Classes Voting on the Plan***.  As a result of the provision of sections 4.3 and 4.4 of this Plan, only the votes of Holders of Claims of the Contributing Debtors in Classes  4, 5 and 6, Holders of FXA Claims in Classes  4, 5 and 6 and Holders of RCM Claims in Classes 3, 4, 5,6 ,7 and 8 will be solicited with respect to this Plan.

**4.6**        ***Elimination Of Classes***.  Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

**4.7**        ***Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code***.  To the extent that any Impaired Class votes to reject the Plan or is deemed to have rejected it, the Plan Proponents shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

 **5.1** *a Of Subsidiaries Into Refco Inc.*  As soon after the Effective Date that the Plan Administrator determines, in consultation with the Litigation Trustee, that it is appropriate, each of the Affiliate Debtors may be  merged with and into Refco Inc., with Refco Inc. as the surviving entity.  Notwithstanding anything to the contrary in this section of the Plan, mergers in fact of each of the Affiliate Debtors, other than FXA, with and into Refco Inc. referenced in such section shall occur no earlier than the Effective Date.  Upon the occurrence of such a merger, the Plan Administrator, on behalf of the Reorganized Debtors, shall file all appropriate and required documentation with applicable state governmental agencies to reflect the occurrence of such mergers.

 **5.2** *Continued Corporate Existence And Dissolution Of Reorganized Debtors*.

  (a) Refco Inc., FXA and, until they are wound up and dissolved, the Affiliate Debtors shall continue to exist as Reorganized Refco, Reorganized FXA and/or the applicable Reorganized Affiliate Debtor, respectively, after the Effective Date pursuant to the certificate of incorporation, certificate of formation or other corporate governance document, as applicable, and by-laws, operating agreement or other corporate governance document in effect prior to the Effective Date, except to the extent that such corporate governance documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates, and making Distributions in accordance with the Plan.

  (b) As soon as practicable after the Plan Administrator, liquidates or otherwise disposes of assets of the Estates of the Reorganized Debtors and makes the final Distribution under the Plan, the Plan Administrator shall, at the expense of the Estates of the Reorganized Debtors and in consultation with the Plan Committee, (i) provide for the retention and storage of the books, records, and files that shall have been delivered to or created by the Plan Administrator until such time as all such books, records, and files are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books, records, and files are being stored, (ii) file a certification stating that the Plan Administrator has liquidated or otherwise disposed of the assets of the Estates of the Reorganized Debtors and made a final Distribution under the Plan, (iii) file the necessary paperwork with the Office of the Secretary of State for the State of Delaware to effectuate the dissolution of the Reorganized Debtors in accordance with the laws of the State of Delaware, and (iv) resign as the sole officer, manager or director, as applicable, of the Reorganized Debtors.  Upon the filing of the certificates described in sub-section (ii) of the preceding sentence, the Reorganized Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be made in connection therewith.

  (c) The RCM Trustee shall have sole discretion with respect to determining the timing and manner of dissolution of Post-Confirmation RCM in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

 **5.3** *Corporate Governance Documentation*.  The certificate of incorporation of Reorganized Refco shall be restated to, among other things: (a) authorize issuance of one share of new common stock, $0.01 par value per share that will be held by the Plan Administrator; (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (c) limit the activities of the Reorganized Refco to matters related to the implementation of the Plan and to matters reasonably incidental thereto.  The corporate governance documents of Reorganized FXA shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of the Reorganized FXA to matters related to the implementation of the Plan and to matters reasonably incidental thereto.  To the extent that the Plan Administrator decides it necessary, the corporate governance documents of the Affiliate Debtors that will continue in existence following the Effective Date pending the wind up of their businesses shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of such Reorganized Affiliate Debtor to matters related to the implementation

of the Plan and to matters reasonably incidental thereto.  The form of the restated corporate governance documents are attached hereto as Exhibit C.

**5.4**    ***Directors, Managers And Officers; Effectuating Documents; Further Transactions***.
From and after the Effective Date, the Plan Administrator shall serve as the sole officer and director or manager, as applicable, of the Reorganized Debtors and the RCM Trustee shall serve as the sole representative of RCM. The Plan Administrator on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**5.5**    ***The Plan Administrator***.

(a)    *Appointment.*  From and after the Effective Date, a person or entity designated by the Joint Sub- Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) prior to the Confirmation Date, shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan.

(b)    *Plan Administrator Agreement.*  Prior to or on the Effective Date, the Contributing Debtors and FXA shall execute a Plan Administrator Agreement in substantially the same form as Exhibit E hereto with the Plan Administrator.  The form of Plan Administrator Agreement is hereby approved.  Any nonmaterial modifications to the Plan Administrator Agreement by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement necessary to implement the provisions of this Plan.

(c)    *Separate Administration of the RCM Estates.*  Notwithstanding anything herein to the contrary, all references in the Plan to the Plan Administrator shall refer exclusively to the administration of the Estates of the Contributing Debtors and FXA.  The RCM Estate shall be administered separately by the RCM Trustee and the RCM Trustee shall wind down the RCM Estate in accordance with the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

(d)    *Rights, Powers, And Duties Of The Reorganized Debtors And The Plan Administrator.*  The Reorganized Debtors shall retain and have all the rights, powers, and duties necessary to carry out their responsibilities under the Plan.  Such rights, powers, and duties, which shall be exercisable by the Plan Administrator on behalf of the Reorganized Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement, shall include, among others:

(i)    liquidating the Reorganized Debtors' assets;

(ii)    investing the Cash of the Estates of the Reorganized Debtors, including, but not limited to, the Cash held in the Reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court;

(iii)    calculating and paying all Distributions in accordance with the terms of the Plan, the Plan Administrator Agreement, and other orders of the Bankruptcy Court by the Plan Administrator to Holders of Allowed Claims;

(iv)    employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Reorganized Debtors and their Estates;

(v)    making and filing tax returns for any of the Contributing Debtors, FXA or the Reorganized Debtors;

(vi)    as provided in Article V, objecting to Claims or Interests filed against the Estates of any of the Contributing Debtors, FXA or the Reorganized Debtors on any basis except to the extent such Claims or Interests have previously been allowed by a Final Order;

(vii)    seeking estimation of contingent or unliquidated Claims against the Contributing Debtors, FXA or the Reorganized Debtors under section 502(c) of the Bankruptcy Code;

(viii)    seeking determination of tax liability for the Contributing Debtors, FXA and the Reorganized Debtors under section 505 of the Bankruptcy Code;

(ix)    closing the Chapter 11 Cases of the Reorganized Debtors;

(x)    dissolving and winding up the Reorganized Debtors;

(xi)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan Administrator Agreement; and

(xii)    taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the Plan Administrator Agreement.

(e)    *Compensation Of The Plan Administrator.* The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms and conditions of the Plan Administrator Agreement. Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided*, *however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(f)    *Indemnification.* The Reorganized Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer, director or manager, as applicable of the Reorganized Debtors), (ii) such individuals as may serve as officers, directors or managers, as applicable of the Reorganized Debtors, if any, and (iii) the Administrative Professionals (collectively, the "Indemnified Parties"), from and against, and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan or Plan Administration Agreement. To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Indemnified Party in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve. The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(g)    *Insurance.* The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, and the Reorganized Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Reorganized Debtors or their

Estates and (ii) the liabilities, duties, and obligations of the Plan Administrator and its agents, representatives, employees, or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Plan Administrator, remain in effect for a reasonable period (not to exceed seven years) after the termination of the Plan Administrator Agreement.

> (h)       *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder or by Court order, after consultation with the Plan Committee, (i) to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims against any of the Contributing Debtors' or FXA's Estates, in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements of claims:

> > (i)       If the proposed face amount at which the Disputed Claim is to be allowed is less than or equal to $500,000, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any party or Bankruptcy Court approval and the Plan Administrator shall have no liability to any party for the reasonableness of such settlement, except to the extent such settlement is determined by a Final Order to have been the product of the Plan Administrator's gross negligence or willful misconduct.

> > (ii)       If the proposed face amount at which the Disputed Claim is to be allowed is greater than $500,000, but less than or equal to $10 million, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized and empowered to settle such Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee approval or, if such approval of the Plan Committee is not forthcoming, upon Bankruptcy Court approval of such settlement.

> > (iii)       If the proposed face amount at which the Disputed Claim is to be allowed is greater than $10 million, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee and Bankruptcy Court approval of such settlement.

Other than as set forth in section 5.21 herein, parties in interest (other than the Reorganized Debtors and Plan Administrator, whose objection deadlines are set forth in section 8.1 of the Plan) shall have 90 days following the Effective Date to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates to the extent that under the Bankruptcy Code such parties are permitted (to the extent not previously allowed pursuant to the Plan or by order of the Bankruptcy Court), and have standing, to assert such objections.  Notwithstanding anything to the contrary in this section of the Plan, Disputed Claims may not be resolved absent Bankruptcy Court approval under the procedures set forth in this section of the Plan until the date that is on or after 90 days following the Effective Date.

> **5.6       *Administration of Post-Confirmation RCM*.**

> > (a)       *Rights, Powers, And Duties Of The RCM Trustee.*  The RCM Trustee shall retain and have all the rights, powers, and duties necessary to carry out his responsibilities under the Plan, the RCM Settlement Agreement or applicable law.  Such rights, powers, and duties, which shall be exercisable by the RCM Trustee on behalf of Post-Confirmation RCM and the RCM Estate pursuant to the Plan and the RCM Settlement Agreement, shall include, among others:

> > > (i)       liquidating Post-Confirmation RCM's assets;

(ii)    investing Post-Confirmation RCM's Cash, including, but not limited to, the Cash held in any reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise order by the Bankruptcy Court;

(iii)    calculating and paying all Distributions to be made under the Plan, the RCM Settlement Agreement, and other orders of the Bankruptcy Court to Holders of Allowed Claims against RCM;

(iv)    employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Post-Confirmation RCM including professionals engaged for the valuation, sale or other disposition of Post-Confirmation RCM's assets or proceeds thereof;

(v)    making and filing tax returns, if any are required, for Post-Confirmation RCM;

(vi)    as provided in Article V, objecting to Claims or Interests filed against RCM or Post-Confirmation RCM on any basis except to the extent such Claims or Interests have previously been Allowed;

(vii)    seeking estimation of contingent or unliquidated Claims against RCM or Post-Confirmation RCM under section 502(c) of the Bankruptcy Code;

(viii)    seeking determination of tax liability, if any, for RCM and Post-Confirmation RCM under section 505 of the Bankruptcy Code;

(ix)    closing the RCM Chapter 11 Case or chapter 7 case;

(x)    dissolving and winding up Post-Confirmation RCM;

(xi)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the RCM Settlement Agreement or applicable law; and

(xii)    taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the RCM Settlement Agreement or to administer the RCM Estate.

(b)    *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the RCM Trustee, on behalf of Post-Confirmation RCM, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder, under the RCM Settlement Agreement or by Court order (i) to object to any Claims or Interests filed against the RCM Estate and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle any such Disputed Claims asserted against RCM.

**5.7**    *Litigation Trust*.

(a)    *Establishment of the Litigation Trust*.  The Litigation Trust shall be established for pursuit of the Contributed Claims and shall become effective on the Effective Date as summarized below and in accordance with the terms and conditions set forth in more detail in the Litigation Trust Agreement attached hereto as <u>Exhibit F</u>.  The Litigation Trustee will be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture

Trustee), and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing.

(b)      *Transfer of Assets.*  The transfer of the Contributed Claims to the Litigation Trust shall be made, as provided herein, for the ratable benefit of the Litigation Trust Beneficiaries as set forth herein.  On the Effective Date, the Contributed Claims, held by the Debtors and RCM on behalf of the Litigation Trust Beneficiaries shall be transferred to the Litigation Trust in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust Beneficiaries.  Upon transfer of the Contributed Claims to the Litigation Trust, the Debtors, RCM and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust and the Litigation Trustee shall be a representative of the Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code with respect to the Contributed Claims. To the extent that any Contributed Claims cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Contributed Claims shall be deemed to have been retained by the Reorganized Debtors and RCM, as applicable, and the Litigation Trustee shall be deemed to have been designated as a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Contributed Claims on behalf of the Estates.  Notwithstanding the foregoing, all net proceeds of the Contributed Claims shall be transferred to the Effective Beneficiaries consistent with the remaining provisions of this Plan and the Litigation Trust Agreement.

(c)      *Structure of the Litigation Trust and Trust Distributions.*  The Litigation Trust shall be structured in a manner that provides for a Tranche A and a Tranche B.  All Contributed Claims Recoveries, whether applicable to Tranche A or Tranche B, will be distributed Pro Rata according to the beneficial interests in Tranche A and Tranche B.  The Litigation Trustee (in consultation with the Litigation Trust Committee) may establish further separate sub-Tranches, as necessary, in respect of the beneficial interests of the Litigation Trust Beneficiaries in Tranche A and Tranche B.  To the extent deemed "securities," the Litigation Trust Interests (or any redistribution of such interests or related interests by the RCM Trustee to the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims) will be exempt from registration to the extent provided in section 1145 of the Bankruptcy Code.

(i)      *Tranche A Litigation Trust Interests*.  Beneficiaries of Tranche A Litigation Trust Interests will be the RCM Estate (for Distribution in accordance with the RCM Settlement Agreements), Holders of Allowed Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lenders, the Senior Subordinated Note Indenture Trustee or the Holders of Senior Subordinated Notes) and Holders of Allowed FXA General Unsecured Claims (which for the sake of clarity, shall not include Holders of FXA Convenience Class Claims, RCM Securities Customer Convenience Claims or RCM FX/Unsecured Convenience Claims) and such Beneficiaries shall share the Tranche A Litigation Trust Interests Pro Rata based on (x) in the case of the RCM Estate, the aggregate amount of Allowed RCM Implied Deficiency Claims and the Allowed RCM FX/Unsecured Claims and (y) in the case of Holders of Contributing Debtors General Unsecured Claims and the Holders of FXA General Unsecured Claims, the amount of each such Holder's Allowed Claim.

(ii)      *Tranche B Litigation Trust Interests*.  Beneficiaries of Tranche B Litigation Trust Interests will be the Holders of Old Equity Interests who have made a Private Actions Trust Election and such Beneficiaries shall share the Tranche B Litigation Trust Interests Pro Rata based on the number of shares held by the Holders of such Interests or the number of shares previously held to the extent that the Holder has asserted a Claim related to such shares.

(d)      *Management of the Litigation Trust*.  The Litigation Trust shall be managed and operated by the Litigation Trustee.  A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings shall have certain approval rights on key issues relating to the operation and management of the Litigation Trust.  The Four members (other than VR) shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee). No Holder of Tranche A Litigation Trust Interests (except to the extent such Holder is a member of the Litigation

Trust Committee) and no Holder of Tranche B Litigation Trust Interests shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust

(e)  *Funding the Litigation Trust*.  The Litigation Trust may be funded (i) from a loan that is non-recourse to RCM, the Debtors or the Estates, secured only by the proceeds of the Contributed Claims from one or more lenders who agree to make such loan on terms acceptable to the RCM Trustee, the Committees and the Super Majority (as defined in the RCM Settlement Agreement) or (ii) with up to $25 million drawn from the Contributing Debtors Distributive Assets, deducted on a Pro Rata basis from the Distributions that otherwise would be made to (x) Holders of Contributing Debtors General Unsecured Claims in accordance with the calculation of the Contributing Debtors General Unsecured Distribution and (y) to the RCM Estate in accordance with the calculation of the RCM Intercompany Claims Distribution in section 3.1 of this Plan.  Any failure or inability of the Litigation Trust to obtain funding will not affect the consummation of this Plan.

(f)  *Distributions by the Litigation Trust*.  Any Contributed Claims Recoveries will first be used to repay the funding described in section 5.7(e) above and then will be transferred to the Disbursing Agent or the RCM Trustee, as applicable, for distribution to the Litigation Trust Beneficiaries as set forth herein.  In addition, to the extent that the Reorganized Debtors or Post-Confirmation RCM become liable for the payment of any Claims arising under section 502(h) of the Bankruptcy Code by reason of the Litigation Trustee's prosecution of the Litigation Claims, the Litigation Trustee will be responsible for making Distributions on account of such Claims from the assets of the Litigation Trust.

(g)  *Cash-Out Option.*  As set forth more fully in the Cash-Out Option Agreement, if any, the form of which would be attached as an exhibit to the Litigation Trust Agreement, one or more third parties may offer, to Purchase Litigation Trust Interests from the Litigation Trust Beneficiaries.

(h)  *Duration of Trust*.  The Litigation Trust shall have an initial term of five (5) years, provided that if reasonably necessary to realize maximum value with respect to the assets in the Litigation Trust and following Bankruptcy Court approval, the term of the Litigation Trust may be extended for one or more one (1) year terms.  The Litigation Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing all of or the last of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and the RCM Case to the extent the RCM Case was converted to chapter 7; and (ii) the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust Agreement.

(i)  *Certain Federal Income Tax Matters.*

(j)  For federal income tax purposes, the Debtors, RCM, the Litigation Trustee and the Effective Beneficiaries will treat the transfer of assets to the Litigation Trust and issuance of Litigation Trust Interests as a transfer by the Debtors and RCM of the assets to the Effective Beneficiaries, followed by a transfer of such assets by the Effective Beneficiaries to the Litigation Trust in exchange for direct or indirect beneficial interests in the Litigation Trust.  For federal income tax purposes, the Effective Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Litigation Trust.

(k)  The Litigation Trustee, the Debtors and RCM will determine the fair market value as of the Effective Date of all assets transferred to the Litigation Trust, and such determined fair market value shall be used by the Debtors, RCM, the Litigation Trust, the Litigation Trustee and the Effective Beneficiaries for all federal income tax purposes.

**5.8**  *Private Actions Trust*.

(a)  On the Effective Date the Private Actions Trust will be established on the terms set forth in the Private Actions Trust Agreement attached hereto as Exhibit G.  The Private Actions Trust shall hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates.  Beneficiaries of the Private Actions

Trust will be Holders of Contributing Debtors General Unsecured Claims, FXA General Unsecured Claims, RCM Securities Customer Claims, RCM FX/Unsecured Claims and those Old Equity Interests that make the Private Actions Trust Election, who shall be given interests in the Private Actions Trust to the same extent as in the Litigation Trust; *provided, however*, that a secondary purchaser of a Contributing Debtors General Unsecured Claim, FXA General Unsecured Claim, RCM Securities Customer Claim or RCM FX/Unsecured Claim may participate in the Private Actions Trust only if such purchaser has received an assignment of Non-Estate Refco Claims from the original holder of such claims and has elected to (i) assign such Non-Estate Refco Claims to the Private Actions Trust and (ii) assign (or cause to be assigned) its allocable share of any proceeds of Class Action Claims to the Private Actions Trust. The Private Actions Trust shall be managed and operated by the Private Actions Trustee. The Private Actions Trustee will be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust, and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing. A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings (in each case, only to the extent such parties have assigned their Non-Estate Refco Claims to the Private Actions Trust) shall have certain approval rights on key issues relating to the operation and management of the Private Actions Trust. The Four members (other than VR) shall be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust.

(b)    To the extent that any Non-Estate Refco Claims cannot be transferred to the Private Actions Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Non-Estate Refco Claims shall be deemed to have been retained by the grantor, as applicable, and the Private Actions Trustee shall be deemed to have been designated as a representative of such grantor to enforce and pursue such Non-Estate Refco Claims on behalf of such grantor. Notwithstanding the foregoing, all net proceeds of such Non-Estate Refco Claims shall be transferred to the Private Actions Trust Beneficiaries consistent with the other provisions of this Plan and the Private Actions Trust Agreement.

**5.9**    ***No Revesting of Assets***.    Other than as set forth herein, the remaining property of the respective Estates, other than the Contributed Claims, which shall be transferred to and vest in the Litigation Trust, shall not revest in the Debtors or RCM on or following the Confirmation Date or Effective Date, but shall remain property of the respective Estates and continue to be subject to the jurisdiction of the Bankruptcy Court until distributed to Holders of Allowed Claims in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement. From and after the Effective Date, all such property shall be distributed in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement, without further order of the Court (except as specifically required). For the avoidance of doubt, the Debtors' or RCM's insurance policies shall remain property of their respective Estates in accordance with this section of the Plan, and shall not be subject to the rejection provisions of section 7.1 of the Plan.

**5.10**    ***Preservation of Rights of Action; Settlement of Litigation***

(a)    ***Preservation Of Rights Of Action.***    Except as otherwise provided herein, the Confirmation Order, the RCM Settlement Agreement, or in any other Plan Document, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors and RCM shall retain all Retained Causes of Action notwithstanding the Confirmation of the Plan and the occurrence of the Effective Date, to be administered and prosecuted after the Effective Date pursuant to the terms of the Plan.

(b)    ***Settlement Of Litigation Claims Prior to the Effective Date.***    At any time prior to the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors (and the RCM Trustee on behalf of RCM with respect to Litigation Claims of RCM) may settle any or all of the Litigation Claims with Bankruptcy Court approval pursuant to Bankruptcy Rule 9019, following notice to parties-in-interest and a hearing.

Any net proceeds obtained in respect of Litigation Claims prior to the Effective Date shall be contributed to the Litigation Trust.

### 5.11 *The Committees and the Plan Committee*.

(a) *Dissolution of the Committees.* The Committees shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and such other duties as they may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Committees shall be dissolved and their members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committees' attorneys, accountants, professionals and other agents shall terminate, except with respect to (i) all Professional Fees and matters relating to the Fee Committee, (ii) any appeals of the Confirmation Order and (iii) the continuation and completion of any litigation to which the Creditors' Committee or the Additional Committee, as applicable, is a party as of the Effective Date. All expenses of members of the Committees and the fees and expenses of the Committees' professionals through the Effective Date shall be paid in accordance with any applicable orders of the Bankruptcy Court. Counsel to the Committees shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities authorized hereunder without further court approval upon the submission of invoices to the Reorganized Debtors. Following the Effective Date, subject to actual conflicts of interest, none of the Committees' professionals shall be precluded from representing any entity acting for any successor fiduciaries or other entities created by this Plan, including the Plan Administrator, Plan Committee, Litigation Trustee or any of the Reorganized Debtors.

(b) *Creation of Plan Committee; Procedures.*

(i) Unless there are no parties in interest willing to serve, on the Effective Date, the Plan Committee shall be formed and constituted. The Plan Committee shall be of a size determined by and composed of members chosen by the Joint Sub-Committee (exclusive of the Senior Subordinated Note Indenture Trustee and any Holder of a Senior Subordinated Note Claim); *provided, however*, that the Plan Committee shall include VR, Leuthold and Cargill and shall include the Senior Subordinated Note Indenture Trustee until such time as all payments in respect of the Senior Subordinated Note Holder Distribution have been made. All proposed members of the Plan Committee shall be disclosed to the Bankruptcy Court on or before the Confirmation Hearing. Membership on the Plan Committee shall be on an institutional and not on an individual basis. In the event that a member of the Plan Committee resigns from its position on the Plan Committee, the remaining members shall have the right to designate its successor on the Plan Committee as set forth in the Plan Administrator Agreement. The Plan Committee shall, absent further order of the Bankruptcy Court, have not fewer than three members.

(ii) In the event that there are fewer than three members of the Plan Committee for a period of sixty (60) consecutive days, then the Plan Administrator may, during such vacancy and thereafter, in its sole discretion, ignore any reference in the Plan, the Plan Administrator Agreement or the Confirmation Order to the Plan Committee, and all references to the Plan Committee's ongoing duties and rights in the Plan, the Plan Administrator Agreement and the Confirmation Order shall be null and void.

(c) *Standing of Plan Committee.* The Plan Committee shall have independent standing to appear and be heard in the Bankruptcy Court as to any matter relating to the Plan, the Plan Administrator, the Estates or the Reorganized Debtors, including any matter as to which the Bankruptcy Court has retained jurisdiction pursuant to Article XI of the Plan.

(d) *Function and Duration; Compensation and Expenses.* The Plan Committee shall have ultimate supervisory authority over the Plan Administrator (but shall have no authority over the RCM Trustee, the RCM Estate or the Litigation Trustee, in such capacity). The Plan Administrator shall report to the Plan Committee and the Plan Committee shall have the power to remove the Plan Administrator with or without cause. The Plan Committee (i) shall be responsible for (A) instructing and supervising the Reorganized Debtors and the Plan Administrator with respect to their responsibilities under the Plan and the Plan Administrator Agreement, (B)

reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof, (C) reviewing and approving objections to and proposed settlements of Disputed Claims against the Contributing Debtors, FXA or the Reorganized Debtors, (D) performing such other duties that may be necessary and proper to assist the Plan Administrator and its retained professionals, and (ii) shall remain in existence until such time as the final Distributions under the Plan have been made by the Disbursing Agent, on behalf of the Reorganized Debtors.  The members of the Plan Committee shall serve without compensation for their performance of services as members of the Plan Committee, except that they shall be entitled to reimbursement of reasonable expenses by the Reorganized Debtors to be paid from the Wind-Down Reserve.  The Plan Committee may retain counsel or other professionals who shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses to be paid from the Wind-Down Reserve upon the submission of invoices to the Reorganized Debtors; provided, however, that any disputes related to such fees and expenses may be brought before the Bankruptcy Court.

(e)     *Liability; Indemnification.*  Neither the Plan Committee, nor any of its members or designees, nor any duly designated agent or representative of the Plan Committee, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Committee, nor shall any member be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Committee, other than acts or omissions resulting from such member's willful misconduct or gross negligence.  The Reorganized Debtors shall indemnify and hold harmless the Plan Committee and its members and designees, and any duly designated agent or representative thereof (in their capacity as such), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan.  To the extent the Reorganized Debtors indemnify and hold harmless the Plan Committee and its members and designees, or any duly designated agent or representative thereof (in their capacity as such), as provided above, the legal fees and related costs incurred by counsel to the Plan Committee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be advanced to the Plan Committee (and the Plan Committee undertakes to repay such amounts if it ultimately shall be determined that the Plan Committee is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any applicable insurance.

5.12     *Fee Committee*.  From and after the Confirmation Date, the members of the Fee Committee (including the RCM Trustee) and the Fee Committee's professionals shall continue to serve and be authorized to continue, in a manner consistent with practice before the Confirmation Date, to review, analyze, and prepare advisory reports with respect to applications for the payment of fees and the reimbursement of expenses of professionals retained in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court during the period up to and including the Confirmation Date, including, without limitation, final fee applications in accordance with sections 328, 330, 331, and 503 of the Bankruptcy Code.  From and after the Confirmation Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the members of the Fee Committee to satisfy their duties and responsibilities.  Notwithstanding the foregoing, unless otherwise provided by the Bankruptcy Court, the Fee Committee shall be dissolved and the members thereof and the professionals retained by the Fee Committee shall be released and discharged from their respective obligations upon the earlier to occur of (i) the date which is six (6) months after the Confirmation Date and (ii) resolution of all duties of the Fee Committee set forth in this section of the Plan.

5.13     *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests*.  With the exception of the equity interests of any Refco Entity held by any other Refco Entity pending wind-up and dissolution of such entities pursuant to this Plan, and except as otherwise provided in the Plan and in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Article V, the promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors or RCM under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged; *provided*, *however*, that the Senior Subordinated Notes Indenture shall continue in effect solely for the purposes of allowing the Senior Note Indenture Trustee to enforce the indemnity provisions of

the Senior Subordinated Note Indenture on account of the Senior Subordinated Note Indenture Trustee's service on the Plan Committee, to make the Distributions to be made on account of Senior Subordinated Note Claims under the Plan and, to the extent necessary, enforce the Senior Subordinated Note Indenture Trustee Charging Lien, after which point the Senior Subordinated Note Indenture shall be cancelled and discharged. The Holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan.

       **5.14**    *Sources of Cash for Plan Distributions*. Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors and the Plan Administrator to make payments pursuant to the Plan shall be obtained from the Reorganized Debtors' Cash balances and the liquidation of the Reorganized Debtors' remaining non-Cash assets, if any, including the Contributing Debtors BAWAG Proceeds. Cash payments to be made pursuant to the Plan to Holders of Allowed Claims and to the Senior Subordinated Note Indenture Trustee for the benefit of the Holders of Senior Subordinated Note Claims shall be made by the Reorganized Debtors (or any successor thereto) or, if the Disbursing Agent is an entity other than the Reorganized Debtors, the Disbursing Agent, which may be the Senior Subordinated Note Indenture Trustee. Distributions to be made on behalf of the RCM Estate pursuant to the Plan or the RCM Settlement Agreement shall be made by the RCM Trustee in accordance with the Plan, the RCM Settlement Agreement and applicable law.

       **5.15**    *Risk Sharing in Respect of Cargill Administrative Claim*. In the event that Cargill receives a Cargill Administrative Claim, the amount of such Claim shall be borne by RCM and the Contributing Debtors as follows: (i) to the extent the allowance of the Cargill Administrative Claim reduces the Allowed amount of any RCM FX/Unsecured Claim held by Cargill, RCM shall bear for the benefit of the Contributing Debtors a portion of the Cargill Administrative Claim equal to forty percent (40%) of the amount of the RCM Difference; (ii) the Contributing Debtors shall next pay an amount up to the remainder of the Cargill Administrative Claim Amount; *provided, however*, that such payment pursuant to this subsection (ii) shall be capped at the amount that would cause recoveries of Holders of Allowed Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets plus the Contributing Debtors portion of the RGL FXCM Distribution to fall below 30% of the face amount of such Allowed Contributing Debtors General Unsecured Claims; and (iii) if not yet paid in full, the remainder of the Cargill Administrative Claim will be borne by the Contributing Debtors and RCM equally. For the avoidance of doubt, amounts to be borne by the Contributing Debtors shall be deducted from the amounts available for the Contributing Debtors General Unsecured Distribution and amounts to be borne by RCM shall be deducted from the amounts available for the RCM Cash Distribution.

       **5.16**    *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims*. Payment of Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims of the Contributing Debtors and of the RCM Estate and Administrative Claims of the Contributing Debtors and of the RCM Estate, other than amounts in respect of the RCM Advance, accrued through the Effective Date (excluding any amounts paid as of August 31, 2006) will be allocated such that RCM will first provide up to $60 million, the Contributing Debtors will next provide up to $120 million and to the extent that such Claims exceed $180 million in the aggregate, RCM and the Contributing Debtors will bear the cost of such excess (the "Excess Priority Claims") equally. Notwithstanding the preceding sentence, the Contributing Debtors may fund the payment of any Pre-Conversion Administrative Claim Amounts if and to the extent that the RCM Trustee and the Contributing Debtors determine such funding necessary to facilitate Distributions in respect of such amounts on the Effective Date; *provided, however,* that any amounts so paid by the Contributing Debtors shall be deducted from the RCM Cash Distribution in a manner that causes RCM to ultimately bear the cost of the Pre-Conversion Administrative Claim Amounts. FXA shall be responsible for all of its Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, *provided*, *however*, that professional services (other than those related to FXA's claims resolution process and issues unique to FXA after the initial date of the filing of this Plan) and overhead allocable to FXA in the period between the Plan Filing Date and the Plan Effective Date shall be borne by RCM and the Contributing Debtors as set forth in the preceding sentence. Only Allowed Administrative Claims accrued from the Petition Date through the Plan Effective Date that were or are paid after August 31, 2006 shall be counted toward the sharing allocation of the preceding three sentences; provided that the Contributing Debtors shall alone bear the cost of repaying the RCM Advance. To the extent RCM is responsible for bearing amounts in respect of Excess Priority Claims, payment of such amounts shall be made from Cash otherwise available for the RCM Cash Distribution. Allowed Administrative

Claims incurred by the Contributing Debtors after the Effective Date shall be borne by the Contributing Debtors out of the Cash or value that would otherwise be paid to Holders of Allowed Contributing Debtors General Unsecured Claims. Allowed Administrative Claims incurred by RCM after the Effective Date shall be borne by RCM from the RCM Wind-Down Reserve, and, to the extent the RCM Wind-Down Reserve is not sufficient to pay such Allowed Administrative Claims, such Claims shall be paid directly by RCM out of the Cash or value that would otherwise be paid to Holders of Allowed Securities Customer Claims and RCM FX/Unsecured Claims as more particularly set forth in the RCM Settlement Agreement. Allowed Administrative Claims incurred by FXA after the Effective Date shall be borne by the FXA out of the Cash or value that would otherwise be paid to Holders of Allowed FXA General Unsecured Claims. All costs and expenses of administering the Litigation Trust described in section 5.7 shall be separately funded by the Litigation Trust and shall not be included in the calculation of the allocations of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims above.

5.17    *Additional RCM Claim*.    If, at the conclusion of the claims reconciliation process, (x) the total Allowed Contributing Debtors General Unsecured Claims are less than $394 million, and (y) the Distributions to be made to Holders of Allowed Contributing Debtors General Unsecured Claims would result in a recovery for such Holders in excess of 35% from the sum of the Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution, RCM shall be entitled to an additional Claim. Specifically, RCM shall be entitled to an additional Claim equal to the positive difference between $394 million minus the amount of the Allowed Contributing Debtors General Unsecured Claims. This "Additional RCM Claim" shall participate Pro Rata in all Distributions from Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims that exceed the 35% recovery threshold set forth in clause (y) above; *provided*, *however*, that such Additional RCM Claim shall not be subject to the 40% limit on Distributions set forth in the Contributing Debtors General Unsecured Distribution.

5.18    *Contributing Debtors BAWAG Proceeds*.    Notwithstanding the actual timing and source of any payments hereunder, so long as not inconsistent with the BAWAG Allocation Order, (i) a portion of BAWAG Guaranteed Proceeds equal to $100 million will be deemed to have been received by the Contributing Debtors and paid to the Secured Lenders under the Early Payment Order, (ii) a portion of BAWAG Guaranteed Proceeds equal to $150 million will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Senior Subordinated Note Claims, (iii) a portion of BAWAG Guaranteed Proceeds equal to $56.25 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims, and (iv) a portion of BAWAG Guaranteed Proceeds equal to $200 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by RCM or the Contributing Debtors and made available for Distribution to Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims. For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan. To the extent that a Holder of an Allowed Senior Subordinated Note Claim against the Contributing Debtors, a Holder of an Allowed Contributing Debtors General Unsecured Claim, a Holder of an Allowed RCM Securities Customer Claim or a Holder of an Allowed RCM FX/Unsecured Claim elects not to receive its allocable share of the Senior Subordinated Note Holder BAWAG Proceeds, the Contributing Debtors General Unsecured Proceeds or the RCM BAWAG Proceeds, as applicable, such portion of BAWAG Proceeds shall be returned to BAWAG in accordance with the BAWAG Settlement. For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan.

5.19    *Exemption from Transfer Taxes*.    Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of any contract, lease, or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer

tax, or other similar tax.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property, approved by the Bankruptcy Court on or prior to the Effective Date, shall be deemed to have been in furtherance of, or in connection with, the Plan.  Notwithstanding anything in this section of the Plan to the contrary, the exemption from taxes referenced in this section of the Plan shall only be to the extent permitted for under section 1146 of the Bankruptcy Code.

        **5.20**    ***RCM Settlement Agreement and Conversion***.  This Plan incorporates the RCM Settlement Agreement in its entirety.  On or prior to the Effective Date, the RCM Chapter 11 Case will, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code.  Any conversion of the RCM Chapter 11 Case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases.  Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of claims between the chapter 7 Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan. In the event that the RCM Estate does not convert to chapter 7, the Distributions to RCM's creditors shall be governed by the terms of the RCM Settlement Agreement and this Plan.

        **5.21**    ***Allowance of VR/Leuthold Guarantee Claims***. The VR/Leuthold Guarantee Claims shall be Allowed Contributing Debtors General Unsecured Claims (subject, however, to allowance of the underlying Claims against RCM) unless objected to by the Contributing Debtors prior to entry of the Confirmation Order.  No party other than the Contributing Debtors shall be authorized to object to or otherwise challenge the VR/Leuthold Guarantee Claims.  The Contributing Debtors will not object to or otherwise challenge the VR/Leuthold Guarantee Claims based on or related to any of the following theories or issues: the corporate structure or business practices of any of the Contributing Debtors; alter ego; substantive consolidation; fraud; or any other theories or causes of action similar to the foregoing. The Contributing Debtors, however, may object to the VR/Leuthold Guarantee Claims based on facts specific to a particular VR/Leuthold Guarantee Claim, including, but not limited to, objections based on Bankruptcy Code avoidance theories or challenges to the purported dollar amount of the asserted claims.

        **5.22**    ***Wind-Up of Non-Debtor Affiliates***.  All Non-Debtor Affiliates, other than the direct or indirect subsidiaries of RCM and Refco LLC, shall be wound up and dissolved as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to the Contributing Debtors and Refco LLC on account of intercompany balances (or equity dividends where applicable).  All Non-Debtor Affiliates that are direct or indirect subsidiaries of RCM shall be wound up as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to RCM on account of intercompany balances (or equity dividends where appropriate).  The direct and indirect subsidiaries of RCM shall be wound up and dissolved by the RCM Trustee and the remainder of the Non-Debtor Affiliates shall be wound up and dissolved by the Plan Administrator.

        **5.23**    ***FXCM***.  If not liquidated in advance of the Effective Date, RGL's 35% interest in FXCM shall become an interest of and be held by Reorganized Refco upon the merger of RGL into Reorganized Refco pursuant to section 5.1 of this Plan.  The Plan Administrator shall exercise all rights of Reorganized Refco in respect of the 35% interest in FXCM.  Notwithstanding the above, the FXCM Committee shall be formed to coordinate on all matters relating to the disposition or distribution of the 35% interest in FXCM.  If not formed as of the Effective Date pursuant to the Plan Support Agreement, the members of the FXCM Committee, other than the RCM Trustee, shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee).  All decisions in respect of the disposition or distribution of the 35% interest in FXCM shall be made by Reorganized Refco; *provided, however*, that no such decision shall be made by Reorganized Refco without first consulting with the FXCM Committee and, to the extent permitted by applicable law, obtaining the consent of the FXCM Committee.  Bylaws of the FXCM Committee shall be established by the FXCM Committee after its formation and shall be substantially in the form attached hereto as Exhibit J.

5.24    *Examiner*.  No provision of the Plan shall be construed as impairing the Examiner's investigation, and his authority to file his report in accordance with the provisions of the Examiner Order and the additional directions given by the Bankruptcy Court at the Hearing held on June 21, 2006, even if such investigation concludes, and such filing occurs, after the occurrence of the Effective Date.  Unless otherwise ordered by the Bankruptcy Court prior to the Effective Date, the procedures with respect to the filing and consideration of the Examiner's Fee Applications and Requests for Reimbursements of Expenses shall continue after the Effective Date in the same manner as prior to the Effective Date as provided in the Examiner Order.

5.25    *Transfer of Tranche B Litigation Trust Interests*.  In consideration of  the litigation expenses and potential delay avoided by the withdrawal of the objections to this Plan asserted by the Ad Hoc Equity Committee, the Beneficiaries of Tranche A Litigation Trust Interests (the RCM Estate, Holders of Allowed Contributing Debtors General Unsecured Claims and Holders of Allowed FXA General Unsecured Claims) shall be deemed to have transferred to each Holder of an Allowed Class 8 Old Equity Interest who has made a Private Actions Trust Election a Pro Rata share of  the Tranche B Litigation Trust Interests.

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1    *RCM Rights Distribution*.  On the Effective Date the Plan Administrator shall be deemed to have made the RCM Rights Distribution to the RCM Trustee and the Plan Administrator or the RCM Trustee, as the case may be, shall establish the RCM Distribution Reserve. Unless a Holder of an RCM FX/Unsecured Claim or RCM Securities Customer Claim has decided to not participate in the RCM Cash Distribution by electing not to (i) assign such Holder's RCM Related Claims, if any, to the Litigation Trust; (ii) affirm its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate shall be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing Claims against and equity Interests in the applicable Contributing Non-Debtor Affiliate, and (iii) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any, such Holder will receive its applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution.  Upon contribution of the RCM Related Claims against any Debtor to the Litigation Trust, such Claims will be deemed Allowed.

6.2    *Distributions for Claims Allowed as of the Effective Date*.  Except as otherwise provided herein or as ordered by the Bankruptcy Court, Distributions to be made on account of Claims against FXA, the Contributing Debtors or RCM that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable; *provided, however*, that the Disbursing Agent, on behalf of the Reorganized Debtors, shall not make Distributions to Holders of Allowed Claims (other than Allowed Secured Lender Claims) that are not Senior Subordinated Note Claims until all Reserves have been established and adequately funded in accordance with the terms of this Plan and the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution have been paid in full; *provided further, however*, that the RCM Trustee shall not be required to make Distributions until all RCM Reserves have been established and adequately funded in accordance with the terms of this Plan and the RCM Settlement Agreement.  Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

6.3    *Distributions of Proceeds of the Litigation Trust*.  Pursuant to the terms and conditions set forth in the Litigation Trust Agreement, the Litigation Trustee shall transfer all the Contributed Claims Recoveries to the Disbursing Agent or the RCM Trustee for Distribution in accordance with the provisions of this Plan and the RCM Settlement Agreement.

6.4    *Single Distribution*.  Except with respect to Allowed Secured Lender Claims and Senior Subordinated Note Claims, any Holder of a Claim asserted against more than one Debtor (or a Debtor and RCM), shall be entitled to a Distribution from only the Refco Entity with which such Holder was in privity or had another direct right to payment not predicated upon theories of fraud, piercing the corporate veil, alter ego, domination,

constructive trust or other equitable principles arising from a lack of knowledge of the true prepetition financial condition of the Refco Entities  (whether that results in Distribution from RCM, FXA, or the Contributing Debtors), and all RCM Related Claims and Other Related Claims shall be subordinated and shall receive no Distribution from the assets of the applicable Debtor or RCM, as the case may be, unless and until such time as all Allowed General Unsecured Claims (or in the case of RCM, all Allowed RCM Securities Customer Claims, Allowed RCM FX/Unsecured Claims and Allowed Leuthold Metals Claims) against the applicable Debtor or RCM, as the case may be, have been paid in full; *provided, however*, that (A) any Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by RCM, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from RCM under this Plan), (B) any Holder of a Contributing Debtors General Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by such Contributing Debtor, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the guaranteeing Contributing Debtor shall not be limited to the amount remaining after recovery from non-guaranteeing Contributing Debtor under this Plan) and (C) any Holder of a Claim against FXA with an independent Claim against the Contributing Debtors or RCM based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by FXA, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from FXA under this Plan).  In addition, subject to the earning of interest in respect of the Litigation Trust as set forth in section 5.7 of this Plan no Holder of a Claim against one or more Debtors (or a Debtor and RCM) shall receive a Distribution under the Plan that results in greater than a 100% recovery on such Holder's Claim (which, in the case of a Holder of both a primary Claim against a Debtor or RCM and a contractual guarantee from another Debtor or RCM, shall mean no more than a cumulative 100% recovery on the underlying Claim amount owed by the primary obligor).

**6.5**    *Accounts; Escrows; Reserves for the Reorganized Debtors*.  The Plan Administrator, on behalf of the Reorganized Debtors, in accordance with the provisions of the Plan Administrator Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan.  The Plan Administrator shall dispose of non-Cash assets of the Estates of the Reorganized Debtors, if any, in accordance with the provisions of the Plan and the Plan Administrator Agreement.

(a)    *Administrative/Priority Claims Reserve.*  On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator shall, subject to the provisions of section 5.16 hereof, create and fund the Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of the Contributing Debtors and FXA, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full.  The Plan Administrator may increase the amount of the Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the Claims Distribution Account.

(b)    *Disputed Claims Reserve.*

(i)    The Plan Administrator shall create and fund the Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Contributing Debtors General Unsecured Distribution or the FXA General Unsecured Distribution, as applicable, that would have been made to each Holder of a Disputed Claim against the Contributing Debtors or FXA if such Claim were an Allowed Contributing Debtors General Unsecured Claim or an Allowed FXA General Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided*, *however*, that the Debtors, the Plan Administrator or the

Reorganized Debtors may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)    The Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims against the Contributing Debtors or FXA whose Claims have become Allowed Claims.

(iii)    If any Cash or Litigation Trust Interests remains in the Disputed Claims Reserve after all Disputed Claims against the Contributing Debtors and FXA have been resolved, such remaining assets shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, the Plan Administrator may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)    The Plan Administrator shall maintain two sub-accounts within the Disputed Claims Reserve for (i) the Contributing Debtors and (ii) FXA.

(c)    *Wind-Down Reserves.*  On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator, on behalf of the Reorganized Debtors, shall create and fund the Wind-Down Reserve with sufficient Cash to administer the Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals.  The Plan Administrator may make reasonable adjustments to the Wind-Down Reserve as necessary.  Any Cash in the Wind-Down Reserve which is unnecessary for the administration of the Plan shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution to Holders of Allowed Claims against the Contributing Debtors or FXA, as applicable, in accordance with the terms hereof.

**6.6    *Accounts; Escrows; Reserves for the Post-Confirmation RCM*.**  The RCM Trustee, on behalf of Post-Confirmation RCM, in accordance with the provisions of the RCM Settlement Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, RCM Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan.  The RCM Trustee shall dispose of non-Cash assets of the RCM Estate, if any, in accordance with the provisions of the Plan and the RCM Settlement Agreement and applicable law.

(a)    *RCM Administrative/Priority Claims Reserve*.  On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee shall, subject to the provisions of section 5.16 hereof, create and fund the RCM Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of RCM, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full.  The RCM Trustee may increase the amount of the RCM Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the RCM Claims Distribution Account.  If the Chapter 11 Case of RCM is converted to a case in chapter 7, prior to any conversion the RCM Trustee shall be entitled to set aside appropriate reserves for Administrative Claims incurred or to be incurred prior to conversion, with the amounts of such Administrative Claims to be payable from the reserves upon allowance of the Claims therefor so long as the RCM Trustee has determined that there are or will be sufficient funds available to pay all Administrative Claims of the chapter 7 case.

(b)    *RCM Disputed Claims Reserve.*

(i)    The RCM Trustee shall create and fund the RCM Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Distribution that would have been made to each holder of a Disputed Claim against RCM if such Claim were an Allowed RCM Securities Customer Claim or RCM FX/Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however,* that the RCM, Post-Confirmation RCM or the RCM Trustee may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)    The RCM Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the RCM Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims whose Claims against RCM have become Allowed Claims.

(iii)    If any Cash or Litigation Trust Interests remain in the RCM Disputed Claims Reserve after all Disputed Claims against RCM have been resolved, such remaining amounts shall be transferred to Post-Confirmation RCM for Distribution in accordance with the terms of the Plan and the RCM Settlement Agreement.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim against RCM, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however,* that, if the estimate constitutes the maximum limitation on such Claim, the RCM Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)    The RCM Trustee shall maintain sub-accounts within the RCM Disputed Claims Reserve for RCM Securities Customer Claims and RCM FX/Unsecured Claims.  Each sub-account shall be further subdivided for Assets in Place and Additional Property (each as defined in the RCM Settlement Agreement).  The RCM Trustee may maintain such other reserves as are permitted by the RCM Settlement Agreement.

(v)    Distributions of Additional Property under the RCM Settlement Agreement on behalf of RCM Securities Customer Claims and RCM FX/Unsecured Claims shall be made Pro Rata (as such term is defined in the RCM Settlement Agreement).  True up Distributions (as defined in the RCM Settlement Agreement)  shall be made from time to time from Additional Property as determined by the RCM Trustee.  The RCM Reserves shall take into account the requirement to true up with respect to Pro Rata (as defined in the RCM Settlement Agreement) shares of Additional Property.

(c)    *RCM Distribution Reserve.*  On the Effective Date, the Plan Administrator shall create and fund the RCM Distribution Reserve.  Each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the Plan Administrator with an RCM Related Claim Subordination Form shall receive from the Plan Administrator on the next available Distribution Date its allocable share (as determined by the RCM Trustee consistent with their elections) of the RCM Distribution Reserve (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot); *provided, however*, if the RCM Settlement Agreement is amended prior to the Confirmation Hearing so as to permit the RCM Trustee to receive conditional Distributions of Additional Property (as defined in the RCM Settlement Agreement) and to not require an immediate distribution of all assets received by the RCM Trustee to Holders of Allowed Claims against RCM, any amounts that would have been held in the RCM Distribution Reserve shall be transferred to the RCM Trustee who shall then distribute such funds on the next available Distribution Date to each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the RCM Trustee with an RCM Related

Claim Subordination Form (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot).  In the event that any Holder of an RCM Related Claim has not provided an RCM Related Claim Subordination Form, but the RCM Related Claim of such Holder is subsequently expunged by objection of the Plan Administrator, the reserve in respect of such Claim shall be distributed (net of costs of expunging the RCM Related Claim) by the RCM Trustee or the Plan Administrator, as applicable, Pro Rata (as defined in the RCM Settlement Agreement) to such Holder and to those Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that provided the Plan Administrator or the RCM Trustee, as applicable, with an RCM Related Claim Subordination Form.  In the event that any RCM Related Claim becomes an Allowed Claim, the reserve in respect of such Claim shall be deposited in the Claims Distribution Account for Distribution in accordance with the terms of this Plan.

(d)    *RCM Wind-Down Reserve.*  On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee or the Plan Administrator, as the case may be, on behalf of Post-Confirmation RCM, shall create and fund the RCM Wind-Down Reserve with sufficient Cash from the RCM Cash Distribution to administer the Plan and the RCM Settlement Agreement, including, but not limited to, compensation of the RCM Trustee and RCM Administrative Professionals.  The RCM Trustee may make reasonable adjustments to the RCM Wind-Down Reserve as necessary.  Any Cash in the RCM Wind-Down Reserve which is unnecessary for the administration of the Plan and the RCM Settlement Agreement shall be transferred to Post-Confirmation RCM for Distribution to Holders of Allowed Claims against RCM in accordance with the terms hereof.

**6.7    *Interest and Penalties on Claims***.  Unless otherwise specifically provided for in this Plan, the Confirmation Order or another order of the Court (including, without limitation, the Early Payment Order), or if required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

**6.8    *Distributions by Disbursing Agent and RCM Trustee***.  All Distributions under the Plan on behalf of the Reorganized Debtors shall be made by the Disbursing Agent at the direction of the Plan Administrator and all Distributions under the Plan and the RCM Settlement Agreement on behalf of RCM shall be made by the RCM Trustee.  The Disbursing Agent and the RCM Trustee shall be deemed to hold all property to be distributed by each hereunder in trust for Persons entitled to receive the same.  The Disbursing Agent and the RCM Trustee shall not hold an economic or beneficial interest in such property.

**6.9    *Delivery of Distributions and Undeliverable or Unclaimed Distributions***.

(a)    *Delivery Of Distributions In General.*  Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' or RCM's records unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001; *provided*, *however*, Distributions on account of Senior Subordinated Note Claims shall be made to the Senior Subordinated Note Indenture Trustee who shall, in turn, administer such Distributions to the Holders of Senior Subordinated Note Claims in accordance with the terms of the Senior Subordinated Note Indenture.  The Senior Subordinated Note Indenture Trustee shall be authorized but not required to effect any Distribution under the Plan through the book entry transfer facilities of The Depositary Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution.  Distributions on account of Secured Lender Claims shall be made to the Secured Lender Agent, who shall in turn administer such Distributions in accordance with the terms of the Credit Agreement.

(b)    *Undeliverable and Unclaimed Distributions.*

(i)    *Holding and Investment of Undeliverable and Unclaimed Distributions.*  If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent or the RCM Trustee, as applicable, as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent or the RCM Trustee, as applicable, is notified in writing of such Holder's then current address.  Undeliverable and unclaimed Distributions shall be deposited in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as the case may be, until

such time as a Distribution becomes deliverable or is unclaimed in accordance with this section of the Plan. The accounts for the Unclaimed Distribution Reserve and RCM Unclaimed Distribution Reserve may be interest-bearing accounts, provided that any interest accruing on funds in the Unclaimed Distribution Reserve shall be transferred to the Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof and any interest accruing on funds in the RCM Unclaimed Distribution Reserve shall be transferred to the RCM Trustee for Distribution in accordance with the terms of this Plan and the RCM Settlement Agreement.

(ii)    *After Distributions Become Deliverable*.  The Disbursing Agent or RCM Trustee, as applicable, shall make all Distributions that have become deliverable or have been claimed since the Effective Date or the next Quarterly Distribution Date as soon as practicable after such Distribution has become deliverable.

(iii)    *Failure to Claim Undeliverable Distributions*.  Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed Distribution within one year after the applicable date of Distribution shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtors, RCM or their Estates, the Reorganized Debtors, the Plan Administrator, Post-Confirmation RCM, the RCM Trustee or their property.  In such cases, any Cash in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as applicable, for Distribution on account of such Claims for undeliverable or unclaimed Distributions shall become the property of the applicable Estate free of any restrictions thereon. Such unclaimed or undeliverable funds shall be transferred to the Reorganized Debtors or Post-Confirmation RCM, as applicable, to be distributed in accordance with the terms of the Plan or the RCM Settlement Agreement.  Nothing contained in this Plan, the Plan Administrator Agreement or the RCM Settlement Agreement shall require the Disbursing Agent or the RCM Trustee to attempt to locate any Holder of an Allowed Claim.

(c)    *Time Bar to Cash Payments*.  Checks issued by the Disbursing Agent or the RCM Trustee, as applicable, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent or the RCM Trustee, as applicable, by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors or RCM, as the case may be, shall retain all monies related thereto for the sole purpose of redistribution to Holders of Allowed Claims or Interests in accordance with the terms of this Plan and the RCM Settlement Agreement, as applicable.

**6.10**    ***Record Date for Distributions***.  With respect to all Claims except Senior Subordinated Note Claims, the Disbursing Agent or the Plan Administrator or the RCM Trustee, as applicable, shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes herein to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.  No Distribution Record Date shall be established for Distributions on account of Senior Subordinated Note Claims.

**6.11**    ***Distributions to Holders of Senior Subordinated Note Claims***.  As a condition precedent to receiving any Distribution under this Plan on account of an Allowed Senior Subordinated Note Claim, the registered Holders (as defined in the Senior Subordinated Note Indenture) of such Senior Subordinated Note Claim shall surrender any certificate(s) evidencing such Senior Subordinated Note Claim in accordance with written instructions to be provided to such registered Holders (as defined in the Senior Subordinated Note Indenture) and the Senior Subordinated Note Indenture Trustee by the Plan Administrator (in consultation with the Senior Subordinated

Note Indenture Trustee, and consistent with customary market practice), unless waived in writing by the Debtors or the Plan Administrator.

**6.12** *Senior Subordinated Notes Indenture Trustee as Claim Holder*. Consistent with Bankruptcy Rule 3003(c), the Debtors or the Plan Administrator, as the case may be, shall recognize a proof of claim filed by the Senior Subordinated Notes Indenture Trustee in respect of the Senior Subordinated Notes Claims. Accordingly, any Senior Subordinated Note Claim, proof of which is filed by the registered or beneficial Holder of a Senior Subordinated Note Claim, may be disallowed as duplicative of any Senior Subordinated Note Claims of the Senior Subordinated Notes Indenture Trustee, without need for any further action or Bankruptcy Court order. For the avoidance of doubt, the Senior Subordinated Notes Indenture Trustee shall be authorized to distribute amounts received in respect of Senior Subordinated Note Holder Distributions.

**6.13** *Allocation of Plan Distributions Between Principal and Interest*. Except for Distributions made in respect of Allowed Secured Lender Claims, which shall be made in accordance with the Credit Agreement, to the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**6.14** *Means of Cash Payment*. Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Plan Administrator or the RCM Trustee, as applicable, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Plan Administrator or the RCM Trustee, as applicable. Cash payments to foreign creditors may be made, at the option of the Plan Administrator or the RCM Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**6.15** *Withholding and Reporting Requirements*. In connection with this Plan and all Distributions thereunder, the Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, on behalf of the Reorganized Debtors, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent, the Plan Administrator and the RCM Trustee, on behalf of the Reorganized Debtors and RCM, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

**6.16** *Setoffs*. Unless prohibited by the terms of this Plan or any other Plan Document, the Plan Administrator on behalf of the Reorganized Debtors or the RCM Trustee on behalf of Post-Confirmation RCM, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever (other than the Released/Subordinated Claims) that the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or Post-Confirmation RCM of any such claim that the Debtors, RCM, Post-Confirmation RCM or the Reorganized Debtors may have against such Holder.

**6.17** *Fractional Dollars*. Notwithstanding any other provision of the Plan, the Plan Administrator Agreement or the RCM Settlement Agreement, none of the Plan Administrator, the Reorganized Debtors, the RCM Trustee or RCM, as applicable, shall be required to make Distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**6.18** *Release of Liens*. Except as otherwise provided in this Plan or in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, all mortgages, deeds of trust, liens, pledges, or other security interests (collectively, the "Mortgages") in and against the property of any Estate automatically shall be fully released and discharged, and all such property shall be free and

clear of all such Mortgages. Nothing in the Plan shall be deemed, asserted or construed to affect the Senior Subordinated Notes Indenture Trustee Charging Lien.

# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1     *Rejected Contracts and Leases*.**  Except as otherwise provided in the Confirmation Order, the Plan, or in any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is identified in Exhibit D to this Plan as a contract or lease to be assumed; *provided*, *however*, that the Debtors may amend such exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.2     *Bar to Rejection Damages*.**  If the rejection of an executory contract or unexpired lease pursuant to section 7.1 above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Reorganized Debtors, the Plan Administrator, or their respective successors or properties unless a proof of Claim is filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

**7.3     *Assumed and Assigned Contracts and Leases*.**  Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code assuming, as of the Effective Date, those executory contracts and unexpired leases listed on Exhibit D to this Plan; *provided*, *however*, that the Debtors may amend such Exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.4     *Compensation and Benefit Programs*.**  All Employee Benefit Plans, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date shall be deemed to be, and shall be treated as if they were, executory contracts that are subject to rejection in accordance with section 7.1 of the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code).

**7.5     *Treatment of RCM Executory Contracts and Unexpired Leases*.**  Notwithstanding the preceding sections of this Article VII, the RCM Trustee shall determine the appropriate treatment for the executory contracts and unexpired leases of RCM in accordance with applicable law and the RCM Settlement Agreement.

# ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**8.1     *Objection Deadline; Prosecution of Objections*.**  Subject to section 5.21 of this Plan, no later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the Plan Administrator on behalf of the Reorganized Debtors, after consultation with the Plan Committee, may file objections to Claims or Interests against FXA and the Contributing Debtors that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made.  No later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the RCM

Trustee on behalf of Post-Confirmation RCM may file objections to Claims or Interests against RCM that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. Nothing contained herein, however, shall limit the ability of the Plan Administrator or the RCM Trustee, as applicable, to object to Claims or Interests, if any, filed or amended after the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable. Subject to limitations set forth in the Plan Administrator Agreement and the Plan, as applicable, the Plan Administrator shall be authorized to, and shall, dispose of all Disputed Claims or Interests by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court as may have jurisdiction the validity, nature, and/or amount thereof. The RCM Trustee shall have sole discretion and authority to object to any RCM Claims or Interests in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

**8.2    *No Distributions Pending Allowance*.** Notwithstanding any other provision of this Plan, no payments or Distributions shall be made with respect to any disputed portion of a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest have been settled or withdrawn or have been determined by Final Order and the Disputed Claim or Interest, or some portion thereof, has become an Allowed Claim or Interest.

**8.3    *Distributions After Allowance*.** The Disbursing Agent on behalf of the Reorganized Debtors and the RCM Trustee on behalf of RCM shall make payments and Distributions from the Disputed Claims Reserve and the RCM Disputed Claims Reserve, as applicable, to the Holder of any Disputed Claim or Interest that has become an Allowed Claim or Interest, or any portion of which has become Allowed, on the first Quarterly Distribution Date following the date that such Disputed Claim or Interest becomes an Allowed Claim. Such Distributions shall be made in accordance with the Plan, the Plan Administrator Agreement and the RCM Settlement Agreement, as applicable.

# ARTICLE IX

# CONFIRMATION AND CONSUMMATION OF THE PLAN

**9.1    *Conditions to Confirmation*.**

(a)    The Confirmation Order shall be reasonably acceptable in form and substance to the Plan Proponents (and with respect to any matter affecting the Secured Lender Agent and/or the Secured Lenders, the Secured Lender Agent);

(b)    The Confirmation Date of this Plan shall have occurred on or before December 15, 2006; and

(c)    The Plan Proponents shall have determined and shall have filed with the Bankruptcy Court a notice confirming that the Allotted Administrative Claims are not reasonably expected to exceed, in the aggregate, $180 million;

(d)    Houlihan and Capstone shall have each filed with the Bankruptcy Court in advance of the Voting Deadline, its respective RCM Projection and Contributing Debtors Projection.

(e)    Either (i) both of the Houlihan and Capstone RCM Projections shall be equal to or exceed $430 million, or (ii) in the event that one such RCM Projection is less than $430 million and the other is equal to or exceeds $430 million, the Bankruptcy Court (after reviewing both RCM Projections and the assumptions therein) shall have determined that the appropriate RCM Projection is equal to or exceeds $430 million; and

(f)    Either (i) both of the Houlihan and Capstone Contributing Debtors Projections shall be equal to or exceed $64 million, or (ii) in the event that one such Contributing Debtors Projection is less than $64 million and the other is equal to or exceeds $64 million, the Bankruptcy Court (after reviewing both RCM

Projections and the assumptions therein) shall have determined that the appropriate Contributing Debtors Projection is equal to or exceeds $64 million.

**9.2    *Conditions to Effective Date*.**  The Plan Proponents shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Plan Proponents in accordance with the terms hereof prior to December 31, 2006:

(a)    The Confirmation Order, in form and substance reasonably satisfactory to the Plan Proponents, shall have been entered and not thereafter stayed, reversed or vacated and shall, among other things, provide that:

(i)    the Debtors, the Plan Administrator, on behalf of the Reorganized Debtors, and the RCM Trustee on behalf of Post-Confirmation RCM are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; and

(ii)    the provisions of the Confirmation Order are non severable and mutually dependent.

(b)    Unless the condition set forth in paragraph 15(a) of the Early Payment Order that the Early Payment Order shall have become a Final Order in full force and effect shall have been waived in accordance therewith, the Early Payment Order shall have become a Final Order and shall be in full force and effect;

(c)    The RCM Settlement Agreement shall have been approved by the Bankruptcy Court and shall have become effective by satisfaction of all conditions to effectiveness therein.

(d)    All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(e)    The Secured Lender Payment Date shall have occurred; and

(f)    The Debtors shall have sufficient Cash to make all required payments to be made on the Effective Date.

(g)    All amounts owed, as of the Effective Date, to the Secured Lender Agent and/or any Secured Lender pursuant to paragraph 12 of the Early Payment Order shall have been paid in full.

**9.3    *Waiver of Conditions*.**  Each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the Plan Proponents by agreement, without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided, however,* in the event that such waiver is not unanimous, the waiving Plan Proponents shall be required to obtain approval of the Bankruptcy Court to effect such waiver, following notice and a hearing and; *provided further,* the conditions set forth in the parenthetical of section 9.1(a) and sections 9.2(b), (e) and (g) hereof shall not be waived without the consent of the Secured Lender Agent and Secured Lenders that hold the number and amount of Secured Lender Claims required to accept a plan pursuant to section 1126(c) of the Bankruptcy Code (as if, for purposes of this paragraph, such Secured Lender Claims were impaired).  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Plan Proponents.  The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**9.4    *Consequences of Non-Occurrence of Effective Date*.**  In the event that the Effective Date does not timely occur, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court

directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan, other than those contained in the RCM Settlement Agreement, be null and void.  In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of 60 days after the date the Confirmation Order is vacated, without prejudice to further extensions.

## ARTICLE X

## EFFECT OF PLAN CONFIRMATION

10.1    ***Binding Effect***.  This Plan, and all compromises and settlements contemplated hereby or incorporated by reference herein, shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors and any Chapter 7 trustee appointed to administer any of the Estates.

10.2    ***Releases***.

(a)    ***Releases by the Debtors and RCM.***  **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and RCM (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, RCM, Post-Confirmation RCM, the Chapter 11 Cases, this Plan, the Disclosure Statement or the RCM Settlement Agreement and that could have been asserted by or on behalf of the Debtors, RCM,  their Estates, the Reorganized Debtors or Post-Confirmation RCM, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in any such case, against the Released Parties.  For the avoidance of doubt, Released/Subordinated Claims shall include any and all claims and causes of action against the Released Parties, acting in such capacity, arising from or relating to (w) the Debtors' and RCM's centralized cash management system and intercompany transfers other than the RCM Intercompany Claim and Intercompany Claims with respect to Non-Debtor Affiliates, (x) the leveraged recapitalization in August 2004, (y) the initial public offering, and any related transactions effectuated in August 2005/September 2005, and (z) any transfer or payment made in respect of the Credit Agreement or the Senior Subordinated Note Indenture, including any redemption of Senior Subordinated Notes, which shall include any Claim or cause of action arising therefrom pursuant to sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.**

(b)    ***Releases by Holders of Claims and Interests in Respect of Released Parties***.  **On the Effective Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities (other than the right to enforce Released Parties' obligations under the Plan, the Confirmation Order, and the contracts, instruments, releases, agreements, and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the**

Effective Date in any way relating to the Debtors, RCM the Chapter 11 Cases, the Plan, or the Disclosure Statement, in any such case, against the Released Parties.

(c)     *Releases and Subordination by Holders of Claims and Interests in Respect of Contributing Non-Debtor Affiliates and Contributing Non-Debtor Affiliate Management.*  On each Contributing Non-Debtor Affiliate Trigger Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution under the Plan in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to (a) subordinate all claims of the type described in section 10.2(b) against the applicable Contributing Non-Debtor Affiliate to all other existing claims against and equity interests in such Contributing Non-Debtor Affiliate, and (b) release all claims of the type described in section 10.2(b) against parties who are Contributing Non-Debtor Affiliate Management of such Contributing Non-Debtor Affiliate; *provided, however*, that the RCM Trustee, with the consent of the Plan Committee, may deem any subordination referenced in this section 10.2(c) to be a "release" of claims (and may request the Bankruptcy Court to enter an Order confirming the same) to the extent the RCM Trustee determines such a release necessary to ensuring that the applicable Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash to the Contributing Debtors and RCM or, if insufficient Cash will be available for Distribution to RCM and the Contributing Debtors, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors.

(d)     *Qualifying Plan Releases*.  In order to obtain for the estates of the Debtors the full benefits of the Early Payment Order, including the final allowance of Secured Lender Indemnification Claims at zero for purposes of the Chapter 11 Cases pursuant to paragraph 9(a) and (b) of the Early Payment Order, any Secured Lender Released Claims not previously released under the Early Payment Order are hereby fully, finally and forever released as of the Effective Date.  For the avoidance of doubt, the releases provided under this section 10.2(d) of the Plan shall be interpreted such that their scope will satisfy the requirements under the Early Payment Order for the Plan to be a Qualifying Plan thereunder.

(e)     *Releases by Recipients of BAWAG Proceeds*.  On the Effective Date, or in the case of Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims, the later of the Effective Date and the date at which an RCM Related Claim Subordination Form is provided (i) each Holder of a Secured Lender Claim, (ii) each Holder, that has not affirmatively exercised its option to be excluded from any Distribution of BAWAG Proceeds prior to the Voting Deadline, of (A) a Senior Subordinated Note Claim, or (B) a Contributing Debtors General Unsecured Claim, or (iii) each Holder, that has provided an RCM Related Claim Subordination form electing to receive RCM BAWAG Proceeds, of (A) an RCM Securities Customer Claim or (B) an RCM FX/Unsecured Claim, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities against BAWAG, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way arising from or relating to Refco or the RGHI Entities (each as defined in the BAWAG Settlement), and any transactions involving such parties, including, but not limited to, claims or actions arising from or related to (a) the allegations set forth in the Complaint and the Counterclaim (each as defined in the BAWAG Settlement), (b) the allegations set forth in the Adversary Proceeding (as defined in the BAWAG Settlement), or (c) any allegations that could have been made by any of the Refco Parties (as defined in the BAWAG Settlement); *provided however,* that pursuant to the Securities Class Action Stipulation, any Holder of a Claim or Interest against the Debtors, that is also a member of the securities class action class described in the Securities Class Action Stipulation may, assuming approval of the Securities Class Action Stipulation (and the settlement contained therein), elect to receive BAWAG Proceeds without releasing BAWAG of its Securities Class Action claims as set forth in this subparagraph.

(f)     *Injunction Related to Releases*.  The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively, or otherwise, of any

**claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this Plan or the Early Payment Order, including, but not limited to, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released in this section of the Plan. For the avoidance of doubt, neither the Litigation Trust nor the Private Actions Trust shall bring any action to recover on any Released/Subordinated Claims. Notwithstanding any provision contained herein or any provision in any documents incorporating or implementing in any manner the Plan to the contrary, nothing in this Plan or the transactions approved hereby is intended to or shall release any non debtor of any liabilities or obligations to the United States of America or its agencies or subdivisions (the "United States"), nor shall it enjoin or bar any claim by the United States against any Non-Debtor Affiliate.**

**10.3    *Exculpation and Limitation of Liability*.** To the maximum extent permitted by the Bankruptcy Code and applicable law, none of the (a) Debtors, (b) RCM, (c) the Reorganized Debtors, (d) the Plan Administrator, (e) any professionals retained by the Debtors or the RCM Trustee pursuant to an order of the Bankruptcy Court, (f) the Committees (including any present and former members thereof), (g) the RCM Trustee, (h) the parties to the RCM Settlement Agreement and the Plan Support Agreement (in such capacities), (i) the Post-Petition Management, (j) Post-Confirmation RCM, (k) the chapter 7 trustee appointed in Refco LLC's chapter 7 case, (l) AlixPartners, (m) the members of the Portfolio Management Advisory Committee and the Plan, Negotiation, and Litigation Advisory Committee, in each case, established under the RCM Settlement Agreement and in each case acting in such capacities, (n) the Ad Hoc Equity Committee, (o) the Ad Hoc Committee of Senior Subordinated Note Holders. (p) the Senior Subordinated Note Indenture Trustee in its role of effectuating Distributions to Holders of Senior Subordinated Notes nor (q) any of their respective representatives, agents, officers, directors, employees, advisors, or attorneys shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the RCM Settlement Agreement or, if on or prior to the Effective Date, RCM's Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7, related to, or arising out of, the chapter 7 case, formulating, negotiating, or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

**10.4    *No Discharge of Claims; Injunction*.**

(a)    Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Contributing Debtors, FXA and RCM; provided, however, that no holder of a Claim against or Interest in any Contributing Debtor, FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against the Estates of any Contributing Debtor, FXA or RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their respective properties, except as expressly provided herein. Accordingly, except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold, or may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM, the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined from taking any of the following actions against any of the Contributing Debtors, FXA, RCM, the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that (x) nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of this Plan and (y) the preliminary injunction of actions against the Contributing Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property (if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized Debtors and Post-Confirmation RCM and completion of the winding up of their affairs. Notwithstanding anything to the contrary set

forth in this Plan, creditors' rights of setoff and recoupment are preserved, and the injunctions referenced in this section or section 10.5 of the Plan shall not enjoin the valid exercise of such rights of setoff and recoupment.

> (b)    By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in this Article X.

**10.5    *Term of Bankruptcy Injunction or Stays*.**  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all of the property of the Estates of the Contributing Debtors, FXA, the Reorganized Debtors and Post-Confirmation RCM have been distributed and the Contributing Debtors and the Reorganized Debtors have been merged into the Reorganized Debtors, dissolved or otherwise liquidated, as the case may be, in accordance with the terms of the Plan or any Plan Document, and the Estate of Post-Confirmation RCM shall have been fully administered and the RCM Trustee discharged from his duties; *provided, however*, that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court), shall be continued without modification, notwithstanding anything to the contrary contained in this Plan.

**10.6    *Continuation of Forex Adversary*.**  Notwithstanding any provision herein to the contrary, neither this Plan nor any contract, instrument, release, agreement or document executed or delivered in connection therewith, nor the occurrence of the Effective Date (i) shall release, waive or discharge any of the claims or causes of action asserted in that certain adversary proceeding styled Forex Trading, LLC and The Ad Hoc Refco F/X Customer Committee v. Refco F/X Associates, LLC and Refco Capital Markets, Ltd., Adv. Proc. No. 06-01748 (RDD) (the "Forex Adversary") against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property, and/or (ii) shall permanently or preliminarily enjoin, prohibit or prevent in any way the continuation and/or prosecution of the Forex Adversary and the claims and causes of action asserted therein against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property; and all such claims and causes of action, as well as any and all defenses and counterclaims of FXA and RCM (including, without limitation, FXA's right to argue that the constructive trust claim asserted against RCM in the Forex Adversary belongs to FXA and not Forex Trading LLC or the Ad Hoc Refco F/X Customer Committee, as defined in the Forex Adversary), are hereby expressly preserved.

## ARTICLE XI

## RETENTION OF JURISDICTION

**11.1    *Exclusive Jurisdiction of the Bankruptcy Court*.**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases, this Plan and the RCM Settlement Agreement to the fullest extent permitted by law, including, among other things, jurisdiction to:

> (a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Allowed Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

> (b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

(c)    Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor or RCM is a party or with respect to which any Debtor or RCM may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(d)    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the RCM Settlement Agreement, as applicable;

(e)    Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors or RCM that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(f)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the RCM Settlement Agreement and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the RCM Settlement Agreement, the Disclosure Statement or the Confirmation Order;

(g)    Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or the RCM Settlement Agreement or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan the RCM Settlement Agreement or any entity's rights arising from or obligations incurred in connection with this Plan the RCM Settlement Agreement;

(h)    Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any other Plan Document, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(i)    Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Confirmation Date the payment of fees and expenses of the Reorganized Debtors and the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(j)    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(k)    Hear and determine causes of action by or on behalf of the Contributing Debtor, FXA, RCM, the Reorganized Debtors, the Litigation Trustee, the Private Actions Trustee or Post-Confirmation RCM;

(l)    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or Distributions pursuant to this Plan are enjoined or stayed;

(n)    Determine any other matters that may arise in connection with or relate to this Plan, the RCM Settlement Agreement, the Disclosure Statement, the Confirmation Order or any other Plan Document;

(o)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or any subsequent chapter 7 case, as applicable (which jurisdiction shall be non-exclusive except as otherwise provided by Titles 11 and 28 of the United States Code);

(p)     Hear and determine all matters related to (i) the property of the Estates of the Reorganized Debtors and Post-Confirmation RCM from and after the Confirmation Date, (ii) the winding up of the Debtors' and RCM's affairs, and (iii) the activities of the Plan Administrator and the RCM Trustee, including (A) challenges to or approvals of the Reorganized Debtors', the Plan Administrator's, the RCM Trustee's or Post-Confirmation RCM's activities, (B) resignation, incapacity, or removal of the Plan Administrator or the RCM Trustee and selection of a successor, (C) reporting by, termination of, and accounting by the Reorganized Debtors, the Plan Administrator, the RCM Trustee and Post-Confirmation RCM, and (D) release of the Plan Administrator or the RCM Trustee from their duties;

(q)     Hear and determine disputes with respect to compensation of (i) the Reorganized Debtors' and Post-Confirmation RCM's professional advisors and (ii) the Plan Administrator, the RCM Trustee, the Litigation Trustee, the Private Actions Trustee and their professional advisors;

(r)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(s)     Enter an order closing the Chapter 11 Cases or chapter 7 case of RCM, if any, as applicable.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.1     *Effectuating Documents and Further Transactions*.**  Each of the Debtors, RCM,  the Plan Administrator on behalf of the Reorganized Debtors and the RCM Trustee on behalf of Post-Confirmation RCM shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**12.2     *Corporate Action*.**  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, members, directors or managers of one or more of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM are incorporated or formed without any requirement of further action by the stockholders, members, directors or managers, as applicable, of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM.

**12.3     *Bar Dates for Certain Claims*.**

(a)     *Administrative Claims.*  The Confirmation Order shall establish an Administrative Claims Bar Date for filing Administrative Claims against all Debtors and RCM which date shall be thirty (30) days after the Effective Date.  Holders of asserted Administrative Claims not paid prior to the Confirmation Date shall submit requests for the payment of administrative expenses on or before such Administrative Claims Bar Date or forever be barred from doing so.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) shall set forth such date and constitute notice of this Administrative Claims Bar Date.  The Reorganized Debtors and the RCM Trustee shall have until the Administrative Claims Objection Deadline to object to such claims.

(b)    *Professional Fee Claims.*  All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date shall file and serve on the Reorganized Debtors and counsel for the Reorganized Debtors and on the RCM Trustee and his counsel an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, the RCM Trustee and his counsel, and the requesting Professional or other entity no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for compensation or reimbursement was served.  Upon the Confirmation Date, any requirement that Professionals comply with sections 328, 330, or 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  Professional Fee Claims relating to fees and expenses incurred after the Effective Date shall be paid in the ordinary course of business.

(c)    *Professional Fee Holdback.*  Within 10 calendar days prior to the Confirmation Hearing, each Professional shall provide to the Plan Proponents (with a copy to the Fee Committee) a notice of Professional Fee Claim containing (i) a disclosure of fees and expenses incurred, unbilled and unpaid in the Chapter 11 Cases, including any amounts that may be sought by any Professional as an enhancement of the fees billed by it in the Chapter 11 Cases based on the results achieved in the Chapter 11 Cases  and (ii) an estimate of additional fees and expenses expected to be incurred by each such Professional through the Effective Date (in the aggregate, the "Professional Fee Claims").  On the Effective Date, the Reorganized Debtors and Post-Confirmation RCM shall fund an escrow account consisting of 110% of (x) the amount of any holdbacks on previously billed and paid amounts and (y) the amount of the Professional Fee Claims estimated in (ii) of the first sentence of this subparagraph 12.3(c).  Amounts held in such escrow account shall be used to pay amounts not previously paid and subsequently allowed by the Bankruptcy Court following compliance with the interim compensation procedures established by the Bankruptcy Court in these Chapter 11 Cases and/or a hearing on the Professionals' final fee applications.  When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to the Reorganized Debtors and Post-Confirmation RCM.

**12.4**    *Payment of Statutory Fees*.  All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM shall remain liable for any quarterly fees validly due and owing to the United States Trustee under 28 U.S.C. § 1930 through and including such dates that their respective Chapter 11 Cases are converted to cases under chapter 7, dismissed, or closed.

**12.5**    *Amendment or Modification of the Plan*.  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan; *provided, however*, that no such alteration, amendment or modification shall conflict with any Final Order (including, without limitation, the Early Payment Order).  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**12.6**    *Severability of Plan Provisions*.  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.7    *Successors and Assigns*.**  This Plan shall be binding upon and inure to the benefit of the Debtors, RCM, and their respective successors and assigns, including, without limitation, any chapter 7 trustee subsequently appointed.  The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**12.8    *Revocation, Withdrawal, or Non-Consummation*.**  The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects, (ii) except as provided in sections 12.15 and 12.16 of the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Proponents or any other Person, (B) prejudice in any manner the rights of the Plan Proponents or any Person in any further proceedings involving the Plan Proponents, or (C) constitute an admission of any sort by the Plan Proponents or any other Person.

**12.9    *Notice*.**  All notices, requests, and demands to or upon the Reorganized Debtors and Post-Confirmation RCM to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> SKADDEN, ARPS, SLATE, MEAGHER
>     & FLOM LLP
> Four Times Square
> New York, New York  10036-6522
> Telephone:  (212) 735-3000
> Facsimile:  (212) 735-2000
> Att'n:    J. Gregory Milmoe, Esq.
>             Sally McDonald Henry, Esq.
>             J. Gregory St. Clair, Esq.
>
> Attorneys for Debtors and Debtors-in-Possession
>
>
> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Telephone: (212) 530-5000
> Facsimile: (212) 530-5219
> Att'n:    Luc A. Despins
>             Susheel Kirpalani
>             Dennis C. O'Donnell
>
> Counsel for the Official Committee of Unsecured Creditors of Refco Inc., *et al.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile:
Att'n:    David S. Rosner
          Andrew K. Glenn
          Jeffrey R. Gleit

Counsel for Additional Committee of Unsecured Creditors of Refco Inc., *et al.*

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
Att'n:    Tina L. Brozman
          Timothy B. DeSieno
          Mark W. Deveno

Counsel for the Chapter 11 Trustee for Refco Capital Markets, Ltd.

**12.10    *Governing Law*.**  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware without giving effect to the principles of conflicts of law of such jurisdiction.

**12.11    *Tax Reporting and Compliance*.**  The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**12.12    *Filing of Additional Documents*.**  On or before substantial consummation of this Plan, the Plan Proponents shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**12.13    *Limit on Precedential Effect*.**  The structure of this Plan and the classification of creditors or groups of creditors within one Class contained herein shall have no evidentiary or precedential effect if the such Plan is not confirmed and consummated.

**12.14    *Claims Preserved Pending Consummation*.**  Except as provided in the Early Payment Order and the RCM Settlement Agreement, in the event this Plan is not consummated, all parties-in-interest expressly reserve their claims and rights, as well as all defenses to such claims and rights and causes of action against such other parties, including, without limitation, (i) the subrogation claim of any Debtor that is a Guarantor under the Credit Agreement against any other Debtor that is a Loan Party under the Credit Agreement, arising out of the payment to the Secured Lenders, (ii) all claims of RCM and Holders of RCM Customer Claims and RCM FX/Unsecured Claims against the Contributing Debtors, Refco LLC and other third parties, (iii) all claims of the Contributing Debtors and Refco LLC, and their respective creditors, against RCM and other third parties and (iv) avoidance actions and other causes of action against creditors of RCM and the Contributing Debtors.

**12.15    *Continuation of RCM Settlement Agreement*.**  Neither any term or provision of this Plan, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11

Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the RCM Settlement Agreement, which will at all times operate and be binding in accordance with its terms.

        **12.16**    ***Continuation of Early Payment Order***.  Neither any term or provision of this Plan or the Confirmation Order, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the Early Payment Order, which will at all times operate and be binding in accordance with its terms.

Dated:  New York, New York
        December 14, 2006

REFCO INC.
    (for itself and on behalf of the Affiliate Debtors other than Refco Finance Inc. and Refco Global Finance Ltd.)

By: _____/s/ Harrison J. Goldin_____
    Name:    Harrison J. Goldin
    Title:     Chief Executive Officer

REFCO FINANCE INC.

By: _____/s/ Harrison J. Goldin_____
    Name:    Harrison J. Goldin
    Title:     President

REFCO GLOBAL FINANCE LTD.

By: _____/s/ Harrison J. Goldin_____
    Name:    Harrison J. Goldin
    Title:     Executive Vice President

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    Attorneys for Refco Inc. and the Affiliate Debtors

By: _____/s/ J. Gregory Milmoe_____
    J. Gregory Milmoe (JGM 0919)
    Sally McDonald Henry (SMH 0839)
    J. Gregory St. Clair (GS 8344)
    Four Times Square
    New York, New York 10036-6522
    (212) 735-3000

REFCO CAPITAL MARKETS, LTD.


By: _____/s/ Marc S. Kirschner_____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


RCM Trustee


By: _____/s/ Marc S. Kirschner_____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


BINGHAM McCUTCHEN LLP
    Attorneys for Marc S. Kirschner, the Chapter 11 Trustee for
    Refco Capital Markets, Ltd.


By: _____/s/ Tina L. Brozman_____
    Tina L. Brozman
    Timothy B. DeSieno
    Mark W. Deveno
    399 Park Avenue
    New York, NY 10022
    (212) 705-7000


MILBANK, TWEED, HADLEY & McCLOY LLP
    Attorneys for the Official Committee of
    Unsecured Creditors of Refco Inc., *et al.*


By: _/s/ Susheel Kirpalani_____
    Luc A. Despins
    Susheel Kirpalani
    Dennis C. O'Donnell
    One Chase Manhattan Plaza
    New York, New York 10005
    (212) 530-5000

KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP
    Attorneys for the Additional Committee of
    Unsecured Creditors of Refco Inc., *et al.*


By: /s/ David S. Rosner
    David S. Rosner
    Andrew K. Glenn
    Jeffrey R. Gleit
    1633 Broadway
    New York, New York 10019
    (212) 506-1700

**<u>Exhibit I</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
|   |   |   |
|---|---|---|
| | **:** | |
| **In re:** | **:** | **Chapter 11** |
| | **:** | |
| **ENRON CORP.,** *et al.*, | **:** | **Case No. 01-16034 (AJG)** |
| | **:** | |
| **Debtors.** | **:** | **Jointly Administered** |

--------------------------------------------------------x

SUPPLEMENTAL MODIFIED FIFTH AMENDED JOINT PLAN OF
AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF
THE UNITED STATES BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000
– and –
700 Louisiana
Houston, Texas  77002
(713) 546-5000
Attorneys for Debtors and
  Debtors in Possession

Dated:  July 2, 2004

# TABLE OF CONTENTS

**Page**

ARTICLE I            DEFINITIONS ..................................................................................... 2

1.1     ACFI ................................................................................................................. 2

1.2     ACFI Guaranty Claim ...................................................................................... 2

1.3     ACFI Guaranty Distributive Assets ................................................................ 2

1.4     ACFI Guaranty Distributive Interests ............................................................ 3

1.5     Administrative Expense Claim ........................................................................ 3

1.6     Affiliate ............................................................................................................ 4

1.7     Allowed Administrative Expense Claim ......................................................... 4

1.8     Allowed Claim/Allowed Equity Interest ........................................................ 4

1.9     Allowed Convenience Claim ........................................................................... 4

1.10    Allowed ENA Debenture Claim ..................................................................... 4

1.11    Allowed Enron Common Equity Interest ....................................................... 5

1.12    Allowed Enron Guaranty Claim ..................................................................... 5

1.13    Allowed Enron Preferred Equity Interest ...................................................... 5

1.14    Allowed Enron Senior Note Claim ................................................................ 5

1.15    Allowed Enron Subordinated Debenture Claim ............................................ 5

1.16    Allowed Enron TOPRS Debenture Claim ..................................................... 5

1.17    Allowed Enron TOPRS Subordinated Guaranty Claim ................................ 5

1.18    Allowed ETS Debenture Claim ...................................................................... 5

1.19    Allowed General Unsecured Claim ................................................................ 5

1.20    Allowed Guaranty Claim ................................................................................ 5

1.21    Allowed Intercompany Claim ......................................................................... 5

1.22    Allowed Joint Liability Claim ........................................................................ 5

1.23    Allowed Other Subordinated Claim ............................................................... 6

1.24    Allowed Priority Claim ................................................................................... 6

1.25    Allowed Priority Non-Tax Claim ................................................................... 6

1.26    Allowed Priority Tax Claim ........................................................................... 6

1.27    Allowed Secured Claim .................................................................................. 6

1.28    Allowed Section 510 Enron Common Equity Interest Claim ....................... 6

# TABLE OF CONTENTS
### (continued)

Page

1.29    Allowed Section 510 Enron Preferred Equity Interest Claim ............................... 6

1.30    Allowed Section 510 Enron Senior Notes Claim ................................................. 6

1.31    Allowed Section 510 Enron Subordinated Debenture Claim ............................... 6

1.32    Allowed Subordinated Claim ............................................................................... 6

1.33    Allowed Wind Guaranty Claim ........................................................................... 6

1.34    Assets .................................................................................................................. 6

1.35    Assumption Schedule .......................................................................................... 7

1.36    Ballot ................................................................................................................... 7

1.37    Ballot Date .......................................................................................................... 7

1.38    Bankruptcy Code ................................................................................................. 7

1.39    Bankruptcy Court ................................................................................................ 7

1.40    Bankruptcy Rules ................................................................................................ 7

1.41    Benefit Plan ......................................................................................................... 7

1.42    Business Day ....................................................................................................... 7

1.43    Case Management Order ...................................................................................... 7

1.44    Cash ..................................................................................................................... 8

1.45    Cash Equivalents ................................................................................................. 8

1.46    Chapter 11 Cases ................................................................................................. 8

1.47    Claim ................................................................................................................... 8

1.48    Class .................................................................................................................... 8

1.49    Class Actions ...................................................................................................... 8

1.50    Collateral ............................................................................................................. 8

1.51    Common Equity Interest ...................................................................................... 8

1.52    Common Equity Trust .......................................................................................... 9

1.53    Common Equity Trustee ...................................................................................... 9

1.54    Common Equity Trust Agreement ....................................................................... 9

1.55    Common Equity Trust Board ............................................................................... 9

1.56    Common Equity Trust Interests ........................................................................... 9

1.57    Confirmation Date ............................................................................................... 9

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 1.58 | Confirmation Hearing | 9 |
| 1.59 | Confirmation Order | 9 |
| 1.60 | Consolidated Basis | 9 |
| 1.61 | Convenience Claim | 9 |
| 1.62 | Convenience Claim Distribution Percentage | 10 |
| 1.63 | Creditor | 10 |
| 1.64 | Creditor Cash | 10 |
| 1.65 | Creditors' Committee | 10 |
| 1.66 | CrossCountry Assets | 10 |
| 1.67 | CrossCountry By-laws/Organizational Agreement | 11 |
| 1.68 | CrossCountry Charter | 11 |
| 1.69 | CrossCountry Common Equity | 11 |
| 1.70 | CrossCountry Distributing Company | 11 |
| 1.71 | CrossCountry Trust | 11 |
| 1.72 | CrossCountry Trust Agreement | 11 |
| 1.73 | CrossCountry Trust Board | 12 |
| 1.74 | CrossCountry Trustee | 12 |
| 1.75 | CrossCountry Trust Interests | 12 |
| 1.76 | DCR Overseers | 12 |
| 1.77 | Debtors | 12 |
| 1.78 | Debtors in Possession | 13 |
| 1.79 | Deferred Compensation Litigation | 13 |
| 1.80 | Defined Benefit Plans | 14 |
| 1.81 | DIP Orders | 14 |
| 1.82 | Disbursement Account(s) | 14 |
| 1.83 | Disbursing Agent | 14 |
| 1.84 | Disclosure Statement | 14 |
| 1.85 | Disclosure Statement Order | 14 |
| 1.86 | Disputed Claim; Disputed Equity Interest | 14 |

# TABLE OF CONTENTS
## (continued)

Page

1.87    Disputed Claim Amount ........................................................................... 14

1.88    Distribution Model................................................................................... 15

1.89    Distributive Assets .................................................................................. 15

1.90    Distributive Interests............................................................................... 15

1.91    District Court........................................................................................... 16

1.92    ECT I ....................................................................................................... 16

1.93    ECT I Trust Declarations ........................................................................ 16

1.94    ECT II ...................................................................................................... 16

1.95    ECT II Trust Declarations....................................................................... 16

1.96    Effective Date ......................................................................................... 16

1.97    8.25% Subordinated Debentures............................................................. 16

1.98    Employee Committee............................................................................... 16

1.99    Employee Counsel Orders ...................................................................... 17

1.100   Employee Prepetition Stay Bonus Payments ......................................... 17

1.101   ENA ......................................................................................................... 17

1.102   ENA Debentures ...................................................................................... 17

1.103   ENA Debentures Claim ........................................................................... 17

1.104   ENA Examiner ......................................................................................... 17

1.105   ENA Examiner Order............................................................................... 17

1.106   ENA Guaranty Claim............................................................................... 17

1.107   ENA Guaranty Distributive Assets ......................................................... 17

1.108   ENA Guaranty Distributive Interests ..................................................... 18

1.109   ENA Indentures........................................................................................ 18

1.110   ENA Indenture Trustee ........................................................................... 19

1.111   ENE.......................................................................................................... 19

1.112   ENE Examiner ......................................................................................... 19

1.113   ENE Examiner Orders ............................................................................. 19

1.114   Enron Affiliate ........................................................................................ 19

1.115   Enron Common Equity Interest .............................................................. 19

# TABLE OF CONTENTS
### (continued)

1.116  Enron Guaranty Claim ................................................................. 19

1.117  Enron Guaranty Distributive Assets ................................................ 19

1.118  Enron Guaranty Distributive Interests  ........................................... 20

1.119  Enron MIPS Agreements ............................................................. 20

1.120  Enron Preferred Equity Interest .................................................... 20

1.121  Enron Senior Notes ................................................................... 21

1.122  Enron Senior Notes Claim ........................................................... 21

1.123  Enron Senior Notes Indentures ..................................................... 21

1.124  Enron Senior Notes Indenture Trustees ........................................... 21

1.125  Enron Subordinated Debentures .................................................... 21

1.126  Enron Subordinated Debenture Claim .............................................. 21

1.127  Enron Subordinated Indenture ...................................................... 21

1.128  Enron Subordinated Indenture Trustee ............................................ 21

1.129  Enron TOPRS Debenture Claim .................................................... 21

1.130  Enron TOPRS Debentures ........................................................... 21

1.131  Enron TOPRS Indenture Trustee ................................................... 22

1.132  Enron TOPRS Indentures ........................................................... 22

1.133  Enron TOPRS Subordinated Guaranty Claim .................................... 22

1.134  Entity.................................................................................... 22

1.135  EPC ..................................................................................... 22

1.136  EPC Guaranty Claim.................................................................. 22

1.137  EPC Guaranty Distributive Assets ................................................. 22

1.138  EPC Guaranty Distributive Interests............................................... 23

1.139  EPF I ................................................................................... 23

1.140  EPF I Partnership Agreement ....................................................... 23

1.141  EPF II .................................................................................. 24

1.142  EPF II Partnership Agreement ...................................................... 24

1.143  Equity Interest......................................................................... 24

1.144  ERISA .................................................................................. 24

# TABLE OF CONTENTS
### (continued)

Page

1.145  ETS ........................................................................................................ 24

1.146  ETS Debenture Claim ............................................................................ 24

1.147  ETS Indentures ...................................................................................... 24

1.148  ETS Indenture Trustee .......................................................................... 24

1.149  Exchanged Enron Common Stock ........................................................ 24

1.150  Exchanged Enron Preferred Stock ....................................................... 24

1.151  Existing PGE Common Stock ............................................................... 25

1.152  Fair Market Value ................................................................................. 25

1.153  Fee Committee ...................................................................................... 25

1.154  Final Order ............................................................................................ 25

1.155  General Unsecured Claim ..................................................................... 25

1.156  Guaranty Claims ................................................................................... 25

1.157  Indentures .............................................................................................. 25

1.158  Indenture Trustees ................................................................................ 25

1.159  Indenture Trustee Claims ..................................................................... 25

1.160  Initial Petition Date .............................................................................. 26

1.161  Intercompany Claims ............................................................................ 26

1.162  Intercompany Distributive Assets ........................................................ 26

1.163  Intercompany Distributive Interests ..................................................... 26

1.164  Investigative Orders .............................................................................. 26

1.165  IRC ........................................................................................................ 26

1.166  IRS ........................................................................................................ 26

1.167  Joint Liability Claim ............................................................................. 26

1.168  Lien ....................................................................................................... 27

1.169  Litigation Trust ..................................................................................... 27

1.170  Litigation Trustee ................................................................................. 27

1.171  Litigation Trust Agreement .................................................................. 27

1.172  Litigation Trust Board .......................................................................... 27

1.173  Litigation Trust Claims ........................................................................ 27

# TABLE OF CONTENTS
## (continued)

Page

1.174  Litigation Trust Interests ............................................................................... 28

1.175  Mediation Orders ........................................................................................... 28

1.176  Mediator ......................................................................................................... 28

1.177  MegaClaim Litigation .................................................................................... 28

1.178  Montgomery County Litigation ...................................................................... 28

1.179  Operating Trustee ........................................................................................... 28

1.180  Operating Trust Agreements .......................................................................... 28

1.181  Operating Trusts ............................................................................................. 28

1.182  Operating Trust Interests ............................................................................... 28

1.183  Other Equity Interest ...................................................................................... 28

1.184  Other Subordinated Claim ............................................................................. 28

1.185  Penalty Claim ................................................................................................. 29

1.186  Person ............................................................................................................. 29

1.187  Petition Date ................................................................................................... 29

1.188  PGE ................................................................................................................ 29

1.189  PGE By-laws .................................................................................................. 29

1.190  PGE Certificate of Incorporation .................................................................. 29

1.191  PGE Common Stock ....................................................................................... 29

1.192  PGE Trust ....................................................................................................... 29

1.193  PGE Trust Agreement ..................................................................................... 29

1.194  PGE Trust Board ............................................................................................ 29

1.195  PGE Trustee ................................................................................................... 30

1.196  PGE Trust Interests ........................................................................................ 30

1.197  Plan ................................................................................................................. 30

1.198  Plan Currency ................................................................................................. 30

1.199  Plan Securities ................................................................................................ 30

1.200  Plan Supplement ............................................................................................. 30

1.201  Portland Creditor Cash ................................................................................... 31

1.202  Portland Debtors ............................................................................................ 31

# TABLE OF CONTENTS
## (continued)

Page

1.203    Preferred Equity Trust ................................................................. 31

1.204    Preferred Equity Trustee ............................................................... 31

1.205    Preferred Equity Trust Agreement .................................................. 31

1.206    Preferred Equity Trust Board ......................................................... 31

1.207    Preferred Equity Trust Interests ..................................................... 32

1.208    Priority Claim ............................................................................. 32

1.209    Priority Non-Tax Claim ................................................................ 32

1.210    Priority Tax Claim ....................................................................... 32

1.211    Prisma ....................................................................................... 32

1.212    Prisma Articles of Association ........................................................ 32

1.213    Prisma Assets ............................................................................. 32

1.214    Prisma Common Stock .................................................................. 32

1.215    Prisma Memorandum of Association ................................................ 33

1.216    Prisma Trust ............................................................................... 33

1.217    Prisma Trust Agreement ................................................................ 33

1.218    Prisma Trust Board ...................................................................... 33

1.219    Prisma Trustee ............................................................................ 33

1.220    Prisma Trust Interests ................................................................... 33

1.221    Proponents ................................................................................. 33

1.222    Pro Rata Share ............................................................................ 33

1.223    Record Date ............................................................................... 34

1.224    Remaining Assets ........................................................................ 34

1.225    Remaining Asset Trust(s) .............................................................. 34

1.226    Remaining Asset Trustee .............................................................. 34

1.227    Remaining Asset Trust Agreement(s) ............................................... 34

1.228    Remaining Asset Trust Board(s) ..................................................... 34

1.229    Remaining Asset Trust Interests ..................................................... 34

1.230    Reorganized Debtor Plan Administration Agreement .......................... 34

1.231    Reorganized Debtor Plan Administrator ........................................... 35

# TABLE OF CONTENTS
## (continued)

1.232    Reorganized Debtors................................................................................. 35

1.233    Reorganized Debtors By-laws .................................................................. 35

1.234    Reorganized Debtors Certificate of Incorporation.................................. 35

1.235    Reorganized ENE...................................................................................... 35

1.236    Reorganized Portland Debtors .................................................................. 35

1.237    Sale/Settlement Orders.............................................................................. 35

1.238    Sale Transaction........................................................................................ 35

1.239    Schedules .................................................................................................. 35

1.240    SEC ........................................................................................................... 35

1.241    Section 510 Enron Common Equity Interest Claim ................................. 35

1.242    Section 510 Enron Preferred Equity Interest Claim ................................ 36

1.243    Section 510 Enron Senior Notes Claim ................................................... 36

1.244    Section 510 Enron Subordinated Debenture Claim ................................. 36

1.245    Secured Claim ........................................................................................... 36

1.246    Series 1 Exchanged Preferred Stock ........................................................ 36

1.247    Series 2 Exchanged Preferred Stock ........................................................ 36

1.248    Series 3 Exchanged Preferred Stock ........................................................ 37

1.249    Series 4 Exchanged Preferred Stock ........................................................ 37

1.250    Settling Former Employees....................................................................... 37

1.251    Severance Settlement Fund Litigation...................................................... 37

1.252    Severance Settlement Fund Proceeds ....................................................... 38

1.253    Severance Settlement Fund Trust ............................................................. 38

1.254    Severance Settlement Fund Trust Agreement .......................................... 38

1.255    Severance Settlement Fund Trustee .......................................................... 38

1.256    Severance Settlement Order....................................................................... 38

1.257    6.75% Subordinated Debentures................................................................ 38

1.258    Special Litigation Trust............................................................................. 38

1.259    Special Litigation Trustee ......................................................................... 38

1.260    Special Litigation Trust Agreement ......................................................... 39

# TABLE OF CONTENTS
## (continued)

1.261  Special Litigation Trust Board ....................................................................... 39

1.262  Special Litigation Trust Claims ...................................................................... 39

1.263  Special Litigation Trust Interests ................................................................... 39

1.264  Standard Termination Order ........................................................................... 39

1.265  Subordinated Claim ........................................................................................ 39

1.266  TOPRS ........................................................................................................... 40

1.267  TOPRS Stipulation ......................................................................................... 40

1.268  Trust Interests ................................................................................................ 40

1.269  Unsecured Claim ............................................................................................ 40

1.270  Value .............................................................................................................. 40

1.271  WD Management Agreement ......................................................................... 41

1.272  WD Trust ........................................................................................................ 41

1.273  WD Trust Agreement ..................................................................................... 41

1.274  WS Management Agreement .......................................................................... 41

1.275  WS Trust ........................................................................................................ 41

1.276  WS Trust Agreement ...................................................................................... 41

1.277  Wind ............................................................................................................... 41

1.278  Wind Debtors ................................................................................................. 41

1.279  Wind Guaranty Claim .................................................................................... 41

1.280  Wind Guaranty Distributive Assets ............................................................... 41

1.281  Wind Guaranty Distributive Interests ............................................................ 42

1.282  Wind Management Agreements ...................................................................... 42

1.283  Wind Reserve Fund ........................................................................................ 42

1.284  Wind Reserve Fund Order .............................................................................. 43

1.285  Wind Trusts .................................................................................................... 43

1.286  Wind Trusts Assets ........................................................................................ 43

1.287  Other Definitions ........................................................................................... 43

ARTICLE II          COMPROMISE AND SETTLEMENT OF DISPUTES;
                    SUBSTANTIVE CONSOLIDATION; ASSUMPTION OF
                    OBLIGATIONS UNDER THE PLAN ................................................... 43

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| 2.1 | Compromise and Settlement | | 43 |
| | (a) | Substantive Consolidation | 43 |
| | (b) | Related Issues | 44 |
| | | (i) Intercompany Claims | 44 |
| | | (ii) Guaranty Claims | 44 |
| | | (iii) Ownership of Certain Assets | 44 |
| | | (iv) Ownership of Certain Litigation Claims | 45 |
| | (c) | Plan Currency | 45 |
| | (d) | Inter-Debtor Waivers | 45 |
| | (e) | Governance | 45 |
| 2.2 | Non-Substantive Consolidation | | 46 |
| 2.3 | Allocation of Expenses | | 46 |
| 2.4 | Wind Reserve Fund | | 46 |

ARTICLE III    PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND DEBTOR IN POSSESSION FINANCING ... 46

| | | |
|---|---|---|
| 3.1 | Administrative Expense Claims | 46 |
| 3.2 | Professional Compensation and Reimbursement Claims | 47 |
| 3.3 | Payment of Priority Tax Claims | 47 |
| 3.4 | Debtor in Possession Financing | 47 |

ARTICLE IV    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ... 48

| | | |
|---|---|---|
| 4.1 | Class 1 – Priority Non-Tax Claims | 48 |
| 4.2 | Class 2 – Secured Claims | 48 |
| 4.3 | Classes 3 through 182 – General Unsecured Claims (Other than Enron Subordinated Debenture Claims and Enron TOPRS Debenture Claims) | 48 |
| 4.4 | Class 183 – Enron Subordinated Debenture Claims | 48 |
| 4.5 | Class 184 – Enron TOPRS Debenture Claims | 48 |
| 4.6 | Class 185 – Enron Guaranty Claims | 48 |
| 4.7 | Class 186 – Wind Guaranty Claims | 48 |
| 4.8 | Class 187 – ENA Guaranty Claims | 48 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 4.9 | Class 188 – ACFI Guaranty Claims | 48 |
| 4.10 | Class 189 – EPC Guaranty Claims | 48 |
| 4.11 | Class 190 – Intercompany Claims | 48 |
| 4.12 | Classes 191 through 375 – Convenience Claims | 48 |
| 4.13 | Classes 376 through 382 – Subordinated Claims | 48 |
| 4.14 | Class 383 – Enron Preferred Equity Interests | 48 |
| 4.15 | Class 384 – Enron Common Equity Interests | 48 |
| 4.16 | Class 385 – Other Equity Interests | 48 |
| ARTICLE V | PROVISION FOR TREATMENT OF PRIORITY NON-TAX CLAIMS (CLASS 1) | 49 |
| 5.1 | Payment of Allowed Priority Non-Tax Claims | 49 |
| ARTICLE VI | PROVISION FOR TREATMENT OF SECURED CLAIMS (CLASS 2) | 49 |
| 6.1 | Treatment of Secured Claims | 49 |
| ARTICLE VII | PROVISION FOR TREATMENT OF GENERAL UNSECURED CLAIMS (CLASSES 3-182) | 49 |
| 7.1 | Treatment of General Unsecured Claims Other than Those Against the Portland Debtors (Classes 3 through 180) | 49 |
| 7.2 | Treatment of General Unsecured Claims Against the Portland Debtors (Classes 181 and 182) | 50 |
| 7.3 | Election to Receive Additional Cash Distributions in Lieu of Partial Plan Securities | 50 |
| 7.4 | Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim | 50 |
| 7.5 | Limitation on Recovery | 51 |
| 7.6 | Severance Settlement Fund Litigation Payments | 51 |
| 7.7 | Termination of Wind Trusts/Election of Wind Creditors to Receive Additional Cash Distributions in Partial Plan Securities | 51 |
| | (a) Termination | 51 |
| | (b) Election | 51 |
| 7.8 | Election of TOPRS Holders to Receive Additional Cash Distributions in Lieu of Partial Plan Securities | 52 |

# TABLE OF CONTENTS
## (continued)

Page

7.9       Dabhol Debtors Removal...................................................................................... 52

ARTICLE VIII      PROVISION FOR TREATMENT OF ENRON
                  SUBORDINATED DEBENTURE CLAIMS (CLASS 183) .................. 52

8.1       Treatment of Allowed Enron Subordinated Debenture Claims (Class 183)........ 52

8.2       Contingent Distribution/Limitation on Recovery................................................. 53

ARTICLE IX       PROVISION FOR TREATMENT OF ENRON TOPRS
                 DEBENTURE CLAIMS (CLASS 184)..................................................... 53

9.1       Treatment of Allowed Enron TOPRS Debenture Claims (Class 184) ............... 53

9.2       Contingent Distribution/Limitation on Recovery................................................. 53

ARTICLE X        PROVISIONS FOR TREATMENT OF ENRON GUARANTY
                 CLAIMS (CLASS 185) ........................................................................... 54

10.1      Treatment of Enron Guaranty Claims (Class 185) ............................................ 54

10.2      Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated
          as a Convenience Claim ..................................................................................... 54

ARTICLE XI       PROVISIONS FOR TREATMENT OF WIND GUARANTY
                 CLAIMS (CLASS 186) ........................................................................... 55

11.1      Treatment of Wind Guaranty Claims (Class 186) ............................................. 55

11.2      Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated
          as a Convenience Claim ..................................................................................... 55

ARTICLE XII      PROVISIONS FOR TREATMENT OF ENA GUARANTY
                 CLAIMS (CLASS 187) ........................................................................... 55

12.1      Treatment of ENA Guaranty Claims (Class 187) .............................................. 55

12.2      Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated
          as a Convenience Claim ..................................................................................... 56

ARTICLE XIII     PROVISIONS FOR TREATMENT OF ACFI GUARANTY
                 CLAIMS (CLASS 188) ........................................................................... 56

13.1      Treatment of ACFI Guaranty Claims (Class 188) ............................................. 56

13.2      Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated
          as a Convenience Claim ..................................................................................... 56

ARTICLE XIV      PROVISIONS FOR TREATMENT OF EPC GUARANTY
                 CLAIMS (CLASS 189) ........................................................................... 57

14.1      Treatment of EPC Guaranty Claims (Class 189) .............................................. 57

# TABLE OF CONTENTS
## (continued)

Page

14.2    Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim ........................................................................ 57

ARTICLE XV    PROVISIONS FOR TREATMENT OF INTERCOMPANY CLAIMS (CLASS 190) .............................................................. 57

15.1    Treatment of Intercompany Claims (Class 190) ................................. 57

ARTICLE XVI    PROVISIONS FOR TREATMENT OF CONVENIENCE CLAIMS (CLASSES 191-375) ................................................ 58

16.1    Treatment of Convenience Claims (Classes 191 through 375) .......................... 58

16.2    Plan Currency Opportunity ..................................................................... 58

16.3    Dabhol Debtors Removal ........................................................................ 58

ARTICLE XVII    PROVISION FOR TREATMENT OF SUBORDINATED CLAIMS (CLASSES 376 – 382) .............................................. 58

17.1    Treatment of Allowed Subordinated Claims (Classes 376 through 382) ........... 58

17.2    Contingent Distribution/Limitation on Recovery ............................... 58

ARTICLE XVIII    PROVISIONS FOR TREATMENT OF ENRON PREFERRED EQUITY INTERESTS (CLASS 383) ..................................... 59

18.1    Treatment of Allowed Enron Preferred Equity Interests (Class 383) ................. 59

18.2    Contingent Distribution/Limitation on Recovery ............................... 59

18.3    Cancellation of Enron Preferred Equity Interests and Exchanged Enron Preferred Stock ...................................................................................... 59

ARTICLE XIX    PROVISION FOR TREATMENT OF ENRON COMMON EQUITY INTERESTS (CLASS 384) ..................................... 60

19.1    Treatment of Allowed Enron Common Equity Interests (Class 384) ................. 60

19.2    Contingent Distribution to Common Equity Trust ............................. 60

19.3    Cancellation of Enron Common Equity Interests and Exchanged Enron Common Stock ..................................................................................... 60

ARTICLE XX    PROVISIONS FOR TREATMENT OF OTHER EQUITY INTERESTS (CLASS 385) ..................................................... 60

20.1    Cancellation of Other Equity Interests (Class 385) ........................... 60

ARTICLE XXI    PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS UNDER THE PLAN ............................................................ 61

21.1    Objections to Claims; Prosecution of Disputed Claims ..................... 61

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 21.2 | Estimation of Claims | 61 |
| 21.3 | Payments and Distributions on Disputed Claims | 62 |
| | (a) Disputed Claims Reserve | 62 |
| | (b) Allowance of Disputed Claims | 62 |
| | (c) Tax Treatment of Escrow | 63 |
| | (d) Funding of Escrow's Tax Obligation | 63 |
| ARTICLE XXII | THE LITIGATION TRUST | 63 |
| 22.1 | Establishment of the Trust | 63 |
| 22.2 | Purpose of the Litigation Trust | 64 |
| 22.3 | Funding Expenses of the Litigation Trust | 64 |
| 22.4 | Transfer of Assets | 64 |
| 22.5 | Valuation of Assets | 65 |
| 22.6 | Litigation; Responsibilities of Litigation Trustee | 65 |
| 22.7 | Investment Powers | 65 |
| 22.8 | Annual Distribution; Withholding | 66 |
| 22.9 | Reporting Duties | 66 |
| | (a) Federal Income Tax | 66 |
| | (b) Allocations of Litigation Trust Taxable Income | 66 |
| | (c) Other | 67 |
| 22.10 | Trust Implementation | 67 |
| 22.11 | Registry of Beneficial Interests | 67 |
| 22.12 | Termination | 67 |
| 22.13 | Net Litigation Trust Recovery/Assignment of Claims | 67 |
| | (a) Net Judgment | 67 |
| | (b) Assignment | 68 |
| 22.14 | Applicability to Certain Claims and Equity Interests | 68 |
| ARTICLE XXIII | THE SPECIAL LITIGATION TRUST | 68 |
| 23.1 | Establishment of the Trust | 68 |
| 23.2 | Purpose of the Special Litigation Trust | 69 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 23.3 | Funding Expenses of the Special Litigation Trust | 69 |
| 23.4 | Transfer of Assets | 69 |
| 23.5 | Valuation of Assets | 70 |
| 23.6 | Litigation of Assets; Responsibilities of Special Litigation Trustee | 70 |
| 23.7 | Investment Powers | 70 |
| 23.8 | Annual Distribution; Withholding | 71 |
| 23.9 | Reporting Duties | 71 |
| | (a) Federal Income Tax | 71 |
| | (b) Allocations of Special Litigation Trust Taxable Income | 71 |
| | (c) Other | 72 |
| 23.10 | Trust Implementation | 72 |
| 23.11 | Registry of Beneficial Interests | 72 |
| 23.12 | Termination | 72 |
| 23.13 | Net Special Litigation Trust Recovery/Assignment of Claims | 73 |
| | (a) Net Judgment | 73 |
| | (b) Assignment | 73 |
| 23.14 | Applicability to Certain Claims and Equity Interests | 73 |
| ARTICLE XXIV | THE OPERATING TRUSTS | 73 |
| 24.1 | Establishment of the Trusts | 73 |
| 24.2 | Purpose of the Operating Trusts | 74 |
| 24.3 | Funding Expenses of the Operating Trusts | 74 |
| 24.4 | Transfer of Assets | 74 |
| 24.5 | Valuation of Assets | 74 |
| 24.6 | Investment Powers | 75 |
| 24.7 | Annual Distribution; Withholding | 75 |
| 24.8 | Reporting Duties | 75 |
| | (a) Federal Income Tax | 75 |
| | (b) Allocations of Operating Trusts Taxable Income | 76 |
| | (c) Other | 76 |

# TABLE OF CONTENTS
### (continued)

**Page**

24.9    Trust Implementation.........................................................................76

24.10    Registry of Beneficial Interests.........................................................76

24.11    Termination.......................................................................................76

24.12    Non-Transferability or Certification..................................................77

24.13    Applicability to Certain Claims and Equity Interests ........................77

ARTICLE XXV        THE REMAINING ASSET TRUSTS .................................77

25.1    Establishment of the Trusts................................................................77

25.2    Purpose of the Remaining Asset Trusts .............................................77

25.3    Funding Expenses of the Remaining Asset Trusts ............................77

25.4    Transfer of Assets .............................................................................78

25.5    Valuation of Assets ...........................................................................78

25.6    Investment Powers ............................................................................78

25.7    Annual Distribution; Withholding ....................................................79

25.8    Reporting Duties ...............................................................................79

            (a)        Federal Income Tax ...............................................................79

            (b)        Allocations of Remaining Asset Trust Taxable Income ........79

            (c)        Other.......................................................................................80

25.9    Trust Implementation.........................................................................80

25.10    Registry of Beneficial Interests.........................................................80

25.11    Termination.......................................................................................80

25.12    Non-Transferability or Certification..................................................80

25.13    Applicability to Certain Claims and Equity Interests ........................80

ARTICLE XXVI        THE PREFERRED EQUITY TRUST..................................81

26.1    Establishment of the Trust .................................................................81

26.2    Purpose of the Preferred Equity Trust ...............................................81

26.3    Funding Expenses of the Preferred Equity Trust...............................81

26.4    Transfer of Preferred Stock...............................................................81

26.5    Investment Powers ............................................................................82

26.6    Annual Distribution; Withholding ....................................................82

# TABLE OF CONTENTS
## (continued)

Page

26.7    Reporting Duties ................................................................ 83

     (a)    Federal Income Tax ............................................ 83

     (b)    Allocations of Preferred Equity Trust Taxable Income ........................... 83

     (c)    Other ................................................................ 83

26.8    Trust Implementation ........................................................ 83

26.9    Registry of Beneficial Interests ........................................ 84

26.10   Termination ...................................................................... 84

26.11   Non-Transferability or Certification .............................. 84

ARTICLE XXVII      THE COMMON EQUITY TRUST ................................ 84

27.1    Establishment of the Trusts ............................................ 84

27.2    Purpose of the Common Equity Trust ............................ 84

27.3    Funding Expenses of the Common Equity Trust ........... 84

27.4    Transfer of Common Stock .............................................. 85

27.5    Investment Powers ............................................................ 85

27.6    Annual Distribution; Withholding .................................. 85

27.7    Reporting Duties .............................................................. 86

     (a)    Federal Income Tax ............................................ 86

     (b)    Allocations of Common Equity Trust Taxable Income ........................... 86

     (c)    Other ................................................................ 86

27.8    Trust Implementation ........................................................ 86

27.9    Registry of Beneficial Interests ........................................ 87

27.10   Termination ...................................................................... 87

27.11   Non-Transferability or Certification .............................. 87

ARTICLE XXVIII      PROSECUTION, COMPROMISE AND EXTINGUISHMENT
OF CLAIMS HELD BY THE DEBTORS ............................ 87

28.1    Prosecution of Claims ...................................................... 87

28.2    Compromise of Certain Guaranty Claim Litigation ........... 88

28.3    Extinguishment of Certain Claims .................................. 88

     (a)    Intercompany Claims ........................................ 88

     (b)    Guaranty Claims ................................................ 88

# TABLE OF CONTENTS
### (continued)

**Page**

ARTICLE XXIX       ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF
                   REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
                   EQUITY INTEREST.............................................................. 89

   29.1    Impaired Classes to Vote .................................................... 89

   29.2    Acceptance by Class of Creditors and Holders of Equity Interests .................... 89

   29.3    Cramdown........................................................................ 89

ARTICLE XXX        IDENTIFICATION OF CLAIMS AND EQUITY INTERESTS
                   IMPAIRED AND NOT IMPAIRED BY THE PLAN ........................... 89

   30.1    Impaired and Unimpaired Classes ........................................ 89

   30.2    Impaired Classes to Vote on Plan........................................ 89

   30.3    Controversy Concerning Impairment ................................... 89

ARTICLE XXXI       PROVISIONS FOR THE ESTABLISHMENT AND
                   MAINTENANCE OF DISBURSEMENT ACCOUNTS ...................... 90

   31.1    Establishment of Disbursement Account ............................. 90

   31.2    Maintenance of Disbursement Account(s)............................ 90

ARTICLE XXXII      PROVISIONS REGARDING DISTRIBUTIONS ................................. 90

   32.1    Time and Manner of Distributions...................................... 90

      (a)    Initial Distributions of Cash............................. 90

      (b)    Subsequent Distributions of Cash.................... 90

      (c)    Distributions of Plan Securities ....................... 91

         (i)     Prisma ........................................... 91

         (ii)    CrossCountry ............................... 91

         (iii)   PGE ............................................. 91

      (d)    Distribution of Trust Interests ........................ 92

      (e)    Allocation of Remaining Asset Trust Interests ....................... 92

      (f)    Recalculation of Distributive Assets, Guaranty Distributive Assets
                   and Intercompany Distributive Assets ...................... 92

      (g)    Prior and Subsequent Bankruptcy Court Orders Regarding Non-
                   Conforming Distributions ....................... 93

   32.2    Timeliness of Payments ................................................ 93

   32.3    Distributions by the Disbursing Agent ............................. 93

# TABLE OF CONTENTS
## (continued)

**Page**

32.4    Manner of Payment under the Plan ................................................................. 93

32.5    Delivery of Distributions ............................................................................... 93

32.6    Fractional Securities ...................................................................................... 93

32.7    Undeliverable Distributions ........................................................................... 94

    (a)    Holding of Undeliverable Distributions ................................................ 94

    (b)    Failure to Claim Undeliverable Distributions ....................................... 94

32.8    Compliance with Tax Requirements ............................................................... 94

32.9    Time Bar to Cash Payments ........................................................................... 94

32.10   Distributions After Effective Date .................................................................. 94

32.11   Setoffs .......................................................................................................... 95

32.12   Allocation of Plan Distributions Between Principal and Interest ...................... 95

32.13   Surrender of Instruments ............................................................................... 95

32.14   Cancellation of Existing Securities and Agreements ........................................ 95

32.15   Certain Indenture Trustee Fees and Expenses ................................................. 96

32.16   Cancellation of PGE, CrossCountry Distributing Company and Prisma
Securities ....................................................................................................... 96

32.17   Record Date .................................................................................................. 97

32.18   Applicability to Certain Claims and Equity Interests ....................................... 97

ARTICLE XXXIII    COMMITTEES, EXAMINERS, MEDIATOR AND EMPLOYEE
COUNSEL ................................................................................................. 97

33.1    Creditors' Committee - Term and Fees ........................................................... 97

33.2    Employee Committee - Term and Fees ............................................................ 98

33.3    ENE Examiner - Term and Fees ..................................................................... 98

33.4    ENA Examiner - Term and Fees ..................................................................... 99

    (a)    Pre-Effective Date Role ....................................................................... 99

    (b)    Post-Effective Date Role ...................................................................... 99

33.5    Fee Committee - Term and Fees ..................................................................... 100

33.6    Mediator - Term and Fees .............................................................................. 100

33.7    Employee Counsel ......................................................................................... 101

ARTICLE XXXIV    EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 101

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 34.1 | Rejection of Executory Contracts and Unexpired Leases | 101 |
| 34.2 | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 101 |
| 34.3 | Rejection of Intercompany Trading Contracts | 102 |
| 34.4 | Rejection Damage Claims | 102 |
| 34.5 | Indemnification and Reimbursement Obligations | 102 |
| 34.6 | Rejection of TOPRS-Related Agreements | 102 |
| 34.7 | Termination of Benefit Plans | 103 |
| ARTICLE XXXV | RIGHTS AND POWERS OF DISBURSING AGENT | 104 |
| 35.1 | Exculpation | 104 |
| 35.2 | Powers of the Disbursing Agent | 104 |
| 35.3 | Fees and Expenses Incurred From and After the Effective Date | 104 |
| ARTICLE XXXVI | THE REORGANIZED DEBTOR PLAN ADMINISTRATOR | 104 |
| 36.1 | Appointment of Reorganized Debtor Plan Administrator | 104 |
| 36.2 | Responsibilities of the Reorganized Debtor Plan Administrator | 105 |
| 36.3 | Powers of the Reorganized Debtor Plan Administrator | 105 |
| 36.4 | Compensation of the Reorganized Debtor Plan Administrator | 105 |
| 36.5 | Termination of Reorganized Debtor Plan Administrator | 105 |
| ARTICLE XXXVII | CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN; IMPLEMENTATION PROVISIONS | 106 |
| 37.1 | Conditions Precedent to Effective Date of the Plan | 106 |
| | (a) Entry of the Confirmation Order | 106 |
| | (b) Execution of Documents; Other Actions | 106 |
| | (c) Prisma Consents Obtained | 106 |
| | (d) CrossCountry Consents Obtained | 106 |
| | (e) PGE Approval | 106 |
| 37.2 | Waiver of Conditions Precedent | 106 |
| 37.3 | Alternative Structures | 106 |
| ARTICLE XXXVIII | RETENTION OF JURISDICTION | 107 |
| 38.1 | Retention of Jurisdiction | 107 |

# TABLE OF CONTENTS
## (continued)

**Page**

ARTICLE XXXIX    MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........................................................................... 108

    39.1    Modification of Plan ........................................................................... 108

    39.2    Revocation or Withdrawal ................................................................. 109

ARTICLE XL    PROVISION FOR MANAGEMENT ................................................ 109

    40.1    Reorganized Debtors Directors ......................................................... 109

    40.2    Operating Entities Directors .............................................................. 109

ARTICLE XLI    ARTICLES OF INCORPORATION AND BY-LAWS OF THE DEBTORS; CORPORATE ACTION ................................................. 110

    41.1    Amendment of Articles of Incorporation and By-Laws ..................... 110

    41.2    Corporate Action ............................................................................... 110

ARTICLE XLII    MISCELLANEOUS PROVISIONS ................................................ 110

    42.1    Title to Assets ................................................................................... 110

    42.2    Distribution of Reserved Funds ........................................................ 111

    42.3    Discharge of Debtors ........................................................................ 111

    42.4    Injunction on Claims ......................................................................... 112

    42.5    Term of Existing Injunctions or Stays .............................................. 113

    42.6    Limited Release of Directors, Officers and Employees ..................... 113

    42.7    Exculpation ....................................................................................... 113

    42.8    Preservation of Rights of Action ....................................................... 114

    42.9    Injunction on Actions ........................................................................ 114

    42.10    Payment of Statutory Fees .............................................................. 114

    42.11    Retiree Benefits .............................................................................. 114

    42.12    Retention of Documents ................................................................. 115

    42.13    Post-Confirmation Date Fees and Expenses ................................... 115

    42.14    Severability ..................................................................................... 115

    42.15    Governing Law ................................................................................ 115

    42.16    Notices ............................................................................................ 115

    42.17    Closing of Cases ............................................................................. 116

    42.18    Section Headings ............................................................................ 116

## TABLE OF CONTENTS
### (continued)

**Page**

42.19   Exemption from Registration ................................................................. 116

42.20   Exemption from Transfer Taxes ........................................................... 116

42.21   Inconsistencies ....................................................................................... 117

EXHIBIT A          ALLOWED ENA DEBENTURE CLAIMS ......................................... A-1

EXHIBIT B          ALLOWED ENRON SENIOR NOTE CLAIMS ................................. B-1

EXHIBIT C          ALLOWED ENRON SUBORDINATED DEBENTURE CLAIMS .... C-1

EXHIBIT D          ALLOWED ENRON TOPRS DEBENTURE CLAIM ....................... D-1

EXHIBIT E          ALLOWED ETS DEBENTURE CLAIM .............................................. E-1

EXHIBIT F          ALLOWED INTERCOMPANY CLAIMS ........................................... F-1

        Section I:   Payables ................................................................................. F-1

        Section II:  Receivables ............................................................................ F-20

EXHIBIT G          CONVENIENCE CLAIM DISTRIBUTION PERCENTAGE ............ G-1

EXHIBIT H          LIST OF POTENTIAL PRISMA ASSETS ......................................... H-1

EXHIBIT I          CLASSES OF GENERAL UNSECURED CLAIMS ............................ I-1

EXHIBIT J          CLASSES OF CONVENIENCE CLAIMS ........................................... J-1

EXHIBIT K          CLASSES OF SUBORDINATED CLAIMS ........................................ K-1

EXHIBIT L          SENIOR INDEBTEDNESS ................................................................. L-1

Enron Metals & Commodity Corp., Enron Corp., Enron North America Corp., Enron Power Marketing, Inc., PBOG Corp., Smith Street Land Company, Enron Broadband Services, Inc., Enron Energy Services Operations, Inc., Enron Energy Marketing Corp., Enron Energy Services, Inc., Enron Energy Services, LLC, Enron Transportation Services, LLC, BAM Lease Company, ENA Asset Holdings L.P., Enron Gas Liquids, Inc., Enron Global Markets LLC, Enron Net Works LLC, Enron Industrial Markets LLC, Operational Energy Corp., Enron Engineering & Construction Company, Enron Engineering & Operational Services Company, Garden State Paper Company, LLC, Palm Beach Development Company, L.L.C., Tenant Services, Inc., Enron Energy Information Solutions, Inc., EESO Merchant Investments, Inc., Enron Federal Solutions, Inc., Enron Freight Markets Corp., Enron Broadband Services, L.P., Enron Energy Services North America, Inc., Enron LNG Marketing LLC, Calypso Pipeline, LLC, Enron Global LNG LLC, Enron International Fuel Management Company, Enron Natural Gas Marketing Corp., ENA Upstream Company LLC, Enron Liquid Fuels, Inc., Enron LNG Shipping Company, Enron Property & Services Corp., Enron Capital & Trade Resources International Corp., Enron Communications Leasing Corp., Enron Wind Corp., Enron Wind Systems, Inc., Enron Wind Energy Systems Corp., Enron Wind Maintenance Corp., Enron Wind Constructors Corp., EREC Subsidiary I, LLC, EREC Subsidiary II, LLC, EREC Subsidiary III, LLC, EREC Subsidiary IV, LLC, EREC Subsidiary V, LLC, Intratex Gas Company, Enron Processing Properties, Inc., Enron Methanol Company, Enron Ventures Corp., The New Energy Trading Company, EES Service Holdings, Inc., Enron Wind Development LLC, ZWHC LLC, Zond Pacific, LLC, Enron Reserve Acquisition Corp., EPC Estates Services, Inc., f/k/a National Energy Production Corporation, Enron Power & Industrial Construction Company, NEPCO Power Procurement Company, NEPCO Services International, Inc., Caribe Verde (SJG) Inc., f/k/a San Juan Gas Company, Inc., EBF LLC, Zond Minnesota Construction Company LLC, Enron Fuels International, Inc., E Power Holdings Corp., EFS Construction Management Services, Inc., Enron Management, Inc., Enron Expat Services, Inc., Artemis Associates, LLC, Clinton Energy Management Services, Inc., LINGTEC Constructors L.P., EGS New Ventures Corp., Louisiana Gas Marketing Company, Louisiana Resources Company, LGMI, Inc., LRCI, Inc., Enron Communications Group, Inc., EnRock Management, LLC, ECI-Texas, L.P., EnRock, L.P., ECI-Nevada Corp., Enron Alligator Alley Pipeline Company, Enron Wind Storm Lake I LLC, ECT Merchant Investments Corp., EnronOnLine, LLC, St. Charles Development Company, L.L.C., Calcasieu Development Company, L.L.C., Calvert City Power I, L.L.C., Enron ACS, Inc., LOA, Inc., Enron India LLC, Enron International Inc., Enron International Holdings Corp., Enron Middle East LLC, Enron WarpSpeed Services, Inc., Modulus Technologies, Inc., Enron Telecommunications, Inc., DataSystems Group, Inc. Risk Management & Trading Corp., Omicron Enterprises, Inc., EFS I, Inc., EFS II, Inc., EFS III, Inc., EFS V, Inc., EFS VI, LP., EFS VII, Inc., EFS IX, Inc., EFS X, Inc., EFS XI, Inc., EFS XII, Inc., EFS XV, Inc., EFS XVII, Inc., Jovinole Associates, EFS Holdings, Inc., Enron Operations Services, LLC, Green Power Partners I LLC, TLS Investors, L.L.C., ECT Securities Limited Partnership, ECT Securities LP Corp., ECT Securities GP Corp., KUCC Cleburne, LLC, Enron International Asset Management Corp., Enron Brazil Power Holdings XI Ltd., Enron Holding Company L.L.C., Enron Development Management Ltd., Enron International Korea Holdings Corp., Enron Caribe VI Holdings Ltd., Enron International Asia Corp., Enron Brazil Power Investments XI Ltd., Paulista Electrical Distribution, L.L.C., Enron Pipeline Construction Services Company, Enron Pipeline Services Company, Enron Trailblazer Pipeline Company, Enron Liquid Services Corp., Enron Machine and Mechanical Services, Inc., Enron Commercial

Finance Ltd., Enron Permian Gathering Inc., Transwestern Gathering Company, Enron
Gathering Company, EGP Fuels Company, Enron Asset Management Resources, Inc., Enron
Brazil Power Holdings I Ltd., Enron do Brazil Holdings Ltd., Enron Wind Storm Lake II LLC,
Enron Renewable Energy Corp., Enron Acquisition III Corp., Enron Wind Lake Benton LLC,
Superior Construction Company, EFS IV, Inc., EFS VIII, Inc., EFS XIII, Inc., Enron Credit Inc.,
Enron Power Corp., Richmond Power Enterprise, L.P., ECT Strategic Value Corp., Enron
Development Funding Ltd., Atlantic Commercial Finance, Inc., The Protane Corporation, Enron
Asia Pacific/Africa/China LLC, Enron Development Corp., ET Power 3 LLC, Nowa Sarzyna
Holding B.V., Enron South America LLC, Enron Global Power & Pipelines LLC, Portland
General Holdings, Inc., Portland Transition Company, Inc., Cabazon Power Partners LLC,
Cabazon Holdings LLC, Enron Caribbean Basin LLC, Victory Garden Power Partners I LLC,
Oswego Cogen Company, LLC and Enron Equipment & Procurement Company hereby propose
the following joint chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code.

## ARTICLE I

## DEFINITIONS

As used in the Plan, the following terms shall have the respective meanings
specified below and be equally applicable to the singular and plural of terms defined:

1.1     **ACFI**:  Atlantic Commercial Finance, Inc., a Delaware corporation.

1.2     **ACFI Guaranty Claim**:  Any Unsecured Claim, other than an Intercompany
Claim, against ACFI arising from or relating to an agreement by ACFI to guarantee or otherwise
satisfy the obligations of another Debtor, including, without limitation, any Claim arising from or
relating to rights of contribution or reimbursement.

1.3     **ACFI Guaranty Distributive Assets**:  The Plan Currency to be made available to
holders of Allowed ACFI Guaranty Claims in an amount derived from the Distribution Model
equal to the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the
sum of ACFI Guaranty Claims and (b) the product of (y) the Value of ACFI's Assets minus an
amount equal to the sum of (1) one hundred percent (100%) of ACFI's Administrative Expense
Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of ACFI's
Convenience Claim Distribution Percentage times ACFI's Convenience Claims times (z) a
fraction, the numerator of which is equal to the amount of ACFI Guaranty Claims and the
denominator of which is equal to the sum of ACFI's (1) General Unsecured Claims, (2) ACFI
Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%)
times (ii) the Value of all of the Debtors' Assets, calculated as if the Debtors' chapter 11 estates
were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent
(100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims,
calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's
Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a
fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum
of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of ACFI Guaranty Claims
and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated
Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors'

General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims; provided, however, that, for purposes of calculating "ACFI Guaranty Distributive Assets", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.4    **ACFI Guaranty Distributive Interests**:  The Litigation Trust Interests or the Special Litigation Trust Interests, as the case may be, to be made available to holders of Allowed ACFI Guaranty Claims in an amount derived from the Distribution Model equal to the quotient of (I) the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of ACFI Guaranty Claims and (b) the product of (y) the sum of the Value of ACFI's Assets and the Fair Market Value of ACFI's Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, minus an amount equal to the sum of (1) one hundred percent (100%) of ACFI's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of ACFI's Convenience Claim Distribution Percentage times ACFI's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of ACFI Guaranty Claims and the denominator of which is equal to the sum of ACFI's (1) General Unsecured Claims, (2) ACFI Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%) times (ii) the sum of the Value of all of the Debtors' Assets and the Fair Market Value of all of the Debtors' Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of ACFI Guaranty Claims and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims, minus (C) ACFI Guaranty Distributive Assets, divided by (II) the Fair Market Value of a Litigation Trust Interest or a Special Litigation Trust Interest, as the case may be; provided, however, that, for purposes of calculating "ACFI Guaranty Distributive Interests", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.5    **Administrative Expense Claim**:  Any Claim constituting a cost or expense of administration of the Chapter 11 Cases asserted or authorized to be asserted in accordance with sections 503(b) and 507(a)(1) of the Bankruptcy Code during the period up to and including the Effective Date, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the businesses of the Debtors in Possession, any post-Petition Date loans and advances extended by one Debtor to another Debtor, any costs and expenses of the Debtors in Possession for the management, maintenance, preservation, sale or other disposition of any assets, the administration and implementation of the Plan, the administration, prosecution or defense of Claims by or against the Debtors and for distributions under the Plan, any guarantees or indemnification obligations extended by the Debtors in Possession, any Claims for reclamation in accordance with section 546(c)(2) of the Bankruptcy Code allowed pursuant to Final Order,

any Claims for compensation and reimbursement of expenses arising during the period from and after the respective Petition Dates and prior to the Effective Date and awarded by the Bankruptcy Court in accordance with sections 328, 330, 331 or 503(b) of the Bankruptcy Code or otherwise in accordance with the provisions of the Plan, whether fixed before or after the Effective Date, and any fees or charges assessed against the Debtors' estates pursuant to section 1930, chapter 123, Title 28, United States Code.

1.6    **Affiliate**: Any Entity that is an "affiliate" of any of the Debtors within the meaning of section 101(2) of the Bankruptcy Code.

1.7    **Allowed Administrative Expense Claim**: An Administrative Expense Claim, to the extent it is or has become an Allowed Claim.

1.8    **Allowed Claim/Allowed Equity Interest**: Any Claim against or Equity Interest in any of the Debtors or the Debtors' estates, (i) proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing such proof of claim against or equity interest in any such Debtor or such Debtor's estate, (ii) if no proof of Claim or Equity Interest has been timely filed, which has been or hereafter is listed by such Debtor in its Schedules as liquidated in amount and not disputed or contingent or (iii) any Equity Interest registered in the stock register maintained by or on behalf of the Debtors as of the Record Date, in each such case in clauses (i), (ii) and (iii) above, a Claim or Equity Interest as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.  For purposes of determining the amount of an "Allowed Claim", there shall be deducted therefrom an amount equal to the amount of any claim which the Debtors may hold against the holder thereof, to the extent such claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law.  Without in any way limiting the foregoing, "Allowed Claim" shall include any Claim arising from the recovery of property in accordance with sections 550 and 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code, any Claim allowed under or pursuant to the terms of the Plan or any Claim to the extent that it has been allowed pursuant to a Final Order; provided, however, that (i) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder unless otherwise specified herein or by order of the Bankruptcy Court, (ii) for any purpose under the Plan, other than with respect to an Allowed ETS Debenture Claim, unless distributions shall be made in accordance with the provisions of Section 17.2 or 18.2 of the Plan, "Allowed Claim" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date and (iii) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.9    **Allowed Convenience Claim**: A Convenience Claim, to the extent it is or has become an Allowed Claim.

1.10    **Allowed ENA Debenture Claim**: An ENA Debenture Claim, to the extent it is or has become an Allowed Claim and as set forth on Exhibit "A" hereto.

1.11    **Allowed Enron Common Equity Interest**:  An Enron Common Equity Interest, to the extent it is or has become an Allowed Equity Interest.

1.12    **Allowed Enron Guaranty Claim**:  An Enron Guaranty Claim, to the extent it is or has become an Allowed Claim.

1.13    **Allowed Enron Preferred Equity Interest**:  An Enron Preferred Equity Interest, to the extent it is or has become an Allowed Equity Interest.

1.14    **Allowed Enron Senior Note Claim**:  An Enron Senior Note Claim, to the extent set forth on Exhibit "B" hereto.

1.15    **Allowed Enron Subordinated Debenture Claim**:  An Enron Subordinated Debenture Claim, to the extent it is or has become an Allowed Claim and as set forth on Exhibit "C" hereto.

1.16    **Allowed Enron TOPRS Debenture Claim**:  An Enron TOPRS Debenture Claim, to the extent it is or has become an Allowed Claim and as set forth on Exhibit "D" hereto.

1.17    **Allowed Enron TOPRS Subordinated Guaranty Claim**:  An Enron TOPRS Subordinated Guaranty Claim, to the extent it is or has become an Allowed Claim.

1.18    **Allowed ETS Debenture Claim**:  An ETS Debenture Claim, to the extent it is or has become an Allowed Claim and as set forth on Exhibit "E" hereto.

1.19    **Allowed General Unsecured Claim**:  A General Unsecured Claim, to the extent it is or has become an Allowed Claim.

1.20    **Allowed Guaranty Claim**:  A Guaranty Claim, to the extent it is or has become an Allowed Claim.

1.21    **Allowed Intercompany Claim**:  An Intercompany Claim, to the extent it is or has become an Allowed Claim and as set forth on Exhibit "F" hereto; provided, however, that, based upon a methodology or procedure agreed upon by the Debtors, the Creditors' Committee and the ENA Examiner and set forth in the Plan Supplement, the amount of each such Intercompany Claim may be adjusted pursuant to a Final Order of the Bankruptcy Court entered after the date of the Disclosure Statement Order to reflect (a) Allowed Claims, other than Guaranty Claims, arising from a Debtor satisfying, or being deemed to have satisfied, the obligations of another Debtor, (b) Allowed Claims arising under section 502(h) of the Bankruptcy Code solely to the extent that a Debtor does not receive a full recovery due to the effect of the proviso set forth in Section 28.1 of the Plan or (c) Allowed Claims arising from the rejection of written executory contracts or unexpired leases between or among the Debtors, other than with respect to Claims relating to the rejection damages referenced in Section 34.3 hereof.

1.22    **Allowed Joint Liability Claim**:  A Joint Liability Claim, to the extent it is or has become an Allowed Claim.

1.23    **Allowed Other Subordinated Claim**:  An Other Subordinated Claim, to the extent it is or has become an Allowed Claim.

1.24    **Allowed Priority Claim**:  A Priority Claim, to the extent it is or has become an Allowed Claim.

1.25    **Allowed Priority Non-Tax Claim**:  A Priority Non-Tax Claim, to the extent it is or has become an Allowed Claim.

1.26    **Allowed Priority Tax Claim**:  A Priority Tax Claim, to the extent it is or has become an Allowed Claim.

1.27    **Allowed Secured Claim**:  A Secured Claim, to the extent it is or has become an Allowed Claim.

1.28    **Allowed Section 510 Enron Common Equity Interest Claim**:  A Section 510 Enron Common Equity Interest Claim, to the extent it is or has become an Allowed Claim.

1.29    **Allowed Section 510 Enron Preferred Equity Interest Claim**:  A Section 510 Enron Preferred Equity Interest Claim, to the extent it is or has become an Allowed Claim.

1.30    **Allowed Section 510 Enron Senior Notes Claim**:  A Section 510 Enron Senior Notes Claim, to the extent it is or has become an Allowed Claim.

1.31    **Allowed Section 510 Enron Subordinated Debenture Claim**:  A Section 510 Enron Subordinated Debenture Claim, to the extent it is or has become an Allowed Claim.

1.32    **Allowed Subordinated Claim**:  A Subordinated Claim, to the extent it is or has become an Allowed Claim.

1.33    **Allowed Wind Guaranty Claim**:  A Wind Guaranty Claim, to the extent it is or has become an Allowed Claim.

1.34    **Assets**:  With respect to a Debtor, (a) all "property" of such Debtor's estate, as defined in section 541 of the Bankruptcy Code, including such property as is reflected on such Debtor's books and records as of the date of the Disclosure Statement Order, unless modified pursuant to the Plan or a Final Order and (b) all claims and causes of action, including those that may be allocated or reallocated in accordance with the provisions of Articles II, XXII, XXIII and XXVIII of the Plan, that have been or may be commenced by such Debtor in Possession or other authorized representative for the benefit of such Debtor's estate, unless modified pursuant to the Plan or a Final Order; provided, however, that, "Assets" shall not include claims and causes of action which are the subject of the Severance Settlement Fund Litigation or such other property otherwise provided for in the Plan or by a Final Order; and, provided, further, that, in the event that the Litigation Trust or the Special Litigation Trust is created, Litigation Trust Claims or Special Litigation Claims, as the case may be, shall not constitute "Assets".

1.35    **Assumption Schedule**:  The list of executory contracts and unexpired leases to be assumed in accordance with section 365 of the Bankruptcy Code and Article XXXIV of the Plan and filed with the Bankruptcy Court pursuant to the provisions of Article XXXIV of the Plan.

1.36    **Ballot**:  The form distributed to each holder of an impaired Claim on which is to be indicated acceptance or rejection of the Plan.

1.37    **Ballot Date**:  The date established by the Bankruptcy Court and set forth in the Disclosure Statement Order for the submission of Ballots and the election of alternative treatments pursuant to the terms and provisions of the Plan.

1.38    **Bankruptcy Code**:  The Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, as applicable to the Chapter 11 Cases.

1.39    **Bankruptcy Court**:  The United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases.

1.40    **Bankruptcy Rules**:  The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, and any Local Rules of the Bankruptcy Court, as amended, as applicable to the Chapter 11 Cases.

1.41    **Benefit Plan**:  Any employee welfare benefit plan, employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan within the meaning of Section 3(3) of ERISA, including, without limitation, the Enron Corp. Medical Plan for Actives, the Enron Corp. Medical Plan for Inactives, the Enron Corp. Savings Plan, the Enron Corp. Flexible Compensation Plan, the Enron Corp. Long Term Care Plan, the Enron Corp. Dental Plan for Active Employees, the Enron Corp. Dental Plan for Inactive Participants, the Enron Corp. Business Travel Accident Plan, the Enron Corp. Accidental Death & Dismemberment Insurance Plan, the Enron Corp. Life Insurance Plan, the Enron Corp. Educational Assistance Plan, the Enron Gas Pipelines Employee Benefit Trust, the Data Systems Group, Inc. Employees' 401(k) Plan, the Enron Wind Corp. Profit Sharing Plan, the Enron Wind Corp. Savings & Retirement Plan, the Garden State Paper 401(k) Plan, the MGMCC Savings Plan & Trust, the Affiliated Building Services, Inc. Money Purchase Pension Plan, the Limbach Holdings, Inc. Profit Sharing Retirement Plan, the EFS Savings Plan, the Enron Corp. Cash Balance Plan, the San Juan Gas Pension Plan, the Garden State Paper Pension Plan, the EFS Pension Plan and any such similar employee benefit plan or arrangement which any of the Debtors maintained prior to the Initial Petition Date.

1.42    **Business Day**:  A day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.43    **Case Management Order**:  The Second Amended Case Management Order Establishing, Among Other Things, Noticing Electronic Procedures, Hearing Dates, Independent Website and Alternative Methods of Participation at Hearings, dated December 17, 2002, entered by the Bankruptcy Court.

1.44   **Cash**: Lawful currency of the United States of America.

1.45   **Cash Equivalents**: Equivalents of Cash in the form of readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's Rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than One Hundred Million Dollars ($100,000,000.00), having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

1.46   **Chapter 11 Cases**: The cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on or after the Initial Petition Date, styled In re Enron Corp. et al., Chapter 11 Case No. 01-16034 (AJG), Jointly Administered, currently pending before the Bankruptcy Court.

1.47   **Claim**: Any right to payment from the Debtors or from property of the Debtors or their estates, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors or from property of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.48   **Class**: A category of holders of Claims or Equity Interests set forth in Article IV of the Plan.

1.49   **Class Actions**: The litigations styled (1) In re Enron Corporation Securities, Derivative and "ERISA" Litigation, Case No. MDL 1446, (2) Newby, et al. v. Enron Corporation, et al., Civil Action No. H-01-3624, (3) Tittle, et al. v. Enron Corp., et al., Civil Action No. H-01-3913, (4) American National Insurance Company, et al. v. Arthur Andersen, LLP, et al., Civil Action No. G-02585, (5) American National Insurance Company, et al. v. Citigroup, Inc., et al., Civil Action No. G-02-723, (6) Blaz, et al. v. Robert A. Belfer, et al., Civil Action No. H-02-1150, (7) Pearson, et al. v. Fastow, et al., Civil Action No. H-02-3786, (8) Rosen, et al. v. Fastow, et al., Civil Action No. H-02-3787, (9) Ahlich, et al. v. Arthur Andersen LLP, et al., Civil Action No. H-02-3794, (10) Silvercreek Management, Inc., et al. v. Salomon Smith Barney, Inc., et al., Civil Action No. H-02-3185, and (11) such other actions which may be pending and become consolidated or coordinated for pre-trial or administrative purposes in the United States District Court for the Southern District of Texas, Houston Division.

1.50   **Collateral**: Any property or interest in property of the estates of any of the Debtors that is subject to an unavoidable Lien to secure the payment or performance of a Claim.

1.51   **Common Equity Interest**: A common Equity Interest.

1.52    **Common Equity Trust**:  The Entity to be created on or prior to the Effective Date to hold the Exchanged Enron Common Stock for the benefit of the holders of Enron Common Equity Trust Interests.

1.53    **Common Equity Trustee**:  Stephen Forbes Cooper, LLC, or such other Entity appointed by the Bankruptcy Court to administer the Common Equity Trust in accordance with the terms and provisions of Article XXVII of the Plan and the Common Equity Trust Agreement.

1.54    **Common Equity Trust Agreement**:  The trust agreement, which agreement shall be in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan Supplement.

1.55    **Common Equity Trust Board**:  The Persons selected by the Debtors, after consultation with the Creditors' Committee, and appointed by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the Common Equity Trust Agreement.

1.56    **Common Equity Trust Interests**:  The beneficial interests in the Common Equity Trust, in a number equal to the outstanding shares of Exchanged Enron Common Stock, to be allocated to holders of Allowed Enron Common Equity Interests.

1.57    **Confirmation Date**:  The date the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases.

1.58    **Confirmation Hearing**:  The hearing to consider confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.59    **Confirmation Order**:  The order of the Bankruptcy Court confirming the Plan.

1.60    **Consolidated Basis**:  With respect to any Claims (a) asserted by an Entity against two or more Debtors and (b) arising from or related to the same liability, or on the basis of secondary liability, co-liability or joint liability, for certain purposes of the Plan, such Claims shall be deemed to be treated as a single Claim of such Entity against the Debtors as if the Debtors' estates were substantively consolidated.

1.61    **Convenience Claim**:  Except as provided in Section 16.2 of the Plan, any Claim equal to or less than Fifty Thousand Dollars ($50,000.00) or greater than Fifty Thousand Dollars ($50,000.00) but, with respect to which, the holder thereof voluntarily reduces the Claim to Fifty Thousand Dollars ($50,000.00) on the Ballot; provided, however, that, for purposes of the Plan and the distributions to be made hereunder, "Convenience Claim" shall not include (i) an Enron Senior Note Claim, (ii) an Enron Subordinated Debenture Claim, (iii) an ETS Debenture Claim, (iv) an ENA Debenture Claim, (v) an Enron TOPRS Debenture Claim and (vi) any other Claim that is a component of a larger Claim, portions of which may be held by one or more holders of Allowed Claims.

1.62    **Convenience Claim Distribution Percentage**:  With respect to a Convenience Claim against an individual Debtor, the amount set forth opposite the appropriate Class listed on Exhibit "G" hereto.

1.63    **Creditor**:  Any Person or Entity holding a Claim against the Debtors' estates or, pursuant to section 102(2) of the Bankruptcy Code, against property of the Debtors that arose or is deemed to have arisen on or prior to the Petition Date, including, without limitation, a Claim against any of the Debtors or Debtors in Possession of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

1.64    **Creditor Cash**:  At any time, the excess, if any, of (a) all Cash and Cash Equivalents (i) in the Disbursement Account(s) or (ii) to be distributed in accordance with the provisions of Sections 22.8 and 23.8 of the Plan over (b) such amounts of Cash (i) reasonably determined by the Disbursing Agent as necessary to satisfy, in accordance with the terms and conditions of the Plan, Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, Convenience Claims and Secured Claims, (ii) necessary to fund the Litigation Trust and the Special Litigation Trust in accordance with Articles XXII and XXIII of the Plan, respectively, (iii) necessary to make pro rata distributions to holders of Disputed Claims as if such Disputed Claims were, at such time, Allowed Claims and (iv) such other amounts reasonably determined by the Reorganized Debtors as necessary to fund the ongoing operations of the Reorganized Debtors or the Remaining Asset Trusts, as the case may be, during the period from the Effective Date up to and including such later date as the Reorganized Debtor Plan Administrator shall reasonably determine; provided, however, that, on the Effective Date, Creditor Cash available as of the Effective Date shall be equal to or greater than the amount of Creditor Cash jointly determined by the Debtors and the Creditors' Committee and set forth in the Plan Supplement, which amount may be subsequently adjusted with the consent of the Creditors' Committee; and, provided, further, that such projected amount of Creditor Cash shall be reduced, on a dollar-for-dollar basis, to the extent of any distributions of Cash made by the Debtors to Creditors, pursuant to a Final Order, during the period from the Confirmation Date up to and including the Effective Date.

1.65    **Creditors' Committee**:  The statutory committee of creditors holding Unsecured Claims appointed in the Chapter 11 Cases pursuant to section 1102(a)(1) of the Bankruptcy Code, as reconstituted from time to time.

1.66    **CrossCountry Assets**:  The assets of CrossCountry Distributing Company or a subsidiary of CrossCountry Distributing Company, including, without limitation, (a) (i) eight hundred (800) shares of common stock of Transwestern Holding Company, Inc., having a par value of $0.01 per share, (ii) five hundred (500) shares of Class B common stock of Citrus Corp., having a par value of $1.00 per share, (iii) four hundred (400) shares of common stock of Northern Plains Natural Gas Company, having a par value of $1.00 per share, (iv) one hundred percent (100%) of the membership interests in CrossCountry Energy Services, LLC (successor-in-interest to CGNN Holding Company, Inc.) and (v) one thousand (1000) shares of common stock of NBP Services Corporation, having a par value of $1.00 per share; provided, however, that, in the event that, during the period from the date of the Disclosure Statement Order up to and including the date of the initial distribution of Plan Securities pursuant to the terms and provisions of Section 32.1(c) hereof, the Debtors, with the consent of the Creditors'

Committee, determine not to include in CrossCountry Distributing Company or a subsidiary thereof a particular asset set forth above, the Debtors shall file a notice thereof with the Bankruptcy Court and the Value of the CrossCountry Common Equity shall be reduced by the Value attributable to such asset, as set forth in the Disclosure Statement or determined by the Bankruptcy Court at the Confirmation Hearing, and (b) such other assets as the Debtors, with the consent of the Creditors' Committee, determine on or prior to the date of the initial distribution of Plan Securities pursuant to the terms and provisions of Section 32.1(c) hereof to include in CrossCountry Distributing Company or a subsidiary thereof and the Value of the CrossCountry Common Equity shall be increased by the Value attributable to any such assets.

1.67    **CrossCountry By-laws/Organizational Agreement**:  The by-laws or organizational agreement of CrossCountry Distributing Company, which by-laws or other organizational agreement shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.68    **CrossCountry Charter**:  The Certificate of Incorporation or other charter document, as applicable, of CrossCountry Distributing Company, to be filed with its jurisdiction of organization, which certificate of incorporation or other organizational document shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.69    **CrossCountry Common Equity**:  In the event that CrossCountry Distributing Company is (i) a corporation, the shares of common equity authorized and to be issued pursuant to the Plan, which shares shall have a par value of $0.01 per share, of which one hundred million (100,000,000) shares shall be authorized and of which seventy-five million (75,000,000) shares shall be issued pursuant to the Plan, or (ii) an Entity other than a corporation, units of common equity of such Entity, of which one hundred million (100,000,000) units shall be authorized and of which seventy-five million (75,000,000) units shall be issued pursuant to the Plan, and such other rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable non-bankruptcy law or the CrossCountry Charter or the CrossCountry By-laws/ Organizational Agreement.

1.70    **CrossCountry Distributing Company**:  The Entity designated jointly by the Debtors and the Creditors' Committee pursuant to the Plan to distribute shares of capital stock or equity interests in accordance with Section 32.1(c) of the Plan representing interests in the CrossCountry Assets.

1.71    **CrossCountry Trust**:  The Entity, if jointly determined by the Debtors and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, to be created on or subsequent to the Confirmation Date, but in no event later than the date on which the Litigation Trust is created, in addition to the creation of CrossCountry Distributing Company, and to which Entity shall be conveyed one hundred percent (100%) of the CrossCountry Common Equity.

1.72    **CrossCountry Trust Agreement**:  In the event the CrossCountry Trust is created, the CrossCountry Trust Agreement, which agreement shall be in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan

Supplement, pursuant to which the CrossCountry Trust Board and the CrossCountry Trustee shall manage, administer, operate and liquidate the assets contained in the CrossCountry Trust and distribute the proceeds thereof or the CrossCountry Common Equity.

1.73   **CrossCountry Trust Board**:  In the event the CrossCountry Trust is created, the Persons selected by the Debtors, after consultation with the Creditors' Committee, and appointed by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the CrossCountry Trust Agreement.

1.74   **CrossCountry Trustee**:  In the event the CrossCountry Trust is created, Stephen Forbes Cooper, LLC, or such other Entity appointed by the CrossCountry Trust Board and approved by the Bankruptcy Court to administer the CrossCountry Trust in accordance with the provisions of Article XXIV hereof and the CrossCountry Trust Agreement.

1.75   **CrossCountry Trust Interests**:  In the event the CrossCountry Trust is created, the seventy-five million (75,000,000) beneficial interests in CrossCountry Distributing Company to be allocated to holders of Allowed Claims.

1.76   **DCR Overseers**:  The group of five (5) Persons selected by the Debtors with the consent of (a) the Creditors' Committee with respect to four (4) of the Debtors' selections and (b) the ENA Examiner with respect to one (1) of the Debtors' selections, and appointed prior to the Effective Date by the Bankruptcy Court, or any replacements thereafter selected in accordance with the guidelines of the Disputed Claims reserve set forth in the Plan Supplement, who shall determine, in accordance with the provisions set forth therein, to vote or sell the Plan Securities held by the Disputed Claims reserve to be created in accordance with the provisions of Section 21.3 of the Plan.

1.77   **Debtors**:  Enron Metals & Commodity Corp., Enron Corp., Enron North America Corp., Enron Power Marketing, Inc., PBOG Corp., Smith Street Land Company, Enron Broadband Services, Inc., Enron Energy Services Operations, Inc., Enron Energy Marketing Corp., Enron Energy Services, Inc., Enron Energy Services, LLC, Enron Transportation Services, LLC, BAM Lease Company, ENA Asset Holdings L.P., Enron Gas Liquids, Inc., Enron Global Markets LLC, Enron Net Works LLC, Enron Industrial Markets LLC, Operational Energy Corp., Enron Engineering & Construction Company, Enron Engineering & Operational Services Company, Garden State Paper Company, LLC, Palm Beach Development Company, L.L.C., Tenant Services, Inc., Enron Energy Information Solutions, Inc., EESO Merchant Investments, Inc., Enron Federal Solutions, Inc., Enron Freight Markets Corp., Enron Broadband Services, L.P., Enron Energy Services North America, Inc., Enron LNG Marketing LLC, Calypso Pipeline, LLC, Enron Global LNG LLC, Enron International Fuel Management Company, Enron Natural Gas Marketing Corp., ENA Upstream Company LLC, Enron Liquid Fuels, Inc., Enron LNG Shipping Company, Enron Property & Services Corp., Enron Capital & Trade Resources International Corp., Enron Communications Leasing Corp., Enron Wind Corp., Enron Wind Systems, Inc., Enron Wind Energy Systems Corp., Enron Wind Maintenance Corp., Enron Wind Constructors Corp., EREC Subsidiary I, LLC, EREC Subsidiary II, LLC, EREC Subsidiary III, LLC, EREC Subsidiary IV, LLC, EREC Subsidiary V, LLC, Intratex Gas Company, Enron Processing Properties, Inc., Enron Methanol Company, Enron Ventures Corp., The New Energy Trading Company, EES Service Holdings, Inc., Enron Wind Development

LLC, ZWHC LLC, Zond Pacific, LLC, Enron Reserve Acquisition Corp., EPC Estates Services, Inc., f/k/a National Energy Production Corporation, Enron Power & Industrial Construction Company, NEPCO Power Procurement Company, NEPCO Services International, Inc., Caribe Verde (SJG) Inc., f/k/a San Juan Gas Company, Inc., EBF LLC, Zond Minnesota Construction Company LLC, Enron Fuels International, Inc., E Power Holdings Corp., EFS Construction Management Services, Inc., Enron Management, Inc., Enron Expat Services, Inc., Artemis Associates, LLC, Clinton Energy Management Services, Inc., LINGTEC Constructors L.P., EGS New Ventures Corp., Louisiana Gas Marketing Company, Louisiana Resources Company, LGMI, Inc., LRCI, Inc., Enron Communications Group, Inc., EnRock Management, LLC, ECI-Texas, L.P., EnRock, L.P., ECI-Nevada Corp., Enron Alligator Alley Pipeline Company, Enron Wind Storm Lake I LLC, ECT Merchant Investments Corp., EnronOnLine, LLC, St. Charles Development Company, L.L.C., Calcasieu Development Company, L.L.C., Calvert City Power I, L.L.C., Enron ACS, Inc., LOA, Inc., Enron India LLC, Enron International Inc., Enron International Holdings Corp., Enron Middle East LLC, Enron WarpSpeed Services, Inc., Modulus Technologies, Inc., Enron Telecommunications, Inc., DataSystems Group, Inc. Risk Management & Trading Corp., Omicron Enterprises, Inc., EFS I, Inc., EFS II, Inc., EFS III, Inc., EFS V, Inc., EFS VI, LP., EFS VII, Inc., EFS IX, Inc., EFS X, Inc., EFS XI, Inc., EFS XII, Inc., EFS XV, Inc., EFS XVII, Inc., Jovinole Associates, EFS Holdings, Inc., Enron Operations Services, LLC, Green Power Partners I LLC, TLS Investors, L.L.C., ECT Securities Limited Partnership, ECT Securities LP Corp., ECT Securities GP Corp., KUCC Cleburne, LLC, Enron International Asset Management Corp., Enron Brazil Power Holdings XI Ltd., Enron Holding Company L.L.C., Enron Development Management Ltd., Enron International Korea Holdings Corp., Enron Caribe VI Holdings Ltd., Enron International Asia Corp., Enron Brazil Power Investments XI Ltd., Paulista Electrical Distribution, L.L.C., Enron Pipeline Construction Services Company, Enron Pipeline Services Company, Enron Trailblazer Pipeline Company, Enron Liquid Services Corp., Enron Machine and Mechanical Services, Inc., Enron Commercial Finance Ltd., Enron Permian Gathering Inc., Transwestern Gathering Company, Enron Gathering Company, EGP Fuels Company, Enron Asset Management Resources, Inc., Enron Brazil Power Holdings I Ltd., Enron do Brazil Holdings Ltd., Enron Wind Storm Lake II LLC, Enron Renewable Energy Corp., Enron Acquisition III Corp., Enron Wind Lake Benton LLC, Superior Construction Company, EFS IV, Inc., EFS VIII, Inc., EFS XIII, Inc., Enron Credit Inc., Enron Power Corp., Richmond Power Enterprise, L.P., ECT Strategic Value Corp., Enron Development Funding Ltd., Atlantic Commercial Finance, Inc., The Protane Corporation, Enron Asia Pacific/Africa/China LLC, Enron Development Corp., ET Power 3 LLC, Nowa Sarzyna Holding B.V., Enron South America LLC, Enron Global Power & Pipelines LLC, Portland General Holdings, Inc., Portland Transition Company, Inc., Cabazon Power Partners LLC, Cabazon Holdings LLC, Enron Caribbean Basin LLC, Victory Garden Power Partners I LLC, Oswego Cogen Company, LLC and Enron Equipment & Procurement Company.

     1.78    **Debtors in Possession**:  The Debtors as debtors in possession pursuant to sections 1101(1) and 1107(a) of the Bankruptcy Code.

     1.79    **Deferred Compensation Litigation**:  The avoidance actions commenced or to be commenced by the Debtors in Possession or the Employee Committee, for and on behalf of the Debtors' estates, in connection with payments made with respect to the Enron Corp. 1994 Deferral Plan and Enron Expat Services, Inc. 1998 Deferral Plan.

1.80    **Defined Benefit Plans**: The Enron Corp. Cash Balance Plan, the San Juan Gas Pension Plan, the Garden State Paper Pension Plan and the EFS Pension Plan.

1.81    **DIP Orders**: The Bankruptcy Court orders, dated December 3, 2001, July 2, 2002 and May 8, 2003, authorizing and approving the Debtors' incurrence of post-Petition Date debtor in possession financing and the granting of liens and security interests in connection therewith.

1.82    **Disbursement Account(s)**: The account(s) to be established by the Reorganized Debtors on the Effective Date in accordance with Section 31.1 of the Plan, together with any interest earned thereon.

1.83    **Disbursing Agent**: Solely in its capacity as agent of the Debtors to effectuate distributions pursuant to the Plan, the Reorganized Debtors, the Reorganized Debtor Plan Administrator or such other Entity as may be designated by the Debtors, with the consent of the Creditors' Committee, and appointed by the Bankruptcy Court and set forth in the Confirmation Order.

1.84    **Disclosure Statement**: The disclosure statement for the Plan approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code.

1.85    **Disclosure Statement Order**: The Final Order of the Bankruptcy Court approving the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code.

1.86    **Disputed Claim; Disputed Equity Interest**: Any Claim against or Equity Interest in the Debtors, to the extent the allowance of such Claim or Equity Interest is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order, or is otherwise disputed by the Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn, with prejudice, or determined by a Final Order; provided, however, that a Claim of a lender in a syndicated credit facility in which such lender holds a direct Claim, and not (a) a credit facility in which such lender holds a participation in a Claim held by the agent(s) or (b) a facility which is the subject of the MegaClaim Litigation or other pending adversary proceeding, shall not be deemed to be a Disputed Claim solely by reason of the agent(s) for such syndicated credit facility being named, in its individual capacity in an objection, the MegaClaim Litigation or other proceeding.

1.87    **Disputed Claim Amount**: The lesser of (a) the liquidated amount set forth in the proof of claim filed with the Bankruptcy Court relating to a Disputed Claim, (b) if the Bankruptcy Court has estimated such Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, the amount of a Disputed Claim as estimated by the Bankruptcy Court, and (c) the amount of such Disputed Claim allowed by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code, or zero, if such Disputed Claim is disallowed by the Bankruptcy Court pursuant to such section, in either case, regardless of whether the order or judgment allowing or disallowing such Claim has become a Final Order; provided, however, that, in the event that such Claim has been disallowed, but the order of disallowance has not yet become a Final Order, the Bankruptcy Court may require the Disbursing Agent to reserve Cash, Plan Securities and Trust

Interests in an amount equal to the Pro Rata Share that would be attributed to such Claim if it were an Allowed Claim, or a lesser amount, to the extent that the Bankruptcy Court, in its sole and absolute discretion, determines such reserve is necessary to protect the rights of such holder under all of the facts and circumstances relating to the order of disallowance and the appeal of such holder from such order.

1.88    **Distribution Model**:  The computer program developed by The Blackstone Group L.P. for the Debtors, which program tracks the assets and liabilities of, among others, each of the Debtors and calculates the recoveries and distributions to be made pursuant to the Plan.

1.89    **Distributive Assets**:  The Plan Currency to be made available to holders of Allowed General Unsecured Claims of a Debtor in an amount derived from the Distribution Model equal to the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of such Debtor's General Unsecured Claims and (b) the product of (y) the Value of such Debtor's Assets minus an amount equal to the sum of (1) one hundred percent (100%) of such Debtor's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of such Debtor's Convenience Claim Distribution Percentage times such Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of such Debtor's General Unsecured Claims and the denominator of which is equal to the sum of such Debtor's (1) General Unsecured Claims, (2) Guaranty Claims and (3) Intercompany Claims, plus (B) the product of (i) thirty percent (30%) times (ii) the Value of all of the Debtors' Assets as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to the amount of such Debtor's General Unsecured Claims, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis, and (z) fifty percent (50%) of all Guaranty Claims; provided, however, that, for purposes of calculating "Distributive Assets", (i) such calculation shall not include the Assets of or General Unsecured Claims against either of the Portland Debtors and (ii) with respect to Allowed General Unsecured Claims against ETS, the product set forth in clause (A) above shall be equal to seventy cents ($0.70) per dollar.

1.90    **Distributive Interests**:  The Litigation Trust Interests or the Special Litigation Trust Interests, as the case may be, to be made available to holders of Allowed General Unsecured Claims of a Debtor in an amount derived from the Distribution Model equal to the quotient of (I) the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of such Debtor's General Unsecured Claims and (b) the product of (y) the sum of the Value of such Debtor's Assets and the Fair Market Value of such Debtor's Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, minus an amount equal to the sum of (1) one hundred percent (100%) of such Debtor's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of such Debtor's Convenience Claim Distribution Percentage times such Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of such Debtor's General Unsecured Claims and the denominator of which is equal to the sum of such Debtor's (1) General Unsecured Claims,

(2) Guaranty Claims and (3) Intercompany Claims, plus (B) the product of (i) thirty percent (30%) times (ii) the sum of the Value of all of the Debtors' Assets and the Fair Market Value of all of the Debtors' Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to the amount of such Debtor's General Unsecured Claims, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis, and (z) fifty percent (50%) of all Guaranty Claims, minus (C) Distributive Assets, divided by (II) the Fair Market Value of a Litigation Trust Interest or a Special Litigation Trust Interest, as the case may be; provided, however, that, for purposes of calculating "Distributive Interests", such calculation shall not include the Assets of or General Unsecured Claims against either of the Portland Debtors.

1.91 **District Court**:  The United States District Court for the Southern District of Texas, Houston Division, having jurisdiction over the Class Actions.

1.92 **ECT I**:  Enron Capital Trust I, a trust under the Delaware Business Trust Act pursuant to the ECT I Trust Declarations.

1.93 **ECT I Trust Declarations**:  That certain Declaration of Trust, dated as of October 25, 1996, as amended by certain Amended and Restated Declaration of Trust of Enron Capital Trust I, dated as of November 18, 1996.

1.94 **ECT II**:  Enron Capital Trust II, a trust under the Delaware Business Trust Act pursuant to the ECT II Trust Declarations.

1.95 **ECT II Trust Declarations**:  That certain Declaration of Trust, dated as of December 23, 1996, as amended by that certain Amended and Restated Declaration of Trust of Enron Capital Trust II, dated as of January 13, 1997.

1.96 **Effective Date**:  The earlier to occur of (a) the first (1st) Business Day following the Confirmation Date that (i) the conditions to effectiveness of the Plan set forth in Section 37.1 of the Plan have been satisfied or otherwise waived in accordance with Section 37.2 of the Plan, but in no event earlier than December 31, 2004, and (ii) the effectiveness of the Confirmation Order shall not be stayed and (b) such other date following the Confirmation Date that the Debtors and the Creditors' Committee, in their joint and absolute discretion, designate.

1.97 **8.25% Subordinated Debentures**:  Those certain debentures issued in the original aggregate principal amount of One Hundred Fifty Million Dollars ($150,000,000.00) in accordance with the terms and conditions of the Enron Subordinated Indenture.

1.98 **Employee Committee**:  The statutory committee appointed in the Chapter 11 Cases pursuant to section 1102(a)(2) of the Bankruptcy Code, as reconstituted from time to time, to advise and represent the interests of former and current employees with respect to employee

related issues to the extent provided in the Bankruptcy Court's order, dated July 19, 2002, as such order may be amended or modified.

1.99    **Employee Counsel Orders**:  The Bankruptcy Court orders, dated March 29, 2002 and November 1, 2002, together with all other orders entered by the Bankruptcy Court in conjunction therewith, authorizing the retention of counsel to represent former and present employees of the Debtors in connection with the investigations of governmental entities, authorities or agencies with respect to the Debtors' operations and financial transactions.

1.100    **Employee Prepetition Stay Bonus Payments**:  The stay bonus payments made to certain of the Debtors' former employees which are the subject of the Severance Settlement Fund Litigation.

1.101    **ENA**:  Enron North America Corp., a Delaware corporation.

1.102    **ENA Debentures**:  The 7.75% Debentures Due 2016, issued in the original aggregate principal amount of $29,108,000.00 and the 7.75% Debentures Due 2016, Series II, issued in the original aggregate principal amount of $21,836,000.00, pursuant to the ENA Indentures.

1.103    **ENA Debentures Claim**:  Any General Unsecured Claim arising from or related to the ENA Indentures.

1.104    **ENA Examiner**:  Harrison J. Goldin, appointed as examiner of ENA pursuant to the Bankruptcy Court's order, dated March 12, 2002.

1.105    **ENA Examiner Order**:  The Bankruptcy Court order, dated June 3, 2004, relating to, among other things, the transition of the ENA Examiner's duties and obligations.

1.106    **ENA Guaranty Claim**:  Any Unsecured Claim, other than an Intercompany Claim, against ENA arising from or relating to an agreement by ENA to guarantee or otherwise satisfy the obligations of another Debtor, including, without limitation, any Claim arising from or relating to rights of contribution or reimbursement.

1.107    **ENA Guaranty Distributive Assets**:  The Plan Currency to be made available to holders of Allowed ENA Guaranty Claims in an amount derived from the Distribution Model equal to the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of ENA Guaranty Claims and (b) the product of (y) the Value of ENA's Assets minus an amount equal to the sum of (1) one hundred percent (100%) of ENA's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of ENA's Convenience Claim Distribution Percentage times ENA's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of ENA Guaranty Claims and the denominator of which is equal to the sum of ENA's (1) General Unsecured Claims, (2) ENA Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%) times (ii) the Value of all of the Debtors' Assets, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's

Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of ENA Guaranty Claims and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims; provided, however, that, for purposes of calculating "ENA Guaranty Distributive Assets", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.108    **ENA Guaranty Distributive Interests**:  The Litigation Trust Interests or the Special Litigation Trust Interests, as the case may be, to be made available to holders of Allowed ENA Guaranty Claims in an amount derived from the Distribution Model equal to the quotient of (I) the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of ENA Guaranty Claims and (b) the product of (y) the sum of the Value of ENA's Assets and the Fair Market Value of ENA's Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, minus an amount equal to the sum of (1) one hundred percent (100%) of ENA's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of ENA's Convenience Claim Distribution Percentage times ENA's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of ENA Guaranty Claims and the denominator of which is equal to the sum of ENA's (1) General Unsecured Claims, (2) ENA Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%) times (ii) the sum of the Value of all of the Debtors' Assets and the Fair Market Value of all of the Debtors' Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of ENA Guaranty Claims and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims, minus (C) ENA Guaranty Distributive Assets, divided by (II) the Fair Market Value of a Litigation Trust Interest or a Special Litigation Trust Interest, as the case may be; provided, however, that, for purposes of calculating "ENA Guaranty Distributive Interests", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.109    **ENA Indentures**:  That certain (1) Indenture, dated as of November 21, 1996, by and among Enron Capital & Trade Resources Corp., now known as ENA, ENE, as Guarantor, and The Chase Manhattan Bank, as Indenture Trustee, and (2) Indenture, dated as of January 16, 1997, by and among Enron Capital & Trade Resources Corp., now known as ENA, ENE, as Guarantor, and The Chase Manhattan Bank, as Indenture Trustee.

1.110   **ENA Indenture Trustee**:  National City Bank, solely in its capacity as successor in interest to The Chase Manhattan Bank, as Indenture Trustee under the ENA Indentures, or its duly appointed successor.

1.111   **ENE**:  Enron Corp., an Oregon corporation.

1.112   **ENE Examiner**:  Neal A. Batson, appointed as examiner of ENE pursuant to the Bankruptcy Court's order, dated May 24, 2002.

1.113   **ENE Examiner Orders**:  The Bankruptcy Court orders, dated December 17, 2003, December 18, 2003 and February 19, 2004, together with such other orders of the Bankruptcy Court,  relating to, among other things, the termination of the ENE Examiner's duties and obligations.

1.114   **Enron Affiliate**:  Any of the Debtors and any other direct or indirect subsidiary of ENE.

1.115   **Enron Common Equity Interest**:  An Equity Interest represented by one of the one billion two hundred million (1,200,000,000) authorized shares of common stock of ENE as of the Petition Date or any interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to or on the Petition Date.

1.116   **Enron Guaranty Claim**:  Any Unsecured Claim, other than an Intercompany Claim, against ENE arising from or relating to an agreement by ENE to guarantee or otherwise satisfy the obligations of another Debtor, including, without limitation, any Claim arising from or relating to rights of contribution or reimbursement.

1.117   **Enron Guaranty Distributive Assets**:  The Plan Currency to be made available to holders of Allowed Enron Guaranty Claims in an amount derived from the Distribution Model equal to the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of ENE's Enron Guaranty Claims and (b) the product of (y) the Value of ENE's Assets minus an amount equal to the sum of (1) one hundred percent (100%) of ENE's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of ENE's Convenience Claim Distribution Percentage times ENE's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of ENE's Enron Guaranty Claims and the denominator of which is equal to the sum of ENE's (1) General Unsecured Claims, (2) Enron Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%) times (ii) the Value of all of the Debtors' Assets, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of Enron Guaranty Claims and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors'

General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims; provided, however, that, for purposes of calculating "Enron Guaranty Distributive Assets", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.118    **Enron Guaranty Distributive Interests**: The Litigation Trust Interests or the Special Litigation Trust Interests, as the case may be, to be made available to holders of Allowed Enron Guaranty Claims in an amount derived from the Distribution Model equal to the quotient of (I) the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of ENE's Enron Guaranty Claims and (b) the product of (y) the sum of the Value of ENE's Assets and the Fair Market Value of ENE's Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, minus an amount equal to the sum of (1) one hundred percent (100%) of ENE's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of ENE's Convenience Claim Distribution Percentage times ENE's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of ENE's Enron Guaranty Claims and the denominator of which is equal to the sum of ENE's (1) General Unsecured Claims, (2) Enron Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%) times (ii) the sum of the Value of all of the Debtors' Assets and the Fair Market Value of all of the Debtors' Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of Enron Guaranty Claims and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims, minus (C) Enron Guaranty Distributive Assets, divided by (II) the Fair Market Value of a Litigation Trust Interest or a Special Litigation Trust Interest, as the case may be; provided, however, that, for purposes of calculating "Enron Guaranty Distributive Interests", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.119    **Enron MIPS Agreements**: That certain (a) Loan Agreement, dated as of November 15, 1993, between ENE and Enron Capital LLC, executed and delivered in connection with the issuance of 8% Cumulative Guaranteed Monthly Income Preferred Shares, and relating to a loan in the original principal amount of Two Hundred Seventy Million Five Hundred Sixty-Nine Thousand Six Hundred Twenty-One Dollars ($270,569,621.00), and (b) Loan Agreement, dated as of August 3, 1994, between ENE and Enron Capital Resources, L.P., executed and delivered in connection with the issuance of 9% Cumulative Preferred Securities, Series A, and relating to a loan in the original principal amount of Ninety-Four Million Nine Hundred Thirty-Six Thousand Seven Hundred Nine Dollars ($94,936,709.00).

1.120    **Enron Preferred Equity Interest**: An Equity Interest represented by an issued and outstanding share of preferred stock of ENE as of the Petition Date, including, without

limitation, that certain (a) Cumulative Second Preferred Convertible Stock, (b) 9.142% Perpetual Second Preferred Stock, (c) Mandatorily Convertible Junior Preferred Stock, Series B, and (d) Mandatorily Convertible Single Reset Preferred Stock, Series C, or any other interest or right to convert into such a preferred equity interest or acquire any preferred equity interest of the Debtors which was in existence immediately prior to the Petition Date.

1.121    **Enron Senior Notes**:  The promissory notes and debentures issued and delivered by ENE in accordance with the terms and conditions of the Enron Senior Notes Indentures and set forth on Exhibit "B" hereto.

1.122    **Enron Senior Notes Claim**:  Any General Unsecured Claim arising from or relating to the Enron Senior Notes Indentures.

1.123    **Enron Senior Notes Indentures**:  That certain (a) Indenture, dated as of November 1, 1985, as supplemented on December 1, 1995, May 8, 1997, September 1, 1997 and August 17, 1999, between ENE, as Issuer, and The Bank of New York, as Indenture Trustee, (b) Indenture, dated as of October 15, 1985, as supplemented, between ENE, as Issuer, and Wells Fargo Bank Minnesota, as Indenture Trustee, (c) Indenture, dated as of April 8, 1999, as supplemented, between ENE, as Issuer, and Wells Fargo Bank Minnesota, as Indenture Trustee, and (d) Indenture, dated as of February 7, 2001, as supplemented, between ENE, as Issuer, and Wells Fargo Bank Minnesota, as Indenture Trustee.

1.124    **Enron Senior Notes Indenture Trustees**:  The Bank of New York, solely in its capacity as successor in interest to Harris Trust and Savings Bank, as Indenture Trustee, or its duly appointed successor, and Wells Fargo Bank Minnesota, solely in its capacity as successor in interest to JPMorgan Chase Bank, as Indenture Trustee, or its duly appointed successor, solely in their capacities as indenture trustees with regard to the respective Enron Senior Notes Indentures.

1.125    **Enron Subordinated Debentures**:  The 8.25% Subordinated Debentures and the 6.75% Subordinated Debentures.

1.126    **Enron Subordinated Debenture Claim**:  Any General Unsecured Claim arising from or relating to the Enron Subordinated Indenture.

1.127    **Enron Subordinated Indenture**:  That certain Indenture, dated February 1, 1987, between ENE, as Issuer, and the Enron Subordinated Indenture Trustee, as Indenture Trustee.

1.128    **Enron Subordinated Indenture Trustee**:  The Bank of New York, solely in its capacity as successor in interest to InterFirst Bank Houston, N.A., as indenture trustee under the Enron Subordinated Indenture, or its duly appointed successor.

1.129    **Enron TOPRS Debenture Claim**:  Any General Unsecured Claim arising from or relating to the Enron TOPRS Indentures.

1.130    **Enron TOPRS Debentures**:  The 7.75% Subordinated Debentures Due 2016, issued in the original aggregate principal amount of $181,926,000.00 and the 7.75%

Subordinated Debentures Due 2016, Series II, issued in the original aggregate principal amount of $136,450,000.00, pursuant to the Enron TOPRS Indentures.

1.131  **Enron TOPRS Indenture Trustee**:  National City Bank, solely in its capacity as successor in interest to The Chase Manhattan Bank, as Indenture Trustee under the Enron TOPRS Indentures, or its duly appointed successor.

1.132  **Enron TOPRS Indentures**:  That certain (1) Indenture, dated as of November 21, 1996, between ENE, as Issuer, and The Chase Manhattan Bank, as Indenture Trustee, and (2) Indenture, dated as of January 16, 1997, between ENE, as Issuer, and The Chase Manhattan Bank, as Indenture Trustee.

1.133  **Enron TOPRS Subordinated Guaranty Claim**:  Any Unsecured Claim, other than an Intercompany Claim, against ENE arising from or relating to an agreement by ENE to guarantee or otherwise satisfy the obligations of another Debtor or affiliate thereof with respect to, arising from or in connection with the issuance of the TOPRS or the structure created as a result thereof, the performance of which is subordinated to the payment and performance of ENE with respect to all other Claims.

1.134  **Entity**:  A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the Office of the United States Trustee, or any other entity.

1.135  **EPC**:  Enron Power Corp., a Delaware corporation.

1.136  **EPC Guaranty Claim**:  Any Unsecured Claim, other than an Intercompany Claim, against EPC arising from or relating to an agreement by EPC to guarantee or otherwise satisfy the obligations of another Debtor, including, without limitation, any Claim arising from or relating to rights of contribution or reimbursement.

1.137  **EPC Guaranty Distributive Assets**:  The Plan Currency to be made available to holders of Allowed EPC Guaranty Claims in an amount derived from the Distribution Model equal to the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of EPC Guaranty Claims and (b) the product of (y) the Value of EPC's Assets minus an amount equal to the sum of (1) one hundred percent (100%) of EPC's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of EPC's Convenience Claim Distribution Percentage times EPC's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of EPC Guaranty Claims and the denominator of which is equal to the sum of EPC's (1) General Unsecured Claims, (2) EPC Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%) times (ii) the Value of all of the Debtors' Assets, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a

fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of EPC Guaranty Claims and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims; provided, however, that, for purposes of calculating "EPC Guaranty Distributive Assets", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.138   **EPC Guaranty Distributive Interests**:  The Litigation Trust Interests or the Special Litigation Trust Interests, as the case may be, to be made available to holders of Allowed EPC Guaranty Claims in an amount derived from the Distribution Model equal to the quotient of (I) the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of EPC Guaranty Claims and (b) the product of (y) the sum of the Value of EPC's Assets and the Fair Market Value of EPC's Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, minus an amount equal to the sum of (1) one hundred percent (100%) of EPC's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to the product of EPC's Convenience Claim Distribution Percentage times EPC's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of EPC Guaranty Claims and the denominator of which is equal to the sum of EPC's (1) General Unsecured Claims, (2) EPC Guaranty Claims and (3) Intercompany Claims plus (B) the product of (i) thirty percent (30%) times (ii) the sum of the Value of all of the Debtors' Assets and the Fair Market Value of all of the Debtors' Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of EPC Guaranty Claims and (2) the corresponding primary General Unsecured Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis and (z) fifty percent (50%) of all Guaranty Claims, minus (C) EPC Guaranty Distributive Assets, divided by (II) the Fair Market Value of a Litigation Trust Interest or a Special Litigation Trust Interest, as the case may be; provided, however, that, for purposes of calculating "EPC Guaranty Distributive Interests", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.139   **EPF I**:  Enron Preferred Funding, L.P., a Delaware limited partnership formed pursuant to the EPF I Partnership Agreement.

1.140   **EPF I Partnership Agreement**:  That certain Agreement of Limited Partnership, dated as of October 25, 1996, as amended by that certain Amended and Restated Agreement of Limited Partnership of Enron Preferred Funding, L.P., dated as of November 21, 1996.

1.141   **EPF II**:  Enron Preferred Funding II, a Delaware limited partnership formed pursuant to the EPF II Partnership Agreement.

1.142   **EPF II Partnership Agreement**:  That certain Agreement of Limited Partnership, dated as of December 23, 1996, as amended by that certain Amended and Restated Agreement of Limited Partnership of Enron Preferred Funding II, dated as of January 16, 1997.

1.143   **Equity Interest**:  Any equity interest in any of the Debtors represented by duly authorized, validly issued and outstanding shares of preferred stock or common stock or any interest or right to convert into such an equity interest or acquire any equity interest of the Debtors which was in existence immediately prior to or on the Petition Date.

1.144   **ERISA**:  Employee Retirement Income Security Act of 1974, as amended, to the extent codified in Title 29, United States Code.

1.145   **ETS**:  Enron Transportation Services, LLC, a Delaware limited liability company and successor-in-interest to Enron Transportation Services Company, one of the Debtors.

1.146   **ETS Debenture Claim**:  Any General Unsecured Claim arising from or relating to the ETS Indentures.

1.147   **ETS Indentures**:  That certain (1) Indenture, dated as of November 21, 1996, by and among Enron Pipeline Company, now known as ETS, as Issuer, ENE, as Guarantor, and The Chase Manhattan Bank, as Indenture Trustee, and (2) Indenture, dated as of January 16, 1997, by and among Enron Pipeline Company, now known as ETS, as Issuer, ENE, as Guarantor, and The Chase Manhattan Bank, as Indenture Trustee.

1.148   **ETS Indenture Trustee**:  National City Bank, solely in its capacity as successor in interest to The Chase Manhattan Bank, as indenture trustee under the ETS Indentures, or its duly appointed successor.

1.149   **Exchanged Enron Common Stock**:  The common stock of Reorganized ENE authorized and to be issued pursuant to the Plan, having a par value of $0.01 per share, of which the same number of shares as the number of shares of authorized Enron Common Equity Interests shall be authorized, and the same number of shares as the number of shares of Enron Common Equity Interests consisting of common stock (not interests or rights to convert into, or acquire, common stock) outstanding on the Effective Date shall be issued pursuant to the Plan with such rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law or the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws, and which are being issued in exchange for, and on account of, each Enron Common Equity Interest consisting of outstanding common stock (not interests or rights to convert into, or acquire, common stock) and transferred to the Common Equity Trust with the same economic interests and rights to receive distributions from ENE or Reorganized ENE, after all Claims have been satisfied, in full, as such Enron Common Equity Interest.

1.150   **Exchanged Enron Preferred Stock**:  The Series 1 Exchanged Preferred Stock, the Series 2 Exchanged Preferred Stock, the Series 3 Exchanged Preferred Stock and the Series 4

Exchanged Preferred Stock, and such other issues of preferred stock which may be issued on account of preferred stock in existence as of the Confirmation Date.

1.151    **Existing PGE Common Stock**:  The issued and outstanding shares of PGE common stock, having a par value of $3.75 per share, held by ENE as of the date hereof.

1.152    **Fair Market Value**:  The value of the Litigation Trust Claims and the Special Litigation Trust Claims determined in accordance with the provisions of Sections 22.5 and 23.5 of the Plan, respectively.

1.153    **Fee Committee**:  The committee appointed by the Bankruptcy Court pursuant to an order, dated April 26, 2002, to, among other things, review the amounts and propriety of the fees and expenses incurred by professionals retained in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court.

1.154    **Final Order**:  An order or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; and if an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be but has not then been filed with respect to such order, shall not cause such order not to be a Final Order.

1.155    **General Unsecured Claim**:  An Unsecured Claim, other than a Guaranty Claim or an Intercompany Claim.

1.156    **Guaranty Claims**:  ACFI Guaranty Claims, ENA Guaranty Claims, Enron Guaranty Claims, EPC Guaranty Claims and Wind Guaranty Claims.

1.157    **Indentures**:  The Enron Senior Notes Indenture, the Enron Subordinated Indenture, the ETS Indentures, the ENA Indentures and the Enron TOPRS Indentures.

1.158    **Indenture Trustees**:  The Enron Senior Notes Indenture Trustees, the Enron Subordinated Indenture Trustee, the ETS Indenture Trustee, the ENA Indenture Trustee and the Enron TOPRS Indenture Trustee.

1.159    **Indenture Trustee Claims**:  The Claims of the Enron Senior Notes Indenture Trustees, the Enron Subordinated Indenture Trustee, the ETS Indenture Trustee, the ENA Indenture Trustee and the Enron TOPRS Indenture Trustee pursuant to the Enron Senior Notes Indenture, the Enron Subordinated Indenture, the ETS Indentures, the ENA Indentures and the Enron TOPRS Indentures, respectively, for reasonable fees and expenses, including, without limitation, reasonable attorney's fees and expenses.

1.160   **Initial Petition Date**:  December 2, 2001, the date on which ENE and thirteen of its direct and indirect subsidiaries filed their voluntary petitions for relief commencing the Chapter 11 Cases.

1.161   **Intercompany Claims**:  Any Unsecured Claim held by any Debtor, other than the Portland Debtors, against any other Debtor, other than the Portland Debtors.

1.162   **Intercompany Distributive Assets**:  The Plan Currency to be made available to holders of Allowed Intercompany Claims of an individual Debtor in an amount derived from the Distribution Model equal to the product of (i) seventy percent (70%) times (ii) the lesser of (a) such Debtor's Intercompany Claims and (b) the product of (y) the Value of such Debtor's Assets minus an amount equal to the sum of (1) one hundred percent (100%) of such Debtor's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to such Debtor's Convenience Claim Distribution Percentage times such Debtor's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of such Debtor's Intercompany Claims and the denominator of which is equal to the sum of such Debtor's (1) General Unsecured Claims, (2) Guaranty Claims and (3) Intercompany Claims.

1.163   **Intercompany Distributive Interests**:  The Trust Interests to be made available to holders of Allowed Intercompany Claims of an individual Debtor in an amount derived from the Distribution Model equal to the quotient of (I) the difference of (A) to the product of (i) seventy percent (70%) times (ii) the lesser of (a) such Debtor's Intercompany Claims and (b) the product of (y) the sum of the Value of such Debtor's Assets and the Fair Market Value of such Debtor's Trust Interests minus an amount equal to the sum of (1) one hundred percent (100%) of such Debtor's Administrative Expense Claims, Secured Claims and Priority Claims plus (2) an amount equal to such Debtor's Convenience Claim Distribution Percentage times such Debtor's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of such Debtor's Intercompany Claims and the denominator of which is equal to the sum of such Debtor's (1) General Unsecured Claims, (2) Guaranty Claims and (3) Intercompany Claims, minus (B) Intercompany Distributive Assets, divided by (II) the Fair Market Value of a Litigation Trust Interest or a Special Litigation Trust Interest, as the case may be.

1.164   **Investigative Orders**:  The Bankruptcy Court orders, dated April 8, 2002, February 4, 2003, June 2, 2003, and June 11, 2003, authorizing and directing the ENE Examiner and the ENA Examiner to conduct certain investigations of the Debtors' pre-Petition Date transactions.

1.165   **IRC**:  The Internal Revenue Code of 1986, as amended from time to time.

1.166   **IRS**:  The Internal Revenue Service, an agency of the United States Department of Treasury.

1.167   **Joint Liability Claim**:  Any General Unsecured Claim against more than one Debtor arising from or relating to the same liability, or on the basis of secondary liability, co-liability or joint liability, other than a Claim predicated upon a master netting agreement, to the extent determined to be enforceable by a Final Order.

1.168  **Lien**:  Any charge against or interest in property to secure payment of a debt or performance of an obligation.

1.169  **Litigation Trust**:  The Entity, if jointly determined by the Debtors or the Reorganized Debtors, as the case may be, and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, to be created on or prior to December 31st of the calendar year in which the Effective Date occurs, unless such date is otherwise extended by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, in their joint and absolute discretion and by notice filed with the Bankruptcy Court, in accordance with the provisions of Article XXII hereof and the Litigation Trust Agreement for the benefit of holders of Allowed Claims, as if Litigation Trust Claims were owned by ENE, in accordance with the terms and provisions of the Distribution Model and Article XXII of the Plan.

1.170  **Litigation Trustee**:  In the event the Litigation Trust is created, Stephen Forbes Cooper, LLC, the Entity approved by the Bankruptcy Court to administer the Litigation Trust in accordance with the terms and provisions of Article XXII hereof and the Litigation Trust Agreement.

1.171  **Litigation Trust Agreement**:  In the event the Litigation Trust is created, the trust agreement, which agreement shall be in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the Litigation Trust shall pursue the Litigation Trust Claims, if applicable, and distribute the proceeds thereof, if any.

1.172  **Litigation Trust Board**:  In the event the Litigation Trust is created, the group of five (5) Persons selected by the Debtors, after consultation with (a) the Creditors' Committee with respect to four (4) of the Debtors' selections and (b) the ENA Examiner with respect to one (1) of the Debtors' selections, and appointed prior to the Effective Date by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the Litigation Trust Agreement, who shall determine in accordance with the Litigation Trust Agreement whether to prosecute, compromise or discontinue any Litigation Trust Claims.

1.173  **Litigation Trust Claims**:  All claims and causes of action asserted, or which may be asserted, by or on behalf of the Debtors or the Debtors' estates (i) in the MegaClaim Litigation, (ii) in the Montgomery County Litigation (other than claims and causes of action against insiders or former insiders of the Debtors), (iii) of the same nature against other financial institutions, law firms, accountants and accounting firms, certain of the Debtors' other professionals and such other Entities as may be described in the Plan Supplement and (iv) arising under or pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code against the Entities referenced in subsections (i), (ii) and (iii) above; provided, however, that, under no circumstances, shall such claims and causes of action include (a) Special Litigation Trust Claims to be prosecuted by the Special Litigation Trust and the Special Litigation Trustee pursuant to Article XXIII hereof, (b) any claims and causes of action of the estates of the Debtors waived and released in accordance with the provisions of Sections 28.3 and 42.6 of the Plan or (c) any claims or causes of action of Entities that are not Affiliates of the Debtors against other Entities that are not Affiliates of the Debtors; and, provided, further, that, in the event that the

Debtors and the Creditors' Committee jointly determine not to form the Litigation Trust, the claims and causes of action referred to in clauses (i), (ii), (iii) and (iv) above shall be deemed to be Assets of ENE, notwithstanding the inclusion of ENE and other Debtors or their estates as a plaintiff in such litigation and without the execution and delivery of any additional documents or the entry of any order of the Bankruptcy Court or such other court of competent jurisdiction.

1.174   **Litigation Trust Interests**:  In the event the Litigation Trust is created, the twelve million (12,000,000) beneficial interests in the Litigation Trust to be deemed distributed ratably to holders of Allowed Claims pursuant to the terms and conditions of Article XXII of the Plan.

1.175   **Mediation Orders**:  The orders, dated May 28, 2003, June 4, 2003, June 16, 2003, and November 1, 2003, of the District Court and the Bankruptcy Court referring certain parties to mediation to facilitate the resolution of the Class Actions, the MegaClaim Litigation, certain additional litigation and other claims arising from or related to the Chapter 11 Cases.

1.176   **Mediator**:  The Honorable William C. Conner, Senior United States District Judge, as mediator in accordance with the Mediation Orders.

1.177   **MegaClaim Litigation**:  The litigation styled Enron Corp. and Enron North America Corp. v. Citigroup Inc., et al., Adversary Proceeding No. 03-9266 (AJG), pending in the Bankruptcy Court.

1.178   **Montgomery County Litigation**:  The litigation styled Official Committee of Unsecured Creditors of Enron Corp. v. Fastow, et al., Case No. 02-10-06531, pending in the District Court for the 9th Judicial District, Montgomery County, Texas.

1.179   **Operating Trustee**:  In the event the Operating Trusts are created, Stephen Forbes Cooper, LLC, or such other Entity appointed by the Bankruptcy Court to administer the respective Operating Trusts in accordance with the terms and provisions of Article XXIV hereof and the respective Operating Trust Agreements.

1.180   **Operating Trust Agreements**:  The Prisma Trust Agreement, the CrossCountry Trust Agreement and the PGE Trust Agreement.

1.181   **Operating Trusts**:  The Prisma Trust, the CrossCountry Trust and the PGE Trust.

1.182   **Operating Trust Interests**:  The CrossCountry Trust Interests, the PGE Trust Interests and the Prisma Trust Interests.

1.183   **Other Equity Interest**:  Any Common Equity Interests in any of the Debtors, other than an Enron Common Equity Interest.

1.184   **Other Subordinated Claim**:  Any Claim determined pursuant to a Final Order to be subordinated in accordance with section 510(c) of the Bankruptcy Code under the principles of equitable subordination or otherwise.

1.185   **Penalty Claim**:  Any Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages or otherwise not predicated upon compensatory damages and that is subject to subordination in accordance with section 726(a)(4) of the Bankruptcy Code or otherwise, as determined pursuant to a Final Order.

1.186   **Person**:  A "person" as defined in section 101(41) of the Bankruptcy Code.

1.187   **Petition Date**:  The Initial Petition Date; provided, however, that, with respect to those Debtors which commenced their Chapter 11 Cases subsequent to December 2, 2001, "Petition Date" shall refer to the respective dates on which such Chapter 11 Cases were commenced.

1.188   **PGE**:  Portland General Electric Company, an Oregon corporation.

1.189   **PGE By-laws**:  The by-laws of PGE, which by-laws shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.190   **PGE Certificate of Incorporation**:  The Certificate of Incorporation of PGE, which certificate of incorporation shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.191   **PGE Common Stock**:  The shares of PGE Common Stock authorized and to be issued pursuant to the Plan, which shares shall have no par value per share, of which eighty million (80,000,000) shares shall be authorized and of which sixty-two million five hundred thousand (62,500,000) shares shall be issued pursuant to the Plan, and such other rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law or the PGE Certificate of Incorporation or the PGE By-laws.

1.192   **PGE Trust**:  The Entity, if jointly determined by the Debtors and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, to be created on or subsequent to the Confirmation Date, but in no event later than the date on which the Litigation Trust is created, to hold as its sole assets the Existing PGE Common Stock or the PGE Common Stock in lieu thereof, but in no event the assets of PGE.

1.193   **PGE Trust Agreement**:  In the event the PGE Trust is created, the PGE Trust Agreement, which agreement shall be in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the PGE  Trustee shall manage, administer, operate and liquidate the assets contained in the PGE Trust, either the Existing PGE Common Stock or the PGE Common Stock, as the case may be, and distribute the proceeds thereof or the Existing PGE Common Stock or the PGE Common Stock, as the case may be.

1.194   **PGE Trust Board**:  In the event the PGE Trust is created, the Persons selected by the Debtors, after consultation with the Creditors' Committee, and appointed by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the PGE Trust Agreement.

1.195  **PGE Trustee**:  In the event the PGE Trust is created, Stephen Forbes Cooper, LLC, or such other Entity appointed by the PGE Trust Board and approved by the Bankruptcy Court to administer the PGE Trust in accordance with the provisions of Article XXIV hereof and the PGE Trust Agreement.

1.196  **PGE Trust Interests**:  The sixty-two million five hundred thousand (62,500,000) beneficial interests in the PGE Trust to be allocated to holders of Allowed Claims in the event that Enron transfers the Existing PGE Common Stock, or issues the PGE Common Stock, as the case may be, to the PGE Trust.

1.197  **Plan**:  This Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, including, without limitation, the Plan Supplement and the exhibits and schedules hereto or thereto, as the same is amended, modified or supplemented from time to time in accordance with the terms and provisions hereof.

1.198  **Plan Currency**:  The mixture of Creditor Cash, Prisma Common Stock, CrossCountry Common Equity and PGE Common Stock to be distributed to holders of Allowed General Unsecured Claims, Allowed Guaranty Claims and Allowed Intercompany Claims pursuant to the Plan; provided, however, that, if jointly determined by the Debtors and the Creditors' Committee, "Plan Currency" may include Prisma Trust Interests, CrossCountry Trust Interests, PGE Trust Interests and the Remaining Asset Trust Interests.

1.199  **Plan Securities**:  Prisma Common Stock, CrossCountry Common Equity and PGE Common Stock.

1.200  **Plan Supplement**:  A separate volume, to be filed with the Clerk of the Bankruptcy Court including, among other documents, forms of (a) the Litigation Trust Agreement, (b) the Special Litigation Trust Agreement, (c) the Prisma Trust Agreement, (d) the CrossCountry Trust Agreement, (e) the PGE Trust Agreement, (f) the Remaining Asset Trust Agreement(s), (g) the Common Equity Trust Agreement, (h) the Preferred Equity Trust Agreement, (i) the Prisma Articles of Association, (j) the Prisma Memorandum of Association, (k) the CrossCountry By-laws/Organizational Agreement, (l) the CrossCountry Charter, (m) the PGE By-Laws, (n) the PGE Certificate of Incorporation, (o) the Reorganized Debtor Plan Administration Agreement, (p) the Reorganized Debtors By-laws, (q) the Reorganized Debtors Certificate of Incorporation, (r) the Severance Settlement Fund Trust Agreement, (s) a schedule of the types of Claims entitled to the benefits of subordination afforded by the documents referred to and the definitions set forth on Exhibit "L" to the Plan, (t) a schedule of Allowed General Unsecured Claims held by affiliated non-Debtor Entities and structures created by the Debtors and which are controlled or managed by the Debtors or their Affiliates, (u) a schedule setting forth the identity of the proposed senior officers and directors of Reorganized ENE, (v) a schedule setting forth the identity and compensation of any insiders to be retained or employed by Reorganized ENE, (w) a schedule setting forth the litigation commenced by the Debtors on or after December 15, 2003 to the extent that such litigation is not set forth in the Disclosure Statement, (x) the methodology or procedure agreed upon by the Debtors, the Creditors' Committee and the ENA Examiner with respect to the adjustment of Allowed Intercompany Claims, as referenced in Section 1.21 of the Plan, and to the extent adjusted or to be adjusted

pursuant to such methodology or procedure, an updated Exhibit "F" to the Plan and a range of adjustment which may be made in accordance with Section 1.21(c) of the Plan, (y) the guidelines of the Disputed Claims reserve to be created in accordance with Section 21.3 of the Plan, (z) the guidelines for the DCR Overseers in connection with the Disputed Claims reserve and (aa) a schedule or description of Litigation Trust Claims and Special Litigation Trust Claims, in each case, consistent with the substance of the economic and governance provisions contained in the Plan, (1) in form and substance satisfactory to the Creditors' Committee and (2) in substance satisfactory to the ENA Examiner.  The Plan Supplement shall also set forth the amount of Creditor Cash to be available as of the Effective Date as jointly determined by the Debtors and the Creditors' Committee, which amount may be subsequently adjusted with the consent of the Creditors' Committee.  The Plan Supplement (containing drafts or final versions of the foregoing documents) shall be (i) filed with the Clerk of the Bankruptcy Court as early as practicable (but in no event later than fifteen (15) days) prior to the Ballot Date, or on such other date as the Bankruptcy Court establishes and (ii) provided to the ENA Examiner as early as practicable (but in no event later than thirty (30) days) prior to the Ballot Date.

1.201  **Portland Creditor Cash**:  At any time, the excess, if any, of (a) all Cash and Cash Equivalents in the Disbursement Account(s) relating to each of the Portland Debtors over (b) such amounts of Cash (i) reasonably determined by the Disbursing Agent as necessary to satisfy, in accordance with the terms and conditions of the Plan, Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, Convenience Claims and Secured Claims relating to each of the Portland Debtors, (ii) necessary to make pro rata distributions to holders of Disputed Claims as if such Disputed Claims relating to each of the Portland Debtors were, at such time, Allowed Claims and (iii) such other amounts reasonably determined by each of the Reorganized Portland Debtors as necessary to fund the ongoing operations of each of the Reorganized Portland Debtors during the period from the Effective Date up to and including the date such Debtors' Chapter 11 Cases are closed.

1.202  **Portland Debtors**:  Portland General Holdings, Inc. and Portland Transition Company, Inc.

1.203  **Preferred Equity Trust**:  The Entity to be created on the Effective Date to hold the Exchanged Enron Preferred Stock for the benefit of holders of Preferred Equity Trust Interests.

1.204  **Preferred Equity Trustee**:  Stephen Forbes Cooper, LLC, or such other Entity appointed by the Bankruptcy Court to administer the Preferred Equity Trust in accordance with the terms and provisions of Article XXVI of the Plan and the Preferred Equity Trust Agreement.

1.205  **Preferred Equity Trust Agreement**:  The trust agreement, which agreement shall be in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the Preferred Equity Trustee shall manage, administer, operate and liquidate the assets contained in the Preferred Equity Trust and distribute the proceeds thereof.

1.206  **Preferred Equity Trust Board**:  The Persons selected by the Debtors, after consultation with the Creditors' Committee, and appointed by the Bankruptcy Court, or any

replacements thereafter selected in accordance with the provisions of the Preferred Equity Trust Agreement.

1.207  **Preferred Equity Trust Interests**:  The beneficial interests in the Preferred Equity Trust, in the classes and in a number equal to the outstanding shares of Exchanged Enron Preferred Stock, to be allocated to holders of Allowed Enron Preferred Equity Interests.

1.208  **Priority Claim**:  A Priority Non-Tax Claim or a Priority Tax Claim, as the case may be.

1.209  **Priority Non-Tax Claim**:  Any Claim against the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with sections 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, but only to the extent entitled to such priority.

1.210  **Priority Tax Claim**:  Any Claim of a governmental unit against the Debtors entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.211  **Prisma**:  Prisma Energy International Inc., a Cayman Islands company, the assets of which shall consist of the Prisma Assets.

1.212  **Prisma Articles of Association**:  The articles of association of Prisma, which articles of association shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.213  **Prisma Assets**:  The assets to be contributed into or transferred to Prisma, including, without limitation (a) those assets set forth on Exhibit "H" hereto; provided, however, that, in the event that, during the period from the date of the Disclosure Statement Order up to and including the date of the initial distribution of Plan Securities pursuant to the terms and provisions of Section 32.1(c)(i) hereof, the Debtors, with the consent of the Creditors' Committee, determine not to include in Prisma a particular asset set forth on Exhibit "H" hereto, the Debtors shall file a notice thereof with the Bankruptcy Court and the Value of the Prisma Common Stock shall be reduced by the Value attributable to such asset, as set forth in the Disclosure Statement or determined by the Bankruptcy Court at the Confirmation Hearing, and (b) such other assets as the Debtors, with the consent of the Creditors' Committee, determine on or prior to the date of the initial distribution of Plan Securities pursuant to the terms and provisions of Section 32.1(c)(i) hereof to include in Prisma and the Value of the Prisma Common Stock shall be increased by the Value attributable to any such assets.

1.214  **Prisma Common Stock**:  The ordinary shares of Prisma authorized and to be issued pursuant to the Plan, which shares shall have a par value of $0.01 per share, of which fifty million (50,000,000) shares shall be authorized and of which forty million (40,000,000) shares shall be issued pursuant to the Plan, and such other rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law or the Prisma Memorandum of Association or the Prisma Articles of Association.

1.215  **Prisma Memorandum of Association**:  The memorandum of association of Prisma, which memorandum of association shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.216  **Prisma Trust**:  The Entity, if jointly determined by the Debtors and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, to be created on or subsequent to the Confirmation Date, but in no event later than the date on which the Litigation Trust is created, in addition to the creation of Prisma, and to which Entity shall be conveyed one hundred percent (100%) of the Prisma Common Stock.

1.217  **Prisma Trust Agreement**:  In the event that the Prisma Trust is created, the Prisma Trust Agreement, which agreement shall be in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the Prisma Trust Board and the Prisma Trustee shall manage, administer, operate and liquidate the assets contained in the Prisma Trust and distribute the proceeds thereof or the Prisma Common Stock.

1.218  **Prisma Trust Board**:  In the event that the Prisma Trust is created, the Persons selected by the Debtors, after consultation with the Creditors' Committee, and appointed by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the Prisma Trust Agreement.

1.219  **Prisma Trustee**:  In the event that the Prisma Trust is created, Stephen Forbes Cooper, LLC, or such other Entity appointed by the Prisma Trust Board and approved by the Bankruptcy Court to administer the Prisma Trust in accordance with the provisions of Article XXIV hereof and the Prisma Trust Agreement.

1.220  **Prisma Trust Interests**:  In the event that the Prisma Trust is created, the forty million (40,000,000) beneficial interests in the Prisma Trust to be allocated to holders of Allowed Claims in accordance with the provisions of Article XXXII of the Plan.

1.221  **Proponents**:  The Debtors and Debtors in Possession.

1.222  **Pro Rata Share**:  With respect to Claims or Equity Interests (a) within the same Class or sub-Class, the proportion that a Claim or Equity Interest bears to the sum of all Claims and/or Equity Interests, as the case may be, within such Class or sub-Class, and (b) among all Classes, the proportion that a Class of Claims or Equity Interests bears to the sum of all Claims and/or Equity Interests, as the case may be; provided, however, that, notwithstanding the foregoing, for purposes of distributing Litigation Trust Interests and Special Litigation Trust Interests, "Pro Rata Share" shall not include Convenience Claims; and, provided, further, that, notwithstanding the foregoing, with respect to the election of distributions to be made pursuant to Section 7.3 of the Plan, "Pro Rata Share" shall refer to the proportion that a Claim held by a Creditor electing such distribution bears to the sum of all Claims electing such alternative distributions pursuant to Section 7.3 of the Plan.

1.223 **Record Date**: The date or dates established by the Bankruptcy Court in the Confirmation Order for the purpose of determining the holders of Allowed Claims and Allowed Equity Interests entitled to receive distributions pursuant to the Plan.

1.224 **Remaining Assets**: From and after the Effective Date, all Assets of the Reorganized Debtors; provided, however, that, under no circumstances, shall "Remaining Assets" include (a) Creditor Cash on the Effective Date, (b) the Litigation Trust Claims, (c) the Special Litigation Trust Claims, (d) the Plan Securities and (e) claims and causes of action subject to the Severance Settlement Fund Litigation.

1.225 **Remaining Asset Trust(s)**: One or more Entities, if jointly determined by the Debtors or the Reorganized Debtors, as the case may be, and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, to be created on or after the Confirmation Date in accordance with the provisions of Article XXV hereof and the Remaining Asset Trust Agreement(s) for the benefit of holders of Allowed General Unsecured Claims, Allowed Guaranty Claims and Allowed Intercompany Claims and such other Allowed Claims and Allowed Equity Interests in accordance with the terms and provisions of the Plan.

1.226 **Remaining Asset Trustee**: In the event the Remaining Asset Trusts are created, Stephen Forbes Cooper, LLC, or such other Entity appointed by the Remaining Asset Trust Board to administer the Remaining Asset Trust(s) in accordance with the terms and provisions of Article XXV hereof and the respective Remaining Asset Trust Agreement.

1.227 **Remaining Asset Trust Agreement(s)**: In the event the Remaining Asset Trusts are created, the Remaining Asset Trust Agreement(s), in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the Remaining Asset Trustee shall manage, administer and operate the Remaining Assets and distribute the proceeds thereof, if any.

1.228 **Remaining Asset Trust Board(s)**: In the event the Remaining Asset Trusts are created, the group(s) of five (5) Persons selected by the Debtors, after consultation with (a) the Creditors' Committee with respect to four (4) of the Debtors' selections and (b) the ENA Examiner with respect to one (1) of the Debtors' selections, and appointed prior to the Effective Date by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the respective Remaining Asset Trust Agreement(s).

1.229 **Remaining Asset Trust Interests**: In the event the Remaining Asset Trusts are created, the twelve million (12,000,000) beneficial interests in the Remaining Asset Trust(s) to be deemed to be allocated to holders of Allowed Claims pursuant to the terms and conditions of Article XXV of the Plan.

1.230 **Reorganized Debtor Plan Administration Agreement**: The agreement prescribing the powers, duties and rights of the Reorganized Debtor Plan Administrator in administering the Plan, which agreement shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.231    **Reorganized Debtor Plan Administrator**:  Stephen Forbes Cooper, LLC, retained, as of the Effective Date, by the Reorganized Debtors as the employee responsible for, among other things, the matters described in Section 36.2 hereof.

1.232    **Reorganized Debtors**:  The Debtors, other than the Portland Debtors, from and after the Effective Date.

1.233    **Reorganized Debtors By-laws**:  The respective by-laws of the Reorganized Debtors, including Reorganized ENE, which by-laws shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.234    **Reorganized Debtors Certificate of Incorporation**:  The respective Certificates of Incorporation of the Reorganized Debtors, which certificates of incorporation shall be in form and substance satisfactory to the Creditors' Committee and in substantially the form included in the Plan Supplement.

1.235    **Reorganized ENE**:  ENE, from and after the Effective Date.

1.236    **Reorganized Portland Debtors**:  The Portland Debtors, from and after the Effective Date.

1.237    **Sale/Settlement Orders**:  Those orders entered by the Bankruptcy Court in connection with the sale or other disposition of the assets of the Debtors or their affiliates or the compromise and settlement of claims and causes of action with regard to, among other things, wholesale and retail trading agreements, special purpose entities and structured finance transactions, wherein the proceeds thereof have been reserved, escrowed or otherwise segregated pending either a further order of the Bankruptcy Court or the agreement of the Debtors and the Creditors' Committee.

1.238    **Sale Transaction**:  One or more transactions jointly determined by the Debtors and the Creditors' Committee, in their sole and absolute discretion, to sell all or a portion of the issued and outstanding Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock or substantially all of the Prisma Assets, CrossCountry Assets or the assets of PGE; provided, however, that, notwithstanding the foregoing, in the event of a transaction involving PGE, PGE shall be sold only as a going-concern and a vertically integrated electric utility, and not on a piecemeal basis.

1.239    **Schedules**:  The respective schedules of assets and liabilities, the list of Equity Interests, and the statements of financial affairs filed by the Debtors in accordance with section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended on or prior to the Effective Date.

1.240    **SEC**:  The United States Securities and Exchange Commission.

1.241    **Section 510 Enron Common Equity Interest Claim**:  Any Claim of a holder or former holder of an Enron Common Equity Interest for rescission of or damages arising from the purchase or sale of an Enron Common Equity Interest, including, without limitation, any Claims

arising from equity forward agreements and other understandings to purchase Enron Common Equity Interests, subject to subordination in accordance with section 510(b) of the Bankruptcy Code.

1.242  **Section 510 Enron Preferred Equity Interest Claim**:  Any Claim of a holder or former holder of an Enron Preferred Equity Interest for rescission of or damages arising from the purchase or sale of an Enron Preferred Equity Interest, including, without limitation, any Claims arising from an obligation of ENE guaranteeing the payment and performance with respect to an Enron Preferred Equity Interest, subject to subordination in accordance with section 510(b) of the Bankruptcy Code.

1.243  **Section 510 Enron Senior Notes Claim**:  Any Claim of a holder or former holder of an Enron Senior Note for rescission of or damages arising from or relating to the purchase or sale of an Enron Senior Note subject to subordination in accordance with section 510(b) of the Bankruptcy Code.

1.244  **Section 510 Enron Subordinated Debenture Claim**:  Any Claim of a holder or former holder of an Enron Subordinated Debenture for rescission of or damages arising from or relating to the purchase or sale of an Enron Subordinated Debenture, subject to subordination in accordance with section 510(b) of the Bankruptcy Code.

1.245  **Secured Claim**:  A Claim against the estates of the Debtors (a) secured by a Lien on Collateral or (b) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with section 506(a) of the Bankruptcy Code or as otherwise agreed to, in writing, by the (1) Debtors and the holder of such Claim, subject to the consent of the Creditors' Committee, or (2) the Reorganized Debtors and the holder of such Claim, as the case may be; provided, however, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

1.246  **Series 1 Exchanged Preferred Stock**:  The one million one hundred thirty-seven thousand nine hundred ninety-one (1,137,991) shares of preferred stock of Reorganized ENE to be distributed to holders of Allowed Enron Preferred Equity Interests on account of their shares of Cumulative Second Preferred Convertible Stock, with such rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law or the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws, and which are being issued in exchange for, and on account of, such Enron Preferred Equity Interests and transferred to the Preferred Equity Trust with the same economic interests and rights to receive distributions from ENE or Reorganized ENE, after all Claims have been satisfied, in full, as such Enron Preferred Equity Interest.

1.247  **Series 2 Exchanged Preferred Stock**:  The 35.568509 shares of preferred stock of Reorganized ENE to be distributed to holders of Allowed Enron Preferred Equity Interests on account of their shares of 9.142% Perpetual Second Preferred Stock, with such rights with

respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law or the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws, and which are being issued in exchange for, and on account of, such Enron Preferred Equity Interests and transferred to the Preferred Equity Trust with the same economic interests and rights to receive distributions from ENE or Reorganized ENE, after all Claims have been satisfied, in full, as such Enron Preferred Equity Interest.

1.248   **Series 3 Exchanged Preferred Stock**:  The two hundred fifty thousand (250,000) shares of preferred stock of Reorganized ENE to be distributed to holders of Allowed Enron Preferred Equity Interests on account of their shares of Mandatorily Convertible Junior Preferred Stock Series B, with such rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law or the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws, and which are being issued in exchange for, and on account of, such Enron Preferred Equity Interests and transferred to the Preferred Equity Trust with the same economic interests and rights to receive distributions from ENE or Reorganized ENE, after all Claims have been satisfied, in full, as such Enron Preferred Equity Interest.

1.249   **Series 4 Exchanged Preferred Stock**:  The one hundred eighty-two thousand nine hundred eight (182,908) shares of preferred stock of Reorganized ENE to be distributed to holders of Allowed Enron Preferred Equity Interests on account of their shares of Mandatorily Convertible Single Reset Preferred Stock, Series C, with such rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law or the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws, and which are being issued in exchange for, and on account of, such Enron Preferred Equity Interests and transferred to the Preferred Equity Trust with the same economic interests and rights to receive distributions from ENE or Reorganized ENE, after all Claims have been satisfied, in full, as such Enron Preferred Equity Interest.

1.250   **Settling Former Employees**:  The Debtors' former employees entitled to receive distributions of Severance Settlement Fund Proceeds in accordance with the terms and conditions of the Severance Settlement Order and the Severance Settlement Fund Trust Agreement.

1.251   **Severance Settlement Fund Litigation**:  Those claims and causes of action arising from and relating to the payment of the Employee Prepetition Stay Bonus Payments to certain of the Debtors' employees, which claims and causes of action were assigned to the Employee Committee pursuant to the Severance Settlement Order, including, without limitation, the claims and causes of action which are the subject of litigation styled (a) Thresa A. Allen et al. v. Official Employment-Related Issues Committee; Enron Corp.; Enron North America Corp.; Enron Net Works, L.L.C., Adversary Proceeding No. 03-02084-AJG, currently pending in the Bankruptcy Court, (b) Official Employment-Related Issues Committee of Enron Corp., et al. v. John D. Arnold, et al., Adversary Proceeding No. 03-3522, currently pending in the United States Bankruptcy Court for the Southern District of Texas, (c) Official Employment-Related Issues Committee of Enron Corp., et al. v. James B. Fallon, et al., Adversary Proceeding No. 03-3496, currently pending in the United States Bankruptcy Court for the Southern District of Texas, (d) Official Employment-Related Issues Committee of Enron Corp., et al. v. Jeffrey McMahon, Adversary Proceeding No. 03-3598, currently pending in the United States

Bankruptcy Court for the Southern District of Texas, and (e) Official Employment-Related Issues Committee of Enron Corp., et al. v. John J. Lavorato, et al., Adversary Proceeding No. 03-3721, currently pending in the United States Bankruptcy Court for the Southern District of Texas.

1.252   **Severance Settlement Fund Proceeds**:  The net proceeds, if any, to be realized from the Severance Settlement Fund Litigation, which proceeds shall be distributed to Settling Former Employees in accordance with the terms and conditions of the Severance Settlement Fund Trust Agreement.

1.253   **Severance Settlement Fund Trust**:  The trust to be created on or prior to the Effective Date, to be funded from the proceeds, if any, realized from the Severance Settlement Fund Litigation, in accordance with the Severance Settlement Fund Trust Agreement for the benefit of Settling Former Employees.

1.254   **Severance Settlement Fund Trust Agreement**:  The trust agreement, substantially in the form contained in the Plan Supplement, pursuant to which the Severance Settlement Fund Trustee shall pursue the Severance Settlement Fund Litigation and distribute the Severance Settlement Fund Proceeds.

1.255   **Severance Settlement Fund Trustee**:  The Entity appointed by the Employee Committee to administer the Severance Settlement Fund Trust, and to be compensated from the proceeds, if any, realized from the Severance Settlement Fund Litigation, in accordance with the terms and provisions of the Severance Settlement Fund Trust Agreement.

1.256   **Severance Settlement Order**:  The order, dated August 28, 2002, of the Bankruptcy Court approving, among other things, a compromise and settlement of severance claims of similarly-situated claimants and authorizing the Employee Committee to commence certain avoidance actions on behalf of the Debtors and their chapter 11 estates.

1.257   **6.75% Subordinated Debentures**:  Those certain debentures issued in the original aggregate principal amount of Two Hundred Fifty Million Dollars ($250,000,000.00) in accordance with the terms and conditions of the Enron Subordinated Indenture.

1.258   **Special Litigation Trust**:  The Entity, if jointly determined by the Debtors or the Reorganized Debtors, as the case may be, and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, Creditors' Committee, to be created on or prior to December 31st of the calendar year in which the Effective Date occurs, unless such date is otherwise extended by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, in their joint and absolute discretion and by notice filed with the Bankruptcy Court, in accordance with the provisions of Article XXIII hereof and the Special Litigation Trust Agreement for the benefit of holders of Allowed Claims against ENE in accordance with the terms and provisions of Article XXIII of the Plan.

1.259   **Special Litigation Trustee**:  In the event the Special Litigation Trust is created, the Entity appointed by the Special Litigation Trust Board and approved by the Bankruptcy Court to administer the Special Litigation Trust in accordance with the terms and provisions of Article XXIII hereof and the Special Litigation Trust Agreement.

1.260 **Special Litigation Trust Agreement**: In the event the Special Litigation Trust is created, the Special Litigation Trust Agreement, which agreement shall be in form and substance satisfactory to the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the Special Litigation Trust shall pursue the Special Litigation Trust Claims, if applicable, and distribute the proceeds thereof, if any.

1.261 **Special Litigation Trust Board**: In the event the Special Litigation Trust is created, the group of up to five (5) Persons appointed prior to the Effective Date by the Bankruptcy Court, all of whom shall be nominated by the Creditors' Committee or any replacements thereafter selected in accordance with the provisions of the Special Litigation Trust Agreement, who shall determine in accordance with the Special Litigation Trust Agreement whether to prosecute, compromise or discontinue any Special Litigation Trust Claims.

1.262 **Special Litigation Trust Claims**: All claims and causes of action of the Debtors or Debtors in Possession, if any, that asserted, or which may be asserted, by or on behalf of the Debtors or the Debtors' estates (i) in the Montgomery County Litigation (solely with respect to claims and causes of action against insiders or former insiders of the Debtors), (ii) of the same nature against other of the Debtors' current or former insiders and such other Entities as may be described in the Plan Supplement and (iii) arising under or pursuant to sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code against the Entities referenced in subsections (i) and (ii) above; provided, however, that, under no circumstances, shall such claims and causes of action include (a) Litigation Trust Claims to be prosecuted by the Litigation Trust, the Debtors or Reorganized Debtors, as the case may be, and (b) any claims and causes of action waived and released in accordance with the provisions of Sections 28.3 and 42.6 of the Plan; and, provided, further, that, in the event that the Debtors and the Creditors' Committee jointly determine not to form the Special Litigation Trust, the claims and causes of action referred to in clauses (i), (ii) and (iii) above shall be deemed to be Assets of ENE, notwithstanding the inclusion of ENE and other Debtors or their estates as a plaintiff in such litigation and with the execution and delivery of any additional documents or the entry of any order of the Bankruptcy Court or such other court of competent jurisdiction.

1.263 **Special Litigation Trust Interests**: In the event the Special Litigation Trust is created, the twelve million (12,000,000) beneficial interests in the Special Litigation Trust deemed distributed ratably to holders of Allowed Claims pursuant to the terms and conditions of Article XXIII of the Plan.

1.264 **Standard Termination Order**: The Bankruptcy Court order, dated January 30, 2004, authorizing the commencement of standard termination proceedings, the execution of amendments to defined benefit pension plans and the funding and annuitization of benefits thereunder.

1.265 **Subordinated Claim**: A Section 510 Enron Senior Notes Claim, a Section 510 Enron Subordinated Debenture Claim, a Section 510 Enron Preferred Equity Interest Claim, a Section 510 Enron Common Equity Interest Claim, a Penalty Claim, an Enron TOPRS Subordinated Guaranty Claim or an Other Subordinated Claim.

1.266  **TOPRS**:  The Trust Originated Preferred Securities issued by each of ECT I and ECT II in connection with (a) the formation of EPF I and EPF II, respectively, and (b) the Enron TOPRS Debentures, the ENA Debentures and the ETS Debentures, among other securities.

1.267  **TOPRS Stipulation**:  That certain Stipulation and Order Regarding Issues By and Among Enron Corp., Enron Transportation Services Company, Enron Preferred Funding L.P., Enron Preferred Funding II, L.P., Enron Capital Trust I, Enron Capital Trust II and National City Bank, as Indenture Trustee and Property Trustee, dated September 18, 2003, and as so ordered by the Bankruptcy Court on October 2, 2003.

1.268  **Trust Interests**:  In the event the Litigation Trust is created, Litigation Trust Interests and, in the event the Special Litigation Trust is created, Special Litigation Trust Interests.

1.269  **Unsecured Claim**:  Any Claim against the Debtors, other than an Administrative Expense Claim, a Secured Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Subordinated Claim or a Convenience Claim.

1.270  **Value**:  The Cash realized, at any time, from the disposition of or recovery with respect to all or any portion of the Assets; provided, however, that, with respect to Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock and PGE Common Stock, as the case may be, the "Value" thereof as determined by the Bankruptcy Court as of the Confirmation Date, as the same may be increased or reduced in accordance with the provisions hereof; and, provided, further, that, to the extent that all of the Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock, as the case may be, is converted into Cash, one or more promissory notes, equity interests of the purchaser thereof or such other form of consideration prior to the later to occur of (1) the commencement of distributions with respect thereto and (2) the Effective Date, the "Value" of such amount realized in Cash or the then-fair market value of the consideration received as determined by the Bankruptcy Court; and, provided, further, that, to the extent that a portion, but not all, of the Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock, as the case may be, is converted into Cash, one or more promissory notes, equity interests of the purchaser thereof or such other form of consideration prior to the later to occur of (1) the commencement of distributions with respect thereto and (2) the Effective Date, the "Value" of such Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock, as the case may be, shall be equal to the sum of (i) the Cash or then-fair market value of such consideration as determined by the Bankruptcy Court realized from such disposition plus (ii) the product of (y) such consideration realized per share upon such disposition of Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock, as the case may be, times (z) the number of shares of Prisma Common Stock, CrossCountry Common Equity, Existing PGE Common Stock or PGE Common Stock, respectively, remaining with the Debtors immediately following such disposition; and, provided, further, that, in the event that one or more Remaining Asset Trusts are created, "Value" of the Remaining Assets contributed thereto shall be the value determined as of the date of such contribution in accordance with the provisions of Section 25.5 of the Plan.

1.271  **WD Management Agreement**:  That certain Management Agreement, dated as of February 27, 2003, between Enron Wind LLC and Wind Development Trust.

1.272  **WD Trust**:  The grantor trust created pursuant to the WD Trust Agreement.

1.273  **WD Trust Agreement**:  That certain Wind Development Trust Agreement, dated as of February 27, 2003, by and among Enron Wind Development LLC, Enron Wind Domestic Holding LLC, Enron Wind LLC, Enron Renewable Energy Corp. and Cloyses Partners LLC, as Managing Trustee.

1.274  **WS Management Agreement**:  That certain Management Agreement, dated as of February 27, 2003, between Enron Wind LLC and Wind Systems Trust.

1.275  **WS Trust**:  The grantor trust created pursuant to the WS Trust Agreement.

1.276  **WS Trust Agreement**:  That certain Wind Systems Trust Agreement, dated as of February 27, 2003, by and among Enron Wind Systems, LLC, Enron Wind Domestic Holding LLC, Enron Wind LLC, Enron Renewable Energy Corp. and Cloyses Partners LLC, as Managing Trustee.

1.277  **Wind**:  Enron Wind Corp., a California corporation.

1.278  **Wind Debtors**:  Wind, Enron Wind Systems, LLC, Enron Wind Constructors LLC, Enron Wind Energy Systems LLC, Enron Wind Maintenance LLC, Enron Wind LLC, Enron Wind Development LLC, ZWHC LLC, Zond Pacific, LLC, Zond Minnesota Construction Company LLC, Enron Wind Storm Lake I LLC, Green Power Partners I LLC, Enron Wind Storm Lake II LLC, Enron Wind Lake Benton, LLC, Cabazon Power Partners LLC, Cabazon Holdings LLC and Victory Garden Power Partners I LLC.

1.279  **Wind Guaranty Claim**:  Any Unsecured Claim, other than an Intercompany Claim, against Wind arising from or relating to an agreement by Wind to guarantee or otherwise satisfy the obligations of another Debtor, including, without limitation, any Claim arising from or relating to rights of contribution or reimbursement.

1.280  **Wind Guaranty Distributive Assets**:  The Plan Currency to be made available to holders of Allowed Wind Guaranty Claims in an amount derived from the Distribution Model equal to the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of the Wind Guaranty Claims and (b)  the product of (y) the Value of Wind's Assets minus an amount equal to the sum of (1) one hundred percent (100%) of Wind's Administrative Expense Claims, Secured Claims, and Priority Claims plus (2) an amount equal to the product of Wind's Convenience Claim Distribution Percentage times Wind's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of the Wind Guaranty Claims and the denominator of which is equal to the sum of Wind's (1) General Unsecured Claims, (2) Wind Guaranty Claims and (3) Intercompany Claims plus, (B) the product of (i) thirty percent (30%) times (ii) the Value of all of the Debtors' Assets, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's

Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of Wind Guaranty Claims and (2) the corresponding primary Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis, and (z) fifty percent (50%) of all Guaranty Claims; provided, however, that, for purposes of calculating "Wind Guaranty Distributive Assets", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.281   **Wind Guaranty Distributive Interests**:  The Litigation Trust Interests or the Special Litigation Trust Interests, as the case may be, to be made available to holders of Allowed Wind Guaranty Claims in an amount derived from the Distribution Model equal to the quotient of (I) the sum of (A) the product of (i) seventy percent (70%) times (ii) the lesser of (a) the sum of the Wind Guaranty Claims and (b)  the product of (y) the sum of the Value of Wind's Assets and the Fair Market Value of Wind's Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, minus an amount equal to the sum of (1) one hundred percent (100%) of Wind's Administrative Expense Claims, Secured Claims, and Priority Claims plus (2) an amount equal to the product of Wind's Convenience Claim Distribution Percentage times Wind's Convenience Claims times (z) a fraction, the numerator of which is equal to the amount of the Wind Guaranty Claims and the denominator of which is equal to the sum of Wind's (1) General Unsecured Claims, (2) Wind Guaranty Claims and (3) Intercompany Claims plus, (B) the product of (i) thirty percent (30%) times (ii) the sum of the Value of all of the Debtors' Assets and the Fair Market Value of all of the Debtors' Litigation Trust Interests or Special Litigation Trust Interests, as the case may be, calculated as if the Debtors' chapter 11 estates were substantively consolidated, minus an amount equal to the sum of (1) one hundred percent (100%) of all Debtors' Administrative Expense Claims, Secured Claims and Priority Claims, calculated on a Consolidated Basis, plus (2) the sum of the products of each Debtor's Convenience Claims times its respective Convenience Claim Distribution Percentage times (iii) a fraction, the numerator of which is equal to fifty percent (50%) times an amount equal to the sum of the lesser of, calculated on a Claim-by-Claim basis, (1) the amount of Wind Guaranty Claims and (2) the corresponding primary Claim, calculated on a Consolidated Basis, and the denominator of which is equal to the sum of the amount of (y) all Debtors' General Unsecured Claims, calculated on a Consolidated Basis, and (z) fifty percent (50%) of all Guaranty Claims, minus (C) Wind Guaranty Distributive Assets, divided by (II) the Fair Market Value of a Litigation Trust Interest or a Special Litigation Trust Interest, as the case may be; provided, however, that, for purposes of calculating "Wind Guaranty Distributive Interests", such calculation shall not include the Assets of or the General Unsecured Claims against either of the Portland Debtors.

1.282   **Wind Management Agreements**:  The WD Management Agreement and the WS Management Agreement.

1.283   **Wind Reserve Fund**:  The fund in the amount of Twenty-Five Million Dollars ($25,000,000.00) created pursuant to the Wind Reserve Fund Order.

1.284  **Wind Reserve Fund Order**:  The order, dated June 23, 2003, of the Bankruptcy Court approving the terms and conditions of a compromise and settlement with respect to issues arising from or related to the sale of certain assets of Wind and its affiliates to General Electric Company and its designee.

1.285  **Wind Trusts**:  The WD Trust and the WS Trust.

1.286  **Wind Trusts Assets**:  The assets subject to the respective Wind Trusts.

1.287  **Other Definitions**:  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in the Bankruptcy Code shall have the meaning assigned to that term in the Bankruptcy Code.  Unless otherwise specified, (a) all section, schedule or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES; SUBSTANTIVE CONSOLIDATION; ASSUMPTION OF OBLIGATIONS UNDER THE PLAN

2.1  **Compromise and Settlement**:  The Plan incorporates a proposed compromise and settlement of certain issues disputed by the Proponents, the Creditors' Committee, the ENA Examiner and other parties in interest.  These issues include whether the estates of each of the Debtors should be treated separately for purposes of making payments to Creditors, whether and to what extent proceeds from the liquidation of assets, including claims and causes of action, or from the Sale Transactions should be allocated among the Debtors based upon their respective claims of ownership to such assets, and the amount, allowance and priority of certain Intercompany Claims.  The provisions of the Plan relating to substantive consolidation of the Debtors, the treatment of Intercompany Claims, and the treatment of each Class of Claims under the Plan reflect this compromise and settlement, which, upon the Effective Date, shall be binding upon the Debtors, all Creditors, and all Entities receiving any payments or other distributions under the Plan.  Without limiting the foregoing, the Plan and the definitions of "Distributive Assets", "Enron Guaranty Distributive Assets", "Wind Guaranty Distributive Assets", "ACFI Guaranty Distributive Assets", "ENA Guaranty Distributive Assets", "EPC Guaranty Distributive Assets", "Intercompany Distributive Assets" and corresponding provisions with respect to the calculation and distribution of "Trust Interests" set forth in Article I hereof incorporate the following salient provisions of such compromise and settlement:

(a)  Substantive Consolidation:  The Plan Currency and, if applicable, the Trust Interests to be distributed to each holder of an Allowed General Unsecured Claim against each Debtor, other than the Portland Debtors, shall equal the sum of (i) seventy percent (70%) of

the distribution such holder would receive if the Debtors, other than the Portland Debtors, were not substantively consolidated and (ii) thirty percent (30%) of the distribution such holder would receive if all of the Debtors' estates, other than the estates of the Portland Debtors, were substantively consolidated, but, notwithstanding such substantive consolidation, one-half of Allowed Guaranty Claims were included in such calculation.

(b)    Related Issues:  The compromise and settlement of the substantive consolidation issue set forth in the Plan encompasses a global settlement of numerous issues related to or impacted by substantive consolidation, including, without limitation, characterization of Intercompany Claims, treatment of Guaranty Claims, transactions involving certain of the Debtors' structured-finance transactions and ownership of certain claims and causes of action.

(i)    Intercompany Claims:  The Plan Currency and, if applicable, Trust Interests to be allocated to each holder of an Intercompany Claim against another Debtor shall equal seventy percent (70%) of the distribution such holder would receive if the Debtors were not substantively consolidated.

(ii)    Guaranty Claims:  The Plan Currency and, if applicable, Trust Interests to be distributed to each holder of an Allowed Guaranty Claim shall equal the sum of (i) seventy percent (70%) of the distribution such holder would receive if the Debtors, other than the Portland Debtors, were not substantively consolidated and (ii)  thirty percent (30%) of the distribution such holder would receive if all of the Debtors' estates, other than the estates of the Portland Debtors, were substantively consolidated, but, notwithstanding such substantive consolidation, one-half of Allowed Guaranty Claims were included in such calculation.

(iii)    Ownership of Certain Assets:  For purposes of calculating the Distributive Assets of ENE and ENA, the Debtors shall take, or cause to be taken, such action as is appropriate to reflect that:  (a) ENA's Assets shall include ENE's preferred stock interests in Enron Canada Corp., either through a capital contribution or otherwise; (b) the preferred stock interests in Enron Canada Corp. held by Enron Canada Power Corp. and the preferred stock interests in Enron Canada Power Corp. held by Enron Canada Corp. shall be deemed cancelled or otherwise returned  to their respective issuers; provided, however, that, if such cancellation or return leaves Enron Canada Power Corp. with insufficient funds to satisfy third-party obligations, Enron Canada Corp. shall contribute such monies to Enron Canada Power Corp. as are necessary as to satisfy such third-party obligations; (c) to the extent that proceeds are received in connection with the sale or contribution of Papiers Stadacona Ltée., ENE and ENA Assets shall each include fifty percent (50%) of the proceeds thereof, net of the payment of third-party obligations; and (d) to the extent that proceeds are received in connection with the sale or contribution of Bridgeline Holdings, L.P., ENA's Assets shall include all the proceeds thereof, net of the payment of third-party obligations.

(iv)    Ownership of Certain Litigation Claims:  The Litigation Trust Claims and the Special Litigation Trust Claims, whether or not the Litigation Trust or the Special Litigation Trust, as the case may be, is created, shall be deemed to be owned by ENE and its Creditors.  In the event the Litigation Trust or the Special Litigation Trust, as the case may be, is created, Litigation Trust Interests and Special Litigation Trust Interests shall be distributed to holders of Allowed Claims, as if such Litigation Trust Claims and Special Litigation Trust Claims were owned by ENE, in accordance with the Distribution Model and Articles XXII and XXIII of the Plan.

(c)    Plan Currency:  By virtue of and integral to the compromise and settlement of the issues set forth in the Plan, except as provided in Sections 7.3 and 7.8 hereof with respect to ENA and certain of its subsidiaries and the holders of TOPRS, respectively, each holder of an Allowed Unsecured Claim against each Debtor, other than the Portland Debtors, shall receive the same Plan Currency regardless of the asset composition of such Debtor's estate on or subsequent to the Effective Date.  Such mixture of Plan Currency shall bear direct relationship to the amount of Creditor Cash available for distribution and the value of the respective Plan Securities, as recalculated in accordance with the provisions of Section 32.1(d) of the Plan.

(d)    Inter-Debtor Waivers:  By virtue of and integral to the compromise and settlement of the issues set forth in the Plan, on the Effective Date, (i) each Debtor, other than the Portland Debtors, shall waive any defense, including, without limitation, defenses arising under sections 502(d) and 553(a) of the Bankruptcy Code, to Intercompany Claims asserted by another Debtor and such Claims shall be deemed to be Allowed Claims; provided, however, that such waiver and allowance shall not inhibit the assertion of any defense in the MegaClaim Litigation, the Montgomery County Litigation and any other litigation commenced by the Debtors, the Debtors in Possession, the Reorganized Debtors, or on their behalf in accordance with sections 509, 544, 547, 548, 550, 551, 553, 555, 556, 559 and 560 of the Bankruptcy Code or Article XXVIII of the Plan, (ii) Intercompany Claims between Debtors shall be deemed to be mutual claims arising prior to the Initial Petition Date for purposes of setoff, (iii) each of the Debtors and Debtors in Possession, other than the Portland Debtors, shall waive its right to receive distributions on any claims and causes of action such Debtor and Debtor in Possession may have against another Debtor and Debtor in Possession, other than the Portland Debtors, arising in accordance with sections 509, 544, 547, 548, 553, 555, 556, 559 and 560 of the Bankruptcy Code, without waiving or releasing any claims and causes of action against non-Debtor parties and (iv) except as provided in subsection (i) hereof, each Debtor and Debtor in Possession, other than the Portland Debtors, shall waive and forever release any right, claim or cause of action which has been or could have been asserted by such Debtor or Debtor in Possession against any other Debtor and Debtor in Possession, other than the Portland Debtors, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws.

(e)    Governance:  By virtue of and integral to the compromise and settlement of the issues set forth in the Plan, the post-Effective Date role for the ENA Examiner, the Creditors' Committee and the boards of the respective Entities contemplated pursuant to the Plan

represent the interests of Creditor constituencies and provide protections to safeguard the interests of such constituencies.

2.2     **Non-Substantive Consolidation**:  On the Effective Date, the Debtors' estates shall not be deemed to be substantively consolidated for purposes of the Plan; provided, however, that, as part of the compromise and settlement embodied in the Plan, holders of Allowed Claims and Allowed Equity Interests shall receive a portion of their distributions based upon the hypothetical pooling of the assets and liabilities of the Debtors, other than the Portland Debtors.  Any Claims against one or more of the Debtors based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor shall be treated as separate and distinct Claims against the estate of the respective Debtors and shall be entitled to distributions under the Plan in accordance with the provisions hereof.

2.3     **Allocation of Expenses**:  On or prior to the Ballot Date, the Debtors shall file, after consultation with the Creditors' Committee and the ENA Examiner, a motion with the Bankruptcy Court and, in connection with the entry of the Confirmation Order, the Bankruptcy Court shall enter an order with respect to the allocation of overhead and expenses among the Debtors and the Reorganized Debtors, as the case may be.  Without limiting the foregoing, such allocation shall (i) reallocate overhead and expenses to the extent that the Assets of a Debtor are insufficient to satisfy the administrative professional fees and the allocable overhead of such Debtor and (ii) be predicated upon the tasks to be performed by the Debtors and the Reorganized Debtors, as the case may be, from and after the Confirmation Date, including, without limitation, the number of employees required to discharge such duties and obligations.  Except as provided therein, all other provisions of the Bankruptcy Court's orders, dated February 25, 2002, November 21, 2002 and November 25, 2002, with respect to the allocation of overhead and expenses shall remain in full force and effect.

2.4     **Wind Reserve Fund**:  Pursuant to the Wind Reserve Fund Order and for purposes of calculating distributions pursuant to the Plan, including, without limitation, the amount and value of Distributive Assets, Enron Guaranty Distributive Assets, Intercompany Distributive Assets and Wind Guaranty Distributive Assets, the Wind Reserve Fund shall not be included in the Assets of any of the Debtors, including Wind.

**ARTICLE III**

**PROVISIONS FOR PAYMENT OF
ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY
TAX CLAIMS AND DEBTOR IN POSSESSION FINANCING**

3.1     **Administrative Expense Claims**:  On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Debtors or the Reorganized Debtors, as the case may be; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtors in

Possession during the Chapter 11 Cases shall be paid by the Reorganized Debtor Plan Administrator in accordance with the terms and conditions of the particular transaction and any agreements relating thereto.

3.2 **Professional Compensation and Reimbursement Claims**: All Entities awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with sections 328, 330 or 331 of the Bankruptcy Code or entitled to the priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order or (b) upon such other terms no more favorable to the Claimant than as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtors or the Reorganized Debtors, as the case may be.

3.3 **Payment of Priority Tax Claims**: Each holder of an Allowed Priority Tax Claim shall be entitled to receive distributions in an amount equal to the full amount of such Allowed Priority Tax Claim. At the option and discretion of the Debtors, with the consent of the Creditors' Committee, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, such payment shall be made (a) in full, in Cash, on the Effective Date, (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the sixth (6th) anniversary of assessment of such Allowed Priority Tax Claim, together with interest accrued thereon at a rate to be determined by the Bankruptcy Court and set forth in the Confirmation Order, or (c) by mutual agreement of the holder of such Allowed Priority Tax Claim and the Debtors, subject to the consent of the Creditors' Committee.

3.4 **Debtor in Possession Financing**: On the Effective Date, (a) all outstanding DIP Obligations, as defined in the DIP Orders, shall be paid and satisfied, in full, by the Debtors, (b) all letters of credit outstanding and all commitments under the DIP Credit Agreement, as defined in the DIP Orders, will terminate, (c) the Debtors will provide the beneficiaries of such letters of credit with the consent of the Creditors' Committee and, unless approved by a Final Order, on terms and conditions no less favorable to any of the Debtors or Reorganized Debtors than as provided in the DIP Orders (1) replacement letters of credit, (2) cash collateral or (3) such other terms as may be mutually agreed upon between the holder of any letter of credit issued and then outstanding in accordance with the DIP Orders and the Debtors and (d) all monies posted by the Debtors to the lenders in accordance with the DIP Orders and the agreements and instruments executed in connection therewith shall be released to the applicable Reorganized Debtors for distribution in accordance with the terms and provisions of the Plan. Nothing in this Plan or in the Confirmation Order, whether under section 1141 of the Bankruptcy Code or otherwise, shall discharge any remaining DIP Obligations.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims and Equity Interests are classified as follows:

| | | | |
|---|---|---|---|
| 4.1 | Class 1 | – | Priority Non-Tax Claims |
| 4.2 | Class 2 | – | Secured Claims |
| 4.3 | Classes 3 through 182 | – | General Unsecured Claims (Other than Enron Subordinated Debenture Claims and Enron TOPRS Debenture Claims) |
| 4.4 | Class 183 | – | Enron Subordinated Debenture Claims |
| 4.5 | Class 184 | – | Enron TOPRS Debenture Claims |
| 4.6 | Class 185 | – | Enron Guaranty Claims |
| 4.7 | Class 186 | – | Wind Guaranty Claims |
| 4.8 | Class 187 | – | ENA Guaranty Claims |
| 4.9 | Class 188 | – | ACFI Guaranty Claims |
| 4.10 | Class 189 | – | EPC Guaranty Claims |
| 4.11 | Class 190 | – | Intercompany Claims |
| 4.12 | Classes 191 through 375 | – | Convenience Claims |
| 4.13 | Classes 376 through 382 | – | Subordinated Claims |
| 4.14 | Class 383 | – | Enron Preferred Equity Interests |
| 4.15 | Class 384 | – | Enron Common Equity Interests |
| 4.16 | Class 385 | – | Other Equity Interests |

Annexed as Exhibits "I", "J" and "K" are schedules setting forth the classes of General Unsecured Claims, Convenience Claims and Subordinated Claims, respectively, for each of the individual Debtors.

## ARTICLE V

### PROVISION FOR TREATMENT OF
### PRIORITY NON-TAX CLAIMS (CLASS 1)

5.1     **Payment of Allowed Priority Non-Tax Claims**:  Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtors, each holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim, Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

### ARTICLE VI

### PROVISION FOR TREATMENT OF
### SECURED CLAIMS (CLASS 2)

6.1     **Treatment of Secured Claims**:  On the Effective Date, each holder of an Allowed Secured Claim shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Secured Claim one of the following distributions:  (a) the payment of such holder's Allowed Secured Claim in full, in Cash; (b) the sale or disposition proceeds of the property securing any Allowed Secured Claim to the extent of the value of their respective interests in such property; (c) the surrender to the holder or holders of any Allowed Secured Claim of the property securing such Claim; or (d) such other distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code.  The manner and treatment of each Secured Claim shall be determined by the Debtors, subject to the consent of the Creditors' Committee and transmitted, in writing, to holder of a Secured Claim on or prior to the commencement of the Confirmation Hearing.

### ARTICLE VII

### PROVISION FOR TREATMENT OF
### GENERAL UNSECURED CLAIMS (CLASSES 3-182)

7.1     **Treatment of General Unsecured Claims Other than Those Against the Portland Debtors (Classes 3 through 180)**:  Commencing on the Effective Date and subject to the provisions of Sections 7.3, 7.4, 7.5 and 7.8 hereof, each holder of an Allowed General Unsecured Claim against a Debtor, other than a Portland Debtor, shall be entitled to receive on account of such Allowed General Unsecured Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of (i) the Distributive Assets and Distributive Interests attributable to such Debtor and (ii) such amounts of Cash or Distributive Interests as may be allocated to a holder of an Allowed General Unsecured Claim against such Debtor in accordance with the provisions of Section 10.1 of the Plan; provided, however, that, notwithstanding the foregoing, for purposes of making distributions to a holder of an Allowed Joint Liability Claim against more than one Debtor, such holder's Pro Rata Share of Distributive Assets and Distributive Interests shall include the amounts calculated pursuant to sub-clause (B) of Sections 1.89 and

1.90 of the Plan, respectively, with respect to only one Debtor; and, provided, further, that, notwithstanding the foregoing, the contractual subordination rights, if any, of holders of "Senior Indebtedness" or any similar term under the Enron MIPS Agreements shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and, in the event such rights are determined to be enforceable, any such distributions shall be distributed to holders of Allowed Claims that constitute "Senior Indebtedness", as identified on Exhibit "L" hereto, until such time as such holder's Claims have been satisfied in accordance with the terms and provisions of the Enron MIPS Agreements.

7.2    **Treatment of General Unsecured Claims Against the Portland Debtors (Classes 181 and 182)**:  Commencing on the Effective Date and subject to the provisions of Section 7.4 hereof, each holder of an Allowed General Unsecured Claim against either of the Portland Debtors shall be entitled to receive on account of such Allowed General Unsecured Claim distributions in an aggregate amount equal to such holders' Pro Rata Share of the Portland Creditor Cash.

7.3    **Election to Receive Additional Cash Distributions in Lieu of Partial Plan Securities**:  Notwithstanding the provisions of Section 7.1 of the Plan, any holder of an Allowed General Unsecured Claim against Enron North America Corp., Enron Power Marketing, Inc., Enron Gas Liquids, Inc., Enron Global Markets LLC, Enron Industrial Markets LLC, Enron Natural Gas Marketing Corp., ENA Upstream Company LLC, Enron Capital & Trade Resources International Corp. and Enron Reserve Acquisition Corp. may elect to receive such holder's Pro Rata Share of One Hundred Twenty-Five Million Dollars ($125,000,000.00) in lieu of all or a portion of the Plan Securities to which such holder is otherwise entitled to receive pursuant to the Plan.  In the event that any such holder elects to receive such additional Cash distribution, (a) such holder's distribution of Plan Securities shall be reduced on a dollar-for-dollar basis and (b) distributions of Plan Securities to be made to holders of Allowed General Unsecured Claims against ENE shall be increased on a dollar-for-dollar basis.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

7.4    **Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim**:  Notwithstanding the provisions of Sections 7.1 and 7.3 of the Plan, any holder of an Allowed General Unsecured Claim, other than (i) an Enron Senior Notes Claim, (ii) an Enron Subordinated Debenture Claim, (iii) an ETS Debenture Claim, (iv) an ENA Debenture Claim and (v) any other General Unsecured Claim that is a component of a larger General Unsecured Claim, portions of which may be held by such or any other holder whose Allowed General Unsecured Claim, is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed Claim as so reduced, distributions pursuant to Article XVI hereof.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

7.5    **Limitation on Recovery**:  Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed General Unsecured Claim in accordance with this Article VII, in the event that the sum of the distributions of Plan Currency and Trust Interests in accordance with this Article VII are equal to or in excess of one hundred percent (100%) of such holder's Allowed General Unsecured Claim, then, the Plan Currency and Trust Interests remaining to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims and Allowed Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims and Disputed Equity Interests and accordingly shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Claims and Equity Interests, including, without limitation, the contractual subordination provisions set forth therein, and the Bankruptcy Code.

7.6    **Severance Settlement Fund Litigation Payments**:  In accordance with Severance Settlement Order and the Severance Settlement Fund Trust Agreement, Severance Settlement Fund Proceeds shall be paid to the Settling Former Employees in full and final satisfaction of all Claims deemed released in accordance with the Severance Settlement Order.

7.7    **Termination of Wind Trusts/Election of Wind Creditors to Receive Additional Cash Distributions in Partial Plan Securities**:

(a)    Termination:  From and after the Confirmation Date, the Managing Trustee, as defined in the WD Trust Agreement and the WS Trust Agreement, and the Manager, as defined in the WD Management Agreement and the WS Management Agreement, shall continue to operate the Wind Trusts and liquidate the Wind Trusts Assets in accordance with the terms and provisions set forth therein and all documents related thereto.  Upon liquidation of the Wind Trusts Assets, (a) the net proceeds thereof shall be delivered to the Debtors or the Reorganized Debtors, as the case may be, for distribution to holders of Allowed General Unsecured Claims in accordance with the provisions of this Article VII; provided, however, that, under no circumstances, shall an Electric Utility, as defined in the WD Trust Agreement and the WS Trust Agreement, receive Cash proceeds from any of the Wind Trusts Assets and, in lieu thereof, the Disbursing Agent shall include in the distributions to be made to a holder of an Allowed General Unsecured Claim that is an Electric Utility Cash from other sources of Creditor Cash, on a dollar-for-dollar basis, and (b) upon delivery of all such proceeds to the Debtors or the Reorganized Debtors, as the case may be, and compliance with all requirements, including, without limitation, the filing of appropriate tax returns, (i) the Wind Trusts shall be terminated and (ii) all parties to the Wind Trusts, the Wind Trust Agreements and the Wind Management Agreements shall be relieved of any and all obligations hereunder and thereunder.

(b)    Election:  Notwithstanding the provisions of Section 7.1 of the Plan, each holder of (i) an Allowed General Unsecured Claim against a Wind Debtor or (ii) an Allowed Wind Guaranty Claim that accepts the Plan may elect to receive additional distributions of Cash in lieu of distributions of CrossCountry Common Equity, PGE Common Stock and Prisma Common Stock to which such holder is entitled to receive.  To the extent elected, ENE shall be deemed to have purchased the shares of CrossCountry Common Equity, PGE Common Stock and Prisma Common Stock otherwise distributed at a price equal to the per share value determined by the Bankruptcy Court at the Confirmation Hearing.  Such election must be made

on the Ballot and be received by the Debtors on or prior to the Ballot Date. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtor occur on or after the Effective Date.

7.8 **Election of TOPRS Holders to Receive Additional Cash Distributions in Lieu of Partial Plan Securities**: Notwithstanding the provisions of Section 7.1 of the Plan, pursuant to the compromise and settlement set forth herein and in the TOPRS Stipulation, each holder of TOPRS may elect to receive additional distributions of Cash in lieu of distributions of CrossCountry Common Equity, PGE Common Stock and Prisma Common Stock to which such holder is entitled to receive derivatively on account of the Allowed ETS Debenture Claims held by EPF I and EPF II. To the extent elected, ENE shall be deemed to have purchased from EPF I and EPF II the shares of CrossCountry Common Equity, PGE Common Stock and Prisma Common Stock otherwise distributed at a price equal to the per share value determined by the Bankruptcy Court at the Confirmation Hearing. Such election must be made on the Ballot tendered by the ETS Indenture Trustee with respect to the ETS Debenture Claims and be received by the Debtors on or prior to the Ballot Date; provided, however, that, in the event that the holders of Allowed ETS Debenture Claims do not vote to accept the Plan such that, if the ETS Debenture Claims were deemed to be a separate Class of Claims, such Class would be deemed to have rejected the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, any such election shall be deemed null and void and the provisions of this Section 7.8 shall have no force or effect. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

7.9 **Dabhol Debtors Removal**: Pursuant to the Bankruptcy Court's order, dated April 8, 2004, and the notice, dated May 17, 2004 in connection therewith, (a) a majority of the equity interests of Enron Mauritius Company, Enron India Holdings Ltd. and Offshore Power Production C.V. were sold, (b) such entities were, among other things, removed as Debtors and Proponents of the Plan and (c) Classes 58, 59 and 60 of the Plan have been rendered inoperative.

## ARTICLE VIII

## PROVISION FOR TREATMENT OF
## ENRON SUBORDINATED DEBENTURE CLAIMS (CLASS 183)

8.1 **Treatment of Allowed Enron Subordinated Debenture Claims (Class 183)**: Commencing on the Effective Date, each holder of an Allowed Enron Subordinated Debenture Claim shall be entitled to receive on account of such Allowed Enron Subordinated Debenture Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of the Distributive Assets and Distributive Interests attributable to ENE; provided, however, that, notwithstanding the foregoing, the contractual subordination rights, if any, of holders of "Senior Indebtedness" or any similar term under the Enron Subordinated Indentures shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and, in the event such rights are determined to be enforceable, any such distributions shall be distributed to holders of Allowed Claims that constitute "Senior Indebtedness", as identified on Exhibit "L" hereto, until

such time as such holder's Claims have been satisfied in accordance with the terms and provisions of the Enron Subordinated Indentures.

8.2 **Contingent Distribution/Limitation on Recovery**: Notwithstanding anything contained herein to the contrary, in the event that (a) distributions of Plan Currency and Trust Interests are deemed redistributed to a holder of an Allowed Enron Subordinated Debenture Claim in accordance with the provisions of Section 7.5 hereof and (b) the sum of the distributions of Plan Currency and Trust Interests to be distributed to a holder of an Allowed Enron Subordinated Debenture Claim are equal to or in excess of one hundred percent (100%) of such holder's Allowed Enron Subordinated Debenture Claim, then, the Plan Currency and Trust Interests remaining to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims and Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims and Disputed Equity Interest and accordingly shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Claims and Equity Interests, including, without limitation, the contractual subordination provisions set forth therein, and the Bankruptcy Code.

## ARTICLE IX

## PROVISION FOR TREATMENT OF
## ENRON TOPRS DEBENTURE CLAIMS (CLASS 184)

9.1 **Treatment of Allowed Enron TOPRS Debenture Claims (Class 184)**: Commencing on the Effective Date, each holder of an Allowed Enron TOPRS Debenture Claim shall be entitled to receive on account of such Allowed Enron TOPRS Debenture Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of the Distributive Assets and Distributive Interests attributable to ENE; provided, however, that, notwithstanding the foregoing, the contractual subordination rights, if any, of holders of "Senior Indebtedness" or any similar term under the Enron TOPRS Indentures shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and, in the event such rights are determined to be enforceable, any such distributions shall be distributed, subject to Bankruptcy Rule 3021 and subject to the lien or priority rights of the Enron TOPRS Indenture Trustee, to holders of Allowed Claims that constitute "Senior Indebtedness", as identified on Exhibit "L" hereto, in the manner and to the extent set forth in the Enron TOPRS Indentures until such time as such holder's Claims have been satisfied in accordance with the terms and provisions of the Enron TOPRS Indentures.

9.2 **Contingent Distribution/Limitation on Recovery**: Notwithstanding anything contained herein to the contrary, in the event that (a) distributions of Plan Currency and Trust Interests are deemed redistributed to a holder of an Allowed Enron TOPRS Debenture Claim in accordance with the provisions of Section 7.5 hereof and (b) the sum of the distributions of Plan Currency and Trust Interests are equal to or in excess of one hundred percent (100%) of such holder's Allowed Enron TOPRS Debenture Claim, then, the Plan Currency and Trust Interests remaining to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims and Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims and Disputed Equity Interest and accordingly shall be distributed in accordance with the provisions of the documents, instruments and

agreements governing such Claims and Equity Interests, including, without limitation, the contractual subordination provisions set forth therein, and the Bankruptcy Code.

## ARTICLE X

## PROVISIONS FOR TREATMENT OF
## ENRON GUARANTY CLAIMS (CLASS 185)

10.1    **Treatment of Enron Guaranty Claims (Class 185)**:  Commencing on the Effective Date and subject to the provisions of Section 10.2 hereof, each holder of an Allowed Enron Guaranty Claim shall be entitled to receive on account of such Allowed Enron Guaranty Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of the Enron Guaranty Distributive Assets and the Enron Guaranty Distributive Interests; provided, however, that, to the extent that a holder of an Allowed Enron Guaranty Claim shall be entitled to receive a distribution on account of a recovery with respect to a Litigation Trust Claim or a Special Litigation Claim, as the case may be, such distribution shall be allocated (i) eighty percent (80%) to the holder of such Allowed Enron Guaranty Claim and (ii) twenty percent (20%) to the holders of Allowed General Unsecured Claims against the primary obligor relating to such Allowed Enron Guaranty Claims; and, provided, further, that, for purposes of calculation and distribution of such twenty percent (20%) allocation, any holder of an Allowed General Unsecured Claim against such primary obligor to the extent such holder holds an Allowed Enron Guaranty Claim corresponding to such Allowed General Unsecured Claim shall be excluded; and, provided, further, that, under no circumstances, shall a holder of an Allowed Enron Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and X of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim; and, provided, further, that, notwithstanding the foregoing, the contractual subordination rights, if any, of holders of "Senior Indebtedness" or any similar term under the Enron MIPS Agreements and the guarantee agreements executed in connection therewith shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and, in the event such rights are determined to be enforceable, any such distributions shall be distributed to holders of Allowed Claims that constitute "Senior Indebtedness", as identified on Exhibit "L" hereto, until such time as such holder's Claims have been satisfied in accordance with the terms and provisions of the Enron MIPS Agreements and such related agreements.

10.2    **Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim**:  Notwithstanding the provisions of Section 10.1 of the Plan, any holder of an Allowed Enron Guaranty Claim whose Allowed Enron Guaranty Claim is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed Claim as so reduced, distributions pursuant to Article XVI hereof; provided, however, that, under no circumstances, shall a holder of an Allowed Enron Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and X of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided,

however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

## ARTICLE XI

## PROVISIONS FOR TREATMENT OF
## WIND GUARANTY CLAIMS (CLASS 186)

11.1    **Treatment of Wind Guaranty Claims (Class 186)** :  Commencing on the Effective Date and subject to the provisions of Section 11.2 hereof, each holder of an Allowed Wind Guaranty Claim shall be entitled to receive on account of such Allowed Wind Guaranty Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of the Wind Guaranty Distributive Assets and the Wind Guaranty Distributive Interests; provided, however, that, under no circumstances, shall a holder of an Allowed Wind Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XI of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.

11.2    **Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim**:  Notwithstanding the provisions of Section 11.1 of the Plan, any holder of an Allowed Wind Guaranty Claim whose Allowed Wind Guaranty Claim is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed Claim as so reduced, distributions pursuant to Article XVI hereof; provided, however, that, under no circumstances, shall a holder of an Allowed Wind Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XI of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

## ARTICLE XII

## PROVISIONS FOR TREATMENT OF
## ENA GUARANTY CLAIMS (CLASS 187)

12.1    **Treatment of ENA Guaranty Claims (Class 187)** :  Commencing on the Effective Date and subject to the provisions of Section 12.2 hereof, each holder of an Allowed ENA Guaranty Claim shall be entitled to receive on account of such Allowed ENA Guaranty Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of the ENA Guaranty Distributive Assets and the ENA Guaranty Distributive Interests; provided, however, that, under no circumstances, shall a holder of an Allowed ENA Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XII of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.

**12.2    Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim**:  Notwithstanding the provisions of Section 12.1 of the Plan, any holder of an Allowed ENA Guaranty Claim whose Allowed ENA Guaranty Claim is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed Claim as so reduced, distributions pursuant to Article XVI hereof; provided, however, that, under no circumstances, shall a holder of an Allowed ENA Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XII of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

## ARTICLE XIII

## PROVISIONS FOR TREATMENT OF
## ACFI GUARANTY CLAIMS (CLASS 188)

**13.1    Treatment of ACFI Guaranty Claims (Class 188)** :  Commencing on the Effective Date and subject to the provisions of Section 13.2 hereof, each holder of an Allowed ACFI Guaranty Claim shall be entitled to receive on account of such Allowed ACFI Guaranty Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of the ACFI Guaranty Distributive Assets and the ACFI Guaranty Distributive Interests; provided, however, that, under no circumstances, shall a holder of an Allowed ACFI Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XIII of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.

**13.2    Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim**:  Notwithstanding the provisions of Section 13.1 of the Plan, any holder of an Allowed ACFI Guaranty Claim whose Allowed ACFI Guaranty Claim is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed Claim as so reduced, distributions pursuant to Article XVI hereof; provided, however, that, under no circumstances, shall a holder of an Allowed ACFI Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XIII of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

# ARTICLE XIV

## PROVISIONS FOR TREATMENT OF
## EPC GUARANTY CLAIMS (CLASS 189)

14.1    **Treatment of EPC Guaranty Claims (Class 189)** :  Commencing on the Effective Date and subject to the provisions of Section 14.2 hereof, each holder of an Allowed EPC Guaranty Claim shall be entitled to receive on account of such Allowed EPC Guaranty Claim distributions in an aggregate amount equal to such holder's Pro Rata Share of the EPC Guaranty Distributive Assets and the EPC Guaranty Distributive Interests; provided, however, that, under no circumstances, shall a holder of an Allowed EPC Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XIV of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.

14.2    **Allowed Claims of Fifty Thousand Dollars or More/Election to be Treated as a Convenience Claim**:  Notwithstanding the provisions of Section 14.1 of the Plan, any holder of an Allowed EPC Guaranty Claim whose Allowed EPC Guaranty Claim is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed Claim as so reduced, distributions pursuant to Article XVI hereof; provided, however, that, under no circumstances, shall a holder of an Allowed ACFI Guaranty Claim receive aggregate distributions in accordance with the provisions of Articles VII and XIV of the Plan in excess of one hundred percent (100%) of such holder's corresponding Allowed General Unsecured Claim.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

# ARTICLE XV

## PROVISIONS FOR TREATMENT OF
## INTERCOMPANY CLAIMS (CLASS 190)

15.1    **Treatment of Intercompany Claims (Class 190)** :  Commencing on the Effective Date, each Debtor which is a holder of an Allowed Intercompany Claim shall be deemed to be entitled to receive on account of such Allowed Intercompany Claim allocations in an aggregate amount equal to such holder's Pro Rata Share of the Intercompany Distributive Assets and Intercompany Distributive Interests and such allocations shall be redistributed to holders of Allowed Claims in accordance with the provisions of Articles VII through IX and XVII through XX hereof.

## ARTICLE XVI

### PROVISIONS FOR TREATMENT OF
### CONVENIENCE CLAIMS (CLASSES 191-375)

16.1 **Treatment of Convenience Claims (Classes 191 through 375)**: On the Effective Date or as soon as practicable thereafter, and except as provided in Section 16.2 hereof, each holder of an Allowed Convenience Claim against a Debtor shall receive Cash in an amount equal to the applicable Convenience Claim Distribution Percentage of such Allowed Convenience Claim.

16.2 **Plan Currency Opportunity**: Notwithstanding the provisions of this Article XVI, any holder of an Allowed Convenience Claim against a Debtor may elect to have such holder's Claim treated as a General Unsecured Claim or a Guaranty Claim against such Debtor in accordance with the respective provisions of Articles VII, X, XI, XII, XIII and XIV hereof. Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date. Any election made after the Ballot date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

16.3 **Dabhol Debtors Removal**: Pursuant to the Bankruptcy Court's order, dated April 8, 2004, and the notice, dated May 17, 2004 in connection therewith, (a) a majority of the equity interests of Enron Mauritius Company, Enron India Holdings Ltd. and Offshore Power Production C.V. were sold, (b) such entities were, among other things, removed as Debtors and Proponents of the Plan and (c) Classes 246, 247 and 248 have been rendered inoperative.

## ARTICLE XVII

### PROVISION FOR TREATMENT OF
### SUBORDINATED CLAIMS (CLASSES 376 – 382)

17.1 **Treatment of Allowed Subordinated Claims (Classes 376 through 382)**: Except as otherwise provided in Section 17.2 of the Plan, each holder of an Allowed Subordinated Claim shall receive no distribution for and on account of such Claim.

17.2 **Contingent Distribution/Limitation on Recovery**: Notwithstanding anything contained herein to the contrary, in the event that Plan Currency and Trust Interests are deemed redistributed to a holder of an Allowed Subordinated Claim in accordance with the provisions of Sections 7.5, 8.2 and 9.2 of the Plan, such redistribution shall be made to holders of Allowed Subordinated Claims and Allowed Equity Interests in the following order of priority, until such Claims are paid, or deemed paid in full, in Cash, or through the value of the balance of the Plan Currency and Trust Interests  so distributed: (a) holders of Allowed Section 510 Enron Senior Notes Claims and Allowed Section 510 Enron Subordinated Debenture Claims; (b) holders of Allowed Penalty Claims and Allowed Other Subordinated Claims; (c) holders of Allowed Section 510 Enron Preferred Equity Interest Claims; (d) holders of Allowed Enron Preferred Equity Interests and Allowed Enron TOPRS Subordinated Guaranty Claims; and (e) holders of Allowed Section 510 Enron Common Equity Interest Claims and Allowed Enron Common

Equity Interests in accordance with the provisions of the documents, instruments and agreements governing such Equity Interests, including, without limitation, the contractual subordination provisions set forth therein and the Bankruptcy Code.

## ARTICLE XVIII

## PROVISIONS FOR TREATMENT OF
## ENRON PREFERRED EQUITY INTERESTS (CLASS 383)

18.1   **Treatment of Allowed Enron Preferred Equity Interests (Class 383)**:  Except as otherwise provided in Section 18.2 of the Plan, on the Effective Date, each holder of an Allowed Enron Preferred Equity Interest shall be entitled to receive such holder's Pro Rata Share of the separate class of Preferred Equity Trust Interests relating to such holder's class of Exchanged Enron Preferred Stock to be allocated pursuant to Article XXVI of the Plan.  For purposes of this Section 18.1, a holder's class of Exchanged Enron Preferred Stock is the class of Exchanged Enron Preferred Stock to be issued in lieu of such holder's class of Enron Preferred Equity Interest.

18.2   **Contingent Distribution/Limitation on Recovery**:  Notwithstanding anything contained herein to the contrary, in the event that (a) Plan Currency and Trust Interests are deemed redistributed to a holder of an Allowed Enron Preferred Equity Interest, and, as a result of the issuance and transfer of the Exchanged Enron Preferred Stock, to the Preferred Equity Trustee for and on behalf of the holders of Preferred Equity Trust Interests, in accordance with the provisions of Sections 7.5, 8.2, 9.2 and 17.2 of the Plan, and (b) the sum of such distributions to such holder are equal or in excess of to one hundred percent (100%) of such holder's Allowed Enron Preferred Equity Interests, then, the Plan Currency and Trust Interests remaining to be distributed to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Section 510 Enron Common Equity Interest Claims and Allowed Enron Common Equity Interests and accordingly shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Equity Interests, including, without limitation, the contractual subordination provisions set forth therein, and the Bankruptcy Code.

18.3   **Cancellation of Enron Preferred Equity Interests and Exchanged Enron Preferred Stock**:  On the Effective Date, the Enron Preferred Equity Interests shall be deemed cancelled and of no force and effect and the Exchanged Enron Preferred Stock shall be issued in lieu thereof.  On the later to occur of (a) the entry of a Final Order resolving all Claims in the Chapter 11 Cases and (b) the final distribution made to holders of Allowed Claims and Allowed Equity Interests in accordance with Article XXXII of the Plan, the Exchanged Enron Preferred Stock shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

**ARTICLE XIX**

**PROVISION FOR TREATMENT OF
ENRON COMMON EQUITY INTERESTS (CLASS 384)**

19.1    **Treatment of Allowed Enron Common Equity Interests (Class 384)**:  Except as otherwise provided in Section 19.2 of the Plan, on the Effective Date, each holder of an Allowed Enron Common Equity Interest shall be entitled to receive such holder's Pro Rata Share of Common Equity Trust Interests to be allocated pursuant to Article XXVII of the Plan.

19.2    **Contingent Distribution to Common Equity Trust**:  Notwithstanding anything contained herein to the contrary, in the event that Plan Currency and Trust Interests are deemed redistributed to a holder of an Allowed Enron Common Equity Interest in accordance with the provisions of Sections 7.5, 8.2, 9.2, 17.2 and 18.2 of the Plan, as a result of the issuance and transfer of Exchanged Enron Common Stock, such Plan Currency shall be distributed to the Common Equity Trustee for and on behalf of the holders of Common Equity Trust Interests.

19.3    **Cancellation of Enron Common Equity Interests and Exchanged Enron Common Stock**:  On the Effective Date, the Enron Common Equity Interests shall be deemed cancelled and of no force and effect and the Exchanged Enron Common Stock shall be issued in lieu of the Enron Common Equity Interests consisting of outstanding common stock (not interests or rights to convert into, or acquire, common stock).  On the later to occur of (a) the entry of a Final Order resolving all Claims in the Chapter 11 Cases and (b) the final distribution made to holders of Allowed Claims and Allowed Equity Interests in accordance with Article XXXII of the Plan, the Exchanged Enron Common Stock shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

**ARTICLE XX**

**PROVISIONS FOR TREATMENT OF
OTHER EQUITY INTERESTS (CLASS 385)**

20.1    **Cancellation of Other Equity Interests (Class 385)**:  On the latest to occur of (1) the Effective Date, (2) the entry of a Final Order resolving all Claims in the Chapter 11 Cases and (3) the final distribution made to holders of Allowed Claims and Allowed Equity Interests in accordance with Article XXXII of the Plan, unless otherwise determined by the Debtors and the Creditors' Committee, (a) all Other Equity Interests shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect and (b) the Reorganized Debtor Plan Administrator shall administer the assets of such Entity in accordance with the provisions of Article XXXVI hereof; provided, however, that no Other Equity Interests shall be cancelled if the result of such cancellation shall adversely economically impact the estate of any Debtor.

## ARTICLE XXI

## PROVISIONS FOR TREATMENT OF
## DISPUTED CLAIMS UNDER THE PLAN

21.1    **Objections to Claims; Prosecution of Disputed Claims**:  The Reorganized Debtors shall object to the allowance of Claims or Equity Interests filed with the Bankruptcy Court with respect to which they dispute liability, priority or amount, including, without limitation, objections to Claims which have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that the Reorganized Debtors (within such parameters as may be established by the Board of Directors of the Reorganized Debtors) shall have the authority to file, settle, compromise or withdraw any objections to Claims or Equity Interests.  Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall file and serve (i) objections to Claims with regard to the Yosemite and Credit Linked Notes financing transaction, the Apache/Choctaw financing transaction and the Zephyrus/Tammy financing transaction, each as described in the Disclosure Statement, no later than twenty (20) days following the Confirmation Date, unless extended for cause upon motion by the Debtors upon notice to the Creditors' Committee and the Creditors affected thereby, (ii) objections to twenty (20) of the largest proofs of Claim filed against ENA, and identified by the ENA Examiner in a list provided no later than the Confirmation Date, no later than fifty (50) days following the Confirmation Date, unless extended for cause upon motion by the Debtors upon notice to the Creditors' Committee and the Creditors affected thereby, and (iii) all objections to other Claims as soon as practicable, but, in each instance, not later than two hundred forty (240) days following the Confirmation Date or such later date as may be approved by the Bankruptcy Court.

21.2    **Estimation of Claims**:  Unless otherwise limited by an order of the Bankruptcy Court, the Reorganized Debtors may at any time request the Bankruptcy Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

21.3    **Payments and Distributions on Disputed Claims**:

(a)    Disputed Claims Reserve:  From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Disbursing Agent shall reserve and hold in escrow for the benefit of each holder of a Disputed Claim, Cash, Plan Securities, Operating Trust Interests, Remaining Asset Trust Interests, Litigation Trust Interests and Special Litigation Trust Interests and any dividends, gains or income attributable thereto, in an amount equal to the Pro Rata Share of distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the Disputed Claim Amount, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Reorganized Debtors; provided, however, that, under no circumstances, shall a holder of an Allowed Convenience Claim be entitled to distributions of Litigation Trust Interests, Special Litigation Trusts Interests or the proceeds thereof.  Any Cash, Plan Securities, Operating Trust Interests, Remaining Asset Trust Interests, Litigation Trust Interests and Special Litigation Trust Interests reserved and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash or distributed in Plan Securities in the event the Disputed Claim ultimately becomes an Allowed Claim.  Such Cash and any dividends, gains or income paid on account of Plan Securities, Operating Trust Interests, Remaining Asset Trust Interests, Litigation Trust Interests and Special Litigation Trust Interests reserved for the benefit of holders of Disputed Claims shall be either (x) held by the Disbursing Agent, in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States Government, or by an agency of the United States Government and guaranteed by the United States Government, and having (in either case) a maturity of not more than thirty (30) days, for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan.  No payments or distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

(b)    Allowance of Disputed Claims:  At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Disbursing Agent shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan together with any interest which has accrued on the amount of Cash and any dividends or distributions attributable to the Plan Currency or Trust Interests so reserved (net of any expenses, including any taxes of the escrow, relating thereto), but only to the extent that such interest is attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order but in no event more than ninety (90) days thereafter. The balance of any Cash previously reserved shall be included in Creditor Cash and the balance of any Plan Currency and Trust Interests  previously reserved shall be included in future calculations of Plan Currency and Trust Interests , respectively, to holders of Allowed Claims and, to the extent determined to be distributable to holders of Allowed Equity Interests in accordance with the terms and provisions of the Plan, holders of Allowed Equity Interests.

(c)    <u>Tax Treatment of Escrow</u>:  Subject to the receipt of contrary guidance from the IRS or a court of competent jurisdiction (including the receipt by the Disbursing Agent of a private letter ruling requested by the Disbursing Agent, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent, or a condition imposed by the IRS in connection with a private letter ruling requested by the Debtors), the Disbursing Agent shall (i) treat the escrow as one or more discrete trusts (which may be composed of separate and independent shares) for federal income tax purposes in accordance with the trust provisions of the IRC (Sections 641 et seq.) and (ii) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes.  All holders of Allowed Claims and Allowed Equity Interests shall report, for tax purposes, consistent with the foregoing.

(d)    <u>Funding of Escrow's Tax Obligation</u>:  If the reserve created in accordance with Section 21.3(a) hereof has insufficient funds to pay any applicable taxes imposed upon it or its assets, subject to the other provisions contained herein, the Reorganized Debtors shall advance to the escrow the funds necessary to pay such taxes (a "Tax Advance"), with such Tax Advances repayable from future amounts otherwise receivable by the escrow pursuant to Section 21.3 or otherwise.  If and when a distribution is to be made from the escrow, the distributee will be charged its pro rata portion of any outstanding Tax Advance (including accrued interest).  If a cash distribution is to be made to such distributee, the Disbursing Agent shall be entitled to withhold from such distributee's distribution the amount required to pay such portion of the Tax Advance (including accrued interest).  If such cash is insufficient to satisfy the respective portion of the Tax Advance and there is also to be made to such distributee a distribution of other Plan Currency or interests in the trusts to be created hereunder, the distributee shall, as a condition to receiving such other assets, pay in cash to the Disbursing Agent an amount equal to the unsatisfied portion of the Tax Advance (including accrued interest).  Failure to make such payment shall entitle the Disbursing Agent to reduce and permanently adjust the amounts that would otherwise be distributed to such distributee to fairly compensate the Disputed Claims reserve created in accordance with Section 21.3(a) of the Plan for the unpaid portion of the Tax Advance (including accrued interest).

## ARTICLE XXII

## THE LITIGATION TRUST

22.1    **Establishment of the Trust**:  Upon the joint determination of the Debtors or the Reorganized Debtors, as the case may be, and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, on or after the Effective Date, but in no event later than December 31st of the calendar year in which the Effective Date occurs, unless such date is otherwise extended by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, in their joint and absolute discretion and by notice filed with the Bankruptcy Court, the Debtors or the Reorganized Debtors, as the case may be, on their own behalf and on behalf of holders of Allowed Claims in Classes 3 through 190, shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust; provided, however, that, in the event that the board of directors of Reorganized ENE and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan,

the Creditors' Committee determine that the aggregate distributions of Plan Currency and Trust Interests would permit a distribution to be made pursuant to Section 17.2, 18.2 or 19.2 of the Plan, then, the Debtors or the Reorganized Debtors, as the case may be, shall modify the Plan to provide for such distributions to be made. In the event that the Litigation Trust is created, in accordance with and pursuant to the terms of Section 22.4 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall transfer to the Litigation Trust all of their right, title, and interest in the Litigation Trust Claims. In connection with the above-described rights and causes of action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) shall be transferred to the Litigation Trust and shall vest in the Litigation Trustee and its representatives, and the Debtors or the Reorganized Debtors, as the case may be, the Debtors in Possession and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges.

22.2    **Purpose of the Litigation Trust**: The Litigation Trust shall be established for the sole purpose of liquidating its assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

22.3    **Funding Expenses of the Litigation Trust**: In accordance with the Litigation Trust Agreement and any agreements entered into in connection therewith, upon the creation of the Litigation Trust, the Debtors or the Reorganized Debtors, as the case may be, shall transfer such amounts of Cash as jointly determined by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee as necessary to fund the operations of the Litigation Trust. The Debtors and the Reorganized Debtors shall have no further obligation to provide any funding with respect to the Litigation Trust.

22.4    **Transfer of Assets**:

(a)    The transfer of the Litigation Trust Claims to the Litigation Trust shall be made, as provided herein, for the ratable benefit of the holders of Allowed Claims in Classes 3 through 190, only to the extent such holders in such Classes are entitled to distributions under the Plan. In partial satisfaction of Allowed Claims in Classes 3 through 190, the Litigation Trust Claims shall be transferred to such holders of Allowed Claims, to be held by the Debtors on their behalf. Immediately thereafter, on behalf of the holders of Allowed Claims in Classes 3 through 190, the Debtors or the Reorganized Debtors, as the case may be, shall transfer such Litigation Trust Claims to the Litigation Trust in exchange for Litigation Trust Interests for the ratable benefit of holders of Allowed Claims in Classes 3 through 190, in accordance with the Plan. Upon the transfer of the Litigation Trust Claims, the Debtors or the Reorganized Debtors, as the case may be, shall have no interest in or with respect to the Litigation Trust Claims or the Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Claims to the Litigation Trust shall not affect the mutuality of obligations which may have otherwise existed prior to the effectuation of such transfer.

(b)    For all federal income tax purposes, all parties (including, without limitation, the Debtors or the Reorganized Debtors, as the case may be, the Litigation Trustee and the beneficiaries of the Litigation Trust) shall treat the transfer of assets to the Litigation

Trust in accordance with the terms of the Plan, as a transfer to the holders of Allowed Claims in Classes 3 through 190, followed by a transfer by such holders to the Litigation Trust and the beneficiaries of the Litigation Trust shall be treated as the grantors and owners thereof.

22.5    **Valuation of Assets**:  As soon as possible after the creation of the Litigation Trust, but in no event later than thirty (30) days thereafter, the Litigation Trust Board shall inform, in writing, the Litigation Trustee of the value of the assets transferred to the Litigation Trust, based on the good faith determination of the Litigation Trust Board, and the Litigation Trustee shall apprise, in writing, the beneficiaries of the Litigation Trust of such valuation.  The valuation shall be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Litigation Trustee and the beneficiaries of the Litigation Trust) for all federal income tax purposes.

22.6    **Litigation; Responsibilities of Litigation Trustee**:

(a)    The Litigation Trustee, upon direction by the Litigation Trust Board and the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Litigation Trust, make timely distributions and not unduly prolong the duration of the Litigation Trust.  The liquidation of the Litigation Trust Claims may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise.  The Litigation Trustee, upon direction by the Litigation Trust Board, shall have the absolute right to pursue or not to pursue any and all Litigation Trust Claims as it determines is in the best interests of the beneficiaries of the Litigation Trust, and consistent with the purposes of the Litigation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence.  The Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the assets to Cash and shall be reimbursed in accordance with the provisions of the Litigation Trust Agreement.

(b)    The Litigation Trustee shall be named in the Confirmation Order or in the Litigation Trust Agreement and shall have the power (i) to prosecute for the benefit of the Litigation Trust all claims, rights and causes of action transferred to the Litigation Trust (whether such suits are brought in the name of the Litigation Trust or otherwise), and (ii) to otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Litigation Trustee pursuant to the Plan.  Any and all proceeds generated from such claims, rights, and causes of action shall be the property of the Litigation Trust.

22.7    **Investment Powers** :  The right and power of the Litigation Trustee to invest assets transferred to the Litigation Trust, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 22.8 of the Plan) in Cash Equivalents; provided, however, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the

Litigation Trustee may expend the assets of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Litigation Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement; and, provided, further, that, under no circumstances, shall the Litigation Trust segregate the assets of the Litigation Trust on the basis of classification of the holders of Litigation Trust Interests, other than with respect to distributions to be made on account of Disputed Claims and Disputed Equity Interests in accordance with the provisions hereof.

22.8    **Annual Distribution; Withholding**:  The Litigation Trustee shall distribute at least annually to the holders of Litigation Trust Interests all net cash income plus all net cash proceeds from the liquidation of assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Litigation Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Litigation Trust during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Litigation Trust or in respect of the assets of the Litigation Trust), and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement.  All such distributions shall be pro rata based on the number of Litigation Trust Interests held by a holder compared with the aggregate number of Litigation Trust Interests outstanding, subject to the terms of the Plan and the Litigation Trust Agreement.  The Litigation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

22.9    **Reporting Duties**:

(a)    Federal Income Tax:  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee (or the Debtors) so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Litigation Trustee shall also annually send to each holder of a Litigation Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns.

(b)    Allocations of Litigation Trust Taxable Income:  Allocations of Litigation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Litigation Trust Interests, taking into account all prior and concurrent distributions from the Litigation Trust (including all distributions held in escrow pending the resolution of Disputed Claims).  Similarly, taxable loss of the Litigation Trust will be allocated by reference to

the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Claims. The tax book value of the Litigation Trust Claims for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Litigation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)    Other:  The Litigation Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.

22.10    **Trust Implementation**:  Upon the joint determination of the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, on or after the Effective Date, but in no event later than December 31st of the calendar year in which the Effective Date occurs, unless such date is otherwise extended by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, in their joint and absolute discretion and by notice filed with the Bankruptcy Court, the Litigation Trust shall be established and become effective for the benefit of Allowed Claims in Classes 3 through 190. The Litigation Trust Agreement shall be filed in the Plan Supplement and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Litigation Trust as a grantor trust for federal income tax purposes. All parties (including the Debtors or the Reorganized Debtors, as the case may be, the Litigation Trustee and holders of Allowed Claims in Classes 3 through 190) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Litigation Trust.

22.11    **Registry of Beneficial Interests**:  The Litigation Trustee shall maintain a registry of the holders of Litigation Trust Interests.

22.12    **Termination**:  The Litigation Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust if it is necessary to the liquidation of the Litigation Trust Claims. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term.

22.13    **Net Litigation Trust Recovery/Assignment of Claims** :

(a)    Net Judgment :  Notwithstanding anything contained herein to the contrary, in the event that a defendant in a litigation brought by the Litigation Trustee for and on behalf of the Litigation Trust (i) is required by a Final Order to make payment to the Litigation Trust (the "Judgment Amount"), and (ii) is permitted by a Final Order to assert a right of setoff under section 553 of the Bankruptcy Code or applicable non-bankruptcy law against the Judgment Amount (a "Valid Setoff"), (y) such defendant shall be obligated to pay only the excess, if any, of the amount of the Judgment Amount over the Valid Setoff and (z) none of the Litigation

Trust, the holders or beneficiaries of the Litigation Trust Interests shall be entitled to assert a claim against the Debtors or the Reorganized Debtors with respect to the Valid Setoff.

(b)    Assignment:  Notwithstanding anything contained herein to the contrary, in the event that a compromise and settlement of a Litigation Trust Claim or a Final Order with respect to a Litigation Trust Claim provides for a waiver, subordination or disallowance of a defendant's Claim or Claims against one or more of the Debtors, other than ENE, for purposes of computing amounts of distributions, (i) such Claim shall be deemed allowed at the lesser of (y) the "Estimated Allowed Amount" (which shall exclude duplicative Claims) of such Claim, as reflected on the Debtors' claims management system, and (z) the filed proof of claim with respect thereto; provided, however, that, in the event that such proof of claim was filed in a zero-dollar ($0.00), contingent or unliquidated amount, such Claim shall be deemed allowed at the "Estimated Allowed Amount" of such Claim on the Debtors' claims management system, (ii) such defendant shall be deemed to have assigned such Claim or Claims and right to receive distributions in accordance with the Plan to the Litigation Trust, (iii) the Disbursing Agent shall make distributions with respect to such Allowed Claims to the Litigation Trust and (iv) such defendant shall not be entitled to receive distributions from the Litigation Trust on account thereof; and, provided, further, that, in the event that any modifications are made to the "Estimated Allowed Amount" of Claims as reflected in the Debtors' claims management system, and provided that the Creditors' Committee and the ENA Examiner have not been dissolved or released in accordance with the provisions of Sections 33.1 and 33.4 of the Plan, respectively, the ENA Examiner and the Creditors' Committee shall have an opportunity to review such modifications.

22.14    **Applicability to Certain Claims and Equity Interests**:  In the event that distributions of Litigation Trust Interests are made to holders of Allowed Claims or Allowed Equity Interests in accordance with the provisions of Section 17.2, 18.2 or 19.2 of the Plan, all provisions contained in this Article XXII shall be for the benefit of and be applicable to such holders of Allowed Claims or Allowed Equity Interests, as the case may be, as though set forth in this Article XXII in the first instance.

# ARTICLE XXIII

## THE SPECIAL LITIGATION TRUST

23.1    **Establishment of the Trust**:  Upon the joint determination of the Debtors or the Reorganized Debtors, as the case may be, and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, on or after the Effective Date, but in no event later than December 31st of the calendar year in which the Effective Date occurs, unless such date is otherwise extended by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, in their joint and absolute discretion and by notice filed with the Bankruptcy Court, the Debtors or the Reorganized Debtors, as the case may be, on their own behalf and on behalf of holders of Allowed Claims in Classes 3 through 190, shall execute the Special Litigation Trust Agreement and shall take all other steps necessary to establish the Special Litigation Trust; provided, however, that, in the event that the board of directors of Reorganized ENE and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1

of the Plan, the Creditors' Committee determine that the aggregate distributions of Plan Currency and Trust Interests would permit a distribution to be made pursuant to Section 17.2, 18.2 or 19.2 of the Plan, then, the Debtors or the Reorganized Debtors, as the case may be, shall modify the Plan to provide for such distributions to be made. On the Effective Date, and in accordance with and pursuant to the terms of Section 23.4 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall transfer to the Special Litigation Trust all of their right, title, and interest in the Special Litigation Trust Claims. In connection with the above-described rights and causes of action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Special Litigation Trust shall vest in the Special Litigation Trustee and its representatives, and the Debtors or the Reorganized Debtors, as the case may be, the Debtors in Possession and the Special Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges.

23.2    **Purpose of the Special Litigation Trust**: The Special Litigation Trust shall be established for the sole purpose of liquidating its assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

23.3    **Funding Expenses of the Special Litigation Trust**: In accordance with the Special Litigation Trust Agreement and any agreements entered into in connection therewith, upon the creation of the Special Litigation Trust, the Debtors or the Reorganized Debtors, as the case may be, shall transfer such amounts of Cash as jointly determined by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee as necessary to fund the operations of the Special Litigation Trust. The Debtors and the Reorganized Debtors shall have no further obligation to provide any funding with respect to the Special Litigation Trust.

23.4    **Transfer of Assets**:

(a)    The transfer of the Special Litigation Trust Claims to the Special Litigation Trust shall be made, as provided herein, for the ratable benefit of the holders of Allowed Claims in Classes 3 through 190, only to the extent such holders in such Classes are entitled to distributions under the Plan. In partial satisfaction of Allowed Claims in Classes 3 through 190, the Special Litigation Trust Claims shall be transferred to such holders of Allowed Claims, to be held by the Debtors on their behalf. Immediately thereafter, on behalf of the holders of Allowed Claims in Classes 3 through 190, the Debtors or the Reorganized Debtors, as the case may be, shall transfer such Special Litigation Trust Claims to the Special Litigation Trust in exchange for the Special Litigation Trust Interests for the ratable benefit of holders of Allowed Claims in Classes 3 through 190, in accordance with the Plan. Upon the transfer of the Special Litigation Trust Claims, the Debtors or the Reorganized Debtors, as the case may be, shall have no interest in or with respect to the Special Litigation Trust Claims or the Special Litigation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Special Litigation Trust Claims to the Special Litigation Trust shall not affect the mutuality of obligations which may have otherwise existed prior to the effectuation of such transfer.

(b)    For all federal income tax purposes, all parties (including, without limitation, the Debtors or the Reorganized Debtors, as the case may be, the Special Litigation Trustee and the beneficiaries of the Special Litigation Trust) shall treat the transfer of assets to the Special Litigation Trust in accordance with the terms of the Plan, as a transfer to the holders of Allowed Claims in Classes 3 through 190, followed by a transfer by such holders to the Special Litigation Trust and the beneficiaries of the Special Litigation Trust shall be treated as the grantors and owners thereof.

23.5    **Valuation of Assets**:  As soon as possible after the creation of the Special Litigation Trust, but in no event later than thirty (30) days thereafter, the Special Litigation Trust Board shall inform, in writing, the Special Litigation Trustee of the value of the assets transferred to the Special Litigation Trust, based on the good faith determination of the Special Litigation Trust Board, and the Special Litigation Trustee shall apprise, in writing, the beneficiaries of the Special Litigation Trust of such valuation.  The valuation shall be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Special Litigation Trustee and the beneficiaries of the Special Litigation Trust) for all federal income tax purposes.

23.6    **Litigation of Assets; Responsibilities of Special Litigation Trustee**:

(a)    The Special Litigation Trustee, upon direction by the Special Litigation Trust Board and the exercise of their collective reasonable business judgment, shall, in an expeditious but orderly manner, liquidate and convert to Cash the assets of the Special Litigation Trust, make timely distributions and not unduly prolong the duration of the Special Litigation Trust.  The liquidation of the Special Litigation Trust Claims may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise.  The Special Litigation Trustee, upon direction by the Special Litigation Trust Board, shall have the absolute right to pursue or not to pursue any and all claims, rights, or causes of action, as it determines is in the best interests of the beneficiaries of the Special Litigation Trust, and consistent with the purposes of the Special Litigation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence.  The Special Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the assets to Cash.

(b)    The Special Litigation Trustee shall be named in the Confirmation Order or in the Special Litigation Trust Agreement and shall have the power (i) to prosecute for the benefit of the Special Litigation Trust all claims, rights and causes of action transferred to the Special Litigation Trust (whether such suits are brought in the name of the Special Litigation Trust or otherwise), and (ii) to otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Special Litigation Trustee pursuant to the Plan.  Any and all proceeds generated from such claims, rights, and causes of action shall be the property of the Special Litigation Trust.

23.7    **Investment Powers**:  The right and power of the Special Litigation Trustee to invest assets transferred to the Special Litigation Trust, the proceeds thereof, or any income earned by the Special Litigation Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 23.8 of the Plan) in Cash Equivalents; provided, however, that (a) the scope of any such permissible investments shall be

limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Special Litigation Trustee may expend the assets of the Special Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Special Litigation Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Special Litigation Trust or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Special Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Special Litigation Trust Agreement; and, provided, further, that, under no circumstances, shall the Special Litigation Trust segregate the assets of the Special Litigation Trust on the basis of classification of the holders of Special Litigation Trust Interests, other than with respect to distributions to be made on account of Disputed Claims and Disputed Equity Interests in accordance with the provisions hereof.

23.8    **Annual Distribution; Withholding**:  The Special Litigation Trustee shall distribute at least annually to the holders of Special Litigation Trust Interests all net cash income plus all net cash proceeds from the liquidation of assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Special Litigation Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Special Litigation Trust during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Special Litigation Trust or in respect of the assets of the Special Litigation Trust), and (iii) to satisfy other liabilities incurred or assumed by the Special Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Special Litigation Trust Agreement.  All such distributions shall be pro rata based on the number of Special Litigation Trust Interests held by a holder compared with the aggregate number of Special Litigation Trust Interests outstanding, subject to the terms of the Plan and the Special Litigation Trust Agreement.  The Special Litigation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Special Litigation Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

23.9    **Reporting Duties**:

(a)    Federal Income Tax:  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Special Litigation Trustee of a private letter ruling if the Special Litigation Trustee (or the Debtors) so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Special Litigation Trustee), the Special Litigation Trustee shall file returns for the Special Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Special Litigation Trustee shall also annually send to each holder of a Special Litigation Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.

(b)    Allocations of Special Litigation Trust Taxable Income:  Allocations of Special Litigation Trust taxable income shall be determined by reference to the manner in which

an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Special Litigation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Special Litigation Trust Interests, taking into account all prior and concurrent distributions from the Special Litigation Trust (including all distributions held in escrow pending the resolution of Disputed Claims). Similarly, taxable loss of the Special Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Special Litigation Trust Claims. The tax book value of the Special Litigation Trust Claims for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Special Litigation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)    Other: The Special Litigation Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Special Litigation Trust that are required by any governmental unit.

23.10  **Trust Implementation**: Upon the joint determination of the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, on or after the Effective Date, but in no event later than December 31st of the calendar year in which the Effective Date occurs, unless such date is otherwise extended by the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, in their joint and absolute discretion and by notice filed with the Bankruptcy Court, the Special Litigation Trust shall be established and become effective for the benefit of Allowed Claims in Classes 3 through 190. The Special Litigation Trust Agreement shall be filed in the Plan Supplement and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Special Litigation Trust as a grantor trust for federal income tax purposes. All parties (including the Debtors or the Reorganized Debtors, as the case may be, the Special Litigation Trustee and holders of Allowed Claims in Classes 3 through 190) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Special Litigation Trust.

23.11  **Registry of Beneficial Interests**: The Special Litigation Trustee shall maintain a registry of the holders of Special Litigation Trust Interests.

23.12  **Termination**: The Special Litigation Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Special Litigation Trust if it is necessary to the liquidation of the Special Litigation Trust Claims. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term.

23.13  **Net Special Litigation Trust Recovery/Assignment of Claims**:

(a)  Net Judgment:  Notwithstanding anything contained herein to the contrary, in the event that a defendant in a litigation brought by the Special Litigation Trustee for and on behalf of the Special Litigation Trust (i) is required by a Final Order to pay a Judgment Amount to the Special Litigation Trust and (ii) is permitted by a Final Order to assert a Valid Setoff, (y) such defendant shall be obligated to pay only the excess, if any, of the amount of the Judgment Amount over the Valid Setoff and (z) none of the Special Litigation Trust, the holders or beneficiaries of the Special Litigation Trust Interests shall be entitled to assert a claim against the Debtors or the Reorganized Debtors with respect to the Valid Setoff.

(b)  Assignment:  Notwithstanding anything contained herein to the contrary, in the event that a compromise and settlement of a Special Litigation Trust Claim or a Final Order with respect to a Special Litigation Trust Claim provides for a waiver, subordination or disallowance of a defendant's Claim or Claims against one or more of the Debtors, other than ENE, for purposes of computing amounts of distributions, (i) such Claim shall be deemed allowed at the lesser of (y) the "Estimated Allowed Amount" (which shall exclude duplicative Claims) of such Claim as reflected on the Debtors' claims management system) and (z) the filed proof of claim with respect thereto; provided, however, that, in the event that such proof of claim was filed in a zero-dollar ($0.00), contingent or unliquidated amount, such Claim shall be deemed allowed at the "Estimated Allowed Amount" of such Claim on the Debtors' claims management system, (ii) such defendant shall be deemed to have assigned such Claim or Claims and right to receive distributions in accordance with the Plan to the Special Litigation Trust, and (iv) such defendant shall not be entitled to receive distributions from the Special Litigation Trust on account thereof; and, provided, further, that, in the event that any modifications are made to the "Estimated Allowed Amount" of Claims as reflected in the Debtors' claims management system, and provided that the Creditors' Committee and the ENA Examiner have not been dissolved or released in accordance with the provisions of Sections 33.1 and 33.4 of the Plan, respectively, the ENA Examiner and the Creditors' Committee shall have an opportunity to review such modifications.

23.14  **Applicability to Certain Claims and Equity Interests**:  In the event that distributions of Special Litigation Trust Interests are made to holders of Allowed Claims or Allowed Equity Interests in accordance with the provisions of Section 17.2, 18.2 or 19.2 of the Plan, all provisions contained in this Article XXIII shall be for the benefit of and be applicable to such holders of Allowed Claims or Allowed Equity Interests, as the case may be, as though set forth in this Article XXIII in the first instance.

## ARTICLE XXIV

## THE OPERATING TRUSTS

24.1  **Establishment of the Trusts**:  Upon the joint determination of the Debtors or the Reorganized Debtors, as the case may be, and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, on or after the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, on their own behalf and on behalf of holders of Allowed Claims in Classes 3

through 180, 183 through 189 and 376 through 382 shall execute the respective Operating Trust Agreements and shall take all other steps necessary to establish the respective Operating Trusts. On such date, or as soon as practicable thereafter, including, without limitation, subject to appropriate or required governmental, agency or other consents, and in accordance with and pursuant to the terms of Section 24.4 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall transfer to the respective Operating Trusts all of their right, title, and interest in the assets subject to the Operating Trust Agreements.

24.2    **Purpose of the Operating Trusts**:  The Operating Trusts shall be established for the sole purpose of holding and liquidating the respective assets in the Prisma Trust, the CrossCountry Trust and the PGE Trust in accordance with Treasury Regulation Section 301.7701-4(d) and the terms and provisions of the Operating Trust Agreements.  Without limiting the foregoing, the Operating Trust Agreements shall each provide that the applicable Operating Trust shall not distribute any of the Prisma Common Stock, CrossCountry Common Equity or PGE Common Stock, as the case may be, prior to the date referred to in Sections 29.1(c)(i), (ii) and (iii), respectively.

24.3    **Funding Expenses of the Operating Trusts**:  In accordance with the respective Operating Trust Agreements and any agreements entered into in connection therewith, on the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall have no obligation to provide any funding with respect to any of the Operating Trusts.

24.4    **Transfer of Assets**:

(a)    The transfer of assets to the Operating Trusts shall be made, as provided herein, for the benefit of the holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, only to the extent such holders in such Classes are entitled to distributions under the Plan.  In partial satisfaction of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, the assets subject to the respective Operating Trusts shall be transferred to such holders of Allowed Claims, to be held by the Debtors on their behalf. Immediately thereafter, on behalf of the holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, the Debtors or the Reorganized Debtors, as the case may be, shall transfer such assets to the Operating Trusts for the benefit of holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, in accordance with the Plan.

(b)    For all federal income tax purposes, all parties (including, without limitation, the Debtors or the Reorganized Debtors, as the case may be, the Operating Trustee and the beneficiaries of the Operating Trusts) shall treat the transfer of assets to the respective Operating Trusts in accordance with the terms of the Plan, as a transfer to the holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, followed by a transfer by such holders to the respective Operating Trusts and the beneficiaries of the Operating Trusts shall be treated as the grantors and owners thereof.

24.5    **Valuation of Assets**:  As soon as possible after the creation of the Operating Trusts, but in no event later than thirty (30) days thereafter, the respective Operating Trust Boards shall inform, in writing, the Operating Trustee of the value of the assets transferred to the respective Operating Trusts, based on the good faith determination of the respective Operating

Trust Boards, and the Operating Trustee shall apprise, in writing, the beneficiaries of the respective Operating Trusts of such valuation.  The valuation shall be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Operating Trustee and the beneficiaries of the Operating Trusts) for all federal income tax purposes.

24.6    **Investment Powers** :  The right and power of the Operating Trustee to invest assets transferred to the Operating Trust, the proceeds thereof, or any income earned by the respective Operating Trusts, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 24.7 of the Plan) in Cash Equivalents; provided, however, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Operating Trustee may expend the assets of the Operating Trusts (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Operating Trusts during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Operating Trusts or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Operating Trusts (or to which the assets are otherwise subject) in accordance with the Plan or the Operating Trust Agreements; and, provided, further, that, under no circumstances, shall the Operating Trusts segregate the assets of the Operating Trusts on the basis of classification of the holders of respective Operating Trust Interests, other than with respect to distributions to be made on account of Disputed Claims and Disputed Equity Interests in accordance with the provisions hereof.

24.7    **Annual Distribution; Withholding** :  The Operating Trustee shall distribute at least annually to the holders of respective Operating Trust Interests all net cash income plus all net cash proceeds from the liquidation of assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Operating Trusts may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Operating Trusts during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Operating Trusts or in respect of the assets of the Operating Trust), and (iii) to satisfy other liabilities incurred or assumed by the Operating Trusts (or to which the assets are otherwise subject) in accordance with the Plan or the Operating Trust Agreements.  All such distributions shall be pro rata based on the number of Operating Trust Interests held by a holder compared with the aggregate number of Operating Trust Interests outstanding, subject to the terms of the Plan and the respective Operating Trust Agreements.  The Operating Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Operating Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

24.8    **Reporting Duties** :

(a)    Federal Income Tax:  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Operating Trustee of a private letter ruling if the Operating Trustee so requests one, or the receipt of an adverse

determination by the IRS upon audit if not contested by the Operating Trustee), the Operating Trustee shall file returns for the Operating Trusts as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Operating Trustee shall also annually send to each holder of a Operating Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.

(b)    Allocations of Operating Trusts Taxable Income:  Allocations of Operating Trusts taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Operating Trusts had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Operating Trust Interests (treating any holder of a Disputed Claim, for this purpose, as a current holder of a Operating Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Operating Trusts (including all distributions held in escrow pending the resolution of Disputed Claims).  Similarly, taxable loss of the Operating Trusts shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of an Operating Trust.  The tax book value of the assets of an Operating Trust for this purpose shall equal their fair market value on the date such Operating Trusts were created or, if later, the date such assets were acquired by the Operating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)    Other:  The Operating Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Operating Trust that are required by any governmental unit.

24.9    **Trust Implementation**:  On or after the Confirmation Date, the Operating Trusts shall be established and become effective for the benefit of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382.  The Operating Trust Agreements shall be filed in the Plan Supplement and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Operating Trusts as a grantor trust for federal income tax purposes.  All parties (including the Debtors or the Reorganized Debtors, as the case may be, the Operating Trustee and holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Operating Trusts.

24.10    **Registry of Beneficial Interests**:  The Operating Trustee shall maintain a registry of the holders of Operating Trust Interests.

24.11    **Termination**:  The Operating Trusts shall terminate no later than the third (3rd) anniversary of the Confirmation Date; provided, however, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Operating Trusts if it is necessary to the liquidation of the assets of Operating Trusts.  Notwithstanding the foregoing, multiple extensions can be obtained so long as

Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years from and after the third (3rd) anniversary of the Confirmation Date.

24.12  **Non-Transferability or Certification**:  Upon the creation of each Operating Trust, the beneficial interests in such Operating Trust shall be allocated on the books and records of such Operating Trust to the appropriate holders thereof, but such interests shall not be certificated and shall not be transferable by the holder thereof except through the laws of descent or distribution.

24.13  **Applicability to Certain Claims and Equity Interests**:  In the event that allocations of Operating Trust Interests are made to holders of Allowed Claims or Allowed Equity Interests in accordance with the provisions of Section 17.2, 18.2 or 19.2 of the Plan, all provisions contained in this Article XXIV shall be for the benefit of and be applicable to such holders of Allowed Claims or Allowed Equity Interests, as the case may be, as though set forth in this Article XXIV in the first instance.

## ARTICLE XXV

## THE REMAINING ASSET TRUSTS

25.1  **Establishment of the Trusts**:  Upon the joint determination of the Debtors or the Reorganized Debtors, as the case may be, and, provided that the Creditors' Committee has not been dissolved in accordance with the provisions of Section 33.1 of the Plan, the Creditors' Committee, on or after the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, on their own behalf and on behalf of holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382 shall execute the respective Remaining Asset Trust Agreements and shall take all other steps necessary to establish the respective Remaining Asset Trusts.  On such date, or as soon as practicable thereafter, including, without limitation, subject to appropriate or required governmental agency or other consents, and in accordance with and pursuant to the terms of Section 25.4 of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall transfer to the respective Remaining Asset Trusts all of their right, title, and interest in the Remaining Assets.

25.2  **Purpose of the Remaining Asset Trusts**:  The Remaining Asset Trusts shall be established for the sole purpose of holding and liquidating the respective assets in the Remaining Asset Trusts in accordance with Treasury Regulation Section 301.7701-4(d) and the terms and provisions of the Remaining Asset Trust Agreements.

25.3  **Funding Expenses of the Remaining Asset Trusts**:  In accordance with the respective Remaining Asset Trust Agreements and any agreements entered into in connection therewith, on the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall have no obligation to provide any funding with respect to any of the Remaining Asset Trusts.

25.4    **Transfer of Assets**:

(a)    The transfer of assets to the Remaining Asset Trusts shall be made, as provided herein, for the benefit of the holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, only to the extent such holders in such Classes are entitled to distributions under the Plan. In partial satisfaction of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, the Remaining Assets shall be transferred to such holders of Allowed Claims, to be held by the Debtors on their behalf. Immediately thereafter, on behalf of the holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, the Debtors or the Reorganized Debtors, as the case may be, shall transfer such assets to the Remaining Asset Trusts for the benefit of holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, in accordance with the Plan. Upon the transfer of the Remaining Assets, the Debtors shall have no interest in or with respect to the Remaining Assets or the Remaining Asset Trusts.

(b)    For all federal income tax purposes, all parties (including, without limitation, the Debtors or the Reorganized Debtors, as the case may be, the Remaining Asset Trustee and the beneficiaries of the Remaining Asset Trusts) shall treat the transfer of assets to the respective Remaining Asset Trusts in accordance with the terms of the Plan, as a transfer to the holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382, followed by a transfer by such holders to the Remaining Asset Trust and the beneficiaries of the respective Remaining Asset Trusts shall be treated as the grantors and owners thereof.

25.5    **Valuation of Assets**:  As soon as possible after the creation of the Remaining Asset Trusts, but in no event later than thirty (30) days thereafter, the respective Remaining Asset Trust Boards shall inform, in writing, the Remaining Asset Trustees of the value of the assets transferred to the respective Remaining Asset Trusts, based on the good faith determination of the respective Remaining Asset Trust Boards, and the Remaining Asset Trustees shall apprise, in writing, the beneficiaries of the respective Remaining Asset Trusts of such valuation. The valuation shall be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Remaining Asset Trustees and the beneficiaries of the Remaining Asset Trusts) for all federal income tax purposes.

25.6    **Investment Powers**:  The right and power of the Remaining Asset Trustee to invest assets transferred to the Remaining Asset Trusts, the proceeds thereof, or any income earned by the respective Remaining Asset Trusts, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 25.7 of the Plan) in Cash Equivalents; provided, however, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Remaining Asset Trustee may expend the assets of the Remaining Asset Trusts (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Remaining Asset Trusts during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Remaining Asset Trusts or fees and expenses in connection with litigation), and (iii) to satisfy

other liabilities incurred or assumed by the Remaining Asset Trusts (or to which the assets are otherwise subject) in accordance with the Plan or the Remaining Asset Trust Agreements; and, provided, further, that, under no circumstances, shall the Remaining Asset Trustee segregate the assets of the Remaining Asset Trust on the basis of classification of the holders of Remaining Asset Trust Interests, other than with respect to distributions to be made on account of Disputed Claims and Disputed Equity Interests in accordance with the provisions hereof.

25.7    **Annual Distribution; Withholding**:  The Remaining Asset Trustee shall distribute at least annually to the holders of Remaining Asset Trust Interests all net cash income plus all net cash proceeds from the liquidation of assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Remaining Asset Trusts may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Remaining Asset Trusts during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Remaining Asset Trust or in respect of the assets of the Remaining Asset Trusts), and (iii) to satisfy other liabilities incurred or assumed by the Remaining Asset Trusts (or to which the assets are otherwise subject) in accordance with the Plan or the Remaining Asset Trust Agreements.  All such distributions shall be pro rata based on the number of Remaining Asset Trust Interests held by a holder compared with the aggregate number of Remaining Asset Trust Interests outstanding, subject to the terms of the Plan and the Remaining Asset Trust Agreements.  The Remaining Asset Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Remaining Asset Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

25.8    **Reporting Duties**:

(a)    Federal Income Tax:  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Remaining Asset Trustee of a private letter ruling if the Remaining Asset Trustee (or the Debtors) so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Remaining Asset Trustee), the Remaining Asset Trustee shall file returns for the Remaining Asset Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Remaining Asset Trustee shall also annually send to each holder of a Remaining Asset Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.

(b)    Allocations of Remaining Asset Trust Taxable Income:  Allocations of Remaining Asset Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Remaining Asset Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Remaining Asset Trust Interests (treating any holder of a Disputed Claim, for this purpose, as a current holder of a Remaining Asset Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Remaining Asset Trust (including all distributions held in escrow pending the resolution of Disputed Claims).  Similarly, taxable loss of the Remaining Asset Trusts shall be allocated by reference to

the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Remaining Asset Trust Assets.  The tax book value of the Remaining Asset Trust Assets for this purpose shall equal their fair market value on the date such Remaining Assets Trusts were created or, if later, the date such assets were acquired by the Remaining Asset Trusts, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)    <u>Other</u>:  The Remaining Asset Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Remaining Asset Trust that are required by any governmental unit.

25.9    **Trust Implementation**:  On or after the Confirmation Date, the Remaining Asset Trust will be established and become effective for the benefit of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382.  The Remaining Asset Trust Agreement shall be filed in the Plan Supplement and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Remaining Asset Trust as a grantor trust for federal income tax purposes.  All parties (including the Debtors or the Reorganized Debtors, as the case may be, the Remaining Asset Trustee and holders of Allowed Claims in Classes 3 through 180, 183 through 189 and 376 through 382) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Remaining Asset Trust.

25.10    **Registry of Beneficial Interests**:  The Remaining Asset Trustee shall maintain a registry of the holders of Remaining Asset Trust Interests.

25.11    **Termination**:  The Remaining Asset Trusts shall terminate no later than the third (3rd) anniversary of the Confirmation Date; <u>provided</u>, <u>however</u>, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Remaining Asset Trusts if it is necessary to the liquidation of the Remaining Asset Trust Assets.  Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term; <u>provided</u>, <u>however</u>, that the aggregate of all such extensions shall not exceed three (3) years from and after the third (3rd) anniversary of the Confirmation Date.

25.12    **Non-Transferability or Certification**:  Upon the creation of the Remaining Asset Trust, the Remaining Asset Trust Interests shall be allocated on the books and records of the Remaining Asset Trust to the appropriate holders thereof, but the Remaining Asset Trust Interests shall not be certificated and shall not be transferable by the holder thereof except through the laws of descent or distribution; <u>provided</u>, <u>however</u>, that the deemed recipient thereof may hold such Remaining Asset Trust Interests through a single wholly owned Entity.

25.13    **Applicability to Certain Claims and Equity Interests**:  In the event that allocations of Remaining Asset Trust Interests are made to holders of Allowed Claims or Allowed Equity Interests in accordance with the provisions of Section 17.2, 18.2 or 19.2 of the

Plan, all provisions contained in this Article XXV shall be for the benefit of and be applicable to such holders of Allowed Equity Interests, as the case may be, as though set forth in this Article XXV in the first instance.

## ARTICLE XXVI

### THE PREFERRED EQUITY TRUST

26.1    **Establishment of the Trust**:  On or after the Confirmation Date, but prior to the Effective Date, the Debtors, on their own behalf and on behalf of holders of Allowed Equity Interests in Class 383 shall execute the Preferred Equity Trust Agreement and shall take all other steps necessary to establish the Preferred Equity Trust.  On such date of execution, or as soon as practicable thereafter, including, without limitation, subject to appropriate or required governmental, agency or other consents, and in accordance with and pursuant to the terms of Section 26.4 of the Plan, the Debtors shall issue to the Preferred Equity Trust the Exchanged Enron Preferred Stock subject to the Preferred Equity Trust Agreement.  Notwithstanding anything contained herein to the contrary, there shall be separate classes of Preferred Equity Trust Interests that (a) separately reflect the distributions and other economic entitlements and (b) maintain the following order of priority with respect to the separate classes of Exchanged Preferred Equity Interests contributed:  (1) Series 1 Exchanged Preferred Stock and Series 2 Exchanged Preferred Stock on a <u>pari passu</u> basis; (2) Series 3 Exchanged Preferred Stock; and (3) Series 4 Exchanged Preferred Stock.

26.2    **Purpose of the Preferred Equity Trust**:  The Preferred Equity Trust shall be established for the sole purpose of holding the Exchanged Enron Preferred Stock in accordance with Treasury Regulation Section 301.7701-4(d) and the terms and provisions of the Preferred Equity Trust Agreement.  Without limiting the foregoing, the Preferred Equity Trust Agreement shall provide that, to the extent that the Preferred Equity Trust receives distributions of Plan Currency and Trust Interests  under this Plan in respect of a particular class of Exchanged Preferred Equity Interests, it will redistribute such Plan Currency and Trust Interests  to the holders of the separate class of Preferred Equity Trust Interests that corresponds to such class of Exchanged Preferred Equity Interests, but in no event will any holder of Preferred Equity Trust Interests receive a distribution of Exchanged Enron Preferred Stock.

26.3    **Funding Expenses of the Preferred Equity Trust**:  In accordance with the Preferred Equity Trust Agreement and any agreements entered into in connection therewith, on the Effective Date, the Debtors shall have no obligation to provide any funding with respect to any expenses of the Preferred Equity Trust.

26.4    **Transfer of Preferred Stock**:

(a)    The issuance of the Exchanged Enron Preferred Stock to the Preferred Equity Trust shall be made, as provided herein, for the benefit of the holders of Allowed Enron Preferred Equity Interests in Class 383.

(b)    For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Preferred Equity Trustee and the beneficiaries of the Preferred Equity

Trust) shall treat the issuance of the Exchanged Enron Preferred Stock to the Preferred Equity Trust in accordance with the terms of the Plan, as an issuance to the holders of Allowed Enron Preferred Equity Interests in Class 383, followed by a transfer by such holders to the Preferred Equity Trust and the beneficiaries of the Preferred Equity Trust shall be treated as the grantors and owners thereof.

26.5    **Investment Powers** :  The right and power of the Preferred Equity Trustee to invest assets transferred to the Preferred Equity Trust, the proceeds thereof, or any income earned by the Preferred Equity Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 26.6 of the Plan) in Cash Equivalents; provided, however, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Preferred Equity Trustee may expend the assets of the Preferred Equity Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Preferred Equity Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Preferred Equity Trust or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Preferred Equity Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Preferred Equity Trust Agreement; and, provided, further, that, under no circumstances, shall the Preferred Equity Trust segregate the assets of the Preferred Equity Trust on the basis of classification of the holders of Preferred Equity Trust Interests, other than with respect to distributions to be made on account of Disputed Claims and Disputed Equity Interests in accordance with the provisions hereof or with respect to the separate classes of interests in the Preferred Equity Trust referred to in Sections 26.1 and 26.2 of the Plan.

26.6    **Annual Distribution; Withholding** :  The Preferred Equity Trustee shall distribute at least annually to the holders of each class of Preferred Equity Trust Interests all net cash income plus all net cash proceeds from the liquidation of assets (including as Cash for this purpose, all Cash Equivalents) attributable to such class; provided, however, that the Preferred Equity Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Preferred Equity Trust during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Preferred Equity Trust or in respect of the assets of the Preferred Equity Trust), and (iii) to satisfy other liabilities incurred or assumed by the Preferred Equity Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Preferred Equity Trust Agreement.  All such distributions with respect to a given class of Preferred Equity Trust Interests shall be pro rata based on the number of Preferred Equity Trust Interests of such class held by a holder compared with the aggregate number of Preferred Equity Trust Interests of such class outstanding, subject to the terms of the Plan and the respective Preferred Equity Trust Agreement.  The Preferred Equity Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Preferred Equity Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.  Notwithstanding the foregoing, any distributions to be made on account of the separate classes of Preferred Equity Trust Interests shall be made in the following order of priority with respect to the separate classes

of Exchanged Preferred Equity Interests:  (1) Series 1 Exchanged Preferred Stock and Series 2 Exchanged Preferred Stock on a pari passu basis; (2) Series 3 Exchanged Preferred Stock and (3) Series 4 Exchanged Preferred Stock.

26.7    **Reporting Duties**:

(a)    Federal Income Tax:  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Preferred Equity Trustee of a private letter ruling if the Preferred Equity Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Preferred Equity Trustee), the Preferred Equity Trustee shall file returns for the Preferred Equity Trust as a grantor trust (consisting of separate shares for each class of Exchanged Enron Preferred Stock owned by the Preferred Equity Trust) pursuant to Treasury Regulation Section 1.671-4(a).  The Preferred Equity Trustee shall also annually send to each holder of a Preferred Equity Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.

(b)    Allocations of Preferred Equity Trust Taxable Income:  Allocations of Preferred Equity Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Preferred Equity Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Preferred Equity Trust Interests (treating any holder of a Disputed Claim, for this purpose, as a current holder of a Preferred Equity Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Preferred Equity Trust (including all distributions held in escrow pending the resolution of Disputed Claims).  Similarly, taxable loss of the Preferred Equity Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Preferred Equity Trust.  The tax book value of the assets of the Preferred Equity Trust for this purpose shall equal their fair market value on the date the Preferred Equity Trust was created or, if later, the date such assets were acquired by the Preferred Equity Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)    Other:  The Preferred Equity Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Preferred Equity Trust that are required by any governmental unit.

26.8    **Trust Implementation**:  On the Effective Date, the Preferred Equity Trust shall be established and become effective for the benefit of Allowed Enron Preferred Equity Interests in Class 383.  The Preferred Equity Trust Agreement shall be filed in the Plan Supplement and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Preferred Equity Trust as a grantor trust for federal income tax purposes.  All parties (including the Debtors, the Preferred Equity Trustee and holders of Allowed Enron Preferred

Equity Interests in Class 383) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Preferred Equity Trust.

26.9    **Registry of Beneficial Interests**:  The Preferred Equity Trustee shall maintain a registry of the holders of Preferred Equity Trust Interests.

26.10    **Termination**:  The Preferred Equity Trust shall terminate no later than the third (3rd) anniversary of the Confirmation Date; provided, however, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Preferred Equity Trust if it is necessary to the liquidation of the assets of Preferred Equity Trust.  Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years from and after the third (3rd) anniversary of the Confirmation Date.

26.11    **Non-Transferability or Certification**:  Upon the creation of the Preferred Equity Trust, the Preferred Equity Trust Interests shall be allocated on the books and records of the Preferred Equity Trust to the appropriate holders thereof, but the Preferred Equity Trust Interests shall not be certificated and shall not be transferable by the holder thereof except through the laws of descent or distribution.

# ARTICLE XXVII

## THE COMMON EQUITY TRUST

27.1    **Establishment of the Trusts**:  On or after the Confirmation Date, but prior to the Effective Date, the Debtors, on their own behalf and on behalf of holders of Allowed Enron Common Equity Interests in Class 384, shall execute the Common Equity Trust Agreement and shall take all other steps necessary to establish the respective Common Equity Trust.  On such date of execution, or as soon as practicable thereafter, including, without limitation, subject to appropriate or required governmental, agency or other consents, and in accordance with and pursuant to the terms of Section 27.4 of the Plan, the Debtors shall issue to the Common Equity Trust the Exchanged Enron Common Stock subject to the Common Equity Trust Agreement.

27.2    **Purpose of the Common Equity Trust**:  The Common Equity Trust shall be established for the sole purpose of holding the Exchanged Enron Common Stock in accordance with Treasury Regulation Section 301.7701-4(d) and the terms and provisions of the Common Equity Trust Agreement.  Without limiting the foregoing, the Common Equity Trust Agreement shall provide that, to the extent that the Common Equity Trust receives distributions of Plan Currency and Trust Interests under this Plan, it will redistribute such Plan Currency and Trust Interests to the holders to the Common Equity Trust Interests, but in no event will any holder of Common Equity Trust Interests receive a distribution of Exchanged Enron Common Stock.

27.3    **Funding Expenses of the Common Equity Trust**:  In accordance with the Common Equity Trust Agreement and any agreements entered into in connection therewith, on the Effective Date, the Debtors shall have no obligation to provide any funding with respect to any expenses of the Common Equity Trust.

27.4    **Transfer of Common Stock**:

(a)    The issuance of the Exchanged Enron Common Stock to the Common Equity Trust shall be made, as provided herein, for the benefit of the holders of Allowed Enron Common Equity Interests in Class 384.

(b)    For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Common Equity Trustee and the beneficiaries of the Common Equity Trust) shall treat the issuance of the Exchanged Enron Common Stock to the Common Equity Trust in accordance with the terms of the Plan, as an issuance to the holders of Allowed Enron Common Equity Interests in Class 384, followed by a transfer by such holders to the Common Equity Trust and the beneficiaries of the Common Equity Trust shall be treated as the grantors and owners thereof.

27.5    **Investment Powers**:  The right and power of the Common Equity Trustee to invest assets transferred to the Common Equity Trust, the proceeds thereof, or any income earned by the Common Equity Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Section 27.6 of the Plan) in Cash Equivalents; provided, however, that (a) the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Common Equity Trustee may expend the assets of the Common Equity Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Common Equity Trust during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Common Equity Trust or fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Common Equity Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Common Equity Trust Agreement; and, provided, further, that, under no circumstances, shall the Common Equity Trust segregate the assets of the Common Equity Trust on the basis of classification of the holders of Common Equity Trust Interests, other than with respect to distributions to be made on account of Disputed Claims and Disputed Equity Interests in accordance with the provisions hereof.

27.6    **Annual Distribution; Withholding**:  The Common Equity Trustee shall distribute at least annually to the holders of Common Equity Trust Interests all net cash income plus all net cash proceeds from the liquidation of assets (including as Cash for this purpose, all Cash Equivalents); provided, however, that the Common Equity Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Common Equity Trust during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Common Equity Trust or in respect of the assets of the Common Equity Trust), and (iii) to satisfy other liabilities incurred or assumed by the Common Equity Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Common Equity Trust Agreement.  All such distributions shall be pro rata based on the number of Common Equity Trust Interests held by a holder compared with the aggregate number of Common Equity Trust Interests outstanding, subject to the terms of the Plan and the respective

Common Equity Trust Agreement. The Common Equity Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Common Equity Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

27.7    **Reporting Duties**:

(a)    Federal Income Tax: Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Common Equity Trustee of a private letter ruling if the Common Equity Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Common Equity Trustee), the Common Equity Trustee shall file returns for the Common Equity Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Common Equity Trustee shall also annually send to each holder of a Common Equity Trust Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.

(b)    Allocations of Common Equity Trust Taxable Income: Allocations of Common Equity Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Common Equity Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the Common Equity Trust Interests (treating any holder of a Disputed Claim, for this purpose, as a current holder of a Common Equity Trust Interest entitled to distributions), taking into account all prior and concurrent distributions from the Common Equity Trust (including all distributions held in escrow pending the resolution of Disputed Claims). Similarly, taxable loss of the Common Equity Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Common Equity Trust. The tax book value of the assets of the Common Equity Trust for this purpose shall equal their fair market value on the date the Common Equity Trust was created or, if later, the date such assets were acquired by the Common Equity Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)    Other: The Common Equity Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Common Equity Trust that are required by any governmental unit.

27.8    **Trust Implementation**: On the Effective Date, the Common Equity Trust shall be established and become effective for the benefit of Allowed Enron Common Equity Interests in Class 384. The Common Equity Trust Agreement shall be filed in the Plan Supplement and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Common Equity Trust as a grantor trust for federal income tax purposes. All parties (including the Debtors, the Common Equity Trustee and holders of Allowed Enron Common

Equity Interests in Class 384) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Common Equity Trust.

27.9    **Registry of Beneficial Interests**:  The Common Equity Trustee shall maintain a registry of the holders of Common Equity Trust Interests.

27.10    **Termination**:  The Common Equity Trust shall terminate no later than the third (3rd) anniversary of the Confirmation Date; provided, however, that, on or prior to the date three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Common Equity Trust if it is necessary to the liquidation of the assets of Common Equity Trust.  Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years from and after the third (3rd) anniversary of the Confirmation Date.

27.11    **Non-Transferability or Certification**:  Upon the creation of the Common Equity Trust, the Common Equity Trust Interests shall be allocated on the books and records of the Common Equity Trust to the appropriate holders thereof, but the Common Equity Trust Interests shall not be certificated and shall not be transferable by the holder thereof except through the laws of descent or distribution.

**ARTICLE XXVIII**

**PROSECUTION, COMPROMISE AND EXTINGUISHMENT
OF CLAIMS HELD BY THE DEBTORS**

28.1    **Prosecution of Claims**:  Except with respect to the Litigation Trust Claims, the Special Litigation Trust Claims and the Severance Settlement Fund Litigation, from and after the Effective Date, the Reorganized Debtors, the Creditors' Committee or the Employee Committee, as a representative of the estates of the Debtors, shall litigate any claims or causes of action that constituted Assets of the Debtors or Debtors in Possession, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Effective Date or instituted by the Debtors or Debtors in Possession thereafter, to a Final Order, and the Reorganized Debtors, the Creditors' Committee or the Employee Committee may compromise and settle such claims, upon approval of the Bankruptcy Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be remitted to the Disbursing Agent for (i) allocation to the Debtor which owned such Asset and (ii) distribution in accordance with the Distributive Assets, ACFI Guaranty Distributive Assets, ENA Guaranty Distributive Assets, EPC Guaranty Distributive Assets, Enron Guaranty Distributive Assets, or Wind Distributive Assets, as the case may be, attributable to such Debtor; provided, however, that, to the extent that any avoidance or recovery action under section 544, 547, 548, 550, 551 and 553 is asserted, the net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be allocated in equal amount among the transferor Debtor and, if applicable, the Debtor on whose behalf an obligation was satisfied.

28.2    **Compromise of Certain Guaranty Claim Litigation**:  Notwithstanding the provisions of Section 28.1 of the Plan, in the event that (a) a holder of a Claim arising from or relating to a guaranty executed during the period from December 2, 2000 up to and including December 2, 2001 and (b) the Debtors have commenced litigation to avoid the incurrence of such guaranty obligation and disallow such Claim as a constructive fraudulent conveyance or transfer or executed a tolling agreement with respect thereto, the holder of such Claim may elect to compromise and settle such litigation in accordance with the following schedule, subject to allowance of such Claim:

| Percentage Discount to Allowed Guaranty Claim | Date of Execution |
| --- | --- |
| 50.0% | 12/02/00 – 01/31/01 |
| 52.5% | 02/01/01 – 02/28/01 |
| 55.0% | 03/01/01 – 03/31/01 |
| 57.5% | 04/01/01 – 04/30/01 |
| 60.0% | 05/01/01 – 05/31/01 |
| 62.5% | 06/01/01 – 06/30/01 |
| 65.0% | 07/01/01 – 07/31/01 |
| 67.5% | 08/01/01 – 08/31/01 |
| 70.0% | 09/01/01 – 09/30/01 |
| 72.5% | 10/01/01 – 10/31/01 |
| 75.0% | 11/01/01 – 12/01/01 |

Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances, may such waiver by the Debtors occur on or after the Effective Date.

28.3    **Extinguishment of Certain Claims**

(a)    Intercompany Claims:  Except with regard to the allowance of Intercompany Claims in accordance with Sections 2.1 and 15.1 of the Plan, on the Effective Date, each Debtor and Debtor in Possession, other than the Portland Debtors, shall waive and forever release any right, claim or cause of action which could have been asserted by such Debtor or Debtor in Possession against any other Debtor or Debtor in Possession, other than the Portland Debtors, and which constitutes property of a Debtor's estate, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, and such rights, claims and causes of action shall be extinguished even if otherwise assertable by parties other than the Debtor or Debtor in Possession had the Chapter 11 Cases not been commenced.

(b)    Guaranty Claims:  Except to the extent otherwise tolled, each Debtor and Debtor in Possession, other than the Portland Debtors, shall (i) waive and release any right, claim or cause of action on the basis of a constructive fraudulent transfer relating to the Guaranty Claims with respect to the Citibank/Delta Prepays, the Mahonia Prepaid Forward Contracts, the London Prepay and the Yosemite and Credit Linked Notes financing transactions, each as

described in the Disclosure Statement, and (ii) not commence any action against any Enron Guaranty Claim on the basis of a constructive fraudulent transfer to the extent not commenced as of December 2, 2003.

## ARTICLE XXIX

## ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTEREST

29.1   **Impaired Classes to Vote**:  Each holder of a Claim or Equity Interest in an impaired Class, not otherwise deemed to have rejected the Plan in accordance with Section 29.2 of the Plan, shall be entitled to vote separately to accept or reject the Plan.

29.2   **Acceptance by Class of Creditors and Holders of Equity Interests**:  An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.  An impaired Class of holders of Equity Interests shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount of the Allowed Equity Interests of such Class that have voted to accept or reject the Plan.

29.3   **Cramdown**:  In the event that any impaired Class of Claims or Equity Interests shall fail to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or amend the Plan.

## ARTICLE XXX

## IDENTIFICATION OF CLAIMS AND EQUITY INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN

30.1   **Impaired and Unimpaired Classes**:  Claims in Classes 1 and 2 of the Plan are not impaired under the Plan.  Claims and Equity Interests in Classes 3 through 385 are impaired under the Plan.

30.2   **Impaired Classes to Vote on Plan**:  The Claims included in Classes 3 through 385 of the Plan are impaired and are therefore entitled to vote to accept or reject the Plan. Notwithstanding the foregoing, (a) the Claims included in Class 190 are deemed to have accepted the Plan and (b) the Claims and Equity Interests included in Classes 183 and 376 through 385 of the Plan are deemed to have rejected the Plan in accordance with the provisions of section 1126 (g) of the Bankruptcy Code.

30.3   **Controversy Concerning Impairment**:  In the event of a controversy as to whether any Class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE XXXI

## PROVISIONS FOR THE ESTABLISHMENT
## AND MAINTENANCE OF DISBURSEMENT ACCOUNTS

31.1    **Establishment of Disbursement Account**:  On or prior to the Effective Date, the Debtors shall establish one or more segregated bank accounts in the name of the Reorganized Debtors as Disbursing Agent under the Plan, which accounts shall be trust accounts for the benefit of Creditors and holders of Administrative Expense Claims pursuant to the Plan and utilized solely for the investment and distribution of Cash consistent with the terms and conditions of the Plan.  On or prior to the Effective Date, and periodically thereafter, the Debtors shall deposit into such Disbursement Account(s) all Cash and Cash Equivalents of the Debtors, less amounts reasonably determined by the Debtors or the Reorganized Debtors, as the case may be, as necessary to fund the ongoing implementation of the Plan and operations of the Reorganized Debtors.

31.2    **Maintenance of Disbursement Account(s)**:  Disbursement Account(s) shall be maintained at one or more domestic banks or financial institutions of the Reorganized Debtors' choice having a shareholder's equity or equivalent capital of not less than One Hundred Million ($100,000,000.00).  The Reorganized Debtors shall invest Cash in Disbursement Account(s) in Cash Equivalents; provided, however, that sufficient liquidity shall be maintained in such account or accounts to (a) make promptly when due all payments upon Disputed Claims if, as and when they become Allowed Claims and (b) make promptly when due the other payments provided for in the Plan.

## ARTICLE XXXII

## PROVISIONS REGARDING DISTRIBUTIONS

32.1    **Time and Manner of Distributions**:  Distributions under the Plan shall be made to each holder of an Allowed Unsecured Claim as follows:

(a)    Initial Distributions of Cash:  On or as soon as practicable after the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to the Reorganized Debtor Plan Administrator on behalf of holders of Disputed Claims, and to each holder of an Allowed General Unsecured Claim, an Allowed Guaranty Claim, an Allowed Intercompany Claim and an Allowed Convenience Claim, such Creditor's share, if any, of Creditor Cash as determined pursuant to Articles VII, X, XI, XII, XIII, XIV, XV and XVI hereof.

(b)    Subsequent Distributions of Cash:  On the first (1st) Business Day that is after the close of one (1) full calendar quarter following the date of the initial Effective Date distributions, and, thereafter, on each first (1st) Business Day following the close of two (2) full calendar quarters, the Disbursing Agent shall distribute, or cause to be distributed, to the Reorganized Debtor Plan Administrator on behalf of holders of Disputed Claims, and to each holder of an Allowed General Unsecured Claim, an Allowed Guaranty Claim, an Allowed Intercompany Claim, and an Allowed Convenience Claim, an amount equal to such Creditor's

share, if any, of Creditor Cash as determined pursuant to Articles VII, X, XI, XII, XIII, XIV, XV and XVI hereof, until such time as there are no longer any potential Creditor Cash.

(c)    Distributions of Plan Securities:  Notwithstanding anything contained herein to the contrary, commencing on or as soon as practicable after the Effective Date, subject to the availability of any historical financial information required to comply with applicable securities laws, the Disbursing Agent shall commence distributions, or cause to be distributed, to the Reorganized Debtor Plan Administrator on behalf of holders of Disputed Claims, and to each holder of an Allowed General Unsecured Claim, an Allowed Guaranty Claim and an Allowed Intercompany Claim, an amount equal to such Creditor's share, if any, of Plan Securities, as determined pursuant to Articles VII, X, XI, XII, XIII, XIV, XV and XVI hereof, and semi-annually thereafter until such time as there is no longer any potential Plan Securities to distribute, as follows:

(i)    Prisma:  Distribution of Prisma Common Stock to holders of Allowed General Unsecured Claims, Allowed Guaranty Claims and Allowed Intercompany Claims shall commence upon (a) allowance of General Unsecured Claims in an amount which would result in the distribution of thirty percent (30%) of the issued and outstanding shares of Prisma Common Stock and (b) obtaining the requisite consents for the transfer of the Prisma Assets to Prisma and the issuance of the Prisma Common Stock;

(ii)    CrossCountry:  Distributions of CrossCountry Common Equity to holders of Allowed General Unsecured Claims, Allowed Guaranty Claims and Allowed Intercompany Claims shall commence upon (a) allowance of General Unsecured Claims in an amount which would result in the distribution of thirty percent (30%) of the issued and outstanding shares of CrossCountry Common Equity and (b) obtaining the requisite consents for the issuance of the CrossCountry Common Equity; and

(iii)    PGE:  Distributions of PGE Common Stock to holders of Allowed General Unsecured Claims, Allowed Guaranty Claims and Allowed Intercompany Claims shall commence upon (a) allowance of General Unsecured Claims in an amount which would result in the distribution of thirty percent (30%) of the issued and outstanding shares of PGE Common Stock and (b) obtaining the requisite consents for the issuance of the PGE Common Stock;

provided, however, that, in the event that a Sale Transaction has occurred, or an agreement for a Sale Transaction has been entered into and has not been terminated, prior to the satisfaction of the conditions for the distribution of such Plan Securities pursuant to this Section 32.1(c), the proceeds thereof shall be distributed in accordance with the provisions of Section 32.1(a) of the Plan in lieu of the Plan Securities that are the subject of such Sale Transaction or agreement, or in the case of a Sale Transaction involving a sale of all or substantially all of the assets of an issuer of Plan Securities, the Plan Securities of such issuer (unless the agreement for such Sale Transaction terminates subsequent to the satisfaction of such applicable conditions in this

Section 32.1(c), in which case, such Plan Securities shall be distributed pursuant to this Section 32.1(c)), with the balance of such Plan Securities distributed in accordance with the provisions of this Section 32.1(c); and, provided, further, that, if in the joint determination of the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, the Prisma Trust Interests, CrossCountry Trust Interests and/or PGE Trust Interests are created, on or as soon as practicable following the creation of the Operating Trusts, such interests shall be allocated to the appropriate holders thereof in accordance with Article XXIV of the Plan in lieu of the distributions of Prisma Common Stock, CrossCountry Common Equity and/or PGE Common Stock, respectively; and, provided, further, that during the period of retention of any such Plan Securities, the Disbursing Agent shall distribute, or cause to be distributed, to the Reorganized Debtor Plan Administrator on behalf of holders of Disputed Claims, and to each holder of an Allowed General Unsecured Claim, an Allowed Guaranty Claim and an Allowed Intercompany Claim, an amount equal to such Creditor's share, if any, of dividends declared and distributed with respect to any of the Plan Securities; and, provided, further, until such time as all Disputed Claims have been allowed by Final Order, in whole or in part, the Disbursing Agent shall hold in reserve at least one percent (1%) of the Plan Securities to be distributed in accordance with Section 21.3 of the Plan and this Section 32.1.

(d)    Distribution of Trust Interests:  In the event that the Litigation Trust or the Special Litigation Trust is created, on or as soon as practicable thereafter, the Disbursing Agent shall commence distributions, or cause to be distributed, to the Reorganized Debtor Plan Administrator on behalf of holders of Disputed Claims, and to each holder of an Allowed General Unsecured Claim, an Allowed Guaranty Claim, and an Allowed Intercompany Claim, such Creditor's share, if any, of Trust Interests as determined pursuant to Articles VII, X, XI, XII, XIII, XIV, XV and XVI hereof, and semi-annually thereafter until such time as there is no longer any Trust Interests to distribute.

(e)    Allocation of Remaining Asset Trust Interests:  In the event the Remaining Asset Trusts are created, on or as soon as practicable thereafter, the Disbursing Agent shall allocate, or cause to be allocated, to the Reorganized Debtor Plan Administrator on behalf of holders of Disputed Claims, and to each holder of an Allowed General Unsecured Claim, an Allowed Guaranty Claim, and an Allowed Intercompany Claim, such Creditor's share, if any, of Remaining Asset Trust Interests as determined pursuant to Articles VII, X, XI, XII, XIII, XIV, XV and XVI hereof.

(f)    Recalculation of Distributive Assets, Guaranty Distributive Assets and Intercompany Distributive Assets:  Notwithstanding anything contained herein to the contrary, in connection with each of the distributions of Plan Currency to be made in accordance with this Section 32.1, the Disbursing Agent shall calculate, or cause to be calculated, Distributive Assets, Enron Guaranty Distributive Assets, Wind Guaranty Distributive Assets, ACFI Guaranty Distributive Assets, ENA Guaranty Distributive Assets, EPC Guaranty Distributive Assets and Intercompany Distributive Assets as of the date thereof, taking into account, among other things, (i) sales of Remaining Assets, prior to the creation of the Remaining Asset Trust(s), (ii) proceeds, if any, of Sale Transactions and (iii) the allowance or disallowance of Disputed Claims, as the case may be.

(g)    Prior and Subsequent Bankruptcy Court Orders Regarding Non-Conforming Distributions: For purposes of calculating distributions to be made in accordance with Section 32.1 of the Plan, including, without limitation, the payment of Allowed Claims in full, the Debtors, the Reorganized Debtors, the Disbursing Agent and the Reorganized Debtor Plan Administrator shall take into account those payments made or to be made to holders of Allowed Enron Senior Note Claims and Allowed Enron Subordinated Debenture Claims pursuant to the provisions of prior or subsequent orders of the Bankruptcy Court.

32.2    **Timeliness of Payments**: Any payments or distributions to be made pursuant to the Plan shall be deemed to be timely made if made within twenty (20) days after the dates specified in the Plan. Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

32.3    **Distributions by the Disbursing Agent**: All distributions under the Plan shall be made by the Disbursing Agent at the direction of the Reorganized Debtor Plan Administrator. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Persons entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

32.4    **Manner of Payment under the Plan**: Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Reorganized Debtors shall be made, at the election of the Reorganized Debtors, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payments shall be made to a holder of an Allowed Claim or an Allowed Equity Interest until such time as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

32.5    **Delivery of Distributions**: Subject to the provisions of Rule 9010 of the Bankruptcy Rules and the TOPRS Stipulation, and except as provided in Section 32.4 of the Plan, distributions and deliveries to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address set forth on proofs of claim filed by such holders, or at the last known address of such a holder if no proof of claim is filed or if the Debtors has been notified in writing of a change of address. Subject to the provisions of Section 9.1 of the Plan and the TOPRS Stipulation, distributions for the benefit of holders of Enron Senior Notes shall be made to the appropriate Enron Senior Notes Indenture Trustee. Each such Enron Senior Note Indenture Trustee shall in turn administer the distribution to the holders of Allowed Enron Senior Note Claims in accordance with the Plan and the applicable Enron Senior Notes Indenture. The Enron Senior Notes Indenture Trustee shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.

32.6    **Fractional Securities**: No fractional shares of Plan Securities shall be issued. Fractional shares of Plan Securities shall be rounded to the next greater or next lower number of shares in accordance with the following method: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number. The total number of shares or interests of Plan Securities to be distributed to a Class hereunder shall be adjusted as necessary to account for the

rounding provided for in this Section 32.6.  In the event that, as a result of such rounding, a holder of a Claim would receive no distribution pursuant to this Plan, such holder shall receive Cash in lieu of the fractional shares of Plan Securities to purchase fractional shares such holder was entitled to receive.

32.7    **Undeliverable Distributions**:

(a)     Holding of Undeliverable Distributions:  If any distribution to any holder is returned to the Reorganized Debtors as undeliverable, no further distributions shall be made to such holder unless and until the Reorganized Debtors is notified, in writing, of such holder's then-current address.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable.  All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind.  Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim or an Allowed Equity Interest.

(b)     Failure to Claim Undeliverable Distributions:  On or about the second (2nd) anniversary of the Effective Date, the Reorganized Debtors shall file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been made hereunder and have been returned as undeliverable as of the date thereof.  Any holder of an Allowed Claim or an Allowed Equity Interest that does not assert its rights pursuant to the Plan to receive a distribution within three (3) years from and after the Effective Date shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan against the Reorganized Debtors or its property.  In such case, any consideration held for distribution on account of such Claim or Equity Interest shall revert to the Reorganized Debtors for redistribution to holders of Allowed Claims and Allowed Equity Interests in accordance with the provisions of Section 32.1 hereof.

32.8    **Compliance with Tax Requirements**:  The Reorganized Debtors shall comply with all applicable tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

32.9    **Time Bar to Cash Payments**:  Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors shall retain all monies related thereto for the sole purpose of adding such monies to Creditor Cash for purposes of redistribution to Creditors in accordance with the terms and provisions hereof.

32.10    **Distributions After Effective Date**:  Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later

become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Section 32.1 of the Plan.

32.11 **Setoffs**: The Reorganized Debtors may, pursuant to applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature the Debtors or the Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Debtors in Possession or the Reorganized Debtors of any such claims, rights and causes of action that the Debtors, Debtors in Possession or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

32.12 **Allocation of Plan Distributions Between Principal and Interest**: To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

32.13 **Surrender of Instruments**: Except to the extent evidenced by electronic entry, as a condition of receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note to the appropriate Indenture Trustee or Disbursing Agent or its designee, unless such certificated instrument or note is being reinstated or left unimpaired under the Plan. Any holder of such instrument or note that fails to (i) surrender such instrument or note, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the appropriate Indenture Trustee or Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to have forfeited all rights and claims and may not participate in any distribution under the Plan. Any distribution so forfeited shall become the property of the Reorganized Debtors.

32.14 **Cancellation of Existing Securities and Agreements**: On the latest to occur of (a) the Effective Date, (b) the entry of a Final Order resolving all Claims in the Chapter 11 Cases and (c) the final distribution made to holders of Allowed Claims and Allowed Equity Interests in accordance with Article XXXII of the Plan, any document, agreement, or instrument evidencing any Claim shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under such documents, agreements or instruments evidencing such Claims shall be discharged; provided, however, that the Enron Subordinated Indenture, the Enron Senior Notes Indentures, the Enron TOPRS Indentures, the ETS Indentures and the ENA Indentures shall continue in effect for the purposes of (i) allowing the Enron Subordinated Indenture Trustee, the Enron Senior Notes Indenture Trustees, the Enron TOPRS Indenture Trustee, the ETS Indenture Trustee and the ENA Indenture Trustee to make any distributions pursuant to the Plan and the TOPRS Stipulation, as the case may be, and to perform such other necessary functions with respect

thereto, and (ii) permitting the Enron Senior Notes Indenture Trustees, the Enron Subordinated Indenture Trustee, the Enron TOPRS Indenture Trustee, the ETS Indenture Trustee and the ENA Indenture Trustee to maintain and assert any rights or liens for reasonable fees, costs, and expenses under the Indentures; and, provided, further, that, except as otherwise provided herein, nothing in this Plan shall impair, affect or adversely affect the related transactions and the rights of the parties thereto; and, provided, further, that distributions to holders of the TOPRS shall be made by National City Bank as distribution agent pursuant to a distribution agency agreement to be entered into between the Debtors and National City Bank.

32.15    **Certain Indenture Trustee Fees and Expenses**: Except as otherwise provided in decretal paragraph 12 of the TOPRS Stipulation, in the event that the Debtors and the Creditors' Committee agree, in their joint and absolute discretion, as to the Indenture Trustee Claims incurred during the period up to and including the Effective Date, such Indenture Trustee Claims shall be paid in Cash by the Reorganized Debtors on the Effective Date, or as soon as practicable thereafter, without the need for the Indenture Trustees to file an application for allowance thereof with the Bankruptcy Court. In the event that either the Debtors or the Creditors' Committee disagree with an Indenture Trustee as to the reasonableness of all or a portion of the fees and expenses requested in an Indenture Trustee Claim, such Indenture Trustee may, at its sole discretion, request that the Bankruptcy Court (i) determine the reasonableness and allowance of such contested amounts and (ii) direct the Reorganized Debtors to pay such additional amounts determined to be reasonable, if any, and the Debtors, Creditors' Committee and any other creditor or party in interest may object thereto. To the extent that the Reorganized Debtors fail to pay any Indenture Trustee Claim in full, whether as a result of the Creditors' Committee's or the Debtors' objection as to reasonableness, Bankruptcy Court's determination as to reasonableness or an Indenture Trustee's determination not to request payment therefor, such Indenture Trustee shall have the right to assert its lien and priority rights pursuant to the applicable Indenture for payment of any unpaid amount upon any payment or other distribution to be made in accordance with the provisions contained herein. Notwithstanding the foregoing, the Reorganized Debtors shall be responsible and, upon presentation of supporting documentation in form and substance satisfactory to the Reorganized Debtors, satisfy the reasonable direct out-of-pocket costs and expenses incurred by the Indenture Trustees in connection with making distributions pursuant to the Plan; provided, however, that, under no circumstances, shall the Reorganized Debtors be responsible for any indemnification obligations, costs and expenses of any of the Indenture Trustees associated with the negligence or willful misconduct of an Indenture Trustee in making any such distributions.

32.16    **Cancellation of PGE, CrossCountry Distributing Company and Prisma Securities**: Upon the issuance of each of the PGE Common Stock, CrossCountry Common Equity and Prisma Common Stock to holders of Allowed Claims or the Operating Trusts, the Existing PGE Common Stock, stock or other equity interests of CrossCountry Distributing Company held by ENE and/or any of its subsidiaries, and stock of Prisma held by ENE and/or any of its subsidiaries, respectively, shall be cancelled; provided, however, that, notwithstanding the foregoing, in the event that (a) the Debtors and the Creditors' Committee, in their joint and absolute discretion, determine to have issued preferred stock of PGE, CrossCountry Distributing Company or one of the alternative structures contemplated pursuant to Section 37.3 of the Plan, and (b) such preferred stock is issued subsequent to the Confirmation Date and prior to the issuance of the PGE Common Stock, or the CrossCountry Common Equity, as the case may be,

to holders of Allowed Claims or the Operating Trusts, such preferred stock shall not be cancelled.

32.17 **Record Date**: On the Record Date, registers of the respective Indenture Trustees shall be closed and the Indenture Trustees shall have no obligation to recognize any transfers of Claims arising under or related to the Enron Subordinated Indenture, the Enron Senior Notes Indentures, the ETS Indentures, the Enron TOPRS Indentures or the ENA Indentures occurring from and after the Record Date.

32.18 **Applicability to Certain Claims and Equity Interests**: Notwithstanding anything contained in this Article XXXII to the contrary, in the event that (a) distributions of Cash, Plan Securities or Trust Interests or (b) allocations of Remaining Asset Trust Interests are made to holders of Allowed Claims or Allowed Equity Interests in accordance with the provisions of Section 17.2, 18.2 or 19.2 of the Plan, all provisions contained in this Article XXXII shall be for the benefit of and be applicable to such holders of Allowed Claims or Allowed Equity Interests, as the case may be, as though set forth in this Article XXXII in the first instance.

## ARTICLE XXXIII

## COMMITTEES, EXAMINERS, MEDIATOR AND EMPLOYEE COUNSEL

33.1 **Creditors' Committee - Term and Fees**: Except as provided below, from and after the Effective Date, the Creditors' Committee shall be authorized only to perform the following functions:

(a)   to prosecute, or to continue to prosecute, as the case may be, claims on behalf of the Debtors' estates against individual insiders of the Debtors; provided, however, that, if any such claims constitute Special Litigation Trust Claims, such claims and causes of action shall be assigned to the Special Litigation Trust and prosecuted by the Special Litigation Trustee for and on behalf of the Special Litigation Trust and the beneficiaries thereof;

(b)   to complete litigation, other than such litigation referenced in Section 33.1(a) hereof, if any, to which the Creditors' Committee is a party as of the Effective Date; provided, however, that, if the claims and causes of action underlying such litigation are assigned to another representative of the Debtors' estates, such assignee shall continue such prosecution; and

(c)   to participate, with the Creditors' Committee's professionals and the Reorganized Debtors and their professionals, on the joint task force created with respect to the prosecution of the Litigation Trust Claims pursuant to the terms and conditions and to the extent agreed upon between the Creditors' Committee and the Debtors as of the date of the Disclosure Statement Order.

The Creditors' Committee shall be dissolved and the members thereof and the professionals retained by the Creditors' Committee in accordance with section 1103 of the Bankruptcy Code shall be released and discharged from their respective fiduciary obligations upon (1) the later to occur of (y) resolution of all litigation to which the Creditors' Committee is a party and (z)

resolution or determination by Final Order of the Litigation Trust Claims or (2) the entry of a Final Order dissolving the Creditors' Committee; provided, however, that, in the event the Bankruptcy Court continues the duties of the ENA Examiner beyond the Effective Date in accordance with provisions of Section 33.4 hereof, the Creditors' Committee shall continue to exist to exercise all of its statutory rights, powers and authority until the date the ENA Examiner's duties are fully terminated pursuant to a Final Order; and, provided, further, that, in no event shall any position taken by the Debtors or the Creditors' Committee (or any other party in interest) in opposition to any such pleading relating to the ENA Examiner's post-Effective Date duties result in a limitation of scope for the Creditors' Committee as provided in section 1103 of the Bankruptcy Code.

From and after the Effective Date, the Reorganized Debtors shall pay the reasonable fees and expenses of professionals the Creditors' Committee retains or continues the retention of to satisfy the obligations and duties set forth in this Section 33.1 and shall reimburse the members of the Creditors' Committee for reasonable disbursements incurred.

33.2    **Employee Committee - Term and Fees**:  From and after the Confirmation Date, the Employee Committee shall be authorized only to perform the following functions:

(a)    to prosecute, or continue to prosecute, as the case may be, Deferred Compensation Litigation and Severance Settlement Fund Litigation; and

(b)    to complete litigation, other than such litigation referenced in Section 33.2(a) hereof, if any, to which the Employee Committee is a party as of the Confirmation Date.

From and after the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, shall pay the reasonable fees and expenses of professionals the Employee Committee retains or continues the retention of to satisfy the obligations and duties associated with the Deferred Compensation Litigation; provided, however, that, in connection with the Severance Settlement Fund Litigation, counsel to the Employee Committee shall continue to serve as counsel to the Severance Settlement Fund Trustee and be compensated and reimbursed solely in accordance with the provisions of the Severance Settlement Fund Trust Agreement and the Severance Settlement Fund Order.  The Employee Committee shall be dissolved and the members thereof and the professionals retained by the Employee Committee in accordance with section 327, 328 or 1102 of the Bankruptcy Code shall be released and discharged from their respective fiduciary obligations upon the earlier to occur of (y) resolution of all litigation to which the Employee Committee is a party and (z) the entry of a Final Order dissolving the Employee Committee.

33.3    **ENE Examiner - Term and Fees**:  To the extent not discharged and released on or prior to the Confirmation Date, on the tenth (10th) day following the Confirmation Date, the ENE Examiner and the professionals retained by the ENE Examiner shall be released and discharged from their respective obligations outstanding pursuant to the Investigative Orders of the Bankruptcy Court.  On or prior to the thirtieth (30th) day following the Confirmation Date, or such other date as shall be agreed upon, in writing, by the ENE Examiner, the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, and except as (y) otherwise available on a centralized, coded filing system available to the Debtors and the Creditors' Committee or (z) as prohibited by any existing confidentiality order entered by the

Bankruptcy Court or other confidentiality agreement executed by the ENE Examiner, the ENE Examiner shall deliver to the Reorganized Debtors and the Creditors' Committee (i) one copy of each report filed by such Person in the Chapter 11 Cases, (ii) all material cited in the footnotes of any such report, (iii) any other materials, including, without limitation, transcripts, interview memoranda, witness folders and transactional documents and summaries thereof, produced, developed or compiled by the ENE Examiner in connection with the Investigative Orders and (iv) a schedule of all materials which such Entity is, or claims to be, precluded from delivering to the Debtors or the Creditors' Committee, in each case in connection with the Investigative Orders.  Notwithstanding the foregoing, nothing contained in the Plan is intended, nor shall it be deemed, to modify, affect or amend the terms or provisions of the ENE Examiner Orders.

33.4    **ENA Examiner - Term and Fees:**

(a)    Pre-Effective Date Role:  Except as provided below, (a) on the tenth (10th) day following the Confirmation Date, the ENA Examiner and the professionals retained by the ENA Examiner shall be released and discharged from their respective obligations outstanding pursuant to the Investigative Orders of the Bankruptcy Court and (b) on or prior to the thirtieth (30th) day following the Confirmation Date, or such other date as shall be agreed upon, in writing, by the ENA Examiner, the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee, and except as (1) otherwise available on a centralized, coded filing system available to the Debtors and the Creditors' Committee or (2) as prohibited by any existing confidentiality order entered by the Bankruptcy Court or other confidentiality agreement executed by the ENA Examiner, the ENA Examiner shall deliver to the Reorganized Debtors and the Creditors' Committee (i) one copy of each report filed by such Person in the Chapter 11 Cases, (ii) all material cited in the footnotes of any such report, (iii) any other materials, including, without limitation, transcripts, interview memoranda, witness folders and transactional documents and summaries thereof, produced, developed or compiled by the ENA Examiner in connection with the Investigative Orders and (iv) a schedule of all materials which such Entity is, or claims to be, precluded from delivering to the Debtors or the Creditors' Committee, in each case in connection with the Investigative Orders.  Notwithstanding the foregoing, (y) during the period from the Confirmation Date up to and including the Effective Date, the ENA Examiner shall continue all of its other duties and obligations, other than those defined by the Investigative Orders, (1) pursuant to orders of the Bankruptcy Court entered as of the date of the Disclosure Statement Order and (2) in connection with the allocation of expenses in accordance with Section 2.3 of the Plan, and such functions shall be subject to the Debtors' right, in their sole and absolute discretion, to streamline existing internal processes, including cash management and the Debtors' Bankruptcy Transaction Review Committee processes; provided, however, that the information typically given to the ENA Examiner by the Debtors will continue to be given to him, notwithstanding any streamlined procedures implemented; and, provided, further, that, unless otherwise directed by the Bankruptcy Court, the ENA Examiner shall be relieved of all routine reporting duties, including, without limitation, the submission of weekly and monthly reports to the Bankruptcy Court and (z) nothing contained in the Plan is intended, nor shall it be deemed, to modify, affect or amend the terms or provisions of the ENA Examiner Order.

(b)    Post-Effective Date Role: On or before the twentieth (20th) day following the Confirmation Date, the ENA Examiner or any Creditor of ENA or its direct or indirect Debtor subsidiaries may file a motion requesting that the Bankruptcy Court define the role and

duties of the ENA Examiner, if any, for the period from and after the Effective Date and any party in interest, including, without limitation, the Debtors or the Creditors' Committee may interpose an objection or a response with respect thereto; provided, however, that, if no such motion is filed by the ENA Examiner or any Creditor of ENA or its direct or indirect Debtor subsidiaries on or prior to such deadline, the ENA Examiner's role shall conclude on the Effective Date and the ENA Examiner and the professionals retained by the ENA Examiner shall be released and discharged from any remaining obligations outstanding pursuant to orders of the Bankruptcy Court; and, provided, further, that, in no event shall the ENA Examiner's scope be expanded beyond the scope approved by orders entered by the Court as of the date of the Disclosure Statement Order or in connection with the allocation of expenses in accordance with Section 2.3 of the Plan; and, provided, further, that, in all circumstances whether or not a motion is filed requesting the continuation of the ENA Examiner, the ENA Examiner shall consult with the Debtors with respect to or, in the case of the DCR Overseers, consent to one (1) out of five (5) members of the DCR Overseers and the boards of Reorganized ENE, the Litigation Trust Board and the Remaining Asset Trust Board(s), if any, to be appointed.

From and after the Effective Date, and subject to the provisions of Section 33.4(b) hereof, the Reorganized Debtors shall pay the reasonable fees and expenses of the ENA Examiner and the professionals the ENA Examiner retains or continues the retention of to satisfy the obligations and duties set forth in this Section 33.4.

33.5    **Fee Committee - Term and Fees**:  From and after the Confirmation Date, the members of the Fee Committee and the Fee Committee's employees and representatives shall continue to serve and be authorized to perform the following functions:

(a)    to review, analyze and prepare advisory reports with respect to applications for the payment of fees and the reimbursement of expenses of professionals retained in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court during the period up to and including the Confirmation Date, including, without limitation, final fee applications in accordance with sections 328, 330, 331 and 503 of the Bankruptcy Code; and

(b)    if necessary, appear before the Bankruptcy Court with respect to any such application.

From and after the Confirmation Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the members of the Fee Committee and the Fee Committee's employees and representatives to satisfy the obligations and duties set forth in this Section 33.5. Notwithstanding the foregoing, unless otherwise ordered by the Bankruptcy Court, the Fee Committee shall be dissolved and the members thereof and the employees and professionals retained by the Fee Committee shall be released and discharged from their respective obligations upon the earlier to occur of (i) the eighteen (18) month anniversary of the Confirmation Date and (ii) satisfaction of the obligations and duties set forth in this Section 33.5.

33.6    **Mediator - Term and Fees**:  From and after the Confirmation Date and until such time as the Mediator terminates all efforts with respect thereto, the Reorganized Debtors shall continue to participate in the mediation required by the Mediation Orders.  In accordance with the Mediation Orders, the Reorganized Debtors shall be responsible for their one-third (1/3)

share of the Mediator's expenses and such expenses shall be treated as Administrative Expense Claims in accordance with the provisions of the Plan and the Confirmation Order.

33.7    **Employee Counsel**:  From and after the Confirmation Date and until such time as the board of directors of ENE or Reorganized ENE, as the case may be, determines otherwise, all counsel retained and authorized to provide services to then-current employees of the Debtors pursuant to the Employee Counsel Orders shall continue to provide services to such employees in accordance with the provisions contained therein; provided, however, that, nothing contained in this Section 33.7 shall inhibit, prejudice or otherwise affect the rights of the Creditors' Committee with respect to its appeals of the Employee Counsel Orders in connection with fees and expenses incurred prior to the Confirmation Date.

## ARTICLE XXXIV

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

34.1    **Rejection of Executory Contracts and Unexpired Leases**:  Any executory contracts or unexpired leases not set forth on the Assumption Schedule that have not expired by their own terms on or prior to the Confirmation Date, which have not been assumed and assigned or rejected with the approval of the Bankruptcy Court, or which are not the subject of a motion to assume the same pending as of the Confirmation Date shall be deemed rejected by the Debtors in Possession on the Confirmation Date and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

34.2    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**:  Not later than five (5) days prior to the Ballot Date, as the same may be extended, the Debtors in Possession shall file the Assumption Schedule with the Bankruptcy Court setting forth the list of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan as of the Effective Date, and such executory contracts and unexpired leases shall be deemed assumed as of the Effective Date.  The listing of a document on the Assumption Schedule shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder, with the exception of the amount of any proposed cure amount listed thereon.  Unless otherwise specified on the Assumption Schedule, each executory contract or unexpired lease listed on the Assumption Schedule shall include all exhibits, schedules, riders, modifications, amendments, supplements, attachments, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the Assumption Schedule.  The Debtors in Possession may at any time during the period from the Confirmation Date up to and including the Effective Date amend the Assumption Schedule to delete any executory contracts or unexpired leases therefrom.  In the event that the Debtors in Possession determine to amend the Assumption Schedule, (1) the Debtors in Possession shall file a notice (a "Rejection Notice") of any such amendment with the Bankruptcy Court and serve such Rejection Notice on any affected party and (2) any executory contract or unexpired lease deleted from the Assumption Schedule shall be deemed rejected as of the date of such Rejection Notice.  Any monetary amounts required as cure payments on each executory contract and

unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases otherwise may agree.  In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption arises, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be subject to the jurisdiction of the Bankruptcy Court and made following the existence of a Final Order resolving such dispute.

34.3 **Rejection of Intercompany Trading Contracts**:  Notwithstanding anything contained herein to the contrary, all trading contracts between or among (a) two or more Debtors or (b) a Debtor and any wholly-owned Affiliate shall be deemed for all purposes to have been rejected and otherwise terminated as of the Initial Petition Date and the values and damages attributable thereto shall be calculated as of the Initial Petition Date.

34.4 **Rejection Damage Claims**:  Except with regard to executory contracts governed in accordance with the provisions of Section 34.3 hereof, if the rejection of an executory contract or unexpired lease by the Debtors in Possession hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon attorneys for the Debtors on or before thirty (30) days after the latest to occur of (a) the Confirmation Date, (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease and (c) the date of the Rejection Notice with respect to a particular executory contract or unexpired lease.

34.5 **Indemnification and Reimbursement Obligations**:  For purposes of the Plan, the obligations of the Debtors to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be treated as Section 510 Subordinated Claims.  Indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Initial Petition Date shall be Administrative Expense Claims to the extent previously authorized by a Final Order.

34.6 **Rejection of TOPRS-Related Agreements**:  On the Effective Date, (a) each of the (i) ECT I Trust Declarations, (ii) ECT II Trust Declarations, (iii) EPF I Partnership Agreement and (iv) EPF II Partnership Agreement shall be deemed to be rejected, and (b) subject to the Debtors' obligations set forth in decretal paragraph 16 of the TOPRS Stipulation and herein, in full and final satisfaction of any rights, interests or Claims of ECT I, ECT II, EPF I, EPF II and holders of the TOPRS against any of the Debtors and their affiliates, ENE, as general partner of EPF I and EPF II, shall (1) waive any right of EPF I and EPF II to reinvest distributions made pursuant to the Plan, (2) liquidate the Eligible Debt Securities, as defined in the EPF I Partnership Agreement and the EPF II Partnership Agreement, owned by EPF I and EPF II to Cash as soon as practicable following the Effective Date and (3) declare a distribution of all assets of EPF I and EPF II, including, without limitation, Cash, Plan Securities and Eligible Debt Securities, as defined in the EPF I Partnership Agreement and the EPF II Partnership

Agreement, to ECT I and ECT II, respectively, which distribution shall be made to National City Bank, in its capacity as ECT I Property Trustee and ECT II Property Trustee. Upon the earlier to occur of (i) the Confirmation Order becoming a Final Order and (ii) the Effective Date, (a) all claims, causes of action or other challenges of any kind or nature which could be asserted by the Debtors, the Creditors' Committee, any trustee appointed in the Debtors' bankruptcy cases, or any creditor or party in interest in the Debtors' bankruptcy cases, or any of them, against or with respect to National City Bank, as Indenture Trustee, ECT I Property Trustee and ECT II Property Trustee, ECT I, ECT II, the TOPRS issued by either of them, EPF I, EPF II, the limited partnership interests issued by either of them, the ETS Debentures, the ENA Debentures or the Enron TOPRS Debentures, including, without limitation, substantive consolidation, piercing of the corporate veil, recharacterization of the TOPRS or the limited partnership interests in EPF I or EPF II as preferred stock or any other equity interest of ENE or any of its affiliates, preferences, fraudulent conveyance and other avoidance actions shall be deemed forever waived and released and (b) none of the Debtors, the Creditors' Committee, any trustee or any creditor or party in interest in the Debtors' bankruptcy cases, or any of them, shall without National City Bank's prior written consent, which consent shall not be unreasonably withheld, (i) seek to change, remove or substitute any of the Enron TOPRS Debentures, the ETS Debentures, the ENA Debentures, the Eligible Securities or any other interest of any of ECT I, ECT II, EPF I or EPF II in any property or (ii) otherwise seek to merge or consolidate any or all of ECT I, ECT II, EPF I, EPF II, ENE, ENA or ETS or in any manner change or otherwise affect the economic or other interests of National City Bank, as Indenture Trustee and Property Trustee, the holders of TOPRS, ECT I, ECT II, EPF I or EPF II, or any of them.

34.7    **Termination of Benefit Plans**: Notwithstanding anything contained in the Plan to the contrary, from and after the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, shall be entitled to terminate any and all Benefit Plans in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law; provided, however, that, until the termination of any such Benefit Plan, the Debtors or the Reorganized Debtors, as the case may be, shall (i) continue to perform any and all of their administrative obligations thereunder and (ii) with respect to the Defined Benefit Plans, continue to make minimum contributions and pay Pension Benefit Guaranty Corporation insurance premiums; and, provided, further, that, upon termination thereof, the Debtors or the Reorganized Debtors, as the case may be, shall provide administrative services in connection with the operation and winddown of the Benefit Plans; and, provided, further, that the continuation of the Benefit Plans from and after the Confirmation Date, including, without limitation, the provision of administrative services in connection with the operation and winddown of the Benefit Plans, shall not constitute an assumption of the Benefit Plans in accordance with section 365 of the Bankruptcy Code; and, provided, further, that, except with respect to the making of minimum contributions and the payment of Pension Benefit Guaranty Corporation insurance premiums in connection with the Defined Benefit Plans, the failure to perform any obligations under the Benefit Plans or to provide administrative services in connection with the winddown of the Benefit Plans shall be without prejudice to any Entity to (i) assert such failure gives rise to an Administrative Expense Claim and (ii) contest the assertion thereof; and, provided, further, that the foregoing is without prejudice to the rights of the Debtors or the Reorganized Debtors, as the case may be, to make payments in accordance with the terms and provisions of the Standard Termination Order.

# ARTICLE XXXV

## RIGHTS AND POWERS OF DISBURSING AGENT

35.1 **Exculpation**:  From and after the Effective Date, the Disbursing Agent shall be exculpated by all Persons and Entities, including, without limitation, holders of Claims and Equity Interests and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent.  No holder of a Claim or an Equity Interest or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

35.2 **Powers of the Disbursing Agent**:  Except to the extent that the responsibility for the same is vested in the Reorganized Debtor Plan Administrator pursuant to the Reorganized Debtor Plan Administration Agreement, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, (d) file all tax returns and pay taxes in connection with the reserves created pursuant to Article XVIII of the Plan, and (e) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

35.3 **Fees and Expenses Incurred From and After the Effective Date**:  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, made by the Disbursing Agent, shall be paid in Cash by the Reorganized Debtors without further order of the Bankruptcy Court within fifteen (15) days of submission of an invoice by the Disbursing Agent.  In the event that the Reorganized Debtors object to the payment of such invoice for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by the Reorganized Debtors.

# ARTICLE XXXVI

## THE REORGANIZED DEBTOR PLAN ADMINISTRATOR

36.1 **Appointment of Reorganized Debtor Plan Administrator**:  On the Effective Date, compliance with the provisions of the Plan shall become the general responsibility of the Reorganized Debtor Plan Administrator, an employee of the Reorganized Debtors, (subject to the supervision of the Board of Directors of the Reorganized Debtors) pursuant to and in accordance with the provisions of the Plan and the Reorganized Debtor Plan Administration Agreement.

36.2    **Responsibilities of the Reorganized Debtor Plan Administrator**:  In accordance with the Reorganized Debtor Plan Administration Agreement, the responsibilities of the Reorganized Debtor Plan Administrator shall include (a) facilitating the Reorganized Debtors' prosecution or settlement of objections to and estimations of Claims, (b) prosecution or settlement of claims and causes of action held by the Debtors and Debtors in Possession, (c) assisting the Litigation Trustee and the Special Litigation Trustee in performing their respective duties, (d) calculating and assisting the Disbursing Agent in implementing all distributions in accordance with the Plan, (e) filing all required tax returns and paying taxes and all other obligations on behalf of the Reorganized Debtors from funds held by the Reorganized Debtors, (f) periodic reporting to the Bankruptcy Court, of the status of the Claims resolution process, distributions on Allowed Claims and prosecution of causes of action, (g) liquidating the Remaining Assets and providing for the distribution of the net proceeds thereof in accordance with the provisions of the Plan, (h) consulting with, and providing information to , the DCR Overseers in connection with the voting or sale of the Plan Securities to be deposited into the Disputed Claims reserve to be created in accordance with Section 21.3 of the Plan, and (i) such other responsibilities as may be vested in the Reorganized Debtor Plan Administrator pursuant to the Plan, the Reorganized Debtor Plan Administration Agreement or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

36.3    **Powers of the Reorganized Debtor Plan Administrator**:  The powers of the Reorganized Debtor Plan Administrator shall, without any further Bankruptcy Court approval in each of the following cases, include (a) the power to invest funds in, and withdraw, make distributions and pay taxes and other obligations owed by the Reorganized Debtors from funds held by the Reorganized Debtor Plan Administrator and/or the Reorganized Debtors in accordance with the Plan, (b) the power to compromise and settle claims and causes of action on behalf of or against the Reorganized Debtors, other than Litigation Trust Claims, Special Litigation Trust Claims and claims and causes of action which are the subject of the Severance Settlement Fund Litigation, and (c) such other powers as may be vested in or assumed by the Reorganized Debtor Plan Administrator pursuant to the Plan, the Reorganized Debtor Plan Administration Agreement or as may be deemed necessary and proper to carry out the provisions of the Plan.

36.4    **Compensation of the Reorganized Debtor Plan Administrator**:  In addition to reimbursement for actual out-of-pocket expenses incurred by the Reorganized Debtor Plan Administrator, the Reorganized Debtor Plan Administrator shall be entitled to receive reasonable compensation for services rendered on behalf of the Reorganized Debtors in an amount and on such terms as may be reflected in the Reorganized Debtor Plan Administration Agreement.

36.5    **Termination of Reorganized Debtor Plan Administrator**:  The duties, responsibilities and powers of the Reorganized Debtor Plan Administrator shall terminate pursuant to the terms of the Reorganized Debtor Plan Administration Agreement.

## ARTICLE XXXVII

## CONDITIONS PRECEDENT TO EFFECTIVE DATE OF
## THE PLAN; IMPLEMENTATION PROVISIONS

37.1    **Conditions Precedent to Effective Date of the Plan**:  The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a)    Entry of the Confirmation Order:  The Clerk of the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee and the effectiveness of which shall not have been stayed ten (10) days following the entry thereof.

(b)    Execution of Documents; Other Actions:  All other actions and documents necessary to implement the Plan shall have been effected or executed.

(c)    Prisma Consents Obtained:  The requisite consents to the transfer of the Prisma Assets to Prisma and the issuance of the Prisma Common Stock have been obtained.

(d)    CrossCountry Consents Obtained:  The requisite consents to the issuance of the CrossCountry Common Equity have been obtained.

(e)    PGE Approval:  The requisite consents for the issuance of the PGE Common Stock have been obtained.

37.2    **Waiver of Conditions Precedent**:  To the extent practicable and legally permissible, each of the conditions precedent in Section 37.1 hereof, may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Bankruptcy Court.

37.3    **Alternative Structures**:  Notwithstanding anything contained in the Plan to the contrary, the Debtors, if jointly determined after consultation with the Creditors' Committee, may, after obtaining the requisite approvals, (a) form one (1) or more holding companies to hold the common stock of the Entities to be issued hereunder and issue the common equity interest therein in lieu of the common stock to be issued hereunder and (b) form one (1) or more limited liability companies or corporations in lieu of the Entities to be created hereunder and issue the membership interests or capital stock therein in lieu of the common stock to be issued hereunder; provided, however, that no such structures shall materially adversely affect the substance of the economic and governance provisions contained herein.

# ARTICLE XXXVIII

## RETENTION OF JURISDICTION

38.1    **Retention of Jurisdiction**:  The Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, or that relates to the following:

(a)    to resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be rejected;

(b)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

(c)    to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtors, the Litigation Trust or the Special Litigation Trust prior to or after the Effective Date;

(d)    to ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished as provided herein;

(e)    to hear and determine any timely objections to Administrative Expense Claims or to proofs of Claim and Equity Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

(f)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

(g)    to issue such orders in aide of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(h)    to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)    to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

(j)       to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

(k)       to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

(l)       to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Disclosure Statement;

(m)      to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(n)       to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

(o)       to enter a final decree closing the Chapter 11 Cases;

provided, however, that the foregoing is not intended to (1) expand the Bankruptcy Court's jurisdiction beyond that allowed by applicable law, (2) impair the rights of an Entity to (i) invoke the jurisdiction of a court, commission or tribunal, including, without limitation, the Federal Energy Regulatory Commission, with respect to matters relating to a governmental unit's police and regulatory powers and (ii) contest the invocation of any such jurisdiction; provided, however, that the invocation of such jurisdiction, if granted, shall not extend to the allowance or priority of Claims or the enforcement of any money judgment against a Debtor or a Reorganized Debtor, as the case may be, entered by such court, commission or tribunal, and (3) impair the rights of an Entity to (i) seek the withdrawal of the reference in accordance with 28 U.S.C. § 157(d) and (ii) contest any request for the withdrawal of reference in accordance with 28 U.S.C. § 157(d).

## ARTICLE XXXIX

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

39.1     **Modification of Plan**:  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, subject to the consent of the Creditors' Committee and, in the event any amendment or modification would materially adversely affect the substance of the economic and governance provisions set forth in the Plan, including, without limitation, Article II of the Plan, the ENA Examiner as Plan facilitator, to amend or modify the Plan, the Plan Supplement or any exhibits to the Plan at any time prior to the entry of the Confirmation Order, including, without limitation, to exclude one (1) or more Debtors from the Plan.  Upon entry of the Confirmation Order, the Debtors may, and provided that the Creditors' Committee and the ENA Examiner have not been dissolved and released in accordance with the provisions of Section 33.1 and 33.4 of the Plan, respectively, subject to the consent of the Creditors' Committee and, in the event any amendment or modification would materially adversely affect

the substance of the economic and governance provisions set forth in the Plan, including, without limitation, Article II of the Plan, the ENA Examiner as Plan facilitator, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, including, without limitation, to exclude one (1) or more Debtors from the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

39.2    **Revocation or Withdrawal**:

(a)    The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

(b)    If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## ARTICLE XL

## PROVISION FOR MANAGEMENT

40.1    **Reorganized Debtors Directors**: On the Effective Date, the board of directors of Reorganized ENE shall consist of five (5) persons selected by the Debtors, after consultation with (a) the Creditors' Committee with respect to four (4) of the Debtors' selections and (b) the ENA Examiner with respect to one (1) of the Debtors' selections, all of which shall be disclosed prior to the Confirmation Hearing. In the event that, during the period from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the board of directors of Reorganized ENE, the Debtors shall file a notice thereof with the Bankruptcy Court and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with the requirements of the immediately preceding sentence, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing. The terms and manner of selection of the directors of each of the other Reorganized Debtors shall be as provided in the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws, as the same may be amended, and shall be disclosed prior to the Confirmation Hearing.

40.2    **Operating Entities Directors**: On the Effective Date, the respective boards of directors or boards of managers of Prisma, CrossCountry Distributing Company (and, if applicable, any predecessor Entity formed to hold the CrossCountry Assets prior to CrossCountry Distributing Company) and PGE shall consist of individuals designated by the Debtors, after consultation with the Creditors' Committee, all of which shall be disclosed prior to the Confirmation Hearing. In the event that, during the period from the Confirmation Date up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve, the Debtors shall file a notice thereof with the Bankruptcy Court and,

for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated after consultation with the Creditors' Committee, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing.  Thereafter, the terms and manner of selection of the directors of Prisma, CrossCountry Distributing Company (or, if applicable, such predecessor Entity) and PGE shall be as provided in (a) the Prisma Memorandum of Association and Prisma Articles of Association, (b) the CrossCountry Charter and CrossCountry By-laws/Organizational Agreement (or, if applicable, such charter documents of such predecessor Entity), and (c) the PGE Certificate of Incorporation and PGE By-laws, respectively, as the same may be amended.

## ARTICLE XLI

## ARTICLES OF INCORPORATION AND BY-LAWS OF THE DEBTORS; CORPORATE ACTION

41.1    **Amendment of Articles of Incorporation and By-Laws**:  The articles of incorporation and by-laws of the Debtors shall be amended as of the Effective Date to provide substantially as set forth in the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws.

41.2    **Corporate Action**:  On the Effective Date, the adoption of the Reorganized Debtors Certificate of Incorporation and the Reorganized Debtors By-laws shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  The cancellation of all Equity Interests and other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors. Without limiting the foregoing, from and after the Confirmation Date, the Debtors, the Reorganized Debtors and the Reorganized Debtor Plan Administrator shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein, including, without limitation, to sell or otherwise dispose of all of the Reorganized Debtors' assets and wind-up their respective affairs and not engage in business (except to the extent reasonably necessary to, and consistent with, such purpose) and, notwithstanding any provision contained in the Debtors' articles of incorporation and by-laws to the contrary, such Entities shall not require the affirmative vote of holders of Equity Interests in order to take any corporate action including to (i) consummate a Sale Transaction, (ii) compromise and settle claims and causes of action of or against the Debtors and their chapter 11 estates, and (iii) dissolve, merge or consolidate with any other Entity.

## ARTICLE XLII

## MISCELLANEOUS PROVISIONS

42.1    **Title to Assets**:  Except as otherwise provided by the Plan, including, without limitation, Section 42.2 of the Plan, on the Effective Date, title to all assets and properties encompassed by the Plan shall vest in the Reorganized Debtors and, to the extent created, the

Remaining Asset Trust(s), the Litigation Trust and the Special Litigation Trust, as the case may be, free and clear of all Liens and in accordance with section 1141 of the Bankruptcy Code, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors and the Debtors in Possession except as provided in the Plan. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors, in their sole and absolute discretion, may (a) encumber all of the Debtors' assets for the benefit of Creditors or (b) transfer such assets to another Entity to secure the payment and performance of all obligations provided for herein.

42.2    **Distribution of Reserved Funds**: Except to the extent subject to a valid and enforceable Lien, upon the Effective Date, all proceeds reserved pursuant to a Sale/Settlement Order and not subject to a dispute concerning the allocation thereof shall vest in the Reorganized Debtors, the Litigation Trust or the Special Litigation Trust, as the case may be, free and clear of all Liens and in accordance with section 1141 of the Bankruptcy Code and be subject to distribution in accordance with the provisions hereof; provided, however, that, notwithstanding the foregoing, the Debtors shall escrow Two Hundred Million Dollars ($200,000,000.00) to satisfy its obligations in accordance with the terms and provisions of the Standard Termination Order until the earlier to occur of (a) satisfaction of the obligations contained in the Standard Termination Order and (b) entry of an order of the Bankruptcy Court, upon notice to the Pension Benefit Guaranty Corporation, authorizing the release thereof. Notwithstanding the terms and conditions of any of the Sale/Settlement Orders, to the extent necessary to allocate the proceeds reserved pursuant to a Sale/Settlement Order, on or prior to the three (3) month anniversary of the Confirmation Date, the Debtors shall file one or more motions with the Bankruptcy Court to determine the allocation of proceeds reserved pursuant to a Sale/Settlement Order. Any such motion shall be deemed served upon the necessary parties if served in accordance with the Case Management Order. Upon entry of a Final Order of the Bankruptcy Court with respect to the allocation of such proceeds, and to the extent allocated to the Debtors, the Litigation Trust, the Special Litigation Trust, or any Enron Affiliate, as the case may be, all such proceeds shall vest in the Reorganized Debtors or such Enron Affiliate free and clear of all Liens and in accordance with section 1141 of the Bankruptcy Code and be subject to distribution in accordance with the provisions hereof.

42.3    **Discharge of Debtors**: Except as otherwise provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, on the latest to occur of (a) the Effective Date, (b) the entry of a Final Order resolving all Claims in the Chapter 11 Cases and (c) the final distribution made to holders of Allowed Claims and Allowed Equity Interests in accordance with Article XXXII of the Plan, all Claims against and Equity Interests in the Debtors and Debtors in Possession, shall be discharged and released in full; provided, however, that, the Bankruptcy Court may, upon request by the Reorganized Debtors, and notice and a hearing, enter an order setting forth that such Claims and Equity Interests shall be deemed discharged and released on such earlier date as determined by the Bankruptcy Court; and, provided, further, that, upon all distributions being made pursuant to the Plan, the Debtors and the Reorganized Debtors, as the case may be, shall be deemed dissolved for all purposes and the Reorganized Debtor Plan Administrator shall cause the Debtors and the Reorganized Debtors, as the case may be, to take such action to effect such dissolution in accordance with applicable state law. All Persons and Entities shall be precluded from asserting against the Debtors, the Debtors in Possession, their successors or assigns, including, without limitation, the Reorganized Debtors or their respective assets properties or interests in property, any other or

further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not the facts or legal bases therefor were known or existed prior to the Confirmation Date regardless of whether a proof of Claim or Equity Interest was filed, whether the holder thereof voted to accept or reject the Plan or whether the Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest.

42.4    **Injunction on Claims**: **Except as otherwise expressly provided in the Plan, the Confirmation Order or such other order of the Bankruptcy Court that may be applicable, all Persons or Entities who have held, hold or may hold Claims or other debt or liability that is discharged or Equity Interests or other right of equity interest that is terminated or cancelled pursuant to the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or other debt or liability or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan against the Debtors, the Debtors in Possession or the Reorganized Debtors, the Debtors' estates or properties or interests in properties of the Debtors or the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Debtors in Possession or the Reorganized Debtors, the Debtors' estates or properties or interests in properties of the Debtors, the Debtors in Possession or the Reorganized Debtors, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Debtors in Possession or the Reorganized Debtors or against the property or interests in property of the Debtors, the Debtors in Possession or the Reorganized Debtors, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, the Debtors in Possession or the Reorganized Debtors or against the property or interests in property of the Debtors, the Debtors in Possession or the Reorganized Debtors, with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan; _provided_, _however_, that such injunction shall not preclude the United States of America, any State or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, _provided_, _further_, that, except in connection with a properly filed proof of claim, the foregoing proviso does not permit the United States of America, any State or any of their respective police or regulatory agencies from obtaining any monetary recovery from the Debtors, the Debtors in Possession or the Reorganized Debtors or their respective property or interests in property with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power.  Such injunction (y) shall extend to all successors of the Debtors and Debtors in Possession and the Creditors' Committee and its members, and their respective properties and interests in property; _provided_, _however_, that such injunction shall not extend to or protect members of the Creditors' Committee and their respective properties and interests in property for actions based upon acts outside the scope of service on the Creditors' Committee, and (z) is not intended, nor shall it be construed, to extend to the assertion, the commencement or the prosecution of any claim or cause of action against any present or former member of the Creditors'**

**Committee and their respective properties and interests in property arising from or relating to such member's pre-Petition Date acts or omissions, including, without limitation, the Class Actions.**

42.5    **Term of Existing Injunctions or Stays**:  Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362 or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until entry of an order in accordance with Section 42.17 of the Plan or such other Final Order of the Bankruptcy Court.

42.6    **Limited Release of Directors, Officers and Employees**:  No claims of the Debtors' estates against their present and former officers, directors, employees, consultants and agents and arising from or relating to the period prior to the Initial Petition Date are released by this Plan.  As of the Effective Date, the Debtors and the Debtors in Possession shall be deemed to have waived and released its present and former directors, officers, employees, consultants and agents who were directors, officers, employees, consultants or agents, respectively, at any time during the Chapter 11 Cases, from any and all claims of the Debtors' estates arising from or relating to the period from and after the Initial Petition Date; provided, however, that, except as otherwise provided by prior or subsequent Final Order of the Bankruptcy Court, this provision shall not operate as a waiver or release of (a) any Person (i) named or subsequently named as a defendant in any of the Class Actions, (ii) named or subsequently named as a defendant in any action commenced by or on behalf of the Debtors in Possession, including any actions prosecuted by the Creditors' Committee and the Employee Committee, (iii) identified or subsequently identified as a wrongful actor in the "Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp.", dated February 1, 2002, (iv) identified or subsequently identified in a report by the Enron Examiner or the ENA Examiner as having engaged in acts of dishonesty or willful misconduct detrimental to the interests of the Debtors, or (v) adjudicated or subsequently adjudicated by a court of competent jurisdiction to have engaged in acts of dishonesty or willful misconduct detrimental to the interests of the Debtors or (b) any claim (i) with respect to any loan, advance or similar payment by the Debtors to any such person, (ii) with respect to any contractual obligation owed by such person to the Debtors, (iii) relating to such person's knowing fraud, or (iv) to the extent based upon or attributable to such person gaining in fact a personal profit to which such person was not legally entitled, including, without limitation, profits made from the purchase or sale of equity securities of the Debtors which are recoverable by the Debtors pursuant to section 16(b) of the Securities Exchange Act of 1934, as amended; and, provided, further, that the foregoing is not intended, nor shall it be construed, to release any of the Debtors' claims that may exist against the Debtors' directors and officers liability insurance.

42.7    **Exculpation**:  None of the Debtors, the Reorganized Debtors, the Creditors' Committee, the Employee Committee, the ENA Examiner (other than those functions defined by the Investigative Orders), the Indenture Trustees, and any of their respective directors, officers, employees, members, attorneys, consultants, advisors and agents (acting in such capacity), shall have or incur any liability to any Entity for any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement related thereto or any

contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 42.7 shall not affect the liability of (a) any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, including, without limitation, fraud and criminal misconduct, (b) State Street Bank and Trust Company in its capacity as Independent Fiduciary appointed in accordance with the Bankruptcy Court's order, dated April 19, 2002, or (c) the professionals of the Debtors, the Reorganized Debtors, the Creditors' Committee, the Employee Committee, the ENA Examiner or the Indenture Trustees to their respective clients pursuant to DR 6-102 of the New York Code of Professional Responsibility. Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

42.8    **Preservation of Rights of Action**: Except as otherwise provided in the Plan, including, without limitation, Articles XXII and XXIII of the Plan, or in any contract, instrument, release of other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain sole and exclusive authority to enforce any claims, rights or causes of action that the Debtors, the Debtors in Possession or their chapter 11 estates may hold against any Entity, including any claims, rights or causes of action arising under sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

42.9    **Injunction on Actions**: **Except as provided in the Plan, as of the Effective Date, all non-Debtor entities are permanently enjoined from commencing or continuing in any manner, any action or proceeding, whether directly, derivatively, on account of or respecting any claim, debt, right or cause of action of the Debtors, the Debtors in Possession or the Reorganized Debtors which the Debtors, the Debtors in Possession or the Reorganized Debtors, as the case may be, retain sole and exclusive authority to pursue in accordance with Section 28.1 of the Plan or which has been released pursuant to the Plan, including, without limitation, pursuant to Sections 2.1, 28.3 and 42.6 of the Plan; provided, however, that such injunction is not intended, nor shall it be construed to, (a) to the extent authorized or permitted by an order of the Bankruptcy Court, extend to the ongoing prosecution of the Class Actions or (b) to apply to any proceeding not involving property of any Debtor's estate that a non-Debtor Entity may bring against another non-Debtor Entity.**

42.10    **Payment of Statutory Fees**: All fees payable pursuant to section 1930 of title 28 of the United States Code, shall be paid as and when due or otherwise pursuant to an agreement between the Reorganized Debtors and the United States Department of Justice, Office of the United States Trustee, until such time as a Chapter 11 Case for a Debtor shall be closed in accordance with the provisions of Section 42.17 of the Plan.

42.11    **Retiree Benefits**: From and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, and for the duration of the period during which the Debtors have obligated themselves to provide such benefits; provided, however, that the

Debtors or the Reorganized Debtors may modify such benefits to the extent permitted by applicable law.

42.12  **Retention of Documents**:  Notwithstanding the terms and provisions of that certain Stipulation and Consent Order Pursuant to 11 U.S.C. § 105 and 541 By and Between Enron Corp. and Its Affiliated Debtors-in-Possession and the Official Committee of Unsecured Creditors Regarding Document Preservation and Retention, dated February 15, 2002, unless otherwise ordered by the Bankruptcy Court, the Debtors and each Enron Affiliate shall retain and not destroy or otherwise dispose of the Documents, as defined therein.

42.13  **Post-Confirmation Date Fees and Expenses**:  From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, (a) retain such professionals and (b) pay the reasonable professional fees and expenses incurred by the Debtors or the Reorganized Debtors, as the case may be, the Creditors' Committee and the ENA Examiner related to implementation and consummation of or consistent with the provisions of the Plan, including, without limitation, reasonable fees and expenses of the Indenture Trustees incurred in connection with the distributions to be made pursuant to the Plan.

42.14  **Severability**:  If, prior to the Confirmation Date, any term or provision of the Plan shall be held by the Bankruptcy Court to be invalid, void or unenforceable, including, without limitation, the inclusion of one (1) or more of the Debtors in the Plan, the Bankruptcy Court shall, with the consent of the Debtors and the Creditors' Committee, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

42.15  **Governing Law**:  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or document contained in the Plan Supplement provides otherwise, the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York, without giving effect to principles of conflicts of laws.

42.16  **Notices**:  All notices, requests, and demands to or upon the Debtors, the Debtors in Possession or the Reorganized Debtors to be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Enron Corp.
1221 Lamar Street, Suite 1600
Houston, Texas  77010
Attention:  Chief Financial Officer
Telecopier:  (713) 646-3620
Telephonic Confirmation:  (713) 853-7433

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attention:  Martin J. Bienenstock, Esq.
                    Brian S. Rosen, Esq.
Telecopier:  (212) 310-8007
Telephonic Confirmation:  (212) 310-8888

-and-

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005
Attention:  Luc A. Despins, Esq.
                    Susheel Kirpalani, Esq.
Telecopier:  (212) 530-5219
Telephonic Confirmation:  (212) 530-5000

42.17  **Closing of Cases**:  The Reorganized Debtors shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court.

42.18  **Section Headings**:  The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

42.19  **Exemption from Registration**:  Pursuant to section 1145 of the Bankruptcy Code, and except as provided in subsection (b) thereof, the issuance of the Plan Securities, the Litigation Trust Interests and the Special Litigation Trust Interests on account of, and in exchange for, the Claims against the Debtors shall be exempt from registration pursuant to section 5 of the Securities Act of 1933 and any other applicable non-bankruptcy law or regulation.

42.20  **Exemption from Transfer Taxes**:  Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes, Equity Interests or Plan Securities pursuant to the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

42.21  **Inconsistencies**:  To the extent of any inconsistencies between the information contained in the Disclosure Statement, the Distribution Model and the terms and provisions of the Plan, the terms and provisions contained herein shall govern.

Dated: New York, New York
       July 2, 2004

Enron Metals & Commodity Corp.

By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Corp.

By:  /s/ Stephen F. Cooper
    Name:  Stephen F. Cooper
    Title:    Acting President,
           Acting Chief Executive Officer and
           Chief Restructuring Officer

Enron North America Corp.

By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Power Marketing, Inc.

By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

PBOG Corp.

By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Smith Street Land Company

By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Broadband Services, Inc.

By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Energy Services Operations, Inc.

By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Energy Marketing Corp.

By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Energy Services, Inc.

By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Energy Services, LLC

By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Transportation Services, LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

BAM Lease Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

ENA Asset Holdings L.P.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Gas Liquids, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Global Markets LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Net Works LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Industrial Markets LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Operational Energy Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Engineering & Construction Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Engineering & Operational Services Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Garden State Paper Company, LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Palm Beach Development Company, L.L.C.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Tenant Services, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Energy Information Solutions, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

EESO Merchant Investments, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Federal Solutions, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Freight Markets Corp.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Broadband Services, L.P.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Energy Services North America, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron LNG Marketing LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Calypso Pipeline, LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Global LNG LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron International Fuel Management Company


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Natural Gas Marketing Corp.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

ENA Upstream Company LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Liquid Fuels, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron LNG Shipping Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Property & Services Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Capital & Trade Resources International Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Communications Leasing Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Wind Systems, LLC, f/k/a
    EREC Subsidiary I, LLC and successor to
    Enron Wind Systems Inc.


By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Wind Constructors LLC, f/k/a
    EREC Subsidiary II, LLC and successor to
    Enron Wind Constructors Corp.


By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Wind Energy Systems LLC, f/k/a
    EREC Subsidiary III, LLC and successor to
    Enron Wind Energy Systems Corp.


By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Wind Maintenance LLC, f/k/a
    EREC Subsidiary IV, LLC and successor to
    Enron Wind Maintenance Corp.


By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Wind LLC, f/k/a
    EREC Subsidiary V, LLC and successor to
    Enron Wind Corp.


By:  /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:  Authorized Representative

Intratex Gas Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Processing Properties, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Methanol Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Ventures Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

The New Energy Trading Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EES Service Holdings, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Wind Development LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

ZWHC LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Zond Pacific, LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Reserve Acquisition Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

EPC Estates Services, Inc., f/k/a
    National Energy Production Corporation


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Power & Industrial Construction Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

NEPCO Power Procurement Company


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

NEPCO Services International, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Caribe Verde (SJG) Inc., f/k/a San Juan Gas
    Company, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

EBF LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Zond Minnesota Construction Company LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Fuels International, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

E Power Holdings Corp.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:    Authorized Representative

EFS Construction Management Services, Inc.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:    Authorized Representative

Enron Management, Inc.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:    Authorized Representative

Enron Expat Services, Inc.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:    Authorized Representative

Artemis Associates, LLC


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:    Authorized Representative

Clinton Energy Management Services, Inc.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:    Authorized Representative

LINGTEC Constructors L.P.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

EGS New Ventures Corp.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Louisiana Gas Marketing Company


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Louisiana Resources Company


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

LGMI, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

LRCI, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Communications Group, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EnRock Management, LLC.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

ECI-Texas, L.P.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EnRock, L.P.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

ECI-Nevada Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Alligator Alley Pipeline Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Wind Storm Lake I LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

ECT Merchant Investments Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EnronOnLine, LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

St. Charles Development Company, L.L.C.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Calcasieu Development Company, L.L.C.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Calvert City Power I, L.L.C.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron ACS, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

LOA, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron India LLC.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron International Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron International Holdings Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Middle East LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron WarpSpeed Services, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Modulus Technologies, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Telecommunications, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

DataSystems Group, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Risk Management & Trading Corp.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Omicron Enterprises, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

133

EFS I, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EFS II, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EFS III, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EFS V, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EFS VI, L.P.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EFS VII, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

EFS IX, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

EFS X, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

EFS XI, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

EFS XII, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

EFS XV, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

EFS XVII, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Jovinole Associates

By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

EFS Holdings, Inc.

By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Operations Services, LLC

By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Green Power Partners I LLC

By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

TLS Investors, L.L.C.

By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

ECT Securities Limited Partnership

By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

ECT Securities LP Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

ECT Securities GP Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

KUCC Cleburne, LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron International Asset Management Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Brazil Power Holdings XI Ltd.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Holding Company L.L.C.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Development Management Ltd.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron International Korea Holdings Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Caribe VI Holdings Ltd.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron International Asia Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Brazil Power Investments XI Ltd.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Paulista Electrical Distribution, L.L.C.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Pipeline Construction Services Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Pipeline Services Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Trailblazer Pipeline Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Liquid Services Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Machine and Mechanical Services, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Commercial Finance Ltd.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Permian Gathering Inc.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:   Authorized Representative

Transwestern Gathering Company


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:   Authorized Representative

Enron Gathering Company


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:   Authorized Representative

EGP Fuels Company


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:   Authorized Representative

Enron Asset Management Resources, Inc.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:   Authorized Representative

Enron Brazil Power Holdings I Ltd.


By: /s/ K. Wade Cline
      Name:  K. Wade Cline
      Title:   Authorized Representative

Enron do Brazil Holdings Ltd.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Wind Storm Lake II LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Renewable Energy Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Acquisition III Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Enron Wind Lake Benton LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

Superior Construction Company


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:   Authorized Representative

EFS IV, Inc.


By: /s/ K. Wade Cline
   Name: K. Wade Cline
   Title: Authorized Representative


EFS VIII, Inc.


By: /s/ K. Wade Cline
   Name: K. Wade Cline
   Title: Authorized Representative


EFS XIII, Inc.


By: /s/ K. Wade Cline
   Name: K. Wade Cline
   Title: Authorized Representative


Enron Credit Inc.


By: /s/ K. Wade Cline
   Name: K. Wade Cline
   Title: Authorized Representative


Enron Power Corp.


By: /s/ K. Wade Cline
   Name: K. Wade Cline
   Title: Authorized Representative


Richmond Power Enterprise, L.P.


By: /s/ K. Wade Cline
   Name: K. Wade Cline
   Title: Authorized Representative

ECT Strategic Value Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Development Funding Ltd.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Atlantic Commercial Finance, Inc.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

The Protane Corporation


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Asia Pacific/Africa/China LLC


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

Enron Development Corp.


By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

ET Power 3 LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Nowa Sarzyna Holding B.V.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron South America LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Global Power & Pipelines LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Portland General Holdings, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Portland Transition Company, Inc.


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Cabazon Power Partners LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Cabazon Holdings LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Caribbean Basin LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Victory Garden Power Partners I LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Oswego Cogen Company, LLC


By: /s/ K. Wade Cline
     Name:  K. Wade Cline
     Title:    Authorized Representative

Enron Equipment & Procurement Company

By: /s/ K. Wade Cline
    Name:  K. Wade Cline
    Title:    Authorized Representative

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

        – and –

700 Louisiana
Houston, Texas  77002
(713) 546-5000

By:    /s/ Brian S. Rosen
       Name: Brian S. Rosen

Attorneys for Debtors and
Debtors in Possession

**Exhibit J**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

WINN-DIXIE STORES, INC., et al.,

         Debtors.

_____/

Case No.: 3:05-bk-03817-JAF

Chapter 11

Jointly Administered

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case came before the Court upon Winn-Dixie Stores, Inc. and Affiliated

Debtors' ("Debtors")[1] Joint Plan of Reorganization (the "Plan") and related Disclosure

Statement (the "Disclosure Statement") filed on June 29, 2006. Debtors filed their

petitions for relief on February 21, 2005 (the "Petition Date"). On August 2, 2006,

Debtors filed a Second Proposed Disclosure Statement and Second Proposed Plan. On

August 4, 2006, the Court entered an order approving the Disclosure Statement as

containing adequate information within the meaning of Bankruptcy Code section

1125(a). On August 9, 2006, Debtors filed their Final Plan of Reorganization and

Disclosure Statement.

Following the hearing to approve the Disclosure Statement held on August 4,

2006 (the "Disclosure Statement Hearing"), the Court entered an order, among other

things, (i) determining the dates, procedures, and forms applicable to the solicitation

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor
Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie
Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc.,
Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt
Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD
Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie
Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie
Supermarkets, Inc.

process, (ii) establishing tabulation procedures, and (iii) establishing the objection

deadline and scheduling the hearing to consider confirmation of the Plan (the

"Solicitation Procedures Order").  As set forth in the certifications of Kathleen M. Logan,

the President and CEO of Logan & Company, Inc. ("Logan"), Debtors' solicitation and

tabulation agent, the confirmation hearing notice, the Disclosure Statement, the Plan,

Debtors' and the Creditors Committee's approved solicitation letters, and the appropriate

ballots (or, in the case of non-voting holders of claims or non-voting Classes, the

appropriate notice) (collectively, the "Solicitation Package") were transmitted to all

holders of Claims in Classes that will receive distributions under the Plan, and holders of

Claims and Interests in Classes 18 through 21 were mailed a notice of deemed rejecting

status as required by the Solicitation Procedures Order.  Debtors filed with the Court the

Plan Supplement, dated October 3, 2006, containing certain documents and other

information related to the Plan, as provided in Section 12.18 of the Plan.

On October 9, 2006, Debtors filed the declaration of Kathleen M. Logan

certifying the results of the ballot and master ballot tabulation for the Classes of Claims

voting to accept or reject the Plan, and on October 12, 2006, Debtors filed the amended

declaration of Kathleen M. Logan (the "Logan Tabulation Declaration") certifying the

results of the ballot and master ballot tabulation.  On October 10, 2006, Debtors filed

their Memorandum in Response to Objections to Confirmation of Joint Plan of

Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Confirmation

Memorandum").  The objections to confirmation were voluminous, but the Court is

consolidating those objections into seven categories: 1) the Objecting Landlords'

Objections to Consolidation;[2] 2) the United States' Objections;[3] 3) the Insurance

Proceeds Proceeding;[4] 4) the Class 10 Claims' Objections;[5] 5) the Florida Tax Collectors'

Objections;[6] 6) the United States Trustee's Objections;[7] and 7) the Shareholders'

Objections.[8]  A confirmation hearing was held on October 13, 2006 (the "Confirmation

Hearing") to consider confirmation of the Plan.  Based upon the number of objections,

the Court will address each objection category in turn.  Upon the evidence presented at

the hearings, the Court makes the following Findings of Fact and Conclusions of Law.

---

[2] Objections filed by Bank of America as Trustee of Betty Holland, et. al. (Docket No. 11312), CWCapital Asset Management, LLC as successor-in-interest to CRIMMI MAE Services Limited Partnership (Docket No. 11313), Liquidity Solutions, Inc. (Docket No. 11314), Saran, Ltd. (Docket No. 11315), ORIX Capital Markets, LLC (Docket No. 11319), Knightsdale Crossing, LLC (Docket No. 11320), Daniel G. Kamin, et. al. (Docket No. 11332), and Merrill Lynch LP Holdings, Inc. (Docket No. 11431)(filed untimely) (collectively, the "Objecting Landlords").

[3] Objection to Confirmation filed by the United States of America as creditor.  (Docket No. 11302.)

[4] Objection to Confirmation filed by Creditor Bundy New Orleans Co., LLC.  (Docket No. 11303.)

[5] Objections filed by Kentucky Department of Revenue (Docket No. 11305), Mike Hogan Tax Collector for Duval County, Florida (Docket No. 11307), Forrest County, Mississippi, et. al. (Docket No. 11323), Tax Commissioner of Bulloch County, Georgia (Docket No. 11326), Harrison County, Mississippi (Docket No. 11327), and Muscogee County (Georgia) Tax Commissioner (Docket No. 11328), and the Florida Tax Collectors (collectively, the "Objecting Class 10 Claimants").

[6] Objection to Confirmation filed by Florida Tax Collectors, which consist of the tax collectors for each of the following counties within the State of Florida: Alachua, Baker, Bay, Bradford, Brevard, Broward, Charlotte, Citrus, Clay, Collier, Columbia, DeSoto, Duval, Escambia, Flagler, Gadsden, Hardee, Hendry, Hernando, Highlands, Hillsborough, Indian River, Jackson, Jefferson, Lake, Lee, Leon, Levy, Madison, Manatee, Marion, Martin, Miami-Dade, Monroe, Nassau, Okaloosa, Okeechobee, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Taylor, Volusia, Wakulla, and Walton (collectively, "Florida Tax Collectors").  (Docket No. 11310.)

[7] Objection to Confirmation filed by United States Trustee – JAX.  (Docket No. 11318.)

[8] Objections filed by Ronnie Wilson (Docket No. 8988), Sarah H. Box (Docket No. 9913), Charles E. Armstrong, Jr. (Docket No. 10416), Frances A. Rogers (Docket No. 10516), Jose C. Hernandez (Docket No. 10621), Ronald G. and Carlotta W. Walsingham (Docket No. 10623), Geraldine D. Parker and William Parker (Docket No. 10634), Robert Vaughn, Jr. (Docket No. 10695), Lee Ricciardi (Docket No. 10717), Wesley E. McCall (Docket No. 10855), Matthew and Jessie M. Williams (Docket No. 10884), Sandra Jones (Docket No. 10915), Barbara L. Hart (Docket No. 11082), Cesar Garcia (Docket No. 11119), Louise Brannon (Docket No. 11262), Deborah Tindel Cheney (Docket No. 11263), Janet Bourland (Docket No. 11266), Doris Baumgardner (Docket No. 11397), Bridget Boaz (Docket No. 11399), and Joseph Tomazin

## I.   OBJECTING LANDLORDS' OBJECTIONS TO CONSOLIDATION

According to § 1129(a)(1) of the Bankruptcy Code, the Court "shall confirm a plan only if . . . [t]he plan complies with all of the provisions of" the Code. 11 U.S.C. § 1129(a)(1) (2005). The Objecting Landlords argue that the Court cannot confirm Debtors' Plan because the provisions regarding Class 13, the Landlord Class, cause the Plan to be inconsistent with § 1123(a)(4). Section 1123(a)(4) states that a plan "shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . . ." 11 U.S.C. § 1123(a)(4) (2005). The Court believes the argument proffered by the Objecting Landlords is a valid argument, yet the weight of the evidence adduced in the record frustrates the Court's ability to agree with the Objecting Landlords. To elucidate, the Court will address each relevant issue in turn.

### A.   Application of § 1123(a)(4) to Claims of Objecting Landlords

Following the Petition Date, Debtors began restructuring so as to cut costs and increase profitability through their "footprint process", which reduced their store footprint and generally improved their business operations. (Disclosure Statement at 41-42.) After this "footprint process" was substantially completed, Debtors attempted to formulate a consensual plan of reorganization by creating a business plan in November 2005. (Mem. of Law of Official Committee of Unsecured Creditors (A) in Support of Confirmation and (B) Joining in Debtors' Response to Objections to Confirmation at 6.) It became apparent during these negotiations that the decision whether to substantively

---

(Docket No. 11383). Sarah H. Box, however, was the only shareholder to appear and object at the Confirmation Hearing.

consolidate was a pivotal issue, one that materially divided the creditors.[9]  As a result,

Debtors requested that the Official Committee of Unsecured Creditors ("Creditors

Committee"), which includes representatives of the landlords, trade creditors, and

bondholders, settle the issue as successfully as possible with the ad hoc trade and retiree

committees.  (Disclosure Statement at 48-50.)

Debtors' Plan provides for a settlement of issues relating to the substantive

consolidation of the Debtors' estates (the "Substantive Consolidation Compromise").  (Id.

at 51-56.)  To settle the issue of whether the estates should be consolidated, the Plan

provides for different distributions to holders of Noteholder Claims (Class 12), Landlord

Claims (Class 13), Vendor/Supplier Claims (Class 14), Retirement Plan Claims (Class

15), and Other Unsecured Claims (Class 16).  The Substantive Consolidation

Compromise was reached after extensive factual and legal analysis by the Debtors, the

Creditors Committee, the Indenture Trustee, the Ad Hoc Vendors' Committee, the Ad

Hoc Retirees' Committee, and other interested parties.

The Objecting Landlords assert that because of this compromise, they are not

receiving the same treatment as other members of Class 13 as required by § 1123(a)(4).

To support their argument, the Objecting Landlords reference In re AOV Indus., Inc., 792

F.2d 1140 (D.C. Cir. 1986).  The proposition upon which the Objecting Landlords rely in

AOV Indus. is that members of a class must not receive disparate treatment.  Specifically,

the court states that

---

[9] The Court became aware of how hotly contested the issue was when the Ad Hoc Trade Committee filed a
Motion to Substantively Consolidate (Docket No. 7763) concurrently with a Motion to File Documents in
Support of Its Motion to Substantively Consolidate Under Seal (Docket No. 7765) on May 11, 2006.  The
Court scheduled a hearing for these motions to be held on June 1, 2006.  (Docket No. 8005.)  Various
creditors filed objections to these motions, and Debtors themselves objected.  (See Resp. to and Req. to
Abate the Ad Hoc Trade Committee's Mot. to Consolidate, Docket No. 8427.)  The hearing was continued

> the most conspicuous inequality that § 1123(a)(4) prohibits
> is payment of different percentage settlements to co-class
> members. The other side of the coin of unequal payment,
> however, has to be unequal consideration tendered for
> equal payment. It is disparate treatment when members of
> a common class are required to tender more valuable
> consideration – be it their claim against specific property of
> the debtor or some other cognizable chose in action – in
> exchange for the same percentage of recovery.

AOV Indus., 792 F.2d at 1152.

The facts in AOV Indus. are quite voluminous, but the pertinent events are as follows. AOV was a conglomeration of coal mining, processing, exporting and trading companies. Id. at 1142. Hawley Fuel Coalmart and Hawley Fuel Coal (collectively, "Hawley") supplied an AOV subsidiary with a considerable amount of coal on credit, thereby becoming a creditor of AOV when it filed for bankruptcy. Id. at 1141 and 1142. Hawley sued AOV in district court based upon an alleged pre-bankruptcy communication sent by Steag Handel GmbH ("Steag"), a company which acted exclusively as AOV's overseas marketing agent, which stated that Steag guaranteed payment in full to Hawley if it continued to supply coal to AOV and its subsidiaries. Id. at 1142. Hawley won a jury verdict for the full amount of its claim, but the district court granted Steag's motion for judgment notwithstanding the verdict. Id.

The plan proposed by AOV involved release provisions which required unsecured creditors to release all claims against Steag and the 50% owner of AOV, H.C. Sleigh, Ltd. ("Sleigh"), in order to receive their pro rata share. Id. at 1143. Furthermore, the plan propounded that none of the money would be made available to anyone without the releases from all save for a few select creditors, one of whom was Hawley. Id. As a

---

until June 15, 2006, when counsel for Debtors announced that the issue had been resolved and that the Ad Hoc Trade Committee would not proceed with its motions.

result, Hawley's release of its claim was not necessary for the plan to take effect, but it was necessary for Hawley to receive its pro rata share. Id. Roughly 90% of the creditors in each of the classes voted to accept the plan. Id.

These events formed the basis for the AOV Indus. court to find that Hawley was being subjected to unequal treatment in violation of § 1123(a)(4). Id. at 1152. While the court did not state that Hawley in fact had a guarantee against Steag, the court found that Hawley's release of its direct claim in order to participate in the plan was disparate treatment from the other members in its class. Id. In its rationale, the court found that two other creditors received similar communications from Steag which guaranteed their debts. Id. The disclosure statement reported that these other creditors received additional consideration for settling lawsuits the creditors had against Steag. Id. Therefore, Hawley's requisite release of its alleged guarantee against Steag in order to participate in the plan was unequal in comparison to the other creditors with similar claims. Id. at 1153. In so finding, however, the AOV Indus. court cautioned that it was not trailblazing new law. Instead, the court stated that

> we do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court's broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others. We simply find that on these facts, it is unfair to require a creditor to pay a higher price for the same benefit.

Id. at 1154.

Although the Court is not bound by this case, it finds the rationale persuasive. However, the facts before the Court differ immensely from those that were before the AOV Indus. court, and, therefore, a similar holding would be inapposite. The Creditors

Committee argues, and the Court agrees, that while the landlords without guarantees are receiving the same pro rata share that the landlords with guarantees are receiving, this is due to the Substantive Consolidation Compromise. (Joinder of Official Committee of Unsecured Creditors to Debtors' Mem. of Law in Resp. to Post Hearing Brief of Objecting Landlords at ¶ 3.) In essence, those landlords without guarantees would have generally preferred substantive consolidation so as to increase their pro rata share. Those landlords with guarantees, contrarily, would prefer to keep both of their claims so as to maximize their share. As a result, the Objecting Landlords are not receiving disparate treatment in violation of § 1123(a)(4) because both parties had to give up something in exchange for their share: the landlords without guarantees had to forego pursuit of a possible substantive consolidation, and the landlords with guarantees had to abandon their guarantee claims.[10] Given that there was only one creditor that was affected in AOV Indus., and that single creditor had to relinquish a potential guarantee claim while two similarly-situated creditors received compensation, the Court is satisfied that the persuasiveness of AOV Indus. is undercut. The Objecting Landlords are not receiving unequal treatment in violation of § 1123(a)(4).

Moreover, the Court is reticent to agree with the Objecting Landlords given the opportunity they had to review the financial documents that the Creditors Committee utilized in developing the Substantive Consolidation Compromise. At the August 4, 2006 hearing on the adequacy of the Disclosure Statement, the Objecting Landlords (among other creditors) challenged the Disclosure Statement for failure to comply with § 1125(a) in that it lacked adequate information. (See, e.g., Docket No. 9468.) To wit, the

---

[10] It is for this same reason that the Plan does not violate 11 U.S.C. § 1129(b)(1), which requires that the plan not discriminate unfairly between classes of claims or interests.

8

Objecting Landlords argued that they were not privy to the settlement negotiations and

thus were unable to agree that the Substantive Consolidation Compromise was indeed fair

to all parties. The Court, in order to avail all interested parties of the information used to

create the Substantive Consolidation Compromise, forced Debtors and the Creditors

Committee to comply with discovery requests in exchange for applicable confidentiality

agreements. Because the Objecting Landlords never apprised the Court that such

discovery requests were not fulfilled, the Court must infer that the Objecting Landlords

had access to the financial information. Despite their review of such documents,

however, the Objecting Landlords chose not to present any evidence to the Court that the

Substantive Consolidation Compromise was in fact unfair. Furthermore, having been

furnished with these models of potential recovery with or without consolidation, the

Objecting Landlords did not file a Motion to Reclassify their claims. To the contrary, the

Objecting Landlords candidly admitted at the Confirmation Hearing that they liked the

way they were classified. (Tr. Vol. II at 248, lines 16-23.)[11] It was their burden to prove

to the Court that they were receiving disparate treatment in violation of § 1123(a)(4), and

the Objecting Landlords simply failed to meet that burden. As a result, the Court finds

Debtors' Plan is in compliance with § 1123(a)(4).

**B.**     **Effect of Settlement on Objecting Landlords' Claims**

The Substantive Consolidation Compromise was a settlement that was reached

between the various unsecured creditors and Debtors. In bolstering their assertion that

---

[11] It is for precisely this reason that the Court will not address the Objecting Landlords' argument that the
Plan's classification of the Class 13 claims is impermissible. The Objecting Landlords argue that Debtors
do not provide a rational basis for classifying the landlords with guarantee claims with the landlords
without guarantee claims. (Joint Objection of [Objecting Landlords] to the Debtors' Plan of
Reorganization at 11-12.) The Objecting Landlords never filed a motion for reclassification and, as
aforementioned, candidly admitted they preferred this classification scheme. They cannot now argue that
the classification scheme is impermissible.

the Creditors Committee and Debtors cannot settle away their rights, the Objecting

Landlords rely on U.S. ex. rel. Rahman v. Oncology Assocs., P.C., 269 B.R. 139 (D. Md.

2001). Rahman involved a False Claims Act brought by the United States against some

physicians specializing in radiation oncology and the more than 80 healthcare entities

they owned, operated or controlled. Id. at 143. Allegedly, the physicians and their

service providers engaged in fraudulent billing schemes, thereby depriving the

government's Medicare and Champus programs of over $12 million in revenues. Id. at

144. As a result, the United States was seeking over $86 million in penalties and treble

damages against the defendants. Thereafter, certain creditors filed an involuntary petition

for relief under Chapter 7 with respect to one of the service provider defendants,

EquiMed, Inc. ("EquiMed"). Id. Pending in that bankruptcy case was an action brought

by EquiMed, one of the physician defendants, Dr. Douglas Colkitt ("Colkitt"), Id. at 143,

and others seeking coverage from two insurance providers ("Coverage Action"). Id. at

146-47. At some point the trustee entered into a settlement with the two insurance

providers and moved the court for approval of the settlement ("Insurance Settlement").

Id. at 147. The reference was withdrawn as to that approval, yet the insurance providers

urged the court to grant the motion for approval of the settlement. Id. at 158.

In denying the motion for approval of the settlement, the Rahman court noted that

the Insurance Settlement conflicted with a separate major settlement involving

approximately fourteen parties, one of whom was Colkitt, who participated in the other

settlement but did not participate in the Insurance Settlement. Id. at 158, 145. As a

result, the Rahman court could only approve one of the two settlements, as to grant the

motion to approve the Insurance Settlement would inherently cause denial of the other.

10

Id. at 159. The basis of the Coverage Action was that the insurance providers afforded

liability coverage to directors and officers of the service providers. Id. The major

dispute in the Coverage Action was that the insurance providers denied coverage to

Colkitt and also sought to rescind the policies extended to EquiMed because of alleged

material misrepresentations in the applications for coverage. Id. The Insurance

Settlement resulted in $1.3 million to the bankruptcy estate in exchange for the

extinguishment of the claim of Colkitt and other officers and directors. Id. The trustee

sought to withdraw from the Insurance Settlement based upon his belief that the other

settlement was more beneficial to the estate. Id.

In considering the validity of the Insurance Settlement, the Rahman court stated

that a court "cannot uphold 'an impairment of rights accomplished in violation of

applicable legal rules.'" Id. at 160 (quoting In re Joint E. & S. Dist. Asbestos Litig., 982

F.2d 721, 750 (2d Cir. 1992)). The Rahman court held that the policies provided by the

insurance providers to shield the officers and directors from liability belonged to the

officers and directors themselves, not to the bankruptcy estate. Id. "Since rights under

the policies may belong to the officers and directors and not to EquiMed, the Trustee was

not entitled to bargain away those rights in return for a payment to the estate from the

insurers." Id. Furthermore, the Rahman court stated that "Colkitt and the other officers

and directors were not parties to the Insurance Settlement and were not compensated in

any way for the extinguishment of their rights . . . ." Id.

The Rahman case is not binding precedent, but the Court indulged in the above

synopsis to demonstrate the inapplicability of the Rahman holding to the facts before the

Court. Whether the Objecting Landlords agree with the Substantive Consolidation

Compromise or not, their interests were represented during the exhaustive negotiations

between the various unsecured creditors. There were two landlord representatives on the

Creditors Committee, one with a guarantee claim and one without. As a result, the

Objecting Landlords' interests were taken into account during the negotiations.[12] With

respect to the Rahman decision, the officers and directors were third parties who had no

voice during the negotiations between the trustee and the insurance providers. In

addition, Colkitt had interests that were not only adverse to the insurance providers, but

were also surely antagonistic to the best interests of the bankruptcy estate. These two

factors alone differentiate the holding in Rahman from the case currently before the

Court. The Creditors Committee negotiated on behalf of all unsecured creditors within

the defined classes.[13] While the Objecting Landlords do not agree with that compromise,

they cannot now claim that their rights were settled away without their consent,

especially considering that they had the opportunity to view the models and financial

documents utilized in procuring the settlement agreement.

Consequently, Eleventh Circuit precedent dictates that every affected creditor

need not consent to a settlement for it to be binding on all creditors. The Eleventh Circuit

merely lists several factors that a bankruptcy court must take into account in determining

whether to approve a settlement. In Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II,

---

[12] See Mirant Americas Energy Marketing, L.P. v. Official Comm. of Unsecured Creditors of Enron Corp., No. 02 Civ. 6274 (GBD), 2003 WL 22327118, at *7, 2003 U.S. Dist. LEXIS 18149, at *22-24 (S.D.N.Y. October 10, 2003) ("[C]reditors committees often contain creditors having a variety of viewpoints. . . . Such conflicts are not unusual in reorganization. Indeed, they are inherent in all bankruptcy cases, and inevitable in complex cases . . . . Yet, despite the likely conflicts, and in recognition of the greater efficiencies achieved, jointly administered cases with a single creditors' committee is commonplace. Often single committees represent what can be characterized as different 'classes' of unsecured creditors. Bankruptcy Courts have recognized that – at least prior to submission of a reorganization plan – creditors possessing claims with significantly different characteristics nonetheless continue to possess greater commonality as unsecured creditors.") (internal quotations and citations omitted.)
[13] "It is well settled that a creditors' committee owes a fiduciary obligation to its constituency." Mirant Americas, 2003 WL 22327118, at *4, 2003 U.S. Dist. LEXIS 18149, at *15 (citations omitted).

Ltd.), 898 F.2d 1544 (11th Cir. 1990), cert. denied, 498 U.S. 959 (1990), the Eleventh

Circuit stated that a court must consider four factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Id. at 1549 (citations omitted).  As a result, "[w]hile the desires of the creditors are not

binding, a court should carefully consider the wishes of the majority of the creditors."

Romagosa v. Thomas, No. 06-cv-301-Orl-19JGG, 2006 U.S. Dist. LEXIS 50629, at *19,

2006 WL 2085461, slip op. at *5 (M.D. Fla. July 25, 2006) (citation omitted).

 The Court notes that of 421 holders of landlord claims, 324 holders accepted the

Plan while 97 holders rejected it.  (Debtors' Ex. 5 at 5.)  That means roughly 23% of

landlords rejected the Plan, while approximately 77% (~ 76.96%) in that class voted to

accept the Plan.  (Id. at 6.)  Those accepting constituted $180,965,273.11 of the amount

held by the landlord class (Id. at 5), or 82.46% of the amount held.  (Id. at 6.)

Furthermore, only 12 landlords with guarantee claims filed formal objections to

confirmation of the Plan.  As a result, the majority of the landlord class voted to accept

the Plan.  The Court opines that the paramount interests of the creditors, even within the

subset of landlords, is that the Substantive Consolidation Compromise is a better

alternative than forcing impending litigation.

 If this case were to proceed to litigation, witnesses testified that the protracted

litigation could wipe out the estate.  Therefore, the probability of success would be next

to nil, from either perspective.  If the Court denied the settlement and the parties filed a

motion for substantive consolidation which the Court then decided to grant, the estate

13

would be reduced to going-concern value plus whatever is left in the estate after paying attorney's fees and other expenses consonant with litigation. If the Court denied the settlement and the parties filed a motion for substantive consolidation which the Court then denied, the estate would still be decimated due to litigation costs and fees. Therefore, there would be little probability of success if this case continued to litigation.

Next, if the Court denied confirmation based upon the Substantive Consolidation Compromise, the creditors would be faced with the Sisyphean task of attempting to collect any percentage of their claims. After fees and costs, the going-concern value of the estate may cover all of the administrative claims and secured claims the Debtors would be required to pay. It may not. In the Court's reasonable judgment, it is most apparent that the unsecured creditors, namely, the Objecting Landlords, would face much difficulty in their collection efforts.

With respect to the complexity of the litigation, if the Court were forced to decide substantive consolidation, the Court would have to consider much testimony from the individual creditors to determine whether they obtained their guarantees from the subsidiaries or the parent company, and if the parent company, which one. After days, possibly weeks, of testimony and other evidence, the Court would also have to consider the possibility that the Debtors' operations may be so hopelessly intermingled that substantive consolidation would be the only choice. Again, this would have to be proven with extensive evidence.[14] As a result, due to the complexity of the case, the expense,

---

[14] See, e.g., In re Worldcom, No. 02-12533, 2003 Bankr. LEXIS 1401, at *133, 2003 WL 23861928, at *45 (Bankr. S.D.N.Y. October 31, 2003) ("Litigation of the issues resolved by the [substantive consolidation settlement] would be highly fact-intensive, complex and protracted, involving expert analyses and detailed testimony regarding the extent of the [debtors'] accounting and operational entanglement, including complex issues attendant to [many] . . . intercompany claims . . . , as well as evidence of the extent to which each holder of [a claim] that opposes substantive consolidation relied upon the separate legal identity of [the debtor] when it extended credit . . . .") (internal citations omitted).

14

inconvenience and delay to the estate and the creditors, the litigation would be so

inhibitive as to make the Substantive Consolidation Compromise a vastly more

appropriate option.

Thus, the Justice Oaks factors lead the Court to conclude that the Substantive

Consolidation Compromise should be approved.  Bankruptcy Rule 9019(a) allows the

Court to approve a compromise or settlement, Fed. R. Bankr. P. 9019(a) (2005), and §

1123(b)(3)(A) of the Code permits a plan to incorporate a settlement.  11 U.S.C. §

1123(b)(3)(A) (2005).  Besides utilizing the Justice Oaks factors as guidance, a court

must also ensure that "the proposed compromise is fair and equitable and in the best

interests of the bankruptcy estate."  In re Gallagher, 283 B.R. 342, 346 (Bankr. M.D. Fla.

2002) (citation omitted).  The Objecting Landlords had sufficient representation during

the negotiations for the Substantive Consolidation Compromise, so their rights were not

settled away.  They may not consent to the compromise, but all parties had to participate

in the give-and-take accordant with settlement.  The result may not be just in their

opinion, but the Court concludes that the Substantive Consolidation Compromise

embodied in Debtors' Plan is fair and equitable and in the best interests of Debtors'

estate.

### C.    Application of Owens Corning and "Deemed" Consolidation

The Objecting Landlords' final argument states that Debtors' Plan incorporates a

"deemed" consolidation.  Advancing the recent Third Circuit decision In re Owens

Corning, 419 F.3d 195 (3d Cir. 2005), the Objecting Landlords contend that the

consolidation is inequitable and therefore cannot be approved.  In Owens Corning, a

syndicate of banks extended $2 billion in unsecured loans to Owens Corning, a Delaware

corporation, and a few of its subsidiaries. Id. at 199. In extending such financing, the

banks included direct guarantee claims against the guarantors in the event of default. Id.

at 201. These guarantees were "credit enhancements" to protect the banks' interests in

their $2 billion loan. Id. Subsumed within the loan agreement was specific language

limiting Owens Corning's operations with its subsidiaries. Namely, the subsidiaries were

directed to remain separate entities from Owens Corning. Id.

Although Owens Corning attempted to regain footing as a result of this loan,

inevitably it had to file for reorganization under Chapter 11. Id. at 201-02. The plan it

submitted to the bankruptcy court was a "deemed" consolidation, wherein for purposes of

valuing and satisfying creditor claims the subsidiaries were to be considered

consolidated. Id. at 202. For all other purposes, however, Owens Corning and its

subsidiaries would not merge nor commingle their assets. In addition, all guarantees

would be eliminated, thereby extinguishing the guarantees obtained by the banks when

they extended their financing. Id. In anticipation of submitting the plan, the plan

proponents filed a motion for consolidation to be ruled upon by the bankruptcy court. Id.

at 202 n.6.

While the Third Circuit found many reasons that the bankruptcy court and district

court erred in granting the motion for consolidation, the court stated that

> the flaw most fatal to the Plan Proponents' proposal is that
> the consolidation sought was "deemed" (i.e., a pretend
> consolidation for all but the Banks). If Debtors' corporate
> and financial structure was such a sham before the filing of
> the motion to consolidation, then how is it that post the
> Plan's effective date this structure stays largely
> undisturbed, with the Debtors reaping all the liability-
> limiting, tax and regulatory benefits achieved by forming
> subsidiaries in the first place? In effect, the Plan
> Proponents seek to remake substantive consolidation not as

> a remedy, but rather a stratagem to "deem" separate
> resources reallocated to [Owens Corning] to strip the Banks
> of rights under the Bankruptcy Code, favor other creditors,
> and yet trump possible Plan objections by the Banks. Such
> "deemed" schemes we deem not Hoyle.

Id. at 216. Essentially, the plan proposed by Owens Corning would undo the bargain the

banks had that other creditors of Owens Corning did not have. Id. at 212. The Third

Circuit articulated that

> [n]o principled, or even plausible, reason exists to undo
> [Owens Corning's] and the Banks' arms-length negotiation
> and lending arrangement, especially when to do so
> punishes the very parties that conferred the prepetition
> benefit – a $ 2 billion loan unsecured by [Owens Corning]
> and guaranteed by others only in part. To overturn this
> bargain, set in place by [Owens Corning's] own pre-loan
> choices of organizational form, would cause chaos in the
> marketplace, as it would make this case the Banquo's ghost
> of bankruptcy.

Id. at 216.

The Court is impressed by the Third Circuit's decision and finds its exposition

very persuasive. However, the issue presented in Owens Corning is not currently before

the Court. First, Debtors have not sought "deemed" consolidation or even substantive

consolidation, unlike the case in Owens Corning.[15] What is before the Court is a Plan

wherein certain provisions regarding the unsecured creditors incorporate a settlement

which touches on events consistent with consolidation. Normally unsecured creditors are

not divided into separate classes, but the creditors divided themselves up due to their

varying interests, not for the purpose of gerrymandering of votes. As aforementioned, the

Ad Hoc Committee of Trade Creditors had filed a motion for substantive consolidation.

---

[15] The Court is in no way ruling on the propriety of "deemed" consolidation. It is the opinion of the Court
that such "deemed" consolidation can be equated with a company being slightly liquidated, or a person
being somewhat bankrupt. Similarly, consolidation is an either-or scenario. There is no middle ground.

But based upon the overwhelming agreement of the parties, they determined that substantive consolidation would not be prudent and reached a compromise.[16]

Thus, what is before the Court is an agreement reached between the parties. As the Court has already noted, this compromise is fair and equitable and in the best interests of the estate. The Objecting Landlords had adequate representation with the Creditors Committee. This was a compromise that entailed bargaining for specific benefits while giving away certain rights. The landlords with guarantees thought it was fair to give up their guarantee claims in exchange for 70.6% of their unsecured claims. The landlords without guarantees thought it was fair to forego seeking substantive consolidation, as did the vendors and suppliers, in exchange for 70.6% of their unsecured claims.

The Objecting Landlords had access to all financial documents and models utilized by the Creditors Committee. Armed with that information, the Objecting Landlords failed in their burden to show to the Court that they would have received a higher percentage without the Substantive Consolidation Compromise. They did not present any evidence that the settlement was unfair. In fact, the Objecting Landlords did not prove anything, but merely proffered evidence that giving them more shares would scarcely dilute the percentages of the other unsecured creditors yet significantly improve the percentage share of the Objecting Landlords. While the Court is pleased with the Objecting Landlords' ingenuity, unfortunately, the Court cannot modify the Plan without evidence of an inequity. As a result, the Court duly notes the Objecting Landlords' well-

---

[16] Assuming, arguendo, that the Court were faced with a motion for consolidation, the facts from Owens Corning are not directly on point as the facts in this case. It is significant that the loan in Owens Corning was for $2 billion. It would be unfathomable and beyond all coherence to permit those few creditors to be pooled into a category of other unsecured creditors and have their guarantees wiped out. In mentioning this key fact, the Court does not wish to disparage the claims of the Objecting Landlords. But $2 billion is an overwhelming amount of money, and the Court is certain this was a highly compelling fact to the Third

placed arguments, but based upon the record as a whole, the Court cannot agree with

their assertions. Therefore, the Objecting Landlords' objections are overruled.

## II.   THE UNITED STATES' OBJECTIONS

The United States had numerous objections to Debtors' Plan, but through the

various modifications of the Plan the United States has either withdrawn or settled such

objections with Debtors with respect to all but three objections. These objections are: 1)

the Plan does not justify differing treatment of general unsecured claims; 2) the effective

date is not definite; and 3) the proposal to pay professional fees without the filing of a fee

application contravenes the Bankruptcy Code. This final objection was also made by the

United States Trustee and is discussed in that section of this opinion. Thus, this section

will only address the first two objections of the United States.

### A.   Differing treatment of general unsecured claims

The United States objects to the treatment of its general unsecured claim,

specifically, its non-compensatory damages claim, which was placed in Class 20 and

receives no distribution under the Plan. (See Joint Plan of Reorganization at 20.) Section

1122(a) of the Bankruptcy Code states that a "plan may place a claim or an interest in a

particular class only if such claim or interest is substantially similar to the other claims or

interests of such class." 11 U.S.C. § 1122(a) (2005). The Eleventh Circuit has

articulated that a plan proponent has considerable discretion in delineating claims into

classes, but such discretion is curtailed if the plan "unfairly creates too many or too few

classes, if the classifications are designed to manipulate class voting, or if the

classification scheme violates basic priority rights." Olympia & York Florida Equity

---

Circuit. The Third Circuit itself noted that to allow "deemed" consolidation in Owens Corning would
cause the case to become the "Banquo's ghost of bankruptcy." 419 F.3d at 216.

Corp. v. Bank of New York (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990) (citations omitted). Debtors' Plan provides for nine separate classes of general unsecured claims. The United States contends that Debtors do not provide adequate justification for such disparate treatment.

The Court finds that Debtors have provided adequate justification for the allegedly disparate treatment. As discussed in the Objecting Landlords' Objections to Consolidation section of this opinion, the treatment of the various classes of claims reflects a compromise based upon what each representative of such claims deemed appropriate for its class. Notwithstanding the fact that the United States did not take part in the Substantive Consolidation Compromise, the Court finds that the classifications were not intended to gerrymander the vote, that the number of classes is appropriate, and the classification scheme does not violate any basic priority rights. See Holywell, 913 F.2d at 880. In addition, in a Chapter 7 liquidation the United States would probably receive the same distribution in Class 20, given the going-concern value of Debtors. As a result, the Court overrules the United States' objection to the differing treatment of general unsecured claims.

**B.        Effective date**

According to Debtors' Plan, the "effective date" is the day upon which seven conditions must be satisfied, as listed in Section 10.2 of the Plan. (See Joint Plan of Reorganization at 36-37.) The Court finds that the conditions listed are adequately definite, and many of them have already been completed. As a result, the Court overrules the United States' objection as to the effective date. However, in order to assuage the United States' fears that the effective date is too tenuous and capable of manipulation by

the parties, the Court reserves jurisdiction to impose an effective date. Thus, the United States or any other party in interest may file an appropriate motion to impose the effective date if the parties dawdle.

### III.   INSURANCE PROCEEDS PROCEEDING

Bundy New Orleans Co., LLC ("Bundy") is the lessor under a lease (the "Lease") with Winn-Dixie Louisiana, Inc. ("WD Louisiana") in New Orleans, Louisiana. The Lease required WD Louisiana to maintain insurance covering any losses to the property. The property suffered significant damage as a result of the devastation from Hurricane Katrina. As a result, WD Louisiana or Winn-Dixie Montgomery, Inc. ("WD Montgomery") (collectively, the "Lessee") filed an insurance claim relating to such damage. Without delving into the specific facts of this proceeding, Bundy claims that the Lessee, and, by default, Debtors, have absconded with the insurance proceeds relating to the insurance claim.

Bundy is the holder of a Class 13 Landlord claim and also has an administrative claim. Objecting under numerous theories, Bundy essentially claims that Debtors use of the allegedly absconded insurance proceeds is in violation of § 1129(a)(1) and (a)(2) because neither the Plan nor Debtors, the Plan proponent, complies with the applicable provisions of the Bankruptcy Code. Specifically, Bundy claims that the Plan violates § 1129(a)(3) because the Plan is not proposed in good faith and is forbidden by law. In addition, Bundy claims that the Plan does not comply with § 1129(a)(7) in that it fails to meet the best interests of creditors test because Debtors have not proposed to pay Bundy the insurance proceeds or Bundy's administrative claim. Furthermore, Bundy claims that the Plan does not comply with § 1129(a)(11) because the Plan does not take into account

21

several administrative claims not covered by insurance proceeds. Lastly, Bundy asserts

that Debtors have not complied with § 1129(b)(2) because, among other things, the Plan

proposes to pay creditors with the allegedly absconded insurance proceeds.

Bundy also objects on other grounds, but these are immaterial because the Court

overrules Bundy's objections. Without deciding the merits of the underlying adversary

proceeding, the Court finds that there is ample liquidity to pay Bundy without affecting

feasibility. Because of such liquidity, if Bundy is victorious in the underlying adversary

proceeding, it will be in a position to receive all of its allegedly absconded insurance

proceeds from Debtors. Therefore, all of Bundy's objections are inapposite and

accordingly overruled.

## IV.    <u>CLASS 10 CLAIMS' OBJECTIONS</u>

Although the Plan is silent as to the interest rate for Class 10 secured tax claims,

the Debtors propose to pay 7% interest on the claims. Debtors base the proposed rate on

the approximate amount they will pay their exit financing lender. The Objecting Class 10

Claimants assert that their claims should be paid at their respective statutory rates and

that Debtors' proposal to pay anything less violates § 1129(b)(2). Section 1129(b)(2)

requires that holders of secured claims in classes that have voted against the Plan receive

the present value of their claims. In other words, they must receive a payment over time

that is equal to the payment they would receive on the Plan's effective date. The manner

in which the appropriate interest rate is to be set, however, is not specified in the Code.

The following evidence was adduced at the Confirmation Hearing. Debtors'

search for exit financing resulted in fourteen proposals. (Tr. Vol. I at 57, lines 22-25.)

The interest rate Debtors obtained under the approximate $720 million exit financing

facility varies according to the amount of unused liquidity available to Debtors and ranges from LIBOR[17] plus 125 basis points to LIBOR plus 225 basis points. (Tr. Vol. I at 60, lines 21-22.) Debtors expect the exit financing interest rate to be LIBOR plus 150 basis points, currently equivalent to a 7% interest rate. (Tr. Vol. I at 61, lines 1-2.) Because of their statutory liens, allowed Class 10 Claimants are senior to the exit lenders. (Tr. Vol. I at 61, lines 16-21.) Other than requesting that the Court take judicial notice of the respective statutory rates ranging from 10-18%, the Objecting Class 10 Claimants presented no evidence as to an appropriate interest rate.

Paul Huffard ("Mr. Huffard") is a senior managing director and a restructuring advisory partner at Blackstone Group, a private investment banking firm which has assisted Debtors in these cases by helping develop a business plan, valuing Debtors, and negotiating the Plan. Mr. Huffard testified that based upon the Class 10 Claimants' senior lien position and the consequent low risk of non-payment, the appropriate market interest rate for Class 10 tax claims should be no higher than LIBOR plus 150 points.

The appropriate interest rate under § 1129(a)(9)(C) is the prevailing market rate for a loan of a term equal to the payout period, taking into account the quality of the security and the risk of default. In re Southern States Motor Inns, Inc., 709 F.2d 647, 651 (11th Cir. 1983). In a case dealing with the appropriate rate of cram down interest in a Chapter 13 case, the Supreme Court noted that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what an efficient market would produce." Till v. SCS Credit Corp., 541 U.S. 465, 477 n.14 (2004). "Tak[ing] [its] cue" from

---

[17] London Interbank Offered Rate ("LIBOR") is a daily reference rate based on the interest rates at which banks offer to lend unsecured funds to other banks in the London wholesale (or "interbank") money market. Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/LIBOR (last visited November 14, 2006).

Footnote 14 of <u>Till</u>, the Sixth Circuit Court of Appeals held that where there is an efficient market in a Chapter 11 case, the market rate should be applied. <u>American Homepatient, Inc.</u>, 420 F.3d 559, 567 (6th Cir. 2006). The court held that where no efficient market exists for a chapter 11 debtor, the bankruptcy court should employ the formula approach. <u>Id.</u> The Court agrees with the holding of <u>American Homepatient</u> and holds that in an efficient market rate in a Chapter 11 case, the market rate should be applied.

The only evidence before the Court is that Debtors went out into an efficient market and shopped $720 million in post-petition financing, which is secured by all of Debtors' assets, including the collateral, which is the collateral of the Objecting Class 10 Claimants. Debtors' search resulted in fourteen proposals among competing lending institutions for a loan that would be junior to the Class 10 Claimants' liens. The result of that search was an interest rate of LIBOR plus 150 points. The Court finds that the process leading to the exit facility was an efficient test of the market. The existence of an efficient market in this case coupled with the Class 10 Claimants' senior lien position and the consequent low risk of non-payment, leads the Court to conclude that the appropriate interest rate in providing for deferred payments to the Class 10 Claimants is 7%.

## V.    **FLORIDA TAX COLLECTORS' OBJECTIONS**

The Florida Tax Collectors ("FTC") object to Debtors' Plan on numerous constitutional grounds, including sovereign immunity defenses, subject matter jurisdiction pursuant to the Tenth Amendment, violations of the Full Faith and Credit Clause, as well as state law arguments. The Court finds that these objections are relevant to FTC's Motion for Leave to File Their Proof of Claim without Prejudice, FTC's Motion

to Abstain, and FTC's Motion to Dismiss, but are not relevant to confirmation of the

Plan. The Court has taken these constitutional issues under advisement, and the Court

will separately enter findings of fact and conclusions of law in due course.

FTC also objects to confirmation under §§ 1129(a)(9)(A) and 1129(a)(1),

asserting that the 2006 post-petition ad valorem property taxes must be treated as an

administrative expense and paid in cash on the effective date of the Plan. This issue was

neither addressed at the Confirmation Hearing nor in Debtor's Reply to Florida Tax

Collector's Supplemental Memorandum of Law. FTC also raises other objections based

on various provisions of § 1129 of the Code. With respect to FTC's objections to the

Plan being confirmed, all objections save the issue of whether the 2006 ad valorem

property taxes must be classified as an administrative expense are overruled. It is

axiomatic that all post-petition taxes are administrative expenses. To the extent that the

issue of whether the 2006 ad valorem property taxes must be classified as an

administrative expense remains pending, that objection is sustained. With respect to its

remaining objections, FTC is being treated in accordance with the provisions of the

Bankruptcy Code.

## VI.    UNITED STATES TRUSTEE'S OBJECTIONS

The United States Trustee objects to the following: 1) section 12.3 of the Plan,

which provides for the payment by Debtors of certain professional fees and expenses of

the members of the Creditors Committee, the members of the ad hoc committee of trade

vendors, and the members of the ad hoc committee of retirees; 2) section 12.4 of the Plan

which provides for the payment by Debtors of certain professional fees and expenses of

the Indentured Trustee; and 3) sections 12.12(a), 12.12(b), and 12.15 of the Plan, which

provide for non-debtor releases.

### A.    Section 12.3 – Debtors' payment of Substantive Consolidation Compromise Professional Fees

By all accounts, the parties involved in analyzing and negotiating the substantive

consolidation issue and ultimately forging the Substantive Consolidation Compromise

dedicated significant time and effort to the process.  As part of the Substantive

Consolidation Compromise, Section 12.3 of the Plan provides for Debtors to pay, without

necessity of the filing of a fee application, certain fees and expenses of professionals

retained by the following creditors in the following amounts in an aggregate amount not

to exceed $2,760,000: a) the members of the Creditors Committee – an amount not to

exceed $1,410,000; b) the members of the ad hoc committee of trade vendors – an

amount not to exceed $1,300,000; and c) the members of the ad hoc committee of retirees

– an amount not to exceed $50,000.  Specifically, Section 12.3 provides that the parties

seeking fees and expenses shall not be required to file fee applications or comply with the

guidelines and rules applicable to fee applications, and shall not be subject to § 330 or §

503 of the Bankruptcy Code.  The Plan provides for court review of the reasonableness of

the fees in the event Debtors object thereto.

Mr. Huffard testified that Debtors' agreement to pay the professional fees set

forth in 12.3

> was an integral part of the settlement that was
> reached by the creditors, so you really can't pick and
> choose. . . .
> That being said, even if it hadn't been part of the
> deal, I think this would be an excellent use of the
> company's assets.  By paying these fees and getting to this

settlement, we will have saved multiples of this in avoided
legal fees from litigation down the road.

(Tr. Vol. I at 39, lines 1-11.)  The United States Trustee suggests that the Court require

that the parties who seek fees pursuant to 12.3 of the Plan file a fee application so the

Court can determine whether the fees are reasonable.

The Court finds, based upon the testimony at the confirmation hearing, that the

professionals involved made a substantial contribution to Debtors' Chapter 11 case.  The

testimony reflected that the various Creditors Committee members devoted a significant

amount of time, effort, and funds to analyzing the substantive consolidation issue and

negotiating a compromise.  Given that the professionals made a substantial contribution

to the cases, the Court finds that the allowance of fees as set forth in section 12.3 is

appropriate.  However, the Court will require the professionals who seek fees and

expenses pursuant to 12.3 of the Plan to file fee applications and serve a copy upon the

Creditors Committee, the United States Trustee, Debtors, and any other party that

requests a copy.  The Court will schedule a hearing to determine the reasonableness of

the fees.  Any objections as to reasonableness must be filed at least 7 days prior to the

hearing, and must be specifically detailed objections.

**B.**    **Section 12.4 - Debtors' payment of Indentured Trustee Fees**

Wilmington Trust Company serves as Indenture Trustee.  Under the terms of the

Indenture, the Indenture Trustee is entitled to have its fees and expenses paid by Debtors.

In order to secure its right to receive such payments, the Indenture Trustee holds a

charging lien in all money held or collected by the Indenture Trustee with respect to the

Notes.  Accordingly, the charging lien provides the Indenture Trustee a security interest

in a portion of the New Common Stock (the "Stock") to be issued by Debtors and distributed to the Noteholders.

Section 12.4 of the Plan provides for the payment of the Indenture Trustee expenses (the "Expenses"), which do not relate to the Substantive Consolidation Compromise,[18] to be paid by Debtors rather than require the Indenture Trustee pursue the recovery of its Expenses by enforcing its charging lien. It also requires that "on or before the Confirmation Date, the Indenture Trustee shall serve on the Debtors reasonably substantiating documents in support of the Indenture Trustee Expenses incurred to such date by the Indenture Trustee, whether incurred prior to or subsequent to the Petition Date, together with a detailed, reasonable estimate of any fees and expenses to be incurred through the Effective Date." (See Joint Plan of Reorganization at 40.) If Debtors object to all or any portion of the Expenses, the Plan provides that they may object in writing and the Court will then resolve the allowance of any disputed Expenses under a reasonable standard.

The United States Trustee objects to section 12.4, asserting that the Court should require a fee application to be filed in order to determine whether the fees sought are reasonable.[19] Debtors, the Creditors Committee, and the Indenture Trustee filed responses to the United States Trustee's Objection, citing a number of (unpublished) confirmation orders in which bankruptcy courts have approved similar provisions without

---

[18] Debtors asserted at the Confirmation Hearing that the Indenture Trustee Expenses were part of the Substantive Consolidation Compromise. A review of the Plan, however, evidences that the fees set forth in Section 12.4 do not relate to and were not part of the Substantive Consolidation Compromise.

[19] The United States Trustee's written objection appears to object both to the payment by Debtors of the Indentured Trustee Expenses and to the procedure by which the Expenses will be paid. The Court finds that by not prosecuting the former at the Confirmation Hearing, the United States Trustee abandoned that objection.

confirmation orders in which bankruptcy courts have approved similar provisions without the necessity of the filing of a fee application. However, none of the memoranda indicate whether these provisions were permitted in the presence of an objection.

Upon review of the memoranda and the arguments of the parties at the Confirmation Hearing, the Court finds it appropriate to sustain the United States Trustee's Objection to section 12.4 of the Plan. Despite the requirement in the Plan that the Indenture Trustee provide the Debtors with a "detailed, reasonable estimate of any fees and expenses to be incurred through the Effective Date" (see Joint Plan of Reorganization at 40), neither Debtors nor the Indenture Trustee provided the Court with an estimate of the fees sought. The Court recognizes that when the Noteholders voted on the Plan they expected the Indentured Trustee Expenses to be paid by Debtors without the necessity of the filing of a fee application. Despite those expectations, the Court finds it ill-advised and is unwilling to sign a blank check for the Indenture Trustee Expenses.[21] Accordingly, the Court will sustain the United States Trustee's objection to section 12.4 of the Plan. The Court will require the Indenture Trustee to file an Expense application and serve a copy upon the Creditors Committee, the United States Trustee, Debtors, and any other party that requests a copy. The Court will schedule a hearing to determine the reasonableness of the Expenses. Any objections as to reasonableness must be filed at least 7 days prior to the hearing, and must be specifically detailed objections.

---

[21] The Noteholders were on notice that their distribution would be reduced in the event the Court did not approve section 12.4 because paragraph f of section 4.3 of the Plan provides that "[n]otwithstanding the foregoing, all distributions to holders of Allowed Noteholder Claims shall be subject to, and the allocations herein shall be reduced on a Pro Rata basis by the Indenture Trustee Charging Lien to the extent of any

## C.    **Releases**

The United States Trustee objects to the release provisions in sections 12.12(a),

12.12(b), and 12.15 of the Plan.  The United States Trustee objects to the release

provisions, contending that they are inconsistent with 11 U.S.C. § 524 and therefore

violate the requirements of § 1129(a)(1).  Section 524(e) provides that "except as

provided in subsection (a)(3) of this section, discharge of a debt of a debtor does not

affect the liability of any other entity on, or the property of any other entity for, such

debt."  11 U.S.C. § 524 (2005).  The Eleventh Circuit has not addressed the propriety of

non-debtor releases in a plan of reorganization.  The circuit courts which have addressed

the issue are split on whether § 524(e) proscribes non-debtor releases in a Chapter 11

reorganization plan.  The Fifth, Ninth, and Tenth Circuits have concluded that § 524(e)

conflicts with an interpretation of § 105[22] of the Bankruptcy Code that would permit non-

debtor releases.  In re Lowenschuss, 67 F.3d 1394 (9th Cir. 1995); In re Zale Corp., 62

F.3d 746 (5th Cir. 1995); In re W. Real Estate Fund, Inc., 922 F.2d 592 (10th Cir. 1990).

Other circuit courts have found no conflict between sections 105(a) and 524(e).  In re

Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002); In re Continental Airlines, 203 F.3d

203 (3rd Cir. 2000); In re Specialty Equip. Cos., Inc., 3 F.3d 1043 (7th Cir. 1993); In re

Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2nd Cir. 1992); In re A.H. Robins

Co., Inc., 880 F.2d 694 (4th Cir. 1989).  The Court agrees with those courts, which hold

---

unpaid Indenture Trustee Expenses that are not paid pursuant to Section 12.4 of the Plan."  (See Joint Plan
of Reorganization at 40.)

[22] Section 105 of the Bankruptcy Code grants a court broad equitable power to "issue any order, process or
judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. §
105 (2005).  However, "whatever equitable powers remain in the bankruptcy courts must and can only be
exercised within the confines of the Bankruptcy Code."  Norwest Bank Worthington v. Ahlers, 485 U.S.
197, 206 (1988).

that bankruptcy courts have the power under § 105 to issue permanent injunctions or third

party releases under certain factual circumstances.

### 1.  Section 12.12(a) - Releases by Debtors

Section 12.12(a) of the Plan provides for the release by Debtors of estate causes

of action against the following non-debtor parties: 1) Debtors' non-debtor subsidiaries; 2)

the present or former directors, officers, and employees of any of Debtors or any of

Debtors' non-debtor subsidiaries; 3) professionals of Debtors; 4) Wachovia and its

advisors; 5) the Creditors Committee, its members, and its and their advisors (but not its

members in their individual capacities).  Section 12.12(a) releases all claims that could be

brought in the name of Debtors from the period of emergence from Chapter 11

backwards.  (Tr. Vol. I at 119, lines 6-8.)

Larry Appel ("Mr. Appel"), Winn Dixie Stores' senior vice-president, testified to

the following.  Debtors and the Creditor's Committee conducted a substantial review of

the potential existence of claims that could be brought on behalf of Debtors and

concluded that there were no valid claims.  (Tr. Vol. I at 119, lines 13-19.)  The

beneficiaries of the section 12.12(a) release "put a tremendous amount of time, effort, and

attention into this business."  (Tr. Vol. I at 120, lines 7-8.)  Debtors believe it is in their

best interests to issue the release rather than face the specter of pursuing the claims and

expending time, energy, effort, and management attention on an exercise in futility.  (Tr.

Vol. I at 119, lines 20-24.)  The 12.12(a) release provision will permit Debtors to

eliminate pre-petition indemnification obligations to their officers, directors, and

employees.  (Tr. Vol. I at 121, lines 20-25 through 122, lines 1-10.)

31

As the Court previously noted, Bankruptcy Rule 9019(a) permits a bankruptcy court to approve a compromise or settlement. Similarly, § 1123(b)(3)(A) of the Bankruptcy Code permits the settlement of claims or interests belonging to a bankruptcy estate through a reorganization plan. Besides utilizing the Justice Oaks factors as guidance, a court must find that "the proposed compromise is fair and equitable and in the best interests of the bankruptcy estate." In re Gallagher, 238 B.R. 342, 346 (Bankr. M. D. Fla. 2002). Taking into account Mr. Appel's testimony and the entire record of this case, the Justice Oaks factors weigh heavily in favor of approving the release provision set forth in Section 12.12(a) of the Plan. In addition, the Court finds that the releases set forth in section 12.12(a) of the plan are fair and equitable and in the best interests of Debtors' estates. Therefore, the Court overrules the United States Trustee's Objection to Section 12.12(a) of the Plan.

### 2.    Section 12.12(b) - Consensual Release

The releases set forth in 12.12(b) relate to the present or former directors, officers, or employees of the Debtors in connection with or related to Debtors, the conduct of Debtors' business, the Chapter 11 Case, or the Plan. The 12.12(b) releases were disclosed in bold and conspicuous lettering on the ballot and provide a voluntary release of claims by Claimholders who voted to accept the Plan. The 12.12(b) releases do not apply to Claimholders who did not vote or who voted against the Plan notwithstanding their membership in a class, which voted in favor of the Plan.

Consensual releases have been routinely upheld by courts. See In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005) (holding that nondebtor releases should ordinarily only be granted under unique circumstances but that "[n]ondebtor

32

releases may also be tolerated if the affected creditors consent.") (citing In re Specialty

Equip. Cos., 3 F.3d 1043, 1047 (7th Cir. 1993)); Specialty Equip., 3 F.3d at 1047 (noting

that § 524(e) "does not purport to limit or restrain the power of the bankruptcy court to

otherwise grant a release to a third party" as long as such releases are "consensual and

non-coercive"); In re Zenith Elecs. Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999)

(approving releases of claims against non-debtor parties as to creditors who voted to

accept the plan).  As the Court has noted on several previous occasions, it is here to

adjudicate disputes.  In view of the fact that only Claimholders who vote to accept the

Plan are effected by the releases, the Court finds it inappropriate to interject itself into the

process and invalidate the releases.  Accordingly, the Court will overrule the United

States Trustee's Objection to section 12.12(b) of the Plan.

### 3.    Sections 12.15(a) and (b) - Exculpation and Limitation of Liability

Section 12.15 limits liability and provides for an injunction of any right of action

against Debtors, the Reorganized Debtors, their respective subsidiaries, the Creditors

Committee, Wachovia, the Indenture Trustee, or any of their respective present or former

members, officers, directors, employees, advisors, professionals, and agents for any

matters related to the Chapter 11 Case or the Plan process except for acts and omissions

which are the result of fraud, gross negligence, or willful misconduct.  Section 12.15

applies to the period between the filing date and the emergence date.

The United States Trustee objects to section 12.15 as it relates to Wachovia and to

the professionals, specifically the attorneys, on the basis that it goes beyond a mere

request for immunity for official acts normally included in an exculpation clause.

Additionally, the United States Trustee asserts that 12.15's application to the attorneys

hired by Debtors, the Reorganized Debtors, the Creditor's Committee, and Wachovia

conflicts with the ethical standards set forth in Florida Bar Rule 4-1.8 and Disciplinary

Rule 6-102 of the New York Code of Professional Responsibility because it limits the

attorneys' liability to acts or omissions, which are the result of fraud, gross negligence, or

willful misconduct.

Mr. Appel testified that the beneficiaries of section 12.15 performed substantial

work in these cases with the understanding and the expectation that the exculpation

provision would be included in the Plan. (Tr. Vol. I at 125, lines 1-4.)  Moreover, the

parties to the Plan and the creditors who voted on the Plan bargained for the exculpation

provision.  (Tr. Vol. I at 125, lines 8-12.)  The release and exculpation provisions "were

specifically discussed, they were specifically incorporated into the plan, they were key

elements of the plan, and to pull them out and pretend that the plan still represents an

appropriate answer for the company or any of these individuals is not fair." (Tr. Vol. I at

126, lines 4-9.)  In light of the significant contributions made to this case by the

beneficiaries of the exculpation clause, the beneficiaries' expectation that the exculpation

would be included in the Plan in exchange for their participation in the case, the fact that

the exculpation was the result of negotiation by all parties, and the overwhelming

acceptance of the Plan, the Court finds that the exculpation provision is appropriate.[23]

See In re Enron Corp., 326 B.R. 497, 500 (S.D.N.Y. 2005) (affirming bankruptcy court

confirmation order which found that a similar exculpation provision was "reasonable and

customary and in the best interests of the estates" and without which negotiation of the

plan would have been impossible).

---

[23] The Court notes that its finding is based specifically on the record of and circumstances in this case.

Finally, the Court notes that the United States Trustee misconstrues the

application of Florida Bar Rule 4-1.8 and Disciplinary Rule 6-102 of the New York Code

of Professional Responsibility. Those provisions prohibit a lawyer from prospectively

limiting liability to a client for malpractice, and also prohibit an attorney from settling a

claim for liability without first advising the client that independent representation is

appropriate. First, the parties involved with this provision are not limited from suing the

professionals for malpractice prospectively, but rather are retroactively waiving any

claims they might have for the window of time up until confirmation. This does not

violate the ethical rules. In addition, Debtors and the parties involved with this provision

are not settling any claim with their professionals. What is before the Court with this

provision is the exculpation of any party involved with the creation of the Plan – Debtors,

their employees, their professionals, et. al. – from being sued by any other party, namely,

holders of claims, for any cause of action save fraud, gross negligence, or willful

misconduct. Debtors are not settling with their professionals a cause of action for

malpractice. The Court trusts based upon the integrity of counsel in this case that they

would not settle away their clients' rights without first advising them to seek independent

representation. Neither scenario is currently before the Court, and therefore these

applications to the ethical rules are inapposite. Accordingly, the Trustee's objections to

this provision of the Plan are overruled.

## VII.    SHAREHOLDERS' OBJECTIONS

A number of Debtors' shareholders have objected to the Plan on the grounds that

the shareholders are not receiving a distribution under the Plan. Unfortunately, because

the absolute priority rule of the Bankruptcy Code does not allow for a distribution to

shareholders when unsecured claim-holders are not being paid in full (unless the creditors, as a class, consent to such a gift), no distribution is possible to the shareholders.

The testimony at the Confirmation Hearing revealed that the value of the stock to be distributed to creditors is less than the amount of the claims. Accordingly, absent creditor consent – and such consent has not been granted – § 1129(b)(2) does not allow for a distribution to the shareholders. Section 1129(b) provides, in part, that the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the fact that classes have rejected the plan if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. See 11 U.S.C. § 1129(b)(1) (2005).

The Court finds that the Plan does not discriminate unfairly among Classes 18, 19, 20 and 21. Rather, holders of claims or interests in these Classes are not receiving distribution because Debtors are unable to pay their creditors in full. The Court has no authority to permit the owners of a company to reap the benefits of payment when the company's creditors are not receiving payment in full of their claims. Moreover, the Plan is fair and equitable because it satisfies the absolute priority rule of § 1129(b)(2). Specifically, no class or interests junior to Classes 18, 19, 20 and 21 will receive any property on account of their claims or interests. Accordingly, the Shareholders' objections are overruled.

## CONCLUSION

Based upon the record taken as a whole, the Court overrules the objections by the Objecting Landlords' because Debtors' Plan is in compliance with § 1123(a)(4), the Substantive Consolidation Compromise embodied in Debtors' Plan is fair and equitable

and in the best interests of Debtors' estate, and Debtors are not seeking approval of a

"deemed" consolidation from the Court.   The Court overrules the objections of the

United States because there is no differing treatment of the general unsecured claims, and

the parameters set forth for the effective date are adequate.  The Court overrules the

objections pertaining to the Insurance Proceeds Proceeding because there is ample

liquidity to pay Bundy without affecting the feasibility of the Plan.  The Court overrules

the objections by the Class 10 Claimants because the appropriate interest rate in

providing for deferred payments to the Class 10 Claimants is 7%.  The Court sustains in

part and overrules in part the objections by the Florida Tax Collectors.  The Court has

taken FTC's constitutional issues under advisement, and the Court will separately enter

findings of fact and conclusions of law in due course.  With respect to FTC's objections

to the Plan being confirmed, all objections save the issue of whether the 2006 ad valorem

property taxes must be classified as an administrative expense are overruled.  To the

extent that the issue of whether the 2006 ad valorem property taxes must be classified as

an administrative expense remains pending, that objection is sustained.  The Court

sustains in part and overrules in part the objections by the United States Trustee.  The

Court sustains the United States Trustee's objections to sections 12.3 and 12.4 of the Plan

and will require the parties who seek fees and Expenses pursuant to those sections to file

fee and Expense applications and serve a copy upon the Creditors Committee, the United

States Trustee, Debtors, and any other party that requests a copy.  The Court will conduct

a hearing as to reasonableness.  The Court overrules the objections by the United States

Trustee to sections 12.12(a), 12.12(b), and 12.15 of the Plan, which provide for non-

debtor releases because: 1) the releases set forth in section 12.12(a) of the plan are fair

and equitable and in the best interests of the Debtors' estates; 2) the releases set forth in

section 12.12(b) are consensual; and 3) the exculpation clause set forth in section 12.15 is

appropriate in light of the significant contributions made to this case by the beneficiaries

of the exculpation clause, the beneficiaries' expectation that the exculpation clause would

be included in the Plan in exchange for their participation in the case, the fact that the

exculpation clause was the result of negotiation by all parties, and the overwhelming

acceptance of the Plan.  In addition, the Unites States Trustee's applications to the ethical

rules are inapposite.  Lastly, the Court overrules the objections by the Shareholders

because of the absolute priority rule, the Plan does not discriminate unfairly among

Classes 18, 19, 20 and 21, and no class or interests junior to Classes 18, 19, 20 and 21

will receive any property on account of their claims or interests.  In the event that these

Findings of Fact and Conclusions of law conflict with the Confirmation Order, these

Findings of Fact and Conclusions of Law control.

DATED this 16 day of November, 2006 in Jacksonville, Florida.

**JERRY A. FUNK**
United States Bankruptcy Judge

**Exhibit K**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) |
|  | ) Chapter 11 |
| TRIBUNE COMPANY, et al.,[1] | ) Case No. 08-13141 (KJC) |
|  | ) Jointly Administered |
| Debtors. | ) |

### FOURTH AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P., AND JPMORGAN CHASE BANK, N.A. (AS MODIFIED JULY 19, 2012)

| | |
|---|---|
| SIDLEY AUSTIN LLP | COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A. |
| James F. Conlan | Norman L. Pernick (No. 2290) |
| Bryan Krakauer | J. Kate Stickles (No. 2917) |
| Kevin T. Lantry | Patrick J. Reilley (No. 4451) |
| Jessica C.K. Boelter | 500 Delaware Avenue, Suite 1410 |
| One South Dearborn Street | Wilmington, DE 19801 |
| Chicago, IL 60603 | Telecopier: (302) 652-3117 |
| Telecopier: (312) 853-7036 | |

*Counsel For Debtors and Debtors In Possession and Certain Non-Debtor Affiliates*

| | | |
|---|---|---|
| CHADBOURNE & PARKE LLP | LANDIS RATH & COBB LLP | ZUCKERMAN SPAEDER LLP |
| Howard Seife | Adam G. Landis | Graeme W. Bush |
| David M. LeMay | 919 Market Street, Suite 1800 | James Sottile |
| 30 Rockefeller Plaza | Wilmington, Delaware 19801 | 1800 M Street, N.W., Suite 1000 |
| New York, New York 10112 | Telecopier: (302) 467-4450 | Washington, D.C. 20036 |
| Telecopier: (212) 541-5369 | | Telecopier: (202) 822-8106 |

*Counsel For the Official Committee of Unsecured Creditors*

| | |
|---|---|
| JONES DAY | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Bruce Bennett | Robert S. Brady (No. 2847) |
| James O. Johnston | M. Blake Cleary (No. 3614) |
| Joshua M. Mester | Rodney Square; 1000 North King Street |
| 555 South Flower Street, Fiftieth Floor | Wilmington, Delaware 19801 |
| Los Angeles, California 90071 | Telecopier: (302) 571-1253 |
| Telecopier: (213) 489-3939 | |

*Counsel For Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE &
DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel For Angelo, Gordon & Co, L.P.*

| | |
|---|---|
| DAVIS POLK & WARDWELL LLP | RICHARDS LAYTON & FINGER |
| Donald S. Bernstein | Mark Collins |
| Damian S. Schaible | One Rodney Square |
| 450 Lexington Avenue | 920 North King Street |
| New York, New York 10017 | Wilmington, Delaware 19801 |
| Telecopier: (212) 701 5800 | Telecopier: (302) 651-7701 |

*Counsel For JPMorgan Chase Bank, N.A.*

### DATED: July 19, 2012

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services, LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company, LLC (9479); JuliusAir Company II, LLC (9479); KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC, f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); WLVI Inc. (8074); and WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARTICLE I : DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS .................................1

    1.1    DEFINITIONS...................................................................................................1
    1.2    RULES OF INTERPRETATION. ............................................................................31
    1.3    COMPUTATION OF TIME. .................................................................................31
    1.4    EXHIBITS AND PLAN SUPPLEMENT. ..................................................................32
    1.5    DEEMED ACTS................................................................................................32

ARTICLE II : TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS .............32

    2.1    DIP FACILITY CLAIMS. ...................................................................................32
    2.2    ADMINISTRATIVE EXPENSE CLAIMS...................................................................32
    2.3    PRIORITY TAX CLAIMS.....................................................................................33

ARTICLE III : CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS...33

    3.1    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS. .....................33
    3.2    CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN TRIBUNE COMPANY (DEBTOR 1)................................................................................35
    3.3    CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN FILED SUBSIDIARY DEBTORS (DEBTORS 2 THROUGH 111). ............................................43
    3.4    PREPACKAGED PLANS FOR AND TREATMENT OF CLAIMS AGAINST AND INTERESTS IN GUARANTOR NON-DEBTORS, IF ANY, THAT BECOME DEBTORS. ....................47

ARTICLE IV : ACCEPTANCE OR REJECTION OF PLAN ......................................................49

    4.1    IMPAIRED CLASSES OF CLAIMS AND INTERESTS ENTITLED TO VOTE. ........................49
    4.2    ACCEPTANCE BY AN IMPAIRED CLASS OF CLAIMS. ..............................................49
    4.3    DEEMED ACCEPTANCE BY HOLDERS OF INTERCOMPANY CLAIMS. ...........................49
    4.4    PRESUMED ACCEPTANCES BY UNIMPAIRED CLASSES. ...........................................49
    4.5    PRESUMED REJECTION OF THE PLAN. ................................................................49
    4.6    CONFIRMABILITY AND SEVERABILITY OF THIS PLAN. ...........................................50

ARTICLE V : MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................50

    5.1    NON-SUBSTANTIVE CONSOLIDATION. .................................................................50
    5.2    RESTRUCTURING TRANSACTIONS. ......................................................................51
    5.3    CORPORATE GOVERNANCE, DIRECTORS, OFFICERS AND CORPORATE ACTION. ...........52
    5.4    ISSUANCE AND DISTRIBUTION OF NEW SECURITIES AND RELATED MATTERS. ..............54
    5.5    REPORTING REQUIREMENTS UNDER SECURITIES EXCHANGE ACT OF 1934 AND LISTING OF NEW CLASS A COMMON STOCK ON SECURITIES EXCHANGE OR QUOTATION SYSTEM........................57
    5.6    NEW SENIOR SECURED TERM LOAN AGREEMENT. ...............................................59
    5.7    CONTINUED CORPORATE EXISTENCE AND VESTING OF ASSETS IN THE REORGANIZED DEBTORS. ...........59
    5.8    CANCELLATION OF LOAN AGREEMENTS, LOAN GUARANTY AGREEMENTS, THE PLEDGE AGREEMENT, NOTES ISSUED UNDER THE LOAN AGREEMENTS, SENIOR NOTES, DEBENTURES, INSTRUMENTS, INDENTURES, EGI-TRB LLC NOTES, PHONES NOTES, OLD COMMON STOCK AND OTHER TRIBUNE INTERESTS. .........................59
    5.9    CANCELLATION OF LIENS AND GUARANTIES. ......................................................61
    5.10   EXIT FACILITY.................................................................................................61
    5.11   EQUITY INCENTIVE PLAN. ................................................................................62
    5.12   SOURCES OF CASH FOR PLAN DISTRIBUTIONS. ....................................................62
    5.13   INITIAL FUNDING OF THE LITIGATION TRUST. .....................................................62
    5.14   ADDITIONAL TRANSACTIONS AUTHORIZED UNDER THE PLAN...................................62
    5.15   SETTLEMENT OF CLAIMS AND CONTROVERSIES. ...................................................63
    5.16   PRESERVATION OF RIGHTS OF ACTION AND SETTLEMENT OF ORDINARY LITIGATION CLAIMS.................65
    5.17   FCC APPLICATIONS. ........................................................................................65

**ARTICLE VI : TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................65**

6.1    ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.......................................65
6.2    CURE OF DEFAULTS OF ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ...........66
6.3    REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ...........................................66
6.4    REJECTION DAMAGES BAR DATE. ...........................................................................................67
6.5    COMPENSATION AND BENEFIT PROGRAMS.................................................................................67
6.6    COLLECTIVE BARGAINING AGREEMENTS...................................................................................67
6.7    POST-PETITION CONTRACTS AND LEASES. .................................................................................67
6.8    TERMINATION OF ESOP. ..........................................................................................................68
6.9    INSURANCE POLICIES. ...............................................................................................................68

**ARTICLE VII : PROVISIONS GOVERNING DISTRIBUTIONS..................................................69**

7.1    GENERAL...................................................................................................................................69
7.2    DISTRIBUTIONS FOR CERTAIN CLAIMS. ....................................................................................69
7.3    SPECIAL PROVISIONS GOVERNING DISTRIBUTIONS TO HOLDERS OF LOAN CLAIMS AND LOAN GUARANTY
       CLAIMS. ....................................................................................................................................70
7.4    INTEREST ON CLAIMS. ...............................................................................................................71
7.5    DISTRIBUTIONS BY DISBURSING AGENT....................................................................................72
7.6    DELIVERY OF DISTRIBUTIONS AND UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS. ............72
7.7    RECORD DATE FOR DISTRIBUTIONS. ..........................................................................................73
7.8    ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST. ...........................74
7.9    MEANS OF CASH PAYMENT. ......................................................................................................74
7.10   WITHHOLDING AND REPORTING REQUIREMENTS.......................................................................74
7.11   SETOFFS. ...................................................................................................................................74
7.12   FRACTIONAL SHARES. ...............................................................................................................75
7.13   DE MINIMIS DISTRIBUTIONS. .....................................................................................................75
7.14   SPECIAL PROVISION REGARDING UNIMPAIRED CLAIMS. ............................................................75
7.15   SUBORDINATION. .......................................................................................................................75

**ARTICLE VIII : PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS76**

8.1    OBJECTIONS TO AND ESTIMATION OF CLAIMS............................................................................76
8.2    PAYMENTS AND DISTRIBUTIONS ON DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND
       INTERESTS AND ON CLAIMS FOR WHICH PROOFS OF CLAIM ARE FILED. ....................................76
8.3    TREATMENT OF DISPUTED DEPARTMENT OF LABOR CLAIMS .....................................................77

**ARTICLE IX : PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS ...........................77**

9.1    PAYMENT OF CERTAIN FEE AND EXPENSE CLAIMS. ...................................................................77
9.2    BAR DATE FOR PAYMENT OR REIMBURSEMENT OF PROFESSIONAL FEES AND EXPENSES AND CLAIMS FOR
       SUBSTANTIAL CONTRIBUTION. ..................................................................................................79

**ARTICLE X : CONFIRMATION AND CONSUMMATION OF THE PLAN.......................................80**

10.1   CONDITIONS TO EFFECTIVE DATE. ............................................................................................80
10.2   WAIVER OF CONDITIONS. ..........................................................................................................82
10.3   CONSEQUENCES IF CONFIRMATION ORDER IS VACATED. ...........................................................82

**ARTICLE XI : INJUNCTIONS, RELEASES AND DISCHARGE ....................................................82**

11.1   DISCHARGE. ..............................................................................................................................82
11.2   RELEASES...................................................................................................................................83
11.3   BAR ORDER................................................................................................................................87
11.4   DISALLOWED CLAIMS AND DISALLOWED INTERESTS. ...............................................................89
11.5   EXCULPATION. ...........................................................................................................................90
11.6   CORPORATE INDEMNITIES .........................................................................................................90
11.7   TERM OF BANKRUPTCY INJUNCTION OR STAYS. .......................................................................91

**ARTICLE XII : RETENTION OF JURISDICTION .........................................................................91**

12.1    RETENTION OF JURISDICTION. ................................................................................................91

**ARTICLE XIII :  LITIGATION TRUST** ..................................................................................................**93**

13.1    ESTABLISHMENT OF TRUST. ..................................................................................................93
13.2    LITIGATION TRUST ASSETS. ..................................................................................................93
13.3    LITIGATION TRUSTEE. ...........................................................................................................94
13.4    DISSOLUTION. ........................................................................................................................98
13.5    FUNDING THE LITIGATION TRUST. ........................................................................................98

**ARTICLE XIV : [RESERVED]** ...........................................................................................................**98**

**ARTICLE XV : MISCELLANEOUS** .....................................................................................................**98**

15.1    SURRENDER OF INSTRUMENTS. ............................................................................................98
15.2    CREDITORS COMMITTEE. ......................................................................................................99
15.3    POST-CONFIRMATION DATE RETENTION OF PROFESSIONALS. ...........................................99
15.4    EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS. ............................................99
15.5    EXEMPTION FROM TRANSFER TAXES. .................................................................................100
15.6    PAID-IN CAPITAL OF CORPORATE REORGANIZED DEBTORS. .............................................100
15.7    PAYMENT OF STATUTORY FEES. .........................................................................................101
15.8    AMENDMENT OR MODIFICATION OF THIS PLAN. ...............................................................101
15.9    SEVERABILITY OF PLAN PROVISIONS. ................................................................................101
15.10   SUCCESSORS AND ASSIGNS. ..............................................................................................102
15.11   REVOCATION, WITHDRAWAL OR NON-CONSUMMATION. ..................................................102
15.12   NOTICE. ................................................................................................................................102
15.13   GOVERNING LAW. ...............................................................................................................104
15.14   TAX REPORTING AND COMPLIANCE. ..................................................................................104
15.15   EXHIBITS AND APPENDICES. ...............................................................................................104
15.16   RESERVATION OF RIGHTS. ..................................................................................................104
15.17   NOTICE OF THE EFFECTIVE DATE. ......................................................................................104

## APPENDICES AND EXHIBITS

| | |
|---|---|
| Appendix A | Filed Subsidiary Debtors |
| Appendix B | Subsidiary Non-Debtors |
| Appendix C | Collective Bargaining Agreements |
| | |
| Exhibit 1.1.122 | Terms of Intercompany Claims Settlement |
| Exhibit 1.1.154 | Terms of New Warrant Agreement |
| Exhibit 5.2 | Restructuring Transactions |
| Exhibit 5.3.1(1) | Certificate of Incorporation of Reorganized Tribune |
| Exhibit 5.3.1(2) | By-Laws of Reorganized Tribune |
| Exhibit 5.3.1(3) | Registration Rights Agreement |
| Exhibit 5.3.2(1) | Officers of Reorganized Tribune |
| Exhibit 5.3.2(2) | Directors of Reorganized Tribune |
| Exhibit 5.3.3 | Directors, Managers, and Officers of Reorganized Debtors Other Than Reorganized Tribune |
| Exhibit 5.6 | Terms of New Senior Secured Term Loan |
| Exhibit 5.10 | Terms of Exit Facility |
| Exhibit 5.13 | Terms of Trust Loan Agreement |
| Exhibit 5.15.1(1) | Step Two/Disgorgement Settlement Undertaking |
| Exhibit 5.15.1(2) | Step Two/Disgorgement Settlement Procedures |
| Exhibit 5.15.4 | Terms of Retiree Claimant Settlement Agreement |
| Exhibit 6.3 | Rejected Executory Contracts and Unexpired Leases |
| Exhibit 13.1 | Litigation Trust Agreement |

# INTRODUCTION

The Proponents are the Debtors, the Creditors' Committee (as hereafter defined), certain investment funds and accounts managed by Oaktree Capital Management, L.P. and/or its Affiliates ("Oaktree") and Angelo, Gordon & Co., L.P. and/or certain of its Affiliates ("Angelo Gordon"), each of which is a Holder, or is a general partner or manager of an entity that is a Holder, of Senior Loan Claims, and JPMorgan Chase Bank, N.A. and certain of its Affiliates, as the Senior Loan Agent and as Holders of Senior Loan Claims ("JPMorgan").  The Proponents are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

The Proponents hereby propose the following joint plan of reorganization for the resolution of all outstanding Claims against and Interests in all of the Debtors in their reorganization cases under chapter 11 of the Bankruptcy Code.  The Guarantor Non-Debtors shall participate in this Plan with the Debtors.  This Plan amends the Second Amended Plan in order to address concerns noted by the Bankruptcy Court in its Opinion on Confirmation issued on October 31, 2011 [D.I. 10133], as subsequently modified on December 29, 2011 [D.I. 10531].

Reference is made to the Disclosure Documents for a discussion of the Debtors' history, businesses, properties and operations, projections for those operations, risk factors, a summary and analysis of this Plan, and certain related matters including, among other things, the indebtedness and securities to be issued under this Plan.  Subject to certain restrictions and requirements set forth herein, including, without limitation Sections 15.8 and 15.9 of this Plan, and in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Proponents reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation in accordance with the terms hereof, the Confirmation Order, and the Bankruptcy Code.

## ARTICLE I: DEFINITIONS; RULES OF INTERPRETATION; EXHIBITS

1.1    Definitions.

As used herein, capitalized terms shall have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1.1    Administrative Expense Claim means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the businesses of the Debtors (such as wages, salaries and commissions for services and payments for inventory, leased equipment and premises) and Claims of governmental units for taxes (including tax audit Claims) related to tax years ending on or after the Petition Date or commencing after the Petition Date, but excluding Claims related to tax periods ending on or before the Petition Date; (b) all compensation for legal, financial, advisory, accounting and other professional services and reimbursement of expenses incurred during the Chapter 11 Cases Allowed by the Bankruptcy Court; (c) any indebtedness or obligation incurred or assumed by the

Debtors during the Chapter 11 Cases pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement; (d) any payment to cure a default on an assumed executory contract or unexpired lease; (e) post-petition Claims against any of the Debtors held by a Debtor or a non-Debtor Affiliate; or (f) any fees and charges assessed against the Debtors' Estates under section 1930, chapter 123, of title 28 of the United States Code.

 1.1.2  <u>Advisors</u> means any Persons who acted as advisors to a Tribune Entity or to any of its officers, directors, or any special or independent committee of its Board of Directors with respect to any matter arising from or related to the leveraged buy-out of Tribune that occurred in 2007, provided that the Step Two Arrangers shall not be deemed to have been Advisors with respect to actions they took solely in their capacities as agents, arrangers or lenders under the Senior Loan Agreement, Bridge Loan Agreement or related guarantees.

 1.1.3  <u>Advisor Claims</u> means any and all LBO-Related Causes of Action that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective Estates against any Person related to such Person's conduct as Advisor.

 1.1.4  <u>Affiliate</u> shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be limited to, each of the other Debtors.

 1.1.5  <u>Allocation Disputes Rulings</u> means (a) the Order Regarding Allocation Disputes, dated April 9, 2012 [D.I. 11338] and (b) the Memorandum Regarding Allocation Disputes, dated April 9, 2012 [D.I. 11337].

 1.1.6  <u>Allowed</u> means, with respect to a Claim or Interest, or any portion thereof, in any Class or category specified, a Claim or Interest (a) that is evidenced by a Proof of Claim or Interest and as to which no objection or request for estimation has been filed on or before any objection deadline established pursuant to <u>Section 8.1</u> of this Plan or the expiration of such other applicable period fixed by the Bankruptcy Court, (b) that is listed on the pertinent Debtor's schedules but is not listed as disputed, contingent or unliquidated, that is not otherwise subject to an objection and as for which no contrary or superseding Proof of Claim or Interest has been filed, (c) as to which any objection has been settled, waived, withdrawn or overruled by a Final Order; or (d) that is expressly allowed (i) by a Final Order, (ii) pursuant to the terms of the Claims Settlement Order, (iii) solely with respect to those Claims that are not pre-petition Claims and are not required under applicable bankruptcy law to be allowed pursuant to an order of the Bankruptcy Court, by an agreement between the Holder of such Claim and the pertinent Debtor or Reorganized Debtor pursuant to an agreement which was approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement that, unless *de minimis* in nature, has been provided to and has not been objected to in writing by the Proponents, or (iv) pursuant to the terms of this Plan. For the avoidance of doubt, to the extent a Claim is not Allowed, such Claim is still subject to objection based upon potentially applicable rights of avoidance, setoff, subordination, and any other defenses.

 1.1.7  <u>Arranger Bridge Lenders</u> means each of JPMorgan, Citicorp North America, Inc., the Former Bridge Loan Agent and Bank of America, N.A., in each case

including their respective Affiliates (other than Citigroup Financial Products, Inc.), each in their capacity as Holders of Bridge Loan Claims for their own account.

1.1.8  Assigned Senior Guaranty Claims has the meaning set forth in Section 11.2.5 of this Plan.

1.1.9  Available Cash means all bank Cash balances that are immediately available for disbursement reduced by the value of (a) any funds held in accounts that are restricted in their use, including, but not limited to, Cash held as collateral for issued letters of credit, Cash held in escrow accounts, Cash held for collateral in respect of utility deposits, and Cash held by Multimedia Insurance Company, a Non-Guarantor Non-Debtor and (b) up to $5,000,000 held in bank accounts that are not part of the Debtors' centralized cash management system.

1.1.10 Average Distributable Cash means the average of the Available Cash balance of all of the Tribune Entities at the close of business on each of the four Fridays (or the immediately preceding Business Day if any such Friday is not a Business Day) immediately preceding the Effective Date.

1.1.11 Ballot means the document for accepting or rejecting the Plan in the form approved by the Bankruptcy Court.

1.1.12 Bankruptcy Code means title 11 of the United States Code, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.13 Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware.

1.1.14 Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any local rules of the Bankruptcy Court, as in effect on the Petition Date, together with any and all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases.

1.1.15 Bridge Lender Fee/Expense Claims means all of the reasonable and documented fees, costs and expenses of the professionals and advisors for the Bridge Plan Proponents and/or the Bridge Loan Agent incurred in connection with the Chapter 11 Cases on or after the Petition Date through the Effective Date and not previously reimbursed by the Debtors or Reorganized Debtors.

1.1.16 Bridge Lender Group means Non-Arranger Bridge Lenders that have been in communication with the Bridge Loan Agent in connection with the Chapter 11 Cases and their respective Affiliates and funds under common management, that in the aggregate are Holders of approximately fifty percent (50%) of the Claims in Class 1D by outstanding principal amount, or successors thereto, in their capacities as Holders of Bridge Loan Claims, and that include the Bridge Plan Proponents and/or their successors.

1.1.17 <u>Bridge Lenders</u> means the lenders from time to time party to the Bridge Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.18 <u>Bridge Loan Agent</u> means Wells Fargo Bank, N.A. as administrative agent, and its Affiliates and Related Persons of such entities (but excluding the Former Bridge Loan Agent as a Related Person of the Bridge Loan Agent for all purposes in the Plan), and any successor administrative agent, under the Bridge Loan Agreement.

1.1.19 <u>Bridge Loan Agreement</u> means that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Former Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

1.1.20 <u>Bridge Loan Arrangers</u> means any Administrative Agent, Syndication Agent, Documentation Agent, Lead Arranger, Joint Bookrunner or other party serving a similar purpose, holding a similar title or serving in a similar capacity under the Bridge Loan Agreement, as such terms are used in the Bridge Loan Agreement.

1.1.21 <u>Bridge Loan Claim</u> means a Claim arising under the Bridge Loan Agreement.

1.1.22 <u>Bridge Loan Guaranty Agreement</u> means the Guarantee Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Former Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.23 <u>Bridge Loan Guaranty Claim</u> means a Claim arising under Bridge Loan Guaranty Agreement.

1.1.24 <u>Bridge Plan Proponents</u> means King Street Acquisition Company, L.L.C., King Street Capital, L.P. and Marathon Asset Management, L.P.

1.1.25 <u>Bridge Settlement Proceeds</u> means an amount of consideration equal to $2,277,549.

1.1.26 <u>Bridge Settlement Term Sheet</u> means the Bridge Settlement Term Sheet attached to the Mediator's Third Report, filed on January 28, 2011 [D.I. 7656].

1.1.27 <u>Business Day</u> means any day other than a Saturday, a Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.1.28 <u>By-Laws</u> means the amended and restated by-laws of Reorganized Tribune, in substantially the form of <u>Exhibit 5.3.1(2)</u> to be filed with the Plan Supplement.

1.1.29 Cash means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer or any other customary payment method.

1.1.30 Certificate of Incorporation means the amended and restated certificate of incorporation of Reorganized Tribune, in substantially the form of Exhibit 5.3.1(1) to be filed with the Plan Supplement.

1.1.31 Chapter 11 Cases means the voluntary cases commenced on the Petition Date by the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code and the voluntary cases, if any, commenced by any of the Subsidiary Non-Debtors under chapter 11 of the Bankruptcy Code.

1.1.32 Claim means a "claim," as defined in section 101(5) of the Bankruptcy Code.

1.1.33 Claims Settlement Order means the Order Granting Debtors (I) Limited Waiver of Requirements of Local Rule 3007-1(f) and (II) Authority to Settle Disputed Claims, as entered on November 25, 2009 [D.I. 2657], as the same may be amended, modified or supplemented from time to time.

1.1.34 Class means a category of Claims or Interests set forth in Article III of this Plan, as such term is used and described in section 1122 and section 1123(a)(1) of the Bankruptcy Code.

1.1.35 Class 1C Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1C Claims, which shall entitle such Holders to a Pro Rata share, calculated together with Allowed Class 1D Claims, of the Senior Loan Claims Net Litigation Trust Proceeds; provided, however, that in no event shall any Holder of an Allowed Class 1C Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim plus, to the extent permissible under applicable law, accrued Post-petition Interest thereon.

1.1.36 Class 1D Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1D Claims, which shall entitle such Holders to a Pro Rata share, calculated together with Allowed Class 1C Claims, of the Senior Loan Claims Net Litigation Trust Proceeds; provided, however, that in no event shall any Holder of an Allowed Class 1D Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim plus, to the extent permissible under applicable law, accrued Post-petition Interest thereon.

1.1.37 Class 1E Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1E Claims, which shall entitle such Holders to (i) a Pro Rata share, calculated together with Allowed Class 1I and 1J Claims and Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv), of the Parent GUC Trust Preference and (ii) a Pro Rata share, calculated together with Allowed Class 1I and 1J Claims and Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv), of

the Parent GUC Net Litigation Trust Proceeds; provided, however, that in no event shall any Holder of an Allowed Class 1E Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim plus, in accordance with the Allocation Disputes Rulings and applicable law, accrued Post-petition Interest thereon.

1.1.38 Class 1F Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv), which shall entitle such Holders to a Pro Rata share, calculated together with Allowed Class 1E, 1I and 1J Claims, of: (i) the Parent GUC Trust Preference; and (ii) the Parent GUC Net Litigation Trust Proceeds; provided, however, that in no event shall any Holder of an Allowed Class 1F Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim plus, in accordance with the Allocation Disputes Rulings and applicable law, accrued Post-petition Interest thereon.

1.1.39 Class 1I Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1I Claims, which shall entitle such Holders to a Pro Rata share, calculated together with Allowed Class 1E and 1J Claims and Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv), of (i) the Parent GUC Trust Preference; and (ii) the Parent GUC Net Litigation Trust Proceeds; provided that all distributions that would otherwise be made on account of Class 1I Litigation Trust Interests first  shall be turned over and distributed Pro Rata to Holders of Class 1E Litigation Trust Interests, Class 1F Litigation Trust Interests and Class 1J Litigation Trust Interests, provided that any amounts allocable to Class 1J Litigation Trust Interests shall not be distributed directly to the Holders of Class 1J Litigation Trust Interests and instead shall be turned over and distributed Pro Rata to Holders of Class 1E Litigation Trust Interests and Class 1F Litigation Trust Interests until such Holders have received payment in full of the Allowed amount of such Holders' Allowed Claims plus, in accordance with the Allocation Disputes Rulings and applicable law, accrued Post-petition Interest thereon, and thereafter shall be turned over and distributed Pro Rata to the Holders of Class 1J Litigation Trust Interests until such Holders have received payment in full of the Allowed amount of such Holders' Claims plus, in accordance with the Allocation Disputes Rulings and applicable law, accrued Post-petition Interest thereon; provided further, that in no event shall any Holder of an Allowed Class 1I Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim plus, to the extent permissible under applicable law, accrued Post-petition Interest thereon.

1.1.40 Class 1J Litigation Trust Interests means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1J Claims, which shall entitle such Holders to a Pro Rata share, calculated together with Allowed Class 1E and 1I Claims and Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv), of (i) the Parent GUC Trust Preference; and (ii) the Parent GUC Net Litigation Trust Proceeds; provided that all distributions that would otherwise be made on account of Class 1J Litigation Trust Interests  (including any distributions made in respect of Class 1I Litigation Trust Interests) shall be turned over and distributed Pro Rata to Holders of Class 1E Litigation Trust Interests and Class 1F Litigation Trust Interests until such Holders have received payment in full of the Allowed amount of such Holders' Allowed Claims plus, in accordance with the Allocation Disputes Rulings and applicable law, accrued Post-petition Interest thereon; provided

6

<u>further</u>, that in no event shall any Holder of an Allowed Class 1J Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim plus, in accordance with the Allocation Disputes Rulings and applicable law, accrued Post-petition Interest thereon.

1.1.41 <u>Class 1L Litigation Trust Interests</u> means beneficial interests in the Litigation Trust granted to Holders of Allowed Class 1L Claims, which shall entitle such Holders to a Pro Rata share of the Net Litigation Trust Proceeds, if any, remaining after the payment in full of all other Allowed Claims against Tribune including, to the extent permissible under applicable law, accrued Post-petition Interest thereon; <u>provided</u>, <u>however</u>, that in no event shall any Holder of an Allowed Class 1L Claim be entitled to receive payments that exceed the Allowed amount of such Holder's Claim plus, to the extent permissible under applicable law, accrued Post-petition Interest thereon.

1.1.42 <u>Collective Bargaining Agreement(s)</u> means, individually or collectively, the collective bargaining agreements listed on <u>Appendix C</u> hereto.

1.1.43 <u>Committee Complaints</u> means the complaints, as amended, filed by the Creditors' Committee in the lawsuits entitled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC) and *Official Committee of Unsecured Creditors v. JPMorgan Chase Bank, N.A., et al. (In re Tribune Co.)*, Adv. Proc. No. 10-53963 (Bankr. D. Del.) (KJC).

1.1.44 <u>Communications Act</u> means the Communications Act of 1934, as amended, or any other successor federal statute, and the rules and regulations of the FCC promulgated thereunder.

1.1.45 <u>Confirmation Date</u> means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

1.1.46 <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court on confirmation of this Plan, as such hearing may be continued from time to time.

1.1.47 <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.48 <u>Convenience Claim</u> means a Claim against Tribune that would otherwise be a General Unsecured Claim that is (a) in an amount equal to or less than $1,000 or (b) in an amount that has been reduced to $1,000 pursuant to a Convenience Class Election made by the Holder of such Claim; <u>provided</u>, <u>however</u>, that where any portion(s) of a single Claim has been transferred on or after April 12, 2010, any transferred portion(s) shall continue to be treated together with such Claim as a single Claim for purposes of the Convenience Class Election and determining whether such Claim qualifies as a Convenience Claim.

1.1.49 <u>Convenience Class Election</u> means an irrevocable election made on the Ballot by the Holder of a Claim against Tribune that would otherwise be a General Unsecured Claim in an amount greater than $1,000 to reduce such Claim to $1,000.

1.1.50 <u>Creditor Proponents</u> means the Proponents other than the Debtors and the Creditors' Committee; <u>provided</u>, <u>however</u>, that where this Plan provides for any approval, waiver, modification, or action by the "Creditor Proponents", such approval or waiver may be given or modification or action may be taken by the Creditor Proponents so long as each of Oaktree, Angelo Gordon, and JPMorgan all agree in writing with such approval or action; and provided further, however, that other Proponents may become "Creditor Proponents" of this Plan with the written consent of each of Oaktree, Angelo Gordon, and JPMorgan.

1.1.51 <u>Creditors' Committee</u> means the official committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.1.52 <u>Creditors' Committee Member Fee/Expense Claims</u> means amounts incurred by individual members of the Creditors' Committee solely in their capacity as members of the Creditors' Committee on and after the Petition Date through and including the Effective Date for the reasonable and documented fees, costs and expenses of their individual outside legal and/or financial advisors.

1.1.53 <u>Customer Program</u> means any of the Debtors' customer programs and practices as to which the Debtors were authorized, in their sole discretion and in the ordinary course of business, to honor and perform all obligations in respect thereof by the Order Authorizing, But Not Requiring, the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business, which was signed by the Bankruptcy Court on December 10, 2008 [D.I. 50].

1.1.54 <u>Debtor(s)</u> means, individually or collectively, the debtors and debtors in possession identified in footnote 1 hereto, and shall also include any Subsidiary Non-Debtor that files a chapter 11 petition for relief prior to the Confirmation Date.

1.1.55 <u>Debtor Released Claims</u> has the meaning set forth in <u>Section 11.2.1</u> of this Plan.

1.1.56 <u>Defined Benefit Plan</u> means a single-employer plan within the meaning of section 4001(a)(15) of the Employee Retirement Income Security Act of 1974, as amended.

1.1.57 <u>Designation Rights</u> has the meaning set forth in <u>Section 5.3.2</u> of this Plan.

1.1.58 <u>Deutsche Bank</u> means Deutsche Bank Trust Company Americas, not personally but as successor trustee under (i) that certain indenture dated March 1, 1992, by and between Tribune and Continental Bank, N.A.; (ii) that certain indenture dated January 30, 1995, by and between Tribune and First Interstate Bank of California; and (iii) that certain indenture dated January 1, 1997, by and between Tribune and Bank of Montreal Trust Company, as each may be amended, restated or otherwise modified from time to time.

1.1.59 <u>DIP Facility</u> means the financing facility and letter of credit facility entered into by the Debtors pursuant to the DIP Facility Agreements.

1.1.60 <u>DIP Facility Agent</u> means Barclays Bank PLC, as administrative agent and letter of credit agent under the DIP Facility Agreements.

1.1.61 <u>DIP Facility Agreements</u> means collectively, as each may be amended, supplemented or otherwise modified from time to time, (a) that certain Amended and Restated Receivables Loan Agreement among Tribune, Tribune Receivables, LLC, the DIP Facility Agent, and the DIP Facility Lenders, (b) that certain Amended and Restated Receivables Purchase Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (c) that certain Amended and Restated Servicing Agreement among Tribune Receivables, LLC, Tribune and the other Originators (as defined therein), (d) that certain Amended and Restated Guaranty Security Agreement among Tribune, the other Debtors, and the DIP Facility Agent, (e) that certain Letter of Credit Agreement among the DIP Facility Agent, certain DIP Facility Lenders and the Debtors, and (f) that certain Payout and Termination Agreement, dated as of March 1, 2010, among Tribune Receivables, LLC, Tribune, certain subsidiaries of Tribune party thereto, and Barclays Bank PLC, as administrative agent.

1.1.62 <u>DIP Facility Claims</u> means all Claims held by the DIP Facility Agent and the DIP Facility Lenders pursuant to the DIP Facility Agreements and the Final DIP Order.

1.1.63 <u>DIP Facility Lenders</u> means the lenders from time to time party to the DIP Facility Agreements, including any applicable assignees and participants thereof.

1.1.64 <u>Disallowed Claim</u> means all or such part of a Claim that is disallowed by a Final Order.

1.1.65 <u>Disbursing Agent</u> means any entity in its capacity as a disbursing agent under <u>Section 7.5</u> of this Plan.

1.1.66 <u>Discharge Injunction</u> means the injunction described in section 1141 of the Bankruptcy Code and contained in <u>Section 11.1.2</u> of this Plan.

1.1.67 <u>Disclaimed State Law Avoidance Claims</u> means any and all LBO-Related Causes of Action arising under state fraudulent conveyance law that existed in favor of any Holder of a Claim that arose prior to the Petition Date against Selling Stockholders, solely in their capacities as such and solely with respect to funds received in their capacities as such, that are not released by the relevant Holder of a Claim in accordance with <u>Section 11.2.2</u> of this Plan; <u>provided</u>, <u>however</u>, that Disclaimed State Law Avoidance Claims shall not include (i) any claims for intentional fraudulent conveyance, (ii) any and all LBO-Related Causes of Action arising under state fraudulent conveyance law set forth in the amended complaint filed by the Creditors' Committee on December 7, 2010 in the lawsuit entitled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC), (iii) any Released Claims, or, for the avoidance of doubt (iv) any LBO-Related Causes of Action against any Released Parties or any LBO-Related Causes of Action arising under state fraudulent conveyance law as to which the right to pursue, prosecute, settle or release such claims has been explicitly retained by the Estates. For the avoidance of doubt, nothing in this Plan is intended to determine whether a Selling Stockholder properly faces liability with respect to the Disclaimed State Law Avoidance Claims.

9

1.1.68 <u>Disclosure Documents</u> means that certain supplemental disclosure document relating to this Plan and the general and specific disclosure statement relating to the Second Amended Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.1.69 <u>Disputed Claim</u> means any portion of a Claim (a) that is neither an Allowed Claim nor a Disallowed Claim, (b) that is listed as disputed, contingent or unliquidated on the Debtors' schedules or that is otherwise subject to an objection, (c) for which a Proof of Claim has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors have, or any party in interest entitled to do so has, interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order, or (d) that is subject to challenge by the Litigation Trust pursuant to this Plan.

1.1.70 <u>Distributable Cash</u> means an amount in Cash equal to (a) the Distributable Cash Pool plus (b) the Step Two/Disgorgement Settlement Proceeds less (c) the sum of (i) $325 million, (ii) the amount of Cash necessary to fund the Trust Loan, (iii) the amount of Cash estimated by the Proponents to be required to be distributed to or reserved for Holders of Allowed Administrative Expense Claims (including fees paid pursuant to <u>Section 9.1</u> and <u>Section 9.2</u> of this Plan, any fees and expenses associated with the Exit Facility or any new indebtedness under <u>Section 5.6</u> of this Plan, and cure costs required to be paid by the Debtors but excluding post-petition payables arising and paid in the ordinary course of business), Priority Tax Claims estimated to be payable at or in connection with the Effective Date, DIP Facility Claims, Priority Non-Tax Claims, Claims arising from Employee Benefit Plans continuing with current employees, and Cash required to be posted to cash collateralize outstanding letters of credit, (iv) fees and expenses estimated to be payable pursuant to <u>Section 15.2</u> of this Plan, and (v) tax reserves, to the extent not duplicative of any amounts otherwise taken into account in clauses (i) through (iii) or any amounts otherwise excluded from Available Cash.

1.1.71 <u>Distributable Cash Pool</u> means an amount in Cash equal to (i) if the Average Distributable Cash is more than $25 million greater than the Effective Date Cash, the Effective Date Cash plus $25 million, or (ii) if the Average Distributable Cash is more than $25 million less than the Effective Date Cash, the Effective Date Cash less $25 million, or (iii) if the Average Distributable Cash is within $25 million higher or lower than the Effective Date Cash, the Average Distributable Cash.

1.1.72 <u>Distribution Date</u> means any of the Initial Distribution Date, the Quarterly Distribution Date and the Final Distribution Date, but in no event a date prior to the Effective Date.

1.1.73 <u>Distribution Record Date</u> means the Confirmation Date or such other date as may be designated in the Confirmation Order.

1.1.74 <u>DTC</u> means The Depository Trust Company.

10

1.1.75 Effective Date means the first Business Day on which all of the conditions to the Effective Date specified in Section 10.1 of this Plan have been satisfied or waived in accordance with Section 10.2 of this Plan.

1.1.76 Effective Date Cash means an amount in Cash equal to the Available Cash balance of all of the Tribune Entities at the close of business on the Friday immediately preceding the Effective Date (or the immediately preceding Business Day if any such Friday is not a Business Day).

1.1.77 EGI-TRB LLC Noteholder means a Holder of EGI-TRB LLC Notes.

1.1.78 EGI-TRB LLC Notes means those certain promissory notes in the aggregate principal amount of $225 million issued by Tribune in favor of EGI-TRB LLC and certain direct and indirect assignees of EGI-TRB LLC.

1.1.79 EGI-TRB LLC Notes Claim means all Claims held by the EGI-TRB LLC Noteholders pursuant to the EGI-TRB LLC Notes.

1.1.80 EGI-TRB LLC Warrant means those certain 15-year warrants issued to EGI-TRB LLC and certain assignees evidencing rights to purchase 43,478,261 shares in the aggregate (subject to adjustment) of Old Common Stock.

1.1.81 Employee Benefit Claim means any Claim arising under or in connection with an assumed Employee Benefit Plan.

1.1.82 Employee Benefit Plan means any employment, compensation, tax-qualified or non-tax qualified Pension Plan, Defined Benefit Plan, Multiemployer Plan, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, expense reimbursement, dependent care, retirement, savings, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other benefit plan or any individual contract or agreement that has not been rejected or terminated prior to the Confirmation Date for the benefit of the directors, officers or employees (whether salaried or hourly) of the applicable Debtor, or maintained by any Debtor for employees of non-Debtor direct or indirect subsidiaries of a Debtor, and any retiree benefit program of the applicable Debtor included in the protections of section 1114 of the Bankruptcy Code, in all cases that has been in existence and has accrued to a specific person before or on the Petition Date or has been approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, plan or program, provided that any of the foregoing that specifically applies to any of the top twenty (20) officers of Tribune and its wholly-owned subsidiaries (determined by salary and bonus payments earned with respect to the most recently completed fiscal year) and does not have broad application to employees other than such officers, must have been disclosed to and approved by the Creditor Proponents to constitute an "Employee Benefit Plan"; provided further, that the definition of "Employee Benefit Plan" excludes Non-Qualified Former Employee Benefit Plans and the ESOP.

1.1.83 Equity Incentive Plan means an equity incentive plan pertaining to the Reorganized Debtors described in Section 5.11 of this Plan.

1.1.84 ESOP means, individually or collectively, the Tribune Employee Stock Ownership Plan and the Tribune Employee Stock Ownership Trust and any related documents and agreements, as the context implies.

1.1.85 Estate(s) means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.1.86 Exhibit means an exhibit annexed to this Plan.

1.1.87 Exit Facility means a new revolving credit facility, if any, as described in Exhibit 5.10 to be filed with the Plan Supplement, providing for loans and other extensions of credit in an aggregate amount up to $300 million, with a letter of credit sub-facility of up to $100 million, which may be entered into by Reorganized Tribune and certain of the other Reorganized Debtors and U.S. Subsidiary Non-Debtors on the Effective Date.

1.1.88 Exit Facility Credit Agreement means the definitive agreement relating to the Exit Facility.

1.1.89 Face Amount means (a) when used in reference to a Disputed Claim, (i) the full stated amount claimed by the Holder of such Claim in any Proof of Claim timely filed with the Bankruptcy Court (or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law) or such other lesser amount agreed to by such Holder or authorized by the Bankruptcy Court, (ii) if no such claim is filed in accordance with clause (i) above, the full stated amount listed on the pertinent Debtor's schedules as disputed, contingent or unliquidated if no contrary or superseding Proof of Claim or an objection to the Claim has been filed, or (iii) if no stated amount is included in the Proof of Claim or the pertinent Debtor's schedules with respect to a disputed, contingent or unliquidated claim, then an amount determined by the pertinent Debtor, and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

1.1.90 FCC means the Federal Communications Commission or any other federal agency succeeding to its jurisdiction.

1.1.91 FCC Applications means, collectively, each application filed with the FCC in connection with this Plan, including those filed in connection with the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and any other FCC applications necessary to complete the Restructuring Transactions.

1.1.92 FCC Approval means an action or actions by the FCC (including any action or actions taken by the FCC's staff pursuant to delegated authority and regardless of whether any action or actions may be subject to further administrative or judicial review) on the FCC Applications granting any consent of the FCC necessary to consummate the assignment and/or transfer of control of FCC Licenses from the Debtors to the Reorganized Debtors and/or otherwise necessary to implement this Plan.

1.1.93 FCC Licenses means broadcasting and other licenses, authorizations, waivers and permits that are issued from time to time by the FCC.

1.1.94    Fee Procedures Order means the Order Establishing Procedure for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members Pursuant to 11 U.S.C. §§ 105(a) and 331 [D.I. 225], as may be amended from time to time.

1.1.95    Filed Subsidiary Debtors means, individually or collectively, the Debtors listed on Appendix A hereto.

1.1.96    Final DIP Order means the Final Order Pursuant to Sections 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), and 365 of the Bankruptcy Code (1) Authorizing the Debtors to Guarantee an Amended Securitization Facility and For Certain Debtors to Continue Selling Receivables and Related Rights Pursuant Thereto, (2) Authorizing the Debtors to Enter Into a Letter of Credit Facility, (3) Modifying the Automatic Stay and (4) Granting Other Related Relief, as entered on January 15, 2009 [D.I. 233], as the same has been and may be amended, modified or supplemented from time to time, together with any modifications and amendments thereto, including, without limitation, the Order Authorizing Debtors to Amend Letter of Credit Facility Pursuant to Sections 105, 362(d), 363(b)(1), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 365 of the Bankruptcy Code and Granting Other Related Relief, as entered on March 22, 2010 [D.I. 3808].

1.1.97    Final Distribution Date means a date selected by the Reorganized Debtors that is no later than thirty (30) days after the date that all Disputed Claims in the applicable Class(es) shall have been Allowed or Disallowed.

1.1.98    Final Order means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered on the docket in the Chapter 11 Cases (or on the docket of any other court of competent jurisdiction), which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.1.99    Foreign Ownership Certification means the certification of aggregate foreign voting interests and aggregate foreign equity interests that each Holder of a Claim that is eligible to receive New Common Stock under this Plan must provide.

1.1.100    Former Bridge Loan Agent means Merrill Lynch Capital Corporation as former administrative agent under the Bridge Loan Agreement.

13

1.1.101 <u>General Unsecured Claim</u> means any Claim against the Debtors that is not an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Senior Loan Claim, a Bridge Loan Claim, a Senior Noteholder Claim, a Convenience Claim, an EGI-TRB LLC Notes Claim, a PHONES Notes Claim, an Employee Benefit Claim, an Intercompany Claim, a Securities Litigation Claim, a Senior Guaranty Claim or a Bridge Loan Guaranty Claim and shall not include Disallowed Claims or Claims that are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise (for the avoidance of doubt, General Unsecured Claims shall include any Allowed Claim by Wilmington Trust for fees and expenses arising under Section 6.07 of the PHONES Notes Indenture).

1.1.102 <u>Global Contract Motion</u> means a motion seeking the assumption or rejection of unassumed or unrejected executory contracts and unexpired leases of the Debtors, which motion may be filed with the Bankruptcy Court and heard at the Confirmation Hearing.

1.1.103 <u>Guarantor Debtors</u> means those Debtors listed on <u>Appendix A</u> hereto as "Guarantor Debtors".

1.1.104 <u>Guarantor Non-Debtor Release</u> means the release by all Holders of Loan Guaranty Claims against the Guarantor Non-Debtors on the Effective Date (a) releasing the Guarantor Non-Debtors from any and all Senior Guaranty Claims and Bridge Loan Guaranty Claims and (b) releasing the Senior Loan Agent, Former Bridge Loan Agent, and Bridge Loan Agent, respectively, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities of any nature whatsoever resulting from the release of the Guarantor Non-Debtors from any and all Senior Guaranty Claims and Bridge Loan Guaranty Claims.

1.1.105 <u>Guarantor Non-Debtors</u> means those non-Debtors listed on <u>Appendix B</u> hereto as "Guarantor Non-Debtors".

1.1.106 <u>Holder</u> means a Person holding a Claim or Interest.

1.1.107 <u>Holder Released Claims</u> has the meaning set forth in <u>Section 11.2.2</u> of this Plan.

1.1.108 <u>Impaired</u> means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.1.109 <u>Incremental Senior Loans</u> means the "Incremental Term Advances" or "Incremental Term Borrowings" as defined in the Senior Loan Agreement.

1.1.110 <u>Indemnity, Subrogation and Contribution Agreements</u> means (a) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Former Bridge Loan Agent, as amended, restated, supplemented or otherwise modified from time to time, and (b) the Indemnity, Subrogation and Contribution Agreement, dated as of December 20, 2007, among Tribune, each of the subsidiaries of Tribune listed on Schedule I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.111  Indentures means the Senior Notes Indentures and the PHONES Notes Indenture.

1.1.112  Indenture Trustees means the Senior Notes Indenture Trustees and the PHONES Notes Indenture Trustee.

1.1.113  Initial Distribution Date means a date selected by the Reorganized Debtors that is as soon as practicable following the Effective Date and is in no event later than thirty (30) days after the Effective Date.

1.1.114  Initial Report has the meaning set forth in Section 9.2 hereto.

1.1.115  Intercompany Claims means all prepetition Claims against any of the Debtors held by another Debtor or a non-Debtor Affiliate.

1.1.116  Intercompany Claims Settlement means the settlement and compromise respecting Intercompany Claims on the terms set forth in Exhibit 1.1.122 to be filed with the Plan Supplement.

1.1.117  Interest means any share of common stock, preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, including, but not limited to, any Tribune Interest and Interest in a Subsidiary Debtor.

1.1.118  Law Debenture means Law Debenture Trust Company of New York, not personally but solely in its capacity as successor indenture trustee under that certain Indenture, dated as of March 19, 1996, as amended, restated or otherwise modified from time to time, between Tribune and Law Debenture Trust Company of New York.

1.1.119  LBO-Related Causes of Action means any and all claims (including, without limitation, claims for pre- and post-judgment interest to the extent allowable), obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal or equitable remedies against any Person arising from the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

1.1.120  Lien means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest, easement or encumbrance of any kind whatsoever affecting such interest in property.

1.1.121  Litigation Trust means the trust created pursuant to the Litigation Trust Agreement on the Effective Date in accordance with this Plan, the Confirmation Order and the Litigation Trust Agreement.

15

1.1.122 <u>Litigation Trust Advisory Board</u> means the advisory board of the Litigation Trust to be established pursuant to Article XIII of this Plan, which shall have no more than three members consisting of (i) Wilmington Trust or its designee as provided in <u>Section 13.3.1</u>, (ii) Deutsche Bank or its designee as provided in <u>Section 13.3.1</u> and (iii) a member of the Creditors' Committee that will be a beneficiary of Litigation Trust Interests, but excluding the Senior Loan Agent, each of whom, including any designee, will be identified in the Plan Supplement, to advise, assist and supervise the Litigation Trustee in the administration of the Litigation Trust pursuant to the Litigation Trust Agreement.

1.1.123 <u>Litigation Trust Agreement</u> means the Litigation Trust Agreement to be dated as of the Effective Date establishing the terms and conditions of the Litigation Trust, on substantially the terms described in <u>Exhibit 13.1</u> to be filed as part of the Plan Supplement, including, without limitation (i) procedures for control of any legal proceedings and/or settlements in respect of any Preserved Causes of Action against the Non-Settling Step Two Payees, in each case on a basis satisfactory to both the Committee and the Step Two Arrangers that are signatories to the Step Two/Disgorgement Settlement Undertaking, and (ii) the assumption of the setoff obligations as provided in <u>Section 7.11.2</u> of this Plan; <u>provided</u> that in the event of any conflict between the terms of the Litigation Trust Agreement and the terms of this Plan, this Plan shall control.

1.1.124 <u>Litigation Trust Assets</u> means all Preserved Causes of Action, including any proceeds therefrom, and any interest and earnings on such proceeds.

1.1.125 <u>Litigation Trust Beneficiaries</u> means the holders of Litigation Trust Interests.

1.1.126 <u>Litigation Trust Indemnified Parties</u> has the meaning set forth in <u>Section 13.3.7</u> of this Plan.

1.1.127 <u>Litigation Trust Interests</u> means the Class 1C Litigation Trust Interests, Class 1D Litigation Trust Interests, Class 1E Litigation Trust Interests, Class 1F Litigation Trust Interests, Class 1I Litigation Trust Interests, and Class 1J Litigation Trust Interests.

1.1.128 <u>Litigation Trustee</u> means the trustee to serve pursuant to <u>Article XIII</u> of the Plan and under the Litigation Trust Agreement.

1.1.129 <u>Loan Agents</u> means the Senior Loan Agent and the Bridge Loan Agent.

1.1.130 <u>Loan Agreements</u> means the Senior Loan Agreement and the Bridge Loan Agreement.

1.1.131 <u>Loan Claims</u> means the Senior Loan Claims and the Bridge Loan Claims.

1.1.132 <u>Loan Guaranty Agreements</u> means the Senior Guaranty Agreement, the Bridge Loan Guaranty Agreement and the Indemnity, Subrogation and Contribution Agreements.

1.1.133 <u>Loan Guaranty Claims</u> means the Senior Guaranty Claims and the Bridge Loan Guaranty Claims.

1.1.134 <u>LT Agreement</u> means the "Agreement Respecting Transfer of Documents, Information, and Privileges from Debtors and Reorganized Debtors" to be entered into between the Reorganized Debtors and the Litigation Trust governing the transfer of certain documents, information and privileges from the Debtors, the Debtors' Estates and Reorganized Debtors to the Litigation Trust.

1.1.135 <u>LT Reserve</u> means any reserve established by the Litigation Trustee on account of Disputed Claims held by any Litigation Trust Beneficiary that, if Allowed, would entitle such Litigation Trust Beneficiary to a distribution of Net Litigation Trust Proceeds.

1.1.136 <u>LT Tax Items</u> has the meaning set forth in <u>Section 13.2.2</u> of this Plan.

1.1.137 <u>Media Ownership Certification</u> means the certification of other media investments and holdings, and any other information that the Debtors deem reasonably necessary for purposes of the FCC Applications and/or FCC Approval, including, without limitation, on FCC qualifications to hold an attributable interest in the Reorganized Debtors under FCC rules and policies that each Holder that is entitled to receive New Common Stock under this Plan may be required to provide.

1.1.138 <u>Morgan Stanley Claims</u> means all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, and including any and all rights, claims and actions (including avoidance actions arising under chapter 5 of the Bankruptcy Code) that Tribune or any of its Affiliates may have against MSCS except for claims against MSCS arising solely in its capacity as a holder of Senior Loan Claims that do not arise from trading by MSCS in Senior Loan Claims.  Subject to the limitations specified above, Morgan Stanley Claims include but are not limited to rights, claims and actions arising from or related to (a) the acquisition, sale or disposition of any notes, bonds or other indebtedness held by MSCS, (b) the interest rate swap transaction executed pursuant to the ISDA Master Agreement dated as of August 5, 1994 (as subsequently amended and together with any schedules, exhibits and confirmations) between The Times Mirror Company and MSCS and any set-offs of claims arising from such interest rate swap transaction, and (c) any advisory engagement or potential advisory engagement of, and/or advice given by, or information or analyses withheld, MSCS, including but not limited to (i) services provided by MSCS as an Advisor, and (ii) the agreement between Tribune and MSCS dated as of November 30, 2008, regardless of whether such rights, claims and actions may be asserted pursuant to the Bankruptcy Code or any other applicable law. For avoidance of doubt, rights, claims and actions arising from or related to (a)-(c) in the preceding sentence and all claims that were asserted against MSCS in the adversary proceeding captioned *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC)  are Preserved Causes of Action and are not released pursuant to this Plan or the Confirmation Order.

1.1.139 <u>MSCS</u> means Morgan Stanley Capital Services Inc. and its Affiliates and Related Persons of such entities, including, without limitation, Morgan Stanley & Co, Inc.

1.1.140 <u>Multiemployer Plan</u> means a plan (i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and (iii) which satisfies such other requirements contained in regulations promulgated by the United States Department of Labor.

1.1.141 <u>Net Litigation Trust Proceeds</u> means the proceeds received by the Litigation Trust from the pursuit of any Litigation Trust Assets <u>less,</u> without duplication, (a) the amount of proceeds received by the Litigation Trust from the pursuit of any Preserved Causes of Action against the Non-Settling Step Two Payees required to satisfy the Step Two Arrangers Litigation Trust Preference, if any; (b) the amount of any fees and expenses incurred by the Litigation Trust in pursuing the Litigation Trust Assets, administering the Litigation Trust, managing the Litigation Trust Assets and making distributions on account of Litigation Trust Interests; (c) such amounts as the Litigation Trustee determines should be held in the Expense Fund (as defined in the Litigation Trust Agreement), which amounts shall not exceed $25 million prior to repayment in full of the Trust Loan; and (d) amounts held in the LT Reserves.

1.1.142 <u>New Class A Common Stock</u> means the Class A Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.143 <u>New Class B Common Stock</u> means the Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan, which shall have the powers, preferences and rights and be subject to the limitations, qualifications and restrictions, in each case as set forth in the Certificate of Incorporation.

1.1.144 <u>New Common Stock</u> means, collectively, the New Class A Common Stock and the New Class B Common Stock; <u>provided</u> that, under the circumstances set forth in <u>Section 5.4.2</u> of this Plan, certain Holders of Claims that would otherwise be entitled to receive New Class A Common Stock or New Class B Common Stock may instead receive New Warrants.

1.1.145 <u>New Senior Secured Term Loan</u> means the new senior secured term loan in an aggregate principal amount of not more than the lesser of (a) $1.1 billion or (b) two times the Debtors' trailing twelve month operating cash flow excluding minority equity interests (each as described and defined in the New Senior Secured Term Loan Agreement) as of the end of the fiscal quarter most recently ended prior to the Effective Date; which, subject to the terms of <u>Section 5.6</u> of this Plan, may be issued on the Effective Date by Reorganized Tribune pursuant to the New Senior Secured Term Loan Agreement, or may be replaced in whole or in part with a distribution of Cash pursuant to and in accordance with <u>Section 5.6.2</u> of this Plan.

1.1.146 <u>New Senior Secured Term Loan Agreement</u> means the loan agreement among Reorganized Tribune, as borrower, the other Reorganized Debtors and U.S. Subsidiary Non-Debtors as provided in and subject to <u>Section 5.6</u> of this Plan (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions), as guarantors, the administrative agent party thereto, and the

Holders of Claims entitled to receive the New Senior Secured Term Loan under this Plan, which shall contain terms substantially as set forth in Exhibit 5.6 and filed with the Plan Supplement.

1.1.147 New Warrant Agreement means the warrant agreement with substantially the terms set forth in Exhibit 1.1.154 to be filed with the Plan Supplement.

1.1.148 New Warrants means the warrants to purchase New Class A Common Stock or New Class B Common Stock to be issued by Reorganized Tribune in connection with the implementation of, and as authorized by, this Plan.

1.1.149 Non-Arranger Bridge Lenders means the Holders of Bridge Loan Claims other than the Arranger Bridge Lenders.

1.1.150 Non-Guarantor Debtors means those Debtors listed on Appendix A hereto as "Non-Guarantor Debtors".

1.1.151 Non-Guarantor Non-Debtors means those non-Debtors listed on Appendix B hereto as "Non-Guarantor Non-Debtors".

1.1.152 Non-Qualified Former Employee Benefit Plan means any of the Debtors' non-tax qualified Pension Plans and individual agreements providing for retirement compensation, or deferred compensation arrangements of the applicable Debtor covering an individual who was not an employee, consultant or director of the applicable Debtor as of the Effective Date.

1.1.153 Non-Settling Defendants means all Persons who are or may be defendants on LBO-Related Causes of Action or Morgan Stanley Claims other than Released Parties in their capacities as such.

1.1.154 Non-Settling Step Two Payees means any current or former Senior Lender or Bridge Lender that (i) received any payment (a) under the Senior Loan Agreement on account of the Incremental Senior Loans or (b) under the Bridge Loan Agreement, in each case prior to the Petition Date and (ii) does not participate in the Step Two/Disgorgement Settlement, solely in any such Person's capacities (if any) as an agent or arranger with respect to the Step Two Transactions or as a recipient of such payments.

1.1.155 Old Common Stock means the issued and outstanding common stock of Tribune as of the Petition Date.

1.1.156 Ordinary Litigation Claims means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Person as of the Petition Date including, without limitation, any and all claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold under chapter 5 of the Bankruptcy Code that do not arise from the leveraged buy-out of Tribune that occurred in 2007.  Notwithstanding anything to the contrary in this definition, Ordinary Litigation Claims shall include, without limitation, any action for avoidance and recovery of payments arising from stock options, restricted stock units and/or deferred compensation paid to the Debtors' current or former

officers, directors and/or employees; provided, however, Ordinary Litigation Claims shall not include (a) any claim, right of action, suit or proceeding that has been settled on or prior to the Effective Date, (b) the Released LBO-Related Causes of Action, (c) other claims, rights of action, suits or proceedings waived or released pursuant to Article XI of this Plan, (d) the Preserved Causes of Action against the Non-Settling Defendants, except, for the avoidance of doubt, the actions described in this sentence preceding the word "provided", (e) the Disclaimed State Law Avoidance Claims, and (f) any claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any of the Debtors' current or former officers, directors and/or employees for payments on any phantom equity grant pursuant to the 2007 Management Equity Incentive Plan or success bonus compensation arising from the leveraged buy-out of Tribune that occurred in 2007.

1.1.157 Other Parent Claims means General Unsecured Claims against Tribune and the Swap Claim (and for the avoidance of doubt includes all Claims against Tribune under Non-Qualified Former Employee Benefit Plans, but does not include Convenience Claims).

1.1.158 Other Parent Claims Reserve means one or more reserves of New Senior Secured Term Loan, Distributable Cash and/or New Common Stock established for the benefit of Allowed Other Parent Claims pursuant to Section 7.2.1(a) of this Plan.

1.1.159 Other Secured Claim means a Secured Claim, other than an Administrative Expense Claim, a DIP Facility Claim, a Priority Tax Claim, a Senior Loan Claim (other than a right to setoff) or a Senior Noteholder Claim (other than a right to setoff).

1.1.160 Parent GUC Net Litigation Trust Proceeds means, after the Parent GUC Trust Preference and the Trust Loan Preference have been paid in full, sixty five percent (65%) of the Net Litigation Trust Proceeds to be distributed to Holders of Allowed Claims in Classes 1E, 1I and 1J and Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv), and, after the payment in full of all the foregoing Claims, Holders of Allowed Claims in Class 1C and Class 1D.

1.1.161 Parent GUC Trust Preference means one hundred percent (100%) of the Net Litigation Trust Proceeds to be distributed to Holders of Allowed Claims in Classes 1E, 1I and 1J and Allowed Class 1F Claims the Holders of which elect the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv) until such Holders have received an amount equal to $90,000,000 in the aggregate from the Litigation Trust.

1.1.162 Pension Plan means an employee pension benefit plan within the meaning of section (2)(A) of the Employee Retirement Income Security Act of 1974, as amended, but excludes Multiemployer Plans.

1.1.163 Person means an individual, corporation, partnership, association, joint stock company, joint venture, limited liability company, limited liability partnership, trust, estate, unincorporated organization or other entity, or any government, governmental agency or any subdivision, department or other instrumentality thereof.

1.1.164 Petition Date means (i) for Tribune and for all Debtors listed on Appendix A to this Plan other than Tribune CNLBC, LLC, December 8, 2008, the date on which

such Debtors commenced their Chapter 11 Cases, (ii) for Tribune CNLBC, LLC, October 12, 2009, the date on which such Debtor commenced its Chapter 11 Case, and (iii) with respect to the Subsidiary Non-Debtors, the date on which any such Subsidiary Non-Debtor commences its Chapter 11 Case, if any.

1.1.165 PHONES Notes means the issued and outstanding notes under the PHONES Notes Indenture.

1.1.166 PHONES Notes Claim means a Claim arising under or evidenced by the PHONES Notes Indenture and related documents, except any claim made by Wilmington Trust, as successor indenture trustee, for reasonable compensation for services under the PHONES Notes Indenture or for the reimbursement of reasonable expenses, disbursements, and advances incurred or made by Wilmington Trust in accordance with any provision of the PHONES Notes Indenture.

1.1.167 PHONES Notes Indenture means that certain Indenture, dated as of April 1, 1999, between Tribune and Wilmington Trust, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.168 PHONES Notes Indenture Trustee means the indenture trustee under the PHONES Notes Indenture.

1.1.169 Plan means this third amended chapter 11 plan of reorganization for the Debtors in the Chapter 11 Cases and, with the consent of the Proponents, this chapter 11 plan of reorganization for the Non-Guarantor Non-Debtors, if any, that become Debtors and the Prepackaged Plan for the Guarantor Non-Debtors, if any, that become Debtors, including Exhibits and all supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.1.170 Plan Supplement means the supplement to the Second Amended Plan filed on January 31, 2011 [D.I. 7701] and any modifications thereto that may be filed with the Bankruptcy Court not later than fifteen (15) calendar days prior to the deadline established for objecting to confirmation of this Plan, in form and substance acceptable to the Proponents.

1.1.171 Pledge Agreement means the Pledge Agreement, dated as of June 4, 2007, between Tribune and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.172 Post-petition Interest means interest on an Allowed Claim accrued after the Petition Date to the extent applicable and, if applicable, payable at either (i) the reasonable contract rate or (ii) if there is no reasonable contract rate the federal judgment rate as of the Petition Date.

1.1.173 Prepackaged Plan means this Plan for the Guarantor Non-Debtors, if any, that become Debtors.

1.1.174 <u>Preserved Causes of Action</u> means (a) any and all LBO-Related Causes of Action that the Tribune Entities or the Debtors' Estates may have or are entitled to assert on behalf of their respective Estates (whether or not asserted) against the Non-Settling Defendants under any provision of the Bankruptcy Code or any applicable nonbankruptcy law including, without limitation, any and all claims under chapter 5 of the Bankruptcy Code; (b) Advisor Claims; (c) Morgan Stanley Claims; and (d) claims and causes of action against Non-Settling Step Two Payees to the extent such claims or causes of action seek recovery of payments (i) under the Senior Loan Agreement on account of the Incremental Senior Loans or (ii) under the Bridge Loan Agreement, in each case whether based on avoidance and disallowance of Senior Loan Claims or Bridge Loan Claims or any other theory; <u>provided</u>, <u>however</u>, that Preserved Causes of Action shall not include the Disclaimed State Law Avoidance Claims or any claims, causes of action, suits or proceedings that have been released or settled on or prior to the Effective Date.  For avoidance of doubt, all claims that were asserted against any Person (except for Released Stockholder Parties) in the complaint filed by the Creditors' Committee on January 11, 2012, in the lawsuit entitled *Official Committee of Unsecured Creditors of the Tribune Company v. FitzSimons, et al. (In re Tribune Co.)*, Adv. Proc. No. 10-54010 (Bankr. D. Del.) (KJC)  are Preserved Causes of Action and are not released pursuant to this Plan or the Confirmation Order.  For the avoidance of doubt, nothing in this Plan is intended to determine whether any defendant properly faces liability with respect to a Preserved Cause of Action.

1.1.175 <u>Priority Non-Tax Claims</u> means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.1.176 <u>Priority Tax Claim</u> means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.1.177 <u>Proof of Claim or Proof of Interest</u> means the proof of claim or proof of interest, respectively, that must be filed by a Holder of a Claim or Interest by the date(s) designated by the Bankruptcy Court as the last date(s) for filing proofs of claim or interests against the Debtors, or as is otherwise permitted to be filed against any of the Debtors pursuant to a Final Order of the Bankruptcy Court.

1.1.178 <u>Proponents</u> means (a) the Debtors, (b) the Creditors' Committee, (c) Oaktree and Angelo Gordon, each in its capacity as a Holder of Senior Loan Claims, or as a general partner or manager of an entity that is a Holder of Senior Loan Claims, and as a proponent of this Plan and (d) JPMorgan as the Senior Loan Agent and as a Holder of Senior Loan Claims; <u>provided</u>, <u>however</u>, that where this Plan provides for any approval, waiver, modification, or action by the "Proponents", such approval or waiver may be given or modification or action may be taken by the Proponents so long as each of the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon, and JPMorgan all agree in writing with such approval or action; and provided further, however, that other Persons may become "Proponents" of this Plan with the written consent of each of the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon, and JPMorgan.

1.1.179  Pro Rata means that proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such Class except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Interests in such multiple Classes, or in reference to a specific type of Claim, in which case Pro Rata means the proportion that an Allowed Claim of such type bears to the aggregate amount of all Allowed Claims of such type.

1.1.180  Quarterly Distribution Date means fifteen (15) calendar days after the conclusion of the calendar quarters ending in March, June, September and December.

1.1.181  Reinstated or Reinstatement means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (i) curing any such default whether or not such default occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than a Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

1.1.182  Related Person means, with respect to any Person, such Person's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, employees, managers, advisors and professionals).

1.1.183  Related Person Preference Actions means those actions pursuant to sections 547 and 548 of the Bankruptcy Code against certain Related Persons of the Debtors commenced by the Creditors' Committee on December 3, 2010 and December 4, 2010 in the Bankrupcy Court, which are referenced under the following case numbers: Adv. Proc. Nos. 10-55585, 55593-55609, and 55611-55802.

1.1.184  Released Claims means the Debtor Released Claims and the Holder Released Claims, as such terms are defined in Sections 11.2.1 and 11.2.2 respectively.

1.1.185 Released LBO-Related Causes of Action means any and all LBO-Related Causes of Action against the Released Parties that belong to or have been or could now be asserted by or on behalf of the Tribune Entities, the Debtors' Estates (in each case in their individual and representative capacities), or any other Person that is deemed to have given a release pursuant to Section 11.2 of this Plan, including, without limitation, all claims against the Released Parties contained in the complaint filed by the Creditors' Committee on December 7, 2010, in the lawsuit entitled *Official Committee of Unsecured Creditors v. JPMorgan Chase Bank, N.A., et al. (In re Tribune Co.)*, Adv. Proc. No. 10-53963 (Bankr. D. Del.) (KJC).

1.1.186 Released Parties means, except as otherwise provided in Sections 11.2.1, 11.2.3, 11.2.6 and 3.2.4(b) of this Plan, each of (a) the Debtors, their non-Debtor Affiliates, including the Subsidiary Non-Debtors, and the Reorganized Debtors; (b) the current and former Senior Lenders in all capacities except their capacities, if any, as (i) Selling Stockholders, (ii) Non-Settling Step Two Payees, and (iii) Advisors; (c) the current and former Bridge Lenders, each in all capacities except their capacities, if any, as (i) Selling Stockholders, (ii) Non-Settling Step Two Payees, and (iii) Advisors; (d) the Settling Step Two Payees in all capacities except their capacities, if any, as (i) Selling Stockholders and (ii) Advisors; (e) each of the following, solely in their capacities as such: (i) the Senior Loan Agent, the Bridge Loan Agent and the Former Bridge Loan Agent, (ii) the Creditor Proponents, and (iii) the Released Stockholder Parties (except with respect to any Disclaimed State Law Avoidance Claims); and (f) Related Persons of Persons listed in clauses (b), (c), (d) and (e) of this paragraph to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of one of the Persons listed in clauses (b), (c), (d) and (e) of this paragraph and is released against the party as to which they are a Related Person. Notwithstanding anything to the contrary in this definition, (A) none of the following, solely in their capacities as such, shall be Released Parties with respect to LBO-Related Causes of Action: (s) Related Persons of the Debtors (with the exception of the Persons identified in clause (a) of this paragraph and Released Stockholder Parties; provided, however, that Released Stockholder Parties shall not be Released Parties with respect to any Disclaimed State Law Avoidance Claims), (t) Advisors, (u) Selling Stockholders (with the exception of Released Stockholder Parties; provided, however, that Released Stockholder Parties shall not be Released Parties with respect to any Disclaimed State Law Avoidance Claims), (v) Non-Settling Step Two Payees, (w) EGI-TRB LLC, (x) Samuel Zell, and (y) Valuation Research Corporation, and (B) MSCS shall not be a Released Party with respect to the Morgan Stanley Claims.

1.1.187 Released Stockholder Parties means (a) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.6(c)(i) or Section 3.2.6(c)(ii) of this Plan, and (b) the Retiree Claimants or other Holders of Claims arising from Non-Qualified Former Employee Benefit Plans that elect to receive the treatment set forth in Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv) of this Plan, solely with respect to the first $100,000 of Cash in the aggregate received from the sale of common stock, stock equivalents or options of Tribune to Tribune on or about June 4, 2007 and/or the redemption of common stock, stock equivalents or options of Tribune in connection with the Step Two Transactions; provided, however, that the parties set forth in this definition of Released Stockholder Parties shall only be Released Stockholder Parties to the extent the Retiree Claimant Settlement Agreement is implemented and incorporated into this Plan pursuant to Section 5.15.4 herein.

24

1.1.188 <u>Remaining Distributable Cash</u> means an amount in Cash equal to (a) 100% of the Distributable Cash less (b) the sum of (i) the amount of Cash to be distributed to the Holders of Allowed Bridge Loan Claims pursuant to <u>Section 3.2.4(c)</u>, (ii) the amount of Cash to be distributed to or reserved for the Holders of Allowed Senior Noteholder Claims pursuant to <u>Section 3.2.5(c)</u>, (iii) the amount of Cash to be distributed to or reserved for the Holders of Allowed Other Parent Claims pursuant to <u>Section 3.2.6(c)</u>, (iv) the amount of Cash to be distributed to or reserved for the Holders of Allowed Convenience Claims pursuant to <u>Section 3.2.7</u>, and (v) the amount of Cash to be distributed to or reserved for the Holders of Allowed General Unsecured Claims pursuant to <u>Section 3.3.5</u>.

1.1.189 <u>Remaining New Common Stock</u> means 100% of the New Common Stock less (i) the amount of New Common Stock to be distributed to or reserved for the Holders of Allowed Senior Noteholder Claims pursuant to <u>Section 3.2.5(c)</u>,  and (ii) the amount of New Common Stock to be distributed to or reserved for the Holders of Allowed Other Parent Claims pursuant to <u>Section 3.2.6(c)</u>.

1.1.190 <u>Remaining New Senior Secured Term Loan</u> means 100% of the New Senior Secured Term Loan less (i) the amount of New Senior Secured Term Loan to be distributed to or reserved for the Holders of Allowed Senior Noteholder Claims pursuant to <u>Section 3.2.5(c)</u>, and (ii) the amount of New Senior Secured Term Loan to be distributed to or reserved for the Holders of Allowed Other Parent Claims pursuant to <u>Section 3.2.6(c)</u>.

1.1.191 <u>Reorganized Debtors</u> means Reorganized Tribune and the other reorganized Debtors or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan (including, without limitation, the Restructuring Transactions).

1.1.192 <u>Reorganized Tribune</u> means reorganized Tribune or any successors thereto by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the transactions occurring on or prior to the Effective Date in accordance with this Plan.

1.1.193 <u>Restructuring Transactions</u> means those transactions or other actions (including, without limitation, mergers, consolidations, conversions, joint ventures, restructurings, recapitalizations, dispositions, liquidations or dissolutions) that one or more of the applicable Debtors or Reorganized Debtors may enter into or undertake on, prior to, or after the Effective Date outside the ordinary course of business of such Debtors or Reorganized Debtors in accordance with <u>Section 5.2</u> hereof and as shall be set forth in the Plan Supplement.

1.1.194 <u>Retiree Claimants</u> means those Holders of Claims under Non-Qualified Former Employee Benefit Plans that are parties to the Retiree Claimant Settlement Agreement.

1.1.195 <u>Retiree Claimant Settlement Agreement</u> means that certain settlement agreement by and among Tribune and certain Retiree Claimants attached hereto as <u>Exhibit 5.15.4</u>.

1.1.196 <u>Second Amended Plan</u> means the Second Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co.,

L.P., and JPMorgan Chase Bank, N.A. (as Modified April 26, 2011) [D.I. 8769], as amended on October 19, 2011 [D.I. 10024].

1.1.197 <u>Secured Claim</u> means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral (i) as set forth in this Plan, (ii) as agreed to by the Holder of such Claim and the Debtors, which agreement is approved or otherwise permitted by a Final Order of the Bankruptcy Court or is an ordinary course agreement, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

1.1.198 <u>Securities Litigation Claim</u> means any Claim against any of the Debtors, except any Claim that survives confirmation and effectiveness of this Plan pursuant to <u>Section 11.6</u>, (i) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or an Affiliate of any of the Debtors, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws or the Employee Retirement Income Security Act of 1974 (unless there has been a judicial determination by Final Order that any such Claim is not subject to subordination under section 510(b) of the Bankruptcy Code), including, without limitation, any Claim against any of the Debtors asserted by the United States Department of Labor, or for misrepresentations or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (iv) asserted by or on behalf of the ESOP and/or any present or former participants in the ESOP in their capacity as such, (v) for attorneys' fees, other charges or costs incurred on account of any of the foregoing Claims, or (vi) for reimbursement, contribution or indemnification allowed under section 502 of the Bankruptcy Code on account of any of the foregoing Claims, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer, purchase, or sale of securities.

1.1.199 <u>Selling Stockholders</u> means (i) all Persons that directly or indirectly received payments, including the initial recipients and subsequent transferees, made in exchange for the purchase and/or redemption by Tribune of issued and outstanding common stock of Tribune on or about June 4, 2007 and/or pursuant to the Step Two Transactions, including all legal or beneficial owners of such stock, solely in their capacity as direct or indirect recipients of payments with respect to such purchase or redemption; and (ii) the guardians, trustees, partners, administrators, custodians, fiduciaries, estates, executors, owners, representatives, beneficiaries, members, and managers of such Persons within subsection (i) above to the extent that they must be named as defendants in order to pursue state law fraudulent conveyance claims with respect to Persons within subsection (i) above, solely in such capacity and solely with respect to such amounts as are sought with respect to Persons within subsection (i).

1.1.200 <u>Senior Guaranty Agreement</u> means the Guarantee Agreement, dated as of June 4, 2007, among Tribune, each of the subsidiaries of Tribune listed on Annex I thereto, and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.201 <u>Senior Guaranty Claim</u> means a Claim arising under the Senior Guaranty Agreement, including, without limitation, the guaranty of the Swap Claim.

1.1.202 <u>Senior Guaranty Claim Assignee</u> means Reorganized Tribune or a designee of Reorganized Tribune, in each case vested with full standing and authority to hold and enforce any and all rights, claims, causes of action, obligations, and remedies in respect of Assigned Senior Guaranty Claims against the Guarantor Non-Debtors and to hold and enforce any and all rights of subordination in respect of the Bridge Loan Guaranty Agreement.

1.1.203 <u>Senior Lender Fee/Expense Claims</u> means all of the reasonable and documented fees, costs and expenses of the Senior Lender Professionals incurred in connection with the Chapter 11 Cases and not previously reimbursed by the Debtors or Reorganized Debtors.

1.1.204 <u>Senior Lender Holdback</u> has the meaning set forth in <u>Section 3.3.3</u> of this Plan.

1.1.205 <u>Senior Lender Professionals</u> means (i) the professionals and advisors for JPMorgan, (ii) Hennigan, Bennett & Dorman LLP, Dewey & LeBoeuf LLP, Young, Conaway, Stargatt & Taylor LLP and Wilmer Cutler Pickering Hale & Dorr LLP, as counsel to Angelo Gordon, Oaktree, and other holders of Senior Loan Claims, and (iii) any other counsel previously retained by Angelo Gordon or Oaktree in connection with the Chapter 11 Cases on or after the Petition Date through the Effective Date.

1.1.206 <u>Senior Lenders</u> means the lenders from time to time party to the Senior Loan Agreement as Lenders thereunder, including former lenders and any applicable assignees and participants thereof.

1.1.207 <u>Senior Loan Agent</u> means JPMorgan Chase Bank, N.A. as administrative agent under the Senior Loan Agreement.

1.1.208 <u>Senior Loan Agreement</u> means, collectively, (a) that certain Credit Agreement, dated as of May 17, 2007, among Tribune, the Senior Lenders, the Senior Loan Agent, Merrill Lynch Capital Corporation, as syndication agent, and Citicorp North America, Inc., Bank of America, N.A. and Barclays Bank PLC, as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time and (b) those certain Increase Joinders, dated as of December 20, 2007, among Tribune, certain of the Senior Lenders and the Senior Loan Agent, as amended, restated, supplemented or otherwise modified from time to time.

1.1.209 <u>Senior Loan Arrangers</u> means any Agent, Syndication Agent, Documentation Agent, Lead Arranger, Joint Bookrunner or other party serving a similar purpose under the Senior Loan Agreement, as such terms are used in the Senior Loan Agreement.

1.1.210 <u>Senior Loan Claim</u> means a Claim arising under the Senior Loan Agreement, other than a Senior Lender Fee/Expense Claim, and any Claim of the Senior Lenders or the Senior Loan Agent arising under the Pledge Agreement.

1.1.211 <u>Senior Loan Claims Distribution</u> means 1.50% of the Remaining Distributable Cash, 1.50% of the Remaining New Senior Secured Term Loan and 1.50% of the Remaining New Common Stock (subject to dilution by the Equity Incentive Plan).

27

1.1.212 <u>Senior Loan Claims Net Litigation Trust Proceeds</u> means, after the Parent GUC Preference and the Trust Loan Preference have been paid in full, thirty five percent (35%) of the Net Litigation Trust Proceeds and, after the Holders of Allowed Claims in Classes 1E, 1I and 1J and Allowed Class 1F Claims the Holders of which elect the treatment set forth in <u>Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv)</u> have received payment in full of the Allowed amount of such Holders' Claims plus, to the extent permissible under applicable law, accrued Post-petition Interest thereon, one hundred percent (100%) of the Net Litigation Trust Proceeds, in each case which will be distributed to Holders of Allowed Claims in Class 1C and Class 1D.

1.1.213 <u>Senior Noteholder Claims</u> means all Claims arising under or evidenced by the Senior Notes Indentures and related documents and any Claim of the Senior Noteholders arising under the Pledge Agreement.

1.1.214 <u>Senior Noteholder(s)</u> means, individually or collectively, the Holder(s) of a Senior Noteholder Claim(s).

1.1.215 <u>Senior Notes</u> means the eight series of notes issued and outstanding under the Senior Notes Indentures.

1.1.216 <u>Senior Notes Indenture(s)</u> means, individually or collectively: (a) that certain Indenture, dated as of January 1, 1997, between Tribune and Deutsche Bank, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (b) that certain Indenture, dated as of March 19, 1996, between Tribune and Law Debenture, as successor indenture trustee, as amended, restated or otherwise modified from time to time; (c) that certain Indenture, dated as of January 30, 1995, between Tribune and Deutsche Bank, as successor indenture trustee, as amended, restated or otherwise modified from time to time; and (d) that certain Indenture, dated as of March 1, 1992, between Tribune and Deutsche Bank, as successor indenture trustee, as amended, restated or otherwise modified from time to time.

1.1.217 <u>Senior Notes Indenture Trustee(s)</u> means, individually or collectively, the indenture trustees under the Senior Notes Indentures as of the Effective Date

1.1.218 <u>Settlement</u> has the meaning set forth in <u>Section 5.15.2</u> hereto.

1.1.219 <u>Settling Step Two Payees</u> means any current or former Senior Lender, Bridge Lender, or Step Two Arranger that (i) received any payment (a) under the Senior Loan Agreement on account of the Incremental Senior Loans or (b) under the Bridge Loan Agreement prior to the Petition Date and (ii) participates in the Step Two/Disgorgement Settlement and pays to the Disbursing Agent the portion of the Step Two/Disgorgement Settlement allocable to such party pursuant to <u>Section 5.15.1</u> of this Plan.

1.1.220 <u>Solicitation Order</u> means the Order (I) Approving the General Disclosure Statement and Specific Disclosure Statements; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plans of Reorganization; (III) Approving Forms of Ballots, Master Ballots and Related Instructions; (IV) Approving Solicitation Package Contents and Authorizing Distribution of Solicitation and Notice Materials; (V) Fixing Voting Record Date; (VI) Establishing Notice and Objection Procedures in Respect of Confirmation; (VII) Setting Confirmation Schedule and Establishing Parameters on

Confirmation-Related Discovery; (VIII) Establishing New Deadline for Return of Media Ownership Certifications; (IX) Authorizing Expansion of Balloting and Tabulation Agent's Retention and Allocation of Costs of Same; and (X) Granting Related Relief [D.I. 7126].

1.1.221 Step Two Arrangers means the Senior Loan Agent, the Former Bridge Loan Agent, the Senior Loan Arrangers, the Bridge Loan Arrangers, each in their capacity as agents and arrangers of the Incremental Senior Loans and the Bridge Loans.

1.1.222 Step Two Arranger Litigation Trust Preference means ninety percent (90%) of the proceeds received by the Litigation Trust from the pursuit of Litigation Trust Assets against the Non-Settling Step Two Payees to be distributed to the Step Two Arrangers that are signatories to the Step Two/Disgorgement Settlement Undertaking until such Step Two Arrangers that are signatories to the Step Two/Disgorgement Settlement Undertaking have been reimbursed in full for the portion of the Step Two/Disgorgement Settlement allocable to Senior Lenders and Bridge Lenders that did not elect to participate in the Step Two/Disgorgement Settlement that was advanced by the Step Two Arrangers that are signatories to the Step Two/Disgorgement Settlement Undertaking.

1.1.223 Step Two/Disgorgement Settlement has the meaning set forth in Section 5.15.1 of this Plan.

1.1.224 Step Two/Disgorgement Settlement Proceeds has the meaning set forth in Section 5.15.1 of this Plan.

1.1.225 Step Two Transactions means (a) the merger that was consummated on or about December 20, 2007 of Tribune with and into Tesop Corporation pursuant to that certain Agreement and Plan of Merger, dated as of April 1, 2007, by and among Tribune, GreatBanc Trust Company, Tesop Corporation, and EGI-TRB, L.L.C. with Tribune surviving the merger and becoming a wholly-owned subsidiary of the ESOP, including the distributions that were made to Selling Stockholders pursuant to the merger, (b) the execution, delivery and performance of the Bridge Loan Agreement, and (c) the making of additional advances of $2.105 billion under the tranche B facility of the Senior Loan Agreement or as a new tranche of term loans under the Senior Loan Agreement.

1.1.226 Subsidiary Debtors means, individually or collectively, the Filed Subsidiary Debtors, and such Subsidiary Non-Debtors, if any, that become Debtors prior to the Confirmation Date.

1.1.227 Subsidiary GUC Reserve means one or more reserves, if any, of Distributable Cash that may be established for the benefit of Allowed General Unsecured Claims against the Filed Subsidiary Debtors pursuant to Section 7.2.2 of this Plan.

1.1.228 Subsidiary Non-Debtors means those entities listed on Appendix B hereto.

1.1.229 Subsidiary Revoting Classes means Classes 2E, 4E, 5E, 6E, 7E, 10E, 12E, 13E, 14E, 15E, 18E, 19E, 20E, 22E, 23E, 24E, 25E, 26E, 27E, 28E, 29E, 31E, 32E, 33E, 34E, 35E, 36E, 37E, 38E, 40E, 42E, 43E, 46E, 47E, 48E, and 49E.

1.1.230  Supplemental Solicitation Order means the Order (I) Approving Supplemental Disclosure Document; (II) Establishing Scope, Forms, Procedures, And Deadlines For Resolicitation And Tabulation Of Votes To Accept Or Reject DCL Plan From Certain Classes; (III) Authorizing Tabulation Of Prior Votes And Elections On DCL Plan Made By Holders Of Claims In Non-Resolicited Classes; (IV) Scheduling The Confirmation Hearing And Establishing Notice And Objection Procedures In Respect Thereof; And (V) Granting Related Relief [D.I. 11419].

1.1.231  Swap Claim means any Claims asserted under that certain 1992 ISDA Master Agreement, dated as of July 2, 2007, between Barclays Bank PLC and Tribune.

1.1.232  Total DEV means the cumulative value of 100% of the Distributable Cash (for the avoidance of doubt, including the Step Two/Disgorgement Settlement Proceeds), 100% of the New Common Stock and 100% of the New Senior Secured Term Loan.

1.1.233  Tribune means Tribune Company, a Debtor in the Chapter 11 Cases.

1.1.234  Tribune Entities means, collectively, the Debtors and the Subsidiary Non-Debtors.

1.1.235  Tribune Interest means any shares of Old Common Stock, preferred stock or other instrument evidencing an ownership interest in Tribune, whether or not transferable, and any options, warrants (including, without limitation, the EGI-TRB LLC Warrants), calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised stock options, unvested common stock, unvested preferred stock or any other agreements of any character related to the Old Common Stock, but does not include the Securities Litigation Claims.

1.1.236  Trust Loan means a new term loan in an aggregate principal amount of $20 million to be made by Reorganized Tribune to the Litigation Trust.

1.1.237  Trust Loan Agreement means the credit agreement for the Trust Loan between Reorganized Tribune, as lender, and the Litigation Trust, as borrower, filed with the Bankruptcy Court on June 19, 2012 [D.I. 11836] (as amended, restated, supplemented or otherwise modified from time to time).

1.1.238  Trust Loan Preference means one hundred percent (100%) of the Net Litigation Trust Proceeds to be applied to repay the Trust Loan in accordance with the terms of the Trust Loan Agreement after the Parent GUC Trust Preference has been paid in full until the Trust Loan has been satisfied in full in accordance with the terms of the Trust Loan Agreement. For the avoidance of doubt, Net Litigation Trust Proceeds shall be calculated net of amounts held in the Expense Fund (as defined in the Litigation Trust Agreement), and as set forth in the Trust Loan Agreement, the Litigation Trustee shall have no obligation to make any distributions on account of (i) the Parent GUC Trust Preference or (ii) the Trust Loan Preference unless the Expense Fund has a balance of $25 million in Cash as of the date of any such proposed distribution and will maintain such a balance after the making of any such distribution.

30

1.1.239 <u>Unimpaired</u> means with respect to a Claim or Interest that such Claim or Interest is not Impaired including, without limitation, as a result of being Reinstated under this Plan.

1.1.240 <u>Valuation Expert</u> has the meaning set forth in Section <u>13.2.2</u> of this Plan.

1.1.241 <u>Voting Deadline</u> means the deadlines established by the Bankruptcy Court for returning Ballots.

1.1.242 <u>Wilmington Trust</u> means Wilmington Trust Company, not personally but solely in its capacity as successor indenture trustee under the PHONES Notes Indenture.

1.2     <u>Rules of Interpretation</u>.

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document attached as an Exhibit to this Plan being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document, schedule or Exhibit filed or to be filed means such document, schedule or Exhibit, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors and assigns; (e) all references in this Plan to Sections, Articles and Appendices are references to Sections, Articles and Appendices of or to this Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time; (f) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, subsection or clause contained in this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to <u>Section 15.13</u> and the provisions of any contract, certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (j) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

1.3     <u>Computation of Time</u>.

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  In the event that any payment, distribution, act or deadline under this Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but if so made, performed or completed by such next

succeeding Business Day shall be deemed to have been completed or to have occurred as of the required date.

    1.4    <u>Exhibits and Plan Supplement</u>.

    All Exhibits, as well as the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits and Plan Supplement shall be timely filed in accordance with this Plan.  Holders of Claims and Interests may obtain a copy of the filed Exhibits and Plan Supplement upon written request to the Proponents.  Upon their filing, the Exhibits and Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the Exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

    1.5    <u>Deemed Acts</u>.

    Whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of this Plan and the Confirmation Order.

## ARTICLE II: TREATMENT OF ADMINISTRATIVE AND PRIORITY TAX CLAIMS

    In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in <u>Article III</u>.

    2.1    <u>DIP Facility Claims</u>.

    On or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Reorganized Debtors shall pay Allowed DIP Facility Claims in full in Cash.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall be, at Reorganized Tribune's option, (i) returned to the issuer undrawn and marked cancelled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof, or (iv) to the extent not as described in the foregoing clauses (i)-(iii), then otherwise deemed to be subject to reimbursement pursuant to terms and conditions of the Exit Facility; provided that any such treatment of unexpired letters of credit outstanding under the DIP Facility pursuant to this clause (iv), including, without limitation, treatment of reimbursement claims on account of such unexpired letters of credit, shall be in form and substance acceptable to the issuer of any such outstanding letters of credit.

    2.2    <u>Administrative Expense Claims</u>.

    Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed

Administrative Expense Claim, except to the extent that any Holder of an Allowed Administrative Expense Claim agrees to different treatment, or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Expense Claim shall receive payment in full, in Cash, on the later of: (i) the Effective Date if due on or before that date, (ii) the date upon which such Administrative Expense Claim becomes an Allowed Claim, (iii) with respect to Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business during these Chapter 11 Cases, or assumed by the Debtors during these Chapter 11 Cases, such time as such Allowed Administrative Expense Claims are due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, or (iv) such other date as may be agreed upon between the Holder of such Allowed Administrative Expense Claim and the Reorganized Debtors.

    2.3    <u>Priority Tax Claims</u>.

    Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive either, at the sole option of the Reorganized Debtors, (a) payment in full in Cash after such Priority Tax Claim becomes an Allowed Claim, or as soon as practicable thereafter, together with interest from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, (b) except as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, regular installment payments in Cash equal to the Allowed amount of such Claim over a period ending not later than the fifth anniversary of the Petition Date, together with interest from the Effective Date on any outstanding balance calculated at a rate determined under section 511 of the Bankruptcy Code, which installment payments shall commence after such Priority Tax Claim becomes an Allowed Claim, or (c) such other treatment as agreed to by the Holder of an Allowed Priority Tax Claim and the Reorganized Debtors.

## ARTICLE III: CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

    3.1    <u>Summary of Classification and Treatment of Classified Claims and Interests</u>.

    3.1.1    <u>General</u>.

    (a)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation and distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.  Except as otherwise specifically provided for in this Plan (including, without limitation, <u>Section 3.3.3</u> of this Plan and with respect to the distributions to holders of

Litigation Trust Interests), the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final DIP Order), or required by applicable bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim.

(b)     This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  For purposes of brevity and convenience, the classification and treatment of Claims and Interests has been set forth in three groups: (i) Tribune (Debtor 1), (ii) Filed Subsidiary Debtors (Debtors 2 through 111) and (iii) any Guarantor Non-Debtors that become Debtors and participate in the Prepackaged Plan.

3.1.2   Identification of Classes Against Tribune (Debtor 1).  The following chart assigns a letter to each Class against Tribune for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Senior Loan Claims |
| D | Bridge Loan Claims |
| E | Senior Noteholder Claims |
| F | Other Parent Claims |
| G | Convenience Claims |
| I | EGI-TRB LLC Notes Claims |
| J | PHONES Notes Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Tribune Interests |

3.1.3   Identification of Classes Against Filed Subsidiary Debtors (Debtors 2 through 111).  The following chart assigns a letter to each Class against the Filed Subsidiary Debtors for purposes of identifying each separate Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|

| | |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Senior Guaranty Claims |
| D | Bridge Loan Guaranty Claims |
| E | General Unsecured Claims |
| K | Intercompany Claims |
| L | Securities Litigation Claims |
| M | Interests in Filed Subsidiary Debtors |

3.2    Classification and Treatment of Claims Against and Interests in Tribune Company (Debtor 1).

3.2.1    Class 1A – Priority Non-Tax Claims.

(a)    Classification:  Class 1A consists of all Priority Non-Tax Claims against Tribune.

(b)    Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against Tribune shall have its Claim Reinstated.

(c)    Voting:  Allowed Claims in Class 1A are Unimpaired, and the Holders of Class 1A Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1A Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1A Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

3.2.2    Class 1B – Other Secured Claims.

(a)    Classification:  Class 1B consists of all Other Secured Claims against Tribune.

(b)    Treatment:  Each Holder of an Allowed Other Secured Claim against Tribune shall have its Claim Reinstated.

(c)    Voting:  Allowed Claims in Class 1B are Unimpaired, and the Holders of Class 1B Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1B Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1B Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

### 3.2.3    Class 1C – Senior Loan Claims.

(a)    Classification:  Class 1C consists of all Senior Loan Claims against Tribune.

(b)    Allowance:  The Senior Loan Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Loan Agreement or the Pledge Agreement, other than the Senior Lender Fee/Expense Claims, including the full amount of principal, interest, and all other amounts due and owing under the Senior Loan Agreement and the Pledge Agreement as of the Petition Date, and neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.

(c)    Treatment: On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in this Plan, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Loan Claims against Tribune, subject to Section 5.4.2 herein, each Holder of an Allowed Senior Loan Claim against Tribune shall receive (i) a Pro Rata share of the Senior Loan Claims Distribution, and (ii) a Pro Rata share of the Class 1C Litigation Trust Interests.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the Senior Loan Agreement shall be either, at Tribune's option, (i) returned to the issuer undrawn and marked canceled, (ii) collateralized with Cash in an amount equal to 105% of the face amount of such outstanding letter of credit in form and substance acceptable to the issuer thereof, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facility in an amount equal to 105% of the face amount of such outstanding letter of credit, in form and substance acceptable to the issuer thereof.

(d)    Voting:  Claims in Class 1C are Impaired, and Holders of Class 1C Claims are entitled to vote to accept or reject the Plan.

### 3.2.4    Class 1D – Bridge Loan Claims.

(a)    Classification:  Class 1D consists of all Bridge Loan Claims against Tribune.

(b)    Allowance:  So long as (i) the Bridge Plan Proponents shall have withdrawn their proposed plan of reorganization and their related discovery requests issued to the Proponents on or prior to February 8, 2011 and (ii) the Bridge Lender Group shall have supported the Plan, taken no actions inconsistent with confirmation of the Plan in their capacities as Holders of Bridge Loan Claims from and after January 28, 2011, and voted all Bridge Loan Claims held by them to accept the Plan, Bridge Loan Claims against Tribune shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Agreement and the Pledge Agreement, other than the Bridge Lender Fee/Expense Claims (payment of which shall be subject only to Section 9.1.2), including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Agreement and the Pledge Agreement as of the Petition Date, and neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.

(c)    Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for

36

Allowed Bridge Loan Claims against Tribune, each Holder of an Allowed Bridge Loan Claim against Tribune shall receive (i) a Pro Rata share of $64,500,000 of Distributable Cash, and (ii) a Pro Rata share of the Class 1D Litigation Trust Interests. In addition to and without limiting the provisions of Section 11.2.5, by accepting the foregoing distributions, all Holders of Allowed Bridge Loan Claims shall be deemed to have unconditionally and irrevocably agreed to the Non-Guarantor Debtor Release and to have directed the Bridge Loan Agent to release all Bridge Loan Guaranty Claims.

(d)    Arranger Bridge Lender Treatment Option: Each Arranger Bridge Lender shall have the option to either:

(i)    receive their Pro Rata share of the distributions set forth in Section 3.2.4(c) above on account of Bridge Loan Claims held for their own account and not receive a release of any claims or causes of action from any Non-Arranger Bridge Lenders, which claims shall be unaffected by the Plan or the Confirmation Order, regardless of whether any such Non-Arranger Bridge Lenders agreed or are deemed to provide the releases set forth in Section 11.2.2 and regardless of whether any such Non-Arranger Bridge Lender elected, by executing an "Election to Participate in Step Two/Disgorgement Settlement" set forth in a "Notice of Step Two/Disgorgement Settlement," or otherwise, to participate in the Step Two/Disgorgement Settlement; or

(ii)    forgo their Pro Rata share of the distributions set forth in Section 3.2.4(c) above on account of Bridge Loan Claims held for their own account (which shall in no event be lower in aggregate principal amount than the Bridge Loan Claims held by such Arranger Bridge Lender for its own account as of January 28, 2011), in which case the distributions allocable to such Arranger Bridge Lender shall instead be distributed Pro Rata to the Non-Arranger Bridge Lenders, and by accepting such additional distributions each Non-Arranger Bridge Lender, other than any Non-Arranger Bridge Lender that returns such additional distribution to the Disbursing Agent within five (5) Business Days of disbursement, and the Bridge Loan Agent shall be deemed to have unconditionally and irrevocably released each and all of the Arranger Bridge Lenders that elected the treatment set forth in this Section 3.2.4(d)(ii) of and from any and all Holder Released Claims and any other claims or causes of action related to or arising out of the Bridge Loan Agreement, any related documents, the Bridge Loan Claims or the Bridge Loan Guaranty Claims, regardless of whether each or any Non-Arranger Bridge Lender agreed to provide the releases set forth in Section 11.2.2, unless such Non-Arranger Bridge Lender has returned its additional distribution as set forth above. The foregoing election must have been exercised by any Arranger Bridge Lender in writing and delivered to the Debtors before the commencement of the Confirmation Hearing on the Second Amended Plan or such later date as the Debtors shall have agreed in consultation with the Bridge Plan Proponents, and any such election

37

shall be irrevocable.  For the avoidance of doubt, any Arranger Bridge Lender that elected such treatment in connection with the Second Amended Plan will be deemed to have elected such treatment in connection with this Plan.  By electing such treatment in accordance with the foregoing, each Arranger Bridge Lender shall be deemed to have unconditionally and irrevocably released each and all of the Non-Arranger Bridge Lenders that accept such additional distributions (and that do not return such additional distributions within five (5) Business Days of disbursement as set forth above) and the Bridge Loan Agent of and from any and all Holder Released Claims and any other claims or causes of action related to or arising out of the Bridge Loan Agreement, any related documents, the Bridge Loan Claims or the Bridge Loan Guaranty Claims, regardless of whether such Arranger Bridge Lender agreed or are deemed to provide the releases set forth in Section 11.2.2.  Any such additional distributions that are not accepted and are instead returned to the Disbursing Agent within five (5) Business Days of disbursement as set forth above shall, upon receipt by the Disbursing Agent, be promptly returned by the Disbursing Agent to the Arranger Bridge Lenders that elected the treatment set forth in this Section 3.2.4(d)(ii).  For the avoidance of doubt, any releases by and in favor of Merrill Lynch and its affiliates, in their collective capacities as Arranger Bridge Lenders, includes releases by and in favor of Bank of America and its affiliates, in their collective capacities as Arranger Bridge Lenders.

(e)     Voting:  Claims in Class 1D are Impaired, and Holders of Class 1D Claims are entitled to vote to accept or reject the Plan.

3.2.5  Class 1E – Senior Noteholder Claims.

(a)     Classification:  Class 1E consists of all Senior Noteholder Claims against Tribune.

(b)     Allowance:  The Senior Noteholder Claims shall together be deemed Allowed in the aggregate amount of $1,283,055,743.77 (a) plus the amount (if any) of any other Claims arising under or evidenced by the Senior Notes Indentures and related documents, solely to the extent any such Claims are Allowed and (b) less any Senior Noteholder claims held by MSCS.  The Senior Noteholder Claims owned by MSCS shall be subject to challenge by the Litigation Trust pursuant to Article XIII herein.  The Senior Noteholder Claims shall not be subject to reduction, disallowance, subordination, set off or counterclaim (other than the Senior Noteholder Claims of MSCS with respect to the Morgan Stanley Claims).

(c)     Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Noteholder Claims against Tribune, each Holder of an Allowed Senior Noteholder Claim shall receive

(i)    Option 1:  subject to Section 5.4.2 herein, (i) a Pro Rata share of 6.27425 % of the Distributable Cash, 6.27425% of the New Senior Secured Term Loan and 6.27425% of the New Common Stock (subject to dilution by the Equity Incentive Plan),  and (ii) a Pro Rata share of the Class 1E Litigation Trust Interests; or

(ii)    Option 2:  (i) a Pro Rata share of $431,041,451 in Distributable Cash, and (ii) a Pro Rata share of the Class 1E Litigation Trust Interests.

Each Holder of an Allowed Senior Noteholder Claim may, on such Holder's Ballot or election form, as applicable, elect the treatment specified in Section 3.2.5(c)(i) or Section 3.2.5(c)(ii). Each Holder of an Allowed Senior Noteholder Claim that does not submit a Ballot or that submits a Ballot but fails to affirmatively elect the treatment set forth in Section 3.2.5(c)(i) shall be deemed to have elected the treatment specified in Section 3.2.5(c)(ii) with respect to its Allowed Senior Noteholder Claim.

Each Holder's Pro Rata share of the consideration set forth in clauses (i) and (ii) above shall be calculated by reference to all Allowed Senior Noteholder Claims regardless of how many such Holders elect Option 1 or Option 2.

Reorganized Tribune shall (a) withhold from the distributions provided for in this Section 3.2.5(c) the amount of any consideration allocable to the Senior Noteholder Claims held by MSCS and (b) hold such amount in reserve pending a determination of the allowance of MSCS's Senior Noteholder Claims and MSCS's entitlement to such distribution.  For the avoidance of doubt, if the Senior Noteholder Claims held by MSCS are disallowed or MSCS is otherwise found not to be entitled to such distribution, the consideration that would otherwise be distributed to MSCS on account of its Senior Noteholder Claims shall instead be distributed to the other Holders of Allowed Senior Noteholder Claims as set forth in this Section 3.2.5(c).  The Debtors, the Creditors' Committee, the applicable Indenture Trustee and MSCS shall work in good faith to agree upon an appropriate procedure, which shall be implemented prior to the Initial Distribution Date, to insure that MSCS does not receive a distribution on account of any Senior Noteholder Claims held by MSCS for its own account unless and until it is determined that such Senior Noteholder Claims are Allowed Claims and entitled to a distribution pursuant to this Section 3.2.5(c); provided, however, if such parties are unable to agree upon an appropriate procedure, upon notice and an opportunity to be heard, the Debtors, the Creditors' Committee, the applicable Indenture Trustee or MSCS may seek an order in aid of confirmation of this Plan resolving any disputes and implementing an appropriate procedure.

(d)    Voting:  Claims in Class 1E are Impaired, and Holders of Class 1E Claims are entitled to vote to accept or reject the Plan.

3.2.6    Class 1F – Other Parent Claims.

(a)    Classification:  Class 1F consists of all Other Parent Claims against Tribune.

39

(b)    Allowance:  The Swap Claim shall be Allowed against Tribune in the amount of $150,948,822.  The Claims of the Retiree Claimants shall be Allowed in accordance with the Retiree Claimant Settlement Agreement to the extent the Retiree Claimant Settlement Agreement is implemented and incorporated into this Plan pursuant to Section 5.15.4 herein.  Additional Other Parent Claims shall be subject to allowance, disallowance, or offset under the applicable provisions of this Plan, including, but not limited to, Article VIII and Section 7.11.

(c)    Treatment: On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Other Parent Claims against Tribune, each Holder of an Allowed Other Parent Claim shall receive:

(i)    Option 1:  (y) an amount of Distributable Cash equal to 35.18 % of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim, and (z) a Pro Rata share of the Bridge Settlement Proceeds from Distributable Cash; or

(ii)    Option 2:  subject to Section 5.4.2 herein, (y) an amount of New Senior Secured Term Loan, Distributable Cash and New Common Stock in the same ratio as the distribution to Holders of Allowed Senior Noteholder Claims that, on the basis of an assumed Total DEV of $6,870,000,000 (comprised of a base DEV of $6,750,000,000 plus the Step Two/Disgorgement Settlement Proceeds) regardless of any finding by the Bankruptcy Court that Total DEV is higher or lower, has an aggregate value equal to 35.18% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim, and (z) a Pro Rata share of an amount of New Senior Secured Term Loan, Distributable Cash and New Common Stock in the same ratio as the distribution to Holders of Allowed Senior Noteholder Claims that, on the basis of an assumed Total DEV of $6,870,000,000 regardless of any finding by the Bankruptcy Court that Total DEV is higher or lower, has an aggregate value equal to the Bridge Settlement Proceeds; or

(iii)    Option 3:  subject to Section 5.4.2 herein, (w) an amount of New Senior Secured Term Loan, Distributable Cash and New Common Stock in the same ratio as the distribution to Holders of Allowed Senior Noteholder Claims that, on the basis of an assumed Total DEV of $6,870,000,000 regardless of any finding by the Bankruptcy Court that Total DEV is higher or lower, has an aggregate value equal to 32.73% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim, (x) a Pro Rata share of an amount of New Senior Secured Term Loan, Distributable Cash and New Common Stock in the same ratio as the distribution to Holders of Allowed Senior Noteholder Claims that, on the basis of an assumed Total DEV of $6,870,000,000 regardless of any finding by the Bankruptcy Court that Total DEV is higher or lower, has an aggregate value equal to the Bridge Settlement Proceeds, and (y) a

Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which elect the treatment set forth in this Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv), of the Class 1F Litigation Trust Interests; or

(iv)    Option 4:  (w) an amount of Distributable Cash equal to 32.73% of the aggregate amount in U.S. dollars of such Holder's Allowed Other Parent Claim, (x) such Holder's Pro Rata share of the Bridge Settlement Proceeds from Distributable Cash, and (y) a Pro Rata share, calculated based upon the aggregate amount of Allowed Other Parent Claims the Holders of which elect the treatment set forth in this Section 3.2.6(c)(iv) or Section 3.2.6(c)(iii), of the Class 1F Litigation Trust Interests.

Each Holder of an Allowed Other Parent Claim may, on such Holder's Ballot, elect the treatment specified in Section 3.2.6(c)(i), Section 3.2.6(c)(ii), Section 3.2.6(c)(iii) or Section 3.2.6(c)(iv). Each Holder of an Allowed Other Parent Claim that does not submit a Ballot, or that submits a Ballot but fails to affirmatively elect the treatment set forth in Section 3.2.6(c)(i), Section 3.2.6(c)(ii) or Section 3.2.6(c)(iii) shall be deemed to have elected the treatment specified in Section 3.2.6(c)(iv) with respect to its Allowed Other Parent Claim.

Each Holder's Pro Rata share of the consideration set forth in clauses (i) through (iv) above shall be calculated by reference to all Allowed Other Parent Claims regardless of how many such Holders elect Option 1, 2, 3, or 4.

(d)    Voting:  Claims in Class 1F are Impaired, and Holders of Class 1F Claims are entitled to vote to accept or reject the Plan.

3.2.7    Class 1G – Convenience Claims.

(a)    Classification:  Class 1G consists of all Convenience Claims against Tribune.

(b)    Treatment:  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Convenience Claims against Tribune, on or as soon as practicable after the applicable Distribution Date, each Holder of an Allowed Convenience Claim against Tribune shall receive payment in full in Cash on account of such Claim; provided, however, that, subject to Section 7.4 of this Plan, Post-petition Interest shall not be paid to any Holder on any Convenience Claim without regard to whether such amount has accrued for federal income tax purposes.

(c)    Voting:  Allowed Claims in Class 1G are Unimpaired, and the Holders of Class 1G Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1G Claims are not entitled to vote to accept or reject the Plan; provided, however, that all Class 1G Claims shall be subject to allowance or disallowance in whole or in part under the applicable provisions of the Plan, including, but not limited to, Article VIII.

41

### 3.2.8   Class 1I – EGI-TRB LLC Notes Claims.

(a)      Classification:  Class 1I consists of all EGI-TRB LLC Notes Claims against Tribune.

(b)      Allowance:  EGI-TRB LLC Notes Claims against Tribune shall be subject to challenge by the Litigation Trust pursuant to Article XIII of this Plan.

(c)      Treatment:  On or as soon as practicable after the applicable Distribution Date, together with other distributions provided for in this Plan, in full satisfaction, settlement, release and discharge of and in exchange for Allowed EGI-TRB LLC Notes Claims against Tribune, each Holder of an Allowed EGI-TRB LLC Notes Claim against Tribune shall receive a Pro Rata share of the Class 1I Litigation Trust Interests.

(d)      Voting:  Claims in Class 1I are Impaired, and Holders of Class 1I Claims are entitled to vote to accept or reject the Plan.

### 3.2.9   Class 1J – PHONES Notes Claims.

(a)      Classification:  Class 1J consists of all PHONES Notes Claims against Tribune.

(b)      Allowance: The PHONES Notes Claims shall together be deemed Allowed in the aggregate amount of $759,252,932 (plus unpaid interest that accrued between November 15, 2008 and December 8, 2008).

(c)      Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed PHONES Notes Claims against Tribune, each Holder of an Allowed PHONES Notes Claim shall receive a Pro Rata share of the Class 1J Litigation Trust Interests.

(d)      Voting:  Claims in Class 1J are Impaired, and Holders of Class 1J Claims are entitled to vote to accept or reject the Plan.

### 3.2.10  Class 1K – Intercompany Claims.

(a)      Classification:  Class 1K consists of all Intercompany Claims against Tribune.

(b)      Treatment:  In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Tribune, except as otherwise provided herein, Holders of Intercompany Claims against Tribune shall receive the treatment afforded to them in the Intercompany Claims Settlement.

(c)      Voting:  Claims in Class 1K are Impaired; however, as set forth in Section 4.3, votes shall not be solicited from Holders of Claims in Class 1K.

### 3.2.11  Class 1L – Securities Litigation Claims.

(a)     Classification:  Class 1L consists of all Securities Litigation Claims against Tribune.

(b)     Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Securities Litigation Claims against Tribune,  each Holder of an Allowed Securities Litigation Claim against Tribune shall receive a Pro Rata share of the Class 1L Litigation Trust Interests.  .

(c)     Voting:  Claims in Class 1L are Impaired.  Holders of Claims in Class 1L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

3.2.12  Class 1M – Tribune Interests.

(a)     Classification:  Class 1M consists of all Tribune Interests in Tribune.

(b)     Treatment:  On the Effective Date, all Tribune Interests in Tribune shall be extinguished and Holders of such Interests shall not receive or retain any property under the Plan on account of such Tribune Interests.

(c)     Voting:  Interests in Class 1M are Impaired.  Holders of Interests in Class 1M are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

3.3     Classification and Treatment of Claims Against and Interests in Filed Subsidiary Debtors (Debtors 2 through 111).

3.3.1  Classes 2A through 111A – Priority Non-Tax Claims.

(a)     Classification:  Classes 2A through 111A consist of all Priority Non-Tax Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  Each Holder of an Allowed Priority Non-Tax Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

(c)     Voting:  Allowed Claims in Classes 2A through 111A are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2A through 111A are not entitled to vote to accept or reject this Plan; provided, however, that all Claims in Classes 2A through 111A shall be subject to allowance or disallowance in whole or in part under the applicable provisions of this Plan, including, but not limited to, Article VIII.

### 3.3.2   Classes 2B through 111B – Other Secured Claims.

(a)      Classification:  Classes 2B through 111B consist of all Other Secured Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)      Treatment:  Each Holder of an Allowed Other Secured Claim against a Filed Subsidiary Debtor shall have such Claim Reinstated.

(c)      Voting:  Allowed Claims in Classes 2B through 111B are Unimpaired, and the Holders of Claims in such Classes are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Classes 2B through 111B are not entitled to vote to accept or reject this Plan; provided, however, that all Claims in Classes 2B through 111B shall be subject to allowance or disallowance in whole or in part under the applicable provisions of this Plan, including, but not limited to, Article VIII.

### 3.3.3   Classes 50C through 111C – Senior Guaranty Claims.

(a)      Classification:  Classes 50C through 111C consist of all Senior Guaranty Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)      Allowance:  The Senior Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Senior Guaranty Agreement, including the full amount of principal, interest, and all other amounts due and owing under the Senior Guaranty Agreement as of the Petition Date, plus, to the extent allowable under the Bankruptcy Code, all postpetition interest and other amounts due and owing under the Senior Guaranty Agreement from and after the Petition Date, and neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.

(c)      Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Guaranty Claims against the Guarantor Debtors, subject to Section 5.4.2, each Holder of an Allowed Senior Guaranty Claim against a Guarantor Debtor shall receive a Pro Rata share of:

(i)      98.50% of the Remaining New Senior Secured Term Loan;

(ii)      98.50% of the Remaining Distributable Cash; and

(iii)      98.50% of the Remaining New Common Stock.

The distributions payable to the Holder(s) of the Swap Claim shall be paid directly to such Holder by the Disbursing Agent and all other distributions payable to the Holders of the Senior Guaranty Claims shall be paid to the Senior Loan Agent for distribution in accordance with Section 7.3 of this Plan, and prior to distributing such amounts the Senior Loan Agent is only

authorized to retain $32,500,000 from the Distributable Cash included in such distribution (such amount the "Senior Lender Holdback"), to be used by the Senior Loan Agent, or, to the extent unused, distributed, solely in accordance with Section 7.3 of this Plan.

(d)    Voting:  Claims in Classes 50C through 111C are Impaired, and Holders of Claims in Classes 50C through 111C are entitled to vote to accept or reject the Plan against the relevant Debtors.

### 3.3.4    Classes 50D through 111D – Bridge Loan Guaranty Claims.

(a)    Classification:  Classes 50D through 111D consist of all Bridge Loan Guaranty Claims against the relevant Guarantor Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)    Allowance:  So long as (i) the Bridge Plan Proponents shall have withdrawn their proposed plan of reorganization and their related discovery requests issued to the Proponents on or prior to February 8, 2011 and (ii) the Bridge Lender Group shall have supported the Plan, taken no actions inconsistent with confirmation of the Plan in their capacities as Holders of Bridge Loan Claims from and after January 28, 2011, and voted all Bridge Loan Claims held by them to accept the Plan, the Bridge Loan Guaranty Claims shall be deemed Allowed in an aggregate amount equal to all amounts payable under the Bridge Loan Guaranty Agreement, other than the Bridge Lender Fee/Expense Claims (payment of which shall be subject only to Section 9.1.2), including the full amount of principal, interest, and all other amounts due and owing under the Bridge Loan Guaranty Agreement as of the Petition Date, and neither such Claims nor the distributions thereon shall be subject to reduction, disallowance, subordination, set off or counterclaim.  To the extent that any Bridge Loan Guaranty Claims are Allowed, Bridge Loan Guaranty Claims held by the Settling Step Two Payees or their Affiliates will receive no worse treatment than other Bridge Loan Guaranty Claims unless otherwise agreed by such Settling Step Two Payees.

(c)    Treatment:  In accordance with Section 7.3, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the Remaining New Senior Secured Term Loan, (ii) the Remaining Distributable Cash and (iii) the Remaining New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Guaranty Claims.  Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against the Guarantor Debtors shall be extinguished and Holders of such Claims shall not receive or retain any property under the Plan on account of such Bridge Loan Guaranty Claims.

(d)    Voting:  Claims in Class 50D through 111D are Impaired, and Holders of Claims in Classes 50D through 111D are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

### 3.3.5  Classes 2E through 111E – General Unsecured Claims.

(a)     Classification:  Classes 2E through 111E consist of all General Unsecured Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  On or as soon as reasonably practicable after the applicable Distribution Date, each Holder of an Allowed General Unsecured Claim against a Filed Subsidiary Debtor shall receive an amount of Distributable Cash equal to 100% of such Holders' Allowed General Unsecured Claim Against a Filed Subsidiary Debtor; provided, however, that Post-petition Interest shall not accrue or be paid on any General Unsecured Claim against a Filed Subsidiary Debtor.

(c)     Voting:  Claims in Classes 2E through 111E are Impaired, and Holders of Claims in Classes 2E through 111E are entitled to vote to accept or reject the Plan against the relevant Debtors; provided, however, that, except for Holders of Claims in the Subsidiary Revoting Classes, votes to accept or reject the Second Amended Plan cast by Holders of General Unsecured Claims against the Filed Subsidiary Debtors shall be deemed to be votes to accept or reject this Plan.

### 3.3.6  Classes 2K through 111K – Intercompany Claims.

(a)     Classification:  Classes 2K through 111K consist of all Intercompany Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  In full satisfaction, settlement, release and discharge of and in exchange for Intercompany Claims against Filed Subsidiary Debtors, except as otherwise provided herein, Holders of Intercompany Claims shall receive the treatment afforded to them in the Intercompany Claims Settlement.

(c)     Voting:  Claims in Classes 2K through 111K are Impaired; however, as set forth in Section 4.3, votes on the Plan shall not be solicited from Holders of Claims in Classes 2K through 111K.

### 3.3.7  Classes 2L through 111L – Securities Litigation Claims.

(a)     Classification:  Classes 2L through 111L consist of all Securities Litigation Claims against the relevant Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  On or as soon as practicable after the applicable Distribution Date, in full satisfaction, settlement, release and discharge of and in exchange for Allowed Securities Litigation Claims against Filed Subsidiary Debtors,  each Holder of an Allowed Securities Litigation Claim against a Filed Subsidiary Debtor shall receive the distributions, if any, provided to such Holder under Section 3.2.11 of this Plan.

(c)     Voting:  Claims in Classes 2L through 111L are Impaired.  Holders of Claims in Classes 2L through 111L are conclusively deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

### 3.3.8   Classes 2M through 111M – Interests in Filed Subsidiary Debtors.

(a)     Classification:  Classes 2M through 111M consist of all Interests in the Filed Subsidiary Debtors.  The numerical portion of the Class designation corresponds to the applicable Debtor number on Appendix A hereto.

(b)     Treatment:  Subject to Section 5.2 of this Plan, each Holder of an Allowed Interest in the Filed Subsidiary Debtors shall have its Interest Reinstated.  Allowed Interests in each Filed Subsidiary Debtor shall be Reinstated for administrative convenience and (1) in the case of the Guarantor Debtors, for the ultimate benefit of the Holders of Senior Guaranty Claims against such Guarantor Debtors and (2) in the case of the Non-Guarantor Debtors, in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain Cash distributions to the Holders of Allowed Claims against such Non-Guarantor Debtors.

(c)     Voting:  Allowed Interests in Classes 2M through 111M are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Interests in Classes 2M through 111M are not entitled to vote to accept or reject the Plan.

### 3.4   Prepackaged Plans for and Treatment of Claims Against and Interests in Guarantor Non-Debtors, if Any, That Become Debtors.

### 3.4.1   Prepackaged Plan.  This Plan constitutes a Prepackaged Plan for the Guarantor Non-Debtors, if any, that commence Chapter 11 Cases.  For any Guarantor Non-Debtor that commences a Chapter 11 Case, such Prepackaged Plan shall classify Allowed Claims and Interests in the same manner as set forth in Section 3.3 above for the Filed Subsidiary Debtors.

### 3.4.2   Unimpaired Claims and Interests.  Except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, each Holder of an Allowed Claim against or Interest in a Guarantor Non-Debtor that becomes a Debtor shall have its Claim or Interest Reinstated.  In addition, except for Loan Guaranty Claims, Intercompany Claims and Securities Litigation Claims, Allowed Claims against and Interests in any Guarantor Non-Debtor that becomes a Debtor are Unimpaired, and the Holders of such Claims and Interests are conclusively deemed to have accepted the Prepackaged Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of such Claims and Interests are not entitled to vote to accept or reject the relevant Prepackaged Plan.  All executory contracts and unexpired leases of the Guarantor Non-Debtors that become Debtors shall be assumed and shall be fully enforceable in accordance with their terms.  Joint venture agreements, stockholder agreements, limited liability company agreements, limited liability partnership agreements, limited partnership agreements, general partnership agreements, affiliate agreements, and any other agreements or arrangements related to the foregoing shall continue in accordance with their terms and shall remain in full

47

force and effect and the parties' rights thereunder shall not be modified by the relevant Prepackaged Plan.

### 3.4.3  Loan Guaranty Claims.

(a)  Senior Guaranty Claims.  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Senior Guaranty Claims against Guarantor Non-Debtors that become Debtors, each Holder of an Allowed Senior Guaranty Claim against a Guarantor Non-Debtor that becomes a Debtor shall be entitled to receive the distributions provided to such Holder under Section 3.3.3 and the guaranties described in Section 5.6 and shall not be entitled to receive any other or further distributions or guaranties.  Senior Guaranty Claims are Impaired, and Holders of Senior Guaranty Claims are entitled to vote to accept or reject the relevant Prepackaged Plan.  Votes cast by Holders of Senior Guaranty Claims in Classes 50C through 111C shall be counted as votes cast on the relevant Prepackaged Plan prepared on behalf of the relevant Guarantor Non-Debtors.

(b)  Bridge Loan Guaranty Claims.  In accordance with Section 7.3, in order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions of (i) the Remaining New Senior Secured Term Loan, (ii) the Remaining Distributable Cash and (iii) the Remaining New Common Stock that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall instead be distributed to the Senior Loan Agent for distribution on account of Allowed Senior Guaranty Claims.  Accordingly, on the Effective Date, all Bridge Loan Guaranty Claims against Guarantor Non-Debtors that become Debtors shall be extinguished and the Holders of such Claims shall not receive or retain any property under the relevant Prepackaged Plan on account of such Bridge Loan Guaranty Claims.  Bridge Loan Guaranty Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan

### 3.4.4  Intercompany Claims.  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Intercompany Claims against Guarantor Non-Debtors that become Debtors, all Intercompany Claims against a Guarantor Non-Debtor that becomes a Debtor shall receive the treatment set forth in the Intercompany Claims Settlement and shall be deemed satisfied, discharged and extinguished in full and shall be eliminated as of the Effective Date.  Intercompany Claims are Impaired; however, as set forth in Section 4.3, votes shall not be solicited from the Holders of such Claims.

### 3.4.5  Securities Litigation Claims.  In full satisfaction, settlement, release and discharge of and in exchange for Allowed Securities Litigation Claims against Guarantor Non-Debtors that become Debtors,  each Holder of an Allowed Securities Litigation Claim against a Guarantor Non-Debtor that becomes a Debtor shall receive the distributions, if any, provided to such Holder under Section 3.2.11 of this Plan.  Securities Litigation Claims are Impaired and Holders of such Claims are conclusively deemed to have rejected the relevant Prepackaged Plan and are not entitled to vote to accept or reject the relevant Prepackaged Plan.

## ARTICLE IV: ACCEPTANCE OR REJECTION OF PLAN

4.1     Impaired Classes of Claims and Interests Entitled to Vote.

Holders of Claims or Interests in each Impaired Class of Claims or Interests that receive or retain property pursuant to this Plan shall be entitled to vote to accept or reject this Plan.

4.2     Acceptance by an Impaired Class of Claims.

4.2.1   Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if, after excluding any Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept such Plan, and (b) more than one-half in number of such Allowed Claims actually voting in such Class have voted to accept the Plan.

4.2.2   Except for Holders of Claims in Classes that are deemed or presumed to have accepted or rejected this Plan pursuant to the terms of this Plan other than this Section 4.2.2, if Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject this Plan and notified that a failure of any Holders of Claims in such Impaired Class of Claims to vote to accept or reject this Plan would result in such Impaired Class of Claims being deemed to have accepted this Plan, but no Holders of Claims in such Impaired Class of Claims voted to accept or reject this Plan (or the Second Amended Plan if such Holders' votes on the Second Amended Plan are deemed to be votes on this Plan), then such Class of Claims shall be deemed to have accepted this Plan.

4.3     Deemed Acceptance by Holders of Intercompany Claims.

As proponents of this Plan (or Affiliates thereof), Holders of Intercompany Claims are conclusively deemed to accept this Plan and votes shall not be solicited from the Holders of such Claims.

4.4     Presumed Acceptances by Unimpaired Classes.

Classes of Claims or Interests designated as Unimpaired are conclusively presumed to have voted to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, and the votes of the Holders of such Claims or Interests will not be solicited.

4.5     Presumed Rejection of the Plan.

Impaired Classes of Claims or Interests that do not receive or retain property under the Plan are conclusively presumed to have voted to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and the votes of Holders of such Claims or Interests will not be solicited.

4.6     Confirmability and Severability of this Plan.

4.6.1   Consensual Confirmation.  The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in this joint plan of reorganization for purposes of, among other things, economy and efficiency, this Plan shall be deemed a separate chapter 11 plan for each such Debtor.

4.6.2   Cramdown.  With respect to any Impaired Class of Claims or Interests that fails to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors request that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, in which case or cases, the Plan shall constitute a motion for such relief.

4.6.3   Reservation of Rights.  Subject to Section 15.8 of this Plan, the Proponents reserve the right to modify or withdraw this Plan, in its entirety or in part, for any reason, including, without limitation, in the event that the Plan as it applies to any particular Debtor is not confirmed.  In addition, and also subject to Section 15.8 of this Plan, should this Plan fail to be accepted by the requisite number and amount of Claims and Interests voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of this Plan to the contrary, the Proponents reserve the right to reclassify Claims or Interests or otherwise amend, modify or withdraw this Plan in its entirety, in part or with respect to a particular Debtor.  Without limiting the foregoing, if the Proponents withdraw the Plan as to any particular Debtor because the Plan with respect to such Debtor fails to be accepted by the requisite number and amount of Claims voting or due to the Court, for any reason, denying Plan confirmation with respect to such Debtor, then at the option of such Debtor (a) the Chapter 11 Case for such Debtor may be dismissed or (b) such Debtor's assets may be sold to a Debtor that is a Proponent, such sale to be effective at or prior to the Effective Date of the Plan for such Proponent, and the sale price shall be paid to the seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by Tribune and approved by the Court.

## ARTICLE V: MEANS FOR IMPLEMENTATION OF THE PLAN

5.1     Non-Substantive Consolidation.

Although the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason.  Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds may be advanced to the relevant Debtors by the Estate of Tribune or any of the Subsidiary Debtors at the option of the advancing Debtor, as applicable.  Except as specifically set forth herein, nothing in this Plan or the Disclosure Documents shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim.  Notwithstanding

anything to the contrary in this Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of this Plan, the Chapter 11 Cases, or otherwise.

      5.2    <u>Restructuring Transactions</u>.

      On or prior to the Effective Date, any Debtor and, after the Effective Date, any Reorganized Debtor, may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions.  The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.  The Restructuring Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transactions for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Reorganized Debtors.  In each case in which the surviving, resulting or acquiring person in any such Restructuring Transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Debtor or Reorganized Debtor pursuant to this Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Debtor or Reorganized Debtor will perform such obligations.  Implementation of the Restructuring Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in this Plan.  <u>Exhibit 5.2</u>, to be filed with the Plan Supplement, shall set forth a description of the Restructuring Transactions.  On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in this <u>Section 5.2</u>.  The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and section 303 of title 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order.  To the extent that any Restructuring Transaction may require the prior consent of the FCC to an assignment of FCC Licenses or a

transfer of control of a holder of FCC Licenses, no such Restructuring Transaction shall be consummated until all necessary prior consents of the FCC shall have been obtained.

5.3     Corporate Governance, Directors, Officers and Corporate Action.

5.3.1   Certificate of Incorporation; By-Laws; Limited Liability Company Agreement; Limited Liability Partnership Agreement.  On the Effective Date, the Certificate of Incorporation and By-Laws substantially in the forms attached as Exhibit 5.3.1(1) and Exhibit 5.3.1(2), respectively, to be filed with the Plan Supplement, shall go into effect.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities. Additionally, the Certificate of Incorporation shall contain director and officer liability exculpation and indemnity provisions to the fullest extent permitted under Delaware law applicable to directors and officers serving from and after the Effective Date.  To the extent the summary description in this Plan conflicts with the terms of the Certificate of Incorporation or the By-Laws, the terms of such documents shall govern.  The certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, of the other Debtors or Reorganized Debtors shall be amended as necessary to satisfy the provisions of this Plan (including, without limitation, Section 5.2) and the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents, as applicable, as permitted by applicable law.  In addition, on the Effective Date, Reorganized Tribune, the Creditor Proponents and holders of more than 10% of the New Common Stock of Reorganized Tribune as of the Effective Date shall enter into a registration rights agreement substantially in the form set forth in Exhibit 5.3.1(3), which shall be filed prior to the commencement of the Confirmation Hearing.

5.3.2   Directors and Officers of Reorganized Tribune.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of Reorganized Tribune shall be the persons identified in Exhibit 5.3.2(1), to be filed with the Plan Supplement, which shall be acceptable to the Proponents.  On the Effective Date, the board of directors of Reorganized Tribune shall have seven (7) members, including the chief executive officer of Reorganized Tribune if the employment agreement with such chief executive officer so provides, consistent with the provisions of Section 5.5 of this Plan.  All members of the initial board of directors of Reorganized Tribune will be in compliance with all applicable requirements of the Communications Act and the FCC's rules.  As set forth in the Certificate of Incorporation, (i) Oaktree or its affiliated designee shall have the sole right to designate two members of the initial board of directors of Reorganized Tribune, one of whom shall serve for a three-year term and the other of whom shall serve for a two-year term; (ii) Angelo Gordon or its affiliated designee shall have the sole right to designate one member of the initial board of directors of Reorganized Tribune, who shall serve for a three-year term; (iii) JPMorgan or its affiliated designee shall have the sole right to designate one member of the initial board of directors of Reorganized Tribune, who shall serve for a three-year term and (iv) Oaktree, Angelo Gordon and JPMorgan (or their respective affiliated designees) shall have the right to jointly designate two members of the initial board of directors of Reorganized Tribune by majority consent of Oaktree, Angelo

Gordon and JPMorgan (each of whom shall have one vote), both of whom shall serve for one-year terms; and in each case be subject to re-election based on a shareholder vote pursuant to the terms of the Certificate of Incorporation and applicable law; provided that, if any of the foregoing directors that were so designated shall resign or be removed prior to the end of such director's initial term, the party or parties that designated such director shall have the sole right to designate a replacement director to serve the remaining term of the vacated seat; provided further that, in the event a Creditor Proponent and the Debtors reasonably determine, based upon comments received from the FCC, that the required approval of the FCC will not be obtained due to the designation rights afforded to such Creditor Proponent(s) in this Section 5.3.2 (the "Designation Rights"), then such Creditor Proponent(s) shall within 60 days of such determination take such action as is necessary or appropriate to enable the Debtors and the Creditor Proponents to obtain such FCC approval.  Such action may include, at the sole discretion of such Creditor Proponent(s), without limitation, (i) altering or divesting an investment or other interest held by such Creditor Proponent(s) in any entity, (ii) relinquishing its Designation Rights, or (iii) making any commitment or explanatory filing to the FCC to permit the FCC approval to be obtained; provided further that, in the event such Creditor Proponent(s) fails to take action pursuant to (i) and/or (iii) above within the foregoing time period that is adequate to enable the Debtors and Creditor Proponents to obtain FCC approval, then such Creditor Proponent(s) immediately shall relinquish its Designation Rights, and any prior designation by such Creditor Proponent(s) shall be deemed withdrawn, and any designee of such Creditor Proponent shall be deemed to have resigned from the Board concurrent with the relinquishment of such Designation Rights.  In the event Designation Rights are relinquished to obtain FCC approval, any Creditor Proponent relinquishing such rights shall be afforded rights to nominate one or more members of the initial board of Reorganized Tribune or other investor protections that, in each case, shall be mutually agreed upon by the Creditor Proponents and the Debtors in order to obtain the required FCC approval; provided, that such Creditor Proponent shall be afforded such rights only to the extent such rights can be held and exercised in compliance with the Communications Act and FCC's rules.  If a Creditor Proponent that has relinquished Designation Rights cannot be afforded the right to nominate one or more members of the initial board under the Communications Act or the FCC's rules, those Creditor Proponents that may exercise their Designation Rights shall mutually agree upon the member or members to be designated.  In the event a Creditor Proponent relinquishes its Designation Rights to obtain FCC approval, such Creditor Proponent(s) shall have a six month period from the date that such Designation Rights are relinquished to take such action as is necessary to allow such Creditor Proponent(s) to regain its Designation Rights if such Designation Rights can be held and exercised in compliance with the Communications Act and the FCC's rules.  In such event, such Creditor Proponent(s) shall immediately notify the other Creditor Proponents and the Debtors in writing that it has regained its Designation Rights and the other Creditor Proponents and the Debtors immediately thereafter shall take such action that is necessary to permit such Creditor Proponent(s) to designate its director(s) as set forth in this Section 5.3.2 at any time during the terms specified in this Section 5.3.2.  Upon such designation, the director (or directors) serving in the interim shall be deemed to have resigned his or her office concurrent with the effectiveness of such designation.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Creditor Proponents will disclose in Exhibit 5.3.2(2), to be filed with the Plan Supplement, the identity and affiliations of any person proposed to serve on the board of directors of Tribune after the Confirmation Date and to the extent such person is an insider (as defined in section

101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person. The Creditor Proponents anticipate that the current directors of Tribune will serve on Tribune's board of directors after the Confirmation Date until the Effective Date. The Creditor Proponents shall file a notice specifying the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Tribune from and after the Effective Date and to the extent such person is an insider (as defined in section 101(31) of the Bankruptcy Code) other than by virtue of being a director, the nature of any compensation for such person, as that information becomes available and in any event before the Effective Date. Any and all rights of any parties to seek Bankruptcy Court review of such directors pursuant to section 1129(a)(5) of the Bankruptcy Code shall be preserved with respect to such filing, notwithstanding that such filing may be made after the Confirmation Date. Each such director and officer of Reorganized Tribune shall serve from and after the Effective Date pursuant to the terms of the Certificate of Incorporation and applicable law. Each member of the current board of directors of Tribune will be deemed to have resigned on the Effective Date unless identified in the supplemented Exhibit 5.3.2(2) as continuing on the board of directors of Reorganized Tribune after the Effective Date.

      5.3.3 <u>Ownership and Management of Reorganized Debtors Other Than Reorganized Tribune</u>. Except as set forth in Exhibit 5.2, from and after the Effective Date, each Reorganized Debtor shall retain its equity interest in any other Reorganized Debtor. The initial boards of directors or managers and officers of the Reorganized Debtors other than Reorganized Tribune shall be as set forth in Exhibit 5.3.3, to be filed no later than five days before the commencement of the Confirmation Hearing.

      5.3.4 <u>Corporate Action</u>. The adoption of the Certificate of Incorporation or similar constituent documents, the adoption of the By-Laws, the selection of directors and officers for Reorganized Tribune, and all other actions contemplated by this Plan shall be authorized and approved in all respects (subject to the provisions of this Plan) by the Confirmation Order. All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders, directors, or managers of the Debtors or the Reorganized Debtors. On or before the Effective Date, as applicable, the appropriate officers of the Debtors and/or the Reorganized Debtors and members of the boards of directors or managers of the Debtors and/or Reorganized Debtors are authorized and directed to issue, execute and deliver, and cause the Reorganized Debtors to perform, the agreements, documents, securities and instruments contemplated by this Plan in the name of and on behalf of the Debtors and/or Reorganized Debtors.

      5.4    <u>Issuance and Distribution of New Securities and Related Matters</u>.

      5.4.1 <u>Issuance of New Securities</u>. On the Effective Date or a subsequent Distribution Date, as applicable, Reorganized Tribune shall issue shares of New Common Stock and New Warrants and all instruments, certificates and other documents required to be issued or distributed pursuant to this Plan without further act or action under applicable law, regulation, order or rule. Except as otherwise provided in this Plan, including as specifically provided in

Section 5.4.2 hereof, each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to the Plan will be issued New Class A Common Stock, provided that any such Holder will be entitled to receive all or a portion of its shares of New Common Stock in the form of New Class B Common Stock if such Holder informs the Proponents of its desire to receive instead such New Class B Common Stock by the date announced by the Proponents in a filing with the Bankruptcy Court, with such date to be no earlier than the first day of the Confirmation Hearing.  The Certificate of Incorporation, substantially in the form of Exhibit 5.3.1(1), to be filed with the Plan Supplement, sets forth the rights and preferences of the New Common Stock.  The Certificate of Incorporation may contain customary provisions restricting the sale, transfer, assignment, conversion or other disposal of such shares of New Common Stock.  To the extent the shares of New Class A Common Stock or New Class B Common Stock are certificated, such certificates may contain a legend restricting the sale, transfer, assignment, conversion or other disposal of such shares.  The New Warrant Agreement substantially in the form of Exhibit 1.1.141 hereto, to be filed with the Plan Supplement, sets forth the rights of the holders of the New Warrants.  The issuance of the New Common Stock and the New Warrants and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.  In addition, although the Proponents intend that the Litigation Trust Interests shall not be "securities" under applicable laws, if such Litigation Trust Interests are securities, they shall be exempt from registration under section 1145 of the Bankruptcy Code and under applicable securities laws.  Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of this Plan, including, without limitation, the Exit Facility Credit Agreement (if any), the New Senior Secured Term Loan Agreement (if any), and any other agreement entered into in connection with the foregoing, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

    5.4.2    Distribution of New Common Stock and New Warrants.

        (a)    Foreign Ownership Certification.  Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to this Plan will be required (1) to provide the Foreign Ownership Certification by the deadline established by the Bankruptcy Court and (2) to report any changes in foreign ownership percentages between the submission of the Foreign Ownership Certification and the Effective Date or such other deadline established by the Bankruptcy Court by providing an amended Foreign Ownership Certification and, upon request of the Proponents, confirm the absence of any changes.  Notwithstanding anything else to the contrary in this Plan, any such Holder that fails to provide (i) the Foreign Ownership Certification by the deadline established by the Bankruptcy Court, (ii) an amended Foreign Ownership Certification if one is required, (iii) a Foreign Ownership Certification that is reasonably satisfactory to the Proponents or (iv) a timely confirmation, if required, that its foreign ownership and voting rights percentages have not changed, may be deemed to be an entity that is foreign-owned and controlled for purposes of determining the allocation of New Common Stock and New Warrants as set forth in Section 5.4.2(c).

        (b)    Media Ownership Certification.  Each Holder of a Claim that is eligible to receive a distribution of New Common Stock pursuant to this Plan may be required to provide a Media Ownership Certification by the deadline established by the Bankruptcy Court, in

accordance with the instructions set forth in the Media Ownership Certification document that may be distributed to any such Holder.  Any such Holder that fails to provide the Media Ownership Certification by the deadline established by the Bankruptcy Court or that does not do so to the reasonable satisfaction of the Proponents may be allocated New Class B Common Stock in lieu of New Class A Common Stock as set forth in Section 5.4.2(d) at the discretion of the Proponents.

(c)    Foreign-Owned or Controlled Entities.  Notwithstanding anything else to the contrary in this Plan, Reorganized Tribune shall issue (i) New Warrants in lieu of New Common Stock, (ii) New Common Stock or (iii) a combination of New Warrants and New Common Stock (in lieu of only New Common Stock or only New Warrants), to any Holder of a Claim that is eligible to receive New Common Stock under this Plan and that, based on the Holder's Foreign Ownership Certification (or failure to provide the Foreign Ownership Certification or otherwise comply with Section 5.4.2(a) herein), is (or is deemed to be pursuant to Section 5.4.2(a)) more than twenty five percent (25%) foreign owned or controlled, on either a voting or an equity basis, as determined pursuant to section 310(b) of the Communications Act.  Such issuance of New Warrants, New Common Stock, or a combination of New Warrants and New Common Stock to such Holders shall be pursuant to an allocation mechanism to be determined by the Proponents or Reorganized Tribune that, based on the aggregated results of the Foreign Ownership Certifications, ensures compliance with section 310(b) of the Communications Act.

(d)    Entities with Conflicting Media Interests.  Reorganized Tribune, in its discretion, may issue shares of New Class B Common Stock in lieu of shares of New Class A Common Stock to any Holder of a Claim that is eligible to receive a distribution of New Common Stock under this Plan to ensure that such Holder will hold, in the aggregate (including with entities under common ownership or control) less than five percent (5%) of the voting rights of Reorganized Tribune, if Reorganized Tribune determines, based on the Holder's Media Ownership Certification (or failure to provide the Media Ownership Certification or otherwise comply with Section 5.4.2(b) herein), that such Holder has other media interests that could impair the ability of Reorganized Tribune to comply with the Communications Act or the FCC's rules if such Holder were issued the shares of New Class A Common Stock that it otherwise would be eligible to receive pursuant to this Plan, provided, however, that to the extent a Creditor Proponent has been approved by the FCC as a party to the FCC Applications, Reorganized Tribune shall not be entitled to issue shares of New Class B Common Stock to such Creditor Proponent at emergence without its express consent unless the issuance of Class A Common Stock to a Creditor Proponent would result in a violation of the Communications Act or the FCC's rules or unless such Creditor Proponent has failed to comply with or satisfy any conditions imposed by the FCC as part of the FCC Approval or any commitment made in the FCC Applications, in which case Reorganized Tribune may issue shares of New Class B Common Stock to such Creditor Proponent only to the minimum extent necessary to cure such violation or non-compliance.  Notwithstanding the foregoing, the Debtors will not request any waivers of the Communications Act or the FCC's rules in or regarding the FCC Applications to accommodate separate media interests held by a Creditor Proponent independent of its interest in Reorganized Tribune.

(e)    Holders of Five Percent (5%) or More of New Class A Common Stock.  If any Holder of a Claim is eligible under this Plan to receive New Class A Common Stock such that, upon the Effective Date or such other deadline established by the Bankruptcy Court, such Holder would receive five percent (5%) or more of the shares of New Class A Common Stock (for any reason, including, but not limited to, as a result of the distribution of New Warrants or the distribution of New Class B Common Stock in lieu of New Class A Common Stock in accordance with Sections 5.4.2(c) or 5.4.2(d)), and such ownership has not been disclosed in the FCC Applications and approved by the FCC, then Reorganized Tribune shall be entitled to issue to such Holder as many shares of New Class B Common Stock in lieu of shares of New Class A Common Stock as Reorganized Tribune deems necessary to ensure compliance with the Communications Act or the FCC's rules and/or to avoid substantial delay in obtaining the FCC Approval.

(f)    Distributions.  On or as soon as reasonably practicable after the applicable Distribution Date, all of the shares of the New Common Stock and New Warrants to which any Holder of a Claim shall become entitled pursuant to this Plan shall be transferred by delivery of one or more certificates representing such shares as described herein or issued in the name of such Holder or DTC or its nominee or nominees in accordance with DTC's book-entry exchange procedures, as contemplated by Section 7.7.2, subject to the terms and conditions of this Plan.  In the period after the Effective Date and pending distribution of the New Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such Holder's New Common Stock (including receiving any proceeds of any permitted transfer of such New Common Stock), and to exercise all other rights in respect of the New Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of the New Common Stock issued in the name of such Holder).

5.5    Reporting Requirements Under Securities Exchange Act of 1934 and Listing of New Class A Common Stock on Securities Exchange or Quotation System.

Unless otherwise required by applicable law, the board of directors of Reorganized Tribune will determine when after the Effective Date Reorganized Tribune will (a) become a reporting company under section 12 of the Securities Exchange Act of 1934, as amended, and (b) list the New Class A Common Stock for trading on the New York Stock Exchange or the NASDAQ Stock Market. Notwithstanding the foregoing sentence, in the event Reorganized Tribune fails to list the New Class A Common Stock within 12 months after the Effective Date, then any one of the Proponents holding at least 5% of the outstanding New Class A Common Stock on a fully-diluted basis at the time may exercise its right to demand registration in accordance with the terms of the registration rights agreement (which shall be substantially in the form set forth in Exhibit 5.3.1(3), subject to technical changes thereto), and have the New Class A Common Stock listed on a stock exchange in accordance with such demand registration. In addition, after the Effective Date Reorganized Tribune shall make available to the holders of the New Common Stock on a password-protected website, intranet or other reasonable means, (i) with respect to each fiscal quarter other than a fiscal year end, all financial information that would be required to be presented in Item 1 and Item 2 of Part 1 of a quarterly report on Form 10-Q under the Exchange Act (including a "Management's Discussion and Analysis of Financial Condition and Results of Operations"), within 60 days after the end of such fiscal quarter and (ii)

with respect to each fiscal year end, all financial information that would be required to be presented in Item 7 and Item 8 of Part II of an annual report on Form 10-K (including a "Management's Discussion and Analysis of Financial Condition and Results of Operations") within 120 days after the end of such fiscal year end. Notwithstanding the foregoing, it is understood that Reorganized Tribune (i) shall not be required to comply with Section 302, 404 or 906 of the Sarbanes-Oxley Act or the Commission's XBRL requirements with respect to the information to be provided pursuant to the preceding sentence, (ii) shall not be required to provide any financial statements with respect to periods ending prior to the Effective Date, (iii) shall not be required to provide any information pursuant to the preceding sentence during the first 180 days after the Effective Date but shall provide on the 181st day after the Effective Date the last set of information that would have been required to be provided pursuant to the preceding sentence during such 180-day period and (iv) shall be deemed to have provided the information required pursuant to the previous sentence at the time it files with the Commission the annual or quarterly report on Form 10-K or Form 10-Q with respect to the relevant period that would be required under the Exchange Act. Persons receiving distributions of New Class A Common Stock, by accepting such distributions, will have agreed to cooperate with Reorganized Tribune's reasonable requests to assist Reorganized Tribune in its efforts to list the New Class A Common Stock on the New York Stock Exchange or the NASDAQ Stock Market, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized Tribune who satisfy the independence and other requirements of the New York Stock Exchange or the NASDAQ Stock Market, as applicable.

5.6    New Senior Secured Term Loan Agreement.

5.6.1   Subject to the terms of this Section 5.6, if the Creditor Proponents and the Debtors have not elected to have the Reorganized Debtors replace the New Senior Secured Term Loan in its entirety with distributions of Cash, on the Effective Date, (a) Reorganized Tribune, as borrower, (b) the other Reorganized Debtors and U.S. Subsidiary Non-Debtors (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Creditor Proponents in consultation with the Debtors), as guarantors, (c) the administrative agent party thereto, and (d) the Holders of Claims receiving a distribution of the New Senior Secured Term Loan under this Plan shall become parties to the New Senior Secured Term Loan Agreement regardless of whether any party actually executes the New Senior Secured Term Loan Agreement. If issued, the New Senior Secured Term Loan shall (i) be guaranteed by the U.S. subsidiaries of Reorganized Tribune (including, without limitation, the Guarantor Non-Debtors and any successors to the Reorganized Debtors after giving effect to the Restructuring Transactions, but excluding any entities identified by the Creditor Proponents in consultation with the Debtors) (ii) be secured by certain assets of Reorganized Tribune and the guarantors thereof subject to specified exceptions and customary intercreditor arrangements, (iii) have interest payable in Cash quarterly, (iv) have principal payable in Cash quarterly, with the unpaid balance payable on the final maturity date thereof, (v) mature on the fifth anniversary of the Effective Date, (vi) include usual and customary affirmative and negative covenants for term loan facilities of this type and (vii) be repayable by Reorganized Tribune at any time prior to scheduled maturity without premium or penalty. The New Senior Secured Term Loan Agreement shall contain terms as set forth in Exhibit 5.6 to be filed with the Plan Supplement.

5.6.2  To the extent that replacement financing is available on commercially reasonable terms, the Creditor Proponents and the Debtors may elect to have the Reorganized Debtors distribute Cash in the amount of all or part of the initial principal amount of the New Senior Secured Term Loan in lieu of all or such part of the New Senior Secured Term Loan to Holders of Allowed Claims receiving the New Senior Secured Term Loan under this Plan.  If the Creditor Proponents and the Debtors so elect, the relevant Reorganized Debtors, as applicable, are hereby authorized, without any requirement of further action by the security holders or directors of the Debtors or Reorganized Debtors, to make such repayment including through the issuance of new indebtedness; provided, however, that any such Cash distribution shall be distributed Pro Rata to Holders of Allowed Claims that otherwise would have received the New Senior Secured Term Loan.

5.7    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.

Subject to Section 5.2, after the Effective Date, the Reorganized Debtors shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of this Plan. Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Debtors and their Estates, including all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan (but excluding the Preserved Causes of Action), shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

5.8    Cancellation of Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, Notes Issued Under the Loan Agreements, Senior Notes, Debentures, Instruments, Indentures, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock and Other Tribune Interests.

5.8.1  Except as otherwise provided for in this Plan, as of the Effective Date, all (a) Loan Agreements, Loan Guaranty Agreements, the Pledge Agreement, notes issued under the Loan Agreements, Senior Notes, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds (with the exception of surety bonds outstanding), indentures (including the Indentures), stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under this Plan shall be cancelled, and (b) all amounts owed

59

by and the obligations of the Debtors under any agreements, credit agreements, guaranty agreements, stockholders' agreements, registration rights agreements, repurchase agreements and repurchase arrangements, indentures (including the Indentures) or certificates of designation governing the Loan Claims, Loan Guaranty Claims, Senior Notes, Swap Claim, EGI-TRB LLC Notes, PHONES Notes, Old Common Stock, other Tribune Interests and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims against or Interests in a Debtor that are Impaired under the Plan shall be discharged.  In addition, as of the Effective Date, all Old Common Stock and other Tribune Interests that have been authorized to be issued but that have not been issued shall be deemed cancelled and extinguished without any further action of any party.  Notwithstanding anything to the contrary herein, the obligations of parties to the Loan Agreements and the Loan Guaranty Agreements that are not Reorganized Debtors or Subsidiary Non-Debtors shall not be discharged or limited in any way.

       5.8.2   Notwithstanding the foregoing provisions of this <u>Section 5.8</u> and anything contained elsewhere in this Plan, but subject in all respects to <u>Section 5.8.1</u>, <u>Article XI</u>, and any provision of the Confirmation Order corresponding to the foregoing sections,  (x) the Indentures and the debt issued thereunder shall continue in effect solely for the purpose of allowing (i) the Reorganized Debtors and the Indenture Trustees to make distributions pursuant to the Plan under the respective Indentures, (ii) for the applicable Indenture Trustee to assert, prosecute or defend on behalf of Holders of Senior Notes or PHONES Notes, as applicable, Disclaimed State Law Avoidance Claims and to perform such other functions with respect thereto, including, without limitation, to make distributions to their respective Holders, (iii) for the applicable Indenture Trustee to assert any rights preserved under subsection (z) of this <u>Section 5.8.2</u>, (iv) for the individual Holders of Senior Notes or PHONES Notes to prosecute the Disclaimed State Law Avoidance Claims in the event a court determines they are necessary parties, (v) for the Litigation Trust to prosecute Preserved Causes of Action, (vi) the Holders of PHONES Notes to assert any subrogation rights such Holders may have under section 14.06 of the PHONES Notes Indenture, (vii) any Indenture Trustee to pursue or continue to pursue any appeal of an order of the Bankruptcy Court, commenced by such Indenture Trustee on or before the Effective Date, (viii) Wilmington Trust or Deutsche Bank (or their respective successors under the applicable Indentures) to serve as members of the Litigation Trust Advisory Board or to replace a designee to the Litigation Trust Advisory Board appointed by such member solely in accordance with the terms of this Plan and the Litigation Trust Agreement, and (ix) the continuation of any contractual right or obligation that any Indenture Trustee has with any Person other than the Debtors, the Reorganized Debtors or a Released Party; (y) the Loan Agreements (including, without limitation, the intercreditor provisions described in <u>Section 7.3</u> of this Plan) shall continue in effect (i) to the extent necessary to allow the Reorganized Debtors and Loan Agents to make distributions pursuant to the Plan on account of the Loan Claims and Loan Guaranty Claims and perform such other functions in connection with this Plan as the applicable Loan Agent shall deem reasonably necessary or appropriate, (ii) with respect to all rights of the applicable Loan Agent and all Persons other than the Reorganized Debtors or Subsidiary Non-Debtors, and (iii) for all purposes with respect to Assigned Senior Guaranty Claims (if any); and (z) nothing herein shall waive, release, or impair any rights, claims or interests, if any, that any Indenture Trustee may have under the applicable Indenture or otherwise or that any other party acting in a representative capacity may have (subject to the limitations imposed pursuant to <u>Section 7.3.2</u>) to the recovery and/or reimbursement of its fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder or

any amounts allocable or otherwise payable resulting from the pursuit or settlement of Disclaimed State Law Avoidance Claims to the Holders of Claims for which such party is a representative, whether such rights, claims or interests are in the nature of a charging lien or otherwise, all of which rights, claims and interests expressly are preserved. Except as otherwise provided herein, upon cancellation of the applicable Indenture, the respective Indenture Trustee shall be relieved of any obligations as Indenture Trustee under such Indenture. Except as expressly provided in this Plan, neither the Debtors nor the Reorganized Debtors shall have any obligations to any Indenture Trustee or Loan Agent for any fees, costs or expenses; provided, however, that if any applicable Indenture Trustee timely asserts a Claim in the Chapter 11 Cases and such Claim becomes an Allowed Claim, such Allowed Claim shall receive the treatment specified for the applicable Class of Claims pursuant to this Plan. The foregoing subsections 5.8.2(x)(iv) and (v) shall apply to the Claims that are subject to the Retiree Claimant Settlement Agreement. For the avoidance of doubt, nothing in this Plan shall or is intended to impair the rights of (i) any Indenture Trustee or any Holder of a Senior Notes Claim or PHONES Notes Claim from prosecuting any Disclaimed State Law Avoidance Claim, with the exception of any Disclaimed State Law Avoidance Claim that becomes a Holder Released Claim pursuant to Section 11.2.2 of this Plan, and (ii) the Litigation Trust and Litigation Trustee from pursuing the Preserved Causes of Action.

    5.8.3    Notwithstanding any other provision of this Plan, the indemnification or guaranty obligations of the Debtors contained in (A) that certain Indemnity Agreement between CSC Holdings, Inc., NMG Holdings, Inc. and Tribune dated July 29, 2008; (B) that certain Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Credit Agreement Loans (as defined therein) and the Private Placement Notes (as defined therein); and (C) that certain Subordinated Guaranty of Collection entered into on October 27, 2009 made by Tribune to various parties with respect to the obligations of Chicago Baseball Holdings, LLC in respect of the Loans (as defined therein) shall continue in full force and effect.

    5.9    Cancellation of Liens and Guaranties.

    Except as otherwise provided in this Plan, on the Effective Date, any Lien securing any Secured Claim (other than a Lien securing any Other Secured Claim that is Reinstated pursuant to this Plan) shall be deemed released and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or the Reorganized Debtors, as the case may be). In addition, it is a condition to the release, cancellation and extinguishment of the Senior Guaranty Claims against the Guarantor Non-Debtors that all Bridge Loan Guaranty Claims shall be concurrently released, extinguished and cancelled. The consummation of this Plan shall effect and constitute a full and final release, extinguishment and cancellation of any and all Senior Guaranty Claims and any and all Bridge Loan Guaranty Claims against Guarantor Non-Debtors.

    5.10    Exit Facility.

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors or Reorganized Debtors, the Debtors and Reorganized Debtors shall be authorized, but not directed, to enter into the Exit Facility Credit Agreement, if any, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

5.11    Equity Incentive Plan.

At the discretion of the Board of Directors of Reorganized Tribune, after the Effective Date the Reorganized Debtors may adopt an Equity Incentive Plan for the purpose of granting awards over time to directors, officers and employees of Reorganized Tribune and the other Reorganized Debtors.  Stock awarded pursuant to the Equity Incentive Plan shall not exceed five percent (5%) of the New Common Stock on a fully diluted basis.

5.12    Sources of Cash for Plan Distributions.

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to this Plan may be obtained from existing Cash balances, the operations of the Debtors or the Reorganized Debtors, sales of assets, the Step Two/Disgorgement Settlement or the Exit Facility.  Subject to Section 5.1, the Reorganized Debtors may also make such payments using Cash received from their Affiliates through the Reorganized Debtors' consolidated cash management systems.

5.13    Initial Funding of the Litigation Trust.

On the Effective Date, Reorganized Tribune, as lender, and the Litigation Trust, as borrower, shall become parties to the Trust Loan Agreement.  The Trust Loan Agreement shall provide for a term loan in the aggregate principal amount of $20 million, which shall contain terms and conditions to be agreed upon by the Proponents, including, (a) the Litigation Trust shall be prohibited from reborrowing the principal amount thereof, and (b) after the Parent GUC Trust Preference has been paid in full, the Litigation Trust shall not make any distributions on account of Litigation Trust Interests until the Trust Loan has been repaid in full in accordance with the terms of the Trust Loan Agreement and the commitments thereunder shall have terminated; provided, however, that Net Litigation Trust Proceeds shall be calculated net of amounts held in the Expense Fund (as defined in the Litigation Trust Agreement), and as set forth in the Trust Loan Agreement, the Litigation Trustee shall have no obligation to make any distributions on account of (i) the Parent GUC Trust Preference or (ii) the Trust Loan Preference unless the Expense Fund has a balance of $25 million in Cash as of the date of any such proposed distribution and will maintain such a balance after the making of any such distribution.

5.14    Additional Transactions Authorized Under the Plan.

On or prior to the Effective Date, the Debtors, with the consent of the Proponents, shall be authorized to take any such actions as may be necessary or appropriate to have Claims or Interests Reinstated or render Claims or Interests Unimpaired to the extent provided herein.  On the Effective Date, the Agents are authorized and directed to take such actions as are necessary or appropriate to effect all transactions specified or referred to in or provided for under this Plan.

5.15    Settlement of Claims and Controversies.

5.15.1 Step Two/Disgorgement Settlement: Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the Step Two Arrangers and current or former Senior Lenders or Bridge Lenders that received any principal, interest or fees under the Bridge Loan Agreement or under the Senior Loan Agreement in respect of the Incremental Senior Loans prior to the Petition Date (each, a "Potential Step Two Disgorgement Defendant") shall each have the option to settle (the "Step Two/Disgorgement Settlement") claims against the Step Two Arrangers and their respective Affiliates (to the extent a claim against an Affiliate arises from actions taken by such Affiliate in its capacity as an Affiliate of a Step Two Arranger and is released against such Step Two Arranger) and claims against any current and former Senior Lenders and Bridge Lenders for disgorgement of principal, interest and fees paid under the Bridge Loan Agreement or under the Senior Loan Agreement in respect of the Incremental Senior Loans prior to the Petition Date for an aggregate amount of Cash equal to $120,000,000 (the "Step Two/Disgorgement Settlement Proceeds"), made up of (i) each such party's pro rata share (based on amounts received by such party under the Senior Loan Agreement in respect of the Incremental Senior Loans) of $63,269,787, and (ii) each such party's pro rata share (based on amounts received by such Bridge Lender in respect of the Bridge Loans) of $56,730,213. Current and former Senior Lenders and Bridge Lenders that participate in the Step Two/Disgorgement Settlement shall waive any right to assert additional Senior Loan or Bridge Loan Claims in excess of those Claims currently held by such Persons on account of the settlement payments, provided, however, that nothing herein shall limit the provisions set forth in Section 3.2.4 and 3.3.4 of this Plan. Amounts allocable to Senior Lenders and Bridge Lenders that do not elect to participate in the Step Two/Disgorgement Settlement shall be advanced by the Step Two Arrangers that are signatories to the undertaking attached hereto as Exhibit 5.15.1(1) (the "Step Two/Disgorgement Settlement Undertaking"), subject to reimbursement from the proceeds of Litigation Trust recoveries in respect of the related claims as set forth herein, pursuant to such undertaking. The procedures for Potential Step Two Disgorgement Defendants to elect to participate in the Step Two/Disgorgement Settlement will be set forth in Exhibit 5.15.1(2), which procedures shall be acceptable to the Proponents and the Step Two Arrangers that are signatories to the Step Two/Disgorgement Settlement Undertaking. Any Potential Step Two Disgorgement Defendant that elected to participate in the Step Two/Disgorgement Settlement in accordance with the procedures set forth in the form of Exhibit 5.15.1(2) attached to the Second Amended Plan will be deemed to have elected to participate in the Step Two/Disgorgement Settlement in connection with this Plan except to the extent that any such party shall have delivered to the Debtors a notice revoking such election on or before the first day of the Confirmation Hearing. Any Potential Step Two Disgorgement Defendant that did not elect to participate in the Step Two/Disgorgement Settlement in connection with the Second Amended Plan may elect to participate in the Step Two/Disgorgement Settlement in connection with this Plan in accordance with the procedures set forth in Exhibit 5.15.1(2) at any time on or before the first day of the Confirmation Hearing or such later date as may be agreed to by the Step Two Arrangers. No party's participation in the Step Two/Disgorgement Settlement shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter.

5.15.2 Settlement Under the Plan. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other

benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Released Claims against the Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve such compromise and settlement, to release all of the Released Claims, including, without limitation, the Released LBO-Related Causes of Action, belonging to the Tribune Entities, the Debtors' Estates and any other Person that is deemed to have given a release pursuant to Section 11.2 of this Plan against each and every and all Released Parties (the "Settlement"). Distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Settlement. Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Settlement and the Bankruptcy Court's finding that the Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

5.15.3 Intercompany Claims Settlement Under the Plan. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the Plan implements and incorporates by reference the Intercompany Claims Settlement, and the Plan constitutes a request to authorize and approve the compromise and settlement of all Intercompany Claims pursuant to the Intercompany Claims Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Intercompany Claims Settlement and the Bankruptcy Court's finding that the Intercompany Claims Settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable.

5.15.4 Implementation of Retiree Claimant Settlement. Pursuant to Bankruptcy Rule 9019, the Plan implements and incorporates by reference the terms of the Retiree Claimant Settlement Agreement, which is attached hereto as Exhibit 5.15.4, including, without limitation, the allowance of the Claims of certain Retiree Claimants. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Retiree Claimant Settlement Agreement and the Bankruptcy Court's finding that the Retiree Claimant Settlement Agreement is in the best interests of the Debtors, the Reorganized Debtors, their respective Estates, and the Holders of Claims and Interests, and is fair, equitable and reasonable, solely to the extent the Retiree Claimant Settlement Agreement is implemented.

5.15.5 Effect of Settlement on Participants of Senior Lenders and/or Bridge Lenders. Notwithstanding anything contained in this Plan, the Litigation Trust and the Litigation Trustee shall not have the right to commence, assert or prosecute LBO-Related Causes of Action against any participant of a Senior Lender or a Bridge Lender to the extent that the Senior Lender or Bridge Lender as to which it is a participant is a Released Party, solely in such participant's capacity as a participant, and any LBO-Related Causes of Action against any such participant, solely in its capacity as a participant, shall not be considered a Litigation Trust Asset or Preserved Causes of Action. Any LBO-Related Causes of Action against any participant of a Senior Lender or a Bridge Lender to the extent that the Senior Lender or Bridge Lender as to which it is a participant is a Released Party, solely in such participant's capacity as a participant are hereby Released Claims. Notwithstanding the foregoing, nothing contained in this Plan shall preclude any Senior Lender or Bridge Lender from commencing, asserting or prosecuting demands, claims and causes of action against any one or more of its participants with respect to

64

(a) any LBO-Related Causes of Action asserted against such Senior Lender or Bridge Lender, or (b) the election by such Senior Lender or Bridge Lender to settle pursuant to the terms of the Step Two/Disgorgement Settlement or otherwise.

5.16    Preservation of Rights of Action and Settlement of Ordinary Litigation Claims.

Except as otherwise provided in this Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with this Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Debtors and their Estates shall retain the Ordinary Litigation Claims.  The Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Ordinary Litigation Claims or any other claims, rights of action, suits or proceedings that any Debtor or Estate may hold against any Person.

5.17    FCC Applications.

The Debtors, the Senior Lenders and any other Holders of Claims that are eligible to receive New Common Stock shall use their best efforts to cooperate in diligently pursuing and in taking all reasonable steps necessary to obtain the requisite FCC Approvals and shall provide such additional documents or information as are reasonably requested by the Debtors or the Proponents or that the Debtors or the Proponents reasonably deem necessary for the FCC's review of such applications.

## ARTICLE VI:  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    Assumption of Executory Contracts and Unexpired Leases.

6.1.1  On the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is an executory contract or unexpired lease that is included in the Global Contract Motion, (iv) is an executory contract or unexpired lease that is expressly excluded from the assumptions set forth in Section 6.5 hereto or is set forth on Exhibit 6.3, to be filed with the Plan Supplement, or (v) is an executory contract or unexpired lease that is included in a pending motion to reject such executory contract or unexpired lease.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed during the Chapter 11 Cases or pursuant to this Article VI shall revest in and be fully enforceable by the applicable Reorganized Debtor, including any successor to such Reorganized Debtor after giving effect to the Restructuring Transactions, in accordance with its terms, except as modified by the provisions of this Plan, agreement of the parties thereto, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

6.1.2  Subject to the terms of Article VII and Section 6.1.1 herein and except for any Customer Program otherwise designated on Exhibit 6.3, all refund and subscriber credit

programs or similar obligations of the Debtors to subscribers or former subscribers to any of the Debtors' publications under the Customer Programs shall be deemed assumed effective as of the Effective Date and the proposed cure amount with respect to each shall be zero dollars.  Nothing contained in this Section 6.1.2 shall constitute or be deemed to be a waiver of any claim or cause of action that the Debtors may hold against any Person.  Except with respect to any Customer Programs included on Exhibit 6.3 to be filed with the Plan Supplement, as a result of the deemed assumption of the Debtors' refund, subscriber credit and other obligations under the Customer Programs to subscribers and former subscribers pursuant to this Section 6.1.2, all Proofs of Claim on account of or in respect of any such obligations shall be deemed withdrawn automatically and without any further notice to or action by the Bankruptcy Court, and the Debtors' Claims Agent shall be authorized as of the Effective Date to expunge such Proofs of Claim from the claims register.

6.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.

The proposed cure amount for any executory contract or unexpired lease that is assumed pursuant to this Plan shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Plan Supplement or other pleading approved by the Creditor Proponents and the Debtors.  Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default and not subsequently cured shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Pending the Bankruptcy Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Debtor unless otherwise ordered by the Bankruptcy Court.

6.3    Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, each executory contract and unexpired lease that is listed on Exhibit 6.3 to be filed with the Plan Supplement, shall be rejected pursuant to section 365 of the Bankruptcy Code.  Each contract or lease listed on Exhibit 6.3 shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.  The Debtors reserve their right to amend Exhibit 6.3 to delete any unexpired lease or executory contract therefrom or add any unexpired lease or executory contract thereto.  Listing a contract or lease on Exhibit 6.3 shall not constitute an admission by a Debtor nor a Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that such Debtor or Reorganized Debtor has any liability thereunder.

6.4    Rejection Damages Bar Date.

If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed and served upon counsel to the Debtors within thirty (30) days after service of the notice that the executory contract or unexpired lease has been rejected.

6.5    Compensation and Benefit Programs.

Except as set forth in Article II.F.4 of the specific portion of the disclosure statement relating to the Second Amended Plan and such other Employee Benefit Plans as may be disclosed in the Plan Supplement, the Reorganized Debtors shall continue to perform their obligations under all Employee Benefit Plans and all such Employee Benefit Plans shall be assumed by the applicable Reorganized Debtors; provided, however, that nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, causes of action, or other rights with respect to the interpretation, application or enforcement of any such Employee Benefit Plan or the payment of any Employee Benefit Claim, including the Reorganized Debtors' rights to amend, modify or terminate any such Employee Benefit Plan either prior to or after the Effective Date.

6.6    Collective Bargaining Agreements.

Upon the Effective Date, any Collective Bargaining Agreement entered into by the Debtors that has not expired by its terms and is in effect as of the Effective Date shall be deemed to have been assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and/or the pertinent Debtor's assumption of the Collective Bargaining Agreements then in effect, except to the extent that such agreements have already been assumed prior to the entry of the Confirmation Order. Upon the Effective Date, with respect to any Collective Bargaining Agreement entered into by the Debtors that has expired by its terms, the rights and obligations, if any, of the Reorganized Debtors with respect to such expired agreement shall not be affected by the Confirmation Order, and the Reorganized Debtors shall continue to have the same rights and obligations with respect to any such expired agreement as the Debtors had immediately prior to the entry of the Confirmation Order and any such rights and obligations of the Reorganized Debtors under any such expired agreement shall continue to be determined in accordance with applicable federal labor law.

6.7    Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by such Debtors to the Reorganized Debtors, including any successor to any Debtor or Reorganized Debtor after giving effect to the Restructuring Transactions, on the Effective Date.

6.8     Termination of ESOP.

Upon the Effective Date, the ESOP shall be deemed terminated in accordance with its terms, and the amount of unpaid principal and interest remaining on the ESOP Note dated April 1, 2007 shall be forgiven pursuant to section 6.3 of the ESOP Loan Agreement by and between Tribune and GreatBanc Trust Company, not in its individual or corporate capacity, but solely as trustee of the Tribune Employee Stock Ownership Trust dated April 1, 2007.  In connection with Tribune's forgiveness of the balance due under the ESOP Note, the Proponents will seek, in their sole discretion, (1) confirmation that Tribune has a right under the ESOP Plan and ESOP Note to forgive the ESOP's obligations; (2) confirmation that Tribune's forgiveness of any post-petition payments due from the ESOP in connection with the ESOP Note, including, without limitation, the payment due on or about April 1, 2009, was in compliance with the ESOP Note and ESOP Plan and satisfied Tribune's obligations, if any, under the ESOP Plan to make a contribution to the ESOP during the relevant time period; (3) a determination of the amount of the balance of the ESOP Note being forgiven, the value of any obligations of the ESOP owed to Tribune under the ESOP Note, and the legal effect of the forgiveness of the ESOP Note on the Debtors and their Estates.  Approval of this Plan is not conditioned upon these determinations, but these determinations may be sought in connection with this Plan.

6.9     Insurance Policies.

Notwithstanding anything to the contrary in the Disclosure Documents, Plan, any other Plan document, the Confirmation Order or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release) (collectively, the "Plan-Related Documents"), the insurance policies (including, without limitation, any policies covering directors' or officers' conduct) issued to, or insurance agreements or claims servicing agreements entered into by, any one or more of the Debtors prior to the Petition Date (the "Insurance Policies and Agreements") shall continue in effect after the Effective Date pursuant to their respective terms and conditions, and nothing in the Plan Documents shall relieve any of the Reorganized Debtors from performing any of the Debtors' obligations under the Insurance Policies and Agreements (including, without limitation, the provision or maintenance of any collateral and security required by the Insurance Policies and Agreements), nor shall anything in the Plan Documents relieve any insurer from performing its obligations under the Insurance Policies and Agreements, in each case  regardless of whether such obligations arise prior to or after the Effective Date.  To the extent that any Insurance Policies or Agreements are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such Insurance Policies and Agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such Insurance Policy or Agreement assumed by the Debtors.  To the extent that the Bankruptcy Court determines that a cure payment is required as to any such Insurance Policy or Agreement, the Proponents reserve the right to seek the rejection of such Insurance Policy or Agreement or other available relief.

## ARTICLE VII:  PROVISIONS GOVERNING DISTRIBUTIONS

7.1    General.

Unless the Holder of an Allowed Claim or Allowed Interest against any of the Debtors and the Reorganized Debtors agree to a different distribution date or except as otherwise provided herein or as ordered by the Bankruptcy Court, (1) distributions to be made on account of Claims or Interests that are Allowed as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable and (2) distributions to be made on account of Claims or Interests that become Allowed after the Effective Date shall be made on the succeeding Quarterly Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.2    Distributions for Certain Claims.

7.2.1    Distributions to Holders of Other Parent Claims.

(a)    Other Parent Claims Reserve.  On or as soon as practicable after the Effective Date, Reorganized Tribune shall establish one or more Other Parent Claims Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed Other Parent Claims after the Effective Date.  The amount of New Senior Secured Term Loan, Distributable Cash and New Common Stock contributed to the Other Parent Claims Reserve(s) shall be equal to the sum of (i) the amount of New Senior Secured Term Loan, Distributable Cash and New Common Stock necessary to satisfy the distributions required to be made pursuant to this Plan based upon the Face Amount of Disputed Other Parent Claims the Holders of which elected the treatment set forth in Section 3.2.6(c)(ii) or Section 3.2.6(c)(iii) if such Disputed Claims are subsequently Allowed Other Parent Claims and (ii) the amount of Distributable Cash necessary to satisfy the distributions required to be made pursuant to this Plan based upon the Face Amount of Disputed Other Parent Claims the Holders of which did not elect the treatment set forth in Section 3.2.6(c)(ii) or Section 3.2.6(c)(iii) if such Disputed Claims are subsequently Allowed Other Parent Claims.

(b)    Distributions On Account of Disputed Claims Once Allowed.  On each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Cash, in accordance with the terms of the Plan, from the Other Parent Claims Reserve(s) to each Holder of a Disputed Claim that has become an Allowed Other Parent Claim during the preceding calendar quarter and that is entitled to receive such a distribution.  On or as soon as practicable after the Final Distribution Date, after distributions are made to Holders of Disputed Claims that have become Allowed Other Parent Claims during the preceding calendar quarter, any New Senior Secured Term Loan, Distributable Cash or New Common Stock remaining in the Other Parent Claims Reserve(s) shall become Remaining New Senior Secured Term Loan, Remaining Distributable Cash and Remaining New Common Stock, as applicable, and shall be distributed Pro Rata to the Holders of Allowed Senior Loan Claims and Allowed Senior Guaranty Claims.

7.2.2    Distributions to Holders of General Unsecured Claims Against Filed Subsidiary Debtors.

(a)    Subsidiary GUC Reserve. On or as soon as practicable after the Effective Date, Reorganized Tribune may establish one or more Subsidiary GUC Reserve(s) to make distributions to Holders of Disputed Claims that become Allowed General Unsecured Claims against a Filed Subsidiary Debtor after the Effective Date.  The amount of Distributable Cash contributed to the Subsidiary GUC Reserve(s) shall be equal to the amount of Distributable Cash estimated by the pertinent Debtor as necessary to satisfy the distributions required to be made pursuant to this Plan to Holders of Disputed Claims that may be entitled to receive a distribution of Distributable Cash if such Disputed Claims are subsequently Allowed General Unsecured Claims against such Debtor.

(b)    Distributions On Account of Disputed Claims Once Allowed.  If one or more Subsidiary GUC Reserves are established, on each Quarterly Distribution Date, the Disbursing Agent shall make distributions of Distributable Cash, in accordance with the terms of this Plan, from the Subsidiary GUC Reserve(s) to each Holder of a Disputed Claim that has become an Allowed General Unsecured Claim against a Filed Subsidiary Debtor during the preceding calendar quarter and that is entitled to receive such a distribution.  On or as soon as practicable after the Final Distribution Date, after initial distributions are made to Holders of Disputed Claims that have become Allowed General Unsecured Claim against a Filed Subsidiary Debtor during the preceding calendar quarter, any Distributable Cash remaining in the Subsidiary GUC Reserve(s) shall become Remaining Distributable Cash and shall be distributed Pro Rata to the Holders of Allowed Senior Loan Claims and Allowed Senior Guaranty Claims.

7.2.3   Distributions of New Common Stock and New Warrants.  In the event that a Holder of an Allowed Claim entitled to receive a distribution of New Common Stock or New Warrants under this Plan shall advise the voting agent responsible for the tabulation of Ballots for voting on the Plan in writing prior to the deadline established by the Bankruptcy Court that all or part of such distribution of New Common Stock or New Warrants should be made to one or more affiliates of such Holder or other parties as such Holder shall have designated in the written notice provided to such voting agent, the Disbursing Agent shall make such distribution to the party designated in the written notice, which distribution shall satisfy any and all obligations of the Disbursing Agent to distribute New Common Stock or New Warrants on account of the relevant Holder's Allowed Claim under this Plan.

7.3    Special Provisions Governing Distributions to Holders of Loan Claims and Loan Guaranty Claims.

7.3.1   General.  Other than as specifically set forth in this Plan, distributions made on account of Loan Claims and Loan Guaranty Claims shall be made by the Disbursing Agent to the applicable Loan Agent for further distribution to the Holders of the applicable Loan Claims and Loan Guaranty Claims in accordance with the terms of the applicable Loan Agreement or Loan Guaranty Agreement.  In order to comply with the contractual subordination provisions in the Loan Guaranty Agreements, all distributions that would otherwise be made on account of Allowed Bridge Loan Guaranty Claims shall be distributed to the Senior Loan Agent, and no distribution on account of the Bridge Loan Guaranty Claims shall be provided to Holders of Allowed Bridge Loan Guaranty Claims.

7.3.2    <u>Senior Lender Holdback</u>.  As provided in <u>Section 3.3.3</u> hereof, prior to distributing Remaining Distributable Cash that would otherwise be made to Holders of Senior Guaranty Claims pursuant to <u>Section 3.3.3</u> of this Plan, the Senior Loan Agent shall retain the Senior Lender Holdback from such distributions to be used for the reimbursement of fees and/or expenses incurred by JPMorgan as set forth in <u>Section 7.3.3</u> below.  Except for the Senior Lender Holdback, the Senior Loan Agent shall not hold back, withhold, keep, reserve, recoup, setoff against, delay delivery of, or refuse to deliver any distributions payable to the Holders of Senior Loan Claims at any time for any reason whatsoever.  Subject to the immediately preceding sentence in this <u>Section 7.3.2</u> and to <u>Section 7.3.3.</u> of this Plan, no other provision in this Plan nor JPMorgan's agreement to or compliance with the provisions of this Plan or any failure to withhold distributions to the Senior Lenders in accordance herewith shall waive, release, or otherwise impair any rights, claims, counterclaims, or defenses (if any) that JPMorgan may from time to time have against the Senior Lenders under the Senior Loan Agreement or applicable law, and all such claims, counterclaims, and defenses of JPMorgan (if any) are expressly preserved.  Subject to <u>Sections 3.3.3</u> and <u>7.3.3.</u> of this Plan and the second sentence in this <u>Section 7.3.2</u>, nothing in this Plan or the performance hereof shall waive, release, or otherwise impair any rights, claims, counterclaims, or defenses (if any) that the Senior Lenders may from time to time have against the Senior Loan Agent under the Senior Loan Agreement or applicable law or with respect to the claims of JPMorgan that are preserved by the immediately preceding sentence of this <u>Section 7.3.2</u>, including without limitation the rights (if any) of the Senior Lenders to credit the Senior Lender Holdback against the claims that JPMorgan may assert against the Senior Lenders, and any such rights, claims, counterclaims, and defenses of the Senior Lenders (if any) against JPMorgan are expressly preserved.

7.3.3    <u>Distributions of the Senior Lender Holdback</u>.  JPMorgan may apply the Senior Lender Holdback as follows:

(a)    JPMorgan shall be irrevocably entitled to utilize the Senior Lender Holdback to pay, without notice, demand or further authorization from any party, any fees and/or expenses (including, without limitation, reasonable and documented fees and disbursements of counsel) of any kind or nature whatsoever that are incurred by JPMorgan in any way relating to or arising out of either of the Loan Agreements or any action taken or omitted by JPMorgan in any of its roles thereunder, including, without limitation, in connection with enforcement of the Loan Agreements, the defense of any claims or causes of action, or any legal proceedings relating thereto.

(b)    On or as soon as practicable after the date that is 60 days after the later of (i) expiration of the statute of limitations on all potential LBO-Related Causes of Action against JPMorgan, or, (ii) in the event any claim is made in respect thereof prior to such expiration, the date on which all such claims are finally resolved (including any appeal thereof), after all distributions to which JPMorgan is entitled pursuant to this <u>Section 7.3.3</u> have been made, JPMorgan will distribute any unused portion of the Senior Lender Holdback Pro Rata to the Holders of Senior Loan Claims in accordance with the provisions of the Senior Loan Agreement.

7.4    <u>Interest on Claims</u>.

71

Except as otherwise specifically provided for in this Plan (including, without limitation, Section 3.3.3 of this Plan and with respect to the distributions to holders of Litigation Trust Interests), the Confirmation Order or other order of the Bankruptcy Court (including, without limitation, the Final DIP Order), or required by applicable bankruptcy law, Post-petition Interest shall not be paid on any Claims, and no Holder of a Claim shall be entitled to be paid interest accruing on or after the Petition Date on any Claim without regard to whether such amount has accrued for federal income tax purposes.  Any Post-petition Interest that has been accrued for federal income tax purposes shall be cancelled as of the Effective Date.

7.5     Distributions by Disbursing Agent.

7.5.1   Other than as specifically set forth in this Plan, the Disbursing Agent shall make all distributions required to be made under the Plan.  The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to act as the Disbursing Agent or to assist in or make the distributions required by this Plan.

7.5.2   Other than as specifically set forth in this Plan, the distributions to be made on account of Senior Noteholder Claims shall be made in accordance with the terms of the particular Indenture or in accordance with this Plan where such Indenture is silent.

7.6     Delivery of Distributions and Undeliverable or Unclaimed Distributions.

7.6.1   Delivery of Distributions in General.  Other than as set forth in Section 7.2.3, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' records unless such addresses are superseded by Proofs of Claim or transfers of claim filed pursuant to Bankruptcy Rule 3001.

7.6.2   Undeliverable and Unclaimed Distributions.

(a)     General.  The Reorganized Debtors and the Disbursing Agent shall have no duty to make distributions to any Holder of an Allowed Claim with an undeliverable address as determined by any undeliverable or returned notice to the Debtors since the commencement of the Chapter 11 Cases unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address prior to the Distribution Record Date.  If the distribution to any Holder of an Allowed Claim or Interest is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent are notified in writing of such Holder's then-current address.

(b)     Non-Negotiated Check Voucher Distributions.  Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 90-calendar-day period.  After such date, such Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat laws to the contrary.

(c)    Failure to Claim Undeliverable Distributions.  Except as otherwise expressly provided in this Plan, any Holder of an Allowed Claim or Interest that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors or their Estates or the Reorganized Debtors or their property.  In such cases, any Cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary.  Any New Common Stock or New Warrants held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing contained in this Plan shall require any Disbursing Agent, including, but not limited to, the Reorganized Debtors, to attempt to locate any Holder of an Allowed Claim or Interest.

7.7    Record Date for Distributions.

7.7.1  With the exception of Senior Noteholder Claims and PHONES Notes Claims, the Reorganized Debtors and the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Claim or Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims or Interests (including Holders of Claims and Interests that become Allowed after the Distribution Record Date) that are Holders of such Claims or Interests, or participants therein, as of the close of business on the Distribution Record Date.  With the exception of the Senior Noteholder Claims and PHONES Notes Claims, the Reorganized Debtors and the Disbursing Agent shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

7.7.2  Unless otherwise set forth in the Confirmation Order, the Proponents shall not establish a record date for distributions to Holders of Senior Noteholder Claims or PHONES Notes Claims.  Distributions to Holders of such Claims held through DTC shall be made by means of book-entry exchange through the facilities of DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply.  In connection with such book-entry exchange, the Reorganized Debtors will provide rate information to each Indenture Trustee, which such Indenture Trustee shall convey to DTC to effect distributions on a Pro Rata basis as provided under this Plan, subject to the treatment elections set forth in Section 3.2.5(c) herein, with respect to such Claims upon which such Indenture Trustee acts as trustee.  Subject to Section 7.5.2 of this Plan, distributions of Cash to Holders of Allowed Senior Noteholder Claims or Allowed PHONES Notes Claims (including distributions of Cash to Holders of Class 1E Litigation Trust Interests or Class 1J Litigation Trust Interests) shall be made to the applicable Indenture Trustees, which, in turn, shall make such distributions to the applicable Holders either through DTC or, in the case of Claims, Class 1E Litigation Trust Interests or Class 1J Litigation Trust Interests held directly by the Holder thereof, through the applicable Indenture Trustee, subject to the respective rights, claims and interests, if any, that the Indenture Trustees may have under the applicable Indentures or otherwise to the recovery and/or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder,

whether such rights, claims or interests are in the nature of a charging lien or otherwise. Distributions of other consideration to Holders of Senior Noteholder Claims or PHONES Notes Claims shall be made by the Disbursing Agent either through DTC or, in the case of Claims held directly by the Holder thereof, through the Disbursing Agent upon surrender or deemed surrender of such Holder's Senior Notes or PHONES Notes except as otherwise provided in this Plan.

      7.8    <u>Allocation of Plan Distributions Between Principal and Interest</u>.

      Except as otherwise expressly provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

      7.9    <u>Means of Cash Payment</u>.

      Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on, (b) automated clearing house transfer from, or (c) wire transfer from a bank selected by the Reorganized Debtors. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

      7.10    <u>Withholding and Reporting Requirements</u>.

      In connection with this Plan and all distributions hereunder, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution and (b) no distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Nothing in the preceding sentence shall affect distributions under this Plan to the Senior Loan Agent, the Bridge Loan Agent, the Senior Notes Indenture Trustees or the Holders of Allowed Loan Claims, Loan Guaranty Claims or Senior Noteholder Claims.

      7.11    <u>Setoffs</u>.

      7.11.1 The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim

(other than Allowed Claims in Classes 1C and 50C through 111C, which under no circumstances shall be subject to set off) the payments or other distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

7.11.2 To the extent that any Person has either (i) an Allowed Other Parent Claim against Tribune, (ii) an Allowed General Unsecured Claim against any of the Filed Subsidiary Debtors or (iii) a valid and enforceable claim against any other direct or indirect subsidiary of the Debtors, in each case for (a) indemnification, reimbursement, contribution or claims pursuant to Bankruptcy Code section 502(h), and (b) arising from or relating to the assertion of any claim or cause of action by the Litigation Trust or the Litigation Trustee against such Person or any of its Related Persons, such Allowed Claim shall be setoff against any recovery by the Litigation Trust against such Person.  For the purposes of this Section 7.11.2, "setoff against" shall mean that the Litigation Trust shall either use Litigation Trust Assets assets to pay such Claim or shall take actions necessary to cause the release or waiver of such Claim.  The Litigation Trust shall be authorized to object to the allowance of, and entitled to assert any claim, counterclaim, or defense of the Debtors or applicable direct or indirect subsidiary of a Debtor to, any such indemnification, reimbursement, contribution or Bankruptcy Code section 502(h) claim.

7.12    Fractional Shares.

No fractional shares of New Common Stock or New Warrants shall be distributed.  Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New Common Stock or New Warrant or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New Common Stock or New Warrant.  The total number of shares of New Common Stock or New Warrants to be distributed pursuant to this Plan shall be adjusted as necessary to account for the rounding provided for herein.

7.13    De Minimis Distributions.

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.

7.14    Special Provision Regarding Unimpaired Claims.

Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

7.15    Subordination.

Pursuant to the Settlement, no (i) distributions under the Plan allocable or otherwise payable to PHONES Notes Claims or EGI-TRB Notes Claims (including, without limitation, proceeds from the pursuit or settlement of Preserved Causes of Action) or (ii) amounts allocable or otherwise payable to PHONES Notes Claims or EGI-TRB Notes Claims resulting from the pursuit or settlement of Disclaimed State Law Avoidance Claims shall be subject to turnover to Holders of Senior Loan Claims, Senior Loan Guaranty Claims, Bridge Loan Claims or Bridge Loan Guaranty Claims in respect of such Senior Loan Claims, Senior Loan Guaranty Claims, Bridge Loan Claims or Bridge Loan Guaranty Claims. Except as permitted by the Allocation Disputes Rulings, the distributions and treatments provided to Claims and Interests under this Plan otherwise take into account and/or conform to the relative priority and rights of such Claims and Interests under any applicable subordination and turnover provisions in any applicable contracts, and nothing in this Plan shall be deemed to impair, diminish, eliminate or otherwise adversely affect the rights or remedies of beneficiaries (including, for the avoidance of doubt, their respective Indenture Trustees and Agents, as applicable) of any such contractual subordination and turnover provisions.

### ARTICLE VIII: PROVISIONS FOR RESOLVING DISPUTED CLAIMS AND DISPUTED INTERESTS

8.1     Objections to and Estimation of Claims.

After the Effective Date, only the Reorganized Debtors and, solely to the extent provided in this Plan, the Litigation Trustee on behalf of the Litigation Trust may object to the allowance of any Claim or Administrative Expense Claim. After the Effective Date, the Reorganized Debtors or the Litigation Trustee shall be accorded the power and authority to allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court, and the Litigation Trustee on behalf of the Litigation Trust shall have the power and authority to allow or settle and compromise Claims as provided in Article XIII of this Plan. In addition, the Reorganized Debtors or the Litigation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim. Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors and/or the Litigation Trustee shall serve and file any objections to Claims and Interests as soon as practicable, but in no event later than (a) two hundred ten (210) days after the Effective Date or (b) such later date as may be determined by the Bankruptcy Court upon a motion which may be made without further notice or hearing.

8.2     Payments and Distributions on Disputed, Contingent and Unliquidated Claims and Interests and on Claims for Which Proofs of Claim are Filed.

Except as provided herein, no partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest, or with respect to any Claim for which a Proof of Claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by Final Order. On the next Distribution Date after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the Holder of such Allowed Claim or Interest will receive all payments and distributions to which such Holder is then entitled under this Plan.

8.3     Treatment of Disputed Department of Labor Claims

Reference is made to that certain settlement agreement dated October 19, 2011 by and between, among other persons, Tribune and the Secretary of the United States Department of Labor ("DOL") (the "ERISA Claim Settlement Agreement").

8.3.1  If the ERISA Claim Settlement Agreement is consummated, then, in conjunction therewith, notwithstanding any other provision of this Plan, Tribune shall have authority to provide the DOL, by written stipulation, with an allowed Class 1F Claim in an amount not greater than $3.2 million, subject to reduction as set forth in the ERISA Claim Settlement Agreement.

8.3.2  If the ERISA Claim Settlement Agreement is not consummated due to a reason other than a breach of the ERISA Claim Settlement Agreement by the DOL, then:

(a)     all Proofs of Claim filed with the Bankruptcy Court by the DOL (the "DOL Proofs of Claim") shall be treated as Disputed Claims, and the priority and amount of such Claims shall be determined by a Final Order of the Bankruptcy Court;

(b)     all rights of the DOL to seek allowance of the DOL Proofs of Claim without subordination under Bankruptcy Code section 510(b), and all rights of the Debtors and all other persons to dispute, seek to disallow, or seek to subordinate the DOL Proofs of Claim under Bankruptcy Code section 510(b), shall be fully preserved; and

(c)     the confirmation or consummation (and actions taken in furtherance thereof) of this Plan shall not moot, and no provision in this Plan shall moot, the allowance or disallowance or subordination of the DOL Proofs of Claim, or any arguments with respect to the allowance, disallowance or priority of the DOL Proofs of Claim, in any proceeding before any court or in any appeal.

8.3.3  If the ERISA Claim Settlement Agreement is not consummated due to a breach of the ERISA Claim Settlement Agreement by the DOL, then the provisions of this Section 8.3 shall be of no force or effect.

**ARTICLE IX:  PAYMENT AND FILING OF PROFESSIONAL FEE CLAIMS**

9.1     Payment of Certain Fee and Expense Claims.

9.1.1  Payment of Senior Lender Fee/Expense Claims.  No later than forty-five (45) days after the Effective Date, each Creditor Proponent shall submit to Reorganized Tribune, the Creditors' Committee and the United States Trustee reasonably detailed statements of the Senior Lender Fee/Expense Claims (which statements shall include descriptions of services provided in summary form without individual time records), and shall concurrently file such statements on the docket in the Chapter 11 Cases.  Subject to the provisions of this Section 9.1.1, amounts due under each such statement shall be paid by Reorganized Tribune within thirty (30) days of submission of such statement.  If, prior to the end of such thirty day period, Reorganized Tribune, the Creditors' Committee or the United States Trustee disputes in writing the reasonableness of any amounts due under any such statements, the applicable parties will

attempt in good faith to resolve any such dispute. If the applicable parties are unable to resolve the dispute, any such party may, within fifteen (15) days after disputing the reasonableness of any such amounts, seek review of the reasonableness of the disputed amounts by the Bankruptcy Court pursuant to section 1129(a)(4) of the Bankruptcy Code, and the undisputed amounts shall be paid without delay. Each Creditor Proponent shall provide the Debtors with estimates of the Senior Lender Fee/Expense Claims seven (7) calendar days prior to the anticipated Effective Date; provided, however, that such estimates shall be used solely for administrative purposes, shall not be binding on the Creditor Proponents and shall not in any way limit, cap, or reduce the amount of the Senior Lender Fee/Expense Claims.

9.1.2   Payment of Bridge Lender Fee/Expense Claims. So long as (i) the Bridge Plan Proponents shall have withdrawn their proposed plan of reorganization and their related discovery requests issued to the Proponents on or prior to February 8, 2011 and (ii) the Bridge Lender Group shall have supported the Plan, taken no actions inconsistent with confirmation of the Plan in their capacities as Holders of Bridge Loan Claims from and after January 28, 2011, and voted all Bridge Loan Claims held by them to accept the Plan, reorganized Tribune shall provide reimbursement for the Bridge Lender Fee/Expense Claims up to an aggregate amount not to exceed $7,000,000 in accordance with the procedures set forth in this Section 9.1.2. No later than forty-five (45) days after the Effective Date, each Bridge Plan Proponent shall submit to Reorganized Tribune, the Creditors' Committee and the United States Trustee reasonably detailed statements of the Bridge Lender Fee/Expense Claims (which statements shall include descriptions of services provided in summary form without individual time records), and shall concurrently file such statements on the docket in the Chapter 11 Cases. Subject to the limitations set forth above, amounts due under each such statement shall be paid by Reorganized Tribune within thirty (30) days of submission of such statement. If, prior to the end of such thirty day period, Reorganized Tribune, the Creditors' Committee or the United States Trustee disputes in writing the reasonableness of any amounts due under any such statements, the applicable parties will attempt in good faith to resolve any such dispute. If the applicable parties are unable to resolve the dispute, any such party may, within fifteen (15) days after disputing the reasonableness of any such amounts, seek review of the reasonableness of the disputed amounts by the Bankruptcy Court pursuant to section 1129(a)(4) of the Bankruptcy Code, and the undisputed amounts shall be paid without delay. Each Bridge Plan Proponent shall provide the Debtors with estimates of the Bridge Lender Fee/Expense Claims seven (7) calendar days prior to the anticipated Effective Date; provided, however, that such estimates shall be used solely for administrative purposes and shall not be binding on the Bridge Plan Proponents and shall not in any way limit, cap, or reduce the amount of the Bridge Lender Fee/Expense Claims.

9.1.3   Payment of Creditors' Committee Member Fee/Expense Claims. No later than forty-five (45) days after the Effective Date, counsel to the Creditors' Committee shall submit to Reorganized Tribune and the United States Trustee, reasonably detailed statements of the Creditors' Committee Member Fee/Expense Claims, which statements shall include descriptions of services provided in summary form without individual time records. Subject to the provisions of this Section 9.1.3, amounts due under each such statement, (up to an aggregate amount not to exceed $6,000,000, plus reasonable amounts incurred in connection with discovery (including deposition testimony) sought from members of the Creditors' Committee in connection with litigation related to confirmation of this Plan) shall be paid by Reorganized Tribune within thirty (30) days of submission of such statement. If, prior to the end of such

thirty day period, Reorganized Tribune or the United States Trustee disputes in writing the reasonableness of any amounts due under any such statements, the applicable parties will attempt in good faith to resolve any such dispute.  If the applicable parties are unable to resolve the dispute, any such party may, within fifteen (15) days after disputing the reasonableness of any such amounts, seek review of the reasonableness of the disputed amounts by the Bankruptcy Court pursuant to section 1129(a)(4) of the Bankruptcy Code, and the undisputed amounts shall be paid without delay.  Counsel to the Creditors' Committee shall provide the Debtors with estimates of the Creditors' Committee Member Fee/Expense Claims seven (7) calendar days prior to the anticipated Effective Date; provided, however, that such estimates shall be used solely for administrative purposes and shall not be binding on the members of the Creditors' Committee and shall not in any way limit, cap, or reduce the amount of the Creditors' Committee Member Fee/Expense Claims.

9.2    Bar Date for Payment or Reimbursement of Professional Fees and Expenses and Claims for Substantial Contribution.

Except as provided in Section 9.1 of this Plan, all final requests for compensation or reimbursement of the fees of any professional employed pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise in the Chapter 11 Cases, including any Claims for making a substantial contribution under section 503(b)(4) of the Bankruptcy Code, must be filed and served on the Reorganized Debtors and their counsel, together with the Bankruptcy Court-appointed fee examiner, and the Office of the United States Trustee, not later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified above in this Section 9.2 and the requesting professional or other entity not later than twenty (20) days after the date on which the applicable application for compensation or reimbursement was served; provided, however, that the following protocol shall apply to the fee examiner previously appointed by the Bankruptcy Court in the Chapter 11 Cases in lieu of such twenty (20) day objection deadline:

(i)    applicants shall submit all final requests for compensation or reimbursement of fees and expenses, and any responses provided for below, in the format required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the Guidelines of the Office of the United States Trustee, and applicable orders of the Bankruptcy Court;

(ii)    if the fee examiner has any questions for any applicant, the fee examiner may communicate such questions in writing to the applicant in an initial report (an "Initial Report") within thirty (30) days after the date on which the applicable application for compensation or reimbursement was served on the fee examiner;

(iii)    any applicant who receives such an Initial Report and wishes to respond thereto shall respond within twenty (20) days after the date of the Initial Report;

(iv)    within thirty (30) days after the date on which any response to an Initial Report is served on the fee examiner (or, if no such response is served, within thirty (30) days after the deadline for serving such Initial Report has passed), the fee examiner shall file with the

Court a final report with respect to each such application for compensation or reimbursement; and

(v)    within fifteen (15) days after the date of the final report, the subject applicant may file with the Court a response to such final report.

Notwithstanding the foregoing, the fee examiner and a professional may agree to extend any of the time periods set forth in items (ii) through (v) above with respect to any application filed by such professional. In addition, notwithstanding the foregoing provisions of this <u>Section 9.2</u>, those professionals retained by the Debtors pursuant to that certain Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business entered by the Bankruptcy Court on January 15, 2009 [D.I. 227] shall continue to be compensated in accordance with the provisions of such Order, and shall not be subject to the final application procedures set forth in this <u>Section 9.2</u>.

## ARTICLE X: CONFIRMATION AND CONSUMMATION OF THE PLAN

10.1    <u>Conditions to Effective Date</u>.

10.1.1    This Plan shall not become effective and the Effective Date shall not occur unless and until the Proponents concur that all of following conditions shall have been satisfied or waived in accordance with <u>Section 10.2</u>:

(a)    The Confirmation Order confirming this Plan, as this Plan may have been modified in accordance with the terms hereof, shall conform to this Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Proponents.

(b)    The Confirmation Order shall authorize and approve the Settlement in all respects and shall not modify the Settlement in any way or sever any component of the Settlement and all distributions to the Senior Lenders and to the Bridge Lenders shall be made in accordance with <u>Section 7.3</u> of this Plan.

(c)    The Confirmation Order shall authorize and approve the Step Two/Disgorgement Settlement and the related releases of Claims against the Settling Step Two Payees in all respects and shall not modify the Step Two/Disgorgement Settlement in any way or sever any component of the Step Two/Disgorgement Settlement.

(d)    The Confirmation Order shall authorize and approve the Intercompany Claims Settlement in all respects and shall not modify the Intercompany Claims Settlement in any way or sever any component of the Intercompany Claims Settlement.

(e)    The Certificate of Incorporation and By-Laws and any amended certificates or articles of incorporation, certificates of formation, limited liability company agreements, partnership agreements or similar governing documents of the other Debtors, as necessary and in form and substance satisfactory to the Proponents, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions and shall become effective on the Effective Date in accordance with such jurisdictions' laws except to the extent that any such

governing documents shall be adopted or filed after the Effective Date in connection with the Restructuring Transactions.

(f)     All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained in form and substance satisfactory to the Proponents or shall have occurred, including, if determined to be necessary by the Proponents in their discretion, a ruling from the Internal Revenue Service that the Litigation Trust qualifies and will be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations, unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

(g)     The board of directors of Reorganized Tribune shall have been selected and shall have expressed a willingness to serve on the board of directors of Reorganized Tribune.

(h)     All other documents and agreements necessary to implement this Plan on the Effective Date shall have been executed and delivered in form and substance satisfactory to the Proponents and all other actions required to be taken in connection with the Effective Date shall have occurred.

(i)     All consents, approvals and waivers from the FCC that are necessary or that the Proponents deem appropriate to consummate the transactions contemplated herein and to continue the operation of the Debtors' ownership structure shall have been obtained in form and substance satisfactory to the Proponents.

(j)     The Litigation Trustee shall have executed the Litigation Trust Agreement.

(k)     [Reserved.]

(l)     The Disbursing Agent, in accordance with the terms of Exhibit 5.15.1(2), shall have calculated amounts that will be offset from Step Two/Disgorgement Settlement participants' distributions pursuant to Article III of this Plan that, together with any payments received from the Step Two/Disgorgement Settlement participants, shall be an amount that is equal to the aggregate Step Two/Disgorgement Settlement Proceeds.

(m)     The Confirmation Order shall include the language set forth in Section 11.3 of this Plan.

(n)     The Creditor Proponents shall have determined, in their sole discretion, that the aggregate amount of Allowed Other Parent Claims shall not exceed $400,000,000, excluding (i) Allowed Other Parent Claims against Tribune for indemnification, reimbursement, or contribution arising from or relating to the assertion of any Preserved Cause of Action by the Litigation Trust; (ii) Allowed Other Parent Claims asserted by the PBGC as a result of termination of any Pension Plan; and (iii) Allowed Other Parent Claims arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim.

(o)    On the Effective Date all of the claims and causes of action asserted in the Committee Complaints, which shall include the Released Claims and the Preserved Causes of Action, shall remain pending, and shall not have been dismissed or withdrawn, except to the extent expressly provided in the Plan or except for any such claims and causes of action that have been settled prior to the Effective Date.

(p)    The Creditor Proponents shall have determined, in their reasonable good faith judgment, that the aggregate amount of Allowed General Unsecured Claims against all Filed Subsidiary Debtors shall not exceed $150,000,000 *plus* an amount equal to the aggregate amount of Allowed General Unsecured Claims against a Filed Subsidiary arising under section 502(h) of the Bankruptcy Code as a result of the payment to the Estates on account of an Ordinary Litigation Claim.

10.2    <u>Waiver of Conditions</u>.

Except for the conditions set forth in <u>Sections 10.1.1(b)</u>, <u>10.1.1(c)</u>, and <u>10.1.1(l)</u> (which may not be waived, modified or amended), each of the remaining conditions set forth in <u>Section 10.1.1</u> may be waived in whole or in part solely by agreement in writing of all of the Proponents without the need for notice or a hearing; <u>provided</u>, <u>however</u>, that the Proponents may not waive any condition the waiver of which is proscribed by law.

10.3    <u>Consequences if Confirmation Order is Vacated</u>.

If the Confirmation Order is vacated, (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for herein shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases of personal property shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

## ARTICLE XI: INJUNCTIONS, RELEASES AND DISCHARGE

11.1    <u>Discharge</u>.

11.1.1    <u>Discharge of Claims and Termination of Interests</u>.

(a)    As of the Effective Date, except as provided in this Plan, the distributions and rights afforded under this Plan and the treatment of Claims and Interests under this Plan shall be in exchange for, and in complete discharge of, all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in Tribune. Except as otherwise specifically provided in this Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled. Accordingly, except as otherwise provided in this Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (x) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (y) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code (or is otherwise resolved), or (z) the Holder of a

Claim based on such debt has accepted the Plan; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors except as otherwise provided in the Plan.  In addition, confirmation of the Plan shall, as of the Effective Date, authorize the release of the Senior Guaranty Claims and the Bridge Loan Guaranty Claims against the Guarantor Non-Debtors.

(b)    As of the Effective Date, except as provided in this Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, debts, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date and from asserting against the Guarantor Non-Debtors any Senior Guaranty Claims or Bridge Loan Guaranty Claims.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims and other debts and liabilities of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent such judgment is related to a discharged Claim.  Notwithstanding anything in Sections 11.1.1(a) or (b), the provisions of this Plan shall not operate to discharge any debts that are otherwise rendered non-dischargeable pursuant to section 1141(d)(6) of the Bankruptcy Code.

11.1.2    Discharge Injunction.  Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons that hold, have held, or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an equity security holder that is terminated pursuant to the terms of this Plan, are permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims, debts or liabilities, or terminated Interests or rights: (i) commencing or continuing any action or other proceeding against the Debtors, the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Reorganized Debtors or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Debtors, the Reorganized Debtors or their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of this Plan; provided, that this injunction shall have no effect on any right of setoff to the extent provided under section 553 of the Bankruptcy Code or any right of recoupment to the extent permitted under applicable law.

11.2    Releases.

11.2.1    Releases by Debtors and Estates.  Except for the Preserved Causes of Action, on the Effective Date and effective simultaneously with the effectiveness of this Plan, the Debtors and the Reorganized Debtors on their own behalf and as representatives of their respective Estates release unconditionally and are hereby deemed to release unconditionally, each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever

(including, without limitation, the Released LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Documents or the Restructuring Transactions, in each case excluding any claims against Chase Bank USA, N.A. or JPMorgan Chase Bank, N.A. for disgorgement of payments made in the ninety days prior to the Petition Date solely to the extent they were made by Tribune Company pursuant to its obligations under the First USA Commercial Card Master Agreement dated as of October 18, 1999, as amended, which for the avoidance of doubt shall be Ordinary Litigation Claims (the "Debtor Released Claims"), provided, however, that, with the exception of the Released LBO-Related Causes of Action, nothing in this Section shall be construed to release any party from liability for actions or omissions constituting willful misconduct or gross negligence as determined by a Final Order; provided further, that nothing in this Section shall be construed to release any Released Party from a Related Person Preference Action.  Except as the Debtors may otherwise provide prior to the Confirmation Date, the releases contained in this Section shall not apply to or otherwise affect the obligations of any of the Debtors' officers or directors to repay loans or advances of money or other property contractually owed to the Debtors or their Estates or with respect to loans or advances of money that the Debtors guaranteed on behalf of such officers or directors.  Furthermore, notwithstanding the foregoing, such release, waiver and discharge shall not operate as a release, waiver or discharge of any express contractual commercial obligations arising in the ordinary course of any Person to the Debtors not directly related to the Released LBO-Related Causes of Action.  On the Effective Date, each Guarantor Non-Debtor will provide each Holder of a Loan Guaranty Claim against the Guarantor Non-Debtors, the Senior Loan Agent, the Former Bridge Loan Agent, the Bridge Loan Agent, the Settling Step Two Payees and the other Released Parties a release of scope equivalent to the release provided by the Debtors hereunder in consideration for the Guarantor Non-Debtor Release contemplated hereby.  For the avoidance of doubt, the Debtor Released Claims do not include any Disclaimed State Law Avoidance Claims.

        11.2.2     <u>Releases by Holders of Claims and Interests</u>.  Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of this Plan, each Person (a) that has voted to accept the Plan and has not opted out from granting the releases in this <u>Section 11.2.2</u>, (b) that has voted to reject the Plan but has opted to grant the releases in this <u>Section 11.2.2</u>, (c) that is deemed to accept the Plan and has been provided an opportunity but has not opted out of granting the releases in this <u>Section 11.2.2</u>, or (d) who otherwise agrees to provide the releases set forth in this <u>Section 11.2.2</u>, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claim), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or before the Effective Date that are in connection with

the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, Disclosure Documents or the Restructuring Transactions (the "Holder Released Claims"); provided, however, that nothing in this Section 11.2.2 shall be construed as a release of (x) the Preserved Causes of Action, (y) any Claims against non-Debtors arising under the Employee Retirement Income Security Act of 1974 held or assertable by the United States Department of Labor or any participant, beneficiary or fiduciary of any ESOP or any other ERISA-covered plan against ERISA-covered plan fiduciaries or (z) any claim by any Non-Arranger Bridge Lender against any Arranger Bridge Lender that is not released as set forth in Section 3.2.4(d)(ii) regardless of whether any such Non-Arranger Bridge Lenders agreed or are deemed to provide the releases set forth in this Section 11.2.2 and regardless of whether any such Non-Arranger Bridge Lender elected, by executing an "Election to Participate in Step Two/Disgorgement Settlement" set forth in a "Notice of Step Two/Disgorgement Settlement," or otherwise, to participate in the Step Two/Disgorgement Settlement; provided further, that no agent or indenture trustee is, by virtue of giving its own release hereunder, releasing individual claims, if any, of lenders or noteholders for which it acts or acted as agent or indenture trustee that are not themselves Released Parties; provided further that no agent, arranger or indenture trustee shall be deemed to have released any lenders or noteholders for which it acts or acted as agent or indenture trustee from any obligations under the relevant instruments; provided further, that nothing in this Section 11.2.2 shall release the Debtors or the Reorganized Debtors from their obligations under this Plan with respect to the treatment of Claims and Interests or any assumed executory contract, unexpired lease or other obligation.  Furthermore, notwithstanding the foregoing and except as provided in Section 11.2.5 hereof with respect to the Guarantor Non-Debtors, such release, waiver and discharge shall not operate as a release, waiver or discharge of any contractual obligation of any non-Debtor party due to any other non-Debtor party that is not related in any way to the leveraged buy-out of Tribune that occurred in 2007.  Notwithstanding anything in this Plan to the contrary, the Bridge Loan Agent (solely in its capacity as Bridge Loan Agent) and the Bridge Lenders (solely in their capacity as Bridge Lenders) shall receive the benefit of the releases set forth in this Section 11.2.2 only to the extent that Persons who granted the releases referred to in this Section 11.2.2 in accordance with the procedures set forth in the Solicitation Order are given the opportunity to elect not to expand the scope of such releases to include the Bridge Loan Agent (solely in its capacity as Bridge Loan Agent) and Bridge Lenders (solely in their capacity as Bridge Lenders) and have not so elected; provided, however, that this sentence shall not apply to any Holder of a Claim in Classes 1C, 1D, 1E, 1F, 1I or 1J that receives a Ballot for voting on this Plan pursuant to the Supplemental Solicitation Order and such Ballot includes elections for opting to grant or not to grant the releases set forth in this Section 11.2.2.  In addition, notwithstanding anything in this Plan to the contrary, any Person that is deemed to grant the releases provided for in this Section 11.2.2 in accordance with the procedures set forth in the Solicitation Order shall be afforded the opportunity to reconsider such Person's release of claims that would otherwise constitute Disclaimed State Law Avoidance Claims in light of modifications to the Plan that affect the definitions of "Disclaimed State Law Avoidance Claims" and "Released Parties" and related provisions, which were made after the deadline for the return of Ballots established by the Solicitation Order; provided, however, that this sentence shall not apply to any Holder of a Claim in Classes 1C, 1D, 1E, 1F, 1I or 1J that receives a Ballot for voting on this Plan pursuant to the Supplemental Solicitation Order and such Ballot includes elections for opting to grant or not to grant the releases set forth in this Section 11.2.2.  Any claims that would otherwise constitute Disclaimed State Law

Avoidance Claims against Released Stockholder Parties shall instead be deemed to constitute Holder Released Claims if any such Person has not elected to exclude Disclaimed State Law Avoidance Claims against Released Stockholder Parties from the releases referred to in this Section 11.2.2 pursuant to any supplemental process implemented in connection with the immediately preceding sentence prior to the Effective Date.

       11.2.3     Failure to Grant Release.  Any Holder of a Claim or Interest that has timely submitted to the Debtors or filed with the Court a Ballot or an election form pursuant to Section 11.2.2(c) opting not to grant the releases set forth in Section 11.2.2 shall not receive the benefit of the releases set forth in Section 11.2.2 (even if for any reason otherwise entitled).

       11.2.4     Injunction Related to Releases.  Except as provided in this Plan or the Confirmation Order, as of the Effective Date, all Persons, including those that hold, have held, or may hold a Claim or other debt, right, cause of action or liability that is released pursuant to the provisions of the Plan, are permanently enjoined from taking any of the following actions on account of or based upon the Released Claims:  (i) commencing or continuing any action or other proceeding against the Released Parties or their respective property; (ii) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or their respective property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Released Parties or their respective property; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due the Released Parties or against their respective property; and (v) commencing or continuing any judicial or administrative proceeding, in any forum, that does not comply with or is inconsistent with the provisions of this Plan.

       11.2.5     Release of Guarantor Non-Debtors from Senior Guaranty Claims and Bridge Loan Guaranty Claims.  All Holders of Loan Guaranty Claims against the Guarantor Non-Debtors shall be deemed on the Effective Date to have granted the Guarantor Non-Debtor Release and the Guarantor Non-Debtors shall be unconditionally relieved from any liability to the Senior Lenders or the Bridge Lenders on account of the Senior Guaranty Claims or the Bridge Loan Guaranty Claims and the Senior Loan Agent, the Former Bridge Loan Agent, and the Bridge Loan Agent, respectively, shall be unconditionally relieved from any liability of any nature whatsoever to such Holders as a result of the release of the Guarantor Non-Debtors from any and all Senior Guaranty Claims and Bridge Loan Guaranty Claims; provided that the Guarantor Non-Debtor Release is dependent upon and only effective upon (i) the execution by each of the Guarantor Non-Debtors of a guaranty of the New Senior Secured Term Loan pursuant to and to the extent provided in Section 5.6 of this Plan, (ii) the unconditional release by each of the Guarantor Non-Debtors, in form and substance acceptable to the Creditor Proponents, as of the Effective Date, of each of the Holders of Loan Guaranty Claims, the Bridge Loan Agent, the Former Bridge Loan Agent and the Senior Loan Agents, in each case solely in their capacities as Released Parties, of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, the LBO-Related Causes of Action and those arising under the Bankruptcy Code, including any avoidance claims), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the

Effective Date that are in connection with the Debtors or any of them, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, the Disclosure Documents or the Restructuring Transactions, and (iii) the granting by the Guarantor Non-Debtors of Liens on certain property of the Guarantor Non-Debtors pursuant to and to the extent provided in Section 5.6 of this Plan.  Pursuant to Bankruptcy Rule 9019 and/or 11 U.S.C § 1123(b)(3), the Bankruptcy Court's entry of the Confirmation Order shall constitute its approval of this good faith settlement and compromise of the claims released by the Guarantor Non-Debtor Release and adequate factual findings that the Guarantor Non-Debtor Release is: (1) fair, equitable and reasonable; (2) necessary and essential to the Debtors' successful reorganization; (3) in exchange for good and valuable consideration provided by the Guarantor Non-Debtors; (4) warranted by the exceptional and unique circumstances of the Debtors' reorganization; and (5) consistent with public policy and due process principles.  Notwithstanding the foregoing, in the event that the Guarantor Non-Debtor Release set forth in this Section 11.2.5 does not become or remain effective for any reason whatsoever, all Senior Guaranty Claims against the Guarantor Non-Debtors and any and all rights of subordination in respect of the Bridge Loan Guaranty Agreement (the "Assigned Senior Guaranty Claims") shall and shall be deemed to have been assigned and transferred as of the Effective Date by the Senior Lenders and the Senior Loan Agent to the Senior Guaranty Claim Assignee.

      11.2.6    Preserved Causes of Action. The Preserved Causes of Action are expressly preserved and shall not be subject to the releases set forth in Section 11.2.1 or 11.2.2 of this Plan; provided, however, that the Preserved Causes of Action shall be subject to the provisions of Section 11.3 of this Plan.  Any Disclaimed State Law Avoidance Claims shall also be subject to the provisions of Section 11.3 of this Plan.  In addition, any claims, rights or causes of action related to setoffs against amounts owing to the Debtors are expressly preserved and are not subject to the releases set forth in this Plan; provided, however, that, except as set forth in Section 7.11.2, in no event shall the Debtors or the Disbursing Agent setoff against any distributions under this Plan to Holders of Allowed Claims in Classes 1C, 1D and 50C through 111C (other than any distributions to MSCS with respect to the Morgan Stanley Claims).

      11.2.7    Non-release of Certain Defined Benefit Plans.  Notwithstanding anything to the contrary herein, with respect to any Defined Benefit Plan that has not been terminated or does not terminate by its terms prior to the entry of the Confirmation Order, all Claims of, or with respect to, such a Defined Benefit Plan (including any based on fiduciary duties under the Employee Retirement Income Security Act of 1974, as amended) and all Claims of the Pension Benefit Guaranty Corporation, whether or not contingent, under 29 U.S.C. § 1362(b) for unfunded benefit liabilities, under 29 U.S.C. § 1306(a)(7) for termination premiums, and under 29 U.S.C. § 1362(c) for due and unpaid employer contributions shall not be discharged, released, exculpated or otherwise affected by the Plan (including this Section 11.2), the entry of the Confirmation Order or the Chapter 11 Cases.  Notwithstanding anything to the contrary herein, in the event that a Defined Benefit Plan does not terminate prior to the entry of the Confirmation Order, obligations of the Debtors under the Defined Benefit Plan as of the Effective Date shall become obligations of the applicable Reorganized Debtors and, as required by the Internal Revenue Code of 1986, as amended, or the Employee Retirement Income Security Act of 1974, as amended, the controlled group members.

      11.3    Bar Order.

The Confirmation Order shall provide, among other things (and the inclusion of such language, or language substantially similar to the following, and subject to Section 10.2 of this Plan, shall be a condition to the Effective Date):

"ORDERED that all (i) Non-Settling Defendants; (ii) Released Parties; (iii) Persons who have voted for or against the Plan or who are presumed to have voted for or against the Plan under Section 1126(f)-(g) of the Bankruptcy Code; and (iv) any other Persons that hold, have held or may hold a Claim or other debt or liability, or an Interest or other right of an equity holder, against, in or relating to any of the Debtors or their respective estate (collectively, the "Barred Persons"), are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Released Party (including any other non-contractual claim against the Released Parties, whether or not denominated as for contribution or indemnity, where the injury to the Barred Person is the liability of the Barred Person to the Plaintiff (as defined below)), arising out of or reasonably flowing from the claims or allegations in any of the Released Claims, the Preserved Causes of Actions, or the Disclaimed State Law Avoidance Claims, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"). Barred Claims shall not include any claim for non-contractual indemnity or contribution against any Released Party solely in its capacity, if any, as a Selling Stockholder. If a court or tribunal determines that Barred Claims exist that would have given rise to liability of any Released Party to a Barred Person but for this Order, the Barred Persons are also entitled to the judgment reduction provisions set forth herein. This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim; and it is further

ORDERED that in the event any Person asserts a Preserved Cause of Action or a Disclaimed State Law Avoidance Claim (a "Plaintiff") against any Barred Person with respect to one or more Preserved Causes of Action or Disclaimed State Law Avoidance Claims based upon, arising from, or related to the facts, allegations, or transactions underlying any Released Claims (the "Action"), then, prior to entry of any judgment or arbitration award ("Judgment") in the Action, the Plaintiff shall provide notice of this Bar Order to the court or tribunal hearing the Action. Such court or tribunal shall determine whether the Action gives rise to Barred Claims on which Released Parties would have been liable to the Barred Persons in the absence of this Bar Order. If the court or tribunal so determines, it shall reduce any Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Released Party or Parties that would have been liable on a Barred Claim in the absence of this Bar Order expressed as a percentage of the aggregate fault of (i) the Barred Person, (ii) such Released Party or Parties, and (iii) all other Persons determined by such court or tribunal to be liable to the Barred Person in connection with the Action, whether or not such Persons are sued in such Action. Nothing herein shall prejudice or operate to preclude the right of any defendant in such Action to (i) provide notice of this Bar Order to the court or tribunal hearing the Action at any point, or (ii) raise any issues, claims or defenses regarding judgment reduction or proportionate share of fault in the court or tribunal hearing the Action at any point in accordance with applicable law or procedure and this Bar Order. For the avoidance of doubt, nothing herein shall

be deemed to entitle a Plaintiff to more than a single satisfaction with respect to any Preserved Causes of Action or Disclaimed State Law Avoidance Claims; and it is further

ORDERED that nothing herein shall prejudice or operate to preclude the rights of any Barred Person to assert any claims or causes of action (including, without limitation, any direct or personal claims or causes of action), other than claims for non-contractual indemnity or contribution against any Released Party as set forth above.  For the avoidance of doubt, the provisions of this Bar Order, including the judgment reduction provisions set forth herein, shall not apply to (i) any contractual indemnity; (ii) any claim for which a court determines joint liability does not exist as a matter of law, equity or fact as between any Barred Person and any Released Party; or (iii) any claims for non-contractual indemnity or contribution asserted with respect to claims or causes of action that are brought by any Person other than (a) the Litigation Trust; (b) any Person asserting a claim on behalf of the Debtors' estates; (c) any Person asserting a Preserved Cause of Action; or (d) any Person asserting a Disclaimed State Law Avoidance Claim; and it is further

ORDERED that if any Plaintiff enters into a settlement with any Person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement; and it is further

ORDERED that each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any Non-Settling Defendants in any manner that fails to conform to the terms of this Bar Order, including, without limitation, the proportionate judgment reduction provision set forth herein; and it is further

ORDERED that this Court shall retain continuing jurisdiction with respect to all matters concerning this Bar Order, including, without limitation, hearing a petition for relief by a Barred Person or any other party in interest in the event that a court or tribunal hearing the Action fails to apply the judgment reduction provisions of this Bar Order."

11.4    Disallowed Claims And Disallowed Interests.

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on a Disallowed Claim or a disallowed Interest, and any Order disallowing a Claim or an Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, shall constitute an Order: (a) disallowing all Claims and Interests to the extent such Claims and Interests are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims and Interests, and Claims for unmatured interest and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages to the extent permissible under the Bankruptcy Code and applicable non-bankruptcy law.

11.5    <u>Exculpation</u>.

To the fullest extent permitted under applicable law, (a) none of the Debtors (including without limitation the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases) or the Creditors' Committee, (b) none of the current and former members of the Creditors' Committee (in their capacities as such), and (c) none of the Related Persons to the parties in (a) and (b) to the extent a claim arises from actions taken by such Related Person in its capacity as a Related Person of one of such parties, shall have or incur any liability to any person or entity for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, negotiation of any plans of reorganization, including this Plan, pursuit of confirmation of any plans of reorganization, including this Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, the Disclosure Documents, the Restructuring Transactions, the Plan Supplement, the releases and injunctions, or the management or operation of the Debtors (except for any liability that results from willful misconduct or gross negligence as determined by a Final Order or from any act or omission occurring before the Petition Date).  Any of the Debtors (including without limitation the Special Committee of the Board of Directors of Tribune formed during the Chapter 11 Cases), the Creditors' Committee, the members of the Creditors' Committee and the Related Persons to each of the foregoing (with respect to actions taken by such Related Person in its capacity as a Related Person of one of such parties) shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and the administration thereof.

11.6    <u>Corporate Indemnities</u>

11.6.1    <u>Prepetition Indemnification and Reimbursement Obligations</u>.  For purposes of this Plan, the respective obligations of Tribune and the other Debtors to indemnify and reimburse any Persons who are or were directors, officers or employees of the Debtors on or after the Petition Date, against and for any obligations pursuant to certificates or articles of incorporation, certificates of formation, codes of regulation, bylaws, limited liability company agreements, partnership agreements, applicable state or non-bankruptcy law, or specific agreements or any combination of the foregoing, but excluding any obligations of Tribune and the other Debtors to any Person in respect of any such indemnification or reimbursement related to, based upon, or in connection with any LBO-Related Causes of Action arising prior to the Petition Date, shall survive confirmation of this Plan, remain unaffected thereby, and not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on, or after the Petition Date.

11.6.2    <u>Director and Officer and Fiduciary Liability Insurance</u>.  In accordance with the authority granted under the Order Authorizing tribune Company to Purchase Tail Coverage Respecting the Debtors' Existing Directors and Officers and Fiduciary Liability Insurance Policies Pursuant to Section 363(b) of the Bankruptcy Code [D.I. 3190], the Debtors may in their discretion purchase "Tail Coverage" as defined in the motion with respect to such order.

11.7    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## ARTICLE XII:  RETENTION OF JURISDICTION

12.1    Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

12.1.1    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

12.1.2    resolve any matters related to the rejection, assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

12.1.3    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

12.1.4    decide or resolve any motions, adversary proceedings, contested or litigated matters, the Preserved Causes of Action and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

12.1.5    enter such orders as may be necessary or appropriate to implement, enforce, or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Documents or the Confirmation Order;

12.1.6    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from or obligations incurred in connection with this Plan or such documents;

12.1.7    approve any modification of this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or remedy any defect or omission or

reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, or enter any order in aid of Confirmation pursuant to section 1142 of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate this Plan;

12.1.8    hear and determine all applications for compensation and reimbursement of expenses of professionals under this Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court; provided, however, that the professional fees and expenses of the Reorganized Debtors, incurred after the Effective Date, including counsel fees, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

12.1.9    hear and determine any dispute concerning the compromise by and between the Holders of Loan Guaranty Claims against the Guarantor Non-Debtors, the Loan Agents and the Guarantor Non-Debtors, and the Loan Agents' release of all Senior Guaranty Claims and Bridge Loan Guaranty Claims against the Guarantor Non-Debtors;

12.1.10    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

12.1.11    hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

12.1.12    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

12.1.13    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to this Plan are enjoined or stayed;

12.1.14    hear and determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Documents, the Confirmation Order or any contract, instrument, release, or other agreement, or document created in connection with this Plan, the Disclosure Documents or the Confirmation Order;

12.1.15    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

12.1.16    hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

12.1.17    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code;

12.1.18    hear and determine all matters arising under the Litigation Trust Agreement or relating to the Litigation Trust;

12.1.19    hear and determine any "Allocation Disputes" (as described in the Allocation Dispute Rulings) that were not resolved by the Allocation Dispute Rulings; provided, however, the Bankruptcy Court's jurisdiction shall not be exclusive with respect to the matters set forth in this Section 12.1.19; and

12.1.20    enter an order closing the Chapter 11 Cases.

## ARTICLE XIII:  LITIGATION TRUST

13.1    Establishment of Trust.

On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of administering the Litigation Trust Assets and making all distributions on account of Litigation Trust Interests as provided for under the Plan. The Litigation Trust is intended to qualify as a liquidating trust pursuant to Regulations section 301.7701-4(d).  Except as expressly provided in Section 5.13 with respect to the Trust Loan, none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Litigation Trust.  The Litigation Trust Agreement shall be substantially in the form of Exhibit 13.1 hereto, which shall be filed prior to the Confirmation Hearing.

13.2    Litigation Trust Assets.

13.2.1 On the Effective Date, in accordance with Section 1141 of the Bankruptcy Code, all of the Litigation Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the Litigation Trust Assets, shall automatically vest in the Litigation Trust, free and clear of all Claims and Interests for the benefit of the Litigation Trust Beneficiaries.  For the avoidance of doubt, (i) in no event shall the term "Litigation Trust Assets" be deemed to include any Released Claims against any Released Parties, and (ii) the Litigation Trust shall not have the right to assert any Released Claims against any Released Parties.

13.2.2 The transfer of each of the Litigation Trust Assets to the Litigation Trust shall be treated for U.S. federal income tax purposes as a transfer of the Litigation Trust Assets (other than the amounts set aside in the LT Reserves if the LT Reserves are subject to an entity level tax) to the Litigation Trust Beneficiaries, followed by a transfer of the Litigation Trust Assets by the Litigation Trust Beneficiaries to the Litigation Trust.  For federal income tax purposes, the Litigation Trust Beneficiaries will be treated as grantors, deemed owners and beneficiaries of the Litigation Trust.  The Debtors shall retain a valuation expert (the "Valuation Expert"), which Valuation Expert shall be acceptable to the other Proponents.  Prior to the Effective Date, the Valuation Expert will determine and provide to the Debtors an initial estimated fair market value of the Litigation Trust Assets to be transferred to the Litigation Trust.  Promptly after the Effective Date, the Valuation Expert will determine and file with the Bankruptcy Court the final fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust, giving due regard to the initial estimated valuation of such Litigation Trust Assets.  The Valuation Expert's final determination of the fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust shall be

used consistently by the Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries for all U.S. federal income tax purposes, including for determining tax basis and gain or loss.  The Litigation Trustee shall file federal income tax returns for the Litigation Trust as a grantor trust in accordance with United States Treasury Regulation Section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss, deductions and credits ("LT Tax Items").  The holders of Litigation Trust Interests shall report such LT Tax Items on their federal income tax returns and pay any resulting federal income tax liability.  Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the applicable Estates' rights, title and interest in the Litigation Trust Assets and the Debtors shall have no further interest in or with respect to the Litigation Trust Assets.

13.2.3 The Litigation Trustee may establish one or more LT Reserves on account of Disputed Claims the Holders of which would be entitled to Litigation Trust Interests were such Disputed Claims ultimately Allowed.  The amount held back in the LT Reserve(s) shall be equal to the amount necessary to satisfy the distributions to which the Holders of the relevant Disputed Claims would be entitled if all such Disputed Claims were to be subsequently Allowed. The Litigation Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve(s) as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve(s), with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims), and (iii) distribute assets from the LT Reserve(s) as, when, and to the extent, such Disputed Claims either become Allowed or are otherwise resolved.  The Litigation Trust Beneficiaries shall be bound by such election, if made by the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

13.2.4 The Litigation Trust, acting through the Litigation Trustee, shall be authorized to exercise and perform the rights, powers, and duties held by the Estate with respect to the Litigation Trust Assets, including, without limitation, the authority under Section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, supervise, manage or liquidate the Debtors, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Litigation Trust Assets.  Notwithstanding anything to the contrary herein or in the Confirmation Order, certain acts of or by the Litigation Trust or the Litigation Trustee are and shall remain subject to the consent of the Litigation Trust Advisory Board pursuant to the terms of the Litigation Trust Agreement.

13.3    Litigation Trustee.

13.3.1 The Litigation Trust shall be managed and operated by the Litigation Trustee.  The Litigation Trustee shall be appointed by the Litigation Trust Advisory Board on the Effective Date, or as soon as practicable thereafter.  The Litigation Trust Advisory Board shall have the functions, duties and rights provided in the Litigation Trust Agreement.  No other Litigation Trust Beneficiary shall have any consultation or approval rights whatsoever in respect

94

of management and operation of the Litigation Trust, except as may be set forth in the Litigation Trust Agreement with respect to the repayment of the Step Two Arranger Litigation Trust Preference. The Litigation Trustee will be identified as soon after the Plan Supplement filing date as a majority of the parties who will be the initial members of the Litigation Trust Advisory Board inform the Proponents of their selection of the Litigation Trustee; provided, however, the Litigation Trustee shall (a) have no standing, and shall not appear or be heard, in the Chapter 11 Cases or any pending actions related to the Committee Complaints or the Disclaimed State Law Avoidance Claims prior to the Effective Date and (b) not be entitled to receive any reimbursement for its costs or expenses of any kind from the Debtors or Reorganized Debtors. There shall be three members of the Litigation Trust Advisory Board, consisting of (i) Wilmington Trust, (ii) Deutsche Bank and (iii) William Niese. Wilmington Trust and Deutsche Bank (or either of their successors as Indenture Trustee) shall each have the right to name a party to serve as its designee on the Litigation Trust Advisory Board; provided, however, that if such designee ceases for any reason to be a member of the Litigation Trust Advisory Board, then, so long as Wilmington Trust or Deutsche Bank, as applicable, continue to serve as Indenture Trustee, it shall have the right to appoint a successor member of the Litigation Trust Advisory Board to replace its previous designee. Each member of the Litigation Trust Advisory Board, including any designee, will be identified in the Plan Supplement. The members of the Litigation Trust Advisory Board shall be compensated as set forth in the Litigation Trust Agreement.

13.3.2 The responsibilities of the Litigation Trustee shall include, but shall not be limited to: (a) prosecuting through judgment and/or settling the Litigation Trust Assets and any defense asserted by the Litigation Trust in connection with any counterclaim or cross claim asserted against the Litigation Trust; (b) at least annually, calculating and making distributions required under the Plan to be made from the Litigation Trust Assets; (c) filing all required tax returns, and paying obligations on behalf of the Litigation Trust from the Litigation Trust Assets; (d) otherwise administering the Litigation Trust; (e) filing quarterly reports with the Bankruptcy Court (and serving the same upon counsel for the Reorganized Debtors), and providing annual reports to the Litigation Trust Beneficiaries, with respect to (i) the prosecution and resolution of the Litigation Trust Assets and (ii) expenditures, receipts, and distributions of the Litigation Trust; and (f) such other responsibilities as may be vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to Litigation Trust Beneficiaries contemplated or effectuated under the Plan. The Litigation Trustee shall have fiduciary duties to the Litigation Trust Beneficiaries consistent with the fiduciary duties that a member of an official committee of creditors appointed pursuant to section 1102 of the Bankruptcy Code has to the creditor constituents represented by such committee and shall exercise his, her or its responsibilities accordingly; provided, that the Litigation Trustee shall not owe fiduciary obligations to any defendants of Preserved Causes of Action in their capacities as such, it being the intent of such fiduciary duties to ensure that the Litigation Trustee's obligations are to maximize the value of the Litigation Trust Assets, including the Preserved Causes of Action.

13.3.3    The Litigation Trustee upon the written consent of the Litigation Trust Advisory Board may, without any further approval from the Bankruptcy Court: (a) invest the Litigation Trust Assets in short term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as treasury bills, and withdraw funds of the Litigation Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash, and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee in accordance with the Plan; (b) evaluate and determine strategy with respect to the Litigation Trust Assets, and to prosecute, compromise, release, abandon and/or settle the Litigation Trust Assets against the Non-Settling Defendants on behalf of the Litigation Trust; provided, however, that Bankruptcy Court authority must be obtained to settle, dispose of or abandon any affirmative Preserved Causes of Action where the stated face amount in controversy exceeds $5,000,000; (c) liquidate any remaining Litigation Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan; (d) otherwise administer the Litigation Trust, except as set forth in the Litigation Trust Agreement with respect to the repayment of the Step Two Arranger Litigation Trust Preference; and (e) exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust; provided that in no event shall the Litigation Trustee be authorized to take any action to pursue any Released Claims. The Litigation Trustee, acting on behalf of the Litigation Trust, shall agree to comply with, and shall not take any actions inconsistent with, the Bar Order as set forth in Section 11.3. The Litigation Trustee, on behalf of the Litigation Trust and upon the prior written consent of the Litigation Trust Advisory Board, may pursue, not pursue, and/or settle any and all Litigation Trust Assets, and the Litigation Trustee shall have no liability whatsoever for the outcome of that decision, except in the event that there is a Final Order determining that the Litigation Trustee committed fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct. In connection with the administration of the Litigation Trust, the Litigation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan and applicable law.

13.3.4 Upon the prior written consent of the Litigation Trust Advisory Board, the Litigation Trustee may, without further order of the Bankruptcy Court, employ various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist her or him in fulfilling her or his obligations under the Litigation Trust Agreement and this Plan, and on whatever fee arrangement she or he deems appropriate, including, without limitation, contingency fee arrangements. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Assets or the Trust Loan. The Reorganized Debtors shall have no liability therefor, except for the making of the Trust Loan pursuant to Section 5.13 of this Plan, and the Litigation Trust Beneficiaries shall have no liability therefor.

13.3.5 In addition to reimbursement for actual out-of-pocket expenses incurred by the Litigation Trustee, the Litigation Trustee shall be entitled to receive reasonable compensation for services rendered on behalf of the Litigation Trust on terms to be set forth in the Litigation Trust Agreement. All such compensation and reimbursement shall be paid from

the Litigation Trust with Litigation Trust Assets. The Reorganized Debtors shall have no liability therefor.

13.3.6 The Litigation Trustee or any successor Litigation Trustee appointed pursuant to the Plan may be removed as Litigation Trustee (i) without cause by the Litigation Trust Advisory Board, or (ii) for cause pursuant to the terms and conditions set forth in the Litigation Trust Agreement upon order of the Bankruptcy Court upon motion of any holder of a Litigation Trust Interest that has not received payment in full plus interest as specified in this Plan. For purposes of this provision, cause shall mean fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct. In addition, the Litigation Trustee may resign with thirty (30) days' notice served on the Litigation Trust Beneficiaries and filed with the Bankruptcy Court. In the event that the Litigation Trustee is removed, resigns, or otherwise ceases to serve as Litigation Trustee, the Litigation Trust Advisory Board shall appoint a successor Litigation Trustee. Any successor Litigation Trustee shall be subject to the same qualifications and shall have the same rights, powers, duties, and discretion, and otherwise be in the same position, as the originally named Litigation Trustee. References herein to the Litigation Trustee shall be deemed to refer to the successor Litigation Trustee acting hereunder.

13.3.7 The Litigation Trustee and the Litigation Trust Advisory Board and each of their respective directors, members, shareholders, partners, officers, agents, professionals or employees shall be indemnified by the Litigation Trust to the extent set forth in the Litigation Trust Agreement as of the Effective Date, and in no event shall they be indemnified by the Reorganized Debtors or Related Persons of the Reorganized Debtors.

13.3.8 To effectively investigate, prosecute, compromise, and/or settle the Litigation Trust Assets on behalf of the Litigation Trust, the Litigation Trustee and its counsel and representatives may require reasonable access to the Debtors' and Reorganized Debtors' documents and information relating to the Litigation Trust Assets and, in such event, must be able to exchange such information with the Reorganized Debtors on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Accordingly, on the Effective Date, the Reorganized Debtors and the Litigation Trustee shall enter into the LT Agreement providing for reasonable access to, at the Litigation Trust's own expense, copies of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets, including, without limitation, electronic records or documents.

13.3.9 The Reorganized Debtors shall preserve all records and documents (including all electronic records or documents) related to the Litigation Trust Assets for a period of five (5) years after the Effective Date or, if any Preserved Cause of Action has been asserted in a pending action, then until such later time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved; provided, however, that nothing herein shall or shall be deemed to expand the scope of documents available, and/or require production of work product, to the Litigation Trust, that would not otherwise have been available to the Debtors or be available to the Reorganized Debtors. The Litigation Trust shall reimburse the Reorganized Debtors for all reasonable out of pocket costs incurred (including for legal fees, travel accommodations, electronic discovery and other forensic investigation and analysis or courier and mail service) in performing their obligations under this Section 13.3.9 or

in otherwise supporting the Litigation Trust to the extent such support is required by the Litigation Trust Agreement or is otherwise requested and provided under the LT Agreement. The Litigation Trust shall provide reimbursement for all reasonable out of pocket costs incurred within 30 days of receipt of an appropriately detailed written invoice.

13.3.10    The duties, responsibilities, and powers of the Litigation Trustee shall terminate in accordance with the terms of the Litigation Trust Agreement after all of the Litigation Trust Assets have been liquidated and after all proceeds thereof have been distributed to the Litigation Trust Beneficiaries.

13.4    Dissolution.

The Litigation Trust will be dissolved no later than five (5) years from the Effective Date; provided, however, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust for a finite period if (i) such extension is necessary to the purpose of the Litigation Trust, (ii) the Litigation Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Litigation Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable.  Upon dissolution of the Litigation Trust, any remaining Cash on hand and other assets, with the exception of any Preserved Causes of Action will be distributed to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.  Upon the dissolution of the Litigation Trust, all remaining Preserved Causes of Action shall be deemed void and abandoned and no Litigation Trust Beneficiary shall have any right, title or interest in or to any such Preserved Cause of Action.

13.5    Funding the Litigation Trust.

The Litigation Trust will receive initial funding as set forth in Section 5.13.

**ARTICLE XIV: [Reserved]**

**ARTICLE XV: MISCELLANEOUS**

15.1    Surrender of Instruments.

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of any of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by this Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate this Plan; provided, however, that if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the Debtors or the applicable Indenture Trustee for such note, debenture or other evidence of indebtedness may waive the requirement of

surrender; provided further, however, that the surrender of any note, debenture or other evidence of indebtedness or a waiver of the requirement of surrender is not intended to adversely impact the prosecution of the Disclaimed State Law Avoidance Claims or the Preserved Causes of Action in any way.  Except as otherwise provided in this Section 15.1, in the Reorganized Debtors' sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement (without any bond), in form and substance reasonably satisfactory to the Reorganized Debtors, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim is based on such note, debenture or other evidence of indebtedness thereof.

15.2    Creditors Committee.

The appointment of the Creditors Committee shall terminate on the Effective Date, except that the Creditors Committee shall continue in existence after the Effective Date for the sole purposes of (1) preparing and prosecuting applications for the payment of fees and reimbursement of expenses and evaluating the reasonableness of fees payable under Section 9.1, solely to the extent in the interests of unsecured creditors generally and (2) complying with its obligations pursuant to an agreement to be entered into between the Creditors' Committee and the Litigation Trust governing the transfer of certain documents, information and privileges from the Creditors' Committee to the Litigation Trust; provided that, any compensation, costs or expenses incurred by the Creditors' Committee in connection with such agreement shall be paid in accordance with the terms of the agreement.  Except for subpart (2) of the immediately preceding sentence, as to the post-emergence matters and issues covered by this Section, the attorneys and, to the extent consented to by the Reorganized Debtors (such consent not to be unreasonably withheld), one financial advisor, retained by the Committee (but for the avoidance of doubt not by individual members of the Committee) shall continue to be compensated and reimbursed for their reasonable and documented expenses incurred after the Effective Date pursuant to the procedures set forth in the Fee Procedures Orders as though the Effective Date had not occurred; provided that in no event shall any financial advisors or other professionals retained by the Creditors' Committee be entitled to any additional success or transaction based fee after the Effective Date.  Notwithstanding the foregoing, the appointment of the Bankruptcy Court-appointed fee examiner shall not apply to the reimbursement of fees and expenses pursuant to this Section 15.2.

15.3    Post-Confirmation Date Retention of Professionals.

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

15.4    Effectuating Documents and Further Transactions.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

15.5   <u>Exemption from Transfer Taxes</u>.

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes, debentures or equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under this Plan, including, without limitation, merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property, will not be subject to any stamp tax or other similar tax.

15.6   <u>Paid-in Capital of Corporate Reorganized Debtors</u>.

On the Effective Date, after taking into account all of the transactions contemplated by this Plan (including, but not limited to, the cancellation of indebtedness pursuant to <u>Section 5.8</u> of this Plan), the Paid-in Capital, as such term is defined in section 1.80(j) of the Business Corporation Act of 1983, as amended, 805 ILCS 5/1.01, et seq. (the "BCA"), of each corporate Reorganized Debtor shall, pursuant to Section 9.20(a)(2) of the BCA, be reduced to the following amounts (such reduced amounts to be referred to individually and collectively as the "Article XIII Paid-in Capital Amount" and "Article XIII Paid-in Capital Amounts," respectively): (i) in the case of Reorganized Tribune, its Paid-in Capital shall be reduced to the aggregate par value, if any, of Reorganized Tribune's issued shares of capital stock plus such amounts as are recorded on Reorganized Tribune's financial statements as paid-in capital and additional paid-in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor, its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other Reorganized Debtor's issued shares of capital stock plus such amounts as are recorded on each such other Reorganized Debtor's financial statements as paid-in capital and additional paid-in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles.  The amount required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its Article XIII Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under Section 9.20(a)(2) of the BCA.  Notwithstanding anything to the contrary, this Section 15.6 shall only apply to capital stock of Reorganized Tribune and each corporate Reorganized Debtor that is contemplated to be issued pursuant to this Plan.

In any document required to be filed with the Illinois Secretary of State's office on or after the Effective Date and on or before the date the Article XIII Paid-in Capital Amounts are finally recorded on each corporate Reorganized Debtor's financial statements in accordance with the preceding paragraph, such reduction shall be made by good faith determination of the Article XIII Paid-in Capital Amounts as of the close of business on the Effective Date, after taking into account all of the transactions contemplated by this Plan (including but not limited to, the cancellation of indebtedness pursuant to <u>Section 5.8</u> of this Plan).  If such good faith

determination differs from the Article XIII Paid-in Capital Amounts as finally recorded on any Reorganized Debtor's financial statements, a statement of correction will be filed on Form BCA 1.15 to correct such good faith determination, together with supporting documentation, which shall consist of a copy of the Reorganized Debtor's fresh start accounting certified financial statements.  The Reorganized Debtors shall not be required to file Form BCA 1.35, unless the Reorganized Debtors report a correction in apportionment in Form BCA 1.15.  Such corrections to Reorganized Debtors' paid-in capital shall occur without interest or penalties, provided that Form BCA 1.15 (and Form BCA 1.35, if applicable) is submitted for filing no later than 30 days after the date on which the Reorganized Debtor's fresh start accounting financial statements, as of the Effective Date, are first certified.

For purposes of this <u>Section 15.6</u>, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

15.7    <u>Payment of Statutory Fees</u>.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

15.8    <u>Amendment or Modification of this Plan</u>.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code and other applicable provisions of this Plan, the Proponents may alter, amend or modify this Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, but only by a writing evincing the agreement of all Proponents to do so.  A Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.  Notwithstanding the foregoing, the Plan shall not be amended, supplemented or otherwise modified (including by operation of the Confirmation Order) in a manner materially adverse to the distributions to Holders of Bridge Loan Claims (whether in Cash or Litigation Trust Interests) or releases granted to the Holders of Bridge Loan Claims or in any other manner that is materially inconsistent with the Bridge Settlement Term Sheet without the express written consent of the Bridge Plan Proponents; <u>provided</u>, <u>however</u>, that the following modifications shall not be considered materially adverse to the Holders of Bridge Loan Claims or materially inconsistent with the Bridge Settlement Term Sheet: (a) modifications to the contents, control and/or operations of the Litigation Trust, so long as: (i) the Holders of Bridge Loan Claims' percentage interests in the Litigation Trust are not altered and (ii) the priority of the Holders of Bridge Loan Claims' interests and distribution rights, including in respect of any settlement, are unaffected, (b) generally applicable modifications to releases provided in the Plan and (c) to the extent required by the Bankruptcy Court, the provisions of <u>Section 11.2.2</u> related to the Bridge Loan Agreement and Bridge Lenders.

15.9    <u>Severability of Plan Provisions</u>.

If any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Proponents will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.10    Successors and Assigns.

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The rights, benefits and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

15.11    Revocation, Withdrawal or Non-Consummation.

Each of the Proponents reserve the right to revoke or withdraw its support for this Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Proponents revoke or withdraw this Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.  If the Plan is revoked or withdrawn prior to the Effective Date, all parties' rights are hereby reserved with regard to the LBO-Related Causes of Action.

15.12    Notice.

To be effective, all notices, requests and demands to or upon the Debtors or the Reorganized Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or electronic transmission, when received and telephonically confirmed, addressed as follows:

**Debtors or Reorganized Debtors:**

Tribune Company
435 Michigan Avenue
Chicago, Illinois 60611
Facsimile: (312) 222-4206
Attn: Chief Legal Officer

*With a copy to:*

**Counsel to the Debtors and Reorganized Debtors:**

| | |
|---|---|
| Sidley Austin LLP | Cole Schotz Meisel Forman & Leonard, P.A. |
| One South Dearborn Street | 500 Delaware Avenue, Suite 1410 |
| Chicago, Illinois 60603 | Wilmington, Delaware 19801 |
| Facsimile: (312) 853-7036 | Facsimile: (302) 652-3117 |
| Attn: Jessica C.K. Boelter | Attn: J. Kate Stickles |

*And, if prior to the Effective Date, to the following additional parties:*

**Counsel to the Official Committee of Unsecured Creditors:**

| | |
|---|---|
| Chadbourne & Parke LLP | Landis Rath & Cobb LLP |
| 30 Rockefeller Plaza | 919 Market Street, Suite 1800 |
| New York, New York 10112 | Wilmington, Delaware 19801 |
| Fax (212) 541-5369 | Fax (302) 467-4450 |
| Attn: David M. LeMay | Attn: Adam G. Landis |

**Counsel to Oaktree and Angelo Gordon:**

| | |
|---|---|
| Jones Day | |
| 555 South Flower Street, Fiftieth Floor | Young Conaway Stargatt & Taylor, LLP |
| Los Angeles, California 90071 | Rodney Square; 1000 North King Street |
| Telecopier: (213) 489-3939 | Wilmington, Delaware 19899 0391 |
| Attn: Bruce Bennett | Telecopier: (302) 571-1253 |
| | Attn: Robert S. Brady |

**Co-Counsel to Angelo Gordon:**

Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888
Attn: Andrew Goldman

**Counsel to JPMorgan:**

| | |
|---|---|
| Davis Polk & Wardwell LLP | Richards Layton & Finger |
| 450 Lexington Avenue | One Rodney Square |
| New York, New York 10017 | 920 North King Street |
| Telecopier: (212) 701-5800 | Wilmington, Delaware 19801 |
| Attn: Damian S. Schaible | Telecopier: (302) 651-7701 |
| | Attn: Mark Collins |

15.13   <u>Governing Law</u>.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other Federal law is applicable, or to the extent that an exhibit or schedule to this Plan or the relevant document provide otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

15.14   <u>Tax Reporting and Compliance</u>.

The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505 of the Bankruptcy Code of the tax liability of any of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

15.15   <u>Exhibits and Appendices</u>.

All Exhibits and appendices to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

15.16   <u>Reservation of Rights</u>.

Except as expressly set forth herein, this Plan shall have no force and effect unless the Bankruptcy Court has entered the Confirmation Order.  The filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the Debtors in furtherance of seeking confirmation of this Plan shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

15.17   <u>Notice of the Effective Date</u>.

On or before ten (10) Business Days after occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all holders of Claims and Interests a Notice that informs such holders of (a) entry of the Confirmation Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of executory contracts and unexpired leases pursuant to this Plan, as well as the deadline for the filing of Claims arising from such rejection; (d) the deadline established under this Plan for the filing Claims pursuant to <u>Section 9.2</u>; (e) the procedures for changing an address of record pursuant to <u>Section 7.6.2</u> of this Plan; and (f) such other matters as the Reorganized Debtor deems to be appropriate.

Dated: July 19, 2012

TRIBUNE COMPANY (for itself and on behalf of
the other Debtors, as Debtors and Debtors in
Possession, and the Guarantor Non-Debtors and
Non-Guarantor Non-Debtors)

By: Donald J. Liebentritt
Title:  Chief Restructuring Officer, Tribune

Date:  July 19, 2012

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TRIBUNE COMPANY, <u>ET</u> <u>AL</u>.
Warner Bros., solely in its capacity as Co-Chair of
the Creditors' Committee and not in its individual
capacity


_____/s/ Wayne M. Smith_____

By:    Wayne M. Smith
Title:   Vice President, Senior Litigation & Chief
Patent Counsel

Date:  July 19, 2012

OAKTREE CAPITAL MANAGEMENT, L.P.
on behalf of certain funds and accounts it manages


_____/s/ Ken Liang_____
By:     Mr. Ken Liang
Title:  Managing Director


_____/s/ Edgar Lee_____
By:     Mr. Edgar Lee
Title:  Senior Vice President

Date:  July 19, 2012

ANGELO, GORDON & CO., L.P.
on behalf of certain funds and managed accounts


_____/s/ Gavin Baiera_____

By:      Gavin Baiera
Title:   Authorized Signatory

Date: July 19, 2012

JPMORGAN CHASE BANK, N.A.

By: _____

Name:  Marina S. Levin

Title:    Executive Director

**<u>Exhibit L</u>**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
-------------------------------------------------------x
                                      :
In re                                 :      Chapter 11
                                      :
WASHINGTON MUTUAL, INC., et al.,¹     :      Case No. 08-12229 (MFW)
                                      :
            Debtors.                  :      (Jointly Administered)
                                      :
                                      :
-------------------------------------------------------x
```

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING
THE SEVENTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS
PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Washington Mutual, Inc. and WMI Investment Corp., as debtors and debtors in

possession (collectively, the "Debtors"), having proposed and filed with the United States

Bankruptcy Court for the District of Delaware (the "Court") the *Seventh Amended Joint Plan of*

*Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated

December 12, 2011 [D.I. 9178] (the "Filed Plan"), as has been and may be further modified,

including, without limitation, pursuant to that certain (1) Modification of Seventh Amended Joint

Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated

January 9, 2012 [D.I. 9365] (the "First Plan Modification"), (2) Second Modification of Seventh

Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States

Bankruptcy Code, dated January 12, 2012 [D.I. 9400] (the "Second Plan Modification"), and (3)

Third Modification of Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11

of the United States Bankruptcy Code, dated February 16, 2012 [D.I. 9697] (the "Third Plan

---

¹ The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax
identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).
The Debtors' principal offices are located at 1201 Third Avenue, Suite 3000, Seattle, Washington 98101.

US_ACTIVE:\43911945\15\79831.0003
RLF1 5853319v. 1

Modification" and, together with the First Plan Modification and the Second Plan Modification, the "Plan Modifications" and, collectively with the Filed Plan, the "Plan")[2]; and the Court having entered, pursuant to, *inter alia*, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated January 13, 2012 [D.I. 9414] (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, approving the forms of ballots, master ballots, and election forms used in connection therewith, and scheduling the Confirmation Hearing; and the Court having entered (i) an Opinion with respect to the Sixth Amended Plan [D.I. 6528] (the "January Opinion") and a related Order [D.I. 6529] (the "January Order"); and the Court having entered an Opinion with respect to the Modified Sixth Amended Plan [D.I. 8612] (the "September Opinion") and a related order [D.I. 8613] (the "September Order"); and the following documents having been filed by the Debtors in support of or in connection with confirmation of the Plan:

    (a)    the *Notice of Election of Treatment of Priority Tax Claims*, dated February 13, 2012 [D.I. 9656];

    (b)    the Plan Supplement;

    (c)    the Cure Notice;

    (d)    the Service Affidavits;

    (e)    the Voting Certifications;

    (f)    the Goulding Declaration;

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, or the Confirmation Brief (each as defined herein), as applicable. A composite copy of the Filed Plan and Plan Modifications is annexed hereto as Exhibit A.

(g)     *Memorandum of Law in Support of Confirmation of the Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated February 13, 2012 [D.I. 9665] (the "Confirmation Brief"); and

(h)     *Stipulation and Agreement Among the Debtors, the TPS Group, the TPS Consortium, the Equity Committee, and JP.Morgan Chase Bank, N.A. With Respect to the Debtors' Seventh Amended Plan* [D.I. 9705] (the "TPS Stipulation");

and responses or statements in support of the Plan having been filed by the Creditors' Committee [D.I. 9666], the Equity Committee [D.I. 9657], JPMC [D.I. 9660], and Law Debenture Trust Company of New York [D.I. 9654]; and objections to confirmation having been interposed by certain parties, as reflected on the docket of the Chapter 11 Cases and/or on the record of the Confirmation Hearing; and each of the objections having been resolved, overruled, or withdrawn at, prior to, or subsequent to the Confirmation Hearing; and the Court having held the Confirmation Hearing commencing on February 16, 2012; and the appearances of all interested parties having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Chapter 11 Cases, including, without limitation, motions, applications and orders in the Chapter 11 Cases, the foregoing documents, and the evidence admitted and arguments of counsel made at the Confirmation Hearing; and after due deliberation and good and sufficient cause appearing therefor; the Court hereby FINDS, DETERMINES, AND CONCLUDES as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.     Findings and Conclusions. The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.  Any headings

or sub-headings used herein are for reference purposes only and shall not affect in any way the

meaning or interpretation of this Order and the Plan.

B.    Jurisdiction.  This Court has jurisdiction over the Chapter 11 Cases

pursuant to 28 U.S.C. § 1334.  Confirmation of the Plan and approval of the Global Settlement

Agreement are core proceedings pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to

enter a final order with respect thereto.  Venue is proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409.

C.    Judicial Notice.  The Court takes judicial notice of the dockets of the

Chapter 11 Cases, the appellate court dockets of any and all appeals filed from any orders

entered or opinions issued by the Court in the Chapter 11 Cases, and the following litigations and

adversary proceedings: JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc., et al.,

Adversary Pro. No. 09-50551 (MFW) (the "JPMC Action"); Washington Mutual, Inc., et al. v.

JPMorgan Chase Bank, N.A., Adversary Pro. No. 09-50934 (MFW) (the "Turnover Action");

Official Committee of Equity Security Holders v. Washington Mutual, Inc., Adversary Pro. No.

10-50731 (MFW) (the "Equity Committee Adversary Proceeding"); Willingham, et al v.

Washington Mutual, Inc., et al., Adv. Pro. No. 10-51297 (MFW) (the "Equity Committee Action

to Compel"); Broadbill Investment Corp., et al. v. Washington Mutual, Inc., Adversary Pro. No.

10-50911 (MFW) (the "Dime Warrant Litigation") and Black Horse Capital Master Fund Ltd., et

al. v. Washington Mutual, Inc., et al., Adv. Pro. No. 10-51387 (MFW) (the "TPS Action"), each

of which is maintained by the Clerk of the Court, including all pleadings and other documents

filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the

hearings held before the Court during the pendency of the Chapter 11 Cases and such adversary

proceedings.

        D.     <u>Burden of Proof.</u>  The Debtors have the burden of proving the elements of

section 1129 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules by a

preponderance of the evidence.  With respect to each Debtor and each element of section 1129 of

the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors have met their burden.

**The Chapter 11 Cases**

        E.     <u>Chapter 11 Petitions.</u>  On September 26, 2008, each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  [D.I. 1, 6]

The Debtors continue to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  In accordance with

this Court's Order, dated October 3, 2008 [D.I. 25], the Debtors' cases are being jointly

administered pursuant to Bankruptcy Rule 1015(b).  Conf DX 569 – Goulding Decl. ¶ 7.

        F.     <u>Statutory Committees.</u>  On October 15, 2008, the United States Trustee for

the District of Delaware (the "<u>U.S. Trustee</u>") appointed the Creditors' Committee [D.I. 78].  On

January 11, 2010, the U.S. Trustee appointed the Equity Committee [D.I. 2130].  Membership on

each of the Creditors' Committee and the Equity Committee have been modified or reconstituted

from time to time.  No trustee has been appointed in the Chapter 11 Cases.

        G.     By order, dated September 13, 2010 [D.I. 5416], the Bankruptcy Court

approved that certain *Stipulation Authorizing the Official Committee of Unsecured Creditors to*

*Bring Certain Causes of Action on Behalf of Debtors' Estate* [D.I. 5410] (the "<u>UCC</u>

<u>Stipulation</u>").  Pursuant to the UCC Stipulation, during the Debtors' Chapter 11 Cases, the

Creditors' Committee was vested with the right to make demands in connection with,

commence, litigate, settle or otherwise abandon certain "Assigned Avoidance Actions" (as

             5

defined in the UCC Stipulation), including "causes of action related by a factual or transaction nexus to" the Transfers (as defined in the UCC Stipulation). The "Assigned Avoidance Actions" include, without limitation, (i) avoidance actions under chapter 5 of the Bankruptcy Code and other applicable law, and (ii) causes of action (whether for breach of fiduciary duty, corporate waste or otherwise) against current and former officers and directors of WMI and its subsidiaries relating to transfers from WMI to affiliates (including WMB) before the Petition Date. During the pendency of the Chapter 11 Cases, pursuant to the UCC Stipulation, the Creditors' Committee asserted claims and made demands with respect to the Assigned Avoidance Actions. Pursuant to the Plan, any and all Assigned Avoidance Actions not settled or resolved under the Plan are vested in the Liquidating Trust for prosecution by the Liquidating Trustee.

H.    Sixth Amended Plan.    On October 6, 2010, the Debtors filed the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 6, 2010 [D.I. 5548] (as subsequently modified, the "Sixth Amended Plan"). Conf DX 2 – Sixth Amended Plan; Conf DX 569 – Goulding Decl. ¶ 12. The Sixth Amended Plan was premised on the implementation of that certain Amended and Restated Settlement Agreement, dated as of October 6, 2010, by and among the Debtors, JPMC, the FDIC, the Creditors' Committee, and certain creditor constituencies resolving certain claims and causes of action among such parties (the "Initial Global Settlement Agreement"). Conf DX 2H – Initial Global Settlement Agreement; Conf DX 569 – Goulding Decl. ¶ 12.

I.    December Confirmation Hearing.    This Court held a hearing to consider confirmation of the Sixth Amended Plan on December 2, 3, 6 and 7, 2010 (the "December Confirmation Hearing"). Upon the conclusion of the December Confirmation Hearing, on January 7, 2011, this Court issued the January Opinion and January Order, which, among other

things, found that (i) the Initial Global Settlement Agreement, the integral foundation of the

Sixth Amended Plan, and the transactions completed therein, are fair, reasonable, and in the best

interests of the Debtors' creditors and the Debtors' chapter 11 estates, Conf DX 265 – January

Opinion at 2, 60, and (ii) certain modifications to the Sixth Amended Plan, if made, would

enable the Sixth Amended Plan to be confirmed. Id. at 2. In conjunction with its determination

that the Initial Global Settlement should be approved, this Court concluded that (i) the Debtors

are not likely to achieve a significantly better result if they were to continue to litigate the claims

resolved pursuant to the Initial Global Settlement Agreement, (ii) there are difficulties inherent in

collecting on account of the Debtors' potential claims against JPMC and the FDIC Receiver,

(iii) the claims resolved pursuant to the Initial Global Settlement Agreement are complex and

would be expensive and would cause delay to litigate, and (iv) the Initial Global Settlement

Agreement provides a reasonable return in light of the possible results of the litigation resolved

by such agreement. Id. at 56-60. This Court specifically noted that, "[a]lthough equity interest

holders are not likely to get a recovery, the Court is not convinced that continued litigation,

against JPMC and/or the FDIC would change that result." Id. at 66-67.

   J. On January 7, 2011, this Court entered an opinion concerning the TPS

Action wherein this Court granted the defendants' motions for summary judgment and found,

among other things, that the Conditional Exchange was automatic and occurred on

September 26, 2008 [Adv. Proc. 10-51387, D.I. 179] (the "TPS Summary Judgment Opinion").

Conf DX 267 – TPS Summary Judgment Opinion. Thus, this Court determined that the prior

holders of the Trust Preferred Securities now hold Depositary Shares (as defined in the TPS

Summary Judgment Opinion) representing REIT Series, which comprise certain related series of

WMI Preferred Shares (as defined in the TPS Summary Judgment Opinion). Id. at 13.

K.    Appeals from the January Opinion and TPS Summary Judgment Opinion.

On January 19, 2011, the Equity Committee filed a notice of appeal of that portion of the January

Opinion finding that the Initial Global Settlement Agreement satisfies the requisite standards for

approval [D.I. 6575]. This action, styled as Official Committee of Equity Security Holders v.

Washington Mutual, Inc., et al., Civil Action No. 11-158 (the "January Equity Committee

Appeal"), is pending in the United States District Court for the District of Delaware (the

"Delaware District Court") as of the date hereof, as, by order, dated February 8, 2011 [D.I.

6703], the Court denied the Equity Committee's motion for a direct appeal to the United States

Court of Appeals for the Third Circuit.

L.    On January 14, 2011, certain of the plaintiffs in the TPS Action filed a

notice of appeal of the TPS Summary Judgment Opinion to the Delaware District Court [Adv.

Proc. 10-51387, D.I. 182] (the "TPS Appeal"). As of the date hereof, the TPS Appeal is pending

in the Delaware District Court as Case No. 1:11-cv-00124-GMS. The parties have completed

briefing, and the plaintiffs in the TPS Action have requested oral argument [TPS Appeal, D.I.

42]. The Delaware District Court has not yet ruled on this request. On January 15, 2012, the

plaintiffs in the TPS Action filed with the Delaware District Court an emergency motion for a

stay of the hearing on confirmation of the Plan [TPS Appeal, D.I. 44] and a motion for writ of

mandamus [TPS Appeal, D.I. 46], as well as an emergency motion to expedite the hearings on

such motions. The Delaware District Court denied all three motions by order, dated January 19,

2012 [TPS Appeal, D.I. 52]. On January 30, 2012, the plaintiffs in the TPS Action filed a notice

of appeal from such order [TPS Appeal, D.I. 55], as well as a request for certification of a direct

appeal to the United States Circuit Court for the Third Circuit (the "Third Circuit") [TPS Appeal,

D.I. 55]. Notwithstanding the fact that the Delaware District Court did not grant the motion for

8

direct certification, the plaintiffs in the TPS Action then filed motions in the Third Circuit

seeking to stay the Confirmation Hearing, for a writ of mandamus, and for expedited review of

such requests. By order, dated February 10, 2012, the Third Circuit denied such requests.

      M.     Global Settlement Agreement. On February 7, 2011, WMI, WMI

Investment Corp., JPMC, the FDIC Receiver, FDIC Corporate, and the Creditors' Committee, all

of whom were parties to the Initial Global Settlement Agreement, entered into the Second

Amended and Restated Settlement Agreement (as amended, the "Global Settlement

Agreement"). Conf DX 255H, 402, 422 – Global Settlement Agreement (as amended). The

Global Settlement Agreement incorporates the terms of and mirrors the Initial Global Settlement

Agreement, except that it excludes certain creditors who previously were parties to the Initial

Global Settlement Agreement and certain non-economic provisions were amended to conform to

certain plan-related modifications and in accordance with the January Opinion. See id.

      N.     Modified Sixth Amended Plan. On February 8, 2011, the Debtors filed

the Modified Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the

United States Bankruptcy Code, dated February 7, 2011 [D.I. 6696] (as subsequently modified,

the "Modified Sixth Amended Plan"), as well as a corresponding disclosure statement [D.I.

7081] (the "Supplemental Disclosure Statement"). Conf DX 255 – Modified Sixth Amended

Plan; Conf DX 253 – Supplemental Disclosure Statement. Similar to the Sixth Amended Plan,

the Modified Sixth Amended Plan was premised on the Global Settlement Agreement. Conf DX

374 – Goulding Decl. Supporting Modified Sixth Plan ¶ 19. In addition, the Modified Sixth

Amended Plan incorporated modifications consistent with the January Opinion. Id. Like the

Sixth Amended Plan, the Modified Sixth Amended Plan provided for the Debtors'

reorganization, with WMMRC remaining as Reorganized WMI's sole operating entity. Id. ¶ 27.

WMMRC is a captive reinsurance company that entered into mortgage reinsurance agreements based on mortgage insurance policies on mortgage loans issued by WMB and other affiliates of the Debtors. Id.; Conf DX 442 – September Opinion at 43. Since the seizure of WMB, WMMRC has operated on a runoff basis in that it has not issued any new policies and is simply collecting premiums and paying claims on the existing policies. Id.

        O.     The July Confirmation Hearing and the Equity Committee's Standing Motion. Commencing on July 13, 2011 and concluding on July 21, 2011, this Court held a hearing to consider, among other things, confirmation of the Modified Sixth Amended Plan (the "July Confirmation Hearing"). On July 12, 2011, on the eve of the July Confirmation Hearing, the Equity Committee filed, under seal, a motion seeking authority to prosecute, on the Debtors' behalf, an action to equitably disallow or, in the alternative, to equitably subordinate certain Claims [D.I. 8179] (the "Standing Motion"). At the July Confirmation Hearing, counsel for the Equity Committee requested that the Court take into account the evidence adduced at the July Confirmation Hearing in connection with deciding the Standing Motion. During closing arguments at the July Confirmation Hearing, several parties presented argument on the Standing Motion. In addition, on August 10, 2011, the Debtors, the Creditors' Committee, and certain other parties filed objections to the Standing Motion.

        P.     September Opinion and Order. On September 13, 2011, this Court issued the September Opinion and entered the September Order that, among other things (i) found that this Court has jurisdiction to approve the Global Settlement Agreement [September Opinion at 16, 22-23]; (ii) reaffirmed its conclusion that the settlements underlying the Initial Global Settlement Agreement, which were at that time embodied in the Global Settlement Agreement, and all the transactions contemplated therein are fair and reasonable [id. at 26, 35, 101];

(iii) ordered that this Court's ruling with respect to the Global Settlement Agreement constitutes the "law of the case" [id. at 27]; (iv) overruled objections that the Modified Sixth Amended Plan was not proposed in good faith [id. at 73]; and (v) denied confirmation of the Modified Sixth Amended Plan, but identified certain modifications that, if incorporated, would permit confirmation thereof. The September Opinion also granted the Standing Motion with respect to certain equitable disallowance claims, but stayed all proceedings related to the Standing Motion and directed certain parties to participate in mediation (the "Mediation") to explore a possible settlement of the Standing Motion and any issues that remained an impediment to confirmation of a plan of reorganization. Id. at 138.

Q.   Valuation. Pursuant to the September Opinion, and on the basis of the evidence presented at the July Confirmation Hearing, this Court determined that "the value of the existing business of WMMRC (assuming no new business is generated or acquisitions are made) is . . . $140 million." Conf DX 442 – September Opinion at 45. In addition, this Court determined that Reorganized WMI's total enterprise value is $210 million, taking into account the value of net operating losses ("NOLs") potentially available to Reorganized WMI, including both "the value of the NOLs to the existing WMMRC business" (which the Court determined had a value of $20 million) and the value of "the NOLs that might be able to be used in the event of a future acquisition of a profitable business" (which this Court determined had a value of $50 million). Conf DX 442 – September Opinion at 47, 62. This Court's finding as to the value of the NOLs that might be able to be used in the event of a future acquisition of a profitable business was "based on the Court's conclusion that the Reorganized Debtor should be able to raise additional capital and debt over the next twenty years equal to twice the value of its current

assets which will be invested in restarting the reinsurance business of WMMRC or acquiring

other related businesses." Conf DX 442 – September Opinion at 62.

   R.  Appeals from the September Opinion and September Order.  Several

parties filed notices of appeal (the "September Appeals") from the September Opinion and

September Order: (i) AAOC,[3] with (a) Aurelius [D.I. 8670] filing individually and

(b) Appaloosa, Owl Creek and Centerbridge filing jointly [D.I. 8673]; (ii) the Creditors'

Committee [D.I. 8726]; (iii) the Debtors [D.I. 8785]; (iv) the Equity Committee, which filed a

conditional notice of cross-appeal [D.I. 8791]; (v) the WMB Noteholders [D.I. 8679];

(vi) Normandy Hill Capital L.P. ("Normandy Hill") [D.I. 8671]; and (vii) Wells Fargo [D.I.

8771] (collectively, the "September Appellants").

   S.  Mediation.  By order, dated October 10, 2011 [D.I. 8780], this Court

appointed the Honorable Raymond Lyons, United States Bankruptcy Judge, as mediator (the

"Mediator"), and directed the following parties to participate in the Mediation: (i) the Debtors,

(ii) the Creditors' Committee, (iii) the Equity Committee, (iv) Aurelius, (v) Appaloosa,

(vi) Centerbridge, (vii) Owl Creek, (viii) the TPS Consortium and the TPS Group, (ix) the WMB

Noteholders, (x) Normandy Hill, (xi) The Bank of New York Mellon Trust Company, N.A.,

("BNY Mellon"), in its capacity as Indenture Trustee for the Senior Notes, and (xii) the WMI

Noteholders Group (as such term is used in the September Opinion) (collectively, the "Mediation

---

[3] "AAOC" means each of (a) Appaloosa Management L.P., Appaloosa Investment L.P.I, Palomino Fund
Ltd., Thoroughbred Fund, L.P., and Thoroughbred Master Ltd. (collectively, "Appaloosa"), (b) Aurelius
Capital Management, LP, Aurelius Capital Partners, LP and Aurelius Investment, LLC (collectively,
"Aurelius"), (c) Owl Creek Asset Management, L.P., Owl Creek I, L.P., Owl Creek II, L.P., Owl Creek
Overseas Fund, Ltd., Owl Creek Socially Responsible Investment Fund, Ltd., Owl Creek Asia I, L.P.,
Owl Creek Asia II, L.P., and Owl Creek Asia Master Fund, Ltd. (collectively, "Owl Creek"), and (d)
Centerbridge Partners, L.P., Centerbridge Special Credit Partners, L.P., Centerbridge Credit Partners,
L.P., and Centerbridge Credit Partners Master, L.P. (collectively, "Centerbridge") and any other Affiliates
of the funds listed in (a) through (d) above that own or, during the Chapter 11 Cases, owned securities
issued by and/or have direct or indirect Claims against WMI.

Parties"); provided, however, that Normandy Hill and BNY Mellon were not required to attend the Mediation.

      T.     The Mediation commenced on October 19, 2011. At status conferences held on November 7, 2011, and on December 8, 2011, this Court granted the Mediator's request for additional time to continue the Mediation. As a result of the Mediation, discussions among the Debtors, the Creditors' Committee, the Equity Committee, Aurelius, Appaloosa, Owl Creek, Centerbridge, and other Creditor constituencies culminated in certain modifications to the Modified Sixth Amended Plan, which are embodied in the Plan and which resolve, among other things, certain plan-related issues and objections, as well as the Standing Motion.

      U.     The Plan. The Debtors filed the Plan and Disclosure Statement on December 12, 2011. Like the Modified Sixth Amended Plan, the Plan is premised upon and incorporates the terms of the Global Settlement Agreement, which, as discussed above, this Court has already determined, pursuant to both the January Opinion and the September Opinion, to be fair, reasonable and in the best interests of the Debtors' estates. Conf DX 265 – January Opinion at 60; Conf DX 442 – September Opinion at 26, 35, 101. In addition, as was the case pursuant to the Modified Sixth Amended Plan, pursuant to the Plan, WMI will reorganize around its sole remaining active subsidiary, WMMRC, a mortgage reinsurance company currently operating on a runoff basis. Conf DX 569 - Goulding Decl. ¶ 54. However, the Plan incorporates modifications thereto made after the Mediation to resolve the Standing Motion and certain plan-related issues and objections, as well as additional modifications that the Court determined, pursuant to the September Opinion, were required for the Modified Sixth Amended Plan to satisfy the confirmation requirements set forth in the Bankruptcy Code. Conf DX 569 - Goulding Decl. ¶¶ 15, 19.

V.    The Plan and Related Documents Are Consistent With the September Opinion. Consistent with the September Opinion, (i) the Plan provides that Postpetition Interest Claims are (a) calculated using the federal judgment rate determined as of the Petition Date (1.95%), and (b) compounded annually; (ii) the form of Liquidating Trust Agreement filed with the Plan Supplement provides that the Liquidating Trustee may be removed by a majority vote of the members of the Trust Advisory Board; (iii) the provisions of the Plan and Liquidating Trust Agreement ensure that the Trust Advisory Board will adequately represent the constituencies of the Liquidating Trust at any given time[4]; (iv) the Plan provides that "[t]he individual(s) serving as or comprising the Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the court" (emphasis added); and (v) the Plan provides that fees paid pursuant to Section 41.18 of the Plan must be approved by the Court. See Conf DX 442 - September Opinion at 24-25, 77-78, 89-90; Conf DX 432A - Plan §§ 1.231; 1.169; 27.12; 41.18; Conf DX 434 – Liquidating Trust Agreement §§ 4.1, 6.4, 7.7, 8.2. Accordingly the Plan incorporates modifications resolving each of the areas of concern raised by the Court in the September Opinion.

W.    The Compromise and Settlement Embodied in the Plan is Fair, Reasonable and in the Best Interests of the Debtors' Estates. The Plan is the result of extensive arms' length negotiations among the Debtors, the Creditors' Committee, the Equity Committee, and

---

[4] Specifically, the Trust Advisory Board will have an oversight function with respect to the Liquidating Trust and, initially, shall be comprised of ten (10) members, four (4) members solely selected by the Creditors' Committee, four (4) members selected solely by the Equity Committee, one (1) member selected by the Creditors' Committee and approved by the Equity Committee, which approval shall not be unreasonably withheld, and one (1) member selected by HoldCo Advisors, LLC serving in a non-voting ex officio capacity,. Conf DX 432A – Plan § 1.231. The composition of the Trust Advisory Board may change only in accordance with the provisions of the Liquidating Trust Agreement. Id.

significant Creditor constituencies, Conf DX 569 - Goulding Decl. ¶ 33, and, among other things, resolves the Standing Motion and has the full support of the Equity Committee. Conf DX 432 - Disclosure Statement at 10. Pursuant to the Plan, all of the September Appeals will be deemed withdrawn, with prejudice, and the Equity Committee will cause the withdrawal and dismissal, with prejudice, of the January Equity Committee Appeal, the Equity Committee Adversary Proceeding, and Equity Committee Action to Compel. Id.; Conf DX 432A - Plan §§ 33.1; 41.17.

      X.    Any attempt to confirm a chapter 11 plan without the compromises and settlements embodied in the Plan would have invited significant confirmation objections by the Equity Committee, among others, including with respect to issues related to the Standing Motion and the effect that such disputes would have with respect to distributions pursuant to any such plan. Conf DX 432 - Disclosure Statement at 10. Without addressing the merits, it is beyond doubt that such issues were likely to lead to further contested confirmation hearings, significant delays in confirmation of a plan, and erosion of Creditor distributions. Id.; see also Hr'g Tr. 10/6/11 83:19–23.

      Y.    The detrimental effects of further delay in confirmation and consummation of a plan in the Chapter 11 Cases cannot be underestimated. Conf DX 432 - Disclosure Statement at 10. As delay in consummation of a plan would have been accompanied by a continued accrual of interest and fees in significant amounts and the attendant depletion of estate assets and increase in total Claims, further delay would have significantly eroded recoveries for the Debtors' junior-most Creditors and stakeholders. Id. Unlike the Modified Sixth Amended Plan, the Plan resolves many of the objections and issues that have been or could be raised, regardless of the merits. Id. Furthermore, as a result of the compromises and

settlements, Reorganized WMI will receive the Senior Notes Release Consideration and the

Senior Subordinated Notes Release Consideration in the aggregate amount of $75 million, access

to the Credit Facility to be provided by certain members of AAOC, and, to the extent available,

Runoff Proceeds having a face value of $10 million, subject to the priority scheme set forth in

the documents governing the Runoff Notes, as well as certain potential Litigation Proceeds. Id.;

see also Notice of Lenders Under the Credit Facility [D.I. 9671]. Thus, it was a reasonable

exercise of business judgment for the Debtors to conclude that the Plan was more likely to result

in an expeditious exit from bankruptcy and prevent further deterioration of Creditors' recoveries

than any alternative plan. Conf DX 432 - Disclosure Statement at 10. The Court finds that the

compromises and settlements embodied in the Plan are fair, reasonable, in the best interests of

the Debtors' estates and above the lowest level of the range of reasonableness.

**The Solicitation Process**

          Z.    Adequacy of Disclosure Statement. Pursuant to the Disclosure Statement

Order, entered on January 13, 2012, this Court approved the Disclosure Statement and found,

among other things, that the Disclosure Statement contained "adequate information" within the

meaning of section 1125 of the Bankruptcy Code and authorized the Debtors to solicit

acceptances and rejections of the Plan, as well as certain elections with respect thereto. Conf DX

432B – Disclosure Statement Order. Prior to the transmission of the Disclosure Statement, the

Debtors did not solicit acceptances of the Plan by any holder of Claims or Equity Interests. See

Conf DX 569 – Goulding Decl. ¶ 30.

          AA.    Solicitation and Notice. As described in the Voting Certifications, the

(i) Disclosure Statement Order, (ii) Confirmation Hearing Notice, (iii) Disclosure Statement

(which includes as an exhibit a copy of the Plan), (iv) Ballots, (v) Election Forms, and

(vi) Notices of Non-Voting Status (collectively, the "Solicitation Packages") were served in

                16

compliance with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and the

Disclosure Statement Order. See Conf DX 570 – Klamser Decl. ¶ 11-22; Conf DX 571 – Sharp

Decl. ¶¶ 11-21; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19 –

Sharp Decl. for the Sixth Amended Plan ¶ 3.

        BB.    On January 25, 2012, the Debtors caused the posting with the Depository

Trust Company of a communication to holders of PIERS Claims in Class 16 from Whitebox

Advisors, LLC, who had issued an earlier communication to holders of PIERS Claims in Class

16, which earlier communication was included in the Solicitation Packages pursuant to the

Procedures Order. Conf DX 571 – Sharp Decl. ¶ 19. The second communication of Whitebox

Advisors, LLC was served on Class 16 and posted at www.kccllc.net/wamu. Id.; Class 16 Letter

Service Affidavit.

        CC.    The (a) service of the Solicitation Packages, (b) publication of the

Confirmation Hearing Notice, and (c) notice of the Ballot Date: (i) were adequate and sufficient

under the circumstances of these Chapter 11 Cases; (ii) provided adequate and sufficient notice

of the Ballot Date, the deadline for objecting to confirmation of the Plan, the method of voting,

and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims

and Equity Interests with a reasonable period of time to make an informed decision to accept or

reject the Plan and to make certain elections provided thereunder; (iv) were in compliance with

the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Disclosure

Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due

process to all parties in interest in these Chapter 11 Cases. See Service Affidavits; Conf DX 570

– Klamser Decl. ¶¶ 11-22; Conf DX 571 – Sharp Decl ¶¶ 11-21; Conf DX 18 – Klamser Decl.

for the Sixth Amended Plan ¶ 3; Conf DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 3.

DD.    With respect to holders of Equity Interests, efforts to ensure that

(a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and

(c) notice of the Ballot Date to such holders gave such holders a reasonable period of time to

make an informed decision to accept or reject the Plan and to make certain elections provided

thereunder went above and beyond what was required.  For example, the Disclosure Statement

Order, as modified on the record of the Confirmation Hearing, provides that holders of Preferred

Equity Interests and Common Equity Interests have until March 7, 2012 to submit elections with

respect to the releases set forth in Section 41.6 of the Plan, notwithstanding that the Ballot Date

was February 9, 2012 for all holders of Claims and Equity Interests other than holders of Dime

Warrants, for whom the Ballot Date is February 29, 2012.  Conf DX 431 – Disclosure Statement

Order ¶¶ 46-47.  In addition, on January 13, 2012, the Equity Committee issued a press release

recommending that all foreign Equity Interest holders immediately contact their Voting

Nominees to request that the Voting Nominee immediately contact KCC to request electronic

receipt of the Solicitation Packages and instructions on how to properly process responses.  See

Conf DX 540 - Equity Committee Press Release to Foreign Shareholders, dated January 13, 2012

(the "Foreign Shareholders Press Release").  The Foreign Shareholders Press Release further

(1) provided that all ballots must be returned to the applicable Voting Nominee, not KCC, (2)

provided notice of the Ballot Date, (3) provided notice of the February 28, 2012 deadline for

submission of elections with respect to the releases set forth in Section 41.6 of the Plan for

holders of Preferred Equity Interests and Common Equity Interests (which deadline was

subsequently extended, by the Debtors on the record of the Confirmation Hearing, to March 7,

2012), and (4) encouraged holders to avoid delay in returning Ballots.  Id.  The Debtors' efforts

in this regard were largely successful, as 96.46% (by dollar amount) of holders of Senior Note

Claims, 99.71% (by dollar amount) of holders of Senior Subordinated Notes Claims, 97.22% (by

dollar amount) of holders of PIERS, 87.26% (by dollar amount of liquidation preference) of

holders of Preferred Equity Interests, and 63.70% (by number of shares) of holders of Common

Equity Interests voted on the Plan.

EE.    No other or further notice with respect to the Plan or the Confirmation

Hearing is required.  Based upon the foregoing, the Debtors, the Creditors' Committee, the

Equity Committee, and each of their respective successors, predecessors, control persons,

members, officers, directors, employees, agents, attorneys, financial advisors, investment

bankers, accountants, and other retained professionals, and any and all affiliates, members,

managers, shareholders, partners, employees, attorneys, and advisors of the foregoing (i) have

acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in

compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the Local

Bankruptcy Rules, and any applicable nonbankruptcy law, rule, or regulation governing the

adequacy of disclosure in connection with all their respective activities relating to the solicitation

of acceptances to the Plan or elections thereunder and their participation in the activities

described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated

in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the

offer and issuance of securities under the Plan and, therefore, are not, and on account of such

offer, issuance and solicitation will not be, liable at any time for the violation of any applicable

law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or

elections thereunder or the offer and issuance of the securities under the Plan, and are entitled to

the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such

parties are listed therein, the exculpation provisions set forth in Section 41.8 of the Plan. Conf.

DX 432A - Plan § 41.8.

   FF. <u>Voting</u>. As evidenced by the Voting Certifications, votes to accept or

reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with

the order approving the disclosure statement for the Sixth Amended Plan (the "<u>Prior Disclosure</u>

<u>Statement Order</u>"), the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules,

and the Local Bankruptcy Rules. <u>See</u> Conf DX 570 – Klamser Decl. ¶¶ 3, 11-24; Conf DX 571

– Sharp Decl. ¶¶ 3, 9, 11-24; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf

DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 3.

   GG. <u>Plan Elections</u>. As set forth in the Voting Certifications, elections made

by holders of Claims and Equity Interests pursuant to the Plan were and continue to be solicited,

tabulated, and implemented fairly, in good faith, and in a manner consistent with the Plan, the

Prior Disclosure Statement Order, the Disclosure Statement Order, the Bankruptcy Code, the

Bankruptcy Rules, and the Local Rules. <u>See</u> Conf DX 570 – Klamser Decl. ¶ 11-24, 31-33; Conf

DX 571 – Sharp Decl ¶ 11-24, 31-35; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan

¶ 36; Conf DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 36.

   HH. <u>Plan Supplement</u>. All materials contained in the Plan Supplement comply

with the terms of the Plan, and the filing, notice, and service of such documents were done in

accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other

or further notice is or shall be required. <u>See</u> Service Affidavits; Conf DX 434 – Plan

Supplement.

## Compliance with the Requirements of Section 1129 of the Bankruptcy Code

   II. <u>Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. As

required by Bankruptcy Rule 3016, the Plan is dated and identifies the Debtors as proponents.

Conf DX 432A – Plan at 1, 108. In addition, the Plan contains provisions consistent with the requirements of sections 1122 and 1123 of the Bankruptcy Code:

(1)    Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). With the exception of Administrative Expense Claims and Priority Tax Claims, which need not be classified, Article IV of the Plan classifies twenty-three (23) Classes of Claims and Equity Interests. Conf DX 432A – Plan Art. IV. The Claims or Equity Interests in each Class are substantially similar to the other Claims or Equity Interests, as the case may be, in each such Class. Conf DX 569 – Goulding Decl. ¶ 29. All the Preferred Equity Interests in Class 19 are substantially similar notwithstanding differences in the liquidation preferences on a per share basis between various of the series of Preferred Equity Interests because, among other things, (i) each series of the Preferred Equity Interests is a separately designated series of a single class of WMI preferred stock, and (ii) each of the series of Preferred Equity Interests ranks on parity with each of the others in terms of those aspects of such interests affecting their legal status in relation to the Debtors' assets, namely, their equal standing with respect to priority of payment in the event of a liquidation. See *Order Denying Motion of the Consortium of Trust Preferred Security Holders to Determine Propriety of Proposed Classification of Interests Subject to Treatment Under Class of the Plan of Liquidation*, dated January 11, 2012 [D.I. 9398]; Hr'g Tr. 1/11/2012 at 94:3-11 (denying motion for reclassification filed by certain Trust Preferred Securities holders on the basis that such holders have "the exact same [rights] as the other[] [holders of Preferred Equity Interests," but stating that "the liquidation preference has to be accounted for, used as the calculation for determining the votes in that class").

(2)    To the extent that Unsecured Claims or Equity Interests of equal priority are placed in different Classes pursuant to the Plan, valid business, factual, and/or legal

reasons exist for such separate classification, and such classification does not unfairly

discriminate between holders of Claims and Equity Interests.  Conf DX 569 – Goulding Decl.

¶ 29.  Specifically, with respect to the separate classification of Unsecured Claims of equal

priority:

> (i)     The Claims in each of Classes 2, 3 and 16 relate to notes
> issued by WMI, but such notes arose from different
> debentures, each with slightly different legal rights,
> including, among other things, inter-creditor contractual
> subordination provisions.
>
> (ii)    The Claims in Classes 4 through 11 are for liabilities
> related to certain assets transferred to JPMC pursuant to the
> P&A Agreement, or to be transferred to JPMC pursuant to
> the Global Settlement Agreement and, accordingly, JPMC
> has agreed to satisfy such Claims.
>
> (iii)   The Claims in Classes 14 and 15 relate to guarantees issued
> by WMI of funded indebtedness of WMB and are governed
> by slightly different underlying documentation (both as
> compared to other Unsecured Claims as well as compared
> to one another).
>
> (iv)    The Claims in Classes 17A and 17B relate to funded
> indebtedness of WMB, with respect to which such holders
> asserted related Claims against WMI.  The Claims in Class
> 17A are contractually senior to the Claims in Class 17B,
> and the Claims in Class 17B represent only derivative, and
> not direct, Claims against the Debtors.

See Conf DX 569 – Goulding Decl. ¶ 29.  With respect to the separate classification of Equity

Interests of equal priority:

(i)    Although the Dime Warrants and Common Equity Interests in Classes 21 and 22, respectively, represent common stock interests, the Dime Warrants arise from a different, unrelated issuance of securities. Moreover, unlike holders of Common Equity Interests, voting by and distributions to Dime Warrants holders are governed by the LTW Stipulation. Pursuant to the LTW Stipulation, unlike holders of Common Equity Interests, holders of Dime Warrants will receive certain distributions as holders of Allowed General Unsecured Claims and Allowed Subordinated Claims in addition to certain distributions as holders of Allowed Equity Interests.

See id.; Conf DX 567 - LTW Settlement Approval Order. In addition to the above justifications, such separate classification does not unfairly discriminate between holders of similar Claims and Equity Interests. See Conf DX 569 – Goulding Decl. ¶ 29. Moreover, the definition and classification of Convenience Claims in Class 13 is reasonable and necessary for administrative convenience. Id.

(3)    Unimpaired Classes Specified (11 U.S.C. § 1123(a)(2)). Class 1 (Priority Non-Tax Claims), Class 4 (WMI Medical Plan Claims), and Class 7 (Qualified Plan Claims) (collectively, the "Unimpaired Classes") are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code. Conf DX 432A – Plan § 31.1; Conf DX 569 – Goulding Decl. ¶ 29.

(4)    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Articles VI, VII, IX, X, and XII through XXVI and Section 30.1 of the Plan designate Class 2 (Senior Notes Claims), Class 3 (Senior Subordinated Notes Claims), Class 5 (JPMC Rabbi Trust/Policy Claims), Class 6 (Other Benefit Plan Claims), Class 8 (WMB Vendor Claims), Class 9 (Visa Claims), Class 10 (Bond Claims), Class 11 (WMI Vendor Claims), Class 12 (General Unsecured Claims), Class 12A (Late-Filed Claims), Class 13 (Convenience Claims), Class 14 (CCB-1 Guarantees Claims), Class 15 (CCB-2 Guarantees Claims), Class 16 (PIERS

Claims), Class 17A (WMB Senior Notes Claims), Class 17B (WMB Subordinated Notes Claims), Class 18 (Subordinated Claims), Class 19 (Preferred Equity Interests), Class 21 (Dime Warrants), and Class 22 (Common Equity Interests) (collectively, the "Impaired Classes") as impaired within the meaning of section 1124 of the Bankruptcy Code and clearly specify the treatment of the Claims and Equity Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code. Conf DX 432A – Plan Arts. VI, VII, IX, X, XII through XXVI, § 31.1; Conf DX 569 – Goulding Decl. ¶ 23.

(5)    No Discrimination (11 U.S.C. § 1123(a)(4)). Pursuant to the Plan, the treatment of each Claim against or Equity Interest in the Debtors, in each respective Class, is the same as the treatment of every other Claim or Equity Interest in such Class, except to the extent that a particular holder has elected different treatment (and, even in such circumstances, each holder was offered the very same election), thereby satisfying section 1123(a)(4) of the Bankruptcy Code. See Conf DX 569 – Goulding Decl. ¶ 29. This does not violate section 1123(a)(4), as any applicable elections (i.e., Runoff Notes Election and Reorganized Common Stock Election), consistent with the January Opinion, have been made available, as applicable, to all holders within a Class, including holders of Disputed Claims and Dime Warrants. See Conf DX 265 – January Opinion at 101. All members of each Class, including holders of Disputed Claims as of the Effective Date that subsequently become Allowed Claims and holders of Dime Warrants will receive the same ultimate percentage recovery on account of their Claims, irrespective of whether they elected (if applicable) to receive Runoff Notes or Reorganized Common Stock. See Conf DX 432A – Plan §§ 6.2, 7.2, 16.1, 18.2, 19.2, 20.2; Conf DX 569 – Goulding Decl. ¶ 29.

(6)    In addition, holders of Claims and Equity Interests were provided

with the opportunity to elect not to grant the releases set forth in Section 41.6 of the Plan (in

which case, such non-releasing holders are not entitled to receive a distribution). See Conf DX

432A – Plan § 41.6; Conf DX 569 – Goulding Decl. ¶ 29.  To the extent that holders of REIT

Series elected to grant the releases in connection with the Sixth Amended Plan, such holders also

are entitled to receive a distribution from JPMC. See Conf DX 432A – Plan § 2.1(h); Conf DX

255H, 402, 422 – Global Settlement Agreement (as amended) § 2.24; Conf DX 431 – Disclosure

Statement Order at 12; see also Conf DX 265 – January Opinion at 102-103 (approving the

treatment of the REIT Series over objection that such treatment was discriminatory as to other

holders of Preferred Equity Interests and finding that "[t]o the extent that the REIT Holders are

receiving anything more than other preferred shareholders, they are receiving it directly from

JPMC in exchange for the releases").

(7)    Implementation of the Plan (11 U.S.C. § 1123(a)(5)). The Plan

and the various documents and agreements set forth in the Plan Supplement and other related

documents provide adequate and proper means for implementation of the Plan, including (a) the

creation of a Liquidating Trust pursuant to Article XXVII of the Plan, (b) the transfer of certain

property of the Debtors' estates to JPMC, the FDIC Receiver, and the Liquidating Trust, as set

forth more fully in the Plan and Global Settlement Agreement, (c) the distribution and/or

issuance, as the case may be, of Cash, Reorganized Common Stock, Runoff Notes and

Liquidating Trust Interests, as set forth in Articles XXXI and XXXII of the Plan, (d) the prompt

release of the tax refunds from the JPMC Escrow Account, the Washington Mutual Escrow

Account, and the FDIC Escrow Account in accordance with and as defined in Section 2.4 of the

Global Settlement Agreement, (e) the retention by the Reorganized Debtors of all remaining

property of the Debtors' estates, (f) the cancellation of all documents, agreements, and

instruments evidencing Claims against or Equity Interests in the Debtors, except as provided in

the Plan, (g) the surrender of all instruments or notes, pursuant to Section 32.6 of the Plan, (h)

the curing of defaults with respect to assumed executory contracts and leases, pursuant to Article

XXXIV of the Plan, (i) the entry by the Reorganized Debtors and the lenders thereto into the

Credit Facility and all Financing Documents (as defined below), and (j) to the extent applicable,

the adoption and filing of the Reorganized Debtors Certificates of Incorporation and the

Reorganized Debtors By-Laws, as set forth in Article XL of the Plan and the Plan Supplement.

See Conf DX 432A – Plan Arts. XXVII, XXXI, XXXII, XXXIV, XL; Plan §§ 32.4, 32.6; Conf

DX 434 – Liquidating Trust Agreement §§ 1.1, 1.3; Conf DX 569 – Goulding Decl. ¶ 29; Conf

DX 434 – Plan Supplement; Conf DX 492 – Cure Notice.  Accordingly, the Plan satisfies the

requirements of section 1123(a)(5) of the Bankruptcy Code.

       (8)      <u>Prohibition of Issuance of Non-Voting Securities (11 U.S.C.</u>

<u>§ 1123(a)(6))</u>.  Article XL of the Plan provides that, as of the Effective Date of the Plan, the

articles of incorporation and by-laws of the Debtors shall be amended and restated to provide

substantially as set forth in the Reorganized Debtors Certificates of Incorporation and the

Reorganized Debtors By-Laws, which, as set forth in the forms of such documents included with

the Plan Supplement, prohibit the issuance of nonvoting equity securities, thereby satisfying

section 1123(a)(6) of the Bankruptcy Code.  Conf DX 432A – Plan Art. XL; Conf DX 569 –

Goulding Decl. ¶ 29.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of

the Bankruptcy Code.

       (9)      <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.

Section 40.4 of the Plan provides that, on the Effective Date, the board of directors of each of the

Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity

Committee (subject to the provisions of the TPS Stipulation) and one (1) member selected by the

lenders party to the Credit Facility.  See Conf DX 432A – Plan § 40.4; Conf DX 569 – Goulding

Decl. ¶ 29; Conf DX 434 – Plan Supplement, Ex. E (naming the proposed directors).  Pursuant to

Section 40.5 of the Plan, the boards of directors of the Reorganized Debtors shall elect officers of

the Reorganized Debtors as of or after the Effective Date.  See Conf DX 432A – Plan § 40.5;

Conf DX 569 – Goulding Decl. ¶ 29.  Such provisions are consistent with the interests of

creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the

Bankruptcy Code.

> (10)     Impairment/Unimpairment of Classes of Claims and Equity
> Interests (11 U.S.C. § 1123(b)(1)).  Claims in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A, 13, 14, 15,

16, 17A, 17B and 18, and Equity Interests in Classes 19, 21 and 22 are impaired by the Plan.

Claims in Classes 1, 4 and 7 are not impaired by the Plan.  See Conf DX 432A – Plan Arts. V-

XXV, § 30.1; Conf DX 569 – Goulding Decl. ¶ 29.  Accordingly, the Plan is consistent with

section 1123(b)(1) of the Bankruptcy Code.

> (11)     Assumption and Rejection (11 U.S.C. § 1123(b)(2)).  Section 34.1

of the Plan provides that, on the Effective Date, all prepetition executory contracts and unexpired

leases that exist between one or both of the Debtors and any Entity, and which have not expired

by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the

Debtors, except for any executory contract or unexpired lease that (i) has been assumed, assumed

and assigned, or rejected pursuant to an order of the Court entered prior to the Effective Date or

(ii) that is specifically designated as a contract or lease to be assumed or assumed and assigned

on the schedules to the Plan Supplement, including, without limitation, any executory contract or

unexpired lease sold, accepted or transferred to one of the JPMC Entities pursuant to the terms of

the Global Settlement Agreement.  See Conf DX 432A – Plan § 34.1; Conf DX 434D – Plan

Supplement at Ex. D [D.I. 9488].  Pursuant to the Cure Notice, the Debtors provided notice of

any defaults to be cured with respect to each agreement to be assumed or assumed and assigned

by the Debtors.  Conf DX 492 – Cure Notice.  Specifically, there are no defaults to be cured with

respect to the contracts to be assigned to JPMC.  Conf DX 492 – Cure Notice.  As a significant

national bank with over $2 trillion in assets, JPMC, as assignee of certain of the contracts to be

transferred, is financially sound and able to provide adequate assurances of future performance

under such contracts.  Moreover, based upon the relative value to the Debtors post-Effective

Date of the agreements that JPMC will obtain pursuant to the Plan, transfer of such contracts is

within the Debtors' reasonable business judgment, is warranted and is in the best interests of

their chapter 11 estates.  Accordingly, the Plan is consistent with section 1123(b)(2) of the

Bankruptcy Code.

(12)    Settlement/Retention of Claims or Interests (11 U.S.C.

§ 1123(b)(3)).  The Plan is premised upon the Global Settlement Agreement, which is integral to

the Plan and settles and compromises certain Claims and Causes of Action among the Debtors,

the JPMC Entities, and the FDIC, and which settlement this Court has determined is fair and

reasonable and is in the best interests of all creditors and above the lowest range of

reasonableness.  See Conf DX 265 – January Opinion at 2; Conf DX 441 – September Opinion at

31-32; Conf DX 255H, 402, 422 – Global Settlement Agreement (as amended); Conf DX 569 –

Goulding Decl. ¶ 29.  Section 41.11 of the Plan provides that, except as provided in the Plan,

nothing contained in the Plan or this Order shall be deemed to limit, abridge or otherwise affect

the rights of the Reorganized Debtors, the Creditors' Committee, the Liquidating Trustee, the

JPMC Entities, the FDIC Receiver, or FDIC Corporate to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them. Conf DX 432A – Plan § 41.11; Conf DX 569 – Goulding Decl. ¶ 29. The Debtors' estates are retaining certain claims and causes of action against Persons other than the JPMC Entities pursuant to Section 28.1 of the Plan and the UCC Stipulation, and the Liquidating Trustee or the Creditors' Committee, as applicable, shall have the right and power to litigate any Claim or Cause of Action that constitutes an Asset of the Debtors and their estates that is not otherwise settled or released pursuant to the Plan or the Global Settlement Agreement, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors thereafter. See Conf DX 432A – Plan § 28.1; Conf DX 434 – Liquidating Trust Agreement §§ 1.5, 9.6; Conf DX 569 – Goulding Decl. ¶ 29. These provisions are consistent with section 1123(b)(3) of the Bankruptcy Code and are in the best interests of the Debtors' estates and within the range of reasonableness.

(13)    Sale of Assets (11 U.S.C. § 1123(b)(4)). Although, pursuant to the Plan and Global Settlement Agreement, the Debtors are selling, transferring and assigning certain assets to the JPMC Entities pursuant to sections 363 and 365 of the Bankruptcy Code, such sale, transfer, and assignment does not constitute a sale of all or substantially all of the Debtors' property. Conf DX 569 – Goulding Decl. ¶ 29; Opinion, dated Jan. 3, 2012 [Adv. No. 10-50911, D.I. 312] at 26 (stating that the Global Settlement Agreement "is not a sale of substantially all the assets of WMI.")

(14)    Modification of Rights (11 U.S.C. § 1123(b)(5)). The Plan modifies the rights of holders of Claims in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A, 13, 14, 15, 16,

17A, 17B, and 18, and Equity Interests in Classes 19, 21, and 22.  The Plan also leaves

unaffected the rights of holders of Claims in Classes 1, 4 and 7.  Conf DX 432A – Plan Arts. V-

XXV; Conf DX 569 – Goulding Decl. ¶ 29.

(15)    Additional Plan Provisions (11 U.S.C. § 1123(b)(6)).  The Plan

contains release, injunction and exculpation provisions in Article XLI of the Plan—including

releases by the Debtors, the third party releases set forth in Section 41.6 of the Plan, consensual

releases by holders of Claims and Equity Interests (to the extent they affirmatively elect to grant

such releases and are entitled to receive a distribution pursuant to the Plan), and a customary

exculpation provision (which provision is consistent with the January Opinion).  Conf DX 432A

– Plan Art. XLI.  Such provisions are consistent with the January Opinion, are an integral

component of the complex compromises underlying the Plan, the Global Settlement Agreement,

and the compromise and settlement related to the Mediation that is incorporated in the Plan, are

necessary for the Debtors' reorganization and the realization of value for stakeholders, are the

product of extensive arm's-length negotiations, were necessary to the formation of consensus to

support the Global Settlement Agreement and the Plan, and are, in light of the foregoing,

appropriate.  See, e.g., Conf DX 265 – January Opinion at 58-60.  In addition, the third party

releases set forth in Section 41.6 of the Plan are consensual and only are binding against

consenting Entities who receive a distribution from the Debtors' estates.  Conf DX 432A -- Plan

§ 41.6.  Furthermore, the exculpation provision in Section 41.8 of the Plan is limited to a

qualified immunity for acts of negligence, does not relieve any party of liability for gross

negligence or willful misconduct, and provides exculpation only to the Debtors, the estates'

professionals, the Creditors' Committee and the Equity Committee and their respective members

and professionals, and the Debtors' directors and officers. Id. § 41.8. Accordingly, the Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

(16)    Vacatur. Article XXXVI of the Plan notes several conditions precedent to the confirmation of the plan, including, among other things, the condition that this Court vacate, for all purposes, (a) the September Order to the extent it relates to the Standing Motion, and (b) those portions of the September Opinion that relate to the Standing Motion, namely, (i) Section III (H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73. See Conf DX 432A - Plan § 36.1(a)(11).

(a)    Pursuant to Federal Rule of Civil Procedure 60(b), "on motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for, among other things, "any . . . reason that justifies relief," FED. R. CIV. PRO. 60(b), including, for example, when "exceptional circumstances" warrant vacatur because "the negative effects of vacating [the] case are relatively minor and the positive effects substantial." See, e.g., McKinney v. Philadelphia Hous. Auth., 2010 WL 2510382, at *1 (E.D. Pa. June 16, 2010). The Third Circuit has advised that, when a party seeks vacatur of an order on appeal, several steps should be followed. First, the requesting party should seek relief from the trial court pursuant to Rule 60(b). Second, if the trial court "is inclined to grant the motion or intends to grant the motion . . . it should certify its inclination or its intention to the appellate court which can then entertain a motion to remand the case. Once remanded, the . . . [trial] court will have the power to grant the motion, but not before." Venen v. Sweet, 758 F.2d 117, 123 (3d Cir.

1985); see also FED. R. CIV. P. 62.1 (providing procedures for remand to resolve a motion that a court states it would grant or states raised a substantial issue); FED. R. APP. P. 12.1 (same).[5]

        (b)    On January 9, 2012, the Debtors filed the *Motion of Washington Mutual, Inc., and WMI Investment Corp. for an Order Pursuant to Bankruptcy Rule 9024, Federal Rule of Civil Procedure 60(b) and Section 105(a) of the Bankruptcy Code, to Vacate, in Part, the September Opinion and the September Order, as a Condition of Mediated Settlement Embodied in the Plan* [D.I. 9358] (the "Vacatur Motion"), and, by order, dated January 25, 2012, the Court granted the Vacatur Motion and the relief requested therein [D.I. 9481]. Thereafter, pursuant to that certain *Order Granting Appellants' Joint Emergency Motion for Immediate, Limited Remand of Their Respective Pending Appeals to Enable the court to Vacate, In Part, Its September 13, 2011 Order and Opinion in Conjunction with Confirmation Proceedings on the Debtors' Plan*, dated February 9, 2012, the Delaware District Court remanded the September Appeals to this Court to enable the Court to vacate (a) the September Order to the extent it relates to the Standing Motion, and (b) those portions of the September Opinion relating to the Standing Motion, namely, (i) Section III(H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73.

---

[5] See also Freedom Wireless, Inc., v. Boston Commc'ns Group, Inc., 2006 WL 4451477 (D. Mass. Oct. 11, 2006) (granting motion to vacate after (i) movant filed Rule 60(b) motion with the district court; (ii) the district court stated its inclination to grant the motion if jurisdiction was reestablished; and (iii) the court of appeals granted a motion to remand); Tommy Hilfiger Licensing, Inc. v. Costco Cos., 2002 WL 31654958, at *3 (S.D.N.Y. Nov. 25, 2002) ("[T]he Court finds that the requested 60(b) relief is merited . . . [but] this Court does not actually grant vacatur at this time, but instead hereby advises the Second Circuit of its intention to grant such relief if the case is remanded for that purpose."); In re Fairchild Aircraft Corp., 220 B.R. 909, 910 (Bankr. W.D. Tex. 1998) (bankruptcy court vacated its prior appealed decision, following remand from the district court).

(c)    Under the circumstances, the Court finds that exceptional

circumstances exist, such that partial vacatur of the September Opinion and September Order, as

a condition of the compromise and settlement embodied in the Plan, is warranted. Specifically,

as discussed in detail elsewhere herein, the Court has determined that the compromise and

settlement incorporated in the Plan after the Mediation is fair, reasonable and in the best interests

of the Debtors' estates. See supra ¶¶ W - Y. Furthermore, pursuant to this Order, the Court has

confirmed the Plan. See infra ¶ 1.

(d)    Pursuant to the settlements and compromises by and among the

Debtors, the Creditors' Committee, the Equity Committee, and certain significant Creditor

constituencies, which settlements and compromises are embodied in the Plan, (i) the

shareholders of WMI will receive substantially all of the equity of Reorganized WMI, see Conf

DX 432A - Plan, §§ 23.1, 24.1, 25.1, (ii) Reorganized WMI will receive the Senior Notes

Release Consideration and the Senior Subordinated Notes Release Consideration in the

aggregate amount of $75 million, access to the $125 million Credit Facility to be provided by

certain members of AAOC, and, to the extent available, Runoff Proceeds having a face value of

$10 million, subject to the priority scheme set forth in the documents governing the Runoff

Notes, as well as certain potential Litigation Proceeds, (iii) granting partial vacatur of the

September Order and September Opinion in furtherance of the settlement embodied in the Plan,

and in conjunction with consideration of confirmation of the Plan, will enable the distribution of

more than $7 billion in value to the Debtors' stakeholders, see Conf DX 569 – Goulding Decl.

¶¶ 22, 25, (iv) absent the requested vacatur, the collapse of the Plan could result in the

termination of the Global Settlement Agreement, see Conf DX 569 - Goulding Decl. ¶¶ 22, 25,

which would mean the loss of billions of dollars in recoveries and the recommencement of

litigation that the Court has already determined to be "the precise type of multi-faceted litigation that cries out for settlement" due to the multiplicity of issues, the complexity of the various arguments, and the significant risks associated with litigation of the multitude of claims asserted therein, see Conf DX 265 – January Opinion at 59, (v) if the Settlement is not consummated, recoveries for holders of Allowed PIERS Claims and, thereafter, for holders of Allowed CCB-1 Guarantees Claims and Allowed CCB-2 Guarantees Claims will evaporate, due to the additional incurrence of expenses and the ongoing accrual of postpetition interest, Conf DX 569 – Goulding Decl. ¶ 23, (vi) absent vacatur, the eight separate appeals of the September Opinion will proceed in at least one appellate court, if not more, which appellate process could last for years, imposing significant costs on the parties and the judicial system, Conf DX 569 – Goulding Decl. ¶ 23, (vii) if the requested relief is denied, the Settlement will be void and litigation over the Standing Motion, which could last for years, will continue, Conf DX 569 – Goulding Decl. ¶ 23; Conf DX 441 - September Opinion at 138, (viii) the portions of the September Order and September Opinion that the Motion seeks to vacate are fact-specific, unique to this bankruptcy, and are non-binding on other courts, Hr'g Tr. 1/25/11 48:13-49:22, (ix) vacating in part the September Order and September Opinion in furtherance of the Settlement will avoid further protracted litigation in this Court, in the Delaware District Court, and in the Third Circuit, Conf DX 569 – Goulding Decl. ¶ 24, and (x) the Settlement resolves a complex, multi-party action and will conserve the resources of this Court and potentially other courts, and similarly conserve the time, money, and resources of the Debtors, the Creditors' Committee, the Equity Committee, and AAOC—all in furtherance of the public interest, Conf DX 569 – Goulding Decl. ¶ 24.

(e)     This Court finds that there is "a strong public policy in bankruptcy cases to encourage settlement." See 1/25/2012 Tr. at 49:23-24. Here, this policy counsels in

favor of granting the request for partial vacatur, especially in the context of the complex and

contentious procedural history of this bankruptcy, the historic context in which it arose, and in

light of the multitude of disputes that have arisen over the three year history of the Chapter 11

Cases, the vast majority of which are consensually resolved pursuant to the Plan. Moreover, the

Court's determination, pursuant to the September Opinion and September Order, that the Equity

Committee has standing to pursue certain equitable disallowance claims was merely a

preliminary ruling. In contrast to a ruling on the merits based upon a fully developed factual

record after a full trial and discovery, the precedential value of the portions of the September

Opinion and September Order that are related to the Standing Motion therefore is not high. On

the other hand, the resolution of the Chapter 11 Cases pursuant to the Plan and the compromises

and settlements embodied therein preserves estate resources, conserves judicial resources, and

ensures that billions of dollars in distributions can be made to creditors and holders of equity

interests who have waited over three years for any recovery. This Court thus concludes that the

Debtors have demonstrated the presence of "exceptional circumstances" warranting the

requested vacatur and that the requested vacatur will serve the public interest.

JJ.    Sale of Exempt Property (11 U.S.C. § 1123(c)). The Debtors are not

"individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1123(c)

of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. Conf DX 569 – Goulding

Decl. ¶ 29.

KK.    Cure of Defaults (11 U.S.C. § 1123(d)). Section 34.4 of the Plan provides

for the satisfaction of default claims associated with each executory contract and unexpired lease

to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.

Conf DX 432A – Plan § 34.4. All cure amounts are set forth in the Cure Notice, and were

determined in accordance with the underlying agreements and applicable bankruptcy and nonbankruptcy law. Conf DX 569 – Goulding Decl. ¶ 29; Conf DX 492 – Cure Notice.  No party has objected to the Cure Notice.  Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

LL.    Plan Proponents' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). Except as otherwise provided for or permitted by orders of the Court, the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Prior Disclosure Statement Order (with respect to Class 17A and, with respect to certain elections, holders of REIT Series), and the Disclosure Statement Order (with respect to all other Classes) in transmitting the Solicitation Packages and in tabulating the votes and elections with respect to the Plan. Conf DX 5B - Prior Disclosure Statement Order; Conf DX 570 – Klamser Decl. ¶ 11-22; Conf DX 571 – Sharp Decl. ¶ 11-21; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 3. Accordingly, the Plan complies with section 1129(a)(2) of the Bankruptcy Code.

MM.    Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). Pursuant to the January Opinion and the September Opinion, the Court determined that both the Sixth Amended Plan and Modified Sixth Amended Plan were proposed in good faith. Conf DX 265 – January Opinion at 106; Conf DX 441 – September Opinion at 73. The Plan (including the Global Settlement Agreement and all other agreements, documents and instruments necessary to effectuate the Plan) is the result of extensive arm's-length negotiations among, and with substantial input from, a large number of independent parties and their respective professionals, including during and as a result of the Mediation. Conf DX 569 – Goulding Decl. ¶ 19.

Moreover, because the major provisions of the Modified Sixth Amended Plan are incorporated into the Plan, this Court's good faith determinations in the January Opinion and September Opinion apply equally to the Plan. See Conf DX 569 – Goulding Decl. ¶ 32. The Plan achieves a reorganization of the Debtors, provides for a distribution to holders of Equity Interests, and properly distributes value to Creditors based upon their respective priorities, including through the enforcement of certain parties' contractual subordination rights and implementation of parties' elections with respect to distributions. Conf DX 569 – Goulding Decl. ¶ 34. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates, and to maximize distributions to all creditors. Conf DX 569 – Goulding Decl. ¶ 31.

NN.    The Court further finds that the financial accommodations to be extended pursuant to the Financing Documents are being extended by the lenders thereunder in good faith, for legitimate business purposes, and are reasonable. In addition, despite efforts by the Debtors in accordance with Section 32.11 of the Plan, (i) the Debtors did not receive any other bona fide financing proposals with respect to the Reorganized Debtors, and (ii) two (2) parties contacted the Debtors regarding the Credit Facility, which parties were referred to the Equity Committee, and the Equity Committee declined to move forward with such parties. Moreover, the Credit Facility has been negotiated in good faith and among independent parties.

OO.    Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). Pursuant to the interim compensation procedures previously approved by this Court and established in these Chapter 11 Cases pursuant to section 331 of the Bankruptcy Code,[6] all payments made or to be made by the Debtors to their retained professionals for services rendered

---

[6] *Amended Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, dated November 17, 2008 [D.I. 302].

and expenses incurred in or in connection with these Chapter 11 Cases, or in connection with the Plan and incidental to these Chapter 11 Cases, have been or will be authorized and approved by this Court, subject to final review for reasonableness by this Court pursuant to section 330 of the Bankruptcy Code. As set forth in Section 3.2 of the Plan, all Entities awarded compensation or reimbursement of expenses by the court in accordance with section 328, 330, or 331 of the Bankruptcy Code, or entitled to priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, will have ninety (90) days following the Effective Date to submit final fee applications. Conf DX 432A - Plan § 3.2. In addition, consistent with the determination set forth in the September Opinion, the Plan provides that fees and expenses of the Liquidating Trustee, other Trustees and certain creditors' professionals listed in Section 41.18 of the Plan must be approved by the court as reasonable before being paid by the Debtors. See Conf DX 441 - September Opinion at 23-24; Conf DX 432A – Plan §§ 27.12, 41.18; Conf DX 434A – Liquidating Trust Agreement §§ 4.1, 6.2(d), 6.4(l), 6.5(k), 6.6(b) and (c), 6.8(b), 7.7; Conf DX 569 – Goulding Decl. ¶ 35.

> PP.    Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)). The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. Section 40.4 of the Plan provides that the boards of directors of each of the Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity Committee (subject to the terms of the TPS Stipulation) and one (1) member selected by the lenders party to the Credit Facility. Conf DX 432A – Plan § 40.4. The Equity Committee has currently selected, as members of the Reorganized Debtors' boards of directors, (i) Michael Willingham, (ii) Mark Holiday, (iii) Diane Glossman and (iv) Timothy Graham. The member selected by the lenders party to the Credit Facility is Gene Davis. Pursuant to Section 40.5 of the Plan, the boards of directors of the

Reorganized Debtors shall elect officers of the Reorganized Debtors as of or after the Effective

Date. Conf DX 432A - Plan § 40.5. Each director and officer will serve in accordance with the

terms and subject to the conditions of the Reorganized Debtors' Certificates of Incorporation, the

Reorganized Debtors' By-Laws, and other relevant organizational documents, each as

applicable.

QQ.   The ten (10) initial members of the Trust Advisory Board shall (a) consist

of (i) four (4) members selected solely by the Creditors' Committee (subject to the terms of the

*Stipulation and Agreement Between the Debtors and Tricadia Capital Management, LLC With*

*Respect to the Debtors' Seventh Amended Plan,* dated February 12, 2012), (ii) four (4) members

selected solely by the Equity Committee (subject to the terms of the TPS Stipulation), (iii) one

(1) member selected by the Creditors' Committee and approved by the Equity Committee, which

approval shall not be unreasonably withheld, and (iv) one (1) member selected by HoldCo

Advisors, L.P. serving in a non-voting *ex officio* capacity, and (b) have an oversight function

with respect to the Liquidating Trust, the composition of which may change only in accordance

with the provisions of the Liquidating Trust Agreement. Currently, (i) Wells Fargo Bank, N.A.,

Arnold Kastenbaum, Mayur Lakhani, and Marc Kirschner have been selected as the Creditors'

Committee's designees to the Trust Advisory Board; (ii) Joel Klein, Michael Willingham, and

the Honorable Douglas Southard have been selected as the Equity Committee's designees to the

Trust Advisory Board; (iii) Matthew Cantor has been selected as the joint designee to the Trust

Advisory Board; and (iv) William Kosturos has been named the Liquidating Trustee. Conf DX

434 – Liquidating Trust Agreement §§ 1.4, 6.1. Further, Misha Zaitzeff, a principal of HoldCo

Advisors, L.P. shall be appointed as an *ex officio* member to the Trust Advisory Board (with

limited rights). See *Stipulation and Agreement Resolving Objection of HoldCo Advisors, L.P. to*

*the Debtors' Plan*, dated February 12, 2012 [D.I. 9683, Ex. 1]. If, prior to the Effective Date, the

Equity Committee and Creditors' Committee designate additional or substitute persons than

those listed above to serve as one or more of such parties' nominees, such committee shall file a

notice thereof with this Court. In addition, pursuant to Section 8.2 of the Form of Liquidating

Trust Agreement that was filed as part of the Plan Supplement, the Liquidating Trustee may be

removed by a majority vote of the members of the Trust Advisory Board.

  RR. To address the concern of the Court that the composition of the Trust

Advisory Board should change once creditors have been paid in full, the Trust Advisory Board

members solely appointed by the Creditors' Committee are subject to replacement on a staggered

basis as and when all Allowed Claims approach satisfaction in full.

  SS. <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not provide for

rate changes by any of the Reorganized Debtors. Thus, section 1129(a)(6) of the Bankruptcy

Code is not applicable in these Chapter 11 Cases. <u>See</u> Conf DX 569 – Goulding Decl. ¶ 39.

**Converting to Chapter 7 Would Result in Delay, Added Costs, and Loss of Value**

  TT. <u>Best Interest of Creditors (11 U.S.C. § 1129(a)(7))</u>. Recoveries pursuant

to the Plan are equal to or in excess of those that would be available if the Debtors were

liquidated pursuant to chapter 7 and, therefore, the Plan satisfies the "best interests" test set forth

in section 1129(a)(7) of the Bankruptcy Code.

  UU. Section 1129(a)(7) is satisfied as to each holder of a Claim in an

unimpaired class of Claims, as they are deemed to have accepted the Plan. As to the remaining

Creditors, the Debtors' Liquidation Analysis demonstrates that each of the Debtors' creditors

will receive at least as much, if not more, value under the Plan than it would receive in a

hypothetical chapter 7 liquidation. Conf DX 569 – Goulding Decl. ¶¶ 40-46. Under either

scenario, holders of claims in Class 17B receive nothing. <u>Id.</u> ¶¶ 30, 45.

VV.    In a chapter 7 liquidation, assuming a chapter 7 trustee is able to consummate a settlement of the issues resolved by the Global Settlement Agreement on the same terms and conditions as the Debtors, the cash available for distribution to creditors would consist mainly of the proceeds from the Global Settlement Agreement. Conf DX 569 – Goulding Decl. ¶ 42. The Debtors' Liquidation Analysis assumes that the Global Settlement Agreement would still exist in a chapter 7 liquidation because, without consummation of a similar global settlement on similar terms as the Global Settlement Agreement or, in the alternative, litigating to finality each issue related to distribution of assets (which would take a substantial amount of time), a chapter 7 trustee would be unable to resolve all claims in these estates or make significant distributions. Id. As this Court has noted, however, the Debtors can provide no assurance that a global settlement agreement will be reached in the Chapter 7 Cases. See Conf DX 265 – January Opinion at 95-96. Without the Global Settlement Agreement, an additional $54 billion in claims would have to be considered. See id. This Court has concluded that, under a scenario where no similar global settlement agreement is consummated, the recovery under the Chapter 7 Cases would be less than the recovery under the Chapter 11 Cases. See id.

WW.    Cash distributions in a chapter 7 liquidation, however, would be delayed and significantly reduced by the costs and expenses of a chapter 7 liquidation, including fees payable to the chapter 7 trustee and its professional advisors, who would need to engage in a substantial amount of work to become familiar with the many complex legal and factual issues in the Debtors' bankruptcy cases. Conf DX 265 – Goulding Decl. ¶ 43. This could "stall" the cases for a prolonged period of time while these new parties familiarize themselves with the background and status of the cases. Id. Given the complexities of these chapter 11 cases and the underlying assets and Claims, and after considering the time it took the Equity Committee upon

formation to bring itself "up-to-speed" regarding the complex issues involved in the Chapter 11

Cases, a chapter 7 trustee and its professionals likely would require at least 2 to 4 months to

familiarize themselves with the Debtors' estates and their assets (the "Start-up Time"). Id. After

the Start-up Time, the actual liquidation of the Debtors would continue for an additional

estimated 2 to 4 months. Id. A conversion of these cases would result in an increase of $3

million in operational expenses and $37 million in professional fees, in addition to an estimated

$37 million chapter 7 trustee transaction fee. Id.; Conf DX 432C - Disclosure Statement, Ex. C

at vi-vii.

XX.    In addition to the foregoing, in a chapter 7 liquidation, a chapter 7 trustee

would be forced to sell WMMRC quickly. Conf DX 569 - Goulding Decl. ¶ 44. Thus, creditors

would suffer diminished recoveries because a "fire-sale" liquidation of WMMRC would

substantially reduce the potential value of this asset, as compared to the value to be generated by

reorganizing around this entity. Id. Moreover, third parties may be inclined to submit lower bids

to a chapter 7 trustee knowing that the asset must be sold at any price. Id. In any event, a

chapter 7 liquidation would not permit WMMRC or any other entity to utilize the WMI tax

group's large NOLs on a go forward basis to any significant extent. Id.

YY.    Aside from the additional fees and expenses, and the reduction in available

proceeds from a sale of WMMRC, any such delay would impact the recoveries of junior

creditors subject to contractual subordination provisions who are obligated to "pay-up" to senior

creditors until such senior creditors' claims are paid in full, including postpetition interest at the

contract rate that would continue to accrue. Id. ¶ 45. Accordingly, after contractual

subordination, holders of PIERS Claims, CCB-1 Guarantee Claims, CCB-2 Guarantee Claims,

Subordinated Claims, Preferred Equity Interests, and Common Equity Interests would recover

nothing in a chapter 7 liquidation. Id. Such creditors and equity holders will thus recover substantially more value under the proposed Plan than they would through a chapter 7 liquidation. Id.

ZZ.    Based upon the foregoing, if these chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code, there likely would be a several month delay in returns to creditors to conduct a liquidation that would result in the reduced estimated liquidation proceeds set forth in the Liquidation Analysis, as compared with the certainty and timing of distributions under the Plan. Id. ¶ 46. For some Creditors, such as holders of Allowed Senior Notes Claims, this would result in the same value recovered with respect to such holders' Allowed Claims, but only after a significant delay. Id. For holders of Allowed Senior Subordinated Notes Claims and Allowed General Unsecured Claims (as well as holders of Allowed Senior Notes Claims with respect to such holders' Claims for postpetition interest), however, this would mean a smaller recovery than that which is projected pursuant to the Plan. Id.; see also Conf DX 432C - Disclosure Statement, Ex. C at v. For holders of PIERS Claims, CCB-1 Guarantee Claims, CCB-2 Guarantee Claims, Subordinated Claims, Preferred Equity Interests, and Common Equity Interests, however, chapter 7 liquidation would mean that such holders' recoveries would evaporate completely. Conf DX 569 - Goulding Decl. ¶ 46. Moreover, and as discussed above, there is no guarantee that a chapter 7 trustee would be able to consummate a global settlement on the same terms and conditions as the Debtors.[7] Id.; Conf DX 265 – January Opinion at 95-96. If this did not occur, the recoveries for creditors in all Classes could drop precipitously. Conf DX 569 - Goulding Decl. ¶ 46. The Court further notes that,

---

[7] Additionally, Class 17A may see their recoveries disappear if a chapter 7 trustee withdraws its support for the settlement with the holders of WMB Senior Notes, and the WMB Senior Notes Claims are disallowed.

even after the Senior Notes Release Consideration and Senior Subordinated Notes Release Consideration are taken into account, holders of Allowed Senior Notes Claims and Allowed Senior Subordinated Notes Claims still fare the same or better pursuant to the Plan than they would in a chapter 7 liquidation. Id. at n.20. Accordingly, this Court finds the Plan satisfies section 1129(a)(7) of the Bankruptcy Code notwithstanding the payment pursuant to the Plan to Reorganized WMI of a small percentage of their recoveries by holders of Allowed Senior Notes Claims and Allowed Senior Subordinated Notes Claims.

AAA.   Based upon the foregoing, recoveries pursuant to the Plan are greater than what estimated recoveries would be pursuant to a chapter 7 liquidation (except with respect to Classes receiving no distribution pursuant to the Plan, which would receive no distribution in either scenario).

BBB.   Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). As set forth in the Voting Certifications, holders of Claims in Classes 2, 3, 5, 6, 10, 11, 12, 12A, 13, 14, 15, 16 17A, 18, 19, and 22 voted to accept the Plan. See Conf DX 570 – Klamser Decl. ¶ 25. Conf DX 571 – Sharp Decl. ¶ 24; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 29. Pursuant to the LTW Settlement Approval Order, votes on behalf of holders of interests in Class 21 were deemed cast in support of acceptance of the Plan. Conf DX – Goulding Decl. ¶ 28 n.9. However, because the distribution to the class of holders is through Classes 12, 18, and 22, such votes were cast in Classes 12, 18, and 22. Id. Pursuant to the TPS Stipulation, votes on behalf of holders of Equity Interests held by the TPS Funds (as defined in the TPS Stipulation) were deemed cast in support of acceptance of the Plan. See *Stipulation and Agreement Among the Debtors, the TPS Group, the TPS Consortium, the Equity Committee, and JP Morgan Chase Bank, N.A. With Respect to the Debtors' Seventh Amended Plan* [D.I.9705]. The Plan therefore

satisfies section 1129(a)(8) of the Bankruptcy Code with respect to Classes 2, 3, 5, 6, 10, 11, 12, 12A, 13, 14, 15, 16, 17A, 18, 19 and 22.[8]  With respect to the other Classes, the Plan is confirmable because the Plan satisfies section 1129(b)(2) of the Bankruptcy Code.  As such, section 1129(a)(8) is satisfied.

CCC.   Treatment of Administrative Expense Claims, Priority Non-Tax Claims, and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).  The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.  Section 3.1 of the Plan provides that, on the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim becomes an Allowed Claim, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim.  Conf DX 432A – Plan § 3.1.  Section 5.1 of the Plan provides that, unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Debtors, on the later of (i) the Effective Date and (ii) the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Priority Non-Tax Claim, in Cash, the full amount of such Allowed Priority Non-Tax Claim.  Conf DX 255 – Plan § 5.1.  Pursuant to Section 3.3 of the Plan, and as set forth in the Priority Tax Claim Election Notice, each holder of an Allowed Priority Tax Claim shall receive, in satisfaction, release, and exchange of such holder's Allowed Priority Tax Claim, payment in full, in Cash, on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such claim becomes an Allowed Claim, and to the extent that payment is made after the Effective Date, together with interest accrued thereon at the applicable non-bankruptcy rate as of the calendar month in which this Order is

---

[8] Class 8 contains no claims, and thus, no votes were cast on behalf of this class.

entered.  Conf DX 432A – Plan § 3.3; Conf DX 574 – Priority Tax Claim Election Notice; Conf

DX 569 – Goulding Decl. ¶¶ 48-51.

DDD.    Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).  Fifteen (15)

impaired Classes entitled to vote affirmatively accepted the Plan, thereby satisfying the

requirements of section 1129(a)(10) of the Bankruptcy Code.  See Conf DX 570 – Klamser Decl.

¶ 25; Conf DX 571 – Sharp Decl. ¶ 24; Conf DX 18 – Klamser Decl. for the Sixth Amended

Plan ¶ 29.

EEE.    Feasibility (11 U.S.C. § 1129(a)(11)).  Pursuant to the September Opinion,

and based on the evidence presented at the hearing on confirmation of the Modified Sixth

Amended Plan, the Court determined that the value of WMMRC's existing portfolio is $140

million and that, if it is assumed that Reorganized WMI raises new capital and acquires new

businesses, the value of the NOLs that are potentially available to Reorganized WMI is $70

million.  Conf DX 441 – September Opinion at 43-45, 62.  Pursuant to the Plan, in addition to

owning WMMRC and having the potential ability to apply the NOLs against its future taxable

income, (see Conf DX 432A – Plan § 1.192; Conf DX 432 – Disclosure Statement at 221),

Reorganized WMI will have unrestricted access to cash, as of the Effective Date, in the form of

the $75 million Senior Notes Release Consideration and Senior Subordinated Notes Release

Consideration that will be paid to Reorganized WMI by holders of Allowed Senior Notes Claims

and Allowed Senior Subordinated Notes Claims.  Conf DX 432A – Plan §§ 6.1, 7.1; Conf DX

569 – Goulding Decl. ¶ 56.  Further, certain members of AAOC will provide Reorganized WMI

a senior secured multi-draw term Credit Facility, in the aggregate original principal amount of

$125 million, to be used by Reorganized WMI to finance working capital and general corporate

purposes, as well as certain permitted acquisitions and originations, all subject to the terms and

conditions of the Credit Agreement and the Financing Documents (as defined below). <u>See</u> Conf
DX 569 – Goulding Decl. ¶ 22.

FFF.    As of the Effective Date, the Reorganized Debtors' assets will exceed its
liabilities. <u>See</u> Conf DX 569 - Goulding Decl. ¶ 57. Upon such date, Reorganized WMI will
have only two sources of significant liability—loan loss reserves associated with the WMMRC
Trusts and the Runoff Notes. <u>Id.</u> ¶ 55. The loan loss reserves are limited to the assets available
within each of the WMMRC Trusts. <u>Id.</u>; Conf DX 432 - Disclosure Statement § IV.A.6.
Pursuant to the Plan, Reorganized WMI will issue Runoff Notes in the aggregate original
principal amount of One Hundred Forty Million Dollars ($140,000,000.00) (subject to reduction
as a result of the Reorganized Common Stock Elections, as discussed in Disclosure Statement).
Conf DX 569 - Goulding Decl. ¶ 55. Such Runoff Notes are, except for the limited
circumstances set forth in the governing indentures, non-recourse to the Reorganized Debtors
and may only be satisfied by the Runoff Proceeds. <u>Id.</u> Except for the limited circumstances set
forth in the governing indentures, Reorganized WMI has no obligation to satisfy any deficiency
if the Runoff Proceeds prove to be insufficient to fully repay the Runoff Notes. <u>Id.</u> The only
other source of liability for Reorganized WMI relates to Reorganized WMI's obligation to be a
public reporting company. <u>Id.</u>

GGG.    Additional sources of income for Reorganized WMI will potentially
become available as well, including (i) an additional $10 million, as well as interest accrued
thereon at a rate of thirteen percent (13%) per annum, in the form of a portion of the Runoff
Proceeds, to the extent available and in accordance with the relative priorities thereto as set forth

in the documents governing the Runoff Notes,[9] (ii) certain potential Litigation Proceeds, and (iii) all distributions of Runoff Proceeds after all amounts due on the Runoff Notes have been paid in full, solely to the extent any such additional distributions are available. Conf DX 569 – Goulding Decl. ¶ 56.

HHH.  In light of the excess of their Effective Date assets over their liabilities, their potential additional sources of funding, and the general non-recourse nature of the Runoff Notes described above, the Court concludes that the Reorganized Debtors will be able to pay their liabilities as they become due. For example, the Reorganized Debtors' assets are more than adequate to cover the anticipated public reporting costs, as is demonstrated by the Debtors' post-Effective Date financial projections, which show that Reorganized WMI will have a cash balance of Seventy-Four Million Eleven Thousand Dollars ($74,011,000.00) in the final year of such projections. Conf DX 432 – Disclosure Statement at 210; Conf DX 569 - Goulding Decl. ¶ 57. Accordingly, this Court concludes that confirmation of the Plan is not likely to be followed by the eventual liquidation of either of the Reorganized Debtors. Rather, the Reorganized Debtors will have sufficient funds to continue to manage their assets and satisfy their liabilities.

---

[9] Pursuant to the Plan, any eligible Creditor that elected to or that is otherwise entitled to receive Runoff Notes in lieu of Creditor Cash has the right to make a further election (a "Reorganized Common Stock Election") to receive Reorganized Common Stock in lieu of (among other things) some or all of such Runoff Notes. To the extent any such holder makes such a Reorganized Common Stock Election, such holder's share of the Runoff Notes to which the Reorganized Common Stock Election was effective will not be issued, thereby reducing the aggregate amount of Runoff Notes outstanding and, subject to the relative priorities set forth in the documents governing the Runoff Notes, Reorganized WMI will retain (and will not transfer to the Liquidating Trust) Runoff Proceeds in an amount equal to the payments of principal and interest that would have been due on the Runoff Notes to which the Reorganized Common Stock Election was effective. In the event that holders of Claims with rights to make Reorganized Common Stock Elections decline to tender Runoff Notes in the original principal amount necessary to reach the Runoff Threshold, Section 31.14(d) of the Plan deems AAOC to have made certain elections as set forth more fully therein to ensure that the Runoff Threshold is reached.

III.    In addition, this Court concludes that the Debtors have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. In particular, pursuant to the provisions of the Plan and the Liquidating Trust Agreement, it is clear that the Liquidating Trust will have sufficient funds to manage the Liquidating Trust, maintain the Liquidating Trust assets, and make payments to the Liquidating Trust Beneficiaries. Conf DX 432A - Plan § 27.10; Conf DX 434A - Liquidating Trust Agreement § 1.3. The Liquidating Trust will consist of the Liquidating Trust Assets (as defined in the Plan), which include, among other things, the cash necessary to fund the Liquidating Trust. See id. § 1.4; Conf DX 432A - Plan §§ 1.140, 27.3.

JJJ.    Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)). Pursuant to Section 41.14 of the Plan, all fees currently payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Code, have been or will be paid on or before the Effective Date, thereafter as and when they become due, or otherwise pursuant to an agreement between the Reorganized Debtors and the United States Department Justice, Office of the United States Trustee, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code. See Conf DX 432A – Plan § 41.14; Conf DX 569 – Goulding Decl. ¶ 59.

KKK.    Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)). Pursuant to Section 34.7 of the Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors, and the Liquidating Trustee, as the case may be, shall (a) continue to perform any and all of their administrative obligations under the Benefit Plans and (b) continue to make any required minimum funding and insurance premium payments, until such time as the Debtors or the Liquidating Trustee, as the case may be, decides to transfer or terminate any such Benefit Plan in accordance with the terms and provisions of the documents and instruments relating

thereto and applicable law. Conf DX 432A – Plan § 34.7; Conf DX 569 – Goulding Decl. ¶ 60.

Thus, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

LLL.    No Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).    The Debtors
are not subject to any domestic support obligations. Accordingly, section 1129(a)(14) of the
Bankruptcy Code is inapplicable in these Chapter 11 Cases. See Conf DX 569 – Goulding Decl.
¶ 61.

MMM. Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15)). The Debtors are
not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section
1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. See Conf DX
569 – Goulding Decl. ¶ 62.

NNN.    No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C.
§ 1129(a)(16)).    The Debtors are each a moneyed, business, or commercial corporation and,
accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11
Cases. See Conf DX 569 – Goulding Decl. ¶ 63.

OOO.    No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).
Class 9 (Visa Claims) voted to reject the Plan.[10]  Conf DX 569 – Goulding Decl. ¶ 64; Conf DX
570 – Klamser Decl. ¶ 25; Conf DX 571 – Sharp Decl. ¶ 24; Conf DX 19 – Sharp Decl. for Sixth
Amended Plan ¶ 30. Accordingly, the "cram down" requirements of section 1129(b) of the
Bankruptcy Code must be satisfied with respect to Class 9.

---

[10] Class 17B is not receiving any distribution pursuant to the Plan. Conf DX 569 – Goulding Decl. ¶ 64.
In light of that fact, the Disclosure Statement Order provided that Class 17B was deemed to reject the
Plan. Conf DX 432B – Disclosure Statement Order ¶ M. However, it must be noted that there are no
Claims in Class 17B because any such Claims are derivative in nature and belong to the FDIC, and the
Debtors are providing a distribution on account thereof to the FDIC Receiver pursuant to the Global
Settlement Agreement. Conf DX 569 - Goulding Decl. ¶ 65. Because there are no Allowed Claims in
Class 17B—indeed no Claims at all—it does not matter that Classes junior to such Class may receive or
retain property on account of the Claims or Equity Interests classified therein. Id. ¶ 66 n. 27.

PPP.    Based upon the evidence proffered, adduced, and presented by the Debtors and supporters of the Plan at the Confirmation Hearing, the Plan does not discriminate unfairly and is fair and equitable with respect to Class 9, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code. With respect to Class 9, except to the extent waived, no holder of a Claim or Equity Interest junior to each of the Claims classified in Class 9 will receive or retain any property pursuant to the Plan, unless and until such Classes are paid in full. See Conf DX 569 – Goulding Decl. ¶ 66. Specifically, Class 9 is being paid in full so holders of Claims junior to Class 9 may receive distributions pursuant to the Plan. Id.

QQQ.    The Plan provides for payment of Allowed Claims and, if appropriate, Postpetition Interest Claims on account of Allowed Claims. Id. ¶ 67. Distributions to claimants will be made in Cash, Liquidating Trust Interests that represent the right to receive future Cash distributions from the Liquidating Trust and, in certain circumstances, Runoff Notes and/or Reorganized Common Stock. Id. No Class is projected to recover more than one hundred percent (100%) on account of the Claims or Equity Interests, as the case may be, classified in each Class. See Conf DX 432C - Disclosure Statement, Ex. C at 4-5.

RRR.    No holder of a Claim or Equity Interest will receive more value than such respective Claim or Equity Interest (based on liquidation preference amount). Conf DX 569 - Goulding Decl. ¶ 68.

SSS.    Only One Plan (11 U.S.C. § 1129(c)). Other than with respect to prior plans of reorganization filed in these cases, namely, the Sixth Amended Plan and Modified Sixth Amended Plan, the Plan is the only plan filed in each of these cases. Conf DX 569 – Goulding Decl. ¶ 69. Accordingly, section 1129(c) is inapplicable in these Chapter 11 Cases.

TTT.   Principal Purpose of the Plan (11 U.S.C. § 1129(d)).  The principal purpose of the Plan is not the avoidance of taxes or the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to confirmation of the Plan on any such grounds. Id. ¶ 70.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

UUU.   Not a Small Business Case (11 U.S.C. § 1129(e)).  The Chapter 11 Cases are not "small business cases" as defined in the Bankruptcy Code. Id. ¶ 71.  Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

VVV.   Satisfaction of Confirmation Requirements.  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

WWW.     Implementation.  All documents necessary to implement the Plan, including those contained in the Plan Supplement and the Global Settlement Agreement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtors, prior to the Effective Date, and Reorganized WMI, from and after the Effective Date, are authorized to enter into the Credit Facility substantially on the terms set forth in the Plan and Plan Supplement.  The execution, delivery, or performance by the Debtors or Reorganized Debtors, as the case may be, of the Credit Facility and any documents in connection with the Credit Facility, including any guarantees and security documents (together, the "Financing Documents"), and the granting of all Liens and security interests thereunder, and

compliance by the Debtors or Reorganized Debtors, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

XXX.  Good Faith.  The Debtors will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby, including, without limitation, the Global Settlement Agreement, and (ii) take the actions authorized and directed by this Order.

YYY.  Liquidating Trust.  Entry into the Liquidating Trust Agreement is in the best interests of the Debtors, the Debtors' estates, and creditors and holders of Equity Interests. The establishment of the Liquidating Trust, the selection of William C. Kosturos to serve as the Liquidating Trustee, and the form of the proposed Liquidating Trust Agreement (as it may be modified or amended) is appropriate and in the best interests of creditors and holders of Equity Interests. The Liquidating Trust Agreement shall, upon execution, be valid, binding, and enforceable in accordance with its terms.

ZZZ.  Preservation of Causes of Action.  It is in the best interests of the Debtors, their Creditors, and Equity Interest holders, that all Causes of Action, other than those expressly released pursuant to the Plan and the Global Settlement Agreement, be retained by the Liquidating Trust, as set forth in the Plan.

AAAA.        Retention of Jurisdiction.  This Court may properly and, upon the Effective Date shall, consistent with Article XXXVIII of the Plan, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including, without limitation, all Causes of Action not otherwise released pursuant to the Plan and the matters set forth in Article XXXVIII of the Plan and section 1142 of the Bankruptcy Code. Conf DX 432A - Plan, Art. XXXVIII.

**Modifications of the Plan**

      BBBB. Plan Modifications. The Plan, as modified by the Plan Modifications, is consistent with and meets the requirements of section 1127 of the Bankruptcy Code because such modifications were filed prior to the solicitation of votes and elections on the Plan.

      ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

<b>ORDER</b>

      1.    Confirmation of the Plan. The Plan and each of its provisions, as modified pursuant to the Plan Modifications and any revisions made at or subsequent to the Confirmation Hearing as set forth in this Order, including the Plan Supplement, and as may be modified pursuant to section 1127 of the Bankruptcy Code, shall be, and hereby are, CONFIRMED pursuant to section 1129 of the Bankruptcy Code. The documents contained in the Plan Supplement are authorized and approved. The terms of the Plan, as modified by the Plan Modifications and revisions made at or subsequent to the Confirmation Hearing, as set forth in this Order as well as in the revised composite copy attached hereto as Exhibit A, and including the Global Settlement Agreement and the Plan Supplement, as has and may be amended, are incorporated by reference into and are an integral part of this Order.

      2.    Compromise of Controversies. For the reasons stated herein and in the January Opinion and September Opinion, the provisions of the Plan and the Global Settlement Agreement constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the Global Settlement Agreement and the compromise and settlement incorporated into the Plan after the Mediation, and the entry of this Order constitutes approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and sections 105(a), 363, and 365 of the

Bankruptcy Code. To the extent provided in the Plan and the Global Settlement Agreement, on the Effective Date, such compromises and settlements shall be binding upon the Debtors, the other parties to the Global Settlement Agreement, all Creditors, all holders of Equity Interests, and other Entities.

3.     Global Settlement Agreement Approved.  The Court (a) approves the Global Settlement Agreement as a good faith compromise that is fair and reasonable and in the estates' best interests and integral to the Plan, (b) hereby reaffirms its prior approval of the Global Settlement Agreement as set forth in the January Opinion and September Opinion and, (c) subject to the provisions of decretal paragraph 11 hereof, upon the Effective Date, authorizes and directs the consummation of the Global Settlement Agreement by all parties thereto.

4.     Plan Settlement Approved.  The Court hereby approves the compromises and settlements embodied in the Plan after and as a result of the Mediation as fair, reasonable, and in the estates' best interests and, upon the effectiveness of the Plan, authorizes and directs the consummation thereof.

5.     Objections.  All Objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the Plan and the Global Settlement Agreement shall be and hereby are, OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn with prejudice.

6.     Equity Committee Actions and Appeals Deemed Withdrawn, With Prejudice.  As soon as practicable after the Effective Date, the Equity Committee shall take any and all actions necessary to cause the withdrawal, with prejudice, of each of the Equity Committee Adversary Proceeding, the Equity Committee Action to Compel, the January Equity Committee Appeal, and the Equity Committee's cross-appeal from the September Opinion and

September Order, as well as any other proceeding or action instituted by the Equity Committee with respect to the Debtors or the Global Settlement Agreement, including any appeals.

7.    September Appeals.  As soon as practicable after the Effective Date, each of (i) AAOC, with (a) Aurelius filing individually and (b) Appaloosa, Owl Creek and Centerbridge filing jointly, (ii) the Creditors' Committee, (iii) the Debtors, (iv) the WMB Noteholders, (v) Normandy Hill, and (vi) Wells Fargo Bank, National Association, solely in its capacity as the PIERS Trustee shall take any and all actions necessary to cause the withdrawal, with prejudice, of such Entities' appeals from the September Opinion and September Order.

8.    Treatment of Preferred Equity Interests.  Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of a Preferred Equity Interest, including, without limitation, each holder of a REIT Series, shall be entitled to receive such holder's Pro Rata Share of seventy-five percent (75%) of (a) subject to the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b) and 20.2(b) of the Plan, the Reorganized Common Stock, and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed.

9.    Treatment of Common Equity Interests.  Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of Common Equity Interests shall be entitled to receive such holder's Pro Rata Share of twenty-five percent (25%) of (a) subject to (i) the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b), and 20.2(b) of the Plan and (ii) the rights of holders of Dime Warrants pursuant to the LTW Stipulation, the Reorganized

Common Stock, and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed.

10.    Partial Vacatur of September Opinion and September Order.  The Court hereby vacates, for all purposes, (a) the September Order to the extent it relates to the Standing Motion, and (b) those portions of the September Opinion that relate to the Standing Motion, namely, (i) Section III (H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73.  All official and unofficial publishers of the September Opinion and/or September Order are hereby advised that such portions of the September Opinion and the September Order have been vacated and should be removed from any publication and/or computer database.

11.    Execution of Certain Documents.  Prior to the Effective Date, the Debtors and any and all other parties to such documents shall execute and take all other actions necessary to effect and execute the documents necessary to implement the Plan and the Global Settlement Agreement, including, without limitation, the Credit Facility and all related documents, and shall take any and all steps necessary, if any, to reflect or effectuate, as the case may be, the transfer of the Trust Preferred Securities to WMI and then to WMB, and to reflect JPMC as the sole legal, equitable and beneficial owner of the Trust Preferred Securities in accordance with Section 2.3 of the Global Settlement Agreement and in conformity with applicable law.  In accordance with Section 2.3 of the Global Settlement Agreement, with respect to matters related to the Trust Preferred Securities, all persons and entities shall be authorized and directed to take instructions solely from JPMC or its designee with respect to those items as to which the owner is entitled to

give instructions, any and all persons and entities shall be authorized and directed to take

necessary, proper or advisable actions and all other actions reasonably requested or instructed by

JPMC to record, reflect, transfer, vest, assign, convey, and maintain, as necessary, that a transfer

of the Trust Preferred Securities was made to WMI (and subsequently by WMI to JPMC) and

that JPMC is the sole legal, equitable, and beneficial owner of the Trust Preferred Securities as

transferee of WMI, including, without limitation, by: (i) causing the applicable trustees,

registrars, paying agents, depositary, and transfer agents to amend their records (including the

securities registers of each Issuing Trust) to reflect a transfer of the Trust Preferred Securities to

WMI and then to WMB, and to reflect JPMC as the sole legal, equitable, and beneficial owner of

the Trust Preferred Securities; (ii) causing the trustees and boards of directors of the Issuing

Trusts to take all necessary, proper and advisable action to reflect JPMC as the sole legal,

equitable, and beneficial owner of the Trust Preferred Securities; and (iii) amending any

agreements, articles, or declarations to reflect JPMC as the sole legal, equitable, and beneficial

owner of the Trust Preferred Securities.

12.    Implementation of the Plan.  subject to the provisions of decretal

paragraph 11 hereof, on and after the Effective Date, the Debtors, the Reorganized Debtors, and

the Liquidating Trust are authorized to (i) execute, deliver, file, or record such documents,

contracts, instruments, releases, and other agreements, including, without limitation, those

contained in the Plan Supplement and the Global Settlement Agreement, and including, without

limitation, Section 2.3 of the Global Settlement Agreement, (ii) make any and all distributions

and transfers contemplated pursuant to, and as provided for in, the Plan and the Global

Settlement Agreement, and (iii) take such other actions as may be necessary to effectuate,

implement, and further evidence the terms and conditions of the Plan and the Global Settlement

Agreement, including, among other things, all such actions delineated in Article XXXII of the

Plan. On the Effective Date, the appropriate officers or representatives of the Debtors, the

Reorganized Debtors and the Liquidating Trust, as the case may be, and members of the boards

of directors of the same (including, without limitation, the Trust Advisory Board), are authorized

and empowered to issue, execute, file, and deliver or record such documents, contracts,

instruments, releases, and other agreements, including those contained in the Plan Supplement,

contemplated by the Plan and the Global Settlement Agreement, and make any and all

distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the

Global Settlement Agreement, in the name of and on behalf of the Debtors and their estates, the

Reorganized Debtors and the Liquidating Trust, as applicable. Except as otherwise provided in

the Plan, the Prior Disclosure Statement Order, or the Disclosure Statement Order (including,

without limitation, with respect to holders of WMB Senior Notes), the record date for

determining the holders of Allowed Claims and Equity Interests entitled to receive distributions

pursuant to the Plan shall be the Effective Date. Without limiting the generality of the foregoing,

and without further action by the Bankruptcy Court or any other party, the Debtors and the

Reorganized Debtors are authorized and empowered pursuant to Section 1142 of the Bankruptcy

Code to (a) execute, deliver and consummate the Credit Facility and the Financing Documents,

(b) perform and comply with all of the terms, conditions, and obligations of and under the Credit

Facility and the Financing Documents, (c) take all other actions and execute, deliver, record, and

file all other such agreements, documents, instruments, mortgages, deeds of trust, financing

statements, releases, applications, registration statements, reports and changes, additions, or

modifications thereto in connection with the consummation of the transactions contemplated by

the Credit Facility and the Financing Documents and the performance thereof, including, without

limitation, the making of such filings or the recording of any security interests, as may be required under such documents, (d) grant valid, binding, enforceable, and perfected security interests and Liens upon all of the collateral specified in the Credit Facility and the Financing Documents in accordance with the terms thereof, and (e) pay all fees, costs, and expenses under the Credit Facility and Financing Documents. The financial accommodations to be extended pursuant to the Credit Facility and the other Financing Documents are being extended, and shall be deemed to have been extended by the lenders thereunder, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable nonbankruptcy law. Any person or entity that has asserted mortgages, deeds of trust, Liens, security interests, financing statements, lis pendens or other documents or agreements evidencing claims on or interests in property of the Debtors, as may have been recorded or may otherwise exist, is authorized and directed to execute termination statements, instruments of satisfaction or discharge, or releases of all such claims or interests which such person or entity has with respect to property of the Debtors; if any such person or entity shall not have delivered to the Debtors or the Reorganized Debtors, in proper form for filing or recording and executed by the appropriate party(ies), such termination statements, instruments of satisfaction or discharge, or releases of all such claims or interests which such person or entity has with respect to the property of the Debtors, then the Reorganized Debtors are hereby authorized and directed to execute and file or record any and all such statements, instruments, discharges, releases and other documents, and take any and all other actions as may be necessary on behalf of such person or entity asserting a claim or interests in the Debtors' property.

13.    <u>No Action</u>. Pursuant to section 1142(b) of the Bankruptcy Code, no action of the respective directors or stockholders of the Debtors shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and the Global Settlement Agreement, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan and the Global Settlement Agreement, including, without limitation, the Plan Supplement.

14.    <u>Credit Facility</u>. The financial accommodations to be extended pursuant to the Financing Documents shall not be subject to recharacterization for any purposes whatsoever. Each party to the Credit Facility may rely on the provisions of this Order in closing the Credit Facility.

15.    <u>Binding Effect</u>. On or after entry of this Order, and subject to the occurrence of the Effective Date, except to the extent otherwise provided in the Plan or this Order, the provisions of the Plan shall bind the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, all holders of Claims and Equity Interests of the Debtors (irrespective of whether such Claims or Equity Interests are impaired pursuant to the Plan or whether the holders of such Claims or Equity Interests accepted, rejected, or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in these Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.

16.    <u>Free and Clear</u>. Except as otherwise provided in the Plan, in this Order, in the Credit Facility or in the Financing Documents, from and after the Effective Date, (i) pursuant

to sections 363, 1123, and 1141(c) of the Bankruptcy Code, the Plan Contribution Assets to be transferred to the JPMC Entities and the FDIC Receiver, respectively, pursuant to the Global Settlement Agreement shall be transferred to such Entities, free and clear of all Claims, liens, encumbrances, charges, and other interests of any Entity, including, but not limited to, creditors and equity security holders of the Debtors, except for any claim that is an Allowed JPMC Assumed Liability Claim, (ii) the Liquidating Trust Assets shall be transferred to the Liquidating Trust, free and clear of all Claims, liens, encumbrances, charges, and other interests of creditors and equity security holders of the Debtors, and (iii) the Reorganized Debtors shall be vested with all property of the estates not otherwise transferred pursuant to the terms of the Plan and the Global Settlement Agreement, free and clear of all Claims, liens, encumbrances, charges and other interests of creditors and equity security holders of the Debtors. Each of the transfers of property of the Debtors, their estates, the Reorganized Debtors, or the Liquidating Trust, as the case may be, pursuant to the Plan (a) are or shall be deemed to be legal, valid and effective transfers of property, (b) shall not constitute, or be construed to be, avoidable transfers pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (c) shall not subject the Debtors, the Reorganized Debtors, the Liquidating Trustee, or the Liquidating Trust, as the case may be, to any liability by reason of such transfer pursuant to the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, any law affecting successor or transferee liability. From and after the Effective Date, the Reorganized Debtors may operate each of their businesses and use, acquire, or dispose of assets free of any restriction imposed by the Bankruptcy Code, the Court, or the United States Trustee.

   17. <u>Exhibit "U" Contracts</u>. All right, title and interest in the contracts listed on Exhibit "U" to the Global Settlement Agreement and all of the assets acquired thereunder are

deemed to have been the assets of WMB and sold to the Acquisition JPMC Entities pursuant to

the Purchase and Assumption Agreement and, effective as of the Effective Date, the WMI

Entities shall be deemed to have waived any and all claims and rights to such contracts and all of

the assets acquired thereunder.

18.    <u>Intellectual Property</u>.  All of the WMI Entities' right, title and interest in

and to the intellectual property listed on Exhibit "W" to the Global Settlement Agreement shall

be deemed to have been sold, transferred and assigned by the WMI Entities to JPMC or its

designee on the Effective Date, free and clear of any liens, Claims, interests and encumbrances

of any Person, other than the liens, Claims, interests and encumbrances, if any, of JPMC.  All

right, title and interest in and to the intellectual property listed on Exhibit "X" to the Global

Settlement Agreement was sold to the Acquisition JPMC Entities pursuant to the Purchase and

Assumption Agreement.  All right, title and interest in and to the intellectual property listed on

Exhibit "Y" to the Global Settlement Agreement was and remains assets of the WMI Entities.

All of the WMI Entities' right, title and interest, if any, in and to trademarks, patents, domain

names and copyrighted materials (whether or not the subject of registration) that were used by

WMB by license or otherwise, or were available for WMB's use, prior to the Petition Date, but

are not listed on Exhibit "W" or "Y" to the Global Settlement Agreement shall be deemed to

have been sold, transferred, and assigned by the WMI Entities to JPMC or its designee on the

Effective Date.

19.    <u>Issuance of Liquidating Trust Interests, Runoff Notes, and Reorganized</u>
<u>Common Stock</u>.  The Debtors, the Reorganized Debtors and the Liquidating Trustee, as

applicable, are authorized, without the need for any further corporate action and without any

further action by holders of Claims or Equity Interests, to execute the Liquidating Trust

Agreement and to take all other necessary steps to establish the Liquidating Trust and the Liquidating Trust Interests therein for the benefit of the Liquidating Trust Beneficiaries. In addition, Reorganized WMI is authorized, without the need for any further corporate action and without any further action by holders of Claims or Equity Interests, to issue the Runoff Notes and Reorganized Common Stock and such notes and stock shall be, upon execution and delivery, legal, valid, and binding obligations, enforceable against Reorganized WMI in accordance with their terms.

20.   Compliance with Section 1123(a)(6) of the Bankruptcy Code. The Reorganized Debtors Certificates of Incorporation and the Reorganized Debtors By-laws (together, the "Organizational Documents"), and the terms governing the issuance of the stock of Reorganized WMI, comply in all respects with section 1123(a)(6) of the Bankruptcy Code, and are hereby approved. The adoption and filing of the Organizational Documents are hereby authorized, ratified, and approved. The Debtors have complied in all respects, to the extent necessary, with section 1123(a)(6) of the Bankruptcy Code.

21.   Boards of Directors of Reorganized Debtors. As of the Effective Date, the board of directors of each of the Debtors, as constituted immediately prior to the Effective Date, are hereby removed and Michael Willingham, Mark Holliday, Diane Glossman, Timothy Graham, and Gene Davis are hereby appointed as directors of the Reorganized Debtors, to serve until their resignation or removal pursuant to the terms and provisions of the Organizational Documents; provided, however, that the first annual election of the boards of directors shall take place no later than fifteen (15) months after the Effective Date. At such time as the Equity Committee has designated its two (2) remaining selections for the boards of directors of the Reorganized Debtors, a notice thereof shall be filed with this Court. In the event that, during the

period from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the boards of directors of the Reorganized Debtors, the Equity Committee and the lenders party to the Credit Facility, as the case may be, shall choose a respective substitute and the Debtors shall file a notice thereof with the Bankruptcy Court, and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with Section 40.4 of the Plan, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing.

22. <u>Exemption from Securities Law</u>. The issuance of Runoff Notes, Reorganized Common Stock, and the Liquidating Trust Interests, and any subsequent sale, resale, transfer, or other distribution of any such securities shall be exempt from any federal or state securities laws registration requirements, including section 5 of the Securities Act, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

23. <u>Cancellation of Existing Securities and Agreements</u>. Pursuant to Section 32.4 of the Plan, and except as otherwise provided in the Plan, any document, agreement, or instrument evidencing any Claim or Equity Interest shall be deemed automatically cancelled and terminated on the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and any and all obligations or liabilities of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests shall be discharged; <u>provided</u>, <u>however</u>, that the foregoing cancellation of securities, documents, agreements or instruments shall not apply to (a) the securities related to the WMB Senior Notes or the WMB Subordinated Notes and (b) any security, document, agreement or instrument related to a Disputed Claim or Disputed Equity Interest until a Final Order resolving any such Disputed Claim or Disputed Equity Interest, as applicable, is entered; and, <u>provided</u>, <u>further</u>, that,

during the pendency of any such dispute, and except as provided in the Plan with respect to

Postpetition Interest Claims, the Debtors shall not accrue or incur any additional liability or

obligation with respect thereto; and, underlined provided, further, that the Indentures and Guarantee

Agreements shall continue in effect for the limited purposes of (i) allowing the Trustees to make

distributions pursuant to the Plan and to perform such other necessary functions with respect

thereto, (ii) permitting the Trustees to maintain and assert any right or Lien for reasonable fees,

costs, expenses and indemnities under the Indentures and Guarantee Agreements, (iii)

effectuating the applicable subordination provisions of such documents, (iv) enabling the

beneficial holders of the securities to receive distributions and (v) enabling the Trustees to make

applications in accordance with Section 31.12 of the Plan; and, provided, further, that, except as

otherwise provided in the Plan, nothing in the Plan shall impair, affect, or adversely affect the

related transactions and the rights of the parties thereto.  Notwithstanding any of the foregoing,

nothing contained in the Plan shall be deemed to impair, waive or extinguish any rights of the

Trustees with respect to any rights contained in the respective Indentures or Guarantee

Agreements; provided, however, that, upon payment in full of the respective Trustee Claims and

Trustee Distribution Expenses in accordance with the Plan, the rights of the Trustees to seek

payment from or assert claims against the Debtors for amounts owed under the respective

Indentures or Guarantee Agreements shall be discharged as provided in the Plan.

    24.    Surrender of Instruments.  Except to the extent evidenced by electronic

entry, as a condition of receiving any distribution pursuant to the Plan, each holder of a

certificated instrument (other than with respect to WMI Preferred Equity Interests or WMI

Common Equity Interests) or note must surrender such instrument or note to the appropriate

Trustee, agent, or the Disbursing Agent or its designee.  Any holder of such instrument or note

that fails to (i) surrender such instrument or note or (ii) execute and deliver an affidavit of loss

and/or indemnity or similar affidavit reasonably satisfactory to the appropriate Trustee, agent, or

the Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to

have forfeited all rights, interests and Claims and may not participate in any distribution pursuant

to the Plan. Any distribution so forfeited shall become the property of the Disbursing Agent for

distribution to holders of Allowed Claims and Equity Interests in accordance with the terms and

provisions of the Plan.

     25.    <u>Liquidating Trust</u>. On or before the Effective Date, the Liquidating Trust

Agreement shall be executed by the Debtors or the Reorganized Debtors, as applicable, and the

Liquidating Trustee. In addition, the parties shall, without any additional or further Court

authority, take all other steps necessary to establish the Liquidating Trust and the Liquidating

Trust Interests therein. In the event of any conflict between the terms of the Plan and the terms

of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern.

The Liquidating Trust Agreement may provide powers, duties and authorities in addition to those

explicitly stated in the Plan, but only to the extent that such powers, duties and authorities do not

affect the status of the Liquidating Trust as a liquidating trust for United States federal income

tax purposes. The Liquidating Trust Assets shall be transferred to the Liquidating Trust in

accordance with the provisions of the Plan, the Liquidating Trust Agreement, and this Order.

Pursuant to the Liquidating Trust Agreement, William C. Kosturos is hereby appointed as

"Managing Trustee" and CSC Trust Company of Delaware is hereby appointed as "Resident

Trustee" of the Liquidating Trust.

     26.    <u>Assumption or Rejection of Contracts and Leases</u>. Pursuant to Section

34.1 of the Plan, except as otherwise provided herein, or in any contract, instrument, release, or

other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected each prepetition executory contract and unexpired lease to which they are a party, pursuant to section 365 of the Bankruptcy Code, unless such contract or lease (i) was assumed, assumed and assigned, or rejected pursuant to an order of the Court entered prior to the Effective Date, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties, (iii) is the subject of a motion to assume or assume and assign filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be assumed or assumed and assigned on the Schedule to the Plan Supplement, including, without limitation, any executory contract or unexpired lease sold, accepted, or transferred to one of the JPMC Entities pursuant to the terms of the Global Settlement Agreement. This Order shall constitute an order of the Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

27.    <u>Objection to Cure Amounts; Rejection Damage Claims</u>. Any dispute regarding (i) the amount of any cure payment, (ii) the ability to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (iii) any other matter pertaining to assumption had to have been filed and served within twenty (20) days of the date of service of the Cure Notice. No party filed any such objection. If the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors and the Liquidating Trust, unless a proof of Claim is

filed with the Court and served upon attorneys for the Debtors or the Liquidating Trustee, as the case may be, on or before thirty (30) days after the latest to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Court authorizing rejection of such executory contract or unexpired lease.

28.    Payment of Cure Amounts.  Any monetary amount required as a cure payment with respect to each prepetition executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases and the Debtors, otherwise may agree.

29.    Non-Release of Certain Obligations.  Notwithstanding anything contained in the Global Settlement Agreement or the Plan to the contrary, nothing is intended to release, nor shall it have the effect of releasing, (a) the WMI Releasees (as defined in the Global Settlement Agreement), the JPMC Releasees (as defined in the Global Settlement Agreement), or the FDIC Parties from the performance of their obligations in accordance with the Global Settlement Agreement and the agreements set forth on Schedules 3.1(b) and 3.2 to the Global Settlement Agreement and (b) any Releasee (as defined in the Global Settlement Agreement) or any Person, including, without limitation, the United States of America, from any claims and causes of action asserted or that could be asserted in either the American Savings Litigation or the Anchor Litigation, nor is it intended to assign, nor shall it have the effect of assigning, any claims or causes of action asserted or that could be asserted in either the American Savings Litigation or the Anchor Litigation, but only to provide for the disposition of the proceeds, if any, arising from such litigation.  In addition, as set forth in and consistent with Section 3.8 of the Global Settlement Agreement, nothing in the Global Settlement Agreement, the Plan, or this

Order shall waive, release, acquit or discharge, nor shall anything in the Global Settlement Agreement, the Plan, or this Order be construed to waive, release, acquit or discharge the rights and obligations of JPMC and the FDIC Parties pursuant to the Purchase and Assumption Agreement, including, without limitation, any right to assert that liabilities remain with the FDIC Parties or seek indemnification in accordance with the provisions of Section 12.1 of the Purchase and Assumption Agreement or dispute the assertion of liabilities or the entitlement to indemnification; provided, however, that the Global Settlement Agreement shall affect and be binding upon JPMC and the FDIC Parties to the extent it resolves any and all claims among JPMC and the FDIC Parties to the assets and consideration paid, sold, assigned and transferred to the JPMC Entities and the FDIC Parties pursuant to the Global Settlement Agreement and the Purchase and Assumption Agreement.

30.    Setoff.  Except as otherwise provided in the Plan, the Disbursing Agent may, pursuant to applicable bankruptcy and nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Allowed Claim), the Claims, rights, and Causes of Action of any nature the Debtors, the Reorganized Debtors, or the Liquidating Trust may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Reorganized Debtors, or Liquidating Trust of any such Claims, rights, and Causes of Action.

31.    Delivery of Distributions.  Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in Section 31.5 of the Plan and herein, distributions and deliveries to holders of Allowed Claims or Equity Interests shall be made at the address of

each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim or Equity Interests filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that initial distributions of Creditor Cash by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims as applicable, shall be made to the appropriate Trustee (or such Trustee's designee) under the respective governing documents for such obligations. Each such Trustee (or such Trustee's designee) shall, in turn, in accordance with the Plan, distribute and deliver Creditor Cash, as applicable, to those holders in whose name Senior Notes, Senior Subordinated Notes, CCB-1 Common Securities, CCB-1 Preferred Securities, CCB-2 Common Securities, CCB-2 Preferred Securities, PIERS Common Securities (subject to Section 37 below), and PIERS Preferred Securities representing Allowed Claims are registered, in the applicable Trustees' books and records, on the Distribution Record Date, in the manner provided for in the applicable Indenture and other governing documents. The Trustees may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to contra-CUSIP positions and escrow positions set up by the Debtors or their agents with the DTC, and the Trustees shall close and terminate the original CUSIPS after making initial distributions of Creditor Cash and shall have no further distribution obligations thereafter. The Trustees shall not be required to give any bond or surety or other security for the performance of their duties, unless otherwise ordered by the Court. The Trustees shall only be required to make the distributions and deliveries described in this decretal paragraph and shall be only required to make such distributions and deliveries in accordance with the terms of this Order and the Plan,

and shall have no liability for actions taken in accordance with this Order, the Plan or in reliance upon information provided to the Trustees in accordance with this Order, the Plan or in connection with distributions to be made hereunder and thereunder, except for liabilities resulting from their own gross negligence or willful misconduct.  Initial distributions of Runoff Notes, Reorganized Common Stock and Liquidating Trust Interests by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed General Unsecured Claims, Allowed Late-Filed Claims, Allowed PIERS Claims, Allowed WMB Senior Notes Claims, Accepting Non-Filing WMB Senior Note Holders, Allowed Subordinated Claims, Allowed Preferred Equity Interests, Allowed Dime Warrants and Allowed Common Equity Interests, as and to the extent applicable, will be made by the Disbursing Agent directly to such holders, upon consent of the applicable Trustee, which consent shall not be unreasonably withheld.  Subsequent distributions to such holders, as and to the extent applicable, that have identified themselves to the Liquidating Trustee, to the extent the Liquidating Trustee deems appropriate, will be the responsibility of the Liquidating Trustee as Disbursing Agent. Notwithstanding the foregoing, all distributions are subject to the Lien and priority rights of the Trustees.  The Debtors, their agents and servicers, the Disbursing Agent and the Trustees shall have no obligation to recognize any transfer of Senior Notes Claims, Senior Notes, Senior Subordinated Notes Claims, Senior Subordinated Notes, CCB-1 Guarantees Claims, CCB-1 Guarantees, CCB-1 Common Securities, CCB-1 Preferred Securities, CCB-2 Guarantees Claims, CCB-2 Guarantees, CCB-2 Common Securities, CCB-2 Preferred Securities, General Unsecured Claims, Late-Filed Claims PIERS Claims, PIERS Common Securities, PIERS Preferred Securities, Preferred Equity Interests, Dime Warrants and Common Equity Interests occurring

after the Distribution Record Date, or any transfer of WMB Senior Notes or WMB Senior Notes

Claims occurring after October 25, 2010; provided, however, that the Liquidating Trustee shall

recognize transfers of Liquidating Trust Interests in accordance with the Plan and the Liquidating

Trust Agreement, which provide that a Liquidating Trust Interest is not transferable or assignable

by a Liquidating Trust Beneficiary except by will, intestate succession or operation of law.

       32.    <u>Distributions to Holders of Dime Warrants</u>.  The Distributions on account

of the Allowed LTW Claims (as defined in that certain *Stipulation and Agreement Between the*

*Debtors and Class Representatives of the LTW Holders Resolving Adversary Proceeding and the*

*LTW Proofs of Claim*, dated January 10, 2012 (the "<u>LTW Stipulation</u>")) shall be made in

accordance with the LTW Stipulation.  After reimbursement of fees and expenses allowed by the

Court, the balance of the distribution on account of the Allowed LTW Claims (as defined in the

LTW Stipulation) shall be made on a pro rata basis to those holders of Dime Warrants who

execute and deliver the release required pursuant to in Section 41.6 of the Plan on or prior to

February 29, 2012.

       33.    <u>Disbursing Agent</u>.  Pursuant to Section 1.89 of the Plan, the Disbursing

Agent shall be (a) the Reorganized Debtors or the Reorganized Debtors' designee, with respect

to the initial distribution of (i) Cash pursuant to Article III of the Plan to holders of Allowed

Administrative Expense Claims and, to the extent applicable, Allowed Priority Tax Claims as of

the Effective Date; (ii) Cash to holders of Allowed Priority Non-Tax Claims as of the Effective

Date; (iii) Cash to holders of Allowed Convenience Claims, Allowed WMI Claims, Allowed

Trustee Claims and the fees and expenses owed to certain Creditors' professionals pursuant to

Section 41.18 of the Plan (to the extent approved by the Court as reasonable), in each case as of

the Effective Date; (iv) Creditor Cash pursuant to Section 31.1 of the Plan; and (v) Runoff Notes,

Liquidating Trust Interests and Reorganized Common Stock to or for the benefit of holders of Allowed Claims and Equity Interests, as applicable, the Reorganized Debtors or the Reorganized Debtors' designee, and (b) the Liquidating Trustee or any Entity in its capacity as a disbursing agent, with respect to all other distributions. The Disbursing Agent also shall, at the election of JPMC, make the distribution to each Releasing REIT Trust Holder set forth in Article XXIII of the Plan Cash or stock transferred by JPMC to the Disbursing Agent for that purpose. In its role as Disbursing Agent, the Reorganized Debtors shall hold Cash, Creditor Cash, Runoff Notes, Reorganized Common Stock, and Liquidating Trust Interests as agent only, and shall not have any ownership interest in such cash, stock or interests.

34.    "Pro Rata Share" for Holders of Claims Subordinated to the Level of Equity Interests.  For purposes of calculating Pro Rata Share of distributions for holders of Claims, the share count for such holders shall be determined by dividing the amount of an Allowed Claim by the per share price of WMI common stock as of the close of business on the day immediately preceding the Petition Date.

35.    Tax Withholdings by Liquidating Trustee.  The Liquidating Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests. All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion

the Liquidating Trustee deems necessary to effectuate the Plan, this Order, and the Liquidating

Trust Agreement. In order to receive distributions under the Plan, all holders of Liquidating

Trust Interests (including, without limitation, (i) holders of Allowed Senior Notes Claims,

Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-

2 Guarantees Claims, Allowed General Unsecured Claims, Allowed Late-Filed Claims, Allowed

PIERS Claims, Allowed WMB Senior Notes Claims, Allowed Preferred Equity Interests,

Allowed Common Equity Interests and holders of Dime Warrants and (ii) Accepting Non-Filing

WMB Senior Note Holders, who, in each case, deliver a release in accordance with the

provisions of Section 41.6 of the Plan shall be required to identify themselves to the Liquidating

Trustee and provide tax information and the specifics of their holdings, to the extent the

Liquidating Trustee deems appropriate in the manner and in accordance with the procedures

from time to time established by the Liquidating Trustee for these purposes. This identification

requirement generally applies to all holders, including those who hold their securities in street

name. The Liquidating Trustee may refuse to make a distribution to any holder of a Liquidating

Trust Interest that fails to furnish such information in a timely fashion, and until such

information is delivered, and may treat such holder's Liquidating Trust Interests as disputed;

provided, however, that, upon the delivery of such information by a holder of a Liquidating Trust

Interest, the Liquidating Trustee shall make such distribution to which the holder of the

Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's

delay in providing tax information; and, provided, further, that, if such information is not

furnished to the Liquidating Trustee within six (6) months of the original request to furnish such

information, no further distributions shall be made to the holder of such Liquidating Trust

Interest; and, provided, further that, if the Liquidating Trustee fails to withhold in respect of

amounts received or distributable with respect to any such holder and the Liquidating Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee for such liability (to the extent such amounts were actually distributed to such holder).

36.     Distributions to Holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders.  Pursuant to Sections 21.1(a) and (b) of the Plan, amounts distributed to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders shall not be credited against or otherwise reduce such holders' claims against the Receivership solely for purposes of determining the holder's relative participation in distributions (unless and until the holder has recovered, in the aggregate, through distributions pursuant to the Plan and from the Receivership, the full amount of its claim); provided, however, that no holder of a WMB Senior Note shall be entitled to receive, in the aggregate from distributions from the Debtors and the Receivership, more than the amount owed with respect to such WMB Senior Note.  Pursuant to the Plan and the Plan Support Agreement, payments made by the Debtors pursuant to Sections 21.1(a) and (b) of the Plan shall be treated as payments made on account of the WMB Senior Notes held by holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders, and shall reduce the principal amount of such notes (and thus the maximum recovery permitted against the Receivership).

37.     Distributions on Account of PIERS Common Securities.  Pursuant to Section 20.1 of the Plan, the beneficial holder of the PIERS Common Securities shall receive its Pro Rata Share of Creditor Cash and Liquidating Trust Interests; provided, however, that any distribution on account of the PIERS Common Securities of Creditor Cash and Cash on account of Liquidating Trust Interests shall be redistributed to Entities who hold PIERS Preferred

Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities'

Allowed PIERS Claims and Postpetition Interest Claims have been satisfied in accordance with

the terms and provisions of the PIERS Trust Agreement, and the beneficial holder of the PIERS

Common Securities shall be deemed to have waived its right to receive any distribution in excess

of such amount.

38.    <u>Distributions on Account of CCB-1 Common Securities</u>.  Pursuant to

Section 18.1 of the Plan, the beneficial holder of the CCB-1 Common Securities shall receive its

Pro Rata Share of Creditor Cash and Liquidating Trust Interests; <u>provided</u>, <u>however</u>, that any

distribution on account of the CCB-1 Common Securities of Creditor Cash and Cash on account

of Liquidating Trust Interests shall be redistributed to Entities who hold CCB-1 Preferred

Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities'

Allowed CCB-1 Guarantees Claims and Postpetition Interest Claims have been satisfied in

accordance with the terms and provisions of the CCB Trust Agreements.

39.    <u>Distributions on Account of CCB-2 Common Securities</u>.  Pursuant to

Section 19.1 of the Plan, the beneficial holder of the CCB-2 Common Securities shall receive its

Pro Rata Share of Creditor Cash and Liquidating Trust Interests; <u>provided</u>, <u>however</u>, that any

distribution on account of the CCB-2 Common Securities of Creditor Cash and Cash on account

of Liquidating Trust Interests shall be redistributed to Entities who hold CCB-2 Preferred

Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities'

Allowed CCB-2 Guarantees Claims and Postpetition Interest Claims have been satisfied in

accordance with the terms and provisions of the CCB Trust Agreements.

40.    <u>Disputed Claims Holdback</u>.  The holdback for Disputed Claims provided

for in Section 26.3 of the Plan and the terms thereof are hereby approved in their entirety;

provided, however, that the Debtors and the Liquidating Trustee are not obligated to hold back or reserve any Creditor Cash, Cash, Liquidating Trust Interests, Runoff Notes, Reorganized Common Stock, or other currency on account of Claims that JPMC is obligated to pay pursuant to the Global Settlement Agreement, including, without limitation, (a) Claims in Classes 4 through 10, which will be paid or funded by JPMC (to the extent provided in the Plan), or (b) Claims in Class 11, which will be paid from the Vendor Escrow; and, provided, further, that the Debtors and the Liquidating Trustee are not obligated to hold back or reserve any Creditor Cash, Cash, Liquidating Trust Interests, Runoff Notes, Reorganized Common Stock or other currency on account of any tax claim for which monies have been set aside in the Refund Escrow Account (as defined in the Global Settlement Agreement) for potential payment.

41.    <u>Disputed Equity Escrow</u>.  From and after the Effective Date, until such time, or from time to time, as each Disputed Equity Interest has been compromised and settled or allowed or disallowed by Final Order of the Bankruptcy Court, there shall be held in the Disputed Equity Escrow by the Liquidating Trustee, as escrow agent, for the benefit of each holder of a Disputed Equity Interest, Reorganized Common Stock and any dividends, gains or income attributable in respect of such Reorganized Common Stock, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Equity Interest if it were an Allowed Equity Interest.  To the extent that the Liquidating Trustee retains any such Reorganized Common Stock, until such time as such stock is distributed, the Liquidating Trustee shall exercise voting or consent rights with respect to such stock; provided, however, that the Liquidating Trustee shall be obligated to vote or consent, as the case may be, as to such stock in the same proportion as all other holders of issued and distributed Reorganized Common Stock have voted or consented, in each case on an issue-by-issue basis.  Apart from the

Liquidating Trustee serving as escrow agent, the Disputed Equity Escrow shall be separate and distinct from the Liquidating Trust (and the Liquidating Trust Claims Reserve), and the assets therein shall not comprise part of the Liquidating Trust Assets. At such time as any other Disputed Equity Interest becomes, in whole or in part, an Allowed Equity Interest, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any dividends, gains or income attributable thereto. To the extent a Disputed Equity Interest is disallowed, in whole or in part, the Liquidating Trustee, as escrow agent, shall distribute to the holders of Common Equity Interests entitled to receive a distribution in accordance with the provisions of Sections 24.1 and 25.1 of the Plan, on a pro rata basis, the shares of Reorganized Common Stock, together with any dividends, gains or income attributable thereto, allocable to such Disputed Equity Interest. to the extent of such disallowance.

42. <u>Reserve Pending Delivery of Third Party Release by Holders of Claims</u>.
Notwithstanding anything contained in the Plan to the contrary, in the event that a holder of a Claim entitled to a distribution thereunder failed to execute and deliver prior to the Ballot Date the third party release required in accordance with the provisions of Section 41.6 of the Plan (other than (a) holders that affirmatively elect to opt out of granting the releases provided in Section 41.6 and (b) of Claims in Class 17A and Non-Filing WMB Senior Note Holders), (i) from and after the Effective Date, the Disbursing Agent or the Liquidating Trustee, as the case may be, shall reserve amounts of Creditor Cash and Liquidating Trust Interests (but not Runoff Notes), as the case may be, otherwise to be distributed to such holder,[11] (ii) provided that a third

---

[11] With respect to Claims in Classes 2, 3, and 16 relating to debt securities, holders of such securities as of the cancellation date of such securities (*i.e.*: the Effective Date).

party release is not executed and delivered by such holder to the Liquidating Trustee prior to the

three (3), six (6) and nine (9) month anniversary of the Effective Date, on or prior to the fifth

(5th) Business Day following any such date, the Liquidating Trustee shall serve a notice

(together with a form of release) upon such holder, either directly or indirectly through such

holder's nominee, informing such holder of such reserved distribution and the requirement of

such holder to execute and deliver such third party release to the Liquidating Trustee prior to

delivery of such reserved distribution, and (iii) in the event that, on or prior to the one (1) year

anniversary of the Effective Date, such holder fails to execute and deliver such third party release

to the Liquidating Trustee, then, the Liquidating Trustee shall be deemed authorized to

permanently remove such holder and its corresponding Claim from the Liquidating Trustee's

books and records and any consideration held for distribution on account of such Allowed Claim

shall revert to the Liquidating Trustee for redistribution to holders of Liquidating Trust Interests

in accordance with the terms and provisions of the Plan and hereof.  Without in any way limiting

the foregoing, any release election, whether submitted in accordance with this Section 31.6(c) of

the Plan or otherwise, submitted during the period between the Ballot Date and the Effective

Date shall not be recognized and shall be deemed null and void.  In the event that a holder of a

Claim seeks to receive and execute a release form in accordance with this provision at any time

from and after the Effective Date, but other than pursuant to the periodic notices to be distributed

as set forth above, then such holder may, following the Effective Date, submit a request, in

writing, to the Liquidating Trustee to receive a release form, and the appropriate trustee will send

such form to such requesting holder on or prior to the fifth (5th) Business Day following the date

such trustee receives such request; provided, however, that under no circumstances shall requests

for such release form from holders of Claims in Class 17A and Non-Filing WMB Senior Note Holders be honored by the Liquidating Trustee.

43.    <u>Deadline for Submission of Third Party Releases by Holders of Equity Interests and Dime Warrants</u>.  Holders of Preferred Equity Interests and Common Equity Interests that do not submit elections with respect to the releases set forth in Section 41.6 of the Plan on or prior to March 7, 2012 will not receive a distribution pursuant to the Plan.  Holders of Dime Warrants that do not submit elections with respect to the releases set forth in Section 41.6 of the Plan on or prior to February 29, 2012 will not receive a distribution pursuant to the Plan.

44.    <u>Claims of Subordination</u>.  Except as specifically provided in the Plan, to the fullest extent permitted by applicable law, on the latest to occur of (i) the Effective Date, (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Cases, and (iii) the final distribution made to holders of Allowed Claims in accordance with Article XXXI of the Plan, all Claims and Equity Interests, and all rights and claims between or among holders of Claims and Equity Interests relating in any manner whatsoever to Claims or Equity Interests, based upon any contractual, equitable or legal subordination and/or subrogation rights, will be terminated and discharged in the manner provided in the Plan, and all such Claims, Equity Interests and rights so based, and all such contractual, equitable and legal subordination and/or subrogation rights to which any Entity may be entitled will be irrevocably waived.  To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under this Plan will not be subject to levy, garnishment, attachment or like legal process by any holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination and/or subrogation rights, so that, notwithstanding any such contractual,

equitable or legal subordination and/or subrogation rights, each holder of a Claim or Equity Interest shall have and receive the benefit of the rights and distributions set forth in this Plan.

45.    No Amendments to Proofs of Claim.  As of the commencement of the Confirmation Hearing, a proof of Claim may not be filed or amended without the authority of the Court.  Notwithstanding that the Court may permit the filing or amendment of such a proof of Claim, the Debtors are not required to reserve Liquidating Trust Assets to pay or otherwise satisfy any such Claims.

46.    Conditions to Effective Date.  The Plan shall not become effective unless and until the conditions set forth in Section 37.1 of the Plan have been satisfied or waived pursuant to Section 37.2 of the Plan.  For the avoidance of doubt, no waiver of the conditions precedent to the Effective Date shall have occurred without the consent of the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate, and AAOC.

47.    Administrative Claim Bar Date.  The last day to file proof of Administrative Expense Claims shall be ninety (90) days after the Effective Date, after which date, any proof of Administrative Expense Claim not filed with this Court shall be deemed forever barred and the Debtors, the Reorganized Debtors, and the Liquidating Trust shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim shall have been incurred (i) in accordance with an order of this Court or (ii) with the consent of the Debtors and in the ordinary course of the Debtors' operations.

48.    Professional Compensation and Reimbursement Claims.  Except as provided in Section 41.18 of the Plan, all Entities awarded compensation or reimbursement of

expenses by the Bankruptcy Court in accordance with sections 328, 330, or 331 of the

Bankruptcy Code or entitled to priorities established pursuant to sections 503(b)(2), 503(b)(3),

503(b)(4), or 503(b)(5) of the Bankruptcy Code shall be paid in full, in Cash, in the amounts

allowed by the Bankruptcy Court (i) on or as soon as reasonably practicable following the later

to occur of (a) the Effective Date and (b) the date upon which the Bankruptcy Court order

allowing such Claim becomes a Final Order or (ii) upon such other terms no more favorable to

the claimant than as may be mutually agreed upon between such claimant and the Disbursing

Agent; provided, however, that, except as provided herein, each professional must file its

application for final allowance of compensation for professional services rendered and

reimbursement of expenses on or prior to the Administrative Claim Bar Date.  Except as

otherwise ordered by the Court, the Disbursing Agent is authorized to pay compensation for

professional services rendered and reimbursement of expenses incurred after the Effective Date

in the ordinary course and without the need for Court approval.

49.     <u>Objections to Final Fee Applications</u>.  All objections to any Final Fee

Application shall be filed with the Court, together with proof of service thereof, and served upon

the applicant, the Debtors, the U.S. Trustee, the Creditors' Committee, the Equity Committee,

and parties entitled to receive notice in these Chapter 11 Cases pursuant to Bankruptcy Rule

2002, so as to be received not later than 4:00 p.m., prevailing Eastern Time, on the date that is

fifteen (15) days prior to the Final Fee Hearing.

50.     <u>Assumption of Blackstone Engagement Letter by Liquidating Trustee in

Certain Circumstances</u>.  From and after the Effective Date, the Reorganized Debtors shall remain

bound by that certain engagement letter, dated April 20, 2010, by and among Blackstone

Advisory Partners L.P. ("<u>Blackstone</u>") and the Debtors (including that certain indemnification

agreement, dated April 9, 2010), as amended by that certain supplemental engagement letter,

dated November 3, 2010 (collectively, the "Engagement Letter").

      51.    Administrative Expenses.  Administrative expenses incurred by the

Debtors or the Reorganized Debtors after the Effective Date, including Claims for professionals'

fees and expenses, shall not be subject to an application and may be paid by the Debtors or the

Reorganized Debtors, as the case may be, in the ordinary course of business and without further

Court approval.

      52.    Discharge.  As of the Effective Date, the confirmation of the Plan shall

effectuate the following:

      a.    Except as expressly provided in Section 41.6 of the Plan or this

Order, all distributions and rights afforded under the Plan and the treatment of Claims and

Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in

complete satisfaction, settlement, discharge and release of, all Claims and any other

obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities

of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity

Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective

assets, property and estates, or interests of any nature whatsoever, including any interest

accrued on such Claims from and after the Petition Date, and regardless of whether any

property will have been distributed or retained pursuant to the Plan on account of such

Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of

action or liabilities, or Equity Interests or other rights of a holder of an equity security or

other ownership interest.  Upon the Effective Date, the Debtors and the Reorganized Debtors

shall (i) be deemed discharged under section 1141(d)(1)(A) of the Bankruptcy Code and

released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests or other rights of a holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan, and (ii) terminate and cancel all rights of any equity security holder in any of the Debtors and all Equity Interests.

b.    Except as provided in Sections 41.6 and 41.12 of the Plan or in this Order, all Entities shall be precluded from asserting against any and each of the Debtors and the Reorganized Debtors, and any and each of their respective assets, property and estates, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Equity Interests or other rights of a holder of an equity security or other ownership interest. In accordance with the foregoing, except as expressly provided in the Plan or this Order, this Order shall constitute a judicial determination, as of the Effective

Date, of the discharge and release of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests, or other rights of a holder of an equity interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against any of the Debtors or the Reorganized Debtors, and their respective assets, property and estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity Interest in any of the Debtors.  As of the Effective Date, and in consideration for the value provided under the Global Settlement Agreement to effectuate the Plan, each holder of a Claim or Equity Interest in any Class under the Plan shall be and hereby is deemed to release and forever waive and discharge as against each and any of the Debtors and the Reorganized Debtors, and their respective assets, property and estates, all such Claims and Equity Interests.

       c.      Except as expressly provided in Sections 41.6 and 41.12 of the Plan or this Order, in furtherance of the foregoing and for good and valuable consideration, and except for the JPMC Assumed Liabilities, Allowed WMB Vendor Claims, and Allowed WMI Vendor Claims, to the extent provided in the Global Settlement Agreement, none of the JPMC Entities or any of their Related Persons shall have any liability for, and the Debtors, on behalf of themselves, their respective estates and their present Affiliates (other than WMB and its subsidiaries), hereby release the JPMC Entities and each of their Related Persons from liability for, any and all Claims that (i) are or were property of the Debtors, their respective estates, or their present Affiliates (other than WMB and its subsidiaries), and (ii) were or could have been brought in any of the Related Actions.

53.    <u>Releases by the Debtors, the Creditors' Committee and the Equity</u>
<u>Committee</u>.

a.    <u>Released Parties</u>.  Except as otherwise expressly provided in the Plan, this Order, or the Global Settlement Agreement, on the Effective Date, for good and valuable consideration, each of the Debtors and the Reorganized Debtors on its own behalf and as representative of its respective estate, the Disbursing Agent and each of the Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, the Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to the Debtors taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees; <u>provided, however,</u> that the foregoing release shall not extend to acts of gross negligence or willful misconduct (other than with respect to the JPMC Entities and their respective Related Persons).

b.    <u>Release of AAOC, Holders of Allowed Senior Notes Claims,</u>
<u>Holders of Allowed Senior Subordinated Notes Claims, Holders of CCB-1 Guarantees</u>

                                87

Claims, Holders of CCB-2 Guarantees Claims and Holders of Allowed PIERS Claims.

On the Effective Date, for good and valuable consideration, each of the Debtors and the

Reorganized Debtors, on its own behalf and as representative of its respective estate, the

Disbursing Agent and each of the Debtors' Related Persons, the Creditors' Committee

and the Equity Committee, without giving any legitimacy or merit to any of the

allegations raised or asserted with respect to AAOC, holders of Allowed Senior Notes

Claims, Allowed Senior Subordinated Notes Claims and holders of Allowed PIERS

Claims during the Chapter 11 Cases, shall be deemed to have and hereby does

irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and

discharge (1) the AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior

Subordinated Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB

Releasees, and each of their respective officers, directors, agents, employees and, solely

in their capacity as counsel with respect to the Debtors' Chapter 11 Cases, attorneys from

any and all Estate Claims that the Debtors, the Creditors' Committee and the Equity

Committee, have or may have or claim to have, now or in the future, against (1) the

AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated

Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB Releasees, and

each of their respective officers, directors, agents, employees and, solely in their capacity

as counsel with respect to the Debtors' Chapter 11 Cases, attorneys.

54.     Releases by Holders of Claims.

a.     Global Third Party Releases.  On the Effective Date, for good and

valuable consideration, and to the fullest extent permissible under applicable law, each

Entity (Creditor or holder of an Equity Interest) that (i) has held, currently holds or may

hold a Released Claim or any Released Third Party Causes of Action, (ii) is entitled to receive, directly or indirectly, a distribution or satisfaction of its Claim or Equity Interest pursuant to the Plan, and (iii) elects, by not checking or checking the appropriate box on its Ballot or election form, as the case may be, to grant the releases set forth in Section 41.6 of the Plan, on their own behalf and on behalf of anyone claiming through them, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge (1) each and all of the Released Parties from any and all Released Claims and/or any claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged in the Actions or in the Texas Litigation, or that could have been alleged in respect of the foregoing or other similar proceeding, including, without limitation, any such claim demand, right, liability, or cause of action for indemnification, contribution or any other basis in law or equity for damages, costs or fees incurred by the releasors therein arising directly or indirectly from or otherwise relating thereto and (2) each of (a) the AAOC Releasees, (b) the Senior Notes Claims Releasees, (c) the Senior Subordinated Notes Claims Releasees, (d) the PIERS Claims Releasees and (e) the CCB Releasees from any and all Released Third Party Causes of Action; **provided, however, that each Entity that has elected not to grant the releases set forth in Section 41.6 of the Plan, including, without limitation, any Entity that fails to execute and deliver a release following notice in accordance with the provisions of Section 31.6(c) of the Plan, shall not be entitled to, and shall not receive, any payment, distribution or other satisfaction of its claim pursuant to the Plan;** and, provided, further, that, notwithstanding anything contained in Section 41.6(a) of the Plan to the contrary, the release set forth in Section 41.6(a)(1) of the Plan

shall not extend to acts of gross negligence or willful misconduct of any Released Parties

(other than with respect to the JPMC Entities and their respective Related Persons); and,

provided, further, that, notwithstanding the foregoing, solely for purposes of Section

41.6(a) of the Plan, "Released Parties" shall not include Related Persons other than

(i) Related Persons of the JPMC Entities and (ii) Related Persons of the FDIC Receiver

and FDIC Corporate.

           b.    <u>Limited Governmental Exceptions</u>.  Nothing contained in the Plan

or this Order shall (1) (i) release, or is intended to release, any non-Debtor, including any

non-Debtor Entity that may be a Released Party or a Related Person, in connection with

any legal action or claim brought by the United States Securities and Exchange

Commission or (ii) prejudice the rights of any such non-Debtor Entity to defend or

otherwise contest any such legal action or claim, (2) (i) to the extent that (A) the Pension

Plans are terminated from and after the Effective Date and (B) the Pension Plans are

underfunded as of the Effective Date, release, or is intended to release, any non-Debtor,

including any non-Debtor Entity that may be a Released Party or a Related Person, from

any liability as a fiduciary of the Pension Plans, under any law, government policy or

regulatory provision, (ii) enjoin or preclude the Pension Benefit Guaranty Corporation

from enforcing such liability against such non-Debtor Entity during the applicable statute

of limitations period set forth in 29 U.S.C. § 1303 following any such termination, or

(iii) prejudice the rights of any such non-Debtor Entity to defend or otherwise contest any

such legal action or claim, and (3) (i) release the claims held by the California Franchise

Tax Board or the Oregon Department of Revenue (together, the "<u>State Taxing</u>

<u>Agencies</u>"), including rights of setoff and recoupment with respect to claims against or

among two or more non-Debtor Entities, against any non-Debtor and, notwithstanding

any other provision of the Plan or this Order, the State Taxing Agencies shall not be

enjoined from pursuing any such claims and (ii) prejudice the rights of any such non-

Debtor to defend or otherwise contest any such legal action or claim, or the rights and

obligations as between JPMC and the FDIC pursuant to the P&A Agreement with respect

to any such legal action or claim.

      c.     <u>BKK Liabilities</u>.  Nothing in the Plan or this Order is intended to,

nor shall it, release any non-Debtor or non-Debtor Entity that may be a Released Party or

a Related Person, in connection with any legal action or claim brought by CDTSC or the

BKK Group relating to the BKK Site that is the subject of the BKK Litigation; <u>provided,</u>

<u>however,</u> that nothing contained in Section 41.6(c) of the Plan is intended, nor shall it be

construed, to (1) constitute evidence of or any support for an argument that any such non-

Debtors have any such liabilities, or (2) create any liability on behalf of the Liquidating

Trust.  For the avoidance of doubt, nothing herein shall affect the releases or other terms

of the BKK Settlement Agreement, which provisions shall control over any contrary

provision in this Order, the Plan or the Global Settlement Agreement.

      d.     <u>Securities Litigations</u>.  Nothing in the Plan, this Order or the

Global Settlement Agreement with respect to the releases, exculpations, injunctions or

similar provisions is intended to, nor shall it, release, enjoin or impact in any way the

prosecution of the claims asserted, or to be asserted, against any non-Debtor or non-

Debtor Entity in the Securities Litigations, including, but not limited to, the defendants

named in the Securities Litigations (the "<u>Securities Litigations Carve-Out</u>"), nor will any

potential distribution on account of the relevant proofs of claim filed by lead plaintiffs in

the Securities Litigations and/or which have been withdrawn without prejudice (subject to all parties' rights with respect to the relevant proofs of claim in accordance with and subject to the terms of the Bankruptcy Court-approved stipulations) be forfeited by virtue of the Securities Litigations Carve-Out. Subject to further order of the Court, in accordance with the terms and provisions of Section 26.3 of the Plan, the Debtors shall treat that certain Proof of Claim filed by the Class Representatives, Policemen's Annuity and Benefit Fund of the City of Chicago, Boilermaker National Annuity Trust and Doral Bank Puerto Rico, on behalf of the class in *Boilermaker National Annuity Trust Fund, on Behalf of Itself and All Others Similarly Situated v. WAMU Mortgage Pass-Through Certificates, Series AR1, et al.*, Case No. C09-0037 (MJP) (W.D. Wash.), dated January 26, 2012 and assigned Proof of Claim number 4069 (the "MBS Plaintiffs' Claim"), as a Disputed Claim in Class 12 of the Plan and reserve distributions in connection therewith as if an Allowed Claim in the amount of Four Hundred Thirty-Five Million Dollars ($435,000,000.00); provided, however, that this reserve is without prejudice to any party's right to argue that the MBS Plaintiffs' Claim is invalid on any ground or shall be treated in a different class for distribution purposes.

        e.     Tranquility. Pending the effective date of that certain Stipulation and Agreement Between the Debtors and Tranquility Master Fund, Ltd. (A) Resolving Amended Proof of Claim Number 3925 and (B) Allowing Claims for Voting Purposes, dated February 16, 2012 [D.I. 9698], the following language, which was deleted pursuant to the Third Plan Modification, shall be deemed reinserted in Section 41.6(e) of the Plan, and is hereby approved and deemed effective:

> Nothing contained herein or in the Confirmation Order with respect to releases, exculpations, injunctions or similar provisions is intended to, nor

shall it, affect, impact, impair, modify, or limit or otherwise be used to contest the Tranquility Claim, or Tranquility's ability to receive distributions on account of the Tranquility Claim; provided, however, that the Debtors' ability to contest whether any subsequent amendments or modifications to the Tranquility Claim were properly filed and relate to the Tranquility Claim are expressly reserved.

f.    Truck and Fire.  Notwithstanding anything contained herein or in the Plan or in the Verification Form (as defined in the order approving the Supplemental Disclosure Statement [D.I. 7081]), with respect to the Claims of Truck Insurance Exchange ("Truck") and Fire Insurance Exchange ("Fire") asserted against the Debtors and the Debtors' chapter 11 estates (collectively, the "Truck/Fire Claims"), including, without limitation, those Claims included in Classes 17A and 17B of the Plan, (a) the release and injunction provisions of the Plan and this Order are intended to, and shall release only, all Claims of Truck and Fire against any Released Parties arising from or relating to the Truck/Fire Claims, other than any claims, counterclaims or defenses under or relating to any policies of insurance, and (b) the release and injunction provisions of the Plan and this Order are not intended to, and shall not release, any claims of Truck, Fire or any Affiliate of Truck or Fire against (i) a non-Debtor as an investor in securities issued by any such non-Debtor Entity, (ii) WMB, (iii) the Receivership or (iv) the FDIC Receiver solely with respect to the Receivership.

g.    Texas Litigation.  Nothing in the Plan or this Order with respect to the releases, exculpations, injunctions or similar provisions is intended to, nor shall it, release, enjoin or restrain the prosecution of direct claims, if any, asserted, or that could have been asserted, in the Texas Litigation against any non-Debtor Entity; provided, however, that the foregoing is without prejudice to the rights of any such non-Debtor Entity to contest, upon notice and a hearing, the validity, merits and ownership of or

standing to assert any such direct claims; and, <u>provided</u>, <u>further</u>, that this Court is not making, either pursuant to the Plan or this Order, a determination as to which Entity, including, without limitation, the Debtors, owns the claims asserted, or that could have been asserted, in the Texas Litigation; and, <u>provided</u>, <u>further</u>, that any and all direct claims against the Debtors and derivative claims of the Debtors, if any, that have been or could have been asserted against any Released Party in the Texas Litigation shall, upon the Effective Date, be released, discharged and enjoined.

h.    In addition to, and not in any way limiting the foregoing, each holder of an Allowed WMB Senior Notes Claim and each Accepting Non-Filing WMB Senior Notes Holder shall be deemed to have released the Debtors, the Reorganized Debtors, and each of their respective Related Persons from any and all direct and derivative claims arising from or related to such holder's WMB Senior Notes, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holder's WMB Senior Notes (including, without limitation, any Section 510(b) Subordinated WMB Notes Claims that such holder may have).

i.    <u>Waiver of Section 1542</u>:  **All persons providing releases pursuant to the provisions of Section 41.6 of the Plan are hereby deemed to have expressly and voluntarily waived Section 1542 of the California Civil Code, or any similar, comparable or equivalent provision of the statutory or non-statutory law of California or any other jurisdiction.  Section 1542 provides:**

> **A general release does not extend to claims under which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

55.    <u>Release and Exculpation Provisions</u>.  All release and exculpation provisions, including, but not limited to, those contained in Article XLIII of the Plan, are approved and shall be effective and binding on all Entities, to the extent provided herein.

56.    **Injunctions and Stays**.

a.    **Injunctions on Claims.**  Except as otherwise expressly provided in Sections 41.6 and 41.12 of the Plan, this Order or such other order of this Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or Equity Interests or other right of equity interest that is terminated or cancelled pursuant to the Plan or the Global Settlement Agreement, or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 of the Plan, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan against any of the Released Parties or any of their respective assets, property or estates, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets, property or estates on account of any Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released

Parties or any of their respective assets, property or estates on account of any Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets, property or estates, with respect to any such Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan; provided, however, that such injunction shall not preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, provided, further, that, except in connection with a properly filed proof of Claim, the foregoing proviso does not permit the United States of America, any State or any of their respective police or regulatory agencies from obtaining any monetary recovery, including fines, restitution or forfeiture, from any of the Released Parties, including, without limitation, the Debtors, the Debtors in Possession or the Reorganized Debtors, or any of their respective assets, property or estates, with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power; and, provided, further that, subject to Section 3.8 of the Global Settlement Agreement, such injunction shall not preclude the JPMC Entities, the Receivership,

the FDIC Receiver and the FDIC Corporate from pursuing any and all claims against each other or any other defenses thereto pursuant to the Purchase and Assumption Agreement. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets, property and estates.

b. **Injunction Related to Releases.** As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim, an Estate Claim, any Released Third Party Cause of Action or an Equity Interest that is released pursuant to Sections 41.5 and 41.6 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims, Estate Claims, Released Third Party Causes of Action or such Equity Interests: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Sections 41.5 and 41.6 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in

**any forum, that does not comply with or is inconsistent with the provisions of the the Plan or this Order.**

57.    <u>Exculpation</u>.  The Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity Committee, and each of their respective professionals shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Chapter 11 Cases (including any actions taken by the Creditors' Committee or the Equity Committee after the Effective Date), the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement and the Supplemental Disclosure Statement related thereto, the Global Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Global Settlement Agreement; <u>provided</u>, <u>however</u>, that the foregoing provisions, set forth in Section 41.8 of the Plan, shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Nothing in Section 41.8 of the Plan shall prejudice the right of any of the Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity

Committee, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

58.    **Bar Order.**  To the limited extent provided in Section 41.6 of the Plan and decretal paragraph 54 of this Order, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, the Debtors' Claims, the JPMC Claims, the FDIC Claim, the Purchase and Assumption Agreement (other than any rights or claims the JPMC Entities, the Receivership, the FDIC Receiver or the FDIC Corporate may have under the Purchase and Assumption Agreement), confirmation and consummation of the Plan, the negotiation and consummation of the Global Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Related Actions, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the Related Actions or any other action brought or that might be brought by, through, on

behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

59.    Deemed Consent. By submitting a Ballot or election form and receiving a distribution under or any benefit pursuant to this Plan and not electing to withhold consent to the releases of the applicable Released Parties and the Entities set forth in Section 41.6 of the Plan, or by order of this Court, each holder of a Claim or Equity Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 41.6 of the Plan.

60.    **Supplemental Injunction**. **Notwithstanding anything contained herein or in the Plan to the contrary, except to the limited extent provided in Section 41.6 of the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims or Equity Interests against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims or Equity Interests arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:**

(a)    **Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim or Equity Interest against any of the Released Parties or the assets or property of any Released Party;**

(b)    Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;

(c)    Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;

(d)    Except as otherwise expressly provided in the Plan, this Order, or the Global Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim or Equity Interest; and

(e)    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, this, or the Global Settlement Agreement relating to such Released Claim or Equity Interest;

provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code and, provided, further, that the supplemental injunction provided pursuant to the terms of this Section 41.12 shall not preclude any current or former officers or directors of WMI from asserting any setoff or recoupment rights against any judgment or other obligation due to the Debtors, the Debtors' estates, or the Liquidating Trust or against the property of the Debtors or the Debtors' estates, to the extent such individuals have such rights pursuant to applicable non-bankruptcy law.

61.    Term of Existing Injunctions or Stays.  Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362, or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until entry of an order in accordance with Section 41.23 of the Plan or such other Final Order of the Court; provided, however, that the terms of the Stock Trading Order

shall remain in full force and effect forever, including, without limitation, with respect to any violation thereof on or before the Effective Date.

62.    <u>Prosecution of Claims</u>.  Except as settled and released herein, from and after the Effective Date, the Liquidating Trustee, subject to the oversight and consent rights of the Trust Advisory Board, the Litigation Subcommittee, and the Bankruptcy Court, and subject to the terms of this Order, the Plan, and the Liquidating Trust Agreement, shall have the right and power to litigate, and the Liquidating Trust shall be vested with, any Claim or Cause of Action that constituted an Asset of the Debtors and their estates, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors or the Liquidating Trust thereafter, to a Final Order, and the Liquidating Trustee may compromise and settle such claims, upon approval of the Court.

63.    Nothing in this Order, the Plan or the Global Settlement Agreement shall be deemed or construed to release, waive or abandon any demands, claims or causes of action of the Debtors and their estates against present and former officers and directors of the Debtors for actions occurring prior to the Petition Date (collectively, "<u>D&O Claims</u>").  By virtue of the UCC Stipulation and the *Order* thereon [Docket No. 5416], the Creditors' Committee was authorized to prosecute claims or causes of action related by a factual or transaction nexus to the Transfers (as defined in the UCC Stipulation) and, in accordance therewith, the Creditors' Committee asserted D&O Claims pursuant to the authority granted it by the referenced *Stipulation* and *Order*.  Any D&O Claims that the Creditors' Committee previously was authorized to prosecute shall be vested in the Liquidating Trust for prosecution by the Liquidating Trustee as if any such

D&O Claims had continued to have been asserted by the Creditors' Committee, and nothing in such transfer or vesting shall waive or diminish the rights to pursue any such D&O Claims. With respect to the D&O Claims and any other any demands, claims or causes of action of the Debtors and their estates vested in the Liquidating Trust and over which the Liquidating Trustee shall have the right and power to litigate, the Liquidating Trust shall succeed to and constitute the assignee of all rights, powers and privileges that, before the Effective Date of the Plan, could be exercised by the Creditors' Committee, any representative of the estates, and any comparable authority, including a trustee or examiner with expanded powers. Any D&O Claims and any other demands, claims or causes of action of the Debtors and their estates, which are hereby vested in the Liquidating Trust shall be brought by the Liquidating Trustee on behalf of the Liquidating Trust.

64.    The Liquidating Trustee is appointed as trustee pursuant to Bankruptcy Code § 1123(a)(7) and, with respect to the D&O Claims and any other any demands, claims or causes of action of the Debtors and their estates vested in the Liquidating Trust, shall have all rights, powers and privileges as if such Liquidating Trustee had been appointed trustee in the Chapter 11 Cases.

65.    <u>Indemnification and Reimbursement Obligations</u>. For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be deemed rejected as of the Effective Date and such parties' rights to assert rejection damage claims, if any, shall be governed by Section 34.5 of the Plan and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

66.    <u>Intercompany Claims</u>. Intercompany Claims shall be extinguished, unless otherwise agreed or resolved between the parties to a given Intercompany Claim, resolved by the Global Settlement Agreement or released by operation of the Plan. Any such transaction may be effected without any further action by the stockholders of any of the Debtors or the Debtors in Possession. To the extent that any Intercompany Claim is extinguished in accordance with this provision, Kurtzman Carson Consultants LLC, the Debtors' Court-retained claims agent, may take such action as is necessary to reflect such extinguishment on the Debtors' claims registry.

67.    <u>Benefit Plans</u>. Notwithstanding anything contained in the Plan to the contrary, the Debtors and the Liquidating Trustee, as the case may be, are authorized, but not required, to terminate all Benefit Plans, in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law, at such time as determined by the Debtors or the Liquidating Trustee, as the case may be, in their sole discretion; <u>provided, however</u>, that, until the transfer or termination of any Benefit Plan, the Debtors, the Liquidating Trustee, and the Reorganized Debtors, as the case may be, shall (a) continue to perform any and all of their administrative obligations thereunder and (b) with respect to Benefit Plans subject to Title IV of ERISA, continue to make any required minimum funding contributions and pay applicable Pension Benefit Guaranty Corporation insurance premiums; and, <u>provided, further</u>, that, upon termination thereof, the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, shall provide administrative services in connection with the operation and wind down of the Benefit Plans; and, <u>provided, further</u>, that the continuation of any Benefit Plan by the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, from and after the Confirmation Date, including, without limitation, the provision of administrative services in connection with the operation and wind down of such Benefit Plan, shall not

constitute an assumption of such Benefit Plans in accordance with section 365 of the Bankruptcy Code; and, provided, further, that the failure to perform any obligation under the Benefit Plans or to provide administrative services in connection with the wind down of the Benefit Plans shall be without prejudice to (i) any Entity to assert such failure gives rise to an Administrative Expense Claim and (ii) the Debtors or the Liquidating Trustee to contest the assertion thereof. For the avoidance of doubt, the foregoing shall not apply to any employee benefit or welfare plan to be maintained by the Reorganized Debtors or the Liquidating Trustee, as the case may be, in the ordinary course of business after the Effective Date for the benefit of employees actively employed by the Reorganized Debtors or the Liquidating Trustee.

68.    Termination of Vendor Stipulation.  On the Effective Date, that certain Stipulation By and Between Debtors and JPMorgan Chase Bank, N.A. Concerning Certain Contracts, dated October 16, 2008, approved by the Court pursuant to the Order Approving Stipulation By and Between the Debtors and JPMorgan Chase Bank. N.A. Concerning Certain Vendor Contracts, dated December 30, 2008 (the "Confidentiality Order"), shall be terminated and deemed of no further force and effect, except as specifically provided in Section 2.14 of the Global Settlement Agreement; provided, however, that notwithstanding anything to the contrary in this Order or the Plan or the Confidentiality Order, the Debtors, the Creditors' Committee, and their respective Representatives (as such term is used in the Confidentiality Order) shall continue, in accordance with the obligations described in the Confidentiality Order and the Debtors' undertakings on the record of the hearing to consider approval of the stipulation, to protect "Confidential Information" provided in connection with a "Vendor Claim" or "Vendor Contracts," as those terms are defined in the Confidentiality Order, until final resolution of any objection to a Vendor Claim, including any appeal thereof. Upon such a final resolution, and as

set forth in the Confidentiality Order, the Debtors, the Creditors' Committee, and their respective

Representatives shall return to JPMC or destroy, and certify such destruction, the Vendor

Contract and any other Confidential Information pertaining to such Vendor Claim.

69.    D&O Policies.  Notwithstanding anything contained in the Plan or this

Order to the contrary, neither the Plan nor this Order shall be deemed to invalidate or otherwise

affect coverage under the Debtors' director and officer liability insurance policies which were

acquired in connection with WMI's indemnification obligations to its officers and directors (the

"D&O Policies"), the obligations of the insurers pursuant to the D&O Policies, or the rights of

the insureds thereunder.

70.    IAA/JPMC.  Pursuant to Section 2.20(a) of the Global Settlement

Agreement, that certain Information Access Agreement, dated November 21, 2008, between the

Debtors and JPMC, as amended (the "IAA/JPMC"), shall be deemed amended under its current

terms to provide for the extension of the term set forth therein to the entry of an order of the

Court closing the Chapter 11 Cases; provided, however, that such extension shall be solely for

the limited purposes of providing the Debtors, or their successors in interest, as the case may be,

with access to documents reasonably necessary (1) to comply with pending or future requests in

any litigation or governmental investigation, (2) in connection with any objection by the Debtors,

or their successors in interest, as the case may be, to any claim in the Chapter 11 Cases, so long

as such objection is interposed on or prior to December 31, 2012, and (3) with respect to the

Debtors' administration and resolution of all Pre-2009 Group Tax (as defined in the Global

Settlement Agreement) matters in accordance with the terms and provisions of the Global

Settlement Agreement.  Notwithstanding the foregoing, rather than extending the expiration of

the IAA/JPMC in accordance with Section 2.20(a) of the Global Settlement Agreement (as set

forth above), JPMC, at its sole option, discretion and expense, may elect to make available for
inspection and copying by WMI any or all of the books and records to which WMI has access
under the IAA/JPMC, including all electronic records, through and up to twelve (12) months
following the Effective Date of the Global Settlement Agreement. If so elected, WMI and JPMC
shall agree on a third party provider which, subject to confidentiality limitations, shall have such
access as may reasonably be required to copy the records (including electronic records and
backup tapes) designated by WMI, and JPMC shall be relieved of any further obligations or
undertaking to the WMI Entities with respect thereto.

71.    IAA/FDIC. Pursuant to Section 2.20(b) of the Global Settlement
Agreement, that certain letter agreement, dated November 19, 2008, between the Debtors, the
Creditors' Committee and the FDIC Receiver, as may be amended, shall be deemed amended
under its current terms to provide for an expiration upon the earlier to occur of (a) entry of an
order of this Court closing the Chapter 11 Cases and (b) the closing of the Receivership.

72.    Compliance with Tax Requirements. Any party issuing any instrument or
making any distribution under the Plan shall comply with all applicable withholding and
reporting requirements imposed by any United States federal, state or local tax law or Tax
Authority, and all distributions under the Plan shall be subject to any such withholding or
reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Equity
Interest that is to receive a distribution under the Plan shall have the sole and exclusive
responsibility for the satisfaction and payment of any Taxes imposed on such holder by any
governmental unit, including income, withholding and other tax obligations, on account of such
distribution. Any party issuing any instrument or making any distribution pursuant to the Plan
has the right, but not the obligation, to not make a distribution until such holder has made

arrangements satisfactory to such issuing or disbursing party for payment of any such Tax

obligations and, if any party issuing any instrument or making any distribution pursuant to the

Plan fails to withhold with respect to any such holder's distribution, and is later held liable for

the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent

may require, as a condition to the receipt of a distribution, that the holder complete the

appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply

with such a request within one year, such distribution shall be deemed an unclaimed distribution.

     73.    <u>Exemption from Transfer Taxes</u>.  Pursuant to sections 106, 1141 and

1146(a) of the Bankruptcy Code, the issuance, transfer and exchange of assets, notes or equity

securities pursuant to or in connection with the Plan or the Global Settlement Agreement, the

creation of any mortgage, deed of trust or other security interest, the making or assignment of

any lease or sublease, or the making or delivery of any deed or other instrument of transfer

pursuant to, in furtherance of, or in connection with the Plan or the Global Settlement

Agreement, including, without limitation, the Runoff Notes, the Credit Facility, the Reorganized

Common Stock, the Trust Preferred Securities, and any merger agreements or agreements of

consolidation, deeds, bills of sale, or assignments executed in connection with any of the

transactions contemplated pursuant to the Plan or the Global Settlement Agreement shall not be

subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar Tax.  All

state and local government officials and agents shall forego the collection of any such Tax or

governmental assessment and shall accept for filing and recordation any instrument or other

document issued or transferred pursuant to the Plan, without the payment of any such Tax or

government assessment.

74.    <u>Dissolution of the Creditors' Committee</u>.  On the first (1st) Business Day thirty (30) days following the Effective Date, and provided that payments to holders of Unsecured Claims have been made in accordance with Article XXXI of the Plan, the Creditors' Committee shall be dissolved, and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith; <u>provided, however</u>, that the Creditors' Committee may, at its own discretion, continue or resume its duties arising from or relating to (i) any pending litigation or contested matter to which the Creditors' Committee is a party, (ii) the MBS Plaintiffs' Claim (iii) any appeal filed regarding confirmation of the Plan, (iv) obligations arising under confidentiality agreements, joint interest agreements, and protective orders, if any, entered during the Chapter 11 Cases that remain in full force and effect according to their terms, (v) applications for fees and expenses of members of the Creditors' Committee and requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases, and (vi) motions, appeals or other litigation seeking the enforcement of the provisions of the Plan and the transactions contemplated hereunder or in the Confirmation Order; and, <u>provided, further</u>, that the Liquidating Trust shall continue to compensate the Creditors' Committee's attorneys, financial advisors, and other agents, if any, for any such post-Effective Date activities or those identified Section 33.1 of the Plan; and, <u>provided, further</u>, that, in the event that (a) the Creditors' Committee elects to continue or resume any or all of the

enumerated duties set forth in Section 33.1 of the Plan or this Confirmation Order and (b) all then-appointed members of the Creditors' Committee subsequently resign, (i) the United States Trustee may appoint such Persons as the United States Trustee deems appropriate to represent the interests of the Creditors' Committee and (ii) if no such Persons are appointed, then, only with respect to this second proviso to this paragraph 74, (y) all right, title and interest of the Creditors' Committee in any and all tolling agreements entered into by the Creditors' Committee, for itself or on behalf of the Debtors and their estates, on the one hand, and a potential defendant, on the other hand, shall be deemed assigned to the Liquidating Trust and the Liquidating Trustee and the Liquidating Trust and the Liquidating Trustee shall be entitled to the benefits therein, including, without limitation, timing with respect to the commencement of any litigation, as if the Liquidating Trust and the Liquidating Trustee were a party to any such tolling agreement, and (z) in its sole and absolute discretion, the Liquidating Trustee may, and, if it chooses to, shall, accede to the position of the Creditors' Committee in prospective or then-pending litigations or contested matters, as the case may be.  Without limiting the foregoing, on the Effective Date, the Creditors' Committee shall take any and all action as is necessary to cause the withdrawal and dismissal, with prejudice, of the appeal taken by the Creditors' Committee from the September Opinion.

75.    [Intentionally omitted.]

76.    <u>Dissolution of Equity Committee</u>.  On the Effective Date, other than with respect to its duties and obligations set forth herein or in the Plan, the Equity Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Equity Committee's

attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of

filing and prosecuting applications for final allowances of compensation for professional services

rendered and reimbursement of expenses incurred in connection therewith; provided, however,

that, in the event that (a) a timely appeal is taken from the Confirmation Order and (b) such

appeal remains pending, the Equity Committee shall be dissolved on the earlier to occur of (1)

dismissal or withdrawal of such appeal and (2) a determination, by Final Order, as to the merits

of such appeal and; provided, further that, in the event of any such appeal from the Confirmation

Order, the Liquidating Trust shall pay the reasonable fees and expenses of the Equity Committee

in connection with any such appeal, subject to approval by the Bankruptcy Court.  Without

limiting the foregoing, on the Effective Date, the Equity Committee shall take any and all action

as is necessary to cause the withdrawal and dismissal, with prejudice, of (x) the Equity

Committee Adversary Proceeding, (y) the Equity Committee Action to Compel and (z) the

appeals taken by the Equity Committee from (i) the January Opinion and (ii) the September

Opinion.

77.    Payment of Statutory Fees.  All fees payable pursuant to section 1930 of

title 28 of the United States Code and, if applicable, any interest payable pursuant to section

3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be

obligations and liabilities of the Liquidating Trust and shall be paid on the Effective Date or

thereafter as and when they become due or otherwise pursuant to an agreement between the

Debtors and the United States Department of Justice, Office of the United States Trustee, until

such time as the Chapter 11 Cases shall be closed in accordance with the provisions of Section

41.23 of the Plan.

78.    <u>Payment of Fees and Expenses of Certain Creditors</u>. Within ninety (90) days of the Effective Date, (i) Fried, Frank, Harris, Shriver & Jacobson LLP, (ii) Blank Rome LLP, (iii) White & Case LLP, (iv) Kasowitz, Benson, Torres & Friedman LLP, (v) Zolfo Cooper LLC, (vi) Kramer, Levin, Naftalis & Frankel LLP, (vii) Halperin Battaglia Raicht LLP, (viii) Kilpatrick Townsend & Stockton LLP, (ix) Brown Rudnick LLP, (x) Arkin Kaplan Rice LLP, (xi) Campbell & Levine, LLC, (xii) Mesirow Financial Consulting, LLC, (xiii) Schnader Harrison Segal & Lewis LLP, and (xiv) in accordance with Section 21.1(a) of the Plan, Wilmer Cutler Pickering Hale & Dorr LLP, Pachulski Stang Ziehl & Jones LLP, and Boies, Schiller & Flexner LLP, to the extent any clients with respect to the foregoing professionals seek reimbursement for the payment of fees and expenses incurred, shall file with this Court an application (for purposes of reviewing the reasonableness of the amounts requested therein), together with detailed invoices annexed thereto, requesting payment for reasonable fees and expenses incurred during the period from the Petition Date through and including the Effective Date, in connection with the Chapter 11 Cases, the Global Settlement Agreement, the Plan or the transactions contemplated herein or therein (including, without limitation, investigating, negotiating, documenting, and completing such transactions and enforcing, attempting to enforce, and preserving any right or remedy contemplated under the Global Settlement Agreement and in the Chapter 11 Cases). All objections to any such fee applications shall be filed with the Court, together with proof of service thereof, and served upon the applicant, the Debtors, the U.S. Trustee, the Creditors' Committee, and parties entitled to receive notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, so as to be received not later than 4:00 p.m., prevailing Eastern Time, on the date that is fifteen (15) days prior to the final hearing with respect to such fees. Within ten (10) Business Days of the entry of a Final Order by this

Court approving the payment thereof, in whole or in part, the Disbursing Agent shall pay such fees and expenses so approved.

79.    <u>Securities Litigations Documents</u>.  On the Effective Date, the Debtors shall not transfer any documents, in electronic form or otherwise, to the Reorganized Debtors that relate to the claims, defenses and allegations in the Securities Litigations.  All such documents will be transferred to the Liquidating Trust on the Effective Date and shall be thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement; <u>provided</u>, <u>however</u>, that, in the event that any documents are required for the operations of the Reorganized Debtors and are transferred to the Reorganized Debtors, copies of any such documents shall be transferred to the Liquidating Trust on the Effective Date and thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement.

80.    <u>Documents Requested by the Reorganized Debtors</u>.  Upon receipt of a written request from the Reorganized Debtors, at any time within the two years following the Effective Date, the Liquidating Trust, JPMC or the FDIC Receiver, as applicable, shall make available for inspection and copying (at the expense of the Reorganized Debtors) such documents or information, in either written or electronic form, as is reasonably requested by the Reorganized Debtors, that the Reorganized Debtors may require in order to comply with U.S. federal and state governmental regulations, including, but not limited to, Federal and state tax, insurance or securities laws, rules, or regulations, and that is not protected by the attorney-client privilege or any other legal protection for confidential dealings and communications; <u>provided</u>, <u>however</u>, nothing herein shall constitute an obligation of, or undertaking by, the Liquidating Trust, JPMC or the FDIC Receiver, as the case may be, to create documents or information, or to retain documents or information other than in the ordinary course of business in order to make

such documents or information available to the Reorganized Debtors or the Liquidating Trust as contemplated hereby.

81.    <u>Documents and Instruments</u>.  Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan, the Global Settlement Agreement, and this Order.

82.    <u>Reversal/Stay/Modification/Vacatur of Order</u>.  Except as otherwise provided in this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors, the Reorganized Debtors, the Liquidating Trust, or the JPMC Entities, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Order, the Global Settlement Agreement and the Plan.  To the extent not specifically reversed, modified, vacated, or stayed by an order of this Court, all existing orders entered in these Chapter 11 Cases remain in full force and effect.

83.    <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of this Order or the occurrence of the Effective Date, subject to Article XXXVIII of the Plan and except as otherwise provided in the Plan or herein, pursuant to sections 105 and 1142 of the Bankruptcy Code, this Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter

11 Cases to the fullest extent as is legally permissible, including, but not limited to, jurisdiction over the matters set forth in Article XXXVIII of the Plan.

84.    <u>Conflicts Among Order, Plan and Global Settlement Agreement</u>.  The provisions of the Plan, this Order, and the Global Settlement Agreement shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided, however</u> that, in the event of any inconsistency between the Global Settlement Agreement, the Plan or this Order, the documents shall control in the following order of priority:  (i) this Order, (ii) the Global Settlement Agreement, and (iii) the Plan; <u>provided, however</u>, that, in the event of any inconsistency between these documents with respect to the releases provided in Section 41.6 of the Plan, the documents shall control in the following order of priority:  (i) this Order, (ii) the Plan, and (iii) the Global Settlement Agreement; and <u>provided, further</u>, however, that nothing herein is intended to nor shall be construed to modify the economic terms of the Plan.

85.    <u>Modifications</u>.  Without need for further order or authorization of the Court and subject to any limitations set forth in the Plan (including consent rights) and any stipulation approved by this Court in connection with the Plan, the Debtors, the Reorganized Debtors, or the Liquidating Trust are authorized and empowered to make any and all modifications to the Plan, any and all documents included as part of the Plan Supplement, and any other document that is necessary to effectuate the Plan that does not materially modify the terms of such documents and are consistent with the Plan.

86.    <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

87.    <u>Governing Law</u>. Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law therein shall be applicable to such Exhibit), the rights, duties and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws.

88.    <u>Applicable Nonbankruptcy Law</u>. Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Plan and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

89.    <u>Waiver of Filings</u>. Any requirement pursuant to section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court of the Office of the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived as to any such list, schedule, or statement not filed as of the Effective Date.

90.    <u>Police Powers</u>. Nothing contained in the Plan or this Order shall preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their statutory, police or regulatory powers.

91.    <u>Notice of Order</u>. In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order and the occurrence of the Effective Date, substantially in the form attached as <u>Exhibit B</u> hereto, to all parties who hold a Claim or Equity Interest in these Chapter 11 Cases, as well as the Creditors' Committee, Equity Committee, the U.S. Trustee, any party filing a notice

pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal

Revenue Service, and the United States attorney for the District of Delaware. Such notice is

hereby approved in all respects and shall be deemed good and sufficient notice of entry of this

Order.

      92.    <u>Substantial Consummation</u>. On the Effective Date, the Plan shall be

deemed to be substantially consummated pursuant to sections 1101 and 1127 of the Bankruptcy

Code.

      93.    <u>No Waiver</u>. The failure to specifically include any particular provision of

the Plan in this Order will not diminish the effectiveness of such provision nor constitute a

waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and

incorporated herein by this reference.

Dated: _____ Feb. 23, 2012
      Wilmington, Delaware


                          _____
                    THE HONORABLE MARY F. WALRATH
                    UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

**The Plan**

US_ACTIVE:\43911945\14\79831.0003

**COMPOSITE**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

-----------------------------------------------------x

| | |
|---|---|
| *In re* : | Chapter 11 |
| : | |
| WASHINGTON MUTUAL, INC., *et al.*, : | |
| : | Case No. 08-12229 (MFW) |
| : | |
| Debtors. : | (Jointly Administered) |
| : | |
| : | |

-----------------------------------------------------x

## SEVENTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS
## PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Dated: December 12, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS ................................................................................ 1

1.1    AAOC ....................................................................................................... 1
1.2    AAOC Releasees ...................................................................................... 1
1.3    Accepting Non-Filing WMB Senior Note Holder ................................... 1
1.4    Acquisition JPMC Entities ....................................................................... 1
1.5    Actions ...................................................................................................... 1
1.6    Admin Account .......................................................................................... 1
1.7    Administrative Claim Bar Date ................................................................ 1
1.8    Administrative Expense Claim ................................................................. 2
1.9    Affiliate ..................................................................................................... 2
1.10   Affiliated Banks ........................................................................................ 2
1.11   Allowed Administrative Expense Claim ................................................... 2
1.12   Allowed CCB-1 Guarantees Claim .......................................................... 2
1.13   Allowed CCB-2 Guarantees Claim .......................................................... 2
1.14   Allowed Claim ........................................................................................... 2
1.15   Allowed Convenience Claim ..................................................................... 3
1.16   Allowed General Unsecured Claim .......................................................... 3
1.17   Allowed JPMC Assumed Liability Claim ................................................. 3
1.18   Allowed Late-Filed Claim ........................................................................ 3
1.19   Allowed PIERS Claim .............................................................................. 3
1.20   Allowed Priority Non-Tax Claim ............................................................. 3
1.21   Allowed Priority Tax Claim ...................................................................... 3
1.22   Allowed Senior Notes Claim .................................................................... 3
1.23   Allowed Senior Subordinated Notes Claim .............................................. 3
1.24   Allowed Subordinated Claim .................................................................... 4
1.25   Allowed Trustee Claim ............................................................................. 4
1.26   Allowed Unsecured Claim ........................................................................ 4
1.27   Allowed WMB Senior Notes Claim ......................................................... 4
1.28   Allowed WMB Vendor Claim ................................................................... 4
1.29   Allowed WMI Vendor Claim .................................................................... 4
1.30   American Savings Escrow Funds .............................................................. 4
1.31   American Savings Litigation ..................................................................... 4
1.32   Anchor Litigation ...................................................................................... 4
1.33   Assets ........................................................................................................ 4
1.34   Avoidance Actions .................................................................................... 4
1.35   Ballot ........................................................................................................ 5
1.36   Ballot Date ................................................................................................ 5
1.37   Bankruptcy Code ....................................................................................... 5
1.38   Bankruptcy Court ...................................................................................... 5
1.39   Bankruptcy Rules ...................................................................................... 5
1.40   Bankruptcy Stay Motions ......................................................................... 5
1.41   BB Liquidating Trust Interests .................................................................. 5

# TABLE OF CONTENTS
## (continued)

                                                                                                    **Page**

1.42    Benefit Plan ................................................................................................................ 5
1.43    BKK Group ................................................................................................................. 5
1.44    BKK Liabilities ........................................................................................................... 5
1.45    BKK Litigation ........................................................................................................... 5
1.46    BKK Proofs of Claim .................................................................................................. 6
1.47    BKK Settlement Agreement ........................................................................................ 6
1.48    Bond Claim .................................................................................................................. 6
1.49    Bond Indemnity ........................................................................................................... 6
1.50    Bonding Companies ..................................................................................................... 6
1.51    Bonds ........................................................................................................................... 6
1.52    Business Day ................................................................................................................ 6
1.53    Cash ............................................................................................................................. 6
1.54    Cash Equivalents ......................................................................................................... 6
1.55    Causes of Action ......................................................................................................... 7
1.56    CCB-1 Common Securities .......................................................................................... 7
1.57    CCB-1 Guarantees ....................................................................................................... 7
1.58    CCB-1 Guarantees Claim ............................................................................................ 7
1.59    CCB-1 Guarantee Agreements .................................................................................... 7
1.60    CCB-1 Preferred Securities ......................................................................................... 7
1.61    CCB-1 Trustee ............................................................................................................. 7
1.62    CCB-2 Common Securities .......................................................................................... 7
1.63    CCB-2 Guarantees ....................................................................................................... 8
1.64    CCB-2 Guarantees Claim ............................................................................................ 8
1.65    CCB-2 Guarantee Agreements .................................................................................... 8
1.66    CCB-2 Preferred Securities ......................................................................................... 8
1.67    CCB-2 Trustees ........................................................................................................... 8
1.68    CCB Releasees ............................................................................................................ 8
1.69    CDTSC ......................................................................................................................... 8
1.70    Chapter 11 Cases ......................................................................................................... 8
1.71    Claim ............................................................................................................................ 8
1.72    Class ............................................................................................................................. 8
1.73    Common Equity Interest .............................................................................................. 9
1.74    Common Stock Allotment ........................................................................................... 9
1.75    Confirmation Date ....................................................................................................... 9
1.76    Confirmation Hearing .................................................................................................. 9
1.77    Confirmation Order ..................................................................................................... 9
1.78    Convenience Claim ...................................................................................................... 9
1.79    Credit Facility ............................................................................................................ 10
1.80    Creditor ...................................................................................................................... 10
1.81    Creditor Cash ............................................................................................................. 10
1.82    Creditors' Committee ................................................................................................. 10
1.83    Debtors ....................................................................................................................... 10

# TABLE OF CONTENTS
## (continued)

Page

1.84   Debtors' Claims .................................................................................................. 10
1.85   Debtors in Possession ......................................................................................... 10
1.86   Dime Inc. ............................................................................................................. 10
1.87   Dime Warrant Litigation..................................................................................... 11
1.88   Dime Warrants..................................................................................................... 11
1.89   Disbursing Agent ................................................................................................ 11
1.90   Disclosure Statement .......................................................................................... 11
1.91   Disclosure Statement Order ................................................................................ 11
1.92   Disputed Accounts .............................................................................................. 11
1.93   Disputed Claim ................................................................................................... 11
1.94   Disputed Equity Escrow ..................................................................................... 12
1.95   Disputed Equity Interest ..................................................................................... 12
1.96   Distribution Record Date .................................................................................... 12
1.97   Effective Date ..................................................................................................... 12
1.98   Entity................................................................................................................... 12
1.99   Equity Committee ............................................................................................... 12
1.100  Equity Committee Adversary Proceeding .......................................................... 12
1.101  Equity Committee Action to Compel ................................................................. 12
1.102  Equity Release Election Date.............................................................................. 13
1.103  Equity Interest ..................................................................................................... 13
1.104  Estate Claims ...................................................................................................... 13
1.105  FDIC Claim......................................................................................................... 13
1.106  FDIC Corporate .................................................................................................. 13
1.107  FDIC Receiver ..................................................................................................... 14
1.108  FDIC Stay Relief Motion.................................................................................... 14
1.109  Final Order .......................................................................................................... 14
1.110  Fixed Rate Notes................................................................................................. 14
1.111  Floating Rate Notes............................................................................................. 14
1.112  FSB ...................................................................................................................... 14
1.113  General Unsecured Claim ................................................................................... 14
1.114  Global Settlement Agreement............................................................................. 14
1.115  Guarantee Agreements........................................................................................ 15
1.116  Indentures............................................................................................................ 15
1.117  Information Demands .......................................................................................... 15
1.118  Intercompany Claim............................................................................................ 15
1.119  Intercompany Notes............................................................................................ 15
1.120  IRC ...................................................................................................................... 15
1.121  Intercreditor Interest Claim ................................................................................ 15
1.122  IRS ...................................................................................................................... 15
1.123  January Opinion .................................................................................................. 15
1.124  JPMC................................................................................................................... 15
1.125  JPMC Action....................................................................................................... 15

# TABLE OF CONTENTS
## (continued)

**Page**

1.126  JPMC Allowed Unsecured Claim ................................................................... 16
1.127  JPMC Assumed Liabilities ......................................................................... 16
1.128  JPMC Assumed Liability Claim .................................................................. 16
1.129  JPMC Claims .............................................................................................. 16
1.130  JPMC Entities ............................................................................................. 16
1.131  JPMC Policies ............................................................................................. 16
1.132  JPMC Rabbi Trust/Policy Claim ................................................................ 16
1.133  JPMC Rabbi Trusts ..................................................................................... 17
1.134  Junior Subordinated Notes Indenture ......................................................... 17
1.135  Lakeview Plan ............................................................................................. 17
1.136  Late-Filed Claim ........................................................................................ 17
1.137  Lien ............................................................................................................. 17
1.138  Liquidating Trust ........................................................................................ 17
1.139  Liquidating Trust Agreement ..................................................................... 17
1.140  Liquidating Trust Assets ............................................................................ 17
1.141  Liquidating Trust Beneficiaries .................................................................. 18
1.142  Liquidating Trust Claims Reserve .............................................................. 18
1.143  Liquidating Trustee ..................................................................................... 18
1.144  Liquidating Trust Interests ......................................................................... 18
1.145  Litigation Proceeds ..................................................................................... 18
1.146  Litigation Proceeds Interest ....................................................................... 18
1.147  Local Bankruptcy Rules ............................................................................. 18
1.148  Modified Plan .............................................................................................. 19
1.149  Non-Filing WMB Senior Note Holder ....................................................... 19
1.150  Non-Filing WMB Senior Note Holders Election Form .............................. 19
1.151  Original Disclosure Statement Order .......................................................... 19
1.152  Other Benefit Plan Claim ........................................................................... 19
1.153  Other Subordinated Claim .......................................................................... 19
1.154  Penalty Claim .............................................................................................. 19
1.155  Pension Plans .............................................................................................. 19
1.156  Person ......................................................................................................... 20
1.157  Petition Date ............................................................................................... 20
1.158  PIERS Claim ............................................................................................... 20
1.159  PIERS Claims Releasees ............................................................................ 20
1.160  PIERS Common Securities ......................................................................... 20
1.161  PIERS Guarantee Agreement ..................................................................... 20
1.162  PIERS Preferred Securities ........................................................................ 20
1.163  PIERS Trust Agreement .............................................................................. 20
1.164  PIERS Trustee: ........................................................................................... 20
1.165  Plan ............................................................................................................. 20
1.166  Plan Contribution Assets ............................................................................ 20
1.167  Plan Supplement ......................................................................................... 21

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 1.168 | Plan Support Agreement | 21 |
| 1.169 | Postpetition Interest Claim | 21 |
| 1.170 | Preferred Equity Interest | 21 |
| 1.171 | Preserved Avoidance Actions | 21 |
| 1.172 | Priority Non-Tax Claim | 21 |
| 1.173 | Priority Tax Claim | 21 |
| 1.174 | Privileges | 21 |
| 1.175 | Pro Rata Share | 22 |
| 1.176 | Purchase and Assumption Agreement | 22 |
| 1.177 | Qualified Plan Claim | 23 |
| 1.178 | Receivership | 23 |
| 1.179 | Registry Funds | 23 |
| 1.180 | REIT Series | 23 |
| 1.181 | Related Actions | 23 |
| 1.182 | Related Persons | 23 |
| 1.183 | Released Claims | 23 |
| 1.184 | Released Parties | 24 |
| 1.185 | Released Third Party Causes of Action | 24 |
| 1.186 | Releasing REIT Trust Holder | 24 |
| 1.187 | Remaining Postpetition Interest Claim | 25 |
| 1.188 | Reorganized Common Stock | 25 |
| 1.189 | Reorganized Debtors | 25 |
| 1.190 | Reorganized Debtors By-Laws | 25 |
| 1.191 | Reorganized Debtors Certificates of Incorporation | 25 |
| 1.192 | Reorganized WMI | 25 |
| 1.193 | Rule 2004 Inquiry | 25 |
| 1.194 | Rule 2019 Appeal | 25 |
| 1.195 | Runoff Indenture | 25 |
| 1.196 | Runoff Notes | 26 |
| 1.197 | Runoff Proceeds | 26 |
| 1.198 | Runoff Threshold | 26 |
| 1.199 | Schedules | 26 |
| 1.200 | Section 510(b) Subordinated WMB Notes Claim | 27 |
| 1.201 | Securities Litigations | 27 |
| 1.202 | Senior Notes | 27 |
| 1.203 | Senior Notes Claim | 27 |
| 1.204 | Senior Notes Claims Releasees | 27 |
| 1.205 | Senior Notes Indenture | 27 |
| 1.206 | Senior Notes Indenture Trustee | 27 |
| 1.207 | Senior Notes Release Consideration | 27 |
| 1.208 | Senior Subordinated Notes | 28 |
| 1.209 | Senior Subordinated Notes Claim | 28 |

# TABLE OF CONTENTS
## (continued)

Page

1.210 Senior Subordinated Notes Claims Releasees ................................................... 28
1.211 Senior Subordinated Notes Indenture .............................................................. 28
1.212 Senior Subordinated Notes Indenture Trustee .................................................. 28
1.213 Senior Subordinated Notes Release Consideration............................................. 28
1.214 September Opinion ........................................................................................ 28
1.215 September Order ........................................................................................... 28
1.216 Settlement WMB Senior Note Holders............................................................. 28
1.217 Sixth Amended Plan ...................................................................................... 29
1.218 Standing Motion............................................................................................ 29
1.219 Stock Trading Order ...................................................................................... 29
1.220 Subordinated Claim ....................................................................................... 29
1.221 Subordination Model ..................................................................................... 29
1.222 Tax Authority................................................................................................ 29
1.223 Taxes........................................................................................................... 29
1.224 Tax Refunds ................................................................................................. 29
1.225 Tax Return ................................................................................................... 29
1.226 Texas Litigation ............................................................................................ 29
1.227 Tranquility.................................................................................................... 30
1.228 Tranquility Claim .......................................................................................... 30
1.229 Transferred Intellectual Property .................................................................... 30
1.230 Treasury Regulations ..................................................................................... 30
1.231 Trust Advisory Board .................................................................................... 30
1.232 Trustee Claims .............................................................................................. 30
1.233 Trustee Distribution Expenses ........................................................................ 30
1.234 Trustees........................................................................................................ 30
1.235 Trust Preferred Securities .............................................................................. 30
1.236 Trust Preferred Trustees................................................................................. 31
1.237 Trusts........................................................................................................... 31
1.238 Turnover Action............................................................................................ 31
1.239 Unidentified Intellectual Property................................................................... 31
1.240 Unsecured Claim ........................................................................................... 31
1.241 Vendor Escrow.............................................................................................. 31
1.242 Visa Claims.................................................................................................. 31
1.243 Visa Shares................................................................................................... 31
1.244 Voting Record Date ....................................................................................... 32
1.245 WaMu Pension Plan....................................................................................... 32
1.246 WMB............................................................................................................ 32
1.247 WMB Intellectual Property ............................................................................ 32
1.248 WMB Global Note Program ........................................................................... 32
1.249 WMB Notes Claim ........................................................................................ 32
1.250 WMB Senior Notes........................................................................................ 32
1.251 WMB Senior Notes Claim .............................................................................. 32

# TABLE OF CONTENTS
## (continued)

                                                                                              **Page**

1.252  WMB Subordinated Notes ........................................................................... 32
1.253  WMB Subordinated Notes Claim ................................................................ 32
1.254  WMB Vendor Claim .................................................................................. 32
1.255  WMI ........................................................................................................... 32
1.256  WMI Accounts ........................................................................................... 33
1.257  WMI Action ............................................................................................... 33
1.258  WMI Entities ............................................................................................. 33
1.259  WMI Intellectual Property ......................................................................... 33
1.260  WMI Investment ........................................................................................ 33
1.261  WMI Medical Plan ..................................................................................... 33
1.262  WMI Medical Plan Claim .......................................................................... 33
1.263  WMI Policies ............................................................................................. 33
1.264  WMI Rabbi Trust ....................................................................................... 33
1.265  WMI Vendor Claim .................................................................................... 33
1.266  WMI/WMB Intercompany Claim .............................................................. 33
1.267  WMMRC .................................................................................................... 33
1.268  Other Definitions ....................................................................................... 33
1.269  Allowed Equity Interest ............................................................................ 34
1.270  LTW Stipulation ........................................................................................ 34

ARTICLE II        COMPROMISE AND SETTLEMENT OF DISPUTES ........................ 34

2.1    Compromise, Settlement and Sale .............................................................. 34

ARTICLE III       PROVISIONS FOR PAYMENT OF ADMINISTRATIVE
                  EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ........................ 38

3.1    Administrative Expense Claims .................................................................. 38
3.2    Professional Compensation and Reimbursement Claims ........................... 38
3.3    Priority Tax Claims .................................................................................... 39
3.4    Statutory Fees ............................................................................................ 39
3.5    Administrative Tax Claims ......................................................................... 39

ARTICLE IV       CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ........... 39

4.1    Class 1 Priority Non-Tax Claims ................................................................ 39
4.2    Class 2 Senior Notes Claims ...................................................................... 40
4.3    Class 3 Senior Subordinated Notes Claims ................................................ 40
4.4    Class 4 WMI Medical Plan Claims ............................................................. 40
4.5    Class 5 JPMC Rabbi Trust/Policy Claims .................................................. 40
4.6    Class 6 Other Benefit Plan Claims ............................................................. 40
4.7    Class 7 Qualified Plan Claims .................................................................... 40
4.8    Class 8 WMB Vendor Claims ..................................................................... 40
4.9    Class 9 Visa Claims ................................................................................... 40
4.10   Class 10 Bond Claims ................................................................................ 40
4.11   Class 11 WMI Vendor Claims .................................................................... 40

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| 4.12 | Class 12 General Unsecured Claims Class 12A Late-Filed Claims | 40 |
| 4.13 | Class 13 Convenience Claims | 40 |
| 4.14 | Class 14 CCB-1 Guarantees Claims | 40 |
| 4.15 | Class 15 CCB-2 Guarantees Claims | 40 |
| 4.16 | Class 16 PIERS Claims | 40 |
| 4.17 | Class 17A WMB Senior Notes Claims Class 17B WMB Subordinated Notes Claims | 40 |
| 4.18 | Class 18 Subordinated Claims | 40 |
| 4.19 | Class 19 Preferred Equity Interests | 40 |
| 4.20 | Class 20 Intentionally Left Blank | 40 |
| 4.21 | Class 21 Dime Warrants | 40 |
| 4.22 | Class 22 Common Equity Interests | 40 |
| ARTICLE V | PROVISION FOR TREATMENT OF PRIORITY NON-TAX CLAIMS (CLASS 1) | 40 |
| 5.1 | Payment of Allowed Priority Non-Tax Claims | 40 |
| ARTICLE VI | PROVISION FOR TREATMENT OF SENIOR NOTES CLAIMS (CLASS 2) | 40 |
| 6.1 | Treatment of Senior Notes Claims | 40 |
| 6.2 | Rights of Election | 42 |
| 6.3 | Limitation on Recovery | 42 |
| ARTICLE VII | PROVISION FOR TREATMENT OF SENIOR SUBORDINATED NOTES CLAIMS (CLASS 3) | 43 |
| 7.1 | Treatment of Senior Subordinated Notes Claims | 43 |
| 7.2 | Rights of Election | 44 |
| 7.3 | Limitation on Recovery | 45 |
| ARTICLE VIII | PROVISION FOR TREATMENT OF WMI MEDICAL PLAN CLAIMS (CLASS 4) | 45 |
| 8.1 | Treatment of WMI Medical Plan Claims | 45 |
| ARTICLE IX | PROVISION FOR TREATMENT OF JPMC RABBI TRUST/POLICY CLAIMS (CLASS 5) | 45 |
| 9.1 | Treatment of JPMC Rabbi Trust/Policy Claims | 45 |
| ARTICLE X | PROVISION FOR TREATMENT OF OTHER BENEFIT PLAN CLAIMS (CLASS 6) | 46 |
| 10.1 | Treatment of Other Benefit Plan Claims | 46 |

# TABLE OF CONTENTS
## (continued)

                                                                                    **Page**

ARTICLE XI         PROVISION FOR TREATMENT OF QUALIFIED PLAN
                   CLAIMS (CLASS 7) ............................................................ 46

   11.1      Treatment of Qualified Plan Claims ............................................. 46

ARTICLE XII        PROVISION FOR TREATMENT OF WMB VENDOR CLAIMS
                   (CLASS 8) ........................................................................ 46

   12.1      Treatment of WMB Vendor Claims ............................................. 46

ARTICLE XIII       PROVISION FOR TREATMENT OF VISA CLAIMS (CLASS 9)....... 46

   13.1      Treatment of Visa Claims ......................................................... 46

ARTICLE XIV        PROVISION FOR TREATMENT OF BOND CLAIMS (CLASS
                   10) .................................................................................. 46

   14.1      Treatment of Bond Claims ........................................................ 46

ARTICLE XV         PROVISION FOR TREATMENT OF WMI VENDOR CLAIMS
                   (CLASS 11) ...................................................................... 46

   15.1      Treatment of WMI Vendor Claims .............................................. 46

ARTICLE XVI        PROVISION FOR TREATMENT OF GENERAL UNSECURED
                   CLAIMS (CLASS 12) .......................................................... 47

   16.1      Class 12 – General Unsecured Claims.......................................... 47
   16.2      Class 12A – Late-Filed Claims.................................................. 48
   16.3      Limitation on Recovery .......................................................... 49

ARTICLE XVII       PROVISION FOR TREATMENT OF CONVENIENCE CLAIMS
                   (CLASS 13) ...................................................................... 49

   17.1      Treatment of Convenience Claims............................................... 49

ARTICLE XVIII      PROVISION FOR TREATMENT OF  CCB-1 GUARANTEES
                   CLAIMS (CLASS 14) .......................................................... 49

   18.1      Treatment of CCB-1 Guarantees Claims ....................................... 49
   18.2      Rights of Election ................................................................. 50
   18.3      Limitation on Recovery .......................................................... 51

ARTICLE XIX        PROVISION FOR TREATMENT OF  CCB-2 GUARANTEES
                   CLAIMS (CLASS 15) .......................................................... 51

   19.1      Treatment of CCB-2 Guarantees Claims ....................................... 51
   19.2      Rights of Election ................................................................. 52
   19.3      Limitation on Recovery .......................................................... 53

# TABLE OF CONTENTS
## (continued)

**Page**

ARTICLE XX    PROVISION FOR TREATMENT OF PIERS CLAIMS (CLASS 16) ........................................................................................................ 54

   20.1    Treatment of PIERS Claims........................................................................ 54
   20.2    Reorganized Common Stock Election ....................................................... 55
   20.3    Limitation on Recovery ............................................................................. 55

ARTICLE XXI    PROVISION FOR TREATMENT OF WMB NOTES CLAIMS AND NON-FILING WMB SENIOR NOTE HOLDERS (CLASS 17) ..................................................................................................... 55

   21.1    Treatment of WMB Notes Claims ............................................................. 55

ARTICLE XXII    PROVISION FOR TREATMENT OF SUBORDINATED CLAIMS (CLASS 18) .......................................................................... 58

   22.1    Treatment of Subordinated Claims ............................................................ 58
   22.2    Limitation on Recovery ............................................................................. 58

ARTICLE XXIII    PROVISION FOR TREATMENT OF PREFERRED EQUITY INTEREST (CLASS 19).................................................................... 59

   23.1    Treatment of Preferred Equity Interests..................................................... 59
   23.2    Cancellation of REIT Series ...................................................................... 59
   23.3    Cancellation of Preferred Equity Interests................................................. 60

ARTICLE XXIV    PROVISION FOR TREATMENT OF DIME WARRANTS (CLASS 21) .......................................................................................... 60

   24.1    Treatment of Dime Warrants ..................................................................... 60
   24.2    Cancellation of Dime Warrants ................................................................. 60

ARTICLE XXV    PROVISION FOR TREATMENT OF COMMON EQUITY INTERESTS (CLASS 22) ..................................................................... 60

   25.1    Treatment of Common Equity Interests..................................................... 60
   25.2    Cancellation of Common Equity Interests................................................. 60

ARTICLE XXVI    PROVISION FOR TREATMENT OF DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS ....................................................... 61

   26.1    Objections to Claims; Prosecution of Disputed Claims and Disputed Equity Interests ......................................................................................... 61
   26.2    Estimation of Claims.................................................................................. 61
   26.3    Payments and Distributions on Disputed Claims and Disputed Equity Interests ..................................................................................................... 61

ARTICLE XXVII    THE LIQUIDATING TRUST .................................................................. 64

   27.1    Execution of Liquidating Trust Agreement .............................................. 64
   27.2    Purpose of the Liquidating Trust .............................................................. 65

# TABLE OF CONTENTS
## (continued)

Page

27.3    Liquidating Trust Assets ............................................................................... 65
27.4    Administration of the Liquidating Trust .......................................................... 65
27.5    The Liquidating Trustee ................................................................................. 65
27.6    Role of the Liquidating Trustee ..................................................................... 65
27.7    Liquidating Trustee's Tax Power for Debtors ................................................ 66
27.8    Transferability of Liquidating Trust Interests ................................................. 66
27.9    Cash ................................................................................................................ 66
27.10   Distribution of Liquidating Trust Assets ........................................................ 67
27.11   Costs and Expenses of the Liquidating Trust ................................................ 67
27.12   Compensation of the Liquidating Trustee ...................................................... 67
27.13   Retention of Professionals/Employees by the Liquidating Trustee ................ 67
27.14   Federal Income Tax Treatment of the Liquidating Trust ................................ 68
27.15   Indemnification of Liquidating Trustee .......................................................... 71
27.16   Privileges and Obligation to Respond to Ongoing Investigations .................. 71

ARTICLE XXVIII    PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD
                   BY THE DEBTORS .................................................................... 72

28.1    Prosecution of Claims .................................................................................... 72

ARTICLE XXIX    ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
                REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
                EQUITY INTERESTS ..................................................................... 73

29.1    Impaired Classes to Vote ............................................................................... 73
29.2    Acceptance by Class of Creditors ................................................................. 73
29.3    Cramdown ...................................................................................................... 73

ARTICLE XXX    IDENTIFICATION OF CLAIMS AND EQUITY INTERESTS
                IMPAIRED AND NOT IMPAIRED BY THE PLAN ....................... 73

30.1    Impaired and Unimpaired Classes ................................................................. 73
30.2    Impaired Classes Entitled to Vote on Plan ................................................... 73
30.3    Claims and Equity Interests Deemed to Reject .............................................. 73
30.4    Claims Deemed to Accept ............................................................................. 74
30.5    Controversy Concerning Impairment ............................................................ 74

ARTICLE XXXI    PROVISIONS GOVERNING DISTRIBUTIONS ............................. 74

31.1    Time and Manner of Distributions ................................................................. 74
31.2    Timeliness of Payments ................................................................................. 75
31.3    Distributions by the Disbursing Agent ........................................................... 75
31.4    Manner of Payment under the Plan ............................................................... 75
31.5    Delivery of Distributions ............................................................................... 75
31.6    Undeliverable/Reserved Distributions ........................................................... 76
31.7    Withholding and Reporting Requirements ...................................................... 78
31.8    Time Bar to Cash Payments .......................................................................... 78

**TABLE OF CONTENTS**
**(continued)**

31.9    Distributions After Effective Date .................................................................... 79
31.10   Setoffs .................................................................................................................. 79
31.11   Allocation of Plan Distributions Between Principal and Interest ........................ 79
31.12   Payment of Trustee Fees and Expenses .............................................................. 79
31.13   Distribution Record Date ..................................................................................... 80
31.14   Runoff Notes ........................................................................................................ 80

ARTICLE XXXII    ................................................................................................................. 81

32.1    Incorporation and Enforcement of the Settlement Agreement ........................... 81
32.2    Intercompany Claims ........................................................................................... 82
32.3    Merger/Dissolution/Consolidation ...................................................................... 82
32.4    Cancellation of Existing Securities and Agreements ........................................... 82
32.5    Claims of Subordination ...................................................................................... 83
32.6    Surrender of Instruments ...................................................................................... 83
32.7    Issuance of Runoff Notes, Liquidating Trust Interests and Reorganized
        Common Stock ...................................................................................................... 83
32.8    Exemption from Securities Laws .......................................................................... 83
32.9    Hart-Scott-Rodino Compliance ............................................................................ 84
32.10   Fractional Stock or Other Distributions ............................................................... 84
32.11   Credit Facility ...................................................................................................... 84

ARTICLE XXXIII    CREDITORS' COMMITTEE/EQUITY COMMITTEE ....................... 84

33.1    Dissolution of the Creditors' Committee .............................................................. 84
33.2    Dissolution of the Equity Committee ................................................................... 85

ARTICLE XXXIV    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............... 86

34.1    Rejection or Assumption of Remaining Executory Contracts and
        Unexpired Leases .................................................................................................. 86
34.2    Approval of Rejection or Assumption of Executory Contracts and
        Unexpired Leases .................................................................................................. 86
34.3    Inclusiveness ........................................................................................................ 86
34.4    Cure of Defaults ................................................................................................... 86
34.5    Rejection Damage Claims ..................................................................................... 87
34.6    Indemnification and Reimbursement Obligations ................................................ 87
34.7    Termination of Benefit Plans ................................................................................ 87
34.8    Termination of Vendor Stipulation ....................................................................... 88

ARTICLE XXXV    RIGHTS AND POWERS OF DISBURSING AGENT ......................... 88

35.1    Exculpation .......................................................................................................... 88
35.2    Powers of the Disbursing Agent .......................................................................... 88
35.3    Fees and Expenses Incurred From and After the Effective Date ......................... 88

# TABLE OF CONTENTS
## (continued)

**Page**

ARTICLE XXXVI    CONDITIONS PRECEDENT TO CONFIRMATION OF THE
PLAN ........................................................................................... 89

    36.1    Conditions Precedent to Confirmation of the Plan ............................................. 89
    36.2    Waiver of Conditions Precedent to Confirmation ............................................... 90

ARTICLE XXXVII    CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE
PLAN ........................................................................................... 90

    37.1    Conditions Precedent to Effective Date of the Plan............................................ 90
    37.2    Waiver of Conditions Precedent ....................................................................... 91

ARTICLE XXXVIII    RETENTION OF JURISDICTION ....................................................... 91

    38.1    Retention of Jurisdiction .................................................................................. 91

ARTICLE XXXIX    MODIFICATION, REVOCATION, OR WITHDRAWAL OF
THE PLAN .................................................................................... 93

    39.1    Modification of Plan ........................................................................................ 93
    39.2    Revocation or Withdrawal ................................................................................ 93
    39.3    Amendment of Plan Documents ....................................................................... 93
    39.4    No Admission of Liability ................................................................................ 93

ARTICLE XL    CORPORATE GOVERNANCE AND MANAGEMENT OF THE
REORGANIZED DEBTORS ................................................................ 94

    40.1    Corporate Action.............................................................................................. 94
    40.2    Reincorporation................................................................................................ 95
    40.3    Amendment of Articles of Incorporation and By-Laws ...................................... 95
    40.4    Directors of the Reorganized Debtors................................................................ 95
    40.5    Officers of the Reorganized Debtors ................................................................. 95

ARTICLE XLI    MISCELLANEOUS PROVISIONS ....................................................... 95

    41.1    Title to Assets .................................................................................................. 95
    41.2    Discharge and Release of Claims and Termination of Equity Interests .............. 96
    41.3    Injunction on Claims......................................................................................... 97
    41.4    Integral to Plan ................................................................................................ 98
    41.5    Releases by the Debtors, the Creditors' Committee and the Equity
Committee........................................................................................................ 98
    41.6    Releases by Holders of Claims and Equity Interests .......................................... 99
    41.7    Injunction Related to Releases........................................................................... 102
    41.8    Exculpation ...................................................................................................... 102
    41.9    Bar Order ......................................................................................................... 102
    41.10    Deemed Consent............................................................................................. 103
    41.11    No Waiver....................................................................................................... 103
    41.12    Supplemental Injunction .................................................................................. 103
    41.13    Term of Existing Injunctions or Stays ............................................................. 104

# TABLE OF CONTENTS
## (continued)

|  |  | Page |
|---|---|---|
| 41.14 | Payment of Statutory Fees | 104 |
| 41.15 | Post-Effective Date Fees and Expenses | 105 |
| 41.16 | Exemption from Transfer Taxes | 105 |
| 41.17 | Withdrawal of Equity Committee Proceedings | 105 |
| 41.18 | Payment of Fees and Expenses of Certain Creditors | 105 |
| 41.19 | Securities Litigations Documents | 106 |
| 41.20 | Severability | 106 |
| 41.21 | Governing Law | 106 |
| 41.22 | Notices | 106 |
| 41.23 | Closing of Case | 107 |
| 41.24 | Section Headings | 107 |
| 41.25 | Inconsistencies | 107 |

Washington Mutual, Inc. and WMI Investment Corp. hereby propose the following joint chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS

As used in the Plan, the following terms shall have the respective meanings specified below and be equally applicable to the singular and plural of the terms defined:

1.1    **AAOC**: Each of (a) Appaloosa Management L.P., Appaloosa Investment L.P. I, Palomino Fund Ltd., Thoroughbred Fund, L.P., and Thoroughbred Master Ltd., (b) Aurelius Capital Management, LP, Aurelius Capital Partners, LP, Aurelius Convergence Master, Ltd., ACP Master, Ltd., Aurelius Capital Master, Ltd. and Aurelius Investment, LLC, (c) Owl Creek Asset Management, L.P., Owl Creek I, L.P., Owl Creek II, L.P., Owl Creek Overseas Fund, Ltd., Owl Creek Socially Responsible Investment Fund, Ltd., Owl Creek Asia I, L.P., Owl Creek Asia II, L.P., and Owl Creek Asia Master Fund, Ltd. and (d) Centerbridge Partners, L.P., Centerbridge Special Credit Partners, L.P., Centerbridge Credit Partners, L.P., and Centerbridge Credit Partners Master, L.P. and any other Affiliates of the funds listed in (a) through (d) above which own or, during the Chapter 11 Cases, owned securities issued by and/or have direct or indirect Claims against WMI.

1.2    **AAOC Releasees**: AAOC, any Entities or funds managed by AAOC and each of their respective officers, directors, partners, general partners, limited partners, equity investors, investment managers, management companies, members, employees and, solely in their capacity as counsel to AAOC with respect to the Debtors' Chapter 11 Cases, attorneys.

1.3    **Accepting Non-Filing WMB Senior Note Holder**: A Non-Filing WMB Senior Note Holder that checked the box on the Non-Filing WMB Senior Note Holder Election Form labeled "Grant Plan Section 43.6 Release", tendered in connection with the solicitation of acceptances and releases with respect to the Sixth Amended Plan.

1.4    **Acquisition JPMC Entities**: JPMC in its capacity as the "Acquiring Bank" pursuant to the Purchase and Assumption Agreement and each former subsidiary of WMB acquired pursuant to the Purchase and Assumption Agreement (including each entity into which such former subsidiary may have been merged, consolidated or liquidated), together with JPMC in its capacity as the "Purchaser" pursuant to the Purchase and Assumption Agreement.

1.5    **Actions**: The "Actions," as defined in the Global Settlement Agreement.

1.6    **Admin Account**: That certain account identified as Account No. xxxxxx1206, identified by WMI as having a balance as of the Petition Date in the approximate amount of Fifty Two Million Six Hundred Thousand Dollars ($52,600,000.00).

1.7    **Administrative Claim Bar Date**: Unless otherwise ordered by the Bankruptcy Court, the date established by the Bankruptcy Court and set forth in the Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than ninety (90) days after the Effective Date, after which date, any proof of

Administrative Expense Claim not filed shall be deemed forever barred, and the Debtors, the Reorganized Debtors and the Liquidating Trust shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim shall have been incurred (i) in accordance with an order of the Bankruptcy Court or (ii) with the consent of the Debtors and in the ordinary course of the Debtors' operations.

1.8    **Administrative Expense Claim:**  A Claim constituting a cost or expense of administration of the Chapter 11 Cases asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the Effective Date, including, without limitation, (i) any actual and necessary cost and expense of preserving the estates of the Debtors, (ii) any actual and necessary cost and expense of operating the businesses of the Debtors in Possession, (iii) any post-Petition Date loan or advance extended by one Debtor to the other Debtor, (iv) any cost and expense of the Debtors in Possession for the management, maintenance, preservation, sale, or other disposition of any assets, (v) the administration and implementation of the Plan, (vi) the administration, prosecution, or defense of Claims by or against the Debtors and for distributions under the Plan, (vii) any guarantee or indemnification obligation extended by the Debtors in Possession, (viii) any Claim for compensation and reimbursement of expenses arising during the period from and after the Petition Date and prior to the Effective Date and awarded by the Bankruptcy Court in accordance with section 328, 330, 331, or 503(b) of the Bankruptcy Code or otherwise in accordance with the provisions of the Plan, whether fixed before or after the Effective Date, (ix) any fee or charge assessed against the Debtors' estates pursuant to section 1930, chapter 123, title 28, United States Code, and (x) any tort or extracontractual claims against the Debtors in Possession.

1.9    **Affiliate:**  With respect to any specified Entity, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified entity.

1.10    **Affiliated Banks:**  WMB and FSB.

1.11    **Allowed Administrative Expense Claim:**  An Administrative Expense Claim, to the extent it is or has become an Allowed Claim.

1.12    **Allowed CCB-1 Guarantees Claim:**  A CCB-1 Guarantees Claim, to the extent set forth on Exhibit "A" hereto.

1.13    **Allowed CCB-2 Guarantees Claim:**  A CCB-2 Guarantees Claim, to the extent set forth on Exhibit "B" hereto.

1.14    **Allowed Claim:**  A Claim against any of the Debtors or the Debtors' estates, (i) proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing such proof of claim against any such Debtor or such Debtor's estate, or (ii) if no proof of Claim has been timely filed, which has been or hereafter is listed by such Debtor in its Schedules as liquidated in amount and not disputed or contingent, in each such case in clauses (i) and (ii) above, a Claim as to which no objection to the allowance thereof, or action to

equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. For purposes of determining the amount of an "Allowed Claim," there shall be deducted therefrom an amount equal to the amount of any claim that the Debtors may hold against the holder thereof, to the extent such claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law. Without in any way limiting the foregoing, "Allowed Claim" shall include any Claim arising from the recovery of property in accordance with sections 550 and 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code, any Claim allowed under or pursuant to the terms of the Plan, or any Claim to the extent that it has been allowed pursuant to a Final Order; provided, however, that (i) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder unless otherwise specified herein or by order of the Bankruptcy Court, (ii) for any purpose under the Plan, "Allowed Claim" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (iii) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code. Notwithstanding the foregoing, a WMB Senior Notes Claim may become an Allowed WMB Senior Notes Claim (in an amount equal to the principal balance thereof plus all interest accrued thereunder as of the Petition Date) in the manner provided for in Section 21.1(a) hereof.

1.15 **Allowed Convenience Claim**: A Convenience Claim, to the extent it is or has become an Allowed Claim.

1.16 **Allowed General Unsecured Claim**: A General Unsecured Claim, to the extent it is or has become an Allowed Claim.

1.17 **Allowed JPMC Assumed Liability Claim**: A JPMC Assumed Liability Claim, to the extent it is or has become an Allowed Claim.

1.18 **Allowed Late-Filed Claim**: A Late-Filed Claim to the extent it is or has become an Allowed Claim.

1.19 **Allowed PIERS Claim**: A PIERS Claim, to the extent set forth on Exhibit "D" hereto.

1.20 **Allowed Priority Non-Tax Claim**: A Priority Non-Tax Claim, to the extent it is or has become an Allowed Claim.

1.21 **Allowed Priority Tax Claim**: A Priority Tax Claim, to the extent it is or has become an Allowed Claim.

1.22 **Allowed Senior Notes Claim**: A Senior Notes Claim, to the extent set forth on Exhibit "E" hereto.

1.23 **Allowed Senior Subordinated Notes Claim**: A Senior Subordinated Notes Claim, to the extent set forth on Exhibit "F" hereto.

1.24    **Allowed Subordinated Claim**: A Subordinated Claim, to the extent it is or has become an Allowed Claim.

1.25    **Allowed Trustee Claim**: A Trustee Claim, to the extent it is or has become an Allowed Claim.

1.26    **Allowed Unsecured Claim**: An Unsecured Claim, to the extent it is or has become an Allowed Claim.

1.27    **Allowed WMB Senior Notes Claim**: A WMB Senior Notes Claim, to the extent it is or has become an Allowed Claim.

1.28    **Allowed WMB Vendor Claim**: A WMB Vendor Claim, to the extent it is or has become an Allowed Claim.

1.29    **Allowed WMI Vendor Claim**: A WMI Vendor Claim, to the extent it is or has become an Allowed Claim.

1.30    **American Savings Escrow Funds**: All funds held in escrow in connection with the American Savings Litigation, pursuant to that certain Escrow Agreement, dated December 20, 1996, by and among WMI, Keystone Holdings Partners, L.P., Escrow Partners, L.P. and The Bank of New York.

1.31    **American Savings Litigation**: That certain litigation styled American Savings Bank, F.A. v. United States, No. 92-872C, currently pending in the United States Court of Federal Claims.

1.32    **Anchor Litigation**: That certain litigation styled Anchor Savings Bank, FSB v. United States, No. 95-39C, currently pending in the United States Court of Federal Claims, and on appeal in the United States Court of Appeals for the Federal Circuit, as Anchor Savings Bank, FSB v. United States, No. 2008-5175, -5182.

1.33    **Assets**: With respect to a Debtor, (i) all "property" of such Debtor's estate, as defined in section 541 of the Bankruptcy Code, including, without limitation, such property as is reflected on such Debtor's books and records as of the date of the Disclosure Statement Order (including, without limitation, received and anticipated "Net Tax Refunds," as defined in the Global Settlement Agreement) and certain Plan Contribution Assets transferred to such Debtor pursuant to the Global Settlement Agreement, unless modified pursuant to the Plan or a Final Order, and except as transferred pursuant to the Global Settlement Agreement and (ii) all claims and causes of action, and any subsequent proceeds thereof, that have been or may be commenced by such Debtor in Possession or other authorized representative for the benefit of such Debtor's estate, unless modified pursuant to the Plan or a Final Order, including, without limitation, any claim or cause of action pursuant to chapter 5 of the Bankruptcy Code.

1.34    **Avoidance Actions**: Any and all avoidance, recovery, subordination or other actions or remedies against Entities that may be brought by or on behalf of a Debtor or its estate under the Bankruptcy Code or applicable non-bankruptcy law under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

1.35    **Ballot:** The form distributed to each holder of an impaired Claim or Equity Interest entitled to vote on the plan (as set forth herein), on which is to be indicated, among other things, acceptance or rejection of the Plan.

1.36    **Ballot Date:** The date(s) established by the Bankruptcy Court and set forth in the Disclosure Statement Order for the submission of Ballots and the election of alternative treatments pursuant to the terms and provisions of the Plan; provided, however, that with respect to holders of an Equity Interest, such holders may execute and deliver a release in accordance with the provisions of Section 41.6 of the Plan up to and including the Equity Release Election Date.

1.37    **Bankruptcy Code:** The Bankruptcy Reform Act of 1978, as amended, to the extent codified in title 11, United States Code, as applicable to the Chapter 11 Cases.

1.38    **Bankruptcy Court:** The United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

1.39    **Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Chapter 11 Cases.

1.40    **Bankruptcy Stay Motions:** The motions by the FDIC Receiver and JPMC to stay or dismiss the Turnover Action and the JPMC Action in favor of proceedings before the United States District Court for the District of Columbia in the WMI Action.

1.41    **BB Liquidating Trust Interests:** Those certain Liquidating Trust Interests that are to be distributed to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders, which interests, in the aggregate, shall represent an undivided interest in WMI's share of the Homeownership Carryback Refund Amount, as defined and set forth in Section 2.4 of the Global Settlement Agreement, in an amount equal to Three Hundred Thirty-Five Million Dollars ($335,000,000.00).

1.42    **Benefit Plan:** Any employee welfare benefit plan, employee pension benefit plan, or a plan that is both an employee welfare benefit plan and an employee pension benefit plan within the meaning of Section 3(3) of ERISA, including, without limitation, those benefit plans listed on Exhibit "G" hereto, or any such similar employee benefit plan or arrangement that any of the Debtors maintained prior to the Petition Date; provided, however, that the term "Benefit Plan" does not include the WaMu Savings Plan (#002) and does not include any plan policy, or arrangement transferred to JPMC pursuant to the Global Settlement Agreement.

1.43    **BKK Group:** Collectively, the BKK Joint Defense Group, as defined in the BKK Settlement Agreement, Atlantic Richfield Corporation, THUMS Long Beach Company, Shell Exploration & Production Company, Shell Oil Company and Bayer CropScience Inc.

1.44    **BKK Liabilities:** Any and all liabilities and obligations of the WMI Entities (other than WMI Rainier LLC) for remediation or clean-up costs and expenses (and

excluding tort and tort related liabilities, if any) in excess of applicable and available insurance arising from or relating to (i) the BKK Litigation, (ii) the Amended Consent Decree, dated March 6, 2006, entered in connection therewith, and (iii) that certain Amended and Restated Joint Defense, Privilege and Confidentiality Agreement, dated as of February 28, 2005, by and among the BKK Joint Defense Group, as defined therein.

1.45   **BKK Litigation:** That certain litigation styled <u>California Department of Toxic Substances Control, et al.</u> v. <u>American Honda Motor Co., Inc., et al.,</u> No. CV05-7746 CAS (JWJx), currently pending in the United States District Court for the Central District of California.

1.46   **BKK Proofs of Claim:** The BKK Liabilities-related proofs of claim filed against the Debtors and the Debtors' chapter 11 estates numbered 2138, 2213, 2233, 2405, 2467, 2693 and 3148.

1.47   **BKK Settlement Agreement:** That certain Settlement Agreement, dated as of December 3, 2010, by and among the Debtors, JPMC, the CDTSC and the BKK Group, setting forth the compromise and settlement between the parties.

1.48   **Bond Claim:** Any Claim against the Debtors set forth on Schedule 2.23 to the Global Settlement Agreement filed by any of the Bonding Companies, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

1.49   **Bond Indemnity:** That certain General Agreement of Indemnity, as amended, dated as of June 14, 1999, executed and delivered by WMI, pursuant to which, among other things, the Bonds were to be issued and WMI agreed to pay all losses and expenses of the Bonding Companies associated therewith.

1.50   **Bonding Companies:** Safeco Insurance Company, its successor in interest, and such other insurance or bonding companies that issued Bonds pursuant to the Bond Indemnity.

1.51   **Bonds:** The bonds issued by the Bonding Companies on behalf of one or more of the Affiliated Banks or their Affiliates, each as identified on Exhibit "D" to the Global Settlement Agreement, together with the numbers of the respective proofs of Claim that have been filed with the Bankruptcy Court in connection therewith.

1.52   **Business Day:** A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York are required or authorized to close by law or executive order.

1.53   **Cash:** Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and other similar items.

1.54   **Cash Equivalents:** Equivalents of Cash in the form of readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's Rating of "A" or

better, or equivalent rating of any other nationally recognized rating service, or interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than One Hundred Million Dollars ($100,000,000.00), having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

1.55    **Causes of Action:**  All Claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) of any of the Debtors and/or their estates that are pending or may be asserted against any Entity on or after the date hereof, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

1.56    **CCB-1 Common Securities:**  The common securities set forth on Exhibit "A" hereto.

1.57    **CCB-1 Guarantees:**  The guarantees issued and delivered by WMI in accordance with the terms and conditions of the CCB-1 Guarantee Agreements, and set forth on Exhibit "A" hereto.

1.58    **CCB-1 Guarantees Claim:**  An Unsecured Claim arising from or relating to the CCB-1 Guarantees.

1.59    **CCB-1 Guarantee Agreements:**  Those certain agreements titled "Guarantee of Washington Mutual, Inc.," dated as of November 1, 2007, pursuant to which WMI guaranteed payment of the obligations and liabilities of WMB under certain agreements and related securities issued by the CCB Capital Trust IV, CCB Capital Trust V, CCB Capital Trust VII, and CCB Capital Trust VIII.

1.60    **CCB-1 Preferred Securities:**  The preferred securities set forth on Exhibit "A" hereto.

1.61    **CCB-1 Trustee:**  Wilmington Trust Company, as Trustee, or its duly appointed successor, solely in its capacity as trustee with regard to each of the CCB-1 Guarantee Agreements.

1.62    **CCB-2 Common Securities:**  The common securities set forth on Exhibit "B" hereto.

1.63    **CCB-2 Guarantees:** The guarantees issued and delivered by WMI in accordance with the terms and conditions of the CCB-2 Guarantee Agreements, and set forth on Exhibit "B" hereto.

1.64    **CCB-2 Guarantees Claim:** An Unsecured Claim arising from or relating to the CCB-2 Guarantees.

1.65    **CCB-2 Guarantee Agreements:** Those certain agreements titled "Guarantee of Washington Mutual, Inc.," dated as of November 1, 2007, pursuant to which WMI guaranteed payment of the obligations and liabilities of WMB under certain agreements and related securities issued by the HFC Capital Trust I, CCB Capital Trust VI, and CCB Capital Trust IX.

1.66    **CCB-2 Preferred Securities:** The preferred securities set forth on Exhibit "B" hereto.

1.67    **CCB-2 Trustees:** Wilmington Trust Company, as Trustee, and Deutsche Bank Trust Company Americas, as Trustee, or their duly appointed successors, solely in their capacities as trustees with regard to each of the CCB-2 Guarantee Agreements.

1.68    **CCB Releasees:** Collectively, and in the event that CCB-1 Guarantees Claims, CCB-2 Guarantees Claims and Postpetition Interest Claims with respect to each of the foregoing Claims are not paid in full in accordance with the provisions of the Plan, each holder of record or beneficial owner of an Allowed CCB-1 Guarantees Claim or an Allowed CCB-2 Guarantees Claim, and any Affiliate of such Entities which, during the Chapter 11 Cases, owned, invested or acquired a CCB-1 Guarantees Claim or a CCB-2 Guarantees Claim, and each of their respective officers, directors, partners, equity investors, investment managers, management companies, members, employees and, solely to the extent as counsel to a holder of record or beneficial owner of an Allowed CCB-1 Guarantees Claim or an Allowed CCB-2 Guarantees Claim with respect to the Debtors' Chapter 11 Cases, attorneys.

1.69    **CDTSC:** California Department of Toxic Substances Control.

1.70    **Chapter 11 Cases:** The jointly administered cases commenced by the Debtors styled as In re Washington Mutual, Inc., et al. and being jointly administered in the Bankruptcy Court, Case No. 08-12229 (MFW), under chapter 11 of the Bankruptcy Code.

1.71    **Claim:** Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, causes of action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.72    **Class:** A category of holders of Claims or Equity Interests set forth in Article IV of the Plan.

1.73    **Common Equity Interest:** Collectively, (a) an Equity Interest represented by the 3,000,000,000 authorized shares of common stock of WMI, including, without limitation, one of the 1,704,958,913 shares of common stock of WMI issued and outstanding as of the Petition Date, or any interest or right to convert into such an Equity Interest or acquire any Equity Interest of WMI that was in existence immediately prior to or on the Petition Date or (b) a Claim, other than with respect to the Dime Warrants, which pursuant to a Final Order, has been subordinated to the level of Equity Interest in accordance with section 510 of the Bankruptcy Code or otherwise and whose shall count, for purposes of calculating Pro Rata Share of distributions, shall be determined by dividing the amount of an Allowed Claim by the per share price of WMI common stock as of either (a) the Petition Date, (b) the close of business on the day immediately preceding the Petition Date, (c) December 12, 2011, or (3) such other date as determined by the Bankruptcy Court.

1.74    **Common Stock Allotment:** Ten Million (10,000,000) shares of Reorganized Common Stock, representing five percent (5%) of the issued and outstanding Reorganized Common Stock as of the Effective Date.

1.75    **Confirmation Date:** The date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.76    **Confirmation Hearing:** The hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.77    **Confirmation Order:** The order of the Bankruptcy Court confirming the Plan in accordance with section 1129 of the Bankruptcy Code, approving the compromise and settlement set forth in the Global Settlement Agreement and directing the consummation of the transactions contemplated therein, which order shall be in form and substance reasonably satisfactory to the Debtors, JPMC, the Creditors' Committee, the Equity Committee, the FDIC Receiver, FDIC Corporate and AAOC; provided, however, that, with respect to provisions of the Confirmation Order that affect or otherwise relate to (a) the economic substance of the Plan, (b) the withdrawal and vacatur of the September Order, to the extent relating to the Standing Motion, and certain portions of the September Opinion, as set forth in Section 36.1(a)(11) of the Plan, and (c) the releases provided in Sections 41.5 and 41.6 the Plan, such order shall be in form and substance satisfactory to the foregoing parties and the WMI Noteholder Group as represented by White & Case LLP.

1.78    **Convenience Claim:** A Claim equal to or less than Fifty Thousand Dollars ($50,000.00) or greater than Fifty Thousand Dollars ($50,000.00) but, with respect to which, the holder thereof voluntarily reduces such Claim to Fifty Thousand Dollars ($50,000.00) on the Ballot; provided, however, that, for purposes of the Plan and the distributions to be made hereunder, "Convenience Claim" shall not include (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) a Priority Non-Tax Claim, (iv) a Senior Notes Claim, (v) a Senior Subordinated Notes Claim, (vi) any JPMC Assumed Liability Claim, (vii) a WMB Vendor Claim, (viii) a WMI Vendor Claim, (ix) a CCB-1 Guarantees Claim, (x) a CCB-2 Guarantees Claim, (xi) a PIERS Claim, (xii) a WMB Notes Claim, (xiii) a Subordinated Claim, (xiv) a

Trustee Claim, (xv) a Late-Filed Claim, and (xvi) any other Claim that is a component of a larger Claim, portions of which may be held by one or more holders of Allowed Claims.

1.79    **Credit Facility**: The credit facility to be entered into by Reorganized WMI on the Effective Date providing for the funding of, among other things, working capital, permitted acquisitions and permitted originations by Reorganized WMI, as referenced in Section 32.11 of the Plan and fully set forth in the Credit Agreement annexed hereto as Exhibit "C".

1.80    **Creditor**: Any Entity holding a Claim against one or more of the Debtors or the Debtors' estates or, pursuant to section 102(2) of the Bankruptcy Code, against property of the Debtors, including, without limitation, a Claim against either one of the Debtors or Debtors in Possession of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

1.81    **Creditor Cash**: On the Effective Date (or as soon as practicable thereafter when the Disbursing Agent is prepared to make its initial distribution pursuant to Section 31.1 of the Plan), the excess, if any, of (i) all Cash and Cash Equivalents to be distributed by the Disbursing Agent in accordance with the Plan over (ii) such amounts of Cash (a) reasonably determined by the Disbursing Agent as necessary to satisfy, in accordance with the terms and conditions of the Plan, Allowed Administrative Expense Claims, Allowed Priority Tax Claims (to the extent necessary), Allowed Priority Non-Tax Claims, Allowed Convenience Claims, Trustee Claims, the fees and expenses owed to certain Creditors' professionals pursuant to Section 41.18 herein, and fees and expenses of the Disbursing Agent as of the Effective Date, (b) necessary to fund the Liquidating Trust in accordance with Article XXVII of the Plan, as reasonably determined by the Debtors, (c) necessary to make pro rata distributions to holders of Disputed Claims as if such Disputed Claims were, at such time, Allowed Claims, (d) necessary to make pro rata distributions to holders of Administrative Expense Claims that have not yet been filed or Allowed as of the Effective Date, and (e) such other amounts reasonably determined by the Disbursing Agent (in consultation with the Liquidating Trustee) as necessary to fund the ongoing operations of the Liquidating Trust during the period from the Effective Date up to and including such later date as the Disbursing Agent shall reasonably determine; provided, however, that "Creditor Cash" shall include Cash in the Vendor Escrow only to the extent of WMI's share of Cash remaining in such escrow after payment of Allowed WMI Vendor Claims.

1.82    **Creditors' Committee**: The official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.83    **Debtors**: WMI and WMI Investment.

1.84    **Debtors' Claims**: The proof of claim filed by the Debtors and each of WMI's direct and indirect non-banking subsidiaries, on December 30, 2008, with the FDIC Receiver in connection with WMB's receivership, asserting claims on behalf of the Debtors' chapter 11 estates, and as asserted in the WMI Action.

1.85    **Debtors in Possession**: The Debtors as debtors in possession pursuant to sections 1101(1), 1107(a), and 1108 of the Bankruptcy Code.

1.86    **Dime Inc.**: Dime Bancorp, Inc.

1.87 **Dime Warrant Litigation**: That certain litigation styled Broadbill Investment Corp., et al. v. Washington Mutual, Inc., Adversary Pro. No. 10-50911 (MFW), currently pending in the Bankruptcy Court.

1.88 **Dime Warrants**: Those certain Litigation Tracking Warrants™ for shares of Dime Inc. common stock based on the value of the recovery in the Anchor Litigation, which warrants, as a result of the merger of Dime Inc. into WMI, are exchangeable for and into shares of Common Equity Interests in WMI upon certain conditions and whose share count, for purposes of calculating Pro Rata Share of distributions and the number of shares of Reorganized Common Stock to be reserved in the Disputed Equity Escrow, shall be determined by dividing the amount of the Claim by the per share price of WMI common stock as of either (a) the Petition Date, as if the Trigger Event, as defined in the Dime Warrant Litigation, had not occurred, (b) the close of business on the day immediately preceding the Petition Date, (c) December 12, 2011, as if the Trigger Event had not occurred, (d) the Petition Date, as if the Trigger Event had occurred, (e) December 12, 2011, as if the Trigger Event had occurred, or (f) such other date as determined by the Bankruptcy Court.

1.89 **Disbursing Agent**: With respect to (a) the initial distribution of (i) Cash pursuant to Article III of the Plan to holders of Allowed Administrative Expense Claims and, to the extent applicable, Allowed Priority Tax Claims as of the Effective Date, (ii) Cash to holders of Allowed Priority Non-Tax Claims as of the Effective Date, (iii) Cash to holders of Allowed Convenience Claims, Allowed WMI Claims, Allowed Trustee Claims, and the fees and expenses owed to certain Creditors' professionals pursuant to Section 41.18 hereof, in each case as of the Effective Date, (iv) Creditor Cash pursuant to Section 31.1 hereof, and (v) Runoff Notes, Liquidating Trust Interests and Reorganized Common Stock to or for the benefit of holders of Allowed Claims and Equity Interests, as applicable, the Reorganized Debtors or the Reorganized Debtors' designee and (b) with respect to all other distributions, the Liquidating Trustee or any Entity in its capacity as a disbursing agent. The Disbursing Agent also shall, at the election of JPMC, make the distribution to each Releasing REIT Trust Holder set forth in Article XXIII of the Plan from Cash or stock transferred by JPMC to the Disbursing Agent for that purpose. In their role as Disbursing Agent, the Reorganized Debtors shall hold Cash, Creditor Cash, Runoff Notes, Reorganized Common Stock and Liquidating Trust Interests as agent only, and shall not have any ownership interest in such cash, stock or interests.

1.90 **Disclosure Statement**: The disclosure statement relating to the Plan and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.91 **Disclosure Statement Order**: The Final Order of the Bankruptcy Court approving the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code.

1.92 **Disputed Accounts**: The amounts and intercompany balances identified with the account numbers set forth on Exhibit "E" to the Global Settlement Agreement.

1.93 **Disputed Claim**: A Claim against the Debtors, to the extent the allowance of such Claim is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed by the Debtors in accordance with applicable law, and which

objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

1.94    **Disputed Equity Escrow:** The escrow created on the Effective Date to hold such shares of Reorganized Common Stock allocable to any Disputed Equity Interest, including, but not limited to, Dime Warrants until such time as the Dime Warrant Litigation is determined, pursuant to a Final Order, or a compromise and settlement is approved by the Bankruptcy Court.

1.95    **Disputed Equity Interest:** An Equity Interest in or Claim against the Debtors (which Claim is or has been determined by the Bankruptcy Court to be subject to subordination to the level of Common Equity Interest in accordance with section 510 of the Bankruptcy Code), including, without limitation, holders of restricted shares of Common Equity Interests, to the extent the allowance of such Equity Interest is the subject of a timely objection in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or as otherwise disputed by the Debtors in accordance with applicable law, and which objection or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

1.96    **Distribution Record Date:** The Effective Date.

1.97    **Effective Date:** The first (1st) Business Day on which (i) all of the conditions precedent to confirmation of the Plan specified in Section 36.1 of the Plan shall have been satisfied or waived, as provided in Section 36.2 of the Plan, and (ii) all the conditions precedent to the effectiveness of the Plan specified in Section 37.1 of the Plan shall have been satisfied or waived as provided in Section 37.2 of the Plan.

1.98    **Entity:** A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.99    **Equity Committee:** The official committee of equity security holders appointed in the Chapter 11 Cases.

1.100    **Equity Committee Adversary Proceeding:** The adversary proceeding commenced in the Chapter 11 Cases by the Equity Committee, styled Official Committee of Equity Security Holders v. Washington Mutual, Inc., Adversary Pro. No. 10-50731 (MFW).

1.101    **Equity Committee Action to Compel:** The action commenced by the Equity Committee on April 26, 2010 in the Thurston County Superior Court in the state of Washington seeking to compel WMI to convene and hold an annual shareholders' meeting for the nomination and election of directors in accordance with Washington state law, which action was (i) removed to the United States Bankruptcy Court for the Western District of Washington on May 13, 2010, and (ii) transferred to the Bankruptcy Court pursuant to an order, dated June 21, 2010.

1.102  **Equity Release Election Date**:  The date established by the Bankruptcy Court and set forth in the Disclosure Statement Order for the submission by holders of Preferred Equity Interests and Common Equity Interests of executed releases in accordance with Section 41.6 of the Plan in order to be entitled to receive distributions pursuant to the Plan.

1.103  **Equity Interest**:  The interest of any holder of one or more equity securities of WMI (including, without limitation, voting rights, if any, related to such equity securities) represented by issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in WMI, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including, without limitation, unvested restricted stock.

1.104  **Estate Claims**:  Any Claims and causes of action, regardless of whether asserted by the Debtors, the Liquidating Trust, the Creditors' Committee or the Equity Committee, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, that (a) are based upon, relate to, or arise out of or in connection with, in whole or in part any act, omission, transaction, event or other circumstance relating to the Debtors and the Chapter 11 Cases, (b) exist on or prior to the Effective Date, and (c) are or may be asserted against (i) the AAOC Releasees with respect to any conduct or, (ii) any of (1) the PIERS Claims Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated Notes Claims Releasees and (4) the CCB Releasees with respect to (A) any and all Claims for equitable disallowance and equitable subordination, (B) any and all Claims with respect to any conduct undertaken during the period from and after the Petition Date and (C) any and all Claims with respect to conduct undertaken during the period prior to the Petition Date solely in their capacity as holders of any securities issued by the Debtors or their subsidiaries, including, without limitation, any claims for insider trading or violations of securities laws; provided, however, that, solely with respect to clause (ii) above, under no circumstances shall Estate Claims include (y) any Claims related to trading in the securities issued by the Debtors or their subsidiaries that are based on an allegation that such trading contributed to the failure of WMB or the commencement of the Chapter 11 Cases, including, without limitation, any Claims discussed on pages 330-338 of that certain Final Report of the Examiner, dated November 1, 2010, issued by Joshua R. Hochberg, appointed as Examiner in these Chapter 11 Cases, and (z) Preserved Avoidance Actions.  For the avoidance of doubt, "Estate Claims" shall include, without limitation, (1) any claim relating to the trading of the Debtors' securities during the period from the Petition Date up to and including the Effective Date and (2) any claim for equitable subordination or equitable disallowance.

1.105  **FDIC Claim**:  The proof of Claim filed by the FDIC Receiver against the Debtors and the Debtors' estates, in an unliquidated amount, which was assigned claim number 2140.

1.106  **FDIC Corporate**:  The Federal Deposit Insurance Corporation, in its corporate capacity.

1.107  **FDIC Receiver:**  The Federal Deposit Insurance Corporation, in its capacity as receiver for WMB.

1.108  **FDIC Stay Relief Motion:**  That certain Motion of the Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank, for an Order Modifying the Automatic Stay, filed by the FDIC Receiver in the Chapter 11 Cases, dated November 4, 2009 [Docket No. 1834], seeking relief from the automatic stay pursuant to section 362 of the Bankruptcy Code in order to exercise rights pursuant to Section 9.5 of the Purchase and Assumption Agreement.

1.109  **Final Order:**  An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or, (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, (a) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order and (b) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.110  **Fixed Rate Notes:**  Those Senior Notes issued pursuant to the Senior Notes Indenture having a fixed rate of interest.

1.111  **Floating Rate Notes:**  Those Senior Notes issued pursuant to the Senior Notes Indenture having a floating rate of interest.

1.112  **FSB:**  Washington Mutual Bank fsb.

1.113  **General Unsecured Claim:**  An Unsecured Claim against the Debtors other than a Senior Notes Claim, a Senior Subordinated Notes Claim, a JPMC Assumed Liability Claim, a WMB Vendor Claim, a WMI Vendor Claim, a CCB-1 Guarantees Claim, a CCB-2 Guarantees Claim, a PIERS Claim, a WMB Notes Claim, a Convenience Claim, a Subordinated Claim, a Late-Filed Claim, or a Trustee Claim, including, without limitation, any portion of a larger claim to the extent such portion does not relate to JPMC Assumed Liabilities.

1.114  **Global Settlement Agreement:**  That certain Second Amended and Restated Settlement Agreement, dated as of February 7, 2011, by and among the Debtors, the JPMC Entities, the FDIC Receiver, FDIC Corporate, and the Creditors' Committee, as it has been and may be further amended, together with all exhibits annexed thereto, setting forth the compromise and settlement between the parties of, among other things, (i) the WMI Action, (ii) the JPMC Action, (iii) the Turnover Action, (iv) the Rule 2004 Inquiry, (v) the Debtors' Claims,

(vi) the JPMC Claims, (vii) the Bankruptcy Stay Motions and the appeals therefrom, (viii) the FDIC Claim, and (ix) the transfer of the Trust Preferred Securities and the consequent issuance of the REIT Series, and the sale, free and clear of all Liens, Claims and encumbrances, of the Plan Contribution Assets, a copy of which is annexed hereto as Exhibit "I".

1.115  **Guarantee Agreements:** The CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, and PIERS Guarantee Agreement.

1.116  **Indentures:** The Senior Notes Indenture, the Senior Subordinated Notes Indenture, and the Junior Subordinated Notes Indenture.

1.117  **Information Demands:** Any and all subpoenas and other demands for documents, testimony and other information issued in connection with any current or future pending or threatened legal proceedings (whether judicial, regulatory, administrative, arbitral, investigative, criminal, civil, or otherwise).

1.118  **Intercompany Claim:** A Claim against any of the WMI Entities held by another of the WMI Entities; provided, however, that "Intercompany Claim" does not include any PIERS Claim.

1.119  **Intercompany Notes:** Those certain intercompany notes set forth on Exhibit "V" to the Global Settlement Agreement.

1.120  **IRC:** The Internal Revenue Code of 1986, as amended from time to time.

1.121  **Intercreditor Interest Claim:** A Claim for interest accrued in respect of an outstanding obligation or liability during the period from the Petition Date up to and including the date of final payment in full of such Claim, arising from contractual subordination rights and payable in accordance with the Subordination Model attached hereto as Exhibit "H", as required by section 510(a) of the Bankruptcy Code, calculated at the contract rate set forth in any agreement related to such Claim, compounded as provided in such agreement, provided that interest shall continue to accrue only on the then outstanding and unpaid obligation or liability that is the subject of such Claim.

1.122  **IRS:** The Internal Revenue Service, an agency of the United States Department of Treasury.

1.123  **January Opinion:** That certain Opinion, dated January 7, 2011, issued by the Bankruptcy Court with respect to, among other things, the confirmability of the Sixth Amended Plan and the solicitation of acceptances and releases in connection with the Sixth Amended Plan [Docket No. 6528].

1.124  **JPMC:** JPMorgan Chase Bank, N.A.

1.125  **JPMC Action:** The adversary proceeding commenced in the Chapter 11 Cases by JPMC, styled JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc., et al., Adversary Pro. No. 09-50551 (MFW).

1.126  **JPMC Allowed Unsecured Claim:** Collectively, the JPMC Claims, which shall be deemed an Allowed Claim against WMI and shall be classified with and treated in the same manner as other Allowed General Unsecured Claims pursuant to the Plan; provided, however, that, in the sole and absolute discretion of the Debtors, for purposes of the Global Settlement Agreement, each Allowed Claim constituting the JPMC Allowed Unsecured Claim may be counted as a separate claim for purposes of voting to accept or reject the Plan.

1.127  **JPMC Assumed Liabilities:** Collectively, and except as otherwise set forth in the Global Settlement Agreement, the obligations, undertakings and liabilities expressly assumed by JPMC and the Acquisition JPMC Entities in the Global Settlement Agreement, as follows:  (a) to the extent payment or performance of such liability or obligation arising from or relating to the period from and after the effective date of the Global Settlement Agreement, all obligations, undertakings and liabilities relating to such payment or performance, and (b) to the extent payment or performance of such liability or obligation was due during the period prior to the effective date of the Global Settlement Agreement, all obligations, undertakings and liabilities relating to such payment or performance to the extent of, and in the amounts of, the contractual obligations, undertakings and liabilities arising from or relating to such obligations, undertakings and liabilities; provided, however, that, for purposes of clause (b) above, or to the extent that the delay in payment or performance thereof was due to the actions or inactions, as the case may be, of the WMI Entities, "JPMC Assumed Liabilities" shall not include (i) any damages or compensation for any default, failure to perform or delay in the performance or payment of any obligations, undertakings, or liabilities in connection with such assets or agreements, whether or not provided for in any agreement, document, applicable provision of law or otherwise, (ii) any damages, losses, liabilities, claims or causes of action that are based in tort or on any statute, regulation, rule or principle of applicable or common law or promulgated by governmental or regulatory authority or agency, or that otherwise are extra contractual, (iii) any special, exemplary, consequential or punitive damages, or (iv) Taxes other than Taxes that JPMC has specifically agreed to pay pursuant to Section 2.4 of the Global Settlement Agreement.

1.128  **JPMC Assumed Liability Claim:** A Claim arising from or relating to a JPMC Assumed Liability.

1.129  **JPMC Claims:** The proofs of Claim filed by JPMC against the Debtors and the Debtors' estates, as listed in Exhibit "A" to the Global Settlement Agreement and as resolved in accordance with Section 2.22 of the Global Settlement Agreement.

1.130  **JPMC Entities:** JPMC, collectively with those of its Affiliates that have filed proofs of Claims against the Debtors or that are Acquisition JPMC Entities.

1.131  **JPMC Policies:** All BOLI/COLI policies and the proceeds thereof set forth on Exhibit "N" to the Global Settlement Agreement, and all CCBI split dollar policies set forth on Exhibit "O" to the Global Settlement Agreement.

1.132  **JPMC Rabbi Trust/Policy Claim:** Any Claim against the Debtors and their chapter 11 estates set forth on Schedule 2.9(a) to the Global Settlement Agreement filed by a beneficiary of the JPMC Rabbi Trusts or the JPMC Policies, to the extent such Claim

constitutes an Allowed JPMC Assumed Liability Claim and to the extent payable, in whole or in part, by the Debtors or the Debtors' chapter 11 estates.

1.133  **JPMC Rabbi Trusts:** The "rabbi trusts" set forth on Exhibit "M" to the Global Settlement Agreement, including all assets therein.

1.134  **Junior Subordinated Notes Indenture:** That certain Indenture, dated as of April 30, 2001, as supplemented by that certain First Supplemental Indenture, dated as of April 30, 2001, between WMI and The Bank of New York Mellon Trust Company, N.A., as Trustee.

1.135  **Lakeview Plan:** That certain Retirement Income Plan for the Salaried Employees of Lakeview Savings Bank, which plan is intended to satisfy the tax requirements of Section 401 of the IRC and is sponsored by WMI.

1.136  **Late-Filed Claim:** A Claim against any of the Debtors or the Debtors' estates, (i) proof of which was filed subsequent to the date designated by the Bankruptcy Court as the last date for filing such proof of claim against any such Debtor or such Debtors' estate, but prior to the commencement of the Confirmation Hearing, and which is not merely amending or superseding a Claim that was filed prior to such date, and (ii) which has not been listed by such Debtor in its Schedules as liquidated in amount and not disputed or contingent.

1.137  **Lien:** Any charge against or interest in property to secure payment of a debt or performance of an obligation.

1.138  **Liquidating Trust:** The Entity to be created on or after the Confirmation Date in accordance with the provisions of Article XXVII hereof and the Liquidating Trust Agreement, for the benefit of (i) holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, Allowed WMB Senior Notes Claims, Allowed Late-Filed Claims, and Allowed Subordinated Claims, (ii) Accepting Non-Filing WMB Senior Note Holders, and (iii) in certain circumstances, holders of Preferred Equity Interests, Dime Warrants and Common Equity Interests, in accordance with the terms and provisions of the Plan.

1.139  **Liquidating Trust Agreement:** The Liquidating Trust Agreement, substantially in the form contained in the Plan Supplement, pursuant to which the Liquidating Trustee shall manage and administer the Liquidating Trust Assets and distribute the proceeds thereof, if any.

1.140  **Liquidating Trust Assets:** From and after the Effective Date, all Assets of the Debtors (including, without limitation, certain Plan Contribution Assets and such Runoff Notes which are either (a) not distributed on the Effective Date or (b) placed into the Liquidating Trust Claims Reserve) except (i) Cash to be distributed by the Reorganized Debtors as Disbursing Agent to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims (to the extent applicable), Allowed Priority Non-Tax Claims, Allowed Convenience Claims, Allowed WMI Vendor Claims, Allowed Trustee Claims, and the fees and expenses owed to certain Creditors' professionals pursuant to Section 41.18 herein, in each case as of the

Effective Date, (ii) Cash necessary to reimburse the Reorganized Debtors for fees and expenses incurred in connection with initial distributions made by the Reorganized Debtors as Disbursing Agent, (iii) the economic interest retained by the Debtors in any Litigation Proceeds pursuant to the respective elections for Reorganized Common Stock, and (iv) Creditor Cash on the Effective Date and the equity interests in each of WMI Investment (all the assets of which, for the avoidance of doubt, shall be contributed to the Liquidating Trust, including any Intercompany Claims), WMMRC and WMB.

1.141    **Liquidating Trust Beneficiaries:**  The (i) holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, Allowed Late-Filed Claims, and Allowed WMB Senior Notes Claims, (ii) Accepting Non-Filing WMB Senior Note Holders, and (iii) in certain circumstances, holders of Allowed Subordinated Claims, Preferred Equity Interests, Dime Warrants and Common Equity Interests, to the extent such holders have received Liquidating Trust Interests under the Plan (and any transferee thereof, and any subsequent transferee of any transferor of Liquidating Trust Interests in accordance with the provisions of Section 27.8 of the Plan).

1.142    **Liquidating Trust Claims Reserve:**  Any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, even if held in commingled accounts.

1.143    **Liquidating Trustee:**  William C. Kosturos, as "Managing Trustee," CSC Trust Company of Delaware, as "Resident Trustee," and such additional trustee(s) as may be appointed by the Trust Advisory Board in accordance with applicable law.

1.144    **Liquidating Trust Interests:**  The beneficial interests in the Liquidating Trust allocable to certain holders of Allowed Claims and Equity Interests (and any transferee thereof, and any subsequent transferee of any transferor of Liquidating Trust Interests) in accordance with the terms and conditions of Article XXVII of the Plan, including, without limitation, the BB Liquidating Trust Interests; provided, however, that (i) the BB Liquidating Trust Interests shall only be distributed to holders of Allowed WMB Senior Notes Claims and Accepting Non Filing WMB Senior Note Holders and (ii) for purposes of distributing Liquidating Trust Interests, "Pro Rata Share" shall not include the BB Liquidating Trust Interests.

1.145    **Litigation Proceeds:**  Recoveries, net of related legal fees and other expenses, on account of Causes of Action against third parties, including, without limitation, and subject to the release and exculpation provisions herein, professionals and other advisors engaged by the Debtors on or prior to the Petition Date, officers, directors and employees and relating to actions taken or inactions, as the case may be, during the period prior to the Petition Date, but, expressly excluding recoveries on account of any Avoidance Actions.

1.146    **Litigation Proceeds Interest:**  The interest of a holder of a Claim or Equity Interest in the Litigation Proceeds by virtue of such holder's right to receive Liquidating Trust Interests pursuant to the Plan.

1.147 **Local Bankruptcy Rules:** The Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as amended from time to time.

1.148 **Modified Plan:** The Modified Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated February 7, 2011, as amended.

1.149 **Non-Filing WMB Senior Note Holder:** A holder of a WMB Senior Note who did not timely file a proof of Claim against the Debtors.

1.150 **Non-Filing WMB Senior Note Holders Election Form:** The form distributed to each Non-Filing WMB Senior Note Holder in connection with the solicitation of acceptances with respect to the Sixth Amended Plan on which each such holder indicated, among other things, whether or not such holder elects to grant certain releases (as described therein and in the Plan) in order to share in their Pro Rata Share of BB Liquidating Trust Interests, as set forth in Section 21.1(b) of the Plan.

1.151 **Original Disclosure Statement Order:** The Final Order of the Bankruptcy Court, dated October 21, 2010, (a) approving the adequacy of the information contained in the disclosure statement associated with the Sixth Amended Plan and (b) establishing, among other things, the solicitation procedures with respect to the Sixth Amended Plan, including, without limitation, procedures for holders of REIT Series to elect to receive distributions pursuant to the Sixth Amended Plan.

1.152 **Other Benefit Plan Claim:** Any Claim against the Debtors set forth on Schedule 2.9(c) to the Global Settlement Agreement filed by a beneficiary of a benefit plan listed on Exhibit "P" to the Global Settlement Agreement, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

1.153 **Other Subordinated Claim:** A Claim determined pursuant to a Final Order to be subordinated in accordance with section 510(b), to the extent that such Claim related to the purchase or sale of a debt security (rather than an equity security), or 510(c) of the Bankruptcy Code; provided, however, that "Other Subordinated Claim" shall not include Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed JPMC Assumed Liability Claims, Allowed WMB Vendor Claims, Allowed WMI Vendor Claims, Allowed Convenience Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Trustee Claims; and, provided, further, that, any Claim related to the purchase or sale of an equity security that is subordinated in accordance with section 510(b) of the Bankruptcy Code shall be classified with and receive the treatment provided for the Preferred Equity Interests or Common Equity Interests, as appropriate.

1.154 **Penalty Claim:** A Claim for a fine, penalty, forfeiture, or for multiple, exemplary, or punitive damages, or otherwise not predicated upon compensatory damages, that is subject to subordination in accordance with section 726(a)(4) of the Bankruptcy Code or otherwise, as determined pursuant to a Final Order.

1.155 **Pension Plans:** The WaMu Pension Plan and the Lakeview Plan.

1.156  **Person:** An individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government, or agency or political subdivision thereof, or any other form of legal entity.

1.157  **Petition Date:** September 26, 2008, the date on which each of the respective Debtors filed its voluntary petition for relief commencing the Chapter 11 Cases.

1.158  **PIERS Claim:** An Unsecured Claim arising from or related to the PIERS Trust Agreement, the PIERS Guarantee Agreement and the Junior Subordinated Notes Indenture, on account of the PIERS Common Securities or the PIERS Preferred Securities.

1.159  **PIERS Claims Releasees:** Each holder of record or beneficial owner of an Allowed PIERS Claim, and any Affiliate of such Entities which, during the Chapter 11 Cases, owned, invested or acquired PIERS Claims, and each of their respective officers, directors, partners, equity investors, investment managers, management companies, members, employees and, solely to the extent as counsel to a holder of record or beneficial owner of an Allowed PIERS Claim with respect to the Debtors' Chapter 11 Cases, attorneys.

1.160  **PIERS Common Securities:** The common securities set forth on Exhibit "D" hereto.

1.161  **PIERS Guarantee Agreement:** That certain Guarantee Agreement, dated as of April 30, 2001, as amended by that certain Amendment No. 1 to the Guarantee Agreement, dated as of May 16, 2001, between WMI, as Guarantor, and The Bank of New York, as Guarantee Trustee.

1.162  **PIERS Preferred Securities:** The preferred securities set forth on Exhibit "D" hereto.

1.163  **PIERS Trust Agreement:** That certain Amended and Restated Declaration of Trust, Washington Mutual Capital Trust 2001, dated as of April 30, 2001.

1.164  **PIERS Trustee:** Wells Fargo Bank, National Association, solely in its capacity as successor in interest to The Bank of New York Mellon Trust Company, N.A., solely in its capacity as successor in interest to The Bank of New York, or its duly appointed successor, as Trustee and as Guarantee Trustee, solely in its capacity as trustee with regard to the Junior Subordinated Notes Indenture and the PIERS Guarantee Agreement.

1.165  **Plan:** This Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, including, without limitation, the exhibits and schedules hereto, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.166  **Plan Contribution Assets:** All right, title and interest of the WMI Entities, the JPMC Entities, and the FDIC Receiver and FDIC Corporate in and to the assets set forth on Exhibit "G" to the Global Settlement Agreement, which shall be sold, pursuant to the Plan and as required by the Global Settlement Agreement, free and clear of all Liens, Claims and encumbrances.

1.167  **Plan Supplement:** A separate volume, to be filed with the clerk of the Bankruptcy Court, including, among other documents, forms of (i) the Liquidating Trust Agreement, (ii) the Reorganized Debtors By-laws, if applicable, (iii) (A) the Reorganized Debtors' Amended and Restated Articles of Incorporation and (B) the Reorganized Debtors' Certificates of Incorporation, if applicable, (iv) a schedule of executory contracts and unexpired leases to be assumed or assumed and assigned pursuant to Section 34.1 of the Plan, (v) a registration rights agreement (if any) with respect to the Reorganized Common Stock, (vi) the documents governing the Runoff Notes and (vii) the documents associated with the Credit Facility (other than the Credit Agreement annexed hereto as Exhibit "C"), which, in each case, shall be in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, the Equity Committee and AAOC; provided, however, that, with respect to documents associated with the Credit Facility, such documents shall be in form and substance satisfactory to all such parties. The Plan Supplement (containing drafts or final versions of the foregoing documents) shall be filed with the clerk of the Bankruptcy Court as soon as practicable (but in no event later than fifteen (15) days) prior to the Ballot Date, or on such other date as the Bankruptcy Court establishes. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

1.168  **Plan Support Agreement:** That certain Plan Support Agreement, dated as of October 6, 2010, by and among the Debtors and the Settlement WMB Senior Note Holders.

1.169  **Postpetition Interest Claim:** A Claim against any of the Debtors or the Debtors' estates for interest accrued in respect of an outstanding obligation or liability that is the subject of an Allowed Claim during the period from the Petition Date up to and including the date of final payment in full of such Allowed Claim, calculated at the federal judgment rate of 1.95%, the rate as in effect on the Petition Date, compounded annually, provided that interest shall continue to accrue only on the then outstanding and unpaid obligation or liability, including any postpetition interest compounded thereon, that is the subject of an Allowed Claim.

1.170  **Preferred Equity Interest:** An Equity Interest represented by an issued and outstanding share of preferred stock of WMI prior to or on the Petition Date, including, without limitation, those certain (i) Series K Perpetual Non-Cumulative Floating Rate Preferred Stock, (ii) Series R Non-Cumulative Perpetual Convertible Preferred Stock, and (iii) the REIT Series.

1.171  **Preserved Avoidance Actions:** An Avoidance Action that is, as of December 12, 2011, preserved by (a) a tolling agreement between the Creditors' Committee, the Equity Committee and/or the Debtors, on the one hand, and the target of such Avoidance Action, on the other hand, or (b) the litigation commenced by the Creditors' Committee, the Equity Committee and/or the Debtors against the target of any such Avoidance Action.

1.172  **Priority Non-Tax Claim:** A Claim entitled to priority in payment pursuant to section 507(a)(4), 507(a)(5), 507(a)(7), or 507(a)(9) of the Bankruptcy Code.

1.173  **Priority Tax Claim:** A Claim of a governmental unit against the Debtors of the kind entitled to priority in payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.174 **Privileges:** All attorney-client privileges, work product protections, and other immunities or protections from disclosure held by the Debtors.

1.175 **Pro Rata Share:** With respect to Allowed Claims (i) within the same Class, the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class, and (ii) among all Classes, the proportion that a Class of Allowed Claims bears to the sum of all Allowed Claims, without regard to subordination; provided, however, that, notwithstanding the foregoing, for purposes of distributing Creditor Cash and Liquidating Trust Interests, "Pro Rata Share" shall not include Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, JPMC Assumed Liability Claims, WMB Vendor Claims, WMI Vendor Claims, WMB Senior Notes Claims, Convenience Claims, Subordinated Claims and Trustee Claims. With respect to redistributions of Liquidating Trust Interests to holders of Allowed Subordinated Claims, the proportion that an Allowed Subordinated Claim bears to the sum of all Allowed Subordinated Claims; and, provided, further, that, with respect to distribution of BB Liquidating Trust Interests to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders, "Pro Rata Share" shall mean the proportion that an Allowed WMB Senior Notes Claim or the aggregate face amount of WMB Senior Notes, plus interest accrued to the Petition Date, held by an Accepting Non-Filing WMB Senior Note Holder bears to the aggregate of (i) all Allowed WMB Senior Notes Claims and (ii) the aggregate face amount of WMB Senior Notes, plus interest accrued to the Petition Date, held by Accepting Non-Filing WMB Senior Note Holders; and, provided, further, that, with respect to any elections to receive Reorganized Common Stock, "Pro Rata Share" shall mean the proportion of the original principal amount of the Runoff Notes which a holder may be entitled to receive and for which such holder elected to be tendered bears to the sum of the original principal amount of the Runoff Notes which all holders may be entitled to receive and for which all holders elected to be tendered pursuant to Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b) and 20.2 of the Plan. With respect to Equity Interests, "Pro Rata Share" shall mean (i) within the same Class, the proportion that an Equity Interest bears to the sum of all Equity Interests within such Class, and (ii) among all Classes, the proportion that a Class of Equity Interests bears to the sum of all Equity Interests; provided, however, that, with respect to distributions of Reorganized Common Stock, "Pro Rata Share" shall mean (i) the proportion that an Equity Interest within the Class of Preferred Equity Interest, entitled to receive distributions in accordance with the provisions of Sections 23.1 and 41.6 of the Plan, bears to the sum of all Equity Interests in such Class which are entitled to receive distributions in accordance with the provisions of Sections 23.1 and 41.6 of the Plan or (ii) the proportion that an Equity Interest within the Class of either the Dime Warrants (if determined pursuant to a Final Order to be an Equity Interest or a Claim subordinated to the level of Common Equity Interests pursuant to section 510 of the Bankruptcy Code) or Common Equity Interests, entitled to receive distributions in accordance with the provisions of Sections 24.1, 25.1 and 41.6 of the Plan bears to the sum of all Equity Interests in such classes which are entitled to receive distributions in accordance with the provisions of Sections 24.1, 25.1 and 41.6 of the Plan.

1.176 **Purchase and Assumption Agreement:** That certain Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008, between the FDIC Receiver, FDIC Corporate, and JPMC, as amended, modified or supplemented prior to the date hereof.

1.177 **Qualified Plan Claim:** Any Claim against the Debtors and their chapter 11 estates set forth on Schedule 2.10 to the Global Settlement Agreement filed by any Person arising from or relating to the WaMu Pension Plan or the Lakeview Plan, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

1.178 **Receivership:** WMB's receivership.

1.179 **Registry Funds:** The funds deposited into the registry of the Bankruptcy Court with respect to the American Savings Litigation.

1.180 **REIT Series:** Those certain (i) Series I Perpetual Non-Cumulative Fixed-to-Floating Preferred Stock, (ii) Series J Perpetual Non-Cumulative Fixed Rate Preferred Stock, (iii) Series L Perpetual Non-Cumulative Fixed-to-Floating Rate Preferred Stock, (iv) Series M Perpetual Non- Cumulative Fixed-to-Floating Rate Preferred Stock, and (v) Series N Perpetual Non-Cumulative Fixed-to-Floating Rate Preferred Stock.

1.181 **Related Actions:** The "Related Actions," as defined in the Global Settlement Agreement.

1.182 **Related Persons:** With respect to any Entity, its predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present Affiliates and each of their respective current and former members, partners, equity holders, officers, directors, employees, managers, shareholders (other than holders of Equity Interests of WMI), partners, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals (including, without limitation, any and all professionals retained by WMI or the Creditors' Committee in the Chapter 11 Cases either (a) pursuant to an order of the Bankruptcy Court other than ordinary course professionals or (b) as set forth on Schedule 3.1(a) to the Global Settlement Agreement), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals), but, under all circumstances, excluding the "Excluded Parties," as such term is defined in the Global Settlement Agreement.

1.183 **Released Claims:** Collectively, (a) with respect to those Entities party to the Global Settlement Agreement, claims and causes of action released thereunder, (b) claims or causes of action that arise in, relate to or have been or could have been asserted (i) in the Chapter 11 Cases, the Receivership or the Related Actions, or (ii) by the Debtors (with respect to releases given by the Debtors) and by Creditors relating to Claims or holders of Equity Interests relating to Equity Interests, as the case may be, they have against the Debtors (with respect to releases given by Creditors or holders of Equity Interests, as the case may be), and (c) claims that otherwise arise from or relate to the Receivership, the Purchase and Assumption Agreement, the 363 Sale and Settlement, as defined in the Global Settlement Agreement, the Plan, the Global Settlement Agreement, and the negotiations and compromises set forth in the Global Settlement Agreement and the Plan, including, without limitation, in connection with or related to any of the Debtors, the Affiliated Banks, and their respective subsidiaries, assets, liabilities, operations, property or estates, the assets to be received by JPMC pursuant to the Global Settlement Agreement, the Debtors' Claims, the JPMC Claims, the FDIC Claim, the WMI/WMB

Intercompany Claims, any intercompany claims on the books of WMI or WMB related to the WaMu Pension Plan or the Lakeview Plan, or the Trust Preferred Securities (including, without limitation, the creation of the Trust Preferred Securities, the financing associated therewith, the requested assignment of the Trust Preferred Securities by the Office of Thrift Supervision and the transfer and the asserted assignment of the Trust Preferred Securities subsequent thereto); provided, however, that "Released Claims" does not include (1) any and all claims that the JPMC Entities, the Receivership, the FDIC Receiver and the FDIC Corporate are entitled to assert against each other or any other defenses thereto pursuant to the Purchase and Assumption Agreement, which claims and defenses shall continue to be governed by the Purchase and Assumption Agreement, (2) any and all claims held by Entities against WMB, the Receivership and the FDIC Receiver solely with respect to the Receivership, and (3) subject to the exculpation provisions set forth in the Plan, any avoidance action or claim objection regarding an Excluded Party or the WMI Entities, WMB, each of the Debtors' estates, the Reorganized Debtors and their respective Related Persons; and, provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the Confirmation Order or the Plan.

1.184   **Released Parties:**  Collectively, each of the Debtors, WMB, each of the Debtors' estates, the JPMC Entities, the FDIC Receiver and FDIC Corporate, and the Related Persons of each of the JPMC Entities, FDIC Corporate and the FDIC Receiver.

1.185   **Released Third Party Causes of Action:**  Any Claims and causes of action, regardless of whether asserted by any of the parties executing and delivering a release in accordance with the provisions of Section 41.6 of the Plan, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, that are based upon, relate to, or arise out of or in connection with, in whole or in part any act, omission, transaction, event or other circumstance relating to the Debtors and the Chapter 11 Cases and taking place or existing on or prior to the Effective Date, including, without limitation, (a) any such claim relating to the trading of the Debtors' securities during the period from the Petition Date up to and including the Effective Date and (b) any claim for equitable subordination or equitable disallowance with respect to any Claims held by (i) the AAOC Releasees, (ii) the Senior Notes Claims Releasees, (iii) the Senior Subordinated Notes Claims Releasees, (iv) the PIERS Claims Releasees, and (v) the CCB Releasees against the Debtors or the Debtors' chapter 11 estates.

1.186   **Releasing REIT Trust Holder:**  A holder of REIT Series that (i) voted to accept the Sixth Amended Plan and, to the extent such holder is a holder of REIT Series as of the Voting Record Date with respect to solicitation of acceptances to the Plan, votes to accept the Plan and grants the releases set forth in Section 41.6 of the Plan, (ii) did not interpose an objection to confirmation of the Sixth Amended Plan as it related to the REIT Series or the Trust Preferred Securities, (iii) with respect to the Plan, does not otherwise interpose an objection to confirmation of the Plan as it relates to the REIT Series or the Trust Preferred Securities, (iv) acknowledges that JPMC or its designee is the sole legal, equitable and beneficial owner of the Trust Preferred Securities for all purposes and that such REIT Series holder has no legal, equitable or beneficial interest in the Trust Preferred Securities, and (v) in connection with the

solicitation of acceptances to the Sixth Amended Plan, executed and delivered the release of claims against the "Releasees", as set forth in Section 2.24 of the Global Settlement Agreement and as incorporated into the Ballots distributed to holders of REIT Series.

1.187  **Remaining Postpetition Interest Claim:**  A Claim by a holder of an Allowed Senior Notes Claim with respect to Floating Rate Notes against any of the Debtors or the Debtors' estates for interest accrued during the period from the Petition Date up to and including the date of final payment of such Claim, in an amount equal to (a) such holder's Postpetition Interest Claim <u>minus</u> (b) such holder's Intercreditor Interest Claim, all as set forth in the Subordination Model annexed hereto as Exhibit "H".

1.188  **Reorganized Common Stock:**  Subject to the provisions of Section 31.1(d) hereof, the Two Hundred Million (200,000,000) shares of duly authorized common stock of Reorganized WMI to be issued as of the Effective Date, with a par value of $0.00001 per share.

1.189  **Reorganized Debtors:**  The Debtors from and after the Effective Date.

1.190  **Reorganized Debtors By-Laws:**  The respective by-laws of the Reorganized Debtors, which by-laws shall be in substantially the form included in the Plan Supplement and shall be in form and substance reasonably satisfactory to the Creditors' Committee, the Equity Committee and AAOC.

1.191  **Reorganized Debtors Certificates of Incorporation:**  The respective Amended and Restated Articles of Incorporation and Certificates of Incorporation, if applicable, of the Reorganized Debtors, which certificates shall be in substantially the form included in the Plan Supplement and shall be in form and substance reasonably satisfactory to the Creditors' Committee, the Equity Committee and AAOC.

1.192  **Reorganized WMI:**  WMI, on and after the Effective Date, which shall include One Hundred Percent (100%) of the equity interests of WMI Investment, WMMRC and, subject to the abandonment of the equity interests of WMB, WMB.

1.193  **Rule 2004 Inquiry:**  That certain discovery authorized by the Bankruptcy Court and conducted by the Debtors, pursuant to Bankruptcy Rule 2004, in order to facilitate the Debtors' inquiry into the existence of potential additional claims and causes of action of the Debtors and the Debtors' chapter 11 estates against JPMC.

1.194  **Rule 2019 Appeal:**  The appeal filed on December 14, 2009 by the WMI Noteholders Group from the Bankruptcy Court order, dated December 2, 2009, granting JPMC's Motion to Compel the Washington Mutual, Inc. Noteholders Group to Comply with Rule 2019 of the Federal Rules of Bankruptcy.

1.195  **Runoff Indenture:**  That certain Senior First Lien Notes Indenture, dated as of the Effective Date, to be executed and delivered in connection with the issuance of the Runoff Notes, substantially in the form annexed hereto as Exhibit "J".

1.196  **Runoff Notes:**  The two series of non-recourse promissory notes to be issued on the Effective Date by Reorganized WMI and either (a) distributed to Entities electing distributions of Runoff Notes in lieu of Creditor Cash on the Effective Date or (b) to the extent unavailable for distribution to Entities in accordance with such elections, constituting Liquidating Trust Assets, in the aggregate original principal amount of One Hundred Forty Million Dollars ($140,000,000.00), subject to the elections and reductions set forth in the Plan, maturing on the eighteenth (18th) anniversary of the Effective Date, bearing interest at the rate of thirteen percent (13%) per annum (payable in cash to the extent available and payable in kind through capitalization of accrued interest at the rate of thirteen percent (13%) per annum to the extent cash is unavailable) and, to the extent permitted by applicable law and upon regulatory approval with respect thereto, the repayment thereof secured by, and having a specified priority in right of payment in, as and to (1) a securities or deposit account into which Reorganized WMI shall deposit distributions of Runoff Proceeds and (2) the equity interest in either WMMRC or such other Entity as holds the Trusts and their assets, to the extent a valid and perfected lien has been granted therein, all as more fully described in the Runoff Indenture.

1.197  **Runoff Proceeds:**  Collectively, (a) all net premiums, reinsurance recoverables, net revenue resulting from commutation of insurance contracts, net interest income, reserve releases and other revenues derived from the reinsurance contracts, investments and other assets of the Trusts, <u>minus</u>, without duplication, (y) the reasonable and necessary costs and expenses of the Trusts and WMMRC (or its successor in interest upon closure of WMMRC's book of insurance) (including, but not limited to, general and administrative expenses, audit fees, required regulatory capital contributions (which capital contributions will be added back to the Runoff Proceeds if applicable regulations permit such distribution thereof), expenses of regulatory compliance, including all costs associated with the closure of WMMRC's book of insurance, expenses of administering the Runoff Indenture and Taxes) attributable to the administration of the Trusts or the assets thereof, and the collection of premiums and/or management of investments in connection therewith, which expenses shall include reasonable and customary expenses attributable to the foregoing paid under any administrative services agreement, investment management agreement or similar agreement, and (z) the claims paid for covered losses, <u>plus</u> (b) the proceeds from the foregoing received by WMMRC (or its successor in interest upon closure of WMMRC's book of insurance) or Reorganized WMI in cash, securities and/or other property from any sale, liquidation, merger or other disposition in respect of WMMRC (or its successor in interest upon closure of WMMRC's book of insurance) or its interests in the Trusts or the assets thereof. The inclusion of clause (b) of this Section 1.197 shall not be construed as a consent to any sale, liquidation, merger or other disposition or waiver of compliance with any covenant related thereto. For the avoidance of doubt, to the extent that WMI or WMMRC pays any such cost, capital contribution or expense described in clause (y), payment by WMI or WMMRC will be deemed a cost or expense of the Trusts.

1.198  **Runoff Threshold:**  Runoff Notes in the original principal amount of Ten Million Dollars ($10,000,000.00).

1.199  **Schedules:**  Collectively, the schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms in the Chapter 11 Cases, as

may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

1.200   **Section 510(b) Subordinated WMB Notes Claim:**  A WMB Notes Claim, to the extent determined pursuant to a Final Order to be subordinated in accordance with section 510(b) of the Bankruptcy Code; provided, however, that, for all purposes, and for the avoidance of doubt, to the extent that a holder of an Allowed WMB Senior Notes Claim receives a distribution pursuant to the Plan, such holder shall be deemed to have released any and all Section 510(b) Subordinated WMB Notes Claims that such holder may have.

1.201   **Securities Litigations:**  Collectively, the litigations styled (i) South Ferry LP #2, Individually and on Behalf of All Others Similarly Situated v. Killinger, Case No. C04-1599 (MJP), and (ii) Boilermakers National Annuity Trust Fund, on Behalf of Itself and All Others Similarly Situated v. WAMU Mortgage Pass-Through Certificates, Series AR1, et al., Case No. C09-0037 (MJP), each pending in the United States District Court for the Western District of Washington.

1.202   **Senior Notes:**  The promissory notes and debentures issued and delivered by WMI in accordance with the terms and conditions of the Senior Notes Indenture and set forth on Exhibit "E" hereto.

1.203   **Senior Notes Claim:**  An Unsecured Claim arising from or relating to the Senior Notes.

1.204   **Senior Notes Claims Releasees:**  Each holder of record or beneficial owner of an Allowed Senior Notes Claim, and any Affiliate of such Entities which, during the Chapter 11 Cases, owned, invested or acquired Senior Notes Claims, and each of their respective officers, directors, partners, equity investors, investment managers, management companies, members, employees and, solely to the extent as counsel to a holder of record or beneficial owner of an Allowed Senior Notes Claim with respect to the Debtors' Chapter 11 Cases, attorneys.

1.205   **Senior Notes Indenture:**  That certain Senior Debt Securities Indenture, dated as of August 10, 1999, as supplemented by that certain First Supplemental Indenture and Second Supplemental Indenture, dated as of August 1, 2002 and November 20, 2002, respectively, between WMI and The Bank of New York Mellon Trust Company, N.A., as Trustee.

1.206   **Senior Notes Indenture Trustee:**  The Bank of New York Mellon Trust Company, N.A., solely in its capacity as successor in interest to The Bank of New York, solely in its capacity as successor in interest to Harris Trust and Savings Bank, as Trustee, or its duly appointed successor, solely in its capacity as indenture trustee with regard to the Senior Notes Indenture.

1.207   **Senior Notes Release Consideration:**  The consideration to be contributed by holders of Allowed Senior Notes Claims from distributions received, in accordance with the provisions of Sections 6.1 and 31.1 of the Plan, to Reorganized WMI in

exchange for the releases executed and delivered to the Senior Notes Claims Releasees in accordance with the provisions of Section 41.6 of the Plan.

1.208   **Senior Subordinated Notes:** The promissory notes and debentures issued and delivered by WMI in accordance with the terms and conditions of the Senior Subordinated Notes Indenture and set forth on Exhibit "F" hereto.

1.209   **Senior Subordinated Notes Claim:** An Unsecured Claim arising from or relating to the Senior Subordinated Notes.

1.210   **Senior Subordinated Notes Claims Releasees:** Each holder of record or beneficial owner of an Allowed Senior Subordinated Notes Claim, and any Affiliate of such Entities which, during the Chapter 11 Cases, owned, invested or acquired a Senior Subordinated Notes Claim, and each of their respective officers, directors, partners, equity investors, investment managers, management companies, members, employees and, solely to the extent as counsel to a holder of record or beneficial owner of an Allowed Senior Subordinated Notes Claim with respect to the Debtors' Chapter 11 Cases, attorneys.

1.211   **Senior Subordinated Notes Indenture:** That certain Subordinated Debt Securities Indenture, dated as of April 4, 2000, as supplemented by that certain First Supplemental Indenture and Second Supplemental Indenture, dated as of August 1, 2002 and March 16, 2004, respectively, between WMI and The Bank of New York Mellon Trust Company, N.A., as Trustee.

1.212   **Senior Subordinated Notes Indenture Trustee:** Law Debenture Trust Company of New York, solely in its capacity as successor in interest to The Bank of New York Mellon Trust Company, N.A., solely in its capacity as successor in interest to The Bank of New York, solely in its capacity as successor in interest to Harris Trust and Savings Bank, as Trustee, or its duly appointed successor, solely in its capacity as indenture trustee with regard to the Senior Subordinated Notes Indenture.

1.213   **Senior Subordinated Notes Release Consideration:** The consideration to be contributed by holders of Allowed Senior Subordinated Notes Claims from distributions received, in accordance with the provisions of Sections 7.1 and 31.1 of the Plan, to Reorganized WMI in exchange for the releases executed and delivered to the Senior Subordinated Notes Claims Releases in accordance with the provisions of Section 41.6 of the Plan.

1.214   **September Opinion:** That certain Opinion, dated September 13, 2011, issued by the Bankruptcy Court with respect to, among other things, the confirmability of the Modified Plan [Docket No. 8612].

1.215   **September Order:** That certain order, dated September 13, 2011, issued by the Bankruptcy Court in connection with the September Opinion [Docket No. 8613].

1.216   **Settlement WMB Senior Note Holders:** Each of the signatories, other than the Debtors, to the Plan Support Agreement.

1.217  **Sixth Amended Plan**: The Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 6, 2010, as amended.

1.218  **Standing Motion**: That certain Motion for an Order Authorizing the Official Committee of Equity Security Holders to Commence and Prosecute Certain Claims of Debtors' Estates, dated July 12, 2011 [Docket. No. 8179].

1.219  **Stock Trading Order**: That certain Final Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, dated November 18, 2008, entered by the Bankruptcy Court in the Chapter 11 Cases [Docket No. 315].

1.220  **Subordinated Claim**: A Penalty Claim, an Other Subordinated Claim, or a Section 510(b) Subordinated WMB Notes Claim.

1.221  **Subordination Model**: The model developed by Alvarez & Marsal LLC for the Debtors, a copy of which is attached hereto as Exhibit "H," which implements the Debtors' interpretation of the respective subordination provisions in the Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and PIERS Guarantee Agreement.

1.222  **Tax Authority**: A federal, state, local, or foreign government, or agency, instrumentality, or employee thereof, court, or other body (if any) charged with the administration of any law relating to Taxes.

1.223  **Taxes**: All (i) federal, state, local, or foreign taxes, including, without limitation, all net income, alternative minimum, net worth or gross receipts, capital, value added, franchise, profits, and estimated taxes, and (ii) interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority or paid in connection with any item described in clause (i) hereof.

1.224  **Tax Refunds**: To the extent of the Debtors' rights, title and interest therein in whatever capacity, all refunds of Taxes of the Debtors and any consolidated, combined or unitary tax group of which the Debtors are members for taxable periods ended on or before December 31, 2009, including all of the Debtors' rights, title and interest in and with respect to any "Net Tax Refunds" as defined in the Global Settlement Agreement, including, without limitation, any interest received with respect to such refunds.

1.225  **Tax Return**: A return, declaration, form, election letter, report, statement, estimate, information return, or other information filed or required to be filed with respect to any Taxes, including any schedule or attachment thereto or amendment thereof, including any claim for a Tax Refund.

1.226  **Texas Litigation**: That certain litigation styled <u>American National Insurance Company</u> v. <u>FDIC</u>, Case No. 09-1743 (RMC), with respect to which the United States District Court for the District of Columbia entered an order granting motions to dismiss filed by JPMC and the FDIC Receiver.

1.227  **Tranquility**: Tranquility Master Fund, Ltd.

1.228  **Tranquility Claim**: The proof of claim filed by Tranquility, assigned claim number 2206 by the Debtors' claims agent, or any subsequent amendments or modifications thereto, including, but not limited to, the asserted proof of claim filed by Tranquility on November 30, 2010.

1.229  **Transferred Intellectual Property**: The intellectual property listed on Exhibit "W" to the Global Settlement Agreement.

1.230  **Treasury Regulations**: The United States Department of Treasury regulations promulgated under the IRC.

1.231  **Trust Advisory Board**: The trust advisory board provided for in the Liquidating Trust Agreement, which board shall (a) be initially comprised of ten (10) members: (i) four (4) members selected solely by the Creditors' Committee, (ii) four (4) members selected solely by the Equity Committee, (iii) one (1) member selected by the Creditors' Committee and approved by the Equity Committee, which approval shall not be unreasonably withheld, and (iv) one (1) member selected by HoldCo Advisors, LLC serving in a non-voting *ex officio* capacity, and (b) have an oversight function with respect to the Liquidating Trust, and the composition of which may change only in accordance with the provisions of the Liquidating Trust Agreement.

1.232  **Trustee Claims**: The Claims of the Senior Notes Indenture Trustee, Senior Subordinated Notes Indenture Trustee, CCB-1 Trustee, CCB-2 Trustees, PIERS Trustee, and Trust Preferred Trustees, pursuant to the Senior Notes Indenture, Senior Subordinated Notes Indenture, CCB-1 Guarantee Agreements, CCB-2 Guarantee Agreements, Junior Subordinated Notes Indenture and PIERS Guarantee Agreement, and Trust Preferred Securities documents, respectively, for indemnification and for reasonable fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, which claims shall be satisfied in accordance with Section 31.12 of the Plan or such other order of the Bankruptcy Court.

1.233  **Trustee Distribution Expenses**: The reasonable, direct, out-of-pocket costs and expenses incurred by the Trustees in connection with making distributions pursuant to the Plan.

1.234  **Trustees**: The Senior Notes Indenture Trustee, Senior Subordinated Notes Indenture Trustee, CCB-1 Trustee, CCB-2 Trustees, PIERS Trustee, and Trust Preferred Trustees.

1.235  **Trust Preferred Securities**: Collectively, those certain (i) Washington Mutual Preferred (Cayman) I Ltd. 7.25% Perpetual Non-Cumulative Preferred Securities, Series A-1, (ii) Washington Mutual Preferred (Cayman) I Ltd. 7.25% Perpetual Non-Cumulative Preferred Securities, Series A-2, (iii) Washington Mutual Preferred Funding Trust I Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, (iv) Washington Mutual Preferred Funding Trust II Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, (v) Washington Mutual Preferred Funding Trust III Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, and (vi) Washington Mutual Preferred Funding Trust IV Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities.

1.236 **Trust Preferred Trustees:** Wilmington Trust Company, solely in its capacity as Property Trustee, Delaware Trustee, Transfer Agent and Registrar for Washington Mutual Preferred Funding Trust I, Washington Mutual Preferred Funding Trust II, Washington Mutual Preferred Funding Trust III and Washington Mutual Preferred Funding Trust IV, Wilmington Trust (Cayman) Ltd., solely in its capacity as Preferred Securities Paying Agent, Securities Registrar and Transfer Agent for Washington Mutual Preferred Funding (Cayman) I, Ltd. and Maples Finance Limited as Original Trustee for Washington Mutual Preferred Funding (Cayman) I Ltd.

1.237 **Trusts:** Collectively, (a) Home Loan Reinsurance Co. United Guaranty Residential Insurance Company Reinsurance Agreement (Acct. No. x6401); (b) Home Loan Reinsurance Co. Genworth Reinsurance Co. Trust Agreement (Acct. No. x6403); (c) Mortgage Guaranty Insurance Corporation/WM MTG Reinsurance Co. Trust; (Acct. No. x2400); (d) Reinsurance Escrow Agreement among WM Mortgage Reinsurance Co. PMI Mortgage Insurance Company and US Bank (Acct. No. x6404); (e) Radian Guaranty Inc. and WM Mortgage Reinsurance Company Agreement, dated March 27, 2001 (Acct. No. x5700); (f) Home Loan Reinsurance Co. Republic Mortgage Co. Reinsurance Agreement, dated December 14, 1998 (Acct. No. x6402); (g) Washington Mutual Custody Account (Acct. No. x6406); and (h) WM Mortgage Reinsurance Company Inc. (Acct. No. x4202).

1.238 **Turnover Action:** The adversary proceeding commenced in the Chapter 11 Cases by the Debtors, styled Washington Mutual, Inc., et al. v. JPMorgan Chase Bank, N.A., Adversary Pro. No. 09-50934 (MFW).

1.239 **Unidentified Intellectual Property:** The trademarks, patents, domain names and copyrighted materials (whether or not the subject of registration) that were used by WMB by license or otherwise, or were available for WMB's use, prior to the Petition Date, but are not listed on Exhibits "W" or "Y" to the Global Settlement Agreement.

1.240 **Unsecured Claim:** A Claim against the Debtors, other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Convenience Claim, a Trustee Claim or a Subordinated Claim; provided, however, that, in the event that the Bankruptcy Court determines, pursuant to a Final Order, that the Dime Warrants constitute Claims, such Claims shall be considered to be Unsecured Claims and, pursuant to such Final Order, shall be treated as General Unsecured Claims in accordance with Class 12 of the Plan or as otherwise determined by the Bankruptcy Court.

1.241 **Vendor Escrow:** The escrow administered by WMI, or its successor in interest, containing Fifty Million Dollars ($50,000,000.00) paid by JPMC pursuant to the terms of the Global Settlement Agreement, which funds shall be used in connection with the satisfaction of Allowed WMI Vendor Claims and, upon payment of all such Claims and all fees and expenses associated with such escrow, which remaining funds shall be distributed equally to WMI and JPMC.

1.242 **Visa Claims:** Any Claim against the Debtors set forth on Schedule 2.15(a) to the Global Settlement Agreement filed in connection with the Visa Shares or any litigation or agreement relating thereto, and the Claims asserted by VISA U.S.A. Inc. in its proof

of claim filed against the Debtors and the Debtors' chapter 11 cases, Claim No. 2483, pertaining to the VISA Strategic Agreement to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

1.243  **Visa Shares:**  The 3.147 million Class B shares of Visa Inc. held by WMI and set forth on the Schedules and/or WMI's books and records as of the Petition Date.

1.244  **Voting Record Date:**  The date established by the Bankruptcy Court in the Disclosure Statement Order for the purpose of determining the holders of Allowed Claims and Equity Interests entitled to vote on the Plan.

1.245  **WaMu Pension Plan:**  That certain WaMu Pension Plan, which plan is intended to satisfy the tax requirements of Section 401 of the IRC and is sponsored by WMI.

1.246  **WMB:**  Washington Mutual Bank.

1.247  **WMB Intellectual Property:**  The intellectual property listed on Exhibit "X" to the Global Settlement Agreement.

1.248  **WMB Global Note Program:**  That certain program, established by WMB in 2005, providing for the issuance of up to $22 billion in debt financing, pursuant to which WMB issued Senior Global Notes and Subordinated Global Notes.

1.249  **WMB Notes Claim:**  A WMB Senior Notes Claim or a WMB Subordinated Notes Claim.

1.250  **WMB Senior Notes:**  The Senior Global Notes issued by WMB pursuant to the WMB Global Note Program.

1.251  **WMB Senior Notes Claim:**  An Unsecured Claim arising from or relating to WMB Senior Notes and with respect to which a proof of Claim was timely filed against the Debtors.

1.252  **WMB Subordinated Notes:**  The Subordinated Global Notes issued by WMB pursuant to the WMB Global Note Program.

1.253  **WMB Subordinated Notes Claim:**  An Unsecured Claim arising from or relating to WMB Subordinated Notes and with respect to which a proof of Claim was timely filed against the Debtors.

1.254  **WMB Vendor Claim:**  Any Claim against the Debtors and their chapter 11 estates filed by a vendor with respect to services, software licenses or goods provided to WMB and its subsidiaries (whether prior or subsequent to JPMC's acquisition of the assets of WMB) pursuant to a contract or written agreement between WMB and/or its subsidiaries and such vendor.

1.255  **WMI:**  Washington Mutual, Inc., a Debtor in these Chapter 11 Cases.

1.256  **WMI Accounts:**  The accounts as set forth on Exhibit "E" to the Global Settlement Agreement that are not Disputed Accounts.

1.257  **WMI Action:**  The litigation commenced by the Debtors against the FDIC, styled Washington Mutual, Inc. and WMI Investment Corp. v. FDIC, Case No. 09-00533, in the United States District Court for the District of Columbia.

1.258  **WMI Entities:**  WMI, WMI Investment, Ahmanson Obligation Company, H.S. Loan Corporation, WAMU 1031 Exchange, WM Mortgage Reinsurance Company, Inc., WM Citation Holdings, LLC, WMI Rainier LLC and Washington Mutual Capital Trust 2001.

1.259  **WMI Intellectual Property:**  The intellectual property listed on Exhibit "Y" to the Global Settlement Agreement.

1.260  **WMI Investment:**  WMI Investment Corp., a Debtor in these Chapter 11 Cases and, as applicable, WMI Investment Corp. as a reorganized entity from and after the Effective Date.

1.261  **WMI Medical Plan:**  Washington Mutual, Inc. Flexible Benefits Plan.

1.262  **WMI Medical Plan Claim:**  Any Claim against the Debtors and their chapter 11 estates filed by a beneficiary of the WMI Medical Plan, to the extent such Claim constitutes an Allowed JPMC Assumed Liability Claim.

1.263  **WMI Policies:**  The BOLI/COLI policies and the proceeds thereof set forth on Exhibit "R" to the Global Settlement Agreement.

1.264  **WMI Rabbi Trust:**  The "rabbi trust" listed on Exhibit "Q" to the Global Settlement Agreement, including all assets therein.

1.265  **WMI Vendor Claim:**  Any Claim against WMI asserted by a vendor with respect to services, software licenses or goods asserted to have been provided by the counterparty to or for the benefit of WMB or any of its subsidiaries or minority investments operations prior to the Petition Date pursuant to an agreement between WMI and such vendor.

1.266  **WMI/WMB Intercompany Claim:**  Any Claim against WMI, WMB, or one of WMB's subsidiaries held by WMI, WMB, or one of WMB's subsidiaries.

1.267  **WMMRC:**  WM Mortgage Reinsurance Company, Inc., a Hawaiian domiciled corporation.

1.268  **Other Definitions:**  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in the Bankruptcy Code shall have the meaning assigned to that term in the Bankruptcy Code. Unless otherwise specified, (a) all section, schedule, or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America. The words "herein," "hereof," "hereto," "hereunder," and other words

of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.269 **Allowed Equity Interest**: An Equity Interest in WMI, as reflected on the books and records of WMI or its duly authorized agents and as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or an Equity Interest in WMI as to which an objection has been interposed and such Equity Interest has been allowed in whole or in part by a Final Order.

1.270 **LTW Stipulation**: That certain Stipulation and Agreement Between the Debtors and Class Representatives of the LTW Holders Resolving Adversary Proceeding and the LTW Proofs of Claim, dated January 10, 2012.

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES

2.1 **Compromise, Settlement and Sale**: Pursuant to sections 363, 365, 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates, and is expressly conditioned upon the approval and effectiveness of, the sale, free and clear of all Liens, Claims and encumbrances, of the Debtors' rights to and interests in certain of the Plan Contribution Assets and the compromise and settlement by and among the Debtors, JPMC, the FDIC Receiver, and FDIC Corporate, all as set forth in the Global Settlement Agreement. The Global Settlement Agreement is incorporated into this Plan by reference as if fully set forth herein and, subject to the occurrence of the Effective Date and execution of the Global Settlement Agreement, represents a full, final and complete compromise, settlement, and release of, among other matters, the issues in dispute among the Debtors, JPMC, the FDIC Receiver, and FDIC Corporate, including, among other issues, resolution of all Related Actions. Without limiting the foregoing, subsections (a) through (h) below describes certain of the principal provisions of the Global Settlement Agreement, but, except with respect to the releases provided in Section 41.6 hereof, nothing in this Plan shall be construed to, or is intended to, limit or diminish the benefits to be received by, or rights of, any of the parties pursuant to the Global Settlement Agreement. In the event of any inconsistency between the Global Settlement Agreement, the Plan or the Confirmation Order, the documents shall control in the following order of priority: (i) Confirmation Order, (ii) Global Settlement Agreement, and (iii) Plan; provided, however, that, in the event of any inconsistency between these documents with respect to the releases provided in Section 41.6 herein, the documents shall control in the following order of priority: (i) Confirmation Order, (ii) Plan, and (iii) Global Settlement Agreement.

(a) WMI Accounts and Disputed Accounts. In partial consideration for the assets sold pursuant to the Global Settlement Agreement and the releases and other benefits provided to the Released Parties pursuant to this Plan, (1) the JPMC Entities, the FDIC

Receiver, and FDIC Corporate shall (i) waive any and all claims, rights and liabilities with respect to the WMI Accounts and the Disputed Accounts and (ii) take such actions, if any, as may be reasonably requested by WMI, including, without limitation, (A) filing with the Bankruptcy Court such notices or pleadings setting forth the waiver of any and all interest in the WMI Accounts and the Disputed Accounts and (B) seeking dismissals referred to in Section 2.6(b) of the Global Settlement Agreement, (2) the FDIC Receiver and FDIC Corporate shall waive and release any and all rights to seize or set off the WMI Accounts and the Disputed Accounts and any funds contained therein in accordance with Section 9.5 of the Purchase and Assumption Agreement, including, without limitation, by withdrawing, with prejudice, the FDIC Stay Relief Motion, and (3) JPMC shall pay to WMI or such other of the WMI Entities as WMI shall designate, the amounts contained in the Disputed Accounts and the WMI Accounts as of the effective date of the Global Settlement Agreement, net of eighty percent (80%) of the amounts received by WMI during the period from the Petition Date up to and including the date hereof attributable to refunds of Taxes deposited into the Disputed Accounts and the WMI Accounts (including the interest component of any such refunds and interest, if any, earned thereon), free and clear of all Liens, Claims, interests and encumbrances of any Person. In addition, JPMC, as successor to WMB, shall (i) release any security interest in or Lien upon the Admin Account and the monies contained therein and (ii) release and otherwise transfer the Admin Account and the funds contained therein in accordance with the direction of WMI.

(b)    *Tax Matters.*  In partial consideration for the releases and other benefits provided under the Plan, WMI, the FDIC Receiver, and JPMC shall jointly direct all Tax Authorities to pay refunds of "Pre-2009 Group Taxes" (as defined in the Global Settlement Agreement) to an escrow account, the custodian of which will distribute such Tax Refunds in accordance with the terms and procedures set forth in the Global Settlement Agreement.  If any such Pre-2009 Group Tax refund is paid directly to any party, such party will deposit such refund in the Refund Escrow Account (as defined in the Global Settlement Agreement).

(c)    *Transfer of Assets to JPMC.*  In further consideration for the satisfaction, settlement, release, and discharge of, and in exchange for, the JPMC Action and the JPMC Claims, and the payment by JPMC of the amounts specified in the Global Settlement Agreement, the WMI Entities, the FDIC Receiver and the Receivership shall sell, transfer, and assign to the JPMC Entities, and the JPMC Entities shall acquire, pursuant to the Plan and sections 363 and 365 of the Bankruptcy Code, any and all right, title and interest any of the WMI Entities, the FDIC Receiver and the Receivership may have in (i) the Trust Preferred Securities, (ii) the WMI Medical Plan, any outstanding checks made out to WMI, including pharmacy rebates in connection with contracts associated with or attributable to the WMI Medical Plan and an amount equal to the pharmacy rebates received by the WMI Entities from and after the Petition Date, currently estimated to be approximately Seven Hundred Seventy-Five Thousand Dollars ($775,000.00), (iii) the JPMC Rabbi Trusts and the JPMC Policies, (iv) the WaMu Pension Plan and the Lakeview Plan and all of the sponsor's interest in the assets contained in any trusts or otherwise associated with such plans (subject to the correction and satisfaction of certain potential defects and remediation obligations, as set forth in the Global Settlement Agreement), (v) the Anchor Litigation, (vi) the Visa Shares and the VISA Strategic Agreement (as defined in the Global Settlement Agreement), (vii) the Transferred Intellectual Property, the WMB Intellectual Property and the Unidentified Intellectual Property, (viii) JPMC Wind Investment Portfolio LLC and (ix) the Bonds, in each case under clauses (i) through (ix)

inclusively, free and clear of all Liens, Claims, interests and encumbrances of any Entity, except for any claim that is an Allowed JPMC Assumed Liability Claim.

       (d)    <u>JPMC Claims</u>. The JPMC Allowed Unsecured Claim shall be deemed an Allowed Claim against WMI. The JPMC Allowed Unsecured Claim shall be classified with and treated in the same manner as other Allowed General Unsecured Claims under the Plan, including, without limitation, with respect to distributions pursuant to the Plan; <u>provided, however</u>, that, in partial consideration for the releases and other benefits provided to JPMC pursuant to the Plan, JPMC shall waive any distribution JPMC otherwise would be entitled to receive on account of the JPMC Allowed Unsecured Claim.

       (e)    <u>Transfer of Assets to the Debtors</u>. In further consideration for the satisfaction, settlement, release and discharge of, and in exchange for, the Turnover Action and the Rule 2004 Inquiry, and as further consideration for the releases and other benefits provided to JPMC pursuant to this Plan, and as set forth in the Global Settlement Agreement, the JPMC Entities shall sell, transfer, and assign to the WMI Entities, and the WMI Entities shall acquire, pursuant to the Plan and sections 363 and 365 of the Bankruptcy Code, any and all right, title and interest any of the JPMC Entities may have in, among other assets, (i) the WMI Rabbi Trust and the WMI Policies, (ii) the stock of H.S. Loan Corporation, (iii) the Registry Funds and the American Savings Escrow Funds, and (iv) the WMI Intellectual Property, in each case, free and clear of all Liens, Claims, interests and encumbrances of any Entity.

       (f)    <u>Additional Consideration to the Debtors</u>. As additional consideration for the asset sale and compromise and settlement embodied in the Global Settlement Agreement, and as further consideration for the releases and other benefits provided to JPMC pursuant to this Plan:

       (1)    JPMC shall pay WMI an additional Twenty-Five Million Dollars ($25,000,000.00) for the Visa Shares, WMI shall retain all dividends with respect thereto received prior to the effective date of the Global Settlement Agreement, and JPMC shall assume certain related litigation liabilities (as set forth in the Global Settlement Agreement);

       (2)    JPMC shall pay all obligations under the Intercompany Notes in the amounts set forth in Exhibit "V" to the Global Settlement Agreement, and shall forgive all obligations of the WMI Entities to the extent set forth in the Global Settlement Agreement, which Intercompany Notes shall be cancelled upon payment thereof;

       (3)    As set forth in more detail in the Global Settlement Agreement, JPMC shall cause its affiliates to continue providing loan servicing with respect to certain loans and the remittal of checks and payments received in connection therewith;

       (4)    As set forth in the Global Settlement Agreement and the BKK Settlement Agreement, JPMC shall assume the BKK Liabilities and shall defend the Debtors against and reimburse the Debtors for any

distribution on account of remediation or clean-up costs and expenses contained in the BKK Proofs of Claims and not otherwise covered by the BKK-Related Policies and/or reimbursed by the BKK-Related Carriers, as defined in the Global Settlement Agreement;

(5)     JPMC shall assume the JPMC Assumed Liabilities in connection with the assets it receives pursuant to the Global Settlement Agreement and, on or after the Effective Date, JPMC shall pay or fund the payment of Allowed JPMC Assumed Liability Claims; and

(6)     JPMC shall pay or fund the payment of Allowed WMB Vendor Claims and shall pay the sum of Fifty Million Dollars ($50,000,000.00) to be placed by the Debtors in an escrow and used for satisfaction of Allowed WMI Vendor Claims.

(g)     <u>Additional Consideration to the FDIC</u>.  In further consideration for the satisfaction, settlement, release and discharge of, and in exchange for, the FDIC Claim:

(1)     The FDIC Receiver shall receive distributions in accordance with Section 2.4 of the Global Settlement Agreement; and

(2)     The FDIC Receiver, FDIC Corporate and the Receivership shall receive the releases set forth in the Global Settlement Agreement and Article XLI herein.

(h)     <u>Settlement with REIT Series Holders</u>.  In consideration for the releases by the REIT Series holders of any and all claims arising out of, related to, or resulting from, among other things, the issuance, sale or assignment of the Trust Preferred Securities, the commitments to or exchange event ordered by the Office of Thrift Supervision or any capital or other commitment, disclosure or non-disclosure with respect thereto, the assignment of the Trust Preferred Securities subsequent thereto, and any and all claims in any way related to the Trust Preferred Securities or the REIT Series, on the Effective Date, JPMC shall pay, or transfer to the Disbursing Agent, for payment to each Releasing REIT Trust Holder its pro rata share of Fifty Million Dollars ($50,000,000.00), determined by multiplying (a) Fifty Million Dollars ($50,000,000.00) times (b) an amount equal to (i) the principal amount of REIT Series held by such Releasing REIT Trust Holder on the Voting Record Date divided by (ii) the outstanding principal amount of all REIT Series (which is Four Billion Dollars ($4,000,000,000.00)); <u>provided</u>, <u>however</u>, that, at the election of JPMC, the amount payable to Releasing REIT Trust Holders pursuant to Section 2.24 of the Global Settlement Agreement may be paid in shares of common stock of JPMC, having an aggregate value equal to the amount of cash to be paid pursuant to Section 2.24 of the Global Settlement Agreement, valued at the average trading price during the thirty (30) day period immediately preceding the Effective Date.  While JPMC's maximum liability pursuant to Section 2.24 of the Global Settlement Agreement is Fifty Million Dollars ($50,000,000.00), JPMC's liability shall be reduced to the extent the Releasing REIT Trust Holders comprise less than all of the outstanding REIT Series holders.

(i)    <u>Settlement with WMB Senior Note Holders</u>. In consideration for the releases to be granted by holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders of, among other things, all direct and derivative claims arising from or related to such holders' WMB Senior Notes, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holders' WMB Senior Notes (including, without limitation, any Section 510(b) Subordinated WMB Notes Claims that such holders may have), the Debtors have agreed to provide such holders with those certain BB Liquidating Trust Interests, representing an undivided interest in WMI's share of the Homeownership Carryback Refund Amount, as defined and set forth in Section 2.4 of the Global Settlement Agreement, in an amount equal to Three Hundred Thirty-Five Million Dollars ($335,000,000.00) in the aggregate. In connection therewith, certain holders of WMB Senior Notes Claims – the Settlement WMB Senior Note Holders – have executed an agreement with the Debtors, pursuant to which such holders have agreed, in exchange for the treatment and distributions to be provided pursuant to the Plan to holders of Allowed WMB Senior Notes Claims, to not sell or otherwise transfer their note holdings without first binding such transferee or assignee to the Plan Support Agreement, to support confirmation of the Plan, and to provide certain releases, as set forth more fully in the Plan Support Agreement.

(j)    <u>Releases</u>. The releases provided in Article XLI herein are integral to obtaining the value provided under the Global Settlement Agreement and the releases under this Plan constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan.

## ARTICLE III

## PROVISIONS FOR PAYMENT OF
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

3.1    **Administrative Expense Claims:** On the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Disbursing Agent shall (a) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Disbursing Agent; <u>provided, however,</u> that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid in full and performed by the Disbursing Agent in the ordinary course of business in accordance with the terms and subject to the conditions of any agreement governing, instrument evidencing, or other document relating to such transactions; and <u>provided, further,</u> that, if any such ordinary course expense is not billed, or a request for payment is not made, within ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to a distribution pursuant to the Plan.

3.2    **Professional Compensation and Reimbursement Claims:** Except as otherwise provided in Section 41.18 hereof, all Entities awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with section 328, 330, or 331 of the Bankruptcy Code or entitled to priorities established pursuant to section 503(b)(2), 503(b)(3),

503(b)(4), or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, in the amounts allowed by the Bankruptcy Court (i) on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order or (ii) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Disbursing Agent; provided, however, that, except as provided herein, each professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the Administrative Claim Bar Date. The Disbursing Agent is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

   3.3 **Priority Tax Claims**: Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed Priority Tax Claim, distributions in an amount equal to the full amount of such Allowed Priority Tax Claim. At the option and discretion of the Debtors, which option shall be exercised, in writing, on or prior to the commencement of the Confirmation Hearing, such payment shall be made (i) in full, in Cash, on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date on which such claim becomes an Allowed Claim, and to the extent that payment is made after the Effective Date, together with interest accrued thereon at the applicable non-bankruptcy rate as of the calendar month in which the Confirmation Order is entered, (ii) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, in full, in Cash, in equal quarterly installments commencing on the first (1st) Business Day following the Effective Date and continuing over a period not exceeding five (5) years from and after the Petition Date, together with interest accrued thereon at the applicable non-bankruptcy rate, subject to the sole option of the Disbursing Agent to prepay the entire amount of the Allowed Priority Tax Claim, or (iii) by mutual agreement of the holder of such Allowed Priority Tax Claim and the Disbursing Agent.

   3.4 **Statutory Fees**: All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or as soon as reasonably practicable following the Effective Date.

   3.5 **Administrative Tax Claims**: Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, a governmental unit shall not be required to file, make or submit a request for payment (or any document, including, without limitation, a bill) of an expense described in section 503(b)(1)(B) or (C) of the Bankruptcy Code as a condition of its being an Allowed Administrative Expense Claim, and the Disbursing Agent shall pay in full all such Allowed Administrative Expense Claims, including any interest related thereto, when due.

# ARTICLE IV

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims and Equity Interests are classified as follows:

   4.1 **Class 1**   **Priority Non-Tax Claims**

| 4.2 | Class 2 | Senior Notes Claims |
| 4.3 | Class 3 | Senior Subordinated Notes Claims |
| 4.4 | Class 4 | WMI Medical Plan Claims |
| 4.5 | Class 5 | JPMC Rabbi Trust/Policy Claims |
| 4.6 | Class 6 | Other Benefit Plan Claims |
| 4.7 | Class 7 | Qualified Plan Claims |
| 4.8 | Class 8 | WMB Vendor Claims |
| 4.9 | Class 9 | Visa Claims |
| 4.10 | Class 10 | Bond Claims |
| 4.11 | Class 11 | WMI Vendor Claims |
| 4.12 | Class 12 | General Unsecured Claims |
| | Class 12A | Late-Filed Claims |
| 4.13 | Class 13 | Convenience Claims |
| 4.14 | Class 14 | CCB-1 Guarantees Claims |
| 4.15 | Class 15 | CCB-2 Guarantees Claims |
| 4.16 | Class 16 | PIERS Claims |
| 4.17 | Class 17A | WMB Senior Notes Claims |
| | Class 17B | WMB Subordinated Notes Claims |
| 4.18 | Class 18 | Subordinated Claims |
| 4.19 | Class 19 | Preferred Equity Interests |
| 4.20 | Class 20 | Intentionally Left Blank |
| 4.21 | Class 21 | Dime Warrants |
| 4.22 | Class 22 | Common Equity Interests |

## ARTICLE V

## PROVISION FOR TREATMENT OF PRIORITY NON-TAX CLAIMS (CLASS 1)

5.1    **Payment of Allowed Priority Non-Tax Claims:**  Unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Debtors, on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Priority Non-Tax Claim, in Cash, the full amount of such Allowed Priority Non-Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Priority Non-Tax Claim.

## ARTICLE VI

## PROVISION FOR TREATMENT OF SENIOR NOTES CLAIMS (CLASS 2)

6.1    **Treatment of Senior Notes Claims:**

(a)    Fixed Rate Notes.  Commencing on the Effective Date, and subject to the rights of election described in Section 6.2 below, each holder of an Allowed Senior Notes Claim relating to a Fixed Rate Note shall receive, in full satisfaction, release and exchange of such holder's Allowed Senior Notes Claim, Intercreditor Interest Claim and Postpetition Interest Claim (which, for the avoidance of doubt, on the Confirmation Date, shall be finally determined

to not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person), subject to the Lien or priority rights of the Senior Notes Indenture Trustee, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to such holder's Allowed Senior Notes Claim and Intercreditor Interest Claim.

        (b)    Floating Rate Notes. Commencing on the Effective Date, and subject to the rights of election described in Section 6.2 below, each holder of an Allowed Senior Notes Claim relating to a Floating Rate Note shall receive, in full satisfaction, release and exchange of such holder's Allowed Senior Notes Claim, Intercreditor Interest Claim and Postpetition Interest Claim (which, for avoidance of doubt, on the Confirmation Date, shall be finally determined to not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person), subject to the Lien or priority rights of the Senior Notes Indenture Trustee, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to such holder's Allowed Senior Notes Claim, Intercreditor Interest Claim and Remaining Postpetition Interest Claim.

In consideration for, and subject in all respects to the grant and approval of, the third party release being granted by each holder of a Preferred Equity Interest, Dime Warrant and Common Equity Interest executing and delivering a release in accordance with Section 41.6 hereof, on the Effective Date, from the initial distributions of Creditor Cash referred to above and to be made in accordance with Section 31.1(a) of the Plan, each holder of an Allowed Senior Notes Claim, whether relating to a Fixed Rate Note or a Floating Rate Note, shall contribute Cash to Reorganized WMI, for and on behalf of each such holder of a Preferred Equity Interest, Dime Warrant and Common Equity Interest, in an amount equal to Nine Hundred Sixty-Eight Thousandths of one percent (0.968%) of such holder's Allowed Senior Notes Claim (in the aggregate amount for all Allowed Senior Notes Claim, Forty Million Dollars ($40,000,000.00)); and, provided, further, that, for the avoidance of doubt, with respect to the foregoing provision, "Allowed Senior Notes Claim" shall mean the principal amount of such Senior Notes Claim and interest accrued thereon, remaining unpaid and relating to the period up to and including the Petition Date; and, provided, further, that, for the avoidance of doubt, for the applicability of the contractual subordination provisions referred to below, such contributions shall not be recouped through the enforcement of any such contractual subordination provision. Subject to the foregoing sentence, each holder of an Allowed Senior Notes Claim shall be entitled to receive on account of such Allowed Senior Notes Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Intercreditor Interest Claim and, if applicable, Remaining Postpetition Interest Claim, redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests and, subject to the provisions of Section 31.14 of the Plan, Runoff Notes. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Late-Filed Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims, Intercreditor Interest Claims, Remaining Postpetition Interest Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination and

subrogation provisions, are set forth in more detail in the Subordination Model attached hereto as Exhibit "H".

6.2    **Rights of Election:**

(a)    Runoff Notes Election.  On the Ballot, and subject to the provisions of Section 31.14 of the Plan, each holder of an Allowed Senior Notes Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Runoff Notes, in lieu of some or all of the Creditor Cash that such holder otherwise is entitled to receive on the Effective Date pursuant to the provisions of Section 31.1(a) of the Plan, subject to the Lien or priority rights of the Senior Notes Indenture Trustee.  To the extent that, on the Effective Date, a holder of an Allowed Senior Notes Claim receives Runoff Notes, such holder's distribution of Creditor Cash to be received on the Effective Date shall be reduced on a dollar-for-dollar basis by the original principal amount of the Runoff Notes received.

(b)    Reorganized Common Stock Election.  On the Ballot, each holder of an Allowed Senior Notes Claim that elected to receive Runoff Notes in accordance with the provisions of Section 6.2(a) of the Plan shall be provided the right to elect, in its sole and absolute discretion, to receive such holder's Pro Rata Share of the Common Stock Allotment in lieu of (i) fifty percent (50%) of such holder's Litigation Proceeds Interest (solely in its capacity as a holder of an Allowed Senior Notes Claim) and (ii) subject to the provisions of Section 31.14 of the Plan, some or all of the Runoff Notes that such holder otherwise is entitled to and has elected to receive pursuant to Section 6.2(a) of the Plan.  To the extent a holder of an Allowed Senior Notes Claim receives Reorganized Common Stock pursuant to the foregoing election, such holder's share of the Runoff Notes to which the election was effective shall not be issued and Reorganized WMI shall retain an economic interest in the Litigation Proceeds (and such interest shall not constitute a component of the Liquidating Trust Assets) equal to fifty percent (50%) of the Litigation Proceeds such holder otherwise would have received (solely in its capacity as a holder of an Allowed Senior Notes Claim) (and the holder's rights in respect of distributions from the Liquidating Trust shall be adjusted to the extent such proceeds are received by Reorganized WMI).

Failure by any holder of an Allowed Senior Notes Claim to elect to exercise rights provided in this Section 6.2 on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

6.3    **Limitation on Recovery:**  Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed Senior Notes Claim in accordance with Section 6.1 of the Plan, in the event that the sum of (i) distributions of Runoff Notes, Creditor Cash, Cash received on account of Liquidating Trust Interests and Reorganized  Common Stock in accordance with Sections 6.1 and 6.2 and (ii), redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests, and, subject to the provisions of Section 31.14 of the Plan, Runoff Notes, in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached hereto as Exhibit "H", are equal to

or in excess of one hundred percent (100%) of such holder's Allowed Senior Notes Claim, Intercreditor Interest Claim and, with respect to the Floating Rate Notes, Remaining Postpetition Interest Claim, (inclusive of monies tendered by holders of Allowed Senior Notes Claims in connection with the Senior Notes Release Consideration), the Cash or, subject to the provisions of Section 31.14 of the Plan, Runoff Notes received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached hereto as Exhibit "H". Notwithstanding anything contained herein to the contrary, for the avoidance of doubt, the subrogation rights with respect to Allowed Senior Notes Claims shall be preserved.

## ARTICLE VII

## PROVISION FOR TREATMENT OF
## SENIOR SUBORDINATED NOTES CLAIMS (CLASS 3)

7.1    **Treatment of Senior Subordinated Notes Claims:** Commencing on the Effective Date, and subject to the rights of election described in Section 7.2 below, each holder of an Allowed Senior Subordinated Notes Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed Senior Subordinated Notes Claim, Intercreditor Interest Claim and Postpetition Interest Claim (which, for the avoidance of doubt, on the Confirmation Date shall be finally determined to not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person), subject to the Lien or priority rights of the Senior Subordinated Notes Indenture Trustee, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed Senior Subordinated Notes Claim and (b) such holder's Intercreditor Interest Claim; provided, however, that any distribution to holders of Allowed Senior Subordinated Notes Claims of (a) Creditor Cash, (b) Cash received on account of Liquidating Trust Interests and (c) Runoff Notes (to the extent elected pursuant to Section 7.2 of the Plan), shall be redistributed, subject to Bankruptcy Rule 3021 and subject to any Lien or priority rights of the Senior Subordinated Notes Indenture Trustee, in accordance with the priorities set forth in the Subordination Model attached hereto as Exhibit "H"; provided, however, that, in consideration for, and subject in all respects to the grant and approval of, the third party release being granted by each holder of a Preferred Equity Interest, Dime Warrant and Common Equity Interest executing and delivering a release in accordance with Section 41.6 hereof, on the Effective Date, from the initial distributions of Creditor Cash referred to above and to be made in accordance with Section 31.1(a) of the Plan, each holder of an Allowed Senior Subordinated Notes Claim shall contribute Cash to Reorganized WMI, for and on behalf of each holder of a Preferred Equity Interest, Dime Warrant and Common Equity Interest, in an amount equal to Two and One-Tenth percent of (2.1%) of such holder's Allowed Senior Subordinated Notes Claim (in the aggregate amount for all Allowed Senior Subordinated Notes Claims, Thirty Five Million Dollars ($35,000,000.00)); and, provided, further, that, for the avoidance of doubt, with respect to the foregoing provision, "Allowed Senior Subordinated Notes Claim" shall mean the principal amount of such Senior Notes Claim and interest accrued thereon, remaining unpaid and relating to the period up to and including the Petition Date; and, provided, further, that,

notwithstanding the applicability of the contractual subordination provisions referred to below, such contributions shall not be recouped through the enforcement of any such contractual subordination provision. Subject to the foregoing sentence, each holder of an Allowed Senior Subordinated Notes Claim shall be entitled to receive on account of such Allowed Senior Subordinated Notes Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Intercreditor Interest Claim, redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests and Runoff Notes. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Late-Filed Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims, Intercreditor Interest Claims, Remaining Postpetition Interest Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination and subrogation provisions, are set forth in more detail in the Subordination Model attached hereto as Exhibit "H".

7.2    **Rights of Election:**

(a)    Runoff Notes Election.  On the Ballot, and subject to the provisions of Section 31.14 of the Plan, each holder of an Allowed Senior Subordinated Notes Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Runoff Notes, in lieu of some or all of the Creditor Cash that such holder otherwise is entitled to receive on the Effective Date pursuant to the provisions of Section 31.14 of the Plan, subject to the Lien or priority rights of the Senior Subordinated Notes Indenture Trustee. To the extent that, on the Effective Date, a holder of an Allowed Senior Subordinated Notes Claim receives Runoff Notes, such holder's distribution of Creditor Cash to be received on the Effective Date shall be reduced on a dollar-for-dollar basis by the original principal amount of the Runoff Notes received.

(b)    Reorganized Common Stock Election.  On the Ballot, each holder of an Allowed Senior Subordinated Notes Claim that elected to receive Runoff Notes in accordance with the provisions of Section 7.2(a) of the Plan shall be provided the right to elect, in its sole and absolute discretion, to receive such holder's Pro Rata Share of the Common Stock Allotment in lieu of (i) fifty percent (50%) of such holder's Litigation Proceeds Interest (solely in its capacity as a holder of an Allowed Senior Subordinated Claim) and (ii) subject to the provisions of Section 31.14 of the Plan, some or all of the Runoff Notes that such holder otherwise is entitled to and has elected to receive pursuant to Section 7.2(a) of the Plan. To the extent that a holder of an Allowed Senior Subordinated Notes Claim receives Reorganized Common Stock pursuant to the foregoing election, such holder's share of the Runoff Notes to which the election was effective shall not be issued and Reorganized WMI shall retain an economic interest in the Litigation Proceeds (and such interest shall not constitute a component of the Liquidating Trust Assets) equal to fifty percent (50%) of the Litigation Proceeds such holder otherwise would have received (solely in its capacity as a holder of an Allowed Senior Subordinated Notes Claim) (and the holder's rights in respect of distributions from the Liquidating Trust shall be adjusted to the extent such proceeds are received by Reorganized WMI).

Failure by any holder of an Allowed Senior Subordinated Notes Claim to elect to exercise rights provided in this Section 7.2 on or before the Ballot Date shall constitute a deemed waiver and

relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

7.3    **Limitation on Recovery**: Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed Senior Subordinated Notes Claim in accordance with Section 7.1 of the Plan, in the event that the sum of (i) distributions of Runoff Notes, Creditor Cash, Cash received on account of Liquidating Trust Interests and Reorganized Common Stock in accordance with Sections 7.1 and 7.2 of the Plan, (ii) redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests and Runoff Notes, in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached hereto as Exhibit "H", and (iii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of Section 6.3 herein are equal to or in excess of one hundred percent (100%) of such holder's Allowed Senior Subordinated Notes Claim and Intercreditor Interest Claim, (inclusive of monies tendered by holders of Allowed Senior Subordinated Notes Claims in connection with the Senior Subordinated Notes Release Consideration), the Cash or, subject to the provisions of Section 31.14 of the Plan, Runoff Notes received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached hereto as Exhibit "H". Notwithstanding anything contained herein to the contrary, for the avoidance of doubt, the subrogation rights with respect to Allowed Senior Subordinated Notes Claims shall be preserved.

## ARTICLE VIII

## PROVISION FOR TREATMENT OF WMI MEDICAL PLAN CLAIMS (CLASS 4)

8.1    **Treatment of WMI Medical Plan Claims**: Commencing on the Effective Date, JPMC shall pay or fund the payment of all WMI Medical Plan Claims, in full satisfaction, release and exchange of such Claims.

## ARTICLE IX

## PROVISION FOR TREATMENT OF
## JPMC RABBI TRUST/POLICY CLAIMS (CLASS 5)

9.1    **Treatment of JPMC Rabbi Trust/Policy Claims**: On the Effective Date, JPMC shall commence to evaluate each of the JPMC Rabbi Trust/Policy Claims in accordance with the Global Settlement Agreement, the Plan and the Confirmation Order, and, upon determination thereof, shall pay or fund the payment of all JPMC Rabbi Trust/Policy Claims, in full satisfaction, release and exchange of such Claims.

# ARTICLE X

## PROVISION FOR TREATMENT OF
## OTHER BENEFIT PLAN CLAIMS (CLASS 6)

10.1    **Treatment of Other Benefit Plan Claims:** Commencing on the Effective Date, JPMC shall pay or fund the payment of all Other Benefit Plan Claims, in full satisfaction, release and exchange of such Claims.

# ARTICLE XI

## PROVISION FOR TREATMENT OF QUALIFIED PLAN CLAIMS (CLASS 7)

11.1    **Treatment of Qualified Plan Claims:** Commencing on the Effective Date, JPMC shall pay or fund the payment of all Qualified Plan Claims, in full satisfaction, release and exchange of such Claims.

# ARTICLE XII

## PROVISION FOR TREATMENT OF WMB VENDOR CLAIMS (CLASS 8)

12.1    **Treatment of WMB Vendor Claims:** Commencing on the Effective Date, JPMC shall pay or otherwise satisfy all Allowed WMB Vendor Claims, in full satisfaction, release and exchange of such Claims.

# ARTICLE XIII

## PROVISION FOR TREATMENT OF VISA CLAIMS (CLASS 9)

13.1    **Treatment of Visa Claims:** Commencing on the Effective Date, JPMC shall pay or fund the payment of all Visa Claims, in full satisfaction, release and exchange of such Claims.

# ARTICLE XIV

## PROVISION FOR TREATMENT OF BOND CLAIMS (CLASS 10)

14.1    **Treatment of Bond Claims:** Commencing on the Effective Date, JPMC shall pay or fund the payment of all Bond Claims, in full satisfaction, release and exchange of such Claims.

# ARTICLE XV

## PROVISION FOR TREATMENT OF WMI VENDOR CLAIMS (CLASS 11)

15.1    **Treatment of WMI Vendor Claims:** Commencing on the Effective Date, each holder of an Allowed WMI Vendor Claim shall receive, in full satisfaction, release and exchange of such holder's WMI Vendor Claim, payment in Cash from the Vendor Escrow.

# ARTICLE XVI

## PROVISION FOR TREATMENT OF GENERAL UNSECURED CLAIMS (CLASS 12)

### 16.1    <u>Class 12 – General Unsecured Claims</u>:

(a)    <u>Treatment of General Unsecured Claims</u>.  Commencing on the Effective Date, and subject to the right of election described in Section 16.1(b) below, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed General Unsecured Claim and Postpetition Interest Claim, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed General Unsecured Claim and (b) in the event that all Allowed Claims (other than Subordinated Claims) are paid in full, such holder's Postpetition Interest Claim; provided, however, that, pursuant to the terms of the Global Settlement Agreement, and as partial consideration for the releases set forth in Article XLI herein, upon the Effective Date, JPMC shall be deemed to have waived its right to receive any distribution on account of the JPMC Allowed Unsecured Claim, including, without limitation, the right to elect to receive Runoff Notes, pursuant to Section 16.1(b) below.  The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Late-Filed Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims, Intercreditor Interest Claims, Remaining Postpetition Interest Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination and subrogation provisions, are set forth in more detail in the Subordination Model attached hereto as Exhibit "H"; provided, however, that such claims shall be subject to, among other things, reduction, offset or disallowance on account of counterclaims, to the extent applicable, including, but not limited to, the right of the Liquidating Trustee to pursue Avoidance Actions.

(b)    <u>Rights of Election</u>.

(i)    <u>Runoff Notes Election</u>.  On the Ballot, and subject to the provisions of Section 31.14 of the Plan, each holder of a General Unsecured Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Runoff Notes in lieu of some or all of the Creditor Cash that such holder otherwise is entitled to receive on the Effective Date pursuant to the provisions of Section 31.1(a) of the Plan.  To the extent that, on the Effective Date, a holder of an Allowed General Unsecured Claim receives Runoff Notes, such holder's distribution of Creditor Cash to be received on the Effective Date shall be reduced on a dollar-for-dollar basis by the original principal amount of the Runoff Notes received.

(ii)    <u>Reorganized Common Stock Election</u>.  On the Ballot, each holder of an Allowed General Unsecured Claim that elected to receive Runoff Notes in accordance with the provisions of Section 16.1(b)(i) of the Plan shall be provided the right to elect, in its sole and absolute discretion, to receive such holder's Pro Rata Share of the Common Stock Allotment, in lieu of (i) fifty percent (50%) of such holder's Litigation Proceeds Interest (solely in its capacity as a holder of an Allowed General Unsecured Claim) and (ii) subject to the provisions of Section 31.14 of the Plan, some or all of the Runoff Notes that such holder

otherwise is entitled to and has elected to receive pursuant to Section 16.1(b)(i) of the Plan. To the extent a holder of an Allowed General Unsecured Claim receives Reorganized Common Stock pursuant to the foregoing election, such holder's share of the Runoff Notes to which the election was effective shall not be issued and Reorganized WMI shall retain an economic interest in the Litigation Proceeds (and such interest shall not constitute a component of the Liquidating Trust Assets) equal to fifty percent (50%) of the Litigation Proceeds such holder otherwise would have received (solely in its capacity as a holder of an Allowed General Unsecured Claim) (and the holder's rights in respect of distributions from the Liquidating Trust shall be adjusted to the extent such proceeds are received by Reorganized WMI).

Failure by any holder of an Allowed General Unsecured Claim to elect to exercise rights provided in this Section 16.1(b) on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

(c)   Allowed Claims of Fifty Thousand Dollars ($50,000.00) or More/Election to be Treated as a Convenience Claim.  Notwithstanding the provisions of Section 16.1 of the Plan, any holder of an Allowed General Unsecured Claim, other than a General Unsecured Claim that is a component of a larger General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, whose Allowed General Unsecured Claim is more than Fifty Thousand Dollars ($50,000.00), and who elects to reduce the amount of such Allowed General Unsecured Claim to Fifty Thousand Dollars ($50,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed General Unsecured Claim as so reduced, distributions pursuant to Section 17.1 hereof.  Such election must be made on the Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

16.2   **Class 12A – Late-Filed Claims:**  Commencing on the Effective Date, and subject to the priorities set forth in the Subordination Model, each holder of an Allowed Late-Filed Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed Late-Filed Claim and Postpetition Interest Claim, such holder's Pro Rata Share of Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed Late-Filed Claim and (b) in the event that all Allowed Claims (other than Subordinated Claims) are paid in full, such holder's Postpetition Interest Claim, which interests shall entitle such holder to distributions from the Liquidating Trust after all Allowed Unsecured Claims are paid in full (but prior to payment of Subordinated Claims).  The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Late-Filed Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination and subrogation provisions, are set forth in more detail in the Subordination Model attached hereto as Exhibit "H".  Holders of Late-Filed

Claims are not entitled to elect to have their Late-Filed Claims treated as Convenience Claims pursuant to Section 16.1(c) hereof.

16.3    **Limitation on Recovery:**  Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed General Unsecured Claim or an Allowed Late Filed Claim in accordance with Sections 16.1 and 16.2 of the Plan, as applicable, in the event that the sum of the distributions of Runoff Notes, Creditor Cash, Cash received on account of Liquidating Trust Interests and Reorganized Common Stock in accordance with Sections 16.1 or 16.2 are equal to or in excess of one hundred percent (100%) of such holder's Allowed General Unsecured Claim and Postpetition Interest Claim or Allowed Late-Filed Claim and Postpetition Interest Claim, as the case may be, the Cash or, subject to the provisions of Section 31.14 of the Plan, Runoff Notes received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached hereto as Exhibit "H".

## ARTICLE XVII

## PROVISION FOR TREATMENT OF CONVENIENCE CLAIMS (CLASS 13)

17.1    **Treatment of Convenience Claims:**  On the later of the Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim.

## ARTICLE XVIII

## PROVISION FOR TREATMENT OF CCB-1 GUARANTEES CLAIMS (CLASS 14)

18.1    **Treatment of CCB-1 Guarantees Claims:**  Commencing on the Effective Date, and subject to the right of election described in Section 18.2 below, each holder of an Allowed CCB-1 Guarantees Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed CCB-1 Guarantees Claim, Intercreditor Interest Claim and Postpetition Interest Claim (which, for the avoidance of doubt, on the Confirmation Date shall be finally determined to not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person), subject to the Lien or priority rights of the CCB-1 Trustee, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed CCB-1 Guarantees Claim and (b) such holder's Intercreditor Interest Claim; provided, however, that, notwithstanding the foregoing, the contractual subordination and subrogation rights of Entities who hold CCB-1 Preferred Securities shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and any proposed distribution on account of the CCB-1 Common Securities of (i) Runoff Notes, (ii) Creditor Cash

and (iii) Cash on account of Liquidating Trust Interests shall be recalculated and then distributed, subject to Bankruptcy Rule 3021 and subject to the Lien and priority rights of the CCB-1 Trustee, to Entities who hold CCB-1 Preferred Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities' Allowed CCB-1 Guarantees Claims, Intercreditor Interest Claims and Postpetition Interest Claims have been satisfied in accordance with the terms and provisions of the trust agreements related to such securities; and, provided, further, that, following such distribution to holders of CCB-1 Common Securities, in accordance with the Global Settlement Agreement, the Receivership shall not retain any such distribution and the Liquidating Trust shall redistribute such distribution in accordance with the priorities set forth in the Subordination Model attached hereto as Exhibit "H"; and, provided, however, that, following the distribution to CCB-1 Preferred Securities referred to above, any remaining distribution to holders of Allowed CCB-1 Guarantees Claims of (a) Creditor Cash, (b) Cash received on account of Liquidating Trust Interests, and (c) Runoff Notes (to the extent elected pursuant to Section 18.2) shall be distributed, subject to Bankruptcy Rule 3021 and subject to the Lien or priority rights of the CCB-1 Trustee, in accordance with the priorities set forth in the Subordination Model attached hereto as Exhibit "H". In addition, in accordance with the Subordination Model attached hereto as Exhibit "H", each holder of an Allowed CCB-1 Guarantees Claim shall be entitled to receive on account of such Allowed CCB-1 Guarantees Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Intercreditor Interest Claim, redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests and Runoff Notes. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Late-Filed Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims, Intercreditor Interest Claims, Remaining Postpetition Interest Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination and subrogation provisions, are set forth in more detail in the Subordination Model attached hereto as Exhibit "H".

18.2    **Rights of Election:**

(a)    _Runoff Notes Election._ On the Ballot, and subject to the provisions of Section 31.14 of the Plan, each holder of an Allowed CCB-1 Guarantees Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Runoff Notes, in lieu of some or all of the Creditor Cash that such holder otherwise is entitled to receive on the Effective Date pursuant to the provisions of Section 31.1(a) of the Plan, subject to the Lien or priority rights of the CCB-1 Trustee. To the extent that, on the Effective Date, a holder of an Allowed CCB-1 Guarantees Claim receives Runoff Notes such holder's distribution of Creditor Cash to be received on the Effective Date shall be reduced on a dollar-for-dollar basis by the original principal amount of the Runoff Notes received.

(b)    _Reorganized Common Stock Election._ On the Ballot, each holder of an Allowed CCB-1 Guarantees Claim that elected to receive Runoff Notes in accordance with the provisions of Section 18.2(a) of the Plan shall be provided the right to elect, in its sole and absolute discretion, to receive such holder's Pro Rata Share of the Common Stock Allotment, in lieu of (i) fifty percent (50%) of such holder's Litigation Proceeds Interest (solely in its capacity as a holder of an Allowed CCB-1 Guarantees Claim) and (ii) subject to the provisions of Section

31.14 of the Plan, some or all of the Runoff Notes that such holder otherwise is entitled to and has elected to receive pursuant to Section 18.2(a) of the Plan. To the extent a holder of an Allowed CCB-1 Guarantees Claim receives Reorganized Common Stock pursuant to the foregoing election, such holder's share of the Runoff Notes to which the election was effective shall not be issued and Reorganized WMI shall retain an economic interest in the Litigation Proceeds (and such interest shall not constitute a component of the Liquidating Trust Assets) equal to fifty percent (50%) of the Litigation Proceeds such holder otherwise would have received (solely in its capacity as a holder of an Allowed CCB-1 Guarantees Claim) (and the holder's rights in respect of distributions from the Liquidating Trust shall be adjusted to the extent such proceeds are received by Reorganized WMI).

Failure by any holder of an Allowed CCB-1 Guarantees Claim to elect to exercise rights provided in this Section 18.2 on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

18.3    **Limitation on Recovery:** Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed CCB-1 Guarantees Claim in accordance with Section 18.1 of the Plan, in the event that the sum of (i) distributions of Runoff Notes, Creditor Cash, Cash received on account of Liquidating Trust Interests and Reorganized Common Stock in accordance with Sections 18.1 and 18.2, (ii) redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests and Runoff Notes, in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached hereto as Exhibit "H", (iii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of Sections 6.3 or 7.3 herein and (iv) distributions from the Receivership are equal to or in excess of one hundred percent (100%) of such holder's Allowed CCB-1 Guarantees Claim and Intercreditor Interest Claim, the Cash or, subject to the provisions of Section 31.14 of the Plan, Runoff Notes received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached hereto as Exhibit "H". Notwithstanding anything contained herein to the contrary, for the avoidance of doubt, the subrogation rights with respect to Allowed CCB-1 Guarantees Claims shall be preserved.

## ARTICLE XIX

## PROVISION FOR TREATMENT OF
## CCB-2 GUARANTEES CLAIMS (CLASS 15)

19.1    **Treatment of CCB-2 Guarantees Claims:** Commencing on the Effective Date, and subject to the right of election described in Section 19.2 below, each holder of an Allowed CCB-2 Guarantees Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed CCB-2 Guarantees Claim, Intercreditor Interest Claim and Postpetition

Interest Claim (which, for the avoidance of doubt, on the Confirmation Date shall be finally determined to not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person), subject to the Lien or priority rights of the CCB-2 Trustees, such holder's Pro Rata Share of (i) Creditor Cash and (ii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed CCB-2 Guarantees Claim and (b) such holder's Intercreditor Interest Claim; provided, however, that, notwithstanding the foregoing, the contractual subordination and subrogation rights of Entities who hold CCB-2 Preferred Securities shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and any proposed distribution on account of the CCB-2 Common Securities of (i) Runoff Notes, (ii) Creditor Cash and (iii) Cash on account of Liquidating Trust Interests shall be recalculated and then distributed, subject to Bankruptcy Rule 3021 and subject to the Lien and priority rights of the CCB-2 Trustees, to Entities who hold CCB-2 Preferred Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities' Allowed CCB-2 Guarantees Claims and Postpetition Interest Claims have been satisfied in accordance with the terms and provisions of the trust agreements related to such securities; and, provided, further, that, following such distribution to holders of the CCB-2 Common Securities, in accordance with the Global Settlement Agreement, the Receivership shall not retain any such distribution and the Liquidating Trustee shall redistribute such distributions in accordance with the priorities set forth in the Subordination Model attached hereto as Exhibit "H"; and provided, further, that, following the distribution to CCB-2 Preferred Securities referred to above, any remaining distribution to holders of Allowed CCB-2 Guarantees Claims of (a) Creditor Cash, (b) Cash received on account of Liquidating Trust Interests, and (c) Runoff Notes (to the extent elected pursuant to Section 19.2), shall be distributed, subject to Bankruptcy Rule 3021 and subject to the Lien or priority rights of the CCB-2 Trustees, in accordance with the priorities set forth in the Subordination Model attached hereto as Exhibit "H". In addition, in accordance with the Subordination Model attached hereto as Exhibit "H", each holder of an Allowed CCB-2 Guarantees Claim shall be entitled to receive on account of such Allowed CCB-2 Guarantees Claim and, irrespective of whether all Allowed Claims are paid in full, such holder's Intercreditor Interest Claim, redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests and Runoff Notes. The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Late-Filed Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims, Intercreditor Interest Claims, Remaining Postpetition Interest Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination and subrogation provisions, are set forth in more detail in the Subordination Model attached hereto as Exhibit "H".

### 19.2    **Rights of Election**:

(a)    Runoff Notes Election. On the Ballot, and subject to the provisions of Section 31.14 of the Plan, each holder of an Allowed CCB-2 Guarantees Claim shall be provided the right to elect, in its sole and absolute discretion, to receive Runoff Notes, in lieu of some or all of the Creditor Cash that such holder otherwise is entitled to receive on the Effective Date pursuant to the provisions of Section 31.1(a) of the Plan, subject to the Lien or

priority rights of the CCB-2 Trustees. To the extent that, on the Effective Date, a holder of an Allowed CCB-2 Guarantees Claim receives Runoff Notes, such holder's distribution of Creditor Cash to be received on the Effective Date shall be reduced on a dollar-for-dollar basis by the original principal amount of the Runoff Notes received.

(b)    Reorganized Common Stock Election. On the Ballot, each holder of an Allowed CCB-2 Guarantees Claim that elected to receive Runoff Notes in accordance with the provisions of Section 19.2(a) of the Plan shall be provided the right to elect, in its sole and absolute discretion, to receive such holder's Pro Rata Share of the Common Stock Allotment, in lieu of (i) fifty percent (50%) of such holder's Litigation Proceeds Interest (solely in its capacity as a holder of an Allowed CCB-2 Guarantees Claim) and (ii) subject to the provisions of Section 31.14 of the Plan, some or all of the Runoff Notes that such holder otherwise is entitled to and has elected to receive pursuant to Section 19.2(a) of the Plan. To the extent a holder of an Allowed CCB-2 Guarantees Claim receives Reorganized Common Stock pursuant to the foregoing election, such holder's share of the Runoff Notes to which the election was effective shall not be issued and Reorganized WMI shall retain an economic interest in the Litigation Proceeds (and such interest shall not constitute a component of Liquidating Trust Assets) equal to fifty percent (50%) of the Litigation Proceeds such holder otherwise would have received (solely in its capacity as a holder of an Allowed CCB-2 Guarantees Claim) (and the holder's rights in respect of distributions from the Liquidating Trust shall be adjusted to the extent such proceeds are received by Reorganized WMI).

Failure by any holder of an Allowed CCB-2 Guarantees Claim to elect to exercise rights provided in this Section 19.2 on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

19.3    **Limitation on Recovery:** Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed CCB-2 Guarantees Claim in accordance with Section 19.1 of the Plan, in the event that the sum of (i) distributions of Runoff Notes, Creditor Cash, Cash received on account Liquidating Trust Interests and Reorganized Common Stock in accordance with Sections 19.1 and 19.2, (ii) redistributions of Creditor Cash, Cash received on account of Liquidating Trust Interests and Runoff Notes, in accordance with the enforcement, pursuant to section 510(a) of the Bankruptcy Code, of contractual subordination provisions, as set forth in the Subordination Model attached hereto as Exhibit "H", (iii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of Sections 6.3 or 7.3 and (iv) distributions from the Receivership are equal to or in excess of one hundred percent (100%) of such holder's Allowed CCB-2 Guarantees Claim and Intercreditor Interest Claim, the Cash or, subject to the provisions of Section 31.14 of the Plan, Runoff Notes received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached hereto as Exhibit "H". Notwithstanding anything contained herein to the contrary, for the

avoidance of doubt, the subrogation rights with respect to Allowed CCB-2 Guarantees Claims shall be preserved.

## ARTICLE XX

## PROVISION FOR TREATMENT OF PIERS CLAIMS (CLASS 16)

20.1    **Treatment of PIERS Claims:** Commencing on the Effective Date, each holder of an Allowed PIERS Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed PIERS Claim and Postpetition Interest Claim (which, for the avoidance of doubt, on the Confirmation Date shall be finally determined to not be subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross claim, defense, disallowance, impairment, objection, or challenge under applicable law or regulation by any person), subject to the Lien or priority rights of the PIERS Trustee, such holder's Pro Rata Share of (i) Runoff Notes (subject to the provisions of Section 31.14 of the Plan and to the extent remaining after distribution to holders of Allowed Senior Notes Claims, Allowed General Unsecured Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, and Allowed CCB-2 Guarantees Claims), (ii) Creditor Cash and (iii) Liquidating Trust Interests, in an aggregate amount equal to (a) such holder's Allowed PIERS Claim and (b) in the event that all Allowed Claims (other than Subordinated Claims) are paid in full, such holder's Postpetition Interest Claim; provided, however, that, notwithstanding the foregoing, the contractual subordination and subrogation rights of Entities who hold PIERS Preferred Securities shall be preserved and enforced hereunder pursuant to section 510(a) of the Bankruptcy Code and any proposed distribution on account of the PIERS Common Securities of (i) Runoff Notes, (ii) Creditor Cash and (iii) Cash on account of Liquidating Trust Interests shall be recalculated and then distributed, subject to Bankruptcy Rule 3021 and subject to the Lien and priority rights of the PIERS Trustee, to Entities who hold PIERS Preferred Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities' Allowed PIERS Claims and Postpetition Interest Claims have been satisfied in accordance with the terms and provisions of the PIERS Trust Agreement; and, provided, further, that, following such distributions to holders of the PIERS Preferred Securities, WMI shall not retain any distribution on account of the PIERS Common Securities, including, without limitation, the Runoff Notes; and, provided, further, that, following the distribution to PIERS Preferred Securities referred to above, any remaining distribution of (a) Creditor Cash, (b) Cash received on account of Liquidating Trust Interests, and (c) Runoff Notes, shall be distributed, subject to Bankruptcy Rule 3021 and subject to the Lien or priority rights of the PIERS Trustee, in accordance with the priorities set forth in the Subordination Model attached hereto as Exhibit "H". The relative priorities among holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and Allowed Late-Filed Claims, and the order in which such holders are entitled to receive payment of their Allowed Claims, Intercreditor Interest Claims, Remaining Postpetition Interest Claims and Postpetition Interest Claims, including, without limitation, on account of contractual subordination and subrogation provisions, are set forth in more detail in the Subordination Model attached hereto as Exhibit "H"

20.2    **Reorganized Common Stock Election:** On the Ballot, each holder of an Allowed PIERS Claim shall be provided the right to elect, in its sole and absolute discretion, to receive such holder's Pro Rata Share of the Common Stock Allotment in lieu of (i) fifty percent (50%) of such holder's Litigation Proceeds Interest (solely in its capacity as a holder of an Allowed PIERS Claim) and (ii) subject to the provisions of Section 31.14 of the Plan, some or all of the Runoff Notes that such holder otherwise is entitled to receive pursuant to Section 20.1 of the Plan. To the extent a holder of an Allowed PIERS Claim receives Reorganized Common Stock pursuant to the foregoing election, such holder's share of the Runoff Notes to which the election was effective shall not be issued and Reorganized WMI shall retain an economic interest in the Litigation Proceeds equal to fifty percent (50%) of the Litigation Proceeds (and such interest shall not constitute a component of the Liquidating Trust Assets) such holder otherwise would have received (solely in its capacity as a holder of an Allowed PIERS Claim) (and the holder's rights in respect of distributions from the Liquidating Trust shall be adjusted to the extent such proceeds are received by Reorganized WMI).

Failure by any holder of an Allowed PIERS Claim to elect to exercise rights provided in this Section 20.2 on or before the Ballot Date shall constitute a deemed waiver and relinquishment of such rights by such holder. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is waived, in writing, by the Debtors; provided, however, that under no circumstance may such waiver by the Debtors occur on or after the Effective Date.

20.3    **Limitation on Recovery:** Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed PIERS Claim in accordance with Section 20.1 of the Plan, in the event that the sum of (i) distributions of Runoff Notes, Creditor Cash, Cash received on account of Liquidating Trust Interests and Reorganized Common Stock in accordance with Sections 20.1 and 20.2 of the Plan and (ii) redistributions of Cash received on account of Liquidating Trust Interests in accordance with the provisions of Sections 6.3, 7.3, 18.3, or 19.3 are equal to or in excess of one hundred percent (100%) of such holder's Allowed PIERS Claim and Postpetition Interest Claim, the Cash or, subject to the provisions of Section 31.14 of the Plan, Runoff Notes received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of Allowed Claims or Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached hereto as Exhibit "H". Notwithstanding anything contained herein to the contrary, for the avoidance of doubt, the subrogation rights of holders of Allowed PIERS Claims shall be preserved.

## ARTICLE XXI

## PROVISION FOR TREATMENT OF WMB NOTES CLAIMS
## AND NON-FILING WMB SENIOR NOTE HOLDERS (CLASS 17)

21.1    **Treatment of WMB Notes Claims:**

(a)    Class 17A – WMB Senior Notes Claims. Class 17A shall consist of WMB Senior Notes Claims. Commencing on the Effective Date, each holder of an Allowed WMB Senior Notes Claim shall receive, in full satisfaction, release and exchange of such

holder's Allowed WMB Senior Notes Claim, such holder's Pro Rata Share of BB Liquidating Trust Interests (which interests, in the aggregate, represent an undivided interest in WMI's share of the Homeownership Carryback Refund Amount, as defined and set forth in Section 2.4 of the Global Settlement Agreement, in an amount equal to Three Hundred Thirty-Five Million Dollars ($335,000,000.00)); provided, however, that, notwithstanding the foregoing, but subject to the provisions of Section 41.18 hereof, the Settlement WMB Senior Note Holders shall have first priority to recover Cash distributions made on account of the BB Liquidating Trust Interests up to an aggregate amount of Ten Million Dollars ($10,000,000.00), to compensate for the legal fees and expenses incurred by the Settlement WMB Senior Note Holders' and other WMB Senior Note Holders' retention of Wilmer Cutler Pickering Hale & Dorr LLP, Pachulski Stang Ziehl & Jones LLP, and Boies, Schiller & Flexner LLP in connection with the Debtors' Chapter 11 Cases. Each holder of a WMB Senior Notes Claim that, in accordance with the Original Disclosure Statement Order, elected to check the box on the Class 17A Ballot labeled "Grant Plan Section 43.6 Release" in connection with the Sixth Amended Plan and, by having checked such box: (i) solely with respect to the Plan, such holder's WMB Senior Notes Claim shall be deemed an Allowed WMB Senior Notes Claim in an amount equal to the aggregate face value and interest accrued as of the Petition Date with respect to all WMB Senior Notes held by such holder as of October 25, 2010; provided, however, that, notwithstanding the foregoing, such amount shall be only for purposes of voting and calculating each holder's "Pro Rata Share" of BB Liquidating Trust Interests, and shall not in any way increase the amount to be distributed to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders in excess of Three Hundred Thirty-Five Million Dollars ($335,000,000.00); (ii) the Debtors, the Liquidating Trustee, and all other parties in interest shall be deemed to have waived and released any and all objections, defenses, rights to setoff or recoupment, and rights to subordinate or recharacterize with respect to such Allowed WMB Senior Notes Claim; and (iii) the holder of such Allowed WMB Senior Notes Claim shall consent to provide on its behalf and with respect to its Allowed WMB Senior Notes Claim the releases provided in Section 41.6 of the Plan, including, without limitation, a release of the Debtors, the Reorganized Debtors, and the Liquidating Trustee from all direct and derivative claims arising from or related to such holder's Allowed WMB Senior Notes Claim, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holder's Allowed WMB Senior Notes Claim (including, without limitation, any Section 510(b) Subordinated WMB Notes Claims that such holder may have); provided, however, that the foregoing is not intended, nor shall it be construed, to release (i) the Debtors from their obligations pursuant to the Plan and (ii) the FDIC Receiver or the Receivership with respect to distributions to be made from the Receivership on account of WMB Senior Notes. In the event that, in accordance with the Original Disclosure Statement Order, the holder of a WMB Senior Notes Claim did not check the box on the Class 17A Ballot labeled "Grant Plan Section 43.6 Release" in connection with the Sixth Amended Plan, the Debtors, the Liquidating Trustee, and all parties in interest shall reserve and maintain all of their respective rights to dispute such WMB Senior Notes Claim, including, without limitation, on the basis that the holder thereof have no liability with respect thereto, the Claim is subject to other defenses, setoff, or recoupment, and/or the Claim is subject to equitable or mandatory subordination pursuant to section 510 of the Bankruptcy Code; provided, however, that, to the extent that such WMB Senior Notes Claim is determined pursuant to a Final Order of the Bankruptcy Court to be an Allowed Claim, (i) such Claim shall be deemed an Allowed WMB Senior Notes Claim, (ii) the holder of such Allowed WMB Senior Notes Claim shall be

entitled to receive its Pro Rata Share of the BB Liquidating Trust Interests, and (iii) such holder shall be deemed to have consented to the releases provided in Section 41.6 of the Plan, including, without limitation, a release of the Debtors, the Reorganized Debtors, the Liquidating Trustee, and each of their respective Related Persons from any and all direct and derivative claims arising from or related to such holder's Allowed WMB Senior Notes Claim, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holder's Allowed WMB Senior Notes Claim (including, without limitation, any Section 510(b) Subordinated WMB Notes Claims that such holder may have). Payments made by WMI pursuant to this Section 21.1(a) shall be treated as payments made on account of the WMB Senior Notes held by holders of Allowed WMB Senior Notes Claims, and shall reduce the principal amount of such notes (and thus the maximum recovery permitted against the Receivership). The FDIC Receiver acknowledges that amounts distributed to the holders of Allowed WMB Senior Notes Claims under the Plan shall not be credited against or otherwise reduce their claims against the Receivership solely for purposes of determining the holders' relative participation in distributions (unless and until each holder has recovered, in the aggregate, through distributions pursuant to the Plan and from the Receivership, the full amount of its claim). For the avoidance of doubt, all of the $335 million allocated for payment to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders, as provided in Sections 21.1(a) and (b) of the Plan, shall be paid either to counsel to or to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders, and none of the foregoing amounts shall revert either to the Debtors or the Reorganized Debtors, or be payable to creditors in any other Class under the Plan.

(b)    Non-Filing WMB Senior Note Holders. Each Non-Filing WMB Senior Note Holder that, in accordance with the Original Disclosure Statement Order, elected to check the box on the Non-Filing WMB Senior Note Holder Election Form labeled "Grant Plan Section 43.6 Release" in connection with the Sixth Amended Plan and, by having checked such box: (i) such holder shall be deemed to be an Accepting Non-Filing WMB Senior Note Holder, (ii) such holder shall be entitled to receive its Pro Rata Share of BB Liquidating Trust Interests, and (iii) such holder shall consent to provide on its behalf and with respect to its WMB Senior Notes the releases provided in Section 41.6 of the Plan, including, without limitation, a release of the Debtors, the Reorganized Debtors, and the Liquidating Trustee from all direct and derivative claims arising from or related to such holder's WMB Senior Notes, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holders (WMB Senior Notes); provided, however, that the foregoing is not intended, nor shall it be construed, to release (i) the Debtors from their obligations pursuant to the Plan and (ii) the FDIC Receiver or the Receivership with respect to distributions to be made from the Receivership on account of WMB Senior Notes. Payments made by WMI pursuant to this Section 21.1(b) shall be treated as payments made on account of the WMB Senior Notes held by Accepting Non-Filing WMB Senior Note Holders, and shall reduce the principal amount of such notes (and thus the maximum recovery permitted against the Receivership). The FDIC Receiver acknowledges that amounts distributed to Accepting Non-Filing WMB Senior Note Holders under the Plan shall not be credited against or otherwise reduce their claims against the Receivership solely for purposes of determining the holders' relative participation in distributions (unless and until each holder has recovered, in the aggregate, through distributions pursuant to the Plan and from the Receivership, the full amount of its claim). Notwithstanding the foregoing, and irrespective of whether a Non-Filing WMB Senior Note Holder receives a

distribution of BB Liquidating Trust Interests pursuant to this Section (b), no Non-Filing WMB Senior Note Holder shall be deemed to hold a Claim against the Debtors with respect to such holder's WMB Senior Notes.

(c)    Class 17B – WMB Subordinated Notes. On the Effective Date, and in consideration for the distribution to be made to the FDIC Receiver pursuant to the Global Settlement Agreement, all WMB Subordinated Notes Claims, to the extent that they are not Section 510(b) Subordinated WMB Notes Claims, shall be deemed disallowed, and holders thereof shall not receive any distribution from the Debtors.

(d)    Right to Recovery. WMB Senior Notes Claims and WMB Subordinated Notes Claims are not superior in right of recovery to Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, Allowed General Unsecured Claims, or Allowed Late Filed Claims, and the holders of WMB Senior Notes Claims and WMB Subordinated Notes Claims may not seek recourse, payment, turnover, indemnity, damages, setoff, pay-over, or other compensation from holders of any Allowed Claims, including, without limitation, Senior Notes Claims, Senior Subordinated Notes Claims, CCB-1 Guarantees Claims, CCB-2 Guarantees Claims, PIERS Claims, General Unsecured Claims, or Late-Filed Claims, on account of WMB-issued obligations.

## ARTICLE XXII

## PROVISION FOR TREATMENT OF SUBORDINATED CLAIMS (CLASS 18)

22.1    **Treatment of Subordinated Claims:** Commencing on the Effective Date, and in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full, each holder of an Allowed Subordinated Claim shall receive, in full satisfaction, release and exchange of such holder's Allowed Subordinated Claim and Postpetition Interest Claim, such holder's Pro Rata Share of, Liquidating Trust Interests in an aggregate amount equal to such holder's Allowed Subordinated Claim and Postpetition Interest Claim.

22.2    **Limitation on Recovery:** Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to a holder of an Allowed Subordinated Claim in accordance with Section 22.1 of the Plan, in the event that the sum of Cash received on account of Liquidating Trust Interests in accordance with Section 22.1 are equal to or in excess of one hundred percent (100%) of such holder's Allowed Subordinated Claim and Postpetition Interest Claim, the Cash received on account of Liquidating Trust Interests that is distributable to such holder in excess of such one hundred percent (100%) shall be deemed redistributed to holders of the Equity Interests or the Disbursing Agent for and on behalf of holders of Disputed Claims in accordance with the Subordination Model attached hereto as Exhibit "H".

## ARTICLE XXIII

## PROVISION FOR TREATMENT OF PREFERRED EQUITY INTEREST (CLASS 19)

23.1    **Treatment of Preferred Equity Interests:**  Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of a Preferred Equity Interest, including, without limitation, each holder of a REIT Series, shall be entitled to receive such holder's Pro Rata Share of seventy-five percent (75%) of (a) subject to the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b) and 20.2(b) of the Plan, the Reorganized Common Stock, and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed; provided, however, that, in the event that, at the Confirmation Hearing and in the Confirmation Order, the Bankruptcy Court determines that a different percentage should apply, the foregoing percentage shall be adjusted in accordance with the determination of the Bankruptcy Court and be binding upon each holder of a Preferred Equity Interest. In addition, and separate and distinct from the distribution to be provided to holders of the Preferred Equity Interests from the Debtors, pursuant to the Global Settlement Agreement, and in exchange for the releases set forth in the Global Settlement Agreement and in Article XLI herein, on the Effective Date, JPMC shall pay, or transfer to the Disbursing Agent, for payment to each Releasing REIT Trust Holder its pro rata share of Fifty Million Dollars ($50,000,000.00), determined by multiplying (a) Fifty Million Dollars ($50,000,000.00) times (b) an amount equal to (i) the principal amount of REIT Series held by such Releasing REIT Trust Holder on the voting record date with respect to the Sixth Amended Plan divided by (ii) the outstanding principal amount of all REIT Series (which is Four Billion Dollars ($4,000,000,000.00)); provided, however, that the release of claims against the "Releasees" delivered in connection with the solicitation of acceptances and rejections to the Sixth Amended Plan shall be deemed binding and effective for each Releasing REIT Trust Holder; and, provided, further, that, at the election of JPMC, the amount payable to Releasing REIT Trust Holders pursuant to this Section 23.1 and Section 2.24 of the Global Settlement Agreement may be paid in shares of common stock of JPMC, having an aggregate value equal to the amount of cash to be paid pursuant to this Section 23.1 and Section 2.24 of the Global Settlement Agreement, valued at the average trading price during the thirty (30) day period immediately preceding the Effective Date. While JPMC's maximum liability pursuant to this Section 23.1 and Section 2.24 of the Global Settlement Agreement is Fifty Million Dollars ($50,000,000.00), JPMC's liability shall be reduced to the extent the Releasing REIT Trust Holders comprise less than all of the outstanding REIT Series holders.

23.2    **Cancellation of REIT Series:**  Notwithstanding the provisions of Section 23.1 hereof, on the Effective Date, all REIT Series shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect. For the avoidance of doubt, this Section 23.2 shall have no effect on, and shall not result in the extinguishment or cancellation of, the Trust Preferred Securities and, in accordance with the Global Settlement Agreement, JPMC or its designee is the sole legal, equitable and beneficial owner of the Trust Preferred Securities for all purposes.

23.3   **Cancellation of Preferred Equity Interests**: Notwithstanding the provisions of Section 23.1 hereof, on the Effective Date, all non-REIT Series Preferred Equity Interests shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

## ARTICLE XXIV

## PROVISION FOR TREATMENT OF DIME WARRANTS (CLASS 21)

24.1   **Treatment of Dime Warrants**: Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of Dime Warrants shall be entitled to receive such holder's Pro Rata Share of distributions to be made in accordance with the terms and provisions of the LTW Stipulation.

24.2   **Cancellation of Dime Warrants**: Notwithstanding the provisions of Section 24.1 hereof, on the Effective Date, all Dime Warrants shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

## ARTICLE XXV

## PROVISION FOR TREATMENT OF COMMON EQUITY INTERESTS (CLASS 22)

25.1   **Treatment of Common Equity Interests**: Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of Common Equity Interests shall be entitled to receive such holder's Pro Rata Share of twenty-five percent (25%) of (a) subject to (i) the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b) and 20.2(b) of the Plan and (ii) the rights of holders of Dime Warrants pursuant to the LTW Stipulation, the Reorganized Common Stock and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed; provided, however, that, in the event at the Confirmation Hearing and in the Confirmation Order, the Bankruptcy Court determines that a different percentage should apply, the foregoing percentage shall be adjusted in accordance with the determination of the Bankruptcy Court and be binding upon each holder of a Common Equity Interest.

25.2   **Cancellation of Common Equity Interests**: Notwithstanding the provisions of Section 25.1 hereof, on the Effective Date, all Common Equity Interests shall be deemed extinguished and the certificates and all other documents representing such Equity Interests shall be deemed cancelled and of no force and effect.

## ARTICLE XXVI

### PROVISION FOR TREATMENT OF DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

26.1 **Objections to Claims; Prosecution of Disputed Claims and Disputed Equity Interests:** The Liquidating Trustee shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims and Equity Interests filed with the Bankruptcy Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims and Equity Interests that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that the Liquidating Trustee shall have the authority to file, settle, compromise or withdraw any objections to Claims or Equity Interests. Unless otherwise ordered by the Bankruptcy Court, to the extent not already objected to by the Debtors, the Liquidating Trustee shall file and serve all objections to Claims and Equity Interests as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Bankruptcy Court.

26.2 **Estimation of Claims:** On and after the Effective Date, and unless otherwise limited by an order of the Bankruptcy Court, the Liquidating Trustee may at any time request the Bankruptcy Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to or sought to estimate such Claim, and the Bankruptcy Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, the Liquidating Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another; provided, however, that in no event shall any such procedure increase or expand payment or performance from JPMC for any JPMC Assumed Liabilities.

26.3 **Payments and Distributions on Disputed Claims and Disputed Equity Interests:**

(a)     Disputed Claims Holdback. From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Bankruptcy Court, the Liquidating Trustee shall retain, for the benefit of each holder of a Disputed Claim, Creditor Cash (which the Disbursing Agent shall transfer to the Liquidating Trustee), Liquidating Trust Interests, and, to the extent elected by such holder,

Runoff Notes and Reorganized Common Stock, and any dividends, gains or income attributable in respect of any of the foregoing, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Liquidating Trustee; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above. Any Creditor Cash, Liquidating Trust Interests, Runoff Notes and Reorganized Common Stock retained and held for the benefit of a holder of a Disputed Claim shall be treated as a payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash and distributed in Liquidating Trust Interests, Runoff Notes or Reorganized Common Stock in the event the Disputed Claim ultimately becomes an Allowed Claim. Such Creditor Cash and any dividends, gains or income paid on account of the Liquidating Trust Interests, Runoff Notes and the Reorganized Common Stock (if any) retained for the benefit of holders of Disputed Claims shall be retained by the Liquidating Trust for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan. To the extent that the Liquidating Trust retains Runoff Notes or Reorganized Common Stock on behalf of Disputed Claim holders, until such time as such stock is distributed, the Liquidating Trustee shall exercise voting or consent rights with respect to such stock; provided, however, that the Liquidating Trustee shall be obligated to vote or consent, as the case may be, as to such stock in the same proportion as all other holders of issued and distributed Reorganized Common Stock have voted or consented, in each case on an issue-by-issue basis.

(b)    Allowance of Disputed Claims. At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any earnings that has accrued on the amount of Creditor Cash, Liquidating Trust Interests, Runoff Notes and Reorganized Common Stock so retained (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter. The balance of any Creditor Cash, Liquidating Trust Interests, Runoff Notes and Reorganized Common Stock previously retained but not distributed to a Disputed Claim holder shall be included in future calculations of Cash, Liquidating Trust Interests, Runoff Notes and Reorganized Common Stock, respectively, to holders of Allowed Claims.

(c)    Tax Treatment of Retained Assets on Account of Disputed Claims. The Liquidating Trustee shall treat any Assets retained pursuant to this Section 26.3 as part of the Liquidating Trust Claims Reserve.

(d)    Disputed Equity Escrow. From and after the Effective Date, (i) until such time as the Dime Warrant Litigation is determined, pursuant to a Final Order, or a compromise and settlement is approved by the Bankruptcy Court with respect to the Dime

Warrant Litigation, there shall be held in the Disputed Equity Escrow by the Liquidating Trustee, as escrow agent, for the benefit of each holder of a Dime Warrant, Reorganized Common Stock, and any dividends, gains or income attributable in respect of such Reorganized Common Stock, in an amount equal to the Pro Rata Share of Reorganized Common Stock that would have been made to the holders of Dime Warrants if such Dime Warrants were Allowed Equity Interests; and (ii) until such time, or from time to time, as each Disputed Equity Interest has been compromised and settled or allowed or disallowed by Final Order of the Bankruptcy Court, there shall be held in the Disputed Equity Escrow by the Liquidating Trustee, as escrow agent, for the benefit of each holder of a Disputed Equity Interest, Reorganized Common Stock and any dividends, gains or income attributable in respect of such Reorganized Common Stock, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Equity Interest if it were an Allowed Equity Interest. To the extent that the Liquidating Trustee retains any such Reorganized Common Stock, until such time as such stock is distributed, the Liquidating Trustee shall exercise voting or consent rights with respect to such stock; provided, however, that the Liquidating Trustee shall be obligated to vote or consent, as the case may be, as to such stock in the same proportion as all other holders of issued and distributed Reorganized Common Stock have voted or consented, in each case on an issue-by-issue basis. Apart from the Liquidating Trustee serving as escrow agent, the Disputed Equity Escrow shall be separate and distinct from the Liquidating Trust (and the Liquidating Trust Claims Reserve), and the assets therein shall not comprise part of the Liquidating Trust Assets.

(e)   Determinations With Respect to Disputed Equity Interests. At such time as it is determined, pursuant to a Final Order, that (1) the holders of the Dime Warrants hold Allowed Claims, and such Allowed Claims are not otherwise subordinated to the level of Common Equity Interests in accordance with section 510 of the Bankruptcy Code, the Liquidating Trustee, as escrow agent, shall distribute to the holders of Common Equity Interests entitled to receive a distribution in accordance with the provisions of Section 25.1 hereof, on a pro rata basis, the shares of the Reorganized Common Stock, together with any dividends, gains or income attributable thereto, in the Disputed Equity Escrow and (2) the holders of Dime Warrants hold Equity Interests or Allowed Claims, and Allowed Claims are otherwise subordinated to the level of Common Equity Interests in accordance with section 510 of the Bankruptcy Code, the Liquidating Trustee, as escrow agent, shall distribute to the holders of Dime Warrants the shares of Reorganized Common Stock, together with any dividends, gains or income attributable thereto in the Disputed Equity Escrow. At such time as any other Disputed Equity Interest becomes, in whole or in part, an Allowed Equity Interest, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any dividends, gains or income attributable thereto. To the extent a Disputed Equity Interest is disallowed, in whole or in part, the Liquidating Trustee, as escrow agent, shall distribute to the holders of Common Equity Interests entitled to receive a distribution in accordance with the provisions of Sections 24.1 and 25.1 of the Plan, on a pro rata basis, the shares of Reorganized Common Stock, together with any dividends, gains or income attributable thereto, allocable to such Disputed Equity Interest. to the extent of such disallowance. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court with respect to the Dime Warrant Litigation becomes a Final Order, but in no event more than ninety (90) days thereafter.

(f)   Tax Treatment of Disputed Equity Escrow.

(1)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee, as escrow agent, of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (A) treat the Disputed Equity Escrow as "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections), and (B) to the extent permitted by applicable law, report consistently wit the foregoing for state and local income tax purposes.  All parties (including the Liquidating Trustee, the Debtors, and the holders of Dime Warrants and Disputed Equity Interests) shall report for United States federal, state and local income tax purposes consistently wit the foregoing.

(2)     The Liquidating Trustee, as escrow agent, shall be responsible for payment, out of the assets of the Disputed Equity Escrow, of any Taxes imposed on the escrow or its assets.  In the event, and to the extent, any Cash in the Disputed Equity Escrow is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets of the escrow (including any income that may arise upon the distribution of the assets in the escrow), assets of the escrow may be sold to pay such Taxes.

(3)     The Liquidating Trustee, as escrow agent, may request an expedited determination of Taxes of the Disputed Equity Escrow under section 505(b) of the Bankruptcy Code for all Tax Returns for all taxable periods through the termination of the escrow.

(4)     The Liquidating Trustee, as escrow agent, shall have the same rights and powers, subject to the same limitations, with respect to withholding on distributions of the assets of the Disputed Equity Escrow as the Liquidating Trustee possesses with respect to the Liquidating Trust, as provided in Section 27.14(c) of the Plan.

## ARTICLE XXVII

## THE LIQUIDATING TRUST

27.1    **Execution of Liquidating Trust Agreement**:  On or before the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement, and shall take all other necessary steps to establish the Liquidating Trust and the Liquidating Trust Interests therein, which shall be for the benefit of the Liquidating Trust Beneficiaries, as provided in Sections 6.1, 7.1, 16.1, 16.2, 18.1, 19.1, 20.1 and 22.1, and, in certain circumstances, 23.1, 24.1 and 25.1 of the Plan, whether their Claims are Allowed before, on or after the Effective Date. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and

authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

27.2    **Purpose of the Liquidating Trust**:  The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

27.3    **Liquidating Trust Assets**:  The Liquidating Trust shall consist of the Liquidating Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Liquidating Trust Assets to the Liquidating Trust.  The Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Liquidating Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Section 41.5 herein shall be discharged and released from all liability with respect to the delivery of such distributions.  In addition, the Liquidating Trust shall assume all of WMI's rights and obligations pursuant to Section 2.4 of the Global Settlement Agreement, and WMI shall have no further liability or obligations thereunder, to the extent that the transfer to the Liquidating Trust shall not impose any additional obligations or liabilities on JPMC.

27.4    **Administration of the Liquidating Trust**:  The Liquidating Trust shall be administered by the Liquidating Trustee according to the Liquidating Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Liquidating Trust Agreement, the Liquidating Trust Agreement shall govern.

27.5    **The Liquidating Trustee**:  In the event the Liquidating Trustee dies, is terminated, or resigns for any reason, the Trust Advisory Board shall designate a successor; provided, however, that under no circumstance shall the Liquidating Trustee be a director or officer with respect to any Affiliate of the Liquidating Trust.

27.6    **Role of the Liquidating Trustee**:  In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Liquidating Trust Agreement, and the oversight of the Trust Advisory Board, the Liquidating Trustee shall, among other things, have the following rights, powers and duties, in each case subject to the Global Settlement Agreement: (i) to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets, including prosecuting and resolving the Claims belonging to the Liquidating Trust, (ii) to hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (iii) in the Liquidating Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, causes of action, or litigation of the Liquidating Trust, including, without limitation, Avoidance Actions, (iv) to monitor and enforce the implementation of the Plan, (v) to file all tax and regulatory forms, returns, reports, and other documents required with respect to the Liquidating Trust, (vi) in the Liquidating Trustee's reasonable business judgment, to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Liquidating Trustee (as Disbursing Agent) will be

responsible (if Allowed) for making distributions under the Plan, (vii) to take all actions necessary and create any document necessary to implement the Plan, (viii) to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority, (ix) to act as a signatory to the Debtors for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtors' assets, and (x) to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Cases. In all circumstances, the Liquidating Trustee shall comply with all of the Debtors' obligations under the Global Settlement Agreement and in accordance with applicable law, and otherwise shall act in the best interests of all Liquidating Trust Beneficiaries and in furtherance of the purpose of the Liquidating Trust. Under no circumstance may the Liquidating Trustee serve on the Board of Directors of any Affiliate of the Liquidating Trust.

### 27.7 Liquidating Trustee's Tax Power for Debtors:

(a)   Following the Effective Date, the Liquidating Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all Tax Returns required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds for all taxable periods ended on or before December 31, 2009.

(b)   For all taxable periods ended on or before December 31, 2009, the Liquidating Trustee shall have full and exclusive authority and responsibility in respect of all Taxes of the Debtors (including, without limitation, as the common parent or other agent of any consolidated, combined or unitary tax group of which the Debtors were the agent), to the same extent as if the Liquidating Trustee was the Debtor-in-Possession. Without limiting the foregoing, each of the Debtors shall execute, on or prior to the Effective Date, a power of attorney authorizing the Liquidating Trustee to correspond with any Authority on behalf of such Debtor and to sign, collect, negotiate, settle, and administer Tax payments and Tax Returns.

(c)   In furtherance of the transfer of the Liquidating Trust Assets to the Liquidating Trust on the Effective Date, the Liquidating Trust shall be entitled to all Tax Refunds of the Debtors (and the Liquidating Trust bears responsibility for (i) all Tax liabilities of the Debtors for taxable years ended on or before December 31, 2009, to the extent not discharged by the Plan or provided for payment in the Plan or the Global Settlement Agreement and (ii) WMI's obligations pursuant to Section 2.4 of the Global Settlement Agreement), it being understood that the Liquidating Trustee only shall have whatever rights WMI itself has pursuant to the terms of the Global Settlement Agreement and the Liquidating Trustee shall be contractually bound to all restrictions in the Global Settlement Agreement with respect to tax filings.

### 27.8 Transferability of Liquidating Trust Interests:   The Liquidating Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

### 27.9 Cash:   The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust

within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

27.10    **Distribution of Liquidating Trust Assets:** The Liquidating Trustee shall distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a quarterly basis, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 27.10), except (i) Cash reserved pursuant to the Liquidating Trust Agreement to fund the activities of the Liquidating Trust, (ii) such amounts as are allocable to or retained on account of Disputed Claims in accordance with Section 26.3 of the Plan, and (iii) such additional amounts as are reasonably necessary to (A) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (B) pay reasonable incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (C) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan, the Global Settlement Agreement, or the Liquidating Trust Agreement; provided, however, that, and subject to the distribution of Runoff Notes as may be required in accordance with the provisions of Section 31.14 of the Plan, the Liquidating Trustee shall not be required to make a distribution pursuant to this Section 27.10 if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Liquidating Trustee, with the consent of the Trust Advisory Board, in accordance with applicable law, and so long as such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00); and, provided, further, that the Liquidating Trustee, with the consent of the Trust Advisory Board, may decide to forego the first quarterly distribution to those holders of Liquidating Trust Interests with respect to which the Liquidating Trustee, in its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Liquidating Trustee is administratively prepared to do so.

27.11    **Costs and Expenses of the Liquidating Trust:** The reasonable costs and expenses of the Liquidating Trust, including the fees and expenses of the Liquidating Trustee and its retained professionals, shall be paid out of the Liquidating Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Liquidating Trust.

27.12    **Compensation of the Liquidating Trustee:** The individual(s) serving as or comprising the Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the Bankruptcy Court.

27.13    **Retention of Professionals/Employees by the Liquidating Trustee:** The Liquidating Trustee may retain and compensate attorneys, other professionals, and employees to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval. The Liquidating Trustee may assume existing contracts and/or leases that WMI is party to, including, without limitation, employment agreements, or may enter into new arrangements on substantially similar terms. Without limiting

the foregoing, the Liquidating Trustee may retain any professional that represented parties in interest in the Chapter 11 Cases.

### 27.14  Federal Income Tax Treatment of the Liquidating Trust:

(a)    Liquidating Trust Assets Treated as Owned by Creditors.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries and, to the extent Liquidating Trust Assets are allocable to Disputed Claims, to the Liquidating Trust Claims Reserve, followed by (2) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to the Liquidating Trust Claims Reserve) in exchange for Liquidating Trust Interests.  Accordingly, the Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to the Liquidating Trust Claims Reserve, discussed below).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b)    Tax Reporting.

(1)    The Liquidating Trustee shall file Tax Returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 27.14.  The Liquidating Trustee also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  The Liquidating Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust that is required by any governmental unit.

(2)    On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with a good-faith valuation of the Tax Refunds as of the Effective Date.  The Liquidating Trustee will then in good faith value all other Liquidating Trust Assets, and shall make all such values (including the Tax Refund values) available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

(3)     Allocations of Liquidating Trust taxable income among the
Liquidating Trust Beneficiaries (other than taxable income allocable to the
Liquidating Trust Claims Reserve) shall be determined by reference to the
manner in which an amount of cash representing such taxable income
would be distributed (were such cash permitted to be distributed at such
time) if, immediately prior to such deemed distribution, the Liquidating
Trust had distributed all its assets (valued at their tax book value, and
other than assets allocable to the Liquidating Trust Claims Reserve) to the
holders of the Liquidating Trust Interests, adjusted for prior taxable
income and loss and taking into account all prior and concurrent
distributions from the Liquidating Trust.  Similarly, taxable loss of the
Liquidating Trust shall be allocated by reference to the manner in which
an economic loss would be borne immediately after a hypothetical
liquidating distribution of the remaining Liquidating Trust Assets.  The tax
book value of the Liquidating Trust Assets for purpose of this paragraph
shall equal their fair market value on the Effective Date, adjusted in
accordance with tax accounting principles prescribed by the IRC, the
applicable Treasury Regulations, and other applicable administrative and
judicial authorities and pronouncements.

(4)     Subject to definitive guidance from the IRS or a court of
competent jurisdiction to the contrary (including the receipt by the
Liquidating Trustee of a private letter ruling if the Liquidating Trustee so
requests one, or the receipt of an adverse determination by the IRS upon
audit if not contested by the Liquidating Trustee), the Liquidating Trustee
shall (A) timely elect to treat any Liquidating Trust Claims Reserve as a
"disputed ownership fund" governed by Treasury Regulation section
1.468B-9, and (B) to the extent permitted by applicable law, report
consistently with the foregoing for state and local income tax purposes.
All parties (including the Liquidating Trustee, the Debtors, and the
Liquidating Trust Beneficiaries) shall report for United States federal,
state and local income tax purposes consistently with the foregoing.

(5)     The Liquidating Trustee shall be responsible for payment,
out of the Liquidating Trust Assets, of any Taxes imposed on the trust or
its assets, including the Liquidating Trust Claims Reserve.  In the event,
and to the extent, any Cash retained on account of Disputed Claims in the
Liquidating Trust Claims Reserve is insufficient to pay the portion of any
such Taxes attributable to the taxable income arising from the assets
allocable to, or retained on account of, Disputed Claims (including any
income that may arise upon the distribution of the assets of the Liquidating
Trust Claims Reserve), such Taxes may be (i) reimbursed from any
subsequent Cash amounts retained on account of Disputed Claims, or (ii)
to the extent such Disputed Claims have subsequently been resolved,
deducted from any amounts otherwise distributable by the Liquidating
Trustee as a result of the resolution of such Disputed Claims.

(6)    The Liquidating Trustee may request an expedited determination of Taxes of the Liquidating Trust, including the Liquidating Trust Claims Reserve, or the Debtors under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the Liquidating Trust or the Debtors for all taxable periods through the dissolution of the Liquidating Trust.

(c)    <u>Tax Withholdings by Liquidating Trustee</u>. The Liquidating Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests. All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Liquidating Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Liquidating Trust Agreement. In order to receive distributions under the Plan, all holders of Liquidating Trust Interests (including, without limitation, (i) holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, Allowed General Unsecured Claims, Allowed Late-Filed Claims, Allowed WMB Senior Notes Claims, Allowed Preferred Equity Interests, Allowed Common Equity Interests and holders of Dime Warrants and (ii) Accepting Non-Filing WMB Senior Note Holders, who, in each case, deliver a release in accordance with the provisions of Section 41.6 of the Plan) shall be required to identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Liquidating Trustee for these purposes. This identification requirement generally applies to all holders, including those who hold their securities in street name. The Liquidating Trustee may refuse to make a distribution to any holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Liquidating Trust Interests as disputed; <u>provided, however</u>, that, if such information is not furnished to the Liquidating Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Liquidating Trust Interest; and, <u>provided, further</u>, that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the Liquidating Trustee shall make such distribution to which the holder of the Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, <u>provided, further</u> that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidating Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee for such liability (to the extent such amounts were actually distributed to such holder).

(d)    <u>Dissolution</u>. The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (ii) the Liquidating Trustee determines, with the consent of the Trust Advisory

Board, that the administration of any remaining Liquidating Trust Assets is not likely to yield
sufficient additional Liquidating Trust proceeds to justify further pursuit, and (iii) all
distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating
Trust Agreement have been made; provided, however, in no event shall the Liquidating Trust be
dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon
motion within the six-month period prior to the third (3rd) anniversary (or within the six-month
period prior to the end of an extension period), determines that a fixed period extension (not to
exceed three (3) years, together with any prior extensions, without a favorable private letter
ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee and the Trust
Advisory Board that any further extension would not adversely affect the status of the trust as a
liquidating trust for United States federal income tax purposes) is necessary to facilitate or
complete the recovery and liquidation of the Liquidating Trust Assets. If at any time the
Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee
may retain, that the expense of administering the Liquidating Trust so as to make a final
distribution to its beneficiaries is likely to exceed the value of the assets remaining in the
Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i)
reserve any amount necessary to dissolve the Liquidating Trust, (ii) donate any balance to a
charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United
States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as
defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, the Reorganized
Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the
Liquidating Trust.

27.15  **Indemnification of Liquidating Trustee:** The Liquidating Trustee or the
individual(s) comprising the Liquidating Trustee, as the case may be, and the Liquidating
Trustee's employees, agents and professionals, shall not be liable to the Liquidating Trust
Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Liquidating
Trustee, except those acts arising out of their own willful misconduct or gross negligence, and
each shall be entitled to indemnification and reimbursement for fees and expenses in defending
any and all actions or inactions in their capacity as, or on behalf of, the Liquidating Trustee,
except for any actions or inactions involving willful misconduct or gross negligence. Any
indemnification claim of the Liquidating Trustee (and the other parties entitled to
indemnification under this subsection) shall be satisfied solely from the Liquidating Trust Assets
and shall be entitled to a priority distribution therefrom, ahead of the Liquidating Trust Interests
and any other claim to or interest in such assets. The Liquidating Trustee shall be entitled to
rely, in good faith, on the advice of its retained professionals.

27.16  **Privileges and Obligation to Respond to Ongoing Investigations:** All
Privileges shall be transferred, assigned, and delivered to the Liquidating Trust, without waiver,
and shall vest in the Liquidating Trustee solely in its capacity as such (and any other individual
the Liquidating Trustee, with the consent of the Trust Advisory Board, may designate, as well as
any other individual designated in the Liquidating Trust Agreement). Pursuant to Federal Rule
of Evidence 502(d) (to the extent Rule 502(d) is relevant notwithstanding the fact that the
Debtors, the Liquidating Trustee, the FDIC Receiver and JPMC are joint holders of certain
attorney-client privileges, work product protections, or other immunities or protections from
disclosure), no Privileges shall be waived by disclosure to the Liquidating Trustee and the Trust
Advisory Board of the Debtors' information subject to attorney-client privileges, work product

protections, or other immunities or protections from disclosure, or by disclosure among the Debtors, the Liquidating Trustee, the Trust Advisory Board, the FDIC Receiver, and/or JPMC of information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the Debtors, the Trust Advisory Board, the FDIC Receiver, the Liquidating Trustee and/or JPMC. The Liquidating Trustee shall be obligated to respond, on behalf of the Debtors, to all Information Demands. The FDIC Receiver and JPMC shall take reasonable steps to cooperate with the Liquidating Trustee in responding to Information Demands, and such cooperation shall include, for example, taking all steps necessary to maintain and avoid waiver of any and all Privileges (including, without limitation, any Privileges that are shared jointly among or between any of the parties). The Liquidating Trustee, with the consent of the Trust Advisory Board, may waive Privileges that are held solely by the Debtors and/or the Liquidating Trust, but not jointly held with the FDIC Receiver and/or JPMC, in the event and to the extent the Liquidating Trustee, with the consent of the Trust Advisory Board, determines in good faith that doing so is in the best interests of the Liquidating Trust and its beneficiaries. The Liquidating Trustee, the Trust Advisory Board, the FDIC Receiver and JPMC may disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the FDIC Receiver and/or JPMC only (i) upon written permission from the Liquidating Trustee, the FDIC Receiver and JPMC, as the case may be; (ii) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies; or (iii) as otherwise required by law, subject to the procedure described in the next sentence insofar as it applies. If the Liquidating Trustee, the Trust Advisory Board, the FDIC Receiver or JPMC receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Liquidating Trustee, the Trust Advisory Board, the FDIC Receiver and/or JPMC, the party or parties who receives such request will (w) pursue all reasonable steps to maintain the applicable privileges or protections from disclosure, including, if necessary, to maintain the privileges or protections from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, (x) notify the Liquidating Trustee, the Trust Advisory Board, FDIC Receiver and/or JPMC, as the case may be, (y) allow the Liquidating Trustee, the Trust Advisory Board, the FDIC Receiver and/or JPMC, as the case may be, reasonable time under the circumstances to seek a protective order against and/or otherwise object to the production of such material, and (z) unless required by law, not disclose the materials in question unless and until any objection raised by the Liquidating Trustee, the Trust Advisory Board, the FDIC Receiver and/or JPMC is resolved in favor of disclosure.

## ARTICLE XXVIII

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTORS

28.1  **Prosecution of Claims:** Except as settled and released herein, from and after the Effective Date, the Liquidating Trustee shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of the Debtors or Debtors in Possession, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors, Debtors in Possession or the Liquidating Trust thereafter, to a Final Order, and the

Liquidating Trustee may compromise and settle such claims, upon approval of the Bankruptcy Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Liquidating Trust for distribution in accordance with the Plan and the Liquidating Trust Agreement.

## ARTICLE XXIX

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

29.1 **Impaired Classes to Vote:** Each holder, as of the Voting Record Date, of a Claim or Equity Interest in an impaired Class not otherwise deemed to have rejected or accepted the Plan in accordance with Sections 30.3 and 30.4 of the Plan shall be entitled to vote separately to accept or reject the Plan.

29.2 **Acceptance by Class of Creditors:** An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

29.3 **Cramdown:** In the event that any impaired Class of Claims or Equity Interests shall fail to accept, or be deemed to reject, the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) subject to the consent of the Creditors' Committee, the Equity Committee and AAOC and, in the event it affects any of JPMC's rights, obligations or liabilities, JPMC, amend the Plan.

## ARTICLE XXX

## IDENTIFICATION OF CLAIMS AND EQUITY INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN

30.1 **Impaired and Unimpaired Classes:** Claims in Classes 1, 4, and 7 are not impaired under the Plan. Claims and Equity Interests in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A and 13 through 22 are impaired under the Plan.

30.2 **Impaired Classes Entitled to Vote on Plan:** The Claims and Equity Interests in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A, 13 through 16, 17A, and 18 through 22 are impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan; provided, however, that, in accordance with the Original Disclosure Statement Order, entitlement to vote in Class 19 does not include the right to elect to receive any portion of the payment provided for by JPMC in Section 23.1 of the Plan.

30.3 **Claims and Equity Interests Deemed to Reject:** The Claims in Class 17B are not entitled to receive any distribution or retain their Claims pursuant to the Plan, are deemed to reject the Plan, and are not entitled to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

30.4  **Claims Deemed to Accept:** The Claims in Classes 1, 4 and 7 are not impaired pursuant to the Plan, are deemed to accept the Plan, and are not entitled to accept or reject the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

30.5  **Controversy Concerning Impairment:** In the event of a controversy as to whether any Class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE XXXI

## PROVISIONS GOVERNING DISTRIBUTIONS

31.1  **Time and Manner of Distributions:** Except as otherwise provided herein, distributions under the Plan shall be made to each holder of an Allowed Claim or Equity Interest as follows:

(a)  Initial Distributions of Creditor Cash and Runoff Notes . Within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Senior Notes Claim, an Allowed Senior Subordinated Notes Claim, an Allowed General Unsecured Claim, an Allowed CCB-1 Guarantees Claim, an Allowed CCB-2 Guarantees Claim, or an Allowed PIERS Claim, such Creditor's share, if any, of Creditor Cash and Runoff Notes, as determined pursuant to Article VI, Article VII, Article VIII, Article XVI, Article XVIII, Article XIX, and Article XX hereof.

(b)  Allocation of Liquidating Trust Interests. Within ten (10) Business Days after creation of the Liquidating Trust, the Disbursing Agent shall allocate, or cause to be allocated, (i) to the Liquidating Trustee on behalf of holders of Disputed Claims, (ii) to each holder of an Allowed Senior Notes Claim, an Allowed Senior Subordinated Notes Claim, an Allowed General Unsecured Claim, an Allowed CCB-1 Guarantees Claim, an Allowed CCB-2 Guarantees Claim, an Allowed PIERS Claim, an Allowed Late-Filed Claim, an Allowed WMB Senior Notes Claim, and Postpetition Interest Claims in respect of the foregoing, and (iii) to each Accepting Non-Filing WMB Senior Note Holder, such holder's share, if any, of Liquidating Trust Interests, as determined pursuant to Article VI, Article VII, Article VIII, Article XVI, Article XVIII, Article XIX, and Article XX hereof. In addition, in the event that all Allowed Claims and Postpetition Interest Claims are paid in full, the Liquidating Trust Interests shall be redistributed to holders of Subordinated Claims and, after such Allowed Claims and Postpetition Interest Claims are paid in full, holders of Preferred Equity Interests, Dime Warrants and Common Equity Interests as set forth in Sections 23.1, 24.1 and 25.1 of the Plan.

(c)  Distribution of Cash to Holders of Certain Other Claims. Except as otherwise provided herein, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, an Allowed Priority Tax Claim (to the extent applicable), an Allowed Priority Non-Tax Claim, an Allowed WMI Vendor Claim, an Allowed Convenience Claim, or an Allowed Trustee Claim, such holder's share of Cash, as determined pursuant to Article III, Article V, Article XV, Article XVII and Section 31.12 hereof.

(d)     Distribution of Reorganized Common Stock.  Subject to the provisions of Sections 26.3 and 31.14 of the Plan, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of a Preferred Equity Interest, Dime Warrant (to the extent that holders of Dime Warrants are determined, pursuant to a Final Order, to hold Equity Interests or Allowed Claims subordinated to the level of Common Equity Interests in accordance with section 510 of the Bankruptcy Code), Allowed Common Equity Interests and each holder exercising a right of election pursuant to Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b), 20.2 and 31.14 of the Plan, such holder's share of Reorganized Common Stock.

31.2   **Timeliness of Payments:**  Any payment or distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) days after the date specified in the Plan.  Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to Section 31.1(a) hereof to have been made on the Effective Date.

31.3   **Distributions by the Disbursing Agent:**  All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same.  The Disbursing Agent shall not hold an economic or beneficial interest in such property.

31.4   **Manner of Payment under the Plan:**  Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim or Equity Interest until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

31.5   **Delivery of Distributions:**  Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in Section 31.4 hereof, distributions and deliveries to holders of Allowed Claims or Equity Interests shall be made at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim or Equity Interests filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that initial distributions of Creditor Cash by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and REIT Series, as applicable, shall be made to the appropriate Trustee (or such Trustee's designee) under the respective governing documents for such obligations, with the REIT Series distributions to be made to the Trust Preferred Trustees for distribution to holders of the REIT Series.  Each such Trustee (or such Trustee's designee) shall, in turn, in accordance with the Plan, distribute and deliver Creditor Cash, as applicable, to those holders in whose name Senior Notes, Senior Subordinated Notes, CCB-1 Common Securities, CCB-1 Preferred Securities, CCB-2 Common Securities, CCB-2 Preferred Securities, PIERS Common Securities, PIERS Preferred Securities, and REIT Series representing Allowed Claims are registered, in the

applicable Trustees' books and records, on the Distribution Record Date, in the manner provided for in the applicable Indenture and other governing documents. The Trustees may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to contra-CUSIP positions and escrow positions set up by the Debtors or their agents with the Depository Trust Company, and the Trustees shall close and terminate the original CUSIPS after making initial distributions of Creditor Cash and shall have no further distribution obligations thereafter. The Trustees shall not be required to give any bond or surety or other security for the performance of their duties, unless otherwise ordered by the Court. The Trustees shall only be required to make the distributions and deliveries described in this Section 31.5 and shall be only required to make such distributions and deliveries in accordance with the terms of the Confirmation Order and the Plan and shall have no liability for actions taken in accordance with the Confirmation Order, the Plan or in reliance upon information provided to the Trustees in accordance with the Confirmation Order, the Plan or in connection with distributions to be made hereunder and thereunder, except for liabilities resulting from their own gross negligence or willful misconduct. Initial distributions of Reorganized Common Stock and Liquidating Trust Interests by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and REIT Series, as applicable, will be made by the Disbursing Agent directly to such holders, upon consent of the applicable Trustee, which consent shall not be unreasonably withheld. Subsequent distributions to holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed PIERS Claims, and REIT Series on account of Liquidating Trust Interests (or such holders' transferees) that have identified themselves to the Liquidating Trustee, to the extent the Liquidating Trustee deems appropriate, will be the responsibility of the Liquidating Trustee as Disbursing Agent. Notwithstanding the foregoing, all distributions are subject to the Lien and priority rights of the Trustees. The Debtors, their agents and servicers, the Disbursing Agent and the Trustees shall have no obligation to recognize any transfer of Senior Notes Claims, Senior Notes, Senior Subordinated Notes Claims, Senior Subordinated Notes, CCB-1 Guarantees Claims, CCB-1 Guarantees, CCB-1 Common Securities, CCB-1 Preferred Securities, CCB-2 Guarantees Claims, CCB-2 Guarantees, CCB-2 Common Securities, CCB-2 Preferred Securities, PIERS Claims, PIERS Common Securities, PIERS Preferred Securities, REIT Series, Preferred Equity Interests, Dime Warrants and Common Equity Interests occurring after the Distribution Record Date.

### 31.6    Undeliverable/Reserved Distributions:

(a)    (1)    Holding of Undeliverable Distributions by the Disbursing Agent. If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable. All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim or Equity Interest.

(2)    Holding of Undeliverable Distributions by the Liquidating Trustee. In connection with distributions to be made pursuant to the

Liquidating Trust Agreement, an "undeliverable" distribution shall include, without limitation, a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the issuance thereof. Subject to the provisions of Section 31.6(c) of the Plan, if any distribution to a holder of a Liquidating Trust Interest is undeliverable, no additional distribution shall be made to such holder unless and until the Liquidating Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Liquidating Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable or as set forth in Section 31.6(b) of the Plan. All Entities ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution. Except as required by law, the Liquidating Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of a Liquidating Trust Interest.

(b)     Failure to Claim Undeliverable Distributions. If (i) a check is sent, by either the Disbursing Agent or the Liquidating Trustee, to a holder in respect of distributions and such check is not negotiated within six (6) months following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent or the Liquidating Trustee, as the case may be, (or their duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Bankruptcy Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim or Equity Interest on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within one (1) year from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, the Trustees, or their respective professionals, agents, or property. In such case, the Liquidating Trustee is authorized to permanently remove such holder and its corresponding Claim and/or Trust Interest from such trustee's books and records and any consideration held for distribution on account of such Allowed Claim or Equity Interest shall revert to such trustee for redistribution to holders of Liquidating Trust Interests in accordance with the terms and provisions hereof.

(c)     Reserve Pending Delivery of Third Party Release. Notwithstanding anything contained herein to the contrary, in the event that a holder of a Claim entitled to a distribution hereunder fails to execute and deliver prior to the Ballot Date the third party release required in accordance with the provisions of Section 41.6 of the Plan (other than (a) holders that affirmatively elect to opt out of granting the releases provided in Section 41.6 and (b) holders of Claims in Class 17A and Non-Filing WMB Senior Note Holders), (i) from and after the Effective Date, the Disbursing Agent or the Liquidating Trustee, as the case may be,

shall reserve amounts of Creditor Cash and Liquidating Trust Interests (but not Runoff Notes) otherwise to be distributed to such holder, (ii) provided that a third party release is not executed and delivered by such holder to the Liquidating Trustee prior to the three (3), six (6) and nine (9) month anniversary of the Effective Date, on or prior to the fifth (5th) Business Day following any such date, the Liquidating Trustee shall serve a notice (together with a form of release) upon such holder, either directly or indirectly through such holder's nominee, informing such holder of such reserved distribution and the requirement of such holder to execute and deliver such third party release to the appropriate trustee prior to delivery of such reserved distribution, and (iii) in the event that, on or prior to the one (1) year anniversary of the Effective Date, such holder fails to execute and deliver such third party release to the appropriate trustee, then, such trustee shall be deemed authorized to permanently remove such holder and its corresponding Claim from such trustee's books and records and any consideration held for distribution on account of such Allowed Claim shall revert to the Liquidating Trustee for redistribution to holders of Liquidating Trust Interests in accordance with the terms and provisions hereof. Without in any way limiting the foregoing, release elections, whether submitted in accordance with this Section 31.6(c) or otherwise, will not be accepted during the period between the Ballot Date and the Effective Date, and any release election submitted during such period shall not be recognized and shall be deemed null and void. In the event that a holder of a Claim seeks to receive and execute a release form in accordance with this provision at any time from and after the Effective Date, but other than pursuant to the periodic notices to be distributed as set forth above, then such holder may, following the Effective Date, submit a request, in writing, to the appropriate trustee to receive a release form, and the appropriate trustee will send such form to such requesting holder on or prior to the fifth (5th) Business Day following the date such trustee receives such request; provided, however, that under no circumstances shall requests for such release form from holders of Claims in Class 17A and Non-Filing WMB Senior Note Holders be honored by the Liquidating Trustee.

        31.7   **Withholding and Reporting Requirements**: Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution.

        31.8   **Time Bar to Cash Payments**: Checks issued by the Disbursing Agent on account of Allowed Claims or Equity Interests shall be null and void if not negotiated within

ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim or Equity Interest with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim or Equity Interest. After such date, all Claims and Equity Interests in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims and Equity Interests in accordance with the terms and provisions hereof.

**31.9    Distributions After Effective Date:** Distributions made after the Effective Date to (a) holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, (b) holders of Claims that fail to execute and deliver a third party release prior to the Effective Date, but later do so, and (c) holders of Dime Warrants to the extent the Dime Warrants are determined, pursuant to a Final Order, to hold Equity Interests or Allowed Claims which are subordinated to the level of Common Equity Interests in accordance with section 510 of the Bankruptcy Code, shall be deemed to have been made in accordance with the terms and provisions of Article XXXI of the Plan.

**31.10    Setoffs:** Except as otherwise provided in the Plan or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and causes of action of any nature that one or more of the Debtors, Debtors in Possession, or the Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Debtors in Possession, or the Reorganized Debtors of any such claims, rights, and causes of action that the Debtors, Debtors in Possession, or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

**31.11    Allocation of Plan Distributions Between Principal and Interest:** To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**31.12    Payment of Trustee Fees and Expenses:** Upon the entry of an order of the Bankruptcy Court authorizing payment thereof, upon notice and a hearing, the Disbursing Agent, unless otherwise stayed, shall pay the Trustee Claims; provided, however, that, with respect to the allowance of Trustee Claims for which an order of the Bankruptcy Court had been entered prior to the Effective Date the Disbursing Agent shall pay such Trustee Claims as soon as practicable after the Effective Date. To the extent that the Disbursing Agent fails to pay any

Trustee Claim in full, whether as a result of the Bankruptcy Court's determination as to whether the Trustee Claim or the amount thereof is reasonable, or a Trustee's determination not to request payment therefor, such Trustee shall have the right to assert its Lien and priority rights pursuant to the applicable Indenture or Guarantee Agreement for payment of any unpaid amount upon any payment or other distribution to be made in accordance with the provisions contained herein. Notwithstanding the foregoing, the Disbursing Agent shall be responsible and, upon presentation of supporting documentation in form and substance satisfactory to the Disbursing Agent, shall satisfy the Trustee Distribution Expenses; provided, however, that, under no circumstance shall the Disbursing Agent be responsible for any indemnification obligation, cost, or expense of any of the Trustees associated with the gross negligence or willful misconduct of a Trustee in making any such distribution. To the extent not liquidated and Allowed as of the Effective Date, Trustee Claims shall remain an obligation of the Liquidating Trust pending termination of the Liquidating Trust; provided, however, that neither a reserve shall be created nor a distribution shall be made in respect thereof without entry of an order of the Bankruptcy Court authorizing such reserve to be created or distribution to be made.

31.13  **Distribution Record Date:**  For purposes of distributions, on the Distribution Record Date, registers of the respective Trustees shall be closed and the Trustees shall have no obligation to recognize, and shall not recognize, any transfers of Claims arising under or related to the Indentures or the Guarantee Agreements occurring from and after the Distribution Record Date.

31.14  **Runoff Notes:**  Notwithstanding anything contained in the Plan to the contrary, in accordance with Section 31.1(a) of the Plan, and subject to the provisions set forth in subsections of this Section 31.14, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute Runoff Notes to those holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed General Unsecured Claims, Allowed CCB-1 Guarantees Claims and Allowed CCB-2 Guarantees Claims that elected to receive Runoff Notes in lieu of distributions of Creditor Cash on the Effective Date.

(a)  In the event that elections to receive Runoff Notes in accordance with Sections 6.2(a), 7.2(a), 16.1(b)(i), 18.2(a) and 19.2(a) of the Plan are made in an aggregate original principal amount greater than One Hundred Forty Million Dollars ($140,000,000.00), such elections shall be reduced pro rata such that the aggregate original principal amount elected is equal to One Hundred Forty Million Dollars ($140,000,000.00); provided, however, that, in the event that, (i) elections to receive Runoff Notes in accordance with Sections 6.2(a), 7.2(a), 16.1(b)(i), 18.2(a) and 19.2(a) of the Plan are made in an aggregate original principal amount equal to or greater than One Hundred Thirty Million Dollars ($130,000,000.00) and (ii) Runoff Notes are tendered in election for the Common Stock Allotment in an aggregate amount less than the Runoff Threshold, such elections to receive Runoff Notes shall be reduced pro rata by an amount necessary to permit the deemed elections contemplated by Section 31.14(d) to occur.

(b)  In the event that less than all of the original principal amount of Runoff Notes have been distributed in lieu of Creditor Cash on the Effective Date, the balance thereof shall constitute Liquidating Trust Assets, and such Runoff Notes and the proceeds thereof shall be distributed to beneficial holders of Liquidating Trust Interests in accordance with the provisions of Article XXVII of the Plan.

(c)      In the event that, pursuant to elections of Reorganized Common Stock in lieu of Runoff Notes, elections are made with respect to Runoff Notes having an aggregate original principal amount in excess of the Runoff Threshold, such elections shall be reduced pro rata by the amount of such excess so that each holder making such election shall receive shares of Reorganized Common Stock equal to its Pro Rata Share of the Common Stock Allotment.

(d)      In the event that holders of Claims with the right of elections pursuant to Sections 6.2(a), 7.2(a), 16.1(b)(ii), 18.2(a) and 19.2(a) of the Plan decline to tender, in the aggregate, Runoff Notes in the original principal amount necessary to reach the Runoff Threshold, each of AAOC, severally and not jointly, shall be deemed to have elected to receive its Pro Rata Share of the Common Stock Allotment in lieu of (i) Runoff Notes (based upon an allocation developed in their sole and absolute discretion) that they would otherwise receive on the Effective Date in their capacity as a holder of Allowed PIERS Claims, in the aggregate amount as is necessary to reach the Runoff Threshold; provided, however, that, to the extent that any of AAOC would not receive Runoff Notes on the Effective Date in its capacity as a holder of Allowed PIERS Claims in an amount sufficient to reach its allocable share of the Runoff Threshold, such AAOC Entity will instead be deemed to have elected to receive such amount of Runoff Notes (based upon an allocation developed in their sole and absolute discretion) in lieu of distributions of Creditor Cash on the Effective Date on account of its Allowed Senior Subordinated Notes Claims, and (ii) fifty percent (50%) of such holders' Litigation Proceeds Interest in their capacity as holders of Allowed PIERS Claims.

Upon the earlier to occur of (x) the determination of the Trust Advisory Board, with the consent of each Entity which would be a recipient of Runoff Notes, (y) all Allowed CCB-1 Guarantees Claims and Allowed CCB-2 Guarantees Claims having been paid, in full, in accordance with the provisions of Articles XIX and XX of the Plan, respectively, and (z) Runoff Notes being the sole remaining Liquidating Trust Asset, the balance of the Runoff Notes in the Liquidating Trust, as the balance thereof may have been reduced from time-to-time, shall be distributed to Creditors whose Allowed Claims have not been paid in full as of the date thereof. To the extent that a holder of an Allowed Claim receives Runoff Notes pursuant to such distribution, the amount of such holder's outstanding Claim shall be reduced on a dollar-for-dollar basis by the lesser of (i) the original outstanding principal amount of the Runoff Notes so received and (ii) the then outstanding principal amount (without regard to any interest paid-in-kind) of the Runoff Notes so received.

## ARTICLE XXXII

## MEANS OF IMPLEMENTATION

32.1      **Incorporation and Enforcement of the Settlement Agreement:** The Plan incorporates by reference the terms of the Global Settlement Agreement, including, without limitation, (i) the Debtors' agreement to sell, free and clear of all Claims, rights, interests, and Liens, certain of the Plan Contribution Assets to the JPMC Entities, (ii) JPMC's obligations to pay certain consideration for such sale, including, without limitation, JPMC's agreement to pay or fund the payment of the JPMC Assumed Liabilities and certain other Claims, and to waive

certain of its Claims against the Debtors, (iii) JPMC's obligation to transfer certain of the Plan Contribution Assets to the Debtors, (iv) the FDIC Receiver's transfer of any interest it or the Receivership might have in any Plan Contribution Assets, and (v) the agreement among the parties to resolve certain pending Claims and litigation, including the Related Actions, pursuant to the terms of the Global Settlement Agreement and the Plan.

32.2    **Intercompany Claims:** Intercompany Claims shall be extinguished, unless otherwise agreed or resolved between the parties to a given Intercompany Claim, resolved by the Global Settlement Agreement or released by operation of the Plan. Any such transaction may be effected without any further action by the stockholders of any of the Debtors or the Debtors in Possession.

32.3    **Merger/Dissolution/Consolidation:** On or as of the Effective Date or as soon as practicable thereafter, and without the need for any consent or approval, Reorganized WMI may, in its sole and absolute discretion, (i) cause any of the Reorganized WMI Entities to be merged, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized WMI Entities, or (iii) engage in any other transaction in furtherance of the Plan. As soon as practicable after initial distributions are made pursuant to Section 31.1 of the Plan, and without the need for any consent or approval, Reorganized WMI shall complete, or shall cause the completion of, the administrative dissolution of the Washington Mutual Capital Trust 2001.

32.4    **Cancellation of Existing Securities and Agreements:** Except as provided herein, any document, agreement, or instrument evidencing any Claim or Equity Interest shall be deemed automatically cancelled and terminated on the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and any and all obligations or liabilities of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests shall be discharged; provided, however, that the foregoing cancellation of securities, documents, agreements or instruments shall not apply to (a) the securities related to the WMB Senior Notes or the WMB Subordinated Notes and (b) any security, document, agreement or instrument related to a Disputed Claim until a Final Order resolving any such Disputed Claim is entered; and, provided, further, that, during the pendency of any such disputes, the Debtors shall not accrue or incur any additional liability or obligation with respect thereto; and, provided, further, that the Indentures and Guarantee Agreements shall continue in effect for the limited purposes of (i) allowing the Trustees to make distributions pursuant to the Plan and to perform such other functions with respect thereto, (ii) permitting the Trustees to maintain and assert any right or Lien for reasonable fees, costs, expenses and indemnities under the Indentures and Guarantee Agreements, (iii) effectuating the applicable subordination provisions of such documents or contesting the application thereof in the prosecution of any appeal to which a Trustee may be a party as of the Effective Date, (iv) enabling the noteholders and the holders of PIERS Claims to receive distributions and (v) enabling the Trustees to make applications in accordance with Section 31.12 of the Plan; and, provided, further, that, except as otherwise provided herein, nothing in this Plan shall impair, affect, or adversely affect the related transactions and the rights of the parties thereto. Notwithstanding any of the foregoing, nothing contained herein shall be deemed to impair, waive or extinguish any rights of the Trustees with respect to any rights contained in the respective Indentures or Guarantee Agreements; provided, however, that, upon payment in full of the

respective Trustee Claims and Trustee Distribution Expenses in accordance with the Plan, the rights of the Trustees to seek payment from or assert claims against the Debtors for amounts owed under the respective Indentures or Guarantee Agreements shall be discharged as provided in this Plan.

32.5   **Claims of Subordination:**  Except as specifically provided herein, to the fullest extent permitted by applicable law, on the latest to occur of (i) the Effective Date, (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Cases, and (iii) the final distribution made to holders of Allowed Claims in accordance with Article XXXI of the Plan, all Claims and Equity Interests, and all rights and claims between or among holders of Claims and Equity Interests relating in any manner whatsoever to Claims or Equity Interests, based upon any contractual, equitable or legal subordination and/or subrogation rights, will be terminated and discharged in the manner provided in this Plan, and all such Claims, Equity Interests and rights so based, and all such contractual, equitable and legal subordination and/or subrogation rights to which any Entity may be entitled will be irrevocably waived. To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under this Plan will not be subject to levy, garnishment, attachment or like legal process by any holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination and/or subrogation rights, so that, notwithstanding any such contractual, equitable or legal subordination and/or subrogation rights, each holder of a Claim or Equity Interest shall have and receive the benefit of the rights and distributions set forth in this Plan.

32.6   **Surrender of Instruments:**  Except to the extent evidenced by electronic entry, and except with respect to the WMB Senior Notes and the WMB Subordinated Notes, as a condition of receiving any distribution pursuant to the Plan, each holder of a certificated instrument or note must surrender such instrument or note to the appropriate Trustee or the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity, or similar affidavit reasonably satisfactory to the appropriate Trustee or the Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to have forfeited all rights, interests and Claims and may not participate in any distribution under the Plan. Any distribution so forfeited shall become the property of the Disbursing Agent for distribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

32.7   **Issuance of Runoff Notes, Liquidating Trust Interests and Reorganized Common Stock:**  The issuance by Reorganized WMI of the Runoff Notes, the Liquidating Trust Interests and the Reorganized Common Stock on the Effective Date, if applicable, is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Equity Interests.

32.8   **Exemption from Securities Laws:**  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the Runoff Notes, the Liquidating Trust Interests and the Reorganized Common Stock will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

32.9    **Hart-Scott-Rodino Compliance:** Any shares of Reorganized Common Stock to be distributed under the Plan to any Entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity shall have expired or been terminated.

32.10    **Fractional Stock or Other Distributions:** Notwithstanding anything to the contrary contained herein, no fractional shares of Reorganized Common Stock shall be distributed, and no Cash payments of fractions of cents will be made. Fractional dollars shall be rounded down to the nearest whole dollar. Unless otherwise determined by the Bankruptcy Court at the Confirmation Hearing, fractional shares of stock shall be rounded up or down, as the case may be, to the nearest whole unit. No Cash will be paid in lieu of such fractional shares of stock or dollars.

32.11    **Credit Facility:**

(a)    Terms of Credit Facility: The terms of the Credit Facility are set forth in the Credit Agreement annexed hereto as Exhibit "C".

(b)    Replacement Lenders: During the period from the date hereof up to and including the Ballot Date, the Debtors shall market the terms of the Credit Facility in an effort to obtain terms superior to those set forth in Section 32.11(a) of the Plan; provided, however, that, in accordance with the procedures set forth on the Ballot, any Creditor or holder of an Equity Interest may, upon (1) presentation of financial information necessary to establish the ability to participate as a lender in accordance with the provisions of the Credit Facility and (2) the consent of the Equity Committee, which consent shall not be unreasonably withheld, become a lender under the Credit Facility in lieu of the lenders contemplated pursuant to the Credit Agreement. Prior to the commencement of the Confirmation Hearing, the Debtors shall file a notice with the Bankruptcy Court setting forth the lender(s) selected to provide the Credit Facility.

# ARTICLE XXXIII

## CREDITORS' COMMITTEE/EQUITY COMMITTEE

33.1    **Dissolution of the Creditors' Committee:** On the first (1st) Business Day thirty (30) days following the Effective Date, and provided that payments to holders of Unsecured Claims have been made in accordance with Article XXXI of the Plan, the Creditors' Committee shall be dissolved, and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith; provided, however, that the Creditors' Committee may, at its own discretion, continue or resume its duties arising from or relating to (i) any pending litigation or contested matter to which the Creditors' Committee is a party, (ii) any appeal filed regarding confirmation of the Plan, (iii)

obligations arising under confidentiality agreements, joint interest agreements, and protective orders, if any, entered during the Chapter 11 Cases that remain in full force and effect according to their terms, (iv) applications for fees and expenses of members of the Creditors' Committee and requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases, and (v) motions, appeals or other litigation seeking the enforcement of the provisions of the Plan and the transactions contemplated hereunder or in the Confirmation Order; and, provided, further, that the Liquidating Trust shall continue to compensate the Creditors' Committee's attorneys, financial advisors, and other agents, if any, for any of the post-Effective Date activities identified in this Section 33.1 of the Plan; and, provided, further, that, in the event that (a) the Creditors' Committee elects to continue or resume any or all of the enumerated duties set forth in this Section 35.1 and (b) all then-appointed members of the Creditors' Committee subsequently resign, (i) the United States Trustee may appoint such Persons as the United States Trustee deems appropriate to represent the interests of the Creditors' Committee and (ii) if no such Persons are appointed, then, (y) all right, title and interest of the Creditors' Committee in any and all tolling agreements entered into by the Creditors' Committee, for itself or on behalf of the Debtors and Debtors in Possession, on the one hand, and a potential defendant, on the other hand, shall be deemed assigned to the Liquidating Trust and the Liquidating Trustee and the Liquidating Trust and the Liquidating Trustee shall be entitled to the benefits therein, including, without limitation, timing with respect to the commencement of any litigation, as if the Liquidating Trust and the Liquidating Trustee were a party to any such tolling agreement, and (z) in its sole and absolute discretion, the Liquidating Trustee may, and, if it chooses to, shall, accede to the position of the Creditors' Committee in prospective or then-pending litigations or contested matters, as the case may be. Without limiting the foregoing, on the Effective Date, the Creditors' Committee shall take any and all action as is necessary to cause the withdrawal and dismissal, with prejudice, of the appeal taken by the Creditors' Committee from the September Opinion.

33.2    **Dissolution of the Equity Committee:** On the Effective Date, other than with respect to its duties and obligations set forth herein, the Equity Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Equity Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith; provided, however, that, in the event that (a) a timely appeal is taken from the Confirmation Order and (b) such appeal remains pending, the Equity Committee shall be dissolved on the earlier to occur of (1) dismissal or withdrawal of such appeal and (2) a determination, by Final Order, as to the merits of such appeal. Without limiting the foregoing, on the Effective Date, the Equity Committee shall take any and all action as is necessary to cause the withdrawal and dismissal, with prejudice, of (x) the Equity Committee Adversary Proceeding, (y) the Equity Committee Action to Compel and (z) the appeals taken by the Equity Committee from (i) the January Opinion and (ii) the September Opinion.

## ARTICLE XXXIV

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

34.1    **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases:** Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all prepetition executory contracts and unexpired leases that exist between one or both of the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (i) has been assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date or (ii) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, including, without limitation, any executory contract or unexpired lease sold, accepted, or transferred to one of the JPMC Entities pursuant to the terms of the Global Settlement Agreement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date. The Debtors shall serve (i) notice of any executory contract and unexpired lease to be assumed or assumed and assigned through the operation of this Section 34.1 by including a schedule of such contracts and leases in the Plan Supplement and (ii) notice of any executory contract and unexpired lease to be rejected through the operation of this Section 34.1 by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

34.2    **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases:** Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of executory contracts and unexpired leases pursuant to Section 34.1 of the Plan or pursuant to the Global Settlement Agreement.

34.3    **Inclusiveness:** Unless otherwise specified on the schedules to the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

34.4    **Cure of Defaults:** Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed or assumed and assigned pursuant to Section 34.1 of the Plan, the Debtors shall,

pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases to be assumed pursuant to Section 34.1 of the Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned. The parties to such executory contracts or unexpired leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtors. If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court. Notwithstanding Section 34.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

34.5    **Rejection Damage Claims**: If the rejection of an executory contract or unexpired lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors and the Liquidating Trust, unless a proof of Claim is filed with the Bankruptcy Court and served upon attorneys for the Debtors or the Liquidating Trustee, as the case may be, on or before thirty (30) days after the latest to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease.

34.6    **Indemnification and Reimbursement Obligations**: For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be deemed rejected as of the Effective Date and such parties' rights to assert rejection damage claims, if any, shall be governed by Section 34.5 of the Plan and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

34.7    **Termination of Benefit Plans**: Notwithstanding anything contained in the Plan to the contrary, the Debtors and the Liquidating Trustee, as the case may be, shall be authorized, but not required, to terminate all Benefit Plans, in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law, at such time as determined by the Debtors or the Liquidating Trustee, as the case may be, in their sole discretion; provided, however, that, until the transfer or termination of any Benefit Plan, the Debtors, the Liquidating Trustee, and the Reorganized Debtors, as the case may be, shall (a) continue to perform any and all of their administrative obligations thereunder and (b) with respect to Benefit Plans subject to Title IV of ERISA, continue to make any required minimum funding contributions and pay applicable Pension Benefit Guaranty Corporation insurance premiums; and, provided, further, that, upon termination thereof, the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, shall provide administrative services in connection with the operation and wind down of the Benefit Plans; and, provided, further, that the continuation of any Benefit Plan by the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, from and after the Confirmation Date, including, without limitation,

the provision of administrative services in connection with the operation and wind down of such Benefit Plan, shall not constitute an assumption of such Benefit Plans in accordance with section 365 of the Bankruptcy Code; and, provided, further, that the failure to perform any obligation under the Benefit Plans or to provide administrative services in connection with the wind down of the Benefit Plans shall be without prejudice to (i) any Entity to assert such failure gives rise to an Administrative Expense Claim and (ii) the Debtors or the Liquidating Trustee to contest the assertion thereof. For the avoidance of doubt, the foregoing shall not apply to any employee benefit or welfare plan to be maintained by the Reorganized Debtors or the Liquidating Trustee, as the case may be, in the ordinary course of business after the Effective Date for the benefit of employees actively employed by the Reorganized Debtors or the Liquidating Trustee.

34.8 **Termination of Vendor Stipulation:** On the Effective Date, that certain Stipulation By and Between Debtors and JPMorgan Chase Bank, N.A. Concerning Certain Contracts, dated October 16, 2008, shall be terminated and deemed of no further force and effect, except as specifically provided in the Confirmation Order and in Section 2.14 of the Global Settlement Agreement.

## ARTICLE XXXV

## RIGHTS AND POWERS OF DISBURSING AGENT

35.1 **Exculpation:** From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and Equity Interests and other parties in interest, from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or an Equity Interest or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

35.2 **Powers of the Disbursing Agent:** Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (i) take all steps and execute all instruments and documents necessary to effectuate the Plan, (ii) make distributions contemplated by the Plan, (iii) comply with the Plan and the obligations thereunder, and (iv) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

35.3 **Fees and Expenses Incurred From and After the Effective Date:** Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Bankruptcy Court.

# ARTICLE XXXVI

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

36.1    **Conditions Precedent to Confirmation of the Plan**: Confirmation of the Plan is subject to satisfaction of the following conditions precedent:

(a)    **Required Orders**. The Clerk of the Bankruptcy Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the Confirmation Order):

(1)    approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(2)    authorizing the solicitation of votes with respect to the Plan;

(3)    determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(4)    confirming and giving effect to the terms and provisions of the Plan, including the releases in Article XLI of the Plan;

(5)    approving the Global Settlement Agreement in accordance with its terms including, but not limited to the releases of the Released Parties;

(6)    determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(7)    approving the documents in the Plan Supplement;

(8)    authorizing the Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, the documents in the Plan Supplement, and the Global Settlement Agreement;

(9)    determining that the compromises and settlements set forth in the Global Settlement Agreement and this Plan are appropriate, reasonable and approved;

(10)    ordering the sale of the Plan Contribution Assets to be sold to the JPMC Entities or the Debtors, as applicable, pursuant to the Global Settlement Agreement, free and clear of all rights, Claims, interests and Liens, and finding that the parties acquired such assets in good faith under

the meaning of, and subject to the protections of, section 363(m) and pursuant to section 1123(a)(5) of the Bankruptcy Code; and

(11)    withdrawing and vacating for all purposes (a) the September Order to the extent relating to the Standing Motion and (b) those portions of the September Opinion relating to the Standing Motion, including, but not limited to, (i) Section III (H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73.

(b)    <u>Form of Orders</u>.  The Confirmation Order and this Plan each is in a form and substance satisfactory to the Debtors, the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and AAOC.

(c)    <u>Confirmation Order</u>.  The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan and the Global Settlement Agreement satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, and (ii) the releases and injunctions set forth in  Article XLI of the Plan.

36.2    **Waiver of Conditions Precedent to Confirmation:**  To the extent practicable and legally permissible, each of the conditions precedent in Section 36.1 hereof may be waived, in whole or in part, by the Debtors, subject to the prior written approval of the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and AAOC.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Bankruptcy Court executed by the Debtors, the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and AAOC.

## ARTICLE XXXVII

## CONDITIONS PRECEDENT TO EFFECTIVE DATE OF THE PLAN

37.1    **Conditions Precedent to Effective Date of the Plan:**  The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a)    <u>Satisfaction of Certain Settlement Agreement Conditions</u>.  The satisfaction of the "Conditions to Effective Date" set forth in Section 7.2 of the Global Settlement Agreement.

(b)    <u>Entry of the Confirmation Order</u>.  The Clerk of the Bankruptcy Court shall have entered the Confirmation Order in accordance with section 1129 of the Bankruptcy Code, and the Confirmation Order shall have become a Final Order.

(c)    <u>Execution of Documents; Other Actions</u>.  All other actions and documents necessary to implement the Plan shall have been effected or executed.

37.2    **Waiver of Conditions Precedent**: To the extent practicable and legally permissible, each of the conditions precedent in Section 37.1 hereof may be waived, in whole or in part, by the Debtors, subject to the prior written approval of the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate, and AAOC. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Bankruptcy Court executed by the Debtors, the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and AAOC.

## ARTICLE XXXVIII

## RETENTION OF JURISDICTION

38.1    **Retention of Jurisdiction**: The Bankruptcy Court shall retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code, arising in or related to the Chapter 11 Cases or the Plan, or that relates to the following:

(a)    to resolve any matter related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claim arising therefrom, including those matters related to the amendment after the Effective Date of the Plan to add any executory contract or unexpired lease to the list of executory contracts and unexpired leases to be rejected;

(b)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, including, without limitation, the Global Settlement Agreement, unless any such agreements or documents contain express enforcement and dispute resolution provisions to the contrary, in which case, such provisions shall govern;

(c)    to determine any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtors, the Reorganized Debtors, or the Liquidating Trustee prior to or after the Effective Date;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(e)    to hear and determine any timely objection to any Claim or Equity Interest, whether such objection is filed before or after the Confirmation Date, including any objection to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim or Equity Interest, in whole or in part;

(f)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(g)    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(h)    to consider any modification of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)    to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

(j)    to hear and determine disputes arising in connection with or relating to the Plan or the Global Settlement Agreement, or the interpretation, implementation, or enforcement of the Plan or the Global Settlement Agreement, or the extent of any Entity's obligations incurred in connection with or released under the Plan or the Global Settlement Agreement, unless such agreements or documents contain express enforcement or dispute resolution provisions to the contrary, in which case such provisions should govern;

(k)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan or the Global Settlement Agreement;

(l)    to determine any other matter that may arise in connection with or that is related to the Plan, the Disclosure Statement, the Supplemental Disclosure Statement, the Confirmation Order, the Global Settlement Agreement, or any contract, instrument, release, or other agreement or document created in connection therewith, unless such agreements or documents contain express enforcement or dispute resolution provisions, in which case, such provisions should govern;

(m)    to hear and determine matters concerning state, local, and federal Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, any matter relating to the Tax Refunds, and any request by the Debtors or by the Liquidating Trustee, as applicable, for an expedited determination of Tax under section 505(b) of the Bankruptcy Code with respect to the Debtors, the Liquidating Trust, or the Liquidating Trust Claims Reserve, as applicable);

(n)    to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

(o)    to enter a final decree closing the Chapter 11 Cases;

provided, however, that the foregoing is not intended to (i) expand the Bankruptcy Court's jurisdiction beyond that allowed by applicable law, (ii) grant the Bankruptcy Court jurisdiction over disputes between JPMC and the FDIC Receiver and/or FDIC Corporate under the Purchase and Assumption Agreement, (iii) impair the rights of an Entity to (a) invoke the jurisdiction of a court, commission, or tribunal with respect to matters relating to a governmental unit's police and regulatory powers and (b) contest the invocation of any such jurisdiction; and provided, further, that the invocation of such jurisdiction, if granted, shall not extend to the allowance or priority of Claims or the enforcement of any money judgment against the Debtors, the

Reorganized Debtors, or the Liquidating Trust, as the case may be, entered by such court, commission, or tribunal, and (iv) impair the rights of an Entity to (a) seek the withdrawal of the reference in accordance with 28 U.S.C. § 157(d) and (b) contest any request for the withdrawal of reference in accordance with 28 U.S.C. § 157(d).

## ARTICLE XXXIX

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

39.1 **Modification of Plan:** The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, except in the event any amendment or modification would materially adversely affect the substance of the economic provisions set forth in the Plan or the Global Settlement Agreement, to amend or modify the Plan, the Plan Supplement, or any exhibit to the Plan at any time prior to the entry of the Confirmation Order, subject in each case to the consent of the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and AAOC; provided, however, that, for the avoidance of doubt, it is understood and agreed that any change to the definition of JPMC Assumed Liabilities or to the releases in Article XLI of the Plan, or to the assets or benefits to be received by JPMC pursuant to the Global Settlement Agreement would be material to the JPMC Entities. Upon entry of the Confirmation Order, the Debtors may, with the consent of the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate and AAOC, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject in each case to the terms of the Global Settlement Agreement. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

39.2 **Revocation or Withdrawal:**

(a) The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

(b) If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceeding involving the Debtors.

39.3 **Amendment of Plan Documents:** From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan and their respective attachments, as the case may be.

39.4 **No Admission of Liability:**

(a)    The submission of this Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this Plan.

(b)    None of this Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against the Reorganized Debtors, the Debtors, or any other Person or Entity with respect to the validity of any Claim; or (iv) is or may be deemed to be used as an admission or evidence of the jurisdiction of any court to adjudicate claims or matters relating to the Receivership.  None of this Plan or any settlement entered, act performed or document executed in connection with this Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this Plan, and except that, once confirmed, any Entity may file this Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## ARTICLE XL

## CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

40.1    **Corporate Action:** On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, the authorization to issue or cause to be issued the Runoff Notes and the Reorganized Common Stock, the authorization to enter into the Credit Facility, the adoption of the Reorganized Debtors Certificates of Incorporation and the Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors, as the case may be.  The cancellation of all Equity Interests and other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by the Reorganized Debtors, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Reorganized Debtors.  Without limiting the foregoing, from and after the Confirmation Date, the Debtors and the Reorganized Debtors shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein, and, notwithstanding any provision contained in the Debtors' articles of incorporation and by-laws to the contrary, such Entities shall not require the affirmative vote of holders of Equity Interests in

order to take any corporate action including to (i) compromise and settle claims and causes of action of or against the Debtors and their chapter 11 estates and (ii) dissolve, merge, or consolidate with any other Entity.

40.2    **Reincorporation:** No later than one (1) year following the Effective Date, Reorganized WMI may, at the discretion of the board of directors of Reorganized WMI and without requiring the approval of Reorganized WMI's shareholders, reincorporate from the State of Washington to the State of Delaware, including, without limitation, by merging with a corporation incorporated under the laws of the State of Delaware or by such conversion or redomestication process as is authorized under applicable law.

40.3    **Amendment of Articles of Incorporation and By-Laws:** The articles of incorporation and by-laws of the Debtors shall be amended as of the Effective Date to provide substantially as set forth in the Reorganized Debtors Certificates of Incorporation and the Reorganized Debtors By-Laws, each of which shall in form and substance be reasonably satisfactory to the Creditors' Committee, the Equity Committee and AAOC. The Reorganized Debtors Certificates of Incorporation and the Reorganized Debtors By-Laws, to the extent applicable, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

40.4    **Directors of the Reorganized Debtors:** On the Effective Date, the board of directors of each of the Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity Committee and one (1) member selected by the lenders party to the Credit Facility. The initial directors shall be disclosed prior to the Confirmation Hearing. In the event that, during the period from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the boards of directors of the Reorganized Debtors, the Equity Committee and the lenders party to the Credit Facility, as the case may be, shall choose a respective substitute and the Debtors shall file a notice thereof with the Bankruptcy Court and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with the requirements of the immediately preceding sentence, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing.

40.5    **Officers of the Reorganized Debtors:** To the extent applicable, the board of directors of the Reorganized Debtors shall elect officers of the Reorganized Debtors as of or after the Effective Date.

## ARTICLE XLI

## MISCELLANEOUS PROVISIONS

41.1    **Title to Assets:** Except as provided in Confirmation Order, on the Effective Date, title to all assets and properties encompassed by the Plan shall vest in the Reorganized Debtors, Reorganized WMI, the Liquidating Trust, the JPMC Entities or the FDIC Receiver, as the case may be, free and clear of all Liens and in accordance with sections 363 and 1141 of the Bankruptcy Code, and the Confirmation Order shall be a judicial determination of

discharge of the liabilities of the Debtors and the Debtors in Possession except as provided in the Plan.

### 41.2    Discharge and Release of Claims and Termination of Equity Interests:

(a)    Except as expressly provided in Section 41.6 of the Plan or the Confirmation Order, all distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Equity Interests or other rights of a holder of an equity security or other ownership interest. Upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under section 1141(d)(1)(A) of the Bankruptcy Code and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests or other rights of a holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security holder in any of the Debtors and all Equity Interests.

(b)    Except as provided in Sections 41.6 and 41.12 of the Plan or the Confirmation Order, all Entities shall be precluded from asserting against any and each of the Debtors and the Reorganized Debtors, and any and each of their respective assets, property and estates, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Equity Interests or other rights of a holder of an equity security or other ownership interest. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests, or other rights of a holder of an equity interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall

void and extinguish any judgment obtained against any of the Debtors or the Reorganized
Debtors, and their respective assets, property and estates at any time, to the extent such judgment
is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity
Interest in any of the Debtors. As of the Effective Date, and in consideration for the value
provided under the Global Settlement Agreement to effectuate the Plan, each holder of a Claim
or Equity Interest in any Class under this Plan shall be and hereby is deemed to release and
forever waive and discharge as against each and any of the Debtors and the Reorganized
Debtors, and their respective assets, property and estates, all such Claims and Equity Interests.

        (c)     Except as expressly provided in Sections 41.6 and 41.12 of the
Plan or the Confirmation Order, in furtherance of the foregoing, and except for the JPMC
Assumed Liabilities, Allowed WMB Vendor Claims, and Allowed WMI Vendor Claims, to the
extent provided in the Global Settlement Agreement, none of the JPMC Entities or any of their
Related Persons shall have any liability for, and the Debtors, on behalf of themselves, their
respective estates and their present Affiliates (other than WMB and its subsidiaries), hereby
release the JPMC Entities and each of their Related Persons from liability for, any and all Claims
that (i) are or were property of the Debtors, their respective estates, or their present Affiliates
(other than WMB and its subsidiaries), and (ii) were or could have been brought in any of the
Related Actions.

        41.3   **Injunction on Claims**: Except as otherwise expressly provided in
Sections 41.6 and 41.12 of the Plan, the Confirmation Order or such other order of the
Bankruptcy Court that may be applicable, all Entities who have held, hold or may hold Claims or
any other debt or liability that is discharged or Equity Interests or other right of equity interest
that is terminated or cancelled pursuant to the Plan or the Global Settlement Agreement, or who
have held, hold or may hold Claims or any other debt or liability that is discharged or released
pursuant to Section 41.2 hereof, are permanently enjoined, from and after the Effective Date,
from (a) commencing or continuing, directly or indirectly, in any manner, any action or other
proceeding (including, without limitation, any judicial, arbitral, administrative or other
proceeding) of any kind on any such Claim or other debt or liability that is discharged or Equity
Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan against any of
the Released Parties or any of their respective assets, property or estates, (b) the enforcement,
attachment, collection or recovery by any manner or means of any judgment, award, decree or
order against any of the Released Parties or any of their respective assets, property or estates on
account of any Claim or other debt or liability that is discharged or Equity Interest that is
terminated, cancelled, assumed or transferred pursuant to the Plan, (c) creating, perfecting, or
enforcing any encumbrance of any kind against any of the Released Parties or any of their
respective assets, property or estates on account of any Claim or other debt or liability that is
discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the
Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556,
559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment,
asserting any right of setoff, subrogation or recoupment of any kind against any obligation due
from any of the Released Parties or any of their respective assets, property or estates, with
respect to any such Claim or other debt or liability that is discharged or Equity Interest that is
terminated, cancelled, assumed or transferred pursuant to the Plan; provided, however, that such
injunction shall not preclude the United States of America, any state or any of their respective
police or regulatory agencies from enforcing their police or regulatory powers; and, provided,

further, that, except in connection with a properly filed proof of Claim, the foregoing proviso does not permit the United States of America, any State or any of their respective police or regulatory agencies from obtaining any monetary recovery, including fines, restitution or forfeiture, from any of the Released Parties, including, without limitation, the Debtors, the Debtors in Possession or the Reorganized Debtors, or any of their respective assets, property or estates, with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power; and, provided, further, that, subject to Section 3.8 of the Global Settlement Agreement, such injunction shall not preclude the JPMC Entities, the Receivership, the FDIC Receiver and the FDIC Corporate from pursuing any and all claims against each other or any other defenses thereto pursuant to the Purchase and Assumption Agreement. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets, property and estates.

41.4    **Integral to Plan:** Each of the discharge, injunction and release provisions provided in this Article XLI is an integral part of the Plan and is essential to its implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XLI.

41.5    **Releases by the Debtors, the Creditors' Committee and the Equity Committee:**

(a)    Released Parties. Except as otherwise expressly provided in the Plan, the Confirmation Order, or the Global Settlement Agreement, on the Effective Date, for good and valuable consideration, each of the Debtors and the Reorganized Debtors, on its own behalf and as representative of its respective estate, the Disbursing Agent and each of the Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, the Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to the Debtors taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees; provided, however, that the foregoing release shall not extend to acts of gross negligence or willful misconduct (other than with respect to the JPMC Entities and their respective Related Persons).

(b)    Release of AAOC, Holders of Allowed Senior Notes Claims, Holders of Allowed Senior Subordinated Notes Claims, Holders of CCB-1 Guarantees Claims, Holders of CCB-2 Guarantees Claims and Holders of Allowed PIERS Claims. On the Effective

Date, for good and valuable consideration, each of the Debtors and the Reorganized Debtors, on its own behalf and as representative of its respective estate, the Disbursing Agent and each of the Debtors' Related Persons, the Creditors' Committee and the Equity Committee, without giving any legitimacy or merit to any of the allegations raised or asserted with respect to AAOC, holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims and holders of Allowed PIERS Claims during the Chapter 11 Cases, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge (1) the AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB Releasees, and each of their respective officers, directors, agents, employees and, solely in their capacity as counsel with respect to the Debtors' Chapter 11 Cases, attorneys from any and all Estate Claims that the Debtors, the Creditors' Committee and the Equity Committee, have or may have or claim to have, now or in the future, against (1) the AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB Releasees, and each of their respective officers, directors, agents, employees and, solely in their capacity as counsel with respect to the Debtors' Chapter 11 Cases, attorneys.

## 41.6    Releases by Holders of Claims and Equity Interests:

(a)    Global Third Party Releases. On the Effective Date, for good and valuable consideration, and to the fullest extent permissible under applicable law, each Entity (Creditor or holder of an Equity Interest) that (i) has held, currently holds or may hold a Released Claim or any Released Third Party Causes of Action, (ii) is entitled to receive, directly or indirectly, a distribution or satisfaction of its Claim or Equity Interest pursuant to the Plan, and (iii) elects, by not checking or checking the appropriate box on its Ballot or election form, as the case may be, to grant the releases set forth in this Section 41.6, on their own behalf and on behalf of anyone claiming through them, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge (1) each and all of the Released Parties, from any and all Released Claims and/or any claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged in the Actions or in the Texas Litigation, or that could have been alleged in respect of the foregoing or other similar proceeding, including, without limitation, any such claim demand, right, liability, or cause of action for indemnification, contribution or any other basis in law or equity for damages, costs or fees incurred by the releasors herein arising directly or indirectly from or otherwise relating thereto and (2) each of (a) the AAOC Releasees, (b) the Senior Notes Claims Releasees, (c) the Senior Subordinated Notes Claims Releasees, (d) the PIERS Claims Releasees and (e) the CCB Releasees from any and all Released Third Party Causes of Action; **provided, however, that each Entity that has elected not to grant the releases set forth in this Section 41.6, including, without limitation, any Entity that fails to execute and deliver a release following notice in accordance with the provisions of Section 31.6(c) hereof, shall not be entitled to, and shall not receive, any payment, distribution or other satisfaction of its claim pursuant to the Plan**; and, provided, further, that, notwithstanding anything contained in this Section 41.6(a) to the contrary, the release set forth in Section 41.6(a)(1) shall not extend to acts of gross negligence or willful misconduct of any Released Parties (other than with respect to the JPMC Entities and their respective Related Persons); and, provided, further, that, notwithstanding the foregoing, solely for purposes of this Section 41.6(a), "Released Parties" shall not include

Related Persons other than (i) Related Persons of the JPMC Entities and (ii) Related Persons of the FDIC Receiver and FDIC Corporate.

(b)    Limited Governmental Exceptions. Nothing contained herein or in the Confirmation Order shall (1) (i) release, or is intended to release, any non-Debtor, including any non-Debtor Entity that may be a Released Party or a Related Person, in connection with any legal action or claim brought by the United States Securities and Exchange Commission or (ii) prejudice the rights of any such non-Debtor Entity to defend or otherwise contest any such legal action or claim, (2) (i) to the extent that (A) the Pension Plans are terminated from and after the Effective Date and (B) the Pension Plans are underfunded as of the Effective Date, release, or is intended to release, any non-Debtor, including any non-Debtor Entity that may be a Released Party or a Related Person, from any liability as a fiduciary of the Pension Plans, under any law, government policy or regulatory provision, (ii) enjoin or preclude the Pension Benefit Guaranty Corporation from enforcing such liability against such non-Debtor Entity during the applicable statute of limitations period set forth in 29 U.S.C. § 1303 following any such termination, or (iii) prejudice the rights of any such non-Debtor Entity to defend or otherwise contest any such legal action or claim, and (3) (i) release the claims held by the California Franchise Tax Board, including rights of setoff and recoupment with respect to claims against or among two or more non-Debtor Entities, against any non-Debtor and, notwithstanding any other provision of the Plan or the Confirmation Order, the California Franchise Tax Board shall not be enjoined from pursuing any such claims and (ii) prejudice the rights of any such non-Debtor to defend or otherwise contest any such legal action or claim.

(c)    BKK Liabilities. Nothing contained herein or in the Confirmation Order is intended to, nor shall it, release any non-Debtor or non-Debtor Entity that may be a Released Party or a Related Person, in connection with any legal action or claim brought by CDTSC or the BKK Group relating to the BKK Site that is the subject of the BKK Litigation; provided, however, that nothing contained in this Section 41.6(c) is intended, nor shall it be construed, to (1) constitute evidence of or any support for an argument that any such non-Debtors have any such liabilities, or (2) create any liability on behalf of the Liquidating Trust. For the avoidance of doubt, nothing herein shall affect the releases or other terms of the BKK Settlement Agreement, which provisions shall control over any contrary provision in the Confirmation Order, the Plan or the Global Settlement Agreement.

(d)    Securities Litigations. Nothing contained herein, in the Confirmation Order or the Global Settlement Agreement with respect to the releases, exculpations, injunctions or similar provisions is intended to, nor shall it, release, enjoin or impact in any way the prosecution of the claims asserted, or to be asserted, against any non-Debtor or non-Debtor Entity in the Securities Litigations, including, but not limited to, the defendants named in the Securities Litigations (the "Securities Litigations Carve-Out"), nor will any potential distribution on account of the relevant proofs of claim filed by lead plaintiffs in the Securities Litigations and/or which have been withdrawn without prejudice (subject to all parties' rights with respect to the relevant proofs of claim in accordance with and subject to the terms of the Bankruptcy Court-approved stipulations) be forfeited by virtue of the Securities Litigations Carve-Out.

(e)    Intentionally Deleted

(f)    <u>Truck and Fire</u>. Notwithstanding anything contained herein or in the Verification Form (as defined in the Order [D.I. 7081] approving the Supplemental Disclosure Statement), with respect to the Claims of Truck Insurance Exchange ("<u>Truck</u>") and Fire Insurance Exchange ("<u>Fire</u>") asserted against the Debtors and the Debtors' chapter 11 estates (collectively, the "<u>Truck/Fire Claims</u>"), including, without limitation, those Claims included in Classes 17A and 17B of the Plan, (a) the release and injunction provisions of the Plan are intended to, and shall release only, all Claims of Truck and Fire against any Released Parties arising from or relating to the Truck/Fire Claims, other than any claims, counterclaims or defenses under or relating to any policies of insurance, and (b) the release and injunction provisions of the Plan are not intended to, and shall not release, any claims of Truck, Fire or any Affiliate of Truck or Fire against (i) a non-Debtor as an investor in securities issued by any such non-Debtor Entity, (ii) WMB, (iii) the Receivership, or (iv) the FDIC Receiver solely with respect to the Receivership.

(g)    <u>Texas Litigation</u>. Nothing contained herein or in the Confirmation Order with respect to the releases, exculpations, injunctions or similar provisions is intended to, nor shall it, release, enjoin or restrain the prosecution of direct claims, if any, asserted, or that could have been asserted, in the Texas Litigation against any non-Debtor Entity; <u>provided, however</u>, that the foregoing is without prejudice to the rights of any such non-Debtor Entity to contest, upon notice and a hearing, the validity, merits and ownership of or standing to assert any such direct claims; and, <u>provided, further</u>, that the Bankruptcy Court is not making, either pursuant to the Plan or the Confirmation Order, a determination as to which Entity, including, without limitation, the Debtors, owns the claims asserted, or that could have been asserted, in the Texas Litigation; and, <u>provided, further</u>, that any and all direct claims against the Debtors and derivative claims of the Debtors, if any, that have been or could have been asserted against any Released Party in the Texas Litigation shall, upon the Effective Date, be released, discharged and enjoined.

In addition to, and not in any way limiting the foregoing, each holder of an Allowed WMB Senior Notes Claim and each Accepting Non-Filing WMB Senior Notes Holder shall be deemed to have released the Debtors, the Reorganized Debtors, and each of their respective Related Persons from any and all direct and derivative claims arising from or related to such holder's WMB Senior Notes, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holder's WMB Senior Notes (including, without limitation, any Section 510(b) Subordinated WMB Notes Claims that such holder may have).

<u>Waiver of Section 1542</u>: All persons providing releases pursuant to the provisions of Section 41.6 of the Plan expressly and voluntarily waive Section 1542 of the California Civil Code, or any similar, comparable or equivalent provision of the statutory or non-statutory law of California or any other jurisdiction. Section 1542 provides:

A general release does not extend to claims under which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

41.7   **Injunction Related to Releases:** As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim, an Estate Claim, any Released Third Party Causes of Action or an Equity Interest that is released pursuant to Sections 41.5 and 41.6 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims, Estate Claim, Released Third Party Causes of Action or such Equity Interests: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Sections 41.5 and 41.6 hereof; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

41.8   **Exculpation:** The Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity Committee, and each of their respective professionals shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Chapter 11 Cases (including any actions taken by the Creditors' Committee after the Effective Date), the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement and the Supplemental Disclosure Statement related thereto, the Global Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Global Settlement Agreement; provided, however, that the foregoing provisions of this Section 41.8, shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct. Nothing in the foregoing Section 41.8 shall prejudice the right of any of the Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity Committee, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

41.9   **Bar Order:** To the limited extent provided in Section 41.6 of the Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the

Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, the Debtors' Claims, the JPMC Claims, the FDIC Claim, the Purchase and Assumption Agreement (other than any rights or claims the JPMC Entities, the Receivership, the FDIC Receiver or the FDIC Corporate may have under the Purchase and Assumption Agreement), confirmation and consummation of the Plan, the negotiation and consummation of the Global Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Related Actions, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the Related Actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

      41.10  **Deemed Consent:** By submitting a Ballot or election form and receiving a distribution under or any benefit pursuant to this Plan and not electing to withhold consent to the releases of the applicable Released Parties and the Entities set forth in Section 41.6 of the Plan, or by order of the Bankruptcy Court, each holder of a Claim or Equity Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 41.6 of the Plan.

      41.11  **No Waiver:** Notwithstanding anything to the contrary contained in Sections 41.5 and 41.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors, the Creditors' Committee, the Liquidating Trustee, the JPMC Entities, the FDIC Receiver, or FDIC Corporate to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

      41.12  **Supplemental Injunction:** Notwithstanding anything contained herein to the contrary, except to the limited extent provided in Section 41.6 of the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims or Equity Interests against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims or Equity Interests arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

      (a)  **Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim or Equity Interest against any of the Released Parties or the assets or property of any Released Party;**

(b)    Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;

(c)    Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;

(d)    Except as otherwise expressly provided in the Plan, the Confirmation Order, or the Global Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim or Equity Interest; and

(e)    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Confirmation Order, or the Global Settlement Agreement relating to such Released Claim or Equity Interest;

provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code; and, provided, further, that the supplemental injunction provided pursuant to the terms of this Section 41.12 shall not preclude any current or former officers or directors of WMI from asserting any setoff or recoupment rights against any judgment or other obligation due to the Debtors, the Debtors' estates, or the Liquidating Trust or against the property of the Debtors or the Debtors' estates, to the extent such individuals have such rights pursuant to applicable non-bankruptcy law.

41.13    **Term of Existing Injunctions or Stays:**  Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362, or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until entry of an order in accordance with Section 41.23 of the Plan or such other Final Order of the Bankruptcy Court; provided, however, that the terms of the Stock Trading Order shall remain in full force and effect forever, including, without limitation, with respect to any violation thereof on or before the Effective Date.

41.14    **Payment of Statutory Fees:**  All fees payable pursuant to section 1930 of title 28 of the United States Code, and, if applicable, any interest payable pursuant to section 3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be obligations and liabilities of the Liquidating Trust and shall be paid on the Effective Date or thereafter as and when they become due or otherwise pursuant to an agreement between the Debtors and the United States Department Justice, Office of the United States Trustee, until such time as the Chapter 11 Cases are closed in accordance with the provisions of Section 41.23 of the Plan.

41.15  **Post-Effective Date Fees and Expenses:** From and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, retain professionals and pay the reasonable professional fees and expenses incurred by the Reorganized Debtors related to implementation and consummation of the Plan without further approval from the Bankruptcy Court.

41.16  **Exemption from Transfer Taxes:** Pursuant to sections 106, 1141 and 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan or the Global Settlement Agreement, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan or the Global Settlement Agreement, including, without limitation, the Runoff Notes, the Reorganized Common Stock, the Trust Preferred Securities, and any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the Global Settlement Agreement shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar Tax. The Confirmation Order shall direct all state and local government officials and agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any instrument or other document issued or transferred pursuant to the Plan, without the payment of any such tax or government assessment.

41.17  **Withdrawal of Equity Committee Proceedings:** Without limiting the provisions of Section 35.2 of the Plan, on the Effective Date, the Equity Committee Adversary Proceeding and the Equity Committee Action to Compel, and any other proceeding or action instituted by the Equity Committee (including any appeal), shall be deemed withdrawn, with prejudice, without any further action.

41.18  **Payment of Fees and Expenses of Certain Creditors:** Within ninety (90) days of the Effective Date, (i) Fried, Frank, Harris, Shriver & Jacobson LLP, (ii) Blank Rome LLP, (iii) White & Case LLP, (iv) Kasowitz, Benson, Torres & Friedman LLP, (v) Zolfo Cooper LLC, (vi) Kramer, Levin, Naftalis & Frankel LLP, (vii) Halperin Battaglia Raicht LLP, (viii) Kilpatrick Townsend & Stockton LLP, (ix) Brown Rudnick LLP, (x) Arkin Kaplan Rice LLP, (xi) Campbell & Levine, LLC, (xii) Mesirow Financial Consulting, LLC, (xiii) Schnader Harrison Segal & Lewis LLP, and (xiv) in accordance with Section 21.1(a) hereof, Wilmer Cutler Pickering Hale & Dorr LLP, Pachulski Stang Ziehl & Jones LLP, and Boies, Schiller & Flexner LLP, to the extent any clients with respect to the foregoing professionals seek reimbursement for the payment of fees and expenses incurred, shall file with the Bankruptcy Court an application (for purposes of reviewing the reasonableness of the amounts requested therein), together with detailed invoices annexed thereto, requesting payment for reasonable fees and expenses incurred during the period from the Petition Date through and including the Effective Date, in connection with the Chapter 11 Cases, the Global Settlement Agreement, the Plan or the transactions contemplated herein or therein (including, without limitation, investigating, negotiating, documenting, and completing such transactions and enforcing, attempting to enforce, and preserving any right or remedy contemplated under the Global Settlement Agreement and in the Chapter 11 Cases). Within ten (10) Business Days of the entry of a Final Order by the Bankruptcy Court approving the payment thereof, in whole or in part, the Disbursing Agent shall pay such fees and expenses so approved.

41.19  **Securities Litigations Documents:** On the Effective Date, and to the extent that the Reorganized Debtors are formed, the Debtors shall not transfer any documents, in electronic form or otherwise, to the Reorganized Debtors that relate to the claims, defenses and allegations in the Securities Litigations. All such documents will be transferred to the Liquidating Trust on the Effective Date and shall be thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement; provided, however, that, in the event that any documents are required for the operations of the Reorganized Debtors and are transferred to the Reorganized Debtors, copies of any such documents shall be transferred to the Liquidating Trust or the Effective Date and thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement.

41.20  **Severability:** If, prior to the Confirmation Date, any term or provision of the Plan shall be held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, the Creditors' Committee, the Equity Committee and AAOC, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation; provided, however, that, any holding, alteration or interpretation that alters, amends or modifies the definition of JPMC Assumed Liabilities or the releases provided in the Plan or the assets or benefits to be provided to JPMC pursuant to the Global Settlement Agreement absent JPMC's express written consent (which may be withheld, delayed, or conditioned in JPMC's sole discretion) shall render the remainder of the terms and provisions of the Plan and the Global Settlement Agreement of no force or effect. Except with respect to the foregoing proviso, the Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted, is valid and enforceable pursuant to its terms.

41.21  **Governing Law:** Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of New York, without giving effect to principles of conflicts of laws.

41.22  **Notices:** All notices, requests, and demands to or upon the Debtors, the Debtors in Possession, the Reorganized Debtors, or the Liquidating Trustee to be effective shall be in writing, including by facsimile transmission, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors or the Debtors in Possession:

Washington Mutual, Inc.
1201 Third Avenue, Suite 3000
Seattle, Washington 98101
Attention: General Counsel
Telephone: (206) 432-8731
Facsimile: (206) 432-8879

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Brian S. Rosen, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

41.23    **Closing of Case:**  The Liquidating Trustee shall, promptly upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court.

41.24    **Section Headings:**  The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

41.25    **Inconsistencies**:  To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern and (b) the terms and provisions of the Plan and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan; provided, however, that under no circumstances shall the Confirmation Order modify the economic terms set forth herein.

Dated:    Seattle, Washington
          December 12, 2011


                                        WASHINGTON MUTUAL, INC.

                              By:    /s/ William C. Kosturos____
                                     Name:  William C. Kosturos
                                     Title:   Chief Restructuring Officer

WMI INVESTMENT CORP.

By:    /s/ William C. Kosturos
       Name: William C. Kosturos
       Title:  President & Chief Executive
               Officer


/s/ Mark D. Collins
Mark D. Collins (No. 2981)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

– and –

Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

ATTORNEYS TO THE DEBTORS
AND DEBTORS IN POSSESSION

**<u>Exhibit M</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:** | **Chapter 11 Cases** |
| **SPANSION INC.,** *et al.*,[1] | **Case No.: 09-10690 (KJC)** |
| **Debtors**. | **(Jointly Administered)** |

**DEBTORS' SECOND AMENDED JOINT PLAN OF
REORGANIZATION DATED APRIL 7, 2010 (AS AMENDED)**

LATHAM & WATKINS LLP
Michael S. Lurey
Gregory O. Lunt
Kimberly A. Posin
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

DUANE MORRIS, LLP
Michael R. Lastowski
Richard W. Riley
Sommer L. Ross
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Spansion Inc., a Delaware corporation (8239); Spansion Technology LLC, a Delaware limited liability company (3982); Spansion LLC, a Delaware limited liability company (0482); Cerium Laboratories LLC, a Delaware limited liability company (0482), and Spansion International, Inc., a Delaware corporation (7542). The mailing address for each Debtor is 915 DeGuigne Dr., Sunnyvale, CA 94085.

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND GENERAL PROVISIONS......................................................2

    1.1    Definitions............................................................................................2
    1.2    Time....................................................................................................24
    1.3    Rules of Interpretation .......................................................................24

ARTICLE II. CLASSIFICATION OF CLAIMS AND INTERESTS;
IMPAIRMENT .........................................................................................................25

    2.1    Generally.............................................................................................25
    2.2    Settlement of Intercompany Claims and Treatment of Claims
          Generally.............................................................................................26
    2.3    Treatment of Multiple Claims and Guaranty and Joint Liability
          Claims Against Multiple Debtors. ......................................................26
    2.4    Summary of Classification..................................................................26
    2.5    Unimpaired Classes Deem to Accept Plan .........................................27
    2.6    Impaired Classes Deemed to Reject Plan ...........................................27
    2.7    Impaired Classes Entitled to Vote on Plan .........................................27
    2.8    Impairment Controversies...................................................................27
    2.9    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code....................27

ARTICLE III. TREATMENT OF CLAIMS AND INTERESTS ................................................28

    3.1    Class 1 – Secured Credit Facility Claims. ..........................................28
    3.2    Class 2 – UBS Credit Facility Claims.................................................28
    3.3    Class 3 – FRN Claims.........................................................................29
    3.4    Class 4 – Other Secured Claims..........................................................31
    3.5    Class 5A – Senior Notes Claims.........................................................32
    3.6    Class 5B – General Unsecured Claims. ...............................................32
    3.7    Class 5C – Exchangeable Debentures Claims. ....................................33
    3.8    [Reserved]...........................................................................................33
    3.9    Class 6 – Convenience Class Claims. ..................................................33
    3.10    Class 7 – Non-Compensatory Damages Claims. .................................33
    3.11    Class 8 – Interdebtor Claims...............................................................33
    3.12    Class 9 – Old Spansion Interests.........................................................34
    3.13    Class 10 – Other Old Equity. ..............................................................34
    3.14    Class 11 – Other Old Equity Rights.....................................................34
    3.15    Class 12 – Securities Claims...............................................................35
    3.16    Class 13 – Non-Debtor Intercompany Claims. ....................................35
    3.17    Special Provision Governing Unimpaired Claims................................35
    3.18    Preservation of Subordination Rights. .................................................35

ARTICLE IV. TREATMENT OF UNCLASSIFIED CLAIMS....................................................36

    4.1    Generally..............................................................................................36

LA\2058780.10DM3\1345606.1

    4.2       Unclassified Claims. ................................................................................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND
    UNEXPIRED LEASES ...........................................................................41

    5.1       Assumption and Cure of Executory Contracts and Unexpired
               Leases................................................................................................41
    5.2       Cure of Defaults of Assumed Executory Contracts and Unexpired
               Leases................................................................................................41
    5.3       Consent Rights. ................................................................................42
    5.4       Effect of Assumption and/or Assignment................................................42
    5.5       Rejection of Executory Contracts and Unexpired Leases.....................42
    5.6       Employment Agreements and Other Benefits ......................................42
    5.7       Insurance Policies. ..........................................................................43
    5.8       Rejection Damages Claims Bar Date; Approval of Rejection.............44

ARTICLE VI. MEANS FOR IMPLEMENTATION OF PLAN .................................44

    6.1       Continued Corporate Existence and Vesting of Assets in
               Reorganized Debtors........................................................................44
    6.2       Sources of Cash for Distribution.......................................................45
    6.3       Corporate and Limited Liability Company Action...............................46
    6.4       Effectuating Documents; Further Transactions ...................................46
    6.5       Exemption from Certain Transfer Taxes and Recording Fees...............46
    6.6       Retained Actions .............................................................................46
    6.7       Employee Claims ............................................................................47
    6.8       Executory Contracts and Unexpired Leases Entered Into, and
               Other Obligations Incurred After, the Petition Date ............................48
    6.9       Operations Between Confirmation Date and the Effective Date. ..........48
    6.10     Rights Offering. ..............................................................................48
    6.11     New Spansion Debt..........................................................................52
    6.12     Cancellation of the FRNs, Senior Notes, and the Exchangeable
               Debentures. .....................................................................................52

ARTICLE VII. PROVISIONS REGARDING CORPORATE GOVERNANCE
    OF REORGANIZED DEBTORS..........................................................53

    7.1       New Governing Documents...............................................................53
    7.2       Directors and Officers of Reorganized Debtors..................................53
    7.3       New Employee Incentive Compensation Programs ...........................54
    7.4       Authorization and Issuance of New Equity; Securities Laws..............54
    7.5       Holdback from Common Stock Distribution ......................................54
    7.6       Listing of New Spansion Common Stock...........................................55
    7.7       Old Spansion Interests ....................................................................55

ARTICLE VIII. VOTING AND DISTRIBUTIONS................................................55

    8.1       Voting of Claims.............................................................................55

iii

8.2    Distributions of Cash on Account of Claims Allowed as of the Effective Date ...............................................................................55
8.3    Disbursing Agent ..................................................................................55
8.4    Distributions of Cash ...........................................................................56
8.5    No Interest on Claims or Interests .......................................................56
8.6    Delivery of Distributions .....................................................................56
8.7    Distributions to Holders of the FRNs, the Senior Notes, and the Exchangeable Debentures. .................................................................57
8.8    Distributions to Holders as of the Record Date ..................................57
8.9    Indenture Trustees as Claim Holders. ..................................................58
8.10   Payments and Distributions to Holders of Disputed Claims Which Become Allowed Claims. ....................................................................58
8.11   Distributions of Stock to Holders of Allowed Class 5A Claims, Allowed Class 5B Claims and Allowed Class 5C Claims. ..................58
8.12   Reserve for Disputed Claims. ..............................................................59
8.13   De Minimis Distributions .....................................................................60
8.14   No Fractional Securities; No Fractional Dollars..................................60
8.15   Surrender of Instruments......................................................................61
8.16   Procedures for Distributions to Holders of FRN Claims, Senior Notes Claims, and Allowed Exchangeable Debentures Claims. ...........61
8.17   Allocation of Distributions Between Principal and Interest .................62
8.18   Compliance With Tax Requirements.....................................................62
8.19   Saturday, Sunday or Legal Holiday .....................................................62

ARTICLE IX. PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS ........................................................................62

9.1    Objections to Claims............................................................................62
9.2    Authority to Prosecute Objections. ......................................................62
9.3    No Distributions Pending Allowance ...................................................65
9.4    Estimation of Claims............................................................................65
9.5    Distributions After Allowance .............................................................66
9.6    Claims Covered by Insurance Policy....................................................66

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE OF THE PLAN ......................................................66

10.1   Conditions to Confirmation .................................................................67
10.2   Conditions to the Effective Date..........................................................67
10.3   Waiver of Conditions............................................................................69
10.4   Effect of Failure of Conditions ............................................................69
10.5   Order Denying Confirmation................................................................69
10.6   Revocation of the Plan .........................................................................69

ARTICLE XI. EFFECT OF PLAN ON CLAIMS AND INTERESTS.........................70

11.1   Discharge of Claims and Termination of Interests ...............................70

iv

11.2    Cancellation of Claims and Interests ....................................................................70
11.3    Release by Debtors of Certain Parties ..................................................................71
11.4    Release by Holders of Claims and Interests. ........................................................73
11.5    California Civil Code § 1542 Waiver. ..................................................................74
11.6    Jurisdiction Related Hereto...................................................................................75
11.7    Setoffs ...................................................................................................................75
11.8    Exculpation and Limitation of Liability ...............................................................75
11.9    Injunction ..............................................................................................................76
11.10  Effect of Confirmation..........................................................................................76

ARTICLE XII. RETENTION AND SCOPE OF JURISDICTION OF THE
        BANKRUPTCY COURT ...................................................................................77

12.1    Retention of Jurisdiction .......................................................................................77
12.2    Final Decree ..........................................................................................................79

ARTICLE XIII. MISCELLANEOUS PROVISIONS ...................................................................79

13.1    Modification of the Plan ........................................................................................79
13.2    Deadlines................................................................................................................80
13.3    Applicable Law ......................................................................................................80
13.4    Plan Supplement ....................................................................................................80
13.5    Dissolution of Creditors' Committee....................................................................80
13.6    Preparation of Estates' Returns and Resolution of Tax Claims............................81
13.7    Headings ................................................................................................................81
13.8    Confirmation of Plans for Separate Debtors.........................................................81
13.9    No Admissions; Objection to Claims ....................................................................81
13.10  No Waiver ..............................................................................................................81
13.11  No Bar to Suits.......................................................................................................82
13.12  Successors and Assigns..........................................................................................82
13.13  Post-Effective Date Effect of Evidence of Claims or Interests.............................82
13.14  Conflicts.................................................................................................................82
13.15  Exhibits/Schedules.................................................................................................82
13.16  No Injunctive Relief...............................................................................................82
13.17  Service of Documents............................................................................................82
13.18  Binding Effect........................................................................................................83
13.19  Entire Agreement ...................................................................................................84

v

## INTRODUCTION

Spansion Inc., Spansion Technology LLC, Spansion LLC, Cerium Laboratories LLC and Spansion International, Inc. (defined hereinafter, collectively, as the "**Debtors**," and each individually as a "**Debtor**") hereby propose this Second Amended Joint Plan of Reorganization Dated April 7, 2010 (As Amended) (defined hereinafter as the "**Plan**") for the resolution of the outstanding Claims against and Interests in the Debtors. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. All capitalized terms not defined in this Introduction have the meanings given to them in Article I hereof or as otherwise specified in the first paragraph of Section 1.1

Reference is made to the Disclosure Statement for a description of the Debtors' history, businesses, results of operations, historical financial information, projections and properties, and for a summary of the Plan and certain related matters. There also are other agreements and documents that are, or will be, Filed (as part of the Plan Supplement or otherwise) and are referenced in the Plan or the Disclosure Statement or both. These documents are or will be accessible on the website http://chapter11.epiqsystems.com/Spansion.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from Holders of Claims until the Disclosure Statement has been approved by the Bankruptcy Court. The Debtors urge the Holders of all Claims entitled to vote on the Plan to read, in their entirety, the Plan, the Disclosure Statement, and the exhibits attached hereto and thereto before voting to accept or reject the Plan. To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will

govern. No solicitation materials other than the Disclosure Statement, any schedules and

exhibits attached thereto or referenced therein, and the other documents and materials

included in the Solicitation Materials, have been authorized by the Debtors or the

Bankruptcy Court for use in soliciting acceptances of the Plan. The Debtors expressly

reserve the right to alter, amend, modify, revoke, or withdraw the Plan as set forth in

section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 10.6 and 13.1.

## ARTICLE I.
## DEFINITIONS AND GENERAL PROVISIONS

**1.1    Definitions**. For the purposes of the Plan, except as expressly provided to the contrary in the Plan or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings given to them below in this Section 1.1. Any capitalized term that is not otherwise defined herein, but that is used in the Bankruptcy Code, the Bankruptcy Rules or the local rules of the Bankruptcy Court, shall have the meaning given to that term in the Bankruptcy Code, the Bankruptcy Rules or the local rules of the Bankruptcy Court, as applicable.

(1)    "**503(b)(9) Claim**" means a Claim for payment of administrative expense of a kind specified in section 503(b)(9) of the Bankruptcy Code or any other claim that was incurred before the Petition Date and is purportedly entitled to administrative priority treatment whether pursuant to section 503(b) or otherwise other than any Indenture Trustee Fees and Expenses.

(2)    "**510(c) Actions**" has the meaning ascribed to it in Section 9.2(1).

(3)    "**Ad Hoc Consortium**" means the ad hoc consortium of holders of the FRNs represented by Brown Rudnick LLP.

(4)    "**Administrative and Priority Claims Estimate**" means an estimate established by the Bankruptcy Court at or before the Confirmation Hearing of the aggregate Allowed amount of Administrative Expense Claims and Priority Claims as of the Effective Date or, if the Bankruptcy Court does not establish such an estimate, the estimate for such Claims as determined by the Debtors, with the consent of the Ad Hoc Consortium, and included on a schedule that shall be filed with the Plan Supplement.

(5)    "**Administrative Expense Claim**" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and/or entitled to priority pursuant to sections 507(a)(2) or 507(b) of the Bankruptcy Code, including (a) the actual, necessary costs and expenses, incurred on or after the Petition Date, of

2

preserving the Estates and operating the business of the Debtors, (b) Professional Compensation, (c) any payment to be made under this Plan to cure a default on an executory contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (d) Allowed Claims entitled to be treated as Administrative Expense Claims pursuant to a Final Order of the Bankruptcy Court, (e) Indenture Trustee Fees and Expenses, (f) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and (g) all 503(b)(9) Claims.

(6)     "**Administrative Expense Claim Bar Date**" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

(7)     "**Adjusted Plan Equity Value for Conversion Price Calculation**" means an amount equal to (i) the estimated value of the Reorganized Debtors' operations on a going-concern basis excluding any (a) estimated net recoveries by the Debtors or the Reorganized Debtors associated with ongoing litigation and (b) net operating loss carry-forwards and similar items (estimated mid-point of $762.5 million in the Disclosure Statement); (ii) plus the net value associated with auction rate securities owned by the Debtors (estimated at approximately $42.9 million in the Disclosure Statement), (iii) plus the remaining proceeds from the sale of the Debtors' Suzhou facility, which are anticipated to be collected in early 2010, of approximately $15.4 million; (iv) plus the positive difference between Cash and Cash equivalents on hand as of the Effective Date (inclusive of the Cash payment described in clause (a) of Section 3.3(2)(a) of this Plan) and the Administrative and Priority Claims Estimate, up to a maximum of $240 million, (v) less the par value of liabilities associated with capital leases as of the Effective Date that have been assumed by the Debtors pursuant to this Plan or otherwise, (vi) less the aggregate principal amount of New Convertible Notes, New Senior Notes and New Spansion Debt as of the Effective Date, (vii) less the Cash payment described in Clause (a) of Section 3.3(2)(a) of this Plan, (ix) less any payments to be made to Spansion Japan Limited on or after the Effective Date (but only to the extent the amount of such payment is fixed as of the Effective Date) pursuant to any arrangement with Spansion Japan Limited other than any payments to be made in the ordinary course of business pursuant to a foundry or sort agreement and other than any amount that is otherwise included in the Administrative and Priority Claims Estimate. Adjusted Plan Equity Value for Conversion Price Calculation shall be determined by the Bankruptcy Court at or before the Confirmation Hearing, or, if the Bankruptcy Court makes no such determination, shall be determined by the Debtors, with the consent of the Ad Hoc Consortium, and included on a schedule that shall be filed with the Plan Supplement.

(8)     "**Affiliates**" has the meaning given to such term by section 101(2) of the Bankruptcy Code.

3

(9)     "**Allowed**" means, with respect to a Claim, or any portion thereof, in any Class or category of Claims specified in this Plan, a Claim (a) that is not listed as disputed, contingent or unliquidated on the Schedules, and as to which no objection or request for estimation has been Filed on or before the Claims Objection Deadline, or the expiration of such other applicable period fixed by the Bankruptcy Court, and as to which the Debtors have assented to the validity thereof (and as to which a Proof of Claim has been properly an timely Filed); (b) as to which any objection has been settled, waived, withdrawn or denied by a Final Order; or (c) that is expressly allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim and the Debtors or the Reorganized Debtor, or (iii) pursuant to the terms of this Plan. Unless otherwise specified in this Plan or in an Order of the Bankruptcy Court allowing such Claim, "Allowed" in reference to a Claim shall not include (a) any interest on the amount of such Claim accruing from and after the Petition Date, (b) any punitive or exemplary damages, or (c) any fine, penalty or forfeiture.

(10)    "**Allowed Class ... Claim**" means an Allowed Claim in the designated Class.

(11)    "**Assets**" means, collectively, all of the legal and equitable interests of the Debtors in the "property," as defined by section 541 of the Bankruptcy Code, of the Estates of the Debtors (including all of the assets, property, interests (including Interests) and effects, real and personal, tangible and intangible, including all Avoidance Actions), wherever situated as such properties exist on the Petition Date or thereafter.

(12)    "**Avoidance Action**" means any claim or cause of action of an Estate arising out of or maintainable pursuant to sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

(13)    "**Backstop Commitment**" means the agreement by the Backstop Party, if any, pursuant to the Backstop Rights Purchase Agreement to purchase all of the Rights Offering Shares that are not purchased by the Rights Offering Participants as part of the Rights Offering.

(14)    "**Backstop Party**" means Silver Lake Sumeru, L.P. and/or its Affiliates and managed accounts, or  another Person or Persons who may be selected by the Debtors and, if so selected, will enter into the Backstop Rights Purchase Agreement with Spansion Inc.. If the Debtors decide to proceed with the Rights Offering with a Backstop Party other than Silver Lake Sumeru, L.P. and/or its Affiliates, the identity of the Backstop Party will be disclosed in the Plan Supplement.

4

(15)    "**Backstop Rights Purchase Agreement**" means the agreement between the Backstop Party and Spansion Inc. which sets forth the Backstop Commitment and the terms and conditions thereof.  If the Debtors decide to proceed with the Rights Offering with a Backstop Party, the terms and conditions of the Backstop Rights Purchase Agreement shall be no less favorable to the Debtors and the Estates than those set forth on Exhibit D and a form of the Backstop Rights Purchase Agreement will be included in the Plan Supplement.

(16)    "**Ballot**" means each of the ballot forms that are distributed with the Solicitation Materials to Holders of Claims included in Voting Classes.

(17)    "**Bankruptcy Code**" means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Chapter 11 Cases.

(18)    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or, in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, the District Court or such court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

(19)    "**Bankruptcy Rules**" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Chapter 11 Cases, the Federal Rules of Civil Procedure, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applied to the Chapter 11 Cases or proceedings therein, as the case may be.

(20)    "**Bar Date**" means the applicable bar date by which a proof of Claim or a request for payment of an Administrative Expense Claim must be or must have been Filed, as established by an Order of the Bankruptcy Court, including the Bar Date Order and the Confirmation Order.

(21)    "**Bar Date Order**" means that certain Order Granting the Motion of the Debtors Establishing Bar Dates and Related Procedures for Filing Proofs of Claim and Approving the Form, Manner and Sufficiency of Notice of the Bar Dates Pursuant to Fed.R.Bankr.P. 3003 and 2007, entered by the Bankruptcy Court on May 27, 2009 [D.I. 554].

(22)    "**Business Day**" means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York or in California, except any Saturday, Sunday or any day designated as a legal holiday in Bankruptcy Rule 9006(a).

(23)    "**Cash**" means legal tender of the United States of America and equivalents thereof, including currency, a certified check, a cashier's

5

check or a wire transfer of good funds from any source, or a check issued by any Entity making any Distribution under the Plan drawn on funds from the Debtors or the Estates, denominated in United States dollars.

(24)     "**Cash Out Option**" has the meaning ascribed to it in Section 3.3(2)(b).

(25)     "**Causes of Action**" means all claims, actions, Avoidance Actions, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) of any of the Debtors and/or the Estates (including those actions set forth in the Plan Supplement) that existed as of the Petition Date, that are or may be pending on the Effective Date or that may be instituted by the Reorganized Debtors after the Effective Date against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

(26)     "**Chapter 11 Case**" means, with respect to each Debtor, the Chapter 11 Case initiated by such Debtor's filing on the Petition Date of a voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered in the Bankruptcy Court as Bankruptcy Case No. 09-10690 pursuant to the Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015 and Local Rule 1015-1, entered by the Bankruptcy Court on March 4, 2009 [D.I. 58].

(27)     "**Claim**" means a claim, as defined in section 101(5) of the Bankruptcy Code, against one of the Debtors (or all or some of them) whether or not asserted or Allowed.

(28)     "**Claims and Voting Agent**" means Epiq Bankruptcy Solutions, LLC (and its successors) in its capacity as claims and voting agent for the Debtors, or any other entity approved by the Bankruptcy Court as Claims and Voting Agent in lieu of, or in addition to, Epiq Bankruptcy Solutions, LLC and its successors.

(29)     "**Claims Agent**" has the meaning ascribed to it in Section 9.2(1).

(30)     "**Claims Agent Avoidance Action**" has the meaning ascribed to it in Section 9.2(1).

(31)     "**Claims Agent Fund**" has the meaning ascribed to it in Section 9.2(4).

6

(32)   "**Claims Objection Deadline**" means the later of the first Business Day which is (i) one hundred eighty (180) days after the Effective Date, or (ii) such later date as may be ordered by the Bankruptcy Court, as such dates may be from time to time extended by the Bankruptcy Court without further notice to parties in interest.

(33)   "**Class**" means a category of Claims or Interests designated pursuant to the Plan.

(34)   "**Class 1 Collateral**" means the lesser of: (i) cash collateral equal to one hundred five percent (105%) of the obligations related to outstanding equipment leases and letter of credit agreements, and (ii) such other consideration as agreed to by the Holders of Claim in allowed Class 1 prior to the commencement of the Confirmation Hearing, with the consent of the Senior Noteholders Group and the Creditors' Committee.

(35)   "**Class 3 Special Election Form**" means the special election form that is distributed with the Solicitation Materials to Holders of Claims included in Class 3.

(36)   "**Clerk**" means the Clerk of the Bankruptcy Court.

(37)   "**Confirmation**" means the entry of the Confirmation Order on the docket of the Bankruptcy Court, within the meaning of Bankruptcy Rules 5003 and 9021.

(38)   "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

(39)   "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of this Plan and related matters under section 1128 of the Bankruptcy Code, as such hearing may be continued.

(40)   "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(41)   "**Contract/Lease Schedule**" has the meaning ascribed to it in Section 5.1.

(42)   "**Convenience Class Claim**" means an Unsecured Claim (i) Scheduled or Filed in an amount less than or equal to $2,000, (ii) Allowed in an amount less than or equal to $2,000 or (iii) as to which the Holder of such Unsecured Claim has elected (by marking the appropriate box on its Ballot) to reduce its Claim to $2,000 in order to have its Claim treated as a Convenience Class Claim.

(43)   "**Conversion Price**" has the meaning ascribed to it in the definition of "New Convertible Note."

7

(44)     "**Creditor**" means the Holder of a Claim.

(45)     "**Creditors' Committee**" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code as its composition may be changed from time to time by addition, resignation or removal of its members.

(46)      "**Cure Amount**" means the amount required to satisfy any Debtor's obligations under section 365(b) of the Bankruptcy Code with respect to such Debtor's assumption of any executory contract or unexpired lease.

(47)     "**Debtor**" means, individually, each of Spansion Inc., Spansion Technology LLC, Spansion LLC, Cerium Laboratories LLC, and Spansion International, Inc., each of which is a Debtor in its Chapter 11 Case.  The term "**Debtors**" means all of the foregoing entities.

(48)     "**Debtor Releasees**" has the meaning ascribed to it in Section 11.3.

(49)     "**Debtors-in-Possession**" means the Debtors in their capacities as debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

(50)     "**Deficiency Claim**" means any Claim against a Debtor representing the amount, if any, by which the Allowed amount of a Secured Claim exceeds the value of the collateral securing such Claim or the amount by which a Claim subject to setoff exceeds the amount of any setoff.

(51)     "**Designated Disputed Claim**" means a Disputed Claim in any of Classes 5(A)-(C) (i) that is Filed in the amount of $25,000 or less, (ii) for which the variance between (A) the amount of such Claim as Filed and (B) the liquidated, non-contingent and undisputed amount scheduled for such Claim in the Schedules is $25,000 or less or (iii) that is related to or arises from any of the law suits and litigation described in Sections II.F and III.E.6 of the Disclosure Statement.  Notwithstanding the foregoing, (x) if the Claims Agent determines in its reasonable discretion that a Claims Agent Avoidance Action in the amount of $250,000 or more can be asserted against the Holder of a Designated Disputed Claim, then such Claim shall not be treated as a Designated Disputed Claim under the Plan for purposes of bringing such Claims Agent Avoidance Action and (y) the Reorganized Debtors shall not settle any Designated Disputed Claim described in clause (iii) above for an amount in excess of $500,000 (after giving effect to any relevant setoffs or other credits) without the prior written consent of the Claims Agent.

(52)     "**Disallowed**" means, with respect to any Claim or Interest, any Claim or Interest (i) proof of which was required to be Filed by the Bankruptcy Code or an Order of the Court but as to which no proof of Claim or

8

Interest or request for payment was timely or properly Filed, (ii) which has been withdrawn in whole or in part, by agreement between the Debtors, the Reorganized Debtors or the Claims Agent, as applicable, and the Holder thereof or unilaterally by the Holder thereof, or (iii) which has been disallowed, in whole or in part, by Final Order. In case a Claim is Disallowed in part, the Claim might be an Allowed Claim with respect to amounts asserted under the Claim which have not been Disallowed.

(53) "**Disbursing Agent**" means any entity (including any Reorganized Debtor and any other Disbursing Agent), in its capacity as a disbursing agent pursuant to Section 8.3.

(54) "**Disclosure Statement**" means the Second Amended Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization Dated December 16, 2009, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time in accordance with applicable law.

(55) "**Disclosure Statement Order**" means that certain Order (I) Approving Disclosure Statement, (II) Scheduling Confirmation Hearing (III) Approving Solicitation and Other Procedures, Including Fixing the Voting Record Date and Establishing Deadlines for Voting on the Plan and Objecting to the Plan, and (IV) Approving the Solicitation Package and Forms of Notice [D.I. 2042].

(56) "**Disputed Claim**" means, as of any relevant point in time, (i) any Claim, as to which a proof of Claim has been Filed or is deemed to have been Filed, that has not been Allowed or Disallowed, or (ii) if no proof of Claim has been Filed, a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but as to which an objection has been Filed on or before the Effective Date, and such objection has not been withdrawn or denied by a Final Order.

(57) "**Distribution**" means any distribution by the Debtors or Reorganized Debtors, whether directly or through a Disbursing Agent, to a Holder of an Allowed Claim or Interest under the Plan.

(58) "**District Court**" means the United States District Court for the District of Delaware.

(59) "**Effective Date**" means, subject to the provisions of Section 10.3, the date specified by the Debtors in a notice Filed by the Debtors as the date on which this Plan shall take effect, which date shall be not more than ten (10) Business Days after the date on which the conditions to the Effective Date provided for in this Plan have been satisfied or waived.

LA\2058780.10DM3\1345606.1

(60)    "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

(61)    "**Estate**" means, with regard to each Debtor, the estate that was created by the commencement by such Debtor of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges of such Debtor and any and all Assets and interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the Petition Date, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code, or otherwise. "**Estates**" has a correlative meaning.

(62)    "**Exchangeable Debentures Indenture**" means the indenture governing the Exchangeable Debentures.

(63)    "**Exchangeable Debentures**" means the $207 million aggregate principal amount 2.25% Senior Exchangeable Debentures due 2016. "Exchangeable Debenture" means one of the debentures comprising the Exchangeable Debentures.

(64)    "**Exchangeable Debentures Claims**" means any Claim that is or could be asserted by the Holders of the Exchangeable Debentures against any of the Debtors or any of the Estates.

(65)    "**Exculpated Claims**" has the meaning ascribed to it in Section 11.8.

(66)    "**Exit Financing Facility**" means a new revolving credit facility for the Reorganized Debtors with third party lender(s) for up to $100 million in revolving loans to fund the Reorganized Debtors' working capital requirements and other general corporate purposes, with a borrowing base supported by eligible accounts receivable and inventory.    The Exit Financing Facility may be secured only by a first priority lien on accounts receivable, inventory and deposit accounts (and the proceeds thereof) of Reorganized Spansion LLC and guarantors.

(67)    "**Face Amount**" for any Disputed Claim means (a) the full stated amount set forth in any proof of Claim with respect to such Claim, (b) if the amount of such Claim has been estimated in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018 for purposes of distributions, pursuant to a Final Order of the Court, the amount so estimated, unless otherwise expressly set forth in the Plan with respect to a specific Claim or Class of Claims, or (c) such other amount as the Court may establish for purposes of allocating funds for the Reserve for Disputed Claims with respect to such Disputed Claim pursuant to a

10

Final Order.  For any proof of Claim which is Filed for an unliquidated amount, the Debtors or any other party-in-interest may ask the Court to either (i) establish an amount for such Claim that will be deemed the "Face Amount" for purposes of the Plan, or (ii) estimate the Claim for purposes of distributions under the Plan.

(68)    "**Fee Auditor**" means Warren H. Smith & Assoc. (and its successors) in its capacity as the Bankruptcy Court appointed fee auditor    for Professional Compensation in the Chapter 11 Cases, or any other Entity appointed by the Bankruptcy Court as fee auditor for Professional Compensation in the Chapter 11 Cases in lieu of, or in addition to, Warren H. Smith & Assoc. and its successors.

(69)    "**File**," "**Filed**" or "**Filing**" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

(70)    "**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

(71)    "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or resulted in no modification of such order, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

(72)    "**Final Trading Order**" means the Final Order Establishing Notice, Hearing and Sell-Down Procedures for Trading in Equity Securities and Claims Against the Debtors' Estates entered by the Bankruptcy Court on or about April 2, 2009.  [D.I. 211].

(73)    "**FRN Claim**" means any Claim that is or could be asserted by the Holder of any FRN against the Debtors or their Estates.

(74)    "**FRN Indenture**" means the indenture governing the FRNs.

11

(75)     "**FRNs**" means the Prepetition $625 million aggregate principal amount Senior Secured Floating Rate Notes due 2013 issued pursuant to the FRN Indenture.  "**FRN**" means one of the notes comprising the FRNs.

(76)     "**General Unsecured Claim**" means any Unsecured Claim against a Debtor other than a Senior Note Claim, an Exchangeable Debentures Claim, a Convenience Class Claim or a Non-Compensatory Damages Claim.  The term "**General Unsecured Claim**" shall not include any Claim against any of the Debtors that is eligible for classification in a Class other than Class 5B.

(77)     "**Holder**" means the Entity that is the owner of record of a Claim or Interest, as applicable.

(78)     "**Impaired**" means, with respect to any Class of Claims or Interests, the Claims or Interests in such Class that are impaired within the meaning of section 1124 of the Bankruptcy Code.

(79)     "**Indenture Trustee**" means the indenture trustee, trustee, or other collateral or administrative agent for any of the Secured Credit Facility Debt, the FRNs, the Senior Notes, the Exchangeable Debentures or the Exit Financing Facility.  "**Indenture Trustees**" means all of the foregoing, collectively.

(80)     "**Indenture Trustee Fees and Expenses**" means the reasonable fees and expenses of any Indenture Trustee (including reasonable attorneys fees) allowable under the applicable facility or indenture whether incurred before or after the Petition Date.

(81)     "**Initial Board**" has the meaning ascribed to it in Section 7.2.

(82)     "**Insider**" has the meaning given to such term in section 101(31) of the Bankruptcy Code.

(83)     "**Instrument**" means any share of stock, security, promissory note or other "instrument," within the meaning of that term, as defined in section 9102(47) of the California Commercial Code.

(84)     "**Insured Claim**" has the meaning ascribed to it in Section 9.6.

(85)     "**Interdebtor Claim**" means any Claim that is or could be asserted by any Debtor(s) or its/their Estate(s) against any other Debtor(s) or its/their Estate(s).

(86)     "**Interest**" means the legal, equitable contractual and other rights of the Holders of Old Spansion Interests, Other Old Equity and Other Old Equity Rights

12

(87)    "**IRC**" means the Internal Revenue Code of 1986, as amended.

(88)    "**Lien**" means any "lien" as defined in section 101(37) of the Bankruptcy Code.

(89)    "**Max New Convertible Notes Distribution**" has the meaning ascribed to it in Section 3.3(3).

(90)    "**Max New Senior Notes Distribution**" has the meaning ascribed to it in Section 3.3(3).

(91)    "**Minimum Shares for Distribution**" has the meaning ascribed to it in Section 8.11.

(92)    "**New Capital Proceeds**" means net Cash proceeds from the closing of the Rights Offering and/or from the issuance or incurrence of the New Spansion Debt.

(93)    "**New Convertible Notes**" means the $237,500,000 (as adjusted pursuant to Section 3.3(2)(b)) aggregate principal amount of 4.75% Senior Secured Convertible Notes due 2016 of Reorganized Spansion Inc. having the terms and conditions summarized on Exhibit A.  The New Convertible Notes will be guaranteed by certain Affiliates of Reorganized Spansion Inc. and secured by a Lien on substantially all of the Property and Assets of the Reorganized Debtors and their domestic subsidiaries, subject only to the senior Liens of the Exit Financing Facility (solely respecting accounts receivable, inventory and deposit accounts of Reorganized Spansion LLC), New Senior Notes, the Secured Credit Facility (solely respecting the Class 1 Collateral) and Permitted Liens as defined in the New Convertible Notes Documents.  The New Convertible Notes also may be converted into shares of New Spansion Common Stock at a purchase price per share equal to: (i) the Adjusted Plan Equity Value for Conversion Price Calculation; (ii) plus $100 million; (iii) divided by 50 million; (iv) multiplied by 115% (the "**Conversion Price**").

(94)    "**New Convertible Notes Documents**" means the indenture governing the New Convertible Notes Filed in substantially the form Filed with the Bankruptcy Court in the Plan Supplement and any security agreement, deeds of trust, mortgages, financing statements, guaranties and other collateral documents executed in connection therewith.

(95)    "**New Equity**" means all shares of common stock or other ownership interests of the applicable Reorganized Debtor, authorized hereunder as of the Effective Date and any additional shares or ownership interests authorized for the purposes specified herein and as further described in the New Governing Documents.

13

(96)     "**New Governing Documents**" means the amended and restated
certificate of incorporation and amended and restated bylaws or certificate
of formation and amended and restated limited liability company
agreement, as the case may be, of each of the Reorganized Debtors
prepared pursuant to Section 7.1 of this Plan, in substantially the forms
contained in the Plan Supplement.

(97)     "**New Senior Notes**" means the $237,500,000 (as adjusted pursuant to
Section 3.3(2)(b)) aggregate principal amount of 10.75% Senior Secured
Notes due 2014 of Reorganized Spansion Inc. having the terms and
conditions summarized on Exhibit B.  The New Senior Notes will be
guaranteed by all domestic Affiliates and secured by a Lien on
substantially all of the property and Assets of the Reorganized Debtors
and their domestic subsidiaries subject only to the senior Liens of the Exit
Financing Facility (solely respecting accounts receivable, inventory and
deposit accounts of the Reorganized Spansion LLC), the Secured Credit
Facility (solely respecting the Class 1 Collateral) and Permitted Liens as
defined in the New Senior Notes Documents.

(98)     "**New Senior Notes Documents**" means the indenture governing the New
Senior Notes in substantially the form Filed in the Plan Supplement and
any security agreement, deeds of trust, mortgages, financing statements,
guaranties, other collateral documents, and intercreditor subordination
agreements executed in connection therewith.

(99)     "**New Spansion Common Stock**" means New Equity of Reorganized
Spansion Inc., par value $0.01 per share, to be issued or reserved for
issuance by Reorganized Spansion Inc. on or after the Effective Date
pursuant to the Plan.

(100)    "**New Spansion Debt**" means the new notes or other debt obligations of
one or more of the Reorganized Debtors having an interest rate acceptable
to the Debtors and in an aggregate principal amount of up to $500 million,
having the terms and conditions summarized on Exhibit C.  The New
Spansion Debt may, at the Debtors' discretion, be guaranteed by all
domestic Affiliates of the Reorganized Spansion LLC and may, at the
Debtors' discretion, be secured by a Lien on a portion or substantially all
of the property and Assets of the Reorganized Debtors and their domestic
subsidiaries subject only to the senior Liens of the Exit Financing Facility
(solely respecting accounts receivable, inventory and deposit accounts of
the Reorganized Spansion LLC), the Secured Credit Facility (solely
respecting the Class 1 Collateral) and other liens permitted pursuant to the
New Spansion Debt Documents; provided, however, that if any New
Senior Notes and/or New Convertible Notes are issued to the Holders of
Class 3 Claims pursuant to this Plan, the New Spansion Debt must be
unsecured.

14

(101) "**New Spansion Debt Documents**" means the indentures, credit agreements and other documents governing the New Spansion Debt and any security agreement, deeds of trust, mortgages, financing statements, guaranties, other collateral documents, and intercreditor subordination agreements executed in connection therewith. If the Debtors determine to issue or incur the New Spansion Debt, the indenture(s), credit agreement(s) or other document(s) evidencing and governing the New Spansion Debt will be Filed in the Plan Supplement.

(102) "**Non-Compensatory Damages Claim**" means any Claim for any fine, penalty or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the Holder of such Claim, including any such Claim based upon, arising from, or relating to any cause of action whatsoever (including violation of law, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit.

(103) "**Non-Debtor Affiliate**" means any Affiliate of the Debtors that is not a Debtor in the Chapter 11 Cases.

(104) "**Non-Debtor Intercompany Claim**" means any Claim against a Debtor held by a Non-Debtor Affiliate, including any Claim asserted by any Creditor whose Claim is derivative of liabilities owed to any Non-Debtor Affiliate, provided, Non-Debtor Intercompany Claim does not include any Claim or Administrative Expense Claim of Spansion Japan Limited, including, but not limited to, the Spansion Japan Rejection Damages Claim or the Spansion Japan Administrative Expense Claim.

(105) "**Old Spansion Interests**" means (i) the interests of any Holder of equity securities of Spansion Inc. represented by any issued outstanding common stock, preferred stock or other instrument evidencing a present ownership interest in Spansion Inc. prior to the Effective Date, whether or not transferable, (ii) any calls, options, restricted stock units, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common, preferred or other interests or any other agreement of any character related to the common, preferred or other interests of Spansion Inc., obligating Spansion Inc. to issue, transfer, purchase, redeem, or sell any common, preferred or other interests or securities, (iii) any rights under any equity incentive plans, voting agreements and registration rights agreements regarding common, preferred or other interests or equity securities of Spansion Inc., (iv) any claims arising from the retention or rescission of a purchase, sale or other acquisition of any outstanding common, preferred or other interests or

15

equity securities (or any right, claim, or interest in and to any common, preferred or other interests or equity securities) of Spansion Inc., (v) any claims for the payment of any distributions with respect to any common, preferred or other interests or equity securities of Spansion Inc., and (vi) any claims for damages or any other relief arising from the purchase, sale, or other acquisition of Spansion Inc.'s outstanding common, preferred or other interests or equity securities.

(106)   "**Order**" means an order of judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction.

(107)   "**Other Old Equity**" means any outstanding ownership interests in any of the Debtors other than Spansion Inc., including interests evidenced by common or preferred stock, membership interests or their equivalents, but excluding the Other Old Equity Rights.

(108)   "**Other Old Equity Rights**" means any calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common, preferred or other interests or any other agreement of any character related to the Other Old Equity, obligating any of the Debtors other than Spansion Inc. to issue, transfer, purchase, redeem, or sell any common, preferred or other interests or securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding common, preferred or other interests or equity securities of any of the Debtors other than Spansion Inc., any claims arising from the rescission of a purchase, sale or other acquisition of any outstanding common, preferred, membership or other interests or equity securities (or any right, claim, or interest in and to any common, preferred, membership or other interests or equity securities) of any of the Debtors other than Spansion Inc., any claims for the payment of any distributions with respect to any common, preferred, membership or other interests or equity securities of any of the Debtors other than Spansion Inc., and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of the outstanding common, preferred, membership or other interests or equity securities of any of the Debtors other than Spansion Inc.

(109)   "**Other Secured Claims**" mean a Secured Claim other than a Secured Credit Facility Claim, a UBS Credit Facility Claim or an FRN Claim.

(110)   "**Oversubscription Offering Subscription**" has the meaning ascribed to it in Section 6.10(2).

(111)   "**Oversubscription Pro Rata Share**" means, with respect to any Rights Offering Participant that has submitted an Oversubscription Offering Subscription, the ratio of (a) the maximum number of shares selected by

16

such Rights Offering Participant in its Oversubscription Offering Subscription to (b) the total maximum number of shares selected by all Rights Offering Participants in all Oversubscription Offering Subscriptions.

(112)   "**Oversubscription Shares**" means, for any Rights Offering Participant, the lesser of (a) the maximum number of shares selected by such Rights Offering Participant in its Oversubscription Offering Subscription and (b) such Rights Offering Participant's Oversubscription Pro Rata Share of the Remaining Rights Offering Shares, rounded down to the nearest 100 shares.

(113)   "**Person**" has the meaning given to such term in section 101(41) of the Bankruptcy Code.

(114)   "**Petition Date**" means March 1, 2009, the date on which each of the Debtors Filed its respective petition for relief in the Bankruptcy Court, commencing its Chapter 11 Case.

(115)   "**Plan**" means this joint plan of reorganization as the same may hereafter be amended or modified.  If the Plan is withdrawn as the Plan for a particular Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Debtor in its Chapter 11 Case except where the context otherwise requires.

(116)   "**Plan Documents**" means, collectively, the Disclosure Statement, this Plan, all exhibits, schedules and annexes to each, all of the documents included in the Plan Supplement, and all other agreements contemplated by the Plan.

(117)   "**Plan Objection Deadline**" means January 26, 2010, at 4:00 p.m. (Eastern Time), the deadline established by the Bankruptcy Court for filing and serving objections to the Confirmation of the Plan.

(118)   "**Plan Supplement**" means the compilation of documents and forms of documents, schedules and exhibits, including those specified in Section 13.4, as it may thereafter be altered, amended, modified or supplemented in accordance with the terms hereof.

(119)   "**Postpetition Tax Claims**" means Administrative Expense Claims and other Claims by a governmental unit for taxes against any of the Debtors (and for interest and/or penalties related to such taxes) for any tax year or period, which Claims first arise from and including the Petition Date through and including the Effective Date.

(120)   "**Primary Offering Subscription**" has the meaning ascribed to it in Section 6.10(2).

17

(121)  "**Priority Claims**" means all Priority Non-Tax Claims plus all Priority Tax Claims.

(122)  "**Priority Non-Tax Claim**" means a Claim entitled to priority under the provisions of sections 507(a)(3) through 507(a)(7) of the Bankruptcy Code other than an Administrative Expense Claim, a Postpetition Tax Claim or a Priority Tax Claim.

(123)  "**Priority Tax Claim**" means a Claim against the Debtors that is of a kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

(124)  "**Pro Rata**" means proportionately so that, with respect to any Class, the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the amount of the Allowed Claim, is the same as the ratio of (x) the amount of consideration distributed on account of all Allowed Claims in the Class in which the particular Allowed Claim is included to (y) the aggregate amount of all Allowed Claims of that Class.

(125)  "**Pro Rata Class 3 Distribution**" has the meaning ascribed to it in Section 3.3(3).

(126)  "**Pro Rata Share of the Rights Offering Shares**" means, with respect to an applicable Rights Offering Participant,  the proportion that (a) the amount of the Class 5A Claims, Class 5B Claims and Class 5C Claims that are (i) held by such Rights Offering Participant and (ii) are deemed to be allowed in an amount equal to or greater than $100,000 for purposes of voting on the Plan pursuant to the provisions of the Disclosure Statement Order bears to (b) the aggregate amount of Class 5A Claims, Class 5B Claims and Class 5C Claims that are (i) held by all Rights Offering Participants and (ii) deemed to be allowed in an amount equal to or greater than $100,000 for purposes of voting on the Plan pursuant to the provisions of the Disclosure Statement Order.

(127)  "**Professional**" means any professional employed in the Chapter 11 Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or any Professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

(128)  "**Professional Compensation**" means (i) any amounts that the Bankruptcy Court allows pursuant to section 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by Professionals employed by the Debtors and the Creditors' Committee, and (ii) any amounts the Bankruptcy Court allows pursuant to sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Chapter 11 Cases.

18

(129)    "**Record Date**" means the date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of Holders of Allowed Claims entitled to Distributions under this Plan.

(130)    "**Record Holder**" means the Holder of a Claim or Interest as of the Record Date.

(131)    "**Reinstated**" or "**Reinstatement**" means (x) with respect to a Claim, (i) the Debtors shall cure any default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) the maturity of such Claim shall be reinstated as such maturity existed before any such default, (iii) the Holder of such Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the Holder on any right to accelerate its Claim, (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(a), the Holder of such Claim is compensated for any actual pecuniary loss incurred by such Holder as a result of such failure, and (iv) the legal, equitable and contractual rights of such Holder will not otherwise be altered, and (y) with respect to an Interest, the legal, equitable and contractual rights of the Holder of such Interest will not be altered.

(132)    "**Release Obligor**" has the meaning ascribed to it in Section 11.4.

(133)    "**Remaining Rights Offering Shares**" means those Rights Offering Shares that are not subscribed for pursuant to the Primary Offering Subscriptions submitted by the Rights Offering Participants prior to the expiration of the Subscription Deadline.

(134)    "**Reorganized Debtor**" or "**Reorganized Debtors**" means, on and after the Effective Date, the Debtors as reorganized pursuant to the Plan, as the case may be and, in each case, to the extent applicable.  When referring to a specific Debtor as reorganized pursuant to the Plan, the Plan shall use the term "**Reorganized [name of Debtor]**."

(135)    "**Reserve for Disputed Claims**" has the meaning ascribed to it in Section 8.12.

(136)    "**Retained Actions**" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtors' Estate may hold against any Entity, including (i) claims and Causes of Action brought prior to the Effective Date, (ii) claims and Causes of Action against any Entities for failure to pay for products or services provided or rendered by any of the

19

Debtors, (iii) claims and Causes of Action relating to strict enforcement of any of the Debtors' intellectual property rights, including patents, copyrights and trademarks, including claims against third parties for infringement of any such intellectual property rights or other misuse of such intellectual property, (iv) claims and Causes of Action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including claim overpayments and tax refunds, and (v) all Causes of Action that are Avoidance Actions.

(137)   "**Rights Offering**" means that certain rights offering of New Spansion Common Stock in an amount of up to $109,375,000 to be offered to the Rights Offering Participants, the terms of which are set forth in Section 6.10.

(138)   "**Rights Offering Amount**" means up to $109,375,000.

(139)   "**Rights Offering Participant**" means each Holder of a Class 5A Claim, Class 5B Claim or Class 5C Claim as of the Rights Offering Record Date that is deemed to be allowed in an amount equal to or greater than $100,000 for purposes of voting on the Plan pursuant to the provisions of the Disclosure Statement Order.

(140)   "**Rights Offering Purchaser**" means a Rights Offering Participant who timely and properly executes and delivers the Subscription Form to the Debtors or other Entity specified in the Subscription Form prior to the expiration of the Subscription Deadline.

(141)   "**Rights Offering Record Date**" means the date for determining which Holders of Class 5A Claims, Class 5B Claims and Class 5C Claims are eligible to participate in the Rights Offering and shall be the Voting Record Date applicable to such Claims, or such other date as designated in an Order of the Bankruptcy Court.

(142)   "**Rights Offering Shares**" means the New Spansion Common Stock to be issued and sold through the Rights Offering (including either (a) if the Debtors do not select a Backstop Party, the Total Oversubscription Shares or (b) if the Debtors select a Backstop Party, the Remaining Rights Offering Shares to be issued pursuant to the Backstop Rights Purchase Agreement).

(143)   "**Scheduled**" means set forth on the Schedules.

(144)   "**Schedules**" means, with respect to any Debtor, the Schedules of Assets and Liabilities such Debtor Filed, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

20

(145) "**Secured Claim**" means: (a) a Claim that is secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, all as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) a Claim which is Allowed under the Plan as a Secured Claim.

(146) "**Secured Credit Facility**" means the secured credit facility pursuant to that certain Credit Agreement, dated September 19, 2005, by and Among Bank of America, N.A., as Agent, Banc of America Securities LLC, as the Sole Lead Arranger and the Sole Book Manager, Spansion LLC, and the lenders party thereto from time to time, as such agreement has been amended to date.

(147) "**Secured Credit Facility Claims**" means any Claim that is or could be asserted on account of the Secured Credit Facility against the Debtors or their Estates.

(148) "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended.

(149) "**Securities Claim**" means any Claim (a) described in section 510(b) of the Bankruptcy Code against any Debtor arising from rescission of a purchase or sale of a security of any Debtor, (b) for damages arising from the purchase or sale of such security, or for reimbursement, indemnity or contribution Allowed under section 502 of the Bankruptcy Code on account of such Claim, or (c) arising out of the ownership of an Interest.

(150) "**Senior Noteholders Group**" means the Informal Group of holders of Senior Notes represented by Akin Gump Strauss Hauer & Feld LLP.

(151) "**Senior Notes**" means the $250 million aggregate principal amount 11.25% Senior Notes of Spansion LLC due 2016, representing general unsecured senior obligations of Spansion LLC, issued pursuant to the Senior Notes Indenture. "**Senior Note**" means one of the notes comprising the Senior Notes.

(152) "**Senior Notes Claim**" means any Claim that is or could be asserted by the Holders of the Senior Notes against the Debtors or their Estates.

(153) "**Senior Notes Indenture**" means the indenture governing the Senior Notes.

(154) "**Solicitation Materials**" has the meaning ascribed to it in the Disclosure Statement.

21

(155) "**Spansion Japan Administrative Expense Claim**" means any Administrative Expense Claim of Spansion Japan Limited arising or accruing after October 27, 2009, in accordance with that certain Order Approving Settlement between Spansion LLC and Spansion Japan dated January 29, 2010 (Docket No. 2552).

(156) "**Spansion Japan Rejection Damages Claim**" means any General Unsecured Claim that is or could be asserted by Spansion Japan Limited against the Debtors or their Estates on account of the rejection of any executory contract between the Debtors and Spansion Japan Limited, including but not limited to, the Second Amended and Restated Foundry Agreement, dated March 30, 2007, which rejection was approved by the Court under the Order Pursuant to 11 U.S.C. section 365 and Fed. R. Bankr. P. 6006 Authorizing the Rejection of Second Amended and Restated Foundry Agreement with Spansion Japan Limited, excluding the Spansion Japan Administrative Expense Claim.

(157) "**Subscription Commencement Date**" means the date on which the Subscription Period commences, which shall be the earliest date reasonably practicable occurring after the Rights Offering Record Date.

(158) "**Subscription Deadline**" means the date on which the Rights Offering shall expire as set forth in the Subscription Form, which date shall be January 26, 2010.

(159) "**Subscription Form**" means that certain form to be distributed to Rights Offering Participants pursuant to which such Rights Offering Participants may exercise their Subscription Rights, which form was approved by the Bankruptcy Court in the Disclosure Statement Order.

(160) "**Subscription Notification Date**" means a date that is not later than seven (7) days following the Subscription Deadline.

(161) "**Subscription Payment Amount**" means, with respect to a particular Rights Offering Purchaser, an amount of Cash equal to (a) the Rights Offering Amount multiplied by such Rights Offering Purchaser's Pro Rata Share of the Rights Offering Share plus (b) if the Debtors do not select a Backstop Party, the Subscription Price multiplied by such Rights Offering Purchaser's Oversubscription Shares.

(162) "**Subscription Payment Date**" means the date that is three (3) Business Days following the applicable Subscription Notification Date (or such later date as approved in writing by the Debtors or Reorganized Debtors); provided, however, that such date must occur on or prior to the earlier of February 12, 2010, or Effective Date.

(163) "**Subscription Period**" means the time period during which the Rights Offering Participants may subscribe to purchase the Rights Offering

22

Shares, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline.

(164)  "**Subscription Price**" means an amount determined by the Debtors as the per share purchase price for the Rights Offering Shares, but shall not be less than $8.43.

(165)  "**Subscription Right**" means the right to participate in the Rights Offering, which right shall be non-Transferable and non-certificated as set forth in Section 6.10 of this Plan.

(166)  "**Total Oversubscription Shares**" means (a) if the Debtors select a Backstop Party, zero or (b) if the Debtors do not select a Backstop Party the sum of the Oversubscription Shares for all Rights Offering Participants that submitted Oversubscription Offering Subscriptions.

(167)  "**Transfer**" or "**Transferable**" means, with respect to the Rights Offering, (a) the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of any Subscription Right or the beneficial ownership thereof, (b) the offer to make such a sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition, and (c) each option, agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing.  The term "constructive sale" for purposes of this definition means (i) a short sale with respect to such right, (ii) entering into or acquiring an offsetting derivative contract with respect to such right, (iii) entering into or acquiring a futures or forward contract to deliver such right, or (iv) entering into any transaction that has substantially the same effect as any of the foregoing.  The term "beneficially owned" or "beneficial ownership" as used in this definition shall include, with respect to any Subscription Right, the beneficial ownership of such Subscription Right by a Person and by any direct or indirect subsidiary of such Person.

(168)  "**UBS**" means UBS Bank USA or any successor.

(169)  "**UBS Credit Facility**" means that certain Credit Line Account Application and Agreement and the Addendum to the Credit Line Account Application and Agreement, and all documents entered into in connection therewith, between UBS Bank USA and Spansion LLC that provides up to $85 million in the form of an uncommitted revolving line of credit, which is secured by certain auction rate securities owned by Spansion LLC.

(170)  "**UBS Credit Facility Claims**" means any Claim that is or could be asserted by UBS against the Debtors or their Estates on account of the UBS Credit Facility.

23

(171) "**Unimpaired**" means, with respect to a Class of Claims or Interests, any Class that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

(172) "**Unsecured Claim**" means any Claim against a Debtor other than an Administrative Expense Claim, a Priority Claim, a Secured Claim, an Interdebtor Claim, a Securities Claim or a Non-Debtor Intercompany Claim.

(173) "**Unsecured Claims Pro Rata**" means proportionately so that, with respect to Claims in Class 5A, Class 5B and Class 5C, the ratio of (a) the amount of the Allowed Claim to (b) the aggregate amount of all Allowed Claims of Class 5A, Class 5B and Class 5C.  For purposes of determining Unsecured Claims Pro Rata, all Disputed Claims that have not been Disallowed at the determination of such calculation shall be treated as if they were Allowed, except as otherwise provided by order of the Court.

(174) "**Voting Classes**" means Class 1, Class 3, Class 5A, Class 5B, and Class 5C.

(175) "**Voting Deadline**" means February 8, 2010, at 4:00 p.m. (Eastern Time), the date and time by which all Ballots must be received by the Claims and Voting Agent.

(176) "**Voting Instructions**" means the instructions for voting on the Plan that are included with the Ballots.

(177) "**Voting Record Date**" means the date established by the Bankruptcy Court for determining the identity of Holders of Allowed Claims in the Voting Classes entitled to vote on this Plan.

**1.2    Time**.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day that is not a Business Day, then the time for the next occurrence or happening of said event shall be extended to the next day following which is a Business Day.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**1.3    Rules of Interpretation.**

(1) For purposes of the Plan, unless otherwise provided herein: (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been

24

or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified in a particular reference, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan or Plan Supplement; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) unless otherwise specified, the words "acceptable to the Debtors" shall in each instance mean "acceptable to the Debtors in their sole and reasonable discretion;" (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (i) all Exhibits to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed; (j) all documents set forth in the Plan Supplement are incorporated into the Plan and shall be deemed to be included in the Plan; (k) the rules of construction set forth in section 102 of the Bankruptcy Code will apply, except to the extent inconsistent with the provisions of this Section 1.3; and (l) the word "including" means "including, without limitation."

(2)     Whenever a Distribution of Cash or other property is required to be made on a particular date, the Distribution shall be made on such date or as soon as practicable thereafter, but no later than thirty (30) days after such date.

(3)     Subject to the provisions of any contract, certificate, bylaws, Instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT

**2.1    Generally.**  Pursuant to section 1122 of the Bankruptcy Code, all Claims and Interests in the Debtors, except Administrative Expense Claims, Professional Claims, and Priority Tax Claims, are placed in Classes as summarized in this Article below and more fully set forth in Article III.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Claims and Priority Tax Claims have not been classified and are treated as set forth in Article IV, below.

The following summary is for the convenience of all interested parties and is superseded for all purposes by the classification, description and treatment of Claims and Interests in Articles III and IV.  The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtors for all purposes of this Plan.  A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest

25

qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. The treatment with respect to each Class of Claims and Interests provided for in Articles III and IV shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

**2.2    Settlement of Intercompany Claims and Treatment of Claims Generally.** In settlement and compromise of certain existing and potential disputes regarding Interdebtor Claims and related matters, pursuant to sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan treats the Debtors as compromising a single Estate solely for purposes of voting on the Plan, Confirmation of the Plan and making Distributions in respect of Claims and Interests under the Plan. Such treatment shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any Assets of any of the Debtors or their Estates, and all Debtors shall continue to exist as separate legal entities. The above treatment serves only as a mechanism to effect a fair distribution of value to the Debtors' constituencies. Any Avoidance Action held by any of the Debtors against any Entity other than another Debtor or a Non-Debtor Affiliate is preserved and remains unaffected by the provisions of this Section.

**2.3    Treatment of Multiple Claims and Guaranty and Joint Liability Claims Against Multiple Debtors.** A Creditor which holds multiple Claims against a single Debtor or multiple Claims against multiple Debtors, all of which Claims are based upon or relate to the same or similar indebtedness or obligations, whether by reason of guarantee, indemnity agreement, joint and several obligation or otherwise, shall be deemed to have only one Claim against the Estates in an amount equal to the largest of all such similar Allowed Claims for purposes of Distributions under the Plan. For purposes of voting on the Plan, any Creditor holding such similar Claims against a Debtor or multiple Debtors may only vote the largest of all such similar Allowed Claims.

**2.4    Summary of Classification.** The classification of Claims under this Plan is as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Secured Credit Facility Claims | Impaired | Yes |
| 2 | UBS Credit Facility Claims | Unimpaired | No |
| 3 | FRN Claims | Impaired | Yes |
| 4 | Other Secured Claims | Unimpaired | No |
| 4A | Travis County, Texas Tax Claims | Unimpaired | No |

26

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 5A | Senior Notes Claims | Impaired | Yes |
| 5B | General Unsecured Claims | Impaired | Yes |
| 5C | Exchangeable Debentures Claims | Impaired | Yes |
| 6 | Convenience Class Claims | Unimpaired | No |
| 7 | Non-Compensatory Damages Claims | Impaired | No |
| 8 | Interdebtor Claims | Impaired | No |
| 9 | Old Spansion Interests | Impaired | No |
| 10 | Other Old Equity | Unimpaired | No |
| 11 | Other Old Equity Rights | Impaired | No |
| 12 | Securities Claims | Impaired | No |
| 13 | Non-Debtor Intercompany Claims | Impaired | No |

**2.5    Unimpaired Classes Deem to Accept Plan.**    Classes 2, 4, 6 and 10 are Unimpaired under this Plan.  Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims and Interests in Classes 2, 4, 6 and 10 are deemed to accept this Plan and are not entitled to vote to accept or reject this Plan.

**2.6    Impaired Classes Deemed to Reject Plan.**    Classes 7, 8, 9, 11, 12 and 13 are Impaired under this Plan, and because Classes 7, 8, 9, 11, 12 and 13 shall receive no distribution under the Plan, they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Consequently, Holders of Claims and Interests in Classes 7, 8, 9, 11, 12 and 13 may not vote on the Plan.

**2.7    Impaired Classes Entitled to Vote on Plan.**    Classes 1, 3, 5A, 5B, and 5C are Impaired and are entitled to vote on the Plan.

**2.8    Impairment Controversies.**    If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

**2.9    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.**    In the event at least one Impaired Class of Claims votes to accept the Plan, not including the vote of any Insider (and at least one Impaired Class either votes to reject the Plan or is deemed to have rejected the Plan), the Debtors shall request the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code.

LA\2058780.10DM3\1345606.1

## ARTICLE III.
## TREATMENT OF CLAIMS AND INTERESTS

The timing and procedures for all Distributions specified in this Article III are governed by Article VIII. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**3.1     Class 1 – Secured Credit Facility Claims.**

(1)     Classification. Class 1 consists of the Allowed Secured Credit Facility Claims.

(2)     Treatment. All rights of the Debtors to receive additional loan advances or further credit under the Secured Credit Facility will be cancelled as of the Effective Date. Claims held by the Holders of Class 1 Claims based on any contingent or other obligations shall be extinguished. In full and final satisfaction of Allowed Class 1 Claims, prior to the commencement of the Confirmation Hearing, the Debtors will enter into documentation with the Holder of the Class 1 Claims reflecting the post-Effective Date relationship between such parties, which treatment and documentation hereunder shall be satisfactory to the Senior Noteholders Group and the Creditors' Committee. The obligations of the Reorganized Debtors on account of the Allowed Class 1 Claims will be secured by the Class 1 Collateral.

(3)     Voting. Class 1 is Impaired and is entitled to vote to accept or reject this Plan pursuant to section 1126 of the Bankruptcy Code.

**3.2     Class 2 – UBS Credit Facility Claims.**

(1)     Classification. Class 2 consists of the Allowed UBS Credit Facility Claims.

(2)     Treatment. As of the Effective Date, the UBS Credit Facility Claim shall be an Allowed Claim in an amount to be agreed upon by the Debtors and UBS, which Claim shall include reasonable attorneys fees of counsel to UBS. Within ten (10) Business Days after the Effective Date, the Debtors shall File a notice with the Bankruptcy Court setting forth the Allowed amount of the UBS Credit Facility Claims. In the event UBS and the Debtors or Reorganized Debtors cannot agree on the Allowed amount of the UBS Credit Facility Claims within ten (10) Business Days after the Effective Date, the Debtors shall, within five (5) Business Days thereafter, File a motion seeking a determination of the Allowed amount thereof. The legal, equitable and contractual rights of UBS as the Holder of Allowed Class 2 Claims are unaltered by this Plan and the UBS Credit Facility will remain in place and be secured by a first priority lien on the

28

same collateral that secured such facility immediately prior to the Petition Date.

(3)     Voting.  Class 2 is Unimpaired and UBS as the Holder of Allowed Claims in Class 2 is conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, UBS, as the Holder of Claims in Class 2, is not entitled to vote to accept or reject this Plan.

**3.3     Class 3 – FRN Claims.**

(1)     Classification.  Class 3 consists of all Allowed FRN Claims.

(2)     Treatment.

(a)     FRN Claims are deemed Allowed by the Plan in the aggregate amount of $625 million of principal, plus accrued and unpaid (as of the Effective Date) interest and reasonable professional fees. Subject to the right of election described in subsection 3.3(3) below, each Holder of an Allowed Class 3 Claim is entitled to receive as of the Effective Date in full and final satisfaction and discharge of and in exchange for its Allowed Class 3 Claim, such Holder's Pro Rata share of (a) Cash in the amount of $158.3 million plus the amount of all accrued and unpaid interest accruing from the Petition Date to the Effective Date, (b) $237.5 million of New Senior Notes and (c) $237.5 million of New Convertible Notes.

(b)     Notwithstanding subsection (a) above, but subject to Sections 6.10(1) and 6.10(10) below, if, on or prior to the earlier of (x) the Effective Date and (y) February 12, 2010, the Debtors shall have received New Capital Proceeds, then each Holder of an Allowed Class 3 Claim is entitled to receive as of the Effective Date such Holder's Pro Rata share of such New Capital Proceeds and the principal amount of New Senior Notes and New Convertible Notes shall be reduced as follows:  (i) the first $75 million of the New Capital Proceeds (or all of such proceeds if the amount of the New Capital Proceeds is less than $75 million) shall be applied 50% to reduce the principal amount of the New Senior Notes and 50% to reduce the principal amount of the New Convertible Notes; and (ii) any additional New Capital Proceeds shall be applied, at the option of the Debtors, to reduce either the principal amount of the New Senior Notes or the principal amount of the New Convertible Notes until the New Senior Notes or the New Convertible Notes, as applicable, have been reduced to zero and thereafter to the other of such notes; provided that, unless the principal amount of the New Senior Notes or the New Convertible Notes has been reduced to zero in

29

accordance with clause (ii) above (the "**Cash Out Option**"), the minimum principal amount of the each of the New Senior Notes facility and the New Convertible Notes facility, as applicable, after giving effect to any such reduction under clause (i) above shall be not less than $200 million. **Notwithstanding anything to the contrary contained in this Plan, the Debtors have elected to exercise the Cash Out Option, and on the Effective Date, the Debtors will do so in lieu of issuing any New Senior Notes or New Convertible Notes to Holders of Allowed Class 3 Claims.**

(3)    Each Holder of an Allowed Class 3 Claims shall receive its Pro Rata share of Cash AND shall have the right, in its sole and absolute discretion, to elect to receive, in the amount of its remaining Allowed Class 3 Claim (after giving effect such Holder's receipt of its Pro Rata share of Cash), either, (i) its Pro Rata share of the New Convertible Senior Notes and the New Senior Notes ("**Pro Rata Class 3 Distribution**"); OR (ii) one of the following (A) New Senior Notes ("**Max New Senior Notes Distribution**") or (B) New Convertible Notes ("**Max New Convertible Notes Distribution**"), provided, however, that to the extent there is an over-subscription to New Senior Notes or New Convertible Notes elected by Holders of Allowed Class 3 Claims, then the Holders requesting the oversubscribed portion of the New Senior Notes or New Convertible Notes shall receive, in the amount of the balance of their Allowed Class 3 Claim, their Pro Rata portion of the New Senior Notes or New Convertible Notes, as applicable, that are not oversubscribed. The exercise of the Max New Senior Notes Distribution and the Max New Convertible Notes Distribution must be made by checking the box for the exercise of such options on the Class 3 Special Election Form. Any Holder of an Allowed Class 3 Claim who elects to receive a Pro Rata Class 3 Distribution (by checking the box for the exercise of such option on the Class 3 Special Election Form) or who fails to check the box to exercise any of the options on its the Class 3 Special Election Form will receive a Pro Rata Class 3 Distribution. Notwithstanding the foregoing, in no event will the Debtors issue (i) more than $237.5 million (as adjusted pursuant to Section 3.3(2)(b)) of New Senior Notes or (ii) more than $237.5 million (as adjusted pursuant to Section 3.3(2)(b)) of New Convertible Notes to the Holders of Allowed Class 3 Claims (in satisfaction of their Allowed Class 3 Claims), and any election made by a Holder of an Allowed Class 3 Claim pursuant to this Section 3.3(3) shall be null and void in the event that the Debtors reduce the principal amount of the New Senior Notes and/or the New Convertible Notes to zero pursuant to Section 3.3(2)(b) above (in which case, each Holder of an Allowed Class 3 Claim shall receive its Pro Rata share of the (i) Cash or (ii) Cash and New Senior Notes or New Convertible Notes distributed to Class 3 under this Plan).

    (4)      By reason of the treatment of Allowed Class 3 Claims hereunder, in the event the Confirmation of this Plan occurs and this Plan becomes effective, for purposes of Distributions under this Plan (and only for such purposes), the Holders of Allowed Class 3 Claims shall not be entitled to the benefit of the subordination of the Exchangeable Debenture Claims to the FRN Claims.

    (5)      Voting.  Class 3 is Impaired and is entitled to vote to accept or reject this Plan pursuant to section 1126 of the Bankruptcy Code.

**3.4**    **Class 4 – Other Secured Claims.**

    (1)      Classification.  Class 4 consists of Other Secured Claims.  Although Other Secured Claims have been placed into one category for purposes of nomenclature, each such other Secured Claim shall be treated as a separate Class for purposes of voting on the Plan and receiving Distributions (to be designated as Class 4A, 4B, 4C, etc.).

    (2)      Treatment.  At the option of the Debtors, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be Reinstated, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the collateral securing its Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable. Notwithstanding the foregoing, the Debtors and any Holder of an Allowed Other Secured Claim may agree to any alternate treatment for such Other Secured Claim, provided that such treatment shall not provide a Distribution to such Holder having a present value as of the Effective Date in excess of the amount of such Holder's Allowed Other Secured Claim. Notwithstanding anything in this subsection to the contrary, in the event Other Secured Claims are Allowed in an amount in excess of $1 million for any one Claim, or for more than $3 million in the aggregate, then the consent of the Senior Noteholders Group and the Creditors' Committee for the treatment of such Claim in excess of $1 million or all Claims in excess of $3 million shall be required for any treatment of any such Claims other than pursuant to clause (i), (ii) or (iii) above. A list of each of the Other Secured Claims as well as the specific treatment to be afforded to each such Other Secured Claim will be included in the Plan Supplement or otherwise filed with the Bankruptcy Court prior to the Confirmation Hearing.

31

(3)    Class 4A.  Travis County, Texas Tax Claim.  Class 4A consists of the Secured Claims of Travis County, Texas.  The Debtors have Filed an objection to the amount of these Secured Claims.  The Allowed Amount of these Secured Claims as determined by the Bankruptcy Court will be paid in full in Cash on or before the January 31, 2010 deadline for the payment of such Claims without penalty.

(4)    Voting.  Class 4 is Unimpaired and the Holders of Allowed Claims in Class 4 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 4 are not entitled to vote to accept or reject this Plan.

### 3.5    Class 5A – Senior Notes Claims.

(1)    Classification.  Class 5A consists of all Senior Notes Claims.

(2)    Treatment:  The Senior Notes Claims are deemed Allowed by the Plan in the aggregate principal amount of $250 million, plus accrued and unpaid interest (as of the Petition Date) for an aggregate amount of $251,133,413.[2]  Subject to Section 3.18 below, each Holder of an Allowed Class 5A Claim will receive such Holder's Unsecured Claims Pro Rata share of 46,247,760 shares of New Spansion Common Stock.

(3)    Voting.  Class 5A is Impaired and is entitled to vote to accept or reject this Plan pursuant to section 1126 of the Bankruptcy Code.

### 3.6    Class 5B – General Unsecured Claims.

(1)    Classification.  Class 5B consists of all General Unsecured Claims.

(2)    Treatment:  Each Holder of an Allowed Class 5B Claim will receive such Holder's Unsecured Claims Pro Rata share of 46,247,760 shares of New Spansion Common Stock.

(3)    Voting.  Class 5B is Impaired and is entitled to vote to accept or reject this Plan pursuant to section 1126 of the Bankruptcy Code.

---

[2]    Pursuant to the relevant provisions in the Senior Notes Indenture and the Exchangeable Debentures Indenture, holders of Class 5A Claims are entitled to receive payment in full of all obligations in respect of their Claims, including all interest accrued or accruing on such claims after the commencement of any bankruptcy, insolvency or reorganization or similar case or proceeding at the contract rate (including, without limitation, any contract rate applicable upon default) specified in the relevant documentation, before holders of Class 5C Claims are entitled to receive any payment of principal or of interest on their Claims; and until the Class 5A Claims are paid in full, any distribution to which holders of Class 5C Claims would be entitled but for the subordination provisions in the relevant indentures shall instead be made to holders of Class 5A Claims.  Including such post-petition accrued and accreting interest, the Indenture Trustee for the Senior Notes asserts that the Senior Notes Claims are in the aggregate amount of $296,021,484.38, as of January 31, 2010.

32

**3.7    Class 5C – Exchangeable Debentures Claims.**

(1)    Classification.  Class 5C consists of all Exchangeable Debentures Claims.

(2)    Treatment:  The Exchangeable Debentures Claims are deemed Allowed by the Plan in the aggregate amount of $207 million of principal, plus accrued and unpaid interest (as of the Petition Date) for an aggregate amount of $207,998,036.  Subject to Section 3.18 below, each Holder of an Allowed Class 5C Claim will receive such Holder's Unsecured Claims Pro Rata share of 46,247,760 shares of New Spansion Common Stock.

(3)    Voting.  Class 5C is Impaired and is entitled to vote to accept or reject this Plan pursuant to section 1126 of the Bankruptcy Code.

**3.8    [Reserved].**

**3.9    Class 6 – Convenience Class Claims.**

(1)    Classification.  Class 6 consists of all Allowed Convenience Class Claims.

(2)    Treatment.  Each Holder of an Allowed Class 6 Claim will receive Cash equal to 100% of such Claim in full satisfaction of such Claim not to exceed $2,000, which Cash shall be paid by the later of (a) on or as soon as practicable after the Effective Date, and (b) promptly following the allowance of such Claim.

(3)    Voting.  Class 6 is Unimpaired and the Holders of Allowed Claims in Class 6 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 6 are not entitled to vote to accept or reject this Plan.

**3.10    Class 7 – Non-Compensatory Damages Claims.**

(1)    Classification.   Class 7 consists of all Non-Compensatory Damages Claims.

(2)    Treatment.  No Holder of a Class 7 Claim will receive or retain any property of the Debtors under the Plan on account of such Claim and all Non-Compensatory Damages Claims will be cancelled as of the Effective Date.

(3)    Voting.  Class 7 is an Impaired Class.  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Class 7 Claims are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.11    Class 8 – Interdebtor Claims.**

33

(1)    Classification.  Class 8 consists of all Interdebtor Claims.

(2)    Treatment.  Except as otherwise provided in the Plan, Interdebtor Claims, including any Interdebtor Claims that are Administrative Expense Claims, shall, solely for purposes of receiving Distributions, be deemed resolved as a result of the settlement and compromise described in Section 2.2 above and therefore not entitled to any Distribution.

(3)    Voting.  Class 8 is an Impaired Class.  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Class 8 Claims are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.12    Class 9 – Old Spansion Interests.**

(1)    Classification.  Class 9 consists of all Old Spansion Interests.

(2)    Treatment.   On the Effective Date, all Class 9 Interests shall be cancelled, and each Holder of an Old Spansion Interest shall not be entitled to any Distribution.

(3)    Voting.  Class 9 is an Impaired Class.  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Class 9 Interests are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.13    Class 10 – Other Old Equity.**

(1)    Classification.  Class 10 consists of all Interests arising from Other Old Equity.

(2)    Treatment.   On the Effective Date, all Class 10 Interests shall be Unimpaired, and each Holder of an Other Old Equity Interest shall retain such Interest.

(3)    Voting.  Class 10 Interests are Unimpaired and therefore the Holders of such Interests are not entitled to vote to accept or reject this Plan.

**3.14    Class 11 – Other Old Equity Rights.**

(1)    Classification.  Class 11 consists of all Claims and Interests arising from or relating to Other Old Equity Rights.

(2)    Treatment.  On the Effective Date, all Other Old Equity Rights and any Interests or Claims arising from or relating to any such Other Old Equity Right shall be cancelled, and each Holder of a Class 11 Claim or Interest shall not be entitled to any Distribution.

34

(3)     Voting.  Class 11 is an Impaired Class.  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Class 11 Claims and Interests are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject the Plan.

**3.15    Class 12 – Securities Claims.**

(1)     Classification.  Class 12 consists of Securities Claims.

(2)     Treatment.  Notwithstanding anything to the contrary contained in this Plan, all Holders of any Class 12 Claim will not receive or retain any property of the Debtors under the Plan on account of such Claim and all Securities Claims will be cancelled as of the Effective Date.

(3)     Voting.  Class 12 is an Impaired Class.  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Class 12 Claims are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.16    Class 13 – Non-Debtor Intercompany Claims.**

(1)     Classification.  Class 13 consists of Non-Debtor Intercompany Claims, which includes all Claims asserted by any Creditor whose Claims are derivative of liabilities owed to any Non-Debtor Affiliate.

(2)     Treatment.  The Holder of each Allowed Class 13 Claim will not receive or retain any property of the Debtors under the Plan on account of such Claim and such Non-Debtor Intercompany Claims will be cancelled as of the Effective Date.

(3)     Voting.  No Allowed Class 13 Claims are entitled to vote to accept or reject the Plan because the Holders of such Claims will receive no Distribution under the Plan and, pursuant to section 1126(g) of the Bankruptcy Code, such Holders are conclusively deemed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

**3.17    Special Provision Governing Unimpaired Claims.**    Except as otherwise provided in this Plan, nothing under this Plan is intended to or shall affect the Debtors', the Reorganized Debtors' or the Claims Agent's rights and defenses in respect of any Claim that is Unimpaired under this Plan, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against such Unimpaired Claims.

**3.18    Preservation of Subordination Rights.**    Nothing contained in this Plan shall be deemed to modify, impair, terminate or otherwise affect in any way the rights of any Entity under section 510(a) of the Bankruptcy Code, and all such rights are expressly preserved under this Plan.  The treatment set forth in this Article III and the Distributions to the various Classes of Claims hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Distributions by

35

reason of any claimed subordination rights or otherwise. All such rights and any agreements relating thereto shall remain in full force and effect, <u>except</u> as otherwise expressly compromised and settled pursuant to the Plan.

Distributions shall be subject to and modified by any Final Order directing Distributions other than as provided in the Plan. Except respecting the FRN Claims, the right of the Debtors or any other Entity to seek subordination of any Claim pursuant to section 510 of the Bankruptcy Code is fully reserved except as set forth in Sections 11.3, 11.4 and 11.8 below, and the treatment afforded any Claim that becomes a subordinated Claim at any time shall be modified to reflect such subordination. Except respecting the FRN Claims, unless the Confirmation Order provides otherwise, no Distribution shall be made to the Holder of a subordinated Claim on account of such claim until the rights or the Holders of Claims senior to such Claim have been satisfied.

Unless the Confirmation Order provides otherwise and unless and until all Allowed Class 5A Claims have been satisfied in full in accordance with the provisions of the Exchangeable Debentures Indenture and the Senior Notes Indenture, no Distribution shall be made on account of Class 5C Claims to the Indenture Trustee for the Exchangeable Debentures or the Holders of Exchangeable Debentures Claims. Accordingly, unless the Confirmation Order provides otherwise, the Pro Rata portion of any Distribution allocable to Allowed Class 5C Claims shall be distributed to Holders of Allowed Class 5A Claims unless and until all Allowed Class 5A Claims have been satisfied in full in accordance with the provisions of the Exchangeable Debentures Indenture and the Senior Notes Indenture.[3]

## ARTICLE IV.
## TREATMENT OF UNCLASSIFIED CLAIMS

**4.1    Generally.**    Pursuant to section 1123(a)(l) of the Bankruptcy Code, Administrative Expense Claims (including Claims for Professional Compensation) and Priority Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under this Plan. Holders of such Claims are not entitled to vote on this Plan. All such Claims are instead treated separately in accordance with this Article IV and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

**4.2    Unclassified Claims.**

(1)    Administrative Expense Claims.

(a)    General.

Effective as of February 8, 2010, and except as otherwise ordered by the Bankruptcy Court, the Debtors shall not pay any Administrative Expense Claim in excess of $250,000 other than any Administrative Expense Claims for Professional

---

[3] *See supra* note 2.

Compensation, the Spansion Japan Administrative Expense Claim, liabilities incurred by any of the Debtors in the ordinary course of the conduct of its business, the fees and expenses of the Ad Hoc Consortium's professionals, the professionals of the Holders of the Secured Credit Facility Claims, compensation or expenses to the Indenture Trustees or Indenture Trustees' professionals, without the prior consent of the Senior Noteholders Group and the Creditors' Committee.  Subject to the Bar Date provisions and additional requirements for Professionals and certain other entities, set forth in Section 4.2(1)(c) hereof, the Reorganized Debtors shall pay to each Holder of an Allowed Administrative Expense Claim, on account of its Administrative Expense Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Expense Claim on the Effective Date (or as soon as practicable thereafter), unless the Holder and the Reorganized Debtors agree in writing to other treatment of such Claim.  Payment on an Administrative Expense Claim that arose in the ordinary course of the Debtors' business will not be made until such payment would have become due in the ordinary course of the Debtors' business or under the terms of the legal obligation giving rise to the Claim in the absence of the Chapter 11 Cases.

(b)      Payment Of Statutory Fees.

On or before the Effective Date, all fees then payable pursuant to 28 U.S.C. § 1930 shall be paid in full in Cash.

(c)      Reserve for Alleged Administrative Expense Claim of Tessera, Inc.

On or before the Effective Date, the Debtors shall establish a Cash reserve account in the amount of $4,232,986.13 for the alleged Administrative Expense Claim of Tessera, Inc. and shall hold the funds in such account until such Claim of Tessera, Inc. becomes an Allowed or Disallowed Administrative Expense Claim.  To the extent the Claim of Tessera, Inc becomes fully or partially Allowed or Disallowed, the portion Allowed or Disallowed may be withdrawn from this account to pay to Tessera, Inc. to the extent such Claim is Allowed or returned to the general funds of the Reorganized Debtors to the extent such Claim is Disallowed.  The Reorganized Debtors shall keep such reserve account free of liens or security interests.  Any interest or other earnings on the funds in such account shall not be added to the reserve account, but shall become general funds of the Reorganized Debtors.

(d)      Bar Date for Administrative Expense Claims.

(i)      General Provisions.

Except for Administrative Expense Claims of Professionals for Professional Compensation, which are addressed in Section 4.2(1)(c)(ii) below, and 503(b)(9) Claims, which are addressed in Section 4.2(1)(c)(vi) below, and except as otherwise provided below for (A) non-tax liabilities incurred in the ordinary course of business by each Debtor, (B) Postpetition Tax Claims and (C) the fees and expenses of the Ad Hoc Consortium professionals, Indenture Trustees and Indenture Trustee Fees and Expenses,

37

requests for payment of Administrative Expense Claims must be Filed and served on counsel for the Reorganized Debtors no later than (x) the Administrative Expense Claim Bar Date, or (y) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the expiration of the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims (including the Holders of any Claims for federal, state or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized Debtors or any of their respective properties.

(ii)    Professionals.

(A)    Entities requesting Professional Compensation pursuant to any of sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date shall File and serve on the Debtors, or the Reorganized Debtors, as applicable, the Fee Auditor, the United States Trustee, and any other party entitled to receive a copy of such application pursuant to rule or Order of the Bankruptcy Court, an application for final allowance of compensation and reimbursement of expenses on or before sixty (60) days after the Effective Date.

(B)    Objections to applications of Professionals or other Entities for Professional Compensation must be Filed and served on the Debtors or Reorganized Debtors, as applicable, the Fee Auditor, the United States Trustee, and the Professionals (or other Entities) to whose application the objections are addressed on or before the later of (i) thirty (30) days after such application is Filed with the Bankruptcy Court, (ii) ninety (90) days after the Effective Date, or (iii) such later date as the Bankruptcy Court shall order upon application or upon agreement between the Reorganized Debtors and the affected Professional (or other Entity).

(C)    The Fee Auditor shall continue to act in its appointed capacity until all final applications for Professional Compensation have been ruled on by the Bankruptcy Court, and the Debtors and Reorganized Debtors, as the case may be, shall be responsible to pay the fees and expenses incurred by the Fee Auditor in rendering services prior to and after the Effective Date.

(iii)    Ad Hoc Consortium Professionals, Indenture Trustee s and Indenture Trustee s' Professionals.

The Ad Hoc Consortium's professionals, the Indenture Trustees, and the Indenture Trustees' professionals may seek payment of their reasonable fees and/or expenses incurred on or before the Effective Date, to the extent unpaid as of the Effective Date, by delivering copies to the Reorganized Debtors of invoices, statements, receipts and/or other documents evidencing, in reasonable detail, such fees and/or expenses, which invoices, statements, receipts and/or other documents may be delivered prior to the Effective Date. The Reorganized Debtors shall have thirty (30) days from receipt of such invoices, statements, receipts and/or other documents to send written notice to the requesting Entity that they object to the payment thereof in full or in part, and describing

38

the portion objected to, if less than all.  In the event the Reorganized Debtors give notice of objection hereunder, the disputed portion of such fees and/or expenses shall not be required to be paid to such requesting Entity until such objection is withdrawn or the Bankruptcy Court resolves the dispute by Final Order following notice and hearing.  To the extent the objecting party and such requesting Entity are unable to resolve any objection to the disputed fees and expenses within thirty (30) days after the date on which the objecting party delivered its notice of objection to the requesting Entity, the objecting party shall be required to immediately File its objection with the Bankruptcy Court.  The requesting Entity may file a motion seeking payment of any disputed amounts at any time after receiving written notice of a dispute from the Reorganized Debtors.  If no written objection to such fees and/or expenses is timely sent to the requesting Entity, then the Reorganized Debtors will promptly pay the amounts requested.

The Ad Hoc Consortium's professionals shall be entitled to assert a Claim for reasonable services rendered and expenses incurred in connection with the consummation of the Plan.  In the event an appeal is pending from the Confirmation Order as of the Effective Date, the Ad Hoc Consortium's professionals shall be entitled to compensation and reimbursement of expenses for services related to such appeal; provided, however, that the Ad Hoc Consortium's professionals shall not be entitled to compensation and reimbursement of expenses for services related to such appeal if the Holders of FRN Claims have received the Distributions set forth in Section 3.3 herein.  The Ad Hoc Consortium Professionals may also recover their reasonable fees and expenses incurred in litigating any disputed fees and/or expenses to the extent allowed by the court adjudicating such litigation.

Notwithstanding the foregoing or anything to the contrary in the Plan, any "charging lien" held by any Indenture Trustee is unaffected by the Plan, and the Indenture Trustees are entitled to assert any such "charging liens" to obtain payment of their respective fees and expenses and the fees and expenses of their professionals in lieu of the Bankruptcy Court resolution procedure described above, and nothing in this Section shall be deemed to impair, extinguish, or negatively impact the Indenture Trustees' charging liens.

(iv)     Ordinary Course Liabilities.

Holders of Administrative Expense Claims (other than Postpetition Tax Claims) based on liabilities incurred in the ordinary course of the Debtors' business within 60 days prior to the Effective Date shall not be required to File any request for payment of such Claims.  Such Administrative Expense Claims shall be assumed and paid by the Reorganized Debtors, as appropriate, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim, without any further action by the Holders of such Claims; provided, however, that, notwithstanding the foregoing, the Reorganized Debtors reserve the right to dispute through any means permitted at law, equity and/or contract any Administrative Expense Claims based on liabilities incurred after the Petition Date in the ordinary course of the Debtors' business that the Reorganized Debtors believe are incorrect, invalid or otherwise objectionable.

39

(v)      Postpetition Tax Claims.

All requests for payment of Postpetition Tax Claims, for which no Bar Date has otherwise been previously established, must be Filed on or before the later of (i) sixty (60) days following the Effective Date; and (ii) one hundred and twenty (120) days following the filing of the tax return for such tax year or period with the applicable governmental unit.  Any Holder of any Postpetition Tax Claim that is required to File a request for payment of such taxes and that does not File such a Claim by the applicable Bar Date shall be forever barred from asserting any such Postpetition Tax Claim against any of the Debtors or Reorganized Debtors, or any of their respective Assets, whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date.

(vi)      503(b)(9) Claims.

In accordance with the Bar Date Order, all proofs of claim or requests for payment of 503(b)(9) Claims were required to be Filed on or before September 4, 2009. Pursuant to the Bar Date Order, any Holder of a 503(b)(9) Claims that failed to File such a Claim by September 4, 2009, shall be forever barred from asserting any 503(b)(9) Claim against any of the Debtors or Reorganized Debtors, or any of their respective Assets.

(2)      Treatment of Priority Tax Claims.

At the election of the Debtors, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction of such Allowed Priority Tax Claim (a) payments in Cash, in regular installments over a period ending not later than five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) a lesser amount in one Cash payment as may be agreed upon in writing by such Holder and the Debtors or Reorganized Debtors, as applicable; or (c) such other treatment as may be agreed upon in writing by such Holder and the Debtors or Reorganized Debtors, as applicable, provided that, such agreed upon treatment may not provide such Holder with a return having a present value as of the Effective Date that is greater than the amount of such Holder's Allowed Priority Tax Claim or that is less favorable than the treatment provided to the most favored nonpriority Unsecured Claims under the Plan.  A Secured Claim which would otherwise meet the description of an Allowed Priority Tax Claim, but for the secured status of that Claim, shall be deemed to be a Priority Tax Claim for purposes of this Plan and receive the treatment set forth in the preceding sentence.  The Confirmation Order shall enjoin any Holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors or the Reorganized Debtors that might be liable to such Holder for payment of a Priority Tax Claim so long as the Debtors or Reorganized Debtors, as the case may be, are in compliance with this Section as to such Allowed Priority Tax Claim.  So long as the Holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under this Section or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or

40

proceeding shall be tolled.  In accordance with section 1124 of the Bankruptcy Code, this Plan leaves unaltered the legal, equitable, and contractual rights of each Holder of a Priority Tax Claim.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1    Assumption and Cure of Executory Contracts and Unexpired Leases.**  On or before the date that is the fifth day before the Voting Deadline, the Debtors will File an Exhibit to this Plan identifying executory contracts and unexpired leases to be assumed pursuant to the Plan in addition to those previously assumed by the Debtors by order of the Bankruptcy Court (the "**Contract/Lease Schedule**"), provided that the Debtors reserve the right to amend the Contract/Lease Schedule at any time up to three (3) days before the Confirmation Hearing to delete any executory contract or unexpired lease contained therein, or, with the consent of the affected counterparty, to add any executory contract or unexpired lease to the Contract/Lease Schedule.  The Debtors will provide notice of any amendments to the Contract/Lease Schedule to the parties to the executory contracts and unexpired leases added or removed and the Creditors' Committee, the Ad Hoc Consortium and the Senior Noteholders Group.  The Contract/Lease Schedule shall include a designation of the monetary cure amount the Debtors believe is owed with respect to each executory contract or unexpired lease set forth in the schedule.  Except as provided elsewhere in this Plan, any non-Debtor party to an executory contract or unexpired lease shall File and serve its objection thereto in writing no later than 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) days after the Debtors file and serve the Contract/Lease Schedule.  The failure of any non-Debtor party to an executory contract or unexpired lease to File and serve an objection to the cure amount listed on the Contract/Lease Schedule for such contract or lease, or an objection to the assumption of the contract or lease, by the deadline therefor shall be deemed consent to the assumption of the contract or lease and to such cure amount.  On the Effective Date, in addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by Order of the Bankruptcy Court, each of the executory contracts and unexpired leases of the Debtors that are identified in the Contract/Lease Schedule, shall be deemed assumed in accordance with the provision and requirements of sections 365 and 1123 of the Bankruptcy Code.

**5.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.** The monetary cure amounts owed under each executory contract and unexpired lease to be assumed pursuant to the Plan, as set forth in the Contract/Lease Schedule, or as otherwise established by the Bankruptcy Court at the Confirmation Hearing, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) as due in the ordinary course of business or (iii) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.  In the event of a dispute regarding: (1) the amount of any cure payments, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (3) any other matter pertaining to

41

assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made on the later of: (A) the applicable date set forth in clause (i), (ii), or (iii), above, and (B) fifteen (15) days following the entry of a Final Order resolving the dispute and approving the assumption.

**5.3    Consent Rights.**

[Reserved.]

**5.4    Effect of Assumption and/or Assignment**.    Each executory contract and unexpired lease assumed and/or assigned pursuant to this Article V (or pursuant to Bankruptcy Court Order) shall remain in full force and effect and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any Order of the Bankruptcy Court authorizing and providing for its assumption.    To the extent applicable, all executory contracts or unexpired leases of the Reorganized Debtors assumed during the Chapter 11 Cases, including those assumed pursuant to Section 5.1, shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the confirmation of the Plan.

**5.5    Rejection of Executory Contracts and Unexpired Leases.**    All executory contracts or unexpired leases of the Reorganized Debtors not set forth on the Contract/Lease Schedule (or not previously assumed by the Debtors by Order of the Bankruptcy Court or the subject of a motion to assume Filed prior to the commencement of the Confirmation Hearing) that were not previously rejected will be deemed rejected as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.

**5.6    Employment Agreements and Other Benefits.**

(1)    Employment Agreements.    Except as otherwise provided in this Plan, to the extent the Debtors had employment agreements with certain of their employees as of the Petition Date, the Debtors will disclose in the Contract/Lease Schedule whether they intend to assume or reject such contracts.    Notwithstanding anything to the contrary in this Plan, the Reorganized Debtors shall maintain all of their existing rights, including any rights that they may have to amend, modify, or terminate, the employment agreements assumed pursuant to this Article, subject to the existing contractual rights, if any, of the directors, officers or employees affected thereby.

(2)    Compensation and Benefit Programs.    All employment and severance agreements and policies and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, officers and directors in effect as of the Confirmation Date (including all savings plans, retirement plans, health care plans, disability plans, severance benefit

42

agreements and plans, incentive plans, and life, accidental death and dismemberment insurance plans) shall, to the extent listed on the Contract/Lease Schedule, be treated as executory contracts under the Plan, and on the Effective Date will be deemed assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; and the Debtors' and Reorganized Debtors' obligations under such programs to such Entities shall survive Confirmation of the Plan, provided that any and all such agreements, policies, plans, or programs of the Debtors entitling their employees, officers or directors to acquire Old Spansion Interests or Other Old Equity Rights in the form of stock options, restricted stock units or any other form of equity-based compensation of any kind, will be deemed rejected and cancelled.

(3)     Workers' Compensation Programs.    As of the Effective Date, the Reorganized Debtors shall continue to honor all of the obligations of the Debtors to insurers, including those incurred on or prior to the Effective Date, under: (i) all applicable workers' compensation laws; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the Confirmation Order shall: (a) limit, diminish, or otherwise alter or impair the Debtors', Reorganized Debtors' and/or insurers' defenses, claims, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and/or plans; or (b) preclude or limit, in any way, the rights of the Debtors, Reorganized Debtors and/or insurers to contest and/or litigate with any party the existence, primacy and/or scope of available coverage under any alleged applicable policy, provided further that nothing herein shall be deemed to impose any obligations on the Debtors, Reorganized Debtors or insurers beyond what is provided for in the applicable laws, policies and/or related insurance agreements.

**5.7    Insurance Policies.**

(1)     Notwithstanding anything to the contrary in the Plan, nothing in the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to or have the effect of impairing the legal, equitable or contractual rights of any of (i) the Debtors' insurers, or (ii) any of the Holders of any Claims with respect to such Holders' rights, if any, to recover under applicable insurance policies providing coverage for such Claims (including any amounts recoverable within any policy deductible and provided that any recovery under any insurance policy is not in duplication of any Distribution such Holder may receive under this Plan). The rights, obligations and liabilities of insurers and the Debtors shall be determined under the subject insurance policies and related agreements. All insurance

43

policies and related agreements entered into or issued prior to the Effective Date shall continue after the Effective Date unaltered by the Plan or the Confirmation Order. The terms, conditions, limitations, exclusions and coverages, and the Debtors' rights, obligations and liabilities under their insurance policies and related agreements shall remain unmodified, including any duty of the Debtors to defend, at their own expense, against claims asserted under their insurance policies; provided, however, that the rights, obligations and liabilities of the Debtors, whether now existing or hereafter arising, shall be the rights, obligations and liabilities of the Reorganized Debtors and shall be fully enforceable by and against the Reorganized Debtors.

(2)     Nothing in the Plan, including the injunction and release provisions of Sections 11.3, 11.4 and 11.8, or in the Confirmation Order shall preclude the Debtors or any insurer from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any insurance policy or any insurance settlement agreement, including the rights of the insurers to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable insurance policy.

(3)     All of the Debtors' rights, obligations and liabilities arising under any insurance policies and any agreements, documents and instruments relating thereto shall be deemed transferred to and fully enforceable by and against the Reorganized Debtors on the Effective Date.

**5.8     Rejection Damages Claims Bar Date; Approval of Rejection.**

(1)     The Holder of any Claim arising from the rejection of an executory contract or unexpired lease must File a proof of Claim within the earlier of (a) thirty (30) days following entry of an Order by the Bankruptcy Court authorizing rejection of the applicable contract or lease, and (b) thirty (30) days after the Confirmation Date.

(2)     Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF PLAN

**6.1     Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.**

(1)     Subject to the other provisions of this Plan, after the Effective Date, each Reorganized Debtor shall continue to exist in accordance with the law in the jurisdiction in which it is incorporated or organized and pursuant to its certificate of incorporation and bylaws or other applicable organizational

44

documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other applicable organizational documents are amended or restated under the Plan and as provided in the New Governing Documents. Spansion Inc., on or after the Effective Date, shall operate under its New Governing Documents.

(2)     On and after the Effective Date, all Assets of the Estates, including all claims, rights and Causes of Action and any assets acquired by any Debtor or Reorganized Debtor under or in connection with the Plan (including Retained Actions, but excluding Assets that have been abandoned pursuant to an Order of the Bankruptcy Court), shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as specifically set forth in the Plan. On and after the Effective Date, each Reorganized Debtor may operate its business, may use, acquire and dispose of property, may retain, compensate and pay any professionals or advisors, and compromise or settle any Claims or Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

(3)     There are certain Non-Debtor Affiliates of the Debtors that are not Debtors in the Chapter 11 Cases. The continued existence, operation and ownership of such Non-Debtor Affiliates are a material component of the Debtors' businesses. All of the Interests and other property interests in such Non-Debtor Affiliates held by any Debtor on the Petition Date (other than Non-Debtor Affiliates owned by other Non-Debtor Affiliates) shall vest in the applicable Reorganized Debtor or its successor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances, and interests, except as specifically set forth in the Plan.

**6.2     Sources of Cash for Distribution.**  All Cash necessary for the Debtors or Reorganized Debtors to make payments required by this Plan shall be obtained from existing Cash balances, the operations of the Debtors or Reorganized Debtors, the Exit Financing Facility, the New Spansion Debt (if issued or incurred), the Rights Offering (if consummated) and other Cash available to the Debtors or Reorganized Debtors, as applicable.  Except as provided in Article VIII, Cash payments to be made pursuant to the Plan shall be made by the Debtors and the Reorganized Debtors, as applicable, provided that, subject to the terms of the New Senior Notes Documents, the New Convertible Notes Documents and the documents related to the Exit Financing Facility, the Debtors and the Reorganized Debtors, as applicable, shall be entitled to transfer funds between and among themselves as may be necessary or appropriate to enable any of the Debtors or the Reorganized Debtors, as applicable, to satisfy its or their obligations under the Plan.

LA\2058780.10DM3\1345606.1

**6.3** **Corporate and Limited Liability Company Action.** Each of the matters provided for under this Plan involving the corporate or limited liability company structure of any Debtor or Reorganized Debtor or any corporate or limited liability company action to be taken by or required of any Debtor or Reorganized Debtor, including the adoption of the New Governing Documents of each of the Reorganized Debtors as provided for in Section 7.1 of this Plan, the initial selection of directors and officers for the Reorganized Debtors, the Distribution of Cash pursuant to the Plan, the issuance and sale of New Spansion Common Stock, the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing, and other matters involving the corporate or organizational structure of any Debtor or Reorganized Debtor or corporate or organizational action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent authorized pursuant to the Plan or taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, Creditors, directors, or managers of any of the Debtors or the Reorganized Debtors.

**6.4** **Effectuating Documents; Further Transactions.** Each of the Debtors and Reorganized Debtors, as applicable, and any of their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including any documents relating to the Exit Financing Facility), provided that such documents are in form and substance satisfactory to the Senior Noteholders Group and the Creditors' Committee, and take such actions or seek such orders, judgments, injunctions and rulings as the Debtors or Reorganized Debtors deem necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or any notes or securities issued pursuant to this Plan, or to otherwise comply with applicable law.

**6.5** **Exemption from Certain Transfer Taxes and Recording Fees.** Pursuant to section 1146 of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' Assets will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.6** **Retained Actions.** Except as set forth in this Section, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may exclusively enforce any Retained Actions subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into, in connection with the Plan, provided that the Senior Noteholders Group and the Creditors' Committee shall consent to any waiver or release of any Retained Action by the Debtors entered into after February 5, 2010 and prior to the

46

Effective Date.  The Confirmation Order's approval of the Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Causes of Action, and no such Retained Action is deemed waived, released or determined by virtue of the entry of the Confirmation Order or the occurrence of the Effective Date, notwithstanding that the specific Claims and Retained Actions are not identified or described in more detail than as contained in this Plan or in the Disclosure Statement.  All Retained Actions may be asserted or prosecuted before or after solicitation of votes on the Plan and before or after the Effective Date.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Actions and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after Confirmation, the Effective Date or the consummation of the Plan.  For example (and without limiting the generality of the foregoing), the utilization or assertion of a Retained Action, or the initiation of any proceeding with respect thereto against an Entity, by the Reorganized Debtors or any of their successors or assigns, shall not be barred (whether by estoppel, collateral estoppel, *res judicata* or otherwise) as a result of: (a) the solicitation of a vote on the Plan from such Entity or such Entity's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Entity or such Entity's predecessor in interest having been listed in a Debtor's Schedules, List of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim or Interest of the Entity or such Entity's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim, the Claims Agent and/or the Reorganized Debtors, as applicable, reserve the right to seek, among other things, to have such Claim Disallowed if the Claims Agent or any Reorganized Debtor, as applicable, at the appropriate time, determines that it has a defense under section 502(d) of the Bankruptcy Code, e.g., the Claims Agent or the Reorganized Debtor holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

**6.7    Employee Claims.**  Except as provided in the Final Order (I) Authorizing the Debtors to (A) Pay Certain Prepetition (1) Wages, Salaries, and Other Compensation; (2) Employee Medical, Retirement and Similar Benefits; (3) Withholdings and Deductions; and (4) Reimbursable Employee Expenses; (B) Continue to Provide Employee Benefits in the Ordinary Course of Business; and (C) Pay All Related Costs and Expenses; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks Presented for Payment and All Funds Transfer Requests Relating to the Foregoing, entered by the Bankruptcy Court on March 23, 2009 [D.I. 143], each Debtor's employees shall have a Priority Claim for unpaid wages, benefits and other entitlements to the extent permitted by section 507(a)(3) of the Bankruptcy Code, which, if allowed, will be either (i) paid in full, or (ii) Reinstated.  To the extent that any employee's Claim exceeds the amount prescribed by section 507(a)(3) of the Bankruptcy

47

Code, the employee shall receive a General Unsecured Claim for the excess amount. Notwithstanding the foregoing, any employee who continues to be an employee in good standing with the Reorganized Debtors after the Effective Date shall be entitled to take (in the form of vacation days and not in Cash) all unused and unpaid vacation time accrued prior to the Petition Date or while the Chapter 11 Cases are pending on such terms as will be prescribed by the Reorganized Debtors.

**6.8    Executory Contracts and Unexpired Leases Entered Into, and Other Obligations Incurred After, the Petition Date.**  All executory contracts and unexpired leases (a) assumed by the Debtors after the Petition Date, or (b) entered into, and other obligations incurred, after the Petition Date by the Debtors, shall survive and remain unaffected by the entry of the Confirmation Order or the occurrence of the Effective Date under, and the effectiveness of, the Plan.

**6.9    Operations Between Confirmation Date and the Effective Date.**  During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all Orders of the Bankruptcy Court that are then in full force and effect.

**6.10    Rights Offering.**

(1)    Introduction.

Subject to Section 6.10(10) below, the Debtors shall have the right to consummate the Rights Offering on or before the Effective Date if they determine that it is desirable and feasible to do so.  If the Debtors decide to consummate the Rights Offering, they may do so with or without a Backstop Party.  In order to consummate the Rights Offering, proceeds from the Rights Offering must be deposited in a segregated account or escrow account as of the earlier to occur of the Effective Date or February 12, 2010 in a sufficient amount, when combined with any other New Capital Proceeds held in one or more segregated accounts or escrow accounts, to (i) satisfy the requirements of clause (i) of Section 3.3(2)(b) and (ii) reduce the principal amount of the New Convertible Notes to zero.  **The Debtors shall not effectuate the Rights Offering if any New Convertible Notes will be issued to Holders of Allowed Class 3 Claims on the Effective Date.**

(2)    Issuance of Rights.

Each Rights Offering Participant will receive Subscription Rights (a) to subscribe for its Pro Rata Share of the Rights Offering Shares (each such subscription, a "**Primary Offering Subscription**") and/or (b) to subscribe for additional Rights Offering Shares, in a number of shares not to exceed such Rights Offering Participant's Oversubscription Pro Rata Share of the Remaining Rights Offering Shares (each such subscription, an "**Oversubscription Offering Subscription**"), for an aggregate purchase price equal to the applicable Subscription Payment Amount.  The Rights Offering Shares will be issued to the Rights Offering Purchasers at a price per share equal to the Subscription Price.

48

(3)     Subscription Period.

The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Deadline. Each Rights Offering Participant that intends or desires to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights (and if it submits a Primary Offering Subscription, may elect to submit an Oversubscription Offering Subscription), and provide written notice thereof to the Entities specified in the Subscription Form, on or prior to the Subscription Deadline in accordance with the terms of this Plan and the Subscription Form. On the Subscription Deadline, (a) if the Debtors select a Backstop Party, the Remaining Rights Offering Shares shall be allocated to, and purchased by the Backstop Party, and (b) if the Debtors do not select a Backstop Party, the Oversubscription Shares for each Rights Offering Participant that submitted Oversubscription Offering Subscriptions shall be allocated to, and purchased by such Rights Offering Participant.

(4)     Exercise of Subscription Rights and Payment of Subscription Payment Amount.

On the Subscription Commencement Date, the Debtors, through the Claims and Voting Agent, will mail the Subscription Form to each Rights Offering Participant known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form, as well as instructions for the payment of the eventual Subscription Payment Amount for that portion of the Subscription Rights sought to be exercised by such Person. The Debtors may adopt such additional detailed procedures consistent with the provisions of this Plan to more efficiently administer the exercise of the Subscription Rights.

In order to exercise the Subscription Rights, each Rights Offering Participant must return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering, including a binding and irrevocable commitment to purchase Oversubscription Shares if such Rights Offering Participant submits an Oversubscription Offering Subscription) to the Debtors or other Entity specified in the Subscription Form so that such form is actually received by the Debtors or such other Entity on or before the Subscription Deadline. In order to exercise its Subscription Rights, a Rights Offering Participant must subscribe for its entire Pro Rata Share of the Rights Offering Shares rather than only a part of its Pro Rata Share of the Rights Offering Shares. If the Debtors or such other Entity for any reason does not receive from a given holder of Subscription Rights a duly completed Subscription Form on or prior to the Subscription Deadline, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering. On the Subscription Notification Date, the Debtors will notify each Rights Offering Purchaser of its respective allocated portion of Rights Offering Shares (including its Oversubscription Shares, if any), and if the Debtors have selected a Backstop Party, the Debtors will notify the Backstop Party after the Subscription Deadline of its portion of the Remaining Rights Offering Shares that the Backstop Party is obligated to purchase pursuant to the Backstop Rights Purchase Agreement. Each

49

Rights Offering Purchaser (including the Backstop Party, if applicable) must tender its Subscription Payment Amount to the Debtors so that it is actually received on or prior to the Subscription Payment Date.  Any Rights Offering Purchaser who fails to tender its Subscription Payment Amount so that it is received on or prior to the Subscription Payment Date shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering.  The Debtors shall hold the payments they receive for the exercise of Subscription Rights in a separate account.  In the event the conditions to the Effective Date are not met or waived by the deadline set forth in Section 10.2(8) below or the requirements of Section 6.10(1) are not satisfied, such payments shall be returned, without accrual or payment of any interest thereon, to the applicable Rights Offering Purchaser, without reduction, offset or counter-claim.

(5)    Rights Offering Backstop.

If the Debtors decide to have a Backstop Party for the Rights Offering, they will enter into the Backstop Rights Purchase Agreement.  In accordance with the Backstop Rights Purchase Agreement, the Backstop Party will commit to purchase all Remaining Rights Offering Shares.  As part of the Backstop Rights Purchase Agreement, the Debtors may grant certain rights and protections to the Backstop Party, including, without limitation, the rights, protections and fees set forth in Exhibit D.  If the Debtors enter into a Backstop Rights Purchase Agreement, each Rights Offering Purchasers (other than the Backstop Party) shall, subject to Section 6.10(4) above, be entitled to only its Primary Offering Subscription (and not its Oversubscription Offering Subscription), and no Oversubscription Shares will be issued to any Rights Offering Participant other than in its capacity as a Backstop Party.

(6)    Number of Rights Offering Shares.

The number of Rights Offering Shares to be sold pursuant to the Rights Offering shall be determined by dividing the Rights Offering Amount by the Subscription Price.

(7)    No Transfer; Detachment Restrictions; No Revocation.

The Subscription Rights are not Transferable or detachable.  Any such Transfer or detachment, or attempted Transfer or detachment, will be null and void and the Debtors will not treat any purported transferee of the Subscription Rights separate from the associated Class 5A Claims, Class 5B Claims and/or Class 5C Claims as the holder of any Subscription Rights.  Once a Rights Offering Participant has exercised any of its Subscription Rights by properly executing and delivering a Subscription Form to the Debtors or other Entity specified in the Subscription Form, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

(8)    Distribution of Rights Offering Shares.

50

On, or as soon as reasonably practicable after, the Effective Date, the Reorganized Debtors or other applicable Disbursing Agent shall distribute the Rights Offering Shares purchased by each Rights Offering Purchaser.

(9)     Validity of Exercise of Subscription Rights.

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by the Debtors or Reorganized Debtors.  The Debtors or Reorganized Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights.  Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors or Reorganized Debtors determine in their discretion reasonably exercised in good faith.  The Debtors or Reorganized Debtors will use commercially reasonable efforts to give written notice to any Rights Offering Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Entity and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors and Reorganized Debtors nor any of their predecessors, successors, assigns, present and former Affiliates and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity on or any time after the Petition Date, and any Person claiming by or through any of them, shall incur any liability for giving, or failing to give, such notification and opportunity to cure.  Once a Rights Offering Participant has timely and validly exercised its Subscription Rights, subject to the occurrence or satisfaction of all conditions precedent to the Rights Offering and to the Rights Offering Participants' participation in same, and notwithstanding the subsequent disallowance of any or all of its underlying Claim, such Rights Offering Participant's right to participate in the Rights Offering will be irreversible and shall not be subject to dissolution, avoidance or disgorgement and shall not be withheld from such Rights Offering Participant on account of such disallowance.

(10)     Rights Offering Proceeds.

The proceeds of the Rights Offering will be used to fund Cash payments contemplated by Section 3.3(2)(b). Notwithstanding the foregoing, the Debtors shall be entitled to effectuate the Rights Offering only if (i) the New Capital Proceeds therefrom, when coupled with the New Capital Proceeds of any New Spansion Debt, are sufficient to (x) satisfy the requirements of clause (i) of Section 3.3(2)(b) and (y) reduce the principal amount of the New Convertible Notes to zero and (ii) such New Capital Proceeds are used for those purposes.  In the event that the Debtors receive any New Capital Proceeds from the Rights Offering and those proceeds, when coupled with any other New Capital Proceeds, are insufficient to satisfy the requirements of the preceding

51

sentence, the Debtors shall return such New Capital Proceeds to the applicable Rights Offering Purchaser or Rights Offering Purchasers in accordance with Section 6.10(4).

**6.11    New Spansion Debt.**  The Debtors shall have the right to issue or incur the New Spansion Debt on or before the Effective Date if they determine that it is desirable and feasible to do so.  The New Spansion Debt, if any, will have terms that are no less favorable than those set forth on <u>Exhibit C</u>.  In order to issue or incur the New Spansion Debt, proceeds from the New Spansion Debt must be deposited in a segregated account or escrow account in a sufficient amount, when combined with any other New Capital Proceeds held in one or more segregated accounts or escrow accounts, to satisfy the requirements of Section 3.3(2)(b) as of the earlier to occur of the Effective Date or February 12, 2010.  Notwithstanding anything to the contrary contained in this Plan, the Debtors shall be permitted to issue or incur New Spansion Debt only to make the Cash payments contemplated by Section 3.3(2)(b) unless the New Capital Proceeds from such New Spansion Debt, when combined with the New Capital Proceeds from the Rights Offering, if any, exceed the total amount necessary to pay all Class 3 Claims in Cash in full pursuant to Section 3.3(2)(b).

**6.12    Cancellation of the FRNs, Senior Notes, and the Exchangeable Debentures.**  The FRN Indenture, the Senior Notes Indenture, and the Exchangeable Debentures Indenture and the FRNs, the Senior Notes and the Exchangeable Debentures issued thereunder, shall terminate as of the Effective Date, except as necessary to preserve, pursue or administer the rights, claims, liens, and interests of the applicable Indenture Trustees and the Holders of the FRN Claims, the Senior Notes Claims and the Exchangeable Debentures Claims (including the claims asserted in the complaint filed by the Senior Notes Indenture Trustee in the Bankruptcy Court against the Debtors and the Exchangeable Debentures Indenture Trustee (case number 09-52274) seeking, inter alia, a declaratory judgment with respect to the subordination provisions governing the Senior Notes and the Exchangeable Debentures), and except the FRN Indenture, the Senior Notes Indenture and the Exchangeable Debentures Indenture shall continue in effect to the extent necessary to allow the applicable Indenture Trustees to receive Distributions pursuant to this Plan and make distributions under the FRN Indenture, the Senior Notes Indenture and the Exchangeable Debentures Indenture on account of their respective allowed FRN Claims, Exchangeable Debentures Claims, and Senior Notes Claims.  The applicable Indenture Trustees will close their respective transfer records as of the Record Date and the applicable Indenture Trustees (and their agents) shall have no further obligation under the FRN Indenture, the Senior Notes Indenture, and the Exchangeable Debentures Indenture, and shall be relieved of all obligations under their respective indentures relating to the FRNs, the Senior Notes, and the Exchangeable Debentures, except with respect to the distributions required to be made to the applicable Indenture Trustees in respect of their claims, and with respect to such other rights, claims, liens, and interests of the applicable Indenture Trustees and the Holders of the FRN Claims, the Senior Notes Claims and the Exchangeable Debentures Claims described herein or that, pursuant to the terms of their respective indentures, survive the termination of same.  Termination of the FRN Indenture, the Senior Notes Indenture, and the Exchangeable Debentures Indenture shall not impair the rights of the Holders of the FRN Claims, the Senior Notes Claims and the Exchangeable Debentures Claims to receive Distributions

52

on account of such Claims pursuant to the Plan, and shall not impair the rights of the applicable Indenture Trustees to enforce their charging liens, created in law or pursuant to the indentures governing the FRNs, the Senior Notes and the Exchangeable Debenture, as applicable, against property that would otherwise be distributed to such Holders. The rights, claims, liens, and interests of the Senior Notes Indenture Trustee and the Holders of Senior Notes Claims arising under the subordination provisions of the Exchangeable Debentures Indenture, to the extent applicable, shall survive any termination of the Exchangeable Debentures Indenture. Upon termination of the indentures for the FRNs, the Senior Notes and the Exchangeable Debentures, and without further action or order of the Bankruptcy Court, the charging liens of the applicable Indenture Trustee shall attach to any property distributable to the Holders of the FRN Claims, the Senior Notes Claims or the Exchangeable Debentures Claims under the Plan, as applicable, with the same priority, dignity, and effect that such liens had on property distributable under the indenture for the FRNS, the Senior Notes or the Exchangeable Debentures, as applicable. Subsequent to the performance by the applicable Indenture Trustee (or its agents) of its obligations pursuant to the Plan and the Confirmation Order, such Indenture Trustee (and its agents) shall be relieved of all obligations related to the indenture for the FRNs, the Senior Notes or the Exchangeable Debentures, as applicable.

## ARTICLE VII.
## PROVISIONS REGARDING CORPORATE GOVERNANCE OF REORGANIZED DEBTORS

**7.1    New Governing Documents.** The New Governing Documents of each of the Reorganized Debtors shall be adopted as may be required in order to be consistent with the provisions of this Plan and the Bankruptcy Code. The New Governing Documents of the Reorganized Debtors shall, as applicable and among other things, (a) authorize the issuance of New Spansion Common Stock in amounts not less than the amounts necessary to permit the Distributions thereof required or contemplated by the Plan, and (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for (i) a provision prohibiting the issuance of nonvoting equity securities, and (ii) to the extent necessary, a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. Forms of the New Governing Documents of the Debtors will be contained in the Plan Supplement.

**7.2    Directors and Officers of Reorganized Debtors.** The initial board of directors of Reorganized Spansion Inc. (the "**Initial Board**") shall consist of the seven (7) Persons identified in the Third Addendum to the Plan Supplement; provided that (i) if any of the identified Persons, other than any Person selected by the Backstop Party pursuant to the terms of the Backstop Rights Purchase Agreement, is unable or unwilling to serve on the Initial Board for any reason, the Debtors, the Senior Noteholders Group and the Creditors' Committee shall jointly designate a replacement and (ii) if any of the identified Persons that were designated by the Backstop Party to serve on the Initial Board pursuant to the terms of the Backstop Rights Purchase Agreement is unable or unwilling to serve

53

on the Initial Board for any reason, the Backstop Party shall designate a replacement. The Initial Board shall choose the members of the Boards of Directors of each of the other Reorganized Debtors on the Effective Date or as soon as practicable thereafter. Each of the Persons on the Initial Board, the post-Effective Date board of directors or managers of each of the Reorganized Debtors (other than Reorganized Spansion Inc.), and each of the initial officers of the respective Reorganized Debtors shall serve in accordance with the New Governing Documents of each of the respective Reorganized Debtors, as the same may be amended from time to time.

**7.3    New Employee Incentive Compensation Programs.**  Reorganized Spansion Inc. shall reserve 6,580,240 shares of New Spansion Common Stock for issuance under an equity incentive plan for employees, management and the directors of Reorganized Spansion Inc. and the other Reorganized Debtors, <u>provided</u>, that grants of no more than 3,290,120 shares of New Spansion Common Stock may be issued for an exercise, conversion or purchase price below (i) in the 90 days following the Effective Date, the greater of (A) the value per share of New Spansion Common Stock issued under the Plan or (B) the fair market value per share of New Spansion Common Stock at the time of issuance and (ii) thereafter, the fair market value per share of New Spansion Common Stock at the time of grant.  The new equity incentive plan shall have a term of 10 years, and shall permit the issuance of up to 6,580,240 shares in the form of incentive stock options within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended, and other standard equity incentive awards.  In all other regards, the remaining terms of and distribution under the equity incentive plan will be determined by Reorganized Spansion Inc.'s Initial Board within 90 days after the Effective Date of the Plan without further notice to or order of the Bankruptcy Court, or the vote, consent, authorization or approval of any Entity or shareholder.  Confirmation constitutes approval of the equity incentive plan pursuant to Section 303 of the Delaware General Corporate Law.

**7.4    Authorization and Issuance of New Equity; Securities Laws.**  The issuance of securities pursuant to the Plan shall be made pursuant to section 1145 of the Bankruptcy Code and, except with respect to securities held by any entity that is an "underwriter" as that term is defined in section 1145(b) of the Bankruptcy Code, shall be (A) validly issued, fully paid and nonassessable, and (B) freely tradable.   The entry of the Confirmation Order shall be (1) a final determination of the Bankruptcy Court that the securities authorized, issued or Distributed pursuant to this Plan shall be freely tradable securities and (2) deemed to incorporate the provisions of this Article VII as mixed findings of fact and conclusions of law.  Section 5 of the Securities Act and any state or local law requiring registration for the offer or sale of a security, or registration or licensing of an issuer or underwriter or broker or dealer in securities, do not apply to the offer or sale of any New Equity in accordance with the Plan.

**7.5    Holdback from Common Stock Distribution.**  The Reorganized Debtors shall be authorized, without further act or action by the Initial Board and without further act or action under applicable law, regulation, order, or rule to hold back from the issuance of the authorized shares of New Spansion Common Stock, that number of shares of New Spansion Common Stock required for issuance to the Holders of Allowed Claims as and

54

when required under the Plan as well as that number of shares necessary for the employee and management incentive programs described in Section 7.3. The Initial Board may reduce the number of shares of New Spansion Common Stock so held at any time as it deems appropriate to the extent it determines in good faith that such holdback is in excess of the number of shares needed to satisfy the foregoing requirements.

**7.6     Listing of New Spansion Common Stock.**  Reorganized Spansion Inc. shall use good faith efforts to list the New Spansion Common Stock on a national securities exchange or over-the-counter trading market within 90 days of the Effective Date. Except as set forth in the New Senior Notes Documents and the New Convertible Notes Documents, Reorganized Spansion Inc. shall have no liability if it is unable to list the New Spansion Common Stock as described above.  Entities receiving Distributions of New Spansion Common Stock, by accepting such Distributions, agree to cooperate with the Reorganized Debtors' reasonable requests to assist Reorganized Spansion Inc. in its efforts to list the New Spansion Common Stock on a securities exchange or over-the-counter trading market to the extent necessary, provided that such cooperation shall not require them to incur more than immaterial expense.

**7.7     Old Spansion Interests.**  On the Effective Date, all Old Spansion Interests and all Other Old  Equity Rights will be cancelled.  All Other Old Equity will be Unimpaired.

**ARTICLE VIII.**
**VOTING AND DISTRIBUTIONS**

**8.1     Voting of Claims.**  Only Claims in the Voting Classes are entitled to vote to accept or reject the Plan.  Claims in other impaired Classes are deemed to have accepted or rejected the Plan, as applicable, in accordance with sections 1126(f) and 1126(g) of the Bankruptcy Code.  A Claim in a Voting Class must be an Allowed Claim or "allowed" for purposes of voting in order for the Holder of such Claim to have the right to vote on the Plan.  If an objection to a Claim is Filed, the Holder of such Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or orders that the Claim be Allowed for voting purposes.  Pursuant to the treatment for the FRN Claims specified in Section 3.3, all FRN Claims are deemed Allowed for voting purposes.

**8.2     Distributions of Cash on Account of Claims Allowed as of the Effective Date.** Except as otherwise provided in this Article VIII, Distributions of Cash to be made on the Effective Date to Holders of Claims that are Allowed as of the Effective Date will be made on the Effective Date or as promptly thereafter as practicable, but in no event later than: (i) 30 days after the Effective Date, or (ii) 30 days after such later date when the applicable conditions of Section 5.2 (regarding cure payments for executory contracts and unexpired leases being assumed) and Section 8.6 (regarding undeliverable Distributions) are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section 9.5.

**8.3     Disbursing Agent.**  Except as otherwise provided in this Article VIII, the Reorganized Debtors, or such Disbursing Agents as the Reorganized Debtors may

55

employ in their sole discretion, will make all Distributions of Cash, New Spansion Common Stock, the New Senior Notes, the New Convertible Notes and other instruments or documents required under the Plan.  Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or to make the Distributions required by the Plan.  Each Disbursing Agent, including, for these purposes, any Indenture Trustee providing services related to Distributions pursuant to the Plan, will receive reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors without Bankruptcy Court approval.  These payments will be made on terms agreed to with the Reorganized Debtors and will not be deducted from Distributions to be made pursuant to the Plan to Holders of Allowed Claims.  Any Indenture Trustee shall receive an Administrative Claim in an amount equal to such Indenture Trustee's reasonable fees and expenses related to such Distributions.  To the extent such Administrative Claim is not paid to the Indenture Trustee (or escrowed pending the resolution of any dispute), the Indenture Trustee shall retain its charging lien on Distributions to Holders of the Claims to the fullest extent permitted under the applicable indentures or credit agreements.

**8.4    Distributions of Cash.**  Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in United States currency by checks drawn on a domestic bank selected by the applicable Reorganized Debtor or by wire transfer from a domestic bank; <u>provided</u> that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction or in United States currency utilizing the exchange rate on or about the time of such Distribution.

**8.5    No Interest on Claims or Interests.**  Unless otherwise specifically provided for or contemplated elsewhere in the Plan or Confirmation Order, or required by applicable bankruptcy law to render a Claim Unimpaired or otherwise, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim, other than an Other Secured Claim to the extent required by the applicable documents giving rise to such Claim, <u>provided</u> that to the extent a Holder of an Other Secured Claim has a Deficiency Claim on account of such Other Secured Claim, interest shall not accrue on or after the Petition Date on the Other Secured Claim or the Deficiency Claim.  Notwithstanding the foregoing, nothing in this Plan shall affect the rights of the Holders of the Senior Notes, if any, to receive the interest accrued or accruing after the commencement of the Chapter 11 Cases pursuant to the Exchangeable Debentures Indenture.

**8.6    Delivery of Distributions.**  The Distribution to a Holder of an Allowed Claim shall be made by the Reorganized Debtors (a) at the address set forth on the proof of Claim Filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Reorganized Debtors after the date of any related proof of Claim, (c) at the addresses reflected in the Schedules if no proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address, (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records, or (e) in the case of Claims owed to Holders

56

of Secured Credit Facility Claims, FRN Claims, Senior Notes Claims, and Exchangeable Debentures Claims (subject to Section 3.18 above), to the appropriate Indenture Trustee for ultimate distribution to the Record Holders of such Claims.   The Indenture Trustees shall be directed to effect any Distribution under the Plan through the most efficient method available in the Indenture Trustees' discretion, including through the book entry transfer facilities of the Depository Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  All Cash Distributions returned to the Reorganized Debtors and not claimed within six (6) months of return shall be irrevocably retained by the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary. All Distributions of New Spansion Common Stock returned to the Reorganized Debtors and not claimed within six (6) months of return, shall irrevocably revert to Reorganized Spansion Inc. and shall be retained and held as set forth in the New Governing Documents. Upon such reversion, the claim of any Holder or their successors with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**8.7    Distributions to Holders of the FRNs, the Senior Notes, and the Exchangeable Debentures.**  The distribution provisions contained in the FRN Indenture, the Senior Notes Indenture, and the Exchangeable Debentures Indenture will continue in effect to the extent necessary for the applicable Indenture Trustee to make distributions on account of Allowed FRN, Senior Notes, and Exchangeable Debentures Claims.
Nothing in the Plan shall limit the right of the Indenture Trustees to distribute Cash to the Holders of Class 5 Claims.

**8.8    Distributions to Holders as of the Record Date.**  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Claims and Voting Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim.  The Reorganized Debtors, the Indenture Trustees and any Disbursing Agents shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  The Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.  As of the close of business on the Record Date, the transfer ledgers for the Indenture Trustees shall be deemed closed and the Indenture Trustees may take whatever action is necessary to close the transfer ledgers and there shall be no further transfers or changes in the holders of record of such securities in such transfer ledgers.  The Disbursing Agent and the Indenture Trustees shall have no obligation to recognize the transfer of, or sale of any participation in, any of the Secured Credit Facility, FRNs, Senior Notes, and Exchangeable Debentures, or any Claim based thereon, that occurs after close of business on the Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Record Date.  PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION

57

FROM THE DEBTORS OR THE REORGANIZED DEBTORS ON ACCOUNT OF THAT CLAIM.  IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF THAT CLAIM.

**8.9     Indenture Trustees as Claim Holders.**     Consistent with Bankruptcy Rule 3003(c), the Debtors and Reorganized Debtors shall recognize the proofs of Claim Filed by the Indenture Trustees in respect of the Claims for the Holders each represents, in the amounts as Allowed herein.  Accordingly, any Claim Filed by the registered or beneficial holder of such Claims shall be Disallowed by the Confirmation Order as duplicative of the Claims of the Indenture Trustees without need for any further action or Bankruptcy Court Order except to the extent any Claim, or a portion of a proof of Claim, Filed by a holder of such Claims is not included within the proofs of Claim filed by the Indenture Trustees.

**8.10     Payments and Distributions to Holders of Disputed Claims Which Become Allowed Claims.**  Following the Effective Date, as soon as reasonably practicable after (i) a Disputed Claim becomes an Allowed Claim, (ii) the deadline to object to a previously Allowed Claim, other than a Claim expressly allowed pursuant to this Plan or a Claim covered by the definition of "Allowed" in subsections (a) and (b) of Section 1.1(8), expires and no objection has been asserted, or (iii) a notice of no objection is Filed with respect to an Allowed Claim as provided in clause (c)(ii) of the definition of the term "Allowed," the Holder of such Allowed Claim shall be entitled to receive such payments and Distributions which the Holder of such an Allowed Claim would have received if its Claim were an Allowed Claim as of the Effective Date, provided that with respect to any Disputed Claim in Class 5A, Class 5B, or Class 5C that becomes an Allowed Claim after the date of the initial Distribution to Class 5A, Class 5B, and Class 5C, the Reorganized Debtors (or the Disbursing Agent) shall make the Distribution from the Reserve for Disputed Claims to which such Holder is entitled within thirty (30) days after the Reorganized Debtors receive a report from the Claims Agent pursuant to Section 9.2(6) informing them that such Holder's Claim has become an Allowed Claim.  Subject to Section 3.18 hereof, the Holder of a Disputed Class 5A Claim, Disputed Class 5B Claim, or Disputed Class 5C Claim which becomes an Allowed Class 5A Claim, Allowed Class 5B Claim, or Allowed Class 5C Claim shall receive from the Reserve for Disputed Claims its Unsecured Claims Pro Rata share of any Distributions which have been made on account of Class 5A Claims, Class 5B Claims, and Class 5C Claims prior to the date such Disputed Claim becomes an Allowed Class 5A Claim, Allowed Class 5B Claim, or Allowed Class 5C Claim, as contemplated by Section 8.12, but only with respect to the portion of such Disputed Claim which has become an Allowed Class 5A Claim, Allowed Class 5B Claim, or Allowed Class 5C Claim and shall be entitled to any subsequent distributions from the Reserve for Disputed Claims to which such Allowed Claim is entitled pursuant to Section 8.12.

**8.11     Distributions of Stock to Holders of Allowed Class 5A Claims, Allowed Class 5B Claims and Allowed Class 5C Claims.**  The initial Distribution to Holders of Allowed Class 5A Claims, Allowed Class 5B Claims and Allowed Class 5C Claims of shares of New Spansion Common Stock will be made on the Effective Date or as soon as

58

practicable after such date, <u>provided</u>, however, that all Distributions to Holders of Allowed Class 5C Claims are subject to Section 3.18. Thereafter, subject to Section 3.18 hereof, the Reorganized Debtors or any Disbursing Agents employed by the Reorganized Debtors shall make a supplemental Distribution (in accordance with Section 8.12) to Holders of Allowed Class 5A Claims, Allowed Class 5B Claims and Allowed Class 5C Claims who have previously received a Distribution not less frequently than quarterly, <u>provided</u> that, except as otherwise provided in Section 8.12(7), there are not less than 100,000 shares (the "**Minimum Shares for Distribution**") available for a Distribution as of the end of the previous calendar quarter.

**8.12    Reserve for Disputed Claims.**

(1)    Notwithstanding any other provisions of the Plan, no payment or Distribution shall be made to any Holder on account of any Claim until such Claim becomes an Allowed Claim, and then only to the extent that it becomes an Allowed Claim.

(2)    Subject to Section 3.18, at any time that a Distribution is made to Class 5A, Class 5B or Class 5C under the Plan, such Distribution shall be made to (a) all of the Holders of Allowed Claims in Class 5A, Class 5B or Class 5C and (b), if at the time of such Distribution, there are any Disputed Claims in Class 5A, Class 5B or Class 5C, to a reserve for Disputed Claims on account of such Disputed Claims (the "**Reserve for Disputed Claims**"), pending resolution of such Disputed Claims, in each case, as determined on an Unsecured Claims Pro Rata basis.

(3)    The Distributions on account of Disputed Claims shall be made to the Reserve for Disputed Claims and any Disputed Claim (to the extent not previously Disallowed) shall be treated as being Allowed in the lesser of (i) the Face Amount of such Disputed Claims or (ii) any other amount for purposes of the Reserve for Disputed Claims established by the Bankruptcy Court for such Disputed Claims.

(4)    To the extent that any Disputed Claim in Class 5A, Class 5B or Class 5C becomes an Allowed Class 5A Claim, Allowed Class 5B Claim or Allowed Class 5C Claim after a Distribution has been made with respect to Class 5A, Class 5B or Class 5C, the shares of New Spansion Common Stock reserved for such Disputed Claim shall be distributed (at the time specified in Section 8.10) from the Reserve for Disputed Claims to the Holder of such Allowed Claim such that, after giving effect to such Distribution, it shall have received the aggregate Distribution that such Holder would have received if such Allowed Claim had been Allowed on the Effective Date (subject to Section 3.18 hereof).

(5)    Within forty (40) days after their receipt of any report provided by the Claims Agent pursuant to Section 9.2(6), the Reorganized Debtors shall determine whether the number of shares of New Spansion Common Stock held in the Reserve for Disputed Claims exceeds, as of the end of the three-month period that is the subject of such report, the number of shares that is required to be held in the Reserve for Disputed Claims on account of Disputed Claims in Class 5A, Class 5B and Class 5C pursuant to

this Section as a result of Disputed Claims becoming Allowed Claims in less than the amount used to determine the reserve for such Disputed Claim as set forth in paragraph (3) of this Section 8.12; provided that (solely for purposes of distributions to Class 5A and Class 5C) the value of such shares shall be based on the share price of the New Spansion Common Stock as determined by the Bankruptcy Court at the Confirmation Hearing.

(6)    If the Reorganized Debtors determine that the number of shares of New Spansion Common Stock held in the Reserve for Disputed Claims exceeds the number of shares required to be held in such Reserve pursuant to this Section (as a result of Disputed Claims becoming Allowed Claims in less than the amount reserved for such Disputed Claim as set forth in paragraph (3) of this Section 8.12) as of the preceding calendar quarter end by at least the Minimum Shares for Distribution, the Reorganized Debtors (or the Disbursing Agent) shall distribute promptly, in accordance with Section 8.12(2) to (a) the Holders of Allowed Class 5A Claims, Allowed Class 5B Claims, and, subject to Section 3.18 hereof, Allowed Class 5C Claims, the number of shares that are available for Distribution to each such Holders of Allowed Class 5A Claims, Allowed Class 5B Claims and, subject to Section 3.18 hereof, Allowed Class 5C Claims, and (b) the Reserve for Disputed Claims, the number of shares that are to be allocated to the Reserve for Disputed Claims.

(7)    In addition, within sixty (60) days after all Disputed Claims in Class 5A, Class 5B and Class 5C have been Allowed or Disallowed and Distributions have been made to the Holders of Disputed Claims that have become Allowed Class 5A Claims, Allowed Class 5B Claims or Allowed Class 5C Claims, the Reorganized Debtors (or the Disbursing Agent) shall distribute any shares of New Spansion Common Stock then remaining in the Reserve for Disputed Claims to Holders of Allowed Class 5A Claims, Allowed Class 5B Claims and, subject to Section 3.18 hereof, Allowed Class 5C Claims on an Unsecured Claims Pro Rata basis.

**8.13    De Minimis Distributions.**  The Reorganized Debtors shall have no obligation to make a Distribution to any Holder of an Allowed Claim (whether an initial Distribution or any subsequent Distribution) if the amount to be distributed to such Holder is Cash in an amount less than fifty dollars ($50.00) or is fewer than five (5) shares of New Spansion Common Stock.  Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than fifty ($50.00) dollars or the number of shares of New Spansion Common Stock to be distributed is fewer than five (5) shares will have its claim for such Distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or their property. Any Cash not distributed pursuant to this Section will be the property of the Reorganized Debtors, free of any restrictions thereon, and any such Cash held by a Disbursing Agent will be returned to or retained by the Reorganized Debtors.

**8.14    No Fractional Securities; No Fractional Dollars.**  Any other provision of this Plan notwithstanding, Distributions of fractional shares of New Spansion Common Stock will not be made.  Whenever any Distribution of securities, including in connection with the Rights Offering, would require the Distribution of a fractional share, the Distribution

60

will be rounded to the nearest integer of shares (any fraction of 0.50 or less shall be rounded down to the next lower integer; any fraction higher than 0.50 shall be rounded up to the next higher integer). Any other provision of this Plan notwithstanding, the Reorganized Debtors shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar is due under this Plan, the payment made shall be rounded to the nearest whole dollar (with $ .50 or less being rounded down to the next lower dollar and any amount greater than $ .50 being rounded up to the next higher dollar).

**8.15    Surrender of Instruments.**  Except as set forth in Section 8.16 below and except for Holders of Secured Credit Facility Claims and UBS Credit Facility Claims, each Holder of a promissory note, bond, or other Instrument evidencing a Claim shall surrender such promissory note, bond, or Instrument to the Debtors or Reorganized Debtors, as the case may be, prior to being entitled to receive any Distribution, unless this requirement is waived by the Debtors or Reorganized Debtors, as the case may be, provided, however, that the Holders of Senior Notes and Exchangeable Debentures shall return the Instruments evidencing their Claims to the applicable Indenture Trustee.  No Distribution of Cash or other property shall be made to or on behalf of any such Holder unless and until (A) such promissory note, bond, or Instrument is received by the Debtors or the Reorganized Debtors, as the case may be, (B) the unavailability of such promissory note, bond, or Instrument is established to the reasonable satisfaction of the Debtors or Reorganized Debtors, as the case may be, or (C) such requirement is waived by the Debtors or Reorganized Debtors, as the case may be.  The Debtors or Reorganized Debtors, as the case may be, may require any such Holder who is unable to surrender or cause to be surrendered any such promissory note, bond, or Instrument to deliver an affidavit of loss and indemnity and/or furnish a bond in form and substance (including with respect to amount) reasonably satisfactory to the Debtors or Reorganized Debtors, as the case may be.  Any such Holder that fails within the later of (i) one year after the Effective Date, and (ii) the date of Allowance of its Claim, (a) if possible, to surrender or cause to be surrendered such promissory note, bond or Instrument, or (b) if requested, to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Debtors or Reorganized Debtors, as the case may be, shall be deemed to have forfeited all rights, claims, and causes of action against the Debtors or Reorganized Debtors, as the case may be, and shall not participate in any Distribution under this Plan.

**8.16    Procedures for Distributions to Holders of FRN Claims, Senior Notes Claims, and Allowed Exchangeable Debentures Claims.**  Distributions to be made under the Plan to Holders of Allowed FRN, Senior Notes, or Exchangeable Debentures Claims will be made to the applicable Indenture Trustee, which, subject to the right of the Indenture Trustee to assert any charging lien that it might have under the applicable indenture, will transmit the Distributions to the Holders of such Allowed FRN, Senior Notes, and Exchangeable Debentures Claims.  Such Distributions will only be made after the Holder's compliance with the requirement to surrender such FRN, Senior Note, or Exchangeable Debentures set forth in Section 8.15 of the Plan, and are subject to the rights of the applicable Indenture Trustee to assert its applicable charging lien, if any, against such Distribution.

61

**8.17    Allocation of Distributions Between Principal and Interest.**  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated, for purposes of United States federal income tax, first to the principal amount of the Claim, and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**8.18    Compliance With Tax Requirements.**  The Debtors or the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements. The Debtors and the Reorganized Debtors shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each Entity receiving a Distribution of Cash or New Spansion Common Stock pursuant to the Plan, including pursuant to the Rights Offering, shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other tax obligations.

**8.19    Saturday, Sunday or Legal Holiday.**  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## ARTICLE IX.
## PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

**9.1    Objections to Claims.**  All objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline, and: (a) if Filed prior to the Effective Date, such objections shall be served on the parties on the then applicable service list in the Chapter 11 Cases; and (b) if Filed after the Effective Date, such objections shall be served on the Reorganized Debtors and the United States Trustee.  If an objection has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim.

**9.2    Authority to Prosecute Objections.**

(1)    Mr. Eugene Davis shall act as the agent for the Estates (the "**Claims Agent**") in evaluating and prosecuting (i) objections to Disputed Claims in Classes 5A, 5B, and 5C, and (ii) Avoidance Actions to recover any alleged transfers made to any Entity that received payments or transfers during the applicable "look back" period (the "**Claims Agent Avoidance Actions**") and (iii) all actions brought pursuant to Section 510(c) of the Bankruptcy Code (the "**510(c) Actions**"), except with respect to Holders of Designated Disputed Claims, Secured Credit Facility Claims, UBS Credit Facility Claims, FRN Claims, Senior Note Claims, Exchangeable Debentures Claims, Other

Secured Claims and Claims for Professional Compensation, <u>provided</u> that such exclusion from the authority of the Claims Agent is solely for such Entities in their capacity as Holders of such Claims. The Claims Agent's compensation shall be approved by the Senior Noteholders Group, in consultation with the Creditors' Committee, and shall be reasonably satisfactory to the Debtors. Any adjustment in the Claims Agent's compensation shall be subject to the approval of Reorganized Spansion Inc.'s board of directors but may not be adjusted downward prior to the second anniversary of the Effective Date; provided, however, that the Claims Agent shall be entitled to such compensation only until the earlier to occur of (x) the date on which all Disputed Claims in Classes 5A – 5C and all Claims Agent Avoidance Actions have been resolved or adjudicated pursuant to a Final Order and (y) the date on which such Claims Agent resigns, terminates his or her engagement as Claims Agent or is removed pursuant to Section 9.2(3).

(2)    Subject to the terms and provisions of this Section 9.2 and except as otherwise set forth in this subsection or Section 9.2(4), the Claims Agent shall be authorized and empowered to evaluate, make, File, prosecute, settle and abandon objections to (i) any Disputed Claims in Classes 5A – 5C (ii) any Claims Agent Avoidance Actions and (iii) any 510(c) Actions. Notwithstanding the foregoing, the Reorganized Debtors shall have the right to settle, but not prosecute objections to, any Designated Disputed Claims, provided that the Reorganized Debtors shall promptly give written notice of any such settlement to the Claims Agent. The Claims Agent shall not make, File or prosecute an objection to any Designated Disputed Claim without first obtaining the consent of the Reorganized Debtors unless (i) the objection to such Designated Disputed Claim was pending as of the Effective Date or (ii) the objection to such Designated Disputed Claim is based entirely on such Designated Disputed Claim not being filed by the applicable Bar Date, or such Designated Disputed Claim being duplicative of or superseded by anther Claim filed in the Chapter 11 Cases. No Disputed Claim in Classes 5A – 5C, other than Designated Disputed Claims, may be settled or deemed Allowed by the Debtors after Confirmation and prior to the Effective Date without the consent of both the Creditors' Committee and the Senior Noteholders Group, which consents shall not be unreasonably withheld. The Claims Agent shall be entitled to retain counsel and other advisors to exercise the foregoing rights and duties, which counsel and other advisors, as well as the terms of their employment, shall be reasonably satisfactory to the Claims Agent and paid for by the Reorganized Debtors subject to receipt by the Debtors of invoices, statements and/or other documentation demonstrating in sufficient detail the reasonableness of the proposed charges. On or before the Effective Date, the Debtors shall deposit $750,000, or such other amount as agreed to by the Debtors, the Creditors' Committee and the Senior Noteholders Group, into an account designated by and held in the name of the Claims Agent (the "**Claims Agent Fund**"), which amounts shall be used from and after (but not for services rendered or costs or expenses incurred before) the Effective Date by the Claims Agent to perform the duties and responsibilities set forth above (other than for the payment of the Claims Agent's professionals, who shall be paid by the Reorganized Debtors subject to receipt by the Debtors of invoices, statements and/or other documentation demonstrating in sufficient detail the reasonableness of the proposed charges). If, subsequent to the initial funding of the Claims Agent Fund, the Claims Agent determines that the amount then held in the

63

Claims Agent Fund is insufficient for it to conclude the performance of its duties under this Section 9.2, it shall notify the Reorganized Debtors, and they shall meet together in good faith to determine what, if any, additional amounts should be deposited by the Reorganized Debtors into the Claims Agent Fund. Reorganized Spansion Inc.'s board of directors shall determine the amount of subsequent funding of the Claims Agent Fund.

(3)     In the event that the Claims Agent resigns or otherwise terminates its service in such capacity prior to the resolution or adjudication of all Disputed Claims in Classes 5A – 5C, Reorganized Spansion Inc.'s board of directors shall designate a successor Claims Agent (which shall be vested with all of the rights and powers set forth in this Section 9.2). The Reorganized Debtors shall provide the Claims Agent (or any successor Claims Agent) with reasonable access to the Debtors' books and records and personnel during normal business hours upon reasonable prior notice, and the Reorganized Debtors shall take commercially reasonable steps (so long as such steps are not unduly burdensome or costly) to cooperate with the Claims Agent in the performance of its duties under this Section 9.2. The Claims Agent may only be removed for gross negligence or fraud.

(4)     After the Effective Date, except as provided in subsections 9.2(1) and 9.2(2) above or otherwise in the Plan, only the Claims Agent shall have the authority to File, prosecute, settle, compromise, withdraw or litigate to judgment objections to Disputed Classes 5A – 5C Claims, Claims Agent Avoidance Actions or 510(c) Actions, provided that (i) the Debtors' authority to File, prosecute, settle, compromise, withdraw or litigate to judgment objections to Disputed Class 5B Claims, Claims Agent Avoidance Actions or 510(c) Actions shall terminate on the Effective Date as provided in this Section 9.2, and (ii) the Claims Agent shall provide periodic updates on claims resolutions to Reorganized Spansion Inc.'s board of directors. Before bringing any Claims Agent Avoidance Actions other than Claims Agent Avoidance Actions brought solely for purposes of section 502(d) of the Bankruptcy Code, the Claims Agent shall obtain the approval of Reorganized Spansion Inc.'s board of directors to such proposal, which approval shall not be unreasonably withheld. Notwithstanding the foregoing, the Claims Agent shall have full authority to settle (x) any Claims that would result in an Allowed Claim in an amount less than $500,000 and (y) any Claims Agent Avoidance Action that would result in a recovery of less than $500,000. Any settlements of Class 5A-C Disputed Claims or Claims Agent Avoidance Actions that result in Claims or recoveries in excess of $500,000 shall require approval of Reorganized Spansion Inc.'s board of directors.

(5)     Any previously prosecuted objections to any Disputed Claims in Classes 5A – 5C or Claims Agent Avoidance Action pending as of the Effective Date shall be deemed to have been assigned to the Claims Agent, and, subject to subsection 9.2(3), the Claims Agent shall have the sole and exclusive right, subject to the limitations set forth above, to continue the prosecution of such Disputed Classes 5A – 5C Claim or Claims Agent Avoidance Action, abandon such Claim objections, or settle or compromise such Disputed Claims in Classes 5A – 5C or Claims Agent Avoidance Action, subject to the terms of this Section 9.2.

64

(6)     Within thirty (30) days following the end of each February, May, August and November until all Disputed Claims in Classes 5A – 5C have been Allowed or Disallowed and all Claims Agent Avoidance Actions and 510(c) Actions have been settled, abandoned or prosecuted to judgment and recoveries of judgments received, the Claims Agent shall provide to the Reorganized Debtors a report with such information and detail as the Reorganized Debtors shall reasonably request in order for them to make the Distributions described in Section 8.10.

(7)     All amounts recovered by the Claims Agent as a result of its prosecution or settlement of any Claims Agent Avoidance Action or 510(c) Action shall be promptly paid to the Reorganized Debtors.

(8)     Except as set forth herein, notwithstanding that the Claims Agent shall have the right to File objections to Disputed Classes 5A – 5C Claims, litigate and/or settle objections to Disputed Claims in Classes 5A – 5C on behalf of the Debtors and their Estates, and commence, prosecute, litigate and settle any Claims Agent Avoidance Actions or 510(c) Actions, nothing contained herein shall be deemed to obligate the Claims Agent to take any such actions, all of which shall be determined by the Claims Agent in its sole and absolute discretion.

(9)     Notwithstanding the foregoing, (a) the Claims Agent shall not have any right or authority to evaluate, make, File, prosecute, settle or abandon objections to any Disputed Claims other than Claims in Classes 5A – 5C, and (b) the Debtors or Reorganized Debtors, as applicable, shall have the sole and exclusive right and authority to evaluate, make, File, prosecute, settle or abandon objections to any and all Disputed Claims other than Claims in Classes 5A – 5C.  Notwithstanding the foregoing, (x) the Reorganized Debtors shall have full authority to settle any Claims other than Disputed Claims in Classes 5A – 5C that would result in an Allowed Claim in an amount less than $500,000 and (y) any settlements of by the Debtors of any non-Class 5A, 5B, or 5C Disputed Claim that result in an Allowed Claim in excess of $500,000 shall require approval of the Claims Agent.

**9.3     No Distributions Pending Allowance.**  Notwithstanding anything to the contrary in this Plan, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Claims Objection Deadline has passed and no objection to such Claim has been Filed, (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court or (iii) such Claim has been Allowed pursuant to the Confirmation Order or other Final Order of the Bankruptcy Court.

**9.4     Estimation of Claims.**  Except as otherwise ordered by the Bankruptcy Court, the Debtors, the Reorganized Debtors (with respect to non-Class 5A – 5C Claims) or the Claims Agent (with respect to Class 5A – 5C Claims), as the case may be, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502 of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any

Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (and after the Effective Date, the Reorganized Debtors) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim, subject to Section 9.2 hereof. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

**9.5    Distributions After Allowance.**  As soon as practicable after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely Filed, or (ii) the Disputed Claim becomes an Allowed Claim, the Reorganized Debtors will distribute to the Holder thereof all Distributions to which such Holder is then entitled under this Plan. In the event that the New Spansion Common Stock being held for Distribution with respect to a Claim is greater than the Distribution that is made to a Holder once the Claim becomes entitled to a Distribution, the excess remaining New Spansion Common Stock will be held by the Reserve for Disputed Claims pending subsequent Distributions in accordance with Section 8.12. All Distributions made under this Article IX will be made with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed Holders included in the applicable Class.

**9.6    Claims Covered by Insurance Policy.**  To the extent a Claim is asserted for liability that is covered, in whole or in part, by any insurance policy or related agreement of the Debtors ("**Insured Claim**"), the Holder of such Claim may continue to pursue the Claim against the Reorganized Debtors solely for the purpose of liquidating such Claim, provided that in accordance with the terms of the applicable insurance policies, related agreements and the Plan, the Reorganized Debtors (on behalf of the Debtors) or the insurer, as applicable, may employ counsel, direct the defense, and determine whether and on what terms to settle any such Claim. Once the Claim is determined to be valid by agreement or Final Order, then the Claim shall be an Allowed Insured Claim in the amount set forth in such Order or agreement. Subject to applicable policy terms, conditions, endorsements and applicable non-bankruptcy law, the Holder of such Allowed Insured Claim will be entitled to: (i) a Distribution under the Plan only to the extent of (a) any unpaid or unexhausted deductible or self-insured retention under the applicable insurance policies or related agreements, and (b) any amount in excess of the limit of coverage provided by any applicable insurance policy or related agreement; and (ii) a recovery under the applicable insurance policy of the amount of such Allowed Insured Claim that is in excess of the deductible or self-insured retention but subject to the limit of coverage provided by such applicable insurance policy or related agreement.

### ARTICLE X.
### CONDITIONS PRECEDENT TO CONFIRMATION
### AND THE EFFECTIVE DATE OF THE PLAN

66

**10.1    Conditions to Confirmation.**    The following are conditions precedent to Confirmation of this Plan that must be (i) satisfied, or (ii) waived in accordance with Section 10.3 below:

(1)    The Bankruptcy Court shall have approved the Disclosure Statement with respect to this Plan in form and substance that is acceptable to the Debtors and the Ad Hoc Consortium.

(2)    The Confirmation Order shall be in form and substance acceptable to the Debtors, the Ad Hoc Consortium, the Creditors' Committee and the Senior Noteholders Group, shall have been signed by the Bankruptcy Court, and shall have been entered on the docket of the Chapter 11 Cases.

(3)    The Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation.

(4)    The Debtors and the Holders of the Secured Credit Facility Claim shall have entered into documentation reasonably satisfactory to each of them.

(5)    The Debtors shall not have committed a material breach of their obligations under this Plan.

**10.2    Conditions to the Effective Date.**  The following are conditions precedent to the Effective Date that must be (i) satisfied, or (ii) waived in accordance with Section 10.3 below:

(1)    All conditions to Confirmation of this Plan set forth in Section 10.1 shall remain satisfied or have been waived.

(2)    Each Order of the Bankruptcy Court referred to in Section 10.1 shall have become a Final Order.

(3)    The Confirmation Order and supporting findings of fact and conclusions of law shall be entered by the Bankruptcy Court in form and substance acceptable to the Debtors, the Ad Hoc Consortium, Creditors' Committee and the Senior Noteholders Group and shall have become a Final Order.

(4)    All documents and agreements to be executed on the Effective Date or otherwise necessary to implement this Plan shall be in form and substance acceptable to the Debtors, the Creditors' Committee and the Senior Noteholders Group, except as otherwise specifically provided herein.

(5)    The Debtors shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order

67

(collectively, the "**Authorizations**"), and such Authorizations shall not have been revoked.

(6)     All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

(7)     All corporate and other proceedings to be taken by the Debtors in connection with the Plan and Plan Supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to the Debtors, and the Debtors shall have received all such counterpart originals or certified or other copies of the Plan and documents contemplated by the Plan and such other documents as they may reasonably request.

(8)     The Effective Date shall have occurred prior to six months after the Confirmation Date unless such period is extended by the Debtors with the consent of the Ad Hoc Consortium, the Creditors' Committee and the Senior Noteholders Group.

(9)     The Initial Board shall have been elected or appointed as of the Effective Date, and directors' and officers' liability insurance shall be available to the members of the Initial Board on terms reasonably satisfactory to the Debtors and the Initial Board.

(10)    All applicable waiting periods imposed by applicable law (including under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable) in connection with the consummation of the Plan and transactions contemplated thereby shall have expired or been terminated without any action having been taken by any court of competent jurisdiction restraining, preventing or imposing materially adverse conditions upon such transactions, and the Debtors shall have received all material regulatory approvals required for the consummation of the Plan and the transactions contemplated thereby and for the Reorganized Debtors to continue to carry on their businesses without material change, each of which approvals shall have become final.

(11)    All other actions and documents necessary to implement the treatment of Claims and Interests set forth in this Plan shall have been effected or executed or, if waivable, waived by the Entity or Entities entitled to the benefit thereof.

(12)    If the Debtors consummate the Rights Offering and/or issue or incur the New Spansion Debt, New Capital Proceeds in an amount to satisfy the requirements of Section 3.3(2)(b) and, if applicable, Sections 6.10(1) and

68

6.10(10), shall be held in an escrow account or segregated account of the Debtors.

**10.3    Waiver of Conditions.**  The conditions to Confirmation of the Plan set forth in Section 10.1 or the Effective Date set forth in Section 10.2 may be waived, in whole or in part, by the Debtors, with the consent of the Creditors' Committee and the Senior Noteholders Group and, as to the conditions set forth in Sections 10.1(1) and (2) and Sections 10.2(3) and (8), with the consent of the Ad Hoc Consortium, without any notice to any other parties in interest or the Bankruptcy Court and without leave or Order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their respective sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors).  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**10.4    Effect of Failure of Conditions.**  In the event that all of the conditions to the Effective Date are not satisfied or waived within three (3) months following entry of the Confirmation Order (or such longer period as is agreed to by the Debtors, the Ad Hoc Consortium, the Creditors' Committee and the Senior Noteholders Group): (a) any party-in-interest may request that the Bankruptcy Court vacate the Confirmation Order; (b) no Distributions shall be made; (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (d) all settlements included in the Plan or incorporated into the Plan, including settlements implicit in the terms of the Plan, shall be deemed revoked; and (e) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged (except to the extent of any payments made after entry of the Confirmation Order but prior to the Effective Date) and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

**10.5    Order Denying Confirmation.**  If an Order denying confirmation of the Plan is entered by the Bankruptcy Court, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy or Claim of the Debtors, (d) be deemed an admission against interest by the Debtors, or (e) constitute a settlement, implicit or otherwise, of any kind whatsoever.

**10.6    Revocation of the Plan.**  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; (b) constitute an admission of any fact or legal conclusion by the Debtors or any

69

other Entity; or (c) prejudice in any manner the rights of the Debtors or any other party, including the Creditors' Committee, the Ad Hoc Consortium and the Senior Noteholders Group, in any related or further proceedings.

## ARTICLE XI.
## EFFECT OF PLAN ON CLAIMS AND INTERESTS

**11.1    Discharge of Claims and Termination of Interests.**    Except as otherwise provided in the Plan or the Confirmation Order:

> (1)    on the Effective Date, each Reorganized Debtor shall be deemed discharged and released from all Claims and Interests, including demands, liabilities, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, (C) the Holder of a Claim or Interest based on such debt or Interest has accepted the Plan, or (D) such Claim is listed in the Schedules; and

> (2)    all Entities shall be precluded from asserting against each Reorganized Debtor, its successors, or its Assets any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Except as otherwise provided in the Plan or the Confirmation Order, upon the occurrence of the Effective Date, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Reorganized Debtors, as provided in sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Reorganized Debtor at any time obtained to the extent that it relates to a discharged Claim or terminated Interest.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against the Assets of any Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.

**11.2    Cancellation of Claims and Interests.**    Except as otherwise set forth in this Plan, and except for purposes of evidencing a right to Distributions, on the Effective Date, all agreements and other documents evidencing the Claims or rights of any Holder of a Claim against the Debtors, including all notes, guarantees, mortgages, and all Old Spansion Interests and Other Old Equity Rights shall be canceled.

70

**11.3    Release by Debtors of Certain Parties.**    EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, ON THE EFFECTIVE DATE, THE DEBTORS AND REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHTS OF THE DEBTORS OR REORGANIZED DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, REORGANIZED DEBTORS, THE PARTIES RELEASED PURSUANT TO THIS SECTION, THE CHAPTER 11 CASES, THE PLAN OR THE DISCLOSURE STATEMENT, AND THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES OR THE REORGANIZED DEBTORS, WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR IN ANY REPRESENTATIVE OR ANY OTHER CAPACITY, AGAINST: (I) THE CURRENT DIRECTORS, OFFICERS AND EMPLOYEES OF THE DEBTORS (OTHER THAN FOR MONEY BORROWED FROM OR OWED TO THE DEBTORS BY ANY SUCH DIRECTORS, OFFICERS OR EMPLOYEES AS SET FORTH IN THE DEBTORS' BOOKS AND RECORDS) AND THE DEBTORS' FORMER AND CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH ENTITY;    (II) THE CREDITORS' COMMITTEE AND ITS CURRENT AND FORMER MEMBERS (SOLELY IN SUCH CAPACITY), THE INDENTURE TRUSTEES, THEIR RESPECTIVE ADVISORS (INCLUDING ANY FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH ENTITIES SOLELY IN THEIR CAPACITIES AS SUCH) AND THEIR PRESENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (SOLELY IN THEIR CAPACITIES AS SUCH); (III) ALL HOLDERS OF SECURED CREDIT FACILITY CLAIMS SOLELY WITH RESPECT TO CLAIMS RELATING TO OR ARISING IN CONNECTION WITH SUCH CLAIMS AND ALL HOLDERS OF FRN CLAIMS, OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH ENTITIES), AND THE FRN INDENTURE TRUSTEE OR ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND

71

OTHER PROFESSIONALS RETAINED BY SUCH ENTITIES) RELATING TO OR ARISING IN CONNECTION WITH THE FRN CLAIMS; (IV) THE BACKSTOP PARTY, IF ANY, AND ITS AFFILIATES AND THEIR RESPECTIVE ADVISORS (INCLUDING ANY FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH ENTITY SOLELY IN THEIR CAPACITY AS SUCH) AND THEIR RESPECTIVE PRESENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (SOLELY IN THEIR CAPACITIES AS SUCH); (V) THE DEBTORS OR THEIR RESPECTIVE AFFILIATES (OTHER THAN SPANSION JAPAN) AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH ENTITIES), EXCEPT CLAIMS ARISING IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS WITH RESPECT TO EMPLOYEE MATTERS; AND (VI) THE SENIOR NOTEHOLDERS GROUP AND ITS CURRENT AND FORMER MEMBERS (SOLELY IN SUCH CAPACITY) AND ITS RESPECTIVE ADVISORS (INCLUDING ANY FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH ENTITIES SOLELY IN THEIR CAPACITIES AS SUCH) AND THEIR PRESENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES (SOLELY IN THEIR CAPACITIES AS SUCH).    THOSE ENTITIES DESCRIBED IN SUBSECTIONS (I) THROUGH (VI) OF THE PRECEDING SENTENCE SHALL BE REFERRED TO AS THE "**DEBTOR RELEASEES**".    NOTWITHSTANDING THE FOREGOING, NOTHING IN THE PLAN SHALL RELEASE (I) ANY DEBTOR RELEASEE OTHER THAN THE DEBTORS FROM (A) ANY CLAIMS ASSERTED BY THE DEBTORS THAT ARE THE SUBJECT OF A PENDING LITIGATION, ADVERSARY PROCEEDING OR OTHER CONTESTED MATTER OR JUDGMENT AS OF THE EFFECTIVE DATE, (B) WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER, (C) ANY OBJECTIONS BY THE DEBTORS OR THE REORGANIZED DEBTORS TO CLAIMS FILED BY SUCH ENTITY AGAINST THE DEBTORS AND/OR THE ESTATES OR (D) ANY OBLIGATIONS OF SUCH PERSON UNDER OR IN CONNECTION WITH THIS PLAN AND (II) SPANSION JAPAN AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS EMPLOYED BY SPANSION JAPAN) (FOR ALL SUCH ENTITIES OTHER THAN SPANSION JAPAN, IN THE CAPACITY NAMED HEREIN).    THIS RELEASE, WAIVER AND DISCHARGE WILL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED HEREIN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES SET FORTH HEREIN, WHICH INCLUDE BY

72

REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASES; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER ENTITY ACTING ON BEHALF OF THEM ASSERTING ANY CLAIM RELEASED BY THE DEBTOR AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE ASSETS. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION, THE RELEASE OF THE DEBTORS' OFFICERS, DIRECTORS AND EMPLOYEES SET FORTH ABOVE SHALL BE OF NO FORCE AND EFFECT IN FAVOR OF ANY OFFICER, DIRECTOR OR EMPLOYEE WHO ASSERTS ANY PRE-EFFECTIVE DATE CLAIM AGAINST THE DEBTORS OR REORGANIZED DEBTORS FOR INDEMNIFICATION, DAMAGES OR ANY OTHER CAUSES OF ACTION OTHER THAN FOR UNPAID COMPENSATION, WAGES OR BENEFITS THAT AROSE IN THE ORDINARY COURSE OF BUSINESS OR PURSUANT TO THE PLANS AND PROGRAMS APPROVED BY THE BANKRUPTCY COURT PURSUANT TO ITS (A) ORDER (I) APPROVING CERTAIN INCENTIVE PLANS AND (II) AUTHORIZING PAYMENT THEREUNDER PURSUANT TO SECTIONS 105(E), 363(B) AND 503(C) OF THE BANKRUPTCY CODE, ENTERED ON JUNE 29, 2009 [D.I. 730], (B) ORDER (I) APPROVING CERTAIN INCENTIVE PLANS AND (II) AUTHORIZING PAYMENT THEREUNDER PURSUANT TO SECTIONS 105(E), 363(B) AND 503(C) OF THE BANKRUPTCY CODE, ENTERED ON JULY 22, 2009 [D.I. 849], AND (C) ORDER (I) APPROVING INCENTIVE PLANS AND (II) AUTHORIZING PAYMENT THEREUNDER PURSUANT TO SECTIONS 105(E), 363(B) AND 503(C) OF THE BANKRUPTCY CODE, ENTERED ON JULY 23, 2009 [D.I. 874].

**11.4    Release by Holders of Claims and Interests.**  EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, ON THE EFFECTIVE DATE: (A) EACH ENTITY THAT VOTES TO ACCEPT THIS PLAN OR IS PRESUMED TO HAVE VOTED FOR THIS PLAN PURSUANT TO SECTION 1126(f) OF THE BANKRUPTCY CODE; (B) EACH ENTITY WHO OBTAINS A RELEASE UNDER THE PLAN; AND (C) EACH ENTITY THAT IS A MEMBER OF A CLASS OF CREDITORS WHICH RECEIVES A DISTRIBUTION PURSUANT TO THE PLAN, IF SUCH ENTITY DID NOT EXERCISE ITS RIGHT TO OPT OUT OF THE RELEASES GRANTED UNDER THIS SECTION PURSUANT TO ANY BALLOT CAST ON THE PLAN BY SUCH ENTITY (EACH, A "**RELEASE OBLIGOR**"), IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS, THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THIS PLAN AND THE CASH, NEW SPANSION COMMON STOCK, AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE DELIVERED IN CONNECTION WITH THIS PLAN, SHALL HAVE CONCLUSIVELY,

73

ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED EACH PARTY RELEASED IN SECTION 11.3 HEREOF FROM ANY CLAIM, RETAINED ACTION, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSES OF ACTION, LIABILITY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE SUBJECT MATTER OF, OR THE TRANSACTION OR EVENT GIVING RISE TO, THE CLAIM OF SUCH RELEASED OBLIGOR, AND ANY ACT, OMISSION, OCCURRENCE OR EVENT IN ANY MANNER RELATED TO SUCH SUBJECT MATTER, TRANSACTION OR OBLIGATION, <u>PROVIDED</u> THAT NOTHING IN THE PLAN WILL RESTRICT ANY GOVERNMENTAL OR REGULATORY AGENCY FROM PURSUING ANY REGULATORY OR POLICE ENFORCEMENT ACTION AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THEIR CURRENT OR FORMER OFFICERS, DIRECTORS OR EMPLOYEES, AND THEIR RESPECTIVE AGENTS, ADVISORS, ATTORNEYS AND REPRESENTATIVES ACTING IN ANY CAPACITY, OTHER THAN ANY ACTION OR PROCEEDING OF ANY TYPE TO RECOVER MONETARY CLAIMS, DAMAGES, OR PENALTIES AGAINST THE DEBTORS FOR AN ACT OR OMISSION OCCURRING PRIOR TO CONFIRMATION.  THIS RELEASE, WAIVER AND DISCHARGE WILL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTEREST PROVIDED HEREIN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE.

NOTWITHSTANDING THE FOREGOING AND ANYTHING CONTAINED IN THIS PLAN, (i) THE SENIOR NOTES INDENTURE TRUSTEE DOES NOT RELEASE, AND THE DEBTORS AND EXCHANGEABLE DEBENTURES INDENTURE TRUSTEE ARE NOT RELEASED, FROM THE CLAIMS AND CAUSES OF ACTION SET FORTH IN ADV PRO. NO. 09-52274 AND (II) SPANSION JAPAN AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS EMPLOYED BY SPANSION JAPAN) (FOR ALL SUCH ENTITIES OTHER THAN SPANSION JAPAN, IN THE CAPACITY NAMED HEREIN) SHALL NOT BE A "DEBTOR RELEASEE" AS DEFINED IN THE PLAN AND SHALL NOT BE RELEASED OR DISCHARGED FROM ANY CLAIMS, OBLIGATIONS ETC. PURSUANT TO THE PLAN.

**11.5   California Civil Code § 1542 Waiver.**   To the extent any of the Debtors or Holders of Claims or Interests grant a release pursuant to the terms of this Plan, such Debtor or Holder acknowledges that it, she or he is familiar with or has been advised regarding  the provisions of section 1542 of the California Civil Code, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her

74

> favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

and similar statutes of other states or the United States, and common law principles of similar effect as section 1542.

The Debtors and Holders of Claims and Interests, being made aware of section 1542 and similar laws and common law principles, hereby are deemed to have expressly waived any rights that any of them might have or assert thereunder, to the extent such section relates to any of the claims released pursuant to Sections 11.3 11.4 or 11.8.

**11.6    Jurisdiction Related Hereto.**  Any action brought against any party receiving a release hereunder for any matter or thing related to the Chapter 11 Cases or the Plan must be brought in Bankruptcy Court.

**11.7    Setoffs.**  The Debtors may, but shall not be required to, setoff against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Holder; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

**11.8    Exculpation and Limitation of Liability.**  The Debtors, the present and former members of the Creditors' Committee, the Ad Hoc Consortium and the Senior Noteholders Group in their capacities as such, the Indenture Trustees in their capacities as such, the Backstop Party, if any, in its capacity as such, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date Affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the settlement of Claims or renegotiation of executory contracts and leases, the pursuit of Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan or the exercise of the powers and duties conferred on the Indenture Trustees by the indentures, this Plan or any order of the Bankruptcy Court, except for their willful misconduct or gross negligence or any obligations that they have under or in connection with this Plan or the transactions contemplated in this Plan, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan (collectively, the "**Exculpated Claims**"). No Holder of any Claim or Interest, or other party-in-interest, none of their respective

75

agents, employees, representatives, financial advisors, attorneys, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Debtors, the Creditors' Committee, the Ad Hoc Consortium, the Senior Noteholders Group, the present and former members of the Creditors' Committee, the Ad Hoc Consortium, and the Senior Noteholders Group in their capacities as such, each of the Indenture Trustees in its capacity as such, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date Affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns with respect to the Exculpated Claims.  No Holder of any Claim or Interest, or other party-in-interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, and no successors or assigns of the foregoing, shall have or pursue any claim or cause of action against the Indenture Trustees for making Distributions in accordance with this Plan or for implementing the provisions of this Plan.

Notwithstanding the foregoing and anything contained in this Plan, the Senior Notes Indenture Trustee does not release, and the Debtors and the Exchangeable Debentures Indenture Trustee are not released from, the claims and causes of action set forth in ADV Pro. No. 09-52274.

**11.9    Injunction.**  The Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 11.3, 11.4 and 11.8; provided, however, that nothing in this Plan will restrict any governmental or regulatory agency from pursuing any regulatory or police enforcement action against the Debtors, the Reorganized Debtors, their current or former officers, directors or employees, and their respective agents, advisors, attorneys and representatives acting in any capacity, other than any action or proceeding of any type to recover monetary claims, damages or penalties against the Debtors for an act or omission occurring prior to Confirmation.

**11.10    Effect of Confirmation.**

(1)    Binding Effect.  On the Confirmation Date, the provisions of this Plan shall be binding on the Debtors, the Estates, all Holders of Claims against or Interests in the Debtors, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan.

(2)    Effect of Confirmation on Automatic Stay.  Except as provided otherwise in this Plan, from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code shall terminate.

76

(3)     Filing of Reports.  The Reorganized Debtors shall file all reports and pay all fees required by the Bankruptcy Code, Bankruptcy Rules, United States Trustee guidelines, and the rules and orders of the Bankruptcy Court.

(4)     Post-Confirmation Date Retention of Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

## ARTICLE XII.
## RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT

**12.1    Retention of Jurisdiction.**  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will have or retain jurisdiction over the Chapter 11 Cases after the Effective Date to the extent legally permissible, including jurisdiction for the following purposes:

(1)     To allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including, the resolution of any request for payment of any Administrative Expense Claim, the resolution of any objections to the allowance, classification or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to Reinstate or render Unimpaired a Claim or Interest pursuant to the Plan, as well as the approval of any Indenture Trustees Fees and Expenses, to the extent of any dispute between the applicable Indenture Trustees and the Debtors or Reorganized Debtors, as applicable;

(2)     To establish a date or dates by which objections to Claims must be Filed to the extent not established herein;

(3)     To establish the amount of any reserve required to be withheld from any Distribution under this Plan on account of any disputed, contingent or unliquidated claim.

(4)     To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

(5)     To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by the Debtors and/or the Reorganized Debtors;

77

(6)    To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

(7)    To hear and rule upon all applications for Professional Compensation;

(8)    To modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate or carry out the intent and purpose the Plan, with the consent of the Debtors or Reorganized Debtors, as applicable, the Creditors' Committee, the Senior Noteholders Group, and, to the extent that any of the foregoing actions could affect the treatment of Holders of Allowed Class 3 Claims, the Ad Hoc Consortium.

(9)    To enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(10)    To issue injunctions, enforce the injunctions contained in the Plan and the Confirmation order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(11)    To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

(12)    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estates and the payment of Claims;

(13)    To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the

LA\2058780.10DM3\1345606.1

Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(14)     To determine any suit or proceeding brought by the Debtors and/or the Reorganized Debtors to recover property under any provisions of the Bankruptcy Code;

(15)     To determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes, and to determine and declare any tax effects under this Plan;

(16)     To determine any matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(17)     To determine any other matters as may be authorized by or under the provisions of the Bankruptcy Code; and

(18)     To enter a Final Decree closing the Chapter 11 Cases.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.2     Final Decree.**  The Bankruptcy Court may, upon application of the Reorganized Debtors at any time after 120 days after the Effective Date, enter a Final Decree in these cases.

**ARTICLE XIII.**
**MISCELLANEOUS PROVISIONS**

**13.1     Modification of the Plan.**  The Debtors, before the Effective Date, reserve the right in accordance with section 1127 of the Bankruptcy Code to modify, alter or amend this Plan at any time before its substantial consummation, with the consent of the Creditors' Committee and the Senior Noteholders Group and, if any such modification, alteration or amendment would affect the treatment of Allowed Class 3 Claims hereunder, the Ad Hoc Consortium.  Subject to the limitations contained herein, the Debtors may modify, alter or amend this Plan in accordance with this paragraph, before or after Confirmation, without notice or hearing, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the modification,

79

alteration or amendment does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto. In the event of any modification, alteration or amendment on or before Confirmation, any votes to accept or reject this Plan shall be deemed to be votes to accept or reject this Plan as modified, unless the Bankruptcy Court finds that the modification, alteration or amendment materially and adversely affects the rights of parties in interest which have cast said votes.

**13.2    Deadlines.**  Any deadline in this Plan may be extended, either before or after the Effective Date, by an Order entered on a motion or application of the Debtors or Reorganized Debtors, as applicable, so long as such motion or application is made prior to the expiration of such deadline.

**13.3    Applicable Law.**  Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the, Plan, or (iii) applicable non-bankruptcy law, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof.

**13.4    Plan Supplement.**  The Plan Supplement will contain, among other things, (a) forms of the  New Governing Documents, (b) a form of the indenture for the New Senior Notes and the form of New Senior Note, (c) a form of the indenture for the New Convertible Notes and the form of New Convertible Notes, (d) a form of the indenture(s), credit agreement(s) or other governing document(s) for the New Spansion Debt, if the New Spansion Debt is to be issued or incurred, (e) the definitive documents for the Rights Offering, if the Rights Offering is to be consummated, (f) a list of the Persons who will serve on the Initial Board, (g) the Contract/Lease Schedule, and (h) the proposed Confirmation Order.  The Plan Supplement shall be Filed with the Bankruptcy Court on or before January 19, 2010.  Notwithstanding the foregoing, subject to any express limitations set forth herein, the Debtors may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date.

**13.5    Dissolution of Creditors' Committee.**  On the Effective Date, unless an appeal is pending from the Confirmation Order, the Creditors' Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released and discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code.  The Professionals retained by the Creditor's Committee and the members thereof shall be entitled to assert claims for reasonable fees for services rendered and expenses incurred in connection with the consummation of the Plan or File applications for allowance of compensation and reimbursement of expenses of the Creditors' Committee's members or Professionals pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 4.2.  In the event an appeal is pending from the Confirmation Order as of the Effective Date the Creditors' Committee shall remain in existence for all purposes related to the prosecution and defense of such

80

appeal, and the Creditors' Committee Professionals shall be entitled to compensation and reimbursement of expenses in connection with such matters.

**13.6    Preparation of Estates' Returns and Resolution of Tax Claims.**  The Debtors or Reorganized Debtors shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.  The Reorganized Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

**13.7    Headings.**  The headings of the Articles and the Sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning of the provisions of this Plan.

**13.8    Confirmation of Plans for Separate Debtors.**  In the event the Debtors are unable to confirm this Plan with respect to all Debtors, the Debtors reserve the right, unilaterally and unconditionally, to proceed with this Plan with respect to any Debtor for which the confirmation requirements of the Bankruptcy Code are met.

**13.9    No Admissions; Objection to Claims.**  Notwithstanding anything herein or in the Disclosure Statement to the contrary, nothing contained in this Plan or in the Disclosure Statement shall be deemed to be an admission by the Debtors, the Claims Agent, the Creditors' Committee, the Ad Hoc Consortium or the Senior Noteholders Group with respect to any matter set forth herein including liability on any Claim or Interest or the propriety of the classification of any Claim or Interest.  The Debtors, the Reorganized Debtors, the Claims Agent, the Creditors' Committee, the Senior Noteholders Group and the Ad Hoc Consortium shall not be bound by any statements herein or in the Disclosure Statement as judicial admissions.

**13.10    No Waiver.**  Neither the failure of a Debtor to list a Claim or Interest in the Debtor's Schedules, the failure of a Debtor to object to any Claim, Administrative Expense Claim or Interest for purposes of voting, the failure of a Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date, nor the failure of a Debtor to assert a Retained Action prior to the Confirmation Date or the Effective Date, in the absence of a legally-effective express waiver or release executed by the Debtors with the approval of the Bankruptcy Court, if required, and with any other consents or approvals required under the Plan, shall be deemed a waiver or release of the right of a Debtor, a Reorganized Debtor or the Claims Agent, or their successors, either before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part, or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Retained Action as against the Holder of any such Claim, Administrative Expense Claim or Interest.

81

**13.11  No Bar to Suits.**  Except as provided in this Plan, neither this Plan nor Confirmation shall operate to bar or estop the Debtors or Reorganized Debtors from commencing any Retained Action, or any other legal action against any Holder of a Claim or Interest or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal Entity, whether such Retained Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Retained Action, or any other legal action, was disclosed in any Disclosure Statement Filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

**13.12  Successors and Assigns.**  The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**13.13  Post-Effective Date Effect of Evidence of Claims or Interests.**  Notes, bonds, stock certificates and other evidence of Claims against or Interests in the Debtors, and all Instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Plan), shall, upon the Effective Date, represent only the right to participate in the Distributions contemplated by the Plan, except as otherwise provided in the Plan.

**13.14  Conflicts.**  In the event that provisions of Exhibit A, Exhibit B, Exhibit C, or Exhibit D hereto conflicts with the final documents contained in the Plan Supplement, then the documents in the Plan Supplement shall govern.  In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, then the terms of this Plan shall govern.  In the event that provisions of the Confirmation Order and this Plan conflict, then the terms of the Confirmation Order shall govern.

**13.15  Exhibits/Schedules.**  All exhibits and schedules to this Plan and the Disclosure Statement, including the Plan Supplement, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.  Any exhibits to the Plan which are voluminous may not be served with copies of the Plan.  Any party-in-interest may view the Plan, Disclosure Statement, and all Exhibits thereto on the following website http://chapter11.epiqsystems.com under the link for "Spansion Inc.".  Copies are also available upon request to Debtors' counsel.  Please direct such requests to:  Latham & Watkins LLP, Attn: Kathryn Bowman, 355 South Grand Avenue, Los Angeles, California  90071-1560 (Fax: (213) 891-8763); or Duane Morris, LLP, Attn: Stacie Wolfenden, 110 North Market Street, Suite 1200, Wilmington, DE 19801 (Fax: (302) 657-2901

**13.16  No Injunctive Relief.**  Except as otherwise provided in the Plan or Confirmation Order, no Holder of a Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable, or other prospective relief with respect to such Claim or Interest.

**13.17  Service of Documents.**  Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors or the

LA\2058780.10DM3\1345606.1

Reorganized Debtors must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

    Michael S. Lurey
    Gregory O. Lunt
    Latham & Watkins LLP
    355 South Grand Avenue
    Los Angeles, CA 90071-1560
    Facsimile: (213) 891-8763

    Robert J. Stark
    Brown Rudnick LLP
    One Financial Center
    Boston, MA 02111
    Facsimile: (617) 289-0495

    Luc A. Despins
    Paul, Hastings, Janofsky & Walker LLP
    75 East 55th Street
    New York, NY 10022
    Facsimile: (212) 230-7881

    Gregory Bray
    Neil J Wertlieb
    Brett Goldblatt
    Milbank, Tweed, Hadley & McCloy LLP
    601 S. Figueroa Street, 30th Floor
    Los Angeles, CA  90017
    Facsimile: (213) 629-5063

    Ira Dizengoff
    Shaya Rochester
    Akin Gump Strauss Hauer & Feld LLP
    One Bryant Park
    New York, New York  10036
    Facsimile:  (212) 872-1002

**13.18  Binding Effect.**  The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims or Interests affected by the Plan, and any other Entity named or referred to in the Plan, and their respective successors and assigns, including any trustee subsequently appointed in any of the Cases or in any superseding chapter 7 case.

83

**13.19 Entire Agreement.** This Plan (together with the Exhibits and schedules hereto and the Plan Supplement) and the Confirmation Order set forth the entire agreement and undertaking relating to the subject matter hereof and supersede all prior discussions and documents. The Debtors' Estates shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein.

Dated April 7, 2010                    Respectfully submitted,

SPANSION INC.

_____
Randy W. Furr
Executive Vice President and Chief Financial Officer

SPANSION TECHNOLOGY LLC

_____
Randy W. Furr
Chief Financial Officer

SPANSION LLC

_____
Randy W. Furr
Chief Financial Officer

SPANSION INTERNATIONAL, INC.

_____
Randy W. Furr
Chief Financial Officer

CERIUM LABORATORIES LLC

_____
Randy W. Furr
Chief Financial Officer