**Hearing Date and Time:** December 12, 2012 at 10:00 a.m. (Prevailing Eastern Time)
**Objection Date and Time:** November 29, 2012 at 4:00 p.m. (Prevailing Eastern Time)

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York
Lisa M. Coyle
lisa.coyle@ropesgray.com

and

Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
+1 617 951 7000
Peter L. Welsh
D. Ross Martin
peter.welsh@ropesgray.com
ross.martin@ropesgray.com

Attorneys for Objectors FYI Ltd., FFI Fund Ltd. and Olifant Fund, Ltd.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al*., : | **Chapter 11 Case No.** |
| | **08-13555 (JMP)** |
| Debtors. : | **(Jointly Administered)** |

------------------------------------------------------x

**FYI LTD., FFI FUND LTD. AND OLIFANT FUND, LTD.'S
OBJECTION TO LEHMAN BROTHERS HOLDINGS INC'S
MOTION FOR AN ORDER AMENDING THE ORDER PURSUANT
TO SECTION 105 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE
9014, AND GENERAL ORDER M-390 AUTHORIZING THE DEBTORS TO
IMPLEMENT CLAIMS HEARING PROCEDURES AND ALTERNATIVE
DISPUTE RESOLUTION PROCEDURES FOR CLAIMS AGAINST DEBTORS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

FYI Ltd., FFI Fund Ltd. and Olifant Fund, Ltd. (collectively, the "Funds"), hereby object to Lehman Brothers Holdings Inc.'s ("LBHI") motion for an order amending the order pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule

9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors (the "Motion"), and respectfully represent as follows:

## Background

*The Integrated Claims Hearing Procedures and Mediation Procedures*

1. On September 15, 2008, LBHI and several of its affiliates (the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Bankruptcy Filing"), and on April 19, 2010, upon the motion of the Debtors, the Court entered an Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors [ECF 8474] which, *inter alia*, set forth certain procedures by which the Debtors can impose mandatory mediation of contested claims against the Debtors (the "Mediation Procedures").

2. The Mediation Procedures, which LBHI now seeks to modify, were not a standalone protocol. They were part of an integrated and balanced claims resolution process on which creditors in these cases, such as the Funds, have been relying. The overall claims procedures have already given the Debtors every necessary tool to appropriately schedule and sequence claims disputes. Understandably, in this largest-ever Chapter 11 case, it was necessary for the Debtors to await confirmation of a plan to conduct most claims litigation, and to have a reasonable process in place to try to narrow and sequence disputes.

3. But now LBHI seeks something far more: an expansion of its authority to delay claims litigation indefinitely, for claims large and small. LBHI seeks

2

the power to put creditors into a mediation from which they may never emerge: the only exit is at the complete, unreviewable discretion of a mediator as to whom the creditor has no input, and with whom LBHI (who will no doubt be arguing for continuation of mediations) will be a familiar face and a repeat player. The only conceivable actual effect of such a change would be to enable the Debtors to inappropriately exercise additional leverage against creditors who have legitimate disagreements with the estates about the size of their claims.

4. The plan has now been confirmed, and the primary remaining task is resolving disputed claims. Creditors have been more than patient, which has been critical in making this case successful. Basic fairness to those creditors in the claims process is required.

5. The change LBHI seeks is simple: removal of an outside time limit on the length of mandatory mediation. As discussed below, that alone is objectionable. But to place it in true context, it should be seen against the backdrop of the overall claims procedures of which the Mediation Procedures are an integrated part. The Debtors have an extensive period within which to object to a claim. Once they file a claims objection, the creditors must immediately expend the resources and time to file a response, but their disputed claims are then immediately and automatically subject to a litigation stay, and the Debtors have sole discretionary authority to adjourn hearings for as long as they want. The procedures then provide for a negotiation period and, potentially, mandatory mediation. All of that is acceptable estate control of a large, complex Chapter 11 proceeding. But once the Debtors do turn their attention to a particular disputed claim and start the mediation process, if no deal is struck within four months, the procedures entitle the creditor to have its day in court. This makes perfect

3

sense, because the creditor has, at that point, had to marshal its evidence in connection with the mediation (indeed both sides have had to do so), and the fair and efficient course of action is to move forward to the ultimate resolution of the disputed claim.

