Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS, INC.,        CAUSE NO.

7    et al,                                 08-13555(JMP)

8            Debtors.

9    - - - - - - - - - - - - - - - - - - x

10   In re

11   LEHMAN BROTHERS, INC.,                 CAUSE NO.

12           Debtor.                        08-01420(JMP)(SIPA)

13   - - - - - - - - - - - - - - - - - - -x

14

15                    U.S. Bankruptcy Court

16                    One Bowling Green

17                    New York, New York

18

19                    November 14, 2012

20                    10:02 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  MATTHEW

Page 2

1   HEARING re Notice of Final Applications of Retained

2   Professionals for Final Allowance and Approval of

3   Compensation for Professional Services Rendered and

4   Reimbursement of Actual and Necessary Expenses Incurred from

5   September 15, 2008 to March 6, 2012 (ECF Nos. 31901)

6

7   HEARING re Plan Administrator's Cross-Motion to Compel

8   Giants Stadium LLC to comply with Rule 2004 Subpoenas and

9   Objection to Giants Stadium's Motion to Quash the Rule 2004

10  Subpoenas (ECF No. 31652)

11

12  HEARING re Motion to Quash a Subpoena filed by Bruce E.

13  Clark on behalf of Giants Stadium LLC (ECF No. 31339)

14

15  HEARING re Amended Motion of Giants Stadium LLC for Leave to

16  Conduct Discovery of the Debtors Pursuant to Federal Rule of

17  Bankruptcy Procedure 2004 (ECF No. 31105)

18

19  SIPA PROCEDURES

20  HEARING re Motion Pursuant to Federal Rule of Bankruptcy

21  Procedure 9019 for Entry of an Order Approving Settlement

22  Agreement Between the Trustee and Lehman Brothers Finance

23  AG, in Liquidation (a/k/a Lehman Brothers Finance SA, in

24  Liquidation)(LBI ECF No. 5362)

25

Page 3

1   HEARING re Trustee's Motion Pursuant to Section 105(a) of

2   the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b)

3   for Approval of General Creditor Claim (I) Objections

4   Procedures and (II) Settlement Procedures (LBI ECF No. 5392)

5

6   HEARING re Debtor's Three Hundred Fifty-Seventh Omnibus

7   Objection to Claims (Misclassified Claims (ECF No. 31048)

8

9   HEARING re Objection to Claim No. 17763 Filed by Laurel Cove

10  Development, LLC (ECF No. 29187)

11

12  HEARING re Three Hundred Twentieth Omnibus Objection to

13  Claims (No Liability Rose Ranch LLC Claims)(ECF No. 29292)

14

15  HEARING re Debtor's Three Hundred Twenty-Ninth Omnibus

16  Objection to Claims (Misclassified Claims)(ECF No. 29324)

17

18  HEARING re Motion for an Order Pursuant to Section 105(a) of

19  the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing

20  and Approving the Settlement with Lehman Brothers, Inc. (ECF

21  No. 43)

22

23  HEARING re Turnberry Centra Sub, LLC et al v Lehman Brothers

24  Holdings, Inc., et al (Adversary Case No. 09-01062)

25  Transcribed by:  Sheila Orms and Josh

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Lehman Brothers Holdings, Inc.

5          767 Fifth Avenue

6          New York, NY 10153

7

8    BY:   RICHARD W. SLACK, ESQ.

9          JACQUELINE MARCUS, ESQ.

10         KYLE ORTIZ, ESQ.

11         CANDACE ARTHUR, ESQ.

12

13   WEIL, GOTHAL & MANGES LLP

14         Attorneys for Lehman Brothers Holdings, Inc.

15         1395 Brickett Avenue

16         Suite 1200

17         Miami, FL  33131

18

19   BY:   EDWARD R. MCCARTHY, ESQ.

20

21

22

23

24

25

Page 5

1   PAUL WEISS RIPKIND WHARTON & GARRISON LLP

2        Attorneys for Houlihan Lokey Howard & Zukin Capital,

3           Inc.

4        1295 Avenue of the Americas

5        New York, NY  10019

6

7   BY:   ALAN W. KORNBERG, ESQ.

8         PHILLIP Q. WEINTRAUB, ESQ.

9

10  LATHAM & WATKINS LLP

11        Attorneys for Ernest & Young LLP

12        53rd at Third, 855 Third Avenue

13        New York, NY  10022

14

15  BY:   MICHAEL RIELA, ESQ.

16

17  CARMODY MACDONALD

18        Attorneys for Alvarez & Marsal

19        120 S. Central Avenue

20        Suite 1800

21        St. Louis, MO  63105-1705

22

23  BY:   GREGORY D. WILLARD, ESQ.

24

25

Page 6

1  HUGHES HUBBARD

2       Attorneys for SIPA Trustee

3       One Battery Park Plaza

4       New York, NY  10004-1482

5

6  BY:   JEFFREY S. MARGOLIN, ESQ.

7        JEFFREY M. GREILSHEIMER, ESQ.

8        MEAGHAN C. GRAGG, ESQ.

9

10  GODFREY KAHN S.C.

11       Attorneys for Fee Committee

12       One East Main Street

13       Suite 500

14       Madison, WI  54701

15

16  BY:   KATHERINE STADLER, ESQ.

17        RICHARD GITLIN, ESQ.

18

19  SULLIVAN & CROMWELL, LLP

20       Attorneys for Giants Stadium

21       125 Broad Street

22       New York, NY  10004

23

24  BY:   THOMAS JOHN WRIGHT, ESQ.

25        BRUCE E. CLARK, ESQ.

Page 7

1   STAGG, TERENZI, CONFUSIONE & WAHNIK, LLP

2         Attorneys for Laurel Cove Development

3         401 Franklin Avenue

4         Suite 300

5         Garden City, NY  11530

6

7   BY:   CARA M. GOLDSTEIN, ESQ.

8

9   DECHERT, LLP

10        Attorneys for ???

11        1095 Avenue of the Americas

12        New York, NY  10036

13

14  BY:   NICOLE B. HERTHER-SPIRO, ESQ.

15

16  GIBSON DUNN

17        Attorneys for Lehman Brothers Finance AO

18        2100 McKinney Avenue

19        Dallas, TX  75201-6912

20

21  BY:   ROBERT B. KRAKOW, ESQ.

22

23

24

25

Page 8

1    CLEARY GOTTLIEB STEEN & HAMILTON LLP

2         Attorneys for ???

3         One Liberty Plaza

4         New York, NY  10006

5

6    BY:   JOSH E. ANDERSON, ESQ.

7

8    MEISTER SEELIG & FEIN LLP

9         Attorneys for ???

10        2 Grand Central Tower

11        140 East 45h Street

12        19th Floor

13        New York, NY  10017

14

15   BY:   STEPHEN B. MEISTER, ESQ.

16

17   UNITED STATES DEPARTMENT OF JUSTICE

18        Attorney for the Office of the United States Trustee

19        76 Chapel Street, Suite 200

20        Albany, NY 12207

21

22   BY:  SUSAN GOLDEN, ESQ. (TELEPHONICALLY)

23

24   OTHERS PRESENT:

25   THERESA CARPENTER, BREGAL INVESTMENTS, INC.

1  TELEPHONIC APPEARANCES:

2

3  ANASTOLY BUSHLER, FARALLON CAPITAL MANAGEMENT

4  JEFFREY H. DAVIDSON, STUTMAN, TRIESTER & GLATT

5  NICK LANE, WITNESS, WEIL, GOTSHAL & MANGES LLP

6  TRISTA S. LYONS, PRO SE

7  MICHAEL NEUMEISTER, STUTMAN, TREISTER & GLATT

8  MITCHELL SOCKETT, KING STREET CAPITAL MANAGEMENT, LLC

9  KATHERINE A. TRADER, PAUL HASTINGS, LLP

10  JEFFREY H. DAVIDSON, STUTMAN, TREISTER & GLATT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

1                  P R O C E E D I N G S

2           THE COURT:  Be seated, please.  Good morning.

3           MS. MARCUS:  Good morning, Your Honor, Jacqueline

4    Marcus from Weil Gotshal and Manges on behalf of Lehman

5    Brothers Holdings, Inc. as plan administrator.

6           We're here this morning, Your Honor, for the fifty-

7    fifth omnibus hearing, as well as the rescheduled claims

8    hearing that had previously been scheduled for October 31.

9    We're glad that the courthouse has reopened, and that things

10   are starting to get back to normal.

11          The first item on the agenda, Your Honor, is the

12   fee hearing related to uncontested fee applications.  Mr.

13   Gitlin will be handling that on behalf of the fee committee.

14          THE COURT:  Fine.  Mr. Gitlin, good morning.

15          MR. GITLIN:  Good morning, Your Honor.  Richard

16   Gitlin, chairman of the fee committee.

17          Your Honor, I'm very pleased to report to the Court

18   that the fee committee has reached a consensual agreement

19   with 25 of the 47 professionals, which is outlined in the

20   report that we submitted to the Court.

21          I would like to comment on the professionals, both

22   their work and their activity in working with the fee

23   committee, Your Honor.  This has been an extraordinary

24   effort on behalf of the professionals and the Court to make

25   this happen in three years, as successfully as it has been

Page 11

1    done.

2           And the professionals are to be complimented for

3    that.  But they're also to be complimented for the civility

4    and attention they gave to the fee committee, as the fee

5    committee raised issues and issues that had to be resolved.

6    And I will say these 25 professionals in all acted in that

7    fashion, and they should be commended for that, Your Honor.

8           So I would respectfully request Your Honor to

9    approve the 25 uncontested professional final fee

10   applications.  I would mention that the remaining 22 are

11   scheduled for November 29th.  We are in conversation with

12   all them.  We do have some sticky issues, we're still

13   dealing with, but we are hopeful that we'll be able to come

14   before the Court on the 29th with similar consensual

15   agreements.  Thank you.

16          THE COURT:  Thank you, Mr. Gitlin, and I'm hopeful

17   that you're successful with the remaining 22 myself.

18          I'd like to make a couple of comments.  First of

19   all, all of the 25 applications that are the subject of the

20   committee's report are approved, with the adjustments

21   reflected in the schedule to your report.  I also wanted to

22   say I found the committee's report to be remarkably well

23   prepared, nuanced in its treatment of the issues that were

24   addressed by the committee, and a model of the kind of work

25   that fee committees or fee examiners as they're sometimes

Page 12

1    identified to be, can do in all significant cases.  It's a

2    superb precedent, and I commend you and your counsel in

3    preparing it.

4           Additionally, a true public service has been done

5    here by members of the committee in making the fee

6    application process in the largest bankruptcy case in

7    history one that even through today has been consensual and

8    without public controversy.  That is a particularly

9    remarkable accomplishment in consideration not only of the

10   size of the case, but the aggregate fee awards themselves.

11          Business publications including the Wall Street

12   Journal routinely have written about the burn rate in the

13   case and the aggregate fees in the case.  I think your

14   report very appropriately puts those expenses in context,

15   compliments the professionals for their good work, but also

16   compliments them for their flexibility and integrity in

17   dealing with the fee review process.

18          One of the more telling comments made in the report

19   is that the approximately $1.8 billion in approved

20   cumulative professional fees in the cases represents, and I

21   haven't done the math, but I accept what you said,

22   approximately three percent of distributions to unsecured

23   creditors.  In effect, the fees in this case represent on a

24   percentage basis a result that would be admirable in

25   virtually any bankruptcy case.

Page 13

1          Under the circumstances, I am not only pleased to

2    approve the 25 applications that are the subject of today's

3    hearing, but to compliment you and the other members of the

4    fee committee for doing truly extraordinary work that

5    benefitted the Court, benefitted the professionals, but also

6    served the public interest in demonstrating that the

7    professionals in the case were held accountable, but were

8    held accountable in a manner that was sensitive to the needs

9    of the case, and to the issues that have been identified in

10   your report, which I commend you on again.

11          MR. GITLIN:  Well, Your Honor, thank you very much

12   for your comments.  But I must say that the report is a

13   reflection of the quality of the work that counsel has

14   provided in this case.  Godfrey and Kahn has been the

15   machinery behind the ability to deal effectively with these

16   fees, and the draftsmen of that report.  So I must extend

17   your compliments more to them, Your Honor, but I very much

18   appreciate your comments, Your Honor.

19          THE COURT:  Anyone who had a hand in drafting the

20   report deserves praise.

21          MR. GITLIN:  Thank you, Your Honor.

22          THE COURT:  All right, fine.

23          MR. KORNBERG:  Your Honor, Alan Kornberg of Paul

24   Weiss Rifkin and Garrison for Houlihan Lokey.  We have one

25   technical issue with respect to Houlihan's final fee

Page 14

1    application, which is the subject of the fee examiner's

2    report.

3           Your Honor may recall that the deferred fees paid

4    to Houlihan are paid as and when distributions are made to

5    general unsecured creditors.  As we mentioned in our final

6    fee application, there need to be a procedure for payment of

7    those, and we have a form of order that we circulated, and I

8    believe is acceptable to the parties, that provides -- there

9    don't have to be further Court orders to approve those fees

10   when they're paid, as to when the distributions are made,

11   but there is a process by which Houlihan will send a fee

12   statement, the debtor, the U.S. Trustee, counsel for the

13   committee will have 30 days to verify that's correct.  If

14   there's a problem, we can talk about it.  If we can't

15   resolve it, we would then come back to the Court.

16          So we have a very simple form of order that

17   provides for that mechanism with respect to the deferred

18   fees.

19          THE COURT:  Okay.

20          MR. KORNBERG:  And I'd like to submit that to Your

21   Honor.

22          THE COURT:  That's fine.  Has that order been

23   reviewed by everyone who needs to see it and comment upon

24   it?

25          MR. KORNBERG:  It has been reviewed by folks in

1     your office.

2          MS. MARCUS:  That was my question.

3          MR. KORNBERG:  And the fee committee and the U.S.

4     Trustee, and I believe -- okay, so we'll show it to Malank

5     (ph) and then submit it, Your Honor.

6          THE COURT:  Okay, fine.  I just -- since you

7     mentioned the U.S. Trustee, I just would like to note

8     something on the record.  We received a telephone call this

9     morning from Andrea Schwartz, who would have been here

10    today, but apparently suffered an accident on the way to

11    work in the subway, and has been taken to the hospital.

12         We believe this is not serious, but she wanted us

13    to know that her absence should not be viewed as an

14    indication that the U.S. Trustee did not take very seriously

15    the matters that were before the Court with respect to

16    professional fees.  I understand that Susan Golden from her

17    office is participating by telephone, just in case --

18         MS. GOLDEN:  Good morning, Your Honor.  This is

19    Susan Golden, I literally just dialed in and heard the last

20    part of what you just said.

21         THE COURT:  You missed the best part of the

22    hearing.  I just wanted to note that the comments that I

23    made with respect to the fee committee certainly apply to

24    the role of the U.S. Trustee as a member of that committee.

25    And we hope that Andrea Schwartz has not been seriously hurt

Page 16

1   and will be back in court soon.

2         MS. GOLDEN:  To our knowledge, you know, she just

3   has a minor injury, but she'll be okay.

4         THE COURT:  Okay.

5         MS. GOLDEN:  Thank you for inquiring.

6         THE COURT:  All right.  And then as far as the

7   Houlihan Lokey order is concerned, which became an

8   opportunity for that digression, it will be entered as an

9   agreed order.

10         MR. KORNBERG:  Thank you, Your Honor.

11         MR. GITLIN:  Thank you, Your Honor.

12         THE COURT:  And everyone who wishes to be excused

13   in connection with the fee issues that were just presented

14   may do so.

15         (Pause)

16         MS. MARCUS:  Your Honor, the first group of

17   contested matters on the agenda relates to the plan

18   administrator's disputes with Giants Stadium.  My partner,

19   Richard Slack will be handling those matters.

20         THE COURT:  Okay.  Let's wait for other counsel to

21   assemble.

22         MR. SLACK:  Thank you, Your Honor.

23         THE COURT:  Good morning.  Before we get into the

24   argument with respect to this discovery dispute, I'll take

25   appearances, and I'm also going to ask some questions that I

Page 17

1    would like you to focus on in your presentation.

2           MR. SLACK:  Okay.  So, Your Honor, Richard Slack

3    from Weil Gotshal on behalf of the plan administrator and

4    Lehman.

5           MR. CLARK:  Good morning, Your Honor, Bruce Clark

6    from Sullivan and Cromwell for Giants Stadium.  With me is

7    my colleague Thomas Wright.

8           MR. WRIGHT:  Good morning, Your Honor.

9           THE COURT:  Good morning.  Okay.  It's my

10   recollection and the recollection has been reinforced by

11   reviewing the papers that we last had a discovery argument

12   in connection with 2004 discovery in September of last year,

13   approximately 14 months ago.

14          The papers that I have read provide different

15   perspectives of what has occurred over the last 14 months.

16   But to me one of the revelations is that the claim

17   originally held by Giants Stadium is now held by an entity

18   affiliated with Baupost called Goal Line, and that an

19   intermediate transferee was Bank of America.

20          To me this is a result of -- as a result of this

21   revelation to me this becomes one of the first examples

22   presented to me in this case, although I'm sure there are

23   many others that are invisible to me, of the phenomenon

24   discussed by scholars as the so-called empty creditor.

25          The creditor that appears to have real party in

1    interest status in a bankruptcy case, but who has actually

2    divested itself of all or substantially all of the economics

3    associated with that creditor interest, and it may have

4    other disguised interests that impact that creditor's

5    motivation within the bankruptcy case.

6        Henry (indiscernible) a professor of law at the

7    University of Texas, who for a time had a senior position

8    with the SEC has written extensively on this subject.  And I

9    am personally not only familiar with it, but interested in

10   it.  I bring this up because one of my real concerns here is

11   that the papers disclose apparently heroic good faith

12   efforts to settle disputes between Giants Stadium on the one

13   hand, and Lehman on the other, but uncharacteristically this

14   is one of the few cases presented to me at least on the

15   current docket, I don't know what next year will bring, in

16   which parties that have sincerely attempted to resolve their

17   differences have failed in those efforts.

18       As I understand it, a mediator who is one of the

19   mediators quite skilled in dealing with derivative disputes

20   in the Lehman case participated in at least a one day

21   mediation session, and that that session ended with no

22   agreement, and that thereafter at some point, the parties

23   endeavored to try to restart discussions.  And the current

24   flap, if I can call it that, with respect to discovery is a

25   manifestation of the ongoing antagonism between the parties.

Page 19

1    To me, at least, the discovery dispute represents deflected

2    antagonism and is subtext for what is really the ongoing

3    unresolved business issues among the parties.

4            I will note the obvious, this Court and every other

5    Court in the nation despises discovery disputes that cannot

6    be rationally resolved by experienced counsel, and here we

7    have experienced and skilled counsel on both sides.  The

8    papers are voluminous and include declarations, references

9    to the transcript from September of last year, and involve a

10   level of effort that to me seems disproportionate to the

11   issues that are in dispute.

12           And so I have the following questions.  First, what

13   is the explanation for the increase in the purported claim

14   amount from $301 million to $585 million?  How did that

15   happen, what's the justification for it, and has that been

16   the subject of negotiations between the parties?

17           Secondly, who is Lehman negotiating with when it

18   negotiates?  Are you negotiating with counsel for Giants

19   Stadium or counsel for Goal Line?

20           Third, why is historical counsel for Giants Stadium

21   still here purporting to act on behalf of an historical

22   creditor when, in fact, the real economics in whole or in

23   part, are elsewhere?  To what extent does this represent

24   independent judgment of Sullivan and Cromwell's client and

25   to what extent does it represent Sullivan and Cromwell, and

Page 20

1    I hate to use the term, as a puppet for other parties that

2    are driving this bus?

3         Those are my questions, and I want them answered

4    before we get into the merits of the discovery dispute,

5    which as I said, appears to me to be largely a strategyn

6    chosen by both sides to get into court.  I don't view it as

7    a real dispute.  I know you do, and you're going to have to

8    justify to me why this isn't one of the biggest wastes of

9    time since this case began.

