**HEARING DATE AND TIME:** December 19, 2012 at 10:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Lehman Brothers Holdings
Inc. and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
In re                                    :    Chapter 11 Case No.
                                         :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :    08-13555 (JMP)
                                         :
                    Debtors.             :    (Jointly Administered)
------------------------------------------------------------------x
```

**OMNIBUS REPLY TO CERTAIN RESPONSES TO**
**DEBTORS' ONE HUNDRED FORTY-THIRD AND THREE HUNDRED**
**TWENTY-THIRD OMNIBUS OBJECTIONS TO CLAIMS (LATE-FILED CLAIMS)**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator under the

*Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its*

*Affiliated Debtors* [ECF No. 22737] (the "Plan") for the entities in the above referenced chapter 11

cases (collectively, the "Chapter 11 Estates"), files this omnibus reply (the "Reply") to certain

responses (the "Responses")[1] received by CF Midas Balanced Growth Fund (the "CF Fund") and

Dow Corning Corporation ("Dow Corning" and, collectively with the CF Fund, the "Claimants")

opposing the (i) Debtors' One Hundred Forty-Third Omnibus Objection to Claims (Late-Filed

Claims) [ECF No. 16856] and (ii) Debtors' Three Hundred Twenty-Third Omnibus Objection to

---

[1] This Reply only addresses the Responses listed on Exhibit A. The Plan Administrator reserves its right to file reply briefs responding to all other responses received in opposition to the Omnibus Objections.

Claims (Late-Filed Claims) [ECF No. 29295] (collectively, the "Omnibus Objections") and

respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      This Court's order setting forth claim filing procedures and deadlines in

these Chapter 11 Cases (as defined below) provided that claims would only be deemed timely if

*actually received* on or before the deadline applicable to such claims.  The proofs of claim

included on Exhibit B (the "Late-Filed Claims") attached hereto, were received after the

applicable deadline.

2.      The Responses primarily assert that the Claimants' delay in filing timely

proofs of claim was the result of excusable neglect, and as a result, the Claimants are entitled to

relief pursuant to Rule 9006(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules").  Specifically, the Claimants argue that their failure to file timely proofs of claim was

caused by confusion about the difference between these Chapter 11 Cases and the liquidation

proceedings of other entities affiliated with the Chapter 11 Estates, but entirely outside the control

of the Chapter 11 Estates.

3.      For the reasons set forth herein, the Claimants cannot satisfy the "hard line"

application of the "excusable neglect" standard followed by the Second Circuit and by this Court

in these Chapter 11 Cases.  Any confusion on the part of the Claimants was entirely within their

control and does not constitute excusable neglect.  For these reasons, the Late-Filed Claims should

be expunged.

## BACKGROUND

### Chapter 11 Case Background

4.      Commencing on September 15, 2008 and periodically thereafter, LBHI and

certain of its subsidiaries (collectively, the "Debtors") commenced with this Court voluntary cases

2

(the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

5.     On December 6, 2011, the Court entered the order confirming the Plan. The Plan became effective on March 6, 2012 (the "Effective Date"). Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to claims filed against the Chapter 11 Estates.

**The Bar Date**

6.     By order dated July 2, 2009 (the "Bar Date Order"), the Court established (a) September 22, 2009 at 5:00 p.m. as the deadline (the "Bar Date") for filing proofs of claim ("Proofs of Claim") against any of the Chapter 11 Estates in these Chapter 11 Cases; (b) October 22, 2009 at 5:00 p.m. as the deadline (the "Questionnaire Deadline") for filing Derivative Questionnaires and Guarantee Questionnaires in these Chapter 11 Cases; and (c) November 2, 2009 at 5:00 p.m. as the deadline (the "Securities Programs Bar Date") for filing proofs of claim ("Securities Programs Proofs of Claim") against any of the Chapter 11 Estates arising from securities on the Lehman Programs Securities list. (Bar Date Order at 2, 7-8, and 12.) The Bar Date Order expressly provides that "any holder of a claim against the Debtors who is required, but fails to file a proof of such claim in accordance with the Bar Date Order . . . including filling out the Derivative Questionnaire or the Guarantee Questionnaire . . . shall forever be barred, estopped, and enjoined from asserting such claim against the Debtors (or filing a Proof of Claim with respect thereto) . . . ." (*Id.* at 9-10.) A copy of the Bar Date Order was made publicly available at http://www.lehman-docket.com.

7.     In addition to providing actual notice of the Bar Date (the "Bar Date Notice") by mail to all parties known to the Chapter 11 Estates as having potential claims against

3

the Chapter 11 Estates, the Bar Date Notice was published in <u>The New York Times</u> (International

Edition), <u>The Wall Street Journal</u> (International Edition), and <u>The Financial Times</u>.  Notice of the

Securities Programs Bar Date (the "<u>Securities Programs Bar Date Notice</u>") was also widely

published and disseminated.  Pursuant to the Bar Date Order, the Securities Programs Bar Date

Notice was published by the Chapter 11 Estates in ten languages, plus seven translations for local

dialects, and in twenty-six newspapers in eighteen countries, including in each of Italy, Spain,

France, Germany, The Netherlands (in English), Switzerland, Luxembourg, United Kingdom,

Hong Kong, Mexico, Belgium, Austria, Greece, Brazil, Argentina, Australia, and Japan.  Bar Date

Order ¶ 14.  The Programs Securities Bar Date Notice was also provided to Euroclear,

Clearstream, and similar clearing systems as well as to the issuers of the Lehman Programs

Securities and these entities were to distribute the notice to the holders of the Lehman Programs

Securities.

## THE LATE-FILED CLAIMS SHOULD NOT BE DEEMED TIMELY FILED

**A.    The Second Circuit Strictly Enforces
Bar Dates Absent a Finding of Excusable Neglect**

8.    As this Court has recognized, "bar dates are critically important to the

administration of a successful chapter 11 case." *In re Lehman Bros. Holdings, Inc.*, 433 B.R. 113,

119 (Bankr. S.D.N.Y. 2010), *aff'd.* 445 B.R. 137 (S.D.N.Y. 2011).  A bar date enables debtors to

determine with reasonable promptness, efficiency, and finality what claims will be made against

their estates—a determination without which they cannot effectively reorganize. *In re Keene*

*Corp.*, 188 B.R. 903, 907 (Bankr. S.D.N.Y. 1995); *Florida Dept. of Ins. v. Drexel Burnham*

*Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 148 B.R. 1002, 1005

(S.D.N.Y. 1993) ("The bar order by forcing creditors to make known their claims against the

estate, enables the bankruptcy judge to tally up the debtor's assets and liabilities so that a

4

reorganization plan can be developed.") (internal quotations omitted). Bankruptcy Rule 9006(b)

vests the decision to extend the bar date "squarely within the discretion of the bankruptcy judge."

*In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. at 1008.

**B.     The Claimants Cannot Demonstrate Excusable Neglect**

9.     Bankruptcy Rule 9006(b)(1) provides that "on motion made after the

expiration of the specified period [the court may] permit the act to be done where the failure to act

was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1). The Supreme Court, in

interpreting the term "excusable neglect," has held that the term "neglect" in its ordinary sense

means "to give little attention or respect to a matter, or . . . to leave undone or unattended to

esp[ecially] through carelessness . . . and encompasses both simple, faultless omissions to act and

more commonly, omissions caused by carelessness." *Pioneer Inv. Serv. Co. v. Brunswick Assocs.

L.P.*, 507 U.S. 380, 388 (1993). Under *Pioneer*, the determination of whether a claimant's neglect

is excusable is an equitable determination in which a court should consider all relevant

circumstances surrounding the claimant's omission, such as: "the danger of prejudice to the

debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the

delay, including whether it was within the reasonable control of the movant, and whether the

movant acted in good faith." *Id.* at 395.

10.     In applying the *Pioneer* factors to determine whether a late-filed proof of

claim was the result of "excusable neglect," the Second Circuit has taken a "hard line" approach

that does not give the four factors equal weight. *In re Enron Corp.*, 419 F.3d 115, 122-24 (2d Cir.

2005); *In re Lehman Bros. Holdings Inc.*, 433 B.R. at 119-20. The third *Pioneer* factor—the

reason for the delay in filing, including whether the cause of such delay was within the reasonable

control of the claimant—is the most critical. *See Enron*, 419 F.3d at 122-24. The Second Circuit

5

has noted that the reason for this approach is that the other factors delineated in *Pioneer*—prejudice, length of delay and impact on judicial proceedings, and the claimant's good faith—will typically weigh in favor of the claimant, and the court will therefore focus on the reason for the delay in filing.  *Id*. at 122 (citing *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003)).

