Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-jmp

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC.,

8

9             Debtors.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17                  December 19, 2012

18                  10:06 AM

19

20   B E F O R E :

21   HON JAMES M. PECK

22   U.S. BANKRUPTCY JUDGE

23

24

25

Page 2

1    Hearing re:  Three Hundred Eighteenth Omnibus Objection to

2    Claims (Partnership Claims) [ECF No. 28442]

3

4    Hearing re:  Three Hundred Twenty-Sixth Omnibus Objection to

5    Claims (Severance and Other Employee Claims) [ECF Nos.

6    29321]

7

8    Hearing re:  Three Hundred Twenty-Seventh Omnibus Objection

9    to Claims (Partnership and Other Employee Claims) [ECF Nos.

10   29322]

11

12   Hearing re:  Three Hundred Sixty-Sixth Omnibus Objection to

13   Claims (Employment-Related Claims) [ECF No. 31989]

14

15   Hearing re:  One Hundred Forty-Third Omnibus Objection to

16   Claims (Late-Filed Claims) [ECF No. 16856]

17

18   Hearing re:  Three Hundred Twenty-Third Omnibus Objection to

19   Claims (Late-Filed Claims) [ECF No. 29295]

20

21   Hearing re:  Three Hundred Seventy-Second Omnibus Objection

22   to Claims (Late-Filed Claims) [ECF No. 31995]

23

24   Hearing re:  Omnibus Application of (i) Individual members

25   of Official Committee of Unsecured Creditors and (ii)

1    Indenture Trustees Pursuant to Section 1129(a)(4), or,

2    Alternatively, Sections 503(b)(3)(D) and 503(b)(4) of

3    Bankruptcy Code for Payment of Fees and Reimbursement of

4    Expenses, filed January 30, 2012 [ECF Nos. 24762 and 24881]

5

6    Hearing re:  Debtors' Ninety-Seventh Omnibus Objection to

7    Claims (Insufficient Documentation) [ECF No. 14492]

8

9    Hearing re:  Debtors' One Hundred Twenty-Fifth Omnibus

10   Objection to Claims (Insufficient Documentation) [ECF No.

11   16079]

12

13   Hearing re:  Debtors' One Hundred Thirty-Eighth Omnibus

14   Objection to Claims (No Liability Derivatives Claims) [ECF

15   No. 16865]

16

17   Hearing re:  Three Hundred Forty-Sixth Omnibus Objection to

18   Claims (Securities Claims) [ECF No. 30062]

19

20   Hearing re:  Three Hundred Sixty-First Omnibus Objection to

21   Claims (No Guarantee Claims) [ECF No. 31317]

22

23   Hearing re:  Three Hundred Sixty-Sixth Omnibus Objection to

24   Claims (Employment-Related Claims) [ECF No. 31989]

25

Page 4

1    Hearing re:  Debtors' Objection to Proof of Claim No. 66099

2    Filed by Syncora Guarantee, Inc. [ECF No. 20087]

3

4    Hearing re:  Objection to Proofs of Claim Number 14824 and

5    14826 [ECF No. 30055]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Nicole Yawn, Melissa Looney

Page 5

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3          Attorneys for Debtors

4          767 Fifth Avenue

5          New York, New York 10153

6

7    BY:  MAURICE HORWITZ, ESQ.

8          HARVEY MILLER, ESQ.

9

10   YOUNG CONAWAY STARGATT & TAYLOR, LLP

11         Attorney for CF Midas Balanced Growth Fund

12         1270 Avenue of the Americas

13         New York, New York 10020

14

15   BY:  DANIEL F.X. GEOGHAN, ESQ.

16

17   MILBANK, TWEED, HADLEY & MCCLOY LLP

18         Attorney for Official Committee

19         One Chase Manhattan Plaza

20         New York, New York 10005-1413

21

22   BY:  DENNIS F. DUNNE, ESQ.

23

24

25

```
 1   KIRKLAND & ELLIS LLP

 2        Attorneys for the Dow Corning Corporation

 3        153 East 53rd Street

 4        New York, New York 10022-4611

 5   and

 6        601 Lexington Avenue

 7        New York, New York 10022

 8

 9   BY:  PETER TSAO, ESQ.

10        CRAIG A. BRUENS, ESQ.

11

12   OFFICE OF THE UNITED STATES TRUSTEE

13        Attorney for the Trustee

14        33 Whitehall Street

15        21st Floor

16        New York, New York 10004

17

18   BY:  SUSAN GOLDEN, ESQ.

19        TRACY HOPE DAVIS, ESQ.

20

21

22

23

24

25
```

Page 7

```
 1   GODFREY & KAHN, S.C.

 2        Attorney for Creditor, Fee Committee

 3        One East Main Street

 4        Suite 500

 5        Madison, Wisconsin 53701-2719

 6

 7   BY:  KATHERINE STADLER, ESQ. (TELEPHONIC)

 8

 9   SULLIVAN & WORCESTER LLP

10        Attorneys for U.S. Bank National Assoc., as Trustee

11        One Post Office Square

12        Boston, Massachusetts 02109

13

14   BY:  RICHARD HIERSTEINER, ESQ.

15        JEANNE P. DARCEY, ESQ.

16

17   COVINGTON & BURLING LLP

18        Attorney for Wilmington Trust

19        620 Eighth Avenue

20        New York, New York 10018-1405

21

22   BY:  MICHAEL B. HOPKINS, ESQ.

23

24

25
```

Page 8

1    SHEPPARD MULLIN (UK) LLP and SHEPPARD MULLIN RICHTER &

2    HAMPTON LLP

3         Attorneys for Bank of New York Mellon

4         25 Southampton Buildings

5         London, England WC2A 1AL

6    and

7         Four Embarcadero Center

8         17th Floor

9         San Francisco, California 94111-4109

10

11   BY:  RUSSELL L. REID, JR., ESQ.

12        MICHAEL AHRENS, ESQ.

13

14   KLEINBERG, KAPLAN, WOLFF, COHEN

15        551 Fifth Avenue

16        New York, New York 10176

17

18   BY:  MATTHEW J. GOLD, ESQ.

19

20

21

22

23

24

25

Page 9

```
 1              P R O C E E D I N G S
 2         THE COURT:  Be seated, please.  Good morning.
 3         MR. HORWITZ:  Good morning, Your Honor.  Maurice
 4    Horwitz, Weil, Gotshal & Manges, on behalf of Lehman
 5    Brothers Holdings, Inc., as plan administrator.
 6         We have four uncontested items on today's agenda.
 7    The first is the three hundred and eighteenth omnibus
 8    objection to claims.  This objection sought to disallow and
 9    expunge certain claims for partnership interests that are
10    claims against non-debtor entities.
11         We're proceeding today with respect to one
12    claimant, Charles Moore, who had filed a response to the
13    objection.  Mr. Moore filed a proof of claim against LBHI in
14    the amount of $11 million with two components.  One
15    component was for carried interest in a partnership in the
16    amount of approximately $8 million, which is currently
17    subject to omni 318.  Another portion of this claim is for
18    bonus compensation in the amount of approximately $2
19    million.  That portion of the claim is currently subject to
20    omni 315.
21         The claimant has no objection today to the relief
22    requested by the plan administrator to expunge that portion
23    of the claim that relates to carried interest, and, as such,
24    we're proceeding on a consensual basis today with respect to
25    that portion of the claim.  The requested relief will have
```

1    no effect on the portion of Mr. Moore's claim for bonus

2    compensation.

3              THE COURT:  It's approved on an uncontested basis.

4              MR. HORWITZ:  Thank you, Your Honor.

5              The next two items on the agenda, omni three

6    twenty-six and three twenty-seven, are also both

7    uncontested.  The omni three twenty-six sought to reduce and

8    allow certain claims for severance filed against LBHI.  One

9    claimant filed a response.  That response has been resolved,

10   and the claimant has agreed to the relief sought by the plan

11   administrator.  So we're submitting a consensual order on

12   that omni as well.

13             THE COURT:  That's approved.

14             MR. HORWITZ:  Omni three twenty-seven sought to

15   reduce and allow certain claims for partnership interests.

16   Certain claimants filed responses.  Three of those responses

17   have been resolved, and the plan administrator is proceeding

18   on an uncontested basis with respect to those three.  The

19   rest are adjourned.

20             THE COURT:  Fine.  That's all approved.

21             MR. HORWITZ:  The fourth and last uncontested item

22   on the agenda is omnibus objection three sixty-six.  The

23   plan administrator in this omnibus objection sought to

24   disallow the claim of Arthur Kenney (ph), claim 67880, on

25   the grounds that it was duplicative of claim number 14067.

Page 11

```
 1    The parties have agreed that one portion of that claim for
 2    approximately $65,000 is duplicative and will be expunged
 3    today on a consensual basis.  About $16,000 -- just over
 4    $16,000 of the claim we agree will not be affected by
 5    today's order and will remain active and subject to another
 6    objection.
 7              THE COURT:  Okay.  This is approved with that oral
 8    modification.
 9              MR. HORWITZ:  Okay.  Proceeding to the contested
10    portion of the agenda.  The first contested matter on
11    today's agenda is the one hundred and forty-third omnibus
12    objection to claims, which sought to disallow certain claims
13    that were filed after the bar date in these cases.
14              MR. GEOGHAN:  Your Honor, excuse me.  I apologize.
15    Before we begin, my client was joining us through court call
16    from Europe.  I got an email a few minutes ago.  There's
17    just a problem with court call and the conference I.D.  If
18    we could possibly move this matter over to after the --
19    there's two contested matters on.  If we could possibly be
20    the second, just to give them an extra two or three minutes,
21    see if they can call in, I would appreciate it.
22              THE COURT:  That's fine.
23              MR. GEOGHAN:  Thank you, Your Honor.
24              MR. HORWITZ:  Okay.  The second item on the
25    contested portion of the agenda is omnibus -- the three
```

Page 12

1   hundred and twenty-third omnibus objection to claims.  This

2   objection also sought to disallow certain claims that were

3   filed after the bar date.

4        The plan administrator is proceeding today with

5   respect to two claims on omni three twenty-three.  Each were

6   filed 30 days after the general bar date in these cases,

7   which was September 22nd, 2009.  The claims were filed by

8   the Dow Corning Corporation, one against Lehman Brothers

9   Special Financing in connection with the swap agreements.

10  That is claim number 43840.  The other claim was filed

11  against LBHI.  It's based on LBHI's guarantee of LBSF's

12  obligations under the same swap.  That is claim number

13  43964.

14       In its response, Dow Corning argues that its

15  claims should be deemed timely pursuant to rule 9006(b)(1)

16  on the grounds of excusable neglect.  As this Court is

17  aware, I have recited the factors many times, but I'll

18  recite them again today.

19       In Pioneer, the U.S. Supreme Court held that a

20  determination of excusable neglect depends on four factors,

21  prejudice to the debtors, the length of the delay, the

22  reason for the delay, and whether the claimant acted in good

23  faith.  The Second Circuit doesn't give equal weight to

24  these four factors.  The third factor, the reason for the

25  delay, is the most important and critical factor in

Page 13

1    determining whether a claimant has established grounds for

2    finding excusable neglect.

3           Dow Corning argues that its delay in this case was

4    justified because it was confused regarding the distinction

5    between the LBI SIPA proceeding and these chapter 11 cases.

6    According to Dow Corning, shortly after sending a

7    termination notice to LBSF and a demand for payment in

8    connection with the swap agreement, it received a notice

9    from LBI's SIPA trustee informing it of the liquidation --

10   commencement of the SIPA proceeding in this court.

11          It also received a customer claim form, and, on

12   January 22nd, 2009, Dow Corning filed a customer claim in

13   the LBI SIPA proceeding and believed that this was an

14   appropriate way to assert a claim against LBSF and LBHI in

15   their respective chapter 11 cases.  Dow Corning further

16   claims that it did not realize it had filed the wrong claim

17   in the wrong case until six days after the bar date in these

18   cases when it received a letter from the SIPA trustee

19   denying its asserted customer claim.

20          Your Honor, as a preliminary matter, I would point

21   out that, shortly after this Court entered the bar date

22   order in July of 2009, Dow Corning was served with notice of

23   the bar date order.  We attached to our reply papers as

24   Exhibit D the corrected affidavit of service of Herbert

25   indicating that Dow Corning was properly served, and Dow

Page 14

1    Corning has not disputed this fact.

2            This was almost six months after Dow Corning filed

3    its customer claim against LBI, and it's roughly eight or

4    nine months after it received notice of the SIPA

5    liquidation.  In other words, it's not like Dow Corning had

6    20 balls thrown at it at once and couldn't tell one from the

7    other.  This notice, the notice of the bar date order, came

8    nearly half a year after the first notices and clearly

9    stated that claims against LBHI and LBSF needed to be filed

10   pursuant to its terms and actually received on or before

11   September 22nd, 2009.

12            Secondly, Your Honor, the Dow Corning Corporation

13   is not an unsophisticated party.  The average person on the

14   street may not know the difference between a SIPA

15   liquidation of a broker/dealer in a chapter 11 case.  It may

16   not know the difference between a customer claim and a

17   general unsecured claim, but this is a multi-national

18   enterprise and had the means to hire advisers and to conduct

19   the minimal diligence that would have been required in these

20   circumstances to determine, upon receipt of the bar date

21   order and the bar date notice, that its claims needed to be

22   filed in accordance with the bar date order entered in

23   LBSF's and LBHI's chapter 11 cases.  It clearly knew the

24   difference between LBSF and LBI, because it was able to send

25   both a termination notice and a demand for payment to LBSF

Page 15

1    immediately after LBHI's petition date.

2              Your Honor, simply put, Dow Corning's failure to

3    follow the clear requirements of the bar date order was a

4    factor that was entirely within its own control, and, in

5    these circumstances, the plan administrator submits that Dow

6    Corning has not demonstrated a reason for the delay that

7    would ground a finding for excusable neglect.  Accordingly,

8    the plan administrator requests that the claim be expunged,

9    both claims be expunged as untimely.

10             THE COURT:  Thank you.

11             I'll hear from Dow Corning.

12             MR. TSAO:  Good morning, Your Honor.  Peter Tsao,

13   from Kirkland & Ellis, on behalf of the Dow Corning

14   Corporation.

15             Your Honor, before I begin, I just want to just

16   note that our declarant, Kathleen Smith, who had -- for who

17   we had filed a declaration attached to our response, was

18   unavailable to attend this hearing today due to a passing in

19   her family.  We advised counsel for the plan administrator,

20   and, to the extent Your Honor has any questions for that

21   declarant, we are obviously happy to have her come up at the

22   next omnibus hearing.

23             THE COURT:  I reviewed her declaration, and the

24   content is largely congruent with the statements made in

25   your papers, and I don't have any particular questions of

Page 16

1    her.

2            It's unclear to me, based upon the declaration,

3    that she had actual and personal knowledge of the

4    circumstances surrounding this mistake, and I don't think,

5    unless a showing can be made that she had actual

6    participation in the bad judgment call, that her further

7    testimony will provide a lot of background.  It's unclear to

8    me, from your papers and from her declaration, who within

9    the legal department was actually responsible for this

10   matter and how this actually occurred, but this is an

11   opportunity for you to try to explain that, if you know.

12           MR. TSAO:  Your Honor, I think -- to an extent, I

13   think we're in a similar situation in that Ms. Smith, who

14   was our declarant -- it was more of a supervisory role.  I

15   actually think the facts in question and the facts provided

16   by Mr. Horwitz just now I don't think, for the most part, we

17   dispute them.  I think, at the end of the day, we've read

18   your opinion on late claims that you issued in May of 2010.

19           We understand that the Second Circuit has a firm

20   stance on bar dates, and, being debtors' counsel in other

21   cases, we completely understand that position, but, looking

22   at the other instances where claimants have moved for a

23   finding of excusable neglect, we think that what

24   distinguishes this instance is that our client, Dow Corning,

25   did act prior to the bar date.  As Mr. Horwitz pointed out,

```
1     they did receive a SIPA notice and the customer claim.

2            They filed or entered that information and filed

3     it in a timely manner before the bar date.  They mistakenly

4     -- and I -- Your Honor, I can't point to the exact person in

5     Dow Corning, but the legal department --

6            THE COURT:  Is that person still working for Dow

7     Corning?

8            MR. TSAO:  Your Honor, I don't know, but I can

9     tell you that they mistakenly believed that, by filing the

10    SIPA proceeding in the Southern District with the trustee,

11    that that was the equivalent of protecting their rights

12    against LBSF and LBHI in these proceedings.

13           THE COURT:  Forgive my characterization, but it's

14    a clearly bone-headed move on the part of anyone.  The

15    circumstances surrounding the Lehman bankruptcy and SIPA

16    cases were at the time and continue to be so notorious that

17    it is very difficult to understand how notices from the SIPA

18    trustee rationally could have been confused with obligations

19    to file proofs of claim as to the chapter 11 cases for LBSF

20    and LBHI, particularly in a setting in which Dow Corning was

21    able to take action almost immediately to terminate the swap

22    and knew the names of the entities that received notice of

23    termination.  So this is a hard case for you to win.

24           MR. TSAO:  Your Honor, I think we understand, and

25    we understand the case law clearly on this, and I think
```

Page 18

1    we're looking at the equities of the situation, and, at the

2    end of the day, I think the dispute really -- or the issue

3    really comes down to, you know, the reason for the delay,

4    and, in this instance, you know, our client -- the reason

5    for their inability to file a timely proof of claim was

6    simply a misunderstanding about the SIPA proceeding notice.

