ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
D. Ross Martin
Peter L. Welsh
Adam J. Goldstein
Aliza F. Goren

Hearing Date: April 17, 2013
Objection Deadline: TBD

*Attorneys for Massachusetts Housing Finance Agency*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.* | **Case No. 08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

**MOTION OF MASSACHUSETTS HOUSING FINANCE AGENCY
FOR A DETERMINATION THAT THE AUTOMATIC STAY DOES
NOT BAR COMMENCEMENT OF CERTAIN LITIGATION AGAINST THE
DEBTORS FOR POST-PETITION CONDUCT OR, IN THE ALTERNATIVE,
GRANTING RELIEF FROM THE AUTOMATIC STAY TO PERMIT
COMMENCEMENT OF SUCH LITIGATION**

Massachusetts Housing Finance Agency ("Mass Housing" or the "Agency") hereby files

this motion (the "Motion") for entry of an order clarifying that the automatic stay does not

preclude Mass Housing from filing a declaratory judgment action in Massachusetts state court

against Lehman Brothers Special Financing, Inc. ("LBSF") and Lehman Brothers Holdings, Inc.

("LBHI", and together with LBSF and their debtor and non-debtor affiliates, and the successors-

in-interest of each of the foregoing, "Lehman").  In the alternative, Mass Housing requests relief

from the automatic stay, pursuant to 11 U.S.C. § 362(d), so that it may commence such litigation. In support of the Motion, Mass Housing respectfully represents as follows:[1]

## PRELIMINARY STATEMENT

1.      Mass Housing seeks to file a complaint against LBSF and LBHI (the "Complaint"), substantially in the form attached hereto as **Exhibit A**, in the Business Litigation Session of the Superior Court of Massachusetts, seeking a declaration that Lehman's purported termination of certain interest rate swap transactions, between Mass Housing and LBSF, was not valid because Mass Housing had validly terminated the swap transactions at issue over two years earlier.[2]

2.      Mass Housing is an independent public agency that was created by an act of the Massachusetts Legislature in 1966 to increase the availability of affordable rental and for-sale housing in the Commonwealth of Massachusetts.   To fulfill its legislative directive, Mass Housing provides, *inter alia*, long-term fixed rate mortgage loans to low-income residents of the Commonwealth of Massachusetts ("Homeownership Program") and long-term fixed rate mortgage loans to developers of low-income multi-family housing in the Commonwealth ("Multi-Family Program").  Mass Housing finances loans to low-income residents and housing projects through the issuance of bonds, among other financing sources.

3.      Mass Housing has utilized interest rate swap transactions in connection with the issuance of variable rate debt to achieve synthetic fixed rate financing for low-income housing units for residents of the Commonwealth under its Multi-Family Program.   Prior to LBSF's

---

[1] The filing of this Motion and related papers and any other papers previously, contemporaneously or subsequently filed in the Cases shall not constitute a waiver of Mass Housing's rights: (1) to have final orders in non-core matters entered only after de novo review by a District Judge; (2) to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to these Cases; or (3) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal.

[2] Mass Housing brings this Motion while reserving all objections to the exercise by this Court of jurisdiction over any claims which the Debtors or any party may assert against it.

commencement of its chapter 11 case, Mass Housing entered into various long-term swaps with LBSF, not as a speculative bet on the likely future direction of market interest rates, but to finance housing projects with forty year fixed rate loans funded by variable rate bonds, and to hedge its real exposure to interest rate fluctuations that could impact its lending activities and ability to pay bond holders.  Accordingly, a majority of these swaps had terms of approximately forty years.  The swaps entered into with LBSF provided support for the long-term fixed rate financing of eight properties with an aggregate of 1,121 affordable housing units located in Massachusetts.

4.      Because Mass Housing was hedging substantial financial risk, it was particularly important to Mass Housing to have a financially stable counterparty for the life of its swaps. Mass Housing was deprived of an effective counterparty to its long-term swaps with LBSF once LBSF filed for chapter 11 with an eye towards an orderly liquidation and wind-down.

5.      Mass Housing properly terminated the interest rate swaps at issue in June of 2009 solely because of Lehman's commencement of these chapter 11 cases and immediately paid LBSF over $5.69 million as a termination payment, calculated pursuant to the Loss method[3] as provided in the relevant swap agreements.

6.      For over a year following Mass Housing's termination, LBSF consistently demanded an additional termination payment from Mass Housing—demands implicitly premised upon the validity of such termination.  The parties engaged in negotiations over the amount of the termination payment until July of 2010 (nearly two years post-petition) when LBSF changed course from its then-current position and demanded a substantially higher termination payment, undermining months of the parties' negotiations.

