# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                                      SUPERIOR COURT
                                                                                  BUSINESS LITIGATION
                                                                                  SESSIONS
                                                                                  CIVIL ACTION NO:

|  |  |
|---|---|
| MASSACHUSETTS HOUSING FINANCE AGENCY, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| LEHMAN BROTHERS HOLDING INC., and LEHMAN BROTHERS SPECIAL FINANCING INC., | ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

1.  Plaintiff Massachusetts Housing Finance Agency ("Mass Housing" or the "Agency"), through its undersigned counsel and pursuant to M.G.L. c. 231A, brings this action for declaratory judgment against Defendants Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI," and together with LBSF and their debtor and non-debtor affiliates, and the successors-in-interest of each of the foregoing, "Lehman"), and alleges as follows:

### Introduction

2.  This lawsuit arises out of Lehman's improper attempt to void Mass Housing's termination of certain interest rate swap transactions between Mass Housing and LBSF. Mass Housing validly terminated the interest rate swap transactions at issue in June of 2009 solely

1

because of Lehman's Event of Default—its ongoing bankruptcy proceedings—and paid LBSF a termination payment (the "Termination Payment") in excess of $5.69 million.  For over a year following Mass Housing's termination, Mass Housing and Lehman engaged in discussions over the proper amount owed to LBSF upon Mass Housing's termination.  When Mass Housing refused to concede to Lehman's unreasonable termination payment demands, Lehman purported to void Mass Housing's termination, purported to declare Mass Housing in default for non-payment of swap obligations allegedly due on the ongoing swap transactions, and purported to terminate for Mass Housing's alleged default.  Lehman now claims that Mass Housing owes an obligation in excess of $18 million, representing the present value of the swaps as of LBSF's "termination" and swap payments purportedly coming due after Mass Housing terminated the transactions, plus default interest.  Mass Housing seeks an order from this Court declaring its termination of the interest rate swap transactions valid and enforceable on the grounds that Mass Housing terminated "because of" Lehman's chapter 11 proceedings and that Mass Housing's termination was otherwise in accordance with the terms of relevant swap agreement.

**Parties**

3.      Mass Housing is an independent, not-for-profit, public agency organized under the laws of the Commonwealth of Massachusetts with its principal place of business at One Beacon Street, Boston, MA 02108.  Mass Housing was created by an act of the Massachusetts Legislature to provide financing for the construction and preservation of affordable rental housing and to make affordable mortgage loans to low-income residents of the Commonwealth.

4.      LBHI is a Delaware corporation with its principal place of business in New York, New York.  LBHI has commenced a voluntary case under chapter 11, title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and is authorized to operate its

2

business and manage its property as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5. LBSF is a Delaware corporation with its principal place of business in New York, New York that has reorganized pursuant to chapter 11 of the Bankruptcy Code. Prior to, and following the commencement of Lehman's chapter 11 proceedings, LBSF was Lehman's fixed income derivatives trading business. LBSF creates, trades and manages fixed income derivative contracts to maximize returns, including the liquidation of swap positions at opportune times. During Lehman's chapter 11 proceedings, LBSF continued to operate its business and manage its fixed income derivative assets as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction over this action pursuant to M.G.L. c. 231A, § 2.

7. This Court has jurisdiction over LBSF and LBHI pursuant to M.G.L. c. 223A because this action for declaratory relief arises out of the business which LBSF and LBHI transacted in the Commonwealth and because LBSF irrevocably consented to the non-exclusive jurisdiction of the courts of the Commonwealth of Massachusetts, in any suit, action or proceedings relating to the swap agreement. (Master Agreement (as defined herein) § 11(b); Schedule (as defined herein), Part 4(d)). Further, pursuant to Part 4(d) of the Schedule to the Master Agreement, each party "waives any objection which it may have at any time to the laying of venue of any Proceeding in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party."

8.  Venue is proper in this District pursuant to M.G.L. c. 223 § 8 and Section 11(b) of the Master Agreement.

## Facts

*The Agreement*

9.  To fulfill its legislative directive, Mass Housing provides, *inter alia*, long-term fixed rate mortgage loans to low-income residents of the Commonwealth of Massachusetts ("Homeownership Program") and long-term fixed rate mortgage loans to developers of low-income multi-family rental housing in the Commonwealth ("Multi-Family Program"). Mass Housing finances loans to low-income residents and housing projects through the issuance of bonds, among other financing sources. Mass Housing has utilized interest rate swap transactions in connection with the issuance of variable rate debt to achieve synthetic fixed rate financing for housing projects for low-income residents of the Commonwealth under its Multi-Family Program.

