# EXHIBIT B

# LEHMAN BROTHERS

EXECUTION COPY

## CONFIRMATION

June 13, 2002

## TRANSACTION

Massachusetts Housing Finance Agency
Boston, MA

RE:     Summit ID:

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.     This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of June 10, 2002 (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.     The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | LEHMAN BROTHERS SPECIAL FINANCING INC. |
| Party B: | MASSACHUSETTS HOUSING FINANCE AGENCY |
| Notional Amount: | $41,145,000, which shall reduce on the dates and in the amounts set forth in Annex I hereto |
| Trade Date: | June 13, 2002 |
| Effective Date: | July 1, 2003 |
| Termination Date: | January 1, 2045 |

**FIXED AMOUNTS:**

Fixed Rate Payer:                      Party B

Fixed Rate Payer Payment Dates:        Monthly on the first Business Day of each calendar month,
                                       commencing on August 1, 2003 and terminating on the
                                       Termination Date.

Fixed Rate Payer Period End Dates:     Monthly on the first Business Day of each calendar month,
                                       commencing on the August 1, 2003 and terminating on the
                                       Termination Date.  No Adjustment shall apply to Period
                                       End Dates.

Fixed Rate:                            6.84%

Fixed Rate Day Count Fraction:         Actual/360


**FLOATING AMOUNTS:**

Floating Rate Payer:                   Party A

Floating Rate Payer Payment Dates:     Monthly on the first Business Day of each calendar month,
                                       commencing on August 1, 2003 and terminating on the
                                       Termination Date.

Floating Rate Payer Period End Dates:  Monthly on the first Business Day of each calendar month,
                                       commencing on the August 1, 2003 and terminating on the
                                       Termination Date.  No Adjustment shall apply to Period
                                       End Dates.

Floating Rate Option:                  USD-LIBOR-BBA

Designated Maturity:                   One month

Spread:                                Plus 0.25%

Reset Dates:                           Weekly on each Wednesday

Method of Averaging:                   Unweighted Average

Floating Rate Day Count Fraction:      Actual/360

First Special Termination Date:        July 1, 2017

LEHMAN BROTHERS
745 SEVENTH AVENUE NEW YORK, NY 10019

3.    *Optional Termination.*  Party B may terminate this Transaction prior to the First Special
Termination Date by providing to Party A at least thirty (30) days prior written notice of the termination
date.  In the event Party B exercises its right to terminate this Transaction prior to the First Special
Termination Date, the provisions of Section 6(e)(i)(3) of the Agreement shall apply to such termination
and a Settlement Amount shall be determined assuming that Party B is the Defaulting Party and Party A
is the Non-defaulting Party.  The Settlement Amount shall be calculated based on the average of three
quotations from Reference Market-makers (one of which Reference Market-makers shall be selected by
Party A, one of which shall be selected by Party B and one of which shall be mutually agreed upon by
Party A and Party B) and shall be payable as provided in Section 6(e)(i)(3).

4.    *Special Termination Date.*  Party B may, upon not less than two (2) Business Days'
written notice, elect to terminate this Transaction in whole or in part on any Fixed Rate Payer Payment
Date on or after the First Special Termination Date (each, a "Special Termination Date") by specifying an
amount (the "Special Termination Amount") of the Notional Amount to be terminated; provided, that the
minimum Applicable Amount of each Special Termination Amount shall be $100,000, and each Special
Termination Amount shall equal $100,000 plus an integral multiple of $5,000 in excess of $100,000, up
to a maximum of the then-current Notional Amount.   On each Special Termination Date, (i) this
Transaction shall terminate with respect to the designated Special Termination Amount, (ii) no amounts
(other than as provided in clause (iv) of this sentence) shall be payable after such Special Termination
Date by either party hereto in respect of the Special Termination Amount, (iii) the Notional Amount shall
be reduced by taking into account such Special Termination Amount and (iv) the parties will be obligated
to pay any Unpaid Amounts in respect of the portion of the Notional Amount that is based on such
Special Termination Amount that would otherwise be due on such Special Termination Date.  A special
termination of a portion of this Transaction pursuant to this Section 4 shall not affect the continuing
effectiveness of the portion of this Transaction not terminated.

5.    Payment Instructions:

Payments to Party A:

Chase NYC
ABA: 021000021
for the Account of Lehman Brothers Special Financing Inc.
A/C# 066 143 543

Payments to Party B:

[PLEASE PROVIDE]

3

6.      Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified.  Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:

Confirmed as of the
date first above written

MASSACHUSETTS HOUSING FINANCE AGENCY

By: _____
Name:  Paul Burbine
Title:  Financial Director

4

6.    Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name:  T. Courtney Jenkins
Title:    Vice President

Confirmed as of the
date first above written

MASSACHUSETTS HOUSING FINANCE AGENCY

By: _____
Name:
Title:

4

# ANNEX I
## to Confirmation, dated June 13, 2002,
## between Lehman Brothers Special Financing Inc.
## and Massachusetts Housing Finance Agency

### Initial Notional Amount - $41,145,000

| Reduction Date | Notional Amount Reduction[1] | Revised Notional Amount |
|---|---|---|
| 07/01/03 | $0 | $41,145,000 |
| 01/01/04 | $0 | $41,145,000 |
| 07/01/04 | $0 | $41,145,000 |
| 01/01/05 | $0 | $41,145,000 |
| 07/01/05 | $170,000 | $40,975,000 |
| 01/01/06 | $150,000 | $40,825,000 |
| 07/01/06 | $180,000 | $40,645,000 |
| 01/01/07 | $160,000 | $40,485,000 |
| 07/01/07 | $190,000 | $40,295,000 |
| 01/01/08 | $175,000 | $40,120,000 |
| 07/01/08 | $195,000 | $39,925,000 |
| 01/01/09 | $185,000 | $39,740,000 |
| 07/01/09 | $215,000 | $39,525,000 |
| 01/01/10 | $200,000 | $39,325,000 |
| 07/01/10 | $230,000 | $39,095,000 |
| 01/01/11 | $215,000 | $38,880,000 |
| 07/01/11 | $245,000 | $38,635,000 |
| 01/01/12 | $230,000 | $38,405,000 |
| 07/01/12 | $255,000 | $38,150,000 |
| 01/01/13 | $250,000 | $37,900,000 |
| 07/01/13 | $280,000 | $37,620,000 |
| 01/01/14 | $265,000 | $37,355,000 |
| 07/01/14 | $295,000 | $37,060,000 |
| 01/01/15 | $285,000 | $36,775,000 |
| 07/01/15 | $315,000 | $36,460,000 |
| 01/01/16 | $310,000 | $36,150,000 |
| 07/01/16 | $335,000 | $35,815,000 |
| 01/01/17 | $330,000 | $35,485,000 |
| 07/01/17 | $360,000 | $35,125,000 |
| 01/01/18 | $355,000 | $34,770,000 |
| 07/01/18 | $385,000 | $34,385,000 |
| 01/01/19 | $375,000 | $34,010,000 |
| 07/01/19 | $410,000 | $33,600,000 |
| 01/01/20 | $410,000 | $33,190,000 |
| 07/01/20 | $430,000 | $32,760,000 |
| 01/01/21 | $435,000 | $32,325,000 |

[1] Each amount in this column remaining after any Special Termination Date shall be reduced pro rata (in multiples of $5,000) in proportion to the ratio of the Special Termination Amount to the Notional Amount immediately prior to such Special Termination Date.

