**HEARING DATE AND TIME: January 16, 2013, at 10:00 a.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re                                                       :    Chapter 11 Case No.
                                                            :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                :    08-13555 (JMP)
                                                            :
                    Debtors.                                :    (Jointly Administered)
------------------------------------------------------------x

### RESPONSE OF PLAN ADMINISTRATOR TO MOTION OF TRAXIS FUND LP AND TRAXIS EMERGING MARKET OPPORTUNITIES FUND LP TO COMPEL DEBTORS TO REISSUE DISTRIBUTION CHECKS

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan")[1] for the entities in the above referenced chapter 11 cases (collectively, the "Chapter 11 Estates"), files this response to the motion of Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP (collectively, "Traxis") to compel the Plan Administrator to make Distributions in contravention of the Plan [ECF No. 32163] (the "Motion") and respectfully represents as follows:

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

US_ACTIVE:\44146121\11\58399.0011

**PRELIMINARY STATEMENT**

1.  Traxis' claim for the "reissuance" of certain Plan Distributions is explicitly "discharged and forever barred from assertion" by the confirmed Plan. (Plan ¶ 8.9.) The Plan provides that the amount now claimed by Traxis "irrevocably" reverted to the respective Chapter 11 Estates to be distributed to all creditors in accordance with the Plan, technically including to Traxis on account of its future distributions. *See id.* The Plan granted no discretion or flexibility to the Plan Administrator to honor Traxis' request.

2.  None of sections 105(a), 347(b), 1142(b), or 1143 or the Bankruptcy Code or Bankruptcy Rule 3021 supports Traxis' primary argument that its claim is not time barred. Traxis identifies no "clerical mistake or mistake arising from oversight or omission" in the Plan or Confirmation Order to support its request for relief pursuant to Federal Rule of Civil Procedure 60(a), made applicable by Bankruptcy Rule 9024. To grant the relief requested, the Court must adopt Traxis' alternative argument and find excusable neglect in accordance with Bankruptcy Rule 9006(b)(2) or Federal Rule of Civil Procedure 60(b). Facts relevant to the excusable neglect analysis are set forth below and in the affidavit of Herb Baer (the "Baer Affidavit") filed contemporaneously herewith [ECF No. 33716] and do not support a finding of excusable neglect.

**RELEVANT BACKGROUND**

3.  Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its affiliates commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. The chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

4.  On April 6, 2010, Traxis filed four proofs of claim (collectively, the "Traxis Claims"): two against LBHI (proofs of claim numbers 66509 and 66511) and two against Lehman Brothers Special Financing Inc. ("LBSF") (proofs of claim numbers 66510 and 66512).

5. On December 6, 2011, the Court entered an order confirming the Plan [ECF No. 23023]. Paragraph 8.9 of the Plan provides:

> <u>Time Bar to Cash Payment Rights</u>. Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued. *Any claim in respect of such a voided check shall be made on or before 90 days after the expiration of the 90 day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtor and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor and its property.*

(Plan ¶ 8.9) (emphasis added).

6. On January 19, 2012, Epiq Bankruptcy Solutions, LLC ("<u>Epiq</u>") mailed a *Notice of Confirmation Order* to both Traxis and Traxis' attorneys, Seward & Kissel LLP, at the addresses listed on the Traxis Claims, announcing that the Plan has been confirmed. (Baer Aff. ¶ 3.)

7. The Plan became effective on March 6, 2012 (the "<u>Effective Date</u>").

8. On March 6, 2012, the Plan Administrator filed a *Notice of Effective Date and Distribution Date* [ECF No. 26039], announcing that the Effective Date has occurred and that initial Distributions under the Plan would commence on April 17, 2012. On the same date, the Plan Administrator issued a press release. Both the notice and the press release were posted on the website maintained by the Chapter 11 Estates, www.lehman-docket.com (the "<u>Website</u>")

9. On April 11, 2012, the Plan Administrator filed a *Notice Regarding Initial Distributions* [ECF No. 27312], specifying the percentage recovery that will be distributed to each class of Allowed Claims commencing on April 17, 2012. On the same date, the Plan Administrator issued a press release. Both the notice and the press release were posted on the Website.

