WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Peter D. Isakoff
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**In re:**                                            :        **Chapter 11 Case No.**
                                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :        **08-13555 (JMP)**
                                                      :
                          **Debtors.**                :        **(Jointly Administered)**
-----------------------------------------------------------------x

## REPLY TO CANARY WHARF RESPONSE AND IN FURTHER
## SUPPORT OF OBJECTION TO PROOFS OF CLAIM NUMBER 14824 AND 14826

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND.................................................................................................6

ARGUMENT .................................................................................................9

I.     LBHI's Obligations Were Automatically Discharged
in Their Entirety Because of a "Material Variation" .........................................................9

     A.     Schedule 4 of the Lease Is a Guarantee, Not an Indemnity ...................................11

     B.     Paragraph 1 Does Not Contain Two Independent Obligations............................14

     C.     LBHI Did Not Give Advance Consent to the Material Variation .........................15

     D.     The Forfeiture Letter Is a "Material Variation"....................................................16

II.     If LBHI's Liability Was Not Entirely Discharged,
LBHI Was Released from any Liability for Any Period
Following Ten Days After Forfeiture, i.e., December 20, 2010....................................16

     A.     The Forfeiture Letter Foreclosed All Damages for Future Rent Except as
Expressly Stated by Paragraph 7 of the Guarantee ................................................17

     B.     Paragraph 7 is an Exclusive Post-Forfeiture Remedy for Claimants....................20

     C.     LBHI Did Not Anticipatorily Breach Paragraph 7(a)............................................21

III.     Claimants Have Provided No Evidence and
Failed to Satisfy Their Burden for Dilapidations and Costs ...............................................25

IV.     To the Extent Claimants Are Entitled to any Damages, Such Damages Are
Subject to Section 502(b)(6) of the Bankruptcy Code ......................................................26

     A.     Claims for Dilapidations, Attorneys' and
Consulting Fees and Estate Service Charges Should Be Disallowed....................29

     B.     Section 502(b)(6)(B) Is Not Applicable to Claimants' Claims .............................30

     C.     The Lease Is Not a Capital Lease ..........................................................................31

     D.     LBHI Is Not Judicially Estopped from
Arguing that the Lease Is Not a Capital Lease ......................................................34

CONCLUSION....................................................................................................................37

i

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Barney's Inc. v. Isetan Co. (In re Barney's, Inc.),*
    206 B.R. 328 (Bankr. S.D.N.Y. 1997)..........................................................................31, 32

*Baroque Investments Limited v Heis*
    [2012]...........................................................................................................................26

*Commerzanstalt v. Telewide Sys., Inc.,*
    790 F.2d 206 (2d Cir. 1986)...........................................................................................24

*Constitution Bank v. Tubbs,*
    68 F.3d 685 (3d Cir. 1995).............................................................................................24

*Escalus Properties Ltd v. Robinson*
    [1996]...........................................................................................................................19

*Estate of Ginor v. Landsberg,*
    No. 97-9061, 1998 WL 514304 (2d Cir. June 16, 1998)......................................................36

*Goldacre (Offices) Ltd. v. Nortel Networks UK Ltd. (in administration),*
    [2009]...........................................................................................................................10

*Holme v. Brunskill,*
    (1878) ...................................................................................................................... passim

*In re Adelphia Commc'ns Corp.,*
    No. 02-41729 (REG), 2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) ...........................25

*In re Andover Togs, Inc.,*
    231 B.R. 521 (Bankr. S.D.N.Y. 1999) ............................................................................28

*In re EDM Corp.,*
    Case No. 08-40788 (TLS), 2009 WL 6338012 (Bankr. D. Neb. Dec. 21, 2009) ...................27

*In re Enron Corp.,*
    300 B.R. 201 (Bankr. S.D.N.Y. 2003) .........................................................................23, 24

*In re Episode USA, Inc.,*
    202 B.R. 691 (Bankr. S.D.N.Y. 1996) ............................................................................27

*In re Ernie Haire Ford,*
    403 B.R. 750 (Bankr. M.D. Fla. 2009) ............................................................................24

US_ACTIVE:\44142242\30\58399.0011

*In re Gantos, Inc.*,
    181 B.R. 903 (Bankr. W.D. Mich. 1995)................................................................................29

*In re Hotel Syracuse, Inc.*,
    155 B.R. 824 (Bankr. N.D.N.Y. 1993) .................................................................31, 32, 33, 35

*In re Oneida Ltd.*,
    400 B.R. 384 (Bankr. S.D.N.Y. 2009) ..................................................................................25

*In re PCH Assocs.*,
    55 B.R. 273 (Bankr. S.D.N.Y. 1985), *aff'd*, 60 B.R. 870 (S.D.N.Y. 1986), *aff'd*, 804
    F.2d 193 (2d Cir. 1986).........................................................................................31, 32, 34

*In re Rock & Republic Enters., Inc.*,
    Case No. 10–11728 (SHL), 2011 WL 2471000 (Bankr. S.D.N.Y. June 20,
    2011) ....................................................................................................................27, 28, 29, 30

*In re Rockefeller Ctr. Props.*,
    272 B.R. 524 (Bankr. S.D.N.Y. 2000) ..................................................................................25

*Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*,
    936 F.2d 744 (2d Cir. 1991).........................................................................................31, 32

*Kuske v. McSheridan (In re McSheridan)*,
    184 B.R. 91 (B.A.P. 9th Cir. 1995).....................................................................27, 28, 29, 30

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ...............................................................................................................13

*Meyer v. Insurance Co. of America*,
    No. 97-4678, 1998 WL 709854 (S.D.N.Y. Oct. 9, 1998)......................................................36

*N.L.R.B. v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)..............................................................................................................23

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)........................................................................................................34, 35

*New York v. Oneida Indian Nation of New York*,
    90 F.3d 58 (2d Cir. 1996)......................................................................................................13

*Official Comm. of Unsecured Creditors of LTV Steel Co. v. Valley Fidelity Bank & Trust
    Co. (In re Chateaugay Corp.)*,
    961 F.2d 378 (2d Cir. 1992)..................................................................................................34

*Petro Can. Exploration Inc. v. Tormac Transp. Ltd.*,
    [1983] ....................................................................................................................................9

iii

*Rainey Bros. Ltd. v. Kearney*
  [1990] ..................................................................................................................18, 19, 20

*Reichman v. Beveridge,*
  (2006) ..................................................................................................................17, 18, 19

*Schachter v. Lefrak (In re Lefrak),*
  223 B.R. 431 (Bankr. S.D.N.Y. 1998) ..........................................................................31, 33

*Shimer v. Fugazy (In re Fugazy Express, Inc.),*
  982 F.2d 769 (2d Cir. 1992) ...........................................................................................24

*Smith v. Sprayberry Square Holdings, Inc. (In re Smith),*
  249 B.R. 328 (Bankr. S.D. Ga. 2000) .........................................................................29, 30

## Other Authorities

English Insolvency Act 1986, § 178(6) ............................................................................19

Landlord and Tenant Act 1927, § 18(1) ...........................................................................26

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan") for the entities in the above-referenced chapter 11 cases (the "Chapter 11 Estates"), submits this reply (the "Reply") to the response (the "Response") (ECF No. 31341) filed by Canary Wharf Management Ltd. (the "Management Company") and Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited (the "Landlord" and together with the Management Company, the "Claimants") to the Objection to Proofs of Claim Number 14824 and 14826 (the "Objection") (ECF No. 30055)[1] and in further support of its Objection respectfully represents:

### PRELIMINARY STATEMENT

1.      In contravention of settled principles of English law and the Bankruptcy Code, Claimants seek to recover approximately $780 million in purported damages from LBHI that are not allowable and if permitted would unfairly dilute the recoveries of LBHI's legitimate creditors.  LBHI guaranteed the obligations under the Lease of the tenant Lehman Brothers Limited ("LBL") – an entity that is not controlled by LBHI.  In December 2010, Claimants and LBL's administrators – without prior notice to LBHI or LBHI's consent – executed a Forfeiture Letter pursuant to which the Premises were forfeited by the Landlord and LBL's administrators were released from their obligation to pay all rents relating to the Premises as administration expenses in exchange for a *de minimis* payment.  Under well-settled principles of governing English law, these actions had the legal effect of discharging LBHI from all of its obligations under the Guarantee or, at the very least, obliterating all but a small portion of Claimants'

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection.

1

Claims.  Moreover, even if the Claims were not discharged or significantly reduced under English law, they would be substantially circumscribed by section 502(b)(6) of the Bankruptcy Code.  All of Claimants' arguments to the contrary are wrong and should be rejected.

2.      As explained further below and in the accompanying declaration of Richard Millett Q.C. ("Q.C. Millett") in support of the Objection ("Millett Decl."), attached hereto as Exhibit A, there are at least four reasons why LBHI's liability to Claimants has been fully extinguished or should be substantially eliminated.

3.      *First*, LBHI's alleged liability as guarantor was discharged *in its entirety* as a result of the Forfeiture Letter.  As explained by Q.C. Millett, under the long-standing principle of English law established by *Holme v. Brunskill*, (1878) 3 Q.B.D. 495,[2] any variation to an underlying contract after the giving of a guarantee that has the effect of actually or potentially prejudicing the guarantor will automatically discharge the guarantor's liability under the guarantee unless (i) the guarantor consents to the variation or (ii) the variation is not material (*i.e.,* it is patently insubstantial or incapable of adversely affecting the guarantor).  *See* Millett Decl. ¶¶ 40-44.  Under English insolvency law, Claimants were required to be paid certain pre-forfeiture amounts due under the Lease by LBL as an administration expense of LBL's insolvency proceeding.  *See* Millett Decl. ¶ 49(i) and (ii).  Pursuant to the Forfeiture Letter, however, Claimants waived administration claims against LBL in exchange for a small payment, thereby exposing LBHI to liability for amounts that should have been paid by LBL.  This was a material variation of LBHI's obligation that was prejudicial to LBHI and done without LBHI's consent.  Consequently, all Claims against LBHI under the Guarantee have been discharged pursuant to *Holme v. Brunskill.*

---

[2] English law authorities are attached to hereto as Appendix 4 to Exhibit A.

2

4.       In the Response – and in the hope of avoiding the plain consequences of the Forfeiture Letter and their actions under the *Holme v. Brunskill* principle – Claimants offer a hyper-technical and thoroughly wrong argument that LBHI's obligations should be characterized as an "indemnity" rather than a "guarantee."  But as explained in detail by Q.C. Millett, a proper construction of the Guarantee leads to the unequivocal conclusion that LBHI's obligations were a guarantee, not an indemnity under English law.  *See* Millett Decl. ¶¶ 30-38.  To cite just one example, under the express terms of Paragraph 1 of the Guarantee, LBHI's obligations are co-extensive with LBL's obligations under the Lease, which is indicative of a guarantee and not an indemnity.  *See* Guarantee ¶ 1 (LBHI is bound "until the Tenant shall cease to be bound by the Tenant's covenants in the Lease … .").  Claimants' response is to attempt to rewrite Paragraph 1 and argue that it provides two separate covenants by LBHI:  (i) one that is limited to the extent liability may be imposed on the Tenant and (ii) another separate covenant that requires LBHI to indemnify the Landlord whether or not the Tenant is bound by its covenants.  But this forcibly artificial reading of Paragraph 1 is incorrect and contrary to applicable principles of contract interpretation under English law (which are similar to U.S. law) and underscores the lengths to which Claimants are willing to go to inflate their meritless claims.  *See* Millett Decl. ¶¶ 68-72.

5.       *Second*, even if the Forfeiture Letter did not operate to discharge LBHI's liability fully, LBHI was released of any liability thereafter, except to the extent provided for by express agreement.  In accordance with Paragraph 7(b) of the Guarantee, the express agreement of the parties limited LBHI's liability to that accruing until a new tenant took possession, *i.e.*, on December 20, 2010, ten days after the Lease was forfeited.

6.       Under English law, upon a default of a lease by the tenant, the landlord has two options.  It can either retain the lease and charge the tenant for any unpaid rent as it

3

becomes due or it can forfeit the lease and recover the premises. The landlord cannot recover

lost future rent from the tenant. *See* Millett Decl. ¶¶ 73-88. Pursuant to the Forfeiture Letter, the

Lease was forfeited as of December 10, 2010. As a result, because LBHI's liability under the

Guarantee is co-extensive with LBL's under the Lease, the Landlord's rights to claim rent and

other amounts due under the Lease after that date were extinguished, except as otherwise agreed

with LBHI. *See* Millett Decl. ¶¶ 73-88.

7.    The exclusive post-forfeiture remedy that LBHI agreed to is set forth in

Paragraph 7 of the Guarantee. Paragraph 7 states that, after a forfeiture of the Lease, the

Landlord may request that LBHI enter into a replacement lease; but where, as here, no such

request is made within 180 days of the forfeiture, then LBHI's liability for rent and other sums

ends upon the earlier of (a) the Landlord's entry into a lease with a third party or (b) 180 days

following the forfeiture. Claimants never made a request that LBHI enter into a replacement

lease in accordance with the requirements of the Guarantee. And, as it happened, the Premises

were leased to JPMorgan Chase Bank, National Association ("JPMorgan") on December 20,

2010, some ten days after the forfeiture. Thus, pursuant to Paragraph 7(b) of the Guarantee, the

most that LBHI could be liable for is rent and other allowable costs up to ten days after the

December 10, 2010 forfeiture.

8.    *Third,* Claimants have failed to provide any evidence whatsoever in

support of the claim for dilapidations and costs. Claimants present three hypothetical amounts of

dilapidations, all of which are unrelated to any actual damages purportedly suffered. Rather, the

hypothetical amounts were prepared for and used in connection with negotiations between

Claimants and JPMorgan for the new lease. Neither the Response nor the declarations in support

thereof cite to a single example of LBL's violations of the Lease terms, the state of the Premises

4

when JPMorgan went into occupation thereof or actual costs incurred by Claimants.  Claimants

also have not provided evidence to support their claim for costs.  Claimants bear the burden of

proof and have utterly failed to satisfy it.  Accordingly, these portions of the Claims should be

disallowed in their entirety.

9.      *Fourth,* to the extent Claimants are entitled to any damages at all against

LBHI, such damages are subject to section 502(b)(6)(A) of the Bankruptcy Code.  Accordingly,

Claims for dilapidations, attorneys' and consulting fees and estate charges may not be recovered

at all because they do not qualify as "rent reserved."  Any portions of the Claims that may be

allowed are subject to the statutory cap imposed by section 502(b)(6)(A) of the Bankruptcy

Code.  Claimants contend that section 502(b)(6)(A) is inapplicable because the Lease is a

"capital lease."  That is absurd.  LBL had no ownership interest in the Premises and there are no

facts to support the conclusion that the Lease was anything other than a true lease.

10.      For these reasons as explained more fully below, the Claims should be (i)

disallowed in their entirety or (ii) limited to any pre-forfeiture rent and unpaid sums legitimately

due plus amounts for the ten days following forfeiture, all as may be further reduced pursuant to

section 502(b)(6)(A) of the Bankruptcy Code.  To the extent that Claimants can satisfy their

burden of proof that LBHI should have any liability at all, LBHI should be permitted to take

discovery to test the validity of the Claims and challenge the amounts claimed.[3]

---

[3] To the extent that the Claims are not disallowed and expunged in their entirety, LBHI requests that it be
permitted to seek discovery pursuant to a schedule to be negotiated by LBHI and Claimants.  Such
discovery should include, but not be limited to, written discovery, fact depositions and sequential rounds
of expert reports and depositions, including of Queen's Counsel, to be followed by supplemental briefing
based upon the record then developed.

## FACTUAL BACKGROUND

11.     The relevant facts as LBHI currently understands them are set forth as follows.  Certain facts that have been alleged by Claimants are outside of LBHI's control or knowledge, in particular, Claimants' contentions regarding their asserted damages and the details, timing and structure of the JPMorgan transaction.  LBHI lacks sufficient information to confirm or deny their accuracy and would need discovery to the extent the Claims are not entirely disallowed as a matter of law.  Any references to such facts by Claimants that are not expressly denied or refuted by LBHI should not be construed having been admitted by LBHI.

12.     LBHI, LBL and Canary Wharf completed a Lease for the Premises on March 16, 2005.  The Lease is for a term of 30 years commencing July 3, 2003.  *See* Lease Particulars ¶ 6.  The Lease is governed by the Laws of England.  *See* Lease ¶ 8.16.  LBHI guaranteed LBL's obligations under the Lease.  *See* Lease ¶ 10; Schedule 4.

13.     On September 17, 2009, the Landlord filed a proof of claim (Claim No. 14826) against LBHI.  The Landlord's Claim asserted approximately $4.28 billion against LBHI under the Guarantee in estimated damages if LBL stopped paying rent and other charges under the Lease.  On that same date, the Management Company also filed a proof of claim (Claim No. 14824) against LBHI.  The Management Company's claim asserted approximately $195 million against LBHI under the Guarantee in estimated damages if LBL stopped paying estate service charges due under the Lease.  On August 22, 2011, LBHI and Claimants agreed to a maximum allowable amount of the Landlord's Claim at $770 million and of the Management Company's Claim at $9.15 million, subject to LBHI's continuing rights, claims, defenses, challenges and objections to the Claims on any grounds.  The Court approved the stipulation on September 1, 2011.  (ECF No. 19644)

6

14.     According to Claimants, LBL vacated the Premises in March 2010 and LBL's administrators stopped paying rent and other amounts due under the Lease as of March 31, 2010.  *See* Response ¶ 26.  Claimants admit that from September 2008 through December 2010, various subtenants continued to occupy the Premises, and assert that the subtenants collectively paid £51,903,248 in respect of the amounts due under the Lease.  *See id.* ¶ 27.  LBHI lacks sufficient information to confirm the amounts paid by the subtenants or the terms of their occupancy or the extent of any shortfall in rent or other amounts due.[4]

15.     On December 3, 2010, LBL and Claimants – without prior notice to LBHI or LBHI's consent – executed the Forfeiture Letter.  The Forfeiture Letter provides that Claimants "request consent of the Administrators of LBL … to our forfeiting the Lease by means of peaceable re-entry …" and that "we [Claimants] shall exercise that right before 11:59 pm on 10 December 2010."  *See* Forfeiture Letter ¶¶ 1.1, 2.  Claimants also released all administration expense claims under the Lease against LBL in exchange for a payment by LBL of £1.5m.  *See id.* ¶ 4.  Claimants reserved the right to claim unsecured damages against LBL for unpaid amounts under the Lease up to the date of forfeiture.  *See id.*

16.     According to Claimants, Canary Wharf began negotiations with JPMorgan in March 2010 regarding a possible long-term lease of the Premises.  *See* Response ¶ 29. JPMorgan and Canary Wharf purportedly signed a memorandum of understanding in August 2010, which LBHI has not yet seen, that included certain economic terms under which JPMorgan would take a 999-year lease of the Premises.  *See id.*  JPMorgan and a related Canary Wharf

---

[4] Upon information and belief, Claimants may have been insured against LBL's default under the Lease pursuant to an insurance policy issued by AIG Financial Products.  To the extent that the Claims are not expunged in their entirety, the discovery referenced in n. 2, *supra*, would include  discovery to determine whether any available insurance proceeds were paid to Claimants as to mitigate Claimants' alleged damages.

7

entity other than the Landlord on the LBL Lease executed a 999-year lease for the Premises on

December 20, 2010.  *See id.* ¶ 34.

      17.    Claimants assert the following damages against LBHI:

- **Amounts Owed Pre-Forfeiture**:  Claimants allege that from the commencement of LBL's administration in September 2008 through December 2010, £131,784,619.28 was owed in rent, insurance and estate service charges under the Lease and £101,520,066.20 was paid by LBL, its administrators and the subtenants.  Claimants assert the difference (£30,264,553.08) against LBHI notwithstanding that these amounts would have been paid in whole or in part by LBL as an administration expense but for Claimants' waiver of administration claims pursuant to the Forfeiture Letter.  *See* Response ¶ 37.

- **Amounts That Would Have Been Paid Post-Forfeiture**:  Ignoring settled principles of English law and the express terms of the Guarantee, Claimants contend that LBHI is responsible for (i) post-forfeiture amounts that would have been paid by LBL through the end of the Lease term in 2033 if the Lease had not been forfeited, plus (ii) an unspecified amount reflecting the value of the property in July 2033 that Claimants allege is LBHI's responsibility because the Landlord would have retaken possession of the property at that time instead of December 3009 when the JPMorgan lease expires.  *See* Response ¶ 38.  Claimants contend that LBHI is responsible for £397,537,663.92, which Claimants allege is the present value of the difference between the rental amounts that would have been paid by LBL and the amounts paid (or to be paid) by JPMorgan less Claimants' costs to complete the lease transaction with JPMorgan.  Claimants do not offer any legal or logical basis to support their contention that LBHI should be responsible for the hypothetical value of the property in July 2033.

- **Dilapidations**:  Claimants assert that LBHI is responsible for hypothetical dilapidation costs that were apparently contemplated in the context of negotiations with JPMorgan regarding the new lease transaction.  Claimants have failed, however, to assert – let alone offer evidence to support – any actual deficiencies by LBL under the Lease terms or damages suffered.  *See* Response ¶¶ 30, 34, 40.  Accordingly, LBHI has no basis to confirm the purported cost for dilapidations or reason to believe that the charge for dilapidations has any validity.

- **Costs:**  Claimants contend that LBHI is responsible for the costs, including legal costs, associated with collecting unpaid amounts under the Lease, which allegedly total $845,582.00.

8

18.    LBHI disputes that these Claims have any legitimacy at all.  At the very least, the Claims should not be allowed in the overstated and unsubstantiated amounts asserted by Claimants.  To the extent that any damages may be recoverable against LBHI, discovery is necessary so that LBHI can test the validity and reasonableness of the Claims and examine whether Claimants actually suffered the asserted damages to ensure that Claimants do not realize an unfair windfall.  LBHI also disputes the methodologies that Claimants have applied to calculate their damages and would require additional information to determine whether damages have been properly mitigated by Claimants.

## ARGUMENT

### I.    LBHI's Obligations Were Automatically Discharged in Their Entirety Because of a "Material Variation"

19.    Under English law, a guarantee is discharged if there is a material variation to the underlying contract to which the guarantor does not consent:

> . . . if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, . . . if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court . . . will hold that . . . if he has not so consented he will be discharged.

*Holme v. Brunskill*, (1878) 3 Q.B.D. 495, 505, per Cotton, L.J.  This rule rests on the principle that "the law will not assist a party to enforce a bargain who has placed the other party in jeopardy by unilateral alteration of the instrument by which their bargain was made."  *Petro Can. Exploration Inc. v. Tormac Transp. Ltd.*, [1983] 44 B.C.L.R. 220, ¶ 22, per Taylor, J.  *See generally* Millett Decl.  ¶¶ 40-44.  Q.C. Laurence Rabinowitz,[5] Claimants' declarant on the

---

[5] Hereinafter "Q.C. Rabinowitz" and references to the declaration of Q.C. Rabinowitz in support of Claimants' proofs of claim (ECF No. 31343), the "Rabinowitz Decl.".

9

relevant English law issues, does not dispute this bedrock principle of English surety law.  *See*
Rabinowitz Dec. ¶ 28.

20.     English insolvency law provides that rent in respect of administration-
occupied premises is payable as an administration expense regardless of the amount of space the
administrators occupied at any given time.  *See* Millett Decl. ¶ 49 (*citing Goldacre (Offices) Ltd.
v. Nortel Networks UK Ltd. (in administration)*, [2009] EWHC 3389 (Ch); *In Re Lundy Granite
Co., ex p. Heavan* (1871) L.R. 6 Ch. App. 462).  Like administrative expenses under the
Bankruptcy Code, administration expenses in an English insolvency proceeding have priority
over the claims of prepetition general unsecured creditors.  *See id.*  Q.C. Rabinowitz does not
dispute this principle of English insolvency law.  *See* Rabinowitz Dec. ¶ 45.

21.     Under the *Nortel* principles, a liability under a lease arises as an
administration expense if, on any rent payment date, the premises or any part of the premises are
being used for the purposes of the administration.  The declaration of Anthony Jordan (the
"Jordan Decl.") states that the Tenant's subtenant, Nomura International plc, occupied the
Premises until September 2010.  (Jordan Decl. ¶ 11).  Based upon this assertion, at a minimum,
the Premises were occupied for the purposes of the administration until September 2010, and as
such, all amounts due under the Lease until that time were entitled to treatment as an
administration expense.

22.     Notwithstanding that LBL was obligated to pay Claimants amounts due
under the Lease as an administration expense and evidently could have done so, Claimants
waived all such administration claims against LBL in excess of £1.5 million in the Forfeiture
Letter without prior notice to LBHI or its consent, to LBHI's obvious and direct prejudice.  But
for the Forfeiture Letter, LBHI would not have been exposed to liability for the substantial

10

majority of pre-forfeiture rent or other charges under the Lease because such amounts would almost certainly have been paid in full by LBL. *See* Millett Decl. ¶ 49. Instead, Claimants released LBL from these administration obligations and now seek to leave LBHI holding the bag for some of £30,264,553.08 (the pre-forfeiture amount asserted by Claimants against LBHI). This is precisely the type of alteration that discharges a guarantor from any and all liability under English law under the *Holme v. Brunskill* principle. *See* Millett Decl. ¶ 56.

23.    In their attempt to evade this result, Claimants twist the plain meaning of the contract and argue that the Guarantee is really an "indemnity," and, as such, a material variation does not discharge LBHI's obligations under English law. In the alternative, Claimants contend that LBHI gave advance consent to the variation in section 6 of the Guarantee or that the Forfeiture Letter was not really a "material variation." Because Claimants' arguments are contrary to English law and basic principles of contract interpretation, they should be rejected.

A.    **Schedule 4 of the Lease Is a Guarantee, Not an Indemnity**

24.    As explained by Q.C. Millett, "the basic touchstone of whether the contract is one of guarantee or of indemnity is whether the surety assumes an original liability to the creditor or whether his liability is contingent on the default of the principal debtor." Millett Decl. ¶ 30. "The basic rule of thumb is that if the surety's liability is independent of any default by the principal debtor, then the contract will be one of indemnity. If the surety's liability depends on default by the principal debtor in his obligations, then the contract will be one of guarantee." *Id.* While the terms of the instrument should guide the court's interpretation, the "essential character of the bargain is paramount." *Id.* ¶ 32.

25.    In interpreting whether the contract is an indemnity or a guarantee, the general approach under English law "seems to be that contracts of this kind must be strictly construed in favour of the surety and that no liability is to be imposed on him which is not

11

clearly and distinctly covered by the contract." *See* Millett Decl. ¶ 26 (*citing* 2 CHITTY ON CONTRACTS ¶ 44-066 (31st ed. 2012)).  In paragraph 37 of his declaration, Q.C. Millett sets forth multiple reasons why Schedule 4 to the Lease is properly construed as a guarantee and not an indemnity, which include:

i. **LBHI's liability is contingent on LBL's default**.  The operative language in Paragraph 1 of the Guarantee makes clear that LBHI's obligations are secondary or accessory to those of LBL and only arise if LBL defaults, which is indicative of a guarantee and not an indemnity.  Specifically, Paragraph 1 of the Guarantee provides:

    a. LBHI's obligations to indemnify are limited to "all claims demands losses … whatsoever sustained by the [Claimants] *by reason of or arising directly or indirectly out of any default by the Tenant* …" *See* Guarantee ¶ 1 (emphasis added); Millett Decl. ¶ 37(i).

    b. LBHI's liability exists only "until the Tenant shall cease to be bound by Tenant's covenants in the Lease" such that if LBL ceases to be bound, so does LBHI;

ii. **LBHI is jointly and severally liable with LBL**.  Paragraph 2 of the Guarantee provides that LBHI is "jointly and severally liable with Tenant." *See* Guarantee ¶ 2.  This is indicative of a Guarantee and not an indemnity because LBHI's liability is tied to LBL's and is not "separate and independent" of LBL's liability. *See* Millett Decl. ¶ 37(ii).

iii. **Paragraph 3 would be unnecessary if the contract was an indemnity.**  Paragraph 3 of the Guarantee is a waiver of any right to require the Landlord to proceed against the Tenant before proceeding against the Guarantor. *See* Guarantee ¶ 3.  This clause would be unnecessary if Schedule 4 was an indemnity because in that event the Landlord could have proceeded against LBHI irrespective of its prosecution of claims against LBL. *See* Millett Decl. ¶ 37(iii).

iv. **Paragraph 6 would be unnecessary if the contract was an indemnity.**  Paragraph 6 of the Guarantee sets forth a list of events or circumstances that ordinarily could release a guarantor, but shall not act as a discharge or release of LBHI.  Claimants summarily dismiss the significance of Paragraph 6 and state that this provision and each of its 7 subclauses are merely there for the "avoidance of doubt." *See* Response ¶ 54; Rabinowitz Decl. ¶ 39(6).  That is

12

illogical.  As Q.C. Millett states, Paragraph 6 "puts it beyond any reasonable doubt that LBHI's obligations are intended to be those in the nature of a guarantee."  *See* Millett Decl. ¶ 37(v).

v.    **The Landlord and Tenant (Covenants) Act 1995 referenced in Paragraph 6(d) would be irrelevant if Schedule 4 was an indemnity.**  Paragraph 6(d) of the Guarantee provides that LBHI is not released of its obligations if there is a variation of the terms of the Lease, but such clause is subject to Section 18 of the Landlord and Tenant (Covenants) Act 1995.  This Act generally provides that an assignment of a tenancy releases all those bound by such tenancy.  *See* Millet Decl. ¶ 37(vi) and appx. 4.  As stated by Q.C. Millett, section 18 must apply to guarantees "and could never have application to an indemnity contract" because a party providing an indemnity is independently responsible for the obligations under the lease irrespective of whether the tenant is no longer obligated. *See* Millett Decl. ¶ 37(vi).  Thus, the reference to this Act in paragraph 6(d) of the Guarantee supports treating LBHI's obligations as a guarantee, not an indemnity.

vi.   Paragraphs 4, 5 and 7 are standard provisions in most lease guarantees.  *See* Millett Decl. ¶¶ 37(iv) and (vii).

