# APPENDIX 4

## APPENDIX 4 – INDEX OF CITATIONS

**A: CASE LAW**

| | |
|---|---|
| 1. | Active Estates v Parness [2002] BPIR 865 |
| 2. | Ankhar Pty Ltd v National Westminster Finance (Australia) Ltd (1987) 162 C.L.R. 549 |
| 3. | Associated British Ports v Ferryways NV [2009] EWCA Civ 189 |
| 4. | Bank of Baroda v Patel [1996] 1 Ll Rep 391 |
| 5. | Bank of India v Transcontinental Commodity Merchants Ltd [1983] 2 Ll Rep 298 |
| 6. | Barclays Bank plc v Kingston [2006] 2 Ll Rep 59 |
| 7. | Baroque Investments Limited v Heis [2012] EWHC 2886 |
| 8. | Basch v Stekel [2001] L & TR 1 |
| 9. | Berghoff v Swinbrook Developments Ltd [2009] EWCA Civ 413 |
| 10. | Birch v Wright (1786) 1 Term Rep 378 |
| 11. | Black v Ottoman Bank (1862) 15 Moo PCC 472 |
| 12. | Blest v Brown (1862) De G, F and J, 367 |
| 13. | Bradley v H Newsom Sons & Co [1919] AC 16 |
| 14. | Carey Value Added SL v Grupo Urvasco SA [2011] 2 All ER (Comm) 140 |
| 15. | Cattles plc v Welcome Financial Services Ltd [2010] 2 Ll Rep 514 |
| 16. | Eastern Counties Building Society v Russell [1947] 1 All ER 500 |
| 17. | Escalus Properties Ltd v Robinson [1996] QB 2312 |
| 18. | Estates Gazette Ltd v Benjamin Restaurants Ltd [1994] 1 WLR 1528 |
| 19. | Finch v Jukes [1877] WN 211 |
| 20. | Franklin v Carter (1845) 1 CB 750 |
| 21. | Frost v Knight (1872) LR 7 Ex 111 |
| 22. | Goldcare (Offices) Limited v Nortel Networks UK Limited (in administration) [2009] EWHC 3389 (Ch) |
| 23. | Gray v Owen [1910] 1 KB 622 |

| 24. | Great Western Rly Co v Smith [1876] 2 Ch D 235 |
| 25. | Hochster v de la Tour (1853) 2 El & Bl 678 |
| 26. | Holme v Brunskill [1877] 3QBD 495 |
| 27. | Howard de Walden Estates Ltd v Pasta Place Ltd and others [1995] 1 EGLR 79 |
| 28. | Hussein v Mehlman [1992] EGLR 87 |
| 29. | IIG Capital LLC v Van Der Merwe [2008] 2 Lloyd's Rep 187 |
| 30. | Jones v Carter (1846) 15 M & W |
| 31. | Liberty Mutual v HSBC Bank plc [2002] EWCA Civ 691 |
| 32. | In Re Lundy Granite Co., ex p. Heavan (1871) 6 Ch App 462 |
| 33. | Marquis of Camden v Batterbury (1859) 5 CBNS 808 (affd (1860) 7 CBNS 864) |
| 34. | Marshall v Mackintosh (1898) 78 LT 750 |
| 35. | Moschi v Lep Air Services [1973] AC 331 |
| 36. | MS Fashions v BCCI [1993] Ch 425 |
| 37. | Nangus Pty Ltd v Charles Donovan Pty Ltd (in liq) [1989] VR 1984 |
| 38. | Official Custodian for Charities v Mackey [1985] Ch 168 |
| 39. | P W & Co v Milton Gate Investments Ltd [2004] 3 EGLR 103 |
| 40. | Petro Can Exploration Inc. v Tormac Transport Ltd (1983) 23 B.L.R. 1, BCSC |
| 41. | Photo Production Ltd v Securicor Transport Ltd [1980] AC 827 |
| 42. | Pybus v Gibb (1856) 6 E&B 902 |
| 43. | Rainey Bros Ltd v Kearney [1990] NI 18 |
| 44. | Re Park Air Services plc [2000] 2 AC 172 |
| 45. | Reichman v Beveridge [2006] EWCA Civ 1659 |
| 46. | Sea Emerald SA v Prominvestbank – Joint Stockpoint Commercial Industrial and Investment Bank [2008] EWHC 1979 (Comm) |
| 47. | Selous Street Properties Ltd v Oronel Fabrics Ltd [1984] EDG 360 |
| 48. | Shaw v Doleman [2009] 2 BCLC 123 |

| 49. | Sofaer v Anglo Irish Asset Finance Ltd [2011] BPIR 1736 |
|-----|---------------------------------------------------------|
| 50. | Spiro v Glencrown [1991] Ch 537 |
| 51. | Stacey v Hill [1901] 1 KB 660 |
| 52. | Stadium Finance v Helm (1965) 109 SJ 471 (CA) |
| 53. | Static Control Components (Europe) Limited v Egan [2004] EWCA Civ 392, [2004] 2 Lloyd's Rep 429 |
| 54. | Synge v Synge [1894] 1 QB 466 |
| 55. | Total Oil (Great Britain) Ltd v Thompson Garages (Biggin Hill) Ltd [1972] 1 QB 318 (CA) |
| 56. | Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Ltd [1996] 1 AC 199 |
| 57. | Triodos Bank NV v Dobbs [2005] 2 Ll Rep 588 |
| 58. | TS&S Global Ltd v Fithian-Franks [2008] 1 BCLC 277 |
| 59. | United Scientific Holdings Ltd v Burnley BC [1978] AC 904 |
| 60. | Vossloh Aktiengesellschaft v Alpha Trains (UK) Ltd [2011] 2 All ER (Comm) 307 |
| 61. | West Horndon Industrial Park Ltd v Phoenix Timber plc [1995] 29 EG 137 |
| 62. | Western Credit Ltd v Alberry [1964] 2 Al ER 938 |
| 63. | William v Lewis [1915] 3 KB 493 |
| 64. | Yeoman Credit v Latter [1961] 1 WLR 828 |

**B: STATUTE**

| | |
|---|---|
| 1. | Insolvency Act 1986<br><br>    i.     Sections 177 - 179<br><br>    ii.    Schedule B1 paragraphs 42 to 43 |
| 2. | Landlord and Tenant (Covenants) Act 1995, section 18 |

## C: ACADEMIC COMMENTARY

| | |
|---|---|
| 1. | Barclay, M., 2010. Case Comment – When is a variation not a variation? Landlord & Tenant Review, 2010. Volume 14, Issue 1. |
| 2. | Chitty on Contracts (31st Edition, 2012) at Vol 1, paragraphs 24-021 to 24-024 |
| 3. | Chitty on Contracts (31st Edition, 2012) at Vol 2<br><br>i.   Paragraphs 44-065 to 44-066<br><br>ii.   Paragraph 44-098 to 44-100 |
| 4. | Choo Choy, "Discharge of guarantees: the rule in Holme v Brunskill revisited" (2007) 7 JIBFL 450 |
| 5. | Halsbury's Law of England (2006 reissue), Vol 27(1), paragraphs 600 to 601 |
| 6. | Hill & Redman, Law of Landlord and Tenant, paragraphs 1541 to 1543 |
| 7. | O'Donovan & Phillips, The Modern Contract of Guarantee (2nd English Ed, 2010)<br><br>i.   Paragraphs 1-88 to 1-111<br><br>ii.   Paragraphs 5-01 to 5-12<br><br>iii.   Paragraphs 6-126 to 6-132<br><br>iv.   Paragraphs 8-105 to 8-114 |
| 8. | Woodfall on Landlord and Tenant Law (Release 60 October 2012), paragraphs 17.312 to 17.315 |

6(5)]', a court
nal law'. This
es of opinion,
gested that the
(*Re Dallhold*
stion has been
scretion of the
nple, that the
rced: *Re Bank*
*of Credit and*
R 764 at 785.
operate when
or that of the
ernational law
t to the law of
resumption in
ncorporation. I
o account the
nections of the
esent case this
of Isle of Man
nt the English
e creditors are
eir affairs are
, and there is
986 Act.
reclude orders
used to apply
administration
ngful trading,
ent in CVAs is
ne court has an
al in terms, but
I am prepared
lest is that Part
proposals have
lo not consider
rospectively. If
who were not
ctively become
rinciple. I will
that a revised
ttings.

# ACTIVE ESTATES LTD v PARNESS ET AL
## [2002] EWHC 893 (Ch)

Chancery Division

Neuberger J

19 April 2002

*Winding up – Disclaimer of lease by liquidator – Whether guarantor of lease obliged to take up lease – Whether lessor had waived its rights to enforce claim against guarantor*

*Leases – Notices requiring guarantors to take up residue of lease on disclaimer – Whether notices had to conform to requirements of s 2 of Law of Property (Miscellaneous Provisions) Act 1999*

The claimant, A Ltd, was the successor in title to a lessor of property which on 22 April 1993 granted a 25-year lease of premises to the company. The defendants (Mr P and Mr O) acted as guarantors to this lease. Under the terms of the guarantee the defendants agreed (cl 8.2) on disclaimer by the lessee and if requested by the lessor to take up a new lease for the residue of the term. Alternatively, if disclaimer had taken place and the lessor did not require the guarantors to take up the residue then, under cl 8.3, the guarantor would make specified payments to the lessor.

In 1997, the company assigned the lease to G Ltd, though from early 1999 another company, J Ltd, was in occupation and paying the rent on behalf of G Ltd. In June 1999, G Ltd went into compulsory liquidation. After discussion with representatives of the claimant, it was agreed that J Ltd would remain in occupation with it paying reduced rent on behalf of G Ltd. The possibility of the lease being assigned to J Ltd if the liquidator of G Ltd disclaimed it was agreed in principle. The liquidator of G Ltd disclaimed the lease on 27 August 1999, J Ltd continued to make the reduced rent payments on behalf of G Ltd but without a new tenancy being created. In October 1999, the claimants sought to invoke cl 8.2 against the guarantors by requiring them to take up the residue of the lease. Rent payments from J Ltd ceased in April 2000 and in January 2001 a court order for possession of the premises was granted to the claimant.

In response to the claimant's demand that the defendants take up the residue of the lease from the date of disclaimer several points were raised. It was argued that the lease had been forfeited before the disclaimer or that the claimant had taken possession after disclaimer. It was contended that clause 8.2 could not be enforced because of delay on the part of the claimant. Finally, it was suggested that the notice had been a breach of the formal requirements of s 2 of the Law of Property (Miscellaneous Provisions) Act 1989.

**Held** – upholding the claim –

(1)  There was no evidence that the lease had been surrendered or forfeited before the date of the disclaimer. Representatives of the claimant had made it clear that although J Ltd was paying the rent it was being regarded as doing so on behalf of G Ltd.

(2)  With regard to the actions of the claimant between the date of disclaimer and the service of the notice on the guarantors on 7 October 1999, several points needed to be taken into account. Retaking possession after disclaimer is not consistent with requiring a guarantor to take up the residue of the lease, but on the facts the claimant did not retake possession. When the claimant agreed to accept a reduced rent from J Ltd that was not an enforceable agreement but rather an act of indulgence.

(3)  When the notices were served on the guarantors the claimant was in a position to give possession of the property to the defendants because at best J Ltd enjoyed only a tenancy at will which the claimant could have terminated.

(4)  With regard to events after 7 October 1999 (when the notices were served), there was nothing done by the claimants to prevent the enforcement of such notices. The delay on the part of the claimants was in the circumstances understandable and did not prejudice the position of the defendants.

(5)  The argument that the notice failed to comply with the formal requirements of s 2 of the 1999 Act because it did not incorporate all the terms in a single document was misconceived because the relevant document was the original agreement under which the notice was served. *Spiro v Glencrown Properties Ltd and Another* followed.

## Statutory provisions considered
Law of Property Act 1925, s 146
Protection from Eviction Act 1977
Insolvency Act 1986, s 178(4)(b)
Law of Property (Miscellaneous Provisions) Act 1989, s 2

## Cases referred to in judgment
*Ashton and Others v Sobelman* [1987] 1 WLR 177, [1987] 1 All ER 755, [1987] EGLR 33, ChD
*Basch v Stekel* [2001] L & TR 1, CA
*Bircham & Co Nominees (2) Ltd and Another v Worrell Holdings Ltd* [2001] EWCA Civ 775, [2001] 47 EG 149, CA
*Coronation Street Industrial Properties Ltd v Ingall Industries Ltd* [1989] 1 WLR 304, [1989] 1 All ER 979, HL
*Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] AC 70, [1996] 2 WLR 262, [1996] BPIR 595, [1996] 1 All ER 737, HL
*Javad v Aqil* [1991] 1 WLR 1007, [1991] 1 All ER 243, CA
*Mulholland's Will Trusts, In re; Bryan and Others v Westminster Bank Ltd* [1949] 1 All ER 460, ChD
*Spiro v Glencrown Properties Ltd and Another* [1991] Ch 537, [1991] 2 WLR 931, [1991] 1 All ER 600, ChD
*Walji and Others v Mount Cook Land Ltd* [2002] 1 P & CR 163, CA

*Edwin Prince* for the claimant
*Nicholas O'Brien* for the defendants

## NEUBERGER J:

### Introduction
This case raises some not altogether easy points relating to the enforceability of the obligation of a guarantor to take up a new lease in the event of a liquidator of the tenant company disclaiming the lease.

The facts are as follows. The lease in question demised 53–54 Commercial Street, Newport, Gwent (the premises), and was granted on 22 April 1993 by a company (the lessor), the predecessor in title of the claimant, Active Estates Ltd, to EHS Precision Engineers Ltd (the lessee). The lease was for a term of 25 years from 25 March 1993, at a rent payable quarterly in advance on the usual quarter days. The annual rent was £33,500, rising to £65,000 with effect from 25 March 1998, and thereafter subject to review every 5 years. The lease contained a proviso for re-entry in familiar form in the event, inter alia, of non-payment of rent, breach of covenant, or tenant's insolvency.

Apart from the lessor and the lessee, there were two other parties to the lease, namely the defendants, Joseph Parness, and George Osztreicher, therein referred to as 'the guarantor'.

Clause 8 of the lease was in these terms:

were served),
such notices,
standable and

quirements of
gle document
eement under
*her* followed.

₹ 755, [1987]

2001] EWCA

1989] 1 WLR

1996] 2 WLR

: *Ltd* [1949] 1

| 2 WLR 931,

:nforceability
e event of a

Commercial
april 1993 by
.ctive Estates
for a term of
vance on the
)0 with effect
urs. The lease
inter alia, of

parties to the
icher, therein

'8 GUARANTEE

The Guarantor covenants with the Landlord by way of indemnity and guarantee as follows:

8.1   that if the Tenant shall make any default at any time during the term in payment of rent, or in observing or performing any of the covenants or restrictions contained in this lease or shall tender a payment of rent to the Landlord which the Landlord shall (during a period in which the Landlord is entitled or would, after service of a notice under Section 146 of the Law of Property Act 1925, be entitled to re-enter the Demised Premises) refuse, the Guarantor will pay the rent and observe and perform the covenants or restrictions in respect of which the Tenant shall be in default, notwithstanding any time or indulgence granted by the Landlord to the Tenant or that this lease may have been assigned or that the Tenant may have ceased to exist or that the Tenant shall have surrendered part of the Demised Premises in which event the liability of the Guarantor under this Lease shall continue only in respect of the part of the Demised Premises not so surrendered or any other act or thing whereby but for this provision the Guarantor would have been released;

8.2   that if this lease shall be disclaimed, or the Tenant (being a corporation) shall be dissolved or cease to exist, the Guarantor will, if the Landlord shall by notice in writing within two months after receiving notice of such disclaimer dissolution or cesser so require, take from the Landlord a new lease of the Demised Premises for the residue of the term which would have remained had there been no disclaimer of this lease or dissolution or cesser (as the case may be) at the rent then being paid and subject to the same covenants and restrictions as in this lease with the exception of the guarantee covenants contained in this clause 9 such new lease to take effect from the date of such disclaimer or dissolution or cesser (as the case may be) and in such case the Guarantor shall pay the reasonable costs of such new lease and execute and deliver to the Landlord a counterpart of such new lease; and

8.3   that if this lease shall be disclaimed, or the Tenant (being a corporation) shall be dissolved or cease to exist, and for any reason the Landlord does not require the Guarantor to accept a new lease of the Demised Premises as is mentioned in the foregoing subclause then the Guarantor shall pay to the Landlord on demand an amount equal to the difference between any money received by the Landlord for the use or occupation of the Demised Premises and the rent reserved by this lease for the period commencing with the date of such disclaimer or dissolution or cesser (as the case may be) and ending on whichever is the earlier of the following dates:

8.3.1   the date 6 months after such disclaimer or dissolution or cesser (as the case may be);

8.3.2   the date (if any) upon which the Demised Premises are re-let.'

Clause 8.4 provided for a release of the defendants as guarantors with effect from 22 April 1998 if the guarantor so requested and if:

'... the Tenant ... shall have observed and performed the covenants herein contained ...'

It is not suggested that cl 8.4 has been operated.

The reversion to the lease became vested in the claimant, and it is common ground, not least because of the definitions in the lease, that the claimant could, in principle, enforce the provisions of cl 8.

The lease was assigned by the lessee to a company called Gherkesh Ltd in 1997. Gherkesh was a company effectively owned by a Mr Lindsay Morgan and his family, and run by Mr Morgan. The premises were operated as a fast-food franchise, albeit through a different company, also owned by the Morgan family and run by Mr Morgan. From 1 March 1999, the operating company was a company called Jointport Ltd.

In early 1999, Gherkesh had difficulties in paying the rent, but, after a bailiff had been instructed by the claimant, the rent was paid by Jointport, and accepted by the claimant expressly on the basis that Jointport was acting as agent for Gherkesh. On 23 June 1999, Gherkesh was wound up by the High Court pursuant to a petition presented on 30 April 1999. News of the winding-up order only reached Mr Peter Waddington of the claimant, a day or two after he had had a meeting with Mr Morgan on 29 July 1999. At that meeting, Mr Morgan told Mr Waddington that the premises were occupied by Jointport. Although Mr Waddington did not recall this, it seems clear, from his note of the meeting and from the evidence of Mr Morgan, that that was said. Mr Morgan also told Mr Waddington that Gherkesh was in the process of being put into liquidation. They discussed what should happen, and reached an understanding to the following effect. First, whilst the lease was vested in Gherkesh, they agreed that Jointport could remain in occupation of the premises, and would pay the rent, albeit on behalf of Gherkesh. Secondly, if and when the lease was disclaimed by a liquidator of Gherkesh, it was agreed that Jointport would remain in occupation while there were negotiations for a new lease, essentially on the terms of the current lease, subject to the claimant being satisfied as to the reliability of Jointport's covenant and with its references. It was also agreed that, while this situation obtained, the rent otherwise payable under the lease, £65,000 per quarter, would be paid by Jointport, albeit at a reduced rate, £57,000 per quarter, and by monthly instalments, on behalf of Gherkesh.

This arrangement was confirmed by Mr Waddington in two letters dated 3 August 1999, the first to his solicitors, a copy of which was thereafter sent to Mr Morgan, and the other to the Official Receiver, who, by then, he knew to be the liquidator of Gherkesh. The letter to the Official Receiver confirmed that Gherkesh had not paid rent due in June, and that Jointport had paid the rent on behalf of Gherkesh. The letter then went on:

'We have not terminated the tenancy but have agreed in principle with the tenant that Jointport Ltd will take an assignment of the lease in the event that the Insolvency Service disclaims the lease.'

In the letter to the claimant's solicitors, a copy of which, as I have said, was subsequently sent to Mr Morgan, Mr Waddington confirmed that the claimant and Jointport had:

> '… provisionally agreed that subject to covenant and bank references and on the assumption the Official Receiver disclaims the lease [the claimant] will assign the lease to Jointport Ltd, another of [Mr Morgan's] companies.'

The letter went on:

> 'I should mention that he remains in occupation and is trading, and in respect of the current quarter's rent, it was paid by post-dated cheques.'

Before he knew of the disclaimer, Mr Waddington wrote to Mr Morgan on 27 August 1999, confirming that:

> '… following the liquidation of Gherkesh Ltd we are pursuing the personal guarantors under the lease in the first instance …'

The letter continued:

> 'Until such time as this matter has been resolved, any payments due in respect of the premises which are received from Jointport Ltd will be accepted only on the basis that Jointport Ltd is acting as agent for Gherkesh Ltd in liquidation. Our September invoice will reflect the Personal Agreement we came to in respect of the rent, but our invoices will be issued on a "without prejudice" basis.'

At some point during the next 4 weeks, it came to the attention of Mr Waddington, through the service of a formal notice, that the Official Receiver, as the liquidator of Gherkesh, had disclaimed the lease on 27 August 1999. Following that notification, the claimant sent, on 30 September 1999, a rent statement addressed to Gherkesh at Mr Morgan's premises, in these terms:

> 'To rent due per quarter, 29 September 1999 to 24 December 1999, £57,500 pa payable monthly in advance by standing order under the terms of the Personal Agreement.'

Monthly payments were made substantially in accordance with that demand by Jointport in October, November and December 1999. The first such payment was received by the claimants on or before 5 October 1999.

On 6 October 1999, the claimant's solicitors sent a notice to each of the defendants, purportedly pursuant to cl 8.2 of the lease, requesting them to take up a new lease of premises in accordance with their obligations thereunder.

Thereafter, in December 1999 and March 2000, the claimant served rent statements addressed to Gherkesh, in similar terms to the September 1999 statement at Mr Morgan's address. Jointport initially paid substantially in accordance with those requests; however, by April 2000, no money was being paid by Jointport. The claimant's solicitors then wrote to the defendants' solicitors explaining what was happening, seeking to make it clear that the

claimant was not releasing the defendants from any obligation under cl 8.2. They also suggested that the defendants might like to talk to Mr Morgan. Despite letters from the claimant's solicitors to Jointport, Jointport did not continue negotiations, although they remained in occupation of the premises. In July 2000, the claimant started proceedings in the High Court for possession of the premises against Jointport, and obtained an agreed order for possession in January 2001, that order being a varied version of an earlier agreed order made on 26 October 2000.

### The issues

The claimant now seeks to enforce cl 8.2 of the lease against the defendants by requiring them to take a new lease of the premises with effect from the date of disclaimer, subject to the same terms, and at the same rent, as the lease.

The defences which are raised on behalf of the defendants are as follows. First, the lease was surrendered by forfeiture or surrender before the purported disclaimer. Secondly, possession was taken by the claimant after the purported disclaimer, which prevents the claimant from enforcing cl 8.2, either on the basis that the claimant thereby lost the right to enforce cl 8.2, or on the basis that the claimant's cl 8.2 notices were invalid. Thirdly, the claimant cannot enforce cl 8.2 due to delay. Fourthly, the claimant cannot enforce cl 8.2 by virtue of the provisions of s 2 of the Law of Property (Miscellaneous Provisions) Act 1989. Of these four arguments, Mr Nicholas O'Brien, who appears on behalf of the defendants, concentrated on the second and fourth arguments, and in my view he was right to do so.

### Was the right to enforce cl 8.2 lost by the date of the disclaimer?

So far as the first argument is concerned, it seems to me to be unrealistic to conclude that, so long as the lease was vested in Gherkesh, ie until the disclaimer, there was any arrangement which could fairly be characterised as a surrender or a forfeiture, thereby putting an end to the lease. The arrangement which the claimant agreed on 29 July 1999 with Jointport is the only basis upon which it is argued that the lease was forfeited or surrendered. As Mr Edwin Prince, who appears on behalf of the claimant, says, surrender would involve some consensual act on the part of the claimant landlord and Gherkesh as tenant, and forfeiture would normally involve an intention to forfeit on the part of the claimant landlord. None the less, I accept that circumstances can arise in which either surrender or forfeiture occur without the parties concerned intending it to happen.

As I see it, during the discussions between Mr Morgan and Mr Waddington, the claimant made it clear that it was continuing to treat Gherkesh as the tenant. The claimant also made it clear that Jointport could continue to occupy the premises, as it had done before the discussions of 29 July, effectively as licensee of Gherkesh, and that Jointport could pay the rent as agent for Gherkesh. Furthermore, insofar as it might be said that Mr Morgan could not agree to this arrangement on behalf of Gherkesh because it was in liquidation, the position was explained to the Official Receiver, as agent for Gherkesh, by the letter of 3 August; that letter makes it clear that there was no intention to put an end to the lease. The Official Receiver thought the lease survived the arrangement: otherwise he would not have disclaimed it. Even without the letter to the Official Receiver, there could have been no forfeiture or surrender, in my view.

As mentioned, I accept that it is possible for a lease to be surrendered or forfeited without the landlord intending to effect a surrender or a forfeiture. But, to my mind, any act or statement said to give rise to a surrender or forfeiture where it was plainly not intended to do so, should only be held to have that effect if it is incapable of having any other effect. In this case, it was agreed that the lease would continue and that Jointport could remain Gherkesh's licensee, paying the rent on behalf of Gherkesh. There is no reason why the court should not conclude that the arrangement had a different effect.

It seems to me that the claimant's case on this first point is stronger than that of the successful party in *Ashton and Others v Sobelman* [1987] 1 WLR 177, where Mr John Chadwick QC (as he then was), sitting as a judge of the High Court, rejected at 764H the proposition that (quoting from 185):

'… a landlord may effect a re-entry of premises against his tenant by an arrangement made with an existing sub-tenant under which the sub-tenant is to remain in occupation of the premises as the tenant of the landlord for the residue and otherwise on the terms of his existing sublease.'

He went on to say that the authority cited to make out that proposition could, at most, support the contention that (to quote from 186):

'… a landlord may effect a re-entry against his tenant by an arrangement with an existing sub-tenant under which the sub-tenant is to remain in occupation as the tenant of the landlord on the terms of a new tenancy.'

In this case, it seems to me it cannot possibly said that there was any intention on the part of the claimant or of Jointport (or indeed of Gherkesh) to create a new tenancy while the lease was vested in Gherkesh.

The defendants rely on the way in which the claimant pleaded its previous claim against Jointport. That cannot alter the proper analysis of the nature and effect of the arrangement agreed between Mr Waddington and Mr Morgan, based on the oral and documentary evidence before me. The defendants were not parties to the proceedings between the claimant and Jointport; there was no suggestion that the defendants knew of the contents of any documents in these proceedings. In any event, there is nothing in the documents in these proceedings which casts doubt on the conclusion I reach.

*Was the right to enforce cl 8.2 lost by 7 October 1999?*
The next issue is whether the claimant lost the right to enforce cl 8.2 between the date of the disclaimer and 7 October 1999, when the notices under the clause were served.

The defendants' argument is that, upon a disclaimer, or more accurately, once the claimant was notified of the disclaimer, the second part of the agreement of 29 July 1999 took effect, which involved the claimant granting, and Jointport taking, a tenancy of the premises, which necessitated the claimant taking possession and, once the claimant took possession, it was not thereafter open to it to seek to enforce cl 8.2. In other words, Mr O'Brien contends that the claimant was not entitled to serve the cl 8.2 notices, because it had taken possession of the premises by granting Jointport a tenancy with effect from the date of notification of the disclaimer, by virtue of the

agreement of 29 July 1999, a contention supported by the rent statement of 30 September 1999 and the acceptance of the first instalment of the monthly payments on or about 5 October.

In effect, therefore, this argument of the defendants rests on the proposition that, if a landlord takes possession after a disclaimer, it is not open to him subsequently to seek to invoke a provision such as cl 8.2. It seems to me that the defendants' contention thus raises two questions, namely, whether the proposition is right in principle, and, if it is, whether it applies in relation to the facts of the present case.

Support for the proposition in principle is said to be found in the speech of Lord Nicholls of Birkenhead in *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] AC 70 at 89A–C, [1996] BPIR 595 at 605 where he said this:

> 'If no vesting order is made and the landlord takes possession, the liabilities of other persons to pay the rent and perform the tenant's covenants will come to an end as far as the future is concerned. If the landlord acts in this way, he is no longer merely the involuntary recipient of a disclaimed lease. By his own act of taking possession he has demonstrated that he regards the lease as ended for all purposes. His conduct is inconsistent with there being a continuing liability on others to perform the tenant covenants in the lease. He cannot have possession of the property and, at the same time, claim rent from the property from others.'

That observation has irresistible force in the context of a provision such as cl 8.1, in respect of which it was made. If a landlord re-enters into possession of the demised premises, his action is inconsistent with the lease continuing, as I have already indicated, and, in particular, therefore, with the rent under the lease accruing thereafter. If the landlord cannot recover the rent from the tenant in respect of the period after his re-entry, he plainly cannot recover from a surety either. However, it is by no means so clear that the same conclusion should apply to a provision such as cl 8.2, where a landlord has re-entered after a disclaimer. After all, it could be said that cl 8.2 is simply an option whose express conditions have to be satisfied before it can be exercised, and in respect of which the guarantors have the protection of a strict 2-month time-limit for its enforcement. There is simple force in the point that there is no inconsistency between the landlord taking possession and thereafter seeking to enforce an option in his favour to require a third party to take a new lease. As I see it, there is no inevitable loss of the right to enforce a provision such as cl 8.2, when read on its own, where a landlord has retaken possession after a disclaimer, at least not on the face of it.

Despite this, I have come to the conclusion that the proposition relied on by the defendants is correct in principle, and that Lord Nicholls of Birkenhead's observation applies to a provision such as cl 8.2, just as much as to a provision such as cl 8.1.

First, cl 8.2 is really supplementary to cl 8.1. If cl 8.1 goes, then it seems logical that cl 8.2 goes. While it is a little dangerous to argue by reference to a hypothetical situation, if cl 8.1 did not have the words from and including 'notwithstanding', so that the guarantors would be released from cl 8.1 by a variation in the lease, it does not seem to me realistic to treat cl 8.2 as enforceable, if cl 8.1 has been discharged by such a variation. The close

connection between cl 8.1 and cl 8.2 for this purpose appears to me to derive support from what Lord Templeman said in *Coronation Street Industrial Properties Ltd v Ingall Industries Ltd* [1989] 1 WLR 304 at 307, namely:

'The surety's obligation to take a new lease after a disclaimer gives effect to the surety's obligation to procure compliance with the terms of the old lease.'

