Neutral Citation Number: [2009] EWCA Civ 413

Case No: A3/2008/2041

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM QUEEN'S BENCH DIVISION COMMERCIAL COURT**
**MR JUSTICE TEARE**
**2008/199**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19/05/2009

Before :

**SIR ANTHONY CLARKE MR**
**LORD JUSTICE RIX**
and
**LADY JUSTICE ARDEN**
- - - - - - - - - - - - - - - - - - - - -
Between :

|  |  |
|---|---|
| **(1) BERGHOFF TRADING LIMITED** | **Respondents/** |
| **(2) GEA HOLDINGS LIMITED** | **Claimants** |
| **(3) CASPIAN ENERGY GROUP LP** |  |
| **- and -** |  |
| **(1) SWINBROOK DEVELOPMENTS LIMITED** | **Appellants /** |
| **(2) ROSSERLANE CONSULTANTS LIMITED** | **Defendants** |
| **(3) Dr ZAUR LESHKASHELI** |  |

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No: 020 7404 1400, Fax No: 020 7404 1424
Official Shorthand Writers to the Court)

**Mr Stephen Phillips QC & Mr Richard Edwards** (instructed by **Messrs Masseys LLP**) for
the **Appellants / Defendants**
**Mr George Leggatt QC & Ms Sarah Ford** (instructed by **Messrs McGuireWoods London
LLP**) for the **Respondents / Claimants**

Hearing dates : 22nd April 2009
- - - - - - - - - - - - - - - - - - - - -
Judgment
As Approved by the Court

Crown copyright©

**Lord Justice Rix :**

1.     The question which arises on this appeal is whether a limited partnership in which its partners sold their equity interests to new buyers was and remains subject to any obligation to pay a common law indemnity or contribution to its erstwhile partner or was otherwise subject to repay to that partner a loan which, if it existed, did so only contingently before the sale and emerged into existence only after the sale. The judge, Mr Justice Teare, has decided the issues arising out of that question in favour of the partnership and its buyers and has therefore given summary judgment in respect of them.

*The parties, their contracts, and their disputes*

2.     The partnership in question is Caspian Energy Group LP ("Caspian"). Prior to its dissolution on 11 June 2008 Caspian was a Scottish limited partnership. It owned a 51% share in Shirvan Oil Limited, a joint venture company established in Azerbaijan with rights in an oil field in Azerbaijan. The partners in Caspian *before* the sale were Rosserlane Consultants Limited ("Rosserlane") and Swinbrook Developments Limited ("Swinbrook"). Rosserlane was the general partner, and Swinbrook was the limited partner, of Caspian. The value of Caspian's interest in the oil field at the relevant time may, for the purposes of these proceedings, be assumed to have been at least US $500 million. Effectively, Rosserlane owned all but a miniscule part of the equity in Caspian. In turn, Dr Zaur Leshkasheli, a citizen of the Republic of Georgia, was the ultimate owner of both Rosserlane and Swinbrook.

3.     Rosserlane, Swinbrook and Dr Leshkasheli are defendants in these proceedings. It is Rosserlane's counterclaim which is in issue.

4.     On 15 February 2008, Rosserlane and Swinbrook sold their interests in Caspian for US $245 million. The purchasers were Berghoff Trading Limited ("Berghoff") and GEA Holdings Limited (together the "buyers"). Caspian thereupon moved from the defendants' stable to the buyers' stable. Thus the buyers and Caspian have found themselves together as claimants in these proceedings, and the previous owners (direct or indirect) of Caspian are ranged against them as defendants. We are concerned with a counterclaim which Rosserlane seeks to bring against the claimants, principally against Berghoff, which has unlimited liability for the debts of Caspian. The judge, Mr Justice Teare, has given summary judgment against Rosserlane on the ground that it has no real prospect of success on its counterclaim. Rosserlane appeals.

5.      The sale agreement was made in the name of Rosserlane and Swinbrook by Credit Suisse ("the bank") under a power of attorney granted to it in connection with a loan and associated arrangements. The sale was referred to in the documentation as a "mandatory sale" or "forced sale". The defendants had at best only some twenty-four hours' notice of it. The loan agreement was dated 14 December 2006. Under it Caspian was described as the "Borrower" and the three defendants (inter alios) were described as both "Guarantors" and "Obligors". The sale proceeds were received under the sale by the bank and were used by it to discharge all of the obligations of the defendants and Caspian under the loan agreement. There remained a small surplus.

6.      There is a potential dispute between the defendants and the bank relating to this sale which may result in other proceedings. Rosserlane's counterclaim in these proceedings is, so to speak, an attempt to make the new owners of Caspian responsible for the discharge of the loan.

7.      I say "so to speak", because the matter is more complicated than that. Rosserlane submits that under the loan agreement it was no more than a secondary party, at any rate vis a vis Caspian, in respect of its obligations to the bank: and that, as a result, it is entitled to an *indemnity*, or, at worst and even if it is a primary party along with Caspian, a *contribution* as a co-obligor, from Caspian. Alternatively, it submits that the indemnity solution was reinforced by a resolution which Rosserlane made, allegedly as general partner on behalf of Caspian, dated 5 January 2007, to the effect that, on any sale of Caspian, its debt to the bank would be repaid by it with the help of Rosserlane making it an interest free loan out of the proceeds of the sale.

8.      On the sale of the holdings in Caspian, that is to say of Rosserlane's and Swinbrook's partnership interests in it, Caspian was sold with its liabilities as they were: and there were no representations or warranties given to the buyers as to such liabilities. However, by a "deed of assumption and retiral and assignation of partnership interests" of the same date as the sale agreement, Rosserlane (i) assigned all its rights in Caspian to the buyers' new general partner, (ii) retired as general partner, and (iii) gave up all further rights or claims and was released from all obligations as partner.

9.      In sum, the dispute between the parties is as follows. Rosserlane submits that as guarantor of Caspian's obligations under the loan agreement to the bank, it is entitled under common law and/or in equity to be indemnified by Caspian to the extent that the proceeds of its sale of its partnership interest in Caspian were used by the bank to pay off Caspian's borrowings. Alternatively, Rosserlane submits that, even if it is a primary obligor together with Caspian under the loan

agreement, it is entitled under common law and/or in equity to a proper contribution from Caspian in as much as the whole of Caspian's debt to the bank was paid off by using the proceeds of the sale of its partnership interest. As a further alternative, Rosserlane submits by reference to the Resolution that it has a direct contractual claim against Caspian for repayment of its interest free loan made to Caspian, post sale, out of the proceeds of the sale, thereby permitting Caspian to repay the bank. Rosserlane submits that these obligations, or one or other of them, survived the sale, and remain the obligation of Caspian's new owners.

10.    On the other side, however, the buyers of Caspian submit that these claims are bad and can be summarily dismissed. They submit (i) that there is no guarantor's right of indemnity, because Rosserlane was a primary obligor alongside Caspian; (ii) that the Resolution is a fictitious document, but in any event does not seek to bind Caspian, only Rosserlane; and (iii) that any possible liability arising under the Resolution cannot bind Caspian in any event: either because it was itself assigned and/or released under the sale transaction, or because it post-dated the transfer of the partnership interests in circumstances where Rosserlane no longer had any power to bind Caspian.

11.    The judge found in favour of sufficient of these submissions to enable him summarily to dismiss Rosserlane's counterclaim.

## The contractual documents

12.    With that introduction, it is necessary to set out substantial parts of the contractual documents.

### (a)  The Loan Agreement

13.    The Loan Agreement was originally dated 14 December 2006. It was itself part of a linked series of documents, which included a security agreement and an "equity upside agreement" also known as a "participation agreement" of the same date. Under these agreements the bank provided a loan facility of $127 million (in two tranches) for the short period of one year and contemplated a sale of the partnership interests in Caspian within that period: either by Rosserlane and Swinbrook of their own motion or by the bank by way of forced sale. Depending

on the price of the sale, the bank would earn an equity upside or participation in various amounts. As stated above, Caspian was described as "Borrower" and Rosserlane and Swinbrook and Dr Leshkasheli were described as "Guarantors" and "Obligors".

14.    The Loan Agreement was amended by a letter dated 14 May 2007 and further amended and extended by a deed of amendment and restatement dated 13 December 2007. The final repayment date was pushed back (for a price) to 15 February 2008. Thus it became a 15-month facility. In the event, the bank arranged a forced sale which was ultimately dated and completed on 15 February 2008 itself, the final repayment date of the Loan Agreement.

15.    The following provisions are relevant:

"THIS LOAN AGREEMENT…

BETWEEN

CASPIAN ENERGY GROUP…(the *Borrower*)…acting by its general partner Rosserlane…(the *General Partner*)…

ROSSERLANE…(*Rosserlane*)…

WHEREAS

The Borrower wishes to borrow, and the Lenders wish to make facilities available in an aggregate sum of up to…(US$ 127,000,000)…

1.    DEFINITIONS AND INTERPRETATION
      Definitions

*Beneficial Owner* means Dr. Zaur Leshkasheli…

*Equity Owner* means the Beneficial Owner,…Swinbrook, Rosserlane and the Borrower…

*Equity Upside Agreement* means the participation agreement…

*Funds Flow Statement* means the statement prepared by the Borrower…

*Guarantors* means the Borrower,…Swinbrook…Rosserlane…and "Guarantor" means any of them…

*Indebtedness* means any obligation for the payment or repayment of money, whether as principal or as surety and whether present or future, actual or contingent…

*Obligors* means the Borrower and the Guarantors and *Obligor* means any of them…

*"Sale"* means
(a)  a disposal…
    (i) of any Equity Interest (including by way of trade sale…Forced Sale (as defined in Clause 4 of the Equity Upside Agreement)…

1.3  Construction of Certain terms…

(c) a "guarantee" also includes any other obligation (whatever called) of any person to pay, purchase, provide funds…for the payment of, indemnity against the consequences of default in payment of, or otherwise be responsible for, any Indebtedness of any other person…

THE LOAN

2.1 Loans

The Lenders…agree to lend:
(a)  The First Loan…($115,000,000) to the General Partner (acting on behalf of the Borrower)…
(b)  The Drilling Plan Loan…($12,000,000) to the General Partner (acting on behalf of the Borrower)…

2.2 Purpose

The First Loan is provided by the Lenders to the Borrower for, and the Borrower shall apply all amounts borrowed by it under the First Loan [for,] the purposes of…

4. DRAWDOWN OF THE LOAN

4.1 Drawdown

The Borrower may request the disbursement of the First Loan by…

5. INTEREST

5.1 Interest

…The Borrower shall pay accrued interest on the Loans on the last day of each Interest Period.

5.2 Default Interest

If any Obligor fails to pay any amount payable by it to the Finance Parties under the Finance Documents on its due date, interest shall accrue on the overdue amount from the due date…

7. FEES

The Borrower shall pay to the Arranger an arrangement fee in the amount and at the times agreed in a Fee Letter.

8. PREPAYMENT AND CANCELLATION

…
8.2 Mandatory prepayment

If a Sale occurs, the Borrower shall promptly notify the Agent upon becoming aware of that event and the outstanding Loans, together with accrued interest, and all other amounts accrued under the Finance Documents shall become immediately due and payable.

8.3 Voluntary prepayment

The Borrower may by giving not less than ten (10) Business Days' prior written notice to the Agent, prepay the full amount of the Loans (but not any part thereof)…

9. REPAYMENT

9.1 The Borrower shall, repay the First Loan in full on the Final Repayment Date…

10. JOINT AND SEVERAL OBLIGATIONS

The obligations of the Obligors to repay the Loans and to pay interest on the Loans, the fee specified in Clause 7 (*Fees*) and any other amounts under the Finance Documents are joint and several obligations.

11. EXPENSES

11.1 Transaction expenses

The Borrower shall promptly on demand following production of an invoice reimburse the Agent and the Arranger the amount of all costs and expenses…

11.2 Stamp and other duties

The Borrower shall pay and, promptly on demand, following production of an invoice indemnify each Finance Party…

11.3 Enforcement expenses

The Borrower shall, promptly on demand, indemnify each Finance Party against any loss or liability…reasonably incurred by the Finance Parties in connection with the occurrence of any Event of Default…

## 13. PAYMENTS AND CALCULATIONS

13.1 Payments by the Obligors

(a)  All payments by the Obligors under the Finance Documents shall be made in full, without any set-off…

## 16. COVENANTS

Each Obligor agrees to be bound by the covenants set out in this Clause relating to it…

[There follow detailed covenants relating to the provision of information, disposals, indebtedness, acquisitions, loans and guarantees, corporate records, encumbrance, security documents, authorisations, compliance, change of business, preservation of assets, accounts, share capital, distributions, partnership matters, etc.]

## 19. GUARANTEE

19.1 Guarantee

In consideration of the Finance Parties entering into the Finance Documents and making the Loans available to the Borrower, the Guarantors jointly and severally and irrevocable and unconditionally:

(a)  guarantee to each Finance Party punctual performance by any Obligor of their respective obligations under the Finance Documents;

(b)  agree to pay as if they were the primary obligor from time to time immediately on demand the full sum or sums of money which any Obligor is at any time liable to pay to any Finance Party under or pursuant to the Finance Documents (including for breach of any warranty, representation or covenant) and which has become due and payable but has not been paid at the time such demand is made;

(c)  agree as a primary obligation to indemnify each Finance Party (on an after Tax basis) from time to time on demand from and against any cost, loss or liability incurred by any Finance Party as a result of any obligation guaranteed by it becoming void, voidable, unenforceable, invalid or illegal or otherwise ineffective against any Obligor for any reason whatsoever…

19.4 Waiver of defences

The obligations of the Guarantors under this Clause 19 (*Guarantee*) will not be affected by any act, omission, matter or thing which, but for this clause, would reduce, release or prejudice any of its obligations under this Clause 19 (*Guarantee*) (without limitation and whether or not known to it or any Finance Party (or any agent or trustee on its behalf) including:

(a)  any time, waiver or consent granted to or composition with any person…

19.8 Joint and several obligations of the Guarantors

The obligations of the Guarantors under this agreement are joint and several obligations."

*(b)  The Security Agreement*

16.     The Security Agreement of the same date, 14 December 2006, made provision for security for the loan advanced by the bank. Each of the obligors under the Loan Agreement was made a chargor under the Security Agreement. It stated in relevant part as follows:

"WHEREAS:

(A) The Lenders have agreed to make available to the Chargors certain loan facilities (the *Facilities*) on and subject to the Loan Agreement.

(B) It is a condition precedent to the Lenders making the Facilities available that the Chargors enter into this Security Agreement…

COVENANT TO PAY

2.1. Covenant to pay

Each Chargor, as primary obligor and not merely as surety, covenants with the Security Agent that it will on demand pay and discharge (on an after-tax basis) the Secured Liabilities on the date or dates on which such Secured Liabilities are expressed to become due or apply and in the manner provided in the Finance Document."

*(c)  The Participation Agreement*

17.     The Participation Agreement, also dated 14 December 2006 (but subsequently amended and restated on 13 December 2007), provided for the sale of the partnership interests of Rosserlane and Swinbrook in Caspian, and for the "equity

upside payment" which on such sale was to be payable to the bank, depending on the price of the sale, and for the manner in which the proceeds of sale were to be applied. Clause 4 (below) provided that if a sale had not taken place voluntarily by 14 August 2007, the bank could force a mandatory sale. Under the Participation Agreement those interested in any way in any assets of the Shirvan oil concession were described as "Equity Owners". They were listed in schedule 1 and included Caspian, Rosserlane, Swinbrook and Dr Leshkasheli. The Participation Agreement provided in relevant part as follows:

"3. EQUITY UPSIDE PAYMENT

3.1 If a Sale occurs and the amount of the Sale Proceeds are within the Low Range, the Selling Equity Owner shall ensure (and each of the other Equity Owners shall procure) that the Sale Proceeds are paid directly to the Bank at completion of the Sale for application by the Bank in the following order:

(a)  firstly, payment to the Finance Parties of all outstanding principal, interest and other amounts due and owing to them (or any of them) under the Relevant Finance Documents;

(b)  secondly, payment to the Selling Equity Owner of any amount remaining of the Sale Proceeds after the deduction of the Payments under Clause 3.1(a).

3.2 If a sale occurs and the amount of the Sale Proceeds are within the Mid Range, the Selling Equity Owner shall ensure (and each of the other Equity Owners shall procure) that the Sale Proceeds are paid directly to the Bank at completion of the Sale for application by the Bank in the following order:

(a)  firstly, payment to the Finance Parties of all outstanding principal, interest any other amounts due and owing to them (or any of them) under the Relevant Finance Documents;

(b)  secondly, to the Bank of 33.0% of the Sale Proceeds in excess of $180,000,000; and

(c)  thirdly, to the Equity Owner of any amount remaining of the Sale Proceeds after the deduction of the payments under Clauses 3.2(a) and 3.2(b).

3.3 If a Sale occurs and the amount of the Sale Proceeds are within the Top Range, the Selling Equity Owner shall ensure (and each of the other Equity Owners shall procure) that the Sale Proceeds are paid directly to the Bank at completion of the Sale for application by the Bank in the following order:

(a)  firstly, payment to the Finance Parties of all outstanding principal, interest any other amounts due and owing to them (or any of them) under the Relevant Finance Documents;

(b)  secondly, to the Bank of 33.0% of the Sale Proceeds in excess of $180,000,000 and equal to or less than $400,000,000;

(c)  thirdly, to the Bank of 12.0% of the Sale Proceeds in excess of $400,000,000 save that one-sixth of such payment will not be payable

pursuant to this Clause if a Sale of the Equity Interest or the Assets is made to the Oil and Natural Gas Corporation Limited of India and fully and irrevocably completes prior to 1 March 2007; and

(d) fourthly, to the Equity Owner of any amount remaining of the Sale Proceeds after the deduction of the payments under Clauses 3.3(a) to (c)…

3.6 If at any time on or before the Expiry Date, any Equity Owner (or any person on its behalf) receives any Sale Proceeds it shall promptly pay all amounts received to the Bank for distribution in accordance with Clauses 3.1 to 3.4 and pending such payment shall hold those amounts on trust for the Bank…

4. MANDATORY SALE

4.1 If by the date which falls eight months after the date of this Agreement (the "Trigger Date"), no sale of 100% of the Equity Interests of one of the Equity Owners or of 100% of the Assets has been completed, the Bank shall be entitled to force the Equity Owners to Sell, or procure the Sale of, the Equity Interests or the Assets (in whole or in part) to any purchaser provided that the Sale Proceeds from such Sale are not less than $180,000,000 ("Forced Sale").

4.2 For the purposes of effecting a Forced Sale, each of the Equity Owners:

4.2.1 hereby irrevocably appoints the Bank as its attorney to execute and do in its name or otherwise and on its behalf all documents, acts, deeds and things which the Bank shall in its absolute discretion consider necessary or desirable in order to implement the Forced Sale…"

*(d)  The Sale and Purchase Agreement*

18.    The bank exercised its right to force a sale, which it completed on 15 February 2008, the final date for repayment of the loan. The first and second claimants were the buyers, and Rosserlane and Swinbrook were the sellers, for a total of $245,000,000. The sale and purchase agreement provided in relevant part as follows:

"WHEREAS…

(C) Credit Suisse, acting solely in its capacity as attorney for Rosserlane and Swinbrook, wishes to effect the sale of, and the Buyer wishes to purchase, Rosserlane and Swinbrook's respective partnership interests in the Partnership…

1.  INTERPRETATION

1.1…

"Proceeds Bank Account" means an account in the name of Credit Suisse…

"Rosserlane Partnership Interest" means the partnership interest held by Rosserlane as a general partner in the Partnership

"Sellers" means Rosserlane and Swinbrook…

2.   SALE AND PURCHASE

2.1 Upon the terms and subject to the conditions of this agreement, the Sellers shall sell and the Buyer shall purchase, on behalf of itself and the Buyer's Nominee, the Partnership Interests, with effect from Completion, free from any Encumbrance together with all accrued benefits and rights.

2.2 The consideration for such sale and purchase shall be the sum of…(US$241,026,747.41) to be satisfied in cash on Completion.

2.3 In addition to the amount payable pursuant to Clause 2.1, the Buyer shall procure the discharge of an outstanding debt of the Partnership owed to an affiliate of Credit Suisse in the amount of…(US$3,973,252.59) (the "Relevant Debt") by payment to Credit Suisse on Completion…

2.4 The Buyer shall be the new general partner of the Partnership…

3.   COMPLETION…

3.2 On Completion all (but not some only) of the steps set out below shall take place…

    (a)  The Sellers shall deliver to the Buyer:
        (i)     the duly executed deed of assumption and retiral and assignation of partnership interests in respect of Rosserlane as general partner in the Partnership and the Rosserlane Partnership Interest in the form attached as schedule 3…

    (b)  The Buyer shall:
        (i)     pay…(US$245,000,000)…into the Proceeds Bank Account…"

*(e) The Deed of Assumption and Retiral and Assignation*

19.   This deed was made between Rosserlane as "Assignor" and Berghoff (the first claimant) as "Assignee". It provided in relevant part as follows:

"3. ASSIGNATION

In consideration of the payment by the Assignee to the Assignor of…(US$245,000,000) under the Sale and Purchase Agreement…the Assignor HEREBY ASSIGNS its whole right, title and interest in and to the Assigning Interest to the Assignee.

4.  ASSUMPTION OF OBLIGATIONS

The Assignee hereby acknowledges the assumption of the obligations of the Assignor under the Partnership Agreement in respect of the Assigning Interest and agrees to be bound by the terms of the Partnership Agreement as if it were an original signatory as a general partner thereto.

5.  RETIREMENT AND RELEASE OF ASSIGNOR

Immediately following the assumption of the Assignee as a general partner of the Partnership and assignation to the Assignee of the Partnership Interest, the Assignor retires from the Partnership and ceases to be a partner of the Partnership in all respects and thereafter shall have no further rights or claims, or obligations as partner of the Partnership. The Assignee and the Limited Partner hereby consent to the retiral of the Assignor and release the Assignor from all obligations under the Partnership Agreement in respect of the Assigning Interest."

*(f)  The Resolution*

20.  The Resolution is dated 5 January 2007, but was first mentioned in a letter dated 1 April 2008 from Rosserlane's solicitors to the buyers' solicitors. The Resolution reads as follows:

"CASPIAN ENERGY GROUP (the "Partnership")

WRITTEN RESOLUTION of Rosserlane Consultants Limited as the General Partner of the Partnership ("Rosserlane") dated 5 January 2007

WHEREAS:

(A) A Loan Agreement was concluded between the Partnership and Credit Suisse Bank, London Branch, on 14 December 2006. The General Partner is interested in the transaction as a result of its interest in the capital of the Partnership;

(B) The Loan was concluded by the Partnership in order to meet certain short term funding objectives of the Partnership;

(C) The fundraising took the form of a loan made, *inter alia*, to the Partnership by Credit Suisse London Branch ("Credit Suisse") in a principal aggregate sum of US$127,000,000 (the "Loan") the terms of which were provided for in the loan agreement entered into between, *inter alia*, Credit Suisse and the Partnership on 14 December 2006;

(D) The Partnership is seeking to conclude a sale by way of its partners, Rosserlane Consultants Limited and Swinbrook Developments Limited.

IT IS RESOLVED THAT:

On the conclusion of the sale of the Partnership, the debts of the Partnership in respect of the Loan and all related interest and costs are to be repaid from the proceeds of the sale, as an interest free loan from Rosserlane to the Partnership. If such a sale is concluded on the basis that no liabilities pass to any eventual purchaser, then it is agreed that the partnership will not repay this loan. If such a sale is concluded on the basis that liabilities will pass to any eventual purchaser, then it is agreed that the Partnership will repay this loan to Rosserlane.

Duly authorised for and on behalf of
Rosserlane Consultants Limited, General Partner
Of CASPIAN ENERGY GROUP

(Signature of Dr Leshkasheli)

Dr Zaur Leshkasheli
Director
For and on behalf of
Rosserlane Consultants Limited"

21.    It will be observed that this Resolution is the document of Rosserlane, not of Caspian. It is not said expressly to be the resolution of Caspian, by its general partner, Rosserlane. On the contrary, it is said to be the resolution "of Rosserlane". On the other hand it is headed "Caspian Energy Group (the "Partnership")", and it is signed by Dr Leshkasheli for Rosserlane described as "General Partner of Caspian Energy Group". It also refers to an agreement between Rosserlane and Caspian in its terms ("it is agreed"). There was evidence before the judge that in Scots law, which it was common ground governed the Resolution, a unilateral promise was binding; and that the Resolution was "valid as an instrument of Caspian".

