# Carey Value Added SL v Grupo Urvasco SA

## [2010] EWHC 1905 (Comm)

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

BLAIR J

2, 23 JULY 2010

*Guarantee – Construction – Nature of guarantor's obligation – Defendant's subsidiary entering into loan agreement with claimant investment fund – Defendant guaranteeing obligations of subsidiary under loan agreement through deed of guarantee and indemnity – Claimant making demand to defendant under deed – Defendant seeking to rely on defences available to subsidiary – Whether deed being demand bond – Whether defendant under independent primary obligation to pay sums certified as due.*

The defendant and its subsidiary were Spanish companies. The Spanish subsidiary acquired a site in London through its own English subsidiary, with the purpose of building a hotel and luxury apartments there. The claimant investment fund provided some of the finance for the project through a sale and leaseback transaction in relation to the hotel. A loan agreement was entered into between the claimant and the Spanish subsidiary, together with a sale and purchase agreement in relation to the shares of the English subsidiary. In addition, the defendant entered into a deed of guarantee and indemnity, under which it guaranteed the obligations of the Spanish subsidiary under the loan agreement. Under cl 2(c) of the deed, the defendant undertook 'to be responsible as primary obligor for any failure by an Obligor to perform, discharge or fulfil for whatever reason any of the Guaranteed Obligations when due and promptly on demand by [the claimant]'. Under cl 2(d), the defendant undertook 'to indemnify [the claimant] immediately on demand against any cost, loss or liability suffered and expenses incurred … (i) in consequence of an Obligor's failure to perform any of its obligations under the Transactions Documents; (ii) if any obligation guaranteed by the Guarantor is or becomes unenforceable, invalid or illegal. The amount of the cost, loss or liability shall be equal to the amount which [the claimant] would otherwise have been entitled to recover under the Transaction Documents'. Clause 20.6 of the deed provided that: 'Any certification or determination by [the claimant] of a rate or amount under any Transaction Document or this deed is, in the absence of manifest error, conclusive evidence of the matters to which it relates.' Subsequently, disputes arose between the parties, and the claimant sought to rely on the deed of guarantee and indemnity. The defendant sought to rely on defences available to its Spanish subsidiary, which it argued was no longer liable to repay any part of the loan to the claimant and had very substantial claims against the claimant for breaches of the loan agreement that it was entitled to set off against any sums due to the claimant. The claimant sought summary judgment of its claim under the deed. It argued that the deed was on its true construction a demand bond, under which the defendant was obliged to pay as a separate independent obligation the amounts certified to be due. The claimant submitted that the very purpose of the deed was to enable it to recover from the defendant without having first to litigate the sorts of

QBD                      Carey Value Added v Grupo Urvasco                      141

*a*  defences raised by the defendant. It argued that as a result the defendant did not have a reasonable prospect of defending the claim under the deed.

**Held** – The deed of guarantee and indemnity was not a demand bond. The absence of language appropriate to a demand bond in a transaction outside the banking context created a strong presumption against the interpretation of
*b*  the instrument as a demand bond. The use of words such as 'on demand' did not in themselves have the effect of creating a demand bond. On the other hand, the avowed purpose of the instrument and the overall context of the contractual arrangements might be relevant in determining whether on-demand liability had been created. The difference between secondary and
*c*  primary liability was not in itself decisive. The language of primary and secondary liability was routinely found in the same contracts and was not itself a guide to the content of the liability. The mere incorporation of a principal debtor clause would not usually suffice in itself to determine the nature of the contract. Moreover, conclusive evidence clauses would be interpreted strictly, with any ambiguity being resolved in favour of the guarantor. Such a
*d*  clause would not readily be construed as being conclusive of the legal existence of the indebtedness or as precluding the guarantor from relying on any equitable set off. In the instant case, the language of cl 2.1(d) was the language of co-extensive liability, and was certainly not indicative of the unqualified liability which arose under a demand bond. Moreover, any ambiguity in cl 20.6 should be resolved in favour of the defendant, with the result that the word
*e*  'amount' referred to the amount advanced, not the amount due and payable. On that basis, a certificate under cl 20.6 was not conclusive evidence as to liability. Accordingly, the presumption against the instrument being a demand bond was not rebutted, and the defendant had a real prospect of successfully defending the claim (see [17]–[24], [36]–[43], below).
      *Hyundai Shipbuilding and Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's
*f*  Rep 502 and *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] 2 All ER (Comm) 289 applied.
      *IIG Capital LLC v Van Der Merwe* [2008] 2 All ER (Comm) 1173 distinguished.
      *BOC Group plc v Centeon LLC* [1999] 1 All ER (Comm) 970 and *Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2002] 1 All ER (Comm) 142 considered.

*g*  **Notes**
      For performance or demand bonds in general, see *49 Halsbury's Laws* (5th edn) (2008) para 1271.

      **Cases referred to in judgment**
*h*  *Bache & Co (London) Ltd v Banque Vernes et Commerciale de Paris SA* [1973] 2
            Lloyd's Rep 437, CA.
      *BOC Group plc v Centeon LLC* [1999] 1 All ER (Comm) 53; *affd* [1999] 1 All ER
            (Comm) 970, CA.
      *Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2001] EWCA Civ 1806, [2002]
            1 All ER (Comm) 142.
*j*  *Hyundai Shipbuilding and Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep
            502, CA.
      *IIG Capital LLC v Van Der Merwe* [2008] EWCA Civ 542, [2008] 2 All ER (Comm)
            1173; *affg* [2007] EWHC 2631 (Comm), [2008] 1 All ER (Comm) 435.
      *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] EWCA
            Civ 395, [2005] 2 All ER (Comm) 289, [2005] 1 WLR 2497.

*Owen (Edward) Engineering Ltd v Barclays Bank International Ltd* [1978] 1 All ER    *a*
  976, [1978] QB 159, [1977] 3 WLR 764, CA.

**Application**
The claimant, Carey Value Added SL (formerly Losan Hotels World Value
Added I SL), applied for summary judgment on its claim against the defendant,    *b*
Grupo Urvasco SA, under a deed of guarantee and indemnity dated
21 December 2007, by which the defendant guaranteed the obligations of its
subsidiary, Grupo Hotelero Urvasco SA, under a loan agreement entered into
on the same date between the subsidiary (as borrower) and the claimant (as
lender). The facts are set out in the judgment.

                                                                                *c*
*Robert Miles QC* and *Andrew de Mestre* (instructed by *Mayer Brown International
  LLP*) for the claimant.
*Mark Hapgood QC* and *Tom Smith* (instructed by *Hogan Lovells International LLP*)
  for the defendant.

                                                        *Judgment was reserved.*    *d*

23 July 2010. The following judgment was delivered.

**BLAIR J.**
  [**1**] This is an application by the claimant, Carey Value Added SL, for
summary judgment on its claim under a deed of guarantee and indemnity    *e*
dated 21 December 2007 by which the defendant, Grupo Urvasco SA,
guaranteed the obligations of its subsidiary, Grupo Hotelero Urvasco SA,
under a loan agreement entered into on the same date between Grupo
Hotelero Urvasco (as borrower) and Carey (as lender). The loan was in
connection with development of a hotel and luxury apartments on the
Citibank House site on the Strand, central London. Carey claims    *f*
€55,435,526·07 plus accrued interest at 2·5% over the three-month Euribor rate
since the date of the demand under the deed of guarantee and indemnity.
Grupo Urvasco submits that Grupo Hotelero Urvasco had the right to rescind
a related agreement, following the exercise of which it was no longer liable to
repay any part of the loan to Carey. Accordingly, there is no outstanding
indebtedness on which the guarantee can bite. Alternatively, it submits that    *g*
Grupo Hotelero Urvasco has very substantial claims against Carey for breaches
of the relevant loan agreement which Grupo Urvasco is entitled to set off
against any sums due to Carey. In response, Carey says that the deed of
guarantee and indemnity prevents Grupo Urvasco from relying on those
defences and that Grupo Urvasco is obliged to pay as a separate, independent    *h*
obligation by way of demand bond the amounts certified to be due. The very
purpose of the material terms, it is submitted, is to enable Carey to recover
from Grupo Urvasco without having first to litigate these kinds of defences. As
a result, it submits that Grupo Urvasco does not have a reasonable prospect of
defending the claim.
  [**2**] The facts are set out in the four witness statements filed by the parties.    *j*
Although overall the matter is highly contentious, so far as this summary
judgment application under the deed of guarantee and indemnity is concerned,
the ambit of the factual dispute is relatively limited. Grupo Urvasco and its
subsidiary, Grupo Hotelero Urvasco, are Spanish companies. Grupo Hotelero
Urvasco is a hotel developer which acquired the site in the Strand that I have

*a*  mentioned through its own subsidiary, an English company called Urvasco Ltd. Prior to Carey coming on the scene, the development was funded by Banco Bilbao Vizcaya Argentaria SA (BBVA) pursuant to a credit agreement dated 22 December 2004 to which the three Urvasco companies were parties (Grupo Urvasco as guarantor). However it appeared that the BBVA financing would be insufficient to complete the development, and in about November 2007 Grupo

*b*  Hotelero Urvasco approached Carey for further finance. As an investment fund rather than a traditional lender, the financing was to be provided by Carey by a sale and leaseback transaction in relation to the hotel.

[**3**] In implementation of the transaction, the parties entered into the following agreements all dated 21 December 2007. (1) A loan agreement between Grupo Hotelero Urvasco and Carey (then called Losan Hotels World

*c*  Value Added I SL). Under the loan agreement, Carey agreed to advance to Grupo Hotelero Urvasco a loan to a maximum amount of the euro equivalent of £70,000,000 in various tranches. (2) A sale and purchase agreement (SPA) between Grupo Hotelero Urvasco and Carey in respect of the shares of Urvasco. The SPA provided the sale and leaseback element of the transaction

*d*  under which, at completion, Carey (through its English nominee company, London Value Added I Ltd) was to purchase the shares in Urvasco from Grupo Hotelero Urvasco (subject to the latter's right of repurchase seven years later). Carey was entitled to apply any sums due under the loan agreement towards the purchase price. (3) The deed of guarantee and indemnity between Carey and Grupo Urvasco, under which the present claim is brought.

*e*  [**4**] The first two tranches of the loan were €8m and €33·58m advanced on 28 December 2007 and 15 January 2008 respectively. In circumstances which are in dispute, further tranches were advanced in the sums of €4,106,798·62 on 2 April 2008, and €3,441,880·59 on 5 May 2008, but none thereafter. By July 2008, the parties were at odds with each other, though there were various proposals to resolve matters. It appears that work on the site ceased on

*f*  8 September 2008. On 8 July 2009, BBVA appointed receivers over the property in reliance on events of default under the BBVA credit agreement, namely the failure to pay the sums due on 31 December 2008 and 30 June 2009 totalling €29,854,152·62, and the voluntary abandonment of the development of the property for a period longer than 28 days.

*g*  [**5**] The defendant contends that the financial difficulties which Grupo Hotelero Urvasco ran into were caused by Carey's wrongful failure to provide financing for the development works. As it was put by Mr Mark Hapgood QC for Grupo Urvasco, Carey cynically and deliberately starved it of cash. Carey strongly denies this. It maintains that it had the funds available to advance, going so far as to place one further tranche into an escrow account. But as it

*h*  was put by Mr Robert Miles QC for Carey, in its view, Grupo Hotelero Urvasco was pretty much bust. Carey has, it submits, a compelling case that there was a default within the terms of the loan agreement and, as a result, it had no obligation to advance further tranches. Among the matters it relies on are: (a) material adverse changes in the financial position of each of the Urvasco companies from December 2007 to mid-2008 such that Grupo Urvasco was in

*j*  negotiations with its creditors, (b) the fact that the development had suffered very substantial delays in the first four months of 2008 and the long-stop date for completion of 30 April 2009 would not be met and (c) the failure to provide required documentation and notice of a claim against Urvasco to the monitoring surveyor, as well as failure to follow the procedure required under the loan agreement.

[**6**] On 9 July 2009, Grupo Hotelero Urvasco issued proceedings in the
Commercial Court against Carey and its nominee company claiming
declaratory relief in respect of its right to rescind the SPA pursuant to cl 6.17
thereof, and thereby to cancel the indebtedness under the loan agreement, and
claiming damages in respect of Carey's alleged breaches of the loan agreement.
I shall have to come back to cl 6.17 of the SPA which has been central to the
argument on the summary judgment application. There is an issue about the
time of service of these proceedings. Although the nominee's address for
service was the same address as that of Carey's solicitors, Mayer Brown, the
firm has no record of the proceedings having been received. It is however
common ground that Mr Couto of Grupo Urvasco notified Carey on
4 December 2009 that the proceedings had been commenced, but they were
not formally served on Carey in Spain until 22 December 2009. I shall refer to
them as the 'loan agreement proceedings', and they are presently ongoing in
the Commercial Court.

[**7**] It is not in dispute that about €49m in total was advanced by Carey to
Grupo Hotelero Urvasco (leaving aside interest), and nothing has been repaid.
Following the receipt of consent from BBVA (which was required by the terms
of an inter-creditor agreement), by a letter dated 20 November 2009, Carey
demanded repayment from Grupo Hotelero Urvasco of all sums outstanding
under the loan agreement, and made a demand of Grupo Urvasco under the
deed of guarantee and indemnity, both in the amount of €55,108,702·58. The
following month, further demands were made of: (1) Grupo Hotelero Urvasco
by a letter dated 23 December 2009 in which the amount outstanding under
the loan agreement was certified by Carey as being €55,426,655·61. This was in
reliance on cl 11(a) of the loan agreement, which provides that Carey's
certificate as to any amount payable to Carey by Grupo Hotelero Urvasco
under that agreement is conclusive save to the extent of any manifest error;
and (2) Grupo Urvasco by a letter dated 24 December 2009 in which the
amount outstanding under the deed of guarantee and indemnity was certified
by Carey as €55,435,526·07. This was in reliance on cl 20.6 of the deed, which
provides that any certification or determination by Carey of a rate or amount
under the deed is, in the absence of manifest error, conclusive evidence of the
matters to which it relates. I will come back to this clause, which again has
been important in the argument on this application.

[**8**] On 29 December 2009, a number of significant events occurred, which I
shall take in the order of the agreed chronology. By letter of that date, Grupo
Hotelero Urvasco rescinded, or purported to rescind, the SPA pursuant to
cl 6.17 on the basis that Carey had failed to advance tranches which it was
obliged to provide under the loan agreement. In the loan agreement
proceedings, Carey denies the effectiveness of this purported rescission on a
number of grounds including that (a) there was no obligation to advance
further tranches under the loan agreement because of the existing defaults and
(b) Grupo Hotelero Urvasco had waived its rights to or was estopped from
relying on cl 6.17 (including by reference to an agreement made between the
parties in October 2008).

[**9**] On or about 29 December 2009, the property was finally sold by the
receivers, the sale being to Adprotel Strand SL, a BBVA subsidiary, for a gross
sum of £116,441,700.

[**10**] Also on 29 December 2009, the present proceedings were begun by
Carey against Grupo Urvasco under the deed of guarantee and indemnity.
Following service of the defence, Carey issued its application for summary

*a* judgment on 31 March 2010. Grupo Urvasco says that it should be dismissed, and that at the case management conference in respect of the loan agreement proceedings which has been listed to take place on 29 September 2010, a direction should be made that both actions are joined or heard together.

*b* THE PARTIES' CONTENTIONS

[**11**] In summary, Carey contends that the deed of guarantee and indemnity takes effect as equivalent to a performance bond, though it is better described in this case as a demand bond, which is payable on a demand and a certificate, and that on this basis no defences which are available to Grupo Hotelero Urvasco are available to Grupo Urvasco in defence to the claim made against it
*c* by Carey under the deed of guarantee and indemnity. (In this respect Mr Miles accepted the substance of the characterisation of Carey's argument at para 80, p 24 of Grupo Urvasco's skeleton argument.)

[**12**] Equally in summary, Grupo Urvasco submits that the deed of guarantee and indemnity does not give rise to obligations akin to those imposed by a performance bond. It asserts that Grupo Hotelero Urvasco is not indebted to
*d* Carey in any amount in respect of the loan agreement. This is on the basis that (1) Grupo Hotelero Urvasco has it says rescinded the SPA under cl 6.17, and that following such rescission it is not obliged to make any repayment in respect of moneys advanced to it by Carey under the loan agreement; and/or (2) Grupo Hotelero Urvasco is entitled to set off the damages said to be due to
*e* it from Carey as a result of Carey's alleged breaches of the loan agreement. Accordingly, Grupo Hotelero Urvasco submits, there are no amounts owing by Grupo Hotelero Urvasco to Carey in respect of any 'Guaranteed Obligations' which are the subject of the deed of guarantee and indemnity.

[**13**] As to Grupo Urvasco's first point, its evidence is to the effect that Grupo Hotelero Urvasco had concerns about Carey's financial position and its ability
*f* to meet its commitment under the loan agreement. Accordingly, Grupo Hotelero Urvasco sought some form of 'guarantee' that the tranche payments would be made, and this was provided by the inclusion of a provision in the SPA entitling Grupo Hotelero Urvasco to rescind the SPA in the event of a failure by Carey to advance funding under the loan agreement, and to cancel any outstanding indebtedness under the loan agreement. It contends that in the
*g* evidence of Mr Garcia-Tapia for Carey, he appears to accept that cl 6.17 was included in the SPA as a result of Grupo Hotelero Urvasco's concern about Carey's ability to comply with its funding obligations under the loan agreement. I do not read it that way. Mr Garcia-Tapia merely says that Grupo Hotelero Urvasco asked for cl 6.17 to be included. In any case, factual matters
*h* as regards why cl 6.17 came to be included (so far as relevant and admissible) are not for the summary judgment application.

[**14**] Clause 6.17 of the SPA provides that—

'[i]f the Purchaser [Carey] fails to advance any Tranche due to be advanced under and in accordance with the Loan and fails to remedy such
*j* breach within a period of 30 days of notice from the Seller [Grupo Hotelero Urvasco] requiring such remedy, the Seller shall be entitled to rescind this Agreement by written [notice] to the Purchaser without liability of any kind on the Seller's part under this Agreement. Upon such rescission the Seller shall not be obliged to repay the Loan. In the event of delay on the part of the Purchaser in advancing any Tranche, the Long

Stop Date shall be extended by an equivalent period. For the avoidance of *a*
doubt, this Clause shall not apply in relation to the Initial Payment due on
Completion in respect of which Clause 5.6 shall apply.'

[**15**] In the loan agreement proceedings, Carey contends that it was not
obliged to advance further tranches of the loan because Grupo Hotelero
Urvasco was already in default under the loan agreement. It also submits that *b*
cl 6.17 is penal, or that it is entitled to relief against forfeiture. As regards the
notice of rescission given on 29 December 2009, it submits that by then
demand had been made under the deed of guarantee and indemnity, and that
the subsequent notice of rescission cannot affect the accrued debt. In any case,
liability under the deed is preserved by cl 6(g), which provides that the
obligations of Grupo Urvasco will not be affected by 'any unenforceability, *c*
illegality or invalidity of any obligation of any person under the Transaction
Documents or any other document or security'. Thus, it submits, even if Carey
is unable to enforce the loan agreement, the deed remains enforceable. On that
last point, Grupo Urvasco responds that cl 6(g) does not apply to the cl 6.17
right which it submits is a contractual right to cancel the indebtedness under
the loan agreement, rather than an act which renders the loan agreement *d*
unenforceable, illegal or invalid.

[**16**] There is (or was) a disagreement as to how these factual disputes were to
be regarded on the summary judgment application. In its written submissions,
Grupo Urvasco suggested that for the purposes of the application, the court
must proceed on the basis that Carey breached the loan agreement, that Grupo
Hotelero Urvasco was entitled to, and has, rescinded the SPA with the effect *e*
that all outstanding indebtedness it owes under the loan agreement had been
cancelled, and that Grupo Hotelero Urvasco has a claim against Carey for
damages for breach of contract in an amount which exceeds the claim made by
Carey under the loan agreement and the guarantee. Mr Hapgood did not
pursue this stance in oral argument, and for the reasons given by Mr Miles, it is *f*
not correct. As he points out, it is very often the case in a claim under a
guarantee that there is an underlying dispute between the creditor and the
debtor. On a summary judgment application, if the dispute is one of substance
which cannot itself be determined summarily (which is not at issue here) the
court does not assume that the debtor is right. It simply assumes that there is a
dispute as to the underlying liability, and the question is whether the guarantor *g*
is nevertheless liable. In the present case, as Mr Miles made clear in argument,
this turns on whether the deed of guarantee and indemnity is on its true
construction (as Carey submits) in the nature of a demand bond, and I come
now to consider the nature of the instrument.

*h*

THE NATURE OF THE DEED OF GUARANTEE AND INDEMNITY

[**17**] It is not in dispute that unless the right is expressly excluded, a guarantor
can prima facie avail himself of any right of set-off possessed by the primary
debtor against the creditor (see *BOC Group plc v Centeon LLC* ([1999] 1 All ER
(Comm) 53, affirmed [1999] 1 All ER (Comm) 970). Carey's fundamental *j*
submission is that this principle does not apply here, because the deed of
guarantee and indemnity takes effect as equivalent to a performance bond.
Mr Miles points out that characterisation in this regard is bedevilled by
terminology, and the deed is best described, he says, not as a performance bond
but as a 'demand bond'. It is not, however, a matter of the label to be attached,
but a question of the substance of the obligations. (This point is common

*a* ground.) The distinction is, he submits, between a primary, independent obligation, and a secondary obligation. He submits that the deed in this case created a primary, independent obligation, so that the principal debtor's defences are unavailable for set-off.

[**18**] In support of its case, Carey places considerable reliance on *IIG Capital LLC v Van Der Merwe* [2008] EWCA Civ 542, [2008] 2 All ER (Comm) 1173. In *b* that case, the directors of a company executed 'deeds of guarantee' in favour of a lender. The loan agreement was governed by New York law, under which the directors argued that reasonable notice of the demand for repayment should have been given. The company had (it was argued) a complete defence to the claim, and the directors sought to rely on that defence against liability on the guarantee. It was held however both by the master, and by Lewison J ([2007] *c* EWHC 2631 (Comm), [2008] 1 All ER (Comm) 435), and by the Court of Appeal that the guarantee imposed a primary obligation on the directors, who had bound themselves to pay on demand as primary obligors the amount stated in a certificate.

[**19**] Having set out the applicable principles, Waller LJ (with whom *d* Lawrence Collins and Rimer LJJ agreed) said that the question at the end of the day was what, on the true construction of the deeds of guarantee, the directors agreed (see [2008] 2 All ER (Comm) 1173 at [30]). He continued:

'[31] I turn thus to the operative language of the deeds of guarantee. By condition 2.1 the guarantor (Mr or Mrs Van Der Merwe) agreed "as *e* principal obligor … not merely as surety" that "if … the Guaranteed Moneys are not paid in full on their due date … it (the guarantor) will immediately upon demand unconditionally pay to the Lender (IIG) the Guaranteed moneys which have not been so paid". The guaranteed moneys are defined as "all moneys and liabilities … which are now or may at any time hereafter be due, owing, payable, *or expressed to be due, owing or f payable, to the Lender from or by the Borrower*" … The obligation to pay moneys "expressed to be due" "upon demand" "unconditionally" as "principal obligor" "not merely as surety" would indicate that the Van Der Merwes were taking on something more than a secondary obligation.

[32] Clause 4.2 then provides that "[a] certificate in writing signed by a *g* duly authorised officer … stating the amount at any particular time due and payable by the Guarantor … shall, save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof". I agree with the judge that that clause puts the matter beyond doubt. Any presumption has by the language used been clearly rebutted. Apart from manifest error, the Van Der Merwes have bound themselves to pay on *h* demand as primary obligor the amount stated in a certificate pursuant to cl 4.2.'

(There was held to be no manifest error in that case, and at the hearing of this application Grupo Urvasco made it clear that no such contention is advanced on its behalf in this case.)

*j* [**20**] The correct question, Carey submitted, is as set out in Waller LJ's judgment in the *IIG Capital* case at [8], namely whether Grupo Urvasco was assuming a secondary liability dependent on the primary liability of Grupo Hotelero Urvasco, or whether it was assuming a primary liability independent of the liability of Grupo Hotelero Urvasco. It is accepted (at least on this summary judgment application) that if the liability is secondary in nature,

Grupo Urvasco can rely on Grupo Hotelero Urvasco's defences. Thus the issue    *a*
on the application is to identify the nature of the obligations assumed by
Grupo Urvasco under the deed, which is a matter of construction of the
wording and context of the deed.

[**21**] For Grupo Urvasco, Mr Mark Hapgood submits that there is a profound
conceptual flaw in Carey's case. The distinction which it draws is between two    *b*
possibilities, namely secondary liability or primary liability. But to say that
someone is primarily liable begs the question of the content of that primary
liability. To say that someone is primarily or secondarily liable is meaningless,
since it depends on the definition of the liability in question, and in either case,
the liability may be co-extensive with that of the underlying debtor and, he
submits, is in this case. As to demand bonds, typically these are short    *c*
instruments (unlike the present deed of guarantee and indemnity), since there
is no need for the extensive language found in guarantees to preserve the
beneficiary's rights in case of variation of the underlying contract and so forth
(this is to be found in cl 6 of this deed). The *IIG Capital* case is, he submits, an
unusual case explained by the wording of the instrument in question.

[**22**] I agree with Mr Hapgood that the difference between secondary liability    *d*
and primary liability is not in itself decisive. It was clearly not treated as such in
the *IIG Capital* case: in the passage from Waller LJ's judgment (at [32]) that I
have set out above, he concludes that the defendants bound themselves to pay
on demand as primary obligor the amount stated in a certificate. It was the fact
that a certificate in the prescribed form was agreed to be conclusive and
binding on the defendants save in the case of manifest error which clinched the    *e*
argument in IIG's favour (see [32], and Lewison J ([2008] 1 All ER (Comm) 435
at [51])). In any case, the language of primary and secondary liability is
routinely found in the same contracts, and is not in itself a guide to the content
of the liability. Thus it has been said, in my view rightly, that the mere
incorporation of a principal debtor clause will not usually suffice in itself to
determine the nature of the contract. To take the familiar distinction between    *f*
a guarantee and an indemnity, a principal debtor clause will not automatically
convert one into the other (see Andrews and Millett *The Law of Guarantees*
(5th edn, 2008) para 1–014). In fact, although Carey's skeleton argument at one
point makes reference to an indemnity, it is Carey's case (as I have explained)
that the deed in question took effect as a performance bond, or as it preferred
to put it, a demand bond. Its case is that the demand as certified (such    *g*
certification being conclusive) gives rise to the liability, as in the *IIG Capital*
case. This is the case which it must make out to be entitled to summary
judgment.

[**23**] As Tuckey LJ pointed out in *Gold Coast Ltd v Caja de Ahorros del
Mediterraneo* [2001] EWCA Civ 1806 at [10], [2002] 1 All ER (Comm) 142 at [10],    *h*
on-demand guarantees or performance bonds have now been a feature of
commercial life for many years. Such instruments are neither guarantees nor
indemnities—the analogy drawn in the case law is with letters of credit (see
*Edward Owen Engineering Ltd v Barclays Bank International Ltd* [1978] 1 All ER 976
at 983, [1978] QB 159 at 171 per Lord Denning MR). As Carnwath LJ explained
in *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005]    *j*
EWCA Civ 395 at [23], [2005] 2 All ER (Comm) 289 at [23], [2005] 1 WLR 2497:
' "demand bonds" (however described) are a specialised form of irrevocable
instrument, developed by the banking world for its commercial customers.
They have been accepted by the courts as the equivalent of irrevocable letters
of credit'. Often, as the cases show, they provide for payment of, or up to, a

QBD          Carey Value Added v Grupo Urvasco (Blair J)          149

*a*    specified amount, upon the making of a demand that conforms with the requirements of the instrument (for example as regards any supporting documents), and which is made within the validity period of the instrument. The issuer is not concerned with disputes between the parties as to the underlying contract. There is no standard nomenclature by which such an instrument can automatically be classified however, and the authorities make it
*b*    clear that the nature of the instrument in question is a matter of construction of the instrument as a whole without any preconceptions as to what it is (see the *Gold Coast* case [2002] 1 All ER (Comm) 142 at [15] and the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [7]).

[**24**] It has also been held that the absence of language appropriate to a
*c*    demand bond in a transaction outside the banking context creates a strong presumption against the interpretation of the instrument as a demand bond (see the *Marubeni Hong Kong and South China* case [2005] 2 All ER (Comm) 289 at [30] and the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [8]–[9]). Plainly, the use of words such as 'on demand' do not in themselves have the effect of creating a demand bond (see the *IIG Capital* case [2008] 1 All ER (Comm) 435
*d*    at [25]). On the other hand, the avowed purpose of the instrument (*Hyundai Shipbuilding and Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep 502 at 508) and the overall context of the contractual arrangements (the *BOC Group* case [1999] 1 All ER (Comm) 53 at 66) may be relevant in determining whether on-demand type liability has been created. Outside the banking context, *IIG Capital* is an example of a case in which, on the language in question, the
*e*    presumption referred to in the *Marubeni Hong Kong and South China* case was rebutted.

[**25**] With those principles in mind, I come to the language of the deed of guarantee and indemnity. By cl 2.1:

*f*       '[Grupo Urvasco] irrevocably and unconditionally:

   (a) guarantees to the Losan Entities [that is Carey] punctual and complete performance by the Obligors [that is Grupo Hotelero Urvasco] of the Guaranteed Obligations;

   (b) [this has to do with the lease of the property]

   (c) undertakes with the Losan Entities to be responsible as primary obligor for any failure by an Obligor to perform, discharge or fulfil for
*g*    whatever reason any of the Guaranteed Obligations when due and promptly on demand by any Losan Entity:

   (i) fully, punctually and specifically perform or procure to be performed the relevant Guaranteed Obligations as if it were itself a direct and primary obligor to the Losan Entities in respect of such Guaranteed Obligations
*h*    and be liable as if the Transaction Documents had been entered into directly between the Guarantor and the Losan Entities;

   (ii) pay the amount of any Guaranteed Obligation which has not been paid by the relevant Obligor and without any deduction or withholding; and

   (d) undertakes with the Losan Entities to indemnify any of them
*j*    immediately on demand against any cost, loss or liability suffered and expenses incurred by any Losan Entity:

   (i) in consequence of an Obligor's failure to perform any of its obligations under the Transactions Documents;

   (ii) if any obligation guaranteed by the Guarantor is or becomes unenforceable, invalid or illegal.

> The amount of the cost, loss or liability shall be equal to the amount which that Losan Entity would otherwise have been entitled to recover under the Transaction Documents.'

[**26**] 'Guaranteed Obligations' are defined as in cl 1.1 as 'all obligations of the Obligors under or in connection with the Transaction Documents'.

[**27**] Taking the points in the order set out in its skeleton argument, first, Carey relies on the fact that the deed imposes obligations on Grupo Urvasco which are expressly described as being 'primary' (cl 2.1(c)) and by way of 'indemnity' (cl 2.1(d)). In the language of cl 2.1(c), it emphasises the words 'primary obligor' and 'on demand'. Grupo Urvasco is to be liable as if the loan agreement had been entered into directly between it and Carey. It has to pay without any deduction or withholding. In the language of cl 2.1(d), it emphasises the obligation to indemnify Carey immediately on demand, an obligation that subsists even if any obligation guaranteed by the guarantor is or becomes unenforceable, invalid or illegal. Carey submits that these words are clearly indicative of a primary liability, and are very similar to the wording in the *IIG Capital* case.

[**28**] Second, it is said that cl 20.6 of the deed of guarantee and indemnity contains an express provision for Carey to certify conclusively the amount due from Grupo Urvasco under the deed. Clause 11(a) of the loan agreement made similar provision as to amounts payable under the loan agreement by Grupo Hotelero Urvasco. Thus a certificate from Carey stating the amount due under the loan agreement is conclusive. Therefore, it is submitted, Grupo Urvasco is bound by Carey certifying that sums are due under the loan agreement and under the deed. Again, the *IIG Capital* case is relied on in this regard.

[**29**] Third, Carey submits that the deed contains a range of other terms which support the primary and independent nature of the obligations it undertook. By cl 3.2, the indemnities referred to in the deed are 'continuing obligations of Grupo Urvasco, separate and independent from the other obligations of Grupo Urvasco and shall survive the termination of this deed or any Transaction Document [which includes the loan agreement]'. Thus, it is said, any link between the liability under the loan agreement and liability under the deed is severed. By cl 6(g) of the deed, the obligations of Grupo Urvasco under the deed are not affected by any act, omission, matter or thing which, but for cl 6, would reduce, release or prejudice any of its obligations under the deed, including, and whether or not known to it or Carey (or others), any unenforceability, illegality or invalidity of any obligation of any person under the transaction documents or any other document or security. Thus, it is submitted, even if Carey is unable to enforce the loan agreement, the deed of guarantee and indemnity remains enforceable. By cl 20.4 of the deed, all moneys payable by Grupo Urvasco under the deed 'shall be paid in full without set-off or counterclaim of any kind and free and clear of, and without any deduction or withholding of any kind'. The combination of these matters, it is submitted, demonstrates a clear and unanswerable case that the obligations of Grupo Urvasco under the deed are primary, separate and independent.

[**30**] In response, Grupo Urvasco submits that it is of significance that the deed is not called an 'on demand bond', and is specifically expressed to be supplemental to the SPA. The definition of 'Guaranteed Obligations' means (it is said) actual obligations of Grupo Hotelero Urvasco. As regards cl 2.1(c), it is said that Carey has emphasised some parts of the wording, whilst minimising the effect of other parts. In particular, Grupo Urvasco relies on the fact that it

*a*  is liable for any failure by Grupo Hotelero Urvasco to perform or discharge the guaranteed obligations when due. This, it submits, shows that its liability is co-extensive with that of Grupo Hotelero Urvasco. The liability of Grupo Urvasco is not unconditional and arising only on the presentation of a demand by Carey, but conditioned on there having been a failure by an obligor (ie Grupo Hotelero Urvasco) to perform, discharge or fulfil its own obligations

*b*  when due. This is made clear, it is said, by the words 'which has not been paid by the relevant Obligor' in cl 2.1(c)(ii). The clause does not include the 'unconditionally' and 'not merely as surety' language relied on by Lewison J and the Court of Appeal in the *IIG Capital* case. As regards cl 2.1(d), the indemnity clause, it is specifically provided that '[t]he amount of the cost, loss or liability shall be equal to the amount which that Losan Entity would

*c*  otherwise have been entitled to recover under the Transaction Documents'. This shows, it is submitted, that Carey is only entitled to the amount which it would in fact have been entitled to recover from Grupo Hotelero Urvasco under the loan agreement.

