# GREAT WESTERN RAILWAY COMPANY *v.* SMITH.

### [1875 G. 64.]

*Railway Company—Mines—Lessee—Owner's Compensation—Forfeiture—*
*Surrender—Railways Clauses Act (8 Vict. c. 20), ss. 6, 78.*

A railway company bought land without the minerals thereunder, and constructed a railway upon the land. The landowner made a lease for fifteen years of the minerals. The lessee gave to the company notice of his intention to work the minerals; the company gave him notice, and paid him under the *Railways Clauses Act,* 1845, s. 78, compensation for leaving the minerals. The lessee fell into arrear with his rent, and surrendered the lease to the landowner. A purchaser from the landowner gave to the company notice of his intention to work the minerals, and claimed compensation without regard to the payment already made to the lessee, and began to work the minerals so as to endanger the railway :—

*Held,* that the company had obtained a right to support from the minerals, and that the landowner would be restrained from working the minerals, but might obtain compensation under sect. 6 or sect. 81 of the *Railways Clauses Act,* 1845, and might have obtained compensation under sect. 68 of the *Lands Clauses Act,* 1845.

Where a lessor re-enters on a forfeiture the rights of under-lessees are gone, but where a lessor accepts a surrender from a lessee the rights of the under-lessees remain although the lessee was at the time liable to forfeiture.

Decree of *Hall,* V.C., reversed.

C. A.
———
1875
V.-C. H.
*Nov.* 23.

C. A.
1876
*Jan.* 11, 12.
———

THE *Great Western Railway* near *Wednesbury* runs for about 300 yards upon an embankment and viaduct, about twenty feet above the level of the soil, and eighty feet above the coal beneath it. This part of the railway originally belonged to the *Birmingham, Wolverhampton, and Dudley Railway Company,* who had, in 1854, bought the land, about four and a half acres, from one *Benjamin Round,* under the Consolidation Acts of 1845. In the conveyance from *Round* to the railway company the mines and minerals under the surface were not included.

The coal under this land had been previously worked out by persons claiming under *Benjamin Round,* leaving only certain ribs or pillars of thick coal, which served to support the railway.

In 1865 the trustees under *Benjamin Round's* will made a lease to one *Hodgkins* of the colliery of which the mines under the railway formed part. The term was fifteen years, at rents of £150

*Statement.*

236                         CHANCERY DIVISION.                    [VOL. II.

C. A.

1876

GREAT
WESTERN
RAILWAY Co.
*v.*
SMITH.

Statement.

and £550 an acre, payable until a total sum of £10,339 had been paid. In 1864 *Hodgkins*, being then in possession of the colliery under a verbal agreement, had given notice under the *Railways Clauses Act*, 1845, to the *Great Western Railway Company* of his intention to work the coal under the railway; and the company then gave him notice that the working would be dangerous, and that they were willing to make compensation (1). After some negotiation the company agreed to pay *Hodgkins* £688 compensation for leaving ungotten all the coal and ironstone under the company's land, *Hodgkins* covenanting to pay the £150 an acre to his lessors, and to facilitate the assessment of the lessors' compensation for leaving the coal permanently ungotten. The company paid the £688, and *Hodgkins* ceased to work the coal. *Hodgkins* died in 1866. In 1869, on an application by his lessors for rent, which was then in arrear, they were informed that his estate was insolvent, and that his executors wished to surrender

---

(1) 8 Vict. c. 20: " And with respect to mines lying under or near the railway, be it enacted as follows :—

" 77. The company shall not be entitled to any mines of coal, ironstone, slate, or other minerals under any land purchased by them, except only such parts thereof as shall be necessary to be dug or carried away or used in the construction of the works, unless the same shall have been expressly purchased, and all such mines, excepting as aforesaid, shall be deemed to be excepted out of the conveyance of such lands unless they shall have been expressly named therein and conveyed thereby.

" 78. If the owner, lessee, or occupier of any mines or minerals lying under the railway, or any of the works connected therewith, or within the prescribed distance, or, where no distance shall be prescribed, forty yards therefrom, be desirous of working the same, such owner, lessee, or occupier shall give to the company notice in writing of his intention so to do thirty days

before the commencement of working ; and upon the receipt of such notice it shall be lawful for the company to cause such mines to be inspected by any person appointed by them for the purpose ; and if it appear to the company that the working of such mines or minerals is likely to damage the works of the railway, and if the company be willing to make compensation for such mines, or any part thereof, to such owner, lessee, or occupier thereof, then he shall not work or get the same ; and if the company and such owner, lessee, or occupier do not agree as to the amount of such compensation, the same shall be settled as in other cases of disputed compensation.

" 79. If before the expiration of such thirty days the company do not state their willingness to treat with such owner, lessee, or occupier for the payment of such compensation, it shall be lawful for him to work the said mines, or any part thereof, for which the company shall not have agreed to pay compensation," &c.

the lease.   After some negotiations, and the filing of a bill to restrain the discontinuing by the executors of the draining of the collieries, an arrangement was made, and the executors of *Hodgkins*, by an indenture, dated the 1st of July, 1869, surrendered on certain terms to the trustees under *Round's* will the colliery comprised in the lease of 1865, except a part which had been underlet. In 1873 the trustees under *Round's* will sold to *Edward Smith* the colliery, including the minerals under the company's land. *Smith*, on the 30th of September, 1873, served on the company notice that he was desirous of working the minerals under the railway. *Smith* and the company were unable to agree as to what, if any, compensation was to be made to him for not working the coal. *Smith* then proceeded to work the coal, and the company found it necessary to build a support to the railway at an expense of upwards of £1000.   The Government surveyor reported it doubtful whether these precautions would be adequate to meet the danger; and it was stated that the trains were obliged to slacken their speed at this part of the line.

The railway company accordingly filed their bill in this suit to restrain the Defendant from working the coal under their land so as to injure the railway or impede the traffic, and for an account of damages, the company being willing to pay compensation to *Smith*, having regard to the compensation already made to *Hodgkins*.

*Smith* stated that he had had no notice of the bargain between the company and *Hodgkins*.   The company alleged, and *Round's* trustees denied that they had any notice.

The company obtained an interim injunction, and the cause came on before the Vice-Chancellor *Hall* on motion for a decree on the 23rd of November, 1875.

*Davey*, Q.C., and *H. A. Giffard*, for the company, cited *Caledonian Railway Company* v. *Sprot* (1); *Elliot* v. *North Eastern Railway Company* (2); *Holmes* v. *Powell* (3); *Pleasant* v. *Benson* (4); *Midland Railway Company* v. *Checkley* (5);

| | |
|---|---|
| (1) 2 Macq. 449. | (3) 8 D. M. & G. 572. |
| (2) 10 H. L. C. 333. | (4) 14 East, 234. |
| | (5) Law Rep. 4 Eq. 19. |

*Margin notes:*
C. A.
1876
GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.
——
Statement.
——

Argument.
——

CHANCERY DIVISION.                    [VOL. II.

C. A.        *Dickinson*, Q.C , and *Jolliffe*, for the Defendant.

1876
⁓⁓
GREAT        HALL, V.C. :—
WESTERN
RAILWAY CO.      It appears to me that the Plaintiffs' case entirely fails.
*v.*
SMITH.          The questions which have been discussed are no doubt of very
            great importance to railway companies with reference to their
Judgment,   interest in mines under their railways, and many of the questions
V.-C. H.
            are of extreme nicety and difficulty.   I have formed opinions
            upon most of them, but in the view which I take of the case, it
            will not be necessary for me to express my opinions, and I intend
            not to do so :—[His Lordship then stated the facts of the case.]

It is clear that when a person who has a right to work
mines under a railway gives a notice under the 78th section of
the *Railways Clauses Act,* and the company object to the mines
being worked, they must give compensation to the person so
giving notice in respect of the interest which that person has.
It is monstrous to suppose, as has been contended before me,
that in the case of a person who has a lease of the minerals for
perhaps two years the company are at liberty to deal with that
person, and offer him compensation in respect of the entire fee
simple in those minerals.   That cannot be the meaning of the
section.   Each person who is about to work is entitled to give
notice and to get compensation in respect of his interest.

Now, what was Mr. *Hodgkins'* interest at the time when com-
pensation was made to him ?   He was lessee for fifteen years,
a term which was liable to come to an end by the re-entry of
the landlord in respect of the non-payment of any one of
the instalments of rent, or in respect of the non-performance
of the covenants on the part of Mr. *Hodgkins* the lessee.   The
railway company perfectly well knew the risk they incurred ; and
they must be taken to have incurred it.   They may have thought
that there was nothing or not much in it.   They seem, according
to their statement, to have compensated him as for the value of
the minerals without making any deduction in respect of the
possible determination of his lease before the time, and without
taking any covenant or any provision which would protect them
in respect of their having paid compensation for the whole fifteen
years—that is, for the whole of the coal—and the tenant being

turned out the next year.  That was their fault.  They may have
been in a great difficulty as to knowing how to fix the compensa-
tion for an interest of that kind.  But such is the case.  They
must deal with it in that way, and they must· protect themselves
as best they can.  If the present legislation on the subject does not
enable them effectually to protect themselves, it would be right
that they should be protected by further legislation upon the
subject; but all I can deal with is the Act of Parliament as it
stands at present.

Then, under what circumstances did the interest of Mr. *Hodgkins*
come to an end ?  It is said that a lessee who has created a deri-
vative interest, and made contracts with third parties to the benefit
of which those third parties are entitled, is, by the creation of such
derivative interest or by such contracts, prevented from making
arrangements and dealing with his interest, except subject to those
arrangements.    As a general proposition of law I do not at all
dispute the correctness of that, but the whole of the circumstances
of each particular case must be considered, and it cannot be said
that in this case it has been shewn upon the evidence that the
landlord was compelled to wait until the end of the fifteen years·
before he could resume possession.    To my mind it is clearly
established that he was in a position to resume possession under
his power of re-entry ; and to say that he is to wait, nevertheless,
because of this arrangement between the railway company and
the tenant is, I think, a proposition which cannot be maintained.
We must look at the circumstances of the case.  If this was a case
of an ordinary character, or could be fairly and properly viewed as·
a purchase between the landlord and the tenant of the tenant's
interest, it might be said that their dealings could not affect the
Plaintiffs' right during the continuance of this term.    That, how-
ever, is not the real truth of the transaction.    The landlords were·
not, as I conceive, bound to go through the process ·of bringing
an ejectment for the purpose of putting in force their power of
re-entry.  They were at liberty, I consider, to make an arrange-
ment with their tenant that should spare them the necessity of
going through that process :—[His Lordship then stated the evi-
dence on the subject.]    It was impossible for the executors of
*William Hodgkins* to make any stipulation for a confirmation

C. A.

1876

GREAT
WESTERN
RAILWAY Co.
*v.*
SMITH.

Judgment,
V.-C. H.

CHANCERY DIVISION. [VOL. II.

C. A.
1876

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment,
V.-C. H.

of the Plaintiffs' rights to the mines so sold to them, as the executors had no funds whatever, and the lessors were entitled to re-enter for nonpayment, and also to distrain all the stock and plant on the colliery, which stock and plant were liable to be distrained for arrears of royalty, and would not under a distress have realized anything like enough to satisfy such arrears. I consider that this lease must be taken to have come to an end according to its term and provisions, and that the interest which was compensated for therefore being at an end (whether the compensation was too much or not I have nothing to do with), what has been paid has been paid in respect of an interest which has terminated, and correctly and properly terminated.

I have nothing therefore to do in this case, as it appears to me, with the questions which have been argued and discussed before me as to whether or not Mr. *Smith*, the purchaser, had notice of the compensation having been paid as it is alleged to have been paid, and I do not express any opinion whether there was or was not under the circumstances of this case either actual or constructive notice which could affect Mr. *Smith*.

But it is said that if that be so, then this is a case of compensation; and therefore the Court will even now, at the instance of the Plaintiffs, say that the Defendant, the legal owner of these mines, is to be restrained from working these mines because the Plaintiffs are willing to make compensation, and for that purpose the case of *Midland Railway Company* v. *Checkley* (1) has been referred to. The conclusion there come to was, that the company was entitled to work the mines, making compensation. It was not a case arising upon the sections of the Act of Parliament which I have now to deal with. According to those sections Mr. *Smith* as the owner of these mines, was the person who, desiring to work them, had to give notice to the company of his intention to work them. Thereupon the company were entitled, within a certain time, to give notice that they would make compensation, and if they had done so, then compensation must have been received by Mr. *Smith*. But the Act of Parliament declares and enacts that if the company fail to give him notice Mr. *Smith* is to be entitled to work the mines; I cannot, there-

(1) Law Rep. 4 Eq. 19.

fore, take away his statutory right; and that being his statutory right, I cannot say that he shall not now work the mines as the company have not thought proper to offer the compensation within the time which the Act of Parliament allowed them.

The result, therefore, as it seems to me, upon the short ground on which I have put the case, is that the Plaintiffs' bill entirely fails. I cannot, therefore, do otherwise than dismiss the bill, and of course with costs; and there must be an inquiry as to the damage sustained by the Defendant through the injunction.

C. A.

1876

GREAT
WESTERN
RAILWAY CO.
v.
SMITH.

Judgment,
V.-C. H.

From this decision the company appealed, and the appeal came on for hearing before the Court of Appeal on the 11th of January, 1876.

C. A.

*Thesiger*, Q.C., and *H. A. Giffard* (*Davey*, Q.C., with them), for the company :—

Argument.

We have already paid for this coal, and now the purchaser wants to be paid for it again. As to the question of notice of the previous purchase, we do not consider it very material; but whether the purchaser had actual notice or not, he must have had constructive notice, seeing that the coal was, and had for many years been, under the railway. The meaning of the 77th and 78th sections of the Act is clear. As the minerals may become very valuable the company is not to be entitled to take them, but whenever the landowner is in a position to work them, the company is to pay for them their full value. It can never have been intended that every time there is a fresh lease or sale of an adjoining colliery the company are to pay for the coal again. When a lease of a mine is for a time sufficient to work out the coal, it is equivalent to a sale of the coal to the lessee, as he will be assumed to intend to work it. He has bought the coal, and can sell it to the company. What has the landowner to complain of? No doubt the sections in the Act are badly worded, but the intention is clear enough. The company pay the lessee for the coal, and he pays to the landowner rent, royalty, or price, or whatever it may be, as if he had got the coal. If the landowner thinks himself injured, he can, under the 68th section of the *Lands Clauses Consolidation Act*, obtain compensation, and the company are quite ready to pay what

242                     CHANCERY DIVISION.               [VOL. II.

C. A.

1876

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Argument.

is reasonable : *London and North Western Railway Company* v. *Ackroyd* (1). We dealt with the only person with whom we could deal : *Slipper* v. *Tottenham and Hampstead Junction Railway Company* (2); *Great Western Railway Company* v. *Bennett* (3).

If the landlords had seized as for a forfeiture, they might not be affected by anything which the lessee has done ; but this lease was surrendered, and then the company are like a sub-lessee, and are not affected : *Doe* v. *Pyke* (4). Perhaps the landlords might have seized as for a forfeiture, but they did not, and we know nothing about their dealings. At all events, we must be allowed to ransom the railway on reasonable terms.

*Dickinson*, Q.C., and *Jolliffe*, for the Defendant :—

The Defendant here has bought and is owner in fee simple of this coal, and yet it is said that, by Act of Parliament, his right has been taken away from him, and he is to get no compensation. No one has ventured to suggest that the company is owner of this coal, and how, then, can the company be said to have bought the coal ? The company claims support from this coal, but then the owner must be compensated for being prevented from working it. They say they have compensated one tenant, and perhaps he has been compensated for his interest, but that is not ours. Whatever coal the lessee has left clearly belongs, at the end of the term, to the lessor ; and why is he not to have it ? The Act is rational and consistent, and leaves the company to deal with the owner of the coal. Could the company, within a week of the expiration of the term, pay what the lessee would accept, and then say that the lessor was to have nothing ? If the lessee is to pay a royalty on the coal worked, then he will pocket the money paid by the company, and the lessor will get nothing whatever for his coal. Of course, if the Act of Parliament was clear to that effect, we must submit, but avowedly it is not, and is rather the other way. It may be hard on the company, but is the landowner to be left without compensation for what is unquestionably his property ? The company may have purchased, but it was from a vendor who had no title, and they must take the usual con-

(1) 31 L. J. (Ch.) 589.            (3) Law Rep. 2 H. L. 27.
(2) Law Rep. 4 Eq. 112.            (4) 5 M. & S. 146.

VOL. II.]                    CHANCERY DIVISION.                    243

sequences.  As to the surrender of the lease, that is clearly equiva-
lent to forfeiture.  The lessee was in default, and surely it could
not be necessary for the landlord to go to the expense and delay
of an ejectment when the lessee was ready to give all that could
be got by an ejectment.

C. A.

1876

GREAT
WESTERN
RAILWAY Co.
v.
SMITH.

Judgment, C. A.
James, L.J.

JAMES, L.J. :—

This case is, no doubt, in many respects a peculiar case, but,
after the elaborate manner in which it has been argued, and after
the whole case has been fully placed before the Court, and all the
consequences resulting from the different views have been shewn
to us, it does not appear to me that there really is any very great
difficulty in arriving at a conclusion.  I say that with great respect
to the Vice-Chancellor, who appears to think there was no great
difficulty in arriving at a conclusion different from that which to
me and my learned Brothers appears to be the right conclusion.

The *Great Western Railway Company* have filed their bill to
restrain a gentleman of the name of *Smith* from working some
mines under their railway which are essential to the support of
their railway, and without which support the railway in all pro-
bability would collapse.

The circumstances under which this case has arisen are these :—
[His Lordship then stated the facts.]  If Mr. *Smith's* contention
is right, if *Round's* trustees had a right to give their tenant a
claim for compensation as against the railway company, and then,
on the expiration of the lease, had the right again to have com-
pensation, then Mr. *Smith* is in the same position, and could also
make his claim.  He might also grant a lease for a year to a
friend of his, and the lessee for a year could go to the railway
company and give a similar notice, and say to them : " Now pay
me, or else I will work."  The railway company would, if the con-
tention is right, have no alternative but to pay him.  At the end
of that year Mr. *Smith* might grant another lease to another
friend, or indeed to the same friend, and that lessee would then
say : " Now you must pay me again."  So it might go on *de anno
in annum,* giving the person who is the owner of the minerals,
under a clause which is said to be introduced for the benefit of the
railway company, the power of compelling the railway company to

C. A.
1876
GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment, C. A.
James, L.J.

pay him the whole value of the excepted minerals every year, or it may be every month (if a month were sufficient to work out the mineral), during which the railway was in existence; that is to say, the owner of the minerals would be entitled to take not only the pound of flesh, but the whole life blood of the railway, if that contention is right.

Now, is that the construction which the Act of Parliament compels the Court to put upon this clause? Fortunately it is not. It seems to me to be such a *reductio ad absurdum*, that it would be impossible for the Legislature to have intended that to be the result of their legislation. What is it that the Legislature has done? The Legislature being of opinion that it was for the public benefit that a railway should be made, and certain persons being of opinion that it would be for their personal benefit to do this beneficial work, they, for their personal benefit, no doubt, obtained from the Legislature the power of making, constructing, and maintaining the railway for ever. For the purpose of enabling them to make, construct, and maintain the railway, they are authorized to buy lands, which is, in fact, the power which they required; but with regard to minerals lying under the land the Legislature said this: "You do not want the minerals, you only want a sufficient substratum or a sufficient support for your railway, and although you are authorized to buy land from anybody, you are not authorized to take the minerals, except only the part required to be taken or used in the actual construction; and minerals shall be deemed to be excepted out of the conveyance."

Of course it struck the Legislature that those mines might still be wanted, not in their character of mines, but for the absolute support of the railway itself, and accordingly the Legislature has said that, notwithstanding they are excepted, they are only to be worked in this way :—[His Lordship then read the 78th section.]

There, no doubt, the Legislature is dealing with a company and a person who is actually on the eve of working the minerals. Now, what was the right of that person? He had got, not a right to occupy, not a right to use, not a right to have a thing like a farm or a house for a certain term of years, but the right to carry and take away the minerals, the actual piece of coal or the actual

piece of iron ore that was found there lying imbedded in the soil; to take that away as a chattel and sell it after he had removed it. But then the Legislature, dealing with him as a man who is really and substantially the owner, said: "No, you shall not take it away if the railway company are minded to pay you for it." In the result, it seems to me that, looked upon as a matter of common sense, the owner was prevented from removing and selling it to anybody else, and was compelled and authorized to sell it *in situ* to the company for the purpose of leaving it there as a permanent support for their railway. He was the person who would have been damaged, and he was the person, therefore, whom the Legislature considered to be entitled to compensation for that which was intended to be a permanent appropriation of this particular mineral for the purpose of a pillar or support to the railway.

Then it is said that if the lessee had not got it, it would have remained, and was the property of the owner; and that we are taking away this property from the owner without making him any compensation. Of course, if property is taken from anybody, or anybody is injuriously affected by the result of any construction put upon an Act of Parliament, that would be a very strong reason why that construction should not be adopted. I understand the broad principle of all these Acts to be, that the railway company is to pay for all property taken or injured, but not to give compensation to persons, except for actual loss or damage. No actual loss or damage is sustained by the reversioner because somebody was prevented from removing that which, if he had removed it, the reversioner would never have got. Therefore there was originally no damage in that sense.

It is possible, however, and not only possible, but probable, that this right to stop the working might have enured to the loss of the reversioner; that is to say, this state of things might well have arisen, and the reversioner might say, "You stopped my tenant from working the mines, and therefore you stopped me from enforcing his covenant to work, which working would have been followed by a payment by him of royalties and other sums of money, and therefore I have been prejudiced to that extent." If so, if damage is ever done to the reversioner by

