L. JJ.

1871

*Ex parte*
JOINT STOCK
DISCOUNT CO.

*In re*
DAUNT.

the trustees of the deed have discovered, or taken means to find out, who are the creditors, and have found out the value of their debts, because, even with the dissenting creditors, they must certify that a majority in number, representing three-fourths in value, have assented.    I should have been disposed to think that when the 197th section refers to the creditors as having proved, what it means is, that the creditors are to be treated as having been *primâ facie* ascertained, and their debts proved, though not ascertained or proved conclusively, so as to preclude the requiring further proof, or the striking a man's name out of the list if he is found not to be a creditor, or the correction of any other mistake that has been made.    As, however, Lord *Cairns* has decided the contrary, and the Lord Justice is of opinion that that decision is correct, the judgment in this case will be affirmed.

Solicitors: Messrs. *Lawrance, Plews, & Co.; W. W. Wynne.*

———

L. JJ.

1871

*March* 10.

## *In re* LUNDY GRANITE COMPANY.
### *Ex parte* HEAVAN.

*Company—Winding-up—Rent—Distress—Companies Act,* 1862, *ss.* 87, 163.

Where a company, being equitable owner of a lease, continues after a winding-up order in the occupation of the leaseholds, and leaves goods upon the land, the landlord is not, by sect. 87 or sect. 163 of the *Companies Act,* 1862, prevented from distraining upon the goods of the company for rent accrued since the winding-up.

Orders of the Master of the Rolls discharged.

IN August, 1863, Mr. *H. Heavan* demised to Mr. *McKenna, Lundy Island* for seven or fourteen years, at the yearly rent of £700. Shortly afterwards *McKenna* agreed to assign the lease to the *Lundy Granite Company, Limited,* and the company took possession of the island, and continued in possession.    On the 19th of November 1868, an order for winding up the company was made.    The official liquidator did not remove the goods of the company from the island, and paid the rent to Mr. *Heavan* up to the 24th of June, 1869, but apparently for *McKenna,* and Mr. *Heavan* seemed

not to have recognised the company as tenants. Some negotiations took place between the official liquidator, *McKenna*, and Mr. *Heavan*, and some proceedings in Chambers as to a surrender of the lease, and the grant of a new lease to one *Benthall*, which, however, had no result. There was a considerable amount of property on the island belonging to the company, and the official liquidator proposed to sell this and the other property of the company; whereupon Mr. *Heavan*, having previously applied to *McKenna* for the rent, distrained for the rent due to the 25th of December, 1870, *McKenna* being named in the warrant as the tenant. The property taken under the distress belonged to the company, and the Master of the Rolls, on the 23rd of February, 1871, made an order in the winding-up restraining Mr. *Heavan* from proceeding. Mr. *Heavan* then moved for leave to proceed, which was refused by the Master of the Rolls (1).

L. JJ.

1871

*In re*
LUNDY
GRANITE Co.

*Ex parte*
HEAVAN.

(1) 1871. March 6.

LORD ROMILLY, M.R.:—

This is an application by the proprietor of *Lundy Island* for leave to issue a distress upon certain goods of the company which are upon *Lundy Island* for payment of rent which is admitted to be due to him.

The property on which the proprietor of the island wishes to distrain belongs to the company, but it happens to be on land which is leased to another person. The company are not carrying on business, or doing anything which would in any shape make them liable to pay rent, so that there is no debt due from them to the proprietor; but there is property of theirs which is upon the land that is demised, upon which property the landlord, according to the ordinary law of *England*, unless it is modified by the statutes relating to joint stock companies, is entitled to distrain. The question in this case is, whether he is entitled to distrain upon those goods.

In the first place, one very important distinction arises in this case. The distress was put in, or was asked to be

put in, which is the same thing, subsequently to the winding-up order. Therefore the cases in which the Court has held that where an execution issues, or the goods are taken, before the winding-up order is made, the Court will not interfere, do not apply.

Then, how is Mr. *Heavan* affected by the Act of Parliament? There are two sections on the subject which are very plain and clear. The first is the 163rd section, which is to this effect: " Where any company is being wound up by the Court, or subject to the supervision of the Court, any attachment, sequestration, distress, or execution put in force against the estate or effects of the company after the commencement of the winding-up shall be void to all intents." Without raising any question whether " being wound up" means before the order or not, it is quite clear that it applies after the winding-up order, and this section says distinctly that the distress "shall be void to all intents." The result is, that if that section stood alone the distress cannot be levied. It does not say a distress in respect of any rent due, or

CHANCERY APPEALS.                        [L. R.

L. JJ.

1871

*In re*
LUNDY
GRANITE CO.

*Ex parte*
HEAVAN.

Mr. *Heavan* appealed from both the orders.

Mr. *Roxburgh*, Q.C., and Mr. *Badcock*, for the Appellant :—

Sections 163 and 164 of the *Companies Act*, 1862, on which the

anything of that description, but a distress upon the goods of the company.

But this section is to be taken in conjunction with the 87th section, which is to this effect : " When an order has been made for winding up a company under this Act no suit, action, or other proceeding shall be proceeded with or commenced against the company, except with the leave of the Court, and subject to such terms as the Court may impose." Now, it is quite clear that a distress is a proceeding against the goods of the company, because, if this section does not apply, the other section makes it absolutely void. Therefore the Court may give leave, and also impose such terms as it thinks fit. I am of opinion that the Court has clear jurisdiction to do what it thinks right in this matter. I hold it to be quite clear and certain, that, assuming that the company was the lessee of the applicant, then the Court would stop the distress, and allow the applicant to prove for the amount of rent against the company. That, in fact, was done by me in a previous case. I do not understand that it has been objected to, and I believe that it has always been followed.

Mr. *Roxburgh*, who argued this case with great ingenuity and ability, said that it did not apply to this case, because Mr. *Heavan* was not a creditor of the company, and could not prove at all in the winding-up. Technically, that may be correct ; but, substantially, I do not think it has any weight, because this applicant has a species of lien, according to the English law, unless taken away by this statute, against

certain goods of the company, and the Court has the power of saying that he shall not levy a distress upon these goods of the company, or, if he does, he shall levy it upon such terms and conditions as the Court shall direct.

I am of opinion that the whole of the principle of this Act, and the reason of these sections, was not to prevent a person from recovering his proper debt against the company, or his proper claim against the company, but to put everybody who had claims upon the company upon an equal footing. It so happens, from the peculiarity of the English law, that a person can distrain upon the goods of the company which happen to be upon the lands of the lessee, though the landlord is, strictly speaking, not a creditor of the company. Yet I am of opinion that he is, for all intents and purposes under this Act, to be treated as in exactly the same situation—that he ought to be put *pari passu* with all those persons who have any claims upon the company ; that he ought not to have any particular or exclusive preference or advantage by reason of the circumstance that he has only incidentally by law a claim upon the property of the company without being a creditor of the company, and that he ought to be put in the same situation as if it were the property of the company. Therefore I am of opinion that the proper order to make on this motion is to say that the distress shall not issue, but that Mr. *Heavan* shall be at liberty to prove against the company, not as a creditor, but merely to prove to this amount against the company, and that he is to be entitled to receive a

Master of the Rolls went, apply only to creditors of the company. If the landlord was a creditor of the company it would be different, as appears from sect. 87, but he is not; he has nothing to do with the company, and is only proceeding to recover his rent. The statute cannot have been intended to take away the common law rights of the landlord, and to leave him without a remedy: *In re Exhall Coal Mining Company* (1); *In re Progress Assurance Company* (2).

<div style="float:right">L. JJ.

1871

*In re*
LUNDY
GRANITE CO.

*Ex parte*
HEAVAN.</div>

Mr. *Swanston*, Q.C., and the Hon. *E. Romilly*, for the official liquidator:—

There had been negotiations between Mr. *Heavan* and the official liquidator for the surrender of the lease, and Mr. *Heavan* knew that the goods belonged to the company. There is no case in which the Court has given leave to a creditor where proceedings had not been begun before the winding-up. The whole scope of the Act is, that creditors shall be put upon an equal footing, and that no one shall be allowed to avail himself of any special rights. This is clearly a distress on the goods of the company, and as such is void under sect. 163; nor is it a case where leave to proceed ought to be given. It makes no difference that the company is not the lessee, as the goods belong to the company, and are protected. The Act could not have intended to place the company in a worse position as lessee than as under-lessee. If there had been a lien on the goods before the winding-up, of course it must have been discharged, but this rent has accrued since.

SIR W. M. JAMES, L.J.:—

My opinion is, that the appeal in this case is well founded, and that the orders of the Master of the Rolls cannot stand. Before we consider the application of the 163rd section to distress against a lessee, the goods being on the property, and liable, it may be expedient to consider how it would have been if the case had been

---

dividend *pari passu* with all the creditors of the company. I think, also, having regard to all the circumstances of this case, that he ought to add his

costs of this application to his proof, and prove the whole against the company.

(1) 12 W. R. 727; 4 N. R. 127.
(2) Law Rep. 9 Eq. 370.

CHANCERY APPEALS.                      [L. R

L. JJ.
1871

*In re*
LUNDY
GRANITE CO.
*Ex parte*
HEAVAN.

between the lessor and the company, in which case it is settled
that the distress issued against the company is not made void by
sect. 163, but is, like every other proceeding, subject to the power
of the Court, to deal with according as the Court think right. The
Court has dealt with it by putting the landlord, who has not for-
feited his right, in the same position as any other creditor, as he
may go in and prove, which appears to be the result of what has
been done in this case.

But in some cases between the landlord and the company, if the
company for its own purposes, and with a view to the realization
of the property to better advantage, remains in possession of the
estate, which the lessor is therefore not able to obtain possession
of, common sense and ordinary justice require the Court to see
that the landlord receives the full value of the property. He must
have the same rights as any other creditor, and if the company
choose to keep the estates for their own purposes, they ought to
pay the full value to the landlord, as they ought to pay any other
person for anything else, and the Court ought to take care that he
receives it.

There is nothing to shew that Mr. *Heavan* has in any way de-
prived himself of his right to receive the full amount of the rent.
He appears to have been ready to make any reasonable arrange-
ment, and there seems to be nothing to affect his right to do
what was best for himself.

That being so, we must consider what is the position of a stranger
under the Act, the landlord having the power of distress against
the tenant :—[His Lordship read the 163rd section.]   Now these
words cannot be taken as meaning that the distress is to be abso-
lutely void to all intents, or else the Court would have no jurisdic-
tion to allow the landlord to proceed ; and, moreover, a distress
would be void as against another lessee if the goods of the company
were left on the land and were taken.   But it is impossible that a
distress on land can be void merely because the company have
goods there.

In no other part of the Act is any person dealt with except the
company, its creditors, and its contributories.   The sole object of
the Act was to make an equitable provision in the nature of a
bankruptcy for the distribution of the effects of the company

amongst the persons entitled, but not to alter any other rights which they might acquire during the winding-up. If the official liquidator chooses to leave goods in the order and disposition of a bankrupt, there is nothing, as far as I can see, to prevent the assignee from taking them; and so if he leaves goods in a house where a landlord has a right to distrain, the official liquidator must take the consequences. It must be the true meaning of the Act to consider these provisions as confined to proceedings by a creditor of the company against the goods of the company; and the Act must be read according to the manifest intention, which could not have been that during the many years over which the winding-up may extend the Court should have power to interfere with the rights of every one who happened to have goods of the company in his possession. The landlord has a right to proceed against his tenant, and against the goods of every stranger which happen to be upon the land, and subject to distress.

As a general rule, I should have no hesitation in granting leave to a landlord to pursue his rights by distress for rent accrued during the time when the official liquidator chooses to leave the goods on the land.

SIR G. MELLISH, L.J. :—

I agree. If the official liquidator, for the convenience of the winding-up, does not surrender the lease, but continues to keep possession for the purpose of obtaining a better price for the goods, the landlord should not be deprived of his right to recover his rent.

It is a question of general importance whether this section relates only to distress against the company, that is to say, where the company is the debtor, or extends, as has been contended, to all cases of distress. The landlord is, by the law of this country, entitled to take as a security for his rent the goods upon his land, whomsoever they belong to. Then, was it intended to deprive the landlord of that right if the goods happened to belong to a company under liquidation?

It would be very extraordinary if the Legislature had deprived the landlord of that right without clear and express words, and

*L. JJ.*

*1871*

*In re*
LUNDY
GRANITE CO.
*Ex parte*
HEAVAN.

468                              CHANCERY APPEALS.                          [L. R.

L. JJ.

1871

*In re*
LUNDY
GRANITE CO.
*Ex parte*
HEAVAN.

without giving him any compensation. The right to prove debts is confined to creditors of the company, and if this section makes this distress void, I do not see what power the Court would have to say that the landlord has any right to prove for his debt. It would be very extraordinary if, during the whole time of a liquidation, the liquidator might make any agreement with any insolvent tenant, and keep the goods on the land without any risk. The difficulty is not met by saying that the landlord can get leave to proceed under sect. 87, for that section is confined to proceedings against the company:—[His Lordship read the section]. This throws a good deal of light upon sect. 163, and when we look at the place where sect. 163 comes in, it is seen clearly to deal with the rights of creditors under the winding-up. As to all the words except the word "distress," there can be no doubt, and I think that they all in some way relate to proceedings by a creditor of the company against the company, in which the company would be a Defendant. It was not the intention of the Legislature to deal at all with the rights of a landlord, who may be a total stranger to the company, and may not know to whom the goods belong.

It was said that Mr. *Heavan* was a party to the proceedings between the company and the proposed new lessee, but that gives no equitable right against him.

We must discharge the two orders. Mr. *Heavan* will have his costs below, and the official liquidator will have his out of the estate.

Solicitors : Messrs. *Vizard, Crowder, & Co.* ; Mr. *R. Miller.*

324        THE MARQUIS OF CAMDEN *v.* BATTERBURY        5 C. B. (N. S.) 808.

facts which the witness had contradicted. If, therefore, it were necessary to put an interpretation upon the word "adverse," with reference to the second branch of the section, I should incline to think it impossible that the legislature could have intended to use that word in a sense which would impose a restriction which did not before exist. However, perhaps the better course is, to consider the second branch of the section as altogether superfluous and useless. The whole section is so refused, and it is so difficult to make any sense of it, that my mind is not satisfied so far as to induce me to assent to the judgment of the court. Without, therefore, actually dissenting from it, it is enough to say that I do not wholly concur in it.

Rule discharged (a).

[808] THE MARQUIS OF CAMDEN *v.* BATTERBURY. Feb. 5th, 1859.

[Affirmed in Exchequer Chamber, 7 C. B. N. S. 864.]

By articles of agreement under seal, the plaintiff covenanted with one E. that he would, from time to time, when and so soon as he should have erected and covered in one or more of the messuages thereinafter agreed and covenanted to be built by him upon the land thereinafter described and agreed to be demised, &c., by indenture demise and lease unto E., his executors, &c., the whole or such part or parts whereon one or more of the said messuages or tenements should have been built, &c., for ninety-eight years from the 29th of September then last (1852), at a certain yearly rent, payable quarterly,—the rents to be so apportioned that the yearly rent to be reserved on any such lease to be granted as aforesaid should not exceed one sixth of the yearly value of the land and buildings to be thereby demised ; with a proviso, that, if the yearly rent or rents to be reserved upon the lease or leases to be granted of any part or parts only of the land thereby agreed to be demised should amount to or make up the full yearly rent thereby agreed to be reserved, the remainder of the land, when built upon, should be demised and leased at the yearly rent of a peppercorn only. The articles then contained a covenant by E. with the plaintiff to pay the rent therein-before agreed to be reserved, and to pay rates, &c., to erect the messuages ; and also a covenant, that, until the land, and the buildings erected as aforesaid, should be leased in execution of the covenant in that behalf, the said E., his executors, &c., would pay for the same the several yearly rents or sums thereinbefore stipulated or agreed to be reserved in the leases to be granted, to such persons, and in such manner and proportions, and at such times as the same would be payable in case such leases were actually granted. There was also a proviso for re-entry by the plaintiff in case the whole or any part of the said yearly rent or rents thereby or by the said leases so to be granted as aforesaid to be reserved, should be behind or unpaid for twenty-one days.—In January, 1854, E. assigned all his interest in the agreement to the defendant, who thereupon entered and occupied the land, erected certain buildings thereon, and paid the stipulated yearly sums, and then assigned to one W. :—Held, that neither E. nor the defendant acquired any estate in the premises under the building agreement ; nor was any tenancy from year to year created thereby, or by the occupation of the land and payment of the stipulated sums.

This was an action for use and occupation, and for money found due upon accounts stated. Plea, never indebted.

The cause was tried before Willes, J., at the last Summer Assizes for Surrey. The action was brought to recover 241l. for one year's rent from Lady-Day, 1857, to Lady-Day, 1858, of certain ground and premises at Camden Town, St. Pancras, under the following circumstances :—

By an indenture under seal, bearing date the 4th of February, 1853, being certain building articles between the plaintiff of the first part, the Rev. Thomas Randolph, prebendary of the prebend of Cantlowes, in the Cathedral Church of St. Paul's, London, of the second part, and one John Watts Elliott, therein described, of the third part, it was witnessed as follows :—"In pursuance of an act of parliament passed in the 53 G. 3, [809] intituled 'An Act for enabling the prebendary of Cantlowes, in

(a) See *Dear* v. *Knight*, 1 Foster & F. N. C. P. 433.

the Cathedral Church of St. Paul's, London, to grant a lease with powers of renewal of the prebendal lands in Kentish Town, in the county of Middlesex,' and in consideration of the expense which the said J. W. Elliott, his executors, &c., will be at in erecting the messuages, tenements, and buildings hereinafter covenanted to be erected and built upon the ground hereinafter described and agreed to be demised, and also in consideration of the yearly rents, covenants, and agreements hereinafter reserved and contained on the part of the said J. W. Elliott, his executors, &c., he the said George Charles Marquis Camden, with the privity and approbation of the said Thomas Randolph, testified, &c., doth hereby, for himself, his heirs, &c., covenant and agree with the said J. W. Elliott, his executors, &c., that he the said Marquis, his executors, &c., shall and will, at the costs and charges of the said J. W. Elliott, his executors, &c., from time to time, when and so soon as the said J. W. Elliott, his executors, &c., shall have erected and covered in one or more of the messuages or tenements hereafter agreed and covenanted to be built by him, upon the piece or parcel of ground hereinafter described and agreed to be demised, and laid the gutters with lead or iron, and fixed up iron pipes to carry off the water, and made the areas and the fence and garden walls, nine inches in thickness at the least, to divide and separate each house and the ground to be thereto allotted for yards or gardens from the premises adjoining on each side, by indenture or indentures of lease, demise and lease unto the said J. W. Elliott, his executors, administrators, nominees, or assigns, the whole or such part or parts whereon one or more of the said messuages or tenements shall be built or covered in, and such other things thereon done as aforesaid, of all [810] that piece or parcel of ground situate, lying, and being, &c., together with the several brick messuages or tenements and buildings which shall be erected and built on the pieces or parcels of ground hereinbefore described and hereby agreed to be demised, pursuant to the covenants for that purpose hereinafter contained (except and always reserved unto the said Marquis Camden, his executors, &c., and his and their tenants of the adjoining property, the free passage and running of water and soil through the sewers and drains made or to be made upon, through, or under the said several pieces or parcels of ground and other the premises hereby agreed to be demised), To hold the said piece or parcel of ground and other the premises hereby agreed to be demised, with their appurtenances, except as aforesaid, unto the said J. W. Elliott, his executors, &c., from the 29th of September now last past, for and during and unto the full end and term of ninety-eight years thence next ensuing, and fully to be complete and ended, yielding and paying therefore for and during the first year of the said term the rent or sum of 30l., and for and during the second year of the said term the rent or sum of 60l., and for and during the third year of the said term the rent or sum of 120l., and for and during the fourth year of the said term the rent or sum of 200l., and for and during the fifth year and remainder of the said term the yearly rent or sum of 285l., and that in the several proportions and manner following, that is to say, one equal third part of the said several rents unto the said Thomas Randolph and his successors, prebendaries of the prebend aforesaid, and the remaining two equal third parts thereof respectively unto the said George Charles Marquis Camden, his executors, &c. The indenture then contained a stipulation that the rents should be payable quarterly, the first quarterly payment to be due on the 25th of De-[811]-cember then last past, and the said rents to be so apportioned that the yearly rent to be reserved on any such lease to be granted as aforesaid should not exceed one sixth of the clear yearly value of the land and buildings to be thereby demised, reckoning such annual value upon the said land and buildings when the same should be completely finished and fit for habitation, and be not less than 40s. ; with a proviso, that, if the yearly rent or rents to be reserved upon or by the lease or leases to be granted of any part or parts only of the piece or parcel of ground thereinbefore described and agreed to be demised, should amount to or make up the full yearly rent or rents thereby agreed to be reserved and made payable, then and in such case the remainder of the said piece or parcel of ground, or any part or parts thereof, should from time to time when and as the same should be built upon be demised and leased, together with the houses and buildings thereupon erected, at the yearly rent of a peppercorn only. The indenture then stated an agreement, that, in every such lease to be so granted as aforesaid, there should be contained on the part of the said J. W. Elliott, his executors, &c., such covenants as were usually inserted in leases granted on the same estate, and in particular certain stipulations therein mentioned ; and that, in every such lease, there

326     THE MARQUIS OF CAMDEN *v.* BATTERBURY     5 C. B. (N. S.) 812.

should be contained on the part of the Marquis the usual covenant entered into by him for quiet enjoyment by the lessee or lessees therein on payment of the rent and observance of the covenants therein contained. It further contained covenants by the said J. W. Elliott with the Marquis to pay the said several yearly rents thereinbefore agreed to be reserved, on the several days and times and in the proportions and manner thereinbefore appointed,—to pay all rates and taxes,—and to erect and completely finish the several brick messuages therein mentioned, &c.,—**[812]** to accept such leases as agreed,—and also a covenant, that, until the said piece or parcel of ground, and the buildings to be erected as aforesaid, should be leased in execution of the covenant in that behalf, the said J. W. Elliott, his executors, &c., would pay for the same the several yearly rents or sums thereinbefore stipulated or agreed to be reserved in the leases to be granted as aforesaid, to such persons, and in such manner and proportions, and at such time, as the same would be payable in case such leases were actually granted ; and that he or they would in the meantime until the granting of such lease or leases perform all the covenants agreed to be inserted therein, as if such lease or leases had been granted. The indenture then contained the following proviso for re-entry,—"Provided that, if the whole or any part of the said yearly rent or rents hereby or by the said leases so to be granted as aforesaid to be reserved shall be behind or unpaid for the space of twenty-one days next over or after any or either of the days or times whereon the same ought to be paid as aforesaid, or if the said J. W. Elliott, his executors, &c., shall make default in erecting, building, and finishing the several messuages, &c., then and from thenceforth, and in any of the said cases, and at any time then afterwards, it shall and may be lawful for the said George Charles Marquis Camden, his executors, &c., into and upon the same premises, or any part thereof, in the name of the whole, wholly to re-enter, and the said J. W. Elliott, his executors, &c., and all other tenants and occupiers of the same premises, thereout and from thence utterly to expel and amove, and all and singular the same premises, or so much thereof as shall not then have been actually leased, to have again, retain, repossess, and enjoy, as in his or their first and former estate."

By an indenture dated the 31st of January, 1854, **[813]** and made between the said J. W. Elliott of the one part, and the defendant of the other part,—after reciting the said building articles of the 4th of February, 1853, and that the said J. W. Elliott had erected upon parts of the said ground certain buildings, therein described, which had been demised to him by certain indentures of lease by which ground-rents to the amount of 35l. had been reserved, in consideration of 1500l., the said J. W. Elliott assigned unto the defendant, his executors, &c., the said recited building articles, and all the right, title, interest, property, possession, benefit, claim, and demand whatsoever which the said J. W. Elliott then had or might have by virtue of the said indenture, and the covenants and agreements therein contained on the part of the plaintiff, into or out of the said premises therein described, subject to the performance by the defendant, his executors, &c., of the covenants therein contained, amongst others, a covenant by the defendant to perform the covenants in the said articles on the part of the said J. W. Elliott, and to indemnify the said J. W. Elliott from the same.

The defendant erected or completed, on part of the premises so assigned to him, certain messuages which, according to the contract, were demised to him by indentures of lease.

By an indenture of the 23rd of May, 1857, and made between the defendant of the one part, and one George White of the other part, the defendant, for a nominal consideration, assigned to White, his executors, &c., the said building articles of the 4th of February, 1853, and all his interest therein.

The defendant had paid to the plaintiff all the rent due under the building agreement of the 4th of February, 1853, up to Lady-Day, 1857, being the last quarter-day previous to the date of the assignment to White.

**[814]** Upon proof of these facts, the learned judge directed a verdict to be entered for the plaintiff for the amount claimed,—reserving leave to the defendant to move to enter a verdict for him, or a nonsuit.

Bovill, Q. C., in Michaelmas Term last accordingly, obtained a rule nisi to enter a verdict for the defendant, on the grounds,—first, that the building-articles of the 4th of February, 1853, amounted to an actual demise,—secondly, that the defendant never took any interest except under the building agreement, and was not tenant from year to year,—thirdly, that, if there was any tenancy from year to year, Elliott became

5 C. B. (N. S.) 815.    THE MARQUIS OF CAMDEN *v.* BATTERBURY    327

such tenant, and that tenancy was assigned to the defendant, and by him assigned over,—fourthly, that, if any rent was recoverable, it would be due to the plaintiff and Randolph or the prebendary of St. Paul's. He cited *Doe d. Walker* v. *Groves*, 15 East, 244, and *Curling* v. *Mills*, 6 M. & G. 173, 7 Scott, N. R. 709.

Malcolm shewed cause. The articles of agreement of the 4th of February, 1853, clearly do not amount to an actual demise. The matter rests entirely in contract. The whole scope of the agreement shews that the only demise contemplated, was, a demise of each house when erected. [Willes, J. If the articles constitute a demise of the whole piece of land, out of what estate would the separate leases be granted?] The parties have carefully worded the agreement so as to prevent its operating as a lease. Neither did Elliott hold as tenant from year to year. He merely held under the terms of the agreement; and, by the assignment to the defendant, the latter became assignee of a chose in action; but, when he entered into possession and paid rent, he became tenant from year to year. **[815]** [Williams, J. Does not the same argument shew that Elliott became tenant from year to year?] It is submitted that it does not: a tenancy from year to year in Elliott is quite inconsistent with the building agreement. The covenants entered into by Elliott in that instrument do not bind his assignee. The position of the defendant, therefore, is simply that of a man holding under the plaintiff and paying him rent. [Cockburn, C. J. If the terms of the agreement do not create the relation of landlord and tenant, when the defendant becomes assignee of that agreement and goes to pay the stipulated sum under it, why is it to be assumed that he makes the payment in the character of tenant rather than as assignee of the agreement? Being bound by his agreement with Elliott, he makes the payment in discharge of that obligation. Why should the money be held to be rent in the case of the defendant, and not in the case of Elliott?] The defendant as assignee would not be bound by the covenants entered into by Elliott. He, therefore, does not hold under the articles. His is the common case of a man occupying land and paying rent,—which clearly creates a tenancy from year to year. If not tenant from year to year, the defendant was at the least tenant at will, and so liable for the rent. [The other point was waived.]

Bovill, Q. C., and Garth, contrà, were not called upon.

WILLIAMS, J.(a). I am of opinion that this rule must be made absolute, upon one of the points made (but not much insisted on) at the trial and upon the motion. I think there was no evidence at all of any **[816]** liability in the defendant to pay the sum claimed in this action. The way in which it is sought to make him liable is this:—It is contended, and I think properly contended, on the part of the plaintiff, that the agreement of the 4th of February, 1853, did not amount to a lease. So far from that instrument being intended to operate as a lease, every possible care seems to have been taken, not only to avoid its being treated as a demise, but also to prevent any estate being taken under it until the houses should be built and the leases granted. Then, it is further insisted on the part of the plaintiff, that Elliott never gained a tenancy from year to year under the agreement. The reason why these arguments were urged (and, as I think, successfully urged) is, that, if that agreement amounted to a lease, then the defendant would be merely an assignee; and, having assigned over before any part of the rent claimed became due, he would be discharged, inasmuch as he would as assignee only be liable for rent accruing whilst he was in possession. That is the reason why it has been urged that the articles of the 4th of February, 1853, did not amount to a lease, and that Elliott never became tenant from year to year under them. I think Mr. Malcolm has made out those two propositions. But, then comes the question whether he has succeeded in shewing that a tenancy from year to year subsisted between the plaintiff and the defendant. I think he has not. It seems to me to be clear that the building articles carefully exclude the acquisition of any estate by Elliott. It would perhaps be difficult to say that he did not become tenant at will: but, beyond a tenancy at will, he clearly had no estate. What, then, was Elliott's position? He had under the articles a right to enter upon the land and devote it to the purposes thereby contemplated, and for this right he was to pay an annual sum, not as **[817]** rent, but as a collateral payment until the leases should be granted, and an estate thereby acquired. It is plain, therefore, that the sum stipulated to be

(a) Cockburn, C. J., was absent on account of indisposition, and Willes, J. had gone to Chambers.

328        THE MARQUIS OF CAMDEN *v.* BATTERBURY        5 C. B. (N. S.) 818.

paid by Elliott not being payable as rent for the occupation of the land, but merely a stipulated sum payable by virtue of the agreement, so far as he was concerned there is no ground for saying that he ever paid rent in the sense of creating a tenancy.  But it is contended by Mr. Malcolm, that, when the defendant came in, the payment was to be considered as rent paid for the enjoyment of the land, and so a tenancy from year to year was created.  It seems to me that there is no ground whatever for implying a tenancy from year to year in the defendant.  Where a tenancy from year to year is implied from periodical payments, it is because you cannot account for the payment of the money upon any other hypothesis than that it is paid for rent, and hence the law implies a tenancy from year to year.  But here there is no more reason for implying a tenancy from year to year after the defendant came in than there was when Elliott held the land.  The defendant became liable to pay the money because Elliott had assigned the agreement to him, and he had agreed with Elliott to make the payments.  I am of opinion that the only person liable in a court of law for the payment of the stipulated annual sum to the Marquis, would be Elliott himself : and that the fact of the defendant having become assignee of the agreement would not make him liable to the Marquis.  The payments which were made by him were not made in discharge of any original liability in himself, but in discharge of the liability of Elliott, against which the defendant as assignee was bound to indemnify Elliott.  It is said that the defendant held upon terms different from those under which Elliott held.  But that leaves the question precisely as it was before.  Can **[818]** you imply from the payment of the money by the defendant, that he meant to become tenant from year to year to the plaintiff?  Clearly not.  The payment being due to the liability of Elliott under the agreement, there is no more reason for inferring that the defendant became tenant from year to year than that Elliott became such.  Then it is said, that, if the defendant was tenant at will only, inasmuch as he continued tenant for a portion of the year, he ought to pay rent pro rata.  Be it that he was tenant at will, he was not tenant at will on the terms of paying so much a year' rent.  The amount still remains a collateral sum, for which Elliott, and Elliott alone, was, in my opinion, liable under his agreement with the plaintiff.

CROWDER, J.    I also am of opinion that this rule should be made absolute, though not precisely on the grounds upon which it was moved.  The first of these was, that the building-articles of the 4th of February, 1853, amounted to a demise of the land to Elliott.  I am clearly of opinion that those articles did not amount to an actual demise.  At first I was inclined to think that they did : but, upon looking more closely at the instrument, it seems to me to have been the intention of both parties to exclude the passing of any estate.  In substance it amounts to this :—Certain land was staked out, upon which houses were from time to time to be erected, and, when and as one or more of the houses so agreed to be built were covered in, leases were to be granted ; and for this certain annual sums were to be paid from time to time.  The expression used is "rent or sum :" but the word rent was probably inserted from the difficulty of distinguishing between rent which would be payable under the intended leases, and the annual payments to be made for the right to occupy the land for the purpose of **[819]** erecting the houses thereon in the meantime.  There are also expressions about re-entering and re-possessing the land for covenants broken.  But I think it is clear, upon the whole instrument, that nothing was intended to be demised until the buildings should from time to time be erected ; and that no tenancy was thereby created.  Elliott entered under the agreement, and commenced building, and afterwards assigned all his interest in the agreement to the defendant, who completed two houses upon the land.  I am clearly of opinion that there was no actual demise, and no tenancy from year to year.  The next point made in the rule is, that the defendant never took any interest except under the building agreement, and was not tenant from year to year.  Upon that ground, I think the defendant is entitled to succeed, though not in the way in which it was presented to the court on moving for this rule.  It seems to me that the defendant never became tenant from year to year.  It was insisted, that, under the agreement of the 4th of February, 1853, Elliott became tenant from year to year ; and, if so, Elliott having assigned his interest to the defendant, and the defendant having assigned to White before any of the rent claimed in this action became due, the defendant could not be liable.  Mr. Malcolm has, however, satisfied me that Elliott never became tenant from year to year under the agreement.  His position was rather that of tenant at will,—that is, he was not in as a trespasser, but the annual payment

5 C. B. (N. S.) 820.   THE EASTERN COUNTIES RAILWAY CO. *v.* DORLING   329·

was not a payment as or in the nature of rent, but a stipulated collateral payment under the articles. Then it is contended, on the part of the plaintiff, that, assuming Elliott not to have been tenant from year to year, yet the defendant, from the altered circumstances, became so. That argument, however, clearly fails. By the assignment to him, the defendant became so far placed in the posi-[820]-tion of Elliott that he might well make the annual payment stipulated to be paid by Elliott under the building-articles. It is said that, because the defendant paid the money, and because it was a payment in the nature of rent, he thereby became tenant from year to year to the Marquis. But it seems to me that the existence of a tenancy from year to year is negatived by all the evidence in the case. It is clear that the defendant was acting merely as Elliott acted. It does not in my opinion follow from the altered circumstances that the payment was made by the defendant as rent. It is true, the defendant was not under covenant with the plaintiff to make the payments : but they were made in discharge of Elliott's liability, pursuant to the defendant's bargain with Elliott. He was merely carrying out Elliott's engagement under the stipulations he had entered into with Elliott. I agree with my Brother Williams, that, when a tenancy from year to year is implied from the payment of rent, it is only where the payment can be referred to nothing else. Here, however, there is no necessity for any such inference : the facts negative the inference of a tenancy from year to year. What, then, is the condition of the defendant? Assuming him to have been tenant at will, he was not tenant at a rent : the payment was a mere collateral payment, referable to the agreement, and to nothing else. As between the plaintiff and defendant, the payment clearly was not enforceable. The plaintiff's only remedy at law is against Elliott. The rule must, therefore, be made absolute.

Rule absolute (a).

[821]   THE EASTERN COUNTIES RAILWAY COMPANY *v.* DORLING. Feb. 12th, 1859.

[S. C. 28 L. J. C. P. 202 ; 5 Jur. N. S. 869. Applied, *Marshall* v. *Ulleswater Steam Navigation Company,* 1871, L. R. 7 Q. B. 173. Distinguished, *Lyon* v. *Fishmongers' Company,* 1876, 1 App. Cas. 677.]

To a declaration charging the defendant with breaking and entering upon a certain dummy or landing-stage of the plaintiffs, the same being a barge of the plaintiffs, moored to a wharf in the river Orwell, and embarking and disembarking from the same passengers and others on, to, and from divers ships and vessels, and mooring ships and vessels against the same,—the defendant pleaded that the Orwell was a public and common navigable river and common highway ; that he had a right to land and was desirous of landing passengers from his steam-vessel at the wharf ; that the plaintiffs' dummy or landing-stage at the time when, &c. was permanently moored and fixed alongside the wharf so that his passengers could not embark or disembark there without his vessel being moored thereto and his passengers passing over the same, &c. :—Held, on demurrer, a sufficient answer to the declaration,— the dummy appearing to be a permanent obstruction of the defendant's right to use the river as a highway, which he could only exercise by removing it or passing over it.—Issue having been taken upon the above and other pleas, the cause went down to trial, when it appeared that the dummy was moored to the wharf so as to rise and fall with the tide, that vessels could not if the dummy had not been there have approached the wharf at low water, and that the defendant claimed the right of landing at all times over the dummy :—Held that, if the plaintiffs had intended to complain of the defendant's exercise of his supposed right at times of low water, when he could not have come to the wharf if their dummy had not been there, they should have new-assigned.—There was evidence of a custom for barges or other vessels arriving at a wharf for the purpose of loading and unloading, to pass for that purpose over any other barge or vessel moored alongside a wharf and thereby preventing access to it otherwise :—Quære, whether such custom applied to a thing like this, which was a mere landing-stage for steam-boat passengers.

This was an action brought by the Eastern Counties Railway Company against the defendant for an alleged trespass.

---

(a) See *Alexander* v. *Bonnin,* 6 Scott, 611, 4 N. C. 799.

C. P. XIX.—11*

Q.B. Div.]

MARSHALL v. MACKINTOSH.

[Q.B. Div.

lessee of refreshment-rooms and a coal-cellar, and there was an opening for putting coals into the coal-cellar on the arrival platform at a railway station. The defendant employed a coal merchant to put coals into the cellar, and the coal merchant's servants, while putting coals into the cellar, left the hole insufficiently guarded. The plaintiff, whilst passing in the usual way out of the station, fell into the coal-cellar and was injured. It was held that the defendant was liable. The principle of the decision, I think, is this—that when a person employs a contractor to do work in a place where the public are in the habit of passing, which work will, unless precautions are taken, cause danger to the public, an obligation is thrown upon the person who orders the work to be done to see that the necessary precautions are taken, and that, if the necessary precautions are not taken, he cannot escape liability by seeking to throw the blame on the contractor. *Pickard* v. *Smith* is an authority for the proposition that no sound distinction in this respect can be drawn between the case of a public highway and a road which may be, and to the knowledge of the wrongdoer probably will in fact be, used by persons lawfully entitled so to do. The district council employ the contractor to do work upon the surface of a road which they know is being used by the public, and they must have known that the works which were to be executed would cause some obstruction to the traffic, and some danger unless means were taken to give due warning to the public. The duty of affording protection to the public was in the circumstances incurred by the district council, and the district council could not avoid the obligation of the duty by entering into a contract with Iles. The question remains, Can the defendants, the district council, avail themselves of the separate defence which is pleaded by Iles ? The two defendants, if they had pleased, might have joined in a defence of payment into court which would have been available for both. But the district council have chosen to put in a separate defence. I cannot see in the circumstances that they can avail themselves of the payment into court by Iles. So far as their defence is concerned it simply amounts to a denial of liability, but in that defence they have failed. The plaintiff is therefore entitled to judgment for 50l. and costs. Of course, as the 50l. has been obtained from the other defendant, Iles, the judgment against the district council will be confined to costs only.

