# LANDLORD AND TENANT
## GENERAL

A ## PW & Co v Milton Gate Investments Ltd and another

CHANCERY DIVISION

[2004] EWHC 1994 (Ch)

8 August 2003

Neuberger J

B *Landlord and tenant — Underlease — Determination of headlease — Break clause — Contractual provision for continuation of underleases notwithstanding principle in Pennell v Payne that underleases determine with headlease — Whether underleases continued on exercise of headlease break clause — Whether effective contracting out of principle in Pennell — Whether covenants between underlessee and freeholder enforceable — Whether covenants enforceable pursuant to section 3 of Human Rights Act 1998 — Whether surrender of headlease — Whether estoppel by deed or convention — Whether estoppel between successors in title*

C In 1990, the then freehold owner of certain business premises, City of London Real Property Co Ltd (CLRP), granted the claimant (PW) a 25-year term of those premises (the headlease). By a break clause in the headlease, PW was entitled, "subject to any permitted underleases", to determine the headlease on 24 June 2002; a substantial premium was payable on such determination unless the premises were subject to permitted or other underleases with unexpired terms exceeding five years (the penalty). By June 2000, the defendant Milton Gate Investment Ltd (Milton Gate) had acquired the freehold reversion. In 1994/5, PW granted five underleases to British Telecommunications plc (BT), corresponding to the five lower floors of the premises. Two further underleases of the upper two floors

D were granted to Merrill Lynch (Europe) Ltd (MLEL), which assigned them to BT in March 2002, although BT did not go into occupation of those floors. Each of the underleases was granted pursuant to a licence, given by the freeholder, that accepted that the respective underlease was a "permitted underlease", and each contained a break clause by which it could be determined on 17 June 2002. In October 2000, PW served notice under the break clause exercising the right to determine the headlease; it assumed that the underleases would continue beyond 24 June 2002. On receipt of the break notice, Milton Gate contended that the underleases would also be determined (relying upon the decision of the Court of Appeal in *Pennell v Payne* [1995] 1 EGLR 6, but that

E it would negotiate new terms with BT. BT initially denied that its underleases would determine, since it wished to remain; it later decided that the accommodation was surplus to its requirements. BT then agreed to vacate the five lower floors in March 2003. However, as it had never occupied the two upper floors, it contended that the tenancies under the respective underleases were not continued by Part II of the Landlord and Tenant Act 1954 and it initially refused to pay rent from 24 June 2002. It later paid the rent under protest. PW then issued proceedings seeking a declaration that the penalty was not payable. Milton Gate pleaded that, because the underleases had determined, the proviso to the break clause did not apply and the penalty was payable; it joined

F BT as a Part 20 defendant. The following issues were before the court in relation to the principal question as to whether the underleases continued, notwithstanding the general rule in *Pennell*, namely: (i) if the headlease was terminated by the notice, whether a landlord and tenant could contract that an underlease would continue, contrary to the general rule, and whether there was a valid contract to that effect in the terms of the break clause; (ii) if there was no contracting out of the general rule, whether the effect of the notice under the break clause would cause a surrender of the headlease; and (iii) in the further alternative, whether the underlease continued on the basis of either estoppel by deed or estoppel by convention, and, if so, whether the

G estoppel bound BT, and/or whether Milton Gate would be estopped from recovering the penalty from PW.

*Held*: The underleases expired on 24 June 2002 and PW was liable for the payment of the penalty to Milton Gate as at 20 June 2002. Although CLRP and PW purported, by the break clause, to contract out of the general rule, it was not, as a matter of law, possible to contract out of that rule. If it had been possible, the covenants in the underleases would have been enforceable as between Milton Gate and BT by virtue of section 3 of the Human Rights Act 1998. The break clause cannot be characterised as a surrender provision. There was no estoppel by deed or by convention. However, an estoppel by convention did arise between

H CLRP and PW as a result of the grant of the underleases and the associated licences, and BT and MLEL became bound by the convention. Milton Gate became bound by, and was entitled to the benefit of, the convention. Between Milton Gate and BT there was a mutual resiling from the convention. Between Milton Gate and PW, the convention could not give rise to an estoppel if PW was not exposed to a claim for derogation from grant by BT. But since BT did not want the underleases to continue, and could not claim damages for their premature determination, no estoppel by convention was operable between any of the parties.

J The following cases are referred to in this report.

*Amalgamated Investment & Property Co Ltd (in liquidation) v Texas Commerce nternational Bank Ltd* [1982] QB 84; [1981] 3 WLR 565; [1981] 3 All ER 577; [1982] 1 Lloyd's Rep 27, CA

*Ballard (Kent) Ltd v Oliver Ashworth (Holdings) Ltd; sub nom Oliver Ashworth (Holdings) Ltd v Ballard (Kent) Ltd* [2000] Ch 12; [1999] 3 WLR 57; [1999] 2 All ER 791; [1999] 2 EGLR 23; [1999] 19 EG 161, CA

*Barrett v Morgan* [2000] 2 AC 264; [2000] 2 WLR 284; [2000] 1 All ER 481; (2001) 81 P&CR 1; [2000] 1 EGLR 8; [2000] 06 EG 165, HL

*Brikom Investments Ltd v Carr; Brikom Investments Ltd v Roddy; Brikom Investments Ltd v Hickey* [1979] QB 467; [1979] 2 WLR 737; [1979] 2 All ER 753; (1979) 38 P&CR 326; 251 EG 359, CA

*Brown v Wilson* (1949) 208 LT 144; 156 EG 45

*Coombes v Smith* [1986] 1 WLR 808, Ch

*CP Holdings Ltd v Dugdale* [1998] NPC 97, Ch

*Cuthbertson v Irving* (1860) 4 H&N 742; 157 ER 1034

*Distributors & Warehousing Ltd, Re* [1986] 1 EGLR 90; (1985) 278 EG 1363; [1986] BCLC 129, Ch

*Electricity Supply Nominees Ltd v Thorn EMI Retail Ltd* (1991) 63 P&CR 143; [1991] 2 EGLR 46; [1991] 35 EG 114, CA

*Express Newspapers plc v News (UK) Ltd* [1990] 1 WLR 1320; [1990] 3 All ER 376, Ch

*Gloyne v Richardson* [2001] EWCA Civ 716; [2001] 2 BCLC 669, CA

A  *Goode v Martin* [2001] EWCA Civ 1899; [2002] 1 WLR 1828; [2002] 1 All ER 620, CA
   *Goodtitle d Edwards v Bailey* (1777) 2 Cowp 597
   *Greasley v Cooke* [1980] 3 All ER 710, CA
   *Greer v Kettle* [1938] AC 156, HL
   *Hamed el Chiaty & Co (t/a Travco Nile Cruise Lines) v Thomas Cook Group Ltd (The Nile Rhapsody)* [1992] 2 Lloyd's Rep 399, QB
   *Hamel-Smith v Pycroft & Jetsave Ltd* Unreported 5 February 1987
   *Hopgood v Brown* [1955] 1 WLR 213; [1955] 1 All ER 550, CA
   *Jenkin R Lewis & Son Ltd v Kerman* [1971] Ch 477; [1970] 3 WLR 673; [1970] 3 All ER 414; (1970) 21 P&CR 941, CA

B  *John v George* (1996) 71 P&CR 375; [1996] 1 EGLR 7; [1996] 08 EG 140, CA
   *Johnson v Gore Wood & Co (No1)* [2002] 2 AC 1; [2001] 2 WLR 72; [2001] 1 All ER 481, HL
   *K Lokumal & Sons (London) Ltd v Lotte Shipping Co Pte Ltd (The August Leonhardt)* [1985] 2 Lloyd's Rep 28, CA
   *Keen v Holland* [1984] 1 WLR 251; [1984] 1 All ER 75; (1984) 47 P&CR 639; [1984] 1 EGLR 9; (1983) 269 EG 1043, CA
   *King (Deceased), Re; sub nom Robinson v Gray* [1963] Ch 459; [1963] 2 WLR 629; [1963] 1 All ER 781; [1963] RVR 245, CA
   *Lissenden v CAV Bosch Ltd* [1940] AC 412; [1940] 1 All ER 425; 56 TLR 347, HL
   *London & North Western Railway Co v West* (1866-67) LR 2 CP 553, CCP
   *Milmo v Carreras* [1946] KB 306, CA

C  *Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord)* [1988] 2 Lloyd's Rep 343, CA
   *Onward Building Society v Smithson* [1893] 1 Ch 1, CA
   *Parker v Jones* [1910] 2 KB 32, KB
   *Pennell v Payne* [1995] QB 192; [1995] 2 WLR 261; [1995] 2 All ER 592; [1995] 1 EGLR 6; [1995] 06 EG 152, CA
   *Poulton v Moore* [1915] 1 KB 400, CA
   *Printing and Numerical Registering Co v Sampson* (1875) LR 19 Eq 462
   *Public Trustee v Pearlberg* [1940] 2 KB 1, CA
   *R v A (No 2)* [2001] UKHL 25; [2002] 1 AC 45, HL
   *Secretary of State for Social Security v Tunnicliffe* [1991] 2 All ER 712, CA
   *Stevens & Cutting Ltd v Anderson* [1990] 1 EGLR 95; [1990] 11 EG 70, CA
   *Stirrup's Contract, Re; sub nom Stirrup v Foal Agricultural Cooperative*

D  *Society* [1961] 1 WLR 449; [1961] 1 All ER 805, Ch
   *Street v Mountford* [1985] AC 809; [1985] 2 WLR 877; [1985] 2 All ER 289; [1985] 1 EGLR 128; (1985) 274 EG 821, HL
   *Stretch v United Kingdom 44277/98* (2004) 38 EHRR 12; [2004] BLGR 401; [2004] 1 EGLR 11; [2004] 03 EG 100; [2003] NPC 125; The Times 3 July 2003, ECHR
   *Swift (P&A) Investments v Combined English Stores Group plc* [1989] AC 632; [1988] 3 WLR 313; [1988] 2 All ER 885; (1989) 57 P&CR 42; [1988] 2 EGLR 67; [1988] 43 EG 73, HL
   *Turner v Walsh* [1909] 2 KB 484; [1908-10] All ER Rep 822; (1909) 100 LT 832; 25 TLR 605, CA
   *Valentine v Nash* [2003] EWCA Civ 915, CAJ

E  *Wayling v Jones* [1995] 2 FLR 1029; (1995) 69 P&CR 170, CA
   *Webb v Russell* (1789) 3 TR 393; 100 ER 639
   *Wilson v First County Trust Ltd (No 2); sub nom Wilson v Secretary of State for Trade and Industry* [2003] UKHL 40; [2004] 1 AC 816; [2003] 3 WLR 568; [2003] 4 All ER 97, HL
   *Wilson v Truelove* [2003] EWHC 750; [2003] 2 EGLR 63; [2003] 23 EG 136, Ch

   This was the hearing of an application for declaratory relief by the claimant, PW & Co, in proceedings against the defendant, Milton Gate Investments Ltd, to which British Telecommunications plc had been joined as Part 20 defendant.

F  Kirk Reynolds QC and Nicholas Taggart (instructed by Slaughter & May) appeared for the claimant; David Hodge QC and Nicole Sandells (instructed by Denton Wilde Sapte, of Milton Keynes) represented the defendant; Nicholas Dowding QC and Jonathan Evans (instructed by Ashurst Morris Crisp) represented the Part 20 defendant.

   Giving judgment, NEUBERGER J said:

   *Introduction*
   [1] This case involves two connected disputes, that raise a number of points of difficulty. The first dispute is between PW & Co (PW), in its capacity as the former tenant of a substantial office building, and Milton Gate Investments Ltd (Milton Gate), its former landlord. The second dispute is between Milton Gate and PW's former subtenants of parts of

G  the building, which are two companies in the BT plc group, under seven underleases (the underleases).

   [2] The disputes have their origin in the fact that, when the lease of the building (the headlease) was granted to PW, and when PW granted the underleases, the parties involved, and their respective advisers, were all under an arguable misconception as to the effect on a subtenancy of the exercise by the head tenant of a right to determine the head tenancy. Because it is so fundamental to an understanding of the issues in this case, it is appropriate to explain the point, albeit in fairly summary terms, before turning to the facts, and the issues between the parties.

H  [3] In *Pennell v Payne* [1995] QB 192*, the Court of Appeal had to determine what Simon Brown LJ (who gave the only reasoned judgment) described, at p195C, as "a pure question of law", which he then summarised in these terms:

   [W]here a head tenant serves an upwards notice to quit, ie a notice upon his landlord, is the landlord thereupon entitled to possession against a subtenant irrespective of whether that subtenancy was granted within the terms of the Headlease?

   [4] Two points should be made about that formulation. First, it is implicit that, in the absence of the notice, the subtenancy in question would, as between head tenant and subtenant, have otherwise continued. Second, even if the effect of the notice described by Simon Brown LJ

J  would be to determine the subtenancy in common law, it may be that the subtenant would be entitled to remain in possession as against the landlord because statute entitled it to do so.

   [5] The only case in which the question as formulated by Simon Brown LJ had previously been decided was *Brown v Wilson* (1949) 208 LT 144. In the light of observations in earlier cases, Hilbery J concluded that, in the case envisaged by Simon Brown LJ, the subtenant was entitled to remain in possession: in other words, the notice by the head tenant determining the head tenancy did not put an end to the subtenancy.

K  [6] In *Pennell*, the Court of Appeal unanimously took the opposite view, and overruled the decision in *Brown*. The decision in *Pennell* was considered by the House of Lords in *Barrett v Morgan* [2000] 2 AC 264†, where Lord Millett (who gave the only reasoned speech) said that he had "no doubt that this case was correctly decided": see p274A.

   [7] The decision in *Brown* had stood for some 45 years, and (as was pointed out by Simon Brown LJ at p201A-B of *Pennell*) it had been assumed, in various textbooks (some of which expressed doubts as to its correctness) to represent the law. Accordingly, it is perhaps not very

L  surprising that those involved with the drafting of the headlease and underleases in the present case were under an arguable misapprehension as to the law.

   [8] There is one other point of law that should be mentioned at this stage. The headlease and underleases came, at least potentially, within the ambit of Part II of the Landlord and Tenant Act 1954 (the 1954 Act), which affords protection to tenants in occupation of business premises (unless their tenancies have been lawfully excluded from such protection by a court order). Accordingly, even if the effect of a notice served by a head tenant to determine the head tenancy were to

M  put an end to a subtenancy as a matter of extra-statutory law, a subtenant who has the benefit of the 1954 Act would none the less be entitled to remain in occupation of the premises sublet to it because its tenancy would continue pursuant to the provisions of that Act.

   [9] The apparent misconception on the part of those involved in the conveyancing documentation in the present case has led to a wide ranging series of well-presented arguments, involving fundamental questions of property law, including the effect of the Human Rights Act 1998 (the 1998 Act), questions relating to the permissible ambit of estoppel by deed and estoppel by convention, and the circumstances

   ─────────────────────────────
   * Editor's note: Also reported at [1995] 1 EGLR 6
   † Editor's note: Also reported at [2000] 1 EGLR 8; [2000] 06 EG 165

in which such an estoppel can be avoided, generally and in a tripartite situation.

[10] With those introductory observations, I turn to the relevant facts.

*Facts*

[11] I shall begin by setting out the relevant provision of the headlease, of the underleases, and of the licences pursuant to which they were granted. I shall then summarise the evidence relating to the negotiation of the grant of the headlease and the underleases (which can be dealt with pretty shortly). Finally, I shall describe the relevant events that took place from the time that Milton Gate was proposing to acquire the freehold reversion to the headlease (which must be explained in a little more detail).

*Headlease*

[12] Until late 1994, the freehold of Milton Gate, 1 Moor Lane, London EC2 (the premises), was owned by City of London Real Property Co Ltd (CLRP), a member of the Land Securities plc Group. By the headlease dated 29 November 1990, CLRP let the premises to PW, the firm of chartered accountants, then known as Price Waterhouse. The headlease was for a term of 25 years from 24 June 1990, at an annual rent (payable in advance on the usual quarter days) of £6,616,000, subject to upwards review every five years.

[13] The centrally relevant provision of the headlease was clause 5(6), which was in the following terms:

The Lessee [that is, PW] may determine this Lease on the 24th day of June 2002 by giving to the Lessors [that is CLRP] not less than twelve months prior written notice and on the expiration of such notice this present Lease shall determine *subject to any Permitted Underleases* but without prejudice to any claim by either party against the other in respect of any antecedent breach of any covenant… and in the event of the Lessee serving such notice the Lessee shall upon the 24th day of June 2002 pay to the Lessors a sum equivalent to nine months yearly rent payable at that date Provided That such sum will not be payable if on the expiration of such notice 75% of the lettable office area of the… premises is underlet in accordance with the terms of this Lease *and such Permitted Underlease or Underleases have an unexpired term of at least 5 years*

(Emphasis added).

I shall refer to the sum equivalent to "nine months yearly rent payable" as "the penalty".

[14] Clause 3(25) of the headlease contained detailed provisions that limited and controlled the circumstances in which, and the basis upon which, PW could underlet. By virtue of clause 3(25)(2)(e)(i), a "Permitted Underlease" was a subtenancy which was required to:

Contain on the part of the Underlessees (inter alia) the Stipulated Covenants and provisions for rent reviews on the same dates and in the manner (mutatis mutandis) specified [herein] and [to] reserve no less than the open market rent then reasonably obtainable for the subject premises…

Clause 3(25)(2)(e)(ii) defined a "Permitted Underlessee" as a person "who shall have previously to the execution of the permitted underlease entered into the Stipulated Covenants directly with the Lessors".

[15] The "Stipulated Covenants" referred to in clauses 3(25)(2)(e)(i) and (ii) were defined in clause 3(25)(1)(iii) as including obligations to:

Observe and form the covenants and conditions on the Lessee's part herein contained so far as they relate to or affect the subject premises (save… the covenant to pay the rents hereby reserved…)

[16] Clause 3(25) also required PW not to underlet the whole or any part of the premises, save by a permitted underlease to a permitted underlessee, and not to effect any such underletting without first obtaining the consent of the lessors, which consent was not to be unreasonably withheld.

[17] The headlease was at all times vested in PW. Towards the end of 1994, CLRP transferred the freehold reversion to the headlease to three Swedish companies, to which I will refer as Allmanna. On 19 June 2000, the freehold reversion was transferred by Allmanna to Milton Gate, which retains the freehold of the premises to this day.

*Underleases*

[18] PW granted a total of seven underleases, each of which was in respect of a single floor of the premises. Between them, they involved subletting effectively the whole of the premises. Four of these underleases were entered into on 3 March 1994, and they extended to the ground, first, second, and third floors of the premises. Each of these four underleases was granted to BT for a term expiring on 28 September 2007. A fifth underlease was granted by PW to BT on 28 April 1995; it related to the fourth floor, and was for a term expiring on 20 June 2015. I shall refer to these five underleases as the BT underleases and to the parts of the premises thereby demised as the lower five floors.

[19] Each of the underleases granted to BT on 3 March 1994 had a clause that conferred on BT the right to determine, by giving at least 12 months' notice, on 29 September 1998 or 17 June 2002, but, in the event of it exercising such right, BT would have to pay a penalty to PW. In the underlease that I have seen (that of the third floor), the penalty was to be twice the annual rent in the event of determination on 29 September 1998, and the annual rent in the event of determination on 17 June 2002.

[20] Two further underleases (the MLEL underleases) for terms expiring on 20 June 2015, were granted by PW on 10 January 1995; they extended to the fifth and sixth floors (the upper two floors). These two underleases were granted to Merrill Lynch (Europe) Ltd (MLEL), which assigned them to BT on 22 March 2002.

[21] In each of these seven underleases, PW was "the Lessor", which expression was defined to include "where the context admits… the estate owner for the time being entitled to the reversion immediately expectant on the determination of the term hereof".

[22] All the seven underleases reserved rents that were subject to upwards-only reviews. Because the underleases were each in respect of part only of the premises, they contained service charge provisions, which included a sinking fund (that is, a fund to which the lessee could require the lessee to make periodical payments, that in due course, could be used for defraying the cost of substantial services). However, it was open to the lessor under the underleases to implement the sinking fund only from 18 June 2002.

[23] In the normal way, each of the underleases was granted pursuant to a written licence executed by the freeholder (CLRP or Allmanna), the head tenant (M), and the proposed subtenant (BT or MLEL). With one or two variations (not material for present purposes) the licences to underlet (the licences):

(i) provided that it was "accepted by the parties that such sub-lettings will create Permitted Underleases as such expression is defined by the Lease";

(ii) stated that the licence was "supplemental to" the headlease;

(iii) contained, in clause 11, a covenant by the proposed subtenant (that is, BT or MLEL) direct with "the Landlord" (namely CLRP or Allmanna) substantially in these terms:

that the subtenant will as from the date of the subtenancy and for so long as the subtenant (here meaning [BT or MLEL] only) is liable to the lessor thereunder [ie PW] to perform and observe the covenants (other than as to payments of rent) on the part of the lessee contained in the [Head]lease in so far as the same are not inconsistent with the lessee's covenants to be contained in the subtenancy hereby created…

*Parties' beliefs at the time of the negotiations*

[24] The negotiations for the grant of the headlease between the respective advisers to CLRP and PW were under way by early 1990, and the discussions relating to PW's right to break, which eventually became clause 5(6) of the headlease (clause 5(6)), took place between April and June 1990. I believe that it is unnecessary to describe the contents of the negotiations, because they throw no more light on the understanding of each of the parties than one can gather from the terms of the headlease.

[25] In addition, there is evidence, in the form of witness statements, as to the state of mind of the individuals at CLRP and PW, and at their respective solicitors, who were responsible for negotiating the terms of the headlease. The members of both negotiating teams, and their

A  respective clients, believed that, in the event of PW exercising its right to break under clause 5(6), any subtenancy granted by PW, at least provided that it was a permitted underlease, would become enforceable and binding as between the subtenant and the freeholder.

[26] The correspondence and witness statements that have been disclosed in relation to the grant of the BT underleases, and the associated licences, reveal a very similar state of mind on the part of each of the parties involved. It is fair to say that there is nothing in the correspondence leading up to the grant of the BT underleases that unequivocally indicates that BT believed that its underleases would survive the exercise by PW of its right to determine the headlease.

B  The negotiations that led to the inclusion in each of the BT underleases of the right of the lessor thereunder to introduce a sinking fund for service charges only after 18 June 2002 arose from BT's desire to avoid a sinking fund, PW's comparative indifference on the issue, and CLRP's desire to have a sinking fund. At first sight, this aspect of the negotiations therefore suggests that BT communicated, albeit by implication, the fact that it shared the assumption that its underleases would survive the determination of the headlease pursuant to clause 5(6) with effect from 24 June 2002. However, the agreement that the sinking fund provision applied only from 18 June 2002 could be justified on the basis that, given that the BT underleases were likely to come within

C  the 1954 Act, BT would become the direct tenant of the headlandlord, even if its underleases otherwise determined pursuant to the general and extra-statutory law. Indeed, there was reference, in the correspondence concerning the sinking fund, to the underleases continuing under the 1954 Act.

[27] The negotiations for the MLEL underleases involved not only a different proposed subtenant, MLEL, but also a different freeholder, because Allmanna had by then acquired the freehold reversion to the headlease. The correspondence leading up to the MLEL underleases reveals a virtually identical position to that indicated by the correspondence leading up to the grant of the BT underleases.

D  [28] As in the case of the grant of the headlease, there is evidence as to the state of mind of the parties involved in the grant of the BT underleases and the associated licences. They all believed that the BT underleases would survive the exercise by PW of its right to break the headlease. Although I do not have evidence from MLEL in this connection, I think it is a fair assumption that it and its advisers had the same view at the time of the negotiations for the grant of the MLEL underleases.

*Events after the grant of the underleases*

E  [29] By March 2000, Milton Gate was considering purchasing the freehold of the premises. An internal memorandum produced by its solicitor, dated 10 April 2000, indicates that Milton Gate was told, and believed, that, in the event of PW exercising its right under clause 5(6), the underleases would determine on 20 June 2002, subject to any rights that BT and MLEL or their successors (the undertenants) might have pursuant to the 1954 Act. The correspondence shows that, in that event, Milton Gate envisaged serving notices on the undertenants "to renegotiate the terms" of the underleases. Given Milton Gate's subsequent statements, it seems clear that, from April 2000 onwards, it and its advisers were of the view that this, indeed, represented the position.

F  [30] As already mentioned, Milton Gate acquired the freehold reversion from Allmanna on 19 June 2000.

[31] On 6 October 2000, PW served a notice exercising its right to determine the headlease pursuant to clause 5(6). The effect of this notice was, it is accepted on all sides, to put an end to the headlease on 24 June 2002. At the time of service of the notice, PW believed that the underleases would continue beyond 24 June 2002, notwithstanding the determination of the headlease (unless BT exercised its respective rights to determine the underleases).

[32] In his witness statement, Mr Roderick Menzies, PW's estates manager, said that, from 1998, PW "always knew that [it] would exercise the break clause as [PW] had no occupational requirement for [the premises]. He said that he had started considering "the ramifications

G  of exercising the break and... the terms of the [Head]leases in more detail" in early 2000. As a result, he "understood that if [PW exercised its right under clause 5(6)], the sub-tenancies would continue" (unless the subtenants exercised their right to break) because of the terms of clause 5(6). It appears that this understanding was based upon advice, because he went on to say in his evidence that the effect of certain reinstatement provisions in the headlease was "also explained to me".

[33] Mr Menzies also stated in his evidence that PW's rent under the headlease, which had been increased to around £6.95m pa on review in 1995, was kept the same on the 2000 review by an agreement reached in March 2001. In March 2001, the rent under the BT underleases

H  was reviewed to a level such that the aggregate rents under all seven underleases was around £6.735m pa.

[34] At a meeting on 15 November 2000, following a conversation between solicitors a week or so earlier, Milton Gate told PW that, in the light of the decision in *Pennell*, the effect of the notice would be to determine not merely the headlease but also the underleases. PW was taken by surprise by this contention and took issue with it. Milton Gate's position was subsequently communicated to BT at a meeting, and was discussed between their respective solicitors shortly afterwards, on 25 April 2001.

J  [35] During 2001, there were three sets of independent negotia ns. First, PW was suggesting to Milton Gate that the headlease shou d be surrendered (on the basis that this would ensure that the underleases would not determine on 24 June 2002). Second, Milton Gate and BT were discussing the possibility of BT taking a new 15-year overriding lease of the whole of the premises. Third, there were negotiations between BT (which remained in occupation of the lower five floors) and MLEL, with a view to BT taking an assignment of the two MLEL underleases.

[36] The third set of negotiations proved fruitful and, in January 2002, BT agreed to acquire the two MLEL underleases, which were duly assigned to BT in March 2002. The second set of negotiations,

K  between Milton Gate and BT for the grant of an overriding lease, continued more actively into 2002. During the negotiations with BT, Milton Gate was maintaining its position that the underleases would all expire on 24 June 2002, and BT was contending that they would not. The overriding lease that was being negotiated would have been for a term expiring in 2017, at an initial rent of more than £7.21m pa significantly above both the then passing rent and the then market rental value of the premises. BT was anxious to remain in the premises, and Milton Gate was putting pressure on it by threatening to serve hostile notices under section 25 of the 1954 Act, relying upon an intention to redevelop, that could have led to BT having to vacate, probably some time in 2003. These threats caused BT "serious concern" as it wished

L  to stay in the premises. If the premises had been let on the overriding lease at an annual rent of more than £200,000 above the passing rent under the headlease, and for an unbreakable term running to 2017, it would have considerably increased the value of Milton Gate's freehold reversion by millions of pounds. Indeed, an increase of £10m or even £15m has been mentioned in the evidence.

[37] In April 2002, BT's wish to remain in the premises, as evidenced by its negotiations with Milton Gate for the grant of an overriding 15-year lease, and by its acquisition of the two MLEL underleases, changed. BT decided that the premises were surplus to its requirements, and that it wished to vacate. Accordingly, on or around

M  16 April 2002, BT ended the negotiations for the overriding lease, and informed Milton Gate of their intention to vacate the premises. During April and May, Milton Gate and BT had discussions, which led to an agreement in principle, in early June 2002, that BT would vacate by March 2003.

[38] As so often happens, one party's change of tack was followed by a corresponding change on the part of the other. The rent due under the BT underleases on 24 June 2002 was paid by BT, because, even if those underleases had determined on 24 June 2002, they were continuing under the 1954 Act, since BT was in occupation of the lower five floors. However, that did not apply to the upper two floors, because no one was in occupation: MLEL had moved out and BT had not moved

A    in. Accordingly, BT did not pay any rent under the MLEL underleases on 24 June 2002, on the basis that they had expired on that date.

[39] On 4 July 2002, Milton Gate's solicitor wrote to BT's solicitor threatening to wind up BT if it did not pay the rent due under the MLEL underleases on 24 June 2002. This was explained in a letter from Milton Gate to BT's agent written on the following day. The letter stated that:

[F]ollowing a further review, the *Pennell v Payne* issue is becoming more difficult for us to pursue and Milton Gate… has decided not to take the issue any further. Accordingly… I can confirm that the [under] leases… including those relating to the fifth and sixth floors, continue in full force and effect notwithstanding the service of a break notice by PWC.

B    [40] BT replied through its solicitor, pointing out that Milton Gate had taken precisely the opposite position as against BT for more than a year, and that it was too late for Milton Gate now to contend that *Pennell* did not apply. Thereafter, perhaps not surprisingly, BT's solicitors wrote to Milton Gate's solicitor asking why "the *Pennell v Payne* issue is becoming more difficult to pursue", and, perhaps usual unsurprisingly, Milton Gate did not reply. BT thereafter paid the rent for 24 June 2002 in respect of the upper two floors "under protest".

[41] Meanwhile, the first set of negotiations between PW and Milton Gate had been proceeding fitfully. PW was pressing a surrender of
C    the headlease to Milton Gate, which was being generally unreceptive to the notion. On 24 April 2002, Milton Gate's solicitor wrote to PW's solicitor, making it clear that Milton Gate expected PW to pay the penalty, which amounted to just over £5.17m, on 24 June 2002. This was justified by Milton Gate on the basis that the proviso to clause 5(6) could not be satisfied because the effect of *Pennell* was to determine the underleases on 24 June 2002. PW's solicitor replied on 23 May 2002, challenging this contention and renewing PW's offer to surrender the headlease to Milton Gate. Milton Gate did not reply to this offer and, to protect its position, PW issued the instant proceedings on 11 June 2002, seeking a declaration that the penalty would not be payable.

D    [42] In its defence and counterclaim dated 23 July 2002 (and which has subsequently been substantially amended), Milton Gate alleged against PW that the underleases had determined on 24 June 2002, that the proviso to clause 5(6) accordingly did not apply, and that PW was therefore liable to pay the penalty, with interest. On 9 October 2002, BT was added as a Part 20 defendant to the current proceedings, on the application of Milton Gate.

[43] Meanwhile, because BT's case was that its tenancies of the lower five floors were continuing pursuant to the 1954 Act, it served notices under section 26 of that Act on Milton Gate for the grant of new tenancies of those floors of the premises.

E    *Summary of the issues*

[44] BT's case is that the conclusion and reasoning in *Pennell*, as discussed and approved in *Barrett*, means that all seven underleases determined on 24 June 2002 as a result of the service of the notice. As a consequence, because BT was in occupation of the lower five floors as at 24 June 2002, the BT underleases were continued, but only through the operation of the 1954 Act, and because no one was in occupation of the upper two floors, the MLEL underleases expired on that date for all purposes.

[45] This analysis is challenged by PW and (in what is now its primary case) by Milton Gate. They contend that clause 5(6) was
F    so expressed as to make it clear that, notwithstanding the fact that the headlease came to an end as a result of the service of the notice, the underleases none the less continued. In effect, they say that, by clause 5(6), the landlord, originally CLRP, and the head tenant, PW, agreed not only that PW could serve the notice to determine the headlease on 24 June 2002 but also that any subtenancy, provided it was a permitted underlease, would continue according to its terms, and would not determine, despite the normal rule, established in *Pennell*, which I shall call "the general rule".

[46] In these circumstances, the first issue to be considered is whether, and, if so, in what circumstances, a landlord and a tenant can validly contract out of the normal consequence on a subtenancy of the service of a notice under a provision such as clause 5(6) (a break notice)

G    under a head tenancy, and whether there has been such a valid contract in this case.

[47] If BT were to lose on this issue, that is the end of this case (subject to one point about the enforceability of the covenants in the underleases). The underleases, all of which are now vested in BT, will continue until their respective contractual term dates, and the proviso to clause 5(6) is satisfied, so that PW is not obliged to pay the penalty for exercising its right under clause 5(6).

[48] If CLRP and PW did not contract out of the general rule (either because they did not purport to do so or because they could not do so), PW and Milton Gate contend that clause 5(6) should be construed
H    so that a notice served thereunder has the effect of surrendering the headlease, rather than determining it by effluxion of time. BT's reply is that this is impermissible, and that, in any event, it does not assist Milton Gate and PW in their case.

[49] If BT were to succeed on this issue, Milton Gate and PW argue that the same result for which they contend, as a matter of contract, is none the less effectively justified on the basis of estoppel. This estoppel argument is put in two ways. First, they rely upon estoppel by deed. Second, they rely upon estoppel by convention. Each estoppel is said to be between the landlord under the headlease (the landlord) and PW as tenant thereunder. BT contends that the facts and documents in this case
J    do not satisfy the requirements of either type of estoppel, and, a way, that the estoppel never bound them.

[50] If Milton Gate and PW were to succeed on one or both of the estoppel points, BT contends that Milton Gate, whether or not it is bound by the estoppel as against PW, cannot insist on the estoppel as against BT. If BT were to succeed in defeating Milton Gate on estoppel, PW argues that Milton Gate would be estopped from recovering the penalty from PW.

[51] Having briefly explained the disputes between the parties, the issues that require to be determined may be conveniently summarised and considered in the following order:

(i) Contracting out of the general rule that a subtenancy is determined
K    by determination of the head tenancy.
  (a) Did CLRP and PW purport to contract out?
  (b) Can a landlord and a tenant contract out of the general rule?
  (c) Is there a problem due to lack of reversion?
  (d) Does the 1998 Act affect this conclusion?
(ii) Characterising the effect of the notice as a surrender.
  (a) Can this be done?
  (b) Does it help Milton Gate and PW?
(iii) Estoppel by deed.
(iv) Estoppel by convention: the existence of a convention.
L    (a) Was there a convention as a result of the headlease?
  (b) Was there a convention as a result of the underleases and licences?
  (c) Was BT bound by any such convention?
  (d) Was Milton Gate entitled to rely upon any such convention?
(v) Estoppel by convention: the existence of an estoppel.
  (a) An estoppel between Milton Gate and BT.
  (b) An estoppel between Milton Gate and PW.
  (c) How can the tripartite relationship be reconciled?

*Contracting out of the rule in Pennell v Payne*
*Was there a purported contracting out?*

M    [52] It is common ground that, in the absence of the words that I have emphasised when quoting the clause (namely "subject to any permitted underleases" and "such permitted underlease or underleases have an expired term of at least 5 years"), the effect of service of a notice under clause 5(6) would be to determine the underleases. That must follow as a result of the decisions in *Pennell* and *Barrett*. Milton Gate and PW contend that the effect of the words I have emphasised is that there was an agreement between CLRP and PW to the effect that the underleases would survive notwithstanding the determination of the headlease. The first question it is convenient to consider is whether the parties did in fact purport to contract out of the consequences of the general rule laid down in *Pennell*.

[53] On behalf of BT, Mr Nicholas Dowding QC, who appeared with Mr Jonathan Evans, contended that the wording of clause 5(6) did not give rise to any agreement between CLRP and PW to the effect that any permitted underlease would continue after 24 June 2002, notwithstanding the service of a notice, and notwithstanding the general rule to the contrary. In particular, he argued that the words "subject to any permitted underleases" are the only words upon which such contention could rest, and that those words are insufficiently clear and unequivocal to justify the conclusion for which Milton Gate and PW argue.

[54] On a fair reading of clause 5(6), it appears to me that the parties agreed that, on service of a notice, the headlease would determine on 24 June 2002, and, equally, that they agreed that such determination would be "subject to any permitted underleases". At least in the absence of the general rule, as decided in *Pennell*, the natural meaning of those words is that any permitted underlease would be unaffected by, and continue notwithstanding, determination of the headlease. To put it at its lowest, that is at least a natural meaning of the expression "subject to any permitted underleases". Indeed, in my view, it is the natural meaning. If the exercise of a right is described as "subject to" another right or interest, then the normal meaning of the words is that the other right or interest should not be detrimentally affected by the exercise of the first right. Further, it is not very easy to envisage what other purpose the words in question were intended to have. Mr Dowding's suggestion that the words were included to protect PW against the possibility of any subtenant remaining in occupation does not strike me as convincing. It does not give the words a natural meaning. In so far as the subtenant was entitled to remain in occupation by virtue of the 1954 Act, its presence would not represent a breach of PW's obligation to deliver up possession. If it was not entitled to remain in occupation, that would be because its subtenancy had come to an end, in which case the words "subject to any permitted underleases" would not protect PW; the former subtenant would be a trespasser.

[55] At first sight, it could be said that if the parties had intended to produce a different result from that normally required by law as laid down in *Pennell*, CLRP and PW would have made their intention clearer than they did. There are two reasons for rejecting that argument. The first is that the headlease was entered into at a time when the decision in *Brown* was assumed to represent the law; consequently, the parties could well have expressed their agreement fairly shortly, believing that it was consistent with the general law. Second, it appears to me that the closing words of clause 5(6) make it abundantly clear that the parties did believe that any subtenancy would survive the expiry of the head tenancy by a notice under clause 5(6). Accordingly, to give the words "subject to any permitted underleases" the meaning for which PW and Milton Gate contend, accords entirely with the understanding as expressed at the end of the clause. I am by no means convinced that I would have reached a different conclusion, even in the absence of these two arguments, but they render the likelihood of the parties having agreed that permitted underleases would survive the expiry of the headlease pursuant to a notice relatively easy to accept.

[56] Mr Dowding also relied upon the fact that, in the first draft of clause 5(6), before the penalty provision or the proviso had been added, the words "subject to any permitted underlease" were included. I do not consider that this assists BT. First, one cannot invoke an earlier draft as an aid to the construction of an agreement (whether a deed or otherwise). Second, given that the solicitors, like the parties, believed that the subtenancies would or could survive the expiry of the headlease, this point would take matters no further in any event.

[57] In these circumstances, I conclude that CLRP and PW purported to contract out of the consequences of *Pennell*, at least in relation to permitted underleases, in the event of the headlease being determined by a notice pursuant to clause 5(6). The next question is whether that was an effective agreement.

*Was the agreement effective as a matter of law?*

[58] The question that arises in this connection is, as in *Pennell*, a pure question of law. It is whether a landlord and head tenant can effectively agree that, notwithstanding the head tenancy's determination by a break notice, a subtenant will none the less be entitled to retain possession as against the landlord, for the contractual duration of the subtenancy. Mr Kirk Reynolds QC, who appeared with Mr Nicholas Taggart for PW, and Mr David Hodge QC, who appeared with Ms Nicole Sandells, for Milton Gate, contend that it is open to a landlord and a head tenant so to contract. They argued that the point was not disposed of against them by the decisions in *Pennell* and *Barrett* that it is therefore an open point, and that it should be answered in the affirmative, both in the light of the general thrust of the reasoning in those two cases, and because of the general principle that parties should be free to contract as they wish, save in so far as public policy or statute indicate otherwise. In that connection, Mr Reynolds relied upon a *dictum* of Sir George Jessel MR in *Printing and Numerical Registering Co* v *Sampson* (1875) LR 19 Eq 462, at p465.

[59] This contention is based upon the proposition that the general rule as laid down in *Pennell* is, to quote Mr Reynolds, "not one of deep legal principle" or, to quote Mr Hodge, a "general default position based upon clear policy arguments" that does not apply "regardless of the bargain between the parties".

[60] The only authoritative material available to test those propositions is the reasoning in the judgment of Simon Brown LJ in *Pennell*, and in the speech of Lord Millett in *Barrett*. Because that material is not only authoritative but also potentially directly on point and recent, it justifies close scrutiny. On the other hand, because the instant problem does not appear to have featured in the arguments, or in the minds of the tribunals, in those cases, it could be a little dangerous to place too much weight on the precise words used during the course of the judgment or speech, as the case may be.

[61] On the particular issue that falls to be decided here, the judgment of Simon Brown LJ in *Pennell* does not seem to me to provide much assistance. Mr Dowding, on behalf of BT, pointed out that the issue was described as "one of general principle" at p195D. Mr Reynolds and Mr Hodge relied upon the fact that, in order to decide the issue, it was considered "necessary to examine the policy considerations in play, and, above all, the necessary consequences of a decision either way": see at p201C. As they say, Simon Brown LJ then went on to consider the practical consequences of either party being right, and concluded that, if the normal rule were that the subtenancies survived the service of an upwards notice by the head tenant on the landlord, it could cause such injustice to the landlord that the contrary conclusion would be "compelling": see at p202H.

[62] The fact that the issue was described as "one of general principle and application" does not seem to me necessarily to assist BT in the present case. A "general principle" can always have exceptions, and there are no clear grounds for thinking that Simon Brown LJ might not have accepted that a prior agreement between a landlord and head tenant might not have amounted to such an exception. Equally, the fact that Simon Brown LJ relied upon policy as justifying his decision does not mean that if the policy considerations do not apply in a particular case a different result would obtain. Many, indeed I suspect the great majority, of legal principles and rules (whether of equitable, common law, or statutory origin) will have been based upon what could be called policy considerations. Yet that does not result in the rule or principle not applying simply because, on the particular facts of a case, the policy considerations do not apply.

[63] The reasoning of Lord Millett in *Barrett* appears to me to provide significantly more assistance on this issue. However, because he did not have in mind the facts of a case such as this, it is almost inevitable that each side can take comfort from at least parts of what he said.

[64] At p270D-E, Lord Millett said:

A lease or tenancy for a fixed term comes to an end by effluxion of time on the date fixed for its determination. A periodic tenancy comes to an end on the expiry of a notice to quit served by the landlord on the tenant or by the tenant on the landlord… [I]t also comes to an end by effluxion of time. In each case the tenancy is determined in accordance with its terms. By granting and accepting a periodic tenancy with provision, express or implied, for its determination

A    by notice to quit, the parties have agreed at the outset on the manner its of termination.

By contrast, Lord Millett said, at pp270F-271A:

A surrender is ineffective unless the landlord consents to accept it, and is therefore consensual in the fullest sense of the term... On its surrender the tenancy is brought to an end prematurely at a time and in a manner not provided for by the terms of the tenancy agreement. In this respect it differs from the case where a tenancy is determined by notice to quit. It is because the landlord or his predecessor in title has not, by granting the tenancy, previously agreed that the tenant should have the right to surrender the tenancy prematurely that the landlord's consent is necessary.

B    [65] As I have mentioned, Lord Millett had "no doubt" that *Pennell* was rightly decided (see at p274A), although he considered that a different result obtained where the head tenancy was determined by surrender. At p271D-E he stated:

It is a general and salutary principle of law that a person cannot be adversely affected by an agreement or arrangement to which he is not a party. So far as he is concerned, it is res inter alios acta. It would conflict with this principle if the destruction of a tenancy by surrender carried with it the destruction of the interest of a subtenant under a subtenancy previously granted.

C    [66] At p272A-F, Lord Millett set out four "major differences" between a determination of a head tenancy by surrender, and determination of a head tenancy by service of a tenant's break notice. The first difference is that a surrender determines a tenancy "prematurely otherwise than at the time and in the manner stipulate" in the tenancy, whereas determination by a break notice is "at a time and in the manner previously agreed between the parties". Second, because a surrender has not been agreed in advance, it requires the landlord's consent, whereas "no further consent [was] necessary" in the case of a break notice. Third, at p272C-D:

D    A subtenant holds a derivative title which cannot be prejudiced by the surrender of the head tenancy from which it is derived or any other agreement between the parties to the head tenancy which is later than the creation of a subtenancy. His title is, however, precarious, for it cannot survive the natural termination of the head tenancy in accordance with its terms agreed before his subtenancy was created.

Fourthly, if the head tenancy is surrendered, it is fictionally treated as continuing, so as to support the existence of the subtenancy, but, if determined by notice, the head tenancy "has come to the end of its natural life", and cannot be treated as surviving.

E    [67] In *Barrett*, the landlord served a notice to determine a head tenancy (which it was contractually entitled to do) and the head tenant agreed in advance not to serve a counternotice, which would have given him protection under the Agricultural Holdings legislation. The Court of Appeal had held that this arrangement should be treated as a surrender, because the head tenant had bound himself not to serve the counter notice, and, accordingly, the subtenancy survived as against the landlord. That reasoning was described by Lord Millett, at p274G, as inconsistent with "the orderly development of the common law".

F    [68] There is undoubtedly a formidable pragmatic case for concluding that a landlord and head tenant can agree precisely that which CLRP and PW purported to agree in clause 5(6), namely that, notwithstanding determination of the head tenancy by an upward (or indeed a downward) notice, any subtenancy will survive. Indeed, given that such a consequence could not be said to be contrary to public policy or to any statutory principle, the natural instinct of anyone other than a property lawyer, and, indeed, the natural instinct of some property lawyers, would be to conclude that such a result is permissible. This instinct is supported by principle, as is indicated by the observation of Sir George Jessel, at p465, in *Printing and Numerical* upon which Mr Reynolds relied:

It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held

G    sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider — that you are not lightly to interfere with this freedom of contract.

[69] None the less, as is made clear in that passage, Sir George Jessel was dealing with contracts that were said to be void on public policy grounds, and, more importantly, for present purposes, he was concerned with cases that might involve an arbitrary extension of pre-existing law.

[70] It is fair to say that there are aspects of the speech of Lord Millett in *Barrett* that can be said to support, or at least to be consistent with, the notion that a landlord and a head tenant can contract out of the general rule. Thus, the thrust of Lord Millett's reasoning can    H    be analysed as meaning that the landlord's right to treat the head tenancy as determined by the head tenant's break notice should have priority over the rights of a subtenant under the subtenancy, because the break clause predates the grant of the subtenancy. If that is right, one sees how it can be said that there is no reason why the landlord cannot agree in advance, for instance in the head tenancy itself, that its right to possession pursuant to the break notice will, as it were, be postponed to the right of a subtenant (or, as in this case, a certain class of subtenant) to remain in possession under its subtenancy.

[71] Although I was, and remain, impressed by that argument, I    J    have come to the conclusion that it is contrary to principle, and, indeed, contrary to the reasoning of Lord Millett, and, consequently, that it would not represent an "orderly development of the common law".

[72] As explained by Lord Millett, it appears to me that the principle is that the determination of a head tenancy in accordance with its terms will lead to the destruction of any subtenancy, but where the determination of the head tenancy arises from some consensual arrangement between the landlord and the head tenant not provided for in the head tenancy, the subtenancy will survive. This view seems consistent, in particular, with the observations of Lord Millett, at p272A-B, and p272C-E. As I have said, care must be taken lest one places too much weight on words in a judgment where the tribunal did    K    not have in mind the point at issue in the instant case. None the less, in those two passages, Lord Millett did say that the subtenancy "cannot survive the natural termination of the head tenancy in accordance with its terms agreed before the subtenancy was created", and that, "when [the head tenancy] is determined by notice to quit, it has come to the end of its natural life. There is no further period remaining during which the tenancy can have continuance". It appears to me that, in those observations, he was stating, or applying, a point of general principle.

[73] I consider that this conclusion is supported by three further points. First, it is important to remember in connection with this sort of issue that a tenancy is not merely a contract: it is, and it creates,    L    an estate in land. When a tenant grants a subtenancy, it is granting a subsidiary estate out of the estate vested in it by the head tenancy. As a matter of principle, it would seem to follow ineluctably that, if and when the head tenancy determines, and the estate thereby created ceases to exist, any subsidiary estate carved out of it, including any subtenancy, must also determine. This is, I suppose, an example of the maxim *nemo dat quod non habet*. Ultimately, that is the simple proposition upon which the general rule and decisions such as *Pennell* and *Barrett* rest. If that is the right analysis, it is difficult to see how a subtenancy can survive a destruction of the head tenancy simply because the landlord and head tenant agree that it should.    M

[74] The fact that it is well established that a subtenancy does survive in the case of a consensual surrender of the head tenancy admittedly provides some apparent basis for a different conclusion. If, in such a case, the head tenancy can be notionally treated as continuing for the purpose of preserving the subtenancy, that could be said to provide support for the view that such a notional continuance could be agreed between the landlord and the head tenant, when agreeing that the head tenancy is to be determined by notice. However, as I see it, the fact that there is a well established exception of general application to the normal rule, which is of itself of general application, does not by any means automatically mean that, in a specific case, it is open to the parties to agree another category of exception.

[75] The surrender exception to the general rule is of great antiquity: it is described in *Coke's Commentary upon Littleton* (vol 11) in §636 at p338b, cited in *Barrett*, at p271E-F. It was explained by Lord Millett on the basis that, after surrender, "the head-tenancy... is treated as continuing until its natural termination so far as this is necessary to support the derivative interest of the subtenant": see p272D.

[76] In my opinion, the exception is, to all intents and purposes, as well established in authority and principle as the general rule. Given that the general rule is based upon an easily identifiable consequence of the fact that a lease or tenancy creates an estate, I do not think that it is legitimate to invent a new exception to the rule.

[77] The fact that the common law developed the principle that, in a specific type of case, a head tenancy that had determined could be treated as notionally continuing, albeit only for a specific and limited purpose, does not seem to me to justify the conclusion that it is therefore open to a landlord and tenant to agree in advance that there should be such a notional continuance in rather different circumstances. The fact that a legal fiction has been developed over the centuries by the common law to deal with a particular set of circumstances and to satisfy a legal principle (identified by Lord Millett, at p271D-E in *Barrett*). cannot, at least without more, justify the conclusion that it is open to parties contractually to agree that the fiction will apply in a different set of circumstances.

[78] I believe that this conclusion is supported by the fact that the common law exception to the general common law rule is not itself cut down merely because it can lead to an unjust result. As Simon Brown LJ said in *Pennell*, at p202C, the decision in that case (whichever way it went) would apply equally to unlawful subtenancies as to lawful subtenancies. That is well demonstrated by *Parker* v *Jones* [1910] 2 KB 32, where a landlord, that accepted a surrender of a tenancy, was bound by an unlawful subtenancy. If the pragmatic approach urged by Milton Gate and PW, rather than the principled approach adopted by BT, were correct, this decision would presumably have gone the other way.

[79] Second, as pointed out by Mr Dowding, the fact that a lease creates an estate does sometimes produce results that do not accord with the plain contractual intention of parties. Thus, in *Jenkin R Lewis & Son Ltd* v *Kerman* [1971] Ch 477 at p496B-F, the Court of Appeal emphasised that a landlord and tenant cannot vary a lease by adding land to the demised premises or by extending the duration of the term, even if that is what they plainly agreed and intended. At p496E-F, Russell LJ said:

It is not possible simply to convert the existing estate in the land into a different estate by adding more years to it, and even if the parties use words which indicate that this is what they wished to achieve the law will achieve the result at which they are aiming in the only way in which it can, namely by implying a fresh lease for the longer period and a surrender of the old lease...

A little later, he made effectively the same point in relation to the purported addition of land to the existing demised premises.

[80] Perhaps even closer to the issue in the present case is the principle that a tenant that purports to grant a subtenancy for a term equal to, or greater than, the term of his tenancy will in fact thereby assign his tenancy to that person, even though it is quite clear that both parties intended the arrangement to be a subtenancy. The principle was confirmed by the Court of Appeal in *Milmo* v *Carreras* [1946] KB 306, where Lord Greene MR said, at pp310-311:

[I]n accordance with a very ancient and established rule, where a lessee, by a document in the form of a sub-lease, divests himself of everything that he has got (which he must necessarily do if he is transferring to his so-called sub-lessee an estate as great as, or purporting to be greater than, his own) he from that moment is a stranger to the land, in the sense that the relationship of landlord and tenant, in respect of tenure, cannot any longer exist between him and the so-called sub-lessee. That relationship must depend on privity of estate... You cannot have a purely contractual tenure. Tenure exists by reason of privity of estate.

[81] Both these cases, and, in particular, *Milmo*, expressly emphasised, indeed they turned on, the tenurial nature of a lease. They also provide very good examples of how that tenurial nature can, on occasion, result in the contractual intention of the landlord and tenant, however unequivocally and forcibly expressed, being thwarted, not by virtue of public policy or statute, but by the limitations placed on their freedom to agree by reason of the inherent nature of a leasehold estate. As I see it, just as a tenant cannot grant a subtenancy for a term equal to or exceeding that of the head tenancy, neither can a tenant effectively agree with its landlord that any subtenancy will survive the expiry of the head tenancy according to its terms.

[82] Third, there is the practical consequence if there is an ability to contract out of the general rule. The position is explained by Lord Millett in *Barrett*, at p271B-D:

Formerly the extinguishment of the tenancy by surrender also extinguished the reversion to any subtenancy, so that the remedy for the rent and the covenants attached to the reversion ceased with the reversion to which they were annexed. The subtenant held the property as tenant of the head landlord for the residue of the term of the extinguished tenancy but without privity of estate and accordingly without an obligation to pay the rent or perform the tenant's covenants: see *Webb* v *Russell* (1789) 3 Durn & E 393. This unsatisfactory state of affairs was remedied by statute in two stages. Section 6 of the Landlord and Tenant Act 1730... (now section 150 of the Law of Property Act 1925) effected a partial reversal of the common law rule. Section 9 of the Real Property Act 1845... (now section 139 of the Act of 1925) reversed it more generally. Those provisions apply only where the head tenancy is surrendered.

[83] Section 139(1) of the Law of Property Act 1925 (the 1925 Act) provides:

Where a reversion expectant on a lease... is surrendered or merged, the estate or interest which as against the lessee for the time being confers the next vested right to the land, shall be deemed the reversion for the purpose of preserving the same incidents and obligations as would have affected the original reversion had there been no surrender or merger thereof.

[84] Subject to the arguments to which I turn in the next two sections of this judgment, it appears to me that this represents another reason why a landlord and head tenant should not be able to contract out of the general rule. As Lord Millett explained, although a subtenancy survived the surrender of the head tenancy, there was, in common law, no basis upon which the landlord could enforce the covenants in the subtenancy because surrender destroyed the reversion to the subtenancy and there was no privity of estate between the landlord and the subtenant. Although such a result could, at least in theory, have been avoided by treating a surrender as a notional assignment of the term of the head tenancy to the landlord, that was not the analysis that the common law adopted: by a surrender, a tenancy became "absolutely drowned": see *Coke on Littleton* op cit. The fact that this was a conclusion reached only after investigation and with obvious regret by Lord Kenyon CJ in *Webb* v *Russell* (1789) 3 TR 393, at p403) appears to me, if anything, to emphasise its strength.

[85] If the position in common law was that, upon the surrender of the head tenancy, a subtenancy survived but the landlord could not enforce the covenants against the subtenant, then it seems to me that the position in common law must be the same if a subtenancy can survive determination of the head tenancy by the exercise of a break clause. The legislature has dealt with this problem, but only where the head tenancy has been surrendered (or merged) through the medium of what is now section 139 of the 1925 Act (section 139). In those circumstances, subject to the arguments raised by Mr Reynolds and Mr Hodge, to which I must now turn, it seems to me to follow that if a landlord and a head tenant can contract out of the general rule, the result would be that the landlord is prevented from obtaining possession for the remaining contractual period of the subtenancy, but would not be entitled to recover any rent under (or enforce the lessee's covenants in) the subtenancy. I suppose it is possible that the landlord and the tenant in a case such as this could have overlooked that problem. However, in my view, the more telling point is that, by restricting the ambit of section 139 (and its predecessors) to surrender (and merger), the natural inference is that the legislature considered that it was not necessary to

extend it to any other case, because in no other case would a subtenancy survive the determination of the head tenancy.

*Problem due to the lack of a reversion (absent the Human Rights dimension)*

[86] As mentioned, Mr Dowding, for BT, argued that, if a landlord and head tenant can agree that a subtenancy will continue notwithstanding the determination of a head tenancy by notice, it would lead to the problem identified and reluctantly upheld by the court in *Webb*, a problem that has only been solved by statute in the case of a surrender. Mr Dowding accordingly contended that this problem would exist in the present case, if the seven underleases have survived the expiry of the head tenancy. If that contention is correct, it is significant in the present case for two reasons. First, as I have said, it assists the conclusion that a landlord and head tenant cannot contract out of the general rule. Second, if I am wrong in my view as to the ability of a landlord and head tenant to contract out of the general rule -- and there has been such a contracting out in the present case -- the result would be, at least to the thinking of any fair-minded commercial person, absurd. Each of the seven underleases would continue beyond 24 June 2002, and would be binding on Milton Gate, until their respective contractual expiry dates, but Milton Gate would not be able to recover any rent because there would be no privity of estate between Milton Gate and BT. Mr Hodge and Mr Reynolds had a number of points to rebut Mr Dowding's contention, to which I now turn. (Mr Hodge also has a point under the 1998 Act, which was raised rather late, prompted by a very recently reported decision of the European Court of Justice. I propose to deal with it separately, reflecting the way in which the case was argued.)

[87] First, it is contended that the common law rule, as exemplified by the decision in *Webb*, has been effectively reversed in all cases by subsection (1) of section 141 the 1925 Act (section 141). This provides, so far as is relevant:

Rent reserved by a lease, and the benefit of every covenant or provision therein contained... and every condition of re-entry... shall be annexed and incident to and shall go with the reversionary estate in the land... immediately expectant on the term granted by the lease...

[88] This provision had its origin in the Grantees of Reversions Act 1540, a statute enacted as a result of the dissolution of the monasteries, to enable those who acquired the former monasteries and their lands to enforce the covenants in any pre-existing leases. However, not surprisingly, the provisions of section 141 are very differently worded from those of the 1540 Act and, consequently, cases on the 1540 Act are not of assistance when construing the section: see *per* Upjohn LJ at p490 in *In re King (Deceased)* [1963] Ch 459. It appears to me that the argument that section 141(1) enables a landlord to enforce covenants in a subtenancy in any circumstances where the head tenancy has been determined suffers from three problems. The first is that it would result in section 139, a provision in the same part of the same Act, being wholly otiose. The 1925 Act was intended to consolidate and significantly to change the pre-existing law, and, given its authoritative and careful drafting, I think that any construction of a section that would result in another section being wholly otiose is unlikely to be correct. (It should be added that if section 141(1) has the effect contended for, section 65(2) of the 1954 Act would also be wholly otiose.)

[89] Second, I consider that the argument that section 141(1) reversed *Webb* involves a misunderstanding of the basis of the conclusion in that case. The effect of section 141(1) is to make the right to claim rent under a lease go "with the reversionary estate in the land... immediately expectant on the term granted by the lease [in question]". The basis of the reasoning in *Webb*, as explained by Lord Millett in *Barrett*, at p271B, is that "the extinguishment of the tenancy by surrender also extinguished the reversion to any subtenancy". Accordingly, section 141(1) does not take the argument any further, because "the reversionary estate" referred to in the statute is the same as the "reversion to any subtenancy" referred to by Lord Millett. I do not consider that it is legitimate to construe "the reversionary estate in the land...

land... immediately expectant on the term granted by the [under]lease" as being a reference to the estate in the land that, if the subtenancy did not exist, would give the right to possession of the land, in a case where it is very well established that, but for the existence of section 139, the reversion in question had ceased to exist.

[90] Third, there is the history of section 141(1). Consideration of the legislative history of a particular statutory provision is often unhelpful, even potentially misleading, particularly where the wording of the provision has changed. That is a point made graphically clear in the passage in *King*, to which I have referred . However, the immediate predecessor of section 141(1) is the first and main portion of section 10(1) of the Conveyancing Act 1881, whose wording was effectively identical. It is clear from the 10th (1913) edition of *Wolstenholme's Conveyancing and Settled Land Acts* (edited by Sir Benjamin Cherry, who was primarily responsible for the drafting of the 1925 Act) from the notes to section 10(1) of the 1881 Act, that the section was not intended to have the effect for which Mr Reynolds and Mr Hodge contended. Indeed, the point was made by Farwell LJ, giving the judgment of the Court of Appeal in *Turner v Walsh* [1909] 2 KB 484, at p494:

The 10th section makes no alteration in the rights of anyone, but merely alters procedure, so as to give the right of action to the person entitled to the proceeds of such action.

[91] A second, and not dissimilar, argument was raised by Mr Reynolds and Mr Hodge, based upon the provisions of section 141(2), which provides as follows:

Any such rent, covenant or provision shall be capable of being recovered, received, enforced and taken advantage of, by the person from time to time entitled, subject to the term, to the income of... of the land leased.

[92] The first reason for rejecting the reliance of Milton Gate and PW upon section 141(1), namely that it would render section 139 (and section 65(2) of the 1954 Act) otiose, applies equally to their reliance upon section 141(2). The third reason, namely the legislative history of section 141(2), also applies equally. That is because section 10(1) of the 1881 Act contained, almost word for word, in a single subsection, what are now two subsections, namely subsections (1) and (2) of section 141. The observations of Sir Benjamin Cherry in *Wolstenholme* op cit, and of Farwell LJ in *Turner*, apply with equal force to the argument based upon section 141(2) as they do in relation to that based upon section 141(1).

[93] It is fair to say that the second reason for rejecting the argument based upon section 141(1) does not apply with such immediate force in relation to the argument based upon section 141(2): there is no specific reference to "the reversion" in the latter subsection. However, it appears to me that it would be extraordinary if an identically worded provision in a later Act had a much wider meaning than it had had in an earlier Act, in circumstances where the later Act is a consolidating (albeit also a significantly amending) statute, which is intended to repeal and substantially to re-enact the earlier Act, and the only distinction is that the new provision is in a separate subsection, rather than the closing part of a larger immediately preceding subsection.

[94] In any event, it seems to me that the reference, at the beginning of section 141(2) to "any *such* rent..." is to rent "reserved by a lease" that is "annexed and incident to... the reversionary estate..." in section 141(1). That brings one straight back to the second point that can be raised against the argument based upon section 141(1).

[95] An argument is also advanced by Milton Gate and PW based upon section 141(3), which provides, so far as is relevant:

Where that person becomes entitled by conveyance or otherwise, such rent, covenant or provision may be recovered, received, enforced or taken advantage of by him notwithstanding that he becomes so entitled after the condition of re-entry or forfeiture has become enforceable...

[96] It is true that the words "by conveyance or otherwise" could scarcely be wider, as was recognised by the Court of Appeal

A    in *Electricity Supply Nominees Ltd* v *Thorn EMI Retail Ltd* [1991] 2 EGLR 46*, at p48H-J. However, I do not think that section 141(3) takes the argument any further because it is merely concerned to defeat an argument against a reversioner bringing a claim against a lessee, based on how the reversioner acquired the reversion, or based upon the point that the right to forfeiture has arisen. It does not deal with the centrally relevant issue for present purposes, namely whether it can be said that the party in question, in this case Milton Gate, has the reversion vested in it at all.

[97] In these circumstances, I do not consider that any aspect of section 141 answers the general point that if a landlord and a head

B    tenant can contract out of the general rule, the landlord will not be able to enforce the covenants, and in particular will not be able to recover the rent due, under any subtenancy that survives the determination of the head tenancy, by a break notice.

[98] It seems to me that that view is supported by consideration of section 142, which is concerned with enforceability of the lessor's covenants. So far as relevant, section 142 provides that the lessor's obligations are "annexed and incident to and shall go with [the] reversionary estate". If, as was held in *Webb*, and still remains the common law as explained by Lord Millett, the survival of a subtenancy following the determination of the head tenancy carries with it the

C    problem that the subtenant's covenants cannot be enforced because the reversion is destroyed, it appears to me to follow as a matter of logic that, in such a case, common law must also result in the subtenant being unable to enforce the head tenant's covenants as contained in the subtenancy, essentially for the same reason. Additionally, as Mr Dowding pointed out, section 142 annexes the benefit of the lessor's covenants to the reversionary estate only "if and as far as the lessor has power to bind" that estate. In the present case, "the lessor" under the underleases was PW, and it had no power to bind either its immediate landlord, CLRP or Allmanna. Whatever arguments can be raised in relation to section 141, it therefore appears to me that there is nothing in

D    section 142, that could fairly be said to fill the gap on the other side.

[99] On the facts of this case, it was suggested by Mr Reynolds and Mr Hodge that the conveyancing documentation provides an answer to the problem. I do not agree. If anything, it highlights the problem. Reliance is placed upon clause 11 of the licences, which contained a direct covenant between the subtenant (BT or MLEL) and the landlord (that is, CLRP or Allmanna).

[100] In my view, there are three, or, at any rate, two problems with that argument. First, it is clear that clause 11 expressly excludes any liability in relation to the payment of rent. Second, the liability under clause 11 lasts only "so long as the subtenant… is liable to the lessor

E    thereunder". As the reasoning in *Webb* establishes, if the underleases survive the determination of the head tenancy, then "the subtenant", namely BT, is no longer "liable to the lessor thereunder", namely PW, and therefore the provisions of clause 11 would have fallen away at the very moment when Milton Gate's argument seeks to invoke them. Third, given that clause 11 was a covenant with Milton Gate's predecessor, it is not immediately easy to see the basis upon which Milton Gate could enforce it: there is no privity of contract, and no privity of estate between Milton Gate and PW. Mr Hodge suggested that the answer to that point might be found in section 56 of the Law of Property Act 1925, but, as he accepts, that would be a revolutionary proposition inconsistent with the

F    characteristically trenchant observations of Walton J in *Re Distributors & Warehousing Ltd* [1986] 1 EGLR 90†, at p94E-F. In particular, Walton J said that, in order for section 56 to apply:

It is essential that the third party, upon whom rights are thus sought to be conferred, should be in existence and identifiable.

[101] On reflection, it may be that the answer to this third point is to be found in the reasoning of the House of Lords in *P&A Swift Investments* v *Combined English Stores Group plc* [1989] AC 632‡.

* Editor's note: Also reported at [1991] 35 EG 114
† Editor's note: Also reported at (1985) 278 EG 1363
‡ Editor's note: Also reported at [1988] 2 EGLR 67; [1988] 43 EG 73

However, the first two points seem to me to dispose of any reliance that
G    Milton Gate can place upon clause 11 of the licences.

[102] The other argument raised on behalf of Milton Gate in this connection rests on the definition of "the lessors" in each of the underleases. In my judgment, for reasons that have already been explained, this cannot assist Milton Gate. The expression "the lessors" extends to "the estate owner for the time being entitled to the reversion immediately expectant on the determination of the term [of the subtenancy]", but, as with section 141(1), any attempt to rely upon this definition runs straight into the reasons for the decision in *Webb*, as explained by Lord Millett in *Barrett*, at p271B. In any event,
H    if section 141 does not assist Milton Gate as a matter of general law, it is hard to see how Milton Gate could succeed as a matter of private contract, given that there is no privity of contract or privity of estate between Milton Gate and BT, and section 56 of the 1925 Act cannot assist. In this connection, I do not think that the decision in *Swift* can help Milton Gate because in no sensible way can it be said to be the successor of "the lessors" under the underleases, namely PW.

[103] In these circumstances, I am of the view that both as a general proposition and on the particular facts of this case it would follow that, if the underleases survived the determination of the headlease on 24 June 2002, the covenants in the underleases, and, in particular, the covenants to pay rent, could not be enforced by Milton Gate against BT.
J    In my judgment, that is a powerful reason, at the very least as a matter of commercial common sense, for concluding that Milton Gate and PW cannot have contracted out of the general rule.

*Effect of the 1998 Act and the Convention*

[104] I turn now to Mr Hodge's argument based upon the Human Rights Act 1998, which he raised if (as he and Mr Reynolds accepted) section 139, and if (as I have found) section 141, do not enable a head landlord to recover the rent under the subtenancy in the event of the head tenancy being determined other than by surrender, when construed in accordance with the traditional approach to construction. In that
K    event, he argued that either or both sections of the 1925 Act should be construed in a different way and, in particular, that they should be construed so as to apply to a case where the head tenancy has been determined by notice, in light of the provisions of section 3(1) of the 1998 Act (section 3).

[105] The argument proceeded on the basis that, if the determination of the head tenancy by the notice did not put an end to the underleases, but the lessee's covenants in the underleases are unenforceable by Milton Gate, that would infringe Milton Gate's rights under Article 1 of the First Protocol to the European Convention on Human Rights (the Convention). This Article (Article 1) provides, in summary, that every
L    person is not to be deprived of his possessions and is to be entitled to the peaceful enjoyment of his possessions, subject to law. In those circumstances, Mr Hodge argued that, in the light of section 3, the court should strain to arrive, and can arrive, at a construction of a relevant statutory provision that deals with the problem (that is, section 139 and/or section 141) so as to extend it to apply to a case such as this. Section 3 requires legislation, so far as possible, to be read and given effect in a way compatible with rights under the Convention.

[106] It seems to me that Mr Hodge's argument raises four issues. The first is whether section 3 can be invoked in a case such as this, where the rights concerned arise under an agreement, namely the
M    headlease, entered into long before the 1998 Act came into force. The second issue is whether Article 1 is engaged at all. The third issue is whether it is properly possible to construe sections 139 and/or 141 so as to render the covenants in a subtenancy enforceable as between the landlord and the subtenant in the event of the head tenancy coming to an end other than by merger or surrender. The final issue that then has to be considered is whether this justifies a different result from that which I have so far arrived at on the question of whether the determination of the headlease resulted in the determination of the underleases.

[107] The extent to which section 3 of the 1998 Act can be retroactively applied has been authoritatively considered in *Wilson* v *First County Trust Ltd (No 2)* [2003] UKHL 40; [2003] 3 WLR 568.

[108] In [19] of his speech, Lord Nicholls approved what was said by Staughton LJ in *Secretary of State for Social Security v Tunnicliffe* [1991] 2 All ER 712, at p724:

the true principle is that Parliament is presumed not to have intended to alter the law applicable to past events and transactions in a manner which is unfair to those concerned in them, unless a contrary intention appears. It is not simply a question of classifying an enactment as retrospective or not retrospective. Rather it may well be a matter of degree — the greater the unfairness, the more it is to be expected that Parliament will make it clear if that is intended.

In the following paragraph, Lord Nicholls, in agreement with an earlier judgment of Mummery LJ, concluded that "in general… section 3(1) does not apply to causes of action accruing before the section came into force".

[109] Lord Hope said, in [98] that the presumption of retrospectivity "is based on concepts of fairness and legal certainty". He continued:

These concepts require that accrued rights and the legal effect of past acts should not be altered by subsequent legislation. But the mere fact that a Statute depends for its application in the future on events that have happened in the past does not offend against the presumption.

In the next paragraph, he said:

To restrict the application of the interpretative obligation [in section 3 of the 1998 Act], without exception, to "events" that happened or "transactions" entered into on or after 2 October 2000 would be to introduce a restriction which is not stated expressly anywhere in the 1998 Act.

[110] In [161], Lord Scott, although accepting that section 3 should not "have a general retrospective effect", went on to refer to an example that is pertinent to the present case:

Where transactions calculated to continue for some considerable period are entered into, intervening legislation may in some respect or other affect the rights and obligations that accrue under the transaction after the legislation has come into force. Landlord and tenant legislation is a good example. If a lease is granted for, say, 99 years, there might well be intervening legislation capable of affecting the ability of the landlord to forfeit the lease, to operate a rent review clause… But it would be unusual for the legislation to alter the rights and obligations of the parties resulting from events that had already taken place, such as a forfeiture notice already served… rent review machinery already in train, and so on.

[111] Lord Rodger, with whom Lord Hobhouse agreed, considered the question of retrospectivity, both in general, and in relation to section 3 of the 1998 Act, in illuminating detail in a passage beginning in [186]. In [196], he said:

The presumption is against legislation impairing rights that are described as "vested". The courts have tried, without conspicuous success, to define what is meant by "vested rights" for this purpose… [A]s Lord Mustill observed… the basis of any presumption in this area of the law "is no more than simple fairness, which ought to be the basis of every general rule".

[112] In [210], Lord Rodger accepted that "the presumption would be that Parliament did not intend that, when used to give to effect to them, the operative provisions [of the 1998 Act] should interfere with vested rights or pending actions". In [212], he concluded that "none of the operative provisions of the [1998] Act, including section 3, is retroactive".

[113] In the present case, Mr Dowding contended, on behalf of BT, that it is not open to Milton Gate to invoke section 3 when construing the 1925 Act because such an invocation would be in relation to transactions, namely the headlease and the underleases, entered into before the 1998 Act came into force; indeed, before the 1998 Act was enacted, or even in gestation.

[114] Although I see the force of this argument, I consider that it is not well founded. Although I accept that the notion of "vested rights" is somewhat elusive and unsatisfactory, it appears to me that the earliest that any "vested rights" could be said to have arisen under clause 5(6) was the date of the service of the notice under that clause. Unless and until clause 5(6) was operated, the rights and obligations of any of the parties as a result of the exercise were merely contingent, and not

vested. The reasoning of Lord Scott in relation to leases appears to me to be very much in point, and to support this conclusion.

[115] If one approaches the question by reference to fairness, it does not appear to me to be unfair that the 1998 Act should be capable of being invoked to produce a result that the parties clearly intended at the time when they entered into their contracts, and was intended by the person who exercised the unilateral right that gives rise to the relevant issue. It is true that the notice was served only four days after the 1998 Act came into force, but two points may be made in answer to that. First, the issue is whether the relevant step had been taken before or after the 1998 Act came into force; all lawyers are familiar with the vital importance of a particular date in many different circumstances. Second, the 1998 Act had, self-evidently, been on the statute book for around two years by the time it came into force; indeed, as Lord Rodger pointed out in [183] in *Wilson*, "the 1998 Act did not arrive on the scene unheralded".

[116] Having reached this conclusion on the first issue, it is next necessary to consider whether Mr Hodge was correct in his contention that the provisions of Article 1 are engaged. In this connection, Milton Gate's argument is that if, following the determination of the headlease pursuant to clause 5(6), the underleases continue as against Milton Gate, but Milton Gate is unable to recover any rent due under the underleases (or to enforce the other tenant's covenants therein), this inability would constitute an infringement of Milton Gate's Article 1 rights.

[117] The case upon which Milton Gate primarily relies in this connection is the decision of the European Court of Human Rights (Fourth Section) in *Stretch v United Kingdom (44277/98)* (24 June 2003, Times Law Reports of 3 July 2003)*. In that case, a district council had granted an applicant a lease of land for a term of 22 years. The lease required the applicant to erect buildings at his own expense on the land, and included an option in his favour to renew for a further 21 years. The applicant constructed the buildings, and in due course exercised the option. The Court of Appeal held that the grant of the option had been beyond the council's statutory powers. The applicant applied for relief from the European Court of Human Rights ("the European Court") on the basis that he had been deprived of the benefit of the option in the lease, which infringed Article 1. The UK government contended that, as the council never had the capacity to grant the option, it had been a nullity from the start, and there was therefore no question of the tenant being deprived of any "possession".

[118] The European Court rejected the British Government's case. In para 32, it explained:

[A]ccording to the established case-law of the Convention organs, "possessions" can be "existing possessions" or assets, including claims, in respect of which the applicant can argue that he has at least a "legitimate expectation" of obtaining effective enjoyment of a property right.

[119] The court then said, in para 34:

Although it is true that, under English law, the option was rendered invalid due to the operation of the doctrine of *ultra vires*, the Court observes that the applicants had entered into the agreement with [the Council] on the basis that he would have the possibility of extending the term of the lease. Neither party had been aware that there was any legal obstacle to this term forming part of the applicant's consideration for agreeing to the contract. The applicant proceeded to build… He clearly expected to be able to renew the lease.

[120] In these circumstances, in para 35, the European Court concluded that:

[I]n the circumstances of this case,… the applicant must be regarded as having at least a legitimate expectation of exercising the option to renew and this may be regarded, for the purposes of Article 1…, as attached to the property rights granted to him by [the Council] under the lease.

[121] It was accordingly decided, in para 36, that, by refusing to renew the lease, the council "may be regarded as frustrating the applicant's legitimate expectations under the lease and depriving

* Editor's note: Also reported at [2004] 1 EGLR 11; [2004] 03 EG 100

A    him in part of the consideration which he gave in entering into the agreement". The European Court said that Article 1 was engaged either on the basis that there was "interference with the peaceful enjoyment of the applicant's possessions" or on the basis that there was "a deprivation of possessions", in each case within Article 1.

[122] In paras 37-41, the court went on to consider whether the interference or deprivation could be justified on the basis that the law none the less represented a "fair balance" between "the demands of the general interests of the community and the requirements of the individual's fundamental rights". Although accepting that the doctrine of *ultra vires* "provides an important safe guard against abuse of power
B    by local or statutory authorities acting beyond the competence given to them", the court effectively concluded, in para 39, that there was no question in that case of the council acting against the public interest "in the way in which it disposed [or purported to dispose] of the property" (that is, by the grant of the lease including the option) or "by giving effect to a renewal provision". In para 40, the European Court also expressed the view that it was no answer to say that the applicant or his advisers should have been aware of the law, given that the mistake was shared by all parties, including the council.

[123] So far as the present case is concerned, it seems to me plain that,
C    at least until Milton Gate came on to the scene, the landlord under the headlease, namely CLRP and then Allmanna, and the tenant thereunder, PW, clearly anticipated not merely that permitted underleases would continue, notwithstanding the expiry of the headlease pursuant to clause 5(6), but that the landlord under the headlease would be able to enforce the tenant's covenants in the underleases. Apart from anything else, it would have been wholly absurd for the landlord to be entitled to the penalty if the proviso to clause 5(6) had not been satisfied (for instance, if the premises were empty), but was not to be entitled to the penalty if the proviso was satisfied (and at least 75% of the premises was subject to some tenancies that had more than five years to run). If there had been any question of the landlord not being able to recover the
D    rents under such continuing underleases, it would have been worse off, not better off, as a result of the continuation of any underleases.

[124] It is true that, from the moment it acquired the landlord's interest, Milton Gate had a different view of matters. However, given that it was effectively tied into whatever arrangement bound its predecessors, I do not think that that makes any difference. I draw some support from the facts and decision in *Stretch*, where the identity of the landlord council changed between the date of grant of the lease and the date of exercise of the option. Quite apart from this, although Milton Gate's expectation was that the underleases would not survive the determination of the headlease pursuant to clause 5(6), that does
E    not even begin to support the notion that it believed, or would have believed, that, if its understanding was wrong, the underleases would survive the determination of the headlease, without Milton Gate being able to enforce the covenants therein.

[125] It is true that, as pointed out by Mr Dowding, *Stretch* involved a misunderstanding as to one party's capacity to enter into the contract, whereas in the present case the misunderstanding was as to the consequences of a subtenancy surviving the determination of the head tenancy by an upward notice. However, in each case, the misunderstanding was the oversight of a legal technicality, shared by all parties involved. In terms of culpability, if it is relevant, it appears
F    to me that, if anything, less blame could be attached to the parties in the present case than to those in *Stretch*. In that case, the powers of the council were set out in sections 164 and 172 of the Local Government Act 1933, a fairly obvious place to look once one appreciated that the council was a statutory body whose powers could well be circumscribed. The unenforceability of covenants in subtenancies following the determination of head tenancies is a rather esoteric point, which may well not occur even to reasonably experienced conveyancers, bearing in mind that the only circumstance in which it would normally otherwise be encountered has been disposed of by section 139.

[126] In light of the observations of the European Court at para 32 in *Stretch* as to what constitutes "possessions" in Article 1, it seems to me that the ambit of the word is wide enough to cover the present case.

G    Furthermore, if the underleases would survive the determination of the headlease, without the tenant's covenants being enforceable, Milton Gate would be kept out of four floors of the premises for more than five years, and of the remaining three floors for some 13 years, without being able to recover any rent whatever. That is scarcely "peaceful enjoyment of [its] possessions".

[127] I have considered whether the point really falls outside the ambit of section 3, because it is ultimately the common law, rather than statute, that gives rise to the Article 1 infringement in the present case. On balance, I consider that that involves too narrow a reading of section 3. Where the legislature has, through a statutory provision, sought to reverse a common law rule that would (albeit only as it
H    subsequently transpires) infringe a Convention right, it seems to me that section 3 is properly engaged by that provision. The purpose of the section, as I see it, is to require the courts, so far as they properly can, to construe a statute so as to eliminate (or failing that, to minimise) the extent to which English law involves, or results in, infringement of Convention rights.

[128] In these circumstances, I am of the view that Article 1 would be engaged in the present case if the underleases survived the determination of the headlease on 24 June 2002, without Milton Gate being able to enforce PW's covenants therein, and, in particular, the
J    obligation to pay rent.

[129] The next question is whether it is possible to construe sections 139 or 141 in such a way as to avoid the conclusion that, should the underleases survive the expiry of the headlease, there would none the less be no infringement of Milton Gate's Article 1 rights. In this connection, the obligation under section 3 to construe the 1925 Act so as to produce a result that is compatible with Convention rights is only to be effected "so far as it is possible to do so". However, as Lord Steyn said in an important passage in *R v A (No 2)* [2001] UKHL 25; [2002] 1 AC 45, at pp67F-68E, section 3 imposes an "interpretative obligation [which is] strong" and permits, indeed may require, "an interpretation which linguistically may appear strained": see also *per* Brooke LJ in
K    *Goode v Martin* [2001] EWCA Civ 1899; [2002] 1 WLR 1828, at pp1840D-1841A.

[130] In my judgment, it is possible to construe sections 141 and 142, in light of the requirements of section 3, so as to enable a landlord under a head tenancy, that has been determined by a break notice, to enforce the lessee's covenants as contained in the subtenancy. The arguments, which I have set out above, for rejecting such a conclusion, in circumstances where section 3 is not engaged, appear to me to be outweighed by the requirements of section 3.

[131] As to section 141(1), although the landlord's interest
L    in such a case would not technically fall within the words "the reversionary estate… immediately expectant on the term granted by the [subtenancy]", it seems to me that it is capable of falling within those words as a matter of ordinary language. Thus, the landlord's interest can fairly be said to be "reversionary", in the sense that, after the determination of the head tenancy, it would be kept out of possession unless and until the subtenancy expires. For the same reason, it would not be a misuse of language to describe its estate as "immediately expectant" on the term granted by the subtenancy, in the sense that there is no interest between the landlord's interest and that of the subtenant. In other words, the argument based upon the historical and technical context of section 141(1) is outweighed by the fact that the words can
M    be given a meaning that would enable the section to achieve a result that is compatible with the Convention, which is a result that not otherwise be achievable. The fact that it could then be argued that section 139 is otiose, which would otherwise be difficult to accept, does not present nearly so much difficulty if it is part of the cost of complying with section 3. Equally, it seems to me that the current pressures exerted by section 3 should outweigh the relatively historic factor of the legislative ancestry of the section.

[132] Even if that is not right, I would reach the same conclusion in relation to section 141(2). It is possible to read "such rent [or] covenant" as being a reference merely to the "rent reserved by a lease, and… every covenant… therein contained" in section 141(1), which would

present Milton Gate's case with no difficulty. It is also possible to read the words "entitled, subject to the term, to the income… of the land…" as being a reference to the landlord's interest after the head tenancy has been surrendered, on the basis that the words "subject to the term" mean "in the absence of the subtenancy". On that analysis, section 141(3) has a similar result.

[133] It is right to add this. On the basis of essentially the same reasoning, it appears to me that the subtenant can enforce against the landlord the lessor's covenants in the subtenancy where the head tenancy has been determined by a notice, on the proper construction of section 142, when construed in accordance with the requirements of section 3.

[134] In these circumstances, I am persuaded that, in the light of the provisions of section 3 and the decision in *Stretch*, the 1925 Act could, in this case, be construed, if possible, in such a way as to enable the covenants in a subtenancy to be enforceable as between head landlord and subtenant, in the event of the head tenancy being determined by a notice, and that this result can be achieved through the medium of a modern and purposive construction of section 141. That, then, brings me to the fourth issue, namely whether this causes me to revise my conclusion that the underleases did not survive the determination of the headlease as a result of the notice served pursuant to clause 5(6).

[135] In my view, the above discussion and conclusion do not justify a different result, and notwithstanding the impact of the Convention and the 1998 Act, I am of the view that the underleases did not survive determination of the headlease as a result of the notice served pursuant to clause 5(6).

[136] In the first place, it appears to me that the fact that the covenants therein would have been unenforceable if the underleases had survived the determination of the headlease was only a supporting factor, albeit quite an important supporting factor, for the conclusion I have reached. That conclusion was primarily based upon the nature of legal estates and well-established common law principle, and, indeed, the desire to maintain "the orderly development of the common law".

[137] Second, it seems to me that my conclusion as to the effect of section 3 by no means destroys any value that the argument based upon *Webb* affords to BT's case. It is clear from the provisions of clause 5(6) that CLRP and PW intended, indeed agreed, that the underleases would survive the determination of the headlease pursuant to clause 5(6). However, as at the date of the grant of the headlease, and, indeed, as at the date of the underleases, there would have been no question of the 1925 Act being construed by reference to the approach required by section 3. Accordingly, it remains the case that the terms of clause 5(6) (and the underleases) were agreed at a time when, in the light of the legislation then in force, the legislature appears to have assumed that a subtenancy would not survive the determination of the head tenancy pursuant to a break notice.

*Treating clause 5(6) as a surrender provision*

[138] On the basis that CLRP and PW could not, or did not, contract out of the general principle that a break notice served by a head tenant determined any subtenancy, PW and Milton Gate contend that the headlease should be treated as determined by surrender, rather than determined by a notice to break on 24 June 2002, with the result that the underleases continued, notwithstanding the determination of the headlease. In my view, both limbs of that argument should be rejected.

*Can clause 5(6) be treated as a surrender provision?*

[139] So far as the first limb of the argument is concerned, I accept that the law, particularly since equity prevails over the common law, is concerned with substance rather than with form. The law on this topic was discussed and applied in characteristically authoritative fashion by Wilberforce J in *Re Stirrup's Contract* [1961] 1 WLR 449, at pp452-453. At p453, he quoted Lord Mansfield CJ in *Goodtitle d Edwards v Bailey* (1777) 2 Cowp 597, at p600 as saying:

The rules laid down in respect of the construction of deeds are founded in law, reason, and common sense: That they shall operate according to the intention of the parties, if by law they may: And if they cannot operate in one form, they shall operate in that, which by law will effectuate the intention.

[140] Wilberforce J then immediately went on to apply that approach to the case in front of him:

[A]s a matter of general approach, once the court is satisfied that the intention of a document is to pass the legal estate… it should not allow that intention to be defeated by the fact that instead of the word "grant" or "conveyance", the word "assent" is used.

[141] The words of Lord Mansfield are salutary, and I would not wish to derogate from them in any way; on the contrary. However, it would scarcely be consistent with what Lord Millett called "the orderly development of the common law" in *Barrett*, at p274G, if those words were interpreted so widely as to enable the court, as a matter of construction, to produce the result that it believes that the parties to the contract wanted, by rewriting the contract, characterising the nature of the contract as being different from what it is, provided only that that would not infringe public policy or statute.

[142] To construe a document, which on its face, plainly intends to effect a transfer of a property, as conveying the property notwithstanding the fact that the parties have not used the appropriate language of "conveyance" or "grant", but instead have used the word "assent", is a long way away from the characterisation of the effect of the service of a notice pursuant to a break clause in a lease as effecting a surrender of the lease. Indeed, it appears to me that the proper characterisation of the relationship between the parties, or the effect of an act permitted by contract, is ultimately a question of law, although the intention of the parties (particularly if expressed in the document concerned) may be a significant factor in some cases. As Mr Dowding said, that proposition is familiarly demonstrated in the landlord and tenant field by the decision of the House of Lords in *Street v Mountford* [1985] AC 809\*. In that case, because the agreement in question involved the grantor giving exclusive possession to the grantee in return for a periodic payment, the arrangement created a tenancy notwithstanding the fact that it was plain from its terms that the parties intended it to create a licence.

[143] In the present case, clause 5(6) permitted PW to determine the headlease on 24 June 2002 simply by serving a notice of requisite length, and nothing more was required to put an end to the term. To my mind, if the parties had characterised that arrangement as a surrender, they would have been attempting to achieve that which Lord Templeman said in *Street* they could not effectively do. As he graphically observed, the parties can no more turn an agreement, which in law creates a tenancy, into a licence by calling it a licence, than they can turn a five-pronged digging instrument, which as a matter of concept and language is a fork (albeit with a supernumerary tine), into a spade by calling it a spade. Clause 5(6) in the instant case is a provision that entitles the tenant thereunder to determine it simply by service of a notice: that is, determination by notice, and not determination by surrender. A surrender, as a matter of law, involves some subsequent consensual act, such as execution of a deed of surrender or handing over and acceptance of the key, before the transaction is completed. The fact that there can be a unilateral aspect to surrender, in the sense that the landlord – or indeed the tenant – can contractually commit itself in advance to execute a deed of surrender, does not call that point into question, in my view.

*What if clause 5(6) were a surrender provision?*

[144] Even if the determination of the headlease on 24 June 2002 could be characterised or treated as a determination by surrender, rather than a determination by notice, I tend to the view that it would not have resulted in the underleases continuing if they would not have continued were the determination pursuant to a break notice. It appears to me that the contrary view proceeds on the assumption that a subtenancy will survive the surrender of the head tenancy even where the surrender of the head tenancy is effected pursuant to a unilateral right to require a surrender contained therein. In my judgment, that assumption is incorrect, and, indeed, is inconsistent with the reasoning of Lord Millett in *Barrett*.

* Editor's note: Also reported at [1985] 1 EGLR 128; (1985) 274 EG 821

[145] The distinction that Lord Millett drew was between two categories of case, namely a unilateral right to determine the head tenancy, contained in the head tenancy itself, and a bilateral agreement to determine the head tenancy entered into after it had been granted: see the passages cited above from his speech. In the present case, characterising clause 5(6) as giving rise to a surrender would not alter the fact that it is a provision in the head tenancy, permitting the head tenant unilaterally to determine it, albeit by surrender. It seems to me that such a recharacterisation of clause 5(6) would not alter the fact that determination of the headlease pursuant to its terms would fall into Lord Millett's first category, rather than into his second category.

[146] However, it is right to acknowledge that if clause 5(6) could be characterised as giving effect to a surrender of the headlease, it would dispose of one of the reasons that I have identified (subject to the effect of the 1998 Act) as to why the notice should not have put an end to the underleases. The reason in question is, of course, that if the underleases survived the determination of the headlease, Milton Gate, although bound by the underleases, could not enforce any of the covenants therein. If, however, clause 5(6) can be interpreted as effecting a surrender, this particular problem is avoided, because section 139 would apply. None the less, the fact that that problem would be avoided, if clause 5(6) can be interpreted as a surrender provision, does not seem to me to justify disapplying the general principle that, in my view, is to be extracted from the reasoning in *Barrett*, as discussed above.

[147] In these circumstances, I am of the view that although CLRP and PW purported to agree to disapply the general rule (that a subtenancy could not survive the unilateral determination of the head tenancy in accordance with its terms), it is not possible to contract out of this general rule, and, accordingly, the underleases all determined on 24 June 2002, when the notice took effect. This conclusion is, however, subject to two qualifications. The first is that the determination of the underleases in accordance with the general rule does not alter the fact that the BT underleases could continue pursuant to the provisions of the 1954 Act because BT was in occupation of the lower floors on 24 June 2002. Second, this conclusion is subject to the effect of the argument based upon estoppel, to which I now turn.

*Estoppel by deed*

[148] The principle of estoppel by deed is explained in summary form in para 1018 of *Halsbury's Laws of England* (4th ed) vol 16(1), in the following terms:

Estoppel by deed is based on the principle that, when a person has entered into a solemn engagement by deed as to certain facts, he will not be permitted to deny any matter which he has so asserted… The averment relied upon to work an estoppel must be "certain to every intent" without any ambiguity, but may be contained in the recital or any part of the deed.

[149] Estoppel by deed differs from estoppel by convention, not only by virtue of the relatively restricted circumstances in which it can arise (as described in the passage that I have just quoted) but also in that it requires no subsequent conduct or any other act of reliance by the party invoking the estoppel (the claimant).

[150] In my view, the only provision in the present case upon which an estoppel by deed could even be arguably raised is clause 5(6) itself, which is also to be treated as included in the recital to each of the licences by virtue of section 58 of the 1925 Act, in the light of the fact that each licence is described as being "supplemental to" the headlease. I do not consider that any estoppel by deed could arise from the fact that, in each licence, the underlease thereby permitted is confirmed to be a permitted underlease. First, as I have mentioned, clause 3(25) of the headlease requires every underletting both to be licensed by the landlord and to be by way of a permitted underlease. Therefore, the confirmation in the licence could be said to take matters no further. Second, even if that were wrong, the furthest any reliance upon such confirmation in each licence gets is to suggest by implication that the subtenancy will survive the determination of the headlease pursuant to clause 5(6). However, an estoppel by deed cannot arise by implication: see para 1020 of *Halsbury* op cit.

[151] For the same two reasons, I do not consider that the provision in each underlease, to the effect that the service charge sinking fund provisions will apply only as from 18 June 2002 can give rise to an estoppel by deed. First, as I have mentioned, it is justifiable on the basis that the underleases could well be expected to continue under the provisions of the 1954 Act. Second, in any event, the argument that the sinking fund provision indicates that the parties expected the underleases to survive the expiry of the headlease pursuant to clause 5(6), is based upon an implication.

[152] I turn, then, to consider whether an estoppel by deed could have arisen as a result of the provisions of clause 5(6) itself. I do not consider that it could. In *Greer* v *Kettle* [1938] AC 156, Lord Maugham said, at p170, after referring to the fact that the court had decided that an estoppel by deed can arise from a recital in a deed:

Subsequent cases laid down that the recital must relate to specific facts, must be certain, clear and unambiguous, and would not avail persons who were not parties or privies to the deed.

In this connection, see also *Onward Building Society* v *Smithson* [1893] 1 Ch 1, at p14, and *Re Distributors*, at p93.

[153] In the present case, far from being a clear and unambiguous express statement as to present fact, clause 5(6) appears to me to encapsulate an agreement as to what may arise in the future as a matter of law: I use the word "may", because the event is dependent upon a notice being served under clause 5(6) and upon there being extant permitted underleases at the date such notice takes effect. I do not think that that can found an estoppel by deed. I believe that this conclusion is also consistent with a passage at the end of the judgment of Park J in *CP Holdings Ltd* v *Dugdale* unreported 22 May 1998 to the following effect:

X and Y enter into an agreement: "Whereas we believe that the effect of the new agreement will be MNO, we now agree as follows." X later wants to argue that the effect of the new agreement on its true construction is not MNO, but is PQR instead. He is not estopped from doing so. He may have an uphill struggle in his arguments on construction, but he is not estopped from putting them forward. In a case like that it is rectification or nothing.

[154] It was argued by Mr Hodge that this view is inconsistent with the decision of the Court of Appeal in *Poulton* v *Moore* [1915] 1 KB 400 where, by a majority, the Court of Appeal concluded that a recital in a deed was sufficiently precise to estop a party from asserting that a right of way had not been released. It is clear that that was regarded as a statement as to present fact: see *per* Buckley LJ at p412, where he referred to the relevant provision as being "a recital that the state of facts exists at the moment" (in a passage with which Phillimore LJ agreed, at p415). However, the fact that Pickford LJ, at p416, was "not satisfied that the statement in this recital is so precise as to operate as an estoppel", indicates just how strictly the court approaches an estoppel by deed, given that the relevant words in the recital in that case were that the predecessor of the person estopped "is entitled" to a right of way.

[155] It may, at least at first sight, seem out of keeping with the modern, relatively flexible view of estoppel that such a strict approach should be adopted to any type of estoppel. However, as I have mentioned, unlike most other estoppels, an estoppel by deed will, if its strict conditions have been satisfied, normally operate as an estoppel without more – see *per* Lord Mansfield CJ in *Goodtitle* – at pp600-601. Estoppel by deed is described in para 1018 of *Halsbury* op cit as "a rule of evidence", and there is therefore normally no question of considering the issue of unconscionability, that looms so large in relation to other estoppels, including estoppel by convention.

[156] In those circumstances, it is not hard to understand why the court should tend to limit the ambit of estoppel by deed. After all, if a provision in a deed, such as clause 5(6) in this case, is insufficient to found an estoppel by deed, but is sufficient to indicate a common understanding or common assumption, then, if there is subsequent conduct based upon that understanding, such that it would be

A unconscionable for one party to resile from the common understanding, estoppel by convention would frequently come into play.

*Estoppel by convention: Existence of a convention*

[157] In *Spencer Bower and Turner on Estoppel by Representation* (3rd ed) at p157, estoppel by convention is described in these terms:

This form of estoppel is founded, not on a representation of fact made by a representor and believed by a representee, but on an agreed statement of the facts the truth of which has been assumed, by the convention of the parties, as the basis of a transaction into which they are about to enter. When the parties have acted in their transaction upon the agreed assumption that a given state of facts is to be accepted between them as true, then as regards that transaction each will be estopped against the other from questioning the truth of the statement of facts so assumed.

[158] In *Amalgamated Investment & Property Co Ltd (in liquidation) v Texas Commerce International Bank Ltd* [1982] QB 84, Lord Denning MR put it thus, at p122C-D:

When the parties to a transaction proceed on the basis of an underlying assumption – either of fact or of law – whether due to misrepresentation or mistake makes no difference – on which they have conducted the dealings between them – neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.

[159] The circumstances in which an estoppel by convention can arise have been considered in a number of cases. Given its relatively flexible nature, it is perhaps inevitable that one can detect differing approaches in various judgments. In some cases, such as *Amalgamated Investment*, the court has sought to lay down and apply general principles; in other cases, such as *Keen v Holland* [1984] 1 WLR 251\*, the court has identified limits to the general principles; in yet other cases, such as *Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord)* [1988] 2 Lloyd's Rep 343, the court has extended the principles; there are also cases, such as *Johnson v Gore Wood & Co (No 1)* [2002] 2 AC 1, in which authoritative, if somewhat generalised, doubts about the extent of the principle have been expressed; finally, there are cases, such as *John v George* (1996) 71 P&CR 375†, where the principle has been expressed virtually as being one of unconscionability, almost no more and no less.

[160] It is convenient to start by considering whether a convention, by which I mean a convention sufficient in principle to found an estoppel, has been established between PW and its landlord under the headlease (that is, the landlord) up to the time that Milton Gate acquired the freehold reversion. I shall then consider whether BT was also bound by this convention on taking the underleases. Next, I shall deal with Milton Gate's position on acquiring the reversion to the headlease.

[161] Milton Gate and PW contend that a convention arose between them by virtue of the fact that:

(i) CLRP and PW entered into the headlease on the common understanding that the general rule would not apply, at least in relation to permitted underleases, in the event of the headlease being determined under clause 5(6); and

(ii) the licences were entered into and the underleases granted after the grant of the headlease, and that they were based u[p]on the common misunderstanding of PW and the landlord that the general rule would not apply.

*Was there a convention between the landlord and PW as a result of the headlease?*

[162] I accept that it is clear from the terms of clause 5(6) itself (supported by the correspondence between, and evidence as to the then state of mind of the parties and their advisers) that CLRP and PW both believed that the general rule would not apply and that clause 5(6) was negotiated and agreed on this basis. However, I do not consider that that is capable, upon the basis of the law as it stands, of founding a convention that could give rise to an estoppel.

[163] I reach this conclusion because of the reasoning of the Court of Appeal in a judgment delivered by Oliver LJ in *Keen*. The issue in that case arose from the curiosity that although a tenancy of an agricultural holding of a periodic nature, or of a fixed term for one year or more than two years, is afforded statutory protection, a tenancy for a fixed term of between one year and two years is not afforded such protection. In that case, it was clear from the negotiations between the parties that the landlord was prepared to grant a term of only between one and two years, and that the parties therefore intended that the term be for such a period. However, they made a mistake in believing that the term granted ran from the date from which it was expressed to run, rather than from the date of the tenancy. When the tenant claimed the protection of the agricultural holdings legislation, the landlord contended that the tenant was estopped from relying upon such an argument.

[164] The first ground upon which the Court of Appeal dismissed the estoppel argument was that it was impossible for parties to estop themselves out of a statute such as the Agricultural Holdings Act 1948. However, Oliver LJ continued, at pp261F-262A:

That is sufficient to dispose of the argument but there seems to us to be other insuperable obstacles to a successful plea of estoppel. This is not strictly a case of the parties, having established by their construction of their agreement or by the apprehension of its legal effect, a conventional basis upon which they have regulated their subsequent dealings… The dealing alleged to give rise to the estoppel is the entry into the agreement itself in the belief that it would produce a particular legal result. In fact, for reasons which have nothing to do with the defendant, the plaintiffs got it wrong: and what [counsel] appears to us to be contending for is a much wider conventional estoppel than has yet been established by any authority, namely, that where parties are shown to have had a common view about the legal effect of a contract into which they have entered and it is established that one of them would not to the other's knowledge have entered into it if he had appreciated its true legal effect, they are, without more, estopped from asserting that the effect is otherwise than they originally supposed.

So broad a proposition cannot be deduced from the actual decision in the *Amalgamated Investment* case and although it may be supported on the basis of the very wide proposition of Lord Denning MR… it cannot, in our judgment, be right.

[165] Unless that passage does not represent the law, it seems to me that it must dispose of the first way in which the estoppel by convention argument is run by Milton Gate and PW. Mr Hodge's suggestion that the words "without more" indicate that a convention could be established in the circumstances described by Oliver LJ, provided that the essential additional element of unconscionability could also be established, does not appear to me to accord naturally with the meaning of the words in that context. In my opinion, Oliver LJ was indicating that some course of dealing after the contract in question had been entered into was necessary. That conclusion is supported by the fact that the judge below had expressly dealt with the question of unconscionability, and it seems to me that if by "without more" the Court of Appeal had had in mind unconscionability, it would have dealt with the Judge's finding on that issue.

[166] It is true that passages in two subsequent Court of Appeal judgments, namely in *The Vistafjord* and in *John*, support the view that estoppel by convention has a wide and flexible doctrine, and there is nothing in the way in which some of the observations are expressed that appears to exclude in terms a convention arising before the contract in question was entered into. However, to construe any of those observations as being inconsistent with, let alone overruling, what was said by the Court of Appeal in *Keen*, appears to me to be illegitimate. In neither of the two later cases was there any question of the estoppel being based upon a convention that had arisen from the negotiations for the contract in question or as a result of the terms of the contract in question. Accordingly, the point with which I am now concerned was simply not in issue.

---

\* Editor's note: Also reported at [1984] 1 EGLR 9; (1983) 269 EG 1043
† Editor's note: Also reported at [1996] 1 EGLR 7; [1996] 08 EG 140, CA

\* Editor's note: Also reported at [2003] 2 EGLR 63; [2003] 23 EG 136

**A**

[167] In any event, the principle articulated in the judgment of Oliver LJ in *Keen*, as I understand it, has been accepted and adopted in at least three first instance decisions. They are *Hamed el Chiaty & Co (t/a Travco Nile Cruise Lines) v Thomas Cook Group Ltd (The Nile Rhapsody)* [1992] 2 Lloyd's Rep 399, *per* Hirst J, at pp407-408, *Wilson v Truelove* [2003] EWHC 750 (Ch); [2003] All ER(D) 302* *per* Mr Simon Berry QC in [22] and [23], and *CP Holdings per* Park J in the passage quoted above.

[168] Mr Hodge suggested that, in that passage, Park J was concerned with the meaning of what the parties had agreed, rather than the effect of what they had agreed. I do not consider that such

**B**

a very fine, almost teleological, distinction justifies a different result. First, if one goes back to the facts of *Keen*, it was a case concerned with effect rather than meaning. Second, it is now well established that rectification, referred to by Park J in *CP Holdings*, is available where the mistake sought to be rectified relates to effect and not merely where it relates to meaning.

[169] I also consider that it would be wrong to extend too readily the circumstances in which estoppel by convention can apply, in the light of the concerns expressed by Lord Goff, at pp39D-40H (and, arguably, by Lord Millett, at p61A-B) in *Johnson*. It is right to add that the other members of the House of Lords in that case were prepared to

**C**

accept "the correctness in principle of Lord Denning MR's statement in *Amalgamated Investment* as referred to, and quoted by Lord Bingham, at p33C-F.

*Was there a convention as a result of the underleases and licences?*

[170] I turn, then, to the second basis upon which the convention is said to arise. In this connection, PW contends that, during 1994 and 1995, it granted each of the seven underleases and entered into each of the licences in the belief that each of the underleases would survive the determination of the headlease, and that the landlord shared this belief. On behalf of PW, Mr Reynolds contended, with the support of Mr Hodge, for Milton Gate, that this was sufficient

**D**

to create a convention, which could give rise to an estoppel that would prevent Milton Gate and PW, as between each other, from asserting that the underleases could not survive the determination of the headlease pursuant to clause 5(6).

[171] For BT, Mr Dowding first argued that because the mistake in question was one of general law, it could not found a convention that gives rise to an estoppel. It seems to me clear that an estoppel by convention can be founded on a mistake of law. That is most clearly established in terms by the judgment of Peter Gibson J in *Hamel-Smith v Pycroft & Jetsave Ltd* unreported 5 February 1987, in a passage cited

**E**

with warm approval by Bingham LJ in *The Vistafjord*, at pp351-352. Peter Gibson J suggested that the passage I have quoted from *Spencer Bower* is "better understood as [an] illustration... of estoppel by convention rather than a definition of that category of estoppel". He gave three reasons (which I do not think were intended to be exhaustive) as to why the statement was unsatisfactory as a general principle, the first of which was:

The agreed assumption need not be of fact, but may be of law. That is exemplified by the *Amalgamated* case itself, the assumption there being as to the effect [in] law of a guarantee.

[172] I do not see the reasoning of the Court of Appeal in the passage

**F**

in *Keen* quoted above as being inconsistent with this view. The fact that the mistake in that case was one of law does not appear to me to have been a problem for the person alleging the estoppel. That point is perhaps best illustrated by the reference early on in the passage I have quoted from the judgment of Oliver LJ to "their apprehension of its legal effect".

[173] Mr Dowding suggested that there might be a difference between a case such as the present, where the misunderstanding related to a general legal principle and could not be characterised in any sensible way as a mistake of fact, and a case such as *Amalgamated* or *The Vistafjord*, where the mistake, although it could be characterised as one of law, could also be characterised as a mistake of fact, in the sense that the parties were under a common misapprehension as to the

**G**

effect of their agreement. There is a distinction between a mistake as to the general law or a legal principle, such as whether a subtenancy can survive the determination of a head tenancy, and the mistake as to the effect of a particular agreement, such as a mistake as to the type of undertenancy to which a provision in a tenancy applies. However, it does not appear to me that there is any good reason for concluding that the former type of misapprehension cannot in any circumstances give rise to an estoppel by convention, if the latter type of misapprehension can do so.

[174] Of course, in some cases of the former type, it may be impossible to give effect to the estoppel, either because it would

**H**

infringe public policy or statute to do so, or because it would be simply conceptually impossible to do so, whereas such a problem is much less likely to arise in the latter type of case. However, I can see no reason in principle or practice why a common misapprehension as to the general law cannot, in an appropriate case, found an estoppel by convention. That view is reinforced by the fact that some misapprehensions can be characterised, according to one's viewpoint, either as mistakes as to the general law or as mistakes as to the interpretation of private rights. The mistake in *Keen* provides a tolerably good example; the mistake there could be characterised as one of general law, namely a belief that the

**J**

term of a lease runs from the date from which it is expressed to run, rather, from the date of grant. It could also be described as a mistake as to private rights, namely the effect of the particular agreement into which the parties had entered. So, too, the mistake in this case.

[175] PW's case, in so far as it is based upon conduct subsequent to the execution of the headlease, is as follows. First, when entering into the headlease, and when entering into the subsequent underleases and licences, PW believed that the underleases would survive the determination of the headlease pursuant to a break notice, and that the proviso to clause 5(6) could apply so that the penalty would not be payable. Second, the landlord for the time being shared this belief. Third, on a fair reading of all the documents, namely the headlease,

**K**

the underleases, and the licences, that common understanding was effectively communicated between the parties. Fourth, to a reasonable person in the position of the landlord under the headlease, it was, or at least should have been, apparent that PW had entered into the underleases and the licences in the belief and expectation that the underleases would continue notwithstanding the determination of the headlease under clause 5(6). Fifth, PW would have acted differently had it not had the relevant belief and expectation.

[176] So far as the first step is concerned, it is clear on the evidence that, until Milton Gate suggested otherwise to PW in November 2000, PW plainly believed that the underleases would survive the determination of the headlease pursuant to a notice under clause 5(6).

**L**

As to the second step in the argument, it is clear that CLRP, and its successor, Allmanna, shared this belief and, between them, they were the landlord at the date of the grant of the headlease, and at the date of the grant of each of the underleases and the licences.

[177] I turn to the third step. It appears to me that this common understanding is clear from the headlease, entered into between PW and the landlord, the licences between PW and the landlord, and the underleases, whose terms were specifically approved by the landlord in the licences. The terms of clause 5(6) show, as I have stated, that CLRP and PW believed that, at least if it was a permitted underlease,

**M**

a subtenancy would survive the determination of the headlease by a notice, and that if any such subtenancies had more than five years to run as of 24 June 2002, and the total area occupied thereunder was more than 75% of the area of the premises, the penalty would not be payable.

[178] On a fair reading, it seems to me that the terms of the licences, particularly when read together with the underleases they permitted, demonstrate that this understanding continued to be held by PW and the landlord, and was impliedly communicated between them. First, there seems little point in the provision in each licence that the underlease thereby permitted would be a permitted underlease unless such an acknowledgement was to ensure that such underlease would survive the determination of the headlease pursuant to clause 5(6) thereof, and

A    therefore falls within the proviso to that clause. Mr Dowding contended that PW might have wanted the comfort of knowing that the landlord accepted that the underlease was lawful, given that PW could sublet only pursuant to a permitted underlease, but I think that is pretty fanciful. Given that the landlord was permitting the particular subtenancy by virtue of entering into the licence, it would have added nothing for the landlord to agree that the subtenancy was a permitted underlease unless it was for the purpose of confirming that the underlease was capable of falling within the proviso to clause 5(6).

[179] Each licence was described as being "supplemental to" the headlease, which, by virtue of section 58 of the Law of Property Act 1925
B    means that all the terms of the headlease, including clause 5(6), are treated as being set out in the recital to each licence. Accordingly, the provisions of clause 5(6) of the headlease, with all that they entailed, were treated as being set out in a notional recital to each of the licences.

[180] Further, there is the fact that each of the underleases was granted for a term that would extend well beyond that of the headlease, if determined pursuant to clause 5(6), unless the subtenant exercised its right to determine the underlease shortly before 24 June 2002. The fact that the underleases could not be determined by PW before their respective contractual term dates strongly suggests that PW
C    must have believed that the underleases would survive determination of the headlease under clause 5(6). Otherwise, PW would have been liable in damages to BT and MLEL, if it had served notice under clause 5(6), because that would have led to a premature determination of the underleases to the potential, and quite possibly very substantial, disadvantage of BT and MLEL. That such liability would arise on the basis of derogation from grant appears clearly from the speech of Lord Millett in *Barrett*, at p274C.

[181] I am of the view that the fourth step is also satisfied, essentially for the reasons discussed. The landlord and PW were parties to each of the licences. Confirmation from the landlord in the licences
D    that the underleases were permitted underleases could only have been required by PW because it might want to exercise its right to break under clause 5(6). The grant of underleases (which were attached in draft form to the icences) for terms going well beyond 24 June 2002 without any right in PW to break them would make commercial sense only if PW thought that they would survive such break.

[182] In this connection, I do not consider that this is a case such as *K Lokumal & Sons (London) Ltd v Lotte Shipping Co Pte Ltd (The August Leonhardt)* [1985] 2 Lloyd's Rep 28, where the Court of Appeal rejected a claim based upon estoppel by convention because there was no "mutually manifest conduct by the parties... based on a
E    common but mistaken assumption"; each party "acted – or failed to act – independently from the other on the basis of a mutual mistake which remained uncommunicated between them": *per* Kerr LJ giving the judgment of the Court of Appeal, at paras 34-35). In the passage in the judgment in *Hamel-Smith*, which Bingham LJ endorsed in *The Vistafjord*, at pp351-352, Peter Gibson J said:

What is important for an estoppel by convention is that there should have been a common assumption which has been acted upon. Further, such action need not follow immediately after the common assumption is made, nor be in the course of the same transaction between the parties.

F    Bingham LJ went on, at p353, to refer to unilateral conduct being sufficient to give rise to a convention, if it were conduct "of which the other party was fully cognisant".

[183] The fifth step is a little more difficult, in the sense that there is no statement in the evidence filed on behalf of PW to the effect that if PW had not believed that the underleases would survive the exercise of its right to break the headlease it would have acted differently in 1994 and 1995. The partner concerned with the grant of the underleases of PW, Mr Walter Clark (now retired), and the person involved on behalf of CLRP at the time, have provided witness statements. Mr Clark does not say that PW would not have granted underleases for terms that significantly extended beyond 24 June 2002, without some sort of protection for PW should it serve a notice under clause 5(6), if it had

G    appreciated that the underleases would be determined by the service of such a notice. Nor is there any suggestion that there would have been discussions between PW and CLRP to protect PW's position in relation to the underlessee, let alone the penalty, in the event of the true position having been appreciated.

[184] None the less, I am satisfied that, as a matter of commercial common sense, it is highly improbable that PW would have simply granted underleases extending well beyond 24 June 2002 if it had appreciated the general rule, at least unless it had decided not to exercise clause 5(6). The effect of the general rule would have been not only that the penalty of more than £5m would have been payable
H    to the landlord, but unquantifiable and potentially very substantial damages would have been payable to BT (and to MLEL) by way of damages for derogation from grant. It seems very likely, in the light of Mr Menzies's evidence, that PW was expecting to determine the headlease under clause 5(6) at the time the underleases were granted. Even though the evidence indicates that it was a tenant's market at the time, I believe that it is not much short of fanciful to think that PW would not have tried to take steps to insulate itself against any liability for damages if it had appreciated the true effect of exercising its right under clause 5(6) on any underlease.

[185] I accept that PW would have underlet the various floors of the
J    premises in 1994 and 1995 irrespective of their understanding of the effect of clause 5(6) of the headlease: the premises were surplus to PW's requirements, and were costing it a substantial amount of money in terms of rent, and would continue to do so until, at the earliest, 24 June 2002. The obvious course for PW was either to sublet or to assign. However, I consider it substantially more likely than not that PW would not have granted underleases for terms expiring beyond 24 June 2002 unless it had had some sort of protection from any claim by BT or MLEL for damages caused by the premature determination of each underlease as a result of the headlease being determined pursuant to clause 5(6). PW might have been able to obtain protection from such a claim by granting
K    subtenancies expiring on 24 June 2002, by expressly precluding such a claim in each underlease, or even (but much more speculatively) by obtaining an agreement from the landlord to grant new tenancies to BT or MLEL in the event of PW serving a notice. I accept that it is possible that the underlessees might not have accepted shorter underleases, and that PW might not have been able to obtain any protection against liability to the underlessees in the event of exercising its right under clause 5(6). However, on the balance of probabilities, and at the risk of being accused of making a commercial assessment without any expert evidence on the point, I think that it is not merely very likely that PW would have been able to act, and it would have acted differently had it
L    appreciated the true position, but that it is more likely than not that PW would have acted differently. More specifically, I believe that I am prepared to assume that PW would have negotiated a provision in the underleases exonerating it for a liability for damages if it exercised its right to break the headlease, especially bearing in mind that the underleases had the protection of the 1954 Act. However, in that event, I accept that PW would have had to accord the underlessees a quid pro quo, probably by way of a somewhat reduced rent.

[186] In these circumstances, I consider that there was a sufficient course of conduct after the grant of the headlease, a sufficient common understanding, a sufficient communication of that understanding, sufficient acts of reliance on the part of PW, known to the landlord, and
M    sufficient detriment. Accordingly, I conclude that PW has established that, by 1994/1995, there was a sufficient convention to maintain an estoppel by convention against Milton Gate.

*Were BT (and MLEL) bound by the convention?*

[187] On the basis that a convention arose between PW and the landlord under the headlease as a result of the licences and the underleases, Mr Hodge contended, on behalf of Milton Gate, that BT and MLEL were bound by the convention as a result of entering into the underleases and the licences. This argument is advanced on two bases. The first is that the convention that came into existence as between the landlord and PW, as landlord and tenant under the headlease, was of

A  such a nature as to bind persons holding derivative interests from either of those parties, and therefore it extended to BT and MLEL. Second, it is contended that BT and MLEL became bound by the convention in the light of the licences (to which they were parties) being expressly supplemental to the headlease — and, in particular, clause 5(6) — and the fact that each of the underleases was for a term that, subject to the subtenant's right to break, would extend beyond the determination of the headlease if a notice under clause 5(6) were served.

[188] The issue of whether a subtenant is bound by (and entitled to rely upon) a convention that has been established as between his immediate landlord and the head landlord, particularly when the

B  very act that gives rise to the convention is said to be the grant of the subtenancy itself (and associated licence), appears to be free of direct authority.

[189] In that connection, I refer to paras 1024 and 990 in vol 16(1) of Halsbury's Laws op cit. Paragraph 1024, which is concerned with estoppel by deed, states that such an estoppel extends to the parties to the deed and their "privies". For that expression, one is referred to para 990, which is concerned with the identity of "privies" to parties estopped by judgment, and the expression appears to extend to assigns. However, those passages are concerned with estoppel by deed or by

C  judgment, and do not deal, at least in clear terms, with a subtenant of one of the parties.

[190] In Brikom Investments Ltd v Carr [1979] QB 467*, Lord Denning MR expressed the view that an assignee of a tenant (or indeed of a landlord) could take the benefit of, and would be bound by, a promissory estoppel that had arisen between his predecessor and the landlord. At p484G, he cited Coke on Littleton op cit vol H p352a-b, to this effect:

[E]very estoppel ought to be reciprocal… privies in estate, as the feoffee, lessee &… shall be bound and take advantage of estoppels…

D  However, Roskill LJ, at pp489H-490A, expressed doubts about this view where the estoppel was of a promissory nature and Cumming-Bruce LJ agreed with him: see at p490A. None the less, all three members of the Court of Appeal agreed in the result, as the majority based their decision upon waiver.

[191] In Cuthbertson v Irving (1860) 6 H&N 135, it was accepted in the judgment of Wightman J, at p139, that where there is a lease by estoppel and the lessee assigns, the assignee would be estopped from denying the landlord's title, just as much as his assignor, the grantee of the lease, would have been estopped. The reasoning in Poulton was assumed, if not decided, that a successor in title of a person who is

E  estopped by deed is himself estopped by deed.

[192] In Hopgood v Brown [1955] 1 WLR 213, the Court of Appeal had no hesitation in holding that a successor in title would be bound by an estoppel between his predecessor in title and a neighbour as to the location of a boundary between their respective properties: see per Evershed MR at pp224-225, and at 229 and 231 per Jerkins LJ and Morris LJ respectively.

[193] In Valentine v Nash [2003] EWCA Civ 915 unreported 4 July 2003, a right of access was held to have arisen by estoppel (probably proprietary estoppel). At para 65, Chadwick LJ said that the estoppel bound "successors in title".

F  [194] None of these cases was concerned with the position of a subtenant, as opposed to an assignee. In London & North Western Railway Co v West (1867) LR 2 CP 553, that point did arise. West was a tenant by estoppel from Budd, who was in turn a tenant by estoppel of the company. It was held that West could not dispute the company's title, as he derived his rights from Budd, who was himself estopped from denying the company's title. The effect of the judgment of Willes J was that, because West could not deny Budd's title, and Budd could not deny the company's title, it must follow that West could not deny the company's title.

* Editor's note: Also reported at (1979) 251 EG 359

G  [195] Estoppel is a flexible doctrine, which depends in almost all cases upon unconscionability, and there are different species of estoppel, each of which has its own characteristics. Thus, an estoppel of the sort considered in West is very different from that considered in Brikom. It is easy to see why a subtenant would be more easily bound by the former type of estoppel — directly concerned with title — than with the latter type — based on an oral promise. In these circumstances, it might be dangerous to conclude that, as a matter of principle, any estoppel (or any convention) between landlord and tenant will be binding on, and enforceable by, a subtenant. However, I think that it is possible to draw some conclusions as to the normal position.

H  [196] The general thrust of the authorities to which I have referred tends to support the proposition that once an estoppel (perhaps other than estoppel by representation) is established as between a landlord and a tenant, it would normally bind their respective successors in title. As a matter of logic, the same conclusion must apply to a convention that, in due course, might give rise to such an estoppel. If that is correct, it appears to support the conclusion that a subtenant would also normally be bound, at least provided its subtenancy does not predate the coming into being of the convention. In my judgment, such an estoppel, and therefore such a convention, which unambiguously relates to the relationship of landlord and tenant, and can fairly work

J  only if it extends to the subtenant, will generally do so, particularly if the subtenant had prior notice of it. In such a case, unconscionability would normally, I would have thought, work in favour of the estoppel binding the subtenant rather than not.

[197] It would seem surprising if a subtenant of the tenant were in a stronger position than an assignee of the tenant: the former will have a shorter, more precarious, interest, and one more dependent upon the continued observance of the obligations of the tenant, than the latter. It would be odd if, in the case of an estoppel between a landlord and a tenant under a 999-year lease, an assignee of that 999-year term were

K  bound by the estoppel, but a subtenant for 998 years, or, indeed, for two years, were not so bound. Further, if the rights of the landlord under the convention were to predate the rights of the subtenant under the subtenancy, the observations of Lord Millett as to the "general and salutary principle of law" at p2711 in Barrett suggest that the landlord's rights under the convention should prevail over those of the subtenant under the subtenancy. At least in some cases; it would be more difficult where the subtenant had no reason to know of the facts giving rise to the convention until after it took the subtenancy.

[198] In this case, there is no problem in concluding that BT was bound by the convention even though the first four underleases they were granted could be said to have created the convention. First, the

L  convention was created by the first four underleases. granted to BT. It subsequently took the fifth, and (by assignment) the sixth and seventh underleases. Second, in any event, I consider that BT was "locked into" the convention when it took the first four underleases. The convention thereby established between landlord and tenant was one that was not merely intimately connected with both the landlord-tenant and the tenant-subtenant relationships. It was equally intimately connected with the landlord-subtenant relationship.

[199] The conclusion that BT became bound by the convention by taking the first four underleases might be said to appear somewhat inconsistent with the reasoning at the end of the judgment of the Court of Appeal in Keen. That is because it involves BT being bound by

M  a convention as a result of entering into the very transaction that is said to give rise to it. However, I consider that there is a very considerable difference between a convention arising purely as a result of two parties entering into an agreement on the basis of a common understanding, and a third party becoming bound by a convention that arose from an agreement that it entered into with other parties (one of whom can be said to be its privy), which were already contractually bound, and between whom there was already a common understanding.

[200] Another ground for justifying the inclusion of BT and MLEL in the convention between Milton Gate and PW is that the convention could not work properly, or fairly, between landlord and head tenant unless the subtenant was also bound by it. If Milton Gate was bound

*PW & Co v Milton Gate Investments Ltd*

by the convention as against PW, it would not be able to recover the penalty on the basis that the underleases were treated as continuing; it would scarcely be fair on Milton Gate, at least in the absence of further facts, if it could not treat the underleases as continuing as against BT. Equally, from PW's point of view, the convention would be of limited value only if, having granted the underleases with a view to escaping the penalty, it none the less found itself facing a substantial claim for damages by the underlessees on the ground that the underleases had been determined prematurely, in derogation from grant.

[201] There is no question of BT being unfairly prejudiced if it is treated as having become bound by the convention as a result of entering into the BT underleases and the associated licences. It entered into each underlease with knowledge of all the relevant information, namely the terms of clause 5(6), the fact that the licence stated that the underlease was a permitted underlease, and the fact that the duration of such underlease was, subject to BT's right to break, to extend well beyond the term of the headlease if determined in accordance with clause 5(6). It is also clear that BT entered into the BT underleases, and, indeed, the associated licences, in the belief that the underleases would continue even if the headlease was determined pursuant to clause 5(6). Quite apart from this, at the time of the grant of the underleases, and, indeed, even after service of the notice, BT wanted its underleases to continue until their respective expiry dates. No doubt, BT would have wished to enforce any convention, and it could do so only if it were bound by it.

*Did Milton Gate become party to the convention?*

[202] In these circumstances, it is necessary to consider whether the convention could be relied upon by PW as against Milton Gate and by Milton Gate against BT, at least before the events that have happened since the service of the notice. In the light of the authorities and principles that I have just been considering, one would expect Milton Gate to have become bound by, and entitled to enforce, the convention, as the successor in title to one of the parties to the convention.

[203] However, Mr Dowding contended that even if BT were bound by the convention as against PW and CLRP/Allmanna, Milton Gate never had the right to rely upon the convention as against BT. This contention is based upon the proposition that, from the moment that it acquired the reversion to the headlease, and, indeed, before that, Milton Gate never shared the common assumption that permitted underleases would survive the determination of the headlease pursuant to clause 5(6), and that the sharing of a common assumption is an essential ingredient of estoppel by convention.

[204] However, the existence of the convention had arisen and, owing to the grant of the underleases, its effect was, as it were, complete before Milton Gate acquired the reversion to the headlease. Further, as a successor in title, it seems to me that Milton Gate cannot be in a stronger position on this issue than CLRP or Allmanna, if they had remained the landlord under the headlease, but had been disabused of their misconception as to the effect of clause 5(6), in June 2000 (when, in fact, Milton Gate acquired the reversion). The convention arose as a result of the grant of the underleases and licences in 1994 and 1995, and the fact that the landlord under the headlease appreciated the true position in 2000 would plainly not be enough, of itself, to prevent PW from enforcing the estoppel against the landlord. Apart from anything else, it would have been necessary for the landlord to communicate the change in its understanding (again applying the reasoning in *The August Leonhardt*), but even that would not have been enough, on its own, to dispose of the convention.

[205] If, as I believe to be the case, the mere fact that the landlord no longer suffered from the common misconception after 19 June 2000, was of itself insufficient to prevent PW from enforcing the convention, I think it must follow that Milton Gate was equally entitled to enforce that convention. Estoppel is based upon equitable principles, and those principles include at least a presumption of mutuality. It seems to me that it cannot be right that a party is bound by a common entitlement to the benefit of a convention so long as it is ignorant of the law, but that it is no longer entitled to that benefit, but continues to be bound by the convention, simply upon appreciating the true legal position.

[206] There is nothing unfair about this conclusion so far as BT is concerned. On the contrary. As I have explained, so long as the convention applies, it is not merely that BT is bound by it: BT would also be entitled to enforce it. For BT to lose the right to enforce the convention because of a change of head landlord would seem unjust and contrary to the general principle that estoppels bind privies of the original parties.

*Estoppel by convention: the existence of an estoppel*
*Position as between Milton Gate and BT*

[207] On 6 October 2000, when the notice was served, the position was that, as a matter of strict law, it would have had the effect of determining the underleases on 24 June 2002. However, by virtue of the existence of the convention to which I have referred, Milton Gate and BT were potentially estopped, as against each other, from so contending, and from asserting that the underleases would not continue until their respective contractual expiry dates. If such an estoppel took effect, I think it would follow that, subject to the estoppel being in some way discharged thereafter, Milton Gate would be entitled to enforce the lessee's covenants, and would be bound by the lessor's covenants, in the underleases. In that connection, quite apart from the effect of the 1998 Act, I see no warrant for extending the principle embodied in *Webb* to a case where a subtenancy becomes directly binding on a head landlord through estoppel. Equity is flexible and strong enough to ensure that any estoppel results in a sensible commercial outcome, which is not thwarted by archaic and technical rules of property law, unless those rules are based upon public policy, or are so fundamental as to be incapable of being overridden.

[208] The issue that has to be determined is whether the events subsequent to the service of the notice enable BT to escape the consequences of the convention as against Milton Gate, thereby enabling BT to contend that the underleases expired on 24 June 2002. Perhaps it is more correct to formulate the issue as being whether Milton Gate is entitled to rely upon the convention so as to give rise to an estoppel against BT in the light of those events.

[209] In this context, I consider that the centrally relevant question for the purpose of establishing an estoppel by convention in the present case is whether it would be unconscionable in all the circumstances for BT to go back on the common assumption, and to contend that the underleases were in fact determined by PW's exercise of its right to break the headlease under clause 5(6). Peter Gibson J made that point very clearly in *Hamel-Smith* in the passage quoted by Bingham LJ in *The Vistafjord*, at p352, where he said:

A third reason why the two sentences in Spencer Bower should not be taken as definitions is that they are not qualified, as I think they should be, by considerations of justice and equity. Even if parties had acted on a common mistake or assumption it does not follow that the estoppel will follow as of course… [T]he court is not so rigid and inflexible as to insist on the parties being held to an assumed and incorrect state of fact or law when there is no injustice in allowing a party to resile therefrom…

[210] In *John*, Morritt LJ clearly considered unconscionability a vital factor: see at pp384-385; Evans LJ agreed generally (at p391) and specifically on the issue of unconscionability (at the top of p393). At p396, Simon Brown LJ said:

[F]or estoppel by convention to apply there must be, first, an assumption (shared and communicated between the parties) underlying the transaction and, secondly, unfairness or injustice in allowing the party seeking to benefit to go back on that assumption.

[211] In *Johnson*, at p41B-C, Lord Goff said:

In the end, I am inclined to think that the many circumstances capable of giving rise to an estoppel cannot be accommodated within a single formula, and that it is unconscionability which provides the link between them.

[212] BT's case is that, as a result of the negotiations and discussions between BT and Milton Gate, there was a mutual resiling from the

A convention by April, or, at the latest, May, 2002. BT says that, in those circumstances, an estoppel by convention cannot be invoked, and, in particular, the convention could not be unilaterally revived against BT by Milton Gate, as it attempted on 4 and 5 July 2002. In my judgment, subject to one point, that contention is well founded.

[213] So far as the facts are concerned, I have already described them. Shortly after the service of the notice, namely from around April 2001, in its communications with BT, Milton Gate consistently and unequivocally contended that the underleases would determine on 24 June 2002; in other words, it was unambiguously seeking to resile from the convention. BT was unhappy about this, and was

B effectively seeking to maintain the convention, but it negotiated the overriding lease of the premises which, if granted, would have rendered the whole issue academic, at least as between BT and Milton Gate. However, in April 2002, BT pulled out of those negotiations, and, during April and May 2002, it made it clear to Milton Gate that BT was accepting, indeed (due to a change of plan on its part) relatively enthusiastically accepting, that the underleases would come to an end on 24 June 2002. There were then negotiations between BT and Milton Gate during May and June 2002, with a view to agreeing a basis upon which BT would remain in the premises until some time in 2003, when it would vacate.

C [214] In my view, subject to the effect of the convention in this case being tripartite, there was a clear and common understanding between BT and Milton Gate that the convention would no longer apply between them. Milton Gate had sought to resile from it, and, albeit after a substantial delay, in April 2002 BT accepted that resiling. Thereafter, late in June or July 2002, the parties were negotiating on the basis of the true legal position, namely that (subject to the effect of the 1954 Act) the underleases would determine on 24 June 2002. Accordingly, subject to this being a tripartite convention, by the time that date arrived, the convention no longer existed as between Milton Gate and BT.

[215] I believe that this conclusion derives support from the decision
D of the Court of Appeal in *Gloyne* v *Richardson* [2001] EWCA Civ 716; [2001] 2 BCLC 669, where, at pp683-684, Laws LJ said:

> 40. The doctrine of estoppel by convention was explained by this court in… *The Vistafjord*… Bingham LJ said this at 352:
> "It is sufficient… to say that it [sc the doctrine of estoppel by convention] applies where (1) the parties have established by their construction of their agreement or their apprehension of its legal effect a conventional basis, (2) on that basis they have regulated their subsequent dealings, to which I would add (3) it will be unjust or unconscionable if one of the parties resiled from that, convention".
> 41. I accept without demur conditions (1) and (2) in this formulation are
E established on the facts of this case. My difficulty is with (3). At the very least, once [Mr Richardson] had resiled from the terms of the letter agreement by asserting a claim based upon option rights… it cannot be said that it was unconscionable for [Mr Gloyne] thereafter to depart from the "convention" constitutedly the letter agreement, and to stand on the original term 1 s of [the agreement of 25th July 1988]. In these circumstances, in my judgment there is no estoppel by convention…

Blackburne J and Aldous LJ, in [55] and [65] respectively, agreed.

[216] There is, however, a problem with applying the reasoning in *Gloyne* without modification to the present case. In *Gloyne*, as in most cases where estoppel by convention is alleged, there were two
F parties to the convention, and, accordingly, it was open to one party to resile from the convention once the other party had done so. There could normally be no reason why such a bilateral resiling could lead to an unconscionable result. However, in the present case, Mr Hodge and Mr Reynolds contended that it would be unconscionable to conclude that, as between Milton Gate and BT, there had been an effective resiling from the convention because of the consequences as between PW and Milton Gate. Otherwise, either Milton Gate would have the disadvantage of the strict legal position as against BT and the disadvantage of the convention as against PW, or PW would lose the benefit of the convention through no fault of its own. The first possibility would arise if the proviso were treated as being satisfied against Milton Gate in favour of PW on the basis of estoppel by convention, although

G it is not satisfied as a matter of strict law, and BT could rely as against Milton Gate upon the strict legal position. The second possibility would arise if, as a result of the mutual resiling between Milton Gate and BT, in which PW played no part, Milton Gate lost the ability to insist on the continuation of the underleases and therefore became entitled to claim the penalty from PW.

[217] Mr Hodge said that it is clear from the way in which Laws LJ expressed himself in *Gloyne* that a mutual resiling from a convention does not dispose of any estoppel simply on the basis of an agreement between the parties. It is more that such a mutual resiling will thereafter no longer normally render it unconscionable for either party to rely
H upon the strict legal position. That appears to me to be correct.

[218] Where the convention involves only two parties, and they communicate a desire or intention to resile from it, then, at least in the absence of unusual circumstances, there would be no justification for permitting either party to revert to the convention against the wish of the other party. However, where there is mutual communication of a desire or an intention to resile between two of three parties bound by a convention, that might be insufficient to prevent one of those parties from unilaterally reverting to the convention as against the other party, because the third party would in no way be involved in resiling, and
J would be entitled to insist upon the convention.

[219] In these circumstances, it is right to turn to the question of estoppel by convention as between Milton Gate and PW and, having come to a view in relation to that, to reach a final conclusion with regard to the argument based upon estoppel by convention as between all three parties.

*Position as between Milton Gate and PW*

[220] I turn then to the question of whether PW can avoid having to pay the penalty to Milton Gate (ignoring for the moment that BT was
K party to the convention). If the underleases are due to continue until their respective contractual expiry dates as a result of the convention, then there can be no doubt but that Milton Gate is not entitled to the penalty. If the underleases determined on 24 June 2002, there is equally no doubt that, in the light of the applicability of the general rule, PW would be liable to pay the penalty to Milton Gate, at least as a matter of strict law.

[221] There was a convention as between PW and Milton Gate, and, unlike the position as between Milton Gate and BT, there was no question of any mutual resiling from the convention. Throughout 2001 and into July 2002, Milton Gate was effectively trying to resile from any convention by contending that the underleases would determine
L in June 2002, but PW was insisting that the convention subsisted and gave rise to an estoppel. In those circumstances, it appears to me that the question that needs to be considered, reverting to the formulation of Bingham LJ (quoting from Peter Gibson J) in *The Vistafjord*, as quoted by Laws LJ in *Gloyne*, is whether it would be unconscionable for Milton Gate to insist upon its strict legal right to recover the penalty from PW.

[222] In almost all cases, such unconscionability must be based upon the prejudice that would be caused to the claimant if the strict legal position applied. As I see it, the claimant must also establish that that prejudice arises from its reliance upon the convention. In other words, the court generally must be satisfied that: (a) the claimant will
M suffer real prejudice; and (b) the prejudice arises from its reliance upon the convention. It should be emphasised that even if the claimant satisfies these criteria, there may still be no estoppel because there may be other, more powerful, factors pointing the other way.

[223] In the present case, it appears that the prejudice that PW might allege as a result of having granted the underleases is, first, liability for the penalty to Milton Gate, and, second, liability to BT for damages based upon derogation from grant owing to the premature determination of its underleases. However, on analysis, it seems to me that, in this connection, neither of these two liabilities can properly found a contention that it would be unconscionable if Milton Gate were permitted to resile from the convention.

**A** [224] So far as the liability for the penalty is concerned, it arises from the terms of clause 5(6) itself, and the service of the notice in October 2002. It does not arise from the grant of the underleases. Further, there is no evidence to show that, in 1994 or 1995, PW could or would have entered into arrangements (for example, involving CLRP and/or Allmanna) that would have enabled the proviso to clause 5(6) to be satisfied. I accept that some sort of put and call arrangement could have been arranged between the landlord and the underlessees, but that is far too speculative, hypothetical, and unusual an arrangement upon which to base any estoppel. For PW to allege estoppel by convention **B** against Milton Gate on the basis of a very unusual arrangement with third parties that Milton Gate's predecessors might have entered into, but were under no obligation to enter into and were not even asked to enter into, and of which PW might well have been asked to pay, possibly substantially, seems quite inappropriate, particularly where that arrangement would have been designed to deprive Milton Gate's predecessors of a potential substantial benefit, namely the penalty. Indeed, no argument to that effect has, as I understand it, been raised. In these circumstances, in my judgment, PW's liability to pay the penalty cannot be relied upon to support an estoppel based upon the convention arising out of the grant of the underleases.

[225] PW's reliance upon its potential liability to BT for derogation **C** from grant, arising from premature determination of the underleases, looks much stronger. Such a potential liability to BT was a very real and substantial risk as at October 2000, when the notice was served, because BT was anxious to remain in occupation of the premises. However, on closer examination, I am not convinced that it assists PW. As I have mentioned, I do not consider that the mere fact that PW granted subtenancies can be said to give rise to any estoppel. By 1994, the premises were plainly surplus to PW's requirements, and, whatever its belief as to the effect of clause 5(6), it clearly would have granted subtenancies (albeit I suppose that it might have contemplated an assignment of the headlease, although there is nothing to suggest **D** that that was, or would have been, in its mind). However, the fact that the underleases were for terms going substantially beyond 2002 with no protection for PW if it exercised the break clause in the headlease, which give rise to the convention.

[226] On the other hand, by 24 June 2002, the date upon which the headlease came to an end by virtue of the notice, and the date upon which Milton Gate contends that its entitlement to the penalty from PW arose, there was no possibility of any such claim being raised by BT, and, indeed, as at today, there is no such possibility. The reason is that, albeit contrary to its position up to that time, in April 2002 BT no longer **E** wished to retain the underleases, and was only too pleased to go along with Milton Gate's contention that those underleases would expire on 24 June 2002, albeit subject to continuation (in the case of the BT underleases) under the 1954 Act. Even if BT now wished to change its mind, I do not consider that it could sue PW for derogation from grant. The effective reason why the underleases would have determined on 24 June 2002 would have been BT voluntarily joining Milton Gate in resiling from the convention. (This could be alternatively characterised as a failure to mitigate on the part of BT.)

[227] Accordingly, in my view, unless some other aspect of unconscionability or some other legal principle be identified by PW, its defence to the claim for the penalty should fail, subject to its **F** being entitled to insist on the convention applying as between BT and Milton Gate. I turn to consider whether there is any other ground of unconscionability that PW could raise against Milton Gate.

[228] The only actions of PW that could be linked to the convention are the entering into the licences and the underleases and the service of the notice. Other than the duration of the underleases, it is not suggested that any of the terms of the licences or the underleases that were influenced by PW's belief as to the effect of the exercise of the right to break the headlease under clause 5(6) on any permitted underlease could be relied upon to support an estoppel. The sinking fund provisions in the underleases take matters no further in this connection. The existence and terms of the break clauses in the underleases were plainly influenced by the existence and terms of clause 5(6). However,

in the first place, those break clauses were never operated, and, second, **G** if they had been operated, it would have been to the benefit of PW, because of the penalty provisions.

[229] There is no evidence that the rent charged under the underleases was any less than it would have been had PW not been under a misconception as to the effect of the exercise of the provisions of clause 5(6). Indeed, commercial common sense, and the implication in the evidence of Mr Clark, suggest the contrary. If anything, the rents under the underleases were higher than they would have otherwise been because BT and MLEL believed that they had the benefit of guaranteed longer terms than was in fact the case.

[230] I turn, then, to the issue of whether PW can rely upn its service **H** of the notice in October 2000 to establish unconscionability. PW's case appears to be that it served the notice on the basis that it would not have to pay the penalty of just over £5m. (That would not be so if one or two of the underleases had been determined by BT or MLEL, but, in that case, PW would have been paid a penalty, albeit of a smaller amount.) That raises a difficult question, not least in the light of the relative dearth of relevant evidence from witnesses, the lack of any direct or expert evidence of the commercial realities, and the briefness of the argument on this issue.

[231] The operation of clause 5(6) with effect from 24 June 2002 **J** was the only opportunity available to PW to determine the headlease, for which it had no operational use, and which would otherwise run until 2015, at a very substantial rent of at least around £7m pa. As at the date of the service of the notice, the aggregate annual rents under the underleases appear to have been around £2m less than the rent under the headlease. (This is based upon Mr Menzies' evidence that the rent under the BT underleases was around £22.50 psf against £43.50 psf under the headlease.) However, by March 2001, when the reviewed rents under the BT underleases were agreed, the gap had become much smaller, at around £240,000 pa. Accordingly, PW was facing a substantial shortfall at the time it served the notice, but, given that it had until June 2001 **K** to serve the notice, PW could have waited until the reviewed rent was agreed with BT, and then would have appreciated that the shortfall was much less, albeit still significant, before deciding whether to serve the notice.

[232] However, PW might well have anticipated that the shortfall could widen over the remainder of the headlease; although it could also have narrowed, or even have turned into a surplus. Furthermore, PW would have been aware that over half of the premises, that is four of the seven floors, might well become vacant in 2007, when four of the five BT underleases were due to expire. Accordingly, at least with effect from around 2007, PW would have appreciated that it might have been **L** facing an increased shortfall, but, even then, there was no guarantee that there would have been any shortfall, and it is even possible that there could have been a surplus. Additionally, because the headlease contained a tenant's full repairing obligation, and the underleases contained service charges, PW would have been aware that, had it not determined the headlease, it would continue to suffer the cost and bother of management.

[233] The only witness statement that throws light on PW's thought processes and intentions leading up to, and at the time of, the service of the notice, is that of Mr Menzies, its estates manager. He made it clear that PW had always intended to serve the notice, since summer 2000 at the latest, but that takes matters little further, because that was plainly **M** at a time when PW believed that the underleases would survive the determination of the headlease.

[234] Mr Menzies said that Milton Gate's stance in early November 2000 caused him "considerable surprise" and that PW had "concern at the possibility of having to pay a large cost which had not been foreseen or budgeted for" and that the penalty "is not currently budgeted for as [PW] strongly believe[s that it is] not liable to pay [the Penalty]". However, he nowhere stated, or even hinted, that PW would, or even might, not have served the notice if it appreciated the true effect on the underleases of determining the headlease by the notice. Nor was there any suggestion of such a factor in the mind of PW in Mr Reynolds' skeleton argument.

A    [235] PW's primary argument is, I think, that, judging the matter at the date of the service of the notice, it must be likely that the notice would not have been served had PW been aware that the underleases would, or even would probably, determine on 20 June 2002. On that basis, the notice would give rise not merely to the liability for the penalty of over £5m but also to a potential substantial liability for damages to BT, which, at that time, was anxious to stay in the premises.

[236] PW would therefore argue that it is pretty clear that it would not have served the notice if it had not been proceeding, in effect, under the convention. In those circumstances, the consequences of the service of the notice must, runs the argument, at least as between Milton Gate

B    and PW, be governed by the convention.

[237] If it is wrong to judge the matter by reference to the date of service of the notice, PW must, I think, accept that any such argument is significantly weaker. As I have mentioned, any risk of liability to BT for substantial damages for derogation from grant had evaporated by the date the notice took effect. As at 24 June 2002, and as at present, PW's only liability as a result of serving the notice is for the payment of the penalty of just over £5m. If at the date it had served the notice (or at any date before 24 June 2001, the last moment for the service of the break notice) PW had appreciated that the service of the notice would give rise to a liability for £5m, it presumably would still contend that it would not

C    have served the notice. Although it was suffering a net rental shortfall, this was less than £250,000 pa. Although there was a danger of further shortfalls accruing (owing to differential valuations in relation to the rent review under the headlease and the underleases) and, after 2007, much greater uncertainty (because four of the seven underleases were due for determination), that would have been some way away, and, in any event, these various uncertainties might not have produced much of a shortfall, and could even have resulted in a profit. Even taking into account the disadvantage of having to manage the premises until 2015, it might be said to be unlikely that PW would have been prepared to pay more than £5m simply to get out of a rather small present disadvantage,

D    and a future potentially much larger disadvantage that might never materialise. In these circumstances, PW would argue, even judging the matter on 24 June 2002 or today, it would be unconscionable for Milton Gate to be permitted to resile from the convention.

[238] On the face of it, there is obvious force in saying that the issue of unconscionability must be judged at the date of the service of the notice because, on the present argument, it is that irrevocable act upon which PW relies to found the unconscionability that is an essential ingredient of an estoppel by convention. However, it appears to me that when considering the question of unconscionability in connection with an estoppel by convention, the court must ultimately carry out its

E    assessment by reference to facts and matters known to it at the date of the hearing. Estoppel is a doctrine designed to do justice, and, at least normally, it seems scarcely consistent with doing justice to ignore facts, that have occurred since the date upon which an action was taken in reliance upon the estoppel, and which may well impinge significantly, or even determinatively, on the issue of unconscionability. It appears to me that it would be an undesirable fetter on the flexibility of the equity, which could lead to injustice rather than justice, if the court, at least in a case such as this, had to ignore the effect of events that occurred after the action taken allegedly in reliance upon the convention.

F    [239] What if the only reason it could be said to be unconscionable for PW to pay the penalty was that it had exposed itself to a very substantial potential liability to BT and MLEL by serving the notice without appreciating that it would thereby put itself in derogation from grant under the underleases? If one judged the question of unconscionability as at the date of the service of the notice, this might well be a powerful argument for holding that PW escaped liability for the penalty on the basis of estoppel by convention. It appeared, at that time, that BT would be likely to seek substantial damages if its underleases were prematurely determined. However, if one moves forward to the date upon which the penalty would have become payable, that is 24 June 2002 or the present time, there would be no unconscionability in requiring PW to pay the penalty. The sole unfairness of Milton Gate insisting upon its strict legal rights, namely the possible liability of

G    PW for derogation from grant, would have disappeared. The result of PW's estoppel argument would be a windfall for PW, and a consequent unjustifiable deprivation of Milton Gate's strict legal rights, which seems positively unconscionable.

[240] On this basis, it appears to me that the correct date upon which to assess unconscionability is either the date upon which the penalty would fall due or the date of the hearing. Of course, different, and, indeed, possibly difficult, considerations might apply if, shortly after the notice had been served, PW had embarked on a course of action, such as disposing of all its assets or effecting a substantial investment, in the honest and reasonable belief that the penalty was not payable. However,

H    there is no suggestion of that having occurred in the present case, and such considerations do not therefore arise. In these circumstances, I think that the correct date for assessing unconscionability is 24 June 2002 or the present day. It could be that the financial effect of having served the notice is different on those two dates, but there is simply no evidence to suggest that.

[241] I was prepared to accept that the underleases would not have been granted for terms extending beyond 24 June 2002 without some provision protecting PW from liability to BT and MLEL in the event of the underleases being prematurely determined, as a result of the service of a notice under clause 5(6), on the basis of the commercial

J    probabilities, without any specific evidence to that effect. However, I am not prepared to accept that the service of the notice would not have occurred, if PW appreciated that it would thereby be liable for the penalty. Given that clause 5(6) gave only one opportunity to break the headlease, which would otherwise run to 2015, it appears to me quite possible that PW would have exercised its rights under clause 5(6), even if it had appreciated that it would lead to its having to pay the penalty. It would have been only too easy for PW's estate manager, Mr Menzies, or someone else on behalf of PW, to say that PW would not, or even may well not, have served the notice if it had appreciated that it would thereby expose itself to the penalty, and to justify this by

K    expert evidence.

[242] There was only relatively brief discussion as to the burden of proof on this question. It appears to me that, in this connection, it is important to distinguish between reliance and detriment. In *Greasley v Cooke* [1980] 1 WLR 1306, a case of proprietary estoppel, Lord Denning MR said, at p1311D-F:

These statements to Miss Cooke were calculated to influence her — so as to put her mind at rest — so that she should not worry about being turned out. No one can say what she would have done if Kenneth and Hedley had not made those statements... There is a presumption that she [stayed on in the house] relying on the assurances given to her by Kenneth and Hedley. The burden is not on her,

L    but on them, to prove that she did not rely on their assurances.

Waller and Dunn LJJ took the same view as to the onus of proof: see at p1312G, and pp1313H-1314A.

[243] The reasoning in *Greasley* is consistent with what Lord Denning had said earlier in *Brikom*, at pp482F-483A and with the analysis of Balcombe LJ in *Wayling v Jones* [1995] 2 FLR 1029, at pp1031G-1032B. The reasoning was considered and explained by Mr Jonathan Parker QC, sitting as a deputy judge, in *Coombes v Smith* [1986] 1 WLR 808, at p821D-E where he said:

The decision as it seems to me, was concerned with the presumption of reliance,

M    rather than with the existence of detriment in isolation. The statement of Lord Denning MR... that "There is no need for her to prove that she acted to her detriment or to her prejudice" must not be taken out of context. Read in context, I take it to mean merely that where, following assurances made by the other party, the claimant has adopted a course of conduct which is prejudicial or otherwise detrimental to her, there is a rebuttable presumption that she adopted that course of conduct in reliance on the assurances.

[244] That analysis is consistent with the reasoning of the Court of Appeal in *Stevens & Cutting Ltd v Anderson* [1990] 1 EGLR 95*.

---

* Editor's note: Also reported at [1990] 11 EG 70

A    Stuart-Smith LJ accepted, at p97M, that *Greasley* was authority for the proposition that:

> If... there was a clear representation or promise... and... the appellant had suffered detriment by adopting a course of conduct consistent with the assumption that the representation was true or the promise binding, I would be disposed to conclude that in the absence of evidence to the contrary the appellant had adopted that course in reliance on the representation or promise.

[245] However, he went on to indicate that he was not prepared to assume, in the absence of any specific evidence to that effect, that any detriment had been suffered: see at p98A-C. The same view was taken

B    by Farquharson LJ, who, at p99F, said that "[t]he difficulty" for the claimant was "that it called no evidence of detriment".

[246] I do not know whether, as at October 2000 (when the notice was served), June 2001 (the last month for serving the notice), June 2002 (when the notice took effect, and the penalty became, or would have become, payable), or today, PW was, or is, better off or worse off if it is free of the headlease but liable for the penalty. On any view, it has rid itself of a tenancy of property that it does not want, which would cost it around £7m or more a year until 2015. It is true that there was only a relatively small (£245,00 pa) current rental shortfall,

C    but there was obviously a real risk that it could well increase, possibly substantially, from 2006 or 2007. There was also the disadvantage to PW of having to manage the premises until 2015. The financial implications of that risk and that disadvantage are a matter for an expert valuation surveyor and depend very much upon the state of the market and market perception. I simply do not know whether, judged from an objective market-value basis, it would be worth paying the penalty in order to be shot of the lease. Nor do I know the answer to that question if judged from the subjective viewpoint of PW.

[247] It seems pretty likely that the headlease had, and would have, a significant negative value, in the light of the features that I have identified. That view is supported by the very fact that PW served

D    the notice. That it may not have expected to pay the penalty does not impinge on the point that, if the headlease had any significant value, it appears unlikely that PW would have determined it. PW would presumably have assigned it. I have no basis upon which I can even hazard an informed guess at the likely value to PW of having determined the headlease.

[248] PW has the benefit of having exercised its rights under clause 5(6) against Milton Gate. PW wishes to avoid the concomitant burden under the clause on the ground of an estoppel by convention. This ground involves establishing unconscionability, which in a case such as this means relevant detriment to PW. As a matter of principle,

E    it seems to me that the burden should be on PW to establish that detriment. That view is supported by the cases to which I have just referred. It is also consistent with the fact that it appears likely, indeed, I think very likely, that the determination of the headlease was, and is, of substantial value to PW.

[249] In all these circumstances, I do not consider that PW has made out its case on estoppel by convention, subject to considering the issue on a tripartite basis. However, that is not the end of the issues as between PW and Milton Gate, because PW has a further argument based upon the doctrine of approbation and reprobation.

[250] PW's case in this connection is that it is not open to Milton

F    Gate to contend as against PW that the underleases have determined (and therefore Milton Gate is entitled to recover the Penalty) in circumstances where Milton Gate is contending, and has contended since 4 July 2002, as against BT, that the underleases are continuing. The technical expression upon which PW relies is that a person cannot approbate and reprobate; the expression used frequently by lawyers is that one cannot blow hot and cold; less technical versions are that one cannot have one's cake and eat it, and that one cannot have the penny and the bun.

[251] In my view, that argument cannot succeed in the present case. It seems to me that there is normally nothing to prevent someone running two inconsistent arguments (whether both arguments are against the same person or each argument is against different persons), and at some

G    point opting for one argument rather than the other. It would be pretty surprising if it were otherwise. If A runs two inconsistent arguments against B, it cannot be right that simply because of that fact, B can either choose which of the two arguments to accept or defeat both of those arguments. Equally, if A runs two inconsistent arguments, one against C and the other against D, there would seem no warrant for concluding that C and D could get together to decide which of the two arguments should succeed; equally, it would seem ridiculous if C could defeat A because A had run an inconsistent argument against D, and that D could defeat A because A had run an inconsistent argument against C.

[252] Of course, different considerations may apply where A has

H    achieved success on one of the arguments. In that event, it may very well be right that A will have disentitled itself from seeking to run the other argument. However, in such a case, there would rarely be a need to rely upon approbation and reprobation because A would probably be prevented from relying upon its alternative argument on the basis of election or estoppel. Of course, in some cases it may not be inequitable or otherwise inappropriate to permit A to run the other argument, albeit subject to some qualification.

[253] In the present case, I can see no basis, either in fairness or in legal principle, for holding that Milton Gate should be disentitled from recovering the penalty from PW simply because it has contended

J    as against BT, since around 4 July 2002, that the underleases have been continuing. If Milton Gate establishes, or BT accepts, that the underleases are to be treated as continuing, that would prevent Milton Gate from contending for the opposite conclusion as against PW. However, there has been no determination or acceptance of Milton Gate's argument as against BT that the underleases are continuing. In those circumstances, there is no question of Milton Gate having its cake and eating it. While Milton Gate is trying to have its cake (by claiming against BT that the underleases are continuing) there is a risk that it will not be able to eat the cake (in the form of recovering the penalty from PW), but I do not see why it should be prevented from

K    pursuing inconsistent remedies. Even if one regards Milton Gate's negotiating stance between November 2000 and July 2002 as pretty tough, there was nothing dishonest about it, and there was nothing even unusual about its taking inconsistent positions in an open way in the present proceedings.

[254] Mr Reynolds cites four authorities to support his argument on approbation and reprobation. The first is in *Lissenden v CAV Bosch Ltd* [1940] AC 412, at pp418-419, where Viscount Maugham explained that the doctrine was Scottish in origin and that it related to inconsistent claims under wills and instruments *inter vivos*. Essentially, it appears to be a species of election. In that case, the fact that a successful claimant

L    received instalments of an award did not prevent him from subsequently appealing that award on the basis that it was too small. The unsuccessful claim based upon approbation and reprobation was stronger than PW's because the claimant had received some benefit under the award that he was seeking to impugn.

[255] *Express Newspapers plc v News (UK) Ltd* [1990] 1 WLR 1320, involved two copyright disputes between two newspapers. In the first dispute, the *Daily Express* alleged that *Today* had infringed its copyright in one article, and in the second dispute, *Today* alleged that the *Daily Express* had infringed its copyright in another article. The *Daily Express* obtained summary judgment in its action. In *Today's*

M    application for summary judgment in its action, the *Daily Express* ran an argument that, if correct, would have meant that *Today* had had a defence in the *Daily Express's* action, and that the *Daily Express* should accordingly not have obtained summary judgment.

[256] Sir Nicolas Browne-Wilkinson V-C accepted that *Today* was entitled to judgment in its action, saying, at p1329F:

There is a principle of law of general application that it is not possible to approbate and reprobate. That means that you are not allowed to blow hot and cold in the attitude that you adopt. A man cannot adopt two inconsistent attitudes towards another: he must elect between them and, having elected to adopt one stance, cannot thereafter be permitted to go back and adopt an inconsistent stance.

Landlord and Tenant — General

A   [257] I consider that the Vice-Chancellor was saying that, having obtained a benefit against *Today* on the basis that a particular argument was wrong, it was not open to the *Daily Express* then to deny *Today* a similar benefit on the basis that the argument was right. By contrast, in the present case, Milton Gate has not obtained judgment against BT to the effect that the underleases are continuing: only if it had obtained such judgment would the reasoning in *Express Newspapers* apply. Even then, there is the difference that, in this case, the inconsistent cases were advanced against different persons.

[258] In *Oliver Ashworth (Holdings) Ltd v Ballard (Kent) Ltd* [2000] Ch 12\*, at p31, Robert Walker LJ considered that, in some

B   circumstances, the law could well deprive a person of the right to raise inconsistent arguments in proceedings, even when no election had occurred, on the basis of approbation and reprobation. However, as he appears to have acknowledged in his observations on the point, in most cases the issue would be determined by reference to the doctrine of election.

[259] Robert Walker LJ's observations in that case were tentative and *obiter*. In any event, his reasoning does not apply here. On the basis that a notice to quit was defective, a landlord in that case had issued a claim for rent, but when it subsequently appeared that the notice was probably

C   valid, the landlord sought to amend its pleadings to claim double rent on the basis that the tenant had been a trespasser. The point made by Robert Walker LJ at p31 was that it was "at least arguable that by demanding and suing for rent the landlord was unequivocally treating the tenant as not being a trespasser", and that, accordingly, any subsequent amendment of the landlord's pleading to claim that the tenant was not a tenant should not operate retrospectively. In my judgment, it does not follow from this that, in the present case, Milton Gate was disentitled from alleging, on 23 July 2002, in its defence against PW, that the underleases had expired, merely because, as against BT, Milton Gate had been maintaining the opposite from 4 July 2002.

[260] Mr Reynolds also referred to the decision of the Court of

D   Appeal in *Public Trustee v Pearlberg* [1940] 2 KB 1. The effect of that decision was that, so long as a party had live proceedings seeking specific performance of a contract, it could not seek to rescind the contract. There is nothing in the reasoning in *Public Trustee* to prevent a party from putting forward alternative cases, particularly when having to face two different parties with conflicting positions. Indeed, if anything, *Public Trustee* is consistent with Milton Gate's case, since it is implicit in the reasoning that once the specific performance action had been discontinued, rescission could then be sought.

[261] Quite apart from this, the sequence of events does not help PW's case. From 2000, Milton Gate argued against PW and BT that

E   the underleases had expired: that was its position until early July 2002. Further, Milton Gate pleaded its case against PW (that the underleases had expired) before it pleaded its case against BT (that they had not expired). Therefore, it would appear that, if there is anything in this argument, it would assist BT, and not PW.

[262] I should mention one further point in relation to this aspect. It might be said that Milton Gate did in fact receive a benefit from alleging against BT that two of the underleases were continuing, because it was only upon this basis that Milton Gate was entitled to the rent in respect of the upper two floors. However, it is common ground between Milton Gate and BT that the basis upon which BT paid the rent

F   in respect of the upper floors from Milton Gate from 24 June 2002 would entitle BT to repayment of the rent if, as between Milton Gate and BT, the underleases had determined on 20 June 2002.

*Reconciling the estoppel as between Milton Gate, PW and BT*

[263] It appears to me that the effect of the discussion in the two immediately preceding sections of this judgment is as follows. As between Milton Gate and BT, there was a convention, but it had been mutually resiled from, and, in those circumstances, were it not for the involvement of PW in the convention, there would be no estoppel by

convention, and BT would be entitled to insist upon its strict legal   G

rights, and to contend that the underleases had expired on 24 June 2002. As between Milton Gate and PW, although there was a convention that could have given rise to an estoppel, PW is unable to establish the essential ingredient of unconscionability to make good its estoppel because it has not established that it would suffer relevant detriment if the strict legal position obtained. In those circumstances, at least at first sight, it would seem that there is no good reason why the strict legal position should not be enforced as between all the parties.

[264] In my judgment, it seems to me that the issue is not, at least necessarily, quite as simple as that. First, it is appropriate to consider the one aspect of the tripartite relationship that has not so far been discussed   H

in this context, namely that between PW and BT. Second, even after considering that aspect, it is appropriate to consider the overall justice of the situation if the strict legal position were to obtain. After all, as has been emphasised in a number of cases, estoppel is a flexible doctrine to be applied to arrive at a just result, albeit on a principled basis. I turn to consider those two questions.

[265] PW's contention, that BT is estopped by convention from contending, as against PW, that the underleases expired on 24 June 2002, appears to me to suffer from the same problem as PW's similar contention as against Milton Gate. Although able to establish a convention to that effect, PW's problem is establishing   J

any unconscionability in BT resiling from that contention. My reasons for that conclusion are the same as my reasons for concluding that PW cannot raise an estoppel by convention as against Milton Gate in this connection.

[266] I turn, then, to a consideration of the tripartite relationship on a broader basis. Given that (a) BT and Milton Gate effectively agreed a mutual resiling from the convention in and from April 2002, (b) there is no question of BT claiming damages against PW for derogation from grant owing to the premature determination of the underleases, and (c) PW cannot establish that, by serving the notice, and thereby putting an end to the headlease but becoming liable to the penalty, it is   K

worse off than if it had not served the notice, there is, as I have said, at least on the face of it, no unconscionability as between any of the parties, if the strict legal position applies. In those circumstances, I think it would require an exceptional case before the court should be prepared to conclude that the strict legal position does not apply as between each of the parties.

[267] It appears to me that the only possible oddity in this conclusion is that PW has become liable for the penalty essentially as a result of a mutual resiling from a tripartite convention by the two other parties to the convention, in circumstances over which PW had no control, and indeed of which it was unaware. This fact might, of itself, be said to give   L

rise to a separate, rather more subtle, argument of unconscionability in favour of PW.

[268] However, I do not think that that is a good argument. First, it appears to me that where there is a tripartite convention that could give rise to an estoppel, each of the three parties to the convention runs the risk that an arrangement between two of them may result in it not being unconscionable for those parties being able to resile from the convention as against the third party. Of course, each case will turn on its own particular facts, but such a possibility is inherent in any tripartite convention. Second, on the facts of this case, the convention is, and was, primarily between Milton Gate and PW, and BT was brought into the   M

convention only as a privy of PW and in order to make the convention work in a fair and equitable way, as explained above.

[269] Indeed, this leads to a wider point. It seems to me that there is a powerful argument for saying that even if there had been no mutual resiling from the convention by Milton Gate and BT in and after April 2002, it would probably have been right to conclude that, because BT did not want the underleases to continue, there should be no estoppel by convention as between the parties in any event, and each of them should be entitled to insist upon the strict legal position. Given that I have rejected the argument that PW could rely upon the service of the notice in October 2000 to raise an argument based upon unconscionability, the only ground upon which it can raise a claim for unconscionability is,

---

\* Editor's note: Also reported at [1999] 2 EGLR 23; [1999] 19 EG 161

A  in effect, its potential liability to BT for derogation from grant owing to the premature determination of the underleases. By the same token, the only basis upon which Milton Gate could run an argument based upon estoppel by convention would be that it would be wrong if the convention enabled PW to prevent it from recovering the penalty, unless it also enabled Milton Gate to insist upon the underleases continuing until their respective contractual expiry dates. In other words, Milton Gate's estoppel argument against BT is based upon the contention that Milton Gate should not have the burden of the estoppel as against PW without having the benefit of the estoppel as against BT. Neither Milton Gate nor PW appears to me to have any other basis for

B  raising the estoppel argument.

[270] Given that the convention is primarily between Milton Gate and PW, and that BT's subjection to the convention arises from the need to make the convention work fairly, it seems to me that if BT is able, even unilaterally, to arrange matters so as to avoid the damage upon which PW could otherwise justifiably rely to give rise to the estoppel, there would be no injustice in the estoppel argument falling away. In other words, by making it clear that it would not claim, or by effectively disentitling itself from claiming, damages for premature determination of the underleases, it seems to me that BT could thereby put an end to the ability of PW, and therefore of Milton Gate, to contend that the

C  convention gives rise to an estoppel. The fact that BT cannot claim such damages from PW deprives PW of any argument that it would be unconscionable for Milton Gate to enforce the estoppel (because the only other ground upon which PW could rely, namely service of the notice itself, fails on the facts). As a result, Milton Gate would be entitled to recover the penalty from PW, and, in those circumstances, far from it being equitable, it would be positively unconscionable if Milton Gate could insist upon the underleases continuing beyond 24 June 2002, as against BT.

[271] On the particular facts of this case, there is, none the less, some ground for sympathy with PW's argument, in the light of Milton

D  Gate's conduct. Milton Gate acquired the reversion to the headlease knowing all the relevant facts, in particular the effect of clause 5(6) of the headlease, the terms of the licences, and the fact that the underleases were for terms extending well beyond the break date under clause 5(6) of the headlease. It also knew that the effect of the service of a notice under clause 5(6) of the headlease would lead to the determination of the underleases. If (as seems unlikely) it had not appreciated that PW and BT had a very different view as to the effect of the determination of the headlease by a notice on the underleases, I consider that the position of PW and BT was made quite clear to Milton Gate by May 2001.

.E  [272] It is true that the case based upon estoppel by convention was not spelt out in terms to Milton Gate until after June 2002, but the facts giving rise to the estoppel were plain to see, and would have been obvious to reasonably sophisticated commercial property lawyers, such as Milton Gate's solicitor, and, indeed, to sophisticated commercial property advisers, such as Milton Gate apparently employed. It was apparent from clause 5(6) that the parties to the headlease anticipated that underleases would survive the service of the notice. Further, the fact that the underleases all extended well beyond the break date under clause 5(6) showed that they were entered into on the basis that they would continue beyond the break date. Bearing in mind that Milton

F  Gate and its solicitor appreciated the legal position, they must also have realised that the parties to the headlease, the licences and the underleases were under a misapprehension as to the law. *Pennell* had been decided in December 1994, and *Barrett* had been decided in January 2000. Milton Gate was being advised by its solicitor by March 2000, and had appreciated the fact that a subtenancy could not survive the determination of a head tenancy by notice served in accordance with its terms. Further, the first time that the dispute was discussed in detail between Milton Gate and PW, on 15 November 2000, it was made clear in terms to Milton Gate that PW's case was that the application of the general rule in the present case would be an "unjust conclusion": BT was clearly subscribing to this view in its discussions with Milton Gate, until its change of heart in April 2002.

G  [273] It was in those circumstances that Milton Gate chose in early 2001 to state in unequivocal terms to BT that the underleases would determine on 24 June 2002, and it maintained this position to BT in unequivocal terms until after 24 June 2002. Milton Gate was not at any time under any misapprehension as to the law or the facts, and it appreciated the position of BT and PW. It decided to take advantage of the situation, believing that it could drive a hard bargain with BT, which, it thought (correctly), had been unexpectedly and inconveniently thrown back on its potentially precarious and uncertain rights under the 1954 Act, rather than being able to look forward to a continuing substantial contractual term.

H  [274] Milton Gate attempted to get the best of both worlds. It sought to achieve a situation that (in fact if not in law) would satisfy the proviso to clause 5(6) by negotiating the overriding lease with BT. Indeed, in the light of its higher rent and longer term than the combined rents and average terms of the underleases, the overriding lease would have represented a substantial improvement for Milton Gate. At the same time, Milton Gate was refusing a surrender of the headlease (which was consistently on offer from PW from November 2002 until May, or even June, 2002), so that it could recover the penalty from PW on the basis that the proviso to clause 5(6) had not been satisfied.

J  [275] Even though it can therefore be said that Milton Gate might have brought such an outcome on itself, the fact remains that it would be unfair on Milton Gate if it neither had its cake nor could eat it, in the sense that it could neither enforce the continuation of the underleases against BT nor recover the penalty from PW. Although it negotiated toughly, it was not in any way dishonest, and without it getting close, it did not receive a tangible benefit from its tough negotiations. To let PW off the penalty, if it is not liable to BT for damages, would seem something of a windfall. It seems likely that PW has obtained a benefit of substantial financial value, although it is not possible to quantify that value in the light of the absence of any relevant evidence, by determining the headlease. Additionally, although it is a matter of

K  speculation, it is a fair inference from the evidence that a higher rent was paid by BT (and presumably by MLEL) under the underleases at the time of their grant, because of their expected duration, than would have been paid if it had been appreciated that the underleases would be determined by the service of the notice under clause 5(6). PW has therefore probably obtained a hidden benefit from the common misunderstanding. Additionally, given that *Barrett* had been decided some nine months before the notice had been served, PW had the opportunity of appreciating the risks of serving the notice.

[276] In all these circumstances, I am of the view that it would not be unconscionable if the strict legal position applied as between

L  all three parties in the present case. If I am wrong, and there is in fact an estoppel between Milton Gate and PW, it would be necessary to consider whether, in those circumstances, Milton Gate's activities after acquiring the freehold in June 2000 have disentitled it from insisting upon the convention as against BT. On the one hand, there would be the obvious injustice to Milton Gate of having the burden of the estoppel by convention against PW but not having the benefit of that estoppel as against BT. On the other hand, there is the fact that there was a clear and mutual resiling from the convention as between Milton Gate and BT, and, as the facts outlined above indicate, Milton Gate can be said to have only themselves to blame for this outcome. Having

M  appreciated that it was in a highly advantageous position because of the misunderstanding on the part of BT and PW as to the strict legal position, Milton Gate entered into negotiations with BT for the grant of the overriding lease and did not accept PW's proposal of a surrender of the headlease.

[277] Milton Gate pushed its advantage as hard as it could, perfectly properly. Indeed, its stance almost came off, the overriding lease for a longer term, at an increased rent, was on the point of being executed. However, at the last minute, BT had a change of mind, and went along with what Milton Gate had been unequivocally saying and relying upon for more than a year. Even after its attempt failed to get the best of both worlds, Milton Gate could have tied BT into the underleases

A by accepting a surrender of the headlease, which was plainly on offer from PW.

[278] Although I accept that BT has not identified any act that they took in reliance upon there having been a mutual resiling from the convention, I do not consider that it would be inequitable or unconscionable for BT to be permitted to rely upon the mutual resiling from the convention, even if PW was entitled to raise an estoppel on that convention against Milton Gate. Although a sword is normally invoked in a rather different context in connection with estoppel, it seems to me that, having chosen to live by the sword of insisting upon the strict legal position as against BT, and seeking to have it both ways
B (that is, the benefit of the reversion to the overriding lease, and the payment of the penalty from PW), Milton Gate could scarcely have complained if it were unable to raise the shield of unconscionability to avoid dying by the sword of suffering both ways. However, that point does not, in my opinion, arise.

*Conclusion*

[279] In these circumstances, my conclusions are as follows:
(i) By clause 5(6) of the headlease, CLRP and PW purported to contract out of the general rule that a subtenancy comes to an end on the determination of the head tenancy in accordance with its terms.
C (ii) However, as a matter of law, it is not possible to contract out of the general rule, and the underleases therefore expired on 24 June 2002 (subject to the other arguments).
(iii) If the position were otherwise, then, in a case such as this, where the determination of the head tenancy is by a break notice, the covenants in the subtenancy would have been unenforceable as between the landlord and the subtenant, but that position has now been reversed as a result of section 3 of the 1998 Act.
(iv) Accordingly, if my conclusion in (ii) is wrong, the covenants in the underleases would be enforceable as between Milton Gate and BT.
(v) A break clause such as clause 5(6) cannot be re-characterised as a surrender provision, and, even if it could, it would not alter
D conclusion (ii).
(vi) There can be no estoppel by deed in the present case.
(vii) There can be no estoppel by convention in the present case as a result of CLRP and PW themselves having entered into the headlease.
(viii) However, a convention, sufficient in principle to give rise to an estoppel, did arise as between the landlord and PW as a result of the grants of the underleases and the associated licences.
(ix) BT and MLEL, as the tenants under the underleases and as parties to the licences, became bound by the convention.
(x) Although aware of the true position at the time it acquired the reversion to the headlease, Milton Gate was bound by, and entitled to
E the benefit of, the convention.
(xi) As between Milton Gate and BT, there was a mutual resiling from the convention.
(xii) As between Milton Gate and PW, the convention could not give rise to an estoppel if PW was not, in the event, exposed to a claim for derogation from grant by BT.
(xiii) Both because of the immediately preceding two conclusions, and, in any event, because BT did not want the underleases to continue beyond 20 June 2002 and can claim no damages in respect of their premature determination, there is no estoppel by convention operable as between any of the parties.
F (xiv) In these circumstances, as between all three parties, the underleases expired on 24 June 2002, and PW became liable for the payment of the penalty to Milton Gate as at 20 June 2002.

*Claim dismissed.*

# Crehan v Inntrepreneur Pub Co (CPC)

COURT OF APPEAL

21 May 2004

PETER GIBSON AND TUCKEY JJ, AND SIR MARTIN NOURSE

[2004] EWCA 637

*Landlord and tenant — Beer tie — European legislation — Tenant of pub restricted to purchasing specified beers from landlord or nominated supplier — Whether breach of Article 81 of the European Community Treaty — Whether court entitled to have regard to commission decisions on ties — Whether tied lease within block exemption — Whether damages claimed of type Article 81 intended to prevent — Whether damages assessable at date of loss or date of trial*

Following the making of the Supply of Beer (Tied Estates) Order 1989 (the TEO), which required a reduction in the number of tied public houses owned by a brewery company or group, two large brewery groups (GM and C) transferred the pubs in their tied estates to the respondent company. This company, which had no brewing activities, was formed for the purpose and was a wholly owned subsidiary of a holding company owned by GM and C in equal shares. GM transferred its breweries to C. The respondent let its pubs under a new form of lease. The leases were on 20-year terms, assignable after two years and at higher rents than the previous traditional tied tenancies. They contained a beer tie requiring the lessees to purchase beer from the respondent or a nominated supplier. The respondent nominated C as the supplier, and beer was to be supplied at the full list price (the beer procurement agreement). The new arrangements were approved by the European Commission and the Office of Fair Trading, although the latter imposed undertakings on the respondent that were more severe than the requirements of the TEO. The respondent was required, *inter alia*, to release its lessees from the tie on or before 28 March 1998. In February 1997, the government agreed to release the respondent from the undertakings, and although the respondent released some lessees on 28 March, many pubs remained as tied pubs.

In 1991, the respondent granted the appellant leases, in its standard form, of two pubs. Certain specified beers were required to be obtained from C. The appellant's first two trading years were a financial disaster; total beer barrelage was lower than previous years. In 1993, he surrendered the leases having made a loss in excess of £45,000. In 1993, proceedings were commenced against the appellant for sums due for purchases of beer and other goods; he joined the respondent and counterclaimed for damages and set-off, contending that the beer tie breached Article 81 of the European Community Treaty. Meanwhile the respondent, which had become concerned as to whether the beer ties breached Article 81 (formerly Article 85), notified the agreements to the European Commission for a decision that its leases did not breach the Article, alternatively that they were taken out of the Article by a block exemption for beer supply agreements issued by Council Regulation 1984/83. In 1996, the Commission was close to a decision that Article 81 had been infringed, and that the block exemption did not apply. The respondent, which had, in the meantime, introduced new and different schemes for the supply of beer, withdrew its original notification to the Commission, which therefore declined to issue any formal decision upon whether Article 81 had been infringed or whether the block exemption applied. In 1998, Carnwath J dismissed the appellant's counterclaim, and the appellant appealed. The Court of Appeal, concerned that, by reason of its earlier decision in *Gibbs Mew plc v Gemmell* [1999] 1 EGLR 43, based upon the decision of the House of Lords in *Tinsley v Milligan* [1994] 1 AC 340, a tenant participating in an illegal contract would be precluded from claiming damages when the claim was based upon that illegality, referred various questions to the European Court of Justice (ECJ): see *Courage Ltd v Crehan*

actual recollection of the circumstances in which the page came to be prepared or signed.

It is significant, I think, that the several matters about which the trial judge criticized Inkster had nothing to do with the execution of the will. They were collateral matters properly to be taken into account, of course, in weighing the credibility of Inkster. But I find his explanation of the signing of p. 2 to be quite reasonable. Even if one sets aside that explanation, there remains the trued up copy that lacked the signatures of the testator and the witnesses on p. 2 the day after the will was executed and the other circumstances I have discussed. Finally, his apparent distaste of the contents of the will does not accord with the notion that he would support its promulgation by deliberate lies.

The evidence satisfies me that p. 2 was a part of the will on its execution on 29th February 1972. I have no reason, then, to explore the issue of revocation. I would allow the appeal and make an order pronouncing for the validity of the will of Allan Roy Ireland, deceased, executed on 29th February 1972.

*Appeal allowed.*

---

## PETRO CANADA EXPLORATION INC. v. TORMAC TRANSPORT LTD., TORGERSON AND McCONNELL

### Supreme Court, Taylor J.

Heard — March 10 and 11, 1983.
Judgment — March 17, 1983.

**Contracts — Effect of alteration of documents — Creditor's employee adding red wafer seals to personal guarantees without authority — Unauthorized alteration of document varying original legal force or effect — Party responsible for unauthorized variation debarred from enforcing covenants.**

The defendants executed personal guarantees for a debt owed to the plaintiff, which guarantees were not intended to be under seal. Without authorization, an employee of the plaintiff later affixed red wafer seals beside the defendants' names. The plaintiff brought an action against the defendants on the personal guarantees.

**Held** — Action dismissed.

An unauthorized alteration of a document, including a sealing, which varies its legal force or effect as originally expressed, forever debars the party responsible from

**Petro Can. Exploration Inc., etc.**                Taylor J.    221

enforcing any covenant contained in it as against the party who might have been prejudiced thereby.

**Cases considered**

*Bank of N.S. v. Spear* (1973), 37 D.L.R. (3d) 130, 6 N.B.R. (2d) 377 (C.A.) — considered.

*Davidson v. Cooper* (1844), 13 M. & W. 343, 153 E.R. 142 (Exch.) — considered.

*Girvan v. Longdo*, N.B.C.A., 15th September 1966 (unreported) — considered.

*Johnson v. Trobak*, [1977] 6 W.W.R. 289, 79 D.L.R. (3d) 684 (B.C.C.A.) — considered.

*Linton v. Royal Bank of Can.*, [1967] 1 O.R. 315, 60 D.L.R. (2d) 398 (H.C.) — considered.

*Pigot's Case* (1614), 11 Co. Rep. 26b, 77 E.R. 1177 — referred to.

*Royal Bank of Can. v. Bermuda Holdings Ltd.*, [1976] W.W.D. 89, 67 D.L.R. (3d) 316 (B.C.S.C.) — considered.

*Suffell v. Bank of England* (1882), 9 Q.B.D. 555 (C.A.) — considered.

**Authorities considered**

9 Hals. (4th) 413, para. 597.

Holmes, ''The Path of the Law'' (1896-97), 10 Harvard L. Rev. 457, p. 473.

[Note up with 7 C.E.D. (West. 3rd) *Contracts*, XI, 4, d; 11A C.E.D. (West. 3rd) *Deeds and Documents*, VI, 2; 17 C.E.D. (West. 3rd) *Guarantee and Indemnity*, I, 7; 7 Can. Abr. (2d) *Contracts*, XVII; 17 Can. Abr. (2d) *Guarantee and Indemnity*, I, 8, c.]

ACTION for judgment on personal guarantees.

*R. N. Apps,* for plaintiff.
*W. H. Pope,* for defendants.

(Dawson Creek No. C91/82)

17th March 1983. TAYLOR J.:— The sole question raised by this action is whether the subsequent addition of red wafers by an employee of the plaintiff beside the signatures of the personal defendants on guarantees of their company's indebtedness to the plaintiff operates in law to discharge them.

I gave judgment at trial against the corporate defendant in the sum of $35,269.59, and for costs, reserving for further consideration the question whether the conduct of the plaintiff's sales representative in applying wafers beside the signatures on the guarantee documents without the authority of the guarantors constitutes a ''material alteration'' which will bar the plaintiff from later enforcing their guarantees. If

not, the plaintiff is entitled to judgment in the same terms against the personal defendants.

After the two guarantees had been executed in duplicate the plaintiff's sales representative, who had witnessed their execution, took both copies of each home with him, stopping to purchase red wafers at a stationer's on the way. He affixed a red wafer beside the signature on each executed copy of each guarantee and sent all four documents that day to the plaintiff's credit department in Calgary. One original executed copy only of each guarantee was entered at trial, and neither then bore a wafer beside the signature. Both also entered in evidence were photocopies of the second executed copy of each guarantee, and both showed a wafer affixed beside the maker's signature. The plaintiff has been unable to find the original sealed documents from which these photocopies were made.

The witness who affixed the wafers says they must have fallen off the original documents entered in evidence. It seems to me more likely that if seals were put on those copies, they must have later been taken off. It is clear that seals were put on one executed copy of each guarantee; the undisputed evidence is that they were put on both copies of each. There was a clear intention on the part of the agent for the plaintiff unilaterally to transform an undertaking made without seal into an instrument under seal, and I accepted that this intention was carried into effect.

For reasons which I will give in a moment, it is apparent that the sealing of the guarantees was not only unauthorized by their makers, but contrary to the express terms of the documents.

*(a) The Authorities Cited*

The law regarding the effect of unauthorized alteration of instruments is often said to have its origin in *Pigot's Case* (1614), 11 Co. Rep. 266, 77 E.R. 1177. The rule there laid down was applied in relation to the unauthorized sealing of a guarantee in *Davidson v. Cooper* (1844), 13 M. & W. 343, 153 E.R. 142. That was a proceeding in error before the Exchequer Chamber in which Lord Denman, delivering the judgment of the court, said (at p. 146):

> Upon the doubt whether this instrument is altered, because it remains exactly as it was when signed, but only something is added near to the signature of the defendants, we may observe, that that addition gives a different legal character to the writing, and would, if made with the consent of all interested, completely change the nature of the relation towards each other of the parties to it, and the remedies upon it.

**Petro Can. Exploration Inc., etc.**                    Taylor J.        223

Lord Denman goes on to emphasize that the result of unauthorized addition of a seal to such a document prejudices the position of the party whose exection has been thus altered. He says:

> The truth cannot be known from inspection, but would require to be established by evidence, and this through some default of the person to whose care it was consigned, and who would be possessed of a superior legal remedy if the altered writing could be imposed on the contractor as genuine.

The court affirmed a judgment by which the guarantee in question had been declared void because of the unauthorized alteration.

In the Ontario case of *Linton v. Royal Bank of Can.,* [1967] 1 O.R. 315, 60 D.L.R. (2d) 398 (H.C.), also involving the unauthorized addition of a seal to a guarantee, Hartt J. distinguished the decision in *Davidson v. Cooper*. In the *Linton* case a red wafer had been applied by the bank's employee over the word ''seal'' which appeared on the form beside the place for signature and below the phrase: ''Signed, sealed and delivered''.

Referring in the *Linton* case to the dictum of Lord Denman in *Davidson v. Cooper,* Hartt J. observes (at p. 400):

> It would seem therefore that a material alteration to an instrument is one which changes the legal incidence thereof. When such an alteration is made to a document without the consent of a party to be bound thereby the document is voided. If the effect of the evidence in this case had been that the document in question was changed from a document not under seal to a deed, that is, a document under seal, then regardless of whether consideration had been given or not, the addition of the seal in law would have negatived the requirement of proof of consideration and in my opinion the alteration would have been material. However, in the circumstances of the case at bar, no such material change was effected.

The learned judge went on to cite authority for the proposition that *any* indication of a seal on a document which is signed with the intention that it be a deed will suffice to render the document a deed — there is no need for the actual application of wax or wafer.

*Bank of N.S. v. Spear* (1973), 37 D.L.R. (3d) 130, 6 N.B.R. (2d) 377, is a very similar case in which the New Brunswick Court of Appeal, following the decision in *Linton v. Royal Bank of Can.,* enforced a guarantee document to which wafers had later been added by a bank employee without the authority of the makers. The judgment indicates (at p. 138) that the document in question was, again, a form on which the word ''(seal)'' had been printed prior to execution beside the place for signature, as well as the traditional testimonium clause stating it to be given under hand and seal.

The *Linton* and *Spear* decisions were followed by this court in *Royal Bank of Can. v. Bermuda Holdings Ltd.*, [1976] W.W.D. 89, 67 D.L.R. (3d) 316, a case upon which counsel for the plaintiff particularly relies.

In *Bermuda Holdings Ltd.*, Craig J. (as he then was) found the evidence before him inadequate to establish that wafers appearing beside the signatures on a guarantee had in fact been added subsequent to its execution. The learned judge indicates the document in question to be one on which the word ''(seal)'' was printed beside the place provided for the maker's signature, because he says (at p. 323) that it appeared to be the very same form which was discussed in the *Linton* case. The learned judge goes on to make the observations on which counsel for the plaintiff now relies, first expressing the view (at p. 322) that the principle in *Davidson v. Cooper* appears to be ''an anachronism'', and that he would not have followed it, and later finding (at p. 323) that the guarantee would, in any event, bind the makers without regard to the sealing, because subsequent advances had been made by the bank in reliance on it, these constituting valuable consideration to support the guarantee both as to prior and subsequent indebtedness of the principal debtor. Those statements, of course, are obiter dicta, because there was in that case no finding of unauthorized alteration.

*(b) The Principles Applied*

In the circumstances of the present case there is a factor which distinguishes it from all the bank cases.

While the words ''GIVEN under the seal'' appear at the beginning of the testimonium clause of these guarantees, there also appear, below the place provided for execution, the words: ''IF INDIVIDUAL DO NOT SEAL''. The document must be taken as one intended to be under seal only if the guarantor is a corporation. Where, as here, the maker is an individual, the document, by its terms, is one intended *not* to be under seal. Nothing referring to a seal appears beside the place for signature.

In the case of individual guarantors, such as these defendants, the addition of a seal must therefore contradict and defeat the stated intention of the words of the document itself.

As in the *Bermuda Holdings Ltd.* case, the guarantees here are expressed to cover both past and future indebtedness of the principal debtor. As in that case, there was existing indebtedness at the time of execution of the guarantee and some time following the unauthorized application of the wafers the creditor proceeded to extend further credit in reliance on the guarantees. Had action been brought on the

guarantees immediately after sealing, the makers, by virtue of the sealing, would have been liable for existing indebtedness for which they had not in fact then bound themselves, unless they could meet the onus of showing the wafers had been added later without their authority. That was an onus which the defendants in *Bermuda Holdings Ltd.* proved unable to meet.

The alteration thus had the same effect, at the time it was made, as would an unauthorized change in wording extending a sealed guarantee of future indebtedness to existing indebtedness also.

The alteration is now no longer material. Subsequent advances have been made which would bind the defendants to the terms without the need of seals. Does an unauthorized alteration which was material when made but has since become immaterial still render the altered document unenforceable by the person who changed it against the person prejudiced by the change? The *Bermuda Holdings* case, albeit by way of obiter dicta, suggests the contrary. That decision may also seem to cast some doubt on the decision in *Davidson v. Cooper* itself.

Subsequent to *Bermuda Holdings Ltd.*, the law concerning unauthorized alteration of written agreements was considered at length by our Court of Appeal in *Johnson v. Trobak*, [1977] 6 W.W.R. 289, 79 D.L.R. (3d) 684. A lease had been varied after execution by a notary public in whose possession it had been left by the parties, so as to extend the scope of a purchase option which it contained. The Court of Appeal found the lessor to have acquiesced in the alteration and, on this ground, held the document enforceable in its altered form. In the course of a review of the authorities, Taggart J.A., giving the judgment of the court, makes it plain that the law of England in this connection continues in full force in British Columbia.

The judgment approves (at p. 695) statements contained in 9 Hals. (4th) 413 as correctly setting out the applicable principles. Halsbury says:

> 597 . . . If, after a written contract has been executed a promisee intentionally alters it in a material respect without the consent of the promisor, whether by adding anything to it or by striking out any part of it *or otherwise* the promisor is discharged, even if the original words can still be read. The rule applies not only to contracts under seal, but to all contracts in writing and written instruments. (The italics are mine.)

And later (vol. 12, pp. 552-53):

> 1378 . . .
>
> A material alteration is one which varies the rights, liabilities, or legal position of the parties as ascertained by the deed in its original state,

226        BRITISH COLUMBIA LAW REPORTS    44 B.C.L.R.

> *or otherwise varies the legal effect of the instrument as originally expressed*, or reduces to certainty some provision which was originally unascertained and as such void, or which may otherwise prejudice the party bound by the deed as originally executed.
>
> The effect of making such an alteration without the consent of the party bound is exactly *the same as that of cancelling the deed*. (The italics are mine.)

The learned authors go on to make it quite clear that a party making such an unauthorized alteration can thereafter no longer enforce any part of the agreement contained in the document.

I take the effect of the authorities to be that while later unauthorized addition of a seal to a document which may already be taken to be made under seal will not affect its validity — because the alteration is immaterial — any unauthorized alteration in a document, including a sealing, which varies its legal force or effect, as originally expressed, forever debars the party responsible from enforcing any covenant contained in it as against the party who might have been prejudiced thereby.

In *Girvan v. Longdo*, N.B.C.A., 15th September 1966 (unreported), unauthorized affixing of seals was held to invalidate the executed copy of a deed in the possession of the party whose solicitor had altered it, but an executed copy left in the possession of another signatory was admitted in evidence, this executed copy never having been sealed or submitted to any other unauthorized alteration. The case shows clearly that unauthorized application of a seal will invalidate a document not expressed to be made under seal. But insofar as an unaltered executed copy of the same document was admitted the case turns, I think, on special and unusual facts. Unless the rule is one of a purely formal and arbitrary character — which does not seem to be the case in its modern application — I do not think that a party who has altered an executed copy of a document in a material way can, in a normal case, later be allowed to rely on another unaltered executed copy.

*(c) Conclusion*

The rule excluding altered documents, in its modern application, appears to rest on the principle or policy that the law will not assist a party to enforce a bargain who has placed the other party in jeopardy by unilateral alteration of the instrument by which their bargain was made.

The basis of the rule is stated by Jessel M.R. in *Suffell v. Bank of England* (1882), 9 Q.B.D. 555 (C.A.), cited by our Court of Appeal in *Johnson v. Trobak* (supra, p. 690):

"The policy of the law has been already stated, namely, that a man shall not take the chance of committing a fraud, and when that fraud is detected recover on the instrument as it was originally made."

It is clear that the "fraud" referred to need not be a dishonest act, but may be any unauthorized alteration by which the document might be misrepresented and which, if unexplained, might have prejudiced its maker. The policy of the law is, by a perhaps stern and sometimes costly rule, firmly to discourage a practice hazardous to commercial dealings.

Thus a person who effects such an alteration, so far as the law is concerned, is taken to have obliterated the whole document and rendered it void as against any party who could have been prejudiced by the alteration. While the rule has attracted critical comment from some writers — notably Mr. Justice Holmes in his memorable address on "The Path of the Law" (1896-97), 10 Harvard L. Rev. 457, at p. 473 — it still serves a practical purpose and appears to continue to be in full force in this province.

The plaintiff's claim against both of the personal defendants must accordingly be dismissed with costs.

*Action dismissed.*

---

## STEELE and STEELE v. ROYAL INSURANCE COMPANY OF CANADA

### County Court, Hutchison Co. Ct. J.

Heard — December 22, 1982.
Judgment — January 18, 1983.

**Practice (General) — Institution of proceedings — Writ of summons — Form of writ — Nullities and irregularities — Writ intituled in "County Court of Victoria" after amendments to County Court Act amalgamating such court with County Court of Nanaimo to form County Court of Vancouver Island — Misnomer capable of amendment.**

A writ of summons intituled in the County Court of Victoria is not a nullity, notwithstanding the passage of the amendments made to the County Courts Act under the Attorney-General Statutes Amendment Act, 1978. Under the amendments, the County Court of Victoria and the County Court of Nanaimo were "amalgamated" under the name and style of "The County Court of Vancouver Island". As the word "amalgamated" implies the intermingling of two bodies into one, the County Court of

A

[HOUSE OF LORDS]

PHOTO PRODUCTION LTD. . . . . . RESPONDENTS

AND

SECURICOR TRANSPORT LTD. . . . . APPELLANTS

B
1979  Nov. 12, 13, 14;                    Lord Wilberforce, Lord Diplock,
1980  Feb. 14,                    Lord Salmon, Lord Keith of Kinkel and
                                                    Lord Scarman

*Contract—Exceptions clause—Fundamental breach of contract—*
*Contract providing night security patrol for factory—Security*
*company under no circumstances to be liable for unforeseeable*
C    *acts.of employee—Employee deliberately starting fire destroying*
*factory—Whether fundamental breach terminating contract rule*
*of law—Whether exceptions clause covering deliberate acts*

The plaintiffs contracted with the defendants for the pro-
vision of a night patrol service for their factory of four
visits a night. The main perils which the parties had in mind
were fire and theft. The contract was on the defendants'
D    printed form incorporating standard conditions which pro-
vided: "1. Under no circumstances shall the company be
responsible for any injurious act or default by any employee
of the company unless such act or default could have been
foreseen and avoided by the exercise of due diligence on the
part of the company as his employer; nor, in any event, shall
the company be held responsible for: (*a*) Any loss suffered by
the customer through . . . fire or any other cause, except
E    insofar as such loss is solely attributable to the negligence of
the company's employees acting within the course of their
employment." Condition 2 limited the defendants' potential
liability under the terms of the contract " or at common law."

On a Sunday night one of the defendants' employees
entered the factory on duty patrol and lit a fire which
burned down the factory. The employee, who had satisfactory
references and had been employed by the defendants for some
F    three months, later said that he had only meant to start a
small fire but that it had got out of control.

The plaintiffs claimed damages, particularised at over
£648,000, based on breach of contract and/or negligence.
MacKenna J. rejected allegations against the defendants of
want of care and failure to use due diligence as employers,
and held that condition 1 of the contract excluded them from
responsibility for his act in setting fire to the factory and
G    that the doctrine of fundamental breach did not prevent judg-
ment being given for the defendants. The Court of Appeal
reversed his decision.

On appeal by the defendants:—

*Held,* allowing the appeal, (1) that the doctrine of funda-
mental breach by virtue of which the termination of a contract
brought it, and, with it, any exclusion clause to an end was not
H    good law; that the question whether and to what extent an
exclusion clause was to be applied to any breach of contract
was a matter of construction of the contract and normally
when the parties were bargaining on equal terms they should
be free to apportion the risks as they thought fit, making

Photo Production v. Securicor Ltd. (H.L.(E.))                    [1980]

provision for their respective risks according to the terms   A
they chose to agree (*post*, pp. 841D, 842E–G, H—843A, E, 848E–G,
849A–B, 850A—851A, 853B–C, E–F).

*Suisse Atlantique Société d'Armement Maritime S.A.* v.
*N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361,
H.L.(E.) explained.

*Charterhouse Credit Co. Ltd.* v. *Tolly* [1963] 2 Q.B. 683,
C.A.; *Harbutt's " Plasticine" Ltd.* v. *Wayne Tank and Pump
Co. Ltd.* [1970] 1 Q.B. 447, C.A. and *Wathes (Western) Ltd.*   B
v. *Austins (Menswear) Ltd.* [1976] 1 Lloyd's Rep. 14, C.A.
overruled.

(2) That the words of the exclusion clause were clear and
on their true construction covered deliberate acts as well as
negligence so as to relieve the defendants from responsibility
for their breach of the implied duty to operate with due
regard to the safety of the premises (*post*, pp. 846C, E–F,
850D–F, 851D–E, 852E–G, 853E–F).

Decision of the Court of Appeal [1978] 1 W.L.R. 856;   C
[1978] 3 All E.R. 146 reversed.

The following cases are referred to in their Lordships' opinions.

*Alderslade* v. *Hendon Laundry Ltd.* [1945] K.B. 189; [1945] 1 All E.R.
244, C.A.

*Boston Deep Sea Fishing and Ice Co.* v. *Ansell* (1888) 39 Ch.D. 339, C.A.   D

*Charterhouse Credit Co. Ltd.* v. *Tolly* [1963] 2 Q.B. 683; [1963] 2 W.L.R.
1168; [1963] 2 All E.R. 432, C.A.

*Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.* (1936) 155 L.T. 177; [1936]
2 All E.R. 597, H.L.(E.).

*Harbutt's " Plasticine" Ltd.* v. *Wayne Tank and Pump Co. Ltd.* [1970]
1 Q.B. 447; [1970] 2 W.L.R. 198; [1970] 1 All E.R. 225, C.A.

*Hardwick Game Farm* v. *Suffolk Agricultural Poultry Producers Associa-*   E
*tion* [1966] 1 W.L.R. 287; [1966] 1 All E.R. 309, C.A.; [1969] 2 A.C.
31; [1968] 3 W.L.R. 110; [1968] 2 All E.R. 444, H.L.(E.).

*Heyman* v. *Darwins Ltd.* [1942] A.C. 356; [1942] 1 All E.R. 337, H.L.(E.).

*Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962]
2 Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.

*Johnson* v. *Agnew* [1980] A.C. 367; [1979] 2 W.L.R. 487; [1979] 1 All
E.R. 883, C.A.   F

*Karsales (Harrow) Ltd.* v. *Wallis* [1956] 1 W.L.R. 936; [1956] 2 All E.R.
866, C.A.

*Kenyon, Son & Craven Ltd.* v. *Baxter Hoare & Co. Ltd.* [1971] 1 W.L.R.
519; [1971] 2 All E.R. 708.

*Lep Air Services Ltd.* v. *Rolloswin Investments Ltd.* [1973] A.C. 331;
[1972] 2 W.L.R. 1175; [1972] 2 All E.R. 393, H.L.(E.).

*Levison* v. *Patent Steam Carpet Cleaning Co. Ltd.* [1978] Q.B. 69; [1977]   G
3 W.L.R. 90; [1977] 3 All E.R. 498, C.A.

*Morris* v. *C. W. Martin & Sons Ltd.* [1966] 1 Q.B. 716; [1965] 3 W.L.R.
276; [1965] 2 All E.R. 725, C.A.

*Suisse Atlantique Société d'Armement Maritime S.A.* v. *N.V. Rotter-
damsche Kolen Centrale* [1967] 1 A.C. 361; [1966] 2 W.L.R. 944;
[1966] 2 All E.R. 61, H.L.(E.).

*Trade and Transport Inc.* v. *Iino Kaiun Kaisha Ltd. (The Angelia)* [1973]   H
1 W.L.R. 210; [1973] 2 All E.R. 144.

*U.G.S. Finance Ltd.* v. *National Mortgage Bank of Greece and National
Bank of Greece S.A.* [1964] 1 Lloyd's Rep. 446, C.A.

**A**

*Ward (R. V.) Ltd.* v. *Bignall* [1967] 1 Q.B. 534; [1967] 2 W.L.R. 1050;
    [1967] 2 All E.R. 449, C.A.

*Wathes (Western) Ltd.* v. *Austins (Menswear) Ltd.* [1976] 1 Lloyd's Rep.
    14, C.A.

The following additional cases were cited in argument:

*Alexander* v. *Railway Executive* [1951] 2 K.B. 882; [1951] 2 All E.R. 442.

**B**

*Canada Steamship Lines Ltd.* v. *The King* [1952] A.C. 192; [1952] 1 All
    E.R. 305, P.C.

*Carter (John) (Fine Worsteds) Ltd.* v. *Hanson Haulage (Leeds) Ltd.*
    [1965] 2 Q.B. 495; [1965] 2 W.L.R. 553; [1965] 1 All E.R. 113, C.A.

*Cheshire* v. *Bailey* [1905] 1 K.B. 237, C.A.

*Evans* v. *Glasgow District Council*, 1979 S.L.T. 270.

*Farnworth Finance Facilities Ltd.* v. *Attryde* [1970] 1 W.L.R. 1053; [1970]
    2 All E.R. 774, C.A.

**C**

*Gillespie Bros. & Co. Ltd.* v. *Roy Bowles Transport Ltd.* [1973] Q.B.
    400; [1972] 3 W.L.R. 1003; [1973] 1 All E.R. 193, C.A.

*Gibaud* v. *Great Eastern Railway Co.* [1921] 2 K.B. 426, C.A.

*Hollier* v. *Rambler Motors (A. M. C.) Ltd.* [1972] 2 Q.B. 71; [1972] 2
    W.L.R. 401; [1972] 1 All E.R. 399, C.A.

*Port Swettenham Authority* v. *T. W. Wu & Co. (M.) Sdn. Bhd.* [1979]

**D**

    A.C. 580; [1978] 3 W.L.R. 530; [1978] 3 All E.R. 337, P.C.

*Smith* v. *South Wales Switchgear Co. Ltd.* [1978] 1 W.L.R. 165; 1978
    S.C.(H.L.) 1; [1978] 1 All E.R. 18, H.L.(Sc.).

*Tesco Supermarkets Ltd.* v. *Nattrass* [1972] A.C. 153; [1971] 2 W.L.R.
    1166; [1971] 2 All E.R. 127, H.L.(E.).

APPEAL from the Court of Appeal.

**E**    This was an appeal from the Court of Appeal (Lord Denning M.R.,
Shaw and Waller L.JJ.) dated March 15, 1978, whereby the appeal of the
present respondents, Photo Production Ltd., was allowed and the judg-
ment of MacKenna J. dated April 7, 1976, was set aside and in lieu
thereof judgment was entered for the respondents for £615,000 with
interest to be agreed and costs, and it was further ordered that the
present appellants, Securicor Transport Ltd., should pay the respon-

**F**    dents' costs of the appeal.

The material facts which gave rise to the questions involved in this
appeal, and which were either admitted or proved, were as follows:

(1) The respondents were the owners of factory premises at Gilling-
ham in Kent where they made cards including Christmas cards. (2) The
appellants and the respondents entered into a written agreement dated

**G**    January 2, 1968, by paragraph 1 of which the respondents requested the
appellants to carry out in respect of their premises the service described
in paragraph 2 of the agreement at the agreed charge of £8.15.0. per
week. (3) Paragraph 2 of the agreement described the service to be
provided by the appellants in the following words: " The company shall
provide their night patrol service whereby four visits per night shall be
made seven nights per week and two visits shall made during the afternoon

**H**    of Saturday and four visits shall be made during the day of Sunday."

(4) Paragraph 4 of the agreement provided that the standard
conditions printed on its reverse were incorporated therein. (5) The

standard conditions printed on the reverse of the agreement included the
following (so far as is material):                    .                    A

" 1. Under no circumstances shall the company be responsible for
any injurious act or default by any employee of the company unless such
act or default could have been foreseen and avoided by the exercise of
due diligence on the part of the company as his employer; nor, in any
event, shall the company be held responsible for: (a) Any loss suffered
by the customer through burglary, theft, fire or any other cause, except   B
insofar as such loss is solely attributable to the negligence of the
company's employees acting within the course of their employment . . .
(b) Any failure by the company to carry out the service by reason of
strikes, lockouts, labour disputes, weather conditions, traffic congestion,
mechanical breakdown, obstruction of any public or private road or
highway or other cause beyond the company's control. . . . 2. If, not-   C
withstanding the foregoing provision, any liability on the part of the
company shall arise (whether under the express or implied terms hereof
or at common law) for any injury to or loss or damage of whatsoever
nature sustained by the customer, such liability shall under all circum-
stances be confined to claims of which written notification is received by
the secretary of the company at its head office within one month of the
happening of the default by the company alleged to give rise to such   D
liability; and subject thereto, shall be limited to the payment by the
company by way of damages of a sum not exceeding £1,000 (inclusive of
costs) in respect of any one claim arising from any duty assumed by the
company which involves the operation, testing, examination or inspection
of the operational condition of any machine, plant or equipment in or
about the customer's premises, or which involves the provision of any   E
service unrelated solely to the prevention or detection of fire or theft; and
shall be otherwise limited to a maximum of £25,000 for the consequences
of each incident involving fire or explosion; and shall be further limited
to a maximum of £250,000 (inclusive of costs) in respect of the aggregate
of all claims of whatsoever nature arising during any consecutive period
of twelve months."

F

. . (6) In June 1970 the appellants employed George Andrew Musgrove
as a patrolman at their branch in Chatham in Kent. Musgrove was
then 23 years old, unmarried, came of a respectable family, had a good
work record, and lived with his parents. He provided satisfactory
references. (7) On the night of Sunday, October 18, 1970, Musgrove
was sent by the appellants to carry out their nightly patrol service at
the respondents' premises. (8) At about 11.50 p.m. Musgrove arrived   G
at the respondents' premises and entered the main factory building. He
there deliberately started a fire by lighting a match and throwing it into
a cardboard box or other material. The fire spread and a large part of
the factory was destroyed. MacKenna J. was unable to decide whether
Musgrove intended to light only a small fire (which was the very least he
intended to do) or whether he intended to cause much more serious   H
damage, and in either case what was the reason for his act. Musgrove
subsequently pleaded guilty to the offence of maliciously damaging a
building, stock and machinery, contrary to section 51 of the Malicious

A   Damage Act 1861, and was sentenced to three years' imprisonment.   (9)
As a result of the fire the respondents suffered loss amounting to the
agreed sum £615,000. (10) After the fire the appellants and the respondents
entered into a new written agreement dated October 27, 1970, which
related to the respondents' office block only, and which incorporated
special conditions differing from that of the contract in question in the
action.

B

*Richard Yorke Q.C., Anthony Machin Q.C.* and *Roger Toulson* for
the appellants.   The Law Commission's report on exemption clauses, 1975
(Law Com. No. 69), p. 18, para. 43; p. 78, para. 209, provides the Law
Commission's view on the point here in issue.

If the appellants fail to establish that *Harbutt's " Plasticine " Ltd.* v.
C   *Wayne Pump and Tank Co. Ltd.* [1970] 1 Q.B. 447 was wrongly decided
they may succeed on another ground.   If they succeed further questions
may arise as to liability and limitation of damages.

Ten propositions of law may be derived from *Suisse Atlantique Société
d'Armement Maritime S.A.* v. *N.V. Rotterdamsche Kolen Centrale*
[1967] 1 A.C. 361 and certain other cases, all in the House of Lords:

(1) Unless an exclusion clause in a contract is so wide that to give literal
D   effect to it would deprive the so-called contract of any meaning it falls
to be construed as does any other clause in the contract: pp. 398G, 432B–C.

(2) Corollary: There is no rule of law that an exclusion clause, as
such, will not be given effect to its tenor in any particular
circumstances: pp. 392E, 399C–E, 405G, 425E—426A.   (Quaere, save where
the performance is totally different from that which the contract con-
E   templates: p. 431A–B.)

(3) It is always a question of construction, and there are established
canons of construction; among them, such clauses will be construed
strictly normally, not applying to a situation created by a fundamental
breach of contract (pp. 398F, 406G, 410C, E–F) because they are not
intended to give exemption from the consequences of fundamental
F   breach: pp: 392F, 427E.

(4) An exclusion clause may have the effect of either preventing what
would otherwise be a breach of contract from being a breach or relieve
the party in default from the obligation to pay damages, either in whole
or in part: pp. 420E, 431G.

(5) But if sufficiently clear and unambiguous terms are used (and the
more radical the clause the clearer must be the language) such a clause
G   may even apply to breach of what would otherwise be a fundamental
term or what would otherwise be a fundamental breach, either because
it makes the " breach " not a breach at all or because it prevents the
breach or term from being regarded as fundamental in which case it may
also modify the obligation to pay damages: pp. 392E, 398—399, 428F,
431F.

H   (6) What is meant by fundamental is something which the innocent
party would be entitled to regard as a repudiation and elect whether to
accept it or not, as a fundamental term, because the contract stipulates
expressly or by necessary implication for it to be a fundamental breach

Photo Production v. Securicor Ltd. (H.L.(E.))                    [1980]

and the parties must be taken to have contemplated that, if such an
event occurred the innocent party would be entitled to be relieved from    A
further performance: pp 397E, 410A–B, 421G—422A, C–D.

(7) The innocent party always has a choice to accept the repudiation
or to affirm and continue the contract. If he accepts, the contract
" ceases to exist " or is " at an end." (This includes the case where he
has no choice and he " accepts " by issuing his writ.) If he affirms, the
contract continues with its exclusion clauses: *Hain Steamship Co. Ltd.* v.    B
*Tate and Lyle Ltd.* (1936) 155 L.T. 177, 179–180; *Suisse Atlantique* [1967]
1 A.C. 361, 398C, 400A, 425F–G.

(8) That the contract " ceases to exist " or is " at an end " does not
mean that the terms have no application. It means: (1) The innocent
party is relieved from his obligation as to further performance. (2) The
guilty party's obligations and right to further performance are also at an    C
end. But they are replaced by a secondary obligation to pay money to the
innocent party in compensation for loss resulting from failure to perform
the primary obligations: the *Hain Steamship* case, 155 L.T. 177, 179–180;
*Suisse Atlantique* [1967] 1 A.C. 361, 391–392 and *Lep Air Services Ltd.* v.
*Rolloswin Investments Ltd.* [1973] A.C. 331, 345G—346A, 350C–E.

(9) Those damages can only be measured against the terms of the
primary obligation. If the contract ceased to exist there would be nothing    D
by which to measure the damages. Therefore the expressions " cease to
exist " and " at an end " can only refer to the further performance of
the primary obligation: the *Lep* case at pp. 345G—346A and *Heyman* v.
*Darwins Ltd.* [1942] A.C. 356, 379, 399.

(10) Conclusion: An exclusion clause has no effect after an accepted
repudiation (for fundamental breach in either sense) as regards any    E
matters after the breach. As to matters leading up to the breach,
including the breach itself, it is a question of construction of the contract
whether the clause applies and, if so, with what effect: *Heyman* v.
*Darwins Ltd.* at pp. 371—372, 379, 398—399.

It is to be noted that: (1) There is no suggestion in any of the speeches
cited that, after the affirmation of a contract by the innocent party,
exclusion clauses are somehow excised from the continuing contract. (2)    F
None of their Lordships said that on the acceptance of repudiation by
fundamental breach, an exclusion clause necessarily ceased to apply,
whatever its terms.

The development of this branch of the law has been bedevilled by well
meaning concessions made by counsel in the reported cases which do not
bind the courts. The decision in the present case cannot be supported on    G
the grounds in any of the judgments in the Court of Appeal.

All the opinions in *Suisse Atlantique* [1967] 1 A.C. 361 support the
appellants' propositions: Viscount Dilhorne, pp. 390—395; Lord Reid, pp.
397—401, 405—406; Lord Hodson, pp. 409—412; Lord Upjohn, pp. 420—
422, 425, 427—428 and Lord Wilberforce, pp. 430, 432, 434—435. See
also the *Lep* case [1973] A.C. 331, 345—346, 350 *per* Lord Reid and    H
Lord Diplock and *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, 371—372,
379, 398–399, *per* Lord Macmillan, Lord Wright and Lord Porter
respectively.

A.C.    Photo Production v. Securicor Ltd. (H.L.(E.))

A    *Harbutt's* case [1970] 1 Q.B. 447, 462, 464, 466, 470—472, 474—475, was wrongly decided. Nothing in the report of the argument expressly supports the statement of Widgery L.J. at p. 470H that it was not disputed that if there was a fundamental breach which the plaintiffs accepted as amounting to repudiation that put an end to the whole contract depriving the defendants of the protection of clause 15: see p. 458F–G. To see whether a breach is fundamental one must look at the facts after the

B    event and not merely at the breach itself. It does not follow that, in considering an exemption clause, that answers the question whether it was in the contemplation of the parties that there should be liability for the damage in question. *Harbutt's* case [1970] 1 Q.B. 447 is discussed in the Law Commission's report in 1975 (Law Com. No. 69 pp. 77—78, paras. 206—207). *Charterhouse Credit Co. Ltd.* v. *Tolley* [1963] 2 Q.B.

C    683, 693, 702—705, 707—710, 713—714, was rightly decided on its facts but not for the reasons given.

*Harbutt's* case [1970] 1 Q.B. 447 was considered in *Farnworth Finance Facilities Ltd.* v. *Attryde* [1970] 1 W.L.R. 1053, 1058, 1060; *Wathes (Western) Ltd.* v. *Austins (Menswear) Ltd.* [1976] 1 Lloyd's Rep. 14, 18 20—22. 23, 25 and *Levison* v. *Patent Steam Carpet Cleaning Co. Ltd.* [1978] Q.B. 69, 79—81, 82G–H, 83A–B. See also *Trade and Transport Inc.*

D    v. *Iino Kaiun Kaisha Ltd.* (*The Angelia*) [1973] 1 W.L.R. 210, 232, 236 and *Kenyon, Son & Craven Ltd.* v. *Baxter Hoare & Co. Ltd.* [1971] 1 W.L.R. 519.

The true question which arises is: " what was the contract in the present case ? " One cannot spell out of it an enlarged general duty, imposing liability on the appellants simply because an employee has done

E    something which he should not have done. What this man did had nothing to do with what he was employed to do. The trial judge correctly applied his mind to the provisions of the contract in holding that it excluded the appellants' liability. The man's act was not to be attributed to his employers. In any event, he did not deliberately burn down the factory. His plea of guilty did not amount to that; he was not convicted

F    of arson. The language of condition 1 was enough to protect the appellants from liability.

There is no ambiguity in condition 1 and it can only be read to limit the appellants' liability. This was not a case where a man was put in to patrol the factory who was not up to it because he was not trained or where the company failed to take up references which would have revealed that he was temperamentally unsuitable. The appellants would not have

G    been liable if the respondents' managing director working on a Saturday had gone away leaving open a door by which burglars got in, since his negligence would have been the real cause of the loss.

*Gibaud* v. *Great Eastern Railway Co.* [1921] 2 K.B. 426, 437—438, and *Gillespie Bros. & Co. Ltd.* v. *Roy Bowles Transport Ltd.* [1973] Q.B. 400, 416—417, 418—421 show that under condition 1 the appellants were

H    accepting liability for acts of the patrolman if they could have reasonably been foreseen by them. Otherwise the customer takes the risks. But if they were at fault the liability would be limited as set out in condition 2.

As to the concession referred to by Lord Denning M.R. in the Court

of Appeal [1978] 1 W.L.R. 856, 861, it was only made because it was
in no one's interest to argue the point.   The House of Lords is not now
invited to approve the concession as a statement of the law that the
patrolman was acting in the course of his employment even though he
started the fire deliberately.   The appellants had contracted to provide
a service on the premises.   The patrolman while there went off on a
frolic of his own.

The appellants have exempted themselves by clear and unambiguous
language from vicarious liability for the deliberate act of their servant:
*John Carter (Fine Worsteds) Ltd.* v. *Hanson Haulage (Leeds) Ltd.* [1965]
2 Q.B. 495, 513, 524, 533.   As to *Morris* v. *C. W. Martin & Sons Ltd.*
[1966] 1 Q.B. 716, 725, 727—728, 729—730, 732—733, 738, 740, the mind
of the patrolman cannot be attributed to the appellants and so it cannot
be said that they deliberately burnt down the factory in fundamental
breach of their contract.

The Unfair Contract Terms Act 1977 was passed after this contract
was entered into but Schedule 2 records a series of objective tests of
unfairness.   To apply them it would be necessary to plead them and call
evidence with regard to them.   Here no such matters were raised on the
pleadings, so it was not open to the Court of Appeal to consider them.
See also sections 3 and 11.

In this exemption clause one must distinguish between misconduct of
the authority and misconduct of its servant: *Port Swettenham Authority*
v. *T. W. Wu & Co. (M.) Sdn. Bhd.* [1979] A.C. 580, 592.

*Michael Wright Q.C.* and *John Crowley* for the respondents.   It is
necessary to decide the nature and purpose of the contract entered into
by the parties and what obligations were undertaken by the appellants.
This contract was to provide a service, a patrol service.   The purpose
of the visits was to safeguard (so far as the skill and ability of the
appellants' servants could) the property of their customers against (inter
alia) fire.   It was clearly contemplated that one of the major purposes
of the patrol service was protection against fire and theft.   The
appellants' duty was not limited to using reasonable care in recruiting
their staff, training them and giving them instructions to carry out the
visits.   Even if a man were properly recruited, " vetted ", trained and
directed, it would be idle to suggest that, if he went home to bed, he
would not be involving the appellants in a breach of duty to their
customers, since there must be an attendance at the premises by a man
whose purpose was to preserve them from fire.

It was a fundamental term of the contract that, while the appellants'
employees were on the premises to discharge their contractual obligation,
they would not do any deliberate act calculated to do damage to the
customers' property; it matters not whether the fire is large or small.   If
this security service had been a one-man business in which the contractor
was carrying out the work he had undertaken to do a negligent breach
would be a breach of contract and no more, but, if he did deliberate
damage, that would be a fundamental breach and if a representative
of the customers saw him deliberately drop a match on combustible
materials, he would have been entitled to order him off the premises

A.C.                    **Photo Production v. Securicor Ltd. (H.L.(E.))**

A and to have no more to do with him. The act of setting fire to the customers' property is to be properly described as a total breach of contract, akin to deliberate misdelivery or theft in the bailment cases, an act wholly inconsistent with the purpose of the contract. It is not necessary to attribute the deliberateness of the act to the employers, but its deliberateness fixes its quality, enabling the innocent party to say that there is a total breach. If the act of the servant is to be described as a

B total breach, there is a rule of law that an exceptions clause will not apply. A total breach is a fundamental breach: *Suisse Atlantique* [1967] 1 A.C. 361, 432.

The contract was to safeguard the customers' property within certain limits. An act was committed by the appellants' servant who deliberately started a fire, wholly contrary to the purposes of the contract and destructive of the customers' property.

C *Kenyon's* case [1971] 1 W.L.R. 519 was a case of purported performance of the contract and therefore turned on construction of the contract. The breach in the present case went to the root of the contract: the *Hain Steamship* case, 155 L.T. 177, 179, 182. An essential part of the contract was to safeguard the premises and the fundamental breach of it brought the contract to an end: *Alexander* v. *Railway*

D *Executive* [1951] 2 K.B. 882, 887, 888.

It is also necessary to look at the relevant clause itself and establish whether or not it modifies the basic obligations of the parties or limits liability for the breach. In clause 1 there is a subclause which modifies the obligations and relates to an exclusion of liability: clause 1 (b). The essential core of the contract was that the appellants should send a

E patrolman into the premises and clause 1 was contemplating that if he committed an injurious act, that was prima facie a breach of their obligations under the contract, but that they would not be responsible unless certain conditions were fulfilled. If the patrolman did not turn up, that would be a default, and if, in his absence, the factory burnt, that would be a default too. What the draftsman of the contract achieved was to provide for a duty to give a patrol service and to limit the

F consequences of a breach. Clause 1 must be read as in any event imposing on the parties sufficient duties to give some meaning to the contract. At the very least the customer could withhold payment for a visit which did not take place, since it is fundamental to the contract that the appellant should see that a man is on the premises to prevent fire or theft. On any view an exceptions clause which purports to relieve a party of the con-

G sequences of his breach of contract must be construed strictly and its words must be clear. One can never construe a contract so as to remove the substance of it. One should never construe an exceptions clause so as to exclude a major breach if the clause has enough content in excluding a minor breach: *Alderslade* v. *Hendon Laundry Ltd.* [1945] K.B. 189, 192, 194; *Canada Steamship Lines Ltd.* v. *The King* [1952] A.C. 192, 207—208, 211—212, and *Gillespie's* case [1973] Q.B. 400, 414, 420—421.

H The words of an exceptions clause will not protect a party from liability for negligence unless they are express. Similarly where the act is one of deliberate wrongdoing such a clause should not be interpreted as affording

Photo Production v. Securicor Ltd. (H.L.(E.))          [1980]

A
protection unless the words are express. The more extensive the scope
of the conduct against which protection is sought, the more explicit the
language must be to cover it. Even assuming that negligence is covered,
as well as innocent, though injurious, conduct by the patrolman, the clause
should not be used to protect the appellant from liability for the wilful
wrongdoing of their servants.

B
*Carter's* case [1965] 2 Q.B. 495 may need to be reconsidered in the
light of *Morris's* case [1966] 1 Q.B. 716. When it was decided *Cheshire*
v. *Bailey* [1905] 1 K.B. 237 was still regarded as good law. Now we know
that a master may be liable for the criminal wrongdoing of his servant
if it is within the scope of the task entrusted to him. *Carter's* case [1965]
2 Q.B. 495 cannot be regarded as an authority for the proposition for
which it is cited. This patrolman was dealing with the security of the
premises and his employers were liable for the way in which he carried
out his duties.

C
In *Smith* v. *South Wales Switchgear Co. Ltd.* [1978] 1 W.L.R. 165,
168—169, 172—175, 177—180, *Gillespie's* case [1973] Q.B. 400 was
explained in favour of the respondents' submissions and effectively limits
its scope, so that it appears that the word " whatsoever " is not of an all
embracing character. See also *Evans* v. *Glasgow District Council*, 1979
S.L.T. 270.

D
It is not necessary to examine *Harbutt's* case [1970] 1 Q.B. 447
because on the true construction of the clause in the present case the
appellants cannot succeed and therefore no point of principle arises.
The words " any injurious act " in clause 1 must refer to an act falling
within the class of negligence and not to a deliberate act. But *Harbutt's*
case can be reconciled with *Suisse Atlantique* [1967] 1 A.C. 361. In
the latter case *Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.*, 155 L.T.
177 was relied on as an authority and is good law. The language of
Lord Atkin at p. 179 is unequivocal that if there is a breach of contract
(a deviation in that case) the innocent party can say that he is not
bound by the contract, and that includes an exceptions clause. He is
entitled to treat the deviation as a repudiation. In *Suisse Atlantique*
[1967] 1 A.C. 361 both Lord Reid and Lord Upjohn accepted what
Lord Atkin said and took it to its logical conclusion. At pp. 397—398
Lord Reid described fundamental breach as being that which entitled
the innocent party to rescind the contract. He did not say " breach
of a fundamental term." This branch of the law is bedevilled by con-
fusion in the use of terms. What Lord Upjohn said at p. 425E–G as
to the guilty party in the case of fundamental breach not being able
to rely on any special term of the contract, is the language not of
construction but of a rule of law. See also pp. 419–420, 425–427, (Lord
Upjohn). For the different approach of Viscount Dilhorne, Lord Hodson
and Lord Wilberforce: see pp. 390, 392, 410–412, 431–436.

H
*Harbutt's* case [1970] 1 Q.B. 447 can be regarded either as a case
of a breach of a fundamental term or a radical or total breach of
contract. Without reference to the consequences the innocent customer
here is entitled to reject or not to be bound by the exceptions clause.
*Kenyon's* case [1971] 1 W.L.R. 519, 529–530 indicates how *Suisse*

*Atlantique* [1967] 1 A.C. 361 and *Harbutt's* case [1970] 1 Q.B. 447 can be reconciled.

One must always bear in mind the difference between " breach of a fundamental term " and " fundamental breach." The latter corresponds to a performance totally different from that which the contract contemplates: Lord Wilberforce in *Suisse Atlantique* [1967] 1 A.C. 361, 431. The *Charterhouse* case [1963] 2 Q.B. 683 does not appear to fit into his categorisation.

The fundamental content of this contract is that the appellants were agreeing to patrol the premises, not just to provide staff; they were undertaking a duty to do that. The fundamental purpose of the contract was to afford protection to the premises. The servants to whom the task was entrusted must not deliberately hazard the property, whether by starting a fire or conspiring with thieves. The breach here was in its quality a breach of a fundamental term. The fact that it was committed by a servant is irrelevant. A company can only act through servants. As a result of that breach the contract went and with it the exceptions clauses.

The theory of interdependent promises promulgated by Francis Dawson in " Fundamental Breach of Contract " (1975) 91 L.Q.R. 380 is consistent with the *Hain Steamship* case, 155 L.T. 177, which illustrates the corollary.

On the facts of the present case Lord Denning M.R. was fully entitled to approach it as he did. The *Hain Steamship* case, 155 L.T. 177, was authority for saying that the exceptions clause did not apply. Waller L.J. was correct in his analysis [1978] 1 W.L.R. 856, 872. It is a question of fact and degree in each case. The language of Shaw L.J. at p. 867 shows that he regarded the parties as having stepped right outside the contract. The situation was that of performance totally different from that contemplated by the contract: Lord Wilberforce in *Suisse Atlantique* [1967] 1 A.C. 361, 431.

What Diplock L.J. said in *Morris's* case [1966] 1 Q.B. 716, 732–733, shows that the master is stamped with the act of his servant and in the case of a dishonest servant cannot say that only his servant, and not he, was dishonest: see too *Chitty on Contracts,* 24th ed. (1977), vol. 2, para. 2820, pp. 319–320, note 15.

The appellants say that they are not liable for the acts of the patrolman if they have been duly diligent in supplying the service, but clause 1 does not bear that out. If a typist fails to put the customers' premises on the right list for patrol or if the man was not vetted by the local manager in employing him, both these omissions would be " injurious acts " and the appellants would not be absolved from liability because the default was not at managerial level. Otherwise the contract would be stripped of any benefit or content.

The owners of a factory are at risk from fire, flood and theft. The question is: who should bear the risk created by the introduction to the premises of strangers, outside their control, coming in when the owners are not present and cannot control them, nor have the owners any part in their employment, training or instruction. The owners are

obliged to hand over their keys to them. In the London area fire
insurers will not insure factories unless a security system is provided
and the purpose of the contract is to diminish the risks. But it carries
with it the seeds of another risk and that risk should be borne by those
who can control the men and make sure they are not criminal or care-
less or mad. The problem only arises when the men introduced are
entrusted with the safety of the premises.

For malicious damage by a patrolman his employers are liable. The
essential quality of the act which would entitle the customers to resile
from the contract meant that they could have terminated the contract
the moment the man dropped the match. All the loss for which the
claim is brought was then in futuro. Any question of election is otiose.
The contract was discharged by force majeure.

Condition 2 is dependent on condition 1. Before it can come into
operation in the ordinary case the claim will have to be started off by
condition 1, because the claimant will have to prove an injurious act by
the patrolman which could have been avoided by the appellants and is
the cause of the loss. Condition 2 contemplates negligence, but not a
deliberate act by the patrolman.

In summary: (1) The basic purpose of the contract is to provide a
service, i.e. to patrol the premises. To treat clause 1 as modifying the
obligation ignores this fact and treats the appellants as suppliers of
trained manpower without obligation for the way the men discharge
their duties.

(2) It is necessary that the patrolmen should so act as to safeguard
the property for which they are responsible while patrolling, and the
corollary of that is that they must not deliberately damage the property
in their charge.

(3) A breach of that duty, which must be wilful, falls within *Suisse
Atlantique* [1967] 1 A.C. 361, 432B, and a guilty party cannot rely on
an exclusion clause as a rule of law: *Hain Steamship* case, 155 L.T.
177. If that is wrong, then as a result of the rule of construction,
which would describe the exception as repugnant to the purpose of
the contract, it should be struck out.

(4) In any event the effect of the breach was fundamental and in
such a case if the " interdependent promises " theory is right the innocent
party is not bound by the exceptions clause.

(5) The Court of Appeal was right in attributing the quality of the
patrolman's act to the appellants because that is the only logical conse-
quence of *Morris's* case [1966] 1 Q.B. 716 and any other answer would
seriously diminish the responsibility of the employers for the conduct
of their employees. Further, the deliberateness of the patrolman's act
is also relevant.

(6) Such secondary obligations as might survive the collapse of the
contract are not here material.

(7) In any event, on the proper construction of conditions 1 and 2
these are interdependent and only cover negligence and not deliberate
wrongdoing. (8) The contractual relations, as so interpreted, are
reasonable.

A   *Yorke Q.C.* in reply.   Under the Hague Rules one cannot attribute the wicked mind of the master of a ship to his owners, e.g., in scuttling a ship or letting her be picked up by pirates, though one might ask: Did they check the master's references?   Had he a long record of unfortunate happenings?   Similarly the patrolman's wicked mind cannot be attributed to his employers, though the appellants accept that under condition 1 they are responsible if they have not themselves used due

B diligence.

*Alexander* v. *Railway Executive* [1951] 2 K.B. 882 does not help the respondents because the judge was only construing the relevant clause and not considering the mind of the Railway Executive.

In considering the responsibility of the company for the acts of employees one must see where the authority lies and who is in actual

C control.   See *Tesco Supermarkets Ltd.* v. *Nattrass* [1972] A.C. 153, 187 (Viscount Dilhorne); but see also p. 199A–B (Lord Diplock).   Here there is no question of the appellants thinking through the patrolman. Reliance is also placed on *Hollier* v. *Rambler Motors* (*A. M. C.*) *Ltd.* [1972] 2 Q.B. 71, 78–80.   In *Gillespie's* case [1973] Q.B. 400 the court was dealing with a clause which did not include the word " negligence." Counsel at p. 407 referred to the tests propounded in *Canada Steamship*

D *Lines Ltd.* v. *The King* [1952] A.C. 192, 208, but on the facts and in the context of *Gillespie's* case the word " whatsoever " in the indemnity clause could have no other meaning than one including negligence. *Smith* v. *South Wales Switchgear Co. Ltd.* [1978] 1 W.L.R. 165, 169, 172–173 was a totally different case from the present.   See also the article on " Exception Clauses as Dependent Promises " by Brian Coote

E (1977) 40 Modern Law Review, 41–46.

Two different things may be contemplated by " fundamental breach ": *Suisse Atlantique* [1967] 1 A.C. 361, 431 (Lord Wilberforce).   There may be a difference between Lord Wilberforce and Lord Upjohn (pp. 425–427).

The respondents are confusing two separate matters: (1) the test of reasonableness as a matter of construction, i.e., whether reasonable

F parties would have meant what is submitted, and (2) a separate test of reasonableness looking at a whole series of other matters to find whether they lead to a reasonable conclusion.   But if the words of the condition can only have one meaning, the courts can go no further than that.

Their Lordships took time for consideration.

G

February 14, 1980.   LORD WILBERFORCE.   My Lords, this appeal arises from the destruction by fire of the respondents' factory involving loss and damage agreed to amount to £615,000.   The question is whether the appellant is liable to the respondents for this sum.

The appellant is a company which provides security services.   In 1968

H it entered into a contract with the respondents by which for a charge of £8 15s. 0d. (old currency) per week it agreed to " provide their night patrol service whereby four visits per night shall be made seven nights per week and two visits shall be made during the afternoon of Saturday

**Lord Wilberforce   Photo Production v. Securicor Ltd. (H.L.(E.))**          **[1980]**

and four visits shall be made during the day of Sunday." The contract
incorporated printed standard conditions which, in some circumstances,    A
might exclude or limit the appellant's liability. The questions in this
appeal are (i) whether these conditions can be invoked at all in the events
which happened and (ii) if so, whether either the exclusion provision, or a
provision limiting liability, can be applied on the facts. The trial judge
(MacKenna J.) decided these issues in favour of the appellant. The
Court of Appeal decided issue (i) in the respondents' favour invoking the    B
doctrine of fundamental breach. Waller L.J. in addition would have
decided for the respondents on issue (ii).

What happened was that on a Sunday night the duty employee of the
appellant was one Musgrove. It was not suggested that he was unsuitable
for the job or that the appellant was negligent in employing him. He
visited the factory at the correct time, but when inside he deliberately
started a fire by throwing a match on to some cartons. The fire got out    C
of control and a large part of the premises was burnt down. Though
what he did was deliberate, it was not established that he intended to
destroy the factory. The judge's finding was in these words:

> " Whether Musgrove intended to light only a small fire (which was
> the very least he meant to do) or whether he intended to cause much
> more serious damage, and, in either case, what was the reason for    D
> his act, are mysteries I am unable to solve."

This, and it is important to bear it in mind when considering the judg-
ments in the Court of Appeal, falls short of a finding that Musgrove
deliberately burnt or intended to burn the respondents' factory.

The condition upon which the appellant relies reads, relevantly, as
follows:                                                                     E

> " Under no circumstances shall the company [Securicor] be respon-
> sible for any injurious act or default by any employee of the company
> unless such act or default could have been foreseen and avoided
> by the exercise of due diligence on the part of the company as his
> employer; nor, in any event, shall the company be held responsible
> for (a) any loss suffered by the customer through burglary, theft,    F
> fire or any other cause, except insofar as such loss is solely attri-
> butable to the negligence of the company's employees acting within
> the course of their employment. . . ."

There are further provisions limiting to stated amounts the liability of
the appellant upon which it relies in the alternative if held not to be totally
exempt.                                                                      G

It is first necessary to decide upon the correct approach to a case such
as this where it is sought to invoke an exception or limitation clause in
the contract. The approach of Lord Denning M.R. in the Court of
Appeal was to consider first whether the breach was " fundamental."
If so, he said, the court itself deprives the party of the benefit of an
exemption or limitation clause ([1978] 1 W.L.R. 856, 863). Shaw    H
and Waller L.JJ. substantially followed him in this argument.

Lord Denning M.R. in this was following the earlier decision of the
Court of Appeal, and in particular his own judgment in *Harbutt's "Plasti-*

A    *cine " Ltd.* v. *Wayne Tank & Pump Co. Ltd.* [1970] 1 Q.B. 447. In that case Lord Denning M.R. distinguished two cases (a) the case where as the result of a breach of contract the innocent party has, and exercises, the right to bring the contract to an end, (b) the case where the breach automatically brings the contract to an end, without the innocent party having to make an election whether to terminate the contract or to continue it. In the first case the Master of the Rolls, purportedly applying

B    this House's decision in *Suisse Atlantique Société d'Armement Maritime S.A.* v. *N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, but in effect two citations from two of their Lordships' speeches, extracted a rule of law that the " termination " of the contract brings it, and with it the exclusion clause, to an end. The *Suisse Atlantique* case in his view

C    " affirms the long line of cases in this court that when one party has been guilty of a fundamental breach of the contract . . . and the other side accepts it, so that the contract comes to an end . . . then the guilty party cannot rely on an exception or limitation clause to escape from his liability for the breach " (*Harbutt's* case [1970] 1 Q.B. 447, 467).

He then applied the same principle to the second case.

D    My Lords, whatever the intrinsic merit of this doctrine, as to which I shall have something to say later, it is clear to me that so far from following this House's decision in the *Suisse Atlantique* it is directly opposed to it and that the whole purpose and tenor of the *Suisse Atlantique* was to repudiate it. The lengthy, and perhaps I may say sometimes indigestible speeches of their Lordships, are correctly summarised

E    in the headnote—holding No. 3 [1967] 1 A.C. 361, 362—" That the question whether an exceptions clause was applicable where there was a fundamental breach of contract was one of the true construction of the contract." That there was any rule of law by which exceptions clauses are eliminated, or deprived of effect, regardless of their terms, was clearly not the view of Viscount Dilhorne, Lord Hodson, or of myself. The passages invoked for the contrary view of a rule of law consist only

F    of short extracts from two of the speeches—on any view a minority. But the case for the doctrine does not even go so far as that. Lord Reid, in my respectful opinion, and I recognise that I may not be the best judge of this matter, in his speech read as a whole, cannot be claimed as a supporter of a rule of law. Indeed he expressly disagreed with the Master of the Rolls' observations in two previous cases (*Karsales (Harrow)*

G    *Ltd.* v. *Wallis* [1956] 1 W.L.R. 936 and *U.G.S. Finance Ltd.* v. *National Mortgage Bank of Greece and National Bank of Greece S.A.* [1964] 1 Lloyd's Rep. 446 in which he had put forward the " rule of law " doctrine. In order to show how close the disapproved doctrine is to that sought to be revived in *Harbutt's* case I shall quote one passage from *Karsales* [1956] 1 W.L.R. 936, 940:

H    " Notwithstanding earlier cases which might suggest the contrary, it is now settled that exempting clauses of this kind, no matter how widely they are expressed, only avail the party when he is carrying out his contract in its essential respects. He is not allowed to use

Lord Wilberforce ·Photo Production v. Securicor Ltd. (H.L.(E.))                [1980]

A   them as a cover for misconduct or indifference or to enable him to
turn a blind eye to his obligations. They do not avail him when he
is guilty of a breach which goes to the root of the contract."

Lord Reid comments at p. 401 as to this that he could not deduce
from the authorities cited in *Karsales* that the proposition stated in the
judgments could be regarded as in any way " settled law." His conclusion
is stated on p. 405: " In my view no such rule of law ought to be
B   adopted "—adding that there is room for legislative reform.

My Lords, in the light of this, the passage cited by Lord Denning M.R.
[1970] 1 Q.B. 447, 465 has to be considered. For convenience I restate it:

"If fundamental breach is established the next question is what
effect, if any, that has on the applicability of other terms of the
contract. This question has often arisen with regard to clauses
C   excluding liability, in whole or in part, of the party in breach. I do
not think that there is generally much difficulty where the innocent
party has elected to treat the breach as a repudiation, bring the
contract to an end and sue for damages. Then the whole contract
has ceased to exist including the exclusion clause, and I do not see
how that clause can then be used to exclude an action for loss which
D   will be suffered by the innocent party after it has ceased to exist,
such as loss of the profit which would have accrued if the contract
had run its full term." (*Suisse Atlantique* [1967] 1 A.C. 361, 398).

It is with the utmost reluctance that, not forgetting the " beams " that
may exist elsewhere, I have to detect here a mote of ambiguity or perhaps
even of inconsistency. What is referred to is " loss which will be suffered
by the innocent party after [the contract] has ceased to exist " and I
E   venture to think that all that is being said, rather elliptically, relates only
to what is to happen in the future, and is not a proposition as to the
immediate consequences caused by the breach: if it were that would be
inconsistent with the full and reasoned discussion which follows.

It is only because of Lord Reid's great authority in the law that I
have found it necessary to embark on what in the end may be super-
F   fluous analysis. For I am convinced that, with the possible exception of
Lord Upjohn whose critical passage, when read in full, is somewhat
ambiguous, their Lordships, fairly read, can only be taken to have
rejected those suggestions for a rule of law which had appeared in the
Court of Appeal and to have firmly stated that the question is one of
construction, not merely of course of the exclusion clause alone, but of
the whole contract.
G

Much has been written about the *Suisse Atlantique* case. Each
speech has been subjected to various degrees of analysis and criticism,
much of it constructive. Speaking for myself I am conscious of imper-
fections of terminology, though sometimes in good company. But I do
not think that I should be conducing to the clarity of the law by adding
H   to what was already too ample a discussion a further analysis which in
turn would have to be interpreted. I have no second thoughts as to the
main proposition that the question whether, and to what extent, an
exclusion clause is to be applied to a fundamental breach, or a breach

A.C.                    Photo Production v. Securicor Ltd. (H.L.(E.))   Lord Wilberforce

A of a fundamental term, or indeed to any breach of contract, is a matter of construction of the contract.   Many difficult questions arise and will continue to arise in the infinitely varied situations in which contracts come to be breached—by repudiatory breaches, accepted or not, by anticipatory breaches, by breaches of conditions or of various terms and whether by negligent, or deliberate action or otherwise.   But there are ample resources in the normal rules of contract law for dealing with

B these without the superimposition of a judicially invented rule of law. I am content to leave the matter there with some supplementary observations.

1. The doctrine of " fundamental breach " in spite of its imperfections and doubtful parentage has served a useful purpose.   There was a large number of problems, productive of injustice, in which it was worse than unsatisfactory to leave exception clauses to operate.   Lord Reid referred

C to these in the *Suisse Atlantique* case [1967] 1 A.C. 361, 406, pointing out at the same time that the doctrine of fundamental breach was a dubious specific.   But since then Parliament has taken a hand: it has passed the Unfair Contract Terms Act 1977.   This Act applies to consumer contracts and those based on standard terms and enables exception clauses to be applied with regard to what is just and reasonable.

D It is significant that Parliament refrained from legislating over the whole field of contract.   After this Act, in commercial matters generally, when the parties are not of unequal bargaining power, and when risks are normally borne by insurance, not only is the case for judicial intervention undemonstrated, but there is everything to be said, and this seems to have been Parliament's intention, for leaving the parties free to apportion the risks as they think fit and for respecting their decisions.

E At the stage of negotiation as to the consequences of a breach, there is everything to be said for allowing the parties to estimate their respective claims according to the contractual provisions they have themselves made, rather than for facing them with a legal complex so uncertain as the doctrine of fundamental breach must be.   What, for example, would have been the position of the respondents' factory if instead of being

F destroyed it had been damaged, slightly or moderately or severely?   At what point does the doctrine (with what logical justification I have not understood) decide, ex post facto, that the breach was (factually) fundamental before going on to ask whether legally it is to be regarded as fundamental?   How is the date of " termination " to be fixed?   Is it the date of the incident causing the damage, or the date of the innocent party's election, or some other date?   All these difficulties arise

G from the doctrine and are left unsolved by it.

At the judicial stage there is still more to be said for leaving cases to be decided straightforwardly on what the parties have bargained for rather than upon analysis, which becomes progressively more refined, of decisions in other cases leading to inevitable appeals.   The learned judge was able to decide this case on normal principles of contractual law with

H minimal citation of authority.   I am sure that most commercial judges have wished to be able to do the same: see *Trade and Transport Inc.* v. *Iino Kaiun Kaisha Ltd.* [1973] 1 W.L.R. 210, 232, *per* Kerr J.   In my opinion they can and should.

Lord Wilberforce   Photo Production v. Securicor Ltd. (H.L.(E.) )          **[1980]**

2. The case of *Harbutt* [1970] 1 Q.B. 447 must clearly be overruled.
It would be enough to put that upon its radical inconsistency with the   A
*Suisse Atlantique* case [1967] 1 A.C. 361.  But even if the matter were
res integra I would find the decision to be based upon unsatisfactory
reasoning as to the "termination" of the contract and the effect of
"termination" on the plaintiffs' claim for damage.  I have, indeed,
been unable to understand how the doctrine can be reconciled with the
well accepted principle of law, stated by the highest modern authority,   B
that when in the context of a breach of contract one speaks of "termina-
tion," what is meant is no more than that the innocent party or, in some
cases, both parties, are excused from further performance.  Damages,
in such cases, are then claimed under the contract, so what reason in
principle can there be for disregarding what the contract itself says about
damages—whether it "liquidates" them, or limits them, or excludes
them?  These difficulties arise in part from uncertain or inconsistent   C
terminology.  A vast number of expressions are used to describe situa-
tions where a breach has been committed by one party of such a character
as to entitle the other party to refuse further performance: discharge,
rescission, termination, the contract is at an end, or dead, or displaced;
clauses cannot survive, or simply go.  I have come to think that some of
these difficulties can be avoided; in particular the use of "rescission,"   D
even if distinguished from rescission ab initio, as an equivalent for dis-
charge, though justifiable in some contexts (see *Johnson* v. *Agnew*
[1980] A.C. 367) may lead to confusion in others.  To plead for complete
uniformity may be to cry for the moon.  But what can and ought to be
avoided is to make use of these confusions in order to produce a con-
cealed and unreasoned legal innovation: to pass, for example, from
saying that a party, victim of a breach of contract, is entitled to refuse   E
further performance; to saying that he may treat the contract as at an
end, or as rescinded, and to draw from this the proposition, which is not
analytical but one of policy, that all or (arbitrarily) some of the clauses of
the contract lose, automatically, their force, regardless of intention.

If this process is discontinued the way is free to use such words as
"discharge" or "termination" consistently with principles as stated by   F
modern authority which *Harbutt's* case [1970] 1 Q.B. 447 disregards.
I venture with apology to relate the classic passages.  In *Heyman* v.
*Darwins Ltd.* [1942] A.C. 356, 399 Lord Porter said:

"To say that the contract is rescinded or has come to an end or has
ceased to exist may in individual cases convey the truth with sufficient
accuracy, but the fuller expression that the injured party is thereby   G
absolved from future performance of his obligations under the
contract is a more exact description of the position.  Strictly
speaking, to say that on acceptance of the renunciation of a con-
tract the contract is rescinded is incorrect.  In such a case the
injured party may accept the renunciation as a breach going to the
root of the whole of the consideration.  By that acceptance he is   H
discharged from further performance and may bring an action for
damages, but the contract itself is not rescinded."

A.C.          Photo Production v. Securicor Ltd. (H.L.(E.))    Lord Wilberforce

A And similarly Lord Macmillan at p. 373: see also *Boston Deep Sea Fishing and Ice Co.* v. *Ansell* (1888) 39 Ch.D. 339, 361, *per* Bowen L.J. In *Lep Air Services Ltd.* v. *Rolloswin Investments Ltd.* [1973] A.C. 331, 350, my noble and learned friend, Lord Diplock, drew a distinction (relevant for that case) between primary obligations under a contract, which on " rescission " generally come to an end, and secondary obligations which may then arise. Among the latter he includes an

B obligation to pay compensation, i.e., damages. And he states in terms that this latter obligation " is just as much an obligation arising from the contract as are the primary obligations that it replaces." My noble and learned friend has developed this line of thought in an enlightening manner in his opinion which I have now had the benefit of reading.

These passages I believe to state correctly the modern law of contract in the relevant respects: they demonstrate that the whole foundation

C of *Harbutt's* case [1970] 1 Q.B. 447 is unsound. A fortiori, in addition to *Harbutt's* case there must be overruled the case of *Wathes (Western) Ltd.* v. *Austins (Menswear) Ltd.* [1976] 1 Lloyd's Rep. 14 which sought to apply the doctrine of fundamental breach to a case where, by election of the innocent party, the contract had not been terminated, an impossible acrobatic, yet necessarily engendered by the doctrine. Similarly, *Charter-*

D *house Credit Co. Ltd.* v. *Tolly* [1963] 2 Q.B. 683 must be overruled, though the result might have been reached on construction of the contract.

3. I must add to this, by way of exception to the decision not to " gloss " the *Suisse Atlantique* [1967] 1 A.C. 361 a brief observation on the deviation cases, since some reliance has been placed upon them,

E particularly upon the decision of this House in *Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.* (1936) 155 L.T. 177 (so earlier than the *Suisse Atlantique*) in the support of the *Harbutt* doctrine. I suggested in the *Suisse Atlantique* that these cases can be regarded as proceeding upon normal principles applicable to the law of contract generally viz., that it is a matter of the parties' intentions whether and to what extent clauses in shipping contracts can be applied after a deviation, i.e., a

F departure from the contractually agreed voyage or adventure. It may be preferable that they should be considered as a body of authority sui generis with special rules derived from historical and commercial reasons. What on either view they cannot do is to lay down different rules as to contracts generally from those later stated by this House in *Heyman* v. *Darwins Ltd.* [1942] A.C. 356. The ingenious use by

G Donaldson J. in *Kenyon, Son & Craven Ltd.* v. *Baxter Hoare & Co. Ltd.* [1971] 1 W.L.R. 519 of the doctrine of deviation in order to reconcile the *Suisse Atlantique* with *Harbutt's* case, itself based in part on the use of the doctrine of deviation, illustrates the contortions which that case has made necessary and would be unnecessary if it vanished as an authority.

4. It is not necessary to review fully the numerous cases in which

H the doctrine of fundamental breach has been applied or discussed. Many of these have now been superseded by the Unfair Contract Terms Act 1977. Others, as decisions, may be justified as depending upon the construction of the contract (see *Levison* v. *Patent Steam Carpet*

*Cleaning Co. Ltd.* [1978] Q.B. 69) in the light of well known principles    A
such as that stated in *Alderslade* v. *Hendon Laundry Ltd.* [1945] K.B.
189.

In this situation the present case has to be decided. As a preliminary,
the nature of the contract has to be understood. Securicor undertook
to provide a service of periodical visits for a very modest charge which
works out at 26p. per visit. It did not agree to provide equipment. It
would have no knowledge of the value of the plaintiffs' factory: that,    B
and the efficacy of their fire precautions, would be known to the respon-
dents. In these circumstances nobody could consider it unreasonable,
that as between these two equal parties the risk assumed by Securicor
should be a modest one, and that the respondents should carry the
substantial risk of damage or destruction.

The duty of Securicor was, as stated, to provide a service. There
must be implied an obligation to use due care in selecting their patrol-    C
men, to take care of the keys and, I would think, to operate the
service with due and proper regard to the safety and security of the
premises. The breach of duty committed by Securicor lay in a failure
to discharge this latter obligation. Alternatively it could be put upon a
vicarious responsibility for the wrongful act of Musgrove—viz., starting
a fire on the premises: Securicor would be responsible for this upon    D
the principle stated in *Morris* v. *C. W. Martin & Sons Ltd.* [1966] 1 Q.B.
716, 739. This being the breach, does condition 1 apply? It is drafted
in strong terms, " Under no circumstances " . . . " any injurious act or
default by any employee." These words have to be approached with the
aid of the cardinal rules of construction that they must be read contra
proferentem and that in order to escape from the consequences of one's
own wrongdoing, or that of one's servant, clear words are necessary. I    E
think that these words are clear. The respondents in facts relied upon
them for an argument that since they exempted from negligence they
must be taken as not exempting from the consequence of deliberate acts.
But this is a perversion of the rule that if a clause can cover something
other than negligence, it will not be applied to negligence. Whether,
in addition to negligence, it covers other, e.g., deliberate, acts, remains    F
a matter of construction requiring, of course, clear words. I am of
opinion that it does, and being free to construe and apply the clause,
I must hold that liability is excluded. On this part of the case I agree
with the judge and adopt his reasons for judgment. I would allow the
appeal.

Lord Diplock.    My Lords, my noble and learned friend, Lord    G
Wilberforce, has summarised the facts which have given rise to this appeal.
The contract which falls to be considered was a contract for the rendering
of services by the defendants (" Securicor ") to the plaintiffs (" the
factory owners "). It was a contract of indefinite duration terminable
by one month's notice on either side. It had been in existence for
some two-and-a-half years when the breach that is the subject matter of    H
these proceedings occurred. It is not disputed that the act of Securicor's
servant, Musgrove, in starting a fire in the factory which they had under-
taken to protect was a breach of contract by Securicor; and since it

**A**  was the cause of an event, the destruction of the factory, that rendered further performance of the contract impossible it is not an unnatural use of ordinary language to describe it as a " fundamental breach."

It was by attaching that label to it that all three members of the Court of Appeal found themselves able to dispose of Securicor's defence based on the exclusion clause restricting its liability for its servants' torts in terms which Lord Wilberforce has already set out, by holding

**B**  that where there had been a fundamental breach by a party to a contract, there was a rule of law which prevented him from relying upon any exclusion clause appearing in the contract, whatever its wording might be.

The Court of Appeal was, I think, bound so to hold by previous decisions of its own, of which the first was *Harbutt's " Plasticine " Ltd.* v. *Wayne Tank and Pump Co. Ltd.* [1970] 1 Q.B. 447. It purported in that case to find support for the rule of law it there laid down in the reasoning

**C**  of this House in *Suisse Atlantique Société d'Armement Maritime S.A.* v. *N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361. I agree with Lord Wilberforce's analysis of the speeches in *Suisse Atlantique,* and with his conclusion that this House rejected the argument that there was any such rule of law. I also agree that *Harbutt's " Plasticine "* and the subsequent cases in which the so-called " rule of law " was applied to defeat

**D**  exclusion clauses should be overruled, though the actual decisions in some of the later cases might have been justified on the proper construction of the particular exclusion clause on which the defendant relied.

My Lords, the contract in the instant case was entered into before the passing of the Unfair Contract Terms Act 1977. So what we are concerned with is the common law of contract—of which the subject matter is the legally enforceable obligations as between the parties to

**E**  it of which the contract is the source. The " rule of law " theory which the Court of Appeal has adopted in the last decade to defeat exclusion clauses is at first sight attractive in the simplicity of its logic. A fundamental breach is one which entitles the party not in default to elect to terminate the contract. Upon his doing so the contract comes to an end. The exclusion clause is part of the contract, so it comes to an

**F**  end too; the party in default can no longer rely on it. This reasoning can be extended without undue strain to cases where the party entitled to elect to terminate the contract does not become aware of the breach until some time after it occurred; his election to terminate the contract could not implausibly be treated as exercisable nunc pro tunc. But even the superficial logic of the reasoning is shattered when it is applied, as it was in *Wathes (Western) Ltd.* v. *Austins (Menswear) Ltd.* [1976]

**G**  1 Lloyd's Rep. 14, to cases where, despite the " fundamental breach," the party not in default elects to maintain the contract in being.

The fallacy in the reasoning and what I venture to think is the disarray into which the common law about breaches of contract has fallen, is due to the use in many of the leading judgments on this subject of ambiguous or imprecise expressions without defining the sense in

**H**  which they are used. I am conscious that I have myself sometimes been guilty of this when I look back on judgments I have given in such cases as *Hongkong Fir Shipping Co. Ltd.* v. *Kawakasi Kisen Kaisha Ltd.* [1962] 2 Q.B. 26; *R. V. Ward Ltd.* v. *Bignall* [1967] 1 Q.B. 534; *Lep*

**Lord Diplock** **Photo Production v. Securicor Ltd. (H.L.(E.) )** **[1980]**

*Air Services Ltd.* v. *Rolloswin Investments Ltd.* [1973] A.C. 331; and in particular *Hardwick Game Farm* v. *Suffolk Agricultural Poultry Producers Association* [1966] 1 W.L.R. 287, when commenting unfavourably on the then budding doctrine of fundamental breach in a portion of my judgment in the Court of Appeal that did not subsequently incur the disapproval of this House.

My Lords, it is characteristic of commercial contracts, nearly all of which today are entered into not by natural legal persons, but by fictitious ones, i.e., companies, that the parties promise to one another that some thing will be done; for instance, that property and possession of goods will be transferred, that goods will be carried by ship from one port to another, that a building will be constructed in accordance with agreed plans, that services of a particular kind will be provided. Such a contract is the source of primary legal obligations upon each party to it to procure that whatever he has promised will be done is done. (I leave aside arbitration clauses which do not come into operation until a party to the contract claims that a primary obligation has not been observed.)

Where what is promised will be done involves the doing of a physical act, performance of the promise necessitates procuring a natural person to do it; but the legal relationship between the promisor and the natural person by whom the act is done, whether it is that of master and servant, or principal and agent, or of parties to an independent sub-contract, is generally irrelevant. If that person fails to do it in the manner in which the promisor has promised to procure it to be done, as, for instance, with reasonable skill and care, the promisor has failed to fulfil his own primary obligation. This is to be distinguished from "vicarious liability"—a legal concept which does depend upon the existence of a particular legal relationship between the natural person by whom a tortious act was done and the person sought to be made vicariously liable for it. In the interests of clarity the expression should, in my view, be confined to liability for tort.

A basic principle of the common law of contract, to which there are no exceptions that are relevant in the instant case, is that parties to a contract are free to determine for themselves what primary obligations they will accept. They may state these in express words in the contract itself and, where they do, the statement is determinative; but in practice a commercial contract never states all the primary obligations of the parties in full; many are left to be incorporated by implication of law from the legal nature of the contract into which the parties are entering. But if the parties wish to reject or modify primary obligations which would otherwise be so incorporated, they are fully at liberty to do so by express words.

Leaving aside those comparatively rare cases in which the court is able to enforce a primary obligation by decreeing specific performance of it, breaches of primary obligations give rise to substituted or secondary obligations on the part of the party in default, and, in some cases, may entitle the other party to be relieved from further performance of his own primary obligations. These secondary obligations of the contract-breaker and any concomitant relief of the other party from his own

**A**  primary obligations also arise by implication of law—generally common law, but sometimes statute, as in the case of codifying statutes passed at the turn of the century, notably the Sale of Goods Act 1893. The contract, however, is just as much the source of secondary obligations as it is of primary obligations; and like primary obligations that are implied by law, secondary obligations too can be modified by agreement between the parties, although, for reasons to be mentioned later, they cannot, in **B** my view, be totally excluded. In the instant case, the only secondary obligations and concomitant reliefs that are applicable arise by implication of the common law as modified by the express words of the contract.

Every failure to perform a primary obligation is a breach of contract. The secondary obligation on the part of the contract breaker to which it gives rise by implication of the common law is to pay monetary compensation to the other party for the loss sustained by him in consequence **C** of the breach; but, with two exceptions, the primary obligations of both parties so far as they have not yet been fully performed remain unchanged. This secondary obligation to pay compensation (damages) for non-performance of primary obligations I will call the " general secondary obligation." It applies in the cases of the two exceptions as well.

**D**  The exceptions are: (1) Where the event resulting from the failure by one party to perform a primary obligation has the effect of depriving the other party of substantially the whole benefit which it was the intention of the parties that he should obtain from the contract, the party not in default may elect to put an end to all primary obligations of both parties remaining unperformed. (If the expression " fundamental breach " is to be retained, it should, in the interests of clarity, be confined **E** to this exception.) (2) Where the contracting parties have agreed, whether by express words or by implication of law, that any failure by one party to perform a particular primary obligation (" condition " in the nomenclature of the Sale of Goods Act 1893), irrespective of the gravity of the event that has in fact resulted from the breach, shall entitle the other party to elect to put an end to all primary obligations of both **F** parties remaining unperformed. (In the interests of clarity, the nomenclature of the Sale of Goods Act 1893, " breach of condition " should be reserved for this exception.)

Where such an election is made (a) there is substituted by implication of law for the primary obligations of the party in default which remain unperformed a secondary obligation to pay monetary compensation to **G** the other party for the loss sustained by him in consequence of their non-performance in the future and (b) the unperformed primary obligations of that other party are discharged. This secondary obligation is additional to the general secondary obligation; I will call it " the anticipatory secondary obligation."

In cases falling within the first exception, fundamental breach, the **H** anticipatory secondary obligation arises under contracts of all kinds by implication of the common law, except to the extent that it is excluded or modified by the express words of the contract. In cases falling within the second exception, breach of condition, the anticipatory secondary

obligation generally arises under particular kinds of contracts by impli-
cation of statute law; though in the case of " deviation " from the      A
contract voyage under a contract of carriage of goods by sea it arises by
implication of the common law.  The anticipatory secondary obligation
in these cases too can be excluded or modified by express words.

When there has been a fundamental breach or breach of condition,
the coming to an end of the primary obligations of both parties to the
contract at the election of the party not in default, is often referred to    B
as the " determination " or " rescission " of the contract or, as in the
Sale of Goods Act 1893 " treating the contract as repudiated."  The first
two of these expressions, however, are misleading unless it is borne in
mind that for the unperformed primary obligations of the party in default
there are substituted by operation of law what I have called the secondary
obligations.

The bringing to an end of all primary obligations under the contract    C
may also leave the parties in a relationship, typically that of bailor and
bailee, in which they owe to one another by operation of law fresh
primary obligations of which the contract is the source; but no such
relationship is involved in the instant case.

I have left out of account in this analysis as irrelevant to the instant
case an arbitration or choice of forum clause.  This does not come into    D
operation until a party to the contract claims that a primary obligation
of the other party has not been performed; and its relationship to other
obligations of which the contract is the source was dealt with by this
House in *Heyman* v. *Darwins Ltd.* [1942] A.C. 356.

My Lords, an exclusion clause is one which excludes or modifies an
obligation, whether primary, general secondary or anticipatory secondary,
that would otherwise arise under the contract by implication of law.    E
Parties are free to agree to whatever exclusion or modification of all
types of obligations as they please within the limits that the agreement
must retain the legal characteristics of a contract; and must not offend
against the equitable rule against penalties; that is to say, it must not
impose upon the breaker of a primary obligation a general secondary
obligation to pay to the other party a sum of money that is manifestly    F
intended to be in excess of the amount which would fully compensate
the other party for the loss sustained by him in consequence of the
breach of the primary obligation.  Since the presumption is that the
parties by entering into the contract intended to accept the implied
obligations exclusion clauses are to be construed strictly and the degree
of strictness appropriate to be applied to their construction may properly
depend upon the extent to which they involve departure from the    G
implied obligations.  Since the obligations implied by law in a commercial
contract are those which, by judicial consensus over the years or by
Parliament in passing a statute, have been regarded as obligations which
a reasonable businessman would realise that he was accepting when he
entered into a contract of a particular kind, the court's view of the
reasonableness of any departure from the implied obligations which would    H
be involved in construing the express words of an exclusion clause in
one sense that they are capable of bearing rather than another, is a rele-
vant consideration in deciding what meaning the words were intended

A.C.                **Photo Production v. Securicor Ltd. (H.L.(E.) )**        Lord Diplock

A  by the parties to bear. But this does not entitle the court to reject the exclusion clause, however unreasonable the court itself may think it is, if the words are clear and fairly susceptible of one meaning only.

My Lords, the reports are full of cases in which what would appear to be very strained constructions have been placed upon exclusion clauses, mainly in what to-day would be called consumer contracts and contracts of adhesion. As Lord Wilberforce has pointed out, any need for this
B  kind of judicial distortion of the English language has been banished by Parliament's having made these kinds of contracts subject to the Unfair Contract Terms Act 1977. In commercial contracts negotiated between business-men capable of looking after their own interests and of deciding how risks inherent in the performance of various kinds of contract can be most economically borne (generally by insurance), it is, in my view,
C  wrong to place a strained construction upon words in an exclusion clause which are clear and fairly susceptible of one meaning only even after due allowance has been made for the presumption in favour of the implied primary and secondary obligations.

Applying these principles to the instant case; in the absence of the exclusion clause which Lord Wilberforce has cited, a primary obligation of Securicor under the contract, which would be implied by law, would
D  be an absolute obligation to procure that the visits by the night patrol to the factory were conducted by natural persons who would exercise reasonable skill and care for the safety of the factory. That primary obligation is modified by the exclusion clause. Securicor's obligation to do this is not to be absolute, but is limited to exercising due diligence in its capacity as employer of the natural persons by whom the visits are conducted, to procure that those persons shall exercise reasonable skill and
E  care for the safety of the factory.

For the reasons given by Lord Wilberforce it seems to me that this apportionment of the risk of the factory being damaged or destroyed by the injurious act of an employee of Securicor while carrying out a visit to the factory is one which reasonable business-men in the position of Securicor and the factory owners might well think was the most econo-
F  mical. An analogous apportionment of risk is provided for by the Hague Rules in the case of goods carried by sea under bills of lading. The risk that a servant of Securicor would damage or destroy the factory or steal goods from it, despite the exercise of all reasonable diligence by Securicor to prevent it, is what in the context of maritime law would be called a " misfortune risk "—something which reasonable diligence of
G  neither party to the contract can prevent. Either party can insure against it. It is generally more economical for the person by whom the loss will be directly sustained to do so rather than that it should be covered by the other party by liability insurance. This makes it unnecessary to consider whether a later exclusion clause in the contract which modifies the general secondary obligation implied by law by placing limits on the amount of damages recoverable for breaches of primary obligations,
H  would have applied in the instant case.

For the reasons given by Lord Wilberforce and in application of the principles that I have here stated, I would allow this appeal.

**Photo Production v. Securicor Ltd. (H.L.(E.) )**                    **[1980]**

LORD SALMON. My Lords, the contract with which this appeal is concerned is a very simple commercial contract entered into by two highly experienced business enterprises—the appellants whom I shall call Securicor and the respondents whom I shall call Photo Production.

This appeal turns in my view entirely upon certain words in the contract which read as follows:

> " Under no circumstances shall [Securicor] be responsible for any injurious act or default by any employee of [Securicor] unless such act or default could have been foreseen and avoided by the exercise of due diligence on the part of [Securicor] as his employer."

We are not concerned with the Unfair Contract Terms Act 1977 since the present contract was entered into before that Act was passed. Accordingly, I prefer to express no view about the effect of that Act as the result of this appeal depends solely on the common law.

The facts relevant to this case are very short. Indubitably, one of Securicor's servants called Musgrove committed an injurious act or default which caused Photo Production's factory to be burned down; and as a result, Photo Production suffered a loss of £615,000. This disaster occurred when Musgrove was visiting the factory on patrol one Sunday night and deliberately threw a lighted match on some cartons lying on the floor of one of the rooms he was inspecting. Whether Musgrove intended to light only a small fire or to burn down the factory, and what his motives were for what he did were found by the learned trial judge to be mysteries which it was impossible to solve.

No one has suggested that Securicor could have foreseen or avoided by due diligence the act or default which caused the damage or that Securicor had been negligent in employing or supervising Musgrove.

The contract between the two parties provided that Securicor should supply a patrol service at Photo Production's factory by four visits a night for seven nights a week and two visits every Saturday afternoon and four day visits every Sunday. The contract provided that for this service, Securicor should be paid £8 15s. a week. There can be no doubt that but for the clause in the contract which I have recited, Securicor would have been liable for the damage which was caused by their servant, Musgrove, whilst indubitably acting in the course of his employment: *Morris* v. *C. W. Martin & Sons Ltd.* [1966] 1 Q.B. 716. To my mind, however, the words of the clause are so crystal clear that they obviously relieve Securicor from what would otherwise have been their liability for the damage caused by Musgrove. Indeed the words of the clause are incapable of any other meaning. I think that any businessman entering into this contract could have had no doubt as to the real meaning of this clause and would have made his insurance arrangements accordingly. The cost to Photo Production for the benefit of the patrol service provided by Securicor was very modest and probably substantially less than the reduction of the insurance premiums which Photo Production may have enjoyed as a result of obtaining that service.

Clauses which absolve a party to a contract from liability for breaking it are no doubt unpopular—particularly when they are unfair, which incidentally, in my view, this clause is not. It is, I think, because of

A.C.                 Photo Production v. Securicor Ltd. (H.L.(E.))              Lord Salmon

A the unpopularity of such clauses that a so called " rule of law " has been developed in the Court of Appeal to the effect that what was characterised as " a fundamental breach of contract," automatically or with the consent of the innocent party, brings the contract to an end; and that therefore the contract breaker will then immediately be barred from relying on any clause in the contract, however clearly worded, which would otherwise have safeguarded him against being liable inter alia in
B respect of the damages caused by the default; see, for example, *Karsales (Harrow) Ltd.* v. *Wallis* [1956] 1 W.L.R. 936, 940 *per* Denning L.J. and *Harbutt's " Plasticine " Ltd.* v. *Wayne Tank and Pump Co. Ltd.* [1970] 1 Q.B. 447.

I entirely agree with my noble and learned friend Lord Wilberforce's analysis of the *Suisse Atlantique* case [1967] 1 A.C. 361 which explains why the breach does not bring the contract to an end and why the so-
C called " rule of law " upon which Photo Production rely is therefore non-existent. This proposition is strongly supported by the passage recited by Lord Wilberforce in Lord Porter's speech in *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, 399.

Any persons capable of making a contract are free to enter into any contract they choose: and providing the contract is not illegal or
D voidable, it is binding upon them. It is not denied that the present contract was binding upon each of the parties to it. In the end, everything depends upon the true construction of the clause in dispute about which I have already expressed my opinion.

My Lords, I would accordingly allow the appeal.

E LORD KEITH OF KINKEL. My Lords, I agree with the speech of my noble and learned friend, Lord Wilberforce, which I have had the advantage of reading in draft and to which I cannot usefully add anything. Accordingly I too would allow the appeal.

LORD SCARMAN. My Lords, I have the advantage of reading in draft the speech delivered by my noble and learned friend, Lord Wilberforce. I
F agree with it. I would, therefore, allow the appeal.

I applaud the refusal of the trial judge, MacKenna J., to allow the sophisticated refinements into which, before the enactment of the Unfair Contract Terms Act 1977, the courts were driven in order to do justice to the consumer to govern his judgment in a commercial dispute between parties well able to look after themselves. In such a situation what the parties agreed (expressly or impliedly) is what matters; and the duty of
G the courts is to construe their contract according to its tenor.

*Appeal allowed.*

Solicitors: *Berrymans; Stanleys & Simpson, North.*

H                                                             F. C.

he gave rings with the motto Fiat justitia.    His Lordship was afterwards sworn in as member of Her Majesty's Privy Council.

In the same Vacation, Baron Platt resigned the office of Baron of the Court of Exchequer.

[902] He was succeeded, in this Term, by William Henry Watson, of Lincoln's Inn, Esquire, one of Her Majesty's counsel, who was previously called to the degree of the coif, when he gave rings with the motto Militavi.    The learned Baron afterwards received the honour of Knighthood.

In this Term,

Sir Richard Bethell, Knight, Her Majesty's Solicitor General, was appointed to the office of Attorney General, vacant by the promotion of Cockburn C.J.    And

The Right Honourable James Stuart Wortley, of The Inner Temple, one of Her Majesty's Counsel, and Recorder of London, was appointed to the office of Solicitor General, vacant by the promotion of Sir R. Bethell, Attorney General.    He resigned the office of Recorder.

ROBERT PYBUS *against* HENRY GIBB, JOHN BOLTON AND WILLIAM HINDMARSH.
Friday, November 7th, 1856.    A bond was executed by G. and two sureties conditioned for indemnifying the high bailiff of a county court against liabilities from the misconduct in his office of G., who was appointed by the high bailiff one of the bailiffs.    At the time the bond was executed, the jurisdiction of the county court was regulated by stat. 9 & 10 Vict. c. 95.    After the execution of the bond, the jurisdiction of the county court was extended, and increased by stat. 10 & 11 Vict. c. 102, stat. 12 & 13 Vict. c. 101, stat. 13 & 14 Vict. c. 61, and stat. 14 & 15 Vict. c. 52.—Held, that these statutes had so materially altered the nature of the office of bailiff that the sureties were no longer liable to indemnify the high bailiff, even though the misconduct of G. was in respect of a matter within the jurisdiction conferred by stat. 9 & 10 Vict. c. 95, in respect of which the duty of the bailiff was not altered by the subsequent Acts.

[S. C. 26 L. J. Q. B. 41; 5 W. R. 44; 3 Jur. N. S. 315.    Followed, *Portsea Island Building Society* v. *Whillier*, 1860, 2 El. & El. 770.    Distinguished, *Skillett* v. *Fletcher*, 1867, L. R. 2 C. P. 472.]

Action on the defendants' writing obligatory subject to a condition, "whereby, after reciting to the effect following, that the plaintiff had been duly appointed high bailiff of and for the County Court of Northumberland" "to be holden at Alnwick" "under and by virtue of an Act" (9 & 10 Vict. c. 95, "for the more easy recovery of small debts and demands in England"), "and [903] that the said high bailiff had, in consideration of the security given by the said writing obligatory, appointed the said defendant, Henry Gibb, to act under and for him as a bailiff of the said court," "during the pleasure of the plaintiff, subject to be suspended or dismissed by the judge of the said court, it was and is conditioned that, if the defendant Henry Gibb did and should well and truly serve all summonses, judgments, orders, notices and processes whatever issuing out of the said court and to him delivered for service, and execute all warrants, precepts and writs, issuing out of the said court and to the high bailiff of the said court and other the bailiffs thereof directed, and to the said Henry Gibb delivered for execution, and did and should make true returns respecting such services, and execution, according to the general rules made or to be made for regulating the practice and proceedings of the said court, and did and should well and truly execute and perform the office and duties of bailiff of the said court, and in the execution and performance of such his office and duties conform to the provisions and requisitions of the said Act, and to all such general rules as had been or should from time to time be made for regulating the practice and proceedings of the said court, in respect of the office and duties of high bailiff, or other bailiff, of the said court, and, subject thereunto, to the orders and directions of the judge or of the high bailiff of the said court, and did not and should not ask, demand, levy, or directly or indirectly receive any fee or fees, or other reward, for the service of any summons, judgment, order, notice or process, or for the execution of any warrant, precept or writ, or for the execution or performance of his office and duties as such bailiff as aforesaid, but such as is or are set down [904] in the schedule (D.) to the said Act annexed; and also did or should,

without fee or reward, personally attend each and every of the said county courts which should be holden at Alnwick aforesaid, and not depart or absent himself therefrom without the leave of the judge of the said court, or the said high bailiff; and also did and should, from time to time and at all times thereafter, save, defend, keep harmless and indemnified the said high bailiff, his heirs, executors and administrators, of, from and against all and all manner of actions, suits, attachments, fines, penalties, losses, costs, charges and expences which might be commenced, prosecuted, imposed or set upon him or them, or which he or they might sustain, pay or be liable to for or by reason of the serving or not serving, executing or not executing, returning or not returning, of any summons, judgment, order, notice, process, warrant, precept or writ to him, the said Henry Gibb, delivered as aforesaid, or for or by reason of the non-execution or non-performance of his office and duties, as such bailiff as aforesaid, or for or by reason of his receiving or extorting any fee or fees, or any money or reward, other than such as is or are set down in the schedule (D.) to the said Act annexed, or for or by reason of any neglect, connivance, omission, act or default of the said Henry Gibb, upon or by reason of any cause, matter or thing in any wise relating thereto respectively, then the said obligation to be void and of no effect, but otherwise to be and remain in full force and virtue." Averments: that, while plaintiff was high bailiff, and after the making of the said writing obligatory, and while Gibb was bailiff, a warrant of execution was duly issued out of the county court directed to the high bailiff, to levy of the goods of one Edgar a debt of 11l. 4s. 9d. and costs recovered **[905]** by the judgment of the court, which warrant was delivered, under and by virtue of the said Act of Parliament, to Gibb, as such bailiff as aforesaid, to be executed; under colour of which warrant Gibb, as such bailiff within the district, wrongfully seized in execution, as and for goods of Edgar, certain goods of one Thew, which were not liable to be seized or sold under the warrant, and wrongfully sold the said goods as such bailiff under colour of the warrant, as goods of Edgar: for and by reason of which acts of Gibb, Thew afterwards brought an action in the Court of Exchequer of Pleas against plaintiff and Gibb, and recovered against the plaintiff and Gibb 20l. damages, and 152l. 12s. costs, which plaintiff was obliged to pay, and was not indemnified. The penalty was claimed.

Plea, by the defendants Bolton and Hindmarsh, that the writing obligatory was made and executed before the making and passing and coming into force of certain Acts of Parliament, that is to say: stat. 10 & 11 Vict. c. 102; stat. 12 & 13 Vict. c. 101; stat. 13 & 14 Vict. c. 61; and stat. 14 & 15 Vict. c. 52; that the said several Acts of Parliament in this plea mentioned had been respectively made and passed after the making and execution of the said writing obligatory, and were respectively in force before and at the time of the issuing of the said warrant of execution as in the declaration mentioned, and thence until the commencement of this suit. And that, after the passing and coming into force of stat. 12 & 13 Vict. c. 101, and before the issuing of the said warrant, the judge of the said county court did, under and by virtue of the said last mentioned Act of Parliament, by writing under his hand, authorize Gibb, as such bailiff as aforesaid, to act **[906]** as a broker or appraiser, for the purpose of selling or valuing any goods, chattels or effects taken in execution under stat. 9 and 10 Vict. c. 95.

Demurrer.    Joinder.

Hugh Hill now argued for the plaintiff. The bond was taken by the high bailiff of a county court, for the good behaviour of his bailiff.    At the time when the security was taken the duties of the bailiff, and the liabilities of the high bailiff, were regulated by stat. 9 & 10 Vict. c. 95, which created the county courts and gave them jurisdiction over all pleas of personal actions where the amount claimed did not exceed 20l.; sect. 50.    Sect. 31 directed that for every such court there should be one or more high bailiffs; and it empowered the high bailiff of a county court to appoint bailiffs to assist him.    Sect. 33 prescribes the duties and responsibilities of the high bailiffs. They shall, by themselves or their bailiffs, "serve all the summonses and orders, and execute all the warrants, precepts, and writs, issued out of the court: and the said high bailiffs and bailiffs shall in the execution of their duties conform to all such general rules as shall be from time to time made for regulating the proceedings of the court, as hereinafter provided, and, subject thereunto, to the order and direction of the judge; and the said high bailiffs shall be entitled to receive all fees and sums of money allowed by this Act in the name of fees payable to the bailiff, out of which

1102                          PYBUS *v.* GIBB                    6 EL. & BL. 907.

they shall provide for the execution of the duties for which such fees are allowed, and for the payment of the bailiffs and officers appointed to assist them, according to such scale of remuneration as shall be from time to time approved by the judge; and every such [907] high bailiff shall be responsible for all the acts and defaults of himself and of the bailiffs appointed to assist him, in like manner as the sheriff of any county in England is responsible for the acts and defaults of himself and his officers." The breach of duty, in the present case, was that the bailiff Gibb, having a warrant in execution of a judgment of the county court for less than 20l., in respect of a plaint within that Act, seized the goods of the wrong person, for which the high bailiff was responsible. There can be no doubt that if this had happened before any fresh legislation the sureties would have been responsible; but the plea shews that after the execution of the bond, and before this breach of duty, various other statutes, enumerated in the plea, have come in force. Now it cannot be disputed, since *Oswald* v. *Mayor, Aldermen, and Burgesses, of Berwick upon Tweed* (a)[1], that if subsequent legislation has so altered the functions of the bailiff as to alter the nature of the suretyship, it is no longer the same office and the sureties are discharged. But, if the office and the duties remain unaltered, it is not material that new distinct duties or offices have been accumulated on the same person: the surety will not be liable for the breach of those new duties; but he is not discharged from liability in respect of the old duties. Thus here, by stat. 9 & 10 Vict. c. 95, s. 106, before any sale of goods taken in execution by a bailiff there was to be an appraisement by a sworn appraiser, for whom the high bailiff was responsible, and for whom he took sureties. Stat. 12 & 13 Vict. c. 101, s. 10, authorizes the judge of the court to permit a bailiff to act as appraiser: and it [908] appears by the plea that Gibb was so authorized, and consequently holds the two offices of bailiff and appraiser. The present sureties are not responsible for any misconduct by him as appraiser; but the mistake in seizing goods belonging to the wrong party is in no way connected with appraisement. So by stat. 10 & 11 Vict. c. 102, s. 5, the high bailiff becomes a messenger under the Court of Bankruptcy; and for the defaults of the bailiff acting for him as such the sureties are not liable; but the original office of bailiff, and the original duty, not to take the goods of the wrong party by colour of a warrant, remain unaltered; and for a breach of that duty the sureties are liable.

Knowles, contrà. The alterations both in the office and in the duties have been substantial, and are such as to alter the risk of his sureties. The condition is that Gibb shall properly "serve all summonses, judgments, orders, notices and processes whatever issuing out of the said court and to him delivered for service, and execute all warrants, precepts and writs issuing out of the said court and to the high bailiff of the said court and other the bailiffs thereof directed, and to the said Henry Gibb delivered for execution." Process issuing out of the court under stat. 10 & 11 Vict. c. 102, or stat. 14 & 15 Vict. c. 52, which authorizes the arrest of absconding debtors, is within those words, and certainly never was within the contemplation of the parties. Again, under stat. 9 & 10 Vict. c. 95, the bailiff could not have a warrant in execution of a judgment for more than 20l. But after stat. 13 & 14 Vict. c. 61, the jurisdiction was increased to 50l.; sect. 1; and, by consent, to any amount; sect. 17: the liability therefore for not executing process might be much more serious. By the con-[909] dition the bailiff is to take no fees but those in schedule (D.) to stat. 9 & 10 Vict. c. 95. That table has been abolished and a new one substituted under stat. 12 & 13 Vict. c. 101, s. 6, and stat. 13 & 14 Vict. c. 61, s. 5; Pollock's County Court Practice, Part I. ch. 3 (3d ed.) (a)[2]. It is not possible, as proposed, to discriminate between the responsibilities of the bailiff under the old Act and under the existing law; but, if it were, the surety would nevertheless be discharged. In *Bonar* v. *Macdonald* (3 H. L. Ca. 226, 238) which was an appeal from Scotland to the House of Lords, in the judgment of Lord Cottenham it is said, that the law of Scotland and England are the same, and that "the rule as extracted from the English authorities, *Evans* v. *Whyle* (5 Bing. 485), *Eyre* v. *Bartrop* (3 Madd. 221), *Archer* v. *Hale* (4 Bing. 464), *Whitcher* v. *Hall* (5 B. & C. 269), is, that any variance in the agreement to which

---

(a)[1] 5 H. L. Ca. 856, in Dom. Proc.; affirming the judgment of Exch. Ch. in *Mayor of Berwick* v. *Oswald*, 3 E. & B. 653, which affirmed the judgment of Q. B. in *Mayor of Berwick* v. *Oswald*, 1 E. & B. 295.

(a) And see stat. 19 & 20 Vict. c. 108, s. 78.

PYBUS *v.* GIBB

the surety has subscribed, which is made without the surety's knowledge or consent, which may prejudice him, or which may amount to a substitution of a new agreement for a former agreement, even though the original agreement may, notwithstanding such variance, be substantially performed, will discharge the surety." In that case the defendant was surety that the teller of a bank should duly account to the bankers. Without the knowledge of the surety, the teller agreed with the bankers, for an increased salary, to become liable to one fourth of any loss that might be incurred on bills discounted at the bank. It was held that the surety was discharged and was no longer liable for a default, though not in any way connected with discounting; and this on the ground that [910] the liability of the surety was varied. That was done by the act of the parties: but if the change be made by the Legislature it has the same effect. This was agreed on, in the Exchequer Chamber, by all the Judges in *Mayor of Berwick* v. *Oswald* (3 E. & B. 653). There was a difference of opinion as to the application of the doctrine to the facts. This Court (b) a majority of the Judges in the Exchequer Chamber, and the House of Lords (c)[1] thought that the Legislature had not varied the nature or duties of the office so as to alter the responsibility of the surety, and that a change in the tenure was provided for by the language of the bond; but all agreed that a change in the nature of the office would discharge the sureties.

H. Hill was heard in reply.

Cur adv. vult.

Judgment was delivered on the following day.

Lord Campbell, C.J. This was a demurrer to a plea argued yesterday. The action was on a bond; the declaration set out the condition and assigned a breach. By this it appears that the plaintiff, being high bailiff of the county court of Northumberland, holden at Alnwick, had appointed Gibb, one of the defendants, his bailiff, and that the bond was by the bailiff, and the other defendants as his sureties, conditioned to indemnify the high bailiff for the liability in respect of the conduct of the bailiff in his office. There was a warrant issued out of the county court, directed to the high bailiff and other bailiffs of the court, requiring the levy of the goods of [911] Edgar, of a debt of 11l. 4s. 9d. for which judgment had been given against him, which was delivered for execution to the defendant Gibb as bailiff of the plaintiff for execution. Under colour of this warrant Gibb seized the goods of Thew, who recovered against the plaintiff: and the breach assigned was for not indemnifying the plaintiff against this. The plea, by the sureties, shews that the bond was executed when stat. 9 & 10 Vict. c. 95, was the Act regulating the county court; it alleges that several Acts came into operation after the execution of the bond, and before the breach of duty complained of; and on the demurrer we have to determine whether the effect of those Acts has been to produce such an alteration in the office that the sureties under the bond were discharged before breach.

The law on this subject was much discussed in the case of *Oswald* v. *Mayor, Aldermen, and Burgesses, of Berwick upon Tweed* (5 H. L. Ca. 856; 3 E. & B. 653; 1 E. & B. 295); and it may be considered settled law that, where there is a bond of suretyship for an officer, and, by the act of the parties or by Act of Parliament, the nature of the office is so changed that the duties are materially altered, so as to affect the peril of the sureties, the bond is avoided. Even if the sureties were consenting parties by parol to such a change, it could hardly affect their liability under the bond. The question is, whether the nature and functions of the office or employment are changed; for, if they are, it is not the same office within the meaning of the bond. That was the doctrine laid down in the judgment of this Court in *Mayor of Berwick* v. *Oswald* (1 E. & B. 295). Some of the Judges in the Court of Exchequer Chamber (c)[2] thought that this principle was wrongly [912] applied and the judgment erroneous: but all agreed that the principle was right: and the judgment was finally affirmed in the House of Lords (a). Then, such being the general principle, we come to apply it to this case. When the bond was given the principal was bailiff of a county court, then

_____

(b) *Mayor of Berwick* v. *Oswald*, 1 E. & B. 295.

(c)[1] *Oswald* v. *Mayor, Aldermen, and Burgesses of Berwick upon Tweed*, 5 H. L. Ca. 226.

(c)[2] *Mayor of Berwick* v. *Oswald*, 3 E. & B. 653.

(a) *Oswald* v. *Mayor, Aldermen, and Burgesses, of Berwick upon Tweed*, 5 H. L. Ca. 856.

having its jurisdiction under stat. 9 & 10 Vict. c. 95, and being a court " for the more easy recovery of small debts and demands," with a jurisdiction limited to 20*l*. The condition provides for the due execution by Gibb of his office as bailiff according to that Act, and " all such general rules as had been or should from time to time be made for regulating the practice and proceedings of the said court, in respect of the office." Not, be it observed, according to such Acts of Parliament as might be made respecting the office. Then, the court and the office being of this nature, and such being the condition, various statutes are passed. By these the jurisdiction of the court is raised from 20*l*. to 50*l*.; and by consent the court may take cognizance of a cause to any amount. This extension of jurisdiction, since the bond was given, makes the court no longer one merely for the recovery of small debts and demands. Then, under stat. 9 & 10 Vict. c. 95, s. 106, the bailiff might not sell goods taken in execution without a sworn appraisement. By a subsequent Act the bailiff himself may act as a broker; and the intervention of a third person as sworn appraiser is no longer required. By other Acts jurisdiction in bankruptcy is transferred to the county court; and, by another Act, power to arrest absconding debtors is given. Under these latter Acts the bailiff may have to execute warrants directed to him, involving liabilities not of 20*l*. only but **[913]** of any amount. By another enactment, the fees are no longer to be regulated by schedule (D.) to stat. 9 & 10 Vict. c. 95; and this is important, as the condition is express that the bailiff is to take no fees save those authorized by that schedule. I think we cannot consider that as not an essential part of the condition. There being then an increase in the jurisdiction of the court as to amount, a change in the nature of the court by giving bankruptcy jurisdiction and jurisdiction over absconding debtors, and the table of fees being altered. I think that the office is essentially changed, and the sureties no longer liable. It was said that the breach here was one for which the sureties would have been liable if the office had remained unchanged. I think it would be most inconvenient if the sureties were liable for the breach of the original duties of the office, and not for those superadded, so as to require discrimination as to the duties all performed by the same officer in the same office. But we need not discuss that; for we have the express authority of the House of Lords upon it in *Bonar* v. *Macdonald* (3 H. L. Ca. 226). That was on appeal from Scotland; but on this subject the laws of the two countries are essentially the same. It was not the case of an office but of an employment: fresh duties had without the consent of the surety been added to the employment; and then the principal made a default that was within the scope of his original employment; for that default the action was brought: it was argued there, as here, that the liability should be the same as before; but the House of Lords, affirming the judgment below, held that after the addition of fresh duties the employment was essentially altered, and the sureties **[914]** discharged. That is precisely in point. There is no inconvenience; for, when an Act of Parliament alters the duties of an officer, it will be easy to require him to give fresh sureties, or the surety bonds may be framed as suggested by Maule J. in *Mayor of Berwick* v. *Oswald* (3 E. & B. 665), so as to continue the liability of the sureties, whatever alteration might take place by act of the Legislature. As it is, I think the liability of the sureties on this bond at an end.

Coleridge J. I am of the same opinion, and have but little to add. The liabilities and rights of sureties have often been considered in England; and many points are well established. One is, that, when the nature of the employment of the principal is so altered, by the act either of his employer or of the Legislature, that the risk of his surety is materially altered, the surety has a right to say, " I did not bargain for this risk; I am discharged." This seems to me to depend on the broad principles of justice. Mr. Hill did not dispute this, but argued that here, admitting that other duties were added as to which there would be fresh risk, the surety was not affected, as his bond would not extend to those added duties and risk. If this were so, in fact, the decision in *Bonar* v. *Macdonald* (3 H. L. Ca. 226) would be directly in point and against the plaintiff. But I do not concede to Mr. Hill that the risk of a surety stipulating for the conduct of a principal is not affected by the principal incurring collateral liabilities. Let any man say if he would think it the same thing to become surety for a person who was exposed to collateral liabilities as for one who was not. The chance of the solvency of the **[915]** principal is a great element in the risk; it may well be that Gibb could have made good every loss incurred by his defaults in executing warrants under 20*l*., were it not that he has lost the means by liabilities

PYBUS *v.* GIBB                         1105

The case set out the order, which was dated at Salford in Lancashire, 6th September, incurred in executing those under the new Acts. At all events that must affect the risk of his sureties.

Wightman J. It may be taken as a principle of law that a bond by a surety, conditioned for the due performance by his principal of the duties of an office, is rendered null if the office or its duties are so altered as in any degree to increase or vary the risk of the surety to his possible disadvantage. The principle is recognized in many cases ; but the late case of *Oswald* v. *Mayor, Aldermen, and Burgesses of Berwick-upon-Tweed* (5 H. L. Ca. 856 ; 3 E. & B. 653 ; 1 E. & B. 295) may be considered the leading case upon the subject, as it was ultimately decided in the House of Lords.

The question in this case is, whether this principle is applicable to it, and whether there has been such an alteration in the office of the principal in the bond, or his liabilities, as will bring this case within the principle, and discharge the sureties.

The bond recites that the plaintiff was appointed high bailiff of the County Court of Northumberland, under stat. 9 & 10 Vict. c. 95, and had appointed Gibb (the principal in the bond) to act for him as bailiff of the court, and was conditioned, amongst other things, for the due execution by him of all warrants, precepts and writs issuing out of the court, and directed to the high bailiff and delivered to Gibb, and that the defendants would indemnify the plaintiff from all actions **[916]** and losses which he might be liable to for executing or not executing any warrant or writ delivered to Gibb, or for or by reason of the non-performance of the office and duties as such bailiff : it is then assigned as a breach of duty that, under a warrant of execution of judgment obtained in a suit within the jurisdiction of the court by virtue of stat. 9 & 10 Vict. c. 95, for a debt of 11l. 4s. 9., with costs, against one Edgar, Gibb had wrongfully seized and sold the goods of one Thew, and thereby subjected the plaintiff to an action at the suit of Thew, who had recovered damages and costs against him. For the defendants it was contended that the court and the office of bailiff, as they existed at the time of the making of the bond, had been so changed, and the duties so altered and increased, that the defendants were discharged from liability under the bond ; and they relied upon the effect of several subsequent statutes altering and enlarging the jurisdiction of the court and the duties of the officers, including the bailiff.

By stat. 13 & 14 Vict. c. 61, the jurisdiction of county courts is extended from 20l. to 50l., and by consent to any amount, and the powers and provisions of stat. 9 & 10 Vict. c. 95, are extended to the increased jurisdiction. By stat. 10 & 11 Vict. c. 102, s. 5, the high bailiff of the county court and his assistants are to act as messengers in bankruptcy, under the provisions in that Act, which gives a new jurisdiction to the county court in bankruptcy and insolvency ; and by stat. 14 & 15 Vict. c. 52, the judges of the county court may grant warrants for the arrest of absconding debtors, to be executed by the bailiffs. The effect of these statutes is no doubt greatly to enlarge the duties of the **[917]** bailiffs, and especially with respect to the execution of warrants and process from the county court. The words of the condition as to the duty of Gibb to execute warrants and other process are very general. He is duly to execute all warrants so issuing out of the court and directed to the high bailiff, and delivered to him, Gibb, to be executed. These are general words, and would include warrants under the increased jurisdiction ; but it is admitted that the surety would not be liable in respect of them, but that the liability is limited to such warrants as issue from the court under its original jurisdiction given by stat. 9 & 10 Vict. c. 95 ; and it is contended that, to the extent of the 20l. jurisdiction by that statute, the court and the office of bailiff remain the same as under stat. 9 & 10 Vict. c. 95. But it appears to me that this is a fallacy, and that neither the court nor the office of bailiff are the same after the extension of the jurisdiction to 50l. The court, as constituted under stat. 9 & 10 Vict. c. 95, was for the more easy recovery of small debts and demands, limited by the statute to 20l. If the court had been converted into a court for recovery of demands to an unlimited amount it would hardly be considered as the same court, though, as omne majus continet in se minus, it would still be a court in which small demands might be recovered. Small sums may be recovered in the Courts at Westminster ; but they are not therefore considered Courts for the recovery of small debts. Suppose, instead of increasing the amount to be recovered, the jurisdiction of the court had been extended over a dozen additional counties, and the duties of the bailiff vastly increased :

1106     THE QUEEN *v.* THE GUARDIANS OF MANCHESTER     6 EL. & BL. 918.

1855, and was under the hands and seals of two justices of Lancashire. It recited that, by order of 20th September, 1854, Thomas Wood, a pauper lunatic, was, pursuant could the court and the officer be considered the same within the meaning of **[918]** the bond? Or might the plaintiff contend that, though the extension made the court and the office substantially different from what they were when the bond was entered into, the bond was still effective for the small parts remaining of the original jurisdiction? There is no precedent for such a division; and the case of *Bonar v. McDonald* (3 H. L. Ca. 226) is an authority directly against it. This cannot be admitted; for, where the duties and general liability of the bailiff are so much increased by the alteration and extension of the court, the risk of the surety and his liability to loss must be increased. The bailiff might be very competent in the opinion of the surety to execute the duties of the office of bailiff of the limited jurisdiction, but not if other important duties are added. It appears to me, therefore, that in this case the effect of the increased jurisdiction was so to alter the court and the office of bailiff as to affect the liability of the surety to his prejudice, and so to absolve the surety according to the principle of the decided cases.

Erle J. I am of the same opinion, and have nothing to add.

Judgment for the defendant.

---

**[919]** THE QUEEN *against* THE GUARDIANS OF THE POOR OF THE TOWNSHIP OF MANCHESTER. Saturday, November 8th, 1856. Justices sent a pauper lunatic, residing in the township of M. in the county of L., to the county lunatic asylum of L., where he remained a patient for about three months, when he was discharged. About nine months after, justices made an order adjudicating the settlement of the pauper to be in S. in the union of H., in the county of Y., and ordering the union to pay the expences of the conveyance to the asylum, and of the lodging &c. there, under stat. 16 & 17 Vict. c. 97, s. 99.—On appeal against the order for payment, it was objected that such order was bad, inasmuch as by sect. 102 such expences, in the case of a pauper lunatic who would at the time of the conveyance to the asylum have been exempt from removal to the parish of his settlement by reason of stat. 9 & 10 Vict. c. 66, are to be paid by the parish where the exemption has been acquired, and not by the parish of settlement; and that, under stat. 9 & 10 Vict. c. 66, s. 4, no warrant could be granted for removal of any person becoming chargeable in respect of relief made necessary by sickness, unless it was stated in the warrant that the justices granting it were satisfied that the sickness would produce permanent disability; and that it appeared in this case that the lunacy was not such a sickness.—Held, that sect. 4 of stat. 9 & 10 Vict. c. 66, was inapplicable, and the order for payment good.— Under sect. 107 of stat. 16 & 17 Vict. c. 97, three guardians of M. sent to the union of H. a copy of the order for payment, with the place of confinement, the grounds of adjudication, and the particulars of settlement relied upon. They signed their names to this, adding "guardians of the poor of the said township of M.:" but to one of the three names no other address was added.—Held: that the statement, if not good under sect. 107, was amendable under sect. 112.

[S. C. 26 L. J. M. C. 1 ; 2 Jur. N. S. 1205 ; 5 W. R. 20.]

On appeal against an order of two justices, whereby it was ordered that the guardians of the poor of the Halifax Union, in Yorkshire, should pay to the guardians of the poor of the township of Manchester, in Lancashire, certain sums incurred by the latter about the examination, conveyance, maintenance, &c., of Thomas Wood a pauper lunatic, the Sessions set aside the order, subject to the opinion of this Court upon a case which was in substance as follows.

Thomas Wood, the said pauper lunatic, was, on 20th September, 1854, residing in and chargeable to the township of Manchester, and was on that day sent, under an order of justices, pursuant to the statute in that behalf, from the township of Manchester to the county **[920]** Lunatic Asylum at Prestwick in the same county, where he was then, in obedience to the said order, received into the said asylum; and in which asylum he remained a patient until 29th of December following, on which day he was discharged from the asylum, and before the time of the making of the order appealed against. On 6th September, 1855, the order appealed against was made.

18

[1990]

## RAINEY BROTHERS LTD v KEARNEY

In the Court of Appeal before Hutton LCJ and Kelly LJ: 21,30 March 1990.    A

*Landlord and tenant – Breach of covenant – Rent – Lease terminated – Landlord relet premises at a lower rent – Whether loss on rental after termination of lease recoverable as damages.*

Under a lease dated 12 October 1981, the respondent demised to Hairite Ltd premises at Port Road, Letterkenny, Co Donegal, for a term of twenty years from 1 May 1981 at an annual rent of £4,160. The lease contained a normal proviso for re-entry for non-payment of rent or for breach of covenant by the lessee and stated further that upon re-entry the "demise should be absolutely determined but without prejudice to any claim by the Lessor in respect of any antecedent breach of any covenant ...". On 9 December 1982, Hairite Ltd assigned the premises to Morris Wilson for the residue of the term subject to the rents and covenants contained in the lease. Mr Wilson died on 8 August 1985 and the appellant became his personal representative. No rent was paid from 1 July 1985 onwards and the respondent re-entered the premises on 19 May 1986 and determined the lease.

The respondent subsequently relet the premises but at an annual rent which was IR£1,340 less than the rent which had been payable under the original lease. The respondent claimed, inter alia, damages for loss of rent between the termination of the lease and the date of the granting of the new lease and for the loss arising thereafter by reason of the difference between the rent under the original lease and the rent under the new lease. McCollum J found in favour of the respondent in respect of both claims and the appellant appealed.

*Held,* dismissing the appeal, that a lessor who terminates a lease for non-payment of rent may recover damages to compensate him for the loss of rent which would have been payable under the lease.

The following cases are referred to in the judgment:

*Gray v Owen* [1910] 1 KB 622
*Hartshorne v Watson* (1838) 4 Bing NC 178
*Marshall v Mackintosh* (1898) 78 LT 750
*William v Lewis* [1915] 3 KB 493    F

APPEAL by Brendan Kearney as personal representative of Morris Wilson against an award of damages by McCollum J in favour of Rainey Brothers Ltd. The facts appear sufficiently in the judgment.

*CJ Keenan* (instructed by *Doris & MacMahon*) for the respondent/plaintiff.    G
*JO McNulty QC* and *DJC Mulrine* (instructed by *Brendan Kearney)* for the appellant/defendant.

*Cur adv vult*

HUTTON LCJ. This is an appeal against part of the decision of McCollum J in which he awarded damages against the appellant. The claim by the respondent against the appellant arose in the following way.    H

19

By Indenture of Lease dated 12 October 1981 the respondent demised to Hairite Ltd premises at Port Road, Letterkenny, County Donegal, for the term of 20 years from 1 May 1981 at the yearly rent of £4,160. The lease contained a normal proviso for re-entry for non-payment of rent or for breach of covenant by the lessee and the proviso further stated that upon re-entry:

> "this demise should be absolutely determined but without any prejudice to any claim by the Lessor in respect of any antecedent breach of any covenant or provision herein contained."

By Indenture of Assignment dated 9 December 1982 Hairite Ltd assigned the premises to Morris Wilson for the residue of the term of twenty years subject to the rent and covenants contained in the Lease.

Mr Morris Wilson died on 8 August 1985 and the appellant, Mr Brendan Kearney, became his personal representative.

No rent was paid under the lease in respect of the premises from 1 July 1985 onwards and the respondent re-entered the premises on 19 May 1986 for non-payment of rent and determined the demise.

The respondent subsequently relet the premises but at an annual rent which was IR£1,340 less than the rent which had been payable under the lease of 12 October 1981. The respondent then brought an action against the appellant in respect of rent due up to the date of re-entry on 19 May 1986 and in respect of money which it had to expend to repair the premises, and McCollum J awarded the respondent sums under these two heads. There is no appeal against these parts of his judgment. In addition the respondent claimed damages for the loss of rent between the termination of the lease on 19 May 1986 and the date of the granting of the new lease and for the loss arising thereafter by reason of the difference of IR£1,340 per annum between the rent under the former lease and the rent under the new lease. At the trial the appellant advanced no submission that the respondent had been guilty of delay in reletting the premises or that it had failed to mitigate its damages. McCollum J awarded a sum to the respondent in respect of the claim for loss of rent and reduction in rent after the termination of the lease. The appellant now appeals against this part of the judgment.

The submission advanced on behalf of the appellant by Mr McNulty was that where a lessee was in breach of covenant by failing to pay rent and the lessor terminated the lease by re-entry, the lessor could not recover damages to compensate him for the loss he sustained where he was unable to relet the premises at a rent equal to, or higher than, the rent payable under the former lease. Mr McNulty submitted that the lessor had to make an election: he could decide not to terminate the lease so that the lease would continue, and this would enable the lessor to go on suing the lessee for the rent as it became payable during the term, or else the lessor could decide to terminate the lease and regain possession, but having terminated the lease he would have no right to claim compensation for any loss he might suffer by reason of the non-receipt of the rent payable under the lease.

Mr McNulty was unable to cite any authority to support his submission. I consider that his submission is unsound in law and that the authorities establish that the lessor who terminates a lease for non-payment of rent can

20

**Hutton LCJ**            **Rainey Brothers Ltd v Kearney**                    **[1990]**

recover damages to compensate him for the loss of the rent which would
have been payable under the lease. In *Marshall v Mackintosh* (1898) 78 LT
750 the headnote reads:                                                                                A

> "By a building agreement dated the 10th June 1896, the defendant
> agreed with the plaintiff to pull down and re-erect Holloway's Hotel,
> Doverstreet, in carcase before the 25th Dec. 1896, and thereupon to take
> a lease of it from the plaintiff for eighty years from the 24th June 1896 at
> a peppercorn rent for the first year, and at a rent of £1100 for the second
> and every subsequent year of the term. The defendant undertook to    B
> finish his part of the agreement by the 25th Dec. 1896. ... The defendant
> went into possession on the 10th June 1896, but beyond pulling down
> about £200 worth of materials did nothing, and on the 19th Jan. 1897 the
> plaintiff re-entered.
>
> The defendant contended that the effect of these two clauses was to limit
> the plaintiff to such compensation as he could get by re-entry and taking    C
> possession of the materials on the premises, and that he could recover no
> damages. The plaintiff on re-entry could only relet from June 1899 at
> £900 a year rent.
>
> Held, that, in addition to the re-entry, the plaintiff could recover as
> damages the loss of two years rent at £1100 and the loss of £200 a year at
> twenty-five years' purchase, viz £5000, in all £7200."                              D

At 751 Kennedy J stated:

> "Finding nothing beyond the removal of the £200 worth of material
> being done, and no prospect of anything being further done by the
> defendant, the plaintiff re-entered on the 19th Jan 1897. There can be no
> question of his right under the agreement to do so, and apart from the    E
> express terms of that document, I think that upon the facts in evidence
> the defendant had broken the agreement as he admits he did, and that
> the breach was of such a nature that the plaintiff would be reasonably
> justified in treating the defendant's conduct as showing an intimation on
> the defendant's part, not further to perform the contract. It is clear, in
> my view, that the mere fact of re-entry for a forfeiture, does not of itself    F
> exonerate the defendant from the liability to damages for breach of
> contract prior to re-entry. If authority were needed *Hartshorne v. Watson*
> (4 Bing. N. C. 178), seems to be one on the point. I do not think Mr Scott
> contended for that view, but he did contend for the defendant that the
> effect of clauses 2 and 11 do in this contract limit the plaintiff to such
> compensation as might be afforded to him by taking possession of the
> materials, plant, and buildings on the premises at the time of re-entry    G
> without any allowance or compensation to the defendant, and that the
> plaintiff could not claim damages beyond that. I cannot accept that view,
> for that would be to read into these clauses 'as and for liquidated
> damages' or words to the same effect, and this, I conceive I am not
> entitled to do. It is common enough to find the insertion of such words
> when there was an intention of the parties so to limit the liability for a
> breach of the contract. ... It appears to me that in absence of some such    H
> express words as 'as and for liquidated damages,' I cannot construe

NI                  **Rainey Brothers Ltd v Kearney**              Hutton LCJ

clauses 2 and 11 as depriving the landowner of the right to prove, if he can, actual damages from the defendant's failure to perform the contract."

Mr McNulty submitted that *Marshall v Mackintosh* was distinguishable from the present case because in *Marshall v Mackintosh* there was an agreement to take a lease whereas in the present case there was a lease. But in my opinion that distinction is of no substance and does not affect the principle. If a landowner can recover damages for loss of rent on termination of an agreement for a lease, I consider that a landowner can also recover damages for loss of rent on termination of a lease.

In *Gray v Owen* [1910] 1 KB 622 the headnote reads:

"The plaintiff let a house to the defendant, a naval officer, for a term of years subject to a proviso that 'should the tenant be ordered away from Portsmouth by the Admiralty he may determine this agreement by giving to the landlord one quarter's notice in writing.' During the continuance of the tenancy the defendant received an order from the Admiralty to join a ship for foreign service, but shortly afterwards that order was cancelled. Subsequently to the cancellation the defendant, purporting to act under the terms of the agreement and in the belief that he was thereby entitled to do so, gave the plaintiff a quarter's notice of his intention to give up possession. The plaintiff, in the belief that the defendant was at that time under orders from the Admiralty to leave, resumed possession of the house on the expiry of the notice and advertised it for sale. Subsequently the plaintiff discovered the true facts, and brought the action to recover the rent which had accrued in the interval:--

*Held*, (1.) that the defendant was under the circumstances not entitled to give the notice to terminate the tenancy; (2.) that, as the non-disclosure of the cancellation of the Admiralty's order was not fraudulent, the fact that the plaintiff accepted the notice under a mistake induced by the act of the defendant did not prevent that acceptance from working a surrender by operation of law; but (3.) that the giving of the notice was a breach of an implied contract in respect of which the plaintiff was entitled to recover the amount of the rent due as damages."

Bucknill J stated at 626:

"We have already expressed the opinion that, as the defendant in giving the notice had no intention to deceive, the fact of the plaintiff having been misled by the defendant's act did not prevent his acceptance of the surrender from operating as a determination of the tenancy, and consequently the defendant is not liable for rent as though the tenancy were subsisting. But the acceptance of the surrender does not preclude the plaintiff from suing for damages for the breach by the defendant of the contract. It did not destroy the existing cause of action. If the plaintiff had succeeded in letting the house at the same or a higher rent, of course he would have only been entitled to nominal damages, but as he did not succeed in letting or selling it he is entitled to recover the amount of the rent which he has lost."

22

**Hutton LCJ**             **Rainey Brothers Ltd v Kearney**             **[1990]**

In *William v Lewis* [1915] 3 KB 493 a landlord, after the determination
of the tenancy, sued the tenant for damages for breach of the implied
obligation arising out of the tenancy (see 494). At 497 Bray J stated:   A

> "As the evidence proved no custom as to the measure of damages, the
> usual rule of law must, in my opinion, be followed in respect of all the
> breaches, namely, that it is the injury to the reversion occasioned by the
> breaches. In practice in such a case as the present it is the diminution in
> the rent that the landlord will get on reletting, or the allowance he will
> have to make to the incoming tenant."   B

Accordingly I would dismiss this appeal.

KELLY LJ. I concur.

*Appeal dismissed*
EJDMcB   C

D

E

F

G

H

[2000]

[HOUSE OF LORDS]

A

CHRISTOPHER MORAN HOLDINGS LTD.    .    . RESPONDENTS

AND

BAIRSTOW AND ANOTHER    .    .    .    .    .    . APPELLANTS

B

[On appeal from *In re* PARK AIR SERVICES PLC.]

1998  Nov. 18, 19;          Lord Slynn of Hadley, Lord Lloyd of Berwick,
1999  Feb. 4                    Lord Hope of Craighead, Lord Hobhouse of
                                    Woodborough and Lord Millett

*Insolvency—Winding up—Disclaimer of lease—Solvent company
entering into members' voluntary winding up—Liquidators*
*disclaiming lease—Ascertainment of extent of loss or damage*
*sustained by landlord in consequence of disclaimer—Whether*
*discount for early payment applicable to amount proved for by*
*landlord—Whether landlord proving for future rent—Insolvency Act*
*1986 (c. 45), s. 178(6)—Insolvency Rules 1986 (S.I. 1986*
*No. 1925), (as amended by the Insolvency (Amendment) Rules*
*1987 (S.I. 1987 No. 1919), r. 141), r. 11.13*

C

D

In 1990 the landlord leased office premises to a company for a
term of 25 years from 29 September 1989 at an initial rent during
the first three years of £140,000 per annum, rising to £160,000 per
annum for the fourth and fifth years, with a provision for
upwards only reviews at five-year intervals thereafter. Because of
the state of the property market in September 1994 the rent
payable for 1994–95 remained at £160,000, that sum being
substantially in excess of the current rental value of the premises.
On 9 December 1994 the company entered into a members'
voluntary winding up and joint liquidators were appointed who,
on the same date, gave notice under section 178 of the Insolvency
Act 1986[1] of disclaimer of the lease as onerous property. In their
statement of affairs the directors of the company estimated the
surplus assets of the company at £6·7m., but that took no account
of any sum payable to the landlord as a result of the disclaimer.
The landlord's initial proof of damage of some £5·3m. was
rejected by the liquidators. The landlord appealed, but
recalculated its claim at some £3·5m., whereas the liquidators
calculated it to be less than £200,000. On the question of what
basis should be adopted for quantifying the landlord's loss or
damage for the purpose of section 178(6) of the Act of 1986, the
judge held that the act of disclaimer created an immediate
notional debt due to the landlord so that rule 11.13 of the
Insolvency Rules 1986,[2] which applied only to debts payable in
the future, had no application, and that the proper basis for
making the calculation was to calculate the value at the date of
disclaimer of the rent and other sums payable by the company to
which the landlord would otherwise have been entitled during the
residue of the term and to apply thereto a discount at a market
risk rate to reflect the current worth of payments which would
only have been due in the future and then to give credit for the

E

F

G

H

---

[1] Insolvency Act 1986, s. 178(4): see post, p. 183B–C.
S. 178(6): see post, p. 183G.
[2] Insolvency Rules 1986, r. 11.13: see post, p. 186E–G.

2 A.C.                  In re Park Air Services Plc. (H.L.(E.))

A   value of what was left to the landlord after the disclaimer and
finally to take into account the cost of any repairs necessary to
secure a reletting on the terms of a new lease for a term equivalent
to the residue of the term granted by the disclaimed lease. On the
landlord's appeal the Court of Appeal decided that in principle
the compensation should be calculated without any discount for
early receipt, that the landlord was to be regarded as a secured
creditor, his security taking the form of a right to re-enter and
B   recover possession for non-payment of rent and to distrain for
unpaid rent and that rule 11.13(3) was to be applied.

On appeal by the liquidators:—

*Held,* allowing the appeal, that the right conferred by
section 178(4) was a statutory right to compensation for the loss
caused by the operation of the disclaimer, to be assessed in the
same way as damages for breach of a contract which had been
wrongfully terminated, and in assessing damages allowance would
C   be made for accelerated receipt of any sums which had not fallen
due at the date the contract was terminated; that the landlord was
not a secured creditor within the meaning of section 248 since the
right of re-entry did not secure the performance of the tenant's
liability to pay rent, and if the tenancy had not been disclaimed
the landlord would not have been able to prove in the liquidation
for future rent but only for rent already accrued and unpaid; that
when the company went into liquidation the landlord was not a
D   creditor in respect of any loss arising in consequence of the
disclaimer because the lease had not then been disclaimed, so that
rule 11.13 of the Insolvency Rules 1986 had no application as the
landlord was not proving for a debt for which payment was not
due at the date when the company went into liquidation but for
statutory compensation which, subject to quantification, was a
present right to immediate payment; and that, accordingly, the
order of the judge would be restored subject only to an 8·5 per
E   cent. per annum discount rate, being the yield on gilt-edged
securities for an equivalent term (post, pp. 179B–D, 180C–D, E–F,
G–181A, B–D, 184C–F, G–H, 186B–D, 187A–C, 188D–F).

Decision of the Court of Appeal [1997] 1 W.L.R. 1376; [1997]
3 All E.R. 193 reversed.

The following cases are referred to in their Lordships' opinions:

F   *Hardy v. Fothergill* (1888) 13 App.Cas. 351, H.L.(E.)
*Hindcastle Ltd. v. Barbara Attenborough Associates Ltd.* [1997] A.C. 70; [1996]
  2 W.L.R. 262; [1996] 1 All E.R. 737, H.L.(E.)
*Llynvi Coal and Iron Co., Ex parte; In re Hide* (1871) L.R. 7 Ch.App. 28
*London and Colonial Co., In re; Horsey's Claim* (1868) L.R. 5 Eq. 561
*Metropolis Estates Co. Ltd. v. Wilde* [1940] 2 K.B. 536; [1940] 3 All E.R. 522
*New Oriental Bank Corporation (No. 2), In re* [1895] 1 Ch. 753
G   *Oppenheimer v. British and Foreign Exchange and Investment Bank* (1877)
  6 Ch.D. 744
*Overstone Ltd. v. Shipway* [1962] 1 W.L.R. 117; [1962] 1 All E.R. 52, C.A.
*Photo Production Ltd. v. Securicor Transport Ltd.* [1980] A.C. 827; [1980]
  2 W.L.R. 283; [1980] 1 All E.R. 556, H.L.(E.)

The following additional cases were cited in argument:

H   *Blake, Ex parte; In re McEwan* (1879) 11 Ch.D. 572, C.A.
*Carruthers, In re; Ex parte Tobit* (1895) 2 Manson 172
*Chesapeake and Ohio Railway Co. v. Kelly* (1916) 241 U.S. 485
*Gooch v. London Banking Association* (1886) 32 Ch.D. 41, C.A.

*Grand Trunk Railway Co. of Canada v. Jennings* (1888) 13 App.Cas. 800, P.C.                    A
*Panther Lead Co., In re* [1896] 1 Ch. 978
*Razzaq v. Pala* [1997] 1 W.L.R. 1336
*Robophone Facilities Ltd. v. Blank* [1966] 1 W.L.R. 1428; [1966] 3 All E.R. 128,
    C.A.
*Tickle, In re; Ex parte Leather Sellers' Co.* (1886) 3 Morr. 126
*Wells v. Wells* [1998] 3 W.L.R. 329; [1998] 3 All E.R. 481, H.L.(E.)
*Yeoman Credit Ltd. v. McLean* [1962] 1 W.L.R. 131

B

APPEAL from the Court of Appeal.

This was an appeal by Vivian Murray Bairstow and Nigel Ruddock,
the joint liquidators of Park Air Services Plc. in members voluntary
liquidation, by leave of the House of Lords (Lord Goff of Chieveley, Lord
Hoffmann and Lord Hutton) on 25 March 1998 from the decision of the
Court of Appeal (Nourse, Potter and Mummery L.JJ.) on 1 May 1997    C
allowing an appeal by the landlord, Christopher Moran Holdings Ltd.,
from a decision of Ferris J. on 9 February 1996 on the landlord's
originating application seeking a determination of the debt the landlord
was entitled to prove for in the liquidation.

The facts are stated in the opinion of Lord Millett.

*Jonathan Sumption Q.C.* and *Richard Adkins Q.C.* for the liquidators.    D
Damages for future loss are always less than the lump sum claimed
because payment of an immediate sum is worth more than the future right
to such sum. This fundamental rule is taken for granted and has only
rarely been judicially described: see *Overstone Ltd. v. Shipway* [1962]
1 W.L.R. 117, 124 and *Yeoman Credit Ltd. v. McLean* [1962] 1 W.L.R. 131.
The best discussion is to be found in *Chesapeake and Ohio Railway Co.
v. Kelly* (1916) 241 U.S. 485, 489. There is nothing special about a winding    E
up to change the application of the rule. It is not the function of the rules
governing winding up to alter rights between parties.

A provision such as section 178(6) of the Insolvency Act 1986 has been
part of the law of personal insolvency since the Bankruptcy Act 1869 and
of corporate insolvency since the Companies Act 1929. By the operation of
section 178 the liabilities of the tenant company were extinguished by    F
virtue of the disclaimer and subsection (6) deemed the landlord to be a
creditor of the tenant which could prove in the winding up.

Rule 11.13 of the Insolvency Rules 1986 is concerned with the
calculation of the dividend payable to a creditor in respect of future debt.
Under rule 4.94 of the Rules the creditor is entitled to prove for the
nominal (i.e., undiscounted) amount of the debt, but by rule 11.13(2), for
the purpose of calculating the dividend payable, the amount is to be    G
discounted by 5 per cent. per annum over the period of acceleration.
Before the Rules of 1986 came into effect there were equivalent provisions
to paragraphs (1) and (2) of rule 11.13 but not to paragraph (3).

The effect of rule 11.13(3) on its face is that in a solvent liquidation the
payment of interest out of surplus funds to creditors with accrued debts is
to be postponed until any creditor with a future debt has been paid the    H
discount deducted under paragraph (2). That is a priority provision which
appears to assume that a creditor which proves for a future debt is entitled
to the undiscounted value if there are sufficient funds to pay it, although

A    there is in fact no provision of the Act or Rules which entitles a creditor to any more than the discounted dividend provided for by rule 11.13(2). Rule 11.13(3) has no application to the assessment of the "loss or damage" arising from a disclaimer and provable under section 178(6) of the Act, first, because rule 11.13 is concerned only with future debts, i.e., those binding on the debtor but not accruing until some future time; and second, because rule 11.13 is concerned not with the amount for which a creditor

B    might prove but with the calculation of the dividend payable in respect of proof.

The only authority on the measure of damages for the disclaimer of a lease is *Ex parte Llynvi Coal and Iron Co.; In re Hide* (1871) L.R. 7 Ch.App. 28, which did not deal with the issue of accelerated receipt but decided that the assessment of damages should proceed by analogy with

C    repudiation and damages at common law without regard to the bankruptcy or winding up.

The origin of discounting for accelerated receipts lay in the practice of calculating damages for lost income from employment by reference to the capital value of an annuity equal to the income lost. The first case where there was overt discussion of the concept of discounting for accelerated receipt is *Grand Trunk Railway Co. of Canada v. Jennings* (1888)

D    13 App.Cas. 800. During the 20th century the practice has become routine. The reasoning behind the concept is precisely applicable to the assessment of loss and damage arising from the disclaimer of a contract such as a lease which gives rise to a future income stream.

Contrary to *Ex parte Llynvi Coal and Iron Co.; In re Hide* (1871) L.R. 7 Ch.App. 28, the approach of the Court of Appeal was to regard a creditor proving under section 178(6) as proving for the future debt itself

E    and not a sum analogous to damages for loss of that future income. That approach was fallacious and unsustainable in principle. The court went on apply rule 11.13(3) and hold that its effect was that there could be no discount for accelerated receipt in a solvent liquidation. As rule 11.13 was concerned only with future debts it could not have any direct application. Damages for the disclaimer of the lease constituted an immediate debt, not

F    a future debt. The effect of section 178 was to create a right, as a consequence of the disclaimer, which was an immediate right. Nor could rule 11.13 have any application by virtue of an analogy with a right to future rent from a subsisting lease. The landlord could not, but for the disclaimer, have proved for future rent and recovered without discount. He could only have proved for accrued rent on the footing that the lease subsisted or for damages for the loss of the right to future rent on the

G    basis that it had been disclaimed or wrongfully terminated. A proof on the latter basis would have had to take account of the value of the accelerated receipt.

When a lease is subsisting a landlord is unable to prove for future rent and rule 11.13 has no application. All he can hope to get is rent as it falls due and perhaps some security set aside to ensure that funds will be

H    available at the relevant time: see *Oppenheimer v. British and Foreign Exchange and Investment Bank* (1877) 6 Ch.D. 744 and *Gooch v. London Banking Association* (1886) 32 Ch.D. 41. For further examples of the approach of the courts see *In re New Oriental Bank Corporation (No. 2)*

[1895] 1 Ch. 753; *In re Panther Lead Co.* [1896] 1 Ch. 978 and *Metropolis Estates Co. Ltd. v. Wilde* [1940] 2 K.B. 536. If any anomaly arises it consists not in the application of a discount in the assessment of loss and damage under section 178 but in the non-application of the discount to a proof for future debts.

The appropriate discount rate to be applied is 10 per cent., reflecting the return on gilt edged securities: see *Wells v. Wells* [1998] 3 W.L.R. 329.

*Terence Etherton Q.C.* and *Peter R. Griffiths* for the landlord. It is incorrect that the concept of discount for accelerated receipt only came into being at the end of the 19th century. There was a long tradition whereby practitioners were required by statute to discount for accelerated receipt. A statutory discount of 5 per cent. across the board in relation to future debt went back to 1720 and was continued throughout the 19th century. The only change of any substance since the introduction of the Bankruptcy Rules 1870 has been the introduction of rule 11.13 in the Insolvency Rules 1986. Until 1986 the discount of 5 per cent. per annum applied to all liquidations, whether solvent or insolvent. Rule 11.13(3) was not enacted in error. Its clear effect is to add back the discount taken away under rule 11.13(2) in the case of a company which is solvent. There is nothing unacceptable in providing that when a solvent company wishes to repudiate a contract with a third party the third party should not bear the risk of changes in the value of money. The policy behind rule 11.13(3) is to deal with the relative and respective priorities of creditors who have been subject to a discount under rule 11.13(2) and creditors who have suffered no such discount but wish to receive interest on the capital amount of their proof.

The procedure for payment of creditors in a liquidation is in two stages. The first stage involves a creditor proving for his debt under rules 4.73 and 4.94 of the Rules of 1986. The next stage is payment of dividends to creditors under Part 11 of the Rules. The two stages are distinct. Under rule 4.94 a creditor can prove for a debt of which payment is not yet due. There is no suggestion of any discount when he proves his debt. Rule 11.13 applies only for the purpose of a dividend. The discount is only applicable at the point when the dividend is declared, i.e., at the stage when what is to be paid is calculated, not the date of the winding up or payment. That is correct in principle as it is impossible to anticipate, at the proof stage, the date on which the dividend will be declared and paid and thus impossible to calculate the amount to be paid. A string of 19th century cases showed that there was an assumption that the discount would apply at the dividend stage and they illustrate how the modern rules should interact: see *Ex parte Llynvi Coal and Iron Co.; In re Hide*, L.R. 7 Ch.App. 28; *Ex parte Blake; In re McEwan* (1879) 11 Ch.D. 572; *In re Tickle; Ex parte Leather Sellers' Co.* (1886) 3 Morr. 126 and *In re Carruthers; Ex parte Tobit* (1895) 2 Manson 172.

On the liquidators' interpretation the discount is applied at the proof stage, not the dividend stage, which is impractical and not supported by anything in the Act or Rules. There will always be a discount for accelerated receipt, however solvent the company, which means it will always be in a liquidator's interest to disclaim. There will be little practical scope left in rule 11.13(3). The more onerous the contract is to the

A  company the easier it is to disclaim and the worse it will be for the creditor. In addition, the effect of the formula to be applied under rule 11.13, that a debt payable after 20 years cannot be claimed, will be nullified. There will be no 20-year limit to the future period which can be claimed for.

It is also to be inferred that the liquidators' contention is that in every case the discount is to apply from the date of disclaimer. There is no logic

B  or principle for the discount to be taken from before the date of the declaration. The injustice is obvious on the facts of the instant case where *the judge, having treated the accelerated payment as made on the date of disclaimer,* gave judgment some one year after the disclaimer during which period no rent was paid. Any discount for the payments due during that period was inappropriate. It cannot have been Parliament's intention that

C  a creditor should be so disadvantaged. In successive insolvency enactments there had been a discount at the dividend stage but no mention of any other discounts.

If the liquidators are correct it is on the basis that proofs for loss and damage sustained in consequence of the operation of a disclaimer are calculated on a different basis from the proofs of all other debts. The

D  landlord would be in a significantly worse position by virtue of the statutory power of disclaimer than if the landlord were voluntarily to agree to prove on the basis that the lease had come to an end. That would distinguish him from every other creditor with a future income stream and put him in the same position as secured creditors. There is no discernable reason of policy why the landlord should be prejudiced by disclaimer. Landlords are not in any different position from other creditors.

E  A provision such as section 178 had existed in more or less the same form since the Bankruptcy Act 1883 (46 & 47 Vict. c. 52). The reason for the change in 1883 was to give a narrow construction to deemed surrender. The statutory purpose was to allow the company to sort out its affairs quickly and to facilitate the winding up of the company by compelling creditors to prove at once for all future and contingent claims: see

F  *Hindcastle Ltd. v. Barbara Attenborough Associates Ltd.* [1997] A.C. 70. The purpose was not to disadvantage creditors.

The extent of the landlord's injury was the loss of what it would have received in future rent. "Debt" is given a wide meaning in the Insolvency Rules. Parliament cannot have intended that in relation to a future income stream a different method of proof should apply.

G  Although a landlord is precluded from claiming for future rent so long as he retains possession of the premises and refuses to give credit for the reletting value he can, without a disclaimer, claim future rent in the liquidation if he is prepared to enter into an arrangement with the liquidator under which the lease is deemed to be surrendered and he is willing to give credit for the reletting value. The reason why a landlord is not able to claim for future rent while the lease is on foot is that, in those

H  circumstances, he is treated as a secured creditor: see *In re London and Colonial Co.; Horsey's Claim* (1868) L.R. 5 Eq. 561; *In re New Oriental Bank Corporation (No. 2)* [1895] 1 Ch. 753; *In re Panther Lead Co.* [1896] 1 Ch. 978 and *Razzaq v. Pala* [1997] 1 W.L.R. 1336. A creditor cannot

prove for the debt and be secured. He can only prove for the debt if he  A
gives up the security.

*In re Panther Lead Co.* [1896] 1 Ch. 978 shows that to enable a liquidator to bring an end to the liquidation and in order that land should not be unduly affected the liquidator will be encouraged to agree that in return for a surrender the landlord can prove for the future income stream which will have been due.

In the case of a solvent company Parliament has, by enacting  B
rule 11.13, provided that there should be full recovery. That is of great value and the liquidators' approach destroys that benefit.

If there were to be a discount it should be 5 per cent., the same as the discount under rule 11.13(2). Any higher rate would produce an anomalous distinction (to the prejudice of the creditor) between a voluntary termination of the lease by the creditor and an enforced  C
termination by the operation of the disclaimer provisions, even in the case of a liquidation where the assets were insufficient to pay the creditors in full. Alternatively, the discount should be no more than reflected the value of the use of money over the discounted period, usually reflected in the rate of interest on medium term bank deposits: see *Robophone Facilities Ltd. v. Blank* [1966] 1 W.L.R. 1428.

*Sumption Q.C.* in reply. The landlord's argument is based on the  D
assumption that a lessor's claim when a lease is brought to an end is a claim for something akin to rent rather than damages. That is contrary to principle as well as the authority.

The landlord's view of the security held by a secured creditor is incorrect: see section 248 of the Act of 1986 and *Gore-Browne on Companies,* 44th ed. (1986), vol. 2, para. 34.10. A lessor's right of re-entry  E
is simply a right to terminate the lease. The only way to surrender the right of re-entry was to terminate the lease and thereby terminate the right to income. The landlord's attempt to assimilate a surrendered lease with a future debt is impossible. *Ex parte Llynvi Coal and Iron Co.; In re Hide,* L.R. 7 Ch.App. 28; *In re New Oriental Bank Corporation (No. 2)* [1895] 1 Ch. 753; *Ex parte Blake; In re McEwan,* 11 Ch.D. 572 and *In re Panther Lead Co.* [1896] 1 Ch. 978 do not support the landlord's view of the  F
position.

Section 178 is inconsistent with the landlord's case as it extinguishes the right to rent under the contract after disclaimer. If the right under a disclaimed lease is not a right to future rent it is not a right under rule 11.13.

Rule 11.13 is an enormous expansion in the language of the winding  G
up rules which was not well thought out and was badly drafted. The only discernable policy behind it was that dividends payable should be discounted back to the declaration at a rate of 5 per cent. per annum.

Lessors are not placed in a different position to other creditors. The only difference is that leases are more likely to be disclaimed by liquidators than other liabilities. The distinction is not between leases and other forms of contract, it is between contracts which involve an absolute right to  H
money and those which do not.

If a creditor accepts a repudiation of his contract he has a right to damages. If the same contract is disclaimed by the liquidator the creditor

A   has a right to damages. The award will be the same. A lessor is thus not in
a worse position by virtue of a disclaimer. It is also no injustice to
discount the lessor's claim as he is getting his money up front instead of
waiting for the rent to fall due.

Their Lordships took time for consideration.

B   4 February. LORD SLYNN OF HADLEY. My Lords, I have had the
advantage of reading in draft the speech of my noble and learned friend,
Lord Millett. For the reasons he gives I, too, would allow the appeal. The
judge's order should be restored subject to the discount rates applied being
varied to 8·5 per cent.

C   LORD LLOYD OF BERWICK. My Lords, I have had the advantage of
reading in draft the speech prepared by my noble and learned friend, Lord
Millett. For the reasons he gives I would allow the appeal.

LORD HOPE OF CRAIGHEAD. My Lords, I have had the advantage of
reading in draft the speech prepared by my noble and learned friend, Lord
Millett. I agree with it, and for the reasons which he gives I also would
D   allow the appeal and make the order which he has proposed.

LORD HOBHOUSE OF WOODBOROUGH. My Lords, I have had the
advantage of reading a draft the speech of my noble and learned friend,
Lord Millett, and agree with him that this appeal should be allowed for
the reasons which he gives.
E   Your Lordships are disagreeing with a unanimous judgment of the
Court of Appeal delivered by Mummery L.J. and I therefore consider it
appropriate that I should briefly in my own words state why it is that
I would allow this appeal.
Section 178 of the Insolvency Act 1986 gives a liquidator the option to
disclaim onerous property, that is to say, any unprofitable contract or any
other property of the company which is such that it may give rise to a
F   liability to pay money or perform any other onerous act. On 10 December
1994 the liquidator chose to exercise that power and disclaim the 25-year
lease dated 9 January 1990 of 48, Gray's Inn Road, London, W.C.1. The
disclaimer operated so as to determine from the date of the disclaimer the
rights, interests and liabilities of the company in respect of the property.
The consequence of this was well summarised in the speech of Lord
G   Nicholls of Birkenhead in *Hindcastle Ltd. v. Barbara Attenborough
Associates Ltd.* [1997] A.C. 70, 87:

"In order to determine these rights and obligations it is necessary, in
the nature of things, that the landlord's obligation and rights, which
are the reverse side of the tenant's rights and obligations, must also be
determined. If the tenant's liabilities to the landlord are to be
H   extinguished, of necessity so also must be the landlord's rights against
the tenant. The one cannot be achieved without the other. Disclaimer
also operates to determine the tenant's interests in the property,
namely the lease. Determination of a leasehold estate has the effect of

A

accelerating the reversion expectant upon the determination of that
estate. The leasehold estate ceases to exist."

The act of disclaimer brings into existence the right of the lessor to
claim for the loss or damage which he has sustained in consequence of the
operation of the disclaimer. This right is given by section 178(6) of the
Act. A lessor is deemed to be a creditor of the company to the extent of
the loss or damage and he is accordingly given the right to prove for the
loss or damage in the winding up.

B

This is a statutory right to compensation directly analogous to a right
to claim damages for a statutory fault. Its character is compensatory. It is
a right which comes into existence without more at the moment of the
disclaimer. It is not a right to the performance of the contract disclaimed;
it is not a right to the payment of future debts.

Two things follow from this. The first is that the assessment of the
compensation involves, as the statute says, an ascertainment of the loss or
damage sustained by the lessor as a result of the disclaimer. It is necessary
to quantify the relevant sum in money terms. This is precisely the same
exercise as has to be undertaken when assessing the damages for a breach
of contract, as, for example, where one party has repudiated a contract
and the other party has accepted that repudiation as terminating the
contract and he then exercises his secondary right to claim damages: see
Lord Diplock in *Photo Production Ltd. v. Securicor Transport Ltd.* [1980]
A.C. 827, 849. It is interesting to note that this is the way in which the
Court of Appeal chose to express themselves in *Ex parte Llynvi Coal and
Iron Co.; In re Hide* (1871) L.R. 7 Ch.App. 28. Thus Mellish L.J. said,
at p. 34: "Surely he is to prove for the damage which could be recovered
for the breach of the contract."

C

D

E

Any award of damages involves arriving at a single monetary figure
which in present terms quantifies that loss. Where the loss will be suffered
over a period in the future, the computation will have to make allowance
for any advancement that has occurred (e.g. *Overstone Ltd. v. Shipway*
[1962] 1 W.L.R. 117). To fail to take into account the element of
advancement leads to an over-compensation of the claimant.

F

I consider that the Court of Appeal [1997] 1 W.L.R. 1376, 1383–1384
fell into error in the present case when, under the heading "General
Principles," they gave their first reason for deciding in favour of the lessor.
They failed to take into account that ordinary principles require that the
element of advancement should be allowed for and that the sum awarded
should be appropriately scaled down.

G

The second consequence of the character of a disclaimer of a lease and
the requirement to pay compensation is that the right to prove for loss and
damage is not a right to prove in respect of any debt due in the future.
Such considerations cease to be relevant. For example, rule 11.13 of the
Insolvency Rules 1986 cannot have any application. The creditor is not
proving for a debt "of which payment is not due at the date of the
declaration of dividend." He is claiming in respect of a present right to
compensation which came into existence at the date of disclaimer, that is
to say, in the present case, on 10 December 1994. The argument of the

H

A   lessor and the third ground of decision of the Court of Appeal, at pp. 1388–1389, are therefore misconceived. The rule has no application.

Further (as the lessor has expressly conceded before us) the position under a lease has particular characteristics which it may share with other types of synallagmatic relationship. Whilst the lease is subsisting, the lessor is not entitled to prove for any instalment of rent until the date upon which that payment becomes due. Similarly, if the lease is

B   determined, the right to rent is also determined. This is an additional reason why the attempt of the lessor to introduce rule 11.13 into the assessment of the compensation to which he is entitled under section 178(6) is mistaken. Subsequent to the commencement of the winding up but before the disclaimer, he had no right to receive future payments of rent; he would have to wait until they fell due. The provisions of rule 11.13

C   would not have applied nor, at the time that a dividend was declared, would there have been a future debt in respect of which a dividend could be paid.

After the disclaimer the right to rent is lost. There is only a right to compensation. That involves a comparison between the pre-disclaimer and post-disclaimer positions. For material purposes this difference is the aggregate of the differences between the contractual rent and the market

D   rent over the period of the remainder of the lease discounted to allow for advancement. The second ground on which the Court of Appeal decided in favour of the lessor, at pp. 1384–1388, is accordingly in my judgment mistaken. It does not take into account the inability of the lessor to make an advanced proof of rent and the fact that section 178(6) gives him an immediate right to compensation without having to wait.

E   Further, for the reasons stated by Lord Millett, the references to security are mistaken. The right of re-entry does not secure the payment of rent. The approach in the 19th century cases, for example *In re New Oriental Bank Corporation (No. 2)* [1895] 1 Ch. 753, do not derive from any assertion that the lessor is a secured creditor. They arise from the practical problems resulting from the then inability of a liquidator to disclaim a lease and the need to protect the lessor, who (as stated

F   previously) has to wait before he can prove for instalments of rent, from being defeated by a premature distribution of the assets of the company.

The Court of Appeal were obviously impressed, as were your Lordships, by the detailed historical review undertaken by Mr. Etherton. But the Court of Appeal were mistaken to be persuaded that the right to compensation now given by section 178(6) was simply to be equated with a preservation of the right to be paid rent from time to time during the

G   remainder of the lease. The right to compensation is a different kind of right to the primary right of performance. Just as an acceptance of a repudiatory breach means that the injured party can sue at once for damages without waiting for the time of performance, so also the exercise of the right of disclaimer and the provision in section 178(6) give the lessor an immediate right to compensation. Making an adjustment for the

H   element of advancement is an essential ingredient in the quantification of the compensation.

On the remaining questions argued before us I do not need to add anything to what has been said by Lord Millett. I agree that, on the

findings of fact made in this case by the judge, the 8·5 per cent. discount
rate is the appropriate rate. It is a matter of evidence. There is no
remaining dispute on the question of statutory interest. It runs from the
date of the disclaimer.

On the question of costs, I agree with what Lord Millett has said.

I agree with the order proposed.

LORD MILLETT. My Lords, a solvent company is a tenant of property
under an onerous lease. It goes into members' voluntary liquidation, and
the liquidator disclaims the lease. The landlord comes in to prove for his
loss. Must the landlord submit to an appropriate discount to reflect the
present value of the rents and other payments which would have accrued
in the future but for the disclaimer? The judge (Ferris J.) held that he
must; the Court of Appeal that he need not.

*The facts*

The respondent is the owner of a freehold property 48, Gray's Inn
Road, London, W.C.1. In 1990 it granted a lease of the property to a
company now known as Park Air Services Plc. ("the company") for a term
of 25 years from 29 September 1989. Rent was payable quarterly in
advance with provision for periodic upwards only rent reviews. By the
date of the first rent review in September 1994 the state of the property
market had declined to such an extent that the passing rent was more than
four times the then rental value of the property.

On 9 December 1994 the company entered into members' voluntary
winding up and the appellants were appointed liquidators. The company
has been fully solvent throughout. On the following day the appellants
gave notice to the respondent under section 178(2) of the Insolvency Act
1986 disclaiming the lease. This entitled the respondent under
section 178(6) to prove in the winding up for any loss or damage which it
had sustained in consequence of the operation of the disclaimer.

The respondent duly submitted a proof of debt for a sum in excess of
£5·3m. This sum represented the difference between (i) the amounts which
would have been receivable by the respondent in respect of rent, insurance
rent and other sums payable under the lease for the residue of the term if
there had been no disclaimer and (ii) the amounts which the respondent
would be likely to receive in respect of rent, insurance rent and other sums
on a notional reletting or series of relettings for a similar term after the
disclaimer. Each of these amounts was calculated without any discount for
accelerated receipt.

The appellants rejected the proof on the ground that each of the
relevant amounts ought to have been discounted for accelerated receipt.
The respondent appealed against the rejection of its proof. The appeal was
heard by Ferris J. He upheld the appellants' contention and assessed the
respondent's loss at £1,053,000 with interest. The appellants duly paid this
amount. The Court of Appeal allowed the respondent's appeal. The effect
of the judgment of the Court of Appeal was to increase the amount for
which the respondent was entitled to prove to £2,548,899 together with
interest thereon pursuant to section 189 of the Insolvency Act 1986. That

A    sum, together with interest, has been paid. The appellants now appeal to your Lordships.

*The main question: should a discount be applied?*

The office-holder's right to disclaim onerous property has been part of our bankruptcy law since the Bankruptcy Act 1869 (32 & 33 Vict. c. 71). It
B    was introduced into corporate insolvency by section 267 of the Companies Act 1929. It is currently contained in section 178 of the Insolvency Act 1986. Subsection (4) states the effect of a disclaimer as follows:

"(4) A disclaimer under this section—(a) operates so as to determine, as from the date of the disclaimer, the rights, interests and liabilities of the company in or in respect of the property disclaimed;
C    but (b) does not, except so far as is necessary for the purpose of releasing the company from any liability, affect the rights or liabilities of any other person."

It has long been recognised that the effect of the disclaimer of a lease is to extinguish the lease as between the landlord and the tenant. Where (as in the present case) these are the only parties involved, the disclaimer
D    operates to determine the lease altogether with the result that the landlord's reversion is accelerated: see *Hindcastle Ltd. v. Barbara Attenborough Associates Ltd.* [1997] A.C. 70, 87, *per* Lord Nicholls of Birkenhead. This is because the subsection expressly provides that the tenant's rights and liabilities in respect of the leasehold property are determined. These include its right to possession and its liability to pay rent. Once these are determined, the landlord is entitled to immediate
E    possession and has no right to any further payment of rent. In *Hindcastle Ltd. v. Barbara Attenborough Associates Ltd.* your Lordships explained that the disclaimer has the same effect even where third parties such as sureties are involved. When the lease is disclaimed it is determined and the reversion accelerated, but the effect of subsection (4)(b) is to preserve the rights and liabilities of others, such as guarantors and original tenants, as
F    though the lease continued: see p. 88.

Since the disclaimer operates to bring to an end both the tenant's liability to pay rent and the landlord's right to receive it, the landlord cannot prove for future rent. The tenant's obligation to pay it has gone. Since this is the consequence of an act which is authorised by statute, the landlord has no right to claim damages at common law for his loss. Instead section 178(6) gives him a statutory right to compensation. This
G    provides:

"(6) Any person sustaining loss or damage in consequence of the operation of a disclaimer under this section is deemed a creditor of the company to the extent of the loss or damage and accordingly may prove for the loss or damage in the winding up."

H    This gives the landlord an immediate right to prove for the loss or damage which he has sustained in consequence of the operation of the disclaimer, that is to say in consequence of the determination of the lease and the acceleration of the reversion. This is normally measured by

reference to the difference between the rents and other payments which the landlord would have received in future but for the disclaimer and the rents and other sums which the disclaimer will enable him to receive by reletting. But the subject matter of the landlord's proof is compensation for loss of his right, inter alia, to future rent, not the rent itself, to which he no longer has any claim. The amount of this loss has to be assessed. This involves giving credit for the receipts which the disclaimer will enable him to obtain by reletting. Thus even the undiscounted amount of the landlord's proof does not represent the aggregate amount of the rents and other sums which he would actually have received but for the operation of the disclaimer. The appellants contend that, in order accurately to reflect the value of receipts which would have accrued at a future time, but in respect of which the landlord is given an immediate right of proof, the amount of such receipts must be discounted to an amount which reflects their present value.

It has always been recognised that the right conferred by section 178(6) or its predecessors is a statutory right to compensation for the loss caused by the operation of the disclaimer, and that this must be assessed in the same way as damages. There was a bold attempt in *Ex parte Llynvi Coal and Iron Co.; In re Hide*, L.R. 7 Ch.App. 28 to argue that the landlord was only entitled to compensation for the loss of his dividend in the liquidation, thus compounding the effect of the insolvency; but this was firmly rejected. What is determined by the disclaimer is the landlord's right to the rent, not merely his right to prove for it. As Mellish L.J. asked: Surely he is to prove for the damage which could be recovered for the breach of contract?"

There is no justification for employing a different approach in the assessment of compensation for such damage than would be employed if the claimant were claiming damages for breach of a contract which had been wrongfully terminated. In assessing damages in such a case, however, allowance would have to be made for accelerated receipt of any sums which had not fallen due at the date of breach (and which the contract did not make immediately due and payable in the event of breach). An award of compensation which failed to take this into account would over-compensate the claimant.

It follows that I cannot accept the premise on which the judgment of the Court of Appeal was based, viz., that in principle the compensation should be calculated without any discount for early receipt, and that a discount should not be imposed unless there was something in the Insolvency Act 1986, the Insolvency Rules 1986 or the authorities which required it. The opposite is the truth. Nor do I accept the proposition that the purpose of the disclaimer provisions, which the Court of Appeal described as the early closure of the liquidation, does not require the application of any discount for early payment. It is true that the reason the liquidator is given the right to disclaim onerous property is in order to enable him to achieve an early closure of the liquidation. But the reason the landlord is given a statutory right to compensation by section 178(6) is different. It is to ensure that he is fairly compensated for his loss, and this requires a discount for early receipt.

A    The Court of Appeal conducted an examination of the authorities in order to explain the position which obtained before 1929, but in my view they failed to draw the right conclusion from them. In those days the absence of any right on the part of a liquidator of an insolvent company to disclaim an onerous lease left both parties in an unenviable position. The landlord could forfeit the lease if it contained a proviso for entry in the event of liquidation, as any well-drawn lease did. This would enable

B    him to relet the property but he would lose the right to future rent under the lease, for he could not have both rent and possession, and he could not obtain compensation for the consequences of his own action in forfeiting the lease. In practice, therefore, where the passing rent was greater than the current market rent he would normally treat the lease as still on foot. But if he did so he would be likely to be met by the argument that he could only prove for rent already accrued due: see *In re London and*

C    *Colonial Co.; Horsey's Claim* (1868) L.R. 5 Eq. 561; *In re New Oriental Bank Corporation (No. 2)* [1895] 1 Ch. 753; *Metropolis Estates Co. Ltd.* [1940] 2 K.B. 536. These decisions are not easy to reconcile with *Hardy v. Fothergill* (1888) 13 App.Cas. 351, as that case might have been considered to decide that he could prove for the value of future rent in the event of the lessee's bankruptcy. But on the existing state of the authorities a claim

D    for future rent was likely to encounter difficulty. I shall return to the reason for this later. In respect of such rent his only course in practice was to leave the property empty and submit proofs quarter by quarter as the rent fell due.

The liquidator's position was equally unsatisfactory. He could not safely distribute the estate once he had notice of the landlord's interest. If he did so, he would be personally liable for the rents as they fell due. He

E    could retain an amount by way of indemnity, but without an order of the court he would still be personally liable if the amount he retained proved insufficient. The court would give him leave to distribute, thus protecting him from any risk of personal liability, but only if he retained a sum sufficient when invested at compound interest to fund the future liabilities: see *Oppenheimer v. British and Foreign Exchange and Investment Bank*

F    (1877) 6 Ch.D. 744. In other words, he was required to retain an amount equal to their present or discounted value.

Even this was not wholly satisfactory to either party. The landlord could not relet the property, and the liquidator was bound to retain a sum which gave no credit for its current rental value. In practice the parties were well advised to negotiate a surrender of the lease, and the court encouraged this course while recognising that it could not compel it: see *In*

G    *re New Oriental Bank Corporation (No. 2)* [1895] 1 Ch. 753. The amount of the compensation payable by the liquidator to the landlord on a surrender was a matter for negotiation, but it would be surprising if it did not normally include a discount to reflect the present value of the future liabilities as well as credit for the current rental value of the property. The liquidator would be unlikely to agree to pay more than he would be compelled by the court to retain.

H    The Court of Appeal rejected the appellants' argument that the question should be approached simply as a claim for damages for breach of an ordinary commercial contract in which the claimant is seeking

compensation for the loss of future income; although that is what the    A
language of section 178(6) indicates. Instead the Court of Appeal regarded
the landlord as a secured creditor, his security taking the form of a right to
re-enter and recover possession for non-payment of rent and to distrain
for unpaid rent. This enabled the Court of Appeal to treat the respondent
as a secured creditor who had voluntarily surrendered his security and was
proving for the whole debt as if it was unsecured: see rule 4.88(2) of the
Insolvency Rules 1986.    B

The short answer to this is that a landlord is not a secured creditor
within the meaning of section 248 of the Insolvency Act 1986. Section 248
defines "secured creditor" as a creditor of the company who holds a
security over the property of the company. A secured creditor who does
not realise or voluntarily surrender his security must put a value on his
security and prove only for the balance as an unsecured creditor. None of    C
these provisions is capable of applying to the landlord's right of re-entry.
This is not a security interest subsisting in the tenant's property, nor is it
capable of being realised by the landlord. It does not secure the
performance of the tenant's liability to pay rent, which remains unsatisfied
as well after re-entry as before. It cannot be valued or surrendered. If the
lease is disclaimed it is not voluntarily surrendered by the landlord but
brought to an end by the liquidator without his consent. Once it is    D
disclaimed, the right to re-enter is gone together with the right to future
rents payment of which it is supposed have secured. It is a very curious
security which is liable to evaporate just when it is needed.

Having thus circumnavigated section 178(6), the Court of Appeal
applied rule 11.13(3) to the respondent's proof of debt. Rule 11.13 is
concerned with the proof of debts payable at a future time. It provides:    E

"(1) Where a creditor has proved for a debt of which payment is
not due at the date of the declaration of dividend, he is entitled to
dividend equally with other creditors, but subject as follows. (2) For
the purpose of dividend (and for no other purpose), the amount of
the creditor's admitted proof (or, if a distribution has previously been
made to him, the amount remaining outstanding in respect of his    F
admitted proof) shall be reduced by a percentage calculated as
follows—I x M/12 where I is 5 per cent. and M is the number of
months (expressed, if need be, as, or as including, fractions of
months) between the declaration of dividend and the date when
payment of the creditor's debt would otherwise be due. (3) Other
creditors are not entitled to interest out of surplus funds under
section 189(2) or (as the case may be) 328(4) until any creditor to    G
whom paragraphs (1) and (2) apply has been paid the full amount of
his debt."

By rule 4.94 a creditor whose debt is not due at the date when the
company went into liquidation is entitled to prove for the nominal,
i.e. undiscounted, amount of the debt; but this is subject to adjustment of
the dividend when payment is made before the time it would have become    H
due. Rule 11.13(2) adjusts the dividend payable in respect of the proof by
requiring it to be discounted at the rate of 5 per cent. per annum over the
period of acceleration. Rule 11.13(3) is a very curious provision, newly

A    introduced in 1986, when interest during the winding up was for the first time made payable on debts proved in the winding up. Its effect seems to be that there is no discount for accelerated receipt of a future debt in a solvent winding up.

The judge was plainly right to hold that this rule has no application to a proof submitted by a landlord pursuant to section 178(6). Such a proof is not a proof for a debt of which payment was not due at the date when

B    the company went into liquidation within the meaning of rule 4.94. At that date the landlord was not a creditor in respect of any loss or damage arising in consequence of the disclaimer, for the lease had not then been disclaimed. That is why section 178(6) only deems him to be a creditor. Nor does he afterwards prove for a debt of which payment is not due at the date of the declaration of a dividend. He proves for the statutory

C    compensation to which he is entitled by virtue of the section. That is not a right to a future payment. The claim remains to be quantified; but subject thereto it is a present right to immediate payment.

The respondent's argument attached great importance to the alleged anomaly of applying a discount to the landlord's claim in respect of future rents and not to the proofs of other creditors in respect of future debts. Both, the respondent submitted, suffered the loss of a future stream of

D    income. Why, it was asked, should the landlord be singled out in this way?

But there is no anomaly. The Court of Appeal evidently considered that the landlord could, but for the disclaimer, have proved for the future rent and recovered it without discount. But as I have already pointed out, in practice he could not have proved for the future rent. He would have had to wait until the rent fell due and then prove quarter by quarter. This is because rent is not a simple debt. It is the consideration for the right to

E    remain in possession. The tenant's liability to pay future rent is not debitum in praesenti solvendum in futuro. Its existence depends upon future events. Rent in respect of a future rental period may never become payable at all. Rent payable in future under a subsisting lease cannot be treated as a series of future debts making up a pure income stream.

There is a critical distinction between contracts which have been fully

F    performed by the creditor and contracts which remain executory on his part. The creditor who has lent money which has not been repaid or supplied goods or services which have not been paid for sues or proves in respect of a debt. If the debt is not yet due at the date on which a dividend is declared, the dividend is subject to adjustment under rule 11.13. The creditor who has contracted for payment for goods or services still to be supplied by him, however, is not and may never become entitled to

G    payment. He cannot sue or prove in respect of a debt. The office-holder may adopt the contract and enforce it in return for payment in full. But if the creditor is entitled to treat the contract as discharged by breach or the office-holder disclaims the contract, the creditor is entitled to compensation. He may quantify his loss and prove for it, giving credit for the cost of the goods or services which he is no longer bound to supply.

H    Rule 11.13 has no application to such a proof.

It would be wrong for me to leave rule 11.13 without drawing attention to the respects in which its drafting appears to be seriously defective. For more than a hundred years provision has been made for future debts to be

discounted at the rate of 5 per cent. per annum in order to arrive at their            A
present value. The process of discounting involves applying the discount to
the reducing amount of the debt, thus arriving at a sum which, invested at
compound interest, would equal the nominal value of the debt at the date
when it fell due. Rule 11.13(2), however, applies the discounting formula to
the full (i.e. unreducing) amount of the admitted proof. Such a process
would reduce the proof to zero after 20 years, and at no stage yields an
amount which, invested at 5 per cent. compound interest, would equal the            B
nominal value of the debt at the date fixed for payment.

The second respect in which the drafting appears defective is in
relation to the amount and priority of the discount to be added back
where the company is solvent. Obviously the first priority is to satisfy the
principal amount of the debts, including the discounted value of any future
debt. Once these have been satisfied in full, one would expect the amount            C
of the discount from the date of the liquidation to the date of final
distribution to be paid pari passu with the interest payable during the
winding up to other creditors. Instead, however, the creditor whose proof
has been discounted recovers the full amount of the discount, not to the
date of final distribution, but to the date, possibly still far into the future,
when his debt would have fallen due for payment; and he recovers this,
not pari passu with the interest payable to other creditors during the            D
winding up, but in priority to such interest. It is difficult to believe that
this was the intention of the Rules Committee.

*Two subsidiary issues*

The first issue concerns the rate of discount. The best evidence of the
appropriate discount rate is the yield on gilt-edged securities for an            E
equivalent term. The judge found that this was 8·5 per cent. per annum.
But he applied different rates to the passing rents (10 per cent.) and to the
current market rents for which credit must be given (12 per cent.) to reflect
the fact that the property was over-rented and the risk that the company
might default. The appellants do not seek to support the judge's use of
higher rates to reflect the risk of default, and are content for a rate of
8·5 per cent. The respondent contends for 5 per cent. to reflect the            F
discount rate provided for by rule 11.13. I would reject the latter approach
as without merit. The 5 per cent. rate is a purely nominal rate which has
remained constant for more than a hundred years during periods of high
and low interest rates alike, and its application would not yield a correct
assessment of the amount of the respondent's loss.

There was a second issue which concerned the date from which interest            G
should run under section 189 of the Insolvency Act 1986. It is now
common ground that if the value of the respondent's loss is to be assessed
at the date of disclaimer then the discounted amount can properly be
treated as outstanding at that date and carry interest for the whole period
thereafter until payment.

*Costs*                                                                    H

The respondent lodged a proof for £5·3m. The appellants rejected the
proof, as they were entitled to do, in toto without admitting it in part. At

2 A.C.                    In re Park Air Services Plc. (H.L.(E.))                    Lord Millett

A    the hearing, and on the basis of its own expert evidence, the respondent reduced the amount of its claim to £3·5m. The appellants contended for a sum of £200,000. The respondent recovered £1,053,000. This was far less than it claimed, and far more than the smallest sum for which the appellants contended. The judge recognised that this was hostile litigation, and that accordingly it would not be right to order the costs of both parties to be paid out of the assets of the company. At the same time he

B    did not consider it appropriate to award the respondent its costs on the footing that costs should follow the event. Indeed he said that he could not tell what the event really was. The truth was that the issue had to be determined by the court; and that he had accepted the arguments and evidence of one party on some aspects and those of the other on others. In those circumstances he made no order for costs.

C    The respondent accepts the judge's ruling that this was hostile litigation, but submits that the ordinary rule should follow. The judge was wrong to say that he could not tell what the event was. The respondent was the successful party, in that it obtained an award higher than it could have obtained without coming to court.

I do not think that this is right, even at the most technical level. The respondent submitted an excessive proof. The appellants were entitled to

D    reject it. The respondent appealed from their rejection of its proof. It was unsuccessful. It did not obtain an order that its proof be admitted. On this footing the respondent was the unsuccessful party. But the judge's order reflected the realities of the situation. Neither party was wholly successful or wholly unsuccessful. In my view the judge's order for costs was well within the exercise of his discretion and should be affirmed.

E    *Conclusion*

I would allow the appeal and restore the order of the judge but varied so as to reflect a discount rate of 8·5 per cent. per annum.

*Order accordingly.*

F    *Solicitors: Memery Crystal; Lawrence Graham.*

B. L. S.

G

H