6.  Thus, what LBHI is seeking is the ability to impose *another* indefinite delay after mediation; at the very least, a delay during which the creditor has no judicial recourse to obtain an appropriate schedule, discovery, or any other procedural protections. All of that would instead be left to the undefined and unreviewable discretion of a mediator selected by, and no doubt repeatedly used by, the Debtors.

7.  Due process and basic fairness prohibit the imposition of indefinite mandatory pre-litigation mediation, and LBHI's request should be denied on that ground alone. Additionally, LBHI – which offers no reasonable justification for the requested amendment – and the estate have already repeatedly demonstrated their tendency to wield the vast leverage they possess over holders of disputed claims, and granting their request would undoubtedly exacerbate the situation.

*The Funds' Claims*

8.  The Funds are a typical creditor of these estates. They have, collectively, swap termination claims against LBSF, with guarantees from LBHI (the "Claims"). Their timely filed proofs of claim are in the amount of approximately $262 million.

9.  On April 18, 2011, the Debtors filed their One Hundred and Thirty-Second Omnibus Claims Objection, in which they objected to the Claims (the "Objections"), and on May 18, 2011, the Funds filed a response in opposition to the Objections (the "Response"), thereby initiating an active contested matter. The Debtors

4

unilaterally and repeatedly adjourned the Objections from hearing to hearing, and then adjourned it *sine die* on May 23, 2012.

***The Funds Have Cooperated with Lehman and Repeatedly Requested Formal Mediation, to No Avail***

10. There is, of course, more to the story than this brief procedural history, only a few parts of which need be noted here. First, LBSF and LBHI (together, "Lehman") informed the Funds that it was filing the Objections *precisely for the purpose of starting the formal mediation process*, which has never materialized in the more than 18 months since that time. Moreover, even prior to that time, Lehman had requested extensive information from the Funds, and the Funds had provided massive amounts of data covering many swap transactions in response. Lehman, on the other hand, did not provide a single shred of detailed information to the Funds. Based on the claims procedures in place, the Funds had every reason to expect during this process that the informal provision of information to Lehman would lead to a formal mediation with a fixed time limit, and that if an agreement could not be reached during that time, they would have their day in court. In reliance on this process, the Funds expended significant time, resources and funds to prepare the Response and provide Lehman with extensive amounts of information, yet over the past three years, the Funds' *repeated requests to engage in formal mediation* have gone unanswered.

11. All that has occurred is that the Debtors' existing discretion in the claims procedures has led to inappropriate costs for the Funds. On July 31, 2012, the Official Committee of Unsecured Creditors (the "Committee"), acting as estate representative, issued – in connection with a litigation over swap transactions with a third party – a third-party subpoena (the "Subpoena") to the Funds' investment manager,

5

seeking documents relating to a significant subset of the very swap transactions that are the subject of the Claims. Thus after extensive cooperation with Lehman in handing over documents (without reciprocation), and a promise to mediate that has gone unfulfilled for more than 18 months, the Funds are left with nothing but a one-way formal discovery request from the estate and this Motion, which seeks to eviscerate the one hope they had – a fair, fixed duration mediation process with incentives on both sides to settle – to fix their Claims and receive the distribution to which they are entitled.

12. At this point, Lehman is free to continue ignoring the Claims and the Funds' continued requests for formal mediation with impunity; the Funds' sole consolation is that once formal mediation is finally initiated, Lehman will be incentivized to promptly work in good faith toward settlement and, if such a resolution is not possible after a reasonable period of time, the Funds will be entitled to argue their Claims before this Court. However, if LBHI's request is granted, *even the prospect of formal mediation* will hold no promise of relief for the Funds (or any other creditors) by providing for a definitive timeline for resolution of their claims, but rather will simply leave them entirely at the mercy of Lehman's ability to delay indefinitely. There is simply no justification for imposing such prejudice on creditors because they legitimately disagree with the Debtors' view of the size of a claim.