10        MR. SLACK:  So, Your Honor, starting right with the

11   questions that you've asked.  I think it's fair to say that

12   the debtor that Lehman thinks that the claim amount that was

13   essentially doubled was done purely for negotiating

14   purposes.  In other words, only after this Court back in

15   September sent us back to mediate or essentially to try to

16   resolve it, the claim essentially doubled.

17        We haven't had a stitch of discovery on who made

18   that decision, why it was doubled, what the justification

19   is.  Obviously, they gave us a piece of paper, but unlike

20   the original 301 million, we haven't had any discovery

21   whatsoever under 2004 about that.

22        In terms of whether those matters were the subject

23   of negotiation, let me put it this way.  Obviously the

24   parties had discussion over the amount of the claim, and

25   there was discussion about the amounts of the claim.  I

Page 21

```
 1    don't think it's fair to say, however, that the debtor has
 2    insight as to why it was done, what's the timing of it, what
 3    the basis of it is.  We haven't had insight into any of
 4    that.
 5              THE COURT:  Well, let me just ask you a question,
 6    and I don't want to know anything about the substance of the
 7    negotiations that took place between the parties.  But isn't
 8    the first question that somebody sitting down to the
 9    negotiating table would ask given this fact pattern, how on
10    earth can you justify an increase from $301 million to $585
11    million, what's that about?  Isn't that the first question?
12    Perhaps not expressed in that way, but I think there would
13    be an element of huge exasperation built in the question.
14              MR. SLACK:  There is that exasperation, and I'm
15    sure those were the subject of discussions, and again, there
16    was a piece of paper that's filed.  There is an amended
17    claim that was filed.  So, I mean, to the extent that
18    there's an amended claim, we could look at it and say here's
19    what's in it.  But in terms of why it was done, who made
20    that decision, why didn't their original financial advisor,
21    Goldman, reach that amount, you know, two and a half years
22    earlier.
23              Again, we haven't had any kind of insight into any
24    of those kinds of questions, and those have not been
25    answered.  And, of course, that's one of the reasons that we
```

Page 22

1    wanted to continue the investigation.  So that's, I think,

2    at least from our perspective, you may get another

3    perspective the answer to number one.

4            In terms of number two, at some point we were

5    informed once Baupost, Goal Line acquired the interest that

6    Sullivan and Cromwell was going to jointly represent Giants

7    Stadium and Goal Line.  And so there have been

8    representatives, you know, Sullivan and Cromwell's been

9    involved, Baupost has been involved, and representatives

10   from Giants Stadium have been involved in the negotiations

11   throughout this period.

12           Now, that's not to say that every conversation

13   included representatives of all, but all parties at some

14   level have been involved in negotiations over the past year.

15           And I think that's -- I think that that somewhat

16   answers at least what we know about question three, which is

17   why is Sullivan and Cromwell still representing Giants.  My

18   understanding again is that they're jointly representing

19   Giants and Baupost and Goal Line in connection with this.

20           What I can say is again, we haven't had any

21   discovery into that sale.  We haven't seen the actual

22   transfer papers between Baupost, and I guess it's Bank of

23   America.  We did see the original papers between Giants and

24   Bank of America.  That's one of the things we asked for

25   again in our two thousand and --

1          THE COURT:  Why is that even relevant at this

2     point?

3          MR. SLACK:  The only thing that potentially is

4     relevant is exactly I think the questions that you're

5     asking.  We need to understand when we're talking to

6     somebody, for example, who is the interest.  Who should we

7     be talking to Baupost or not.  And that was part of it.

8          The other thing is, Baupost and Giants Stadium were

9     on opposite sides of that deal.  I think we were entitled to

10    see what was disclosed during those negotiations, and we've

11    asked to see that.  And we -- they're not privileged, and we

12    should have access to it.

13         THE COURT:  Well, whether you should or should not

14    have access to it, I'm just going to make the general

15    observation that ordinarily when claims are transferred and

16    the Lehman case has been one of the largest unregulated

17    trading markets and distressed claims in the world during

18    the past four years.  There's a routine that I'm familiar

19    with not from being a Judge, but having been a practitioner,

20    and you're not likely to find very much of value in the back

21    and forth relating to that claim tread, at least as it

22    relates to the value for purposes of any objection you might

23    file.

24         These are trades between so-called big boys, and

25    everybody makes their own judgments as to the likelihood of

1    success in future litigation with regard to the claim.  You

2    may or may not be ultimately entitled to obtain that

3    information, but even if you do, in my view, it's a big so

4    what.

5             MR. SLACK:  Might be.  Look, you know, what you're

6    saying obviously from experience makes sense.  What I would

7    say, Your Honor, is that this is a little bit unlike other

8    claims, in that it's obviously a very large one.  It's

9    obviously unliquidated.  It's obviously the main issues that

10   somebody looking to buy it are going to be asking themselves

11   are, at the end of the day, is it a receivable or is it a

12   payable, and if so, how much.

13            So I think, you know, it's a little bit different

14   than, you know, a claims market with liquidated claims.

15   But, you know, that's just the tiniest piece of what, you

16   know, we were seeking in our 2004.

17            So, Your Honor, would you like to hear the answers

18   to those questions from counsel, or would you like me to go

19   ahead with my argument?  I mean --

20            THE COURT:  I'd like to hear what counsel for

21   Giants Stadium has to say about the big picture questions

22   that I raised.  And one of the reasons why I'm focused on

23   this is that I am concerned about more than the discovery

24   dispute that has been presented to me, I'm frankly concerned

25   as to why we're having the dispute at all, and why this

1    claim is different from other claims, so many of which have

2    already found their way into formal claims objections.

3              And I'm interested in that question, but before

4    getting to it, Mr. Slack, I'd like to hear comments from --

5              MR. SLACK:  Okay.

6              THE COURT:  -- counsel for Giants Stadium as to

7    some of the preliminary questions that I asked.

8              MR. SLACK:  Sure.

9              MR. CLARK:  Thank you, Your Honor.  Again, Bruce

10   Clark for Giants Stadium.

11             Trying to take your questions in order, as to the

12   increase in the amount of the claim, when the claim was

13   originally filed, it was filed with five, I believe there

14   were five caveats as to items that have yet to be

15   quantified.  And when the claim was revised at least two of

16   those items were the cause of the increase from 301 to 585

17   million.

18             One of them reflects the amount of a capital

19   charge, which the person stepping into the shoes of Lehman,

20   in our view, would've had to incur, in order to protect

21   themselves by way of reserves against the likelihood of a

22   further default.  And the other was a difference in the

23   credit charge.  That difference came about because the

24   original deal with Lehman involved raps by insurance

25   companies, either Figik (ph) or FSA, both of whom at the

Page 26

1    time of the transaction reviewed were rated as AAA credits

2    in the market.  And at the time of the putting out of the

3    proof of claim, the amended proof of claim, we quantified an

4    additional amount because those protections were gone.  And

5    the amount that one would have to pay to get the equivalent

6    protection was greatly increased.

7            And I am not, I've got to say, I'm not trying to

8    duck this, but I am not the person who has studied this in

9    the last month and really can give you a better answer.  But

10   that's my understanding of the two principal reasons that

11   the amount was increased between the first claim and the

12   second claim.

13           THE COURT:  Okay.

14           MR. CLARK:  As to --

15           THE COURT:  Has that information which you just

16   shared with me previously been shared with Lehman when --

17           MR. CLARK:  Yes.

18           THE COURT:  Okay.

19           MR. CLARK:  I mean, as Mr. Slack said, it's in the

20   -- a description of that much is in the amended proof of

21   claim, and neither Weil nor we particularly want to go --

22   and should go into the specifics of the conversations.  But

23   the conversations during the settlement talks centered on

24   this and a lot of other points.

25           I don't know if the question you asked why did you

Page 27

1    increase the 301 to 585 was the first question that came up.

2    But it certainly was a question that was explored.

3                THE COURT:  Assumingly if I were on the receiving

4    end of a claim like that, even if we were talking about

5    hundreds of dollars instead of millions of dollars, the

6    first question I would ask, how on earth could you be

7    claiming that much more.

8                MR. CLARK:  I think --

9                THE COURT:  How did this claim double?

10               MR. CLARK:  I think you're being more courteous

11   than the words I heard when the question was asked.

12               THE COURT:  Okay.  Well then --

13               MR. CLARK:  And clearly that was asked.

14               THE COURT:  Well, I'm in court so I have to be

15   courteous.

16               MR. CLARK:  Right.  But that -- I mean, my best

17   recollection is that was discussed.  As Mr. Slack said, a

18   lot of the conversations in these settlement talks took

19   place with different people from the interested parties at

20   different times, and neither of us was party to all of them

21   by any means.

22               THE COURT:  Okay.

23               MR. CLARK:  I'd be astonished if that was not

24   talked at length.

25               Second, who was Lehman negotiating with, I agree

Page 28

```
 1   with what Mr. Slack said.  I think I just said the same

 2   thing, but they were negotiating with people from Sullivan

 3   and Cromwell.  We are representing both Baupost and Giants

 4   Stadium.  They were all negotiating with people from Baupost

 5   at the same time, and Giants Stadium people as well.  And

 6   there were a variety of people on the Lehman side.  I mean,

 7   there must have been 20 that I met at one time or another.

 8            So it was a very active negotiation or series of

 9   negotiations over that time period.

10            THE COURT:  One of my fundamental questions is

11   whether Giants Stadium has continuing economic interest in

12   this claim or is a so-called empty creditor.  Is it an empty

13   creditor?

14            MR. CLARK:  No, it's not.  The reason it's not is

15   because the sale papers between Giants Stadium and Bank of

16   America which the debtors do have, and which they did ask

17   questions about in the deposition, make it clear that Giants

18   Stadium has a contingent interest in the result of the

19   negotiation or resolution of the claim.  It depends on how

20   much is paid or how much is not paid.  They do have a

21   material interest one way or another.

22            THE COURT:  So as a kicker?

23            MR. CLARK:  It's either a kicker or a pay back or a

24   clawback, one or the other.

25            THE COURT:  Okay.
```

```
 1              MR. CLARK:  Okay.  As to the question that came up

 2      about the sale between Bank of America and Baupost, my

 3      information on that is that Giants Stadium was not involved

 4      in that.  That was a transaction between Bank of America and

 5      Baupost.  They negotiated it.  And I don't believe we have

 6      anything certainly anything material to either produce or to

 7      disclose about it.  That is not a transaction that to my

 8      knowledge, I just heard Mr. Slack say, they have information

 9      about, but neither do we.

10              THE COURT:  All right.

11              MR. CLARK:  Have I addressed the preliminary

12      questions?  I thought I took the list down right.

13              THE COURT:  I think you have, although Mr. Slack

14      seems to want to interject at this point.  Do you want to

15      proceed with your main argument?

16              MR. SLACK:  Yeah, please, thank you, Your Honor.

17              THE COURT:  And understand there is this other

18      question which in effect wraps all the other questions.  Why

19      are we here with a discovery dispute as to a claim, that's

20      whether it's $301 million claim or a $585 million claim

21      appears at least in the Court's view to be more or less

22      indistinguishable from any number of other derivative type

23      claims in this bankruptcy case, and in effect, is a righted

24      question, are you gentlemen both serious about this dispute?

25              So much has gone into a 2004 examination request
```

Page 30

1    and resisting that request and efforts to make it

2    reciprocal, that it raises more questions in the Court's

3    mind than it answers as to what's going on here.  Now, I

4    want to know what's going on here.

5            MR. SLACK:  Well, Your Honor, as I think you know

6    from the docket, the debtor has taken 2004 discovery with

7    respect to, you know, hundreds of counterparty, derivative

8    counterparties and we haven't had these issues.  I mean, if

9    you think about the number of years that I've been before

10   you on matters, if we've had a couple of discovery disputes,

11   that's a lot.

12           And so I think we have a record frankly of these

13   kinds of situations, and this just hasn't gone the way of

14   the other ones.  Because we have frankly been obstructed,

15   and we have a -- you know, we had a situation a year ago,

16   and that -- what happened a year ago in September is we had

17   another discovery dispute, and unfortunately, we had -- you

18   know, we listened to the Court tell us that frankly you

19   didn't like that discovery dispute.

20           THE COURT:  I'll be very consistent.  I'm not

21   likely to like any discovery dispute that you present to me.

22           MR. SLACK:  But what happened in that hearing is

23   important for today.  What happened in that hearing which

24   concerned a motion to compel Giants Stadium with respect to

25   privilege is Giants Stadium said, Your Honor, they won't

Page 31

```
 1    talk to us about the merits.  They won't sit down with us

 2    and talk.  And I said, Your Honor, I was concerned.  And my

 3    concern was, we were in the middle of an investigation that

 4    we had not finished, and we needed a little more time to get

 5    it done, as long as we had cooperation.

 6         And I said I didn't want a gotcha.  I didn't want

 7    to sit down in negotiations, talk about our preliminary

 8    views of the merits, and then have, and be faced with the

 9    argument that Giants Stadium says, well, obviously you know

10    the merits, you've had discussions with us on the merits,

11    you don't need anymore 2004 discovery.  And I sought a

12    commitment from Giants that we wouldn't be faced with that

13    argument.

14         And the Court responded as follows, says, "You

15    don't even need that commitment because I'm going to give

16    you a gotcha from the bench, a no gotcha.  If you choose to

17    have a conversation that could lead to some kind of

18    productive business-like resolution to this, doing that will

19    not constitute a waiver of any of your discovery rights or

20    your rights to continue with your investigation as you see

21    fit."

22         Now, I'd point out that at that time when the Court

23    gave us the assurance that, yes, we could enter into the

24    negotiations, so to speak, talk about the merits even though

25    we hadn't finished, that we weren't going to be faced with
```

Page 32

1   exactly the argument we're being faced with today.  Giants

2   Stadium stayed silent.  They didn't raise their hand and

3   say, Your Honor, you can't do that, they're not entitled to

4   any discovery.  They didn't say any of that.  They stayed

5   silent.

6        THE COURT:  Well, I understand what happened.  I

7   actually remember it and my memory was further refreshed by

8   looking at the transcript.  And I know that there's a point

9   that you've emphasized in your papers, and you're

10  emphasizing it again now.

11       But it's 14 months later.  You've had some further

12  discovery, and you've had further business discussions, and

13  you've had a mediation session.  Without going into the

14  substance of what was discussed in the various sessions, it

15  appears to me at least, that inevitably there has been a

16  sharing of information in positions by the parties, or there

17  could not have been open and good faith negotiations.

18       So today, almost Thanksgiving 2012, you must know

19  much more about the claims and the defenses to those claims

20  than you knew 14 months ago.  It just seems to me impossible

21  that you are in effectively the same position today that you

22  were then.

23       So that's one concern I have relative to your

24  position.  Another that I have is that Giants Stadium argues

25  in effect without using this hackneyed expression, what's

Page 33

1    sauce for the goose is sauce for the gander.  If there's

2    going to be discovery at this stage of the game, it should

3    be reciprocal.  We shouldn't just be turning over 64,000

4    pages if that's the right number of discovery only to be

5    asked for more.  When does this "investigation" come to an

6    end?  Is it serious?  Is it real?  And why are you not

7    simply doing what you've done in other settings, file an

8    objection?  We'll have a contested matter, we'll have

9    reciprocal discovery, and the 2004 discovery that we're

10   arguing about is rendered moot.

11          MR. SLACK:  Well, there's a couple of pieces that I

12   want to answer first.  We haven't had any other discovery in

13   the last year.  Since that hearing, there has been no

14   discovery.  Now, there has been discussions, but I can tell

15   you that we have not had a stitch of additional discovery or

16   information in our investigation.

17          Our investigation has been frozen by both agreement

18   and by the Court effectively during that 14 months.  And --

19          THE COURT:  Let me interject and say that when --

20   you're using the term discovery, I think you're using it as

21   a term of art.  When I use the term discovery, I think I

22   have a broader sense of the term in mind.

23          Necessarily, you must be learning more than you

24   knew before simply by virtue of participating in

25   discussions, information is being shared.  Otherwise, you're

Page 34

1      not having good faith negotiations.  Is it just pointless

2      posturing, or is there in fact some meaningful exchange of

3      information?

4              MR. SLACK:  I don't believe that -- and I'm not

5      going to try to, you know, parse through, but I can tell you

6      this.  I think the parties have had a number of intense

7      discussions on position.  I don't believe there's been a

8      further exchange of what I would call information,

9      underlying information about the matters that we want to

10     investigate.

11              And so, yes, there have been a number of exchanges

12     of position.  I don't want to -- I don't think it's

13     appropriate to go into that, but there hasn't been -- you

14     know, there hasn't been a sharing of additional information.

15     Effectively the investigation froze, and we said we would

16     have discussions with them on the merits based on what we

17     knew.  And I have to tell Your Honor, what happened here is

18     exactly what I was worried would happen.  And that is, we

19     would engage in good faith discussions on the merits, and

20     then be faced with an argument that said, okay, now you

21     can't have 2004 discovery to finish your investigation.

22              And I -- and that's compounded, Your Honor, because

23     not only did we get the Court's assurances, but Giants

24     Stadium actually made an agreement with us.  In other words,

25     you know, Baupost and Giants Stadium when they were

Page 35

1    negotiating with us after the failed mediation we wanted to

2    continue our investigation then.  And they said, if you

3    engage in these principal to principal negotiations at that

4    point, we're not going to hold it against you.  We actually

5    had a written agreement.  It's Exhibit H to the Firestone

6    declaration.

7           And the agreement was, it says, Lehman's

8    "willingness to enter into settlement discussions does not

9    constitute any waiver of our rights and is without prejudice

10   to our ability to complete our investigation under

11   Bankruptcy Rule 2004."

12          I'm really at a loss, Your Honor, to understand how

13   the position that they're taking today isn't a direct breach

14   of that agreement, and frankly, the assurances that we

15   received from the Court should allow us to continue our

16   investigation as we see fit, because it hasn't continued at

17   all since then.

18          And, you know, and the question of when it's going

19   to end, if we had three to four months of cooperation from

20   Giants Stadium and the third parties, I think we would get -

21   - you know, we would get there.  We haven't had that

22   cooperation, and it -- you know, all I can tell you is that

23   there are areas that we've laid out in our papers, and I'm

24   happy to go through, but there are areas that we still need,

25   you know, to investigate.  We said we wanted to investigate

Page 36

1    them back in September of 2011, and we wanted to complete it

2    then.  But it was based on the assurances from the Court,

3    based on the agreement from Giants Stadium that we actually

4    went forward with the discussions.

5              THE COURT:  Mr. Slack, let's circle back and

6    revisit particularly assurances from the Court that I recall

7    giving.  I'm not breaching any commitment made to you.  The

8    commitment related to a term that doesn't have legal

9    significance.  It's gotcha.  The idea was that participating

10   in settlement discussions would not be cause for you to end

11   up with forfeited rights of discovery.

12             I can say that for myself I never expected to be

13   talking about this with you more than a year later.  And one

14   of the things that to me appears to be a changed

15   circumstance, and we can discuss whether it changes any

16   outcomes, is that at least from the perspective of Giants

17   Stadium, there is the protection that this 2004

18   investigation is more tactical than real, and that you

19   really have at a business level already determined that

20   you're objecting to the claim.  So that you don't need the

21   further investigation to make a judgment as to whether this

22   is a claim you're going to say yes to.  You already know

23   you're saying no to it.

24             Given that setting, I think things may have

25   changed.

1          MR. SLACK:  Well, I have to tell you I don't think

2     they've changed one bit, and I don't agree with that at all.

3     And I -- I'm usually not so blunt with this Court, and I've

4     appeared many times in front of it.