11.     This Court has followed the Second Circuit's "hard line" approach in applying the *Pioneer* factors in deciding numerous motions in this case.  Only on two occasions, where "creditors consciously endeavored to comply with the bar date and established that their delay was the result of justifiable confusion over the application of the bar date to their particular claims," did this Court find the existence of excusable neglect.  *In re Lehman Bros. Holdings Inc.*, 433 B.R. at 127.  In this case, the Claimants do not allege confusion regarding the application of the Bar Date Order, and the Claimants' excuse does not relate to the bespoke provisions of the Bar Date Order regarding Lehman Program Securities.  With respect to all other motions filed in this case seeking to have late filed claims deemed timely pursuant to Bankruptcy Rule 9006(b), this Court found that the delay in filing the late claims was within the control of the various movants and that "reasons offered by the Movants demonstrate a lack of care or thoughtful attention to the preparation and filing of their proofs of claim."  *Id.*

12.     The burden of establishing excusable neglect is squarely on the Claimants, not the Plan Administrator or the Court.  *In re Enron Corp.*, 419 F.3d at 121 ("The burden of proving excusable neglect lies with the late-claimant.").  As discussed below, the *Pioneer* factors – particularly the reason for the Claimants' delay in filing the Late-Filed Claims – weigh heavily in favor of the Chapter 11 Estates.  The Court should follow its prior decisions to grant the Omnibus Objections, and deny and overrule the Responses.

6

***i.    The Claimants' Reason for the Delay Was Solely Within the Claimant's Control***

13.    In the context of these cases, this Court has held that

> Neglect in filing a claim before the expiration of a clear bar date is excusable when the creditor, after conducting a reasonable amount of diligence, is justifiably confused or uncertain as to whether a particular transaction giving rise to a claim is or is not subject to the bar date order.

*In re Lehman Bros. Holdings Inc.*, 433 B.R. at 126.  The Claimants assert that their delay in filing the Late-Filed Claims was caused by confusion about the difference between the Chapter 11 Cases and the liquidation proceedings of two non-debtor affiliates.  Both instances of confusion are inexcusable, and neither can be said to have been preceded by any amount of diligence concerning the application of the Bar Date Order to the Late-Filed Claims.  Indeed, although the Bar Date Notice and the Securities Programs Bar Date Notice were widely disseminated, and neither of the Claimants alleges that it did not receive the Bar Date Notice or the Securities Programs Bar Date Notice, neither Claimant appears to have paid any attention to either notice.

14.    Furthermore, neither of the Claimants alleges that the Bar Date Notice or the Securities Programs Bar Date Notice was unclear.  The Bar Date Order, the Bar Date Notice, and the Securities Programs Bar Date Notice unambiguously stated, in no uncertain terms, that claims would only be deemed timely if actually received in these Chapter 11 Cases on or before the Bar Date or the Securities Programs Bar Date, as applicable.  Notwithstanding any notices served on parties to the liquidation proceedings of non-debtor entities, both Claimants were on notice that claims against the Chapter 11 Estates must be filed in these Chapter 11 Cases before the applicable bar date, pursuant to the terms of the Bar Date Order.  The Claimants provide no explanation for why they did not adhere to the terms of these notices.

US_ACTIVE:\44154444\8\58399.0011

*The CF Fund's Lehman Program Securities Claims*

15.    The CF Fund delayed more than one year after the Securities Programs Bar Date before filing a Securities Programs Proof of Claim against LBHI on November 8, 2010, based on LBHI's alleged guarantee of the obligations of Lehman Brothers Treasury Co. B.V. ("LBT").  The CF Fund relied on certain notices (the "LBT Notices") from the LBT bankruptcy proceeding in the Amsterdam District Court, Bankruptcy No. 08.0494-F (the "LBT Proceeding") and erroneously concluded that it was not required to file a Securities Programs Proof of Claim in these Chapter 11 Cases.

16.    As this Court is aware, LBT has operated independently from the Chapter 11 Estates, and has been under the control of Dutch court-appointed bankruptcy trustees (the "LBT Trustees") ever since the commencement of the LBT Proceeding.  After the commencement of the LBT Proceeding, the Chapter 11 Estates had no control, editorial or otherwise, and therefore share no responsibility for LBT's communications with its creditors.

17.    Nevertheless, the CF Fund cannot selectively cite the LBT Notices and claim that its reading of these notices constituted adequate diligence with respect to its claims against either LBT or LBHI.  The LBT Trustees communicate with their creditors in one of two ways: either through the issuance of "Notices to Noteholders," or through the issuance of quarterly reports.  *See Bankruptcy report number 3 of the bankruptcy trustee of Lehman Brothers Treasury Co. B.V. ("LBT")*, dated Jul 22, 2009, attached hereto as Exhibit C (the "Third LBT Report").  On page 1 of the Third Public Report, which was sent to creditors merely twenty days after entry of the Bar Date Order, the LBT Trustees clearly state:

> In the Chapter 11 proceedings of LBHI, dates have been set for the filing of claims. The final date for the filing claims on the basis of guarantees provided by LBHI to noteholders is 2 November 2009. The Bankruptcy Trustee explicitly refers noteholders to the website of LBHI (www.lehman-docket.com) for detailed information regarding

8

the filing of claims in the Chapter 11 proceedings of LBHI.

In sections 6.2 and 6.3 of the Third Public Report, the LBT Trustees further explain the

differences between the claims filing procedures in the LBT Proceeding and the Chapter 11 Cases.

In section 6.2, the LBT Trustees explain that "[a] major difference [between the Netherlands and

the United States] is that in the United States a *bar date* is fixed relatively early in the proceedings.

Creditors who do not file their claims before this *bar date*, can no longer file their claims after that

date."  In contrast:

> The judge that is responsible for the decisions regarding the
> bankruptcy of LBHI, Judge Peck of the United States Bankruptcy
> Court, Southern District of New York, set various bar dates for filing
> claims in the Chapter 11 proceedings of LBHI in his order of 2 July
> 2009. In this order it is established that regarding notes stated on a list
> (which in principle should include the notes issued by LBT) a bank or
> another representative can submit claims in the Chapter 11
> proceedings of LBHI on behalf of noteholders. The filing party is
> deemed to be able to take any decisions in respect of the relevant note
> for these noteholders.

*See* Third Public Report § 6.3.

18.      The LBT Trustees evidently took steps to ensure that LBT's creditors

understood the difference between the requirements of the Chapter 11 Cases and the LBT

Proceedings.  Combined with the dissemination of the Programs Securities Bar Date Notice

through publications in newspapers around the world and through Euroclear and Clearstream, the

Chapter 11 Estates and the LBT Trustees could not have been clearer about the separate nature of

their proceedings and the distinct requirements of each.  Given the foregoing facts, beyond sheer

carelessness, inattention and lack of diligence, it is difficult to comprehend what could have

caused a sophisticated investment fund such as the CF Fund to fail to take the steps necessary to

preserve its rights in these Chapter 11 Cases.

US_ACTIVE:\44154444\8\58399.0011

19.    The CF Fund argues that its confusion was compounded by communications that it had with the London office of Bank of New York Mellon ("BNYM"), which the CF Fund describes as "the entity appointed by the depository to custody the assets of the CF Midas Growth Fund."  CF Fund Response ¶ 13.  It is unclear, however, what import these communications had on the CF Fund's understanding of the Bar Date Order.  The CF Fund claims that it supplied BNYM with "what it thought was the necessary information in order to coordinate the process of filing claims."  *Id*.  When BNYM informed the CF Fund that the documentation supplied was incomplete, a representative of the CF Fund requested additional information from BNYM, but "did not receive a further response."  *Id*.

20.    To the extent that the CF Fund believes that BNYM would be filing claims on its behalf, this is an unfortunate miscommunication that does not excuse the CF Fund's failure to comply with the Bar Date Order.  Courts in the Second Circuit have held that such miscommunications and office mix-ups do not constitute excusable neglect.  *In re Dana Corp.*, No. 06-10354 (BRL), 2008 WL 2885901, at *5 (Bankr. S.D.N.Y. July 23, 2008) (where notice of the bar date was inadvertently filed away without any action being taken, "movant's failure to file a timely proof of claim was entirely within his and his attorneys' reasonable control and does not constitute excusable neglect"); *Pruitt v. Metcalf Eddy Inc.*, No. 03 Civ. 4780 (DF), 2006 WL 760279, at *2 (S.D.N.Y. Mar. 24, 2006) (failure to timely file notice of appeal did not constitute excusable neglect where movant's counsel misplaced notice of appeal after arranging for attorney service to pick up and file it and then failed to follow up with attorney service to determine if the notice had been picked up and filed); *In re Chateaugay Corp.*, No. 92 Civ. 8722 (LJF), 1993 WL 1127180, at *6 (S.D.N.Y. Apr. 22, 1993) (movant's failure to timely file proof of claim due to

10

failure of movant's own internal procedures in forwarding bankruptcy matters to its appropriate

department for review did not constitute excusable neglect).

      21.     Furthermore, this Court has previously held that where the "failure to timely

file a…proof of claim…is traceable to a miscommunication with [a claimant's] investment

advisor," such miscommunication fails to establish excusable neglect. *In re Lehman Bros.*

*Holdings Inc.*, 433 B.R. at 123.  In that case, the claimant had

> "requested the assistance of [its advisors] in filing claims related to the
> transactions that [the advisors] entered into on behalf of [the claimant].