7          I think folks in this courtroom and a lot of folks

8    understand the difference between the SIPA proceeding and

9    the Lehman cases.  Unfortunately, however, the legal

10   department at Dow Corning made a mistake.  They did what

11   they thought was right at the time, which was file the SIPA.

12   They thought that, by doing that, they were protected and

13   they didn't need to file a separate proof of claim against

14   Lehman and LBHI and LBSF.

15          In some ways, this is analogous to if they had

16   filed against the wrong debtor.  Unfortunately, it's not the

17   wrong debtor.  It's a whole different proceeding, but we

18   feel that the equities of the situation lend itself to a

19   potential finding of excusable neglect, and again, this all

20   turns on, you know, our client's mistake in thinking the

21   SIPA filing was the equivalent of filing a claim in these

22   cases.

23          THE COURT:  Okay.

24          MR. TSAO:  Thank you, Your Honor.

25          THE COURT:  I understand the embarrassment of any

Page 19

1    claimant in making a mistake such as this, but it's

2    particularly embarrassing for an enterprise such as Dow

3    Corning that is not only a sophisticated, multi-national

4    enterprise, but a former debtor itself.  So the intricacies

5    of bankruptcy are not foreign to this enterprise.

6            This was a mistake, and I won't characterize it

7    any other way, and the reason for this mistake is, frankly,

8    unexplained, or at least not explained to my satisfaction.

9    The declaration does not really provide meaningful detail as

10   to how whoever was responsible for the claims process within

11   the legal department made the error in question.  The fact

12   that this is such an unusual circumstance demonstrates that

13   it is not reasonable for this mistake to have been made.

14           This is the first instance that I'm aware of in

15   which a claim was not filed as to LBSF and LBHI in

16   connection with a derivative by virtue of confusion

17   associated with the claims process in the SIPA case.  While

18   it's not evidence, the fact that this is so rare a

19   circumstance tends to support the conclusion that the

20   mistake was not one that's easily explainable, other than

21   through some form of negligence.

22           For these reasons and largely based upon the

23   reasoning set forth in LBHI's omnibus reply docketed at

24   32854, I find that the Dow Corning position is unpersuasive,

25   and I find no excuse for the late filed claim, and the

1   claims are disallowed, both those two, LBSF and LBHI.

2           MR. TSAO:  Thank you, Your Honor.

3           MR. BRUENS:  Your Honor, may we be excused?

4           THE COURT:  Yes.

5           MR. BRUENS:  Thank you.

6           MR. HORWITZ:  Okay.  We think that the declarant

7   for the Midas Fund has been able to dial in.  So --

8           THE COURT:  Okay.

9           MR. HORWITZ:  -- we will proceed with --

10          THE COURT:  Let's confirm that.

11          Is there someone on the telephone acting on behalf

12  of CF Midas Balanced Growth Fund?

13          I don't hear any response.

14          MR. GEOGHAN:  No, Your Honor, I don't, either.  I

15  thought I heard the click that they were coming in.  There's

16  apparently a problem with the international calling on the

17  conference I.D. number they were provided.  They've been

18  trying to get in since about a quarter to 10:00.

19          THE COURT:  Do you want to take a short recess

20  while you try to clarify this, or do you want to proceed in

21  the absence of your declarant?

22          MR. GEOGHAN:  If the Court doesn't have questions

23  for my declarant, I think we could proceed in the absence of

24  the declarant.  If the Court believes there will be

25  questions, then I would ask the opportunity to wait a few

Page 21

1    minutes.

2           THE COURT:  I don't have any questions for the

3    declarant.  I've read the declaration.

4           MR. GEOGHAN:  Thank you, Your Honor.  Then, I

5    believe we can proceed.

6           THE COURT:  Let's do that.

7           MR. HORWITZ:  So the next matter is the one

8    hundred and forth-third omnibus objection to claims.  This

9    objection sought to disallow certain claims that were filed

10   after the bar date, LBHI's proceeding with respect to the

11   claim of CF Midas Balanced Growth Fund.  That is claim

12   67193.

13          The Midas Fund's claim is a Lehman Program

14   securities claim.  According to the declaration of Nigel

15   Boyland (ph) that was filed in support of the Midas Fund's

16   response, the Midas Fund holds a structured note issued by

17   Lehman Brothers Treasury Co., BV, the Dutch entity that

18   issued structured notes, which Mr. Boyland says was

19   guaranteed by LBHI.

20          Your Honor, the bar date for claims based on

21   Lehman Program securities, which includes structured notes

22   issued by LBT, was November 2nd, 2009.  The Midas Fund filed

23   its claim a full year after the bar date, on November 8th,

24   2010.  In its response, the Midas Fund argues that the Court

25   should allow the claim pursuant to bankruptcy rule

1    9006(b)(1) on the grounds of excusable neglect.

2            Your Honor, the plan administrator has reviewed

3    the response filed by the Midas Fund and is unable to

4    discern any action that the Midas Fund took to determine

5    whether its asserted claim against LBHI was subject to the

6    bar date order.  From the response, it appears that the

7    Midas Fund relied upon notices that it received from the LBT

8    trustees presiding over the -- or administering the LBT

9    bankruptcy case in the Netherlands.

10            In fact, the Midas Fund states that the reason for

11    its delay of more than one year is that it relied on these

12    notices, which the Midas Fund claims led it to believe that

13    claims did not need to be filed against LBHI in respect of

14    LBT's structured notes.  I would point out, again,

15    Your Honor, that the Midas Fund, while it says very little

16    about itself in its papers, is clearly not an

17    unsophisticated party.  It certainly is not a pro se

18    individual, which as many claimants were who filed Lehman

19    Program securities claims.  There were approximately 25,000

20    claims filed against LBHI based on Lehman Program

21    securities, and many, if not most of them, were filed by or

22    on behalf of individuals.

23            Second, the Midas Fund doesn't attach to its reply

24    or to the accompanying declaration any of the notices that

25    it refers to, and, according to Mr. Boyland's declaration,

Page 23

```
 1    the Midas Fund received three notices.  The third notice was

 2    dated December 22nd, 2008 and stated that beneficial holders

 3    of notes issued by LBT are not required to file claims with

 4    the bankruptcy trustee, and the bankruptcy trustee aims to

 5    coordinate with the LBHI process of filing claims by holders

 6    of notes in respect of the LBHI guarantee in the chapter 11

 7    proceedings.

 8            Although a copy of this notice was not attached to

 9    the Midas Fund's reply or to the declaration, I have copies

10    of the third notice.  I downloaded them from LBT's Web site,

11    lehmanbrotherstreasury.com.  I have copies that I can hand

12    to the Court and to counsel for the Midas Funds, if the

13    Court would like to look at them.

14            THE COURT:  Is there any objection to my taking a

15    look at these downloaded notices?

16            MR. GEOGHAN:  None, Your Honor.  Copies were

17    provided to counsel.  I have copies of all three notices

18    here, if the Court desires.

19            THE COURT:  Okay.  I'll take a look at them then.

20            Thank you.

21            MR. HORWITZ:  Your Honor, the last sentence that I

22    just read to the Court is from section 2.5 of the third

23    notice to holders of LBT notes.  The very next sentence,

24    after the one that I just read to the Court, says, "More

25    information on the insolvency proceedings of LBHI can be
```

Page 24

1    found on HGTP\chapter11.epiqsystems.com under Lehman

2    Brothers Holdings, Inc. Chapter 11.  As far as the

3    bankruptcy trustee is aware, as of the date of this notice,

4    no bar date has been set for the filing of claims in the

5    chapter 11 proceedings of LBHI."

6              "Noteholders are advised to regularly visit the

7    aforementioned Web site for updated information on LBHI.

8    Since the information that the bankruptcy trustee will

9    provide to noteholders is primarily limited to the

10   bankruptcy of LBT, the bankruptcy trustee will not issue a

11   notice if a bar date for the filing of claims is set in the

12   chapter 11 proceedings of LBHI."

13             Your Honor, this is the notice that the Midas Fund

14   read and reasonably relied upon or claims to have reasonably

15   relied upon.  The language in the third notice clearly

16   indicates that LBHI is subject to a separate chapter 11 case

17   and that the requirements for filing claims against LBHI are

18   distinct from the requirements in the LBT proceeding.  The

19   notice clearly warns creditors to monitor the Epiq Web site

20   for information regarding a separate bar date and separate

21   claims filing procedures in respect of guaranteed claims

22   against LBHI.

23             On October 1st, 2009, the LBT trustees actually

24   issued a fourth notice, which was posted on its Web site.  I

25   have copies of that notice as well.  Midas Fund does not say

Page 25

1   in its reply or in the declaration that it received this

2   notice, but this notice was available on the Internet, and

3   the LBT trustees say that they issued it to all holders of

4   LBT notes.  I would like to read from the first page of that

5   notice, and I can hand it up to the Court and to counsel for

6   the Midas Fund, if the Court's willing to hear that portion

7   of the notice.

8           THE COURT:  Do you have any objection?

9           MR. GEOGHAN:  Well, I don't believe so.  I'd

10  reserve any right.  I have yet to see the document.  My

11  client doesn't have a copy of it.  Presumably, it was

12  downloaded from the -- presumably, it's not an objectionable

13  document, though.

14          THE COURT:  I think, regardless of what's in your

15  pleadings or what your declarant says he knew at the time,

16  this is relevant to the question of information available at

17  certain points in time to interested holders of near or

18  medium-term notes, and so, I'll consider it for whatever

19  weight it may be entitled to in this argument.  It's unclear

20  to me that it's directly relevant, but I'm interested in

21  knowing what was generally out there in the public domain.

22          MR. GEOGHAN:  Thank you, Your Honor.

23          MR. HORWITZ:  And, Your Honor, the fourth notice

24  to creditors states on the very first page, "On July 2nd,

25  2009, the United States Bankruptcy Court for the Southern

Page 26

1    District of New York, having jurisdiction over the chapter

2    11 cases of Lehman Brothers Holdings, Inc., entered an order

3    establishing November 2nd, 2009 at 5:00 p.m. prevailing

4    Eastern time as the last date and time for each person or

5    entity to file a proof of claim based upon claims arising

6    out of certain securities issued by LBHI or any of their

7    affiliates, including LBT outside of the United States."

8            Your Honor, in addition to these notices, we cite

9    in our papers the quarterly reports that the LBT trustee

10   issues to holders of LBT structured notes, specifically the

11   third public report in which the LBT trustee goes so far as

12   to -- never to explain the difference between the claims

13   filing requirements of LBT's Dutch bankruptcy proceeding and

14   LBHI's chapter 11 case.  In addition to all of the

15   foregoing, as we state in our papers, notice of the

16   securities program bar date was published in 10 languages in

17   26 newspapers across 18 countries.  I could list them, but

18   I'll spare the Court that litany.

19           The program securities bar date notice was also

20   provided to Euroclear, Clear Stream, and similar clearing

21   systems as well as to the issuers of Lehman Program

22   securities, including LBT, with instructions to distribute

23   the notice to the holders of Lehman Program securities.

24   Your Honor, given, not only the widespread publication of

25   the program securities bar date notice, but also the

Page 27

1    repeated admonitions from the LBT trustees to their holders,

2    the plan administrator submits that the Midas Fund has

3    conducted -- has not conducted even a minimal amount of

4    diligence that it would have been required such that it

5    could have understood the difference between the two

6    proceedings and the application of the bar date order to its

7    asserted claim against LBHI.  As such, the plan

8    administrator submits that the Midas Fund has not made a

9    sufficient showing for finding of excusable neglect and that

10   its claim should be expunged.

11              THE COURT:  Okay.  Thank you.

12              MR. GEOGHAN:  Good morning, Your Honor.  Daniel

13   Geoghan, Young Conaway Stargatt & Taylor, here for CF Midas.

14   Thank you for taking the time this morning, Your Honor.

15              Your Honor, there is -- as much as I was going to

16   start with a long discussion of the background of how we got

17   here on the excusable -- with regard to the excusable

18   neglect issue, I think there's one pressing issue before we

19   get there.  This claim was allowed.  This claim was allowed

20   by the debtor.  On August 26th, 2011 -- and a copy of the

21   notice was provided to the Court in supplemental response,

22   this claim was allowed by the debtor.

23              THE COURT:  Well, I saw your supplemental

24   response, and I understand that's your argument.  I think

25   you're going to need to connect the dots on that argument,

Page 28

1    because I think that there's a distinction to be drawn

2    between a notice and an objection to the claim based upon

3    late filing.  If you want to argue waiver on the basis of a

4    notice, you can certainly make that argument, but you're

5    going to have to connect the dots in order to prevail on

6    that argument, because I'm not very sympathetic to it.

7            MR. GEOGHAN:  Well, Your Honor, I think there are

8    some dots that can be connected, including section 502(j) of

9    the bankruptcy code, which provides that, once a claim is

10   allowed, it can -- that allowance can't be overturned

11   without cause, and that language, that section does not

12   provide that an order is required.  That language simply

13   provides that once a claim is allowed.

14           The debtor clearly, by its own admission, has

15   allowed this claim, and I would differentiate, if I may,

16   from a claim that is listed in schedules as contingent,

17   unliquidated, or disputed, which could subsequently be

18   amended.  I would differentiate that, because here, we had

19   an actual allowance of the claim subsequent to the

20   initiation of a contested matter by the debtor, and I do

21   think that that is a distinguishing factor here, and again,

22   referring the Court to 502(j).  It does not require an order

23   saying that the claim was allowed.  It simply requires that

24   the claim be allowed.

25           Excuse me one second.  And I think that is very

Page 29

1    important, not only in the equitable sense in that my

2    client's claim was allowed by an admission by the debtor and

3    not a simple admission by a notice provided to us that

4    doesn't say anything about reserving the right to come back

5    and challenge us again.  Moreover, in an equitable and an

6    estoppel sense, my client can rely on that notice that their

7    claim is now allowed.

8         So I think that that fact differentiates my client

9    and the late-filed claim from other late-filed claims, which

10   is an important part of the process here, because it also

11   differentiates my client from the floodgates argument that

12   allowing this claim would have some tremendous effect on the

13   estate.  This claim has already been reserved for.  This

14   claim has already been accounted for.

15        It's been allowed.  It's calculated, I'd imagine,

16   into the distribution.  Now, obviously, those are the words

17   of counsel.  There would need to be some form -- I mean, if

18   we were going to go farther down that road as to whether or

19   not this claim was actually calculated into the distribution

20   calculation, obviously, we'd have to take some kind of

21   discovery, but that's -- this is an initial hearing and not

22   an evidentiary hearing, and I appreciate that, Your Honor.

23        In addition to the 502(j) argument, Your Honor,

24   obviously, I would want to make a record on the issues of

25   excusable neglect.  As was stated in the papers, Your Honor,

Page 30

1    my client received, through its corporate representative,

2    numerous notices, and clearly, there was a misunderstanding

3    among people as to what was going on with the notices.  It's

4    not clear that a copy of the bar date order was sent to my

5    client.  I didn't see their name on any affidavit, but, as

6    counsel pointed out, there was publication.  There are other

7    methods.

8              Also, I would point out, as to the fourth notice,

9    which we do not have a copy of, no evidence was presented

10   that my client -- that a copy of that was given to my

11   client, delivered, actual or constructively to my client.

12   So I don't know if anybody was aware of it, but certainly,

13   in October 2009, my client, through its representatives, was

14   taking steps to gather information related to its Lehman

15   claims, and it sought, through its representative.

16             This Bank of New York Mellon was the custody in

17   assets for CF Midas.  So there would have likely been

18   notification to Bank of New York Mellon more than CF Midas,

19   and CF Midas would have communicated back to Bank of New

20   York Mellon directing them what to do, and so forth, and

21   Bank of New York Mellon would have taken action, and my

22   client sought to provide information to Bank of New York

23   Mellon, and, not knowing it needed to provide information to

24   Lehman, Bank of New York Mellon -- excuse me -- informed it

25   that it had provided insufficient information or there was a

Page 31

1    problem with the information.