_____
[3] Capitalized terms not defined herein have the meaning given to such terms in the Master Agreement (as defined herein).

3

7.      Following Mass Housing's refusal to accede to LBSF's unreasonable demands, Lehman purported to: (a) "void" Mass Housing's termination in October 2010, (b) declare an Event of Default in January of 2012 for Mass Housing's refusal to pay amounts allegedly due on the swaps since Mass Housing's termination, and (c) terminate the swaps as of February 8, 2012, over two years after Mass Housing's termination—which conveniently had the effect of almost doubling the purported "net present value" of the swaps that Mass Housing would be required to pay Lehman under the relevant agreement.

8.      Mass Housing specifically negotiated with LBSF for the right to litigate disputes arising out of the interest rate swap transactions in the Commonwealth of Massachusetts.  Mass Housing has filed this Motion out of an abundance of caution to confirm that 11 U.S.C. § 362(a), the automatic stay, does not prohibit Mass Housing from filing the Complaint against LBSF in the Commonwealth.  The Complaint seeks declaratory judgment on a single question:  Did Mass Housing validly terminate the swaps at issue on June 25, 2009?  All of the events relevant to this action occurred post-petition, and the law is clear that the automatic stay does not shield a debtor from lawsuits arising from events and conduct that occur after the commencement of a chapter 11 case.  However, if this Court determines that the automatic stay applies here, the *Sonnax* factors clearly favor Mass Housing's alternative request for relief from the automatic stay for cause pursuant to 11 U.S.C. § 362(d).

## JURISDICTION AND VENUE

9.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).

10.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.    The statutory predicates for the relief sought herein are sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### The Swaps

12.    To hedge against the risk of fluctuating interest rates and to provide bond holders with variable rate debt, Mass Housing entered into a ISDA Master Agreement with LBSF, dated as of June 14, 2002 (the "Master Agreement"), and thereafter executed two transaction confirmations governed by the Master Agreement (the "Swaps"), attached hereto as **Exhibit B**. Pursuant to the Master Agreement, LBHI is a Credit Support Provider of LBSF under the Master Agreement and all transactions thereunder.   Absent Events of Default or other Termination Events, the Swaps terminate on their own terms on January 1, 2046 and January 1, 2045, respectively.

13.    At the time that Mass Housing entered into the Swaps with LBSF, LBSF and other market participants were offering one-way collateral swaps to state agencies, to assist those state agencies who were not in a position to post collateral.   Accordingly, the Swaps Mass Housing entered into with LBSF did not require Mass Housing to post collateral.

14.    The Master Agreement provides, and Mass Housing specifically negotiated for, a modified forum selection clause, which allows Mass Housing to litigate any suit, action or proceedings relating to the Master Agreement in Massachusetts.   LBSF's standard Master Agreement provided for the non-exclusive jurisdiction of the courts of the State of New York. Mass Housing negotiated for a modified forum selection clause in order to litigate any dispute arising out of the Master Agreement in Massachusetts.   Indeed, the parties agreed to waive any

5

right which they might have to object to the bringing of such proceedings in Massachusetts based on venue, personal jurisdiction or inconvenient forum.

15.    The Swaps obligate LBSF to pay a floating interest rate on a notional amount, which declines over time, and conversely obligate Mass Housing to pay a fixed interest rate on the notional amount.  When prevailing market interest rates rise above the fixed rate, LBSF's position decreases in value.  When prevailing market interest rates fall below the fixed rate, LBSF's position increases in value.

***The Events of Default***

16.    On September 15, 2008 (the "LBHI Petition Date"), LBHI filed a petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court" or this "Court").  On October 3, 2008 (together with the LBHI Petition Date, the "Petition Dates"), LBSF filed a petition for relief under the Bankruptcy Code with the Bankruptcy Court.  Each filing constituted an Event of Default under the Master Agreement.

17.    Because Mass Housing utilized the Swaps as insurance against real long-term risk in providing bond holders with long-term variable rate debt and borrowers with long-term fixed rate mortgage loans, it was particularly important to Mass Housing to have a financially stable counterparty and credit support provider for the life of the Swaps.  Accordingly, on October 1, 2008, Mass Housing sent a Notice of Default to LBSF indicating that LBHI's filing for bankruptcy constituted an Event of Default under the Master Agreement.  Two days later, LBSF filed for chapter 11, making clear that the Lehman bankruptcy would deprive Mass Housing of an effective counterparty for the long-term Swaps, which were set to continue for another thirty-five to forty years.  Because of Lehman's default, Mass Housing immediately began

consideration of ways to find a replacement counterparty to hedge its now naked exposure to interest rate fluctuations so that it could proceed to terminate the Swaps.