10.  To hedge against the risk of fluctuating interest rates and to provide bond holders with variable rate debt, Mass Housing entered into a series of interest rate swap transactions with LBSF governed by a common contract between Mass Housing and LBSF dated as of June 10, 2002 (the "Agreement"). These swap transactions provided support for the long-term fixed rate financing of eight properties with an aggregate of 1,121 affordable housing units located in the Commonwealth.

11.  The Agreement consists of two interrelated documents – an ISDA Master Agreement (the "Master Agreement"), and a Schedule to the Master Agreement (the "Schedule"), which amends and supplements the terms of the Master Agreement. The

Agreement contemplated that the parties would enter into Transactions[1] governed by the Agreement, each evidenced by a confirmation. Pursuant to the Agreement, LBHI is a Credit Support Provider of LBSF under the Agreement and all Transactions thereunder.

12. LBSF and Mass Housing executed two transaction confirmations governed by the Agreement (the "Swaps"). Absent Events of Default or other Termination Events, the Swaps each terminate on their own terms on January 1, 2046 and January 1, 2045, respectively.

13. The Swaps obligate LBSF to pay a floating interest rate on a notional amount, which declines over time, and Mass Housing in turn, is obligated to pay a fixed interest rate on the notional amount. The interest payments are settled in net each month such that only one counterparty is obligated to make a swap payment per month, depending on which rate, the floating rate or the fixed rate, is higher over the course of the relevant time period. When prevailing market interest rates rise above the fixed interest rate, LBSF's position decreases in value. When prevailing market interest rates fall below the fixed interest rate, LBSF's position increases in value.

14. At the time that Mass Housing entered into the Swaps with LBSF, LBSF and other market participants were offering one-way collateral swaps to state agencies, as some state agencies were not in a position to post collateral. Accordingly, the terms of the Swaps Mass Housing entered into with LBSF did not require Mass Housing to post collateral.

15. Pursuant to the Agreement, the parties agreed that the "Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." (Schedule, Part 3(e)).

*Events of Default under the Agreement*

---

[1] Capitalized terms not defined herein have the meaning given to such terms in the Agreement.

5

16. Section 5(a) of the Master Agreement lists certain categories of events which, if continuing, constitute an "Event of Default." One category is a party becoming "subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets." (Master Agreement § 5(a)(vii)(6).)

17. Upon the occurrence of an Event of Default, the Non-defaulting Party may designate an Early Termination Date in respect of the outstanding Transactions under the Agreement. (Master Agreement § 6(a).)

*Payments Due Upon Event of Default under the Agreement*

18. The parties agreed in Part 1(f) of the Schedule that any payments due and owed upon an Event of Default would be calculated in accordance with "Market Quotation" and would be measured by the "Second Method." Section 6(e)(i)(3) of the Master Agreement states:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-Defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

19. The Master Agreement defines "Market Quotation" as "an amount determined on the basis of quotations from Reference Market-makers." (Master Agreement § 12 (definition of "Market Quotation").) The Master Agreement sets out details of how to calculate a Market Quotation. The Non-defaulting party must seek quotations from "dealers in the relevant market selected by the party determining a Market Quotation." (*Id*. (definition of "Reference Market-makers").) Reference Market-makers are asked to provide quotations for an amount that they would pay or be paid to enter into a replacement transaction "that would have the effect of preserving for [the Non-defaulting Party] the economic equivalent of any payment or delivery"

6

expected under the Swaps terminated by the Event of Default. (*Id.* (definition of "Market Quotation").) If three quotations cannot be provided, "it will be deemed that the Market Quotation . . . cannot be determined." (*Id.*)

20. If the Market Quotation "cannot be determined" then the payment upon an Event of Default shall be calculated by the "Loss" method. (*Id.* definition of "Settlement Amount").)

21. Section 12 of the Master Agreement defines "Loss" as the,

> amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them).