ANNEX I
to Confirmation, dated June 13, 2002,
between Lehman Brothers Special Financing Inc.
and Massachusetts Housing Finance Agency

Initial Notional Amount - $41,145,000

| Reduction Date | Notional Amount Reduction[1] | Revised Notional Amount |
|---|---|---|
| 07/01/21 | $470,000 | $31,855,000 |
| 01/01/22 | $470,000 | $31,385,000 |
| 07/01/22 | $500,000 | $30,885,000 |
| 01/01/23 | $505,000 | $30,380,000 |
| 07/01/23 | $535,000 | $29,845,000 |
| 01/01/24 | $540,000 | $29,305,000 |
| 07/01/24 | $565,000 | $28,740,000 |
| 01/01/25 | $580,000 | $28,160,000 |
| 07/01/25 | $615,000 | $27,545,000 |
| 01/01/26 | $620,000 | $26,925,000 |
| 07/01/26 | $660,000 | $26,265,000 |
| 01/01/27 | $665,000 | $25,600,000 |
| 07/01/27 | $700,000 | $24,900,000 |
| 01/01/28 | $710,000 | $24,190,000 |
| 07/01/28 | $745,000 | $23,445,000 |
| 01/01/29 | $765,000 | $22,680,000 |
| 07/01/29 | $800,000 | $21,880,000 |
| 01/01/30 | $820,000 | $21,060,000 |
| 07/01/30 | $855,000 | $20,205,000 |
| 01/01/31 | $875,000 | $19,330,000 |
| 07/01/31 | $915,000 | $18,415,000 |
| 01/01/32 | $940,000 | $17,475,000 |
| 07/01/32 | $980,000 | $16,495,000 |
| 01/01/33 | $1,005,000 | $15,490,000 |
| 07/01/33 | $1,050,000 | $14,440,000 |
| 01/01/34 | $1,080,000 | $13,360,000 |
| 07/01/34 | $1,125,000 | $12,235,000 |
| 01/01/35 | $1,150,000 | $11,085,000 |
| 07/01/35 | $395,000 | $10,690,000 |
| 01/01/36 | $405,000 | $10,285,000 |
| 07/01/36 | $420,000 | $9,865,000 |
| 01/01/37 | $430,000 | $9,435,000 |
| 07/01/37 | $455,000 | $8,980,000 |
| 01/01/38 | $465,000 | $8,515,000 |
| 07/01/38 | $485,000 | $8,030,000 |
| 01/01/39 | $500,000 | $7,530,000 |

[1] Each amount in this column remaining after any Special Termination Date shall be reduced pro rata (in multiples of $5,000) in proportion to the ratio of the Special Termination Amount to the Notional Amount immediately prior to such Special Termination Date.

ANNEX I
to Confirmation, dated June 13, 2002,
between Lehman Brothers Special Financing Inc.
and Massachusetts Housing Finance Agency

Initial Notional Amount - $41,145,000

| Reduction Date | Notional Amount Reduction[1] | Revised Notional Amount |
|---|---|---|
| 07/01/39 | $520,000 | $7,010,000 |
| 01/01/40 | $530,000 | $6,480,000 |
| 07/01/40 | $555,000 | $5,925,000 |
| 01/01/41 | $570,000 | $5,355,000 |
| 07/01/41 | $595,000 | $4,760,000 |
| 01/01/42 | $610,000 | $4,150,000 |
| 07/01/42 | $635,000 | $3,515,000 |
| 01/01/43 | $655,000 | $2,860,000 |
| 07/01/43 | $680,000 | $2,180,000 |
| 01/01/44 | $700,000 | $1,480,000 |
| 07/01/44 | $730,000 | $750,000 |
| 01/01/45 | $750,000 | $0 |

[1] Each amount in this column remaining after any Special Termination Date shall be reduced pro rata (in multiples of $5,000) in proportion to the ratio of the Special Termination Amount to the Notional Amount immediately prior to such Special Termination Date.

# LEHMAN BROTHERS

EXECUTION COPY

<u>CONFIRMATION</u>

December 11, 2002

<u>TRANSACTION</u>

Massachusetts Housing Finance Agency
Boston, MA

RE:    Summit ID: 430895L

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 2000 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of June 10, 2002 (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | LEHMAN BROTHERS SPECIAL FINANCING INC. |
| Party B: | MASSACHUSETTS HOUSING FINANCE AGENCY |
| Notional Amount: | $26,355,000, which shall reduce on the dates and in the amounts set forth in Annex I hereto |
| Trade Date: | December 11, 2002 |
| Effective Date: | December 19, 2002 |
| Termination Date: | January 1, 2046 |

**FIXED AMOUNTS:**

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Monthly on the first Business Day of each calendar month, commencing on January 2, 2003 and terminating on the Termination Date. |
| Fixed Rate Payer Period End Dates: | Monthly on the first Business Day of each calendar month, commencing on January 1, 2003 and terminating on the Termination Date. No Adjustment shall apply to Period End Dates. |
| Fixed Rate: | 5.36% |
| Fixed Rate Day Count Fraction: | Actual/360 |

**FLOATING AMOUNTS:**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Monthly on the first Business Day of each calendar month, commencing on January 2, 2003 and terminating on the Termination Date. |
| Floating Rate Payer Period End Dates: | Monthly on the first Business Day of each calendar month, commencing on January 1, 2003 and terminating on the Termination Date. No Adjustment shall apply to Period End Dates. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | One month |
| Spread: | Plus 0.25% |
| Reset Dates: | Weekly on each Wednesday |
| Method of Averaging: | Unweighted Average |
| Floating Rate Day Count Fraction: | Actual/360 |
| First Special Termination Date: | July 1, 2018 |

2

3.    *Optional Termination.* Party B may terminate this Transaction prior to the First Special Termination Date by providing to Party A at least thirty (30) days prior written notice of the termination date. In the event Party B exercises its right to terminate this Transaction prior to the First Special Termination Date, the provisions of Section 6(e)(i)(3) of the Agreement shall apply to such termination and a Settlement Amount shall be determined assuming that Party B is the Defaulting Party and Party A is the Non-defaulting Party. The Settlement Amount shall be calculated based on the average of three quotations from Reference Market-makers (one of which Reference Market-makers shall be selected by Party A, one of which shall be selected by Party B and one of which shall be mutually agreed upon by Party A and Party B) and shall be payable as provided in Section 6(e)(i)(3).

4.    *Special Termination Date.* Party B may, upon not less than two (2) Business Days' written notice, elect to terminate this Transaction in whole or in part on any Fixed Rate Payer Payment Date on or after the First Special Termination Date (each, a "Special Termination Date") by specifying an amount (the "Special Termination Amount") of the Notional Amount to be terminated; provided, that the minimum Applicable Amount of each Special Termination Amount shall be $100,000, and each Special Termination Amount shall equal $100,000 plus an integral multiple of $5,000 in excess of $100,000, up to a maximum of the then-current Notional Amount. On each Special Termination Date, (i) this Transaction shall terminate with respect to the designated Special Termination Amount, (ii) no amounts (other than as provided in clause (iv) of this sentence) shall be payable after such Special Termination Date by either party hereto in respect of the Special Termination Amount, (iii) the Notional Amount shall be reduced by taking into account such Special Termination Amount and (iv) the parties will be obligated to pay any Unpaid Amounts in respect of the portion of the Notional Amount that is based on such Special Termination Amount that would otherwise be due on such Special Termination Date. A special termination of a portion of this Transaction pursuant to this Section 4 shall not affect the continuing effectiveness of the portion of this Transaction not terminated.