10. On April 17, 2012, Epiq mailed four (4) checks in the aggregate amount of $175,948.30 (the "Initial Distribution Checks") on account of the Traxis Claims to Traxis at the address listed for payment on the Traxis Claims. (*Id.* at ¶ 4.) (Traxis listed the same address on the federal tax forms that it submitted to Epiq on December 12, 2011. (*Id.*)) Each Initial Distribution Check was mailed in a separate envelope. None of the four (4) envelopes was returned to Epiq as undeliverable. (*Id.*)

11. On July 2, 2012, Epiq mailed to Traxis two (2) personalized letters offering Traxis the option to have future Plan Distributions sent via wire transfer (the "Wire Solicitation Letters"). In accordance with Traxis' instructions on the Traxis Claims, the Wire Solicitation Letters were mailed to Traxis c/o Seward & Kissel LLP, at the address listed on the Traxis Claims. (*Id.* at ¶ 5.) Traxis did not return the Wire Solicitation Letters to Epiq to request that future Plan Distributions be sent to Traxis via wire transfer. (*Id.*)

12. The Initial Distribution Checks were not negotiated and, pursuant to paragraph 8.9 of the Plan, were deemed voided on July 16, 2012.

13. On September 25, 2012, the Plan Administrator filed a *Notice Regarding Second Distributions* [ECF No. 31082], announcing that additional Distributions under the Plan would commence on October 1, 2012 (the "Second Distribution Date") and specifying the percentage recovery that will be distributed to each class of Allowed Claims. On the same date, the Plan Administrator issued a press release. Both the notice and the press release were posted on the Website.

14. On October 1, 2012, Epiq mailed to Traxis two (2) checks in the aggregate amount of $27,070.89 (the "Second Distribution Checks"). Epiq mailed the Second Distribution Checks to the address listed by Traxis for payment on the Traxis Claims. (*Id.* at ¶ 6.) (Two (2) of

the Initial Distribution Checks were on account of a Convenience Claim or a Convenience Guarantee Claim; such claims were not entitled to subsequent Distributions pursuant to the Plan.)

15. Pursuant to paragraph 8.9 of the Plan, October 14, 2012 was the deadline for Traxis to request the reissue Initial Distribution Checks.

16. On Friday October 19, 2012, the Second Distribution Checks were returned to Epiq as undeliverable. (*Id.*) Promptly thereafter, on Tuesday October 23, 2012, Epiq informed Traxis that the Second Distribution Checks were returned as undeliverable. (*Id.* at ¶ 7.) Prior to October 23, 2012, Traxis did not notify Epiq or the Plan Administrator of any change in Traxis' mailing address. (*Id.*)

17. On October 23, 2012, Traxis advised Epiq of Traxis' new address in Greenwich, Connecticut. (*Id.*) On November 28, 2012, Epiq reissued the Second Distribution Checks (the "Third Series of Checks") and mailed them in two (2) envelopes to Traxis' new address. (*Id.* at ¶ 8.) The Third Series of Checks were not returned as undeliverable. (*Id.*)

18. As of December 20, 2012, neither of the Third Series of Checks had been negotiated. (*Id.* at ¶ 9.) Traxis has alleged in email exchanges with Epiq that it never received the Third Series of Checks. (*Id.*) Accordingly, on December 20, 2012, Epiq voided the Third Series of Checks and is currently in the process of sending a fourth series of checks to Traxis at its new address in Greenwich, Connecticut. (*Id.*)

**RESPONSE**

**I.    Bankruptcy Code Sections 105(a), 347(b), 1142(b), and 1143
       and Bankruptcy Rule 3021 Do Not Support the Relief Requested**

19. Bankruptcy Code Sections 105(a), 347(b), 1142(b), and 1143 and Bankruptcy Rule 3021 do not support the relief requested. To the contrary, together with the

caselaw cited by Traxis, they support the enforcement of the clear, mandatory language of the Plan and the established rules for an orderly distribution of the assets in these cases.