26.    In stark contrast, to support their contention that LBHI provided an indemnity, Claimants offer an exceedingly strained reading of the contract.  Indeed, Q.C. Rabinowitz is reduced to speculating that certain references in the agreement to "guarantees" are "obvious errors" or drafting mistakes.  *See* Rabinowitz Decl. ¶ 39(7) and (8).  Not only does such speculation ignore the fact that the Lease was a significant transaction for both parties,[6] which were represented by very capable counsel, but it also violates one of the most basic principles of contract interpretation that every clause should be read to have meaning.  *See also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (a "cardinal principle of contract construction" is that "a document should be read to give effect to all its provisions and to render them consistent with each other"); *New York v. Oneida Indian Nation of New York*, 90 F.3d 58,

---

[6] Assuming for purposes of argument that Claimants' valuation is correct, the Lease had a purported value to Claimants of £861,552,088.39.  *See* Response ¶ 38.

US_ACTIVE:\44142242\30\58399.0011

63 (2d Cir. 1996) ("[O]ur construction complies with the cardinal principle of contract construction that all provisions of a contract should be given effect if possible.").  Each of the arguments made by Q.C. Rabinowitz that the contract is an indemnity is incorrect and should be rejected for the reasons stated by Q.C. Millett.  *See* Millett Decl. ¶ 38.

### B.    Paragraph 1 Does Not Contain Two Independent Obligations

27.    Claimants wrongly contend that Paragraph 1 of the Guarantee contains two separate obligations of LBHI:  (i) one that is limited to the extent of LBL's liability and (ii) the second of which is an indemnity that is not tied to the obligations of LBL.  *See* Response ¶ 62.  Q.C. Rabinowitz even inserts bracketed numbers purportedly "for explanation," but has effectively rewritten the clause in the process.  *See* Rabinowitz Decl. ¶ 49.  As explained by Q.C. Millett, Paragraph 1 is properly read as a single guarantee obligation and LBHI's liability is co-extensive with LBL's.  *See* Millett Decl. ¶¶ 38(4); 68-72.

28.    Claimants argue that because the paragraph includes the word "and," the introductory language that limits LBHI's obligation to the extent of LBL's – *i.e.,* "Surety shall at all times *until the Tenant shall cease to be bound by the Tenant's covenants in the Lease* …" – somehow does not apply to the LBHI's obligation to "indemnify" Claimants, which appears in the second half of Paragraph 1.  Claimants' rewriting of the Guarantee should be rejected.  Paragraph 1 is a single covenant comprising one singular obligation.  *See* Millett ¶¶ 68-72.  This is clear from the opening words "The Surety hereby covenants with the landlord and as *a* separate covenant with the Management Company as *a* primary obligation … ."  Guarantee ¶ 1 (emphasis added).  The words "and the Surety shall indemnify" do not represent a separate free-standing obligation but simply follow from and form part of the promise in the first part of the paragraph.  Indeed, the references to indemnification are followed by an express reference to the liability of the Tenant, which again makes clear that LBHI's obligation as surety is, unlike an

14

indemnity, dependent upon LBL's default of its obligations under the Lease.  *See* Guarantee ¶ 1

("Surety shall indemnify and keep indemnified the [Claimants] against all claims … *by reason of*

*or arising directly or indirectly out of any default by the Tenant … .*") (emphasis added).

### C.    LBHI Did Not Give Advance Consent to the Material Variation

29.    In their effort to avoid the consequences of the material variation of LBL's

obligations caused by the provisions of the Forfeiture Letter, Claimants also contend that even if

schedule 4 is properly construed as a guarantee, which it is, LBHI consented to the variation by

way of Paragraphs 6(d) and 6(g) thereof.  Paragraph 6(d) of the Guarantee provides that LBHI is

not released from its liability resulting from "any variation of the terms of the Lease."  *See*

Guarantee ¶ 6(d).  As explained by Q.C. Millett, however, the Forfeiture Letter is not a variation

of "the terms of the Lease," but rather is a variation of the mode of performance, which takes it

outside the purview of Paragraph 6(d).  *See* Millett Decl. ¶ 60.

30.    Paragraph 6(g) is a catch-all provision that provides that LBHI is not

released from its liability resulting from "any other act omission or thing whatsoever whereby

but for this provision the Surety would be exonerated … ."  *See* Guarantee ¶ 6(g).  First, as noted

by Q.C. Millett, English courts have been very reluctant to allow creditors to enforce catch-all

provisions against guarantors for liability that they otherwise would not have had.  *See* Millett

Decl. ¶ 62.  Second, in order for LBHI to be liable for an increased amount, which is the result of

the Forfeiture Letter, there must be clear and express wording in the Guarantee for LBHI to have

provided such consent.  *See* Millett Decl. ¶¶ 45-46.  Paragraph 6(g) does not satisfy the standard

for enforceability of advance consent to a material variation of this nature.  *See* Millett Decl.

¶ 63.

15

### D.    The Forfeiture Letter Is a "Material Variation"

31.    Claimants also argue that the release of administration claims against LBL under the Forfeiture Letter was not a material variation of the Lease because administration claims arise under English insolvency legislation, not the Lease.  *See*  Response ¶ 60.  This purported distinction is not only counterintuitive, but is wholly irrelevant under English law.  As explained by Q.C. Millett, the principle of *Holme v. Brunskill* applies to modifications of the mode of performance.  *See* Millett Decl. ¶¶ 50-55, 60.  That is, "courts will not insist on the requirement of variation in a strict contractual sense, and the operation of the relationship in a way which is different from that envisaged by the contract (so as to amount to a waiver by the creditor of what he was entitled to) will suffice."  *Id* ¶ 52 (*citing Bank of Baroda v. Patel*, (1996) 1 Lloyd's Rep. 391, 396 (Q.B.) (Potter, J) (conduct by the creditor to the prejudice of the surety could be sufficient to discharge the guarantor)).  Thus, it is irrelevant that LBL and the Landlord did not technically amend the Lease.  The modification of LBL's performance obligations under the Insolvency Act 1986, *i.e.,* the waiver of administration expense claims against LBL to the obvious prejudice of LBHI, is sufficient to constitute a variation that is neither self-evidently insubstantial nor manifestly unprejudicial to LBHI.  *See Holme v. Brunskill.*

## II.    If LBHI's Liability Was Not Entirely Discharged,
## LBHI Was Released from any Liability for Any Period
## Following Ten Days After Forfeiture, *i.e.,* December 20, 2010

32.    Even if the Forfeiture Letter did not extinguish LBHI's liability in its entirety, pursuant to Paragraph 7(b) of the Guarantee, LBHI was released from any liability attributable to the period more than ten days after forfeiture, *i.e.,* after December 20, 2010.  Paragraph 7 of the Guarantee provides that following a forfeiture, disclaimer in bankruptcy or certain other events, either (a) if the Landlord gives written notice to LBHI within 180 days after the disclaimer or other event, the Landlord can require LBHI to accept the Lease for the

16

remainder of the term, or (b) if no such notice is given, LBHI shall be responsible to pay the rent and other sums due under the lease until the earlier of (i) the expiration of 180 days therefrom or (ii) the Landlord grants a lease of the Premises to a third party.  *See* Guarantee ¶ 7.  The Landlord never gave the requisite notice to LBHI in accordance with Paragraph 7(a).  As a result, under Paragraph 7(b), the latest period for which LBHI could be liable under the Guarantee ended on December 20, 2010, the date when the Premises were leased to JPMorgan.

### A.    The Forfeiture Letter Foreclosed All Damages for Future Rent Except as Expressly Stated by Paragraph 7 of the Guarantee

33.    Claimants contend that even if LBHI's obligations are co-extensive with LBL's, which they are, and Paragraph 7 of the Guarantee limits Landlord's damages, which it does, under English law LBL committed a "repudiatory breach" of the Lease when it purportedly stopped paying rent in March 2010, thereby accelerating Claimants' damages for the full term of the Lease.  This position is plainly contrary to settled English law.

34.    As a matter of English landlord and tenant law, when a landlord elects to forfeit a lease, that brings to an end any liability of the tenant for future rent and there is no basis for any liability in damages for the lost revenue stream.  *See* Millett Decl. ¶ 19(v) (*citing Jones v. Carter*, (1846) 153 Eng. Rep. 1040); *Reichman v. Beveridge*, (2006) EWCA Civ 1659, ¶¶ 26, 42, per Lloyd LJ; Woodfall on Landlord and Tenant Law ¶ 17.315 (Release 60 Oct. 2012)).  When a tenant is in breach of its lease, the landlord can elect either to leave the lease in place and continue to claim rent as it becomes due or to forfeit the lease.  *See* Millett Decl. ¶ 73.  But if the landlord forfeits the lease, it can no longer claim future rent.  The landlord cannot both forfeit the lease and claim damages for any future rent.  *See id*.

35.    This rule was stated by the English Court of Appeal in *Reichman v. Beveridge*, (2006) EWCA Civ 1659, ¶¶ 26, 42, per Lloyd LJ.  The *Reichman* decision is binding

US_ACTIVE:\44142242\30\58399.0011

precedent at every judicial level below the UK Supreme Court including any other English Court of Appeal. *See id.* ¶ 75, fn. 36, 37. In addition, the editors of the two principal practitioner's works on English landlord and tenant law have characterized *Reichman v Beveridge* as stating the settled law. *See id.* ¶ 74 (*citing* WOODFALL, *supra*, at ¶ 7.315, and HILL & REDMAN, LAW OF LANDLORD AND TENANT, Jan. 8, 2013, at ¶ 1543, *available at* www.lexis.com). Indeed, before *Reichman* was decided, the editors of WOODFALL had suggested, on the basis of some non-binding Commonwealth authorities, that perhaps a landlord might be able to accept a tenant's repudiation and sue for future rent. But that suggestion was expressly cited and *disapproved* by Lloyd LJ in *Reichman*. Consequently, the editors of WOODFALL have revised their practice guides to delete their prior suggestion and now cite to *Reichman* as the governing law without further comment. *See id.*

36.     The only authority cited by Claimants in support of their argument is *Rainey Bros. Ltd. v. Kearney* [1990] N. Ir. L.R. 18, a decision of the Court of Appeal of Northern Ireland that is not only contrary to the English Court of Appeal decision in *Reichman*, but is not binding precedent on an English court. Indeed, as noted by Q.C. Millett, not only has *Rainey* not been cited in any of the major textbooks on landlord and tenant law in England, but it has never once even been cited by any English court. *See* Millett Decl. ¶ 81.

37.     Perhaps the reason *Rainey* is such an outlier is that the decision does not cite or indicate any awareness of any of the case law dating back to the eighteenth century holding that liability for rent will continue only for so long as the tenant remains in possession of the premises. *See id.* ¶ 76. In order to adopt the principle of *Rainey*, the UK Supreme Court would have to overrule two hundred years of settled law as to the particular characteristics of rent and its relationship with the right to possession and forfeiture. *See id.* ¶ 81. In short, as

18

Q.C. Millett concludes, the English Supreme Court would not follow *Rainey* over the English Court of Appeal decision in *Reichman*. *See* Millett Decl. ¶¶ 75-85.

38.     The error of *Rainey*, and in Claimants' position, is the mistaken assumption that a lease is just like any other commercial contract. As explained by Q. C. Millett, "[r]ent is special." Millett Decl. ¶ 77. "It has been described in modern times as "axiomatic" that rent has four specific characteristics: it must be (1) a periodical sum, (2) paid in return for the occupation of land, (3) issuing out of the land, (4) for non-payment of which a distress is leviable: *see Escalus Properties Ltd v. Robinson* [1996] QB 231, at 233, Nourse LJ." *Id.* Accordingly, no rent can be due in respect of a particular period unless the tenant has the status of tenant with and interest in and possession of the land for that period. *See id.* Therefore, upon a forfeiture by the landlord, the tenant's obligation to pay rent is discharged because a forfeiture is the act by which the landlord regains possession and the tenant loses its interest in the land. *See id.* ¶ 80.

39.     The only instance in which the landlord is ever entitled to damages for lost future rent is following an affirmative disclaimer of the lease by a liquidator under section 178(6) of the English Insolvency Act 1986 (similar to a rejection of the lease under section 365(a) of the Bankruptcy Code). Before 1929, if the tenant went into liquidation, under English landlord and tenant law as described above, the landlord could forfeit the lease and re-let the property, but in doing so he would lose the right to future rent under the lease. *See* Millett Decl. ¶ 84. The landlord could not both regain possession of the premises and also be compensated for the consequences of his own action in forfeiting the lease. *See id.* The legislative history of section 178(6) of the English Insolvency Act 1986 reflects that its purpose was to cure this disadvantage for the landlord. Accordingly, the statute was amended to permit landlords, where a liquidator

19

disclaims a lease, to calculate their damages in the same manner as contract damages. [7] *See id.*

"If the law in England was as per *Rainey v Kearney* [*i.e.,* the landlord could regain the premises

and collect loss of future rent], the rationale for the introduction of the statutory right of

disclaimer would disappear, and there would be no need for Parliament to have given the

landlord an express right to claim damages (which include damages for future rent)." *Id.*

### B.    Paragraph 7 is an Exclusive Post-Forfeiture Remedy for Claimants

40.    Claimants argue that the remedies set forth in Paragraph 7 of the

Guarantee are not exclusive in the event of a forfeiture.  Rather, they say, the provision

supplements Claimants' purported right to damages against LBHI under Paragraph 1 of the

Guarantee.  *See* Response ¶¶ 68-73.  That understanding of Paragraph 7 is plainly incorrect.  *See*

Millett Decl. ¶ 89-94.  Paragraph 7 represents an exclusive post-forfeiture remedy against LBHI.

As explained above, LBHI's obligations under Paragraph 1 of the Guarantee, by its own express

terms, are co-extensive with and limited to the damages that may be claimed against LBL under

the Lease, as to which LBL's liability ended on the date of the Forfeiture Letter.  *See supra*

¶¶ 26-28.  As there is no independent basis under English law for Claimants to assert the

damages for rent that would have accrued post-forfeiture, except as otherwise agreed by LBHI,

Paragraph 7, with its limitations, is the exclusive source of LBHI's post-Forfeiture Letter

liability, if any.

---

[7] This section does not apply to LBL because disclaimer under the English Insolvency Act 1986 may only be exercised by a liquidator, not administrators such as those appointed for LBL's estate.  Moreover, because the Lease has now been forfeited, to the extent LBL were to enter into a liquidation and a liquidator were to be appointed, there would be nothing left for such liquidator to disclaim.  Thus, there is no possibility that future damages under the Lease could become payable by LBL (and, by extension, LBHI).

20

### C.      LBHI Did Not Anticipatorily Breach Paragraph 7(a)

41.      Notwithstanding Claimants' failure to give notice to LBHI in accordance
with Paragraph 7(a) of the Guarantee, Claimants argue that LBHI should still be responsible for
rent over the entire term of the Lease because LBHI purportedly committed an anticipatory
breach of a purported obligation to take up a new lease that was never tendered.  *See* Response
¶ 74.  Claimants assume that LBHI would not have been able to take over the Lease given its
liquidating status and bankruptcy proceeding and contend that this was purportedly confirmed in
an email by LBHI's counsel.  *See id.* ¶ 76.  Therefore, Claimants believe (and ask this Court to
declare) that they were free to (i) ignore the specific language of the contract, (ii) violate the
prohibitions of the automatic stay under the Bankruptcy Code, (iii) enter into a new lucrative
lease with JPMorgan and (iv) still recover rent for the entire term of the Lease from LBHI.  The
Court should reject Claimants' invitation.

42.      First, as explained by Q.C. Millett, under English law, where fulfillment of
a condition lies entirely in the hands of one party, the other party to a contract cannot commit an
anticipatory breach of a conditional obligation until the obligation has become binding on him,
*i.e.,* the conditional obligation has been triggered.  *See* Millett Decl. ¶ 99.  Under Paragraph 7(a),
LBHI had a conditional obligation to take over the Lease for the remainder of the term if: (i)
Landlord provided proper notice to and made a demand on LBHI to take over the Lease; and (ii)
the Lease was forfeited at the time such demand was made.  *See* Guarantee ¶ 7(a) ("the Surety
shall *if the Landlord by notice in writing given to the Surety* within one hundred and eighty (180)
days *after such disclaimer or other event* so requires … .") (emphasis added); Millett Decl.
¶¶ 97-102.  Neither condition was satisfied.  Claimants never gave proper notice to or made a
demand on LBHI to take over the Lease.  Claimants' assumption that LBHI would not have

21

complied with such a demand is not enough under English law to excuse compliance with the express terms of the Guarantee.  *See* Millett Decl. ¶ 102.

43.    Similarly, Claimants' contention that correspondence between Claimants' attorneys and LBHI's attorneys in the context of settlement negotiations qualifies as notice under Paragraph 7(a) of the Guarantee is incorrect.  The correspondence occurred between December 8 and 9 of 2010.  *See* Response ¶ 33.  The Lease was not forfeited until December 10, 2010.  As a result, the second condition of Paragraph 7(a), which requires the forfeiture to have occurred *before* LBHI could be required to assume the Lease, was not satisfied.  Therefore, the referenced correspondence is irrelevant.  *See* Millett Decl. ¶ 101.

44.    Claimants' failure to follow the procedure laid out in Paragraph 7(a) was neither trivial nor, in LBHI's view, accidental.  LBHI believes (and discovery may show) that Claimants made a conscious and deliberate decision not to propose the Lease to LBHI in accordance with Paragraph 7(a).  As stated in the Response, Claimants began negotiations with JPMorgan regarding a possible long-term lease of the Premises in March 2010 and signed a memorandum of understanding that included basic economic terms of such lease in August 2010. *See* Response ¶ 29.  The memorandum of understanding—which LBHI has not yet seen— evidently provided for JPMorgan to pay Claimants £495 million when the lease with JPMorgan was executed.  *See id.* ¶ 30.  The JPMorgan transaction was contemplated and had been negotiated for months prior to the Forfeiture Letter.  Clearly, the JPMorgan lease was a very significant transaction on which JPMorgan and Claimants expended significant time and resources.  Nothing about it could have been lightly or casually undertaken.  It seems reasonable to assume, therefore, that Claimants and/or JPMorgan were concerned that had the Lease been properly put to LBHI in accordance with Paragraph 7(a) of the Guarantee and the Bankruptcy

22

Code, LBHI might well have taken some action that could have negatively impacted Claimants'

transaction with JPMorgan or otherwise improved its own position.

45.     Indeed, Claimants demanded confirmation from LBHI's attorney that

LBHI would *not* seek to assume the Lease as a pre-condition for sharing a copy of the JPMorgan

lease.  *See* Response ¶ 33.  Having induced that confirmation, Claimants simply did not seek to

follow Paragraph 7(a) of the Lease.  Claimants have provided no explanation for their failure to

comply with the simple terms of Paragraph 7(a).  Claimants had ample opportunity to put the

lease to LBHI if they so wanted.  Having chosen (and likely benefitted from) their actions (and

inactions), Claimants should not now be heard to assert that LBHI would not have complied with

Paragraph 7(a) had Claimants followed its requirements—and therefore be responsible for

unpaid rent due over the entire remaining term of the Lease.  Claimants cannot have their cake

and eat it too.

46.     Second, it is black-letter law that any attempt by Claimants to enforce

Paragraph 7(a) of the Guarantee would have required relief from the automatic stay under the

Bankruptcy Code.[8]  The automatic stay prohibits "any act to obtain possession of property of the

estate or of property from the estate or to exercise control over property of the estate" and "any

act to collect, assess, or recover a claim against the debtor that arose before the commencement

of the case under [chapter 11]."  11 U.S.C. §§ 362(a)(3) and (6).  Contract rights constitute

property of a debtor's estate pursuant to section 541(a)(1) of the Bankruptcy Code.  *See N.L.R.B.*

*v. Bildisco & Bildisco*, 465 U.S. 513, 531-32 (1984); *In re Enron Corp.*, 300 B.R. 201, 211-212

(Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the

---

[8] The Claims arise from LBHI's prepetition guarantee of the Lease, which was not assumed.  Thus, consistent with section 502(g)(1) of the Bankruptcy Code, the Claims are treated as having arisen before the commencement of LBHI's case.

23

estate, and that therefore those rights are protected by the automatic stay") (citations and internal

quotations omitted); *In re Ernie Haire Ford*, 403 B.R. 750, 760 (Bankr. M.D. Fla. 2009)

("[Debtor's] rights under these executory contracts are property of the bankruptcy estate, and,

therefore, exercising a terminable-at-will provision is not permitted without relief from stay.").

Accordingly, Claimants could not enforce Paragraph 7(a) of the Guarantee against LBHI without

relief from the automatic stay.

47.     The protections of the automatic stay cannot be waived by the conduct of

the debtor.  It is well settled that, "since the purpose of the stay is to protect creditors as well as

the debtor, the debtor may not waive the automatic stay."  *Commerzanstalt v. Telewide Sys., Inc.*,

790 F.2d 206, 207 (2d Cir. 1986); *Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769,

776 (2d Cir. 1992) ("Unless lifted by the court, the stay remains in effect until the case is

concluded."); *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995) ("The automatic stay

cannot be waived.  Relief from the stay can be granted only by the bankruptcy court having

jurisdiction over a debtor's case."); *In re Enron Corp.*, 300 B.R. at 212-13 (voiding actions taken

without stay relief by both claimant and debtors).

48.     Had Claimants complied with the automatic stay, the transaction with

JPMorgan would have been delayed, and become more complicated, and perhaps uncertain.

Claimants' evasion of LBHI's protections under the automatic stay may have been motivated by

their desire to protect their deal with JPMorgan and unlikely had such an effect.  LBHI did not

anticipatorily breach the paragraph 7(a) of the Guarantee.  Rather, any breach was committed by

Claimants in their evasion of the procedural and substantive protections afforded to LBHI in both

Paragraph 7(a) of the Lease and the Bankruptcy Code.

### III.    Claimants Have Provided No Evidence and
### Failed to Satisfy Their Burden for Dilapidations and Costs

49.     If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).  The Objection refuted all elements of the Claims. Accordingly, the burden has shifted to Claimants to establish the validity of the Claims.

50.     Claimants have failed to assert the amount of dilapidations they allegedly suffered and to provide any evidence of the specific dilapidations that actually required repair. Rather, Claimants cite to three amounts for hypothetical dilapidations-related damages:

- ▪ £25 million:  "The August 2010 memorandum of understanding provided for JPMorgan to pay Canary Wharf £495 million at the time the lease was signed and for Canary Wharf Contractors Limited ("CWCL") to complete up to £25 million in construction costs for repairs of a limited set of specified dilapidations (not all those required) as well as certain additional improvements at no cost to JPMorgan. (Jordan Decl. ¶ 8.)"  Response ¶ 30.

- ▪ £56,145,280.45:  "CWCL estimated in September 2010 that it would cost £56.35 per square foot in demolition and construction to bring the building into the condition specified in the LBL lease: £11.35/sf to remove LBL's alterations to the building and £45/sf to complete the construction necessary to put the building in the condition specified in the Lease. (Jordan Decl. ¶ 17.) At 996,367 square feet of net usable office space, the total cost would have been £56,145,280.45, or $90,079,487.95. (Jordan Decl. ¶ 17.)"  Response ¶ 40.

- ▪ £100 million:  "In comparison, JPMorgan estimated that it would cost about £100 million ($160.4 million) to repair dilapidations to the building and make additional improvements to the building. (Viets Decl. ¶ 4.)"  Response ¶ 41.

51.     Not only have Claimants failed to specify the amount of dilapidations damages that are being claimed, but in fact they do not assert that they actually incurred any of these costs reflected in these unilateral, self-serving estimates.  And while the Jordan Declaration states in conclusory terms that "CWCL determined that the building had not been left in the

25

condition specified in the Lease. . ." (Jordan Decl. ¶ 6), it does not identify *any* specific failure

by LBL to comply with explicit standards required by the Lease.  That is because the Claims for

dilapidations are entirely hypothetical.  At bottom, Claimants seek to hold LBHI responsible for

hypothetical costs that are unsupported, do not appear to have been actually suffered and are

calculated based upon negotiations and assumed values adopted by parties other than LBHI, or

even LBL.

       52.     Under English law, in order for a landlord to recover damages based upon

an alleged breach of a covenant to repair, the landlord bears the burden of proving that the

alleged damages actually occurred and the extent of the damage.  *See* section 18(1) of the

Landlord and Tenant Act 1927; *Baroque Investments Limited v Heis* [2012] EWHC 2886, ¶¶ 14-

17.  Claimants' calculation of dilapidations based upon the transactions with JPMorgan is plainly

insufficient and inappropriate.  The Claims should not be allowed in any amount.

       53.     Similarly, Claimants have not provided any support for their claim for

costs in the amount of $845,582.00.  The burden rests with Claimants to prove that they are

entitled to damages and costs, a burden—as with the dilapidations—they utterly fail to carry.

**IV.     To the Extent Claimants Are Entitled to any Damages, Such Damages Are Subject
to Section 502(b)(6) of the Bankruptcy Code**

       54.     Section 502(b)(6) of the Bankruptcy Code governs a lessor's damages

arising out of the termination of a lease.  *See* 11 U.S.C. § 502(b)(6).  It provides that a claim is

allowed, "except to the extent that":

> (6) if such claim is the claim of a lessor for damages resulting from
> the termination of a lease of real property, such claim exceeds—
>
> > (A) the rent reserved by such lease, without acceleration, for the greater of
> > one year, or 15 percent, not to exceed three years, of the remaining term of
> > such lease, following the earlier of—
> >
> > > (i) the date of the filing of the petition; and

26

(ii) the date on which such lessor repossessed or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

11 U.S.C. § 502(b)(6).

55.     Section 502(b)(6) of the Bankruptcy Code applies to claims by a lessor against a debtor-guarantor of the tenant.  *In re Episode USA, Inc.*, 202 B.R. 691, 695 (Bankr. S.D.N.Y. 1996) (applying § 502(b)(6) to claims against a debtor-guarantor arising out of the obligations of its non-debtor affiliate under a commercial lease).  By its own terms, section 502(b)(6) of the Bankruptcy Code applies to the "claim of a lessor," and is not tied to the identity of the debtor.  Nothing in the statute suggests that it is to be applied only if the debtor is the tenant.

56.     Section 502(b)(6) of the Bankruptcy Code limits postpetition future damages arising out of the termination of a lease "to the rent reserved under the lease for one year, without acceleration, or 15 percent of the remaining term of the lease for a total period not to exceed three years, whichever amount is greater."  *In re Rock & Republic Enters., Inc.*, Case No. 10–11728 (SHL), 2011 WL 2471000, at *17 (Bankr. S.D.N.Y. June 20, 2011).  Damages associated with the termination of a lease that do not qualify as "rent reserved" are, by reason of section 502(b)(6), not recoverable at all.  *See id.* at *24-25 (holding that attorneys' fees related to litigation in debtors' bankruptcy proceeding were closely related to rejection of the lease agreements and barred by section 502(b)(6) and the *McSheridan* test for "rent reserved" (discussed below)); *In re EDM Corp.*, Case No. 08-40788 (TLS), 2009 WL 6338012, at *3 (Bankr. D. Neb. Dec. 21, 2009) (holding that a landlord's claim for utility payments provided for in a lease are not recoverable under section 502(b)(6)).