Secondly, re-taking possession after disclaimer is scarcely consistent with requiring a new lease to be taken by the guarantor in the context of cl 8.1 and cl 8.2. If, which I doubt, the obligation of the guarantor to take a lease with effect from the date of disclaimer means that the liability for rent runs from that date, it seems peculiar that the landlord should be able to have possession for part of that time. If, as I think (supported by Chadwick LJ in a passage quoted below), liability for rent under the new lease granted to the guarantors takes effect from the date on which it is granted, then it seems to me that there would be an unlikely hiatus between the guarantor's liability to pay rent under cl 8.1, which would cease when the landlord took possession, pursuant to what Lord Nicholls of Birkenhead said, and the resurrection of its liability under cl 8.2, from the date it takes up the new lease.

Thirdly, if the landlord lawfully re-entered the premises before the lease was disclaimed, there can be no real doubt but that his right to enforce cl 8.2 would (subject to any question of relief from forfeiture) be lost. The effect of s 178(4)(b) of the Insolvency Act 1986 suggests that there should be no difference, as between the landlord and the guarantor, if the re-entry is effected after the disclaimer. That is because the issue is the enforceability of a provision in the lease, not as between the landlord and the tenant whose liquidator has disclaimed, but as between the landlord and a third party, namely the guarantor. In this connection s 178(4) is in these terms:

'A disclaimer under this section—

(a) operates so as to determine, as from the date of the disclaimer, the rights, interests and liabilities of the company in or in respect of the property disclaimed; but

(b) does not, except so far as is necessary for the purpose of releasing the company from any liability, affect the rights or liabilities of any other person.'

Fourthly, it is possible to arrive at this conclusion without doing any significant violence to the words of cl 8.2. It either involves implying a limitation on the enforceability of the clause, or else treating the word 'guarantor' in cl 8.2 as carrying with it a requirement that, at the time the clause is sought to be enforced against the guarantor, he is still a guarantor.

Fifthly, I note that this conclusion appears to have been assumed as correct, on all sides in the decision of the Court of Appeal in *Basch v Stekel* [2001] L & TR 1, to which I refer more fully below.

If, as I therefore think, Lord Nicholls of Birkenhead's observation applies to cl 8.2 as well as to cl 8.1, it is necessary to consider whether the claimant 'took possession' of the premises, after learning of the disclaimer of the lease, on or before 7 October 1999.

As mentioned, Mr O'Brien suggests that, by agreeing on 29 July 1999 to grant a right of occupation to Jointport once the disclaimer took effect, the claimant must, of necessity, have 'taken possession' when that agreement took effect ie when the claimant had notice of the disclaimer. He says that, as the arrangement involved the claimant giving possession to Jointport, the claimant would have had no ability to do this unless it had first taken possession for itself.

Attractively though that argument was presented, I have come to the conclusion that, on the facts of this case, it should be rejected. The arrangement between the claimant and Jointport prior to the disclaimer was, as I have said, that, at least during the insolvency of Gherkesh and until the disclaimer, the claimant was prepared to let Jointport remain in occupation provided the rent was paid. Accordingly, the rent statements were addressed by the claimant to Gherkesh, and the arrangement involved treating the lease as continuing, and Jointport paying the rent on behalf of the tenant, Gherkesh. There was thus no question of the claimant taking possession before the disclaimer.

The position after the disclaimer was the same as that before the disclaimer, subject to three differences. The first difference was the agreed variation or indulgence, that is, the reduction in the rent and the fact that it could be paid monthly rather than quarterly. The second was that the agreement as to the future grant of a new lease to Jointport. The third difference was that the lease had been disclaimed.

In my view, the fact that the claimant was prepared to agree a reduced rate of rent payable monthly, rather than quarterly, cannot, on its own, assist the defendants' argument. If, for example, the claimant had agreed to take a reduced payment by instalments, rather than the full rent in one payment, before the disclaimer, that would not have made any difference to my conclusion that there was no taking of possession before the disclaimer. The fact that a landlord agrees to take a lower sum than that to which he is entitled, and the fact he is prepared to accept payment by instalments, cannot of itself give rise to the conclusion that there is, as it were, a surrender or a forfeiture of the original lease. Indeed, in this case, the granting of an indulgence was specifically contemplated by the claimant and the guarantor in the lease itself: see the closing words of cl 8.2.

As to the second difference between the events before disclaimer and following disclaimer, it is clear that any agreement between the claimant and Jointport as to the possible grant of a new lease did not amount to an enforceable contract. There was, at most, an agreement in principle, that a new lease would be granted by the claimant to Jointport, subject to references and subject to covenant. Such an arrangement was plainly not enforceable, even under the law as it stood before the passing of s 2 of the 1989 Act. The existence of that arrangement emphasises, both before and after notice of the disclaimer was received by the claimant, that there was not intended to be any sort of binding arrangement involving the grant of a long-term tenancy between the claimant and Jointport, unless and until those negotiations came to fruition.

The third point of distinction between the pre-disclaimer and post-disclaimer periods is the existence of the disclaimer itself. That is undoubtedly a more powerful point. Unlike the position during the earlier period, the claimant cannot rely on the fact that there was in existence a lease vested in someone, which lease could be treated as being continuing as

between the claimant, Gherkesh and Jointport. The disclaimer (as demonstrated by the passage I have quoted from the speech of Lord Nicholls of Birkenhead) put an end to the lease so far as Gherkesh was concerned. Accordingly, unlike in *Ashton*, and unlike in relation to the pre-disclaimer period, there was no interest in possession by reference to which Jointport's occupation could be related or from which it could be derived. Therefore there is obvious attraction in the contention that there must have been the grant of a right by the claimant to Jointport, which involved the claimant taking possession.

Despite the force of that argument, I do not consider that the arrangement agreed on 29 July 1999, which came into effect by the end of September, as supported by the rent statement of 30 September 1999, and the acceptance of the first monthly instalment, had the effect of the claimant taking possession.

At any rate, in the context of this argument, it seems to me the effect of the disclaimer can be over-stated. The effect of the disclaimer was not to determine the lease for all purposes, as s 178(4) of the 1986 Act makes clear. While the disclaimer determined the lease as against Gherkesh, it did not prevent the lease being treated as enforceable as between, for instance, the claimant and the defendants, or the claimant and the original lessee: see the observations in *Hindcastle* at 87G–89A, especially at 88H and 89E–G. In particular, at 88H ([1997] BPIR 595 at 605), Lord Nicholls of Birkenhead said:

'... when the lease is disclaimed it is determined and the reversion accelerated but the rights and liabilities of others, such as guarantors and original tenants, are to remain *as though* the lease had continued and not been determined. In this way the determination of the lease is not permitted to affect the rights or liabilities of other persons. Statute has so provided.'

At 89F ([1997] BPIR 595 at 606) Lord Nicholls of Birkenhead explained that, if a liquidator of the tenant disclaims, the sub-tenant's interest continues unaffected by the determination of the tenants' interest.

Subject to the indulgence with regard to the reduced rate of rent and the payment by instalments, and subject to the negotiation for a possible new lease, it seems to me that the claimant and Jointport were simply accepting that the situation on the ground, as it was before the disclaimer, could continue after the disclaimer. In other words, they accepted that Jointport could remain in occupation and would be sent rent statements and pay the rent, on behalf of Gherkesh, as before. The disclaimed lease was neither in the heaven of perfect existence, nor in the hell of complete determination. It was in the purgatory of disclaimer, with the features identified by Lord Nicholls of Birkenhead, and with the possibilities of being determined as between parties unaffected by the disclaimer, or being subject to a vesting order. The claimant neither did anything, nor intended to do anything, which put an end to that state of affairs. The arrangement it entered into, as appears from the evidence, was with the intention of 'holding the ring' with a view to the possibility either of granting a formal lease to Jointport, or of requiring the defendants to take a new lease pursuant to cl 8.2. Accordingly, I reject the second point raised by the defendants.

*Was there a right to serve the cl 8.2 notices on 7 October 1999?*

The defendants none the less contend that, when the cl 8.2 notices were served, the claimant was not in a position to give possession of the premises to the defendant, as Jointport was in possession, and therefore the cl 8.2 notices were invalid. I do not think that that point is well-founded in principle or on the facts.

So far as principle is concerned, I would refer to *Basch v Stekel* [2001] L & TR 1, where, at para [26], Chadwick LJ said this:

> 'The effect of the notice,' – that is a notice under an equivalent provision to cl 8.2 – 'if valid, is to bring into existence a contract under which the [guarantors] are obliged to take a grant. When they take a grant the landlord will, under the terms of that grant, be required to deliver possession; but he will not be required to deliver vacant possession until the grant is taken. By serving a notice the landlord asserts that he is ready, willing and able to give vacant possession at the time when the grant is taken.'

In other words, in this case, the claimant must be in a position to give possession to the defendants when the lease is granted. Neither the claimant nor the defendants sought to force the issue of the grant of the new lease while Jointport was in occupation. If Jointport had been in occupation, and the claimant had not been able to exclude Jointport at the time the defendants sought to take the lease, then the claimant may have had a problem. But Jointport has now vacated and no problem, to my mind, therefore arises for the claimant in this connection.

Quite apart from this, assuming that I am wrong and that the claimant had to have been able to give possession on 7 October, I consider that, as at that date, Jointport had no more than a tenancy at will of the premises, and could therefore have been excluded by the claimant without further ado. In that connection, reference was made to two decisions of the Court of Appeal in relation to the status of a person occupying premises during negotiations for a tenancy. In *Javad v Aqil* [1991] 1 WLR 1007, the occupier was held to be a tenant at will on the grounds that it cannot have been intended to grant him any greater right while the negotiations were being pursued. In *Walji and Others v Mount Cook Land Ltd* [2002] 1 P & CR 163, the Court of Appeal upheld the first instance decision that the occupier had become a periodic tenant even though there had been negotiations for the grant of a tenancy.

In my judgment, at any rate as at 7 October 1999, Jointport had no more than a tenancy at will. It does not appear that it was envisaged that negotiations for a new lease to Jointport would even start until after the disclaimer, and there had therefore been very little time for such negotiations. I appreciate that it can be said that the terms of such a new lease were arguably agreed, because they were likely to be the terms of the disclaimed lease, but even if that is right, the claimant had made it quite clear that it wished to see references for Jointport, and to be satisfied that Jointport represented a good covenant. Nothing had been supplied in that connection by 7 October 1999. In these circumstances, I consider that there is no real basis for contending that Jointport was anything other than a tenant at will, as at the date of the service of the cl 8.2 notices. It was not fanciful for the claimant to wish to see references and be satisfied as to Jointport's reliability, particularly bearing in mind Jointport's difficulty in reliably meeting the rent on behalf of

Gherkesh, and Gherkesh's record. Accordingly, even if the claimant had to have been able to give possession as at 7 October 1999, I think it could have satisfied that test.

Just as the seller of a property, which he occupies, is able to give possession even though, when a notice to complete is served, he is in occupation, so is the seller of a property, with a licensee or tenant at will in occupation, able to give possession. At least as a matter of legal right, he can physically exclude the licensee or tenant at will (subject to the provisions of the Protection from Eviction Act 1977, in the case of residential premises) just as easily as he can vacate himself, if he is in occupation.

*Was the right to enforce cl 8.2 lost due to events after 7 October 1999?*

I turn to the position after 7 October 1999. Once the notices were served on 7 October 1999, then, if they were valid, they gave rise to an immediately enforceable contract between the claimant and the defendants for the grant and acceptance of a lease, as explained by Chadwick LJ in the passage quoted from his judgment in *Basch v Stekel* [2001] L & TR 1. On that basis, I do not see how it can be said that the events subsequent to 7 October 1999 give the defendants a defence to a claim for specific performance of cl 8.2, if they had no such defence as at 7 October 1999. If, on that date, there arose an enforceable contract for the grant and acceptance of a new lease, then it seems to me impossible to identify any action or communication on the part of the claimant which put an end to that contract.

As there was a concluded contract for the grant of a lease on 7 October 1999, I consider that the defendants would have to show some agreement with the claimant, some accepted repudiation by the claimant, or some act of abandonment by the claimant, to justify the contention that that contract had come to an end. Far from that, it seems to me that the claimant made it clear by the cl 8.2 notices, and its subsequent communications with the defendants, that it intended to enforce cl 8.2. In my judgment, any delay on the part of the claimant after 7 October is not enough to assist the defendants in the present case. In specific performance actions, where there is delay on the part of a claimant, it seems to me that it is not normally enough for the defendant merely to establish delay. He has to show either that the delay was so great that it evidenced an intention on the part of the claimant to abandon the contract, or that the delay would cause the defendant unfair prejudice if he was forced to complete the contract. Neither of those requirements is satisfied here, particularly when one bears in mind the communications between the claimant and the defendants, where the claimant was making it clear that it was not abandoning its claim to enforce its rights under cl 8.2.

I accept that it is possible that, some time after October 1999, the claimant may have created a periodic tenancy in favour of Jointport by virtue of its continuing acceptance of rent. Without going into the matter in detail, I do not consider that such a periodic tenancy is established, due to the fact that the delay was the fault of Jointport, which renders it difficult and unattractive to characterise the claimant as having the intention of granting a tenancy. However, even if there had been a periodic tenancy granted to Jointport, I do not think that it would assist the defendants. As I have said, after 7 October 1999, there was a binding contract for lease between the claimant and the defendants. The mere fact that the claimant may have created a tenancy of a property after it had agreed to grant a lease (by implication with vacant possession) to the defendants does not enable the defendants, without more, to

treat the contract as at an end. It may be that, by serving a notice making time of the essence for the grant of the new lease, it would have been possible for the defendants to avoid the contract because, by the time the notice took effect, the claimant may have been unable to get possession back, and to complete the contract. However, no such notice was served by the defendants in the present case, and now that the claimant is seeking to enforce the contract, any tenancy was determined and there is no problem for the claimant. In my view, the observations of Lord Nicholls of Birkenhead at [1997] AC 70 at 89A–C as to the effect of taking possession do not apply once a provision such as cl 8.2 has been implemented. After such implementation, as I say, the situation is entirely different. The landlord is no longer seeking to exercise his right under cl 8.2; he is seeking to invoke an enforceable contract which has arisen as a result of his exercise of his right under cl 8.2.

*The effect of s 2 of the 1989 Act*

That brings me to the final argument raised by the defendant, namely that based on s 2 of the 1989 Act. Section 2 is in these terms, so far as relevant:

'(1)    A contract for the sale or other disposition of an interest in land can only be made in writing and only by incorporating all the terms which the parties have expressly agreed in one document or, where contracts are exchanged, in each.

(2)    The terms may be incorporated in a document either by being set out in it or by reference to some other document.

(3)    The document incorporating the terms or, by contracts of exchange, one of the documents incorporating them (but not necessarily the same one) must be signed by or on behalf of each party to the contract.'

The argument on behalf of the defendants on this point is as follows. The contract creating the option was made in cl 8.2, and it was valid under s 2, as it was contained in a single document, namely the lease, signed by both parties. However, the contract that arose as a result of the purported exercise of the option (namely the contract to grant and take the new lease) is not enforceable because there exists no document which satisfies the requirements of s 2. There is only a notice executed by the claimant alone, purporting to seek to enforce cl 8.2. I reject that argument on two grounds.

First, it seems to me that, assuming cl 8.2 is treated as a straightforward option, the argument is disposed of by the decision and reasoning of Hoffmann J in *Spiro v Glencrown Properties Ltd and Another* [1991] Ch 537. The only possible relevant distinction between that case and this case, as Mr O'Brien says, is that cl 8.2 is a put option (ie it is the potential grantor or lessor who is to exercise it), not a call option (as in *Spiro*, where it is the potential grantee or purchaser who can exercise the option). Despite that distinction, I consider that the essence of the reasoning of Hoffmann J applies equally to put options. At [1991] Ch 537 at 541C–E, he said this:

'Apart from authority, it seems plain enough that s 2 was intended to apply to the agreement which created the option and not to the notice by which it was exercised …

The language of s 2 places no obstacle in the way of construing the grant of the option as the relevant contract. An option to buy land can properly be described as a contract for the sale of that land conditional on the exercise of the option.'

Hoffmann J then went on to consider a number of authorities and at the end of his judgment, at [1991] Ch 537 at 546E–G, he said this:

'In my judgment there is nothing in the authorities which prevents me from giving s 2 of the Act of 1989 the meaning which I consider to have been the clear intention of the legislature. On the contrary, the purposive approach taken in cases like *Mulholland* [1949] 1 All ER 460 encourages me to adopt a similar approach to s 2. And the plain purpose of s 2 was, as I have said, to prescribe the formalities for recording the consent of the parties. It follows that in my view the grant of the option was the only "contract for the sale or other disposition of an interest in land" within the meaning of the section and the contract duly complied with the statutory requirements.'

Mr O'Brien argues that the difference between a put option, as in cl 8.2, and a call option, as in *Spiro*, is that the latter creates an immediate interest in land whereas the former does not. I accept that, but I can see no reason in principle or logic, or, based on the reasoning in Spiro or the wording of s 2 why that should produce a different result. It does not seem to me that the fact that the option in Spiro created an interest in land was of the essence of the decision. My view is reinforced by the way in which Chadwick LJ analysed and approved *Spiro* in the Court of Appeal in *Bircham & Co Nominees (2) Ltd and Another v Worrell Holdings Ltd* [2001] EWCA Civ 775, [2001] 47 EG 149 at paras [39]–[43]. It is true that in that case the Court of Appeal held that the enforceability of a right of pre-emption could run into difficulties as a result of s 2. It is also true that the main argument to the contrary was based on the proposition that a right of pre-emption created an equitable interest in the property, an argument which was rejected. But the mere fact that that argument was rejected does not, to my mind, mean that it is illegitimate to conclude that the reasoning in *Spiro*, as approved in *Bircham*, should only apply to call options, and not to put options. All the terms of the new lease are contained in the option – ie, in this case, in cl 8.2. In the case of a right of pre-emption the position is different. The terms are not contained in the grant of the right, but in the offer made pursuant to it. Further, when an option is exercised, there is, as a matter of law (subject to statutory formalities) an immediate binding contract (see per Chadwick LJ in para [26] of *Basch v Stekel* [2001] L & TR 1). By contrast, the operation of a right of pre-emption merely involves making an offer: if the offeree sends the offer back, agreed and countersigned, then I would have thought that there was a powerful case for saying there was then an agreement in common law and which satisfied s 2.

Quite apart from this, even if a put option in general is not enforceable, despite the decision in *Spiro*, I would, albeit with hesitation, hold that the special nature of the right contained in cl 8.2 would take it outside the normal run of put options for this purpose. In support of that view, I would refer again to the decision of the House of Lords in *Coronation Street Industrial*

*Properties Ltd v Ingall Industries Ltd* [1989] 1 WLR 304, in particular in the speech of Lord Jauncey of Tullichettle at 309, where he said this:

> 'The gravamen of [the argument of counsel for the surety] was that with the single anomalous exception of an option to the tenant to renew his lease options in leases did not touch and concern the land and consequently did not run with the land. The provision with which this appeal was concerned was an option in favour of the lessor. I very much doubt whether it is correct so to describe the provision. I would prefer to describe it as a contingent obligation by the surety on the lease being disclaimed on behalf of the lessee to accept a lease of the premises for the unexpired portion of the lease. The contingency is a timeous demand being made by the lessor.'

It is fair to say that the leading speech in that case was that of Lord Templeman, which whom the other three members of the House of Lords agreed, as did Lord Jauncey of Tullichettle. However, it seems to me that the thrust of the passage I have already quoted from Lord Templeman, as well as his closing observations at 309, tend to support the proposition which is clearly contained in the speech of Lord Jauncey of Tullichettle.

### Conclusion

In these circumstances, while paying tribute to the way in which Mr O'Brien advanced his arguments, I have come to the conclusion that all the contentions of the defendants as to why they should not be required to take a new lease of the premises pursuant to cl 8.2 fail, and that I should therefore accord to the claimant the relief it seeks.

Solicitors: *Davies Arnold Cooper* for the claimant
*Freed Kemp Rapport* for the defendants

ANKAR PROPRIETARY LIMITED     .    .    Appellant;
   Plaintiff,

AND

NATIONAL WESTMINSTER FINANCE
        (AUSTRALIA) LIMITED    .    .    .    .    Respondent.
   Defendant,

ARNICK HOLDINGS LIMITED     .    .    .    Appellant;
   Plaintiff,

AND

NATIONAL WESTMINSTER FINANCE
        (AUSTRALIA) LIMITED    .    .    .    .    Respondent.
   Defendant,

ON APPEAL FROM THE SUPREME COURT OF NEW SOUTH WALES.

*Guarantee — Breach by creditor — Circumstances in which surety discharged — Guarantee of hirer's obligations under hiring of machinery — Agreement by creditor to give notice of hirer's breach or of proposal by hirer to assign rights — Failure to do so.*

    A surety guaranteed the performance of a hirer under a contract for the hire of machinery. By cl. 8 of the guarantee the owner of the machinery agreed to notify the surety if the hirer proposed to sell or assign its interest in the machinery. By cl. 9 the owner agreed to notify the surety if the hirer was in default under the contract, whereupon the surety and the owner would confer about the course of action the owner would take pursuant to the default. The owner committed breaches of both clauses.

    *Held*, that the surety was discharged from liability, by Mason A.C.J., Wilson, Brennan and Dawson JJ. on the ground that cll. 8 and 9 were conditions the breach of which, at the surety's election, discharged it from liability, and the surety had so elected, and by Deane J. on the ground that the surety was automatically discharged by the owner's breach.

    *Holme v. Brunskill* (1877), 3 Q.B.D. 495; *Bentsen v. Taylor, Sons & Co.*, [1893] 2 Q.B. 274; *Hong Kong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd.*, [1962] 2 Q.B. 26; and *Bunge Corporation v. Tradax S.A.*, [1981] 1 W.L.R. 711; [1981] 2 All E.R. 513, considered.

H. C. of A.
1986-1987.
⌣
1986,
*Sept.* 24, 25.
———
1987,
*May* 7.
———
Mason A.C.J.,
Wilson,
Brennan,
Deane and
Dawson JJ.

**A.2**

550                                HIGH COURT                        [1986-1987.

H. C. of A.
1986-1987.

Decision of the Supreme Court of New South Wales (Court of Appeal) reversed.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Appeals from the Supreme Court of New South Wales.

Ankar Pty. Ltd. ("Ankar") entered into a Security Deposit Agreement with National Westminster Finance (Australia) Ltd., previously called Lombard Australia Ltd. ("Lombard"), by which Ankar deposited $125,000 as a loan and gave security over it by way of charge for the performance by General Energy (Manufacturing) Pty. Ltd. ("Manufacturing") of its obligations under a contract for the hiring of machinery from Lombard by Manufacturing. By cl. 8 of the Agreement Lombard agreed, inter alia, to notify Ankar if Manufacturing proposed to sell or assign its interest in the machinery. By cl. 9 Lombard agreed to notify Ankar if Manufacturing was in default under the lease, whereupon Lombard and Ankar were to consult about the course of action Lombard would take following the default. Manufacturing defaulted under the contract of hire and thereafter assigned its interest in the machinery to its parent company. Lombard consented to the assignment. Lombard did not notify Ankar of Manufacturing's proposal to assign. Lombard also failed to notify Ankar before the assignment that Manufacturing was in default under the contract. Nor was there any consultation between Lombard and Ankar to determine what course of action Lombard would take. Ankar brought an action in the Supreme Court of New South Wales for a declaration that it was released from its obligations under the Agreement. Clarke J. made the declaration and ordered the return of Ankar's deposit. An appeal by Lombard to the Court of Appeal (Glass, Samuels and Priestley JJ.A.) was allowed. Ankar then appealed, by special leave, to the High Court.

Arnick Holdings Ltd. also entered into a Security Deposit Agreement with Lombard in the same form as Ankar's Agreement. The facts and proceedings relating to Arnick were the same as in Ankar's case. The appeals were heard together.

*A. R. Emmett* Q.C. (with him *D. L. Davies*), for the appellants. The relationship between the parties was that of creditor and surety: *Smith v. Wood* (1); *Re Conley* (2); *Rowlatt on Principal and Surety*, 4th ed. (1982), p. 6; *Halsbury's Laws of England*, 4th ed., vol. 20, par. 104. In any contract the breach of a condition or an essential term entitles the innocent party to rescind. The test of essentiality is

(1) [1929] 1 Ch. 14, at pp. 23, 27.     (2) [1938] 2 All E.R. 127, at
                                              pp. 131, 138.

162 C.L.R.]          OF AUSTRALIA.                          551

H. C. OF A.
1986-1987.

ANKAR
PTY. LTD.
v.
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

whether it appears from the general nature of the contract considered as a whole, or from some particular term or terms, that the promise is of such importance to the promisee that he would not have entered into the contract unless he had been assured of substantial performance of the promise: *Tramways Advertising Pty. Ltd. v. Luna Park (N.S.W.) Ltd.* (3); *Associated Newspapers Ltd. v. Bancks* (4); *D.T.R. Nominees Pty. Ltd. v. Mona Homes Pty. Ltd.* (5). The terms in cll. 8 and 9 were conditions or essential terms. The contract is a commercial agreement, and this points towards treating terms as essential: *Bowes v. Chaleyer* (6); *Bunge Corporation v. Tradax S.A.* (7). Damages would not be an adequate remedy for breach of cll. 8 and 9 because assessment would be difficult. This also points to the terms being conditions: *United Dominions Trust (Commercial) Ltd. v. Eagle Aircraft Services Ltd.* (8). [He referred to *Midland Counties Motor Finance Co. Ltd. v. Slade* (9) and *Spencer v. Lotz* (10).] A surety receives no benefit and no consideration. Therefore a contract of suretyship is regarded as strictissimi juris, and a surety is the object of favour at law and in equity. Into such a contract there is imported entire good faith and confidence: *In re Sherry* (11); *Bacon v. Chesney* (12); *Blest v. Brown* (13); *Bonser v. Cox* (14). For those reasons any departure by a creditor from its contract with a surety without the surety's consent, which is not obviously and without inquiry quite unsubstantial, automatically discharges the surety: *Halsbury's Laws of England*, 4th ed., vol. 20, pars. 253, 259; de Colyar, *A Treatise on the Law of Guarantees*, 3rd ed. (1897), pp. 395-405; *Clarke & Walker Pty. Ltd. v. Thew* (15); *Ward v. National Bank of New Zealand* (16); *Fay v. James Jenks & Co.* (17). No election is required by the surety to terminate his liability. Compliance with cll. 8 and 9 would have ensured that the appellant was aware of the default by Manufacturing and of the proposed assignment. The respondent was obliged by cl. 9 to consult with the appellant after default. In any consultation, the appellant may have persuaded the respondent to take a different course. It

(3) (1938) 38 S.R. (N.S.W.) 632, at pp. 641-642.
(4) (1951) 83 C.L.R. 322, at pp. 336, 337.
(5) (1978) 138 C.L.R. 423, at p. 431.
(6) (1923) 32 C.L.R. 159, at p. 196.
(7) [1981] 1 W.L.R. 711; [1981] 2 All E.R. 513.
(8) [1968] 1 W.L.R. 74; [1968] 1 All E.R. 104.
(9) [1951] 1 K.B. 346.
(10) (1916) 32 T.L.R. 373.
(11) (1884) 25 Ch. D. 692, at p. 703.
(12) (1816) 1 Stark. 192 [171 E.R. 443].
(13) (1862) 4 De G.F. & J. 367 [45 E.R. 1225].
(14) (1844) 13 L.J. Ch. 260.
(15) (1967) 116 C.L.R. 465, at pp. 466-467.
(16) (1883) 8 App. Cas. 755, at pp. 764-765.
(17) (1892) 53 N.W. 163.

552                          HIGH COURT                    [1986-1987.

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
v.
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

was in the contemplation of the parties that consultation might lead to the assignment of the lease to the appellant. Alternatively, the appellant could have paid out the lease or sought assignment of the lessee's interest, thereby giving the appellant the use of the goods. [He referred to *Midland Counties Motor Finance Co.* v. *Slade* (18) and *Polak* v. *Everett* (19).] The respondent departed from its contract with the appellant and accordingly the appellant was discharged.

*K. R. Handley* Q.C. (with him *N. C. Hutley*), for the respondent. The assignment by the lessee did not alter any existing right of the appellant as surety for the lessee. The lessee remained liable for the rent, while the assignee undertook personal liability for the rent to the lessor, and agreed to indemnify the lessee. As a result of the assignment the appellant acquired an additional right to be exonerated by the assignee as well as by the lessee. Accordingly the assignment did not release the appellant from its obligations as surety for the lessee. The effect of the breaches of cll. 8 and 9 depends on the ordinary law of contract. No special rules are applicable in this case because of the relationship of surety and principal creditor. The statement in *Halsbury's Laws of England*, 4th ed., vol. 20, par. 259 does not mean that any breach by the principal creditor of the contract with the surety operates to release the surety. If it does mean that, it is not supported by the cases cited and is contrary to principle and other authority. There is no rule of law that any breach by the principal creditor of a term of the contract of suretyship discharges the surety: *Gordon* v. *Rae* (20). *Fay* v. *James Jenks & Co.* and *Clarke & Walker Pty. Ltd.* v. *Thew* (21) both involved breaches of essential terms. Breach of an inessential term merely gives rise to an action for damages: *Lep Air Services* v. *Rolloswin Ltd.* (22). [He referred to *Bowmaker (Commercial) Ltd.* v. *Smith* (23) and *Covino* v. *Bandag Manufacturing Pty. Ltd.* (24).] The statement in *Halsbury* that "Any departure by the creditor from his contract with the surety ... which is not obviously and without enquiry quite unsubstantial, will discharge the surety" is not supported by the cases cited. *Holme* v. *Brunskill* (25); *Egbert* v. *National Crown Bank* (26); *In re Darwen*

(18) [1951] 1 K.B. 346, at pp. 351, 353.
(19) (1876) 1 Q.B.D. 669, at p. 674.
(20) (1858) 8 E. & B. 1065 [120 E.R. 396].
(21) (1967) 116 C.L.R. 465.