22.     Nevertheless, the buyers submitted to the judge, and do so again on this appeal, that the Resolution is ineffective as the instrument of Caspian because Rosserlane did not purport in making it to be acting for and on behalf of Caspian. The judge described this argument as "very persuasive" but felt that he was unable to be persuaded to that effect on a summary judgment application in the light of the evidence of Scots law before the court.

23.     The buyers also dispute the authenticity of the Resolution, suggesting that it was created after the forced sale. It is accepted that this dispute cannot be resolved on the buyers' summary application. Therefore, subject to the limited point argued before the judge, the Resolution must for present purposes be given its purported effect, in the light of the other relevant documents. The buyers submitted that as such the Resolution at best created a right (to repayment of the interest free loan by Caspian to Rosserlane) which was an accrued benefit or right which was sold and assigned to them or released by Rosserlane under the Sale and Purchase Agreement and/or the Deed of Assumption. Rosserlane, however, submitted that it was only Rosserlane's rights as general partner of Caspian which were so assigned or released, and that the interest free loan under the Resolution was not such a right of Rosserlane as general partner, because it only arose following sale by which time Rosserlane had ceased to be Caspian's general partner. Since the sale was one under which liabilities passed to the buyers (there being no exclusion of them), in the terms of the Resolution, "it is agreed that the Partnership will repay this loan to Rosserlane".

## Issue 1: Is Rosserlane entitled to recover from Caspian an indemnity or contribution?

24.     It is common ground that under general principles of law and/or equity a guarantor is entitled to an indemnity by way of restitution from a primary obligor of the amount of the latter's liability which the guarantor has been called upon to pay. This is an example of a situation where liability for the same debt rests upon two people, and one of them is forced to discharge it: but as between those two, only one is primarily liable to pay. Similarly, if both are liable to pay as between those two, as in the case of co-obligors in respect of the same debt, but only one is called upon to pay, the payer may obtain a contribution from the other. Other things being equal, that contribution will be 50%: but that may depend on other matters.

25.     In the case of guarantors, the contract of guaranty with the creditor may often make the guarantor into a primary obligor, in order to avoid the pitfalls of guaranties, such as their discharge by waiver and so on. In the normal case, however, the fact that the guarantor is a primary obligor vis a vis the creditor does

not ordinarily mean that he ceases to have only a secondary liability vis a vis the debtor. As *Chitty on Contracts*, 30th ed, 2008, puts it at para 44-003 (Vol II):

> "It is by no means unusual for a party to a contract to be a principal debtor as against the creditor, but a surety as against another debtor. Such an arrangement is commonly entered into where the creditor wishes to avoid the technical rules relating to contracts of suretyship under which the surety may become discharged from liability in various circumstances. In this event, the transaction takes effect according to its terms, that is to say, there will be a contract of suretyship between the principal debtor and the surety, but there will be no contract of suretyship between the surety and the creditor. The creditor is accordingly entitled to treat the surety as a principal debtor in every respect."

26.    A leading authority in such matters is *Duncan Fox & Co v. North and South Wales Bank* (1880) 6 App Cas 1, where Lord Selborne LC explained how everything may depend on the nature of the particular agreements which have been made between the three categories of persons concerned, namely creditor, debtor and surety, or, in the absence of any contract of guaranty, between the two categories of persons concerned, namely co-obligors between whom one has a primary and the other only a secondary liability.

27.    The question in the present case is whether, as between Caspian and Rosserlane, they engaged or contracted with one another on the basis that only Caspian had the primary liability to repay the bank.

28.    If one puts aside for the present the Resolution, there is nothing outside the series of agreements made with the bank originally on 14 December 2006 from which the intentions of the parties can be discerned. Those agreements all involve not only Caspian, which is described as the Borrower, but also its general partner, Rosserlane, which owned practically 100% of the immediate equity interest in Caspian, and also the ultimate owner of the equity in the real assets concerned, Dr Leshkasheli.

29.    As the judge observed, it was common ground that if this matter proceeded to trial there would be no further background or factual matrix, beyond that which was already before the court, which might inform the decision. In these circumstances, the judge preferred the submissions of the buyers to those of Rosserlane. He reasoned the matter as follows:

"29. The difficulty with this submission, as it appears to me, is that the contractual structure of the Loan Agreement, to which both Caspian and Rosserlane were party, is that each Obligor, including Caspian and Rosserlane, is jointly and severally liable to repay the debt and each Guarantor, including Caspian and Rosserlane, is also jointly and severally liable to guarantee to the bank performance by each Obligor of its obligations. Thus, each party (save the bank) is at one and the same time an obligor and a guarantor. Since this is the effect of the Loan Agreement and Caspian and Rosserlane are both parties to the Loan Agreement it is not possible, in my judgment, for Rosserlane to say that, as between Rosserlane and Caspian, Rosserlane was only a guarantor of Caspian's obligations as the primary obligor. They both agreed that each was a primary obligor and a guarantor. Rosserlane is not able to contend that there is any difference between the nature of its liability to repay the loan and the nature of Caspian's liability to repay the loan because Rosserlane and Caspian have agreed that these obligations are identical."

30.   On this appeal, Mr Stephen Phillips QC on behalf of Rosserlane has revisited the arguments which had been put below. He stressed that only Caspian is described as the "Borrower" and has imposed on it the obligations as such, to pay fees and interest and to repay and so forth (see clauses 5/9 and 11). These obligations are only imposed on Rosserlane and the other "Guarantors" as a secondary party. Even though, in clause 10, all parties, qua "Obligors", are said to share in these obligations as joint and several obligations, they remain the secondary obligations of guarantors. In this respect, Mr Phillips withdrew the concession which had been made below, that, at any rate as between Rosserlane and other such guarantor "Obligors" and *the bank*, Rosserlane had become a primary obligor. He submitted that the critical words in clause 19 (the "Guarantee" clause) were that the Guarantors "agree to pay *as if* they were the primary obligor" (clause 19.1(b), emphasis added). That was, he said, recognition that as guarantors they were *not* primary obligors, but only secondary obligors: however, for the standard purpose of eliminating the normal defences of a guarantor, they agreed to be treated *as if* they were primary obligors. Thus, returning to clause 10, he submitted that "The obligations of the Obligors to repay the Loans" etc were not primary obligations, and were not said to be primary obligations, but were the obligations found elsewhere in the Loan Agreement, viz in clause 19 so far as the Guarantors were concerned. By reason of clause 19, Guarantors could be treated, together with Caspian, the Borrower, as if they were primary obligors of the bank and thus as owing obligations to the bank which could be described as "joint and several obligations": but the language of the Loan Agreement itself, on top of describing their obligations in terms of those of guaranty, emphasised their essential secondary status by use of the expression "as if". If that remained the formal position between Rosserlane as guarantor and the bank itself, a fortiori it remained the position between Rosserlane and the true primary debtor, Caspian.

31.    Mr Phillips also submitted that nothing turned on describing Caspian itself as a guarantor. This was because each Obligor bound itself to observe the covenants contained in clause 16: and to this extent Caspian itself became the guarantor of the other parties' obligations.

32.    In my judgment, if the documentation had stopped there, I would have considered the argument to be somewhat poised: between the buyers' submission that overall the Loan Agreement demonstrated there to be no substantial difference intended between the position of Caspian as Borrower and that of any other Obligor or Guarantor; and on the other hand Rosserlane's submission that the difference between the primary obligation of Caspian and the merely assimilated obligation of Rosserlane was retained. On balance, I would have been inclined to favour the latter submission. But the documentation does not stop there.

33.    First, there is the Security Agreement, by clause 2.1 of which each Chargor (which expression includes both Caspian and Rosserlane) covenants that "as primary obligor and not merely as surety…it will on demand pay…" That is express language whereby Rosserlane is said to accept a primary obligation and not merely a secondary obligation as guarantor. That is an agreement which binds Caspian and Rosserlane, and not merely Rosserlane and the bank. Even so, even that might not be enough to exclude a true relationship of primary debtor and guarantor where that can otherwise be proved: see *Heald v. O'Connor* [1971] 1 WLR 497 (per Fisher J at 503D).

34.    Of especial importance, however, is the Participation Agreement. This in its way is the focus of the whole arrangement. The loan is a short-term loan, originally for one year only and marginally extended, designed to enable the partners, ie essentially Rosserlane, to sell their equity in Caspian and thereby repay the bank. The partners have eight months to sell of their own accord, and after that the bank becomes entitled to exercise a forced sale on their behalf. From beginning to end of the arrangement, therefore, and whether the sale were to be voluntary or forced, it was always contemplated and expressly provided for that the loan (and any equity uplift under the Participation Agreement) would be paid out of the proceeds of sale, directly to the bank's own account. Since the proceeds would come from the sale of Rosserlane's partnership interest in Caspian, it would follow that the loan would be repaid by Rosserlane, not by Caspian. This therefore is not the normal situation where a guarantor's right of indemnification or reimbursement from the principal debtor is designed to ensure that the guarantor does not lose out merely from the choice of the creditor as to the source of his payment. This is not the normal situation where as between a principal debtor and his guarantor it is agreed or understood that the debt is only that of the former and that if the guarantor is called upon to pay, he will be reimbursed. This is an entirely special case where, from beginning to end, the funds with which to repay the loan were to come from the partners, ie from Rosserlane.

35.    In such a case it seems to me to be impossible to say, in the absence of express agreement between Caspian and Rosserlane, that Caspian is to have any further liability to reimburse Rosserlane. After all, Rosserlane has an equity interest in Caspian, the value of which has to reflect Caspian's debt to the bank. It makes no difference to Rosserlane (fiscal and other such considerations apart) whether Caspian repays the loan (and ancillary obligations) and Rosserlane receives any remaining equity value, or whether Rosserlane receives the gross value of Caspian, but itself provides the bank with what is owed to it. In these circumstances, it is impossible to believe that it was nevertheless an essential part of this transaction that Rosserlane retained a right to be reimbursed by Caspian. On the contrary, this would have made no sense. There is only one egg, the value of Caspian's interest in the Shirvan oil field, and that egg is to be used to repay the loan, for the benefit, and not the burden, of all those, such as Rosserlane or ultimately Dr Leshkasheli himself, who have an equity interest in, and thus a responsibility to the bank to support the indebtedness of, Caspian.

36.    Thus Rosserlane's counter-example (designed to underline the importance of its submission) whereby Caspian receives the loan on day one and Rosserlane is called upon by the bank to repay the loan on day two, leaving Caspian enriched by the loan and Rosserlane impoverished by its guaranty, is beside the point, and rather demonstrates how very different is the factual scenario of the present case. The sale, on terms that the proceeds of it will go to discharge Caspian's obligations to the bank, means that the proceeds of the sale are enhanced by the value of those obligations. For otherwise, if Caspian were liable to discharge those obligations, its value to a buyer would have been reduced by a correlative amount.

37.    In my judgment, therefore, the Participation Agreement disposes of both ways in which Mr Phillips seeks to put the point of Rosserlane's common law rights. Whether Rosserlane seeks the complete indemnification of a guarantor or the contribution of a co-obligor, the answer in either case is provided by the parties' contract. Rosserlane's partnership interest will be sold, the proceeds will discharge all liabilities to the bank, and the parties' agreement as to the disposal of those proceeds is a complete answer to any further suggested cross-liabilities between Caspian and its partners.

38.    For these purposes, the submission of Rosserlane that the structure or potential value of the sale of Rosserlane's partnership interest makes any difference is misconceived. It is suggested that the partnership interest sold was worth more than the $245,000,000 obtained, possibly up to a minimum of $500,000,000; and that because the sale was done on an "as is" basis, without any representations or warranties as to existing liabilities, therefore it was to be assumed that the buyers were factoring into their price of $245,000,000 the potential liability to Rosserlane arising out of it discharging Caspian's liabilities to the bank. However, this is all beside the point. No one for present purposes knows that greater value could have

been extracted on a sale of the partnership interests in the circumstances in which it was sold. Apparently other litigation may arise between the partners and the bank in which the partners may say that the bank did not achieve a proper price for what it sold. So be it. But it is not suggested in the present proceedings that anything depends on investigating the facts underlying the sale to the buyers. All that one can say, in theory, is that the buyers under a forced sale without representations or warranties as to Caspian's business are going to offer less than might otherwise have been obtained: (a) because the sale is a forced sale by a bank rather than by a seller who has a choice in the matter; and (b) because the sale is on an "as is" basis.

*Issue 2: What is the effect of the Resolution?*

39.    Rosserlane relies on the Resolution as a side agreement or binding unilateral promise on the part of Caspian under which it made itself liable for reimbursement of Rosserlane's secondary liability.

40.    For present purposes it must be assumed, subject to the buyers' respondents' notice, that the Resolution represents an obligation of Caspian to Rosserlane on its own terms.

41.    The first point is raised by that respondents' notice. On behalf of the buyers Mr George Leggatt QC submits that the judge was wrong to reject the submission that the Resolution is only Rosserlane's document, not Caspian's. He points out that it speaks only of being the authorised document of Rosserlane, and that the reference to "General Partner of Caspian" is mere description. In my judgment, however, against the background of the current evidence of Scots law, the judge was right to say that he was unable to deny Rosserlane's argument a real prospect of success. It can be observed (a) that the document is headed "Caspian Energy Group (the "Partnership")"; (b) that Rosserlane is designated the "General Partner of Caspian"; and (c) that the body of the Resolution refers to it being "agreed" between Rosserlane and Caspian that certain consequences will follow a sale of the Partnership. In the light of the Scots law evidence, I agree with the judge that this point cannot be summarily decided.

42.    The second point is to ask what if any light the Resolution throws on issue 1 above. It is not contemporaneous with but subsequent to the Loan Agreement and its ancillary documentation, but it is perhaps significant that it does not proceed on the straightforward common law basis that the use of the proceeds of sale to repay the bank will leave Caspian with a liability to reimburse (or to contribute to)

Rosserlane's payment to the bank. On the contrary, it proceeds on the different basis that the repayment of the bank from the proceeds of the sale will be achieved by Rosserlane granting an interest free loan to Caspian, presumably with which to discharge Caspian's liability to the bank. That, however, ignores how the Participation Agreement is structured, which is that the proceeds are paid directly to the bank, at its own account, as its own moneys (see clause 3.6, which says that any money received by an Equity Owner is held on trust for the bank), for application by the bank first in discharge of anything outstanding under the Loan Agreement. Nothing gets paid to Caspian by anyone, nor does Caspian pay the bank anything. It is simply not contemplated that anything will pass to or through Caspian's hands at all. Thus the Resolution ignores the structure of the parties' agreement.

43.    Moreover, the Resolution also ignores Rosserlane's submissions as to how the common law rules of indemnification (or contribution) are supposed to work in Rosserlane's favour. The Resolution does not reflect those rules. If it did, it would provide that on payment of the sale proceeds (or some of them) to the bank in repayment of the loan, Caspian would owe an obligation to Rosserlane to indemnify it (or to contribute). Thus the Resolution offers no support to Rosserlane's primary argument.

44.    Given the structure of the Participation Agreement, it is not apparent to me how the Resolution could possibly work. Rosserlane, whose proceeds of sale are to be paid to the bank, will never have any funds to lend to Caspian until the loan has already been repaid.

45.    It may be that some such point was debated before the judge, for he said:

"44. It was said that in any event the right to repayment pursuant to the Resolution was inconsistent with the Loan Agreement which was restated on 13 December 2007 after the date of the Resolution and therefore could not be effective. I agree that Caspian's obligation to repay the interest free loan to Rosserlane is contrary to the scheme and business sense of the Loan Agreement but I am not persuaded that on that account it cannot be effective as between Rosserlane and Caspian. If this had been the only point I would not have said that there was no real prospect of the counterclaim succeeding on account of it."

46.    On appeal, this matter was not revisited, and in any event the second point under this heading of my judgment was not the subject-matter of any submissions. It is not clear to me that the matter considered by the judge and the matter about which I have just expressed my views are the same, for he speaks of the Loan Agreement

and I refer to the Participation Agreement. But in any event, I do not treat this point as decisive. It does however support, and certainly does not detract from, the answer which I have given to issue 1 above.

47.     The third point is the consequence of any possible liability on the part of Caspian to repay the interest free loan, on the assumptions that the Resolution is binding on Caspian according to its terms, and that the structure of the Participation Agreement did, contrary to my view, enable Rosserlane to make an interest free loan to Caspian in the first place. That raises issues under the Sale and Purchase Agreement and/or the Deed of Assumption.

48.     On behalf of the buyers, Mr Leggatt raised arguments to the effect that the existence of the Resolution was not disclosed to the buyers for the purpose of the sale. If that is correct, it certainly does not improve the merits of Rosserlane's submissions, but on the other hand the sale was made without representations or warranties, and such due diligence as the bank permitted the buyers to perform by means of disclosure through the operation of a virtual "Data Room", whether adequate or inadequate, would be an uncertain basis upon which to lay blame on Rosserlane.

## *Issue 3: What is the effect of the Sale and Purchase Agreement and the Deed of Assumption?*

49.     Assume that I am wrong so far, so that upon the sale of Rosserlane's partnership interest to the buyers, Caspian would, other things being equal, be under an obligation either (i) to indemnify Rosserlane against its liability as Caspian's guarantor; or (ii) to contribute to Rosserlane its share of what Rosserlane has paid the bank as co-obligor with Caspian; or (iii) to repay the interest free loan contemplated by the Resolution.

50.     The question would then arise as to whether any such liability on the part of Caspian would survive the terms of the sale?

51.     The judge accepted the buyers' submissions that the Sale and Purchase Agreement, by its clause 2.1, transferred to the buyers, as "accrued benefits and rights", any rights that Rosserlane might have had to repayment of the loan under the Resolution. The judge also accepted the submission that in any event any such rights were released under clause 5 of the Deed of Assumption. He said:

"39. Counsel for Rosserlane submitted that the right to repayment was not an accrued benefit or right. Firstly, it was said not to be an *accrued* benefit or right. It would only accrue when the sale price had been paid and the interest free loan made by Rosserlane to Caspian. Secondly, it was said not to be a partnership benefit or claim because it was a claim against Caspian. Thirdly, the means by which effect was given to the sale was the Deed of Assumption and all that was assigned was "the Assigning Interest" which, it was common ground, did not include the (assumed) right to repayment pursuant to the Resolution.

40. I am not persuaded by any of these points. I do not consider any of them has a real prospect of success. Firstly, either the right to repayment accrues on sale (because the making of the loan occurs simultaneously with the paying of the price) or, if there is a scintilla of time between the paying of the price and the making of the loan, it cannot have been intended that such a scintilla of time would prevent the right being described as having accrued on sale. Secondly, the rights which are transferred are those which Rosserlane has as general partner. The right to repayment was a right of Rosserlane as general partner because that was the capacity in which it had made the loan. Thirdly, the fact that the Deed of Assumption does not refer to the sale of the accrued benefits and rights does not prevent them passing pursuant to the terms of the Sale Agreement.

41. If I am wrong in concluding that the right to repayment was an "accrued benefit or right" then it was released pursuant to clause 5 of the Deed of Assumption. That clause provided that Rosserlane "shall have no further rights or claims, or obligations as partner of the Partnership." In response it was said that the right to repayment was not a partnership right. However, it seems to me that it was clearly a right which Rosserlane had as partner of the Partnership. The interest free loan had been made because Rosserlane was the general partner."

52.     Many of these submissions were raised again on appeal. In my judgment, the effect of the sale was to assign the accrued rights and to prevent the accrual of any further rights after sale. Nothing else makes any sense. Therefore, if, at the point of sale, the loan was an accrued right, it was assigned. If, however, it was not an accrued right as at that point, it was too late for Rosserlane, who was after all no longer general partner, to accrue any further right thereafter. To that extent I would agree with the judge.

53.     As at the completion of the sale, the assumed loan to Caspian (which could not have occurred, see above, but that is another matter which I leave out of account) had not of course yet taken place. Ex hypothesi, it could only take place out of the proceeds of the sale. Therefore, however little amount of time thereafter it might be supposed to have occurred, it was not an accrued right or benefit of Rosserlane

at the moment of sale. Therefore it was not assigned. To that extent, I would respectfully disagree with the judge. On the other hand, when thereafter the loan was granted to Caspian out of Rosserlane's proceeds of sale (the argument is that the loan was granted to Caspian in order to permit Caspian to repay the bank, but of course the bank had already been repaid, but that again is another matter which I leave out of account), the loan which then came into place for the first time was not, in my judgment, a loan made by Rosserlane to Caspian as its general partner, because ex hypothesi Rosserlane had, upon sale, already sold and assigned its partnership interest to the buyers. Therefore, the loan could not have been made as general partner.

54.     It is true that the Resolution, assuming it to have been the resolution of Caspian made by Rosserlane as its general partner, was made at a time when Rosserlane was general partner, and thus the agreement which that Resolution evidenced and authorised was an agreement between Caspian and Rosserlane as the former's general partner. Any right that such an agreement might have given to Rosserlane must have been an accrued right which passed under the sale to the buyers and which Rosserlane could not thereafter enforce. Moreover, ex hypothesi it was an agreement which *could only take effect* after sale, when Rosserlane was no longer general partner. Even on the assumption that Rosserlane could bind Caspian in this way, proleptically, looking forward to a time when it would no longer be general partner, nevertheless the loan was made and the obligation to repay it was incurred at a time when the partnership link had been severed. In these circumstances and at such a time "the Assignor…thereafter shall have no further rights or claims". Yet that is exactly what Rosserlane on its counterclaim is seeking to advance, a further right or claim. In my judgment, it cannot do so.

55.     If, on the other hand, as the judge thought, the right to repayment of the interest free loan was an accrued right, then it was transferred.

56.     In his submissions, Mr Phillips on behalf of Rosserlane was concerned to make the point that the interest free loan had not been made by Rosserlane as general partner. It will have been seen that I agree. But it follows, in my judgment, that Rosserlane cannot recover from Caspian in respect of it. The loan has to fall on one side of the line of the sale or on the other side of that line. It cannot straddle it. Mr Phillips would prefer to say that it falls on the other side of that line, that is to say post-sale. But whichever side it falls on, Rosserlane cannot pursue a right to recover.

57.     If, alternatively, attention is switched to an assumed right of indemnity or contribution, this right must be viewed, in my judgment, as an accrued right, for it arises at the very moment of sale, when Rosserlane's proceeds are paid, under the terms of the sale and of the Participation Agreement, to the bank as its own moneys, for it to dispose of in accordance with the terms of the Participation Agreement. Therefore, at and by the time of the sale, Rosserlane's prima facie

right to receive the proceeds of sale had already been transmuted into the obligation to permit the bank to receive the proceeds primarily to repay itself what it was owed under the Loan Agreement. If, contrary to my conclusions above, that left any right in Rosserlane to receive an indemnity or contribution from Caspian, that right was in that instant (and not a scintilla thereafter) transferred to the buyers themselves.

## *Conclusion*

58.    For these reasons, I would dismiss this appeal. Rosserlane has no real prospect of succeeding at trial on its counterclaim.

**Lady Justice Arden :**

59.    I agree.

**Sir Anthony Clarke, MR :**

60.    I also agree.

BIRCH *v.* WRIGHT

other way; for as soon as the other three townships were separated, the remaining five had a right to be so. It is clear that the parish, as a parish, cannot have the benefit of the Statute 43 Eliz. because it has always had a greater number of overseers than are allowed by that Act. Therefore upon that ground, as well as upon the former, that the other three townships have had separate overseers, I am of opinion that the five remaining ones are also entitled to have them.

Buller, J. The parties applying for this rule must necessarily make out two points before they can succeed. First, that this is a township. And, secondly, that it cannot have the benefit of the 43 Eliz.

The last is the point which has been most relied on: for as to the first, it certainly is a township. Wherever there is a constable, there there is a township. There may be a constable for a larger district than a township, but not for a smaller. The doubt in many of the cases, whether such a place was a township or not, has arisen where there was no constable.

Then the remaining question is, whether the township of Pilsworth can have the benefit of the 43 Eliz.? What is a decisive answer against that is, that the other three townships have separate overseers. We must consider what is meant by the bene-[377]-fit of the statute. It is that the parish may maintain their own poor, as a parish: for unless they can do it, as such, they cannot have the benefit of that statute. Now it is here stated that three of the townships maintain their own poor; but unless they all join, they cannot reap the benefit of the statute.