  [**31**] As regards cl 20.6, it is submitted that the certification provided for is

*d*  only as to amount and not as to liability. It does not impose an unconditional liability to pay upon a certified demand being made. It is different from the equivalent clause in the *IIG Capital* case where the certification was both as to amount and as to whether that amount was 'due' and 'payable', ie liability (see Lewison J: [2008] 1 All ER (Comm) 435 at [51]). Carey is thus wrong, it is said, to characterise the certification under cl 20.6 as extending to the amount being

*e*  'due' under the deed and/or loan agreement. This is the one word which is conspicuous by its absence from cl 20.6.

  [**32**] As regards the other matters relied on by Carey, it is said that cl 6(g) does not impact on the right of rescission contained in cl 6.17 of the SPA because rescission is a concept different from 'unenforceability, illegality or invalidity'. It

*f*  is submitted that cl 20.4 precludes Grupo Urvasco from relying on its own rights of set-off against Carey in relation to moneys payable by it under the deed, but does not preclude rights of set-off available to Grupo Hotelero Urvasco being relied on in order to ascertain what moneys, if any, are in fact payable by Grupo Urvasco under the deed.

*g*
DISCUSSION AND CONCLUSION

  [**33**] In his lucid submissions on behalf of Carey, Mr Robert Miles pointed out that there is no dispute that Carey has advanced some €49m to Grupo Hotelero Urvasco, of which nothing has been repaid. The parent company

*h*  should therefore now be required to pay on its guarantee. It is, he says, a matter of timing. Should it transpire in the loan agreement proceedings that Grupo Hotelero Urvasco has a good claim, then to that extent the guarantor will fall to be reimbursed. In the meantime, Grupo Urvasco should make payment without regard to the underlying dispute. The certification provisions (which featured centrally in his argument) were clearly intended to have that

*j*  effect, and should be enforced as such.

  [**34**] On its part, Grupo Urvasco places central reliance on cl 6.17 of the SPA, which gave the borrower a right to rescind upon failure to advance any tranche due to be advanced. The clause provided further that upon such rescission the borrower should not be obliged to repay the loan. Although in dispute, its case is that its obligation to repay the loan has by virtue of an expressly negotiated

term ceased altogether. Mr Mark Hapgood says that this is only one of three
rights to rescind given by the SPA, and that taken as a whole, the agreement is
more like a joint venture agreement than a conventional loan.

[**35**] In fact, neither party has suggested on the summary judgment
application that the factual matrix is of any particular significance in construing
the deed of guarantee and indemnity. Carey's case that the deed took effect as
a demand bond is squarely based on the construction of the terms of the
instrument, which require close consideration.

[**36**] A convenient starting point is to identify what was the subject matter of
the obligation. In *IIG Capital*, the case on which Carey principally relies, the
relevant provision is set out in the judgment of the Court of Appeal ([2008] 2
All ER (Comm) 1173 at [6]). At first instance, Lewison J said ([2008] 1 All ER
(Comm) 435 at [48]):

> 'The definition of "Guaranteed Monies" … is of considerable
> significance. It includes not only those moneys which HPIE [the
> borrowers] actually owe IIG but also moneys *"expressed* to be due, owing
> or payable" by HPIE to IIG. These words point towards the conclusion that
> the guaranteed monies may extend beyond what is actually owing by HPIE
> to IIG; and hence that the liability of Mr and Mrs Van Der Merwe is not
> necessarily co-extensive with that of HPIE.'

The use of the words 'expressed to be' means that the definition in the
*IIG Capital* case is (in my view) appreciably wider than the definition of
'Guaranteed Obligations' in the deed of guarantee and indemnity, which in
cl 1.1 are defined as 'all obligations of the Obligors under or in connection with
the Transaction Documents'.

[**37**] In the *IIG Capital* case, the guarantor agreed that if the guaranteed
moneys were not paid in full on their due date, it would immediately upon
demand unconditionally pay them to the lender. There is in my view force in
Grupo Urvasco's submission that this is wider language than in the present
case. By cl 2.1(c) of the deed of guarantee and indemnity, Grupo Urvasco
undertakes to be responsible as primary obligor for any failure of Grupo
Hotelero Urvasco to discharge any of the guaranteed obligations when due.
This tends to suggest that the guarantor's liability is the same as that of the
borrower (see eg the *BOC Group* case [1999] 1 All ER (Comm) 53 at 67). It is
correct (as Carey points out) that cl 2.1(d) creates an obligation on Grupo
Urvasco to indemnify Carey. However the clause is qualified by the proviso that
the amount in question shall be equal to the amount that Carey would
otherwise have been entitled to recover under the loan agreement. It is correct,
as Carey says, that there is a certification provision in the loan agreement as
well as in the deed of guarantee and indemnity. Nevertheless, the language of
cl 2.1(d) appears to me to be the language of co-extensive liability, and certainly
not indicative of the unqualified liability which arises under a demand bond.

[**38**] The crucial point in my view, in agreement with Carey, is as to the effect
of the certification and conclusive evidence provision. A conclusive evidence
clause was upheld in the context of bank guarantees in *Bache & Co (London) Ltd
v Banque Vernes et Commerciale de Paris SA* [1973] 2 Lloyd's Rep 437. That case
concerned such a clause contained in a bank guarantee issued to commodity
brokers on behalf of its customers. It was held that the conclusive evidence
clause was valid and that if notice of default was given it was binding according
to its terms. In the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [12],
Waller LJ records the defendant directors' submission that since the case was

*a*  concerned with a performance bond being given by a bank, it was not an authority which assisted to any great degree in a case outside that context. He said: 'I, of course, understand that submission but it goes no further than requiring an anxious scrutiny of the language of the clause used in any particular case in order to ascertain whether the guarantee is secondary or primary.' In the result, the clause in the *IIG Capital* case was upheld as having

*b*  the effect contended for by the lender.

[**39**] In the *IIG Capital* case, the relevant clause provided that a 'certificate in writing signed by a duly authorised officer … stating the amount at any particular time due and payable by the Guarantor … shall, save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof' (see

*c*  [6]). Clause 20.6 of the deed of guarantee and indemnity is drafted in different terms, and the parties are in disagreement as to whether it makes any difference of substance. Clause 20.6 provides that '[a]ny certification or determination by [Carey] of a rate or amount under any Transaction Document or this deed is, in the absence of manifest error, conclusive evidence of the matters to which it relates'.

*d*  [**40**] The word 'rate' clearly refers to an interest rate, and I do not think that this is in dispute. Carey submits that the reference to 'amount' means the amount due. Grupo Urvasco submits that it means the amount advanced. It seems to me that either reading is a possible one, and the question is which is the correct one in context, and again, the *IIG Capital* case is important in that regard. As I have said, the certificate in the *IIG Capital* case was as to the

*e*  'amount at any particular time due and payable'. Those words are missing from cl 20.6. There is in my view a major difference between a certificate as to 'amount' and a certificate as to 'amount … due and payable'. I do not consider it appropriate to construe the clause so as to include the absent words. It can, and in my view should, be construed as referring to the amount advanced.

[**41**] A further point is made in a leading work on the law of guarantees,

*f*  O'Donovan and Phillips *The Modern Contract of Guarantee* (2003) (English edn) paras 5–104, 5–105, in which the authors say:

'Conclusive evidence clauses will be interpreted strictly, with any ambiguity being resolved in favour of the guarantor. Thus, the clause will not readily be construed as being conclusive of the legal *existence* of the

*g*  indebtedness or as precluding the guarantor relying on any equitable set off since this operates to reduce or extinguish the claim itself …

The fact that conclusive evidence clauses are strictly construed also means that the guarantor may raise arguments as to whether the document served upon him can properly be described as a "certificate" or "statement" and as to whether the person who has signed the certificate

*h*  comes within the class of persons authorised to do so.'

This passage is referred to in the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [13] without any suggestion that it does not accurately state the law, and in my view, the views expressed in it are correct. In so far as there is any ambiguity in cl 20.6, it should be resolved in favour of Grupo Urvasco. On that

*j*  basis also, I conclude that a certificate under cl 20.6 is not conclusive evidence as to liability.

[**42**] In view of that conclusion, for the purposes of the summary judgment application I can deal with Carey's third set of points relatively briefly. In agreement with Carey, I consider that cl 20.4 of the deed of guarantee and indemnity is capable of excluding the right of set-off possessed by the primary

debtor against the creditor, and is not limited to precluding Grupo Urvasco    *a*
from relying on its own rights of set-off against Carey in relation to moneys
payable by it under the deed. As regards cl 6.17 of the SPA, this is (to put it
neutrally) an unusual provision. Each party takes a wholly different view as to
its effect and application, and Grupo Hotelero Urvasco may entirely fail to
make out its case on it in the loan agreement proceedings. If it is correct, its    *b*
obligation to repay the loan has ceased by virtue of its rescission. In this regard,
I consider it arguable that cl 6(g) does not impact on the right of rescission
contained in cl 6.17 of the SPA because rescission is a concept different from
'unenforceability, illegality or invalidity'. If Grupo Hotelero Urvasco makes out
its case on cl 6.17, it is therefore arguable that there is no liability under the
deed of guarantee and indemnity.

[**43**] Grupo Urvasco has demonstrated, in my judgment, that it is well    *c*
arguable that this is not an instrument which contains language appropriate to
a demand bond. Further, it is a transaction outside the banking context, and
subject to the presumption expressed in the *Marubeni Hong Kong and South
China* case [2005] 2 All ER (Comm) 289 against the interpretation of the
instrument as a demand bond. That presumption is not in my view rebutted. I    *d*
consider that Grupo Urvasco has a real (in the sense of a realistic as opposed to
fanciful) prospect of successfully defending the claim. It follows that Carey is
not entitled to summary judgment. I am grateful to both parties for their
assistance.

*Application refused.*    *e*

Rakesh Rajani    Barrister.

# COURT OF APPEAL

13 May 2010

———

## CATTLES PLC
v
## WELCOME FINANCIAL SERVICES LTD AND OTHERS

[2010] EWCA Civ 599

Before Lord Justice MUMMERY,
Lord Justice LLOYD and
Sir PAUL KENNEDY

**Banking — Guarantee — Interpretation — Guarantee clause preventing guarantor from making "any claim" in liquidation — Whether prevented from making "any claim" or just claim under guarantee — Position of bondholders.**

The claimant, Cattles plc, was the parent company of a group providing financial services to consumers and businesses. The group operated by Cattles itself raised finance and loaned on to the trading subsidiaries, including Welcome Financial Services Ltd. Cattles faced financing liabilities of some £2.6 billion, consisting of: (i) syndicated and bilateral credit facilities totalling £1.625 billion, between Cattles as borrower and Royal Bank of Scotland (RBS) as lender, secured by a cross-group Guarantee; (ii) unsecured loan notes, guaranteed by Welcome; (iii) two sets of bonds, for £350 million and £400 million, issued by Cattles, in respect of which HSBC Trustee (CI) Ltd acted as trustee, but not backed by guarantees from Welcome or other companies.

There were outstanding defaults under the terms of all of the Facilities, Notes and Bonds. On 24 July 2009 the trustee of the £400 million bond issue served a notice accelerating Cattles' liability to pay the principal due. Cattles' main assets were the amounts receivable by it from its trading subsidiaries, including about £2.9 billion payable by Welcome to Cattles. RBS asserted that Welcome's debt to Cattles should not be paid, or claimable, in any liquidation or administration of Welcome, until all amounts owed to RBS under the Guarantee had been paid in full.

RBS put forward two arguments. The first was that clause 6 of the Guarantee operated as a contractual prohibition on the claiming of any inter-company debt due between the companies party to it until all the guaranteed obligations to the bank had been paid. Clause 6 provided as follows:

6. Until all claims of the Bank in respect of all of the Obligations of each Debtor have been discharged in full:

6.1 no Guarantor shall be entitled to participate in any security held by the Bank or money received by the Bank in respect of any Debtor's Obligations;

6.2 no Guarantor shall in competition with or in priority to the Bank make any claim against

any Debtor or any co-guarantor or their respective estates nor make any claim in the insolvency of any Debtor or any co-guarantor nor take or enforce any security from or against any Debtor or any co-guarantor;

6.3 any payment received by a Guarantor in breach of clause 6.2 and any security taken by a Guarantor from any Debtor or any co-guarantor shall be held in trust for the Bank as security for the liability of the Guarantors to the Bank under this deed.

The bondholders argued that clause 6 of the Guarantee did not prohibit claims by Cattles against Welcome for any inter-company debt, but only such claims as arose from Cattles' capacity under the Guarantee as guarantor of obligations of Welcome.

Alternatively, the bank argued that if clause 6 did not prevent the claiming of inter-company debt then, under the rule in *Cherry v Boultbee* (1839) 4 My & Cr 442, if Welcome were to enter into insolvent liquidation or administration and Cattles were to prove for the inter-company debt, Welcome's liquidator (or administrator) would be entitled to a right of quasi-retainer by virtue of which he would treat any dividend otherwise due to Cattles in respect of its inter-company debt as being initially satisfied by Cattles' own liability to counter-indemnify Welcome against Welcome's liability to the bank under the Guarantee. The bondholders argued that clause 6 of the Guarantee did not prohibit claims by Cattles against Welcome for any inter-company debt, but only such claims as arose from Cattles' capacity under the Guarantee as guarantor of obligations of Welcome. As regards the *Cherry v Boultbee* point, Welcome's right to exercise a quasi-retainer had been excluded by clause 6 of the Guarantee and also by clause 15.7 of the Facility Agreement.

At first instance HHJ David Cooke ruled that, under the terms of the Guarantee, Cattles was obliged not to make any claim against Welcome and not to prove in a liquidation of Welcome until such time as all obligations under the Guarantee to RBS had been discharged in full. The purpose of clause 6 was to increase the bank's realisations from the assets of any particular group company, by restricting claims that might be made "in competition with or in priority to the Bank" and preventing the application of equitable rules which might otherwise release the obligation of a surety. The claims that were restricted were "any claim". That was not subject to any limitation, and no limitation could be implied by the fact that it imposed its prohibition on a party described as "Guarantor". The use of the term "Guarantor" in clause 6.2 did not carry any implication of restriction on the width of the term "any claim". Such a restriction would be contrary to the purpose of the clause. The choice of the term "Guarantor" merely identified that, if the position of any particular company as debtor was being considered, every other company's capacity in relation to the bank and that company was as Guarantor. The term "in competition with" did not refer to a competition between the bank and a surety to prove against the principal debtor for what was in essence the same debt, but to competition between two separate creditors (the bank and another

group company) for the assets of their common debtor.

As to the second issue, had it arisen, the judge ruled that there would not have been a right of quasi-retainer. While it was the case that, if Cattles were to prove in an insolvent liquidation of Welcome, the liquidator of Welcome would have a right of quasi-retainer for the full amount of Welcome's liability to the bank as surety for Cattles (strictly in respect of Cattles' obligation to counter-indemnify Welcome against that liability), the right of quasi-retainer had been excluded by clause 6.2 and also by the Facility Agreement. The bank was unable to waive the effect of clause 6.2 because it was not solely for the bank's benefit

Party A, representing the bondholders, appealed against the judge's decision

————*Held*, by CA (MUMMERY and LLOYD LJJ and Sir PAUL KENNEDY), that the appeal would be dismissed.

(1) A bank creditor could claim against its debtor in respect of a particular debt and against any or all guarantors of that debt as it chose. If a guarantor paid in pursuance of such a demand, the guarantor might be subrogated to any rights of the bank against the debtor. It was also entitled to claim against the debtor to be indemnified in respect of its payment under the guarantee, and entitled to claim a contribution from any and all co-guarantors in respect of that payment. Even if the guarantor had not yet paid under the guarantee, it was a contingent creditor of the debtor. In an insolvency of the debtor the position of (a) the bank, and (b) other creditors of the debtor was protected by the rule against double proof, under which, where a debtor was subject to insolvency proceedings, if a creditor proved in those proceedings for the debt, a guarantor of the debt, though in principle entitled to a right of contribution against the debtor to the extent that he had paid the creditor, was not allowed to prove against the debtor unless and until he had paid the creditor in full (*see* paras 11 and 25).

(2) The judge was right as to the meaning and scope of clause 6, and he was right for the reasons he gave. The meaning of the clause was clear as a matter of the proper construction of the clause and the deed as a whole. It was not a matter in which there was any ambiguity such as to bring into play the *contra proferentem* rule (*see* para 48).

(3) Clause 6 was not concerned to prevent the undermining of the liability of a guarantor as such. On the contrary, it was to be understood as aimed at preserving the effective value of the bank's claims as regards the assets available to satisfy them. Clause 6.2 covered the ground of the rule against double proof and extended it to a situation existing before insolvency proceedings have commenced. The word "Debtor" was used in relation to obligations extrinsic to the deed; that is to say, the principal obligations which were the subject of the guarantees, for example those arising under the facilities. By contrast, "Guarantor" was used for the purpose of imposing an obligation by the deed on a relevant entity and of restricting the rights otherwise enjoyed by such a relevant entity (*see* paras 31, 32, 36 and 39).

(4) The words "any claim" in clause 6.2 were entirely general. Limiting those words to any claim in the company's capacity as guarantor merely spelt out the law against double proof and did not explain the clause in its context. The context of clause 6 as a whole was one of the insolvency of all or any of the Debtor and the Guarantors. In that context, it was not a commercially rational objective reading of clause 6.2 to limit the words "any claim" to "any claim in the particular company's capacity as guarantor" rather than any claim of any kind, which was the natural meaning of the words "any claim", as part of a clause whose avowed purpose was to preserve the position of the bank in relation to the Guarantors in a position where the problem that the bank faced was the insolvency of one or more of those liable to it and it was seeking to prevent its rights being diluted or otherwise adversely affected by subrogation and by other matters such as were referred to in the clause (*see* para 49).

———————

The following cases were referred to in the judgment:

*Birmingham City Council v Walker* (HL) [2007] 2 AC 262;

*Chartbrook Ltd v Persimmon Homes Ltd* (HL) [2009] BLR 551; [2009] 1 AC 1101;

*Cherry v Boultbee* (1839) 4 My & Cr 442;

*Mills v HSBC Trustee (CI) Ltd, Re Kaupthing Singer & Friedlander Funding plc* [2009] EWHC 3377 (Ch)

*SSSL Realisations (2002) Ltd, Re* [2005] 1 BCLC 1; (CA) [2006] Ch 610;

*Static Control Components (Europe) Ltd v Egan* (CA) [2004] 2 Lloyd's Rep 429.

———————

This was an appeal against the decision of HHJ Cooke, dated 14 December 2009, [2010] Lloyd's Rep Plus 45, the judge granting a declaration to Royal Bank of Scotland plc to the effect that Cattles could not prove in the liquidation of Welcome Financial Services Ltd until Welcome had discharged its obligations under a guarantee given to the bank to secure Cattles' debts.

Robin Knowles CBE QC and Tom Smith, instructed by Quinn Emanuel Urquhart and Sullivan UK LLP, for Party A; Robin Dicker QC and David Allison, instructed by Lawrence Graham LLP, for Cattles plc; William Trower QC and Richard Fisher, instructed by Allen and Overy LLP, for Royal Bank of Scotland plc; Welcome Financial Services Ltd did not appear and was not represented.

The further facts are stated in the judgment of Lloyd LJ.

LLOYD LJ]                    **Cattles v Welcome Financial Services**                    [CA

Thursday, 13 May 2010

———

**JUDGMENT**

**Lord Justice LLOYD:**

1. This is an appeal from an order of HHJ Cooke, sitting as a judge of the Chancery Division on 14 December 2009, by which he answered questions in a Part 8 claim form concerned with disputes between creditors of the claimant Cattles plc ("Cattles"). One creditor is the respondent (second defendant to the proceedings) Royal Bank of Scotland plc (RBS), which has not only a direct liability owed to it by Cattles in respect of substantial bank facilities but also guarantees from many subsidiaries in the Cattles group, including the first defendant to the proceedings, Welcome Financial Services Ltd ("Welcome").

2. Another class of creditors is the holders of bonds in two series issued by Cattles of whom the appellant, known as Party A, is a representative. The bondholders have direct liabilities from Cattles under the bonds but they do not have guarantees from the subsidiaries. The effect of the first declaration in the judge's order is that Cattles cannot make any claim against Welcome or prove in a liquidation or other insolvency proceedings of Welcome in competition with, or in priority to, RBS until such time as all obligations of Welcome to RBS have been satisfied in full, and the same goes for the other subsidiaries in the group. Party A challenges that conclusion which turns on the true construction of the guarantee given to RBS. If Party A were right on that point, other issues would arise of which the judge said that he would have decided two in favour of RBS and one in favour of Party A. He recorded his conclusions on these contingently, so to speak, in declarations 2 to 4 in his order. The judge gave each of RBS and Party A permission to appeal on the point or points decided against it. The judge's admirably clear judgment is available under the neutral citation [2009] EWHC 3027 (Ch) and may be referred to for the full details of the case. I will refer only to the most salient features necessary for understanding the points arising on this appeal in relation to declaration 1.

3. Cattles is a public company listed on the London Stock Exchange, although its listing is currently suspended pending the finalisation of its accounts for the year to 31 December 2008. The group of which it is the parent provided financial services to consumers and businesses. Cattles raised finance for the benefit of the group from a number of sources and lent money on to the various trading subsidiaries, of which Welcome is the main

one. Cattles is said in the evidence to have financing liabilities of £2.6 billion. Primarily these fall into three categories. The first is facilities, both syndicated and bilateral, of some £1.625 billion, in relation to which RBS is the lender or the facility agent or both. The judge took as an example of these a syndicated credit facility agreement for £800 million dated 10 July 2006. RBS has a group cross-guarantee dated 3 April 1998 by which Cattles, Welcome and many other subsidiaries — I dare say all other subsidiaries with any trading activity or assets — each guarantee payment of all obligations owed by any of them to RBS. These include all amounts due under the facilities.

4. Secondly, there are several series of guaranteed senior unsecured notes issued by Cattles. The note holders have not sought to take part in these proceedings; they have guarantees from Welcome and from some other subsidiaries.

5. Thirdly, there are two sets of bonds issued by Cattles, one of £350 million due in 2014 and the other £400 million due in 2017. The trustee of those sets of bond issues is HSBC Trustee (CI) Ltd. Those bonds do not have the benefit of guarantees from Welcome or from any other of the subsidiaries; only Cattles is liable on those bonds for the principal and the interest accruing. Party A holds some of these bonds and represents for the purposes of these proceedings, under a formal representation order, the holders of all such bonds.

6. Cattles is in default under the facilities, the notes and the bonds. Notice has been served under the £400 million bond issue accelerating the liability to repay the principal due under the bonds. No enforcement action has yet been taken. We were told that a standstill agreement exists for the time being. However, the board of Cattles has to consider whether there is any reasonable prospect of avoiding an insolvent liquidation or administration by an agreed restructuring of the debts owed by Cattles and the group or otherwise.

7. In the course of negotiations with a view to such a restructuring, RBS has asserted that it has a trump card, namely that it can prevent Cattles from seeking to recover in respect of the inter-company debts owed to it by Welcome and the subsidiaries until Welcome and the other subsidiaries have satisfied all of their obligations to RBS under the guarantee. If this is right it is disastrous for the bondholders because Cattles' only substantial assets are debts owed to it by Welcome and other subsidiaries by way of the obligation to repay the inter-company loans made by Cattles to Welcome and the other subsidiaries. Instead of those loans being repaid, so far as the assets permit, to Cattles, and then in turn the claims of all Cattles' creditors being satisfied, so far as the assets suffice, out of

those assets, RBS would cause Cattles to be entirely starved of assets and therefore unable to pay anything at all itself to any of its own creditors, in particular the bondholders, while the available assets, in the hands of Welcome and other subsidiaries, would be used, so far as they extend, to satisfy the obligations of Welcome and the other subsidiaries which include their secondary obligations as guarantors to RBS but not any obligation in respect of the two sets of bonds.

8. The first issue decided by the judge, set out in the first declaration, is as to the effect of a clause in the group guarantee to RBS. If that is decided in favour of RBS no other point arises. Otherwise a number of points would arise on which one issue is whether the Court of Appeal is bound by one aspect of a previous decision of the court on appeal, as it happens, from a decision of mine, *Re SSSL Realisations (2002) Ltd* and [2005] 1 BCLC 1, as regards my decision and [2006] Ch 610 as regards the decision in the Court of Appeal.

9. A few days after HHJ Cooke gave judgment in the present case Sir Andrew Morritt, Chancellor, sitting in the Chancery Division, decided a different case about similar issues in relation to the insolvency of Kaupthing Singer & Friedlander, an insolvency which has given rise to a lot of litigation. His decision is at [2009] EWHC 3377 (Ch). HHJ Cooke's judgment had been handed down after conclusion of the argument before the Chancellor and after he had made a draft available to counsel but before the handing down of his judgment. He was shown the judgment. It did not cause him to alter the conclusion expressed in his judgment as originally drafted.

10. In the light of his decision and in the light of the debate before him, he was persuaded to grant a certificate for a leapfrog appeal to the Supreme Court of the United Kingdom from his own decision, and the Supreme Court has accepted that by giving permission to appeal. That is presumably on the basis that the point at issue was concluded in the High Court, and therefore logically also in the Court of Appeal, by the Court of Appeal's decision in *Re SSSL*. The point before the Chancellor was the equivalent of that decided by HHJ Cooke contingently in declaration 3 of his order. We were told that the appeal from the Chancellor to the Supreme Court is due to be heard next January.

11. Since the questions before us turn on the incidents and consequences of the rights and obligations arising under a guarantee, under which any member of the Cattles group may be the principal debtor in respect of particular obligations to the bank to RBS and all other members are jointly liable as guarantors of that obligation, it is as well to start by noting some of the points that may arise

in the ordinary way in respect of guarantees. I do so without intending or purporting to be at all comprehensive or definitive about the law of guarantees. A bank creditor may claim against its debtor in respect of a particular debt and against any or all guarantors of that debt as it chooses. If a guarantor pays in pursuance of such a demand, the guarantor may be subrogated to any rights of the bank against the debtor. It is also entitled to claim against the debtor to be indemnified in respect of its payment under the guarantee, and entitled to claim a contribution from any and all co-guarantors in respect of that payment. Even if it has not yet paid under the guarantee, it is a contingent creditor of the debtor since it may be made so liable. In an insolvency of the debtor the position of (a) the bank, and (b) other creditors of the debtor is protected against one consequence of this position by what is called the rule against double proof, to which I will come later. Commonly creditors, such as banks, protect themselves against some possible incidents in relation to, in particular, that of subrogation, so that that right does not apply until the creditor has been paid in full. The present guarantee in favour of RBS does that; it also goes further, and the question is how far.

12. I turn to the point arising on the guarantee. Clause 6 of the guarantee is as follows:

**Preservation of the Bank's Claims**

6. Until all claims of the Bank in respect of all of the Obligations of each Debtor have been discharged in full:

6.1 No Guarantor shall be entitled to participate in any security held by the Bank or money received by the Bank in respect of any Debtor's Obligations;

6.2 No Guarantor shall in competition with or in prior to the Bank make any claim against any Debtor or any co-guarantor or their respective estates nor make any claim in the insolvency of any Debtor or any co-guarantor nor take or enforce any security from or against any Debtor or any co-guarantor;

6.3 Any payment received by a Guarantor in breach of Clause 6.2 and any security taken by a Guarantor from any Debtor or any co-guarantor shall be held in trust for the Bank as security for the liability of the Guarantors to the Bank under this deed.

13. The bank is RBS. Under the definitions in the guarantee "Debtor" means "Each and any of the Companies". "Companies" means "The Parent Company and the companies named in the Schedule to this deed and each Additional Company". The Parent Company is Cattles. "Guarantor" means "Each and any of the Guarantors". "Guarantors" means "All of the Companies". "Obligations"

means "All liabilities to the Bank of any kind and in any currency (whether present or future actual or contingent and whether incurred alone or jointly with another) together with the Bank's charges and commission Interest and Expenses payable by each Debtor".

14. Clause 1 of the guarantee is as follows, headed "Guarantee and Indemnity":

1. The Guarantors in consideration of the Bank giving time or credit or Banking facilities to any one or more of the Companies:

1.1 Jointly and severally guarantee to discharge on demand all the Obligations of each Debtor with Interest from the date of demand; and

1.2 Agree that any item or amount claimed by the Bank to be included in a Debtor's Obligations which is not recoverable in the Guarantors under this deed for any reason on the basis of a guarantee shall nevertheless be recoverable from the Guarantors as principal debtors by way of indemnity and the Guarantors jointly and severally agree to discharge that liability on demand with Interest from the date of demand.

15. Towards the end of the guarantee, under the heading "Interpretation", clause 16.1 is as follows:

This deed shall confer upon the Bank the same rights as if it were a separate guarantee and indemnity by each of the Companies in respect of each of the other Companies.

16. The judge said about this drafting, at paras 18 to 19:

18. It will be seen that each of the companies party to the Guarantee simultaneously falls within the definition of "Companies", "Debtors" and "Guarantors". The draftsman has clearly created the separate terms so that the operative provisions may be more intelligible when applied to the many potential permutations to be catered for in the circumstances envisaged by the document, in which each of a number of companies guarantees the obligations of each of the others, and at the same time is the subject of guarantees given by each of them. As clause 16.1 makes clear, the Guarantee is to be construed as if it created as many separate guarantees as required for each company to guarantee the obligations of each other company — it would obviously be unmanageable in a group of any size to create and administer such guarantees as separate documents.

19. This drafting technique allows the Guarantee to be read in any of the contexts in which it may be relevant, with each party being considered a Guarantor or Debtor as that context

may require. For instance, if the context is the amounts claimed by the Bank from Welcome, Welcome is a Debtor and Cattles and all other companies are Guarantors. Each operative provision may, against that context, be read accordingly. If a single term such as "Companies" had been used throughout, clause 6.3 might have read as follows:

6.3 any payment received by a *Company* in breach of clause 6.2 and any security taken by a *Company* from any *Company* shall be held in trust for the Bank as security for the liability of the *Companies* to the Bank under this deed.

While it may still have been possible to ascertain the intended meaning the result would be at best clumsy and at worst confusing.

17. The debate between the parties was summarised by the judge in his para 20:

For Party A, Mr Knowles submits that this usage leads to the conclusion that clause 6.2 restricts only the making of any claim which a Guarantor has arising out of its capacity as guarantor — such as a claim for counter-indemnity by the principal debtor, or contribution from a co-guarantor. Mr Trower for the Bank submits that the terminology is merely a matter of identification of the parties referred to and has no connotations for the interpretation of the substantive obligations.

18. In practice, on behalf of Party A, Mr Knowles QC before us, as before the judge, argued that clause 6.2 only applies to a claim by Cattles against Welcome in respect of Cattles' guarantee of any indebtedness by Welcome to RBS. For RBS Mr Trower QC before us, as before the judge, argued that it extends to any claim that Cattles may have against Welcome and is not limited to a claim for an indemnity for sums for which Cattles is liable as guarantor for Welcome or a claim for contribution in respect of Welcome's position as co-guarantor and that therefore it extends to the inter-company debt owed by Welcome to Cattles.

19. Mr Knowles set out 10 criticisms of the judgment in his grounds of appeal and in his skeleton argument. One of them, the last, I will accept without more, namely that the judge ought not to have obtained even the very limited assistance that he referred to at para 41 of his judgment from the construction placed on a similar clause as construed by myself and the Court of Appeal in *Re SSSL*. The true construction of the guarantee in this case turns on its own wording and not on that of another document between different parties. This court has been able to ignore such considerations in a way that was not open to the judge, by having the issue

519

of construction of clause 6.2 argued first, and without having *Re SSSL* cited to us in the course of that argument.

20. That point, however, does not appear to have been significant in the judge's decision. I turn to the points which, on both sides, were rightly treated as more important. At this stage I would like to record my gratitude for the clear and helpful presentation of the written and oral submissions of Mr Knowles and Mr Trower respectively, including in particular the helpful graphic representation of the position in the skeleton argument for RBS, which we were told was the work of Mr Fisher. I would also express gratitude for the written submissions of Mr Dicker QC for Cattles, neutral on the points at issue but very useful in introducing the court not only to the issues but to the limited amount of important material in the bundles which we needed to read so as to understand the issues.

21. At para 24 of his judgment the judge said this:

The purpose of the clause [that is to say clause 6.2] is obviously to increase the Bank's realisations from the assets of any particular group company.

22. Mr Knowles took issue with this. On its own terms the sentence is surely correct. However, in para 32 of his judgment the judge also said this:

Such a restriction would be contrary to the purpose of the clause which, as I have indicated, is to maximise the share of the assets of a Debtor available to the Bank by preventing claims being made "in competition with or in priority to the Bank".

23. Mr Knowles might not cavil with the word "increase" in para 24, but he did submit that if "increase" means "maximise", as indicated in para 32, the judge might be guilty of assuming at the outset of his consideration the outcome contended for by Mr Trower. I should also say that he criticised the judge for the last sentence in para 19 of the judgment. He submitted that the judge's hypothetical clause was neither clumsy nor confusing. By itself that is not a significant point but it impinges on his argument that the choice of the phrase "no Guarantor" rather than "no Company" or, strictly, using the definitions used in the guarantee, "none of the Companies", is significant and shows that "any claim" means any claim arising from or in connection with the capacity of the particular body as guarantor. That is one of his principal points and one of the main subjects debated between counsel.

24. Another is the question whether, on Mr Knowles' construction, there is any real point to clause 6.2. It is accepted that clause 6.1 is concerned with matters arising out of the guarantee. If

RBS obtains money or security for the obligation of any debtor, that is not to be subjected to any claim by a guarantor who has made a payment to RBS under the guarantee to be subrogated to any extent to RBS's recovery or security, until RBS has been paid in full. That is a normal and standard provision in a bank's guarantee form.