C. A.

1876

~~~

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment, C. A.
James, L.J.

CHANCERY DIVISION.                    [VOL. II.

C. A.

1876

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment, C. A.
James, L.J.

reason of the lessee or occupier being prevented from getting minerals, then that reversioner is, beyond all question, injuriously affected by what has taken place, and being injuriously affected in respect of his interest in the land by reason of the interference with his tenant and with what the tenant would otherwise have done, he would be entitled to compensation under those circumstances, like any other person whose property was injuriously affected by reason of the exercise of the powers contained in the Act.

It appears to me that the 6th section of the *Railways Clauses Act* in terms provides for this very case; that is to say, that anybody who is damaged by the exercise of any power given by the Act of Parliament is entitled to be compensated for any damage so sustained. If my view is right, that the Legislature has authorized a railway company to stop the working in the hands of a worker upon paying that worker for the thing which the worker otherwise would have got, and if by reason of being so stopped the reversioner is damaged, then the reversioner can send in his claim to the railway company, and would be entitled either to have the amount of the claim paid, or to have it ascertained exactly in the same way as any other person whose rights are injuriously affected. It appears to me that that is really the meaning of the 6th section; that is to say, you cannot confine it to one particular owner, because if you confine the stoppage to one particular owner it would not affect the heir, it would not affect the executors, it would not affect he administrators, it would not affect the assignee, or anybody else, who might come in the next day. If it were merely to stop the hands of a particular man who was at that particular moment at work, it must, from the absolute necessity of the case, be a perpetual stopping of the work and a perpetual compensation to anybody entitled to compensation. All the sections which follow the 77th section proceed on the assumption that the working has been stopped, and that the bulk of the minerals has been permanently appropriated to the use of the railway. But the subsequent owners and occupiers have rights given to them of working through the excepted space under certain circumstances, and they have rights given to them of being paid compensation by reason of any extra

VOL. II.]                CHANCERY DIVISION.                        247

expense they are put to through what has been done by the sever-
ance of the mine through the operation of the 78th section.

That being so, I am of opinion that the company were right,
and that they were not obliged to pay Mr. *Smith* for the mines
which, subject to the question of damages I have mentioned,
became theirs, that is to say, became subject to their right to sup-
port from the moment when the notices were given, or rather from
the exchange of notices between Mr. *Hodgkins* and them. That
being so, they were right in saying, "You must not work those
mines, for those mines have been wrought far enough, and you must
allow for a support to the railway." Therefore, they were right in
filing their bill for an injunction, and consequently a perpetual
injunction ought to have been granted. That will be without pre-
judice to any question as to any compensation which they might
be entitled to by reason of the mines having been stopped. We do
not say by whom.

In arriving at that conclusion it is not absolutely necessary to
say anything with regard to the effect of the lease and the expira-
tion of the term of fifteen years; but nothing that I have heard
makes me entertain the slightest doubt in this case that there
never was a forfeiture, or anything equivalent to a forfeiture. The
reversioner must enter either by operation of law or by proceeding
*in invitum.* He may have the fullest right to enforce a forfeiture;
but if, instead of enforcing a forfeiture, he comes to an arrange-
ment with the lessee that for some compensation he shall accept a
surrender instead of proceeding to forfeiture, then that is in point
of law a surrender and not a forfeiture; and it is quite clear that
if the right which the company had obtained from Mr. *Hodgkins*
had been obtained during the term of fifteen years, no subsequent
arrangement between him and his reversioner could have deprived
the railway company of that which they had acquired. The right
being in respect of a legal right given by the Act of Parliament to
the railway company; the question of valuable consideration with-
out notice is wholly irrelevant to any question between the parties.

I am of opinion, therefore, that the Plaintiffs are entitled to a
perpetual injunction, and that the Defendant must pay the costs
of the suit, including those of the appeal.

*C. A.*

*1876*

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment, C. A.
James, L.J.

CHANCERY DIVISION.                          [VOL. II.

C. A.    MELLISH, L.J. :—

1876          I am of the same opinion.

GREAT            If the 78th section were construed literally, I think it would be
WESTERN
RAILWAY Co.   difficult not to come to the same conclusion as the Vice-Chan-
v.        cellor did; because, no doubt, what it says is: "If the company be
SMITH.
            willing to make compensation for such mines, or any part thereof,
Judgment, C. A.   to such owner, lessee, or occupier thereof, then he shall not work
Mellish, L.J.
            or get the same." The whole difficulty, as it appears to me, arises
from those words, because I agree that the words " owner, lessee,
or occupier," in that sentence, must mean the owner, if the owner
is the man who has given the notice; the lessee, if the lessee is
the man who has given the notice; or the occupier, if the occu-
pier is the man who has given the notice. Therefore the clause in
terms says, that if the lessee has given a notice, then the lessee
" shall not work or get the same," and it does not in terms say that
the reversioner after the lease has expired shall not get it. With
respect to that difficulty I, in the first place, observe that it ap-
plies to the owner just as much as it does to the lessee, because it
does not say in terms that the heir or assignee of the owner shall
not get it; it only says that he, the owner himself, shall not get
the mines. Everybody must admit that if the person who has to
get the compensation, and who has received the notice is the
owner in fee simple, it must mean not only that he, that is
that particular man, shall not get it, but it must mean that the
people claiming under him—that is to say, his lessee, his heir, or
his devisee—shall not be entitled to get it.

Then the question arises whether the same construction is not
to be put in the case of a lessee or occupier. That makes it very
necessary to consider what, in the case of a lease, would be the
rights of the landlord. If the landlord would not be entitled to
any compensation, then of course there would be a strong reason
for saying that he could not be prevented from getting the mines
when the lease was expired. But if the landlord is entitled to
compensation, if he is to receive compensation in respect of his not
getting royalties, and the lessee is to receive compensation in
respect of his not being allowed to work the mines, then they are
both compensated, and then, so far as I can see, there is very little

difference between the case of a lessee and the case of an owner in fee simple.

Then, can the landlord in that case make a claim for compensation? It appears to me that very clearly he can do so; because in an ordinary case (taking any ordinary case of a lease and not alluding to the terms of this particular lease) if a lessee has given the notice, and if from the company having offered to compensate him he is deprived of the power of working the mines, the necessary consequence is that the landlord is deprived of his royalty in respect of the lessee getting the produce of those mines. I think that this fact has in this case been rather overlooked, because, under the circumstances of this particular case, it may be for the advantage of Mr. *Smith* to be entitled to get the mines after the lease is over—and particularly after the lease has been surrendered, the term not yet having expired—it may be for his advantage that he should be entitled to get the mines, rather than that he, or *Round's* devisees, who were the landlords at the time, should be entitled to be compensated in respect of the royalty. Yet, in a great number of cases, the landlord would be most injuriously affected if he were not entitled to get compensation for losing his royalty; even although he were entitled to enter and get the mines after the lease had expired. A variety of cases might be put. In the first place, a landlord might have merely a limited interest. He might be a mere tenant for life, and when the lease expired he might be dead; and, therefore, might never be able to get the mine after the lease had expired; yet he may be deprived of his royalties in the meantime; or the lease might be a lease for fifty years, and the value of the right to get the minerals at the expiration of those fifty years, might be worth nothing; or the quantity of the minerals might be so small that it would never pay to get them at all at the end of the lease, and yet the landlord might be deprived of the royalty. It therefore appears to me perfectly clear that the landlord is a person who, by reason of the tenant being prevented from getting the minerals, is deprived of his royalties.

I entirely agree with what has been said, that it is impossible to read the 6th section of the *Railway Clauses Act* without seeing that it would apply to that case. It is true that on account of the

C. A.

1876

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment, C. A.
Mellish, L.J.

CHANCERY DIVISION.                    [VOL. II.

C. A.

1876

GREAT
WESTERN
RAILWAY Co.
*v.*
SMITH.

Judgment, C. A.
Mellish, L.J.

introductory words to the 6th section the House of Lords, in *Hammersmith and City Railway Company* v. *Brand* (1), although with a considerable difference of opinion, held that, because this section is prefaced by the words, "and with respect to the construction of the railway and the works connected therewith," compensation cannot be claimed for damage sustained by reason of the working of the railway. That is to say, if a man is prejudiced by the noise of the trains going past his house, or by the dust getting into his house, or by the sparks from the engine setting fire to his property, those being damages which occur, not by reason of the construction of the railway, but by reason of the working of it, therefore, compensation cannot be granted. But that really is not the case here, because the damage that the landlord has sustained surely is damage by reason of the construction of the railway; and even if it does not come within the words, "lands taken or used," which I rather think it would, at any rate it must come within the words " by reason of the exercise, as regards such lands, of the powers by this or the special Act, or any Act incorporated therewith vested in the company." ·

By reason of the railway having been constructed, power is vested in the company, when the lessee is about to get the mines and gives them the notice, to give him a notice that they are ready to compensate him ; they have then the power to prevent his getting the mines, and by reason of his being prevented from getting the mines the landlord is deprived of his rights. It appears to me that the landlord in that case is a person injuriously affected by the powers of the Act. The consequence is that he is a man entitled to give notice under the 68th section of the *Lands Clauses Act,* and to claim compensation at that time.

It seems to me that the Act having given the railway company power to buy the property at its full value, and making them liable to compensate the man who is entitled to get minerals in respect of his having been deprived of the right of getting the minerals, and also making them liable to compensate the landlord who claims to be compensated in respect of his loss of royalties, it necessarily must follow that they thereby gain the right to have the minerals kept for ever for the purpose of supporting their line. The real

(1) Law Rep. 4 H. L. 171.

difference, I think, between us and the Vice-Chancellor arises from this, as is shewn from the Vice-Chancellor's judgment, that he omitted to consider the distinction between a lease of lands and houses and a lease of minerals. No doubt, as he says, it is most unjust, and it is impossible that the Legislature could have intended, in the case of a person who has merely a limited interest, that because the railway company have compensated a person who has merely a limited interest, that shall affect a right which arises after that limited interest is over. No doubt in the case of a lease of houses and lands that would be so, because a person who is a lessee of houses and lands is only entitled to use the houses and lands, and take the benefit of them during the term of the lease; and upon the expiration of the lease the reversioner is entitled to the interest in the houses and lands. But in the case of minerals, if the lessee has time to take them, however limited his interest may be, when he has once taken and sold them, the person who has to come in after him is just as much deprived of the minerals as if the person who got them had been the owner in fee simple. What does it matter? Supposing the person who is entitled to the minerals to be tenant for life, what difference can it make to the reversioner? If the tenant for life has the time and the power to take the minerals and sell them, and put the proceeds in his pocket, is not the man who comes afterwards just as effectually deprived of the minerals as he would be if instead of being tenant for life the person who took them had been tenant in fee simple?

No doubt there will, in construing the Act, be a difficulty—which I do not think it necessary for us to solve in the present case—where it is doubtful whether a person with a limited interest would have time to get the minerals if he were allowed to get them. Whether, in assessing compensation to a person who has given notice, the jury or arbitrators are to take into consideration the probability, or possibility, that he might not be able to get the minerals, and then compensate the reversioner on the footing that he is entitled to the minerals, I conceive to be a very difficult question. If there was a lessee whose lease is to last for a certain time and no longer, or if there was a tenant for life, an actuary would tell you what the value of their interests would

C. A.

1876

GREAT
WESTERN
RAILWAY Co.
*v.*
SMITH.

Judgment, C. A.
Mellish, L.J.

**A.24**

C. A.
1876
GREAT
WESTERN
RAILWAY Co.
*v.*
SMITH.

Judgment, C. A.
Mellish, L.J.

be, and then you might calculate what they were as compared with the interest of the remainderman. But you might have the case of an owner who had a limited interest which it was wholly impossible to calculate. For instance, in the case of a widow who was to lose her estate if she married, how would it be possible to calculate whether she would marry or not? She might give her notice to work, and she might receive a notice that the company were willing that compensation should be assessed. It might be alleged on her behalf that she was entitled to the whole of the minerals; and she might be a young widow likely to live for some thirty or forty years. The compensation could only be assessed on the footing that she was entitled to the whole, and yet she might marry the next day, or be at the time engaged to marry. I have very great doubt whether the Act does not mean that the person who is entitled for the time being must be taken, for the purposes of the Act, as if he were the owner, because, be it observed, notice cannot be given till the owner is in a position by law to give it. If the notice were given when the workings were 80 or 100 yards off, the company would be entitled to say, you have no business to give us this notice, because you are not in a position to get the minerals under the railway. Possibly you may never be in a position to get them, and you cannot give the notice until you have actually worked the minerals so far and arrived at such a position as to be able to get them under the railway. However it is not necessary to decide that question, because in this case there can be no doubt that, at the time when the notice was given, the lessee had before him ample time to get the minerals.

Therefore, on that part of the case, I am of opinion that we are not obliged to adopt the construction of the Vice-Chancellor, which would lead to the extraordinary result which has been pointed out by the Lord Justice, viz., that the railway company might be compelled to pay the full value of the mine, not only twice, but any number of times.

We are not obliged to adopt that which seems to me an absurd construction. If the true construction of the Act of Parliament be that railway companies are to have these minerals perpetually retained under the railway for the purpose of being a support to the railway, it follows that that is a legal right; and it is not

necessary to inquire whether Mr. *Smith* was or was not a purchaser for valuable consideration.

The other question, whether there was a forfeiture in this case or a surrender, does not really arise; but I must say that I cannot entertain any doubt that this was a surrender. It is a rule of law that if there is a lessee, and he has created an under-lease, or any other legal interest, if the lease is forfeited, then the under-lessee, or the person who claims under the lessee, loses his estate as well as the lessee himself; but if the lessee surrenders he cannot, by his own voluntary act in surrendering, prejudice the estate of the under-lessee, or the person who claims under him. If the question arose between an under-lessee and the landlord, the moment the surrender was produced, and it appeared in Court that there was a surrender of the estate, I have no doubt that a Common Law Court must necessarily hold that the landlord had waived all right to forfeiture by accepting a surrender. It would not be a case decided upon equitable grounds, but it would be a purely legal question, that is to say, although there might have been a right to claim a forfeiture if the landlord had chosen to insist upon it, yet he, *de facto*, not coming in under a forfeiture but under a surrender, if he then brought an action of ejectment against the under-lessee, the moment the surrender was produced the action must, in my opinion, fail, and the under-lessee would be entitled to keep his estate.

BAGGALLAY, J.A. :—

I am of the same opinion.

It appears to me to have been the intention of the Legislature in framing the 78th section of the *Railways Clauses Consolidation Act* to confer upon a railway company the power of preventing the working or getting minerals under or within a certain distance of a railway in cases in which it should appear to the company that it might be likely to damage the works of the company if those minerals were worked or got. It provides that upon the person in actual occupation, whoever he may be, whether he fills the character of owner or lessee, or is a mere occupier of the mineral property, giving notice of his intention or desire to work these

C. A.

1876

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment, C. A.
Mellish L.J.

Baggallay, J.A.

C. A.

1876

GREAT
WESTERN
RAILWAY Co.
v.
SMITH.

Judgment, C. A.
Baggallay, J.A.

minerals, the company are to express their willingness to make compensation, and the compensation is then to be assessed. That which is to be assessed is the compensation to "such owner, lessee, or occupier."

Now, no doubt, at first sight it might appear as if the restriction upon the working or getting minerals is limited to the particular person who was in occupation of the mines at the time, and who had expressed his desire to work them. But I think that when reference is made to the following clauses of the Act of Parliament, all of which come under the general head of mines, it is quite clear that the intention was that this restriction was to be permanent, and not limited to the particular occupier at the time. You find there a provision as regards the mineral communication; you find a provision made for any damage which might be sustained by the user of the surface land where the owner is a different person from the owner of the mines below. It all points to the intention that the restriction was to be permanent.

But if, as has been contended in the course of the argument, it had appeared to me that the Act of Parliament contained no provision by which the injury sustained by the person or persons owning the reversionary interest in the mines could be assessed or provided for, I must confess it would have gone a very long way to induce me to think that that restriction was intended to be limited to the particular person who had given the notice. I think, however, that there is an absolute provision in the Act of Parliament for securing compensation. The course adopted in the *Lands Clauses Consolidation Act* and in the *Railways Clauses Consolidation Act* has been to provide for compensation in particular instances, and also to add a sweeping clause in terms which include all cases as regards which there may be a special operation.

The question has not been raised, and I do not desire to express an opinion upon it, but I am by no means certain that compensation in the case of minerals might not be obtained under the 81st section of the *Railways Clauses Act*, which relates to injury done to mines. Supposing it cannot be obtainable under the 81st section, it is clearly expressed in the 6th section. As regards the 6th section, that clause, like other clauses in the *Railways Clauses Act*, is

to be taken subject to the provisions and restrictions contained in the *Lands Clauses Consolidation Act.* Therefore I think that, by the combined operation of the clauses in the one Act and the clauses in the other Act, abundant provision is made for securing full and complete compensation to the reversioner. That compensation might be in respect of the loss of his royalties through the minerals not being worked. It might be compensation in respect of the loss to the reversioner by reason of its being impossible to work the minerals or to get them within the time which the occupying tenant might have to work them. Be that, however, as it may, it is a matter to be determined when a proper application is made for the purpose of having that compensation assessed.

There is no doubt that the peculiar circumstances of this case have introduced elements of difficulty. It is said that that which has been treated as a lease of these mines was substantially a sale, because a term of years is fixed, the length of which is sufficient to enable the whole of these minerals to be obtained from the mine, and the amount of rent was fixed at a sum which appears to be the full estimated value of the minerals. Those are matters which have to be taken into consideration at the proper time, when the question of compensation to the owner of the reversionary interest will have to be decided. At present it appears to me that the decision of the Vice Chancellor cannot be maintained, and there should be a decree for a perpetual injunction, and, as suggested by the Lord Justice, without prejudice to the claim for compensation.

Solicitor for Plaintiffs: *R. R. Nelson.*
Solicitors for Defendant: *Rhodes & Son.*

C. A.

1876

GREAT
WESTERN
RAILWAY CO.
*v.*
SMITH.

Judgment, C. A.
Baggallay, J. A.

922                    HOCHSTER *v.* DE LA TOUR                    2 EL. & BL. 679.

constantly and necessarily arise under this Act, which must be ascertained by parol
evidence for the purpose of deciding whether there is or is not jurisdiction in the
county court: and I do not see that there is any peculiar difficulty in ascertaining the
value to be above or under the yearly amount of 50l. Being of opinion that the
Legislature meant by these words to exclude from the jurisdiction of the county
courts cases where the value is of the larger amount, and the construction of the
clause, though it may be obscure and doubtful, appearing to me to be such as is
capable of carrying out this meaning, I think that I ought to express my opinion
that a prohibition should go, though I need hardly say that I do so with the most
sincere diffidence, when I find that I differ from the rest of the Court who heard this
case.

 Rule discharged.

 ALBERT HOCHSTER *against* EDGAR FREDERICK DE LA TOUR. Saturday, June
  25th, 1853. Declaration on an agreement to employ plaintiff as a courier, from
  a day subsequent to the date of the writ: averment that plaintiff, from the time
  of the agreement, till the refusal by defendant after mentioned, was ready and
  willing to perform his part of the contract: Breach, that, before the day for the
  commencement of the employment, defendant refused to perform the agreement,
  and discharged plaintiff from performing it, and wrongfully wholly put an end
  to the agreement. On motion in arrest of judgment:—Held: that a party to an
  executory agreement may, before the time for executing it, break the agreement
  either by disabling himself from fulfilling it, or by renouncing the contract; and
  that an action will lie for such breach before the time for the fulfilment of the
  agreement. That it sufficiently appeared, on the face of this declaration, that
  there was on the part of defendant, not merely an intention to break the contract,
  of which intention he might repent, but a renunciation communicated to plaintiff,
  on which plaintiff was entitled to act; and consequently that plaintiff was entitled
  to judgment.

[S. C. 22 L. J. Q. B. 455; 17 Jur. 972; 1 W. R. 469. See *Roberts* v. *Brett*, 1859-65,
 6 C. B. N. S. 635; 11 H. L. C. 337; *Churchward* v. *R.*, 1865, L. R. 1 Q. B. 208;
 *In re Agra Bank*, 1867, L. R. 5 Eq. 164; *Frost* v. *Knight*, 1870-72, L. R. 5 Ex. 322;
 L. R. 7 Ex. 111; *Wilkinson* v. *Verity*, 1871, L. R. 6 C. P. 210; *Roper* v. *Johnson*,
 1873, L. R. 8 C. P. 176; *Metcalfe* v. *Britannia Ironworks Company*, 1877, 2 Q. B. D.
 428; *Société Général de Paris* v. *Milders*, 1883, 49 L. T. 58; *Mersey Steel and Iron
 Company* v. *Naylor*, 1884, 9 App. Cas. 443; *Johnstone* v. *Milling*, 1886, 16 Q. B. D.
 470; *Rhymney Railway* v. *Brecon and Merthyr Tydfil Junction Railway*, 1890, 69 L. J.
 Ch. 818; *Synge* v. *Synge*, [1894] 1 Q. B. 471; *Ellis* v. *Pond*, [1898] 1 Q. B. 439.]

 Declaration: "for that, heretofore, to wit on 12th April 1852, in consideration
that plaintiff, at the request of defendant, would agree with the defend-[679]-ant to
enter into the service and employ of the defendant in the capacity of a courier, on a
certain day then to come, to wit the 1st day of June 1852, and to serve the defendant
in that capacity, and travel with him on the continent of Europe as a courier for three
months certain from the day and year last aforesaid, and to be ready to start with the
defendant on such travels on the day and year last aforesaid, at and for certain wages
or salary, to wit" 10l. per month of such service, "the defendant then agreed with
the plaintiff, and then promised him, that he, the defendant, would engage and employ
the plaintiff in the capacity of a courier on and from the said 1st day of June 1852 for
three months" on these terms; "and to start on such travels with the plaintiff on the
day and year last aforesaid, and to pay the plaintiff" on these terms: averment that
plaintiff, confiding in the said agreement and promise of the defendant, "agreed with
the defendant" to fulfil these terms on his part, "and to be ready to start with the
defendant on such travels on the day and year last aforesaid, at and for the wages and
salary aforesaid." That, "from the time of the making of said agreement of the said
promise of the defendant until the time when the defendant wrongfully refused to
perform and broke his said promise, and absolved, exonerated and discharged the
plaintiff from the performance of his agreement as hereinafter mentioned, he the
plaintiff was always ready and willing to enter into the service and employ of the
defendant, in the capacity aforesaid, on the said 1st June 1852, and to serve the defen-

dant in that capacity, and to travel with him on the continent of Europe as a courier
for three months certain from the day and year last aforesaid, and to start with the
defendant on such travels on the day and year last aforesaid, **[680]** at and for the
wages and salary aforesaid; and the plaintiff, but for the breach by the defendant of
his said promise as hereinafter mentioned, would, on the said 1st June 1852, have
entered into the said service and employ of the defendant in the capacity, and upon
the terms and for the time aforesaid: of all which several premises the defendant
always had notice and knowledge: yet the defendant, not regarding the said agree-
ment, nor his said promise, afterwards and before the said 1st June 1852, wrongfully
wholly refused and declined to engage or employ the defendant in the capacity and
for the purpose aforesaid, on or from the said 1st June 1852 for three months, or on,
from or for, any other time, or to start on such travels with the plaintiff on the day
and year last aforesaid, or in any manner whatsoever to perform or fulfil his said
promise, and then wrongfully wholly absolved, exonerated and discharged the plaintiff
from his said agreement, and from the performance of the same agreement on his the
plaintiff's part, and from being ready and willing to perform the same on the plaintiff's
part; and the defendant then wrongfully wholly broke, put an end to and determined
his said promise and engagement:" to the damage of the plaintiff.  The writ was
dated on the 22d of May 1852.

Pleas: 1. That defendant did not agree or promise in manner and form &c.: con-
clusion to the country.  Issue thereon.

2. That plaintiff did not agree with defendant in manner and form &c.: conclusion
to the country.  Issue thereon.

3. That plaintiff was not ready and willing, nor did defendant absolve, exonerate
or discharge plaintiff from being ready and willing, in manner and form &c.: con-
clusion to the country.  Issue thereon.

**[681]** 4. That defendant did not refuse or decline, nor wrongfully absolve,
exonerate or discharge, nor wrongfully break, put an end to or determine, in manner
and form &c.: conclusion to the country.  Issue thereon.

On the trial, before Erle J., at the London sittings in last Easter Term, it appeared
that plaintiff was a courier, who, in April, 1852, was engaged by defendant to accom-
pany him on a tour, to commence on 1st June 1852, on the terms mentioned in the
declaration.  On the 11th May 1852, defendant wrote to plaintiff that he had changed
his mind, and declined his services.  He refused to make him any compensation.  The
action was commenced on 22d May.  The plaintiff, between the commencement of the
action and the 1st June, obtained an engagement with Lord Ashburton, on equally
good terms, but not commencing till 4th July.  The defendant's counsel objected that
there could be no breach of the contract before the 1st of June.  The learned Judge
was of a contrary opinion, but reserved leave to enter a nonsuit on this objection.
The other questions were left to the jury, who found for plaintiff.

Hugh Hill, in the same Term, obtained a rule Nisi to enter a nonsuit, or arrest the
judgment.  In last Trinity Term (*a*),

Hannen shewed cause.  The breach laid is, that defendant, before 1st June, refused
to employ plaintiff; and the averments of readiness and willingness are confined to
readiness and willingness until the time when defendant refused to perform his
contract.  It is upon these averments that issues are taken; and, as they are unques-
tionably proved, there is no ground for the motion **[682]** to enter a nonsuit.  But the
question which arises on the record is a serious one; and it is, whether in law it is
possible to break a contract before the day for its performance comes.  The cases
relied on by the defendant's counsel will probably be *Leigh* v. *Paterson* (8 Taunt. 540),
*Phillpotts* v. *Evans* (5 M. & W. 475) and *Ripley* v. *McClure* (4 Exch. 345).  But no
one of these is an authority for the defendant.  In *Leigh* v. *Paterson* (8 Taunt. 540)
there was a contract by the defendants to supply goods to be delivered in all December.
The defendants, on 1st October, announced that they would not so deliver: and, on
a writ of enquiry to ascertain the amount of damages, the Secondary ruled that the
measure of damages was the difference between the contract price and the market
price on 1st October, when the plaintiffs first knew that the defendants would not fulfil
their contract.  This was held wrong; and it is clear on principle that it was wrong;
for the defendants could not by their refusal cast upon the plaintiffs a duty to go at

---

(*a*)  June 10th.  Before Lord Campbell C.J., Coleridge, Erle and Crompton Js.

once and purchase goods before the time when they wanted them ; and, unless such a duty was cast upon them, the measure of damages was the pecuniary difference between the state the plaintiffs were in, having their money and not the goods, and that in which they would have been had the contract been fulfilled, and they had at the time of delivery paid the money and received the goods ; the damages therefore clearly depended on the market price at the time when the goods ought to have been delivered. *Phillpotts* v. *Evans* (5 M. & W. 475) was, as far as the decision went, a precisely similar case ; but it must be owned that there are dicta of Parke B. in that case which are in favour of the defendant : and in *Ripley* v. *McClure* (4 Exch. 359) Parke B., **[683]** in delivering the considered judgment of the Court of Exchequer, says that it was contended by the defendant's counsel that the refusal, on the part of the defendants in that case, to accept the goods, "which was long before the contract to buy become absolute, was no breach, and nothing more than an expression of an intention to break the contract, not final, and capable of being retracted. And we think, that, if the jury had been told that a refusal before the arrival of the cargo was a breach, that would have been incorrect. We think that point rightly decided in *Phillpotts* v. *Evans*" (5 M. & W. 475). It would seem, from the form of the expressions, that the learned Judge did not mean to decide that a refusal not capable of being retracted would not be a breach. If one party to an executory contract gave the other notice that he refused to go on with the bargain, in order that the other side might act upon that refusal in such a manner as to incapacitate himself from fulfilling it, and he did so act, the refusal could never be retracted : and, accordingly, in *Cort* v. *Ambergate &c. Railway Company* (17 Q. B. 127), this Court, after considering the cases, decided that in such a case the plaintiff might recover, though he was no longer in a position to fulfil his contract. That was a contract under seal to manufacture and supply iron chairs. The purchasers discharged the vendors from manufacturing the goods ; and it was held that an action might be maintained by the vendors. It is true, however, that in that case the writ was issued after the time when the chairs ought to have been received. In the present case, if the writ had been issued on the 2d of June, *Cort* v. *Ambergate &c. Railway Company* (17 Q. B. 127) would have been expressly in point. The question, therefore, comes to be : Does **[684]** it make any difference that the writ was issued before the 1st June ? If the dicta of Parke B. in *Phillpotts* v. *Evans* (5 M. & W. 475) are to be taken as universally applicable, it does make a difference ; but they cannot be so taken. In a contract to marry at a future day, a marriage by the man before that day is a breach ; *Short* v. *Stone* (8 Q. B. 358). The reason of this is, that the marriage is a final refusal to go on with the contract. It is not on the ground that the defendant has rendered it impossible to fulfil the contract ; for, as was urged in vain in *Short* v. *Stone* (8 Q. B. 358), the first wife might be dead before the day came. So also, on a contract to assign a term of years on a day future, a previous assignment to a stranger is a breach ; *Lovelock* v. *Franklyn* (8 Q. B. 371). [Lord Campbell C.J. It probably will not be disputed that an act on the part of the defendant incapacitating himself from going on with the contract would be a breach. But how does the defendant's refusal in May incapacitate him from travelling in June ? It was possible that he might do so.] It was ; but the plaintiff, who, so long as the engagement subsisted, was bound to keep himself disengaged and make preparations so as to be ready and willing to travel with the defendant on the 1st June, was informed by the defendant that he would not go on with the contract, in order that the plaintiff might act upon that information ; and the plaintiff then was entitled to engage himself to another, as he did. In *Planché* v. *Colburn* (8 Bing. 14) the plaintiff had contracted with defendants to write a work for "The Juvenile Library ;" and he was held to be entitled to recover on their discontinuing the publication ; yet the time for the completion of the contract, that is for the work being published in "The Juvenile **[685]** Library," had not arrived, for that would not be till a reasonable time after the author had completed the work. Now in that case the author never did complete the work. [Lord Campbell C.J. It certainly would have been cruelly hard if the author had been obliged, as a condition precedent to redress, to compose a work which he knew could never be published. Crompton J. When a party announces his intention not to fulfil the contract, the other side may take him at his word and rescind the contract. That word "rescind" implies that both parties have agreed that the contract shall be at an end as if it had never been. But I am inclined to think that the party may also say : "Since you have announced that you will not go

2 EL. & BL. 686.   HOCHSTER *v.* DE LA TOUR   925

on with the contract, I will consent that it shall be at an end from this time ; but I will hold you liable for the damage I have sustained ; and I will proceed to make that damage as little as possible by making the best use I can of my liberty." This is the principle of those cases in which there has been a discussion as to the measure of damages to which a servant is entitled on a wrongful dismissal. They were all considered in *Elderton* v. *Emmens* (a)[1]. [Lord Campbell C.J. The counsel in support of the rule have to answer a very able argument.]

Hugh Hill and Deighton, contrà. In *Cort* v. *Ambergate &c. Railway Company* (17 Q. B. 127) the writ was taken out after the time for completing the contract. That case is consistent with the defendant's position, which is, that an act incapacitating the defendant, in law, from **[686]** completing the contract is a breach, because it is implied that the parties to a contract shall keep themselves legally capable of performing it ; but that an announcement of an intention to break the contract when the time comes is no more than an offer to rescind. It is evidence, till retracted, of a dispensation with the necessity of readiness and willingness on the other side ; and, if not retracted, it is, when the time for performance comes, evidence of a continued refusal : but till then it may be retracted. Such is the doctrine in *Phillpotts* v. *Evans* (5 M. & W. 475) and *Ripley* v. *M'Clure* (4 Exch. 345). [Crompton J. May not the plaintiff, on notice that the defendant will not employ him, look out for other employment, so as to diminish the loss?] If he adopts the defendant's notice, which is in legal effect an offer, to rescind, he must adopt it altogether. [Lord Campbell C.J. So that you say the plaintiff, to preserve any remedy at all, was bound to remain idle. Erle J. Do you go one step further? Suppose the defendant, after the plaintiff's engagement with Lord Ashburton, had retracted his refusal and required the plaintiff to travel with him on 1st June, and the plaintiff had refused to do so, and gone with Lord Ashburton instead? Do you say that the now defendant could in that case have sued the now plaintiff for a breach of contract?] It would be, in such a case, a question of fact for a jury, whether there had not been an exoneration. In *Phillpotts* v. *Evans* (5 M. & W. 475) it was held that the measure of damages was the market price at the time when the contract ought to be completed. If a refusal before that time is a breach, how could these damages be ascertained? [Coleridge J. No doubt it was possible, in this case, that, before the 1st June, **[687]** the plaintiff might die, in which case the plaintiff would have gained nothing had the contract gone on. Lord Campbell C.J. All contingencies should be taken into account by the jury in assessing the damages. Crompton J. That objection would equally apply to the action by a servant for dismissing him before the end of his term, and so disabling him from earning his wages ; yet that action may be brought immediately on the dismissal ; note (a)[2] to *Cutter* v. *Powell* (6 T. R. 320).] It is quite possible that the plaintiff himself might have intended not to go on ; no one can tell what intention is. [Lord Campbell C.J. The intention of the defendant might be proved by shewing that he entered in his diary a memorandum to that effect ; and, certainly, no action would lie for entering such a memorandum. But the question is as to the effect of a communication to the other side, made that he might know that intention and act upon it.]

Cur. adv. vult.

Lord Campbell C.J. now delivered the judgment of the Court.

On this motion in arrest of judgment, the question arises, Whether, if there be an agreement between A. and B., whereby B. engages to employ A. on and from a future day for a given period of time, to travel with him into a foreign country as a courier, and to start with him in that capacity on that day, A. being to receive a monthly salary during the continuance of such service, B. may, before the day, refuse to perform the agreement and break and renounce it, so as to entitle A. before the **[688]** day to commence an action against B. to recover damages for breach of the agreement ; A. having been ready and willing to perform it, till it was broken and renounced by B. The defendant's counsel very powerfully contended that, if the plaintiff was not contented to dissolve the contract, and to abandon all remedy upon it, he was bound

---

(a)[1] In the Exchequer Chamber, 6 Com. B. 160, reversing the decision of the Common Pleas in *Elderton* v. *Emmens*, 4 Com. B. 479. Judgment of Exch. Ch. affirmed in Dom. Proc. ; *Emmens* v. *Elderton*, 4 H. L. Ca.

(a)[2] 2 Smith's Leading Cases, 8, 20. See also *Goodman* v. *Pocock*, 15 Q. B. 576.

926.                        HOCHSTER *v.* DE LA TOUR                        2 EL. & BL. 689.

to remain ready and willing to perform it till the day when the actual employment as
courier in the service of the defendant was to begin; and that there could be no
breach of the agreement, before that day, to give a right of action. But it cannot be
laid down as a universal rule that, where by agreement an act is to be done on a future
day, no action can be brought for a breach of the agreement till the day for doing the
act has arrived. If a man promises to marry a woman on a future day, and before
that day marries another woman, he is instantly liable to an action for breach of
promise of marriage; *Short* v. *Stone* (8 Q. B. 358). If a man contracts to execute a
lease on and from a future day for a certain term, and, before that day, executes a lease
to another for the same term, he may be immediately sued for breaking the contract;
*Ford* v. *Tiley* (6 B. & C. 325). So, if a man contracts to sell and deliver specific goods
on a future day, and before the day he sells and delivers them to another, he is immedi-
ately liable to an action at the suit of the person with whom he first contracted to sell
and deliver them; *Bowdell* v. *Parsons* (10 East, 359). One reason alleged in support
of such an action is, that the defendant has, before the day, rendered it impossible
for him to perform the contract at the day: but this does not necessarily follow;
for, prior to the day fixed for doing the act, the first wife may have died, a sur-
[689]-render of the lease executed might be obtained, and the defendant might have
repurchased the goods so as to be in a situation to sell and deliver them to the
plaintiff. Another reason may be, that, where there is a contract to do an act on a
future day, there is a relation constituted between the parties in the meantime by the
contract, and that they impliedly promise that in the meantime neither will do any
thing to the prejudice of the other inconsistent with that relation. As an example,
a man and woman engaged to marry are affianced to one another during the period
between the time of the engagement and the celebration of the marriage. In this very
case, of traveller and courier, from the day of the hiring till the day when the employ-
ment was to begin, they were engaged to each other; and it seems to be a breach of
an implied contract if either of them renounces the engagement. This reasoning
seems in accordance with the unanimous decision of the Exchequer Chamber in
*Elderton* v. *Emmens*(a), which we have followed in subsequent cases in this Court.
The declaration in the present case, in alleging a breach, states a great deal more than
a passing intention on the part of the defendant which he may repent of, and could
only be proved by evidence that he had utterly renounced the contract, or done some
act which rendered it impossible for him to perform it. If the plaintiff has no remedy
for breach of the contract unless he treats the contract as in force, and acts upon it
down to the 1st June 1852, it follows that, till then, he must enter into no employment
which will interfere with his promise "to start with the defend-[690]-ant on such
travels on the day and year," and that he must then be properly equipped in all respects
as a courier for a three months' tour on the continent of Europe. But it is surely much
more rational, and more for the benefit of both parties, that, after the renunciation of
the agreement by the defendant, the plaintiff should be at liberty to consider himself
absolved from any future performance of it, retaining his right to sue for any damage
he has suffered from the breach of it. Thus, instead of remaining idle and laying out
money in preparations which must be useless, he is at liberty to seek service under
another employer, which would go in mitigation of the damages to which he would
otherwise be entitled for a breach of the contract. It seems strange that the defendant,
after renouncing the contract, and absolutely declaring that he will never act under it,
should be permitted to object that faith is given to his assertion, and that an oppor-
tunity is not left to him of changing his mind. If the plaintiff is barred of any remedy
by entering into an engagement inconsistent with starting as a courier with the defen-
dant on the 1st June, he is prejudiced by putting faith in the defendant's assertion:
and it would be more consonant with principle, if the defendant were precluded from
saying that he had not broken the contract when he declared that he entirely renounced
it. Suppose that the defendant, at the time of his renunciation, had embarked on a
voyage for Australia, so as to render it physically impossible for him to employ the
plaintiff as a courier on the continent of Europe in the months of June, July and
August 1852: according to decided cases, the action might have been brought before the
1st June; but the renunciation may have been founded on other facts, to be given in
evi-[691]-dence, which would equally have rendered the defendant's performance of the

(a) 6 Com. B. 160.   Affirmed in Dom. Proc.; *Emmens* v. *Elderton*, 4 H. L. Ca.