*Judgment accordingly.*

Solicitor for the plaintiff, *S. A. Jones.*
Solicitor for the district council, *W. H. Whitfield.*
Solicitor for Iles, *A. E. Copp.*

----

*Jan. 29 and June 7.*
(Before KENNEDY, J.)

MARSHALL v. MACKINTOSH. (a.)

*Contract—Building—Power to re-enter and take possession of plant—Breach of agreement—Damages.*

By a building agreement dated the 10th June 1896, the defendant agreed with the plaintiff to pull down and re-erect Holloway's Hotel, Dover-

(a) Reported by W. DE B. HERBERT, Esq., Barrister at Law.

street, in carcase before the 25th Dec. 1896, and thereupon to take a lease of it from the plaintiff for eighty years from the 24th June 1896 at a peppercorn rent for the first year, and at a rent of 1100l. for the second and every subsequent year of the term. The defendant undertook to finish his part of the agreement by the 25th Dec. 1896.

By clause (2) of the agreement "on default by the lessee of the stipulation contained in this clause" (i.e. to complete within the time allowed) he shall forfeit all benefit under this agreement which shall thereupon cease and be determined, and all the materials and buildings on the said premises shall be forfeited to and become the absolute property of the lessor."

And by clause (11): "If the new buildings shall not be erected or completed within the time and in the manner aforesaid before the 25th Dec. 1896, or if the lessee shall fail to observe or perform any of the stipulations herein and in the said form of lease contained or on his part to be observed and performed, or if he shall not proceed with the works with proper diligence, then and in any of the said cases the lessor shall be entitled to re-enter upon and to take immediate possession of the said piece of land and premises with all buildings, erections, plant, and materials thereon without making to the lessee any allowance or compensation in respect thereof, and without any process at law or any notice to the lessee or any other person or persons to quit the said premises or to determine the holding thereof."

The defendant went into possession on the 10th June 1896, but beyond pulling down about 200l. worth of materials did nothing, and on the 19th Jan. 1897 the plaintiff re-entered.

The defendant contended that the effect of these two clauses was to limit the plaintiff to such compensation as he could get by re-entry and taking possession of the materials on the premises, and that he could recover no damages. The plaintiff on re-entry could only relet from June 1899 at 900l. a year rent.

Held, that, in addition to the re-entry, the plaintiff could recover as damages the loss of two years rent at 1100l., and the loss of 200l. a year at twenty-five years' purchase, viz. 5000l., in all 7200l.

THIS was an action brought to recover damages for the breach of a building agreement.

The facts sufficiently appear from the head-note and the judgment.

*Morten* for the plaintiff.

*G. A. Scott* for the defendant.

*June 7.*—KENNEDY, J.—In this case the only point I have to decide is the question of the damages which the plaintiff is entitled to recover. The damages assessed by the learned official referee under alternative heads are large, and as Field J. took occasion to say in his judgment in *Wigsell* v. *The School for the Indigent Blind* (8 Q. B. Div. 359), few questions as to the principle upon which damages ought to be assessed are free from difficulty. The defendant by an agreement in writing of the 10th June 1896 contracted with the plaintiff (in substance) to pull down and remove certain buildings numbered 47 and 48 Dover-street, Piccadilly, and to build on the site a new structure

1990 N1 1

Q.B. Div.]                    MARSHALL v. MACKINTOSH.                    [Q.B. Div.

according to certain approved plans, elevations, sections, and specifications. The defendant contracted that the new structure should before the 25th Dec. 1896 be erected "in carcase," that is to say the walls built, the structure roofed in, the timbers of the floors and partitions fixed, and all gutters, rain water pipes and drains completed and made good in communication with the common sewer in a workmanlike and substantial manner with the best material and in conformity with the approved plans, elevations, sections, and specifications, under the superintendence, and to the satisfaction of the plaintiff's architect. Upon this being done the plaintiff contracted with the defendant to give him a lease of the land and buildings for the term of eighty years from the 24th June 1896, at a peppercorn rent for the first year and thereafter at a yearly rent of 1100l. The only other provisions of the building agreement to which I will refer specially are the latter part of clause 2 and clause 11. By clause (2) "on default by the lessee of the stipulation contained in this clause" (i.e. to complete within the time allowed) "he shall forfeit all benefit under this agreement, which shall thereupon cease and be determined, and all the materials and buildings on the said premises shall be forfeited to and become the absolute property of the lessor." And by clause 11: "If the new buildings shall not be erected or completed within the time and in the manner aforesaid before the 25th Dec. 1896, or if the lessee shall fail to observe or perform any of the stipulations herein and in the said form of lease contained or on his part to be observed and performed, or if he shall not proceed with the works with proper diligence, then and in any of the said cases the lessor shall be entitled to re-enter upon and to the immediate possession of the said piece of land and premises with all buildings, erections, plant, and materials thereon, without making to the lessee any allowance or compensation in respect thereof, and without any process at law or any notice to the lessee or any other person or persons to quit the said premises or to determine the holding thereof." By clause 13 the defendant had an option during the first year of the term granted by the agreement to purchase the fee simple at the price of 28,600l. The defendant, as stated in the report of the official referee, got possession of the site on the 10th June 1896, but, except that he took down and removed 200l. worth of materials from the old buildings, he did nothing whatever towards the fulfilment of his contract. The fact was that he had entered upon the undertaking as a speculation without the means of fulfilling it. He frankly stated in his evidence that the terms of the agreement were such that he could not raise money to build. He admitted shortly before the plaintiff took possession there was just a prospect of his being able to get the freehold. So far as I can see in this communication of such a prospect to the plaintiff. Finding nothing coming of the 200l. worth of material removed and no prospect of anything being done by the defendant, the plaintiff re-entered on 19th Jan. 1897. There can be no doubt of his right under the agreement to do so. Apart from the express terms of that agreement, that upon the facts in evidence he had broken the agreement as he

admits he did, and that the breach was of such a nature that the plaintiff would be reasonably justified in treating the defendant's conduct as showing an intimation on the defendant's part, not further to perform the contract. It is clear, in my view, that the mere fact of re-entry for a forfeiture, does not of itself exonerate the defendant from the liability to damages for breach of contract prior to re-entry. If authority were needed *Hartshorne* v. *Watson* (4 Bing. N. C. 178), seems to be one on the point. I do not think Mr. Scott contended for that view, but he did contend for the defendant that the effect of clauses 2 and 11 do in this contract limit the plaintiff to such compensation as might be afforded to him by taking possession of the materials, plant, and buildings on the premises at the time of re-entry without any allowance or compensation to the defendant, and that the plaintiff could not claim damages beyond that. I cannot accept that view, for that would be to read into these clauses "as and for liquidated damages" or words to the same effect, and this, I conceive I am not entitled to do. It is common enough to find the insertion of such words when there was an intention of the parties so to limit the liability for a breach of the contract. Instances of this are to be found in *Reilly* v. *Jones* (1 Bing. 302); *Lea* v. *Whitaker* (27 L. T. Rep. 676; L. Rep. 8 C. P. 70); and in *Ex parte Newitt*; *Re Garrud* (44 L. T. Rep. 5; 16 Ch. Div. 522), which was like the present, the case of a building agreement. In the last cited case Brett, L.J. in the course of the argument at p. 529, says, "the words 'as and for liquidated damages' are inserted in favour of the builder; if they were not there, the landowner could also bring an action for damages for the breach of the agreement." James, L.J. on the same page says, "'liquidated damages' only means that the things seized are to be taken in full satisfaction," and in the course of his judgment at page 531 he adds in reference no doubt to this stipulation "as and for liquidated damages," "the building agreement provides in effect that in a certain event certain property of the builder may be taken by the landowner in full satisfaction of the agreement." It appears to me that in the absence of some such express words as "as and for liquidated damages," I cannot construe clauses 2 and 11 as depriving the landowner of the right to prove, if he can, actual damages from the defendant's failure to perform the contract. I may add that I do not think that the words in clause 11 "without making any allowance or compensation in respect thereof," would operate to prevent the builder, if the landowner after a breach re-enters and claims damages, from having included in the damages any value which might exist in the buildings, plant, &c., seized by the landowner when he re-entered. The damages must be assessed *rebus sic stantibus*, and it might be the case that, if the structure was nearly complete "in carcase" or if any valuable plant or material were on the lands at the time of the entry, the landowner would fail to prove any substantial damage at all to flow from the breach which he sued, as he had failed in the case of *Shaw* v. *Holt* (12 A. & E. 591), where, as here, it is made an advantageous lease to the contractor. The remaining question is the damages to which the

752—Vol. LXXVIII.]
THE LAW TIMES.
[Aug. 6, 1898.

plaintiff here is entitled for the breach which was committed before the plaintiff re-entered on the 19th Jan.? The learned official referee to whom I referred the question of damages has given two alternative assessments. He reported that the plaintiff had, after entering, relet at the best rent he could—viz., 900*l.* a year, after the first year, and he assessed the damages at the loss of two years' rent of 1100*l.*, and the loss of 200*l.* a year from the 24th June 1899, at twenty-five years' purchase amounting to 5000*l.*, making in all 7200*l.* In the alternative, if the plaintiff was only entitled to recover damages caused by the removal of materials by the defendant and by the loss of possession from the 24th June 1896 to the 19th Jan. 1897, the official referee found that the amount of such damage was 200*l.*, and one year's rent of 900*l.* from the 24th June 1896 to the 24th June 1897, the earliest date at which the plaintiff was able to relet the premises. The damages must be assessed in my view, upon well-recognised principles. They must be such as flowed naturally, and, in the circumstances of the case, necessarily from the breach of contract; further, they must be such damages as might reasonably be shown to have been in the contemplation of the parties when they entered into the contract. Subject to this, at all events, the plaintiff was, in the language of Field, J. in *Wigsell v. School for Indigent Blind (ubi sup.)*, "entitled to have his damages assessed at the pecuniary amount of the difference between the state of the plaintiff upon the breach of the contract and what it would have been if the contract had been performed." Now what would have been the state here if the defendant's contract had been performed before the date of the re-entry on the 19th Jan.? There would have been a complete removal of the old buildings, and upon this important site the "carcase" completely erected, of a valuable building. If this had been the case, and the defendant had further failed to complete his contract and take his lease, there would have been no difficulty in the plaintiff getting someone to take the undertaking on at least as profitable terms. As it is, there is no new building erected or even begun, but the old building is still on the ground and substantially as it was on the 10th June 1896, except so far as it has been made as I suppose less valuable by its having had 200*l.* worth of material removed from it by the defendant. It is shown by evidence to the satisfaction of the referee that the plaintiff forthwith took reasonable precautions to endeavour to sublet without loss, and did relet on the best terms he could obtain. Those terms as he states in his report involve the money loss of 7200*l.* I have most carefully considered if there is any fault of principle in this assessment, and I can find none. It appears to be fair to assume that if the defendant had not broken this contract the state of the plaintiff would have been that which he had under his contract with the ████defendant—he would have had the value of the ████ract either from the defendant, if he comple████ or from a new contractor, if the defendant ████erforming the contract so far, had subseq███████curred a forfeiture. *Oldershaw v. Holt* ████ which is the case most in point of whi██████re, has never been disapproved, and ███████eld by the Court of Queen's B██████milar case of re-entry upo█████████████case,

the breach being as here the neglect to build, that the jury might properly give a verdict on an estimate of the plaintiff's real damage, taking into consideration an increased rent secured by the agreement which had been made with a new lessee after the re-entry. Upon the same reasoning the official referee might, as it seems to me, properly consider here in getting at the real damages, the fact of the reduced rent which the plaintiff is practically obliged to accept from a new contractor, and come to the conclusion to which he has arrived, that the difference between that rent and what the plaintiff could recover under his contract with the defendant, fairly represents the damages which flowed naturally and necessarily from the defendant's breach of contract before the plaintiff re-entered, as under the agreement with the defendant he is entitled to do on the 19th Jan. On the second or alternative assessment, it is only necessary to say that I do not think that the damages could, according to legal principles be assessed upon this basis.

*Judgment for the plaintiff for 7200l.*

Solicitors for the plaintiff, *Tarry, Sherlock,* and *King.*

Solicitor for the defendant, *A. M. Bradley.*

---

**Tuesday, May 17.**
(Before WILLS and KENNEDY, JJ.)
JENKINS AND SONS v. COOMBER AND
OTHERS. (a.)

*Bills of exchange—Bill to order of drawer—Indorsement by way of security before indorsement by drawer—Bill not complete and regular—Liability of indorser to drawer—Bills of Exchange Act 1882 (45 & 46 Vict. c. 61), ss. 55, 56.*

*A. was indebted to the plaintiffs, and, as he required time for payment, the plaintiffs agreed to take a bill from him provided he got his father's name on the back of the bill to guarantee payment. The plaintiffs accordingly drew a bill upon A. payable to their own order, and without indorsing the bill, sent it to A., who accepted it and brought it back and gave it to the plaintiffs with the signature of his father (the defendant) written across the back of the bill. The plaintiffs subsequently indorsed the bill, which wa█ not paid at maturity. In an action by th█ plaintiffs, as holders, against the defendant, a█ indorser :*

*Held, that, as the bill had not become a comp██ and regular bill by the necessary indorsem██ the drawers at the time the defendant p██ name on the bill, the defendant by so s██ name incurred no liability to the ██ either on the bill, or upon any cont██ demnity or suretyship.*

*The principle laid down by the Ho██ Steele v. McKinlay (43 L. T. R██ Cas. 754), before the passing Exchange Act 1882, followed.*

APPEAL by the plaintiffs from a Judge Lumley Smith, Q.C. sitting █ minster County Court, in a remitt█

The plaintiffs claimed against Alfred Coomber, as indorser of a█

(a) Reported by W. W. ORR, Esq█

A the accused was the evidence of the complainant and of an accomplice
the judge would be bound to tell the jury that as there was nothing to
corroborate the evidence of either witness it would be unsafe for them
to convict. Counsel could not produce any authority to this effect. On
the other hand, in *Rex* v. *Gregg*, 24 Cr.App.R. 13 it was held that the
unsworn evidence of a child of seven who was the complainant could be
corroborated by the sworn evidence of a child of nine. It would, indeed,
B be extraordinary if in the converse case where the complainant gives sworn
evidence the unsworn evidence of the younger child should not be capable
of corroborating her evidence. No doubt that seems to have been held to
be the law by the Court of Criminal Appeal in *Rex* v. *Manser*, 25 Cr.App.R.
18—for I agree with the Court of Appeal that the probabilities are that
the evidence of the child Barbara was sworn evidence—but if that be so
then *Rex* v. *Manser* was I think wrongly decided. The reason given for
C the decision was that the argument for the prosecution was an argument
in a circle; but that is not so, for it was not a condition precedent to the
admission of Barbara's evidence that it should have been corroborated.
Her evidence was admissible apart from any question of corroboration and
having been admitted it was capable of corroborating the evidence of Doris
which in its turn was capable of corroborating Barbara's evidence. In my
D judgment, therefore, the question of law submitted to the House should
be answered in the sense contended for by the appellant. But when one
considers the evidence given it is clear that the conviction was unsafe, and
I agree that the appeal should be dismissed.

*Appeal dismissed.*

E        Solicitors: *Director of Public Prosecutions; Wedlake Bell for Swinburne
& Jackson, Durham.*

                                                                    M. G.

---

F                              [HOUSE OF LORDS]

MOSCHI    .    .    .    .    .    .    .    .    .    APPELLANT

                                    AND

LEP AIR SERVICES LTD. AND OTHERS .    .    .    . RESPONDENTS

G        [On appeal from LEP AIR SERVICES LTD. *v.* ROLLOSWIN
                        INVESTMENTS LTD.]

1972 Feb. 28, 29,            Lord Reid, Lord Gardiner, Lord Diplock,
     March 1, 2, 6;                      Lord Simon of Glaisdale
     April 26                         and Lord Kilbrandon

H  *Guarantee—Debt—Contract for payment by instalments—Principal
    debtor's wrongful repudiation of contract—Acceptance of
    repudiation by creditors—Whether guarantor discharged from
    liability—Whether creditors' acceptance of repudiation material*

*variation of guarantee—Whether guarantor liable for instal-
ments payable after acceptance of repudiation*    A

The respondent creditors were forwarding agents for a
company (the debtor) whose managing director (the guarantor)
held all but one of its shares. By a written contract the
creditors agreed to relinquish their lien over the debtor's goods
in consideration of the debtor agreeing to pay the creditors
£40,000, which was then owed to the creditors for services
rendered, by six weekly instalments of £6,000 plus a final weekly    B
instalment of £4,000. It was also agreed that steps would be
taken to ascertain the exact amount of the debt to the creditors.
The contract contained a guarantee by the guarantor of the
performance by the debtor of its obligations to pay the £40,000
by instalments. The debtor defaulted on its obligations from
the outset and after three weeks had paid only some £10,069
out of a total of £18,000 which had become due. The creditors
treated those breaches by the debtor of its obligations as a    C
wrongful repudiation of the contract and accepted that wrongful
repudiation.

In an action by the creditors against the debtor for
damages and against the guarantor for the full amount of the
weekly instalments of £40,000 less what had been paid, £10,069,
with interest, the official referee held that the guarantor was
liable for the amount of the instalments due and payable at
the date of the acceptance of repudiation, which he held was    D
£24,000 less what had been paid, £10,069, and awarded the
creditors the difference between those two sums of £13,931
which together with interest amounted to £15,811.

The guarantor appealed on the grounds that his liability
was discharged by the creditors' acceptance of the debtor's
repudiation of the contract, alternatively, that it amounted to
a material variation of the contract thus extinguishing his
liability; the creditors cross-appealed on the ground that the    E
guarantor's liability extended to the instalments due and
payable after the date of the acceptance of the repudiation.
The Court of Appeal dismissed the appeal and allowed the
cross-appeal.

On the guarantor's appeal:—

*Held,* dismissing the appeal, (1) that since the creditors'
acceptance of the debtor's wrongful repudiation of the contract
was a right given to the creditors by the law of contract, the    F
exercise of that right did not discharge the guarantor from
liability under the guarantee nor was it a material variation
of the contract which extinguished the guarantor's liability.

*Chatterton* v. *Maclean* [1951] 1 All E.R. 761 approved.

(2) That, accordingly, when the creditors accepted the
debtor's fundamental breach of the terms of the contract, includ-
ing those guaranteed, as a repudiation of the contract, they were
entitled to sue the guarantor in damages for the total sum    G
guaranteed (except in so far as already satisfied by payment
made by the company), and that the measure of damages was
that net sum.

*Per curiam.* When a contract is brought to an end by
repudiation accepted by the other party all the obligations in
the contract come to an end and they are replaced by operation
of law by an obligation to pay damages. The damages are
assessed by reference to the old obligations but the old obliga-    H
tions no longer exist as obligations. Were it otherwise there
would be in existence simultaneously two obligations, one to
perform the contract and the other to pay damages. But that

A    could not be right. The only legal nexus remaining is the
obligation to pay damages (post, pp. 345G—346B, 350G—351A,
352A—B).
Decision of the Court of Appeal [1971] 1 W.L.R. 934;
[1971] 3 All E.R. 45 affirmed on different grounds.

The following cases are referred to in their Lordships' opinions:

*Ascherson* v. *Tredegar Dry Dock and Wharf Co. Ltd.* [1909] 2 Ch. 401.
B    *Chatterton* v. *Maclean* [1951] 1 All E.R. 761.
*Creighton* v. *Rankin* (1840) 7 Cl. & F. 325, H.L.(Sc.).
*Frost* v. *Knight* (1872) L.R. 7 Exch. 111.
*Heyman* v. *Darwins Ltd.* [1942] A.C. 356; [1942] 1 All E.R. 337, H.L.(E.).
*Hochster* v. *De la Tour* (1853) 2 E. & B. 678.
*Holme* v. *Brunskill* (1877) 3 Q.B.D. 495, C.A.
*Hongkong Fir Shipping Co.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2
C        Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.
*Jordan's Case* (1536) Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3.
*Kirkham* v. *Marter* (1819) 2 B. & Ald. 613.
*Lockey, In re* (1845) 1 Ph. 509.
*Mactaggart* v. *Watson* (1835) 3 Cl. & F. 525, H.L.(Sc.).
*Martin* v. *Stout* [1925] A.C. 359, P.C.
*Mines* v. *Sculthorpe* (1809) 2 Camp. 215.
*Prenn* v. *Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237,
D        H.L.(E.).
*Samuell* v. *Howarth* (1817) 3 Mer. 272.
*Ward (R. V.) Ltd.* v. *Bignall* [1967] 1 Q.B. 534; [1967] 2 W.L.R. 1050;
[1967] 2 All E.R. 449, C.A.
*Wright* v. *Simpson* (1802) 6 Ves.Jun. 714.

The following additional cases were cited in argument:
E    *Bradley* v. *H. Newsom, Sons & Co.* [1919] A.C. 16, H.L.(E.).
*Darwen and Pearce, In re* [1927] 1 Ch. 176.
*Faber* v. *Earl of Lathom* (1897) 77 L.T. 168.
*Harbutt's " Plasticine " Ltd.* v. *Wayne Tank and Pump Co. Ltd.* [1970] 1
Q.B. 447; [1970] 2 W.L.R. 198; [1970] 1 All E.R. 225, C.A.
*Hirji Mulji* v. *Cheong Yue SS. Co. Ltd.* [1926] A.C. 497, P.C.
*Howard* v. *Pickford Tool Co. Ltd.* [1951] 1 K.B. 417, C.A.
F    *Johnstone* v. *Milling* (1886) 16 Q.B.D. 460, C.A.
*Midland Motor Showrooms Ltd.* v. *Newman* [1929] 2 K.B. 256, C.A.
*Mihalis Angelos, The* [1971] 1 Q.B. 164; [1970] 3 W.L.R. 601; [1970]
3 All E.R. 125, C.A.
*National Bank of Nigeria Ltd.* v. *Awolesi* [1964] 1 W.L.R. 1311, P.C.
*Sinason-Teicher Inter-American Grain Corporation* v. *Oilcakes and Oil-
seeds Trading Co. Ltd.* [1954] 1 W.L.R. 935; [1954] 2 All E.R. 497.
G    *Stacey* v. *Hill* [1901] 1 K.B. 660, C.A.
*Suisse Atlantique Société d'Armement Maritime S.A.* v. *N.V. Rotter-
damsche Kolen Centrale* [1967] 1 A.C. 361; [1966] 2 W.L.R. 944;
[1966] 2 All E.R. 61, H.L.(E.).

APPEAL from the Court of Appeal.
This was an appeal, by leave of the House of Lords, from an order
H  of the Court of Appeal (Davies, Karminski and Megaw L.JJ.) dated
March 10, 1971, whereby the order of Sir Walker Carter Q.C., official
referee, dated March 15, 1970, was varied, and it was ordered that judg-
ment be entered for the respondents (plaintiffs in the action), Lep Air

Services Ltd. and Lep Transport Ltd. against the appellant (second
defendant in the action), Gabriel Moschi, for the sum of £29,931 with
interest. By his order the official referee had, inter alia, ordered that
judgment be given for the respondents against the appellant for the sum of
£13,931 with interest.

The respondents brought an action in which they claimed damages
against Rolloswin Investments Ltd., a company controlled by the appellant,
for breach of contract and £29,931 with interest against the appellant as
moneys due under a guarantee.

The official referee gave judgment against Rolloswin for a total sum,
including interest, of £54,546 and gave judgment against the appellant for
a total, including interest, of £15,811. Both Rolloswin and the appellant
appealed, and the respondents cross-appealed.

On the hearing of Rolloswin's appeal, no one having appeared to
represent the company, its appeal was dismissed. The Court of Appeal
subsequently dismissed the appellant's appeal and allowed the respondents'
cross-appeal and increased the sum payable by the appellant to £29,931
with interest.

The facts are set out in the opinion of Lord Reid and more fully in the
judgment of the Court of Appeal [1971] 1 W.L.R. 934.

*Montague Waters Q.C.* and *William Poulton* for the appellant. The
general problem for determination is: in the case of a contract containing
interdependent obligations on the part of the creditor and the debtor, in-
cluding an obligation by the debtor to pay money by instalments, what is
the effect if the contract is partly executory on both sides and then the
debtor repudiates the contract and the creditor accepts the repudiation?
Three further questions arise: (1) What is the effect of repudiation on
future instalments which never fall due for payment? (2) What is the effect
of repudiation on accrued unpaid instalments where rescission could operate
to the detriment of the guarantor? (3) Is he, the guarantor, liable for
damages for the total renunciation of the contract?

The argument on behalf of the appellant is founded on the basic rules
of contract as to what is the effect of repudiation on the contract and it
has no such logical consequences as were suggested in the judgment of the
Court of Appeal [1971] 1 W.L.R. 934, 943c.

It is to be borne in mind that these proceedings relate to a contract
partly performed and partly executory, so far as the creditor is concerned,
and so far as the ancillary contract is concerned in clause (XIII) to money
terms alone. There is no dilemma as postulated by the Court of Appeal
[1971] 1 W.L.R. 934, 943e–f. When one or more instalments have fallen
into arrear in relation to the obligations in clause (IX) and assuming
that this non-payment went to the root of the contract the creditor could
at his option treat the contract as at an end. There is nothing here to pre-
vent the creditor calling upon the guarantor to honour his obligation.
Three possibilities follow: (i) The guarantor might pay forthwith. (ii) He
might ask for time—that is not per se repudiatory—and if the creditor
thereby repudiated the guarantor would be released from future payments.
(iii) The guarantor evinces an intention not to pay. The creditor could

A    accept that repudiation and terminate the contract of guarantee and sue for
damages.

The Court of Appeal has proceeded on the principle that the guarantor
was automatically in breach if the principal debtor was in breach. But
why if the creditor does not call upon the guarantor at all should it be
unreasonable that the consequences should flow for which the appellant
contends? The following example elucidates this:

B    Let it be supposed that a ship is to be built for five million pounds with
payment on completion. A bank guarantees payment. The company for
which the ship is being built states after work has proceeded on it for three
months that they will be unable to pay for the ship. The shipbuilder there-
upon sells the keel and parts for scrap. The shipbuilder has no recourse
against the guarantor in those circumstances for the guarantor is in breach
of nothing given those facts. The analysis of the legal situation propounded
C    by the Court of Appeal [1971] 1 W.L.R. 934, 943G–944c is incorrect and is
not supported by authority.

As to the first question whether upon the rescission of a contract in the
way it was rescinded here obligations in futuro are discharged, it is to be
observed that the creditor is doing something inconsistent with obligations
which were yet to be performed had the contract survived. The relevant
D    authorities are to be found in the textbooks under the head " Anticipatory
Breach ": see, for example, *Johnstone* v. *Milling* (1886) 16 Q.B.D. 460
and *Bradley* v. *H. Newsom, Sons & Co.* [1919] A.C. 16, 51. In *Hirji Mulji*
v. *Cheong Yue SS. Co. Ltd.* [1926] A.C. 497, 509, Lord Sumner observed
that " . . . Rescission (except by mutual consent or by a competent court)
is the right of one party, arising upon conduct by the other, by which he
intimates his intention to abide by the contract no longer. It is a right to
E    treat the contract as at an end and to claim damages for its total breach."
In the present case there was nothing to prevent the respondents from suing
for loss of profits which would have formed part of the total damages. If the
reasoning of the court of appeal were right, it would follow that the guaran-
tor would be liable for that loss of profits and this would entail severing
clause (IX) from the rest of the agreement.

F    *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, 361 confirms the principle
stated by Lord Sumner in the *Hirji Mulji* case [1926] A.C. 497, and it
establishes that future performance of the contract is at an end. The con-
tract is at an end and obligations in futuro are at an end and the secondary
obligation arises to pay damages. Reliance is placed on the observations
of Diplock L.J. in *R. V. Ward Ltd.* v. *Bignall* [1967] 1 Q.B. 534, 548B–E:
" Rescission of a contract discharges both parties from any further
G    liability to perform their respective primary obligations under the contract,
that is to say, to do thereafter those things which by their contract they
had stipulated they would do." This statement is in accord with the earlier
statements of principle in the authorities cited above and it cannot be
distinguished on the ground that it concerns the Sale of Goods Act. That
Act is merely a codification of the common law. In those circumstances,
H    the contract is at an end save for those rights which have accrued. Reliance
is also placed on the observations of Lord Reid and Lord Upjohn in
*Suisse Atlantique Société d'Armement Maritime S.A.* v. *N.V. Rotter-
damsche Kolen Centrale* [1967] 1 A.C. 361, 398c, 419c, 421F–422, 425 and

the observations of Lord Denning M.R. and Cross L.J. in *Harbutt's*
*"Plasticine" Ltd.* v. *Wayne Tank and Pump Co. Ltd.* [1970] 1 Q.B. 447,   A
464, 465, 475c. See also *The Mihalis Angelos* [1971] 1 Q.B. 164, 196, 202,
209H, where the Court of Appeal there reversed the judgment of Mocatta J.
which was based on grounds akin to the observations of the Court of
Appeal in the present case [1971] 1 W.L.R. 934, 943H. The above autho-
rities are inconsistent with the reasoning of the Court of Appeal, pp. 943,
944, before one even comes to consider the position of the guarantor. At   B
the moment of rescission there arose a right to damages in the creditor for
breach of the agreement as a whole. The respondents' argument ignores
the position of the guarantor. Clause (IX) is the only clause in this agree-
ment which creates the obligation to make the payments of £6,000 a week
with a final payment of £4,000. Once this contract was rescinded by the
creditor and the contract ceases to exist, then the obligation in clause (IX)
ceases to exist and the obligation on the guarantor in clause (XIII) also   C
ceases to exist. It is plain that the guarantor's obligation is ancillary from
the language of clause (XIII) itself. His obligation is a specific and limited
obligation.

It is pertinent to consider the arguments which stem from convenience.
In an instalment contract, it should not be predicated that the creditor
should always have two persons to fall back on. If there is default on an   D
instalment the creditor can either call upon the guarantor to pay in respect
of that instalment or repudiate the contract and sue the principal debtor,
in which event the guarantor is no longer liable to pay for payments in
futuro. It is submitted that the guarantor's obligation was not tied to
the old pre-existing debt, but is confined to the modification of the original
agreement in that the principal debtor promised to pay at the rate of £6,000
a week. Contracts of surety and guarantee are to be construed strictly.   E

As to the effect on accrued unpaid instalments where rescission could
operate to the detriment of the guarantor, in *Rowlatt on Principal and*
*Surety*, 3rd ed. (1936), p. 102, it is stated: " A guarantee will only extend to
a liability precisely answering the description contained in the guarantee "
and at p. 114: " Where the terms of the principal contract are not set forth
in the bond or guarantee of the surety, the rule is laid down in *Holme* v.   F
*Brunskill* (1877) 3 Q.B.D. 495, that a material variation in that contract will
discharge the surety." Strong reliance is placed upon the judgment of
Cotton L.J. in that case at pp. 505, 506. It is necessary to look at the con-
tract and the contract of guarantee and ask the question: is this a contract
which could prejudice the guarantor? For if so the interest of the guar-
antor should be considered.

The prejudice to the guarantor here may be stated thus: The appellant   G
gave his guarantee in consideration of the obligations undertaken by the
respondents in the agreement. By rescinding the agreement on December
22, 1967, the respondents, by their own voluntary act, put an end to their
obligations to the prejudice or potential prejudice of the appellant. The
respondents reasserted their lien upon the principal debtor's goods and
refused to make further deliveries thus depriving the principal debtor of   H
potential profit and making it less able to make guaranteed payments or
to reimburse the appellant. Thus by their own election, the respondents
so altered the contractual position and so interfered with the appellant's

A    right as guarantor as to release him from liability under the agreement.
Reliance is also placed on the second ground given for the decision in *In re Darwen and Pearce* [1927] 1 Ch. 176, which is applicable here. If *Holme* v. *Brunskill* (1877) 3 Q.B.D. 495 be applicable then the guarantor is wholly discharged, that is, in respect of the accrued liability and also in respect of future payments: see *Midland Motor Showrooms Ltd.* v. *Newman* [1929] 2 K.B. 256, 260, 263. The official referee in the present case
B    has applied in express terms *Holme* v. *Brunskill* but then went on to hold that it did not affect the liability of the guarantor to pay for the accrued payments, but that is to go contrary to the authorities. In the present case, on December 22, 1967, the accrued payments had not been paid. The guarantor could at that date have been called upon to pay. But the creditor repudiated the contract and, therefore, if the guarantor is called upon to pay after December 22, the guarantor is prejudiced since the action
C    of the creditors in cutting off supplies to the principal debtor was to make it more difficult for the guarantor subsequently to have any successful recourse to the principal debtor.

The contention that the liability under clause (XIII) could survive the cessation of the contract under clauses (I) to (XII) is not one that has ever been pleaded or argued hitherto against the appellant.

D    As to *Chatterton* v. *Maclean* [1951] 1 All E.R. 761, 764, 765, the argument put forward by the defendant there is not one put forward by the appellant in the present appeal.

[Reference was also made to *National Bank of Nigeria Ltd.* v. *Awolesi* [1964] 1 W.L.R. 1311.]

*Anthony Lloyd Q.C., A. B. R. Hallgarten* and *Martin Moore-Bick*
for the respondents. (1) Where performance of a contract is guaranteed
E    by a third party and the contract is broken, the guarantor is liable whether or not the time of performance has arrived. This proposition follows from the ordinary law of anticipatory breach and from the law of principal and surety. In the present case, Moschi guaranteed the performance of Rolloswin Ltd. to pay and that obligation was broken by Rolloswin in its entirety. The appellant then and there became liable under his guarantee
F    for the entire breach. (2) If the above submission is held to be too technical, then: (3) The substance of the contract here was that the appellant would guarantee payment of the existing debt up to £40,000, and part of the consideration for that was the respondents' forbearance to sue on the debt. On acceptance of the repudiation the respondents could thereupon sue for the original debt, and since the debt had never been paid the appellant was liable on his guarantee. (4) The appellant by December 22, 1967,
G    had evinced an intention not to be bound by his contract.

As to (3), two questions remain to be answered: (a) What happened to the debt of £40,000 when the agreement of November 29, 1967, was made? (b) What is the true construction of clause (XIII) of the agreement?

As to (a), the debt remained after November 29, 1967, notwithstanding the agreement of that date. After acceptance of that repudiation, the
H    respondents were entitled to sue for that debt. It is said that this is to confuse repudiation with rescission. It is conceded that acceptance of repudiation does not avoid a contract ab initio. On the facts of the present case, it is improbable that the respondents would abandon a debt of

£40,000 owed by the company on the mere promise to pay by instalments.    A
Clause (XIII) on its true construction shows that the appellant was guaran-
teeing the debt subject to the terms of repayment.

In determining the object of the contract, the House is entitled to look
at the surrounding circumstances. If any question of ambiguity in clause
(XIII) arises, it should be construed contra proferentem the appellant.
Contracts of guarantee are to be construed in the same manner as other
contracts and not strictly in favour of the guarantor: see *Rowlatt on Prin-*    B
*cipal and Surety,* 3rd ed., p. 60.

The agreement of November 29 did not extinguish the underlying
debt; it merely provided for payment by instalments and the respondents
were entitled to sue for the whole debt on December 22, and not merely
for the instalments. The appellant guaranteed the whole debt and not
merely the instalments. The fact that the guarantee comprised the whole
debt is strongly supported by clause (XI). If that approach be correct,    C
then that is the end of these proceedings.

The broad effect of the appellant's submission is that acceptance of
the repudiation automatically discharges the guarantor from future obli-
gations. It was said that even if acceptance of repudiation does not auto-
matically discharge the guarantor, he is discharged if there is injury to
the guarantor. As to this argument, there is no case that so decides and    D
*Chatterton* v. *Maclean* [1951] 1 All E.R. 761, so far as it goes, negatives
that contention. It is against common sense that a guarantor should be
discharged in those circumstances for it is the repudiation of the agreement
against which the creditor is guaranteed. Acceptance of repudiation al-
though it discharges further performance does not destroy the underlying
obligation. On an accepted repudiation, the obligation is the same, but
the law provides for discharge by judgment, or accord and satisfaction.    E

If the guarantor has agreed to answer for the repudiation of a contract,
he must have agreed to answer for all the normal consequences of the repu-
diation, namely, that the innocent party is entitled to damages for total
breach of the contract. If the law were otherwise, it would lead to very
grave difficulties for business men who have to deal with guarantees. For
the circumstances in which the court has considered the surety has been    F
discharged, see the cases referred to in *Halsbury's Laws of England,* 3rd
ed., Vol. 18 (1957), p. 502 and *Chitty on Contracts,* 23rd ed., Vol. 2 (1968),
paras. 1681 et seq. The grounds are: (a) Where there has been discharge
of the principal debtor by performance. (b) Where the principal debtor
is released by the creditors. It is plain that the guarantor is then dis-
charged, because otherwise it would be a fraud on the debtor if the creditor
could then go against the guarantor and the guarantor could then go against    G
the debtor. This does not apply here. (c) Where the creditor agrees to
give time to the principal debtor. The guarantor is discharged because
the guarantor might have chosen to pay off the debt and go in the creditor's
name against the principal debtor: *Midland Motor Showrooms Ltd.* v.
*Newman* [1929] 2 K.B. 256. This is not this case. (d) Where the debtor
has been released by operation of law. It is to be noted that this does    H
not apply to a discharge from bankruptcy. (e) Where the creditor releases
securities which otherwise the guarantor would have been entitled to. This
is the second ground of decision in *In re Darwen and Pearce* [1927] 1 Ch.

176. (f) Where the principal contract has been varied between creditor and
A  debtor without the consent of the guarantor: *Holme* v. *Brunskill*, 3 Q.B.D.
495. This is not this case because the acceptance of a repudiation is not
a variation of the contract, but a first step in enforcing the contract. This
is the first ground of the decision in *In re Darwen and Pearce* [1927] 1 Ch.
176. (g) Release by a co-surety.

The appellant is attempting to add another ground to the above, namely,
B  that the obligation is extinguished by acceptance of the repudiation. This
last ground cannot be supported for two reasons: (a) The acceptance of
the repudiation does not extinguish the guaranteed obligation and (b) even
if it did, it would not affect the appellant's obligation under the guarantee.