## Argument

*Due Process and Basic Principles of Fairness Require Denial of LBHI's Motion*

13. Under the current order, the parties are required to mediate in good faith for a full four months. If, after such time, a compromise cannot be reached, it suggests that a settlement is unlikely, and further compelled mediation will delay – rather than expedite – resolution of the dispute. The only circuit-level case examining this

structure and dynamic has held that a mediation order of a complex civil case *must "set reasonable time limits on the duration of the mediation." In re Atlantic Pipe Corp.*, 304 F.3d 135, 145, 147-48 (1st Cir. 2002) (emphasis added). The court in *Atlantic Pipe* held that such time limits are necessary to avoid frustrating the mediation's main purpose of expediting the resolution of disputes, noting that "it is trite but often true that justice delayed is justice denied. An unsuccessful mediation will postpone the ultimate resolution of the case . . . and, thus, prolong the litigation." *In re Atlantic Pipe Corp.*, 304 F.3d 135, 147 (1st Cir. 2002); *see also In re Sosa*, 443 B.R. 263, 267 (Bankr. D.R.I. 2011) (approving a loss mitigation program that set "specific time frames" instead of impermissibly allowing the mediation process to "just drift").

14.     There is good reason for this: Compelled mediation unbounded by any reasonable time limits is inconsistent with claimants' Constitutional rights under the First Amendment, to petition the courts, and under the Fifth and Fourteenth Amendments, to access reasonably prompt adjudication of claims. Reinforcing this fundamental point is the fact that all of the authorities the Debtors' cited in their motion to implement the original claims procedures – each an order approved by this Court – contained a time limit on mediation. *See* Dkt. No. 7581 at 15.

15.     Compelling indefinite mediation where, as here, the Debtors already have leverage over claimants with respect to disputed claims, would be unduly coercive to the Funds and other disputed claim holders: Under the proposed amendment, the Debtors can simply say to a mediator that the estate is taking a good-faith bargaining position and expects the Funds (or any other creditor) to make the next move, and the mediation will be left open unless the creditor can convince the mediator that it should not have to, and will not, change its settlement offer. Because the passage of time

7

uniquely harms the claimant, who receives no distributions and whose litigation prospects deteriorate with every day that passes, as witnesses' memories and other evidence grow more stale, claimants will be forced to settle at almost any cost simply to avoid continued hemorrhaging of expected litigation value.

16.     Indeed, courts have consistently recognized the impropriety of forcing parties to mediate – or to continue to mediate – where settlement seems unlikely. *See, e.g., Meyer v. Alpine Lake Prop. Owners' Ass'n*, 2008 U.S. Dist. LEXIS 5692 (N.D. W. Va. Jan. 11, 2008); *see also Wells Fargo Bank Minn., N.A. v. Kobernick*, 2009 U.S. Dist. LEXIS 81703 (S.D. Tex. Aug. 26, 2009); *Lewis v. Sch. Dist. # 70*, 2009 U.S. Dist. LEXIS 28267 (S.D. Ill. Apr. 6, 2009).[1] Such "pressure tactics to coerce settlement simply are not permissible" even though "the law favors the voluntary settlement of civil suits." *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985); *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 382 (S.D.N.Y. 2011) (stating that "although a court may require parties to appear for a settlement conference, it may not coerce a party into making an offer to settle," and holding that a party may, in good-faith, enter mediation with the firm resolve that it will not settle). This type of coercion is effectively akin to a denial of the

---

[1]     *See also Res. Assocs. Grant Writing & Evaluation Servs., LLC v. Maberry*, 2009 U.S. Dist. LEXIS 45655 (D.N.M. Feb. 2, 2009) ("The Court will not order the parties to mediation if they do not believe mediation will do them any good."); *In re African-Am. Slave Descendants' Litig.*, 272 F. Supp. 2d 755, 760 (N.D. Ill. 2003) (declining to order mediation for unwilling participants); *Stockbridge-Munsee Cmty. v. Oneida Indian Nation of N.Y.*, 2003 U.S. Dist. LEXIS 12703 (N.D.N.Y July 24, 2003) ("The State's unwillingness to discuss settlement of the case suggests that forced mediation would likely be futile."); *cf. Nordyke v. King*, 676 F.3d 828, 829 (9th Cir. 2012) (Kozinsky, C.J., dissenting from an appeals court order compelling mediation for a period of 45 days) ("The parties have not asked for mediation; they have said nothing that suggests mediation would be fruitful; when asked about it in court, they displayed obvious distaste for the idea. *We overstep our authority by forcing the parties to spend time and money engaging in a mediation charade*. Our job is to decide the case, and do so promptly. This delay serves no useful purpose; it only makes us look foolish. I want no part of it." (emphasis added)); *Aranda v. Alcaraz*, 2011 U.S. Dist. LEXIS 85533 (N.D. Ill. Aug. 2, 2011) (granting mediation because mediation would *not* "delay resolution of the case"); *In re A.T. Reynolds & Sons, Inc.*, 452 B.R. 374, 383 (S.D.N.Y. 2011) ("But ultimately, mediation will only succeed if the parties themselves want it to, and a court's order to mediate—even in good faith—will not change the mind of party [sic] who believes that settlement is not in their [sic] best interest. Certain disputes are simply not amenable to mediation, and it should not be a surprise when attempts to mediate them quickly deteriorate.").