5          THE COURT:  Well then you're getting used to it.

6          MR. SLACK:  The fact is, is that we have exactly

7     the same information that we had back when we started in

8     September of 2011.  And what I was worried about was

9     somebody taking exactly the tact that Giants Stadium said,

10    and frankly that Your Honor just took, which is that if we

11    -- you know, obviously our discussions on the merits had to

12    include discussing preliminary views.  And what I was

13    worried about is if we had discussions and we talked about

14    those views based on a partial investigation that someone

15    would say there's changed circumstances.

16         And the truth is, Your Honor, that's a gotcha,

17    because what we should've said is, Your Honor, then we'll

18    finish our investigation and then we'll talk.  Because there

19    are still critical areas that we haven't had the slightest

20    stich of information because we talked for example, we

21    didn't take any information from the NFL.

22         Now, we have a subpoena outstanding to the NFL,

23    that's been frozen as well per agreement, and they've agreed

24    to produce documents now.  There's Goldman Sachs.  Goldman

25    Sachs did all of this work on the valuation, and again

Page 38

1   that's been frozen while we've been in discussions.  There's

2   insurers.  The insurers here which insured the underlying

3   option rate securities, they had certain consent rights, and

4   they were actually -- there are e-mails and communications

5   with them, significant ones during the time frame of the

6   termination.  And again, we have a subpoena outstanding with

7   respect to that, and it's waiting this.

8           We haven't taken any discovery with respect to, and

9   as I mentioned before, the amended claim as to exactly when

10  that was made, and what the basis of that is.  And there are

11  serious issues with respect to one whether that claim should

12  be allowed to be amended at all, and then what it is.

13          So there are significant issues.  And again what

14  I'm concerned about here is that nothing has changed from

15  September of 2011 except that we engaged in real and

16  hopefully good faith discussions, where we did discuss our

17  preliminary views of the merits.  And based on those

18  preliminary views, and that's the only thing that's

19  happening, that's the only thing that's different, and

20  that's the only thing that's changed.  We are now faced with

21  we're not allowed to finish our investigation.

22          And I can tell you this, this is not tactical.

23  This is not tactical.  This is real.  We need the

24  information, and this is information we sought and wanted in

25  September of 2011 before the discussions.  It's not like it

1    was, you know, heaped on now.  They knew we wanted this

2    information.  It's not tactical.  And other parties have

3    allowed us to take this kind of 2004, and we haven't had the

4    disputes.  They've cooperated, it's gone quickly.  And this

5    would go quickly if we had cooperation from Giants Stadium

6    and the third parties.

7         With respect to the -- you know, Giants Stadium's

8    motion to take 2004 --

9         THE COURT:  Before we get to that, let me ask you

10   one more question.  In what respect, if at all, would Lehman

11   be prejudiced if you simply objected to the claim now, based

12   upon what you know, and proceeded to take discovery in a

13   contested matter, everything presumably that would be the

14   subject of the 2004 request would simply be the subject of

15   ordinary course discovery in that contested matter?

16        MR. SLACK:  What I can tell you is there has not

17   yet been a determination, that's one of the reasons that

18   this is a very complex, and I can tell you this, Your Honor,

19   honestly, that there has not yet been a determination by the

20   estate whether we are going to press that this is a

21   receivable to the estate or a payable.

22        There are very interesting issues.  I'm happy to go

23   into what they are.  But in that sense, this is very unlike

24   most of the claims, because in many of the claims, and in

25   many of the swap cases, we know it's either going to be a

Page 40

1    receivable and a payable.  And because of some of the issues

2    here, which are very complex, the estate has not yet made a

3    determination whether to press this as a receivable, and

4    actually bring this as an affirmative claim, or whether

5    simply to treat it as an objection to a claim.  And if we

6    object to the claim, again, what I can tell you honestly is

7    why we have preliminary views, there has been no

8    determination yet as a final matter, as what grounds we are

9    going to take, because again, there are many different

10   layers of this onion.

11           And I would say the following, Your Honor.  It may

12   be that somebody comes in and files a claim, and you've

13   probably seen this in your career.  They file an outrageous

14   claim, you know, they've got something that's $10 billion

15   they put in a claim.  Well, it may very well be that the

16   debtor knows it's not going to pay $10 billion, and it's

17   going to quote object to the claim.

18           I don't believe that cuts off 2004 discovery to

19   figure out and understand the bases for that claim, and to

20   figure out the bases for the objection.  And so whether or

21   not the estate -- you know, I can tell you this, the 600

22   million that they've put in their amended proof of claim is

23   more than the face amount of the underlying notes that were

24   being hedged.

25           So essentially they're taking the position that

Page 41

1    they deserve in unwinding the hedge more than the underlying

2    face amount of the notes.  Now, I can tell Your Honor that

3    sounds to me facially unreasonable.  But that doesn't mean

4    that just because somebody files this wild claim and you're

5    going to say, hey, I know I'm not agreeing to 10 billion, it

6    doesn't mean you can't go and take 2004 discovery.

7            And the analogy on the other side, Your Honor, I

8    think is striking.  What 2004 allows you to do when you're

9    filing an affirmative claim is to understand the bases for

10   it.  It's not just enough to say, hey, I think at the end of

11   the day I'm going to file, you're allowed to go and

12   investigate, so you know the bases of your claim, so you

13   could actually bring a Rule 11 type claim on the affirmative

14   side.  Well, it works the same way on the claims side.

15           So I don't think the question here is are we likely

16   to object to, you know, the 600 million in claims.  I think

17   there's a really serious issue here as to whether this is a

18   receivable and a payable, and if so, what are the bases, and

19   I can tell Your Honor, there is no definitive view on that.

20   And we need to investigate in order to figure out whether

21   we're going to bring this as an adversary proceeding or

22   we're just going to object to the claim.

23           THE COURT:  Okay.

24           MR. SLACK:  I'm happy to talk about now the 2004

25   discovery.  I think I can be a little briefer.  Obviously I

1   was asking some questions from the Court, and do this all at

2   once rather than --

3          THE COURT:  I'm treating this as one matter because

4   it has multiple parts.

5          MR. SLACK:  Let me then speak to the Giant's motion

6   to take 2004.

7          So what the Giants has essentially done has said,

8   because we, the debtor, want to take more discovery, they'd

9   like to take some discovery.  And the difference, of course,

10  is once they've filed the claim, the debtor here can make

11  two decisions.  We could say, we agree with some or all of

12  that claim, and if we do that, much of the discovery that

13  they're going to seek could very well be premature and

14  frankly ultimately useless.

15         And so what makes sense here is to let us finish

16  our investigation, figure out are we bringing this as an

17  adversary proceeding, are we going to object to the claim,

18  and if so, on what bases.  And then that will actually shape

19  the kind of discovery that ultimately if we're going to

20  object to it, that Giants Stadium will be able to get.  If

21  you allow it now, you have a potentially wasteful and

22  unnecessary set of discovery that's unneeded.

23         Second, Giants Stadium is really unable to swear,

24  it never tries.  Its own argument that it makes in

25  opposition to our 2004 with their request to take it, and of

1   course, we're in different situations.  They actually cite a

2   case, GHR Energy Corp for the proposition that a party may

3   not use 2004 after it has determined to pursue a claim.

4   And, of course, it has filed claims.  And what's -- they

5   never try to square these positions.  They never try to

6   square the idea that they are in a situation, because of

7   course, they do have all the information.  They never try to

8   square the

9   -- you know, that they have filed the claim, its detail.

10          And so under their own case law and authority,

11   they're simply not entitled to get any at this point.

12          Third, even if it wasn't, you know, facially

13   deficient, their request for 2004, as a matter of, you know,

14   policy, this Court shouldn't allow it.  And that's because

15   there is a claims process when people file claims.  And this

16   happens, I assume, you see it much more than I do, is people

17   file claims, and yes, debtors take 2004 discovery.  And at

18   some point, debtors will object to those claims or not.  And

19   if they object, there's a full process, sometimes outlined

20   by the Court, sometimes not, to take discovery.  And that's

21   what should happen here.

22          And what Giants Stadium has essentially argued is

23   that they should jump that process, that the process that

24   applies to everybody else's claims shouldn't apply to

25   theirs.  And they even make, I think the incredible argument

Page 44

1   that creditors are actually permitted to take 2004 discovery

2   after filing claims to bolster those claims.  Well, think

3   about that as a precedent for your cases.

4        If that were the case, you would expect to see I

5   think a number of cases where creditors do this all the

6   time.  I can tell you that if that were the law, I'd think

7   we have hundreds if not more creditors in this case trying

8   to seek discovery on their claims.

9        And Giants states two cases that I do want to

10  discuss because we haven't had a chance to do that in any

11  kind of reply for that idea.  The first is a Drexel Burnham

12  (ph) case back in 1991.  That's a case that my colleague,

13  Peter Grunberger (ph) participated in.  And in the Drexel

14  matter, one of the major creditors in that case was the FDIC

15  and there were also creditor's committees.

16       Well, at least one of those committees was taking

17  2004 pursuant to a stipulation.  And what the FDIC wanted,

18  which was a major creditor in Drexel, was it wanted access

19  to the discovery that was being done by the creditor's

20  committees on other issues.

21       And what the Court said is the FDIC because it was

22  such a major creditor could have that discovery even if it

23  would bolster its claim.  But what didn't happen in that

24  case is what Giants Stadium wants here, is that the FDIC was

25  allowed to put forth its own 2004 discovery on its claims.

Page 45

1      That never happened.  What they want here did not happen in

2      the Drexel case at all.

3              The other case cited by Giants Stadium is a Texaco

4      case, another case that Weil appeared in, in which Texaco's

5      largest judgment creditor, Pennzoil sought 2004 discovery,

6      again relating to issues in the case because it was the

7      largest judgment creditor in Texaco.

8              And there was no request to take discovery

9      concerning a filed claim, because remember it was a judgment

10     creditor, it'd actually gone to trial on its claim.  And

11     that claim was not the subject of 2004 discovery.

12             So, you know, I think Giants Stadium is just simply

13     not correct on the law, that once you filed the claim as a

14     creditor, you can take 2004 discovery on that claim.

15     Certainly we see creditors in cases and creditor's

16     committees taking discovery, let's say there's third party

17     claims out there, the debtor's not pursuing, you certainly

18     see that kind of discovery.  But what you don't see is 2004

19     discovery allowed on particular claims filed by those

20     creditors.  And there's no case that they cite where that's

21     the case.

22             And again, if that was the case, it would really

23     blow up the claims process in a case like --

24             THE COURT:  Let me ask you this question, which

25     doesn't relate to precedent that may or may not be directly

Page 46

1    relevant or instructive to the current dispute.  And instead

2    to focus on the current dispute.

3          You have acknowledged in your argument that the

4    underlying facts here are unusually complicated, and that

5    your own client, which is certainly as sophisticated as any

6    counter party has not yet concluded whether there is an

7    affirmative claim here or a defense of claim if there are

8    any defenses, for that matter.

9          Although at the preliminary matter, you've

10   acknowledged that given the change from 301 million to 585

11   million it is highly probable that some objection will be

12   made because you compared it with what might be called a

13   preposterously large claim.

14         But given the complexities that you have

15   acknowledged that underlie an analysis of claims and

16   defenses, is this not a somewhat exceptional circumstance in

17   which the typical discovery may be appropriate, and may not

18   lead to the adverse consequences that you've described of

19   hundreds of creditors coming in to seek what they're really

20   not entitled to discovery with respect to their claim?

21         MR. SLACK:  You'd only see it if you granted it.  I

22   think that the -- I think that you're likely --

23         THE COURT:  Well, I'm asking the question intending

24   to probe some of the issues here.

25         MR. SLACK:  No.  And I think it's -- I think you

Page 47

1   would end up frankly being in the same situation as many

2   other creditors, because every creditor is going to say,

3   they're not going to know the facts, the underlying facts of

4   Giants Stadium, they're going to say, Your Honor, we have a

5   complex derivative.

6          What I can tell you is this, is that the

7   information that we need or the information that's really

8   relevant to the determination is all on their side.  Their

9   discovery is purely harassment.  In other words, what they

10  want from us is purely just a harassing set of discovery.

11  They have told us so many times, even in their papers, they

12  don't like one-sided discovery.  And that has stuck in their

13  crawl.  And so what they're trying to do is purely as a

14  harassing matter.

15         Think about what they did in this motion and I

16  think you can understand that they don't need a stitch of

17  discovery.  They filed this motion 18 months ago, and they

18  have adjourned it for 18 months in a row.  And it wasn't

19  until the settlement discussions ended and we pressed our

20  continuation of the investigation that all of a sudden they

21  say, oh, we need discovery.  And that's because the sole

22  purpose of it is to try to harass us.

23         The information with respect to the termination of

24  the transaction and what happened is all on the Giants

25  Stadium side, not on the debtor side.  And the information

1   that they want here is, at the end of the day, we don't know

2   whether it's going to be irrelevant or not, but it may very

3   well be a waste of our resources to produce all of this

4   stuff now, when we haven't made a decision as to what our

5   defenses are actually going to be here.

6          Again, we have preliminary views or else we

7   wouldn't have been able to engage in the settlement talks.

8   But I can tell you that what's going on here is purely a

9   harassing set of 2004 requests.  And they are unnecessary

10  because at some point, if we object, Giants Stadium will

11  have a complete opportunity to take discovery.

12         Thank you, Your Honor.

13         THE COURT:  Okay.  Thank you.  Mr. Clark.

14         MR. CLARK:  Good morning again, Your Honor.

15         You know, some of the points that you made in your

16  questions frankly fit rather well with the points I was

17  going to make to the Court.  First of all, on the gotcha

18  issue, we have not argued at all, and I'm not arguing today

19  that because Lehman entered into settlement negotiations and

20  we had a mediation and all of that, that they somehow waived

21  their rights.  That's not what we're saying, and I think

22  that's what Your Honor meant when you said there'd be no

23  gotcha.  And I'm equally sure, although I didn't raise it

24  because I didn't think it was necessary, there was no gotcha

25  for the Giants either.  I mean Giants Stadium wasn't waiving

Page 49

```
1   any rights because they went into a year or more of

2   discussions at the same time.

3           But it is a fact that the debtors today are in a

4   different posture, and not just because of the passage of

5   time, although there has been a lot of time that has passed.

6   They just conceded, as I think the transcript will show,

7   that they're not going to do anything other than object to

8   the claim in one form or another.  They're going to object

9   to it, they're going to file an adversary proceeding to

10  collect on their view of what they have is right, but this

11  is going to become a contested matter in one form or

12  another.  It already really is.  And that's the problem.

13          In order to get this to the point where we think

14  the parties have a better chance to resolve this, if it has

15  to be through litigation, so be it, there has to be

16  discovery on both sides.  This last point about us wanting

17  documents from them because of harassment is completely

18  unjustified.

19          If you look at the paragraphs of documents that

20  we're describing the documents we're asking for, and you

21  read the transcript of Mr. Slack's deposition of Ms. Procops

22  (ph), everything we've asked for practically is in there.

23  It's what's at issue in this case.  It's not as though we're

24  wasting our time putting together document demands to make

25  them file a motion.  We have no interest in that whatsoever.
```

1          I think the key in this situation is your question,

2    your point, that shouldn't at this point the obligations to

3    produce information and to proceed be reciprocal.  And I

4    think the answer to that has got to be yes.  And as an

5    indication of the status that we're in, of the stage that

6    we're at, I refer the Court to the new deposition subpoena,

7    the second deposition subpoena, which is a 30(b)(6)

8    deposition.  That is not an investigation tool.  That's a

9    litigator's tool, to help resolve a dispute that is already

10   there.

11         They want us to educate Ms. Procops on all the

12   things that they say she didn't know about before, and on a

13   bunch of other topics.  And the reason they gave was to bind

14   her to that testimony, and to bind us to that testimony.

15   That's not investigation, that's litigation.  We're already

16   at that stage, and that's what they're asking for, and

17   that's why we think either of two things has to happen.

18         Number one, their current subpoenas for additional

19   documents, much of which is repetitive of what we already

20   gave them, and for this additional deposition should be

21   quashed, so that there is not this continuing façade of an

22   investigation.  They should not be allowed to simply say

23   it's preliminary.  They said that 14 times at least in the

24   papers that they submitted to the Court.

25         It's preliminary, therefore, it's likely to have a

Page 51

1    white feather.  We can continue to do whatever we want to do

2    and it's one way.  There's no way that they have not made up

3    their mind that they're going to take action either to

4    object or to file an adversary proceeding.  Nobody in this

5    courtroom can believe that, I hope Your Honor doesn't.

6           So if the motion to quash is granted, then we're at

7    a point where they would have to move forward, and either

8    object or file the adversary proceeding as far as I can see.

9    Our request for discovery under Rule 2004 is an alternative

10   if we're going to continue this 2004 process, we think we

11   should at least be allowed to begin to get the documents

12   from Lehman's files that bear on the same issues that they

13   have raised.

14          In another case mentioned, Mr. Slack mentioned the

15   FDIC application and Drexel Burnam.  In the Federated case,

16   the FDIC came in the same way, and they had major claims,

17   and they wanted to take discovery, I think it was of the

18   creditor's committee, and the Court permitted that.

19          And the Court said I'm going to permit it because

20   these are people who are just preparing their arsenals for

21   battle.  And the way they're going to get to a resolution at

22   the end of the day is if they both know as much as they can

23   about the other side's position.  So that's where we are.

24          We would like to be able to have this is in a

25   position where we can take discovery, they can take

Page 52

1    discovery.  I think personally that that is the best way

2    we're likely to get to a resolution of this.  And I think

3    it's fair at this point.  The bankruptcy has been -- it's

4    over four years old.  We've been in some sort of contest

5    with the folks from Lehman for over two years.  It's simply

6    time to move on to the next stage, and that's why we're

7    objecting to their discovery and suggesting alternatives.

8            THE COURT:  All right.  Thank you.  Anything more,

9    Mr. Slack?

10           MR. SLACK:  Just a few -- a couple of minutes.

11           Your Honor, with respect to the 30(b)(6)

12   deposition, and I think it's important to understand that we

13   took a deposition of a particular person, Christine Procops,

14   who's the CFO of Giants and (indiscernible) Giants Stadium,

15   and there were many instances, and we've put it in our

16   papers where there were critical things that she didn't

17   know.  So we actually had a conversation with counsel for

18   Giants, where I said, look, we can take, you know, the

19   deposition of the other people who all happen to be more

20   senior.  They're the MARs (ph) and the TISH's (ph).  And we

21   said, what we're willing to do is we're willing to take,

22   because we just want the information, we're willing to take

23   a 30(b)(6), you can designate whoever you want, but then you

24   have the obligation to educate.

25           It is purely an investigative tool to find out the

Page 53

```
 1    answers that we didn't get from that deposition.  It is not

 2    a litigation tool, and we took this tact because we thought

 3    it would be more palatable, though, perhaps we should just

 4    go and take the depositions of the other senior people, that

 5    was another way, you know, of getting potentially to that

 6    information.  But it was purely seeking information and not

 7    trying to, you know, go forward with any kind of litigation.

 8          And other than that, Your Honor, I would say as

 9    follows.  Is that when they say that they've never tried to

10    say this is a gotcha, all you have to do is read the first

11    line of their reply.  Where they say that debtor's cross

12    motion is premised on the unsustainable argument that

13    debtors have adopted only a preliminary position as to the

14    merits.  And then they say, "To the contrary, although

15    Giants Stadium is constrained from disclosing the substance

16    of settlement negotiations, it's clear the debtors have

17    determined to object to the claims."

18          What they're saying, Your Honor, I think is exactly

19    the gotcha.  It's exactly that because we entered into

20    settlement discussions which they had an agreement that we

21    could do and not give up our rights to 2004, and this Court

22    gave us assurances we would not, so.

23          THE COURT:  How are you giving up rights to 2004 if

24    those rights are conditioned in whole or in part on some

25    reciprocal discovery?
```

1          MR. SLACK:  Well, two fold on the reciprocal

2     discovery.  I think that the idea of giving reciprocal

3     discovery for what is essentially a claims dispute doesn't

4     make any sense until there is a determination essentially in

5     the investigation.