> [The advisors] agreed to provide this assistance.  Based on these
> communications, and because [the advisors] filed proofs of claim
> against Lehman Brothers Treasury Co. B.V. in its Dutch proceedings,
> [the claimant] believed that [its advisors] had filed the required
> claim…in the LBHI [p]roceeding."

*Id.*  This Court found that "[t]hat belief, whether or not reasonable, was simply incorrect, and the

miscommunication, carelessness or inattention to the guarantee claim was entirely within the

control of [the claimant] and [its advisors]."  Accordingly, this Court held that the claimant had

"not made a sufficient showing for a finding of excusable neglect."  *Id.*  Similarly, the CF Fund's

failure to communicate with BNYM to coordinate the process of filing claims was entirely within

the CF Fund's control, and does not support a finding of excusable neglect.

### *The Dow Corning Claims*

      22.     As stated in its response, Dow Corning was a party to an ISDA Master

Agreement, dated February 21, 2005 (the "<u>Swap Agreement</u>") with one of the Chapter 11 Estates,

Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), which was purportedly guaranteed by LBHI.

Dow Corning states that on September 16, 2008, it sent a notice of default to LBSF (the "<u>Default</u>

<u>Notice</u>") and designated September 16, 2008 as the Early Termination Date (as defined in the

Swap Agreement).  In addition, Dow Corning sent LBSF a demand for payment (the "<u>Demand</u>

<u>Letter</u>") based on amounts that Dow Corning alleged were due under the Swap Agreement.

US_ACTIVE:\44154444\8\58399.0011

23.     Given that Dow Corning was capable of sending LBSF not only the Default

Notice, but also a Demand Letter, it is difficult to understand how Dow Corning could have

subsequently filed a customer claim form in the Securities Investor Protection Corporation's

liquidation proceeding of Lehman Brothers Inc. ("LBI"), Case No. 08-01420 (JMP) SIPA (the

"LBI SIPA Proceeding"), but failed to file timely Proofs of Claim against LBSF and LBHI.  Dow

Corning states that it relied on a notice of the LBI SIPA Proceeding (the "SIPA Notice") that it

received "[s]hortly after sending the Demand Letter to LBSF."  Dow Corning Response ¶ 5.

Based on the SIPA Notice, Dow Corning erroneously concluded that it was not required to file

Proofs of Claim in these Chapter 11 Cases.  However, given Dow Corning's direct interaction

with LBSF immediately before the receipt of the SIPA Notice, its confusion between the LBI

SIPA Proceeding and these Chapter 11 Cases can only be attributed to Dow Corning's own

carelessness.

24.     Even if Dow Corning's receipt of the SIPA Notice was misleading in any

way, Dow Corning cannot plausibly argue, as it states in its response, that "the result of Dow

Corning's justifiable confusion did not become manifest until the SIPA Trustee informed Dow

Corning" that its claim in the LBI SIPA Proceeding was denied.  *Id.* ¶ 16.  Dow Corning was

served with the Bar Date Notice and the Bar Date Order in July of 2009.  *See Corrected Affidavit

of Service of Herb Baer* [ECF No. 9395] (the "Corrected Affidavit") attached hereto as Exhibit D.[2]

As such, Dow Corning had notice of the Bar Date in these Chapter 11 Cases and in particular, of

the fact that the Bar Date applied to claims against LBSF and LBHI.  Even if Dow Corning was

still confused as to the difference between LBI and LBSF – despite its having sent the Default

Notice and Demand Letter to LBSF – Dow Corning could still have reviewed the Bar Date Notice

---

[2] Due to the voluminous size of the Corrected Affidavit, the exhibit annexed hereto has been modified to only
incorporate the relevant pages.

US_ACTIVE:\44154444\8\58399.0011

and taken the necessary steps to preserve its claims against LBSF and LBHI.  Dow Corning's

failure to follow the clear requirements of the Bar Date Order was a factor entirely within its own

control.  As such, Dow Corning has not stated a legitimate grounds for a finding of excusable

neglect.

25.    Dow Corning contends that its confusion in filing a timely customer claim

in the LBI SIPA Proceeding is analogous to circumstances surrounding the claim of Banesco

Holdings CA ("Banesco"), Claim No. 62723.  In a bench ruling on December 16, 2009, this Court

found that Banesco met the excusable neglect standard when it mistakenly believed that its claim

was subject to the November 2, 2009 Securities Programs Bar Date rather than the September 22,

2009 Bar Date.  The difference, however, between Banesco and Dow Corning is that Banesco was

found to have been justifiably confused by certain unique and bespoke provisions of the Bar Date

Order and their application to the particular securities held by Banesco.  The Court found that

Banesco's confusion was excusable because the securities held by Banesco were structured

securities like the securities subject to the Securities Program Bar Date, and "the Banesco note did

not have a CUSIP or ISIN number that would assist in identifying whether it was one of the many

thousands of securities subject to the [Securities Program Bar Date]."  Dec. 16, 2009 Hr'g Tr. at

136:20-25.  The Court therefore found that Banesco "acted properly based on its own erroneous

beliefs."  *Id.* at 137:5-6.

26.    Unlike Banesco, Dow Corning cannot state that it conducted a reasonable

amount of diligence before justifiably concluding that the Swap Agreement was not subject to the

Bar Date Order.  Indeed, it is not clear that Dow Corning conducted any diligence at all, despite

having been served with the Bar Date Notice, which explicitly states that holders of claims based

on a derivative contract must, "on or before the Bar Date, fill-out and return a Proof of Claim in

13

the same manner as all other claimants" and submit a completed Derivate Questionnaire "on or

before the Questionnaire Deadline."[3]  Bar Date Order ¶ 7.  As such, Dow Corning cannot claim

that it acted properly in these circumstances.  Its failure to file Proofs of Claim against LBSF and

LBHI resulted from Dow Corning's inattention to the terms of the Bar Date Order.  Under these

circumstances, Dow Corning has not made a sufficient showing for a finding of excusable neglect.

> ### ii.   Allowing the Late-Filed Claims
> ###       Will Prejudice the Chapter 11 Estates and Other Creditors

27.    "Prejudice" includes not only the harm to the debtor but also the adverse

impact that a late claim may have on the judicial administration of the case, considering the size of

the late claim in relation to the estate.  *See In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y.

1995); *In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. at 1007; *In re Alexander's Inc.*, 176

B.R. 715, 722 (Bankr. S.D.N.Y. 1995).  More than 67,000 claims have been filed against the

Chapter 11 Estates.  Enforcement of the Bar Date is critical for the Chapter 11 Estates to manage

the enormous task of processing the claims and to proceed with reorganization.  This Court has

already determined that in these cases "the enormity of the claims allowance process is self-

evident, and prejudice needs to be evaluated in this unprecedented setting" and therefore, a "strict

application of the Bar Date Order is needed to effectively manage the claims process and that

permitting additional claims will lead to an opening of the claims process with foreseeable

prejudice to the Debtors." *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 120.

28.    Both Claimants argue that the allowance of the Late-Filed Claims would not

prejudice the Chapter 11 Estates.  However, in considering this *Pioneer* factor, it is necessary to

weigh the cumulative effect that permitting the Late-Filed Claims will have on the Chapter 11

---

[3] Similarly, holders of claims based on a guarantee must, "on or before the Bar Date, fill-out and return a Proof of
Claim in the same manner as all other claimants" and submit a completed Guarantee Questionnaire "on or before the
Questionnaire Deadline."  Bar Date Order ¶ 7.

Estates.  Permitting exceptions to the Bar Date does not impact "only one claim" and could have a

significant economic impact on the Chapter 11 Estates, including the distributions available to

creditors that exercised proper diligence in filing their claims.  As this Court has recognized, "[t]he

prejudice to the Debtors is not traceable to the filing of any additional single claim but to the

impact of permitting exceptions that will encourage others to seek similar leniency."  *Id.* at 121.  If

the Claimants are granted leniency on the basis of excusable neglect, then holders of other late-

filed claims will seek similar relief.  A sudden increase in claims at this time would disrupt the

orderly administration of the Chapter 11 Estates.

   29. Dow Corning makes the argument that the allowance of its late claims will

not prejudice the Chapter 11 Estates because Dow Corning "effectively provided the Debtors with

informal notice" of its claims by virtue of the Demand Letter.  Such notices and letters are

insufficient to establish a claim against the Chapter 11 Estates.  The Chapter 11 Estates received

thousands of notices of default and demand letters, particularly in the days and weeks following

September 15, 2008, none of which established claims against the estate unless they were

supplemented by timely filed Proofs of Claim and Derivative Questionnaires.  Dow Corning also

argues that it provided the Chapter 11 Estates with informal notice of its claim by filing the

customer claim in the LBI SIPA Proceeding.  This argument assumes, incorrectly, that the Chapter

11 Estates had any direct insight into the claims filed in the LBI SIPA Proceeding – an entirely

separate proceeding, in which the claims register is not public as it is in the Chapter 11 Cases.