2            My client responded and said well, what

3    information could we need for a U.S. bankruptcy we hold

4    Dutch assets, and no response was given, and there fell the

5    problem, and, when my client realized they had a problem,

6    they had mistakenly not filed the claim, they immediately

7    took action to file that claim.

8            Your Honor, I think, importantly here, is again,

9    the fact that this claim is allowed, and why is that

10   important?  Your Honor, there is no prejudice to the debtor

11   or the creditors.  This claim has been allowed.

12           There is no prejudice with regard to

13   distributions.  The amount of the claim has already been

14   calculated in and reserved for, I would imagine.  There's no

15   interference with the claims review and reconciliation

16   process.  The claim has been allowed.

17           I believe that CF Midas would take the position

18   that the length of delay is not dispositive of the issues

19   here, because the claim has been allowed.  So, Your Honor, I

20   would say that there's been no suggestion that CF Midas

21   acted in bad faith at any time, so I don't believe that that

22   is an issue, and, as I stated earlier, the reason for the

23   delay -- CF Midas had received numerous notices.  It was

24   confused about what expectations people that -- what it may

25   have had to file, if anything.

Page 32

1           It believed it was dealing with a Dutch entity.

2   It was not aware that it had to file something in a chapter

3   11 case in the U.S., and it believed, because it was

4   continuing to receive those notices, even after this October

5   2009 issue, that whatever was going on was still in progress

6   and that it wasn't an issue it needed to address, and that,

7   I believe, stands for why that there is excusable neglect

8   here for a late-filed claim, if the Court believes that

9   that's where we need to -- that we need to consider that,

10  but again, I would come back to the fact that this is an

11  allowed claim, and 502(j) does not require that there have

12  been an order entered.  This claim was allowed by the

13  debtors already.  Thank you, Your Honor.

14          THE COURT:  Does the debtor have a response?

15          MR. HORWITZ:  Your Honor, I actually have to

16  apologize.  I should have raised this initially so that the

17  Court could have had this in mind before listening to

18  counsel for Midas Fund's argument that the claim has been

19  allowed.

20          The order that approved the structured securities

21  valuation methodology process, the process of sending out

22  notices to creditors and resolving any disputes states on

23  page five -- I have a copy of this as well, which I can hand

24  up, if the Court wants to look at that --

25          THE COURT:  I'd like to see it.

Page 33

1        MR. HORWITZ:  -- as I read from it.

2        THE COURT:  Okay.

3        MR. HORWITZ:  If the Court will turn to page five

4   in the center, third -- ordered -- paragraph down, ordered

5   that, "Notwithstanding anything herein, the debtors reserve

6   the right to object to the structured securities claims at

7   any time, including after such claims have been allowed for

8   the purposes of voting and distributions under the plan on

9   the grounds that such claims do not include a blocking

10  number, include invalid blocking number, are duplicative of

11  other claims, have been amended or superseded, or otherwise

12  do not comply with the provisions of the bar date order."

13       Your Honor, LBHI needed this language in this

14  order because it had not at the time that these

15  methodologies and these procedures were being negotiated and

16  approved -- it had not had the time to review all 1,700 late

17  claims that had been filed in these cases and couldn't be

18  sure that, when sending valuation notices, that it wouldn't

19  be sending them to claims that have all kinds of procedural

20  defects, and so, it needed to reserve its right to object to

21  them on those grounds, and the plan administrator submits

22  that those rights were properly reserved and that any

23  objection to the Midas Fund claim on the grounds that it was

24  filed after the bar date has not been waived.

25       THE COURT:  It's true, however, that the notice

Page 34

1    that went out to CF Midas Balanced Growth Fund and

2    presumably to other holders of structured securities claims

3    did not include a specific reference to a reservation of

4    rights to object to the amount of the claim that was set

5    forth in that notice, to which -- do you want to verify

6    that?

7                MR. HORWITZ:  Yeah.

8                THE COURT:  Because I took a look at that notice

9    in the supplement filed by CF Midas, which is ECF No. 21186,

10   and the notice is an attachment to that document, and the

11   argument made in the supplement is that there was, in

12   effect, allowance by notice without reserve.

13               MR. HORWITZ:  Well, as to the reserve, Your Honor,

14   the plan administrator's reserving for all disputed claims,

15   as required by the plan in the amount filed or agreed to

16   with the parties or otherwise ordered by the Court.  There's

17   no question about that.  They certainly are doing, actually,

18   in excess of those amounts, to be conservative.  So a

19   reserve is established for all disputed claims, because

20   that's what's required by the plan.

21               The notice that was sent to claimants and which is

22   attached to the Midas Fund's reply does reference the order

23   that was entered, approving the procedures for sending these

24   notices and only says that the determination of the amount

25   of the portion of this claim is allowed -- or this is the

Page 35

1    allowed amount solely for purposes of voting and

2    distribution.  I'm sorry.  Not distributions.  Oh, I'm

3    sorry.  It says that the order provides for procedures for

4    the determination of allowed amounts for portions of -- for

5    the amount of portions or portions of claims based on

6    structured securities.  So it doesn't actually say that the

7    claim is allowed.  It's merely proposing an amount that

8    creditors had the opportunity to object to.

9            THE COURT:  Well, it's obviously in the claimant's

10   interest to be characterizing this as a method for allowing

11   a claim, and I've already expressed my skepticism with

12   regard to that, but we do need at least to gather the

13   documents in order to determine if this aspect of the

14   argument has merit.

15           MR. HORWITZ:  Well, Your Honor, the only other

16   part of the Midas Fund's argument that I could see having

17   any relevance is the estoppel argument, because the debtors

18   intentionally included this language in the order to

19   preserve their rights to maintain objections.  Even if they

20   sent these notices, and it's not clear to me what damage the

21   Midas Fund's incurred by relying on this notice if the plan

22   administrator's objection was never withdrawn and

23   distributions had never been made, all indicating --

24   especially distributions not being made in the past two

25   distributions, indicating that the plan administrator

Page 36

1    continues to treat this claim as a disputed claim.

2         The plan administrator also contacted counsel for

3    the Midas Funds months ago to schedule this contested

4    hearing.  Every aspect of the plan administrator's behavior

5    has been consistent with the treatment of this claim as a

6    disputed claim, as that term is defined under the plan.

7         So it's not clear -- beyond the receipt of this

8    notice, it's not clear what actions the Midas Fund may have

9    taken in reliance on receipt of that notice that in any way

10   damages its position now.  It's in the same position it

11   would have been in if we had had this hearing the very day

12   -- the day before it received this valuation notice.

13             THE COURT:  Okay.

14             Anything more?

15             MR. HORWITZ:  I just -- I'm sorry?

16             THE COURT:  Anything more?

17             MR. HORWITZ:  I just point out that the argument

18   that the Midas Fund received numerous notices only suggests

19   that the greater likelihood that the fund did actually

20   receive the fourth notice at least, which provided clear

21   notice of the bar date, but, even if the Midas Fund had just

22   read the third notice that it admits it received, it would

23   have had at least the tools necessary for a sophisticated

24   party to do the reasonable diligence to determine whether or

25   not the bar date order applied to its claims.

1            As for the prejudice argument, Your Honor, we've

2    discussed this before many times and in colloquy in these

3    hearings.  The plan administrator does not object -- is not

4    objecting to late claims as a penny-saving exercise.  It is

5    an exercise undertaken with the goal of treating all

6    creditors fairly and equally.

7            So, while the amount of the claim may not

8    completely throw off the distributions in these cases, the

9    point is, as I said, 25,000 Lehman Program securities claims

10   were filed in these cases.  One thousand, seven hundred and

11   fifty claims were filed after the bar date.  Only 70 of

12   those claims remain unresolved in one way or another.

13           For the rest of them, claimants have either had

14   their claims expunged, or they have voluntarily withdrawn

15   their claims, or the plan administrator has reached some

16   kind of a resolution that it's comfortable with in terms of

17   meeting its fiduciary duties to its creditors.  The

18   prejudice here, as I've said before, is to all creditors in

19   these cases who either had their claims expunged because

20   they didn't comply with the bar date or took the steps

21   necessary to comply.  That's all I have.

22           THE COURT:  Okay.

23           Is there anything more?

24           MR. GEOGHAN:  Just two brief points, Your Honor.

25   Again, Daniel Geoghan, Young Conaway.

Page 38

```
 1              Your Honor, first with regard to the point made

 2    that, in August 2011, there was some 1,700 late-filed

 3    claims, and they were -- and Lehman was not in a position to

 4    go through all of them.  Your Honor, in August 2011, we were

 5    in active conversation with Weil -- excuse me, with Lehman's

 6    counsel with regard to these claims.  Our response had been

 7    filed in July.  This did not -- this was not us sitting by

 8    the wayside and this notice showing up.

 9              There was an active conversation, and, when it

10    showed up, we said, "Hey, wait a second.  You've allowed the

11    claim now.  Your objection is moot."

12              In regard to the notice, Your Honor aptly pointed

13    out that, one, it contains no reservation, and, two, it does

14    state that the claim is being allowed for voting and

15    distribution purposes.  I don't think it could be any more

16    unambiguous.

17              While I appreciate that there is a reservation in

18    the order, as pointed out by counsel, the reservation in the

19    order to object to claims at a later time for allowed claims

20    on other grounds, I'm not convinced of, necessarily, its

21    validity.  If I include a reservation in a proof of claim

22    stating I reserve the right to amend this claim and I change

23    the amount some place farther down the road, they still have

24    -- Lehman will still have the right to come back and object

25    to my amended claim as being untimely.
```

Page 39

1           I think that 502(j), as I said, Your Honor, is

2    quite clear, and it does not require an order, and I have

3    gone back to the case law, and I have not found -- and

4    possibly, someone else will, but I have not found a case

5    that states an order is required under 502(j) for a claim to

6    be allowed, and I believe that that's --

7           THE COURT:  But a timely proof of claim is

8    required for a claim to be allowed, or the claim has to be

9    scheduled.  Neither is the case here.  So how do you obtain

10   allowance by ambush, which is what you're really seeking to

11   argue?

12          MR. GEOGHAN:  Well, I disagree wholeheartedly,

13   Your Honor.  I don't believe this is allowance by ambush.

14   Aside from the fact that there have been numerous

15   conversations about this and email exchanges, it is --

16          THE COURT:  Well, but here's the issue, at least

17   as I see it.  In a more perfect world of drafting notices

18   and preserving all rights and defenses at the same time, the

19   notice would have included a conspicuous reservation of

20   rights.  It did not.

21          The question really is whether that matters.

22   You're suggesting that this is a gotcha moment in which an

23   inconsistent position is taken, and, as a result, you're

24   able to say, "Aha, we have an allowed claim because of the

25   notice."

Page 40

```
 1              I seriously question that, particularly in a

 2     setting in which the order dealing with determining the

 3     amounts for voting purposes with respect to structured

 4     securities claims represented one of those major, difficult,

 5     unprecedented issues being addressed in the run-up to the

 6     confirmation hearing, and, from an administrative

 7     perspective, I'm sure looking back on this, debtor's counsel

 8     would wish that you're not in the position to make this

 9     argument, but the question is whether the argument

10     ultimately has legal merit, and that's where you're going to

11     need to address.

12              MR. GEOGHAN:  Your Honor, and if I may just add

13     that I believe it does, obviously, have legal merit.  Again,

14     we --

15              THE COURT:  Well, it's a legal argument.  Whether

16     or not it's --

17              MR. GEOGHAN:  It's an argument.

18              THE COURT:  Whether or not it's an argument that

19     leads you into the promised land of an allowed claim is

20     another question.

21              MR. GEOGHAN:  Your Honor, as I stated there, we

22     were in conversation in the middle of this whole experience

23     between the claims objections, and they knew that the claim

24     objection was in place, and then, they allowed the claim.

25     Moreover, we went back to them immediately and said, "You've
```

Page 41

1    allowed our claim.  We believe your objection is moot."

2              Arguably, at any time thereafter, they could have

3    renewed their objection, put on a new objection.  They could

4    have taken some steps to preserve rights.  If that order --

5    if that notice is determined to act as an allowed claim as

6    of that date, arguably, they're beyond the statute of

7    limitations in 90024 to even seek at this point by cause to

8    reconsider the claim, and, Your Honor, if I may point the

9    Court to in re Tender Loving Care Health Services, Inc.

10             It's a Second Circuit case.  The cite is 562 F.3d

11   158.  It's not squarely on point, I'll admit, but it does

12   discuss the concept of a contested claim dispute that is

13   resolved with an allowed claim.  In that case, it was

14   resolved by an agreement of the parties, a stipulated claim,

15   that then later a trustee came back to seek to object to,

16   because the trustee realized the claim was miscalculated,

17   and the Court, the Second Circuit held in that case that it

18   was beyond the statute of limitations.

19             It's not on point, but I don't think it's that far

20   off point, either, Your Honor.  There, it's a contested

21   matter.  Here, there was an allowed claim, and now, 16

22   months later, after there have been numerous discussions and

23   I begged them to put this on in September and October,

24   begged them.  I filed a motion asking them to put this on,

25   and they refused.  It's now coming back up and becoming an

Page 42

1  issue.

2          Thank you, Your Honor, and I'm not sure what

3  Your Honor will do.  I am guessing maybe we require more

4  briefing at this time, but I await the Court's direction.

5          THE COURT:  Well, one of the things I'd like to

6  focus on -- and I think the pleadings as filed may require

7  some supplementation -- is the true impact on the claim of

8  CF Midas Balanced Growth Fund of the notice that we've been

9  discussing and the application, if any, of 502(j), which,

10  read literally, does not appear to directly apply to this

11  situation, since the language reads, quote, "A claim that

12  has been allowed or disallowed may be reconsidered for

13  cause."

14          That's just the first sentence, but

15  reconsideration speaks in terms of a deliberative process,

16  not an accidental one, and it is truly unclear to me as I

17  consider the argument that 502(j) applies at all, and it's

18  also unclear to me as a matter of the equities of the case a

19  phrase that appears also in 502(j), that it is in any

20  respect equitable for the debtor's position with respect to

21  a late-filed claim to be waived by virtue of a notice that

22  was issued on the strength of an order that included an

23  express reservation of rights, and so, I would be interested

24  in some relatively concise follow-up submissions by each of

25  the claimant and the debtor on a schedule that the two of

Page 43

1      you can agree to.

2              This being the holidays, I'm not going to impose

3      an immediate schedule on this, but let's see if we can have

4      those submissions in anticipation of a hearing to take place

5      either in January or February of next year and deal with

6      this question.  While that's pending, I'll reserve any

7      further comments with regard to the fundamental question of

8      excusable neglect, and we'll deal with that after addressing

9      this other question.

10             MR. GEOGHAN:  Thank you, Your Honor.

11             THE COURT:  Okay.

12             Now, we have Renata Thomas' claim.

13             MR. HORWITZ:  Yes, Your Honor.  This is the last

14     contested item on the agenda.  This is the debtor's three

15     hundred and seventy-second omnibus objection to claims also

16     seeking to disallow claims filed after the bar date.

17     Ms. Thomas filed her claim on December 7th, 2012 and was the

18     sole claimant responding to this objection.  I don't know if

19     she's present in the courtroom or on the phone today.

20             THE COURT:  Is Renata Thomas on the telephone?

21             I believe she resides in the U.K.

22             MR. HORWITZ:  I think that's correct.

23             THE COURT:  Is Renata Thomas in the courtroom?

24             The answer to both questions is negative, so let's

25     proceed in her absence.

Page 44

1            MR. HORWITZ:  Your Honor, the response filed by

2    Ms. Thomas is -- and actually, it tells a very sad story.

3    She tells us that, at the -- she says that, at some time --

4    it's not clear exactly what time she was dealing with

5    numerous personal and family matters that were out of her

6    control.  She was suffering from depression.  Her aunt

7    passed away.

8            She was separated from her partner of ten years.

9    Her nephew passed away.  She didn't know what steps she had

10   to take to file a claim.  She doesn't have any legal

11   background.  She does appear to have several degrees, but

12   not law degrees.

13           Actually, Your Honor, in other circumstances, this

14   is the type of response that the plan administrator might

15   ordinarily consider not proceeding with the objection,

16   because the plan administrator has withdrawn objections to

17   claims that were filed after the bar date when claimants say

18   they were dealing with a death in the family or taking care

19   of, you know, a loved one who was sick or hospitalized

20   themselves, but those are usually claims that were filed at

21   least within a year after the bar date.

22           This is an instance where we believe that the

23   length of the delay really is the critical factor.