18.      As a public agency with limited experience in the swap market and no experience with bankrupt hedging counterparties, Mass Housing was uncertain as to how to effectively terminate the Swaps in a manner that would provide it with the equivalent level of financial support for its long-term financings.  Mass Housing engaged its swap consultant and began interviewing experienced bankruptcy legal counsel to assist Mass Housing with its termination. Mass Housing interviewed various attorneys and settled on bankruptcy counsel by December 12, 2008.

19.      Between December 12, 2008 and March of 2009, Mass Housing actively worked with its advisors to prepare a bid process to obtain a Market Quotation, to find replacement swaps with another counterparty equivalent to the original terms of the Swaps, and to terminate the Swaps.  Concerned with the market displacement that Lehman's bankruptcy precipitated and with rumors that other state entity swap counterparties had been unable to obtain actionable market quotations for one-way collateral swaps, Mass Housing sought simultaneously to terminate the Swaps and enter into replacement transactions on the same terms as the Swaps to ensure continuous coverage to its interest rate exposure.

20.      However, in early March 2009, Mass Housing became aware of pending Massachusetts legislation that would have potentially significant implications on Mass Housing's ability to execute derivative transactions.  Concerned about potentially putting the Agency between a rock and a hard place by initiating a bid process for the Swaps and accepting an actionable market quotation which the Agency might thereafter be prohibited from executing,

depending on the outcome of the legislative process, Mass Housing temporarily suspended the bid process and the termination of the Swaps pending finalization of the legislation.

21.    On April 24, 2009, the Massachusetts legislature enacted certain amendments to G.L. Ch. 6, Section 98 regarding the Finance Advisory Board's (the "Board") oversight with respect to the use of derivative financial products by certain state entities, including Mass Housing.  The legislation required Mass Housing to present a proposed derivative transaction to the Board before executing the transaction.  Accordingly, before Mass Housing could replace and terminate the Swaps, it was required to present the terms of the proposed transactions to the Board for its review and recommendation, if any.  Mass Housing presented to the Board on May 20, 2009, at the first available opportunity to do so, and upon completion of the Board's review on June 19, 2009, proceeded to terminate the Swaps and enter into replacement swaps.

22.    On June 22, 2009, immediately after receiving regulatory approval, Mass Housing sought both actionable and indicative bids from eleven Reference Market-makers in an attempt to determine Market Quotations for the Swaps and to secure a replacement counterparty for the Swaps under their original terms.  Only two Reference Market-makers submitted bids, and both were non-actionable.  Because Mass Housing only received two bids, Mass Housing was unable to determine a Market Quotation for the Swaps.  Mass Housing, in accordance with the Master Agreement, proceeded to calculate a termination payment pursuant to the Loss method for each of the Swaps.

23.    Because Mass Housing did not receive any actionable bids for the Swaps, it was forced to execute replacement swaps with a third-party on less favorable terms.  Under the original Swaps with LBSF, Mass Housing was not required to post collateral and was not subject to financial covenants.  However, following the Petition Dates, most, if not all, financial

8

institutions were no longer willing to enter into one-way collateral swaps. Prevailing market conditions in June 2009 required Mass Housing to both post collateral in certain circumstances and agree to financial covenants to obtain a reasonably priced interest rate swap. Once Mass Housing negotiated and finalized the terms for the new swap transactions, it terminated the Swaps. Lehman's commencement of these chapter 11 cases, which deprived Mass Housing of an effective counterparty, was the sole catalyst for Mass Housing's termination of the Swaps.

***Termination***

24.     On June 25, 2009, Mass Housing delivered a letter to LBSF terminating the Swaps on account of LBSF's Event of Default under the Master Agreement. Mass Housing designated June 25, 2009 as the Early Termination Date for the Swaps.

25.     On July 1, 2009, Mass Housing sent a letter to LBSF outlining in detail its calculations of the amount due to LBSF on account of its termination of the Swaps (the "Termination Payment") in accordance with the Master Agreement. On July 1, 2009, Mass Housing submitted to LBSF $5,694,240 as a Termination Payment plus $2,299,500 in unpaid swap payments, plus interest (the "Unpaid Amount"), for a total payment of $8,051,093, pursuant to the Master Agreement and Lehman's termination instructions.

***Post-Termination***

26.     Notwithstanding Mass Housing's payment to LBSF of over $8 million, LBSF demanded an additional $1.6 million from Mass Housing. For approximately one year, from July 2009 through July 2010, Mass Housing and Courtney Jenkins, Mass Housing's primary contact at Lehman, continued to discuss Mass Housing's calculation of the Termination Payment, discussions implicitly premised on the validity of Mass Housing's termination. However, in June of 2010, when LBSF demanded even more money from Mass Housing, a

resolution of the final amount of the Termination Payment was not reached, and Mass Housing

did not hear from Lehman again until October of 2010.