*Termination of the Swaps*

22. On September 15, 2008 (the "LBHI Petition Date"), LBHI filed a petition for relief under chapter 11, title 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On October 3, 2008 (the "LBSF Petition Date," together with the LBHI Petition Date, the "Petition Dates"), LBSF filed a petition for relief under the Bankruptcy Code with the Bankruptcy Court. Each filing constituted an Event of Default under the Agreement.

23. Because Mass Housing entered into the Swaps effectively as insurance against real long-term risk in providing bond holders with long-term variable rate debt, on the one hand, and borrowers with long-term fixed rate mortgage loans, on the other hand, it was particularly important to Mass Housing to have a financially stable counterparty and credit support provider for the life of the Swaps. Accordingly, on October 1, 2008, Mass Housing sent a Notice of Default to LBSF indicating that LBHI's filing for bankruptcy constituted an Event of Default under the Agreement. Two days later, LBSF filed for chapter 11 with a plan to liquidate and

7

wind down the business, confirming that the Lehman bankruptcy would deprive Mass Housing of an effective counterparty to the long-term Swaps, which were set to continue for another forty years.

24. Because of Lehman's default, Mass Housing immediately began consideration of ways to find a replacement counterparty to hedge its now naked exposure to interest rate fluctuations so that it could proceed to terminate the Swaps.

25. As a public agency with little experience in the swap market and no experience with bankrupt hedging counterparties, Mass Housing was uncertain as to how to effectively terminate the Swaps in a manner that would provide it with the equivalent level of financial support for its long-term financing. Mass Housing engaged its swap consultant and began interviewing experienced bankruptcy legal counsel to assist Mass Housing with its termination. Mass Housing interviewed various attorneys and settled on bankruptcy counsel by December 12, 2008.

26. Between December 12, 2008 and March of 2009, Mass Housing actively worked with its advisors to prepare a bid process to obtain Market Quotations, to find replacement swaps with another counterparty equivalent to the original terms of the Swaps and to terminate the Swaps. Concerned with the market displacement that Lehman's bankruptcy precipitated and with rumors that other state entity swap counterparties had been unable to obtain actionable market quotations for one-way collateral swaps, Mass Housing sought simultaneously to terminate the Swaps and enter into replacement transactions to ensure continuous coverage to its interest rate exposure.

27. However, in early March 2009, Mass Housing became aware of pending Massachusetts legislation which would have potentially significant implications on Mass

8

Housing's ability to execute derivative transactions. Concerned about potentially putting the Agency between a rock and a hard place by initiating a bid process for the Swaps and accepting an actionable bid which the Agency might thereafter be prohibited from executing, depending on the outcome of the legislative process, Mass Housing temporarily suspended the bid process and the termination of the Swaps.

28. On April 24, 2009, the Massachusetts legislature enacted certain amendments to G.L. Ch. 6, Section 98 regarding the Massachusetts Finance Advisory Board's (the "Board") oversight with respect to the use of derivative financial products by certain state entities, including Mass Housing. The legislation required Mass Housing to present a proposed derivative transaction to the Board before executing the transaction. Accordingly, before Mass Housing could replace and terminate the Swaps, it was required to present the terms of the proposed transactions to the Board for its review and recommendation, if any. Mass Housing presented to the Board on May 20, 2009, at the first available opportunity to do so, and upon completion of the Board's review on June 19, 2009, proceeded to terminate the Swaps and enter into replacement transactions.

29. On June 22, 2009, immediately after receiving regulatory approval, Mass Housing sought both actionable and indicative bids on one-way swaps from eleven Reference Market-makers in an attempt to determine Market Quotations for the Swaps and to secure a replacement counterparty for the Swaps under their original terms. Only two Reference Market-makers submitted bids, and both were non-actionable. Because Mass Housing only received two bids (instead of the requisite three), Mass Housing was unable to determine a Market Quotation for the Swaps. Mass Housing, in accordance with the Agreement, proceeded to calculate a termination payment pursuant to the Loss method for each of the Swaps.