5.    Payment Instructions:

Payments to Party A:

    Chase NYC
    ABA: 021000021
    for the Account of Lehman Brothers Special Financing Inc.
    A/C# 066 143 543

Payments to Party B:

    **[PLEASE PROVIDE]**

3

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:   T. Courtney Jenkins
Title:    Vice President

Confirmed as of the
date first above written

MASSACHUSETTS HOUSING FINANCE AGENCY

By:_____
Name:
Title:

4

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Party A and Party B with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Party A

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name:   T. Courtney Jenkins
Title:     Vice President

Confirmed as of the
date first above written

MASSACHUSETTS HOUSING FINANCE AGENCY

By:_____

Name:   Timothy C. Sullivan
Title:     Financial Director

4

### ANNEX I
to Confirmation, dated December 11, 2002,
between Lehman Brothers Special Financing Inc.
and Massachusetts Housing Finance Agency

Initial Notional Amount - $26,355,000

| Reduction Date | Notional Amount Reduction[1] | Revised Notional Amount |
|---|---|---|
| 01/01/03 | $0 | $26,355,000 |
| 07/01/03 | $0 | $26,355,000 |
| 01/01/04 | $180,000 | $26,175,000 |
| 07/01/04 | $200,000 | $25,975,000 |
| 01/01/05 | $240,000 | $25,735,000 |
| 07/01/05 | $300,000 | $25,435,000 |
| 01/01/06 | $320,000 | $25,115,000 |
| 07/01/06 | $350,000 | $24,765,000 |
| 01/01/07 | $365,000 | $24,400,000 |
| 07/01/07 | $375,000 | $24,025,000 |
| 01/01/08 | $385,000 | $23,640,000 |
| 07/01/08 | $395,000 | $23,245,000 |
| 01/01/09 | $410,000 | $22,835,000 |
| 07/01/09 | $420,000 | $22,415,000 |
| 01/01/10 | $430,000 | $21,985,000 |
| 07/01/10 | $445,000 | $21,540,000 |
| 01/01/11 | $455,000 | $21,085,000 |
| 07/01/11 | $465,000 | $20,620,000 |
| 01/01/12 | $480,000 | $20,140,000 |
| 07/01/12 | $495,000 | $19,645,000 |
| 01/01/13 | $510,000 | $19,135,000 |
| 07/01/13 | $520,000 | $18,615,000 |
| 01/01/14 | $535,000 | $18,080,000 |
| 07/01/14 | $545,000 | $17,535,000 |
| 01/01/15 | $560,000 | $16,975,000 |
| 07/01/15 | $575,000 | $16,400,000 |
| 01/01/16 | $595,000 | $15,805,000 |
| 07/01/16 | $610,000 | $15,195,000 |
| 01/01/17 | $625,000 | $14,570,000 |
| 07/01/17 | $640,000 | $13,930,000 |
| 01/01/18 | $660,000 | $13,270,000 |
| 07/01/18 | $675,000 | $12,595,000 |
| 01/01/19 | $695,000 | $11,900,000 |
| 07/01/19 | $715,000 | $11,185,000 |

[1] Each amount in this column remaining after any Special Termination Date shall be reduced pro rata (in multiples of $5,000) in proportion to the ratio of the Special Termination Amount to the Notional Amount immediately prior to such Special Termination Date.

## ANNEX I
to Confirmation, dated December 11, 2002,
between Lehman Brothers Special Financing Inc.
and Massachusetts Housing Finance Agency

Initial Notional Amount - $26,355,000

| Reduction Date | Notional Amount Reduction[1] | Revised Notional Amount |
|---|---|---|
| 01/01/20 | $735,000 | $10,450,000 |
| 07/01/20 | $750,000 | $9,700,000 |
| 01/01/21 | $770,000 | $8,930,000 |
| 07/01/21 | $790,000 | $8,140,000 |
| 01/01/22 | $815,000 | $7,325,000 |
| 07/01/22 | $630,000 | $6,695,000 |
| 01/01/23 | $540,000 | $6,155,000 |
| 07/01/23 | $220,000 | $5,935,000 |
| 01/01/24 | $95,000 | $5,840,000 |
| 07/01/24 | $95,000 | $5,745,000 |
| 01/01/25 | $95,000 | $5,650,000 |
| 07/01/25 | $100,000 | $5,550,000 |
| 01/01/26 | $100,000 | $5,450,000 |
| 07/01/26 | $105,000 | $5,345,000 |
| 01/01/27 | $105,000 | $5,240,000 |
| 07/01/27 | $110,000 | $5,130,000 |
| 01/01/28 | $110,000 | $5,020,000 |
| 07/01/28 | $115,000 | $4,905,000 |
| 01/01/29 | $115,000 | $4,790,000 |
| 07/01/29 | $125,000 | $4,665,000 |
| 01/01/30 | $125,000 | $4,540,000 |
| 07/01/30 | $130,000 | $4,410,000 |
| 01/01/31 | $130,000 | $4,280,000 |
| 07/01/31 | $135,000 | $4,145,000 |
| 01/01/32 | $140,000 | $4,005,000 |
| 07/01/32 | $140,000 | $3,865,000 |
| 01/01/33 | $145,000 | $3,720,000 |
| 07/01/33 | $150,000 | $3,570,000 |
| 01/01/34 | $155,000 | $3,415,000 |
| 07/01/34 | $160,000 | $3,255,000 |
| 01/01/35 | $145,000 | $3,110,000 |
| 07/01/35 | $115,000 | $2,995,000 |
| 01/01/36 | $115,000 | $2,880,000 |
| 07/01/36 | $115,000 | $2,765,000 |

Each amount in this column remaining after any Special Termination Date shall be reduced pro rata (in multiples of $5,000) in proportion to the ratio of the Special Termination Amount to the Notional Amount immediately prior to such Special Termination Date.

ANNEX I
to Confirmation, dated December 11, 2002,
between Lehman Brothers Special Financing Inc.
and Massachusetts Housing Finance Agency

Initial Notional Amount - $26,355,000

| Reduction Date | Notional Amount Reduction[1] | Revised Notional Amount |
|---|---|---|
| 01/01/37 | $120,000 | $2,645,000 |
| 07/01/37 | $125,000 | $2,520,000 |
| 01/01/38 | $130,000 | $2,390,000 |
| 07/01/38 | $130,000 | $2,260,000 |
| 01/01/39 | $135,000 | $2,125,000 |
| 07/01/39 | $135,000 | $1,990,000 |
| 01/01/40 | $145,000 | $1,845,000 |
| 07/01/40 | $150,000 | $1,695,000 |
| 01/01/41 | $150,000 | $1,545,000 |
| 07/01/41 | $155,000 | $1,390,000 |
| 01/01/42 | $155,000 | $1,235,000 |
| 07/01/42 | $165,000 | $1,070,000 |
| 01/01/43 | $170,000 | $900,000 |
| 07/01/43 | $150,000 | $750,000 |
| 01/01/44 | $150,000 | $600,000 |
| 07/01/44 | $150,000 | $450,000 |
| 01/01/45 | $145,000 | $305,000 |
| 07/01/45 | $150,000 | $155,000 |
| 01/01/46 | $155,000 | $0 |

[1] Each amount in this column remaining after any Special Termination Date shall be reduced pro rata (in multiples of $5,000) in proportion to the ratio of the Special Termination Amount to the Notional Amount immediately prior to such Special Termination Date.