20. As an initial matter, the Debtors do not dispute Traxis' conclusion that:

> Sections 105(a), 3021 [sic] an[d] 1142(b) of the Bankruptcy Code collectively empower this Court to issue an order directing the Debtors to effectuate a transfer of distributions, as contemplated by the Plan, to Traxis in respect of the Allowed Claims.

(Mot. ¶ 19.) But the Motion does not request an order directing a Distribution "*as contemplated by the Plan.*" Instead, the Motion requests an order directing a Distribution *in contravention of* the Plan. As acknowledged by Traxis, paragraph 8.9 of the Plan requires that checks issued in respect of Allowed Claims be null and void if not negotiated within 90 days after the date of issuance thereof. If no claim in respect of such a voided check is made on or before 180 days (approximately six (6) months) following the date of issuance of such check, the amount represented by such voided check shall irrevocably revert to the Debtor and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor and its property. (*See Id.* ¶ 14.) Accordingly, Traxis' reliance on Bankruptcy Code section 105(a) and 1142(b) and Bankruptcy Rule 3021 is inapposite.

21. Traxis' suggestion that sections 347(b) or 1143 of the Bankruptcy Code prevent enforcement of paragraph 8.9 of the Plan is equally misplaced. The Court has already found that the Plan complies with Bankruptcy Code section 1129(a)(1), and thus all applicable provisions of the Bankruptcy Code, *see Confirmation Order* ¶ K, and the Confirmation Order, which was entered without objection, became a final, non-appealable order on December 20, 2011. Moreover, substantively, sections 347(b) and 1143 do not mandate a five-year window for creditors to cash checks issued pursuant to a chapter 11 plan.[2] Indeed, all four of the cases cited

---

[2] Section 1143 provides:

by Traxis make clear that such a window is an outside limit that can be reduced under the provisions of a chapter 11 plan.

22. In *In re George Rodman, Inc.*, for example, the bankruptcy court reasoned: "[t]he logic is that a period of time *not to exceed* five years from the order of confirmation *be fixed* for an entity to present itself and cash the check." *In re George Rodman, Inc.*, 50 B.R. 313, 314 (Bankr. W.D. Ok.1985) (emphasis added). Unlike the Lehman Plan, the chapter 11 Plan in *Rodman* did "not specifically deal with unclaimed property." *Id.* at 313. It was only under those circumstances, i.e., "[s]ince no period has been fixed in this case," that the bankruptcy court reasoned: "by implication the trustee holds the funds for the *maximum* period and then follows the requirements of § 347(b)." *Id* at 314. (emphasis added).

23. Likewise, in *In re TLI, Inc.*, the district court stated: "sections 347(b) and 1143 together establish an *outer limit* of five years from entry of a plan confirmation order within which a creditor required to perform an act as a condition of participating in a plan distribution must accomplish the act or relinquish its right to participate." *In re TLI, Inc.*, 213 B.R. 946, 950 (N.D. Tex. 1997) (emphasis added), *aff'd*, 159 F.3d 1355 (5th Cir. 1998). In fact, the district court noted the desirability of shortening the outer limit in liquidating cases "by confirming a plan that

---

> If a plan requires presentment or surrender of a security or the performance of any other act as a condition to participation in distribution under the plan, such action shall be taken *not later than* five years after the date of the entry of the order of confirmation. Any entity that has not within such time presented or surrendered such entity's security or taken any such other action that the plan requires may not participate in distribution under the plan.

11 U.S.C. § 1143 (emphasis added). Section 347(b) provides:

> Any security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under chapter 9, 11, or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan confirmed under section 943 (b), 1129, 1173, or 1225 of this title, as the case may be, becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.