27

57.     In evaluating whether a charge qualifies as "rent reserved," this Court has previously adopted the test set forth in *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91 (B.A.P. 9th Cir. 1995), *overruled on other grounds by Saddleback Valley Cmty. Church v. El Toro Materials Co. (In re El Toro Materials Co.)*, 504 F.3d 978 (9th Cir. 2007); *see In re Rock & Republic Enters., Inc.*, 2011 WL 2471000 at *20-21 (*citing In re Andover Togs, Inc.*, 231 B.R. 521, 540 (Bankr. S.D.N.Y. 1999)).  Under the *McSheridan* test, "an expense found in a lease may be properly considered part of the 'rent reserved' under the lease if:

> 1)  the charge is: (a) designated as "rent" or "additional rent" in the lease, or (b) provided as tenant's obligation in the lease;
>
> 2)  the charge is related to the value of the property or the lease thereon; and
>
> 3)  the charge is properly classifiable as rent because it is a fixed, regular or periodic charge.

*See In re Rock & Republic Enters., Inc.,* 2011 WL 2471000 at *21 (citations omitted).  The bankruptcy court must make an independent determination of what constitutes "rent reserved." *See In re Andover Togs, Inc.*, 231 B.R. at 541 ("simply because a lease denominates an item as rent does not make it necessarily so").

58.     Claimants assert the following lease termination claims against LBHI:

(a)      Pre-forfeiture unpaid rent, insurance and estate service charges allegedly totaling £30,264,553.08;

(b)      Post-forfeiture unpaid rent for the remainder of the Lease term at present value plus the value of the property in 2033 less amounts paid or to be paid by JPMorgan, allegedly totaling £397,537,663.92;[9]

---

[9] Claimants no longer seek amounts for post-forfeiture insurance, service charge, taxes and repair and maintenance charges, including Mechanical & Electrical replacement costs, which are apparently being or will be paid by JPMorgan.  *See* Response ¶ 38, fn. 16.

(c)    Dilapidation expenses allegedly totaling £56,145,280.45; and

(d)    Attorneys' and consulting fees allegedly of $845,582.00.

*See* Response ¶¶ 36-42.

**A.    Claims for Dilapidations, Attorneys' and
Consulting Fees and Estate Service Charges Should Be Disallowed**

59.    The portions of the Claims for dilapidations, attorneys' and consulting

fees and estate service charges are unrecoverable (non-rent reserved) termination damages under

the *McSheridan* test.  Section 4.10 of the Lease provides that "[i]mmediately prior to the

expiration or sooner determination of the Term at the cost of the Tenant: – (iv) the Tenant

shall…put or reinstate the Demised Premises in or to a condition commensurate with that

described in the specification annexed hereto entitled 'Minimum Standard Developer's Finish for

Tenant Work."  Lease § 4.10.  This charge fails to satisfy the second and third prongs of the

*McSheridan* test because Tenant's obligations do not relate to the value of the property, and by

the express terms of the Lease, this is a one-time obligation, not a fixed, regular or period charge.

60.    "Several courts have disallowed similar tenant construction obligations

because they do not relate to the value of the property or the lease or they are not fixed, regular,

periodic charges under the lease."  *In re Rock & Republic Enters., Inc.,* 2011 WL 2471000 at *23

(*citing In re Edwards Theatres Circuit, Inc.*, 281 B.R. 675, 684-85 (Bankr. C.D. Cal. 2002)

(disallowing landlord's claims for tenant's failure to construct a theatre on the leased premises

because it did not satisfy any of the *McSheridan* factors); *Smith v. Sprayberry Square Holdings,

Inc. (In re Smith)*, 249 B.R. 328, 339 (Bankr. S.D. Ga. 2000) (holding that landlord's claim for

return of a construction allowance did not satisfy the *McSheridan* factors and was not

recoverable); *In re Gantos, Inc.*, 181 B.R. 903, 907 (Bankr. W.D. Mich. 1995) (rejecting

landlord's claim for return of construction allowance).

29

61.     Similarly, the portion of the Claims for estate service charges and attorneys' and consulting fees in the alleged amount of £1,759,754.10 and $845,582.00, respectively, are not recoverable under section 502(b)(6) of the Bankruptcy Code.  *See Smith v. Sprayberry Square Holdings, Inc.* (*In re Smith*), 249 B.R. 328 (Bankr. S.D. Ga. 2000) (holding that attorneys' fees are damages arising from the termination of a lease, rendering them unrecoverable).  Neither of these charges related to maintaining the value of the property.  Additionally, the Claims for attorneys' and consulting fees are not fixed and regular charges under the Lease.  Accordingly, they should be disallowed.

62.     Claimants' citation to *Rock & Republic* for the proposition that "legal costs associated with collecting amounts owed under the Lease" are recoverable is incorrect and misleading.  *See* Response ¶ 79.  In *Rock & Republic*, the Court held that to the extent attorneys' fees related to the termination of the lease, "they should be disallowed under the *McSheridan* test."  *See In re Rock & Republic Enters., Inc.,* 2011 WL 2471000 at *24-25.  If, however, the attorneys' fees related to a state court litigation between the landlord and tenant in that case, which was unrelated to the termination of the lease, then such claims were not subject to section 502(b)(6).  *See id.* at *25.  Here, by Claimants' own admission, the legal costs are "associated with collecting unpaid Lease amounts."  *See* Response ¶ 42.  By definition, these claims arise as a result of the termination of the lease due to LBL's failure to pay these amounts.  *See id.*

**B.     Section 502(b)(6)(B) Is Not Applicable to Claimants' Claims**

63.     Claimants argue that damages for unpaid rent, insurance and service charges that came due prior to the forfeiture of the Lease on December 10, 2010 are not subject to the cap imposed by section 502(b)(6)(A) of the Bankruptcy Code, but rather are recoverable in full under section 502(b)(6)(B) of the Bankruptcy Code.  *See* Response ¶ 86 (*citing* 11 U.S.C. § 502(b)(6)(B)).  Claimants' position is simply wrong and based upon a misreading of the plain

30

text of the statute. Section 502(b)(6)(B) allows in full any unpaid rent that became due by the *earlier of* the petition date or the date on which the leased property was repossessed or surrendered. *See* 11 U.S.C. § 502(b)(6)(B) ("any unpaid rent due under such lease, without acceleration, on the *earlier of such dates*" (emphasis added). Here, the earlier of these two dates is the date of LBHI's chapter 11 petition – September 15, 2008, which is more than two years before the Lease was forfeited. Thus, only unpaid rent and other allowable charges under the Lease that became due prior to September 15, 2008, which have not been asserted by Claimants, are outside the scope of the section 502(b)(6)(A) statutory cap. Accordingly, to the extent that any portions of the Claims are allowed at all, such claims constitute termination damages and are subject to the statutory cap imposed by section 502(b)(6)(A) of the Bankruptcy Code.

### C.    The Lease Is Not a Capital Lease

64.    Claimants argue that section 502(b)(6) of the Bankruptcy Code is inapplicable because the Lease is a "capital lease." *See* Response ¶ 80. That is incorrect under federal bankruptcy law and inconsistent with economic reality. The Lease is a true lease, and therefore the Claims are subject to the requirements of section 502(b)(6).

65.    Bankruptcy courts have developed various factors to examine in determining whether a real estate lease is a true lease or actually a secured financing.[10] *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir. 1991); *In re PCH*

---

[10] Bankruptcy courts "determine whether an agreement constitutes a lease for purposes of the Bankruptcy Code by reference to federal law." *Barney's Inc. v. Isetan Co. (In re Barney's, Inc.)*, 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997). Although state or other non-bankruptcy law may state a definition of a lease, bankruptcy courts do not pursue an analysis of non-bankruptcy law to determine the application of section 502(b)(6), because "merely meeting the state definition of a lease does not mandate the unthinking application" of the lease provisions of the Bankruptcy Code. *In re Hotel Syracuse, Inc.*, 155 B.R. 824, 838 (Bankr. N.D.N.Y. 1993). Section 502(b)(6) is part of a "total scheme designed to set forth the rights and obligations of landlords and tenants involved in bankruptcy proceedings." *In re PCH Assocs.*, 804 F.2d at 199-200. In applying federal law, bankruptcy courts consider the "economic substance of the transaction" to determine whether a lease should be treated as a true lease or a secured financing. *See Schachter v. Lefrak (In re Lefrak)*, 223 B.R. 431, 435 (Bankr. S.D.N.Y. 1998).

31

*Assocs.*, 804 F.2d 193, 199-200 (2d Cir. 1986).  The overarching issue is "whether the parties

intended to impose obligations and confer rights significantly different from those arising from

the ordinary landlord/tenant relationship."  *In re PCH Assocs.*, 804 F.2d at 200.  "A court is not

constrained by the labels placed upon the transaction by the parties.  Rather, the court must look

to the economic substance of the transaction to determine whether it is in fact a 'true' lease."  *In

re Hotel Syracuse, Inc.*, 155 B.R. 824, 838 (Bankr. N.D.N.Y. 1993).  The burden of proof "lies

with the party challenging the bona fides of the lease," and the "quantum of evidence necessary

to satisfy that burden is 'substantial.'"  *In re Barney's Inc.*, 206 B.R. at 332 (*citing In re PCH

Assocs.*, 804 F.2d at 200).

        66.    The factors below have been utilized in determining whether a real estate

lease is a "true lease" or a secured financing.  Under the facts at bar, the analysis under all of the

factors refutes treatment of the Lease as a capital or finance lease:

- *If the lessee assumes many of the obligations normally associated with outright ownership*.  This is the sole factor cited by Claimants in support of their argument that the Lease is a financing.  *See* Response ¶ 81.  In this case, however, all factors point to the conclusion that the Lease is a true lease.  As is common in the marketplace, the parties entered into a "triple net" lease, which provides that the rent is "net" to the landlord because the tenant takes responsibility for taxes, operating expenses "and the like."  *Int'l Trade Admin.*, 936 F.2d at 751 (citing *James v. Comm'r*, 899 F.2d 905, 906 (10th Cir. 1990) (stating that in a "triple net" lease, lessee is responsible for installation, maintenance, taxes, and insurance)).  This arrangement assures that the landlord will actually receive the lease's stated profits, and such profits will not be subject to any expenses other than typical income tax.  *Id.*  The "superficial shifting of costs" in a triple net lease, should not be interpreted to mean that an agreement is not a lease under the Bankruptcy Code.  Accordingly, the burden of maintaining these expenses was placed on LBL and does not evidence ownership, but rather fixes the lease payments to Landlord without risk of extraneous costs, such as taxes and operating costs.

- *If lease provisions permit or require the lessee to purchase the real estate for a nominal sum at the end of the lease term*.  Where a tenant has a right to acquire the lessor's interest for a nominal cost, the lessor has, by the end of the lease, received all the monies due to it, both capital and interest.  Under such circumstances, the lessor has little, if any, future economic interest in the property.  Here, neither LBL nor LBHI had an option to purchase the asset at the end of the Lease term, which confirms that the parties intended the Lease to be a true lease.  Furthermore, where the lessor retains ownership of the

property at the end of the lease, the lessor has every reason to make certain that the property is in good repair and condition upon the property's return. As stated above, the Lease provides that the tenant is liable for dilapidations and must return the property in full repair and good condition.

- *If the lease is part of a larger transaction.* There is no indication that the Lease was part of a larger transaction, such as a sale-leaseback or purchases and sales of other properties between the parties.

- *If the length of the lease is unusually long.* The Lease was for a term of 30 years. This is not unusually long in the marketplace. By contrast, JPMorgan entered into a 999-year with Landlord for the Premises.

- *If the transaction was structured as a lease to secure certain tax advantages.* There is no indication that either party structured the Lease as a lease for the purpose of securing certain tax advantages.

- If the "rental" payments are calculated to ensure a particular return on an investment instead of compensating the lessor for the use of the real estate. In this case, the rent under the Lease was prescribed for the first ten years of the term (with fixed annual increases). Starting at the end of year ten, the rental amount was to be calculated as the greater of the rent in year ten of the Lease or the open market rent for the property at such time. See Lease, § 13. That formula was to be repeated every five years from November 9, 2013. As such, the long-term rental payments reflect the leasing value with regular review to keep the rents in line with the market.

- If the purchase price for the real estate is calculated as the amount necessary to finance the transaction, rather than as the fair market value of the real estate. There is no evidence that the rental payments from LBL to Canary Wharf are tied to any type of mortgage payment schedule (and the Lease was not part of a sale-leaseback transaction whereby LBL sold the property to Canary Wharf).

See Hotel Syracuse, 155 B.R. at 838-39 (citing *In re PCH Associates*, 804 F.2d at 200-01);

*Schachter v. Lefrak (In re Lefrak)*, 223 B.R. 431, 435 (Bank. S.D.N.Y. 1998) (*citing Int'l Trade*

*Admin.*, 936 F.2d at 749-50 and *In re TAK Broadcasting Corp.*, 137 B.R. 728, 731, 733-34

(W.D. Wis. 1992)).

67.    Based on the foregoing, it is clear that LBL and the Landlord entered into a standard landlord/tenant relationship and did not enter into a capital lease. Claimants have failed to satisfy their burden in challenging the Lease as a true lease. Accordingly, section 502(b)(6)(A) is applicable to the Claims.

US_ACTIVE:\44142242\30\58399.0011

### D.    LBHI Is Not Judicially Estopped from Arguing that the Lease Is Not a Capital Lease

68.    Continuing down an endless, desperate path to avoid the application of section 502(b)(6)(A) to their Claims, Claimants contend that LBHI should be judicially estopped from arguing that the Lease is not a "capital lease" because of LBHI's purported statements in its financial statements and tax returns.  *See* Response ¶¶ 82-83.  Like all of Claimants' other arguments, this position is hopelessly incorrect and should be rejected.

69.    First, it is well-settled law that tax treatment or classification of a transaction does not determine the treatment or classification of that transaction for purposes of the Bankruptcy Code.  *See Official Comm. of Unsecured Creditors of LTV Steel Co. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378 (2d Cir. 1992) (holding that tax treatment of a debt-for-debt exchange under the Internal Revenue Code did not equate to the same treatment of the exchange under the Bankruptcy Code); *see also In re PCH Assocs.*, 55 B.R. 273 (Bankr. S.D.N.Y. 1985) (holding that agreement structured as a ground lease for tax benefits would be treated as a joint venture under the Bankruptcy Code), *aff'd*, 60 B.R. 870 (S.D.N.Y. 1986), *aff'd*, 804 F.2d 193 (2d Cir. 1986) (affirming Bankruptcy Court's determination that section 365(d)(3) did not apply to the ground lease but without addressing whether joint venture was created) .  Therefore, LBHI is not bound by any alleged statements it allegedly made with respect to the Lease for tax purposes.

70.    Moreover, Claimants misconstrue and misapply the test for judicial estoppel, which is simply inapposite.  In *New Hampshire v. Maine*, 532 U.S. 742 (2001), the United States Supreme Court described the doctrine of judicial estoppel as follows:

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary

34

> position, especially if it be to the prejudice of the party who has
> acquiesced in the position formerly taken by him.

532 U.S. at 749. In evaluating whether to apply the doctrine of judicial estoppel, courts

generally look for the existence of the following three factors: (1) a party's new position is

"clearly inconsistent" with its earlier position, (2) the party seeking to assert this new position

previously persuaded a court to accept its earlier position, so that judicial acceptance of an

inconsistent position in a later proceeding would create "the perception that either the first or the

second court was misled," and (3) the party "would derive an unfair advantage or impose an

unfair detriment on the opposing party if not estopped." *Id*. at 750.

71.    Claimants cannot show the existence of any of the factors that are

necessary to establish judicial estoppel. First, LBHI has not advanced any inconsistent factual

positions. As is common, an agreement that meets a certain classification in one setting might

nonetheless be found not to the same classification in the bankruptcy proceedings. *See*, *e.g.*, *In

re Hotel Syracuse, Inc.*, 155 B.R. at 837 (holding that counterparty failed to prove elements of

judicial estoppel because, *inter alia*, even though Debtors classified agreement as commercial

lease in state court action, the agreement did not satisfy Bankruptcy Code requirements to be

considered commercial lease under section 365).

72.    Next, Claimants cannot cite to any judicial or agency proceeding where

LBHI persuaded a court or tribunal to accept classification of the Lease as a capital lease instead

of a real property lease. Accordingly, there is no "risk of inconsistent court determinations" that

would somehow pose a threat to judicial integrity. *New Hampshire*, 532 U.S. at 751-52 (citing

*United States v. C.I.T. Constr. Inc.,*, 944 F.2d 253, 259 (5th Cir. 1991) and *United States v.

Hook*, 195 F.3d 299, 306 (7th Cir. 1999)).

35

73.     Lastly, Claimants have failed to show how LBHI would derive an unfair advantage or impose an unfair detriment on Claimants.  Claimants never relied on or acquiesced to treatment of the Lease as a capital lease.  To the contrary, Claimants have always taken the position that they are the true owners of the property, as evidenced by, for example, their lease of the Premises to JPMorgan.

74.     Claimants citation to *Estate of Ginor v. Landsberg*, No. 97-9061, 1998 WL 514304 (2d Cir. June 16, 1998), and *Meyer v. Insurance Co. of America*, No. 97-4678, 1998 WL 709854, at *10 (S.D.N.Y. Oct. 9, 1998), to support their contention that LBHI is estopped from arguing that the Lease is not a capital lease should be rejected.  *See* Response ¶ 82.   Not only are these cases not bankruptcy cases, but they do not even consider the well-settled authority cited above that make clear that for purposes of treatment of the Lease under the Bankruptcy Code, LBHI is not bound by any alleged statements or classification of the Lease that may have been made for tax purposes.

75.     Accordingly, the Court should hold that the Lease is a lease of real property, not a capital lease or financing arrangement, and Claimants' contentions that LBHI is estopped from asserting section 502(b)(6) of the Bankruptcy Code to their Claims should be soundly rejected.

US_ACTIVE:\44142242\30\58399.0011

## CONCLUSION

76.    For these reasons, the Claims should be (i) disallowed in their entirety or
(ii) limited to pre-forfeiture sums plus amounts for the ten days following forfeiture and further
subject to reduction, if necessary, pursuant to section 502(b)(6) of the Bankruptcy Code.  To the
extent that LBHI is subject to any liability at all, LBHI should be permitted to take discovery to
test the Claims as to validity and amount.  The scope of such discovery should include, but not
be limited to, information concerning or relating to:

i.    the amounts and nature of any dilapidations, costs, rent, estate service

charges, and insurance, including any payments received by Claimants

from third parties in connection with such charges, for the period from

September 2008 through and including December 20, 2010;

ii.    the details of the AIG insurance coverage, including the amounts and

nature of any payments made to Claimants on account of such coverage;

iii.    the details, timing and structure of the JPMorgan transaction, including

memoranda of understanding between JPMorgan and Claimants in

connection with negotiations with respect to the Premises, including any

communications between them concerning any aspect of the transaction,

the Premises, and how to deal with LBL and LBHI including the

Forfeiture Letter and the Guarantee;

iv.    the amounts due in connection with the Premises from September 2008 to

December 20, 2010 and payment of such amounts, including all

documentation related to the terms of sub-tenancy or insurance, the

amounts due from such sub-tenants or insurers, and the amounts of

payment received from such sub-tenants or insurers;

US_ACTIVE:\44142242\30\58399.0011

    v.     the methodologies used by Claimants to calculate the Claims, including any discount rates applied to post-forfeiture damages for the remainder of the Lease term;

    vi.    the changes of the Canary Wharf entity that was the Landlord under the Lease for LBL and the Canary Wharf entity that is the landlord under the lease with JPMorgan for the Premises;

    vii.   email exchanges that took place between counsel to LBHI and counsel to Claimants in December 2010, including communications between Claimants and JPMorgan.

WHEREFORE the Plan Administrator respectfully requests that the Court overrule the Response, enter an order granting the relief requested in the Objection and grant the Plan Administrator such other and further relief as is just.

Dated: January 10, 2013
     New York, New York

                              /s/ Robert J. Lemons
                              Peter D. Isakoff
                              Robert J. Lemons

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Lehman Brothers Holdings Inc.
                              and Certain of Its Affiliates

US_ACTIVE:\44142242\30\58399.0011

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


IN RE LEHMAN BROTHERS HOLDINGS INC *Et al*, Debtors

Chapter 11 Case No 08-13555(JMP)

(Jointly administered)

**DECLARATION OF RICHARD MILLETT Q.C. IN SUPPORT OF REJECTION OF PROOFS OF CLAIM OF CANARY WHARF MANAGEMENT LIMITED *et al*.**


**RICHARD MILLETT Q.C. hereby declares as follows.**


**Introduction**

1. I have been asked by Lehman Brothers Holdings Inc ("LBHI") to provide a declaration of my opinion as to the objections ("the Objections") made by LBHI to the proofs of debt submitted by Canary Wharf Management Limited and others (together "the landlord") so far as that objection is based on and involves any consideration of English law. In particular I make this declaration in response to the declaration of Laurence Rabinowitz Q.C. dated 11 October 2012 ("the Rabinowitz Declaration"). Save where identified I adopt the abbreviations used in the Rabinowitz Declaration.

2. The structure of this report is as follows:

   (1) Personal background

   (2) Factual background

   (3) Executive summary of my conclusions

   (4) The principles of construction of contracts of guarantee and indemnity

   (5) Schedule 4 to the lease is a guarantee and not an indemnity

   (6) The meaning, content and effect of a material variation

(7) The effect of the Forfeiture Letter on LBHI's obligations

(8) The effect of the anti-release clause

(9) The effect of the forfeiture on LBHI's obligations

(10) The meaning and effect of paragraph 7 of schedule 4 to the Lease

(11) The alleged anticipatory breach

(12) Dilapidations, service charges and costs

(13) General conclusion.

3.  I shall assume, as I have been instructed, that my role is not only to provide my opinion as to what English law is as to the various questions raised but also, as Mr Rabinowitz has done, to provide my opinion as to how English law would answer them in the context of the present dispute.

## (1) Personal Background

4.  I am a practising barrister in the Chambers of Mr Gordon Pollock Q.C., at 24 Lincoln's Inn Fields, London WC2A 3EG. My Chambers is known as Essex Court Chambers. I was called to the Bar by Lincoln's Inn in July 1985 and I have practised at the English Chancery and Commercial Bars continuously ever since. Before I joined Essex Court Chambers in 1990 I practised from 1986 in the Chambers of John Chadwick Q.C. (later Lord Justice Chadwick) at Queen Elizabeth Building, Temple, London EC4. In 2000 I was appointed to the Treasury Counsel "A" Panel, and in 2003 I was appointed Queen's Counsel. In 2010 I was appointed a Civil Recorder with a Chancery specialism and I have been sitting regularly since then as a deputy judge in London on Chancery and property business.

5.  My practice covers a broad range of domestic and international litigation and arbitration work. I am ranked in the 2013 *Legal 500* and *Chambers UK Bar* guides for banking, commercial dispute resolution, international arbitration, offshore work and energy. I have appeared in courts at every level in the English legal system, including frequent appearances in the Court of Appeal and appearances in the House of Lords (now the Supreme Court). I am a permanent member of the Bars of the British Virgin Islands and of Anguilla and have been called *pro hac vice* to the Bars of The Cayman Islands, Nevis, Bermuda, The Commonwealth of The Bahamas, the Isle of Man and The Seychelles. I am a member of both the Chancery

2

Bar Association and the Commercial Bar Association (COMBAR) and I sit on the main committee of the former and numerous sub-committees of each.

6.  Among other publications, I am the co-author (with Geraldine Andrews Q.C.) of the Law of Guarantees (6th Edition, 2011), a work first published in 1992 and now regarded as a (if not the) standard textbook on the subject, and one which is frequently cited by senior courts and practitioners. I am also the editor of Halsbury's Laws of England, 5th edition, Vol 20 (2004) on Guarantee and Indemnity.

7.  I was educated at Trinity Hall, Cambridge where I gained a BA, Part 1 in Classics and Part 1 and Part 2 in Law. I was awarded the Megarry Prize for Landlord and Tenant Law in 1985, having come top in that subject at Bar School.

8.  I attach my current curriculum vitae as Appendix 1 hereto. I have disclosed all relevant publications by me in the last 10 years.

**(2) Factual Background**

9.  As to the summary of facts at paragraphs 11 to 20 of the Rabinowitz Declaration, I make the following observations.

10. First, the rent payment dates under the lease follow the usual Canary Wharf rent payment dates rather than the traditional English quarter days. Rent payment dates are 1 January, 1 April, 1 July and 1 October. Full rent was, therefore, paid on or around 1 January 2010 for the period which expired 31 March 2012. This is consistent with the administrators of LBL vacating the space it had been occupying at or within the demised premises during March 2010. It is stated that the tenant failed to make further rent payments. However, it was on account of that liability that rents continued to be paid by Nomura International PLC ("Nomura") who had acquired the ongoing Lehman European business from the administrators. As to that, the acceptance of Nomura's occupation of part of the premises and their status as LBL's sub-tenant and its rent payments amounted to a waiver by landlord of its right to forfeiture under clause 8.1 of the lease. Indeed, the post 1 April 2010 but pre-forfeiture occupation of 25 Bank Street was by LBL's subtenants. Therefore, the rents "received" by the landlord from Nomura and the other sub-tenants were, in fact, due to LBL

3

as the Tenant and directed to the landlord on account of LBL's liabilities to pay rent under the lease.

11. Secondly, at paragraph 18 of the Rabinowitz Declaration Mr Rabinowitz has proceeded on the assumption that the lease entered into in favour of JP Morgan Chase Bank National Association ("JPM") dated 20 December 2010 ("the new lease") was granted by an assignee of the Claimants. However, I am told that that is not necessarily a sound assumption. The lease was an overriding lease granted by HQCB Investments Limited ("HQCBI"). The copy of the new lease supplied by the administrators is an exempt information version allowed under the Land Registration Rules 2003 and, therefore, a considerable amount of detail set out in that lease has been excluded and the true meaning of many clauses are currently unknown.

12. It may be that an overriding lease was granted simply because HQCBI granted the lease subject to what is defined as the occupational underlease, meaning an underlease of floors 18 and 19, which had been granted on 10 December 2010 to Jones Lang LaSalle ("JLL"). In that lease the landlord is referred to as Heron Quays Properties Limited. However, I am instructed that LBHI's understanding is that forfeiture of the LBL lease on 10 December 2010 was effected by the two original landlords, Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited pursuant to the letter of 3 December 2010 (see Exhibit B to the Rabinowitz Declaration). Accordingly, it appears that at some point on 10 December 2010 there was no longer an interest equivalent to the interest out of which the LBL lease had been granted.

13. The sequence seems to have been as follows:

    (i)     Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited forfeited the LBL lease. It may be that they surrendered their interest to Heron Quays Properties Limited as part of a larger transaction intended to collapse the lease structure.

    (ii)    Heron Quays Properties Limited granted a new occupational lease of floors 18 and 19 to Jones Lang LaSalle and then surrendered its 999 year lease (calculated from 1998) to HQCBI. The JLL sublease would have fallen, by operation of law[1], on the forfeiture of the LBL lease.

---

[1] Great Western Rly Co v Smith [1876] 2 Ch D 235 at 253, per Mellish LJ; Official Custodian for Charities v Mackey [1985] Ch 168.

4

(iii)    HQCBI, holding either a freehold interest or a longer leasehold interest than Heron
Quays Properties Limited, granted or agreed to grant a new lease to JPM for a term
of 999 years calculated from 20 December 2010. It also seems that JPM, via Morgan
Property Development Company Limited, acquired an interest in the premises as
"buyer" pursuant to an agreement also dated 20 December 2010 between Heron
Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited as "seller", Morgan
Property Development Company Limited as "buyer", Canary Wharf Holdings Limited
and HQCB Properties (HQ2) Limited. It is hard to tell, without all the relevant
transaction documents, precisely where this sale agreement fitted in.