(22) [1973] A.C. 331, at p. 348.
(23) [1965] 1 W.L.R. 855; [1965] 2 All E.R. 304.
(24) [1983] 1 N.S.W.L.R. 237.
(25) (1878) 3 Q.B.D. 495.
(26) [1918] A.C. 903.

**A.2**

162 C.L.R.]          OF AUSTRALIA.                                    553

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
v.
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

*and Pearce* (27); *Bowmaker v. Moore* (28); *General Steam-Navigation Co. v. Rolt* (29); *Whitcher v. Hall* (30); and *Wright v. Sandars* (31) were all concerned with a variation or alteration of the principal contract to which the principal creditor and the principal debtor agreed. [He referred to *Bonser v. Cox* (32).] *In re Wolmerhausen* (33); *Smith v. Wood* (34); and *Taylor v. Bank of New South Wales* (35) dealt with the effect of releasing a co-surety, or security held by the creditor, upon the obligation of the surety. [He referred to *Polak v. Everett* (36) and *Egbert v. National Crown Bank* (37).] *Luning v. Milton* (38); *Evans v. Earle* (39); and *Davey v. Phelps* (40) were concerned with the question whether, upon the true construction of certain contracts of guarantee, the surety's liability had arisen. *Bacon v. Chesney* (41) is not authority for the principle maintained by the appellant. The surety's liability was clearly conditioned upon the creditor's granting eighteen months' credit. [He also referred to *Watts v. Shuttleworth* (42) and *Ward v. National Bank of New Zealand* (43).]

*A. R. Emmett* Q.C., in reply.

*Cur. adv. vult.*

The following written judgments were delivered:—          1987, May 7.

MASON A.C.J., WILSON, BRENNAN AND DAWSON JJ. These two appeals raise an important question of principle: In what circumstances does a creditor's breach of a contract of guarantee discharge the surety from liability under that contract? Although the facts and the history of the two appeals, including the relevant transactions, have been sufficiently stated in the reasons prepared by Deane J., we set out very briefly the principal features so far as they are relevant to the first appeal as a preliminary to a statement of our reasons for arriving at the conclusion that the appeals should be

| | |
|---|---|
| (27) [1927] 1 Ch. 176. | (36) (1876) 1 Q.B.D. 669. |
| (28) (1816) 3 Price 214 [146 E.R. 240]. | (37) [1918] A.C. 903. |
| | (38) (1890) 7 T.L.R. 12. |
| (29) (1858) 6 C.B. (N.S.) 550 [141 E.R. 572]. | (39) (1854) 10 Exch. 1 [156 E.R. 330]. |
| (30) (1826) 5 B. & C. 269 [108 E.R. 101]. | (40) (1841) 2 M. & G. 300 [133 E.R. 760]. |
| (31) (1857) 3 Jur. (N.S.) 504. | (41) (1816) 1 Stark. 192 [171 E.R. 443]. |
| (32) (1841) 4 Beav. 379 [49 E.R. 385]. | |
| (33) (1890) 62 L.T. 541. | (42) (1861) 7 H. & N. 353 [158 E.R. 510]. |
| (34) [1929] 1 Ch. 14. | (43) (1883) 8 App. Cas. 755. |
| (35) (1886) 11 App. Cas. 596. | |

HIGH COURT                        [1986-1987.

H. C. OF A.
1986-1987.

ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

allowed. It is common ground that the outcome of the first appeal is necessarily decisive of the second appeal.

The appellant Ankar Pty. Ltd. ("Ankar") entered into a Security Deposit Agreement with the respondent, National Westminster Finance (Australia) Ltd., previously named Lombard Australia Ltd. ("Lombard"), whereby Ankar deposited a sum of $125,000 as a loan and gave security over it by way of charge for the performance by General Energy (Manufacturing) Pty. Ltd. ("Manufacturing") of its obligations under a Lease Agreement made on or about 6 May 1982 of certain plant and equipment from Lombard as lessor to Manufacturing as lessee. Ankar subsequently deposited a further sum of $75,000 pursuant to the Security Deposit Agreement as security for the performance by another lessee of its obligations under a lease, but no question arises in relation to that further sum. The Security Deposit Agreement contained two provisions, cll. 8 and 9, which were breached by the respondent. The provisions are in these terms:

> "8. Lombard agrees with the Depositor that it will use its best endeavours to ensure that the machinery referred to in the Schedule to the Lease Agreement shall remain in the possession of the Lessee and will notify the Depositor should the Lessee propose to sell or assign its interest in any of the said machinery.
> 9. Upon the Lessee being in default under the Lease Agreement Lombard shall agree to notify the Depositor whereupon Lombard and the Depositor shall consult with a view to determine what course of action will be taken by Lombard following such default and without limiting the generality of that action Lombard may at its option assign the Lease Agreement and any security held therefor to the Depositor."

Manufacturing, after making default in payment of rent under the lease between December 1982 and March 1983, assigned its interest by an assignment dated 18 March 1983 in the leased plant and equipment to General Energy Co. Pty. Ltd., the parent company of Manufacturing. Lombard was a party to the agreement dated 18 March 1983 and as such consented to the assignment. The respondent committed a breach of cl. 8 of the Security Deposit Agreement by failing to notify Ankar of Manufacturing's proposal to assign its interest in the plant and equipment which was the subject of the lease.

Lombard also committed a breach of cl. 9 of the Security Deposit Agreement by failing to notify Ankar before the assignment that Manufacturing was in default under the Lease Agreement in failing to pay rent. Moreover, there was no consultation between Lombard

162 C.L.R.]        OF AUSTRALIA.        555

and Ankar with a view to determining what course of action would be taken by Lombard in consequence of the default.

The critical issue is whether Lombard's breaches of the Security Deposit Agreement discharged Ankar from its obligations under that agreement and thereby entitled it to recover the sum of $125,000 which it had paid. The Security Deposit Agreement set out the terms on which Ankar lent the sum of $125,000 to Lombard at 17.5 per cent per annum. But the Security Deposit Agreement also operated as a contract of guarantee in so far as Ankar charged the money lent with the payment by Manufacturing of all moneys payable by it to Lombard under the Lease Agreement. So much was common ground between the parties.

The appellant's case was that it was discharged from liability on the ground that the breaches of cll. 8 and 9 were breaches of essential conditions or, alternatively, on the ground that they were material breaches of the contract of guarantee. It was not in controversy that a surety is discharged from its obligation under a contract of suretyship by the creditor's breach of an essential condition, so long at any rate as the surety treats the contract as at an end. On the other hand Lombard strongly contested the notion that a surety is discharged by anything less than a breach of an essential term or a breach going to the root of the contract. According to Lombard, discharge of the surety for breach of the suretyship contract by the creditor is governed by the ordinary principles of the law of contract, there being no special rule applicable to contracts of suretyship.

Unfortunately the decided cases do not speak with a single voice on the issues presented by these arguments. On the contrary, support can be found in the authorities for a variety of discordant propositions relating to the discharge of the surety. For the moment we shall pass them by with a view to stating as briefly as may be the relevant principles of the general law of contract as they apply to the discharge of the surety's obligations under the suretyship contract for breach of it by the creditor.

Breach of an essential term or a breach going to the root of the contract will of course discharge the surety from future liability if the surety elects to rescind for breach. The expression "essential term" perhaps needs some elaboration in the context of suretyship because it is said sometimes that a surety is discharged by non-fulfilment of a condition precedent and at other times that a surety is discharged by the creditor's breach of a condition. A condition precedent may be unfulfilled without any breach of contract, but when performance by the creditor of a contractual promise is a condition precedent to the liability of the surety under a contract of

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

556                                    HIGH COURT                              [1986-1987.

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

suretyship which otherwise involves no more than a guarantee of *payment* of the debt owing to that creditor, the creditor's promise is necessarily an essential term of the contract. The terms of the contract itself demonstrate that the surety would not have entered into the contract of suretyship unless he had been assured of a strict performance of the promise: see *Tramways Advertising Pty. Ltd. v. Luna Park (N.S.W.) Ltd.* (44); *Associated Newspapers Ltd. v. Bancks* (45); *D.T.R. Nominees Pty. Ltd. v. Mona Homes Pty. Ltd.* (46).

Conversely, when a contractual promise is a condition, performance of the promise, if the promisee so elects, is treated as a condition precedent to the promisee's executory obligations. Acceptance that a promissory condition operated in this way was the very foundation of the illuminating judgment of Bowen L.J. in *Bentsen v. Taylor, Sons & Co.* (47), where his Lordship, in deciding whether a provision was a condition or a warranty, spoke of the need to determine "whether the intention of the parties, as gathered from the instrument itself, will best be carried out by treating the promise as a warranty sounding only in damages, or as a condition precedent by the failure to perform which the other party is relieved of his liability": see also *Hongkong Fir Shipping Co. Ltd. v. Kawasaki Kisen Kaisha Ltd.* (48); *Bunge Corporation v. Tradax S.A.* (49).

In the context of suretyship contracts there has been a natural tendency to refer to the creditor's promise as a condition precedent rather than as a condition. This is because many guarantees are unilateral instruments, containing no promises on the part of the creditor except in so far as the recital of the consideration may refer to such a promise: see, e.g., *United Dominions Trust (Commercial) Ltd. v. Eagle Aircraft Services Ltd.* (50) which, though not involving a guarantee, concerned a unilateral undertaking. This tendency in no way affects the discussion in the preceding paragraph.

In deciding whether a promise has the status and effect of a condition, courts are not too ready to construe a term as a condition and, at least where other considerations are finely balanced, will hold that a term is of such a kind that breach of it does not give rise to an automatic right to rescind. This approach is explained by a preference for a construction that will encourage performance rather

(44) (1938) 38 S.R. (N.S.W.) 632, at pp. 641-642.
(45) (1951) 83 C.L.R. 322, at p. 337.
(46) (1978) 138 C.L.R. 423, at pp. 430-431.
(47) [1893] 2 Q.B. 274, at p. 281.

(48) [1962] 2 Q.B. 26, at pp. 60, 69-70.
(49) [1981] 1 W.L.R. 711, at pp. 717, 718, 721, 725; [1981] 2 All E.R. 513, at pp. 543, 544, 546, 549-550.
(50) [1968] 1 W.L.R. 74; [1968] 1 All E.R. 104.

162 C.L.R.]        OF AUSTRALIA.        557

than avoidance of contractual obligations: *Cehave N.V. v. Bremer m.b.H.* (51); *Bunge Corporation* (52).

Three factors favouring an interpretation of cll. 8 and 9 that gives them the status of conditions may be mentioned. First, in the event of breach, neither clause is readily enforceable by way of an action for damages. Damages for breach would be difficult to prove. Secondly, the two clauses impose an obligation to give the surety notice and the purpose of imposing an obligation to give that notice is to enable the surety to take such action as it can to safeguard its position and its interests. Notice of default would alert the appellant to the immediacy of its risk, enable it to persuade the debtor to remedy the default and put possible alternative proposals to Lombard for its consideration. Notice of a proposed assignment would possibly enable the appellant to make suggestions for the disposition of the debtor's interest in the machinery to the best advantage. Thirdly, as Deane J. explains in his judgment, it was clearly disadvantageous to the surety to be faced with a situation in which it would be liable as surety for a lessee of equipment who no longer enjoyed possession of that equipment, notwithstanding that it remained liable to pay the rent.

On the other hand the provisions are not expressed to be conditions. No time is fixed within which notice is to be given: cf. *Midland Counties Motor Finance Co. Ltd. v. Slade* (53); *United Dominions Trust (Commercial) Ltd.* (54). And the language in which the clauses are expressed does not provide a clear indication that they were intended to be fundamental obligations or to operate as conditions.

If the contract in the present case were to be viewed as an ordinary contract without regard to its special character as a suretyship contract, we incline to think that the factors already mentioned would establish cll. 8 and 9 to be conditions. It is necessary to take into account as well the special character of a suretyship contract and of the relationship that it creates between the parties. As appears later, when this is done, the relevant obligations in cll. 8 and 9 are seen clearly to have the status of conditions. As a preliminary to a consideration of this matter it is necessary to examine the special principle, said to apply to a suretyship contract, that the surety is discharged from its obligations by the creditor's breach of that contract, so long at any rate as the breach materially prejudices the interests of the surety.

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

(51) [1976] Q.B. 44, at pp. 70-71.
(52) [1981] 1 W.L.R., at pp. 715-716; [1981] 2 All E.R., at pp. 541-542.
(53) [1951] 1 K.B. 346, at p. 351.
(54) [1968] 1 W.L.R. 74; [1968] 1 All E.R. 104.

558                                    HIGH COURT                              [1986-1987.

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

One of the problems with this special principle is that it has been expressed in a variety of ways. Thus, it has been said that the surety is discharged by "any departure . . . from the terms as agreed upon in the guarantee": *Barber v. Mackrell* (55); and see *Rose v. Aftenberger* (56). And in *Bacon v. Chesney* (57), Lord Ellenborough said that a claim against a surety is strictissimi juris and that "it is incumbent on the plaintiff to shew that the terms of the guarantee have been strictly complied with".

Then it has been said that any departure by the creditor from the suretyship contract "which is not obviously and without inquiry quite unsubstantial, will discharge the surety from liability, whether it injures him or not, for it constitutes an alteration in the surety's obligations": *Halsbury's Laws of England*, 4th ed., vol. 20, par. 259. The final clause in the passage quoted from *Halsbury* indicates that this proposition is founded not so much on cases dealing with a breach of a term in the suretyship contract, as on cases in which conduct on the part of the creditor materially altered the surety's obligations. Such an alteration takes place when the creditor agrees to a variation of the principal contract or to an extension of time within which the debtor may comply with that contract. The creditor's agreement with the debtor thereby alters the nature of the surety's obligations without the surety's consent.

Two of the authorities cited in support of the proposition stated in *Halsbury* make the point. In *Holme v. Brunskill* (58), the surety's defence to an action on the guarantee was that he was discharged by a material variation of the contract between creditor and debtor. At first instance Denman J. said (59):

"There must, I think, be many cases in which the judge would have to take the opinion of the jury upon the question, whether the alteration was of such a character as to affect the surety in any way by substantially or materially altering the risk."

On appeal, Cotton L.J. (60) expressed a similar view in different terms, saying:

"The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident

(55) (1892) 67 L.T. 108, at p. 109.
(56) (1969) 9 D.L.R. (3d) 42, at p. 49.
(57) (1816) 1 Stark. 192, at p. 193 [171 E.R. 443, at p. 443].

(58) (1877) 3 Q.B.D. 495.
(59) (1877) 3 Q.B.D., at p. 498.
(60) (1877) 3 Q.B.D., at pp. 505-506.

162 C.L.R.]        OF AUSTRALIA.                              559

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court, will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he will be discharged. This is in accordance with what is stated to be the law by Amphlett, L.J., in the *Croydon Gas Co. v. Dickinson* (61)."

Brett L.J. related the principle to the terms of the suretyship contract, observing (62):

"The proposition of law as to suretyship to which I assent is this, if there is a material alteration of the relation in a contract, the observance of which is necessary, and if a man makes himself surety by an instrument reciting the principal relation or contract, in such specific terms as to make the observance of specific terms the condition of his liability, then any alteration which happens is material; but where the surety makes himself responsible in general terms for the observance of certain relations between parties in a certain contract between two parties, he is not released by an immaterial alteration in that relation or contract."

*Croydon Gas Co. v. Dickinson* was also a case in which the creditor had by arrangement with the debtor altered this relationship by extending the time within which the debtor was bound to make payments, the arrangement being made without the surety's assent.

These statements of the principle, like that of Blackburn J. in *Polak v. Everett* (63), indicate that the principle is the by-product, not so much of the general law of contract, as of the special relationship between creditor and surety arising out of the suretyship contract upon which equity fastened to protect the surety when the creditor's conduct affected the surety's liability: *Holme v. Brunskill* (64). According to the English cases, the principle applies so as to discharge the surety when conduct on the part of the creditor has the effect of altering the surety's rights, unless the alteration is unsubstantial and not prejudicial to the surety. The rule does not permit the courts to inquire into the effect of the alteration. The consequence is that, to hold the surety to its bargain, the creditor must show that the nature of the alteration can be beneficial to the surety only or that by its nature it cannot in any circumstances increase the surety's risk, e.g., a reduction in the

(61)  (1876) 2 C.P.D. 46, at p. 51.          (63)  (1876) 1 Q.B.D. 669, at p. 674.
(62)  (1877) 3 Q.B.D., at p. 508.            (64)  (1877) 3 Q.B.D., at p. 505.

560                        HIGH COURT                    [1986-1987.

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
v.
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

debtor's debt or in the interest payable by the surety. The mere possibility of detriment is enough to bring about the discharge of the surety.

The foundation of the rule is that the creditor, by varying the principal contract or extending time, has altered the surety's rights without consulting it though the surety has an interest in the principal contract, and that the creditor cannot be permitted to do: see *Rees v. Berrington* (65). Thus the liability of the surety was seen to be strictissimi juris and the suretyship contract was construed strictly in his favour. In the United States the rule of strict construction, though applied in favour of sureties who receive no reward, is not applied to a compensated surety, i.e., a surety for reward. On the contrary the suretyship contract is construed against the compensated surety. This is largely because surety bonds are thought to resemble insurance contracts, the premiums are calculated against estimated risks and the contracts incorporate forms prepared by the surety. The United States approach may be partly due to a belief that the rule of strict construction, as it has been applied in England, is over-zealous in its protection of the surety: see Cardozo, *The Nature of the Judicial Process*, (1921), pp. 152 et seq.; Stearns, *Law of Suretyship*, 5th ed. (1951), §5.1; New York Law Revision Commission Annual Report (1937), at pp. 891-895; "Guarantee — Effect upon Guarantor's Liability of Subsequent Agreement between Creditor and Principal Debtor" Notes and Comments, *Australian Law Journal*, vol. 8 (1934), p. 58. According to the law as it has developed in the United States, the surety company must show some injury before it will be absolved from the contract (*Chapman v. Hoage* (66)), and then it will be discharged pro tanto to the extent of the damage or prejudice it suffers: *American Jurisprudence* (2d) vol. 74, "Suretyship", §259. In accordance with this approach, a surety company is discharged by the creditor giving the debtor an extension of time only if it is shown that the extension is a material variance in the sense that it results in material harm or prejudice to the surety: *Guaranty Co. v. Pressed Brick Co.* (67).

Lombard does not submit that we should adopt the United States approach. For this reason, if no other, it would be inappropriate to take this course. However, it is of some importance to note that the different approach taken in the United States with respect to the special principle rests on the view that it arises not so much from the

---

(65)  (1795) 2 Ves. Jun. 540 [30 E.R. 765].

(66)  (1936) 296 U.S. 526, at p. 530.

(67)  (1903) 191 U.S. 416.

terms of the suretyship contract, as from the relationship between the parties which the contract creates.

However, the fundamental question still remains: Is the rule of strict construction, derived from the equitable rule which protects the surety from any alteration in its liability, subsumed in the general principles of the law of contract so that the surety may treat itself as discharged from liability if, but only if, the breach is such as to entitle the surety at law to rescind the contract? In truth there is no difference between the equitable rule and the legal rule, as Lord Selborne L.C. pointed out in *In re Sherry; London & County Banking Co. v. Terry* (68). There, in a passage accepted by the Privy Council in *National Bank of Nigeria Ltd. v. Awolesi* (69), his Lordship said:

> "A surety is undoubtedly and not unjustly the object of some favour both at law and in equity, and I do not know that the rules of law and equity differ on the subject."

At law, as in equity, the traditional view is that the liability of the surety is strictissimi juris and that ambiguous contractual provisions should be construed in favour of the surety. The doctrine of strictissimi juris provides a counterpoise to the law's preference for a construction that reads a provision otherwise than as a condition. A doubt as to the status of a provision in a guarantee should therefore be resolved in favour of the surety and so the provision should be interpreted as a condition, or perhaps as an innominate term, instead of a mere warranty. If the surety is to be discharged for breach of a promissory term in the suretyship contract, the justification for the discharge must be that the creditor has failed to comply with a provision that, as a matter of interpretation, requires strict performance as a condition precedent to the surety's obligation or at least requires substantial performance of the promise such that the surety would not have entered into the contract if it had not been assured that there would not be a breach such as the breach which in fact occurred. If on its true interpretation the term is not intended so to operate, it is not easy to understand why the surety should be discharged by its breach. Of course, in construing the contract the court is entitled to look to the general setting in which the contract has come into existence: see, e.g., the discussion in *Reardon Smith Line Ltd. v. Hansen-Tangen* (70).

Since the judgment of Diplock L.J. in *Hongkong Fir* (71) it has

H. C. OF A.
1986-1987.

ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

(68)  (1884) 25 Ch. D. 692, at p. 703.
(69)  [1964] 1 W.L.R. 1311, at p. 1316.
(70)  [1976] 1 W.L.R. 989, at pp. 996-997; [1976] 3 All E.R. 570, at pp. 574-575.
(71)  [1962] 2 Q.B. 26.

562                               HIGH COURT                         [1986-1987.

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
v.
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Mason A.C.J.
Wilson J.
Brennan J.
Dawson J.

been recognized in England that a term in a contract may stand somewhere between a condition and a warranty. Such an intermediate or innominate term, it has been held, is capable of operating, according to the gravity of the breach, as either a condition or a warranty. In *Hongkong Fir* the obligation of seaworthiness was readily classified as innominate because a breach of the obligation might be trivial, making damages an adequate remedy, or grave, in which event it should have effect as a breach of condition. The innominate term brings a greater flexibility to the law of contract, as Lord Wilberforce has remarked on more than one occasion: *Reardon Smith Line Ltd. v. Hansen-Tangen* (72); *Bunge Corporation* (73). Although nothing less than a serious breach of an innominate term entitles the innocent party to treat the contract as at an end, the breaches of cll. 8 and 9 merit this description.

Whether provisions of the kind found in cll. 8 and 9 are provisions which, if they cannot be described as conditions, can be described accurately as innominate terms is a question of some difficulty. In *Bunge Corporation*, Lord Wilberforce suggested (74) that a time clause is not susceptible of treatment as an innominate clause because it can give rise to one kind of breach only — to be late. If this suggestion be well founded, and we would not wish to be taken as implying that it is, there might be a problem in treating the provisions of cll. 8 and 9, especially cl. 9, as innominate terms.

Be this as it may, returning to the earlier discussion of the two provisions in the context of conditions, the special characteristics of the suretyship relationship and the fact that it creates a liability strictissimi juris on the part of the surety are enough, when added to the factors mentioned earlier in this judgment, to justify treating the relevant obligations in the two provisions as conditions, breach of which, at Ankar's option, discharged it from performance of its obligations under the Security Deposit Agreement to the extent to which they related to the sum of $125,000.

In the result we would allow the appeals.

DEANE J. These two appeals have been heard together. It is common ground that the relevant facts and issues involved in them and the course of proceedings which they have followed in the courts below correspond and that the outcome of the appeal in one

(72) [1976] 1 W.L.R., at p. 998;
     [1976] 3 All E.R., at pp. 576-
     577.

(73) [1981] 1 W.L.R., at pp. 715-
     716; [1981] 2 All E.R., at
     pp. 541-542.

(74) [1981] 1 W.L.R., at p. 715;
     [1981] 2 All E.R., at p. 541.

162 C.L.R.]       OF AUSTRALIA.                              563

must necessarily determine that in the other. That being so, the
material placed before the Court has been largely confined to what
is relevant to the appeal by Ankar Pty. Ltd. ("Ankar") and it is to
that appeal only that it is necessary to make detailed reference in
these reasons for judgment.

The respondent, National Westminster Finance (Australia) Ltd.,
was formerly known as Lombard Australia Ltd. Its change of name
occurred after the making of the agreements giving rise to these
proceedings and it is convenient to refer to it as "Lombard". On or
about 6 May 1982, Lombard entered into a number of written
agreements relating to the "lease" of a long list of items of
manufacturing plant and equipment to a company called General
Energy (Manufacturing) Pty. Ltd. ("Manufacturing"). The central
agreement was the actual "Lease Agreement" between Lombard and
Manufacturing. Its effect was that Manufacturing agreed "to take
on lease" from Lombard the relevant plant and equipment for a
period of forty-eight months at a total rental of $573,025.92
($11,938.04 per month). This "Lease Agreement" was referred to in
the courts below as "the lease" and I shall do likewise. It is necessary
to make express mention of but one of its numerous clauses. Clause
25 provided:

> "That the Lessee shall not without the consent in writing of
> Lombard first had and obtained transfer or assign or purport to
> transfer or assign the goods or any interest therein provided
> that Lombard shall not unreasonably refuse its consent to a
> proposed assignment of the Lessee's rights to a respectable and
> responsible assignee who is capable of carrying out the Lessee's
> obligations hereunder and who enters into an agreement with
> Lombard in such form as Lombard may reasonably require for
> the performance of the Lessee's obligations hereunder."

The other agreements included written guarantees of the due and
punctual payment by Manufacturing of the rent and every other
sum payable under the lease and the due performance and
observance of all the terms and provisions of the lease. There were
apparently four of those guarantees: two by companies and two by
individuals. One of the guaranteeing companies was General Energy
Co. Pty. Ltd. which was Manufacturing's parent company and to
which I shall refer as "the parent company". There was also an
agreement between Ankar and Lombard described as a "Security
Deposit Agreement" and I shall refer to it by that description.

The Security Deposit Agreement recited that Manufacturing had
offered to lease from Lombard the plant and equipment and that, as
a condition precedent to Lombard's acceptance of that offer,
Lombard had "required" Ankar to pay to Lombard "a sum of money

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
v.
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Deane J.

564                          HIGH COURT                    [1986-1987.

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
*v.*
National
Westminster
Finance
(Australia)
Ltd.

Deane J.

as security for the performance of [Manufacturing's] obligations"
under the lease. It provided for payment by Ankar to Lombard of
the sum of $125,000 as security for the performance by Manufactur-
ing of its obligations under the lease and that Lombard should open
a special account ("the Security Account") in the name of Ankar in
the books of Lombard to which the $125,000 was to be credited.
Under cl. 3 of the Security Deposit Agreement, Lombard was
required to pay to Ankar interest on the amount from time to time
standing to the credit of the Security Account at a rate of 17.5 per
cent. Clauses 4 to 9 are of central importance to the appeal. In them,
Manufacturing is referred to as "the Lessee" and Ankar is referred
to as "the Depositor". Those clauses provided:

"4. The Depositor hereby charges to Lombard the Security
Account and all moneys from time to time credited to the
Depositor therein as security for the payment by the Lessee of
all moneys payable by the Lessee to Lombard under the Lease
Agreement.
5. Lombard shall be entitled in its absolute discretion at any
time and from time to time to debit the Security Account with
all or part of any moneys then due and payable by the Lessee to
Lombard whether under the Lease Agreement.
6. Nothing herein contained shall in any way affect the
Lessee's obligations to pay to Lombard the rent and other
moneys referred to in the Lease Agreement in the manner and
at the times therein prescribed.
7. The charge hereby created shall be and be deemed to be
fully discharged and satisfied when all moneys payable or
which may become payable by the Lessee to Lombard under
the Lease Agreement have been paid and upon discharge of the
said charge the amount then standing to the credit of the
Security Account shall be paid by Lombard to the Depositor.
8. Lombard agrees with the Depositor that it will use its best
endeavours to ensure that the machinery referred to in the
Schedule to the Lease Agreement shall remain in the possession
of the Lessee and will notify the Depositor should the Lessee
propose to sell or assign its interest in any of the said
machinery.
9. Upon the Lessee being in default under the Lease
Agreement Lombard shall agree to notify the Depositor
whereupon Lombard and the Depositor shall consult with a
view to determine what course of action will be taken by
Lombard following such default and without limiting the
generality of that action Lombard may at its option assign the
Lease Agreement and any security held therefor to the
Depositor."

The sum of $125,000 was duly paid by Ankar to Lombard pursuant
to the terms of the Security Deposit Agreement. A similar "Security
Deposit Agreement" was executed by the appellant in the other

162 C.L.R.]          OF AUSTRALIA.                                     565

appeal, Arnick Holdings Ltd. ("Arnick"), which deposited a separate
sum of $125,000 with Lombard.

By a subsequent agreement between Ankar and Lombard, the
sum of $125,000 lodged by Ankar with Lombard pursuant to the
Security Deposit Agreement was further charged with repayment of
moneys advanced or to be advanced by Lombard to another
company, Nuinga Pty. Ltd. The contents of that further agreement,
to which I shall refer as the "Deed of Charge", are otherwise not
directly relevant to the issues raised on the appeal. On 24 November
1982 Ankar lodged a further $75,000 with Lombard to be held by
Lombard upon the terms of the Security Deposit Agreement as
varied by the Deed of Charge. The amount deposited by Ankar with
Lombard was therefore increased to a total sum of $200,000. A
similar "Deed of Charge" was executed by Arnick which also lodged
a further $75,000 with Lombard.

In December 1982, Manufacturing first made default in payment
of rent under the lease. Default continued until early March 1983
when, in discussions between officers of the respective companies,
Manufacturing requested Lombard to consent to an assignment of
its interest under the lease to the parent company. There followed
an agreement dated 18 March 1983 ("the assignment") to which
Lombard was a party and by which Manufacturing assigned its
interest under the lease to the parent company. The assignment
expressly provided that nothing contained in it should "relieve or be
deemed to relieve" Manufacturing from its "personal liability" to
Lombard under the lease and that that liability should "continue and
be and remain of full force and effect until all the obligations under
the lease on the part of the lessee thereunder have been fully
discharged and satisfied."

It is common ground that Ankar was not, prior to the assignment,
notified by Lombard of Manufacturing's default under the lease.
Nor was it consulted about the assignment to the parent company.
There is nothing in the evidence to suggest, and it is not suggested,
that Ankar was aware of either the default or the assignment until
after the assignment had been effected. On 31 March 1983, after
Ankar became aware of what had occurred, a letter was written on
its behalf to Lombard recording its concern at the fact that it had
not been notified of the default by Manufacturing and the
assignment of the lease. On 5 April 1983, a formal request was made
by Ankar for the repayment of the security deposit together with
accrued interest. The letter did not identify the basis upon which the
request, which was said to be pursuant to "senior legal advice", was
made. Presumably, the basis was a claim that the deposit had
become freed of the charge to secure the performance by Manufac-

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Deane J.