It has been argued that the parties applying for the mandamus should have shewn special reasons to the Court why they cannot have the benefit of the statute. But in fact they have done so; for they have stated the largeness of the parish, and its great population, which circumstances are not denied by the other side. Independently of these reasons, another ground laid for the mandamus is that the five remaining townships require five overseers. If from necessity they must have five overseers to govern their poor, that affords a strong argument to prove that even if these five comprehended one parish, independent of the other three, yet they could not enjoy the benefit of the 43 Eliz. which allows only four overseers.

The cases which have been mentioned were all rightly decided, but they do not apply to the present. As to the case of *Peart and Westgarth* (a), the parish had enjoyed the benefit of the Statute of Elizabeth for 120 years. After such a length of time, the Court said that they must have shewn to them some strong reasons to induce them to believe that it could not be continued, before they would appoint overseers in a different manner from that pointed out by the Statute of Elizabeth, notwithstanding any intervening custom for 40 years: but no sufficient reason appearing, they directed one joint appointment for the whole parish. Next, as to the case of *The King* against *The Justices of Middlesex* (b), it appeared most clearly that the parish of Kentish Town could have the benefit of the Statute of Elizabeth. There were two overseers appointed for the whole parish, which was sufficient to answer the purposes of the statute. Then as to the case of *The King and Uttoxeter* (c), the answer to it is, that the parish did not shew that they could not have the benefit of the 43 Eliz.

Per Curiam (d),
Rule absolute (e).

[378] BIRCH *against* WRIGHT. Friday, Nov. 10th, 1786.  An action for use and occupation may be maintained by a grantee of an annuity after a recovery in ejectment against a tenant, who was in possession under a demise from year to year, for all rent in his hands at the time of notice by the grantee, and down to the day of the demise in the ejectment; but not afterwards.

[Adopted, *Phillips* v. *Homfray*, 1883-86, 24 Ch. D. 462; 11 App. Cas. 466.]

This was an action for use and occupation, tried at the sittings at Westminster,

---

(a) 3 Burr. 1610.              (b) Bott, 17.              (c) Dougl. 332.
(d) Ld. Mansfield was not able to attend on this or any subsequent day in the term.
(e) Vid. *R.* v. *The Inhabitants of Leigh*, post, 3 vol. 746; and *R.* v. *T. Newell*, post, 4 vol. 266.

after last Easter term, before Buller, J. when a verdict was found for the plaintiff, subject to the opinion of the Court of King's Bench, on a case which stated in substance as follows:

That the defendant, before the 18th of July 1777, was tenant from year to year of the lands in question to Mr. Bowes, at the yearly rent of 223l. 10s.—payable half yearly, viz. on the 12th of May and the 22d of November.

That by indenture of 18th of July 1777, Mr. Bowes and his wife Lady Strathmore granted annuities to several persons therein named for the life of Lady Strathmore; and they covenanted to levy a fine to the use of the plaintiff and Mr. Goostrey (who is since dead) upon trust to receive the rents and pay the annuities out of them, and then to pay the residue to Mr. Bowes and Lady Strathmore. That a fine was levied accordingly.

That the defendant paid all the rent which was due on the 22d of November 1785, except 81l. 15s. to Mr. Bowes, which sum of 81l. 15s. is still unpaid; and no rent has been paid by the defendant since that time.

That in May 1785, the plaintiff and Goostrey brought an ejectment against the defendant, and laid the demise on the 6th of April 1785.

That in Trinity term 1785, they obtained judgment; and in September 1785 gave notice to the defendant of their title, and required him to attorn to them and to pay to them the money already in his hands: but the defendant refused to attorn, and thereupon a writ of possession was executed, and the defendant quitted the premises mentioned in the declaration.

That Lady Strathmore is still living.

The question for the opinion of the Court is, whether the plaintiff is entitled to recover any and what sum of money in this action?

This case was argued in last Trinity term by Chambre for the plaintiff, and Law for the defendant; and again on this day by Cowper for the plaintiff, and Mingay for the defendant. But as the Court in giving judgment went so fully into all the points made, and cases cited, at the Bar, it is thought unnecessary to state the arguments at length.

[379] Ashhurst, J. It is very material to distinguish the different dates and times. From the 6th of April 1785 to the time of recovering in the action of ejectment, in my opinion the plaintiff is precluded from recovering in this form of action; for that would be blowing both hot and cold at the same time, by treating the possession of the defendant as that of a trespasser, and that of a lawful tenant, during the same period. The plaintiff cannot first recover in ejectment, and then for use and occupation for the time subsequent to the day of the demise in such ejectment.

But as for the rent due antecedent to the time of the demise, there is no doubt but this action is maintainable. For the Statute of the 4th of Ann. having rendered attornment unnecessary, and having put the party in the same situation by the conveyance as if the tenant had attorned, he is to be considered in possession; and then, as there is no deed between these parties, he may maintain this action for use and occupation. *Moss v. Gallimore (a)* is expressly in point, and stronger than the present case. So that the plaintiff may recover all the rent due at the time of notice given which remained in his hands, and must be considered as landlord from such time, provided the tenant be not prejudiced by the payment of any rent before notice.

The question then is, whether bringing an ejectment is a bar to an action for use and occupation for rent due before the time of the demise? In my opinion it is not, for the actions are not inconsistent. The landlord admits him to be tenant till the 6th of April 1785, and consequently is entitled to rent before that period; and after that he considers him a trespasser.

Buller, J. Upon this case two questions have been argued;

1st, whether the plaintiff be entitled to any of the rents and profits of the lands occupied by the defendant? and,

2dly, supposing him to be entitled to them, whether he can recover them in this form of action?

The material thing to be considered is, who are the parties in the business, and what are their respective interests.

First, I will begin with the defendant, who is the tenant. He originally came

---

1150                    BIRCH *v.* WRIGHT                    1 T. R. 380.

into the estate as tenant from year to year to Mr. Bowes; he was so at the time of
the conveyance from Mr. Bowes to the plaintiff, and he continued to hold the estate,
as such, without any new agreement or notice of the conveyance till the ejectment
was brought.  Whilst he was tenant to Mr. Bowes, he clearly was entitled to six
months' notice before **[380]** the end of a year to quit, and he could not have been
turned out without it.  I hold that he was entitled to the same notice from the
plaintiff before he could be evicted; for as the plaintiff claims under a conveyance
from Mr. Bowes, he cannot be in a better situation than Mr. Bowes himself was.  He
stands exactly in the place of Mr. Bowes, with this difference, that his title is subse-
quent to the title of the defendant.  I mention this difference only for the purpose
of at once laying the case of *Keech and Hall,* Dougl. 21, out of the question.  There a
mortgagor made a lease for years subsequent to the mortgage, and that lease was
holden to be void as against the mortgagee.

In this case I consider the defendant as holding during all the time under a demise
made before the conveyance to the plaintiff.  For if a tenant from year to year hold
for four or five years, either he or his landlord at the expiration of that time may
declare on the demise as having been made for such a number of years.  So it is
expressly laid down by the Court in *Legg* v. *Strudwick,* Salk. 414; though in the next
preceding page there are two cases which at first seem to have been determined
otherwise; the one in the Court of Common Pleas, the other by Holt, Ch.J. at Nisi
Prius: but those are short loose notes jumbled together with others, and not to be
relied on.  Besides, when those cases are examined, they will be found not to contradict
the case of *Legg* v. *Strudwick.*  That in the Common Pleas was *Bellasis and Burbrich;*
and Salkeld (*a*) states it thus: On a lease made for a year, and so from year to year
so long as both parties pleased, it was adjudged a lease for two years, and afterwards
at will.  The same case is reported in Lutw. 213; and it was an action for a rescue;
and the plaintiff stated in his declaration a demise for a year, and so from year to
year, &c., and he distrained for a year and a half's rent.  It was objected that the
lease determined at the end of one year, and so the plaintiff could not distrain for the
rent of that year and half a year more: but it was answered, and so agreed by
the Court, that it was a good lease for two years at the least.  Two years covered
the whole time which was material in that case; it was quite unnecessary to say
what would be the effect of the lease after the two years, and therefore the Court
said nothing about it.  Much less did they say that after the two years it was only
a lease at will; on the contrary, the expression of at the least, imports that it might
be good for more.  The other is a case said to have been determined by Holt, Ch.J.
at Nisi Prius at Lincoln; and Salkeld reports it thus: If A. demise lands to B. **[381]**
for a year, and so from year to year, this is not a lease for two years and afterwards
at will, but it is a lease for every particular year, and after the year is begun the
defendant cannot determine the lease before the year is ended.  But in a lease at will,
the defendant may determine his will after the payment of his rent at the end of a
quarter, but not in the beginning, lest his lessor should lose his rent.  In that case
the question seems to have been whether, after the third year commenced, the lessor
was entitled to the whole year's rent, and Holt, Ch.J. held that he was; because the
tenant could not determine the estate in the middle of the year.  And the expression
for every particular year, does not mean that such a lease operates as a distinct demise
for each year separately, but that when any year has commenced, it is good for the
whole of that year.  Besides, if the case admitted of any other construction, yet after
*Legge and Strudwick,* which was decided by Holt himself in this Court ten years after-
wards, it is impossible to entertain a doubt about it.

It would be unjust to a tenant to say he should be turned out by the assignee of
a reversion, or by any person claiming under his lessor, when he could not be turned
out by the lessor himself.  On the other hand it is no injustice, it is no hardship on
the assignee to say, he must comply with the same rules and conditions as the person
of whom he bought has subjected himself to.

Whether the plaintiff be considered as a mortgagee only, or as a purchaser, or
assignee of the reversion, it will make no difference in this part of the case.  His title
first accrued in July 1777; it was too late then to give notice to the defendant to quit
at the end of the current year, for that expired on the 22d of November.  The

_____

(*a*) 413.

BIRCH *v.* WRIGHT                    1151

defendant, therefore, at the time that the plaintiff's title accrued, had as permanent
an interest in the estate till the 22d of November 1778, as if it had been leased to
him by deed till that time.   He had also a further interest in it, unless determined
by six months' notice previous to that time ; which notice never having been given,
he continued rightful tenant to some one down to the time that the ejectment was
brought.

This brings me to consider who is entitled to that rent ?  That depends on the
nature and effect of the conveyance from Mr. Bowes to the plaintiff, and the operation
of the statute of the 4th Ann. c. 16.   And whether it be considered as a mortgage,
or as an absolute grant of the reversion, in my opinion it will make no difference.
There is in some respects an analogy [382] between this case and the case of a
mortgage, for it is a security for money ; the annuities or rents are to be paid out
of the rents and profits, and then the remainder of those rents and profits is to be
paid to Mr. Bowes.   So in the case of a mortgage, till the principal is called for, the
interest is to be paid out of the rents and profits, and the remainder is to be retained
by the mortgagor.   In both cases the borrower would be liable to pay it, if the rents
and profits were not sufficient ; but that is by virtue of his covenant.   In other
respects this case is not at all like a mortgage ; for a mortgage is always in its nature
redeemable, but these annuities are not made so.   And I hold that this is a grant of
the reversion, and not a mortgage.

But I will first state how the case would stand, supposing Mr. Bowes and the
plaintiff are to be considered as mortgagor and mortgagee.   In that light it would be
said that there is an implied agreement between the mortgagor and the mortgagee,
that the mortgagor shall hold as tenant at will to the mortgagee, paying the interest
from time to time, and the principal when called for.   If the mortgagor be tenant at
will, he is entitled to the rents and profits till that will is determined ; and whenever
the will is determined, it cannot have relation back to a former time ; because that
would be by a subsequent Act to make an estate tortious which was rightful at the
time it existed.   That a mortgagor has often been called a tenant at will to the
mortgagee in Courts of Law and Equity is undoubtedly. true, but I think inaccurately
so ; and the expression has been used when it was not very material to ascertain
what his powers or interest were, or to settle with any great precision in what respects
he did, and in what respects he did not, resemble a tenant at will.   In old cases he
is sometimes called tenant at will, and sometimes tenant at sufferance.   In *Keech* v.
*Hall*, Wallace called him the agent of the mortgagee, and Lord Mansfield stated him
to be tenant at will to some purposes, but not to others.   In *Moss* v. *Gallimore*, Lord
Mansfield said a mortgagor is not in reality a tenant to the mortgagee ; if he were
he must pay rent, but that is not so.   To many purposes he is like a tenant at will ;
but he does not pay rent ; he must pay interest only.   Mr. Justice Ashhurst said,
"In some respects a mortgagor is strictly tenant at will :" but that is not so here ; for
the mortgagor is not in possession, and there cannot be a tenant to a tenant at will.
If a tenant at will lease, it determines the will.

[383] Whoever wishes to wade through all the old books on this subject will find
a great collection of cases in Comyns's Digest, title Estate, l. H.   But it is an herculean
labour ; and, with the opinion which I hold, namely, that this is not a mortgage, it
would be quite useless and immaterial in the present case.

Whenever it is necessary to decide a similar question between the mortgagor and
mortgagee, it seems to me that it will be quite sufficient to call them so, without
having recourse to any other description of men, or to what they are most like.   But
if a likeness must be found, I think, as it was put by Ashhurst, J. in *Moss* v. *Gallimore*,
a mortgagor is as much, if not more, like a receiver than a tenant at will.   In truth
he is not either.   He is not a tenant at will, because he is not entitled to the growing
crops after the will is determined.   He is not considered as tenant at will in those
proceedings which are in daily use between a mortgagor and mortgagee ; I mean in
ejectments brought for the recovery of the mortgaged lands.   If he were tenant at
will, the demise could not be laid on a day antecedent to the determination of the
will (a).   But it is every day's practice to lay the demise on a day long before there
has been any actual determination of the will ; sometimes back to the time when the
mortgage became forfeited, and no objection has ever been made on that account.

───────────────────────────────

(a) Vid. *Goodtitle d. Gallaway* v. *Herbert*, post, 4 vol. 680.

He is not a receiver; for, if he were, he would be obliged to pay all the rents and profits to the mortgagee, which is not the case. Two things which differ from each other in any respect cannot be the same; therefore he is neither tenant at will, nor receiver. Nor is it necessary that he should be so; for a mortgagor and mortgagee are characters as well known, and their rights, powers, and interests as well settled, as any in the law. The possession of the mortgagor is the possession of the mortgagee; and as to the inheritance, they have but one title between them. The mortgagor has no power of making leases to bind the mortgagee. He cannot against the will of the mortgagee do any act to disseise him. Cro. Jac. 660. Cro. Car. 304. 3 Lev. 388, and Skin. 424. And the reason is, because the mortgagee, so long as he receives his interest, is virtually and in the eye of the law in possession. The mortgagee has a right to the actual possession whenever he pleases; he may bring his ejectment at any moment that he will; and he is entitled to the estate as it is with all the crops growing on it. He is also entitled to all the rents which have become due **[384]** since his mortgage, and which are unpaid; as was determined in *Moss and Gallimore*, which case I hold to be sound law; and I am desired by Lord Mansfield to declare, that, on consideration, he is most perfectly satisfied with that decision. The case was, that one Harrison, having demised an estate to the plaintiff for 20 years, afterwards mortgaged it to the defendant, who, without having ever been in the actual possession of the rents, distrained on the plaintiff for rent in arrear, and the distress was held lawful. The legality of the distress depended on the stat. 4 Ann. c. 16. Before that statute, if a reversion were granted over by deed which operated only as a common law conveyance, without attornment the grant itself was void to all intents and purposes. But it was not so where the grant was by fine or by deed of uses, on which the Stat. 27 H. 8 operated; for, in the case of a fine, the estate passed to the conusee and his heirs, and an attornment in that case was necessary only to make a privity between the tenant and the conusee, and, if made after the death of the conusee to his heirs, was sufficient. Where the reversion was conveyed by a deed of uses, the grantee might distrain without any attornment at all. Co. Lit. 309. 6 Co. 68. Cro. Jac. 192. The statute enacts, that all grants or conveyances thereafter to be made by fine or otherwise, of any manors, rents, reversions, or remainders, shall be good and effectual to all intents and purposes, without any attornment of their tenants, as if their attornment had been made. This clause comprehends all grants and conveyances, and therefore whether it be a grant by way of mortgage, or of the fee-simple, or only of the reversion for a term of years, as in the present case, it makes no difference. And the effect of the clause is, that it creates an immediate privity between the grantee and the tenant. It cannot be restrained merely to the making of the grant good as between the grantor and grantee; 1st, because it expressly mentions grants by fine; and they were good to all purposes before without attornment, except as to creating such a privity as would enable the grantee to distrain; 2dly, because the statute says the conveyance shall have the same effect as if an attornment had been made. Now if an attornment in fact were made before the statute, there can be no doubt but the grantee was perfect landlord to the tenant, and entitled to all the rents accruing due from the time of the attornment; though according to Co. Lit. 310 b. it would not have entitled him to the rents which became due between the time of the grant and the time of the attornment; which is contrary to what the **[385]** plaintiff's counsel have contended on this point, namely, that the attornment would relate back to the time of the grant.

The Legislature having gone the length of making the grantee a perfect landlord without the knowledge of the tenant, it occurred to them that mischiefs might ensue by leaving the tenant open to a distress or action for the rent at the suit of a person of whom he knew nothing, and after he had paid his rent to his original landlord; and therefore they prudently added the proviso, that no person should be prejudiced by payment of rent to any grantor or conusor, or by breach of any condition for non-payment of the rent, before notice should be given to him of the grant by the conusee or grantee. I say they prudently added that proviso, because perhaps it was not absolutely necessary; for the wisdom, the benevolence, and the liberality of the common law had made the same provision before.

The case of *Sir John Watts and Others* v. *Ognell*, Cro. Jac. 392, is a strong proof how much equity and good sense have always prevailed in the law. That case was debt for rent by the assignees of a reversion under a fine levied to their use. Several

objections were made in arrest of judgment; one of which was that the declaration was not good, because it was not alleged that the lessee upon this grant by fine attorned, nor that he had any notice of the use limited; and even if he might avow without attornment, yet notice ought to be given to the lessee, for otherwise he should be at mischief; for the use might be limited, and he not having conusance thereof might pay his rent to his ancient lessor. Of this point the Court doubted; but afterwards they held that the action was well brought, and that notice need not be alleged in the declaration. But they agreed that the lessee is not bound to pay without notice; and if he hath paid it to his ancient lessor, it is a good excuse for him, and he may plead it: and if he hath not paid it, the action gives him notice to pay it to the grantee, and then he is chargeable for all which was not paid. This case, though decided almost 100 years before the passing of the Act of Queen Ann., where actual attornment was not necessary, established the same rule which the Act professes to make. And it is a case well worthy of observation; for, 1st, it shews how much the common law regarded and required notice, where a person had not the means of knowing; for at that time there was no statute which required notice to be given. 2dly, it shews that, where attornment is dispensed with or supplied by a [386] statute, the grantee has as complete and perfect a title as if attornment had actually been made. 3dly, this case fortifies an argument, on which I relied much in the case of *Moss and Gallimore*, drawn from the form of pleading, namely, that since the statute an attornment never is alleged either in a declaration in covenant, or in an avowry; which can only be because it is supplied by the statute, and therefore unnecessary. And, 4thly, it proves that nothing can excuse the lessee from paying the rent to the assignee, but actual payment to the original lessor without notice of the grant; and, if that be his case, he may plead it.

From hence I conclude that the plaintiff was the landlord of the defendant. He had a clear legal title which he could support upon pleading, either in an action of covenant, or in avowry; and the tenant was answerable to his action, unless he could allege some legal bar in his defence, and which I think he could only do by shewing payment to the grantor before notice.

The first proposition which I laid down was, that the defendant under his first demise continued rightful tenant to some one till the time when the ejectment was brought. And now I say that that some one, during all the time that the rent in arrear accrued, was the plaintiff. Consequently the plaintiff is entitled to maintain an action for use and occupation against the defendant for all that is due and unpaid, as rent during the time that the plaintiff was landlord and the defendant had the premises as his tenant.

But then another question remains to be considered, namely, down to what time the plaintiff is entitled to recover that rent in the present action.

For the plaintiff it was contended, that he had a right to recover it down to the time of executing the writ of possession; and to establish this point four cases were quoted.

1st, a Nisi Prius determination cited in Cowp. 246. There is no name to it; but it was tried at Launceston Assizes when Gould, J. was at the Bar; and there the lessor of the plaintiff in ejectment had likewise brought an action for use and occupation of the same premises for rent which had accrued subsequent to the time of the demise. Both actions came on to be tried at the same assizes; and in the action for use and occupation it was objected that it was an action founded on promises, and a supposed permission by the plaintiff to the defendant to occupy, therefore an acknowledgment on the part of the plaintiff that he was tenant, and consequently a waver of his notice. But the objection [387] was over-ruled, and the plaintiff recovered, first in the ejectment and afterwards in the action for use and occupation. This at best is but a Nisi Prius determination; and I can find no principle whatever on which to support it to the extent to which it goes. If the plaintiff recovered only in the action for use and occupation to the time of the demise in the ejectment, which he might do notwithstanding his declaration claimed the rent to a later period, I think the case is good law. But if he recovered rent due after the demise, I cannot give my assent to it. For the action for use and occupation is founded on contract; and unless there were a contract either express or implied, the action could not be maintained; as was held by Lord Mansfield in the case cited at the Bar of *Carmier* v. *Mercer*, which was tried about two years ago. And if there were a contract subsisting at the time of the demise, the ejectment could not be maintained.

K. B. XXVIII.—37

1154 WRIGHT *v.* NUTT 1 T. R. 388.

Two other cases quoted were *Hambly* v. *Trott*, Cowp. 371, and *Goodtitle* v. *North and Others*, Dougl. 562. But as those cases do not seem to me to apply to the present, I shall pass them over. They only relate to the questions, what actions may be maintained against an executor or a bankrupt, and what die with the person, or are barred by the certificate.

The last quoted was *Feltham* v. *Terry* (a)[1], where an action for money had and received was brought against an overseer of the poor to recover money in his hands which had been levied on a conviction, but that conviction was afterwards quashed; and the Court held that the action was maintainable for the clear money in the defendant's hands, because the plaintiffs might wave the tort and sue for the clear money really due. I agree that he may do so; but in the present case the plaintiff has not waved the tort: he has brought his ejectment and obtained judgment on it, which is insisting on the tort; and he cannot be permitted to blow both hot and cold at the same time. The action for use and occupation, and the ejectment, when applied to the same time, are totally inconsistent; for in one the plaintiff says the defendant is his tenant, and therefore he must pay him rent; in the other he says he is no longer his tenant, and therefore he must deliver up the possession. He cannot do both. The plaintiff's counsel admit that an action would lie for the mesne profits; it is of course after ejectment, and may be maintained without proving any title. The ejectment is the suit in which the **[388]** defendant is considered as a trespasser; and, unless the judgment in ejectment be laid out of the case, the tort is not waved. The defendant stands convicted on record by judgment as a trespasser from the 6th of April 1785.

Therefore I am of opinion that the plaintiff is in this action entitled to recover the 81l. 15s. which remained unpaid as part of the half year's rent due on the 22d of November, and also a proportional part of the rent up to the 6th of April 1785; the defendant having continued tenant to the plaintiff up to that time, which is the day of the demise laid in the declaration in ejectment. But I think he is not entitled in this action to recover any rent subsequent to that day.

Per Cur. Let the postea be delivered to the plaintiff.

EXECUTORS OF WRIGHT, BART. *against* NUTT, in Error. Friday, Nov. 10th, 1786.
Executors, against whom a scire facias is sued out, recover damages assessed on an interlocutory judgment against their testator before his death, cannot bring error, if the testator's attorney agreed for him that no writ of error should be brought in that action. The Court on motion will order the attorney to nonpros the writ.

The present defendant, who was plaintiff in the original action, obtained an interlocutory judgment against the testator, and executed a writ of inquiry. Pending that action, the testator's attorney agreed that no writ of error should be brought. After the testator's death, a scire facias, to shew cause why the damages assessed by the jury should not be adjudged to the plaintiff, was sued out against the executors; who thereupon brought a writ of error. A rule having been granted against the attorney to shew cause why he should not nonpros the writ of error, as having been brought contrary to his agreement, by which it was insisted that the executors were bound;

Mingay and Law now shewed cause; contending that the agreement entered into by the testator's attorney not to bring a writ of error in that action was not binding upon the executors in the present case; because a scire facias is considered as a new action, though it must pursue the first (a)[2]. That, as the defendant died between the time of executing the writ of inquiry and final judgment, this case was in some measure omitted out of the statute of 8 and 9 W. 3, c. 11, s. 6, which had only declared that, if the defendant died after interlocutory judgment and before final judgment signed, the plaintiff should have a scire facias against his executors to shew cause why damages should not be assessed: but in the present case the damages have been assessed by executing the writ of inquiry. Therefore, if the **[389]** statute did not apply, it stood as at common law, and the suit abated by the death of the parties.