25. It is also accepted that clause 6.2 overlaps in part with the rule against double proof which I have already mentioned. That is the rule under which, where a debtor is subject to insolvency proceedings, if a creditor proves in those proceedings for the debt, a guarantor of the debt, though in principle entitled to a right of contribution against the debtor to the extent that he has paid the creditor, is not allowed to prove against the debtor unless and until he has paid the creditor in full. He cannot do so either in respect of the right of contribution for sums that he has paid to the creditor in part satisfaction of his own liability, nor in respect of his contingent claim for contribution. It is common ground that part of clause 6.2 covers the rule against double proof; it is also common ground that it goes further by including such a claim even before insolvency proceedings are on foot.

26. Mr Knowles submitted that this is an adequate rationale for the clause, whereas Mr Trower submitted that if the clause were to be limited in this way it would have almost no useful purpose and that objectively it cannot be supposed that that was all that the clause was intended to achieve. Another aspect of the clause on which counsel crossed swords is the significance of the words "in competition with". Mr Knowles submitted that this referred most naturally to a case where two parties were each claiming against the third in respect of the same debt. Mr Trower argued that at least as naturally, and he said more so, it referred to competition by separate creditors for the available assets of a single debtor in respect of different debts which would only matter, as indeed does all and any part of clause 6, if the assets are insufficient to satisfy both creditors.

27. Mr Knowles further pointed to para 42 of the judgment. This is as follows:

So far as the first issue is concerned therefore, I answer it in the affirmative, save that the obligation of Cattles not to make any claim against Welcome (including any claim in respect of the Debt), arises only insofar as such a claim would be "in competition with or in priority to" the Bank. No circumstances were envisaged in which such a claim might be made in priority to the Bank. I was not addressed by both parties on the meaning of "in competition with" and whether, for instance, it might extend to circumstances other than those in which the Bank had

LLOYD LJ]   **Cattles v Welcome Financial Services**   [CA

made a demand. I did however put it to Mr Trower, and he accepted, that it would be unlikely that the prohibition was intended to prevent Welcome making payments of its upstream debt in the ordinary course of business, because this would be the only way in which funds would flow back to Cattles to pay its obligations to the Bank and its other creditors.

28. Mr Knowles argued that the need for a concession of the kind referred to towards the end of that paragraph, in order to make RBS's reading of clause 6.2 compatible with the operation of the business of the Cattles group in ordinary circumstances, revealed the flaw in that reading. Even a formal routine invoice or request by the accounts department of Cattles to the accounts department of Welcome (who I dare say are in practice the same people) for payment of part of the inter-company debt, or interest on it, or for example a normal routine quarterly or monthly management charge, would be a claim which, on RBS's reading of clause 6.2, would be precluded while there is any money owing by Welcome to RBS. That would be so despite the fact that, if there is no suggestion of insolvency, RBS would no doubt be content that the payment should be made without which Cattles would have no assets with which to carry on its own business as parent company of the group, or with which to meet its own primary obligations to the bank and its ordinary obligations to other creditors such as there may be, including for example staff.

29. With that, by way of an overview of the main points on which the arguments before us turned, I can now consider clause 6.2 in the context of clause 6 and the guarantee as a whole.

30. The heading of clause 6 is "Preservation of the Bank's Claims". This ties in with clause 5 where the heading is "Preservation of the Guarantors' Liability", which excludes the operation of certain factors that might otherwise vitiate that liability, and with the heading of clause 8, "Preservation of the Bank's Rights", which deals with other matters which might otherwise adversely affect the position of RBS vis-à-vis the guarantors.

31. As Mr Trower pointed out, clause 6 is not concerned to prevent the undermining of the liability of a guarantor as such; that is dealt with by clauses 4, 5 and 8. Nor is it concerned with preventing adverse effects on the claim against, and the liability of, the debtor as such, which is governed by other documents, including in particular the facility agreements. On the contrary, clause 6 is to be understood, he submitted, as aimed at preserving the effective value of the bank's claims as regards the assets available to satisfy them, above all and perhaps exclusively in the circumstances in which one or more parties who are liable to RBS may not have enough assets to satisfy those liabilities in full.

32. The opening words of clause 6 give it a very general and extensive application in terms of time. It applies so long as any obligation of any Debtor is outstanding, not having been discharged in full. Clause 6.1, as already noted, protects any security or any recovery by RBS against dilution by a claim on the part of the guarantor to be subrogated following payment pursuant to the guarantor's obligation to the creditor under the guarantee. As mentioned, this is by its nature limited to matters arising under the guarantee. Clause 6.2, as already noted, covers the ground of the rule against double proof and extends it to a situation existing before insolvency proceedings have commenced. The question is whether it is limited to that; that is to say, whether "any claim" means any claim in the capacity of, or by reason of the position of, a guarantor. Since this is the critical issue we have to decide, I will come back to it after reviewing other aspects of the argument.

33. Clause 6.3 deals with the case where clause 6.2 has been breached. It is intended to give RBS security, in effect, over any money or security obtained by a Guarantor which ought not to have been obtained by reason of the terms of clause 6.2. I note that clause 6.3 uses the phrase "the liability of the Guarantors to the Bank under this deed".

34. In support of his argument that clause 6.2 refers to claims in the company's capacity as Guarantor, Mr Knowles submitted that the use of the label "Guarantor" rather than, for example, the label "Company" or "one of the Companies" is significant. He cited to us, as he had to the judge, para 17 of the speech of Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101, applying what Lord Hoffmann had earlier said in *Birmingham City Council v Walker* [2007] 2 AC 262 at page 268, where the particular label was "successor".

35. I accept the relevance of what Lord Hoffmann said in both those speeches and that it is not something to which reference should only be made if the matter is otherwise in doubt. The word used by way of a label may well not be arbitrary or neutral, and here I have no doubt that the labels used were not arbitrary or neutral. The words "Debtor" and "Guarantor" are used, as I shall show, with care. The particular label used may help to elucidate the meaning of the phrase in which it is used. In this respect it seems to me the judge was entirely right in the third sentence of para 23 of his judgment when he said of the approach to the construction of a document:

LLOYD'S LAW REPORTS

CA] **Cattles v Welcome Financial Services** [Lloyd LJ

If it uses defined terms, the court may be assisted in determining its meaning by the nature of the defined terms used.

36. Mr Knowles' criticism is that the judge did not follow his own guidance correctly. The word "Company" is used in the operative part of the guarantee at clause 1, setting out the consideration for the guarantee, in clause 13, a special provision concerning the release of one or more of the companies as guarantors, and in clause 16.1, which I have already read. Otherwise the word used is either "Debtor" or "Guarantor". This distinction is made for a reason. I consider that Mr Trower is right to submit that Debtor is used in relation to obligations extrinsic to the deed; that is to say, the principal obligations which are the subject of the guarantees, for example those arising under the facilities. Those are the obligations as security for which the guarantee is given. By contrast, "Guarantor" is used for the purpose of imposing an obligation by the deed on a relevant entity, to use a slightly elaborate but deliberately neutral label, and of restricting the rights otherwise enjoyed by such a relevant entity. The deed does from time to time refer specifically to obligations or liabilities "under this deed". Examples are clause 3.2.2, clause 4, clause 6.3 which I have already read and noted, clause 8.3, clause 8.5, clause 9.2 and 9.3 and clause 13. So the draftsman can and does refer specifically to matters arising under the deed when he wishes to do so, but there is no such qualification by limitation or phrase applied in relation to the words "any claim" in clause 6.2.

37. Mr Knowles correctly pointed to the use of both Debtor and Guarantor in, for example, clauses 4.1 to 4.5 inclusive, where the intention must be to refer comprehensively both to primary and to secondary liability; that is to say both to the principal debtor and to the surety, even though the entities comprised in each definition are the same, that is to say all and every one of the Companies. This seems to me show care used by the draftsman in differentiating the position of any one Company as Guarantor from, on the one hand, any or all other Guarantors, and, on the other hand, any other Company in its capacity as Debtor.

38. I agree that the different labels are used with care in the deed, but that by itself is not enough for Mr Knowles. It shows that it is the position of the relevant Company as Guarantor that is affected by clause 6.2. It does not necessarily show that "any claim" is a claim made under or by virtue of a particular Company's status or capacity as a Guarantor, with its Guarantor hat on, so to speak. The words "any claim" are, as is accepted, entirely general in themselves. They could be qualified by the context so as to mean "any claim in respect of, or by reason of, this guarantee". It might not be appro-

priate to qualify them by the words "under this deed" since a contribution or subrogation claim or an indemnity claim would arise because of, but not strictly under, the guarantee itself. Mr Knowles submitted that they are so qualified because of the label, because of the words "in competition with" and also because of the very drastic result that the clause would otherwise have; and he also submits that if there is any ambiguity the phrase should be read as being more limited rather than less so, by virtue of the *contra proferentem* rule, the document being no doubt an RBS standard form.

39. I have discussed the relevance of the use of the label "Guarantor". The words "in competition with or in priority to" the bank seem to me to support Mr Trower's argument that clause 6 is about preserving RBS's ability to proceed against available assets. The words "in competition with" do seem to me at least as apt to cover competition between different creditors in relation to distinct debts against the same pot of assets held by a particular Debtor or Guarantor. If the assets are enough for all, no issue arises; it is only in the case of the risk or reality of insufficient assets — in other words insolvency — that the clause matters. Moreover, the words "in priority" cannot refer to something arising from the position of the relevant entity as Guarantor. Unless it is only referring to timing, ie it means "before", which I would not accept, it must point to priority arising from some other relationship between the Guarantor and the Debtor. That, as it seems to me, also supports a wider than a narrower reading of the words "any claim" in clause 6.2.

40. In the light of those considerations, I would also not accept that the rule against double proof and a limited extension of that to the period before insolvency proceedings provides an adequate objective rationale for the inclusion of clause 6.2 in the guarantee.

41. As for the judge's point set out at para 42 of the judgment which I have read, even if the rendering of an invoice by Cattles to Welcome would count as the making of a claim, if the business is proceeding in the ordinary way without the intervention of insolvency, there would be no competition between Cattles and the bank as I see it; so I cannot accept Mr Knowles' submission that the point made by the judge there reveals an underlying fallacy in RBS's arguments, nor in the judge's reasoning elsewhere in his judgment.

42. Mr Knowles made another point to us to the effect that clause 6.2 should not be construed in the manner upheld by the judge and argued by Mr Trower because that would not be the best way to maximise the recovery for RBS. He referred to Professor Sir Roy Goode's graphic description in

*Legal Problems of Credit and Security*, 2nd Edition, 1988, of his realisation that the better course on the part of a creditor such as the bank is to require a company such as Cattles to claim and prove against its subsidiary and then to impose a trust on the recovery or the dividend for the benefit of the bank. That recommendation is still there in the 4th Edition, though without the description of the circumstances of Professor Goode's discovery of the point. The point may be well made, but the fact is that this is not the approach adopted despite the availability of Professor Goode's advice from 1988, and the question is not what might have been done otherwise, but what was done.

43. As I mentioned, Mr Knowles also relied on the *contra proferentem* rule. That rule has a legitimate role in an appropriate case, but it has been held that it only applies if the document, properly construed, admits of doubt: see Arden LJ in *Static Control Components (Europe) Ltd v Egan* [2004] 2 Lloyd's Rep 429 at para 37. So the court's first task is to construe the document properly on ordinary principles.

44. The question we have to address is the meaning of "any claim" in the context of clause 6.2, in particular in the phrase "no Guarantor shall in competition with or in priority to the Bank make any claim against any Debtor or any co-guarantor". That meaning is to be determined by examining the particular words used in the context of clause 6 in particular, as part of the deed as a whole, and more broadly in the commercial context of the relationship between RBS and the Cattles group, informed, among other things, by a knowledge of the law relating to the rights and obligations arising from, and in relation to, the position under a guarantee.

45. I have referred to the various detailed arguments on aspects of the wording of the clause and of the deed as a whole, and as to the consequences and implications of the rival interpretations. Bearing all those matters in mind, I would also seek to avoid excessive reliance on detailed textual analysis. It is necessary, before coming to a conclusion on any point of this kind, to stand back and consider the matter in the round.

46. One of Mr Knowles' more general arguments was as to the drastic consequences of RBS's position as upheld by the judge. I have referred to the economic effect of this reading of the clause at the start of this judgment. In addition to that, Mr Knowles pointed out that, because the point stems from a clause in the deed of guarantee, there was no way in which another creditor of Cattles, or a potential creditor, would be likely to be able to become aware of this, unlike, for example, a prior floating charge or debenture which must be registered. He told us that this feature of the bank facili-

ties was not referred to in the prospectus for the bonds; that of course cannot affect the correct interpretation of the guarantee, but it does, he submitted, point up the risks for other creditors.

47. As Mr Trower pointed out, however, the books on the law of guarantees show that a clause of this kind is quite common, and, in relation to a group whose finances are organised in the way in which those of Cattles were, it might be thought to be a natural precaution for a financing instrument such as the bonds to be made available on terms that the liabilities are guaranteed by at least the principal operating subsidiaries, including Welcome, rather than relying solely on the primary liability of the parent company Cattles.

48. So, in the end, I come back to clause 6.2. In my judgment the judge was right as to its meaning and scope and he was right for the reasons he gave. The meaning of the clause seems to me to be clear as a matter of the proper construction of the clause and the deed as a whole. It is not a matter in which there is any ambiguity such as to bring into play the *contra proferentem* rule.

49. For my part, I would identify the most important features as being four, not in any particular order of importance and without wishing to underestimate the significance of the other points that I have already mentioned, which I will not repeat at this stage. The first is the very generality of the phrase "any claim". The second is the wide scope of the words "in competition with or in priority to the Bank" and, particularly for the reasons that I have already mentioned, the reference to priority. The third is the references elsewhere in the deed, including as close to clause 6.2 as clause 6.3, to liability "under this deed", which shows that where the draftsman intended to refer to liabilities arising under the deed he could and did so. By contrast, the generality, or at least the potential generality, of "any claim" is not so limited. Fourthly, on Mr Knowles' view, as it seems to me clause 6.2 has almost no use for the bank, since spelling out the law against double proof is not necessary and the extension of that rule as such to the situation before insolvency proceedings have commenced is not of sufficient importance to explain the clause in its context. That context, and the context of clause 6 as a whole, is one of the insolvency of all or any of the Debtor and the Guarantors. In that context I do not see it as a commercially rational objective reading of clause 6.2 to limit the words "any claim" to "any claim in the particular company's capacity as guarantor" rather than any claim of any kind, which is the natural meaning of the words "any claim", as part of a clause whose avowed purpose is to preserve the position of the bank in relation to the Guarantors, as I say, in a position where the problem that the bank faces is the insolvency of one or

more of those liable to it and it is seeking to prevent its rights being diluted or otherwise adversely affected by subrogation and by other matters such as are referred to in the clause.

50. For those reasons I would dismiss the appeal against the judge's first declaration. That renders it unnecessary and, as it seems to me, undesirable to venture into the subject matter of declarations 2 to 4 which do not arise. As Sir Andrew Morritt said in the Kaupthing Singer & Friedlander case, the subject of the rule in *Cherry v Boultbee*, to which I have referred without naming it, has been fully considered by the Court of Appeal in *Re SSSL* and in several more recent first instance cases, including the Chancellor's own decision. He considered that the Court of Appeal decision on this in *Re SSSL* was binding as a matter of precedent. A debate before us, as we were otherwise to be drawn into, as to whether it is binding would be a remarkably arid exercise given that the point is already on its way towards a decision by the Supreme Court of the United Kingdom. It would also delay significantly the resolution of this appeal, which would be undesirable in proceedings which are of commercial urgency and have been brought on both in the Chancery Division and in this court with some expedition.

51. For those reasons it seems to me appropriate to decide the case solely on the construction of clause 6.2. On that I would dismiss Party A's appeal.

**Sir Paul KENNEDY:**

52. I agree.

**Lord Justice MUMMERY:**

53. I agree and have nothing to add to Lloyd LJ's tour de force.

directly affect the premises or the nature of the performance, but which were designed to effect a benefit to a section of the community.

Which of those two authorities should I follow ? It was urged on me that I was untrammelled by authority, but I do not take that view. Other things being equal, I would naturally accept as right, and binding on me in that sense, the decision under the Act of 1932 of ATKINSON, J., unless there is something in the Divisional Court decision to constrict me to the other view. I have given my reasons for thinking that the earlier decision is not really *in pari materia* with that which I have to decide today, and without any hesitation, therefore, I follow the decision in *Harman v. Butt* (2), I hold that this limitation is not outside the powers of the defendant local authority, Wednesbury Corporation, and I decline to make the declaration which the plaintiffs seek. Consequently, the action is dismissed, with costs.

*Judgment for defendants with costs.*

Solicitors : *Norman Hart & Mitchell* (for the plaintiffs) ; *Sharpe, Pritchard & Co.*, agents for *G. F. Thompson*, Wednesbury (for the defendants).

[*Reported by* F. A. AMIES, ESQ., *Barrister-at-Law.*]

---

# EASTERN COUNTIES BUILDING SOCIETY *v.* RUSSELL.

[KING'S BENCH DIVISION (Hilbery, J.), January 31, February 25, 1947.]

*Guarantee—Mortgage—Surety—Proviso that surety's liability should cease if " amount owing in respect of advance " reduced below certain sum— Inclusion of compound interest, solicitors' charges and fines in " amount." Building Societies—Mortgage—Interest—Compound interest—Right to charge— No agreement for compound interest in mortgage deed.*

Under a building society mortgage deed the mortgagor was entitled to " an advance . . . of £775 " by purchasing 7¾ £100 shares of the society at an aggregate bonus for the 7¾ shares of £38 15s. (*i.e.*, at £5 a share), this latter sum also being lent to her. By a proviso to the surety's covenant, the liability of the surety was to cease if " the amount owing . . . in respect of the advance " was reduced below the sum of £700. There was no agreement in the deed for compound interest. In an action by the building society against the surety for payment of the amount due under the mortgage deed and unpaid by the mortgagor, the amount claimed included compound interest and solicitor's charges, but, of the actual sum of £775, less than £700 was still owing. The surety contended (i) that the society's accounts had been kept on a wrong footing and did not correctly show the true balance for which the surety could be held liable, since there was no agreement for compound interest in the deed ; (ii) that his liability had already ceased before the action was brought because the words " the amount owing . . . in respect of the advance " in the proviso discharging him from liability referred solely to the £775 advance to the mortgagor and did not include compound interest and other charges.

HELD : (i) the society was not entitled to charge compound interest since there was no express agreement to that effect in the mortgage deed and an agreement could not be implied because there was no evidence that the mortgagor or surety knew that it was a custom of building societies to keep their accounts in that way. The society's accounts had, therefore, been kept on a wrong footing and did not correctly show the true balance for which the surety could be made liable.

(ii) the words " the amount owing . . . in respect of the advance " in the proviso to the surety's covenant did not include the entire amount due under the deed, but only the amount still due in respect of the £775, and the surety was, therefore, discharged from liability.

[As to Extent of Surety's Liability, see HALSBURY, Hailsham Edn., Vol. 16, pp. 59-63, paras. 52-55, and pp. 71-73, paras. 62, 63 ; and for Cases, see DIGEST, Vol. 26, pp. 561-572.

As to Compound Interest, see HALSBURY, Vol. 23, pp. 401, 402, para. 599 ; and for Cases, see DIGEST, Vol. 35, pp. 199, 200, Nos. 261, 262, and p. 641, No. 3719.]

K.B.D.]      EASTERN COUNTIES BUILDING SOC. *v.* RUSSELL      501

Cases referred to :

    (1) *Bacon* v. *Chesney* (1816), 1 Stark. 192 ; 26 Digest 103, *709*.

    (2) *Stamford, Spalding and Boston Banking Co.* v. *Ball* (1862), 4 De G. F. & J. 310 ; 31 L.J.Ch. 143 ; 5 L.T. 594 ; 26 Digest 79, *566*.

    (3) *Blest* v. *Brown* (1862), 4 De G. F. & J. 367 ; 6 L.T. 620 ; 26 Digest 108, *759*.

    (4) *Wheatley* v. *Bastow* (1855), 7 De G. M. & G. 261 ; 3 Eq. Rep. 859 ; 24 L.J.Ch. 727 ; 25 L.T.O.S. 191 ; 26 Digest 191, *1479*.

    (5) *Re Sherry, London and County Banking Co.* v. *Terry* (1884), 25 Ch.D. 692 ; 53 L.J.Ch. 404 ; 50 L.T. 227 ; 26 Digest 91, *633*.

    (6) *Williamson* v. *Goold* (1823), 1 Bing. 171 ; 7 Moore, C.P. 579 ; 1 L.T.O.S.C.P. 38 ; 26 Digest 151, *1134*.

ACTION by a building society against a surety for payment of an amount due under a mortgage deed and unpaid by the mortgagor. The defence was that, by a proviso to the surety's covenant, the surety was already discharged from liability before the action was brought. The facts and the relevant clauses of the mortgage deed appear in the judgment.

*Sir William McNair, K.C.*, and *B. H. Waddy* for the plaintiffs.

*D. A. Scott Cairns* for the defendant.

*Cur. adv. vult.*

Feb. 25.   HILBERY, J., read the following judgment. The plaintiffs' claim is as mortgagees against the defendant as surety for the due performance by the mortgagor of the mortgagor's covenants contained in a mortgage deed dated Jan. 6, 1937. The plaintiffs claim by the statement of claim that there is an amount due under the mortgage deed in question and unpaid by the mortgagor. The defendant denies that that is the sum due and pleads that before action brought his liability as surety under the deed had absolutely ceased and determined according to the special proviso contained in the mortgage deed.

The material recitals and covenants in the mortgage are as follows :

Whereas *(a)* The mortgagor is the estate owner of the property described in the schedule hereto in respect of the residue of a term of 99 years from June 24, 1879, granted therein by the lease particulars whereof are contained in the said schedule subject to the payment of the yearly rent of £8 by the said lease reserved and to the covenants on the part of the lessee and conditions therein contained. *(b)* The mortgagor being a shareholder in the society hath by purchasing at a bonus at the rate of £5 per share become entitled to an advance from the funds thereof of seven shares and three quarters of another share of £100 per share amounting in all to £775 on her giving the security hereinafter contained. *(c)* It has been agreed that the said sum of £775 and the said bonus together with interest for the same or such part thereof as shall from time to time remain unpaid shall be repaid by monthly instalments of £7 0s. 10d. each the first of such instalments to be payable on Friday Feb. 12 next and the subsequent instalments to be payable successively on the second Friday in each succeeding calendar month until the whole of the said sum of £775 and the said bonus and interest shall be repaid. *(d)* It has been further agreed that this deed shall contain the provisions in default of payment of any instalment interest or other moneys or any fines payable by the rules of the society now in force hereinafter contained. Now this mortgage witnesseth as follows : 1. In consideration of the sum of £775 to the mortgagor now paid out of the funds of the society (the receipt whereof is hereby acknowledged) the mortgagor as beneficial owner hereby demises unto the trustees the property described in the schedule hereto To hold the same unto the trustees for all the residue now vested in the mortgagor of the said term of 99 years granted therein by the said lease as aforesaid (except the last 10 days of the said residue) subject to the proviso for vacating this deed hereinafter contained. 2. Provided always that if the mortgagor shall pay to the trustees all the instalments fines interest and other moneys payable by virtue of the hereinbefore recited agreements or the rules of the society at the times and in the manner thereby provided and shall observe and perform all the rules of the society now in force and the covenants herein contained then the trustees shall at any time thereafter upon the request of the mortgagor indorse upon this deed a proper receipt for all moneys intended to be hereby secured and thereupon this deed shall be vacated. 3. Provided that in case the mortgagor shall neglect or refuse to pay any of the said instalments fines interest or other moneys payable by virtue of the aforesaid agreements or the rules of the society at the times and in manner aforesaid or shall fail to comply with the said rules or to observe the said covenants (of which neglect or refusal the production of the certificate of the manager for the time being of the society shall be conclusive evidence) then the entire sum of money which according to this deed and the rules of the society shall for the time being be secured by this deed shall be and become immediately payable and shall be deemed to be due within the meaning

of the Law of Property Act, 1925, and the trustees may at any time thereafter without
any further notice to or consent on the part of the mortgagor exercise all the powers
by the same statute conferred on mortgagees. 4. The mortgagor hereby covenants
with the trustees as follows : (*a*) That the mortgagor will during the continuance
of this security punctually pay to the trustees all the aforesaid instalments fines interest
and other moneys payable by virtue of the hereinbefore recited agreements at the times
and in manner aforesaid and in default of the payment of any sum or sums so to be
paid as aforesaid will immediately pay the entire sum of money which according to the
said rules and this deed shall for the time being be secured by this deed together with
interest thereon from the time of such default until payment at the rate of £6 per centum
per annum and such interest shall be a charge upon the property hereinbefore expressed
to be hereby assured. (*b*) That the mortgagor will observe and perform all the rules
of the society and will from time to time put and keep every messuage and building
comprised herein in good and tenantable repair and condition and insured against
fire in the trustees' names in such office and through such agency as the trustees shall
from time to time determine to the full value thereof and will deliver to the trustees
the policy of such insurance and produce to the trustees on demand the receipt for the
current year's premium. 5. And whereas it was a condition upon the making of the
hereinbefore mentioned advance that the surety should enter into the covenant herein-
after contained Now in pursuance of such condition and in consideration of the premises
the surety hereby covenants with the trustees that if the mortgagor shall neglect to
make any of the several payments which ought to be made pursuant to any covenant
on the part of the mortgagor hereinbefore contained or shall fail to comply with any
of the regulations prescribed or to be prescribed by the rules of the said society or any
of them in respect of the hereinbefore mentioned advance which on the part of the
mortgagor ought to be complied with then and in such case the surety his executors
or administrators will from time to time and at all times when thereunto required
make the several payments and comply with the several rules and regulations in respect
of which the mortgagor shall have made default as aforesaid and in case the property
hereby expressed to be assured shall be sold under the statutory power of sale will on
demand pay any deficiency which may arise by reason of the proceeds of such sale
being insufficient to liquidate the sums then due by virtue of this deed and will pay all
costs occasioned by such default and that the liability of the surety his executors or
administrators under this covenant shall not be affected by reason of the directors
or trustees of the society giving time to the mortgagor or not proceeding to enforce
the making of the payments and compliance with the rules and regulations anything
herein contained to the contrary notwithstanding Provided always that if and when-
ever the amount owing to the society in respect of the advance hereby made shall be
reduced below the sum of £700 then and in such case the liability of the surety his
executors and administrators under the covenant hereinbefore contained shall abso-
lutely cease and determine.

The issues which I have to decide are whether, on a true construction of
the deed, it is established by the plaintiffs that the sum claimed is outstanding
in respect of the mortgage and that the defendant, as surety, is liable to make
that sum good, or whether it has been established by the surety that he is
discharged because the amount outstanding in respect of the "advance"
was reduced below £700 on any of the dates when it is said to have been so
reduced. The plaintiffs' counsel contends : (i) that the business sense of the
transaction embodied in the mortgage is that the plaintiffs only meant to
discharge the surety if the total amount outstanding on the security of the
mortgaged property was reduced below £700 ; (ii) that their account as kept
between them and the mortgagor shows that the total amount outstanding
and owing was never reduced below £700 and that the surety was, therefore,
never discharged ; (iii) that if the words "the advance" in the proviso
under which the surety claims to have been discharged are to be construed
as referring only to the amount advanced on the shares taken by and
allotted to the mortgagor, none the less the words "amount owing in
respect of the advance" are not the same as "of the advance there remains
owing," and that the words "in respect of" are comprehensive enough to
include interest, solicitor's charges, and fines. He further argued that, if,
in the proviso to cl. 5, the word "advance" was intended to refer only to
the £775, then it was necessary to include in the deed a provision for
apportionment as otherwise the proviso to the surety's covenant could not
be worked out, and the absence of such a provision for apportionment shows
that no such thing was in the contemplation of the parties. Lastly, he stresses
the fact that the accountants on both sides agreed in their evidence that
building societies' accounts are not kept as the defendant here contends the

K.B.D.] EASTERN COUNTIES BUILDING SOC. v. RUSSELL (Hilbery, J.) 503

accounts in this case should have been kept; that the way in which the plaintiff society kept the account in this case is the method in general use by building societies; and the parties would have expressly provided for a different or special method if they had intended that this or any special method should have been employed.

The defendant contends: (a) that the way in which the plaintiff society has kept the account is not in accordance with the terms of the mortgage

A deed and does not correctly show the amounts from time to time due from the principal debtor, inasmuch as interest is periodically capitalised with the result that compound interest has been debited to the mortgagor and forms part of the total amount alleged to be due from the mortgagor, and solicitors' charges incurred since the date of the mortgage have been included; (b) that in the proviso discharging him from his suretyship if and when the amount owing in respect of the advance is reduced below the sum of £700, the word

B " advance " refers solely to the £775 advance to the mortgagor referred to in the deed and not to what is expressly referred to in the deed as " the entire sum of money which," according to the deed and the rules of the society, " shall for the time being be secured " by the deed; and (c) that the expression in the proviso " owing . . . in respect of the advance," read in its context, should not be construed so as to enlarge it and make it comprehend

C the items which the plaintiff society seeks to make it include.

After repeatedly considering the whole written instrument and all the material surrounding circumstances in which this mortgage instrument was drawn up and executed, I am of opinion that the plaintiffs' contentions are not well founded. The mortgage instrument, like any other written contract, must be taken to express what the parties intended to be the contract between them. It is not the function of the court to make a contract for the

D parties which would seem reasonable or which will more conveniently fit the circumstances which have supervened. The whole instrument, as it stands, must be construed so as to give effect to the intention of the parties discovered from the actual terms agreed by the parties and employed by them in the written instrument as expressing what they intend to agree. It must be borne in mind that the plaintiff society was the party putting forward the written instrument as expressing the terms on which they were willing to contract.

E If, therefore, there be a doubt about how an expression in the instrument is to be interpreted, it is to be construed contra proferentes. Moreover, the question here does not arise between the two principals to the contract, but between the society and the surety, and the terms employed in the contract, defining the surety's undertaking and expressing the terms on which he is to be freed from his undertaking, ought to be strictly construed. Rather will the court in case of doubt lean in his favour. Neither equity nor law will put

F a construction on the document which results in imposing on the surety any more than, on the strictest construction of the instrument, he must be said expressly to have undertaken, or so as to detract from the right given to the surety by the proviso defining the circumstances in which the surety is to be held discharged. If authority is needed for saying that the surety's contract has been said to be one strictissimi juris, I would refer to Bacon v. Chesney (1),

G Stamford, Spalding & Boston Banking Co. v. Ball (2) and Blest v. Brown (3) (per Lord Westbury, L.C., (4 De G.F. & J. 376) ). There is plenty of authority for saying that the courts treat a surety as a favoured debtor: per Turner, L.J. (7 De G.M. & G. 279, 280), in Wheatley v. Bastow (4), per Earl of Selborne, L.C. (25 Ch. D. 703) in Re Sherry, London & County Banking Co. v. Terry (5), and per Dallas, C.J. (1 Bing. 176) in Williamson v. Goold (6). Such are the principles which I must apply in construing the

H document in question.

In the first place, however, it is convenient to decide whether the plaintiff society's method of keeping the account as between themselves and the mortgagor is correct, i.e., is in compliance with the contract and, therefore, binding on the defendant. The society has added the interest on the loan at the end of each year. The total of loan, fines (if any) and interest has been brought forward to the next year's account, and, at the end of the next year, interest on the outstanding total, including the amount so brought forward, has again been calculated and added, and so on from year to year. The

result has been that the mortgagor has been charged compound interest and compound interest has gone towards making up the alleged outstanding indebtedness of the principal debtor for which the surety is now in this action sought to be made liable. It is beyond question that there is no express agreement for compound interest to be found in the mortgage deed. It is too well established for it to be necessary to cite the authorities that a mortgagee cannot charge compound interest unless there is an agreement to that effect, and so, as there is here no express agreement for such a charge, the plaintiffs' account has been kept on a wrong footing and does not correctly show the true balance for which the surety could be held liable. An agreement for compound interest can, of course, be implied and here the plaintiff society urges the argument that building society accounts are always kept in this way, but, although that may be true and the building society may know when it enters into such a mortgage contract as this that it intends to keep the account in this way, there is no evidence before me that the mortgagor or the surety knew it. They were not like parties to a contract all of whom are in the same trade, contracting in that trade and knowing its usages. Indeed, the plaintiffs' evidence here was that the account was so kept as a matter of convenience, because the keeping of the account so as to allocate the instalment payments rateably against the sums lent by the society and the fines or other dues, and so as to make rests, would involve much more elaborate book-keeping. The argument that, because no stipulation is made in the deed for allocating, therefore, the inference should be drawn that the parties did not intend that that method should be adopted, seems to me to be of less force than to say that, since compound interest cannot be charged against a mortgagor without express agreement and there is no such agreement here, and since, by the deed in question, the surety is given an absolute discharge if the amount outstanding in respect of the advance is reduced at any time below the sum of £700, the inference is that the account must be kept so as to show the true position of the surety at all times.