contract impossible. The man who wrongfully renounces a contract into which he has deliberately entered cannot justly complain if he is immediately sued for a compensation in damages by the man whom he has injured : and it seems reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done, still holding it as prospectively binding for the exercise of this option, which may be advantageous to the innocent party, and cannot be prejudicial to the wrongdoer. An argument against the action before the 1st of June is urged from the difficulty of calculating the damages : but this argument is equally strong against an action before the 1st of September, when the three months would expire. In either case, the jury in assessing the damages would be justified in looking to all that had happened, or was likely to happen, to increase or mitigate the loss of the plaintiff down to the day of trial. We do not find any decision contrary to the view we are taking of this case. *Leigh* v. *Patterson* (8 Taunt. 540) only shews that, upon a sale of goods to be delivered at a certain time, if the vendor before the time gives information to the vendee that he cannot deliver them, having sold them, the vendee may calculate the damages according to the state of the market when they ought to have been delivered. If this was a sale of specific goods, the action, according to *Bowdell* v. *Parsons* (10 East, 359), might have been brought before that time, as soon as the vendor had sold and delivered them to another. *Phillpotts* v. *Evans* (5 M. & W. 475) was a similar case : **[692]** and the only question there was as to the mode of calculating the damages on a breach of contract for the sale and delivery of wheat ; the Court very properly holding that the plaintiff was entitled to damages according to the state of the market when the wheat was to be delivered ; the Court professing to proceed upon the rule laid down in *Startup* v. *Cortazzi* (2 C. M. & R. 165), where no question arose as to the right to bring an action before the stipulated day of delivery on a renunciation of the contract. Parke B., whose dicta are entitled to very great weight, certainly does say in *Phillpotts* v. *Evans* (5 M. & W. 477), with reference to the notice by the defendants that they would not accept the corn : "I think no action would then have lain for the breach of the contract, but that the plaintiffs were bound to wait until the time arrived for delivery of the wheat, to see whether the defendant would then receive it." But the learned Judge might suppose that the notice did not amount to a renunciation of the contract ; and, if he thought that, after such a renunciation, the plaintiffs were bound to proceed with the performance of the contract on their part, and to incur expense and loss in tendering the wheat before they could have any remedy on the contract, we cannot agree with him. In *Ripley* v. *M'Clure* (4 Exch. 345) it is said that, under a contract for the sale and delivery of goods, a refusal to receive them at any time before they ought to be delivered was not necessarily a breach of the contract : but the Court intimated no opinion upon the question whether, there being a contract to do an act at a future day, if one party before the day renounces the contract, the other thereupon has **[693]** a remedy for a breach of the contract. And they held that a refusal by one party before the day when the act is to be done, if unretracted, would be evidence of a continual refusal down to, and inclusive of, the time when the act was to be done. The only other case cited in the argument which we think it necessary to notice is *Planché* v. *Colburn* (8 Bing. 14), which appears to be an authority for the plaintiff. There the defendants had engaged the plaintiff to write a treatise for a periodical publication. The plaintiff commenced the composition of the treatise ; but, before he had completed it, and before the time when in the course of conducting the publication it would have appeared in print, the publication was abandoned. The plaintiff thereupon, without completing the treatise, brought an action for breach of contract. Objection was made that the plaintiff could not recover on the special contract for want of having completed, tendered and delivered the treatise, according to the contract. Tindal C.J. said : "The fact was, that the defendants not only suspended, but actually put an end to, 'The Juvenile Library ;' they had broken their contract with the plaintiff." The declaration contained counts for work and labour : but the plaintiff appears to have retained his verdict on the count framed on the special contract, thus shewing that, in the opinion of the Court, the plaintiff might treat the renunciation of the contract by the defendants as a breach, and maintain an action for that breach, without considering that it remained in force so as to bind him to perform his part of it before bringing an action for the breach of it. If it should be held that, upon a contract to do an **[694]** act on a future day, a renunciation of the contract

by one party dispenses with a condition to be performed in the meantime by the other, there seems no reason for requiring that other to wait till the day arrives before seeking his remedy by action: and the only ground on which the condition can be dispensed with seems to be, that the renunciation may be treated as a breach of the contract.

Upon the whole, we think that the declaration in this case is sufficient. It gives us great satisfaction to reflect that, the question being on the record, our opinion may be reviewed in a Court of Error. In the meantime we must give judgment for the plaintiff.

Judgment for plaintiff.

THE QUEEN, ON THE PROSECUTION OF WHITTLE AND ROBINSON, *against* THE COMMISSIONERS OF LAND TAX FOR THE TOWER DIVISION, MIDDLESEX. Saturday, June 25th, 1853. The duty of the Commissioners of land tax, in assessing the contributions by the several parishes within a Division, is regulated, not by stat. 38 G. 3, c. 5, s. 8, but by stat. 38 G. 3, c. 60, s. 74 (reenacted by stat. 42 G. 3, c. 116, s. 180), which treats the quota payable by each parish towards making up the amount charged on the Division as permanent at its then proportion to the other parishes of the Division.—And this is not altered by any later enactment.—Where, therefore, such quota had, up to the year 1852, been unchanged for 150 years, it was held that the Commissioners were right in continuing the assessment for that year at such quota, although the result was that an unequal poundage was levied in the several parishes.

[S. C. 22 L. J. Q. B. 386; 18 Jur. 285; 1 W. R. 479. Referred to, *Waterloo Bridge Company* v. *Cull*, 1858, 1 El. & El. 242. Discussed, *Colchester* v. *Kewney*, 1866-67, L. R. 1 Ex. 378; L. R. 2 Ex. 253. See *R.* v. *Land Tax Commissioners*, 1877, 36 L. T. 374. Referred to, *St. Thomas' Hospital* v. *Hudgell*, [1901] 1 Q. B. 369; *Westminster Corporation* v. *Johnson*, [1904] 2 K. B. 747.]

Mandamus, directed to the Commissioners appointed for putting in execution, within and for the Tower Division in Middlesex, the Act of Parliament passed &c., and another Act &c. (stat. 38 G. 3, c. 5, "for granting an aid to His Majesty by a land tax, to be raised in Great Britain, for the service of the year **[695]** 1798;" stat. 53 G. 3, c. 142, "to explain and amend several Acts relative to the land tax;" stat. 42 G. 3, c. 116, "for consolidating the provisions of the several Acts passed for the redemption and sale of the land tax, into one Act, and for making further provision for the redemption and sale thereof;" &c.; stat. 6 G. 4, c. 32, "to provide for the application of moneys arising in certain cases of assessments for land tax in Great Britain;" stat. 4 & 5 W. 4, c. 60, "to amend the laws relating to the land and assessed taxes, and to consolidate the board of stamps and taxes;" and stat. 6 & 7 W. 4, c. 97, "for continuing and making perpetual the duty on certain offices and pensions"). The writ recited that that part of Middlesex which in the first mentioned Act is described as The rest of the county of Middlesex, before and at the time of passing that Act was, and from thenceforth continually hitherto hath been, and still is, divided into certain Divisions, respectively chargeable and charged with the several proportions which ought to be charged thereon respectively for and towards the raising and making up of the whole sum, pursuant to the statutes in that case &c., from time to time charged upon that part of Middlesex, in respect of the sum by the first mentioned Act charged upon that part of the said county; "of which said Divisions your said Tower Division, during all the time aforesaid, hath been and still is one, and during all the time aforesaid hath consisted, and still does consist, of divers parishes and places, which, during all the time aforesaid, respectively, have been and still are separately assessed to the land tax for raising in each such parish and place its proportion or quota of the amount of land tax from time to time charged and chargeable on the whole of the Tower **[696]** Division," to wit &c.: the writ then set out the names of the parishes and places, which included Christ Church and Old Artillery Ground. That the total amount of land tax, which on 25th March last past, and from thence until and at the time of the meeting of the Commissioners on 2d April last past, hereinafter mentioned, was and still is chargeable and charged upon the said part described as aforesaid as The rest of the county of Middlesex, amounts to 107,602*l.* 11s. 7d., whereof, during

[IN THE COURT OF APPEAL.]

### HOLME v. BRUNSKILL.

*Principal and Surety—Discharge of Surety by Alteration of the Guaranteed Contract—Materiality of Alteration in Contract between Principals— Landlord and Tenant—Surrender of part of Demised Premises—Notice to quit.*

1877
June 7.

The plaintiff having agreed to let to G. B., as yearly tenant, a farm, including certain hill pastures and a flock of 700 sheep, the defendant gave the plaintiff a bond to secure the re-delivery to him at the end of the tenancy of the flock in good order and condition. In November the plaintiff gave G. B. a notice to quit, which was ineffectual to determine the tenancy at the expiration of the then current year. G. B. objected to the insufficiency of the notice, and on the 8th of April entered into an agreement with the plaintiff that G. B. should surrender a field to the plaintiff, that G. B.'s rent should be reduced 10*l.*, and the notice to quit should be considered as withdrawn. G. B. then continued tenant of the farm less the field at the reduced rent. In October, 1876, the plaintiff gave G. B. notice to quit on the 10th of April, 1877. On giving up the farm it was ascertained that the flock was reduced in number and deteriorated in quality and value, and the plaintiff sued the defendant on his bond :—

*Held*, by Brett, Cotton, and Thesiger, L.JJ., that neither the giving of the notice to quit and its withdrawal, nor the surrender of the field and the reduction of the rent, created a new tenancy.

*Tayleur* v. *Wilden* (Law Rep. 3 Ex. 303) distinguished.

*Held*, also, by Cotton and Thesiger, L.JJ., Brett, L.J. dissenting, that the contract of the surety was that the flock should be delivered up in good condition together with the farm as originally demised to the tenant; that the surety ought to have been asked to decide whether he would assent to the variation in the terms of the letting, and not having been asked to assent he was discharged from liability.

At the trial the judge left it to the jury to say whether the new agreement with the tenant had made any substantial or material difference in the relation between the parties, as regarded the tenant's capacity to fulfil the condition of the bond :—

*Held*, by Cotton and Thesiger, L.JJ., Brett, L.J. dissenting, that the question was one which ought not to have been submitted to a jury; that the surety was the sole judge whether it was reasonable that he should remain liable notwithstanding the new agreement.

ACTION on a bond against the defendant as surety. The bond was dated the 18th of March, 1873, and after reciting that the plaintiff had agreed to let to G. Brunskill, from year to year, a farm called Riggindale, and a stock of 700 heath going sheep, as regarded the arable land, from the 2nd of February, 1873; as

496                          QUEENS BENCH DIVISION.                    VOL. III.

regarded the lands for pasturage and sheep, from the 10th of April, 1873; and as regarded the dwelling-house and buildings from Whitsuntide then next; and after further reciting that the sheep were delivered to G. Brunskill on the 11th of April, 1873, and consisted of the number, species, and quality mentioned in the schedule to the bond, and it had been agreed that G. Brunskill and R. Brunskill, and C. H. Norman, should enter into the bond for the re-delivery of the said sheep or the offspring thereof in manner thereinafter expressed, stated that the condition of the bond was "if the above bounden G. Brunskill should, at the determination of the tenancy, deliver up unto H. P. Holme, along with the said farm and premises, the like number, species, and quality of good and sound sheep as were delivered to the said G. Brunskill as aforesaid;" and "in case the said stock of sheep should, at the determination of the said tenancy, be reduced or deteriorated in number, quality, or value, should pay to H. P. Holme compensation for such reduction or deterioration, to be ascertained by certain arbitrators" in manner therein provided: and "should yearly and every year during the tenancy pay, or cause to be paid, to H. P. Holme by way of rent or interest for the sheep, the sum of 35*l.* by two equal half yearly payments," then the bond should be void.

The statement of claim, after setting out the bond and averring the performance of all conditions precedent, alleged that the tenancy was determined on the 29th of March, 1877; that G. Brunskill did not deliver up to the plaintiff, along with the farm, the like number, species, and quality of good and sound sheep as were delivered to him, nor did he pay compensation for the reduction and deterioration which had been ascertained in the manner provided by the bond, nor did he pay one half year's rent or interest for the sheep from the 10th of April, 1876.

At the trial at the Cumberland Summer Assizes, 1877, before Denman, J., the following facts were proved: The plaintiff was the owner of Riggindale Farm, consisting of 234 acres, and also of a right of pasturing sheep upon the commons and fells adjoining, all of which he had leased to G. Brunskill as tenant on the terms mentioned in the bond. On the 9th of November, 1875, the plaintiff gave to G. Brunskill a notice to quit the farm and lands

" on the 10th of April, 1876, or at the expiration of the year of your tenancy, which shall expire next after the expiration of one half-year from the service of the notice." On the 8th of April, at an interview between the plaintiff and G. Brunskill, the latter declined to accept the notice to quit on the ground that it was bad, and on that day an agreement was entered into between the parties as follows :—" I agree to give up the field called ' Bog,' now in my occupation, to my landlord, my yearly rent to be reduced by 10*l*., also to give entry to the same on the 10th of April next, and to give up any claim I have to the use of the building known as the ' Stick-barn.'—G. Brunskill."

The notice to quit was then withdrawn, and G. Brunskill then continued tenant of the farm, less the Bog Field, at the reduced rent.   On the 5th of October, 1876, the plaintiff gave G. Brunskill a notice to quit on the 10th of April, 1877, which was admitted to be a good notice ; before that day G. Brunskill filed a petition for liquidation of his affairs by an arrangement with his creditors, and the trustees of his estate gave up possession of the farm to the plaintiff on the 29th of March, 1877. It was afterwards ascertained, in the manner mentioned in the bond, by arbitrators, that the flock of sheep was reduced in number and deteriorated in value and quality, and they assessed the damages at 132*l*.   It was also proved that the Bog Field was a field in which sheep did not usually pasture, but that it was occasionally used for pasturing sheep to the extent of twenty-five at a time being placed on it, and that it was also used during the lambing season ; that the giving up the Bog Field would make an appreciable difference to the tenant in the spring, and that it might make a difference of perhaps fifteen in the number of the sheep that the farm would carry, and that it would compel the tenant to find hay either for the cattle or the sheep elsewhere.

The learned judge left it to the jury to say whether the new agreement with the tenant had made any substantial or material difference in the relation between the parties, as regarded the tenant's capacity to do the things mentioned in the condition of the bond, and for the breach of which the action was brought. The jury answered the question in the negative, and the learned judge reserved judgment.

1878

HOLME
*v.*
BRUNSKILL.

At the further consideration of the case, it was contended on behalf of the defendant; first, that the arrangement made on the 8th of April, 1876, amounted to a fresh tenancy as from the 10th of April, 1876, and to a surrender by operation of law of the original tenancy, and that the plaintiff could not sue in respect of a deficiency of sheep arising at the expiration of the new tenancy, as not being the tenancy contemplated in the condition of the bond. Secondly, that if the tenancy could be considered as the same there had been such an alteration in the terms of the bargain between G. Brunskill and the plaintiff, and such an alteration in the risk of the sureties, as to discharge them from their obligation. Thirdly, that the question of materiality was not for the jury, but that the judge was bound to hold that the alteration in the tenancy discharged the sureties, without reference to its materialty.

It was contended on behalf of the plaintiff that the tenancy continued until the 10th of April, 1877, varied only in its terms in one particular, but still remaining the same tenancy, and that the alteration in the agreement between G. Brunskill and the plaintiff was immaterial to the liability of the defendant in respect of the breach sued for, and did not increase the risk of the sureties.

Dec. 21, 1877. DENMAN, J., after stating the facts and pleadings, delivered the following judgment :—

In order to decide whether there is an alteration in the risk such as to discharge the surety, I think it is impossible to lay down an absolute rule that in all cases it is for the judge to decide as matter of law, whether the alteration was such as to have that effect or not. There must, I think, be many cases in which the judge would have to take the opinion of the jury upon the question, whether the alteration was of such a character as to affect the surety in any way by substantially or materially altering the risk. By way of example, I think it is impossible to say that if in the present case the evidence were that the landlord and tenant had merely agreed that the landlord should have the exclusive use of a small shed on the premises during the continuance of the tenancy, such an agreement would necessarily discharge the surety. I think it would in that case be a question for the jury at the most,

VOL. III.        QUEEN'S BENCH DIVISION.                            499

whether the shed in question was of such importance, whether it
played so material and substantial a part, if any at all, in assisting
the tenant in keeping up his stock of sheep, as that the depriving
himself of it, by allowing the use of it to the landlord, would render
him less capable of performing the condition of the bond.   In the
present case I think that if the same tenancy had continued to
exist, it would have been a question for the jury upon the evidence
whether the alteration in its terms, so far as it relates to the
giving up of the Bog Field, did make any material difference in the
risk, in the sense above explained, and the jury having in effect
found that it did not, I should not feel myself justified in holding
the contrary as matter of law, and on that ground giving judgment
for the defendants.   The matter was one in its nature far more fit
for the consideration of a special jury for the county of Cumber-
land than for a lawyer, and I cannot even say that I am dissatisfied
with the view they took, though I might possibly, perhaps, through
ignorance of sheep farming, come to a different conclusion upon
the evidence if it had been for me to decide the question.

But as to the other contentions of the defendant, namely, that
the contract between the plaintiff and the principal was a different
contract, and that the tenancy was a new tenancy after the agree-
ment of March, 1876, I am of opinion that on this ground the
sureties are not liable; I think it is impossible to contend that
the words "farm and lands called Riggindale" in the recital of
the bond, meant anything except Riggindale Farm as it then
existed, namely, a farm of 234 acres including the Bog Field, and
though in one sense it would still be called Riggindale Farm after
the new agreement, I do not think that that fact would justify me
in holding that I could reject that part of the recital of the bond
as immaterial; on the contrary, I think it was a material part of
the bond, and any such alteration of the holding as the diminution
of the farm by seven acres, and a reduction of the rent by 10*l.*,
however unprejudicial it may in fact have been to the sureties, is
on the face of it such an alteration in the agreement between the
plaintiff and the principal as necessarily to make it a new and
different agreement which, unless assented to by the surety, must
discharge him from his obligation.   *Whitcher* v. *Hall* (1), and *North*

(1) 5 B. & C. 269.

*(margin)* 1878

HOLME
*v.*
BRUNSKILL.

1878

HOLME
*v.*
BRUNSKILL.

*Western Ry. Co.* v. *Whinray* (1), are strong authorities to this effect, and I do not think that the case of *Sanderson* v. *Aston* (2) is in conflict with those decisions, for it only decides that where the surety undertook generally to be responsible for the conduct of a person as clerk and traveller, without any reference in the bond to the terms of the agreement as to the kind of notice which was to be given by either party, the mere substitution of an agreement for a one month's notice for an agreement for a three months' notice was not sufficient to discharge the surety. In the present case I think it impossible to say that the alteration was not such as to make a new agreement in a particular expressly referred to in the condition of the bond, and therefore within the authorities to constitute an altered contract for the performance of which the sureties had given no undertaking.

I also think that the defendant is entitled to succeed on the ground that the tenancy which was contemplated by the bond ceased by the operation of the notice to quit given in November, 1875, followed by the fresh agreement in April, 1876. The only distinction which was pointed out between the present case and that of *Tayleur* v. *Wildin* (3), which was cited for the defendant (but for which distinction it would be precisely in point), is that in that case the notice which had been given was a good notice to quit on the proper day, given in proper time, whereas in the present case the notice was given too late to be a good notice for the day for which it gave notice to quit. But it would have been available as a notice to quit in the following year, and was not therefore wholly void or necessarily inoperative; and therefore it appears to me, when the landlord and tenant agreed together that as from the day mentioned in that notice, as the day for quitting, the rent should be reduced and a field given up by the tenant, the tenancy became a new tenancy as much or even more clearly than was the case in *Tayleur* v. *Wildin.* (3) I am therefore of opinion that the defendant is not responsible for the deficiency of sheep which existed at the expiration of this new tenancy, or for the non-payment of the amount assessed by the arbitrators in respect of that deficiency. I therefore give judgment for the defendant.

(1) 10 Ex. 77.                    (2) Law Rep. 8 Ex. 73.
(3) Law Rep. 3 Ex. 303.

VOL. III.        QUEEN'S BENCH DIVISION.                    501

The plaintiff appealed.

1878

HOLME
*v.*
BRUNSKILL.

May 7. *C. Russell*, Q.C., and *Dickinson*, for the plaintiff. First, no new tenancy was created between the landlord and tenant, for an alteration in the terms of the holding does not create a new tenancy. In Com. Dig. tit. Surrender (I. 2) it is laid down that if a lessee surrender or accept a new lease of part of the estate, that will operate as a surrender for that part only. So in Bacon's Abrid. tit. Leases (S.) 3, "If tenant for years of land accepts a new lease by indenture of part of the same lands, this is a surrender for that part only, and not for the whole, because there is no inconsistency between the two leases for any more than that part only which is so doubly leased; and though a contract for years cannot be so divided or severed as to be avoided for part of the years, and to subsist for the residue, either by act of the party, or by act in law, yet the land itself may be divided or severed, and he may surrender one or two acres, either expressly or by act in law, and yet the lease for the residue remains entire, whereas in the other case the contract for the whole would be divided, which the law will not allow." An alteration in the rent does not create a new tenancy: *Clarke* v. *Moor*. (1) The case of *Tayleur* v. *Wildin* (2), is distinguishable on the ground that in the present case the notice to quit was inoperative. Secondly, there was not such an alteration in the terms of the contract between the plaintiff and the principal debtor as would discharge the surety. For all practical purposes the contract has no relation to the farm, as to its extent or mode of management. The farm still remained Riggendale Farm, though the rent had been reduced and the Bog Field given up to the landlord; there is a distinction between the farm and its appurtenances; the agreement related only to part of the farm, and the guarantee was only for the re-delivery of the sheep to be pastured on the adjacent commons and fells, and in respect of the rent to be paid for their use. [On this point they cited *Whitcher* v. *Hall* (3); *Petty* v. *Cooke* (4); *North Western Ry. Co.* v. *Whinray* (5); *Skillett* v. *Fletcher* (6); *Hollier* v. *Eyre*. (7)]

(1) 1 J. & Lat. 723.
(2) Law Rep. 3 Ex. 303.
(3) 5 B. & C. judgment of Littledale,
J., at p. 277.
(4) Law Rep. 6 Q. B. 790, 795.
(5) 10 Ex. 77.
(6) Law Rep. 2 C. P. 469.
(7) 9 H. L. C. 57.

502                          QUEEN'S BENCH DIVISION.                    VOL. III.

1878

HOLME
*v.*
BRUNSKILL.

Thirdly, that the question of materiality had been properly left to the jury: *Sanderson* v. *Aston.* (1)

*Aspinall, Q.C.,* and *C. Crompton,* for the defendant. First, there was a new letting and a surrender of the premises. There was a surrender of part, and a reduction of rent of the remainder; a creation of a new rent issuing out of a different thing. The concurrence of the two created a new tenancy. *Tayleur* v. *Wildin* (2) is in point. Secondly, when the subject-matter of the contract is specified as the letting of Riggindale Farm, any alteration as to the farm will invalidate the suretyship, because the surety might or might not have continued the suretyship if he had known of the altered circumstances. The Bog Field having been given up to the landlord, the contract in respect of which the suretyship attached was altered, and the surety released, for the tenant did not get what the surety bargained he should get, that is, Riggindale Farm including the Bog Field: *Whitcher* v. *Hall.* (3) Thirdly, whether the giving up of the Bog Field was a reasonable or material alteration, was a question of which the surety was the sole judge: *Polak* v. *Everett.* (4) And the judge was wrong in leaving that question to the jury.

*C. Russell* was heard in reply.

*Cur. adv. vult.*

June 7. The following judgments were delivered.

COTTON, L.J. This is an appeal of the plaintiff against a judgment of Denman, J., in favour of the defendant, Robert Brunskill. The action was on a bond for 1000*l.*, dated the 18th of March, 1873, executed by George Brunskill, Robert Brunskill, and others in favour of the plaintiff. The plaintiff was at the date of the bond, and still is, the owner of a farm called Riggindale, and before the execution of the bond he had agreed with George Brunskill to let to him as yearly tenant Riggindale Farm, including certain hill pasture held therewith, and also a flock of 700 sheep, and the bond in which Robert Brunskill joined as surety for George Brunskill, was given to the plaintiff to secure the delivery to him at the end of the tenancy of the flock of

(1) Law Rep. 8 Ex. 73.                    (3) 5 B. & C. 269.
(2) Law Rep. 3 Ex. 303.                   (4) 1 Q. B. D. 669.

sheep in good order and condition. The material part of the condition of the bond is as follows. [The Lord Justice read the condition.]

1878

HOLME
v.
BRUNSKILL.

On the 9th of November, 1875, the plaintiff gave to George Brunskill a notice to quit the farm, which was in terms, a notice to quit " on the 10th of April, 1876, or at the expiration of the year of your tenancy, which shall expire next after the expiration of one half year from the service of the notice." The notice being served less than six months before the 10th of April, 1876, was ineffectual to determine the tenancy on that day, but was effectual to determine it on the 10th of April, 1877. Before the 10th of April, 1876, George Brunskill and the plaintiff met, and George Brunskill objected to the insufficiency of the notice to quit. Whereupon the plaintiff stated that he did not wish to take the farm from him, but that he wanted part of the farm called the Bog Field, and it was thereupon agreed that George Brunskill should surrender this on the 10th of April then next, and that his rent should from that time be reduced by 10*l.* a year, and that the notice to quit should be considered as withdrawn. This agreement was carried into effect, and George Brunskill continued to hold the remainder of the farm; but early in October following, the plaintiff gave him due notice to quit on the 10th of April, 1877. Before this time arrived George Brunskill got into difficulties and had become insolvent. His trustee, sometime in March, 1877, gave up the farm, and it was then ascertained that the flock referred to in the bond was reduced in number and deteriorated in quality and value; and the action has been brought to recover from the defendant, under his bond, compensation for the diminished value of the flock.

Mr. Justice Denman, before whom the action was tried, gave judgment for the defendant, and against this judgment the plaintiff has appealed.

One ground on which the defendant relied in supporting the judgment was, that his obligation under the suretyship bond had expired before the deficiency arose, that is to say, that by the notice to quit and agreement made as to the surrender of the Bog Field, and the withdrawal of the notice, a new tenancy was created, to which the bond did not apply; and for this he relied on the case

504                        QUEEN'S BENCH DIVISION.                VOL. III.

of *Tayleur* v. *Wildin* (1) as an authority, that under the circumstances, a new tenancy was created; and it was on the authority of *Tayleur* v. *Wildin* (1), that Mr. Justice Denman, as we understand, principally relied, but we are unable to agree with this view. In *Tayleur* v. *Wildin* (1), the tenant continued in the occupation of the farm after the day for which the notice to quit, which was withdrawn, had been effectually given, and the rent for which the surety was sued accrued in respect of the occupation after that day, and the Court considered the continuance of the tenant's possession after that time as a new tenancy, and that the guarantee which applied only to the old tenancy was therefore gone.   But in the present case, the tenancy of George Brunskill was, in fact, determined on or before the day when, if the notice to quit had not been withdrawn it would have ended.   The deficiency and deterioration of the flock therefore occurred at the determination of the very tenancy to which the bond referred.   It was, however, argued that the effect of giving up the Bog Field, must be a surrender of the old tenancy.   But we are of opinion that this cannot be maintained, and that notwithstanding the surrender to a landlord of part of the land demised, the former tenancy of the remainder of the farm still continues.

It was contended by the defendant, that even if there was a continuance of the old tenancy the effect of the surrender of the Bog Field was to discharge him as surety from all liability.   The Bog Field contained about seven acres, and the jury, in answer to a question left to them, at the trial, found that the new agreement with the tenant had not made any substantial or material difference in the relation between the parties, as regards the tenant's capacity to do the things mentioned in the condition of the bond, and for the breaches of which the action was brought.   The plaintiff's contention was that this must be treated as a finding that the alteration was immaterial, and that, except in the case of an agreement to give time to the principal debtor, a surety was not discharged by an agreement between the principals made without his assent, unless it materially varied his liability or altered what was in express terms a condition of the contract.

In my opinion this contention on behalf of the plaintiff cannot

(1) Law Rep. 3 Ex. 303.

be sustained. No doubt, there is a distinction between the cases, which have turned on the creditor agreeing to give time to the principal debtor, and the other cases. Where a creditor does bind himself to give time to the principal debtor, he with an exception hereafter referred to, does deprive the surety of a right which he has, that is to say of the right at once to pay off the debt which he has guaranteed, and to sue the principal debtor, and without inquiry whether the surety has, by being deprived of this right, in fact suffered any loss, the Courts have held that he is discharged. The exception to which I have referred is, where the creditor on making the agreement with the principal debtor expressly reserves his right against the surety, but this reservation is held to preserve to the surety the right above referred to, of which he would be otherwise deprived. The cases as to discharge of a surety by an agreement made by the creditor, to give time to the principal debtor, are only an exemplification of the rule stated by Lord Loughborough in the case of *Rees* v. *Berrington* (1): "It is the clearest and most evident equity not to carry on any transaction without the knowledge of him [the surety], who must necessarily, have a concern in every transaction with the principal debtor. You cannot keep him bound and transact his affairs (for they are as much his as your own) without consulting him."

The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court, will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding

1878

HOLME
*v.*
BRUNSKILL.

(1) 2 Ves. J. 540.

1878

HOLME
*v.*
BRUNSKILL.

the alteration, and that if he has not so consented he will be dis-charged.   This is in accordance with what is stated to be the law by Amphlett, L.J., in the *Croydon Gas Company* v. *Dickenson* (1).

The plaintiff, in support of his contention, that having regard to the finding of the jury, the surety was not discharged, relied on various dicta to the effect that any material change in the contract between the principals will discharge the surety.   Even if by these expressions the judges intended to state that to have the effect of releasing the surety the alteration must be material, it does not follow that they intended to lay down that no alteration would discharge the surety unless the jury in an action to enforce his liability, held it to be material, or to express any opinion at variance with the rule laid down by me.   The case of *Sanderson* v. *Aston* (2), was specially relied on by the plaintiff.   But Martin, B., though he did not formally dissent from the decision of the majo-rity of the Court, was not satisfied with the judgment; and if the decision is to be considered as based on the reason given by Pollock, B., that the Court was entitled to consider whether the alteration was material, it cannot, in our opinion, be sustained.

In the present case, although the Bog Field contained seven acres only, yet it cannot be said to be evident that the surrender of it could not prejudicially affect the surety.   Some of the witnesses for the plaintiff admitted that it was occasionally used for pastur-ing, that its loss would be appreciable in the spring, and that it might make a difference of fifteen in the number of the sheep which the farm would carry.

The case may also be considered in another point of view.   The bond given by the defendant the surety, was to guarantee the delivery up of the flock of sheep therein referred to at the deter-mination of the tenancy of the Riggindale Farm, which in our opinion, must mean Riggindale Farm as then demised to George Brunskill, and the bond certainly implied that he should continue to hold the farm as then demised till the flock was given up.   The contention of the plaintiff, if it could be supported, would make a variation in this contract, as to the materiality of which there is at least a doubt, and would make the defendant liable for a deterioration of the flock during the time when the tenant held

(1) 2 C. P. D. at p. 51.          (2) Law Rep. 8 Ex. 73.

a smaller farm than that contemplated by the contract of the surety.

1878

HOLME
*v.*
BRUNSKILL.

The plaintiff's counsel relied on some observations made by Lord Cottenham in the case of *Hollier* v. *Eyre.* (1)   But, in fact, those observations are in favour of the defendant and not of the plaintiff.   What Lord Cottenham says is, " the surety will be left to judge for himself between his original undertaking and another substituted for it, but that is not the case where the contract remains the same, though part of the subject-matter is withdrawn from its operation."   In this case, as already pointed out, the original contract of the surety was that the flock should be delivered up in good condition, together with the farm, as then demised to the tenant.   No part of that which was guaranteed was ever withdrawn from the operation of the bond.   But the plaintiff attempts to substitute for the contract that the flock should be given up in good condition, with the farm, as then demised, a contract that it should be delivered up in like condition with a farm of different extent.   In my opinion the surety ought to have been asked to decide whether he would assent to the variation.   He never did so assent, and in my opinion was discharged from liability, notwithstanding the finding of the jury, inasmuch as in my opinion the question was not one which ought to have been submitted to them.

Lord Justice Thesiger concurs in this judgment.

BRETT, L.J.   I speak with great deference when I say I cannot bring my mind altogether to agree with this judgment, and I feel bound to observe that I arrive at another view than that which has been expressed.   As to the first part of the judgment I entirely agree.   I do not think there was any new tenancy, and I ground that view on the fact of the finding of the jury, amongst other things, that the alteration was immaterial.   It is the latter part of this view with which I cannot agree.   In the first place, this case comes before us fettered by certain rules.   We are bound to observe that it is a direct appeal from the decision of my Brother Denman, after a trial by jury; we are, therefore, not at liberty to ask whether the question he left was left in proper

(1) 9 H. L. C. 57.

508                    QUEEN'S BENCH DIVISION.                    VOL. III.

1878

HOLME
*v.*
BRUNSKILL.

form. There cannot be a motion here for misdirection, and we are not at liberty to say that the finding of the jury was contrary to the evidence. It is a general rule that we have no right to look at the verdict, but accept it according to its ordinary construction. I find the question left to the jury was, whether the new agreement with the tenant, which we are told did not alter the tenancy, made a substantial or material difference in the relation between the parties as to the tenant's capacity to do the things mentioned in the bond, and for breach of which the action was brought. They not only found that, but my Brother Denman says that the matter is far more fit for the consideration of a jury of the county of Cumberland than for a lawyer, and he cannot say that he is dissatisfied with their view. Therefore there is the finding of the jury with the assent of the judge. If it were necessary to give an opinion, considering I have not an intimate knowledge of these things, but from what I know of Cumberland farmers, so far from dissenting from the opinion of the jury, I think it is a substantial finding. When one remembers how many views are taken as to farms in Cumberland, I should be inclined to agree with the jury and say it did not make any material difference. We are bound by that finding, and can act in conformity with it. Where there is a suretyship bond, and there are some alterations in the contract or relation of the parties under the bond as to guaranteeing its performance, the question is whether the alteration is not material or substantial, and whether the surety is released. I cannot bring my mind to think he is, for the law takes no notice of alterations that are neither material nor specific. The proposition of law as to suretyship to which I assent is this, if there is a material alteration of the relation in a contract, the observance of which is necessary, and if a man makes himself surety by an instrument reciting the principal relation or contract, in such specific terms as to make the observance of specific terms the condition of his liability, then any alteration which happens is material; but where the surety makes himself responsible in general terms for the observance of certain relations between parties in a certain contract between two parties, he is not released by an immaterial alteration in that relation or contract. My opinion is in accordance with the finding of the

jury, and it will be most dangerous in this particular case to put ourselves in the place of a jury and because we think seven acres may make a difference, or 10*l.* a year may make a difference, to set aside the finding of the jury, which is that neither one is material or substantial. I think the surety is not released. The doctrine of the release of suretyship is carried far enough, and to the verge of sense, and I shall not be one to carry it any further.

1878

HOLME
*v.*
BRUNSKILL.

*Judgment affirmed.*

Solicitors for plaintiff: *Johnston & Harrison, for Harrison & Little, Penrith.*

Solicitor for defendant: *Arnison, Penrith.*

---

EX PARTE BRADLAUGH.

*June 6.*

*Obscene Book, Order for Destruction of—20 & 21 Vict. c. 83, s. 1—Absence of Jurisdiction—Certiorari taken away—2 & 3 Vict. c. 71, s. 49—Metropolitan Police Courts.*

A section in an Act of Parliament taking away the certiorari held not to apply in the case of a total absence of jurisdiction.

An order by a magistrate for the destruction of obscene books under 20 & 21 Vict. c. 83, s. 1, is bad if it merely states that the magistrate was satisfied that the books were obscene, but not that he was satisfied that the publication of them would be a misdemeanour, and proper to be prosecuted as such.

IN this case the applicant in person had obtained a rule nisi for a certiorari to bring up an order of a metropolitan magistrate, under 20 & 21 Vict. c. 83, for the destruction of certain books of which the applicant claimed to be the owner, as obscene publications, on the ground that the order did not shew any jurisdiction on the face of it, because it did not state that the magistrate was satisfied that the publication of the books would be a misdemeanour, and proper to be prosecuted as such.

The order was in substance as follows: It recited that complaint had been made by John Green to Mr. Flowers, one of the metropolitan police magistrates, sitting at Bow Street, within the metropolitan police district, that he had reason to believe that certain obscene books were kept by Edward Truelove, at his shop No. 256, Holborn, in the county of Middlesex, within the metropolitan

preserve the guarantor's liability to such obligations and no further. The words "any other act or thing" were therefore, in my judgment, not intended to cover the type of additional burden having the potential effect that clause 3 of the licence has in this case.

Clause 10(1) was therefore not, in my view, intended to be, nor is it, a complete *carte blanche* to entitle the landlord to extract every and any additional burden from the surety. If it were so intended that any such additional burden should be extractable from the surety then, in my judgment, it was necessary so to have provided either expressly or by some clearer implication than is afforded by those concluding words. I accept that they must be given some effect and clearly were intended to imply something additional to the mere giving of time or indulgence or assignment of the lease or the tenant ceasing to exist. But I think Mr David Neuberger QC is right when he submits that what was contemplated was that this should cover such cases as the landlord refusing rent in a case where he wrongly believes there to be a breach of covenant or where, say as a condition of an assignment, he has received security for the rent which he subsequently releases. No doubt there are also other examples such as forebearance or where the landlord has agreed for a time with the tenant that the tenant might suspend payment of the rent for reasons best known to the tenant or the landlord. I do not attempt an exhaustive category of cases intended to be covered by those general words at the end of clause 10(1). Suffice it to say that, in my judgment, they were not intended to cover and do not cover the additional burden imposed by clause 3 of the licence.

I note, for example, that the case of *British Motor Trust Co Ltd v Hyams* (1934) 50 TLR 230, to which I was helpfully referred, was a case where hire purchase payments were guaranteed by the defendant under two hire purchase agreements relating to two separate vehicles. In each of the agreements it was expressly provided that the guarantee should not be avoided by any variation in the terms of the agreement. Branson J held that the replacement of the old agreements with a new single consolidated agreement covering both vehicles was a variation contemplated by the original agreements and accordingly the guarantor was not released. There, there was clearly the type of express provision which is wholly absent from this case.

I was referred also to the decision of the Supreme Court of New South Wales in *Credit Lyonnais (Australia) Ltd v Darling* [1991] 5 ACSR 703. There the guarantor of a financial facility was not to be exonerated under the provisions of clause 8 of the guarantee, *inter alia*, by "any matter or thing which under the law relating to sureties would but for this provision have the effect of releasing the guarantor from his guarantee and indemnity or of discharing his guarantee and indemnity". The question was whether a subsequent variation in the financial arrangements which had been consented to on behalf of the sureties nevertheless had the effect of releasing the surety, and it was held by that court on this particular point that the effect of clause 8 was that the sureties were not released by that variation. But that seems to me to be a different case in a different context and a much clearer and a much more obvious example of the surety not being released. I note, for example, that the opening words of clause 8 in that case were specifically that: "this guarantee and indemnity shall be without prejudice to nor shall the guarantor be exonerated in whole or in part nor shall the rights or remedies of the creditor be in any way prejudiced or adversely affected by any of the matters following". Then one of the matters following was the words which I have already quoted from clause 8. Those words seem to me to appear in a much wider context and a much more different context than this case.

I was also referred to the case of *R v Payne* (1866) LR 1 CCR 27. There the relevant provision which was being construed was the Prison Act 1865, section 37, which forbade the conveyance into any prison with intent to facilitate the escape of a prisoner, of any "mask, dress or other disguise or of any letter or of any other article or thing". This case, as was *Credit Lyonnais*, was urged upon me as support for the wide width to be applied to the concluding words of clause 10(1) of the lease. In *Payne* it was held that a crowbar, notwithstanding that it was vastly different from a "mask, dress or other disguise or any

letter", was nevertheless included within the concluding provisions, "any article or thing", of section 37. I have absolutely no doubt in my mind whatsoever that that was a just and right conclusion having regard to the obvious purpose for which section 37 of the Prison Act 1865 was passed. I do not think, however, that it is necessarily of any assistance in the construction of the words "any other act or thing" in this particular case.

In the result I dismiss the appeal.

*Appeal dismissed.*

# Howard de Walden Estates Ltd *v* Pasta Place Ltd and others

CHANCERY DIVISION

May 19 1994

MORLAND J

Estates Gazette June 3 1995
[1995] 22 EG 143

*Landlord and tenant — Liability of sureties — Whether liability discharged by variation in the obligations of the lessee and assignees*

On November 24 1987 the plaintiff landlords granted two leases to the first defendant, Pasta Place Ltd, of premises for use as a delicatessen; the landlords forbid the sale of wines. The second, third and fourth defendants were sureties to the two leases; the surety covenants containing a proviso that their obligation should not be released by any deeds or documents given to the tenant supplemental to the leases. On February 9 1989 the first defendants assigned the leases to NB Ltd. On August 4 1989 the landlords permitted NB Ltd to serve Italian wine to persons consuming food at the premises, eight tables having earlier been permitted in the premises. On July 16 1990 the landlords granted a licence to use the premises as an off-licence and a licence to use the adjoining premises as a fire escape. NB Ltd went into administrative receivership on October 1990. The landlords who had obtained a judgment for arrears of rent against the first defendants on October 27 1992, which was not satisfied, claimed the arrears from the sureties. The sureties contended that they had been discharged from their liabilities because of the variation of the obligations of the lessee by the two licences granted by the landlords on August 4 1989 and on July 16 1990.

*Held:* The landlords' claim was dismissed. In applying *Holme v Brunskill* (1878) 3 QBD 495, and in deciding whether alterations to the obligations of the lessee are substantial or prejudicial to the surety, the court must assess the alteration objectively. It is not for the court to decide whether in fact there has been material prejudice. The licence granted on August 4 1989 and the two granted on July 16 1990 would be likely to increase the rental value of the premises; the existence of the licences is a factor of potential commercial value, likely at least to a degree to influence a lessee in deciding what the rent would be that he would be prepared to pay. The sureties' liabilities were therefore discharged and were not saved by the proviso in the leases which envisaged a breach or apprehended breach of covenant.

The following cases are referred to in this report.

*Holme v Brunskill* (1878) 3 QBD 495
*Selous Street Properties Ltd v Oronel Fabrics Ltd* [1984] 1 EGLR 50; [1984] EGD 360; (1984) 270 EG 643 & 743

This was the hearing of a claim by the plaintiffs, Howard de Walden Estates Ltd, for arrears of rent against the sureties of two leases of premises at 102 Marylebone High Street, London W1.

**A**  Martyn Zeidman (instructed by Michael Conn & Co) appeared for the plaintiffs; Mark Warwick (instructed by Brecher & Co) represented the second, third and fourth defendants; the first, fifth and sixth defendants did not appear and were not represented.

Giving judgment, MORLAND J said: Despite the excellent and stimulating submissions of Mr Martyn Zeidman for the plaintiff, in my judgment, this claim fails.