As to (a): see *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, *per* Lord
Macmillan and Lord Porter.

C  As to (b): there are three reasons: (i) If the original obligation is extin-
guished, it is clear that another obligation takes its place. (ii) If the dis-
appearance of the original obligation discharges the guarantor, then the
guarantor could never be liable after judgment against the principal debtor.
(iii) If the original obligation is extinguished, it is extinguished because
the obligation has been broken by the debtor and this is the very thing
against which the plaintiff has been guaranteed.

D  The true analysis of the facts here is that on December 22, 1967, Rollo-
swin became liable for breach of the entire obligation, and since the appel-
lant was a guarantor for the entire obligation, he was liable on December
22 for the entire breach. What the guarantor guarantees is performance,
and if therefore the principal debtor completely fails in performance, the
guarantor is at once liable for the breach. It is emphasised that the true
analysis of a contract of guarantee is that the guarantor will perform the
E  contract if the principal debtor does not. It is to be observed that the
guarantor cannot be sued in debt. It was originally an action on a special
assumpsit. This has been established since the Year Books: see *Jordan's
Case* (1536) Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3.

In *Mines* v. *Sculthorpe* (1809) 2 Camp. 215 it was held that the guaran-
tor was in breach of his contract for future instalments from the moment
F  that the principal debtor was in breach. That the surety is immediately
liable in default of the principal debtor is clearly stated in *Rowlatt on
Principal and Surety*, 3rd ed., pp. 143, 152. The surety's obligation is to
see that the principal debtor will perform his contract.

*In re Lockey* (1845) 1 Ph. 509 contains a general statement of the duty
of a guarantor. In the present case the appellant was liable up to £40,000
G  for everything that Rolloswin was liable for and since on the doctrine of
anticipatory breach Rolloswin was liable for future instalments, so was
the appellant. See *Wright* v. *Simpson* (1802) 6 Ves.Jun. 714, 734. As to
the example of a building of a piece of special machinery where the builder
ceases his work on it before completion, the surety becomes immediately
liable for the breach of the contract. The obligation is to answer for the
H  default of the principal debtor and it matters not whether it be a breach
of condition or warranty. In *Guest, The Law of Hire Purchase* (1966),
para. 430, p. 187, it is stated: " Upon repudiation by the hirer, the guar-
antor . . . incurs the full liability of the hirer under the agreement, including

à liability to pay damages to the owner in respect of his loss of profit on the transaction." The same principle applies here.    A

It is emphasised that the guarantor is not liable in debt, but is liable in damages in respect of the breach. This is borne out by the precedent to be found in *Bullen and Leake's Precedents of Pleading*, 3rd ed. (1868), p. 163. The footnote to that precedent is of interest with its reference to section 25 of the Common Law Procedure Act 1854.

The Court of Appeal was correct in holding that as soon as Rolloswin's   B conduct was accepted by the respondents as a repudiation of the contract, Rolloswin was then and there in breach of its obligation to pay each future instalment of money as it fell due week by week. That submission is supported by the authority of *Hochster* v. *De la Tour* (1853) 2 E. & B. 678. As to the measure of damages, see *Frost* v. *Knight* (1872) L.R. 7 Exch. 111. Rolloswin thereby became liable to the respondents in damages for the present breaches of those obligations of which performance lay   C in the future. Accordingly, the appellant also became liable to the respondents in damages since he was thereby in breach of his undertaking that Rolloswin would perform. The appellant contended that his obligation to pay for future instalments was extinguished, but that submission is wrong for the reasons given by Lord Macmillan and Lord Porter in *Heyman* v. *Darwins Ltd*. [1942] A.C. 356.    D

*Hallgarten* following on the issue of repudiation. It is the respondents' contention that not only Rolloswin but also the appellant were in repudiation of the agreement. Three questions arise: (1) Was the appellant in repudiation at all? (2) If he was, was that repudiation accepted? (3) If technically there was no acceptance, does that make any difference?

As to (1), the official referee made no finding on this issue. The acts of an individual where he is an officer of the company are his acts as well   E as those of the company. If this were wrong, it would mean that the House was creating a new doctrine of vicarious immunity. The appellant's repudiation consisted in the fact that on the three occasions when the company failed to pay the instalments, the appellant himself failed to pay those sums. By failing to tender the £6,000 or balance this went to the root of the contract. The appellant was in breach of a fundamental term. Alter-   F natively, one can look at the appellant's conduct as a whole and from this it can be seen that the appellant evinced an intention to tear up the agreement as a whole. It is to be remembered that the guarantee was not a separate document, but an integral part of the agreement as a whole.

As to (2), the guarantee was an integral part of the agreement and therefore an implied acceptance of Rolloswin's repudiation is ipso facto an implied acceptance of the appellant's repudiation. Any other position   G would be logically impossible, for the creditor would not without extreme financial danger to himself accept repudiation by the principal debtor before acceptance of repudiation by the guarantor.

As to (3), there is only need to accept repudiation if there is something still capable of performance. Where a repudiation by the guarantor leads to destruction of the guarantee, there is no need to communicate accept-   H ance. Here the conduct of the guarantor was one of the causes of the respondents' putting to an end the contract of the principal debtor; the appellant's repudiation had the effect of waiving further performance by

the respondents: see *Sinason-Teicher Inter-American Grain Corporation*
A  v. *Oilcakes and Oilseeds Trading Co. Ltd.* [1954] 1 W.L.R. 935, 943, 944,
*per* Devlin J. In these circumstances it does not lie in the appellant's
mouth to complain of the respondents' acceptance of Rolloswin's repudi-
ation.

*Waters Q.C.* in reply. As to the ambit of the guarantee in clause (XIII)
it was contended that clause (XIII) extended in some way beyond the guar-
B  antee of specific money payments on particular dates. But the appellant had
no obligation to the respondents until he entered into this guarantee. The
language of clause (XIII) is plain. The consideration given to the appel-
lant is the promises of the two Lep companies. The words " hereinbefore
set out " can only refer to clause (IX). The obligation, therefore, of the
appellant is that Rolloswin will make payments as set out in clause (IX).
It is particular amounts as they fall due which the appellant guarantees.
C  The contract having been determined on December 22, 1967, the instal-
ments which were payable after that date never fell due for payment and
therefore the appellant's guarantee had no subject-matter on which to
fasten.

It was said that there was no authority for the proposition that future
instalments ceased to be payable and that *Chatterton* v. *Maclean* [1951]
D  1 All E.R. 761 was the only case on this question and that it was a decision
to the contrary. In so far as *Chatterton* v. *Maclean* is a relevant authority,
it shows that Parker J. was accepting the proposition that in so far as future
liabilities were concerned, the guarantor would be relieved: see [1951]
1 All E.R. 761, 764, 765. This case is not against the appellant.

As to *Guest, The Law of Hire Purchase*, see para. 429, p. 187, and the
form of indemnity on pp. 632, 633. The statement in para. 430, p. 187, is
E  too wide if it is meant to apply to all contracts of guarantee irrespective of
the language used therein.

There is no case which establishes or asserts that in the law of *Land-
lord and Tenant* a guarantor is liable after the forfeiture of a lease: see, for
example, *Stacey* v. *Hill* [1901] 1 K.B. 660.

A promise to answer for the debt or default of another person is the
F  definition of a guarantee in the Statute of Frauds. It is said that the debt
refers to an existing debt and default. The obligation of the guarantor
is to answer for the default and the obligation is to answer for the default
to pay a sum of money on a particular day. If the date for payment arrives
and the debtor does not pay, the liability of the guarantor arises at the
moment of default. The guarantor must then pay not damages, but pay-
ment of a liquidated sum. Alternatively, where the guarantor guarantees
G  an obligation to pay instalments of money as they fall due, it involves an
undertaking on the guarantor's part to pay them if the debtor does not
and that is the full measure of his obligation. It then falls upon him to pay
and he pays that sum and not liquidated damages. The guarantor does
not bind himself that the debtor will pay, nor is he liable in damages if
the debtor does not pay. It is an ancillary obligation.

H  *Jordan's Case*, Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3 is in no sense against
the appellant for it is not directed to the question: is a claim against the
guarantor one for a liquidated sum or is it a claim for unliquidated
damages?

The guarantor does not guarantee that the principal debtor will perform
his contract; the promise is to discharge the debtor's obligation if he does   A
not.   Contrast a contract of indemnity: see *Anson's Law of Contract,* 22nd
ed. (1964), p. 69, which is cited in *Guest on Hire Purchase,* para. 414,
p. 179.

Reliance was placed on *Bullen and Leake,* 3rd ed., p. 163 and foot-
note, but if this note and its references are examined, it is wholly against
the appellant.   Further, as to the precedents in *Bullen and Leake* on   B
p. 162 et seq., if there was no obligation on the guarantor to pay the price,
the averment would not be in the form it is.   It is pertinent to consider
the precedents in the current edition (11th) of *Bullen and Leake,* pp. 218
to 222.   For example, if the appellant's argument be correct, Precedent
no. 176, p. 221, would have to be framed as a claim in damages.

As to *Wright* v. *Simpson,* 6 Ves.Jun. 714, this does not assist the
appellant.   *In re Lockey,* 1 Ph. 509 turns on the construction of the bond   C
in question.

The precedents to be found in the *Encyclopaedia of Forms and Prece-
dents,* 4th ed., Vol. 9 (1968), forms 4:5, 4:6, pp. 805, 806, forms 5:1, 5:2,
pp. 821, 822, do not support the appellant's first proposition.   The present
case is an example of the release or discharge of the principal debtor: see
the statement in *Halsbury's Laws of England,* 3rd ed., Vol. 18, p. 520,   D
which is supported by *Faber* v. *Earl of Lathom* (1897) 77 L.T. 168, 170.

The fact that in bankruptcy the surety is not discharged on the dis-
charge of the bankrupt is because there is a special statutory provision to
that effect.   See section 30 (3) of the Bankruptcy Act 1914.

If the above be rejected, then it was said that from the moment of
rescission the guarantor is in breach as regards outstanding instalments.
Prima facie he must be given an opportunity to perform, that is, to see   E
that the debtor pays on those future dates.   It is said that it was impossible
for the principal debtor to perform after December 22, 1967.   The question
arises, why is this so?   (1) It may be because he has evinced an intention
not to be bound: see *Howard* v. *Pickford Tool Co. Ltd.* [1951] 1 K.B. 417.
(2) The creditor at his election has determined to break the contract.
(3)   By consensus the primary obligations have gone and a new or sub-   F
stituted agreement arises that the principal debtor must pay.

As to the subsidiary argument in relation to repudiation, it was said
that the appellant must be treated as being in breach of his contract of
guarantee.   The official referee made no finding on this fact although
pressed so to do.   Junior counsel for the respondents has not distinguished
between the acts and omissions of the appellant as an officer of the com-
pany and his acts and omissions in his personal capacity.   This is a vital   G
distinction.   In those circumstances, it was impossible for the official
referee to hold that the appellant was in repudiation of his contract of
guarantee.   The mere fact that there was non-payment when the appellant
was never called upon to pay makes this contention nigh impossible.

Their Lordships took time for consideration.   H

April 26, 1972.   LORD REID.   My Lords, the respondents acted as
forwarding agents for goods imported by a company Rolloswin which was

A.C.                    Lep Air Services v. Rolloswin Ltd. (H.L.(E.) )          Lord Reid

A    controlled by the appellant. The company was in debt to the respondents
who were exercising a lien. In order that the goods should be released
and that the debt should be paid by instalments the respondents, the com-
pany and the appellant made a tripartite agreement on November 29, 1967.
Its objects were that the amount of the debt should be ascertained, that
meanwhile the respondents should release the goods, and that the company
should pay weekly instalments of £6,000 each. The appellant gave a
B    personal guarantee the meaning and effect of which is the subject of this
appeal.

I need not set out the whole of the agreement. It provided for the
immediate release of the company's goods, for the ascertainment within six
weeks of the amount of the company's existing indebtedness which mean-
while should be deemed not to exceed £40,000 and for prompt payment of
any future debts incurred. Then it was provided:
C
"(IX) We will further pay to one of you for the benefit of both of
you or as you may direct, partly to one of you and partly to the other
sums amounting in all to an overall payment at the rate of not less
than £6,000 a week commencing on November 27, 1967—on account
of which you have already received the sum of approximately £3,820
on November 28—until such payments shall have totalled £36,000
D    whereafter we shall pay a further sum of £4,000 one week after the
said sum of £36,000 shall have been paid this, of course, is an addition
to sums currently being paid for further deliveries referred to in
paragraph (VII).

"(X) If our indebtedness to be agreed as hereinbefore set out (in
(IV) above) shall not amount to £40,000 the difference between that
E    sum and the amount of the payments made under (IX) above, shall be
held in credit for us and may be appropriated by us to the discharge
of any future indebtedness we may have to you or either of you in
such proportions as we shall elect. We will make or confirm any
such election in writing for your records.

"(XI) If and in so far as the agreed indebtedness to date referred
to in (IV) above shall amount to more than £40,000 we will continue
F    to discharge such indebtedness at the rate of £6,000 per week and for
the figures of £36,000 and £4,000 set out in paragraph (IX) hereof
there shall be read in substitution such figure part of the total agreed
indebtedness as shall be a multiple of £6,000 and such figures as shall
be required to discharge the indebtedness thereafter being a sum less
than £6,000.

G    "(XII) In further consideration of the above you have agreed that
you will not and do not claim the right to exercise any lien over any
goods consigned to us or to our customers.

"(XIII) In further consideration of the above Mr. Moschi has
personally guaranteed the performance by Rolloswin Investments
Limited of its obligation to make the payments at the rate of £6,000
per week together with the final payment of £4,000 as hereinbefore
H    set out so however that Mr. Moschi's total obligation under this
guarantee shall not exceed the total sum of £40,000 of which approxi-
mately £3,820 has already been paid as aforesaid."

**Lord Reid**          **Lep Air Services v. Rolloswin Ltd. (H.L.(E.))**          **[1973]**

The company failed to carry out the terms of this agreement. By
December 22 it had only paid £10,060. It is in dispute whether three or    A
four instalments had then become payable. Agreeing with your Lordships
I think four amounting to £24,000 were then due. And there were other
matters as regards which the company was then in breach of this agreement.

On December 22 the respondents claimed that these breaches were
fundamental breaches which they were entitled to treat as bringing the
contract to an end. I think that they were right and that the contract was    B
lawfully brought to an end by them on that day. I agree that apart from
any other breaches the failure to pay more than £10,060 of the £24,000
due was by itself in the circumstances a fundamental breach.

The company is now in liquidation and the respondents sue the
appellant in respect of the guarantee set out in clause (XIII).

The official referee held that the total debt of the company at the date
of the agreement was £48,000, and found that the appellant was liable to    C
the respondents for £13,930 with interest. The Court of Appeal found the
appellant liable to pay £29,930 with interest. That represents the whole
£40,000 referred to in clause (XIII) of the agreement less the sums paid by
the company before December 22, 1967.

The first contention of the appellant is that he is under no liability to
pay anything because his obligation under clause (XIII) was discharged by    D
the action of the respondents in accepting the company's repudiation and
so bringing the contract to an end. He supports this startling contention
by relying on the principle that if a creditor agrees to a variation of the
debtor's contract he thereby discharges a guarantor from liability. He
argues that acceptance of a repudiation should be regarded as equivalent
to a variation of the contract. I agree with your Lordships that there is no
substance in this argument and I reject it.    E

His next argument is more formidable. He says, look at clause (XIII).
It merely guarantees that each instalment of £6,000 shall be duly paid.
But by reason of the accepted repudiation the contract was brought to an
end before the later instalments became payable. So they never did
become payable. All that remained after the contract was terminated was
a claim for damages. But I never guaranteed to pay damages. If the    F
creditor chooses to act so that future instalments are not payable by the
debtor he cannot recover them from me.

To meet that argument I think that it is necessary to see what in fact
the appellant did undertake to do. I would not proceed by saying this is a
contract of guarantee and there is a general rule applicable to all guarantees.
Parties are free to make any agreement they like and we must I think    G
determine just what this agreement means.

With regard to making good to the creditor payments of instalments
by the principal debtor there are at least two possible forms of agreement.
A person might undertake no more than that if the principal debtor fails
to pay any instalment he will pay it. That would be a conditional agree-
ment. There would be no prestable obligation unless and until the debtor    H
failed to pay. There would then on the debtor's failure arise an obligation
to pay. If for any reason the debtor ceased to have any obligation to pay
the instalment on the due date then he could not fail to pay it on that date.

A The condition attached to the undertaking would never be purified and the subsidiary obligation would never arise.

On the other hand, the guarantor's obligation might be of a different kind. He might undertake that the principal debtor will carry out his contract. Then if at any time and for any reason the principal debtor acts or fails to act as required by his contract, he not only breaks his own contract but he also puts the guarantor in breach of his contract of B guarantee. Then the creditor can sue the guarantor, not for the unpaid instalment but for damages. His contract being that the principal debtor would carry out the principal contract, the damages payable by the guarantor must then be the loss suffered by the creditor due to the principal debtor having failed to do what the guarantor undertook that he would do.

C In my view, the appellant's contract is of the latter type. He "personally guaranteed the performance" by the company "of its obligation to make the payments at the rate of £6,000 per week." The rest of the clause does not alter that obligation. So he was in breach of his contract as soon as the company fell into arrears with its payment of the instalments. The guarantor, the appellant, then became liable to the creditor, the respondents, in damages. Those damages were the loss D suffered by the creditor by reason of the company's breach. It is not and could not be suggested that by accepting the company's repudiation the creditor in any way increased his loss. The creditor lost more than the maximum which the appellant guaranteed and it appears to me that the whole loss was caused by the debtor having failed to carry out his contract. That being so, the appellant became liable to pay as damages for his breach of contract of guarantee the whole loss up to the maximum of E £40,000.

I do not get much assistance from the authorities such as they are. I go by the terms of the appellant's contract. I find nothing in the authorities which in any way prevents me from reaching what appears to me to be the natural meaning and effect of this contract. It seems never to have been necessary to make a full analysis of the position in a contract of this F kind, and I shall not refer in detail to such indications as there are in the cases, beyond saying that there is no magic in the word guarantee but that the authorities appear to recognise that at least most contracts of guarantee are of this nature.

The Court of Appeal reached the same result by a different route. I am unable to accept some of their reasoning as to what happens when a contract is broken. In particular I cannot agree that after accepted G repudiation the contractual obligations still exist as obligations. For the breach of any contract the normal remedy is damages in money. The contract may have been to deliver, say, 100 tons of wheat. If the party fails to deliver somehow that obligation disappears and by operation of law is replaced by an obligation to pay money. So it appears to me that when a contract is brought to an end by repudiation accepted by the other party H all the obligations in the contract come to an end and they are replaced by operation of law by an obligation to pay money damages. The damages are assessed by reference to the old obligations but the old obligations no longer exist as obligations. Were it otherwise there would be in existence

simultaneously two obligations, one to perform the contract and the other
to pay damages. But that could not be right. The only legal nexus remain-
ing is the obligation to pay the damages; so here when the respondents
elected to end the company's contract by treating their fundamental breach
as a repudiation and accepting it, their right against the company became a
right to get damages. The respondents did not recover these damages
from the company so they were part of the loss suffered by the respondents
as a result of the company's breaches of contract. The appellant as
guarantor had undertaken that the company would carry out its contract
so the damages which the company have not paid were part of the loss
flowing from the appellant's breach of contract for which the appellant is
liable.

It is unnecessary to deal with the other questions argued.

I would dismiss this appeal.

LORD GARDINER. My Lords, I have had the advantage of reading the
opinions of my noble and learned friends, and I agree that this appeal
should be dismissed.

LORD DIPLOCK. My Lords, the terms of the contract which has given
rise to this appeal and what happened after it was made are set out in the
judgment of the Court of Appeal. I agree with the reasons given by my
noble and learned friend, Lord Simon of Glaisdale, for holding that upon the
true construction of clause (IX) of the contract when read in the light of
what had occurred immediately before its execution four instalments of not
less than £6,000 each had become due from the debtor (the defendant
company) to the creditor (the plaintiff companies) by December 22, 1967,
when the creditor elected to treat the contract as rescinded by the previous
repudiatory breaches by the debtor; and also that the debtor's failure to
pay those instalments entitled the creditor so to do. But as there has
been no previous case upon the effect that the rescission of a contract has
upon the liability of a guarantor in respect of the obligations of the principal
debtor of which performance had not fallen due at the date of the rescission,
I propose to make some observations about the general principles of the
law of guarantee which, in my view, govern this situation.

The law of guarantee is part of the law of contract. The law of contract
is part of the law of obligations. The English law of obligations is about
their sources and the remedies which the court can grant to the obligee for
a failure by the obligor to perform his obligation voluntarily. Obligations
which are performed voluntarily require no intervention by a court of law.
They do not give rise to any cause of action.

English law is thus concerned with contracts as a source of obligations.
The basic principle which the law of contract seeks to enforce is that a
person who makes a promise to another ought to keep his promise. This
basic principle is subject to an historical exception that English law does
not give the promisee a remedy for the failure by a promisor to perform
his promise unless either the promise was made in a particular form, e.g.,
under seal, or the promisee in return promises to do something for the
promisor which he would not otherwise be obliged to do, i.e., gives con-
sideration for the promise. The contract which gives rise to the instant

A    appeal does not fall within this exception. In return for the guarantor's promise to the creditor the latter promised to extend credit to the debtor and to release his lien upon the debtor's goods.

Each promise that a promisor makes to a promisee by entering into a contract with him creates an obligation to perform it owed by the promisor as obligor to the promisee as obligee. If he does not do so voluntarily there are two kinds of remedies which the court can grant to the promisee.

B    It can compel the obligor to pay to the obligee a sum of money to compensate him for the loss that he has sustained as a result of the obligee's failure to perform his obligation. This is the remedy at common law in damages for breach of contract. But there are some kinds of obligation which the court is able to compel the obligor actually to perform. In some cases, such as obligations to transfer title or possession of property to the obligee or to refrain from doing something to the detriment of the

C    obligee, a remedy to compel performance by a decree of specific performance or by injunction is also available. It was formerly obtainable only in a court of equity. In these cases it was an alternative remedy to that of damages for breach of contract obtainable only in a court of common law. But, since a court of common law could make and enforce orders for payment of a sum of money, where the obligation was itself an

D    obligation to pay a sum of money, even a court of common law could compel the obligor to perform it. Historically this was the only remedy which the court would grant at common law when an obligor failed to perform this kind of obligation. The remedy of damages for non-performance of the obligation was not available as an alternative.

It ceased to be important to identify an obligation which the obligor had failed to perform as being an obligation to pay a sum of money after

E    the Judicature Act of 1875 had abolished the necessity for a plaintiff to select the form of action appropriate to his claim. But before the Common Law Procedure Acts 1852 to 1860 there were important procedural differences between an action brought to compel performance of the obligation arising from a promise to pay a sum of money for which the form of action was indebitatus assumpsit, and an action brought to recover

F    compensation for the loss sustained as a result of the obligor's failure to perform any other kind of obligation arising out of contractual promises—for which the form of action was a special assumpsit.

In the absence of modern authority it becomes necessary to go back a century or more to see whether a contractual promise by the guarantor to guarantee to the creditor that the debtor would perform his own obligations to the creditor to pay a sum of money to him was itself classified as giving

G    rise to an obligation on the part of the guarantor to pay that sum of money to the creditor if the debtor did not do so, or as an obligation to see to it that the debtor did perform his own obligations to the creditor.

In section 4 of the Statute of Frauds 1677 a contract of guarantee is described in the language of the 17th century as " any special promise to answer for the debt, default or miscarriage of another person." Translated

H    into modern legal terminology " to answer for " is " to accept liability for," and " debt, default or miscarriage " is descriptive of failure to perform legal obligations, existing and future, arising from any source, not only from contractual promises but in any other factual situations capable

of giving rise to legal obligations such as those resulting from bailment,
tort, or unsatisfied judgments.    These words were so construed by Abbott    A
C.J. in *Kirkham* v. *Marter* (1819) 2 B. & Ald. 613, 616.

By the beginning of the 19th century it appears to have been taken
for granted, without need for any citation of authority, that the contractual
promise of a guarantor to guarantee the performance by a debtor of his
obligations to a creditor arising out of contract gave rise to an obligation
on the part of the guarantor to see to it that the debtor performed his    B
own obligations to the creditor.    Statements to this effect are to be found
in *Wright* v. *Simpson* (1802) 6 Ves.Jun. 714, 734, *per* Lord Eldon and in
*In re Lockey* (1845) 1 Ph. 509, 511, *per* Lord Lyndhurst.    These are the
two cases which are cited as authority for this proposition by Sir Sidney
Rowlatt in his authoritative work on *Principal and Surety*.    They can be
supplemented by other similar statements, including one in your Lordships'
House, which confirm that it was taken for granted that this was the legal    C
nature of the guarantor's obligation arising out of a contract of guarantee:
*Mactaggart* v. *Watson* (1835) 3 Cl. & F. 525, 540, *per* Lord Brougham.

It is because the obligation of the guarantor is to see to it that the
debtor performed his own obligations to the creditor that the guarantor is
not entitled to notice from the creditor of the debtor's failure to perform an
obligation which is the subject of the guarantee, and that the creditor's    D
cause of action against the guarantor arises at the moment of the debtor's
default and the limitation period then starts to run.    It is also why, where
the contract of guarantee was entered into by the guarantor at the debtor's
request, the guarantor has a right in equity to compel the debtor to perform
his own obligation to the creditor if it is of a kind in which a court of
equity is able to compel performance: see *Ascherson* v. *Tredegar Dry
Dock and Wharf Co. Ltd.* [1909] 2 Ch. 401.    It is the existence of this    E
right on the part of the guarantor that accounts for the rule laid down by
Lord Eldon in *Samuell* v. *Howarth* (1817) 3 Mer. 272, 278 and approved by
your Lordships' House in *Creighton* v. *Rankin* (1840) 7 Cl. & F. 325, 346
that where the creditor, after the guarantee has been entered into, gives a
contractual promise to the debtor to allow him time to pay the guaranteed
debt, the guarantor is discharged from his obligation to the creditor.    This is    F
because the creditor by altering the debtor's obligation to him has deprived
the guarantor of his equitable right to compel the debtor to perform his
original obligation to the creditor, which was all that the guarantor had
guaranteed.    In contrast, the guarantor is not discharged by the mere
voluntary forbearance of the creditor to take steps to obtain timeous perfor-
mance by the debtor of the obligation which is the subject of the guarantee;
for this does not affect the guarantor's equitable right to compel the debtor    G
to perform it.

It follows from the legal nature of the obligation of the guarantor to
which a contract of guarantee gives rise that it is not an obligation himself
to pay a sum of money to the creditor, but an obligation to see to it that
another person, the debtor, does something; and that the creditor's remedy
for the guarantor's failure to perform it lies in damages for breach of    H
contract only.    That this was so, even where the debtor's own obligation
that was the subject of the guarantee was to pay a sum of money, is clear
from the fact that formerly the form of action against the guarantor which

A.C.    Lep Air Services v. Rolloswin Ltd. (H.L.(E.) )    Lord Diplock

A  was available to the creditor was in special assumpsit and not in indebitatus
assumpsit: *Mines* v. *Sculthorpe* (1809) 2 Camp. 215.

The legal consequence of this is that whenever the debtor has failed
voluntarily to perform an obligation which is the subject of the guarantee
the creditor can recover from the guarantor as damages for breach of his
contract of guarantee whatever sum the creditor could have recovered
from the debtor himself as a consequence of that failure. The debtor's

B  liability to the creditor is also the measure of the guarantor's.

Whether any particular contractual promise is to be classified as a
guarantee so as to attract all or any of the legal consequences to which
I have referred depends upon the words in which the parties have expressed
the promise. Even the use of the word " guarantee " is not in itself con-
clusive. It is often used loosely in commercial dealings to mean an
ordinary warranty. It is sometimes used to mis-describe what is in law

C  a contract of indemnity and not of guarantee. Where the contractual
promise can be correctly classified as a guarantee it is open to the parties
expressly to exclude or vary any of their mutual rights or obligations which
would otherwise result from its being classifiable as a guarantee. Every
case must depend upon the true construction of the actual words in which
the promise is expressed.

D  In the instant appeal, however, the actual words used are simple,
unambiguous, and contain no qualification except to impose a limit upon
the guarantor's maximum liability under the guarantee.

The particular obligation of the debtor of which performance was
guaranteed was to satisfy an existing debt to the creditor by instalments
to be paid in the future. It arose from one of a number of inter-related
mutual promises made by the debtor to the creditor and by the creditor

E  to the debtor all of which were contained in a single contract; but the
guarantor did not guarantee performance by the debtor of any obligations
arising from any of his other promises. As between the debtor and the
creditor all their obligations to one another to which their mutual promises
gave rise, including the particular obligation of which performance was
guaranteed by the guarantor, possessed the characteristics which the law

F  ascribes to obligations whose common source is the same contract.

The debtor failed to perform voluntarily many of his obligations under
the contract—both the obligation of which performance was guaranteed
and other obligations. The cumulative effect of these failures by December
22, 1967, was to deprive the creditor of substantially the whole benefit
which it was the intention of the parties that he should obtain from the
contract. The creditor accordingly became entitled, although not bound,

G  to treat the contract as rescinded: see *Hongkong Fir Shipping Co.* v.
*Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26. He elected to do so on
that date. It was held by the official referee and by the Court of Appeal,
in my view rightly, that the debtor's failures to pay the instalments of the
existing debt were in themselves sufficient to deprive the creditor of sub-
stantially the whole benefit which it was the intention of the parties that

H  he should obtain from the contract, even if his failures to perform other
obligations were left out of account.

My Lords, it has become usual to speak of the exercise by one party
to a contract of his right to treat the contract as rescinded in circumstances

such as these, as an "acceptance" of the wrongful repudiation of the
contract by the other party as a rescission of the contract. But it would    A
be quite erroneous to suppose that any fresh agreement between the parties
or any variation of the terms of the original contract is involved when the
party who is not in default elects to exercise his right to treat the contract
as rescinded because of a repudiatory breach of the contract by the other
party. He is exercising a right conferred upon him by law of which the
sole source is the original contract. He is not varying that contract; he is   B
enforcing it.

It is no doubt convenient to speak of a contract as being terminated
or coming to an end when the party who is not in default exercises his
right to treat it as rescinded. But the law is concerned with the effect of
that election upon those obligations of the parties of which the contract
was the source, and this depends upon the nature of the particular obliga-
tion and upon which party promised to perform it.                            C

Generally speaking, the rescission of the contract puts an end to the
primary obligations of the party not in default to perform any of his con-
tractual promises which he has not already performed by the time of the
rescission. It deprives him of any right as against the other party to
continue to perform them. It does not give rise to any secondary obligation
in substitution for a primary obligation which has come to an end. The   D
primary obligations of the party in default to perform any of the promises
made by him and remaining unperformed likewise come to an end as does
his right to continue to perform them. But for his primary obligations there
is substituted by operation of law a secondary obligation to pay to the other
party a sum of money to compensate him for the loss he has sustained as a
result of the failure to perform the primary obligations. This secondary
obligation is just as much an obligation arising from the contract as are the   E
primary obligations that it replaces: see *R. V. Ward Ltd.* v. *Bignall* [1967]
1 Q.B. 534, 548.

Although this is the general rule as to the effect of rescission of the
contract upon obligations of which it was the source, there may be excep-
tional primary obligations which continue to exist notwithstanding that the
contract has been rescinded. These are obligations that are ancillary to the   F
main purpose of the contract—which is, of course, that the parties should
perform their primary obligations voluntarily. Mutual promises to submit
to arbitration disputes arising as to the performance by the parties of their
other obligations arising from the contract may be expressed in terms which
make it clear that it was the common intention of the parties that their
primary obligation to continue to perform these promises should continue
notwithstanding that their other primary obligations had come to an end:   G
*Heyman* v. *Darwins Ltd.* [1942] A.C. 356.

But this is the exception. Although in the instant appeal the Court of
Appeal came to the right decision, I cannot accept entirely that part of their
reasoning in support of it in which they suggest that the primary obligation
of the debtor to continue to pay the instalments which he had promised
under clause (IX) of the contract was not ended by the rescission of the   H
contract but remained in existence although the law no longer permitted
him to pay them. A legal obligation to continue to perform is inconsistent
with the withdrawal of any legal right to do so. The better explanation is

A  that which I have already given, viz., that upon rescission of the contract the primary obligation of the debtor to pay the instalments was converted by operation of law into a secondary obligation either to pay damages for failure to perform it; or, as these were instalments of a debt existing at the date of the contract, it may be a revived obligation to pay the balance of the whole debt immediately.

B  The guarantor's obligation under his contract of guarantee does not, as the Court of Appeal appear to suggest, depend upon the debtor's primary obligation continuing to exist after the contract had been rescinded. Nor is it affected by whether the debtor's secondary obligation which was substituted for it by operation of law is classified as an obligation to pay damages or as an obligation to pay the debt. It was the debtor's failure to perform his primary obligation to pay the instalments in circumstances which put an end to it that constituted a failure by the guarantor to perform

C  his own primary obligation to the creditor to see that the instalments were paid by the debtor, and substituted for it a secondary obligation of the guarantor to pay to the creditor a sum of money for the loss he thereby sustained. It is the guarantor's own secondary obligation, not that of the debtor, that the creditor is enforcing in his claim for damages for breach of his contract of guarantee.

D  It is unnecessary for the decision of the instant appeal to consider what would have been the liability of the guarantor if the debtor had paid the guaranteed instalments punctually, but had failed to perform his other contractual obligations which were not the subject of the guarantee. It may well be that the effect of such breaches alone would not be such as to deprive the creditor of substantially the whole benefit which it was the intention of the parties that he should obtain from the contract so that no

E  right to treat the contract as rescinded would have arisen. Or it may be that the mutual promises as to the existing debt should be regarded as severable from the other promises so as to attract the legal characteristics of a separate contract although incorporated in the same document as the other mutual promises. In fact, however, the debtor's breaches in relation to the payment of the guaranteed instalments would have been sufficiently

F  serious in themselves to entitle the creditor to rescind the whole contract even if they had not been accompanied by breaches of its other terms.

My Lords, this analysis of the legal characteristics of the respective obligations of the guarantor, the creditor and the debtor is sufficient to dispose of the arguments advanced on behalf of the guarantor in this appeal. The first was based upon a false analogy between an agreement between the creditor and the debtor to determine or to vary the terms of

G  a contract, and the exercise by the creditor of his right under the contract itself to treat it as rescinded by a repudiatory breach of it by the debtor. The second was based upon the false assumption that the primary obligation of the guarantor was to pay the instalments if the debtor did not do so and that it came to an end when the debtor ceased to be obliged or entitled to pay them as a result of the rescission of the contract.

H  My noble and learned friend, Lord Simon of Glaisdale, deals with both in greater detail in his speech. I agree with and adopt his reasons for rejecting them.

I would dismiss this appeal.

LORD SIMON OF GLAISDALE. My Lords, the facts of this case and the     A
relevant terms of the letter of November 29, 1967, accepted as embodying
the contract finally agreed between the principal debtor ("the company,"
Rolloswin), the principal creditor (the respondents) and the guarantor (the
appellant) are set out in the judgment of the Court of Appeal [1971]
1 W.L.R. 934. I have had the advantage of reading the speeches prepared
by my noble and learned friends, Lord Reid and Lord Diplock; and I agree
with their comments on the judgment of the Court of Appeal. I also agree     B
with the historical analysis made by my noble and learned friend, Lord
Diplock: it is important as showing that the liability of a surety at common
law always sounded in damages rather than in debt, even when he was
guaranteeing a debt.

A subsidiary point was raised in this appeal, relating to £5,000 in a
joint account of the parties' respective solicitors. The appeal on this part
of the case was abandoned during argument; and it is sufficient for me     C
to say that I entirely agree with the judgment of the Court of Appeal at
pp. 946 et seq, on this point.

The common law has framed certain general rules regulating the relation-
ship of principal and surety. These will often govern the relationship in
particular cases—for example, if a surety merely subscribes a contract
between the principal contracting parties with the word "guaranteed"     D
followed by his signature, it is the common law rules which are likely to
be largely significant. But common law rules will frequently be modified
by the terms of the contract of guarantee, which will then pro tanto govern
the relationship of the parties. It follows that I must not be taken to be
propounding hereafter propositions which would be universally applicable.
The first step then, in my view, is to resolve three problems of construction
that arise on this particular contract.     E

The letter of November 29, 1967, states that the contract had been
previously concluded, and that the letter was setting out its terms. In fact
the letter itself introduced amendments to the terms apparently agreed
previously. But there has been no claim for rectification; and, as I have
indicated, the letter of November 29, 1967, has been throughout taken as
setting out the relevant contractual terms. The letter of November 29,     F
1967, was signed by the appellant on behalf of the company as principal
debtor and on his own behalf as guarantor of some of its terms.

*Construction of the contract*

(1) The first, and most important, question of construction is to
determine what it was that the appellant was guaranteeing. This was,
expressly, the *performance* by the company of certain of its obligations     G
under the contract: it is only convenient shorthand to say that he was
guaranteeing payments by the company. In thus guaranteeing *performance*
of obligations, the contract of guarantee was, as will appear, endorsing the
common law obligation and liability of a surety, whereas the contract could
have modified such common law obligation and liability and substituted
some other.     H

(2) It was argued for the appellant that the words "obligation to make
the payments" and "as hereinbefore set out" in clause (XIII) (the
guarantee clause) refer exclusively to the company's obligations under

**A**  clause (IX) of the contract (to pay £40,000 by instalments). But this is not
so: the guarantee clearly also extends to clause (IX) (obligation to pay by
instalments such additional sum as was ascertained to be due). For
example, if the total indebtedness was finally agreed at £60,000, and the
company discharged this sum in accordance with the terms of the contract
by weekly payments amounting to £42,000, and then defaulted as to the
residue (which would arise only under clause (IX)), the appellant would be
**B**  liable on his guarantee for such residue, since it would be less than the
sum of £40,000 which was the limit of his guarantee. This goes to
reinforce the consideration that what the appellant was guaranteeing
(subject to a total liability of £40,000) was *performance* of those contractual
obligations of the company as related to the discharge of its indebtedness
outstanding at November 29, 1967.