8

right to petition a federal court for redress. *See Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) (explaining that the First Amendment's "Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes"); *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) ("We have recognized this right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights . . . ." (citation and quotation marks omitted)); *see also Bounds v. Smith*, 430 U.S. 817, 828 (1977) (recognizing the "fundamental constitutional right to access the courts"). The point here is not that mediation is doomed to fail – but the Funds cannot be forced into a mediation structure that will keep them there even if the Funds believe they are at an impasse.

17. Even where claimants do not succumb to the pressure to settle on unfair terms, the ability of the Debtors to force them to remain in mediation indefinitely infringes upon their right to access prompt justice. *McCullaugh v. Krendick*, 2009 U.S. Dist. LEXIS 87849 (N.D. Ohio Sept. 9, 2009) (acknowledging a plaintiff's "right to an expeditious resolution"); *Bethesda Softworks LLC v. Interplay Entm't Corp.*, 2011 U.S. Dist. LEXIS 44397 (D. Md. Apr. 25, 2011) (explaining that "[i]ndefinite delay" and "disruption of deadlines" amount to prejudice). Certainly, in a complex Chapter 11 case, creditors are required to be patient while a plan is confirmed. But Lehman has now exercised that prerogative, and a fair, efficient, and speedy claims resolution process is the primary remaining task, albeit still a very large one.

18. Indeed, compelling indefinite mediation after four months of unsuccessful negotiations can be analogized to imposing an indefinite stay of litigation, which federal courts hold to be impermissible. *United States v. All Monies*, 107 F.R.D. 361, 366 (S.D.N.Y. 1985) ("A stay of such indefinite duration cannot be granted.")

9

(citing *McKnight v Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982) (holding that a stay will be reversed when found to be immoderate or of an indefinite duration)); *see also In re Anderson*, 349 B.R. 448, 459-60 (E.D. Va. 2006) ("Given the need to resolve the matter while the relevant events were still somewhat fresh in witnesses' minds, the bankruptcy court was well within its discretion to conclude that indefinite delay of the bankruptcy proceeding would substantially prejudice appellees. This is especially true, given that appellees, at that time, had already been seeking relief for approximately five years.").[2] Notably, under the claims procedures, which already impose a stay of claims litigation, the requested amendment would operate to make the stay indefinite.

19.     It is no remedy to have the procedures provide that the mediator has the ability to let a creditor out of the mediation. There is no standard for such a decision, no review, and, with all respect to the mediators, they are private parties chosen with no agreement or even input from creditors. Nor would it be sufficient to have the Court review mediators' decisions, as doing so would burden the parties participating in the mediations with the constant concern that confidential mediation discussions will end up in court, which would defeat the very confidentiality dynamic that makes mediation so successful. Mediations are confidential, not reviewed by the courts, and subject to reasonable time limits for good reason: it is these very factors that encourage the parties to engage in good faith efforts to settle. Open ended mediation would destroy the very

---

[2]     *See also Lasala v. Needham & Co.*, 399 F. Supp. 2d 421, 430 (S.D.N.Y. 2005) (suggesting that indefinite stays cause prejudice to litigants); *Karimona Invs. Llc v. Weinreb*, 2003 U.S. Dist. LEXIS 3324 (S.D.N.Y. Mar. 6, 2003) (denying motion to stay deposition) ("The record suggests that Weinreb is attempting to utilize a stay to gain a tactical advantage. . . . The harm to Plaintiff from an indefinite delay, and the prejudice to Plaintiff resulting from the one-sided discovery in this action, weighs heavily in Plaintiff's favor with respect to this factor."); *United States v. All Right, Title & Interest in Real Property & Bldgs. Known as 228 Blair Ave.*, 821 F. Supp. 893, 898 (S.D.N.Y. 1993) (refusing to grant stay because "any stay would be in place for a potentially lengthy period of time, indefinitely depriving claimants of their property").

10

procedure on which creditors such as the Funds have been patiently relying for years to give them hope that their claims would ultimately be efficiently and fairly resolved.