6          And the reason for that is what I said, number one,

7     is that it might be wasteful, and number two, it sets a bad

8     precedent.  But I would ask a different question on top of

9     that.  Which is, what's the harm, assuming they're right,

10    that they're going to have a -- you know, an objection and

11    this -- you know, what's the harm in letting us finish our

12    investigation over the next three or four months, and then

13    if we file an objection, they'll get full discovery.

14         They need the discovery for the claims process, and

15    they'll have it, because Your Honor's going to make sure

16    that they have whatever they need.  But that's the way all

17    the other claims work, and that's the way this should.

18         And I would ask the Court one other thing, which is

19    to consider that they still have not answered the

20    inconsistency in their own position between their motion to

21    quash and their motion to take discovery.  Because if you

22    look at their argument, GRH and the other pages and pages

23    they raise, their own argument is that they're not entitled

24    to it once they file their claim, and they've never

25    addressed that inconsistency.  Thank you, Your Honor.

 1                THE COURT:  Okay.  One more thing.

 2                MR. CLARK:  Okay.  I'll address the inconsistency.

 3       It's simply a situation of -- there are a number of courts

 4       that have said you can have discovery even after you filed a

 5       claim, so it's not inconsistent across the board.  The only

 6       thing we're trying to do, the only thing we're trying to do

 7       is to have some sort of a process that will let this resolve

 8       itself sooner rather than later.

 9                And the things that we've asked about are not just

10       -- they are not under the control of Giants Stadium.  We've

11       asked questions about how they evaluated and viewed the

12       termination process, about what if any steps they took, that

13       they were obligated to take under the papers, including

14       going out and getting quotes in the market, and doing a

15       number of other things.  These are all issues, they're all

16       documents that are directly tied to issues that are

17       presented in this case.

18                We think the best thing to do would be to go to the

19       next stage, whether there's an objection or an adversary

20       proceeding, and then you're right, all this discovery gets

21       resolved hopefully without Your Honor ever seeing us again

22       for that purpose.

23                But if we're going to have this continuing Rule

24       2004 discovery, then the only way it seems fair to us is to

25       have both sides have access to it.  And, you know, if you

Page 56

1    look at the -- I know Your Honor's familiar with all this,

2    so I'm not going to belabor it, but if you look at the

3    background, the Cameron case and all the other cases that

4    dealt with the origins of Rule 2004.  Originally it dealt

5    with a situation where a receiver came in, wasn't familiar

6    with the debtor, and had to have an expansive and quick,

7    quick review of the debtor's assets in order to protect

8    creditors.  That's what any number of the cases have said.

9            It is not an excuse to allow a debtor in the

10   circumstances present here to just continue with their

11   investigation because the investigation is preliminary and

12   not final, and it's not final because it's preliminary.

13   That's what they're saying.  It's a little circular, and I

14   think we ought to move on.  Thank you.

15           THE COURT:  Okay.  Well, thank you for your candor

16   in answering the Court's questions and in your

17   presentations.  I don't see this as a typical use of Rule

18   2004.  Nor do I see it as a case that will open the

19   proverbial floodgates of other discovery in part because Mr.

20   Slack in his presentation, candidly observed that at this

21   juncture, more than four years into the Lehman bankruptcy

22   case, his client really doesn't fully understand all

23   elements of claims arising out of this complicated auction

24   rate hedge.

25           And it's apparent that if they could determine now

Page 57

1      that they had an affirmative claim, they would assert it.

2      Lehman has not been shy about asserting such claims in the

3      past.  Additionally, it seems fairly obvious that if Lehman

4      had sufficient information available to it that would

5      support not just a shotgun approach objection but a specific

6      and tailored objection to the claim, it would file it.

7              Throughout this case, Lehman has been active in

8      filing and pursuing objections to claims, and in fact, part

9      of this morning's agenda relates to objections to claims.

10     And so I view this as an exceptional case.  And, in fact,

11     that was one of the reasons I asked a number of questions at

12     the outset to determine to what extent the issues that

13     related to this discovery dispute were exceptional and

14     unique, and to what extent this was just another example of

15     a derivatives dispute, this one happening to have the

16     negative gloss of active discovery disputes, as opposed to

17     active negotiations leading to a settlement.

18             I believe a continuing 2004 discovery under the

19     circumstances makes sense, although the fact that this is

20     occurring 14 months after our last discovery dispute is a

21     terribly negative fact.  One conclusion to be drawn from the

22     mere timing of this, is that this dispute is taking too long

23     to resolve, and that despite best efforts, reasonable people

24     are unable to get to yes, and they should.

25             And so I'm going to propose that counsel meet and

1    confer in an effort to develop what I'll call a reciprocal

2    discovery protocol, and it is not necessarily limited to

3    2004.  I believe that one of the things that distinguishes

4    the dispute that I've heard a lot about this morning from

5    other disputes, is that there is no foreseeable outcome here

6    in which Lehman is not objecting, or bringing affirmative

7    claims relief.

8            This is not a situation in which Lehman is engaging

9    in a 2004 process to later shake hands, and say here's the

10   money.  I also believe even though everybody has denied this

11   that the 2004 dance that we're engaged in necessarily has

12   tactical aspects to it.  And so here's what I am directing.

13           Between now and the first of the year, I would like

14   the parties to develop and agreed discovery protocol that

15   will be applicable whether we're dealing with 2004 discovery

16   or claims related discovery.  It would be extraordinarily

17   wasteful for the discovery that's taken in 2004 to be

18   replicated again.  And in the case of Ms. Procops, that's

19   already happening.  Enough already.

20           I recognize that the 2004 sword is more properly

21   used by the debtor than by the creditor in this instance.

22   And so discovery from third parties and discovery from

23   Giants Stadium and discovery from Goal Line may be more

24   appropriate than discovery from the debtor.  But that does

25   not mean that some discovery from the debtor is not also to

Page 59

1   be part of this process.

2           One of the mysteries from the perspective of the

3   Court is that this third party discovery and discovery from

4   others is so critical from the debtor's perspective in being

5   able to formulate its own position with respect to the

6   claim.  But I accept the representations made that ongoing

7   2004 discovery is needed in order for the debtor to complete

8   its investigation to use its words.

9           I would ask the parties to report the results of

10  these efforts at the December omnibus hearing.  You don't

11  have to the point of an agreement, in fact, you could be to

12  the point of no agreement.  I'd like to know that, in which

13  case I will then be able to either rule or take this matter

14  under advisement, but I have I think provided sufficient

15  guidance here to suggest that what I consider to be an

16  appropriate result is reasonable discovery going in both

17  directions with the understanding that the need for that

18  discovery is more obviously greater for the debtor.  And

19  this is not an example of gotcha because I am indicating in

20  agreement that continued 2004 discovery is appropriate for

21  the debtor and the debtor's benefit.

22          I'm also noting the time's up in effect.  This has

23  to come to a conclusion.  And I don't expect there to be

24  another discovery dispute between the parties until there's

25  active litigation between you.  And I hope that doesn't

Page 60

```
 1    occur at that point either.  So I'll hear from you next

 2    time.

 3               MR. CLARK:  Your Honor, just a question of

 4    clarification.  How does the January 1st deadline fit with

 5    the next omnibus hearing?  I'm not --

 6               THE COURT:  I don't know.

 7               MR. CLARK:  Okay.

 8               THE COURT:  I'm just looking for a status report at

 9    the next omnibus hearing.  And if it doesn't fit well for

10    the parties, it can always be put off, and then we can make

11    that a telephone conference.

12               MR. CLARK:  Thank you, Your Honor.

13               MS. MARCUS:  Your Honor, the December hearing is

14    December 19th.

15               THE COURT:  18th?

16               MS. MARCUS:  19th.

17               THE COURT:  That seems like a perfect date for a

18    status report.

19               MR. MARGOLIN:  The omnibus hearing is on December

20    12th, Your Honor.

21               THE COURT:  Why am I hearing different dates?

22               MS. MARCUS:  Sorry.  Sorry, Your Honor.  December

23    12th, sorry about that.

24               THE COURT:  December 12th is a perfect date, too.

25    Either one's fine.
```

Page 61

1           MR. CLARK:  Thank you.

2           MR. SLACK:  Thank you, Your Honor.

3           MR. MARGOLIN:  Good morning, Your Honor.  Shall we

4    wait until --

5           THE COURT:  Why don't we just wait for those people

6    that are leaving to exit.

7           MR. CLARK:  Thank you.

8           (Pause)

9           MR. MARGOLIN:  Good morning, Your Honor, Jeffrey

10   Margolin, Hughes, Hubbard and Reed for the SIPA Trustee, Mr.

11   Giddens.  We have two uncontested matters on this morning's

12   agenda.  The first one is a settlement agreement proposed

13   with the LBF Chapter 15 debtor that is going to be handled

14   by my colleague, Mr. Greilsheimer, and then a portion of the

15   trustee's general creditor claim procedures motion which is

16   going to be handled by my colleague, Meghan Gragg.

17          THE COURT:  Okay.

18          MR. MARGOLIN:  Thank you.

19          MR. GREILSHEIMER:  Good morning, Your Honor, Jeff

20   Greilsheimer for the SIPA Trustee.

21          This is a global resolution of all of the claims

22   between LBI and Lehman Brothers Finance.  It was an

23   aggregate amount of about 6 billion that was submitted to

24   LBI by LBF.  We have resolved that allowing a claim of

25   approximately 190 million as a customer claim and 360

Page 62

1    million as a general creditor claim against the estate.  And

2    it is a complete resolution of everything that we have going

3    between the estates.  We believe it is well within the

4    trustee's discretion, and is an excellent result for the

5    estate.

6            If Your Honor doesn't have any questions, Mr.

7    Krakow on the Chapter 15 proceeding.

8            THE COURT:  I'll handle them together.  I've

9    reviewed the papers.  It seems like a very fair and balanced

10   approach, and there are no objections.  So this becomes as

11   close to a lay up as we get when we're dealing with $6

12   billion.

13           MR. KRAKOW:  Your Honor, Robert Krakow for LBF.

14   I'm not sure there's anything I need to add then.  This is a

15   very fair and substantially negotiated settlement that's the

16   combination of months of efforts by accountants and lawyers,

17   and ultimately the business people on both sides, so it is a

18   fair and reasonable settlement, as reflected by the fact

19   that there are no objections either with respect to the LBF

20   case or the LBI case.

21           THE COURT:  I'm very pleased with the outcome, and

22   I know that these things when they're finally resolved look

23   fairly plain and straight forward on the docket, especially

24   when they're uncontested, but that in dealing with the

25   disputes between these two estates over the years, I know

1    that there have been any number of difficult issues that

2    needed to be reconciled, and I'm delighted that they have

3    been.  It's approved.

4            MR. KRAKOW:  Thank you, Your Honor.

5            MR. GREILSHEIMER:  Thank you, Your Honor.

6            MS. GRAGG:  Good morning, Your Honor, Meaghan Gragg

7    from Hughes Hubbard and Reed on behalf of the SIPA Trustee.

8    The next matter on the calendar is the Trustee's motion for

9    approval of general and credit objection procedures.

10           After consulting with parties in interest, we

11   decided to bifurcate the motion, so we're only presenting

12   the motion as it pertains to the objection procedures today.

13   We've not received any objections.  We have incorporated

14   comments received from LBHI, Libby and the ad hoc group, and

15   those changes are reflected in the revised proposed order

16   that we submitted on Monday.

17           You'll see in the revised proposal we've removed

18   the provisions related to the settlement or the settlement

19   procedures.  And the motion as pertaining to the settlement

20   procedures will be presented at the December 12th hearing.

21   So unless Your Honor has any questions about the objection

22   procedures, we respectfully request that Your Honor grant

23   the motion as it pertains to the objection procedures.

24           THE COURT:  It's unopposed and is procedural.  It

25   reflects the comments of principal parties in interest and

1    it's approved.

2              MS. GRAGG:  Thank you.

3              MS. MARCUS:  Your Honor, I think that brings us to

4    the claims hearing portion of our agenda.

5              MR. MARGOLIN:  Your Honor, may counsel for Hughes

6    Hubbard, the SIPA Trustee be excused?

7              THE COURT:  Yes.

8              MR. MARGOLIN:  Thank you.

9              MS. MARCUS:  I think that brings us to the claims

10   portion of the agenda.  Just a note for the Court.  There

11   were quite a few matters that have been scheduled to the

12   October 31 hearing.  We did submit, I think it's two

13   separate certificates of no objection that dealt with most

14   of those because many of them were uncontested.

15             The first matter for the Court's consideration

16   today is an uncontested matter that will be handled by my

17   colleague, Kyle Ortiz.  It's number seven on the agenda.

18             MR. ORTIZ:  Good morning, Your Honor, Kyle Ortiz of

19   Weil on behalf of Lehman Brothers Holdings, Incorporated as

20   plan administrator.

21             As Jackie said, the next item on the agenda is the

22   357th omnibus objection which is an uncontested matter.  The

23   357th omnibus objection seeks to reclassify certain claims

24   that asserted either priority or secured status as general

25   unsecured because the claims do not meet the criteria

1    required to be entitled to priority or secured status.

2         The 357th omnibus objection included four claims.

3    Three of the four claims asserted priority claims under

4    Section 507 of the Bankruptcy Code, but did not provide any

5    basis upon which they are entitled to such claims, and LBHI

6    did not receive a response from those three claimants.

7         The fourth claim subject to the 357th omnibus

8    objection was asserted by Magnetar Structured Credit Fund

9    and asserted a secured claim based on an alleged right of

10   set off.  Although Section 506(a)(1) of the Bankruptcy Code

11   does provide that a claim subject to set off under Section

12   553 is a secured claim, Magnetar has not asserted any

13   obligations that it's seeking to set off, and thus has no

14   valid basis for its claim to be classified as secured.

15        Although Magnetar did not file a formal response,

16   they did however reach out to LBHI, and requested that we

17   add certain language to the order explicitly reserving

18   certain of their rights, clarifying that the order has no

19   res judicata estoppel or other effect on any future rights

20   they may have to assert a valid right of set off.

21        We did agree to this additional language and it's

22   consistent with language that we've included in other orders

23   that we sought to reclassify secured claims that were based

24   on set off as unsecured claims.  I do have clean and marked

25   copies of the revised order with me today, if Your Honor

Page 66

1   would like to review those at this time.

2          THE COURT:  If you have a blackline version, why

3   don't you hand it up.

4          MR. ORTIZ:  Absolutely.  May I approach the bench?

5          THE COURT:  Yes.  Thank you.

6          MR. ORTIZ:  The added decreetal paragraph is on the

7   second page.  If Your Honor has no questions at this time, I

8   would request that this order be, that is uncontested, and

9   we did add the language requested by Magnetar be entered at

10  this time.

11         THE COURT:  The objection is approved on an

12  uncontested basis, consistent with the language of the order

13  as amended.

14         MR. ORTIZ:  Thank you, Your Honor.  I will now turn

15  the podium over to my colleague Jackie Marcus.

16         MS. MARCUS:  Thank you, Your Honor.  The next

17  matter on the agenda number 8, is the objection filed by

18  Lehman to a claim filed by Laurel Cove Development.

19         Your Honor, we've been before you on this matter

20  several times in the past.  I suspect that you may remember

21  the facts, but I'm just going to go into them very briefly.

22         Laurel Cove has filed a claim in the amount of $150

23  million against LBHI.  The claim allegedly arises out of

24  LBHI's failure to fund the remaining balance of $34 million

25  under a construction loan provided by LBHI to Laurel Cove.

Page 67

1           LBHI entered into the construction loan agreement

2      in May of 2007, and funded approximately $86 million under

3      that loan agreement.  On September 14th, 2008, just one day

4      before the commencement of the Chapter 11 case, Laurel Cove

5      requested a further draw in the amount of $5 million.

6           The draw request was defective, and was not funded

7      prior to the commencement of LBHI's Chapter 11 case.  Over

8      the next two weeks, representatives of TriMont Realty

9      Advisors, the loan servicer, and Laurel Cove engaged in

10     exchange of e-mails regarding the draw request.  Copies of

11     that e-mail correspondence are attached to our reply.

12          In the meantime, on September 17th, an LBHI

13     affiliate, Lehman Re notified LBHI that it was in default

14     under a series of repurchase agreements, and therefore,

15     Lehman Re was taking possession of certain repurchased loans

16     including the Laurel Cove loan.

17          In the objection, Lehman has asserted numerous

18     bases for its contention that it has no liability for the

19     Laurel Cove claim.  First and most importantly we contend

20     that after the default date, which was September 17th,

21     Lehman Re rather than LBHI bore responsibility for funding

22     the construction loan.  And second, in the unlikely event

23     that the Court determines that LBHI is responsible for the

24     funding obligations, we take issue with Laurel Cove's

25     assessment of damages and the magnitude of the damages.

Page 68

1          In response to LBHI's objection, Laurel Cove

2     essentially makes three arguments.  First, that the

3     September 14th draw request was not defective.  Second, that

4     the settlement agreement represented the settlement

5     agreement between LBHI and Lehman Re represented an

6     impermissible assumption and assignment of the loan

7     agreement without notice.  And third, that LBHI may have

8     assigned its rights under the loan, but it did not assign

9     its obligations under the loan.

10          As to whether or not the draw requests was

11     defective, in its reply as I mentioned, LBHI attached the e-

12     mail correspondence which indicates that Laurel Cove had

13     failed to properly substantiate its draw request, and that

14     Laurel Cove was, in fact, made aware of that failure.  Thus

15     the statement in the Najohn (ph) affidavit filed by Laurel

16     Cove to the contrary is belied by the evidence.

17          Moreover, we have also filed the declaration of

18     Nicholas Lane of Trimont in support of the objection that

19     indicates that virtually every draw request that Laurel Cove

20     had submitted was initially deficient, and it was in all

21     cases, a back and forth between Lehman, Lehman's

22     representative, Trimont and Laurel Cove regarding the draw

23     request.  Mr. Lane couldn't be here in person today, but he

24     is on the telephone from Atlanta.

25          The documents between the parties in the prior

Page 69

1    proceedings before the Court reflect that Laurel Cove's

2    second and third arguments are simply wrong.  Pursuant to

3    the settlement agreement that I eluded to between LBHI and

4    Lehman Re, the parties agreed as follows, and I quote,

5            "One, Lehman Re is and has been the sole owner of

6    the Laurel Cove loan since the default date.  Two, Lehman Re

7    shall have all of the Lehman U.S. entities right, title and

8    interest as lender under the Laurel Cove loan as of the

9    default date.  And three, Lehman Re shall have assumed all

10   of the Lehman U.S. entities' obligations as lender arising

11   from the documents evidencing the mortgage loans as of the

12   default date and thereafter."

13           That's paragraph 1 of the settlement agreement.

14   The settlement agreement was approved by this Court in

15   August 2009.  The language in that order provides that the

16   Lehman Re MRA loans were not and never were property of

17   LBHI's estate, or LCPI's estate.  Therefore, there was no

18   need for LBHI or LCPI to assume and assign the construction

19   loan under Section 365.

20           Indeed paragraph 13 of the settlement agreement

21   itself expressly provides that "nothing in this settlement

22   agreement is or shall be construed to be an assumption or an

23   assumption -- an assignment of the MRA by LBHI or LCPI

24   pursuant to the Bankruptcy Code, including under Section

25   365."

Page 70

1           Moreover, when Laurel Cove moved for an emergency

2    hearing by order to show cause in January of 2010, to

3    prevent a foreclosure in Tennessee, the Court determined and

4    Laurel Cove conceded that Laurel Cove had actual notice of

5    the settlement agreement prior to the hearing for Court

6    approval of the settlement agreement.

7           Counsel for Laurel Cove also acknowledged that at

8    least as of October and November 2009, it was quote,

9    absolutely aware that Lehman Re was the appropriate party

10   with which to discuss any protective payments and settlement

11   issues, and I refer the Court to the hearing transcript at

12   page 27.