Even if Dow Corning filed a timely claim in the LBI SIPA Proceeding, the Chapter 11 Estates

would have no way of knowing that Dow Corning intended to assert a claim against LBSF and

LBHI and should not be charged with the responsibility of searching for claims on the dockets of

other entities.

US_ACTIVE:\44154444\8\58399.0011

30.    Most importantly, granting exceptions to creditors such as Dow Corning and the CF Fund purely for their inattention to the requirements of the Bar Date Order prejudices the thousands of creditors who did comply with the Bar Date Order, and those claimants whose late claims have already been expunged by this Court for failure.  To date, approximately 1,683 claims have been expunged (both consensually and by orders of this Court) as a result of the Chapter 11 Estates' objections.  Given the number of claimants whose claims have already been expunged for being late, it would be unfair and inequitable to treat the claims of the CF Fund or Dow Corning any differently from other similarly situated claims absent a showing of an exceptionally strong reason for the delay.

### iii.    *Length of the Delay*

31.    In the Second Circuit, the "lateness of a claim must be considered in the context of the proceeding as a whole."  *In re Enron*, 419 F.3d at 128.  Additionally, in evaluating lateness, "courts generally consider the degree to which, in the context of a particular proceeding, the delay 'may disrupt the judicial administration of the case.'"  *Id. quoting In re Infiltrator Sys., Inc.*, 241 B.R. 278, 281 (Bankr. D. Conn. 1999).  Finally, the inquiry "should, at least to some extent, also take into account the creditor's explanation for the delay."  *Id.* at 129.

32.    Neither Claimant has offered a compelling explanation for their delay in filing proofs of claim in these Chapter 11 Cases.  Furthermore, the CF Fund's delay of more than one year weighs heavily in favor of the Chapter 11 Estates.  While the length of delay as to the Dow Corning claims is shorter, granting leniency to a sophisticated party such as Dow Corning that was served with the Bar Date Notice and failed to comply would be inequitable given the number of less sophisticated parties whose claims have been expunged because they were late.  Accordingly, this *Pioneer* factor weighs in favor of the Chapter 11 Estates.

16

iv.    *Good Faith*

33.    The Plan Administrator has no evidence that the Claimants have acted in bad faith.  However, as discussed above, this factor typically weighs in favor of the party moving to file a late claim and hardly counterbalances the other three *Pioneer* factors which weigh in the Chapter 11 Estates' favor, particularly the "reason for delay" factor, discussed above, which the Second Circuit has deemed to be the most relevant and critical in the equitable determination of whether a movant's neglect is excusable.  *See In re Enron Corp.*, 419 F.3d at 122-24.

## RESERVATION OF RIGHTS

34.    In the event that the Court denies the Omnibus Objections with respect to the Late-Filed Claims and/or grants the relief requested in the Responses, the Plan Administrator reserves the right to object to the validity and amount of any claims that may be filed by the Claimants.  The Plan Administrator reserves the right to conduct discovery as to the Late-Filed Claims and any matters raised in the Responses and to supplement this filing as a result thereof.

## CONCLUSION

35.    The elimination of the Late-Filed Claims will enable the Plan Administrator to maintain a claims register that more accurately reflects the timely-filed claims existing against the Chapter 11 Estates and expedite distributions to creditors by reducing reserves maintained on account of disputed claims.  If parties are permitted to claim excusable neglect at this stage in the proceeding, then the purpose and effect of the Bar Date and the Securities Programs Bar Date will have been diluted.  While the Supreme Court in *Pioneer* recognized that courts are "permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control," *Pioneer*, 507 U.S. at 388, 391, the Second Circuit has applied a strict standard in determining whether inadvertence or mistake amounts to excusable neglect, noting that "the equities will rarely if ever favor a party who fails to

17

follow the clear dictates of a court rule, and … where the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the Pioneer test." *In re Enron Corp.*, 419 F.3d at 123, 126 (internal quotations omitted).  The CF Fund and Dow Corning both failed to follow the clear dictates of the Bar Date Order, which required that they file timely proofs of claim in these Chapter 11 Cases.  Both Claimants are sophisticated entities beyond any measure – one, an investment fund, and the other, a multinational technology corporation.  Their failure to review and comply with the terms of the Bar Date Order is simply inexcusable and cannot ground a finding of excusable neglect.

WHEREFORE, for the reasons set forth above and in the Omnibus Objections, the Plan Administrator respectfully requests that the Court enter an order disallowing and expunging the Late-Filed Claims in their entirety and grant such other and further relief as the Court may deem just and appropriate.

Dated: December 17, 2012
     New York, New York

/s/ Robert J. Lemons
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Lehman Brothers Holdings
Inc. and Certain of its Affiliates

US_ACTIVE:\44154444\8\58399.0011

## Exhibit A

### Responses filed by the Claimants

1. Response of Dow Corning Corporation filed by Jonathan Henes ("Dow Corning Response") [ECF No. 29910].

2. Response of CF Midas Balanced Growth Fund filed by Daniel Geoghan ("CF Fund Response") [ECF No. 18348].

3. Supplemental Response of CF Midas Balanced Growth Fund filed by Daniel Geoghan ("CF Fund Supplemental Response") [ECF No. 21186].

## Exhibit B

Late-Filed Claims

| Claimant Name | Claim Number |
|---|---|
| DOW CORNING CORPORATION | 43840 |
| DOW CORNING CORPORATION | 43964 |
| CF MIDAS BALANCED GROWTH FUND | 67193 |

**Exhibit C**

H O U T H O F F   B U R U M A

# BANKRUPTCY REPORT

Bankruptcy report number **3** of the bankruptcy trustee of

## Lehman Brothers Treasury Co. B.V. ("LBT")

### 22 July 2009

*The Bankruptcy Trustee communicates in two ways with holders of notes and certificates issued by LBT (jointly: "noteholders"): (i) information the Bankruptcy Trustee is obliged to provide to noteholders pursuant to the Dutch Bankruptcy Act, e.g. about the filing of claims, the date of the creditors' meeting and any distribution, is also provided in "Notices to noteholders". The Bankruptcy Trustee will send these notices through the electronic information channels of the clearing systems and the banks; (ii) information about the progress of the bankruptcy will be made public by the Bankruptcy Trustee by issuing quarterly public reports. Both the notices and the public reports are available on [www.lehmanbrotherstreasury.com](www.lehmanbrotherstreasury.com).*

---

### Summary of key items

- In 2009 the Bankruptcy Trustee will <u>not</u> request the Amsterdam District Court to set dates for the filing of claims and for the claims admission meeting.

- The Bankruptcy Trustee received an important part of LBT's books and records from Lehman Brothers International Europe ("**LBIE**").

- The Bankruptcy Trustee signed the *Cross-Border Insolvency Protocol* proposed by Lehman Brothers Holdings Inc. ("**LBHI**") to the various official representatives of the Lehman Brothers Group and has participated in meetings with the official representatives of the important Lehman Brothers Group entities on 16 and 17 July 2009.

- In the Chapter 11 proceedings of LBHI, dates have been set for the filing of claims. The final date for the filing claims on the basis of guarantees provided by LBHI to noteholders is 2 November 2009. The Bankruptcy Trustee explicitly refers noteholders to the website of LBHI (www.lehman-docket.com) for detailed information regarding the filing of claims in the Chapter 11 proceedings of LBHI.

- The assessment of the legal aspects of the recognition and valuation of claims of the noteholders in the LBT bankruptcy makes progress. This report includes the first findings of the Bankruptcy Trustee on this subject.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A                                                    2/17

| | | |
|---|---|---|
| Company details | : | **Lehman Brothers Treasury Co. B.V.** |
| Bankruptcy number | : | 08.0494-F |
| Date of decision | : | (Moratorium: 19 September 2008) |
| | : | Bankruptcy: 8 October 2008 |
| Administrator/bankruptcy trustee | : | R.J. Schimmelpenninck |
| Supervisory judge | : | W.A.H. Melissen |
| Company activities | : | The objective of LBT in accordance with its articles of association is - briefly summarized - the financing of companies that belonged to the Lehman Brothers Group, including by borrowing, lending and raising monies and participating in all kinds of financial transactions, including the issuance of financial instruments. |
| Period under review | : | 1 April 2009 - 30 June 2009 |
| Hours spent in period under review: | | 2,076.9 |
| Hours spent - total | : | 6,234.1 |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver**

**of any rights, claims or defenses.**

**0.      Preliminary comments**

0.1      This is the third report of the bankruptcy trustee of LBT (the "**Bankruptcy
         Trustee**"). The report covers the period of 1 April 2009 through 30 June 2009.