24   Claimants continue to file claims in these cases.  We

25   receive claims even today.  I mean, just this month and last

Page 45

1    month, even though the confirmation order provides that even

2    timely claims cannot be amended any more without a court

3    order, this will interfere with the administration of the

4    cases if people can continue to file late claims up until

5    the closing of the case, even if they were -- even if the

6    circumstances at the time that the bar date order was

7    delivered to them would otherwise have constituted excusable

8    neglect.  For this reason, the plan administrator must --

9            THE COURT:  When was this claim filed?

10            MR. HORWITZ:  December 7th, 2012.

11            THE COURT:  Just a week or so ago?

12            MR. HORWITZ:  Right, right.

13            THE COURT:  How did it happen that something that

14    was filed only this month ended up on the docket as a

15    contested matter this quickly?  Do we have the dates right?

16            MR. HORWITZ:  Oh, I'm sorry.  I'm looking at the

17    -- you know what?  It's not filed in December.  It was --

18    I'm looking at the response date, but I believe it was filed

19    in March.

20            THE COURT:  In March of this year?

21            MR. HORWITZ:  Right.

22            THE COURT:  All right.

23            MR. HORWITZ:  But there have been -- there are

24    claims that were filed this month and last month.  I mean,

25    this is an ongoing problem that we have, and we put -- we

Page 46

1    object to the claims as late so that they are expunged from

2    the register.

3            THE COURT:  Well, I've read the response of Renata

4    Thomas, and it's heartfelt and personal.  It recites a

5    series of personal distractions in her life during the

6    period immediately following the filing of the Lehman

7    bankruptcy case.  She appears to have been an employee who

8    did not make a particularly large salary in her work.

9            It seems that the letter does not include a

10   specific rendition of the excuses that might apply to a

11   late-filed claim, especially one that's as late as this.

12   While the response is a plea for mercy, in effect, it does

13   not provide any cause for excusable neglect of this order,

14   and so, I grant the objection as to the claim of Renata

15   Thomas and find that her response is unavailing.

16           MR. HORWITZ:  Thank you, Your Honor.  That

17   concludes the items on today's agenda.

18           THE COURT:  All right.

19           We have a calendar today at 2:00.  So we're

20   adjourned until 2:00.

21           MR. HORWITZ:  Okay.

22           THE COURT:  Thank you.

23       (Recess at 1:04 p.m.)

24           THE COURT:  Be seated please.  Good afternoon.

25   Mr. Dunne.

1          MR. DUNNE:  Good afternoon, Your Honor.

2     Dennis Dunne from Milbank Tweed on behalf of the committee.

3          I guess that introduction may be worth repeating.

4     Milbank is appearing here today on behalf of the committee

5     of unsecured creditors and no one else.

6          THE COURT:  I understand that from your papers.

7          MR. DUNNE:  We have two matters before the Court

8     today, Your Honor.  Both relate to the requests by members

9     of the committee for payment of the fees and expenses of

10    their respective legal counsel.

11         One is the substantive legal question which we

12    need Your Honor to decide whether Section 1129(a)(4)

13    authorizes the payment of these fees.

14         The other is the question that the U.S. Trustee

15    raised recently about whether Milbank should be heard on

16    this matter and so, Your Honor, we're happy to deal with

17    these issues in any order that pleases the Court and unless

18    Your Honor has a preference, I'll take the disqualification

19    aspect first.

20         THE COURT:  My preference is that you do just

21    that.

22         MR. DUNNE:  Your Honor, contrary to the United

23    States Trustee's allegations, we represent only the

24    committee.  For the past four plus years, we have

25    represented no one else in these cases.  I recognize they

1    wish that weren't the case for purpose of their argument,

2    but that is the truth.  We do not represent the individual

3    committee members.  The members each have their own counsel

4    who I believe are present here today.

5         We are here for one reason and one reason only is

6    that Section 6.7 of the plan, as confirmed last year,

7    provides for the payment of these fees.  The committee was

8    involved in the negotiation and documentation of all

9    agreements embodied in the plan, including this one.

10        The committee exists post the occurrence of the

11   effective date for purposes of implementation of the plan,

12   pending litigation, payment of professional fees.

13        The U.S. Trustee's challenge substantively is a

14   direct assault on one of the provisions of the plan, Section

15   6.7, a section that was voted on by the creditors and

16   received no challenge from any other creditor or economic

17   stakeholder.

18        We're here on behalf of the committee to defend

19   that plan provision as it was negotiated, as it was written

20   and as it was voted upon.

21        Similarly, to the extent the Court has any

22   comments or concerns about the individual applications with

23   respect to reasonableness or otherwise, counsel for the

24   individual committee members will respond to them as

25   appropriate.

Page 49

1                    A couple of other points, Your Honor.  We believe,

2        and we've said this before, because we've appeared a number

3        of times in front of Your Honor on this issue, either at

4        hearings or in chambers conference, that it actually

5        promotes the policy and the purpose of efficiency to have us

6        argue the one global plan issue whether Section 1129(a)(4)

7        authorizes the payments contemplated in Section 6.7 of the

8        plan.

9                    It is somewhat surprising that we are here today

10       on this issue.  We haven't concealed our role, Your Honor.

11       It's been open, it's been notorious.  We have appeared at

12       hearings.  We've appeared at chambers conferences with Your

13       Honor starting, I think as early as last February.  We have

14       consistently addressed the Court and the parties on this

15       issue and we've been the sole mouthpiece regarding the

16       interpretation and implementation of Section 6.7 of the plan

17       and the limits of Section 1129(a)(4) of the Code.

18                   We expect to argue that point today.  Everything

19       else that is specific or unique to a particular applicant's

20       request will be handled by respective counsel for that

21       applicant and not by us.

22                   And, Your Honor, I really have nothing further to

23       say on this point.

24                   THE COURT:  Okay.  Thank you.

25                   MS. GOLDEN:  Good afternoon, Your Honor.

Page 50

1    Susan Golden for the United States Trustee.  With me here

2    today is the United States Trustee --

3              MS. DAVIS:  Tracy Hope Davis.

4              MS. GOLDEN:  Your Honor, our papers set forth our

5    reasons for the objection.  However, in light of Milbank's

6    response, obviously we were waiting until we came to this

7    hearing to respond and Mr. Dunne's presentation just a few

8    moments ago.  I do want add a few additional points in

9    response, which shouldn't take too long.

10             I think that there seems to be a little bit of

11   confusion over which version of Section 6.7 of the plan was

12   actually the confirmed section.

13             The plan provision that is relied upon, excuse me,

14   by the applicants and Milbank is not the provision which was

15   ultimately confirmed in the plan and referenced in the

16   confirmation order.

17             When the third amended plan was filed in September

18   of 2011, Section 6.7 did provide for the direct payment of

19   the counsel fees to the individual committee members'

20   attorneys.  The U.S. Trustee filed her objection to the plan

21   in early November, 2011 and these payments were among the

22   U.S. Trustee's objections.

23             After much negotiation, and realizing that, for

24   the most part, that this historic plan was heading toward a

25   consensual solution and resolution, no one, least of all the

Page 51

1    U.S. Trustee, wanted to stand in the way of confirmation on

2    this particular issue and have it litigated then.

3             So, after much negotiation, the plan was amended

4    and revised and the revised Section 6.7, which was

5    ultimately confirmed in the plan, provided that the

6    applicants could be paid only upon application and approval

7    by the Bankruptcy Court.

8             The confirmation order which controls any

9    inconsistency over the plan went further.  And, in paragraph

10   74, it provides that nothing in the plan or confirmation

11   order shall affect any party's rights to object or defend

12   any application and that all applications -- all -- excuse

13   me.  Paragraph 74 provides that nothing in the plan or

14   confirmation order shall affect any party's rights to object

15   or defend any application and that all objections, including

16   the appropriate legal standard, and any objection as to

17   whether these payments are authorized under the Code and

18   Rules at all were expressly reserved.

19            Now even though all of the committee members filed

20   applications, this is not a committee issue since it really

21   has nothing to do with representing the unsecured creditor

22   body as a whole; the body that Milbank was retained to

23   represent and for whom Milbank owes their fiduciary duty.

24            Here, despite what Mr. Dunne is saying, Milbank is

25   advocating for the committee members as a group and not for

Page 52

1   the committee representing the unsecured creditors.

2          It is not proper for counsel, who has a duty to

3   the entire unsecured body, to advocate for a ruling which,

4   if granted, would harm their constituency -- which, if

5   granted, would harm their constituency by pulling $26

6   million out of the estate.

7          Milbank, as committee counsel, is taking a

8   position detrimental to the unsecured creditor body as a

9   whole.  Milbank should be looking to reduce fees coming out

10  of the estate and not increase them.

11         Now, if Milbank put in a statement as committee

12  counsel, and said, if the Court finds in favor of the

13  applicants, the committee thinks the fees are reasonable,

14  that's one thing.  But to advocate for this, the U.S.

15  Trustee believes is a conflict and a totally different

16  scenario.

17         All of the applicants here, even though they were

18  committee members, or are committee members, are interested

19  parties.  And the only benefit that will accrue will be

20  solely to the individual members.

21         Milbank also made an argument in their response to

22  our motion that because at one of the chambers conferences,

23  debtor's counsel which had not yet taken a look at the

24  applicants' applications, reviewed the fees, the committee

25  didn't have to do so as well because that's duplicative.

1          I mean, if this is true, then perhaps the fee

2    committee should have objected to the committee review of

3    all sorts of documents throughout the case.  Obviously, that

4    cannot be what Milbank was intending as the general rule.

5    Because if it is, then committee counsel fees in all cases

6    would certainly be a lot smaller than they are now, if they

7    didn't have to duplicate what the debtor was doing.

8          Finally, as Mr. Dunne just argued, Milbank argues

9    that it is more efficient for them to argue the standard

10   that the Court should apply to these applications because it

11   is a global issue.  The U.S. Trustee does not expect the

12   Court, should you rule in her favor, to listen to nine or

13   ten different attorneys argue the same legal standard before

14   you.

15         But she does expect that it is appropriate for one

16   of the applicant's attorneys to make that argument, not

17   committee counsel who has a conflict of interest.

18         And, in terms of the -- Milbank's role as the open

19   and notorious and representing the committee all along in

20   this case, for this particular issue, I will say that we do

21   have a disagreement about that.  And for quite some period

22   of time our discussions with Milbank were premised on the

23   idea that -- that they were really acting more as liaisons

24   or intermediaries in connection with the negotiations

25   between the U.S. Trustee, I guess the debtors to a lesser

Page 54

1    degree, and the individual applicants because there were so

2    many other attorneys.

3              So I just wanted to set that out and unless Your

4    Honor has any questions, I'll sit down.

5              THE COURT:  Before you sit down --

6              MS. GOLDEN:  Sure.

7              THE COURT:  -- I have a few questions.  What is

8    the remedy that you seek today to insure that Mr. Dunne is

9    unable to speak on behalf of the committee with respect to

10   this issue?  Or to make sure that he is unable to speak on

11   behalf of individual committee members on this issue?  Or

12   that because of the ambiguity surrounding that question that

13   he is simply unable to speak?

14             MS. GOLDEN:  The U.S. Trustee does not take the

15   position that Mr. Dunne is unable to speak on behalf of the

16   committee.  As I said, certainly the committee can weigh in

17   as to whether or not the committee believes that the fees

18   are reasonable.  Should the Court rule that the applications

19   would be granted.

20             THE COURT:  That's not what we're dealing with

21   today.  We're dealing as a threshold matter --

22             MS. GOLDEN:  Okay.

23             THE COURT:  -- with the standard applicable to

24   these applications and Mr. Dunne, both in his oral

25   statements this afternoon and in his papers, has said that

1    he's here to speak with respect to the enforceability and

2    applicability of Section 6.7.  Most particularly, the

3    1129(a)(4) aspect of that plan provision.

4              In what respect to you object to that role for

5    him?

6              MS. GOLDEN:  It does not appear that Mr. Dunne is,

7    in fact, representing the committee as a committee.

8    Mr. Dunne advocating and making the global argument appears

9    to be committee counsel advocating for the individual

10   members of the committee, all of whom have filed these

11   applications and it appears to be a conflict and the U.S.

12   Trustee believes it is a conflict.

13             THE COURT:  And in what respect does the U.S.

14   Trustee seek a remedy with respect to that conflict and how

15   is that remedy to be applied for purposes of today's

16   hearing, if I were to agree with you.

17             MS. GOLDEN:  If you don't agree with me or you --

18             THE COURT:  What are you looking for?

19             MS. GOLDEN:  -- do agree --  if you were to agree

20   with me, the U.S. Trustee believes that one of the

21   individual applicant's counsel should be arguing and taking

22   the lead role in the global issue of the 1129 versus 503

23   threshold legal issue.

24             THE COURT:  Well, I'm not going to prevent

25   Mr. Dunne from representing the committee and he can say

1    whatever he wants to say.  And he's already done that very

2    effectively in writing and is prepared to do that this

3    afternoon.

4              Are you saying that what you are looking to have

5    me do is to, in effect, impose a gag order on Mr. Dunne and

6    others from his firm and to the extent that anyone is going

7    to be speaking to the general legal issue in question, we're

8    going to have to take some kind of break in the action and

9    have somebody appointed from among the various applicants

10   who will be the common advocate for their cause.  Is that

11   what you're asking for?

12             MS. GOLDEN:  We are asking that one of the

13   applicant's attorneys do the primary argument on behalf of

14   their cause.

15             We have no objection for Mr. Dunne speaking on

16   behalf of the committee as a committee.  But the way the

17   argument is structured, Mr. Dunne and his firm, not

18   Mr. Dunne, personally, is conflicted.  And the other remedy,

19   should you agree with the U.S. Trustee, would be that

20   Milbank's fees, to the degree that he is representing the

21   individual committee members, rather than the committee as a

22   whole, should not be paid from the estate.

23             THE COURT:  One of the problems I'm having here is

24   that your perception of a conflict is being inflated with

25   the proof that a conflict actually exists and that's a

Page 57

1    disputed issue of both fact and law.  It is disputed

2    vigorously by Milbank.  What evidence, if any, exists to

3    suggest that Mr. Dunne and his firm are acting on behalf of

4    individual committee members for purposes of today's hearing

5    as opposed to acting as counsel for the committee, something

6    which he has steadfastly asserted is the only thing that he

7    is doing.  Is there any evidence here or is this just some

8    concern that you have about appearances and the appearances

9    are what drive you?

10           MS. GOLDEN:  No, the appearances are not what

11   drives -- what drives the U.S. Trustee.  What drives the

12   U.S. Trustee is that committee counsel has a fiduciary duty

13   to the entire unsecured creditor body.  The creditors'

14   committee also has a role in reviewing fees.

15           On the one hand, the committee has a role in

16   looking at the fee applications from the individual

17   committee members as part of their duty.

18           Mr. Dunne is also advocating that the fees, in

19   essence, should be paid.  He is not arguing before the Court

20   that the fees shouldn't be paid.  He is arguing for the

21   standard under which the fees should be paid.  And it is our

22   view that committee counsel is on both sides of the issue.

23   And that is a direct conflict.

24           THE COURT:  Okay.  I understand your position.

25   Does anybody else wish to be heard --

Page 58

1             MS. GOLDEN:  Thank you.

2             THE COURT:  -- on this?  I'm going to permit

3     Milbank to act as it has acted throughout these cases as

4     counsel for the committee and I'm going to leave it to

5     Mr. Dunne and his partners and his firm to conclude whether

6     the conduct of today's hearing is or is not conduct on

7     behalf of his actual client, the committee, or conduct which

8     is on behalf of members of the committee.

9             He has asserted that he is acting on behalf of the

10    committee and I accept that.  I also expect the

11    professionalism of Mr. Dunne and his firm and believe that

12    he is doing what he is doing consistent with his conclusion

13    that he is acting in a professional manner on behalf of his

14    sole client, the creditors' committee.

15            I leave it to his arguments to speak for

16    themselves.  But I've read the papers and understand

17    generally what his firm's position is with respect to these

18    issues and we'll get to the merits.

19            To the extent there is an objection by the U.S.

20    Trustee to a conflict of interest, I overrule that

21    objection.

22        (Pause)

23            MR. DUNNE:  Thank you, Your Honor.  Before I turn

24    into the merits, a couple of housekeeping notes relating to

25    today.

1        I believe we do have representatives for each of

2    the eight applicants, either in the courtroom or available

3    today.  Those eight are comprised of seven current members

4    plus there was one former member of the creditors'

5    committee.

6        This application was filed nearly a year ago on

7    January 30th, 2012.  At numerous points over the past year,

8    we continued the hearing date in order to allow

9    opportunities for discussions, negotiations and potentially

10   amicable resolutions to play themselves out.  As a result of

11   some of those discussions with Your Honor at prior hearings

12   and conferences, as well as with the debtors, we've

13   supplemented the record.