27.    On October 20, 2010, over a year and a half after Mass Housing's termination,

Mass Housing received an unexpected letter from a Mr. Jonathon Fox at LBHI.   Mr. Fox

indicated that he was taking Mr. Jenkins' place as Mass Housing's contact at Lehman.   In that

letter, Mr. Fox also informed Mass Housing for the first time that Lehman was unilaterally

voiding Mass Housing's termination.    Mr. Fox further informed Mass Housing that,

unbeknownst to Mass Housing, LBSF had unilaterally applied the $5.69 million Termination

Payment to Mass Housing's purportedly ongoing swap obligations since its supposedly

"voidable" termination over sixteen months earlier.

28.    However, Mass Housing had never received any invoices from LBSF for the

purportedly ongoing Swaps since Mass Housing's termination in June of 2009.  It was not until

late December of 2010, almost a year and a half after Mass Housing's termination, that LBSF

began sending Mass Housing invoices for the payments allegedly due on the Swaps.

29.    On January 31, 2012, Lehman informed Mass Housing that it was in default for

nonpayment under the purportedly ongoing Swaps, and that Mass Housing was accruing interest

on its unpaid swap "obligation" at the default rate.   On February 7, 2012 Lehman sent Mass

Housing a Termination Notice purporting to terminate the Swaps as of February 8, 2012 for

Mass Housing's alleged default.    On February 13, 2012, Lehman sent Mass Housing a

"Valuation Statement" notifying Mass Housing of its position that Mass Housing owed LBSF a

termination payment of $17,822,138.49, calculated under the Loss method.

30.    What LBSF claimed in June 2010 was just over a $1 million obligation to resolve

Mass Housing's termination of the Swaps, LBSF now claimed was an obligation in excess of

$18 million, representing LBSF's calculation of the present value of the Swaps as of February 2012 and continued swap payments purportedly coming due after Mass Housing terminated the Swaps, plus default interest.

31.    Following receipt of Mr. Fox's October, 2010 letter, Mass Housing repeatedly asked LBSF to include Mass Housing in its Alternative Dispute Resolution ("ADR") program to attempt to efficiently resolve this dispute and end the purported ongoing accrual of default interest.  However, LBSF inexplicably refused to engage Mass Housing in ADR for over two years and Mass Housing ultimately determined to seek remedies.

32.    On December 5, 2012, Lehman served Mass Housing with a Derivatives ADR Notice (the "ADR Notice").[4]  The parties agree that the Swaps have been validly terminated, leaving unresolved the central dispute between the parties:  When were the Swaps terminated?  This question turns on whether Mass Housing validly terminated the Swaps in June of 2009.

33.    As made clear by Mass Housing's repeated requests to engage in ADR with Lehman, Mass Housing looks forward to participating in mediation with Lehman at this time.  However, in the event that mediation is unsuccessful, Mass Housing seeks an order from this Court, clarifying that Mass Housing may immediately file the Complaint in the Business Litigation Session of the Superior Court of Massachusetts seeking a declaration that LBSF's post-petition attempt to terminate the Swaps as of February 8, 2012 was invalid because Mass Housing had already terminated the Swaps over two and one-half years earlier as a direct result of Lehman's commencement of these chapter 11 cases.

---

[4] Mass Housing represents that the filing of these papers was contemplated prior to Mass Housing's receipt of Lehman's ADR Notice.  Mass Housing is prepared and looks forward to engaging in mediation with Lehman.  However, in the event that mediation is unsuccessful, Mass Housing seeks to preserve its right to litigate this dispute in Massachusetts.

34.     Normally, the automatic stay no longer applies once a debtor confirms a chapter 11 plan (*see* 11 U.S.C. § 362(c)(2)(C)), which, in Lehman's case would have been on December 6, 2011 when this Court entered the *Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* [Docket No. 23023] (the "Confirmation Order").    However, pursuant to a provision in the Confirmation Order, the automatic stay in these chapter 11 cases will remain in effect until the closing of Lehman's chapter 11 cases.    *See* Confirmation Order, ¶ 54 ("[A]ll injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Closing Date.").    Assuming *arguendo* that Lehman may still avail itself of the automatic stay's protections at this point in time, Mass Housing respectfully submits that the automatic stay does not prohibit Mass Housing from filing the Complaint against LBSF and LBHI in the Commonwealth of Massachusetts because the controversy giving rise to the request for declaratory relief arose after LBSF filed for bankruptcy protection.