9

30. Because Mass Housing did not receive any actionable bids for the Swaps, it was forced to execute replacement swaps with a third-party on less favorable terms. Under the original Swaps with LBSF, Mass Housing was not required to post collateral and was not subject to financial covenants. However, following Lehman's filing for bankruptcy, most, if not all, financial institutions were no longer willing to enter into one-way collateral swaps. Prevailing market conditions in June of 2009 required Mass Housing to both post collateral in certain circumstances and agree to financial covenants to obtain a reasonably priced interest rate swap. Once Mass Housing negotiated and finalized the terms for the new swap transactions, it terminated the Swaps. Lehman's commencement of its chapter 11 cases, which deprived Mass Housing of an effective counterparty, was the sole catalyst for Mass Housing's termination of the Swaps.

31. On June 25, 2009, Mass Housing delivered a letter to LBSF terminating the Swaps on account of Lehman's Event of Default under the Agreement. Mass Housing designated June 25, 2009 as the Early Termination Date for the Swaps.

32. On July 1, 2009, Mass Housing sent a letter to LBSF outlining in detail its calculations of the amount due to LBSF on account of its termination, in accordance with sections 6(d) and (e) of the Master Agreement. On July 1, 2009 Mass Housing submitted payment to LBSF in the amount of $5,694,240 (the "Termination Payment") plus $2,229,500 in unpaid swap obligations, plus interest (the "Unpaid Amount"), for a total payment of $8,051,093, pursuant to Section 6(e) of the Master Agreement and Lehman's settlement instructions.

33. Mass Housing does not speculate on interest rates and is prohibited from doing so by agency guidelines. Although LBSF's position under the Swaps continued to increase in value due to falling interest rates, the decline was immaterial to Mass Housing's decision to terminate.

10

Mass Housing sought solely to maintain a financially stable and effective counterparty for the life of the Swaps, as evidenced by its desire to maintain the original terms of the Swaps with a replacement counterparty, irrespective of declining interest rates. Solely because Lehman's bankruptcy deprived Mass Housing of an effective counterparty, and consistent with its rights under 11 U.S.C. § 560, Mass Housing terminated the Swaps.

34. Such postpetition terminations are explicitly permitted under the Bankruptcy Code. Specifically, section 560 of the Bankruptcy Code preserves the rights of a non-defaulting counterparty to a swap agreement[2] to terminate the contract based upon a condition specified in section 365(e)(1) of the Bankruptcy Code. The conditions listed in section 365(e)(1) of the Bankruptcy Code include, among other things, the filing of a bankruptcy petition.

*Post-Termination*

35. Notwithstanding Mass Housing's payment to LBSF of over $8 million, LBSF demanded an additional $1.6 million from Mass Housing. For approximately one year, from July 2009 through July 2010, Mass Housing and Courtney Jenkins, Mass Housing's primary contact at Lehman, continued to discuss Mass Housing's calculation of the Termination Payment for the Swaps, discussions implicitly premised on the validity of Mass Housing's termination. However, in June 2010, when LBSF demanded even more money from Mass Housing, a resolution of the final amount of the Termination Payment was not reached, and Mass Housing did not hear from Lehman again until October of 2010.

---

[2] The Agreement is a "swap agreement" within the meaning of the Bankruptcy Code. Under section 101(53B) of the Bankruptcy Code a "swap agreement" means:

> (A) an agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, forward rate agreement, commodity swap, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, any other similar agreement (including an option to enter into any of the foregoing);
> (B) any combination of the foregoing; or
> (C) a master agreement for any of the foregoing together with all supplements.

11

36.     On October 20, 2010, over a year and a half after Mass Housing's termination, Mass Housing received an unexpected letter from a Mr. Jonathon Fox at LBHI.  Mr. Fox indicated that he was taking Mr. Jenkins' place as Mass Housing's contact at Lehman.  In what appeared as retaliation for Mass Housing's refusal to accede to LBSF's unreasonable Termination Payment demands, Mr. Fox informed Mass Housing that Lehman was unilaterally voiding Mass Housing's termination.  Mr. Fox also informed Mass Housing that, unbeknownst to Mass Housing, LBSF had applied its Termination Payment to Mass Housing's purportedly ongoing swap obligations since its "voidable" termination over sixteen months earlier.

37.     However, Mass Housing had never received any invoices from LBSF for the purportedly ongoing Swaps since Mass Housing's termination in June 2009.  It was not until late December 2010, almost a year and a half after Mass Housing's termination, that LBSF began sending Mass Housing invoices for payments allegedly due on the Swaps.