(Local Currency-Single Jurisdiction)

# ISDA®

### International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

### dated as of June 10, 2002

LEHMAN BROTHERS SPECIAL FINANCING INC. and MASSACHUSETTS HOUSING FINANCE AGENCY have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.      Interpretation**

(a)      *Definitions.*  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)  *Change of Account*.  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)  *Netting*.  If on any date amounts would otherwise be payable:—

    (i)  in the same currency; and

    (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date).  This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)  *Default Interest; Other Amounts*.  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(e), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)  *Basic Representations*.

    (i)  *Status*.  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

    (ii)  *Powers*.  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

taken all necessary action to authorize such execution, delivery and performance;

(iii)    *No Violation or Conflict.*    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.*    All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.*    Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events.*    No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.*    There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.*    All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.*    It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorizations.*    It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.*    It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

5.    Events of Default and Termination Events

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

3

(a)   *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)   *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)   *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)   *Credit Support Default*.

(1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)   *Misrepresentation*. A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)   *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)   *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)    *Bankruptcy*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)    is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)    *Merger Without Assumption*.  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)    the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(i)   *Illegality.*  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)   *Credit Event Upon Merger.*  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)   *Additional Termination Event.*  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)   *Event of Default and Illegality.*  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.   Early Termination**

(a)   *Right to Terminate Following Event of Default.*  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)   *Right to Terminate Following Termination Event.*

(i)   *Notice.*  If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)   *Two Affected Parties.*  If an Illegality under Section 5(b)(i)(1) occurs and there are two

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)    *Right to Terminate.* If:—

(1)    an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss,"

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties.* If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

8

between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(e)     *Counterparts and Confirmations.*

     (i)      This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

     (ii)      The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)     *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.     Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.     Notices

(a)     *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

     (i)      if in writing and delivered in person or by courier, on the date it is delivered;

     (ii)      if sent by telex, on the date the recipient's answerback is received;

     (iii)      if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

     (iv)      if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

     (v)      if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

that is a Local Business Day.

(b)     *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a)     *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

      (i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

      (ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Waiver of Immunities.*  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

*"Applicable Rate"* means:—

    (a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

    (c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

    (d)    in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

      (a)      the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

      (b)      such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:
Date:

MASSACHUSETTS    HOUSING    FINANCE
AGENCY

By:_____
Name:    Paul Burbine
Title:    Financial Director
Date:    6/14/02

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

06/14/2002    11:27    LEHMAN → 916178541027    NO.173    002

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL FINANCING INC.          MASSACHUSETTS          HOUSING          FINANCE AGENCY

By: _____             By: _____
Name:    T. Courtney Jenkins                      Name:
Title:    Vice President                          Title:
Date:    June 14, 2002                            Date:

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

EXECUTION COPY

**SCHEDULE**
to the
**Master Agreement**
dated as of June 10, 2002,
between

**LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),**
a corporation organized under the laws of the State of Delaware

and

**MASSACHUSETTS HOUSING FINANCE AGENCY ("Party B"),**
a body politic organized under the laws of the Commonwealth of Massachusetts

**Part 1:  Termination Provisions**

In this Agreement:-

(a)  *"Specified Entity"* means in relation to Party A for the purpose of:-

> Section 5(a)(v),         Lehman Brothers Holdings Inc. ("Holdings").
> Section 5(a)(vi), Holdings.
> Section 5(a)(vii),       Holdings.
> Section 5(b)(iv), Holdings.

and in relation to Party B for the purpose of:-

> Section 5(a)(v),         Not applicable.
> Section 5(a)(vi), Not applicable.
> Section 5(a)(vii),       Not applicable.
> Section 5(b)(iv), Not applicable.

(b)  *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)  The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B.

The following provisions apply:-

*"Specified Indebtedness"* will have the meaning specified in Section 12 of this Agreement.

*"Threshold Amount"* means, $20,000,000 in the case of Party A, and $10,000,000 in the case of Party B.

(d)  The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B.

1

(e)    The *"Automatic Early Termination"* provisions of <u>Section 6(a)</u> will not apply to Party A and to
Party B.

(f)    *Payments on Early Termination.* For the purpose of <u>Section 6(e)</u> of this Agreement, Market
Quotation and the Second Method will apply.

(g)    *Additional Termination Event* will apply.  The following shall constitute Additional Termination
Events:—

    (i)    Party A or Holdings, on the one hand (in which case Party A shall be the Affected Party), or
Party B or its Specified Entity (if any) for purposes of Section 5(a)(vi) of this Agreement, on
the other hand (in which case Party B shall be the Affected Party), has one or more
outstanding issues of rated unsecured, unenhanced senior debt and none of such issues has a
rating of at least (i) Baa3 or higher as determined by Moody's Investors Service, Inc., or (ii)
BBB- or higher as determined by Standard & Poor's Ratings Services, A Division of The
McGraw-Hill Companies, Inc. or (iii) an equivalent investment grade rating determined by a
nationally-recognized rating service acceptable to both parties.

(h)    *Events of Default.*

    (i)    *Bankruptcy.* Clause (6) of Section 5(a)(vii) of this Agreement is hereby amended to read in
its entirety as follows:—

        "(6)(A) seeks or becomes subject to the appointment of an administrator, provisional
liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or
substantially all its assets or (B) in the case of a Government Entity, any Credit Support
Provider of such Government Entity or any applicable Specified Entity of such Government
Entity, (I) there shall be appointed or designated with respect to it, an entity such as an
organization, board, commission, authority, agency or body to monitor, review, oversee,
recommend or declare a financial emergency or similar state of financial distress with respect
to it or (II) there shall be declared or introduced or proposed for consideration by it or by any
legislative or regulatory body with competent jurisdiction over it, the existence of a state of
financial emergency or similar state of financial distress in respect of it;".

    (ii)    *Merger Without Assumption.*  Section 5(a)(viii) of this Agreement is hereby amended to
read in its entirety as follows:—

        "(viii)  *Merger Without Assumption.*  The party or any Credit Support Provider of such
party consolidates or amalgamates with, or merges with or into, or transfers all or
substantially all its assets to, another entity (or, without limiting the foregoing, if such party
is a Government Entity, an entity such as an organization, board, commission, authority,
agency, or body succeeds to the principal functions of, or powers and duties granted to, such
party or any Credit Support Provider of such party) and, at the time of such consolidation,
amalgamation, merger, transfer or succession:—

            (1) the resulting, surviving, transferee, or successor entity fails to assume all the
obligations of such party or such Credit Support Provider under this Agreement or any
Credit Support Document to which it or its predecessor was a party by operation of

2

law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving, transferee or successor entity of its obligations under this Agreement."

(i) **Termination Events.** Section 5(b)(ii) of this Agreement is hereby amended to read in its entirety as follows:—

"(ii) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if X is a Government Entity, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, X, any Credit Support Provider of X or any Specified Entity of X) and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving, transferee or successor entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action; provided, however, that the creditworthiness of X on any such entity shall not be deemed to be materially weaker if, immediately after such event, the long-term, unsecured, unsubordinated debt of X or such entity is rated at least A- by Standard & Poor's and at least A3 by Moody's (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or".

(j) **Delivery of Collateral.** Party A shall deliver collateral in respect of each Transaction hereunder (unless otherwise specified in a Confirmation in relation to the relevant Transaction) substantially in the manner and in the amount specified in the ISDA Credit Support Annex attached hereto as Exhibit G and incorporated by reference herein.