11 U.S.C. § 347(b).

provides for appropriate property disposition prior to the five-year deadline." *Id.* at 955 (citing 3 COLLIER ON BANKRUPTCY ¶ 347.03[2] (Lawrence P. King, ed., 15th ed. 1996) ("The best solution may be to draft plan provisions that provide alternate dispositions of property to take effect before the time that section 347(b) would become applicable.")).

24. The bankruptcy court in *In re Sterling Financial Services of Florida - 1, Inc.* did not question the validity of a plan's claim forfeiture provision, which included a shorter timeframe than the one contained in the Plan. *In re Sterling Fin. Servs. of Florida - 1, Inc.*, 374 B.R. 327, 331-32 (Bankr. M.D. Fl. 2007). Applying the provision, the court simply was "unpersuaded that claim forfeiture has occurred pursuant to the terms of the confirmed plan." *Id.* at 332. The plan in that case imposed a "two-step process: the claimant's failure to negotiate a final distribution check within 90 days of issuance, and the failure to negotiate the check within an additional 30 days after the reorganized debtor has given specific notice of the prospective forfeiture." *Id.* at 331. The debtor had "not offered any evidence" that the claimants were given the second 30-day notice required for forfeiture. *Id.* at 332. The decision implies that the claims would have been forfeited if the claim forfeiture provision had been fully complied with and the distribution checks had not yet been negotiated by the deadline.

25. Finally, the bankruptcy court decision in *In re IBIS Corp.* lends no additional support to the Motion. *In re IBIS Corp.*, 272 B.R. 883 (Bankr. E.D. Va. 2001). The decision does not address a chapter 11 plan provision addressing the disposition of unclaimed funds. *See Id.* at 887 n.5 ("The confirmed plan of reorganization makes no provision for the circumstances presented by this case. It is, therefore, unnecessary to decide whether the five-year deadline can be reduced or extended in a chapter 11 plan.").

**II.     Bankruptcy Rule 9006(b)**

26.     Traxis alternatively relies upon Bankruptcy Rule 9006(b) as support for the relief requested in the Motion. Bankruptcy Rule 9006(b) provides that "on motion made after the expiration of the specified period [the court may] permit the act to be done where the failure to act was the result of excusable neglect." FED. R. BANKR. P. 9006(b)(1).

27.     The Supreme Court, in interpreting the term "excusable neglect," has held that the term "neglect" in its ordinary sense means "to give little attention or respect to a matter, or . . . to leave undone or unattended to esp[ecially] through carelessness . . . and encompasses both simple, faultless omissions to act and more commonly, omissions caused by carelessness." *Pioneer Inv. Serv. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 395 (1993). The determination of whether a claimant's neglect of a deadline is *excusable*, according to the *Pioneer* Court, however, is an equitable determination in which a court should consider all relevant circumstances surrounding the claimant's omission, including: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer*, 507 U.S. at 395.

28.     In applying the *Pioneer* factors, the Second Circuit has taken a "hard line" approach that does not give the four factors equal weight but rather focuses on the third *Pioneer* factor—the reason for the delay, including whether the cause of such delay was within the reasonable control of the movant—as the most critical. *In re Enron Corp.*, 419 F.3d 115, 122-24 (2d Cir. 2005). The Second Circuit has noted that the reason for this approach is that the other factors delineated in *Pioneer* – prejudice, length of delay and impact on judicial proceedings, and the movant's good faith – will typically weigh in favor of the movant, and the court will therefore

focus on the reason for the delay. *Id*. at 122 (citing *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003)).

### A. Reason for the Delay

29. Traxis argues it lacked control over its failure to meet the deadline imposed by paragraph 8.9 of the Plan. (Mot. ¶ 44.) Traxis reasons that because it did not receive the Initial Distribution Checks, it was unaware that the time to request reissuance had begun to run. *Id.* But the Court must presume that Traxis received the Initial Distribution and notice of all Plan Distributions and, consequently, that the failure to act in a timely manner was within Traxis' control.