14. These arrangements, so far as one can tell without all the documents, collapsed the lease
structure, cleared up the title and gave JPM a clean lease but may have had the
consequence of breaking the nexus between the original landlords and LBL as to future
liabilities. Presumably the exempted provisions in the new lease contain an attempt to
preserve that liability by contract. Once the full documentation and their detailed provisions
have been disclosed to LBHI they will need to be analysed.

15. In summary, the manner in which the reversionary interests were collapsed may affect the
claims of the original landlords against LBHI for post forfeiture rent (if contrary to my views
as I explain them below, such a liability existed). I will need to review the full documentation
once disclosed in order to form a final view about what happened.

16. Furthermore, I would not wish to be taken as accepting as complete and accurate Mr
Rabinowitz's summary of LBHI's Objections at paragraph 20 of the Rabinowitz Declaration,
and so I attach for completeness a copy of the Objections as Appendix 2 hereto.

17. In addition, it appears from the exchange of e-mails over the period 8 to 10 December 2010
between Richard Krasnow of Weil and Andrew Dietderich Sullivan & Cromwell that the
Landlord had already lined up a new tenant for the Premises and was very close to agreeing
terms with it. LBHI, having been told orally at a meeting on 6 December 2010 about the
economics of the new lease, wanted to review it under a confidentiality agreement in order
to evaluate the proposed settlement and the Landlord's claims[2], and not to evaluate
whether or not to take up a new lease. The Landlord, at the request (it appears) of the new

---

[2] It is relevant that LBL, as tenant, had invested a substantial amount in fitting out the Premises, which would
have had a substantial value to an incoming tenant, particularly one in the same line of business.

tenant, wanted LBHI to confirm, before being given the documents containing the terms of the new lease, that it would not take up a new lease, saying that the new tenant would not give the terms of the new lease to LBHI without that good faith commitment. In short, the Landlord demanded that LBHI confirm that it would not seek to take up a new lease in competition with the new tenant as a condition of letting LBHI review the new lease terms (see e.g. e-mail from Mr Dietderich of 8 December 2010 at 6.59). LBHI's response to that demand was that on the assumption that the economics of the new lease were as previously described, *" ... then LBHI would not elect to enter into a lease for the premises on the same terms as the current CW/LBL lease."* I attach those e-mails at <u>Appendix 3</u> hereto.

18. Appendix 4 hereto comprises a tabbed bundle of the authorities, statutes, articles and other legal materials to which I shall refer in the course of this declaration.


**(3) <u>Executive summary of my conclusions</u>**

19. In summary my views are as follows:

   (i)    Although the ordinary principles of construction of contracts are generally applicable to contracts of guarantee or indemnity, the *contra proferentem* rule applies in cases where the document admits of doubt and in any event clear words are required in order to exclude or limit prevailing rules of law or principles of equity: see e.g. <u>Liberty Mutual v HSBC Bank plc</u> [2002] EWCA Civ 691 at para 56, Rix LJ.

   (ii)   Applying the relevant principles, on its true construction schedule 4 of the Lease is a guarantee and not an indemnity. That is because the basic obligation on LBHI is to pay or perform LBL's obligations in the Lease if LBL does not. Default by LBL is the trigger for all or any obligation by LBHI under schedule 4, and it is irrelevant that LBHI also contracts as a primary obligor (para 1) or as a joint and several obligor with LBL (para 2).

   (iii)  Neither paragraph 6(d) or 6(g) of schedule 4, on their true construction, operates to exclude the principle in <u>Holme v Brunskill</u> [1877] 3QBD 495, or to permit the landlord to expand LBL's liabilities beyond the original purview of the guarantee.

(iv)    The Forfeiture Letter did effect a material variation of the Lease, and so LBHI's
liabilities under schedule 4 were discharged pursuant to the principle in *Holme v
Brunskill*. As I shall explain in further detail below, that principle is that that any
variation to the principal contract, after the giving of the guarantee, which has the
effect of actually or potentially prejudicing the surety, will discharge the surety's
liability under the guarantee unless: (i) the guarantor consents to the variation; or
(ii) it is not "material" in that the variation is <u>patently insubstantial or incapable of
adversely affecting the guarantor</u>. This is fundamental principle of guarantee law
and applies to guarantees of leases.[3] Mr Rabinowitz has focussed too narrowly on
the fact that the Forfeiture Letter limited or reduced the administrators' liability for
arrears of rent as an expense of the administration but failed to take account of the
fact that the Forfeiture Letter, by reducing the amount of the pre-forfeiture arrears
payable as an administration expense (which could have been paid by the
administrators in full), automatically increased the liability of LBL's general estate for
the arrears and hence LBHI's liability as guarantor. Alternatively, on the application
of the principle in <u>Triodos Bank v Dobbs</u> [2005] 2 Ll Rep 588, LBHI cannot be liable
beyond the purview of the guarantee, and any liability by LBL for post-
administration rent as an ordinary debt falls outside the purview of the guarantee.

(v)    LBL did not repudiate the lease by failing to pay the rent with the effect that LBL,
and hence LBHI, is liable in damages for the net present value of the lost future
revenue stream post-termination. As a matter of English landlord and tenant law,
when a landlord elects to forfeit a lease, that brings to an end any liability on the
tenant for future rent and there is no basis for any liability in damages for the lost
revenue stream: <u>Jones v Carter</u> (1846) 15 M & W); <u>Reichman v Beveridge</u> [2006]
EWCA Civ 1659, at paras 26 and 42, per Lloyd LJ; <u>Woodfall on Landlord and Tenant
Law</u>, (Release 90, October 2012) para 17.315. The English Supreme Court would not
overrule <u>Reichman v Beveridge</u> and follow the Northern Irish decision in <u>Rainey Bros
Ltd v Kearney</u> [1990] NI 18. The only basis in English law on which a lessor can claim
the net present value of the future revenue stream is where the lease is disclaimed:
in such circumstances (and only in such circumstances) Parliament has provided for
a statutory right to the landlord to claim loss and damage (section 178(6) of the
Insolvency Act 1986; <u>Re Park Air Services plc</u> [2000] 2 AC 172.

---

[3] <u>West Horndon Industrial Park v Phoenix Timber</u> [1995] 29 E.G 137.

(vi)     There was no anticipatory breach of the lease by LBHI in indicating that, if offered, it
         would not take a new lease under Schedule 4 para 7(b).  The landlord gave no
         written notice to LBL under para 7(a) to take up a new lease, and made no demand
         for any sum under para 7(b), and so there were no obligations on LBHI which fell to
         be performed thereunder which could be or were breached, whether anticipatorily
         or at all.  In fact, as is clear from the e-mails at the time, what happened was that
         the Landlord, having lined up JPM as the new tenant, then required LBHI to confirm
         that it did not wish to take up a new lease, which LBHI did duly confirm. That did not
         involve LBHI evincing an intention not to take up a new lease if the Landlord served
         a notice on LBHI requiring it to do so: the Landlord had made it plain that it was not
         going to do so unless LBHI insisted on having a new lease.

(vii)    The objection as to dilapidations and other matters such as rates and services
         charges are all as to the inadequacy of the proofs in respect of those matters and
         the extent to which they were met by JPM under the new lease.  LBHI has not
         objected on the grounds that the sums so claimed are penal as a matter of English
         law. Its complaint is that the landlord has not attempted to prove quantum.

## (4)  The principles of construction of guarantees and indemnities

20. I agree with Mr Rabinowitz's statement of the basic principles of English law as to the
    interpretation of commercial contracts. I also agree that those principles apply for the most
    part generally to leases, guarantees and indemnities.

21. However, there are particular principles governing the interpretation of contracts of
    guarantee and indemnity.  In Blest v Brown (1862) De G, F and J, 367, Lord Campbell said (at
    p 376):

> "It must always be recollected in what manner a surety is bound.  You bind him to the letter
> of his engagement.  Beyond the proper interpretation of that engagement you have no hold
> upon him.  He receives no benefit and no consideration.  He is bound, therefore, as to the
> proper meaning and effect of the written agreement he has entered into."

22. In Eastern Counties Building Society v Russell [1947] 1 All ER 500 Hilbery J said:

8

> "Rather will the court in case of doubt lean in [the surety's] favour. Neither equity nor law will put a construction on the document which results in imposing on the surety any more than, on the strictest construction of the instrument, he must be said expressly to have undertaken, or so as to detract from the right given to the surety by the proviso defining the circumstances in which the surety is to be held discharged."

23. This dictum was approved by the Court of Appeal in Estates Gazette Ltd v Benjamin Restaurants Ltd [1994] 1 WLR 1528, at 1533. The Court balanced that by going on to say

> "On the other hand, the words have to be fairly construed in their context and in accordance with their proper meaning without in any way favouring the guarantor, who is not placed in any more favourable position in this regard than any other contracting party. The so-called rule of construction is very much a matter of last resort."

24. However, the Court of Appeal did not say that there was no such rule of construction. Moreover, in Cattles plc v Welcome Financial Services Ltd [2010] 2 Ll Rep 514, the Court of Appeal (Lloyd LJ, at para 43) followed the dictum of Arden LJ in Arden LJ in Static Control Components (Europe) Limited v Egan [2004] EWCA Civ 392, [2004] 2 Lloyd's Rep 429 at paragraph 37 to the effect that the *contra proferentem* rule can be used where the document, properly construed, "admits of doubt".

25. Commentators accept that one area where the strict rule of construction may remain applicable is in respect of interpretation of clauses which are designed to preserve the liability of the guarantor when he would otherwise be discharged under the general law: see O'Donovan & Phillips, The Modern Contract of Guarantee (2nd English End, 2010), para 5-05. The preponderance of judicial opinion favours such an approach. In Liberty Mutual v HSBC Bank plc [2002] EWCA Civ 691 at para 56, Rix LJ approved Patten J's view that the modern principles of construction of contracts does not exclude a strict approach to words which purport to restrict or exclude the application of otherwise prevailing rules, since *"the reasonable man does not expect fundamental principles of law, equity and justice, such as rights of set-off or subrogation, to be excluded unless the contract clearly says so."* O'Donovan & Phillips say that "the issue remains an open one" (ibid). However, in doing so they only cite the decision of Stanley Burnton J in Barclays Bank plc v Kingston [2006] 2 Ll Rep 59, in which he said he declined to interpret such clauses in a guarantee *"with the hostility traditionally shown to exclusion clauses"*. In that case, Stanley Burnton J did not consider any of the cases concerned with construction of guarantees and in particular the decision of the Court of Appeal in Liberty Mutual which was binding on him.

9

26. Accordingly, my own view is that the issue is not "an open one", as O'Donovan & Phillips suggest. The editors of Chitty on Contracts (31st Edition, 2012), at Vol 2, para 44-066[4], treat Liberty Mutual as the principal authority on this issue. Furthermore, they say in clear terms that

> "Despite some contradictory dicta in the cases, the general approach seems to be that contracts of this kind must be strictly construed in favour of the surety and that no liability is to be imposed on him which is not clearly and distinctly covered by the contract."[5]

In the context of clauses which purport to exclude rules of common law or equity which are incidental to the contract of suretyship, the editors of Chitty go on to cite the decision of the House of Lords in Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Ltd [1996] 1 AC 199, at 208, per Lord Jauncey of Tullichettle, where he said:

> " ... there is no doubt that in a modern contract of guarantee parties may, if so minded, exclude one or more of the normal incidents of suretyship. However, if they choose to do so clear and unambiguous language must be used."

27. This view was repeated by the Court of Appeal in IIG Capital LLC v Van Der Merwe [2008] 2 Lloyd's Rep 187, by Waller LJ at para 19. In Vossloh Aktiengesellschaft v Alpha Trains (UK) Ltd [2011] 2 All ER (Comm) 307, Sir William Blackburne, summarising the law on the nature of guarantees and their construction, said at para 27[6]:

> "Context is important in deciding what the nature is of the obligation under consideration as even minor variations in language, plus a different context, can produce different results. See IIG Capital LLC v Van Der Merwe [2008] EWCA Civ 542, [2008] 2 Lloyd's Rep 187 ("IIG") at [20] (Waller LJ). But if, in a contract of guarantee (strictly so called), the parties are minded to exclude any one or more of the normal incidents of suretyship "clear and unambiguous language must be used to displace the normal legal consequence of the contract..." See IIG at [19] (Waller LJ)."

---

[4] Chitty on Contracts is the standard and most authoritative practitioners' textbook on the law of contract in use in England. It is afforded very great deference by all courts in England and the Commonwealth. Its editors number among the most eminent academic and practising commercial lawyers in England. The chapter on Suretyship is written by Professor Simon Whittaker, Professor of European Comparative Law in the University of Oxford. The 31st edition was published in October 2012.

[5] The authority cited for this proposition is Blest v Brown (supra).

[6] Mr Rabinowitz has drawn heavily on Vossloh but does not appear to have given any attention to this part of Sir William Blackburne's summary.

28. In summary, therefore, a balanced survey of the present law leads, in my opinion, to the following conclusions as to the proper approach to the construction of contracts of guarantee:

    (i)    Although guarantors are not generally in any more favourable position than any other contracting party, the court will take particular care to ensure that the liability of the surety is no greater than the language of the instrument fairly imposes on him.

    (ii)    The *contra proferentem* principal will apply in favour of the surety in cases of ambiguity or doubt.

    (iii)    In relation to provisions which purport to exclude or limit the normal incidents of suretyship so as to expand the surety's liability, clear and unambiguous words will be required. This seems to be common ground.[7]

29. For the reasons which I will explain under section (8) below, the language of paragraph 6 of schedule 4 to the lease is not sufficiently clear or free from doubt to oust the operation of the principle in Holme v Brunskill, which is a normal incident of a contract of guarantee[8], or to impose on LBHI any greater liability that it has undertaken by the clear and express words used.

**(5) On its true construction schedule 4 to the Lease is a guarantee and not an indemnity**

    (i)    The applicable legal principles

30. The distinction between a contract of guarantee and a contract of surety may often be important. For example, the Statute of Frauds 1677, which requires guarantees to be in writing under the hand of the guarantor, does not apply to indemnities, and nor does the principle in Holme v Brunskill. Telling the difference often calls for fine distinctions to be made. In Yeoman Credit v Latter [1961] 1 WLR 828, Holroyd Pearce LJ complained that the

---

[7] See paragraph 42 of the Rabinowitz Declaration and the unqualified adoption of the reference there to Chitty para 44-099.
[8] The principle in Holme v Brunskill does not apply to a contract of indemnity.

exercise of telling the difference *"has raised many hair-splitting distinctions of exactly that kind which brings the law into hatred, ridicule and contempt by the public."* Be that as it may, the basic touchstone of whether the contract is one of guarantee or of indemnity is whether the surety assumes an original liability to the creditor or whether his liability is contingent on the default of the principal debtor. The basic rule of thumb is that if the surety's liability is independent of any default by the principal debtor, then the contract will be one of indemnity. If the surety's liability depends on default by the principal debtor in his obligations, then the contract will be one of guarantee. These principles were recently summarised (I think accurately) by Sir William Blackburne in Vossloh at paras 20-26. Critically, he said at para 24:

> "An essential distinguishing feature of a true contract of guarantee – but not its only one - is that the liability of the surety (i.e. the guarantor) is always ancillary, or secondary, to that of the principal, who remains primarily liable to the creditor. **There is no liability on the guarantor unless and until the principal has failed to perform his obligation.** The guarantor is generally only liable to the same extent that the principal is liable to the creditor. This has the consequence that there is usually no liability on the part of the guarantor if the underlying obligation is void or unenforceable, or if the obligation ceases to exist (to which principle – the so-called principle of co-extensiveness - there are, however, a number of exceptions)" (emphasis added).

31. As O'Donovan and Phillips put it (op. cit., at para 1-91):

> "The distinction between a contract of guarantee and a contract of indemnity is that in a contract of indemnity a primary liability is assumed whether or not the third party makes default, whilst ... in a contract of guarantee the surety assumes a secondary liability to the creditor for the default of another who remains primarily liable to the creditor."

32. The distinction is always a question of construction of the terms of the instrument and the character of the bargain. The labels that the parties use can be a useful guide, particularly if they are repeated, but it is no more than that: see Western Credit Ltd v Alberry [1964] 2 Al ER 938, at 940, per Davies LJ. The essential character of the bargain is paramount.

33. In Vossloh, Sir William Blackburne also said this (at para 27):

> "A contract which contains a provision preserving liability in circumstances where a guarantor would otherwise be discharged (for example, the granting of time by the creditor to the principal or a material variation of the underlying contract between the principal and the creditor, without (in either case) the guarantor's consent) will usually indicate that the contract is one of guarantee because such a provision would be

12

unnecessary if the contract were one of indemnity.[9] On the other hand, a provision stating that the surety is to be liable in circumstances where the principal has ceased to be liable (for example, on the principal's release by the creditor) may be indicative either of a guarantee (because the provision would be unnecessary in the case of a contract of indemnity) or of an indemnity (because it makes clear that the liability of the surety was intended to continue regardless of the liability of the principal)." (emphasis added).

34.  One point which Sir William Blackburne did not cover in his summary of the legal principles in Vossloh[10] is that words that provide that the surety will be a primary obligor, or liable as if he is a principal debtor, or similar formulae, do not convert what is otherwise a guarantee into an indemnity. That is the dominant view, shared by the commentators on the subject: see eg O'Donovan & Phillips (*op. cit.*) at para 1-105; see also Carey Value Added SL v Grup Urvasco SA [2011] 2 All ER (Comm) 140, at para 22. In MS Fashions v BCCI [1993] Ch 425, Dillon LJ explained that the purpose of including a principal debtor clause in a guarantee was to dispense with the requirement of a demand on the guarantor as a pre-requisite to enforcing the demand against him[11].

35.  Similarly, words of indemnity against loss arising as a result of having entered the agreement, if they are predicated on an underlying liability of the principal debtor, will not turn what is otherwise a contract of guarantee into an indemnity: see eg Stadium Finance v Helm (1965) 109 SJ 471 (CA); and see Vossloh at paras 42-58. More difficult are the cases where there are mixed guarantee and indemnity provisions, which can be read as indemnities and not guarantees: see eg Sofaer v Anglo Irish Asset Finance Ltd [2011] BPIR 1736. However, each instrument must be construed according to its own context and terms.

36.  Subject to the points that I have made above, I would not disagree with the summary of the law set out in paragraphs 32 to 38 of the Rabinowitz Declaration.

(ii)    The terms and context of schedule 4 to the lease

---

[9] It is not a black and white test, and it has been held that the absence of the usual provisions which conserve the surety's liability does not mean that the instrument is not a guarantee: see Associated British Ports v Ferryways NV [2009] EWCA Civ 189, at paras 11 and 12. But their presence is likely to fortify the conclusion that the instrument is a guarantee. Associated British Ports is a case *a fortiori* the present.

[10] Although the point is covered later in his judgment when dealing with the indemnity clauses in the instrument before him, such as clause 2 of the instrument, which contained "primary obligor" provisions which he said (at para 45) were not enough to convert secondary obligations into purely primary obligations.

[11] This dictum was followed in TS&S Global Ltd v Fithian-Franks [2008] 1 BCLC 277.

13

37. At paragraph 39 of the Rabinowitz Declaration Mr Rabinowitz has set out a list of eight reasons why he says that LBHI's obligations under schedule 4 of the lease constitute an indemnity and not a guarantee. I disagree with him. My reasons are as follows:

(i)     The operative words of para 1 of schedule 4 make it plain that LBHI's obligations are secondary or accessory to those of LBL and only arise in the event that LBL defaults. There are three powerful pointers to that conclusion:

(a)   the words that say that LBHI's liability subsists for only so long as LBL continues to be bound by its covenants in the lease during the Term; so if LBL ceases to be so bound, so does LBHI.  That is a clear application of the co-extensiveness principle;

(b)   the words that say that LBHI covenants that LBL or LBHI ("the Tenant or the Surety") will perform LBL's covenants; LBHI is promising both that LBL will perform its covenants and also that if it does not do so then LBHI will perform LBL's covenants.  This is a composite form of guarantee which comprises both a "see to it" element and a "do it" element.  Under the "see to it" element, LBHI promises that LBL will perform its covenants, and if LBL does not then LBHI is in breach of contract and must pay damages; and under the "do it" element LBHI promises that if LBL does not perform its covenants then LBHI will do so.  Critically for present purposes, both forms of assumption of liability are characteristic of a guarantee: see <u>Moschi v Lep Air Services</u> [1973] AC 331 at 344G-345C, per Lord Reid.

(c)   the fact that the words of indemnity are in respect of all *"claims, demands, losses, damages"* etc *"arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents or other sums."*

(ii)    Para 2 provides that the liability of LBHI will be joint and several with LBL, and not separate and independent of LBL's liability.  Furthermore, it expressly provides that the landlord may proceed against LBHI <u>as if</u> it were named as Tenant in the lease, which serves to emphasise that LBHI is not the Tenant and has not taken on the obligations of the Tenant, but only <u>as if</u> he were the Tenant: see further below.

(iii)   Para 3, which is a waiver of any right to require the landlord to proceed against the Tenant, would be quite unnecessary if the contract were one of indemnity.  The existence of the right of the guarantor to compel the creditor to pursue the principal debtor first is controversial but it has never been finally settled[12] and the words *"any right"* are there to ensure that, to the extent that there is any such right in law, it is waived.  Such a right of compulsion does not exist, even arguably, if the contract is one of indemnity.

(iv)   Paras 4 and 5 are standard provisions in most well drawn guarantees.  Their presence is consistent with the instrument being a guarantee (although I would not put it higher than that).

(v)   Para 6, on the other hand, is not only standard in a well drawn guarantee but wholly unnecessary if the instrument is intended to be an indemnity. I note that Rabinowitz has suggested that they are there "for the avoidance of doubt". He may have been prompted to make that suggestion by Sir William Blackburne's observation in Vossloh in the passage at para 27 of his judgment I have quoted above which follows after the passage I have highlighted.  However, there is no language that suggests that para 6 is there to avoid any doubt that the document is an indemnity, not least since it is at best extremely doubtful, without those words, that it is an indemnity.  My view is that, on the contrary, para 6 puts it beyond any reasonable doubt that LBHI's obligations are intended to be those in the nature of a guarantee.

(vi)   Within para 6, I would draw particular attention to the words in para 6(d) *"(subject to section 18 of the Landlord and Tenant (Covenants) Act 1995)"*.  Section 18, which I attach in appendix 4, applies in terms to guarantees properly so called and could never have application to an indemnity contract.  The fact that any variation of the lease would be subject to section 18 demonstrates that the nature of LBHI's obligations were intended to be those of guarantor, otherwise the reference to section 18 would make no sense.

(vii)   Para 7 is a common provision in lease guarantees: see e.g. Active Estates v Parness [2002] BPIR 865.

---

[12] See the discussion in Andrews and Millett, The Law of Guarantees (6th Edn, 2011, para 11-002).

(viii)   Para 8 is headed "Benefit of guarantee and indemnity". Clause 2.7 of the lease
provide that *"titles and headings appearing in this Lease are for reference only and
shall not affect its construction"*, and so strictly the heading of para 8 is an
irrelevance. In any event I would place limited weight on the labels used by the
parties. However, since Mr Rabinowitz has relied on headings in schedule 4, I should
give my views without prejudice to these threshold objections. If any guidance is to
be gained from them, it is notable that the parties considered that at least some part
of schedule 4 constituted a guarantee (the benefit of which would enure to
successors and assigns without the need for any assignment). In order to make
sense of the composite expression "guarantee and indemnity" and give proper
meaning to both elements, the word "guarantee" properly describes the character
of the agreement as a whole and the word "indemnity" refers to the specific
payment obligations ("shall indemnify and keep indemnified") within para 1. As I
explain below, those words are not, contrary to Mr Rabinowitz' view, words that
make the contract one of indemnity but merely words which quantify LBHI's
payment obligation. However, if the contract as a whole is an indemnity, then the
reference to "guarantee" is heterodox and inconsistent.[13]

(ix)   The heading to para 10 describes LBHI as "Guarantor". This is unlikely to have been
a mistake in the context of a commercial contract of very high value which has been
drafted by a leading firm of solicitors (Clifford Chance). This is not a case where
"something has gone wrong with the language". But if it is, then the word is
ambiguous or doubtful and, applying the *contra proferentem* principle of
construction, it is to be resolved in favour of LBHI as meaning what it says: LBHI is
indeed a guarantor.

38. I now turn to address each of Mr Rabinowitz' eight reasons in turn, which I can do shortly by
reference to my views as stated above.

(1) The fact that para 1 of schedule 4 is headed Indemnity is irrelevant and in any event
does not support Mr Rabinowitz's analysis. It is irrelevant because, as I have already
said, clause 2.7 of the lease provides that the titles and headings appearing in the lease

---

[13] Mr Rabinowitz has (at footnote 15) dismissed section 18 as irrelevant because it deals with assignment. So it
does, but if LBHI was not a guarantor, section 18 would have no application and the parties would not have
had to provide a carve-out for it.

16

"are for reference only and shall not affect its construction". Even if the title were relevant, it does not support his analysis because it is simply shorthand for the words of indemnification that appear within clause 1. As I have said above, LBHI's obligation to indemnify the landlord are triggered by default by LBL in the performance and observance of its own obligations under the lease. LBHI is not obliged to indemnify the landlord in respect of any loss or damage which does not arise out of any default by LBL. The use of "indemnity" in the heading, even if it were a permissible aid to construction (which it is not) cannot convert the operative provisions thereunder into an indemnity unless those provisions provide in substance for an indemnity. They do not.

(2) The fact that para 1 is expressed to be a "primary obligation" does not mean that the obligations assumed by LBHI are not those of a guarantor. As I have already noted, "primary obligor" or "principal debtor" clauses, which are very common provisions in many guarantees properly so called, do not turn what are otherwise guarantees into indemnities. In this case, it is plain from the words that immediately follow, namely "that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants' in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease" that LBHI is taking on obligations which are accessory to those of LBL. I note that in <u>Vossloh</u> the words in the instrument connoting primary obligation were not enough to turn what were secondary obligations into primary obligations (see paras 45 and 46).

(3) The fact that para 1 provides either that LBL or LBHI will perform the covenants and not that LBHI will see to it that LBL does so, is not a basis for characterising schedule 4 as an indemnity. Mr Rabinowitz is wrong to say that "a guarantee … only involves a promise to see to it that someone else will perform his obligations." As Lord Reid made clear in <u>Moschi v Lep Air Services</u> (*supra*), a guarantee can comprise either an obligation to "see to it" that the principal debtor performs or an obligation to perform if the principal debtor defaults. This is simply a guarantee of the latter kind. There may be a difference as to whether the cause of action to enforce it lies in debt or in damages, but that is not an issue that arises for consideration in this case.[14]

---

[14] See the discussion in <u>O'Donovan & Phillips</u> (op. cit.) paras 6-129 to 6-132.

(4) The second part of para 1 does contain words referring to an indemnity. However, one must read them in context and not in a vacuum. To my mind the better reading of para 1 is that it comprises a single covenant (as the introductory words say), and that part which begins "and the Surety shall indemnify" is simply a follow-on from what goes before, namely the obligation to perform if LBL does not. The words of indemnity tell us the (very wide) extent of LBHI's obligation when performing its covenant to perform the lease if LBL does not. They are no more than "hold harmless" words to ensure that concepts like foreseeability and remoteness do not operate to cut down the <u>amount</u> that can be recovered by the landlord from LBHI by way of "claims, demands, losses" etc that arises, directly or indirectly, from LBL's default. They do not describe or qualify the juridical nature of the liability assumed by LBHI. Even if para 1 is properly to be split into two separate covenants (which I firmly believe is not the right reading of para 1), the words of indemnity must still be read in the context not only of the first part of para 1 but, critically, the next following part of para 1, which provides that the liability to indemnify attaches in respect of losses etc arising out of LBL's default. That serves to reinforce the accessory nature of the liability.

(5) The fact that para 2 provides that the liability of LBHI will be joint and several with LBL, making LBHI a primary obligor, does not turn schedule 4 into an indemnity as opposed to a guarantee. As I have said, first, LBHI's liability is joint and several with LBL, and not separate and independent of LBL's liability. Furthermore, it expressly provides that the landlord may proceed against LBHI <u>as if</u> it were named as Tenant in the lease, which serves to emphasise that LBHI is not the Tenant and has not taken on the obligations of the Tenant, but only as if he were the Tenant: see <u>Berghoff v Swinbrook Developments Ltd</u> [2009] EWCA Civ 413, at para 32, Rix LJ. Moreover, the provision is about "proceeding" against LBHI, which suggests that it is designed (as in <u>MS Fashions</u>) to make it clear that the landlord is not required to serve a demand on LBHI in order for its liability to accrue due.