566                                HIGH COURT                    [1986-1987.

H. C. of A.
1986-1987.

ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Deane J.

turing of its obligations under the lease. Lombard refused to comply with the request. By letter of 12 April 1983, it advised that it considered that the security deposit was "held as security for the performance of the lease agreement" by the parent company. In fact, what Lombard maintains is that the security deposit was held by it as security for the performance by Manufacturing of its continuing obligations under the lease in circumstances where the parent company has failed to discharge its obligations as lessee of the plant and equipment pursuant to the assignment to it of Manufacturing's right, title and interest under the lease.

In due course, Ankar instituted proceedings in the Supreme Court of New South Wales seeking judgment for the amount of $200,000 together with interest. On the hearing of the action, it became apparent that, even if the deposit no longer remained charged to secure performance by Manufacturing of its continuing obligations, Ankar was not then entitled to a return of the $200,000 since the deposit at that stage remained charged to secure the repayment by Nuinga of moneys advanced to that company by Lombard. In those circumstances, the claim was altered to seek declaratory relief. At first instance, Clarke J. found (as was obviously the case) that Lombard was guilty of breaches of its contractual obligations under cll. 8 and 9 of the Security Deposit Agreement in failing to notify Ankar either of Manufacturing's default (cl. 8) or intended assignment: cl. 9. His Honour rejected an argument that, regardless of whether the relationship between Lombard and Ankar was that of creditor and surety, those clauses constituted essential terms of the contract between Ankar and Lombard according to general principles of contract law. He held, however, that the Security Deposit Agreement constituted Ankar as surety, to the extent of the amount deposited, for the performance by Manufacturing of its obligations under the lease with the consequence that Ankar was entitled to rely upon the special rules which regulate the rights and obligations of sureties. His Honour concluded that, under those special rules, the consequence of the assignment of the lease by Manufacturing with the consent of Lombard "in circumstances involving breaches by [Lombard] of conditions 8 and 9 of the Security Deposit Agreement" was that Ankar was discharged from its obligations as surety for the performance by Manufacturing of its obligations under the lease. Accordingly, his Honour granted declaratory relief in Ankar's favour. Subsequently, when it was disclosed that the liability of Nuinga to Lombard had been fully discharged at the time his Honour had granted that declaratory relief, his Honour entered judgment in Ankar's favour for the then outstanding balance under the Security Deposit Agreement.

162 C.L.R.]        OF AUSTRALIA.        567

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Deane J.

Lombard appealed from the decision of the learned trial judge to the New South Wales Court of Appeal. The Court of Appeal (Glass, Samuels and Priestley JJ.A.) agreed with Clarke J.'s conclusion that cll. 8 and 9 of the Security Deposit Agreement were not essential terms of the contract between Lombard and Ankar according to general principles. That Court also agreed with his Honour that Ankar was constituted a surety under the terms of the Security Deposit Agreement with the consequence that the rules regulating the rights and obligations of a surety were applicable. However, the members of the Court of Appeal disagreed with Clarke J.'s finding that the assignment of the lease by Manufacturing with the consent of Lombard had, in the circumstances in which that assignment and consent had been effected and given, discharged Ankar from its obligations as surety for Manufacturing. Their Honours identified two distinct grounds upon which Ankar had relied to support that finding that it was discharged from its obligations as a surety. The first of those grounds was that the assignment, to which Lombard had been a party, constituted a variation of the principal contract (i.e. the lease) between Lombard and Manufacturing. They held that that ground had not been made good for the reason that the assignment with the consent of Lombard had not involved any variation of the principal contract (i.e. the lease) at all since cl. 25 of that contract had expressly authorized such an assignment. The second ground was that Lombard had been guilty of breach of its obligations under cll. 8 and 9 of the surety agreement (i.e. the Security Deposit Agreement) between itself as principal creditor and Ankar as surety. It would seem that the basis upon which this second ground was advanced before the Court of Appeal was that, even accepting that cll. 8 and 9 were not essential or fundamental terms of the contract between Lombard and Ankar according to general principles, Lombard's conduct in consenting to the assignment in the circumstances of the breaches varied the contract of suretyship or altered Ankar's obligations under it. Their Honours rejected this ground, holding that Lombard's breach of cll. 8 and 9 "did not constitute a variation of the terms of the guarantee": per Samuels J.A., with whom Glass J.A. agreed. In the result, the Court of Appeal upheld the appeal and dismissed Ankar's action. The present appeal is from the judgment and orders of the Court of Appeal.

The argument in this Court has been more narrowly confined than in the courts below. Lombard no longer disputes that the effect of the Security Deposit Agreement was to constitute Ankar a surety with the consequence that the special rules relating to the rights and obligations of sureties are applicable. For its part, Ankar no longer

HIGH COURT

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Deane J.

argues that the effect of Lombard's consenting to the assignment of the lease by Manufacturing was to vary the principal agreement between Lombard as creditor and Manufacturing as debtor. The argument actually advanced on behalf of Ankar has involved a refinement of, and to some extent a departure from, the manner in which it would seem to have been propounded before the Court of Appeal. It is no longer argued that Lombard's breaches of cll. 8 and 9 of the Security Deposit Agreement constituted a "variation" of that agreement in the ordinary meaning of that word. What is now argued is that Lombard's breaches of cll. 8 and 9 of the Security Deposit Agreement were breaches of an agreement between principal creditor and surety of such a nature as to discharge Ankar from its obligations as surety pursuant to the special rules applicable to determine the rights and obligations of a surety. The submission that cll. 8 and 9 constituted essential or fundamental terms of the Security Deposit Agreement has not been abandoned. It has, however, been advanced not so much as a matter of general principle but as a particular consequence of the operation of those special rules.

The argument for Ankar was, to no small extent, founded upon a proposition extracted from *Halsbury's Laws of England*, 4th ed., vol. 20, p. 141, par. 259:

> "Any departure by the creditor from his contract with the surety without the surety's consent, whether it be from the express terms of the guarantee itself or from the embodied terms of the principal contract, which is not obviously and without inquiry quite unsubstantial, will discharge the surety from liability, whether it injures him or not, for it constitutes an alteration in the surety's obligations."

As Samuels J.A. pointed out in the Court of Appeal and senior counsel for Lombard demonstrated in argument in this Court, not all of the large number of cases which are cited in the footnotes of *Halsbury* (p. 142) in support of that proposition actually support it. Moreover, the terms in which the proposition is framed are not without difficulty. Thus, the qualification that the departure be "not obviously and without inquiry quite unsubstantial" is framed in words which are as likely to raise as to solve problems. More important for present purposes is the difficulty in the explanatory statement that a relevant "departure" by the creditor from his contract with the surety "constitutes an alteration in the surety's obligations". In the Court of Appeal, the view prevailed that, in the light of that explanatory statement, the general proposition in *Halsbury* is to be understood as referring to an alteration in the terms of the surety's obligations and not a failure or refusal of

H. C. OF A.
1986-1987.

ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Deane J.

performance by the creditor. It seems to me, with respect, that that view attributes to the words "an alteration in the surety's obligations" a meaning which, properly understood, they were not intended to bear.

Obviously, a creditor could not "without the surety's consent" effect a "departure" from the contract with the surety in the sense of effecting a unilateral variation or alteration of its terms. The reference to a "departure" by the creditor from his contract with the surety constituting an "alteration in the surety's obligations" is a reflection of the fact that the obligations of a surety are strictly confined to what he has undertaken in the contract which constitutes him a surety; "[h]e is bound ... merely" to "the letter of his engagement": see per Lord Westbury L.C., *Blest v. Brown* (75). A failure by the creditor to observe the terms of that contract would, if the surety none the less remained liable, alter the surety's obligations in the sense that the surety would be held liable in circumstances which did not accord with the letter of his engagement as specified by the contract. In other words, the proposition in *Halsbury* should be understood as meaning that a relevant failure by the creditor to perform the terms of his contract with the surety will "discharge" the surety for the reason that the creditor's failure to perform the terms of his contract would otherwise result in a situation where the surety was held liable in circumstances other than those in which he had agreed to be bound. As senior counsel for Ankar pointed out, this reading of the proposition in the 4th edition of *Halsbury* derives support from de Colyar K.C.'s original article on Guarantees (in the 1st edition of *Halsbury*) from which the proposition was derived: see *Halsbury's Laws of England*, 1st ed., vol. 15, pp. 550-552, pars. 1034-1035; and see also de Colyar, *A Treatise on the Law of Guarantees,* 3rd ed. (1897), p. 405. That general proposition accords with the long-standing statement of high authority that a "claim as against a surety is strictissimi juris, and it is incumbent on the plaintiff to shew that the terms of the guarantee have been strictly complied with": see per Lord Ellenborough, *Bacon v. Chesney* (76). So understood, and subject to what is said hereunder, it represents a correct statement of a special rule which prima facie (in the sense that it may be excluded by express or implied agreement to the contrary) governs the particular relationship of guarantor and principal creditor.

In the context of defining that special rule it is inappropriate to

---

(75) (1862) 4 De G.F. & J. 367, at
    p. 376 [45 E.R. 1225, at
    p. 1229].

(76) (1816) 1 Stark. 192, at p. 193
    [171 E.R. 443, at p. 443].

570                        HIGH COURT                    [1986-1987.

H. C. OF A.
1986-1987.

ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Deane J.

speak, as does the 25th edition of *Chitty on Contracts* (1983), vol. II, p. 1222 (and cf., e.g., *Bowmaker (Commercial) Ltd. v. Smith* (77)), of it being necessary that the creditor's breach go "to the root of the contract" between himself and the surety or evince "an intention to repudiate the contract". Nor is it appropriate in that context to speak either of essential or fundamental terms of the guarantee or of the surety being pro tanto discharged to the extent of damage actually sustained: cf. *American Jurisprudence* 2d, vol. 38, "Guaranty", § 107; *Corpus Juris Secundum*, vol. 38, "Guaranty", par. 63, p. 1225. If the breach by the creditor is of an essential or fundamental term or constitutes repudiation of the contract between the surety and himself, the surety will, of course, be entitled to rescind the contract in accordance with general principle. That is not, however, the special rule which is here under discussion. That special rule is that, in the ordinary case where a surety agrees to be liable for the default of another upon the terms of the contract of suretyship, a significant departure by the creditor from the terms of that contract will, in the absence of agreement to the contrary, operate to preclude the existence or continued existence of the circumstances in which the surety has agreed to be bound. That being so, there is no need for the surety to rescind the contract for repudiation or breach of an essential or fundamental term. In the absence of any question of waiver or estoppel, the situation is simply that the circumstances of his liability as surety do not exist: cf., e.g., *United Dominions Trust (Commercial) Ltd. v. Eagle Aircraft Services Ltd.* (78); *Eshelby v. Federated European Bank, Ltd.* (79); *Bank of British Columbia v. Turbo Resources Ltd.* (80); *Corporation of Chatham v. McCrea* (81); *Sullivan v. Willson* (82); but note, e.g., *Bank of Montreal v. Wilder* (83). In some of the cases, one finds that the promissory obligations of the creditor under the surety agreement are described as conditions precedent of the surety's liability. While the difference would seem to be of little real importance, it is preferable to speak of those promissory obligations in terms of their constituting part of the general circumstances in which the surety has agreed to become liable for the default of the principal debtor rather than to categorize them as conditions precedent. One reason

(77) [1965] 1 W.L.R. 855, at p. 858; [1965] 2 All E.R. 304, at p. 306.
(78) [1968] 1 W.L.R. 74, at p. 81; [1968] 1 All E.R. 104, at p. 107.
(79) (1931) 146 L.T. 336, at p. 342 (Div. Ct.; [1932] 1 K.B. 423, at p. 432 (C. of A.).

(80) (1983) 148 D.L.R. (3d) 598, at pp. 605-608.
(81) (1862) 12 U.C.C.P. 352, at p. 355.
(82) (1864) 3 S.C.R. (N.S.W.) (L.) 180, at p. 184.
(83) (1983) 149 D.L.R. (3d) 193, at pp. 199-200.

162 C.L.R.]          OF AUSTRALIA.                                571

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Deane J.

for that is the obvious difficulty in reconciling the unqualified fulfilment required of a true condition precedent with the apparently established qualification to the effect that an obviously immaterial and insignificant failure by the creditor fully to discharge his promissory obligations will not preclude the liability of the surety (see below). A more fundamental reason is that the basis and, for present purposes, the limits of the rights and liabilities of the parties to the particular relationship of guarantor and principal creditor are consensual and it is impermissible to approach the identification of the special rules defining the prima facie limits of the consensual rights and liabilities of the parties to a particular category of relationship in a way that effectively denies their special character by forcing them into the formalized terms appropriate to the expression of universal principle. Put differently, special rules which prima facie (in the sense of being subject to contrary agreement) define the rights and liabilities of the parties to a particular category of consensual relationship, such as that between guarantor and creditor or that between partners, are essentially concerned with presumptions of contractual intention. There is no warrant, either in principle or in utility, for distorting them into statements of immutable and overriding principle.

The Security Deposit Agreement between Lombard and Ankar in the present case had a twofold character. Its first character was that of a contract for the loan of money under which Ankar agreed to place money on deposit with Lombard and Lombard agreed to pay Ankar interest at the rate of 17.5 per cent per annum. Its second character was that of creditor and surety under which Ankar charged the money lent ("deposited") by it to Lombard with the payment by Manufacturing of all moneys payable by it to Lombard under the lease. Analysis of the overall agreement makes it plain that cll. 8 and 9 are properly to be seen as relating to the second character of the agreement, namely, to its character as a contract of suretyship. The effect of those clauses was that Ankar agreed to be liable as surety (up to the amount of the moneys lent) in circumstances where (cl. 8) Lombard would notify it if Manufacturing proposed to sell or assign its interest in any of the machinery and where (cl. 9) Lombard would notify it in the event that Manufacturing was in default under the lease and consult with it with a view to determining a mutually agreeable course of action.

As has been seen, the above-quoted statement of the special rule in *Halsbury* that a departure by the creditor from the terms of his agreement will preclude the surety being held liable is qualified by being confined to the case where the departure is significant in the sense that it "is not obviously and without inquiry quite

HIGH COURT                    [1986-1987.

H. C. of A.
1986-1987.

Ankar
Pty. Ltd.
v.
National
Westminster
Finance
(Australia)
Ltd.

Deane J.

unsubstantial". While some such qualification would seem to be established and desirable, there are some problems with that wording of it. In particular, it would seem arguable in some situations that it is impossible to appreciate the true nature or effect of a particular departure by the creditor from his promissory obligations without some knowledge of or inquiry into the circumstances surrounding its occurrence and that the limitation would be more appropriately framed without the reference to "without inquiry". It is, however, unnecessary to pursue that question here since it seems to me that, regardless of what be the precise qualification, Lombard's departure from its obligations under cll. 8 and 9 was plainly of the seriousness or substantiality necessary to preclude the existence of the circumstances under which Ankar had agreed to be liable as surety for the default of Manufacturing. I turn to explain why that is so.

The provisions of cll. 8 and 9 of the Security Deposit Agreement make clear Ankar's concern to avoid a situation in which its liability as surety for Manufacturing as "lessee" in possession of the equipment had been transformed into a liability as surety for the performance by Manufacturing of its obligations under the lease in circumstances where Manufacturing had ceased to be entitled to possession of the leased machinery. The reason for that is not hard to discern. Obviously, in the latter situation, any rights of subrogation against Manufacturing would be of dubious value. Thus it was that cl. 8 of the Security Deposit Agreement expressly required Lombard to use its best endeavours to ensure that the equipment remained in the possession of Manufacturing while cl. 9 contemplated that, in the event of default by Manufacturing in performance of its obligations under the lease, Ankar might negotiate with Lombard for an assignment to it of Lombard's interest as lessor of the leased equipment. In that context, it simply could not be said that, viewed objectively, Lombard's departure from its obligations under cll. 8 and 9 was not sufficiently serious to preclude the existence of the circumstances under which Ankar had agreed to be liable as surety. To the contrary, the failure to notify Ankar of Manufacturing's default (cl. 8) and intended assignment (cl. 9) precluded the circumstances existing in which Ankar could enjoy the agreed opportunity of attempting to avoid the very situation which it was obviously most concerned to avoid, namely, the situation in which it would be liable as surety for a lessee of equipment who remained liable to pay the rent for the equipment but no longer enjoyed the quid pro quo of possession of it. It follows that Lombard was not entitled to claim from Ankar, as surety, payment of the moneys owing to it by Manufacturing under the

162 C.L.R.]          OF AUSTRALIA.                                573

lease or to apply the amount deposited with it by Ankar in payment of those moneys. It may well be that this result in the instant case is open to the justified criticism that it is brought about by the application to a commercial transaction of a special rule which reflects a common law approach to sureties which is a survival "of the days when commercial dealings were simpler, when surety companies were unknown, when sureties were commonly generous friends whose confidence had been abused": see Cardozo, *The Nature of the Judicial Process* (1921), p. 154; and cf. *Midland Counties Motor Finance Co. Ltd. v. Slade* (84). That special rule can however be excluded by contrary agreement of the parties to a commercial transaction if they so desire. The wider question whether the traditional special rules applicable to sureties should be made generally inapplicable to a guarantee given in a purely commercial context raises considerations of general policy which, in the context of settled law, are best left to the legislature to resolve.

The appeal by Ankar should be upheld and orders should be made having the effect that the judgment and orders of the learned trial judge are restored. Similar orders should be made in the case of the appeal by Arnick.

> *Appeals allowed with costs.*
> *Order that the orders of the New South Wales Court of Appeal dated* 21 *December* 1984 *be set aside and in lieu thereof order that the appeals be dismissed with costs.*
> *Further order that the declarations of Clarke J. dated* 26 *September* 1983 *and the order of Clarke J. dated* 6 *December* 1983 *be restored.*

Solicitors for the appellants, *Shaw McDonald.*
Solicitors for the respondent, *McDonell Moffitt Dowling Tayler.*

R.A.S.

H. C. of A.
1986-1987.
⌐‿⌐
ANKAR
PTY. LTD.
*v.*
NATIONAL
WESTMINSTER
FINANCE
(AUSTRALIA)
LTD.

Deane J.

(84) [1951] 1 K.B. 346, at p. 352.



Neutral Citation Number: [2009] EWCA Civ 189

Case No: A3/2008/1700

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE QUEEN'S BENCH DIVISION (COMMERCIAL)**
**Mr Justice Field**
**2006Folio1049**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 18/03/2009

Before :

### THE MASTER OF THE ROLLS
### LORD JUSTICE JACOB
and
### LORD JUSTICE MAURICE KAY

- - - - - - - - - - - - - - - - - - - - -

Between :

**ASSOCIATED BRITISH PORTS (A company created**
**under statute)**

**Appellant**

**- and -**

**(1)  FERRYWAYS NV**

**Respondents**

**(2)  MSC BELGIUM NV**

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
190 Fleet Street, London EC4A 2AG
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

**Mr Richard Millett QC** (instructed by **Messrs Asb Law**) for the **Appellant**
**Mr Peter Irvin and Miss Victoria Wakefield** (instructed by **Messrs Constant & Constant**)
for the **Respondent (2)**

Hearing date : 16 February 2009

- - - - - - - - - - - - - - - - - - - - -

Judgment
As Approved by the Court

Crown copyright©

**Lord Justice Maurice Kay :**

1.      Guarantee or indemnity?  That old chestnut was one of the issues that fell to be considered by Field J in this case and it is the only part of his decision which is challenged on appeal.  The issue arises most often because the law treats the two concepts differentially when it comes to formality.  A guarantee is subject to the formal requirement of section 4 of the Statute of Frauds 1677 but an indemnity is not.  A guarantee is, in the words of the Statute, a promise "to answer for the debt default or miscarriage of <u>another person</u>".  There must be another person who is primarily liable.  The liability of the guarantor is secondary.  By an indemnity, on the other hand, the surety assumes a primary liability.  The obligation in issue in this appeal raises no question as to form.  It was in writing.  However, it illustrates another difference between a guarantee and an indemnity.  Because the liability of a guarantor is secondary, it is usually discharged by a bilateral variation of the contract between the creditor and the debtor.  In the absence of an express provision to the contrary in the contract of guarantee, the giving of time by the creditor to the debtor will generally discharge the guarantor.  However, it will not have that effect if the suretyship is one of indemnity: the liability of the surety, being a primary liability, survives.  The basic legal principles in this area were developed in the nineteenth century.  With justification, they are described in *Chitty on Contracts*, 30th edition, Vol II, paragraph 44-099, as "technical and inconvenient".

**The factual background**

2.      There is an ample account of the factual background to this case in the judgment of Field J [2008] EWHC 1265 (Comm).  For the purpose of the single issue remaining on this appeal, the facts can be stated more briefly.  Ferryways is a Belgian company which was formed in order to operate a roll-on, roll-off ferry service between Ostend and Ipswich.  Its share capital was owned as to 40% by the state-owned Belgian investment company Gimvindus (acting through another company); as to 40% by an associated company of MSC Belgium (MSCB), which is in turn indirectly controlled by Mediterranean Shipping Company (SA) Geneva Group, the second largest liner container shipping company in the world; and as to 20% by Mast(GB) Limited, a company owned by the businessmen whose idea had given rise to the project.  In furtherance of the project, Ferryways entered into a series of agreements with Associated British Ports (ABP).

3.      By an agreement dated 5 January 2000 (the First Agreement) between ABP and Ferryways, ABP guaranteed a five-hour turnaround of 160 units at its port at Ipswich at designated slot times and at specified rates.  The agreement was stated to run for five years.  From time to time variations in relation to charging rates were agreed by letter and by an addendum dated 16 June 2001 Ferryways guaranteed an annual throughput of 25,000 units through Ipswich from 7 February 2001 to 6 February 2005.  Initially, the business expanded rapidly.  However, there were problems with the linkspan across which the trailers traversed at Ipswich.  Ferryways wanted ABP to improve it but this required an estimated investment of £6.1 million by ABP, which naturally wanted to secure a long-term commitment from Ferryways.  Negotiations led to a new agreement between Ferryways and ABP dated 1 September 2003 (the Second Agreement) which replaced the First Agreement.  The Second Agreement was expressed to run from 1 September 2003 until 31 December 2024.  It made provision for priority use of appropriate berths by Ferryways, for turnaround time and for the

construction of a new linkspan.  There was further provision for index-linked charges.  Volume was dealt with by way of an annual minimum throughput obligation which also required Ferryways to compensate ABP in the event of a shortfall.

4.      On the same day, 1 September 2003, a written agreement (the Letter Agreement) was concluded between ABP and MSCB.  It is enshrined in a letter of that date.  Its purpose was to secure the position of ABP by way of recourse against MSCB.  It is this agreement that gives rise to the issue on this appeal.  It is in the following terms:

> "Dear Sirs
>
> We confirm that Ferryways is a member of the same group of companies as [MSCB].
>
> In consideration of … ABP entering into an agreement relating to the Port of Ipswich of even date with this letter (the Agreement), we assume full responsibility for ensuring (and shall so ensure) that, for seven years from the date of this letter, [Ferryways] (i) has and will at all time have sufficient funds and other resources to fulfil and meet all duties, commitments and liabilities entered into and/or incurred by reason of the Agreement as and when they fall due and (ii) promptly fulfils and meets all such duties, commitments and liabilities.
>
> We are aware that ABP will rely on this letter in deciding whether to enter into the Agreement with [Ferryways].
>
> The construction, validity and performance of this letter shall be governed by English law and we submit to the exclusive jurisdiction of the High Court in London in connection with any disputes arising out of this letter."

5.      The letter concluded with terms as to service of process.  It was signed by the Managing Director of MSCB.  It had been drafted by ABP's General Counsel, a solicitor.

6.      From about August 2004, disputes arose between ABP and Ferryways about the construction of the Second Agreement.  To some extent the position was resolved by an oral agreement at a meeting between representatives of ABP and Ferryways on 23 August 2004.  Field J referred to this as the Concession Agreement.  However, he concluded that it did not discharge MSCB under the Letter Agreement and there is no issue as to that on this appeal.  More importantly, on 17 February 2006, ABP and Ferryways concluded an agreement – the Time to Pay Agreement – which took the form of a supplementary memorandum to the Second Agreement.  Field J held that this did discharge the liability of MSCB under the Letter Agreement, which he construed as a guarantee or guarantees and not an indemnity.  On behalf of ABP, Mr Richard Millett QC (who did not appear below) now takes issue with that construction, but not with the consequence if the judge's construction was correct.

7.      To complete the narrative, further disputes between ABP and Ferryways arose between March and June 2006.  However, negotiations over a possible new agreement

to replace the Second Agreement broke down irretrievably.  The parties continued to operate under the Second Agreement until 13 June 2007 when Ferryways ceased trading, its share capital having been acquired by a competitor, the Cobelfret Group, on 1 June 2007.  Ferryways was put into liquidation on 27 June 2007 and was declared insolvent by the Belgian court on 7 February 2008.  In the present proceedings, ABP sought to recover sums due from Ferryways under the Second Agreement and from MSCB under the Letter Agreement.  Field J gave judgment for ABP against Ferryways for damages to be assessed but dismissed the claim against MSCB.

**The judgment of Field J**

8.      The judgment of Field J on the guarantee/indemnity issue is contained mainly in paragraph 60, which reads:

> "… the obligations provided for in both limbs [ie (i) and (ii) in the Letter Agreement] are defined by reference to the duties, commitments and liabilities of Ferryways under the [Second Agreement] and will only become concrete and of practical significance on such duties, commitments and liabilities accruing and if Ferryways is in default thereof.  The substance of both limbs is therefore an obligation to see to it that Ferryways performs its obligations under the [Second Agreement] and accordingly both are properly to be characterised in my judgment as giving rise to a secondary liability, rather than a primary liability.  This conclusion is more readily reached in respect of limb (ii).  My view that limb (i) is a guarantee is reinforced by the holding  of the majority in *Motemtronic v Autocar* that an undertaking to make sure that a company would have the money to meet a contractual obligation was a promise to answer for the debt of another within s.4 of the Statute of Frauds, assuming that the undertaking was an enforceable contractual warranty."

**Construction**

9.      Whether a document is a guarantee or an indemnity, or whether it imposes a secondary or a primary liability, will always depend upon "the true construction of the actual words in which the promise is expressed" (*Moschi v Lep Air Services Ltd* [1973] AC 331, at page 349C, per Lord Diplock).  It is abundantly clear in the present case, not least from the terms as to choice of law, exclusive jurisdiction and the service of process, that the Letter Agreement created and was intended to create legal rights and obligations.  It was not merely a letter of comfort giving rise simply to moral obligations (as to which, see paragraphs 16 et seq, below).  Mr Millett submits that the words used in the Letter Agreement, or at least those comprising limb (i), imposed a primary liability on MSCB.  He says that Field J fell into error in reaching the contrary conclusion for a number of reasons including: (1) he failed to give any material effect to the words of limb (i); (2) he ignored the true meaning of limb (i) and wrongly treated it as subsumed by limb (ii), thus treating limb (i) as mere surplusage; (3) he wrongly relied on *Motemtronic*; and (4) he failed to construe the document as a whole, in particular by according no weight to the representation that Ferryways was

part of the same corporate group as MSCB, by taking no account of the acknowledgement of reliance in the third paragraph and by failing to attach significance to the fact that the parties chose to refer to the document as a "letter" rather than a "guarantee".

10.    I am not persuaded by these submissions, whether they are viewed separately or cumulatively.  The first and second submissions are interconnected.  They seem to me to rest on a misunderstanding of the judgment.  It is apparent from paragraph 60 (which is set out at paragraph 8, above) and from a later passage in the judgment (paragraph 87: "… the guarantees in limbs (i) and (ii) … were discharged by … the Time to Pay Agreement") that the judge considered that limbs (i) and (ii) contained separate, albeit overlapping guarantees.  He found the classification of limb (i) more difficult than limb (ii), but that is not significant in itself.  The point about surplusage or otiosity cuts both ways.  In given circumstances, limb (i) may render limb (ii) otiose and *vice versa*.

11.    The real issue relates to limb (i).  Mr Millett stops short of submitting that the language of limb (ii) imposes a primary rather than a secondary liability.  However, he says that the crucial words in limb (i) are "at all times" and that they point to a primary liability to ensure that, from the execution of the Letter Agreement and throughout its duration, Ferryways would have sufficient funds to meet its liabilities under the Second Agreement, whether or not they had yet fallen due.  It was an immediate and continuing obligation that was not contingent upon or secondary to any default by Ferryways.  In my judgment, it is simply not possible to reach Mr Millett's destination by focusing on the words "at all times".  Far more significant is the way in which limb (i) defines the obligation of MSCB by reference to Ferryways meeting all *its* "duties, commitments and liabilities entered into and/or incurred by reason of the Agreement as and when they fall due".  It is, in the hallowed words used by the judge, a "see to it" obligation: MSCB would see to it that Ferryways performed its obligations under the Second Agreement.  If Ferryways could not meet its liabilities to ABP "as and when they fall due" (the primary liability), then the secondary liability of MSCB would accrue by way of guarantee.  That would have been sufficient to protect ABP but for the legal significance of the subsequent Time to Pay Agreement and would still have protected it if the Letter Agreement had included the common provision found in guarantees whereby a subsequent variation or time to pay agreement between the creditor and the debtor is expressed <u>not</u> to discharge the surety.  However, such a provision was absent from the Letter Agreement.  It is stated in *Chitty on Contracts* (at paragraph 44-099):

> "… in practice any well-drawn contract of suretyship will nowadays expressly permit variation of the obligations or the giving of time, without discharging the surety."

12.    Mr Millett suggests that the absence of such a provision is itself a reason for not construing the Letter Agreement as a guarantee but I agree with the judge that "the absence of the usual protective term is at best neutral" (paragraph 61).