Cowper and Erskine, in support of the rule, observed that this was not an action

(a)[1] E. 13 Geo. 3, B. R. cited in Cowp. 419.
(a)[2] Cro. Jac. 331. Hob. 4.

BLACK *v.* OTTOMAN BANK [1862]        XV MOORE, 472

[472] ON APPEAL FROM HER MAJESTY'S CONSULAR COURT AT
CONSTANTINOPLE.

THOMAS NIXON BLACK,—*Appellant;* THE OTTOMAN BANK,—*Respondents* *
[July 3, 1862].

Surety sued upon a Bond given to a Bank as guarantee for the due discharge of
certain specified services by their Manager and Cashier, pleaded negligence
and want of due care on the part of the Bank, in not properly checking and
examining the accounts of their Manager: demurrer to plea, that it was bad
in substance and no defence to the action, sustained; the checking and
examining the accounts not being expressed as obligatory on the Principals
in the Bond, and not to be implied in law.

The mere passive inactivity of the Principal to whom a guarantee is given, or
his neglect to call the principal debtor to account in reasonable time, and to
enforce payment against him, does not discharge the Surety; there must be
some positive act done to the prejudice of the Surety, or such degree of
negligence as to imply connivance and amount to fraud. The rule at law
and in equity is the same, and is distinguishable from the principles applied
to Bills of Exchange, which depend upon mercantile usage [15 Moo. P.C. 483].

The Surety guarantees the honesty of the person employed, and is not entitled
to be relieved from his obligation, because the employer fails to use all the
means in his power to guard against the consequences of dishonesty [15 Moo.
P.C. 484].

By the Order in Council creating the Consular Court at Constantinople, it is
provided that the procedure is to be so framed as to insure substantial justice
on the merits, without regard to strict technicalities of pleading [15 Moo.
P.C. 482].

This was an appeal from the decision of the Judge of Her Majesty's Supreme
Consular Court at Constantinople in an action brought by the Respondents, a
Banking Company, carrying on business at Constantinople, against the Appellant,
to recover the sum of £5,000, upon a Bond given by the Appellant to the Respondents
by way of guarantee for one Nicolas Noel Pisani.

The plaint, after reciting an agreement and undertaking formerly made
between the Respondents [473] and Pisani, whereby Pisani undertook the encash-
ment of certain Serghis (*a*), or Government Bonds, that might be placed in the hands
of the Respondents for that purpose, on terms therein specified, set out the Bond in
question, dated the 9th of April, 1857, which was in the following form:—

"Know all men by these presents, that I, Thomas Nixon Black, of Constantinople,
Merchant, am firmly held and bound unto and towards the Ottoman Bank of that City
in the penal sum of £5,000, as surety for Mr. Nicolas Noel Pisani, in the service of
the said Company.

"Whereas the said N. N. Pisani, under the date of the 17th of June, 1856, entered
into an agreement to serve the Company as Agent or Broker, as per copy thereof
annexed hereunto; now the intent and meaning of this Bond is to engage and
guarantee that the said N. N. Pisani shall honestly and faithfully discharge the
several obligations stipulated and contained in that undertaking, and to that end

* Present: The Right Hon. Lord Kingsdown, the Right Hon. Dr. Lushington,
and the Right Hon. Sir Edward Ryan.

(*a*) A Serghi is an engagement for the payment of money on the part of the
department that issues it. Some Serghis are negotiable; sometimes a name is in
them, sometimes not. They are all Government Securities, and are payable by
instalments usually of 500,000 *piastres* each, and the periods of payment are
generally mentioned in the contract annexed to the Serghis; but these are considered
nominal. The instalments are paid upon the production of the Serghi, and an
indorsement is then made upon the back of it, showing the amount paid and the
time when it was paid.

and purpose I hold myself bound and responsible on his behalf towards the said Company.

It is, however, to be clearly understood that the present Bond or surety is not to extend to any loss by fire, robbery, or other casualty or misfortune, over which the said N. N. Pisani could have no control or **[474]** reasonable means of prevention, it being intended solely to guarantee and secure the Company from any and all acts of dishonesty in the transaction of business entrusted to him, or of malversation or misappropriation of the moneys or valuable securities given, or coming into his possession in the service confided and undertaken respectively. And further, that this Bond shall not have reference to or incur any obligation in regard to operations already undertaken under a former Bond of security, but shall only begin from the date hereof, and that it may be revocable at any period after three months' notice of such intention shall be given to the parties; but, notwithstanding such notice this Bond shall remain in full force to all intents and purposes until the said N. N. Pisani shall have rendered a just account of his charge, and full payment and satisfaction to the Company shall have been made by the said N. N. Pisani, of all moneys, bills, notes, bonds, books, securities, and effects, which he shall previously to the expiration of such notice have been entrusted with, or received or obtained for or on account of, or by the permission of, the Company."

The plaint then alleged, that subsequently to the date of the Bond, and while the same remained unrevoked, and on the faith of the security thereby given to the Bank, certain Serghis were entrusted by the Bank to Pisani, which Serghis he undertook to encash pursuant to the terms of the agreement, and to pay the proceeds thereof to the Bank, which operations had not been undertaken by him under any former Bond or security. And the Respondents by the plaint further alleged, that Pisani did afterwards, at various times, receive, on certain of the Serghis, **[475]** divers large sums of money for and on account of the Bank; yet that he did not pay such sums of money to the Bank, but, on the contrary, did fraudulently and dishonestly convert to his own use and misappropriate the sums of money so received by him. And further, that he did fraudulently and dishonestly convert to his own use and misappropriate certain other of the Serghis, by reason whereof the writing obligatory became forfeited.

The Appellant took issue on the several averments in the plaint, and pleaded, first, *Non est factum;* secondly, that subsequently to the date of the Bond no Serghis were entrusted by the Bank to Pisani; third, that Pisani, having received from the Bank the Serghis in the plaint mentioned, did pay to the Bank the moneys received by him thereon on account of the Bank, and did not, as in the plaint alleged, fraudulently and dishonestly convert to his own use and misappropriate the moneys so received; fourth, that Pisani did not fraudulently and dishonestly convert to his own use and misappropriate certain other Serghis in the plaint mentioned; and fifth, that the Officers of the Bank were guilty of negligence and want of due care in checking and properly examining the accounts of Pisani, and in requiring payment from him, from time to time, of the moneys received on its behalf; and that by and owing to such negligence and want of care the default alleged in the plaint arose, whereby the Appellant was released and discharged from the penalty of the Bond.

The Respondents joined issue on the first four pleas, and demurred to the fifth plea, upon the ground that it showed no defence to the action, inasmuch as the **[476]** condition of the Bond in no way limited its operation to such acts of dishonesty committed by Pisani as might have been prevented by the exercise of the amount of care and diligence in the plea referred to.

The Court gave judgment upon this demurrer for the Respondents; and the Appellant appealed therefrom to Her Majesty in Council.

The cause afterwards came on to be heard in the Court below, when it was proved that some of the securities were entrusted to Pisani before the date of the Bond, and it was urged that the encashment of these securities was an operation undertaken before the date of the Bond, and for which the Appellant was not liable; but the Judge (Henry Thomas Wroth, Esq.) overruled that objection. Evidence was also entered into by the Appellant which, in effect, showed want of care and precaution on the part of Bank with respect to Pisani's transactions, and evidence having

been given of a loss beyond the amount of the Bond, the Court gave judgment for the Respondents for the full amount sued for.

The present appeal was against these judgments.

Mr. Bovill, Q.C., and Mr. J. O. Griffits, for the Appellant.— The judgment upon the demurrer was erroneous and ought to be reversed, as well as the judgment in the cause for the full penalty of the Bond. The Appellant's fifth plea, imputing culpable negligence on the Respondents' part, was good in substance, and the truth of the allegations contained in it was admitted by the demurrer. It was good in law, and, being proved by evidence, was a bar to the action. The Bond was not a money Bond, but of the most general **[477]** character, imposing by necessary implication certain duties on the Bank to whom it was given in their dealings with Pisani, their Agent or Broker, whose honesty and faithfulness were guaranteed by the Appellant only for such of the Serghis as were entrusted to him after the Bond. In *Collins* v. *Gwynne* (9 Bing. 544), a similar question was discussed as to whether the condition of a Bond was not discharged by the laches of the Receiver-General; that, however, was a case of the public revenue, and stands on a different footing from the present. The admission of negligence by the Bank implies a duty on their part, and the omission of the care, by legal implication, releases the surety; *Creighton* v. *Rankin* (7 Cl. and Fin. 346). In *Mactaggart* v. *Watson* (3 Cl. and Fin. 525), though the surety was held liable for want of sufficient evidence of the Principal's neglect of duty, yet the judgment proceeded on the ground that such neglect if proved would have been a sufficient release (3 Cl. and Fin. 542). Here it is admitted—*Law* v. *The East India Co.* (4 Ves. 824, 833); *Caple* v. *Butler* (2 Sim. and Stu. 457); *Mein* v. *Hardy* (8 Shaw and Dun. 346); *Watts* v. *Shuttleworth* (Hurlst. and Nor. 235); *Dawson* v. *Lawes* (1 Kay, 280). Independent of the admission of negligence by the demurrer, there was evidence in the cause that the defalcation of Pisani was occasioned by the wilful neglect of the Respondents. That fact ought to have entitled the Appellant to judgment on the fifth plea. Even if the Appellant was not entitled to judgment, which we insist he was, the amount of the verdict ought to have been reduced, or a new trial granted. The **[478]** evidence shows clearly that the Appellant ought not to have been held liable to the full extent of the penalty of the Bond.

The Solicitor-General (Sir R. Palmer, Q.C.), and Mr. Welsby, for the Respondents. —The fifth plea was no answer to the action, inasmuch as negligence on the part of the Officers of the Bank, such as is there alleged, could not release the Appellant from his liability as surety upon the Bond. The terms of the Bond in nowise limited its operation to such acts of dishonesty on the part of Pisani as could have been prevented by the exercise of the amount of care and precaution on the part of the Bank set out in the plea: the plea, therefore, is bad in substance. The Bond itself specifies the losses for which the surety is not to be held liable; but such as are alleged by the plea to be caused by the negligence of the Bank are neither enumerated, nor can they be imported into the Bond. The decision of the Court of Common Pleas in *Collins* v. *Gwynne* (9 Bing. 544) was directly contrary to the Appellant's argument. The reasoning in that case gives no authority for his contention. *The Trent Navigation Co.* v. *Harley* (10 East, 34) is a conclusive authority. There the laches of the obligees in not properly examining the accounts of their Toll Collector for a period of eight or nine years, and not calling on the Principal for payment so soon as they might have done for sums in arrear or unaccounted for, was held not to be estoppel at law in an action against the sureties. *Mactaggart* v. *Watson*, and *Dawson* v. *Lawes*, also cited by the Appellant's Counsel, are confirmative of the doctrine there held. Neither **[479]** was the matter alleged in the fifth plea admissible in restriction of damages. The Appellant was responsible for the defalcation of Pisani; and the evidence clearly proved that he had misappropriated the Serghis, or the proceeds of the Serghis, entrusted to him by the Respondents, to the full amount of the penalty in the Bond sued upon.

Judgment was delivered by

The Right Hon. Lord Kingsdown (16th July, 1862).—This case comes before us upon appeal from a decision of the Judge of a Tribunal recently constituted in Constantinople, called the " Supreme Consular Court."

In the year 1857 a person named Pisani was employed by the Plaintiffs to act

XV MOORE, 480            BLACK *v.* OTTOMAN BANK [1862]

for them in receiving moneys from the Ottoman Government upon engagements called Serghis, or Government Bonds. It was his duty to receive, and to account for, and to pay over to the Plaintiffs the moneys which he might receive.

On the 17th of June, 1856, he signed an agreement for the due discharge of those duties, and undertook to give an approved guarantee for the due fulfilment of his engagement, and as security for the safe custody of any securities or funds entrusted to him.

A gentleman of the name of Ede became security for him, but was discharged in the month of April, 1857; and thereupon the present Appellant executed a Bond, dated the 9th of April, 1857, by which he bound himself in the sum of £5000 as surety for Pisani, and guaranteed that Pisani should honestly **[480]** discharge the several obligations explained in the agreement to which we have referred, a copy of which is annexed to the Bond.

The Bond expresses that it is intended only to guarantee and secure the Company from all acts of dishonesty in the transaction of business entrusted to him, or of malversation or misappropriation of the moneys or valuable securities given or coming into his possession in the service confided and undertaken respectively. And further, that this Bond shall not have reference to or incur any obligation in regard to operations already undertaken under a former Bond of security, but shall only begin from the date hereof. It shall be revocable at any period on giving six months' notice; but, notwithstanding such notice, the Bond is to remain in force till Pisani shall have rendered a just account of his charge, and full payment and satisfaction shall have been made to the Company by Pisani of all moneys, bills, notes, bonds, books, securities, and effects, which he shall previously to the expiration of such notice have been entrusted with, or received, or obtained for or on account of, or by the permission of, the Company.

Pisani having misappropriated funds of the Company, and being indebted to them in a large amount, they sued the Appellant upon his Bond.

Their plaint alleged that, subsequently to the date of the Bond, and while it remained in force, certain Serghis were entrusted by the Bank to Pisani, which he undertook to encash, and to pay the proceeds to them, and which operations were not undertaken by Pisani under any former Bond of security. It then alleged that he had received on account of the Company and dishonestly misappropriated large **[481]** sums of money and securities, by which the Bond became forfeited.

The Defendant, after a formal plea denying the Bond, pleaded that, after the date of the Bond no Serghis or Government securities were entrusted to Pisani by the Plaintiffs. He also filed two other issuable pleas, and a fifth to which the Plaintiffs demurred.

The demurrer on argument was overruled, and the parties went to trial on the other pleas, and the Judge ordered judgment to be entered for the Plaintiff for the sum of £5000.

From these judgments the present appeal was brought to Her Majesty in Council.

We will dispose first of the judgment on the demurrer.

The fifth plea is in these words:—" And further, I say that the Officers of the said Bank were guilty of negligence and want of due care in checking and properly examining the accounts of the said Pisani, and in requiring payment, from time to time, of the moneys received on its behalf; and that, by and owing to such negligence and want of care as aforesaid, the default alleged in the petition arose, whereby I was released and discharged from the penalty of the Bond in the Petitioner's instrument."

The reply of the Plaintiff, which is styled " demurrer," was in these terms:— " The fifth plea shows no defence to the action, inasmuch as the condition of the Bond upon which this action is brought in no way limits its operation to such acts of dishonesty committed by Pisani as might have been prevented by the exercise of the amount of care and diligence in the plea referred to."

**[482]** The first point to be considered is, what is the matter which this demurrer admits. It clearly admits that the Plaintiffs did not exercise as much vigilance as they might have done in checking and examining the accounts of Pisani, and in requiring payment, from time to time, of his balances, and that the loss was owing to such omission.

BLACK *v.* OTTOMAN BANK [1862]        **XV MOORE, 483**

But it was contended by the Appellant that the admission goes further, and is an admission not only that the Plaintiffs did not check and examine the accounts and receive payment, but that it was their duty towards the Defendant to make such examination, and require such payment, and that it is, therefore, an admission that the loss arose from a breach of duty on the part of the Plaintiffs towards the surety.

It was said that negligence is admitted, and there was no negligence if there was no duty. Their Lordships would not be disposed to apply to this case any technical rules of special pleading. The Order in Council of Her Majesty establishing the Consular Court directs that the rules of procedure shall be so framed as to secure, so far as may be, that cases shall be decided on their merits, according to substantial justice, without excessive regard to technicalities of pleading. They think the question ought to be decided on what appears to be the real meaning of the parties, and they think that the point really intended to be asserted on the one side, and admitted on the other, was only this, that if reasonable care had been used by the Plaintiffs in the particulars referred to, no loss would have occurred.

This appears to have been the understanding of the Defendant himself.

[483] In his petition of appeal, he insists not that the Plaintiffs have admitted that it was their duty to check and examine the accounts and require payment, but that the law would imply such obligation from the terms of the Bond and the nature of the transaction, and the point now insisted on is not raised in the Appellant's reasons of appeal.

The terms of the Plaintiffs' " demurrer," as it is called, show that they do not admit the supposed duty, for they insist that no such duty is imposed by the Bond.

The question, therefore, is, whether this obligation is to be implied by law, it clearly not being expressed in the Bond.

The principles applicable to the case seem to be quite established by the authorities referred to in the argument—*The Trent Navigation Co.* v. *Harley* (10 East, 34); *Mactaggart* v. *Watson* (3 Cl. and Fin. 525); *Dawson* v. *Lawes* (1 Kay, 280): to which may be added the authority of Lord Eldon in the cases of *Samuel* v. *Howarth* (3 Mer. 278), and *Eyre* v. *Everett* (2 Russ. 381); and of Lord Cottenham in *Creighton* v. *Rankin* (7 Cl. and Fin. 346).

From these cases it is clear that, upon the point now in dispute, the rule at law and in equity is the same,—that the mere passive inactivity of the person to whom the guarantee is given, his neglect to call the principal debtor to account in reasonable time, and to enforce payment against him, does not discharge the surety; that there must be some positive act done by him to the prejudice of the surety, or such degree of negligence as, in the language of Vice-Chancellor Wood in *Dawson* v. *Lawes*, " to imply connivance and amount to fraud."

[484] The surety guarantees the honesty of the person employed, and is not entitled to be relieved from his obligation because the employer fails to use all the means in his power to guard against the consequences of dishonesty.

The cases referred to upon Bills of Exchange turn upon a different principle, viz., that, by mercantile usage, a contract is implied by the holder to give notice of dishonour, within a certain time, to the drawer or indorser who stands in the situation of surety for the acceptor.

The objection taken to the judgment on the trial is this: that the Judge has held the Defendant liable under the Bond not only for moneys received by Pisani upon Serghis delivered to him after its execution, but for moneys received upon Serghis delivered to him before that time, and permitted to remain afterwards in his possession. It was said that the Defendant expressly stipulated that he would not be liable in regard to obligations already undertaken under a former security; and that the Serghis in question were delivered while a former Bond was in force, which was cancelled when the present Bond was executed. It was further said that the Plaintiffs, in their plaint or declaration, confined their claim to moneys received in respect of Serghis entrusted to Pisani subsequently to the date of this Bond, and that this must mean Serghis delivered to him after the date of the Bond.

But their Lordships cannot adopt this construction. The Serghis left in his hands after the date of the Bond were just as much entrusted to him after that date as if they had been delivered after that date; the moneys which he received upon

XV MOORE, 485 GEN. S.N. CO. *v.* DE JERSEY—EDWARD HAWKINS (THE) [1802]

them after that [485] time were moneys for which he became responsible after the obligations of the former Bond had ceased; and by the concluding passage in the Bond the surety is to be liable for all moneys which he shall have received on account of the Bank previous to the expiration of three months after notice to revoke the Bond.

Upon both points, therefore, their Lordships agree with the judgment of the Court below; and they can see no ground either for reducing the amount of damages or granting a new trial. They think the mode in which the case has been dealt with by the learned Judge is extremely creditable to him. They must humbly advise Her Majesty to affirm the judgment complained of, with costs to be paid by the Appellant.

[Mews' Dig. tit. COLONY, III. APPEALS TO PRIVY COUNCIL, 6. *Practice,* f. *Pleading;* tit. PRINCIPAL AND SURETY, B. 8. *Concealment and Fraud,* 9. *Laches and Negligence.* S.C. 8 Jur. (N.S.) 801; 6 L.T. 763; 10 W.R. 871. See *Carter* v. *White,* 1883, 25 Ch.D. 671; *Durham (Mayor of)* v. *Fowler,* 1889, 22 Q.B.D. 420. As to Consular Court of Constantinople, see now Ottoman Order in Council, 1899 (Stat. R. and O., 1899, 643).]

———————————

[486]    ON APPEAL FROM THE HIGH COURT OF ADMIRALTY

THE GENERAL STEAM NAVIGATION COMPANY,—*Appellants;*
MESSIEURS DE JERSEY,—*Respondents* * [July 9, 10, 1862].

THE "EDWARD HAWKINS."

A Steamer, employed under an agreement for a specified sum to tow a partially disabled Steam-vessel to a specific destination, towed the vessel for some hours, but in consequence of a gale causing the breaking of the hawser, left the vessel in a position of considerable danger, from which she was only saved by her own exertions. Held (affirming the decree of the Admiralty Court), that as it did not appear that the towing had contributed to her safety, the Steamer was not entitled (1) for towage, as she had not performed her contract; or (2) to salvage, as no attempt was made by her to save the vessel.

A cause of salvage. The suit was promoted by the Appellants, the Owners, Master, and crew of the steamship, the *City of Hamburg,* against the screw steamship *Edward Hawkins,* her tackle and the freight earned for the transportation of the cargo, and against the Respondents, her Owners, intervening.

The circumstances under which the claim for salvage arose were as follows:—

The *Edward Hawkins,* of 798 tons, left the port of Cronstadt on the 17th of May, 1860, laden with a general cargo, bound to the port of London. The *Edward Hawkins* experienced bad weather [487] during her passage, and her propeller was broken, but she nevertheless proceeded in the prosecution of her voyage to London; and at 10 p.m. of the 27th of that month had arrived within about 40 miles E. by N. of the south end of Smith's Knowl, and was proceeding at the rate of about four knots an hour, under canvas, her engines working the broken propeller, the action of which kept good steerage way upon her. At this time the paddlewheel steamship, *City of Hamburg,* then in the prosecution of a voyage from Hamburg to London, came in sight, and the Master of the *Edward Hawkins,* being anxious to make his passage to London as quickly as possible, signalled to the *City of Hamburg,* and ultimately the Master of the *Edward Hawkins* agreed with the Master of the *City of Hamburg* for that vessel to tow her to Gravesend. It was alleged on

———————————

* Present: The Right Hon. Lord Chelmsford, the Right Hon. Lord Kingsdown, and the Right Hon. Sir John Taylor Coleridge.

IN RE MOLYNEUX

[365]  In the Matter of MARY MOLYNEUX, a Lunatic.  *Ex parte* HANNAH SPENCER.
Before the Lords Justices.  *May* 2, 1862.

[S. C. 10 W. R. 512.]

Where a decree in a partition suit had declared a lunatic a trustee of an allotted
portion of the land for the Plaintiff :  Held, that the Lords Justices could make a
vesting order under the Trustee Act, 1850.

This was a petition for a vesting order under the Trustee Act, 1850, or, in the
alternative, that the committee of the above-named lunatic might execute a
conveyance.

By a decree of the Court of Chancery of the County Palatine of Lancaster, made
in a suit instituted by the Petitioner against the lunatic and her committee, it was
referred to the registrar to approve of a partition of the lands therein referred to
between the Petitioner and the lunatic.

By an order made on further directions, one portion of the land was allotted to
the Petitioner and the [366] remainder to the lunatic, and it was declared that the
lunatic was a trustee within the meaning of the Trustee Act, 1850, of the part
allotted to the Petitioner.

Mr. North, in support of the petition, said that a difficulty had arisen from the
doubt expressed in the case of *Re Bloomar* (2 De G. & J. 88), and that it was for this
reason that the prayer was in the alternative either for a vesting order or for a
conveyance under the Lunacy Regulation Acts, 14 & 15 Vict. c. 83, s. 13 ; 15 & 16
Vict. c. 87, s. 15, and the Trustee Act, 1830.  It would however be desirable, if
possible, to save the expense of the latter alternative.

THEIR LORDSHIPS held that they had authority to make a vesting order under
the Trustee Act, 1830, but considered that the Petitioner's interest in the other
moiety should first be conveyed to the lunatic.  Their Lordships accordingly made a
vesting order, but directed that it should not be drawn up until such conveyance had
been executed and produced to the registrar.

[367]  BLEST *v.* BROWN.  Before the Lord Chancellor Lord Westbury.
*April* 26, 28, 1862.

[S. C. 8 Jur. (N. S.), 602 ; 6 L. T. 620 ; 10 W. R. 569.]