While I am, therefore, of opinion that these contentions of the plaintiff society are wrong, the question still remains whether or not the surety is right in saying that under the proviso he has, in fact, been discharged because, as he contends, the words " amount owing in respect of the advance hereby made " refer only to the advance by the society of the £775. The recital (b) states that the mortgagor, by purchasing seven £100 shares and three quarters of another £100 share at a bonus of £5 per share, had " become entitled to an advance . . . of £775 " on giving the security contained in the mortgage. If one turns to the rules of the society, it is possible to ascertain what this means and why it is so expressed. The mortgagor, wishing to obtain an advance from the plaintiff society to enable her to purchase the property in question, had first to become a member. This she could do by applying for and obtaining the allotment to her of a sufficient number of shares of a nominal £100 and any fraction of a £100 share, representing a total nominal value equal to the total advance required by her. If the society was willing to make the advance, then the requisite shares and fraction of a share would be allotted to the borrower at a bonus per £100 share fixed by the society. This bonus the society might, and did here, lend to the borrower. It amounted to £38 15s. The plaintiff society itself was, therefore, at all times well aware of what, by its rules or the terms of the mortgage, it was calling " advance " and the distinction between the advance and the bonus paid to obtain the advance. When one looks at the other clauses in the deed, one finds that, where it is intended that a right or obligation is either dependant on or to include, in addition to the £775, the entire amount due under the deed, that intention is expressed in terms—for example, in cll. 2, 3 and 4—but in the clauses affecting the surety, the language is altered. In cl. 5, where the intention is to make the surety liable, while he remains bound for " the several payments which ought to be made pursuant to any covenant on the part of the mortgagor " therein contained or prescribed by the rules of the society, care is taken expressly to say so. In binding the surety by that clause to make good any deficiency which may arise in the case of the enforcement of the security by a sale of the property mortgaged, it is expressly provided that the surety is to provide sufficient

K.B.D.] EASTERN COUNTIES BUILDING SOC. *v.* RUSSELL (Hilbery J.) 505

" to liquidate the sums then due by virtue of " the deed. When it is borne in mind that in the same clause the recital is that " it was a condition upon the making of the hereinbefore mentioned advance that the surety should enter into the covenant " which follows, and the only specific previous mention of an " advance " is the mention in recital (*b*) of an advance on the 7¾ shares of £775, the inference seems to me almost irresistible that the society, in drawing the mortgage deed, has taken care to distinguish throughout

**A** between the entire sum which, according to the deed and the rules of the society, shall for the time being be secured by the deed and the amount of the " advance " made on the shares. The proviso to the surety's covenant, giving the surety the absolute discharge from his liability, does not adopt the language used to define the extent of his undertaking as surety which has just been used. The proviso does not say, as it so easily could have said :
" Provided always that if and whenever the amount owing to the society by

**B** virtue of this deed," the language theretofore used where this was intended, but takes care to use the expression : " . . . the amount owing to the society in respect of the advance."

Applying the principles of construction which I have already stated and which I believe are applicable, I feel forced to the conclusion that the defendant's contention is right. Even if the £38 15*s.* lent to the mortgagor to enable her to acquire the 7¾ shares is added to the £775 by construing the

**C** reference in the proviso to the " advance " as intended to include this £38 15*s.*, still it was conceded that, if the allocation must be made for which the defendant contended, the defendant would still be discharged.

There remain two further arguments of the plaintiff society to be dealt with. It was contended that the words " in respect of " attached to the word " advance " in the proviso are comprehensive enough to include solicitor's

**D** charges, interest and fines, and ought not to be construed as the same as if they had been " of the advance there remains owing." I see no reason to read the words in other than the way in which they would normally be used in such a context. In the ordinary use of language, a person speaking of the amount owing in respect of an advance would mean the amount of the debt remaining unpaid. It was pointed out by counsel for the defendant that there is support for this view and for the view that lawyers so use the expression, for example,

**E** in the Law of Property Act, 1925, s. 115 (5), sched. III, form No. 2. Lastly, since the language of the deed has a natural and ordinary meaning which does not result in anything which on the face of it is contrary to, or fails to give effect to, the apparent intention of the parties, and bearing in mind that this is a question of construction of a written contract of suretyship and the principles which should, therefore, be employed, I see no reason to give it an interpretation which the plaintiffs' counsel advanced as the canon of

**F** construction which I should apply when he invited me to give it what he submitted was its business sense.

*Judgment for the defendant with costs.*

Solicitors : *Bell, Brodrick & Gray,* agents for *Turner, Martin & Symes,* Ipswich (for the plaintiffs) ; *Cooper, Bake, Fettes, Roche & Wade* (for the defendant).

[*Reported by* F. A. Amies, Esq., *Barrister-at-Law.*]

Q.B.                    Marinari v. Lloyds Bank Plc. (E.C.J.)                    Judgment

A    The term "place where the harmful event occurred" in article 5(3) of
the Convention of 27 September 1968 on Jurisdiction and the Enforcement
of Judgments in Civil and Commercial Matters must be interpreted as not
referring to the place where the victim claims to have suffered financial
loss consequential on initial damage arising and suffered by him in another
contracting state.

B                    [Reported by MICHAEL HAWKINGS ESQ., Barrister]

C

                    [COURT OF APPEAL]

            ESCALUS PROPERTIES LTD. v. ROBINSON AND OTHERS

D                    SAME v. DENNIS AND OTHERS

                SAME v. COOPER-SMITH AND ANOTHER

        SINCLAIR GARDENS INVESTMENTS (KENSINGTON) LTD.
                    v. WALSH AND OTHERS

E    1994 Nov. 29, 30;                    Nourse, Roch and Henry L.JJ.
        Dec. 1;
    1995 March 30

    *Landlord and Tenant—Forfeiture of lease—Relief from forfeiture—*
        *Long lease granted for premium at low rent—Lease mortgaged by*
F        *subdemise—Tenant defaulting with mortgage payments and pay-*
        *ments of rent and service charges—Terms on which mortgagee*
        *entitled to relief—Whether landlord entitled to mesne profits—*
        *Whether "rent" including service charge deemed by lease to be sum*
        *due by way of additional rent—Law of Property Act 1925 (15 &*
        *16 Geo. 5, c. 20), s. 146(2)(4)—Supreme Court Act 1981 (c. 54),*
        *s. 38(1)(2)—County Courts Act 1984 (c. 28), s. 138(2)(9A)(9B)*
        *(as inserted by Administration of Justice Act 1985 (c. 61),*
G        *s. 55(4))*

        Each case concerned a claim by a mortgagee by subdemise for
    relief against the forfeiture of a long leasehold interest in
    residential property granted for a premium and at a low rent. The
    various tenants had all mortgaged their properties and defaulted
    in making mortgage payments as well as those required under the
    leases, being arrears of rent and in three of the cases arrears of
H    service charges. In two of the cases where there were arrears of
    service charges the leases contained provisions deeming such
    charges to be sums due by way of additional rent and recoverable
    as such, but in none of the leases was the service charge reserved
    as rent by the reddendum. The landlords commenced possession

A    proceedings, the mortgagees in all cases being joined as defendants in the actions and the tenants taking no part in the proceedings. The landlords conceded that the mortgagees were entitled to relief against forfeiture but only as from the date of the court's order and on terms that they paid all arrears of rent and service charges up to the date of forfeiture and mesne profits thereafter until the date of the order. In two of the cases the landlords brought their actions in the county court and the mortgagees sought relief to be granted retrospectively under section 138 of the County Courts Act 1984.[1] In the third case the action was brought in the High Court, similar relief being sought under section 38 of the Supreme Court Act 1981.[2] In the fourth case the landlord, not being able to rely on section 138 of the Act of 1984 because there were arrears of service charges which were not deemed by the lease to be additional rent, proceeded in the county court claiming entitlement to retrospective relief under section 146 of the Law of Property Act 1925.[3] The mortgagees were granted relief retrospectively on terms that all arrears owing under the leases and costs, but not mesne profits, were paid by them.

On appeal by the landlords:—

*Held,* dismissing the appeals, (1) that "rent" in section 138 of the County Courts Act 1984 and section 38 of the Supreme Court Act 1981 referred to a periodical sum paid in return for the occupation of land, issuing out of the land and for non-payment of which a distress was leviable; and that a lease, by providing that the service charge should be deemed to be sums due by way of additional rent, invested the charge with the character of rent and, notwithstanding an omission to reserve it as rent in the reddendum, it was for the purposes of claiming the relief to be treated as such (post, pp. 243G–244A).

(2) That in proceedings in either the High Court or the county court brought by a landlord for forfeiture of a lease for non-payment of rent by the tenant, the mortgagee of the property was entitled under section 38 of the Supreme Court Act 1981 or under section 138 of the County Courts Act 1984 respectively to retrospective relief against forfeiture on payment to the landlord of all arrears; and that, accordingly, where retrospective relief was sought by the mortgagees as underlessees and where the sums owing by the tenants to the landlord were solely in respect of arrears of rent, the mortgagees were entitled to relief in the form of reinstatement of the lease and without incurring liability to pay mesne profits to the landlords (post, pp. 244D–F, H–245A, 246A–E).

*United Dominions Trust Ltd. v. Shellpoint Trustees Ltd.* [1993] 4 All E.R. 310, C.A. applied.

(3) That the relief granted by section 138 of the County Courts Act 1984 was restricted to cases of forfeiture for non-payment of rent and had no application to the case where there were arrears of service charges not deemed by the terms of the lease to be additional rent; that under section 146(2) of the Law

[1] County Courts Act 1984, s. 138: "(2) If the lessee pays into court not less than five clear days before the return day all the rent in arrear and the costs of the action, the action shall cease, and the lessee shall hold the land according to the lease without any new lease. . . . (9A) Where the lessor recovers possession of the land at any time after the making of the order under subsection (3) . . . the lessee may . . . apply to the court for relief; . . . (9B) Where the lessee is granted relief on an application under subsection (9A) he shall hold the land according to the lease without any new lease."

[2] Supreme Court Act 1981, s. 38: see post, p. 245C–D.

[3] Law of Property Act 1925, s. 146(2)(4)(5)(11): see post, pp. 246G–247E.

A   of Property Act 1925 the court had a discretion to grant
retrospective relief in appropriate circumstances to "the lessee"
against forfeiture for breach of covenant and under section 146(4)
to grant relief to "a person claiming as underlessee" but only as
from the date of the order granting it; that the definition of a
"lessee" in section 146(5)(b) of the Act of 1925 included persons
deriving title "under a lessee" and as such included those persons
such as mortgagees who acquired their estate by way of subdemise;

B   and that, accordingly, where arrears of service charges, not
deemed under the lease to be additional rent, had accrued the
mortgagee was entitled to the relief given by section 146(2) of the
Act of 1925 to the same extent as he would have been under
either section 138 of the County Courts Act 1984 or, in respect of
proceedings in the High Court, under section 38 of the Supreme
Court Act 1981 (post, pp. 250C–G, 251B–G).

C   *Nind v. Nineteenth Century Building Society* [1894] 2 Q.B. 226,
C.A. not followed.

The following cases are referred to in the judgment of Nourse L.J.:

*Abbey National Building Society v. Maybeech Ltd.* [1985] Ch. 190; [1984]
3 W.L.R. 793; [1984] 3 All E.R. 262
*Bowser v. Colby* (1841) 1 Hare 109

D   *Burt v. Gray* [1891] 2 Q.B. 98, D.C.
*Cadogan v. Dimovic* [1984] 1 W.L.R. 609; [1984] 2 All E.R. 168, C.A.
*Creswell v. Davidson* (1887) 56 L.T. 811
*Dendy v. Evans* [1910] 1 K.B. 263, C.A.
*Doe d. Wyatt v. Byron* (1845) 1 C.B. 623
*Gray v. Bonsall* [1904] 1 K.B. 601, C.A.
*Hare v. Elms* [1893] 1 Q.B. 604, D.C.

E   *Nind v. Nineteenth Century Building Society* [1894] 2 Q.B. 226, C.A.
*Official Custodian for Charities v. Mackey* [1985] Ch. 168; [1984] 3 W.L.R.
915; [1984] 3 All E.R. 689
*Property Holding Co. Ltd. v. Clark* [1948] 1 K.B. 630; [1948] 1 All E.R. 165,
C.A.
*Street v. Mountford* [1985] A.C. 809; [1985] 2 W.L.R. 877; [1985] 2 All E.R.
289, H.L.(E.)

F   *United Dominions Trust Ltd. v. Shellpoint Trustees Ltd.* [1993] 3 All E.R. 301;
[1993] 4 All E.R. 310, C.A.

The following additional cases were cited in argument:

*Associated Dairies Ltd. v. Pierce* (1982) 265 E.G. 127, C.A.
*Bailey (C.H.) Ltd. v. Memorial Enterprises Ltd.* [1974] 1 W.L.R. 728; [1974]
1 All E.R. 1003, C.A.

G   *Belgravia Insurance Co. Ltd. v. Meah* [1964] 1 Q.B. 436; [1963] 3 W.L.R. 1033;
[1963] 3 All E.R. 828, C.A.
*Berney v. Moore* (1791) 2 Ridg. 310
*Billson v. Residential Apartments Ltd.* [1992] 1 A.C. 494; [1991] 3 W.L.R. 264;
[1991] 3 All E.R. 265, C.A.
*Blatherwick (Services) Ltd. v. King* [1991] Ch. 218; [1991] 2 W.L.R. 848;
[1991] 2 All E.R. 874, C.A.

H   *Brown v. Peto* [1900] 2 Q.B. 653, C.A.
*Canas Property Co. Ltd. v. K.L. Television Services Ltd.* [1970] 2 Q.B. 433;
[1970] 2 W.L.R. 1133; [1970] 2 All E.R. 795, C.A.
*Chelsea (Viscount) v. Hutchinson* [1994] 2 E.G.L.R. 61, C.A.
*Doe d. Whitfield v. Roe* (1811) 3 Taunt. 402

*Drake v. Mundy* (1631) Cro.Car 207                                                          A

*Driscoll v. Church Commissioners for England* [1957] 1 Q.B. 330; [1956]
   3 W.L.R. 996; [1956] 3 All E.R. 802, C.A.

*Egerton v. Jones* [1939] 2 K.B. 702; [1939] 3 All E.R. 889, C.A.

*Federated Homes Ltd. v. Mill Lodge Properties Ltd.* [1980] 1 W.L.R. 594;
   [1980] 1 All E.R. 371, C.A.

*Grand Junction Co. Ltd. v. Bates* [1954] 2 Q.B. 160; [1954] 3 W.L.R. 45; [1954]
   2 All E.R. 385                                                           B

*Hill v. Griffin* [1987] 1 E.G.L.R. 81, C.A.

*Howard v. Fanshawe* [1895] 2 Ch. 581

*Humphreys v. Morten* [1905] 1 Ch. 739

*Leeds Permanent Building Society v. Manyfield Ltd.* (unreported), 16 June
   1993, Dyson J.

*Liverpool Properties Ltd. v. Oldbridge Investments Ltd.* [1985] 2 E.G.L.R. 111,
   C.A.

*Lovelock v. Margo* [1963] 2 Q.B. 786; [1963] 2 W.L.R. 794; [1963] 2 All E.R.    C
   13, C.A.

*Moore v. Smee and Cornish* [1907] 2 K.B. 8, C.A.

*Newbolt v. Bingham* (1895) 72 L.T. 852, C.A.

*Official Custodian for Charities v. Mackey (No. 2)* [1985] 1 W.L.R. 1308;
   [1985] 2 All E.R. 1016

*Royston Industries Ltd. v. Lawrence* [1994] 1 E.G.L.R. 110

*Sambrin Investments Ltd. v. Taborn* [1990] 1 E.G.L.R. 61                        D

*Shiloh Spinners Ltd. v. Harding* [1973] A.C. 691; [1973] 2 W.L.R. 28; [1973]
   1 All E.R. 90, H.L.(E.)

### ESCALUS PROPERTIES LTD. V. ROBINSON AND OTHERS

APPEAL from Judge Willis sitting in the Croydon County Court.

On 21 December 1989 the landlord, the predecessor in title of Escalus    E
Properties Ltd., granted to the tenants, Stephen Robinson and Julie
Patricia Sims, a lease of premises at 60, Robinson Road, London, S.W.19
for a term of 99 years from 1 July 1989 for a premium of £67,000 and at
an initial rent of £200 per annum. The reddendum did not reserve the
service charges due to the landlord as rent but the lease provided that
such charges "shall be deemed to be sums due by way of additional
rent and shall be recoverable by the landlord as such." The tenants    F
charged the lease to the mortgagee, Abbey National Plc., as security for
the loan of the bulk of the premium and, having fallen into arrears with
the mortgage payments, handed over possession of the premises to the
landlord, then being Escalus Properties Ltd. On 15 March 1993 the
landlord issued proceedings for possession, arrears of rent and non-
payment of service charges against the tenants, the mortgagee being joined    G
as a defendant. The judge made an order for forfeiture in the landlord's
favour and held that the service charges were "rent" and that the
mortgagee, by paying the arrears of rent and service charges and the
landlord's costs, could reinstate the lease. The judge concluded that
the lease could be retrospectively reinstated on the basis that the mortgagee
could claim relief from forfeiture under section 138 of the County Courts
Act 1984 or under section 146(2) of the Law of Property Act 1925.    H

The landlord appealed, with the leave of the judge, on the grounds
that (1) the judge erred in fact and in law in holding that the service
charge payable under the original lease to reimburse the landlord for

A   moneys expended, inter alia, on the insurance and maintenance of the
building of which the demised premises formed a part was rent; (2) the
judge erred in law in holding that the mortgagee of the forfeited leasehold
interest could avail itself of the provisions for relief set out in section
138(2) or (5) of the Act of 1984; (3) the judge erred in law in holding that
the mortgagee of the forfeited leasehold interest could have availed itself
of the provisions for relief set out in section 146(2) of the Act of 1925;
B   (4) the judge erred in law in holding that the forfeited lease could be
reinstated without the original and actual tenants being before the court
or having consented to the burdens of the lease being reimposed on them;
and (5) in all the circumstances the judge erred in law in refusing to make
an order vesting the property comprised in the lease in the mortgagee on
terms as to payment of rent, costs, expenses, damages, compensation or
C   otherwise as sought by the landlord.


ESCALUS PROPERTIES LTD. V. DENNIS AND OTHERS

APPEAL from Judge Willis sitting in the Croydon County Court.
By a lease dated 21 January 1988 the landlord, the predecessor in title
D   of Escalus Properties Ltd., granted the tenants, Gladwyn Marshall Dennis
and Jennifer Michelle Ann Williams-Dennis, a lease of Flat 3, 192, High
Street, London, S.W.19 for a term of 99 years from 24 June 1987 for a
premium of £57,275 and an initial rent of £75 per annum. The reddendum
reserved the rent but not the service charge as rent and the terms of the
lease contained no reference to the service charges being rent. The tenants
E   mortgaged the lease of the property to the mortgagee, Abbey National
Plc., for the loan of the bulk of the premium. The tenants fell into arrears
under the mortgage and on 25 September 1991 the mortgagee entered into
possession of the premises. The landlord began proceedings in the county
court for possession against the tenants for arrears of rent and service
charges, the mortgagee being joined as a defendant. On 22 December 1993
the judge made an order in favour of the landlord and held that the
F   service charges were not rent and accordingly that relief from forfeiture
could only be sought under the provisions of section 146 of the Law of
Property Act 1925 and that the mortgagee was entitled to such relief under
section 146(2).
By a notice of appeal dated 5 January 1994 the landlord appealed,
with the leave of the judge, on the grounds that (1) the judge erred in law
G   in holding that the mortgagee of the forfeited leasehold interest could
avail itself of the provisions for relief set out in section 146(2) of the Act
of 1925; (2) the judge erred in law in holding that the forfeited lease could
be reinstated without the original and actual tenants being in court or
having consented to the burdens of the lease being imposed on them;
(3) the judge erred in law in holding that, if the mortgagee was entitled to
relief under section 146(2), such relief could be by reinstatement of the
H   original lease and not solely by way of a vesting order; and (4) in all the
circumstances the judge erred in law in refusing to make an order vesting
the property in the mortgagee on terms as to payment of rent, costs,
expenses, damages, compensation or otherwise as sought by the landlord.

ESCALUS PROPERTIES LTD. v. COOPER-SMITH AND ANOTHER                    A

APPEAL from Judge Fawcus sitting as a judge of the Queen's Bench Division.

By a lease dated 16 November 1989 the landlord, the predecessor in title of Escalus Properties Ltd., demised to the tenant, Patrick Cooper-Smith, for a term of 99 years premises at 9, Harcourt Avenue, Wallington, Surrey, from 1 July 1989 for a premium of £69,950 and an initial rent of    B
£200 per annum. The terms of the lease were effectively the same as those in *Escalus Properties Ltd. v. Robinson*. The tenant charged the lease of the premises to the mortgagee, Abbey National Plc., as security for the loan of the bulk of the premium. On 3 February 1993 the landlord issued proceedings against the tenant in the High Court for forfeiture based on arrears of rent and service charges and joined the mortgagee, which had by then been in possession of the premises for some two years, as second    C
defendant. On 17 June 1993 the landlord obtained an order for possession in default against the tenant. On 3 December 1993 Master Foster granted relief from forfeiture to the mortgagee by reinstating the lease. The judge upheld the master's decision pursuant to section 38 of the Supreme Court Act 1981 and section 146(2) of the Law of Property Act 1925.

The landlord appealed, with the leave of the judge, on the grounds    D
that (1) the judge erred in fact and in law in holding that the service charge payable under the original lease to reimburse the landlord for moneys expended, inter alia, on the insurance and maintenance of the building of which the demised premises formed part was rent; (2) the judge erred in law in holding that the mortgagee of the forfeited leasehold interest could avail itself of the provisions for relief set out in section 38    E
of the Act of 1981; (3) the judge erred in law in holding that the mortgagee of the forfeited leasehold interest could have availed itself of the provisions for relief set out in section 146(2) of the Act of 1925; (4) the judge erred in law in holding that the forfeited lease could be reinstated without the original and actual tenant being before the court or having consented to the burdens of the lease being reimposed on him; (5) the judge erred in law in holding that, if the mortgagee was entitled to relief under    F
section 38 of the Act of 1981 or section 146(2) of the Act of 1925 such relief could be by reinstatement of the original lease and not solely by way of a vesting order; and (6) in all the circumstances the judge erred in law in refusing to make an order vesting the property comprised in the lease in the mortgagee on terms as to payment of rent, costs, expenses, damages, compensation or otherwise as sought by the landlord.

G

SINCLAIR GARDENS INVESTMENTS (KENSINGTON) LTD. v. WALSH AND OTHERS

APPEAL from Mr. Recorder Bridges-Adams sitting in the Woolwich County Court.

By a lease made on 1 February 1991 the landlord, the predecessor in    H
title of Sinclair Gardens Investments (Kensington) Ltd., granted a lease for a term of 97 years to the tenants, Patrick Walsh and Bridie Folan, of Flat 1, 1–24, Grantley House, 11, Myers Lane, New Cross, London, at a premium of £56,500 and a rent of £80 per annum. The tenants charged

A  the lease to the mortgagee, Bristol & West Building Society, as security for the loan for the premium and fell into arrears under the mortgage deed. On 8 December 1992 the landlord, by then Sinclair Gardens Investments (Kensington) Ltd., issued proceedings in the county court for forfeiture for non-payment of rent and on 21 April 1993 judgment was given for possession. The possession order was executed on 17 June 1993. On 6 July 1993 the mortgagee was added as a defendant and on 25 August

B  1993, having paid £2,176·03 into court, was granted relief against forfeiture under section 138 of the County Courts Act 1984, it being thought that the effect of the judge's decision was that the lease had been effectively retrospectively reinstated.

    By a notice of appeal the landlord appealed on the grounds that the judge erred in law (1) in that (a) he wrongly disallowed the landlord's

C  claim that, as a condition of granting a vesting order to the mortgagee, mesne profits were liable to be paid by the mortgagee for that period during which the tenants were in adverse possession and (b) he wrongly disallowed the landlord's claim that, as a condition of granting a vesting order to the mortgagee, mesne profits were liable to be paid by the mortgagee for that period during which the mortgagee was in occupation and prior to the vesting order being granted; (2) in holding that the

D  mortgagee could in no circumstances be required to pay mesne profits for a period during which it was not itself in adverse possession of the property; (3) in holding that in the circumstances of the case the mortgagee was not liable for mesne profits for the period during which it was itself in occupation of the property and prior to the vesting order being granted; and (4) in holding that the mortgagee was under no obligation to take any steps to safeguard its position, having been put on notice of the

E  proceedings by service on them of the particulars of claim. The appeals were heard together.

    The facts are stated in the judgment of Nourse L.J.

F  *David Neuberger Q.C.* and *Graham Clark* for the landlords. Each case is concerned with the basis on which a mortgagee of a long lease at a low rent can obtain relief from forfeiture. The issues which arise are (1) whether service charges payable under a lease are "rent;" (2) whether a mortgagee seeking relief under section 138 of the County Courts Act 1984 is entitled to rely on subsection (5); (3) whether the relief afforded to a mortgagee in the High Court under section 38 of the Supreme Court Act 1981 takes effect retrospectively; (4) whether a mortgagee seeking

G  relief under section 146 of the Law of Property Act 1925 can rely on subsection (2) or can rely only on subsection (4); (5) the terms on which relief from forfeiture should be granted to a mortgagee.

    *Do service charges constitute rent?* "Rent" means the consideration payable by the tenant to the landlord in respect of the tenant's possession of premises demised to him by the landlord. It does not include service charges which are payments for services provided by the landlord, not for

H  the enjoyment of possession: see *Property Holding Co. Ltd. v. Clark* [1948] 1 K.B. 630, 642; *C.H. Bailey Ltd. v. Memorial Enterprises Ltd.* [1974] 1 W.L.R. 728 and *Blatherwick (Services) Ltd. v. King* [1991] Ch. 218, 224. In *Abbey National Building Society v. Maybeech Ltd.* [1985] Ch. 190, 198,

199 Nicholls J. accepted that the service charge was not rent. Applying    A
the reasoning of Lord Templeman in *Street v. Mountford* [1985] A.C. 809,
826, one can no more turn a service charge into a rent by calling it rent
than one can turn a tenancy into a licence by calling it a licence.
[Reference was also made to *Royston Industries Ltd. v. Lawrence* [1994]
1 E.G.L.R. 110 and section 205(1)(xxiii) of the Law of Property Act 1925.]

 *Relief from forfeiture.* The date of forfeiture is the date on which
proceedings claiming possession are served on the tenant: *Canas Property*    B
*Co. Ltd. v. K.L. Television Services Ltd.* [1970] 2 Q.B. 433. Where a tenant
applies either under section 138(2) of the County Courts Act 1984 or
under section 146(2) of the Law of Property Act 1925 and obtains relief,
whether for non-payment of rent or for breach of any other covenant, the
lease is reinstated retrospectively to the date of forfeiture: *Dendy v. Evans*
[1910] 1 K.B. 263. If relief is granted under section 146(4) it does not take    C
effect retrospectively but by means of a vesting order which vests a new
term in the subtenant: *Official Custodian for Charities v. Mackey* [1985]
Ch. 168 and *Cadogan v. Dimovic* [1984] 1 W.L.R. 609. A mortgagee
seeking relief is in the same position as a subtenant: *Belgravia Insurance*
*Co. Ltd. v. Meah* [1964] 1 Q.B. 436 and *Grand Junction Co. Ltd. v. Bates*
[1954] 2 Q.B. 160.

 Section 138 of the Act of 1984 can be relied on only where forfeiture    D
is claimed for arrears of rent. Thus it cannot apply in the *Cooper-Smith*
case or in the *Dennis* case where there is no question of the service charge
being rent. It might apply in the *Robinson* case if the service charge there
were held to be rent, but it is not open to the mortgagee to rely on section
138(5) to have the lease reinstated retrospectively, notwithstanding the
decision in *United Dominions Trust Ltd. v. Shellpoint Trustees Ltd.* [1993]    E
4 All E.R. 310. The section can be relied on in the *Walsh* case, the
mortgagee only being able to seek relief under section 138(9C) which
would involve a fresh lease being granted by a vesting order. If the effect
of the *United Dominions Trust* case is that a mortgagee can rely on section
138(5) or 138(9A) of the Act of 1984, and if service charges are rent
within the meaning of section 138, then the appeal in the *Robinson* case
and/or the *Dennis* case must fail unless (a) relief under section 138(5)    F
should not be granted in the absence of the original tenant, or (b) the
effect of granting relief under section 138(5) to a mortgagee at any rate
does not reinstate the lease retrospectively. If (a) is correct then relief
from forfeiture should have been afforded under section 146(4) of the Act
of 1925. If (b) is correct then the effect of granting relief under section
138(5) to a mortgagee is effectively the same as granting such relief under    G
section 146(4).

 As to relief under section 146, three issues arise. (a) Can a mortgagee
seek relief from forfeiture under section 146(2) or only under section
146(4)? But for the reasoning in the *United Dominions Trust* case the
answer would be that he could only rely on section 146(4). Subsections
(2) and (4) of section 146 are each intended to be a self-contained code,
for the tenant under the lease and his subtenant or mortgagee respectively:    H
see *Nind v. Nineteenth Century Building Society* [1894] 2 Q.B. 226; *Creswell*
*v. Davidson* (1887) 56 L.T. 811 and *Burt v. Gray* [1891] 2 Q.B. 98. The
decision in the *United Dominions Trust* case might have been reached per

A    incuriam. However, that case concerned rent, and relief from forfeiture on grounds other than non-payment of rent involves different principles: see *per* Sir Nicolas Browne-Wilkinson V.-C. in *Billson v. Residential Apartments Ltd.* [1992] 1 A.C. 494, 508–515. (b) If the court can grant a mortgagee relief under section 146(2), is the nature of the relief left open? It would be wrong for the relief granted to a mortgagee under section 146(2) to be any different from that which would be granted under section

B    146(4): see *per* Lord Denning M.R. in *Belgravia Insurance Co. Ltd. v. Meah* [1964] 1 Q.B. 436, 445–446. (c) Can the relief under section 146(4) be granted retrospectively? It is clear from *Cadogan v. Dimovic* [1984] 1 W.L.R. 609 and *Leeds Permanent Building Society v. Manyfield Ltd.* (unreported), 16 June 1993 that it cannot.

C    Section 38 of the Supreme Court Act 1981 also has the effect of restoring the original lease. Consequently the mortgagee would not be granted relief from forfeiture unless the tenant was before the court: see *Hare v. Elms* [1893] 1 Q.B. 604, 606 and *Gray v. Bonsall* [1904] 1 K.B. 601, 607–608, 609 and *Humphreys v. Morten* [1905] 1 Ch. 739 is distinguishable on the facts: there was no reason for the original lessees to require the lease to be reinstated.

D    The person entitled to possession as against the landlord is the tenant, but only so long as the lease subsists. Once the lease has been determined the landlord is in principle entitled to possession because determination of the lease determines any subsidiary interests. Accordingly, where relief is granted under section 146(4) of the Act of 1925 to a mortgagee, the landlord is entitled to the fruits of possession between the date of forfeiture and the date of a vesting order: *Official Custodian for Charities v. Mackey*

E    [1985] Ch. 168. Under section 146(2) and (4) relief is to be granted as the court thinks fit. Where the mortgagee has been in possession between the date of forfeiture and the date of the vesting order he should be required, as a condition of obtaining relief, to pay to the landlord mesne profits representing the letting value of the premises: *Associated Dairies Ltd. v. Pierce* (1982) 265 E.G. 127. As a further condition of obtaining relief a mortgagee who traces his title through a defaulting tenant is required to

F    remedy any breaches of covenant by the tenant: *Egerton v. Jones* [1939] 2 K.B. 702, 708–709; *Belgravia Insurance Co. Ltd. v. Meah* [1964] 1 Q.B. 436, 445, 446; *Gray v. Bonsall* [1904] 1 K.B. 601 and *Hill v. Griffin* [1987] 1 E.G.L.R. 81. Further, a landlord is effectively prevented from benefiting from his right to possession during the period when relief from forfeiture is sought by a mortgagee or anyone else. An application for relief from

G    forfeiture has been held to be a counterclaim which raises a valid defence to a landlord's claim for possession: *Liverpool Properties Ltd. v. Oldbridge Investments Ltd.* [1985] 2 E.G.L.R. 111 and *Sambrin Investments Ltd. v. Taborn* [1990] 1 E.G.L.R. 61.

*Michael Driscoll Q.C., Timothy Harry* and *John McGhee* for the mortgagees. *Do service charges amount to rent?* Where a lessee has an obligation to pay a service charge to the landlord under the lease, does

H    the service charge amount to rent for the purpose of the court's inherent and statutory jurisdiction relating to relief from forfeiture if the service charge is "deemed to be due by way of additional rent and recoverable by the landlord as such" even though it is not expressly reserved as rent in

A
the reddendum? Not every payment of a service charge is a payment of
rent, but every forfeiture based on non-payment of money by a tenant
should be capable of relief under the same jurisdiction as is available in
the case of forfeiture for non-payment of rent. For this purpose "rent"
has a wider meaning which includes payment of a service charge which is
not reserved as rent or deemed to be rent or recoverable as rent: see
*Property Holding Co. Ltd. v. Clark* [1948] 1 K.B. 630; *United Dominions
Trust Ltd. v. Shellpoint Trustees Ltd.* [1993] 3 All E.R. 301, 310; *Shiloh
Spinners Ltd. v. Harding* [1973] A.C. 691, 722–723; *Billson v. Residential
Apartments Ltd.* [1992] 1 A.C. 494, 510, 513; *Bailey Ltd. v. Memorial
Enterprises Ltd.* [1974] 1 W.L.R. 728; *Brown v. Peto* [1900] 2 Q.B. 653;
*Drake v. Mundy* (1631) Cro.Car. 207; section 2(ix) of the Conveyancing
Act 1881 (44 & 45 Vict. c. 41) and section 205(1) (xxiii) of the Law of
Property Act 1925. In *Abbey National Building Society v. Maybeech Ltd.*
[1985] Ch. 190 the lease had been forfeited for arrears of rent and service
charge and the case is thus distinguishable. So, too, is *Blatherwick
(Services) Ltd. v. King* [1991] Ch. 218 as there the service charge was not
deemed to be rent or to be recoverable as such. If a sum is deemed to be
rent, then it is so deemed for all purposes, and therefore is rent for all
purposes.

*Section 138 of the County Courts Act 1984.* A mortgagee of a lease is
entitled to relief under section 138(2)(9A) and (9B) in a form the effect of
which is that the lease is reinstated as though it had never been forfeited.

The court in the exercise of its jurisdiction has always been willing to
grant a mortgagee of a lease relief from forfeiture of the lease for non-
payment of rent in the form of reinstatement of the lease. Where the lease
is reinstated it is as though it had never been forfeited: see *Berney v.
Moore* (1791) 2 Ridg. 310; *Doe d. Whitfield v. Roe* (1811) 3 Taunt. 402;
*Hare v. Elms* [1893] 1 Q.B. 604; *Howard v. Fanshaw* [1895] 2 Ch. 581;
*Lovelock v. Margo* [1963] 2 Q.B. 786; *Doe d. Wyatt v. Byron* (1845) 1 C.B.
623; *Gray v. Bonsall* [1904] 1 K.B. 601; *Moore v. Smee and Cornish* [1907]
2 K.B. 8; *Newbolt v. Bingham* (1895) 72 L.T. 852 and *Belgravia Insurance
Co. Ltd. v. Meah* [1964] 1 Q.B. 436. Relief under section 138 of the Act of
1984 is available to "the lessee," which is defined in section 140 of the Act
as including "an original or derivative underlessee" and "persons deriving
title under a lessee" and has been held to include a mortgagee: *United
Dominions Trust Ltd. v. Shellpoint Trustees Ltd.* [1993] 4 All E.R. 310.
Section 138(2) (5) and (9B) expressly provides that relief shall be in the
form that "the lessee" holds the land "according to the lease without any
new lease," i.e., in the form of reinstatement of the lease: *United Dominions
Trust Ltd. v. Shellpoint Trustees Ltd.* The mortgagee is similarly entitled
to relief from forfeiture under section 38 of the Supreme Court Act 1981.