The action so far as I am concerned, concerns three sureties, the second, third and fourth defendants, of two leases in respect of 102 Marylebone High Street, London W1, of which the plaintiffs (Howard de Walden Estates) are the lessors. The issue, in short, is whether there **B** has been a variation in the obligations of the lessees or their assignees, by reason of the grant of certain licences which I will described in greater detail later in this judgment, so as to discharge the sureties from their obligations.

The premises, 102 Marylebone High Street, were tenanted by the first defendants, Pasta Place Ltd, prior to November 24 1987. They operated those premises as a delicatessen. They wished to sell wines as part and parcel of the delicatessen business, but they were refused by the plaintiff landlords.

On the November 24 1987, two leases were granted by the **C** plaintiffs to the first defendants. It is not necessary to go into details with regard to many of the provisions in the leases. The first lease related to the ground floor and basement and the second to the rear of the ground floor. The term of the lease was for a period of 16 years from March 25 1986, and the total rent reserved for the two leases was £24,000 reviewable every four years. Under clause 7 in one lease, and clause 8 in the other lease, the sureties entered into obligations in relation to the compliance with the obligations of the lessees in the two leases.

It is necessary to explain what has happened to the various other parties to the proceedings. The first defendants, as the original lessees, **D** remain liable for the rent that was unpaid following the assignment of the lease to a company called Nice Bright Ltd. The assignment took place following a licence to assign on February 9 1989. Nice Bright Ltd, which was run by Mr Loizou, who gave evidence before me, and is the sixth defendant, after the first rent review became in arrears of rent. Nice Bright went into administrative receivership on October 22 1990 and Mr Loizou who had been a surety in respect of Nice Bright Ltd's obligation, went into individual voluntary arrangement on the September 10 1993.

The plaintiffs then obtained judgment under Ord 14 against the first defendants (Pasta Place Ltd) the original lessees, on October 27 1992. **E** That judgment is not satisfied and the company was wound up on March 3 1993. That left the three sureties, the second, third and fourth defendants, as the people against whom the plaintiffs would be able to recover the rent due which they otherwise have not been able to obtain from the other parties.

On September 8 1988, a licence was granted by the plaintiffs to the first defendants to put eight tables in the premises. That presumably was to allow, particularly at lunchtime or thereabouts, people in Marylebone High Street not only to buy made up dishes at these premises, but to eat them in the premises. But the change of user from a pure retail shop to, in part, a cafe, was extremely limited. The terms of the licence were that the tenant was to be

**F**  at liberty to place eight tables in approximate positions indicated on the plan which is attached to the deed of licence for the consumption of food on condition that the table accommodation shall be used for the consumption of food and non-alcoholic beverages only and for not other purposes.

Following assignment of the lease to Nice Bright Ltd and at the same time as the assignment, a licence in similar terms was granted by the landlords, the plaintiffs, to Nice Bright Ltd, that is for eight tables and the service of non-alcoholic drinks at the tables.

We now move ahead towards the time of the first rent review. The first rent review date was March 25 1990. Prior to that, on August 4 1989, the plaintiffs granted a licence to Nice Bright to serve Italian

**G**  wine. That licence was revocable on six months' notice. That particular licence says:

The tenant shall be at liberty to serve Italian wines to persons consuming food on the firstly demised premises and the secondly demised premises as ancillary to their meal and for consumption only on the premises.

When the question of the review came up and an increased rent was put forward by the plaintiffs through their agents, surveyors and valuers, particularly Mr John Broomfield, at the same time while negotiations were going on between the plaintiffs and Nice Bright with regard to what the new rent should be following the review, licences were granted in July of 1990, in particular for the use of the **H** premises as an off-licence for the sale of beers, ciders and wines and also a licence was granted on the same date, July 16 1990, for the use of the adjoining premises which were owned by the plaintiffs as a fire escape from the basement of the demised premises, that is the adjacent premises at 101 Marylebone High Street.

It was not until October 1990 that a final agreement was reached between Nice Bright Ltd, acting through Mr Loizou and the plaintiffs, with regard to the new rent. There was some dispute, and it matters not for the purposes of this case, whether the rent was agreed at £35,000 or £36,000. It was after that time when, as emerged in evidence, Mr **J** Loizou got involved in other business transactions, some premises, I understood it in Beecham Place, that he had difficulties with his bank and the rent fell into arrears and thus the action was brought against all the parties to this action.

This is a brief factual summary of the background to the matter that I have to determine. This is not a case where it is for me to make findings of fact in relation to the oral evidence that has been given before me. Essentially, in deciding whether the sureties are discharged it is a matter of law I have to consider whether the licences that were granted to Nice Bright in particular, and only it is submitted the licences for the sale of Italian wine, the licence in relation to permitted **K** use as an off-licence and the licence in relation to the fire escape, amount to an alteration of the agreement that was guaranteed by the sureties. The general principle of law applicable to this issue is set out in the judgment of Cotton LJ in *Holme v Brunskill* (1878) 3 QBD 495, where Cotton LJ said at p505:

The cases as to discharge of surety by an agreement made by the creditor, to give time to the principal debtor, are only an exemplification of the rule stated by Lord Loughborough in the case of *Rees v Berrington*: "It is the clearest and most evident equity not to carry on any transaction without the knowledge of him [the surety], who must necessarily, have a concern in every transaction with the principal debtor. You cannot keep him bound and transact his affairs (for they are as much his as your own) without consulting him."

The true rule in my opinion is, that if there is any agreement between the **L** principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court, will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he **M** will be discharged.

In deciding whether alterations are unsubstantial, or cannot be prejudicial to the surety, the court must assess the alteration objectively. It is not for the court to decide whether in fact there has been material prejudice. This approach, which in my judgment is clearly right, was followed by Hutchison J in *Selous Street Properties Ltd v Oronel Fabrics Ltd* [1984] EGD 360*, where he said at p396:

I have already stated two conclusions: the first, that the presence of the toilets, once they were legitimised by the licence, was something which could

---

*Editor's note: Also reported at [1984] 1 EGLR 50.

*arguably* have increased the rental value of the premises; the second, admittedly on very sparse evidence, that their presence, so legitimised, did not have that effect. It seems to me that the second of these conclusions is analogous to the jury's finding in *Holme v Brunskill* and that I ought not in the present context to place reliance upon it. The important finding in the light of that authority is the first, because here is an alteration in the contract between the creditor and the principal debtor which is not self-evidently unsubstantial, which is not one which cannot be prejudicial to the surety. If that conclusion be correct, then it seems to me that what happened was sufficient to discharge the surety, subject to the proviso.

The parties to the agreement, in this case the sureties, may limit the application of the general law so that sureties are not discharged if certain alterations in the contract between the creditor and principal debtor are made.

The surety clause in the two leases reads as follows:

The surety in consideration of this lease having been granted at his request hereby covenants with the landlord

(a) that the tenant will throughout the term hereby granted including any statutory extension or continuation thereof pay the rents hereby reserved on the days and in the manner herein specified and will perform observe and comply with all the covenants and obligation on the part of the tenant herein and any deed or document supplemental hereto contained as well after as before disclaimer of this lease by a trustee in bankruptcy or liquidator and in the case of default in any such payment of rent or in the performance or observance of or compliance with such conditions and obligations as aforesaid the surety will pay and make good to the landlord on demand all losses damages costs and expenses thereby arising or incurred by the landlord provided always and it is hereby agreed that any neglect or forbearance of the landlord in endeavour to obtain payment of the rents hereby reserved when the same become payable or to enforce performance of the said covenants and obligations on the part of the tenant herein or any deed or documents supplemental hereto contained at any time which may be given whether to the tenant by the landlord or the landlord by the tenant shall not release or exonerate or in any affect the liability of the surety under this covenant.

In my judgment, the three licences granted to Nice Bright, the first, on August 4 1989, to permit the sale of Italian wine, the second, on July 16 1990, to permit the ground floor as an off-licence for the sale of beers, ciders and wines, and, the third, on July 16, to permit the use of the adjoining premises, 101 Marylebone High Street, owned by the plaintiff as a fire escape, will not only increase the rental value of the premises, but is likely to do so, albeit the licence is revocable at six or three months' notice. In my judgment, on a rent review during negotiations between lessor and lessee, the existence of the licences is a factor of potential commercial value, likely at least to a degree to influence a lessee in deciding what the rent would be that he would be prepared to pay.

The format of the licences, making them part of the leases, therefore, *prima facie*, they become a factor in the rental value of the leases. If one looks at the Italian wine licence it is expressly stated that the licence is supplemental to the two leases, supplemental to the licence granting permission to Pasta Place to have eight tables on the premises, supplemental to a similar licence granted to Nice Bright, having set out what the licence granted, which includes a restriction on the service of Italian wines until the requisite planning consents had been obtained by the tenant, it is again said in para 3 of the licence that:

the tenant covenants with the landlord to observe and perform the foregoing stipulations and conditions and this covenant shall be deemed to be incorporated in the first lease and the second lease and the condition or power of re-entry therein contained shall be construed and have effect accordingly.

Indeed, in so far as it assists me, both the two experts called respectively for the plaintiffs and the defendants, did at least indicate in part that the existence of these licences was a factor to be taken into account in deciding what was the appropriate rent on a rent review on these leases. It was Mr Broomfield in his proof of evidence — although in oral evidence he somewhat back-tracked on this — who said:

It would not have been appropriate in my view for the lease rents to have had any substantial regard for the terms of licences which could at any time be withdrawn upon service of a notice.

Mr Zeidman took the view that they would have an affect and might indeed justify an increase in the rent above that which would be appropriate without the licences of some 15 or 20%. But I do not decide this case on the oral evidence, but on the basis of my judgment that on a rent review the rental value of the premises demonstrably is likely to be enhanced because of the existence of these three licences. Therefore, as a matter of general law, the second, third and fourth defendants would be discharged as sureties.

The next question is can the plaintiffs rely upon the proviso to override the general law? In my judgment, on a proper construction of the proviso, they clearly cannot. The proviso, and I accept to this extent the analysis of Mr Zeidman, does envisage a landlord having a wide discretion in dealing with a tenant, but, in my judgment, it is a wide discretion in dealing with a tenant who either has broken his obligations under the lease, or is likely to break his obligations under the lease. Mr Zeidman submitted that so far as a surety was concerned, if one of these sureties had been asked in this case, "Well are you agreeable still be bound? The rent's going up but the landlords are making various concessions to the tenant. They can sell beers, ciders and wines for consumption off the premises. They can provide wine with meals on the premises. They can use the fire escape by going through the next-door premises at no 101. The turnover will be increased as a result of this permitted changed user" and inevitably Mr Zeidman says the sureties would say: "Well, we are much more likely not to be called on our guarantee because the tenant is in a much better position to honour his obligations under the leases and, in particular, to pay the rent".

The proviso, in my judgment, has to be construed in a way to give purpose to the object of the proviso which is, as I accept in the argument of Mr Zeidman, to give a wide discretion to the lessor or landlord. On the other hand, in my judgment, the words of the proviso are clear, that on a breach or an apprehended breach of covenant or an apprehended failure to pay the rent.

This case differs factually from the *Selous* case decided by Hutchison J where there had been a breach of covenant by the tenant in the erection of toilets. At p387 of that case, Hutchison J said:

Prior to the execution of the licence, the toilets constituted an unauthorised alteration or addition to the premises and were, accordingly, precarious in the sense that the landlords might require the tenant immediately to remove them (see cl 2 (8) (d) of the lease). It seems to me, therefore, that had the licence not been granted, any assessment of the rent on the rent review ought to have disregarded the presence of the toilets, at least as a factor enhancing the rental value of the premises. The licence, therefore, by legitimising the toilets in the sense that it precluded the landlords' requiring their removal until the end of the term, converted them from something which could not to something which conceivably could result in the fixing of a higher rent on the review.

In the present case, the three licences were granted before the date the rent review was agreed. There was no question here of any breach of covenant, or the giving of time to remedy the breach. In the *Selous* case Hutchison J, dealing with the position of the surety in that case, Mr Morgan, said [at p397]:

I now return to Mr Cherryman's third point in answer to the arguments advanced in favour of Mr Morgan's being discharged — namely, his reliance on the terms of the proviso to cl 5(a).

I interpose here to say that for the purposes of this action there is no material difference between the proviso in the present case and the proviso in the *Selous* case. I continue quoting now from Hutchison J where he says:

He points to the fact that the proviso mentions three things — neglect on the part of the lessor in endeavouring to obtain payment of rent or to enforce the covenants in the lease, forbearance by the lessor in respect of the same matters, and the giving of time by the lessor to the lessee. He relies essentially on two contentions, the first of which is that forbearance must be taken to add

something to neglect — the latter word importing merely passive acquiescence — but forbearance being apt to apply to a binding agreement. The second argument is that in the context of the proviso the words "any time which may be given" must envisage a contractual giving of time as opposed to mere inactivity or acquiescence and that in reality all that the licence amounted to was a binding agreement to give extra time for the removal of the toilets by postponing the landlord's right to require immediate removal until the end of the tenancy. I shall consider each of these arguments separately.

I reject the argument based on the word "forbearance" simply as a matter of construction of the proviso. This is because I read the two words "in endeavouring" as qualifying both of the clauses ("to obtain . . . and to enforce . . .") which follow. Thus what this part of the clause is saying is that any neglect or forbearance of the lessor in *endeavouring* to obtain payment of rent or in *endeavouring* to enforce performance of the covenants shall not release or exonerate the guarantor. I think that if it had been intended that the words "in endeavouring", should apply only to payment of rent, then the clause in relation to covenants would have read "in enforcing performance of the several covenants", rather than, as it does, "to enforce performance of the several covenants."

So far (I interpose) I respectfully agree with the construction given to the proviso by Hutchison J. Hutchison J went on to say:

If my construction be correct, then it is difficult to see how, even allowing that forbearance adds something to neglect, it can sensibly be said to envisage a binding agreement not to enforce the covenants.

With that *dicta* I also agree.

I should add, in any event

— says Hutchison J —

that I am not convinced by an argument that depends upon importing to the word "forbearance", some significantly different meaning to that connoted by the word neglect, because it is common experience to find that legal documents like the *Book of Common Prayer*, use two words to convey the same meaning.

I interpose to say that, in my judgment, with respect to Hutchison J, the use of the two words does connote a different meaning. The different meaning, in my judgment, is: neglect indicates a passive non-mental approach, whereas forbearance connotes a deliberate decision to forebear; the purpose of the forbearance is in order to achieve later the fulfilment of the contractual obligations, either in the payment of rent, or of the covenants and obligations under the lease.

Hutchison J went on to say:

I regard the argument based on the giving of time as a more formidable one.

That is the reason (I interpose to say) why Mr Morgan lost in the *Selous* case:

The starting point (see *Halsbury's Laws* (4th ed), vol 20, para 261 and *Rowlatt on Principle and Surety* (4th ed), pp 164-65) is that a surety claiming to be discharged because time has been given is only discharged if a binding agreement is made between the creditor and the principal debtor that time shall be given and that mere delay by the creditor in enforcing his rights does not discharge the surety, even in the absence of any proviso. Mr Cherryman argues, therefore, that what must be being referred to here is a contractual giving of time, because otherwise the provision would be otiose. He reinforces this argument by submitting that in the context the giving of time must mean something different from neglect or forbearance. In this connection, it is to be observed that the words "any time which may be given to the lessee by the lessor" are not qualified by a reference to obtaining payment of rent but appear in the proviso in a place which suggests that they are intended to be of quite general application.

Plainly there are two questions here: first whether the words I am considering are apt to apply to a binding agreement to give time, as opposed merely to a failure to enforce a time provision in the contract; and second whether, if they are, they can properly be applied to the licence in the present case. As to the first, I cannot help being influenced by the reflection that to reject Mr Cherryman's submission would involve that the proviso as a whole was redundant in the sense that it gave to the creditor no advantage that he would not have enjoyed even without it. Moreover, it seems to me that the words "any time which may be given", while they are not consistent only with, are nevertheless perfectly apt to apply to, a contractual giving of time.

Accordingly, I uphold the first part of Mr Cherryman's submission based on this passage in the proviso.

As to the second point, it must be remembered that I have already considered and rejected arguments to the effect that, quite apart from the legitimising of the toilets, the licence imposed additional onerous obligations on the tenant by virtue of cl 3 (2). In so far as it legitimised the toilets while imposing an obligation to remove them if required at the end of the tenancy, can it properly be said that all it was effectively doing was postponing until the latter date the time at which the landlord was entitled to call upon the tenants to remove them? It seems to me that it can and that, accordingly, Mr Cherryman's contention based upon the latter part of the proviso succeeds, with the result that Mr Morgan is not entitled to claim that he has been discharged by virtue of the licence.

In my judgment, these licences on a proper construction of the proviso are outside the ambit of the proviso and it cannot be said that the alterations, viewed objectively from the point of view of a surety, were unsubstantial, or that the surety would not be prejudiced. For those reasons, in my judgment, this claim must fail.

# Dean and Chapter of the Cathedral and Metropolitan Church of Christ Canterbury v Whitbread plc

CHANCERY DIVISION

January 24 1995

JUDGE COOKE, sitting as a judge of the High Court

Estates Gazette June 17 1995

[1995] 24 EG 148

*Landlord and tenant — Tenant holding over — Whether tenant a tenant at will or trespasser — Whether landlords entitled to current rental value or rents under previous lease for period of holding over*

By a lease dated January 3 1972 the plaintiff landlords let business premises for a term expiring on September 29 1991 at a rent, following a review, of £27,500 pa for the last seven years of the term. Although the tenant served a notice under section 26 of the Landlord and Tenant Act 1954 requesting a new lease, it failed to make an application to the court within the time-limit. On July 5 1991 the defendant acquired the residue of the term and initially sought to agree terms for a new lease. When terms could not be agreed, the defendant gave up possession on September 22 1992 and the premises were let at a rent of £50,000 pa. The landlords claimed that for the period of holding over the defendant was a trespasser and liable to pay damages at a rate of £50,000 pa; the defendant contended that it was a tenant at will and liable to pay a rent at the rate of the rent under the original lease.

**Held: The defendant was a tenant at will. The parties were in disagreement as to the amount of the rent under the tenancy at will and, in the absence of agreement, the court must determine the rent having regard to the principle of ordinary market value. The proper approach is to consider what a holding-over tenant carrying on its business would pay for a further year at the end of its tenancy, on the basis that it would be its last year, in order to evaluate the asset of the tenancy the tenant actually got. In those circumstances a holding-over tenant ought to consider: (1) what the premises would let for in the market; (2) the fact that it is paying rent in respect of a yearly tenancy; and (3) that if it wants to carry on business for that period, it realistically has nowhere else to go. Making appropriate adjustments to the market rent of £50,000 for a full repairing and insuring lease, the appropriate annual figure was £43,560 and £42,724.60 for the actual period of holding over.**

*Hussein v Mehlman*                                                                              87

decision of Sir Robert Megarry in *Townsends Carriers Ltd v Pfizer Ltd* (1977) 33 P&CR 361*.

There on both sides it would seem (that is, the landlords and the tenants) the handling of matters relating to the lease was in the hands of agents, in the form of associated companies. There was a clause in the lease 4(c) under which:

If either the landlord or tenant shall desire to determine the term hereby granted at any time . . . and shall give the other party 12 months previous notice . . . and if the tenant shall give such notice . . .

So there is an either-way determination clause expressed as exercisable by notices given by landlord or tenant as the case may be. The notice was sent by the tenants' agents, Unicliffe Ltd, not the tenants themselves, who were Pfizer Ltd. It was sent to Wilkinson Transport Ltd. Wilkinson Transport was a wholly-owned subsidiary of the holding company, of which the actual landlord, Townsends Carriers Ltd, was another subsidiary. Therefore, notice was sent to the agents. What the learned Vice-Chancellor held was that:

Since the plaintiff and defendant stood by and let WT Ltd and U Ltd respectively deal with the premises as if WT Ltd and U Ltd were respectively the landlord and tenant there was general agency both as to the landlord and as to the tenant; that where the general control of the property was left by the landlord with an agent a notice to quit given by the agent would be valid even though it was given by the agent in his own name, and an agent who had power to give an effective notice would also have power to receive a notice.

In the course of his judgment, the learned Vice-Chancellor differentiates the case of an agent that merely had authority to collect rents from one that had general authority. This authority seems to cover both the points that I have here: whether the notice can be given to the managing agent by name rather than to the landlord by name and whether the managing agent had authority to receive it.

Mr Reynolds conceded that there was no authority or stipulation in the clause itself that it had to be given to the lessors, although he stressed that clause 8 of the lease did say:

If the lessee shall desire to serve any notice on the lessor hereunder then such notice shall only be validly served if served by recorded delivery or registered post.

He submitted that that clause did contemplate that the notice should be addressed to the lessors.

In my judgment, that is putting too much on to that clause. The purpose of this clause is to provide for the mode of service. I cannot collect from this clause that there is a specific requirement that the notice shall be directed to the lessors. Of course, if the lessees do not direct it to the lessors, they run the risk that the person to whom they do direct it may have no authority to receive it, but that is a different matter to whether the notice in proper form has to be directed to the lessors. I would not accept that point.

There remains the question of whether the managing agents had authority to receive the notice. An agent can receive a notice of this sort if he has sufficient authority or if he is held out as having that authority, even though in that particular instance his authority has been restricted. The former would be a case of express authority; the latter would be a case of ostensible authority.

Then if he did not have authority, a further question may arise in the particular case. A notice served on an agent who had not got authority to receive might still be good if it could be shown that the agent was likely to pass it on to the landlord. In the present case, the tenants could not rely on that last point simply because there was not time enough for the notice to have got to the hands of the agents and then be handed on to the landlords, having regard to the fact that the offices of the landlords and their agent were closed on the dates I have already mentioned.

So the question comes to this, whether the company to which this notice was directed did have authority to receive it. The way it is put on behalf of the tenant is that there were general agents. The landlords have expressly said in their evidence that the management of the premises demised by the lease was at all material times carried out by the lessors' agent, Peel (South East) Ltd. Letters have been produced which are consistent with that position and not with some more limited authority of the agents. And also the company structure would seem to underline the control of Peel (South East) Ltd over the plaintiffs' affairs. The plaintiffs have not challenged that in any way. They have put forward Peel (South East) Ltd as managing agents. They have not sought to show that their authority is restricted; and it would seem to me that a managing agent, among other things, would

have general authority to receive notices relating to the property and receive them in their own name. That accords with the decision of Sir Robert Megarry V-C in *Townsends Carriers Ltd v Pfizer Ltd*.

It was sought to distinguish this case on the basis that there the plaintiff and defendant had stood by and let the two other companies deal with the premises as if they were respectively landlord and tenant. That, however, was only the mode in which the learned judge there could draw the inference that there was a general agency as to landlord and tenant. He did not suggest that that was the only material from which the inference could be drawn. It all depends on the evidence in the particular case. In this case, Peel (South East) are held out as charged with the management of a property and therefore it seems to me that there is a general agency in relation to this property; and it is really on that short ground, without going further into the authorities, I think that Peel (South East) Ltd did have authority to receive this notice by virtue of the general authority to manage the property conferred on them.

I should finally mention that it was stressed that in the lease there were a number of occasions when the agents were specifically referred to. I could not read that as in some way limiting the general authority that Peel (South East) Ltd had in relation to the management of the property.

Some clauses obviously deal with cases where even a general agent might not have authority to deal with a particular matter and the reference is put in to widen it. An example of this is a certificate signed by the lessors' agents as to the amount of the service charge. There might be a question as to authority on an important matter like that, determining an element in the rent, if the certificate was simply signed by some agent.

In the result, I propose to return affirmative answer to the questions which have been raised by the originating summons. That is to say, whether upon a true construction of clause 5(9)(i) and the events which have happened the notice dated December 20 1990 addressed to Peel (South East) Ltd was valid and effective to determine the term created by the lease at the end of the fifth year of the term. I shall answer affirmatively that it determined it on September 28.

*Declarations accordingly with costs for the defendant.*

# County Court Decision

March 5 1992

(Before Mr Stephen SEDLEY QC, sitting as an assistant recorder at the Wood Green Trial Centre)

HUSSEIN AND OTHERS v MEHLMAN

Estates Gazette August 15 1992

[1992] 32 EG 59

**Landlord and tenant — Repudiatory breach — Whether a repudiatory breach of a contract of letting is legally possible — Whether tenants accepted landlord's breach of a repairing covenant as putting an end to the lease**

The defendant granted the plaintiffs a three-year assured shorthold tenancy of a dwelling-house from December 14 1989 subject to the covenant implied on the part of the landlord by section 11 of the Landlord and Tenant Act 1985 — From the commencement of the term, the plaintiffs made several complaints to the defendant about the state of disrepair of the premises and, by March 1991, one of the bedrooms had been made uninhabitable by a ceiling collapse — The defendant refused to carry out these and other repairs — On March 18 1991 the tenants returned the keys and vacated the premises — They brought the present proceedings claiming a declaration that the defendant was in repudiatory breach of the contract of letting and by returning the keys and giving up possession they had accepted that repudiatory breach and the lease was at an end — The plaintiffs also claimed damages for breach of covenant

*Held*: On the evidence there had been severe breaches of the implied covenant by the defendant — One breach in particular

---

*Editor's note: Also reported at (1977) 242 EG 813.

**A** vitiated the central purpose of the contract of letting — A lease or tenancy can come to an end by repudiation — The breaches of the covenant implied by section 11 of the 1985 Act were repudiatory — By vacating the house and returning the keys, the plaintiffs had accepted the repudiatory conduct of the defendant as putting an end to the contract of letting — The plaintiffs were awarded general damages of £1,250 and £1,280 in respect of want of heating

The following cases are referred to in this report.

**B** *Arden v Pullen* (1842) 10 M&W 321
*Bailey (CH) Ltd v Memorial Enterprises Ltd* [1974] 1 WLR 728; [1974] 1 All ER 1003; [1974] EGD 211; (1973) 229 EG 613, CA
*Baker v Holtzapffel* (1811) 18 Ves 115; 4 Taunt 45; 128 ER 244; 34 ER 261
*Calabar Properties Ltd v Stitcher* [1984] 1 WLR 287; [1983] 3 All ER 759; [1983] EGD 578; (1983) 268 EG 697, CA
*Collins v Barrow* (1831) 1 M&Rob 112
*Edwards v Etherington* (1825) Ry & M 268
*Hammersmith and Fulham London Borough Council v Monk* [1991] 3 WLR 1144; [1992] 1 EGLR 65; [1992] 09 EG 135, HL
*Hart v Windsor* (1843) 12 M&W 68; (1843-60) All ER Rep 681
*Izon v Gorton* (1839) 5 Bing NC 501
*Killick v Roberts* [1991] 1 WLR 1146; [1991] 4 All ER 289; [1991] 2 EGLR 100; [1991] 41 EG 133, CA
*Liverpool City Council v Irwin* [1977] AC 239; [1976] 2 WLR 562; [1976] 2 All ER 39; (1976) 74 LGR 392; [1976] EGD 282; 238 EG 879, HL
**C** *Luxborn v Lambeth London Borough Council* (1987) 20 HLR 165, CA
*National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675; [1981] 2 WLR 45; [1981] 1 All ER 161, HL
*Newham London Borough v Patel* (1978) 13 HLR 77, CA
*O'Brien v Robinson* [1973] AC 912; [1973] 2 WLR 393; [1973] 1 All ER 583; (1973) 25 P&CR 239; [1973] EGD 296; 226 EG 297, HL
*Quick v Taff-Ely Borough Council* [1986] QB 809; [1985] 3 WLR 981; [1985] 3 All ER 321; (1985) 84 LGR 498; [1985] 2 EGLR 50; 276 EG 452, CA
*Smith v Marrable* (1843) 11 M&W 5; 12 LJ Ex 223; 7 Jur 70; 63 RR 493
*Staves v Leeds City Council* [1992] 2 EGLR 37; [1992] 29 EG 119, CA
*Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] 1 QB 318; [1971] 3 WLR 979; [1971] 3 All ER 1226, CA
*United Scientific Holdings Ltd v Burnley Borough Council* [1978] AC 904; [1977] 2 WLR 806; [1977] 2 All ER 62; (1977) 33 P&CR 220; [1977] EGD 195; 243 EG 43 & 127, HL
**D** *Walker v Hobbs & Co* (1889) 23 QBD 458
*Wilson v Finch-Hatton* (1877) 2 ExD 336; 46 LJQB 489; 36 LT 473; 25 WR 537
*Wycombe Area Health Authority v Barnett* (1982) 5 HLR 84

This was an action for damages by the plaintiffs, Ibrahim Hussein, Kawther Hussein and Malcolm Armstrong, in relation to a tenancy granted to them by the defendant, Israel Ben Mehlman, in respect of 27 Kenneth Crescent, Brent, London NW2.

Alan Tunkel (instructed by Hodders) appeared for the plaintiffs; Jonathan Russen (instructed by Ivor Denfield & Co) represented the defendant.

**E** The defendant landlord granted the plaintiffs a three-year assured shorthold tenancy of 27 Kenneth Crescent, Brent, London NW2, at a monthly rent of £520 from December 14 1989 to December 13 1992. The tenancy was subject to a covenant on the part of the landlord implied by section 11 of the Landlord and Tenant Act 1985. On the evidence the assistant recorder found the landlord in breach of the implied covenant in relation to the space heating installation, the plaster ceiling to one of the rooms, the flat roof of a rear extension, the failure of the water pipes and dampness in a hall wall. By the middle of March 1991 Miss Hussein's bedroom had been made uninhabitable by the collapse of its ceiling: cold and dirt were being carried from there into the rest of the house; the sitting-room was letting in rainwater and part of its ceiling was bulging dangerously; the outside toilet was unusable and the hall wall was affected by damp. This situation was not improved by the ill-fitting doors and windows and the effects of the burst pipes. The landlord refused to **F** carry out repairs. On March 18 1991 the plaintiff tenants returned the keys to the landlord's agents and vacated the property. Having found there had been a repudiatory breach by the landlord of the implied covenants to repair, the assistant recorder considered whether a repudiatory breach of contract of letting is legally possible.

Continuing his judgment, STEPHEN SEDLEY QC said: However, everything hangs upon events up to March 18 1991 and nothing of legal consequence now hangs on events after that date. Although certain issues about the construction of the statutory implied covenant have to be addressed, the single most important point in the case is this: is it possible in law for a contract of letting to be terminated by one party's acceptance of the other's repudiatory

**G** conduct? At the conclusion of the hearing, because both parties needed to arrange their affairs without delay in accordance with my decision, I gave my principal conclusions in open court, reserving my reasons until the delivery of this judgment. These conclusions were:
(i) A repudiatory breach of a contract of letting is legally possible.
(ii) There was in this case a repudiatory breach by the defendant of the section 11 covenants.
(iii) The plaintiffs by vacating the property and returning the keys on March 18 1991 had accepted the defendant's breach as putting an end to the lease.

*Repudiation of a lease*

Although a contract of letting, whether for a term of years certain or for a periodic "springing" term, differs from other contracts in **H** creating an estate in land, it is nevertheless a contract: see *United Scientific Holdings Ltd v Burnley Borough Council* [1978] AC 904*, at pp 929E, 935B, 944B, 947B-C, 956F-H, 962A and 963H-964B, approving *CH Bailey Ltd v Memorial Enterprises Ltd* [1974] 1 WLR 728†; and, most recently, *Hammersmith and Fulham London Borough Council v Monk* [1991] 3 WLR 1144‡, at pp 1147C, G, and 1156C, G-H. Since, in the ordinary way, any contract may be brought to an end by one party's repudiatory conduct, the question to be answered is whether a contract of letting is an exception to the rule.

In *CH Bailey Ltd v Memorial Enterprises Ltd* at p 732C, Lord Denning MR said:

It is time to get away from the medieval concept of rent. That appears from a **J** passage in *Holdsworth, A History of English Law*, vol. VII (1900), p 262 . . .:
. . . in modern law, rent is not conceived of as a thing, but rather as a payment which a tenant is bound by his contract to make to his landlord for the use of the land.
The time and manner of the payment is to be ascertained according to the true construction of the contract, and not by reference to out-dated relics of medieval law.

Sir Eric Sachs at p 735E said:

. . . Whatever the position last century, the word "rent" today can often simply refer to any contractual sum to which a landlord becomes entitled for the use of his land.

He endorsed the following passage in *Foa, General Law of* **K** *Landlord and Tenant* (8th ed, 1957) at p 101:

There has been a considerable development from the medieval conception of rent as a "thing" or proprietary interest to the modern conception of rent as a contractual obligation to pay for the use of property let, and the notion that "rent" must have the quality that it can be distrained for is more appropriate to the medieval than the modern conception. Accordingly, the question in each case is to determine what in substance is the subject-matter of the tenancy granted to the tenant by the contract: *prima facie* rent is the monetary compensation payable by the tenant in consideration for the grant, however it be described or allocated . . .

It seems clear, then, that, although the modern law of landlord and tenant has not made obsolete the availability of distress for rent or the concept of an estate in land arising out of the relationship, these are **L** no longer the foundation of the relationship but are its incidents: its foundation is the contract to pay money or give other consideration in return for the exclusive right to occupy land. (It may or may not be that the rent-free tenancy is an anomaly in this context, but that rare species cannot swim very far against the tide of the general law.)

The answer by which Mr Russen, in his able argument, seeks to secure his client's boat against this tide is the decision of the Court of Appeal in *Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] 1 QB 318. It is important to see exactly what this case was about. The defendants held a lease from the plaintiffs of a garage, the lease containing a solus-site agreement, preventing the defendants from selling any petrol but the plaintiffs' and requiring the defendants to pay for petrol on delivery. The defendants fell **N** down on two payments and the plaintiffs in response demanded payment in advance. Both sides were therefore in serious breach of the contractual arrangements. The defendants found another supplier, whom they continued to use even when the plaintiffs offered to resume cash on delivery. When the plaintiffs sued for an injunction to enforce the solus-site agreement, the defendants claimed that the plaintiffs had repudiated by demanding payment in advance and that they had accepted the repudiation by going to other suppliers. But — and this was the important thing in the case — the

---
*Editor's note: Also reported at (1977) 243 EG 43 & 127.
†Editor's note: Also reported at (1973) 229 EG 613.
‡Editor's note: Also reported at [1992] 1 EGLR 65.

*Hussein v Mehlman*  89

defendants were trying to approbate and reprobate, because they were trying to keep the lease but to get rid of the solus-site covenant. The case was not actually about the repudiation of a lease, since neither party contended that this had occurred.

Lord Denning MR accepted that the plaintiffs' demand for advance payment was repudiatory and that the defendants "had a good deal of justification" for pleading another supplier. But the question was whether this by itself had put an end to the solus-site covenant by acceptance of repudiatory conduct or whether, when the plaintiffs offered to go back to the contractual arrangement, they were still in a position to put themselves in the right. The Court of Appeal held that they were, at p 323D:

Mr Thompson for the dealer says that the oil company have repudiated their contract by insisting on the new stipulation of payment before delivery. He says that the dealer accepted that repudiation. He treated the agreement as at an end and got deliveries elsewhere. Seeing that the repudiation was accepted, the oil company can no longer insist on the agreement being performed.

The difficulty which faces Mr Thompson, however — and he faces it quite frankly — is this. The agreement is contained in the lease. If the lease is at an end, as well as the agreement, then the dealer is in a parlous position. He has got to go out. That is the last thing he wants. He wants to keep the lease.

Lord Denning held that the covenant was not severable from the rest of the lease and went on at p 324A:

The second point is: what is the effect of the repudiation by the oil company which was accepted by the dealer? Does it put an end to the lease? I think not. A lease is a demise. It conveys an interest in land. It does not come to an end like an ordinary contract on repudiation and acceptance. There is no authority on the point, but there is one case which points that way. It is *Leighton's Investment Trust Ltd v Cricklewood Property & Investment Trust Ltd* [1943] KB 493 . . . [1945] AC 221. Lord Russell of Killowen and Lord Goddard at pp 234 and 244 were both of opinion that frustration does not bring a lease to an end. Nor I think does repudiation and acceptance.

Edmund Davies LJ, concurring, put his own reasons on a narrower basis: the elements of the lease were not severable and must stand or fall together. He said at p 325C:

Despite the repudiation by the Plaintiffs of part of the lease and the defendants' acceptance thereof, I cannot accept that, as to the latter's occupancy during the remainder of the 14-year term, they would be able to say, "We are entitled to remain in possession without regard being paid to where we obtain our petrol supplies."

This reasoning limits itself to the impossibility of approbating and reprobating at the same time and fixes the defendants with their continuance in possession under the lease. The third judgment, that of Stephenson LJ, agreed with both the previous judgments and went on at p 325D:

This complex of lease and trading agreement has not been repudiated . . .

not "cannot be repudiated".

The *Total Oil* decision, at its fullest, is therefore to be found in the judgment of Lord Denning. If it stood by itself it would, at this level, be binding authority for the proposition that because of the special character of a demise of land a lease is not terminable by frustration nor, therefore, by repudiation and acceptance.

However, since the *Total Oil* case was decided in 1971, both the major and the minor premises upon which Lord Denning's second holding was based appear to have been destroyed by decisions of the House of Lords. As I have already indicated, the major premise that a lease of land is in its essence different from other contracts has been overset, in particular by the decision of the House of Lords in *United Scientific Holdings Ltd v Burnley Borough Council*. The minor premise that a lease cannot be determined by frustration has been overset by the decision of the House of Lords in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, in which a demised warehouse became unusable because of a street closure, and the tenants withheld rent, claiming that the lease had been frustrated. The House of Lords (Lord Russell of Killowen dissenting) held that the doctrine of frustration is in principle applicable to leases but that it did not operate on the facts of the instant case. Their lordships declined to follow the *dicta* in the *Cricklewood* case. The *Total Oil* case was cited but was not referred to in the speeches. Lord Hailsham, at p 690D, said:

I conclude that the matter is not decided by authority and that the question is open to your Lordships to decide on principle. In my view your Lordships ought now so to decide it. Is there anything in principle which ought to prevent a lease frozen ever being frustrated? I think there is not. In favour of the opposite opinion, the difference in principle between real and chattel property was strongly urged. But I find it difficult to accept this, once it has been decided, as has long been the case, that time and demise charters even of the

largest ships and of considerable duration can in principle be frustrated.

Lord Wilberforce at p 694E said:

It was pointed out, however, by Atkin LJ in *Matthey v Curling* [1922] 2 AC 180 200, in a passage later approved by Viscount Simon [1945] AC 221, 230 that as a lease can be determined, according to its terms, upon the happening of certain specified events, there is nothing illogical in implying a term that it should be determined on the happening of other events — namely, those which in an ordinary contract work a frustration . . .

A man may desire possession and use of land or buildings for, and only for, some purpose in view and mutually contemplated. Why is it an answer, when he claims that this purpose is "frustrated", to say that he has an estate if that estate is unusable and unsaleable? In such a case the lease, or the conferring of an estate, is a subsidiary means to an end, not an aim or end of itself.

He concluded at p 696G:

It was not until the *Cricklewood* case that the argument was put on principle and fully explored. The governing decision (of the Court of Appeal) was summary, unargued, and based upon previous cases which will not bear the weight of a generalisation. I think that the movement of the law of contract is away from a rigid theory of autonomy towards the discovery — or I do not hesitate to say imposition — by the Courts of just solutions, which can be ascribed to reasonable men in the position of the parties.

This reasoning, it seems to me, not only takes away the minor premise of the *Total Oil* judgment but has fundamental implications for its major premise: it continues the process, to which I have referred, of assimilating leases to other contracts. It follows, in my judgment, that unless some special exception can be established for acts of repudiation, not only has *Total Oil* ceased to be authority for the proposition that a lease cannot be repudiated: the decisions which have rendered it obsolete point powerfully in the direction of repudiation being a legitimate ground for termination of a lease. I bear in mind, however, that the House of Lords were extremely cautious about the range of situations in which it would allow the doctrine of frustration to operate on a lease and that Lord Hailsham posed the choice, in the language of *HMS Pinafore*, as lying only between "never" and "hardly ever", coming down in favour of the latter.

Very recently the Court of Appeal has held, apparently without argument to the contrary and without any citation of authority, that a tenancy agreement which one party is induced to enter into by the fraud of the other can be rescinded at the innocent party's election: *Killick v Roberts* [1991] 4 All ER 289[*], at p 292d. This seems another step down the same road.

It is perhaps a relief that the *Total Oil* case is no longer good law, because it appears to have silently overruled an important line of cases (not cited in argument) in which, throughout the 19th century, the courts took it as axiomatic that a contract of letting could be terminated by the innocent party without notice if the other party failed to fulfil a fundamental term of the contract. I will refer to them because they are of assistance in deciding the next question, namely what breaches of a lessor's covenant are of a sufficiently fundamental character to amount to repudiation.