**C**  (3) It was common ground before your Lordships that by December
22, 1967, the company was in fundamental breach of its obligations under
the contract including obligations which were not the subject of the
appellant's guarantee, so as to have evinced a repudiation of the contract;
and that such repudiation was on December 22 accepted by the respondents.
The result was that the contract was rescinded; and a secondary obligation
became incumbent on the company (imposed by law, not by contract)—
**D**  namely, to pay damages—in substitution for the primary (contractual)
obligations: see *R. V. Ward Ltd.* v. *Bignall* [1967] 1 Q.B. 534, 548 by
Diplock L.J. It was in issue before your Lordships how far the company
was in default on those obligations which were the subject of the guarantee
—i.e., how many instalments had by then fallen due. The learned official
referee held that four instalments had by then fallen due, and that the short-
fall in payment thereon was "a breach which went to the root of the
**E**  contract." The Court of Appeal held that only three instalments were due;
though they had "no doubt that an identical conclusion should be reached
as to the existence of a wrongful repudiation even if only three instalments
had become due by December 22." The appellant supported the finding of
the Court of Appeal that only three instalments were due; but argued on
this basis that any breach of the guaranteed terms was not so fundamental
**F**  as to amount to a repudiation. How many instalments had become due
depends on when, on the proper construction of clause (IX), the first
payment of £6,000 became payable. The crucial words are "payment at
the rate of not less than £6,000 a week commencing on November 27,
1967." The natural meaning of these words is that the first £6,000 became
due on November 27, 1967. If this were so, four instalments were due by
December 22—i.e., a total of £24,000, of which no more than £10,060
**G**  had been paid. But then there is the odd feature that the words in the
letter of November 29, 1967, "on account of which you have already
received the sum of approx. £3,820 on November 28" apparently recited
neutrally a breach of the contract at the very moment of its execution. I
do not doubt that it was this consideration which caused the Court of
Appeal to prefer their construction. But a scrutiny of the exchange of
**H**  letters between the company and the respondents that took place
immediately before the letter of November 29, which itself referred to that
exchange of letters and purported (though at variance with fact) to be doing
no more than recording the terms agreed therein, and a scrutiny of the

original document of November 29 (with its manuscript amendments) fully
explain why the figures £3,820 appear in clause (IX) where one might
expect the figures £6,000. It is not permissible to construe a contract by
reference to the negotiations leading thereto, for reasons explained most
recently by my noble and learned friend, Lord Wilberforce, in *Prenn* v.
*Simmonds* [1971] 1 W.L.R. 1381, 1384, 1385. However, in order to
ascertain what a promisee had a right to expect from the words used it is
permissible to look not merely to the words used but to all the circum-
stances. As Lord Wilberforce said in *Prenn* v. *Simmonds* (at pp. 1383H,
1384A): " The time [has] long passed when agreements, even those under seal,
were isolated from the matrix of facts in which they were set and interpreted
purely on internal linguistic considerations." The circumstances explain
beyond doubt how it was that by manuscript amendment the words " the sum
of approx. £3,820 " appear in clause (IX) of the letter of November 29, 1967,
and that this affords no reason for reading the words of this clause in other
than the sense they would naturally bear; with the result that four instal-
ments were due by December 22. But even if only three instalments had
been due by this date, I would agree with the Court of Appeal that the
shortfall in guaranteed performance was itself a breach going to the root
of the contract, so amounting to a repudiation thereof.

*The accrued instalments*

It was argued for the appellant that when, on December 22, 1967, the
respondents accepted the company's repudiation of its contractual obliga-
tions, the appellant was discharged from his liability as guarantor, not only
in respect of instalments due after December 22 but also in respect of
any liability arising from the company's failure to meet its contractual
obligations as regards the instalments payable theretofore. The appellant
relied on *Holme* v. *Brunskill* (1877) 3 Q.B.D. 495, and in particular
on a passage from the reserved judgment of Cotton L.J., at pp. 505, 506:

" The true rule in my opinion is, that if there is any agreement
between the principals with reference to the contract guaranteed, the
surety ought to be consulted, and that if he has not consented to the
alteration, although in cases where it is without inquiry evident that
the alteration is unsubstantial, or that it cannot be otherwise than
beneficial to the surety, the surety may not be discharged; yet, that if
it is not self-evident that the alteration is unsubstantial, or one which
cannot be prejudicial to the surety, the court will not, in an action
against the surety, go into an inquiry as to the effect of the alteration,
or allow the question, whether the surety is discharged or not, to be
determined by the finding of a jury as to the materiality of the altera-
tion or on the question whether it is to the prejudice of the surety,
but will hold that in such a case the surety himself must be the sole
judge whether or not he will consent to remain liable notwithstanding
the alteration, and that if he has not so consented he will be
discharged."

It was argued for the appellant that the respondents' acceptance of the
company's repudiation effected a substantial alteration in the contractual
relationship of the parties; that this was clearly prejudicial to the appellant's

A    interest as guarantor; that he should, therefore, have been consulted before,
and his consent obtained to, the alteration; and that, since he was not so
consulted and never consented, he was discharged from liability.

This seems to me to be, with all respect, an impossible argument. It is
only in the jurisprudence of Humpty-Dumpty that the rescission of a
contract can be equated with its variation. The acceptance of the repudia-
tion of an agreement does not alter its terms in any way—it merely
B    transmutes the primary obligation of the promisor to perform the terms
contractually into a secondary obligation, imposed by law, to pay damages
for their breach.

Moreover, the suggested rule would make nonsense of the whole
commercial purpose of suretyship: you would lose your guarantor at the
very moment you most need him—namely, at the moment of fundamental
C    breach by the principal promisor. Take a usual case giving rise to
suretyship—that of a trader with a bank overdraft. The bank forbears to
close the account (so as to put the trader into bankruptcy or liquidation)
in consideration of the trader finding a guarantor of the overdraft and
agreeing to pay it off by instalments. The trader thereafter repudiates his
obligation to pay off the overdraft by instalments; whereupon the bank
closes the account, so terminating the contractual relationship of banker
D    and customer. It would be absurd to suppose that the guarantor of the
overdraft was thereby discharged from his liability as surety.

Finally, if authority were needed *Chatterton* v. *Maclean* [1951] 1 All
E.R. 761 is against the appellant's proposition (see the passage from
Parker J.'s judgment cited below.)


E    *The outstanding instalments*

It was on this part of the case that counsel for the appellant mounted
his most formidable argument. In outline this ran as follows. What the
appellant was guaranteeing was that the company would make weekly
payments on dates most of which fell after December 22, 1967. When,
on December 22, the respondents accepted the company's repudiation, the
contract was rescinded by agreement between them; and the company had
F    thereafter no duty (or, indeed, right) to make the stipulated payments which
the appellant had guaranteed. It follows that the subject-matter of the
appellant's guarantee entirely disappeared after December 22, so that he
was pro tanto exonerated from all liability in relation thereto. The
company admittedly became immediately liable to pay damages for breach
of its contract to make payments; but the appellant had guaranteed the
G    later payments, not the immediate damages.

It was argued for the respondents, on the other hand, that the contractual
duty assumed by the appellant was to ensure the performance by the
company of such of its contractual obligations as were guaranteed; and
that, when the company evinced an intention not to perform its guaranteed
contractual obligations, and when such repudiation was accepted by the
respondents, the appellant became in breach of his own obligation, so as
H    himself to be liable in damages.

In my judgment, the argument for the respondents is the correct legal
analysis, for the following reasons: —

Lord Simon of
Glaisdale        Lep Air Services v. Rollowin Ltd. (H.L.(E.))        [1973]

(1) The contention of the appellant is, in my view, both in principle and
in practice impossible to reconcile with the rule in *Hochster* v. *De la Tour*
(1853) 2 E. & B. 678—namely, that if a promisor under a contract, even
before the time for its performance has arrived, evinces an intention not to
perform it, the promisee may treat this as an immediate breach of contract
and bring his action accordingly. Logical objections have been advanced
against this rule, mainly on the ground that the promisor has a locus
poenitentiae, and may decide, and put himself in a position, to perform his
promise before its time for performance has arrived. But the rule is firmly
established in the law, having been consistently followed, and been approved
in *Martin* v. *Stout* [1925] A.C. 359, 363, 364. Whatever theoretical
criticism can be advanced, the rule is really the only one which is
practicable: as Sir Frederick Pollock pointed out (*Principles of Contract,*
13th ed. (1950) p. 218), the alternative would be to hold the promisee to
an election either to rescind the contract, thereby renouncing any claim for
damages, or to ignore the promisor's refusal and to await the time for
performance, thereby remaining bound to show himself ready and willing
to perform at that time although he knows the promisor will not be. In
the instant case, therefore, it was accepted that the respondents could, on
December 22, treat the company's conduct as a refusal to perform the
executory part of the contract, and sue the company at once for damages
for breach of contract, notwithstanding that the company might notionally
have changed its mind before the time for performance had arrived and
decided to comply with its executory obligations. The measure of damages
in such an action would be the totality of the outstanding debt with a
discount for accelerated payment: cf. *Frost* v. *Knight* (1872) L.R. 7
Exch. 111, 117. It would be very strange and hardly workable if the
promisee had to wait until the time for the promisor's performance had
arrived before having his remedy against the surety. Indeed, it is difficult to
see how the promisee would even then have any remedy against the surety
unless he had himself in the meantime performed his own obligations under
the contract or (if those obligations were still executory) held himself ready
and willing to perform them. The instant case provides a striking example
of the absurdity of any such requirement. Both conceptually and practically,
I find it impossible to reconcile the appellant's proposition with the policy
of the law exemplified in the doctrine of what is conveniently though
perhaps misleadingly called acceptance of anticipatory breach. If the
appellant is right, the promisee is still, vis-à-vis the surety, impaled on that
same Morton's fork from which the rule in *Hochster* v. *De la Tour,*
2 E. & B. 678 enabled him to escape vis-à-vis the principal promisor.

(2) The appellant's contention becomes even more unworkable if the
obligation the performance of which is guaranteed is not one to pay money,
but to deliver goods or to perform services.

(3) The appellant's argument, again in this part of the case, involves
that the promisee would lose the benefit of the guarantee at the very
moment he most needs it—namely, on a repudiation by the principal
promisor of his obligations under the contract.

(4) The respondents' proposition is supported by the high authority of
Rowlatt, *The Law of Principal and Surety,* 3rd ed. (1936), p. 144. The
learned author was discussing the rule that on default of the principal

13555-mg   Doc 33774-5   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendi
Part 5   Pg 43 of 109
357
**A.35**

A.C.         Lep Air Services v. Rolloswin Ltd. (H.L.(E.))         Lord Simon of
                                                                    Glaisdale

A   promisor causing damage to the promisee the surety is, apart from special stipulation, immediately liable to the full extent of his obligation, without being entitled to require either notice of the default, or previous recourse against the principal, or simultaneous recourse against co-sureties. " The reason for the rule," wrote Rowlatt, " is that it is the surety's duty to see that the principal pays or performs his duty as the case may be. . . ." No other reason for the rule was proposed in argument before your Lordships, nor

B   was the rule itself questioned; which suggests that Rowlatt's proposed reason is the correct one, which his own high standing would in any case vouch. It is true that the authorities which Rowlatt cited for the proposition: *Wright* v. *Simpson* (1802) 6 Ves.Jun. 714 and *In re Lockey* (1845) 1 Ph. 509 are not direct decisions on the point, in the sense of its being their ratio decidendi. But, more significantly, both Lord Eldon in the former case and Lord Lyndhurst in the latter seem to assume without

C   question that the law is as stated by Rowlatt.

   (5) That it is the surety's duty to see that the principal pays, or performs his other duty, as the case may be (so that non-payment or other non-performance by the principal is a breach of the surety's contract, sounding in damages), is further suggested by the wording of section 4 of the Statute of Frauds 1677: " any special promise to answer for the debt, default or

D   miscarriages of another person." The teutonic " answer for " is used here in a sense more accurately connoted in modern English by its romance equivalent " be responsible for " (see *Oxford English Dictionary*, s.v. *answer, v.* I. 3). A further shade of meaning as indicating the nature of the surety's common law obligation may be seen in Shakespeare's " Let his neck answer for it, if there be any martial law."

E   (6) The point is still further reinforced by the historical analysis of my noble and learned friend, Lord Diplock, which shows that the liability of the surety gave rise to an action of special assumpsit not of indebitatus assumpsit, breach therefore sounding in damages and not in debt, even if it was a debt which was guaranteed. (And see also *Jordan's Case* (1536) Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3, *per* FitzJames C.J.; translated Fifoot, *History and Sources of the Common Law Tort and Contract* (1949),

F   pp. 353, 355; but for the correct date and citation (as above) see Simpson in 74 *Law Quarterly Review* at p. 384, Cheshire and Fifoot, *The Law of Contract*, 7th ed. (1969), p. 10.) This is only consistent with the surety's obligation, even when guaranteeing a payment, being not to pay a sum of money in default but to ensure performance of the principal promisor's obligation.

G   (7) Although not a direct decision on the point, *Chatterton* v. *Maclean* [1951] 1 All E.R. 761 supports the respondents' proposition. Parker J. is reported as saying, at pp. 764–765:

   " Counsel for the defendant urges, first, that the very acceptance, the very treating of the hirer's conduct as a repudiation of the contract, amounts to a new contract. That leads to the rather startling conclusion that a guarantor of the performance of a contract is always released

H   where the creditor does what he is lawfully entitled to do, namely, to treat the principal debtor's breach as a repudiation. It would mean that whenever a creditor exercised his ordinary rights a guarantor was

released, not merely in respect of future liabilities, but in respect of
accrued liabilities."

Parker J. treats it as self-evident that, where the principal creditor lawfully
accepts the principal debtor's breach as a repudiation of the contract, the
surety is *not* released either in respect of accrued or of future liabilities.

It follows, in my judgment, therefore, that when on December 22, 1967,
the respondents accepted the company's fundamental breach of the terms
of the contract, including those guaranteed, as a repudiation of the contract,
the respondents were entitled to sue the appellant for the total sum
guaranteed (except in so far as already satisfied by payment made by the
company), and that the measure of damages would be such net sum with
an appropriate discount for accelerated payment (though in the instant case
there is no question of any discount). I would therefore dismiss the appeal
on this ground.

That being so, I do not find it necessary to discuss the interesting
argument by junior counsel for the respondents—namely, that the appellant
had himself by December 22 repudiated his own contractual obligations as
surety; and that either the respondents accepted the appellant's repudiation
or it was unnecessary for them to do so as a preliminary to suing him for
breach of contract. But I feel bound to say that there seemed to me to
be formidable difficulties, both in fact and in law, in this way of putting
the case.

LORD KILBRANDON. My Lords, the background of the agreement dated
November 29, 1967, the construction of which is the subject-matter of
this appeal, was as follows. Rolloswin had become indebted to the
respondents in the sum, unascertained with accuracy at the date of the
agreement, of about £40,000. In order that that debt might be liquidated,
and that Rolloswin might continue to enjoy the services provided by the
respondents in relation to the importation of their merchandise, it was
agreed that the sum owing should be paid off by instalments, future
clearances should be against cash, and the respondents were not to claim
a lien on any goods consigned through them to the respondents and their
customers. The agreement contained a guarantee by the appellant, managing
director and principal shareholder in Rolloswin, in the following terms:

" In further consideration of the above Mr. Moschi has personally
guaranteed the performance by Rolloswin Investments Ltd. of its
obligation to make the payments at the rate of £6,000 per week
together with the final payment of £4,000 as hereinbefore set out so
however that Mr. Moschi's total obligation under this guarantee shall
not exceed the total sum of £40,000 of which *approximately £3,820* has
already been paid as aforesaid."

By December 22, 1967, Rolloswin were in breach of the agreement
inasmuch as they had failed to pay the instalments as they fell due, and
the official referee has held that this breach went to the root of the
contract. Rolloswin having repudiated the contract, the respondents were
entitled to accept repudiation and treat the contract as at an end. The
question is, what was then the position under the guarantee?

The appellant argued that the repudiation of the contract had the effect

A  of discharging the guarantor. But this position is inconsistent with what was said in *Chatterton* v. *Maclean* [1951] 1 All E.R. 761. It appears to depend on a misunderstanding of *Holme* v. *Brunskill*, 3 Q.B.D. 495, in which it was held that an agreement between the principals to vary the terms of the contract guaranteed may discharge the guarantor. But repudiation is not variation.

B  In the present case what the appellant guaranteed was " the performance by Rolloswin Investments Ltd. of its obligations to make payments at the rate of £6,000 per week." This is the class of undertaking referred to in *Rowlatt on the Law of Principal and Surety*, 3rd ed. (1936) at p. 143. The learned author points out that as soon as a breach is committed of the duty, performance of which is guaranteed, the surety is immediately liable to the full extent of his obligation, and gives as " the reason for the rule that it is the surety's duty to see that the principal pays or performs
C  his duty as the case may be." This would be very clear where A had undertaken to deliver a valuable object to B twelve months thence, the performance being guaranteed by C. B having on the following day sold the object to D, he immediately (see *Hochster* v. *De la Tour*, 2 E. & B. 678) becomes liable in damages to B (specific performance being impossible) and C becomes liable under the guarantee accordingly. It is
D  satisfactory that the law of Scotland seems for long to have been the same: " Cautionry is that obligation by which one becomes engaged for a debtor, who hath bound himself to pay a sum or perform a deed, that he shall truly fulfil it "—*Erskine's Institute* (1838) III iii 61, p. 717. Non-performance sounds in damages for which the guarantor is liable with recourse. In the present case the damages for repudiating the obligation to pay the sum due are equal to the whole sum, since in the circumstances
E  it is not suggested that a discount would be appropriate.

It is not necessary to consider the further question whether, on the facts, the appellant's conduct should be construed as a repudiation of his contract of surety, and I therefore express no opinion on it. As regards the question, which on the view I have taken does not arise, whether as at the repudiation Rolloswin was owing three or four instalments, I would
F  agree with the official referee rather than with the Court of Appeal.

I would, accordingly, dismiss this appeal.

*Appeal dismissed.*

Solicitors: *Randall, Rose & Co.; Constant & Constant.*

J. A. G.

G

H

Ch.

A

[COURT OF APPEAL]

M.S. FASHIONS LTD. AND OTHERS v. BANK OF CREDIT AND
COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION) AND
OTHERS

B HIGH STREET SERVICES LTD. AND OTHERS v. BANK OF CREDIT
AND COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION)

IMPEXBOND LTD. AND OTHERS v. SAME

[1992 M. No. 4775]
[1992 H. No. 5560]
C                                           [1992 No. 007615]

1992   Sept. 24, 25;                                    Hoffmann J.
       Nov. 27                                          Hoffmann L.J.

1993   March 15, 16; 25                    Dillon, Nolan and Steyn L.JJ.

D   *Insolvency—Winding up—Set-off—Company's debts to bank guaran-*
    *teed by director as "principal debtor" by charging personal deposit*
    *account with bank—Bank becoming insolvent—Director seeking*
    *to set off claim to return of deposit against liability to pay*
    *company's debts—Whether bank entitled to claim whole debt from*
    *company leaving director to prove for deposit in winding up—*
    *Insolvency Rules 1986 (S.I. 1986 No. 1925), r. 4.90*

E        Between 1984 and 1989 three company directors each signed
    as a "principal debtor" an agreement with the bank whereby, as
    guarantee for repayment of loans by the bank to his company,
    the bank could withdraw money from his deposit account with
    that bank towards satisfaction of his company's debts. In 1992
    the bank was compulsorily wound up. The directors and
    companies issued notices of motion seeking declarations that
F   the directors were entitled, pursuant to rule 4.90 of the
    Insolvency Rules 1986,[1] to set off the sums in their deposit
    accounts against the companies' respective liabilities to the bank.
    The judge granted the declarations.
        On the bank's appeal in the second and third cases:—
        *Held,* dismissing the appeals, that where there were
    existing cross-claims arising out of mutual dealings before the
    commencement of the winding up of a company, rule 4.90 of the
G   Insolvency Rules 1986 took effect so as to bring about a set-off;
    that where a liability had been entered into by a "principal
    debtor" it was a primary liability not contingent upon the making
    of a demand in writing and could constitute a valid cross-claim
    for the purposes of the rule; and that, accordingly, the
    indebtedness of the companies as at the date of the winding up
    of the bank had been extinguished or reduced by the amounts
H   which on that date were standing to the credit of the directors
    on their deposit accounts (post, pp. 445F, 447F–448D, 451F–
    452A).

[1] Insolvency Rules 1986, r. 4.90: see post, p. 445G–H.

The following cases are referred to in the judgment of Dillon L.J. in the    A
Court of Appeal:

> *Barnett, Ex parte; In re Deveze* (1874) L.R. 9 Ch.App. 293
> *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833, C.A.
> *Brown's (J.) Estate, In re; Brown v. Brown* [1893] 2 Ch. 300
> *Caldicott, Ex parte; In re Hart* (1883) 25 Ch.D. 716, C.A.
> *City Equitable Fire Insurance Co. Ltd. (No. 2), In re* [1930] 2 Ch. 293, C.A.
> *Daintrey, In re; Ex parte Mant* [1900] 1 Q.B. 546, C.A.                    B
> *Ellis & Co.'s Trustee v. Dixon-Johnson* [1924] 2 Ch. 451, C.A.; [1925] A.C.
>     489, H.L.(E.)
> *Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.*
>     [1972] A.C. 785; [1972] 2 W.L.R. 455; [1972] 1 All E.R. 641, H.L.(E.)
> *Hiley v. Peoples Prudential Assurance Co. Ltd.* (1938) 60 C.L.R. 468
> *Joachimson (N.) v. Swiss Bank Corporation* [1921] 3 K.B. 110, C.A.
> *Mid-Kent Fruit Factory, In re* [1896] 1 Ch. 567                    C
> *Palmer v. Day & Sons* [1895] 2 Q.B. 618, D.C.
> *Pollitt, In re; Ex parte Minor* [1893] 1 Q.B. 455, C.A.
> *Rowe v. Young* (1820) 2 Bli. 391
> *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573, C.A.
> *Young v. Bank of Bengal* (1836) 1 Moo.Ind.App. 87, P.C.

The following additional cases were cited in argument in the Court of    D
Appeal:

> *Batson v. Spearman* (1838) 9 Ad. & E. 298
> *Birks v. Trippet* (1666) 1 Saund. 28
> *Charge Card Services Ltd., In re* [1987] Ch. 150; [1986] 3 W.L.R. 697; [1986]
>     3 All E.R. 289; [1989] Ch. 497; [1988] 3 W.L.R. 723; [1988] 3 All E.R.
>     702, C.A.
> *Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R.    E
>     1474; [1975] 3 All E.R. 358
> *General Produce Co. v. United Bank Ltd.* [1979] 2 Lloyd's Rep. 255
> *Hill v. Wade* (1616) Cro.Jac. 523
> *Mackay, Ex parte; Ex parte Brown; In re Jeavons* (1873) L.R. 8 Ch.App.
>     643
> *National Benefit Assurance Co. Ltd., In re* [1924] 2 Ch. 339
> *Palmer v. Carey* [1926] A.C. 703, P.C.                    F
> *Quistclose Investment Ltd. v. Rolls Razor Ltd.* [1970] A.C. 567; [1967]
>     3 W.L.R. 1097; [1968] 3 All E.R. 651, H.L.(E.)
> *Wallis v. Scott* (1718) 1 Str. 88
> *Welsh Development Agency v. Export Finance Co. Ltd.* [1992] B.C.C. 270,
>     C.A.

The following cases are referred to in the judgment of Hoffmann L.J.:    G

> *Barnett, Ex parte; In re Deveze* (1874) L.R. 9 Ch.App. 293
> *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833, C.A.
> *Brown's (J.) Estate, In re; Brown v. Brown* [1893] 2 Ch. 300
> *Charge Card Services Ltd., In re* [1987] Ch. 150; [1986] 3 W.L.R. 697; [1986]
>     3 All E.R. 289; [1989] Ch. 497; [1988] 3 W.L.R. 723; [1988] 3 All E.R.
>     702, C.A.
> *Daintrey, In re; Ex parte Mant* [1900] 1 Q.B. 546, C.A.                    H
> *Debtor, In re A; Ex parte Peak Hill Goldfield Ltd.* [1909] 1 K.B. 430, C.A.
> *Dynamics Corporation of America, In re* [1976] 1 W.L.R. 757; [1976] 2 All
>     E.R. 669

A    *Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R.
      1474; [1975] 3 All E.R. 358
    *Farley v. Housing and Commercial Developments Ltd.* (1984) 26 B.L.R. 66
    *M.S. Fashions Ltd. v. Bank of Credit and Commerce International S.A.*
      [1992] B.C.C. 571, C.A.
    *Middleton v. Pollock; Ex parte Knight and Raymond* (1875) L.R. 20 Eq. 515
    *New Quebrada Co. Ltd. v. Carr* (1869) L.R. 4 C.P. 651
B    *Northern Counties of England Fire Insurance Co., In re; Macfarlane's Claim*
      (1880) 17 Ch.D. 337
    *Owen v. Wilkinson* (1858) 5 C.B.(N.S.) 526
    *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573, C.A.
    *Stephens, Ex parte* (1805) 11 Ves. 24

    The following additional cases were cited in argument before Hoffmann J.:

C    *Barclays Bank Ltd. v. T.O.S.G. Trust Fund Ltd.* [1984] A.C. 626; [1984]
      2 W.L.R. 650; [1984] 1 All E.R. 1060, H.L.(E.)
    *Batchellor v. Lawrence* (1861) 9 C.B.(N.S.) 543
    *Bowyear v. Pawson* (1881) 6 Q.B.D. 540, D.C.
    *British Eagle International Airlines Ltd. v. Compagnie Nationale Air France*
      [1975] 1 W.L.R. 758; [1975] 2 All E.R. 390, H.L.(E.)
    *Caldicott, Ex parte; In re Hart* (1883) 25 Ch.D. 716, C.A.
D    *Commercial Bank of Australia Ltd. v. Official Assignee of the Estate of John*
      *Wilson & Co.* [1893] A.C. 181, P.C.
    *Debtor (No. 66 of 1955), In re A.; Ex parte the Debtor v. Waite's Trustee*
      [1956] 1 W.L.R. 1226; [1956] 3 All E.R. 225, C.A.
    *Ellis & Co.'s Trustee v. Dixon-Johnson* [1925] A.C. 489, H.L.(E.)
    *Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.*
      [1972] A.C. 785; [1972] 2 W.L.R. 455; [1972] 1 All E.R. 641, H.L.(E.)
    *Hanson, Ex parte* (1811) 18 Ves. 232
E    *Ince Hall Rolling Mills Co. Ltd. v. Douglas Forge Co.* (1882) 8 Q.B.D. 179
    *Langley Constructions (Brixham) Ltd. v. Wells* [1969] 1 W.L.R. 503; [1969]
      2 All E.R. 46, C.A.
    *Lep Air Services Ltd. v. Rolloswin Investments Ltd.* [1971] 1 W.L.R. 934;
      [1971] 3 All E.R. 45, C.A.; [1973] A.C. 331; [1972] 2 W.L.R. 1175;
      [1972] 2 All E.R. 393, H.L.(E)
F    *Mackay, Ex parte; Ex parte Brown; In re Jeavons* (1873) L.R. 8 Ch.App.
      643
    *Mersey Steel and Iron Co. v. Naylor, Benzon & Co.* (1882) 9 Q.B.D. 648,
      C.A.; (1884) 9 App.Cas. 434, H.L.(E.)
    *Peat v. Jones & Co.* (1881) 8 Q.B.D. 147, C.A.
    *Rolls Razor Ltd. v. Cox* [1967] 1 Q.B. 552; [1967] 2 W.L.R. 241; [1967]
      1 All E.R. 397, C.A.
    *Sass, In re; Ex parte National Provincial Bank of England Ltd.* [1896] 2 Q.B.
G      12
    *Ulster Bank Ltd. v. Lambe* [1966] N.I. 161
    *Welsh Development Agency v. Export Finance Co. Ltd.* [1992] B.C.C. 270,
      C.A.

### MOTIONS

H  M.S. FASHIONS LTD. AND OTHERS v. BANK OF CREDIT AND COMMERCE
    INTERNATIONAL S.A. (IN LIQUIDATION) AND OTHERS

    The plaintiffs, M.S. Fashions Ltd., M.S. Fashions (Wholesale) Ltd.
and Mohammed Sarwar, as against the defendants, the Bank of Credit

and Commerce International S.A. (in liquidation) and Anthony Richmond and Roger Taylor, joint administrative receivers of the first and second plaintiffs, by a notice of motion dated 5 June 1992, asked the court to determine certain questions of law relating to the principles of set-off in insolvency in respect of the first and second plaintiff companies' gross aggregate indebtedness to the bank as at 5 July 1991, £596,945·36, together with any interest thereon accruing thereafter.

The questions of law to be determined were (a) whether the third plaintiff's set-off, pursuant to rule 4.90 of the Insolvency Rules 1986, of the bank's debt to him in respect of the amount standing to his credit on his deposit account with the bank's Isle of Man branch, against his liability to the bank as guarantor of the first and second plaintiff companies' gross aggregate indebtedness to the bank, either as "principal debtor," or alternatively following a demand for payment, made by the bank on 12 November 1991, constituted or took effect as a payment by him, as guarantor of the companies' liabilities to the bank, of part of their gross aggregate indebtedness thereby partially discharging it, so that the true level of their indebtedness to the bank was the amount of their net aggregate indebtedness, namely the gross aggregate indebtedness after account was taken of the set-off; (b) whether, alternatively, by reason of the bank's liquidation and on its failure or inability to repay to the third plaintiff, the sums standing to his credit on his Isle of Man deposit account, the bank appropriated or was to be deemed to have appropriated those sums in partial satisfaction and discharge of the gross aggregate indebtedness of the companies, thus reducing the true level of their indebtedness to the amount of their net aggregate indebtedness; (c) whether the companies' offer to pay £318,031·92, contained in a letter dated 27 May 1992 from the third plaintiff's solicitors to the bank's solicitors, was a good tender of all the sums due from the plaintiffs to the bank, on payment of which the bank was bound to discharge the debentures, mortgages and charges held by it in respect of the property and assets of the companies, and to release all securities and guarantees held by it in respect of such indebtedness; (d) whether, if the issue in (c) above were to be determined in the plaintiffs' favour, the second defendants, Anthony Richmond and Roger Taylor, the companies' joint administrative receivers, upon being informed by the plaintiffs' solicitors by letter dated 29 May 1992 that funds were available to pay the companies' preferential creditors and their reasonable costs until that date, were under a duty to cease to act as joint administrative receivers, to determine the receivership and to refrain from any act pursuant to their appointment by the bank, as such receivers, on 20 May 1992; (e) whether, if the issue in (c) above were to be resolved in the plaintiffs' favour, the joint administrative receivers' costs incurred after the tender made on 27 May 1992 should be paid by the bank, by reason of its refusal of such tender.

HIGH STREET SERVICES LTD. AND OTHERS v. BANK OF CREDIT AND COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION)

The plaintiffs, High Street Services Ltd., Portmaid Fashions Ltd., Cira Ltd., Raees Ahmed, and Saeed Ahmed, by notice of motion dated

A   29 June 1992 sought as against the bank a declaration that in taking
account of what was due (a) by the first, second and third plaintiffs
under a cross-guarantee and debenture dated 10 June 1989, made
between the first plaintiff and the bank; (b) by the first, second and
third plaintiffs under a charge by way of legal mortgage dated 2
October 1989, made between the first three plaintiffs, the first plaintiff
B   and the bank, affecting 130, High Street, Gosport; (c) under a charge
by way of legal mortgage dated 2 October 1989, between the first three
plaintiffs and the bank, affecting 62, Somers Road, Southsea;
(d) under a charge by way of legal mortgage, dated 2 October 1989,
between the first three plaintiffs, the first plaintiff and the bank,
affecting 1, Arundel Street, Porstmouth; (e) by the fifth plaintiff under
C   a charge by way of legal mortage dated 2 October 1989, between the
first three plaintiffs, the fifth plaintiff and the bank, affecting 65,
Ancaster Crescent, Kingston-upon-Thames; (f) under a charge by way
of legal mortgage dated 22 December 1986, between the first plaintiff
and the bank, affecting 132, High Street, Gosport; and (g) under a
charge by way of legal mortgage dated 22 April 1988, between the first
D   three plaintiffs, the first plaintiff and the bank, affecting 131, High
Street, Gosport whether the plaintiffs were entitled to set off sums
standing to the credit of the fourth plaintiff in a deposit account with
the bank at the date upon which it was placed into liquidation, namely
14 January 1992.

   The motion further sought an account of what sums, including
E   interest, were standing to the credit of the fourth plaintiff in the deposit
account on the date of the liquidation, an account of what, if anything,
was due on the cross-guarantees, debentures and other legal charges, and
an order that the plaintiffs be at liberty to redeem the property comprised
in the cross-guarantees, debentures and other legal charges.


F       IMPEXBOND LTD. AND OTHERS V. BANK OF CREDIT AND COMMERCE
                    INTERNATIONAL S.A. (IN LIQUIDATION)

   The plaintiffs, Impexbond Ltd., Tucan Investments Plc., and Nasir
Abdul Amir, by a notice of motion dated 27 July 1992 sought (a) a
declaration that by virtue of rule 4.90 of the Insolvency Rules 1986, an
G   account should be taken of what was due from the third plaintiff as co-
principal debtor with the first plaintiff to the bank and from the bank to
the third plaintiff; and that the sums due from him be set off against the
sums due from the bank; (b) a declaration that by virtue of rule 4.90, an
account be taken of what was due from the third plaintiff as co-principal
debtor with the second plaintiff to the bank and from the bank to the
H   third plaintiff; and that the sums due from him be set off against the
sums due from the bank.

   The three motions were heard together by Hoffmann J.
   The facts are stated in the judgment.

*Alan Steinfeld Q.C.* and *Francis Tregear* for the plaintiffs in the first case.          A
  *Jonathan Sumption Q.C.* and *Helen Davies* for the plaintiffs in the
second and third cases.
  *Neville Thomas Q.C.* and *Robin Dicker* for the bank.

*Cur. adv. vult.*

B

27 November.  HOFFMANN L.J. read the following judgment. There
are before the court motions under R.S.C., Ord. 14A in three actions
which raise a common point of principle on the law of set-off in
insolvency.  A bank advances money to a company.  Repayment is
guaranteed by a director who has a deposit account with the bank.  As
between himself and the bank, the director is expressed to be a principal          C
debtor.  On the insolvency of the bank, can the director set off his claim
for return of his deposit against his liability to pay the company's debt,
so that the debt is wholly or pro tanto extinguished?  Or can the bank
*claim the whole debt form the company and leave the director to prove
in the liquidation for his deposit?*

I shall set out briefly the facts of the three cases.  In *M.S. Fashions
Ltd. v. Bank of Credit and Commerce International S.A.* ("B.C.C.I.")          D
Mr. Sarwar and his brother Mr. Safdar executed a mortgage deed dated
30 May 1984 to secure advances by B.C.C.I. to their companies,
M.S. Fashions Ltd. and M.S. Fashions (Wholesale) Ltd.  The main
purpose of this document was to give B.C.C.I. a mortgage over a
property which the brothers owned in Leeds.  But it also contained a
general covenant by which the brothers (defined, together with their          E
companies, as "the principal debtor") covenanted to pay on demand in
writing all moneys owed by all the persons defined as "the principal
debtor," that is to say, each other and their companies.

On 9 December 1985 Mr. Sarwar gave B.C.C.I. additional security.
He deposited money in an account with B.C.C.I. and signed a letter of
charge by which he charged the deposit to secure the liabilities of the
companies.  He agreed that the bank could at any time without notice          F
apply the deposit towards satisfaction of the companies' indebtedness
and that "the liabilities hereunder shall be as that of principal debtor."
In addition, he signed two unlimited guarantees of the companies'
liabilities in B.C.C.I.'s standard form.  These were expressed to be
additional to any other security the bank might have.

In *High Street Services Ltd. v. B.C.C.I.* Mr. Raes Ahmed on 24 April          G
1989 executed three separate documents each headed "Cash deposit security
terms—third party."  Each was to provide security for advances to one of
his companies: High Street Services Ltd., Portmaid Fashions Ltd. and Cira
Ltd.  They were standard forms which contained both a guarantee of the
company's liabilities and also "as a separate and independent obligation" a
covenant that on demand in writing the companies' liabilities would be
recoverable from Mr. Ahmed as principal debtor.  It also gave B.C.C.I. a          H
charge and other rights in respect of a deposit account in Mr. Ahmed's
name.  In addition, Mr. Ahmed signed separate guarantees of the liabilities
of each company in B.C.C.I.'s standard form.

Ch.                          M.S. Fashions Ltd. v. B.C.C.I.                    Hoffmann L.J.

A      In *Impexbond Ltd. v. B.C.C.I.*, Mr. Nasir Abdul Amir on 11 March 1985 deposited money with B.C.C.I. and executed a charge over the deposit to secure the liabilities of his company Impexbond Ltd. The document was similar to the letter of charge in the *M.S. Fashions* case and provided that "the liabilities hereunder shall be as that of principal debtor." On 29 May 1986 Mr. Amir executed a charge in similar form over the same and another deposit account to secure the liabilities of Tucan Investments Plc. He also executed standard form guarantees of the liabilities of both companies.

B      Thus a common feature of all three cases appears to be that the director signed a document saying that his liability to pay the company's debts was to be as that of a principal debtor. Mr. Thomas, who appeared for B.C.C.I. questioned whether this was entirely true. In the *M.S. Fashions* case he said that including Mr. Sarwar and his brother in the definition of the "principal debtor" was strange, and possibly a mistake. But the bank seems to have wanted to pile up as many cumulative rights as possible against the directors, and I cannot say that as a matter of construction it would make no sense to give effect to the definition. There is no claim for rectification, and I doubt whether it would be possible to show the necessary contrary intent on the part of both parties.

C

D      Mr. Thomas also said that the reference to liability being as that of principal debtor in the *M.S. Fashions* and *Impexbond* cases letters of charge was odd, because the letters did not expressly create any liability. They merely constituted a charge over the deposit in favour of B.C.C.I. On the other hand, I think it is a tenable view that such charges over deposits can be analysed as the creation of a liability on the part of the chargor for the company's debt, not exceeding the amount of the deposit, which can be set off against B.C.C.I.'s liability to repay the deposit. It seems to me that the reference to the liability of the depositor as being that of a principal debtor should, as a matter of construction, be taken as having this effect. Whether or not this is the only way in which it can take effect (see *In re Charge Card Services Ltd.* [1987] Ch. 150, 175) I think that the principal debtor clause enables it to do so.