20. Indeed, the First Circuit rebuffed a contingent termination mechanism in *Atlantic Pipe*. There, the proponents of an unlimited mediation urged that "the district court did not need to articulate any limitations in its mediation order because the mediation process will remain under the district court's ultimate supervision" and "a dissatisfied party can easily return to the court at any time." *In re Atlantic Pipe Corp.*, 304 F.3d 135, 147 (1st Cir. 2002). The court held, however, that the litigation before the district court was "sufficiently complicated and the mediation efforts are likely to be sufficiently expensive" that a true time limit was required in order for the mediation order to be enforceable. *Id.*

### *LBHI's Proffered Reasons For Requesting The Amendment Are Unavailing*

21. The only justification LBHI offers for removing the 120 day time limit for unsuccessful formal mediations is a solution in search of a problem. LBHI asserts that there is some need to "induce claimants to participate in good faith mediation" of their disputed claims rather than simply "bid[ing] their time" until they can litigate them. Motion ¶ 13. But creditors with disputed claims have been waiting for over four years since the start of this case for distributions, and therefore have *every* incentive to mediate in good faith. Quite to the contrary, and as is axiomatically understood by bankruptcy practitioners and courts, it is the bankruptcy estates that benefit from delay tactics in claims litigation such as attempting to extend a mediation indefinitely. Accordingly, it is not the claimants (who stand to gain as a result of a successful mediation) but rather the Debtors that have an incentive to delay mediation indefinitely. This fact is amply demonstrated by the history of Lehman's dealing with the

Funds, *see* ¶¶ 8-12, *supra*, and explains why, by LBHI's own admission, it has only "commenced *a handful* of [formal mediations] under the [Mediation] Procedures" to date, even though such procedures have been in effect for more than two and a half years and, in the Funds' case, the estate has spent significant time evaluating the information provided to it. Motion ¶ 11.

22. Nor is there any merit to LBHI's only purported shred of evidence in support of its request. LBHI contends that the supposed results of a single mediation in the derivatives *payables* ADR program justifies the requested change to procedure here. First, LBHI's argument is premised on the conduct and results of *confidential* mediations, which is arguably inappropriate under existing court orders. Second, even if the "no-names basis" on which LBHI uses the information is permitted, creditors and this Court have absolutely no ability to examine and determine whether LBHI has cherry-picked results from those mediations to support its arguments here – certainly no further investigation or discovery would be allowed into the conduct of those mediations. Third, and most importantly, the examples on which LBHI relies were *payables* mediations, meaning that the counterparties had the money that *the Debtors were seeking*, and therefore – in contrast to mediation of claims *against* the Debtors – they had no incentive to delay. Moreover, even if the counterparties were to attempt dilatory tactics in payables mediations, the Debtors retain every right and ability to bring suit to exert its leverage. The present Motion involves precisely the opposite situation: the creditors cannot bring suit elsewhere, and the Debtors, who are holding the money (potential distributions), have the added leverage of the ability to delay.

23. Moreover, LBHI's attempt to portray the time limit as somehow binding the parties' hands, preventing them from reaching otherwise achievable

12

settlements and forcing them unwillingly into litigation, is without merit.  LBHI is simply wrong that "if a settlement is not concluded within 120 days, the parties <u>must</u> proceed to litigation."  Motion ¶ 15 (emphasis in original).  Indeed, in a footnote to that very statement, LBHI concedes that precisely the opposite is true, as the current Mediation Procedures "*permit[] the parties to extend the mediation* upon the agreement of all parties and the mediator."  Motion ¶ 15, n.2 (emphasis added).  Logic dictates that if the parties are making progress toward a settlement in a formal mediation, the creditors will have every incentive to agree to extend the negotiations so that they may receive amounts due to them as soon as possible and avoid costly and protracted litigation.  LBHI offers no explanation whatsoever for their alternative prediction that such agreements to extend negotiations "may not be realistic or practical."  Motion ¶ 15, n.2.

## **Relief Requested**

24.For all the foregoing reasons, the Funds request that the Court deny the Motion.

Dated:November 29, 2012

Respectfully submitted,

ROPES & GRAY LLP

Bys/D. Ross Martin
D. Ross Martin

Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
+1 617 951 7000

Attorneys for Objectors
FYI LTD., FFI FUND LTD.
AND OLIFANT FUND, LTD.