13          The Court should fine, as it did at the January

14   2010 hearing, that Laurel Cove's attempt to collaterally

15   attack the validity and enforceability of the settlement

16   order, quote, is based upon allegations that are simply not

17   credible, close quote.  And that was the transcript at page

18   41.

19          Finally, the terms of the settlement agreement and

20   the Court's findings with respect thereto also address

21   Laurel Cove's argument that LBHI assigned its rights but not

22   its obligations under the construction loan.  The loan

23   agreement did not include any limitation on LBHI's rights to

24   assign the loan, or include a proviso that any assignment

25   would be ineffective to transfer liabilities.  This was a

Page 71

1    sophisticated borrower, and it could've negotiated for that

2    language, but it did not.

3            LBHI was in the business of making loans and

4    transferring them, so it's not even clear whether LBHI would

5    have made the loan if it so admitted.  The Court rejected

6    Laurel Cove's privity argument at the January 2010 hearing,

7    calling the argument quote, a quaint notion in a world in

8    which loans are routinely transferred and securitized, close

9    quote.  That's page 24 of the transcript.

10           Furthermore, there's no question, Your Honor, that

11   Laurel Cove treated Lehman Re as the lender after the

12   default date.  It received over $800,000 in advances from

13   Lehman Re.  Laurel Cove entered into a pre-negotiation

14   letter with Lehman Re in April 2009, and Laurel Cove engaged

15   in extensive negotiations with Lehman Re throughout the

16   autumn of 2009.

17           For all of the foregoing reasons, Your Honor, LBHI

18   requests that the Court enter an order expunging the claim

19   in its entirety.  In the alternative, if the Court does not

20   grant the relief, then LBHI requests the right to contest

21   the amount of the damages at a future hearing.

22           THE COURT:  Let me just ask you a couple of

23   procedural questions.

24           MS. MARCUS:  Sure.

25           THE COURT:  And I'm aware of both the hearing in

Page 72

1    August of 2009 and the hearing in January of 2010, and in

2    connection with my preparation for today's hearing, I

3    reviewed the transcript of the hearing from January of 2010.

4           And one of the questions I have relates to the

5    preclusive effect, if any, of the determinations made during

6    the January 2010 hearing, particularly since they were made

7    in the context of an emergency hearing seeking injunctive

8    relief, in reference to a foreclosure sale in Tennessee.

9    And my findings with respect to this Court's intervention in

10   a state law action in Tennessee speak for themselves, but

11   it's not clear to me that they have preclusive effect.  I'd

12   like you to comment on that.

13          Secondly, I know based upon the record that the

14   loan in question was transferred from Lehman to Lehman Re in

15   accordance with the terms of the settlement agreement that

16   was approved in August 2009.  What is not clear to me is the

17   impact, if any, of that transfer upon the rights of Laurel

18   Cove to pursue claims for damages associated with the

19   affiliate to fund the loan.  And so I'm interested in your

20   views as to that.

21          And finally, and this is a question that really

22   goes to counsel for Laurel Cove, whatever claims Laurel Cove

23   may have, presumably should be made against one responsible

24   party, that's not to say those claims have merit.  What is

25   the status of claims made as to Lehman Re?

Page 73

1           MS. MARCUS:  Okay.  As to preclusive effect, Your

2     Honor, I recognize from reading the transcript that at least

3     some of your findings on that day had to do with whether it

4     was appropriate to run into court at the eleventh hour and

5     try to prevent the foreclosure.

6           But in connection with that, for example, a finding

7     that Laurel Cove had notice of the settlement agreement and

8     the hearing and knew what was -- the settlement agreement

9     between Lehman Re and LBHI, had notice of it, could have

10    appeared, did not, that kind of finding I think should have

11    preclusive effect on Laurel Cove.  They were here, they were

12    arguing, and that should have preclusive effect on them.

13          Similarly, I think other factual determinations

14    that the Court made as to what was going on, the fact -- the

15    privity argument, the fact that Lehman really wasn't in the

16    business of making loans and holding them, but the

17    environment, the business environment then was you make a

18    loan and you transfer it.  Those, I believe, should have

19    preclusive effect.

20          As to the second question, which is the transfer of

21    the loan from Lehman to Lehman Re, I agree with Your Honor

22    that to the extent there would have been a damage claim for

23    something that happened before that moment, and the moment

24    really isn't in November of 2009 when the settlement

25    agreement is signed, because on September 17th, I believe it

Page 74

1   was, it may have been a few days later, Lehman Re said, I

2   own this loan, and I am now taking over for this loan.

3          But damages that may have occurred before that

4   transition happened, I think might be the basis for a valid

5   claim.  But for Lehman Re to have engaged in negotiations,

6   accepted funding -- excuse me, for Laurel Cove to have

7   engaged in negotiations and accepted funding from Lehman Re

8   for quite some time, $800,000, significant even in this

9   case, and then to take the position that the whole sequence

10  of events that occurred thereafter was LBHI's fault we think

11  is inappropriate.

12         And that there are a number of cases that say that

13  a party can quote, consent to release the original obligor

14  by its actions as well as by affirmatively consenting.  And

15  unfortunately, the cases in this area are all about one

16  page, and they don't get into very much legal reasoning.

17  But they all quote -- I think the leading case is Manley v

18  Fisher, where they say, the parties, the original party

19  either has to consent in writing, or through its actions.

20  And here Lehman -- excuse me, too many L's.  Laurel Cove's

21  conduct here directly manifests that Laurel Cove was looking

22  to Lehman Re.

23         Third, and I know this one was a question more for

24  Laurel Cove's counsel, my understanding is that Laurel Cove

25  has filed a claim against Lehman Re, and I think Lehman Re's

Page 75

1    counsel is here as well.

2           THE COURT:  Okay.  Thank you.

3           MS. GOLDSTEIN:  Good morning, Your Honor, Cara

4    Goldstein from Stagg, Terenzi, Confusione & Wabnik on behalf

5    of Laurel Cove Development LLC.

6           Just to I guess start in the order that Lehman's

7    counsel started, going back to the draw request.  The draw

8    request in September and October of 2008 were in

9    substantially the same form as all of the prior draw

10   requests, which were approved.  Each time there was back and

11   forth between the parties for additional back up, additional

12   detail, but the form of the request was never noted as

13   defective.  It was the same form that was approved.

14          As a matter of fact, in the ultimate notice of

15   default that was sent to Laurel Cove, the default was never

16   based on defective draw requests.  It was based on various

17   expenses not being paid which was a result of the funding

18   never being provided.

19          Then as far as the privity question, it is Laurel

20   Cove's position that it entered into the construction loan

21   agreement with LBHI, that whether the agreement was

22   ultimately assigned or sold, or became the property of

23   Lehman Re that Laurel Cove is in privity with LBHI.  It did

24   not consent to the assignment of LBHI's obligations under

25   the construction loan.

```
 1              And you expressly or impliedly Lehman -- Laurel

 2    Cove, at some point was dealing with LBHI and Lehman Re

 3    because between the two parties, there was a time when they

 4    were not sure who was actually responsible, and so Laurel

 5    Cove was trying to deal with both of them.  They were trying

 6    to get funding to get the property continuing to engaged.

 7    It had gone up to phase one through August prior to the

 8    bankruptcy.  Clearly the funding requests in September were

 9    at the time of bankruptcy.  So we understand why they

10    weren't funded, but that's what's led to the ultimate

11    default.

12              We have filed a claim against Lehman Re, they

13    actually just sent us documentation requesting additional

14    information on the claim.  So we feel that LBHI is the party

15    that we contracted with, that has an obligation to Laurel

16    Cove.  You know, that's where we are at this matter.  We

17    haven't gone any further with Lehman Re.

18              THE COURT:  I understand what you just said, but

19    you're also telling me that you are playing both sides of

20    the field on this one.  That you're seeking to prevent

21    expungement of a claim against Lehman, at the same time that

22    you're pursuing claims against Lehman Re.  Are you claiming

23    that Lehman Re had a funding obligation, too?

24              MS. GOLDSTEIN:  Well, I think we're trying to

25    protect Laurel Cove's rights in the event that it's
```

Page 77

1    determined that LBHI is not going to have liability.  It's

2    clear that somebody has to have liability for the lack of

3    funding.  And whether it's ultimately LBHI or Lehman Re,

4    we're trying to, you know, file the timely claim in both of

5    those actions to protect Laurel Cove's rights.

6              THE COURT:  Okay.

7              MS. MARCUS:  Just to clarify, Your Honor, with

8    request to the draw requests.  Our position with respect to

9    the draw requests wasn't that it was fatally defective, and

10   therefore Laurel Cove was in default.  Our position is the

11   timing, which as you know more than anyone, is so critical

12   in this case, their request came in on September 14th.  It

13   was an LBHI obligation on that date, but it wasn't a valid

14   and appropriate request.

15             By the time the kinks were ironed out, the loan had

16   already transitioned to Lehman Re, and therefore, it was a

17   Lehman Re obligation rather than a Lehman obligation.

18             THE COURT:  Okay.  I'm not going to rule on this

19   today.  And I believe that the record needs to be

20   supplemented with information concerning what happened on

21   September 14 in connection with the draw request.  To the

22   extent that the draw request was in a form comparable to

23   similar requests made and honored prior to that date, that

24   may be a fact of significance to the analysis.  I'm not

25   making any preliminary judgments on this at this point,

Page 78

1    except to say that I think the record is insufficient to

2    expunge the claim.  It may be sufficient in the future to

3    expunge the claim.

4          And would suggest that the parties, if they haven't

5    already done so, consider the most expedient means to

6    develop and process the facts relating to the draw requests

7    and other issues surrounding any liability that LBHI may

8    have with regard to the unfunded loan.

9          These discussions conceivably could lead to some

10   agreement to compromise the dispute, and that would be

11   perfectly acceptable to the Court.

12         MS. MARCUS:  Thank you, Your Honor.  For calendar

13   purposes, should we just carry this?

14         THE COURT:  Carry it to some workable date in the

15   future.

16         MS. MARCUS:  Okay.  We'll do that, Your Honor.

17         The next matter will be handled by my colleague,

18   Candace Arthur.

19         MS. ARTHUR:  Good morning, Your Honor.  For the

20   record, Candace Arthur of Weil, Gotshal & Manges, on behalf

21   of Lehman Brothers Holding, Inc. as plan administrator.

22         We're moving forward today with respect to the

23   single remaining claim on the 320th omnibus objection.  The

24   plan administrator filed the 320th omni seeking to expunge

25   and disallow those claims filed against LB Rose Ranch, for

Page 79

1      which Rose Ranch does not have any liability.

2              Specifically, we are addressing proof of claim

3      number 24572 which is filed by Mr. Richard Cogden (ph) and

4      Ms. Rosemary Knox (ph).  The claimants are seeking

5      reimbursement of their membership agreement that they

6      entered into with LB Rose Ranch on April 29, 2003.

7              The terms of the golf club membership agreement

8      provided that the claimants had to submit a deposit in the

9      amount of $35,000, and it also was a proviso in the

10     agreement that stated, in the event that the membership

11     agreement was terminated, they would receive a refund on

12     their deposit.

13             In connection with the confirmed Chapter 11 plan of

14     LB Rose Ranch, affiliated debtors, Rose Ranch moved to

15     assume, among others, the membership agreement of Mr. Cogden

16     and Ms. Knox.  The claimants did not object to the

17     assumption.  It was reflected in the plan supplement, and

18     they did not object to the cure amount in the cure notice as

19     is reflected.

20             Accordingly, the membership agreement was assumed

21     under Section D-65 of the Bankruptcy Code and any claims

22     that the claimants would have otherwise had based upon a

23     prepetition breach of Rose Ranch with respect to the

24     agreement was effectively waived.

25             To date, Your Honor, Mr. Cogden and Ms. Knox still

Page 80

1    enjoy the privileges and rights under the agreement.  They

2    have not terminated the agreement.  And upon receipt of

3    their August 7th response to the omnibus objection, I did

4    personally reach out to them, clarify the plan

5    administrator's position, provide them with excerpts from

6    the plan supplement, and also confirmed the status of their

7    membership, the claimants did express that they would like

8    to maintain the golf club membership as it is.

9         It is unclear how the claimants have a right or

10   entitled to receipt of the membership deposit as well as can

11   remain active members.  Accordingly, and unless Your Honor

12   has any questions, the plan administrator seeks to have the

13   320th omnibus objection granted with respect to this claim,

14   and have the claim expunged, and disallowed in its entirety.

15        THE COURT:  Are the claimants participating in this

16   hearing either in person or on the telephone?

17        (No response)

18        THE COURT:  I hear no response.  They're enjoying

19   the benefits of their membership, and they have no claims as

20   a result, and I wish them a good golf game in the future,

21   and they have no claims in this case.

22        MS. ARTHUR:  Thank you, Your Honor.  Also, in

23   addition to the 320th omnibus objection, as we have noted,

24   we did receive a response by Ms. Kay Young, and she's proof

25   of claim number 8241.  I just wanted to provide a status

Page 81

```
 1    update, that in connection with our discussions as well, and

 2    in correspondence, providing her the same excerpts,

 3    clarifying the effect of Rose Ranch's assumption.  She has

 4    agreed to not object to the expunging of her claim, and to

 5    the extent that you'd like to see the e-mail traffic between

 6    myself and the claimant, we have that today as well.

 7              THE COURT:  Okay.  Fine.  Thank you.

 8              MS. ARTHUR:  Thank you, Your Honor.

 9              THE COURT:  And you'll be submitting orders

10    reflecting what --

11              MS. ARTHUR:  Yes, Your Honor, we will.

12              THE COURT:  -- we've just discussed?

13              MS. ARTHUR:  The next matter on the agenda will be

14    handled by my colleague, Kyle Ortiz.

15              THE COURT:  Okay.  Thank you.

16              MR. ORTIZ:  Good afternoon again, Your Honor.  Kyle

17    Ortiz from Weil on behalf of Lehman Brothers Holding,

18    Incorporated as plan administrator.

19              The next and final item on the contested agenda is

20    the 329th omnibus objection.  This is a carryover from two

21    prior hearings.  The 329th omnibus objection relates to the

22    claims that were filed by employees that asserted priority

23    status under Section 507(a)(4) of the Bankruptcy Code, that

24    exceeded the $10,950 cap in place for such claims at the

25    time of LBHI's Chapter 11 filing.
```

Page 82

1          LBHI is not contesting the merits of any of these

2    claims on the 329th omnibus objection, or addressing the

3    question of whether any of the claims on the 329th omnibus

4    objection are, in fact, entitled to priority under Section

5    507(a)(4) up to the cap.  Rather, the 329th omnibus

6    objection simply seeks to reclassify any amounts in excess

7    of the $10,950 statutory cap provided in Section 507 of the

8    Bankruptcy Code, in order to allow LBHI to more closely

9    align its reserves with what maximum distributions may

10   actually be.

11          And LBHI does reserve all rights to object to the

12   claims on the 329th omnibus objection, based both on their

13   merits, and with any portion of such claims is in fact

14   entitled to priority status in the future.

15          The vast majority of the claims in the 329th

16   omnibus objection were reclassified on an uncontested basis

17   at the August 23rd, 2012 hearing.  The 329th omnibus

18   objection was then contested by two claimants at the

19   September 27th, 2012 omnibus claims hearing, and the Court

20   did enter an order granting the relief requested by LBHI at

21   that time with regard to those two claims.

22          Today, we have one remaining response, contesting

23   the 329th from Claimant Theresa Carpenter.  Ms. Carpenter's

24   claim is based on amounts allegedly owed under a severance

25   agreement that she entered into with LBHI on September 9th,

Page 83

1      2008.

2            Ms. Carpenter checked the box under proof of claim

3      form indicating that her entire claim was entitled to

4      priority status under Section 507(a)(4).  And Ms.

5      Carpenter's response to the 329th omnibus objection, she

6      states that she was informed by Lehman Brothers human

7      resources that her severance package would be fully paid,

8      and thus her full amount should be paid and should not be

9      categorized as unsecured.  And she did provide her September

10     9, 2008 severance letter as evidence to support this

11     assertion.

12           But LBHI does not dispute at this time that a

13     severance agreement was entered to.  And as previously

14     noted, LBHI by the 329th omnibus objection does not take any

15     position to whether any portion of Ms. Carpenter's claim is

16     entitled to priority.  Rather, LBHI is simply asserting that

17     to the extent any portion of Ms. Carpenter's claim is

18     entitled to priority, that is nonetheless still subject to

19     the cap applicable with such claims, and thus, all portions

20     of Ms. Carpenter's claim asserted as priority in excess of

21     the $10,950 cap imposed by Section 507(a)(4) of the

22     Bankruptcy Code in place at the time of LBHI's filing should

23     be reclassified as unsecured.

24           Your Honor, I do not believe that Ms. Carpenter's

25     in the courtroom today, but to the extent --

1              THE COURT:  She is.  She just raised her hand.

2              MR. ORTIZ:  Sounds great.

3              THE COURT:  And she's coming forward.  See

4    courtroom events are almost always surprising.

5              MS. CARPENTER:  Good morning.

6              THE COURT:  Good morning.

7              MS. CARPENTER:  So --

8              THE COURT:  Actually good afternoon now.

9              MS. CARPENTER:  Oh, is it?  Okay.

10             So, yes, I'm here to object to reclassifying my

11   claim as unsecured.  The amount over --

12             THE COURT:  10,950.

13             MS. CARPENTER:  10,950, yes.

14             THE COURT:  Now, has Lehman's counsel fairly

15   characterized in his presentation the basis of your claim,

16   which is you had a severance agreement that was entered into

17   on September 9, and that human resources represented that

18   everything in that document would be paid in full, and

19   that's the basis for your claim?

20             MS. CARPENTER:  Yes.  I think that what the

21   debtor's position is to state it in my words, is that

22   they're not taking any position as to the merits of your

23   claim as an unsecured claim at this point, but rather

24   seeking to reclassify that portion which exceeds a statutory

25   limit, which is imposed under Section 507(a)(4) of the

Page 85

1    Bankruptcy Code, and which provides a limit upon

2    compensation related claims that are treated as priority

3    claims, for purposes of a distribution.

4              Do you have any legal argument, other than in

5    effect, having relied upon what you were told at the time

6    you were terminated?

7              MS. CARPENTER:  I mean, my situation was a little

8    unusual, in the sense I had just returned from maternity

9    leave, and my job was given to someone else, and then the

10   severance package was null and void, and you know, it was a

11   major hardship on my family for the entire thing, four years

12   later, and I'm still standing here trying to --

13             THE COURT:  I'm sure that's true, and I'm aware of

14   the hardship caused by the Lehman bankruptcy everyday that

15   we have a hearing in the Lehman case, particularly when

16   employee related claims are presented.

17             As a matter of bankruptcy law, I conclude that the

18   arguments made by Lehman are, in fact, correct as a matter

19   of law because employee claims are limited to, from a

20   priority perspective, are limited to the statutory cap.

21   And there's a reason for that.  It provides certain benefits

22   to employees that other creditors don't enjoy, in the sense

23   that there's a priority distribution, but it's limited

24   because generally in bankruptcy there's a balancing between

25   the interests of creditors.  So that those creditors that

Page 86

1    enjoy a priority, for example, taxing authority, as well as

2    employees, have certain rights that trade creditors or other

3    creditors don't have.  But they're not limitless.

4           So I'm granting the objection without prejudice to

5    the treatment of other claims that you may have in excess of

6    the $10,950 cap under the severance agreement, and I wish

7    you well.

8           MS. CARPENTER:  Thank you very much.

9           THE COURT:  Okay.  So the objection's granted.  And

10   does that -- that concludes the agenda?

11          MR. ORTIZ:  Yes, Your Honor, that does conclude the

12   agenda for LBHI's afternoon now.