         The Bankruptcy Trustee emphasizes that the information in this report - in
         particular the financial data - is subject of further investigation. It may turn out at
         a later stage that a major part of this information should be adjusted. This report
         should be read in conjunction with the first two reports. Definitions and
         abbreviations in this report are used in the same manner as in the previous
         reports.

0.2      The Bankruptcy Trustee has preciously informed noteholders and (other)
         creditors by means of the notices dated 23 September 2008, 8 October 2008 and
         22 December 2008, respectively. These notices are available, with other
         information of importance, on www.lehmanbrotherstreasury.com. German,
         French and Spanish translations of the aforementioned notices have also been
         made available on this website. The Bankruptcy Trustee will also publish
         German, French and Spanish translations of subsequent notices on this website.

0.3      In this report the Bankruptcy Trustee represents the present state of affairs in a
         simplified manner in accordance with the guidelines for bankruptcy reporting
         applicable in the Netherlands.

**1.      Statement of affairs**

1.1      <u>Management and organisation</u>
         LBT is a wholly-owned subsidiary of Lehman Brothers UK Holdings (Delaware)
         Inc, which company in its turn is fully owned by LBHI, the holding company of
         the worldwide operating Lehman Brothers group (the "**Lehman Brothers
         Group**").

1.2      <u>Activities LBT</u>
         LBT was incorporated for the financing of the business activities of the Lehman
         Brothers Group by issuing - through various intermediary parties acting as
         intermediaries - financial instruments, in particular "(**structured**) **notes**" to
         institutional and private investors. The characteristics of these notes vary from
         relatively simple to very complex. An important characteristic is that in most
         cases – if not in all – the principal of the loan as well as the amount of the return
         were linked to various (embedded) derivative market elements such as the
         development of specific share prices and/or indices, commodities, etcetera. LBT
         lent the revenues of the structured notes on to LBHI.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver

of any rights, claims or defenses.

The risks related to these derivative market elements were hedged by LBT by entering into swaps under ISDA master agreements with other entities of the Lehman Brothers Group. These swaps were entered into by LBT for each individual series of notes, as a result of which LBT was supposed not to run any risk on the movements of the underlying values related to the notes it had issued.

These other Lehman Brothers Group entities subsequently covered the risks that they had assumed from LBT by entering into hedging agreements with external parties.

The Bankruptcy Trustee did not receive from LBIE all the documentation related to all the swaps entered into by LBT. Documentation that was made available, however, shows that the derivative market elements in the notes, contrary to what was intended and perhaps by mistake, were not fully hedged. The Bankruptcy Trustee will further investigate this matter in the coming period.

LBT had no employees. LBIE acted as arranger, dealer and calculation agent under the note issuance programs of LBT and conducted the bookkeeping activities of LBT.

1.3.    Financial information

*Accounting*
As a result of the multitude – and diversity - of financial products issued, as well as the complexity of the valuation of these products, the accounting of LBT is complicated and operationally interwoven with the accounting of the Lehman Brothers Group.

LBIE and Lehman Brothers Limited ("**LBL**"), have their respective corporate seat in London and have been in administration (insolvency proceedings since 15 September 2008. Four partners of PricewaterhouseCoopers in the United Kingdom have been appointed as joint administrators for the two companies (the "**Joint Administrators**").

As set out in the previous report, LBIE performed a number of important duties within the Lehman Brothers Group, including various administrative duties for LBT. As of 28 February 2009, the Bankruptcy Trustee negotiated with the Joint Administrators to obtain accounting information. This has resulted in an agreement between the Joint Administrators and the Bankruptcy Trustee on 27 May 2009. Against payment of £ 213,000 for services provided by a number of employees of LBIE, the Bankruptcy Trustee received a computer file from LBIE

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver
of any rights, claims or defenses.

and LBL which included, among other things, the so-called 'final terms' and 'pricing supplements' of the various series of notes issued by LBT as well as specific accounting data. The agreement referred to above stipulates that LBIE and LBL have not been able to verify the information provided and that they assume no responsibility for its accuracy or completeness. So far, LBIE has not been able to deliver a complete file of hedge or swap agreements. LBIE did state its willingness, in principle, to perform further administrative services for the Bankruptcy Trustee in return for payment of costs. It is noted that LBIE has taken the view that if information is "co-mingled" with information of other entities of the Lehman Brothers Group, such as LBIE, it needs to be investigated to what extent such information can be disclosed to LBT.

*Available financial information*
The global close of the accounts of the Lehman Brothers Group as at 12 September 2008 (as set out in § 1.3 of the first report) was finalised in January 2009. The Bankruptcy Trustee has not actively been involved in the drafting of the global close. As part of this process a provisional balance sheet of LBT as at 12 September 2008 was drawn up (in accordance with US GAAP).

Unlike stated in the previous report, these figures will at this stage not be published on the website. The reason for this is that the way in which the financial data, generated for the purpose of the global close, has been produced has not been confirmed by PwC UK or a third party. A reason for this is that the complex IT and internal control systems of the Lehman Brothers Group were not designed to draw up interim balance sheets. In addition, the production of such data was made more difficult by the partial disintegration of the organisation of the Lehman Brothers Group as a result of the various insolvency proceedings. In order to accomplish this global close, adjustments were made in the administrative systems of the Lehman Brothers Group. However, there is no insight in these adjustments at this moment. The Bankruptcy Trustee expects to receive an explanation from LBIE and/or LBHI in the coming months.

*Revised list of ISIN codes*
On 11 June 2009 the Bankruptcy Trustee placed an amended list - as complete as possible - of series of notes that were outstanding on 15 September 2008, indentified by ISIN code, on the website www.lehmanbrotherstreasury.com. The reconciliation between the list published with the first public report as at 31 August 2008 and this list has been included at the beginning of the amended list. The Bankruptcy Trustee makes no representation in respect of the completeness and accuracy of this list. It has also been noted that the description of the notes as stated on the list, is not always consistent with the description in the documentation concerned.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

*Swaps*

As stated above, LBT in principle covered the risks related to the derivative elements in the notes by entering into swap agreements with other Lehman Brothers Group entities. Some of these ISDA agreements, including the agreement with Lehman Brothers Finance S.A. (**"LBF"**), have automatically terminated as a result of the occurrence of certain events of default as defined in the respective ISDA agreement (such as the moratorium granted to LBT).

As regards the ISDA agreements that do not provide for such an automatic termination, the Bankruptcy Trustee has received so-called termination notices from a number of other counterparties. These notices intend to terminate the relevant agreements with effect from 10 December 2008. As of this date the outstanding debt of the other party concerned owed to LBT would subsequently have to be calculated in accordance with the methodology provided for in the ISDA agreements (close out netting).

The legal validity of both the termination notices and the termination dates referred to in these notices is being investigated in more detail and the Bankruptcy Trustee reserves all rights in respect thereof, also because the Bankruptcy Trustee did not receive some of these notices before January 2009.

The above results in the <u>provisional</u> overview of ISDA master agreements concluded by LBT as shown on the next page.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

HOUTHOFF BURUMA

| Parties ISDA Master Agreement | Nationality Counterparty | Governing Law of ISDA Master Agreement | Automatic Early Termination ("AET") | Termination Date | Amount due/payable under ISDA |
|---|---|---|---|---|---|
| Lehman Brothers Special Financing Inc ("**LBSF**") | US | State of New York | No | **Not terminated (Termination notice sent to incorrect address; If notice will be accepted, termination date is 12 December 2008** | **Termination Date not yet agreed, therefore no calculation has been made.** |
| Lehman Brothers International (Europe) ("**LBIE**") | UK | England and Wales | No | **Not terminated** | **See above** |
| Lehman Brothers Finance S.A. ("**LBF**") | Swiss | State of New York | AET applicable in respect of LBT. ISDA automatically terminated on 19 September 2008 0.00 hours. | 19 September 2008 (date of suspension of payment LBT) | **See above** |
| Lehman Brothers Finance S.A. Netherlands Antilles Branch ("**LBFNA**") | Swiss (Netherlands Antilles branch) | State of New York | No | **Not terminated or unknown** | **See above** |
| Lehman Brothers Commodity Services Inc ("**LBCS**") | US | State of New York | No | 12 December 2008 | **See above** |
| Lehman Brother Commercial Corporation ("**LBCC**") | US | England and Wales | AET applicable in respect of LBT ISDA automatically terminated on 19 September 2008 0.00 hours | 19 September 2008 (suspension of payment LBT) | **See above** |

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

The Bankruptcy Trustee notes that it appears that LBT has also entered into swap agreements with Lehman Brothers Commercial Corporation Asia Ltd ("**LBCCA**"). The Bankruptcy Trustee has not been provided with an ISDA Master Agreement with LBCCA.

In view of the disintegration of the Lehman Brothers Group and the complexity of the derivative instruments, it is difficult for either the Bankruptcy Trustee or the counterparties to the ISDA agreements to come to a calculation of the outstanding positions under the agreements. The Bankruptcy Trustee does not rule out that – in cooperation with the official representatives of the counterparties in question – a practical solution will be adopted, also within the framework of the protocol (see below). First consultations with representatives of LBCS and LBCC about this issue have already begun.