14       We supplemented the record with three

15   declarations.  One from Noel Purcell, who's in the courtroom

16   today, of Mizuho (ph), who is one of the co-chairs of the

17   committee, another from Julie Becker, also who's present in

18   the courtroom today, of Wilmington Trust, again a co-chair

19   of the committee, and one from John Sukow (ph) who is

20   present (indiscernible - 00:18:16).

21       These declarations set out, one, the history of

22   the plan provision in question.  How did Section 6.7 come to

23   be in the plan?  It also sets out the enormous workload that

24   the committee faced and undertook and lastly it sets forth

25   the debtor's view that the requested fees are reasonable

Page 60

1    under the circumstances of this extraordinary case.

2              We were advised, prior to the hearing, that the

3    U.S. Trustee's office was not going to cross-exam any of the

4    declarants.  And accordingly I would move as a housekeeping

5    matter for admission of those declarations.

6              THE COURT:  Is there any objection to admitting

7    the declarations?

8              MS. GOLDEN:  No, Your Honor.

9              THE COURT:  Okay.  They're admitted.

10             MR. DUNNE:  Thank you, Your Honor.  Despite our

11   constant willingness to enter into a good faith dialogue to

12   resolve any questions or concerns, the parties were unable

13   to resolve all issues, but we've narrowed them.

14             One the dust settled from aborted settlement

15   discussions with the U.S. Trustee's office, and from our

16   efforts to respond to questions and comments of the debtors,

17   we stand here today with one legal issue that I'm going to

18   address and one legal issue, I believe, for the Court to

19   adjudicate which is does Section 503(b) of the Bankruptcy

20   Code leave no space for the payment of fees approved under

21   Section 1129(a)(4) of the Bankruptcy Code?

22             And let me just quickly set out the three relevant

23   statutes.  Section 1123(b)(6) provides what a debtor may

24   place in a plan.  It provides maximum flexibility for the

25   debtor to include any "appropriate provision" in a plan so

Page 61

1   long as it is not inconsistent with other sections of the

2   Bankruptcy Code.

3           Section 1129(a)(4) provides that any payment to be

4   made by the debtor, under or in connection with the plan, be

5   subject to Court approval as reasonable.

6           And Section 6.7 does -- of the plan does so

7   provide for the payment and the reimbursement of the fees

8   and expenses of the members of the creditors' committee and

9   it's subject to your Court's finding that they are

10  reasonable.

11          We would not have any issue but for Section 503(b)

12  which governs the request for payment of fees by parties who

13  have rendered a substantial contribution to the case.  We

14  believe our reading of these statutes, as I'll explain in a

15  moment, is consistent with Judge Gerber's ruling and

16  reasoning in Adelphia and is consistent with basic

17  principles of statutory construction as set forth in

18  numerous Supreme Court cases.

19          Our reading harmonizes and breathes life into each

20  of the sections.  On the other hand, the U.S. Trustee's

21  desiccated reading would render Section 1129(a)(4) a nullity

22  with respect to settling parties' fees.

23          In a nutshell, Your Honor, here is the difference

24  between Section 1129(a)(4) and 503(b) of the Bankruptcy

25  Code.  The latter gives a party the right, subject to

Page 62

1    complying with the requirements of Section 503(b), to be

2    paid its fees even if every other party in the case opposes

3    the payment.  So long as the Court finds that the elements

4    of Section 503(b) are satisfied, the estate must pay.

5              In other words, it is a mechanism for saddling the

6    estate with certain obligations it may not want to pay.  It

7    provides, in essence, a mechanism for the non-consensual

8    payment of certain fees granted only when those fees and the

9    corresponding efforts of the applicants have been shown to

10   clear the high bar of Section 503(b).

11             Conversely, Section 1129(a)(4)provides a framework

12   for the payment of certain amounts in the context of the

13   confirmed plan of reorganization.

14             Given the Congressional purpose of Chapter 11

15   plans, this all makes eminent sense.  Congress desired to

16   provide a framework for resolution of disputes and a

17   framework for consensus in Chapter 11.  The public policy

18   favoring settlements over litigation is a strong one.  In

19   that context, using Section 1129(a)(4) to provide an avenue

20   for the payment of reasonable attorneys' fees for those

21   parties that have facilitated, fostered or brokered peace

22   clearly furthers that Congressional goal.

23             In other words, Section 1129(a)(4) is a path for

24   the payment of reasonable fees that has the consent of the

25   creditors pursuant to a confirmed plan.  It is very, very

Page 63

1    different than Section 503(b).

2            THE COURT:  Can I break in and ask a question

3    about some of the implications of this policy?  And this

4    question, or this series of questions that this will prompt,

5    does not reflect on the statutory interpretation argument

6    that you're making.

7            But I do have some questions and concerns about

8    what happens to 503(b) and its role in providing for

9    opportunities for compensation for committee members and for

10   others who provide a substantial contribution in a setting

11   in which parties to plan negotiations become highly

12   motivated to do a work-around by means of 1129(a)(4) and, in

13   effect, provide for, and don't get me wrong when I use this

14   term, payoffs to committee members in the plan negotiations

15   in which everybody's getting something.

16           And one of the concerns I have here is optical.

17   We have an extraordinary, once in a generation, maybe once

18   in a century insolvency event which has resulted in an

19   uncommonly successful consensual plan.  And we're dealing

20   with numbers that we have also become mutes too but that are

21   truly mind boggling in their scale.

22           We're dealing with hundreds of billions of

23   dollars.  And we do it all the time in this case.  That

24   means that a fee request for committee members that in the

25   aggregate is just north of $25 million begins to appear

Page 64

1    relatively small by comparison.

2         The circumstances that led to Section 6.7 could be

3    viewed as both during a consensual plan, the committee did a

4    tremendous job in helping to produce that good result but

5    they certainly weren't the only party-in-interest to claim

6    some credit here and in the context of all this money, why

7    should any committee member be out-of-pocket considering all

8    they did for the good of the case?

9         Now, I'm simply paraphrasing what may be a

10   perception that a third party looking at this might have.

11   I'[m not saying that that dialogue ever took place because I

12   don't know what dialogue took place.

13        But here's the concern.  To the extent that this

14   becomes standard operating procedure in large Chapter 11

15   cases, and when we get to plan phase, the well represented

16   committee members say, you'd better put in a provision that

17   provides for us to get paid, and it's put in under

18   1129(a)(4) so that we avoid the 503(b) requirements, and we

19   end up with a system in which a lot of lubrication is being

20   applied to committee members that may or may not be a good

21   thing.  That's my policy concern.  How do you address that?

22        MR. DUNNE:  Your Honor, I address it because I

23   think that you also answered it in your statements that this

24   is a sui generis case here in Lehman.  This is a case where

25   the committee members themselves were called upon to,

Page 65

1    frankly, just do more work than I've ever seen a committee

2    member have to do between the committees and the

3    subcommittees that they were on.

4            And Your Honor knows that thousands of hours

5    drilling deeply into some of the most complex financial

6    instruments that humans have ever devised.  And they did

7    that at a time when for years they were the only sounding

8    board for the debtors in terms of a proxy or surrogate for

9    the creditor groups at large who were not restricted, did

10   not seek non-public information and, I think a testament to

11   their efforts is that when we finally did go public and a

12   number of the ad hoc groups got restricted in June of 2011,

13   in two weeks we had a plan done with minor changes to it

14   because what we had done with the debtors in that

15   collaborative effort, proved to be a flashpoint for kind of

16   rapid consensus.

17           Every party in this case recognizing the efforts

18   that it takes to kind of be comfortable that we're doing the

19   allocations of value and the claims assessment correctly has

20   been compensated or reimbursed for their respective legal

21   counsel.  There's only one group remaining and we're

22   standing here -- it's the committee members' fees that

23   haven't been paid.  The ad hoc committees and the others

24   have.

25           And I believe that Your Honor can craft a ruling

Page 66

1    that is unique to the extraordinary facts and circumstances

2    of Lehman because what I care about today is the reality of

3    the application of 1129(a)(4) in the Lehman case on the

4    backdrop of what each of -- what I know each of the

5    committee members did in terms of their individual efforts.

6    And the need for counsel in this case that might not exist

7    in other cases.

8             THE COURT:  Understood.  The objection of the U.S.

9    Trustee notes that the committee, as a committee, had access

10   to a number of professionals, your firm, other law firms,

11   (indiscernible 00:30:24), FTI and one of the questions that

12   a third party could reasonably ask is why should any

13   individual member of the committee have significant out-of-

14   pocket expenses in respect to its role on the committee at a

15   time when the estate is already paying hundreds of millions

16   of dollars to pay for professionals who are doing the work

17   for the committee?

18             So I'm not asking you necessarily, in your

19   capacity as committee counsel to be responsive to that

20   question, but understand that from my perspective, I have

21   that question.

22             MR. DUNNE:  Right.

23             THE COURT:  And somebody's going to have to answer

24   it.  I also, and I'm going to be upfront about this right

25   now, I cannot understand how any individual creditor can

Page 67

1    legitimately assert a right to payment with respect to in-

2    house counsel and whoever has asserted such a claim is going

3    to have to speak to that, but not at this moment.  Sometime

4    before this hearing comes to a conclusion.

5            But part of the concern that the objections and

6    the various responses raise, but frankly that the

7    declarations do little to answer is why individual members

8    of the creditors' committee would have fees and expenses of

9    $26 million?  I don't understand even in the largest case in

10   the universe why individual committee members would have

11   such expenses unless such expenses were incurred to deal

12   with their individual interest about which I know nothing

13   and about which you really aren't in a position to comment.

14           MR. DUNNE:  Correct.  But let me make one comment

15   on that, that, Your Honor, which I think will be helpful

16   because I represented a number of official creditors'

17   committees over the course of my career and very often they

18   are a few to no counsel for individual committee members.

19           Lehman was truly exceptional in this regard and it

20   goes without saying, it was exceptional given the size and

21   complexity of it, but I want to put a finer point on it.

22   What I believe a lot of the roles were for the

23   individual counsels was in connection with the plan, and the

24   whole process of getting ready for the plan, at the end of

25   the day when we were getting prepared to engage the debtors

Page 68

```
1    with what we thought would clear the various creditor

2    groups, in terms of acceptable allocations of value among

3    LBHI, LBSF, LCPI and the like, we, the committee's advisors,

4    would present a proposal to the committee which the

5    committee members would then debate it amongst themselves.

6              And the assistance of counsel in that process was

7    critical given what we were talking about here.  It was the

8    nature of Lehman's business that was not particularly

9    familiar to any one of the committee members.

10             So there was time in the cases where it was

11   actually important for us to use the committee members and

12   the fact that the members held different position -- they

13   were -- it was put together by the U.S. Trustee's office for

14   exactly this purpose.  There was people with claims at OBHI.

15   There were people that held claims at LBSF.  And when we

16   called balls and strikes as best we could, it was helpful to

17   take a moment, step back, reflect on and hear what the

18   individual members thought through the prism of where they

19   were at the particular time.

20             To kind of stress test whether we -- you know,

21   people are all kind of marginally all unhappy with this and

22   think they could do better.  That's probably the right place

23   to land which I think was ultimately proved out when we

24   rolled it out to the ad hocs.  But that was something I

25   frankly haven't encountered to the same degree, nearly the
```

Page 69

1    same degree in any other case before, which I think explains

2    a little bit of what Your Honor was asking as to why did

3    they need individual counsel that we -- you know, where you

4    have committee counsel.

5            So -- but beyond that in terms of precisely what

6    they did, I'll leave for other people to address.

7            THE COURT:  Okay.

8            MR. DUNNE:  Your Honor, there is one factual point

9    that I do want to underscore and Ms. Golden mentioned it

10   before which is that the creditors did overwhelmingly vote

11   to accept the plan with Section 6.7 in there.  No creditor,

12   no economic stakeholder objected to Section 6.7 or to the

13   payment of the fees to the legal advisors for the committee

14   members.

15           I submit that fact proves the consensual nature of

16   the payment and is the predicate, the underlying predicate

17   for payment under Section 1129(a)(4) subject to a finding of

18   reasonableness and that the analysis should end there.

19           The U.S. Trustee's reservation of rights to

20   Section 6.7, which includes their right to object to the

21   fees and the propriety of using Section 1129(a)(4) was added

22   on the eve of confirmation and was effectuated through the

23   confirmation order and not the plan itself.  And I raise

24   that for the obvious point that there was -- what was

25   actually in the solicitation package when creditors voted

Page 70

1    was 6.7 without the reservation of rights.

2            So you can't draw the conclusion that creditors

3    voting on the plan saw the reservation of rights and said, I

4    don't have to be bothered with that.  People all reserve

5    their rights.  What they saw was just a statement that these

6    fees will be paid after the effective date.

7            There is one case on point, Your Honor, we should

8    talk about.  Judge Gerber's ruling in the Adelphia case

9    which found that Section 503(b) does not occupy the field

10   completely and that Section 1129(a)(4) provides an

11   independent basis for payment of attorneys' fees.  He

12   recognized that the hurdle for payment of fees under Section

13   503(b) was different, was higher than that under Section

14   1129(a)(4) which simply requires the fees to be reasonable.

15           He concluded that the different standards were

16   appropriate and reflected the difference between forced

17   payments by the debtors or of the debtors under Section

18   503(b) and consensual payments pursuant to a creditor and

19   court-approved reorganization plan.

20           He found that a provision in a plan for the

21   payment of fees was appropriate under Section 1123(b)(6) for

22   inclusion among the "nearly infinite types of provisions

23   that can go into a Chapter 11 plan, pursuant to which the

24   debtors may distribute and allocate the value of their

25   estates by broad array of means."  441 B.R. at page 14.

Page 71

1              The same is true here and we urge the Court to

2      adopt Judge Gerber's rationale.

3              The U.S. Trustee attempts to distinguish Adelphia

4      on several grounds.  They focus on the amount of litigation

5      in Adelphia and the need there, the pressing need for a

6      settlement.  Here, it is true that we avoided the litigation

7      but frankly I think that is more reason to approve the fees

8      not less.

9              As I said before, the committee spent years, in

10     essence, acting as the various creditors' surrogate in

11     discussions with the debtors.  The plan that we negotiated

12     with the debtors reflected that work.  The fact that the

13     creditors in -- which was amazing to me then as it is now,

14     took all of two plus weeks to get onboard with the plan for

15     Lehman is a testament, I think, to the quality of the work

16     undertaken by the committee and its members, who spent years

17     reviewing non-public information, analyzing reams of data

18     relating to Lehman's assets and liabilities, and digesting

19     various legal analyses.

20             Had we not succeeded, this case would be mired in

21     the fever swamp of litigation and inter-estate squabbling.

22     Indeed, had litigation erupted, all of the fees in the case,

23     including those of the applicants today, would have been

24     several orders of magnitude higher by the time, some point

25     in the future, when that litigation had run its course.

Page 72

1           The committee members, Your Honor, I submit, in

2      this case, on these facts and these circumstances should be

3      rewarded for a job well done and not penalized.  They should

4      be commended for perfectly playing the role of creditor

5      proxy because it is as a result of those efforts that we had

6      the flashpoint for success in June of 2011.

7           The U.S. Trustee also argues that Adelphia should

8      be limited to the world of ad hoc committees and not

9      official committees.  There's little basis to so limit Judge

10     Gerber's reasoning in the case on that basis.  He concluded,

11     with respect to ad hoc committees, that Section 503(b) did

12     not apply because 1129(a)(4) governed the consensual

13     payments of fees provided for under confirmed reorganization

14     plan.  The same should be true here.

15          One last comment, Your Honor, and I'll cede the

16     podium.

17          Given the fees paid to date in this case, and the

18     Section 503(b) awards given to the various attorneys and

19     financial advisors for the numerous ad hob committees, I'm

20     somewhat surprised that the U.S. Trustee's office chose to

21     fight this fight.

22          The case has been incredibly successful.

23     Compromise and consensus has been its hallmarks.  I was

24     hoping that they would continue to be the hallmark through

25     today.

1          The U.S. Trustee is right that we are not an ad

2     hoc committee but an official committee.  But as I was

3     preparing for this hearing, I kept reflecting on the  fact

4     that yes, it is an official committee, and it is because the

5     Office of the U.S. Trustee selected these very seven or

6     eight institutions from a cohort of hundreds of creditors

7     willing to serve.  It was the U.S. Trustee who instructed

8     them of their fiduciary duties to all unsecured creditors.

9          She reminded them that they needed to do right by

10    all those creditors and could not be guided by what might

11    provide the best return on their individual claims.  She

12    told them they would be restricted from trading while on the

13    committee.  She warned them to expect a substantial burden

14    of work to flow from the review of Lehman structure and

15    assets and liabilities.