35.     Indeed, the very *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts* [Docket No. 5207] ( the "ADR Order"), drafted by Lehman, and adopted by the Court, explicitly recognizes that there is a universe of disputes with non-creditor derivative counterparties, just like Mass Housing, that can be litigated outside of the Bankruptcy Court.  The ADR Order provides in Paragraph 7:

> *Debtor's Rights As to Proceedings Previously or Hereafter Commenced by Derivative Counterparties.    If a Derivatives Counterparty previously has commenced, any action or proceeding in any other court or forum, or any action or proceeding in any other court or forum **following service** upon it of a Derivatives ADR Package, the Debtors reserve their right, pursuant to the order dated December 18, 2008 [Docket No. 2306], to remove to this Court any such lawsuit, proceeding, or claim and to defend or take action in any such other court or proceeding to protect the estate of the Debtors, despite the incomplete status of*

*the steps prescribed under the Derivative ADR Procedures.* (emphasis added).

The ADR Order recognizes that certain ordinary, Article III, non-bankruptcy, contractual disputes would be heard outside of the Bankruptcy Court. Mass Housing's dispute with Lehman is precisely the cause of the action that should, and arguably must, be litigated in another forum.

36.    Nevertheless, out of an abundance of caution and with deference to the Bankruptcy Court's authority to determine the scope of the automatic stay, Mass Housing seeks an order of this Court clarifying that Mass Housing is permitted to file the Complaint, or in the alternative, granting Mass Housing permission to do so.

## RELIEF REQUESTED

37.    By the Motion, Mass Housing seeks a determination by this Court that the automatic stay does not preclude Mass Housing from filing the Complaint. In the alternative, Mass Housing requests that this Court grant relief from the automatic stay for "cause" so that it may immediately file the Complaint.

## ARGUMENT

### A.    The Automatic Stay Does Not Prohibit Mass Housing from Commencing An Action for Declaratory Relief Against LBSF and LBHI in Massachusetts

38.    It is settled law that the automatic stay does not shield a chapter 11 debtor from lawsuits arising from the debtor's post-petition conduct. *See Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.),* 744 F.2d 332 (3d Cir. 1984), *overruled on other grounds by Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.),* 607 F.3d 114, 121 (3d Cir. 2010). ("Proceedings or claims arising post-petition are not subject to the automatic stay."); *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 996 (5th Cir. 1985) ("The stay simply does not apply to post-bankruptcy events."); *Bellini Imports, Ltd. v. Mason & Dixon Lines, Inc.,* 944 F.2d 199, 201 (4th Cir. 1990) ("The [automatic] stay is limited to actions that could have been instituted before the

petition was filed or that are based on claims that arose before the petition was filed . . . [and] does not include actions arising post-petition.").

39.     Specifically, section 362(a)(1) of the Bankruptcy Code only prohibits "the commencement . . . of a judicial . . . proceeding against the debtor . . . that could have been commenced *before* the [bankruptcy filing]."   11 U.S.C. § 362(a)(1) (emphasis added).   By definition, Mass Housing could not have filed the Complaint prior to LBSF's bankruptcy filing. Mass Housing is seeking a declaration that its termination of the Swaps *after* the Petition Dates was a valid termination consistent with: (a) Mass Housing's rights under section 560 of the Bankruptcy Code to terminate based on Lehman's chapter 11 filing and (b) the contractual terms of the Swaps themselves.   Further, all of the facts giving rise to the actual "case or controversy" occurred post-petition, including Mass Housing's termination of the Swaps in June of 2009, and LBSF's improper attempt to terminate the Swaps in February of 2012.

40.     Further, filing the Complaint would not violate section 362(a)(3) of the Bankruptcy Code, which prohibits any "act to obtain possession of property of the estate . . . or to exercise control over property of the estate."   Section 362(a)(3) was never meant to prohibit every proceeding hostile to a debtor's claimed interest in property.   *Cont'l Air Lines, Inc. v. Hillblom (In re Cont'l Air Lines, Inc.)*, 61 B.R. 758, 778 (S.D. Tex. 1986).   Applying the automatic stay in this fashion would render the express distinction between proceedings arising pre- and post-petition contained in subsection 362(a)(1) (which only prohibits lawsuits against the debtor arising prepetition) superfluous.   *Id.*   Because the automatic stay specifically permits third parties to bring claims against a debtor which arise out of the debtor's post-petition conduct, other limitations imposed by automatic stay do not inhibit this right.   *Id.*   Accordingly,

Mass Housing is not prohibited by the automatic stay from filing the Complaint in Massachusetts, as section 362(a)(1) specifically permits Mass Housing to do so.