38.     On January 31, 2012, LSBF sent a "Notice of Default" informing Mass Housing that it owed LBSF an additional $4,150,714.60 (the "<u>Amount Due</u>") on account of missed payments allegedly owed to date under the Agreement.  Specifically the Notice of Default stated that the "Amount Due" included unpaid amounts of $3,743,141.31 for payments commencing on January 1, 2011 *plus default interest* of $407,573.29.  The Notice of Default indicated that if Mass Housing failed to pay the "Amount Due" to LSBF on or before the third business date after receipt of the notice, then LBSF may declare the occurrence of an Event of Default and terminate.

39.     Needless to say, Mass Housing did not pay the "Amount Due" because, in fact, no amount was actually due and owing from Mass Housing to LBSF as Mass Housing had already terminated the Swaps in June 2009.  Further, Mass Housing and LBSF had been in negotiations

12

over the calculation of the Termination Payment for over a year—an amount owed to LBSF only upon Mass Housing's early termination due to an Event of Default.

40.     On February 7, 2012, Lehman sent Mass Housing a "Termination Notice" purporting to terminate the Swaps for Mass Housing's failure to pay the so-called "Amount Due" and designating February 8, 2012 as the "Early Termination Date."  On February 13, 2012, Lehman sent Mass Housing a "Valuation Statement" notifying Mass Housing of its position that Mass Housing owed LBSF a termination payment of $17,822,138.49, calculated under the Loss method.

41.     What LBSF claimed in June 2010 was just over a $1 million obligation to resolve Mass Housing's termination, LBSF now claimed was an obligation in excess of $18 million, representing LBSF's calculation of the present value of the Swaps as of February 2012 and continued swap payments purportedly coming due after Mass Housing terminated the Swaps, plus default interest.

42.     LBSF's attempt to terminate the Swaps was ineffective as Mass Housing validly terminated the Swaps on June 25, 2009, 31 months prior to LBSF's purported termination.  Mass Housing's termination complied with all the requirements of the Agreement and was properly based on a condition specified in section 365(e)(1) of the Bankruptcy Code, Lehman's chapter 11 proceedings.

43.     LBSF's attempt to void Mass Housing's termination under these circumstances is not only ineffective but also inequitable.  Mass Housing negotiated with LBSF over the calculation of the Termination Payment in good faith and worked with LBSF for over a year to amicably resolve their dispute.  During the course of this time, Mass Housing provided LBSF with detailed information surrounding its Loss calculations, including copies of the bid package

13

Mass Housing used to solicit bids from Reference Market-makers, information on the two non-actionable bids it received, and the specific amount Mass Housing deducted from the Termination Payment for Transaction Fees along with corresponding receipts. Lehman now claims the right to wait over a year and a half to "void" Mass Housing's termination, a lucrative option by which Lehman either gets additional money through demand for a larger Termination Payment or its purported right to unilaterally invalidate its counterparties' termination.

44. The parties agree that the Swaps were validly terminated; leaving unresolved the central contractual dispute between the parties: When were the Swaps terminated? Mass Housing seeks the relief of this Court to determine the validity of its termination of the Swaps.

## COUNT I: DECLARATORY RELIEF

45. Plaintiff re-alleges and incorporates by reference the above-numbered paragraphs.

46. Plaintiff's termination of the Swaps is valid and enforceable. Plaintiff's termination complied with all requirements of the Agreement and effectively terminated the Swaps on June 25, 2009.

47. LBSF's attempt to terminate the Swaps as of February 8, 2012 was invalid because Mass Housing already terminated the Swaps in June 2009.

48. To afford relief from the controversy which defendants' actions have precipitated, plaintiff is entitled to a declaratory judgment that plaintiff's termination of the Swaps is valid and enforceable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests entry of judgment in their favor and against the defendants as follows:

A. Declaring plaintiff's termination of the Swaps valid and enforceable;

B. Declaring plaintiff's termination of the Swaps effective as of June 25, 2009;

C. Declaring that plaintiff has fully satisfied all obligations under the Agreement;

D. Declaring defendants' attempt to terminate the Swaps as of February 8, 2012 as invalid; and

E. Awarding plaintiff such other relief as is just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury on all issues to triable.

Respectfully submitted,

_____
Peter L. Welsh (BBO # 643261)
Aliza F. Goren (BBO# 678632)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
*Attorneys for Massachusetts Housing Finance Agency*

15