**Part 2.     Agreement to Deliver Documents.**

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit C to this Schedule. | Upon execution of this Agreement. | Yes |
| Party B | An opinion of counsel to Party B in the form of Exhibit D to this Schedule. | Upon execution of this Agreement. | Yes |

3

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A copy of the statutory or regulatory authority pursuant to which Party B is authorized to enter into this Agreement and each Transaction. | Upon execution of this Agreement. | Yes |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of the resolution or resolutions (or the equivalent thereof) of the governing body of Party B, certified by an appropriate official of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction, substantially in the form of Exhibit E to this Schedule. | Upon execution of this Agreement. | Yes |
| Party B | A certificate from the Chief Executive Officer or the Chief Financial Officer of Party B, or the equivalent of any thereof, to the effect that any requirements of the statutory or regulatory authority referred to above have been satisfied, substantially in the form of Exhibit F to this Schedule. | Upon execution of this Agreement. | Yes |
| Party B | An executed copy of the Covered Indenture. | Upon execution of this Agreement. | Yes |

**Part 3: Miscellaneous**

(a)     **Addresses for Notices.** For the purpose of Section 12(a):-

Address for notices or communications to Party A:-

Address:        745 Seventh Avenue, 5th Floor, New York, NY 10019
                Attention: Municipal Financial Products - Middle Office
                Facsimile No.: 646-758-2939
                Telephone No.: 212-526-2240

Address for notices or communications to Party B:-

Address:        One Beacon Street, Boston, MA 02108
                Attention:        Financial Director
                Telephone No.:   617-854-1256
                Facsimile No.:   617-854-1027

(b)    *Calculation Agent.*   The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(c)    *Credit Support Document.*   Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:-

In the case of Party A:  a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B .

In the case of Party B:  Not applicable.

(d)    *Credit Support Provider.*

In relation to Party A:  Holdings.

In relation to Party B:  Not applicable.

(e)    *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f)    *Netting of Payments.*  Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any of the Transactions from the date of this Agreement.

(g)    *"Affiliate"* will have the meaning specified in Section 12 of this Agreement.

(h)    *"Covered Indenture"* means the Bond Resolution (as defined below)[to be completed].

(i)    *"Covered Indenture Incorporation Date"* means the date of this Agreement.

(j)    *"Government Entity"* means Party B.

**Part 4.     Other Provisions.**

(a)    *Obligations.*   Section 2(a)(iii) of this Agreement is hereby amended to read in its entirety as follows:—

"(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default, Potential Event of Default or Incipient Illegality with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

(b)    *Representations.*

5

(i)        The introductory clause of Section 3 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a) and 3(e), at all times until the termination of this Agreement) that:—".

(ii)        Section 3(a)(ii) of this Agreement is hereby amended to read in its entirety as follows:—

"(ii) *Powers.*  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action and made all necessary determinations and findings to authorize such execution, delivery and performance;".

(iii)        Section 3(b) of this Agreement is hereby amended to read in its entirety as follows:—

"(b) *Absence of Certain Events.*  No Event of Default or Potential Event of Default or, to its knowledge, Incipient Illegality (in the case of a Government Entity) or Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party."

(iv)        Section 3 of this Agreement is hereby amended by adding the following subsection "(e)" thereto, which subsection shall only apply to the Government Entity:—

"(e) *Non-Speculation.*  This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for purposes of managing its borrowings or investments and not for purposes of speculation."

(v)        Section 3 of this Agreement is hereby amended by adding the following subsection "(f)" thereto:—

"(f) *No Immunity.*  It is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any Proceedings (as defined in Section 11(b)) in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets."

(vi)        Section 2 of this Agreement is hereby amended by adding the following subsection "(e)" thereto:—

"(e) *Obligations.*  The obligations of Party B hereunder to make the payments required hereunder, including, without limitation, Sections 2(a)(I) and 2(d) hereof shall be special obligations of Party B payable solely from amounts deposited in the Debt Service Fund established under Section 507 of the resolution adopted by Party B on December 13, 1994~~February 9, 1993~~ entitled "Rental·Housing

6

Mortgage~~Project~~ Revenue Bond Resolution" (the "General Resolution") as provided in the resolution adopted by Party B on March 12, 2002 entitled "2002 Series A and 2002 Series B Rental Housing Mortgage~~Project~~ Revenue Bond Series Resolutions" (the "2002 Series A Resolution;" and the "2002 Series B Resolutions" and collectively with the General Resolution, the "Bond Resolution"). As security for the payment by Party B of such payments, Party B hereby and by the Bond Resolution pledges and grants a security interest in all Revenues, all Loans and other Revenue producing contracts and all rights and interests of Party B thereto and the proceeds hereof and all moneys, securities and Reserve Deposits in all Funds and Accounts created by or pursuant to the Bond Resolution (other than the Rebate Fund), subject only to the equal pledge thereof and lien thereon granted to the Holders of all Bonds and Notes Outstanding under the Bond Resolution permitting the application of amounts held thereunder for the purposes and on the terms and conditions set forth in the Bond Resolution. All capitalized terms used in this Section 3(g) and in Section 3(h) hereof which are not otherwise defined in this Agreement shall have the meanings given such terms in the General Resolution. The obligations of Party B hereunder to make payments required under Section 6(e) hereof shall be general obligations of Party B secured by the full faith and credit of Party B and shall be payable out of any of its moneys or revenues, subject to lawful expenditures and to the provisions of any resolutions or agreements heretofore or hereafter pledging particular moneys or revenues to particular notes, bonds or other obligations of Party B

(h)     Neither the Commonwealth of Massachusetts nor any political subdivision thereof shall be obligated to make any payment under this Agreement and neither the faith and credit nor the taxing power of the Commonwealth of Massachusetts or any political subdivision thereof is pledged to any such payment."

(c)   *Agreements.*

(i)     The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party agrees with the other (or, in the case of Section 4(d) and (e), the Government Entity agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—".

(ii)     Section 4 of this Agreement is hereby amended by adding the following subsections "(d)" and "(e)" thereto:—

"(d)  *Compliance with Covered Indenture.* The Government Entity will observe, perform and fulfill each provision in the Covered Indenture applicable to such Government Entity in effect on the Covered Indenture Incorporation Date, as any of those provisions may be amended, supplemented or modified for purposes of this Agreement with the prior written consent of the other party hereto (the "Incorporated Provisions"), with the effect that such other party hereto will have the benefit of each of the Incorporated Provisions (including without limitation, covenants, right to consent to certain actions subject to consent under the Covered Indenture and delivery of financial statements and other notices and information). In the event the Covered Indenture ceases to be in effect prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued under the Covered Indenture) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of the Government Entity under this Agreement and any obligations of the Government Entity or any Credit Support Provider of the Government

7

Entity under a Credit Support Document have been fully satisfied. The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. For purposes of this Agreement, the Incorporated Provisions shall be construed as though (i) all references therein to any party making loans, extensions of credit or financial accommodations thereunder or commitments therefor (the "Financings") were to the other party hereto and (ii) to the extent that such Incorporated Provisions are conditioned on or relate to the existence of such Financings or the Government Entity or the Government Entity having any obligations in connection therewith, all references to such Financings or obligations were to the obligations of the Government Entity under this Agreement. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment, supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement.