30. The "rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." *Hagner v. United States,* 285 U.S. 427, 430 (1932); *see also Wintrade*, 2007 Bankr. LEXIS 3633 at *3 ("When notice is properly addressed and mailed, a rebuttable presumption of proper receipt arises.") (citing *Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir. 1985); *In re Mid-Miami Diagnostics, LLP*, 195 B.R. 20, 22-23 (Bankr. S.D.N.Y. 1996) (collecting cases). The Second Circuit has required more evidence than a claimant's mere denial of receipt to rebut the presumption that mail was received. *See Meckel*, 758 F. 2d at 817; *see also, In re Dana Corp.*, 2007 Bankr. Lexis 1934 at *13 (Bankr. S.D.N.Y. May 30, 2007) ("While the presumption is a rebuttable one, it is a very strong presumption and can only be rebutted by specific facts and not by invoking another presumption and not by a mere affidavit to the contrary."); *In re Enron Corp.*, 2003 Bankr. Lexis 2110 at *10 (Bankr. S.D.N.Y. July 30, 2003) (finding that a CFO's "self-serving declaration asserting non receipt of the Notice Package is insufficient to rebut th[e] presumption of receipt."); *Mid-Miami Diagnostics, LLP*, 195 B.R. at 23 (stating that "[a] creditor's denial of receipt, standing alone, does

not rebut the presumption that the mail was received, but merely creates a question of fact."). Courts require clear and convincing evidence of an objective nature to overcome the presumption of delivery. *Dana*, 2007 Bankr. LEXIS 1934 at *13-15 (collecting cases).

31. As set forth in the Baer Affidavit, Epiq mailed the Initial Distribution Checks to Traxis on April 17, 2012. As further set forth in the Baer Affidavit, Epiq mailed the Wire Solicitation Letters to Traxis' attorneys within 90 days of the April 17, 2012 initial Distribution Date.[3] (*See* Baer Aff. ¶ 5.) The Declaration of Adam Jaffe, the Chief Operating Officer of Traxis Partners LP, offers no more than a general denial of receipt of the Initial Distribution Checks. The declaration makes no reference to the Wire Solicitation Letters. Traxis has failed to submit sufficient evidence to rebut the presumption of receipt of the Initial Distribution Checks or the Wire Solicitation Letters.

32. Traxis had means to completely or reasonably control and ensure that it received Plan Distributions. As one example, Traxis could have requested payment of Distributions by wire rather than by check and mail. As another example, Traxis could have informed the Plan Administrator or Epiq of its change of address rather than rely on the postal service to forward its mail. Indeed, the forms on which the Traxis Claims were filed clearly state: "The creditor has a continuing obligation to keep the Court informed of its current address." Further, as a sophisticated party, Traxis had ample time to access the relevant information to determine when the Initial Distribution Checks were mailed, including the provisions in the Plan, the Plan Administrator's filings with the Bankruptcy Court, the Website, press releases, and

---

[3] The general rule for imputing an agent's notice or knowledge applies to the relation of attorney and client and applies in bankruptcy cases. *See In re Linzer*, 264 B.R. 243, 248 (Bankr. E.D.N.Y. 2001). "Knowledge by an agent of a creditor of the pendency of a bankruptcy case will be imputed to the creditor if his agent was employed to collect the debt or was in charge of its collection." *Id.* (citing *Honig v. Minotti*, 62 N.Y.S.2d 261 (N.Y. App. Div. 1946) ("[N]otice to the attorney authorized to collect the judgment and actually engaged in the collection thereof, was notice to the respondent.")).

general press regarding these cases. As Traxis held approximately $1.4 million in claims, it is reasonable that Traxis could have contacted the Plan Administrator, the Plan Administrator's attorneys, Epiq, or Traxis' own attorneys to request an update on the status of the chapter 11 cases and Plan Distributions.