(6) Clause 6, which contains a set of common provisions designed to exclude the operation of common law and equitable principles which, if engaged, would discharge LBHI from liability. In the passage in para 27 of <u>Vossloh</u> which I highlighted, Sir William Blackburne observed that the presence of these provisions "will usually indicate" that the instrument is intended to be a guarantee. He goes on to suggest that a provision which

18

says that the guarantor is to continue to be liable where the principal is not may indicate either a guarantee or an indemnity. It may indicate an indemnity where the parties wished to avoid doubt. However, in this case, had the parties intended that para 6 was to avoid doubt, they would have said so. As I have already said, the reference in para 6(d) to section 18 of the Landlord and Tenant (Covenants) Act 1995) would make little sense if LBHI's obligations were not intended to be those of a guarantor. I will address para 6(g) below, but the presence of such a clause (which is not an uncommon attempt at a catch-all) does not turn the instrument into an indemnity any more than the other sub-paragraphs.

(7)   As to para 8, and the heading "guarantee and indemnity", Mr Rabinowitz' view that the reference to guarantee is a mistake carried across from earlier drafting is based on his *a priori* view that he cannot find any substantive provision in schedule 4 to which the word guarantee could refer. That is because he has already taken the view that clause 1 is not a guarantee. If he is wrong about that, as I think he is, then the foundation of his assumption that the reference to "guarantee" is a drafting error disappears. So his argument pulls itself up by its own bootstraps. His view that, in any event, even if there is an overlap, the landlord can always enforce the indemnity elements, rather depends on the wording of the contract concerned and the extent to which the guarantee and indemnity obligations (each properly so called) relate. The decision of Lewison J in Sofaer v Anglo Irish Asset Finance plc [2011] EWHC 1480[15] is based on a very different set of words. In that case, the main provision was clearly one of indemnity, and the guarantee provision was so wide that it is hard to see why the draftsman had included it.

(8)   The same point goes for the reference to "Guarantor" in para 10 of schedule 4, which again Mr Rabinowitz dismisses as "an obvious error". There is no basis for that assumption. Moreover, the fact that the text refers to LBHI as the Surety is neutral, given (i) that the word is as apt to describe a guarantor as it is an indemnifier, and (ii) that LBHI is defined as the Surety throughout. However, the text goes on to say *"(here meaning the Tenant whose obligations hereunder were originally guaranteed by that Surety"*), which strongly supports the characterisation of LBHI's obligations as those of guarantor.

---

[15] This is the case which is used to exemplify the point being made in Andrews and Millett at para 1-014, on which Mr Rabinowitz relies.

**(6)** **The meaning, content and effect of a material variation**

39. The English law on this topic does not appear to be controversial in this case, given paragraph 28 of the Rabinowitz Declaration. However, it is useful to set out some key principles.

40. The case of Holme v Brunskill, which has been specifically held to apply in the context of property (see for example West Horndon Industrial Park v Phoenix Timber [1995] 29 E.G 137), established the rule that any variation to the principal contract, after the giving of the guarantee, which has the effect of actually or potentially prejudicing the surety, will discharge the surety's liability under the guarantee unless: (i) the guarantor consents to the variation; or (ii) it is not "material" in that the variation is patently insubstantial or incapable of adversely affecting the guarantor.

41. This rule rests on the principle that

> "the law will not assist a party to enforce a bargain who has placed the other party in jeopardy by unilateral alteration of the instrument by which their bargain was made". [16]

42. As one commentator has recently observed, the rationale for the principle is that

> "a surety, in general, agrees only to guarantee a specific actual or potential liability. If the principal liabilities change, the risks change, and it cannot be said that the surety agreed to take those new risks if he was not consulted." [17]

43. The following excerpt from the judgment of Cotton LJ in Holme v Brunskill is the most often cited and sets out the general legal principle (emphasis added):

---

[16] Per Taylor, J, Petro Can Exploration Inc. v Tormac Transport Ltd (1983) 23 B.L.R. 1, BCSC at paragraph 22.

[17] Choo Choy, "Discharge of guarantees: the rule in Holme v Brunskill revisited" (2007) 7 JIBFL 450.

"The cases as to discharge of surety by an agreement made by the creditor, to give time to the principal debtor, are only an exemplification of the rule stated by Lord Loughborough in the case of Rees v Berrington: "It is the clearest and most evident equity not to carry on any transaction without the knowledge of him [the surety], who must necessarily, have a concern in every transaction with the principal debtor. You cannot keep him bound and transact his affairs (for they are as much his as your own) without consulting him."

The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court, will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he will be discharged."[18]

44. A variation is material unless it is self-evident that the alteration is unsubstantial, or, one which is not prejudicial to the surety.[19] The question of whether a variation is material is an objective one[20] and case law illustrates that the materiality threshold is low so that even a minor variation in the underlying contract will trigger discharge of the surety. A surety may also be discharged where, although the variation ultimately has little effect on the surety's risk, the variation is *"potentially prejudicial when made"*.[21] In other words, a variation is regarded as material if it <u>could</u> prejudice the guarantor, regardless of whether it has in fact done so and regardless of whether the likelihood of it doing so is remote.[22]

45. Closely linked to the rule in <u>Holme v Brunskill</u> is a related, but separate, principle, of more general application, articulated in <u>Triodos Bank NV v Dobbs</u> [2005] 2 Ll Rep 588 (esp at

---

[18] <u>Holme v Brunskill</u> [1877] 3 QBD 495 per Cotton LJ at p505.

[19] *Ibid*. See also <u>Ankhar Pty Ltd v National Westminster Finance (Australia) Ltd</u> (1987) 162 C.L.R. 549 (at 559); <u>Selous Street Properties Ltd v Oronel Fabrics Ltd</u> [1984] EDG 360 per Hutchinson J at page 396 cited in <u>Howard de Walden Estates Ltd v Pasta Place Ltd and others</u> [1995] 1 EGLR 79 per Morland, J at page 81.

[20] <u>Howard de Walden Estates Ltd v Pasta Place Ltd and others</u> [1995] 1 EGLR 79 at page 81.

[21] *Ibid* at page 361.

[22] <u>Sea Emerald SA v Prominvestbank – Joint Stockpoint Commercial Industrial and Investment Bank</u> [2008] EWHC 1979 (Comm) at paragraph 142. This is the most recent case to consider the *Triodos* principle.

21

paragraph 34)[23]. In Triodos the Court of Appeal clarified that even if a guarantor expressly agrees to amendments and variations, the guarantor will be bound only to the extent that an amendment or variation is clearly contemplated and remains within the general purview of the Guarantee. For the guarantor to be liable for an increased amount, express wording will be required to which he will have to consent. In Triodos, Chadwick LJ said:

> "the guarantor is not to be taken to have agreed that his liability under the guarantee would be **increased or made more onerous** by a subsequent agreement made between the lender and the borrower (to which he is not party) **unless there are clear words in the guarantee which show that he did agree to be bound to a more onerous obligation in the future imposed without further reference to him."** (emphasis added).

46. Holme v Brunskill materiality is not the test for whether a new obligation is within the "purview" of the guarantee or not. The rule in Holme v Brunskill is concerned with variations of existing obligations within the scope of the guarantee, the effect of which is to discharge the guarantor entirely. The principle in Triodos as to scope or "purview", on the other hand, is concerned with whether a particular contract or obligation is within the guarantee at all to begin with as a matter of the construction of the guarantee. A modification of a guaranteed obligation is not put outside the "purview" of the guarantee simply because it would be regarded as material for the purposes of Holme v Brunskill. There is no hint in Longmore LJ's judgment in Triodos Bank v Dobbs that the test for whether the assumption of a different obligation by the principal debtor amounts to a variation within the scope of the guarantee or an entirely new contract is anything other than one of degree. The Court of Appeal did not apply the materiality test in Holme v Brunskill as the appropriate test for "purview". In my view that was not an oversight. One cannot test the question whether a change is a variation or a new contract outside the scope of the guarantee by reference to a test which assumes that the variation is otherwise within the scope of the guarantee. It can be put simply: if the new obligation is outside the purview of the guarantee on its true construction, then there is no need to invoke the rule in Holme v Brunskill. It is just not guaranteed at all.

---

[23] Further, Barclay, M., 2010. Case Comment – When is a variation not a variation? Landlord & Tenant Review, 2010. Volume 14, Issue 1, pp. 7-11 says that the Triodos case is important in the context of guarantees relating to leasehold properties because, "*although it was not a case arising under a lease, the principles of law reiterated by the Court of Appeal appear to be of general application to all contracts of guarantee.....The fact that a guarantor has agreed to the inclusion of an anti-release clause is not the end of the matter. The question is whether the proper construction of the original agreement, including the anti-release clause, permits the actual variations which have taken place without the guarantor's further express consent*".

**(7)  The effect of the Forfeiture Letter on LBHI's obligations**

47. There are two issues which call for analysis.  The first is what the Forfeiture Letter does, and the second is what effect that has on LBHI's obligations.

    (i)     What the Forfeiture Letter does

48. The key provision is clause 4.  The material parts are set out at paragraph 44 of the Rabinowitz Declaration.  I also agree with Mr Rabinowitz' summary of the law at paragraph 45 of the Rabinowitz Declaration.

49. Properly analysed, the consequences of the Forfeiture Letter are as follows.

    (i)     The *Nortel*[24] judgment makes it clear that the full amount of rent due under a lease for the period during which administrators are in occupation of the premises is payable *as an administration expense*[25], regardless of the amount of space the administrators occupied at any given time.

    (ii)    Accordingly, the full amount of rent for the period during which the Premises were occupied for the purpose of the administration (i.e. the period ending on the exit of Nomura) should have been paid out ahead of *pari passu* payments to the general body of unsecured creditors.

    (iii)    By the Forfeiture Letter, the Landlord agreed that only £1.5m of the outstanding rent for the period would be paid as an expense of the administration, the remainder to be paid out of whatever was available to the general body of unsecured creditors. On any view, £1.5m is significantly less than the full amount of rent outstanding for the period during which the administrators were in occupation.

    (iv)    The landlord thus agreed to give up its claim against LBL for all but £1.5 million of pre-forfeiture rent that would have been recoverable in full as an administration

---

[24] Goldacre (Offices) Limited v Nortel Networks UK Limited (in administration) [2009] EWHC 3389 (Ch). *Nortel* confirmed the Lundy Granite (In Re Lundy Granite Co., ex p. Heavan (1871) 6 Ch App 462) principle (under which rent in respect of liquidator-occupied premises for the purposes of the liquidation is payable as a liquidation expense) applied to an administration as it did a liquidation.

[25] In simple terms, amounts payable as an administrative expense will rank: (a) behind secured creditors with a fixed charge and creditors with a proprietary interest in assets; but (b) *pari passu* with other administration expenses; and (c) ahead of all other creditors.

expense in accordance with the <u>Nortel</u> decision, even though the administrators could have paid it in full, and instead to treat the balance as a provable claim.

(v)    But for the Forfeiture Letter, LBHI would not have been exposed to liability under schedule 4 to the lease either for the substantial majority of the pre-forfeiture rent or for other outstandings such as service charges, because such costs would have been paid (as an administration expense). The effect of the Forfeiture Letter is to expose LBHI to a materially increased liability which it would not have had but for the Forfeiture Letter.

50. Mr Rabinowitz does not appear to take issue with this analysis. His simple point is that the Forfeiture Letter did not vary any term of the lease but operated as a waiver of a right conferred on the landlord under the insolvency legislation. In my opinion, this is a little simplistic.

51. There are two further legal principles of relevance. First, it has been well established since the 19th century that a variation to the principal contract imposed by statute, and not by consensus of the parties to the principal contract, will discharge the guarantor: <u>Finch v Jukes</u> [1877] WN 211; <u>Pybus v Gibb</u> (1856) 6 E&B 902.

52. Secondly, the courts will not insist on the requirement of variation in a strict contractual sense, and the operation of the relationship in a way which is different from that envisaged by the contract (so as to amount to a waiver by the creditor of what he was entitled to) will suffice: see <u>Bank of Baroda v Patel</u> [1996] 1 Ll Rep 391, where Potter J went on to say (at page 396) that conduct by the creditor to the prejudice of the surety could be sufficient to discharge the guarantor. Moreover, there is a view, controversial but entirely open as a matter of law, that the guarantor will be discharged by any conduct by the creditor which is prejudicial to the guarantor. Support for that proposition is to be found in <u>Black v Ottoman Bank</u> (1862) 15 Moo PCC 472, a decision of the Privy Council[26].

53. Applying these principles, the proper analysis is this:

---

[26] <u>O'Donovan and Phillips</u> are of the view that there is no such principle (*op. cit.*, para 8-114). However, in the main case on which they rely, namely <u>Bank of India v Transcontinental Commodity Merchants Ltd</u> [1983] 2 Ll Rep 298, Robert Goff LJ expressly left the point open for future argument (at p 302).

(i) Upon LBL entering administration, two variations to the parties' rights and obligations under the lease were imposed on the parties by statute:

    (a) that the landlord could not exercise its forfeiture right under clause 8.1(c)(iii) of the lease without the leave of the administrators or the court (see Insolvency Act 1986, Schedule B1 para 43(4)); and

    (b) that the rent while LBL continued to occupy any part of the premises for the purposes of the administration would be paid as an expense of the administration.

(ii) These were statutory variations on the way in which the lease was to be performed. They were not, however, prejudicial to LBHI because although the landlord could not forfeit it would be paid in full while the administrators occupied any part of the premises, and that reduced any exposure under the guarantee from having the premises occupied by an insolvent tenant. The disadvantage imposed on the landlord by being deprived by statute of his right to forfeit was balanced by the advantage to it of not having to prove for the rent which continued thereafter to accrue and instead having a right to be paid it in priority to the general body of creditors as an administration expense.

(iii) The Forfeiture Letter, which did operate contractually as between the landlord and LBL, then further varied the relationship between the landlord and LBL by LBL and the landlord agreeing retrospectively to treat the rent incurred while the administrators were in occupation as an ordinary liability of LBL and no longer an expense of the administration (but for £1.5 million). That retrospectively removed the advantage to the landlord of having the rent treated as an expense of the administration but did not and could not allow the landlord any balancing restrospective forfeiture, but only prospective forfeiture. It operated to vary with retrospective and irreversibly prejudicial effect to LBHI the terms on which the parties to the lease had been operating as varied by the statute.

54. So to summarise, the Forfeiture Letter was a contractual variation of an earlier statutory variation to the lease, or specifically, the agreed manner of its performance. Both variations, even though not formal variations to the express language of the lease, would be variations

for the purposes of the rule in <u>Holme v Brunskill</u>. The earlier was not prejudicial to LBHI, and the latter was very much to its prejudice.

55. The variation meant that LBHI's commercial risk as guarantor was increased by being deprived of the legal protection of having the rent incurred while the administrators were in occupation paid 100% to the Landlord as and when it fell due by LBL (by its administrators), and instead it exposed LBHI to the risk, indeed the near certainty, that the Landlord would now, as an ordinary unsecured creditor, not recover 100% of that rent from LBL's estate but would turn to collect it (or at least the shortfall over what the Landlord can obtain in a distribution) instead from LBHI. To put it shortly, LBHI, as guarantor, incurred no risk in respect of LBL's liability for rent in respect of periods of occupation of the Premises because it would fall as a matter of law to be paid in priority as an administration expense and would always be timely paid by LBL 100%; but once the Landlord and LBL agree that that rent falls to be paid as an ordinary unsecured liability of LBL, LBHI is exposed to that risk.

(ii)    <u>The effect on LBHI's obligations</u>

56. Analysed in that way, the arrangements agreed under the Forfeiture Letter amounted to a variation. The variation was on any view prejudicial to LBHI (and the Rabinowitz Declaration does not appear to take issue with that). LBHI is accordingly discharged from all liability thereunder.

57. If I am wrong, and the Forfeiture Letter did not amount to a variation within the rule in <u>Holme v Brunskill</u>, there is nonetheless an alternative approach which leads to the same result, namely by the application of the principle in <u>Triodos</u>. LBHI never agreed to guarantee the payment of rent accruing due during the period after LBL had entered administration and for which the landlord only had a proof in the administration. The lease never contemplated such an arrangement, and that is why entry into administration gave the landlord the right to forfeit. The landlord would legitimately be expected by all parties to have exercised that right but for the statutory prohibition. The statutory prohibition, designed to protect the creditors of LBL, came at a price designed to give equal and opposite protection to the landlord, namely that the rent and other outgoings would be treated as an expense of the administration. It was never contemplated by the terms of the lease or the guarantee that LBL would be allowed to remain in occupation following its administration

but that the landlord should not have its priority right to rent. Such arrangements, and the concomitantly increased risk to the landlord of non-recovery from LBL, can fairly be said to lie outside the "purview" of the guarantee. The effect of the forfeiture letter was to create obligations which lay outside the purview of the guarantee and which are not, therefore, guaranteed at all.

**(8)  The effect of the anti-release clause**

58.  The Rabinowitz Declaration relies on sub-paragraphs 6(d) and 6(g) of schedule 4 to the lease to say that the application of the rule in Holme v Brunskill is excluded, and so LBHI remains liable.

59.  Paragraph 6 provides as follows:

> **"No release of Surety**
> None of the following or any combination thereof shall release discharge or in any way lessen or affect the liability of the Surety under this Lease:
>
> ...
>
> (d)  (subject to Section 18 of the Landlord and Tenant (Covenants) Act 1995, any variation of the terms of this Lease (including any reviews of the rent payable under this Lease) or the transfer of the Landlord's reversion or the assignment of this Lease.
>
> ...
>
> (g)  any other act omission or thing whatsoever whereby but for this provision the Surety would be exonerated either wholly or in part (other than a release under seal given by the Landlord and/or the Management Company as the case may be."

60.  It is important to keep firmly in mind the principles of construction I have set out above. Construed strictly and resolving any doubt in favour of LBHI as guarantor, the expression in paragraph 6(d) "any variation of the terms of this Lease" means just that. It is a reference to a formal variation of the express terms of the lease. It has no wider application to any variation in the mode of performance of the terms or any change to the relationship. It is the landlord's own case that the Forfeiture Letter did not effect any variation to the terms of the lease, and in the strict sense that is correct. However, as the cases to which I have referred show, the rule in Holme v Brunskill is not restricted in its application to those cases where there is a formal contractual variation, but can apply where the variation is not contractually binding but the parties agree or permit a varied mode of performance or proceed on that basis (Bank of Baroda v Patel (*supra*)). That is what happened here. If there is any doubt or ambiguity about that, it falls to be resolved in favour of LBHI.

27

61. Put another way, the language of paragraph 6(d) is not sufficiently clear and unambiguous, nor wide enough, to exclude the rule in Holme v Brunskill in all circumstances of its application, but only where it would be engaged by a formal variation to the terms of the lease.

62. As to paragraph 6(g), this is a very widely drawn catch-all.  English courts have been very loath to allow creditors to use them to fix guarantors with liability that they otherwise would not have had: see e.g. West Horndon Industrial Park Ltd v Phoenix Timber plc [1995] 29 EG 137, where the guarantee contained a term which provided that the guarantor was liable to make good the principal's default *"notwithstanding…. any… act or thing whereby but for this provision the Guarantor would have been released"*, but the court held that it did not constitute *"a complete carte blanche to entitle the landlord to extract every and any additional burden from the surety."*  In my opinion, paragraph 6(g) does not contain sufficiently clear and specific words to oust "the normal incidents of suretyship"[27].  Nor can paragraph 6(g) operate so as to impose on LBHI liabilities which are not "clearly and distinctly covered by the contract"[28].

63. In any event, neither paragraph 6(d) nor paragraph 6(g) can be relied upon to exclude the application of the Triodos principle.  If, as I consider, LBL's liability for post-administration rent as an ordinary provable liability of LBL and not a priority expense of the administration is outside the purview of the guarantee, nothing in paragraph 6 can bring it within the purview of the guarantee.

**(9)  The effect of the forfeiture on LBHI's obligations**

64. Even if the guarantee is not discharged, I consider that paragraph 1 of schedule 4 cannot assist the landlord.  Mr Rabinowitz takes a different view, and at section I of the Rabinowitz Declaration he propounds an argument to the effect, in summary, that LBL was liable in damages for post-forfeiture rent as damages for breach of contract, and that LBHI is liable to indemnify the landlord in respect of that loss and damage under paragraph 1.

65. I disagree with Mr Rabinowitz' argument, at its every step, for the following reasons:

---

[27] Lord Jauncey in Trafalgar House Construction (*supra*).
[28] Chitty, (*supra*)

(i)       Properly construed, paragraph 1 of schedule 4 is not two separate covenants, but one single covenant.  As such, if LBL ceases to be bound by its covenants in the lease, so LBHI ceases to be liable in respect of them.

(ii)      In any event, LBL never incurred any liability, and the landlord never had any claim, for damages for loss of rent after forfeiture.  The law in England is that even if (which is itself not settled) a lease can be repudiated by the tenant by his non-payment of rent, the landlord has an election either to forfeit the lease or to ignore the repudiation, keep the lease on foot and claim rent when it falls due.  He has no right to claim damages for loss of future rent.  Contrary to what Mr Rabinowitz says at para 56(6) of the Rabinowitz Declaration, Reichman v Beveridge is direct authority (against him) on the point.

66. Before I turn to each of these points, I should draw attention to two matters at the outset. First, a lease is not in all respects an ordinary commercial contract, but an instrument that creates an interest in land[29]. The payment of rent is very closely tied to the right to use the land: see United Scientific Holdings v Burnley BC [1978] AC 904 at 935 per Lord Diplock. Once the landlord forfeits the lease, the land is no longer available for the tenant to use and the rent cannot fall due. I expand on this fundamental point below.

67. Secondly, it remains an open question whether the doctrine of termination by repudiatory breach applies to leases at all.  Strictly speaking, the present state of the law is that, short of the Supreme Court it does not: Total Oil (Great Britain) Ltd v Thompson Garages (Biggin Hill) Ltd [1972] 1 QB 318 (CA).  In Hussein v Mehlman [1992] EGLR 87, a county court judge[30] decided that the Total Oil case was no longer good law.  In Reichman v Beveridge Lloyd LJ said since the issue was not directly before the court it would be wrong to decide it

---

[29] The limitations of leases as contracts is well illustrated by PW & Co v Milton Gate Investments Ltd [2004] 3 EGLR 103, Neuberger J, esp at para 73.  In that case it was held that where a head tenant served an upwards notice to quit on the landlord, that would bring to an end the subtenancy as a matter of law (by the rule in Pennell v Payne [1995] QB 192) notwithstanding that the head tenant and landlord had agreed contractually that it would not.

[30] A county court judge is even lower than a high court judge in the English judicial hierarchy, and according to the English doctrine of precedent Total Oil was binding on him.  It is fair to point out that the county court judge who decided Hussein v Mehlman later became a member of the Court of Appeal (Sedley LJ).  It is also fair to point out that the modern view is that the doctrine of repudiation does apply to leases: see Halsbury's Law of England (2006 reissue), Vol 27(1) para 601. Lloyd LJ was in my view right in Reichman to treat the point as undecided authoritatively and the point remains open at Supreme Court level.

unnecessarily[31]. Mr Rabinowitz's entire opinion on this point rests, therefore, on the assumption that it is settled law that the doctrine of repudiation applies to leases, an assumption which is not sound.

(i)     Paragraph 1 of schedule 4: one covenant or two?

68. Mr Rabinowitz starts by accepting (at para 52) that because of the words in paragraph 1 *"until the Tenant shall cease to be bound by the Tenant's covenants"* LBHI would, following forfeiture, no longer be obliged to procure that LBL or itself perform the covenants in the lease. That is an important concession. However, he goes on to say that this does not matter because there is a second, separate, covenant within paragraph 1 that operates to make LBHI liable to indemnity the landlord for all losses and damages etc, and that this second covenant continues to apply even though LBL has ceased to be bound by its covenants.

69. I disagree. Paragraph 1 is a single covenant comprising a single obligation. That is clear from the opening words *"The Surety hereby covenants with the landlord and as a separate covenant with the Management Company as a primary obligation ..."* . The language is that of a single covenant and a single obligation. Accordingly, if the first part ceases to bite, the second part also ceases to bite.

70. Furthermore, the broader text demonstrates that the words *"and the Surety shall indemnify"* are not a separate self-standing obligation but simply follow on from and qualify the promise in first part of the paragraph. As I have said above, those words describe the extent of LBHI's obligation when performing its covenant to perform the lease if LBL does not. That is plain from the fact that the obligation to "indemnify" are expressly said to arise in respect of losses which arise out of the default of LBL *"in the performance and observance of any of its obligations and payment of any rents and other sums"*. So if LBL's liabilities have ceased because the Term has come to an end (which it did on re-entry by the landlord), then by definition so have LBHI's liabilities. It would be commercially absurd and internally inconsistent for paragraph 1 both to relieve LBHI from the obligation to perform LBL's

---

[31] In the last sentence of paragraph 56(6), Mr Rabinowitz says that the Court of Appeal expressly stated that issue of whether damages could be claimed was not *"directly in issue before us and it would be wrong to decide it unnecessarily."* He is wrong about that. In fact, the issue to which the Court of Appeal was referring (at para 42 of its judgment) was not the issue of whether damages could be claimed but whether the doctrine of repudiation applied to leases, which is a different (and *a priori*) issue.

covenants once LBL ceases to be bound to perform them, but nonetheless to impose liability on LBHI to indemnify the landlord for losses arising out of LBL's having failed to perform them. As Mr Rabinowitz rightly points out, English courts strain away from interpretations with commercially absurd consequences.[32]  To read paragraph 1 as containing two separate promises (as Mr Rabinowitz does) involves having the second promise undermine the first, whereas to read it as a single covenant (as I do) not only ensures internal consistency but also reinforces the application of the principle of co-extensiveness which applies as the essential feature of schedule 4 as a guarantee.

71.  Accordingly, since (as is common ground) LBHI ceased, following forfeiture, to be liable to procure that LBL perform the covenants in the lease or to do itself, there is no loss or damage arising out of LBL's default on which the words of indemnity can bite.  Paragraph 1 cannot, therefore, be a basis for LBHI's liability.  Instead, post-forfeiture, the landlord's remedies against LBHI are all contained in paragraph 7 (as to which see below).   If Mr Rabinowitz' reading of paragraph 1 were correct it would render paragraph 7 unnecessary.

72.  If this analysis is correct, it means that it is not necessary to get into the question of whether LBL (and hence LBHI) was liable for damages for the lost future rent.  However, I shall address that issue any event.

(ii)    Damages for lost future rent?

73.  Under English law a landlord cannot recover damages from a tenant for loss of rent after the lease has come to an end by forfeiture: see Reichman v Beveridge, para 36, Lloyd LJ[33].  Where the tenant is in breach of covenant, the landlord has an election to keep the lease on foot and continue to claim rent or to forfeit the lease and re-enter.  He cannot both forfeit the lease and claim damages for the lost rent which would otherwise later accrue due during the remainder of the term.

74.  The editors of the two principle practitioner's works on landlord and tenant law have adopted Reichman v Beveridge unquestioningly as stating the law: see Woodfall, Landlord and Tenant, para 7.315 (Release 90, October 2012), and Hill & Redman, Law of Landlord,

---

[32] See the Rabinowitz Declaration, paras 24(5) and (6).
[33] Rix and Auld LJJ agreed.  It was a strong Court of Appeal.  Rix LJ was and remains one of the foremost commercial contract lawyers on the appellate bench.

para 1543[34]. It is significant that, before Reichman v Beveridge was decided, the editors of Woodfall had (as Lloyd LJ pointed out at para 26) suggested, on the basis of some Commonwealth authorities, that a landlord might accept a tenant's repudiation and sue for future rent, but Lloyd LJ expressly disapproved that suggestion and the editors have consequently revised their text to remove it and to cite Reichman v Beveridge without criticism. Consequently this ought to be a very short point.

75. However, Mr Rabinowitz relies on Rainey Bros Ltd v Kearney [1990] NI 18, a decision of the Court of Appeal of Northern Ireland. I agree with him that Northern Irish decisions are to be afforded considerable respect in an English court. I also agree that the decision was founded entirely upon three earlier English cases and so is not a decision on purely Northern Irish law. However, I do not agree that an English court[35] would follow Rainey v Kearney in preference to Reichman v Beveridge. I believe that the English court would[36], if asked, say that Rainey v Kearney was wrongly decided.