13.    Mr Millett's third submission - wrongful reliance on *Motemtronic* – overstates the judge's reference to that case.  I accept that the case involved very different facts.  All these cases turn on the construction of the language used.  The judge merely referred to it as "reinforcement".  In *Motemtronic*, the context was not documentary but oral.

When the promisee asked: "Where would the money come from if M had to repay £1M?", the promisor replied: "From wherever in the group the money was at the relevant time.  I'll make sure it is there.  I'm good for £1M."  The ratio of the case is that that exchange did not give rise to a legal obligation at all (Aldous and Henry LJJ, Staughton LJ dissenting).  However, the majority went on to say, *obiter*, (Staughton LJ again dissenting), that if there was a contractual obligation it was one of guarantee but was unenforceable by reason of section 4 of the Statute of Frauds.  I do not consider that the majority were identifying a principle of general application or that Field J thought that they were.  It was merely a case-specific issue of construction which, at one level of abstraction, lent some but not decisive support to the judge's construction  of the Letter Agreement.

14.    The remaining construction points advanced by Mr Millett seem to me to be of little or no weight.  The fact that Ferryways was part of the same corporate group as MSCB is entirely neutral.  It does not make it any more likely that MSCB was undertaking one type of liability (primary) rather than another (secondary).  Likewise, ABP would have been as reliant on one form of protection as the other.  Moreover, it is apparent from several of the authorities referred to in this judgment that, in factual situations of some similarity but in which the eventual document is a letter of comfort, the protection previously sought and refused was one of guarantee rather than indemnity or other primary obligation.  The *ex post facto* description of the crucial document as the "Letter Agreement" did no more than attach a neutral appellation.  It is not instructive as to the type of obligation created by the document.

15.    For all these reasons, I have come to the conclusion that Field J was correct to construe the Letter Agreement as a contract of guarantee, the enforceability of which foundered on the subsequent Time to Pay Agreement.

**Letter of comfort**

16.    Mr Millett's alternative submission is that the Letter Agreement was a letter of comfort.  In one sense it is surprising, verging on surreal, for a promisee in the position of ABP – the would-be comfortee – to assert that a document is a letter of comfort.  More usually, such a contention would be expected to come from a promissor – or would-be comforter.  However, surprise recedes a little when it is submitted that the document is not just a letter of comfort but a legally binding letter of comfort.  If that is what it is, then as with an indemnity, any liability would not be discharged by the Time to Pay Agreement.

17.    The archaeology of this submission is interesting.  From the Claim Form down to the Re-amended Particulars of Claim, ABP's pleaded case was that the Letter Agreement was a guarantee.  It was only after MSCB, in its Amended Defence, pleaded amongst other alternatives, that the Letter Agreement was a non-binding letter of comfort, that ABP, by its Amended Reply, pleaded that it was not "a mere comfort letter" but was legally binding.  In his written final submissions at trial, Mr Millett's predecessor put it thus:

"ABP contend that the first limb … is to be construed as a contractual undertaking, alternatively an indemnity …

it is the kind of wording found in letters of comfort – not
guarantees … in essence the Letter is a binding letter of
comfort of the sort considered by the Supreme Court of New
South Wales in *Banque Brussels Lambert SA v ANJ* [1989] 21
NSWLR 502 and found to be binding."

18.   This submission, at least in the form of a "binding letter of comfort", does not seem to
have made a great impression on Field J.   His judgment does not address the
possibility of a binding letter of comfort.   When Mr Millett came on the scene, his
grounds of appeal contended for "an indemnity or other contract imposing primary
liability".   A little later the grounds observe that the document is on its face a letter,
other than a guarantee, and that the parties intended it to be "in the nature of a binding
and enforceable comfort letter, imposing primary liability on MSCB (at least by the
words following (i) in the second paragraph) and not in the nature of a guarantee".
The supporting skeleton argument is to like effect.   It makes no reference to *Banque
Brussels Lambert*, but Mr Millett produced that authority in the course of the hearing
before us.

19.   I can dispose of this submission briefly.   It turns on establishing the taxonomy of the
Letter Agreement as imposing a primary liability, whether it is a "binding letter of
comfort" or "other contract" (not being a guarantee).   Having come to the same
conclusion as Field J, namely that the Letter Agreement did not give rise to a primary
liability, the same result must follow and for the same reasons when one considers
this alternative submission.

20.   However, it is appropriate to add a little on the notion of a binding letter of comfort.
*Banque Brussels Lambert*, too, was a case in which a creditor had sought reassurance
from an associated company – in fact, the parent company – of the debtor.   The parent
company would not provide a guarantee but it did provide a "letter of comfort" (as the
Court was content to describe it) in which it stated that

"it would not be our intention to reduce our shareholding in
[the subsidiary] from the current level of 45%."

21.   It undertook to give notice of any subsequent decision to dispose of the shareholding
and confirmed that

"it is our practice to ensure that our affiliate … will at all times
be in a position to meet its obligations as they fall due."

22.   The Court held that the letter gave rise to legal obligations enforceable by an action
for damages for breach of contract after the shares had been sold without notice.
After some discussion of the international development of letters of comfort and
reference to some periodical literature concerning their equivalents in French and
German law, Rogers CJ said (at page 522E-G):

"First, there are … considerations … in relation to letters of
comfort generally, which explain why, consistently with
intending to make a legally binding commitment, a company
may wish it not to have the character of a guarantee.  Secondly,
the letter makes clear that the defendant is not assuming

> secondary liability for the debts of the principal debtor … The statements made in the letter are more remote from the liability of [the associated company] to repay the facility … Nonetheless, the promises, had they been fulfilled, were calculated to put the plaintiff in a position to receive payment from [the associated company]. It is these features which both distinguish the letter from a guarantee but make the defendant's argument based on that undoubted fact an irrelevance."

23.    Thus, the letter of comfort gave rise to a valid claim that the parent company was in breach of two enforceable promises.

24.    To the extent that this reasoning accepts the possibility of a primary contractual liability to the creditor of another, arising from the insistence of the creditor on such a contract, it is uncontroversial. It seems to me that the confusion arises when such a contractual liability is contained within a document described as a "letter of comfort". I regard a letter of comfort, properly so called, as one that does not give rise to contractual liability. The label used by the parties is not necessarily determinative. It is a matter of construction of the document as a whole. Thus, in *Kleinwort Benson Ltd v Malaysia Mining Corp* at first instance, [1988] 1 All ER 714, Hirst J found in favour of a bank which sought to enforce "letters of comfort" provided by the parent company of the bank's debtor. However, his decision was reversed by the Court of Appeal [1989] 1 All ER 785. Ralph Gibson LJ said (at p.795c-d):

> "The court would not, merely because the parties had referred to the document as a comfort letter, refuse to give effect to the meaning of the words used. But in this case it is clear, in my judgment, that the concept of a comfort letter, to which the parties had resort when the defendants refused to assume joint and several liability or to give a guarantee, was known by both sides at least to extend to or to include a document under which the defendants would give comfort to the plaintiffs by assuming, not a legal liability to ensure repayment of the liabilities of its subsidiary, but a moral responsibility only."

25.    Nicholls and Fox LJJ agreed. In other words, the letter was what I have called "a letter of comfort, properly so-called".

26.    *Kleinwort Benson* was considered in *Banque Brussels Lambert* and was partially relied upon but it does not seem to me to encourage the notion of a "binding letter of comfort". It is more a case of acknowledging that contractual obligations may arise from a document when properly construed, even though, misleadingly, the label "letter of comfort" has been applied to it.

27.    At one stage of his judgment in *Banque Brussels Lambert* (p.523F-G), Rogers CJ was critical of the approval of the Court of Appeal in *Kleinwort Benson*. That criticism does not resonate in this Court, any more than it did at first instance in *Re Atlantic Computers plc (in administration)* [1995] BCC 696, 699 (per Chadwick J). Here the position remains that a document expressed to be a letter of comfort will usually not give rise to legal obligations (except, perhaps, as a warranty of present intention) but sometimes a primary continuing legal obligation may arise as a matter of

construction, notwithstanding the rubric of a letter of comfort.  As always, "the court's task is to ascertain what common intentions should be ascribed to the parties from the terms of the documents and the surrounding circumstances" (*Kleinwort Benson*, per Ralph Gibson LJ, at p.789B).

**Conclusion**

28.    As I have come to the same conclusion as Field J on the central issue of construction, I would dismiss this appeal.

**Lord Justice Jacob:**

29.    I agree.

**The Master of the Rolls:**

30.    I also agree.

[1996] Vol. 1          LLOYD'S LAW REPORTS                    391

Q.B.]                         **Bank of Baroda v. Patel**                         PART 4

## QUEEN'S BENCH DIVISION

Oct. 4, 5 and 6, 1995

BANK OF BARODA
v.
PATEL

Before Mr. Justice POTTER

**Banking — Guarantee — Limitation of time — Allegation that bank waived requirement of ECGD cover — Bank claimed under guarantee — Whether claim time barred — Whether guarantee void or unenforceable by reason of uncertainty — Whether defendant discharged from liability.**

ANY Enterprises Ltd. was involved in the business of importing electrical components into the United Kingdom and acting as confirmer in connection with the importation of goods principally rice and sugar, by third parties into Dubai and other Gulf States mainly from the United States of America. In connection with the latter it was ANY's practice to obtain, and it was required by the plaintiff bank to obtain, ECGD cover.

The plaintiff bank provided banking facilities to ANY, and was given a guarantee by the defendant. Under cl. 1 the guarantor was to pay on demand all moneys due or owing. There was a proviso to cl. 1 which was left blank so far as any limitation of amount was concerned. Alongside the proviso, within the margin there appeared the note "Delete if guarantee to be unlimited". No deletion had taken place. However there appeared in the margin opposite the passage left blank the initials of inter alia the defendant.

Pursuant to the facility the bank from time to time advanced money, gave credit and afforded banking facilities to ANY in accordance with the facility letter.

It was common ground that in relation to a number of foreign bill transactions ANY did not obtain ECGD cover; nor with the knowledge of that failure did the bank require them to do so but rather operated the facility despite the absence of such cover so that as the result of several outstanding transactions ANY's liabilities to the bank very substantially increased.

As at Aug. 30, 1985 ANY were indebted to the bank for sums which totalled £201,862.12.

By letter dated Aug. 30, 1985 addressed to ANY and the defendant the bank formally demanded repayment of these sums by sending the letter to the defendant's last known address in accordance with cl. 16 of the guarantee. Soon thereafter the bank obtained judgment in default against the defendant.

The judgment was set aside on the application of the defendant on the grounds that he had moved from the address stated on the writ so that he had not received it and he had never received the demand of Aug. 30, 1985.

On Mar. 12, 1992 the bank converted all the outstanding balances of ANY into sterling. As at Mar. 20, 1992 the total debt was £2,579,822.94 and by letter of

Apr. 16, 1992 the bank demanded repayment of the sum from the defendant.

The defendant contended that (save in respect of interest and charges which had accrued within six years before the issue of the writ) the bank's claim was time barred in that the relevant limitation period expired some 14 months before the issue of the writ on Oct. 6, 1992. The bank submitted that as the defendant had never received the original demand, that demand was not validly made and the bank was entitled to rely on the second letter of demand dated Apr. 16, 1992 in which case their claim was not time barred.

The defendant further argued that the guarantee was void, alternatively unenforceable by reason of uncertainty on the basis that while it was plainly intended to be limited no limitation of liability was inserted. The defendant also submitted that he was discharged from liability under the guarantee by reason of the bank having waived its requirement that ECGD cover was required to be provided by ANY in respect of transactions involving the purchase of foreign bills and/or by the bank's failure to disclose to the defendant and/or to obtain his consent to the fact that it had waived such requirement.

————*Held*, by Q.B. (POTTER, J.), that (1) the defendant's plea of limitation must succeed; cl. 1 of the guarantee made clear that the sums payable under the guarantee were payable on demand; the guarantee was an agreement under hand for which the prescribed limitation period was six years from the date on which the cause of action accrued; and the cause of action accrued when the first valid demand was made; that letter of demand dated Aug. 30, 1985 properly identified the guarantee, the sums outstanding and made a formal demand (see p. 394, col. 2);

(2) although the defendant had asserted that he had never received the notice, he did so as a statement of fact rather than as any part of a positive case on his part that the notice was not validly given; it had always been the bank's case until recently, that the notice was valid and the parties had shaped their conduct accordingly; the bank had for years treated its cause of action as having accrued on Aug. 30, 1985 and had pursued its remedies on that basis; it was too late for the bank to argue that the notice was invalid; the cause of action for the sums claimed under the original notice and any interests accruing or charges accruing in respect thereof prior to a date six years before the issue of the writ were time barred (see p. 395, cols. 1 and 2);

(3) the guarantee was when granted valid in form and substance as an unlimited guarantee; there was no suggestion by the defendant that there had been any agreement with the bank that the guarantee would be limited nor had any claim for rectification been raised (see p. 396, col. 1);

(4) whether or not, in other contexts it might properly be dubbed as a waiver rather than a variation, the operation of the facility by the bank at the request of ANY without ECGD cover in respect of particular transactions when both parties were well aware of the terms of the facility amounted in broad terms to an agreement so to operate it and in effect as a variation of the terms of the facility; even if that were not so, the operation of the facility in that manner should be

# LLOYD'S LAW REPORTS

POTTER, J.]                              **Bank of Baroda v. Patel**                              [Q.B.

regarded as conduct by the bank as creditor to the prejudice of its surety sufficient to discharge the defendant from liability; the claim of the bank failed in toto and the defendant was entitled to judgment (*see* p. 396, col. 2; p. 397, col. 2);

————*Croydon Commercial Gas Co. v. Dickenson*, (1876) 2 C.P.D. 46, considered.

———

The following cases were referred to in the judgment:

Bank of Baroda v. ANY Enterprises Ltd. & Others, (C.A.) Dec. 4, 1986 unreported;

Batcheller (Robert) & Sons Ltd. v. Batcheller, [1945] 1 Ch. 169;

Croydon Commercial Gas Co. v. Dickenson, (1876) 2 C.P.D. 46;

Harrison v. Seymour, (1866) L.R. 1 C.P. 518;

Holme v. Brunskill, (1878) 3 Q.B.D. 495;

Lex Servicè Plc. v. Johns, [1990] 10 E.G. 67;

Midland Motor Showrooms Ltd. v. Newman, [1929] 2 K.B. 256;

Simmonds (W.R.) Ltd. v. Meek, [1939] 2 All E.R. 645.

———

In this case the plaintiffs Bank of Baroda sued the defendant Mr. N. C. Patel under a guarantee dated May 13, 1981 given in respect of the banking facilities afforded to ANY Enterprises Ltd.

Mr. C. Stoner (instructed by Messrs. Balsara & Co.) for the plaintiff; Mr. D. Parry (instructed by Messrs. Singh & Ruparell) for the defendant.

The further facts are stated in the judgment of Mr. Justice Potter.

## JUDGMENT

**Mr. Justice POTTER**:

*Introduction*

In this case the plaintiff bank ("the bank") sues the defendant under a guarantee dated May 13, 1981 given in respect of the banking facilities afforded to ANY Enterprises Ltd., a company of which Mr. Y. M. Patel, son-in-law of the defendant, was a director and one of three co-signatories of a guarantee. The credit facility connected with which the guarantee was signed was an upward variation of a previous facility, ANY having been customers of the bank for some time.

The business of ANY fell under two broad heads: that of importing electrical components into the United Kingdom and that of acting as confirmer in connection with the importation of goods, princi-

pally rice and sugar, by third parties into Dubai and other Gulf States, mainly from the United States of America. In connection with the latter aspect of the business, it was ANY's practice to obtain, and it was required by the bank to obtain, ECGD cover.

The relevant credit facility was dated Apr. 16, 1981 and provided as follows:

Credit facilities . . . for a further period of 12 months with effect from 12.3.81. subject to review from time to time at Bank's pleasure:

Letters of Credit — cum — Local Bills discounting — cum — Trust Receipt — cum — overdraft: £180,000 for opening documentary sight L/Cs for import of electronic components from various countries to the UK [followed by sub-limits set out]

*For confirming business:*

a. Letters of Credit: £400,000 (including from £250,000). For opening documentary sight L/Cs covering shipment of rice, sugar and other commodities to various countries.

b. Foreign Bills Purchase — cum — Currency Loan: £500,000 (inc. from £250,000) for negotiating of your documentary bills up to a 120 day usance, with ECGD Cover (Comprehensive policy).

Rates of interest: 4% OBR for Sterling advances. 2.1/2% over LIBOR for Currency Loans. Usual Commission for L/Cs . . .

Above facilities are repayable on demand and are to be secured by the following:

1. General undertaking in relation to Documentary Credit (form enclosed).

2. General letter of Hypothecation (form enclosed).

3. Personal guarantee of both the Directors and of Mr. N. C. Patel (form enclosed).

4. Negative lien undertaking (form enclosed).

5. ECGD Cover (Comprehensive). At the time of sending shipping documents to us for advance, you should confirm that you have complied with basic conditions of your ECGD Cover. Further, you should confirm to us, every quarter, that ECGD premium has been paid by you up to date . . .

Contrary to his witness statement, the defendant stated in evidence that the guarantee was signed by him at the offices of ANY at the request of his co-signatories, Mr. Y. M. Patel and Mr. J. A. Patel. It was the bank's standard form of guarantee which contained certain blanks for the identity of the guarantors, the identity of the principal debtor and

[1996] Vol. 1              LLOYD'S LAW REPORTS                          393

Q.B.]                          **Bank of Baroda v. Patel**                        [POTTER, J.

the date. These were completed in manuscript, the identity of the principal debtor (ANY) being specifically initialled by each guarantor. The clauses of the guarantee relevant to these proceedings provided as follows:

1. The guarantor will pay . . . on demand all monies which now are or shall at any time or times hereafter be due or owing or payable to you [the Bank] on any account whatsoever by the Principal [ANY] either solely or jointly with any other person firm or company together with all interest, costs, commission and other banking charges and expenses which you may in the course of your business as bankers charge against the Principal and all costs, charges and expenses which you may incur in enforcing or obtaining payment of the sums of money due to you from the principal . . .

  \* PROVIDED nevertheless the total amount recoverable from the Guarantor hereunder shall not exceed £          (say                  ) together with a further sum for such interest and other charges, costs and expenses as aforesaid shall accrue due to you at any time before or at any time after the date of such demand as aforesaid.

2. The Guarantee shall be a continuing security notwithstanding any settlement of account or other matter or thing whatsoever and shall not prejudice or affect or be prejudiced or affected by any other securities or guarantees which you may now or hereafter hold from or on account of the Principal . . .

6. This Guarantee and your rights under it shall not be affected or prejudiced by your holding or taking any other or further securities or by your varying releasing or omitting or neglecting to enforce any such securities or by your varying or determining any credit to the Principal or by your renewing bills of exchange, promissory notes or other negotiable instruments or giving time for payment or granting any other indulgence to or making any other arrangements with or accepting any composition from the Principal or any . . . persons . . . liable on any bills of exchange, promissory notes or other negotiable instruments or securities held or to be held by you . . .

16. Any notice or demand required to be given or made under this guarantee may be given or made by leaving the same or sending it through the post in a prepaid envelope addressed to the Guarantor or person to or upon whom the notice or demand is to be given or made at their registered or principal office or last known place of abode and a notice of demand so given or made shall be deemed to be given or made on the

day it was left or the day following that on which it is posted as the case may be.

It will be noted that the proviso in cl. 1 was left blank so far as any limitation of amount was concerned. Alongside the proviso, within the margin opposite the asterisk, there appeared the note: "Delete if guarantee to be unlimited". No deletion had taken place. However, there appeared in the margin opposite the passage left blank the initials of each of the guarantors, including the defendant.

When giving evidence, the defendant stated that he had seen and approved the terms of the facility letter before he signed the guarantee. He understood that the facility letter contained terms relating to a number of different facilities, as reflected by sub-headings appearing within pars. 1 and 2. He also understood that the requirement for ANY to obtain ECGD cover in respect of transactions underlying the facility for "Foreign Bill Purchase — cum — Currency Loan" related only to the facility in respect of that head of business. However, he made clear, and I accept, that so far as he was concerned that requirement was a term of the first importance ("a must", as he put it).

In the light of the defendant's oral evidence, I am not clear whether or how far the terms of the guarantee were expressly discussed by him with any representative of the bank. He certainly did not assert any express representation or assurance from any bank official in this respect. However, I am satisfied that the bank must have been well aware of the commercial importance of the term as to ECGD cover and its benefits to the bank and the defendant in terms of the risk attached to ANY's and the bank's financing of foreign transactions.

Pursuant to the facility, the bank from time to time advanced money, gave credit and afforded banking facilities to ANY in accordance with the facility letter. It is not disputed that its upper limits were not exceeded. However, it is also common ground that, in relation to a number of foreign bill transactions, ANY did not obtain ECGD cover; nor, with knowledge of that failure, did the bank require them to do so, but rather operated the facility despite the absence of such cover, so that, as the result of several uncovered transactions, ANY's liabilities to the bank very substantially increased.

I have not heard evidence as to how the bank's waiver of ECGD cover came about, but an internal memorandum of the bank indicates that it was at the request of ANY.

As at Aug. 30, 1985, ANY were indebted to the bank for sums including interest which in sterling totalled £201,862.12, and in U.S. dollars totalled $3,072,235.32.

By a letter dated Aug. 30, 1985, addressed to ANY and the defendant, the bank, by their then

POTTER, J.]    **Bank of Baroda v. Patel**    [Q.B.

solicitors, formally demanded repayment of those sums, by sending the letter to the defendant's last known residence in accordance with cl. 16 of the guarantee. Soon thereafter, the bank obtained judgment in default against the defendant in respect of the sums claimed in action number 1985 B No. 6440 ("the 1985 action"). That action was commenced by postal service to the same address.

However, the judgment was set aside on the application of the defendant on the grounds that he had moved from the address stated on the writ and to which it had been sent so that he did not receive it. In these proceedings he confirmed also that he never received the demand dated Aug. 30, 1985. That is not disputed.

On Mar. 12, 1992 the bank converted all the outstanding U.S. dollar balances of ANY into sterling at the exchange rate and consolidated the amount into one overdraft. As at Mar. 20, 1992, the total debt was £2,579,822.94, inclusive of interest.

By a letter dated Apr. 16, 1992, the bank's solicitors formally demanded from the defendant repayment of that sum with further interest to the date of payment.

*The issues*

The bank commenced these proceedings by writ dated Oct. 6, 1992. In the statement of claim, the bank initially relied upon the formal demand dated Aug. 30, 1985. Upon that basis the bank has been faced with a plea of limitation from the defendant on the grounds that the relevant limitation period of six years expired some 14 months before issue of the writ. In those circumstances, and relying on the statement of the defendant that he never received the original demand, the bank has changed its original stance to assert that the demand was not validly made because it never came to the notice of the defendant until after these proceedings had commenced, and that the bank is entitled to rely upon the second letter of demand dated Apr. 16, 1992. On that basis, it is common ground that their claim would not be statute-barred.

In addition to the limitation point, two further defences of substance are relied on. The first is a plea that the guarantee was void, alternatively unenforceable by reason of uncertainty, on the basis that, while it was plainly intended to be limited, no limitation of liability was inserted. Second, it is asserted that the defendant was discharged from liability under the guarantee by reason of the bank having waived its requirement that ECGD cover was required to be provided by ANY in respect of transactions involving the purchase of foreign bills and/or by the bank's failure to disclose to the defendant and/or to obtain his consent to the fact

that it had waived such requirement. I shall deal with the various defences raised in order.

*Limitation*

It seems to me that the defendant's plea of limitation must succeed. Shortly the position is as follows.

Clause 1 of the guarantee makes clear that the sums payable under the guarantee are payable on demand. The guarantee is an agreement under hand for which the prescribed limitation period is six years from the date on which the cause of action accrued (see s. 5 Limitation Act, 1980). The cause of action accrued when the first valid demand was made.

The letter of demand dated Aug. 30, 1985 properly identified the guarantee and the sums outstanding, made formal demand and ended:

... unless the said sums are received by the Bank or us on their behalf, together with interest accruing due ... our instructions are to proceed to action against you.

Proceedings were shortly thereafter taken.

As already indicated, the demand was sent through the post to the last known address of the defendant in accordance with cl. 16, which provided that:

... a notice or demand so given or made shall be deemed to be given or made on the day it was so left or the day following that on which it was posted ...

In reliance upon the validity of such demand, the bank have commenced proceedings, not merely once (in the first action) but a second time (by these proceedings).

Nonetheless, Mr. Stoner for the bank has maintained that despite the clear "deeming" provision in cl. 16 of the guarantee, he is entitled to argue that no valid demand was in fact made because it is clear from the evidence that no personal service was effected and it did not come to the attention of the defendant, in the sense of actual receipt or sight of the notice, prior to these proceedings.

Mr. Stoner argues that cl. 16, as a deeming provision, should be read as having a similar effect to s. 7 of the Interpretation Act, 1978, which provides that:

... where an Act authorises or requires any document to be served by post (whether the expression "serve" or the expression "give" or "send" or any other expression is used) then, unless the contrary intention appears, the service is deemed to be effective by properly addressing and pre-paying and posting a letter containing the document and, *unless the contrary is proved* [emphasis added], to have been effected at the

Q.B.]                    **Bank of Baroda v. Patel**                    [POTTER, J.

time at which the letter would be delivered in the ordinary course of post.

Such statutory provision permits, in cases where the date or time of service is in issue, contrary evidence to be admitted to displace the statutory provision that service is deemed to have been effected by complying with the relevant provision as to postal service; see *Lex Service Plc. v. Johns*, [1990] 10 E.G. 67. Mr. Stoner also relies on certain remarks of Mr. Justice Romer in *Robert Batcheller & Sons Ltd. v. Batcheller*, [1945] 1 Ch. 169 concerning the effect and interpretation of the articles of a limited company which provided for the deemed re-election of retiring directors. Mr. Justice Romer observed that:

> It is of course, quite permissible to "deem" a thing to have happened when it is not known whether it happened or not. It is an unusual but not an impossible conception to "deem" that a thing happened when it is known positively that it did not happen. To deem, however, that a thing happened when not only is it known that it did not happen, but it is positively known that precisely the opposite of it happened, is a conception which to my mind, if applied to the subject matter such as that of art. 93, amounts to a complete absurdity.

I do not consider either authority to be of any real assistance in the contractual context before me. It is of course common to encounter a term contained in a guarantee, hire-purchase agreement, or other contract between a financial institution and a borrower or customer to whom it may at any time be necessary to send notice in relation to a financial demand or any other notification of importance in a particular commercial context, to the effect that notice shall be deemed validly given or served by a particular method of communication and at a particular or last-known address.

Mr. Stoner has argued that such a provision is a provision for the benefit of the person giving the notice — in this case, the bank — and that it is open to such person to disclaim or waive a notice of demand, if it has not come to the actual notice of the person to whom it is addressed. At the very least, he argues, if receipt of the notice is denied, then it is open to the bank to adopt that denial and treat the notice as never having been given. I do not think that these are good arguments.

Not only does it seem to me that there is no absurdity inherent in a deeming provision of this kind taking effect despite the fact that actual notice was not received at the time; it also seems to me that, by its stance, the bank is seeking to approbate and reprobate in a manner which is not open to it. Although the defendant has asserted that he never received the notice, he did so as a statement of fact rather than as any part of a positive case on his part that notice was not validly given. It has always been part of the bank's case, until very recently, that the notice was valid, and the parties have shaped their conduct accordingly. The bank has for years treated its cause of action as having accrued on Aug. 30, 1985 and has pursued its remedies on that basis. Now that the point is turned against it for the purposes of a limitation plea, it seems to me too late for the bank to seek to go into reverse.

I therefore hold that the cause of action for the sums claimed under the original notice and any interest accruing thereon or charges accruing in respect thereof prior to a date six years before the issue of the writ are statute-barred.

However, that is not the end of the matter. It is common ground that the bank's remedy is not statute-barred in respect of interest on the principal debt and charges accruing *within* six years of the issue of the writ and hence it is necessary to turn to the other defences advanced.

*Uncertainty*

On the assumption that the guarantee falls to be construed on its face without regard to any collateral agreement (a fortiori any unilateral intention on the part of either party), this point has already been resolved against the bank by the Court of Appeal in the case of *Bank of Baroda v. ANY Enterprises Ltd. & Others*, (C.A. Transcript Dec. 4, 1986), in which the Court of Appeal upheld the decision of Sir Douglas Frank, Q.C. sitting as a Deputy Judge of the High Court when he gave judgment against Mr. J. A. Patel and Mr. Y. N. Patel under the terms of the same guarantee when it was the subject of the first action. In that case, in relation to an argument similar to that raised by Mr. Parry for the defendant, Lord Justice Parker observed:

> The point which is taken is that the side note which is printed on the form says "Delete if guarantee is to be unlimited", and it is submitted that the presence of that side note, coupled with the fact that there was no deletion, indicates that there was an intention that the guarantee should be limited. So far as the document is concerned, I have no doubt whatever that there is only one reasonable construction of the clause, and that is that it was intended to be an unlimited guarantee, such intention being vouched by the initials of all three defendants in the margin.

The argument that there was an ambiguity created which should be construed against the plaintiff bank was rejected in that case. Lord Justice Parker agreed with the observation of the Deputy Judge that: "If there were any doubt, extrinsic evidence could be adduced", but he saw no reason to admit any such evidence. So far as that is concerned, in

POTTER, J.]                        **Bank of Baroda v. Patel**                        [Q.B.

this case the defendant asserted in evidence (and I do not doubt) that it was his intention that the guarantee should in fact be limited to the amount of the facility being granted. He also asserted that the bank was well aware that he was worth very little money himself. However that may be, he did not suggest that there had been any agreement with the bank that the guarantee would be limited; nor has any claim for rectification been raised. In those circumstances it seems to me clear that, subject to the other defences raised, the guarantee was, when granted, valid in form and substance as an unlimited guarantee.

*Discharge*

As already indicated, the defendant relies by way of defence upon the bank's waiver of the requirements that ANY should provide ECGD cover in respect of a number of foreign documentary bills purchased, which not only exposed the defendant to liability under the terms of his guarantee but substantially increased the claim which is made against him.