Corn factors supplied flour on credit to a baker, on his executing to them, with a
surety, a bond, the condition of which, after reciting that the baker had entered
into a contract for the supply of bread to the army, was that the bond was to be
void if the baker should deliver to the corn factors his bills on the Government as
he drew them, and if he and the surety should make good the amounts to become
due to the corn factors.  The corn factors supplied flour, but not of the quality
specified in the Government contract, which was vacated on that account.  Held,
that the corn factors could not against the surety allege ignorance of the terms of
the contract, and that the surety was discharged.
Plaintiff, though successful, ordered to pay all costs occasioned by unsustained
charges in the bill.

This was an appeal from a decision of Vice-Chancellor Stuart holding that the
Plaintiff, who had joined in a bond as a surety, was discharged by the conduct of
the obligees from his obligation.

The Plaintiff was applied to by Charles Henderson Millar, one of the Defendants,
who was a baker and contractor, to become surety for him in a bond to the other
Defendants Messrs. Brown & Moore, who were corn factors.

Millar had obtained a contract to supply the barracks at Woolwich and Deptford
with bread for six months from the 1st June 1860, on a tender, subject to conditions,

C. XXV.—39*

among which was one that the bread supplied should be made from good wheat flour in the proportion of one-third of white to two-thirds of red wheat, to be dressed through wire No. 60, without any adulteration whatever, and that the bread was to be of the quality denominated " best seconds."

The Defendants Brown & Moore had previously supplied the Defendant Millar with flour ; and, before tendering for the above contract, Millar consulted an agent of Brown & Moore as to the terms upon which they **[368]** would supply him with flour to enable him to tender for the contract. On the 7th May Brown & Moore wrote to Millar in the following terms :—"Dear Sir,—We agree to supply you with 100 sacks per week of our No. 2 flour at the net price of 39s. 6d. per sack, delivered at your bakery, Artillery Place, Woolwich, in our sacks, you paying the pitching money of 1d. per sack, and returning the empty sacks to our carman free from any charge as sack-money, for a period of six months, commencing the 1st June next, in the event of your obtaining and fulfilling the contract to supply bread to the barracks at Woolwich and Deptford for that period."

By the bond in question, which was dated the 29th May 1860, Millar and the Plaintiff became jointly and severally bound to the Defendants Brown & Moore in £500 subject to the following condition :—

" Whereas the said Charles Henderson Millar has entered into a contract with Her Majesty's Government for the supply of a certain quantity of bread at the barracks of Woolwich and Deptford for six months from the 1st of June next, and has applied to the said William Brown and William Moore to supply him with flour to enable him to carry out such contract, which the said William Brown and William Moore have agreed to do upon the said Charles Henderson Millar and the said Alexander Melville Blest entering into the above bond for the due payment to them of the price agreed upon for such flour : And whereas the said Charles Henderson Millar has agreed to draw and hand over to the said William Brown and William Moore the bills upon the Paymaster-General which the said Charles Henderson Millar may become authorized to draw under the said contract : Now, the condition of the above-written bond or obligation is such that if the said Charles Henderson **[369]** Millar, his heirs, executors or administrators shall duly deliver to the said William Brown and William Moore, their executors, administrators or assigns the said bills of exchange as and when drawn, and if the said Charles Henderson Millar and Alexander Melville Blest, their or either of their respective heirs, executors or administrators shall, within fourteen days after the expiration of such six months, pay or cause to be paid, unto the said William Brown and William Moore all monies that may be due to them from the said Charles Henderson Millar, his heirs, executors or administrators, for the flour so supplied as aforesaid, then this obligation to be void ; otherwise to remain in full force, virtue and effect."

The bill contained an allegation that there was at the time of the execution of the bond a trade debt of £71 or upwards due from Millar to Brown & Moore, and that the existence of any such debt was expressly denied by Frederick Brown. It also alleged that Brown & Moore had received some of the Government bills and had applied the proceeds to pay debts due by Millar to them for goods not connected with the contract, and for flour sent with the view and intention of enabling Millar to evade the contract. The bill stated, and it was in evidence, that on the 13th of July 1860 the Defendant Millar was informed by the Deputy Commissary-General that, in consequence of repeated complaints of the inferior quality of the bread and the numerous rejections which had taken place without any amendment, his contract would be cancelled in one month from that date. The bill also contained allegations that the Plaintiff had lately discovered, and that the facts were, that Millar, previously to tendering for the contract, went over and discussed the terms of it with Brown & Moore or with their agent, in the presence of them or one of them, and also discussed the method by which its **[370]** terms as to the quality of the flour might be evaded, and flour might be used of inferior quality ; and that Brown & Moore knowingly and for the purpose of enabling Millar to evade the terms of the contract agreed by letter to send, and did send, flour of a wholly different and inferior quality and intended to be mixed with rice contrary to the contract, and afterwards sent Millar flour not only of such different and inferior quality but also inferior to the sample quality which they had sent, and that they did this in order

to enable Millar to try experiments with a view to the evasion of the terms of the contract.

The bill charged that the bond was void in equity as against the Plaintiff not only by reason of the misrepresentations made to the Plaintiff, but by reason of the conduct of the Defendants, and prayed for an injunction to restrain the Defendants Brown & Moore from taking proceedings at law on the bond, and that the bond might be delivered up to be cancelled, and that the Plaintiff might be declared entitled to be indemnified for the loss and injury which he had sustained out of the counter-securities taken by the Defendants Brown & Moore from the Defendant Millar.

The Defendants Brown & Moore by their answer denied the allegations of the bill as to adulteration, or that they had contracted with Millar on the terms of the contract with the Government, of which they said that they were entirely ignorant. They said that they had never contracted to supply wheat to be dressed in the manner specified in the contract, but had expressly contracted only to supply No. 2, which was a well known and different quality, and that they had duly fulfilled their contract.

The Vice-Chancellor held the Plaintiff entitled to **[371]** have the contract cancelled, and made a decree accordingly, and restraining the obligees from proceeding at law. The case is reported below in the 3d Volume of Mr. Giffard's Reports (page 450).

Mr. Malins and Mr. Haig, for the Plaintiff.

Mr. Bacon and Mr. Southgate, for the Defendants Brown & Moore.

Mr. Nalder, for the Defendant Millar.

Mr. Malins, in reply.

*Sumner* v. *Powell* (2 Mer. 30) was referred to.

THE LORD CHANCELLOR.   I have heard this case with a very considerable amount of pain, and that pain arises from observing how the inevitable evils of litigation are augmented by the mode of procedure adopted in this Court for the purpose of trying issues of fact.   I have here a question which involves, at the utmost, a sum of £500. The course that has been adopted here will add to the losing party, or rather both parties, an expenditure which, in all probability, will very considerably exceed the value of the subject-matter.

There are two questions to be determined in this case—one is a question of law, the other is an issue of fact.   It is very probable that if those questions had been previously considered, it would have turned out wholly unnecessary to have tried the question of fact.   The Plaintiff is a surety for a baker, who entered into a contract with the Government to supply a quantity of bread **[372]** for the use of the troops at Woolwich.   Government contracts are, with great propriety, very minute and very specific.   Carefully as they are worded, I am afraid that they, almost in every case, are found ineffectual to save the Government from a considerable amount of imposition.   In this particular case bread was to be supplied, and, in order to insure that bread being of a given quality, minute stipulations are inserted in the contract with regard to the quality of the flour, the mode of dressing the flour, the extent to which the flour might be mixed with different qualities, and then, finally, the quality of the bread which was to result from the use of that flour, and in that shape to be supplied to the troops.   The Defendant Millar was the baker who entered into the contract.   Previously to tendering for it, he entered into an engagement with the other Defendants, who are corn factors, to supply him with flour of a certain quality.   That engagement is contained in the letter which is dated the 7th of May 1860.

The contract was afterwards obtained by the Defendant Millar, and having obtained the contract, or rather a promise of the contract (for the contract is dated on a subsequent day), he, in conformity with his engagement with the corn factors, had to find a surety, and desired to obtain the guarantee of the Plaintiff, who appears to have been in a respectable position of life, and to have been an hotel-keeper somewhere in the neighbourhood where the Defendant Millar had carried on his business.   Application was accordingly made to the Plaintiff by Millar on several occasions anterior to the day when the bond was executed.   It appears from the evidence, without much controversy, that on several occasions of Millar's application

the Plaintiff expressed his unwillingness to enter into the engagement of the surety-ship. Millar, however, was **[373]** pertinacious in his entreaty, and finally it appears that an engagement was made for the parties to attend the Plaintiff at his house on a particular day, viz., the day when the bond was executed. Unfortunately, the point which arises in the contest is a question upon which there is great contradic-tion in the evidence, viz., what passed upon the occasion of that interview.

The first head of equity made by the Plaintiff is that an erroneous statement with regard to the condition of Millar was made by the admitted agent of the Defendants, the corn factors, to him, the Plaintiff, upon the occasion of the execution of the bond. The representation is alleged to have been this: that at that time Millar, the baker, was not indebted in anything to the Defendants. That is sworn to by the Plaintiff; it is sworn to by his wife; and is also sworn to by the Defendant Millar. On the other hand, it is most distinctly contradicted by the agent, Mr. Frederick Brown; and a great number of arguments have been, with great propriety, presented to me, in order to shew that there was no inducement for the Defendants to obtain this contract, that they would have been better without the contract, and that there was nothing to instigate them to use any kind of representation to prevail upon the Plaintiff to enter into the contract.

I am myself individually satisfied of the honesty of the Defendants. I am also satisfied that their witness is a witness who comes to state what he believes to be true. On the other hand, I cannot help stating that the representation made to me on the part of the Plaintiff and the representation on the part of his wife are substantially consistent, notwithstanding the discrepancy which has been pointed out, but which rather corroborates their **[374]** general agreement and gives reason for believing the testimony. For, as it has been frequently observed, you must expect in accounts some slight difference in the narrative. Looking at this circumstance, I cannot refuse to give credit to the representation made by the Plaintiff and also to the statement in confirmation of it by the wife. Well, but then, in what manner am I to reconcile these apparently contradictory conclusions? I think that the mode of reconciling them has been shewn by the Bar, and shewn in a satisfactory manner. I believe it to be perfectly true that at the time when this question was put Millar was not a defaulter in respect of his payments, and in that sense was represented as not being indebted to the corn factors. I think that the ordinary notion of debt would be something due and owing and which ought to have been paid. In that sense I think Mr. Frederick Brown correctly represented that Millar was not to be regarded as indebted in any sum of money that had become payable and ought to have been paid. But, on the other hand, I have no reason nor any right to attribute a meaning to the Plaintiff in the question which I believe him to have put different from the meaning which his words, according to their ordinary and *primâ facie* signification, bear. There-fore, it being true that Millar, in the ordinary meaning of the words, was indebted at that time, to the Defendants in a sum of money though probably, according to the course of dealing, that sum of money could not be regarded as a debt in arrear, I must hold that an erroneous statement, though not an untruthful statement—that is, not a wilfully false statement—was the substance of the answer made by Brown to the Plaintiff.

That, however, would not be a satisfactory ground upon which to rest my judg-ment if there was no other; but I think that the most valid and, if I may use the **[375]** expression, the most satisfactory ground is that which is derived from the language of the bond and the undisputed and admitted facts as to what was done by the Defendants. The language of the bond must be taken as the representation made by the corn factors to the Plaintiff in their request to him to become a surety, and the language of the bond states (I treat it as the representation made to the Plaintiff Blest by the corn factors Brown & Moore) that Millar the baker had applied to them to supply him with flour to enable him to carry out his Government contract, which Brown & Moore had agreed to do. Now those words, when plainly trans-lated, are these: "Mr. Millar has a Government contract requiring certain flour; we have engaged to supply him with that flour." The very representation involves an admission by Brown & Moore that they knew the nature of the contract, and that they had engaged to supply Millar with the flour which that contract required. Then I have got in the affidavit of Brown & Moore a clear and definite admission

BLEST *v.* BROWN    1229

that they did not supply Millar with the flour which that contract required. They state a reason which may be a justification in morality or in fact, but which is no justification in a legal point of view, in which I am now considering this case. They say, " We do not know the particular stipulations of that contract. We supplied the flour that Millar required, and in that sense we used the words."

I have already observed in the course of the argument that, as between them and Millar, that was correct enough, but that when they came with a representation to a third person to become a surety, they were bound to know what was the subject about which they undertook to make a representation ; and it is impossible that I can listen to the statement that they were ignorant of the terms of this contract. I must therefore, in this [376] Court, hold them to have known what the Government had required, and I must hold them at the same time to have been conscious that their engagement with Millar was not in conformity with the stipulations of that Government contract.

It must always be recollected in what manner a surety is bound. You bind him to the letter of his engagement. Beyond the proper interpretation of that engagement you have no hold upon him. He receives no benefit and no consideration. He is bound, therefore, merely according to the proper meaning and effect of the written engagement that he has entered into. If that written engagement is altered in a single line, no matter whether it be altered for his benefit, no matter whether the alteration be innocently made, he has a right to say, " The contract is no longer that for which I engaged to be surety ; you have put an end to the contract that I guaranteed, and my obligation, therefore, is at an end." Now, I construe this engagement to be an engagement to be answerable for flour supplied in conformity with the requisitions of this contract. Then I ask *de facto* was any flour supplied to Millar in conformity with the requisitions of the contract ? The answer of the Defendants themselves is an admission that none such was supplied. The conclusion is plain, therefore, that no legal obligation, as far as the surety is concerned, arises upon what has been done under this contract so construed, as I hold it ought to be construed, and as involving the representation that I have stated.

It is a lamentable thing that there was no mode of deciding this case upon that point, on which there would have been no controversy of fact, without the parties being involved in such a number of contradictions upon [377] matters of fact as I find arising upon this record. I regret extremely to hear of the manner in which the examinations have been conducted. I regret extremely to find, that when this bill was amended, one thing was done and one thing was not done. That one thing that was done was, without the smallest justification at all, to insert in this record a most scandalous libel upon the Defendants ; for, without the smallest warranty, they are here charged with having conspired with Millar to cheat the Government, and not only with having conspired to do so, by supplying him with corn to be mixed with another ingredient for the purpose of cheating the Government, but the wickedness alleged is carried even to this—that in order to ascertain how they could best and most effectually cheat the Government, they previously sent to Millar a certain quantity of material to enable Millar to try experiments with a view to the evasion of the printed terms of the contract. There is not the smallest justification nor any attempt at justification of those allegations. I wish I could manifest in a stronger sense what I hold it my judicial duty to express—the bounden obligation on all parties concerned with pleadings to abstain from imputations of this nature unless they are manifestly required by the case, and most fully, not only legally, but morally, justified by the evidence which they have it in their power to produce.

I shall, upon this part of the case, order the Plaintiff to pay every portion of the costs incurred by the Defendants by reason of that charge. But the case does stop there. Independently of the two allegations upon which my judgment in favour of the Plaintiff is rested, there is another allegation contained in the seventh paragraph which also fails in point of fact. That is in itself not an allegation open to any observation as to its impropriety, [378] and I mark it only as an allegation not sustained by the evidence. There is also another allegation in the ninth and another in the tenth which are of the same character. I am extremely desirous to mitigate, as far as I can, the evils which result from the present unfortunate mode of taking evidence in this Court. I do not know how it can be mitigated, until we can agree

1230          CORDINGLEY *v.* CHEESEBOROUGH          4 DE G. F. & J. 379.

upon an altered mode of procedure, except by every Judge strictly examining the evidence and making the party pay for the consequence of an unfounded and unsupported allegation. I shall direct that all the costs occasioned by the evidence taken under the seventh, the ninth and the tenth paragraphs shall be paid by the Plaintiff: all the costs in point of evidence and otherwise.

Upon the rest of the case I affirm the judgment of the Vice-Chancellor, and I must give the Plaintiff the costs of the suit, subject to the deduction of those costs which I have directed that he shall pay.

The order that I make will be this:—Upon the appeal, having regard to the alteration that I have made and, above all, to the reasons of that alteration in the remarks I have been obliged to make upon the twelfth paragraph, I shall give no costs. The Appellants will take back their deposit, and I vary the decree by directing, as I have already said, that all the costs of and occasioned by the seventh paragraph, the ninth paragraph, the tenth paragraph, and the twelfth paragraph, and of and occasioned by the evidence taken thereunder, shall be paid to the Defendants Brown & Moore by the Plaintiff. In other respects the decree of the Vice-Chancellor will be affirmed, which will give the Plaintiff, as against Brown & Moore, the costs of the rest of the suit. Nothing was, I think, said or done with regard to the costs of Millar: he must, of course, bear his own costs.

[379]   CORDINGLEY *v.* CHEESEBOROUGH.   Before the Lord Chancellor
Lord Westbury. *April* 28, 1862.

[S. C. 3 Giff. 496; 31 L. J. Ch. 617; 8 Jur. (N. S.), 585, 755; 6 L. T. 15, 342. See
*Lett* v. *Randall*, 1883, 49 L. T. 73. Commented on, *In re Terry and White's Contract*,
1886, 32 Ch. D. 15.]

On a sale one of the conditions provided that if the purchasers should make any objection to, or requisition as to the title, evidence, conveyance, or as to compensation or otherwise which the vendor should be unwilling to remove or comply with, the vendor should be at liberty to vacate the sale.

Another condition was that the admeasurements were presumed to be correct, but that if any error were discovered therein no allowance should be made or required either way. Another provided that if any error of any kind should be made in the description of the premises, such error should not invalidate the sale, but that compensation should be settled by a referee named in the condition. On a bill for specific performance by the purchaser with a deduction to be assessed by the referee for a deficiency in quantity of nearly one half: Held, that although the Court would not have enforced against the purchaser the condition as to erroneous admeasurements where the error was so great that condition was sufficient to exclude any right in the purchaser to a specific performance with a deduction, and the Court in his suit for that relief decreed specific performance without deduction.

This was the appeal of the Plaintiff from a decree of Vice-Chancellor Stuart directing simply a specific performance of an agreement entered into by the Plaintiff for a purchase, the Plaintiff by his bill having sought a specific performance with an abatement of purchase-money on the ground of deficiency in quantity of the land agreed to be purchased.

The agreement was entered into at a sale by auction subject to printed particulars and conditions, in which the lot in question was described as follows:—

"Lot 2. All that capital messuage or mansion-house called Westbrook House, situated in Great Horton Road in the township of Horton, formerly in one dwelling-house and occupied by Richard Fawcett, Esquire, but afterwards divided into two dwelling-houses one of which has been for many years occupied by Mr. William Cheeseborough and the other successively by Mr. Samuel Laycock Tee and Mr. Samuel Bottomley. The former residence has coach-house, stabling and suitable out-offices attached. The site of the mansion-house and pleasure-grounds (including a moiety of Randall Well [380] Street on the north-west, and of a certain projected

16 HOUSE OF LORDS [1919]

[HOUSE OF LORDS.]

H. L. (E.)* BRADLEY and Others . . . . . . APPELLANTS;

1918

*July* 29.

AND

H. NEWSOM, SONS AND COMPANY RESPONDENTS.

*Ship—Abandonment at Sea—Ship and Cargo subsequently salved—Right of Shipowner to Freight.*

The defendants' ship, while on a voyage from Archangel to Hull with a wood cargo, was attacked by an enemy submarine, and the master and crew were compelled to leave the ship. The enemy attempted, but failed, to sink the ship ; and she was subsequently found in a waterlogged condition by a British patrol boat, and brought, with her cargo, to the Scottish coast, and was there taken possession of by the receiver of wreck. On the receipt of a telegram from the master that the ship had been sunk by a submarine (which he believed to be the fact), the owners wrote to the ship's agents a letter for communication to the cargo owners, advising them of the loss of the ship. On hearing that the ship was afloat, the plaintiffs, who were endorsees of the bill of lading, intervened and intimated to the receiver of wreck that they elected to take possession of the cargo where the ship lay ; but, by arrangement, the defendants delivered the cargo at Hull without prejudice to the rights of the parties. The plaintiffs claimed delivery to them of the cargo free of freight, on the ground that the defendants had abandoned the prosecution of the voyage.

*Held*, (1.) by Lord Finlay L.C., Viscount Haldane, Lord Parmoor, and Lord Wrenbury (Lord Sumner dissenting), that there had been no abandonment of the ship by the master without any intention of returning to her, and without hope of recovery, so as to entitle the cargo owners to treat the contract as at an end, and to claim possession of the cargo without paying the freight; (2.) by all their Lordships, that the letter of the owners conveyed no intimation of an intention no longer to be bound by the contract.

*The Cito* (1881) 7 P. D. 5 and *The Arno* (1895) 72 L. T. 621 distinguished.

Decision of the Court of Appeal [1918] 1 K. B. 271 reversed

APPEAL from a decision of the Court of Appeal (1) affirming a decision of Sankey J. The facts are fully stated in the report of the case before the Court of Appeal and in the judgment of the Lord Chancellor, and are summarized in the headnote.

* *Present :* LORD FINLAY L.C., VISCOUNT HALDANE, LORD SUMNER, LORD PARMOOR, and LORD WRENBURY.

(1) [1918] 1 K. B. 271.

A. C.                    AND PRIVY COUNCIL.                    17

Sankey J. held that the master and crew had abandoned
the ship in such circumstances as to indicate an intention
not to perform the contract of affreightment, and that the
cargo owners, the respondents, were therefore entitled to
receive the cargo free of freight.

<div align="right">H. L. (E.)<br>1918<br>BRADLEY<br>v.<br>H. NEWSOM,<br>SONS AND<br>COMPANY.</div>

In the Court of Appeal this judgment was affirmed by a
majority (Pickford L.J. and Bankes L.J., Sargant J. dis-
senting). The majority did not differ from the conclusion
of Sankey J., that the act of the master and crew in leaving
the ship amounted to an abandonment; but they based their
judgment on the letter of the shipowners, which they held
was a clear intimation to the charterers of their inability
to carry out their contract.

Sargant J. differed on both points. In his opinion there
had been no abandonment of the contract by the shipowners
or their agent.

1918.    June 28, July 2, 4.    *MacKinnon, K.C.* (with him
*Lewis Noad*), for the appellants.

The master and crew, in quitting the ship and seeking
safety ashore, acted under compulsion, and not with any
intention of abandoning the ship, so as to entitle the cargo
owners to take possession of the cargo without paying the
freight. What happened was done by force majeure. The
letter written by the managing owner, under the erroneous
belief that the ship was lost, and communicated to the cargo
owners, carries the matter no further. *The Kathleen* (1),
*The Cito* (2), and *The Arno* (3), upon which the respondents
rely, are distinguishable in their facts; but, if and so far as those
cases support the proposition that if, by whatever means and
under whatever circumstances, a ship is left by the master
and crew, and is subsequently salved, the owner loses his
right to freight, it is submitted that they were wrongly decided.
The question depends on the general rules of the law of contract,
as was recognized by Gainsford Bruce J. in stating the question

(1) (1874) L. R. 4 A. & E. 269.            (2) 7 P. D. 5.
(3) 72 L. T. 621; 8 Asp. M. L. C. 5.

**18**                          HOUSE OF LORDS                          **[1919]**

H. L. (E.)
1918
BRADLEY
v.
H. NEWSOM,
SONS AND
COMPANY.
—

to be determined in *The Arno* (1), and does not depend upon any principle peculiar to charter parties and contracts of affreightment such as was laid down by Brett L.J. in *The Cito.* (2) That question is whether there has been, on the part of the owner or his servants, any intimation of an intention not to be further bound by the contract, so as to entitle the cargo owners to treat the contract as at an end. It cannot be successfully contended that whenever a carrier is out of possession of the goods bailed to him for any substantial time the owner of the goods can claim to take possession of them without paying the carriage, although the carrier is ready and willing to complete his contract. Here the temporary interruption of performance is not so radical a failure to perform the contract of affreightment as to amount to a repudiation of the contract which the cargo owners were entitled to accept.