*Section 38 of the Supreme Court Act 1981.* A mortgagee is entitled to
relief from forfeiture for non-payment of rent in the county court under
section 38 in a form the effect of which is that the lease is reinstated as
though it had never been forfeited. The statutory jurisdiction under section
38 confirms the existing inherent jurisdiction and section 38(2) is expressed
in terms that "Where the lessee or a person deriving title under him is
granted relief . . . he shall hold the demised premises in accordance with
the terms of the lease without the necessity for a new lease." The

A   authorities relied on in the paragraph above show that where this statutory jurisdiction is exercised on the application of a mortgagee the relief takes the form of a reinstatement of the lease.

    *Section 146 of the Law of Property Act 1925.* A mortgagee of a lease is entitled to seek relief under section 146(2) in a form the effect of which is that the lease is reinstated as though it had never been forfeited. His entitlement is not restricted to relief in the form of a vesting order under

B   section 146(4). Section 146(2) of the Act of 1925 is not available where the only ground of forfeiture is non-payment of rent. Relief under section 146(2) is available to "the lessee." The definition of "lessee" in section 146(5)(*b*) is the same as the definition of "lessee" in section 138 of the Act of 1984 and therefore includes a mortgagee: see *Federated Homes Ltd. v. Mill Lodge Properties Ltd.* [1980] 1 W.L.R. 594. The grant of relief under

C   section 146(2) also takes the form of reinstatement of the lease: *Dendy v. Evans* [1910] 1 K.B. 263 and *Driscoll v. Church Commissioners for England.* [1957] 1 Q.B. 330. The landlords rely on *Creswell v. Davidson,* 56 L.T. 811; *Burt v. Gray* [1891] 2 Q.B. 98 and *Nind v. Nineteenth Century Building Society* [1894] 2 Q.B. 226. In so far as they suggest that the mortgagee cannot seek such relief those cases are either distinguishable or wrong, being inconsistent with the *United Dominions Trust* case. The grant of

D   relief to a mortgagee under section 146(2) is discretionary but it would be an unreasonable exercise of the discretion in the present cases to refuse relief under section 146(2). Especially if to do so will result in the landlord achieving a windfall profit. If a mortgagee is entitled to seek relief under section 146(2) in the form of a reinstatement of the lease then there is a consistency of approach to applications for relief by mortgagees in rent

E   and non-rent cases.

    If relief is only available to a mortgagee in the form of a vesting order under section 146(4) of the Law of Property Act 1925 should the mortgagee be required as a condition of relief: (a) to pay mesne profits in respect of any period between the date of forfeiture and the order granting relief during which the lessee was in possession of the property, and (b) to pay mesne profits in respect of any period between the date of the

F   forfeiture and the order granting relief during which the mortgagee was in possession of the property? The question only arises if it is held that there is no jurisdiction to grant relief in the form of a reinstatement of the lease or that jurisdiction should not be exercised in favour of a reinstatement of the lease.

    There is no reason why in an appropriate case the court cannot make

G   a retrospective vesting order. *Cadogan v. Dimovic* [1984] 1 W.L.R. 609; *Official Custodian for Charities v. Mackey* [1985] Ch. 168; *Leeds Permanent Building Society v. Manyfield Ltd.* (unreported), 16 June 1993 and *Viscount Chelsea v. Hutchinson* [1994] 2 E.G.L.R. 61 should not be followed. The purpose of section 146(4) must be to enable the court to restore the mortgagee of the lease to his position before the forfeiture. If that can only be achieved by making the vesting order retrospective then the court

H   should so order: see *Official Custodian for Charities v. Mackey (No. 2)* [1985] 1 W.L.R. 1308.

    *Attendance of lessee.* It is a matter of discretion for the judge whether to grant the mortgagee relief in the form of reinstatement of the lease

A

without the lessee either being present or giving his consent. Ordinarily, however, the lessee should be made a party to the mortgagee's application for relief and given an opportunity to be heard: *Hare v. Elms* [1893] 1 Q.B. 604 and *Abbey National Building Society v. Maybeech Ltd.* [1895] Ch. 190.

In each appeal the judge concluded correctly that the mortgagee was entitled to relief in the form of reinstatement of the lease without any liability to pay the landlord any mesne profits.

B

*Neuberger Q.C.* replied.

The original tenants of the properties did not appear and were not represented.

*Cur. adv. vult.*

C

30 March 1995.   The following judgments were handed down.

NOURSE L.J.

*Introduction*

D

In each of these four appeals a mortgagee by subdemise seeks relief against forfeiture of a long lease granted for a premium and at a low rent. The landlord accepts that relief is available. The dispute is as to its nature and the terms on which it ought to be granted. The mortgagee says that relief can be granted retrospectively and on terms that it pays all arrears of rent and service charge and costs. The landlord says that relief can only be granted as from the date of the order granting it and on terms that the mortgagee pays all arrears of rent and service charge up to the date of forfeiture, thereafter mesne profits until the date of the order, and costs. The lease having been granted at a low rent, it is evident that mesne profits would be far more valuable to the landlord.

E

Because different considerations apply depending on whether the landlord takes proceedings in the county court or the High Court and whether they are based on non-payment of rent or of sums other than rent, each case must be considered separately. Although the erstwhile tenants, against all of whom the leases have been forfeited, have taken no part in the proceedings, the convenient course is to refer to each case by the name of the first defendant, being the tenant, or one of them, under the forfeited lease. In *Robinson, Dennis* and *Cooper-Smith* the plaintiff landlord is Escalus Properties Ltd. and the mortgagee is Abbey National Plc. In *Walsh* the plaintiff landlord is Sinclair Gardens Investments (Kensington) Ltd. and the mortgagee is Bristol & West Building Society. In *Robinson, Dennis* and *Walsh* proceedings have been brought in the county court; in *Cooper-Smith* in the High Court.

F

G

Each of the leases was of a house or flat in London or Surrey for a term of 97 or 99 years from a date in 1987 or later at a premium of between £56,500 and £67,000 and at a rent of between £80 and £200 for the first 33 years or more. Each lease contained covenants by the tenant to pay service charge as well as rent. In none of them did the reddendum

H

A    reserve the service charge as rent. However, in both *Robinson* and *Cooper-Smith* the lease contained a provision that service charge "shall be deemed to be sums due by way of additional rent and shall be recoverable by the landlord as such." The leases in *Dennis* and *Walsh* contained no such provision. Each lease contained a proviso for re-entry on non-payment of rent. In each case the lease was mortgaged by the tenant or tenants in favour of Abbey National or Bristol & West as the case might be. In each
B    case the tenant or tenants defaulted under the mortgage as well as under the lease.

In *Robinson, Dennis* and *Cooper-Smith* judgment was obtained by the landlord against the respective tenants on the basis of arrears of both rent and service charge; in *Walsh* on the basis of arrears of rent only. In each case the appropriate mortgagee was joined as a defendant for the purpose
C    of claiming relief against forfeiture. In each case the judge in the court below (in *Robinson* and *Dennis* Judge Willis sitting in the Croydon County Court, in *Cooper-Smith* Judge Fawcus sitting as a judge of the Queen's Bench Division and in *Walsh* Mr. Recorder Bridges-Adams sitting in the Woolwich County Court) held that relief could be granted retrospectively and that it ought to be granted on terms that all arrears owing under the lease and costs, but not mesne profits, were paid. Against those decisions
D    the landlords appeal to this court.

*Robinson and Cooper-Smith: was the service charge "rent?"*

Because the statutory provisions relating to non-payment of rent differ from those relating to other breaches of covenant, for example payment of service charge, the first point to be decided in *Robinson* and
E    *Cooper-Smith* is into which category the case falls. The point does not arise in *Walsh*, which is a rent only case. Moreover, in *Dennis*, where there were arrears of service charge but the lease contained no provision deeming them to be sums due by way of additional rent and recoverable as such, the mortgagee accepts, correctly, that the service charge cannot be treated as rent. So the point only arises in *Robinson* and *Cooper-Smith*.

F    The question is whether a provision that service charge shall be deemed to be sums due by way of additional rent and shall be recoverable by the landlord as such invests the charge with the character of rent, even though it is not reserved as such by the reddendum. Curiously enough, there appears to be no reported decision directly in point. Several authorities were cited, for example *Property Holding Co. Ltd. v. Clark* [1948] 1 K.B. 630, but they went rather to the question whether service charge can be
G    "rent" without any deeming provision such as that found here. What we have to do is to decide, first, what is meant by "rent" in the statutory provisions and, secondly, whether the relevant provision in each lease had the effect of converting service charge into rent in that sense.

Seeing that the current statutory provisions derive from others enacted in the 18th and 19th centuries, I regard it as axiomatic that they refer to rent in its correct sense being (i) a periodical sum, (ii) paid in return for
H    the occupation of land, (iii) issuing out of the land, (iv) for non-payment of which a distress is leviable. All those attributes were enjoyed by the rents payable under the leases in *Robinson* and *Cooper-Smith*. Each of those leases, by providing that service charge should be deemed to be ·

sums due by way of *additional* rent, had the effect of conferring the like    A
attributes on the service charge, an effect confirmed by the further
provision that it should be recoverable as rent. To hold thus is to do no
more than give full effect to the agreement between the parties. That
agreement is not defeated or modified by the omission to reserve the
service charge as rent in the reddendum.

The primary submission of Mr. Neuberger, for the landlords, was that    B
service charge cannot become rent even if reserved as such in the
reddendum. I do not know why that should be so. I can think of no
ground in public policy such as there was, for example, in *Street v.
Mountford* [1985] A.C. 809, with which Mr. Neuberger sought to draw an
analogy, for holding that the parties to a lease are not entitled to treat as
rent something which is not rent. Alternatively, Mr. Neuberger submitted
that the provision here goes no further than to treat the service charge as    C
being recoverable as rent. That submission ignores the first part of the
provision, which says that the charge shall be deemed to be due by way
of additional rent; in other words, that it is to have all the attributes of
rent.

For these reasons, I am satisfied that both *Robinson* and *Cooper-Smith*
are, like *Walsh*, to be treated as rent only cases. At this point they must
be realigned, the proceedings in *Robinson* and *Walsh* being in the county    D
court and in *Cooper-Smith* in the High Court.

*Robinson: section 138(2) of the County Courts Act 1984*

In *Robinson* the mortgagee had paid into court, not less than five clear
days before the return date, all the rent and service charge in arrear and
also the costs of the action. Accordingly, Judge Willis, applying the    E
decision of this court in *United Dominions Trust Ltd. v. Shellpoint Trustees
Ltd.* [1993] 4 All E.R. 310, held that the mortgagee was automatically
entitled to retrospective relief against forfeiture under section 138(2) of
the County Courts Act 1984. I will return to the *United Dominions Trust*
case in due course. At this stage it is enough to say that it is binding
authority on this court so far as the effect of section 138 is concerned. On    F
that footing the decision of Judge Willis was correct. It follows that the
appeal in *Robinson* must be dismissed.

*Walsh: section 138(9A) and (9B) of the County Courts Act 1984*

In *Walsh* the proceedings became confused, it being assumed that, as
between the landlord and the tenants, the case was governed by    G
section 146 of the Law of Property Act 1925. However, given that the
only basis for forfeiture was non-payment of rent, the landlord accepts
that it was in reality governed by section 138 of the County Courts Act
1984. What happened was that, after an order for possession had been
executed against the tenants, the mortgagee was added as a defendant and
ordered to pay into court within 14 days the sum of £2,176·03, being the
amount of the judgment already entered against the tenants. It was further    H
ordered that the mortgagee "will be given [relief] from forfeiture pending
the final hearing of this matter." The mortgagee duly paid the money into
court. At the final hearing, Mr. Recorder Bridges-Adams made an order

A    granting the mortgagee's application for relief. The landlord, through Mr. Neuberger, accepts that the recorder must be taken to have acted under section 138(9A) and (9B) of the Act of 1984, which, on the authority of the *United Dominions Trust* case [1993] 4 All E.R. 310, empower the court to grant a mortgagee by subdemise retrospective relief against forfeiture. In the result, *Walsh* stands on the same footing as *Robinson* and the appeal must likewise be dismissed.

B

*Cooper-Smith: section 38 of the Supreme Court Act 1981*

It is convenient to deal next with *Cooper-Smith*, the third rent only case, which differs from *Robinson* and *Walsh* in that the proceedings are in the High Court. That means that it is governed by section 38 of the Supreme Court Act 1981:

C    "(1) In any action in the High Court for the forfeiture of a lease for non-payment of rent, the court shall have power to grant relief against forfeiture in a summary manner, and may do so subject to the same terms and conditions as to the payment of rent, costs or otherwise as could have been imposed by it in such an action immediately before the commencement of this Act. (2) Where the
D    lessee or a person deriving title under him is granted relief under this section, he shall hold the demised premises in accordance with the terms of the lease without the necessity for a new lease."

The dates here may be of some importance. The writ was issued on 3 February 1993, an order for substituted service on the tenant being made on 10 March. The mortgagee applied to be joined as a defendant
E    and for relief against forfeiture. On 9 March the master made an order for joinder and adjourned the application for relief. On 17 June 1993 judgment for possession was entered against the tenant in default of notice of intention to defend. The mortgagee having paid into court more than enough to satisfy the arrears of rent and service charge and costs, on 3 December 1993 the master made an order granting it relief against forfeiture by reinstating the lease. The landlord's appeal against the
F    master's order was dismissed by Judge Fawcus on 27 January 1994.

Having held, correctly, that the arrears of service charge were to be treated as arrears of rent, the judge turned to consider relief under section 38(2), which, by referring to "a person deriving title under" the lessee, expressly contemplates that relief may be granted to an underlessee. Moreover, it appears to have been accepted on behalf of the landlord that
G    relief, if granted, would be by way of reinstatement of the lease. The objection taken, based primarily on *Hare v. Elms* [1893] 1 Q.B. 604, was that such relief could not be granted in the absence of the tenant. However, the judge, having read passages from the judgments of Day J. in *Hare v. Elms,* at p. 607, and Nicholls J. in *Abbey National Building Society v. Maybeech Ltd.* [1985] Ch. 190, 206B, held that there was no absolute rule and that the question was whether, on the facts before him,
H    the mortgagee had shown good cause for proceeding in the tenant's absence. Having referred to two affidavits of the mortgagee's solicitor deposing to the unsuccessful efforts that had been made to trace the tenant, Judge Fawcus answered that question in the affirmative, stating

that it was difficult to see what else the mortgagee could have done.    A
Accordingly, being satisfied that the case fell under section 38, he dismissed
the landlord's appeal against the master's order.

The original predecessor of section 38 of the Act of 1981 was section 1
of the Common Law Procedure Act 1860 (23 & 24 Vict. c. 126), on which
several authorities, besides *Hare v. Elms* [1893] 1 Q.B. 604, were cited to
us. None of them casts any doubt on the proposition that an underlessee,
including a mortgagee by subdemise, could apply for relief under that    B
provision and its successors. Indeed they establish the contrary. So the
questions for decision in regard to section 38 are, first, whether relief is
granted retrospectively by reinstatement of the lease and, secondly,
whether Judge Fawcus was entitled to grant the mortgagee relief in the
circumstances of this case.

As to the first of those questions, Mr. Neuberger referred us to a    C
number of authorities which he claimed supported the proposition that
relief granted under section 38 can only be granted as from the date of the
order granting it. However, none of them really dealt with the point and
the proposition advanced is inconsistent with the terms of section 38(2),
which provides that the person to whom relief is granted "shall hold the
demised premises in accordance with the terms of the lease without the
necessity for a new lease." That wording is identical to that of section    D
138(9B) of the County Courts Act 1984 and there is no reason for giving
it an effect different from that already given to the latter provision in
*Walsh.*

As to the second question, I think that Judge Fawcus applied an
entirely correct test as established by the authorities. Moreover, in
applying the test, he gave a decision with which it would be impossible    E
for this court to interfere. The application of the test was essentially a
matter within his discretion. For my part, I do not see that he could
reasonably have given any other decision. Accordingly, I would also
dismiss the appeal in *Cooper-Smith.*

*Dennis: section 146 of the Law of Property Act 1925*

I come finally to *Dennis,* which is without doubt the most difficult of    F
the four cases. It having been accepted by the mortgagee that it is not a
rent only case, it follows that section 138 of the County Courts Act 1984
is not in point and that relief can only be granted under section 146 of the
Law of Property Act 1925, of which the material provisions are the
following. Subsection (1) provides that a right of re-entry or forfeiture
shall not be enforceable unless and until the lessor serves on the lessee an    G
appropriate notice and the lessee fails, within a reasonable time thereafter,
to remedy the breach, if it is capable of remedy, and to make reasonable
compensation in money to the satisfaction of the lessor, for the breach.
Section 146(2) provides:

> "Where a lessor is proceeding, by action or otherwise, to enforce
> such a right of re-entry or forfeiture, the lessee may, in the lessor's
> action, if any, or in any action brought by himself, apply to the court    H
> for relief; and the court may grant or refuse relief, as the court,
> having regard to the proceedings and conduct of the parties under the
> foregoing provisions of this section, and to all the other circumstances,

A    thinks fit; and in case of relief may grant it on such terms, if any, as to costs, expenses, damages, compensation, penalty, or otherwise, including the granting of an injunction to restrain any like breach in the future, as the court, in the circumstances of each case, thinks fit."

Subsection (3) provides for the lessor to recover as a debt due from the lessee all reasonable costs and expenses properly incurred by the lessor in
B    reference to any breach which is waived or from which the lessee is relieved. Subsection (4) provides:

"Where a lessor is proceeding by action or otherwise to enforce a right of re-entry or forfeiture under any covenant, proviso, or stipulation in a lease, or for non-payment of rent, the court may, on application by any person claiming as under-lessee any estate or interest in the property comprised in the lease or any part thereof,
C    either in the lessor's action (if any) or in any action brought by such person for that purpose, make an order vesting, for the whole term of the lease or any less term, the property comprised in the lease or any part thereof in any person entitled as under-lessee to any estate or interest in such property upon such conditions as to execution of any deed or other document, payment of rent, costs, expenses,
D    damages, compensation, giving security, or otherwise, as the court in the circumstances of each case may think fit, but in no case shall any such under-lessee be entitled to require a lease to be granted to him for any longer term than he had under his original sub-lease."

Subsection (5) provides that for the purposes of the section:

"(b) 'Lessee' includes an original or derivative under-lessee, and the
E    persons deriving title under a lessee; also a grantee under any such grant as aforesaid and the persons deriving title under him; . . ."

Subsection (11) provides:

"This section does not, save as otherwise mentioned, affect the law relating to re-entry or forfeiture or relief in case of non-payment of rent."

F    The effect of subsection (11) is to exclude from subsection (2) proceedings based only on non-payment of rent. Subsection (4), on the other hand, expressly includes such proceedings, thus giving effect to the decision of this court in *Gray v. Bonsall* [1904] 1 K.B. 601. Since the proceedings in *Dennis* were based on arrears of service charge as well as rent, the mortgagee, provided it is a "lessee" within subsection (5)(b), is prima
G    facie entitled to apply for relief either under that subsection or under subsection (4).

It is well established that the effect of an order for relief under section 146(2) is to restore the lease as if it had never been forfeited, and with it any underlease: see the decision of this court in *Dendy v. Evans* [1910] 1 K.B. 263. That is what is meant when it is said that relief is granted retrospectively. But where relief is granted under section 146(4) it
H    can only be granted as from the date of the order granting it: see *Cadogan v. Dimovic* [1984] 1 W.L.R. 609, 613, 616, *per* Fox and Robert Goff L.JJ. and the decision of Scott J. in *Official Custodian for Charities v. Mackey* [1985] Ch. 168.

The rival contentions as to section 146(2) and (4) are, shortly stated,    A
as follows. Relying on the definition of "lessee" in subsection (5)(*b*) and
the decision in *United Dominions Trust Ltd. v. Shellpoint Trustees Ltd.*
[1993] 4 All E.R. 310, the mortgagee contends that it is entitled to apply
for and obtain relief under subsection (2), with the same results as under
section 138(9A) and (9B) of the County Courts Act 1984. In answer, the
landlord, relying on authorities not cited in the *United Dominions Trust*
case, in particular the decision of this court in *Nind v. Nineteenth Century*    B
*Building Society* [1894] 2 Q.B. 226, contends that an underlessee cannot be
granted relief under subsection (2), but only under subsection (4), and
that in any event, as a matter of discretion, the mortgagee ought to be
granted relief under subsection (4). In reply, the mortgagee contends that
*Nind's* case and the other authorities relied on by the landlord were
decided in ignorance of *Doe d. Wyatt v. Byron* (1845) 1 C.B. 623, on    C
which this court relied in the *United Dominions Trust* case [1993] 4 All
E.R. 310, further or alternatively, that those authorities, having depended
on the narrow definition of "lessee" in section 14(3) of the Conveyancing
Act 1881 (44 & 45 Vict. c. 41), have been overruled by the enactment of
section 146(5)(*b*).

These contentions make it necessary to consider the earlier legislation
with some care. The original predecessor of section 146(2) was section    D
14(2) of the Act of 1881, the two subsections being expressed in identical
terms. So far as material, section 14(3) provided that for the purposes of
that section: "a lessee includes an original or derivative under-lessee,
and the heirs, executors, administrators, and assigns of a lessee . . ."
Section 14(8), like section 146(11), provided that section 14 should not
affect the law relating to re-entry or forfeiture or relief in case of non-    E
payment of rent.

Before the enactment of section 14 of the Act of 1881 relief against
forfeiture could only be granted in respect of non-payment of rent. So
section 14 was novel in its effect. Moreover, the Act of 1881 contained no
provision equivalent to section 146(4). The original predecessor of that
provision, in nearly identical terms, was section 4 of the Conveyancing
and Law of Property Act 1892 (55 & 56 Vict. c. 13), whose long title    F
described it as an Act to amend the Act of 1881. It appears that section 4
was enacted because the view was taken that the definition of "lessee" in
section 14(3) did not include a lessee of a lessee. Thus in *Creswell v.*
*Davidson* (1887) 56 L.T. 811, 812, Kay J., after reading section 14(3), said:

> "I am not at all sure, therefore, that it can be said that a lessee
> includes an underlessee from an original lessee. By the words of the    G
> third subsection it includes an original or derivative underlessee, but
> apparently not a lessee of a lessee."

In *Burt v. Gray* [1891] 2 Q.B. 98 a Queen's Bench Divisional Court
concurred in the opinion of Kay J. that the effect of section 14(3) was not
to create any privity as between the original lessor and the underlessee
which did not exist before. It further held that "lessee" in section 14(3)    H
did not apply to an underlessee of a part of the demised property.

*Nind v. Nineteenth Century Building Society* [1894] 2 Q.B. 226 was a
case on section 2(1) of the Conveyancing and Law of Property Act 1892,

A   the predecessor of section 146(3) (recovery by the landlord of reasonable costs and expenses properly incurred in relation to breaches by the tenant). It was held that an underlessee was not, as between himself and the original lessor, a "lessee." The decision was based on the wording of section 14(3) of the Act of 1881. Following the views expressed in *Creswell v. Davidson*, 56 L.T. 811 and *Burt v. Gray* [1891] 2 Q.B. 98, this court held that "lessee" in section 2(1) of the Act of 1892 did not include a lessee of

B   a lessee, between whom and the head lessor there was no privity of contract or estate. Thus, Davey L.J., with whose judgment Lord Esher M.R. agreed, said [1894] 2 Q.B. 226, 232:

> "Now, it has been held by Kay L.J. in *Creswell v. Davidson*, 56 L.T. 811 and by a Divisional Court in *Burt v. Gray* [1891] 2 Q.B. 98, that the word 'lessee' in section 14 does not include the lessee of a lessee
>
> C   between whom and the lessor there is no privity of contract or tenure, and that the definition clause in subsection (3), which I need not read again, is to be construed only so as to make the provisions of the section applicable as between a derivative lessor and his lessee as well as between the first or head lessor and his lessee. On the whole, I agree with those decisions. I do not find any sufficient grounds for holding that by section 14 it was intended to create new statutory
>
> D   rights between an original lessor and a derivative lessee claiming under his lessee, between whom no privity of contract exists; and I think that the words of subsection (3) can have full effect given to them without assuming such an intention on the part of the legislature."

A similar view was expressed by A. L. Smith L.J., at p. 231.

E   As I have said, Mr. Neuberger relied on the decision in *Nind's* case for the proposition that an underlessee, including a mortgagee by subdemise, cannot obtain relief against forfeiture under section 146(2), but only under section 146(4). In seeking to controvert that proposition Mr. Driscoll, for the mortgagee, relied not only on the wider definition of "lessee" in section 146(5)(*b*) but also on the comments of the editors of successive editions of *Wolstenholme & Cherry's Conveyancing Statutes*. It is convenient

F   to deal with those comments first. In the 6th edition (1891), of which the principal editor was the eminent conveyancer Mr. E. P. Wolstenholme, the following note appeared under section 14(3) of the Act of 1881, at p. 52:

> "As to an underlessee's right to relief against the superior landlord, see *Burt v. Gray* [1892] 2 Q.B. 98; *Creswell v. Davidson*, 56 L.T. 811. The former case, in which the underlessee was tenant of part of the
>
> G   property only, decided he had none. But this seems a narrow construction of the section; and see *Doe v. Byron* (1845) 1 C.B. 623 (which was not cited in either *Burt v. Gray*, or *Creswell v. Davidson*), where it was held that an underlessee was a 'tenant' within the remedial clause against ejectment for non-payment of rent in [the Landlord and Tenant Act 1730 (4 Geo. 2, c. 28)], section 4."

H   In the 8th edition (1899), of which the editors included both Mr. Wolstenholme and Mr. Benjamin Cherry, the following note appeared under section 14(3) of the Act of 1881, at pp. 56–57:

> "An underlessee has under this section no right to relief against the superior landlord: *Nind v. Nineteenth Century Building Society*

[1894] 2 Q.B. 226—approving *Burt v. Gray; Creswell v. Davidson.* In    A
*Doe v. Byron* (which was not cited in [any] of the three last mentioned
cases), it was held that an underlessee was a 'tenant' within the
remedial clause against ejectment for non-payment of rent, in [the
Landlord and Tenant Act 1730], section 4; but see now [Conveyancing
and Law of Property Act 1892], section 4."

In the 11th edition (1925), vol. 1, of which Sir Benjamin Cherry, by then    B
the principal draftsman of the 1925 property legislation, was the principal
editor, the following note appeared under section 146(3), at p. 384:

"Lessee (subsection (5)(*b*)) includes an original or derivative
underlessee, overruling in this respect *Nind v. Nineteenth Century
Building Society.*"

It is clear that the definition of "lessee" in section 146(5)(*b*) of the Act    C
of 1925 is wider than that in section 14(3) of the Act of 1881. Instead of
including merely an original underlessee, a derivative underlessee and the
heirs, executors, administrators and assigns of a lessee, it now includes
"the persons deriving title under a lessee." Although Mr. Neuberger
submitted that those words were no more than an omnibus description of
the heirs, executors, administrators and assigns of a lessee, it is plain that    D
they cannot be so limited. They must include not only those who acquire
the lessee's own estate but also those who acquire a lesser estate by way
of subdemise. So much indeed is recognised in the application of
section 38 of the Supreme Court Act 1981, subsection (2) of which, by
referring to "a person deriving title under" the lessee allows an underlessee
to obtain relief in the lessor's action: see under *Cooper-Smith* above.

If therefore the definition of "lessee" in section 146(5)(*b*) is applied to    E
"the lessee" in section 146(2), it is seen that where a lessor is proceeding
to enforce a right of forfeiture under section 146(1) an underlessee, no less
than the lessee himself, may apply to the court for relief. It is no longer
permissible, as a matter of construction, to restrict the class of applicants
to those who are in privity of contract or estate with the lessor. Such a
construction would fail to give full effect to subsection (5)(*b*). In order to
arrive at this conclusion it is unnecessary to rely directly either on *United*    F
*Dominions Trust Ltd. v. Shellpoint Trustees Ltd.* [1993] 4 All E.R. 310 or
on the view of the editors of *Wolstenholme & Cherry's Conveyancing*
*Statutes,* 11th ed., that *Nind v. Nineteenth Century Building Society* [1894]
2 Q.B. 226 has been overruled. The conclusion has the incidental merit of
producing an identity amongst those who can obtain relief under section
146(2), section 38 of the Supreme Court Act 1981 and section 138 of the    G
County Courts Act 1984.

From his very great experience in these matters Mr. Neuberger has
told us that it has never before been suggested that an underlessee can
obtain relief under section 146(2). Had I not heard the full and careful
arguments on these appeals, I too would have assumed the suggestion to
be ill-founded. But on reflection I do not think it surprising that
Parliament should have brought about the result I now believe it has.    H

All relief against forfeiture stems from that granted by the old Court
of Chancery in cases of non-payment of rent. The practice of the court
and the effect of its decrees are described by Wigram V.-C. in *Bowser*

A  *v. Colby* (1841) 1 Hare 109, 126, 130 and by Sir Herbert Cozens-Hardy M.R. and Farwell L.J. in *Dendy v. Evans* [1910] 1 K.B. 263, 266–267, 270. In the case where the lessor had already taken possession at law, the court ordered him to grant a new lease to the lessee, the effect of which, in the words of Farwell L.J., at pp. 270–271, was that: "The forfeiture is stopped in limine; so that there is no question of any destruction of an estate which has to be called into existence again." In

B  such a case the remedy, the only remedy which could be granted, was the reinstatement of the lease. Equally, relief was granted to an underlessee by the reinstatement of the lease, and with it the underlease. Against that background it would not have been surprising if the draftsman of section 14 of the Act of 1881 had intended that an underlessee should be able to apply thereunder for relief in the lessor's action. The comments of

C  the editors of *Wolstenholme & Cherry's Conveyancing Statutes*, 6th ed., suggest that a section of informed opinion thought that that objective had been achieved. After the decision in *Nind's* case [1894] 2 Q.B. 226 had established that that was not the case, it would not have been surprising if the draftsman of section 146 of the Act of 1925 had intended to go one better. In my view he succeeded. I would therefore hold that in *Dennis* the mortgagee is entitled to apply for relief either

D  under section 146(2) or (4).

There remains the question whether the mortgagee ought to have been granted relief under section 146(4) instead of subsection (2). That was a question within the discretion of the judge. Although he dealt with the matter quite briefly, it is clear that Judge Willis exercised his discretion by deciding to proceed under subsection (2) and, moreover, that he was

E  entitled to do so. His omission to deal with the *Hare v. Elms* [1893] 1 Q.B. 604 point does not in my view invalidate his decision. The judge said:

"An applicant for relief has an alternative and in some cases might prefer to proceed under subsection (4) if he wanted a clear new lease in his own name rather than taking on the old lease. In my view therefore the *Dennis* case comes under section 146(2) which in the proper exercise [of] my discretion involves the payment of the arrears

F  of ground rent and service charges only with no mesne profits (subject to any argument about costs if these are not agreed)."

As a general point in cases of this kind, a judge might well think it inequitable that a landlord who had received a premium should receive in addition mesne profits vastly exceeding a rent whose minimal rate had been the very means of his acquiring the premium. As in the other three

G  cases, I would also dismiss the appeal in *Dennis*.

ROCH L.J.  I agree.

HENRY L.J.  I also agree.

*Appeals dismissed with costs.*
*Leave to appeal refused.*

H  *Solicitors: Malthouse Chevalier; George Ide Phillips, Bognor Regis; Denton Hall; Shoosmiths & Harrison, Northampton; Veale Wasbrough, Bristol.*

H. D.

08-13555-mg    Doc 33774-3    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
1528                                    Part 3    Pg 53 of 91
The Weekly Law Reports 18 November 1994

**A.18**

[1994]

[COURT OF APPEAL]                                                    A

*ESTATES GAZETTE LTD. v. BENJAMIN RESTAURANTS LTD.
AND ANOTHER

1994    May 9; 20                              Nourse, Hirst and Saville L.JJ.

B

*Landlord and Tenant—Assignment of lease or underletting—Liability of
assignee—Assignee's covenant to pay rent reserved by lease "at
time and in manner therein provided for"—Assignee further
assigning lease—Landlord claiming unpaid rent from assignee and
surety after further assignment—Whether assignee and surety liable
for arrears of rent accruing after assignment*

Under the terms of a lease made between the plaintiff as      C
landlord, the lessee and a surety, business premises were demised
for a term of 20 years from October 1976 at a yearly rental of
£4,500, subject to review. By a licence under seal in 1980 made
between the plaintiff, the lessee, the first defendant and the second
defendant as surety, the plaintiff consented to the assignment of
the lease to the first defendant. By clause 2 of that licence a
covenant in standard form provided for the first defendant to
"pay the rents reserved by the lease at the time and in the manner      D
therein provided for." By clause 3 the second defendant
covenanted that the first defendant would pay the rent as reserved
by the lease and observe and perform all the covenants on the
lessee's part contained in the lease. In 1983 the first defendant
lawfully assigned the remainder of the term of the lease, the
annual rent for the premises then being £34,000. By January 1993
five quarterly instalments of the rent were in arrear and the      E
plaintiff commenced proceedings for summary judgment under
R.S.C., Ord. 14 to recover the amounts due from the defendants.
The master gave judgment for the plaintiff for the amount
claimed. An appeal from that decision was upheld by the judge,
who gave the defendants unconditional leave to defend, holding
that the covenant in clause 2 of the licence was limited to the
period during which the lease had been vested in the first
defendant.                                                            F
On appeal by the plaintiff:—
*Held,* allowing the appeal, that the terms of the licence
imposed on the first defendant obligations to pay the rent reserved
by the lease at the time and in the manner therein provided for
and to observe and perform all the covenants on the lessee's part
contained in the lease; that the "lessee" clearly included the
person or persons in whom the term might from time to time be      G
vested and thus made the first defendant liable to pay the rent
during the whole of the term of the lease; and that the second
defendant, being obliged under the terms of the licence to ensure
that the first defendant would perform the obligations imposed
on it by clause 2 became liable for payment of the rent during the
whole of the term to the extent that it was not paid by the first
defendant (post, pp. 1532D–H, 1533B–C, 1534A–B, E–F).      H
Decision of Judge Zucker Q.C. sitting as a judge of the
Queen's Bench Division [1993] 4 All E.R. 367 reversed.