In *Edwards v Etherington* (1825) Ry&M 268 an action for use and occupation failed by the jury's verdict. The defendant was tenant from year to year of a house, the walls of which were so dilapidated that it became unsafe to live in. The defendant vacated a few days after the rent day and returned the key to the plaintiff. His defence to the action for rent was — very much as Mr Hussein's initially was — that there had been a surrender, but, if not, that the plaintiff was not entitled to rent for "premises utterly useless to the defendant". The Chief Justice told the jury:

Slight circumstances will not suffice but such serious reasons may exist, as will justify a tenant in quitting at any time, and it is for you to say whether in this case any such exist. . . . It is for you to say whether such serious reasons for quitting, existed in this case, as will exempt the defendant from this demand, on the ground of his having had no beneficial use and occupation of these premises; and that, through no default of his own, but through the fault of a person (the Plaintiff) who ought to have taken care, that the premises should have been in such a state, as to continue useful to the defendant.

In *Collins v Barrow* (1831) 1 M&Rob 112 the defendant had a three-year lease with a covenant to keep the premises in tenantable repair. He left without notice after nine months and was sued for the rent accruing thereafter. His defence was that the house had become uninhabitable for want of sufficient drainage. Bayley B directed the jury:

[*]Editor's note: Also reported at [1991] 2 EGLR 100; [1991] 41 EG 133.

**Landlord and Tenant — General**

In any case, the tenant is bound to pay rent during the time for which he has contracted, unless he satisfies the jury that, under the circumstances, he was justified in quitting. I think however that in point of law he will be freed from his obligation to reside on the premises, if he makes out, to the satisfaction of the jury, that the premises were noxious and unwholesome to reside in, and that this state arose from no default or neglect of his own, but from something over which he had no control, or none, except at an extravagant and unreasonable expense. Thus, he could not be bound to make a sewer; and if nothing else could keep the house wholesome, I think he was justified in quitting. The expense of making a sewer may be heavy; but if the Plaintiff would not make it, he cannot, I think, call upon his tenant to continue in a house which requires it.

The issue of fact, on which the jury gave a verdict for the plaintiff, was whether the sewage could reasonably have been pumped away by the defendant without need of a sewer. There was evidently no lessor's covenant to repair.

In *Izon* v *Gorton* (1839) 5 Bing NC 501 Tindal CJ held that the tenant continued to be liable for rent where the premises were destroyed by an accidental fire. The court was bound by authority to that effect (*Baker* v *Holtzapffel* (1811) 4 Taunt 45) on this point, but the Chief Justice also said at p 507:

The cases referred to in the argument, in which the tenant has been allowed to withdraw himself from the tenancy, and to refuse payment of rent, will be found to be cases where there has been either error or fraudulent misdescription of the premises which were the subject of the letting, or where the premises have been found to be uninhabitable by the wrongful act or default of the landlord himself; neither of which circumstances occur in this case.

(Thus it seems that *Killick* v *Roberts*, above, did have precedents.)

In *Arden* v *Pullen* (1842) 10 M&W 321, the tenant had entered into a repairing covenant but left the house because subsidence had caused it to become flooded. The Court of Exchequer held him liable to pay rent notwithstanding. Lord Abinger CB said:

I am of opinion that, unless there has been some fraud or improper concealment on the part of the Plaintiff, which is not suggested, the contract for letting this house was perfectly good. The Defendant was, therefore, bound to perform it so long as the Plaintiff performed her part of it . . .

Alderson B said:

The rule laid down by Tindal, CJ, in *Izon* v *Gorton*, is the correct one, that in order to enable a tenant to avoid his lease, there must be a default on the part of the landlord.

It was this well-established line of authority that the Court of Exchequer followed in the celebrated case of *Smith* v *Marrable* (1843) 11 M&W 5. The defendant had taken a furnished house for his family, who found it infested with bugs and left. On an action for the rent for the remainder of the term of five weeks, Lord Abinger CB directed the jury that:

in point of law every house must be taken to be let upon the implied condition that there was nothing about it so noxious as to render it uninhabitable.

Parke B, giving the leading judgment on a motion for a new trial, cited a number of the authorities to which I have referred and concluded:

These authorities appear to me fully to warrant the position, that if the demised premises are incumbered with a nuisance of so serious a nature that no person can reasonably be expected to live in them, the tenant is at liberty to throw them up.

Lord Abinger CB, sitting as was the custom on the appeal against his own direction to the jury, expressed relief that authorities supported what he had taken to be a proposition of common sense and concluded:

I entertain no doubt whatever on the subject, and think the defendant was fully justified in leaving these premises as he did: indeed, I only wonder that he remained so long, and gave the landlord so much opportunity of remedying the evil.

It will be seen that this case is authority not only for the proposition for which it is known, that there is an implied covenant of fitness for habitation in a letting of a furnished house, but also for the proposition that a contract of tenancy may be repudiated by a breach of such a condition, and — incidentally — that it is not to be held against the tenant that he has endured the breach for longer than he needed to.

Although the vocabulary of repudiation is not consistently used in these cases — the earliest, for example, speaks of "exempting" the defendant from the demand for rent and others speak of the tenant being allowed to "throw up" the letting or "to withdraw", by 1842 Lord Abinger is using the phrase "the contract of letting" and Alderson B is speaking about the tenant "avoiding" the lease for the

landlord's default. When in 1877 the Exchequer division decided *Wilson* v *Finch-Hatton* (1877) 2 Ex D 336 and followed *Smith* v *Marrable*, all three barons used the language of repudiation and Pollock B sought to cut away furnished lettings from the doctrine that rent issues out of the realty and to hold instead that this was simply "a sum paid for the accommodation afforded by the use of the house". (The divergent patch which Parke B charted in relation to demises of real property in *Hart* v *Windsor* (1843) 12 M&W 68, shortly after he decided *Smith* v *Marrable*, has now, it appears, all but converged again with the path of contract, at least since the decision in *C H Bailey Ltd* v *Memorial Enterprises Ltd*.)

It follows, if the foregoing is right, that the passage at present to be found in chapter 17 of *Woodfall's Law of Landlord and Tenant*, para 1-1836, which says, in terms, that a lease or tenancy does not come to an end by repudiation, citing the *Total Oil* case, is wrong. So is the final sentence of para 420 of vol 27 of *Halsbury's Laws of England* (4th ed), which advances the same proposition in relation to leases, citing not only *Total Oil* but *Panalpina* in the footnote, but treating the latter, apparently, as confined to the doctrine of frustration.

I recognise that the proposition that a contract of tenancy can be repudiated like any other contract has a number of important implications, which it is not appropriate to explore on the facts of this case. For example, if the obligation to pay rent is as fundamental as the obligation to keep the house habitable, it will follow that a default in rent payments is a repudiatory act on the tenant's part. That this may follow is not, however, a reason for going back on what appears to me to be the inexorable effect of binding authority. It will, however, have effect subject not only to all the statutory provisions which now hedge the right to recover possession but also, I would think, to the provisions contained in the contract of letting itself in relation to forfeiture (where there is a term certain): in other words, the right to terminate by acceptance of repudiatory conduct may itself be modified by further contractual provisions which lay down conditions, supported by statute, for the exercise of the right.

*Section 11 covenant*

Section 11 of the Landlord and Tenant Act 1985 provides:

(1) In a lease to which this section applies . . . there is implied a covenant by the lessor —

(a) to keep in repair the structure and exterior of the dwelling-house (including drains, gutters and external pipes)

(b) to keep in repair and proper working order the installations in the dwelling-house for the supply of water, gas and electricity . . . and

(c) to keep in repair and proper working order the installations in the dwelling-house for space heating and heating water.

(3) In determining the standard of repair required by the lessor's repairing covenant, regard shall be had to the age, character and prospective life of the dwelling-house and the locality in which it is situated.

It is common ground that this is a lease to which section 11 applies. There is no issue that the gas heaters were installations for space heating, nor that the incursion of rainwater into the sitting-room and the damage to its ceiling were the result of disrepair of the structure or exterior of the dwelling-house. It remains the defendant's contention, however, that the ceiling of the bedroom was not part of the structure within the meaning of section 11(1)(a). Mr Russen has, wisely, taken his stand on this proposition without seeking actively to defend it. In my judgment it is untenable.

The object of section 11(1)(a) is to place upon the lessor the obligation to maintain the fabric of the building in a safe and habitable condition. A house — at least a 1930s London suburban semi-detached house — without plaster on its ceiling is not a complete house and is certainly not safe or habitable. In *Staves* v *Leeds City Council* (Court of Appeal, October 4 1990, unreported*) Ewbank J recorded:

It has been conceded in this case, as in earlier cases, that the internal plasterwork is part of the structure of the house.

(Counsel for the local authority was Mr John Stuart Colyer QC, whose experience in this field of law was unrivalled.) Lloyd LJ concluded his judgment:

Once it was conceded, as it was, that the plaster was part of the structure it follows that there was a breach of the condition implied by section 11(1)(a) of the Landlord and Tenant Act 1985 . . .

As to the precedent in *Hill and Redman* which Ivor Denfield & Co

---

*Editor's note: Also reported at [1992] 2 EGLR 37.

*Hussein v Mehlman*

91

**A** insisted gave support to the defendant's position, the following observations are in place. First, this is a page from the text of a draft form of a lease, not a source of law at all. Second, the precedent defines "the interior" as "the systems and components . . . *forming part of the building* which are enclosed by the exterior but are not part of the structure, including . . . plaster or other surface material applied to and the internal skins, linings and finishes of and to the structure and exterior; . . . ceiling systems . . ." (emphasis supplied). Thus, it is perfectly plain that even this precedent, while distinguishing for its own particular purposes between the structure and the interior of the building, treats ceilings and their plaster as "part of the building".

**B** I want to express my concern at what seems to me the use of the authority which a solicitor understandably enjoys in the community to make assertions of law which fly in the face of common sense but are given a spurious authority by the use of partial and misleading citations of this kind. It is one thing to advance a client's case vigorously; it is another to use ill-founded arguments against lay persons who are trying conscientiously to ascertain their own and their landlord's true legal position.

While the evidence of the environmental health officer, Mr Wallace, is helpful in confirming the general state of the premises, the test which he had to apply for his statutory purposes was different from the test of breach of the section 11 covenant. The environmental

**C** health officer was concerned under the Housing Act 1985 about fitness for human habitation. This is tested by section 604(1) by deeming premises to be unfit if they are so far defective in one or more of 10 broad factors, including repair and freedom from damp, that they are not reasonably suitable for occupation in that condition. It is plain, however, that section 189, which compels a local authority to serve a repair notice wherever they are satisfied that a house is unfit within the meaning of section 604, unless the house is beyond repair, may result in the lawful service of notices in relation to defects which fall short of breaches of the section 11 covenant: see *Newham*

**D** *London Borough v Patel* (1978) 13 HLR 77. I do not therefore place reliance upon the notice or the grounds upon which it was given in deciding whether there was a breach of the section 11 covenant. I do, however, give weight to the fact that the defendant's notice of appeal, which dropped his original ground that the works required were unnecessary and instead sought to place some or all of the liability to repair on the tenants, was not pursued to a hearing but served an evident purpose in deferring any action which would have resulted in compliance, among other things, with the section 11 covenant.

*Breaches of covenant*

The initial breach of the covenant contained in section 11(1)(*c*) was eventually cured, but it did not, in my judgment, cease to have a bearing. It had taken the whole of the first winter, over Mr Mehlman's strident attempts to evade compliance, to get three

**E** working gas heaters installed as they should have been at the start of the letting. This not only sounds in damages: it colours the attitude which it was reasonable for the tenants to take to the succeeding breaches. The same is true of the burst pipes in February 1991. The plaintiffs themselves had them fixed, but the defendant's solicitors' reaction, which was to tell the plaintiffs to do it themselves, again colours the ongoing breaches. These, so far as the present part of my judgment is concerned, were the collapsed bedroom ceiling, which had been there since August 1990 and which the defendant was expressly refusing to repair, and the collapsing and leaky sitting-room ceiling, which the defendant had been admitting his liability to repair but by March 1991 had still done nothing about.

In my judgment, the defendant was making it as plain as was

**F** possible that he was not going to comply with his covenant to keep the structure and exterior of the premises in repair. His previous conduct in relation to other breaches amply demonstrated that this was not due to a bona fide mistake of law or to logistical difficulties with builders: it was due to the determination of the defendant and his son to put not a penny back into the house and, if necessary, to let the tenants suffer hardship in consequence. I find, too, that the two plaintiffs who were living in the house did suffer real hardship, and that the breaches deprived all three of the essential part of what they had contracted for — a house in which all rooms were usable, in which ceilings were not either collapsed or collapsing and into which rain, wind and cold did not penetrate through the associated defects in the structure. In *Walker v Hobbs & Co* (1889) 23 QBD 458 an action on the term implied by the Housing of the Working Classes

**G** Act 1885, section 12, into contracts of letting that the house should be reasonably fit for human habitation, Lord Coleridge CJ said:

It is admitted that the ceilings were in a dangerous condition, and therefore that the rooms were not, speaking in a broad sense, fit for human habitation.

I hold, likewise, that the defects in the ceilings were such as to render the house as a whole unfit to be lived in and that the defendant's conduct, in the classic language, evinced an intention not to be bound by the implied covenant to repair. The breach, in my judgment, vitiated the central purpose of the contract of letting.

Mr Tunkel has also relied on the near-certainty that come the next freeze the pipes would still be unlagged and the loft uninsulated and that there would consequently be another flood. Had he been free to argue the point, and had I been free to decide it, I would have held

**H** that this, too, represented a breach of the covenant implied by section 11(1)(*b*) to keep in repair (which means *put and keep* in repair: see *Liverpool City Council v Irwin* [1977] AC 239*) and proper working order the installations in the dwelling-house for the supply of water. But the Court of Appeal has held otherwise: see *Wycombe Area Health Authority v Barnett* (1982) 5 HLR 84. The reasoning of the Court of Appeal in that case leaves no room for Mr Tunkel's contention that a special duty arose under the covenant after the burst of February 1991. The only duty that arose, given the authorities, was a duty to repair the bursts — which, as I have held,

**J** the defendant made the plaintiffs discharge. It may well be that in this already poorly heated house the collapse of the bedroom ceiling was making it even harder to retain warmth in the building and so contributed to the freezing of the pipes in the loft; but, if so, this was a function of the section 11(1)(*a*) covenant to keep the structure in repair, not of the section 11(1)(*b*) covenant.

The plaintiffs are, however, entitled to rely on the state of the doors, both that of the outside toilet and those in the house, which did not fit their frames. By themselves these defects, however long persisted in, could not have rendered the house uninhabitable but, given the major defects to which I have referred, I consider that the state of the various doors amounted to a further series of breaches of the section 11(1)(*a*) covenant which added to the difficulties of continuing to live in the house.

The damp patch in the hall made things no better, but on the evidence I cannot allocate it to any breach of covenant on the lessor's

**K** part.

As to the problems with the windows and the ventilation of the house to which the environmental health officer's notice related in part, these seem to me to be faults of design and construction related to the age of the house, and so probably outside the statutory repairing covenant: see *Quick v Taff-Ely Borough Council* [1985] 3 All ER 321†. But again, these deficiencies tended to aggravate the misery caused by the breaches of covenant which I have found.

*Notice to the lessor*

It has been established since the House of Lords' decision in *O'Brien v Robinson* [1973] AC 912§ that the liability of the lessor to

**L** repair structural defects under section 32 of the Housing Act 1961 (the predecessor of section 11 of the 1985 Act) arises only when the lessor has knowledge of the defect. It is worth observing in passing that *O'Brien v Robinson* was a case of the collapse of a bedroom ceiling and, although it went to the House of Lords on the question of knowledge, there appears to have been no dispute at any stage, and no point taken by their lordships, as to the ceiling's being part of the structure of the house and so within the covenant.

In the present case I do not find any evidence that the defendant had knowledge of the risk that the bedroom ceiling might collapse before it actually did so. His breach of covenant in this regard is therefore limited to his deliberate failure to repair once the collapse had occurred and been brought, as it promptly was, to his notice.

**M** The state of the sitting-room ceiling was, however, perfectly visible and, I find, must have been known to him before the letting was entered into. In my judgment, it is a matter of common sense:

(a) that a bulging ceiling may collapse; and

(b) that such a bulge in a single-storey extension is likely to be due to rain penetration.

Early in this judgment I mentioned the surveyor's report bespoken by Mr Mehlman in 1987 in relation to repairing liabilities under the previous tenancy. It contained this paragraph:

---

*Editor's note: Also reported at (1976) 238 EG 879.

†Editor's note: Also reported at [1985] 2 EGLR 50.

§Editor's note: Also reported at (1973) 226 EG 297.

**A**  The bituminous felt covering to the roof of the single-storey back addition is in poor condition and needs to be stripped off and renewed with proper detailing provided at the edges, particularly at the junction with the main rear wall. Works of repair may also prove to be necessary to the underlying structure of this roof due to defects resulting from water penetration.

It is clear from the state of the extension ceiling in November 1989 that this advice was ignored.

I do not understand the decision in *O'Brien* v *Robinson* to require formal notice: it reflects the common-sense proposition that a person cannot take steps to remedy a defect of which he knows nothing. This in turn requires that he should not be permitted to claim to be ignorant of things to which he has shut his eyes where a prudent property owner would have taken notice. In practice, however, little **B** now hangs on this, since no real damage accrued until the rain came through at Christmas 1990 and the defendant was put on express notice shortly thereafter.

The question of knowledge is important, however, in relation to the gas fires. Mr Mehlman has denied any knowledge that the gas fires were defective until the latter part of the winter of 1989 to 1990. I reject his denial. It is clear from the documents that Mr Mehlman had had all the fires disconnected before the commencement of the tenancy: on November 1 1989 he wrote to the gas board that two fires had been disconnected and asking for the third to be disconnected. This was the very time at which the house was on the market and the agents taking up references on prospective tenants. I accept Mr Tunkel's submission that Mr Mehlman must have been told by the **C** gas board, probably during October 1989, that the gas fires were not serviceable and that in consequence he not only had the mains supply turned off but had the fires disconnected to stop the tenants using them. I find, therefore, that the defendant, whether in person or through his son, knew that the installations for space heating in the house which were scheduled to the lease were not in working order from the start of the tenancy.

*Termination of the lease*

Accordingly, I hold that when on March 18 1991 the plaintiffs vacated the house and returned the keys they were accepting the repudiatory conduct of the defendant as putting an end to the contract of letting. That they were entitled to do this at any date, not **D** merely on a rent day, and that their forbearance to do it sooner should not count against them is established by the 19th-century authorities to which I have referred. From that date, therefore, they were relieved of the obligation to pay rent, and both parties were relieved of their other obligations under the lease. The defendant was free to re-enter the premises.

*Damages*

Accordingly the plaintiffs are entitled to damages for the following:

(a) The want of heating during the winter of 1989 to 1990 caused by the absence of working gas fires in the three rooms where they should have been.

**E**  (b) The effects of the collapse of the bedroom ceiling from the point of time at which the defendant had notice of it.

(c) The effects of rain penetration and the bulging plaster in the sitting-room.

(d) The ill-fitting doors.

The damages will be awarded to the plaintiffs jointly, since I am not asked to make an apportionment; but it will be clear that some elements of them in fact fall to be apportioned to an individual plaintiff, and I give liberty to the plaintiffs to apply to this court if — unthinkably — they find themselves at odds about the proper division of the award among themselves.

*(a) Space heating*

**F**  Judge Rowntree, in the award which the defendant had set aside, awarded £300 for the lack of heating. He did so after a brief hearing and, while I treat his award with the greatest possible respect, it cannot bind me. I bear in mind that the three gas fires were not enough to keep the house fully warmed on any view, but they were, in my view, an irreducible minimum for enabling the house to be properly warmed during the winter. The lack of them reduced the occupancy of the house to a condition of misery. Because of it, only Miss Hussein, who had nowhere else to go, lived in the house during this period, although the attempts to get things remedied caused endless trouble, upset and loss of working time to Mr Hussein as well.

I award £600 damages for Miss Hussein's ordeal.

Because he was not reasonably able to take up occupancy of the

house, Mr Hussein stayed, somewhat uncomfortably, in the flat of **G** his newsagent partner Mr Williamson above the shop at 90 St John's Avenue. He paid him "about £30 per week" from November 14 1989 to April 2 1990, when the gas heaters were replaced. I accept his evidence, but I allow for the fact that the approximation means that there may have been weeks when he paid Mr Williamson less. The difference, I think, sufficiently represents the quite serious trouble to which Mr Hussein was constantly put in attending so far as he could to his sister's needs and in going to the house every time a builder, a gas fitter or some other workman had to attend. (Miss Hussein and Mr Armstrong both had daily jobs to go to.) This was a period pleaded as 16 weeks (I make it rather more) and I award £480 accordingly under this head.

To these damages must be added a figure representing the net cost **H** of substitute heating. The Calor gas heater with two gas bottles cost £139, but the equipment will have had some residual value apart from its use in the absence of working gas fires. Equally, the cost of refills at £9.99 was in substitution for mains gas, which would also have cost money. Each gas bottle was used only in the evenings for a couple of hours (because without a ventilated flue it became unpleasant after that point), but even so lasted no more than 10 days in use. Clearly this was a cumbersome and expensive form of gas heating by comparison with a properly fitted gas fire. Assuming, therefore, that something like £150 was spent on bottled gas in addition to the cost of the equipment, and discounting the sums spent for the reasons I have indicated, I awarded £200 for the additional trouble and expense **J** caused by having to introduce a Calor gas heater into the house.

*(b) The bedroom ceiling*

From the middle of August 1990 until the plaintiffs left, the rear-right bedroom was uninhabitable because its ceiling had fallen down. The collapse left the laths open to the uninsulated loft and wind constantly blew through the space, carrying cold and dirt into the rest of the house past the badly fitting bedroom door. Mr Armstrong, whose evidence I accept as truthful, described how one could look through the hole in the ceiling and see daylight between the tiles of the roof. He said:

This made it necessary to clean up daily. The wind was carrying soot from the **K** loft and other debris through the house.

Grave inconvenience was caused by this serious breach of covenant, which continued for the last seven months of the plaintiffs' occupancy, including the winters of 1990 and 1991. The damages will be part of a single sum for breach of the covenant to keep the structure in repair.

*(c) The sitting-room*

The incursion of rain at and after Christmas 1990 made it dangerous to sit anywhere near the bulging plaster. Contrary to what had been suggested to Mr Hussein when he was cross-examined (and I do not doubt for a moment that Mr Russen did so on instructions) the defendant's surveyor, Mr Chapman, gave evidence that when he **L** went to the house Mr Hussein and his friends were gathered round the fire on the party wall, at a point remote from the bulge in the ceiling. I accept the evidence of Mr Hussein that the sitting-room could be used in this extraordinary fashion throughout the latter part of the plaintiffs' occupancy. This disrepair, too, was a serious breach.

(d) I have described the poor state and fitting of some of the doors.

*General damages for structural disrepair*

There is no "tariff" as there is in most personal injury cases, for awards of this kind, but a line of recent cases has given some indication of the proper range. In particular I have had regard to *Lubren* v *Lambeth London Borough Council* (1987) 20 HLR 165, in which the Court of Appeal indicated broad approval of a median **M** figure of £1,000 a year for a five-year deterioration of premises from habitable to "appalling". But there is no principle, any more than there is in false imprisonment cases, by which a single multiplier or divisor can be applied to such a figure to reflect greater or lesser periods of time. In general, the passage of time produces a "taper" effect in damages and I consider, therefore, that I am justified today, having in mind all the circumstances and effects of the breaches of the lessor's section 11(1)(*a*) covenant, in awarding £1,250 general damages.

*Other special damage*

For reasons which I have given, the damage to furniture caused by the collapse of the bedroom ceiling and by the burst pipes is not

recoverable. Nor, it seems to me, is the cost of accommodation for the plaintiffs since the date when they terminated the lease, except in so far as it might have exceeded (as it has not done) what they would otherwise have been paying to the defendant for the remainder of the original term.

There is also a claim for storage charges and removal costs on and after March 18 1991. These, it seems to me, are not shown to be consequent on the defendant's breaches of covenant: they are the consequences of the coming to an end of the letting and I am not satisfied on the evidence that they are any greater than they would have been had the term run its course and the plaintiffs then vacated.

The plaintiffs are, however, entitled to recover what they paid the plumber to repair the burst pipes, namely £195.

*Rent thrown away*

Para 6 of the reamended particulars of claim concludes:

Further, or alternatively, the Plaintiffs are entitled to a refund of the whole or part of the rent paid or payable during the contractual term or damages representing the same.

Head (2) of the prayer as reamended reads:

A refund of the whole or part of the rent and deposit of £750 paid to the Defendant or which may be held to be payable to the Defendant.

Are the plaintiffs entitled, in relation to the time before they put an end to the lease, to extinguish or diminish the rent due because of the various failures of consideration? It seems to me that there are two problems. First, the doctrine that the covenant for the payment of rent is independent of the performance of the other covenants is still, as I understand it, the law.

Second, there is a potential element of double-counting in awarding damages for breach and then denying the lessor some or all of the payment due for the occupancy of the premises. On balance, although the contrary is certainly arguable, I do not think that the law permits me to award what is in effect a rebate on the rent in the circumstances of a case like this. The proper approach is laid down by the Court of Appeal in *Calabar Properties v Stitcher* [1983] 3 All ER 759, especially at pp 766g, 769j-770b. Its effect is to limit damages in a case like the present to the inconvenience of occupying a house in a condition in which it would not have been but for the breach of covenant. The rent is paid for the occupancy, the damages for the inconvenience. To them will be added, of course, any recoverable special damages.

*The counterclaim*

The defendant is entitled to the rent remaining unpaid under the lease. By his "further amended" defence and counterclaim he seeks £2,280 rent arrears and rent at £520 per month from January 31 1991 until the date of trial and thereafter. I hold, for the reasons which I have given, that the defendant's entitlement to rent came to an end on March 18 1991 and I give judgment on his counterclaim for £2,834.20 accordingly.

*Interest*

Both parties will have interest on their awards. I should welcome counsel's help as to the appropriate calculations.

*Judgment for the plaintiff with costs.*

**For further cases on this subject see p 231**

## COURT OF APPEAL

2 April; 22 May 2008

————————

IIG CAPITAL LLC
v
VAN DER MERWE AND ANOTHER

[2008] EWCA Civ 542

Before Lord Justice WALLER,
Lord Justice LAWRENCE COLLINS and
Lord Justice RIMER

**Guarantee — Whether guarantors entitled to rely upon defences open to debtor in respect of demand for payment — Construction of guarantee — Whether guarantors accepting primary or secondary liability — Whether manifest error in demand for payment.**

IIG Capital LLC (IIG), a company registered in New York which financed business start-ups by trade finance and invoice discounting, afforded finance to Hurst Parnell Imports and Exports Ltd (HPIE). Mr and Mrs Van Der Merwe transferred HPIE's business to Barclays, but in 2006 IIG recaptured HPIE's financing and a series of documents were executed on 30 June 2006. The first was a loan agreement, governed by New York law, between IIG and HPIE. That agreement contained a number of warranties given and obligations undertaken by HPIE, including: warranties about the accuracy of HPIE's accounts and financial statements (clause 8); obligations to provide regular accounts (clause 10.1); obligations to maintain insurance (clause 10.1.9); obligations not to enter into transactions otherwise than in the normal course of business (clause 11.4); and not to make loans to affiliates (clause 11.6). The second was a debenture granted over the assets of HPIE. The third was a document described as a guarantee and signed by Mrs Van Der Merwe. An identical document was signed by Mr Van Der Merwe. The guarantee stated, in clause 2 that the guarantor agreed "as principal obligor and not merely as surety" that (clause 2.1) "it will immediately upon demand unconditionally pay to the Lender the Guaranteed moneys which have not been so paid". Clause 4.2 provided that "A certificate in writing signed by a duly authorised officer . . . stating the amount at any particular time due and payable by the Guarantor . . . shall save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof".

On 12 January 2007 IIG demanded US$30,303,576 from HPIE, said to be due under the loan agreement; and on the same day appointed administrators over HPIE. HPIE did not pay the amount demanded, and on 16 January 2007 IIG sent letters to Mr and Mrs Van Der Merwe reciting the failure of HPIE to pay and certifying that the amount due and payable by each of them under the guarantee was US$30,303,576. The letter demanded payment within two days.

Mr and Mrs Van Der Merwe did not pay. They argued that under New York law, the law applicable to the loan agreement, there was an implied covenant of good faith and fair dealing which required IIG to give reasonable notice of its demand for payment, which it did not do. HPIE accordingly had a complete answer to the claim, and the Van Der Merwes as guarantors were thus discharged from liability on the principle in of *Holme v Brunskill* (1878) 3 QBD 495 and *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] 2 Lloyd's Rep 231. IIG's case was that on the true construction of the "deeds of guarantee" they excluded the forms of defence available to a guarantor where the liability was secondary, ie, that the Van Der Merwes were obliged to pay as principal obligor monies certified as due by duly authorised officers of IIG.

The judge held that the guarantee was an on-demand guarantee which rendered the Van Der Merwes primary debtors, and that there was no manifest error in the certificate demanding payment. Accordingly they were liable. The Van Der Merwes appealed.

————————*Held* by CA (WALLER, LAWRENCE COLLINS and RIMER LJJ) that the appeal would be dismissed.

(1) The guarantee properly construed was an on-demand bond under which the Van Der Merwes were primary debtors.

(a) It was common ground that it ultimately depended on the true construction of the agreement whether a particular label was the right one to have applied, and that the agreement had to be construed by looking at it as a whole without preconceptions as to what it was (*see* para 7);

————————*Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2002] 1 Lloyd's Rep 617, applied.

(b) It was also common ground that the judge had been correct in taking the view that there was a strong presumption against the deeds of guarantee being demand bonds, and that the presumption would be replaced only if there was clear wording to the contrary (*see* paras 9 and 30);

————————*Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] 2 Lloyd's Rep 231, applied; *Bache & Co v Banque Vernes et Commerciale de Paris SA* [1973] 2 Lloyd's Rep 437, *Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Co Ltd* (1995) 73 BLR 32; [1996] 1 AC 199, considered.

(c) Where a loan agreement required the giving of guarantees, a call for payment of what was found to be due from the guarantors would lead almost certainly to a right of indemnity from the debtor. Even if there was no express agreement between the guarantors and the debtor then, in the event of overpayment, the guarantors would have a right of subrogation by which they could force the creditors to pay back sums which had been overpaid. But the precise mechanism for recovering overpayment was not the most relevant question when considering what the guarantees themselves required. If they did not require payment of the certified sum, then no difficulty arose. If the guarantees by their clear language did require payment, then it was for the Van Der Merwes to protect themselves against that eventuality (*see* paras 26, 27 and 28);

————*Cargill International SA v Bangladesh Sugar & Food Industries Corporation (BSFIC)* [1996] 2 Lloyd's Rep 524, referred to.

(d) Clause 4.2 put the matter beyond doubt. Any presumption had by the language used been clearly rebutted. Apart from manifest error, the Van Der Merwes had bound themselves to pay on demand as primary obligor the amount stated in a certificate pursuant to clause 4.2 (*see* para 32).

(2) There was no "manifest error" in the certificate demanding payment. A manifest error was one that was obvious or easily demonstrable without extensive investigation. However, the certificate in the present case was not required to contain any reasons (*see* paras 33 and 35);

————*Invensys plc v Automotive Sealing Systems Ltd* [2001] EWHC 501 (Comm), considered.

————————

The following cases were referred to in the judgment:

*Bache & Co v Banque Vernes et Commerciale de Paris SA* (CA) [1973] 2 Lloyd's Rep 437;

*Cargill International SA v Bangladesh Sugar & Food Industries Corporation (BSFIC)* [1996] 2 Lloyd's Rep 524;

*Gold Coast Ltd v Caja de Ahorros del Mediterraneo* (CA) [2002] 1 Lloyd's Rep 617;

*Holme v Brunskill* (CA) (1878) 3 QBD 495;

*Invensys plc v Automotive Sealing Systems Ltd* [2001] EWHC 501 (Comm);

*Marubeni Hong Kong and South China Ltd v Government of Mongolia* (CA) [2005] 2 Lloyd's Rep 231;

*Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Co Ltd* (HL) (1995) 73 BLR 32; [1996] 1 AC 199.

————————

This was an appeal by the defendants against the decision of Lewison J dated 13 November 2007, [2007] EWHC 2631 (Ch) dismissing an appeal from summary judgment, given by Master Teverson dated 19 September 2007 in favour of the claimants, in the sum of US$31,882,541.96.

Paul McGrath, instructed by Jones Day, for the claimants; Matthew Collings and Adam Smith, instructed by H L Miller & Co, for the defendants.

The further facts are stated in the judgment of Waller LJ.

Thursday, 22 May 2008

————————

**JUDGMENT**

**Lord Justice WALLER:**

*Introduction*

1. This is an appeal from the judgment of Lewison J dated 13 November 2007 by which he dismissed an appeal from a judgment of Master Teverson dated 19 September 2007. Master Teverson had given summary judgment in the sum of US$31,882,541.96 against the appellants (the Van Der Merwes) in favour of the respondents (IIG).

2. IIG had entered into a loan agreement with Hurst Parnell Imports and Exports Ltd (HPIE). The Van Der Merwes were directors of HPIE and executed "deeds of guarantee" in favour of IIG. Before the Master the Van Der Merwes, in reliance on such authorities as *Holme v Brunskill* (1878) 3 QBD 495 and *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] 2 Lloyd's Rep 231, sought to rely on defences available to HPIE: in particular they sought to rely on expert evidence of New York law (the law by which the loan agreement was governed) to the effect that by that law there would be implied a covenant of good faith and fair dealing which would require IIG to have given reasonable notice of its demand and that such notice had not been given, thereby providing HPIE a complete answer to the claim.

3. IIG's case was however that on the true construction of the "deeds of guarantee" they excluded the forms of defence available to a guarantor where his liability is secondary, ie the defences available to the primary obligor and thus that the above authorities had no application. They submitted that on the true wording of the guarantees executed by the Van Der Merwes, the Van Der Merwes were obliged to pay as principal obligor monies certified as due by duly authorised officers of IIG.

4. The Master concluded that IIG were right as did Lewison J. Chadwick LJ granted permission to appeal despite it being a second appeal because the "security instrument which [the judge] had construed contained common form provisions, such that his decision might give rise to "ramifications".

*The loan and demand*

5. The judge describes the matter in this way:

2. In 2004 Mrs Van Der Merwe came across IIG Capital LLC ("IIG"), a company registered in New York and carrying on business there. She understood that it was interested in financing business start-ups by trade finance and invoice discounting. IIG began affording finance to

HPIE. However, the relationship had its ups and downs and Mr and Mrs Van Der Merwe transferred HPIE's business to Barclays. But in 2006 IIG recaptured HPIE's financing and a series of documents were entered into. All the documents were executed on the same day: 30 June 2006. One of those documents is at the heart of this dispute.

3. The first of the relevant documents is a loan agreement made between IIG and HPIE. The loan agreement contains a number of warranties given and obligations undertaken by HPIE. These include (for example) warranties about the accuracy of HPIE's accounts and financial statements (clause 8); obligations to provide regular accounts (clause 10.1); obligations to maintain insurance (clause 10.1.9); obligations not to enter into transactions otherwise than in the normal course of business (clause 11.4) and not to make loans to affiliates (clause 11.6). Clause 27.1 of that agreement said that the agreement was to be governed by New York Law. The second of the relevant documents was a debenture granted over the assets of HPIE. The third was a document described as a guarantee and signed by Mrs Van Der Merwe. I will refer to it as the guarantee, without prejudice to the contention of either party. Mr Van Der Merwe signed an identical document, although it was not in evidence.

4. On 12 January 2007 IIG demanded US$30,303,576 from HPIE said to be due under the loan agreement; and on the same day appointed administrators over HPIE. HPIE did not pay the amount demanded; and on 16 January 2007 IIG sent letters to Mr and Mrs Van Der Merwe reciting the failure of HPIE to pay and certifying that the amount due and payable by each of them under the guarantee was US$30,303,576. The letter demanded payment within 2 days. Mr and Mrs Van Der Merwe have not paid.

*The terms of the guarantee*

6. I can again take the description and relevant terms from the judge's judgment. He describes Mrs Van Der Merwe's guarantee but it is common ground that Mr Van Der Merwe's was in identical terms:

6. The guarantee begins by describing itself as "THIS GUARANTEE" and Mrs Van Der Merwe is described as "the Guarantor". Recital (A) records the grant of the facility to HPIE (described as "the Borrower") of US$23,000,000. Recital (B) says that it was a condition precedent to the grant of the facility that the "Guarantor enters into this Guarantee of the obligations of the Borrower to the Lender

under the [Loan] Agreement". Recital (C) says that the guarantee is an "all monies" guarantee.

7. The document contains a single definition in clause 1.2. The defined term is "Guaranteed Monies" and the definition is:

"(i) all moneys and liabilities (whether actual or contingent) which are now or may at any time hereafter be due, owing, payable, or expressed to be due, owing or payable, to the Lender from or by the Borrower (ii) all interest . . . costs, commissions, fees and other charges and expenses which the Lender may charge against the Borrower; and (iii) all legal and other costs, charges and expenses which the Lender may incur in enforcing or obtaining, or attempting to enforce or obtain, payment of any such moneys . . . "

8. Clause 2 contains the main payment obligation and reads:

"In consideration of the Lender agreeing to enter into the Agreement, the Guarantor as principal obligor and not merely as surety unconditionally and irrevocably:

2.1 guarantees to the Lender the due and punctual payment of the Guaranteed Moneys and agrees that, if at any time or from time to time any of the Guaranteed Moneys are not paid in full on their due date . . . it will immediately upon demand unconditionally pay to the Lender the Guaranteed Moneys which have not been so paid

2.2 As an original and independent obligation under this Deed, the Guarantor shall

2.2.1 indemnify the Lender and keep the Lender indemnified against any loss . . . incurred by the Lender as a result of a failure by the Borrower to make due and punctual payment of any of the Guaranteed Monies . . . "

9. Clause 3 is headed "Preservation of Guarantee" and provides:

"3.1 The Lender shall be at liberty without thereby affecting its rights hereunder at any time at its absolute discretion and with or without the consent or knowledge of or notice to the Guarantor:

3.1.1 to give time to any Obligor for the payment of all or any sums due or payable under the Agreement or any other Finance Document;

3.1.2 to neglect or forbear to enforce payment of all or any sums due or payable under the Agreement or any other Finance

WALLER LJ]    **IIG v Van Der Merwe**    [CA

Document and (without prejudice to the foregoing) to grant any indulgence or forbearance to and fail to assert or pursue or delay in asserting or pursuing any right or remedy against any Obligor thereunder;

3.1.3 to accept, vary, exchange, renew, abstain from perfecting, or release any other security now held or to be held by it for or on account of the Financial Indebtedness;

3.1.4 to amend, add to or vary the terms of the Finance Documents;

3.1.5 to compound with, accept compositions from and make any other arrangements with any other Obligor.

3.2 This Guarantee and the rights of the Lender hereunder shall not be affected by:

3.2.1 the appointment of a receiver, trustee or similar officer of any other Obligor, its undertaking or all or any of its or his asset.

3.2.2 Any alteration of the status of any other Obligor or any defective or irregular exercise of the powers of the Borrower to raise finance

3.2.3 The insolvency, bankruptcy, death, incapacity, winding up, liquidation or dissolution of any other Obligor;

3.2.3 Any failure by the Lender to take any other security for all or any part of the indebtedness agreed to be taken by the Lender pursuant to the Finance Documents or any total or partial invalidity, voidability or unenforceability of any such security;

3.2.4 The doing by the Lender of anything referred to in clause 3.1 above; or

3.2.5 Any other act or circumstance which (apart from this provision) would or might constitute a legal or equitable defence for or discharge of a surety or guarantor,

and this Guarantee may be called and/or enforced without steps or proceedings first being taken against any other Obligor."

10. Clause 4.2 provided that:

"A certificate in writing signed by a duly authorised officer or officers of the Lender stating the amount at any particular time due and payable by the Guarantor under this Guarantee shall, save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof."

11. Clause 5 said that the guarantee was "a continuing guarantee" and would remain in force until all sums "due from the Borrower under the Finance Documents have been paid in full".

Clause 7.3 prevented the Guarantor from asserting any set-off against the Borrower. Finally, clause 14 said that the guarantee was to be governed by English law.

7. It was common ground before us that it ultimately depends on the true construction of the agreement whether a particular label is the right one to apply to any instrument. It was further common ground that the instrument must be construed "by looking at it as a whole without preconceptions as to what it is" [see Tuckey LJ in *Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2002] 1 Lloyd's Rep 617].