E

F      B.C.C.I. was compulsorily wound up on 14 January 1992. At that date, the state of accounts between the parties in the three cases was as follows. In the *M.S. Fashions* case, Mr. Sarwar had about £300,000 in the deposit account with B.C.C.I. and his companies owed it about £572,000. Mr. Sarwar claims to set off his deposit against what he owes B.C.C.I. under the mortgage deed and the letter of charge, and says that this will pro tanto extinguish liability of the companies as well. In the *High Street Fashions* case, Mr. Ahmed had about £426,000 on deposit and the companies owed B.C.C.I. over £1m. Mr. Ahmed claims to be able to set off B.C.C.I.'s liability on the deposit against his liability in respect of the companies' debts. In the *Impexbond* case, the companies owed B.C.C.I. about £3·3m. and Mr. Amir had about £4·5m. on deposit. He claims to be able to set off part of this sum against his liability to pay the companies' debts, and to prove in the liquidation of B.C.C.I. for the rest.

G

H      The *M.S. Fashions* case litigation was precipitated by B.C.C.I. (through its liquidators) appointing administrative receivers of both M.S.

Fashions companies on 20 May 1992. On the following day the companies    A
applied to Millett J. for leave to bring proceedings against B.C.C.I. and
an order restraining the administrative receivers from acting. On the
following day Millett J. refused relief on the ground that the claim to set-
off was not arguable. On the same day the Court of Appeal (Woolf and
Scott L.JJ.) [1992] B.C.C. 571 expressed a provisional contrary view,
and gave leave to commence originating summons proceedings against
B.C.C.I. claiming a declaration that the companies' indebtedness had      B
been partially extinguished by the set-off of Mr. Sarwar's deposit. But
the Court of Appeal refused injunctive relief, on the grounds that even
after set-off, the companies would still owe B.C.C.I. about £300,000. On
28 July 1992 Mr. Sarwar paid the balance of the indebtedness and costs,
and the administrative receivers were discharged by consent. The set-off
issue comes before the court on a motion to determine an issue of law     C
under R.S.C., Ord. 14A. Similar motions are brought in the *High Street
Services* and *Impexbond* cases.

   Insolvency set-off has been a creature of statute since the time of
Queen Anne (see section 11 of 4 & 5 Anne c. 17). The current provision
applicable to companies is rule 4.90 of the Insolvency Rules 1986:

> "(1) This rule applies where, before the company goes into        D
> liquidation there have been mutual credits, mutual debts or other
> mutual dealings between the company and any creditor of the
> company proving or claiming to prove for a debt in the liquidation.
> (2) An account shall be taken of what is due from each party to the
> other in respect of the mutual dealings, and the sums due from one
> party shall be set off against the sums due from the other. . . .
> (4) Only the balance (if any) of the account is provable in the    E
> liquidation. Alternatively (as the case may be) the amount shall be
> paid to the liquidator as part of the assets."

This language is substantially the same as that used in earlier bankruptcy
statutes going back to the Bankruptcy Act 1869 (32 & 33 Vict. c. 71).
Between the Supreme Court of Judicature Act 1875 (38 & 39 Vict. c. 77)    F
and the Insolvency Rules 1986, the bankruptcy rule was also applied in
company liquidations.

   Certain principles as to the application of these provisions have been
established by the cases. First, the rule is mandatory ("the mandatory
principle"). If there have been mutual dealings before the winding up
order which have given rise to cross-claims, neither party can prove or
sue for his full claim. An account must be taken and he must prove or     G
sue (as the case may be) for the balance. Secondly, the account is taken
as at the date of the winding up order ("the retroactivity principle").
This is only one manifestation of a wider principle of insolvency law,
namely, that the liquidation and distribution of the assets of the insolvent
company are treated as notionally taking place simultaneously on the
date of the winding up order: see *In re Dynamics Corporation of America*
[1976] 1 W.L.R. 757, 762, *per* Oliver J. Thirdly, in taking the account   H
the court has regard to events which have occurred since the date of the
winding up ("the hindsight principle"). The hindsight principle is
pervasive in the valuation of claims and the taking of accounts in

A  bankruptcy and in winding up. A good example of the principle being applied outside the context of set-off is *In re Northern Counties of England Fire Insurance Co.; Macfarlane's Claim* (1880) 17 Ch.D. 337, in which the value of a claim under a fire insurance policy was determined by reference to the loss suffered in a fire which occurred a month after the insurance company had been wound up.

B  In reading the cases, the interaction of these principles has to be borne in mind. Mr. Thomas for B.C.C.I. said that the right of set-off under rule 4.90 was procedural and that the mutual credits and debits of B.C.C.I. and the directors retain their separate existences until such time as the account is taken in the context of the director filing either a proof or a defence to a claim by the liquidator. This is of course true in the somewhat trivial sense that no account will be taken until something

C  happens which makes it necessary to apply rule 4.90 and to take one. But that cannot in my judgment affect the substantive rights of the parties which, whatever the context in which the question may subsequently arise, are treated as having been determined by an account taken at the date of the winding up. This is a consequence of the mandatory and retroactivity principles. Thus in *Farley v. Housing and*

D  *Commercial Developments Ltd.* (1984) 26 B.L.R. 66, Mr. Farley was director of a building company engaged in erecting two buildings for a developer. On 5 February 1975 the building company resolved to go into creditors' voluntary winding up. At that date, the building company had a claim for money owing under the contract but the developer said it had a cross-claim for damages. Three years later, the liquidator of the building company assigned the benefit of its claim to Mr. Farley

E  personally. He argued that he was entitled to claim in full against the developer, leaving it to prove in his company's liquidation for its damages. But Neill J. rejected this submission. He said, at p. 78, that on the date of the winding up section 31 of the Bankruptcy Act 1914 (in similar terms to rule 4.90) immediately took effect and that "the balance of the account and no more became the sum thereafter owing to or from

F  the respective parties."

  Mr. Thomas cited a number of cases which he said were at variance with the retroactivity principle. But I think that on examination it will be found that none of them are concerned with this principle at all. *New Quebrada Co. Ltd. v. Carr* (1869) L.R. 4 C.P. 651 was decided on demurrer to a replication. A company made a call on the three joint holders of shares. They pleaded a set-off. The company's replication

G  alleged lack of mutuality because after the commencement of the action and before the plea, one of the three had been adjudicated bankrupt and his joint interest in the debt due from the company had thereby vested in his assignees. The shareholders argued that nothing passed to the assignees because on the bankruptcy, by virtue of the then equivalent of rule 4.90, the bankrupt's share of the debt was automatically set off

H  against the company's claim for calls. The Court of Common Pleas held that there had been no bankruptcy set-off: the bankrupt's individual interest in a joint debt could not be set off against the company's joint claim against the three shareholders.

None of this represents any challenge to the retroactivity principle. It   A
is true that Brett J. went on to deal with what the position would be if
the set-off rule did apply and said, at p. 653:

> "I think its only effect is to transfer the claim to the assignees,
> subject, when they seek to enforce it, to a right of the plaintiffs to
> deduct their debt. It does not, I think, extinguish the mutual debts,
> but if it did, I should have thought it would have answered the plea   B
> of set-off. In either view I think it does not leave a right of action in
> the bankrupt against the plaintiffs, and that he cannot, therefore,
> avail himself of his claim against the plaintiffs under an ordinary
> plea of set-off . . ."

This passage is not altogether easy because Brett J. is mounting one
rejected hypothesis on another, but I take him to mean that the set-off   C
rule does not mean that the debt owed to the bankrupt does not pass to
his assignees. It does, and is then subject to the account-taking procedure
of the rule. So whether or not the set-off rule applies, the bankrupt no
longer retains a cause of action which can be used as non-bankruptcy set-
off against the company. Brett J. is not in my view addressing himself to
the retroactivity principle.                                              D

In *In re A Debtor; Ex parte Peak Hill Goldfield Ltd.* [1909] 1 K.B.
430 the debtor owed the company £1,453 in respect of the costs of
unsuccessful litigation. The company presented a bankruptcy petition.
Two weeks before the hearing, the debtor bought £1,460 nominal value
of the company's debenture stock and claimed a set-off. But a couple of
days before the petition was heard, a judgment creditor of the debtor
obtained the appointment of a receiver of the debenture stock by way of   E
equitable execution. The Court of Appeal decided that the execution had
deprived the debtor of his beneficial interest in the stock. Accordingly
there was no mutuality and a receiving order was made. Fletcher Moulton
and Farwell L.JJ., like Brett J. in the *New Quebrada* case, L.R. 4 C.P.
651, thought that bankruptcy set-off applied only after the debtor had
become bankrupt and involved a taking of an account with the trustee,   F
not the bankrupt. Accordingly, the debtor could resist the receiving order
only by a valid plea of statutory set-off. This required mutuality at the
date of the hearing of the petition.

In *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573 Mr.
Dodd borrowed £1,170 from the Sovereign Life Assurance Co. on the
security of his life assurance policies. Before the policies matured, the   G
company was wound up. But Mr. Dodd went on paying his premiums
until the policies became due. By this time there was a scheme of
arrangement under which policy holders were only entitled to substantially
reduced payments in respect of their policies. When the company sued
Mr. Dodd for repayment of the £1,170, he pleaded a set-off of the full
amount due on his policies. The company said that he was entitled to
set-off only the reduced sum payable under the scheme of arrangement.   H
The Court of Appeal held that he was entitled to rely by way of set-off
on the full amount. This is a good example of the hindsight principle, by
which account is taken of the fact that the policies have actually matured

A    after the winding up date. Bowen L.J. expressly drew an analogy with *MacFarlane's Claim*, 17 Ch.D. 337.

Mr. Thomas referred to several other cases which are also in my judgment illustrations on the hindsight principle, and I do not think it is necessary to analyse them at length. In my judgment the retroactivity principle is firmly established. It follows that I reject the submission that there can be no set-off until such time as B.C.C.I. decides to sue the
B    directors and they plead a set-off by way of defence. If there are existing cross-claims arising out of mutual dealings before the winding up, then I consider that rule 4.90 takes effect.

This brings me to the question of whether such cross-claims exist. Mr. Thomas said that with the possible exception of the *M.S. Fashions* case, in which a demand in writing was made in November 1991, B.C.C.I. had
C    no claims against the directors, whether now or at the date of the winding up. The liability of the directors was contingent upon the making of a demand and none had been made. Since the liability of the directors was merely contingent, it could not form the subject of set-off. No doubt they would be entitled to plead set-off if B.C.C.I. decided to make a demand and sue them on their guarantees, but this may never happen. In particular, it will not happen if B.C.C.I. can recover the advances
D    from the companies themselves.

The problem of contingent claims can often be solved by the hindsight principle. *MacFarlane's Claim* was a case in which a subsequent event enabled the court for the purposes of proof to quantify a claim against the insolvent company which had been contingent at the date of the winding up. The same would apply to quantification for the purposes of
E    set-off. *In re Daintrey; Ex parte Mant* [1900] 1 Q.B. 546 shows the hindsight principle applied to a contingent claim in favour of the insolvent. An extended discussion of this and similar cases can be found in *In re Charge Card Services Ltd.* [1987] Ch. 150 and it would be superfluous to cover the same ground. Sometimes, however, the insolvent estate needs to be wound up before it is known either that the contingency has occurred or that it will not occur. The court must then
F    put some value on the contingent claim and it will do this for the purposes of ordinary proof or the taking of an account under rule 4.90. There is no similar mechanism for valuing claims by the insolvent, but I am not sure that this is a real problem. Until the contingency occurs, the liquidator or trustee will not be able to use the claim as either a cause of action or a set-off. If the other party has a cross-claim, he will be able to
G    prove for the full amount. I suppose it may happen that the contingency occurs long after the winding up has been completed and the company is then restored to the register and brings an action. The defendant may have proved for his cross-claim and received a small dividend. Can he still rely on the full claim as a set-off, giving credit for the dividend? For my part, I do not see why not.

If the relationship between B.C.C.I. and the directors was governed
H    only by the standard form guarantees I think that there would be no answer to the submission that the liability of the directors remains contingent. All the guarantees in the B.C.C.I. standard form require a demand in writing before any liability arises on the part of the guarantor.

It is well established that in such a case, no cause of action arises until     A
the demand is made: see *Bradford Old Bank Ltd v. Sutcliffe* [1918]
2 K.B. 833. It would follow that (apart from the *M.S. Fashions* case)
there is nothing due from the directors to B.C.C.I. and no basis for set-
off against what is owed to them on the deposit accounts.

In fact, however, the directors are also liable to B.C.C.I. under the
various instruments I have described and which deems them to be
principal debtors. This liability is in my judgment not contingent at all.     B
It is either a joint and several liability with the companies or at any rate
a several liability for the same debt. In the *M.S. Fashions* case and the
*Impexbond* case the letters of charge made no mention of the need for
any demand. In the case of the mortgage deed in the *M.S. Fashions* case
and the charge on the deposit in the *High Street Fashions* case the
obligation was to pay on demand in writing. However, in the case of      C
primary obligations as opposed to secondary ones like guarantees, a
provision for demand in writing is not regarded as creating a contingency:
see *In re J. Brown's Estate; Brown v. Brown* [1893] 2 Ch. 300. Thus in
the case of a promissory note payable "on demand," the debt arises
immediately the note is given and is not contingent upon demand.

In my judgment the "principal debtor" clauses have the effect of
creating primary liability for the purposes of the rule that the debt is not     D
contingent upon demand. This was the provisional view of Walton J. in
*Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R.
1474, 1483, and I think it was correct. It is true that for some purposes
the courts will look to the underlying reality of the suretyship relationship
rather than the formal agreement that liability is to be as principal
debtor. But this is only for the purpose of protecting the surety's      E
equitable rights against the principal debtor and giving effect to such
consequences as may affect the creditor, such as the surety's right to take
over securities and the rule against double proof. Otherwise there is no
reason why creditor and surety should not make whatever terms they
choose. The right to a demand before liability can accrue is not inherent
in the nature of suretyship and will not be implied unless expressly
provided. There seems accordingly no reason why the parties should not      F
modify the effect of such a provision.

One therefore has on the one hand a liability of B.C.C.I. to the
individual director against a several liability of the director to pay the
same debt as that for which the company is liable. Such liabilities may be
set off against each other. Outside the context of suretyship this was
regarded as beyond doubt in *Owen v. Wilkinson* (1858) 5 C.B.(N.S.)      G
526. It was also applied in a suretyship context by Lord Eldon L.C. in
*Ex parte Stephens* (1805) 11 Ves. 24. This is not an easy case to interpret
because it involved a fraud by one of the parties and it is necessary to
analyse, first, what part the fraud played in the decision and secondly,
whether it would still be a necessary element today. Miss Stephens had
entrusted some gilt-edged stock to her bankers who collected the
dividends on her behalf. They dishonestly sold the stock and kept the      H
£3,000 proceeds, but continued to make payments which they pretended
were the dividends they had received. Meanwhile, Miss Stephens's
brother borrowed £1,000 from the bankers on the security of a joint and

A   several promissory note signed by himself and his sister. The bankers were then adjudged bankrupt and Miss Stephens and her brother petitioned Lord Eldon for an order that the £1,000 owed by Miss Stephens on the promissory note be set off against the £3,000 which she had discovered that the bankers owed her as damages for the conversion of her stock. The problem was therefore very similar to that in the present case, because the alternative was to allow the bankers' assignees to sue the brother for the full £1,000 and leave Miss Stephens to prove in the bankruptcy for her £3,000.

   Lord Eldon L.C. thought that this would be unfair. He said, at p. 28:

> "She had a demand against her brother for the sum of £1,000, as paid to his use; also upon the statute of mutual debts and credits; and they shall not be permitted to say, she shall not, if she chooses, pay the debt; when the consequence is, that she loses her money, and they can call upon him. If she had this equity before the bankruptcy, so she has it afterwards; and therefore she has a clear right to say, they shall hold £1,000 of her money in discharge of the note; and shall deliver up the note."

   In *Middleton v. Pollock; Ex parte Knight and Raymond* (1875) L.R. 20 Eq. 515, 520, Sir George Jessel M.R. explained the basis of Lord Eldon L.C.'s decision:

> "If she had not by fraud been kept in ignorance of the facts, she would have known that the bankers had a £3,000 debt due to her, and that she owed them £1,000 on the promissory note, and she would have said to them, 'Set one against the other, and pay as much of the balance as you can;' and in that case she would have paid £1,000 as the surety, and would have had a right to sue the brother from time to time, and to stand in the place of the bankers as his creditors. After the bankruptcy the assignees could be in no better position: they only took what the bankrupts were entitled to, and they could not have been allowed to say, 'You had no right of set-off before action brought,' because it was their own fraud which prevented her knowing the facts which gave rise to the right of set-off. *But the right of set-off was indisputable. There was a several demand on the one side and on the other*; and therefore the only relief that she got was relief against the neglect to assert that right in due time, which was not really neglect, but rather omission—caused by the fraudulent concealment by the bankers of the true facts of the case; and neither they nor their assignees could take advantage of their fraudulent concealment to deprive her of that right of set-off." (Emphasis added.)

Sir George Jessel M.R. said, in the passage I have italicised, that the right to set-off was indisputable. The bankers were severally liable to Miss Stephens for £3,000 and she was severally liable to them for £1,000. If one then applies the manadatory principle, one would think that there was nothing more to be said. Rule 4.90 applies. But Sir George Jessel M.R. seems to be saying that in the ordinary way, Miss Stephens ought to have done something about asserting her right of set-off before the

bankruptcy. The implication is that, but for the fraud which prevented    A
her from knowing that she ought to do something, she would have been
unable to assert the set-off once the bankruptcy had supervened.

I am naturally nervous at finding that I do not fully understand the
reasoning of Sir George Jessel M.R., but I cannot follow why it mattered
that Miss Stephens had not asserted a right of set-off before the
bankruptcy and therefore needed to be relieved, on the ground of fraud,    B
against that omission. I can only think that the consequences of the
mandatory principle (as illustrated by *Farley v. Housing and Commercial
Developments Ltd*, 26 B.L.R. 66) were not as fully appreciated in 1875
as they are today. In my view the fraud would not today be a material
element in deciding whether rule 4.90 applied. All that is necessary is
that there should have been mutual dealings resulting in cross-claims and
it does not matter that one of the parties was unaware of her cross claim    C
until after the relevant date. I therefore regard *Ex parte Stephens*,
11 Ves. 24, as similar to *Owen v. Wilkinson*, 5 C.B.(N.S.) 526, and to
this case.

As I mentioned at the beginning of this judgment, the point at issue
has already received interlocutory consideration by Millett J. and the
Court of Appeal in the *M.S. Fashions* case, Court of Appeal (Civil    D
Division) Transcript No. 484 of 1992. Millett J. refused interlocutory
relief on the ground that there could plainly be no set-off. He said that it
was elementary that set-off operated only by way of defence and was not
equivalent to payment. The bank could release its claims against the
directors—even the director against whom written demand had been
made—and still enforce its claims against the companies. No question of
set-off would arise until B.C.C.I. actually sued a director. Meanwhile,    E
there was nothing to stop B.C.C.I. from suing the companies.

In the Court of Appeal, Scott and Woolf L.JJ. disagreed. They said
that the mandatory principle applied to the directors' obligations as at
the date of the winding up and that the effect of the set-off was to
diminish or extinguish the debt owed by them and their companies. As
will be apparent, I respectfully agree with this analysis.    F

It remains to notice some subsidiary points taken by Mr. Thomas on
behalf of B.C.C.I. He argued that because the deposits were charged to
B.C.C.I. the directors had no beneficial interest in the money and
accordingly there was no mutuality between their claims and those of
B.C.C.I. This is a pleading paradox but in my view fallacious. Ignoring
for the moment the question of whether such a charge is conceptually
possible, the charge was of a debt owed by B.C.C.I. to secure a debt    G
owed to B.C.C.I. The account to be taken by rule 4.90 must require an
unwinding of that arrangement so that the deposit is set off against the
debt it was intended to secure. There is a similar answer to Mr. Thomas's
alternative submission that B.C.C.I. were entitled under their security
documents to transfer the deposit to a suspense account rather than
applying it in discharge of the debt. In my judgment this clause cannot    H
survive the winding up of B.C.C.I. and the application of the mandatory
principle. It is designed to entitle B.C.C.I. to postpone the taking of an
account and inconsistent with taking one as at the date of winding up.

A    Finally, Mr. Thomas said that although rule 4.90 might result in a set-off between B.C.C.I and the director, this did not amount to payment of the debt owed by the company. It gave the director a complete or pro tanto defence but not the company. This, I think ignores the fact that the director's set-off operates in respect of the *same debt* as that owed by the company. If, as I think it must be, the set-off is equivalent to payment by the director (see *Ex parte Barnett; In re Deveze* (1874) L.R.

B    9 Ch.App. 293) then I think it must operate also to extinguish to the same extent the debt owed by the company.

I will therefore declare that the indebtedness of each of the companies as at the date of the winding up has been extinguished or reduced by the amount which on that date was standing to the credit of the directors on their respective deposit accounts.

C

*Order accordingly.*

*Solicitors: Zaiwalla & Co.; Slaughter & May; Lovell White Durrant.*

T. C. C. B.

D    APPEALS from Hoffmann L.J.

HIGH STREET SERVICES LTD. AND OTHERS v. BANK OF CREDIT AND COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION)

By an amended notice of appeal dated 11 January 1993, the bank appealed and sought declarations that, as at the date of the winding up of the bank, namely 14 January 1992, the debts owed by High Street

E    Services Ltd., Portmaid Fashions Ltd., Cira Ltd. and Saeed Ahmed were not and had not been extinguished by the debt owed by the bank to Raees Ahmed concerning the amounts standing to the credit of his deposit account as at 14 January 1992.

The grounds of appeal were that Hoffmann L.J. erred in law (1) in holding that the charge in favour of the bank, of the chose in action

F    constituted by the deposit, required to be "unwound" for the purposes of rule 4.90 of the Insolvency Rules 1986; (2) in failing to hold that there was no debt due to Raees Ahmed which was eligible for set-off under rule 4.90 as, given that the chose in action constituted by the deposit had been charged to the bank, the position was governed by the rules relating to security not set-off and/or there was no debt due to Raees Ahmed in

G    respect of which he could submit a proof and/or Raees Ahmed no longer had the beneficial interest in the debt constituted by the deposit so that there was no mutuality; (3) in holding that, pursuant to the cash deposit security terms, Mr. Raees Ahmed was under a present liability to the bank at the date of its winding up; (4) in holding that clause 7(b)(ii) of the cash deposit security terms had the effect of creating primary liability so that the liability of Raees Ahmed to the bank pursuant to such terms

H    was not contingent upon demand; (5) in failing to hold that the requirement in clause 7(b) of the cash deposit security terms that any sums be repaid on demand made in writing was a condition precedent to any liability of Raees Ahmed; and (6) in failing to hold that the obligaton

of Raees Ahmed pursuant to the cash deposit security terms was to pay    A
a sum due upon a collateral obligation.

IMPEXBOND LTD. AND OTHERS v. BANK OF CREDIT AND COMMERCE
INTERNATIONAL S.A. (IN LIQUIDATION)

The bank appealed by an amended notice of appeal dated 11 January
1993.

The first two grounds of appeal were the same as those in the *High*    B
*Street Services* case, save that the deposit account in question related to
Nasir Abdul Amir. Additional grounds were that Hoffmann L.J. erred
(1) in holding that the letters of charge created a liability on the part of
Mr. Amir for the debts of Impexbond Ltd. and Tucan Investments Plc.;
and (2) in failing to hold that the letters of charge operated as equitable
charges by Mr. Amir to the bank of the property constituted by the    C
choses in action represented by the sums standing to the credit of the
deposit accounts.

The bank did not appeal in the *M.S. Fashions* case.

*Neville Thomas Q.C.* and *Robin Dicker* for the bank. The judge erred
in law in holding that rule 4.90 of the Insolvency Rules 1986 required an    D
unwinding of the bank's security over the deposit. The cash deposit
security terms and the letter of charge each operated as an equitable
charge by the guarantor to the bank of the property constituted by the
choses in action represented by the sums standing to the credit of the
deposit accounts. Contrary to the view expressed by Millett J. in *In re*
*Charge Card Services Ltd.* [1987] Ch. 150, 175, such a charge is not a
conceptual impossibility: see *Ex parte Mackay; Ex parte Brown; In re*    E
*Jeavons* (1873) L.R. 8 Ch.App. 643 and *Welsh Development Agency v.*
*Export Finance Co. Ltd.* [1992] B.C.C. 270. Given that the chose in
action in respect of the deposit account had been charged in favour of
the bank, the position was governed by the rules relating to security and
not to set-off. There was no debt due to the guarantor in respect of
which he could submit a proof. As a result of the charge-back the
guarantor no longer had the beneficial interest in the debt constituted by    F
the deposit. Accordingly there was no mutuality and no debt due to the
guarantor eligible for set-off under rule 4.90: see *Ex parte Caldicott; In re*
*Hart* (1883) 25 Ch.D. 716.

Set-off is mandatory whether it is B.C.C.I. which is in liquidation or
the guarantor. Thus, if Hoffmann L.J. is correct, in other cases, if it was
the guarantor which went into liquidation while the bank remained    G
solvent (the more likely occurrence) the bank would only be entitled to
claim the net amount from the principal debtor, i.e., after taking into
account any set-off arising between it and the guarantor. In taking the
necessary account there would be included not merely a guarantor's
claim for sums owed on a current account or deposit account (whether
charged to the bank or not) but also, for example, liquidated claims for
damages or contingent claims. Since all mutual debts, credits and dealings    H
are required to be included in the account to be taken under rule 4.90
the result would be that in many cases the creditor bank would not know
what was the net sum owing by the principal debtor. There would be

A  potential difficulties if the principal debtor was also to go into liquidation. The creditor's right to prove in the principal debtor's liquidation would be reduced to the net sum owing, after taking into account any sums owed by him to the guarantor. As a matter of principle the secured creditor is entitled to rely first on the personal covenant of the principal debtor and then to rely on the security provided by the guarantor.

B  In both the Impexbond and High Street Services actions, the debts constituted by the deposits were charged to the bank to secure the potential liability of the guarantors. While moneys remained owing by the principal debtor (in relation to the letter of charge) or the guarantor remained potentially liable under his guarantee (in relation to the cash deposit security terms) the guarantor was not entitled to bring an action for the return of the deposit; nor could he prove in respect of it in the

C  liquidation. The rules relating to set-off were irrelevant. The position was governed by the rules relating to security. There was no debt "due" to him for the purposes of rule 4.90. Nor was there any mutuality. The position was analogous to that which exists where money has been paid by X to Y for a special purpose. In such cases, if there is a surplus in Y's hands in respect of the moneys paid to him, he is not entitled to raise, by way of set-off, a claim which he has against X: see *In re Pollitt;*

D  *Ex parte Minor* [1893] 1 Q.B. 455; *In re Mid-Kent Fruit Factory* [1896] 1 Ch. 567 and *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293.

In the *High Street Services* case, the judge erred in holding that a debt existed under the cash deposit security terms prior to any demand being made. On the true construction of the terms, the parties clearly

E  intended the requirement of a demand to be a real stipulation and not mere words: see *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833, 849. The rule that the words "on demand" are not regarded as creating a contingent liability applies where there is a direct liability: see *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833 and *Hill v. Wade* (1616) Cro.Jac. 523. The rule does not apply where the sum is payable under some collateral agreement or a debt is created by such an agreement. In

F  such a case, a demand is necessary under the terms of the agreement, and no liability exists unless and until a demand is made: see *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833 and *In re J. Brown's Estate; Brown v. Brown* [1893] 2 Ch. 300. The judge over-stated the position when he said that Walton J.'s provisional view in *Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R. 1474, 1483 was that

G  "the 'principal debtor' clauses have the effect of creating primary liability for the purposes of the rule that the debt is not contingent upon demand." The assistance to be obtained from that case is limited: see *General Produce Co. v. United Bank Ltd.* [1979] 2 Lloyd's Rep. 255, 259.

The question whether a debt is collateral does not depend on the defendant's liability being secondary rather than primary. Guarantee

H  claims are merely one example of a collateral claim. Indeed the issue whether an obligation is collateral and thus whether a demand is necessary has arisen in cases having nothing to do with secondary liabilities: see *In re J. Brown's Estate; Brown v. Brown* [1893] 2 Ch. 300;

M.S. Fashions Ltd. v. B.C.C.I. (C.A.)                    [1993]

*Batson v. Spearman* (1838) 9 Ad. & E. 298; *Bradford Old Bank Ltd. v.*    A
*Sutcliffe* [1918] 2 K.B. 833 and *Birks v. Trippet* (1666) 1 Saund. 28. The
obligations of the guarantor in the High Street Services action under the
cash deposit security terms were collateral. In particular, no liability
would exist in the absence of that agreement and the guarantor was, in
effect, being charged with the liability of another: see *Hill v. Wade*,
Cro.Jac. 523 and *Wallis v. Scott* (1718) 1 Str. 88.

*Jonathan Sumption Q.C.* and *Mark Hapgood* for the High Street    B
Services and Impexbond plaintiffs. The liabilities of principal debtors are
always enforceable without the need for a demand: see *Rowe v. Young*
(1820) 2 Bli. 391. Rule 4.90 is a rule for ascertaining the amount of any
debt owed between two parties who have had mutual dealings. It is
mandatory and unqualified by any considerations relating to security.
Before any question can arise as to the effect on the set-off of a charge,    C
it has to be established that the charge still subsists. It does not subsist
unless the debt secured by it is still outstanding.

*Ex parte Barnett; In re Deveze* (1874) L.R. 9 Ch.App. 293 is authority
for the proposition that a security interest may be discharged by the
repayment of the secured debt as a result of the operation of insolvency
set-off. There the decision was that the bankrupt could not insist on his
claim being discharged from free funds. The reasoning of the court would    D
have led to the same result if it had been the solvent claimant rather
than the bankrupt who held security. It followed that it was irrelevant
for the purposes of set-off that the creditor could not prove while the
security subsisted. He did not need to: compare *Ellis & Co.'s Trustee v.*
*Dixon-Johnson* [1925] A.C. 489.

*Ex parte Barnett*, L.R. 9 Ch.App. 293 justified the general terms in    E
which the principle was stated by Dixon J. in *Hiley v. Peoples Prudential*
*Assurance Co. Ltd.* (1938) 60 C.L.R. 468, 498 and Lord Selborne's
statement was the basis of the House of Lords' decision in *Halesowen*
*Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.* [1972]
A.C. 785 that set-off was mandatory. The same principle applied where
the debt itself was subject to a security interest, because the problem was
essentially the same. The creditor, it was said, could not prove while his    F
debt was charged. The answer was that the charge had gone because the
secured liability had been paid off by set-off. That was why the proceeds
of a life policy charged to the office which issued it might nevertheless be
set off in insolvency: see *Sovereign Life Assurance Co. v. Dodd* [1892]
2 Q.B. 573 and compare *In re National Benefit Assurance Co. Ltd.* [1924]
2 Ch. 339; *Hiley v. Peoples Prudential Assurance Co. Ltd.*, 60 C.L.R.    G
468; *In re Daintrey; Ex parte Mant* [1900] 1 Q.B. 546 and *Palmer v. Day*
*& Sons* [1895] 2 Q.B. 618. Those decisions also show that there was no
want of mutuality where the charged debt was to be set off against the
same liability which it secured.

*In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293
is not inconsistent with any of these points. The decision is concerned    H
with a payment made to or retained by the debtor for a special purpose.
The basis of the rule in such cases is that money so paid is subject to a
trust for the fulfilment of a purpose other than the discharge of the
liabilities which it is sought to set it off against, with a resulting trust for

A   the payer: see *Quistclose Investment Ltd. v. Rolls Razor Ltd.* [1970] A.C. 567 and *Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785. Where there is a surplus after the purpose is fulfilled, the payer is not a creditor for that surplus; it is his property in equity. The special purpose in *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* for which the insurer retained the money was the satisfaction of the obligations of the reinsurer under the particular treaty. The

B   retained funds were applied to that purpose only after the beginning of the winding up: see p. 296. The only issue concerned the surplus, which the liquidator wished to apply against other liabilities of the reinsurer unconnected with the treaty: see p. 307. It was held that it was not available for set-off against those because that was outside the purpose for which the retention had been permitted. That feature of the case is

C   common to all the cases on the point: see *Young v. Bank of Bengal* (1836) 1 Moo.Ind.App. 87; *In re Pollitt; Ex parte Minor* [1893] 1 Q.B. 455 and *In re Mid-Kent Fruit Factory* [1896] 1 Ch. 567.

    There was nothing in the reasoning of the court in *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* to suggest that there could have been no set-off of the retention fund against the reinsured's liabilities under the treaty. On the contrary, satisfaction of those liabilities was the very

D   purpose for which the retention fund was retained. If the bank is right, then the retention fund could not even have been applied against the reinsurer's liabilities under the treaty, and should have been retained until those liabilities had been discharged from free assets. That was not what the court said. Equally, the court's reasoning in that case would not prevent a set-off of the deposit against the advance in the present cases,

E   because if the analogy with special purpose payments is good, the special purpose here was to meet the liability for the advance. *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* is direct authority against the bank's contention that the result of paying off the debt which the fund secured was merely to leave the creditor with an unencumbered right of action for what it was worth. A charge is simply a right vested in the chargee to require the indebtedness to be paid from the specific fund

F   represented by the deposit: see *Palmer v. Carey* [1926] A.C. 703.

    *Thomas Q.C.* replied.

<div align="right">*Cur. adv. vult.*</div>

  25 March.   The following judgments were handed down.

G

  DILLON L.J.

*Preliminary*

    The court has before it appeals by the Bank of Credit and Commerce International S.A. ("B.C.C.I."), a company in liquidation, acting by its

H   liquidators against orders made by Hoffmann L.J., sitting as an additional judge of the Chancery Division, on 27 November 1992 in two cases which raise, on slightly different documents and facts, essentially the same questions.

**Dillon L.J.**             M.S. Fashions Ltd. v. B.C.C.I. (C.A.)              [1993]

A   Stated broadly, the problem is this. If a bank lends money to a company and takes a guarantee of the company's indebtedness from a director of the company, and also taxes from the director a deposit of money with the bank which is charged in favour of the bank with the payment to the bank of the company's indebtedness to the bank or the director's liability to bank as guarantor of the company's indebtedness, and if the bank later becomes insolvent and is put into liquidation, can

B   the company or the director compel the bank to apply the director's deposit in reduction of the company's indebtedness, and also of the director's liability as guarantor, or can the bank require the company to pay the full amount of its indebtedness to the bank without regard to the director's deposit and, if so, does that leave the director to prove as an unsecured creditor in the liquidation of the bank for the amount of his deposit?

C   To answer this involves consideration of the law of set-off in companies' liquidation and can also raise questions as to the principles of equity as to the enforcement of securities if set-off is not available.

*The facts and documents*

*Impexbond*

D   One of the appeals concerns two associated companies, Impexbond Ltd. and Tucan Investments Plc. These both banked with B.C.C.I. and unlimited guarantees in B.C.C.I.'s standard form of the companies' indebtedness to B.C.C.I. were given by a Mr. Nasir Abdul Amir on, in relation to Impexbond, 11 March 1985, and in relation to Tucan Investments Plc., 29 May 1986. In addition, on 11 March 1985 in respect of Impexbond Ltd. and on 29 May 1986 in respect of Tucan Investments

E   Plc., Mr. Amir signed the bank's form designated "letter of charge by an individual as security for the liabilities of a third party." By those letters of charge Mr. Amir agreed that B.C.C.I. might hold any money standing to the credit of certain specified accounts of his as security, and he charged such moneys or deposits so standing with the repayment of all the moneys due to the bank on any account from Impexbond Ltd. and Tucan Investments Plc. He also agreed in each letter of charge that his

F   liabilities thereunder should be as that of a principal debtor.

When B.C.C.I. was ordered to be wound up on 14 January 1992 the aggregate liability of Impexbond Ltd. and Tucan Investments Plc. to B.C.C.I. was about £3·3m. (with cross-guarantees in favour of B.C.C.I.), while the amount to the credit of Mr. Amir's specified accounts (renumbered on transfer to a different branch of B.C.C.I.) was about

G   £4·5m.

*High Street Services*

The other appeal concerns three associated companies, High Street Services Ltd., Cira Ltd. and Portman Fashions Ltd., which all banked with B.C.C.I. On 24 April 1989 a director, Mr. Raees Ahmed, signed unlimited guarantees in B.C.C.I.'s standard form of each of the three

H   companies' indebtedness to B.C.C.I. He also on the same date, 24 April 1989, signed in respect of each of the three companies a document in the same printed form headed "cash deposit security terms—third party."

A   In these latter documents the term "deposited moneys" was defined as meaning any moneys including accrued interest standing to the credit then or in the future of any deposit account Mr. Ahmed might have with B.C.C.I. It was agreed that B.C.C.I. might at any time, without further order or notice, appropriate whether by way of set-off or otherwise the deposited moneys in or towards satisfaction of the indebtedness of Mr. Ahmed to B.C.C.I. It was acknowledged by Mr. Ahmed that

B   repayment to him of the deposited moneys was conditional upon B.C.C.I. having received payment in full of his indebtedness to B.C.C.I., and that otherwise he should not be entitled to withdraw the deposited moneys except at the absolute discretion of B.C.C.I.

C   In a further section of the "cash deposit security terms" Mr. Ahmed agreed to guarantee to pay and/or discharge to B.C.C.I. upon written demand all liabilities of the company to B.C.C.I. Mr. Ahmed further declared "as a separate and independent obligation hereunder" that the company's liabilities "shall be recoverable by you from me as principal debtor and/or by way of indemnity and shall be repaid by me on demand made in writing by you or on your behalf whether or not demand has been made on the [company]."

D   At the time of the order for the compulsory winding up of B.C.C.I. Mr. Ahmed had about £426,000 on deposit with B.C.C.I., and the three companies owed B.C.C.I. in the aggregate over £1m. B.C.C.I. had the benefit of cross-guarantees in its favour by the three companies and charges on other properties including a charge by Mr. Ahmed on his home.

E   Before the judge there was also a third case, heard at the same time, which involved a company, M.S. Fashions Ltd. and a Mr. Sarwar. But the facts were slightly different in that a demand had actually been made by the liquidators of B.C.C.I. on M.S. Fashions Ltd. and Mr. Sarwar, and B.C.C.I. has not appealed the decision of Hoffmann L.J. in relation to M.S. Fashions Ltd. That matter is resolved.