13          THE COURT:  Fine.  Please submit orders with

14   reference to all the matters on this morning's agenda that

15   require orders.  And for purposes of anybody who may be

16   returning at 2 o'clock, there's a hearing at 2 o'clock in

17   the Turnberry matter.  We're adjourned until 2.

18   (Recessed at 12:10 p.m.; reconvened at 2:18 p.m.)

19          THE COURT:  Be seated, please.

20          We're off to a late start.

21          Mr. Meister, it's your motion.

22          MR. MEISTER:  Thank you, Judge Peck.

23          Your Honor, we're here on a very targeted and

24   limited reargument or reconsideration motion in adversary

25   proceeding, 09-0162, which is the single adversary

Page 87

1    proceeding within the call to town square matter.

2              And we're just here on the third count, which was

3    a count for a promissory estoppel that was dismissed by the

4    Court's previous order.

5              The order is clear, the oral argument, I think, is

6    clear or the Court's statements and oral arguments are clear

7    that the Court's decision dismissing the third count, the

8    promissory estoppel count, was predicated on the integration

9    clause in the $95 million dollar loan in that matter.

10             That integration clause states -- and I'd just

11   like to focus on two fragments on it -- quote, "The

12   agreement/disagreement and other loan documents embody the

13   entire agreement and understanding between the parties and

14   have with respect to the Loan, and that's capital L, and

15   supersede and cancel all prior loan applications,

16   expressions of interest, commitments, agreements, and

17   understandings, whether oral or written, relating the

18   subject matter here hereof, except to specifically agreed to

19   the contrary."

20             The two fragments I would like to focus on briefly

21   this afternoon, Your Honor, are with respect to the loan and

22   the subject matter, hereof, which I think just simply

23   relates back to the first fragment with respect to the loan.

24   The loan is defined, and there's no issue that it is, the

25   $95 million dollar loan.

Page 88

```
 1              Our claim is that a promise was made for a $625

 2      million dollar take out.  The Court hasn't gotten to the

 3      evidence of that promise because the case was -- the claim

 4      was dismissed, but we believe, respectfully, it was

 5      incorrect to say that the whole integration clause and the

 6      $95 million dollar agreement bars a promissory estoppel

 7      claim with respect to the $625 million dollar take out

 8      promise I'll call it because that's a separate subject

 9      matter from the loan and there's no -- the $95 million

10      dollar loan -- and there's no statement whatever in the $95

11      million dollar loan agreement that references the $625

12      million dollar or any larger take out.

13              In addition, Your Honor, the borrower -- the

14      borrowers, I should say, under the $95 million dollar loan

15      were two individuals, Jack -- Jacqueline and Jeffrey Soffer,

16      and the two promisee or the beneficiary of the alleged $625

17      million dollar take out promise was the owner, which is

18      Turnberry Centra Sub, LLC, I believe, which is a Plaintiff

19      in the adversary proceeding.

20              So, therefore, Your Honor, we think that the --

21      that applying the interest integration clause in the $95

22      million dollar loan agreement effectively against Turnberry

23      Centra Sub is applying -- not only does it, we believe, not

24      apply to bar a promissory estoppel claim about this separate

25      subject matter, but, additionally, it's being applied
```

Page 89

1    against an entity, which is not a party to the $95 million

2    dollar loan.

3            The way that I like to think about this is --

4    perhaps this is a bit of a simplification -- but if I was

5    going to a bank and I was buying a house for a million

6    dollars and I asked for a loan and the bank said we'll give

7    you a 60 percent or a $600,000 loan, meaning I had to come

8    up with $400,000, and I asked the bank for some more money

9    and the bank said to me, Well, we'll give you a personal

10   credit line for 100,000, so you're down payment is reduced

11   to $300,000.

12           If the bank then made me that 600 -- that $600,000

13   loan and reneged on the $100,000 credit line, I don't think

14   a Court would use an integration clause in a $600,000

15   mortgage instrument to bar my promissory estoppel claim

16   because the $100,000 credit line is separate subject matter

17   to at the $600,000 mortgage.

18           Now, the two are, obviously, somewhat related or

19   connected and we don't back away from our previous

20   assertions that they're connected.  In other words, we said

21   that the $95 million dollar loan operates, in effect, as an

22   advance, or an initial advance or an interim advance or a

23   bridge, whatever words you would like to use, with respect

24   to the $625 million dollar loan.  But that connection

25   doesn't make them one in the same; it makes them related,

Page 90

1    but not -- it doesn't merge the two.

2              THE COURT:  But Mr. Meister, your theory in the

3    case up until today has been that the connections between

4    the two transactions are more than just incidentally

5    related.  They were, in effect, one in the same.  That the

6    inducement to enter into the $95 million dollar loan was the

7    promise that was hanging out there somewhere in the air that

8    there was going to be this additional financing.  That was

9    always the theory of your case and you're changing it now.

10             MR. MEISTER:  Well, Your Honor, I don't think I'm

11   changing it.

12             THE COURT:  I think you are and I'm challenging

13   you on that.

14             MR. MEISTER:  Okay.  So, let me see if I can meet

15   that challenge, Your Honor.

16             It is true that we, in fact, said there was a

17   three-property integration -- to use the term loosely --

18   that there was this (indiscernible - 6:44) refinancing, that

19   Lehman wanted that refinancing to anchor a $3 billion

20   securitization, that we agreed to give them that.

21             In exchange, Lehman agreed to finance

22   Fontainebleau and to issue the $625 million dollar take out

23   commitment, and as part and parcel of that $625 million

24   dollar take out commitment, this $95 million dollar loan was

25   made as an initial advance where it was contemplated that

Page 91

```
1    that would be repaid out of and when -- from the proceeds of

2    the $625 million dollar financing.

3              I'm not backing away from that.  What I am saying

4    is that yes, they were all connected in that sense.  From a

5    business practical sense, they were discussed together, but

6    that doesn't mean, Your Honor, that the integration clause

7    in the $95 million dollar loan bars a promissory estoppel

8    clause.

9              I'm not here -- this is a very targeted motion --

10   I'm not here saying I was fraud -- today at this moment on

11   this motion to reargue saying that I was fraudulently

12   induced into borrowing the 95 million.

13             What I'm saying is that a promise was made to fund

14   a $625 million dollar loan, that in reliance in that

15   promise, I dropped three other specific commitments or

16   expressions of interest from major banks that were -- that

17   otherwise would have made this agreement, who did not go

18   bankrupt.

19             And that as a result of my not going forward with

20   those and three others, which I did -- or which my clients

21   did because of the $625 million dollar promise -- I lost my

22   equity in the project and that's a recoverable damage under

23   a promissory estoppel theory.

24             So, I'm not saying to Your Honor that we -- my

25   client doesn't owe back the 95 million because of this other
```

Page 92

1    promise that the integration clause would bar.  What I am

2    saying is that it was not correct, Your Honor, to say that

3    integration clause in the $95 million dollar loan bars my

4    promissory estoppel claim.  More specifically, because this

5    claim that I'm asking you to reinstate is not even a

6    contract claim -- in essence, it's a quasi-contract claim.

7    It's a promissory estoppel claim.  Really, the only

8    relevance of the integration clause is that it arguably

9    bears under justifiable reliance element of promissory

10   estoppel.  Because promissory estoppel includes, as one of

11   its elements, that the promisor, here, Lehman, would

12   reasonably expect to induce action or inaction on the part

13   of the promisee, here, Turnberry Centra Sub, or the Soffers,

14   if you'd prefer.

15            And -- so, let me say it to you this way:  If the

16   interest rate in the $95 million dollar loan were ten

17   percent, hypothetically, and I came to court and said, Hey,

18   they promised us -- Lehman said they would reduce it to five

19   percent.  Obviously, the integration clause would bar such a

20   promissory estoppel claim because you would say,

21   Mr. Meister, no one could reasonably rely on a promise of a

22   five percent interest rate when they just signed a loan

23   agreement for ten percent that contains an integration

24   clause.

25            But, the same cannot be said about a $625 million

Page 93

1    dollar take out commitment when there's a $95 million dollar

2    loan.  In other words, it is not correct, in my opinion,

3    Your Honor, to say that it was unreasonable, as a matter of

4    law, within the context of the 12(b)(6) motion on the

5    pleadings for the Soffers or for Turnberry Centra Sub to

6    have relied on the $625 million dollar take out commitment

7    promise simply because of the integration clause in the $95

8    million dollar loan.

9              THE COURT:  Let me ask you a hypothetical

10   question.

11             Assume, for the sake of discussion today, there

12   were no $95 million dollar loan and that it was simply a

13   discussion that the Soffers had with Lehman about take out

14   financing and Lehman said we're going to give you that

15   financing, don't worry.

16             Are you saying that that would have been an

17   enforceable promise, that you could have enforced that

18   financial accommodation, that it would have been reasonable

19   for your clients to have not pursued other lenders to obtain

20   such financing?

21             MR. MEISTER:  Your Honor, I think the answer to

22   that question is a bifurcated one as follows.

23             If I were suing for a breach of contract -- if I

24   said that that promise resulted in the formation of a

25   contract, we'd likely get into term sheets and caveats and

Page 94

1  term sheets and all the things that we have seen in our

2  respective careers.

3           And I would likely have difficulty in that

4  contract claim; however, that is the reason that there is a

5  quasi-contract cause of action for promissory estoppel,

6  which really says -- or the policy behind it, in my view

7  is -- where the promise is such that it does not give rise

8  to contract formation, but it would be reasonable for the

9  promisor to believe that the promisee would be induced into

10  action or inaction.  And that inaction or action occurred,

11  and, in fact, it would be unjust not to allow damages.  I

12  wouldn't say enforce in a specific sense, then a claim is

13  made out for promissory estoppel.

14           So, there was no pre-negotiation agreement that

15  I'm aware of here that disclaimed, which often is in these

16  situations.  So, my answer to you would be that if there

17  were no $95 million dollar loan and all the other facts that

18  are present here were present, I certainly think I would

19  have a claim for promissory estoppel that survives a

20  12(b)(6) motion.

21           THE COURT:  Here's the problem I'm having.

22           I was assuming away the most critical fact in this

23  case which, there is, in fact, a $95 million dollar loan,

24  and the $95 million dollar loan includes an integration

25  clause, which you've read.  And my understanding based upon

1    the original and amended complaint and the argument that

2    took place leading up to the granting of the 12(b)(6) motion

3    in Lehman's favor, is that your clients took the position

4    and really aren't backing away from this today.  That at the

5    time of entering into the $95 million dollar loan, there was

6    an expectation of a related incremental financing of $625

7    million dollars, and as a result, I don't understand how

8    you're able to back away from the promissory estoppel

9    problem you have in the integration clause.

10              This is, in effect, one thing, and while you

11    rather (indiscernible - 14:59) say the capitalized term loan

12    is equivalent to the subject matter hereof.  In fact, the

13    subject matter hereof may be read more broadly and I'd like

14    you to respond to that because your argument is predicated

15    upon the equivalence of those two words and phrases.

16              When, in fact, one could argue the subject matter

17    hereof is everything we talked about as we were getting

18    ready to enter into this loan, including that $625 million

19    dollar incremental loan and your litigation position up to

20    including the time of ruling against you was that these were

21    really closely tied together.

22              MR. MEISTER:  Your Honor, okay.  Fair enough.

23              Let me see if I can address that cogently.

24              In the integration clause, that first fragment is

25    with respect to the Loan, capital L, which is the 95

Page 96

1    million.

2            The second fragment says relating to the subject

3    matter hereof.  I think the "hereof," I would read that

4    under the last antecedent rule to directly reference the

5    previous fragment and the loan.

6            In addition, there's a -- you have (indiscernible

7    - 16:28) between 625 and 95.  It's not another $10 million

8    dollars or another $15 million dollars.  It's many fold the

9    95 million.  In addition to that, there's two different

10   completely different borrowers.

11           I believe that there is a problem with using the

12   integration clause to bar the promissory estoppel claim

13   because you are essentially enforcing the $95 million dollar

14   loan agreement that is not party to the agreement and that's

15   a significant issue, I think, Your Honor, that's not dealt

16   with in the decision.

17           There are -- one of the Plaintiffs to this

18   adversary proceeding is Turnberry Centra Sub, LLC -- I hope

19   I've stated the name correctly -- that owns or owned -- it

20   doesn't own anymore -- the Town Square Shopping Center.

21   That entity was the beneficiary of the alleged promise and

22   that entity is not a party to the $95 million dollar loan

23   agreement.

24           I did think hard about my simple example and I do

25   think it has some utility.  In my example there's a mortgage

Page 97

```
 1    loan commitment and a line of credit -- it happens to be

 2    with the same borrowers, so, in that sense, it's not on all

 3    fours.

 4              But the net effect of those two arrangements in my

 5    hypothetical is to create 70 percent financing, and one

 6    could say it's the same thing.  Meister is getting 70

 7    percent financing for the home he wants to buy.

 8              But the law would say that there are two separate

 9    transactions that the bank is contemplating into with their

10    client.  One is a mortgage loan and one is a line of credit.

11    And if the mortgage loan has an integration clause that says

12    this agreement or instrument is the entire agreement and it

13    embodies the entire understanding of this loan, then that

14    would not bar a promissory estoppel claim on the line of

15    credit.

16              There's a case, Your Honor, that we cite to in our

17    oral argument motion -- Roderick -- sorry, Broddick (ph).

18    And it's a 2009 first Department case -- complicated set of

19    facts, but sort of dumbed down a bit.  A man who was in the

20    investment banking field got a call from his cousin in

21    Texas.

22              Come move to Texas, give up your job with your

23    big, fancy investment bank, help me find money for an oil

24    venture and I'll make you a partner in this venture.

25              He moves his family down.  He gets $150 million
```

1    dollars of financing from some source.  The oil venture is

2    launched and the cousin reneges on the alleged promise to

3    make him part of the -- to make him an owner of the company.

4         He signs two documents:  An at-will employment

5    agreement and some sort of a fee agreement where he was paid

6    some sort of fee for finding the money.  Both those

7    agreements contain venture clauses that they are entire

8    agreements with respect to their respective subject matters.

9         The trial court dismisses his fraud and promissory

10   estoppel claims based upon the agreements and the venture

11   clauses very much in a similar way to Your Honor's decision

12   here.  It goes up to the first Department and the decision

13   is reversed because the subject matters of those two

14   agreements are not identical, although clearly related to

15   the allege promise to become a partner.

16        So, I think that case is meaningful here and

17   instructive.  I think it accurately reflects New York law

18   and I think that New York law does not, in an overly broad

19   way, read integration clauses.

20        And I think that reading an integration clause in

21   a $95 million dollars loan made to Jackie and Jeffrey Soffer

22   to stop Turnberry Centra Sub from making a promissory

23   estoppel claim on a $625 million dollar alleged take out

24   promise or commitment is a -- is not an accurate application

25   of New York law as it relates to these integration clauses.

Page 99

```
 1          You know, on a practical level, we're pretty close
 2    to completing document discovery here, which will be fairly
 3    substantial, I think.  The parties are set to exchange
 4    documents in December, early December.  I supposed -- and
 5    there's thousands of documents in each side.  I supposed
 6    there will be depositions in January or February.
 7          I just think that it would be better for the Court
 8    to be considering this claim in the context of a Rule 56
 9    summary judgment motion instead of a 12(b)(6) motion on the
10    pleadings and applying this promissory estoppel -- applying
11    the integration clause -- pardon me -- in the $95 million
12    dollar loan agreement.
13          I'd like the Court to see the quality of the
14    evidence about this promise, the term sheets -- which both,
15    by the way, pre-dated and post-dated -- in other words, they
16    were drafts -- then it pre- and post-dated the execution of
17    the $95 million dollar loan agreement.  I'd like the Court
18    to see the e-mails between the parties.
19          The Court has already seen, I hope it recalls, the
20    Ersoft (ph) affidavit, a former Lehman executive who
21    attested that -- very clearly, that there was a very
22    significant relationship between Turnberry and Lehman.  That
23    Lehman wanted this (indiscernible - 23:00).  That Lehman did
24    commit to a $625 million dollar take out commitment.  That
25    Lehman had -- that this is the way the parties did business.
```

Page 100

1    They did promises to one another and followed through.  That

2    Lehman, in fact, breached its promise on the $625 million

3    dollars and he says that to the best of his recollection,

4    prior to Lehman's bankruptcy, it had never failed to perform

5    a loan transaction it had agreed to do with any of

6    Turnberry's entities.  So, there's already -- this is a

7    Lehman manager attested to this.

8            So, you have already before you credible unrefuted

9    evidence that we are being truthful when we speak about this

10   commitment.  There are documents which you will see in this

11   motion which corroborate what we're saying and I think that

12   it is incorrect, Your Honor, respectfully, to use the merger

13   clause in the $95 million dollar loan agreement with the

14   individual Soffers on a 12(b)(6) motion to bar a promissory

15   estoppel claim by a corporate entity or an LLC entity, on a

16   much larger transaction, despite, as you accurately say,

17   that the two are related.

18           Your Honor, we also ask, alternatively, for leave

19   to amend only because we were not clear that the promise for

20   the 625 million was made both before and after the $95

21   million dollar loan agreement was signed.

22           The clause -- the integration clause is clear --

23   it has the word "prior" which modifies a series of words

24   that follow it, one of which is "understanding" and

25   "agreements."  And so it would have no application to -- it

Page 101

1    would have no application to a promise made.

2              Just an hour before coming here, I reviewed a term

3    sheet that was disseminated by Lehman a month after this

4    loan agreement was executed.  So, at a minimum, we would

5    like permission to amend to make that one allegation clear

6    as to the timing of these promises and then I don't see how

7    the integration clause is relevant, temporally speaking.

8              THE COURT:  Okay.  Thank you.

9              MR. MEISTER:  Thank you, Your Honor.

10             MR. McCARTHY:  Good afternoon, Your Honor.

11             Ed McCarthy from Weil Gotshal, on behalf of LBHI,

12   the lender, here.

13             I'll try not to repeat what was in the briefing

14   already, Your Honor.  It's clear you understand the issues

15   here.

16             Needless to say, Lehman objects to the motion.

17   It's procedurally improper, as we see it.  There's nothing

18   new to reconsider.  There's no new facts.  There's no new

19   law that they've pointed to and it's substantively

20   deficient.  There's no --

21             THE COURT:  Well, let me just break in on "no new

22   facts."

23             MR. McCARTHY:  Sure.

24             THE COURT:  Mr. Meister's alternative relief to

25   reconsideration is leave to amend the complaint presumably

Page 102

1   for purposes of emphasizing the facts that were not adverted

2   to in the second amended -- or the first amended complaint.

3   This would be the second amended complaint if I were to

4   approve that request.

5           And his focus is now there are multiple term

6   sheets, some were presented before the execution of the $95

7   million dollar loan and at least one was presented

8   subsequent to execution.  So, to the extent that there's an

9   integration clause issue that might otherwise bar a

10  promissory estoppel claim, I still have the claim on account

11  of this more recently crafted term sheet.  So, the facts may

12  be different based on that or at least there's a different

13  emphasis on the same facts.

14          MR. McCARTHY:  I would lean heavily towards the

15  second, Your Honor.

16          THE COURT:  Right.

17          MR. McCARTHY:  These aren't new facts; they're

18  simply not.  And the notion that stressing the fact that

19  this discussion regarding long-term financing, which my

20  client has conceded throughout the course of this

21  litigation, which has gone on for years -- and we would

22  actually look at this amendment as probably the third

23  considering they already changed their theory of the second-

24  amended complaint -- of the first-amended complaint,

25  dropping the repo claims.  So, was that an amendment or was

Page 103

1     it not?

2              In any case, when you look at those -- what

3     they're claiming are new facts, it's truly irrelevant.

4     This -- sure, the integration clause is dated in a finite

5     agreement, the loan for the $95 million dollar loan.  That

6     loan was amended and extended twice.  And in those

7     extensions, which came at the Soffers' request, of course,

8     all the terms of that $95 million dollar loan were extended

9     as well.  The parties thought about that.  They were

10    represented by counsel.  We can't forget that these are very

11    sophisticated parties.  All the cases address that.