*Protocol*
LBHI has taken the initiative to investigate the possibilities of coordination between the so-called "Official Representatives", who are responsible for the winding-up of the insolvencies of the various entities of the Lehman Brothers Group in the world by drafting a multi-party cross border protocol.

The purpose of this protocol is to come to an efficient winding-up of the companies of the Lehman Brothers Group by facilitating the coordination between the various official representatives and the courts involved. The protocol intends, among other things, to simplify the exchange of information between the official representatives and to establish procedures to determine intercompany claims.

On 19 May 2009 the Bankruptcy Trustee placed the protocol on the website of LBT. As stated in the previous report, the Bankruptcy Trustee gave creditors the opportunity to respond to the protocol. Apart from a few questions, the Bankruptcy Trustee did not receive any substantive reactions to his intention to sign the protocol. After approval from the supervisory judge, the Bankruptcy Trustee signed the protocol.

The protocol was also signed by the official representatives of the Lehman Brothers Group in the United States (Lehman Brothers Inc. ("**LBI**") and LBHI), Germany (Lehman Brothers Bankhaus), and various entities in Hong Kong, Singapore, Australia, Switzerland and Curaçao. The protocol is still under review by Lehman Brothers entities in Japan and Luxembourg. LBIE has not sign the protocol and notified that it does not favour a multilateral approach as embodied

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

by the protocol as far as dealing with intercompany relations of entities of the Lehman Brothers Group.

*Joint meetings*

LBHI also took the initiative for a meeting in London on 17 July 2009 between the official representatives of the most important entities of the Lehman Brothers Group. Parties that have not signed the protocol were invited as well. This invitation was accepted by all those invited, with the exception of LBIE.

LBIE, moreover, invited the official representatives of entities with intercompany positions with LBIE for a meeting on 16 July 2009 in London. The Bankruptcy Trustee accepted this invitation. In preparation of this meeting, LBIE sent a draft memorandum of understanding to establish the intercompany payables. This draft is not public. In this meeting LBIE has presented its view on how the global close process was conducted. LBIE intends to have discussions relating to this memorandum of understanding on a bilateral basis.

The meeting of 17 July 2009 was attended by all signatories to the protocol and by representatives of Lehman Brothers Equity Finance (Luxembourg) and Lehman Brothers Japan. Each of the Lehman Brothers representatives presented the meeting with an update of their respective insolvency proceedings. Subsequently, LBHI gave an overview of the global close procedures. Further, the way forward to assess the intercompany claims was discussed. The parties acknowledged the importance of settling the intercompany claims as these claims constitute important items in the respective balance sheets. All parties which were present stated to be willing to investigate a joint approach towards resolving intercompany claims and to have the intent to embark on a number of follow up steps during the coming months.

While the Bankruptcy Trustee realises that any settlement of intercompany claims needs to comply with the national laws of the relevant parties, he is convinced that a joint approach is to be preferred above a bilateral approach.

LBT has over 5,000 swap agreements – each consisting of various "legs" - with other entities of the Lehman Brothers Group under various agreements to which various laws are applicable. As stated above, different termination dates apply. Furthermore, the derivatives embedded in the swap agreements are highly complex and the values are very difficult to calculate.

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

*Information about sales and purchase of notes*

The structure, under which the notes have been issued, did not provide for keeping account of the identities of the holders of notes issued by LBT. As stated above, LBIE acted as dealer and calculation agent. The Bankruptcy Trustee notified in the previous report that LBIE did not wish to share the accounting data from the administration of LBT, which not only relate to LBT but also to LBIE. The Bankruptcy Trustee will further consult with LBIE on this matter and observes that this matter of 'co-mingled data' is also an issue between LBIE and other official representatives of entities in the Lehman Brothers Group.

1.4.    <u>Cause of provisional moratorium and bankruptcy</u>
        The Bankruptcy Trustee refers to the previous report, § 1.9.

**2.      Assets (other than debtors)**

2.1.    See also the previous reports, § 2.1. The Bankruptcy Trustee has reached agreement with the Tax Authorities about the settlement of the tax position for which purpose the Tax Authorities will pay EUR 7,750,000 to the estate in the near future.

2.2.    The balance of LBT's estate account was EUR 2,691,519.12 on 30 June 2009.

**3.      Debtors**

3.1.    As reported in the first report, the receivable of LBT due from LBHI is based on a loan agreement between LBT and LBHI of 26 May 2000 (Annex III to the first report) and amounts to USD 34,782,418,198 according to the balance sheet as at 31 August 2008 and USD 32,604,207,177 according to the balance sheet as at 7 October 2008. The difference is the result of two factors; in the period from 31 August to 7 October 2008 on the balance, repayments were made. The loan to LBHI, moreover, consists of various currencies and in this period the dollar increased in value in respect of the other currencies. The Bankruptcy Trustee will file the claims under the loan agreement, claims under the 'Independent Guarantee' of 16 September 1997 (Annex IV to the first report), claims by virtue of positions under ISDA agreements and any intercompany claims, in the Chapter 11 proceedings of LBHI.

3.2.    In view of the uncertainty about the (date of) termination of the ISDA agreements and the expected complications upon establishing and/or valuating the obligations arising from these agreements, at this moment it has not been established yet what the value is of the intercompany positions related to the swaps.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

**4.      Bank / Security**

4.1.    Claim from bank(s)
        See previous report, § 4.1.

**5.      Lawfulness**

5.1.    Accounting obligation
        The Bankruptcy Trustee refers to the first report and additionally observes that a
        view on the accounts and the accounting obligation will be given at a later stage.
        Even though the Bankruptcy Trustee received important information from LBIE,
        he still does not have the entire records at his disposal.

5.2.    Filing of annual accounts
        According to the Commercial Register the most recent annual accounts of LBT
        (for 2007) were filed on 30 May 2008 and therefore on time.

5.3.    Auditor's unqualified audit report
        The annual accounts of LBT for 2007 have been provided with an unqualified
        auditors' report.

5.4.    Obligation of payment on shares
        This subject has been investigated. Considering the incorporation of LBT in
        1995, any claim to pay up the shares would already have expired before the
        bankruptcy order was made.

5.5.    Improper management
        At a later stage the Bankruptcy Trustee will further investigate the fulfilment of
        duties the Board of Directors (under the articles of association) or any de facto
        director.

5.6.    Fraudulent acts in respect of creditors (*Paulianeus handelen*)
        The Bankruptcy Trustee will further investigate this at a later stage.

**6.      Creditors**

6.1.    Notes

        On the bankruptcy date (8 October 2008) LBT had 3,788 series of notes
        outstanding under the following programs.

|  | no of series | nominal amount |
|---|---|---|
| European Medium Term Note | 3,654 | € 22,973,617,109 |

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver
of any rights, claims or defenses.

| | | |
|---|---|---|
| German Program | 66 | € 1,081,869,248 |
| Swiss Program | 67 | € 288,889,061 |
| (Italian) Inflation Linked Program | 1 | € 12,738,000 |

On 8 October 2008 LBT/LBIE had the following nominal amounts outstanding as classified by LBIE.

| | no of series | nominal amount |
|---|---|---|
| Equity-linked notes | 2,683 | € 11,922,934,831 |
| Interest rate-linked notes | 374 | € 5,239,161,206 |
| Plain vanilla notes | 112 | € 2,901,558,905 |
| Credit-linked notes | 130 | € 2,158,418,658 |
| Currency-linked notes | 283 | € 1,047,938,909 |
| Commodity-linked notes | 166 | € 682,898,812 |
| Other notes | 40 | € 404,202,097 |

*Notes*

With reference to the above, the Bankruptcy Trustee observes that he does not yet have all relevant documentation with respect to the (series of) notes. The Bankruptcy Trustee, however, does have the nearly complete program documentation at his disposal as from the year 1999 and has made this documentation available on the website, with the reservation that the Bankruptcy Trustee cannot verify whether these documents are the final versions.

The legal analysis of the note structures is complex: different legal systems are applicable to the different program documentation (and the notes). The Euro Medium Term Note Program and the Swiss Program are governed by the laws of England and Wales, the German Program is governed by German law and the Italian Inflation Linked Program by Italian law. The filing and valuation of the debt claims arising from the notes is to take place under Dutch bankruptcy law. The guarantees provided by LBHI for the obligations under the notes are governed by the law of the state of New York. The claims of noteholders under these guarantees have to be calculated and filed in accordance with the Federal Bankruptcy Code of the United States.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

6.2.    Filing claims, introduction

The rules and procedures in respect of the filing of claims in insolvency proceedings in the Netherlands and the United States differ considerably.

A major difference is that in the United States a *bar date* is fixed relatively early in the proceedings. Creditors who do not file their claims before this *bar date*, can no longer file their claims after that date. The procedure for establishing the <u>amount</u> of the claim does not take place until after the *bar date*.