16          As we've heard time and again, Lehman's Chapter 11

17    case was and is the largest and most complex case to ever

18    file and the burdens on the committee members were similarly

19    unparalleled.  The committee members took their jobs

20    extremely earnestly.  They rolled up their sleeves and dove

21    deeply into some of the most complex financial instruments

22    that I've ever seen.

23          The sheer magnitude of the claims and the counter

24    party agreements was daunting but they plowed ahead.  They

25    required additional assistance in discharging the duties the

Page 74

1    U.S. Trustee's office set out for them at the beginning of

2    the case.

3              Having performed those duties, in my view,

4    faithfully and selflessly, I'm somewhat confounded that it

5    is the U.S. Trustee's office and only the U.S. Trustee's

6    office who now says that they should alone among the

7    constituents, all of whom have had their lawyers' fees paid

8    and not have their legal expenses reimbursed for their

9    extraordinary efforts.

10             She has turned a bit on her own creation, Your

11   Honor, and I just want to conclude that putting aside the

12   law for a second, I believe it's inequitable not to grant

13   the applicants' request in light of the facts of Lehman and

14   the work done by each of the committee members in this

15   particular case.

16             Thank you, Your Honor.

17             THE COURT:  Thank you.  Before you sit down, I

18   have a question and it's not clear to me whether it's a

19   question or if it's a question both for you and the U.S.

20   Trustee to respond to and it's not so much about the merits

21   of your argument and the passion with which you've expressed

22   it.  I still have this image of myself in a fevered swamp.

23        (Laughter)

24             THE COURT:  But --

25             MR. DUNNE:  That's where we'd all be, Your Honor,

Page 75

1        I share --

2                THE COURT: And it's frankly a frightening -- it's

3        a frightening image.

4                But I am reminded of a somewhat similar issue in

5        this case that arose a few months ago involving 503(b)

6        applications of certain financial advisors to ad hoc

7        committees in this case.

8                And there was a settlement reached and the

9        settlement was not fully put on the record but it became the

10       basis for what turned out to be a consensual hearing in

11       which I ended up making some unscripted remarks about 503(b)

12       and its application to entities that were neither attorneys

13       nor accountants.

14               And it was apparent to me that as I was making

15       those remarks counsel for the U.S. Trustee appeared slightly

16       uncomfortable that I might say some things that would create

17       a record when, in fact, the goal of the settlement was to

18       avoid just that, to avoid a ruling that would have

19       potentially meaningful precedential impact.

20               And one of the things that concerns me a great

21       deal about this afternoon's argument is that we find

22       ourselves having a singular event in this case for the first

23       and only contested hearing with respect to the allowance of

24       professional fees, something that I believe could have been

25       avoided and should have been avoided by parties who are

Page 76

1    acting truly in good faith, with a view toward reaching a

2    constructive resolution.

3             One of the things I would like to know without

4    going into the specifics of the discussions is whether it

5    remains possible for the parties involved in this dispute to

6    reach a resolution that would allow individual members of

7    the creditors' committee to receive reasonable compensation

8    and we could discuss what that means at some appropriate

9    time while avoiding a binding determination as to whether

10   that compensation is being paid pursuant to 1129(a)(4) or

11   503(b), in effect finessing the legal argument we're now

12   having.

13            So my question is do you believe as someone who

14   has participated in this process for now almost a year that

15   peace no longer has a chance?

16            MR. DUNNE:  It's a good question.  I never want to

17   say that peace no longer has a chance but, Your Honor,

18   picked up -- when I had my concluding remarks, I also was

19   thinking about the 503(b) settlement with respect to the

20   financial advisors and there was a strong statutory argument

21   there that they should not be compensated and people

22   resolved it without any precedential effect.  And, frankly,

23   Your Honor, we had this hearing teed up for November 29th

24   and there was -- it was adjourned because we were going to

25   meet on November 30th.  I was hoping that that's precisely

Page 77

1    the dialogue that we would have had on the 30th that -- I

2    can't speak for the individual members, but having spoke to

3    them before the 29th, that I don't any of them are in it to

4    have a ruling necessarily as to how they're getting paid,

5    that it has to be under 1129(a)(4) and it has to be pursuant

6    to 6.7.

7            If there was a settlement that allowed their

8    reasonable fees to be paid and we did it in a way such that

9    it had no precedential value, they can correct me if I'm

10   wrong, but I'm assuming that that would be acceptable to

11   them because that was the premise under which we adjourned

12   the November 29th hearing date to -- in advance of

13   settlement discussions on the 30th.

14           Now I think the question is more appropriately

15   addressed to the office of the United States Trustee because

16   I think the answer from that side is no, that there is no

17   hope for peace.  But from our side, yes, there would be

18   along the lines you were saying.

19           THE COURT:  Well, this doesn't need to become a

20   public airing of several positions but I do want to know

21   whether or not there is any prospect that if we were to take

22   an adjournment here for some period of time, the parties

23   might be able to reach some sort of understanding.  And,

24   frankly, I am deeply troubled that it has gotten to this

25   point and I consider this to be a particularly distasteful

Page 78

1    dispute; one that, in my view, should never have been

2    brought.  It reflects poorly on the U.S. Trustee's office.

3    And I'm saying that publically and on the record.

4                I think we should take an adjournment even for 15

5    minutes so that people can talk to each other.  I'm doing

6    that on my own.

7                MR. DUNNE:  Thank you, Your Honor.

8        (Recess)

9        (Court Resumes)

10               THE COURT:  Be seated please.

11       (Pause)

12               THE COURT:  Anything happen on the break?

13               MS. GOLDEN:  No, Your Honor, the U.S. Trustee

14   would like to proceed.

15               THE COURT:  Go right ahead.

16               MS. GOLDEN:  Thank you, sir.

17       (Pause)

18               MS. GOLDEN:  Your Honor, the U.S. Trustee objects

19   to the applications to the individual committee members for

20   the following reasons and I will give the U.S. Trustee's

21   reasons and then go into a little more detail in my

22   presentation.

23               The approval of the payment of the fees requested

24   by these applicants are expressly prohibited by Section

25   503(b)(4) of the Bankruptcy Code, which was amended in 2005

1    to specifically address the issue of the compensation being

2    sought today.

3              Section 1129(a)(4) does not provide any

4    independent basis for the Court's approval of the fees and

5    the Adelphia decision on which the applicants' rely

6    expressly rejected the contention forwarded by the

7    applicants that Section 1129(a)(4) provides a stand-alone

8    and independent basis for the approval of these fees and the

9    applicants have not really argued any other Code provision

10   which governs their applications.

11             But even if the Court believes that Adelphia does

12   apply to this case, the applicants have not met the

13   standards that Adelphia used under 1123(b)(6) because it

14   could never be appropriate to award fees which are

15   inconsistent and specifically prohibited by the Bankruptcy

16   Code.

17             Even for sake of argument, if the express

18   provisions of Section 503(b)(4) did not prohibit the payment

19   sought, the initial declarations in the original

20   applications and the declarations in the reply that was

21   filed lay out that the committee members did exactly what

22   they were charged to do.

23             The U.S. Trustee does not dispute that the

24   committee -- that the applicants worked extraordinarily hard

25   in this case as did everyone.

1          THE COURT:  Is this an example of no good deed

2     going unpunished?

3          MS. GOLDEN:  No, it's an example that,

4     unfortunately, for the applicants the Code prohibits the

5     payments that they are requesting.

6          THE COURT:  But that's absolutely not true.

7     1129(a)(4) does provide an independent basis for it and a

8     fair reading of the Adelphia case would permit these

9     payments to be made right now, if I chose to.

10          MS. GOLDEN:  No, Your Honor, even Judge Gerber in

11     the Adelphia case, said that 1129(a)(4) is not an

12     independent operative basis --

13          THE COURT:  What if I said that?  What if I were

14     to say, right now, and then write an opinion consistent with

15     it, that it provides an independent basis for it?  That

16     everybody voted for a consensual plan in the largest

17     bankruptcy in history and that these committee members who

18     provided extraordinary service and there's no dispute as to

19     that, are entitled to their payments.  The only question

20     being what's reasonable.

21          Let's just say, for the sake of discussion, that I

22     did that.  Your argument's gone.  So to argue Adelphia

23     doesn't necessarily solve anything since I believe there

24     well could be an independent basis and the committee's

25     papers support that.

Page 81

1          MS. GOLDEN:  Well, the U.S. Trustee --

2          THE COURT:  Another reason why I don't understand,

3     why your office is deciding to make this the issue that

4     you've made it?  You don't have to answer that.  I'm simply

5     shocked.  Deal with it.

6          MS. GOLDEN:  I understand, Your Honor.

7        (Pause)

8          MS. GOLDEN:  Your Honor, in the applicants'

9     declarations, the applicants candidly admit that the fees

10    that they are seeking to have reimbursed were incurred for

11    their own private benefit and not for the interests of the

12    creditors or the estate as a whole and that they had to rely

13    on private counsel because strategic interests diverged from

14    those as creditors as the whole, and that they couldn't rely

15    for certain things on creditor committee counsel.

16          While the applicants were certainly entitled to

17    protect their interests by seeking separate representation,

18    there is no justification for shifting the cost to the

19    creditors generally whose interests were admittedly not

20    aligned on those matters.

21          As I said, Your Honor, the declarations and even

22    the presentation and argument of Mr. Dunne make clear how

23    hard the applicants worked in this case.  But the applicants

24    were sophisticated creditors that were put on a diverse

25    committee.  And they volunteered to sit on that committee.

Page 82

```
 1    And they had the benefit of excellent law firms, including

 2    Milbank, and two financial advisors, Houlihan and FTI.

 3             The committee professionals to date have been paid

 4    over $315 million in total.  Milbank received approximately

 5    $140 million.  And, as Your Honor noted, the amount of

 6    support and advice that was retained by the creditors'

 7    committee was certainly commensurate with the type of case

 8    that this is, or was.

 9             But I think it needs to be noted that the final

10    fee application of Milbank lists 401 separate attorneys that

11    worked on the Lehman case.

12             THE COURT:  What does that have to do with what's

13    before the Court today?

14             MS. GOLDEN:  What that has to do with is that the

15    committee members were adequately represented by committee

16    counsel, who were their advisors, and that their -- excuse

17    me, their declarations do not offer any evidence that they

18    performed services independent of their roles as fiduciaries

19    sitting on the committee.

20        (Pause)

21             THE COURT:  Is it your position, regardless of the

22    legal standard that applies here, that there is no case in

23    which individual committee members, who are appointed to an

24    official creditors' committee can establish entitlement to

25    the recovery of their own professional fees?  Is that your
```

Page 83

1    position?

2              MS. GOLDEN:  That is our position.

3              THE COURT:  And what's the basis for that?

4              MS. GOLDEN:  That in 2005, Congress amended the

5    statute 50 -- excuse me, 503(b)(3) and (4) to specifically

6    exclude the legal and accounting professionals of sitting

7    committee members.

8              THE COURT:  That assumes that that's the exclusive

9    means for committee members to obtain payment and that

10   assumes the correctness of your legal argument that

11   1129(a)(4) does not provide a sound, independent basis for

12   asserting a right to such payment, particularly when the

13   plan itself that was voted on included Section 6.7, that

14   included specific reference to such payments.

15             All of that assumes law on that in evidence.  It

16   assumes the correctness of your argument, correct?

17             MS. GOLDEN:  That is correct.

18             THE COURT:  So it's simply an assertion of your

19   office.

20             MS. GOLDEN:  Well, of course, it's an assertion of

21   our office.

22             THE COURT:  Not based upon any governing

23   precedent.

24             MS. GOLDEN:  Based on the statute, based on --

25             THE COURT:  Well, the statute --

Page 84

1          MS. GOLDEN:  -- the Bankruptcy Code.

2          THE COURT:  -- the statute has not always been the

3     model of clarity which is the reason we have so many cases

4     interpreting it.

5          MS. GOLDEN:  The Bankruptcy Code explicitly

6     prohibits these payments and Section 1129(a)(4) does not

7     give an independent stand-alone basis on which payments

8     which were explicitly prohibited by another section of the

9     Code can be paid.  And that is the position of the U.S.

10    Trustee.

11         THE COURT:  I understand that's your position.

12       (Pause)

13         THE COURT:  It doesn't mean it's correct.  Nor

14    does it mean that I would rule in your favor.

15       (Pause)

16         THE COURT:  But please proceed with your argument.

17         MS. GOLDEN:  Thank you, Your Honor.

18         The Bankruptcy Code deliberately sets a very steep

19    standard for creditors who wish to be reimbursed for their

20    pre-confirmation legal fees out of the estate.

21         Under Section 503(b)(3) and (4), those creditors

22    must show that they performed one of several specified

23    actions for the benefit of the estate or which resulted in a

24    substantial contribution to the case.  It must also show

25    that their legal fees were necessary and reasonable.

1            In the case of creditors who serve on a committee,

2    that steep standard becomes a prohibition.  Section

3    503(b)(3)(f), excuse me, is the exclusive co-provision for

4    the payment of the actual and necessary expenses of

5    individual committee members.

6            The expenses are generally held to be travel,

7    meals, lodging and the like, incident to their service on

8    the committee.  Section 503(b)(4) expressly excludes by its

9    terms the compensation of attorneys or accountants for an

10   entity whose expenses are reimbursable under Section

11   503(b)(f).

12           It is noteworthy that Section 503(b)(4), which

13   prior to 2005 appeared to allow the payments being sought

14   here was amended by Congress to expressly carve out

15   committee member legal fees from the types of expenses that

16   can be recovered no matter how beneficial or necessary they

17   were.

18           In fact, in the First Merchant case, which is a

19   3rd Circuit case, 198 F.3d 394, the court in allowing these

20   fees prior to 2005 was clearly troubled by the result in

21   allowing them.  But, based on the statute, did and wrote in

22   dicta that perhaps Congress should reconsider.  And in 2005,

23   the Code was amended and did just that.

24           The applicants have argued that Section 503 does

25   not govern their applications.  However, they do not explain

Page 86

1    what role, if any, Section 503 does play regarding their

2    applications and whether there are circumstances that make

3    these applications exempt from the Section 503 prohibitions

4    that apply to the very payments that they seek.

5              As Mr. Dunne pointed out, and as the papers imply,

6    they argue that because the payments are consensual, Section

7    503(b)(4) prohibitions do not apply.  However, there is

8    nothing written in the Code which substantiates this claim.

9    There is no consent or complex case or Lehman exception in

10   the Code.

11             The plain language of the text of 503 applies to

12   all payments made by the estate for administrative expenses.

13   It does not distinguish between consensual and non-

14   consensual payments.

15        (Pause)

16             MS. GOLDEN:  Instead, Your Honor, the applicants

17   argue that 1129(a)(4) governs their application.  However,

18   1129(a)(4) does not provide, as I said before, any stand-

19   alone, independent basis for the approval of the

20   applications and the applicants have not cited other

21   statutory provisions pursuant to which their application can

22   be granted.

23             Section 1129(a)(4) is a general statute which

24   provides that the Court exercise substantive control over

25   the fees and costs related to a Chapter 11 case and the

1   payments should be disclosed and approved as reasonable.

2   Nowhere does it --

3            THE COURT:  Why doesn't that provision you just

4   read apply direction to the payments that are part of these

5   applications?

6            MS. GOLDEN:  No, Your Honor.  Excuse me, I'll let

7   you finish.  I'm sorry.

8            THE COURT:  I'm challenging you --

9            MS. GOLDEN:  I know.

10            THE COURT:  I'm challenging your assertion.  Why

11   doesn't what you just read specifically provide that in a

12   plan with my approval as to reasonableness I can approve any

13   fees to anybody in connection with the plan.

14            MS. GOLDEN:  Because 1129 does not purport to

15   authorize payments that are otherwise prohibited --

16   prohibited, excuse me.

17            THE COURT:  Well, what you're saying is that --

18            MS. GOLDEN:  A payment cannot be approved --

19            THE COURT:  What you're saying is they're

20   otherwise prohibited as substantial contributions, but that

21   doesn't mean that they're otherwise prohibited.

22            MS. GOLDEN:  No.  These are otherwise prohibited

23   by a --

24            THE COURT:  Why are they -- but you see, you're

25   conflating substantial contribution with permissible

1    payments.  You're suggesting that substantial contribution

2    is the only way that payments can be approved and that's not

3    what the law says.  And that's also not what Adelphia (ph)

4    says.

5              MS. GOLDEN:  Well, let me address your first --

6    your first comment.  These payments are expressly prohibited

7    by 503(b)(4).

8              THE COURT:  What do you mean by these payments?

9              MS. GOLDEN:  The payment sought by the individual

10   --

11             THE COURT:  The payments provided by Section 6.7

12   of the plan we have to talk about that section.