41.    In any event, section 362(a)(3) of the Bankruptcy Code does not prohibit Mass Housing from filing the Complaint because such action does not seek to exercise control over property of the estate.  Mass Housing recognizes this Court's decision in *Metavante* in which the Court found that conduct by a swap counterparty to interfere with Lehman's rights under an executory contract violated section 362(a)(3) of the Bankruptcy Code because those contract rights were estate property.  *See In re Lehman Bros. Holdings Inc.*, Hr'g Tr. 109:19-110:2, Sept. 15, 2009.  However, the facts here are distinguishable from those before this Court in *Metavante* in three important respects.

42.    **First**, Metavante refused to perform its obligations under the swap agreement as of LBSF's bankruptcy petition and further refused to make any swap payments to LBSF during the pendency of its chapter 11 case.[5]  Mass Housing, on the other hand, was willing to perform under the Swaps, escrowed monthly payments due to LBSF and at no time endeavored to deprive LBSF of payments owed under the Swaps.  Mass Housing promptly paid LBSF a Termination Payment of over $5.69 million plus the Unpaid Amount of $2.29 million shortly after terminating the Swaps.

43.    **Second**, at the time of the litigation between Metavante and Lehman, the swap at issue was still an executory contract that was subject to the Debtor's decision to assume or reject. Here, both Lehman and Mass Housing agree that the Swaps have been validly terminated (and, therefore, no longer executory or capable of being assumed) at some point—the question is

---

[5] This Court criticized Metavante's refusal to perform as an attempt to ride the market with no risk at the Debtor's expense.  At no time, before or after Mass Housing terminated the Swaps, would termination have been profitable for Mass Housing.  Ironically, LBSF is the only party in this case that tried to ride the market by allegedly creating a "voidable" option which it could purportedly exercise when most profitable for LBSF.

which party's post-petition action was valid—a simple contractual dispute for a non-bankruptcy court to decide under a contract that specifically contemplates Massachusetts venue.

44.    **Third**, and most importantly, *Metavante* was decided during the early stages of these chapter 11 cases when LBSF still had a bankruptcy estate.  Now that Lehman's chapter 11 plan has been confirmed and has gone effective, there is no longer any LBSF "estate" that contains any property over which Mass Housing could conceivably exercise control.  *See* Confirmation Order, ¶ 39 ("[A]ll property of each of the Debtor's estates shall vest in that Debtor free and clear of all Claims [and] free of any restrictions of the Bankruptcy Code and Bankruptcy Rules . . . .").

45.    This Court should not expand the automatic stay to protect Lehman's conduct here.  The automatic stay was not designed to be an offensive weapon.  *In re Cont'l Air Lines*, 61 B.R. at 776.  Rather, its purposes are to: (i) give debtors a breathing spell from creditors so that they may reorganize; and (ii) ensure that estate property is protected so that it may be properly apportioned among creditors.  To allow Lehman to use the automatic stay as a license to toy around with Mass Housing for months in a "sham" negotiation and then attempt to shakedown a not-for-profit state affordable housing agency for $18 million (after happily and quietly accepting an $5.69 million wire transfer clearly designated as a Termination Payment) would be perverse.  It would not advance either of the policy objectives underlying the automatic stay, particularly at this late stage in these chapter 11 cases now that Lehman has confirmed and substantially consummated its chapter 11 plan.  Accordingly, because the Complaint stems exclusively from Lehman's post-petition conduct and other post-petition events, Lehman can be required to litigate this dispute in Massachusetts, as previously agreed upon by all parties involved.

16

**B.      In the Alternative, Cause Exists to Grant Mass Housing Relief From the Automatic Stay**

46.      If the Court determines that the automatic stay applies, Mass Housing seeks relief

from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code "for cause."   In

determining whether "cause" exists to justify relief from the automatic stay, courts in this Circuit

analyze such requests in light of the twelve factors listed in *Sonnax Indus., Inc. v. Tri Component*

*Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2nd Cir. 1990) (collectively, the

"*Sonnax* Factors"), which are:

> (1)  whether relief would result in a partial or complete resolution of the issues;
> (2)  lack of any connection with or interference with the bankruptcy case;
> (3)  whether the other proceeding involves the debtor as a fiduciary;
> (4)  whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
> (5)  whether the debtor's insurer has assumed full responsibility for defending it;
> (6)  whether the action primarily involves third parties
> (7)  whether litigation in another forum would prejudice the interests of other creditors;
> (8)  whether the judgment claim arising from the other action is subject to equitable subordination;
> (9)  whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
> (10)  the interests of judicial economy and the expeditious and economical resolution of litigation;
> (11)  whether the parties are ready for trial in the other proceeding; and
> (12)  the impact of the stay on the parties and the balance of harms.

47.      Bankruptcy courts weigh the *Sonnax* Factors when deciding whether to permit

litigation to go forward in another forum.   *In re Enron Corp.*, 306 B.R. 465, 476 (Bankr.