(e) *Notice of Incipient Illegality.* If an Incipient Illegality occurs, the Government Entity will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Incipient Illegality and will also give such other information about that Incipient Illegality as the other party may reasonably require."

(d)    *Jurisdiction.* Section 11(b) of this Agreement is hereby amended to read in its entirety as follows:—

"(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i) submits, to the fullest extent permitted by applicable law, to the non-exclusive jurisdiction of each of the courts of the State of New York, the United States District Court located in the Borough of Manhattan in New York City, the courts of the state in which the Government Entity or other party's principal executive offices are located and the United States District Court with jurisdiction over the location of the Government Entity or the other party's principal executive offices; and

(ii) waives, to the fullest extent permitted by applicable law, (1) any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, (2) any claim that such Proceedings have been brought in an inconvenient forum and (3) the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction."

(e)    Definitions. Section 12 of this Agreement is hereby amended to add the following definitions in their appropriate alphabetical order:—

" `Covered Indenture' has the meaning specified in the Schedule."

" `Covered Indenture Incorporation Date' has the meaning specified in the Schedule."

" `Government Entity' has the meaning specified in the Schedule."

8

" '*Incipient Illegality*' means (a) the enactment by any legislative body with competent jurisdiction over a Government Entity of legislation which, if adopted as law, would render unlawful (i) the performance by such Government Entity of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of a Transaction or the compliance by such Government Entity with any other material provision of this Agreement relating to such Transaction or (ii) the performance by a Government Entity or a Credit Support Provider of such Government Entity of any contingent or other obligation which the Government Entity (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction, (b) any assertion in any proceeding, forum or action by a Government Entity, in respect of such Government Entity or in respect of any entity located or organized under the laws of the state in which such Government Entity is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to a Government Entity or any Credit Support Provider of such Government Entity of any event that constitutes an Illegality."

<u>Miscellaneous</u>:

(f)    Confirmation.  A form of Confirmation is set forth as Exhibit A hereto.

(g)    "Stockholders' Equity" means with respect to Holdings, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(h)    This Agreement is hereby amended by adding the following Section "13" hereto:—

"**13.    Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):—

(a)    *Non-Reliance*.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b)    *Assessment and Understanding*.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

(c)    *Status of Parties*.  The other party is not acting as a fiduciary for or as an advisor to it in respect of that Transaction."

9

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
*Party A*

**MASSACHUSETTS HOUSING FINANCE AGENCY**
*Party B*

Name:  T. Courtney Jenkins

Name:

Title:   Vice President

Title:

Date:    June 14, 2002

Date:

10

The parties executing this Schedule have executed the Master Agreement and have agreed as to the
contents of this Schedule.

**LEHMAN BROTHERS SPECIAL**          **MASSACHUSETTS HOUSING FINANCE**
**FINANCING INC.**                   **AGENCY**
*Party A*                            *Party B*

Name:                                Name:  Paul Burbine

Title:                               Title:  Financial Director

Date:                                Date:  6/14/02

EXHIBIT A to Schedule

Confirmation

[Date]

TRANSACTION

[Counterparty]

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of _____ (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:—

Party A:                              LEHMAN BROTHERS SEPCIAL FINANCING INC.

Party B:

Notional Amount:

Trade Date:

Effective Date:

Termination Date:

FIXED AMOUNTS:

Fixed Rate Payer:                    [Party A/B]

Fixed Rate Payer Payment Dates:

Fixed Rate Period End Dates:

EXHIBIT A
Page 1

Fixed Rate:

Fixed Rate Day Count Fraction:                    30/360


FLOATING AMOUNTS:

Floating Rate Payer:                    [Party B/A]

Floating Rate Payer Payment Dates:

Floating Rate Period End Dates:

Floating Rate Option:

Designated Maturity:

Floating Rate Day Count Fraction:

Reset Dates:

Method of Averaging:

Compounding:

    3.    Account Details

        Payments to Party A

        Payments to Party B

        Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.
By:_____
Name:
Title:

Confirmed as of the
date first written

_____

By:_____
Name:
Title:

EXHIBIT A
Page 2

· EXHIBIT B to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and _____ ("Party B") have entered into a Master Agreement dated as of _____, pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is

EXHIBIT B
Page 1

rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in <u>Section 5(a)(vii)</u> of the Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to <u>Sections 3</u> and <u>4</u> of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." <u>Section 11</u> of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 399 Park Avenue, 11th Floor, New York, NY 10020 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products - Middle Office at 745 Seventh Avenue, 5th Floor, New York, NY 10019 (Fax: 646-758-2939).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:_____
Name:
Title:

<u>EXHIBIT C to Schedule</u>

[Form of Opinion of Counsel to
Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.]

[Date]

[Counterparty]

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of _____ between Party A and _____ ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement. The Master Agreement is to be supplemented by a confirmation of a transaction to be entered into by Party A and Party B on _____ (the "Confirmation") and the Master Agreement together with such Confirmation shall constitute one agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of each of the Master Agreement, the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based upon the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware.

2.    The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.    Each of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes, a legal, valid and binding obligation, enforceable against it in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally

<u>EXHIBIT C</u>
Page 1

(including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.     I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.     My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.     This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party A and Guarantor, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Part A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee.

E.     I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of document submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

EXHIBIT C
Page 2

<u>EXHIBIT D to Schedule</u>

. [Form of Opinion of Counsel to Party B]

[Date]

Lehman Brothers Special Financing Inc.
New York, NY

Ladies and Gentlemen:

We have acted as counsel to _____, a _____ of the State of _____ ("Party B") in connection with the execution and delivery of the Master Agreement (the "Master Agreement") dated as of _____ between Lehman Brothers Special Financing Inc. ("Party A") and Party B. The Master Agreement is to be supplemented by confirmations of Transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

In connection with this opinion, we have examined an executed copy of the Master Agreement and the form of Confirmation attached thereto and such documents and records of Party B, certificates of public officials and officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies.

Based upon the foregoing, we are of the opinion that:

1.    Party B is a _____ of the State of _____ duly organized and validly existing under the laws of the State of _____.

2.    Party B is authorized under [specify statutory and/or regulatory authority] to enter into the Master Agreement and to perform its obligations thereunder and under the Confirmation entered into pursuant to and which form a part of the Master Agreement.

3.    Party B has taken all necessary action required to be taken to ensure that the Master Agreement and the Confirmation entered into pursuant to and which form a part of the Master Agreement comply in all respects with [specify statutory and/or regulatory authority].

4.    The Master Agreement has been duly executed and delivered by Party B and constitutes, and each Confirmation, upon due execution and delivery by Party B, will constitute, a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or

similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

5.    To the best of our knowledge, no consent, authorization, license or approval of, or registration or declaration with, any governmental authority is required in connection with the execution, delivery and performance of the Master Agreement and each Confirmation by Party B.

6.    Party B is subject to suit with respect to its obligations under the Master Agreement and each Confirmation and neither Party B nor any of its properties and assets has any right to immunity from suit or attachment in aid of execution or other legal process on the grounds of sovereignty or otherwise or, to the extent that Party B and any of its properties have any such right to immunity, Party B has effectively waived such right for the purpose of the Master Agreement and the party executing the Master Agreement and each Confirmation on its behalf has the authority to waive such immunity.