33. This Court has followed the Second Circuit's "hard line" approach in applying the *Pioneer* factors. Only where "creditors consciously endeavored to comply with the bar date and established that their delay was the result of justifiable confusion" did this Court find the existence of excusable neglect. *In re Lehman Brothers Holdings Inc.*, 433 B.R. 113, 127 (Bankr. S.D.N.Y. 2010), *aff'd.* 445 B.R. 137 (S.D.N.Y. 2011). With respect to all other instances, this Court found that the relevant delay was within the control of the movants and that "reasons offered by the Movants demonstrate a lack of care or thoughtful attention to the[ir] preparation and filing." *Id.*

34. Whether or not Traxis received the Initial Distribution Checks, the checks were not returned as undeliverable. (*See* Baer Aff. ¶ 4.) Accordingly, neither the Plan Administrator nor Epiq had an obligation to notify Traxis that the checks remained outstanding. *See IBIS*, 272 B.R. 883, 890 (Bankr. E.D. Va. 2001) ("Mailing the check is the last act the disbursement agent is required to perform in order to pay the creditor's claim. It is presumed that mail properly addressed is delivered to the addressee. It, therefore, constitutes notice of the availability of the funds.") When Traxis' Second Distribution Checks were returned to as undeliverable, Epiq promptly took the appropriate actions to locate and contact Traxis. *c.f. Id.* ("The presumption of delivery cannot be sustained because the mail was itself returned. Consequently, it cannot be presumed that the creditor was aware of the availability of the funds.

In these circumstances, the disbursement agent must exercise due diligence in attempting to locate the creditor.")

### B.    Prejudice to the Chapter 11 Estates

35.    "Prejudice" includes not only the harm to the debtor but also the adverse impact on the judicial administration of the case. *See In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995); *In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. 1002, 1007 (S.D.N.Y. 1993); *In re Alexander's Inc.*, 176 B.R. 715, 722 (Bankr. S.D.N.Y. 1995). Traxis does not adequately consider the effect of the relief requested in the Motion on the administration of these cases.

36.    Traxis ignores, but this Court has recognized, the prejudice to the Chapter 11 Estates is traceable "to the impact of permitting exceptions that will encourage others to seek similar leniency." *Lehman Brothers*, 433 B.R. at 121. Traxis is not alone in having its Distributions forfeited. Approximately 288 creditors failed to request that their initial Plan Distributions be reissued. The Chapter 11 Estates continue to liquidate. Paragraph 8.9 was incorporated into the Plan both to provide creditors with a fair and reasonable opportunity (180 days) to negotiate or request a reissuance of Distribution checks and to ensure that the assets of the Chapter 11 Estates could be distributed in an orderly and efficient manner. This Court has recognized that, in these cases, "the enormity of the claims [] process is self-evident, and prejudice needs to be evaluated in this unprecedented setting." *Id.* at 120.

37.    Traxis suggests that the Chapter 11 Estates will not be prejudiced because the Traxis Claims were known and factored into the Disclosure Statement's estimates of claims and creditor recoveries. Traxis suggests that the only harm will be to Traxis, with other creditors getting more than they expected and a "windfall" at Traxis' expense. (*See* Mot. ¶ 36-40.) But

Traxis does not discuss the expectation of sophisticated creditors in these cases that paragraph 8.9 of the Plan will be enforced.  In fact, at least one significant creditor contacted the Plan Administrator to ensure the Plan Administrator's compliance with various forfeiture provisions of the Plan.  The "windfall" predicted by Traxis is not unusual or determinative.  Indeed, in certain of the cases cited by Traxis, undeliverable funds went to parties other than the intended creditor.  *See, e.g., Rodman*, 50 B.R. at 314 (directing distribution of funds held for entities which cannot be located not to other known creditors, but to the debtor or entity that acquired the debtor).