76. First, the decision in Rainey v Kearney was per incuriam[37] a line of cases stretching back to the eighteenth century to the effect that the liability for rent will continue for so long and only for so long as the tenant remains in possession of the premises with the consent of the landlord. Compensation for use and occupation cannot be recovered as rent subsequent to the determination of the lease. That is why the landlord is never entitled to rent for the period following the service of a claim form in an action for possession for forfeiture, but only damages (or "mesne profits") and only in respect of such period as the tenant continues thereafter to occupy the premises against the landlord's interest: see Birch v Wright (1786) 1 Term Rep 378; Jones v Carter (1846) 15 M&W 718; Franklin v Carter (1845) 1 CB 750. In Jones v Carter, Parke B said (at page 726):

> "the bringing of an ejectment for forfeiture, and serving it on the lessee in possession, must be considered as the exercise of the lessor's option to determine the lease; and the option must be exercised once and for all ... for after such an act, by which the lessor treats the lessee as a trespasser, the lessee would know that he was no longer to consider himself as holding under the lease, and bound to perform the covenants contained in it; ..."

---

[34] The editors of Hill and Redman make the point there that the landlord has no duty to mitigate his loss, but must either forfeit or keep the lease on foot and recover the rent as it falls due: United Scientific Holdings (supra).

[35] The only relevant court for this purpose would be the UK Supreme Court, since at every judicial level below it Reichman v Beveridge would be binding precedent.

[36] That is to say, the UK Supreme Court. Any Court of Appeal faced with this question would be bound to follow Reichman v Beveridge.

[37] I.e. decided without citation of and in ignorance of the relevant cases.

77. The point is that if the landlord elects to forfeit, then the tenant has thereafter no interest in the land <u>at all</u> and no liability to pay future rent <u>at all</u>. Rent is special. It has been described in modern times as "axiomatic" that rent has four specific characteristics: it must be (1) a periodical sum (2) paid in return for the occupation of land, (3) issuing out of the land, and (4) for non-payment of which a distress is leviable: see <u>Escalus Properties Ltd v Robinson</u> [1996] QB 2312, at 233, Nourse LJ. So rent cannot fall due in respect of a particular period unless the tenant has the status of tenant with and interest in and possession of the land in respect of that period.

78. The kernel of the error in <u>Rainey v Kearney</u>, and in Mr Rabinowitz' adoption of that decision, lies in the mistaken assumption that a lease is in all respects like any other commercial contract which if repudiated, discharges both parties from their unperformed obligations but replaces them, by implication of law, with a secondary obligation to pay damages sustained in consequence of their non-performance[38]. However, future rent is different. As Lord Millett pointed out in <u>Re Park Air Services</u> [2000] 2 AC 172 (at page 187D-F):

> " ... rent is not a simple debt. It is the consideration for the right to remain in possession. The tenant's liability to pay future rent is not debitum in praesenti solvendum in futuro[39]. Its existence depends upon future events. Rent in respect of a future rental period may never become payable at all. Rent payable in future under a subsisting lease cannot be treated as a series of future debts making up a pure income stream."

79. More recently, as Neuberger J[40] said in <u>Active Estates v Parness</u> [2002] 3 EGRL 13:

> "If a landlord re-enters into possession of the demised premises, his action is inconsistent with the lease continuing, as I have already indicated, and, in particular, therefore, with the rent under the lease accruing thereafter. If the landlord cannot recover the rent from the tenant in respect of the period after his re-entry, he plainly cannot recover from a surety for non-payment of that rent."

80. Where a lease is forfeited by the landlord, the tenant's primary obligation to pay rent is discharged but unlike ordinary commercial contracts it is not replaced with an implied secondary obligation to pay damages sustained in consequence of the non-performance of that primary obligation. That is because forfeiture by the landlord is not merely the

---

[38] See <u>Photo Production Ltd v Securicor Transport Ltd</u> [1980] AC 827, at 849 per Lord Diplock.
[39] A debt obligation existing in the present and dischargeable in the future.
[40] Now Lord Neuberger, President of the Supreme Court. Before his appointment as a judge David Neuberger Q.C. was an eminent specialist practitioner in landlord and tenant law.

33

equivalent of the acceptance of a repudiatory breach by the tenant. It is the act by which the landlord regains possession of, and the tenant loses his interest in, the land and (if he remains in occupation) becomes a trespasser. Forfeiture removes the entire juridical basis for the prospective liability of the tenant for rent. The landlord cannot simultaneously treat the tenant as liable for lost future rent as an unperformed future obligation and regain possession of the premises, since the latter removes the foundation for the former. Where a lease has been terminated by forfeiture, there is in my opinion no room, as there is in ordinary contracts, for the implication of a secondary obligation to pay damages for the lost future rent. That is why the landlord has an election between having the premises and having the rent. He cannot have both[41].

81. If Rainey v Kearney were rightly decided, it would require the overruling of two hundred years of settled law, at the highest level, as to the particular characteristics of rent and its relationship with the right to possession and forfeiture[42]. There is no policy reason that I can see why the UK Supreme Court would consider such a step justified. The fact that courts in the Commonwealth have taken a different approach is not itself a good policy reason. It is also worth pointing out that Reichman v Beveridge has stood for six years and has not to my knowledge provoked either academic or judicial criticism or any adverse reaction from the UK property industry. One's admiration for the industry which led to the discovery by Mr Rabinowitz of Rainey v Kearney must be tempered by the fact that Rainey v Kearney is not cited in any of the major textbooks on landlord and tenant law in England and has not been considered or even cited in any case in England ever. There are usually good reasons why decisions lie undiscovered for decades.

82. Secondly, the three first instance cases on which the Court of Appeal relied in Rainey v Kearney, on closer analysis, are at best very slender support for the far-reaching proposition that the landlord may both forfeit the lease and claim damages for the lost future rent. First, they were all decided at a time when the law was thought to be[43] that a lease could not be repudiated. Secondly, there does not appear to have been any argument on this particular point in any of them. Thirdly, they were all likewise *per incuriam* the line of English cases on the nature of forfeiture and the liability for rent.

---

[41] There is a statutory exception to that rule in in cases where the liquidator of the tenant disclaims the lease (see below).
[42] It would also have been referred to in Re Park Air Services (supra).
[43] As it still may be.

83. A closer study of the three cases reveals the following:

(i)    Marshall v Mackintosh (1898) 78 LT 750. This was a case about a building agreement, not a lease. The defendant builder was not in possession under a lease and the effect of the breach of the building agreement was that the proposed lease would not be granted. At the time of the breach the time had not yet come for him to pay the rent. He had no interest in the land: see Marquis of Camden v Batterbury (1859) 5 CBNS 808, at 816 (affd (1860) 7 CBNS 864)[44]. The building agreement was treated as an ordinary contract and the issue about the difference between a lease and an agreement for a lease did not arise. In Rainey v Kearney the Court of Appeal of Northern Ireland dismissed the argument based on the differences between a lease and an agreement for a lease but cited no cases and devoted no analysis in support of its rejection of that distinction.

(ii)   Gray v Owen [1910] 1 KB 622. In that case Bucknill J did not actually award damages by way of lost rent for the remainder of the term of the lease, but only in respect of the rent accruing in the interval between the surrender and the re-letting.

(iii)  William v Lewis [1915] 3 KB 493. This case was about a series of alleged breaches of covenant of an agricultural tenancy where the breaches related to the condition in which the outgoing tenant had left the land at the end of the lease and the manner in which he had farmed it during the term[45]. It was not a case concerned with termination of the lease for breach of covenant and it involved no forfeiture. The landlord claimed damages by reference to the damage to his reversionary interest by reason of the breach of covenant relating to farming, which the court held could be measured by reference to lost future rent. Not all breaches of covenant will damage the reversionary interest. There is no reason why breach of the covenant to pay rent would ordinarily do so. There is no claim in this case that LBL damaged the landlord's reversionary interest by any breach of covenant.

84. Thirdly, it is important to note that the only instance in which the landlord is ever entitled to damages for lost future rent is following disclaimer, under section 178(6) of the Insolvency

---

[44] Beyond perhaps a tenancy at will, but one under which no rent was reserved.
[45] The case is principally about whether an agricultural tenant in the nineteenth century had an obligation to the landlord to do more than husband the land in accordance with the custom of the country. The tenant was found in breach of that obligation.

Act 1986. The statutory right is to be calculated in the same way as damages for breach of contract: see Re Park Air Services (supra) at page 180 B-E, per Lord Hobhouse; page 184D per Lord Millett. However, as Lord Millett pointed out in that case, the introduction of the statutory right of disclaimer in 1929 was to cure disadvantages for the landlord and the liquidator alike. So far as concerned the landlord, before 1929, where the tenant went into liquidation, although the landlord could forfeit the lease and re-let the property he would lose the right to future rent under the lease, for he could not have both possession and he could not obtain compensation for the consequences of his own action in forfeiting the lease (see Lord Millett at page 184B). If the law in England was as per Rainey v Kearney, the rationale for the introduction of the statutory right of disclaimer would disappear, and there would be no need for Parliament to have given the landlord an express right to claim damages (which include damages for future rent). It should go without saying that where the lease is forfeited by the landlord and not disclaimed by the tenant's liquidator the landlord has no right to damages for future rent.

85. For these reasons, I do not share Mr Rabinowitz' confidence that the UK Supreme Court would follow Rainey v Kearney and overrule Reichman v Beveridge. On the contrary, I think that it would follow Reichman v Beveridge and refuse to follow Rainey v Kearney.

86. Mr Rabinowitz also relies (at footnote 28) on a decision of the Supreme Court of Victoria in Nangus Pty Ltd v Charles Donovan Pty Ltd (in liq) [1989] VR 1984. However, I would not regard that as persuasive enough authority to tempt a UK Supreme Court to overrule Reichman v Beveridge. First, the issue of whether a lease can be repudiated was conceded by the guarantor (and in any event appears to be settled law in the state of Victoria). Secondly, the guarantor neither cited authority to support his proposition - a fact that the court held against him – nor sought to argue it from first principles by reference to the early cases and the peculiar nature of rent. Thirdly, the landlord's response was simply to say that future rent fell to be recovered as an ordinary head of damages for loss of bargain, which rather assumes the conclusion.

87. In summary, therefore, LBL's obligation to pay rent terminated when the term came to an end on forfeiture. LBL had no liability for future rent, whether as damages for lost rent or at all. There is nothing in paragraph 1 of schedule 4 either to create such a liability in LBL nor

to impose it on LBHI. Paragraph 1 imposed co-extensive liability, and if LBKL was not liable (which it was not) neither was LBHI.

88. The scheme and intention of schedule 4 was that it would be paragraph 7 of schedule 4 which provide the remedies open to the landlord on forfeiture and not paragraph 1. I now turn to paragraph 7 of schedule 4.

**(10)**     **The meaning and effect of paragraph 7 of schedule 4**

89. Where the lease is forfeited by the landlord and the term terminates, the sole remaining source of guarantee liability in respect of covenants in the lease that are yet to be performed and will now not be performed by LBL is paragraph 7. That is because the lease has come to an end and paragraph 1 provides that LBHI's liability as guarantor ends when LBL's liability as tenant ends. Paragraph 7 starts with the words "further covenant" because it is just that, a separate covenant, necessitated by the fact that if the lease was forfeited or the tenant ceased to exist, the landlord would be wholly without any remedy against LBHI in respect of any period following the forfeiture of the lease by virtue of paragraph 1.

90. I should point out at the outset that this is not so where the lease is disclaimed, since in that event section 178(4) of the Insolvency Act expressly preserves the liability of third parties (such as guarantors), and paragraph 2 of schedule 4 serves to confirm that LBHI would be liable notwithstanding any disclaimer for the fulfilment of the obligations of LBL under the lease. So if there was a disclaimer by LBL, the landlord would have a statutory claim under section 178(6) for damages for future rent (and it is arguable that under paragraph 2 of schedule 4 LBHI would be liable for that sum[46]). However, paragraph 7 also covers the situation where the lease has been disclaimed. That overlap is a historical quirk and is explained by the fact that, as the Rabinowitz Declaration rightly points out at footnote 29, these kinds of provisions were inserted in order to guard against the effect of disclaimer, which from 1901[47]until 1997 was thought to operate to discharge a guarantor from liability. However, the fact that there is an overlap between paragraphs 1 and 2 and paragraph 7 in

---

[46] My own provisional view is that such argument would not succeed because the liability of LBL to the landlord damages under section 178(6) is not clearly an obligation of LBNL "under this Lease" under paragraph 2. However, it is not necessary for me to reach a concluded view on that point.

[47] Stacey v Hill [1901] 1 KB 660 was a case involving individuals. The statutory right of disclaimer was introduced by the Bankruptcy Act 1869 with regard to individuals, and in respect of companies by section 267 of the Companies Act 1929.

the case of a disclaimer does not mean that there is an overlap in the case of forfeiture. Much of Mr Rabinowitz' view is based on an erroneous failure to treat disclaimer and forfeiture separately. In particular, paragraphs 65 to 67 of the Rabinowitz Declaration tend to ignore both the effect of section 178(4) of the Insolvency Act 1986 and the fact that paragraph 2 only refers to disclaimer whereas paragraph 7 refers to both disclaimer and forfeiture.

91. Accordingly, so far as concerns disclaimer, I would agree with Mr Rabinowitz that paragraph 7 provides for an additional remedy against LBHI in the case of <u>disclaimer</u>; but he is, I think, wrong to extend that conclusion to cases of <u>forfeiture</u>, where in my view paragraph 7 is the sole remedy as against LBHI. <u>Shaw v Doleman</u> [2009] 2 BCLC 123, on which Mr Rabinowitz relies, is not of assistance to him because it is all about disclaimer and it turns on the rather different wording of the particular guarantee in that case.

92. My view applies to both paragraph 7(a) and 7(b). I agree with paragraph 63 of the Rabinowitz Declaration as far as it goes, but I disagree that it is without prejudice to the landlord's rights under paragraph 1. Once the lease has been forfeited and the term has ended, LBL and LBHI alike have no further liability to perform and observe the covenants in the lease and (as I have said) have no liability for post-forfeiture damages for lost future rent.

93. As to Mr Rabinowitz' purported "test" in paragraph 64:

   (i)    Sub-paragraph (1) assumes too much. Where the lease is forfeited, LBL can still remain liable for breaches of covenant by LBL which have accrued during the term, and LBHI is liable as guarantor for those. LBHI would be liable under paragraph 1 in respect of rent which had accrued due but had not been paid prior to forfeiture, but in respect of the period post forfeiture, paragraph 1 has no operation. As I say, any damages flowing from breaches of covenant during the term (eg repairing covenants) would be covered by paragraph 1.

   (ii)   Sub-paragraphs (ii) and (iii) proceed on the misapprehension that LBHI is arguing that if the lease if forfeited, then the breach of covenant that occasioned it cannot sound in damages and be covered by the indemnity. That is not LBHI's case. LBHI's case is far simpler. Forfeiture is not just a reaction by the landlord to a breach but

38

the exercise of a landlord's remedy in itself, and one with a substantive effect on the term. Since it terminates the term, rent is not payable thereafter and the tenant is not in default for not paying it thereafter. That being so, LBHI cannot be liable under the guarantee for any post-forfeiture rent. Any serious breaches by LBL that occasion loss to the landlord during the currency of the term are of course picked up by paragraph 1.

94. The purpose of paragraph 7 is to give the landlord an option, where the lease has been forfeited, either to put an identical lease onto LBHI or else (at the landlord's election) to recover on demand from LBHI 180 days of rent that *"would have been payable under this Lease but for the disclaimer or other event."* It gives the landlord up to 180 days of rent which he would not have got but for clause 7.[48]

### (11)    The alleged anticipatory breach of paragraph 7

95. This is a short point. Under English law an anticipatory breach occurs when, before the time arrives at which a party to an executory contract is bound to perform, he expresses an intention not to do so, or acts is such a way as to lead a reasonable person to conclude that he does not intend to fulfill his part: Chitty Vol 1 para 24-022.

96. In the leading case of Hochster v de la Tour (1853) 2 El & Bl 678, Lord Campbell CJ's explanation of the doctrine proceeds entirely on the basis that there is in existence a binding contract, and that the parties are in a contractual relationship even before the day for performance has arrived. The need for a binding contract is also clear from Lord Wrenbury's exposition of the doctrine in Bradley v H Newsom Sons & Co [1919] AC 16, at page 53:

> "There can be no breach of an obligation in anticipation. It is not breach not to do an act at a time when its performance is not contractually due. If there be a contract to do an act at a future time, and the promisor, before that time arrives, says that when the time does arrive he will not do it, he is repudiating his promise which binds him in the present, but is in no default in not doing an act which is only to be done in the future. He is recalling or repudiating his promise, and that is wrongful. His breach is a breach of a presently binding promise, not an anticipatory breach of an act to be done in the future."

---

[48] Presumably, if the lease had been disclaimed by LBL's liquidator, the landlord would give credit in his proof for damages under section 178(6) for any recoveries he would or could have made under paragraph7.

97. Although it is possible to commit an anticipatory breach of a contingent obligation, the leading cases on that point[49] are cases where the contingency was outside the control of the innocent party and in any event related to the conditions for the performance of the obligation on the future date. There is no case to my knowledge where the contingency was the act of the innocent party himself bringing the relevant binding contract into being in the first place.

98. In this case, since the landlord had given neither notice nor demand, there was no obligation for LBHI to perform or to breach. The existence of any obligation binding on LBHI to take a new lease or pay up to 180 days rent following the forfeiture was conditional upon the landlord's giving of the notice or making of the demand. Only once that notice was given or demand made did any obligation binding on LBHI come into existence. Until that point, the landlord had merely a put option. The landlord's put option was either an irrevocable offer by LBHI or a conditional contract, but on no view was it an unconditionally binding agreement: see Spiro v Glencrown [1991] Ch 537; Active Estates Ltd v Parness [2002] BPIR 865[50]. Either way, in order to be exercised, the conditions of exercise must be strictly complied with: United Scientific Holdings Ltd v Burnley BC [1978] AC 904. Once it is exercised, a binding contract comes into existence: Basch v Stekel [2001] L & TR 1, per Chadwick LJ at para 27. As Lord Simon of Glaisdale put in in United Scientific Holdings (supra),

"the parties, on the exercise of the option, are brought into a new legal relationship."

99. Accordingly, it follows that a party to a contract cannot commit an anticipatory breach of a conditional obligation before the time that the condition is satisfied and obligation has become binding on him, at least where the fulfillment of the condition lies entirely in the other party's hands. If the grantee of the option decides, for whatever reason, not to exercise the option so as to bring about the new legal relationship, then there is no obligation in respect of which the grantor of the option could be in breach.

100.      The Rabinowitz Declaration confuses a binding executory contract with an option. They are not the same. Paragraph 7 conferred an option on the landlord. It was up to the

---

[49] Frost v Knight (1872) LR 7 Ex 111; Synge v Synge [1894] 1 QB 466.
[50] In Active Estates v Parness Neuberger J was dealing with a clause almost identical to paragraph 7 of schedule 4 (save that it had no reference to forfeiture in it). He held that it was a put option and that the reasoning of Hoffman J in Spiro v Glencrown applied to it.

landlord whether or not to satisfy the condition for paragraph 7(a) or (b) by serving a notice or making a demand. It chose not to do so. Whether or not influenced in that decision by anything said by LBHI, its choice meant that no obligation under paragraph 7, executory or otherwise, ever came into existence at all. That being so, there was no obligation for LBHI to breach, anticipatorily or at all.

101.       In addition, it was a pre-requisite of the landlord's right to exercise its option that it first forfeit the lease. The discussions on which the landlord relies to say that LBHI anticipatorily breached its obligations under paragraph 7 all occurred even before the landlord effected forfeiture on 10 December 2008. So the contract which LBHI is said to have breached was, at the time of its alleged breach, doubly conditional.

102.       Furthermore, as a matter of fact, LBHI did not express any intention to the landlord, or act in any way so as to lead a reasonable person to conclude, that it would not comply with a notice from the landlord under paragraph 7(a) or a demand under paragraph 7(b). The fact that objectively it was likely not to do so is not the point: what is needed is some actual word or deed from LBHI. A reasonable assumption that, _had_ the landlord served a notice, LBHI would not have complied is not enough. On the facts of this case, as the e-mail correspondence at appendix 3 of this opinion shows, LBHI only said that it would not take up a new lease because the Landlord had demanded confirmation of that fact in order to be able to continue to pursue the deal with JPM untroubled by any competition for the lease by LBHI, and as the condition for allowing LHBI sight of the new lease documentation. The Landlord can hardly complain that LBHI, in doing what it was invited to do, breached its obligation under clause 7. In short, the Landlord elected not to require LBHI to take up a new lease, and having done so it cannot complain that LBHI was in breach in not doing so.

103.       Accordingly, for all these reasons I disagree that the landlord is entitled to the rents that it would have received under a new lease to LBHI (less the amounts received from JPM under the new lease) by way of damages for anticipatory breach of contract.

104.       Further, and in any event, once the premises were re-let to JPM on 20 December 2008, it was thereafter impossible for the landlord either to seek to put a new lease onto LBHI under paragraph 7(a) or to claim any rent under paragraph 7(b). The landlord cannot claim damages in respect of the period after 20 December 2008. So under the proper measure of damages the landlord would be confined to its loss between the date on which

41

LBHI indicated that it would not take a new lease and 20 December 2008 when the JPM lease was executed. That is no more than a few days.

**(12)**    **Dilapidations, service charges and costs**

105.    The Rabinowitz Declaration assumes that LBHI's objection to liability for these sums is that they amount to a penalty. That is not the basis of LBHI's objection, and there is nothing about penalty in the Objections.

106.    LBHI's complaint is simpler. It is that the landlord has not proved its case by discovery or other evidence as to its losses. It has not proved that it has sought to enforce the repairing covenants against the sub-tenants (JLL or Nomura). It has not sought to prove that it served a notice of dilapidations on LBL or LBHI. It has not provided any evidence as to the state of the premises when JPM went into occupation. LBHI has been given no evidence as to the extent and cost of the dilapidations. Nor is there any evidence of the basis on which JPM calculated its discount to reflect the fitting out of the premises to its requirements, and (crucially) the extent to which that discount was for reinstatement as opposed to fitting out for JPM's own use and benefit (for which neither LBL nor LBHI could be liable). In the case of a covenant to keep in good repair, the measure of the landlord's loss is limited by section 18(1) of the Landlord and Tenant Act 1927 to the diminution in the value of the reversion owing to the breach of covenant, and therefore the landlord needs to prove the value of the reversion of the Premises as affected by the alleged breaches of the repairing covenants, and it is not sufficient to discharge that burden by reliance on the price fetched for the premises under the transaction with JPM. The proper processes must be followed: see Baroque Investments Limited v Heis [2012] EWHC 2886, esp paras 14 to 17.

107.    Accordingly, I express no opinion for the time being as to matters of law covered by Mr Rabinowitz at section L of the Rabinowitz Declaration, although I reserve the right to do so should the need arise.

108.    There is one point in the Response to Objection which Mr Rabinowitz has not covered but which I have been asked to deal with. Response paragraph 28 refers to the Tenant's failure to reinstate following the administrator's vacation from the building. The obligation under clause 4.10 of the lease is a traditional English law yielding-up covenant

42

which applies at the "expiration or sooner determination" of the term, i.e. the obligation arose only at the time that the lease was determined on forfeiture in December 2010 and not March 2010.

## (13)     General conclusion

109.     I refer back to the summary of conclusions under Section (3) of this Declaration. My general conclusion is that, to the extent that they rely upon English law, LBHI's Objections are well founded.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____10 January_____ 2013

_____
RICHARD MILLETT Q.C.

# APPENDIX 1



### RICHARD MILLETT QC
Born 1961

Essex Court Chambers
24 Lincoln's Inn Fields
London WC2A 3EG
United Kingdom

Tel: +44 (0) 20 7813 8000
Fax: +44 (0) 20 7813 8080
Email: rmillett@essexcourt.net

**Richard Millett QC** is a leading commercial and chancery litigation silk with an international practice, particularly in the corporate and banking fields.

*Legal 500* 2011 ranks Richard Millett QC as a leading silk in five categories: banking, commercial litigation, energy, insurance  and reinsurance and media and entertainment.

*Chambers & Partners* 2011 ranked Richard Millett Q.C as a leading silk in four categories: banking and finance, commercial dispute resolution, international arbitration and offshore litigation.

Current cases of interest

Acting for Explorer Fund in the multi-million dollar litigation brought by Liongate Select Fund in a dispute about the validity of redemptions and its status as creditor.

Acting for Renova and Viktor Vekselberg in Cayman in a derivative action relating to a private equity fund and the wrongful diversion of the Faberge brand (*Renova Resources v Gilbertson*).

Acting in Cayman for the liquidators and shareholders of a structured fund vehicle in relation to a loan agreement and derivative product relating to Lehman Bros; part of the *Anthracite* litigation.

Acting for Kuwait Airways Corporation in their ongoing efforts to enforce their US $1.2bn judgments worldwide against IAC.

Acting for a Russian Government entity in a very substantial London arbitration arising out of a major construction project in Moscow.

The *Antonio Gramsci* litigation (piercing the corporate veil and Article 23 agreements in a substantial alleged corporate group fraud).

The *Pacific China Group* case (about enforcement of New York Convention awards) to go from the Eastern Caribbean Supreme Court to the Privy Council in 2013.

Advising several Madoff client groups in the BVI litigation brought by the liquidators of Fairfield Sentry.

Some recent cases of interest (2010-2012)

*Cadogan Oil v Tolley*, the first decision about proprietary claims to the fruits of alleged bribes after *Sinclair v Versailles*.

Acting for Sir Jack Hayward and the trustees of his family trusts in the Bahamian court in the claims brought by the beneficiaries.

Acting for *Danone* in a US $ billion worldwide fraud litigation (BVI, Seychelles, Samoa).

The € multi-billion *Elektrim* litigation and arbitrations.

Acting in litigation for the heirs to the fortune of Loucas Haji-Ioannou in their litigation against John Frangos.

Acting for a Cayman hedge fund in a claim against Barclays Capital over product mispricing.


Specialist practice areas

- Arbitration and arbitration-related litigation
- Banking, Securities, Derivatives and offshore company litigation
- Chancery
- Commercial Litigation
- Company Law
- Insolvency & Corporate Recovery
- Insurance & Reinsurance
- Media & Entertainment
- Mediation
- Professional Negligence
- Public Procurement Contracts
- Restitution
- Telecommunications


Legal publications

He is co-author, with Geraldine Andrews QC, of Andrews and Millett on the Law of Guarantees (6th Edition, 2011).

He is editor of Run-Off Management and Commutations in Practice (IIL, 2006).

He is editor of the 2004 reissue of Halsbury's Laws on Guarantees (Vol 20(1)).

Career

| | |
|---|---|
| 2010 | Appointed Civil Recorder (Chancery). |
| 2010 | Called to St Kitts and Nevis Bar (specific case) |
| 2009 | Called to Cayman Bar (for various cases) |
| 2007 | Called to Anguilla Bar (permanent) |
| 2006 | Called to Cayman Bar  (for various cases) |
| 2005 | Called to BVI Bar (permanent) |
| 2003 | Silk |
| 2000—03 | Treasury A Panel |
| 1990 | Essex Court Chambers |
| 1987—92 | Panel Member, Counsel to the Department of Trade and Industry for company directors' disqualifications |
| 1986 | Chambers of Peter Whiteman QC, Temple |
| 1985 | Call: Lincoln's Inn |

Education

University of Michigan (1980)
BA (Classical Tripos Pt 1, Law Tripos Pts Ib and II) Trinity Hall, Cambridge University (BA 1984)
Inns of Court School of Law
Megarry Prize for Landlord and Tenant Law (1985)

<u>Awards</u>

Megarry Prize for Landlord and Tenant

<u>Languages</u>

French (working knowledge)

<u>Member and further professional qualifications</u>

Also called to the Bars of Isle of Man, Bermuda and The Seychelles for specific cases (all within past four years).