Again, I consider that the defence raised is a good one.

It is not disputed by Mr. Stoner that, albeit the guarantee in this case is an apparently "free standing" agreement covering all ANY's accounts and liabilities to the bank and makes no specific reference to the facility letter, it is to be read in conjunction with the terms of that letter, that being the occasion for the granting of the guarantee.

It is a well-known principle of surety law that any variation of the terms of the agreement between the creditor and principal debtor which could prejudice the surety will, unless he consents thereto, discharge the guarantor from liability, unless the contract of suretyship provides to the contrary: see *Holme v. Brunskill*, (1878) 3 Q.B.D. 495, Chitty on Contracts vol. 2 (27th ed.) par. 42–052 and cases there cited. Thus if the action of the bank is properly to be regarded as a variation of the terms of the contract and there is no clause in the guarantee apt to cover such an eventuality, that is, at least prima facie, an end of the matter.

Mr. Stoner, however, has argued that: (a) no variation of the facility agreement took place. The bank was simply waiving a term in its favour which required the provision of a parallel security (ECGD cover) in respect of moneys advanced by the bank to ANY; and that (b) cl. 6 of the guarantee permitted the bank so to act without discharging the defendant, in that it permitted the bank to vary, release or omit or neglect to enforce any security or grant any other indulgence to the defendant. In this connection he also referred to cl. 2 which provides that the guarantee shall not prejudice or affect or be

prejudiced or affected by any other security held by the bank on account of ANY.

It seems to me that there is a short answer to those contentions. First, whether or not, in other contexts, it might properly be dubbed a waiver rather than a variation, the operation of the facility by the bank at the request of ANY without ECGD cover in respect of particular transactions, when both parties were well aware of the terms of the facility, amounts in broad terms to an agreement so to operate it and in effect as a variation of the terms of the facility. Even were that not so, I consider that operation of the facility in that manner should be regarded as conduct by the bank as creditor to the prejudice of its surety sufficient to discharge the defendant from liability.

I do not think that cl. 6 is apt to assist the bank in this respect. It is a type of clause frequently encountered in bank guarantees relating to the treatment of collateral securities *held* by the bank. The complaint of the defendant in this case is that the bank *failed to obtain* the security (if ECGD cover is appropriately so described), when the facility letter in connection with which the guarantee was given required that it should be obtained.

A final argument was raised by Mr. Stoner to the following effect. He sought to rely on the principle stated at Chitty vol. 2, par. 42–056 in broad terms as follows:

Where a surety has guaranteed several distinct obligations, whether they arise under separate contracts or one contract, a variation or a giving of time in respect of one obligation will discharge the surety as to that obligation, but not as to the others.

The cases cited in support of that proposition are *Harrison v. Seymour*, (1866) L.R. 1 C.P. 518 (in which the principle was enunciated) *Croydon Commercial Gas Co. v. Dickenson*, (1876) 2 C.P.D. 46, and *W. R. Simmonds Ltd. v. Meek*, [1939] 2 All E.R. 645. All concerned the granting of time and it is noteworthy that the second and third were cases where the surety had guaranteed payment of the price of goods supplied by the creditor to the debtor from time to time and it was argued that the mere giving of time in respect of the price of one lot of goods was sufficient to discharge the surety with respect to the price of another lot. In each case, the Court held that there was no perceptible prejudice of any kind to the surety as a result of the time afforded, the clear implication being that, had such prejudice been apparent in relation to liability in respect of the other lot, then the surety would stand discharged.

By way of contrast, in *Midland Motor Showrooms Ltd. v. Newman*, [1929] 2 K.B. 256, it was held, in the case of a hire-purchase agreement, that

Q.B.]                    **Bank of Baroda v. Patel**                    [POTTER, J.

the obligations of payment were properly to be regarded as arising in respect of one contract only between the debtor and the creditor so that the giving of time with respect to one instalment discharged the surety in respect of all.

Mr. Stoner relied strongly on the remarks of Mr. Justice Bramwell in the *Croydon Gas Company* case (p. 50) to the effect:

> I can see no reason why, there being two debts, the giving of time for the payment of one should release the surety from his liability as to the other.

Also upon a passage in the judgment of Mr. Justice Amphlett (p. 51) in which he said in relation to later instalments in respect of which no concession of time had been made:

> Here it seems to me that what was done in the way of giving time for the July payment cannot affect the position of the surety as to the subsequent payments. In fact, the only way in which it could be argued was that in July the payment was not being made at the proper time, there was a larger demand on the principal debtor when the subsequent instalment became due. The answer to that is, the position of the debtor is the same as if there had been no demand at all in July, and then in September there would be the same accumulation of payments, and yet it would be impossible to say that the surety was damaged by the indulgence being given.

I consider that the circumstances in those cases were very different from the position in this case. It is noteworthy that Mr. Justice Bramwell, (p. 49), in considering whether the surety had been discharged in respect of the later payments, began his review of the legal position by stating:

> There are three ways in which the surety might be discharged. First, by time being given to the debtor; secondly, by an alteration in the contract between the principals; and, thirdly, by the principals dealing together so as to affect the position of the surety to his prejudice.

He went on to demonstrate that none of those elements arose in the circumstances of the case.

Mr. Justice Amphlett (p. 52) also added:

> Under these circumstances, it appears to me that if anything had been done with respect to the future payments, the surety would have been damaged by time having been given, but what has been done does not affect the position of the surety as to his subsequent payments.

It seems clear to me in this case, first, that the facility, while relating to several types of business, is essentially and properly to be regarded as a single agreement relating to liabilities arising from a spectrum of trading and financing activities by ANY over a period of time which the bank was agreeing to finance, it being an integral and important part of the overall arrangement that ECGD cover should be provided in respect of foreign bill transactions. The obligation of the defendant as guarantor was a global obligation in respect of the sum of the net balance(s) arising from those activities, to be met if and when demand was made. In those circumstances, his position was the subject of prejudice or potential prejudice from the first occasion when the bank knowingly proceeded to provide the finance for transactions which had no such cover.

Accordingly, it is plain to me that the defendant stands discharged under the second and third of the general principles adverted to by Mr. Justice Bramwell (see above).

In those circumstances, the claim of the bank fails in toto and the defendant is entitled to judgment with costs.

## COURT OF APPEAL

May 23 and 24, 1983

———

BANK OF INDIA

v.

TRANS CONTINENTAL COMMODITY
MERCHANTS LTD.
AND JASHBAI NAGJIBHAI PATEL

Before Lord Justice Stephenson,
Lord Justice O'Connor and
Lord Justice Robert Goff

Banking — Foreign exchange transactions — Guarantee — Bank agreed to buy and sell foreign exchange for company — Performance of contracts guaranteed by guarantor — Company defaulted — Whether bank could claim under guarantee.

In about 1975 the plaintiff bank agreed to open an account to handle documentary credits and to handle the first defendant company's foreign exchange deals. The performance of the contracts was guaranteed by the second defendant (P.) under a guarantee which provided inter alia:

In consideration of the Bank of India (. . . "the Bank") . . . affording Banking facilities for as long as the bank may think fit to [the company] . . . I the undersigned Jashbai N. Patel hereby agree to pay and satisfy to the Bank on demand all and every the sum and sums of money which are now or shall at any time be owing to the bank anywhere on any account whatsoever . . . or for any moneys which [the company] may be liable as surety . . .

The company defaulted on payment in respect of 12 foreign exchange contracts and the bank claimed against both the company and P. under the guarantee.

By order of the Court on Apr. 10, 1981, the defence and counterclaim of the company was struck out and judgment was entered for the bank against the company for damages to be assessed.

P. however denied liability contending that (i) "banking facilities" did not include foreign exchange facilities; (ii) the bank had without the consent of P. caused or permitted the bank's foreign exchange dealing with the company to be conducted in such an irregular way to the prejudice of P. that he was discharged from his guarantee, i.e., the bank had failed to obtain prompt written confirmation of the 12 contracts, and in default of such confirmation had failed to close out the contracts and had entered into new contracts when the existing contracts had not been confirmed in writing; (iii) it was a custom of the London foreign exchange market or an implied term that in these circumstances the bank should close out the contracts and thus mitigate the sum for which the company and hence P. were liable.

———Held, by Bingham, J., that there would be judgment for the bank.

On appeal by P.

———Held, by C.A. (Stephenson, O'Connor and Robert Goff, L.JJ.), that (1) the learned Judge was right in holding that the language of the body of the guarantee was deliberately drawn in the widest possible language; there was no ambiguity in the body of the guarantee justifying recourse to the introductory words to resolve any such ambiguity and even if such recourse was justified, the words "banking facilities" in the introductory words did not exclude foreign exchange transactions of the type which were entered into in the present case (see p. 300, col. 2; p. 301, col. 1);

(2) there was no general principle that "irregular" conduct on the part of the creditor, even if prejudicial to the interests of the surety discharged the surety (see p. 302, cols. 1 and 2);

(3) the submission by P. that the transactions should properly be described as loans would be rejected; there was no way that the manner in which the bank sought to recover the sums due to them under the foreign exchange transactions could lead to such transactions themselves being categorized as loans; no facts were revealed on the evidence that the contracts in this case had an illegal object and in the circumstances the appeal would be dismissed (see p. 303, col. 1).

———

The following cases were referred to in the judgment of Lord Justice Robert Goff:

Edler v. Auerbach, [1950] 1 K.B. 359;

MacTaggart v. Watson, (1835) 3 Clark & Finelly, 525;

Mayor, Aldermen and Citizens of Durham, The v. Fowler, (1888) 22 Q.B.D. 394;

National Bank of Nigeria Ltd. v. M. S. Awolesi, (P.C.) [1964] 1 W.L.R. 1311.

———

This was an appeal by the second defendant, Mr. Jashbai Nagjibhai Patel from the decision of Mr. Justice Bingham ([1982] 1 Lloyd's Rep. 507) in which he held that the second defendants were liable under the guarantees given to the plaintiffs the Bank of India, in respect of the liabilities of the first defendants, Trans Continental Commodity Merchants Ltd.

Mr. R. Gatehouse, Q.C., Mr. Nigel Murray and Mr. Ian Kellow (instructed by Messrs. Philip Conway Thomas & Co.) for the second defendants; Mr. Richard Havery, Q.C. and Mr. Derrick Turriff (instructed by Messrs. Loxleys) for the plaintiffs.

The further facts are stated in the judgment of Lord Justice Robert Goff.

## JUDGMENT

**Lord Justice STEPHENSON:** I ask Lord Justice Robert Goff to give the first judgment.

**Lord Justice ROBERT GOFF:** There is before the Court an appeal by the second defendant, Jashbai Nagjibhai Patel, against a judgment given by Mr. Justice Bingham on Oct. 22, 1981, under which he gave judgment for the respondents, the Bank of India, the plaintiffs in the action, against the appellant in the sum of £185,875.11 together with interest and costs (*see* [1982] 1 Lloyd's Rep. 507).

The matter arose in the following way. The respondents are an Indian bank with a branch in the City of London. They carried on the ordinary business of an international bank, including the handling of documentary credits and the provision of finance for exports. They also had a foreign exchange department. One of the customers of the respondents was Trans Continental Commodity Merchants Ltd., the first defendants in the action, which I shall refer to as "the company". The company carried on business trading in edible oils and other commodities. The Judge found that the company was controlled by the appellant, about whom the Judge had this to say (I quote from p. 508 of his judgment):

> Mr. Patel himself is a somewhat shadowy figure. It seems that he was, at the material time, a man with extensive trading interests particularly in the Far East. He had been known to the bank [— that is, the respondent —] for over 20 years having, through his companies, had dealings with the bank in Singapore and Penang and he was on first name terms with the bank's manager in London. It seems safe to infer that the bank regarded him as a valuable and trustworthy connection and it seem likely that it was at his instigation and because of his long experience in dealing with the bank that the company sought banking facilities in London with the bank. This it did in about February 1975.

The facilities which were then opened included, besides of course opening an account, the handling of documentary credits and of the company's foreign exchange deals. These deals took the form of forward contracts for the sale or purchase of foreign exchange, under which the amount, the currency, the rate, and the date of delivery were agreed. It was the custom of the respondents, except in the case of the very smallest transactions, to cover all foreign exchange contracts by entering into counter-contracts corresponding with the contracts they covered, but to opposite effect. The respondents' reward for handling these foreign exchange transactions thus came not from any speculative profit on the deal, but primarily in the form of a small exchange commission which was debited to the customer's account at the time of the transaction.

When the company became the respondents' customer, a form of guarantee of the company's liabilities to the respondent was entered into by the appellant, dated Mar. 13, 1975; I shall refer to the terms of this guarantee in a moment. Thereafter the respondents handled a number of foreign exchange transactions of the kind I have described. There were about 30 of such transactions in all, some of sale, some of purchase, entered into between Mar. 11 and July 3, 1975. Of these contracts 18 were performed satisfactorily, but the remaining 12 were not. Under these contracts the company had agreed to sell certain amounts of dollars to the respondents at specified rates of exchange, for delivery on specified dates. On the due dates for delivery of the dollars to the respondents the company failed to make such delivery. Accordingly, the respondents commenced proceedings against the company, and the appellant, claiming damages from the company for breach of contract and claiming a total of over £186,000 from the appellant under his guarantee. Pleadings were exchanged. On Apr. 10, 1981, the company's defence and counterclaim were struck out and judgment was entered for the respondents against the company for damages to be assessed. In the result two matters fell to be decided by Mr. Justice Bingham at the trial: (1) the assessment of the damages payable by the company; and (2) the determination of the issue of liability between the respondents and the appellant and, if the appellant was held liable, the determination of the sum due from him. Since the company, for all practical purposes, was no longer in existence, it appears that the crucial question was the liability of the appellant.

The appellant contested liability on a number of grounds. These were as follows: (1) That some of the alleged foreign exchange contracts had never in fact been entered into by the company. In the course of the trial, however, this point was abandoned. (2) That on a true construction of the terms of the guarantee, it did not apply to any liability of the company under foreign exchange transactions of the type in question. (3) That the respondents had, without the knowledge or consent of the appellant, caused or permitted the respondents' foreign exchange dealings with the company to be conducted in

such an irregular manner, to the prejudice of the appellant, that he was discharged from his guarantee. (4) That there was a custom of the London Foreign Exchange Market, or an implied term, that if a bank failed to obtain written confirmation of the contract from its customer within two business days, the bank could, or should, close out the contract and so mitigate the sum for which its customer would be liable under the contract. This the respondents failed to do, and so increased the liability of the company, and therefore also of the appellant under his guarantee. (5) That the foreign exchange transactions between the respondent and the company were ex facie illegal, so that no liability arose in respect of them, either of the company itself or of the appellant under his guarantee.

The last four of these submissions were rejected by the learned Judge. The appellant no longer pursues the fourth submission, but appeals against the learned Judge's decision on the remaining three points relating to the construction of the guarantee, the allegation that by reason of irregularity in the foreign exchange dealings the appellant's guarantee was discharged, and illegality. I shall consider each of these topics in turn.

1. *Construction of the guarantee.* The relevant part of the guarantee was in the following terms:

In consideration of the Bank of India (hereinafter called "the Bank") making or continuing advances or otherwise giving credit or affording banking facilities for as long as the Bank may think fit to [— the company —] of [— and its address is given —] (hereinafter called "the Principal") I the undersigned Jashbhai N. Patel hereby agree to pay and satisfy to the Bank on demand all and every the sum and sums of money which are now or shall at any time be owing to the Bank anywhere on any accounts whatsoever whether from the Principal solely or from the Principal jointly with any other person or persons or from any firm in which the Principal may be a partner including the amount of notes or bills discounted or paid and other loans credits or advances made to or for the accommodation or at the request either of the Principal solely or jointly or of any such firm as aforesaid or for any moneys for which the Principal may be liable as surety or in any other way whatsoever together with in all the cases aforesaid all interest discount and other Banker's charges including legal charges occasioned by or incident to this or any other security held by or offered to the Bank for the same indebtedness or by or to the enforcement of any such security. Provided always that the

total liability ultimately enforceable against me under this guarantee shall not exceed the sum of £600,000 together with interest thereon at the rate of 2 per cent over our [— meaning the Bank's —] Base Rate per annum from the date of demand by the Bank upon me for payment.

Counsel for the appellant sought before us, as he had done before the learned Judge, to place a restricted meaning upon this document. The argument was really twofold. First, the body of the guarantee should be read in the light of the opening words, which specified the consideration for which the guarantee was furnished, viz. —

. . . In consideration of the Bank of India . . . making or continuing advances or otherwise getting credit *or affording banking facilities* for as long as the bank may think fit . . . [— to the company —].

For this proposition reliance was placed upon the advice of the Privy Council in *National Bank of Nigeria Ltd. v. M. S. Awolesi,* [1964] 1 W.L.R. 1311. If this was done, it was submitted, the opening words, controlling the body of the guarantee, showed that the liabilities of the company there referred to must be restricted to circumstances where the bank had made, or continued, advances, or otherwise given credit to the company, or had afforded banking facilities to the company, and the foreign exchange transactions fell within none of these categories. Next it was submitted that the general words in the body of the guarantee should be construed as being ejusdem generis with the liabilities specifically listed in it, which would lead to the same conclusion. The learned Judge rejected both these submissions, and I find myself in agreement both with his conclusion and with his reasoning. I put on one side for this purpose his conclusion of the facts, that the respondent controlled the company, and that the guarantee was given for the very purpose of facilitating the company's international trading in commodities, which was the very activity out of which the company's liabilities giving rise to the claim under the guarantee arose. I am however, like the Judge, of the view that the language of the body of the guarantee was, as he put it —

. . . deliberately drawn in the widest possible language so as to cover any liability of the company to the bank arising out of their mutual relations as bankers and customer, however that liability might arise and whether it arose out of what may be called a pure banking activity or no.

ROBERT GOFF, L.J.]                    Bank of India v. Patel                    [1983] VOL. 2

(I quote from p. 512 of the report of the judgment). This being so, there is no ambiguity in the body of the guarantee justifying recourse to the introductory words to resolve any such ambiguity; but even if such recourse were justified, I would not myself read the words "banking facilities" in those introductory words as excluding foreign exchange transactions of the type which were entered into in the present case. I am therefore unable to accept this argument.

2. *The effect of "irregularity" in the foreign exchange transactions.* For the purposes of this submission it is necessary first to identify the nature of the irregularity which occurred. The procedure adopted in these transactions is described in detail in the judgment at pp. 508 and 509 of the report. It involved, in the ordinary course, a deal made on the telephone, followed by a copy of the slip recording the details of the transaction being sent by the bank to its customer for written confirmation which, if all went well, would in the ordinary course be received back by the bank very shortly thereafter. In the case of the 12 contracts which are the subject of these proceedings, confirmations were in some cases received only after some considerable delay, and in other cases were never received at all. At p. 512 of the report the Judge summarized the complaint of the appellant on the facts of the case in the following terms:

The gravemen of Mr. Patel's case on the facts was that the bank acted to his prejudice in failing to obtain prompt written confirmations of the 12 contracts sued upon and failing, in default of such confirmation, to close out the contracts, and in entering into new contracts when existing contracts had not been confirmed in writing. Later in this judgment I shall have to consider whether the bank was entitled to close out a contract in default of written confirmation; for purposes of this submission it is necessary to assume that it was. This argument, if good, applies to all 12 contracts, because although some of them were confirmed or acknowledged in writing these confirmations and acknowledgements were much overdue, and the loss which was eventually suffered was greater than it would have been had they been closed out promptly.

The sting of this comment has to some extent been drawn, because it is now accepted by the appellant that the respondents were under no duty to close out the contracts. It is, however, still said that the respondents acted to the appellant's prejudice in entering into new contracts when existing contracts had not been confirmed in writing, though this criticism presupposes that, if pressed more strongly by

the respondents, the company would not have provided the necessary confirmation — a conclusion which is by no means inevitable on the material before this Court. Even so, the appellant relies strongly on the evidence of an expert witness called by the respondents, whose evidence was summarized by the learned Judge in the following words (I quote from p. 512 of the report):

. . . The bank's independent expert, when cross-examined, expressed surprise that the bank were prepared to make further foreign exchange contracts after failing to receive confirmations on the early contracts, agreed that the position of the parties was "certainly irregular" and described the situation as "extraordinary". This was the high-water mark of Mr. Patel's case on this point.

Here, no doubt, lies the origin of the use of the word "irregularity" in this context.

The respondents responded to this criticism by pointing to the fact that the directors, or officers, of the company were frequently in the respondents' bank on business, and, when asked for written confirmation, never challenged the existence of the contracts; that they repeated their promise that the requested confirmation would be forthcoming, and that, in the past, unconfirmed contracts had in practice been recognized and honoured. I consider this last point to be particularly telling; indeed, the documents before us reveal that, of the 18 transactions which were fulfilled, half were transactions in repect of which no written confirmation had been received. It is not to be overlooked that the purpose of these written confirmations was to protect the bank by providing it with the necessary written evidence of the deals struck on the telephone. In these circumstances I find myself in entire agreement with the view of the learned Judge that even if the respondents had acted in a way which could be described as "irregular", it cannot be said that they were careless of, or prejudicial towards, the interests of the appellant.

It follows that in my view the factual basis for this submission was never established. But even if it had been, it provided no good answer in law to the respondents' claim.

The learned Judge expressed his view of the law in the following passage in his judgment, at p. 515 of the report:—

. . . But as a matter of principle I cannot accept Mr. Murray's submission that a surety is discharged if a creditor acts towards the principal debtor in a manner which is irregular and prejudicial to the interests of the surety. Leaving aside what may be the special

case of fidelity guarantees, I consider the true principle to be that while a surety is discharged if the creditor acts in bad faith towards him or is guilty of concealment amounting to misrepresentation or causes or connives at the default by the principal debtor in respect of which the guarantee is given or varies the terms of the contract between him and the principal debtor in a way which could prejudice the interests of the surety, other conduct on the part of the creditor, not having these features, even if irregular, and even if prejudicial to the interests of the surety in a general sense, does not discharge the surety.

With that statement of principle I find myself in agreement, subject to the comment that I would perhaps have preferred to state it the other way round, that is to say that there is no general principle that "irregular" conduct on the part of the creditor, even if prejudicial to the interests of the surety, discharges the surety, though there are particular circumstances in which the surety may be discharged, of which the instances specified by the learned Judge provide certainly the most significant, and possibly the only, examples. I say that simply because I do not wish to be thought to be shutting the door upon any further development of the law in this field by rigidly confining the circumstances in which a surety may be discharged to the specified instances, though I freely recognize that I am unaware at present of any others. But that merely irregular conduct on the part of the creditor, even if prejudicial to the interests of the surety, does not discharge the surety, there can in my judgment be no doubt. Here indeed the word "irregular" is so unspecific as to be devoid of legal content, as is vividly illustrated by the facts of the present case, where the criticized "irregularity" consisted of a failure on the part of the creditor (perhaps irrelevant) to conform strictly to procedures devised to protect himself against possible repudiation of liability by the debtor, irrespective of the interests of any surety. But in any event the point is without substance, as is shown by the words of Lord Brougham in *MacTaggart v. Watson*, (1835) 3 Clark & Finelly, 525 at p. 540:—

...assuredly it is no argument against my being answerable for a man's not doing a certain thing that the party to whom I gave this obligation did not see that he did the thing. I had myself undertaken for his doing it, and it is no discharge of my voluntary obligation that the other party, the obligee, did not see to his proceedings.

If this proposition of law requires any further authority, it is to be found in the case of *The Mayor, Aldermen and Citizens of Durham v.*

*Fowler*, (1888) 22 Q.B.D. 394, to which Mr. Havery, on behalf of the respondents, referred us.

It was suggested to us by Mr. Gatehouse, on behalf of the appellant, that if that had been the law in the past, it had been changed by the decision of the Privy Council in *National Bank of Nigeria Ltd. v. M. S. Awolesi*, to which I have already referred. I am unable to accept this submission. Indeed, the advice of the Privy Council in that case, which was delivered by Lord Hodson, exhibits no trace of any intention to change the law. The case was concerned with a guarantee given by the defendant to the plaintiff bank in respect of his nephew's "existing account" with the bank. It was held that when subsequently the bank permitted the debtor to open and operate another, and separate, account with them, into which substantial sums were paid from time to time, but later withdrawn, leaving the indebtedness on the guarantee account unchanged, the surety was discharged from his guarantee, because the guarantee as drawn pre-supposed that the existing account alone should be maintained by the debtor at the bank, or (at the most) if any other account should be opened it should be operated as one with the existing account, which was not done in the instant case. I do not consider that the appellant derives any support from this case for the proposition of law advanced by him in the present case, a proposition of law which I reject as contrary to principle and authority.

It follows that this submission, too, must be rejected.

3. *Illegality.* This submission I feel that I can, like the Judge, deal with briefly. There are two limbs to the argument. The first was that there was ex facie illegality, in that the foreign exchange transactions were contrary to s. 30(3) of the Exchange Control Act, 1947, which provides as follows:—

Except with the permission of the Treasury, no person resident in the United Kingdom shall lend any money, treasury bills or security to any body corporate resident in the scheduled territories which is by any means controlled whether directly or indirectly by persons resident outside the scheduled territories. Provided that this subsection shall not apply where the lender after making such enquiries as are reasonable in the circumstances of the case does not know, and has no reason to suspect that the body corporate is controlled as aforesaid.

This argument prompts the obvious question, how a sale of foreign exchange can constitute a loan. To that, the answer was that following

each transaction the respondents debited the account of the company with the sum due, and that in due course those debits led to that account being overdrawn. For my part, I cannot see how the manner in which the respondents sought to recover the sums due to them under the foreign exchange transactions could lead to the foreign exchange transactions themselves being categorized as loans. Indeed, when it was pointed out that in some instances after the respondents debited the company's account for this purpose, it still remained in credit, Mr. Gatehouse still boldly persisted in his submission that the transaction should nevertheless properly be described as a loan. For my part, if I may adopt the words of Jane Austen, drawn from a very different context, I do not consider that this argument "deserves the compliment of rational opposition".

The other limb of the argument on illegality also found its origin in the Exchange Control Act, 1947. By virtue of r. 15 of regulations set out in a notice No. EC54, issued under the act, the transactions were only lawful if certain conditions were complied with, in particular the condition that the customer was due to receive foreign currency from a third party under a firm contractual commitment. Here submitted the appellant, that condition was not fulfilled. But the difficulty for th appellant on this submission was evidential. The appellant had been refused leave by the Judge to plead illegality, a decision which had been affirmed by this Court. In these circumstances he could only succeed on the point if there was ex facie illegality. In other words, as the learned Judge put it, recalling the language of Mr. Justice Devlin, as he then was, in *Edler v. Auerbach*, [1950] 1 K.B. 359 at p. 371, this must be a case—

. . . where unpleaded facts . . . have been revealed in evidence . . . which provide persuasive and comprehensive evidence that the contract in this case had an illegal object.

It is not, I think, necessary for me to go into the evidence in this case. It is enough for me to say, in agreement with the Judge, that no such facts were revealed on the evidence. It follows that in my judgment this submission must also fail.

In conclusion, I need only say that I would for my part have been content to accept the reasoning of the learned Judge in his lucid judgment in its entirety. I have only set out my conclusion in my own words in deference to the careful and economical arguments advanced by Mr. Gatehouse and Mr. Murray on behalf of the appellant.

I would dismiss the appeal.

**Lord Justice O'CONNOR:** I agree, and I have nothing to add.

**Lord Justice STEPHENSON:** I also agree.

*[Order: Appeal dismissed with costs]*

## QUEEN'S BENCH DIVISION

17 March 2006
―――――――

BARCLAYS BANK PLC
v
KINGSTON

[2006] EWHC 533 (QB)

Before Mr Justice STANLEY BURNTON

**Banking — Guarantee — Defendants guaranteeing liabilities of football club — Club going into administration—Bank selling assets of club — Guarantors arguing that sale was at undervalue — Whether bank owed duty of care to guarantors in selling assets of debtor.**

Kingstonian Football Club (KFC) borrowed £627,500 from the claimant bank, the loan being secured by a legal charge over KFC's stadium. By a guarantee dated 11 December 2000 the defendants, directors of KFC, personally guaranteed the liabilities of KFC up to £100,000 plus interest and costs. The guarantee provided as follows:

1.1 We have agreed, or may agree in the future, to provide or continue to provide banking facilities to the customer. In return, you unconditionally guarantee that all customer liabilities will be paid or satisfied. You will immediately have to pay the amount guaranteed when we demand payment. We do not need to demand payment from the customer first. We may make one or more demands for payment.

. . .

5.3 From time to time we may:

(a) provide the customer with any credit or facilities;

(b) vary, cancel or refuse any credit or facilities;

(c) give the customer time to pay any money owing to us;

(d) make another arrangement, compromise or settlement with the customer or any other person;

(e) take or deal with any security, guarantee or other legal commitment for the customer liabilities; or

(f) release, enforce or not enforce our rights under any such security, guarantee or commitment.

If we carry out any of the above acts, or do or fail to do anything else, this will not affect our rights under the guarantee, even if it would have done so if this condition did not exist.

By October 2001, KFC was in very serious financial difficulties. Administrators were appointed on 24 October 2001 and on the same day the bank served a demand under the guarantee on the defendants. On 22 April 2002, the administrators sold the stadium, along with other fixed and floating charge assets for £445,000, of which the bank received £300,000. KFC was eventually wound up on 29 July 2003. After the liquidation, KFC's unsatisfied indebtedness to the bank was £136,000.

The defendants argued that the property was sold at an undervalue and that the bank had "caused or permitted" the sale by the administrators at an undervalue so that there was a breach of the equitable duty of care. The defendants asserted that the effect was that the value of the guarantee was reduced by the same amount as the value wrongly lost from the property, and that as the value lost was greater than £100,000 the guarantee was extinguished. The bank submitted that the bank owed no duty to the guarantors, and that the terms of the guarantee made it clear that the guarantors were liable to the bank notwithstanding any careless realisation of a security given by the principal debtor.