*Leck, K.C.,* and *R. A. Wright, K.C.,* for the respondents. Wherever the performance of a contract of affreightment is in fact abandoned or has ceased the cargo owner is entitled to treat the contract at an end. When a ship is derelict, as Sankey J. held this ship to be, that is abandonment of possession of both ship and cargo, and that involves abandonment of the voyage. This case is indistinguishable from *The Kathleen* (3), *The Cito* (2), and *The Arno* (1), which have been approved by the Supreme Court in the United States in *The Eliza Lines.* (4) The state of facts created by the violence of the enemy does not differ from the state of facts arising from the violence of the sea. It is not suggested that the master acted improperly, but in quitting the ship he exercised an act of volition just as much as in the case of stress of weather. The abandonment of the ship involves an act by the master which goes to the root of the contract. The principle of *The Cito* (2) is that the cessation of performance of a continuous contract is an abandonment of the contract. Here is a derelict ship—i.e., a ship which the crew have left for good—and, the ship being derelict, the cargo owners were entitled to come

(1) 72 L. T. 621; 8 Asp. M. L. C. 5.        (3) L. R. 4 A. & E. 269.
(2) 7 P. D. 5.                              (4) (1905) 199 U.S. 119.

and claim their property, as they did, before the shipowner
came on the scene.  Suppose there had been no interference
by the cargo owners at the port where the ship lay and the
goods had been delivered at the port of destination ; it might
be held that there had been a waiver of the failure to perform—
a point which Lord Esher leaves open in *The Arno* (1)—but the
abandonment was itself a failure to perform the contract,
although it might be followed by circumstances which annulled
the effect of the abandonment.   The cargo owners are willing
to assume that but for their intervention the shipowners
would have been entitled to freight.   But whereas here there
has been an abandonment in fact, whether with or without
volition is immaterial, and during that abandonment a re-entry
by the cargo owners, the latter have a right to take their
goods, and no claim for freight arises.

*MacKinnon, K.C.*, replied.

[The following cases were also referred to : *Guthrie* v. *North
China Insurance Co.* (2) ;  *Mersey Steel and Iron Co.* v. *Naylor,
Benzon & Co.* (3) ;  *Johnstone* v. *Milling* (4) ;  *Hochster* v.
*De la Tour* (5) ;  *Thornely* v. *Hebson* (6) ;  *Cossman* v. *West* (7) ;
*Bentsen* v. *Taylor, Sons & Co.* (8)]

The House took time for consideration.

July 29.   LORD FINLAY L.C.   My Lords, this case relates
to a contract for the carriage of a cargo of timber from Archangel
to Hull on the ss. *Jupiter*, and the question is whether the
cargo owners, the plaintiffs in the action and now respondents,
were entitled without payment of freight to demand delivery
of the timber at Leith, to which place the vessel had been
brought by salvors.   The claim rested on the contention that
the vessel was " derelict " when she was picked up by salvors,
and that this amounted to an abandonment by the appellants

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

(1) 72 L. T. 621 ; 8 Asp. M. L. C. 5.          (4) (1886) 16 Q. B. D. 460, 472.
(2) (1902) 7 Com. Cas. 130.                    (5) (1853) 2 E. & B. 678.
(3) (1882) 9 Q. B. D. 648, 657 ;               (6) (1819) 2 B. & Al. 513.
(1884) 9 App. Cas. 434.                        (7) (1887) 13 App. Cas. 160, 177.
                    (8) [1893] 2 Q. B. 274.

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

of the contract of carriage which entitled the cargo owners to take possession of the goods at Leith.

The cargo owners brought the action by writ dated October 25, 1916, claiming a declaration that they were entitled to delivery. The points of claim alleged that the *Jupiter* while proceeding on the voyage was attacked on October 7 by enemy submarines, and that the master and crew abandoned the vessel, which was picked up by vessels of H.M. Patrol Flotilla and brought into Leith, where she was beached and placed in the hands of the receiver of wreck. In the points of defence the defendants denied the abandonment, and pleaded that the crew was compelled to leave the vessel by an enemy submarine, and the defendants counter-claimed for the freight.

The respondents had chartered the *Jupiter*, which belongs to the appellants, by the charterparty of July 18, 1916, for the carriage from Archangel to Hull of a cargo of deals, battens and other timber at agreed rates. By the 7th Clause the act of God, the King's enemies, restraints of princes and rulers, the perils of the seas, were excepted. Bills of lading were given and these are held by the respondents.

What happened is best stated in the words of the protest by the master of the *Jupiter* and others, dated October 11, 1916: "That after discharging the pilot and tug the vessel proceeded without the occurrence of anything worthy of note until 3.40 p.m. on the 7th day of October instant, when appearer's vessel was crossing the Firth of Forth with the Longstone Lighthouse bearing S. by W. about 40 miles distant. Whilst following the route laid down by the Admiralty, appearer the master suddenly saw a submarine rise out of the water on his vessel's starboard side, and about a quarter of a mile distant. The submarine at once fired a blank shot over appearer's vessel, followed immediately afterwards by two more live shots forward and aft of the appearer's vessel. The submarine then signalled to appearers to abandon their ship. Seeing no possible chance of escape, appearer the master at once ordered the crew to take to the boats, and the submarine signalled for those to go on her. On getting near the commander of the

submarine asked appearer the master for the ship's papers, but was told they were still on board the vessel. The commander also demanded from the master the name of the vessel, to where she belonged, her registered tonnage and what their position then was, which information was given by the master. Appearer's second boat, which contained the mate and second engineer, was then ordered alongside the submarine, and the engineer was taken on board. Four of the Germans then proceeded to appearer's vessel in the mate's boat, taking the mate with them, and remained aboard about ten minutes, where they took possession of the ship's papers, forcing the mate to show them these with threats of loaded revolvers, and they then returned to the submarine. Shortly afterwards appearer the master heard an explosion aboard his vessel, which had previously had a strong list to port, and which after the explosion took a strong list to starboard. The submarine subsequently took appearer's two boats in tow and towed them in a westerly direction for about five miles, when they were cast adrift, and during this towage appearers heard further explosions aboard their vessel, of which they lost sight in the gathering darkness. At 7.30 p.m. appearers were picked up by the trawler *Ayacanora* of North Shields (No. 72), which vessel took appearers to Aberdeen, where they arrived at 10.30 a.m. on Sunday morning, the 8th October, and where appearer the master at once reported the matter to the naval authorities. And appearer the master saith that as soon as he sighted the submarine he destroyed his secret instructions by tearing them up and throwing the pieces overboard. And appearers lastly say that they have subsequently heard that the vessel, floating on her cargo, has been picked up and beached near Newhaven."

The master was under the impression that the steamship had sunk, and on his arrival at Aberdeen on the morning of October 8 telegraphed to Mr. Bradley, "Ship sunk yesterday submarine," and repeated this in his letter of that day to Mr. Bradley. By Mr. Bradley's instructions his agents, Messrs. Bordewich, sent on October 9 the following letter to the respondents :—

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

22                          HOUSE OF LORDS                    [1919]

H. L. (E.)                                    " 9th October, 1916.

1918         " Messrs. H. Newsom, Sons & Co., Limited,
BRADLEY                      " Hull.
*v.*
H. NEWSOM,   " Dear Sirs,
SONS AND
COMPANY.                     ss. *Jupiter.*

Lord Finlay       " We have the following letter from owner of this steamer
L.C.       to-day, which kindly note :—

           " ' It is with very great regret I advise you of the loss of
my ss. *Jupiter*, which steamer was sunk by enemy submarine
on Saturday last. The crew have all been landed safely.
Will you kindly advise charterers and oblige ? '
                          " Yours faithfully,
                            " (Signed) P. R. Bordewich & Co."


       At 2 a.m. on Wednesday, October 11, the *Jupiter*, which
had been picked up by a Government patrol boat, was beached
at Newhaven, a village within the limits of the port of Leith.
The appellants were informed of this by a telephonic message
from their agents at Leith, Messrs. Furness, Withy & Co., which
they received at 10.35 a.m. on the morning of the same day
(October 11). Mr. Bradley requested Messrs. Furness to pro-
tect his interests at Leith, and informed them that he would
arrive that night. He left Hull by train at 5.5 p.m., and
arrived at Leith after 11 p.m. Before he left Hull he had
received from the respondents' solicitors the following telegram :


                          " Hull, 11th October, 1916.
" London O.
" Handed in at 2.27 p.m.
" Received here at 2.47 p.m.
" To Fuel Hull.
       " *Jupiter* we represent owners cargo of this steamer recently
brought into Leith derelict our clients elect take possession
their property where now lying please note.
                                    " Legal."


       The respondents' solicitors also sent to the receiver of
wreck at Leith the following telegram :—

**A. C.**                    AND PRIVY COUNCIL.                    23

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

" 11th October, 1916.

" Receiver of Wreck, Leith.

" Sent 2.27.

" Received 3.20.

" Steamer *Jupiter* we represent owners cargo understand she is now lying at Newhaven please note our clients claim elect take possession their property where steamer now is please do not allow cargo to be dealt with except with our sanction please do anything necessary protect property for our clients.                    " Legal."

The shipowners asserted that they were entitled to take the cargo on to Hull, thus earning their freight, which would amount to more than 14,000*l.*, while the cargo owners insisted on their right to take possession at Leith without payment of any freight as the voyage had not been completed.    On October 26, the day after the writ in the action was issued, an agreement was entered into by a memorandum of that date arranging for the carriage to Hull of the cargo, reserving the question of liability for payment of freight to be decided in the action.    The cargo was accordingly carried to Hull, and delivered there.

The question now is whether freight was payable. Sankey J. held that the case came within the authority of *The Cito* (1) and *The Arno.* (2)    He said that the abandonment of a vessel by its crew during a voyage without any intention to retake possession gives the owner of the cargo the right to treat the contract of affreightment as at an end, and that the cargo owners had exercised this right before the shipowners resumed possession.    He summed up his view of the case thus : " In my view there was in fact an abandonment of the vessel, and there was, on the part of the servants of the owners, an act done clearly indicating their intention not to carry out the contract ; in other words, there was the predicament mentioned by A. L. Smith L.J. in *The Arno* (3) of a ship left derelict in mid-ocean and abandoned by its master and crew." (4)    His Lordship, therefore, gave judgment for the

(1) 7 P. D. 5.                    (3) 72 L. T. 624.
(2) 72 L. T. 621.                    (4) [1917] 2 K. B. 112, 116.

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

plaintiffs for the relief claimed.  In view of a possible appeal, he found that the amount of freight, if payable, would be 14,050*l.* 2*s.* 9*d.*

The shipowners appealed.  The Court of Appeal were divided in opinion.  The majority, Pickford L.J. and Bankes L.J., affirmed the judgment of Sankey J., but on a different ground.  They held that the letter of October 9, 1916, from the shipowners' agent to the cargo owners, advising them of the loss of the ss. *Jupiter,* amounted to an intimation that the shipowners were not in a position to carry out the contract, and justified the cargo owners in treating the contract of affreightment as at an end, and in claiming the delivery of the cargo at Leith without payment of any freight.  Sargant J. differed.  He held that the crew did not " abandon " the ship by quitting it under the compulsion of the enemy submarine, and that the communication of the supposed fact of the loss of the vessel did not amount to an intimation of the shipowners' intention not to carry out the contract.  In accordance with the opinion of the majority the appeal was dismissed with costs.  From this decision the shipowners appeal to your Lordships' House.

The effect of Sir Robert Phillimore's decisions in *The Kathleen* (1) and of the Court of Appeal's in *The Cito* (2) and *The Arno* (3) is that if a ship be abandoned by her master and crew during a voyage, the cargo owner may elect to treat the contract of affreightment as at an end, and claim delivery of his goods without payment of any freight.  I agree with the principle of law laid down in these cases.  This principle would apply to the present case if quitting the vessel under the circumstances amounted to an abandonment within the meaning of the rule as laid down in these cases.  For this purpose there must be an abandonment without any intention to retake possession, and it must be the act of the master and crew. The test is sometimes said to be whether the vessel has become a derelict.  This is merely another way of stating the same question.  The word " derelict " is sometimes loosely used as denoting a vessel drifting about at sea without any crew on

(1) L. R. 4 A. & E. 269.        (2) 7 P. D. 5.        (3) 72 L. T. 624.

board, but the legal sense of the term is that this state of
things must have been brought about by the abandonment
of the vessel by the master and crew.    A vessel would not be a
derelict if the master and all the crew had been swept off the
deck by a heavy sea and drowned, or if all on board were dead
of the plague.    Sir W. Scott laid it down in *The Aquila* (1)
that it is sufficient to constitute a derelict if there has been
abandonment at sea by the master and crew without hope
of recovery.    There must be no spes recuperandi and no
animus revertendi.    (See *The Zeta.* (2))    And this, as was said
by Dr. Lushington in *The Sarah Bell* (3), depends on the
state of mind of the master and crew at the time when they
quitted the vessel.    If this be once ascertained a subsequent
change of intention on their part and effort to save the vessel
are immaterial.    The animus derelinquendi is essential to
constitute a derelict: *The John and Jane.* (4)    As was
said by Sir Barnes Peacock in delivering the judgment of
the Judicial Committee in *Cossman* v. *West* (5), the term
" derelict " is legally applicable to a ship which is abandoned
and deserted at sea by the master and crew without any
intention of returning to her.

In *The Fenix* (6) the crew of one of two vessels in collision
jumped on to the other, and Dr. Lushington pointed out
that the salvors were not entitled to such a proportion as
is usually given in cases of derelicts, " because the vessel
was not abandoned in consequence of being utterly incapable
of being navigated or because she was not seaworthy ; it
was merely from a sense of imminent danger, not knowing
what the consequences of the collision might be.    It was
an abandonment for the security of the person, accompanied
with an intention of returning, provided that life should
no longer be in danger.    I cannot, therefore," he said,
" consider this case to be placed in the category of ordinary
cases of derelict."    The whole of this subject was considered
in the High Court of Admiralty in Ireland in *The
Cosmopolitan.* (7)    The circumstances of that case were

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

(1) (1798) 1 C. Rob. 37, 41.                (4) (1802) 4 C. Rob. 216.
(2) (1875) L. R. 4 A. & E. 460, 462.        (5) 13 App. Cas. 160, 180.
(3) (1845) 4 Notes of Cases 144, 146.       (6) (1855) Swab. 13, 15.
                (7) (1848) 6 Notes of Cases, Supplement xvii.

26                         HOUSE OF LORDS                    **[1919]**

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

similar to those of *The Fenix* (1), and the learned judge, Dr. Stock, made an elaborate review of the authorities, and said: "The issue is quo animo the act of quitting was done?" (2)   On the question of derelict or not derelict everything depends on the state of mind of the master and crew when they quit the vessel, and their state of mind may, of course, be inferred from the surrounding circumstances.

Dr. Lushington remarked in *The Florence* (3) that the abandonment for the purpose of constituting a case of derelict must be by order of the master, in consequence of danger by reason of damage to the ship and the state of the elements, and went on to say: " The master is, as I conceive, the proper person to form a judgment whether abandonment be absolutely necessary or not.   He is the person whom the owners have voluntarily intrusted with the command of their vessel, and the care of the property embarked in it; they must be taken to have deemed him competent to the discharge of the duties committed to him, and especially that he would not, without adequate cause, leave to destruction their property."   The question is not of the intention of the owner personally.   In the immense majority of cases he does not, and cannot, know anything of the abandonment until after it has been effected; but he acts in this matter through the master as his agent.   The effect upon the contract of affreightment of the final abandonment of a vessel at sea is only an example of the general law of contract, by which if one contracting party puts it out of his power to carry out the contract the other may treat the contract as at an end.

The question of what constitutes a derelict has very commonly arisen when the scale of salvage was under consideration, as more liberal remuneration was usually given if the vessel was a derelict; but it has also arisen when the point was whether the crew of the vessel were entitled to salvage remuneration in afterwards saving her, on the ground that their contract of service was brought to an end when the vessel became derelict.   See *The Florence.* (3)

(1) (1855) Swab. 13, 15.                    (2) At p. xxvi.
            (3) (1852) 16 Jur. (O.S.) 572, 573.

The fact that the vessel is a derelict does not involve necessarily the loss of the owner's property in it, but any salvors by whom such a vessel is picked up have the right to possession and control. In *The Dantzic Packet* (1) Sir John Nicholl, in dealing with the misconduct of salvors who had attempted to exclude other salvors, said : " It is different in the case of a derelict ; there the first occupant has a vested interest, and a right of exclusive possession, if alone he can save the property ; he takes possession indeed for the benefit of the Crown, in the first instance,—but subject to a liberal remuneration." In the marginal note to this passage there are inserted after the words " of the Crown " the words " or owners." The question of property in a derelict was discussed in *The Cito*, and Brett L.J. (2) says that he was not prepared to accept the proposition that abandonment constituting a derelict, together with a subsequent seizure by anyone who found it, would make the ship a droit of Admiralty, and alter the property. It was stated by the King's Advocate in the case of *The King* v. *Property Derelict* (3) that the owner would be entitled if he came in in time, otherwise the Crown ; but this topic is, of course, immaterial for the purposes of the present case.

The crucial question is this. Was this vessel, when she was picked up by salvors, a derelict in the legal sense of the term ; or, in other words, had the master and crew *abandoned* her without any intention of returning to her, and without hope of recovery ? It appears to me to be quite impossible to answer this question in the affirmative. In quitting the vessel the master and crew simply yielded to force. There was no voluntary act on their part, and the case stands exactly as it would have done if they had been carried off the vessel by physical violence on the part of the crew of the German submarine. It would be extravagant to impute to them the intention of leaving the ship finally and for good. They simply bowed to the pressure of irresistible physical force. If a British destroyer had appeared on the scene, and had

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

(1) (1837) 3 Hagg. Adm. 383, 385.          (2) 7 P. D. 8.
(3) (1825) 1 Hagg. Adm. 383, 384.

28                           HOUSE OF LORDS                        [1919]

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Finlay
L.C.

driven off or sunk the submarine, they would gladly have returned to their vessel. All they intended was to save their lives by obeying the orders of the German captain. I entirely agree with Sargant J.'s observations on this part of the case. The physical act of leaving the vessel is only one feature in such a case. Another and essential feature, in order to make it a case of derelict, is the state of mind of the captain and crew when they left. The question quo animo is decisive, and the facts seem to me to show clearly that the quitting of the ship was not under such circumstances as to make it a case of derelict. The *Kathleen* (1), *Cito* (2) and *Arno* (3) appear to me to have no application. The case is merely one of temporary interruption of the voyage by the action of an enemy submarine, and this afforded no ground for the claim of the cargo owners to resume possession of the goods at Leith when the greater part of the voyage had been completed. The shipowners were ready and willing to carry the goods on to Hull, and were entitled to do so.

The contention that the communication to the cargo owners of the erroneous information of the loss of the ship amounted to abandonment of the contract of carriage is not sustainable. It was a very proper thing to convey this information to the cargo owners in order that they might take any action which the fact, if it really had occurred, would render expedient in their interests. I cannot see how it can possibly be considered as an intimation that the shipowners abandoned the contract of carriage whether the information was true or not.

For these reasons I think that the appeal should be allowed, and judgment entered for the appellants, with costs here and below.

VISCOUNT HALDANE. My Lords, this is an appeal from a judgment of the Court of Appeal (Pickford and Banks L.JJ., Sargant J. dissenting), which affirmed a judgment of Sankey J. The question raised was whether the respondents, the

(1) L. R. 4 A. & E. 269.                    (2) 7 P. D. 5.
(3) 72 L. T. 621.

charterers of the s.s. *Jupiter*, were entitled to claim delivery of the cargo (which consisted of timber) at Leith, not being the port of destination, free of freight. The voyage contracted for with the appellants, the owners of the steamer, was to be from Archangel to Hull, where the cargo should have been delivered, and the matter in dispute was as to whether the appellants, through their master, had abandoned possession in the open sea of the steamer and cargo in such a way that the respondents were entitled to resume possession of their cargo at Leith where they found it, free of the freight, which would have amounted to 14,050*l.* 2*s.*

My Lords, the charterparty was dated July 18, 1916. It contained an exceptions clause, which included in its terms the acts of the King's enemies, restraints of princes, perils of the seas, and other matters—even when occasioned by the negligence or error of the master. The cargo of timber was loaded at Archangel, under several bills of lading, all in the same form and with the same exceptions as in the charterparty. The steamer started from Archangel on September 25, 1916, on the voyage. All went well until Saturday, October 7, when she was crossing the Firth of Forth on her way to Hull. As she was crossing the Firth a German submarine attacked her. The submarine fired on the *Jupiter*, and signalled to her crew to quit her. The master, seeing no chance of escape, ordered the crew into the boats. The submarine then signalled for the boats to come to her, and finally the mate's boat was ordered to lie alongside the submarine. Four armed Germans got into her and went back, taking the mate with them, to the *Jupiter*, and there, by threatening him with loaded revolvers, compelled the mate to find, and hand them, the ship's papers. The Germans then went below, and placed bombs in her and opened the sea connections. Then they returned to the submarine. A little later an explosion on board the *Jupiter* was heard, and she was seen to take a list to starboard. The submarine then took the steamer's boats in tow, and towed them towards the coast of Scotland for about five miles. During this towage further explosions were heard by the

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Viscount
Haldane.

HOUSE OF LORDS                              **[1919]**

H. L. (E.)

1918

BRADLEY

*v.*

H. NEWSOM,
SONS AND
COMPANY.

Viscount
Haldane.

master to take place on board the *Jupiter*, but it became so dark that he could not see her any more. The submarine, after towing the boats for five miles, finally cast them off, and the master and crew were later on picked up by a trawler and taken to Aberdeen, where they arrived at 10.30 on Sunday morning, October 8, and at once reported what had happened to the naval authorities. The master was under the impression that the *Jupiter* had been sunk, and telegraphed to the owners to that effect about noon on the Sunday. In the evening he heard that the *Jupiter* was afloat and in tow, but he appears to have been doubtful whether she could actually be saved.

On receipt of the telegram from the master the appellants instructed their brokers to inform the respondents of their news, and the brokers on Monday, October 9, sent to the respondents a copy of a letter which they had that day received from the appellants : " It is with very great regret that I advise you of the loss of my s.s. *Jupiter*, which steamer was sunk by enemy submarine on Saturday last. The crew have all been safely landed. Will you kindly advise charterers, and oblige ? "

My Lords, in fact the *Jupiter* had not been sunk. Her cargo was a buoyant one, and she remained afloat. Salvors got hold of her, and she was brought into Newhaven, close to Leith, on the night of the Tuesday or in the early morning of the Wednesday. On the Wednesday, at 10.35 a.m., Mr. Bradley, who is one of the appellant owners, was informed by telephone by his agents at Leith that the *Jupiter* was afloat, and had been brought in, and he asked them to protect his interests, and said that he would come to Leith that evening. This he did. Just before starting, at 5 p.m., he received a telegram from the respondents' solicitors in these terms : " *Jupiter*, we represent cargo of this steamer, recently brought into Leith derelict. Our clients elect take possession their property where now lying." The respondents' solicitors also telegraphed in similar terms to the receiver of wreck at Leith, requesting him further to do what was necessary to protect their clients' property.

A. C.                AND PRIVY COUNCIL.                31

It will be observed that the telegram from the respondents' solicitors to the appellant Bradley is based on the assertion that the steamer had been derelict. The real question is whether she was so. For the appellant Bradley went to Leith at once ; and finally, on the footing that it was to be without prejudice to any of his rights, got hold of the steamer and navigated her to Hull, where the cargo of timber was landed.

My Lords, what we have to consider is whether the steamer was really abandoned so as to become derelict and no longer possessed or owned by the appellants. If this was so, the contract was abandoned with the vessel, and the cargo owners were entitled to take possession of the cargo if they could, and free of freight. If the steamer had sunk, and the cargo had somehow floated independently of her, the result would have been the same. The physical fact of the actual loss of the steamer which was to have made the voyage would have imported the loss of all title to claim on the footing that the contract had been carried out. But the steamer was, in fact, not lost ; and the question, therefore, is whether she was abandoned so that the same result followed from her having ceased to be, in point of law, any longer the possession or the property of the appellants. It will be convenient to consider this question, in the first place, as one of principle, before referring to authorities. I think that the letter of October 9, 1916, sent by the appellants' brokers to the respondents, did not convey any intimation of intention on the part of the appellants to abandon their steamer if it had not been sunk. The intimation was merely one of their belief that she was sunk, and this belief was founded on what proved, in the result, to have been a mistake of fact. There was nothing in the letter which warranted the statement made by the respondents through their solicitors in their telegram of the 11th, when they had ascertained the truth, that the steamer, not having been sunk, but having been brought into Leith, the owners had abandoned her. If this be so, it follows that the foundation of the reasoning of Sankey J. in his judgment is unsound. He held that there was an abandonment, and that there was, therefore, a repudiation of the

H. L. (E.)
1918
BRADLEY
v.
H. NEWSOM,
SONS AND
COMPANY.

Viscount
Haldane.