The following cases are referred to in the judgments:

*Johnsey Estates Ltd. v. Webb* [1990] 1 E.G.L.R. 80
*Lyons (J.) & Co. Ltd. v. Knowles* [1943] K.B. 366; [1943] 1 All E.R. 477, C.A.
*Waite v. Jennings* [1906] 2 K.B. 11, C.A.

**A.18**

1529

1 W.L.R.                Estates Gazette Ltd. v. Benjamin Restaurants Ltd. (C.A.)

A    The following additional cases were cited in argument:

*Athill, In re; Athill v. Athill* (1880) 16 Ch.D. 211, C.A.
*Equity & Law Life Assurance Society Plc. v. Bodfield Ltd.* (1987) 54 P. & C.R.
   290, C.A.
*Ford and Hill, In re* (1879) 10 Ch.D. 365, C.A.
*Hollis' Hospital Trustees and Hague's Contract, In re* [1899] 2 Ch. 540
*Howard v. Ducane* (1823) 1 T. & R. 81

B    *Kumar v. Dunning* [1989] Q.B. 193; [1987] 3 W.L.R. 1167; [1987] 2 All E.R.
   801, C.A.
*London and County (A. & D.) Ltd. v. Wilfred Sportsman Ltd.* [1971] Ch. 764;
   [1970] 3 W.L.R. 418; [1970] 2 All E.R. 600, C.A.
*Murphy v. Sawyer-Hoare* [1993] 2 E.G.L.R. 61
*Rosher, In re; Rosher v. Rosher* (1884) 26 Ch.D. 801
*Smith v. Doe* (1821) 2 Brod. & Bing. 473

C    *Swift (P. & A.) Investments v. Combined English Stores Group Plc.* [1989]
   A.C. 632; [1988] 3 W.L.R. 313; [1988] 2 All E.R. 885, H.L.(E.)
*Warnford Investments Ltd. v. Duckworth* [1979] Ch. 127; [1978] 2 W.L.R. 741;
   [1978] 2 All E.R. 517

INTERLOCUTORY APPEAL from Judge Zucker Q.C. sitting as a judge of
the Queen's Bench Division.

D    By a writ issued on 5 February 1993 the plaintiff, Estates Gazette Ltd.,
claimed the sum of £49,937 as arrears of rent and VAT thereon together
with interest against the first defendant, Benjamin Restaurants Ltd., and
the second defendant, Mr. Kenneth Benjamin, pursuant to a licence dated
6 October 1980 to assign the lease of business premises at 155, Wardour
Street, London, W.1, under which the first defendant covenanted to pay
E    the rent and observe and perform the covenants on the lessee's part and
the second defendant as surety covenanted in the event of any default to
pay and to make good to the plaintiff all losses. On 5 April 1993
Mr. Alan Cooper, sitting as a deputy master of the Queen's Bench
Division, gave judgment for the plaintiff under R.S.C., Ord. 14 for £27,645
plus VAT and interest. The defendants' appeal from that judgment was
allowed by the judge, who gave them unconditional leave to defend the
F    plaintiff's claim and refused the plaintiff leave to appeal.

By a notice dated 29 September 1993 the plaintiff appealed, pursuant
to leave granted by Hoffmann L.J. on 25 July 1993, on the grounds, inter
alia, that (1) the judge was wrong in his construction of the deed of
licence in finding that the obligations of the first defendants in clause 2
and therefore the obligations of the second defendant described in
clause 3(1) subsisted only during the period of the term created by the
G    lease remained vested in the first defendant; (2) the judge failed to have
regard to the fact that the provisions of clause 2 of the deed would be
otiose if his construction of the deed was correct and he failed to have
regard to the provisions of clause 3(2) of the licence which were consistent
only with the obligations of the defendants continuing after an assignment
of the lease by the first defendant; (3) the judge should have found that
H    on the true construction of the licence the obligations of the first defendant
described in clause 2 and therefore the obligation of the second defendant
described in clause 3(1) continued during the whole of the term granted
by the lease notwithstanding an assignment by the first defendant; (4) there
was no evidence on which the judge could conclude that a liability on the
first defendant's part to pay the rent reserved by the lease and to observe
and perform all the covenants on the lessee's part and the conditions
contained therein after the first defendants had assigned the term would

be "very onerous;" (5) in the premises the judge was wrong in applying a
presumption against the existence of a liability of the nature described in
ground (4); and (6) in the event that the judge properly found that a
liability of the nature described in ground (4) would be "very onerous,"
he was wrong to find that there therefore arose a presumption against the
existence of a liability of the nature described in ground (4).

The facts are stated in the judgment of Nourse L.J.

*David Neuberger Q.C.* and *Edward Denehan* for the plaintiff.
*Norman Primost* for the defendants.

*Cur. adv. vult.*

20 May.   The following judgments were handed down.

NOURSE L.J.   The question for decision on this appeal arises out of a
covenant in a licence to assign a lease of business premises. The assignee
covenanted with the landlord to pay the rents reserved by the lease at the
time and in manner therein provided for and to observe and perform
the covenants on the lessee's part and the conditions therein contained. Is
the covenant limited in point of time to the period during which the lease
is vested in the assignee or does it extend to the whole of the term?

By a lease dated 17 January 1977 and made between the plaintiff,
Estates Gazette Ltd., as lessor of the first part, Sandwich Scene Ltd. as
lessee of the second part and Monty Bloom as surety of the third part, the
plaintiff demised to Sandwich Scene the ground floor shop known as
155, Wardour Street, London, W.1, for a term of 20 years from 6 October
1976. Sandwich Scene was called "the lessee," which expression, where the
context so admitted, was to include the person or persons in whom the
term might from time to time be vested. Clause 1 of the lease contained a
reddendum in standard form for the payment "during the said term hereby
granted" of a yearly rent of £4,500 (subject to review) by equal quarterly
payments in advance on the four usual quarter days in each year. Clause 2
contained covenants by the lessee "for itself and its successors in title and
assigns." The first part of clause 2(1) was in these terms: "To pay the rent
hereinbefore reserved at the times and in manner aforesaid . . ."
Clause 3(c) contained provisions for the rent to be reviewed at the end of
the fourth, eighth, twelfth and sixteenth years of the term. By clause 5(1)
Mr. Bloom gave a surety's covenant in standard form.

By a licence under seal dated 6 October 1980 and made between the
plaintiff of the first part, Sandwich Scene of the second part, the first
defendant, Benjamin Restaurants Ltd. (called "the assignee"), of the third
part and the second defendant, Kenneth Benjamin, of the fourth part, the
plaintiff, at the request of the other parties and in consideration of the
covenants on the part of the defendants thereinafter contained, granted
Sandwich Scene licence to assign the lease to the first defendant. Clause 2
of the licence was in these terms:

"In consideration of the licence hereinbefore contained having
been granted the assignee hereby covenants with the landlord to pay
the rents reserved by the lease at the time and in manner therein
provided for and to observe and perform all the covenants on the
lessee's part and the conditions therein contained."

A    Clause 3(1) contained a covenant by the second defendant with the plaintiff:

"That the assignee will pay the rents reserved by the lease at the time and in manner therein provided for and will observe and perform all the covenants on the lessee's part and the conditions therein contained . . ."

B    The evidence as to what happened after the execution of the licence is, to say the least, sketchy. The second defendant has said that the first defendant took an assignment of the lease on or about 7 October 1980 and remained the lessee thereunder until 25 April 1983, when it was assigned, so we were told, to a company called I.Y. Caterers Ltd. On

C    15 May 1989 the plaintiff and that company signed a memorandum recording that they had agreed that the rent payable as from 6 October 1988 would be £34,000 per year, or, with VAT, £9,987·50 per quarter, subject to a proviso which can be ignored for present purposes. We were also told that on 9 January 1991 the lease was assigned by I.Y. Caterers to a Mr. Keizner.

D    On 27 January 1993 solicitors acting for the plaintiff wrote letters to each of the defendants informing them that the rent payable under the lease was in arrear in respect of the five quarterly instalments due between 29 September 1991 and 29 September 1992, the total sum outstanding being £49,937·50 inclusive of VAT. Demands for payment by 10 February 1993 were made, in the absence of which it was said that proceedings for recovery would be commenced forthwith, together with claims for interest

E    amounting to £6,250 approximately and costs.

It appears from the foregoing that the defaulting assignee was Mr. Keizner and not I.Y. Caterers. We were told that Mr. Keizner is a bankrupt, that the original tenant, Sandwich Scene, is in liquidation and that the original surety, Mr. Bloom, cannot be found. For reasons into which I need not go it was not possible for us to be told whether, on the

F    assignment by the first defendant to I.Y. Caterers, that company and its moving spirit, Mr. Isaac Younis, entered into covenants with the plaintiff similar to those given by the defendants, or, if they did, whether demands were made on them and, if so, with what result. Although these facts are not material to our decision, they may be material to the defendants' rights to recover against third parties if they themselves are liable to the

G    plaintiff. It is unsatisfactory that none of them has been deposed to in evidence.

A writ was issued by the plaintiff against the defendants in the Queen's Bench Division on 5 February 1993, but the amount claimed for arrears and interest was later reduced from £56,402·01 to £40,000·24 by the crediting of a deposit lodged "by the present lessee," presumably

H    Mr. Keizner. The plaintiff took proceedings under R.S.C., Ord. 14 and on 5 April 1993 Mr. Alan Cooper sitting as a deputy master gave judgment for the amount claimed and costs. The defendants then appealed to the judge. Their appeal came before Judge Zucker Q.C., sitting as a judge of the High Court in the Queen's Bench Division, who, on 25 May 1993, allowed it and gave them unconditional leave to defend. He refused the plaintiff leave to appeal, but on 25 July 1993 leave was granted by Hoffmann L.J.

Judge Zucker's judgment is reported at [1993] 4 All E.R. 367. He held    A
that the covenant in clause 2 of the licence was limited to the period
during which the lease was vested in the first defendant. Although that
was enough to dispose of the matter in favour of the defendants, the judge
dealt with two further questions in case the matter should go further.
First, he rejected the defendants' argument that the plaintiff's failure to
provide a VAT invoice had made the demand for arrears of rent illegal.    B
That point has not been revived on this appeal. Secondly, he declined to
award the plaintiff interest under section 35A(1) of the Supreme Court
Act 1981 before 27 January 1993, the date on which its solicitors wrote to
the defendants demanding payment. That point is still in issue.

The judge stated his decision on the question of construction, at p. 371:

"In my judgment, although clause 2 of the licence to assign in this    C
case provides that the assignee is to pay the rents reserved by the
lease at the time and in manner therein provided for, it does not
make clear whether that obligation is to subsist only while the
assignee holds the term or after he has parted with it. As the latter
condition would impose a very onerous obligation upon the assignee
it can only be imposed by words which clearly make provision for it.    D
In my judgment no such words are used in this case and it follows
that the assignee is not liable for rent becoming due after further
assignment by him."

Two obligations were assumed by the first defendant in clause 2 of the
licence. The first was to pay the rents reserved by the lease at the time and    E
in manner therein provided for. The rents reserved by the lease were those
for whose payment provision was made by the reddendum. The reddendum
provided for the payment "during the said term hereby granted" of the
yearly rent of £4,500 (subject to review). Thus the first defendant became
bound to pay the rents payable during the whole of the term.

The second obligation assumed by the first defendant was to observe    F
and perform all the covenants on the lessee's part and the conditions
contained in the lease. It is clear that "the lessee" here includes the person
or persons in whom the term may from time to time be vested. One of the
lessee's covenants is that contained in clause 2(1): "To pay the rent
hereinbefore reserved at the times and in manner aforesaid." So, by an
identical process of construction, the first defendant became doubly bound    G
to pay the rents payable during the whole of the term.

Shortly stated, the obligation assumed by the second defendant in
clause 3(1) of the licence was to ensure that the first defendant would
perform the obligations imposed on it by clause 2. In all material respects
the wording of the two provisions was identical. So the second defendant
became bound to pay the rents payable during the whole of the term, if
and in so far as they were not paid by the first defendant.    H

Mr. Neuberger, for the plaintiff, sought to support the clear meaning
and effect of clauses 2 and 3(1) of the licence by making a number of
additional points. In particular, he argued that, if they had been intended
to have the limited effect favoured by the judge, clause 2 would have been
redundant, since the first defendant, as an assignee, would in any event
have been subject to the lessee's obligations while the lease was vested in

A    it. That was the point made by Hoffmann L.J. when giving brief reasons for granting leave to appeal. In spite of an argument to the contrary advanced by Mr. Primost on behalf of the defendants, I agree that clause 2 would for all practical purposes have been redundant. However, the force of the point is significantly reduced by the advantage achieved by the plaintiff in having the second defendant as a new and additional surety during the period that the lease was vested in the first defendant.

B    In my view none of the additional points relied on by Mr. Neuberger is needed in order to confirm the clear meaning and effect of clauses 2 and 3(1) of the licence, an effect to which the law takes no objection: see *J. Lyons & Co. Ltd. v. Knowles* [1943] K.B. 366. On general principles of construction, they have the effect for which the plaintiff contends. It is only by the application of some special principle that their effect can be

C    modified. Mr. Primost sought to rely on three such principles.

First, adopting the view of the judge, Mr. Primost submitted that the very onerous obligation imposed on the first defendant by clause 2 of the licence could only have been imposed by words which clearly made provision for it. He relied on a dictum of Fletcher Moulton L.J. in *Waite v. Jennings* [1906] 2 K.B. 11, 18, where a covenant by an assignee to pay the rent and perform the covenants of a lease during the whole of the

D    residue of the term was described as an onerous condition on the assignee and a benefit to the lessor. An onerous condition is one which imposes a burden that would not be there without it. There is no special principle of construction which applies to the imposition of such a condition. If, as here, the words are clear, the burden is imposed.

Secondly, Mr. Primost submitted that the covenant by the second

E    defendant in clause 3(1) of the licence, being one entered into by a surety, must be given the strictest possible construction, a construction which would likewise be applied to clause 2. For that proposition he relied on some observations of Millett J. in *Johnsey Estates Ltd. v. Webb* [1990] 1 E.G.L.R. 80, 82, which must, however, be placed in their full context:

    "Lastly it was submitted on behalf of the defendants that if there

F    is an ambiguity or doubt upon the meaning of the suretyship covenant I should construe it in favour of the defendants and against the plaintiffs. Certainly it is true that neither equity nor law will put a construction on a contract of guarantee which results in imposing on the surety any greater obligation than that which on the strictest construction of the instrument he must be said expressly to have undertaken: see *Eastern Counties Building Society v. Russell* [1947]

G    1 All E.R. 500. On the other hand, the words have to be fairly construed in their context and in accordance with their proper meaning without in any way favouring the guarantor, who is not placed in any more favourable position in this regard than any other contracting party. The so-called rule of construction is very much a matter of last resort."

H    Here there is no ambiguity or doubt in the meaning of clauses 2 and 3(1) and the principle relied on by Mr. Primost does not come into play.

Thirdly, Mr. Primost sought to rely on the practice of conveyancers. He submitted that the court should take notice of the invariable practice of conveyancers, when drafting a licence containing a covenant intended to make the assignee liable throughout the term, to include words such as "during the residue of the term." He referred us to precedents in that form in *Butterworth's Encyclopaedia of Forms and Precedents*, 5th ed. (1992),

1534
Nourse L.J.        Estates Gazette Ltd. v. Benjamin Restaurants Ltd. (C.A.)        [1994]

p. 377, and *Kelly's Draftsman*, 15th ed. (1986), p. 437. While certainly A
accepting that it must be the best practice to include the words suggested
by Mr. Primost, I doubt whether the sources he referred to were enough
to establish an invariable practice to that effect. In any event I am unable
to see how even an invariable practice to adopt a particular formula for a
particular provision can affect the construction of a provision in another
form whose effect is neither ambiguous nor doubtful.

I have therefore come to the conclusion, with regret, that none of B
Mr. Primost's three principal submissions is made out. He raised a number
of subsidiary points, to which specific reference need not be made. The
question of construction must be resolved in favour of the plaintiff.

That makes it necessary to deal with the question of interest. In both
courts below interest was claimed from 25 December 1991 onwards, on
the footing, so it was claimed, that it was the first defendant's duty to seek C
out the plaintiff in order to pay the rent. That claim evidently impressed
the deputy master, but was rejected by the judge, who said [1993] 4 All
E.R. 367, 372:

> "In my judgment that is a wholly unrealistic approach to the
> circumstances of this case. The undisputed facts are that the first
> defendant assigned the term on 25 April 1983, and he knew nothing D
> about any arrears of rent until the letter of 27 January 1993. It would
> be inequitable in those circumstances if either he or his surety were
> required to pay interest going back to a period when they knew
> nothing at all about outstanding arrears of rent."

The judge added that if he had awarded interest, he would have awarded
it at the rate of 12·5 per cent. per annum from 27 January 1993.

This was a question for the discretion of the judge. Even if I had not E
thought that his decision was correct, it would not have been one with
which this court could interfere. The amount of the judgment entered by
the deputy master must therefore be amended to allow for a reduction in
interest. Subject to that point and to any question as to the rate of
interest, I would allow the appeal and restore the judgment.

F

HIRST L.J.    I agree.

SAVILLE L.J.    I also agree.

> *Appeal allowed with costs.*
> *Master's order on plaintiff's claim*
>     *restored.*
> *Leave to appeal refused.*                                    G

*Solicitors: Manches & Co., Oxford; Peter Gillis & Co.*

. H. D.

H

pay 30*l.* per cent. The only reason for considering that this was a penalty was that the 6*d.* per pound became payable for non-payment by one day of any month, but he did not think that that circumstance turned the fine into a penalty. This question was considered by the late Master of the Rolls in the case of *Parker* v. *Butcher* (Law Rep. 3 Eq. 762), where one shilling per pound per month was held not to be unreasonable; and as he could not distinguish between that case and the present, he should over-rule the exception to the certificate.

Solicitors: *Clarke, Woodcock, & Ryland,* agents for *T. A. & J. Grundy & Co.,* Bury, Lancashire; *Barnard & Co.* ; *Lewis, Munns, & Longden.*

[1997] (WLR 1648

V.-C. H.        *Re* FINCH & JUKES.        July 31.

*Vendor and Purchaser—Bond to secure Parliamentary Deposit —Crown Debt—Principal and Surety—Discharge of Surety.*

This was a summons under the Vendors and Purchasers Act. In answer to the usual requisition on the title as to whether there were any incumbrances affecting the property, the vendor had stated that the person through whom he claimed had become surety on one of the usual bonds given by a railway company, in order to enable them to take out the money required to be deposited by the standing orders of the Houses of Parliament, the bond being made in the usual way with the Crown, and conditioned to be void in one event—in case the railway was opened for traffic.

A subsequent Act had been passed making some deviations in the proposed line, and abandoning some part of the under-taking, and also authorizing an increase in the capital. The deposit required by this Act was based upon the difference in the amount of the capital required by the two Acts.

The vendor claimed that the position of the surety was so changed by the passing of the second Act that he was dis-charged from his liability on the bond.

*Finch,* for the vendor.

*W. E. M. Tomlinson,* for the purchaser, contended, first, that the bond was a substitute for the parliamentary deposit, and could only be withdrawn if the circumstances were such as would have entitled the parties who paid the money in to have withdrawn it if the bond had not been substituted for it ; secondly, that all the authorities shewed that in order to discharge a surety there must be an arrangement between the creditor and the principal debtor. Here there was no such arrangement, the mere ministerial act of the Crown in assenting to the passing of the second Act not being such; thirdly, that it was not compe-tent to the incumbrancer to aver that something had been done behind his back by which he had been discharged ; all the cases were those of attempts by the creditor to enforce his rights against the surety, and being met by the defence that a transac-tion had taken place between the creditor and the principal by which the rights of the surety were affected ; fourthly, that the title was not one which the Court would enforce upon a pur-chaser, it not being a simple question of law.

THE VICE-CHANCELLOR held that the position of the surety had been so altered that he must be treated as being discharged. It was not a question of the intention of Parliament, but of the rights of the parties to the particular instrument, and though it was true that all the authorities were cases of arrangement between the principal debtor and the creditor, the principle was a general one, applying to all cases where the position of a surety was changed by whatever means. He also held that the question was proper to be decided as between vendor and purchaser, and that it had been properly brought under this Act. But the case was a proper one to be brought before the Court, and each party must pay his own costs.

Solicitors: *Gregory, Rowcliffes, & Rawle.*

V.-C. H.        *In re* PINTO SILVER MINING COMPANY.        Aug. 1.

*Articles of Association—Bond Creditors—Voluntary Winding-up —Sale to New Company—Rights of Creditors of Old Company —Companies Act, 1862, ss. 142, 143—Compulsory Order.*

This was a petition for the winding up of this company. Under the articles of association the directors, being authorized to raise loans upon mortgage of the company's property, borrowed money on bonds, and by deed dated in July, 1872, secured the repayment of them by a charge upon such property, which was transferred to two trustees in trust for sale. A deed of the same date provided that a sale was not to take place until directed by five of those who advanced moneys on the bonds. The petitioner advanced 1000*l.,* and thereby became a creditor of the company. The directors by the articles of association were authorized to enter into any contract for amalgamating with any other company, or for selling or transferring the effects of the company for shares or otherwise.

In January, 1873, the shareholders resolved that the company should be wound up voluntarily, and the two liquidators ap-pointed were instructed to sell for shares the company's property " subject to the existing debt," and that resolution was confirmed in February, 1873. The liquidators in March, 1873, sold the property to another company for 91,000*l.,* to be paid in bonds, paid-up shares, and 5*l.* shares with a liability of 10*s.* each, to be called up if required. The agreement of sale provided that in case any of the shareholders, mortgagees, or creditors of the Pinto Company " should neglect or refuse to accept " his allot-ment of bonds or shares in the new company the liquidators should transfer his interest in such proportion of bonds or shares back again to the new company without incurring any liability in respect thereof; that immediately the agent of the new company should certify that the title was good, the new company should complete the purchase and deliver over the bonds and certificates of shares to the Pinto Company, and the new company was to have possession of the property. The new company was to take over all the property and discharge all the liabilities of the Pinto Company ; and the bonds and shares were to be sufficient to discharge such liabilities, and the new company was to discharge any further liabilities of the Pinto Company.

A meeting of mortgagees was called for the 14th of July, 1873, and those who attended approved of the proposed sale to the new company. The sale to the new company did not provide for the " existing mortgage debt " and other liabilities of the company, but the conveyance was the ordinary one of " free from incumbrances."

The liquidators on the 6th of January, 1874, presented their final report, shewing that they had handed over the shares in the Pinto Company to the new company. But the report did not deal with, and in no way affected, the mortgage creditors of the Pinto company. The directors made a return to the registrar on the 12th of January 1874, and they contended that on the 12th of April the Pinto Company became dissolved by force of the 142nd and 143rd sections of the Act of 1862.

*Karslake, Q.C.,* and *Latham,* for the petitioner.

*Dickinson, Q.C.,* and *P. Beale,* for shareholders, supported.

*W. Pearson, Q.C.,* and *Pugh,* opposed, on the ground that the petitioner became a creditor of the new company.

*Ingle Joyce,* for other parties.

THE VICE-CHANCELLOR held that it had not been made out that the petitioner had become a creditor of the new company, but on the contrary that he neglected to accept his proportion of bonds, and therefore he retained his rights as creditor of the Pinto Company. He was of opinion that the report and account of the liquidators in no way affected the mortgage creditors who had not bonds of the new company sent to them, and that the Pinto Company, so far as regarded the petitioner and other unsatisfied creditors, had not been dissolved, as the affairs of the company had not been fully wound up when the meeting was held and the return made on the 6th of

212                                    THE WEEKLY NOTES.                        [AUG. 11, 1877.

January, 1874, and that therefore, there must be the usual winding-up order.

Solicitors: *J. Wilson Heritage ; J. Vernon Musgrave ; Peckham, Maitland, & Peckham ; Wansey & Bowen.*

---

V.-C. H.                *In re* BATTY'S TRUSTS.                Aug. 3.

*Lands Clauses Consolidation Act, 1845, Payment of Purchase-moneys into Court under—Petition by Beneficiaries, Affidavit in support of, verifying Title, by surviving Trustee of Will—Consolidated Orders* xxxiv. r. 3.

The London School Board had paid into Court, under the Lands Clauses Consolidation Act, 1845, certain purchase-moneys to the credit of this matter, and this was a petition by the ten persons entitled under a will to share in the fund, for payment of it to them. An affidavit verifying their title had been made by the surviving trustee of the will, but no affidavit "not only verifying their title, but also stating that they are not aware of any right in any other person or of any claim made by any other person " to the fund, had been made by any of the petitioners as required by Consolidated Orders xxxiv. r. 3.

*Simmonds,* for the petitioners, referred to *In re Halsey's Estate* (*Weekly Notes,* 1870, p. 68), before Vice-Chancellor Malins.

THE VICE-CHANCELLOR was of opinion that the affidavit of the trustee was sufficient, and made the order for payment of the fund to the petitioners.

Solicitors: *Bridger & Collins.*

---

Fry, J.                                                                Aug. 6.

WEST CUMBERLAND IRON AND STEEL COMPANY *v.* KENYON.

*Mine Owner—Water discharged into neighbouring Mine—Negligence—Ordinary Course of Working—Injunction—Damages.*

This was an action by mine owners to restrain the defendants, who were neighbouring mine owners, from allowing water to flow through a bore-hole, which they had made in a shaft which they had recently sunk, into the plaintiff's workings. The plaintiffs also claimed damages. The plaintiffs alleged that the defendants had made the bore-hole for the sole purpose of getting rid of the water, and not in the ordinary and proper course of working. The defendants said that they had made the hole in the ordinary and proper course of working. The water in question did not flow directly from the bore-hole into the plaintiffs' workings, but into some old unused workings of the defendants, and thence found its way by natural percolation into the plaintiffs' mines. The defendants alleged that if they had not made the bore-hole, the water would nevertheless have found its way by natural percolation into the plaintiffs' mines, and the defendants on this ground contended that they were not liable for any damage which might have been done to the plaintiffs.

*North,* Q.C., and *Ingle Joyce,* for the plaintiffs.

*Ince,* Q.C. *Cookson,* Q.C., and *Plummer,* for the defendants.

FRY, J., held, upon the evidence, that the defendants had made the bore-hole, not in the ordinary and proper course of working, but simply in order to get rid of the water. His Lordship was also of opinion on the evidence that it was highly probable that at any rate a great part of the water which came through the bore-hole would have found its way, if the bore-hole had not been made, into the plaintiffs' mine. But this would not excuse the defendants. They were entitled to appropriate all the water which would naturally flow into the shaft which they had sunk. But having thus acquired a property in the water, they must bear the burden as well as take the benefit. They were responsible for the subsequent course of the water, and could not be allowed to cast it on their neighbour's land to his injury. The plaintiffs had proved substantial injury in the increased amount of pumping required in their mine. An injunction must be granted to restrain the defendants from permitting the bore-hole to remain open, and there must be an inquiry as to damages, the measure of damages being the increased cost of pumping in the plaintiffs' mine during the period in which the bore-hole was open, and the plaintiffs must have the costs of the action.

Solicitors: *Bischoff, Bompas, & Bischoff ; Speechley, Mumford, & Co.*

---

## BANKRUPTCY.

---

C. J. B.                        *In re* HIND.                        Aug. 6.

*Ex parte* SHARP.

*Liquidation—Trustee—Default in Payment of Sum ordered to be paid—Order to commit—Form of Order—Debtors Act, 1869* (32 & 33 *Vict.* c. 62), s. 4, *sub-s.* 3.

At a first meeting of creditors under a liquidation, Robert Sharp, who had been appointed receiver, was appointed trustee ; and at the same meeting Edward Shippey was appointed solicitor to the trustee. Costs having been incurred by the solicitor, which were taxed at 68*l.* 17*s.* 2*d.,* Sharp paid 50*l.* on account. Application having been made for payment of the balance, and of a further sum of taxed costs, amounting to 78*l.* 5*s.* 2*d.,* but without result, an order was, on the 20th of April, 1877, made, on the application of the solicitor, that on or before the 26th of April, Sharp should be at liberty to have the taxation of the first bill of costs reviewed, he paying the costs of such review ; and if he did review, then that he should pay such sum as should become due, together with the 78*l.* 5*s.* 2*d.,* "*and the costs of the motion.*"

The taxation of the first bill of costs was accordingly reviewed, and 1*l.* 12*s.* 8*d.* taxed off, leaving it at 65*l.* 5*s.* 8*d.*

No further payment being made, and evidence having been filed to shew that he had been in receipt of various moneys, a motion was made on behalf of the solicitor to commit Sharp for contempt. An affidavit was filed by Sharp with the object of shewing that he had not "in his possession, or under his control," the means of obeying the order, but the county court judge on the 9th of July made the order to commit.

The order recited the order of the 20th of April, 1877, including the words italicized above, "and the costs of the motion," and proceeded to adjudge Sharp guilty of a contempt "by reason of his disobedience of the said order," and to order that he be committed.

This order was now appealed from.

*Sidney Woolf,* for the appellant:—The order is defective in several particulars. First, the order is absolute; not " until he shall sooner pay." Then no time was, by the order of the 20th of April, fixed for payment. [THE CHIEF JUDGE:—You have waived that]. On the evidence, there has been no disobedience, the appellant never having been in funds; and, at all events, he has never had "the costs of the motion" in his possession or under his control (Debtors Act, s. 4, sub-s. 3).

*H. Humphreys,* for the respondent, the solicitor:—The appellant has had abundant means to satisfy the order. If he objects to the order of the 10th of April, he should have appealed from it. He is clearly in contempt.

THE CHIEF JUDGE was of opinion that the appellant was in contempt, but thought the order wrong in form, so far as it recited the non-payment of the costs of the motion as one of the grounds of contempt. There was no proof that the trustee ever had in his hands sufficient to pay these costs. Non-payment of the costs of a motion was not the subject of committal. The order must be discharged, with liberty to the respondent to apply for a fresh order as he might be advised.

Solicitors: *Lewis & Indermaur,* for *E. C. Blakeway,* Manchester ; *Johnson & Weatherall* for *Edward Shippey & Field,* Manchester.

FRANKLIN *v.* CARTER 737

[749] TINDAL, C. J.   I am of opinion that the replication in question is bad, as professing to answer the whole of the plea to the last count, whereas, in ordinary understanding, it must be taken to answer part only ; for, it is impossible to say that many of the articles referred to in the sixth count, are either beasts of the plough or implements of husbandry (a).   As, therefore, the plea to that count is unanswered, there must be judgment for the defendant thereon.

The rest of the court concurred.

Judgment for the defendant.

## [750]   FRANKLIN *v.* CARTER.   May 28, 1845.

[S. C. 3 D. & L. 213 ;  14 L. J. C. P. 241 ;  9 Jur. 874.   Referred to, *Cumming* v. *Bedborough*, 1846, 15 Mee. & W. 441.   Applied, *Skinner* v. *Hunt*, [1904] 2 K. B. 462.]

To covenant for rent under an indenture, the defendant pleaded, as to 2l. 0s. 10d., that, on the 5th of April, 1843, before any part of the rent became due, 2l. 0s. 10d., being at the rate of 7d. for every 20s. of the annual value, was duly, and according to the form of the statute, assessed on the premises, in respect of the property thereof, for the year ensuing ; that, on the 28th of August, 1844, before the commencement of the suit, the defendant, then being occupier and tenant, paid to T. C., then being collector, the 2l. 0s. 10d. ; and that the defendant had never made any payment on account of the rent since the payment of the 2l. 0s. 10d. :—Held, on general demurrer, that the plea sufficiently shewed that the assessment was made under the property and income tax act, 5 & 6 Vict. c. 35, and that it answered that part of the demand to which it was pleaded.—The defendant also pleaded, in bar of the further maintenance of action, as to 52l. 10s., other parcel of the rent, that the plaintiff held the premises on lease from A., subject to a proviso for re-entry by A. for breach of covenant ; that on the 1st of January, 1844, before any part of that rent became due, the plaintiff incurred a forfeiture by breach of covenant ; that, in consequence of such forfeiture, A. recovered in ejectment against the plaintiff ; and that the defendant afterwards paid A. 52l. 10s., for the profits from the day of the demise in the declaration (1st of January, 1844) :—Held, that the plea disclosed a substantial answer as to the 52l. 10s., argumentativeness not being pointed out as a ground of demurrer.

Covenant, for four quarters' rent, the last quarter due on the 29th of September, 1844, under an indenture of lease reserving 70l. a year " free from all rates, taxes, charges, duties, and assessments."

First plea—as to 2l. 0s. 10d., parcel of the 70l. in the declaration mentioned as due and in arrear to the plaintiff—that, after the making of the indenture, and whilst the defendant held the said tenements thereunder as tenant thereof to the plaintiff, and whilst the plaintiff was entitled to the annual sum of 70l. reserved by the said

declaration, the plaintiff would only have been bound to prove the conversion of some articles, or of some one article, mentioned in the last count of the declaration.   The defendant in this case, appears, in effect, to say—" I admit having taken goods falling within some one or more of the descriptions contained in the last count of your declaration, and to the extent of that admission, I justify the taking as a distress." The plaintiff replies that the goods and chattels in the last count mentioned (that is, some goods coming within some one or more of the descriptions in the last count), were beasts of the plough and implements of husbandry.

The question, whether the replication is good or bad, appears to depend upon whether the allegations in the last count bound the plaintiff to prove that some articles coming within each of the descriptions in that count, had been taken.   If not, it is difficult to see why the replication does not afford a complete answer to the plea. If the insertion of the books, bedsteads, &c., though under a videlicet, had pledged the plaintiff to shew that some books and some bedsteads had been converted by the defendant to his own use, the replication would have been bad on the ground of departure.