8. We were referred as was the judge to certain other authorities of relevance to construing the provisions with which we are concerned. First we were referred to *Marubeni* (*supra*) as to the right approach to the question whether under these instruments the Van Der Merwes were assuming a secondary liability dependant on the primary liability of HPIE, or whether they were assuming a primary liability independent of the liability of HPIE. The judge cites extensively from that authority and I will not repeat those citations because there was as I understand it no issue ultimately between Mr Collings QC and Mr McGrath as to the guidance which that authority provides. It emphasises that the context in which any instrument comes into being is important. Thus performance bonds given by banks are almost invariably construed as imposing a liability on the bank to pay, whatever dispute there may be on liability under the underlying contract. "They have been accepted by the courts as the equivalent of irrevocable letters of credit" (see para 23 of Carnwath LJ's judgment). Furthermore, as he says in that paragraph, "It cannot be assumed that cases relating to such banking instruments provide any useful guide when construing guarantees given outside the banking context". In considering the instrument in that case he said that it was not a banking instrument and that it was not described either on its face or in the supporting legal opinion in terms "appropriate to a demand bond or something having equivalent legal effect". The absence of such language in a transaction outside the banking context created in Carnwath LJ's view "a strong presumption against" interpretation as a demand bond. That was a judgment with which Sir Martin Nourse and I agreed.

9. Lewison J took the view that "the strong presumption" against the deeds of guarantee being demand bonds applied and was thus concerned to see whether there are sufficient indications in the wording to displace that presumption [see para 46]. No criticism is made of that approach by Mr McGrath [see para 12.2 of his skeleton] and Mr Collings unsurprisingly emphasised the approach as the correct one.

10. A second line of authority to which our attention was directed related to what are commonly termed "conclusive evidence clauses". The authority relied on by the judge was *Bache & Co v Banque Vernes et Commerciale de Paris SA* [1973] 2 Lloyd's Rep 437. In that case the plaintiffs had demanded a bank guarantee before entering into buying and selling transactions on behalf of their customer, a French trading company. The French trading company's bank gave a guarantee which included a conclusive evidence clause in the following terms:

Notice of default shall, from time to time, be given by [plaintiffs] to [defendants] and on receipt of any such notice [defendants] will forthwith pay . . .  the amount stated therein as due, such notice of default being as between [plaintiffs and defendants] conclusive evidence that [defendants'] liability hereunder has accrued in respect of the amount claimed.

11. The Court of Appeal held unanimously that the conclusive evidence clause was valid and if notice of default was given it was binding according to its terms.

12. There are various points to record in relation to *Bache*. Mr Collings submitted that since the authority was concerned with a performance bond being given by a bank, it was not an authority which assisted to any great degree in a case outside that context, relying on *Marubeni*. I, of course, understand that submission but it goes no further than requiring an anxious scrutiny of the language of the clause used in any particular case in order to ascertain whether the guarantee is secondary or primary.

13. In this context Mr Collings was critical of the judge supporting the view he took by relying on a quotation from O'Donovan and Phillips without also referring to a passage in the book which appears shortly before the one he quoted. The passage relied on at the end of para 5-105 reads as follows:

The fact that conclusive evidence clauses are strictly construed also means that the guarantor may raise arguments as to whether the document served upon him can properly be described as a "certificate" or "statement" and as to whether the person who has signed the certificate comes within the class of persons authorised to do so.

14. The passage relied on by the judge from para 5-107 appears from his judgment at para 35 in the following terms:

Commenting on this kind of clause O'Donovan and Phillips say in *The Modern Contract of Guarantee English Edition* (2003) (5-107):

"The extraordinary effect of . . .  the more usual conclusive evidence clause, in the context of a guarantee, however, is that a guarantee which is not phrased in terms of a performance bond payable simply on demand without proof of default becomes analogous to such a guarantee as a result of the inclusion of this clause."

15. In *Bache* some attention was paid by all judges to the question which might arise if it ultimately turned out that what had been demanded had been too large a sum once any dispute between the underlying contracting parties had been resolved. Lord Denning MR at page 440 col 1 said this:

Such being the commercial practice, it is only right that brokers should be able to turn to the French bank and say: "On our giving you notice of default, you must pay."

The French bank can in turn recover the sum from their own customer, the French trading company. No doubt they have taken security for the purpose.

This does not lead to any injustice because if the figure should be erroneous, it is always open to the French trading company to have it corrected by instituting proceedings against the brokers, in England or in France, to get it corrected as between them.

16. Megaw LJ dealt with the same point and relied on the fact that the bank would have covered themselves by requiring an indemnity from its customer [see page 441 col 1]. Scarman LJ put it this way at page 441 col 2:

On the question of policy I do not wish to add anything to what has already been said by my Lord, the Master of the Rolls, and Lord Justice Megaw. Had I the slightest doubt about the effect of the clause, I think it would have been right to have accepted the submission of Mr Libbert that there was a triable issue; but there is nothing in the clause which precludes a subsequent adjustment as between the English broker and the French customer of the bank. The result of that adjustment, if it takes place, will ultimately enure to the benefit of the bank, always assuming that the bank has used its opportunities to regulate its relationship with its customer in a businesslike way.

17. The judge in the instant case also thought of some relevance (as indeed did we) how, if the Van Der Merwes were forced to pay the demand as certified but it later transpired that HPIE did not owe the sum, they would recover any overpayment. Mr Collings submitted that since it had to be assumed at the summary judgment stage that the defences being put forward on behalf of HPIE were arguable, it was necessary to consider the position on the basis that at a trial HPIE might be shown to

have a complete defence to the claim. How a company could borrow nearly US$30 million and have a complete defence to repaying any part back, it is difficult to imagine, but on any view with personal liability being at stake if there is an answer to any part of the claim to US$32 million, the point is a serious one.

18. Mr Collings (as he had before the judge) relied on *Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Co Ltd* (1995) 73 BLR 32. That case was concerned with a bond issued jointly by a subcontractor and General Surety, the bond obliging the "guarantors" to pay a sum of money, but it being a condition of the bond that if the subcontractor performed all the terms of the subcontract (described as the first part of the condition), or "if on default by the subcontractors the surety shall satisfy and discharge the damages sustained by the main contractors thereby up to the amount of the above written bond" (described as the second part of the condition) then the bond would be null and void. The speech of Lord Jauncey in the House of Lords was supported by all other members of the Committee. His conclusions, by reference to which the decision of the Court of Appeal was reversed, have some relevance to other matters in issue in this appeal as well as to the particular point now being addressed and for that reason I will quote the relevant passage in its context. First at page 38 he identified the issues in this way:

> Two principal issues arise in this appeal namely, first whether the bond is a guarantee with the consequent result that the appellants are entitled to rely on defences which would be available to Chambers and second whether the affidavits lodged by the appellants raise an issue which ought to be tried (the "triable issue"). For reasons which will become apparent it is appropriate to divide the first issue into two parts namely (1) whether the bond without the second part of the condition which I have italicised would be a guarantee (the "guarantee issue") and (2) if so, whether the addition of that second part alters the position (the "construction issue").

19. He then said this at page 41:

> My Lords I have no doubt that the Court of Appeal were in error in concluding that the bond was not a guarantee but was akin to an on demand bond. No distinction can, in my view, properly be drawn between the effect of this bond minus the second part of the condition and the bond considered by Lord Atkin in the *Workington* case [1937] AC 1, 17 and other bonds using this or similar wording which have for many years been generally treated as guarantees: *Hudson's building and Engineering Contracts*

(11th ed, 1995, vol 2 pp 1499–1500, para 17-007). Thus in a second action arising out of the bond in the *Workington* case, *Workington Harbour & Dock Board v Trade Indemnity Co Ltd (No 2)* [1938] 2 All ER 101, 105, Lord Atkin said:

> . . .
>
> "My Lords, both actions were brought on the money bond." [That is the first and second actions.] "It is well established that in such an action the plaintiff has to establish damages occasioned by the breach or breaches of the conditions, and, if he succeeds, he recovers judgment on the whole amount of the bond, but can only issue execution for the amount of the damages proved."

*The construction issue*

Mr Beloff argued that the words "damages sustained by the main contractor thereby" had the effect of defining the appellants' obligation solely by reference to the additional expenditure incurred by the respondents without reference to any sums which would normally be set against it in an action of damages against Chambers. Such a construction would involve treating these general words as an express exclusion of the normal legal incidents of suretyship. It would, as Mr Pollock for the appellants pointed out, also give rise to problems in the event of a final accounting between Chambers and the respondents producing an overall indebtedness by the latter to the former or a converse indebtedness less than the sum paid by the appellants under the bond. Mr Beloff's answer to this difficulty was that the court might in appropriate circumstances imply into the bond a condition of repayment by the respondents to the appellants. A solution which does not appear to be particularly attractive.

There is no doubt that in a contract of guarantee parties may, if so minded, exclude any one or more of the normal incidents or suretyship. However if they choose to do so clear and unambiguous language must be used to displace the normal legal consequence of the contract — language such as was used in *Hyundai Shipbuilding & Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep 502, 503 where the letter of guarantee provided:

> "the [defendant] hereby irrevocably and unconditionally guarantees the payment in accordance with the terms of the contact of all sums due or to become due by the buyer to you under the contract and in case the buyer is in default of any such payment in default on behalf of the buyer . . . "

This was construed as enabling the shipowner to recover from the guarantors of the buyers and

CA]                          **IIG v Van Der Merwe**                          [Waller LJ

amount due irrespective of the position between yard and buyers (*per* Roskill LJ at page 508). The words relied upon by the respondents however do not clearly displace those legal consequences. Indeed the use of the word "damages" is far more consistent with the compensation arrived at after taking into account all sums due to or by Chambers and the appellants. If the parties had intended to produce the result contended for by Mr Beloff it would have been a simple matter to use a form of words such as "the additional expenditure incurred". Instead they have used words which if anything point away from such a result.

20. I draw attention to the fact that once again it is clear that context is important. Furthermore even minor variations in language plus a different context can produce different results as the last paragraph of Lord Jauncey's speech indicates since he is not saying that *Hyundai* was wrongly decided.

21. As to the reliance that Mr Collings placed on what in that case was said to be not a particularly attractive solution, context once again seems to me important. In that case the context was subcontractors and a building contract with the prospect of a battle over the minutiae involved in such disputes. In this case as Mr McGrath emphasised the context is a company run by the two shareholders borrowing money for a business over which those shareholders have complete control.

*Discussion of the deeds of guarantee in this case*

22. It is convenient to deal with the last point first. Mr McGrath emphasises the context just explained. He submits that these guarantees require the Van Der Merwes to pay what is certified as due. He submits that the language is clear and that if the Van Der Merwes have not put in place a right of indemnity from the company HPIE or some agreement giving the right to force the company to sue to recover any overpayment for their benefit, that is the fault of the Van Der Merwes which should not prejudice IIG.

23. He in fact however goes further and submits that even if some express agreement has not been made between the Van Der Merwes and the company, the law or equity will come to the rescue. The law he submits would require the company to indemnify the Van Der Merwes to the full extent of whatever they had paid, they having paid the company's debt on its behalf. He submits that HPIE would have no right when an indemnity was sought to argue that the Van Der Merwes have paid too much. He submits that the company's obligation would be to indemnify and the company would have a right to recover any overpayment from IIG. In this latter regard he relies on a dictum of Potter

LJ in the Court of Appeal approving the analysis of Morison J at first instance in *Cargill International SA v Bangladesh Sugar & Food Industries Corporation (BSFIC)* [1996] 2 Lloyd's Rep 524.

24. The point is discussed in O'Donovan and Phillips at para 13-54 and following. The judge seemed to be of the view that that paragraph supported an argument for the person liable under the bond or guarantee (ie in this case the Van Der Merwes) having a remedy directly against the overpaid payee. I cannot spell that out from those paragraphs and Mr McGrath did not seek to support that view. Mr McGrath had of course some interest in not supporting that view since a direct claim over might give rise to a more arguable case for allowing a set-off to be raised even at this stage as against IIG seeking to enforce the guarantee.

25. Mr Collings submitted that the law would not imply any indemnity. He submitted that for a director to enter into an open-ended commitment to pay sums which might not even be due could not be said to be an action in the best interests of the company. The law would accordingly not imply a term requiring the company to indemnify the directors. He submitted that the Van Der Merwes would have no direct claim over or if they did they should be allowed to raise that claim now.

26. I am not persuaded that the company would not be bound to indemnify the Van Der Merwes. It seems to me that where a loan agreement requires the giving of guarantees whether on-demand guarantees or only secondary liability guarantees of that loan, a call and payment of what is found to be due from the guarantors will lead almost certainly to a right of indemnity from the company if the guarantee has to be paid.

27. Furthermore I am inclined to the view that even if there is no express contract negotiated between the Van Der Merwes and the company it is strongly arguable that the Van Der Merwes will have a remedy against the company and in my view if the company refused to seek return of the overpayment, the guarantors would have a right of subrogation by which they could force IIG to pay back sums found to have been overpaid.

28. But it seems to me that strictly what precise mechanism there might be for repayment is not the most relevant question when considering what the guarantees themselves require. If of course they do not require payment of the certified sum, then no difficulty arises. Leave to defend must be given so that the defences that the company could raise could be considered at a trial. If the guarantees by their clear language do require payment, then it was for the Van Der Merwes to protect themselves against that eventuality.

29. I should stress that even in a case where an on-demand obligation is undertaken, a question might arise when judgment was given whether there should be a stay. That would depend on the strength or otherwise of the claim that some money would ultimately have to be reimbursed. The argument that if IIG are entitled to judgment there should still be stay has never been run in this case. That would require some detailed consideration of the strength of claims made as a matter of New York law.

30. The question at the end of the day is what on the true language of these deeds of guarantee did the Van Der Merwes agree. I accept there is a presumption against these being demand bonds or guarantees; I also accept that the documents must be looked at as a whole. I accept that clause 3, which would only be necessary if the deeds were or might be undertaking a secondary liability, points in favour of the presumption and that there are other terms which appear in what I would call normal guarantees given to banks in relation to a customer's indebtedness. It will thus only be if clear language has been used in the operative clauses that the presumption will be rebutted.

31. I turn thus to the operative language of the deeds of guarantee. By condition 2.1 the guarantor (Mr or Mrs Van Der Merwe) agreed "as principal obligor" "not merely as surety" that "if . . . the guaranteed moneys are not paid in full on their due date . . . it (the guarantor) will immediately upon demand unconditionally pay to the Lender (IIG) the Guaranteed moneys which have not been so paid". The guaranteed monies are defined as "all moneys and liabilities . . . which are now or may at any time hereafter be due, owing or payable *or expressed to be due owing or payable, to the Lender from or by the borrower . . .* " The obligation to pay monies "expressed to be due" "upon demand" "unconditionally" as "principal obligor" "not merely as surety" would indicate that the Van Der Merwes were taking on something more than a secondary obligation.

32. Clause 4.2 then provides that "A certificate in writing signed by a duly authorised officer . . . stating the amount at any particular time due and payable by the Guarantor . . . shall save for manifest error, be conclusive and binding on the Guaran-

tor for the purposes hereof". I agree with the judge that that clause puts the matter beyond doubt. Any presumption has by the language been clearly rebutted. Apart from manifest error, the Van Der Merwes have bound themselves to pay on demand as primary obligor the amount stated in a certificate pursuant to clause 4.2.

33. Mr Collings before the judge attempted to run an argument based on manifest error. It was rejected by the judge in the following terms:

52. Mr Collings fastened on the phrase in clause 4.2 "save in the case of manifest error". A "manifest error" is one that is obvious or easily demonstrable without extensive investigation. Mr Collings referred to the decision of Thomas J in *Invensys plc v Automotive Sealing Systems Ltd* (8 November 2001). That was a case in which a certificate made by an expert was to be conclusive save in the case of manifest error. Thomas J held that the expert's reasons could be examined in order to determine whether he had made a manifest error. But since the contract in that case provided for the expert to give reasons, Thomas J was undoubtedly right to say that the parties must have contemplated that those reasons could be examined to see whether any manifest error had been made. By contrast, in the present case the certificate was not required to contain any reasons. I did not derive any assistance from the *Invensys* case.

34. The judge's conclusion was not challenged in the appellants' notice of appeal or in Mr Collings' skeleton argument. When during the hearing clarification was sought as to whether Mr Collings was suggesting as an alternative to his other arguments manifest error, Mr Collings initially confirmed he was not seeking so to argue. On reflection however he made a submission to the same effect as he had made before the judge.

35. In my view the judge's conclusion on manifest error was clearly right, and it was rightly not challenged in the notice of appeal.

36. I would accordingly dismiss the appeal.

**Lord Justice LAWRENCE COLLINS:**

37. I agree.

**Lord Justice RIMER:**

38. I also agree.

by the added plea. On taxation, Master Walker allowed the plaintiff the costs of the remanet from the first assizes; upon which an application was made to us to review his taxation. On consideration, we think the Master was right, although we have had some doubt upon the point. We think he was right upon this principle:—The plaintiff would have succeeded on all the issues which were upon the record at the first assizes; he underwent the delay of the postponement from those assizes; and as part of the costs of those issues he ought to have the costs of the delay, and consequently of the remanet.

This rule must therefore be discharged.

Rule discharged.

[**718**]    JONES *v.* CARTER.   July 4, 1846.—The service by lessor upon lessee of a declaration in ejectment for the demised premises, for a forfeiture, operates as a final election by the lessor to determine the term; and he cannot afterwards (although there has not been any judgment in the ejectment) sue for rent due, or covenants broken, after the service of the declaration.

[S. C. 10 Jur. 33. Commented on, *Dendy* v. *Nicholl*, 1859, 4 C. B. (N. S.) 376. Explained, *Grimwood* v. *Moss*, 1872, L. R. 7 C. P. 364. Applied, *Toleman* v. *Portbury*, 1871, L. R. 6 Q. B. 249; *Scarf* v. *Jardine*, 1882, 7 A. C. 360; *James* v. *Young*, 1884, 27 Ch. D. 663. Referred to, *Croft* v. *Lumley*, 1858, 6 H. L. Cas. 705; *Clough* v. *London and North Western Railway Company*, 1876, L. R. 7 Ex. 34; *Morrison* v. *Universal Marine Insurance Company*, 1873, L. R. 8 Ex. 204; *Evans* v. *Wyatt*, 1880, 43 L. T. 177; *Serjeant* v. *Nash, Field, and Company*, [1903] 2 K. B. 304; *Moore* v. *Ullcoats Mining Company Limited*, [1908] 1 Ch. 587.]

Covenant on an indenture, dated the 16th of September, 1844, made between the plaintiff of the one part, and the defendant and Joseph Foster of the other part, whereby the plaintiff gave, granted, and demised to the defendant and Foster full power and authority to work, delve, dig, and open, all the mines, veins, seams, and beds of lead ore, copper ore, sulphate of barytes, mines, minerals, and mineral substances, which were or should be thereafter found, gained, dug, or opened within, under, or upon a certain common or waste land belonging to her Majesty, and then in lease to the plaintiff, situate in the parish of Llysfaen, in the county of Carnarvon; with full powers for the purpose of getting and taking the minerals, erecting machinery, &c. &c.; to hold to the defendant and Foster, their executors, &c., from the 29th of September then instant, for the term of fourteen years, subject to a yearly rent of £50, payable half-yearly in advance, in the nature of a forehand rent, on the 25th of March and the 29th of September in each year, the first payment to be made on the 29th day of September then instant; and subject also to the payment of a certain royalty on the ores and minerals raised and gotten. And the defendant thereby covenanted with the plaintiff, his executors, &c., well and truly to pay and render, or cause to be paid or rendered, to the plaintiff, his executors, &c., the rent and royalty thereinbefore reserved and made payable, at the days and times and according to the true intent and meaning of the said indenture, without any deduction or abatement whatever; and also to pay and discharge all taxes, &c., charged or assessed upon the demised premises. There were also covenants that the defendant and Foster, their executors, &c., would, during the continuance of the demise, with six men at the least, search for lead and other ores and minerals in proper and likely places, &c., and would fairly and effec-[**719**]-tually work and carry on all the mines and works with six able and experienced miners at the least; that they would not cease or discontinue such work, with the aforesaid number of men, for the space of one month in any one year, unless prevented by unavoidable impediments: and other covenants, providing for the dressing and making merchant-able of the ores gotten as soon as might be after they were gotten, for the weighing or measuring them within a certain time, for the keeping and regularly casting up fair and legible books of account of all ores and minerals gotten and sold, and pro-ducing the same for inspection, &c., upon notice, to the lessor and his agents; for the general repair of the demised premises; for the fencing off and securely inclosing open pits, &c.; for effectually filling up and levelling such pits, &c., as should from time to time become useless; for preventing unnecessary or extraordinary damage to the lands through or under which the mines, &c., should be carried on; and for the non-

commission of any wilful or voluntary waste. The declaration then alleged as a breach of the first covenant (for payment of the rent), that after the making of the indenture, and during the term, to wit, on the 25th of March, 1845, a large sum of money, to wit, £50 of the rent aforesaid, to wit, the rent for a year of the said term, became due and still was in arrear and unpaid to the plaintiff. Breaches were also assigned of all the other covenants in the indenture.

The defendant pleaded, as to the breach of covenant first assigned, that there was not, on the said 25th day of March, 1845, or at any time since, the said sum of £50 of the said rent, or any part thereof, due and in arrear from the defendant and Foster to the plaintiff, in manner and form, &c. on which issue was joined. There were also pleas of performance as to the other breaches, and issues joined thereon.

At the trial, before Williams, J., at the last assizes for the county of Carnarvon, the plaintiff clearly proved **[720]** breaches, in the years 1844 and 1845, of several of the covenants set forth in the declaration ; as to others also, the proof of performance of which lay on the defendant, no evidence was given on his part. With respect to the rent, payment was proved of all that was due on the 25th of March, 1845 : and it appeared that, on the 19th of May, 1845, a declaration in ejectment for the recovery of the demised premises (brought under a proviso in the lease, that for any breach of covenant it should determine and be utterly void, and the lessor should be at liberty to re-enter), upon the several demises of the plaintiff and William Lloyd Roberts (a mortgagee), was served on the defendant and Foster, with notice to appear in the following Trinity Term. There was no distinct evidence when the plea and consent rule were delivered ; but it was proved that on the 3rd of December, 1845, the defendants obtained a Judge's order, giving them liberty to withdraw their plea ; since which time no further proceedings had been taken in that action. The present action of covenant was commenced in January, 1846. It appeared that the defendants had not done anything upon the demised premises since July, 1845 ; but it was not shewn that any possession of them had been taken by the plaintiff. It was thereupon contended for the defendant, that by the service of the declaration in ejectment, and the subsequent proceedings in that action, the plaintiff had elected to consider the term as having then determined, and to treat the defendant and Foster as trespassers ; and that he could not, therefore, recover in this action for the rent which would otherwise have become due on the 29th of September, 1845. The learned Judge overruled the objection, and told the jury that the plaintiff was entitled, on the first issue, to recover the sum of £25, for half a year's rent due on the 29th of September, 1845, and also directed them that he was entitled to a verdict on several of the other breaches (on which nominal damages only were claimed). The jury, however, **[721]** found a general verdict for the defendant, saying they were of opinion that there was no rent due, and that there were no breaches of covenant.

In Easter Term, Jervis obtained a rule nisi for a new trial, on the ground of the verdict being contrary to the evidence, and to the direction of the learned Judge.

W. Yardley and Unthank shewed cause on a former day in these sittings (June 26). The verdict of the jury, it must be admitted, was contrary to the direction of the learned Judge on several of the issues. But with respect to the first breach, as to the rent, upon which alone the plaintiff claimed substantial damages, the proceedings in the action of ejectment were an answer to that claim. The plaintiff, when he sued the lessees in ejectment as for a forfeiture of their term, elected thereby to put an end to the term, and could not afterwards treat it as a subsisting term, and the rent as a subsisting rent. It is true there was no judgment in the ejectment ; the plea having been withdrawn, the defendant has no means of compelling the lessors of the plaintiff to proceed to judgment. [Platt, B. If they choose to proceed to judgment now, they may have an action of trespass for the mesne profits from the day of the demise.] Yes, and so they would be recovering this rent twice over. *Birch* v. *Wright* (1 T. R. 378) is an authority for the defendant. It was there held, that an action for use and occupation might be maintained by the grantee of an annuity, after a recovery in ejectment against a tenant from year to year of the lands out of which the annuity issued, for all rent in his hands at the time of notice by the grantee, and down to the day of the demise in the ejectment, but not afterwards. Ashhurst, J., there says—"From the 6th of April of 1785 [the day of the **[722]** demise] to the time of recovering in the action of ejectment, the plaintiff is precluded from recovering in this form of

action ; for that would be blowing both hot and cold at the same time, by treating the possession of the defendant as that of a trespasser, and that of a lawful tenant, during the same period." Littleton says (sect. 219)—"If a man grant by his deed his rent-charge to another, and the rent is behind, the grantee may choose whether he will sue a writ of annuity for this against the grantor, or distreine for the rent behind, and the distress detain until he be paid. But he cannot do or have both together, &c. For if he recovers by a writ of annuity, the land is discharged of the distress," &c. Lord Coke, commenting on these words, "But he cannot do or have both together," says (Co. Litt. 145 a.)—"For there he should recover one thing twice, which should be a double charge to the grantor." In *Bridges* v. *Smyth* (5 Bing. 410), it was held that a landlord, having treated an occupier of his land as a trespasser, by serving him with an ejectment, could not afterwards distrain on him for rent, although the ejectment was directed against the claim of a third person, who came in and defended as tenant, and the occupier was aware of that circumstance, and was never turned out of possession. That case is therefore, stronger than the present.

Welsby (Jervis with him), contrà. No doubt, although the lease says that it is to determine and be void for any breach of covenant, that is to be construed to mean that it is thereupon voidable at the option of the lessor. But there is no conclusive election to treat the term as determined and void, until judgment recovered in the action of ejectment. The mere service of the declaration has no such effect. Might not the plaintiff, notwithstanding that, have waived the forfeiture by subsequent receipt of rent ? It is said **[723]** that he may still proceed to judgment in the ejectment, and have his remedy in trespass for the mesne profits ; but if he did, the recovery of the rent in this action would be pleadable in bar, pro tanto, to the action for the mesne profits. The authority cited from Co. Litt. itself shews that there is no conclusive exercise of this option until judgment. Lord Coke there says—"If I grant to another for life an annuity or a robe at the feast of Easter, and both are behind, the grantee ought to bring his writ of annuity in the disjunctive ; for if he bring his writ of annuity for the one only, and recover, that judgment shall determine his election for ever ; for he shall never have a writ of annuity afterwards, but a scire facias upon the said judgment. Which reason Fitzherbert, in his Natura Brevium, not observing, held an opinion to the contrary. But if I contract with you to pay you twenty shillings or a robe at the feast of Easter, after the feast you may bring an action of debt for the one as for the other." [Alderson, B. Lord Coke, and Fitzherbert in the passage there referred to (Fitz. N. B. 152, G.), are distinguishing between the cases when the thing granted "is of things annual, and are to have continuance,"—in which the election remains to the grantor, as well after the day as before, —and "when the things are to be performed unicâ voce," as in the case of the contract to pay twenty shillings or a robe at Easter.] In *Birch* v. *Wright*, the grantee of the annuity had recovered judgment in the ejectment. And Buller, J., there says—"In the present case the plaintiff has not waived the tort. He has brought his ejectment, and obtained judgment on it, which is insisting on the tort, and he cannot be permitted to blow both hot and cold at the same time." And again—"The ejectment is the suit in which the defendant is considered as a trespasser ; and unless the judgment in ejectment be laid out of the case, the tort is not waived. The defendant stands convicted on **[724]** record by judgment, as a trespasser, from the 6th of April, 1785." In *Bridges* v. *Smyth*, also, there had been judgment against the casual ejector, and the Court relied upon the fact that that judgment would be conclusive against the tenant in possession, although the ejectment was in truth directed against the party who came in to defend as landlord.

Cur. adv. vult.

The judgment of the Court was now delivered by

PARKE, B. This was an action of covenant on a mining lease, in which breaches were assigned, the first for non-payment of rent, and others for different violations of covenants relative to mining. The principal question related to the rent. By the lease, it was to be paid half-yearly in advance, on the 25th of March and the 29th of September. The rent due on the 25th of March, 1845, was paid on that day. On the 19th of May the plaintiff brought an ejectment for breach of covenant, the lease containing a stipulation that for any breach of covenant it should "determine and be utterly void." Some of the breaches of covenant declared upon were clearly proved to have been committed prior to the bringing of the ejectment. The notice, in the

action of ejectment, was to appear in Trinity Term, and no doubt a consent-rule was entered into in or after that term. The plea to the ejectment was afterwards abandoned; but it does not appear by the learned Judge's note that possession was actually taken by the plaintiff.

Under these circumstances, the question which was brought before us for consideration was, whether the lease was put an end to before the 29th of September, 1845, when the half-year's rent became due. We are all of opinion that it was.

Though the lease is declared to be void for breach of covenant, it is perfectly well settled that the true construc-[725]-tion of the proviso is, that it shall be void at the option of the lessor; *Rede* v. *Farr* (6 M. & Selw. 121), *Doe* v. *Bancks* (4 B. & Ald. 401), and other cases; and consequently, on the one hand, if the lessor exercises the option that it shall continue, the lease is rendered valid; if he elect that it shall end, the lease must be determined. In the cases above referred to, the option was held to have been exercised by the receipt of rent subsequently due, and the lease thereby rendered valid. In like manner, the lease would be rendered invalid by some unequivocal act, indicating the intention of the lessor to avail himself of the option given to him, and notified to the lessee, after which he could no longer consider himself bound to perform the other covenants in the lease; and if once rendered void, it could not again be set up. An entry, or ejectment, in which an entry is admitted, would be necessary in the case of a freehold lease, or of a chattel interest, where the terms of the lease provided that it should be avoided by re-entry. Whether any other act unequivocally indicating the intention of the lessor would be sufficient to determine this lease, which is made void at the option of the lessor, we need not determine, because an ejectment was brought, and proceeded with to the consent-rule, by which the defendant admitted an entry, and the entry would certainly be an exercise of the option; and, once determined, the lease could not be revived.

It was said there was no authority upon the point now under consideration; but there is a case at Nisi Prius materially bearing upon it, in which Lord Tenterden expressed a clear opinion that the receipt of rent after an ejectment brought for a forfeiture was no waiver of such forfeiture: *Doe d. Morecraft* v. *Meux* (1 C. & P. 848). A case was desired, but we cannot find that any was argued. We entirely agree in Lord Tenterden's opinion. The precise point that he decided was, that on the trial of an ejectment for a forfeiture **[726]** (in which of course the entry was admitted), the receipt of rent after the bringing of that ejectment was too late, and the lease was not rendered valid. We think the same consequence follows from an entry admitted by the consent-rule; but even supposing no consent-rule to have been entered into, we think that the bringing of an ejectment for a forfeiture, and serving it on the lessee in possession, must be considered as the exercise of the lessor's option to determine the lease; and the option must be exercised once for all. Without inquiring whether an ejectment be a real action, the bringing of which and the counting in which would, according to the authority of Lord Coke, be a determination of an election between two remedies, it seems to us that so distinct and unequivocal an act must, independently of any technical reason, be a final determination of the landlord's option; for after such an act, by which the lessor treats the lessee as a trespasser, the lessee would know that he was no longer to consider himself as holding under the lease, and bound to perform the covenants contained in it; and it would be unjust to permit the landlord again to change his mind, and hold the tenant responsible for the breach of duty, after that time.

We are all, therefore, of opinion that the lease was determined in May, 1845, and consequently the defendant was not liable to pay the subsequent rent, or damages for any subsequent breach of covenant. There is no reason, therefore, for a new trial as to the issue on the rent being in arrear.

With respect to the remainder, the verdict was clearly wrong, and there must be a new trial, unless the defendant will consent that a verdict be entered for the plaintiff with nominal damages, subject to the same discretion as Mr. Justice Williams would have had at the trial, to certify to deprive the plaintiff of costs.

Rule accordingly.

Case No: A3/2001/0450, Neutral Citation No: [2002] EWCA Civ 691

IN THE SUPREME COURT OF JUDICATURE
IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM CHANCERY DIVISION
(THE VICE–CHANCELLOR & Mr Justice PATTEN)

Royal Courts of Justice
Strand,
London, WC2A 2LL

Thursday 16th May, 2002

B e f o r e :

LORD JUSTICE JUDGE,
LORD JUSTICE RIX
AND
LADY JUSTICE ARDEN

– – – – – – –

LIBERTY MUTUAL INSURANCE COMPANY (UK) LTD & ANOTHER

Claimant/
Respondent

– v –

HSBC BANK PLC

Defendant/
Appellant

– – – – – – – – –

(Transcript of the Handed Down Judgment of
Smith Bernal Reporting Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

Gabriel Moss QC and Felicity Toube (instructed by Messrs DLA) for the Claimant/Respondent
Jonathan Sumption QC and Mark Arnold (instructed by Messrs Allen & Overy) for the
Defendant/Appellant

J U D G M E N T
As Approved by the Court

Crown Copyright ©

Lord Justice Rix:

1.   This is an appeal by HSBC Bank plc (the "bank") against three judgments concerned with points of construction arising out of surety bonds in essentially the same form issued to it by two insurance companies, Liberty Mutual Insurance Company (UK) Limited ("Liberty") and St Paul International Insurance Company Limited ("St Paul", formerly Seaboard Surety Co ("Seaboard")). The three judgments are those of the Vice–Chancellor and Patten J (two judgments). The appeals arise in two sets of proceedings in one f which the bank is the claimant and in the other of which Liberty is the claimant, but there is no need to distinguish between them, nor, for the most part, between Liberty and St Paul. I shall therefore refer save as may be necessary to both surety companies by the name of "Liberty".

2.   The bonds were given to secure liabilities which the bank (formerly Midland Bank plc) entered into at the request of its customer, Ocean Marine Mutual Insurance Association Limited ("OMMIA"), a P&I Club incorporated in the Turks and Caicos Islands. As part of its business activities, OMMIA was regularly called upon to provide security in the form of bank guarantees to claimants who had arrested, or threatened to arrest, its members' vessels in various parts of the world in respect of maritime claims such as those arising out of the carriage of goods or collisions. Such guarantees therefore provided security in place of the arrested vessel. A traditional form of such security is a bail bond or so–called admiralty bond, which is a security provided to the court itself: but nowadays a bank guarantee provided directly to the claimant by an acceptable financial institution is the more normal procedure. In OMMIA's case, it would utilise its facilities with the bank to procure from local correspondent banks the provision of the necessary guarantees. In a few cases the bank provided the guarantees itself directly to the beneficiaries; but in the majority of cases it procured their provision from correspondent banks to whom it in turn granted a counter–indemnity. The practice was for OMMIA to name a local bank, which the bank could approve or disapprove, and a local firm of agents or lawyers to negotiate the actual wording of the guarantee. Such guarantees were limited to a specific sum and were "conditional" in the sense that they were payable only upon a judgment, arbitral award or agreement in settlement of the beneficiary's claim. The bank's counter–indemnity, however, took the form of an undertaking to pay, up to the stated maximum, on the correspondent bank's first demand subject only to a statement that the correspondent bank was required to pay in accordance with the terms of its guarantee. Because the security provided to the claimant and the counter–indemnity provided by the bank can both be referred to as guarantees, I shall use the expression "admiralty bond" to refer to the former, and "counter–indemnity" to refer to the latter. I shall set out typical examples of each below.

3.   Liberty's surety bonds were provided to support and secure the bank's engagements, whether in the form of admiralty bonds (of which there were only a handful or so) or of counter–indemnities (of which there were some 140). Since these appeals raise points of construction upon such surety bonds, I shall set out their language without delay, utilising one provided in the case of a vessel called the *Lady Lela* ; but they were all in substantially the same form, thus:

Bank Guarantee Number 102/113865/96 M/V LADY LELA

Surety Guarantee Number×049−000−139

WHEREAS OCEAN MARINE MUTUAL PROTECTION & INDEMNITY ASSOCIATION LIMITED has requested MIDLAND BANK PLC (hereinafter called 'Bank') to execute or procure the execution of a bond, undertaking or guarantee (hereinafter called "Guarantee") as bail or security in connection with their lawful business.

NOW THEREFORE LIBERTY MUTUAL INSURANCE COMPANY (UK) LIMITED (hereinafter called 'Surety') undertakes in the amount of TND 85,000.00 (EIGHTY FIVE THOUSAND TUNISIAN DINARS) to indemnify the Bank and hold it harmless from and against all liability, losses and damages which the Bank×may sustain or incur by reason of having executed or procured the execution of such Guarantee provided always that the loss sustained by the Bank arises from a claim that has been paid by the Bank strictly in accordance with the express terms of the Guarantee and that the aggregate liability of the Surety under this Agreement shall not exceed the sum of TND 85,000.00 (EIGHTY FIVE THOUSAND TUNISIAN DINARS) which is the value of the Guarantee.

This Agreement is separate from any other security or right of indemnity taken in respect of the Guarantee from any person, including your above mentioned customer.

This Agreement shall be a continuing agreement and binding on the Surety, its successors and assigns.

This Agreement shall be governed by and construed in accordance with the Laws of England."

*The preliminary issues*

4.     Disputes arose between Liberty and the bank regarding the construction of the bonds. The bank had taken a fixed charge over all OMMIA's book debts as a continuing security for all its liabilities to the bank, and had subsequently had to appoint a receiver. Liberty's case was that, to the extent that it had discharged by payment any of its surety bonds given to the bank, it was entitled to be subrogated to the bank's security under its fixed charge pari passu with the bank's claims on OMMIA. The bank's case was that the third paragraph of the bond ("This Agreement is separate×") was a consensual exclusion or postponement of Liberty's rights of subrogation. That dispute was decided by the Vice–Chancellor in favour of Liberty. I shall call this the "subrogation issue".

5.     The second dispute was whether the proviso at the end of the second paragraph of the bond ("provided always that the loss×") which requires a payment to have been made "strictly in accordance with the express terms of the Guarantee" refers to the terms of the admiralty bond given to the claimant beneficiaries or to the engagement given by the bank, whether admiralty bond or, as in nearly every case, counter–indemnity. In other words did "Guarantee" in the surety bond mean "admiralty bond" or "the bank's engagement"? In theory it ought to make no difference, because the bank's counter–indemnities can only be called on by the correspondent banks to the extent that the latter have to face a liability under their admiralty bonds: in theory, therefore, the bank is only exposed under its first demand counter–indemnities in the event of negligence or fraud on the part of its correspondents, of which there is no evidence. In practice, however, it is suggested by the

bank that it may face difficulties in proving the condition of the proviso, if "Guarantee" does indeed refer to the admiralty bond and not to its own engagement. I shall call this the "Guarantee issue".

6.  The third dispute relates to a small number of admiralty bonds where OMMIA's instructions to the bank asked it to procure an admiralty bond with a validity of a year, but where the admiralty bond which emerged, although valid in the first instance for only a year, was automatically renewable for successive periods of twelve months. Liberty claims to be entitled to reject any liability under its bonds given in respect of such requests, at any rate beyond the first year, on the ground that its engagement relates only to the admiralty bond requested and not to the admiralty bond given in excess of OMMIA's authority. If the bank's submission on the second issue were to be correct, then this third issue would not arise, for the only question would be whether the bank had suffered loss by reason of its counter–indemnity. I shall call this the "one year issue".

7.  The Guarantee issue was decided by Patten J in his first judgment in favour of Liberty, and the one year issue was decided by Patten J in his second judgment, also in favour of Liberty. Thus the bank is the appellant in this court on all three issues.

8.  These three disputes came before the courts in the form of preliminary issues. In all, five preliminary issues were ordered, of which those numbered (iii) and (iv) below are ancillary to the Guarantee issue and in this court have given rise to no additional debate. The preliminary issues are:

*The subrogation issue*

(i)    Whether on the proper construction of the Bonds×[Liberty and St Paul] have waived in favour of [the bank] such rights as they might otherwise have to be subrogated to the rights of [Liberty and St Paul] under the charge dated 17 November 1997 executed by [OMMIA].

*The Guarantee issue*

(ii)    What is the "Guarantee" within the meaning of Liberty's standard form bond?

(iii)    Where the Guarantee has been issued by [the bank], how does [it] prove that liability attaches to Liberty under Liberty's bond?

(iv)    Where the Guarantee has been issued by [the bank's] correspondent bank, how does [the bank] prove that liability attaches to Liberty under Liberty's bond?

*The one year issue*

(v)    In cases where OMMIA stipulated that [the bank] should give or procure a Guarantee for one year, does Liberty have any potential liability under its bond in respect of loss arising from a claim made in respect of the Guarantee after the end of that period if:

(a) OMMIA further stipulated that the Guarantee should adopt wording to be supplied by a named party, and the Guarantee did so, but such wording was inconsistent with the terms of OMMIA's (first) stipulation; or

(b) the provisions of the applicable system(s) of law governing the Guarantee provided for the extension of such period?