F   *Set-off in companies' liquidation*

It has for long been established that in personal bankruptcy or insolvency and companies' liquidation there is to be set-off where there have been mutual credits, mutual debts or other mutual dealings. The current provision applicable to companies' liquidation is rule 4.90 of the Insolvency Rules 1986, which provides, so far as material:

G   "(1) This rule applies where, before the company goes into liquidation, there have been mutual credits, mutual debts or other mutual dealings between the company and any creditor of the company proving or claiming to prove for a debt in the liquidation. (2) An account shall be taken of what is due from each party to the other in respect of the mutual dealings, and the sums due from one

H   party shall be set off against the sums due from the other. . . . (4) Only the balance (if any) of the acount is provable in liquidation. Alternatively (as the case may be) the amount shall be paid to the liquidator as part of the assets."

It is common ground that where there are such mutual credits, mutual    A
debts or other mutual dealings the set-off is mandatory and cannot be
excluded by any contract between the parties: see *Halesowen Presswork
& Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785.

If there are indeed mutual credits or mutual debts or mutual dealings
between a company, or a bankrupt, and a creditor, then the set-off
applies notwithstanding that one or other of the debts or credits may be
secured. See, for instance, the judgment of Lord Selborne L.C. in    B
*Ex parte Barnett; In re Deveze* (1874) L.R. 9 Ch.App. 293 and the
judgment of Dixon J. in *Hiley v. Peoples Prudential Assurance Co. Ltd.*
(1938) 60 C.L.R. 468, 498. Dixon J. added: "To the extent that
the secured debt is answered by set-off the security is freed."

In *Hiley's* case a life assurance company had issued a policy to a
policy holder. Subsequently the policy holder charged the policy and    C
other property to the company to secure an advance by the company to
the policy holder. Later the company was ordered to be wound up and
the liquidator repudiated the policy. It was held that the policy holder
was entitled to set off his claim against the company for repudiating his
policy against his liability to the company in respect of the advance.
Dixon J. said, at pp. 496–497:

> "In the first place, the general rule does not require that at the    D
> moment when the winding up commences there shall be two
> enforceable debts, a debt provable in the liquidation and a debt
> enforceable by the liquidator against the creditor claiming to prove.
> It is enough that at the commencement of the winding up mutual
> dealings exist which involve rights and obligations whether absolute
> or contingent of such a nature that afterwards in the events that    E
> happen they mature or develop into pecuniary demands capable of
> set off. If the end contemplated by the transaction is a claim
> sounding in money so that, in the phrase employed in the cases, it is
> commensurable with the cross-demand, no more is required than
> that at the commencement of the winding up liabilities shall have
> been contracted by the company and the other party respectively    F
> from which cross money claims accrue during the course of the
> winding up."

That is in line with the judgment of Romer L.J. in *In re Daintrey; Ex
parte Mant* [1900] 1 Q.B. 546, 573–574, and the judgment of Lord
Russell of Killowen C.J. in *Palmer v. Day & Sons* [1895] 2 Q.B. 618. It
also covers the actual circumstances in *Sovereign Life Assurance Co. v.*    G
*Dodd* [1892] 2 Q.B. 573. In that case the policy, which had been charged
by the holder to the issuing company as security for a loan, matured after
a petition had been presented for the winding up of the company but
before any winding up order had been made; but it was then the general
view, contrary to the present view, that the relevant date for the
application of set-off was the date of the presentation of the petition
rather than the date of the order. Set-off was none the less held to be    H
applicable.

It is said, however, for B.C.C.I. that, even accepting the foregoing,
there is even now—let alone at the date of the winding up order—no

A    relevant personal liability on Mr. Amir or Mr. Ahmed to be set off against their deposits because the personal liability of each of them is merely that of guarantor, a guarantor's liability is contingent on the demand being made, and no demand has even now been made on Mr. Amir or Mr. Ahmed.

B    It is accepted by B.C.C.I. that the liabilities of the principal debtors, the various companies, to B.C.C.I. were at all times presently enforceable by B.C.C.I. without any need for a demand before the issue of a writ, even if the indebtedness was described in the relevant documents as "repayable on demand." That is in accordance with many authorities and it is sufficient to take the statement by Bayley J. in *Rowe v. Young* (1820) 2 Bli. 391, 465, where he said:

C    "the rules which the law has laid down as to cases in which a demand is or is not necessary, must be considered. One of these rules I take to be this, that where a man engages to pay upon demand what is to be considered his own debt, he is liable to be sued upon that engagement, without any previous demand; . . ."

But Bayley J. went on to say:

D    "but . . . if he engage to pay upon demand what was not his debt, what he is under no obligation to pay, what but for such engagement he would never be liable to pay any one, a demand is essential, and part of the plaintiff's title."

Consequently it has been held in various contexts that to enforce liability against a mere surety there must be a demand before action brought: see the decision of Chitty J. in *In re J. Brown's Estate; Brown v. Brown*
E    [1893] 2 Ch. 300 and the decision of this court in *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833.

Essentially, however, the question is one of the construction of the contract: see *N. Joachimson v. Swiss Bank Corporation* [1921] 3 K.B. 110, 129, where Atkin L.J. said:

F    "The question appears to me to be in every case, did the parties in fact intend to make the demand a term of the contract? If they did, effect will be given to their contract, whether it be a direct promise to pay or a collateral promise, though in seeking to ascertain their intention the nature of the contract may be material."

In the present case in the letters of charge signed by Mr. Amir in respect of Impexbond Ltd. and Tucan Investments Plc. he has expressly
G    agreed that his liabilities thereunder—namely the companies' liabilities charged on his deposits—shall be as that of a principal debtor.

Similarly in the forms setting out the cash deposit security terms which Mr. Ahmed signed in respect of High Street Services Ltd. and its associated companies he accepted that the liabilities of those companies should be recoverable from him as principal debtor and they were thus within the definition of his indebtedness; he also authorised the
H    appropriation of the deposited moneys in satisfaction of his indebtedness without further notice to him.

The effect of that must be to dispense with any need for a demand in the case of Mr. Amir since he has made the companies' debts to B.C.C.I.

his own debts and thus immediately payable out of the deposit without      A
demand. In the case of Mr. Ahmed there must be immediate liability
even though the word "demand" was used, because he accepted liability
as a principal debtor and his deposit can be appropriated without further
notice.

The banking relationship between B.C.C.I. and the various companies
of course ceased when B.C.C.I. went into liquidation. Therefore we have      B
a situation in which, though the situation is tripartite rather than bipartite
as in the cases referred to earlier, all the rights are immediately
enforceable so far as relevant to the question of set-off. There is a debt
presently due from each of the companies to B.C.C.I. and equally due
from Mr. Amir or Mr. Ahmed as the case may be as a principal debtor
to B.C.C.I. and there is the liability from B.C.C.I. to Mr. Amir or
Mr. Ahmed for the deposits. That satisfies entirely, in my judgment, the      C
requirements for statutory set-off as explained by Dixon J., and
consequently rule 4.90 has automatic effect.

If there is set-off between Mr. Amir and Mr. Ahmed and B.C.C.I.
that must automatically reduce or extinguish the indebtedness to
B.C.C.I. of the companies. The statutory set-off is not something which
B.C.C.I. can, as it were, place in a suspense account. It operates to
reduce or extinguish the liability of the guarantor and necessarily      D
therefore operates as in effect a payment by him to be set against the
liability of the principal debtor. A creditor cannot sue the principal
debtor for an amount of the debt which the creditor has already received
from a guarantor. This is subject, however, to one point, which has been
called "the charge point" to which I now turn.

                                                                          E
*The charge point*

The basis of this is that it is said for B.C.C.I. that the moneys placed
on deposit by Mr. Amir and Mr. Ahmed were moneys paid to B.C.C.I.
for a special purpose, viz. to be charged in favour of B.C.C.I. as security
for the indebtedness to B.C.C.I. of the relevant companies, and it is said
also that, on authority, moneys paid for a special purpose are, whether      F
before or after that purpose has been achieved, outside the scope of the
set-off and mutual dealing provisions of insolvency law—for present
purposes rule 4.90 of the Rules of 1986.

The argument put forward depends in part on a decision of this court
in *Ex parte Caldicott; In re Hart* (1883) 25 Ch.D. 716 but even more on
a decision of this court in *In re City Equitable Fire Insurance Co. Ltd.
(No. 2)* [1930] 2 Ch. 293 and an earlier case of *Young v. Bank of Bengal*      G
(1836) 1 Moo.Ind.App. 87.

In *Ex parte Caldicott*, 25 Ch.D. 716 a father and his son had entered
into a partnership and had arranged banking facilities for the partnership
with Lloyds Banking Co. The father had charged certain land owned by
himself to the bank, but the land had been sold, and had been replaced
by the proceeds, placed on deposit with the bank. The firm later became
bankrupt, which involved the administration in bankruptcy of their joint      H
estate, and the separate administration in bankruptcy of the separate
estate of the father. The issue before the court was whether the bank, in
proving against the joint estate, had to give credit for the moneys it held

A    on deposit from the father. the essence of the decision, as I understand it, is contained in the final paragraph in the brief judgment of Lord Selborne L.C., with which Cotton and Lindley L.JJ. agreed, viz. that the money on deposit with the bank was a security, but not a security on the joint estate, and the rule in bankruptcy was that a valuation or giving up of a security was only necessary when, in the case of a proof by creditors of the joint estate it was a security on the joint estate. The judgment was

B    only concerned with the joint estate.

Lord Selborne L.C. did, however, say in the penultimate paragraph of his judgment, at p. 722:

C    "It appears to me a fallacy to say that the money so deposited was a debt due from the bank to the father, in the sense that an action could have been brought by him for it, so long as it remained in the hands of the bank, and there was a balance due from the firm to them which the mortgage of the real estate was intended to secure; and I cannot think that the conversion of the security into money, and the deposit with the bank of the money, which continued to be the subject of the security, can make any difference in principle."

D    What I understand him to have been meaning by that is that the money still in the hands of the bank was held by the bank as a security and therefore, as it was not a security on the joint estate it did not have to be taken into account in determining the amount of the bank's proof against the joint estate. I do not understand him to have been saying that as the father could not have brought an action against the bank for the money so long as there was a balance due from the firm to the bank,

E    there could not have been any statutory set-off in the father's separate estate to reduce the joint indebtedness to the bank. If that is the correct interpretation, *Ex parte Caldicott* does not govern the present case.

*In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293 is the most important of the trio of cases which, in the words of Lord Simon of Glaisdale in *Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785, 808 show that "mutual

F    dealings" in, as it is now, rule 4.90 do not cover a transaction in which property is made over for a "special (or specific) purpose." Lord Kilbrandon said [1972] A.C. 785, 821:

"In *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293 a fund held by way of a guarantee against the carrying out of specific obligations was held to be 'special' in this sense. In all these

G    cases the funds may be said to have been impressed with quasi-trust purposes, and that is sufficient to destroy the mutuality which is a prerequisite of the right to set-off arising, since it is necessary that the debts were between the parties in the same right, a condition which the holding of a sum as trustee would destroy: . . ."

H    The other two cases in the trio are *In re Pollitt; Ex parte Minor* [1893] 1 Q.B. 455 and *In re Mid-Kent Fruit Factory* [1896] 1 Ch. 567.

The essential facts of the *City Equitable Fire Insurance* case [1930] 2 Ch. 293 were that the City Equitable, as reinsurer, entered into a treaty of reinsurance with an insurance company. Under that treaty a

certain percentage of the premium payable to the City Equitable as the reinsurer was to be retained and accumulated by the insurer "as security for the due performance of the obligations of the reinsurer" under the treaty. The City Equitable was put into compulsory liquidation and the treaty of reinsurance was terminated in accordance with its terms. Then, after all claims of the insurer under the treaty had been satisfied out of the accumulated fund, there was a surplus of £8,000 left in the hands of the insurer. The insurer claimed to set off against that surplus sums due from the City Equitable under other contracts, relying on section 31 of the Bankruptcy Act 1914, the then current predecessor of rule 4.90. It was only the set off of the surplus that was in issue, and it was held that the insurer was not entitled to that.

In giving the leading judgment in this court Lord Hanworth M.R. said, at p. 312:

> "Different considerations apply where money has been handed over for a specific purpose and not treated as a mere item in accounts kept between the bankrupt and his creditors. . . . The effect of handing over money for a specific purpose appears from the cases to be that it is taken out of the course of accounts between the parties to be held, so to speak, in suspense between them, until that specific purpose for which it had been handed over has been completed; and even then it appears that the nature and quality of the specific purpose still attaches to the balance of the fund, if any, which remains in the hands of the depositee. The fund having been originally placed in the depositee's hands for the particular purpose, the nature and quality of that purpose still attaches to the balance of the fund unless and until there has been some subsequent agreement releasing it from the specific purpose. Indeed, it must in all cases be the balance of the fund which is in dispute in cases such as this."

Because the fund was accumulated by the depositee/insurer for a special purpose under the particular treaty of reinsurance, there was no mutuality between the liquidator of the City Equitable's claim for the balance of the accumulated fund and, on the other hand, the claims of the insurer against the City Equitable under other contracts. Those debts were not, in Lord Kilbrandon's words [1972] A.C. 785, 821, "in the same right." Therefore, there was no set-off.

But, as I see it, there had at the earlier stage, before the surplus was ascertained, been ample mutuality between the liquidator's claim for the accumulated fund and the claims of the insurer for the due performance of the obligations of the City Equitable under the particular treaty of reinsurance under which the accumulated fund had been accumulated. Therefore, at that earlier stage, there was no objection to set-off of the claims under the particular treaty of reinsurance; the insurer was not required to hand over the accumulated fund to the liquidator intact and without deductions even under the particular treaty of reinsurance.

The two other cases in the trio, *In re Pollitt; Ex parte Minor* [1893] 1 Q.B. 455 and *In re Mid-Kent Fruit Factory* [1896] 1 Ch. 567, were likewise cases in which what was in issue was the surplus of a deposited fund remaining after the specific purpose for which it had been deposited

A    had been satisfied; it was held that the surplus could not be set-off under
the statutory provisions against other debts which had nothing to do with
those specific purposes.

These three cases do not, in my judgment, bear at all on the problem
with which we are concerned in the present case, and do not prevent the
set-off which the present directors assert.

B    *Young v. Bank of Bengal*, 1 Moo.Ind.App. 87 is a very similar case
to *In re City Equitable Fire Insurance Co. Ltd.* A firm of merchants had
deposited paper with the bank to secure a particular loan. When the firm
became bankrupt, the bank sold the paper, and the proceeds produced a
surplus after paying off the particular loan and interest on it. The bank
claimed to set the surplus off under the statute against other debts due
from the firm to the bank for which the bank held the firm's promissory

C    notes. It was held that the bank could not do so because the case did not
come within the clause of mutual credit in the Indian Insolvency Act
(9 Geo. 4, c. 73). The reasoning of Lord Brougham seems to me to be
in line with that of Lord Hanworth M.R. in *In re City Equitable Fire
Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293.

Lord Brougham incidentally stated, at p. 145, that the introduction of

D    the words "mutual credit" extends the right of set-off to cases where the
party receiving the credit is not debtor in presenti to him who gives the
credit: "Accordingly the relation, contemplated by the statute has been
held to be established where the debt is immediately due from the one
party, and only due at a future date from the other." This anticipated
Dixon J.'s statement in *Hiley's* case, 60 C.L.R. 468. In the present case,

E    therefore, there is nothing in the charge point to defeat the set-off
claimed.

Mr. Amir is, of course, claiming to prove in the liquidation for his
deposits, subject to the set-off. Mr. Ahmed technically has no claim to
prove because the amount due from him to B.C.C.I. exceeds the amount
of his deposit; but the wording "balance (if any) of the account" in

F    paragraph 4 of Rule 4.90 shows that the set-off applies even if its effect
is to reduce the claim in the liquidation to nil.


*Principles of equity as to enforcement of securities*

My conclusions on the foregoing point make it unnecessary to con-
sider the implications of the rule in equity, stated by Viscount Cave L.C.

G    in *Ellis & Co.'s Trustee v. Dixon-Johnson* [1925] A.C. 489, 491, and
stated also by Sargant L.J. in the court below [1924] 2 Ch. 451, 473, that
if a creditor holding security sues for his debt he is under an obligation
on payment of the debt to hand over the security, and if, having
improperly made away with the security he is unable to return it to his
debtor, he cannot have judgment for the debt.

H    For these reasons, which are substantially those of Hoffmann L.J.,
I would dismiss these appeals.


NOLAN L.J.    I agree with the judgment of Dillon L.J.

STEYN L.J.   I agree with the reasons given by Dillon L.J., and with    A
the order which he has proposed. There is nothing which I can usefully
add.

*Appeals dismissed with costs.*

*Solicitors: Lovell White Durrant; Glanvilles, Portsmouth; Slaughter &*    B
*May.*

G. F.

———

C

[COURT OF APPEAL]

*In re* ARROWS LTD. (No. 4)    D

*In re* BISHOPSGATE INVESTMENT MANAGEMENT LTD. AND
ANOTHER

*In re* HEADINGTON INVESTMENTS LTD. AND OTHERS

1993   March 23, 24;                                     Dillon, Steyn and    E
       24, 25;                                                  Rose L.JJ.
       25, 26;
April  7

> *Crime—Evidence—Documents, admissibility of—Examinations by*
> *company office-holders—Examinees charged with criminal*
> *offences—Director of Serious Fraud Office requiring transcripts*    F
> *and other documents relating to examinations—Whether use of*
> *documents by Serious Fraud Office subject to court's control—*
> *Insolvency Act 1986 (c. 45), s. 236—Criminal Justice Act 1987*
> *(c. 38), s. 2(3)(8)*

> N., T. and M., who had been examined by office-holders,
> namely, liquidators or receivers, of various companies, under
> section 236 of the Insolvency Act 1986, were charged with    G
> criminal offences. The Director of the Serious Fraud Office
> served notices, under section 2(3) of the Criminal Justice Act
> 1987,[1] requiring the office-holders to produce the transcripts of
> the examinations. In the first case, on an application by the
> office-holders the judge directed that they release and disclose
> to the Director the transcripts and N.'s affirmations in the
> examination upon undertakings by the Director that he would    H
> not use the transcripts or affirmations in evidence against N.
> save in the circumstances specified in section 2(8) of the Act of

[1] Criminal Justice Act 1987, s. 2(3): see post, p. 461A.

184

<div align="center">

SUPREME COURT OF VICTORIA

</div>

**NANGUS PTY. LTD. and Another v. CHARLES DONOVAN PTY. LTD.
(In liquidation) and Another**

<div align="center">

YOUNG C.J.
KAYE and SOUTHWELL JJ.

11, 12, 31 May 1988

</div>

**Landlord and tenant — Lease — Repudiation by lessee — Acceptance of repudiation
— Damages — Whether damages affected by alteration in lessor's interest in leased
property — Loss of bargain.**

**Guarantee — Lease — Repudiation by lessee — Acceptance of repudiation —
Whether guarantor discharged from liability — Extent of liability under guarantee.**

**Legal practitioners — Counsel — Counsel appearing for parties whose interests may
conflict — Requirement of independent counsel for each party.**

(1) Where a lessee of real property wrongfully repudiates the lease during its
term and the repudiation is accepted, the fact that the lessor's proprietary interest
in the leased property has lessened or otherwise changed since the repudiation is not
a factor which the court can take into account in assessing damages. The damages
are assessed as at the date of the breach and are compensation for loss of a bargain.

> *Buchanan v. Byrnes* (1906) 3 C.L.R. 706; *Moschi v. Lep Air Services Ltd.*
> [1973] A.C. 331; *Progressive Mailing House Pty. Ltd. v. Tabali Pty. Ltd.*
> (1985) 157 C.L.R. 17; 57 A.L.R. 609 and *Sunbird Plaza Pty. Ltd. v. Maloney*
> (1988) 77 A.L.R. 205; 62 A.L.J.R. 195, referred to.

(2) A person who guarantees to a lessor the due performance by the lessee of the
terms of the lease continues to be liable on the guarantee notwithstanding that the
lease comes to an end by the lessor's acceptance of the lessee's wrongful repudiation
of the lease. The liability of the guarantor is for damages resulting from the lessee's
repudiation.

> *Moschi v. Lep Air Services Ltd.* [1973] A.C. 331, applied.

> *McDonald v. Dennys Lascelles Ltd.* (1933) 48 C.L.R. 457; *Chatterton v.*
> *Maclean* [1951] 1 All E.R. 761; *Hyundai Heavy Industries Co. Ltd. v.*
> *Papadopoulos* [1980] 1 W.L.R. 1129; *Progessive Mailing House Pty. Ltd. v.*
> *Tabali Pty. Ltd.* (1985) 157 C.L.R. 17; 57 A.L.R. 609 and *Sunbird Plaza Pty.*
> *Ltd. v. Maloney* (1988) 77 A.L.R. 205; 62 A.L.J.R. 195, referred to.

*Per* Young C.J. Counsel should not appear for two clients whose interests may
conflict. The court is concerned that it should have the assistance of independent
counsel for parties whose interests are not identical in the case before it.

> *Day v. Ponsonby* (1842) 5 I. Eq. R. 24; *Re Burton, Danby v. Burton* [1901]
> W.N. 202 and *Re Morgan, Brown v. Jones* (1927) 71 Sol. Jo. 650, referred to.

**Appeal**

This was an appeal from a judgment of Phillips J. dismissing an appeal
from a Master. The facts are stated in the joint judgment of Kaye and
Southwell JJ.

*A. G. Southall* for the appellants.

*M. W. Shand* for the respondents.

<div align="right">

*Cur. adv. vult.*

</div>

**Young C.J.:** I have had the advantage of reading the joint judgment to be delivered by Kaye and Southwell JJ. I agree in the conclusions which their Honours have reached and I do so substantially for the reasons they have expressed. I wish however to add a few words of my own upon one aspect of the case.

Mr. Southall appeared for both respondents and began his argument with the contention that the learned Judge had assessed the damages incorrectly in that he had not reduced them on account of the fact that there had been changes of ownership interests amongst the lessors. The contention was that a lessor was not entitled to damages for loss of rent in respect of the period after he ceased to be the owner of the premises. In this contention both Mr. Southall's clients have the same interest.

Mr. Southall's second argument however was that the guarantor was not liable under the guarantee for any damages arising from the breach of the lessee's obligations under the lease. If this argument succeeded the whole of the burden of the damages payable would be thrown on the first appellant. A clear conflict of interest arose.

Mr. Southall assured us that his instructions were that both of his clients, who were represented by the same solicitors, agreed to the course he was pursuing notwithstanding the apparent conflict and upon that assurance we allowed the argument to proceed, reserving the question whether any difficulty would arise in disposing of the appeal.

In view of the conclusions at which we have arrived, no difficulty does arise in our disposing of the appeal. It should not however be assumed that the Court would, on another occasion, allow a similar course to be followed.

The general rule undoubtedly is that counsel ought not to appear for two clients whose interests may conflict: see *Halsbury's Laws of England*, 4th ed., vol. 3, para. 1143. The first case cited as authority for that proposition is *Day v. Ponsonby* (1842) 5 I. Eq. R. 24 in which counsel for a plaintiff moved for an order that the Accountant-General should draw on the cash in bank to the credit of the cause pursuant to the general allocation report in favour of several persons mentioned in the report. By that report, a certain sum of money, in which the plaintiff was not interested, was allocated to a creditor. The sum was included in the notice upon which counsel moved. The same counsel also moved on a separate brief on behalf of a third person that the money so allocated to the creditor should be paid to the third person. The report of the case is very short and simply records that the Court was of the opinion that counsel could not hold the two briefs.

Another authority is *Re Burton, Danby v. Burton* [1901] W.N. 202 in which counsel announced upon an originating summons that he appeared for the trustee who had no beneficial interest in the outcome of the proceedings and also for the life tenant. The question for determination on the summons was whether a certain receipt was to be treated as capital or income. Farwell J. would not allow the summons to proceed observing: "It is the duty of the trustee's counsel to assist the Court, and he ought not to argue on behalf of a beneficiary." Farwell J.'s decision has been continuously acted upon ever since.

Reference may also be made to *Re Morgan, Brown v. Jones* (1927) 71 Sol. Jo. 650 in which Clauson J. said, at p. 651: "The principle is that where trustees are represented by the same solicitors, and one of them is interested in the trust fund beneficially, it is prima facie the solicitor's duty

to employ separate counsel to represent the independent trustee in order that the Court may have the assistance of such separate counsel."

Every case must depend upon its own circumstances but it is important to notice, as *Re Burton* and *Re Morgan* show, that the Court is concerned that it should have the assistance of independent counsel for parties whose interests are not identical in the case before it. The Court must necessarily be concerned for its own protection.

For the reasons which I have given it is unnecessary to go further in the present case. It is sufficient to say that where the interests of two parties apparently conflict or may conflict it will be for the Court to say whether there may be a departure from the prima facie rule.

**Kaye** and **Southwell JJ.:** This is an appeal from a judgment of Phillips J. of 5 October 1987 dismissing an appeal from a Master. The issues concern the quantum of damages payable by the appellant Nangus Pty. Ltd. (Nangus) following its repudiation of a lease of commercial premises in Camberwell (the leased premises) and the extent of the liability of the appellant Crawford as a guarantor of Nangus' obligations under the lease.

On 15 April 1982 the first respondent Charles Donovan Pty. Ltd. (the Donovan company) and the second respondent Thomas Patrick Colgan were each the registered proprietor of one equal undivided 4th share of the leased premises; the third respondent Nancye Hamilton Best was the registered proprietor of one equal undivided 12th share, and James Best was the registered proprietor of six equal undivided 36th shares. On 15 April 1982 those four owners executed a lease of the leased premises to Nangus: the lease was for a term of three years at a yearly rental of $40,872 payable at the rate of $3406 monthly in advance, subject to adjustment related to movements in the consumer price index. On the same day the appellant Crawford and one Bruce William McLennan executed a guarantee whereby they "jointly and severally guaranteed . . . the due performance and observance by (Nangus) of all the covenants terms and conditions (of the lease)" and they further acknowledged "that this guarantee shall continue . . . notwithstanding that (Nangus) shall cease to carry on business shall go into liquidation or shall become defunct".

The lease was to operate from 1 June 1982; however Nangus never went into occupation pursuant to the lease: Nangus assigned the lease to Denpro Pty. Ltd. (Denpro) for one year to 31 May 1983.

On 26 May 1983 the solicitors for Nangus wrote to the respondents (the lessors) giving notice that Nangus did not consider itself bound by the lease beyond 31 May 1983, alleging that the lease was unenforceable in that it was procured by the fraud of the lessors' agent. By letter of 27 May 1983 the respondents' solicitors accepted what they termed the wrongful repudiation of the lease, and intimated that the lessors would attempt to mitigate their loss by re-letting the leased premises. This was accomplished at least for part of the term of the lease, but at a lesser rental than was reserved by the lease.

On 12 March 1986 the writ in the present action was issued with the four lessors as plaintiffs, and Nangus and the guarantors as defendants. McLennan was not served with the writ, and has not become a party to the action. James Best was mistakenly named as a plaintiff, he having died on 14 February 1984; probate of his will was granted to the respondents James Donovan Best and William Dillon Best on 1 June 1987 and in due course

NANGUS P./L. v. CHARLES DONOVAN P./L. (KAYE and SOUTHWELL JJ.)        187

an order was made for an appropriate amendment in the names of the plaintiffs.

The plaintiffs took proceedings to obtain final judgment: on 15 July 1986 Master Barker granted leave to enter final judgment against the appellants,
5  with damages to be later assessed. Counsel appeared for the second-named appellant; it was not then argued that she was not liable under the guarantee.

On 13 March 1987 the parties appeared by counsel before Master Evans, who assessed the damages at $88,055.26 (including $8068.62 by way of
10  interest). Nangus and Crawford appealed from that order: Phillips J. heard the appeal, and in a reserved judgment of 5 October 1987 his Honour assessed the damages at $88,282.86. It is from that order that this appeal is now brought.

15  By the statement of claim, the respondents pleaded the lease agreement, the repudiation of the lease, the acceptance of the repudiation, and as against the second-named appellant, breach of the guarantee. The respondents claimed that they had "suffered loss and damage". Particulars were given, setting out the various outgoings in rates, taxes, and interest,
20  and including the items—

> "Rent $49,793.31
> Interest on that rent $14,264.64."

Initially, the total claim was for $78,236.64.

This Court was not apprised in any detail of the nature of the evidence
25  put before Master Evans; however, there is a transcript of the proceedings before Phillips J. Mr. Southall, counsel for the appellants (who had not appeared before Master Barker), adduced evidence of various changes in the ownership of the leased premises since the date of the execution of the lease (15 April 1982). The substantial change followed the voluntary
30  liquidation of the Donovan company in early 1983, which was followed by a gradual distribution of assets among shareholders, including its share of the leased premises. We shall deal later with the issue of the liability of Crawford as guarantor.

The evidence of the changes in ownership was relied upon by
35  Mr. Southall as a basis for the principal submission that in turn Master Evans and Phillips J. had assessed damages upon a wrong basis, ruling that the changes in ownership subsequent to the execution of the lease were irrelevant. Mr. Southall submitted below, and in this Court, that each lessor was entitled to damages only in respect to the extent of his interest,
40  and the term of that interest: accordingly it was said, the Donovan company's entitlement was as to one-quarter of the loss from 15 April 1982 to 1 June 1983, when it acquired another one-quarter interest, but that it was not entitled to any damages for loss said to have been suffered after the date of liquidation: the reducing interests of each of the other lessors was
45  said to lead similarly to a finding that as the ownership share reduced, then so did the entitlement to damages. If this submission were accepted, the damages would be very much less than were in fact assessed.

Before examining the relevant law, it is perhaps useful to note that the respondents were not suing in their capacity as registered proprietors of
50  certain shares in the leased premises; they were suing as lessors, claiming damages for breach of the lease contract. Their right as lessors to sue the lessee in breach has not been brought into question.

Mr. Southall conceded that the ordinary principles of contract apply to the repudiation of a lease: see *Buchanan v. Byrnes* (1906) 3 C.L.R. 706; *Progressive Mailing House Pty. Ltd. v. Tabali Pty. Ltd.* (1985) 157 C.L.R. 17; 57 A.L.R. 609, the latter case demonstrating the correctness of Gray J.'s decision in *Ripka Pty. Ltd. v. Maggiore Bakeries Pty. Ltd.* [1984] V.R. 629, at pp. 632-3, where his Honour refused to follow *Total Oil Great Britain Ltd. v. Thompson Garages (Biggin Hill) Ltd.* [1972] 1 Q.B. 318; see also *Shevill v. Builders Licensing Board* (1982) 149 C.L.R. 620, at p. 625, per Gibbs C.J. with whom Brennan J., at p. 638, agreed.

However, Mr. Southall submitted, while a right of action accrued to the lessor at the time of repudiation and acceptance, it is quite another thing to assert that the damages are to be assessed at that time without reference to future events which might occur during the prospective course of the repudiated contract. It was said that the respondents as the lessors were not entitled to damages in so far as they consisted of loss of rent in respect of a period beyond the cessation of ownership.

Mr. Southall was able to cite no authority directly supporting this principal submission, a fact which tends to militate against acceptance of the submission, for the reason that in the history of landlord and tenant relations under English law, there must have been many instances of changing ownership following repudiation of a lease. We are reminded of the observation of Fullagar J. in *Re K. L. Tractors Ltd.* (1961) 106 C.L.R. 318, at p. 338: "It may seem curious that there is so little in the books bearing directly on the argument now raised. But a not uncommon reason for dearth of direct authority on a point is that there has been a general consensus of opinion that the point is not tenable."

For the respondents, Mr. Shand submitted that there was abundant authority against the contention of the appellants, that the court must assess damages on a "lost bargain" basis, and that while the court does not ignore subsequent events — for example, the fact that the premises were re-let after repudiation, evidence of those facts is admissible only as going to the value of the lost bargain. It was submitted that evidence of subsequent changes in proprietary interest was irrelevant to the assessment of the value of the lost bargain.

These opposing submissions render it necessary for us to examine the nature of the right acquired by a lessor who accepts a repudiation of a lease.

Bearing in mind that the ordinary principles of contract apply, a useful starting point is the statement in *McGregor on Damages,* 15th ed., at para. 29, where it is said: ". . . the basic loss to the other party is the market value of the benefit of which he has been deprived through the breach. Put shortly, the plaintiff is entitled to compensation for the loss of his bargain."

At para. 986 the learned author refers to *Marshall v. Mackintosh* (1898) 78 L.T. 750 where the lessor had re-let the premises at a lower rent and damages were assessed on the basis of the difference between the contractual rent under the broken agreement and the new rent.

In *Sunbird Plaza Pty. Ltd. v. Maloney* (1988) 77 A.L.R. 205; 62 A.L.J.R. 195, a case to which we must later refer in dealing with the question of the liability of the guarantor, Mason C.J. said, at (A.L.R.) p. 212; (A.L.J.R.) p. 199: "Loss of bargain damages are recoverable only if the contract is at an end. Once termination due to the defendant's

wrongful conduct is established the plaintiff is entitled to damages for loss of bargain."

At (A.L.R.) p. 221; (A.L.J.R.) p. 204 Gaudron J. referred to damages flowing from a breach of a contract of sale of land as "damages for loss of
5    bargain and consequential loss".

In *Progressive Mailing House Pty. Ltd. v. Tabali Pty. Ltd.,* Mason J. (with whom Wilson and Deane JJ. agreed generally, Dawson J. agreeing) said, (C.L.R.) at p. 31, that repudiation or fundamental breach "entitles the innocent party to rescind the contract and sue for damages for loss of
10    the bargain". Brennan J., (C.L.R.) at pp. 46-7, quoted with approval *dicta* of Barton J. in *Buchanan v. Byrnes* where the latter said, at p. 719: ". . . the plaintiff was then entitled to claim in an immediate action, prospectively, such damages as would be caused by a breach at the appointed time, subject to any circumstances which might operate in
15    mitigation of damages . . .".

Deane J., at p. 55, said: "It follows that the landlord was entitled to terminate the lease and in accordance with ordinary contractual principles sue the tenant for damages for loss of the benefit of the tenant's covenant to pay future rent and outgoings."

20    In *Buchanan v. Byrnes* the Court was considering the repudiation after five years of a 15 year lease of a hotel, which the lessee abandoned. Griffiths C.J. said, at p. 714, that upon breach: "the plaintiff had at once a complete cause of action against him. He was entitled to bring an action forthwith for the breach of that covenant, and he was entitled to such
25    damages as would properly flow from such a breach of covenant." On the question of damages, his Honour said, at p. 715: "The natural damage is the loss likely to be sustained by the plaintiff during the period for which the covenant ought to be kept." His Honour went on to observe that where an employer unequivocally breaks a contract of employment, the employee
30    can recover not wages, but damages, usually to be assessed as the difference between the wages which would have been earned under the contract and the wages which might reasonably be expected to be earned.

O'Connor J., at p. 721, said: "The landlord's rights upon that breach were to get such compensation and damages as the jury might think that he
35    was entitled to for the loss of the benefit of the 15 years' contract."

In *Moschi v. Lep Air Services Ltd.* [1973] A.C. 331, at p. 345 Lord Reid said in a passage, which we later quote verbatim, that when a contract is brought to an end by repudiation accepted by the other party all the obligations in the contract come to an end and they are replaced by
40    operation of law by an obligation to pay money damages.

Accordingly, there exists what appears to us to be powerful authority for the proposition that at the time of the acceptance by the lessors of the lessee's repudiation of the lease, the lessors were vested with a right to damages for loss of their bargain. Subsequent events may touch upon the
45    extent of that loss, but the damages fall to be assessed as at the date of the acceptance of the repudiation. The same principle applies in actions of an entirely different nature, for example, an action for damages for personal injuries, or under the *Wrongs Act* 1958, in respect of the death of a person upon whom the plaintiff is dependent. In *Wright v. West Australian Trustee*
50    *and Agency Co. Ltd.* [1987] V.R. 771, Murphy J. (with whom Gray and King JJ. agreed), at p. 783, referred to *Ruby v. Marsh* (1975) 132 C.L.R. 642 where it was held that the right to damages for personal injuries accrues when the act is done or the event occurs which leads to liability, and, at

SUPREME COURT OF VICTORIA

p. 784, his Honour went on to say: ". . . at law the loss is suffered at the date of receipt of the injuries, and *that is the loss that should be assessed*" (emphasis added).

In *Nickolau v. Papasavas Phillips & Co.* [1988] V.R. 682, Young C.J. referred, at p. 689, to "the general principle of English law that damages must be assessed as at the date when the damage occurs".

We have said that Mr. Southall was unable to cite any authority in direct support of his principal submission that changes in the proprietary rights of the lessors affected the assessment of the damages to which they are entitled. We know of no principle of law which could support the submission. It tends to equate proprietary rights with the lessors' contractual rights, which are the subject of this action. It cannot be that variations in the lessors' proprietary shares could be held to have increased the extent of the lessee's liability to pay damages: logically, there is no reason why they should decrease that liability.

The evidence of the changes in proprietary shares do not deal with events which throw light on the extent of the damage suffered by the lessees upon the repudiation. Evidence of subsequent events is admissible only where it throws such light.

If on the day after acceptance of the repudiation a court had been called upon to assess the damages for the lessors' lost bargain, it would not have been open to the Court to take into consideration the possibility that at some future date the lessors' proprietary interest might lessen as a factor operating to diminish damages, any more than it could have taken into account the possibility that the interest might increase as a factor operating to increase damages. It must follow that upon a later hearing, the Court cannot take into account the fact of an alteration in proprietary interest.

In our opinion, Phillips J. was correct in ruling that such evidence was irrelevant to the task of assessing damages. Since there was no other attack upon that assessment the appeal of the first-named appellant must be dismissed.

We turn now to the appeal by the second-named appellant, a guarantor.

The complaint made under ground 10 of the notice of appeal is in these terms: "The learned judge was wrong in law in finding that the second-named defendant was liable under the instrument of guarantee for damages accruing subsequent to the first-named defendant's breach of its obligations under the lease."

This ground of appeal was based upon the following passage of his Honour's reasons for judgment: "It was further put for the second-named appellant (specifically for the first time in a written submission by way of reply) that there were defects in the plaintiff's pleadings relating to the guarantees. It is sufficient to say that, in my opinion, this submission sought to subvert a regularly obtained judgment from which no appeal has been made, and it must be rejected."