12             So, I would say that although it's not -- the

13    notion that they can amend or perhaps stress these facts

14    that the promisor -- the so-called promise was made after

15    the first $95 million dollar loan, I would say that it's

16    really irrelevant here because the timing of the original

17    $95 million dollar loan isn't finite of itself.  Because per

18    the request, it was extended twice up until the very day

19    that the Soffers filed suit, and they were the ones who

20    brought this suit first, the day the loan came due.

21             So, I think any reasonableness -- and of course

22    we're talking about reasonableness here -- how reasonable

23    was it for the Soffers to rely on a supposed handshake deal

24    that was going to be for over a half a billion dollars in a

25    fully mortgaged sophisticated transaction, how reasonable

Page 104

1   was that?

2          So when you look at whether a promise was made

3   before or after the first $95 million dollar loan, you need

4   to look at the big picture of what the case is saying here,

5   Your Honor.  And I think the fact that the loan was extended

6   and it became another meeting of the minds of the parties

7   here to extend it, extend all the original terms, shows that

8   that integration clause -- you can't even put a finite term

9   on that.

10          THE COURT:  Let me ask you to comment on

11   Mr. Meister's contention that the integration clause, no

12   matter how you interpret the words "the subject matter

13   hereof," is applicable to parties who are different from the

14   parties who are alleging reliance on the proposed $625

15   million dollar advance.

16          MR. McCARTHY:  I think the facts there may not

17   have come out as accurate as I think they are where the

18   actual -- the Turnberry parties are parties to the $95

19   million dollar loans.  Because they were the mortgagors --

20   and I may be mistaken there -- but you have the Turnberry

21   parties that hold the property, which was the collateral for

22   the $95 million dollar loan.  And that foreclosure was on-

23   going and that's one of the first amendments that came up

24   when they amended their complaint to bring up the repo claim

25   to prevent that foreclosure.

1           So, I think those parties are a little bit closer

2    to that $95 million dollar loan than maybe was put out

3    there, but separately, we're not talking about enforcing a

4    $95 million dollar contract.  I mean we are, but that's why

5    we want to focus on in this dispute, but with respect to

6    looking at promissory estoppel, we're not talking about

7    enforcing that promise.

8           We're saying in light of the integration clause

9    that's there, how reasonable was it for these other parties,

10   these sophisticated business parties, to rely on this

11   supposed handshake deal?

12          So, I don't think they could ever make the

13   argument with a straight face that the Turnberry entities

14   weren't aware of the integration clause even if they weren't

15   parties to the original loan agreement.

16          THE COURT:  Yes, but here's the issue that's

17   presented by Mr. Meister and I don't have the facts before

18   me at the moment as to who signed what and to who knew what.

19   He is, however, arguing that the integration clause, even if

20   you were to construe it strictly would be construed against

21   the parties to the $95 million dollar loan and would not

22   preclude other related parties, even if they knew about it,

23   from asserting a promissory estoppel claim.

24          What's your position with respect to that

25   argument?

Page 106

1           MR. McCARTHY:  I think that is a far too granular

2    reading of the integration clause and of the $95 million

3    dollar loan.  Again, we're not talking about small numbers,

4    even with the $95 million dollar loan.  We're talking about

5    a loan that was fully collateralized and even per the terms

6    of the integration clause, when you look at it, it's much

7    broader than just saying it's a finite integration clause

8    that only applies to the parties, whether it be Jack and

9    Jeffrey Soffer -- Jacqueline and Jeffrey Soffer that signed

10   the actual promissory note.

11           We're talking about a fully integrated, complex

12   business transaction, even when you're looking at the $95

13   million dollar loan by itself.

14           And I think Your Honor was correct when you

15   pointed to the final sentence of the integration clause

16   which talks about "the subject matter hereof."  And while

17   we're looking at the subject matter hereof today, and for

18   this case in general, we've been talking about this since

19   the first complaint that was ever filed in this case, this

20   being an interim loan, a loan that would be taken out.

21           So, when you're talking about this loan, how is it

22   going to be taken out?  It's going to be taken out by this

23   supposed long-term financing.  So, even when you're -- even

24   if you look at it in a granular spirit, that this loan, in

25   and of itself, when they were talking about it was called

1    the "take out loan" because it was going to be repaid,

2    supposedly by this long-term loan.

3            That has been their theory and that's why it would

4    be absolutely unreasonable for a party to think that the

5    terms of this contract, that was, by their own

6    allegations -- and we're not talking about someone just

7    standing up in court -- we're talking about pleadings.

8    We're talking about sworn statements, even from Brett Ersoft

9    who says this was a loan that was going to be taken out by a

10   long-term loan.

11           It would be absolutely unreasonable for a party to

12   think that you could have a handshake deal in light of this

13   integration clause that you could rely on and then go about

14   your business as if the integration clause never existed.

15           I think you were also correct, though, that this

16   case isn't just about an integration clause.  The ruling --

17   the Motion to Dismiss ruling stands on its own.  And I think

18   the cases, Your Honor, cited, within that ruling which

19   haven't been addressed, the Klineberg (ph) case, the Kelter

20   (ph) case, those are controlling cases and they're spot on.

21   They talk about promises made before and after contracts and

22   whether it's reasonable to rely on those promises, and, of

23   course, we know how those come out.  They weren't even

24   addressed in the briefing.

25           But, here, Your Honor was spot on that this

Page 108

1    promissory estoppel claim fails even if the integration

2    clause did not exist and there's several reasons for that.

3              One, procedurally, as we talked about, there's no

4    new facts or new (indiscernible - 34:20) but substantively

5    we're talking about -- the Courts that look at this,

6    especially in the Second Circuit, look at the transaction as

7    a whole.  And what we're looking at here is more than a half

8    a billion dollars in a complicated deal that they're saying

9    was just reasonable to assume it was going to go forward

10   when you had a handshake.

11             In light of this -- in light of the type of

12   transaction it is, even if you didn't have an integration

13   clause, you couldn't have promissory estoppel here.

14             If Your Honor allows them to amend, we will be

15   right back here.  Not on a motion for summary judgment;

16   we'll be here on a motion for dismiss if Your Honor allows

17   it first, because they cannot meet the bare bone elements of

18   promissory estoppel, which is clear in the Second Circuit.

19   You need an unambiguous promise, you need that reasonable

20   reliance, and you need a particularized injury, and they

21   can't meet any of those three prongs.

22             When you're talking -- this is especially true

23   when you have a contract that would otherwise be barred by

24   the statute of frauds.  And this is precisely that type of

25   contract.  You have a contract here for a long-term

1    construction loan, again, for over a half a billion dollars.

2    It's barred by the statute of frauds because both it could

3    never have been completed in a year, even by its own terms,

4    and even if you exclude that, it's a contract that concerns

5    real property.  This was going to be fully mortgaged.

6           So, when Courts look at using promissory estoppel

7    to get around a statute -- a claim that's otherwise barred

8    by the statute of frauds, it requires an unconscionable

9    injury, a particularized unconscionable injury.

10           And the cases are very clear.  The Klineberg case

11   actually cites to this and talking about an unconscionable

12   injury in the case Your Honor cited.  But there's other

13   cases as well and they talk about lost profits, lost

14   business opportunities, damages that kind of flowed from the

15   expected promise.  Those are simply not the unconscionable

16   injuries that could ever survive under a promissory estoppel

17   claim when you have statute of fraud otherwise applying.

18   And that's taken apart, moving aside from the integration

19   clause.

20           Even if the integration clause wasn't applicable,

21   which of course it is, and we think that's the easy and

22   correct way to dismiss this -- even if it wasn't there --

23   you have grounds -- more than enough grounds to get away

24   with this claim on a Motion to Dismiss.

25           So, the integration clause is there.  It certainly

Page 110

1    strengthens our analysis, but the integration clause isn't

2    the only writing that strengthens our analysis.  The term

3    sheets, which have been brought up here today, those are

4    made clear by their own terms that this is a non-final term

5    sheet and needs to be executed, as any term sheet for a

6    large construction loan does.

7              This isn't -- when Your Honor's presented with

8    this evidence, if it ever comes before you, these aren't

9    going to be surprising term sheets to you.  You've seen

10   deals that have been negotiated like this.

11             So, what they're talking about now is that it was

12   reasonable to rely and rule upon this.  That flies in the

13   face of both the integration clause and the terms sheets

14   because those term sheets say this isn't a final promise.

15             In light of that, when you're looking at a type of

16   oral promise that flies in the face of prior written

17   agreements, Courts will simply will not enforce the

18   promissory estoppel claim.

19             THE COURT:  There is an element that Mr. Meister

20   emphasized in reading the S draft declaration, which is the

21   (indiscernible - 37:26) practice between the parties in

22   reference to financing transactions, that -- and I'm not

23   dignifying the argument, I'm just restating it -- that give

24   the borrower an added sense of comfort in relying upon not

25   fully documented commitments from future financing.

Page 111

1            Because what I think Mr. Meister is saying -- and

2     I'm not trying to be his spokesperson here, I'm simply

3     trying to engage in a conversation -- I think he's saying

4     because of the history in the course of dealings between the

5     parties, in a setting in which it might not have been

6     reasonable for a stranger to rely, it might have been

7     reasonable for these borrowers to rely, notwithstanding the

8     legends that were printed on the term sheets, because in the

9     past, at least, these negotiations always resulted in

10    consummated financings.  I think that's what he's saying.

11            Given that, do you give any credit to that course

12    of dealing argument for purposes of the promissory estoppel

13    claim that he wishes to preserve?

14            MR. McCARTHY:  I don't, Your Honor, and I can't,

15    in light of the full Ersoft affidavit and in the light of

16    everything else I've seen in this case.  The Brett Ersoft

17    affidavit talks about, yes, the course of dealing with these

18    parties and the fact that Mr. Ersoft who had a strong

19    relationship as the face man for Lehman when he was there

20    with the Soffers.  And as Your Honor said at one point in

21    this litigation before, I'm sure those parties did shake

22    hands throughout the course of their dealings, but what the

23    Ersoft affidavit says is that there was never a promise that

24    Lehman made in the past that didn't come to fruition in a

25    final written agreement.  That's what he's talking about.

Page 112

1          He's not saying that we made handshake deals in

2     the past and we just went ahead and loaned them $600 million

3     dollars without ever finalizing something in writing.

4     That's not what Mr. Ersoft says in his affidavit; that's

5     simply not true.

6          And then when you look at the rest of the Ersoft

7     affidavit, he goes right back to what the prior allegations

8     were and prior sworn statements of a lot of people in this

9     courtroom, that this was a take out loan.  That these

10    transactions were very similar.  That's been their

11    allegation.  That's been their theory.  And they have a

12    sworn affidavit from Mr. Ersoft that this was supposed to be

13    a take out loan.

14          So, it ties you right back to that integration

15    clause and whether or not it was reasonable for any of these

16    parties to rely on oral promises when you have a fully

17    written agreement that has an integration clause and you

18    have a history of dealing, a long history of dealing where

19    every other contract has been put in writing.

20          Even smaller contracts, this smaller, $95 million

21    dollar loan is put in writing.  That's what Mr. Ersoft is

22    talking about.  He's not talking about a history, of course,

23    of dealing with oral promises.

24          THE COURT:  Okay.

25          MR. McCARTHY:  Your Honor, I think a better

Page 113

1    analysis here, other than -- Mr. Meister used a couple

2    creative analyses to talk about what was really happening

3    here in this case.

4         What's really happening here is you're talking

5    about a party saying they agree with the Court that it was

6    improper, unreasonable for them to rely on a promise, to

7    enter into a $95 million dollar loan, but then they're

8    saying it was reasonable for the very same party, very same

9    group of entities to rely on that exact same promise to do

10   something else.

11        If you want to take a simple transaction, I think

12   the proper analysis would be if you have a seller and a

13   buyer of goods.  You could have someone on the street

14   selling, for instance, bicycles, and you tell the buyer,

15   this bicycle is going to really work great for you.

16        But the buyer looks at the bicycle and they can

17   see it's not a very good functioning bike.  It's got flat

18   tires and it's not going to be a good bike.  And then that

19   buyer comes to this Court and says, Your Honor, well it

20   might not have been smart or reasonable for me to rely on

21   his statement to buy that bike, which I did, but it was

22   reasonable for me to stop negotiating with other sellers of

23   bikes.

24        And that's what they're saying here.  They're

25   saying, Well, I shouldn't have relied on that promise to

Page 114

1      enter into the $95 million dollar loan.  They've now

2      conceded that point.  They said in light of the integration

3      clause, that was unreasonable.  It was reasonable for me to

4      stop negotiating with other lenders to go and get another

5      loan add that's not -- Courts don't look at your actions and

6      what you did to determine whether it was reasonable.

7               The first focus is on the substance of the

8      promise.  Was there any -- was it reasonable to rely on the

9      substance of that promise?  And here we're talking about an

10     oral promise, a supposedly oral promise -- of course we

11     refute that that oral promise was ever made -- but they're

12     talking about relying on an oral promise to enter into a

13     transaction with multiple parties for millions and millions

14     of dollars in a complicated deal that was going to be

15     collateralized by property.

16              It's absolutely unreasonable, any way you take it,

17     for them to have relied on this promise and stop negotiated

18     with other lenders.

19              THE COURT:  Well, that may be, but we're dealing

20     with a 12(b)(6) motion, not a motion for summary judgment or

21     a trial on -- that goes to judgment.  And part of what

22     Mr. Meister is doing here is looking for another bite of

23     this from a slightly different angle.  He seems to be saying

24     it's true that I previously that this was in a sense a fully

25     integrated transaction in which the $625 million dollars in

Page 115

1    take out financing was tied to the $95 million dollar loan

2    and my clients relied upon the availability of the $625

3    million dollar loan in entering into the $95 million dollar

4    loan, which also includes the integration clause.

5            But he's spinning it differently today and he

6    spins it differently toward the end of his Motion for

7    Reconsideration.  He's basically saying I want a do-over in

8    my ability to show that there are certain promises that

9    either do or do not give rise to cognizable promissory

10   estoppel claims that were made following execution of the

11   $95 million dollar loan.  And on that basis alone, I want

12   the ability to go through discovery and if I'm knocked out

13   at the summary judgment stage, maybe then I'll complain

14   then, too, but at least I'll have my ability to deal with

15   this later and not at the pleading stage.  That's what I

16   hear him telling me today.

17           What's your response to that?

18           MR. McCARTHY:  My response to that, Your Honor, is

19   12(b)(6) serves a very specific purpose and that is to

20   prevent parties from having to go through a boondoggle of

21   discovery when there's absolutely no support at all for

22   their claim, and that's what we have here.

23           And I think when you look at this case, which, of

24   course, started in February of 2009 -- this isn't a new

25   case -- and you look at the history of what's happened here,

1   you backtrack a bit, you can really see what's going on.

2   This isn't about buying some extra time for a promissory

3   estoppel claim or about the substance of their claim,

4   because there is none.  It's about delay and we get that.

5           This isn't a targeted motion.  This is about

6   buying time again, so they can bring back in a full new

7   theory of their case that's not targeted when you look at

8   what's going to happen.  It's a strategic decision they've

9   made -- a defense decision -- it gets made all the time, and

10  it's a game of delay here.  To delay paying the creditor who

11  has a written contract and that deserves repayment.

12          And it's not just here.  There are other cases out

13  there.  We've seen that in diligence.  We've seen that in

14  discussions.  There are numerous other creditors; it's

15  nothing new.

16          But considering where we've been in this case --

17  and I'll trace it for just a moment -- the time of delay

18  needs to come to an end now.  As we were here last time, we

19  talked a little bit about how the harm to my client -- harm

20  to Lehman has now become imminent.  Other cases are moving

21  forward.  Other cases are -- there's a concern that there

22  could be other judgments against the Soffers and Lehman now

23  deserves a chance after more than two years of litigation to

24  try and get in line to streamline this case and try to get

25  in line with the other creditors and see what is really the

Page 117

1    issue here, which is, is there a chance to collect, and if

2    so, how much can you collect?  That's what this is really

3    going to come down to and we understand that, and we're

4    trying to push the litigation in a streamlined manner so we

5    can get there.

6         Now, Your Honor mentioned this already a little

7    bit, but this isn't the first time they've had an

8    opportunity to do a redo.  In February of 2009 they brought

9    this case the first time.  Their argument then was breach of

10   contract because the supposed take out loan was intertwined

11   with the long-term handshake deal and that was their

12   original claim.

13        Two years later, approximately, when they wanted

14   to prevent a foreclosure, they asked for a redo and they

15   asked for our consent for that redo and they came to court

16   and asked for consent.  We understood that consent was

17   coming with a -- in agreement -- at least in my memory it

18   was that that would be the last redo, obviously it wasn't.

19   We allowed that claim to go forward and Your Honor listened

20   to our hearing and was very gracious in the time you granted

21   us listening to the dismissal only to send us back to

22   mediation so that we could try and settle this thing and see

23   what was really there.

24        That had some months in delay.  I won't get into

25   the substance of the mediation, Your Honor, but certainly it

1   did not resolve these disputes.  We came back before the

2   Court and we asked -- we were here, again, and we saw

3   another redo, where, for the first time we heard when we

4   were sitting at this table -- it was the first time that you

5   heard it as well -- that their theory of fraud based on repo

6   is no longer their theory.

7            And now they want to rely on this promissory

8   estoppel claim -- or at least the first promissory estoppel

9   claim.  And so we went back to mediation, again, but, yet,

10  fruitless again and more months go by.  More months go by

11  and we have to come back and I had to ask Your Honor to rule

12  on the motion and, you know, this Court did exactly as it

13  said it was going to do and ruled with a very thoughtful

14  opinion and you told the parties to focus on the substance

15  of the claim.

16           We went back thinking we would do this, instead we

17  have this motion and now they're asking for a total another

18  redo, a totally new theory, and this would prejudice my

19  client.

20           They're seeking full discovery in all of this --

21  we're not trying to bar discovery.  We're actually being

22  very (indiscernible - 47:39) in the documents that we're

23  turning over.  We've had numerous conversations about this.

24  But as we see it, the only things that is driving this

25  litigation at this point is that my client has had to take a

Page 119

 1    bullish position and we have to in negotiations in saying

 2    delays can no longer happen.

 3            We've had some delays in discovery that we've had

 4    to bring up.  We've had even delays in some substance.

 5    Recently, we had about a week-long delay where we thought we

 6    were going to have to be here asking for a default because

 7    there wasn't an answer to our counterclaims.  We had to make

 8    hard decisions, internally, about whether we bring those

 9    forward to the Court for decisions or whether we try to

10    focus on the substance of these claims.

11            And instead we've chosen to focus on the substance

12    of the claims.  And the substance here, are the undisputed

13    facts.  You have sophisticated parties, sophisticated

14    entities that are listed on these pleadings.  They

15    negotiated a contract, a final written contract for $95

16    million dollars.  Pen was put to paper and it was negotiated

17    with well-paid, well-regarded counsel of everybody's own

18    choosing.

19            Those are the facts.  That's the undisputed facts

20    of this case and that's what we want to focus on.  We're not

21    trying to prevent people from seeking other evidence that

22    might be tangentially related, but if we allow this claim

23    back in after everywhere we've already been, it will be a

24    complete boondoggle and we'll be starting from square one,

25    because we will move to dismiss that claim.

Page 120

1          Whether -- if the Court allows it -- whether on a

2    Motion to Dismiss or summary judgment because there is

3    absolutely no foundation for the claim as we see it, Court's

4    routinely dismiss promissory estoppel claims on a Motion to

5    Dismiss exactly for this reason and there's numerous courts

6    in this district in this circuit.

7          THE COURT:  Okay.  Before giving Mr. Meister an

8    opportunity to respond, I have a question that really

9    applies to both of you, not directly relating to the

10   argument, but stimulated by the argument.