Dutch bankruptcy proceedings do not have a *bar date* or comparable mechanism for filing claims. If there is a prospect of a distribution to creditors and the bankruptcy trustee has been able to assess the amount of the claims filed, the supervisory judge will set a date for the creditors' meeting (*verificatievergadering*). At this meeting lists of provisionally allowed and provisionally disputed claims are discussed. At the end of the meeting the supervisory judge establishes which claims are definitively allowed and disputed. It is noted that after the creditors' meeting (subsequent) claims can still be allowed. To this day the supervisory judge has not yet set a date for the creditors' meeting or for filing claims in the LBT bankruptcy.

6.3    Filing claims in the bankruptcy of LBHI

The judge that is responsible for the decisions regarding the bankruptcy of LBHI, Judge Peck of the United States Bankruptcy Court, Southern District of New York, set various *bar dates* for filing claims in the Chapter 11 proceedings of LBHI in his order of 2 July 2009. In this order it is established that regarding notes stated on a list (which in principle should include the notes issued by LBT) a bank or another representative can submit claims in the Chapter 11 proceedings of LBHI on behalf of noteholders. The filing party is deemed to be able to take any decisions in respect of the relevant note for these noteholders.

The Bankruptcy Trustee expects that the banks and intermediaries involved will inform the ultimate beneficial noteholders on the details related to the filing of proofs of claims in the bankruptcy of LBHI. For detailed information related to the filing of claim in the Chapter 11 proceedings of LBHI, the Bankruptcy Trustee advises noteholders to visit the website of LBHI (www.lehman-docket.com). This website also includes the aforementioned order and list.

6.4    Filing claims in the bankruptcy of LBT

The Bankruptcy Trustee will not request the supervisory judge until 2010 to set dates for the filing of claims and for the creditors' meeting. Before dates will be

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

set, the Bankruptcy Trustee will try to reach agreement with the representatives of noteholders regarding the amount of the represented claims, as set out in more detail below.

6.5      Phased plan for the valuation of claims

It is the Bankruptcy Trustee's intention to announce in the next public report, mid October 2009, the points of departure for the valuation of claims arising out of notes. Noteholders will then be given the opportunity to respond to these provisional points of departure, which may lead to adjustments.

Subsequently, the Bankruptcy Trustee will announce final valuation principles in the public report of January 2010. The Bankruptcy Trustee intends not to request the supervisory judge until after publication of these definitive valuation principles to set the dates for the creditors' meeting and for filing claims.

Considering the large number of ultimate beneficial noteholders of LBT (more than 100,000) it is desirable that the consultations with the noteholders be structured. An (informal) committee of creditors of LBT would contribute to this. So far, none of the creditors of LBT has requested the formation of such creditors' committee.

*Summary:* by coordinating the (provisional) points of departure for valuation of claims arising out of notes with noteholders or, as the case may be, a creditors' committee, the Bankruptcy Trustee aims to reach agreement about the valuation of these claims. Subsequently, the creditors' meeting will be held. This will not be until in 2010.

LBHI has announced that it intends to propose a '*plan of reorganisation*' to its creditors in 2010 or 2011, which is comparable to a composition plan (*akkoord*) under Dutch law. In connection herewith the Bankruptcy Trustee will investigate the possibility of a (coordinated) composition plan in the bankruptcy proceedings of LBT.

6.6      Valuation of notes

As stated above, there are four different programs under which the notes are issued by LBT. The program documentation includes the specific rights and obligations of noteholders.

Regarding the valuation of claims arising out of notes, the starting point is that the *amount* of such claims is established by the respective program

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

documentation. For the *valuation* of these claims in the bankruptcy of LBT, Dutch bankruptcy law is primarily of importance.

According to the applicable provisions of the relevant program documentation, noteholders were in principle and in most cases entitled - when the notes would reach their final date (the 'Final Maturity Date') - to payment by the issuer (LBT) of an amount, usually referred to as the 'Final Redemption Amount' (as defined in the relevant documentation).

Also, the documentation of most notes gives 'holders' (as defined in the relevant documentation) of notes of a specific series the right to make this series due and payable before the Final Maturity Date by sending an 'acceleration notice' to LBT and, if applicable, to other relevant parties. The modalities of this 'right of acceleration' differ for each series of notes and are included in the respective prospectus and final terms.

The right to accelerate arises, as far as the Bankruptcy Trustee is aware, under all programs as a result of the occurrence of certain 'events of default' specified in the documentation, such as the moratorium or the bankruptcy of LBT or the Chapter 11 proceedings of LBHI. If the holders of a series of notes have accelerated the respective series in accordance with the relevant provisions of the documentation, the amount of the claim of holders of notes of a specific series of notes is calculated according to the formula of the 'Early Redemption Amount' (as referred to in the program documentation).

Until July 2009, the Bankruptcy Trustee received 181 accelerations on a total of 3,788 series of notes. Some of these accelerations appear to be invalid because, among other things, they have not been filed by the quorum of noteholders required pursuant to the relevant program documentation (in most cases 25%). Moreover, it is not clear whether all accelerations have been made by the right holders of the relevant notes. Finally, a (valid) acceleration may under circumstances be cancelled by an ordinary majority of noteholders of a series of notes.

The Bankruptcy Trustee has come to the provisional view that a legally valid acceleration made after the date of the moratorium of LBT or after the date of its bankruptcy, in principle has effect and that the respective *Early Redemption Amount* will be the starting point for valuation of such claim according to Dutch bankruptcy law.

Insofar as the Bankruptcy Trustee can establish, the program documentation does not stipulate if and when a right to accelerate ends. It would appear obvious that acceleration would no longer be possible after the *Final Maturity*

Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.

*Date* of the note in question. It is however noted that many notes mature after the year in which a first distribution may be possible (end of 2010 or 2011) (see next page).



*Visual impression of the Final Maturity Dates of the 3.788 series of notes outstanding on 15 September 2008. The part at the left-hand side of the "15 Sep"-dividing line shows the number and nominal amounts of the series of notes outstanding at 15 September 2008, from their respective issue dates. The right-hand side of the dividing line shows the number and nominal amount of the series of notes existing on 15 September 2008 until their respective maturity dates.*

As part of the claims valuation procedure or of a composition plan, a final date for accepting accelerations may be set. If so, the Bankruptcy Trustee will timely inform noteholders.

**7.    Miscellaneous**

7.1.    <u>Timing</u>

The winding-up of the bankruptcy of LBT largely depends on the completion of the insolvency proceedings of LBHI.

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

H O U T H O F F   B U R U M A

7.2.   Provision of information

This public report (as well as every subsequent public report) will be available on www.lehmanbrotherstreasury.com. The original version in Dutch is also available on this website.

In the event of any difference between the Dutch version and the English translation, the Dutch text prevails. The public reports are also available for inspection at the Amsterdam District Court.

Creditors who are holders of a note issued by LBT, which has been provided with an ISIN code that is stated on the list of ISIN codes belonging to the balance sheet of LBT of 31 August 2008 (Annex I to the first report), are requested to read the Bankruptcy Trustee's notice of 22 December 2008 and to wait for further information from the Bankruptcy Trustee about the filing of claims in the bankruptcy.

Other creditors than holders of notes who believe that they have a claim against LBT are requested to submit those claims in writing, provided with underlying documents, to:

**Houthoff Buruma N.V.**
**Attn. Frédéric Verhoeven**
**PO Box 75505**
**NL-1070 AM Amsterdam, The Netherlands**

Amsterdam, 22 July 2009

Rutger J. Schimmelpenninck,
bankruptcy trustee (*curator*)

**Nothing in this report should be deemed or construed as an admission of liability or claims, or as a waiver of any rights, claims or defenses.**

**<u>Exhibit D</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
|  | : |  |
| In re | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
------------------------------------------------------------------------x    Ref. Docket Nos. 4271, 4349

<u>**CORRECTED AFFIDAVIT OF SERVICE**</u>

STATE OF NEW YORK      )
                                          ) ss.:
COUNTY OF NEW YORK   )

HERB BAER, being duly sworn, deposes and says:

　　　1.　　I am over the age of eighteen years and am not individually a party to the above-captioned proceedings.

　　　2.　　I am a Director of Client Services of Epiq Bankruptcy Solutions, LLC ("Epiq"), located at 757 Third Avenue, 3rd Floor, New York, New York 10017.  Unless otherwise stated, I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

　　　3.　　Lehman Brothers Holdings Inc. and its affiliated debtors (the "Debtors") retained Epiq as their Claims and Noticing Agent pursuant to an Order of the Court dated September 16, 2008.  Accordingly, Epiq maintains the official claims register reflecting all claims listed in the Debtor's Schedules of Liabilities, as amended, and all filed proofs of claim (the "Claims Database").  Additionally, Epiq maintains a database of names and addresses of all potential creditors of the Debtors listed in their Creditor Matrix (together with the Claims Database, the "Master Mailing List").

AFFIDAVIT OF HERB BAER – Page 1

4.      On July 8, 2009, I caused to be served the "NOTICE OF DEADLINES FOR

FILING PROOFS OF CLAIM", dated July 8, 2009 and a Proof of Claim Form upon on all

names and addresses in the Master Mailing List as they existed at the time (the "Bar Date

Mailing").