13             MS. GOLDEN:  Sure.

14             THE COURT:  We can't talk about substantial

15   contribution as if that is what governs because that's your

16   argument.  We have to talk about what the plan says --

17             MS. GOLDEN:  Uh-huh.

18             THE COURT:  -- and what my powers are consistent

19   with applicable bankruptcy law including 1129(a)(4).

20             MS. GOLDEN:  Uh-huh.

21             THE COURT:  So deal with that.

22             MS. GOLDEN:  Okay.  Section 6.7 was amended.

23   Section 6.7 expressly took out the direct payment provision.

24   The provision of the confirmation order specifically

25   accepted all objections and left them on the table regarding

Page 89

```
 1    not only the payments themselves but whether they were able

 2    to be made and also what statutory standard would govern if

 3    any.

 4              THE COURT:  But Ms. Golden, you've put the

 5    (indiscernible - 1:02:58) of your oral argument.

 6              The reason that the confirmation order was changed

 7    with respect to 6.7 was to deal with your objection to that

 8    aspect of the plan.

 9              MS. GOLDEN:  That is correct.

10              THE COURT:  And so you reserved the right to argue

11    for a year after the plan was confirmed that those

12    (indiscernible - 1:03:21) weren't permissible under Section

13    503(b).  You're making that argument now.

14              MS. GOLDEN:  Correct.

15              THE COURT:  But that doesn't mean that at the time

16    that everybody voted on this plan that was (indiscernible -

17    1:03:36) applauded as a magnificent achievement, that they

18    didn't fully recognize that these payments were

19    contemplated.

20              MS. GOLDEN:  Your Honor --

21              THE COURT:  In fact, there is no evidence that

22    there is any person who voted on the plan that didn't fully

23    expect these payments to be made.  And there is no economic

24    stakeholder that's taking any position here contrary to

25    making those payments.
```

Page 90

1           And you are standing here on behalf of your client

2    as a matter (indiscernible - 1:04:00), correct?

3           MS. GOLDEN:  I am standing --

4           THE COURT:  Because you have a certain reading of

5    the code and you're here to enforce it, but that doesn't

6    mean it's the right reading.

7           MS. GOLDEN:  That is Your Honor's jurisdiction,

8    but that is correct.  We are here to enforce what we believe

9    the code allows or does not allow.

10          THE COURT:  But what about what a plan can provide

11   for?

12          MS. GOLDEN:  Your Honor --

13          THE COURT:  Is it your position that a plan cannot

14   permissibly provide for the payment of certain expenses of

15   official committee members?

16          MS. GOLDEN:  Yes.

17          THE COURT:  Why?

18          MS. GOLDEN:  Because it is not authorized by the

19   bankruptcy code, because it is prohibited under Section

20   503(b)(4).

21          THE COURT:  So your position as a matter of law is

22   that Section 503(b)(4) and provisions related to it trump

23   the ability of the parties to a consensual plan to provide

24   for payments to committee members or to others who might

25   qualify for substantial contribution claims in a case?

1          MS. GOLDEN:  The Bankruptcy Code prevails

2     regardless of whether people consent.

3          THE COURT:  Excuse me?

4          MS. GOLDEN:  The Bankruptcy Code on this

5     particular provision in connection with committee --

6     individual committee members fees and expenses -- attorney

7     fees and expenses, not incidental fees and expenses --

8     prohibit the payments and it is the position of the U.S.

9     Trustee that they cannot be consented to in a plan.

10         THE COURT:  But let's just take your next question

11    at face value.

12         MS. GOLDEN:  Sure.

13         THE COURT:  Prohibits the plan.  Prohibits the

14    payment in the context of their substantial contribution

15    claim.  But what makes this a substantial contribution

16    claim?

17         MS. GOLDEN:  This is not a substantial

18    contribution claim.  They're seeking to have their

19    independent attorneys be paid.  They have not provided

20    evidence that they made a substantial contribution, first of

21    all.

22         THE COURT:  Do they have to?  Do they have to if

23    Section 6.7 of the plan provides that the payments can be

24    made?

25         You're conflating -- in my view -- Section 6.7

Page 92

1    with substantial contribution and I'd like you to more

2    precisely parse out your argument if you can.

3                MS. GOLDEN:  Sure.  Section 6.7 was amended and it

4    was carved out by the confirmation order with the discussion

5    argument and ruling by the Court to be deferred.

6                Under the Bankruptcy Code in Section 503(b)(4),

7    the payments being sought by these applicants for their

8    individual attorneys are prohibited.

9                THE COURT:  I don't -- you'll have to explain what

10   you mean by prohibited?

11               MS. GOLDEN:  I think that it's -- I think that the

12   text of the Bankruptcy Code is very clear.

13               THE COURT:  Well, I -- here's where -- here's

14   where -- here's where you need to help me --

15               MS. GOLDEN:  Sure.

16               THE COURT:  -- because I'm drawing a distinction

17   in my mind --

18               MS. GOLDEN:  Uh-huh.

19               THE COURT:  -- between consensual activities that

20   are set forth in a plan the (indiscernible - 1:07:35) and

21   that become in effect the contract that ultimately becomes

22   effective on confirmation.  And statutory provisions that

23   would govern a claim by a third party for a right to payment

24   for having made a substantial contribution in a case.

25               And so what I'm trying to understand and you just

1    have to help me through it --

2              MS. GOLDEN:  Sure.

3              THE COURT:  -- is how anything with respect to

4    503(b) prohibits parties from engaging in consensual

5    behavior to contract and (indiscernible - 1:08:27) terms of

6    a plan.

7              Now presumably, you might argue at some point in

8    the future that a plan that attempted to do that could not

9    be confirmed because it violated provisions of the

10   Bankruptcy Code.  But we didn't do that here.

11             What we did instead was delay to another day --

12             MS. GOLDEN:  Uh-huh.

13             THE COURT:  -- arguments as to these rights to

14   payment.  But that doesn't' really change the fact that the

15   rights to payment are being asserted pursuant to the

16   different code section.

17             And you keep insisting that that code section

18   doesn't apply and I'm disagreeing with you.  So your job now

19   is to convince me that you're right and you haven't done

20   that yet.  So I'm giving you another chance to do it.

21             MS. GOLDEN:  Your Honor, it is the U.S. Trustee's

22   position that parties cannot consent to violate the

23   Bankruptcy Code.

24             THE COURT:  But why is it a violation of the

25   Bankruptcy Code to provide for payments that are otherwise

1    permissible under 1129(a)(4)?

2           MS. GOLDEN:  Because there's nothing in 1129(a)(4)

3    that would override Section 503(b).

4           THE COURT:  That's what you say.

5           MS. GOLDEN:  Correct.  And that's what the Supreme

6    Court says in the --

7           THE COURT:  And what makes -- and what makes you

8    right in saying that?  What makes you right in saying that

9    there's nothing that permits an override of 503(b) in a plan

10   which provides for payments pursuant to 1129(a)(4)?

11          MS. GOLDEN:  Because Section 29 -- excuse me --

12   1129(a)(4) is a broad general statute.  And when the rules

13   of statutory construction sent down by the Supreme Court

14   state that when there is a broad section and a conflicting

15   specific section, it is the specific section that overrides

16   the general section.

17          THE COURT:  That's true, except 503(b) doesn't

18   deal with the contents of a plan.

19          MS. GOLDEN:  No.  But it does deal directly with

20   the payments that are being urged for the Court to approve

21   today.

22          THE COURT:  That's the extent of your argument?

23          MS. GOLDEN:  That's the extent of my argument.

24          THE COURT:  Okay.

25          MS. GOLDEN:  May I continue, Your Honor?

Page 95

1         THE COURT:  Sure.

2         MS. GOLDEN:  Thank you.

3         Your Honor, 1129 does not provide any stand-alone

4    independent basis for the approval of these fees.  And as I

5    just said it is a general statute, which provides only that

6    the Court exercise control over the fees and costs related

7    to Chapter 11 cases.  And as I stated, it does not purport

8    to authorize payments that are otherwise prohibited.

9         Your Honor, the applicants also -- to bolster

10   their argument -- rely on Judge Gerber's Adelphia (ph)

11   decision, which they state is directly on point.  And I will

12   be clear that the U.S. Trustee, not surprisingly, believes

13   that the Adelphia decision was not decided correctly.

14        The U.S. Trustee objected to the payments in

15   Adelphia and the position of the U.S. Trustee continues to

16   be that those types of payments approved in Adelphia and the

17   payments being sought here are prohibited.

18        The U.S. trustee also believes that the applicants

19   have misread Adelphia.  There is a distinction between ad

20   hoc committee members whose applications are not

21   specifically proscribed by the Bankruptcy Code and

22   individual creditors' committee members whose are.  But most

23   importantly, in Adelphia, Judge Gerber expressly rejected

24   the contention put forward by the applicants that 1129(a)(4)

25   provides a stand-alone independent basis for the approval of

1    fees.

2            Judge Gerber stated unequivocally -- and I quote,

3    Section 1129(a)(4) is still no more than a requirement or a

4    condition.  It does not provide an affirmative grant of

5    authority.  It does not give permission to do anything.  And

6    that's the Adelphia Case 441 B.R. 13.

7            In Adelphia, the Court stated that the provision

8    for the payments to the creditors' professionals were

9    actually authorized by Section 1123(b)(3)(a) and (b)(6).

10   And Judge Gerber stated, on its face, 1123 permits a

11   provision of this character, except to the extent that the

12   appropriate requirement demands judicial scrutiny as to a

13   provision's propriety for reasons other than inconsistency

14   with the Bankruptcy Code.  Adelphia at 15.

15           Adelphia did not address 503(b), pro or con with

16   respect to the Court's belief that the payment to the

17   creditors' attorneys in connection with the settlement is

18   allowable.

19           Here, as I stated, the applicants invoke

20   1129(a)(4) in an area where 503(b) expressly prohibits the

21   payment.

22           Your Honor mentioned substantial contribution.

23   And for the sake of argument only, even if the express

24   provisions of 503(b)(4) did not in the U.S. Trustee's view,

25   prohibit the payments sought, the applicant's own

Page 97

1    declarations established that they performed the functions

2    of the members of a creditors committee.  They served on

3    sub-committees.  They had numerous meetings. They handled

4    negotiations.  Everything the committee members are charged

5    to do as fiduciaries and seemed to fall squarely within the

6    503(b)(4) exclusion.

7              As I said at the outset, the U.S. Trustee is more

8    than aware how complex and challenging and historic this

9    case was for everyone involved.  But there is no evidence

10   submitted that the applicants provided a substantial

11   independent benefit to the estate separate and apart from

12   their roles as committee members.

13             Even if already not excluded in their declarations

14   and in the reply, the applicants candidly admit that the

15   fees they are seeking to have reimbursed were incurred for

16   their own private benefit and not for the interests of

17   creditors or the estate as a whole.

18             In paragraphs 29 to 34 of the reply, the

19   applicants assert that they had to rely on private counsel

20   because at times their strategic interests diverged from

21   those of creditors as a whole and they could not rely on

22   committee counsel.

23             And as I also said at the outset, the applicants

24   were certainly entitled to protect their interest by seeking

25   separate representation, but there is no justification

Page 98

1   presented for shifting that burden and that cost to the

2   estates.

3              THE COURT:  Well, let me just break in and --

4              MS. GOLDEN:  Sure.

5              THE COURT:  -- remind you of something that Mr.

6   Dunne said during his argument.

7              MS. GOLDEN:  Sure.

8              THE COURT:  And I'd like you to react to it.

9              My recollection is that he said that one of the

10  unique features of this remarkable case is that when it was

11  time to bring parties together and come up with a plan that

12  ultimately would be tested by voting and the plan approval

13  process.  That was facilitated greatly by the fact that

14  committee composition allowed committee counsel to interact

15  with what amounted to a beta test of different

16  constituencies in the case a whole.

17             And that outside professionals to these individual

18  committee members greatly advanced the process of committee

19  deliberation because given the sophistication of the issues,

20  both legal and factual, no individual committee member could

21  perform the services of a committee member without

22  independent advice.

23             That being so, it seems to me a case could be made

24  for substantial contribution in this instance.

25             MS. GOLDEN:  That's -- that's - -

1             THE COURT:  Do you agree -- do you agree or

2     disagree?

3             MS. GOLDEN:  Are you asking whether I agree that

4     the independent -- the individual committee members could

5     separately sort of freelance have an -- bad word -- but

6     could separately -- separate and apart from their role as

7     committee members file an application for substantial

8     contribution, independent of their role as committee

9     members?  Is that your question?

10            THE COURT:  No.

11            MS. GOLDEN:  Okay.

12            THE COURT:  I was actually asking a much more

13    general question.

14            MS. GOLDEN:  Okay.

15            THE COURT:  I was simply asking in light of your

16    comment that you believe that the applications here if

17    judged on a substantial contribution standard would not fly

18    because everybody was acting in their capacity as a

19    committee member.

20            I gave you the hypothetical of Mr. Dunne's

21    argument that these individual committee members were also,

22    while on the committee, dealing with their individual needs

23    through outside professionals and in so doing provided

24    resources that benefitted the committee as a whole and also

25    provided resources that benefitted the case as a whole.

1          (Pause)

2              MS. GOLDEN:  Those professionals if they were

3      benefitting the committee either should be borne by the

4      individual committee members or should have been retained by

5      the estate or the committee.  Excuse me.

6              If those individual counsels were doing work that

7      committee counsel could not advise on, then perhaps they

8      should have also been retained by the committee or their

9      expense should have been borne by the individual committee

10     members.

11             THE COURT:  I'm very surprised to hear you say

12     that, because  my understanding of what went on here is that

13     certain individual committee members at various points in

14     time recognized that there were issues that were arising in

15     the bankruptcy case that required consultation with their

16     own counsel.  Because there were particular economic

17     interests that affected them, not the committee as a whole.

18             But what I hears Mr. Dunne say was that that

19     process benefitted the entire plan process by giving the

20     committee access to informed members who were able to be

21     representative of the different points of view within the

22     entire constituency of unsecured creditors.

23             That's not a situation that involves retention of

24     further estate professionals.  That's --

25             MS. GOLDEN:  No, no, no, I misunderstood your --

Page 101

1           THE COURT:  That's purely --

2           MS. GOLDEN:  I misunderstood your question, Your

3     Honor.

4           THE COURT:  -- an example of private services that

5     provide indirect, but substantial benefit.

6           MS. GOLDEN:  I -- I misheard your question, Your

7     Honor, and it has always been the U.S. Trustee's position in

8     this case that it is up to Your Honor to make the

9     determination as to whether a substantial contribution has

10    been made.

11          THE COURT:  I understand, but does the fact

12    pattern -- if you accept it as true -- provide a basis for

13    you to reconsider your assertion that there's no basis here

14    for substantial contribution?

15          MS. GOLDEN:  No, Your Honor.

16          THE COURT:  And why is that?

17          MS. GOLDEN:  Because they hired their individual

18    attorneys to advance their own interests and the indirect

19    benefits have not been put forth by the applicants and the

20    U.S. trustee has had no position or time to evaluate any of

21    that.  The declarations that would put -- excuse me -- that

22    were put before the Court do not make any of those

23    representations.

24          I think the declarations before the Court are

25    fairly straightforward and that the committee members did

1    the arduous work in this case as committee members and there

2    is no evidence to the contrary.

3            THE COURT:  Okay.

4            MS. GOLDEN:  Your Honor, the U.S. Trustee believes

5    that to approve these applications under 1129(a)(4) would

6    effectively eviscerate the concept of substantial

7    contribution embodied in Section 503(b) and would rewrite

8    the Code to provide for reimbursement of professional fees

9    incurred for any and all members of any creditors committee

10   as a matter of course.

11           This is not what the Code intends or provides and

12   it is expressly and specifically prohibited and the

13   application should be denied.

14           Do you have anything further, sir?

15           THE COURT:  No.

16           MS. GOLDEN:  Thank you.

17           THE COURT:  Thank you.

18           MR. DUNNE:  Your Honor, I'll be brief.  I only

19   have three points to address.

20           The first one relates to the hypothetical that

21   Your Honor was just teasing out.  I think that the U.S.

22   Trustee's office misunderstands the need for separate and

23   independent representation of the individual committee

24   members.

25           They did not hire counsel to advance their own

Page 103

1    interests.  And I -- I want to take a step back.  I think

2    everybody will recall at the beginning of the case there

3    were numerous requests for multiple committees here.  There

4    were requests for committees at LCPI, LBSF, the U.S.

5    Trustee's office denied those requests.  We agreed with the

6    U.S. Trustee's office.  But they denied it for a number of

7    reasons.

8           One of which is that they believed and correctly,

9    I submit, that this committee contained enough creditors

10   with different claims at different levels such that the

11   adequate representation standards were met.