S.D.N.Y. 2004).   As "cause" is a flexible concept that must generally be determined on a case-

by-case basis, not all of the *Sonnax* Factors are relevant in every case, and those that are relevant

need not be afforded equal weight.   *See Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d

104, 110 (2d Cir. 2002).   As described herein, each of the *Sonnax* Factors either do not apply or

favor granting Mass Housing the requested relief.

17

48.    _Sonnax Factor #1_:  *Whether the Relief Would Result in Full or Partial Resolution of the Issues*.  The first *Sonnax* Factor strongly favors Mass Housing.  The crucial issue of whether Mass Housing validly terminated the Swaps in June 2009 "because of" LBSF's bankruptcy filing (*i.e.*, in compliance with section 560 of the Bankruptcy Code)  requires litigation over the state of mind of Massachusetts state agency executives while potential Massachusetts legislation was pending.   This issue can be resolved by any court in the Commonwealth and this Court.  However, as Lehman's own ADR Order recognizes, only a non-bankruptcy court likely has the jurisdiction and statutory ability to decide whether Mass Housing and/or LBSF properly terminated the Swaps in accordance with the underlying contractual terms.  In this District, bankruptcy courts may only exercise post-confirmation jurisdiction when: (i) the matter has a "close nexus" to the confirmed plan (*i.e.*, "the matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan") and (ii) the plan provides for retention of jurisdiction over the dispute.  *Penthouse Media Grp. V. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 73-74 (Bankr. S.D.N.Y. 2005).  The issue of whether LBSF or Mass Housing sufficiently complied with the terms of the underlying contract when terminating the Swaps has almost ***no*** nexus to Lehman's confirmed plan, much less the required close nexus.  Nor can Lehman manufacture a close nexus simply by positing that a recovery against Mass Housing would increase the amount of property available for distribution pursuant to Lehman's confirmed plan.  After all:

> ***"[a] bankruptcy court cannot hear a post-confirmation dispute simply because it might conceivably increase the recovery to creditors, because the rationale could endlessly stretch a bankruptcy court's jurisdiction."***

*Id*. at 75 (emphasis added).  Even if this Court could exercise post-confirmation jurisdiction over this contractual interpretation issue governed by state law, such a matter would certainly be

"non-core," and this Court would be limited to issuing proposed findings of fact and conclusions of law for a district court to review *de novo*.  *See* 28 U.S.C. § 157(c)(1).  In contrast, either a state or federal district court in the Commonwealth would be able to resolve all legal issues relevant to Mass Housing's request for declaratory relief.

49.    *Sonnax Factor #2*:  *Whether the Requested Relief Would Interfere with the Bankruptcy Case*.  This factor also favors Mass Housing.  Lehman's plan has been confirmed, and a substantial portion of the property to be distributed under the plan has been distributed. Most, if not all, of the mission-critical objectives of Lehman's chapter 11 cases have been accomplished.  Lehman's chapter 11 cases now primarily involve pursuing causes of action against third parties to increase the amount of property to distribute to creditors and resolving claims against Lehman to minimize the pool of allowed claims entitled to receive distributions under Lehman's plan.  Even during the most active phases of Lehman's chapter 11 cases, Lehman voluntarily pursued litigation against third parties in other courts without risking interference with these chapter 11 cases.  *See, e.g.,* Petitioner's Complaint for Breach of Contract, *Lehman Bros. Holdings Inc. v. Bayporte Enters., Inc.*, CV11-0961 (N.D. Cal. March 1, 2011); Complaint, *Lehman Bros. Holdings, Inc. v. Primelending, A PlainsCapital Co.*, Case 1:09-cv-00212-PAB-KLM (D. Co. Feb. 3, 2009).  Having to litigate this dispute in the Commonwealth poses even less risk of interference.

50.    *Sonnax Factor #3*:  *Whether the Other Proceeding Involves LBSF and LBHI as Fiduciaries*.  This factor does not apply and is, therefore, neutral.

51.    *Sonnax Factor #4*:  *Whether a Specialized Tribunal with the Necessary Expertise Has Been Established to Hear the Cause of Action*.  This factor does not apply and is, therefore, neutral.

52.    *Sonnax Factor #5*:  *Whether LBSF's and/or LBHI's Insurer Has Assumed Full Responsibility for Defending the Action*.  Mass Housing is not seeking damages against Lehman, but instead is seeking a declaration that it does not owe Lehman additional amounts on account of the Swaps.  Therefore, this factor does not apply.