Very truly yours,

EXHIBIT D to Schedule

Form of Resolutions

RESOLVED that (i) _____ ("_____") enter into interest rate swap and any similar transactions and (ii) the form, terms and provisions of the Master Agreement (the "Agreement") dated as of _____, between Lehman Brothers Special Financing Inc. ("Lehman") and _____, in the form previously presented to (with such changes, not inconsistent with the intent of these resolutions and the intent of the Board of Directors as the officer(s) executing the same, as evidenced by their execution thereof, shall deem necessary or desirable), and the actions contemplated thereby (including the entry by _____ into Transactions with Lehman evidenced by confirmations thereof) be, and they hereby are, in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that _____ is hereby authorized to enter into the Agreement, in substantially the form presented to this meeting and, from time to time, one or more interest rate swap transactions and agreements terminating any such interest rate swap transaction, pursuant to the Agreement and the documents (each a "Confirmation") exchanged between the parties confirming such interest rate swap transactions. The terms of each interest rate swap transaction, including interest rate, term, Notional Amount (as defined in the Agreement) and options as to commencement and termination of payments, and each termination agreement shall be as described in the Agreement and as provided in the related Confirmation, as approved from time to time by the officers of _____ authorized to execute the Confirmation. The aggregate Notional Amount, as defined in the Agreement, of such interest rate swap transactions outstanding at any one time, net of offsetting interest rate swap transactions, shall not exceed $_____ and each such interest rate swap transaction shall terminate not exceeding _____ years after its effective date. The aggregate Notional Amount of all such interest rate swap transactions as of any time shall be determined on a net basis, i.e., where any such transaction is entered into to offset or reverse an earlier transaction, to the extent of the offsetting or reversing effect, the Notional Amounts of such offsetting or reversing interest rate swap transactions shall not be included in the aggregate total.

RESOLVED that the actions contemplated in the Agreement, and each Confirmation, are hereby in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that all officers or officials of _____ be, and each of them hereby is, authorized to execute and deliver (i) the Agreement in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of ) or otherwise and (ii) such other agreements and documents as are contemplated by the Agreement or are otherwise necessary in connection with entering into interest rate swap and any similar transactions, as any such officer or official shall deem appropriate, including without limitation, officer certificates, legal opinions and credit support documents.

RESOLVED that all officers or officials of _____ and its agents and counsel be, and each of them hereby is, authorized to take all such further actions, to execute and deliver such further instruments and documents in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise to pay all such expenses as in his judgment shall be necessary or advisable in order fully to carry out the purposes of the foregoing resolutions.

RESOLVED that all actions previously taken or that will be taken by any director, officer, official, employee or agent of _____ in connection with or related to the matters set forth in or reasonably contemplated by the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of _____.

EXHIBIT D
Page 1

**EXHIBIT E to Schedule**

**Officer's Certificate**

The undersigned the [Chief Executive Officer] [Chief Financial Officer] of _____ (" __") hereby certifies in connection with the Master Agreement (the "Master Agreement") dated as of _____, between Lehman Brothers Special Financing Inc. ("Lehman") and _____ that:

(a)      _____ has taken all action required to be taken to ensure that the Master Agreement and any Confirmation entered into or to be entered into, and the Transactions contemplated thereby, are authorized under and comply in all respects with [specify statutory and/or regulatory authority] (the "Statute"), [its charter and/or its by-laws], including,

[set forth any actions required by the Statute to be taken];

(ii)      _____ is entering into the Master Agreement and any Transactions entered into or to be entered into thereunder, for hedging purposes and not for the purpose of speculation; and

(iii)      _____ meets all the requirements of the Statute not referred to above including:

[set forth any requirements of the Statute not referred to above, such as "_____ is entering into the Transaction in connection with or incidental to the sale and issuance of bonds"].

Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Master Agreement.

IN WITNESS WHEREOF, this Certificate has been executed as of this _____ day of _____.

Exhibit G to Schedule

# ISDA®

**International Swaps and Derivatives Association, Inc.**

# CREDIT SUPPORT ANNEX

### to the Schedule to the

### ISDA MASTER AGREEMENT

### dated as of June 10, 2002

### between

LEHMAN BROTHERS SPECIAL FINANCING INC.    and    MASSACHUSETTS HOUSING FINANCE
AGENCY

("Party A")                                         ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its
Schedule and is a Credit Support Document under this Agreement with respect to each party.
Accordingly, the parties agree as follows:

Paragraph 1.  Interpretation

(a)      *Definitions and Inconsistency.*  Capitalized terms not otherwise defined herein or elsewhere in this
Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to
Paragraphs are to Paragraphs of this Annex.  In the event of any inconsistency between this Annex and the
other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between
Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.*  All references in this Annex to the "Secured Party" will be to either
party when acting in that capacity and all corresponding references to the Pledgor will be to the other party
when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this
Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support
will be to that party as the beneficiary thereof and will not subject that support or that party as the
beneficiary thereof to provisions of law generally relating to security interests and secured parties.

Paragraph 2.  Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its
Obligations and grants to the Secured Party a first priority continuing security interest in, lien on and right
of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the
Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted
hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any
further action by either party.

Exhibit G
Page 1

**Paragraph 3.    Credit Support Obligations**

(a)      *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon demand made by the Secured Party on or
promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the
Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit
Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount
(rounded pursuant to Paragraph 13).  Unless otherwise specified in Paragraph 13, the *"Delivery Amount"*
applicable to the Pledgor for any Valuation Date will equal the amount by which:

    (i)      the Credit Support Amount

exceeds

    (ii)     the Value as of that Valuation Date of all Posted Credit Support held by the Secured
Party.

(b)      *Return Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or
promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds
Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted
Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close
as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise
specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date
will equal the amount by which:

    (i)      the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

    (ii)     the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i)
the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts
applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if
any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be
deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4.    Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)      *Conditions Precedent.*  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of
the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

    (i)      no Event of Default, Potential Event of Default or Specified Condition has occurred and is
continuing with respect to the other party; and

    (ii)     no Early Termination Date for which any unsatisfied payment obligations exist has
occurred or been designated as the result of an Event of Default or Specified Condition with
respect to the other party.

(b)      *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand
for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then
the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a
demand is made after the Notification Time, then the relevant Transfer will be made not later than the close
of business on the second Local Business Day thereafter.

(c)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will
be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or
the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on
the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d),
following the date of calculation).

(d)    *Substitutions.*

(i)    Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying
the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day,
Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support");
and

(ii)    subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of
Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day
following the date on which the Secured Party receives the Substitute Credit Support, unless
otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will
only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that
Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5.    Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a
Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then
(1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not
the other party) not later than the close of business on the Local Business Day following (X) the date that
the demand is made under Paragraph 3 in case of (I) above or (Y) the date of Transfer in the case of (II)
above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other
party not later than the close of business on the Local Business Day following (X) the date that the demand
is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3)
the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the
dispute by the Resolution Time, then:

(i)    In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise
specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of
the Recalculation Date by:

(A)    utilizing any calculations of Exposure for the Transactions (or Swap
Transactions) that the parties have agreed are not in dispute;

(B)    calculating the Exposure for the Transactions (or Swap Transactions) in dispute
by seeking four actual quotations at mid-market from Reference Market-makers for
purposes of calculating Market Quotation, and taking the arithmetic average of those
obtained; *provided* that if four quotations are not available for a particular Transaction (or
Swap Transaction), then fewer than four quotations may be used for that Transaction (or
Swap Transaction); and if no quotations are available for a particular Transaction (or
Swap Transaction), then the Valuation Agent's original calculations will be used for that
Transaction (or Swap Transaction);

(C)    utilizing the procedures specified in Paragraph 13 for calculating the Value, if
disputed, of Posted Credit Support.