### C. Length of Delay

38. As noted above, the Second Distribution Checks were returned as undeliverable to Epiq on October 19, 2012, five days after the October 14, 2012 deadline to request the Initial Distribution Checks be reissued.  Accordingly, Traxis' claim that "had Epiq notified Traxis immediately upon Epiq's receipt of the [Second Distribution Checks], Traxis would have been made aware of the existence of the Initial Distribution Checks and requested their reissuance in full compliance with Paragraph 8.9 of the Plan" is without merit.

39. When considering Traxis' delay, the Court should consider the full 180 days that Traxis had to discover the relevant facts; Traxis considers only the eleven (11) days between the October 14, 2012 deadline and Traxis' subsequent request.

### III. Bankruptcy Rule 9024 and Federal Rule of Civil Procedure ("Federal Rule") 60

40. Traxis further suggests that Federal Rules 60(a), (b)(1), and (b)(6) support the Motion and relief from the Plan and Confirmation Order.  (*See* Mot. ¶ 46-47.)

41. Federal Rule 60(a) is inapplicable to Motion.  The rule provides that a court "may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record," FED. R. CIV. P. 60(a), but Traxis identifies

no clerical mistake or oversight or omission in the Plan or Confirmation Order on which it can rely. (*See* Mot. ¶ 46-47.)

42. Discretionary relief from a final order pursuant to Federal Rule 60(b) is only appropriate under certain limited circumstances. *See Unsecured Claims Estate Representative of Teligent, Inc., et al. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)*, 326 B.R. 219, 224 (S.D.N.Y. 2005). Traxis bears a heavy burden of proof on a motion pursuant to Federal Rule 60(b). *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1142 (2d Cir. 1994); *see also Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). Traxis relies exclusively upon the "excusable neglect" prong of Federal Rule 60(b)(1), citing no independent "mistake," "inadvertence," or "surprise." (*See* Mot. ¶ 47) (referring back to Traxis' Bankruptcy Rule 9006(b) argument).

43. The Motion sets forth no basis for relief under Federal Rule 60(b)(6) (for "any other reason that justifies relief"). Courts in this circuit have held that relief should be granted under Rule 60(b)(6) only where the more specific provisions of Rule 60(b) do not apply. *See Teligent*, 326 B.R. at 227-28; *see also Nemaizer*, 793 F.2d at 63 ("[Rule 60(b)(6)] is properly invoked only when there are extraordinary circumstances justifying relief, when the judgment may work an extreme and undue hardship, and when the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule." (citations omitted)). Accordingly, the Court must consider the same law and facts described in Section II *supra* in its analysis.

### IV.    Statement of the Former Official Committee of Unsecured Creditors

44. The Official Committee of Unsecured Creditors (the "Creditors' Committee") fully supported confirmation of the Plan, inclusive of paragraph 8.9's mandatory forfeiture provision.

45. On December 17, 2012, a statement in support of the excusable neglect argument in the Motion was filed, purportedly on behalf of the Creditors' Committee (the "Statement") [ECF No. 32863].

46. Pursuant to Section 15.1 of the Plan, however, the Creditors' Committee was "dissolved for all purposes," with certain limited exceptions that are inapplicable to the Motion. The Creditors' Committee existed for implementation of the Plan only "through the date of the initial Distribution," which, as noted above, was April 17, 2012.

47. Neither counsel for nor the members of the former Creditors' Committee contacted the Plan Administrator or its attorneys prior to filing the Statement. As such, they were unaware of all of the facts and circumstances known to the Plan Administrator and set forth herein.

48. Accordingly, the Statement should not be granted the imprimatur of an official committee and should be disregarded.

## RESERVATION OF RIGHTS

49. The Plan Administrator reserves the right to request that the hearing to consider the Motion be adjourned to permit the Plan Administrator to take discovery in connection with the Motion and to supplement this filing as a result thereof.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, the Motion should be denied and the Plan Administrator should be granted such other and further relief as the Court may deem just and appropriate.

Dated: January 9, 2013
       New York, New York

/s/ Garrett A. Fail
Lori R. Fife
Garrett A. Fail

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Lehman Brothers Holdings
Inc. and Certain of its Affiliates