Chancery Bar Association
Commercial Bar Association (COMBAR)
London Common Law and Commercial Bar Association
Royal Television Society

# APPENDIX 2

HEARING DATE AND TIME: September 27, 2012 at 10:00 a.m. (Prevailing Eastern Time)
RESPONSE DEADLINE: September 15, 2012 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Peter D. Isakoff
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re                                                  :    Chapter 11 Case No.
                                                       :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,               :    08-13555 (JMP)
                                                       :
                                      Debtors.         :    (Jointly Administered)
-----------------------------------------------------------------x

## NOTICE OF HEARING ON
## OBJECTION TO PROOFS OF CLAIM NUMBER 14824 AND 14826

**PLEASE TAKE NOTICE** that on August 15, 2012, Lehman Brothers Holdings

Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of LBHI and Its Affiliated Debtors for certain entities in the above-referenced chapter 11 cases,

filed its objection to proof of claim number 14824 filed by Canary Wharf Management Ltd. and

proof of claim number 14826 filed by Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2)

T2 Limited (the "Objection"), and that a hearing to consider the Objection will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York,

New York 10004, on **September 27, 2012 at 10:00 a.m. (Prevailing Eastern Time)**, or as soon

thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Objection must

US_ACTIVE:\44051049\5\58399.0008

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in

accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by

registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest,

on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other

Windows-based word processing format (with a hard copy delivered directly to Chambers), in

accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and

served in accordance with General Order M-399, and on (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii)

attorneys for LBHI, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153 (Attn: Peter D. Isakoff, Esq. and Robert J. Lemons, Esq.); and (iii) the Office of the

United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004

(Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq., and Andrea B. Schwartz, Esq.); so as

to be so filed and received by no later than **September 15, 2012 at 4:00 p.m. (Prevailing**

**Eastern Time)** (the "Response Deadline").

2

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Objection, LBHI may, on or after the Response Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Objection, which order may be entered with no further notice or opportunity to be heard offered

to any party.

Dated: August 15, 2012
       New York, New York

                          /s/ Robert J. Lemons
                          Peter D. Isakoff
                          Robert J. Lemons

                          WEIL, GOTSHAL & MANGES LLP
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone: (212) 310-8000
                          Facsimile: (212) 310-8007

                          Attorneys for Lehman Brothers Holdings Inc.
                          and Certain of Its Affiliates

US_ACTIVE:\44051049\5\58399.0008

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Peter D. Isakoff
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

---------------------------------------------------------------x

## OBJECTION TO PROOFS OF CLAIM NUMBER 14824 AND 14826

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the

Modified Third Amended Joint Chapter 11 Plan of LBHI and Its Affiliated Debtors (the "Plan"),

for the entities in the above-referenced chapter 11 cases (the "Chapter 11 Estates"), respectfully

represents as follows:

### Preliminary Statement

1.      Canary Wharf Management Ltd. (the "Management Company") filed

proof of claim number 14824 against LBHI and Heron Quays (HQ2) T1 Limited and Heron

Quays (HQ2) T2 Limited (the "Landlord" and together with the Management Company, the

"Claimants") filed proof of claim number 14826 (together with proof of claim number 14824,

the "Claims") against LBHI in the total amount of almost $4.5 billion.  The Claimants, as

landlord and management company, Lehman Brothers Limited (the "Tenant"), as tenant, and

1

LBHI, as surety, among others, were parties to a lease agreement, dated as of March 16, 2005

(the "Lease"), of the commercial property at 25 Bank Street, Canary Wharf, London E14 5LE

(Parcel HQ2) (the "Premises").  The Claimants assert that LBHI is liable for unpaid obligations

of the Tenant under a guarantee provision in the Lease.

        2.      Pursuant to letter agreement among the Claimants and the Tenant, among

others, but excluding LBHI, dated December 3, 2010 (the "Forfeiture Letter"), the Claimants

forfeited the Lease and also released all rights to require payment as an administrative expense

claim by the joint administrators of the Tenant in exchange for the Tenant's payment of £1.5

million to the Landlord.  The Lease is governed by English law, and under English law, this

material and prejudicial variation of the Lease discharged all of LBHI's alleged liability under

the guarantee.  Accordingly, LBHI has no liability on account of the Claims, and the Claims

should be disallowed and expunged in their entirety.

### Relief Requested

        3.      LBHI files this objection, pursuant to section 502(b) of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 3007(d) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), to disallow and expunge the Claim.

### Jurisdiction

        4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

        5.      Commencing on September 15, 2008, and periodically thereafter, LBHI

and certain of its subsidiaries commenced with this Court voluntary cases under title 11 of the

Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

2

6.      On December 6, 2011, the Court entered an order confirming the Plan

[ECF No. 23023].  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as

the Plan Administrator, is authorized to interpose and prosecute objections to claims filed against

the Chapter 11 Estates.

## The Claims

7.      On September 15, 2008, joint administrators were appointed in the

administrative insolvency proceedings of the Tenant, a foreign non-debtor affiliate of LBHI, in

the United Kingdom.

8.      On September 17, 2009, the Landlord filed a proof of claim in the

unsecured amount of $4,280,970,000.00 against LBHI, which claim was assigned claim number

14826 (the "Landlord's Claim").  It asserts that the Tenant would likely default on its obligations

under the Lease and that LBHI would be liable for such obligations under a guarantee in

paragraph 1 of Schedule 4 to the Lease (the "Guarantee"), attached hereto as Exhibit A.  More

specifically, the Landlord's Claim asserts that LBHI is liable for the following: (i) rent in the

amount of $2,632,453,293.00, (ii) building service charges in the amount of $310,858,503.00,

(iii) rates, or local taxes, in the amount of $711,317,417.00, (iv) insurance in the amount of

$73,022,194.00, (iv) dilapidations, or damages to the Premises, in the amount of

$284,013,680.00, (v) "M&E Replacement Costs" in the amount of $268,443,878.00, and (vi)

costs, including legal costs, in the amount of $845,582.00.  The Landlord's Claim does not

provide an explanation of or evidence showing "M&E Replacement Costs," nor does it provide

any evidence of damages to the Premises in support of its claim for dilapidations.

9.      On September 17, 2009, the Management Company filed a proof of claim

in the unsecured amount of $195,550,000.00 against LBHI, which was assigned claim number

3

14824 (the "Management Company's Claim").  It asserts that the Tenant would likely default on

its obligations under the Lease and that LBHI would be liable for such obligations pursuant to

the Guarantee.  More specifically, the Management Company's Claim includes amounts

allegedly owing for estate service charges in the amount of $195,496,978.00 and costs, including

legal costs, in the amount of $48,268.00.

10.     On August 22, 2011, LBHI filed a stipulation and agreement whereby

LBHI and the Claimants agreed to a maximum allowable amount of the Claims, ECF No. 19427.

LBHI reserved any and all rights, claims, defenses, challenges, and objections all on any

grounds, relating to the validity, enforceability, and amount of each of the Claims and the

classifications thereof.  The court entered an order approving the stipulation and agreement on

September 1, 2011, ECF No. 19644.  Pursuant to the order, the maximum allowable amount of

the Landlord's Claim is $770,000,000.00, and the maximum allowable amount of the

Management Company's Claim is $9,150,000.00.

## The Forfeiture

11.     It is LBHI's understanding that the Tenant occupied the Premises until

March 2010.  Between April 2010 and December 2010, the Chapter 11 Estates believe that

certain subtenants were occupying the Premises, that the Claimants were receiving direct

payments in accordance with one or more subleases on account of liabilities under the Lease and

that under English law the administrators of the Tenant remained liable for the rent payable

under the Lease.

4

12.    On December 3, 2010, the Forfeiture Letter, attached hereto as <u>Exhibit B</u>, was executed by the Tenant and the Claimants, among others.  The Forfeiture Letter provides that the Claimants "request consent of the Administrators of LBL [the Tenant] . . . to our forfeiting the Lease by means of peaceable re-entry. . ." and that "we [the Claimants] shall exercise that right before 11:59 pm on 10 December 2010."  *See* <u>Exhibit </u>B, *Forfeiture Letter*, ¶ 1.1, 2.

13.    In the Forfeiture Letter, the Claimants provided the Tenant with a release of all administrative expense claims under the Lease:

> (a) in consideration of LBL [Tenant] agreeing to pay to the Landlord £1.5m on the date of forfeiture . . . LBL is unconditionally and irrevocably released and discharged from any claims as an administration expense for unpaid rent that fell due and was payable under the Lease before the date of forfeiture . . .

> (c) LBL [Tenant] is unconditionally and irrevocably released and discharged from any claims as an administration expense for any estate service charge and other sums that fell due and were payable under the Lease . . . before the date of forfeiture;

> provided that LBL agrees that we [Landlord] and/or CWML [Management Company] may claim against LBL [Tenant] as an unsecured creditor for any unpaid rent and estate charge and any other sums falling due under the Lease up to the date of forfeiture.

*See* <u>Exhibit B</u>, *Forfeiture Letter*, ¶ 4.

14.    It is LBHI's understanding that on December 20, 2010, but prior to the grant of the replacement lease for the Premises mentioned below, the Landlord's interest in the Premises was terminated, so that the reversionary interest became vested in Canary Wharf Investments Limited as freeholder, and that subsequently, but again prior to the grant of the replacement lease, the freehold interest in the Premises was transferred by Canary Wharf Investments Limited to HQCB Investments Limited ("<u>HQCB</u>").  Immediately thereafter on

5

December 20, 2010, HQCB granted a lease of the Premises to JPMorgan Chase Bank, National

Association ("JPMorgan") pursuant to an agreement dated December 20, 2010.

        15.     The Guarantee provides that, after a forfeiture of the Lease, the Landlord

may request that LBHI enter into a replacement lease; however, if no request is made within 180

days of the forfeiture, then LBHI's liability is to pay rent and other sums in respect of the period

ending upon the earlier of (a) the Landlord's entry into a lease to a third party or (b) 180 days

following the forfeiture:

> (a)  The Surety hereby further covenants with the Landlord and the Management Company that:-
>
> > (i) if the Crown or a liquidator or trustee in bankruptcy shall disclaim or surrender this Lease or
> >
> > (ii) if this Lease shall be forfeited or
> >
> > (iii) if the Tenant shall cease to exist unless the same occurs as part of an amalgamation merger or reconstruction resulting in a solvent corporation
>
> THEN the Surety shall if the Landlord by notice in writing given to the Surety within one hundred and eighty (180) days after such disclaimer or other event so requires accept from and execute and deliver to the Landlord a counterpart of a new lease of the Demised Premises (duly stamped at the Surety's expense) for a term commencing on the date of the disclaimer or other event and continuing for the residue then remaining unexpired of the Term such new lease to be at the cost of the Surety and to be at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease
>
> (b) If the Landlord shall not require the Surety to take a new lease the Surety shall nevertheless upon demand pay to the Landlord a sum equal to the Rent and other sums that would have been payable under this Lease but for the disclaimer or other event in respect of the period from and including the date of such disclaimer or other event until the expiration of one hundred and eighty (180) days therefrom or until the Landlord shall have granted a lease of the Demised Premises to a third party (whichever shall first occur)

US_ACTIVE:\44051049\5\58399.0008

*See* Exhibit A, *Guarantee*, ¶ 7.

## **The Claims Should Be Disallowed And Expunged**

16.     Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a
claim may not be allowed to the extent that "such claim is unenforceable against the debtor and
property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).  If an
objection refuting at least one of the claim's essential allegations is asserted, the claimant has the
burden to demonstrate the validity of the claim.  *See In re Oneida, Ltd.*, 400 B.R. 384, 389
(Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 WL
601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539
(Bankr. S.D.N.Y. 2000).

17.     Under English law, a guarantee is discharged if there is a material
variation to the underlying contract to which the guarantor does not consent:

> . . . if there is any agreement between the principals with reference
> to the contract guaranteed, the surety ought to be consulted, and
> that if he has not consented to the alteration, . . . if it is not self-
> evident that the alteration is unsubstantial, or one which cannot be
> prejudicial to the surety, the Court . . . will hold that . . . if he has
> not so consented he will be discharged.

*Holme v. Brunskill* [1877] 3 QBD 495, per Cotton, L.J. at 505.  This rule rests on the principle
that "the law will not assist a party to enforce a bargain who has placed the other party in
jeopardy by unilateral alteration of the instrument by which their bargain was made."  *Petro Can
Exploration Inc. v. Tormac Transp. Ltd.* (1983) 23 B.L.R. 1, BCSC, per Taylor, J. at ¶ 22.

18.     English law provides that a variation is material unless it is self-evident
that the alteration is unsubstantial or not prejudicial to the guarantor.  *See Holme v. Brunskill*
[1877] 3 QBD 495, per Cotton, L.J. at 505; *Ankhar Pty Ltd. v. Nat'l Westminster Fin. (Australia)
Ltd.* [1987], 162 C.L.R. 549, 559; *Selous St. Props. Ltd. v. Oronel Fabrics Ltd.* [1984], EDG

7

360, per Hutchinson, J. at 396, *cited in Howard de Walden Estates Ltd. v. Pasta Place Ltd. and others* [1995] 1 EGLR 79, per Morland, J. at 81.

19.     Rent in respect of administration-occupied premises is payable as an administrative expense under English law.  *See Goldacre (Offices) Ltd. v Nortel Networks UK Ltd. (in administration)* [2009] EWHC 3389 (Ch).  But, pursuant to the Forfeiture Letter, the Claimants released the Tenant of all administrative expense claims and all claims arising after the forfeiture of the Lease upon the Tenant's payment of £1.5 million to the Landlord.  *See* Exhibit B, *Forfeiture Letter*, ¶ 4(a).  The settlement contained in the Forfeiture Letter is a variation of the Lease because it removes the ability of the Landlord to pursue the Tenant for obligations arising prior to the forfeiture, which otherwise would have been paid in full as an administrative expense under English law.  The variation of the Lease is material because it exposes LBHI to increased liability under the Guarantee.  LBHI was not a party to the Forfeiture Letter and did not manifest consent to the settlements contained therein.

20.     Because the terms of the Forfeiture Letter constitute material variations to the Lease to which LBHI did not consent, the Guarantee of the Lease is unenforceable as a matter of English law.  As a result, the Claims against LBHI seeking enforcement of the Guarantee should be disallowed and expunged in their entirety.

21.     Even if LBHI's alleged liability under the Guarantee was not discharged upon the material variation of the Lease, and even if the Guarantee survives the forfeiture of the Lease, which LBHI disputes, the terms of the Guarantee provide that LBHI's obligations under the Guarantee cease when the Tenant's obligations under the Lease cease:

> The Surety hereby covenants with the Landlord and as a separate
> covenant with the Management Company as a primary obligation
> that the Tenant or the Surety shall at all times until the Tenant shall
> cease to be bound by the Tenant's covenants in the Lease during

8

the Term duly perform and observe all the covenants on the part of
the Tenant contained in this Lease including the payment of the
rents hereby reserved and all other sums payable under this Lease
in the manner and at the times herein specified . . .

*See* Exhibit A, *Guarantee*, ¶ 1.  Upon forfeiture, the Tenant ceased to be bound by provisions of

the Lease, including the requirement that the Tenant pay rent and other sums.  Because LBHI's

liability under the Guarantee is co-extensive with the Tenant's responsibilities under the Lease,

LBHI is released of any and all liability that accrued post-forfeiture.

22.    Even if LBHI were liable under the Guarantee following the forfeiture,

which LBHI disputes, the Guarantee provides that liability continues only until "the expiration of

one hundred and eighty (180) days therefrom [the forfeiture] or until the Landlord shall have

granted a lease of the Demised Premises to a third party (whichever shall first occur)."  *See*

Exhibit A, *Guarantee*, ¶ 7(b).  Pursuant to the Forfeiture Letter, the forfeiture was to occur

"before 11:59 pm on 10 December 2010."  *See* Exhibit B, *Forfeiture Letter*, ¶ 2.  LBHI

understands that such forfeiture occurred prior to that date and time, and subsequent to such

forfeiture, the Landlord disposed of its interest in the Premises and no longer has any interest

therein.  Pursuant to an agreement dated December 20, 2012, HCQB, "granted a lease of the

Demised Premises" to JPMorgan.  As a result, at a minimum, LBHI is released of any and all

liability that accrued after December 20, 2010.  (Even had the Claimants not entered into a lease

of the Premises with JPMorgan, LBHI's liability under the Guarantee would have terminated 180

days after the forfeiture.  *See* Exhibit A, *Guarantee*, ¶ 7(b).)

23.    If the Claimants were entitled to recovery on account of the Claims, which

LBHI disputes, such Claims would in any event be subject to the statutory cap on claims

9

resulting from the termination of a lease of real property, pursuant to section 502(b)(6) of the

Bankruptcy Code.[1]  This alone would greatly reduce the Claims.

24.    The Claimants assert claims for unpaid rent, service charges, taxes,

insurance, dilapidations, "M&E Replacement Costs," and costs, including attorneys' fees.  The

Claimants provide no evidence of dilapidations and "M&E Replacement Costs."  Absent any

proof that these damages were suffered, the portion of the Claims for dilapidations and "M&E

Replacement Costs" should be disallowed and expunged.

25.    To the extent that the claims for dilapidations and "M&E Replacement

Costs" are not expunged due to lack of evidentiary support, such claims, in addition to service

charges and costs, are unrecoverable termination damages.  To the extent that these amounts are

not determined to be unrecoverable termination damages, such amounts are rent reserved, and

the Claimants' recovery for such amounts is limited by the statutory cap imposed by section

502(b)(6) of the Bankruptcy Code.

26.    In summary, unless the Claims are disallowed and expunged, parties who

do not hold valid claims against LBHI's estate will nonetheless recover from LBHI.

Accordingly, LBHI respectfully requests that the Court enter an order disallowing and expunging

the Claims in their entirety.

---

[1] Section 502(b)(6) of the Bankruptcy Code provides that a claim is allowed, "except to the extent that:"

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a
> lease of real property, such claim exceeds—
>> (A) the rent reserved by such lease, without acceleration, for the greater of one
>> year, or 15 percent, not to exceed three years, of the remaining term of such
>> lease, following the earlier of—
>>> (i) the date of the filing of the petition; and
>>> (ii) the date on which such lessor repossessed or the lessee surrendered,
>>> the leased property; plus
>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of
>> such dates;

US_ACTIVE:\44051049\5\58399.0008

**Reservation of Rights**

27.     LBHI reserves all rights to object on any other basis to the Claims as to
which the relief requested herein is not granted.

**Notice**

28.     No trustee has been appointed in these chapter 11 cases.  Notice of this
Objection has been provided to (i) the United States Trustee for Region 2; (ii) the Securities and
Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for
Region 2; (v) the Landlord; (vi) the Management Company; and (vi) all other parties entitled to
notice in accordance with the procedures set forth in the second amended order entered on June
17, 2010, governing case management and administrative procedures for these cases [ECF No.
9635].  The Plan Administrator submits that no other or further notice need be provided.

29.     No previous request for the relief sought herein has been made by the Plan
Administrator or the Chapter 11 Estates to this or any other Court.

WHEREFORE the Plan Administrator respectfully requests entry of an order
granting the relief requested herein and such other and further relief as is just.

Dated: August 15, 2012
       New York, New York


                                    /s/ Robert J. Lemons
                                    Peter D. Isakoff
                                    Robert J. Lemons


                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Lehman Brothers Holdings Inc.
                                    and Certain of Its Affiliates


                                        11

**EXHIBIT A**

**C L I F F O R D**

**C H A N C E**

LIMITED LIABILITY PARTNERSHIP

<u>DATED</u>   16 MARCH   2005

CERTIFIED A TRUE COPY
OF THE ORIGINAL

*P. Kendell* 20/8/09

PAMELA KENDALL, SOLICITOR
Legal Department
Canary Wharf Limited
One Canada Square, Canary Wharf
London E14 5AB

(1)   Landlord:
HERON QUAYS (HQ2) T1 LIMITED and
HERON QUAYS (HQ2) T2 LIMITED

(2)   Management Company:
CANARY WHARF MANAGEMENT LIMITED

(3)   Landlord's Guarantor:
CANARY WHARF HOLDINGS LIMITED

(4)   Tenant:
LEHMAN BROTHERS LIMITED

(5)   Surety
LEHMAN BROTHERS HOLDINGS INC

COUNTERPART

**U N D E R L E A S E**

- of -

25 Bank Street, Canary Wharf
London E14 5LE (Parcel HQ2)

| | |
|---|---|
| TERM COMMENCES: | 3 July 2003 |
| YEARS: | 30 |
| TERM EXPIRES: | 2 July 2033 |
| RENT: | £41,955,013 p.a. exclusive (subject to fixed increases and to review) |
| CAR PARKING RENT: | £640,000 p.a. exclusive (subject to review) |

# SCHEDULE 4

### COVENANTS BY THE SURETY

1.  **Indemnity by Surety**

    The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums Provided That the Landlord and the Management Company shall notify the Tenant of any such actions or other matters and take all reasonable steps to mitigate such losses having regard to the nature of the breach

2.  **Surety jointly and severally liable with Tenant**

    The Surety hereby further covenants with the Landlord and as a separate covenant with the Management Company that the Surety is jointly and severally liable with the Tenant (whether before or after any disclaimer by a liquidator or trustee in bankruptcy) for the fulfilment of all the obligations of the Tenant under this Lease and agrees that the Landlord or the Management Company in the enforcement of its rights hereunder may proceed against the Surety as if the Surety was named as the Tenant in this Lease

3.  **Waiver by Surety**

    The Surety hereby waives any right to require the Landlord or the Management Company to proceed against the Tenant or to pursue any other remedy whatsoever which may be available to the Landlord or the Management Company before proceeding against the Surety

4.  **Postponement of claims by Surety against Tenant**

    The Surety hereby further covenants with the Landlord and as a separate covenant with the Management Company that the Surety shall not claim in any liquidation bankruptcy composition or arrangement of the Tenant in competition with the Landlord or the Management Company and shall remit to the Landlord the proceeds of all judgments and all distributions it may receive from any liquidator trustee in bankruptcy or supervisor of the Tenant and shall hold for the benefit of the Landlord and the Management Company all security and rights the Surety may have over assets of the Tenant whilst any liabilities of the Tenant or the Surety to the Landlord or the Management Company remain outstanding

5.  **Postponement of participation by Surety in security**

The Surety shall not be entitled to participate in any security held by the Landlord or
the Management Company in respect of the Tenant's obligations to the Landlord or the
Management Company under this Lease or to stand in the place of the Landlord or the
Management Company in respect of any such security until all the obligations of the
Tenant or the Surety to the Landlord and the Management Company under this Lease
have been performed or discharged

6.  **No release of Surety**

None of the following or any combination thereof shall release discharge or in any way
lessen or affect the liability of the Surety under this Lease:-

(a)     any neglect delay or forbearance of the Landlord or the Management
Company in endeavouring to obtain payment of the rents or other amounts
required to be paid by the Tenant or in enforcing the performance or
observance of any of the obligations of the Tenant under this Lease

(b)     any refusal by the Landlord or the Management Company to accept rent
tendered by or on behalf of the Tenant at a time when the Landlord was
entitled (or would after the service of a notice under Section 146 of the Law of
Property Act 1925 have been entitled) to re-enter the Demised Premises

(c)     any extension of time given by the Landlord or the Management Company to
the Tenant

(d)     (subject to Section 18 of the Landlord and Tenant (Covenants) Act 1995) any
variation of the terms of this Lease (including any reviews of the rent payable
under this Lease) or the transfer of the Landlord's reversion or the assignment
of this Lease

(e)     any change in the identity constitution structure or powers of any of the
Tenant the Surety the Landlord or the Management Company or the
liquidation administration or bankruptcy (as the case may be) of either the
Tenant or the Surety

(f)     any legal limitation or any immunity disability or incapacity of the Tenant
(whether or not known to the Landlord or the Management Company) or the
fact that any dealings with the Landlord or the Management Company by the
Tenant may be outside or in excess of the powers of the Tenant

(g)     any other act omission matter or thing whatsoever whereby but for this
provision the Surety would be exonerated either wholly or in part (other than a
release under seal given by the Landlord and/or the Management Company as
the case may be)

7. **Disclaimer or forfeiture of Lease**

(a)    The Surety hereby further covenants with the Landlord and the Management Company that:-

    (i)    if the Crown or a liquidator or trustee in bankruptcy shall disclaim or surrender this Lease or

    (ii)    if this Lease shall be forfeited or

    (iii)    if the Tenant shall cease to exist unless the same occurs as part of an amalgamation merger or reconstruction resulting in a solvent corporation

    THEN the Surety shall if the Landlord by notice in writing given to the Surety within one hundred and eighty (180) days after such disclaimer or other event so requires accept from and execute and deliver to the Landlord a counterpart of a new lease of the Demised Premises (duly stamped at the Surety's expense) for a term commencing on the date of the disclaimer or other event and continuing for the residue then remaining unexpired of the Term such new lease to be at the cost of the Surety and to be at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease

(b)    If the Landlord shall not require the Surety to take a new lease the Surety shall nevertheless upon demand pay to the Landlord a sum equal to the Rent and other sums that would have been payable under this Lease but for the disclaimer or other event in respect of the period from and including the date of such disclaimer or other event until the expiration of one hundred and eighty (180) days therefrom or until the Landlord shall have granted a lease of the Demised Premises to a third party (whichever shall first occur)

8. **Benefit of guarantee and indemnity**

This guarantee and indemnity shall enure for the benefit of the successors and assigns of the Landlord and the Management Company respectively under this Lease without the necessity for any assignment thereof

9. **Value Added Tax**

Where, pursuant to the terms of this Lease, the Landlord or the Management Company or any other person (for the purposes of this paragraph 9, the "**Supplier**") makes or is deemed to make a supply to the Surety for Value Added Tax purposes and Value Added Tax is or becomes chargeable on such supply, the Surety shall (in addition to and at the same time as providing any other consideration for such supply) pay to the Supplier a sum equal to the amount of such Value Added Tax and the Supplier shall provide the Surety with a Value Added Tax invoice in respect of such supply

10.    **Guarantor to join in Authorised Guarantee Agreement**

The Surety covenants with the Landlord, and as a separate covenant with the Tenant, that the Surety will join in, and execute and deliver to the Landlord, any deed which the Tenant (here meaning only the Tenant whose obligations hereunder were originally guaranteed by that Surety) is required to execute and deliver to the Landlord pursuant to Clause 4.21.2(b)(i), so as to give the covenants on the part of the Surety therein contained

08-13555-jmp    Doc 30055    Filed 08/10/12    Entered 08/10/12 16:00:23    Main Document
Pg 21 of 33

## EXHIBIT B

# CANARY WHARF
## G R O U P   P L C

Heron Quays (HQ2) T1 Limited
One Canada Square
Canary Wharf
London
E14 5AB

Tel: +44 (020) 7418 2000
Fax: +44 (020) 7418 2222
Registered in England and Wales No. 4290562

Heron Quays (HQ2) T2 Limited
One Canada Square
Canary Wharf
London
E14 5AB

Tel: +44 (020) 7418 2000
Fax: +44 (020) 7418 2222
Registered in England and Wales No. 4290529

3  December  2010

To : Lehman Brothers Limited (in administration)

**Underlease (the "Lease") of 25 Bank Street, Canary Wharf, London E14 5LE: (the "Property") dated 16 March 2005: Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited (together "the Landlord"): Lehman Brothers Limited (in administration) ("LBL")**

1  On the basis of the agreements and confirmations set out in this letter:

1.1  We hereby request consent of the Administrators of LBL (defined below) to our forfeiting the Lease by means of peaceable re-entry (so that therefore no leave of the Court will be required).

1.2  We hereby request your confirmation that following such forfeiture, LBL waives any right to apply to the Court for relief from forfeiture.

1.3  We hereby request your confirmation that the Administrators of LBL were appointed to act as joint administrators of LBL pursuant to Orders of the High Court of Justice, Chancery Division on 15 September 2008 and on 30 November 2009 (in respect of the appointment of Derek Anthony Howell).

2  We hereby warrant on the understanding that the Administrators of LBL and LBL rely on this confirmation that we are the Landlord of the Lease and the person to whom rent is payable and that we have a valid lawful and current right to forfeit the Lease by peaceable re-entry, and further that we shall exercise that right before 4.5 pm on 10 December 2010.

---

A12788229/0.3/03 Dec 2010

CANARY WHARF
G R O U P   P L C

3    In consideration of the consents requested and confirmations given in paragraphs 1 and 2:

(a)    with effect from such forfeiture Heron Quays Properties Limited ("HQPL") and Canary Wharf Group plc ("CWG") will each unconditionally and irrevocably release and discharge   LBL and LBL will unconditionally and irrevocably release and discharge HQPL and CWG from an agreement dated 30 March 2001 between CWG and LBL relating to numbers 1 and 2 Broadgate and various other premises on the Broadgate Estate London EC2 (and any documents supplemental to it), ("the Broadgate Payments Agreement") and from any claims and counterclaims under the Broadgate Payments Agreement, and each of HQPL, CWG and LBL covenant and undertake in favour of each other that it will not make or suffer or cause to be made or maintained any claims or counterclaims in relation to the Broadgate Payments Agreement.

(b)    With effect from such forfeiture Canary Wharf Contractors Limited ("CWCL"), and Lehman Brothers Lease and Finance (No 1) Limited (in administration) ("LBLF") will each unconditionally and irrevocably release and discharge each other from any claims and counterclaims in relation to an agreement dated 30 March 2001 between LBL, CWCL and LBHI, as novated to LBLF by an agreement dated 29 November 2001 and any supplemental documents ("the Fit Out Contract") and each of CWCL and LBLF covenant and undertake in favour of the other that it will not make or suffer or cause to be made or maintained any claims or counterclaims in relation to the Fit Out Contract.

(c)    LBL and Canary Wharf (Car Parks) Limited, Heron Quays (RT3) T1 Limited, Heron Quays (RT3) T2 Limited and Canary Wharf Management Limited ("CWML")  agree that a Car Parking Agreement dated 16 March 2005 ("Car Parking Agreement") will terminate with effect from the date of forfeiture  and that such Car Parking Agreement and all other documents pertaining to the car parking spaces  will be extinguished and have no further effect, and further that each of LBL, Canary Wharf (Car Parks) Limited, Heron Quays (RT3) T1 Limited, Heron Quays (RT3) T2 Limited and CWML will each unconditionally and irrevocably release and discharge

A12788229/0.3/03 Dec 2010

2

CANARY WHARF
G R O U P   P L C

each other from any claims and counterclaims in relation to the Car Parking Agreement and each of those parties aforesaid covenant and undertake in favour of each other of those parties that it will not make or suffer or cause to be made or maintained any claims or counterclaims in relation to the Car Parking Agreement.

(d)   LBL and the Landlord acknowledge that tenant fixtures fittings chattels and furniture (other than those which are the property of sub-tenants in the building) as at 30 September 2010 have been left in the Property. LBL confirms, as far as it is aware, that it has not received any claim from any third party to any right, title or interest in any such fixtures fittings chattels and furniture and that with effect from such forfeiture   all such estate right title and interest as it may have in those items will be transferred to the Landlord in consideration of the payment of £1 by the Landlord.

(e)   LBL agrees to assign the benefit of the guarantee in relation to cabling works in the form attached on the date of forfeiture.

(f)   We warrant that we have the right to any rents under the Lease, whether fallen due and payable or arising (if any) after the date of this letter and before forfeiture.

(g)   CWG warrant that pursuant to agreements between CWG (or a group company of CWG ("CWG Group Company")) and Nomura International plc ("Nomura") relating to the Property and including an arrangement under which a payment by CWG or a CWG Group Company was made to Nomura of an amount in excess of £6.5m (the "Arrangements"), CWG (and/or any CWG Group Company) has been released from any obligation it or they may have to take proceedings or other action on behalf of and/or at the request of Nomura against LBL for unpaid rent and other liabilities under the Lease and further that   neither CWG nor any CWG Group Company has granted, is aware of or will co-operate with Nomura in respect of any rights which Nomura may have against LBL in respect of such unpaid rent and other liabilities. CWG also warrant that, pursuant to the Arrangements, Nomura has unconditionally and irrevocably released and waived all and any Claims (defined below) against LBL (directly and indirectly) for unpaid rent and other liabilities

## CANARY WHARF
### G R O U P   P L C

under the Lease. CWG agrees to indemnify LBL in respect of any damage loss or liability it may suffer arising from any claim by Nomura and/or any assertion of rights by Nomura, and including any actual or purported rights of set off by Nomura, against LBL relating to (directly or indirectly) unpaid rent or other liabilities under the Lease and the Arrangements. For the avoidance of doubt, neither CWG nor any CWG Group Company shall be entitled to exercise any right of set-off, netting, combination of accounts, withholding or retention, arising pursuant to statute or otherwise, in respect of any sums payable to LBL under such indemnity.

(h)   LBL agrees to provide and procure that its solicitors shall provide to the Landlord all reasonable assistance the Landlord reasonably requires to deal to the satisfaction of the Land Registry with any requisitions which may be raised in connection with LBL's title to forfeit the Lease or any application the Landlord may make to close the title to the Lease.

4   We, Canary Wharf (Car Parks) Limited, Heron Quays (RT3) T1 Limited,  Heron Quays (RT3) T2 Limited and CWML agree that:

(a) in consideration of LBL agreeing to pay to the Landlord  £1.5m. on the date of forfeiture as notified by the Landlord to LBL in writing (such payment being made by way of a direct transfer from LBL's solicitors' bank account to such account as the Landlord shall notify LBL prior to the forfeiture of the Lease), LBL is unconditionally and irrevocably released and discharged from any claims as an administration expense for unpaid rent that fell due  and  was payable under the Lease before the  date of forfeiture,

(b) no amount, liability or obligation in relation to this letter shall be payable out of or charged on the property of LBL under paragraphs 99(3) or 99(4) of Schedule B1 to the Insolvency Act 1986 save for the payment of £1.5m. referred to in paragraph 4(a) (which payment is recognised and acknowledged by the Administrators of LBL as being so payable out of or charged on the property of LBL); and

(c) LBL is unconditionally and irrevocably released and discharged from any claims as an administration expense for any estate service charge and other sums that fell

A12788229/0.3/03 Dec 2010

# CANARY WHARF
### G R O U P    P L C

due and were payable under the Lease and Car Parking Agreement before the
date of forfeiture;

provided that LBL agrees that we and/or CWML may claim against LBL as an unsecured
creditor for any unpaid rent and estate charge and any other sums falling due under the
Lease up to the date of forfeiture.

## 5    Confidentiality

5.1    Subject as mentioned in Clauses 5.2 and 5.3, each party shall keep confidential the terms
of this letter and all information received or obtained as a result of negotiating preparing
executing performing or implementing it which relates to the other parties or any agent or
sub-contractor acting on their behalf including for the avoidance of doubt all discussions
relating to financial claims between the parties and any information concerning persons
currently or previously employed by LBL in connection with the management of and
services provided at the Property. No party shall use such information for any purpose
other than to perform its obligations under this letter.

5.2    Notwithstanding the other provisions of this clause 5 any party may after prior reasonable
notification to the other parties whenever practicable (and in the event of any proposed
disclosure of the arrangements referred to in clause 3(g) by LBL or the Administrators of
LBL, after prior consultation with CWG and having regard to the confidential nature of the
matters to which clause 3(g) relates) disclose confidential information if and to the extent:

    (a)    required by law; or

    (b)    required by any securities exchange on which any party's, or any group company
of any party's, securities are listed or traded; or

    (c)    required by any regulatory or governmental or other authority with relevant powers
to which a party is subject or submits (whether or not the authority has the force of
law); or

    (d)    required to vest the full benefit of this letter in that party or to enforce any of the
rights of that party in this letter; or

---

CANARY WHARF
G R O U P   P L C

(e)     required by its professional advisers officers employees consultants sub-contractors or agents to provide their services (and subject always to similar duties of confidentiality); or

(f)     such disclosure is to any party which has (or has had at any time) an interest in, or charge over, the Landlord's reversion or any superior interest to the Property or the income derived from the Property;

(g)     such disclosure is required to make all appropriate applications to the Land Registry in relation to this letter, the completion of the agreements and actions pursuant to this letter and the closure of LBL's registered title to the Property;

(h)     required in connection with complying with the requirements of TUPE;

(i)     that information is in or has come into the public domain through no fault of that party; or

(j)     the other parties have given prior written consent to the disclosure (such consent not to be unreasonably withheld); or

(k)     it is necessary to obtain any relevant tax clearances from any appropriate tax authority; or

(l)     such disclosure is being made to Lehman Brothers Holding Inc. or its advisors.

5.3     The confidentiality obligations in clause 5.1 shall not apply to:

(a) information disclosed in the exercise of the statutory duties of the Administrators of LBL or to the extent required by current insolvency practice or to enable the Administrators of LBL properly to carry out the duties of their office provided that the arrangements referred to in clause 3(g) may only be disclosed in any such circumstances after prior consultation with CWG and having regard to the confidential nature of the matters to which clause 3(g) relates; or

(b) disclosure of this letter by CWG or a CWG Group Company to a tenant, financier or purchaser (actual or intended) of the Property.

6       Release

CANARY WHARF
G R O U P   P L C

6.1    The Landlord, HQPL, CWG, Canary Wharf (Car Parks) Limited, CWCL, Heron Quays
(RT3) T1 Limited, Heron Quays (RT3) T2 Limited, and CWML (the "Releasing Parties")
unconditionally and irrevocably release and discharge (and shall procure that their
respective Group Companies unconditionally and irrevocably release and discharge) the
Administrators of LBL and the Administrators of LBLF (together the "Administrators"), their
firm, members, partners, employees, agents, advisers and representatives from any
Claims and covenant and undertake in favour of the Administrators, their firm, members,
partners, employees, agents, advisers and representatives that the Releasing Parties will
not make or cause to be made or maintained (and that the Releasing Parties will procure
that their respective Group Companies will not make or cause to be made or maintained)
any Claim against the Administrators, their firm, members, partners, employees, agents,
advisers and representatives. SAVE THAT the Releasing Parties shall not be prevented
from making claims in respect of any liabilities under paragraph 5 of this letter.

6.2    For the purposes of paragraph 3(g) and 6.1 above, "Claims" means any and all claims,
liabilities, damages, debts, losses, obligations, costs, expenses, notices of breach,
reservations of rights, counter-claims, causes or rights of action or proceedings; whether at
law or in equity of whatsoever nature (including but not limited to tort, breach of contract,
misrepresentation, rescission, restitution, tracing, indemnity, contribution, breach of
confidence, intentional misconduct, unfair harm or breach of copyright) and howsoever
arising; in any jurisdiction whatsoever; whether accrued or unaccrued; whether known or
unknown to the parties or any of their Group Companies; whether or not presently known
to the law, and whether arising before, on or after the date of this letter and to the extent
that (in any case) they relate to the Lease, the Broadgate Payments Agreement, the Car
Parking Agreement, the Fit-Out Contract and/or the use of the Property.

6.3    For the purposes of this letter, "Group Company" means a group undertaking (as defined in
the Companies Act 2006).

7.1    LBL acts by its administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael
John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell each a partner

# CANARY WHARF
### GROUP    PLC

of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT (the "Administrators of LBL").

7.2    LBLF acts by its administrators, Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell each a partner of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT (the "Administrators of LBLF").

7.3    Subject to paragraph 7.4, the Administrators of LBL and the Administrators of LBLF have signed this letter as agents for and on behalf of LBL and LBLF respectively and neither they, their firm, members, partners, employees, agents, advisers or representatives shall incur any personal liability whatever in respect of any of the obligations undertaken by LBL and LBLF respectively; or in respect of any failure on the part of LBL and LBLF respectively to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations or under any document or assurance made pursuant to this letter. The exclusion of liability set out in this paragraph shall arise and continue notwithstanding the termination of the agency of the Administrators of LBL and the Administrators of LBLF respectively and shall operate as a waiver of any claims in tort as well as under the laws of contract.

7.4    The Administrators of LBL have signed this letter in their personal capacities solely for the purpose of providing the consent requested in paragraph 1.1, the recognition and acknowledgement in paragraph 4(b) and receiving the benefit of the provisions of this letter in their favour.

Your agreement (and the agreement of HQPL, CWG, Canary Wharf (Car Parks) Limited, CWCL, Heron Quays (RT3) T1 Limited, Heron Quays (RT3) T2 Limited and CWML) to these terms will be confirmed by your (and the other parties') signature of a copy of this letter.

CANARY WHARF
G R O U P   P L C

Yours faithfully,

Heron Quays (HQ2) T1 Limited
and Heron Quays (HQ2) T2 Limited

We agree the terms of this letter.



...................................................

For and on behalf of Canary Wharf Group plc

...................................................

For and on behalf of Canary Wharf Contractors Limited



...................................................

For and on behalf of Canary Wharf (Car Parks) Limited

...................................................

For and on behalf of Heron Quays (RT3) T1 Limited

...................................................

For and on behalf of Heron Quays (RT3) T2 Limited

...................................................

For and on behalf of Heron Quays Properties Limited

...................................................

A12788229/0.3/03 Dec 2010

CANARY WHARF
GROUP PLC

For and on behalf of Canary Wharf Management Limited

For and on behalf of Lehman Brothers Lease and Finance (No 1) Limited
(in administration) (acting as agent and without personal liability)

For and on behalf of Lehman Brothers Limited (in administration) (acting as agents and without personal liability)

We agree the terms of this letter and give the consent

requested in paragraph 1.1 and the recognition and acknowledgement in paragraph 4(b):

Administrator

For and on behalf of the Administrators of LBL (without personal liability and solely for the purpose of providing the consent requested in paragraph 1.1, the recognition and acknowledgement in paragraph 4(b) and receiving the benefit of the provisions of this letter in their favour)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
In re                                                :    Chapter 11 Case No.
                                                     :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,             :    08-13555 (JMP)
                                                     :
                    Debtors.                         :    (Jointly Administered)
------------------------------------------------------------------x

## ORDER GRANTING
## OBJECTION TO PROOFS OF CLAIM NUMBER 14824 AND 14826

Upon the Objection to Proofs of Claim Number 14824 and 14826, dated August

15, 2012 (the "Objection"),[2] of Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator

under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and

its Affiliated Debtors, pursuant to section 502(b) of title 11 of the United States Code (the

"Bankruptcy Code"), and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, seeking

the disallowance and expungement of proofs of claim number 14824 and 14826 (the "Claims")

all as more fully described in the Objection; and due and proper notice of the Objection having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief requested in the Objection is in the best interests of

the Chapter 11 Estates, their creditors, and all parties in interest, and that the legal and factual

bases set forth in the Objection establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Objection is granted; and it is further

ORDERED that pursuant to section 502(b) of the Bankruptcy Code, the Claims

are hereby disallowed and expunged in their entirety with prejudice; and it is further

---

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Objection.

US_ACTIVE:\44051049\5\58399.0008

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2012
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

2

# APPENDIX 3

## Dietderich, Andrew G.

| | |
|---|---|
| **From:** | Krasnow, Richard [richard.krasnow@weil.com] |
| **Sent:** | Friday, December 10, 2010 10:36 AM |
| **To:** | Dietderich, Andrew G. |
| **Cc:** | O'Connor, Michael; 'DODonnell@milbank.com'; Del Nido, Erika; Jones, Rupert |
| **Subject:** | Canary Wharf("CW") |
| **Attachments:** | 58399-0008(2010-12-10 09-57-22).pdf |

Andy,

Attached is a copy of the fully executed confidentiality agreement. It would facilitate a review of the documents if, in addition to sending them to Erika and me, copies were also sent to Rupert Jones, who is in our London office, and Dennis O'Donnell at Milbank, counsel to the Creditors' Committee.

We believe that it's important to advise you that, based on a very preliminary review and consideration of the documents and information provided to us for the first time this week regarding CW 's transaction with LBL/PwC and its anticipated transaction with the third party, it's not certain that LBHI will be able to proceed with the settlement based on the terms set forth in the latest draft of the proposed settlement. We have been consulting with Milbank during the course of this week regarding the information that only recently has come to light, and they us advised us that they, too, would need to re-evaluate the proposed settlement after conducting the same legal and factual due diligence regarding these transactions that we require.

It is highly unlikely that the requisite due diligence will be completed by December 16th, and we believe that it's almost certain that the Creditors' Committee will not be able to take a position on a settlement by that date. You should govern yourself accordingly.

Richard



**Weil**

**Richard P. Krasnow**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
richard.krasnow@weil.com
+1 212 310 8493 Direct
+1 212 310 8007 Fax

---

**From:** Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
**Sent:** Thursday, December 09, 2010 5:49 PM
**To:** Krasnow, Richard; Del Nido, Erika
**Cc:** 'george.iacobescu@canarywharf.com'; Shenker, Joseph; 'levcapital@aol.com'; 'Peter@Canary.co.uk'; 'Pamela.Kendall@CanaryWharf.com'; 'Christopher.Henderson@CanaryWharf.com'; O'Connor, Michael; 'dcash@alvarezandmarsal.com'
**Subject:** Re: Execution Copy of Confidentiality Agreement

Okay. We have lease for you when ready. Can now proceed (thank you for the confirmation) to forfeiture tomorrow and aiming for closing with new tenant on 16th.

---

1

**From:** Krasnow, Richard <richard.krasnow@weil.com>
**To:** Dietderich, Andrew G.; Del Nido, Erika <Erika.delNido@weil.com>
**Cc:** 'George.Iacobescu@CanaryWharf.com' <George.Iacobescu@CanaryWharf.com>; Shenker, Joseph; 'levcapital@aol.com' <levcapital@aol.com>; 'Peter@Canary.co.uk' <Peter@Canary.co.uk>; 'Pamela.Kendall@CanaryWharf.com' <Pamela.Kendall@CanaryWharf.com>; 'Christopher.Henderson@CanaryWharf.com' <Christopher.Henderson@CanaryWharf.com>; O'Connor, Michael; 'dcash@alvarezandmarsal.com' <dcash@alvarezandmarsal.com>
**Sent:** Thu Dec 09 17:46:07 2010
**Subject:** Re: Execution Copy of Confidentiality Agreement

Thanks. Delivery of signature page tonight possible but unlikely.

---

**From:** Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
**Sent:** Thursday, December 09, 2010 05:35 PM
**To:** Dietderich, Andrew G. <dietdericha@sullcrom.com>; Krasnow, Richard; Del Nido, Erika
**Cc:** 'George Iacobescu' <George.Iacobescu@CanaryWharf.com>; Shenker, Joseph <ShenkerJ@sullcrom.com>; 'levcapital@aol.com' <levcapital@aol.com>; 'Peter Anderson' <Peter@Canary.co.uk>; 'Pamela Kendall' <Pamela.Kendall@CanaryWharf.com>; 'Christopher Henderson' <Christopher.Henderson@CanaryWharf.com>; O'Connor, Michael <oconnorm@sullcrom.com>
**Subject:** RE: Execution Copy of Confidentiality Agreement

On behalf of Andy, here is CW's signature page. Could you please let us know if you will be sending your signature page this evening.
Thanks,

Michael O'Connor
Secretary to Andy Dietderich

---

**From:** Dietderich, Andrew G.
**Sent:** Thursday, December 09, 2010 3:41 PM
**To:** Krasnow, Richard; Del Nido, Erika
**Cc:** George Iacobescu; Shenker, Joseph; levcapital@aol.com; Peter Anderson; Pamela Kendall; Christopher Henderson
**Subject:** Execution Copy of Confidentiality Agreement

As requested, here is a clean execution copy with the revised notice information, and a separate signature page just in case something else changes.

Please sign this one and return. I'll get new signature from CW.

---

**From:** Krasnow, Richard [mailto:richard.krasnow@weil.com]
**Sent:** Thursday, December 09, 2010 2:20 PM
**To:** Dietderich, Andrew G.
**Cc:** Del Nido, Erika
**Subject:** RE: revised confidentiality agreement

Sorry to do this since it impacts the signature page, but I think that for the contacts listed in 3.3, we should add phone and fax numbers and email addresses. Makes the most sense for you to add my relevant information, which is noted below, and the relevant info for CW and have them re-execute. Thanks.



Richard P. Krasnow

2

08-13555-jmp    Doc 31342-21    Filed 10/12/12    Entered 10/12/12 18:54    Exhibit 20
Pg 4 of 9

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
richard.krasnow@weil.com
+1 212 310 8493 Direct
+1 212 310 8007 Fax

---

**From:** Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
**Sent:** Thursday, December 09, 2010 2:07 PM
**To:** Del Nido, Erika
**Cc:** Krasnow, Richard
**Subject:** RE: revised confidentiality agreement

Of course.  Here you go.  I also attach a counterpart signature page for CW, which you can hold for release when we have yours.

---

**From:** Del Nido, Erika [mailto:Erika.delNido@weil.com]
**Sent:** Thursday, December 09, 2010 1:05 PM
**To:** Dietderich, Andrew G.
**Cc:** Krasnow, Richard
**Subject:** RE: revised confidentiality agreement

Andrew,

Could you please fill in the address information at the beginning and the notice information for section 3.3?  After receipt of this, we will send to our client for signature.

Thank you,
Erika

**Weil**

**Erika del Nido**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Erika.delNido@weil.com
+1 212 310 8323 Direct

---

**From:** Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
**Sent:** Thursday, December 09, 2010 12:55 PM
**To:** Krasnow, Richard
**Cc:** 'dcash@alvarezandmarsal.com'; Jones, Rupert; 'DODonnell@milbank.com'; Del Nido, Erika; Shenker, Joseph; 'george.iacobescu@canarywharf.com'; 'levcapital@aol.com'
**Subject:** Re: revised confidentiality agreement

Thanks, Richard. Please do so and we will happily send lease for your review.

Separately, I'll send some marks on the stip and, pushing our luck, we can see if there is still a meeting of client minds on that as well.

3

**From:** Krasnow, Richard <richard.krasnow@weil.com>
**To:** Dietderich, Andrew G.
**Cc:** 'dcash@alvarezandmarsal.com' <dcash@alvarezandmarsal.com>; Jones, Rupert <rupert.jones@weil.com>;
'DODonnell@milbank.com' <DODonnell@milbank.com>; Del Nido, Erika <Erika.delNido@weil.com>; Shenker, Joseph;
'george.iacobescu@canarywharf.com' <george.iacobescu@canarywharf.com>; 'levcapital@aol.com'
<levcapital@aol.com>
**Sent:** Thu Dec 09 12:39:14 2010
**Subject:** RE: revised confidentiality agreement

Thanks. We have consulted with our client and, on the assumption that the economic terms of the proposed transaction
are as was described to us at the December 6, 2010 meeting, then LBHI would not elect to enter into a lease for the
premises on the same terms as the current CW/LBL lease. Please advise whether or not we should obtain LBHI's
signature to the confidentiality agreement?


**Weil**

Richard P. Krasnow

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
richard.krasnow@weil.com
+1 212 310 8493 Direct
+1 212 310 8007 Fax

**From:** Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
**Sent:** Thursday, December 09, 2010 10:32 AM
**To:** Krasnow, Richard
**Cc:** 'dcash@alvarezandmarsal.com'; Jones, Rupert; 'DODonnell@milbank.com'; Del Nido, Erika; Shenker, Joseph;
'george.iacobescu@canarywharf.com'; 'levcapital@aol.com'
**Subject:** RE: revised confidentiality agreement

The changes to the confidentiality agreement are acceptable to the new tenant. When we have an answer to the
question we have permission to proceed.

---

**From:** Dietderich, Andrew G.
**Sent:** Wednesday, December 08, 2010 6:59 PM
**To:** 'richard.krasnow@weil.com'
**Cc:** 'dcash@alvarezandmarsal.com'; 'rupert.jones@weil.com'; 'DODonnell@milbank.com'; 'Erika.delNido@weil.com';
Shenker, Joseph; 'george.iacobescu@canarywharf.com'; 'levcapital@aol.com'
**Subject:** Re: revised confidentiality agreement


We said that we could not provide the new tenant's lease if LBHI were reserving the right to compete with the new tenant.
You objected to that on the basis that economics of lease might demonstrate a surprisingly high market value that LBHI
could capture. We disclosed to you the market value (less than half the value of a replacement lease on initial terms), and
said that we would send you the lease if you could confirm that, if lease terms matched our disclosure, you would not
compete with the new tenant. That was a solution that worked for new tenant. You were going to check with A&M. I do not
know what changed.

We continue to have an urgent outstanding question whether you want a new lease on initial terms. It is important to know

4

this so we can do a mitigation deal that is in everyone's interest. Can you please answer the question so we can tell new tenant?

---

**From:** Krasnow, Richard <<u>richard.krasnow@weil.com</u>>
**To:** Dietderich, Andrew G.
**Cc:** 'dcash@alvarezandmarsal.com' <<u>dcash@alvarezandmarsal.com</u>>; Jones, Rupert <<u>rupert.jones@weil.com</u>>;
'DODonnell@milbank.com' <<u>DODonnell@milbank.com</u>>; Del Nido, Erika <<u>Erika.delNido@weil.com</u>>
**Sent:** Wed Dec 08 18:39:11 2010
**Subject:** RE: revised confidentiality agreement

Your statement regarding the reason for the request is inaccurate. We found out about a potential transaction as a result of press reports. We then contacted Clifford Chance about that transaction and advised that we needed to know the specifics of any transaction in order to evaluate the proposed settlement and CW's asserted claims. That's it. LBHI is not seeking that information in order to evaluate whether or not to assume or enter into a lease. I hope that is sufficiently clear. I will resend the documents.

**Weil**

Richard P. Krasnow

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
<u>richard.krasnow@weil.com</u>
+1 212 310 8493 Direct
1 212 310 8007 Fax

---

**From:** Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
**Sent:** Wednesday, December 08, 2010 6:31 PM
**To:** Krasnow, Richard
**Cc:** 'dcash@alvarezandmarsal.com'; Jones, Rupert; 'DODonnell@milbank.com'
**Subject:** Re: revised confidentiality agreement

I didn't receive it. Could you resend.

You correctly describe the permitted uses once you have it: per your request we made this broader.

But please let's speak plainly.
The only purpose of the delivery of the information at this time is because you asked for it prior to confirming you do not want to take up the lease. We understood you were prepared to do so after confirmation that the lease economics are as we described verbally on Monday and you took to A&M. Are you ready to do that upon confirmatory review? I don't think the new tenant will give its lease to you without that good faith commitment, and reserving a useless right to take the lease in competition to the new tenant could have serious consequences for the mitigation deal more generally.

---

**From:** Krasnow, Richard <<u>richard.krasnow@weil.com</u>>
**To:** Dietderich, Andrew G.
**Cc:** Cash, Debra <<u>dcash@alvarezandmarsal.com</u>>; Jones, Rupert <<u>rupert.jones@weil.com</u>>; O'Donnell, Dennis C.
<u>DODonnell@milbank.com</u>>
**Sent:** Wed Dec 08 18:03:18 2010
**Subject:** RE: revised confidentiality agreement

I thought that I sent you an email that addressed this but in any event, section 1.1 of the letter agreement provides that the information may only be used in connection with settlement negotiation or any litigation relating to CW's asserted claims.



Richard P. Krasnow

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
richard.krasnow@weil.com
+1 212 310 8493 Direct
+1 212 310 8007 Fax

---

**From:** Dietderich, Andrew G. [mailto:dietdericha@sullcrom.com]
**Sent:** Wednesday, December 08, 2010 5:02 PM
**To:** Krasnow, Richard
**Cc:** Cash, Debra; Jones, Rupert; O'Donnell, Dennis C.
**Subject:** RE: revised confidentiality agreement

Thanks. I'll take a look. But the purpose of our sharing this information was because you wanted to see it prior to confirming that you do not want take up the 25 Bank Street lease on its initial terms – a fair request of the new tenant we have found to mitigate our losses (and reduce our claim). Before we share anything, it is important to both my client and the tenant to confirm that this remains the premise of your review. It is not tenable for either of them that you reserve the right to compete with the new tenant for the space.

**From:** Krasnow, Richard [mailto:richard.krasnow@weil.com]
**Sent:** Wednesday, December 08, 2010 4:49 PM
**To:** Dietderich, Andrew G.
**Cc:** Cash, Debra; Jones, Rupert; O'Donnell, Dennis C.
**Subject:** FW: revised confidentiality agreement

Andy,

As we consider your requests, let's try to make some progress on one front. Attached are clean and blacklined copies of a revised confidentiality letter. The blacklined version reflects changes that we made to the last draft that you had sent to us. As I mentioned to you on our call, the only substantive comment that Milbank conveyed to us is that since they will need to share information regarding the transaction with the committee when they make a recommendation regarding a settlement, they would like the committee members to be included amongst those parties who have access to the information. As per the letter, members would be deemed subject to the confidentiality provision of the letter agreement and the committee members themselves are subject to confidentiality restrictions based on the committee's by-laws. We have modified the letter to accommodate Milbank's request. Please advise whether that change as well as the other changes are acceptable. Thanks.

Richard



Richard P. Krasnow

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
richard.krasnow@weil.com
+1 212 310 8493 Direct
+1 212 310 8007 Fax

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email (postmaster@weil.com), and destroy the original message. Thank you.