―――――――*Held*, by QBD (STANLEY BURNTON J) that the provisions of the guarantee did not render the defendants liable if the bank had been responsible for a sale of the property at an undervalue.

(1) A creditor owed a duty to guarantors to exercise reasonable care in selling the debtor's property.

(a) Any variation of the principal contract without the consent of the guarantor discharged him, unless the variation was obviously insignificant or was clearly only capable of being beneficial to the guarantor (*see* para 15);

―――――――*Holme v Brunskill* (1878) 3 QBD 495, applied.

(b) The creditor was normally under no duty to the principal debtor or to any sureties to realise any securities, but if he did realise a security he had to do so prudently, with reasonable care, so as to seek to obtain a proper price. The duty to take reasonable care to obtain a proper price was owed to the principal debtor, since his liability to the creditor should have been reduced by the full value of the security (*see* para 16):

―――――――*Cuckmere Brick Co v Mutual Finance* [1971] Ch 949.

(c) The liability of a guarantor fell to be extinguished or reduced by the amount realised by the creditor when he realised the security, assuming it to be sufficient. For that reason the creditor owed him, as well as the principal debtor, a duty, if he realised a security for the liabilities of the principal debtor, to do so at a proper price (*see* paras 17 and 18);

―――――――*Standard Chartered Bank v Walker* [1982] 1 WLR 1410, *American Express v Hurley* [1985] 3 All ER 564, *Skipton Building Society v Stott* [2000] 1 QB 261; *Barclays Bank v Thienel* (1978) 247 EG 385, *Burgess v Auger* [1998] 2 BCLC 478, doubted and not followed; *Buckeridge v Mercantile Credits Ltd* (1981) 147 CLR 654, distinguished.

(2) The duty was not ousted by the express terms of the guarantee.

(a) The provisions of the guarantee would not be approached with the hostility traditionally shown to exemption clauses, but would be construed as a



whole as a commercial document and given a sensible meaning. However, the guarantee was to be construed against the background that it was a standard document prepared by the bank; that the fact that the bank had taken as security a charge over a valuable property was likely to encourage a person to give a guarantee; and that a guarantor was entitled to enter into a guarantee in the expectation that if the creditor chose to realise another security, he would do so properly so as to realise the market value of the property charged (*see* para 29);

——————*American Express v Hurley* [1985] 3 All ER 571, considered.

(b) The terms of the guarantee did not assist the bank. Clearer words than those used in clauses 1.1 and 5.3 of the guarantee were required to impose on a surety a liability exceeding that of the debtor (*see* paras 30 and 35);

——————*The Fedora* [1986] 2 Lloyd's Rep 441, *Silven Properties Ltd v Royal Bank of Scotland plc* [2004] 1 WLR 997, referred to.

————————

The following cases were referred to in the judgment:

*American Express v Hurley* [1985] 3 All ER 564;

*Barclays Bank v Thienel* (1978) 247 EG 385;

*Buckeridge v Mercantile Credits Ltd* (1981) 147 CLR 654;

*Burgess v Auger* [1998] 2 BCLC 478;

*Cuckmere Brick Co v Mutual Finance* (CA) [1971] Ch 949;

*Fedora, The* (CA) [1986] 2 Lloyd's Rep 441;

*Holme v Brunskill* (CA) (1878) 3 QBD 495;

*Silven Properties Ltd v Royal Bank of Scotland plc* (CA) [2004] 1 WLR 997;

*Skipton Building Society v Stott* (CA) [2000] 1 QB 261;

*Standard Chartered Bank v Walker* (CA) [1982] 1 WLR 1410.

————————

This was a trial of the preliminary issue of whether the claimant bank could enforce the liability of the defendants under a guarantee.

Adam Zellick, instructed by Matthew Arnold & Baldwin, for the claimant; Thomas Roe, instructed by Manches LLP, for the defendants.

The further facts are stated in the judgment of Stanley Burnton J.

Friday, 17 March 2006

————————

## JUDGMENT

### Mr Justice STANLEY BURNTON:

*Introduction*

1. In these proceedings, the claimant ("the bank") seeks to enforce the alleged liability of the defendants under a guarantee ("the guarantee") dated 11 December 2000 by which the defendants each personally guaranteed the liabilities to the bank of Kingstonian Football Club Ltd ("KFC"), of which they were directors. The guarantee was limited to £100,000 plus interest and costs.

2. This is the trial of a preliminary issue agreed by the parties and ordered by Master Tennant on 6 July 2005, namely:

Whether notwithstanding the defendants' re-re-amended defence alleging sale of the Kingsmeadow Stadium at an undervalue, the express terms, in particular clauses 1, 3, 5 and 6, of the guarantee entered into by the defendants are effective to make the defendants liable under that guarantee.

*Background*

3. KFC borrowed a total of £627,500 from the bank. In addition to the guarantee, KFC's borrowings were secured by a legal charge over KFC's football ground, Kingsmeadow Stadium ("the property").

4. By October 2001, KFC was in very serious financial difficulties. The defendants, as directors, applied to the High Court for an Administration Order. By an order dated 24 October 2001, joint administrators were appointed of KFC. Thereafter KFC was in the hands of its administrators.

5. On 24 October 2001, the claimant served demand under the guarantee on all the defendants.

6. On 22 April 2002, the administrators sold the property with other fixed and floating charge assets for £445,000. Of this recovery, the claimant received £300,000. A new company called "Kingstonian FC Ltd" continued the football club.

7. KFC was eventually wound up on 29 July 2003. The distribution to creditors was 0.013 pence in the pound. After the liquidation, KFC's unsatisfied indebtedness to the claimant was £136,000 and so the claimant invoked the guarantee to its limit of £100,000.

8. The defendants' re-re-amended defence raises only one defence, which is that the property was sold at an undervalue. The defence is based on an equitable duty of care to obtain a proper price for the property. The defendants' case is that the bank

**A.6**

QBD]                            **Barclays Bank Plc v Kingston**                    [Stanley Burnton J

"caused or permitted" the sale by the administrators at an undervalue; that in consequence there was a breach of the equitable duty of care, with the effect that the value of the guarantee was reduced by the same amount as the value wrongly lost from the property. The defendants believe that the value lost in the sale of the property was greater than the £100,000 value of the guarantee such that no value remains in the guarantee at all.

9. The preliminary issue is whether, even if the defendants' above defence might otherwise succeed, the express terms of the guarantee are nevertheless effective to make the defendants liable to the bank for the entire amount outstanding.

10. As mentioned above, the property was sold by the administrators as an asset of KFC, rather than by the bank under the powers conferred by its charge. Both parties have argued their respective cases on the basis that if the bank interfered with the sale by the administrators, the respective rights and liabilities of the bank and the defendants were the same as they would have been if the property had been sold by the bank's agents under a power of sale.

11. There is a point to be made about the preliminary issue. Care is always required in deciding whether a preliminary issue will result in a saving of costs and in its drafting. In theory, there are three possible results in a case such as the present. The first is that the guarantors are liable to the creditor irrespective of any defect in the sale of a security, and the creditor has no liability to them for any undersale: ie, a sale at an undervalue does not affect their liability or rights. The second is that their liability is reduced by the amount of the undersale: ie, they are entitled to credit not merely for the sum realised by the creditor, but for the sum that the creditor should have realised by the sale of the security. The third is that the guarantors are required to pay on demand the sum demanded by the creditor (ie the liabilities of the debtor less the sum actually realised on the sale of the security), but the debtor and the guarantors may pursue their claim against the creditor for the difference between the sum actually realised and the sum that should have been realised. That was the effect of the guarantee considered by the Court of Appeal in *The Fedora* [1986] 2 Lloyd's Rep 441. In such a case, the provisions of the guarantee go to timing and cash flow rather than liability. The preliminary issue as drafted does not address this possible result. If, on its true construction the guarantee in this case has a similar effect to that in *The Fedora*, the defendants would be required to pay the bank's claim, but, provided they remain solvent, they would be free to pursue their claims against the bank to trial. In that event, the preliminary issue would not have resulted in any saving of costs.

*The contentions of the parties*

12. For the purposes of the preliminary issue, it is to be assumed that the bank was responsible for the sale of the property at an undervalue, and that if due care had been taken in its sale the liability of KFC as the principal debtor, and in consequence that of the guarantors, would have been extinguished. The administrators were not the agents of the bank, and it seems to me that it is to be assumed that the bank caused the sale at an undervalue, if such there was, rather than it merely permitted a sale at such a value.

13. For the bank, Mr Zellick's principal submission was that the express terms of the guarantee, viewed individually and in the context of the instrument as a whole, made it clear that the guarantors are liable to the bank notwithstanding any careless realisation of a security given by the principal debtor. He also suggested that the bank owed no duty to the guarantors, who had paid nothing in satisfaction of their liabilities to the bank. For that purpose, he relied on the judgment of Lightman J in *Burgess v Auger* [1998] 2 BCLC 478.

14. Mr Roe submitted that the bank owed a duty to the defendants to take reasonable steps to obtain a proper price for the property; that the terms of the guarantee relied on by the bank should be narrowly construed, as purporting to exclude its common law liabilities; and that the terms relied upon were insufficient to exclude its duty to the defendants.

*Discussion: (a) General principles*

15. The duties of mortgagees to mortgagors are largely the product of equity rather than the common law. In relation to a security such as a mortgage of a property, the duties of the creditor and the rights of the guarantor will vary with the circumstances of the case. If the taking of the security unless and until it is realised by the creditor is a term of the contract between the creditor and the principal debtor whose performance the guarantor has guaranteed, the guarantor will be wholly discharged if the creditor releases the security without the consent of the guarantor. Any variation of the principal contract without the consent of the guarantor will discharge him, unless the variation is obviously insignificant or is clearly only capable of being beneficial to the guarantor: *Holme v Brunskill* (1878) 3 QBD 495. In that famous case, Cotton LJ, with whose judgment Thesiger LJ agreed, said, at 505–506:

The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is



**A.6**

STANLEY BURNTON J]            **Barclays Bank Plc v Kingston**            [QBD

without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the court, will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he will be discharged.

16. The creditor is normally under no duty to the principal debtor or to any sureties to realise any securities. He cannot be compelled to realise a security at any particular time or at all. But if he does realise a security he must do so prudently, with reasonable care, so as to seek to obtain a proper price. The duty to take reasonable care to obtain a proper price is owed to the principal debtor (assuming it is he whose asset constitutes the security), since his liability to the creditor should have been reduced by the full value of the security: *Cuckmere Brick Co v Mutual Finance* [1971] Ch 949.

17. A guarantor of the principal debtor's liabilities is also interested in the security, in two respects. First, before realisation by the creditor, if he pays the amount owed by the principal debtor he will be entitled to the security by way of subrogation to the rights of the creditor. Secondly, his liability, like that of the principal debtor, falls to be extinguished or reduced by the amount realised by the creditor when he realises the security, assuming it to be sufficient. If the guarantee is of only part of the indebtedness of the principal debtor, whether the guarantee's liability falls to be reduced, and if so by how much, will depend on the amount realised and the amount of the total indebtedness, but that is a complication that does not affect this discussion, since in the present case it is alleged that a sale of the property at a proper price would have discharged the entirety of the indebtedness of KFC.

18. It is because of the second of these interests of the guarantor that the creditor owes him, as well as the principal debtor, a duty, if he realises a security for the liabilities of the principal debtor, to do so at a proper price. It is this duty that the defendants allege was broken by the bank in this case. Of course, the creditor is not liable to both the principal debtor and the guarantor cumulatively. The liability of the principal debtor to the creditor will be reduced by the amount of the undersale, and if the guarantor has guaranteed the entirety of that liability his liability to the creditor will be similarly reduced.

19. That the duty of the creditor is owed to a surety as well as to the principal debtor is established by a number of authorities. See *Standard Chartered Bank v Walker* [1982] 1 WLR 1410 (although this was an appeal by defendants against summary judgment against them, so that strictly the issue was whether there was an arguable defence); *American Express v Hurley* [1985] 3 All ER 564; and, more recently, by the Court of Appeal in *Skipton Building Society v Stott* [2000] 1 QB 261 at [21]. I do not think that the decision in *Skipton Building Society v Stott* in relation to the guarantor can be explained on the basis of the statutory duty of a building society under the then applicable Building Societies Act 1986, since the Court of Appeal decided it on the basis of the authorities at common law and in equity. That decision is binding on me. It follows that *Barclays Bank v Thienel* (1978) 247 EG 385, a decision of Thesiger J, must be regarded as wrongly decided.

20. In *Burgess v Auger* [1998] 2 BCLC 478 Lightman J held that a creditor and a receiver had no duty to a guarantor. The decision, which was on the pleadings, may be explained on the basis that he had paid nothing on the guarantee and his liability to the creditor was statute-barred: see at 483. It follows that the guarantor had ceased to have any interest in the security. To the extent that the judgment of Lightman J has been taken as authority for the proposition that a creditor owes no duty to a guarantor if he realises a security unless the guarantor has satisfied the creditor's claim against him, it cannot stand with *Skipton Building Society v Stott*. In my judgment, the duty to the guarantor arises not because he may in certain circumstances become interested in the equity of redemption of the mortgaged property (as suggested in *Burgess v Auger*), but because of his interests in the security to which I have referred in para 17 above.

21. Mr Zellick also referred me to the decision of the High Court of Australia in *Buckeridge v Mercantile Credits Ltd* (1981) 147 CLR 654, the headnote to which includes the statement that the appellant guarantors "were not entitled to any rights under securities held by the financier because they had not paid any amount under the guarantee". However, the principal claim of the guarantors in that case was that the creditor should have exercised a power of sale under his mortgage, instead of appointing a receiver and manager of the mortgaged property. A creditor is entitled to choose which of his powers over his securities he exercises. He cannot be compelled by a guarantor who has no subrogated rights to exercise a power of sale; it is only if he decides to exercise it negligently that he may incur liability to the creditor and guarantor.


QBD]                **Barclays Bank Plc v Kingston**                [STANLEY BURNTON J

The guarantors in that case therefore had no basis for complaining that the creditor should have exercised one power (to sell as mortgagee) rather than another (to appoint a receiver and manager under a debenture). In any event, the guarantors failed to establish that the manner of sale was to their disadvantage. The High Court did not suggest that a creditor who sells at an undervalue would not be liable to a guarantor. Brennan J said, at 675:

> In a case where the act of a creditor does not discharge a surety, but the creditor has nonetheless sacrificed or impaired a security, or by his neglect or default allowed it to be lost or diminished, the surety is entitled in equity to be credited with the deficiency in reduction of his liability.

22. I am fortified in these conclusions by the statements to similar effect in Andrews & Millett, *Law of Guarantees* (4th ed, 2005) at paras 9-043 and 11-018, and in O'Donovan & Phillips, *The Modern Contract of Guarantee* (2003), at para 8-85.

23. Normally, it is the debtor who may be expected to pursue any claim against the creditor that the latter has undersold a security. If the debtor succeeds in his claim, his indebtedness to the creditor will be reduced, as will the liability of the surety. However, the fact that the creditor owes a distinct duty to sureties may be relevant if the debtor has ceased to exist or for any other reason does not pursue his own remedies against the creditor. In the present case, I am told that KFC has been wound up. It is therefore only the sureties who may be able to pursue the claim that the creditor caused the property to be undersold.

24. However, just as the obligations and rights of a surety are, in a case such as the present, created by a contract, so may they be modified by the terms of the contract between himself and the creditor. It is to those that I now turn.

*The terms of the guarantee*

25. The guarantee was in the bank's standard printed form. It defined "customer" as KFC, and "customer Liabilities" as

> any money and liabilities which the customer now owes us or may owe us in the future in any way. This includes liabilities which:
>
> > depend upon events which may or may not happen,
> >
> > the customer incurs or has incurred with any other person or persons,
> >
> > the customer incurs or has incurred as surety for the liabilities of someone else.
>
> It also includes all interest, fees and other charges which the customer owes us now or in

the future (whether or not they are charged to the customer's account).

26. The relevant provisions of the guarantee were as follows:

> 1.1 We have agreed, or may agree in the future, to provide or continue to provide banking facilities to the customer. In return, you unconditionally guarantee that all customer liabilities will be paid or satisfied. You will immediately have to pay the amount guaranteed when we demand payment. We do not need to demand payment from the customer first. We may make one or more demands for payment.
>
> 2.1 This guarantee is a guarantee of the full amount of all customer liabilities. However, the total amount you have to pay under this guarantee will not be more than:
>
> > (a) the specified amount; plus
> >
> > (b) interest on the specified amount (or, if less, the amount of the customer liabilities) after we demand payment from you, or after the end of any notice you give under condition 4, until you have paid in full . . .
>
> 3.1 You will continue to be bound by this guarantee regardless of any changes in the amount or nature of the customer liabilities, your death or mental illness, or any other matter. However, you can stop this guarantee under condition 4.
>
> 3.2 Until the customer liabilities are paid in full, any payment you make under this guarantee will not entitle you to:
>
> > (a) share in any security we hold or any money we receive;
> >
> > (b) enforce any right or pursue any claim against the customer or any surety; or
> >
> > (c) make any claim in the insolvency of the customer or a surety which would compete with our claim.
>
> In the meantime we may hold any money we receive under this guarantee on "suspense account" to protect the full amount of our claims against the customer or under any other guarantee or security for the customer liabilities. However, when we work out the interest on the customer liabilities which you have to pay, we will treat them as reduced by the amount we hold on suspense account.
>
> 5.1 This guarantee is independent of any other security or guarantee which we hold or may hold in the future for the customer liabilities.
>
> When we hold any other security or guarantee, we may choose which security or guarantee we will enforce and, if we enforce more than one, the order in which we do so. However, we will



not have to enforce any other security or guarantee, or take any steps or proceedings against the customer, before we enforce this guarantee.

5.3 From time to time we may:

(a) provide the customer with any credit or facilities;

(b) vary, cancel or refuse any credit or facilities;

(c) give the customer time to pay any money owing to us;

(d) make another arrangement, compromise or settlement with the customer or any other person;

(e) take or deal with any security, guarantee or other legal commitment for the customer liabilities; or

(f) release, enforce or not enforce our rights under any such security, guarantee or commitment.

If we carry out any of the above acts, or do or fail to do anything else, this will not affect our rights under the guarantee, even if it would have done so if this condition did not exist.

6. You will be liable to us as a principal debtor for any customer liabilities that cannot be recovered from you as a guarantor, whatever the reason and whether or not we know the reason. This is a separate commitment, extra to the guarantee in condition 1.1. You must pay the amounts you are liable for under this separate commitment as soon as we demand payment. The total amount that you will have to pay will be no more than that mentioned in condition 2.

27. The "specified amount" was £100,000.

*Discussion: (b) The effect of the terms of the guarantee*

28. Mr Zellick submitted that the provisions of the guarantee on which the bank relies should not be construed with the hostility conventionally due to exemption clauses. In support of this proposition, he referred to the judgment of the Court of Appeal in *The Fedora*. However, in that case the Court of Appeal declined to construe the provision relied upon by the creditor as if it were an exclusion clause because it did not affect the liability of the creditor, which the guarantor was free to pursue once he had paid the sum demanded by the creditor: see the judgment of Parker LJ at [1986] 1 Lloyd's Rep 444. In *American Express v Hurley*, Mann J interpreted the provision of the guarantee relied upon by the creditor as an exemption clause: see at [1985] 3 All ER 571.

29. I do not approach the provisions of the guarantee with the hostility traditionally shown to exemption clauses. I shall seek to interpret the

guarantee as a whole as a commercial document and to give it a sensible meaning. However, I do so against the background that it is a standard document prepared by the bank; that the fact that the bank has taken as security a charge over a valuable property is likely to encourage a person to give a guarantee; and that a guarantor is entitled to enter into a guarantee in the expectation that if the creditor chooses to realise another security, he will do so properly so as to realise the market value of the property charged, which will go to reduce the liability of the guarantor, unless the terms of the guarantee clearly indicate otherwise. I do not ignore the fact that the guarantor is entitled to be indemnified by the debtor; but since the guarantee is unlikely to be called upon if the debtor is able to meet his liabilities, the right to indemnity from the debtor is likely to be of little value.

30. I do not think that clause 1.1 assists the bank. If it had claimed against the defendants without realising the property, they would clearly have been liable immediately to pay the specified amount to the bank. However, if it sold the property at an undervalue, KFC was entitled to an account of what should have been received by the bank and to have that sum applied in reduction of its liabilities: see *Silven Properties Ltd v Royal Bank of Scotland plc* [2004] 1 WLR 997 at [19]. In my judgment, on a sale of a security, the "money and liabilities which the customer now owes (the Bank)" within the meaning of the definition of customer liabilities are that money and those liabilities reduced by the sum received by the bank on that sale, or which it should have received. If the bank did cause a sale of the property at an undervalue, and a sale at a proper price would have reduced the liability of KFC to the bank to an amount less than £100,000, or extinguished it, the liability of the defendants to the bank has similarly been reduced or extinguished. I contrast the wording of clause 1 with the explicit provision "without set off-or counterclaim and without deductions or withholdings whatsoever" considered by the Court of Appeal in *The Fedora*. Clearer words than those in clause 1 are required to impose on a surety a liability exceeding that of the debtor. I add that in any event the requirement of immediate payment would not exclude the liability of the bank, but would entitle it to be paid the sum claimed, leaving the defendants to pursue their counterclaim to trial: ie, the position would be the same as in *The Fedora*.

31. For the same reason, the provision in clause 2.1 that the defendants pay all customer liabilities does not take the claim any further. Nor does clause 3.1, which permits the bank to vary the amount it lends to the customer without reference to the guarantor, but does not address the present issue. Clause 3.2 too is irrelevant. Its object is to make it



**A.6**

QBD]    **Barclays Bank Plc v Kingston**    [Stanley Burnton J

clear that the guarantor has no right of subrogation to any security until all the customer liabilities (and not merely the specified amount) have been paid to the bank.

32. The provision in clause 5.1 that the guarantee is independent of any other security again does not affect the present issue. It may enable the bank to deal separately with other securities and other guarantors. It does not affect the right of subrogation if the guarantor makes payment of the entirety of the customer liabilities (in a case in which they are less than £100,000); nor, in my judgment, does it affect the liability of the bank to take proper steps to realise a security if it chooses to do so.

33. The realisation of a security is clearly not within any of the paras (a) to (d) of clause 5.3. I do not think it is within para (e), but if it is, that paragraph does not extend to a failure to take reasonable steps to obtain a proper price. Similarly, the enforcing of rights under any security referred to in para (f) does not, in my judgment, include an improper or defective enforcement of rights giving rise to claims on the part of the debtor and the guarantor.

34. It follows that the words in the last sentence of clause 5.3 "If we carry out any of the above acts" do not assist the bank. The defendants complain not that the bank caused the property to be sold, but that it caused it to be sold at an undervalue. Their complaint is not as to the sale as such, but as to its manner and consequent result.

35. The words in clause 5.3 "or if we do or fail to do anything else" have given me more pause for thought; but in the end, I do not think they assist the bank. The defendants complain not that the bank did or failed to do anything "else", ie something other than (in the present case) enforcing its rights under its security over the property as mentioned in para (f), but that the bank defectively enforced those rights. And so I do not think that as a matter of drafting those words assist the bank. In addition, I think that clearer words would be required to exclude the liability of the bank for a defective sale at an undervalue. The meaning of the words "or if we do or fail to do anything else" is influenced by the preceding paragraphs of clause 5.3. None of those indicates that the clause is concerned with a breach of duty by the bank, ie its negligently failing to realise a proper price for a security or causing a security to be realised at an undervalue.

36. Lastly, clause 6 too does not assist the bank. Its effect is to render a guarantor liable as an indemnifier if his liability as guarantor is discharged or reduced. However, an indemnifier is in my judgment similarly entitled to have his liability reduced by the amount that a creditor should have realised on the sale of a security. I see no reason why a creditor when realising a security should not owe the same equitable duty to a party who has given an indemnity against a debtor's liabilities as he does to a guarantor.

*Conclusion*

37. For the above reasons, I do not think that the provisions of the guarantee render the defendants liable if the bank has been responsible for a sale of the property at an undervalue. The preliminary issue will be answered "No".

Neutral Citation Number: [2012] EWHC 2886 (Ch)

Case No: 9339 OF 2008

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 22/10/2012

**Before** :

**THE CHANCELLOR OF THE HIGH COURT**
- - - - - - - - - - - - - - - - - - - -
RE: TEATHERS LTD (No.03019293) (IN LIQUIDATION)
AND IN THE MATTER OF THE INSOLVENCY ACT 1986
**Between :**

| | |
|---|---|
| **BAROQUE INVESTMENTS LIMITED** | **Applicant** |
| **- and -** | |
| **(1) RICHARD HEIS** | **Respondents** |
| **(2) SAMANTHA RAE BEWICK** | |
| **(as Joint Liquidators of Teathers Limited)** | |

**Daniel Margolin** (instructed by **Eversheds LLP**) for the **Applicant**
**Mark Sefton** (instructed by **Nabarro LLP**) for the **Respondents**

Hearing date: 16 October 2012
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE CHANCELLOR OF THE HIGH COURT

**The Chancellor :**

## Introduction

1.    The applicant, Baroque Investments Ltd ("Baroque"), is the owner of the freehold property situate and known as Beaufort House, 15 St Botolph Street, London, EC3. At the material time the fifth floor was let to Landsbanki Securities UK Ltd, now Teathers Ltd ("Teathers"), on the terms of four leases dated respectively 31st July 1991, 7th May 1996, 30th July 1997 and 14th December 2005 made between them or their respective predecessors in title.   Each lease was for a term of years expiring on 30th March 2014 and each contained a covenant on the part of the tenant in the terms or to the effect of the following:

> "to keep the demised premises…in good and substantial repair
> and condition…and in such repair and condition…to yield up
> the same at the expiration or sooner determination of the term".

2.    On 14th December 2005 Baroque granted Teathers two licences to make certain alterations to the 5th floor including the infill of an atrium area on terms, in each licence, that:

> "Before the end of the Lease the Tenant is to dismantle and
> remove the Works and reinstate the Premises to the same plan
> and design as before the carrying out of the Works and as if the
> Works had not been carried out (unless and to the extent that
> the Landlord requests that it does not do so)."

3.    On 23rd October 2008 the defendants were appointed administrators of Teathers.  On 8th October 2009 Teathers went into creditors voluntary winding up and the defendants were appointed joint liquidators ("the Liquidators").  On 13th November 2009 Teathers, by its liquidators, surrendered each of the leases under which it held the 5th floor of Beaufort House.  The terms of the surrender included the following:

> "[Baroque] and [Teathers] respectively release each other from
> the rights and obligations contained in the Lease and from all
> liability in respect of any breach of those rights and obligations
> whether arising on or after, but not before, the date of this
> Surrender."

On the same day Baroque relet the 5th floor to Instant Offices Management LLP for a term of four years at an annual rent of £706,550 but with an initial rent free period of 19 months.

4.    Thereafter Baroque submitted various proofs of debt to the Liquidators of which the highest was for £7,013,964.  By a notice dated 30th November 2011 the Liquidators

rejected them.  On 19th December 2011 Baroque applied under Insolvency Rule 4.83 for an order to vary that decision so as to admit to proof £3,844,831.   Subsequently agreement was reached between Baroque and the Liquidators for the admission of the claim in respect of rent, service charges and electricity, leaving outstanding a dilapidations claim of £1,212,395 and a minor issue with which I am not concerned.   That claim has two components.  The first is the liability to reinstate as provided in the licences referred to in paragraph 2 above.  The second is the liability to keep the demised premises…in good and substantial repair and condition as provided in the repairing covenant contained in each lease and quoted in paragraph 1 above.    The issue between the parties is whether those liabilities were released by the terms of the surrender quoted in paragraph 3 above.

5.       To facilitate the determination of that issue, on 15th June 2012 Registrar Derrett directed the trial of a preliminary issue in the following terms:

> "Whether (or to what extent) the liability of Teathers Limited (in liquidation) averred in paragraphs 2.1 to 3.7 of the second witness statement of Jeremy Howard Grey dated 23 April 2012 is a liability which was released by clause 2.1 of the Deed of Surrender dated 13 November 2009, entered into between Baroque Investments Limited and Teathers Limited (in liquidation), and by paragraph 2.4 of section 11 of the Land Registry Form TR1 entered into between the same parties on the same date."

I will consider the reinstatement and repair liabilities separately and in that order.

**Reinstatement liability**

6.       The obligation is "Before the end of the Lease…to dismantle and remove the Works and reinstate the Premises…".  Counsel for Baroque accepts that he cannot point to a particular time when the liability arose, but he contends that the liability to reinstate must, in accordance with its terms, have arisen before, not on or after the date of the surrenders.   Accordingly, as he submits, the liability was not released by the surrenders.  Consequently in relation to that liability Baroque is entitled to prove in the liquidation of Teathers.

7.       Counsel for the Liquidators disputes this construction.  He points out that, absent the words "Before the end of the Lease.." the tenant would have a reasonable time after its termination to carry out the reinstatement works, see **Matthey v Curling** [1922] 2 AC 180, 240.   The inclusion of these words in the licences was evidently designed to limit the time within which the tenant might carry out the works to the term of the lease.  Accordingly, so he submits, there was no breach of that obligation at the time of the surrenders on 13th November 2009 because the term of the leases did not expire until 30th March 2014.

8.      I prefer the submissions of counsel for the Liquidators.  The licences gave to the tenant the full period of the term created by the leases within which to carry out the requisite reinstatement.  Accordingly, as at 13th November 2009, there was no breach of the obligation to reinstate.  If the works were not carried out before 30th March 2014 then the tenant would have been in breach but that would have been after, not before, the date of the surrenders.  In my view the inescapable consequence is that that potential liability was released by the surrenders.  It follows that there can be no provable liability under this head.

**The repairing liability**

9.      It is common ground that, as held in **Ebbetts v Conquest** (1900) 82 LT 560, the covenant to repair quoted in paragraph 1 above imposes two distinct obligations.  The first is to keep the demised premises in good repair during the term.  The second is to yield up the demised premises in good repair at the expiration or sooner determination of the term.  It is not disputed that the second was released by the surrenders.  The issue between the parties is the extent of the provable liability of Teathers under the first.

10.     Paragraphs 2.1 to 3.7 of the witness statement of Mr Grey referred to in the preliminary issue explain how the claim for £1,212,395 is made up.  (Seemingly an unquantified part of it relates to the liability to reinstate.  To that extent there is some duplication.)     In those paragraphs Mr Grey explains that in order to mitigate Baroque's loss it immediately relet the 5th floor of Beaufort House to Instant Offices Management LLP but due to the poor state of repair it was obliged to give the tenant a rent free period of 19 months and accept a reduced rent for the remainder of the term. He attributes 15 of the 19 months of the rent-free period to the want of repair and reinstatement and quantifies it as £882,812 (para 3.3).  In respect of the rent reduction he quantifies the loss incurred by Baroque as £329,583 (para 3.7).

11.     The Liquidators accept that whether or not that was a proper way to quantify losses arising from a breach of the covenant to yield up the demised premises in good repair that liability was released by the surrenders.  In the case of the covenant to keep in good repair the measure of the landlord's loss is limited by s.18(1) Landlord and Tenant Act 1927.  That subsection, so far as material, provides:

> "Damages for a breach of a covenant or agreement to keep…premises in repair during the currency of a lease,…shall in no case exceed the amount (if any) by which the value of the reversion (whether immediate or not) in the premises is diminished owing to the breach of such covenant or agreement as aforesaid; …"

Accordingly, as the Liquidators maintain, the calculation of the damages necessarily involves the assumption that the lease to which the reversion is subject is continuing. Such claims are relatively rare because their availability is restricted by s.1(2) of the Leasehold Property (Repairs) Act 1938, as amended, to, in effect, the last three years of the term.

12.     Counsel for Baroque accepts that the normal date for the assessment of damages is the date of the breach, namely the day before the surrenders on 13th November 2009.  He points out that that rule may be displaced if some other date for assessment would more accurately reflect the loss sustained, see **County Personnel Ltd v Pulver** [1987] 1 WLR 916, 926A.  In addition he contends that, in accordance with the principle established in **Bwllfa & Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co** [1903] AC 426, the court is entitled to have regard to the facts that occurred after the relevant date rather than speculate.

13.     Counsel for Baroque relies on the decision of the Court of Appeal of New South Wales in **Gagner Property Ltd v Canturi Corporation Pty Ltd** [2009] NSWCA 413; (2009) 262 ALR 691.  It is sufficient to refer to paragraph 54 of the judgment of Campbell JA, with whom Macfarlan JA and Sackville AJA agreed.  Having reviewed a number of authorities on the compensatory purposes of damages he said:

> "It follows that, even though a cause of action for breach of contract has accrued at the time the breach occurs, it cannot now be said that there is an accrued right at that time to receive any particular sum of damages. That is because it must await the trial to decide what is the most appropriate way, in light of events then known, to give effect to the compensatory principle of damages."

In the light of these principles, counsel for Baroque contends that the court is not bound to assume the continuation of the leases in assessing the amount of damage to the reversion but is entitled, indeed bound, to have regard to the subsequent events of surrender and reletting.

14.     This is disputed by counsel for the Liquidators.  He submits that the terms of s.18(1) predicate the continuation of the lease in the valuation of the damage to the reversion during its currency. He relies on the decision of the Court of Appeal in **Hanson v Newman** [1934] Ch 298, 306 in which Romer LJ said:

> "Whatever may be the strict meaning at law of the word "reversion" there can, I think, be no doubt as to the meaning that that word bears in the section of the Landlord and Tenant Act, 1927, with which we are concerned here. The reversion in that section, if it be a freehold reversion, means the freehold subject to the lease, and valuing the reversion for the purposes

of the section you must value the freehold subject to so much,
if any, of the term of the lease as remains in existence."

In that case a similar covenant to yield up in good repair was also relied on and the Court of Appeal took account of the fact that the tenancy was forfeited the following day. In the instant case any such liability to yield up in good repair has been released.

15.    Counsel for the Liquidators contends that in this case the computation of the claim is inconsistent with both the terms of s.18(1) and the fact of the release of the covenant to yield up in good repair. In relation to the **Bwllfa** principle he submits that it cannot apply so as to undermine the express terms of s.18(1) requiring a comparison of the value of the reversion with the property in its actual state and in its repaired state. He relies on the decision of HH Judge Finlay QC in **Gaze v Holden** [1983] 1 EGLR 147 to the effect that the **Bwllfa** principle does not apply to valuations as at a particular date.

16.    Once again I prefer the submissions of counsel for the Liquidators. It is clear from Mr Grey's description of how he arrived at the figure of £1,212,395 that he did not follow the processes required by s.18(1). He made no attempt to value the reversion to the 5th floor of Beaufort House in either its actual or repaired state but assumed that the difference between those valuations would be equal to the loss sustained by Baroque on reletting the 5th floor to Instant Office Management Ltd. It may or may not be. Accordingly, the Liquidators were right to reject the proof of debt so calculated.

17.    That is not to say that there may not be some provable debt if the proper processes are followed. Given the argument I have heard it is appropriate for me to say what they are. First, s.18(1) imposes a limit on what may be recovered to "the amount (if any) by which the value of the reversion is diminished owing to the breach of" the covenant to keep the demised property in repair. Second, the ascertainment of that amount necessarily requires the valuation of the reversion to the property in its actual state and in its repaired state. Third, a valuation of the reversion necessarily assumes that a purchaser will take it subject to the lease with the benefit and burden of all the covenants and other stipulations it contains for the remainder of the term.

18.    Given those statutory requirements there is no room for the **Bwllfa** principle to be applied in the manner for which Baroque contends. In addition, the date as at which the valuations are to be made, whether the date of breach or the date of judgment cannot alter the requirements imposed by s.18(1). As the editors of Dilapidations, the Modern Law and Practice 3rd Ed.para 28.21 observe:

> "In these circumstances it may be difficult to prove that the effect of the disrepair has been to cause any diminution in the value of the reversion."

Finally, by insisting that the debt for which Baroque seeks to prove is calculated in the manner s.18(1) requires the Liquidators are not relying on an 'accrued right' such as Campbell JA referred to in the passage from his judgment in **Gagner Property Ltd v Canturi Corporation Pty Ltd** referred to in paragraph 13 above.  They are relying on their statutory right to have the damage sustained in consequence of the breach of the covenant to keep in good repair limited in the way s.18(1) requires.

### Summary

19.   In these circumstances I will declare that:

> (1) Baroque is not entitled to prove for damage sustained in consequence of the failure of Teathers to reinstate the 5th floor of Beaufort House as required by the Licences; and

> (2) The alleged debt of £1,212,395 referred to by Mr Grey in his witness statement identified in the preliminary issue has not been calculated in accordance with s.18(1) Landlord and Tenant Act 1927 and, in consequence, is not provable.

I invite counsel to consider what other orders or directions I should make and to produce a minute my order.

# BASCH v. STEKEL

COURT OF APPEAL
(Chadwick and Buxton L.JJ.)
July 25, 2000[1]

[2001] L.&T.R. 1

H1 *Disclaimer of lease—Death of guarantor—Whether the obligations of guarantor survived his death—Liability of executors—Effect of notice requiring executors to take a new lease—Whether notice to be treated as taking of possession by landlord*

**Summary of decision**

H2 The obligations of a guarantor under a lease are enforceable against his estate after his death unless the lease provides otherwise. Where the lease permits the landlord to require the guarantor to take a new lease in the event that the old lease is disclaimed, the service of a notice requiring the executors of the guarantor to take a new lease is not to be treated as equivalent to taking possession of the premises by the landlord which would bring the old lease to an end.

**Parties**

H3 *Claimant/applicant*:          Jack Basch ("the landlord")
*Defendants/respondents*:     Ronald Stekel
                              Sullamith Reif ("the executors")

H4 **Facts:** By a lease dated January 21, 1992 the landlord demised premises in Hendon to a company for a term of 15 years from June 24, 1990 at an initial annual rent of £12,500. The obligations of the tenant under the lease were guaranteed by a guarantor and the lease contained a provision that in the event that the tenant went into liquidation during the term and the lease was disclaimed, the guarantor was obliged, if required by the landlord, to take a new lease of the premises for the remainder of the term. The guarantor died in 1995 and the executors were appointed. The company went into liquidation in June 1996 and on January 15, 1998 the liquidators served a notice under section 178 of the Insolvency Act 1986, disclaiming the lease. By a notice dated February 11, 1998 the landlord called upon the executors to take a new lease. The executors declined to do so and the landlord commenced proceedings in the county court for specific performance, for damages for breach of covenant and for unpaid rent. On November 27, 1998 the judge found for the executors, holding that, as a matter of construction of the lease, the obligation imposed on the guarantor was

---

[1] Paragraph numbers added by the publishers.

2                                    BASCH V. STEKEL                                    L.&T.R.

personal and determined on death. He further held that the landlord's notice to take a new lease operated as an election to treat the old lease as having determined, so that there was nothing left to devolve upon the executors. The landlord appealed.

H5    **Held,** allowing the appeal:

H6    (1)    The general law is that the personal representatives of a contracting party are bound, so far as his assets will extend, to perform all his contracts although they are not named in those contracts: *Youngmin v. Heath* [1974] 1 W.L.R. 135 applied. Accordingly the correct question is whether there was anything in the lease which led to the conclusion that the parties intended to restrict the operation of the general law.

H7    (2)    The lease defined "the guarantor" and contained provision for that expression to extend to guarantors of any assignee company. It was not open to the court to derive from those provisions an intention to exclude the rule that a person's estate is liable to meet the obligations which he incurred in his lifetime.

H8    (3)    The disclaimer of a lease brings the lease to an end but the relationship of landlord and tenant is preserved for the purposes of giving rise to an obligation on a surety or other third parties. If the landlord takes possession, however, the liability of other persons to pay the rent and to perform the tenant's covenants will come to an end: *Hindcastle Ltd v. Barbara Attenborough Associates Ltd* [1997] A.C. 70 applied.

H9    (4)    The service of a notice requiring the executors to take a new lease cannot be treated as an act of taking possession by the landlord. Its effect was to bring into existence a contract under which the executors were obliged to accept the grant of a new lease. Had the grant been taken, the landlord would have been obliged to give vacant possession of the premises and the notice asserted that he was ready, willing and able to do so. There would be nothing inconsistent in holding the executors to the old lease until the time at which they had accepted the grant of a new lease and so become subject to the covenants under that lease.

H10   **Legislation referred to:**
Insolvency Act 1986 ss.178, 181

H11   **Cases referred to:**
*Oliver Ashworth (Holdings) Ltd v. Ballard (Kent) Ltd* [2000] Ch. 12
*Hindcastle Ltd v. Barbara Attenborough Associates Ltd* [1997] A.C. 70

| L.&T.R. | CA | BASCH v. STEKEL | 3 |

*Stacey v. Hill* [1901] 1 Q.B. 660

*Youngmin v. Heath* [1974] 1 W.L.R. 135

H12  *For further details of this area of the law, see Woodfall's Landlord and Tenant, Vol. 1, para. 9.227—"Action by or against representatives or assigns" and para. 16.208—"Effect of disclaimer".*

H13  *Paul Staddon* (Landau & Cohen, Middlesex) for the landlord.
*Edward Denehan* (Howard Kennedy, London) for the executors.

1    **CHADWICK L.J.:** This is an appeal against an order made on November 27, 1998 by H.H. Judge Simpson in proceedings brought in the Central London County Court by Mr Jack Basch against the personal representatives of the late Mr Edmund Stekel for performance of an obligation contained in a lease dated January 21, 1992 and made between (1) Mr Basch, as landlord, (2) North Lodge Garages and Services Ltd (to which I will refer as "the company"), as tenant, and (3) Mr Edmund Stekel as guarantor.

2    The short point raised in these proceedings is whether the obligation of Mr Edmund Stekel as guarantor survived his death on March 2, 1995, so that it could be enforced against his executors. The judge held that it did not survive the death of Mr Edmund Stekel. Accordingly, he dismissed the landlord's claim. The landlord appeals with the leave of this Court (Brooke L.J.) granted on April 13, 1999.

3    Following service of the notice of appeal, but pursuant to an arrangement which had been made between the parties to these proceedings in May 1998—that is to say, before the trial of the action—the landlord has re-let the property to a third party. It follows that the claim to specific performance is no longer pursued. The appellant now seeks an order for payment of rent, at the rate payable under the former lease, from March 25, 1998 until the grant of the new lease, together with a contribution to insurance and rates.

4    The underlying facts may be stated shortly. The lease, which was of commercial premises at Buckingham Chambers, Vivian Avenue, Hendon, was granted for a term of 15 years from June 24, 1990, at an initial rent of £12,500 per annum. The rent was subject to upward review on the fifth and tenth anniversaries of the commencement date. Clauses 1.1.1, 1.1.2 and 1.1.3 defined the landlord, the tenant and the guarantor to mean, respectively, Mr Basch, the company and Mr Edmund Stekel. As defined in those clauses those expressions did include successors or assigns.

5    Clause 8 contained the guarantor's covenants. It was in these terms, so far as material:

70

"8. The Guarantor covenants with the person named in clause 1.1.1 [meaning Mr Basch] and without the need for any express assignment with all his successors in title that:

8.1 During the term the Tenant shall punctually pay the rents and observe and perform the covenants and other terms of this lease and if at any time during the Term the Tenant shall make any default in payment of the rents and observe and perform the covenants or terms in respect of which the Tenant shall be in default and make good to the Landlord on demand and indemnify the Landlord against all losses damages costs and expenses arising or incurred by the Landlord as a result of such nonpayment non-performance or nonobservance notwithstanding:

8.1.1 any time or indulgence granted by the Landlord to the Tenant or any neglect or forbearance of the Landlord in enforcing the payment of rents or the observance or performance of the covenants or other terms of this lease . . .
8.1.2 that the terms of this lease may have been varied by agreement between the parties
8.1.3 that the Tenant shall have surrendered part of the Premises . . . and
8.1.4 any other act or thing by which but for this provision the Guarantor would have been released

8.2 If at any time during the Term the Tenant (being an individual) shall become bankrupt or (being a company) shall enter into liquidation and the trustee in bankruptcy or liquidator shall disclaim this lease the Guarantor shall if the Landlord shall by notice within 60 days after such disclaimer so require take from the Landlord a lease of the Premises for the residue of the Contractual Term which would have remained had there been no disclaimer at the Rent then being paid under this lease and subject to the same covenants and terms as in this lease (except that the Guarantor shall not be required to procure that any other person is made party to that lease as guarantor) such new lease to take effect from the date of such disclaimer and in such case the Guarantor shall pay the costs of such new lease and execute and deliver to the Landlord the counterpart of it."

6    It is plain that something has gone wrong with the language of clause 8.1 in the form in which it appears in the letter [*sic*]. What is likely to have happened is that a line of text has been missed out in the course of copying from some earlier text. It is, I think, clear that the provision should read:

"and if at any time during the term the Tenant shall make any default in payment of the rents [and in observing and performing the covenants or terms,

1.1 [meaning
    with all his

    and observe
f at any time
t of the rents
of which the
    demand and
nd expenses
ayment non-

Fenant or any
nent of rents
terms of this

y agreement

Premises . . .

ie Guarantor

vidual) shall
ition and the
ie Guarantor
lisclaimer so
esidue of the
o disclaimer
to the same
    shall not be
hat lease as
sclaimer and
    and execute

:lause 8.1 in
ve happened
: from some

y default in
nts or terms,

then the Guarantor shall pay the rents] and observe and perform the covenant
or terms in respect of which the Tenant shall be in default"

as if the words in square brackets (or some words to like effect) had been
included. It is not suggested that this court should not read clause 8.1 as though
they were there.

7    Mr Edmund Stekel died on March 2, 1995. By his will he had appointed his
son, Mr Ronald Stekel, and Mr Sullamith Reif to be his executors and trustees.
They obtained probate of the will. On June 26, 1996, at an extraordinary general
meeting of the company, it was resolved that the company be wound up. Joint
liquidators were appointed. On January 15, 1998 the joint liquidators served
notice under section 178 of the Insolvency Act 1986, disclaiming the lease. By
notice in writing dated February 11, 1998 the landlord called upon the executors
to take a new lease, pursuant to the provision of clause 8.2. The executors
declined to do so. These proceedings were commenced at or about the end of
May 1998. The primary relief claimed was specific performance of the covenant
in clause 8.2 of the lease—that is to say, the covenant by Mr Edmund Stekel to
take a new lease of the premises for the residue of the contractual term if required
to do so—with an ancillary claim for damages in lieu of or in addition to specific
performance. But there was a secondary claim for rent, under the covenant in
clause 8.1 of the lease, from March 25, 1998 to the date when the new lease was
executed.

8    Shortly before the commencement of these proceedings the parties, by their
respective solicitors, had signed and countersigned a letter in the following
terms:

"Re: Buckingham House.
1. This agreement is made totally without prejudice to either party's position
with regard to proceedings shortly to be issued by Mr Basch against Mr Stekel
and Mr Reif for specific performance of their obligation to take up a new lease
of the above premises.
2. Neither party shall be entitled to rely upon this agreement or any actions
taken pursuant to it (including the proposed joint marketing of the property or
of any subsequent letting of it whether by Mr Basch or by Mr Stekel and/or
Mr Reif (the estate) in the proposed forthcoming litigation or any other
litigation raising the same or similar issues and in particular shall not seek to
rely upon the same as evidence that Mr Basch has accepted the waiver of the
lease by the Liquidator or that he has elected not to call on the estate to take
a new lease or that he has waived his rights to claim rent under the old lease
or that he has elected to treat the old lease as being at an end or as evidence
that the estate has any continuing obligations of any nature whatsoever in
respect of the property.

3. The property shall be jointly marketed by ourselves and yourselves on behalf of our respective clients. All costs of marketing shall be born equally by the parties and the party who is unsuccessful in the litigation will reimburse the successful party.

4. Mr Basch will not be obliged to grant a lease to any intending lessee to whom the property shall have been marketed to.

5. We shall jointly agree with our respective clients those estate agents who are to be instructed to market the property and we shall jointly sign their instructions as agents for our respective clients."

9    That letter was not brought to the attention of the judge at trial. He was allowed to proceed with the trial on the basis that the landlord was continuing to pursue his claim for specific performance; that is to say, that the primary relief sought in the action was an order that the executors take a new lease of the premises in their own names for the residue of the contractual term under the original lease of 1992.

10    It was in those circumstances that the argument before the judge was directed, primarily, to the construction and effect of clause 8.2 of the lease. The executors contended that, as a matter of construction, the obligation imposed on the guarantor by clause 8.2 was personal to Mr Edmund Stekel and determined on his death. They pointed to the contrast between clauses 3.1 and 3.4. Clause 3.1 is in these terms (so far as material):

"3.1 The expressions the Landlord and the Tenant wherever the context admits include the person for the time being entitled to the reversion immediately expectant on the determination of the Term and the Tenant's successors in title respectively . . . "

11    The need for that provision is clear enough when it is in mind that the definitions of the landlord and the tenant set out in clauses 1.1.1 and 1.1.2 do not, as I have already mentioned, include the usual provisions extending those definitions to the successors in title of the original landlord and the original tenant—that is to say, to the persons entitled to the reversion immediately expectant on the determination of the term, and the assignees of the leasehold interest created by the lease. It is to make good those omissions in the definitions in clauses 1.1.1 and 1.1.2 that clause 3.1 is needed. Without it, upon the devolution of either of the reversion or the term, the definitions in the clauses 1.1.1 and 1.1.2 would be inept.

12    By contrast, clause 3.4 provides:

"3.4 The expression Guarantor includes not only the person referred to herein (if any) but also any person who enters into covenants with the landlord pursuant to clause 5 hereof."

ourselves on

rn equally by

reimburse the

ing lessee to

gents who are
their instruc-

rial. He was
continuing to
primary relief
lease of the
rm under the

was directed,
The executors
posed on the
etermined on
4. Clause 3.1

ontext admits
immediately
essors in title

nind that the
1 1.1.2 do not,
ending those
l the original
immediately
the leasehold
he definitions
it, upon the
n the clauses

rred to herein
the landlord

13    The reference there to a person who enters into covenants with the landlord pursuant to clause 5 of the lease is, plainly, intended to give effect to the provisions in clause 5.9.5. That clause requires that, on a permitted assignment to a limited company, and if the landlord shall so reasonably require, the tenant will procure that two directors of the assignee company, or some other guarantor or guarantors acceptable to the landlord, enter into direct covenants with the landlord in the form of the guarantor's covenants contained in the lease, but with the assignee substituted for the tenant. Again, clause 3.4 is necessary in the circumstances that there may be other guarantors introduced under clause 5.9.5 who would not fall into the definition of the guarantor in clause 1.1.3.

14    The judge accepted the argument for the executors on construction. At 4D-G in the transcript of his judgment he said this:

"There is no reason why the expression 'Guarantor' should be extended . . . because it is easy to see that . . . there would be an inconvenience in the distribution of the guarantor's estate and that distribution might be held up for a long time. There is also the question of the severance of the link between the guarantor and the company. I do not think that the parties to this document, having regard to the language which they have used, intended that the obligation of the guarantor should survive and devolve on to his personal representatives. One can easily see the inconvenience which would arise if this were so."

15    Counsel for the executors, who are the respondents in this appeal, seeks to uphold the judge's finding in that respect. But, in my view, the judge asked himself the wrong question. No one has suggested, and it could not be suggested, that the personal representatives were to assume any liability beyond their liability as personal representatives, limited to the assets of the estate in their hands. The relevant question was not whether the expression "the guarantor" should be extended so as to include the personal representatives of Mr Edmund Stekel. The relevant question was whether the obligations which Mr Edmund Stekel had assumed during his lifetime should continue to bind his estate after his death. In other words, whether there was a sufficient intention in the lease to displace the rule appropriate under the general law: that personal representatives of a contracting party are bound, so far as his assets will extend, to perform all his contracts although not named therein—see paragraph 21005 in *Chitty on Contracts* (28th ed., 1999), Vol. 1, page 1070. If further authority is required, it can be found (in the context of landlord and tenant) in the decision of this court in *Youngmin v. Heath* [1974] 1 W.L.R. 135—see, in particular the observations of Lord Denning M.R. at 137C and of Stamp L.J. at 137H.

16    The judge ought to have asked himself, not whether the lease showed an intention to extend the definition of guarantor so as to include the personal

representatives of Mr Edmund Stekel, but whether there was anything in the lease which led to the conclusion that the parties intended to restrict the operation of the general law by providing that obligations of an individual should not be enforceable against his estate. The only provisions relied upon are those in clauses 3.1 and 3.4. For the reasons that I have already set out, those provisions are there for a perfectly understandable, but quite different, purpose. In my view, it is not open to the court to derive from those provisions any intention which goes beyond the obvious purpose for which they have been included. That purpose does not extend to restricting the rule, under the general law, that a person's estate is liable to meet the obligations which he has incurred during his lifetime.

17    The judge went on to consider whether, if he were wrong as a matter of construction, this was a case in which specific performance of the obligation in clause 8.2 should be granted. He came to the conclusion that to grant specific performance against the executors, as executors, would produce a degree of inconvenience or hardship which they should not be required to suffer. Accordingly, specific performance being an equitable remedy, the judge held that it should be denied. It is unnecessary to say more about that in the circumstances that the claim for specific performance is no longer pursued.

18    The judge then turned to the alternative claim for damages for breach of covenant. Since it was his view the liability under clause 8 was restricted to Mr Edmund Stekel personally and was not enforceable against his estate, he held that the claim under clause 8.1 would fail for that reason alone. But he went on to say, at 9D–F in his judgment, that the landlord's action in requiring the executors to take a lease, with rent commencing from January 15, 1998, operated as an election to treat the old lease as having been determined at the latest at the date of the notice, if not before. So he held there was no liability under the old lease which could have devolved on the personal representatives on the death of the guarantor: the landlord had made his election and must be held to it.

19    In this court the point is not put on the basis of election. That seems to me a sensible recognition that election could not be a foundation for the point in the light of the observations of this court in *Oliver Ashworth (Holdings) Ltd v. Ballard (Kent) Ltd* [2000] Ch. 12. The way the point is put before us is that, by serving the notice in February 1998, the landlord had retaken possession of the premises so as to indicate an intention not to rely on the obligations in the old lease which were the subject of Mr Edmund Stekel's guarantee.

20    In order to address that point it is necessary to have regard to the position which arises following a disclaimer under section 178 of the Insolvency Act 1986. As explained by Lord Nicholls, in his speech in the House of Lords in *Hindcastle Ltd v. Barbara Attenborough Associates Ltd* [1997] A.C. 70, section 178(2) of the Insolvency Act 1986 enables a liquidator, by the giving of a notice in the prescribed form, to disclaim any onerous property. Section 178(4) is in these terms:

BASCH V. STEKEL          9

"(4) A disclaimer under this section—

    (a)  operates so as to determine, as from the date of the disclaimer, the rights
        interests and liabilities of the company in or in respect of the property
        disclaimed; but

    (b)  does not, except so far as is necessary for the purpose of releasing the
        company from any liability, affect the rights or liabilities of any other
        person."

21    For over 90 years prior to the decision of the House of Lords in *Hindcastle* the
law was generally thought to be as it had been explained by this court in *Stacey
v. Hill* [1901] 1 Q.B. 660. In *Stacey v. Hill* this court had held that the effect of
the disclaimer, under what was then the comparable provision in the Bankruptcy
Acts, was to free the bankrupt and his property from any future liabilities in
relation to the property; with the consequence that a surety was also released
from his obligation as guarantor of those liabilities. It was to meet that problem
that a well-drawn lease imposed the surety's obligation in two parts: first, an
obligation, as surety, to pay the rents and observe and perform the covenants
which the tenant was obliged to pay and to observe and perform; and, secondly,
following a disclaimer, to take a new lease in the surety's own name. The device
of requiring the surety to take a new lease in his own name was to ensure that he
then became liable under the covenants in the new lease; so that the landlord was
not met with the argument in *Stacey v. Hill* that the liability in relation to the
covenants under the old lease had gone with the disclaimer. That is what was
done in clause 8(1) and 8(2) of the 1992 lease in the present case.

22    Lord Nicholls explained in *Hindcastle v. Barbara Attenborough* why the
former practice was unnecessary. He pointed out that the operation of section 178
of the Insolvency Act 1986 is limited by the provisions in paragraph (b) of
subsection (4). The disclaimer takes effect under the section only in so far as is
necessary for the purpose of releasing the insolvent company from liability. The
disclaimer does not affect the rights and liabilities of other persons, in particular
persons such as a surety or an original tenant. Nevertheless, the tenancy, itself,
does cease to exist as an estate in the land demised by the lease. The relationship
of landlord and tenant is preserved notionally for the purposes only of giving rise
to an obligation on the surety or other third parties.

23    Lord Nicholls put the point, at 88H in the report of his speech:

"The statute provides that a disclaimer operates to determine the interest of the
tenant in the disclaimed property but not so as to affect the rights or liabilities
of any other person. Thus when the lease is disclaimed it is determined and the
reversion accelerated but the rights and liabilities of others, such as guarantors
and original tenants, are to remain as though the lease had continued and not

been determined. In this way the determination of the lease is not permitted to affect the rights or liabilities of other persons. Statute has so provided."

24    Lord Nicholls then drew attention to the provisions in section 181 of the 1986 Act, which enable a person having an interest in the property or a person who is under any liability in respect of the disclaimed property to make an application for the vesting of the property in him. If a vesting order is made, then, of course, the property vests under that order in a new tenant. But Lord Nicholls went on at 89B-C to say this:

"If no vesting order is made and the landlord takes possession, the liabilities of other persons to pay the rent and perform the tenant's covenants will come to an end so far as the future is concerned. If the landlord acts in this way, he is no longer merely the involuntary recipient of a disclaimed lease. By his own act of taking possession he has demonstrated that he regards the lease as ended for all purposes. His conduct is inconsistent with there being a continuing liability on others to perform the tenant's covenants in the lease. He cannot have possession of the property and, at the same time, claim rent for the property from others."

25    In reliance on that passage, it is submitted on behalf of the executors that the landlord's act in serving the notice on February 11, 1998 was an act of taking possession—alternatively an act which demonstrated that he no longer intended to rely on the continuing liability of the executors to perform the tenant's covenants in the lease—so as to prevent the landlord thereafter from relying on the guarantor's liability to perform the tenant's covenants.

26    In my view, that submission is misconceived. The service of a notice requiring the executors to take a lease cannot, of itself, be treated as an act of taking possession by the landlord. The effect of the notice, if valid, is to bring into existence a contract under which the executors are obliged to take a grant. When they take a grant the landlord will, under the terms of that grant, be required to deliver vacant possession; but he will not be required to deliver vacant possession until the grant is taken. By serving the notice the landlord asserts that he is ready, willing and able to give vacant possession at the time when the grant is taken. But that, of course, this landlord was in a position to do; in the circumstances that the estate formerly existing under the lease had been disclaimed.

27    Nor, as it seems to me, was the service of the notice inconsistent with the landlord's continuing intention to enforce the obligations in the tenant's covenants against the executors. For the reasons which I have sought to explain, clause 8 in the lease provides alternate methods of enforcing the covenants against the guarantor: (i) either by treating the guarantor as surety for the tenant's covenant in the former lease, or (ii) by requiring the guarantor to enter into his

own covenants in the new lease. But the covenants in the new lease are to be terms identical to those in the former lease: that is what clause 8.2 requires.

28    It is plain, as it seems to me, that what the landlord was doing by the service of his notice was to reaffirm that he did require the executors to meet the obligations under the covenants in the former lease. Whether that was to be done by enforcing the covenants in the old lease or by requiring the executors to enter into covenants in a new lease seems to me neither here nor there. There is nothing inconsistent in holding the executors to the covenants in the old lease until the time at which they take a grant of the new lease and so become subject to the covenants under that lease. That is what both sides would expect.

29    For those reasons, the points taken by the respondents must fail. I would allow this appeal. It will be for consideration, after hearing submissions, what form of order the court should make.

30    **BUXTON L.J.:**  I agree.

H14

*Appeal allowed.*