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.
———
Viscount
Haldane.

contract. But I am unable to find, in the circumstances, any evidence disclosing the element of intention which seems essential to the application of the doctrine of abandonment in cases where there has been no actual loss. The master and crew really left the steamer not of their own volition but under duress, being forced to do so. As the result, they cannot be taken to have chosen to repudiate their obligation to carry any more than they can be taken to have chosen to abandon the vessel. The fact of having been forced away from her is one thing. An intention to leave her derelict is quite a different thing. They did not leave the vessel. It was really taken from them. I think there is a confusion in the judgments of the Courts below between a being parted from the vessel by force of arms and a quitting of it as an act of freewill. No doubt if they had quitted it because they desired to make sure of saving themselves from being drowned if she went down, that would have been an act to the performance of which they would have been moved by a motive, none the less that it was. one of the most potent. It would have been an act of volition, just as on the other hand it is plainly an act of volition when men elect to perish with a war vessel instead of being taken prisoners and saved. But in this case I am of opinion that there was no act on the part of the master and crew which the law can treat as one of free choice. They were not bound to choose to resist in vain, and they did not do so.

Once reached, this conclusion appears to me to be fatal to the similar reasoning which prevails with the majority in the Court of Appeal. I agree with Sargant J. in thinking that the vessel was neither lost in fact nor was the subject of any intention indicated to abandon her if she should not prove to be lost. There was no such intention indicated either by the owners or by the master and crew. All of them were for a time under the mistaken belief of facts that the vessel had been lost, but there was no more than this belief with the bare implications dependent on it.

Apart from the possible result of authority, I should have thought that these considerations were fatal to the

conclusions reached by Pickford and Bankes L.JJ. But
those learned judges were of opinion that they were bound
to hold as they did because of the decided cases, and
particularly by the decisions in *The Cito* (1) and *The Arno*. (2)
Now, when I look at these cases, I find in them mere
exemplifications of a wider principle which seems to me
not to apply here—the general principle laid down by Lord
Campbell C.J. in *Hochster* v. *De la Tour*. (3)  There the
defendant had bound himself to employ the plaintiff as courier
from a date subsequent to that of the writ.  The breach
alleged was that, before the day for the commencement of
the employment, the defendant had intimated a refusal to
carry out the agreement.  The jury found for the plaintiff,
and there was a motion in arrest of judgment or for a non-suit.
The defendant contended that there could be no breach
until the day for performance, which had not arrived when
the action was commenced, and that both parties remained
bound.  But the Court of Queen's Bench held that, both on
principle and on authority, the parties were, from the time
of making the agreement, engaged each with the other, and
that it was a breach of an implied contract if either of them
renounced the engagement.  Otherwise, if the plaintiff had
no remedy unless he continued to treat this contract as in
force, he could not enter into any other employment which
would prevent him from being bound to performance when
the due date should arrive, and this would merely tend to
increase the damages.  He ought, therefore, to be held as
at liberty to rely on the defendant's assertion of intention
to treat their obligation as altogether at an end, and the
defendant should not be permitted to take this assertion back.
The repudiation in advance, therefore, entitled the plaintiff
to say that there had been a breach of contract.  The principle
laid down in this judgment has often been followed, and is
undoubtedly right.  My Lords, I think it explains and is
the foundation of the decisions on abandonment of contracts
to carry at sea when there has been no actual loss of the vessel.

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Viscount
Haldane.

(1) 7 P. D. 5.          (2) 72 L. T. 621.
(3) (1853) 2 E. & B. 678.

34                          HOUSE OF LORDS                          [1919]

<div style="float:left">H. L. (E.)<br>1918<br>BRADLEY<br><i>v.</i><br>H. NEWSOM,<br>SONS AND<br>COMPANY.<br>——<br>Viscount<br>Haldane.<br>——</div>

In the case of *The Kathleen* (1), a barque, laden with cargo shipped in America for Bremen as the port of destination, was run into in the Channel, and in consequence abandoned. It was held that the abandonment put an end to the contract to pay freight, notwithstanding that the barque and cargo were ultimately salved, and properly sold by order of the Court, reserving questions of freight. Sir Robert Phillimore, in giving judgment, said that even if a new implied contract in the course of the salvage operations might have given the shipowner a title to pro rata freight, no such claim could be established in the face of what had happened. By abandoning the ship was rendered derelict and put into the possession of the salvors, and it was clear that the original contract no longer subsisted, and that the title to the possession of the cargo became as from the time of the abandonment one in the cargo owners, so far as they could assert at all, arising only through the salvors and the Salvage Court, and not through the shipowners.

In *The Cito* (2) the Court of Appeal gave a similar decision. Brett L.J. explained the law as being that " by an abandonment of a ship without any intention to retake possession of it, the shipowner has, so far as he can, abandoned the contract, so as to allow the other party to it, the cargo owner, to treat it as abandoned." Cotton L.J. added that it was true "that the shipowners could not by their own act put an end to the contract of affreightment, but by their abandonment they gave a right to the cargo owners to elect to treat the contract at an end, and the shipowners could not . . . . after their abandonment have objected, if the cargo owners had found another vessel and taken the cargo on in it to the port of destination." Lindley L.J. concurred.

My Lords, *The Arno* (3) was also a decision of the Court of Appeal. The vessel had been justifiably abandoned, owing to perils of the sea, on March 31, 1895. She drifted with her cargo until April 3, when salvors found her, and brought both ship and cargo to Liverpool, the port of

<div style="text-align:center">(1) L. R. 4 A. & E. 269.          (2) 7 P. D. 5, 8, 9.<br>(3) 72 L. T. 621.</div>

`A. C.                     AND PRIVY COUNCIL.                     35

destination and discharge, where they arrived on April 25. On April 11 the owner, having heard of the towage of the ship by salvors, but not knowing to what port in England they might bring her, got the salvors to agree on that date to hold for him subject to their claim for salvage. On April 18 the cargo owners claimed to be entitled to the possession of their cargo free of freight. It was held that the salvors were not the agents of the shipowner, so as to make their possession of the cargo his. He did not get possession of it until arrival at Liverpool, and then, before he could claim, had to pay salvage on the cargo. Thus a new burden had been put on the cargo owner inconsistent with the original contract of affreightment, and he was entitled to elect, as he had done while this state of things existed, to treat the contract as repudiated. The judgments, in my opinion, merely exemplify the principle of *Hochster* v. *De la Tour.* (1)

My Lords, in the case before us, if the vessel had been in point of fact lost, that would have put an end to the very basis of the contract of carriage, and not the less would this have been so if, the ship having been lost, the cargo had floated and the cargo owner had rescued it. But these things did not happen here. Nor did the owners, through the master and crew or otherwise, express or imply an intention to abandon. All that really occurred was that, in the erroneous belief that the former alternative, an actual loss of the *Jupiter*, had taken place, the owners of the steamer informed the cargo owners of what they believed to have happened. They were wrong in this ; but their mistaken statement of the facts disclosed no intention that I can discover to repudiate if the facts were otherwise and the vessel was actually still in existence.

I agree with the view of Sargant J., who dissented from the majority in the Court of Appeal, and I think that we ought to reverse the judgment.

LORD SUMNER (read by Lord Wrenbury). My Lords, two questions have been raised in this case : the first, as

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Viscount
Haldane.

(1) 2 E. & B. 678.

3        D 2

36                          HOUSE OF LORDS                    [1919]

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

to the effect of the communications between the parties on shore ; the second, as to the nature and effect of the events which took place at sea.   I think that the shipowners' letter, passed on to the cargo owners at Hull, did not intimate an intention no longer to be bound by the contract of carriage. It stated a fact, and it stated it wrong.   The cargo owners could not have taken it as a statement of such an intention, for they must have seen that, if the shipowners had known what they knew, their intention would have been the very opposite.   The episode seems to me irrelevant.   There is nothing on the record to show that the solicitors, who first put forward the claim to take the cargo at Leith, knew anything about this letter when they did so.   Their clients may have been underwriters.   They may have acted on news of the ship not obtained from the cargo owners at all.   They have never laid stress on this letter as the foundation of substantive rights, and the prominence given to it in the Court of Appeal was excessive.

The real point of the case is the fact that the *Jupiter* was left for good at sea to fare as she might, and that the master and crew came ashore.   The word " abandonment," though unavoidable, is apt to be ambiguous.   It introduces special considerations of marine insurance law not now in question. As little is it a question of abandoning a contract.   The effect upon the contract is a conclusion of law.   The fact was that all the shipowners' servants abandoned ship and cargo on the high seas, to sink or swim, and believed they had sunk, although the ship just floated on her cargo till she was salved next day.

It is common enough for a laden ship to be left derelict at sea, and many decisions have settled the legal consequences. Several sets of rights are affected.   A salvor's possessory right is different where the ship is derelict and where it is not.   The crew of a derelict may claim that their contract of employment has terminated, and may be awarded remuneration as salvors for services rendered.   The rights of assured and underwriters may be in question, or, as here, the right of a cargo owner to claim that the performance of the contract

**A. C.**                    AND PRIVY COUNCIL.                    37

of carriage has come to an end and cannot be renewed. It
is highly desirable, since so many interests may be affected
by it, that existing views about what makes a derelict should
not be unsettled, and that the test of a ship's being derelict
should be such as can be readily applied and will not be
dependent on inquiry into the state of mind of men, who,
unfortunately, may not have survived the marine disaster.
As to the rights of the cargo owners the authorities, extending
over about forty years, are all one way. *The Kathleen* (1),
*The Cito* (2), and *The Arno* (3) are all decisions on motions
in salvage actions for delivery of cargo to the cargo owners
freight free. They have often been applied in cases not formally
reported, and have been followed in the Supreme Court of the
United States : *The Eliza Lines.* (4)   The proposition there laid
down was that by the general principle of contract an open
cessation of performance with the intent to do no more,
even if justified, excuses the other party from further per-
formance on his side.   No contrary decision has been found.
Judge Carver states their effect thus : (5) " Where a ship
has been definitely abandoned at sea by the master and crew,
without any intention of coming back to her, . . . . the freighter
is entitled to treat the contract of carriage as abandoned.
So that if the ship, or the cargo, be afterwards brought into
port by salvors, the cargo owners may claim to have their
goods without paying any freight ; even though the shipowner
is ready and demands to be allowed to take them on to their
destination," and the learned authors of Scrutton on Charter
Parties (I quote from the edition of 1914, p. 318) say :
" Where the shipowner has no longer a right to carry on, as
where he abandons the ship and cargo, or where he delays
repair or transhipment beyond a reasonable time, the goods
owner, who receives his goods, will not thereby give the
shipowner any claim for freight pro rata."   Obviously,
it is à fortiori to say that there will be no claim for ordinary
bill of lading freight.   Lord Justice Kennedy's work on Civil
Salvage is to the like effect.

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

(1) L. R. 4 A. & E. 269.                    (3) 72 L. T. 621.
(2) 7 P. D. 5.                    (4) 199 U.S. 119.
(5) § 555.

H. L. (E.)      My Lords, I think that the argument disclosed a misappre-
1918       hension of the principle on which these decisions rest, for the
BRADLEY    suggestion was that, except that it is done by an agent, a
*v.*        master's act in leaving ship and cargo derelict at sea is identical
H. NEWSOM,
SONS AND   in principle with an intimation made by one of the parties
COMPANY.   to an executory contract to the other, that he does not intend
Lord Sumner.  to perform his part of the contract or to be bound by his
           obligations under it when the time for performance or observance
           may arrive.  Hence it was argued that in such a case (1.) the
           actual intention of the captain as a mental state is crucial ;
           (2.) that the actual intention of the shipowner is also material,
           since his mind is deemed to have gone to the making of the
           contract, and must therefore play its part in the unmaking
           of it, and that any breach by leaving the ship derelict cannot
           be final so long as it is possible that he may repair the
           consequences of the master's conduct ; and (3.) that the act
           of quitting the ship cannot have effect on the rights of the
           other contracting party until it has been intimated to him
           by the shipowner, or on his behalf.  I think this argument
           was fallacious.

               As the judgments in *The Cito* (1) and *The Arno* (2) show,
           there is an analogy between those cases and *Mersey Steel and
           Iron Co.* v. *Naylor, Benzon & Co.* (3), but the distinctions
           between them must be kept in mind.  The master is the ship-
           owner's agent to perform the voyage and to take such decisions
           and do such acts in the course of it as must be taken then and
           there by the person in command ; but his employment does
           not of itself ordinarily authorize him to vary a contract
           made by his employer.  His actions may have far-reaching
           consequences, but he is not authorized to form, or express,
           his employer's intentions, as such, in a matter of his employer's
           contract.  If, however, the shipowner, by his authorized agent,
           has definitely ended the performance of the voyage in medio,
           and quitted possession of the cargo, which is the effect of leaving
           the ship derelict, the cargo owner is free to do what he will
           with his own.  Thus only the result, and not the question, is

                   (1) 7 P. D. 5.                    (2) 72 L. T. 621.
                              (3) 9 App. Cas. 434.

the same as in the *Mersey Steel Co.'s Case* (1), which turns, not on the significance of an act, but on the intimation of an intention, not on performance entirely brought to a premature end, but on an anticipatory refusal further to perform at all.

If this is right the master's frame of mind is not the question; his acts are. If the master and crew perished the result would be the same. Whether he was moved to quit the vessel by one kind of peril or another cannot matter when he does quit it for good, and not for the purpose of procuring the means of prosecuting the voyage in the course of a temporary absence. In some ways, indeed, the matter is most conclusive when least is known of the captain's actual mental processes. The shipowner's intention is not material nor is even his knowledge, for if the voyage is at an end and the cargo owner has availed himself of his liberty, the shipowner cannot revive it by acquiring knowledge and thereupon forming an intention. Equally little can intimation to the cargo owner matter; for if the master's action has in truth put an end to the voyage and the cargo owner knows it, he is free to avail himself of his legal right without more.

The effect on the contract of carriage of maritime disaster occurring in the course of a voyage was originally always discussed in connection with claims for freight pro rata itineris peracti. It was not until the middle of the last century that the shipowner's right to tranship at a port of refuge and earn original bill of lading freight by carrying on in another bottom was fully recognized in this country; and it has never been formally decided that he has the same right when the ship is abandoned at sea and possession of the cargo has been abandoned with it instead of being retained at the port of refuge as in earlier cases. Yet the language used in the earlier cases is significant, though the circumstances of the two types of cases differ so widely. In *Hunter* v. *Prinsep* (2), where the cargo had been sold at the master's instance by order of a Court in a port of distress, Lord Ellenborough says: " If no freight be earned, and he decline proceeding to earn any, the freighter has a right

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

(1) 9 App. Cas. 434.          (2) (1808) 10 East, 378, 394.

40                        HOUSE OF LORDS                        [1919]

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

to the possession. The captain's conduct in obtaining an order for selling the goods, and selling them accordingly, which was unnecessary, and which disabled him from forwarding the goods, was in effect declining to proceed to earn any freight." I ask myself why the captain's conduct in leaving the goods to their fate at sea is not also in effect a " declining to proceed to earn freight," which gives the freighter a similar right to possession. If stress be laid on the words " which was unnecessary," I recall that the salvors were held to have got possession in *Cossman* v. *West*, though the abandonment was only necessary because the captain had first scuttled the ship. Again, in *Shipton* v. *Thornton* (1), which established the right to tranship in order to complete the earning of the bill of lading freight, Lord Denman says : " In the case supposed " (that is, the case of a ship disabled in a port of refuge without fault of the master) " . . . . let the owner of the goods arrive, and insist, as he undoubtedly may, that the goods shall not proceed, but be delivered to him at the intermediate port: there is then no question that the whole freight at the original rate must be paid; and that because the freighter prevents the master, who is able and willing, and has the right to insist on it, from fulfilling the contract on his part, and because the sending the goods to their destination in another vessel is deemed a fulfilment of the contract." Whatever other criticisms may arise on this language I think it is clear that this passage, which states the principles on which the right to tranship or carry on was upheld, rests on the proposition that the master is able and willing to fulfil the contract, which though a contract for carriage in a named ship is deemed to be validly performable in another, where carriage in the original ship to the destination is both impossible and excusable. This prevents it from being a mere claim to take the benefit of a contract arising out of a breach of the contract. It becomes the next best performance that maritime perils allow. If, however, the captain is neither able nor willing to complete the voyage, but by every act open to a seaman has thrown it up for good, what is there to prevent the owner of the goods from insisting that he may take

(1) (1838) 9 A. & E. 314, 335, 336.

**A. C.**                AND PRIVY COUNCIL.                                41

possession of his own goods, possession of which the master has
abandoned ?  I think it ought to be remembered that these
cases lie, logically as well as historically, behind *The Cito* (1)
and *The Arno* (2), and that the current of authority ought
to be surveyed as a whole.

    The matter may be tested in two other ways.  The ship-
owner has a possessory lien on goods shipped on board his
vessel to secure the earning and payment of his freight.  If he
loses possession, what term in the bill of lading contract
prevents the cargo owner from taking possession of his own
property, or constrains him to ship it over again or to re-
deliver it to the shipowner for his benefit ?  No term in fact
assuredly, and no authority whatever is forthcoming to
support the implication of such a term in law.  Now it is
clear that if a ship and cargo are left derelict at sea the ship-
owner loses possession, and with it his lien.  The ship and cargo
are at large to be taken into the possession of the first salvor.
" In the case of a derelict, the salvors who first take possession
have not only a maritime lien on the ship for salvage services,
but they have the entire and absolute possession and control of
the vessel, and no one can interfere with them except in the
case of manifest incompetence ; but in an ordinary case of
disaster, when the master remains in command he retains the
possession of the ship. . . . . Unless a vessel is derelict the
salvors have not the right as against the master to the exclusive
possession of it, even though he should have left it tempo-
rarily, but they are bound on the master's returning and
claiming charge of the vessel to give it up to him " : *Cossman*
v. *West.* (3)  Again, when a ship is in distress, under certain
circumstances the master, though in general only the servant
of the shipowner, becomes agent of necessity for the cargo
owner to dispose of his cargo, independently of the ship, the
voyage and the bill of lading contract.  When does this happen ?
" The agency of the master from necessity," says Parke B.
in *Vlierboom* v. *Chapman* (4) " arises from his total in-
ability to carry the goods to the place of destination."  How

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

    (1) 7 P. D. 5.                          (3) 13 App. Cas. 181.
    (2) 72 L. T. 621.                       (4) (1844) 13 M. & W. 230, 239

HOUSE OF LORDS                    **[1919]**

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

are these authorities to be reconciled with the view that although the master is so little able to prosecute the voyage or to carry the goods in any way to their destination that he leaves them and the ship out at sea for good, still the cargo owner cannot act as his own agent of necessity, and cannot do what the first salvor can do—namely, take and keep possession of his own goods—but if he meddles at all, becomes an agent of necessity for the shipowner, and must assist him to earn a freight which he cannot earn by himself ?

Cases of derelicts are common enough, but no single decision was produced, in which, under circumstances similar to these, a ship has not been treated as derelict with all the consequences that follow thereupon. Sankey J. found that the ship and cargo were left derelict. I think he was right. Pickford L.J. agreed with him. Bankes L.J. expressed no opinion on the point. Evans P. so found in the salvage action. The judgment of Sargant J. alone holds that the ship was not abandoned, because the master and crew acted involuntarily, and that the facts show no intention on their part to abandon the contract of affreightment on behalf of the shipowners. Even he does not see any ground for supposing that there was any intention of returning to the *Jupiter* or hope of recovering her. Before your Lordships it has also been argued that the ship was not left derelict, because it has not been shown that the master had not some hope or intention of returning to the ship if the enemy left him the chance of doing so. Now as Brett L.J. says in *The Cito* (1), the abandonment of the ship does not put an end to the contract. It is certainly kept alive for the purpose of enforcing causes of action already accrued upon it ; possibly it is kept alive for the purpose of enabling the shipowner to carry on the goods and earn the bill of lading freight, if he can recover possession before the cargo owner has done so or has intimated his election to take his cargo where it lies and not at the port of delivery. This point, expressly reserved in *The Cito* (1) and *The Arno* (2), need not be decided now. I have endeavoured to show that the supposed intention of the master to abandon his owner's contract for him is not material,

(1) 7 P. D. 5.                              (2) 72 L. T. 621.

A. C.                    AND PRIVY COUNCIL.                    43

and it is clear that the cargo owners elected to take their goods at Leith, subject only to the salvors' claim, at a time when the shipowner had taken no steps to prosecute the voyage or even ascertain that it was possible to do so. What he did was far less than what was done by the shipowners in *The Arno* (1), and yet was held by the Court of Appeal to be ineffectual to prevent the cargo owner from claiming his cargo freight free.

After all, what is the evidence about the abandonment of the vessel? It is all contained in the protest, and it is the master's own tale, in his own words, not cross-examined to and not contradicted. The pleadings and judgment in the salvage action add some significant details as to the ship's state next day but none as to her condition on October 7th. The story cannot now be carried by inference or by speculation beyond where it was left by the master. The ship was fired on by an enemy submarine, but was not hit. Signals were made to the captain to abandon ship. He deciphered the signals; he presumably considered the matter, though probably very rapidly. He saw no possible chance of escape. He decided to obey, and at once gave orders to take to the boats. In all this I assume that he displayed neither lack of courage nor lack of wisdom. He did not try to run; perhaps he did not think of it. He did not try to fight; probably the attempt would have been foolhardy. He decided to do what he thought was the only thing to be done, and I take it that he was right. Still he decided. He decided under duress, but pressure, which would have released him from a contract thereby induced or have negatived any consensus ad idem, is very different from that mechanical action which is illustrated by *Scott* v. *Shepherd* (2) or *The Cosmopolitan* (3) or *The Fenix*. (4) His act was neither unintentional nor involuntary.

At this time it was not dark, but, before the submarine cast off the boats, it had become dark enough for the vessel to be lost sight of. After the boats were left free by the enemy, which was before 7.30 p.m., the master might have put back to look for the vessel; after he was picked up by the *Ayacanora*

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

(1) 72 L. T. 621.                    (3) 6 Notes of Cases, Supp. xvii.
(2) (1773) 2 Wm. Bl. 892.            (4) Swab. 13.

44                       HOUSE OF LORDS                    [1919]

H. L. (E.)    he might have prevailed on her commander to go back.
1918       He believed she had sunk, and did neither; but the fact that he
BRADLEY    wrongly thought she had foundered does not prevent his action
v.         from being voluntary, deliberate and unconstrained. Whether
H. NEWSOM,
SONS AND   there was a mistake or not on the part of the master, says
COMPANY.   Dr. Lushington in *The Sarah Bell* (1) is not of the slightest
Lord Sumner. importance, for, assuming it to have been a mistake, his mind
           was actuated thereby, and the spes recuperandi must be
           governed by the feelings of the individual's own mind at the
           time.    So in *The Janet Court* (2) Jeune P. took it as obvious,
           that, if a master believed his ship had been sunk after he
           quitted her, he could have had no intention of returning
           although he was in fact wrong, as in that respect the captain
           always is in salvage cases where the ship is saved. What is
           clear about the whole story is that in fact he then had neither
           animus nor spes revertendi, and if he left the ship to her fate
           for good and all, he did so all the more decidedly because he did
           actually think that she was no longer on the surface but was at
           the bottom. My Lords, if a master and crew quit ship and cargo
           at sea they commit a very grave dereliction of duty, unless the
           grave peril in which they find themselves justifies their action.
           Ships are sometimes left without justification, but I feel sure
           not often; and in my opinion the inference from such an aban-
           donment de facto is that the voyage cannot be further prose-
           cuted. If this is to be rebutted it must be by positive evidence.
           There is no such evidence here. If all that is proved is that
           there was an abandonment de facto the presumption is that
           the master intended to do what he did in fact.    He acted as
           if he had no hope of return; and unless it is proved that he had
           such a hope it must be taken that he had none. It is not as
           though salvors were standing by and the captain had
           remained with them (*The Leptir*) (3), or as if the ship
           was aground or near the shore, and the crew had gone
           ashore for their personal safety, but took steps to recover
           the vessel : *The Clarisse*. (4)    Even when a ship is left at
           sea there is often so far a hope of return that the captain says

         (1) 4 Notes of Cases, 144.      (3) (1885) 52 L. T. 768.
         (2) [1897] P. 59.               (4) (1856) Swab. 129.

to himself "If I do fall in with possible salvors I will send
them back," but, as Dr. Lushington says in *The Coromandel* (1):
"It may be perfectly true that" the captain and crew "intended,
if possible, to employ steamers to go and rescue the vessel. . . . .
But is not that the case every day ?" This does not prevent
the ship from being a derelict when no salvors are sent back.
Surely the right of first salvors to possession and control, the
right of the crew to salvage remuneration for salvage services,
the right of cargo owners to take charge of their own goods,
cannot be left in dubio till the interior of the captain's mind
is explored, if death has not for ever closed that inquiry.
Would the ship have been no derelict if all the crew had been
drowned, and evidence was, therefore, unprocurable about
their hope or despair of return ?   Whatever objections there
are to the argumentum ab inconvenienti, at least it should
dissuade us from applying novel tests to familiar incidents
and disturbing the ordinary legal conclusions drawn from
well-known nautical conduct.   The casualty may take place
in one hemisphere and within reach of the shipper ; must he
stay his hand till the fate of the crew is known and the master's
liberty of judgment can be investigated, or till the shipowner,
perhaps a foreigner resident in the other hemisphere, hears of
the accident and has a chance to intimate one intention or
another ?   A shipowner's first step in such a case is nearly
always to abandon his ship to underwriters, and thereby to
abandon to them such right as he may have to carry on and
earn freight.   His election will virtually be not to abandon
further performance of the contract.   Cargo underwriters
insure against loss of cargo by marine perils but not against
liability to pay freight.   In such a predicament the cargo
owner will naturally leave the derelict alone.

Again, when a ship has proceeded but a short distance on
her voyage and is abandoned, the shipowner has the minimum
of interest in recovering the cargo; the shipper may still
be near at hand.   Towards the end of the voyage the ship-
owner may be able to earn a great reward by recovering and
delivering at its destination a cargo so damaged as to be

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSOM
SONS AND
COMPANY.

Lord Sumner.

(1) (1857) Swab. 205, 208.

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner.

valueless, though, being still in specie, it may be good enough to earn freight. If so, the cargo owner's interest probably is to rescue the cargo from further transit while there is still time *to arrest the damage and pluck something from the disaster.* I think it would be lamentable if in these cases the cargo owner were compelled to stay his hand and do nothing to save the cargo, lest having done so he should only saddle himself with a liability for freight which the shipowner himself might never have earned, instead of letting well alone, and claiming a total loss on his insurance policy. It is to the advantage of all parties, and of the public too, that when a ship is known to have been left to her fate at sea no uncertainty about the rights should stand in the way of an energetic attempt to save the cargo.

It is said that every case of marine disaster is legally a question of fact. Be it so. Let it be, too, that the captain and crew had to go. No one blames them; but is the prosecution of the voyage terminated or only suspended according as the captain's motive or his judgment is good or bad ? A ship may be a derelict with all the consequences that follow in law, though she was corruptly abandoned and equally a derelict though the captain did it for the best. The owner may be liable in damages to the cargo owner according as he has or has not exceptions of barratry or negligence of the captain in the bill of lading to protect him, but if the mere de facto termination of the voyage produces legal results they follow equally, no matter what the captain's motives may have been. Though the question is one of fact it is one which in typical states of fact can only be answered one way. Negligence in a running-down case is a question of fact for a jury; but there is an abundance of ordinary conjunctures in which a jury's verdict must recognise the ordinary views taken of such facts, or it will be set aside. The fact that the captain and crew had little choice here and virtually had to leave their ship to save their lives is an ordinary incident of derelicts. Whether this is caused by fire or by the King's enemies or by perils of the sea cannot distinguish the cases from one another. They have to leave the ship, and they go,

and the ship is left derelict; and the clearer the compulsion the
clearer is the termination of the voyage, unless special circum-
stances show a spes, not a speculation, revertendi, a plan, not a
bare possibility, of leaving the ship the better to procure help
and to continue the voyage. For myself, I do not see how the
judgment of the majority in the Court of Appeal can be
reversed without disregarding *The Cito* (1) and *The Arno* (2), and
without taking a view of maritime disaster which will introduce
new considerations into all these cases, and I should dismiss
the appeal.

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Sumner

LORD PARMOOR. My Lords, the relevant facts for considera-
tion in this appeal are as follows: The respondents are en-
dorsees of Bills of Lading, dated Archangel, September, 1916,
and signed on behalf of the appellants, the owners of the
*Jupiter*, for the carriage of a cargo of wood to Hull at freight
to be paid as per charterparty. When off the coast of Scotland
on October 7 the *Jupiter* was captured by a German sub-
marine. The master and crew were compelled to take to their
boats under threats from loaded revolvers, and bombs were
exploded on board the ship. When last seen by the crew the
ship was believed to be sinking, and the captain telegraphed
from Aberdeen to the owner on October 8: "Ship sunk yester-
day submarine arrived all well Sailors' Home." The ship,
in fact, was not sunk, but was picked up by salvors, beached
at Newhaven, near Leith, on October 11, and there taken
possession of by the receiver of wreck, to whom she was
handed over by the salvors. Subsequently there were certain
messages and letters, to which frequent reference was made
during the argument; but it will be convenient, in the first
place, to consider what would have been the respective rights
of the parties if there had been no such messages or letters.

The main argument put forward on behalf of the
respondents in the statement and points of claim was that
the *Jupiter* was abandoned by the master and crew during the
voyage to which the contract of affreightment attached, and
that such abandonment, without any intention to retake

(1) 7 P. D. 5.                    (2) 72 L. T. 621.

48                              HOUSE OF LORDS                    **[1919]**

H. L. (E.)    possession, gave the cargo owner the right to treat the con-
1918      tract of affreightment as at an end, and that he so treated it.
BRADLEY   In support of this contention the counsel for the respondents
*v.*      relied on *The Cito* (1) and *The Arno* (2) and *The Kathleen*. (3)
H. NEWSOM,
SONS AND      My Lords, I think that the term " abandonment " of a vessel
COMPANY.  in the ordinary sense denotes some discretion or volition on
Lord Parmoor. behalf of the master, and that it is not applicable to a capture,
          followed by the forcible removal of the master and crew under
          enemy threats.   The vessel was abandoned, not by the master
          and crew but by the captors, who intended to sink her, but in
          fact left her a derelict.   If this is the right view of the incidents
          which took place on October 7, it cannot be said that there
          was in any sense an act done on the part of the shipowner, or
          his representatives, indicating an intention to repudiate the
          contract of affreightment such as would entitle the freighter
          to infer that the shipowner did not intend to carry out the
          contract and give him a right to treat it as at an end.   I agree
          with Sargant J. that the conditions of this case are toto cælo
          different from the case of abandonment of the *Cito* or the
          *Arno*, where the master and crew exercised a discretion to
          abandon the vessel under stress of the violence of the weather.

          In the second place, the counsel for the respondents relied on
          the fact that the vessel was left as a derelict, and that the
          consequent inability of the appellants to carry out without
          interruption the contract of affreightment put an end to that
          contract.   I think that it is impossible to maintain this pro-
          position in general terms.   The circumstances of the present
          case are an apt illustration to the contrary.   Assuming, for this
          purpose, that no subsequent communications had passed
          between the shipowner and the cargo owner, but that the
          vessel, in spite of being for a time without a crew, did success-
          fully perform the voyage to Hull for delivery of the cargo at
          that port, I see no ground on which the cargo owner could have
          disputed his liability to pay freight under the terms of the
          contract.   The same argument would apply to carriers by
          land as to carriers by sea.   If carriers, who have done no act
          evincing an intention to abandon the contract of affreightment,

                    (1) 7 P. D. 5.              (2) 72 L. T. 621.
                          (3) L. R. 4 A. & E. 269.

A. C.                    AND PRIVY COUNCIL.                    49

in fact deliver goods entrusted to them in accordance with the
terms of a contract of carriage, freight is not the less payable
under the contract if, during the conveyance, the carriers have
for a time lost control of the vehicle in which the goods are
being carried. Mr. Wright, however, used the additional argu-
ment that it was not only a case of temporary inability to
perform the contract, but that there was evidence of an intention
on the part of the shipowner not to return to the vessel, or take
any steps to perform his obligations under the contract. My
Lords, I find no evidence of any such intention. The subse-
quent action of the appellants appears to have been based not
on any intention to abandon a floating vessel, but on the mis-
taken view that the captors had succeeded in sinking the ship
after taking off the master and crew, and that the vessel had
gone to the bottom of the sea.

A further point, made on behalf of the respondents, was that
if a carrier or his representatives had been removed from the
vehicle of carriage, whether ship or cart or train, and the
freighter finds his goods on such ship or other vehicle, the
freighter is then entitled to take possession of his goods and
to deal with them in such way as he may think fit, not being
under any liability to pay freight to the carrier, since the
contract of affreightment had not at such time been com-
pleted. My Lords, I think that before a freighter is entitled to
take possession of goods which he has entrusted to a carrier
for carriage under a contract of affreightment, he must show
either that he is exercising a right which the contract has
given him, or that the contract itself has in some way been
terminated. For reasons already stated, I think that the
contract of affreightment had not terminated either through
repudiation by the shipowner accepted by the freighter, or by
the fact that the vessel in which the goods were being carried
was for a time without a crew, and in the terms of the contract
the freighter was certainly not entitled to take delivery on the
open sea, or at any other port than the port of delivery. No
doubt if the shipowner had abandoned the ship and cargo so
as to put an end to the contract of affreightment, he could not,
by gaining possession of his ship from salvors, revive the

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Parmoor.

**A.13**

50                               HOUSE OF LORDS                        [1919]

H. L. (E.)      contract, or establish a right to freight, but these conditions
1918         do not apply to the capture of the *Jupiter*, and the forcible
BRADLEY       removal of the master and crew.
*v.*
H. NEWSOM,        The last point raised on behalf of the respondents depends
SONS AND
COMPANY.      on the messages and correspondence which passed subse-
Lord Parmoor. quently to the capture of the vessel.  The majority of the
              Court of Appeal held that these messages and correspondence
              amount to a statement by the shipowner that he is not in a
              position to carry out the contract of affreightment, and that,
              as the freighter acted on this communication, the shipowner,
              who made it, is bound to observe it.  A letter was sent by the
              shipowner to be communicated to the charterers in the following
              terms :—

                  " It is with very great regret I advise you of the loss of my
              ss. *Jupiter*, which steamer was sunk by enemy submarine on
              Saturday last.  The crew have all been landed safely.  Will
              you kindly advise charterers and oblige."

                  At the time when the shipowner made this communication
              he was under the mistaken impression that the *Jupiter* had
              been sunk.  I cannot find anything more in the letter than a
              communication from the shipowner giving the information
              which he had received as to the condition of the vessel and
              crew.  I am unable to construe this communication as an
              intimation of the intention of the shipowner not to carry out
              the obligation of his contract, or that it was written in such
              form as to prevent the shipowner stating later that it was
              sent under a mistake of fact.  On October 11 the following
              telegram was sent on behalf of the respondents :—

                  " *Jupiter* we represent owners cargo of this steamer recently
              brought into Leith derelict our clients elect take possession
              their property where now lying please take note."

                  This telegram shows that the respondents or their represen-
              tatives very early ascertained that the shipowner had made a
              mistake in stating that the vessel had been sunk.  On the same
              day a further telegram was sent to Leith :—

                  " Steamer *Jupiter* we represent owners cargo understand she
              is now lying at Newhaven please note our clients claim elect
              take possession their property where steamer now is please do

not allow cargo to be dealt with except with our sanction
please do anything necessary protect property for our clients."

My Lords, the advisers to the respondents were properly
astute to protect the interests of their client, but on the
assumption that, apart from these communications, the
contract for affreightment was still in force, I cannot draw
the inference that the message sent by the shipowner under a
mistake of fact, read in connection with the subsequent tele-
grams, is sufficient evidence of an act done by the shipowner
indicating his intention to repudiate the contract of affreight-
ment such as would entitle the freighter to put an end to the
contract, and to place him in a position to take possession of
his goods without payment of freight.

My Lords, in my opinion the appeal should be allowed with
costs.

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Parmoor.

LORD WRENBURY. My Lords, the decision in this case
is, in my judgment, to be reached by the application to the
facts of certain principles of the law of contract.    The
application of the principles may not be easy, but the principles
themselves are not difficult of statement, and but for the
arguments which we have heard are not, I should have thought,
capable of serious dispute.

A contract between two persons results from the consensus
of the two minds agreeing animo contrahendi to terms which
each accepts and which create obligations between them.
The contract, having been entered into, may be determined
in any one of three ways. First, consensus created the
contract, and consensus may determine it. If the two parties
agree to determine the contract it is determined. Secondly,
some contracts, though expressed in absolute terms, are,
by the nature of the matter, so obviously dependent upon
the possibility of performing the promise that a term is implied
excepting the events which render performance according
to the promise impossible. In the case of such events
happening the contract ceases to be operative. Thus, in a
contract for personal service for a term of years, will be implied
a condition if the party shall so long live. Thirdly, if the

3        E 2

H. L. (E.)
1918
BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.
———
Lord Wrenbury.
———

one party to the contract, by words or by conduct, expresses to the other party an intention not to perform his obligation under the contract when the time arrives for its performance, the latter may say, " I take you at your word ; I accept your repudiation of your promise, and will sue you for breach." This is really no addition to, but a particular application of, the principle first above stated. The first party has, in fact, made an offer. This offer is : " I am not going to perform the contract. I offer to end it here and now, and to accept the consequences of ending it, those consequences, as I know, being that you can sue me for damages for my refusal." The other may accept or may decline that offer. If he accepts, then by consensus the contract is determined, but with a right to damages against the party who has refused to perform. In each of these cases it is the consensus of the parties which brings the contract to an end. In the first and third cases it is consensus dehors the contract. In the second, it is the consensus to the implied term contained in the contract.

But it is said in argument there is a fourth way in which a contract of affreightment may be determined, and in this case consensus is not necessary. I hope I state the contention accurately when I say it is this. If the performance of the contract of carriage has ceased by the shipowner abandoning his ship, whether sine animo revertendi or sine spe revertendi, the cargo owner may, if he can, while the ship is derelict or in the hands of salvors, retake possession of his cargo. If he can be first in the field and forestall the shipowner in resuming possession he may take his cargo, and refuse to allow the shipowner to resume the voyage, and may escape payment of any freight, even if the goods, in fact, reach the contractual port of discharge. Let me assume, in the first place, that the shipowner has abandoned his ship sine animo revertendi, that his intention in that respect has, by words or by conduct, been communicated to the cargo owner, and that, before any change of intention has been communicated, the cargo owner has acted upon the expressed intention and accepted it. In that state of facts it seems to me that, upon

A. C.   ·   AND PRIVY COUNCIL.   53

the principles already stated, there is a consensus which
terminates the contract. But the contention is carried much
beyond that. The contention is rested not upon any animus—
not upon any intention—but upon a certain fact. " My
case," said Mr. Wright in summarizing his argument, " is
abandonment in fact and possession claimed by cargo owner
before possession re-taken by shipowner." The contention
is that if the shipowner's possession has ceased—if the ship
is out of the owner's possession—is afloat, but not in the
possession of her owner, then, whether the owner's possession
has been determined by violence, or has been abandoned
voluntarily (whether with or without sufficient cause), the
cargo owner may take possession if he can ; and, if he does
so, will not be liable for freight. The ground upon which
the contention is rested is that there has occurred a complete
interruption of the contract of carriage, and that, therefore, ·
it results, not that the contract is at an end, but that at the
option of the cargo owner it can be brought to an end. My
Lords, I cannot accept that proposition.

   In order to make clear what my view is of the law applicable
to such a case I must say something of what is commonly
called ·" anticipatory breach " of contract. My Lords, the
expression is, I think, unfortunate. In *Hochster* v. *De la
Tour* (1), the leading case upon this subject, Lord Campbell
made no use of the expression in his judgment. It is used
several times by Lord Esher in *Johnstone* v. *Milling* (2), but
not by either of his colleagues. The words used are, of course,
immaterial unless they lead, in course of time, to an erroneous
impression. There can be no breach of an obligation in
anticipation. It is no breach not to do an act at a time when
its performance is not yet contractually due. If there be a
·contract to do an act at a future time, and the promisor,
before that time arrives, says that when the time does arrive
he will not do it, he is repudiating his promise which binds
him in the present, but is in no default in not doing an act
which is only to be done in the future. He is recalling or
repudiating his promise, and that is wrongful. His breach

H. L. (E.)

1918

BRADLEY
v.
H. NEWSOM,
SONS AND
COMPANY.

Lord Wrenbury.

   (1) 2 E. & B. 678.           (2) 16 Q. B. D. 460.

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Wrenbury.

is a breach of a presently binding promise, not an anticipatory breach of an act to be done in the future.   To take Bowen L.J.'s words in *Johnstone* v. *Milling* (1), it is " a wrongful renunciation of the contractual relation into which he has entered." It is the third case which I put above.   The result is that the other party to the contract has an option either to ignore the repudiation or to avail himself of it.   If he does the latter it is still by consensus of the parties, and not by some superior force, that the contract is determined.   I cannot see that the doctrine of what is generally called " anticipatory breach " lends any support to the contention of the respondents in this case.   It is no authority for the proposition that anything other than the intention of the contracting parties can either tie or untie the bonds of a contract.

My Lords, I ask myself this question.   What consequence results from the following facts without more : (1.) The ship has been abandoned at sea.   (2.) Neither shipowner nor cargo owner is in possession ; the ship has no one on board.   (3.) The shipowner and the cargo owner arrive together at the place where, in fact, the ship is found to be ? Which of the two has prior right to take possession ? The answer, to my mind, is that contractually the shipowner is entitled, as against the cargo owner, to take possession of the ship and complete the voyage.   It is a wrongful act on the part of the cargo owner to prevent his doing so unless the contract has been determined.   He cannot say, I will take possession of my cargo so as to determine it.   He can only say, I will take possession of my cargo because the contract has been determined.   But the very question is whether it has been determined or not.

Further, upon authority, What is the result of abandonment at sea in itself and without more ?   Does it put an end to the contract of affreightment ?   Brett L.J., in *The Cito* (2), says it does not.   " Suppose," he says, " a wrongful abandonment, without its being occasioned by the perils of the sea, it is clear that in that case the owner of the cargo might sue the shipowner for his breach of contract, so it cannot be said

(1) 16 Q. B. D. 473.                    (2) 7 P. D. 8.

A. C.                  AND PRIVY COUNCIL.                       55

that it puts an end to the contract of affreightment." The
ground of the decision in *The Cito* (1) seems to me to be clear
from Brett L.J.'s next words. "It is sufficient," he says,
"I think, for the determination of the present case, to say
that, by an abandonment of a ship, without any intention to
retake possession of it, the shipowner has, so far as he can,
abandoned the contract, so as to allow the other party to it,
the cargo owner, to treat it as abandoned." If the ship is
abandoned sine animo revertendi, and the cargo owner has
accepted that intention, I feel no difficulty in arriving at the
conclusion at which the Court of Appeal arrived in *The Cito*. (1)
In *The Arno* (2) both Gainsford Bruce J. and Lord Esher
rest the case upon the intention of the shipowner.

My Lords, if I am right in these views, there is no fourth
way in which a contract of affreightment, as distinguished
from all other contracts, is capable of being determined.
If it were alleged and shown that every contract of affreight-
ment contains an implied term that the contract of carriage
shall be performed continuously, and without any interruption
of the shipowner's possession, then I could understand that
the respondents might succeed. That would be the second
case above stated. But that is not alleged or shown.
The respondents did not argue that point. If they had
done so I cannot tell whether the appellants might not
successfully have contended the contrary. My Lords, under
these circumstances, I cannot but reserve my opinion upon
that question. I cannot resolve it in favour of the
respondents, who did not raise it and give their opponents an
opportunity of answering it. It is under these circumstances
that I have to apply to the facts of this case the principles
applicable to all contracts with which I started.

The facts are that there was a contract of affreightment
from Archangel to Hull, and that, in point of fact, the goods
were, in the result, and as the result of arrangement, carried
in the vessel to the contractual port of discharge. During
the voyage—viz., on October 7—the master and crew were
removed vi et armis from the vessel by a German submarine,

H. L. (E.)
1918

BRADLEY
*v.*
H. NEWSOM,
SONS AND
COMPANY.

Lord Wrenbury.

       (1) 7 P. D. 8.                    (2) 72 L. T. 621.

H. L. (E.)
1918
BRADLEY
*v.*
H; NEWSOM,
SONS AND
COMPANY.

Lord Wrenbury.

which endeavoured to sink, and, as everyone thought, had succeeded in sinking, the ship. The submarine towed the master and crew five miles from the spot, and there cast them adrift. Night was coming on, and everyone thought the ship was at the bottom of the sea. The crew were picked up, and from Aberdeen they telegraphed, on October 8, to their owner that the ship had been sunk by a submarine. Later in the same day the master wrote to his owner that he had heard in the evening that the ship was in tow, but that it was doubtful whether they (the salvors) would salve her. That letter will have reached the owner, presumably, on October 10. On October 8, after receipt of the telegram (but, of course, before receipt of the letter), the owner wrote to the brokers who had effected the charter advising them of the loss of the ship (which he, of course, then believed, but erroneously, to have been sunk), and asking them to advise the charterers of the fact. On October 9 the brokers wrote to the charterers accordingly. On October 11, about 10.35 a.m., the owner was informed that the ship had been taken to Leith. In fact, she was at Newhaven, near Leith. At 5.5 p.m. he started by train for Leith. In the interval— viz., about 2.47 p.m.—he received a telegram from the solicitors of the charterers. The charterers, having learned somehow that in point of fact the ship had not been sunk, telegraphed, by their solicitors, to the shipowner that the ship had been brought in, and that they elected to take possession of the cargo. The shipowner, by letter the same evening, wrote that he was going to bring the cargo forward to its destination. The position, therefore, is as follows: The shipowner tells the charterers the ship is sunk; the charterers reply, "She is not sunk, but we avail ourselves of your erroneous belief that she is sunk, and determine the contract." The shipowner replies: "You cannot do that. I find she is not sunk. I am going to perform." There is not much consensus about that. It comes to this. The owner says, "I was always ready and willing to perform. I thought performance had become impossible, and I said so." That is all. Unless the case turns not upon intention but on the fact that the

A. C.            AND PRIVY COUNCIL.            57

owners were out of possession, it seems to me that the respondents cannot succeed.

H. L. (E.)

1918

BRADLEY
*v.*
H. NEWSON,
SONS AND
COMPANY.
———
Lord Wrenbury.
———

There is another ground upon which the contention was sought to be rested, and that was inability to perform. Intention not to perform, or inability to perform, raises, it is said, the right of the cargo owner to treat the contract as at an end. If there was inability to perform, if the contractual act had become impossible, then, upon the second ground above stated, the contract would no doubt determine by the operation of an implied term, that if the act proved to be impossible the contracting parties were not bound. But the point is not open upon the facts of the present case. The contractual act had not become impossible, and the cargo owner, when he acted, knew that it had not become impossible. The shipowner's letter of October 8 was not, I think, an expression of intention at all, but, assuming that it was, it results only in this. The shipowner, I will assume, says : " My contract has become impossible ; I am not going to perform it." The cargo owner replies : " Your expression of intention not to perform is made in ignorance of the real facts ; the contract has not become impossible, but I will accept your expression of intention, and will elect to determine the contract." To say that that is a consensus to determine the contract seems to me impossible.

My Lords, in my view, abandonment at sea is not an operative cause, but only evidence, although it may no doubt be strong evidence of intention. If the owner voluntarily abandons at sea it may well be that the onus is on him to show the animus revertendi. If he abandons only in the sense that he is compulsorily dispossessed by violence, the abandonment, or, as I prefer to call it, the dispossession, does not in itself effect anything in affecting the contract. If the owner, having been dispossessed by violence, does, by words or by conduct, express an intention not to seek to regain possession, no doubt the option arises in the cargo owner to treat the contract as at an end. Nothing of that kind arose here. The owner did not abandon in any way as an act of volition ; having been dispossessed by violence, he did no act to express

H. L. (E.)
1918
BRADLEY
v.
H. NEWSOM,
SONS AND
COMPANY.

Lord Wrenbury.

an intention not to seek to regain possession. He did, in fact, seek to regain possession, and, subject to the prior rights of the salvors, I think he was entitled to take it. For these reasons I think that the appeal must be allowed and judgment entered for the appellants upon the claim, and for 14,050*l.* 2*s.* 9*d.* upon the counterclaim, with costs of both claim and counterclaim.

> *Order of the Court of Appeal reversed and judgment entered for the appellants upon the claim, and for* 14,050*l.* 2*s.* 9*d. upon the counterclaim. The respondents to pay the costs in the courts below, and also the costs of the appeal to this House.*

> *Lords' Journals,* July 29, 1918.

Solicitors for appellants : *Downing, Handcock, Middleton & Lewis.*

Solicitors for respondents : *William A. Crump & Son.*