(a) If the replication is to be construed as alleging that books and bedsteads are implements of husbandry, is the truth of that allegation a question of law, for the court, or of fact, for a jury ?

FRANKLIN *v.* CARTER

indenture, and before any part of the rent in the declaration mentioned had accrued due, to wit, on the 5th of April, 1843, a large sum of money, to wit, 2l. 0s. 10d., being at and after the rate of 7d. for every 20s. of the annual value, to wit, 70l., of the said messuage, &c., was duly, and according to the form of the statute in such case made, assessed on the said messuage, &c., in respect of the property thereof, for the year next [751] ensuing, which sum of 2l. 0s. 10d. was payable by four quarterly instalments, that is to say, on the 20th of June, &c., then next ensuing; that afterwards, and before the commencement of the suit, to wit, on the 28th of August, 1844, the defendant, then being the occupier and tenant of the said messuage, &c., paid to Thomas Casey, then being the collector of the said tax, the said sum of 2l. 0s. 10d.; which sum of 2l. 0s. 10d. so paid by the defendant, was and is 7d. for every 20s. of the said sum of 70l., the annual rent payable by the defendant to the plaintiff, under and by virtue of the said indenture, for the said messuage, &c.; and that the defendant had never made any payment to the plaintiff on account of the rent of the said messuage, &c., since the payment of the said sum of 2l. 0s. 10d.—verification.

To this plea there was a general demurrer.

Second plea—as to 52l. 10s., parcel of the 70l. in the declaration mentioned, being the rent which was alleged to have accrued due on the 25th of March, the 24th of June, and the 29th of September, 1844, and all damages and causes of action in respect thereof—that the plaintiff ought not further to maintain his action thereof, because, before and at the time of making the indenture in the declaration mentioned, to wit, on the 14th of August, 1820, R. J. Smith was lawfully possessed, for a term of years, whereof upwards of fifty-three and a half years, wanting twenty-one days, from the 24th of June, were to come and unexpired, of and in the said messuage, &c., in the declaration mentioned, and, being so seised thereof, before making the said indenture, to wit, on the said 14th of August, in the year last aforesaid, by a certain indenture then made between the said R. J. Smith of the one part, and the plaintiff of the other part, the said R. J. Smith did demise and lease the said messuage, &c., with the appurtenances, in the declaration mentioned, unto the plaintiff, his executors, ad-[752]-ministrators, and assigns: to have and to hold the same unto the plaintiff, his executors, &c., from the 24th of June then last, for and during the term of fifty-three years and a half, wanting twenty-one days, from thence next ensuing; and the plaintiff did in and by the last-mentioned indenture, amongst other things, covenant with the said R. J. Smith, that he the said R. J. Smith, his heirs, executors, administrators, and assigns, should and would, from time to time, and at all times during the term thereby granted, at his and their own proper costs and charges, well and sufficiently repair, uphold, &c.; and also that the plaintiff, his executors, &c., should and would, from time to time, and at all times during the said term thereby granted, insure or cause to be insured the said messuage, &c., and every part thereof, in the Albion Fire Office, in London, to the full amount of the value thereof; and that, in and by the last-mentioned indenture it was and is afterwards provided, and the last-mentioned indenture was declared to be upon the express condition, that, if the plaintiff, his executors, &c., should not in and by all things well and sufficiently observe, perform, fulfil, and keep all and singular the covenants, clauses, articles, conditions, and agreements in the said last-mentioned indenture before contained, which on his and their part and behalf were and ought to be observed, &c., according to the true intent and meaning of the said indenture, then and from thenceforth, and in either of the said cases, it should and might be lawful for the said R. J. Smith, into and upon the said messuage, &c., wholly to re-enter, and the same to have again, retain, repossess, and enjoy as in his and their first and former estate, and the plaintiff, his executors, &c., and all other occupiers, thereout and thence utterly to expel, put out, and amove, the same indenture, or anything thereinbefore contained, to the contrary in any wise notwithstanding: that, after the [753] making of the last-mentioned indenture, and before the making of the indenture in the declaration mentioned, to wit, on the 14th of August, 1820, Franklin entered into the said messuage, &c., and became and was possessed thereof under and by virtue of the said indenture between the said R. J. Smith and Franklin, for the term by the same indenture granted, and was so thereof possessed at the time of the making of the indenture in the declaration mentioned; that afterwards, and before any part of the rent in the introductory part of that plea mentioned, accrued due and in arrear, to wit, on the 1st of January, 1844, Franklin did not nor would, on the day and year last aforesaid, insure or cause to be

insured the said messuage, &c., in the said fire-office, but wholly neglected so to do, and the same was, on the day and year last aforesaid, wholly uninsured in the said fire-office, contrary to the form and effect of the said covenant in that behalf : that, by means of the premises, after the making of the said indenture, and before any part of the said sum of 52l. 10s., parcel, &c., became due and payable, to wit, on the 1st of January, 1844, the estate, term, and interest of Franklin in the demised messuage became and were ended, forfeited, and determined (a)[1] : that, by reason and in consequence of the said forfeiture, John Doe, on the demise of the said R. J. Smith, afterwards, to wit, in Hilary term, 7 Vict., commenced an action of trespass and ejectment in the court of Queen's Bench at Westminster : that to this action (b) Franklin afterwards, in Easter term, in the year last aforesaid, duly appeared in the said court to defend the same as the landlord of the said messuage, &c., and pleaded thereto (b) ; that thereupon, to wit, in **[754]** Hilary term, in the year last aforesaid, the said John Doe duly declared in the said court, in the said action, against Franklin, for that the said R. J. Smith, on the 1st of January, 1844, being a day before any part of the said sum of 52l. 10s., parcel, &c., became payable, demised to John Doe, who entered and was ejected by Franklin, &c. : and that such proceedings were thereupon had, &c., that afterwards, and after the commencement of this suit, to wit, on the 28th of January, in Hilary term, 8 Vict., it was considered by the said court, that the said John Doe should recover against Franklin his said term, &c. ; of all which premises the said R. J. Smith afterwards, to wit, on the day and year last aforesaid, gave notice to the now defendant, and then called upon, and required him to attorn (a)[2] tenant to him the said R. J. Smith of the said messuage, &c., and to pay him for the proceeds, issues, and profits of the said messuage, &c., from the day of the said demise to the said John Doe, and the defendant then attorned (a)[2] tenant to the said R. J. Smith, of the said messuage, &c., and paid him, for the said profits, issues, and proceeds of the same, a large sum of money, to wit, 52l. 10s.—verification, and prayer of judgment, if the plaintiff ought further to maintain his action.

To this plea the plaintiff demurred specially, assigning for causes—that, although the defendant had therein admitted the making of the indenture of lease, and that he thereupon entered into the demised premises, and became thereof possessed as tenant to the plaintiff for the said term, yet the defendant had attempted to deny and to put in issue the plaintiff's title as landlord to the said messuage, &c., which the defendant was, by the **[755]** said indenture and tenancy, estopped from doing ; that the said plea admitted and confessed a breach of the covenant in non-payment of the rent, and a right of action in the plaintiff, without shewing how or when the same was satisfied or discharged, or why the defendant was not in law liable to be sued for breaches of covenant in the said lease, or liable for damages in respect of any such breach ; that the defendant, in his said second plea, alleged that the title of the plaintiff to the said premises was forfeited before the commencement of the action, for the non-performance of the covenants contained in a certain indenture of demise in the second plea set forth, and that the defendant had pleaded and relied upon such indenture, without making profert of, or offering to produce, the same, or shewing any matter in excuse of such profert ; that the plea was double and multifarious, in this, that it was therein stated that the said term and interest of the plaintiff had expired and determined before the commencement of the suit, and also that the defendant was evicted by title paramount to that of the plaintiff ; and that by the said second plea it was attempted to put in issue matters of law ; and that no certain issue could be taken thereon, &c.

Joinder in demurrer.

Channell, Serjt. (with whom was Petersdorff), in support of the demurrers. The first plea is bad in substance. It is probably founded upon the 5 & 6 Vict. c. 35, s. 60, No. iv. reg. 9, which provides that "the occupier of any lands, tenements, heredita-

---

(a)[1] The proviso in the lease gave an optional power of re-entry, but created no cesser of the term, ipso facto, by the mere force of a breach of covenant.

(b) Franklin, being a stranger to the action against the casual ejector (the action here referred to), could not appear to, or plead to, or defend, that action.

(a)[2] No grant having been made of any reversion or remainder expectant upon the defendant's tenancy, there could be no legal attornment. The term is used in the wide and popular sense of—acknowledgment of a tenancy under a new landlord. Vide 6 N. & M. 634, n., 640, n., 4 M. & G. 148.

ments, or heritages, being tenant of the same, and paying the said duties, shall deduct so much thereof in respect of the rent payable to the landlord for the time being (all sums allowed by the commissioners being first deducted) as a rate of 7d. for every 20s. thereof would, by a just proportion, amount unto; which deduction shall be made **[756]** out of the first payment thereafter to be made on account of rent; and the tenant paying the said assessment shall be acquitted and discharged of so much money, as if the same had actually been paid unto the person to or for whom his rent shall have been due and payable." That clause gives to the tenant who has paid property-tax that is chargeable on the landlord, the right to deduct the amount on payment of the next rent, but not to set it off in an action. There is nothing in this plea to shew by what authority, or when, the alleged assessment was made, or that the residue of the rent was paid. It is true, the payment of property-tax was made the subject of a plea in the case of *Tinckler* v. *Prentice* (4 Taunt. 549); but that was under the 46 G. 3, c. 65, s. 74.

It is doubtful, on the face of the second plea, whether it seeks to set up an answer to the action by way of eviction, or is intended as a plea of payment of the rent to a third party. It cannot, however, be a plea of eviction; for, there is no allegation that the defendant was tenant in possession at the time the ejectment was brought, or that there was any eviction until after the commencement of the suit. Neither does it shew that the landlord's title expired before the rent became due. [Cresswell, J. Does not the second plea sufficiently shew that the plaintiff's title ceased and determined (b)[1], before any of the rent became due, by a forfeiture, of which the landlord afterwards elected to take advantage? Maule, J. The defence suggested is, that the plaintiff ought not further to enforce his claim to the rent, because since the commencement of the action, the superior landlord has availed himself of the previous forfeiture, and enforced his claim.] That would be giving the tenant a defence by effluxion of time. There is no allegation in the plea that the plaintiff in the ejectment ever enforced that judgment against the present plaintiff.

**[757]** Byles, Serjt. contrà. The ninth regulation of the 60th section of the recent property and income tax act, puts the payment of the property-tax on the same footing as a payment to the superior landlord. [Maule, J. It seems to provide what would have been implied by law without such provision.] The first plea sufficiently shews, on general demurrer, at least, that the money therein mentioned was assessed under that act; for, it could only have been assessed under some act of parliament in force at the time, which authorized a deduction of 7d. in the pound. [Tindal, C. J. When we see the day on which the rate is alleged to have been assessed, and that it is stated to have been duly assessed in respect of property for the year next ensuing, we can hardly doubt that the 5 & 6 Vict. c. 35, is the act pointed at, seeing that it is the only statute that will support that statement.] *Tinckler* v. *Prentice* (4 Taunt. 549) is a distinct authority to shew that a payment of property-tax on account of the landlord may properly be the subject of a plea.

The second plea is, in substance, a plea of eviction: it alleges that a forfeiture (b)[2] was incurred, and that, by reason and in consequence of that forfeiture, the superior landlord brought ejectment, and recovered judgment.

The formal objections urged are not sustainable.

Channell, Serjt., was heard in reply.

TINDAL, C. J. A tenant, no doubt, is at liberty to shew that his landlord's title has expired by effluxion of time, or has been forfeited by some breach of condition, and that the superior landlord has entered for the forfeiture. That seems to me to be in substance the defence set up in this case, by the second plea. The only objection I can see to it is, that it is an argumentative statement **[758]** that the landlord entered for the condition broken; which, however, is not pointed out as a ground of special demurrer. The statement in the plea is, that, "by reason and in consequence of the said forfeiture," an action of ejectment was commenced by Smith, the superior landlord, in which the present plaintiff was made defendant, laying the demise on the 1st of

---

(b)[1] Vide post, 760, n.

(b)[2] The plea shews a right to re-enter and a judgment in ejectment founded upon a declaration in which an entry by Doe, under Smith, is alleged; but it shews no re-entry in fact, either by Doe or by Smith, under a writ of habere facias possessionem or otherwise.

January, 1844, being a day before any part of the rent in question accrued, and that John Doe recovered judgment in that action. It is true, the judgment in the ejectment is not alleged to have been recovered until after the commencement of the present action; and therefore it is that the plea is pleaded to the further maintenance of the action. It appears to me that it affords a substantial answer as to the 52*l.* 10*s.* to which it is pleaded.

COLTMAN, J.   There can be no doubt that the second plea discloses a substantially good answer to the action as to the 52*l.* 10*s.*, though I should have had a difficulty in holding it to have been well pleaded, had the real objection been properly pointed out by the demurrer. It appears, that, before the commencement of the present action, the term of the plaintiff was put an end to, that is, that he had committed a forfeiture, and that certain proceedings in ejectment were in consequence had against him. That raises an inference that the superior landlord elected to take advantage of the forfeiture. It is true that it is merely an argumentative statement of the fact of the plaintiff's title having been put an end to. But, though many grounds of demurrer are specially assigned, this is not one of them.

MAULE, J.   I also am of opinion that both of these pleas must be held to be sufficient. Obscurely as the statute is hinted at, I think the first plea sufficiently shews, upon general demurrer, that the 2*l.* 0*s.* 10*d.* was assessed upon the value of the property under the **[759]** 5 & 6 Vict. c. 35, s. 60, No. iv. reg. 9. The plea clearly refers to an assessment under some statute; and the plaintiff does not suggest that it was made under any other statute than that of Victoria. It is impossible to entertain any judicial doubt upon the subject. Then comes the question whether money paid by a tenant on account of his landlord under that act, may be set off, or deducted, in an action brought by the landlord for the recovery of rent. The act says, that "the occupier of any lands, tenements, hereditaments, or heritages, being tenant of the same, and paying the said duties, shall deduct so much thereof, in respect of the rent payable to the landlord for the time being (all sums allowed by the commissioners being first deducted,) as a rate of 7*d.* for every 20*s.* thereof would, by a just proportion, amount unto; which deduction shall be made out of the first payment thereafter to be made on account of rent." I think we may hold, without unduly straining the words of the act, that the deduction may be claimed out of the next payment, though made under legal process. It is too much to ask us to go out of our way to put an inconvenient construction upon the words of the act, when they are well susceptible of a meaning that is consistent with reason and justice. For these reasons, I am of opinion that the first plea is a good answer as to the 2*l.* 0*s.* 10*d.*

The second plea, in substance, is this,—that the plaintiff, under whom the defendant held, was entitled to the premises under a lease from one Smith, containing, amongst others, a covenant to insure, and a proviso that Smith should be at liberty to re-enter for breach of that covenant; that there was a breach of the covenant to insure; that Smith brought an ejectment thereupon and recovered judgment; and that the defendant was called upon to, and did, attorn tenant to Smith, and pay him the 52*l.* 10*s.* for profits, &c. It would be monstrous, indeed, if that were to afford no **[760]** defence upon the merits. A doubt is raised as to whether the defence is properly pleaded. I think it is. The plea states,—in a manner that seems to me not to be open to objection,—that a breach of covenant had been committed by the plaintiff before any part of the 52*l.* 10*s.* became due for rent, and before the commencement of the action, and that the superior landlord took certain proceedings by reason and in consequence of such forfeiture, and recovered the term (*a*) from the time of the forfeiture, and that he called upon the defendant, and compelled him, to attorn tenant to him, and to pay him a compensation for the use of the land from that time. If that be a sufficient statement of an election on the part of the superior landlord to proceed for the forfeiture, I see no objection to the plea. But, when it is shewn that the superior landlord had title by reason of the forfeiture, from a given day, and that

(*a*) The term recovered, was, not the term held by Franklin, which, consistently with the allegations in the plea, may still subsist, but the term created in favour of Doe,— a term which must here be regarded as having no existence, actual or conventional, Carter not being party or privy to the estoppel arising between Doe and Franklin upon the judgment in ejectment, and being therefore not entitled to set up that estoppel against Franklin.

he enforced his right from that day, and recovered the term (a), I think the plea discloses circumstances which made it impossible for the defendant to resist the right of the superior landlord to turn him out (b).    For these reasons, I think the defendant is entitled to judgment on the second plea also.

CRESSWELL, J.    I am entirely of the same opinion.

Judgment for the plaintiff (c).

[**761**]    MARRIAGE *v.* MARRIAGE.    May 28, 1845.

[S. C. 14 L. J. C. P. 244; 9 Jur. 581.]

Debt on a bond in the penal sum of 4000l., the condition of which bond,—after reciting that the obligor was indebted to the obligee in the sum of 2000l., and that the latter had agreed to accept and take from the informer, interest for the same at the rate of 5l. per cent. per annum, payable half-yearly, during the joint lives of the obligee and his wife, in full satisfaction and discharge of the debt, provided the same were regularly paid,—was declared to be, that, if the obligor should pay the interest in the manner stipulated, the obligation should be void; but, in case of failure of payment of all or any part of the interest, for twenty-eight days next after each payment should become due, the same having been demanded, the bond was to remain in full force.    The condition further stated that it was agreed, that, in case of failure in making the several payments aforesaid, within the respective times aforesaid, the bond, or any payments made under the same, should not be construed or taken as a discharge of the debt of 2000l., or any part thereof, but the same should forthwith, after such default, become due and payable to the obligee, his executors, &c.—Held—on special demurrer to a plea alleging that the annual sum in the condition mentioned was granted for a pecuniary consideration, and that no memorial was inrolled pursuant to the 53 G. 3, c. 141,—that this was not a grant of an annuity within that statute.—Whether the annuity acts apply to annuities granted in consideration of the forbearance of pre-existing debts—quære.— The defendant further pleaded, that payment of the second half-yearly payment was not demanded by the plaintiff on the day it became due, or at any time within twenty-eight days after, but that the defendant, after the twenty-eight days, and before the commencement of the action, paid the same to the plaintiff, who accepted it in satisfaction, &c. :—Held, on special demurrer, that this was not a good plea of solvit post diem, within the 4 Ann. c. 16, s. 12.

Debt, on a bond in the penal sum of 4000l.

The defendant craved oyer of the bond and condition.    The bond was as follows :— "Know all men by these presents, that I, Francis Marriage, of, &c., am held and firmly bound to Joseph Marriage the elder, of, &c., in the penal sum of 4000l. of lawful British money, to be paid to the said Joseph Marriage, or his attorney, executors, administrators, or assigns; for which payment to be well and truly made, I bind myself, my heirs, executors, and administrators, firmly, by these presents, sealed with my seal.    Dated, the 9th February, 1843."    The condition was as follows :—"Whereas the above-bounden Francis Marriage is indebted to the [**762**] above-named Joseph Marriage in the sum of 2000l. : and whereas the said Joseph Marriage has, at the request of the said Francis Marriage, agreed to accept and take from the said Francis Marriage interest for the same at the rate of 5l. per cent. per annum, payable during

---

(a) The term recovered, was, not the term held by Franklin, which, consistently with the allegations in the plea, may still subsist, but the term created in favour of Doe,—a term which must here be regarded as having no existence, actual or conventional, Carter not being party or privy to the estoppel arising between Doe and Franklin upon the judgment in ejectment, and being therefore not entitled to set up that estoppel against Franklin.

(b) There was, however, no actual turning out.

(c) The lease from Smith containing no clause of forfeiture creating a cesser of the term upon a breach of covenant, but merely a power of re-entry, until the exercise of that power, by actual entry, Franklin's term continued.    The second plea alleges, not a re-entry, but certain proceedings in ejectment,—proceedings which would be nugatory unless preceded or followed by an entry by or on behalf of Smith, and which, with such entry, would be unnecessary.

[IN THE EXCHEQUER CHAMBER.]

FROST *v.* KNIGHT.

1872
*Feb.* 8.

*Breach of Promise of Marriage—Breach of Contract by refusal to perform, the Time for Performance not having arrived.*

The defendant promised to marry the plaintiff so soon as his (defendant's) father should die. During the father's lifetime the defendant refused absolutely to marry the plaintiff. The plaintiff sued for breach of the promise, the defendant's father being still alive.

*Held,* reversing the judgment of the Court below, that the principle of *Hochster* v. *De la Tour* (2 E. & B. 678; 22 L. J. (Q.B.) 455) was applicable to the case of such a promise to marry, and that a breach of contract had been committed on which the plaintiff could sue.

ERROR on a judgment of the Court of Exchequer (Kelly, C.B., and Channell, B.; Martin, B., dissenting), arresting the judgment after a verdict for the plaintiff. The facts and pleadings in the case are stated in the judgment of the Lord Chief Justice, and more fully in the report of the case below. (1)

June 20, 21, 1871. The case was argued by

*Hill, Q.C.* (*Dodd* with him), for the plaintiff.

*Powell, Q.C.* (*Streeten* with him), for the defendant.

The same arguments were used and cases cited as in the court below.

*Cur. adv. vult.* (2)

Feb. 8, 1872. The following judgments were delivered :—

COCKBURN, C.J. (3) This case comes before us on error, brought on a judgment of the Court of Exchequer arresting the judgment in the action on a verdict given for the plaintiff.

The action was for breach of promise of marriage. The promise, as proved, was to marry the plaintiff on the death of the defendant's father. The father still living, the defendant announced his intention of not fulfilling his promise on his father's death, and broke off the engagement, whereupon the plaintiff, without waiting for

(1) Law Rep. 5 Ex. 322.

(2) The case was heard before Cockburn, C.J., and Byles, Montague Smith, Keating, and Lush, JJ.; but before the judgment was delivered

Montague Smith, J., had ceased to be a member of the Court.

(3) In this judgment Keating and Lush, JJ., concurred.

1872

*Frost*
*v.*
*Knight.*

the father's death, at once brought the present action. The plaintiff having obtained a verdict, a rule nisi was applied for to arrest the judgment, on the ground that a breach of the contract could only arise on the father's death, till which event, no claim for performance could be made, and, consequently, till its occurrence, no action for breach of the contract be maintained. A rule nisi having been granted, a majority of the Court of Exchequer concurred in making it absolute, Martin, B., dissenting ; and the question for us is, whether the judgment of the majority was right.

The cases of *Lovelock* v. *Franklyn* (1) and *Short* v. *Stone* (2), which latter case was an action for breach of promise of marriage, had established that where a party bound to the performance of a contract at a future time puts it out of his own power to fulfil it, an action will at once lie. The case of *Hochster* v. *De la Tour* (3), upheld in this court in the *Danube and Black Sea Co.* v. *Xenos* (4) went further, and established that notice of an intended breach of a contract to be performed in futuro had a like effect.

The law with reference to a contract to be performed at a future time, where the party bound to performance announces prior to the time his intention not to perform it, as established by the cases of *Hochster* v. *De la Tour* (3) and *The Danube and Black Sea Co.* v. *Xenos* (4) on the one hand, and *Avery* v. *Bowden* (5), *Reid* v. *Hoskins* (6), and *Barwick* v. *Buba* (7) on the other, may be thus stated. The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of non-performance : but in that case he keeps the contract alive for the benefit of the other party as well as his own ; he remains subject to all his own obligations and liabilities under it, and enables the other party not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any supervening circumstance which would justify him in declining to complete it.

(1) 8 Q. B. 371.
(2) 8 Q. B. 358.
(3) 2 E. & B. 678 ; 22 L. J. (Q.B.) 455.
(4) 13 C. B. (N.S.) 825 ; 31 L. J. (C.P.) 284.
(5) 5 E. & B. 714 ; 26 L. J. (Q.B.) 3.
(6) 6 E. & B. 953 ; 26 L. J. (Q.B.) 5.
(7) 2 C. B. (N.S.) 563 ; 26 L. J. (C.P.) 280.

VOL. VII.]          HILARY TERM, XXXV VICT.                    113

On the other hand, the promisee may, if he thinks proper, treat the repudiation of the other party as a wrongful putting an end to the contract, and may at once bring his action as on a breach of it; and in such action he will be entitled to such damages as would have arisen from the non-performance of the contract at the appointed time, subject, however, to abatement in respect of any circumstances which may have afforded him the means of mitigating his loss.

Considering this to be now settled law, notwithstanding any thing that may have been held or said in the cases of *Philpotts* v. *Evans* (1) and *Ripley* v. *McClure* (2), we should have had no difficulty in applying the principle of the decision in *Hochster* v. *De la Tour* (3) to the present case, were it not for the difference which undoubtedly exists between that case and the present, viz., that, whereas there the performance of the contract was to take place at a fixed time, here no time is fixed, but the performance is made to depend on a contingency, namely, the death of the defendant's father during the lifetime of the contracting parties.   It is true that in every case of a personal obligation to be fulfilled at a future time, there is involved the possible contingency of the death of the party binding himself, before the time of performance arrives; but here we have a further contingency depending on the life of a third person, during which neither party can claim performance of the promise. This being so, we thought it right to take time to consider whether an action would lie before the death of the defendant's father had placed the plaintiff in a position to claim the fulfilment of the defendant's promise.

After full consideration we are of opinion that, notwithstanding the distinguishing circumstance to which I have referred, this case falls within the principle of *Hochster* v. *De la Tour* (3), and that, consequently, the present action is well brought.

The considerations on which the decision in *Hochster* v. *De la Tour* (3) is founded are that the announcement of the contracting party of his intention not to fulfil the contract amounts to a breach, and that it is for the common benefit of both parties that the contract shall be taken to be broken as to all its incidents,

1872

Frost
*v.*
Knight.

(1) 5 M. & W. 475.                    (2) 4 Ex. at p. 359.
(3) 2 E. & B. 678 ; 22 L. J. (Q.B.) 455.

114                    COURT OF EXCHEQUER.                    [L. R.

1872

FROST
*v.*
KNIGHT.

including non-performance at the appointed time; as by an action being brought at once, and the damages consequent on non-performance being assessed at the earliest moment, many of the injurious effects of such non-performance may possibly be averted or mitigated.

It is true, as is pointed out by the Lord Chief Baron, in his judgment in this case, that there can be no actual breach of a contract by reason of non-performance so long as the time for performance has not yet arrived. But, on the other hand, there is—and the decision in *Hochster* v. *De la Tour* (1) proceeds on that assumption—a breach of the contract when the promisor repudiates it and declares he will no longer be bound by it. The promisee has an inchoate right to the performance of the bargain, which becomes complete when the time for performance has arrived. In the mean time he has a right to have the contract kept open as a subsisting and effective contract. Its unimpaired and unimpeached efficacy may be essential to his interests. His rights acquired under it may be dealt with by him in various ways for his benefit and advantage. Of all such advantage the repudiation of the contract by the other party, and the announcement that it never will be fulfilled, must of course deprive him. It is therefore quite right to hold that such an announcement amounts to a violation of the contract *in omnibus,* and that upon it the promisee, if so minded, may at once treat it as a breach of the entire contract, and bring his action accordingly.

The contract having been thus broken by the promisor, and treated as broken by the promisee, performance at the appointed time becomes excluded, and the breach by reason of the future non-performance becomes virtually involved in the action as one of the consequences of the repudiation of the contract; and the eventual non-performance may therefore, by anticipation, be treated as a cause of action, and damages be assessed and recovered in respect of it, though the time for performance may yet be remote.

It is obvious that such a course must lead to the convenience of both parties; and though we should be unwilling to found our opinion on grounds of convenience alone, yet the latter tend strongly to support the view that such an action ought to be ad-

(1) 2 E. & B. 678; 22 L. J. (Q B.) 455.

mitted and upheld. By acting on such a notice of the intention of the promisor, and taking timely measures, the promisee may in many cases avert, or at all events materially lessen, the injurious effects which would otherwise flow from the non-fulfilment of the contract; and in assessing the damages for breach of performance, a jury will of course take into account whatever the plaintiff has done, or has had the means of doing, and, as a prudent man, ought in reason to have done, whereby his loss has been, or would have been, diminished.

It appears to us that the foregoing considerations apply to the case of a contract the performance of which is made to depend on a contingency, as much as to one in which the performance is to take place at a future time; and we are, therefore, of opinion that the principle of the decision of *Hochster v. De la Tour* (1) is equally applicable to such a case as the present.

It is next to be observed, that the law as settled by *Hochster v. De la Tour* (1) and *Danube and Black Sea Company v. Xenos* (2) is obviously quite as applicable to a contract in which personal status or personal rights are involved, as to one relating to commercial or pecuniary interests. Indeed, the contract of marriage appears to afford a striking illustration of the expediency of holding that an action may be maintained on the repudiation of a contract to be performed in futuro. On such a contract being entered into, not only does a right to its completion arise with reference to domestic relations and possibly pecuniary advantages, as also to the social status accruing on marriage, but a new status, that of betrothment, at once arises between the parties. This relation, it is true, has not, by the law of England, the same important consequences which attached to it by the canon law and the law of many other countries. Nevertheless, it carries with it consequences of the utmost importance to the parties. Each becomes bound to the other; neither can, consistently with such a relation, enter into a similar engagement with another person; each has an implied right to have this relation continued till the contract is finally accomplished by marriage. To the woman, more especially, it is all-important that the relation shall not be

1872

FROST
*v.*
KNIGHT.

(1) 2 E. & B. 678; 22 L. J. (Q.B.) 455.    (2) 13 C. B. (N.S.) 825; 31 L. J. (C.P.) 284.

COURT OF EXCHEQUER.                    [L. R.

1872

FROST
*v.*
KNIGHT.

put an end to.  Independently of the mental pain occasioned by the abrupt termination of such an engagement, the fact of its existence, if followed by such a termination, must necessarily operate to her serious disadvantage.  During its continuance others will naturally be deterred from approaching her with matrimonial intentions; nor could she admit of such approaches, if made; while the breaking off of the engagement is too apt to cast a slur upon one who has been thus treated.  We see, therefore, every reason for applying the principle of *Hochster* v. *De la Tour* (1) to such a case, and for holding the contract, if repudiated, to be broken, not only in its present, but also in its ultimate obligations and consequences.  To hold that the aggrieved party must wait till the time fixed for marrying shall have arrived, or the event on which it is to depend shall have happened, would have the effect of aggravating the injury, by preventing the party from forming any other union, and by reason of advancing age rendering the probability of such a union constantly less.  It has been suggested, indeed, that the desire of marrying and the happiness to be expected from it diminish with advancing years, and, therefore, that when by the terms of the contract marriage is only to take place at a remote time, the value of the marriage and the damages to be recovered for a breach of the promise would be less if the refusal were made when the time for marrying was accomplished; and that, consequently, an action ought not to be allowed till the time when the fulfilment of the contract could have been claimed.  We cannot concur in this view.  We think that, in estimating the amount of injury done and of the compensation to be made for it, if the contract were broken when the time for marrying had arrived, the wasted years and the impossibility of forming any other engagement during the intermediate time should be taken into account, and not merely the age of the parties and the then existing value of the marriage.  It is, therefore, manifest that it is better for both parties—for the party intending to break the contract, as well as for the party wronged by the breach of it—that an express repudiation of the contract should be treated as a violation of it in all its incidents, and should give the right to the party wronged to bring an action at once, and have the damages

(1) 2 E. & B. 678; 22 L. J. (Q.B.) 455.

assessed at the earliest moment.  No one can doubt that, morally speaking, a party who determines to break off a matrimonial engagement acts far more commendably if he at once gives notice of his intention, than if he keeps that intention secret till the time for fulfilling the promise has come.  The reason is, that the giving such notice at the earliest moment tends to mitigate, while the delay in giving it necessarily aggravates, the injury to the party wronged.

1872

Frost
*v.*
Knight.

It has been urged that there must be great difficulty in thus assessing damages prospectively.  But this must always be more or less the case whenever the principle of *Hochster* v. *De la Tour* (1) comes to be applied.  It would equally exist where one of the parties, by marrying another person, gave rise, as in the case of *Short* v. *Stone* (2), to an immediate right of action.  It cannot be said that the difficulty is by any means insuperable, and the advantages resulting from the application of the principle of *Hochster* v. *De la Tour* (1) are quite sufficient to outweigh any inconvenience arising from the difficulty of assessing the damages.

We are struck by the fact that the Lord Chief Baron, while holding that the present action would not lie, expressed an opinion that the wrong done by the repudiation of a contract of marriage might be made the foundation of an action on the case, in which the facts should be set forth.  But as the rights and obligations of the parties arise here entirely out of the contract, we have a difficulty in seeing how such an action could be maintained.  But be that as it may, as in such an action as is thus suggested the damages would have to be ascertained with reference to the same facts and the same considerations as in an action brought on the contract, it seems to us by far the simpler course, the case being, as it seems to us for the reasons we have given, clearly within the decision in *Hochster* v. *De la Tour* (1), to hold that the present action for breach of the contract may be maintained, and that in it the plaintiff is entitled to recover damages in respect of the non-fulfilment of the promise as though the death of the defendant's father—the event on which the fulfilment was to depend—had actually occurred.

We are therefore of opinion that the judgment of the Court of Exchequer must be reversed.

(1) 2 E. & B. 678; 22 L. J. (Q.B.) 455.          (2) 8 Q.B. 358.

1872

Frost
*v.*
Knight.

BYLES, J.  I think the plaintiff below entitled to recover, both on principle and on authority, but as my judgment was prepared before I had the advantage of seeing that of the Lord Chief Justice, and as this is a case of great importance, I think I ought to deliver it.

An express pre-contract of marriage, as already suggested by the Lord Chief Justice, places the man and woman in the condition or status of betrothment.  In this state there are certain mutual duties.  The woman, for example, may not, without a breach, marry another man, although it is possible that he may die before the future day appointed for the first intended marriage, whether already fixed, or whether contingent on a future event.  So I conceive the man cannot, during the stipulated period of betrothment, without a breach of contract, marry another woman, though she may die in the mean time.  So, for one of the parties to break off the mutual engagement by an express refusal to perform it, though before the day, seems to me to be equally a breach of the contract, for it puts an end to the condition of betrothment which, according to the contract, was to continue.  In each of these three cases there is a repudiation of the duties springing from the new relation involved in the contract.

But, independently of the peculiarities attending a pre-contract of marriage, the decision in *Hochster* v. *De la Tour* (1) shews that in the analogous case of a pre-contract for future service, the refusal of one of the parties to perform the contract, though before the time appointed for its fulfilment, is a breach.  And the decision in that case goes further than is necessary for our decision in this case.  For there no status had been established like that involved in a pre-contract of marriage.

But the Court of Common Pleas, in the case of *Wilkinson* v. *Verity* (2), and the Court of Error, in *Danube and Black Sea Company* v. *Xenos* (3), affirming the judgment of the Court below, have laid it down that an absolute unconditional renunciation of a contract before the time of performance amounts to a breach, though only at the election of the promisee.

*Judgment reversed.*

Attorneys for plaintiff: *Pitman & Lane.*

Attorneys for defendant: *Austen, De Gex, & Harding.*

(1) 2 E. & B. 678; 22 L. J. (Q.B.) 455.        (2) Law Rep. 6 C. P. 206.
        (3) 13 C. B. (N.S.) 825; 31 L. J. (C.P.) 284.

Neutral Citation Number: [2009] EWHC 3389 (Ch)

Case No.536 of 2009

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

Royal Courts of Justice

Monday, 7th December 2009

Before:

HIS HONOUR JUDGE PURLE QC

(sitting as a High Court Judge)

- - - - - - - - - - - - - - - - - - - - -

B E T W E E N :

| | | |
|---|---|---|
| | GOLDACRE (OFFICES) LIMITED | Applicant |
| | - and - | |
| | NORTEL NETWORKS UK LIMITED (in administration) | Respondent |

- - - - - - - - - - - - - - - - - - - - -

*Transcribed by **BEVERLEY F. NUNNERY & CO***
*Official Shorthand Writers and Tape Transcribers*
*Quality House, Quality Court, Chancery Lane, London WC2A 1HP*
*Tel:  020 7831 5627   Fax:  020 7831 7737*
*info@beverleynunnery.com*

- - - - - - - - - - - - - - - - - - - - -

MR. S. JOURDAN QC and MISS. B. LEAHY (instructed by Olswang LLP) appeared on behalf of the Applicant.

MR. W. TROWER QC and MR. D. ALLISON (instructed by Herbert Smith) appeared on behalf of the Respondent.

- - - - - - - - - - - - - - - - - - - - -

**J U D G M E N T**

JUDGE PURLE:

1    In this case I have to decide whether the rent that is soon to fall due, and future
     rent thereafter, in respect of property held by the respondent company (now in
     administration) in Harlow is payable as an expense of the administration.  There
     are two long leases, both pre-dating the date of the administration.  The premises
     in question have, since the date of the administration, been used to an extent by
     the administrators for the more efficient conduct of the administration and rent
     has been paid to date, albeit late so far as the last September quarter was
     concerned.  It is accepted on behalf of the administrators that interest in respect of
     that late payment will be paid.  The real issue therefore is a future one, but the
     problem is a pressing one because the commercial needs of the applicant, who is
     the landlord of the premises in question, require an immediate decision.
     Moreover, the administrators wish to know where they stand, as that may inform
     their future conduct of the administration.  I would ideally have wished to take
     more time to prepare this judgment, but the parties expressed a preference for
     speed of decision rather than perfection of language.  I have nevertheless reached
     a clear view and have, in approving the transcript, taken the opportunity of
     refining my reasoning.

2    Although the administrators are using part of the premises in respect of both of
     the demises in question, they are only using part and it is a relatively small part.
     There are, in addition, sub-tenants in respect of other parts.  As regards those
     sub-tenants, notices have been served under section 6 of the Law of Distress
     Amendment Act 1908, having the effect of transferring the company's right to
     receive rent to the landlord.  As it happens, some rents are still coming in to the
     administrators, as I understand the position, but they are passing those over to the
     landlord.  In those circumstances, it cannot be said that the company in
     administration is, in any realistic sense, in receipt of rents and profits, so that
     possession of the premises in that sense can be ignored.  What I am concerned
     with is the relative minor use that the administrators are making of the properties
     in question.

3    Mr. Jourdan, for the applicant landlord, submits that upon established authority
     once the administrators decide, as they have done, to continue to use any part of
     the properties for the beneficial outcome of the administration, they are liable to
     pay the rent as it falls due in full as an administration expense.  He says that this
     follows nowadays from the insolvency rules that were adopted following the
     enactment of the Enterprise Act 2000, and that the previous decision of
     Blackburne J in *In Re Salmet International Ltd*. [2001] BCC 796 should not be
     followed in relation to this administration, which is governed by the Insolvency
     Rules 1986 as now amended.  He prays in aid the more recent decision of David

Richards J in *Exeter City Council v Bairstow* [2007] 4 All ER 437; [2007] 2 BCLC 455; [2007] BCC 236.  In that case David Richards J, after a careful analysis both of the rules and of the previous decision of the House of Lords in *In Re Toshoku Finance UK Plc* [2002] 1 WLR 671 (which related to a company in liquidation) held that the expenses regime set out in the rules is mandatory in the case of administrations as well as liquidations.   David Richards J was struck - in my judgment, rightly so - by the closeness of the wording between what is now rule 2.67 (applicable to administrations) with the wording in rule 4.218 considered by the House of Lords in *Toshoku*.  He held, in accordance with his ruling, that rates in an administration are payable as an administration expense. He also expressed the view that that was so in respect of unoccupied as well as occupied property, though that is no longer so as a result of subsequent delegated legislation which came into effect on 1st April 2008.  The House of Lords in *Toshoku* held that corporation tax was payable in a liquidation as a liquidation expense, as it was made necessary by statutory enactment, notwithstanding that the income which was taxed was only deemed income and not income in fact received by the company in liquidation.

4    I agree with Mr. Jourdan's submission that the matter is now to be considered exclusively by reference to the rules and that if the rental liability falls within the rules, then that is payable as a matter of mandatory obligation, not as a matter of discretion, either on the part of the administrators or on the part of the court.

5    *Toshoku*, though a case on corporation tax, considered what is referred to sometimes as the salvage principle, sometimes as the *Lundy Granite* principle, and sometimes as the liquidation expenses principle.  The main speech in the House of Lords was given by Lord Hoffmann, all other four Law Lords agreeing, though in Lord Hobhouse's case with uncharacteristic diffidence.  Lord Hoffmann, in a masterly analysis of the previous law, traced the history of the *Lundy Granite* principle (so named after *In Re Lundy Granite Co., ex p. Heavan* (1871) 6 Ch App 462).  Under that principle, liquidators are held liable to pay rent as a liquidation expense where the liquidators make use of or retain, for the benefit of the liquidation, possession of leasehold premises.  Express reference was made and approval given to the judgment of Lindley LJ (a judge of at least as great eminence in this field as Lord Hoffmann) in *In re Oak Pitts Colliery Co.*, (1882) 21 Ch D 322.  At para.26 of his speech, Lord Hoffmann referred to the following citation of Lindley LJ at p 330:

> "When the liquidator retains property for the purpose of advantageously disposing of it, or when he continues to use it, the rent of it ought to be regarded as a debt contracted for the purposes of winding up the

company, and ought to be paid in full like any other debt or expense
properly incurred by the liquidators for the same purpose..."

6    Lord Hoffmann continued in para.27:

"My Lords, it is important to notice Lindley LJ was not saying that the
liability to pay rent had been incurred as an expense of the winding up.  It
plainly had not.  The liability had been incurred by the company before
the winding up for the whole term of the lease.  Lindley LJ was saying
that it would be just and equitable, in the circumstances to which he
refers, to treat the rent liability *as if* it were an expense of the winding up
and to accord it the same priority."

7    That principle (if it applies in administrations at all) plainly applies to the present
case and has effectively been acknowledged as applicable by the payment of rent
hitherto.  As Lord Hoffmann went on to explain, although the rule emerged
historically in the context of the exercise of a discretion (whether or not to allow
forfeiture proceedings to be brought or distress to be levied) it has evolved into a
principle which, as he put it in para.38, "does not involve an exercise of discretion
any more than the application of any other legal principle to the particular facts of
the case".  He held that the rules - and in that case he was concerned with rule
4.218 - applicable to liquidations were to be construed to include debts which,
under the *Lundy Granite* principle, were deemed to be expenses of the
liquidation, and concluded that ordinarily this meant that debts such as rent under
a lease would be treated as coming within para.(a) of rule 4.218(1), but that the
principle might possibly enlarge the scope of other paragraphs as well.

8    Paragraph (a), as it then stood, referred to "expenses properly chargeable or
incurred by the official receiver or the liquidator in preserving, realising or getting
in any of the assets of the company".  In a liquidation, therefore, upon the
authority of Lord Hoffmann and the remainder of the House of Lords, rent, where
the *Lundy Granite* principle applies, will ordinarily fall within (a) and will be
payable mandatorily.

9    So far as administration is concerned, the relevant rule, as I have said, is rule
2.67(1).  Two subparagraphs have been highlighted before me, (a) and (f).
2.67(1) contains a list of expenses payable in the following order of priority:
(a) refers to "expenses properly incurred by the administrator in performing his
functions in the administration of the company"; (f) refers to "any necessary
disbursements by the administrator in the course of the administration (including
any expenses incurred by members of the creditors' committee or their
representatives and allowed for by the administrator under rule 2.63, but not

including any payment of corporation tax in circumstances referred to [in a later subparagraph which I need not consider]".  Given the closeness of the opening words of rule 4.218(1)(a) as it stood at the time of *Toshoku* (and indeed as the rule now stands, though the relevant part is now para.4.218(3)(a)(ii) and a number of other words have been added) to the opening words of rule 2.67(1)(a), my inclination would be to regard rent as falling within rule 2.67(1)(a).  It seems to me that that subparagraph, were the matter free from authority, would be apt to refer to all of the expenses incurred by the administrator in performing his functions in the administration of the company, making no distinction for this purpose between expenses incurred on his own account for which he was entitled to be reimbursed, and expenses incurred on behalf of the company.

10    Nonetheless, that construction did not find favour with David Richards J in the *Bairstow* case.  He relied on the closeness of wording between section 19(4) of the Insolvency Act 1986 and the wording of rule 2.67(1)(a).  The House of Lords previously in *Centre Reinsurance International Co v. Freakley and Others* [2006] 1 WLR 2863, had ruled that section 19(4) applied only to liabilities incurred personally.  Section 19 seems to me to be different, however, as the contrast (in cases where that section still applies) is made between "remuneration and expenses" (to which section 19(4) applies) which are due to the administrator, and "sums payable in respect of debts or liabilities incurred" (to which section 19(5) applies) which are due to outside creditors, and are expressly given priority over sums payable to the administrator under 19(4), as are sums payable under adopted contracts of employment where 19(6) applies.  There is no similar contrast in rule 4.218 or 2.67.  Moreover, as Blackburne J observed in the *Salmet* case, section 19(4) is concerned merely with the ranking of remuneration and expenses (as a class) as against the claims of floating charge holders.

11    It is however not necessary for me to reach a final view on the point because if the rent does not fall within (a), it falls in my judgment within (f) - the disbursement is a necessary one because the application of the *Lundy Granite* principle requires rent to be paid.  It is clear from other provisions of the Insolvency Act 1986 that the administrator has power to make payments whether or not they are necessary in any ordinary sense of that word.  They may, for example, be merely "incidental" to the performance of his functions within para.13 of Schedule 1, without being "necessary" (both words being used in that paragraph) and his powers under para.59(1) of Schedule B1 enable him to do (and therefore to incur liability in respect of) anything "necessary or expedient" for the management of the affairs, business and property of the company.  It would be surprising if necessary expenses had a measure of priority, but liabilities incurred merely incidentally or through expediency had no priority whatsoever.  That

suggests either that (a) should be construed more broadly, or "necessary" given an extended meaning, or both.

12    In construing what is "necessary", I was referred to the decision of Briggs J in the recent *Lehman Brothers International (Europe)* decision [2009] EWHC 2545, where Briggs J (though his remarks on this point were clearly *obiter*) considered that necessity extended to a payment which ought to be made in fairness and justice to - in that case - a counterparty which, because of administration, had been or would be prejudiced by Lehman Brothers' retention of securities beyond the date when they should have been redelivered.  He also confirmed that necessity was not confined to a situation in which there had been a specific threat for redelivery.  I agree with that observation, which was not in my judgment confined to the facts of that particular case.  In the present case, there has been no threat by the applicant landlord to bring forfeiture proceedings, though Mr Jourdan said he would seek permission to do so if that was thought to be necessary.  In my judgment, it is not, and the application of the *Lundy Granite* principle does not require it.

13    In those circumstances, whatever the precise extent of the meaning of the word "necessary", it is plainly apt, in my judgment, to extend to a case where the *Lundy Granite* principle applies.  Briggs J at para.98 considered the *Lundy Granite* principle to apply to administrations.  The difficulty in its application to the *obiter* part of his judgment was that the securities had not been used for the purpose of the administration within the strict confines of the *Lundy Granite* principle (see para.109).  That is not a difficulty facing me.

14    Mr. Trower, for the administrators, said that a disbursement can only be regarded as necessary if the administrators choose to make it or if the court, founding itself upon some proper jurisdictional basis, orders it.  He said that the court had no jurisdictional basis in the present case for ordering payment of rent, there being no unfair harm which would trigger the court's jurisdiction under para.74 of Schedule B1, or no other good and compelling reason for the court to give directions to that effect to the administrators under para.63 or 68(2) of Schedule B1.

15    Mr Trower also said that there is a major distinction between rule 4.218 as it applies to liquidations and rule 2.67(1) as it applies to administrations because of the absence in rule 2.67(1)(a) of the word "chargeable" which he said meant chargeable to the estate.  For my part I would naturally read "chargeable" in rule 4.218(3)(a)(ii) as chargeable by the liquidators in preserving etc., as the rule goes on to say.  I do not consider the absence of that word in rule 2.67(1)(a) to have any significance in the present context.

16    I do not accept the reasons that Mr. Trower has advanced for not regarding rent as
an administration expense in the present case.  The *Lundy Granite* principle
seems, in my judgment, clearly to apply, and the Court's jurisdiction to order
payment derives from the relevant rules which, properly construed in accordance
with the *Lundy Granite* principle, compel payment.  Any failure on the part of the
administrators to recognise this unfairly harms the applicant landlord, and there
can be no doubting the appropriateness of the Court directing the administrators
to act in accordance with the mandatory requirements of the rules, properly
construed.

17    I am urged also to construe the rules in accordance with the underlying
importance, which I do not dispute for one moment, of the rescue culture upon
which the Insolvency Act 1986 is based.  Mr. Jourdan, however, pointed out that
in a number of the older cases where the *Lundy Granite* principle was developed,
liquidators were in fact carrying on business for the purpose of the winding up in
an endeavour to sell the business as a going concern, which is what administrators
now do, certainly in the early stages, very often.  That did not prevent the *Lundy
Granite* principle from emerging and is no reason, in my judgment, for excluding
it in the present case.  As, moreover, administrators now have power (with the
permission of the Court) to make distributions to unsecured creditors under
para.65(3) of Schedule B1, administrations may come to resemble liquidations,
and it would be surprising were the *Lundy Granite* principle to apply to the one
and not the other.

18    Mr. Trower does not of course say that the administrators should be entitled to
occupy or use the premises for nothing.  What he says is that payments should be
tailored to the use that they are making.  Mr. Jourdan answered that by reference
to *Powdrill v. Watson* [1995] 2 AC 394 and the cases therein referred to.  At
p.450, Lord Browne-Wilkinson said this in the context of contracts of
employment adopted by an administrator, and section 19(5) of the Insolvency Act
1986 as it then stood:

> "Although the authorities show that debts incurred before the liquidation
> could not obtain priority, they indicate that even on the salvage principle
> all liabilities under a contract incurred after the time of adoption of the
> contract by a liquidator are entitled to priority."

19    He then cited *Re S. Davis and & Co. Ltd.* [1945] Ch 402, a case on bailment, and
*Re Levi & Co. Ltd.* [1919] 1 Ch 416, a landlord and tenant case, in which the
liquidator who retained a lease for the benefit of the liquidation was held liable to

pay as a liquidation expense a dilapidations claim under a covenant to deliver up
the premises in good repair at the end of the term.  He continued:

> "The salvage principle in liquidation indicates that if a liquidator adopts a
> contract for the purpose of the more beneficial conduct of a liquidation,
> all such liabilities under such contract after the date of adoption are
> entitled to priority.  This principle is therefore of no assistance in seeking
> to limit the administrators' liability in this case."

20    In my judgment, that principle applies here so that, as the rent falling due on the
next quarter day is a payment in advance, it is not subject to the Apportionment
Act 1870 (*see Ellis v. Rowbotham* [1900] 1QB 740) from which it follows, as
Mr. Jourdan submits and I accept, that the quarter's rent becomes payable in full
from that date as one of the costs and expenses of the administration and would
not fall to be apportioned should the administrators vacate the premises during
that quarter.  It follows also from this that the earlier decision of *Shackell v.
Chorlton* [1895] 1 Ch 378 in the other direction is no longer good law,
notwithstanding its application in  *In re A.B.C. Coupler & Engineering Co. Ltd.
(No. 3)* [1970] 1 WLR 702, where the point was conceded.  The fuller citation of
authority in the *Levi* case, and its approval in *Powdrill*, establishes that a
liquidator electing to hold leasehold premises can do so only on the terms and
conditions contained in the lease, and that any liability incurred while the lease is
being enjoyed or retained for the benefit of the liquidation is payable in full as a
liquidation expense.  The same principle in my judgment applies in an
administration.  As Lord Hoffmann recognised in *Toshoku* at para.28, the liability
to pay rent is not treated as an expense having priority until (and lasts only so
long as) the office holder makes use of or decides to retain the property.  Subject
to that, any such liability accruing during that period is in my judgment to be
treated as an expense having the requisite priority.

21    I mention also that in *In re Linda Marie Ltd*. [1988] 4 BCC 463, rent was
accepted to be a necessary disbursement of the liquidator.  As, however, the case
proceeded on a concession, it was not a matter of decision and so it remains open
to me to decide the point.  I do decide it in the applicant's favour and insofar,
therefore, as the rent does not fall within 2.67(1)(a), it does fall within (f).
I should mention that Warner J in the *Linda Marie* case did not consider that the
rent was correctly described as having been incurred in preserving the underlease.
It seems to me that that observation is difficult now to square with the
observations of the House of Lords in *Toshoku*, who held that rent will ordinarily
fall within para.(a) of what was then para.4.218(1).

22    I should also make reference to the decision of the Court of Appeal in *Sunberry Properties Ltd v. Innovate Logistics Ltd.* [2009] 1 BCLC 145; [2009] BCC 164. In that case the Court of Appeal refused permission, after balancing the interests of the applicant landlord against the interests of the administrators, to bring proceedings requiring the administrators to terminate an occupational licence for 6 months granted by them to a third party in breach of covenants in a lease with a remaining unexpired term of 20 years. That was the main point in the appeal. Under the heading "Consequential matters" starting at para.55 and going through to para.60, Mummery LJ, after recording that it was accepted that the landlord had no automatic right to be paid the contractual amount during the occupation of the company in administration, limited the amount which the administrators should pay to the sums passing under the licence from the third party. What passed under the licence was a monthly payment equivalent to the rent payable under the lease, whereas under the lease rent was payable quarterly in advance. The Court of Appeal also held that the administrators should pay interest on the passing rent, not at the contractual rate, but only to the extent of interest actually received by them.

23    As a decision of the Court of Appeal, that case might be said to require me to exercise a discretion to consider how much it would be fair for the administrators to pay in this case. If I were required to carry out that exercise, I would conclude that on the particular facts of this case it was fair for the administrators to pay the whole of the rent falling due in December because the only evidence of anyone qualified to express an opinion on the matter is that of the applicant's Chartered Surveyor, demonstrating that there is no realistic possibility of maximising the return from the property so long as the administrators are using part, as issues of data security intrude, and the prospect of redevelopment is adversely affected. The administrators themselves do not contend that the rent payable by them should be calculated at a rate other than that provided for in the leases. Nor do they pray in aid (as was the case in *Innovate Logistics*) inability to pay. Their point is that they should only pay a proportionate amount of the rent attributable to the floor space that they occupy, and the applicant landlord is free to have the rest. However, as I have said, that is not, on the evidence, a realistic proposal, or fair to the applicant landlord.

24    Despite the clear indication of the Court of Appeal in the *Innovate Logistics* case that the issue of what the administrators should pay should be approached flexibly, that approach was adopted, as I have said, as a result of a concession, and it was accepted on both sides before me that the decision of the Court of Appeal did not strictly bind me to adopt a similar approach. It is not difficult to see why the matter proceeded by way of concession. On the first part of the case, the landlord had argued (see para.46 of the judgment) that because the landlord

did not have an automatic right to rent, the balancing exercise should be resolved in its favour by allowing the landlord to bring the proposed proceedings. Consistently with that, the landlord could hardly turn round and say the opposite when considering the terms upon which the administrators should be allowed to leave the licence in place. Nor was it in the interests of the administrators to argue that.

25    The Court of Appeal in *Innovate Logistics* did not consider the *Toshoku* case, the *Lundy Granite* line of cases, or *Powdrill*. Had it done so, it would have needed to address the application of the salvage principle, and the rejection in *Toshoku* of the approach of Nicholls LJ in *In re Atlantic Computers Systems Plc* [1992] Ch 505, as subsequently applied by him in *In re Kentish Homes Ltd*. [1993] BCLC 1375. In the *Kentish Homes* case, Nicholls VC (as he had by then become) considered the issue of whether a post-liquidation liability to community charge on empty flats in the possession not of the liquidator but of an administrative receiver was an expense of the liquidation. He held that it was not, but would only rank as such if the court, as a matter of discretion, directed the liquidators to discharge the obligation out of the assets in their hands. The House of Lords, in agreement in this respect with the Court of Appeal in *Toshoku*, concluded that this case was wrongly decided, as the community charge was clearly a post-liquidation liability of the company, and the *Lundy Granite* principle was irrelevant to such liabilities.

26    The House of Lords in *Toshoku* also disapproved of the proposition that the *Lundy Granite* principle conferred a discretion, Lord Hoffmann observing, at p.682 in para.39:

> "There is of course no question that section 130(2) of the 1986 Act (the lineal descendant of section 87 of the 1862 Act upon which the *Lundy Granite Co* principle was originally constructed) confers a statutory discretion. But the discretion is as to the remedy which the creditor should be allowed to exercise; whether he should be able to bring proceedings, levy distress or execution or should have to wait for the distribution of the assets in due course of liquidation. The fact that a debt counts as an expense of the liquidation does not necessarily mean that the creditor should be allowed immediately to bring proceedings or levy execution. The order of priorities under rule 4.218(1) may mean that if he is paid at once, the assets to satisfy prior expense claims may be insufficient. So the question of remedy is entirely a matter of discretion. But the discretion does not determine whether a claim is a liquidation expense or not. It is rather the other way round; the claim must be a liquidation expense before the court can have any discretion to grant a

remedy which will enable the creditor to obtain payment in priority to
other claims."

27    In other words, the court might have a discretion as to whether or not to allow
forfeiture proceedings to be brought or to allow distress to issue, but there is no
discretion to declare something to be or not to be a liquidation expense.  The
same principle applies, in my judgment, to administrations.

28    There is one other point.  The treatment of rent as a liquidation or administration
expense under the *Lundy Granite* principle is not necessarily determinative of the
point of time at which the rent should be paid.  As Lord Hoffmann recognised in
*Toshoku* in the passage I have just cited, if the sufficiency of the realisable assets
is in doubt, the landlord may have to wait and see to what extent the assets will be
enough to satisfy his claim, even though properly treated as a liquidation or
administration expense, as there may be other claims also having priority. There
is in that sense no right to immediate payment, though the right for the accruing
rent to be treated as an expense having appropriate priority where the liquidator or
administrator is making use of the property still remains.  None of that is relevant
here, as the assets are acknowledged to be sufficient to meet the claim of the
applicant landlord for rent to be treated as an administration expense, whether
under rule 2.67(1)(a) or (f), and the administrators are paying administration
expenses as they go along, recognising correctly, as is commonly the case,  that
they have no justification for acting otherwise.

29    For all those reasons, the application succeeds in relation to the December rent as
it is common ground that the premises, even if the administrators now decide to
give them up, will not then be vacant, and rent will continue to be payable as an
administration expense quarterly in advance under the terms of the two leases so
long as the administrators retain or use any part of the premises demised under
each such lease for the benefit of the administration.  If of course they vacate the
property demised under one of the leases entirely, the rental liability under that
lease, but not under the other, will cease to be payable as an administration
expense.  If they vacate the other demised property as well, the rental liabilities
under both leases will cease to be payable as administration expenses.

_____

622                          KING'S BENCH DIVISION.                    [1910]

1910

PARKINSON
*v.*
GARSTANG
AND
KNOTT END
RAILWAY.

Buckuill J.

which has been caused by their breach of the duty which the statute has by s. 61 placed upon them. In the present case the county court judge has found that this gate was insufficient. There was evidence on which he could so find, and therefore in my opinion the defendants are liable. I agree with what Phillimore J. has said as to there being no evidence on which the county court judge could find that the plaintiff was guilty of contributory negligence.

*Appeal allowed.*

Solicitors for plaintiff: *Francis White & Needham, for Forshaw & Parker, Preston.*

Solicitor for defendants: *R. H. Bentley, for C. C. & D. Forrester Addie, Fleetwood.*

F. O. R.

———

1910
*Feb.* 15.
———

## GRAY *v.* OWEN.

*Landlord and Tenant—Surrender by Operation of Law—Acceptance of Surrender under Mistake of Fact induced by Tenant—Liability of Tenant for Rent.*

The plaintiff let a house to the defendant, a naval officer, for a term of years subject to a proviso that "should the tenant be ordered away from Portsmouth by the Admiralty he may determine this agreement by giving to the landlord one quarter's notice in writing." During the continuance of the tenancy the defendant received an order from the Admiralty to join a ship for foreign service, but shortly afterwards that order was cancelled. Subsequently to the cancellation the defendant, purporting to act under the terms of the agreement and in the belief that he was thereby entitled to do so, gave the plaintiff a quarter's notice of his intention to give up possession. The plaintiff, in the belief that the defendant was at that time under orders from the Admiralty to leave, resumed possession of the house on the expiry of the notice and advertised it for sale. Subsequently the plaintiff discovered the true facts, and brought the action to recover the rent which had accrued in the interval:—

*Held*, (1.) that the defendant was under the circumstances not entitled to give the notice to terminate the tenancy; (2.) that, as the non-disclosure of the cancellation of the Admiralty's order was not fraudulent, the fact that the plaintiff accepted the notice under a mistake induced by the act of the defendant did not prevent that acceptance from working

**1 K. B.**           KING'S BENCH DIVISION.                    623

    a surrender by operation of law; but (3.) that the giving of the notice
was a breach of an implied contract in respect of which the plaintiff was
entitled to recover the amount of the rent due as damages.

1910

GRAY
*v.*
OWEN.

APPEAL from the Portsmouth County Court.

    By an agreement dated March 19, 1907, the plaintiff let to the
defendant, an officer in the Royal Navy, a house at Havant for a
term of three years and one half-quarter from May 9, 1907, at
a yearly rent of 34*l.* The agreement provided that "should the
tenant be ordered away from Portsmouth by the Admiralty he
may determine this agreement by giving to the landlord one
quarter's notice in writing to expire on any of the usual quarter
days." The defendant entered under the agreement. On Feb-
ruary 12, 1908, he received orders from the Admiralty to join
H.M.S. *Ocean,* which was ordered to the Mediterranean. As his
wife was ill and he was anxious not to be separated from her, he
petitioned the Admiralty to withdraw his appointment. The
Admiralty gave him the alternative of taking up his appointment
or of being put on half pay. The defendant elected to go on half
pay. On February 20 the Admiralty cancelled their order and on
March 14 they put him on half pay. On March 25, 1908, the
defendant gave notice in writing to the plaintiff of his intention to
give up possession of the house on June 24. In giving that notice
he purported to act under the terms of the agreement, and he did
so under the belief that he was entitled to give it notwithstanding
the cancellation of the Admiralty's order. The plaintiff, in the
belief that the defendant was then under orders to leave Ports-
mouth, accepted the notice. The defendant gave up possession
on June 24, and the plaintiff advertised the house for sale by
auction with vacant possession. Subsequently the plaintiff,
having discovered the true facts, brought this action in January,
1909, to recover two quarters' rent due at Christmas, 1908. The
county court judge held that, the defendant having once been
ordered away from Portsmouth, the condition entitling him to
give notice to quit had arisen, and that the notice was valid not-
withstanding the cancellation of the order, and that even if the
notice was bad the plaintiff's acceptance of possession effected a
surrender by operation of law. He accordingly gave judgment
for the defendant. The plaintiff appealed.

624                    KING'S BENCH DIVISION.               [1910]

*St. Gerrans,* for the plaintiff. The notice to quit was bad. The meaning of the agreement was that the tenant might give notice to quit if he was under orders to leave at the time of the notice given. Here, as the order to leave was cancelled before the date of the notice, the defendant was in the same position as if no order had ever been given. Secondly, there was no surrender by operation of law. Such a surrender only takes effect by way of estoppel, where the landlord has done some act inconsistent with the continuance of the tenancy disentitling him to allege that it is still continuing. But there can be no estoppel where the act of the landlord is done in ignorance of the facts, and a fortiori is this the case where the mistake of the landlord is induced by the conduct of the tenant, as was the case here.

*Rankin,* for the defendant. The defendant was under the circumstances entitled to give the notice. The order to leave was, it is true, withdrawn on February 20, but that withdrawal did not put the defendant in the same position as if it had never been made, for he was thereby put on half pay, which rendered him less able to pay the rent of the house, and he was on half pay when he gave the notice. But if the defendant is wrong on that point, it is clear that the resumption of possession by the plaintiff with the intention of putting an end to the tenancy effected a surrender by operation of law.

[PHILLIMORE J. The defendant by giving the notice induced in the mind of the plaintiff a mistaken belief that the condition on which alone the notice might be given had arisen. Can he under those circumstances be heard to say that the plaintiff is estopped from disputing the determination of the tenancy? In *Bruce* v. *Ruler* (1), where a landlord at the request of his tenant, the defendant, accepted as tenant in his stead a third person who to the knowledge of the defendant had compounded with his creditors, and the defendant did not communicate that fact to the landlord, upon the new tenant proving to be insolvent it was held that the defendant was liable to the landlord for the rent. The suppression of a fact which, had it been known to the landlord, would have caused him to refuse the third person as his tenant was a fraud which vitiated the surrender.]

(1) (1828) 2 Man. & Ry. 3.

**1 K. B.**          KING'S BENCH DIVISION.                    625

But here there was no fraud, and in the absence of fraud the non-
disclosure of a fact however material cannot prevent the surrender
from taking effect upon the landlord's resuming possession.

[BUCKNILL J.  We agree that the surrender of the tenancy was
complete.  But was not the defendant guilty of a breach of
contract in giving the notice in circumstances in which he
was not entitled to give it, and is he not liable in damages
for that breach ?]

There was no implied contract that the defendant would not
give notice except in a certain event.  It was for the landlord
before accepting possession of the premises to satisfy himself
that the occasion upon which the notice may be given has arisen.

BUCKNILL J.  Though the facts of this case are somewhat
novel, the rights of the parties may be determined by reference
to ordinary principles.  The plaintiff in March, 1907, let a house
under a tenancy agreement to the defendant, who is an officer in
the Navy, and by the terms of that agreement in the event of
the defendant being ordered away by the Admiralty he was to
be at liberty to terminate the tenancy by giving a quarter's
notice to quit.  On February 12 in the following year he was
ordered away by the Admiralty, having been appointed to a
ship which was ordered to the Mediterranean.  In consequence
of his wife's illness he begged the Admiralty to withdraw
the appointment.  He was given the option of joining the
ship or being put on half pay.  He chose the latter, and
on February 20 his appointment was cancelled, and he was
shortly afterwards put on half pay.  At that time he had given
no notice to give up possession, and it was not until March 25,
when there was no existing order of the Admiralty ordering him
away from Portsmouth, that he gave the plaintiff notice.  The
first question is whether under those circumstances he was
entitled to give the notice.  I think not, for it was not in accord-
ance with the terms of the agreement, as he was not at that
time under orders to leave.  Therefore I am of opinion that the
notice was bad, though in the absence of any finding of fraud we
are bound to assume that it was given honestly and under a
misunderstanding as to his rights under the agreement.  It was

1910
———
GRAY
*v.*
OWEN.

KING'S BENCH DIVISION.                    [1910]

1910

GRAY
*v.*
OWEN.

Bucknill J.

indeed suggested that as the defendant was in a worse pecuniary position by being put on half pay, and it was a condition of the withdrawal of the Admiralty's order that he should be put on half pay, he could not fairly be treated as being in the same position as if the order had never been made. We cannot accept that contention. It does not get over the difficulty that at the time of the notice there was no existing order to leave. The notice then being bad, we have to decide whether the defendant in giving it was guilty of a breach of his agreement. We think he was. The liberty given by the agreement to the defendant to terminate the tenancy upon the occurrence of one specified event excludes his liberty to do so except in that event, and the agreement must be read as containing an implied undertaking by him not to give notice except in that event. On receiving the notice the plaintiff, in the belief that the notice was a valid one, accepted it, and, upon the defendant giving up possession at the quarter day, advertised the house for sale with vacant possession. We have already expressed the opinion that, as the defendant in giving the notice had no intention to deceive, the fact of the plaintiff having been misled by the defendant's act did not prevent his acceptance of the surrender from operating as a determination of the tenancy, and consequently the defendant is not liable for rent as though the tenancy were subsisting. But the acceptance of the surrender does not preclude the plaintiff from suing for damages for the breach by the defendant of the contract. It did not destroy the existing cause of action. If the plaintiff had succeeded in letting the house at the same or a higher rent, of course he would have only been entitled to nominal damages, but as he did not succeed in letting or selling it he is entitled to recover the amount of the rent which he has lost. The appeal must be allowed.

PHILLIMORE J. concurred.

*Appeal allowed.*

Solicitors for plaintiff: *Fielder, Le Riche & Co.*, for *Biscoe-Smith & Blagg, Portsmouth.*

Solicitors for defendant: *Mills & Morley*, for *B. Kent, Portsmouth,*

J. F. C.