9.    Ultimately, issue (v)(b) was not pursued before Patten J, but a further issue was, namely whether, if the one year issue was decided against the bank, the bank could nevertheless say that Liberty was estopped from asserting that the relevant period of liability is only one year. The bank failed as well in relation to that submission, and the appeal on that point has not been pursued.

10.    This court is therefore concerned only with preliminary issues (i), (ii), (iii), (iv) and (v)(a); and has heard no oral argument as to (iii) and (iv).

11.    The Vice–Chancellor's order on the subrogation issue, reflecting the language of preliminary issue (i), merely stated that Liberty and St Paul had not "waived" in favour of the bank its rights to be subrogated to the bank's rights under its fixed charge.

12.    Patten J's first order, dealing with the Guarantee issue and preliminary issues (ii), (iii) and (iv) above, stated, adopting this judgment's terminology, as follows:

> as to (ii): the "Guarantee" is either the bank's Guarantee issued directly to the claimant (in cases where the Guarantee was executed by the bank) or the correspondent bank Guarantee issued directly to the claimant (in cases where the Guarantee was procured by [the bank]) (in each case, the "admiralty bond");

> as to (iii): the bank must prove that it has made payment strictly in accordance with the terms of the Guarantee by producing a copy of the admiralty bond, evidence of payment and whatever additional document (whether settlement agreement, arbitration award, court order or other document) as is specified in the admiralty bond as the pre–condition for liability;

> as to (iv): the bank must prove that it has made payment strictly in accordance with the terms of the Guarantee by showing that the conditions for liability under the admiralty bond have been satisfied, by proving the judgment, arbitral award or agreement (as the case may be) which triggered liability under the admiralty bond;

13.    Patten J's second order, dealing with the one year issue, stated:

> as to (v): where OMMIA stipulated that the bank should give or procure a Guarantee for one year, Liberty does not have any potential liability under its bond in respect of loss arising from a claim made in respect of the Guarantee after the end of that period if OMMIA further stipulated that the Guarantee should adopt wording to be supplied by a  named third party, and the Guarantee did so, but such wording was inconsistent with the terms of OMMIA's (first) stipulation.

*The background facts*

14.     The Vice–Chancellor decided the subrogation issue essentially on the basis of the surety bond itself. The only other document in evidence was the fixed charge on book debts, annexed to a brief witness statement from the bank's solicitor.

15.     For the purpose of the hearings before Patten J, however, there was further evidence, in the form of the bank's facility letters, documents relating to the setting up of typical transactions, Liberty's internal memorandum relating to the underwriting of its bonds, and a number of witness statements: from James Wade, the bank's relationship manager responsible for its dealings with OMMIA; and from Graham Pitt, Liberty's manager responsible for its relationship with OMMIA. Mr Wade and Mr Pitt were cross–examined at trial. It is agreed that for the purpose of these appeals, the evidence should be treated as generally available on all issues. Whereas such evidence is useful to throw light on the background and structure of the arrangements, it is not clear to me to what extent it assisted, or was admissible to assist, in the points of construction argued, although deployed at times by both sides in their submissions.

16.     The form of the surety bond was first developed by Seaboard. Nothing is known about the circumstances in which that bond was developed, save that  its form was agreed by the bank to be acceptable to it. The earliest Seaboard bond goes back to December 1995. Seaboard/St Paul issued bonds to the bank from then until February 1997. In all there were only 21 such bonds and only 1 of these was issued after December 1996. The bank's facility letter to OMMIA dated 4 November 1996 referred to such Seaboard bonds as being one form of acceptable security required by the bank for providing its engagement at OMMIA's request. Such bonds, there referred to as an "insurance policy", had to be "acceptable in form and substance to Midland in its sole discretion". Mr Wade on behalf of the bank gave evidence to confirm that the Seaboard form was vetted by its internal lawyer. The Seaboard bonds appear to have been provided to OMMIA and assigned by OMMIA to the bank. Another acceptable form of security was a cash deposit in US dollars of not less than 25% of the face value of "each guarantee issued". The bank also required an omnibus counter–indemnity from OMMIA "in respect of all past and future guarantees" given by the bank.

17.      Liberty took over from Seaboard/St Paul the provision of such bonds in the following circumstances. Late in 1996 Mr Pitt, Liberty's senior underwriter based in London, began discussions with OMMIA which by July 1997 had matured into a proposal to his superiors in New York, set out in his memorandum dated 24 July 1997, for the provision to OMMIA of a facility of $25 million. The memorandum discussed the nature of a P&I Club's business in arranging for admiralty bonds to be issued in support of its membership, and also the nature of such admiralty bonds themselves. Thus Patten J quoted most of the following extract:

> Admiralty Bonds are basically "bail/court" bonds. When a vessel is involved in an accident, often the shipowner is required to post a bond in order to release his vessel.

> Admiralty bonds may be issued directly by the P&I clubs or by Guarantors (ie banks or surety companies)×
>
> The value of the bond is calculated on the maximum estimate of the value of the claim caused by the accident.
>
> The valuation is conducted by agents employed by OM and the claimant's agents. A sum is agreed upon which is significantly higher than the settlement amount. Obviously, no liability is admitted by OM until a court decision has been made×
>
> Statistically, the average settlement of a claim is between 30−60% of the initial claimed sum×
>
> Claims can be settled via mutual consent, by arbitration or by a court award. On this basis all bonds are <u>conditional</u> - a sample bond issued to Midland is attached×
>
> The duration of the bond is a function of the length of determining the claim (bonds average 3 years however could possibly be as long as 7 years)×"

18.    The memorandum went on to speak of the "Administration of Admiralty Bonds" as follows:

> In order for Midland to issue bonds, they require either a hold harmless from a surety company or 25% cash cover×
>
> ...it is perceived that we would be able to support a bank fronting on our behalf especially if the underlying obligation was similar to the obligation which a surety would issue.
>
> As these are conditional bonds, this would appear the most sensible route×
>
> Rating - the rate will be between 0.85−1% per annum×"

19.    The memorandum also annexed a form of counter−indemnity from OMMIA to Seaboard/St Paul, which it was proposed would similarly be provided to Liberty, if it went ahead.

20.    There is some confusion of thought apparent here, for instance the Seaboard bond enclosed was not an admiralty bond as that was elsewhere discussed, but a surety to support such an admiralty bond or even to support a counter−indemnity for such an admiralty bond. But the writer appears to have thought that because the ultimate, underlying obligation, reflected by the admiralty bond provided to the claimant, was conditional (upon agreement, judgment or award), therefore any supporting security would be similarly conditional and could be considered in pari materia. And in theory at any rate that was so.

21.    In due course Liberty agreed, by its letter dated 12 August 1997, to provide a "surety bond facility" to OMMIA. It was OMMIA which paid to Liberty the fee agreed of 1% per annum on the face value of the surety bonds provided. That was more advantageous to it than providing the bank with cash collateral of 25% of the value of the admiralty bond. The first

surety bond provided by Liberty, slightly in advance of that letter, was dated 3 August 1997. Between then and 22 September 1998 Liberty provided some 142 bonds. The Liberty facility letter made it clear that Liberty was not, however, committed to the provision of its surety bonds: that would depend inter alia on underwriting criteria such as the financial strength of OMMIA itself.

22. On 29 October 1997 the bank had issued a further facility letter to OMMIA. This continued its $43 million facility for its engagements, subject to an omnibus counter–indemnity from OMMIA and security in the form of either a Seaboard surety bond or a Liberty surety bond or a 25% cash deposit. In addition it required a fixed charge on book debts, but *only* in respect of a separate $12 million standby letter of credit facility. The fixed charge was executed on 17 November 1997.

23. Two particular transactions were focused on below to demonstrate and illustrate how in an individual case Liberty's surety bond was generated. These two transactions concerned the *Lady Lela* and the *Skimmer* , the latter being an illustration of a "one year" admiralty bond requested by OMMIA.

24. *The Lady Lela.* The surety bond provided in this case related to an admiralty bond which had been procured by the bank at OMMIA's request back in May 1996. The counter–indemnity given by the bank to its correspondent bank had presumably been secured in the meantime by a 25% cash deposit.

25. On 1 May 1996 OMMIA issued instructions to the bank in respect of a "New Guarantee" re the *Lady Lela* . The instructions, which were in typical form (subject to the "one year" exception), began by referring to the incident which had given rise to the claim and to the amount of the guarantee and contained paragraphs detailing the "Beneficiary", the "Issuing Bank" (ie the correspondent bank), the party "Wording Supplied by" and the "Expiry Date", here "Until Further Notice". It is clear from such instructions that the "New Guarantee" is a reference to an admiralty bond. There is no express or implied reference to the bank's counter–indemnity.

26.    On the same day the bank telexed its correspondent bank as follows:

> At request [OMMIA] and under our full responsibility please consult with [the party by whom the wording was to be supplied]×immediately and in accordance with their instructions and using the text they provide arrange for the issue and hold for collection by above of guarantee for [the amount] favour [the beneficiary] valid for period required relating m/v Lady Lela - alleged damage to cargo at Sousse on 8 April 1996.

> In consideration of your so doing we issue our unconditional counterindemnity no 102/11386596 your favour and undertake to pay to you on your first demand by mail or by tested telex/swift despite any contestation by our principals any sum or sums that you state are required to pay in accordance with terms of your guarantee.

> Our counterindemnity is valid until we receive your notice we released from all liability towards you hereunder.

Our liability limited to amount not exceeding [the amount]×

No mail confirmation follows. Please forward two translated copies your guarantee quoting our reference 102/11386596."

27.    On 7 May 1996 the correspondent bank sent an (untranslated) copy of the *Lady Lela* admiralty bond. Even in French one can see in its final paragraph the reference to the need for either agreement, arbitration or judgment to dispose of the claim thus guaranteed. The amount of the admiralty bond was subsequently increased, again at the request of OMMIA, but nothing turns on that.

28.    In due course on 29 September 1997 OMMIA sent to Liberty a copy of the bank's instructions to the correspondent bank, and on 30 September Liberty issued its surety bond (see para 3 above). The "Bank Guarantee Number" cited at the top of the surety bond was the bank's reference number for its counter–indemnity. As to that, Patten J found as follows (para 17 of his first judgment):

> ×this remained a feature of all bonds issued by Liberty throughout the relevant period. Mr Pitt's evidence was that the Bank Guarantee Number was simply a convenient method of identifying the particular bond by reference to the claim in question. Liberty could have used OMMIA's reference number but chose instead to follow the practice used in the Seaboard bonds of quoting the Bank's guarantee number. It seems to me that the practice of an identification number linking the bonds with the Bank's guarantee number is an obviously convenient one and is consistent with the bond being given as additional security for the engagements facility. But beyond that it offers little real assistance in the question of construction which I have to resolve."

29.    *The Skimmer.*  This example illustrates a number of differences from the case of the *Lady Lela* . Since it was dealing with a current casualty and claim, OMMIA sent contemporaneously to Liberty a copy of its instructions to the bank. It also sent to Liberty the bank's instructions to its correspondent bank, as soon as it had received a copy of them from the bank. Secondly, OMMIA's instructions were for an admiralty bond whose "Expiry Date" was given as "One Year": that was included in the bank's instructions to its correspondent bank, but even so the bank's counter–indemnity was worded again to be "valid until we receive your notice we released×" Thirdly, the undertaking in the counter–indemnity was worded "to reimburse you on your first demand×any sum or sums that you are required to pay", whereas in the case of the *Lady Lela*  the undertaking was "to pay to you on your first demand×any sum or sums you state that you are required to pay". Fourthly, Liberty provided its surety bond, as requested by OMMIA, dated the same date as the bank's instructions to the correspondent bank, 19 November 1997, even though the admiralty bond was not executed until 23 November and not sent on by the bank to OMMIA until 15 December. In doing so, the bank referred to the "Guarantee" provided by its correspondent and to its own "counterindemnity". Fifthly, the admiralty bond dealt with the question of its expiry date in the following fashion:

> This guarantee shall be valid for a period of twelve months from the date of <u>its issue</u> and shall be automatically renewable for further consecutive periods of twelve months each and will automatically expire upon the fulfilment of our undertaking hereunder during the first or any period of twelve months."

30.    That admiralty bond was rejected by neither the bank nor OMMIA as failing to comply with their respective instructions.

31.    It seems that, as before in the case of the Seaboard bonds, the Liberty bonds were sent by Liberty to OMMIA, who after all had requested and was paying for them, and then sent on by OMMIA to the bank.

32.    When in due course claims under the admiralty bonds were settled, and the correspondent banks began to make demands under the counter–indemnities, the bank did not look to Liberty for recoupment, but debited OMMIA under a running account with it. Indeed, Patten J found that this was the intention of the parties, stating (at para 10 of his first judgment) that -

> The Liberty bond, unlike the Admiralty Bond and (when the Admiralty Bond was provided by a correspondent bank) the counter–indemnity given by Midland to the correspondent bank, was not intended by the parties to be part of the mechanics of payment. A demand under the Admiralty Bond would lead to payment by Midland either directly or to the correspondent bank. The sums involved would be debited to OMMIA's overdraft facility and discharged as part of these continuing banking arrangements. No resort would ever be made to the Liberty bond unless OMMIA was unable to discharge its own indebtedness to Midland. The Liberty bond was therefore unlikely to be called upon except in the event of OMMIA's insolvency."

33.    Unfortunately, OMMIA did become insolvent. Before then, the bank had extended its fixed charge to secure *all* the facilities it provided to OMMIA, including the $43 million facility under which its relevant engagements occurred. This extension of the fixed charge occurred under the terms of the bank's facility letter to OMMIA dated 22 September 1998. It was only from this time that the bank's fixed charge security became relevant to any rights of subrogation which Liberty might acquire by reason of payment under its surety bonds. Then on 4 March 1999 OMMIA went into provisional liquidation and on 2 July 1999 the bank appointed receivers under its fixed charge.

34.    Thereafter the bank has looked to Liberty to recoup its losses under its engagements. For a period those claims were met. Latterly, however, Liberty took the points that the bank was not entitled to be paid because (a) it had not proved that its own payment was "strictly in accordance with the express terms" of the admiralty bonds, and (b) in the case of OMMIA's "one year" instructions, its payment fell outside the terms of the admiralty bond requested by OMMIA. These points are illustrated by Liberty's reactions to the bank's claims under the *Lady Lela* and *Skimmer* surety bonds themselves, which remain unpaid.

35.    Thus in the case of the *Lady Lela,* on 9 June 2000 the bank's correspondent bank made demand on the bank under its counter–indemnity for the maximum amount and was paid. On 22 June 2000 the bank wrote to Liberty enclosing a copy of its counter–indemnity and of the correspondent bank's demand and confirming its own payment. It referred to its own counter–indemnity as its "Engagement" and glossed the words of the surety bond by stating

that it had paid the demand made on it "strictly in accordance with the express terms of the Engagement". Liberty refused to pay. In the case of the *Skimmer* , the correspondent bank made its demands in August/September 2000 and the bank paid and claimed on Liberty in similar terms. However, Liberty had already written by its solicitors to the bank on 10 May 2000 noting OMMIA's "one year" instruction, stating that the admiralty bond had therefore expired and requesting the return of its own surety bond for cancellation.

36.    I can now turn to the three issues which have been argued on these appeals.

*The subrogation issue*

37.    The critical paragraph is the third in the surety bonds, viz

> This Agreement is separate from any other security or right of indemnity taken in respect of the Guarantee from any person, including your above mentioned customer."

38.    On behalf of the bank, Mr Sumption QC has submitted that this paragraph, with its concept of separateness, is a derogation on Liberty's rights of subrogation. The effect of the clause, he submits, is to *postpone  but not to exclude*  such rights of subrogation where, as in the case of the bank's fixed charge, there has, since 22 September 1998, been a security available to the bank which covers *both*  the bank's claims to be indemnified by OMMIA against the bank's losses arising out its engagements in respect of the admiralty bonds *and* the bank's other claims against OMMIA. He calls such a security a "partially overlapping security", and distinguishes it from a security which is either totally confined to claims themselves covered by the surety bonds (which he terms a "totally overlapping" security) or on the other hand exclusively distinct from or completely unconnected with such claims. In the latter case, the distinct security in any event is unavailable to and thus does not assist the subrogated surety. In the former case he accepts that the surety is indeed entitled to be subrogated to the security and that the clause in question does not affect such a case either. In the case, however, of a partially overlapping security the creditor's concern is to use his security first to obtain a complete indemnity for his other claims against the debtor, ie for those for which he has no indemnity from the surety, and only thereafter to permit the subrogated surety to utilise his, the creditor's, security. Only in such a way is his security kept "separate" from his rights under the surety bond. Only in such a way does a clause which appears designed to benefit the creditor give to him rights which are not already enshrined in what the law would otherwise accord him even in the absence of the clause.

39.    It is important to note that Mr Sumption argues only for the clause having the effect of a postponement of Liberty's rights of subrogation. He does not say that it excludes such rights. This was an important clarification of the bank's case. No one has suggested that such a clarification was not open to the bank, or that the bank was not to be entitled to make that argument. It is a pure matter of construction. It is nevertheless relevant to trace for a moment the history of the bank's case in this respect. In its pleaded defence it alleged that the effect of the clause was that Liberty and St Paul had "waived such rights of subrogation as they might otherwise have had upon payment under the Bonds" (para 8(1)). Nothing was said of an alternative case of postponement. The concept of waiver was therefore picked up

both in the language of the preliminary issue ordered (see para 8 above) and in the Vice–Chancellor's declaration incorporated in his order following his judgment (see para 11 above). It appears from that judgment, however, that in the argument before the Vice–Chancellor concepts both of exclusion (waiver) and of postponement were argued, and that is to some extent indicated also by the terms of the bank's skeleton argument below, which submits that the benefit intended by the clause "must have been the right to enjoy the security afforded by *both* the bond and the other securities until the relevant liabilities of [OMMIA] had been discharged in full". It is common ground therefore that the concept of postponement was in play before the Vice–Chancellor. In its skeleton argument on appeal, moreover, both concepts, of total exclusion and of postponement, were expressly advanced. Indeed, it is there stated that whereas before the Vice–Chancellor the bank's argument was that the clause constituted a postponement rather than a complete waiver, the bank proposed to address this court on the basis that the clause "constituted either a postponement or a complete waiver" (at para 16). The primary argument therefore was one of complete waiver, that any other security or the proceeds of its enforcement were not to be brought into account or shared at all; and the alternative argument was that of postponement. It was only on the second day of this appeal, during the submissions of Mr Moss QC on behalf of Liberty, that Mr Sumption made it plain that he was *not* suggesting that the clause effected a total exclusion, only a postponement (Day 2.55). This short history of the windings of the bank's submissions is undertaken only to indicate that even on the bank's side there has been some uncertainty as to the effect of the clause.

40.    On behalf of Liberty Mr Moss has, on the other hand, submitted that rights of subrogation are inherent in the justice of the situation between a surety and a principal creditor. It would therefore take clear words to remove or limit such rights by contract, even if, as he accepted, that was possible in theory. Nevertheless, no case had been cited and he knew of no case where a postponement had been achieved by language of this nature. The closest parallel to the present language were clauses which speak of a surety being "in addition to" other security, but authorities on such clauses were to the effect that they did not affect rights of subrogation. Banking clauses which were expressly concerned with postponement of rights of subrogation in the event of an overlapping security were well known and were a recognised part of the bank's own armoury of clauses; but such clauses were only used to protect a creditor from an "insider" such as a director who guarantees the debts of his own company from utilising via the concept of subrogation the bank's own security over his company's assets. Absent such situations, it would be most unfair and uncommercial for a bank protected by a guarantee to postpone the surety's rights of subrogation until the bank had obtained a complete indemnity in respect of all other debts owed to it, for in such a case not only would a bank's right to be subrogated to the creditor's security be postponed, so that the security was probably rendered worthless, but its unsecured rights of subrogation would also be overwhelmed. As for the meaning of the clause and its concept of separateness, it was not incumbent on Liberty to solve definitively the riddle of its meaning, but in any event there were many arguments and potential defences available to a surety against a principal creditor which the concept of the autonomy of the guarantee and its separateness from any other right of the principal creditor would greatly assist the principal creditor to eradicate: and it made no difference that the existing law would be in favour of the principal creditor in many of these situations even in the absence of such a clause.

41.    The Vice–Chancellor found in favour of Liberty's submissions, as he said "not without hesitation" and he gave the bank permission to appeal. In his judgment he stressed four reasons in particular for his decision (at paras 15/16). First, he accepted that "clear words

are required to exclude, reduce or postpone" the right of subrogation. Secondly, he regarded the clause as more apt to deal with the position before discharge of the surety bond than after and in consequence of its payment in full. Thirdly, he regarded postponement as contrary to commercial reality, as its practical effect was "to extend liability under the bond". And fourthly, he regarded the words "in respect of the Guarantee" as an important qualification, to be understood in the sense of excluding (as it were by interpolation of the word "only") a security to the extent that it was in any event separate because it was given in respect of a different liability.

42.   I have given anxious consideration to the competing submissions of the parties, but in the end I have concluded, even firmly concluded, that Liberty's case is to be preferred, inter alia for the reasons given by the Vice–Chancellor. But before I seek to express in my own words my reasons for that decision, it is necessary to say something both about the nature of subrogation and about some  leading modern authorities on construction which have been referred to.

43.   *Subrogation.*  There was no dispute about the applicable principles of subrogation. It is a remedy, rather than a cause of action, founded in equity and natural justice not in contract, designed to prevent unjust enrichment. A useful statement is that to be found in *GOFF & JONES* , The Law of Restitution, 5th ed, 1998, at 133/4:

> A surety who pays off the debt owed by the principal debtor is subrogated to any securities given by the debtor as security for the debt. The surety's "right to have those securities transferred to him", and his right to seek contribution from a co–surety, are said to be based on "a principle of natural justice." In *Craythorne v. Swinburne* [(1807) 14 Ves 160], Sir Samuel Romilly described why equity intervened in the following words [at 162, as counsel, arguendo], which gained the approval of Lord Eldon [at 169]. He said:
>
>> ×a surety will be entitled to every remedy, which the creditor has against the principal debtor; to enforce every security and all means of payment; to stand in the place of the creditor; not even through the medium of contract, but even by means of securities, entered into without the knowledge of the surety; having a right to have those securities transferred to him; though there was no stipulation for that; and to avail himself of all those securities against the debtor. This right of the surety also stands, not upon contract, but upon a principle of natural justice: the same principle, upon which one surety is entitled to contribution from another."
>
> Subrogation is not then based on contract, for the surety "seldom if ever stipulated for the benefit of the security which the principal debtor has given" [*Yonge v. Reynell*  (1852) 9 Hare 809, 818/819, per Turner V–C]. Its basis is natural justice; it is against conscience for the debtor to regain the securities from the creditor on the discharge of the debt by the surety, because it is the debtor's obligation to indemnify the surety against any loss he incurs."

44.   Thus, even if the securities were given after the contract of guarantee was made, and even if they are deemed to be satisfied by the payment of the debt (see Mercantile Law Amendment Act 1856, section 5), the surety is entitled to the benefit of them.

45.    An insurer as well as a surety is entitled to the rights of subrogation when once he has paid the assured. In *Lord Napier and Ettrick v. Hunter* [1993] AC 713 at 738B Lord Templeman described the principles of subrogation as follows:

> The principles which dictated the decisions of our ancestors and inspired their references to the equitable obligations of an insured person towards an insurer entitled to subrogation are discernible and immutable. They establish that such an insurer has an enforceable equitable interest in the damages payable by the wrongdoer. The insured person is guilty of unconscionable conduct if he does not provide for the insurer to be recouped out of the damages awarded against the wrongdoer. Equity will not allow the insured person to insist on his legal rights×"

46.    Thus subrogation provides to the surety or the insurer an equitable or proprietary interest in the creditor's rights against the debtor. As Millett LJ said in *Boscawen v. Bajwa* [1996] 1 WLR 328 at 335C/D (in a judgment approved by Lord Hoffmann in *Banque Financiere de la Cité v. Parc (Battersea) Ltd* [1999] AC 221 at 233F) -

> It is available in a wide variety of different factual situations in which it is required to reverse the defendant's unjust enrichment. Equity lawyers speak of a right of subrogation, or of an equity of subrogation, but this merely reflects the fact that it is not a remedy which the court has a general discretion to impose whenever it thinks it just to do so. The equity arises from the conduct of the parties on well settled principles and in defined circumstances which make it unconscionable for the defendant to deny the proprietary interest claimed by the plaintiff. A constructive trust arises in the same way. Once the equity is established the court satisfies it by declaring that the property in question is subject to a charge by way of subrogation in the one case or a constructive trust in the other."

47.    It is also common ground that in English (and Commonwealth law) a surety is entitled to be subrogated pari passu to what Mr Sumption has called a partially overlapping security. The authority for that goes back at least to *Goodwin v. Gray* (1874) 22 WR 312. As Mr Richard Sykes QC, sitting as a deputy high court judge, said in *Re Butlers Wharf Ltd* [1995] 2 BCLC 43 at 50a/f:

> ×I now turn to the question mainly argued before me, which is this: is a surety for a part of a larger debt who has discharged the full amount for which he is surety entitled to share rateably with the principal debtor in any security which has been given for the whole debt?
>
> Three principles have been established beyond question:
>
> (1)    The surety, in the situation described above, is entitled both to an indemnity claim against the principal debtor and to all securities which the principal debtor gave to the principal creditor in respect of and limited to the guaranteed part of the debt×

(2)    The surety is neither entitled to amounts paid voluntarily by the debtor in respect of the part of the debt not guaranteed by the surety nor to security given only for the part of the debt not so guaranteed×

(3)    The surety is entitled, upon the insolvency of the principal debtor, to share rateably with the principal creditor in amounts paid by way of dividend in respect of the whole debt×

Each of these principles is of course subject to express terms of the guarantee to the contrary effect.

All the textbooks which deal with the subject regard a fourth principle as established, namely that any security given by the principal debtor for the whole debt must be shared between the principal creditor (the remainder of whose debt remains outstanding, of course) and the surety; *Goodwin v Gray* (1874) 22 WR 312 is the authority most often cited for this principle."

48.    At 51h Mr Sykes acknowledged that the law in the United States appears to be different. This is reflected in the US Restatement of the Law of Security, 1941, at 387 ("The surety in such cases is subrogated only after every duty protected by the security has been fully satisfied") and in the US Restatement of the Law of Suretyship and Guarantee, 1996, at 115 ("Third, when collateral for the underlying obligation also secures other obligations of the principal obligor to the obligee, the secondary obligor is not entitled to subrogation to the obligee's rights to the principal obligor's collateral until all obligations secured by that collateral are satisfied or discharged"): but that merely indicates that another view about such matters is possible. It is common ground that the law in England, and as it would seem (see *Re Butlers Wharf* at 52a) in Ireland, Canada, Australia and New Zealand and probably other Commonwealth countries, is as found by Mr Sykes.

49.    *Construction.*  It was also common ground that the normal incidents of rights of subrogation may be excluded or varied by contract. Mr Moss submits that clear words are needed to exclude or limit the rights otherwise assured by law. He cites in support of that submission *Trafalgar House Construction (Regions) Ltd v. General Surety & Guarantee Co Ltd*  [1996] AC 199 at 208C  *per*  Lord Jauncey of Tullichettle (with whose speech their other Lordships agreed) where he said -

There is no doubt that in a contract of guarantee parties may, if so minded, exclude any one or more of the normal incidents of suretyship. However, if they choose to do so clear and unambiguous language must be used to displace the normal legal consequences of the contract×"

50.    Mr Sumption disputed the need for clear words: but in truth, the point is a general and well recognised one. Lord Jauncey was speaking in the specific context of contracts of guarantee, but the same point has been classically made by Lord Diplock in the context of rights of set–off in *Gilbert Ash (Northern) Ltd v. Modern Engineering (Bristol) Ltd*  [1974] AC 689 at  717H.

51.    Mr Sumption also submitted that rights of subrogation may be excluded by implication, let alone express language clear and unequivocal or otherwise. I would allow that such

implication is always possible, for where the implication is, as it must be, *necessary* , it is not to be denied. Mr Sumption's sole example of such an implication is *Morris v. Ford Motor Co Ltd* [1973] QB 792. There a firm of cleaners contracted to Ford agreed to indemnify Ford against any loss or claim arising out of the performance of their contract. One of the cleaners' employees was injured by the negligence of a Ford employee. The cleaners' employee sued Ford, the cleaners indemnified Ford pursuant to their contract and sought to be subrogated to Ford's common law right (see *Lister v. Romford Ice and Cold Storage Co Ltd* [1957] AC 555) to recover against its own employee. A majority of this court held that the cleaners' claim failed, but varied in their reasoning. Lord Denning MR, having pointed out that the *Lister* decision had been set aside in the case of fellow−employees by a "gentleman's agreement" reached by the members of the British Insurance Association, and that that agreement did not cover the instant case because it did not involve fellow−employees, adverted to Ford's policy of not pursuing its rights against employees for fear of causing serious industrial repercussions. He went on to hold that equity did not compel Ford to lend its name to the cleaners to sue its employee, since "To make the servant personally liable would not only lead to a strike. It would be positively unjust" (at 801F). His secondary ground, if subrogation was to be looked at as a matter of implied contract rather than as founded on principles of equity (modern doctrine would approve Lord Denning's preference for the principles of equity, see Lord Hoffmann in *Banque Financiere* at 234C), was to say that no implication requiring subrogation was to be made in the circumstances. Only James LJ (at 815C) put the matter in terms of an implied term whereby subrogation was excluded. He continued:

> The implied term springs from the nature and terms of the contract between these parties. Their agreement was operative in an industrial setting in which subrogation of the third party to the rights and remedies of the defendants against their employees would be unacceptable and unrealistic."

52.   Stamp LJ dissented, but it is clear from a passage at the end of his judgment at 807D/F that he might have had sympathy for Lord Denning's primary ground had it not been for the fact that the point had not been covered in the pleadings, nor taken by the appellant, nor had the respondent any opportunity of dealing with it.

53.   In my judgment this is an unhelpful authority for Mr Sumption's purposes. In truth it does not proceed so much by construing the contract as by reaching a conclusion based on the equity of the situation, where the alternative conclusion was described as unjust or unacceptable and unrealistic. It is also analogous to the case of the "insider", where the contract will simply not work in any business sense if the right of subrogation survives. A clear example of such a case in the insurance setting is *National Oilwell (UK) Ltd v. Davy Offshore Ltd* [1993] 2 Lloyd's Rep 582, where the "insider" was a co−assured (see headnote 13). In the present case, however, it is common ground that subject to contrary agreement equity requires Liberty, to the extent of any surety bond discharged by payment, to be entitled to share rateably in the bank's fixed charge. There is nothing in the general context of the relations between the parties (subject of course to the issue of construction) to support the bank's claim for preference in the exercise of its fixed charge over Liberty's claim to share rateably in it, and the sole question is what the disputed clause means.

54.   Reference has been made to modern cases on construction such as *Mannai Investment Co Ltd v. Eagle Star Life Assurance Co Ltd* [1997] AC 749 especially per Lord Steyn at 964E/H, *Investors Compensation Scheme Ltd v. West Bromwich Building Society* [1998] 1

WLR 896 especially per Lord Hoffmann at 912H/913E, and *Bank of Credit and Commerce International SA v. Ali* [2001] 2 WLR 735 especially at para 8 per Lord Bingham of Cornhill. The principles are well known. Against the background of the admissible matrix of facts known to or at least reasonably available to the parties, the meaning sought is that which the language in question would convey to the reasonable man. In that context the language used is to be given its natural and ordinary meaning, unless the reasonable man would conclude that something has gone wrong in expressing the parties' intentions.

55.     It was not suggested, however, that in the case of the present subrogation issue anything had gone wrong along the lines of the mistake in *ICS v. West Bromwich* . And, whereas both parties had submissions and claims to make about the commercial context and possible purposes of the clause in question, neither could properly say that the solution of the other was absurd or uncommercial, or in the well known and oft repeated words of Lord Diplock in *Antaios Compania Naviera SA v. Salen Rederierna AB* [1985] AC 191 at 201 "flouts business commonsense". After all, on Liberty's construction the general rule of subrogation would prevail, while on the bank's construction a priority favourable to the bank but perfectly comprehensible in a business setting was proposed.

56.      It was suggested nevertheless that such modern authority is hostile to a maxim of construction requiring "clear words" in certain contexts if the prevailing rule is to be excluded or limited, such as Lord Jauncey's statement in the context of contracts of guarantee and Lord Diplock's statement in the context of set–off. I do not agree. It is true that modern authority (and I have in mind cases other than those referred to above) has moved away from technical or hostile attitudes to exclusion clauses. Even so, situations where "clear words" are required remain. A central example is the exclusion of negligence: see *Ailsa Craig Fishing Co Ltd v. Malvern Fishing Co Ltd* [1983] 1 WLR 964. This is because the reasonable man does not expect the parties to intend to exclude negligence unless the contract clearly says so. So also the reasonable man does not expect fundamental principles of law, equity and justice, such as rights of set–off or of subrogation to be excluded unless the contract clearly says so. A recent application of Lord Diplock's requirement of clear words in relation to remedies for breach of contract can be found in *Stocznia Gdanska SA v. Latvian Shipping Co* [1998] 1 WLR 574 at 585C per Lord Goff. Even in *BCCI v. Ali* itself Lord Bingham expressed himself in similar terms in the context of the problem of construction relevant to that case (I do not say to this), when he said (at para 10):

> But a long and in my view salutary line of authority shows that, in the absence of clear language, the court will be very slow to infer that a party intended to surrender rights and claims of which he was unaware and could not have been aware."

57.     As the Vice–Chancellor said in this case (at para 15 of his judgment) -

> The nature of the right and the circumstances in which it arises are such that an intention to exclude, reduce or postpone it is not lightly to be attributed to the parties."

58.     I am now in a position to give my reasons for preferring the submissions of Liberty on the subrogation issue. I would seek to put the matter in the following way.

59.     (1) I agree with the Vice–Chancellor that clear words (or the necessity of supplying those words by implication) are required if rights of subrogation are to be removed.

60.     (2) I address myself to the language of the clause itself, and note first, that subrogation is not expressly mentioned, nor is the concept of postponement; and secondly, that the focus of the clause is the separateness of the surety bond ("This Agreement") from "any other security or right of indemnity" taken "in respect of the Guarantee". Three matters are emphasised in that language: one is that the clause chooses to underline the separateness of the surety bond, not the separateness of any other security or indemnity; the second is that, whether or not the word "only" is to be interpolated before the phrase "in respect of the Guarantee", that phrase is hardly conducive to a meaning the focus of which, on the bank's case, is *not* rights in respect of the Guarantee but rights which go *beyond* rights in respect of the Guarantee (I shall revert to this matter below); and the third is that the earlier phrase "any other security or right of indemnity" extends beyond a security (whatever that means) in the sense of a secured interest and into merely personal rights. Thus Mr Sumption specifically accepted that it embraced the right of the bank, for instance under its omnibus counter–indemnity, to be indemnified by OMMIA against any loss incurred by the bank by reason of carrying out OMMIA's instructions.

61.     (3) Mr Sumption also accepts that the clause does not *exclude* Liberty's rights of subrogation, but merely postpones them. It is necessary to consider the ramifications of this approach, not for the fixed charge which is understandably the focus of debate, but for just such a personal "right of indemnity" as the omnibus counter–indemnity owed by OMMIA. The suggestion is that such a right of indemnity is not excluded but postponed. This would mean that in a situation where the bank looked for an indemnity from Liberty under the surety bond before OMMIA's insolvency, as under the bond it would of course be entitled to do, for instance in circumstances where the bank was unwilling to give OMMIA any further credit, Liberty would be postponed in its ability to exercise rights of subrogation against OMMIA until the bank had satisfied all its other claims against OMMIA under the omnibus counter–indemnity. The same would occur in any insolvency situation, where, even in the absence of a fixed charge (and it will be recalled the fixed charge only comes on the scene in any relevant sense, as a "partially overlapping" security, from 22 September 1998), Liberty's right to share rateably in the bank's dividend in the liquidation would be postponed until the bank had a complete indemnity, even though the bank's unsecured claim would I suppose be increased by reason of Liberty's subrogated claim. These are odd results. If they have been agreed, so be it; but it is not easy to see how they are to be found in the clause's brief wording. It is true that in practice the parties did not contemplate that the surety bond would be part of the mechanics of payment. But there is nothing in the bond to prevent it being so, even though Mr Sumption was prepared on occasions to suggest that the reference to the need for the bank to show a "loss sustained by the Bank from a claim that has been paid" would have prevented an immediate claim under the surety bond before it had tried and failed to secure payment from OMMIA. In my judgment, however, that is not correct, as Mr Sumption recognised on other occasions when he accepted as almost axiomatically true that the bank was entitled, once it had paid up on any of its engagements by way of admiralty bond or counter–indemnity, to look to its rights under the surety bond even before seeking repayment by OMMIA. Its loss, after all, was crystallised by its payment, not by its failure to recover it from OMMIA.

62.     (4) Mr Sumption submits that the concept of postponement is inherent in the concept of the separateness of the surety bond, or, as he would prefer to present it, in the concept of the

separateness of the other security. To my mind, however, the concept of postponement is a complicated one to derive from a concept of separation, for the very reason that it does not require complete separation. I can understand deriving *exclusion* of the right to subrogate from a concept of the separateness of some other security: in effect, the submission would be that the creditor is entitled to keep what is separate entirely for himself, and that would be inimical to subrogation, which involves a form of equitable transfer of the security to the subrogated surety. However, the concept of postponement does not insist on that complete separation: it allows the surety to share the security, but only after the creditor has satisfied himself completely in respect of *other* debts. Moreover, it is a necessary and inherent element of the concept of postponement that it divides the partially overlapping security into independent parts: that reflecting the guaranteed debt and that reflecting all other debts. Thus the creditor is first allowed to secure for himself a complete indemnity in respect of all other debts owed to him, and only then is required to permit the transfer to the surety of the right to secure the guaranteed debt. Any blurring of that division is said to be inconsistent with the doctrine of separation. All of that, however, as it seems to me, is a great deal to derive from the simple language of the clause, especially from a clause which says nothing about partially overlapping securities or rights (despite Mr Sumption's submission that these are its sole subject–matter) but on the contrary speaks of other securities and rights "in respect of the Guarantee": thus on one view dealing with securities and rights which are *not* concerned with other debts, or at the very least, if partially overlapping securities and rights do come within its reach, emphasising that part of them which relates to the guaranteed debt as distinct from other debts. And so, at one and the same time, the concept of postponement emphasises the separateness of other securities only in so far as they are concerned with other debts and not the guaranteed debt, and allows subrogation (albeit postponed subrogation) and thus the surety's participation in the "separate" security in respect of the guaranteed debt. To my mind this is not a process of construction of a document, but a remaking of it. It is not so much seeking to find what can be derived from the language of a document, but how much can be poured into it.

63.    (5) I am confirmed in these thoughts by the following considerations deriving from the business setting of the surety bonds. The parties involved are financial institutions who are or at least must be regarded as being entirely familiar with the concepts which are the focus of debate. The bank was entitled to be wholly satisfied with the wording and substance of the bonds, and did in fact vet them in their legal department. In these circumstances if, as the bank's thesis goes, it was concerned via the concept of postponement to mitigate the surety's rights of subrogation in the case of partially overlapping securities, it seems surprising that it did not adopt for use a clause which it had to hand, such as that which can be found set out in the then contemporaneous edition of *ROWLATT* on The Law of Principal and Surety, 1982, 4th ed, at 247 (incorporating some appropriate modification of such language as "unless and until the whole of such principal moneys and interest shall have first been completely discharged and satisfied"). Mr Moss, who has considerable experience in this field, has told the court that the use of the postponement technique outside the field of the "insider" surety, such as the director of a company who guarantees to a bank his company's borrowings from that bank but may also have made loans to and taken security from his company, is unknown to him; and that even in such a situation the postponement only operates in relation to the debt owed to the director and not to unrelated debts. Certainly, no case to gainsay that information has been presented to the court, and Mr Sumption, instructed as he is by the bank, has not disputed it. (Mr Sumption can point to a passing reference by Oliver LJ in an obiter part of his judgment in *Barclays Bank Ltd v. TOSG Trust Fund Ltd* [1984] AC 626 at 644B to it being normal in bank guarantees to exclude the surety's right to prove in priority to the creditor, but it is uncertain to what that is a reference, unless to the problem of the "insider".) Moreover, in March 1995, just before

the bank was vetting the Seaboard bond which is the exemplar of all the bonds in question
(it will be recalled that the earliest Seaboard bond is December 1995), the bank was itself a
party to the judgment of Mr Sykes QC in *Re Butlers Wharf*, a case where the bank argued
for a postponement solution, but failed in that argument, in respect of another of its clauses.
The clause there in question said that "This security is in addition to×" any other security,
which before the Vice–Chancellor the bank argued had the same meaning in substance as
the instant clause's language of "separate from" any other security. Mr Sykes actually
pointed out (at 55i) that

> Midland's standard form of guarantee×also contained a clause which
> unequivocally postponed the surety's right of proof and subrogation until
> payment of the whole amount of the debt×"

In all these circumstances I see even less reason to think that the meaning conveyed to the
reasonable man (here the reasonable banker or surety bond provider) by the clause before
this court would be that contended for by the bank.

64.    (6) If therefore, as I think, the postponement of Liberty's right of subrogation is very far
from being the obvious focus of this clause, the question therefore arises as to what its
meaning is. As to that, the Vice–Chancellor said this (at para 15 of his judgment):

> I accept that it is not clear what the draftsman had in mind when inserting the
> provision in question. But I do not think that such uncertainty can be
> converted into the clear words which, in my view, are required to give rise to
> the exclusion or postponement for which the Bank contends."

65.    In giving permission to appeal the Vice–Chancellor expressly excluded a ground whereby
the bank wished to know what, in law, the ambit of the relevant provision is. He said "It is
not the function of the court to give general guidance on matters which are unnecessary to
the decision of the case." On this appeal, however, there have not unnaturally been
submissions as to what the clause might mean, if not what the bank says that it means. Mr
Moss has been at pains to make a number of suggestions, and Mr Sumption to undermine
them with arguments to the effect that they provide nothing more than the law otherwise
provides, ie that such solutions would be mere surplusage, or that they are unrealistic and
uncommercial compared with the hard realistic problem of the partially overlapping security
posited by the bank. I respectfully agree with the Vice–Chancellor to this extent, that if it is
unnecessary to the decision in this case to decide affirmatively what the clause means, then
it is undesirable and indeed dangerous to attempt to do so: experience shows that it is
against the background of a particular issue that points of construction are best dealt with.
But I also agree that if the clause could be shown to be bereft of any sensible meaning if it
did not mean what the bank contends it means, then that of course would be a considerable
weapon in favour of its contention. In my view, therefore, the question best asked is
whether the clause could sensibly have some meaning other than that contended for by the
bank, but not whether it does definitively have some such other meaning.

66.    Mr Moss's suggestions focused on the clause being intended to protect the bank, for he
conceded that it was intended for its benefit, against arguments which, whether or not they
were or might prove to be good arguments in law, were best knocked on the head by a
simple clause. One example of this technique was that, in his submission, the clause

emphasised that the rights afforded by the surety bond were separate from and thus could be exercised separately from any other security or right in respect of the guaranteed debt. Mr Sumption responded by pointing out that it was undisputed law that the bond could be used so, for the law did not require a guaranteed creditor to exhaust any other remedy before relying on his guarantee. In my judgment, however, there is force in Mr Moss's suggestion, particularly in circumstances where the parties in fact contemplated that the bond would not be used as part of the mechanics of payment. Indeed, Mr Sumption had at times seemed to suggest that if OMMIA were in a position to pay, then the bank could not be said to have suffered a loss. Moreover, Mr Moss was able to point out that in the 1982 edition of *ROWLATT* , ie the edition contemporaneous with the vetting of the Seaboard bond, there is a discussion at 132/3 of what is there considered to be a valid argument that a surety has an equity to stay a creditor attempting unfairly to place the whole burden of a debt upon the surety at any rate in circumstances where the debtor is solvent or a security is available which could easily be realised to pay the debt. Therefore I do not consider Mr Moss's suggestion to be fanciful or unrealistic.

67.   Mr Moss's other suggestions as to why the separateness of the surety bond was emphasised were as follows: to prevent an argument that the surety bond is discharged by a debit to OMMIA's running account with the bank, which was certainly a realistic problem on the facts; to deal with the problem where a surety bond is taken as part of a package of securities, a problem discussed in *Byblos Bank SAL v. Al−Khudhairy* [1987] BCLC 232; to deal with other security being given in relation to the same debt (ie in Mr Sumption's terms, totally overlapping security) so as to emphasise the independence of each; to protect the bank against arguments that the surety is released by the release of the debtor, or by the debtor being given time to pay, or by a composition with the debtor (see *ROWLATT* at 162ff), or by the release of a co−surety (*ibid* at 184 and 188/190). In my judgment these are again realistic suggestions. There is no other provision in the surety bond dealing with problems of release, which understandably form a normal part of an informed creditor's concerns. I am not convinced by Mr Sumption's submissions that concerns such as these are all subsumed by underlying black letter law and/or unrealistic. I am satisfied that, whether or not judicial decision would prove that the clause thus understood would add nothing to the existing law, it is entirely realistic to desire such a clause in an instrument such as the bond. However ironic the observation may strike the bank in the light of the present litigation, it makes sense to try to make a bond which is looked to as the equivalent of cash as fool−proof as reasonably possible. So I agree with the Vice−Chancellor that the situation being considered by the clause can realistically be viewed as going to the value of the surety bond *before* it has been discharged by payment ("This Agreement is separate×"), rather than as restricting the rights of subrogation which would only arise *after* such discharge.

68.   I would therefore conclude that the clause has realistic potential value if given a meaning which stresses the independence of the surety bond from other securities or rights given in respect of the same debt. Indeed the advantage of such an interpretation is that it better accords with the language of the clause. It explains why the focus is on the separateness of the surety bond rather than on the separateness of the other security or right; and it accords better with the qualification "in respect of the Guarantee". Whereas, for the reasons given above, I find that the concept of postponement fits ill with the language of the clause. In the Vice−Chancellor's words (at paragraph 15) -

         Had it been intended to exclude, reduce or postpone the right of subrogation
         which would otherwise arise a less oblique approach is to be expected."

69.  (7) Finally, I would refer to the authorities considered by the Vice–Chancellor on the type of clause which refers to the surety bond being "in addition to" other securities and rights (see paras 8/13 of his judgment). The Vice–Chancellor did not give permission to appeal in respect of his conclusions about those authorities, viz *Re Sass* [1896] QB 12, *Barclays Bank v. TOSG* [1984] AC 626 and *Re Butlers Wharf* [1995] 2 BCLC 43. It suffices to say that I agree with what the Vice–Chancellor had to say about them.

70.  For all these reasons, I would conclude that on the subrogation issue the bank's appeal fails. Mr Moss also had submissions to make as to the effect on the receivership should Liberty's case on this issue prevail. Those submissions affect issues within this litigation which lie outside the preliminary issues which have been ordered, and therefore I have not thought it right to afford them consideration at this stage.

*The Guarantee issue*

71.  The essential problem here is as to the meaning of "Guarantee" in the surety bond. Does that expression refer to the admiralty bond, as Liberty contends and Patten J held, or does it refer to the bank's engagement, whether that is an admiralty bond or a counter–indemnity, as the bank contends?

72.  The word "Guarantee" occurs in all seven times in the bond. Its first two appearances are right at the top, prior to the text of the bond, where the word appears in connection with the reference numbers given to each individual bond, one for the bank and one for the surety. Where, as in most cases, the bank's engagement took the form of a counter–indemnity, the bank's reference therefore refers to that. Patten J found, however, that this was a mere matter of convenience and administration and did not affect the construction of the bond (see para 28 above). Mr Sumption relied on the first appearance ("Bank Guarantee Number"), but recognised that it did not take him very far. Its third appearance is in the first paragraph of the bond: "to execute or procure the execution of a bond, undertaking or guarantee (hereinafter called 'Guarantee') as bail or security...". Since the word is here defined, it seems to me that this may well be its critical appearance, and certainly this passage of the bond was carefully addressed by Mr Sumption and Mr Moss. The word then appears three times in the second paragraph of the bond, first in the undertaking itself, obviously another important appearance ("by reason of having executed or procured the execution of such Guarantee"), next in the first condition of the proviso ("paid by the Bank strictly in accordance with the express terms of the Guarantee") which is where its meaning matters for the purpose of the current issue, and thirdly in the second condition of the proviso dealing with aggregate liability ("which is the value of the Guarantee"). The parties made no submission in respect of that last appearance, no doubt because it will work equally in respect of admiralty bond or counter–indemnity. The final reference is in the third paragraph dealing with the separateness of the bond, in the phrase "any other security or right of indemnity taken in respect of the Guarantee". The parties again made no submission in respect of the word's appearance in that paragraph, until asked to do so by the court following the close of the oral hearing. The parties responded in writing.

73.  Mr Sumption submits that the critical appearance is the fifth, ie the first within the proviso, since the words "paid by the Bank strictly in accordance with the express terms of the Guarantee" can, he says, only refer to a payment under the bank's engagement: it is only such a payment that can be said to be paid "by the Bank". He therefore submits as to the

first paragraph containing the word's definition that the only question is whether the bank's engagement, be it an admiralty bond or a counter–indemnity, falls within the words "to execute or procure the execution of a bond, undertaking or guarantee×as bail or security". He answers that question by saying that it does, for even a counter–indemnity is an "undertaking or guarantee" executed "as×security". He stresses the alternatives permitted within that language. Therefore any loss arising from a counter–indemnity is incurred "by reason of having executed×such Guarantee" within the meaning of the undertaking in the second paragraph. The seventh appearance is similarly a reference to the bank's engagement, since the bank does not need to take any other security or right of indemnity in respect of an admiralty bond which it has not executed itself. Mr Sumption supported these submissions on the language of the document by reference to the background facts. He stressed that (save in one anomalous case) Liberty had never received the admiralty bonds, only the bank's instructions to its correspondent banks, containing as they did the terms of the bank's counter–indemnities. In that context it was simply mistaken to view the "Guarantee" as referring to the admiralty bond. Payment against a first demand bank undertaking was totally different from the nature of the liability undertaken under the admiralty bonds, and it would in practice be impossible for the bank to obtain evidence from its correspondents as to strict compliance with those bonds. Against that background, the reasonable man would conclude that "Guarantee" meant the bank's engagement and nothing else.

74.    Mr Moss, however, submits that the critical appearance of the word "Guarantee" is the third, that within the opening paragraph of the bond, where the definition of the word is set out. The word "bail" points towards an admiralty bond, even if that is an incorrect description of a bond given other than to a court. Moreover, only an admiralty bond can be spoken of in terms of "execute or procure the execution of", for the bank's engagement, whether admiralty bond or counter–indemnity, is always executed by the bank. It never procures the execution of its own engagement. Therefore, unless the Guarantee is the admiralty bond, all reference to "or procure the execution of" is redundant. The same is true of the word's fourth appearance, in the undertaking, where the language of the definition paragraph is tracked and thus similar language "having executed or procured the execution of such Guarantee" can be found. All other appearances are neutral. As for the fifth appearance ("paid by the Bank" etc), it is natural and acceptable to speak of the bank's payment of its counter–indemnity as amounting to a payment in accordance with the admiralty bond and even payment of the ultimate claimant's claim under the admiralty bond can similarly be spoken of as paid by or through the medium of the bank. As for the seventh appearance, the fixed charge is appropriately referred to as taken "in respect of" the admiralty bond, even where the bank has given its own counter–indemnity. As for the background facts, they did not assist. There was no evidence as to the circumstances in which the original Seaboard bond was vetted and settled. If, nevertheless, background facts were to be taken into account at all, the evidence was that Liberty regarded its liability under its bonds as reflecting the "conditional" nature of the admiralty bond, rather than dependent on whatever terms the bank may have agreed with its correspondents. There was no evidence before the court as to the difficulties of obtaining material from correspondent banks with which to demonstrate strict compliance with the admiralty bonds.

75.    Patten J in essence accepted Liberty's submissions on this issue. He regarded the language of the first paragraph of the bond, tracked in the wording of the undertaking in the second paragraph, as the most important. In that connection he was impressed by the references in the first paragraph to "procure the execution of" and "bail". As for the former, he said (paragraph 25 of his first judgment):

The Guarantee was to be given either as bail or security. The reference to bail seems to me to be a clear pointer towards the Admiralty Bond being the instrument described. I do not see how that description could ever properly be applied to one of the counter–indemnities. Similarly the use of the word "Guarantee" to describe the Admiralty Bond makes the word "procure" a real and accurate part of the description. On the Bank's argument it is redundant."

76.   As for the proviso, Patten J said this (in para 32):

As a secondary argument, initially encouraged by me, Mr Adkins [counsel for the bank] contended that the use of the word "paid" in the proviso was another pointer in favour of "Guarantee" meaning engagement. But this is I think only a shorthand method of describing a liability which has arisen either directly or indirectly as a result of the Bank having executed or procured the execution of the "Guarantee". I do not consider that the word "paid" is sufficient in itself to dictate or alter the meaning of the word "Guarantee" derived from an examination of the earlier parts of the Liberty bond."

77.   As for the background facts relied on by the bank, Patten J was dismissive. On the contrary, he was prepared to take account of the fact that a 1% premium was a limited reward for taking a risk for which the bank had required a 25% retention and reflected Liberty's understanding that the risk was based on the conditional nature of the admiralty bond. He said:

31×I am not persuaded that the factors [the bank] relies upon are sufficient to justify me in departing from what I regard as the most likely and natural meaning of the language used in the bonds themselves. There has been no evidence from the Bank that it has or would have encountered any difficulties in obtaining copies of relevant awards or judgments from its various correspondents. Nor is there any evidence to show that the counter–indemnities could not have included some form of requirement to produce the necessary documents. Indeed the extract from the ICC Uniform Rules for Demand Guarantees referred to in the latest edition of Paget's Law of Banking which was cited to me indicates that a demand guarantee (properly so called) may include a requirement for the provision of documents. Liberty's apparent lack of concern to see the Admiralty Bonds that were issued is a curiosity but I accept Mr Pitt's evidence that he was aware from the due diligence which he undertook that liability under the bonds was always conditional upon one or more of the following events, viz an agreement, a court judgment or an arbitral award; and that it was not considered necessary in the calculation of the risk to inspect each Admiralty Bond as it came to be issued×

"33. It therefore comes to this: there is nothing in the transactional background or other admissible evidence which I believe justifies me in departing from the relatively clear language of the Liberty bond itself. This is not a case of obvious mistake or where the construction contended for by

> either party produces absurd results. On the contrary both parties have been able to produce what they say are sound commercial reasons for the interpretations which they respectively advance. But the court is not entitled in my judgment to speculate in these circumstances. The only safe and proper course is to be guided by the ordinary meaning of the language which the parties have themselves used."

78.   I agree with the substance of Patten J's reasons, and it is only in places that I would place a different emphasis on the matters in issue. I can therefore be briefer than I might otherwise be in setting out my reasons in my own words. Thus (1) it is correct to begin with the language of the document. (2) The first paragraph of the surety bond used the word "Guarantee" for the purpose of defining it. Only an admiralty bond is capable of being either executed or procured by the bank. The question is not, as Mr Sumption presents it, whether the bank's engagement can in every case be fitted within one or other of the words used, but what the words which define "Guarantee" point to. If they point to an admiralty bond, then a counter–indemnity will not be within the meaning of the word. (3) The reference to "bail" is another pointer in this connection. It is true that the word is a misnomer for a bond given otherwise than to the court: but it is, like the admiralty bond, an instrument which procures the release of a vessel from arrest against the provision of alternative security. The bank's counter–indemnity is none of this. The words "as bail" are given a prominence which they do not deserve unless "Guarantee" refers to the admiralty bond. (4) The definition of the first paragraph is tracked in the language of the undertaking. (5) The words in the proviso "paid by the bank" etc are wholly appropriate where, of course, the surety bond is given to secure the bank's loss; without payment by the bank the surety bond is not engaged. The measure of the bank's loss, however, depends on what is payable to the claimant, and therefore recoupable from the bank, in accordance with the terms of the admiralty bond. Even if the bank's counter–indemnity is payable on *evidence* or in response to a *demand* which is different from the evidence or claim which triggers payment under the admiralty bond, the intention of the whole transaction of course is that it is the *liability* under the admiralty bond which is the measure of everyone's liability. As the bank's counter–indemnity in the *Lady Lela* said: "any sum or sums which you state you are required to pay in accordance with terms of your guarantee"; and as the *Skimmer* counter–indemnity says: "any sum or sums that you are required to pay in accordance with terms your guarantee".

79.   (6) While it is true that in theory the correspondent bank may be negligent or even fraudulent in the terms of their demand, there is no evidence that in practice such errors or deceit occur or that the bank is not well capable of looking after itself in the policing of such engagements. There is no evidence that the possibility of the counter–indemnities not working in the way in which all parties intended that they would work was within the realistic contemplation of these parties, or would be within the realistic contemplation of reasonable men placed in the parties' business situation. If such evidence was to hand, the bank, which is one of the world's major financial institutions, ought to be in the best possible position of presenting it to the court. In these circumstances it seems to me to be idle to insist on a construction which depends on theoretical evidential differences between liability under an admiralty bond and under a counter–indemnity for that liability.

80.   (7) If the parties had really intended to make the bank's payment in accordance with the strict terms of their own engagements the essence of the surety bond, that document could

easily have been worded accordingly. Either the definition of "Guarantee" could have been changed, or the simple exchange of "its engagement" for the fifth (and possibly sixth) appearance of the word "Guarantee" would have sufficed. (8) The references at the top of the document do not really assist. They occur before the word "Guarantee" is defined. In any event, the second appearance of "Guarantee" in the reference to "Surety Guarantee Number" shows that the word "Guarantee" is here being used in a sense different from the body of the text: the surety's reference number is a reference to the surety bond not to the bank's engagement. (9) The words "in respect of the Guarantee" in the third paragraph do not assist because the other security or right of indemnity there referred to is designed to cover the bank's loss "in respect of" what is regarded as the claimant's valid claim on his admiralty bond passed down to the bank through the correspondent bank.

81.    (10) References to the background facts are in my judgment on the whole unhelpful. Nothing is known of the background to the original settling of the Seaboard bond. There is no evidence that any of the parties, let alone all the parties, contemplated or even ought reasonably to have contemplated that there was a real danger that the bank's liability under its counter–indemnities would be greater than a liability under the admiralty bonds themselves. If, nevertheless, that danger was regarded as a real one, it would give point to the words "strictly in accordance with the Guarantee" and especially to the word "strictly". Although the terms of Liberty's internal memorandum of July 1997, with its emphasis on the conditional nature of admiralty bonds, is suggestive, I doubt that it is admissible against the bank for the purpose of an objective evaluation of the surety bond's matrix. All that can be said is that it is reasonable to assume that all the parties concerned were well aware of the so–called conditional nature of admiralty bonds. No inference can be drawn from the level of the 1% rate set by Liberty. Whether or not that is a modest rate, and would be known by all parties to be so, it is impossible to say whether or not the rate takes account of a real risk that the bank's liabilities would prove greater than liabilities under the admiralty bonds. Seeing that the admiralty bonds were not sent to Liberty even in those cases where they were executed by the bank itself, it is difficult to read very much into the fact that the bank's instructions to its correspondent banks were sent. What perhaps is as suggestive as anything, but I would not seek to read any more into it than I am inclined to do for the background facts in general, is that OMMIA's instructions to the bank, which it sent in copy to Liberty when requesting the bank to procure the execution of a surety bond, make request of a "Bank Guarantee" specifying a correspondent bank as the issuing bank, but say nothing at all regarding the provision of a counter–indemnity. (11) Both constructions make commercial sense. Neither is absurd. Nor is it a case where it is clear that some obvious mistake has been made. Indeed, I do not think it has even been suggested that that is a possibility.

82.    In these circumstances it is my judgment that the meaning which a reasonable man would understand as intended by the word "Guarantee" in the proviso is a reference to the admiralty bond, not the bank's counter–indemnity.

83.    The question then arises as to the evidence which the bank must produce to prove that liability attaches to Liberty under its bond. These matters have not been separately debated at the hearing before this court, and therefore, given my view on the Guarantee issue, must in my judgment lie as stated in Patten J's order. I would merely for myself sound the note of caution that it seems to me that ultimately it is up to a trial judge to find whether the evidence put before him is or is not sufficient to satisfy him on the balance of probabilities that the bank has engaged the liability of Liberty under any of its bonds. Where a contract

stipulates the evidence that must be provided, then that becomes the condition precedent for liability. Where, however, a contract does not stipulate the evidence that must be provided, it is a matter for the court to determine what evidence is sufficient to satisfy it that any factual condition precedent has been fulfilled in order to engage liability.

*The one year issue*

84.    This is a nicely poised issue, whose solution has been made more difficult by the form in which the preliminary issue has come forward.

85.    The preliminary issue (see para 8 above) assumed in its very wording that the relevant admiralty bonds delivered by the correspondent banks providing for an initial validity of one year automatically renewable for successive periods of one year were in a form *inconsistent with* the instructions given by OMMIA to the bank to procure an admiralty bond for a period of one year. The issue also assumed in its wording that this inconsistency remained despite OMMIA's further instruction to the bank to procure an admiralty bond whose wording was to be supplied by a named third party. This is because the issue raised the question whether Liberty had any liability under its surety bond in such a case after the end of the initial year -

> if×OMMIA further stipulated that the [admiralty bond] should adopt wording to be supplied by a named third party, and the [admiralty bond] did so, *but such wording was inconsistent with the terms of OMMIA's (first) stipulation* ? *[emphasis added]*

86.    On that narrow issue the question ultimately resolved itself, in the judgment of Patten J and again on the submissions of counsel in this court, to whether Liberty's liability under its surety bonds was premised on the terms of the admiralty bond *requested* by OMMIA or on the admiralty bond *given* ? To that question, Patten J returned the answer, that Liberty's liability depended on the admiralty bond requested. He said (at para 8 of his second judgment):

> The liability which the Liberty Bond secures is that of the Bank arising from it having procured the execution of "such Guarantee". That must be a reference to the Guarantee which in the case of the *Skimmer* or any other particular claim OMMIA had requested the Bank to procure. It is what the recital to the Liberty Bond says. The fact that it refers to the Guarantee in descriptive terms which involve the use of the indefinite rather than the definite article is to my mind completely irrelevant. When OMMIA requests the Bank to provide a Guarantee that then becomes the Guarantee for purposes of the Liberty Bond. Therefore in cases such as the *Skimmer* where the Guarantee was intended to endure for only a year liability under the Liberty Bond does not without more extend beyond that period."

87.    In that final sentence the judge's words "where the Guarantee was intended to endure for only a year" reflected the concession built into the preliminary issue that the admiralty bond given was inconsistent with the admiralty bond requested. I say "concession", but I do not

know why or in what circumstances the preliminary issue was drafted in the way it was. For all I know it reflects the bank's concern to allow it room to argue that, because it faithfully translated OMMIA's request for a one year admiralty bond in its own instructions to the correspondent banks, therefore it was itself entitled to argue as against those banks that it had no liability after the first year had passed. I merely note that in the case of the *Skimmer* itself, it did not take that point: and on the history of the matter (see para 35 above), it appears to have chosen not to take the point even after it was exposed to it by Liberty itself. But of course that may have happened without insight.

88.    On that narrow issue the submissions in this court have tracked the argument recorded in the judgment below. Mr Sumption for the bank has emphasised that what the bank sought in the surety bond was security for any loss which it might suffer by carrying out OMMIA's request. If that request had been faithfully translated into its instructions to the correspondent bank, it was not its fault if the correspondent bank had erred. It remained exposed to loss on its counter–indemnity. It was for that loss that Liberty secured it. The difficulty with that argument, however, apart from the essential issue of whether the surety bond responds to the admiralty bond requested or the admiralty bond given, is that it begs the question of whether the bank is itself truly liable on a counter–indemnity given in respect of an admiralty bond given in terms beyond the bank's own instructions.

89.    There was some discussion about the effect of an admiralty bond drawn up in terms in other respects outside those requested by OMMIA, for instance an admiralty bond which names the wrong ship, or which provides for a maximum amount greater than that stipulated but where the ultimate claim is within the smaller maximum stipulated. I did not find these speculations helpful. The example of the wrong ship would presumably be solved according to the limits of the doctrine whereby an erroneous description does no harm (*falso demonstatio non nocet* ). The example of the larger maximum itself begs the question at issue. If the surety bond covers the bank's liability in accordance with the terms of the admiralty bond given, then there would be no problem. If, however, the surety bond covered liability only in accordance with the terms of the bond requested, then there would be no problem if the bank's liability were limited to the maximum stipulated by OMMIA. Perhaps the most that could be said is that the example of the surety bond issued for more than the maximum stipulated by OMMIA raises in a strong form the consequences of the narrow issue presently under discussion. It would be surprising if Liberty (and OMMIA) were liable for more than OMMIA had stipulated just because the admiralty bond produced by the correspondent bank was drawn up with a maximum greater than that stipulated.

90.    On the narrow issue raised by the preliminary issue stated, I would be content to say that I agree with Patten J, for the reasons given by him. I would add that this conclusion, derived as a matter of the language of the surety bond, and making good sense from the starting point of an acknowledged inconsistency between instructions and outcome, also has the advantage of reflecting the practice between the parties relating to the issue of the surety bond: for it was produced on the basis of OMMIA's and the bank's instructions, and even before the admiralty bond was yet in place.

91.    However, at the hearing of the appeal the court was concerned that the one year issue had been too narrowly focused. I am not sure, however, that the court was fully alive to the implication of the terms in which the preliminary issue had been drawn. Already before Patten J there was an attempt by the bank's counsel to widen the issue, but it was dismissed by the judge (at para 8 of his second judgment) in these terms:

I should mention for completeness that Mr Adkins relied in support of the Bank's contentions upon the reference in OMMIA's instructions to the wording of the Guarantee being supplied by a nominated third party. In my judgment that was simply intended to allow the third party to identify the claim and the basis upon which it should be resolved. It did not delegate to that third party the ability to require the correspondent bank to issue a Guarantee for a period longer than that permitted under OMMIA's express instructions."

92.    On the appeal hearing, however, the court encouraged the parties to revert to a consideration of whether a renewable bond was indeed outside and inconsistent with OMMIA's instructions. Mr Moss fairly submitted that he had not come prepared to deal with the wider proposition. It was arranged that the parties would address the matter in written submissions following the hearing, which they did, beginning, in accordance with the court's invitation, with submissions from Liberty to which the bank then responded.

93.    In those written submissions on behalf of Liberty, Mr Moss contended that a one year bond with an automatic renewal clause could not be said to be within any express or implied authority of OMMIA's request. It was after all in substance the equivalent of a bond without any limit of time. There was no evidence that the renewal was even accompanied by any element of supervision: and at most any such supervision would be a "grandified record keeping process" to pick up Mr Sumption's own language.

94.    Mr Sumption on the other hand responded to the effect that an admiralty bond had to be in an acceptable form to a claimant, for otherwise its function, which was to obtain the release of a vessel from arrest or the threat of arrest, could not be achieved. In circumstances where disputes could often take two or three or even more years to resolve (as Liberty acknowledged in Mr Pitt's July 1997 memorandum), a one year bond renewable on request or even automatically renewable was within the scope of OMMIA's instructions in the light of the fact that OMMIA left it open to the nominated party to provide suitable wording for the admiralty bond. Although Liberty could point to an example within the papers of a one year admiralty bond without any provision for renewal (in the case of the *Gemerela* ), that was the exception and it was of course always open to a claimant to accept a one year bond where he was confident that the dispute would be settled within that period.

95.    It is less than satisfactory for this point to be dealt with in this rather informal way, without any real investigation into the circumstances and practice of the provision of one year bonds of this type. For that reason I have finally come to the conclusion that the proper course is to confine the present appeal to the stated issue, on the basis of its *assumption* that the admiralty bond provided was inconsistent with OMMIA's instructions, but to permit the wider ramifications of the point to be developed, if the parties so wish, at trial of the outstanding pleaded issues. It seems to me that the question whether a renewable one year admiralty bond is within OMMIA's (and thus the bank's) instructions potentially goes wider than merely asking whether the clause permitting renewal was within the implied authority allowed to the draftsman of the admiralty bond. Another question, or at any rate another aspect of the same question, might be whether parties such as the bank and the correspondent banks who act in good faith upon a reasonable interpretation of instructions which might be said to be ambiguous are entitled to be regarded as fulfilling their instructions: see *CHITTY* on Contracts, 1999, 28th ed, Vol II, at para 32–044. A third question in this context is the role and significance of the fact that OMMIA and the bank

appear to have as a matter of practice *accepted* the admiralty bonds in issue as compliant with their respective instructions. Whether that is put as a matter of retrospective ratification, or as a course of practice enlarging the scope of the instructions, it also appears to be relevant as helping to define the nature and width of the instructions, at any rate after the first of such bonds had been accepted.

96.    I regret leaving the parties with a loose end of this kind; but I comfort myself with the thoughts that I have answered the question which the preliminary issue posed and that to go further risks unfairness and error.

*Summary*

97.    In conclusion, I would dismiss all three appeals from the judgments of the Vice–Chancellor and Patten J.

Lady Justice Arden:

98.    I gratefully adopt Rix LJ's careful analysis of the facts and issues in this case.

*The Subrogation Issue*

99.    The critical paragraph in the Liberty bond, to which I shall refer as "the Clause", reads:–

> This Agreement is separate from any other security or right of indemnity taken in respect of the Guarantee from any person, including your above named customer."

100.    In my judgment the approach of the Vice–Chancellor to the construction of the Clause was correct and I can state my additional reasons shortly.

101.    The Vice–Chancellor expressed his reasons thus:–

> 15.  I prefer, not without hesitation, the arguments for the claimants.  First, I accept that clear words are required to exclude, reduce or postpone the right of subrogation.  The nature of the right and the circumstances in which it arises are such that an intention to exclude, reduce or postpone it is not lightly to be attributed to the parties.  Second, the requirement to keep the bond separate from any other security appears to be apt to cover the position before it has been discharged but not to rights arising after and in consequence of its payment in full.  I accept that it is not clear what the draftsman had in mind when inserting the provision in question.  But I do not think that such uncertainty can be converted into the clear words which, in my view, are required to give rise to the exclusion or postponement for which the Bank contends.  Had it been intended to exclude, reduce or postpone the right of subrogation which would otherwise arise a less oblique approach is to be expected.  Third commercial reality supports the case of the

claimants. It is true, as the Bank contends, that the issuer of the bond will not know whether the Bank holds other security for the same liability but the possibility that it may is envisaged by the provision on which the Bank relies. That security may cover not only the liability under the guarantee but, as in this case, other liabilities, present or future, for which the issuer of the bond is not liable. If on payment in full of the liability under the bond the exercise of the right of subrogation is to be postponed until the other liabilities have been discharged as well the practical effect is to extend the liability under the bond.

16. The third consideration leads to the fourth. Even if it be accepted that the effect of the provision relied on by the Bank is to exclude a right of subrogation to "the other security" to which the provision refers why should that requirement extend to such security if and in so far as it secures different liabilities. In the case of an all moneys charge, as in this case, both the creditor and debtor could postpone the right of subrogation of the issuer of the bond for ever by the creation of further liabilities. This, as I understood it, was the short answer to the Bank's contentions advanced by counsel for the claimants in his oral argument. It would involve interpolating the word "only" either before or after the words "taken in respect of the guarantee". Counsel for the Bank sought to refute the argument on the ground that insofar as the second security covered other liabilities then it was separate anyway. So, he submitted, the requirement for separation applied to the extent to which the two securities overlapped.

17. In my view the Bank's argument confirms, rather than refutes, the argument advanced by the claimants as the short answer. Accepting that insofar as a charge for different liability is separate from the bond anyway then to make the interpolation to which I have referred does reflect what the parties must have intended. If such an interpolation is made then the provision applies if and to the extent only that the second charge is security for the same liability. But in that event, in payment in full of the liability under the bond, the bank will have received 100% of that liability. Thereafter there is no ground for denying the right of subrogation to the issuer of the bond to enable him to share with the Bank the benefit of the security held by the Bank to secure the other liabilities. In short is appears to me that the argument for the Bank proves too much."

102. Subject to the effect of the Clause, Liberty, as a surety, is entitled on payment in full of its bond "to have assigned to [it], or to a trustee for [it], every judgment, speciality or other security which shall be held by the [Bank] in respect of the [bond] whether such judgment, speciality or other security shall or shall not be deemed at law to have been satisfied by the payment of the [bond]" (Mercantile Law Amendment Act 1856, section 5). Where the Bank's security also secures other debts, apart from the debt guaranteed, Liberty is entitled, on payment in full of its bond and subject again to the effect of the Clause) to a rateable share of the Bank's security: *Goodwin v Gray* (1874) 22 WR 312. I accept that the parties to the bond could vary or exclude these rights, or subordinate the rights of either party to those of the other (see *Re T.H.Knitwear (Wholesale) Ltd* [1987] 1 WLR 371 at 376 per Sir Nicholas Browne−Wilkinson VC). However, because the arrangement to postpone Liberty's right would be unusual and asymmetric, in my judgment, the Vice−Chancellor was right to say (as he did in his first reason) that clear wording was required. A comparison may be made between this case and *BCCI v Ali* [2002] AC 251 where it was contended that

a general release of claims on its true interpretation effected the release of a claim for stigma damages of which the parties were not aware and could not have been aware because it had not yet been enunciated by the courts. Lord Bingham, with whom Lord Browne–Wilkinson agreed, and Lord Clyde all held that for the release to have this effect, clear or specific language was necessary (see paragraphs 8 to 10, 17, 85, 86 of their speeches).

103.  The wording of the Clause is far from clear. Moreover, there is neither any significant factual background as to the parties' objectives in agreeing the Clause (cf *Investors' Compensation Scheme v West Bromwich Building Society* [1998] 1 WLR 896) nor any evidence as to any market practice (cf *Charter Re–insurance v Fagan* [1997] AC 313). I accept that words can have different tiers of meaning but in the absence of context the difficulties of putting a gloss on the words of the Clause are overwhelming.

104.  Mr Jonathan Sumption QC, for the Bank, makes the point that the weakness of Liberty's case is that Liberty is unable to give any cogent or consistent meaning to that phrase, but in the particular circumstances of this case I would regard that point as only a forensic point. It may be - but Mr Sumption has not taken this line – that what the draftsman intended was that the proceeds of the bond should be kept separate (in a securities realisation account) and not applied in reducing the amount due from OMMIA until the Bank chose to apply those proceeds in this way (see *The Law and Practice of Banking,* J Milnes Holden, 8 edition, 1993, Vol.2 paras. 19 - 19, 2l - 11). If the Clause had been so formulated it might well have had the effect of postponing Liberty's right of subrogation. The parties could also have achieved postponement of Liberty's right of subrogation in other ways, such as by subordination though this may have involved the commercially inconvenient result of creating registrable charges over book debts. For my own part I am not satisfied that, as suggested by Mr Gabriel Moss QC, for the respondent, the Clause effectively disapplies any duty of the Bank as principal creditor to marshall its securities. I am forced to the conclusion that if the draftsman intended to create a stipulation which would alter Liberty's right of subrogation, he failed to achieve that objective. In this situation I agree with Rix LJ that the court does not have to find a meaning for the Clause in order to reject those put forward by the parties. I would regard this conclusion as an exceptional and unusual one. But it is not impossible. For instance, the draftsman may have proceeded on a mistaken view, which may have been widely held among banking law practitioners, as to the effect of *Re Sass* [1896] 2 QB 12. We have not been asked to differ from the Vice–Chancellor's conclusions on that case or on the observations of Lord Oliver in *Barclays Bank Ltd v T.O.S.G.Trust Fund Ltd* [1984] 1 AC 626 at 643 to 644.

105.  I agree with the Vice–Chancellor's second reason. The wording is more apt to pre–empt any argument that by taking the bond the Bank waived some other secured or unsecured right in respect of the bond. I would further add that the conclusion that the Clause is more appropriate to cover the situation before discharge is consistent with the technical analysis of subrogation. When the surety pays the amount owed by the debtor, the latter's debt is in law discharged (see *Copis v Middleton* (1823) T & R 224, 229). It has to be reinstated by means of subrogation. This is reflected in the wording of section 5 of the Mercantile Law Amendment Act 1856, which I have set out above. As payment by a surety of the guaranteed debt discharges the principal debtor's liability, that from which the Agreement has under the Clause to be kept apart or separate, that is the guaranteed debt, ceases on discharge to exist. The obligation to keep the Agreement "separate" is not apt to describe an

obligation not to seek to reinstate by subrogation a right against OMMIA which ex hypothesi could not be brought into existence if the Bank's construction is correct.

106.  In any event, the Clause has no obvious effect on Liberty's own right to sue OMMIA, or to prove in its liquidation and so the Clause would only be partially effective at best even on Mr Sumption's construction.

107.  I agree with the Vice–Chancellor's third reason, which deals with the practical, or economic, effect of the Bank's interpretation of the Clause.

108.  The only reason which the Vice–Chancellor gives with which respectfully I do not agree is his fourth reason.  Mr Sumption does not submit that the word "only" should be inserted, and indeed to do so would be inconsistent with the Bank's case on the subrogation issue. However, this reason was not essential to the Vice–Chancellor's decision.

109.  For these reasons, and those given by the Vice–Chancellor, I agree with Rix LJ that the appeal on the subrogation issue must be dismissed.

*The Guarantee Issue*

110.  I agree with the conclusion of Rix LJ for the reasons given by him.

*The One Year Issue*

111.  I also agree with Rix LJ on this issue for the reasons which he has given.

112.  Accordingly, I too would dismiss this appeal.

Lord Justice Judge:

113.  I have read the judgments of Rix and Arden LJJ.

114.  I have reminded myself that we have been considering and deciding the meaning of a short contractual document, the whole of which has been typed and is contained on a single page. In argument before us, although both sides invited us to eschew technical niceties, the skeleton arguments designed to assist us to discover the true meaning of this single page, or more accurately, some, but by no means all the words on this page, extended to very nearly 100 typed pages of analysis and argument. I have re–read them, with admiration, and reflected on the record of the oral submissions during the hearing before us.

115.  Having done do, I shall content myself with recording that I agree that both the appeal from the Vice–Chancellor, and the appeals from Patten J should be dismissed for the reasons given by Rix and Arden LJJ. The areas of minor disagreement between their four respective

judgments are not material to the outcome of either appeal, and I do not propose to comment on any point of controversy unless it is fundamental to the decision. As there is none, I have nothing to add.

Order:

1.      Appeals dismissed

2.      HSBC shall pay the costs of Liberty of and occasioned by the Appeals to be assessed on a detailed assessment if not agreed.

3.      HSBC do pay the costs of St Paul of and occasioned by Appeal 1 to be assessed on a detailed assessment if not agreed.

(Order does not form part of the approved judgment)