It is clear that his Honour did not make any finding in the terms complained of but he declined to rule upon a submission which in effect challenged the validity of the judgment entered in the action.

The appeal before him was not against the order of Master Barker made on 15 July 1986, by which the respondents (the plaintiffs) were granted leave to enter interlocutory judgment against the appellants (defendants) for damages to be assessed. No appeal against Master Barker's order was made and no application to set aside the entry of judgment entered on

28 August 1986 was made. Consequently the judgment was regularly entered. The subject of the appeal before the learned Judge was the order of Master Evans whereby the amount of damages to be paid by the appellants pursuant to the judgment was assessed in the sum of $88,055.26.

5    His Honour's rejection of the submission was in conformity with the principle expressed by Wigram V.-C. in *Henderson v. Henderson* (1843) 3 Hare 100, at pp. 114-15; 67 E.R. 313, at p. 319, cited in the joint judgment of Gibbs C.J., Mason and Aickin JJ. in *Port of Melbourne Authority v. Anshun Pty. Ltd.* (1981) 147 C.L.R. 589, at p. 598; 36 A.L.R.

10    3, at pp. 8-9 that: "'where a given matter becomes the subject of litigation in, and of adjudication by, a Court of competent jurisdiction, the Court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have

15    been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of *res judicata* applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but

20    to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time.'"

More recently in *University of Wollongong v. Metwally (No. 2)* (1985)

25    59 A.L.J.R. 481, at p. 483; 60 A.L.R. 68, at p. 71, the High Court stated the same principle in these terms: "Except in the most exceptional circumstances, it would be contrary to all principle to allow a party, after a case had been decided against him, to raise a new argument which, whether deliberately or by inadvertence, he failed to put during the hearing

30    when he had an opportunity to do so." See also *Coulton v. Holcombe* (1986) 60 A.L.J.R. 470, at p. 473; 65 A.L.R. 656, per Gibbs C.J., Wilson, Brennan and Dawson JJ., and *Wright v. West Australian Trustee and Agency Co. Ltd.,* [1987] V.R. 771, at p. 795, per Gray J.

The order granting liberty to the respondents to enter final judgment

35    against the appellants was made on the return of a summons dated 10 April 1986. The hearing of the summons was contested, both appellants then being represented by counsel. The appropriate time for the second-named appellant to have submitted that she was not liable under the guarantee was at the hearing of the summons, or by application pursuant to Rules of the

40    Supreme Court 1985, O. 25, r. 4 to strike out para. 7 of the statement of claim in so far as the same related to the guarantee. It was not suggested before this Court that a submission in similar terms to the submission rejected by his Honour was made to Master Barker. In addition, no material explaining the failure to appeal against the order of Master Barker

45    was placed before us.

In the course of his argument in support of ground 10, Mr. Southall made application for orders extending the time for appeal against the order of Master Barker, granting leave to appeal against the order of Master Barker, and setting aside the judgment. We deferred ruling upon counsel's

50    application until the completion of argument on behalf of both parties. Mr. Southall was then heard to address argument in support of his submission that the second-named appellant was not liable under the guarantee for

damages accrued subsequent to the first-named appellant's breach of its obligations under the lease.

It was contended by Mr. Southall that upon the respondent's acceptance of the first-named appellant's repudiation, the lease was brought to an end so that the covenants and terms of the lease yet to be performed ceased to operate. The lease having been so terminated, counsel argued, the second-named appellant, as guarantor, was not liable for the first-named appellant's failures thereafter to perform the covenants. It was further contended that the liability of the guarantor was limited to the lessee's performance of covenants before the termination of the lease, and, the lease having been terminated, the guarantor was no longer liable for damages resulting from the unperformed covenants.

Counsel's submissions would appear to be based on a view that in all cases rescission by acceptance of repudiation terminates a contract *ab initio,* thereby freeing from liability a guarantor from the results of the principal's failure of performance of undischarged obligations under the principal contract.

However, the common law principles of the legal consequences of acceptance of repudiation by an innocent party to a contract was stated and explained by Sir Owen Dixon in *McDonald v. Dennys Lascelles Ltd.* (1933) 48 C.L.R. 457, at pp. 476-7 as follows: "When a party to a simple contract, upon a breach by the other contracting party of a condition of the contract, elects to treat the contract as no longer binding upon him, the contract is not rescinded as from the beginning. Both parties are discharged from the further performance of the contract, but rights are not divested or discharged which have already been unconditionally acquired. Rights and obligations which arise from the partial execution of the contract and causes of action which have accrued from its breach alike continue unaffected. When a contract is rescinded because of matters which affect its formation, as in the case of fraud, the parties are to be rehabilitated and restored, so far as may be, to the position they occupied before the contract was made. But when a contract, which is not void or voidable at law, or liable to be set aside in equity, is dissolved at the election of one party because the other has not observed an essential condition or has committed a breach going to its root, the contract is determined so far as it is executory only and the party in default is liable for damages for its breach."

This passage of his Honour's judgment was cited with approval by Lord Wilberforce (with whom the other members of the House agreed) in *Johnson v. Agnew* [1980] A.C. 367, at p. 396. Lord Edmund Davies in *Hyundai Heavy Industries Co. Ltd. v. Papadopoulos* [1980] 1 W.L.R. 1129, at p. 1141 also cited with approval the same passage from Sir Owen Dixon's judgment, together with the following statement appearing in Treitel, *The Law of Contract,* 5th ed., 1979, p. 641 that: "'Rescission . . . releases the party in breach for the future from his primary obligations to perform. But he is not released from primary obligations already due at the time of rescission, and he also comes under a secondary liability to pay damages. His liability may thus relate both to breaches committed before rescission and to losses suffered by the victim as a result of the defaulting party's repudiation of future obligations.'"

The statements to which we have referred were made in connection with contracts for the sale of land and commercial contracts. Nevertheless, as we have noted above, it is now settled law in Australia, whatever the law might

be elsewhere, that "the ordinary principles of contract law, including that of termination for repudiation on fundamental breach, apply to leases": per Mason J. in *Progressive Mailing Housing Pty. Ltd. v. Tabali Pty. Ltd.*, at p. 29.

5   It follows that liability for damages of the first-named appellant, as lessee, accrued to it from its failure to perform the covenants and terms of the lease during the unexpired term of the lease.

By the instrument of guarantee the second-named appellant guaranteed to the respondents "the due performance and observance by the company of all the covenants terms and conditions contained in the said lease to be observed and performed" by the first-named appellant. Thus the liability undertaken by the second-named appellant as guarantor was for the performance of the covenants by the first-named appellant during the entire period reserved by the lease, and for the consequences of the first-named appellant's failure to perform the covenants. Damages to which the respondents were entitled accrued to them as a result of the first-named appellant's failure to perform the covenants during the unexpired period of the term; and the first-named appellant's liability for damages as lessee accrued at the time of the acceptance of its repudiation. The second-named appellant's liability for the consequences of the first-named appellant's failure to perform the covenants yet to be performed continued after the first-named appellant terminated the lease.

Our conclusions are supported by the decision of the House of Lords in *Moschi v. Lep Air Services Ltd.* There a guarantor guaranteed performance by a debtor of its obligations under an agreement between a debtor and its creditors to make weekly payments of specified amounts in discharge of the whole debt. The debtor having made default of its obligations from the outset by payment of a lesser amount than was due, the creditors treated and accepted the breaches as a wrongful repudiation of the contract, and claimed against the debtor damages and against the guarantor the full amount of the weekly instalments less amounts paid. The House of Lords held that the guarantor was not discharged from liability under the guarantee by the creditors' acceptance of the debtor's wrongful repudiation of the contract, and that the creditors were entitled to recover from the guarantor damages for the net amount of the sum guaranteed. Lord Reid, at p. 334, rejected the guarantor's argument that the contract came to an end by the creditors having accepted repudiation of the contract before later payments became payable. His Lordship, at pp. 345-6, said that the guarantor: "might undertake that the principal debtor will carry out his contract. Then if at any time and for any reason the principal debtor acts or fails to act as required by his contract, he not only breaks his own contract but he also puts the guarantor in breach of his contract of guarantee. The creditor can sue the guarantor, not for the unpaid instalments but for damages. His contract being that the principal debtor would carry out the principal contract, the damages payable by the guarantor must then be the loss suffered by the creditor due to the principal debtor having failed to do what the guarantor undertook that he would do. . . .

"So it appears to me that when a contract is brought to an end by repudiation accepted by the other party all the obligations in the contract come to an end and they are replaced by operation of law by an obligation

to pay money damages. The damages are assessed by reference to the old obligations but the old obligations no longer exist as obligations. Were it otherwise there would be in existence simultaneously two obligations, one to perform the contract and the other to pay damages. But that could not be right. The only legal nexus remaining is the obligation to pay the damages; so here when the respondents elected to end the company's contract by treating their fundamental breach as a repudiation and accepting it, their right against the company became a right to get damages. The respondents did not recover these damages from the company so they were part of the loss suffered by the respondents as a result of the company's breaches of contract. The appellant as guarantor had undertaken that the company would carry out its contract so the damages which the company have not paid were part of the loss flowing from the appellant's breach of contract for which the appellant is liable."

Lord Diplock, at p. 350 stated: "Generally speaking, the rescission of the contract puts an end to the primary obligations of the party not in default to perform any of his contractual promises which he has not already performed by the time of the rescission. It deprives him of any right as against the other party to continue to perform them. It does not give rise to any secondary obligation in substitution for a primary obligation which has come to an end. The primary obligations of the party in default to perform any of the promises made by him and remaining unperformed likewise come to an end as does his right to continue to perform them. But for his primary obligations there is substituted by operation of law a secondary obligation to pay to the other party a sum of money to compensate him for the loss he has sustained as a result of the failure to perform the primary obligations. This secondary obligation is just as much an obligation arising from the contract as are the primary obligations that it replaces."

His Lordship continued, at p. 351: ". . . upon rescission of the contract the primary obligation of the debtor to pay the instalments was converted by operation of law into a secondary obligation either to pay damages for failure to perform it; or, as these were instalments of a debt existing at the date of the contract, it may be a revived obligation to pay the balance of the whole debt immediately.

"The guarantor's obligation under his contract of guarantee does not, as the Court of Appeal appear to suggest, depend upon the debtor's primary obligation continuing to exist after the contract had been rescinded. Nor is it affected by whether the debtor's secondary obligation which was substituted for it by operation of law is classified as an obligation to pay damages or as an obligation to pay the debt. It was the debtor's failure to perform his primary obligation to pay the instalments in circumstances which put an end to it that constituted a failure by the guarantor to perform his own primary obligation to the creditor to see that the instalments were paid by the debtor, and substituted for it a secondary obligation of the guarantor to pay to the creditor a sum of money for the loss he thereby sustained. It is the guarantor's own secondary obligation, not that of the debtor, that the creditor is enforcing in his claim for damages for breach of his contract of guarantee."

Lord Simon of Glaisdale, at p. 352, described as the first and most important question of construction to be to determine what it was that the guarantor was guaranteeing. "This", his Lordship stated, "was expressly

the performance by the company of certain of its obligations under the contract; it is only convenient shorthand to say that he was guaranteeing payments by the company. In thus guaranteeing performance of obligations, the contract of guarantee was, . . . endorsing the common law obligation and liability of a surety, whereas the contract could have modified such common law obligation and liability and substituted some other."

Similarly, in *Chatterton v. Maclean* [1951] 1 All E.R. 761 which was approved by the House of Lords in *Lep Air Services,* Parker J. took the view that a creditor's acceptance of the principal debtor's repudiation of the contract did not release the guarantor in respect of the indebtedness accrued due or future liabilities for damages.

The liability of a guarantor for accrued payments of instalments of the contract price by the buyer of a completed ship to the builders was the matter determined by the House of Lords in *Hyundai Heavy Industries Co. Ltd. v. Papadopoulos.* By the terms of a letter, guarantors guaranteed that, in the event of default of payment of any instalment by the buyer, they would forthwith make payment to the ship builders on behalf of the buyer. The buyer having defaulted in making payment of the second payment, the builders exercised their right to rescind the contract which was a right expressly provided by the terms of the contract, and they sued the guarantors. The guarantors denied liability upon the ground that the contract having been rescinded before the proceedings were commenced, the builders were not possessed of any accrued right to the unpaid instalments which had become due before the date of rescission. The House, rejecting the submission, held that the buyer remained liable for the unpaid instalments and the guarantors remained liable for the instalments under the guarantee. Lord Edmund Davies, at p. 1141, described as "an irrational assumption unsupported by any direct authority" the guarantors' assertion "that the builders exercise of their undoubted right to cancel the ship contract terminated it for all purposes and, in particular, rendered the second instalment no longer exigible". His Lordship stated: "It is true that upon cancellation the builders acquired a right to recover damages for such injury flowing from the buyers default as, in due course and upon proper accounts being taken and a balance struck, the builders could establish."

In *Sunbird Plaza Pty. Ltd. v. Maloney* (1988) 77 A.L.R. 205, at p. 208; 62 A.L.J.R. 195, at p. 197 Mason C.J. noted that: ". . . a creditor's rights against a guarantor depend on the terms of the guarantee and the nature of the obligation, performance of which is guaranteed. If the subject of the guarantee is payment of a debt or a sum of money which has accrued due, the creditor may, on default by the principal debtor, sue the guarantor instead of the principal debtor for the debt or sum of money, his claim being for a liquidated amount. If, on the other hand, the subject of the guarantee is the performance of some other obligation, then the person having the benefit of the guarantee may, upon default, sue the guarantor for damages for breach of contract."

Mr. Southall's contention that the decisions of the High Court in *McDonald v. Dennys Lascelles Ltd.* and in *Sunbird Plaza Pty. Ltd. v. Maloney* supported his submission of a guarantor's liability being discharged upon rescission of the principal debtor's liability to perform the contract was not well founded. Those decisions were based on particular facts which are distinguishable from those in the present case. In *McDonald*

*v. Dennys Lascelles* the purchaser's liability to make an instalment payment under a contract for the sale of land was discharged by the vendor's inability to make title, thereby discharging the guarantor's liability to the vendor. In *Sunbird Plaza Pty. Ltd. v. Maloney* the guarantors guaranteed performance of all the terms and conditions of a contract of sale including the payment of all moneys payable thereunder by the purchaser. The balance of the purchase money was payable upon settlement. The purchaser failed to make payment of the balance of the purchase money and gave notice purporting to avoid the contract. Settlement not having taken place, the guarantors were not liable under the guarantee for the purchaser's failure to pay the balance of the purchase money.

Accordingly, in the present matter the second-named appellant remained liable to the respondent under the instrument of guarantee for damages resulting from the first-named appellant's repudiation of the lease. It follows that no useful purpose would be served by acceding to the application for the several orders sought by the second-named appellant, and we reject the application.

For these reasons, in our opinion the appeal should be dismissed with costs.

*Appeal dismissed.*

Solicitors for the appellant: *Holding Redlich.*

Solicitors for the respondents: *J. A. Wilmoth & Son.*

J. S. GLOVER
BARRISTER-AT-LAW

[CHANCERY DIVISION]                                         A

OFFICIAL CUSTODIAN FOR CHARITIES
AND OTHERS v. MACKEY AND OTHERS

[1984 O. No. 2321]

1984   June 12, 13, 14, 15                              Scott J.
                                                              B

*Landlord and Tenant—Forfeiture of lease—Mortgagees' rights—Lease
subject to mortgages—Receivers appointed by mortgagees—Tenant
going into liquidation—Forfeiture of lease—Possible appeal
pending for relief against forfeiture—Landlords seeking injunctions
to restrain receivers and mortgagees from collecting rents—
Whether mortgagees' title capable of retrospective validation—
Whether power to grant relief retrospectively to mortgagees—Law
of Property Act 1925 (15 & 16 Geo. 5, c. 20), s. 146(4)*          C

By a lease dated 10 August 1961, the plaintiff trustees of a
charity demised land to a company for a term of 107½ years
from 25 March 1961 with a condition entitling them to re-enter
in the event of the company going into liquidation. The land
was the subject of a number of sub-leases and the lease was the
subject of certain mortgages entered into by the company with     D
the third, fourth and fifth defendants. On 22 October 1976 the
third defendants appointed the first and second defendants as
joint receivers under the third mortgage of the lease granted by
the company and, thereafter, the receivers proceeded to collect
rents from the various sub-lessees and to manage the property.
On 26 February 1979 a compulsory winding up order was made
against the company. When the plaintiffs learnt of the winding
up in July 1981 they began proceedings for the forfeiture of the  E
lease. The deputy judge granted the company unconditional
relief against forfeiture but, on appeal, the Court of Appeal
allowed the plaintiffs' appeal on the ground that the High Court
had no jurisdiction to grant relief against forfeiture since the
claim to forfeiture was based on the compulsory winding up of
the company and the claim for relief was not made within one
year from the date of the winding up order. The court declared   F
that the lease had been forfeited from the date of the service of
the writ on 19 July 1982, ordered the company to pay mesne
profits from 20 July until the date of the order, 18 April 1984,
and refused the company leave to appeal to the House of
Lords.

The company intended to petition the House of Lords for
leave to appeal against the order for forfeiture and the
defendants had issued summonses for relief against forfeiture    G
under section 146(4) of the Law of Property Act 1925[1], but they
were not proceeding in the matter until they knew whether the
House of Lords would allow an appeal against the decision of
the Court of Appeal. The receivers continued to collect the
rents and manage the property as though the mortgages and the
sub-leases were still subsisting. On 18 May 1984 the plaintiffs
issued a writ and notice of motion seeking, inter alia, injunctions  H
restraining the defendants from demanding or receiving moneys
or rents payable by the several occupiers or sub-lessees, or
managing or interfering with the plaintiffs' management of the

---

[1] Law of Property Act 1925, s. 146(2)(4): see post, pp. 182B–C, 183B–D.

A    property or from claiming the right to manage the property or to receive rents.

On the plaintiffs' motion for interlocutory injunctions on the basis that unless and until the House of Lords should restore the lease, and with it the various mortgages, the plaintiffs were entitled to the benefit of the Court of Appeal judgment:—

*Held,* (1) that the effect of the Court of Appeal order was that the plaintiffs were entitled to the property freed from the

B    lease and the mortgages and that the receivers had no right to collect rents or manage the property; that the possibility that the House of Lords would give leave to appeal and allow the company's appeal in the plaintiffs' action for forfeiture, with the result that the receivers' acts would be retrospectively validated, was not a defence to the present action; and that, since the defendant mortgagees had chosen not to be joined as parties to the forfeiture proceedings, they were bound by the order of the

C    Court of Appeal and could not now seek in effect to suspend the operation of that order (post, pp. 178c–e, 179f—180a, d–f, g—181b).

(2) That, although the defendant mortgagees would obtain relief under section 146(4) of the Law of Property Act 1925 if and when their summonses were heard, the court's power under the subsection was not to revive the forfeited interest but a

D    power to grant relief in the form of an order vesting in the defendants an interest in the land; that, accordingly, where under the subsection the court granted a new lease, the lease could not have retrospective effect and the power to attach conditions provided for in the subsection could not be construed as being broader than a power to attach conditions precedent to the actual vesting and, therefore, the court could not divest the plaintiffs of proprietary rights in respect of the period before

E    the vesting by ordering them to pay over to the defendants money received between the date of forfeiture and the date of the vesting order (post, pp. 181c–e, 183e–f, 185c–g, 186e—187a).

Dicta of Fox and Robert Goff L.JJ. in *Cadogan v. Dimovic* [1984] 1 W.L.R. 609, 613, 616, C.A. and of Vaughan Williams L.J. in *Ewart v. Fryer* [1901] 1 Ch. 499, C.A. considered.

F    (3) That, since there was no arguable defence to the plaintiffs' claim for interlocutory injunctions, there was no basis for considering whether on the balance of convenience the court should consider an order preserving the status quo; that, accordingly, the plaintiffs were entitled to injunctive relief but those injunctions would be in a form that protected the parties' respective interests (post, p. 187c–f).

*Stocker v. Planet Building Society* (1879) 27 W.R. 877

G    applied.

*American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396, H.L.(E.) considered.

The following cases are referred to in the judgment:

H    *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396; [1975] 2 W.L.R. 316; [1975] 1 All E.R. 504, H.L.(E.)
*Cadogan v. Dimovic* [1984] 1 W.L.R. 609; [1984] 2 All E.R. 168, C.A.
*Dendy v. Evans* [1909] 2 K.B. 894; [1910] 1 K.B. 263, C.A.
*Ewart v. Fryer* [1901] 1 Ch. 499, C.A.

*Manchester Corporation v. Connolly* [1970] Ch. 420; [1970] 2 W.L.R. 746;    A
    [1970] 1 All E.R. 961, C.A.
*Stocker v. Planet Building Society* (1879) 27 W.R. 877, C.A.

The following additional cases were cited in argument;
*Bradshaw v. Pawley* [1980] 1 W.L.R. 10; [1979] 3 All E.R. 273
*Chatham Empire Theatre (1955) Ltd. v. Ultrans Ltd.* [1961] 1 W.L.R. 817;
    [1961] 2 All E.R. 381
*Chelsea Estates Investment Trust Co. Ltd. v. Marche* [1955] Ch. 328; [1955]    B
    2 W.L.R. 139; [1955] 1 All E.R. 195
*City of Westminster Assurance Co. Ltd. v. Ainis* (1975) 29 P. & C.R. 469,
    C.A.
*Meadows v. Clerical Medical and General Life Assurance Society* [1981] Ch.
    70; [1980] 2 W.L.R. 639; [1980] 1 All E.R. 454

MOTION                                                                          C
    By a writ dated 18 May 1984, the plaintiffs, the Official Custodian
for Charities, and the trustees of the Campden Charities, Ian Leonard
Robson, Ernest Anslow Wilson, Philippa Viscountess Astor, Elizabeth
Marty Christmas, David Clifford, Henry Brooks Dennison, William
Howard Goodhart, Stephen Peter Hoier, Clifford Simon Romer Marr
Johnson, Alan Greenwood Morkill, Sir David Francis Muirhead, Belinda    D
Norman Butler, Maurice Hart Parkin, Eric Howard Pierson, Frances
Mary Morgan, Robert Lewis Vigars and Ivan Weekes, sought against
the defendants, William Gowen Mackey, Nigel John Hamilton, the
Royal Bank of Scotland, the London and Manchester Assurance Co.
Ltd. and the London and Manchester (Pensions) Ltd. (formerly the
Welfare Insurance Co. Ltd.), (1) an injunction restraining the defendants
and each of them whether by themselves their servants agents or    E
otherwise howsoever from doing the following acts or any of them, that
is to say (i) demanding or receiving any moneys or rents payable by the
several occupiers or sub-lessees of the piece or parcel of land at
Shepherds Bush in the County of London formerly known as the
Charecroft Estate and now known as Shepherds Bush Centre as the
same is more particularly described in the lease mentioned in paragraph    F
(2) below ("the property"), (ii) managing or in any way interfering with
the plaintiffs' management of the property, (iii) asserting as against the
occupiers or sub-lessees or any of them a right to manage the property
or to receive any moneys or rents payable in respect of their occupation
by such occupiers or sub-lessees; (2) an inquiry as to the amount of all
such moneys or rents received by or on behalf of the defendants and/or
each of them and paid by the occupiers or sub-lessees in respect of the    G
period from 19 July 1982 (the date of the forfeiture by the plaintiffs of
the headlease of the property dated 10 August 1961 and made between
the Official Custodian for Charities and the then trustees of the Campden
(Non-Educational) Charities and Parway Estates Developments Ltd.) to
the date of the inquiry and what has become of the same; (3) all
necessary and consequential accounts inquiries and directions; (4) an    H
order for payment to the plaintiffs of all such moneys or rents or part
thereof after making such allowances if any as might be proper; (5)
alternatively judgment for the sums found due by the defendants
respectively upon the taking of the accounts; (6) interest pursuant to

A section 35A of the Supreme Court Act 1981, as inserted by section 15 of, and Schedule 1, Part I to, the Administration of Justice Act 1982, at a rate of 12·7 per cent. as from 19 July 1982 as aforesaid with payment or judgment to be assessed; (7) further or other relief, and (8) costs.

By a notice of motion, also dated 18 May 1984, the plaintiffs sought (1) an injunction until trial or further order in the meantime restraining the defendants and each of them whether by themselves, their servants

B agents or otherwise howsoever from doing any of the following acts or any of them, i.e., (i) demanding or receiving any moneys or rents payable by the several occupiers or sub-lessees of the piece or parcel of land in the writ of summons mentioned situate at Shepherds Bush in the County of London formerly known as the Charecroft Estate and now known as Shepherds Bush Centre ("the property"); (ii) managing or in

C any way interfering with the plaintiffs' management of the property; (iii) asserting as against the occupiers or sub-lessees or any of them a right to manage the property or to receive any moneys or rents payable by such occupiers or sub-lessees; and (2) costs.

The facts are stated in the judgment.

D *W. J. Mowbray Q.C.* and *George Laurence* for the plaintiffs. The Court of Appeal has declared the lease forfeited as from 19 July 1982. The lease has gone, and with it have gone the mortgages and the sub-leases. So the receivers have no right to receive moneys from the occupiers. The plaintiffs have succeeded in forfeiting the lease and are now entitled to the injunctions sought. They do not seek possession as such, but to make arrangements for the management of the property and collection of rents through the managing agents, without troubling

E the occupiers. The present situation is unsatisfactory in various respects. If the receivers accept "rent," the plaintiffs may have difficulty in recovering it again from the occupiers. The mortgagees have indicated that the premises are not now insured, and the plaintiffs have had to insure at a cost of £320,000 per annum.

There is no defence to the plaintiffs' claim for the injunctive relief

F sought pending the hearing of the mortgagees' applications for relief; so the balance of convenience is irrelevant. The tenant has no pending application for relief, but merely a pending petition for leave to appeal to the House of Lords. At present, unless and until the tenant obtains leave to appeal, the lease has no existence, and the tenant has merely a hope of ultimately obtaining relief. If the tenant gets leave, there will be

G delay before its appeal can be heard, and the mortgagees' application cannot sensibly be heard while the tenant's appeal is pending.

The mortgagees have pending applications for vesting orders under section 146(4) of the Law of Property Act 1925, but the jurisdiction to make a vesting order under that section does not enable the court to vest a term or interest in the applicant prior to the date of the order, *Cadogan v. Dimovic* [1984] 1 W.L.R. 609. The conditions which can be

H imposed under section 146(4) must operate against the grantee; they cannot be imposed on the landlord: *City of Westminster Assurance Co. Ltd. v. Ainis* (1975) 29 P. & C.R. 469 shows that where relief has been granted under section 146(4) to a head tenant, the freeholder is entitled

to possession against others in occupation unless and until the head    A
tenant fulfills the conditions subject to which relief was granted. The
present is an a fortiori case. Contrast the position under section 146(2),
where, it is conceded, the tenant's lease is restored on the grant of relief
as if it had never been forfeited.

To deny the plaintiffs the relief sought would deprive them of the
fruits of victory to which they are entitled. Execution should not be
stayed pending the tenant's application to the House of Lords. The    B
provision in R.S.C., Ord. 59, r. 13(1) that no intermediate act or
proceeding is validated by an appeal is applicable. The estate requires
active management and the plaintiffs owe their charitable objects a duty
to manage the estate.

*E. G. Nugee Q.C.* and *Thomas Seymour* for the first, second and
third defendants. Whether interlocutory relief should be granted depends    C
on the principles to be applied in accordance with *American Cyanamid
Co. v. Ethicon Ltd.* [1975] A.C. 396. Applying these principles the
motion should be dismissed, for the following reasons: (1) There is a
serious triable issue as to who is entitled to the intermediate "rents": (i)
the tenant, if it should obtain relief, or (ii) any of the three mortgagees,
or (iii) the freeholder. The Court of Appeal did not contemplate that
the freeholder could be entitled, so it is necessary to consider whether    D
the plaintiffs would be adequately protected by their claim for an
account. (2) The plaintiffs will be adequately compensated for any loss
which they might sustain. The receivers, since they will be indemnified
by the Royal Bank of Scotland Plc., will be able to pay any sum which
they may be ordered to pay. The court should therefore refuse to grant
interlocutory injunctions. (3) Preservation of the status quo until trial,    E
and in particular the continuation of the present arrangements for
collection of rents by Messrs. Trevors acting on the receivers' instructions,
is convenient and desirable. If Trevors were jointly instructed by the
plaintiffs and the receivers, the cost and difficulty of managing the estate
would be increased. Any alteration in management would increase the
risk that occupiers, learning of the forfeiture, might withhold rent or
cease occupation.    F

(4) As to the strength of the parties' cases, it is just and reasonable
that the mortgagees, who it is accepted are entitled to relief, should not
be deprived of their security in any respect, so long as the plaintiffs
continue to receive the head rent. The jurisdiction to grant the
mortgagees relief arises under section 146 of the Law of Property Act
1925. The purpose of that section is to enable the court to restore the    G
sub-lessee to his position before the forfeiture: see *Cadogan v. Dimovic*
[1984] 1 W.L.R. 609, 615, *per* Fox L.J. and compare *Chatham Empire
Theatre (1955) Ltd. v. Ultrans Ltd.* [1961] 1 W.L.R. 817 as to restoring
the landlord to the status quo ante. The jurisdiction should be exercised
with that purpose in mind. The plaintiffs' interpretation of section 146(4)
has the result that whenever there is a lease of property subject to a
mortgage and the land yields a profit rental to the lessee, the freeholder    H
will always be able to claim a windfall in the form of profit rental during
the interval between the date of forfeiture and the grant of relief to the
mortgagee. This interpretation would defeat the manifest intention of

A    the legislature, and the court should seek, if possible, to avoid doing this; compare *Cadogan v. Dimivic* [1984] 1 W.L.R. 609, 617, *per* Robert Goff L.J. Section 146(4) is broadly drafted. The court has a discretionary power to impose conditions on both parties. The court ought to exercise its jurisdiction under section 146(4) so as to produce the same result as if the new lease vested in the mortgagee ran from the date of forfeiture. The effect of the law as it stands is that because it is a new term which

B    is vested in the mortgagee rather than an assignment of the old term, the status quo ante the forfeiture, including the tenurial relationship with the former sub-tenants, can never be restored. This indicates that a new approach to the construction of section 146(4) is needed. [Reference was made to *Chelsea Estates Investment Trust Co. Ltd. v. Marche* [1955] Ch. 328.]

C    *Michael Essayan Q.C.* and *Nicholas Patten* for the fourth and fifth defendants. Whether the plaintiffs will be entitled to the intermediate rents is speculative. The balance of convenience is overwhelmingly against granting interlocutory relief. The plaintiffs' right to succeed depends on showing that the tenant's application for relief is out of the way, and that the mortgagees cannot get relief entitling them to intermediate rents. The tenant has two contentions in respect of which it

D    is petitioning the House of Lords for leave to appeal, namely: (i) a defence of waiver, which if successful means that the lease was never forfeited, and (ii) an application for relief under the equitable jurisdiction, which if successful means that relief will be as from the date of the writ. In either case the lease will be treated as having always been subsisting: *Dendy v. Evans* [1910] 1 K.B. 263. Likewise the mortgagees' sub-terms

E    will be treated as always having been subsisting, and the plaintiffs will never have been entitled to the rents.

   Even if the tenant fails in the House of Lords, the mortgagees have on foot pending applications for relief. In any event the interim relief sought by the plaintiffs ought not to be granted pending determination of the mortgagees' applications for relief. The grant of the injunctions may cause irreparable damage to the mortgagees especially if the

F    plaintiffs act in accordance with their stated intention of notifying occupiers of the forfeiture of the head lease.

   [SCOTT J. Is there any reason why the mortgagees should not make an application to the Court of Appeal or the House of Lords in the forfeiture action to stay or suspend the operation of the Court of Appeal's declaration?]

G    That is not clear. The mortgagees are not parties to that action and would have to apply to be joined in the action. As the mortgagees are not parties, it is still open to them to contend as against the plaintiffs that the forfeiture was waived by the acceptance of rent. Apart from the tenant's appeal, the defence to the plaintiffs' claim is that relief under section 146(4) of the Law of Property Act 1925 can be granted so as to make the relief retrospective in effect. If it cannot, very great hardship

H    will be caused to mortgagees and sub-lessees.

   The present mortgagees cannot get relief by having a new lease vested in them under section 146(4) until such time as the tenant's application for relief has been determined. This is because any new lease

A

granted to the mortgagees would operate as a lease of the reversion
expectant upon the determination of the tenant's lease if the tenant is
ultimately granted relief and its lease is treated as never having been
forfeited. In the meanwhile the mortgagees stand to lose a large sum in
rents.

The court has a wide jurisdiction under section 146(4) which it will
exercise so as to put the parties back into the position that they would    B
have been in if the forfeiture had not occurred: *Chatham Empire
Theatre (1955) Ltd. v. Ultrans Ltd.* [1961] 1 W.L.R. 817 and *Meadows
v. Clerical Medical and General Life Assurance Society* [1981] Ch. 70.
Even if the court cannot vest a legal estate in the mortgagees as from a
date prior to its order, it can by means of a lease create contractual
obligations between the plaintiffs and the mortgagees as from a date
prior to the vesting of the term: *Bradshaw v. Pawley* [1980] 1 W.L.R.     C
10. The court can when granting relief to the mortgagees provide that
the intermediate rents are to belong to them as a matter of contract
between them and the plaintiffs. The powers of the court under section
146(4) are very wide: see *Ewart v. Fryer* [1901] 1 Ch. 499.

On the basis of the plaintiffs' contention that there is no defence, the
proper course was to apply under R.S.C., Ord. 14 for summary
judgment. But on an Order 14 application the court would not have        D
given judgment for the plaintiffs; the defendants would have been
granted leave to defend.

It would be wrong to make an order now which authorises acts
which might ultimately turn out to be gross trespass, i.e. if the tenant
obtains relief. The plaintiffs' management decisions may substantially
depreciate the value of the mortgagees' security. [Reference was made    E
to *Chelsea Estates Investment Trust Co. Ltd. v. Marche* [1955] Ch. 328.]
*Ltd. v. Marchie* [1955] Ch. 328.]

*Mowbray* Q.C. in reply. the plaintiffs alone have a legal estate in the
property and a present right to manage it and to collect the rents. The
tenant has no present interest of any kind. The Court of Appeal has
jurisdiction to stay or suspend execution: but no stay or suspension has
been sought. The plaintiffs would like to notify the occupiers as to the    F
forfeiture but, in order to be helpful to the defendants, will undertake
not to communicate directly with occupiers. The plaintiffs would be
content if, in accordance with the terms proposed by the plaintiffs
before issuing the notice of motion, the managing agents acted on the
joint instructions of the plaintiffs and the receivers. That course is
neither impracticable nor objectionable.                              G

The receipt of a windfall by the plaintiffs does not necessarily cause
any loss or harm to the mortgagees. Even if the mortgagees do suffer
some loss, it is hardly surprising that a financial institution lending
money on the security of leasehold property which proves inadequate
security should suffer loss when the tenant goes into liquidation.

Scott J. In this case the plaintiffs are the Official Custodian for    H
Charities and the trustees of the Campden Charities who, as such, are
the freehold owners of land at Shepherds Bush, formerly known as the
Charecroft Estate and now known as Shepherds Bush Centre ("the

A    Centre"). By a lease dated 10 August 1961 the then trustees of the Campden Charities demised the Centre to Parway Estates Developments Ltd. ("Parway") for a term of 107½ years from March 1961. The lease contained a condition entitling the landlords to re-enter in the event of the tenant going into liquidation, whether compulsory or voluntary, save for the purpose of reconstruction or amalgamation. The lease was registered at H.M. Land Registry, and it appears from the details on the charges register that the Centre has been at all material times subject to a large number of sub-leases. These sub-leases comprise shops, offices and residential premises, including blocks of council flats. The annual rental from these sub-leases is nearly £700,000 per annum. The rent reserved by the lease is now £27,500 per annum.

B

C    The fourth and fifth defendants, London and Manchester Assurance Co. Ltd. and London and Manchester (Pensions) Ltd., are jointly first mortgagees of the lease. The third defendant, Royal Bank of Scotland, is third mortgagee of the lease. In addition, as I understand it, Slater Walker Ltd. are, in part, second mortgagees and, in part, fourth mortgagees of the lease.

D    By a deed of appointment dated 22 October 1976 the first and second defendants, Mr. Mackey and Mr. Hamilton, who are partners in Ernst & Whinney, were appointed by the third defendants to be joint receivers in respect of the property comprised in the lease. Since then the first and second defendants have, as such receivers, arranged for the collection of the rents payable by the various sub-lessees and have managed the property through agents, Messrs. J. Trevor & Sons.

E    On 26 February 1979 a compulsory winding up order was made in the Companies Court against Parway. However, the rent payable under the lease continued to be paid by the receivers to the plaintiffs and the plaintiffs did not become aware of the winding up until July 1981.

   On 10 December 1981 the plaintiffs took out a summons seeking the leave of the Companies Court to commence proceedings for forfeiture of the lease against Parway. Such leave was granted by an order dated 24 June 1982. Accordingly, on 6 July 1982 the plaintiffs issued a specially endorsed writ claiming forfeiture of the lease. Parway, in liquidation, was the only defendant. I shall refer to this action as "the forfeiture action." The writ was served on 19 July 1982. Parway defended the forfeiture action on the ground that the plaintiffs should be taken to have waived the right to forfeit, and counterclaimed for relief from forfeiture.

F

G    I have been referred to certain material forming part of an exhibit to the affidavit of Peter Robert Lucas, sworn on 18 May 1984, which indicates that the defence of the forfeiture action by Parway was undertaken at the request of the receivers and on receiving the receivers' indemnity to cover any legal costs thereby incurred by Parway. It appears that the liquidator of Parway took the view that the various charges on the lease exhausted the equity therein and was not willing that the legal costs occasioned by a defence should fall upon the estate. It is clear also that the third defendants stood behind the receivers for the purposes of that indemnity.

H

**A.38**

As I have said, Parway counterclaimed in the forfeiture action for relief against forfeiture. In addition, on 23 May 1983 the third defendants and the fourth and fifth defendants respectively issued summonses in the forfeiture action, seeking relief under section 146(4) of the Law of Property Act 1925 and to be joined as parties to the forfeiture action. This relief would be unnecessary in the event that Parway succeeded either in defeating the forfeiture claim or in obtaining relief from forfeiture. In the event, however, that the plaintiffs succeeded against Parway in forfeiting the lease, the mortgagees would seek, under their respective summonses, vesting orders under section 146(4) of the Act of 1925. I will return later in this judgment to consider more particularly the relief available under that subsection.

These summonses were adjourned by the master to the judge, with a direction that they should be dealt with immediately after the forfeiture action.

The forfeiture action came on for hearing before Mr. Vivian Price Q.C., sitting as a deputy judge of the Chancery Division, and on 27 July 1983 the deputy judge rejected the waiver defence put forward by Parway, but granted Parway unconditional relief against forfeiture. The mortgagees' summonses for relief and for joinder were not dealt with since relief from forfeiture had been granted to Parway, the mortgagor.

Mr. Seymour, who appeared with Mr. Nugee for Parway before the deputy judge, and who appears with Mr. Nugee for the first three defendants before me, very properly told me that before the deputy judge he was briefed also to represent the fourth and fifth defendants, who appear before me by Mr. Essayan and Mr. Pattern, and that before the deputy judge Mr. Nugee was briefed also to represent the third defendants. Since the mortgagee defendants were represented before the deputy judge and did not press their respective claims to be joined as parties to the forfeiture action, it is a fair inference that they were content that the defence to the plaintiffs' forfeiture claim on the ground of waiver should be prosecuted by Parway.

The plaintiffs appealed against the grant of relief from forfeiture on the main ground that the High Court had no jurisdiction in the circumstances of the case to grant such relief. Parway, by a respondent's notice, appealed against the deputy judge's rejection of its waiver defence. The Court of Appeal* unanimously upheld the deputy judge's rejection of the waiver defence, but allowed the plaintiffs' appeal on the jurisdiction point. The court held that since the forfeiture was based on the compulsory winding up of Parway on the grounds of insolvency and since the claim for relief was not made within one year from the date of the winding up, the statutory jurisdiction under section 146(4) was excluded by 146(10) and that where the statutory jurisdiction was expressly excluded, the inherent jurisdiction of the court could not be invoked.

Accordingly, the Court of Appeal on 18 April 1984 made an order declaring that the lease had been forfeited on 19 July 1982—the date on which the writ in the forfeiture action was served—and ordering Parway,

---

* *Official Custodian for Charities v. Parway Estates Developments Ltd.* [1985] Ch. 151.

A    inter alia, to pay to the plaintiffs mesne profits from 20 July 1982 down
to the date of the order. In addition, the Court of Appeal refused
Parway leave to appeal to the House of Lords. Parway has petitioned
the House of Lords for such leave. The petition† is, I understand, likely
to be heard towards the end of this month.

B    The summonses of the third, fourth and fifth defendants for relief
under section 146(4) are still pending. In addition, and because the
mortgagee defendants entertain some doubt as to the present status of
those summonses, the mortgagees have, as I understand it, very recently
issued writs claiming such relief. These writs have not yet been served.

C    If the Court of Appeal order should stand, the secton 146(4) claims
for relief will be brought on for hearing. But the defendants' advisers
regard it as inappropriate to proceed with those claims until it is certain
that the lease will remain forfeited. Such certainty must await the
outcome, first, of the petition for leave to appeal to the House of Lords,
and then, if leave is granted, of the appeal itself.

D    In the meantime, and notwithstanding that under the Court of
Appeal order the lease stands forfeited, the receivers are continuing to
collect the rents from the various sub-lessees and are, at present at least,
dealing with those rents as though the interests of the respective
mortgagees were still subsisting. In addition, the receivers, through
Messrs. J. Trevor & Sons, are continuing to manage the property and to
enter into arrangements with the various sub-lessees as though the
mortgages and the sub-leases are all still on foot.

E    The action in which the application now before me is brought was
commenced by writ issued on 18 May 1984. By the writ the plaintiffs
claim, first, injunctions restraining the defendants from demanding or
receiving any moneys or rents payable by the several occupiers or sub-
lessees of the property comprised in the lease or from managing or
interfering with the plaintiffs' management of the property or from
asserting the right to manage the property or to receive any such
moneys or rents. Secondly, the plaintiffs seek an inquiry as to the
F    moneys or rents received by the defendants from the occupiers and sub-
lessees from the date of forfeiture of the lease, 19 July 1982, to the date
of the inquiry. And, thirdly, an order for payment to the plaintiffs of all
such moneys and rents after deduction of such allowances as might be
proper is sought.

G    By the interlocutory application which is now before me the plaintiffs
seek at this interlocutory stage the injunctions to which I have referred
that are claimed by the writ. The plaintiffs base their entitlement to
these injunctions on their position as freeholders of the property
comprised in the lease and on the fact that under the Court of Appeal
order the lease and all derivative interests in the property have
disappeared. The plaintiffs accept that it is possible that the House of
H    Lords may reverse the Court of Appeal and restore the lease and with it
the various interests derived therefrom, including the defendants'
mortgages. But the plaintiffs argue that until such time as the House of

† The petition was dismissed on 28 June 1984: see ante, p. 167.

Lords does so, they (the plaintiffs) are entitled to the benefit of the   A
position in which they are left by the Court of Appeal order.

The plaintiffs accept that the mortgagee defendants will, if the Court
of Appeal order stands, succeed in obtaining relief under section 146(4)
of the Law of Property Act 1925. but, it is contended, that relief, unlike
relief available to a lessee under section 146(2), cannot be given
retrospective effect and cannot vest in the mortgagees any interest in the
property or in the rents and profits thereof in respect of the period   B
between the forfeiture of the lease and the date on which the section
146(4) order is made.

There are, therefore, two points on which the plaintiffs' right to the
relief they seek in this action depend. First, there is the possibility that
the House of Lords may reverse the Court of Appeal and restore the
lease with retrospective effect. Secondly, there is the question whether   C
an order under section 146(4) can detract retrospectively from the
entitlement which the plaintiffs would otherwise have had before the
order was made. I will deal with these two points in turn.

The Court of Appeal, by its order of 18 April 1984, declared the
lease to be forfeited and adjudged Parway liable in damages as a
trespasser as from 20 July 1982. Under that order and for as long as it
stands the lease has gone. It must follow that the interests derived from   D
the lease, the mortgages and the sub-leases, have gone with it. It must
also, in my view, follow that the receivers have had since 19 July 1982
no title or right against the plaintiffs to collect the rents from the
erstwhile sub-tenants or to manage the property. The receivers' rights to
do so was derived from the lease and the mortgage thereof to the third
defendant, and their appointment as receivers by the third defendant.
Once the lease was determined by forfeiture, the edifice on which the   E
receivers' entitlement and status was based disappeared.

On the other hand, if the House of Lords should give Parway leave
to appeal and if Parway's appeal to the House of Lords should succeed,
the lease will stand as though it had never been forfeited. This will be
the result whether Parway succeeds on the waiver point, in which case
there will be shown never to have been a forfeiture, or whether Parway   F
succeeds in claiming relief from forfeiture. It is firmly established by
authority that when relief from forfeiture is granted to a lessee under
section 146(2) of the Law of Property Act 1925 the relief reinstates the
lease as though there had never been a forfeiture: see *Dendy v. Evans*
[1909] 2 K.B. 894, and, on appeal [1910] 1 K.B. 263.

The reversal by the House of Lords of the Court of Appeal order   G
and the restoration by the House of Lords of the relief from forfeiture
granted to Parway by the deputy judge would, therefore, retrospectively
reinstate the lease, the mortgages and the status of the first and second
defendants as receivers, and would retrospectively validate the
management acts of the receivers done since 19 July 1982. It would
retrospectively disentitle the plaintiffs to receipt of the rents or moneys
paid or payable by sub-lessees or occupiers of the property since the   H
Court of Appeal order, and would retrospectively invalidate any
arrangements made by the plaintiffs with those sub-lessees or occupiers
by way of management of the property.

A      What may be done by the House of Lords with the forfeiture action and with the Court of Appeal order is obviously a matter of speculation. What is not a matter of speculation is that at present the first and second defendants have no title or right as receivers to do that which they are now doing, that is to say, collecting rents and managing the property. What is not a matter of speculation is that at present the plaintiffs are entitled to the property freed from the lease and, subject

B      to the mortgagees' claims to relief under section 146(4), freed from the mortgages.

      I do not doubt that the Court of Appeal could, had it thought fit, have made an interlocutory order restraining the plaintiffs, pending the resolution of any petition by Parway to the House of Lords, from interfering with the enjoyment by Parway, or those claiming through

C      Parway, of the rights granted by the lease. But no such order was sought. I do not doubt that the House of Lords, if it sees fit to give Parway leave to appeal, could likewise restrain the plaintiffs, pending the appeal, from interfering with the enjoyment of the rights granted by the lease. But the petition for leave to appeal does not seek any such injunction.

      It is, I think, accepted by Mr. Nugee for the third defendants and by

D      Mr. Essayan for the fourth and fifth defendants that those defendants could petition the House of Lords to be joined in the appeal and for interlocutory relief on the lines I have mentioned. It is possible, although less clear, that those defendants could make such an application to the Court of Appeal. But, as I understand it, none of the defendants propose to make any such application.

      But both counsel, in Mr. Essayan's case expressly and in Mr. Nugee's

E      case by implication, invited me to test the plaintiffs' entitlement to the relief they seek in the present action by considering what those appellate tribunals would have done had those applications to which I have referred been made to them, or what they would do if such applications were now to be made to them.

      I find it very difficult to accept that this can be a proper approach for

F      me to adopt. In my view, I should approach the plaintiffs' claim in this action by considering what defences thereto the defendants might offer and then by considering the effect of such defences on the plaintiffs' entitlement to the relief they claim.

      The first defence, and, in the case of the first and second defendants, the receivers, the only defence, would be a plea that the House of Lords

G      would give leave to appeal, would allow an appeal against the Court of Appeal order and that thereby the mortgages and the status of the receivers would be retrospectively validated. But such a defence would not raise an issue that would be justiciable in the present action. It would not, in my judgment, represent a proper defence, since it would not be asserting any present existing rights, but would be relying simply on speculation as to the view to be taken by the House of Lords of the

H      Court of Appeal order. The point would not represent a defence, but would represent grounds for seeking an extension of time for defence and, if necessary, a stay of proceedings until after the Parway appeal to the House of Lords should have been dealt with. Such an application for

an extension of time would, as I see it, represent an attempt to obtain in this action a suspension of the order of the Court of Appeal.    A

R.S.C., Ord. 59, r.13(1) provides:

> "Except so far as the court below or the Court of Appeal may otherwise direct—(*a*) an appeal shall not operate as a stay of execution or of proceedings under the decision of the court below; (*b*) no intermediate act or proceeding shall be invalidated by an appeal."    B

This provision enables the successful party to enjoy the fruits of success at first instance subject to any order the court below or the Court of Appeal may make. The rule is dealing with appeals to the Court of Appeal, but note 59/13/5 in *The Supreme Court Practice 1982,* p. 957 refers to the position where there is an appeal from the Court of Appeal    C
to the House of Lords. It reads:

> "Stay pending appeal to the House of Lords.—A stay will not be granted save in very exceptional circumstances, such as where execution would destroy the subject matter of the action or deprive the appellant of the means of prosecuting the appeal ..."

But in the present case neither Parway nor any of the defendants before    D
me has made or expressed the intention of making any application to the Court of Appeal or to the House of Lords for the purpose of preventing the plaintiffs from enjoying, pending appeal to the House of Lords, the fruits of victory in the Court of Appeal. In these circumstances, I do not think it can be right for me in this action in effect to suspend the operation of the Court of Appeal order.    E

The circumstances in which the point I am now considering has arisen are, however, unfortunate. It had not originally been the intention of the plaintiffs to seek immediate enjoyment of the fruits of the property following the Court of Appeal decision. It was only after the decision of the Court of Appeal in *Cadogan v. Dimovic* [1984] 1 W.L.R. 609, was reported on 4 May 1984 and came to the attention of the    F
plaintiffs' advisers that that intention was formed. Accordingly, it was not apparent to those acting for Parway in the Court of Appeal that a stay on the order taking effect should be sought. Nor was it apparent to the mortgagee defendants in the present action that they might need to be joined in the forfeiture action in order to obtain such a stay.

It was put to me by counsel for the mortgagees that as their clients were not parties to the forfeiture action, they were not bound by the    G
order of the Court of Appeal, and were still in a position to contend against the plaintiffs that there had been no forfeiture. I do not think that that is right.

Before the deputy judge there were summonses for joinder by the mortgagees that they did not proceed with. Counsel appearing for Parway before the deputy judge were instructed also on behalf of the mortgagees. It cannot be right in those circumstances that the mortgagees,    H
having chosen to allow Parway to stand as sole defendant up to Court of Appeal level, could then assert the right to require the plaintiffs to establish again in a separate action against them the right of forfeiture

A    established against Parway. Such a course would, in my view, be vexatious.

So I conclude that the mortgagees are bound by the Court of Appeal order and, if they wish to escape its effect, must either rely on Parway, as they have done hitherto, and on any applications Parway may make, or must at this late stage apply to be joined in the forfeiture action.

B    Since, however, as I think, there is no absolute procedural bar to prevent applications by Parway or by the mortgagees from being made to the appropriate tribunal, whether the House of Lords or the Court of Appeal, for a stay of the Court of Appeal order pending further appeal, I think that I should allow in any order I may make for the possibility of such applications.

I now turn to the second point in this case, namely, the question

C    whether an order can be made under section 146(4) with retrospective effect.

The mortgagees contend that they will in due course, if the lease stays forfeited, obtain relief from forfeiture under section 146(4). Such relief, they submit, can, and, in the circumstances of this case, would, be given retrospective effect so as to restore them to the position in which they would have been had the lease not been forfeited.

D    Mr. Mowbray, for the plaintiffs, concedes that the defendant mortgagees will, if the lease remains forfeited, all succeed in obtaining relief under section 146(4). He concedes that, if the court has power under subsection (4) to make an order with the retrospective effect to which I have referred, it would make such order. But he contends that on the true construction of subsection (4), the court has no such power.

E    He submits that the relief contemplated by subsection (4) must take the form of the grant of a lease for an appropriate term and on appropriate conditions to the applicant and that such lease cannot do other than take effect from the date of the order.

If it is correct that the power of the court under subsection (4) is thus limited, the result is, as it seems to me, unfortunate and may well work injustice to under-lessees and mortgagees in some cases. Under-

F    lessees and mortgagees cannot apply for relief from forfeiture of the head-lease until the head-lease has been forfeited. There is, therefore, bound to be a lapse of some time before the applications for relief can be dealt with. In a case like the present, where the forfeiture of the lease is hotly contested by the lessee up to House of Lords level, the lapse of time is likely to extend over a period of years. An under-lessee

G    can obtain relief under section 146(4) against forfeiture of the lease. But, if Mr. Mowbray's point is right, an under-lessee who remains in actual occupation is necessarily a trespasser vis-à-vis the freeholder and liable to pay mesne profits accordingly from the date of forfeiture down to the date on which the subsection (4) relief is granted. This may not matter in a case where the under-lessee is a tenant at a rack rent, but in a case where the original lease and the under-lease have been granted at

H    substantial premiums and nominal rents, the windfall to the freeholder and the detriment to the under-lessee may be very considerable. In the present case, at the date of the Court of Appeal order, the rent reserved by the lease was £27,500 per annum while the rents being received from

A.38

A

the various occupiers and sub-lessees by the receivers were not far short
of £700,000 per annum. As I have said, Mr. Mowbray accepts that the
court would, if it had power to do so under section 146(4), restore
the mortgagees to their security as if the lease had not been forfeited.
The question is whether the court has such power under that statutory
provision.

    I should start by reading section 146(2):

B

"Where a lessor is proceeding, by action or otherwise, to enforce
such a right of re-entry or forfeiture, the lessee may, in the lessor's
action, if any, or in any action brought by himself, apply to the
court for relief; and the court may grant or refuse relief, as the
court, having regard to the proceedings and conduct of the parties
under the foregoing provisions of this section, and to all the other
circumstances, thinks fit; and in case of relief may grant it on such      C
terms, if any, as to costs, expenses, damages, compensation, penalty,
or otherwise, including the granting of an injunction to restrain any
like breach in the future, as the court, in the circumstances of each
case, thinks fit."

The reference in that subsection is to the grant of "relief." It was held in
*Dendy v. Evans* [1910] 1 K.B. 263 to which I have already referred, that      D
the use of the word "relief" indicated that the effect of an order under
the statutory predecessor of subsection (2) was that the lease in question
became reinstated as though there had never been a forfeiture. Darling
J. [1909] 2 K.B. 894, at first instance, said, at p. 902: ". . . I think that
the word 'relief' carries with it the meaning that the forfeiture is deemed
not to have taken place at all." On appeal Farwell L.J. said, [1910] 1      E
K.B. 263, at p. 270:

"The Conveyancing Act has enlarged the ambit of cases in which
relief can be given, and has provided that the relief shall be given in
the form that no forfeiture has taken place. This appears from Lord
Davey's definition of 'relief' in *Nind v. Nineteenth Century Building
Society* [1894] 2 Q.B. 226. Referring to this section he says"—then      F
there is a citation from Lord Davey—"'The words "relief" and
"relieve" are the appropriate terms to describe the remedial action
of the court of equity in cases where a penalty or forfeiture has
been incurred, which the court thinks it equitable that the
complainant should not lie under or suffer.'"

Then Farwell L.J. goes on: "It is not the case of the estate having gone      G
and a new estate being now created." And at the end of his judgment
Farwell L.J. said, at pp. 270–271:

"The forfeiture is stopped in limine; so that there is no question of
any destruction of an estate which has to be called into existence
again."

Cozens-Hardy M.R. said, at p. 269:                                          H

". . . I think Darling J. was quite right when he said in effect that
the lease continued for all purposes; it is the original lease which
continues, not a new lease; and, that being so, the derivative lease

A   which was created out of the original lease has not ceased to exist,
but is still a valid lease in respect of which the defendants are liable
to the plaintiff on the covenants."

I have referred to the position under section 146(2), the provision under
which a lessee is enabled to obtain relief from forfeiture, in order to
emphasise the importance placed on the use in subsection (2) of the
B   word "relief" and to contrast the different language used in subsection
(4). Subsection (4) reads:

   "Where a lessor is proceeding by action or otherwise to enforce a
   right of re-entry or forfeiture under any covenant, proviso, or
   stipulation in a lease, or for non-payment of rent, the court may, on
   application by any person claiming as under-lessee"—and I would
C   interpose that that includes mortgagees—"any estate or interest in
   the property comprised in the lease or any part thereof, either in
   the lessor's action (if any) or in any action brought by such person
   for that purpose, make an order vesting, for the whole term of the
   lease or any less term, the property comprised in the lease or any
   part thereof in any person entitled as under-lessee to any estate or
   interest in such property upon such conditions as to execution of
D   any deed or other document, payment of rent, costs, expenses,
   damages, compensation, giving security, or otherwise, as the court
   in the circumstances of each case may think fit, but in no case shall
   any such under-lessee be entitled to require a lease to be granted to
   him for any longer term than he had under his original sub-lease."

There is there no express reference to relief from forfeiture. The lease
E   that has been forfeited remains forfeited notwithstanding any vesting
order made under this subsection. An order under this subsection does
not and cannot revive the original under-lease. That under-lease has
gone with the forfeited lease. An order under this subsection vests in a
successful applicant a new term of years.

   It has been emphasised by a very recent decision of the Court of
F   Appeal that an order made under subsection (4) cannot retrospectively
vest in the applicant a term of years pre-dating the one on which the
order was made. In *Cadogan v. Dimovic* [1984] 1 W.L.R. 609, to which
I have already referred, there was a tenancy which was a business
tenancy for the purposes of Part II of the Landlord and Tenant Act
1954. The plaintiff freeholder forfeited the head–lease. The sub-tenant
applied for relief from forfeiture under section 146(4). Before that
G   application was heard, the contractual term granted by the head–lease
and, consequently, the term expressed to be granted by the sub-lease,
had expired. The judge at first instance held that since section 146(4)
prevented the grant to an applicant thereunder of a lease for any longer
term than the applicants had under the original sub-lease, the court had
no jurisdiction to grant relief under subsection (4). The Court of Appeal
allowed the sub-tenant's appeal on the ground that since the sub-tenancy
H   was a business tenancy, the term thereby granted was not one which
would have ended on the date specified in the sub-lease and the sub-
tenancy would have continued until terminated in accordance with the
relevant provisions of the Act of 1954. The court held that the grant of

relief under subsection (4) would for that reason not represent the grant    A
to the sub-tenant of a longer term than he enjoyed under the original
sub-tenancy. But the court rejected an argument that an order under
section 146(4) could be made with retrospective effect so as to vest the
new term in the sub-lessees with effect from a date preceding the date
on which the term of the original sub-lease was expressed to expire.

Fox L.J. recited the provisions of subsection (4) and continued, at    B
pp. 613–614:

> "It is evident from these provisions that the new sub-lease is not
> merely a restoration of the old one. It is a new grant. The parties,
> the term and the other provisions may be different from those of
> the forfeited sub-tenancy: ... The new lease is therefore a quite
> distinct piece of property from the old, and in this respect the
> position of a sub-lessee is different from that of a lessee under    C
> section 146(2). It is settled law that a lease, as a grant, takes effect
> only from the date of delivery: see *Roberts v. Church Commissioners
> for England* [1972] 1 Q.B. 278, *per* Russell L.J. at p. 282G and *per*
> Stamp L.J. at p. 285B. If, for example, a lease of 1 January 1984 is
> expressed to grant a term of years from 30 June 1983, the document
> is inoperative to create any term in respect of the period prior to 1    D
> January 1984."

Robert Goff L.J. said, at p. 616:

> "It is to be observed that, under section 146(4), the court's
> jurisdiction, in respect of sub-tenancies, is not to grant relief against
> forfeiture (cf. its jurisdiction under section 146(2)) but to grant a
> new lease, no doubt because one of the parties to the new lease will    E
> be a person who was not a party to the original head lease, and
> because the demised premises, the term of the lease and the
> conditions upon which it is held, may also be different: ... I also
> agree that under section 146(4), a lease cannot be granted for any
> longer term than the sub-lessee had under his original sub-lease;
> ..."                                                                       F

So Mr. Essayan and Mr. Nugee accept that their respective clients
cannot obtain by an order under section 146(4) any estate which
predates the date of the order. It might be thought, therefore, that they
would accept that the court has no power under section 146(4) to
deprive the plaintiffs over the period from the date of forfeiture to the
date of the section 146(4) vesting order of the right to enjoy the fruits of    G
the property comprised in the forfeited lease.

But that is not so. Mr. Essayan argued, and Mr. Nugee associated
himself with the argument, that the court had power under section
146(4), in addition to vesting a term in a successful applicant, to make
an order of any other sort thought necessary for the purpose of restoring
to the applicant the benefit of the under-lease or mortgage, as the case
might be, that had been destroyed by the forfeiture.                         H

If, in the present case, the plaintiffs received from the sub-lessees
and occupiers rent or moneys attributable to their occupation and
enjoyment of parts of the property during the relevant period, it was

A   said that the court could order the plaintiffs to pay those sums to the mortgagee defendants. If the mortgagee defendants by themselves receiving during the relevant period those rents and moneys had rendered themselves liable to pay the same as mesne profits to the plaintiffs, it was said that the court could relieve them of that liability. If the plaintiffs themselves went into beneficial occupation of any part of the property during the relevant period, it was said that the court could

B   order payment by the plaintiffs to the mortgagee defendants of a "rent" for such occupation. All this in respect of a period during which it is accepted that the mortgagee defendants have not, and cannot under section 146(4) obtain, any estate in the property and during which it is accepted that the plaintiffs are freeholders freed from the lease and from any encumbrance in respect thereof save only the rights given to under-

C   lessees under section 146(4).

Mr. Essayan justified these submissions by praying in aid judicial dicta as to the purpose of subsection (4) of section 146.

In *Cadogan v. Dimovic* [1984] 1 W.L.R. 609 Fox L.J. said, at p. 615: "In general the purpose of section 146(4) must be to enable the court, if it thinks fit, to restore the sub-lessee to his position before the forfeiture;

D   ..." and Robert Goff L.J. to the same effect, at p. 617:

"I wish to add that I am glad to be able to reach the conclusion which I have reached in this case. To hold otherwise would have been to defeat the manifest intention of the legislature."

But these were general observations, not directed to the specific point with which I am concerned. I quite accept that I should adopt a liberal

E   approach to the construction of subsection (4) but, in the end, the powers of the court under that subsection must depend on the content of that subsection. The power of the court is to make "a vesting order." A vesting order operates as if it had been a conveyance executed by the owner of the legal estate to which the order relates: see section 9 of the Law of Property Act 1925. The vesting order may be made—and I quote again from section 146(4):

F   "upon such conditions as to execution of any deed or other document, payment of rent, costs, expenses, damages, compensation, giving security, or otherwise, as the court in the circumstances of each case may think fit ..."

The court is thereby empowered to impose on the grantee of the vesting

G   order, first, conditions precedent to the grant, whether as to repair of the premises, payment of the rent in arrear, execution of a form of lease or otherwise, and, secondly, to annex lessees' covenants to the term of years being granted. This view of the subsection is consistent with the form of order set out in *Atkin's Court Forms*, 2nd ed. (1981), vol. 24, pp. 287–288. Form 164 is a draft order for the vesting of a term under section 146(4). It provides, first, for an order:

H   "that upon X.Y."—the applicant—"complying with the terms and conditions and executing the deed hereinafter mentioned, the premises demised by lease"—and then the lease details are given— "be vested in the defendant X.Y. pursuant to section 146(4) of the

A

Law of Property Act 1925 for the term of [blank] years from the [blank date] at the rent of [blank] a year payable (quarterly) (in advance) on the usual quarter days the first such payment to be made on [blank] on the following terms and conditions: . . ."

So that provides for the vesting order. Then the draft order goes on.

B

"(2) That the defendant X.Y. do on or before [blank] execute a lease at the rent and for the term hereinbefore referred to and containing all the covenants by the defendant C.D."—that is the lessee of the lease which has been forfeited—"contained in the lease such lease to be prepared by the solicitor for the defendant X.Y. at the expense of the defendant X.Y."

C

It will be noticed, however, that that draft order contains no provision requiring the lessor to execute the lease referred to. The order for execution is directed against the applicant/under-lessee. I do not find the absence of such a provision surprising, for section 146(4) contains nothing that expressly empowers the court to order the landlord to do anything.

D

In *Ewart v. Fryer* [1901] 1 Ch. 499, Vaughan Williams L.J., referring to section 4 of the Conveyancing Act 1892, the statutory predecessor of section 146(4), said, at p. 512: "that gives the power to order the landlord to make a new lease." This remark was, however, obiter and did not follow any argument on the point.

E

I can see great difficulties if the court does not have power under section 146(4) to order the landlord to execute the new lease. All such leases would be expected to contain landlords' covenants for quiet enjoyment. Many might need to contain landlords' covenants as to repair and as to insurance, as, for instance, where the property concerned consisted of a flat or office premises comprised in a block.

F

Mr. Mowbray does not contend that the court does not have such power, and I need not decide the point. Mr. Mowbray does, however, contend that if the court does have power under section 146(4) to impose positive obligations on the landlord, that power must be limited to those obligations that are necessary for the proper enjoyment by the under-lessee of the term to be vested in him. I agree. I find it impossible to read section 146(4) as empowering the court to order the lessor to make payments to the under-lessee, or to divest the lessor of proprietary rights enjoyed by the lessor in respect of the period before the vesting order is made. The reference in the subsection to conditions as to

G

"payment of rent, costs, expenses, damages, compensation," etc., can only, in my judgment, relate to payments by the under-lessee.

In the present case, if the forfeiture stands, then it became effective as from 19 July 1982. As the Court of Appeal recognised in its order, the plaintiffs as from that date are entitled to the mesne profits of the property. Prima facie they will remain so entitled up to the date on which a vesting order in favour of the mortgagees is made under section 146(4). The court has, in my judgment, no power under section 146(4) to attach to such vesting order an order that the plaintiffs pay over to the mortgagees mesne profits received by the plaintiffs since the forfeiture but before the date of the vesting order, nor to relieve the

H

A    recipient of any such mesne profits from the obligation to account therefor to the plaintiffs, nor to relieve the actual occupants of the property from their obligation to pay mesne profits to the plaintiffs in respect of their occupation.

Mr. Essayan has submitted that the court has power under section 146(4) to do all of these things and anything else necessary to give de facto retrospective effect to the grant of the new lease effected by the vesting order. In my judgment, the court has power to do none of them.

B    Accordingly, a defence to the plaintiffs' claim in this action based on the proposition that the plaintiffs will, by an order made in due course on the section 146(4) applications, be deprived of their proprietary rights in respect of the period before such order is made is, in my view, misconceived.

C    It follows, further, that in my opinion the only obstacle the defendants can present to the success of the plaintiffs' claim in the present action is the possibility that the House of Lords may, in the forfeiture action, reverse the Court of Appeal or by interlocutory order suspend the operation of the Court of Appeal order.

In these circumstances, I was invited by Mr. Nugee to apply the principles of *American Cyanamid Co. v. Ethicon Ltd.* [1975] A.C. 396.

D    He submitted that I should consider the balance of convenience and that that balance came down strongly in favour of maintaining the status quo under which the first and second defendants are collecting the rents of the property and managing it. I do not, however, think that this is a case to which the *Cyanamid* principles can be applied. Those principles are not, in my view, applicable to a case where there is no arguable defence to the plaintiffs' claim.

E    In *Stocker v. Planet Building Society* (1879) 27 W.R. 877 in the Court of Appeal, James L.J. said, at p. 878:

"Balance of convenience has nothing to do with a case of this kind; it can only be considered where there is some question which must be decided at the hearing."

F    See also *Manchester Corporation v. Connolly* [1970] Ch. 420 *per* Lord Diplock at 427D. In the present case, in the view I take of the section 146(4) point, there is nothing to be decided at the hearing.

The defendants rely on what the House of Lords might do with the Court of Appeal order in the forfeiture action. This in effect is an attempt to obtain from me a suspension pending the House of Lords

G    decision of that order. Such a suspension is primarily for the courts which are seised of that matter. Prima facie, therefore, the plaintiffs are, in my view, entitled to relief.

The extent of the relief must, however, take into account the uncertainties produced by the pending proceedings before the House of Lords in the forfeiture action and must take into account the effect of the order, which it is accepted will in due course be made under section

H    146(4).

The injunctions sought related, first, to rents and moneys receivable from occupiers, and, secondly, to management. There is, inevitably, in the circumstances of this case, and will be until the House of Lords has

A

disposed of the proposed appeal, uncertainty as to the status of the
various sub-lessees who are occupying the several parts of the property.
At present, and if the forfeiture stands, they have no title or right, save
the right to apply for relief under section 146(4). None has done so
because there is no reason to suppose that any of them know of the
forfeiture. It is thought that some of them, if they did know of it, would
be delighted to be rid of onerous sub-leases and would not apply for
relief. On the other hand, if the Court of Appeal order is reversed, all      B
the sub-leases will continue as though there had never been a forfeiture.
So the sub-leases are, at present, in a state of limbo, and it is likely that
if the sub-lessees learn of the present position, they will decline to pay
anything to anyone until the position is resolved. If they pay the
receivers, they will not obtain a discharge vis-à-vis the plaintiffs. If they
pay the plaintiffs they will not obtain a discharge vis-à-vis the receivers.     C

Management decisions will be attended by similar uncertainty. If the
receivers manage the property, arrangements they make with the sub-
lessees will not be binding on the plaintiffs if the forfeiture stands. Nor,
so far as I can see, would such arrangements be binding on the sub-
lessees in that event, since the arrangements would have been made on
the false footing that the sub-lessees held valid and enforceable sub-
leases. And I would add that it is clear that a vesting order in favour of      D
the mortgagees under section 146(4) could not reinstate the various sub-
leases. Such reinstatement would require agreement between sub-lessees
and the relevant lessor although a measure of reinstatement could be
effected by section 146(4) vesting orders made on the application of the
sub-lessees. On the other hand, if the plaintiffs manage the property,
the arrangements they make with the sub-lessees will not be binding on     E
the receivers if Parway's appeal to the House of Lords succeeds.

In these circumstances, Mr. Mowbray, for the plaintiffs, suggested,
as it seemed to me very sensibly, that by agreement with the defendants
an arrangement on the following lines would be appropriate. First, there
should be joint instructions to the present agents through whom the
Centre should be exclusively managed. Second, the net receipts from the
occupiers should be paid by those agents to the first and second      F
defendants on terms that they should account to the plaintiffs therefor if
it should transpire that the plaintiffs were entitled to them.

The defendants are, naturally, content that the net receipts should
continue to be paid to the receivers, and the receivers, with the
substantial backing of the third defendants, are willing to give to the
plaintiffs the undertaking in respect thereof to which I have referred.      G
But the defendants are not prepared to agree to joint management. Mr.
Seymour, for the first, second and third defendants, explained this
reluctance by reference to the difficulties, delays and expense that
disagreements between the joint managers might produce. The
defendants' reasons do not matter. They are entitled to decline to agree
to Mr. Mowbray's suggestion, if they wish, and to leave the plaintiffs to
such relief as they can persuade the court to grant.      H

There is one further point made by Mr. Essayan to which I should
now refer. The mortgagees have subsisting claims under section 146(4)
which, it is accepted, will lead in due course to a vesting order being

A  made under which they will obtain as security for the indebtedness to them of Parway a lease of the property. The value of that security is capable of being adversely affected by management decisions made before the date of the vesting order. Thus, if the plaintiffs should grant a long lease at a premium, the value of the freehold and accordingly the value of the term subsequently granted to the mortgagees under section 146(4) would be reduced. So, it was submitted, the court ought not to

B  grant the plaintiffs an injunction restraining the defendants from exercising powers of management.

Mr. Essayan's point, although valid, in my view, as a point, is not, in my view, a reason for withholding from the plaintiffs the injunction sought. The plaintiffs' ability to harm the mortgagees in the manner suggested is not dependent on their obtaining the desired injunction. It

C  is dependent on their title as freeholders consequent upon the forfeiture of the lease. With or without the injunction the plaintiffs can by granting a long lease at a low premium harm the mortgagees in the manner suggested—assuming, of course, that the Parway lease remains forfeited. The mortgagees' remedy, if they fear such harm, would be to apply in the proceedings in which the section 146(4) relief is sought for appropriate injunctive relief against the plaintiffs. The court could by

D  interlocutory injunction in those proceedings grant the mortgagees any necessary protection pending the hearing of the section 146(4) applications.

I return to the relief sought on this application. First, the rents: I propose to make an order in terms of paragraph 1(i) of the notice of motion, with these qualifications: (a) the injunction will be discharged if

E  the House of Lords should reverse the Court of Appeal, and will be discharged upon a vesting order being made in favour of the mortgagee defendants, or any of them, under section 146(4); (b) the injunction will be suspended until after the House of Lords has determined the proposed appeal against the Court of Appeal order, but this suspension will be on terms of the receivers undertaking to account to the plaintiffs for the net receipts in the event that the House of Lords should refuse

F  leave to appeal or, having granted leave to appeal, should dismiss the appeal. In lieu of such an undertaking, the injunction will come into effect at once upon the plaintiffs undertaking to account to the receivers for the net receipts if the House of Lords should allow the appeal.

Second, as to management: I propose to make an order in terms of paragraph 1(ii) of the notice of motion upon the plaintiffs undertaking forthwith to instruct the present agents to continue to act, but as the

G  plaintiffs' agents, and to manage exclusively through those agents. This undertaking will be subject to these qualifications: (a) it will be discharged if the House of Lords should reverse the Court of Appeal, and will be discharged by any vesting order made under section 146(4); (b) it will be subject to any interlocutory order made in the forfeiture action by the House of Lords or by the Court of Appeal suspending the effect of the Court of Appeal order; (c) it will be suspended until after

H  the hearing by the House of Lords of the petition for leave to appeal.

I do not see any point in the injunction sought in paragraph 1(iii) but I will hear submissions on that if counsel for the plaintiffs thinks there is some particular point in it.

There is one final matter with which I must deal. It is proposed to    A
consolidate the pending applications under section 146(4) with this
action. That seems to me sensible since an order on these applications
will put an end to the entitlement on which the plaintiffs sue in this
action and will discharge the injunctions I have just granted. Counsel
have, I understand, prepared an appropriate order for that, and I will
look at that and deal with it and discuss it in a few moments.

This consolidation has one important consequence so far as the relief    B
I have just granted is concerned. As I have said, I accept Mr. Essayan's
point that it would be possible for the plaintiffs, in exercise of their
powers as freeholders, to reduce the value of the freehold to the
detriment of the security that the defendants will eventually obtain.
There is no evidence of any threat on their part to do so, or any present
reason to suppose that the plaintiffs might do so. But I would think it    C
appropriate for the plaintiffs, if so minded, to undertake to keep the
defendants informed of any proposed steps which, if taken, might
reduce the value of the defendants' security. The defendants could then,
if so advised, apply to this court for interlocutory injunctions to restrain
the plaintiffs from taking those steps.

I will, of course, hear counsel on whether the plaintiffs are willing to
give an undertaking to keep the defendants so informed, or, if they are    D
not, what, if any, other protection to the defendants might be provided.

<div align="center">

*Injunctions accordingly.*

</div>

*Solicitors: Lee Bolton & Lee; Travers Smith Braithwaite & Co.;*
*W. Winckworth, Exeter.*    E

<div align="right">

T. C. C. B.

</div>

F

<div align="center">

ABBEY NATIONAL BUILDING SOCIETY v. MAYBEECH LTD.
AND ANOTHER

[1983 A. No. 5261]

</div>

1984 April 3, 4; 18    Nicholls J.    G

> *Landlord and Tenant—Forfeiture of lease—Relief from forfeiture—*
> *Mortgagee's charge over lease—Lessee's failure to pay maintenance*
> *contributions—Order for forfeiture of lease—Lessor re-entering*
> *into possession—Whether mortgagee's application for statutory*
> *relief from forfeiture too late—Whether equitable jurisdiction to*
> *grant relief—Law of Property Act 1925 (15 & 16 Geo. 5, c. 20),*
> *s. 146(4)*    H
>
> On the assignment of a lease of a flat to the defendant
> lessee, the plaintiff building society lent him some £17,609 on
> the security of a charge by way of legal mortgage over the lease