11         One of the reasons the Motion to Dismiss was

12   decided when it was is that I received an unsolicited

13   telephone call in August from the mediator who was handling

14   your mediation discussions.  It's the first time in my

15   experience that a mediator has ever contacted me in

16   connection with a matter on my docket and, frankly, it's the

17   first time, to my knowledge, a mediator has ever contacted a

18   Court directly.  It's just not done.

19         And what I was told was that it might well

20   expedite a resolution of the business issues between the

21   parties if the Court were to, without delay, decide the

22   pending Motion to Dismiss.

23         Immediately before the hearing, in connection with

24   my rendering of a ruling on the Motion to Dismiss, you and

25   your colleagues filed a status report that indicated that

Page 121

1   the mediation had failed, that it was futile to continue the

2   discussions and that -- and I'm paraphrasing -- regardless

3   of the outcome of the Motion to Dismiss, mediation was no

4   longer something that Lehman was prepared to engage in

5   because it was no longer productive.  That's my paraphrase

6   of what I recall.

7           My question today is this:  Apparently, the

8   parties having involved in efforts to move forward with

9   document discovery.  Mr. Mister has referenced the fact that

10  there might be some depositions in the early months of 2013.

11  I have no idea where your overall discovery schedule will

12  take you.  But this is a time consuming and expensive

13  process.  Your stated goal, which is to get on with some

14  kind of judgment against your Defendants, so you can get in

15  line is not necessarily consistent with your stated

16  strategy, which is to litigate, because litigation is time

17  consuming and expensive and fraught with risk and

18  uncertainty, including appeal risk, and any appeal,

19  undoubtedly will add even more time to your timeline,

20  presumably to the estate's detriment.

21          With that preamble, my question is:  Why are you

22  gentlemen not proceeding back to the mediation table?

23  Because it seems to me that you are very familiar with the

24  circumstances.  You are certainly able to address the

25  potential outcome of the issues, whether or not the

Page 122

1      complaint is ever amended.  And it seems to me that

2      everybody is wasting time here in litigation.

3              Question to Lehman:  Do you persist in the views

4      stated in your filed report that mediation is simply

5      something you're no longer prepared to consider?

6              MR. McCARTHY:  Your Honor, I don't want to clarify

7      what our report says --

8              THE COURT:  It says what it says.

9              MR. McCARTHY:  Exactly.  Exactly, Your Honor.

10             Lehman's position is that's its ears are open and

11     it certainly views this as a case that could be settled, and

12     the type of case as many other cases as my co-counsel with

13     Weil and other counsel have been here before Lehman have

14     settled cases with you.  Our position in this particular

15     case, and in call cases, is that it takes two to settle.

16             And when we viewed the prior mediations -- and

17     they were extensive; both parties were there for numerous

18     hours with representatives -- we looked at what happened

19     there and we said at this point in time we need to cut it

20     off because those particular mediation attempts, those

21     settlement attempts were not getting anywhere.  The parties

22     were at a stalemate for so long with us viewing -- and this

23     is our view -- with nothing meaningful on the table.

24             And so that's why we told Your Honor at is that

25     point in time that the efforts were futile.  Now, I thought

Page 123

1    Your Honor might ask you about this and I certainly wanted

2    to give you an update on it and so I did ask my client

3    whether there have been any new updates, whether any parties

4    have changed their position based on the recent rulings or

5    not so recent rulings anymore, but based on the recent

6    occurrences and your instructions, which I think have been

7    clear throughout the course of this case to try to continue

8    to see if we can make this happen and there hasn't been any

9    new change in position, based on what I've been told.

10          Our ears are open and we are ready to listen if

11   there is an offer on the table.  And they continue to be

12   open, but this type of case, where we've had these efforts

13   before, where we've been with a mediator before, who used a

14   lot of different techniques to try and bring us together --

15   and simply there was no ground being made.

16          I think it would be futile again to send us back

17   to mediation.  We are hopeful that there is an offer or

18   something that comes across the table at some discussion

19   point that would tie us back into having a meaningful

20   settlement discussion, but at this point, I would have to

21   stand by our statement, which was sending us back to

22   mediation would be futile because we've seen what happened

23   there and we had -- from our view, at least -- no reason to

24   believe that there was going to be any change in position

25   which would allow Lehman to settle in good faith.

Page 124

1          So, I think at this point, Your Honor, absolutely,

2    our ears are open, but we view this as a type of case where

3    a streamlined litigation, one where 12(b)(6) motions have

4    already been briefed extensively, argued extensively, and

5    ruled on thoughtfully, the case should move forward in a

6    streamlined fashion.

7          If there comes a time down the road or it makes

8    sense to cut off the well, cut off the spigot, so that the

9    parties can conserve some costs and try to really meaningful

10   settle, we won't hesitate to get back here, Your Honor, and

11   tell Your Honor that and ask to take a reprieve from the

12   schedule.

13         But at this point, we don't see any reason to do

14   that and it would just be more delay.  And more delay to the

15   pardon me of my client.

16         THE COURT:  Okay.  Thank you.

17         MR. McCARTHY:  Thank you, Your Honor.

18         THE COURT:  Mr. Meister?

19         MR. MEISTER:  Thank you, Your Honor.

20         I'll be brief.

21         Let me proceed sort of backwards starting with the

22   discovery and mediation issues.  With respect to discovery,

23   I believe what happened was that the electronic search terms

24   were agreed to a long time ago before Your Honor entered a

25   decision dismissing claims, and, therefore, those search

Page 125

1    terms were fashioned in a manner where they were designed to

2    pick up the term sheets related to the $625 million dollar

3    take out and those documents have already been isolated on

4    both sides.

5            So, it is simply not true that there is any delay

6    or dilatory aspect to this at all.  I believe, certainly on

7    our side, and I believe, for the reasons I just articulated

8    on the Lehman side, there wouldn't be a second of delay.

9    There would simply be captured into the discovery documents

10   already isolated over the past several months by search

11   terms that were designed before the decision when this claim

12   was in the case.  And the depositions are not going to

13   change -- at least the persons deposed won't change.

14           So, there's no delay associated with the request

15   to amend the claim or the request to reverse the decision,

16   based on the reasons I articulated.

17           In addition, I think -- let's think together for a

18   moment about what happens in the absence of that.  If you

19   were to deny all the relief that we have requested, I

20   suppose I would ask the Court under 8003, I believe it is.

21   It's essentially for permission to appeal a non-final order.

22   I don't know whether, of course, the Court would grant that.

23   I think I might have to actually ask the District Court as

24   well.

25           If I was denied that relief, I would likely be

1    forced to appeal it when I could appeal it when it became

2    final because, Your Honor, if the situation doesn't change

3    and all the claims that Lehman has on its loans are one

4    without any offsets by my clients -- on my client's

5    behalf -- it is of a magnitude that would annihilate my

6    clients, which is why you may recall the negotiations and

7    the mediation were very difficult and trying because they

8    kind of took the form of a virtual bankruptcy discussion of

9    my clients.

10           So, I think what we're headed for in the absence

11   of some relief here is my clients or another bankruptcy

12   trustee or a debtor in possession or in some form or another

13   seeking an appeal here.  And if, after all this discovery is

14   concluded, and we cut short the discovery on the $625

15   million take out, it would be very inefficient in my view.

16           I want to turn to one sentence, Your Honor, in the

17   Ersoft affidavit because I think counsel was not accurate in

18   his characterization.  The one sentence reads -- it's in

19   paragraph two of the declaration, quote, "The relationship

20   with these clients and others like them was such that Lehman

21   and Turnberry would quickly agree to the terms of financing

22   on an oral and formal basis and documents would be prepared

23   later" closed quote.

24           So, Ersoft does plainly say that there was this

25   course of dealing.  Of course they can refute it, but the

Page 127

1    Ersoft does say that and I think that does lend significance

2    credence to our client that it was reasonable for us to rely

3    and that corresponding with it was foreseeable on Lehman's

4    part to expect our reliance.

5            Counsel had made the comment that somehow

6    Turnberry/Centra Sub was a party to the loan agreement.

7    That's not true, Your Honor.  I have the loan agreement in

8    front of me.  It is in the record.  There are three parties

9    to the loan agreement:  Lehman Brothers Holdings, Inc.,

10   Jeffrey Soffer, and Jacqueline Soffer.  It's on the first

11   page of at the document.

12           There are some other parties that consent to it,

13   but it's not Lehman, Turnberry/Centra Sub the promisee of

14   the $625 million dollar take out.

15           In addition, there was some loose talk sort of

16   assuming that there was caveats, for lack of a better term

17   or conditions, in the $625 million dollar term sheets that

18   made them non-binding.

19           The first instance, I want to point out -- and if

20   I'm wrong, counsel will correct me -- but to my knowledge,

21   those term sheets are not been the Court.  The $95 million

22   dollar loan agreement, of course, is before the Court, but

23   the term sheets are not been the Court.

24           Second of all, it's not true.  The term sheet

25   says, "Lender's obligation to make the loan for borrower

Page 128

1   shall be subject to lender's review and approval of the

2   items on Schedule A."

3          So, that sounds more to me like a conditionally

4   binding agreement.  If -- whatever the conditions are in

5   schedule A, which I didn't go back and study -- then, they

6   are bound.

7          But I think the important point here is this is

8   not a summary judgment motion; it's a 12(b)(6) motion and

9   those documents are not in front of the Court.

10         I want to remind the Court respectfully, again,

11  that the yes, it is true, Your Honor, that I am asking the

12  Court in the alternative to allow me to amend, to plead, and

13  after a post-$95 million dollar loan execution, a statement

14  of the $625 million dollar take out commitment.

15         By the way, these are not oral promises; they are

16  written promises.  Whether they're binding writings is a

17  separate matter, but they are certainly written.  I have

18  them on my desk right now.

19         But I do want to be clear that while we are

20  definitely asking for that relief and while we can't see how

21  the integration clause could possibly be involved with those

22  statements because they are subsequent to, not prior to the

23  $95 million dollar loan agreement, we are also alternatively

24  saying both, one, that the $95 million dollar loan agreement

25  is a document to which the Plaintiff on this claim is not a

Page 129

```
 1    party and that is just erroneous to use the integration

 2    clause to bar a claim to a non-party -- asserted by a non-

 3    party and that it isn't the subject matter.

 4              It's very clear to me, Your Honor, that the words

 5    "subject matter" mean the loan, and the loan is the $95

 6    million dollar loan.

 7              I don't think any reasonable person would --

 8    signing that $95 million dollar loan would think it means

 9    that it vitiates the $625 million dollars take out

10    commitment.

11              And I want to take exception to counsel's

12    characterization of our position.  I am not saying that in

13    this motion that it was unreasonable for us to rely on the

14    $625 million dollar take out for purposes of the $95 million

15    dollar loan, but it was reasonable for us to forego

16    discussions with other lenders.  What I'm saying is, yes, we

17    believe the 625 million was true, based on the course of

18    conduct described in the Ersoft declaration.  We relied on

19    it when we enter into the $95 million dollar loan and we

20    relied on it when we discontinued conversations with the

21    Bank of America, Merrill Lynch, and Goldman Sachs, all of

22    whom had made written offers to finance the shopping center.

23    And if we had gone with any of them, my clients would own

24    that shopping center today.

25              What we are saying is that the integration clause
```

Page 130

1    bars the Soffers from arguing that they don't have an

2    obligation to repay the $95 million dollars, but it does not

3    bar Turnberry/Centra Sub from making a claim on a promissory

4    estoppel basis that it suffered damages, in the form of lost

5    equity, by relying on the $625 million dollar promise and

6    that it was inappropriate -- it was particularly

7    inappropriate, we respectfully submit, on a 12(b)(6) Motion

8    to Dismiss that claim.

9            Your Honor, my -- I was pretty deeply involved in

10   the negotiations that took place in the mediation.  I have

11   not been involved since the mediation formally ended.  My

12   understanding is that there have been conversations between

13   principals of my client and principals of Lehman or perhaps

14   the trustee.  I am not privy to those conversations.  I

15   don't know exactly where they have left off, but we are more

16   than happy to go back to mediation.

17           We tried very hard -- obviously I'm not going to

18   get into the substance, but I do want to assure the Court

19   that there were substantive discussions and meaningful

20   substantive offers.  It was a very difficult negotiation and

21   we're happy to go back.

22           But I don't want that to be misconstrued by my

23   adversary.  I'm not looking to delay these proceedings.

24   This motion is targeted, contrary to what counsel says.  It

25   will not delay discovery.  We are not looking to slow the

Page 131

1    case down.  If Lehman is willing to go back to mediation, we

2    want to settle the case and we want to litigate the case,

3    professionally and efficiently.

4              We think that, frankly, leaving things where they

5    stand is an inefficient way for the reasons I previously

6    said.  And what I see on the horizon in the event that

7    things -- the discovery is not opened or is closed to this

8    issue, I just think it's an inefficient way to proceed

9    because ultimately, it's such a massive matter from the

10   perspective of my client that I see it involving leaving no

11   stone unturned -- for lack of a better expression.

12             And if a District Court on appeal were to agree

13   with my analysis, it would be a shame years from now,

14   literally, this then go back to the discovery.  It seems to

15   be much more practical to -- since all the discovery has

16   been done on the search terms, to, at a minimum, allow us to

17   amend, get those documents out and include them in the

18   examinations before trial, and, frankly, I don't think there

19   should be another Motion to Dismiss.  I think we should get

20   some evidence before the Court.

21             Thank you very much, Your Honor.

22             THE COURT:  Do you have anything more?

23             MR. McCARTHY:  I just want to clarify a point on

24   production and this might just be a miscommunication, but I

25   think as Mr. (indiscernible - 1:08:04) and I have discussed

Page 132

1    regarding discovery a bit, those search terms were run on

2    the documents regarding the supposed long-term financing.

3    We are not preventing -- we are not holding those back

4    because it would be almost too costly to rereview all of

5    them.  We see nothing in there that would want us to prevent

6    from holding them back.  My point on delay -- so they will

7    see those docs and if they want to bring them before the

8    Court for whatever reason, they certainly can.

9            But my point on delay, Your Honor, is the exact

10   reason a Motion for Reconsideration requires a demanding

11   standard.  We're not here on a 12(b)(6) anymore.  We're here

12   on a motion to reconsider a ruling that the Court already

13   made.

14           The point on delay is even if they get those

15   documents, if they're able to amend or able to keep their

16   claim back in, we would be rearguing, rebriefing,

17   reinvestigating something that already happened.  And that's

18   why a motion to reconsider requires such a demanding

19   standard; one they have not met here.

20           And that's why I want to leave the Court pointing

21   to the fact that we're not looking at 12(b)(6) again.  We're

22   looking at whether you should reconsider.  And that's what

23   allows us to look beyond what we talked about in 12(b)(6)

24   and look into if these claims do survive, what's going to

25   happen with these claims?

Page 133

1           And the Court is allowed to look at the claims and

2      see whether they will survive or won't.  Is there any

3      futility in letting a claim survive and we are -- we're

4      telling the Court that there absolutely is.  This type of

5      promissory estoppel claim that they're now alleging requires

6      a particularized unconscionable injury.  It's one they

7      simply cannot allege.  It's one they haven't even tried to

8      allege.  That comes from a case called 720 Lex Acquisition,

9      which is 2011 West Law 5039780, Southern District of New

10     York, and another one, Darby Trading 568 F Supp.2d 329,

11     Southern District of New York, 2008.

12           Cases like this required an injury is separate and

13     apart from what you would have expected if the promise was

14     actually made.  All they're saying is they lost the

15     opportunity to get another lender.  That is exactly -- that

16     is a lost business opportunity, one that is strictly

17     forbidden under the law.

18           And also, we're allowed to look up how did -- what

19     are those damages?  What are they going to prove up?

20           These damages are entirely too speculative.  We've

21     had it in our briefing before.  They're going to prove that

22     they would have been able to get another loan from another

23     lender.  That loan would have been on terms that would have

24     been great for them.  It would have saved their project.  It

25     would have made it so they wouldn't have gone through with a

Page 134

1    foreclosure that's already happened.

2         I mean how many ifs are we going to go down once

3    this claim is -- if it's allowed back in -- and that's

4    what -- on reconsideration, Your Honor, you are allowed to

5    look at that and we should to see if it's futile to let this

6    claim back in.

7         Nothing else, Your Honor.  Thank you.

8         THE COURT:  Okay.  Thank you.

9         I'm going to take this under advisement.  The

10   parties are encouraged to return to mediation between now

11   and the end of the year.  I'm not ordering it.  I think that

12   this case has many twists and turns to it.

13        The damages, as noted are speculative on these

14   claims.  These claims are of highly questionable value even

15   if they are part of the compliant, but I believe that the

16   mediation that I'm encouraging should at least assume the

17   possibility that these claims may be reinstated at some

18   point, either through amendments to the complaint or

19   possible reconsideration of the 12(b)(6) dismissal.

20        I say that because I only think it appropriate to

21   level the playing field, somewhat, for purposes of

22   conversations that may take place.

23        The waste associated with this litigation is

24   manifest and should be factored into your consideration as

25   to whether proceeding promptly with some additional

Page 135

1    mediation sessions may be sensible.

2              I hope to have a decision before the end of the

3    year either way.   We're adjourned.

4              MR. McCARTHY:   Thank you, Your Honor.

5    (Proceedings concluded at 3:30 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1                    R U L I N G S

2

3   DESCRIPTION                                    PAGE

4   Notice of Final Applications of Retained        11

5   Professionals for Final Allowance and Approval

6   of Compensation for Professional Services

7   Rendered and Reimbursement of Actual and

8   Necessary Expenses Incurred from

9   September 15, 2008 to March 6, 2012

10

11  Plan Administrator's Cross-Motion to Compel      56

12  Giants Stadium LLC to comply with Rule 2004

13  Subpoenas and Objection to Giants Stadium's

14  Motion to Quash the Rule 2004 Subpoenas

15

16  Motion to Quash a Subpoena filed by             56

17  Bruce E. Clark on behalf of Giants

18  Stadium LLC

19

20  Amended Motion of Giants Stadium LLC for        56

21  Leave to Conduct Discovery of the Debtors

22

23

24

25

**Page 137**

1                    R U L I N G S, CONTD.

2

3    DESCRIPTION                                      PAGE

4    Motion for Entry of an Order Approving            62

5    Settlement Agreement Between the Trustee and

6    Lehman Brothers Finance AG, in Liquidation

7    (a/k/a Lehman Brothers Finance SA, in

8    Liquidation)

9

10   Trustee's Motion for Approval of General          63

11   Creditor Claim, Objections Procedures

12

13   Debtor's Three Hundred Fifty-Seventh             66

14   Omnibus Objection to Claims

15

16   Objection to Claim No. 17763 Filed by Laurel     77

17   Cove Development, LLC

18

19   Three Hundred Twentieth Omnibus Objection        80

20   to Claims (No Liability Rose Ranch LLC Claims)

21

22   Debtor's Three Hundred Twenty-Ninth Omnibus      85

23   Objection to Claims (Misclassified Claims)

24

25

1              R U L I N G S, CONTD.

2

3    DESCRIPTION                                    PAGE

4    Turnberry Centra Sub, LLC et al v Lehman        134

5    Brothers Holdings, Inc., et al, Motion to

6    Reargue and for Reconsideration

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 139

1                C E R T I F I C A T I O N

2

     I, Sheila G. Orms, certify that the foregoing is a correct

3    transcript from the official electronic sound recording of

4    the proceedings in the above-entitled matter.

5

6    Dated:  November 17, 2012

7    **Sheila**          Digitally signed by Sheila Orms
                          DN: cn=Sheila Orms, o, ou,
                          email=digital1@veritext.com,
8    **Orms**            c=US
                          Date: 2012.11.29 15:57:43 -05'00'
9    Signature of Approved Transcriber

10

11

     Veritext

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25