5.      My "Affidavit of Service" dated July 10, 2009 details all parties that were served,

and the manner in which they were served [Docket # 4349](the "Prior Service Affidavit").  The

Prior Service Affidavit incorrectly listed the address of certain parties that were served.  To

correct any errors on the Prior Service Affidavit, I hereby submit this Corrected Affidavit of

Service which fully supersedes the Prior Service Affidavit and hereby certify that all parties were

served at the addresses included on the Master Mailing List as it existed as of July 8, 2009,

which addresses are set forth on Exhibits D, E, and F, as described below.

6.      The Bar Date Mailing was completed as follows:

On July 8, 2009, I caused to be served the:

   a)   "NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM", dated July 8,

        2009, a copy of which is attached as Exhibit A (the "Bar Date Notice"),

   b)   "PROOF OF CLAIM" form, a copy of which is attached hereto as Exhibit B, (the

        "General Proof of Claim Form"), and

   c)   "PROOF OF CLAIM" form with a legend stating "Notice of Scheduled Claim", a

        copy of which is attached hereto as Exhibit C, (the "Schedule Proof of Claim

        Form")

by causing true and correct copies of the:

   a)   Bar Date Notice and a blank General Proof of Claim Form to be enclosed securely

        in separate postage pre-paid envelopes and delivered by first class mail to those

        parties listed on the attached Exhibit D,

AFFIDAVIT OF HERB BAER – Page 2

b) Bar Date Notice and a General Proof of Claim Form, personalized to include the

name and address of the creditor, to be enclosed securely in separate postage pre-

paid envelopes and delivered by first class mail to those parties listed on the

attached Exhibit E, and

c) Bar Date Notice and a Schedule Proof of Claim Form, personalized to include the

name and address of the creditor and debtor, amount, nature, classification and

description of the scheduled claim, to be enclosed securely in separate postage

pre-paid envelopes and delivered by first class mail to those parties listed on the

attached Exhibit F.

7.    All envelopes utilized in the service of the foregoing contained the following

legend:  "LEGAL DOCUMENTS ENCLOSED. PLEASE DIRECT TO ATTENTION OF

ADDRESSEE, PRESIDENT OR LEGAL DEPARTMENT."

_____
Herb Baer

Sworn to before me this
2nd day of June, 2010

_____
Notary Public

SIDNEY J. GARABATO
NOTARY PUBLIC, STATE OF NEW YORK
No. 01GA6218946
Qualified in New York County
Commission Expires March 15, 2014

AFFIDAVIT OF HERB BAER – Page 3

| Claim Name | Address Information |
|---|---|
| DOUGLAS, KENNETH | PAID DETAIL UNIT ONE POLICE PLAZA NEW YORK NY 10038 |
| DOUGLAS, MELODY A. | 215 EAST DEAN ST. FREEPORT NY 11520 |
| DOUGLAS, SCOTT E | 595 27TH STREET MANHATTAN BEACH CA 90266 |
| DOUGLAS,DAVID A | HOUSE C3, STANLEY KNOLL 42 STANLEY VILLAGE ROAD, STANLEY HONG KONG CHINA |
| DOUGLAS,MICHAEL S. | 3616 MAYFLOWER PLACE NASHVILLE TN 37204 |
| DOUGLAS,SPENCER | 1333 CARRIAGE CROSSING LN CHESTERFIELD MO 630054453 |
| DOUGLAS,STEWART | 29 GROSVENOR GARDENS UPMINSTER, ESSEX RM14 1DL UNITED KINGDOM |
| DOUGLAS-HALL,OMARI J | 2235 FIFTH AV APT 11D NEW YORK NY 10037 |
| DOUGLAS-WESTWOOD | ST ANDREWS HOUSE STATION ROAD EAST CANTERBURY CT1 2WD UK |
| DOUGLAS-WESTWOOD | ST ANDREWS HOUSE STATION ROAD EAST CANTERBURY, KENT CT1 2WD UNITED KINGDOM |
| DOUGLASS, MICHAEL | 4 CORAL LANE SOUTH SALEM NY 10590 |
| DOUGLASS, ROBERT | 221 CUMBERLAND ST APARTMENT 1 BROOKLYN NY 11205 |
| DOUGLASS,JACQUELINE | 1535 HAYNE MEMPHIS TN 38119 |
| DOUGLASS,ROBERT | 221 CUMBERLAND ST APT 1 BROOKLYN NY 112054686 |
| DOUIE,TOM | CHEQUERS OAST THE BROADWAY LAMBERHURST, KENT TN3 8DB UNITED KINGDOM |
| DOUIEB, JESSICA R. | 277 WEST 10TH STREET APT. 8C NEW YORK NY 10014 |
| DOUNIS,JOANA | 59 BEECH LANE HICKSVILLE NY 11801 |
| DOUNNE ALEXANDER | PO BOX 218 EAST HAM LONDON E6 6BG UK |
| DOUNNE ALEXANDER | PO BOX 218 EAST HAM LONDON E6 6BG UNITED KINGDOM |
| DOUSSAN,JENNIFER M. | 6 LLOYD VILLAS LEWISHAM WAY LONDON, GT LON SE4 1US UNITED KINGDOM |
| DOUSSE, MARCEL | 1701 FRIBOURG C/O MM BROCCARD & CIE ALLEE DES GD PLACES 1 |
| DOUTHIT, PAUL | 14723 APPALACHIAN TRAIN CHESTERFIELD MO 63017 |
| DOUTHIT, ZONA C. | 300 FRONT ST #516 PAWTUCKET RI 02860-1052 |
| DOUWE EGBERTS | VLEUTENSEVAART 35 3532 AD UTRECHT 3532 AD NETHERLANDS |
| DOV AZOGUI | CARE OF LEHMAN BROTHERS 25 BANK ST LONDON E14 5LE UK |
| DOV AZOGUI | CARE OF LEHMAN BROTHERS 25 BANK ST LONDON E14 5LE UNITED KINGDOM |
| DOV AZOGUI | 31 RUE RAYNOUARD PARIS 75016 FRANCE |
| DOV AZOGUI | 31 RUE RAYNOUARD PARIS 75 75016 FRANCE |
| DOV GERTZULIN | 245 EAST 93RD STREET APT. 5G NEW YORK NY 10128 |
| DOV KANOFSKY | 300 MERCER ST APT 19I NEW YORK NY 10003-6738 |
| DOVALDAS BUZINSKAS | GROUPE HEC, C084 1 RUE DE LA LIBERATION JOUY-EN-JOSAS 78350 FRANCE |
| DOVALDAS BUZINSKAS | GROUPE HEC, C084 1 RUE DE LA LIBERATION JOUY-EN-JOSAS 78 78350 FRANCE |
| DOVE, THOMAS | 67 EARLSWOOD STREET LONDON SE10 9ET UNITED KINGDOM |
| DOVE,ANDREW | 33 MONTAGUE AVENUE LEIGH ON SEA, ESSEX SS9 3SL UNITED KINGDOM |
| DOVE,THOMAS | 67 EARLSWOOD STREET LONDON, GT LON SE10 9ET UNITED KINGDOM |
| DOVER BOARD OF EDUCATION | CITY SCHOOL DIST 2131 NORTH WOOSTER AVE DOVER OH 44622 |
| DOVER INTERNATIONAL SPEEDWAY | P.O. BOX 843 DOVER DE 19903-0843 |
| DOVER, COURTNEY C. | 400 ST. NICHOLAS AVENUE #2N NEW YORK NY 10027 |
| DOVER, PAULA F | 502 SOUTH PUEBLO STREET GILBERT AZ 85233 |
| DOVETAIL CONTRACT FURNITURE | 8 ST JOHNS LANE LONDON EC1M 4BF UK |
| DOVETAIL CONTRACT FURNITURE | 8 ST JOHNS LANE LONDON EC1M 4BF UNITED KINGDOM |
| DOVIDIO,NICHOLAS | 139 WEST DUDLEY AVENUE WESTFIELD NJ 07090 |
| DOW BUSINESS GUIDE | 446 NORTH WELLS STREET UNIT 337 CHICAGO IL 60610 |
| DOW CHEMICAL EMPLOYEES' CREDIT UNION | C/O BARBARA JUNGA, VP FINANCE P.O. BOX 1649 MIDLAND MI 48641-1649 |
| DOW CORNING CORPORATION | GENERAL COUNSEL 2200 W. SALZBURG ROAD MIDLAND MI 48686-0994 |
| DOW EMPLOYEES PENSION PLAN | 2030 DOW CENTER MIDLAND MI 48674 |
| DOW JONES | ATTN: KRIS SCHNECK/MICHAEL A. PETRONELLA 200 LIBERTY STREET NEW YORK NY 10281 |
| DOW JONES & CO | PO BOX 300 PRINCETON NJ 08543-0300 |
| DOW JONES & CO INC | ALLEN MAXWELL & SILVER INC FILE #245381 190 SYLVAN AVENUE ENGLEWOOD CLIFFS NJ |