12          They also did it on the assumption that this

13   committee would do the work of multiple committees.  And it

14   is precisely in that context that the need for their counsel

15   arose.  It's not the only reason for the counsel, but it

16   arose for that.

17          Their counsel assisted them in discharging their

18   duties to all the estates.  We represented 23 different

19   debtor entities.  And it fostered the kind of push and pull

20   of the plan negotiations that were done within the confines

21   of the committee conference calls and meetings and it was

22   very different.  It didn't get a public airing because there

23   weren't multiple committees.  If there were multiple

24   committees, I submit the costs of administration of this

25   estate would have been substantially higher.

Page 104

1          It also allowed -- because we needed to do this

2     come plan time -- different creditors to look at different

3     issues through different prisms.  Somebody could put on an

4     LCPI hat, somebody could put on an LBSF hat and see if that

5     made sense.  And they did that after we had already weighed

6     in.  Their advisors had already weighed in on what we

7     thought was kind of middle of the fairway.

8          And then there was a debate in the hashing out of

9     what -- when we -- this actually seized the light of day.  I

10    like Your Honor's phrase, beta testing.  Do we think that

11    the creditors will actually gravitate towards what we're

12    doing here and what were the arguments each way.  And they

13    did that through in large part, their own counsel.

14         Second point, I don't believe that Section 503(b)

15    is the sole basis for the payment of these fees.  I believe

16    Your Honor could rule that Section 1129(a)(4) authorizes the

17    payment, but clearly we made the argument in the papers, as

18    did Judge Gerber in Adelphia, that Section 1123(b)(6) also

19    provides authority. It authorizes the debtor to include

20    appropriate provisions in a plan.  And the debtor is the

21    gatekeeper for including such a provision.

22         They make the determination for whether or not to

23    allow the payment of the fees of individual committee

24    members counsel.  And their decision in turn is then subject

25    to creditors assent and ratification pursuant to the

Page 105

1    confirmation process.

2          THE COURT:  Well, let me ask you then, because you

3    cited to a particular code section, but I was talking during

4    argument for Ms. Golden, more broadly about the ability to

5    craft a plan that would provide for these payments.  And we

6    had some debate as to the justification for payments under

7    -- I said 1129(a)(4) because that's the confirmation

8    standard that I look to.  I don't craft plans.  I just deal

9    with the plans that are presented.

10          But the question is, is it your position as

11   committee counsel that had a role in dealing with this plan

12   that the plan provisions that provided for payment to your

13   committee members under 6.7 were permissible and if so, how

14   were they permissible?

15          MR. DUNNE:  Yes, they were permissible and the how

16   is because Section 1123(b) of the Bankruptcy Code is --

17   authorizes various -- or empowers the debtors to include

18   various provisions in the plan.  It doesn't mandate it.  The

19   required sections are in 1123(a).  1123(b) authorizes the

20   debtors to include various things.  1123(b)(6) says any

21   other appropriate provision that is not inconsistent with

22   any provision of this title.

23          And then 1129(a)(4) says if one of those

24   provisions that they include -- is my argument under

25   1123(b)(6) in the plan -- call for the payment by the debtor

to somebody in connection with the plan or incidental to the plan. That payment has to be approved or subject to approval by Your Honor as reasonable.

THE COURT: Well the U.S. Trustee says that those payments are here prohibited by virtue of the provisions of Section 503(b).

MR. DUNNE: Let me address that, because that was actually my third point. I'll do it -- I think prohibited is the wrong verb, not just too strong, it's just inaccurate.

If you look at Section 503(b)(3)(f) it is actually an enabling section. It says, you may pay attorneys fees for the following parties. And it does not include an official committee member's counsel. So there's nothing that says or any congressional intent that thou shalt not pay the fees of counsel to individual committee members.

What you have is that 503(b) fails to authorize the payment, which I submit is a huge difference than congressional intent to not pay it. It doesn't say that there's no authority elsewhere in the code. At best -- and this is only at best -- you would argue that there's a lack of authority to pay these fees in the non-consensual, non-plan context.

That's what 503(b)(3)(f) does in my view and cannot therefore rise to the level of something that's

Page 107

1    prohibited under Section 1123(b)(6) as an appropriate

2    provision, but it's inconsistent with any other provision in

3    the plan.

4              The fact that it's failed to be authorized

5    elsewhere all of a sudden it's an inconsistency, it's

6    illogical to me, Your Honor.  And so that is our argument as

7    to why the payment of these fees are appropriate.

8              And with that, Your Honor, I'll yield.

9              THE COURT:  Okay.  Now, we've had a robust

10   argument.  Is there anyone who wishes to weigh in on this

11   issue of applicable law governing the applications?

12       (Pause)

13             THE COURT:  All right.  The argument is closed

14   then.

15             The issue remains what role is being played by

16   those individuals who are here in the gallery on behalf of

17   applicants and what if anything is left over that they may

18   wish to present.

19             Is that something that we should proceed with now

20   or are we going to simply bifurcate this and in effect have

21   a determination of statutory entitlement to then be followed

22   by issues that relate to the individual applications

23   assuming I find a basis for statutory entitlement?

24             Has any consideration been given to order of play

25   at this point?

1           MR. DUNNE:  Your Honor, I clearly believe that the

2   legal issue is not just the threshold issue.  I think it's

3   almost the whole issue.  I don't believe there's much that -

4   - I think everything is going to fall from that with the

5   evidence that's in from the debtors' et cetera on

6   reasonableness.

7           I don't think there's much to argue about

8   reasonableness.  So I think if we have a ruling, I'm hoping

9   we can proceed to an order shortly thereafter on

10  reasonableness to authorize the payment because I don't see

11  reasonableness as a separate contested matter.

12          THE COURT:  Well, I do have a question about

13  entitlement to what amounts to attributed overhead to in

14  house counsel and I'm quite concerned about that.

15          MR. DUNNE:  Your Honor, may I address that?

16          THE COURT:  Sure.

17          MR. DUNNE:  Because this is a good report.  That I

18  because is the MetLife application where they are being

19  compensated for their in-house lawyer's time.  They advised

20  us that they'll withdraw that application completely.

21      (Pause)

22          MR. DUNNE:  Ms. Golden says it's also

23  (indiscernible - 1:31:43).  I thought those were indentured

24  trustee issues which are separate, because they're separate

25  authority for the indentured trustees.

1                THE COURT:  Well, okay.  Let's defer --

2                MR. DUNNE:  Okay.

3                THE COURT:  -- on the question of compensation

4      attributable to the work of in house professionals as

5      opposed to retained professionals.  And if those -- if those

6      items are going to fall away, that's actually a big plus.

7                Ms. Golden?

8                MS. GOLDEN:  Okay.  Thank you.  Well, Your Honor,

9      good news, this is something that Mr. Dunne and I do agree

10     on that this really is the threshold issue, the kit and

11     caboodle.  And the U.S. Trustee at least requests that it be

12     bifurcated and that the decision on the statutory standard

13     be rendered.

14                Just for the record, the U.S. Trustee's original

15     objection to the applications, the U.S. Trustee also did the

16     reasonableness review and would stand on her objections that

17     were in that objection that was filed in February of this

18     year.

19                THE COURT:  Okay.  Now, I have a question about

20     any role to be played by the fee committee at this juncture.

21     A while ago the fee committee submitted some papers in the

22     nature of a limited objection indicating that the fee

23     committee had played a constructive role in reviewing all

24     professional applications and saw no reason to distinguish

25     these applications from the others that have been

Page 110

1   considered.

2          I know that we had a chambers conference that

3   addressed this issue ten months ago and there's no record of

4   what was said during that conference that I have anyway.

5          To what extent is there an understanding between

6   the parties as to the role, if any, to be played by the fee

7   committee on reasonableness in the event that the Court were

8   to determine that these fees should be allowed under one

9   statutory standard or another?

10          MR. DUNNE:  I -- my recollection of that chambers

11   conference and I thought there was agreement that the fee

12   committee was not to get involved and the reason for that

13   was basically you had various members of the fee committee,

14   the debtors have already done an exhaustive review of the

15   applications themselves.

16          THE COURT:  And I have Mr. Sukos's (ph) affidavit

17   or declaration on that point.

18          MR. DUNNE:  And the U.S. Trustee also a member of

19   the fee committee is here pressing a number of objections to

20   the applications.  The committee has frankly lived through

21   it and, you know, obviously believes that the work that they

22   did was reasonable and justified.  But for those reasons, we

23   didn't think the fee committee added anything when all of

24   its members aren't directly involved in this one way or

25   another.

Page 111

1          MS. GOLDEN:  Your Honor, the U.S. Trustee agrees

2     with what Mr. Dunne said.  Also, one of the applicants is --

3     actually sits on the fee committee and it was the

4     understanding generally of the fee committee that the U.S.

5     Trustee would take the lead role in reviewing the general

6     applications of the applicants and the U.S. Trustee has

7     already done the reasonableness review as has debtors

8     counsel and depending on Your Honor's ruling, there's really

9     no reason why -- should Your Honor grant the applications --

10    that the U.S. Trustee couldn't do the normal job that her

11    office does in terms of speaking with the various applicants

12    and the committee.

13          THE COURT:  Okay.

14          MS. STADLER:  Excuse me.  Judge can you hear me?

15          THE COURT:  I think you're going to have to speak

16    up a little louder.  Are you calling from Wisconsin.

17          MS. STADLER:  Can you hear me?  This is Katherine

18    Stadler from (indiscernible - 1:36:01).

19          THE COURT:  We can hear you now.

20          MS. STADLER:  Okay.  Thank you.  Judge, I just

21    wanted to pipe in as counsel for the fee committee.  I've

22    been listening with interest all along and share my

23    recollection of the results of that status conference which

24    was that neither or the unsecured creditors committee nor

25    the U.S. Trustee's office to use their role for the fee

Page 112

1   committee in the review of the applications you're dealing

2   with today.  And the committee agreed to stand down based on

3   that understanding.

4           But I would note that I am here today listening on

5   behalf of the fee committee and speaking perhaps for the

6   chair of the fee committee remains willing and able to step

7   in and play a role if the Court should so desire.

8           THE COURT:  That's fine.  Thank you for that

9   comment.

10          Does anyone else wish to be heard at this moment?

11          I think -- oh, Mr. Hiersteiner.

12          MR. HIERSTEINER:  Excuse me, Your Honor.  Thank

13   you, Your Honor.  Richard Hiersteiner --

14          THE COURT:  You're going to have to walk up a

15   little bit farther than that seat so you can be heard.

16      (Pause)

17          MR. HIERSTEINER:  On other item, Your Honor, the

18   application of U.S. Bank as a committee member and as a

19   member of the -- as an indentured trustee was objected to by

20   another party, Mr. Kuntz (ph) who filed what he called a

21   refocused objection to the payment of fees of U.S. Bank and

22   its counsel.

23          We have replied.  Mr. Kuntz is not here.  He

24   submitted an email to me this morning suggesting that he had

25   reviewed the agenda for today, didn't see these matters on

Page 113

1    and therefore he was not attending.  I responded immediately

2    to tell him that the matters were on and we were appearing

3    in support of the allowance of the fees and expenses of the

4    trustee.

5          So I would ask that his objection to our fees be

6    dispensed with at this time.  Thank you.

7          THE COURT:  Well, one of the problems with what

8    you've just told me is that you've had direct contact with

9    Mr. Kuntz who took the position that it wasn't on.  And

10   you're taking the position that it is on.  And whether it's

11   on or not, I haven't reviewed it.

12         The only matter that I have assumed was no for

13   purposes of today's afternoon argument was the matter that

14   we've just heard.  And while I know it would be desirable to

15   dispense with this remaining objection to your application,

16   I don't feel that I can do that in absence of either Mr.

17   Kuntz's consent to withdraw his objection or an actual

18   hearing on the merits of his objection.

19         So we'll simply carry it to another day.  That

20   doesn't make you happy I can tell from your expression.  I'm

21   seeing a pained expression.

22         MR. HIERSTEINER:  We had -- we had filed a reply

23   to Mr. Kuntz's objection which advised him that the subject

24   of the fee applications of committee members and indentured

25   trustees including U.S. Bank was scheduled for today at 2

Page 114

1    o'clock.  He did not appear and did not press his objection.

2              THE COURT:  What I'm telling you is that as the

3    person who prepared for today's argument, I paid no

4    attention to Mr. Kuntz's objection and I can't in good

5    conscious --

6              MR. HIERSTEINER:  Okay.

7              THE COURT:  -- default him --

8              MR. HIERSTEINER:  I understand.

9              THE COURT:  -- because from my perspective it

10   wasn't on.  It may have been on from your perspective, but

11   from my perspective the only thing I was dealing with was

12   what we've just dealt with.

13             MR. HIERSTEINER:  Thank you, Your Honor.

14             THE COURT:  So we'll deal with it another day one

15   way or the other.  And so that it's clear that nobody is

16   losing any position with respect to this, I'm not deciding

17   this from the bench today anyway.  I'm taking this under

18   advisement.  And I'll advise the parties involved as to when

19   to expect a ruling so that you don't lose any sleep, it will

20   not be before the Christmas holidays.

21             MR. HIERSTEINER:  Thank you, Your Honor.  May I

22   ask one other question while I'm here?  I was a little

23   confused about the resolution of the issue of adjudication

24   of reasonableness of the fees and expenses of the committee

25   members.  On the one hand, I heard that that was no longer

Page 115

1   an issue once the determination, assuming it was made in one

2   direction, had been made by Your Honor.  On the other hand,

3   I heard that those were to be bifurcated and there would be

4   a separate issue --

5         THE COURT:  Here's what I believe is the

6   disposition, but just because I believe it doesn't mean

7   that's what everybody else believes.

8         I believe that I'm going to make a determination

9   in due course as to whether the individual committee members

10  have an entitlement to be paid something under one statutory

11  authority or another based upon the legal issues that we've

12  debated this afternoon.

13        On the question of reasonableness, I have myself

14  identified some concerns.  Those concerns have lead to the

15  withdrawal of one aspect of one application and perhaps --

16  although it hasn't been confirmed, the withdrawal of another

17  aspect of another application relating to time associated

18  with in house lawyers and some assumed billing rate that

19  applies to them, something that I've -- find a curiosity.

20        I have not yet made any independent determination

21  with respect to reasonableness.  I have heard arguments that

22  because the debtor has concluded in the debtor's judgment

23  that this is reasonable, that that should be the end of the

24  analysis.

25        I have heard or read from the U.S. Trustee that

Page 116

1    the debtors' view is not the last word and there are any

2    number of particular objections set forth in the U.S.

3    Trustee's papers.

4           When we get to phase 2, here's what I'm assuming

5    will take place.  If I rule that there is no entitlement to

6    compensation, phase 2 is a very brief period in which

7    nothing happens other than anguish on the part of the

8    applicants and perhaps an appeal.

9           If I find that there is a statutory basis for

10   these applications to be allowed, I am assuming that there

11   will be a dialogue that then takes place in which parties

12   will confirm the amounts that are deemed reasonable either

13   by virtue of an agreement of our one objector, the U.S.

14   Trustee as to reasonableness.  And absence such an

15   agreement, I assume that there will be an opportunity for a

16   hearing on proper notice.

17          Does what I have just said sound right to the

18   parties?

19          UNIDENTIFIED SPEAKER:  Yes, sir.

20          MS. GOLDEN:  Yes, Your Honor.

21          UNIDENTIFIED SPEAKER:  Fine.  Thank you, Your

22   Honor.

23          THE COURT:  Then that's how we're going to leave

24   it.  Have a good holiday everybody.

25          (Chorus of thank you)

Page 117

1          (Proceeding concluded at 4:02 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 118

```
 1                          I N D E X

 2

 3                          RULINGS

 4                                              Page        Line

 5   Debtors' Three Hundred Eighteenth           10            3

 6   Omnibus Objection to Claims

 7

 8   Debtors' Three Hundred Twenty-Six           10           13

 9   Omnibus Objection to Claims

10

11   Debtors' Three Hundred Twenty-Seven         10           20

12   Omnibus Objection to Claims

13

14   Debtors' Three Hundred Sixty-Six            11            7

15   Omnibus Objection to Claims

16

17   Debtors' Three Hundred Twenty-Three         19           24

18   Omnibus Objection to Claims

19

20   Debtors' Three Hundred Seventy-Second       46           14

21   Omnibus Objection to Claims

22

23

24

25
```

1                       C E R T I F I C A T I O N

2

3    I, Nicole Yawn and Melissa Looney certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8

9

10

11

12

13

14

     Veritext

     200 Old Country Road

15

     Suite 580

     Mineola, NY 11501

16

     Date:  December 21, 2012

17

18

19

20

21

22

23

24

25