53.    *Sonnax Factor #6*:  *Whether the Action Primarily Involves Third Parties.*  The contemplated litigation does not primarily involve third parties.  Although this factor might normally disfavor Mass Housing, the fact that the litigation would only involve Lehman and Mass Housing would not harm Lehman nor disrupt these chapter 11 cases.

54.    *Sonnax Factor #7*: *Whether the Litigation in Massachusetts Would Prejudice the Interests of Other Creditors*.   This factor favors granting relief from the automatic stay because no other creditors will be prejudiced if Lehman has to defend the litigation in the Commonwealth, particularly because the Complaint does not seek to recover damages or otherwise collect any money from Lehman.

55.    *Sonnax Factor #8*:    *Whether the Judgment Arising from the Other Action is Subject to Equitable Subordination*.  This factor does not apply and is, therefore, neutral.

56.    *Sonnax Factor #9*:  *Whether Mass Housing's Success in the Litigation Would Result in a Judicial Lien*.   This factor favors Mass Housing.  Mass Housing is seeking declaratory relief only, not a monetary award.  Therefore, a complete victory by Mass Housing could not conceivably give rise to a judicial lien.

57.    *Sonnax Factor #10*:   *The Interests of Judicial Economy*.   For the reasons explained above with respect to the first *Sonnax* Factor, this factor strongly favors granting Mass Housing relief from the automatic stay.  ***Moreover***, if Lehman is successful in the contemplated litigation such that the court determines that the Swaps were not terminated until February 2012

by LBSF, LBSF will likely desire to seek a monetary award from Mass Housing in a contract action.  However, because Mass Housing is not a creditor of Lehman in these chapter 11 cases, this Court cannot constitutionally adjudicate that dispute in light of *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

58.    <u>*Sonnax Factor #11*</u>:    *Whether the Parties Are Ready for Trial in the Other Proceeding*.  No litigation has progressed in either jurisdiction, so this factor does not apply, and is, therefore neutral.

59.    <u>*Sonnax Factor #12*</u>:    *The Impact of the Automatic Stay on the Parties and the Balance of Harms*.  The final *Sonnax* Factor strongly favors Mass Housing.  Lehman does not really need the protection afforded by the automatic stay; Lehman has long since confirmed its chapter 11 plan and has distributed the majority of property to creditors that it expects to distribute.  The impact of the automatic stay at this point in Lehman's chapter 11 cases accomplishes very little, except to give Lehman an unwarranted advantage against potential adversaries in litigation.

60.    Moreover, in balancing the ultimate harms, the Court should consider Lehman's bad faith post-petition dealings with respect to Mass Housing.  Simply because Mass Housing refused to accede to Lehman's calculated termination payment, Lehman, after a year of negotiations premised on Mass Housing's valid termination, purported to void the termination.  Lehman seeks to use the protection of the automatic stay to coerce Mass Housing into paying Lehman an additional $18 million while shielding itself from any attempt by Mass Housing to expose Lehman's conduct to light.  Mass Housing repeatedly sought to resolve this matter amicably both before and after Lehman changed its position with respect to the validity of Mass Housing's termination.  Lehman, for whatever reason, refused to engage Mass Housing in the

21

Court-approved ADR procedures for the last two years (until earlier this month).  Lehman left Mass Housing no choice but to seek relief from the automatic stay to allow Mass Housing to litigate its claims in the forum of its choice and on its own timetable.

61.    Further, Lehman would not be harmed by having to litigate this dispute in Massachusetts.    LBSF and Mass Housing specifically contracted for the nonexclusive jurisdiction of the courts of the Commonwealth of Massachusetts under the terms of the Swaps. Given Lehman's conduct in dealing with Mass Housing throughout the chapter 11 cases and the lack of harm to Lehman or its creditors from having to litigate a run-of-the-mill contract dispute in Massachusetts, the balance of harms clearly weigh in favor granting Mass Housing relief from the automatic stay.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Mass Housing respectfully requests that the Court enter an order clarifying that the automatic stay does not preclude Mass Housing from filing the Complaint in Massachusetts state court, or in the alternative, granting Mass Housing relief from the automatic stay "for cause" so that it may do so, and granting such other and further relief as may be just and proper.

Dated:  December 27, 2012          Respectfully submitted,
          Boston, Massachusetts

                                        /s/  D. Ross Martin_____
                                        D. Ross Martin (DM-2497)
                                        Peter L. Welsh (*pro hac vice* pending)
                                        Adam J. Goldstein (*pro hac vice* pending)
                                        Aliza F. Goren (*pro hac vice* pending)
                                        ROPES & GRAY LLP
                                        Prudential Tower
                                        800 Boylston Street
                                        Boston, MA 02199-3600
                                        Telephone:  (617) 951-7000
                                        Facsimile:  (617) 951-7050

22