(ii)    In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6.    Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)    *Eligibility to Hold Posted Collateral; Custodians.*

(i)    *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii)    *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii)    *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i)    sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii)     register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)     *Distributions and Interest Amount.*

(i)     *Distributions.*  Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii)     *Interest Amount.*  Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).  The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7.   Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i)     that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii)     that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii)     that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8.   Certain Rights and Remedies**

(a)     *Secured Party's Rights and Remedies.*  If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the

Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i)    all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii)    the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv)    the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)    *Pledgor's Rights and Remedies.*  If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i)    the Pledgor may exercise all rights and remedies available to a Pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii)    the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv)    to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A)    Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B)    to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any

Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

## Paragraph 9.    Representations

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

   (i)    it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

   (ii)    it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

   (iii)    upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

   (iv)    the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

## Paragraph 10.   Expenses

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses

Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obliged to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that the Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)   *Good Faith and Commercially Reasonable Manner.*  Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices given by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.*  Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means, with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item

of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

    (x)    the amount of Cash on that day; multiplied by

    (y)    the Interest Rate in effect for that day; divided by

    (z)    360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day,"* unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i)     in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii)    in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii)   in the case of securities that can be paid or delivered in book-entry, the giving of written instruments to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv)    in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i)    Eligible Collateral or Posted Collateral that is:

        (A)    Cash, the amount thereof; and

        (B)    a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii)    Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii)    Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**Paragraph 13. Elections and Variables**

(a)    *Security Interest for "Obligations".* The term "Obligations" as used in this Annex includes the following additional obligations:

    With respect to Party A: Not applicable.

    With respect to Party B: Not applicable.

(b)    *Credit Support Obligations.*

    (i)    *Delivery Amount, Return Amount and Credit Support Amount.*

        (A)    *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)    *"Return Amount"* has the meaning specified in Paragraph 3(b).

        (C)    *"Credit Support Amount"* means, for any Valuation Date (1) 105% of the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any minus (iii) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to Pledgor exceed zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

    (ii)    *Eligible Collateral.* The following items will qualify as "Eligible Collateral" for the party specified:

| Collateral Type | Party A | Valuation Percentage |
|---|---|---|

| (A) | Cash, in the form of U.S. Dollars | [X] | 100% |
| (B) | Negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of not more than one year ("Treasury Bills") | [X] | 100% |
| (C) | Negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of more than one year but not more than ten years ("Treasury Notes") | [X] | 100% |
| (D) | Negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of more than ten years ("Treasury Bonds") | [X] | 100% |

(iii) *Other Eligible Support.* The following items will qualify as **"Other Eligible Support"** for the party specified: Not applicable.

(iv) *Thresholds.*

    (A) **"Independent Amount"** shall mean an amount, if any, as set forth in a confirmation with respect to Party A.

    **"Independent Amount"** shall mean an amount, if any, as set forth in a confirmation with respect to Party B.

    (B) **"Threshold"** means $100,000.

    (C) **"Minimum Transfer Amount"** means, with respect to a party, $10,000; provided, that if an Event of Default has occurred and is continuing with respect to a party as the Defaulting Party, the Minimum Transfer Amount with respect to such party shall be zero.

    (D) *Rounding.* The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of $10,000.

(c) *Valuation and Timing.*

(i) **"Valuation Agent"** means Party A.

(ii) **"Valuation Date"** means the first and fifteenth calendar day of each calendar month or, if such day does not fall on a Local Business Day, then the next following day that is a Local Business Day plus any two (2) additional Local Business Days during each month selected by a party hereto.

(iii) **"Valuation Time"** means 1:00 p.m., New York time (or earlier in the day if the markets relevant to such determination end business earlier on such day); provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) **"Notification Time"** means by 3:00 p.m., New York time, on a Local Business Day.

(d)    *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination
Event(s) will be a "Specified Condition" for the party specified (that party being the Affected party
if the Termination Event occurs with respect to that party);

|  | Party A | Party B |
|---|---|---|
| Illegality | [X] | [X] |
| Credit Event Upon Merger | [X] | [X] |

(e)    *Substitution*

(i)    *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii), unless otherwise
specified here:  Not later than two (2) Local Business Days following the Secured Party's
receipt of Substitute Credit Support.

(ii)    *Consent.* The Pledgor need not obtain the Secured Party's consent for any substitution
pursuant to Paragraph 4(d).

(f)    *Dispute Resolution*

(i)    *"Resolution Time"* means 1:00 p.m. New York time on the fifth Local Business Day
following the time at which notice is given that gives rise to a dispute under Paragraph 5.

(ii)    *"Value."* For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit
Support other than Cash will be calculated as follows:

With respect to any Treasury Bills, Treasury Notes, Treasury Bonds or Agency Securities
(referred to herein as "Government Obligations") the sum of (I)(x) the mean of the high bid
and low asked prices quoted on such date by any principal market maker for such
Government Obligations chosen by the Disputing Party, or (y) if no quotations are
available from a principal market maker for such date, the mean of such high bid and low
asked prices as of the day, next preceding such date, on which such quotations were
available, plus (II) the accrued interest on such Government Obligations (except to the
extent Transferred to a party pursuant to this Agreement or included in the applicable price
referred to in (I) of this Clause) as of such date.

(iii)    *Alternative.* Not Applicable.

(g)    *Holding and Using Posted Collateral.*

(i)    *Eligibility to Hold Posted Collateral; Custodians.*

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph
6(b), provided that the following conditions applicable to it are satisfied:

(1)    Party B is not a Defaulting Party.

(2)    The Custodian, if any, is a bank or trust company having total assets of at least
$100,000,000.

Initially, the Custodian for Party B is:  Not applicable.

(ii)    *"Use of Posted Collateral"* The provisions of Paragraph 6(c) will apply to Party A and Party B.

(h)    *Distributions and Interest Amount.*

    (i)    *"Interest Rate."* The Interest Rate will be the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

    (ii)    *"Transfer of Interest Amount."* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

    (iii)    *"Alternative to Interest Amount."* Not applicable.

(i)    *Additional Representation(s).* Not applicable.

(j)    *Other Eligible Support and Other Posted Support.*

    (i)    *"Value"* with respect to Other Eligible Support and Other Posted Support means: Not applicable.

    (ii)    *"Transfer"* with respect to Other Eligible Support and Other Posted means: Not applicable.

(k)    *Demands and Notices.* All demands, specifications and notices made by a party to this Annex will be made pursuant to the Notices Section of this Agreement.

(l)    *Addresses for Transfers.*

Party A:

    (i)    In the case of cash, by wire transfer of immediately available funds for credit to a bank account of Party A to be designated in Party A's demand for the Delivery Amount or Return Amount, as applicable.

    (ii)    In the case of securities or obligations that can be paid or delivered by book-entry on the records of U.S. Federal Reserve Banks, delivery to Chase, for credit to the account of Lehman Brothers Inc., as agent for Party A (in telegraphic abbreviation, CHASE NYC/LEHMAN, ABA #021000021).

Party B:

    As provided to Party A in writing.

(m)    *Other Provisions.*

    (i)    **Agreement as to Single Secured Party and Pledgor.** Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, Paragraph 1(b) or Paragraph 2 or the definitions in Paragraph 12, (a) the term "Secured Party" as used in this Annex means only Party B, (b) the term "Pledgor" as used in this Annex means only Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph

8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder.