

Neutral Citation Number: [2006] EWCA Civ 1659

Case No: 2005/2438

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE GUILDFORD COUNTY COURT**
**HIS HONOUR JUDGE REID Q.C.**
**ON APPEAL FROM DISTRICT JUDGE KUBIAK**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 13 December 2006

Before:

**LORD JUSTICE AULD**
**LORD JUSTICE RIX**
and
**LORD JUSTICE LLOYD**

- - - - - - - - - - - - - - - - - - - -

Between:

**(1) ROBERT REICHMAN**
**(2) MONICA DUNN**

**Claimants**
**Respondents**

- and –

**(1) SARAH BEVERIDGE**

**Defendant**

**(2) MATTHEW GAUNTLETT**

**Defendant**
**Appellant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

The Appellant in person
The Respondents not present or represented
**Amanda Tipples** (instructed by **The Treasury Solicitor**) as advocate to the court

Hearing date: 13 November 2006
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Lord Justice Lloyd:**

1. The Defendants were in practice together as solicitors in partnership, under the style Beveridge Gauntlett. They had offices in Yateley, Hampshire, which they held as tenants under a lease dated 30 August 2000 from the Claimants as landlords, for a term of 5 years from 26 January 2000. For reasons which do not matter for present purposes, they ceased to practise as solicitors in February 2003 and had no further need for the offices. They did not pay the rent due on 25 March 2003, or thereafter, nor the water rates due after that date. In January 2004 the Claimants sued for the arrears due up to then, seeking only a money judgment for the sums due. Mr Gauntlett, the Second Defendant, served a Defence in which, among other things, he said that the Claimants had failed to mitigate loss arising from any non-payment of rent. He said that the Claimants were fully aware of the plight of the Defendants which led to their ceasing to practise as solicitors, "but failed to forfeit the lease in order to mitigate their own loss". The First Defendant took the same point in her Defence.

2. Something of the factual context of the case can be gathered from Mr Gauntlett's Defence, in which, after the passage referred to above, he said that the landlords' agent at first indicated that they would accept the offer of someone who was their tenant of other premises to take a new lease of the premises let to the Defendants, surrendering her own, that the agent then said that compensation would be necessary for that to be allowed, and finally that no such surrenders would be allowed. The First Defendant put it succinctly in her Defence: the landlords failed to instruct agents to market the premises, failed to accept the offer of a prospective tenant who wanted to take an assignment or a new lease, and failed to accept an offer from the First Defendant to negotiate payment of a consideration for a surrender of the Defendants' lease.

3. Rather than investigate the contentions on the facts, a Deputy District Judge was persuaded to order a preliminary issue as to "whether it is necessary as a matter of law for a landlord to mitigate his loss when seeking to recover arrears of rent." That issue came before District Judge Kubiak on 1 February 2005. She held that a landlord was under no such duty. Mr Gauntlett appealed. The appeal was heard by His Honour Judge Reid Q.C. On 17 October 2005 he handed down a reserved judgment dismissing the appeal. Mr Gauntlett appeals to this court, with permission granted by Chadwick LJ. Mr Gauntlett appears in person, as he has throughout these proceedings. Miss Beveridge has taken no part in the proceedings since the hearing before the District Judge, at which she was professionally represented. The Claimants, having been represented by Counsel in the courts below, have chosen not to take part on this appeal, contending that the judge was right for the reasons he gave. In those circumstances the court was faced with the prospect of grappling with a point of law of sufficient importance to have justified the grant of permission for a second appeal but with argument only from one side. Fortunately, we have had very helpful submissions from Miss Tipples as advocate to the court, supported by a full and learned skeleton argument which is plainly the result of thorough research.

**The lease**

4. There is nothing unusual about the lease. I have mentioned the term. The rent was £23,010 per annum, payable monthly in advance, and the tenants were also liable to

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 7   Pg 3 of 91
**A.45**

Judgment Approved by the court for handing down.                                    Reichman and Dunn v Beveridge and Gauntlett

pay by way of rent the amount of any insurance premium incurred by the landlord for insuring the premises against specified risks. There were normal covenants by the tenants to pay outgoings and to keep the premises in proper repair and decoration, to use the premises only as offices, and not to assign or underlet, part with or share possession of the premises except by way of what were called a permitted assignment or a permitted underlease of the whole, on defined terms, and not in those cases without consent. The lease contained a proviso for forfeiture in the event (among others) of rent being unpaid for 14 days. The lease was excluded from the protection of Part II of the Landlord and Tenant Act 1954.

5.    A number of provisions in the lease allowed the landlords or their representatives to enter the premises otherwise than by way of forfeiture. Clause 3.9 related specifically to the inspection of the state of the premises and, if the tenants did not do work which was specified to them, allowed the landlords to enter in order to have the work done. Clause 3.10 gave a right of entry if that were necessary for work to the building as a whole or to the rest of the building. Clause 3.18 required that the landlords be allowed to enter, within 6 months next before the expiration or sooner determination of the term, to advertise the premises for re-letting and that persons authorised by the landlords be permitted to view the premises on reasonable notice.

## Leases as contracts

6.    At the heart of Mr Gauntlett's argument is the proposition that a lease is a contract, even though it also creates an estate in land, that the courts have recognised increasingly over recent years that the rights and obligations of the parties should be ascertained by reference to principles of contract law, and that there is no reason why that should not also apply to the consequences of a breach of the tenant's covenant to pay rent. He relied on this striking passage in a judgment of Bollen J in the Supreme Court of South Australia:

> "There is no reason why in modern times mitigation of damage should not apply. It is an ordinary principle of contract law. With modern leases the law should recognise the importance of the contractual aspect of a lease. Why should not a landlord faced with abandonment take steps to try to reduce his loss? Why should a vendor of tomatoes faced with refusal to take delivery by his purchaser suffer if he does not sell if he can to another purchaser and yet a quiescent and immobile landlord not suffer if he fails to seek another tenant? Modern ideas say that there is no reason for this anomaly." See *Vickers v Stichtenoth Investments Pty Ltd* (1989) 52 SASR 90 at 100.

7.    The contractual nature of a lease has been emphasised by the House of Lords in several cases over the last thirty years. In *United Scientific Holdings Ltd v Burnley Borough Council* [1978] AC 904, Lord Diplock said at 935:

> "The mediaeval concept of rent as a service rendered by the tenant to the landlord has been displaced by the modern concept of a payment which a tenant is bound by his contract to pay to the landlord for the use of his land."

Accordingly the rights and obligations of the parties in respect of rent, and in particular under rent review clauses, had to be determined as a matter of the construction of the contract, just as payment obligations would be under any other contract.

8. The potential application of the doctrine of frustration to leases (albeit only very exceptionally, and not on the facts of the particular case) was established in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 1965.

9. The fact that a contractual periodic tenancy held by more than one tenant could be determined by any one of them giving notice to the landlord, without the need for all to join, was established in *Hammersmith and Fulham London Borough Council v Monk* [1992] 1 AC 478. Lord Bridge said of that issue, at 483:

> "As a matter of principle I see no reason why this question should receive any different answer in the context of the contractual relationship of landlord and tenant than that which it would receive in any other contractual context."

10. Elsewhere in the judicial hierarchy, Mr Assistant Recorder Sedley Q.C., as he then was, held in the county court in *Hussein v Mehlman* [1992] 2 EGLR 87 that a lease could be brought to an end by the tenant's acceptance of a repudiatory breach by the landlord. He held that a decision of the Court of Appeal to the contrary in *Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] 1 QB 318 could no longer stand after *National Carriers*. Since then, other courts in England have held, or assumed, that a lease can be brought to an end by acceptance of a repudiatory breach, but there is no decision to that effect in this court.

11. There is no doubt that, where a party to a lease seeks to recover damages from the other for breach of covenant under the lease, the rules about mitigation of loss will apply.

12. However, Mr Gauntlett seeks to go further than that, and to establish that the same rule applies even if the landlord does not terminate the lease for breach of the tenant's covenants, but merely sues for each instalment of rent as it falls due. This proposition is not, in truth, part of the principles relating to mitigation of damages properly so-called, which apply only if the claim is for damages. The landlord's claim for rent is in debt and the rule does not apply to a claim in debt: see *Jervis v Harris* [1996] Ch 195. The principle to which Mr Gauntlett seeks to have recourse is, however, analogous to the doctrine of mitigation of loss: see McGregor on Damages, 17th edition, paragraph 7-030. It is based on words of Lord Reid in his speech in *White and Carter (Councils) Ltd v McGregor* [1962] AC 413, at 431.

## What Lord Reid said in *White and Carter (Councils) Ltd v McGregor*

13. In that case Mr McGregor contracted with the appellants for them to display advertisements for three years on litter bins. The contract was made on his behalf by an employee, without specific authority. As soon as he heard about it, on the very day it was made, he sought to cancel the contract. This was no doubt a repudiation of the contract, but the appellants did not accept it. They proceeded to do all that was required of them under the contract, and to sue Mr McGregor for the contractual sums

due. No act in pursuance of the contract had yet been done by the time of the repudiation, but Mr McGregor's co-operation was not necessary for the Appellants to do that which they were obliged to do under the contract.

14. The House of Lords, reversing the lower courts in Scotland, held by a majority that, faced with a repudiation of the contract, the innocent party may accept the repudiation and sue for damages, but he may alternatively disregard or refuse to accept the repudiation and then the contract remains in full effect: see Lord Reid at [1962] AC page 427, and Lord Hodson at page 445, with whom Lord Tucker agreed: page 434. The decision in the case is of no help to Mr Gauntlett. However, at page 431 Lord Reid said this:

> "It may well be that, if it can be shown that a person has no legitimate interest, financial or otherwise, in performing the contract rather than claiming damages, he ought not to be allowed to saddle the other party with an additional burden with no benefit to himself. If a party has no interest to enforce a stipulation, he cannot in general enforce it: so it might be said that, if a party has no interest to insist on a particular remedy, he ought not to be allowed to insist on it. And just as a party is not allowed to enforce a penalty, so he ought not to be allowed to penalise the other party by taking one course when another is equally advantageous to him."

Neither Lord Hodson nor Lord Tucker alluded to such a possibility.

15. On the facts, however, any such principle could have been of no assistance to Mr McGregor because he had not attempted to prove that the Appellants had no legitimate interest in completing the contract and claiming the contract price rather than damages.

16. Lord Reid's observations have been referred to in several subsequent cases, principally concerning charterparties in which the owner claims hire and the charterers wish to be made liable, if at all, for damages instead. They have hardly ever been applied so as to relieve the repudiating party of liability for the contract price. The relevant cases are as follows:

i) *Attica Sea Carriers Corporation v Ferrostaal Poseidon Bulk Reederei GmbH, The Puerto Buitrago* [1976] 1 Lloyds' Reports 250. This concerned a charterparty by demise of a bulk carrier. The vessel was in a poor state of repair. The owners argued that the charterers were bound to repair it before redelivery, and that they were entitled to hire until it had been redelivered in a proper state of repair. Mocatta J accepted this proposition. The Court of Appeal held to the contrary, that if the vessel was out of repair when redelivered, the charterers were liable in damages, but that the redelivery was nevertheless valid. On that basis the issue to which Lord Reid's comments were relevant did not arise. Nevertheless Lord Denning MR considered whether, if the redelivery had been a repudiation of the contract, the owners would have been entitled to refuse to accept it and sue for hire thereafter. He said at page 255 that the decision in *White and Carter* had no application "in a case in which the plaintiff ought, in all reason, to accept the repudiation and sue for damages, provided that damages would provide an adequate remedy

for any loss suffered by him". Orr LJ agreed with Lord Denning on the principal point. As for the *White and Carter* point, he said at page 256 that in the instant case, first, the owners could not perform the contract without the co-operation of the charterers and, secondly, the charterers had set out to prove that the owners had no legitimate interest in claiming the hire rather than damages. Browne LJ also agreed with Lord Denning on the principal point and with Orr LJ on the *White and Carter* point. Thus, Lord Reid's observations were not the basis of the decision, and if the case had turned on them, the case would have been distinguished from *White and Carter* on the facts.

ii)   *Gator Shipping Corporation v Trans-Asiatic Oil Ltd, The Odenfeld* [1978] 2 Lloyd's Reports 357. In this case, as held by Kerr J, the charterers repudiated the charterparty, and the question arose whether the owners were obliged to accept that repudiation, or could disregard it and sue for the hire. The judge reviewed *White and Carter* and *Attica Sea Carriers*, and held that "any fetter on the innocent party's right of election whether or not to accept a repudiation will only be applied in extreme cases, viz. where damage would be an adequate remedy *and* where an election to keep the contract alive would be wholly unreasonable": see page 374. On the facts he held that the owners were entitled to refuse to accept the repudiation.

iii)  *Clea Shipping Corp v Bulk Oil International, The Alaskan Trader* [1984] 1 All ER 129. In this case a vessel subject to a charterparty for 24 months suffered a major engine breakdown after nearly a year, such that the repairs would take several months. The charterers said they had no further use for the vessel but the owner proceeded with the repairs and then sought to hold the charterers liable for hire for the rest of the period of the charterparty, once the repairs had been completed – some seven months. On an arbitration, the award was that the owners had no legitimate interest in pursuing their claim for hire rather than asserting a claim for damages. Lloyd J dismissed an appeal against the award. He reviewed the cases which I have mentioned and held, at 137, that:

> "this court is bound to hold that there is some fetter [on the innocent party's right to elect to disregard the repudiation], if only in extreme cases; and for want of a better way of describing that fetter it is safest for this court to use the language of Lord Reid, which, as I have already said, was adopted by a majority of the Court of Appeal in *The Puerto Buitrago*."

He also said that the correct analysis was that, the court, on equitable grounds, refused to allow the innocent party to enforce his full contractual rights.

iv)   *Ocean Marine Navigation Ltd v Koch Carbon Inc, The Dynamic* [2003] EWHC 1936 Comm. In this case, an arbitrator had held in favour of the charterers that the owners were limited to damages and could not claim hire. On appeal from the award, Simon J held that the arbitrator had not applied the law correctly in rejecting the owners' claim to hire, and he remitted the award. He reviewed the cases already mentioned, but did not depart from the formulation used by Lloyd J.

17.     There is, therefore, a very limited category of cases in which, although the innocent party to a contract has not accepted a repudiation by the other party, and although the innocent party is able to continue to perform all his obligations under the contract despite the absence of co-operation from the other party, nevertheless the court will not allow the innocent party to enforce his full contractual right to maintain the contract in force and sue for the contract price. The characteristics of such cases are that an election to keep the contract alive would be wholly unreasonable and that damages would be an adequate remedy, or that the landlord would have no legitimate interest in making such an election. Mr Gauntlett seeks to establish that a case where the tenant has not only failed to pay rent and all other sums due under the lease, but has also abandoned the demised premises is, or may be, within this category of cases.

## Would damages be an adequate remedy for the landlord?

18.     Mr Gauntlett's proposition has to be that, if the landlord terminates the tenancy and takes steps to re-let, and if the sums payable to him as a result are less than those that would have been payable during the period of the lease after the date on which he took possession, he can recover that loss by way of damages from the tenant. Otherwise damages would not be an adequate remedy for the loss caused, as compared with the landlord's position if he held the tenant to the lease and sued for the rent as it fell due.

19.     Once the landlord has taken possession he cannot recover rent under the lease. The question is whether he can recover damages for the loss of the future rent, which would have to be on the basis that it was loss caused by the tenant's breach of contract. There is no English case which decides that the landlord can recover damages of this kind. There is at least one English decision to the contrary, but it is of some antiquity. In Canada and Australia, however, the highest courts have decided that such damages can be recovered.

## Commonwealth cases on repudiation of leases

20.     The Supreme Court of Canada held that a landlord can recover loss of bargain damages after retaking possession in *Highway Properties Ltd v Kelly, Douglas & Co Ltd* (1971) 17 DLR (3d) 710. In that case the Supreme Court overruled a previous decision of the Ontario Court of Appeal which had held that the landlord had no claim for future damages after taking possession: see *Goldhar v Universal Sections and Mouldings Ltd* (1962) 36 DLR (2d) 450, especially at page 462. In *Highway Properties* Laskin J said this, in a passage quoted in *National Carriers* by Lord Wilberforce, Lord Simon and Lord Roskill:

> "It is no longer sensible to pretend that a commercial lease, such as the one before the court, is simply a conveyance and not also a contract. It is equally untenable to persist in denying resort to the full armoury of remedies ordinarily available to redress repudiation of covenants, merely because the covenants may be associated with an interest in land."

21.     The same result was established by the High Court of Australia in *Progressive Mailing House Pty Ltd v Tabali Pty Ltd* (1985) 157 CLR 17. That was an unusual case on the facts, where a lease had been granted, but the lessor was obliged to carry

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 7   Pg 8 of 91
**A.45**
Judgment Approved by the court for handing down.
Reichman and Dunn v Beveridge and Gauntlett

out certain works within 12 weeks of obtaining development approval, and the lessee was to take possession within 14 days of receiving notice that the works had been completed, with the first payment of rent falling due 2 months later. In fact the lessee went into possession before the lease was executed, and paid rent. The lessor had the works done, and gave notice of that, but the tenant disputed whether they had been done properly, denied that he was bound to pay rent, and refused to pay rent though, apparently, remaining in possession. The landlord sued for possession, arrears of rent and damages, the latter to include the loss, as a result of the re-entry, of the benefit of the future payments of rent that would have fallen due under the lease. The judge ordered possession and payment of the rent and damages claimed. The Defendant appealed only on damages, unsuccessfully, to the Court of Appeal of the Supreme Court of New South Wales and then to the High Court. The High Court held that the tenant's conduct amounted to a repudiation, that neither the presence in the lease of a proviso for forfeiture nor the fact that the landlord had re-entered under it excluded the possibility of claiming damages caused by the repudiation, and also that the right to claim damages was not limited to damages arising before the re-entry, but included loss of bargain damages, that is to say damages for the loss of the rent that would have become payable after the date of termination for the rest of the term. The High Court did not need to consider the quantification of those damages.

**The courses open to the landlord**

22.   The landlord can always decide not to take any particular action, and hold the tenant to the lease. Alternatively he may re-enter and thereby put an end to the lease. In *Highway Properties* the Supreme Court mentioned a third possible course of action for the landlord which, I must confess, came as a surprise to me. Laskin J said at page 716 that

> "[the landlord] may advise the tenant that he proposes to re-let the property on the tenant's account and enter into possession on that basis",

and at page 718 that English and Canadian case law allows for a limitation on the operation of a surrender, despite repudiation and possession, if the landlord gives notice to that effect to the tenant, and that:

> "under the present case law the landlord is not under a duty to mitigate, but mitigation is in fact involved where there is a re-letting on the tenant's account."

23.   The only English authority on that point is *Walls v. Atcheson* (1826) 11 Moore CP and Exch. Reports 379 (which is not in the English Reports), less fully reported at 3 Bing. 462. In that case a tenant took premises for a year, occupied them and paid rent for a quarter and then quitted. After about four weeks the landlord re-let the premises, at a slightly lower rent, and they remained let for some months, but they were empty for the last two months of the original term of a year. The landlord then sued to recover the loss of rent under the original lease, including both the amount by which the rent was less under the later lettings, and the whole rent for the later period when the premises were vacant, but she failed. The Court of Common Pleas (Best CJ, Park J, Burrough J and Gaselee J) held that putting in another tenant amounted either to accepting a surrender or to evicting the tenant, so as to put an end to the right to claim

the rent. Sergeant Vaughan had argued that the lettings were for the tenant's account. Only Gaselee J referred to that argument. He said at 382:

> "If the plaintiff had given the defendant notice, that, if he would not occupy the apartments himself, she would let them to another tenant, on his account, the case would have been different."

24. The possibility alluded to in that passage does not seem ever to have been relied on in any subsequent English case, but it has been used in Canada: see *Green v Tress* [1927] 2 DLR 180, and other cases referred to in *Goldhar* (cited at paragraph [20] above) at pages 459-460.

25. The scope and effect of this possible course of action seem to me somewhat uncertain and questionable, and Gaselee J's remark a rather slender basis for it. A landlord whose rights and obligations are governed by English law could not be criticised for taking the view that it would not be wise to place reliance on that approach to the consequences of a tenant's default.

26. Moreover, the actual decision in *Walls v Atcheson* is authority for the proposition that, subject to that possible exception which did not apply on the facts, a landlord cannot recover damages from the tenant for loss of rent after he has re-entered so as to bring the lease to an end, though it is fair to say that it was not argued on the basis of acceptance of the tenant's repudiation and damages for that breach of contract. There is no English authority which decides otherwise, despite the developments in Canada and Australia which I have described. Woodfall on Landlord and Tenant, at paragraph 17.315, suggests that a landlord may accept a tenant's repudiation and sue for loss of future rent, but the authorities cited are those which I have mentioned from Canada and Australia. It does not seem to me that this is a correct statement of English law as it now stands on this point.

27. By contrast, if it had been held in *White and Carter* that the appellants could not hold Mr McGregor to the contract, they would have been entitled to damages in respect of all their lost profit. Similarly the owners in the charterparty cases would have got repudiation damages quantifiable by reference to loss of the future hire as set against market rates if lower. It may be a logical development to hold that a landlord, having forfeited the lease, can recover damages for the loss of future rent, at least if the breach which led to the forfeiture was fundamental and repudiatory, but it does not seem to me that English law has yet reached that stage. We were shown the Blundell lectures delivered in 2000 by Lord Millett and Sir David Neuberger, respectively against and for the proposition that the doctrine of repudiation is and should be part of the English law of landlord and tenant. It is clear from those powerful texts that there is much to be said each way on the point of principle. I note that the Law Commission's very recent report Termination of Tenancies for Tenant Default, LC303, does not refer to the question of repudiation, being concerned only with the procedure by which tenancies may be brought to an end.

28. If it is still the law of England that damages for the loss of future rent cannot be recovered after the landlord has taken back possession of the premises following a tenant's default, as seems to me to be the case, then damages cannot be an adequate remedy for the landlord in the circumstances suggested by Mr Gauntlett, and one of the conditions for the intervention of equity so as to fetter the landlord's ability to

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
Part 7    Pg 10 of 91

**A.45**

Judgment Approved by the court for handing down.                    Reichman and Dunn v Beveridge and Gauntlett

hold the tenant to the lease is not satisfied. Even if it is not clear that this is the position under English law, the uncertainty of the position at law would be relevant to the reasonableness or otherwise of the landlord's conduct. The landlord could not be criticised for wishing to avoid embarking on litigation which might have to go to the House of Lords before the point was settled.

## Would it be wholly unreasonable for the landlord not to terminate the lease?

29. Miss Tipples suggested that the observations in *White and Carter* might only apply if the innocent party had some acts still to perform under the contract, albeit acts which could be done without the co-operation of the repudiating party, and that in the case of a landlord the relevant acts would already have taken place, namely the grant of the lease, so that the observations were not relevant. She showed us passages from Sir Guenter Treitel's Law of Contract, 11th ed, at pages 1015-6, which suggest that this is a relevant distinction. It is not clear to me why the principle should be affected by that distinction. In *White and Carter* the innocent party did have more to do, but in the charterparty cases this may not have been so.

30. The important point is whether it could be said that a landlord was acting wholly unreasonably in failing to take steps to find an alternative tenant to whom to let in place of the defaulting tenant, rather than leaving the lease in place and suing for the rent as it falls due. That is to be considered against the background of the rights and obligations under the lease. If the lease remains in force, the landlord is entitled to the rent and other sums falling due. Of course, if the tenant is in default there may be a question whether the landlord will in fact recover the sums due in full, but if so the same would be true of any claim for damages to which he may be entitled if the lease is brought to an end. No doubt if the rental market has improved the landlord will forfeit and re-let at a profit, so the question is only likely to arise if the landlord would not be able to re-let easily or only at a lower rent. In that case, as already discussed, the landlord cannot under English law expect to be able to sue the tenant for damages in respect of the difference between the lower rent under a new letting and the rent to which he would have been entitled under the original lease. His right to the original rent comes to an end as soon as he takes possession in a way which is inconsistent with the continuance of the original tenancy. Leaving aside the *Walls v. Atcheson* approach, the landlord had, in the present case, no relevant right to go into the premises under the lease (or not until only 6 months of the term remained, in July 2004). There may be some scope for saying that steps preparatory to re-letting can be taken without amounting to a re-entry such as to forfeit the lease, as in *Oastler v. Henderson* (1877) 2 QBD 575, for example, but the landlord would be entitled to take a cautious line on that, knowing that the tenant would wish to argue that the lease had been determined sooner rather than later.

31. Another factor of practical relevance is that it would almost always be open to the tenant under the terms of the lease (as in the present case) to seek to find an assignee or sub-tenant and to ask the landlord's consent to the assignment or underletting. Of course the tenant might face practical and economic problems in this respect. If the current rent is higher than the market rent, it would be difficult to find an assignee, except perhaps at a reverse premium, and a sub-tenant might not be prepared to pay enough rent to cover the obligations under the headlease. Moreover not only the landlord but also the prospective assignee would, typically, require payment of all arrears of rent before consenting to, or taking, the assignment, as the case may be.

Nevertheless, it seems to me that it would be difficult to describe the landlord's position as wholly unreasonable if it took the line that the tenant, whose default created the problem, should bear the burden of finding a solution, in circumstances in which the lease allows the tenant to do so, with an obligation on the landlord not unreasonably to refuse consent to such a proposal.

32.   No attempt has been made in any previous English case of which I am aware to establish that it would be wholly unreasonable for the landlord to hold the tenant to the lease, though the point was raised indirectly in one case. The point has been taken in three Australian cases, with different results.

i)   In *Maridakis v Kouvaris* (1975) 5 ALR 197, Ward J, in the Supreme Court of the Northern Territory, held that a landlord was under no duty to mitigate by taking steps to re-let the premises.

ii)   In *Tall-Bennett & Co Pty Ltd v Sadot Holdings Pty Ltd* (1988) 4 BPR 9522, Young J, in the Supreme Court of New South Wales, Equity Division, reviewed the cases which I have mentioned and held that, even if there were a principle that an innocent party will not be allowed to insist on its remedy for the contract price, i.e. for the rent, where it would be grossly unreasonable to do so, that could not be said to be so in the case he had to decide. He referred to the fact that if the tenant wants to go out of possession and be relieved of the economic burden of the rent he can try to underlet or find an assignee. He said that he saw nothing unreasonable in a landlord insisting on maintaining his position as a result of the grant of the lease, being reluctant to assume the trouble of finding a new tenant and then suing the original tenant for damages, and leaving it to the tenant to find an assignee or sub-tenant. He therefore rejected the tenant's arguments.

iii)   By contrast, in *Vickers & Vickers v Stichtenoth Investments Pty Ltd* (cited above at paragraph [6]) Bollen J in the Supreme Court of South Australia, on appeal from the Commercial Tribunal, decided the case to the opposite effect, though apparently without citation of *White and Carter* and the following cases, nor of *Tall-Bennett*, though *Maridakis* was cited. Mr and Mrs Vickers were liable under a lease which they had assigned, and under which the assignees had abandoned the premises in September 1987 and defaulted in payment of rent. The respondent landlord re-entered the premises in September 1988 and sought to recover the rent up till then from Mr and Mrs Vickers. The judge considered the decision of the High Court of Australia in *Progressive Mailing House*, and held that it followed from this case that "all ordinary principles of contract law apply to leases". He had also cited an article in the Sydney Law Review by A J Bradbrook, "The application of the principle of mitigation of damages to landlord-tenant law" (1977) 8 SLR 15 which advocates the contractual approach to the relationship, rather than the approach based on property rights. The judge then drew the analogy with a contract for the sale of tomatoes, in the passage quoted above, and held that:

> "mitigation as one ordinary principle of contract law applies to leases. That is to say, when a tenant abandons the leased premises the landlord is under duty to take reasonable steps to mitigate his loss by seeking another tenant. Of course

circumstances may make it impossible or impractical for him
for do that or find a tenant. But I think that the principle
applies."

He therefore remitted it to the tribunal to consider the issue of failure to
mitigate on the facts.

33.    It seems to me that the decision of Bollen J, in *Vickers*, involves an inadequately
reasoned leap from the principle that the general law of contract applies to leases to
the conclusion that the landlord cannot hold the tenant to his obligations under the
lease. Because the decision was made without addressing the factors relevant under
the line of cases derived from *White and Carter*, it seems to me that it cannot be
regarded as sound, by contrast with *Tall-Bennett* in which those cases were cited, and
the opposite conclusion was reached.

34.    In the article by Mr Bradbrook mentioned above, the author deplores the failure of the
judiciary and of all the State legislatures in Australia except that of Queensland to
recognize the application to landlord and tenant law of the principle of mitigation of
damages, by which he means the principle that a landlord "may simply sit back and
sue the defaulting tenant for the rent as it accrues". He advocates applying the
principle of mitigation of damages so as not to allow the landlord that choice but to
require him to take reasonable steps to attempt to secure an alternative tenant. Even
Mr Bradbrook, however, recognises that one problem is that the actions of the
landlord in attempting to re-let might be held to bring the lease to an end, and with it
the obligation to pay rent; he calls this a valid objection but one which can easily be
rectified by appropriate legislative reform. He refers to the possible escape from this
problem offered by *Walls v Atcheson* but comments that, first, this course is
"generally unknown outside the legal profession" (for myself, I wonder how well
known it is even inside the profession), and secondly that its precise application is still
doubtful so that its use might be challenged, and he gives some grounds on which it
might be open to challenge: see (1977) 8 SLR at page 24. His conclusion is to
recommend State legislation, with a number of different possible models. Even he,
therefore, did not contend that the state of the law as it then stood allowed the
conclusion to which Bollen J came in *Vickers*. Bollen J considered that the decision
in *Progressive Mailing House* had achieved what Mr Bradbrook thought remained to
be done. As regards recovery of damages for loss of future rent, it does, but that is
only one of the two necessary conditions. Since the judge did not address the factors
which Lord Reid, Lord Denning and others have said are relevant for the application
of the principle, I cannot accept that his conclusion is justified by his reasoning.

35.    In reference to the analogy which Bollen J drew with a sale of tomatoes, one
distinction is that the property in the tomatoes may well not have passed to the buyer,
whereas the tenant already has the property rights in the lease and the landlord's right
to payment of each instalment of rent arises as each in turn falls due, by way of a debt.
Only the mitigating effect of the intervention of equity along the lines indicated by
Lord Reid in *White and Carter* could relieve the tenant of its liability for the rent and
other sums falling due.

36.    The few relevant English cases are not consistent with the landlord being subject to
this equitable fetter. In *Boyer v Warbey* [1953] 1 QB 234, which was concerned with
a statutory tenancy, and preceded *White and Carter*, the tenant had vacated without

notice, whereas he was bound to give three months' notice. The landlord did re-let, and sued for the rent due up to the date of the re-letting (some three months) which the tenant resisted, claiming that the landlord should have re-let more quickly. Denning LJ said this at pages 244-5:

> "He [the tenant] went out of possession, it is true, and thereupon the landlords would have been entitled to recover possession if they had so wished. But they did not so wish. They were not bound to accept possession whenever the tenant chose to offer it. They were entitled to hold him to the tenancy until he gave a valid three months' notice to quit. Very sensibly they did try to re-let; and as soon as they re-let the statutory tenancy came to an end by surrender by operation of law. But until it came to an end by valid notice to quit or by surrender they were entitled to hold the tenant liable for rent."

Similarly Romer LJ said at 247:

> "A tenant who goes out of possession without giving due notice has no right to dictate to his landlord how he shall deal with his property; and why the landlords here should have disposed of the flat in a manner disadvantageous to themselves in order to save the tenant from the full consequences of his wrongful act I am at a loss to conceive."

37.    In *Bhogal v Cheema* [1999] L&TR 59, Sir John Vinelott had to consider a claim by the landlord that a surety under a lease which had been disclaimed by the liquidator of the tenant company was liable for rent arrears, to which the surety responded by arguing that, following the disclaimer, the landlord was obliged to mitigate the loss of rent from the tenant. The landlord had not taken possession nor taken steps to re-let. The judge said, at page 65:

> "However, the landlord cannot be compelled to take possession and, of course, it will not be in his interest to do so if the market rent of the premises is less than the rent payable under the lease, unless possibly he takes the view that his remedy against the surety is unlikely to yield the full amount of the rent."

38.    In another case of secondary liability, so to speak, the Court of Appeal had to consider a claim by the landlord for arrears of rent against the original tenant, where the lease had been assigned three times in succession: *Norwich Union Life Insurance Society v Low Profile Fashions Ltd* [1992] 1 EGLR 86. The tenant cited *White and Carter* and argued that the landlord should be restrained from pursuing a remedy against the original tenant when, because of alternative remedies against the second assignee and the surety, it was wholly unreasonable to pursue the original tenant. That seems a rather bold step from the cautious words of Lord Reid, and one which, if it was available at all, could presumably have been deployed by any one, or all, of several people each of whom is liable to the landlord, so as to produce an inextricable circle, with no effective remedy. Beldam LJ rejected the argument as being irrelevant to a case of cumulative, as opposed to alternative, remedies.

**Conclusion**

39.    Mr Gauntlett urged on us a modern approach to the relationship between landlord and tenant, focussing on principles of contract law, and a policy approach which would not leave premises empty, after the tenants had abandoned them and while the landlord waited for the end of the lease, so as to avoid the waste of useful space and to ensure that property is put to beneficial use. As to the latter factor, if there is enough demand for the space, the market rent may exceed that payable under the lease in which case the landlord will no doubt terminate the lease and re-let at a profit. Equally, the tenant can attempt to find an assignee or sub-tenant to use the premises; it is not only the landlord who can take steps to fill the space.

40.    Leaving aside policy issues of that kind, it seems to me that Mr Gauntlett's submissions fail to take account of the present state of English law as to the consequences of the premature termination of a tenancy, or of the very limited scope for the intervention of equity as explained in *White and Carter* and subsequent cases. Having regard to the way in which that has been explored and explained in the cases, in particular *The Odenfeld* (see paragraph [16 ii)] above), it seems to me impossible to say that a tenant could successfully invoke equity in that way. First, it seems to me very far from clear, to say the least, that the landlords were acting unreasonably in not taking their own steps to find a new tenant, rather than leaving it to the tenants to propose one, or in rejecting a proposal made by the tenants. Given the extremely limited nature of the test ("wholly unreasonable"), it would have to be a most extraordinary case for a tenant to be able to show that the landlord's conduct could properly be characterised in this way. Secondly, if it be the case that in 2003 the market rent was lower than that reserved by the lease, damages would not be an adequate remedy for the landlords if they terminated the lease by way of forfeiture and then re-let at a lower rent, because under English law as it stands they could not recover damages to compensate for the loss of rent. If, on the other hand the market rent was the same or higher, it should have been possible for the tenants to take their own steps to find an assignee. If they had found an assignee (or subtenant) whom the landlords had refused to accept on reasonable terms, that may have been a different matter; they would have had a statutory remedy under the Landlord and Tenant Act 1985, and there would have been a number of different steps open to them. In the present case, so far as we know, the tenants did not seek to establish that the landlords' refusal to agree to an assignment to a possible new tenant was in breach of the statutory obligation.

41.    It is also to be noted that it is for the party in breach to establish that the innocent party's conduct is wholly unreasonable and that damages would be an adequate remedy. Mr Gauntlett's position seems to be that any landlord, knowing that the tenants have abandoned the premises, ought to take steps to re-let, and therefore to terminate the tenancy, and look to the tenant for damages to cover any resulting loss. It does not seem to me that this could be right. It cannot follow from what Lord Reid said in *White and Carter*. It is clear from that and the later cases that it would be extremely rare for this principle to apply, whereas Mr Gauntlett seeks to apply it to what must be a very common set of circumstances.

42.    With the benefit of the industry and learning of Miss Tipples, the argument in this court has been much fuller than it was before District Judge Kubiak or His Honour Judge Reid Q.C. With that benefit, I have come to the same conclusion as each of

them did, namely that, on the present state of English law, the contention which Mr Gauntlett wishes to advance by way of defence on quantum is not open to him. I do not decide whether or not repudiation plays any, and if so what, part in the English law of landlord and tenant. That is not directly in issue before us, and it would be wrong to decide it unnecessarily. There is, however, no case in English law that shows that a landlord can recover damages from a former tenant in respect of loss of future rent after termination, and there is at least one case which decides that he cannot. In those circumstances, either damages are not an adequate remedy for the landlord, or at least the landlord would be acting reasonably in taking the view that he should not terminate the lease because he may well not be able to recover such damages. In principle, moreover, if the landlord chooses to regard it as up to the tenant to propose an assignee, sub-tenant or, if he wishes, a substitute tenant under a new tenancy, rather than take the initiative himself, that is not unreasonable, still less wholly unreasonable.

43.    For those reasons, what Lord Reid said in *White and Carter*, as developed in the later cases cited above, does not apply to the position in which the present parties found themselves after the Defendants had abandoned the premises. I would therefore dismiss this appeal.

**Lord Justice Rix**

44.    I agree

**Lord Justice Auld**

45.    I also agree.



Neutral Citation Number: [2008] EWHC 1979 (Comm)

Case No: 2006-1067

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 11/08/2008

Before :

**MR JUSTICE ANDREW SMITH**

- - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **Sea Emerald SA** | Claimant |
| - and - | |
| **Prominvestbank - Joint Stockpoint Commercial Industrial and Investment Bank** | Defendant |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**David Foxton QC and David Davies** (instructed by Sach, Solicitors) for the **Claimant**
**Ali Malek QC and Philip Edey** (instructed by Wragge & Co. LLP) for the **Defendant**

Hearing dates: 12, 13, 14, 16, 19 and 20 May 2008
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE ANDREW SMITH

## MR JUSTICE ANDREW SMITH :

1.  This is a claim under a "Refund Guarantee" (the "Guarantee") that was signed by the late Mr N T Skock, an employee of Commercial Industrial Investment Bank (Joint Stock Company), which trades as Prominvestbank, ("the Bank"). The Guarantee was provided to Sea Emerald SA ("the Buyer") and was in respect of obligations of the "shipyard named after 61 Communars" of Nikolaev, Ukraine ("the Yard") under a shipbuilding contract dated 9 December 1993 ("the Contract"). The Buyer seeks (along with other relief) payment of US$17,258,750.63 as being due under the Guarantee. The Bank says (i) that Mr. Skock was not authorised (either actually or ostensibly) to give the Guarantee on its behalf; (ii) that, even if the Guarantee was binding upon it when given, it has been discharged because the Contract was varied by the parties and not carried out according to its original terms; and (iii) that, in any case, the greater part of the Buyer's claim is not covered by the Guarantee.

2.  The Bank was incorporated under Ukrainian law on 26 August 1992 when the Articles of Association were registered. On the same day a state-owned bank in the Ukraine called State Commercial Industrial and Construction Bank ("SCICB"), with a regional department in Nikolaev, ceased to exist. The Bank was not the legal successor to the SCICB, but in commercial terms it took over the business: many of the former customers of SCICB, including the Yard, became customers of Bank, and many of the employees of SCICB, including Mr. Skock, became employees of the Bank. Records about SCICB's customers were transferred to the Bank.

3.  The Bank's head office is in Kiev, and it has a network of Divisions or branches and above them Departments that manage regions and the Divisions in them. One such Department is that for the Nikolaev region, a region where, in the early 1990s, there were some seven branches as well as the regional central office. Nikolaev is an industrial region and the Department's customers included two other shipyard companies as well as the Yard and also a large alumina plant. The Nikolaev Department of the Bank had a foreign currency department that provided foreign currency transaction services for industrial clients. Mr. Skock was the Head of the Nikolaev Regional Department of the Bank from August 1992 when the Bank was formed, having held the corresponding position with SCICB since 1987. He held this position until the end of April 1994, shortly before his death in May 1994.

4.  The Buyer is a Panamanian company. It is in the Laskaridis group (the "Group"), which has extensive shipping interests, and manages a fleet of some 80 merchant vessels, many of them refrigerated cargo vessels and smaller tankers. The Group's President is Mr. Athanassios Laskaridis.

5.  In 1991 the Group bought from a Swiss seller a ship which had been built at the Yard. Mr. Laskaridis was impressed with her and approached the Yard about constructing vessels for the Group. In the summer of 1992, after the Ukraine had declared itself independent of the Union of Soviet Socialist Republics on 24 August 1991 and the leaders of the Russian, Ukrainian and Belarus Republics had announced the dissolution of the Union on 21 December 1991, the Yard sent a delegation, led by its General Director, Mr. I N Ovdienko, to Greece to discuss the possibility of the Yard building ships for the Group. During that visit, on 22 August 1992, the Group agreed to buy six vessels from the Yard, and took and exercised an option for three

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 7   Pg 18 of 91                                                                              **A.46**

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

more.   More specifically, the Group bought three deep freezer ships each costing US$7.8 million, one of which (hull no 1135) was available for immediate delivery and two of which (hulls nos 1136 and 1137) were to be constructed; three deep freezer ships (hulls nos 1138, 1139 and 1140) for the carriage of fruit were to be constructed for US$10.03 million each; and, by the exercise of the option, three similar deep freezer ships (hulls nos 1141, 1142 and 1143), each costing US$10.03 million, were also to be built.

6.   In due course the Group placed further contracts with the Yard and in total 19 ships were ordered for a total of over US$200 million.   Each ship was the subject of a separate contract, entered into by a different company in the Group that was intended to own and operate the ship.   The contracts all stipulated that the Yard was to provide to the purchasing company a refund guarantee.

7.   Only two of the contracts dated 22 August 1992 were available at the trial, and one of those, that for hull no 1140, is incomplete, the provisions relating to the price being missing.   The contract that is complete, that for hull no 1143, provided for payment of US$10,030,000, compromising US$130,000 by way of commission for the buyers; US$3.5 million to be paid to suppliers of the imported equipment for the vessel; and US$6.4 million to be paid to the Yard.   The sum of US$6.4 million was payable in four instalments: US$1 million within 7 days of the signing of the contract; US$1 million within 7 days after keel-laying of the vessel; US$1 million within 7 days after the vessel was launched; and US$3.4 million within 7 days of the vessel being completed and the 'Acceptance Act' being signed.   I infer that the other five contracts similarly provided for four instalments to be paid to the Yard.   (Mr. Laskiridis explained in his evidence that this was the "industry norm".)

8.   As I have said, the Contract which gives rise to this litigation was dated 9 December 1993.   It was for the construction and purchase of hull no 1148, a refrigerated cargo vessel.   An English version of the Contract was signed by Mr. Ovdienko on behalf of the Yard and by Mr. Laskaridis on behalf of the Buyer.   There was also an unsigned Russian version, but neither party has relied upon that before me.

9.   The Contract states that it is governed by English law.   There is an arbitration agreement, providing for disputes to be "referred to arbitration by either party, such arbitration to be governed by English law and take place in London", (with a different procedure for certain technical disputes).   The Contract has an Entire Agreement clause at Article XX paragraph 3:

> "This Contract contains the entire agreement and understanding between the parties hereto and supersedes all prior negotiations, representations, undertakings and agreements or any subject matter of this Contract, except by mutual agreement in writing of subsequent date signed by any duly authorised representative of each party hereto."

The Buyer submitted that this provision does not purport to regulate or restrict how the contracting parties can vary the Contract, and that it is directed only to providing that the parties can agree in writing to include in the Contract pre-contractual negotiations, representations, undertakings and agreements.   This does not seem to me to be the

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 7   Pg 19 of 91
**A.46**

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

natural interpretation of the paragraph: the closing words, I think, are to be read as qualifying the provision that the Contract contains the entire agreement

10.    The agreed contract price was US$20.5 million, and payment was to be made in US dollars. The price consisted of:

   i)     US$8.4 million "payable to the Shipyard and to be paid to Seller's account as follows", and details were given of an account at Deutsche Bank AG in Germany. The account holder was said to be SCICB, Nikolaev, although the SCICB had ceased to exist over a year before the Contract was made. Presumably the parties simply copied from the previous contracts between the Yard and the Group and did not alter this provision.

   ii)    US$10 million "payable by the Buyer directly to the various suppliers of the imported equipment as per Enclosure N1 and in accordance with the contracts to be signed between the Seller and Suppliers of this imported equipment".

   iii)   US$2.1 million "payable to Buyer as Buyer's and financiers' address Commission".

11.    Paragraph 2 of Article II provided as follows:

   "Payment of the Contract Price shall be made by the Buyer by instalments as follows:

   1.    U.S. Dollars 1.300.000. – (one million and three hundred thousand US$) to the Shipyard within 8 (eight) months from the date this Contract becomes effective.

   2.    U.S. Dollars 1.580.000. – (one million and five hundred and eighty thousand US$) within 7 working days after successful launching of the Vessel.

   3.    U.S. Dollars 5,520,000. – (five million five hundred and twenty thousand US$) to the Shipyard within 7 working days after signing the Acceptance Act and the Vessel is ready in all respects for delivery.

   4.    U.S. Dollars 10.000.000. – (ten million US$) to the various Suppliers of the imported equipment as per enclosure N.1

   5.    U.S. Dollars 2.100.000. – (two million and one hundred thousand US$) to the Buyer being Buyer's address Commission.

   It is hereby specifically agreed between the Buyer and the Seller that any equipment whatsoever imported into the Republic of Ukraine for the construction of the Vessel and paid for by the Buyer according to the contracts between the Seller and the Suppliers of equipment shall, at all times up to Vessel's delivery to Buyers remain the sole property of the Buyer."

The paragraph also provided that all payments by the Buyer to the Yard under the contract should be made in US dollars.

12.     Enclosure No 1 to the Contract was a list of 33 items of "foreign-made equipment and material for Hull no 1148", which the parties agreed should be imported into the Ukraine and "used for the construction of this vessel".   17 of the 33 items were stipulated to be "Main Imported Equipment".    The list included such equipment as cranes, but also material that would become an inseparable part of the vessel herself when applied, most obviously, perhaps, paints for the outer shell.    Enclosure No 1 concluded "In addition the Seller shall have the right, with the prior written consent of the Buyer, to stipulate further equipment to be purchased outside CIS countries and to request the Buyer to pay for such additional equipment".   I do not interpret this as qualifying the introductory words of enclosure no 1 that stated that the equipment should be "used for the construction of this vessel" or to contemplate that the Enclosure might be amended so that equipment for other vessels should be bought under the Contract and paid for by the Buyer: it is naturally understood, I think, as recognising that the Yard might require further imported equipment for hull no 1148. After all, the provision that title in equipment should pass to the Buyer applied to what was imported "for the construction of the Vessel" and "up to Vessel's delivery": there was no such provision directed to equipment bought under the Contract for other vessels.

13.     Article XVII dealt further with the equipment that was to be imported into the Ukraine "for the construction of the Vessel, under individual contracts of supply to be signed between the [Yard] and the Supplier".    The Buyer's agreement was to be obtained before any contract for supply of the Main Imported Equipment was signed, but the Yard was to be "responsible for the delivery time, the quality, efficiency and/or performance of the Supplier's equipment subject to compliance with dates of payment by the Buyer as stipulated in the contracts with the Suppliers".   The Article provided that the Buyer "shall effect payment of the imported equipment within the stipulated time under the contracts between the Seller and the Suppliers".

14.     Article III dealt with adjusting the contractual price in the event of delayed delivery of the vessel or in the event that she did not achieve the specified speed, that her fuel consumption was excessive or that her deadweight was deficient.   It provided that, if the delivery was delayed for 180 days or more, the Buyer had the option to rescind the Contract.

15.     Article V of the Contract was headed "Modifications, Changes and Extras".    It was concerned with how "The Specifications and the Plan may be modified and/or changed by written agreement of the parties".

16.     Article VII provided that the vessel should be delivered at the berth of the Yard safely afloat not later than 31 December 1996 (subject to a machinery for the postponement of the delivery date in defined circumstances).    The vessel remained the property of and at the risk of the Yard until delivery.    Paragraph 3 of Article VII dealt with "When and how [delivery of the vessel was] effected", and stipulated that it was to be effected by the delivery by the Yard to the Buyer of the Acceptance Act, by reference to which US$5.52 million was payable.    Article VIII dealt with delays in and extensions of time for the delivery of the vessel.

17.    I go next to Article XI, which is headed "Default", and first set out part of paragraph 1
       of Article XI, which was headed "Definition of Default by the Buyer":

>      "The Buyer shall be deemed to be in default of performance of its obligations
>      under this Contract in the following events:
>
>      (a) The Buyer fails to pay the full amount of any of the 1st,
>      2nd, 3rd instalments to the Seller as and when any such
>      instalments becomes due and payable; or
>
>      (b) The Buyer fails to pay the full amount of the last
>      instalment to the Seller concurrently with the delivery of the
>      Vessel by the Seller to the Buyer; or…"

       The paragraph contemplates on its face that the Buyer is to pay a total of four (not
       three) instalments of price to the Yard.    In this respect it follows the wording of the
       other contracts between the Group and the Yard, including the two contracts for hulls
       nos 1140 and 1143 dated 22 August 1992.    Apparently, the parties to the Contract,
       and other later contracts, simply adopted the definition of default by the buyer from
       the earlier contracts without amending it to reflect the different terms for payment.
       As will be seen, the Guarantee similarly refers to four instalments of the price to be
       paid to the Yard under the Contract.

18.    Paragraph 7 of Article XI dealt with the effect of default on the part of the Yard,
       which was deemed to take place if, for example, the Yard failed to complete and
       deliver the vessel in accordance with the Contract or if the Yard ran into in financial
       difficulties which in the justifiable opinion of the Buyer rendered the completion of
       the Contract impossible.    In the event of such default continuing unremedied for 14
       days, the Buyer was entitled to rescind the Contract by notice and upon receipt of
       such notice the Contract forthwith terminated and "all amounts received by the Seller
       [sc the Yard] from the Buyer at the time of such rescission shall forthwith become due
       and payable back to the Buyer".

19.    Article X was concerned with "Rescission by Buyer".    It provided that the Buyer
       should only be entitled to rescind the Contract in accordance with the express rights
       granted by it and "subject to the general principles of English law".    Upon rescission
       the Seller was, by paragraph 2.1, promptly to refund to the Buyer the full amount of
       "all sums paid by the Buyer or by order of the Seller on account of the Vessel prior to
       such rescission, unless the Seller proceeds to Arbitration…"; and provided the Seller
       did not go to Arbitration, the Seller was also to pay the Buyer "interest at the rate of
       [8%] per annum on the amount required to be refunded to the Buyer, computed from
       the respective dates on which" the Buyer paid the relevant sums to the date of
       payment (except if the Contract was rescinded for excessive delay arising from force
       majeure).    Paragraph 3 of Article X provided that "The refundment by the Seller to
       the Buyer as provided in Paragraph 2 above shall be the sole remedy of the Buyer in
       any case whatsoever resulting or arising from any cause from which the Buyer shall
       have the right to rescind this Contract. Upon such refundment, all liabilities of each
       of the parties hereto to the other under this Contract shall forthwith by [sic]
       completely discharged".

20.    A question arises whether upon rescission the Buyer was to recover only what it had paid to the Yard or whether it was also to recover anything that it had paid to suppliers of equipment.    I agree with the Bank's submission that the Yard was not obliged to pay to the Buyer the amounts of payments made to suppliers.  First, it does not seem to me, as a matter of the natural interpretation of the wording of Article X, that the Contract provided for the Yard to pay these amounts; they were not payments to the Yard nor, to my mind, were they payments made "by order of the Seller", being made under agreements with third parties to which the Buyer had had to consent. Moreover, paragraph 3 of Article X emphasised that the limits of the Buyer's rights upon rescission are defined by paragraph 2.    Secondly, it seems to me that this interpretation is required by the structure of the Contract.    It contemplated that the equipment in enclosure no 1 was to become the property of the Buyer pending delivery of the vessel and was never to become the property of the Yard.    If the Buyer were to have property in the equipment and also to recover the price paid for it, it would be doubly compensated.    Admittedly the question when property passes from the supplier would be determined by the contracts made by the supplier, but under the Contract the Buyer was in a position to insist that they did not expose it to risk in this regard.    It is also true that by including in the enclosure such items as paint which (under English law) would lose their separate identity upon application, the Buyer's protection might be incomplete, but I cannot accept that this affects the parties' intention as to the structure of the arrangements as evinced in the Contract.

21.    Article X paragraph 2 also provided that:

> "The Seller will furnish the Buyer within latest 30 days from the date of signing of this Contract a refund Guarantee to be issued by Seller's Bank, the State Commercial Industrial Bank – Nikolaev Branch.
>
> The Original of this Guarantee must reach the Buyer latest by 15[th] January 1994 and the furnishing of this Guarantee is to form an integral part of this Contract.
>
> No payment whatsoever under this Contract, or the various imported equipment contracts, shall become due and payable prior to the provision of a proper refund Guarantee."

22.    Article XIX provided that the Contract should become effective as from the date of its execution, but if the Seller failed to provide "proper Refund Guarantee" as stipulated in Article X, the Buyer had an option to elect that the Contract be null and void.

23.    The Yard and the Group made three other contracts of the same date for further vessels: for hull no 1147 (for delivery by 30 September 1996); for hull no 1149 (for delivery by 31 May 1997); and for hull no 1150 (for delivery by September 1997). The contracts for hulls nos 1147 and 1149 were in terms generally similar to that for hull no 1148, and although that for hull no 1150 is not in evidence, I infer that that too was in generally similar terms.  However, there were differences in the amounts to be paid to the Yard and the amounts payable by way of address commission: and, although in each case the payments to the Yard were in three instalments payable by reference to when the contract was made, when the vessel was launched and when the

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 7   Pg 23 of 91

A.46

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

Acceptance Act was signed and the vessel ready for delivery, there were differences in the amounts and the precise timing of the payments.   In the case of hull no 1147, US$8,150,000 (not US$8,400,000, as for hull no 1148) was to be paid to the Yard, the instalments being US$1,200,000 payable six months from the date of the contract, US$1,505,000 within seven working days of the vessel being launched and US$5,445,000 within seven working days of the signing of the Acceptance Act and the vessel being ready for delivery.

24.   Drafts for the wording of the contracts and guarantees were provided to the Yard by Mr. Laskaridis.   Mr. Laskaridis explained in his evidence that the form of contract was very similar to contracts that the Group had made when buying vessels from Japan, and he described the draft for the Guarantee as "a simplified version of the refund guarantees we had from the Japanese bank".   He said that, although he is not a lawyer but an engineer, he had simplified it himself "so that it could be very short and very understandable and dispensing with what might cloud the issues".

25.   Although all of the ship building contracts that are in evidence provided for a refund guarantee of the Yard's obligations, they did not stipulate the terms or the amount of the guarantees.   I infer that the contracts which are not in evidence were similar in this respect.

26.   The refund guarantees in respect of the nine vessels ordered in August 1992 were obtained from SCICB by Mr Ovdienko, who gave evidence.   When he retired as Director General of the Yard in December 1993, he was replaced by Mr. V O Lavrinenko in January 1994.   Mr Lavrinenko died earlier this year, but, according to a statement dated 20 November 2006 made for the purpose of proceedings in Ukraine, he obtained from Mr. Skock the Guarantee, and also refund guarantees for hulls nos 1144, 1145, 1146 and 1147.   In the event, refund guarantees were not given by the Bank in respect of the contracts for hulls nos 1149, 1150, 1151 and 1152.

27.   The Guarantee was signed by Mr. Skock and by Mr. Lavrinenko in both a Russian version and an English version.   Both had the name of the Bank and the branch typed at the top.   Mr. Skock signed under the words (in the English version) "Joint Stock Commercial Industrial Investment Bank Nikolaev Branch".   Both versions had company stamps by the signatures: the stamp by Mr. Skock's signature read (in translation) "Ukrainian Joint-Stock Commercial Industry Investment Bank, Nikolaev Regional Department".   At the top of the Guarantee is a third stamp, which was in English and read "Bank of Industry and Construction of the USSR, Nikolaev".   Mr. Skock signed and stamped it when Mr. Lavrinenko went to the offices of the Nikolaev Department of the Bank.   He retained a copy.   There were no direct dealings between the Bank and the Buyer then or at any time before 2006.   (In so concluding, I do not overlook that Mr. Lavrinenko said in his statement that the Guarantee was issued "according to the format which was agreed between Nikolaev region branch of [the Bank] and Mr. Laskaridis".   If by this he means more than that it followed a form previously used for guarantees given by Mr. Skock for the Group, I do not consider the evidence to be reliable.)

28.   I set out the English version of the Refund Guarantee:

"LETTER OF GUARANTEE

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
Part 7    Pg 24 of 91                                          **A.46**

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

Messrs:

SEA AMERALD [sic] S.A.

In consideration of your payment of the instalments under Shipbuilding Contract dated 9th day of December 1993 (hereafter referred to as the "Contract"), entered into by and between you and "Shipbuilding Yard named after 61 Communards" for the construction, sale and purchase of one (1) single screw refrigerated cargo carrier of about 500,000 c.f., Project No. 13450, Shipyard Hull No. 1148 (hereafter referred to as "the Vessel"), we, JOINT STOCK COMMERCIAL INDUSTRY INVESTMENT BANK, NIKOLAEV BRANCH, at the request of the Builder, hereby irrevocably and unconditionally guarantee the payment to you by the Builder of the total maximum sum of USD – 9 900 000 (Nine Million Nine Hundred Thousand U.S.D) or any amount to be paid to the Builder as the first, second, third and fourth instalments under the Contract and any supplement, amendment, charge [sic] or modification made thereto together with interest thereon at the rate as provided for the Contract and any supplement, amendment, charge or modification made thereto from the date of payment to refundment (if and any or all of the said instalments become refundable from the Builder) all strictly in accordance with the terms and conditions of the Contract and any supplement, amendment, charge or modification made thereto as aforesaid (hereby expressly waiving notice of any such supplement, amendment, charge or modification as may by agreed to by the Buyer and confirming that this guarantee shall be fully applicable to the Contract as so supplemented, amended, changed or modified.

Our liability under this letter of guarantee shall be limited to the total sum of the instalments or any lesser amount mutually agreed by and between you and the Builder and actually paid by you as aforesaid, plus interest as stipulated above.

This letter of guarantee shall become null and void upon receipt by you of the full amount for which we are liable hereunder or upon acceptance by you of Vessel delivery in accordance with the terms of the Contract, and in either case this letter or guarantee shall be returned to us for cancellation without demand.

This letter of guarantee is governed by and is to be issued in in [sic] full accordance with the laws od England. We hereby irrevocably appoint Fleet Services Limited [address] London EC3N 1AL England – Tel [number], Tlx [number], Fax [number] as our agent in England to accept service of proceedings on our behalf."

29.   Neither the English nor the Russian version of the Guarantee was dated, and neither
      was on headed paper.    No expiry date for the Guarantee is specified. The English
      version (at least) had typing errors.

30.   The guarantee in respect of hull no 1147, like that in respect of hull no 1148, was
      signed by Mr. Skock and bore similar stamps. Its wording was the same as that for
      hull no 1148, except that the maximum sum was stated to be US$9,650,000 (not
      US$9,900,000). It is possible that this difference is in some way connected with the
      different payments to be made to the Yard for hulls nos 1147 and 1148, but that is
      speculation: there was no evidence explaining the difference.    According to the
      evidence of Mr. Laskaridis and Mr. E Galanopoulos, a marine engineer employed by
      the Group who was entrusted with responsibility for these vessels, the Bank had
      simply refused to sign guarantees for hulls nos 1149 and 1150, but they did not give
      evidence of any reason given by the Bank for so refusing.    They said that the
      maximum sum stated in the Guarantee was explained as being because "the Bank had
      simply refused to go any higher, since it had to limit the value to less than
      US$10,000,000". I accept their evidence about this, but these explanations must have
      been conveyed to the Group by the Yard since, as I have said, the Group had no direct
      dealings with the Bank.

31.   The Group initially proceeded with the contracts for all four vessels, hulls nos 1147 to
      1150, although, as I shall explain, the contracts for hulls nos 1149 and 1150 were later
      cancelled.    However, the contracts did not progress as planned.    In the years
      following the dissolution of the Soviet Union, Ukraine faced difficult economic
      circumstances with a fall in demand for its heavy industry, including ship
      construction.  State support for the industries led to high levels of inflation, interest
      rates were very high, and few loans were available.    The Bank gave particular
      support to the shipbuilding industry, a significant part of which was in the Nikolaev
      region, and its accounts for the year ended 31 December 1998 stated this:

              "The bank has a significant concentration of credits to three
              entities involved in the shipbuilding industry.  These loans were
              issued by the Bank under the Government's shipbuilding
              support programme.   At 31 December 1998, the bank had
              Hryvnia and currency loans extended to these customers
              amounting to US$54,353,000 (1997 US$54,983,000).   The
              management of the Bank has recognised that these loans are
              non-performing and is in the process of negotiating with the
              government for repayment of these amounts from state budgets.
              In view of the uncertainties both in respect of the Ukrainian
              economy and the worldwide shipbuilding industry, the bank
              has made full provision against these loans."

32.   It is clear that the Bank extended substantial amounts of credit to the Yard, including
      credit for the purpose of constructing the vessels for the Group.  In a letter dated 3
      March 1993, the Yard wrote to Mr. Skock that "For the implementation of the
      integrated programme for the construction of refrigerator vessels and floating hotels
      for export ... the [Yard] obtained loans at preferential rates in 1992 in the sum of

2,789 million karbovanets", the equivalent, I was told, of over US$13 million. (Karbovanets were a new unit of currency introduced in 1992 in place of the rouble. It was subject to hyperinflation as the Government provided support for state-owned industries in the first half of the 1990's. Karbovanets were replaced by another new unit of currency, the hryvna, in the mid 1990s.)    As is clear from its pleading, the Bank, generally if not entirely through Mr. Skock, made these loans available to the Yard in 1992 and 1993: by agreement of 9 July 1992 a loan of 1.5 billion roubles; on 20 September 1992 a loan of 157 million roubles; by agreement of 28 October 1992 a loan of 262 million roubles; by agreement of 21 December 1992 a loan of 870 million karbovanets for "the performance of complex scientific technical programmes ... to perform the programme of building transport refrigerator vessels and floating hotels for export"; by agreement of 6 April 1993 a loan of 2.720 billion karbovanets for similar purposes; and by agreement of 21 May 1993 a loan of 1.2993 billion Karbovanets "for the performance of the complex programme ... of designing, engineering and technical research, production of equipment for expansion of merchant shipbuilding, development and production of new consumer goods...".

33.    The Bank continued to make loans to the Yard for constructing the vessels ordered by the Group after Mr. Skock was no longer Head of the Nikolaev Department. The lending was supported by the National Bank of Ukraine.    On 5 August 1994 the Yard wrote to Mr. Skock's successor, Mr. D M Khomich, and explained that it was not in a position to repay debts "arising from the special-purpose loan for the construction of refrigerated cargo ships for export" by the due date and asking for the loan to be extended until 10 January 1995. In September 1994, the Yard again wrote to Mr. Khomich asking for further "preferential-rate credit resources for the implementation of our export programme for a term of 6 months", explaining that money was needed to make progress upon hulls nos 1141 to 1145.    More funds were lent by the Bank on 12 and 28 September 1994, and further substantial loans were made thereafter.    The Yard provided security for its borrowing, for example by mortgage agreements dated 14 June 1994, 16 December 1994 and 7 August 1995. The full details of the amount and terms of the Yard's borrowing from the Bank are not clear, but it was not repaid.    A letter from the Bank to the Yard dated 8 October 1998 referred to an agreement of 6 July 1998 with a new repayment schedule. On 15 June 2000 the Bank rejected a further rescheduling request, stating that the Yard had taken not "effective measures to repay its long-term debts" since 1994.

34.    The Buyer relies on a letter of Mr. Khomich dated 15 November 1995.    It was addressed to the Director of the Nikolaev Regional Board of the Aval Bank and also sent to the National Bank of the Ukraine, the Regional Tax Inspectorate and the Yard. It asserted that the Aval Bank and the Yard were attempting "to wimple revenues and advanced payments for building a series of ships as foreign investments and mislead in such a way the controlling bodies and creditors of the Yard".    It continued:

           "Unfounded is an attempt of the Shipyard to persuade
           Prominvestbank and "Aval" Bank, that the Yard and the Greek
           Company Laskaridis Shipping Group carry out joint economic
           activities with attraction of foreign investments.

           ... In this case built ships as a result of the Yard activity are
           not subject to the distribution between the parties, ... . Both the

Bank and the Yard understand that we deal with an ordinary contract of sale-and-purchase of a number of ships concluded between Ukrainian Yard and the Greek Company.

In compliance with the Contract the Yard undertakes to build and deliver ships to the customer and the latter undertakes to receive them and pay. This Contract specifies subject of the Contract (refrigerator ships of 13476 M project (order 1141-1146, 1151), 13450 project (orders 1147-1149), terms of their delivery, procedure of acceptance, price and procedure of payments, and other terms.

In order to ensure uninterrupted building of the ships the parties envisaged transfer of a portion of advanced payments depending on completion of the order and final settlements after acceptance of the ship. But the Yard decided to transfer advance payments and proceeds from the foreign purchaser not to the single settlement account with the Prominvestbank but to hide it on another account opened with your bank."

35.    The details of the Bank's complaint to Aval Bank are not important. The Buyer relies on the letter as evidence of knowledge within the Bank of the arrangements between the Group and the Bank for the vessels that were being built, including the Contract. The Bank suggested that, because Mr. Khomich refers to a single contract, he is to be taken to be unaware that there were a series of contracts between the Group and the Yard, which would indicate that he was unfamiliar with the business relationship between them. To my mind, this is reading too much into the precise wording of the letter: it would be unrealistic to suppose that Mr. Khomich might have had in mind and been referring to some overarching contract between the Group and Yard, which has not been disclosed and is not in evidence: it was not suggested to any of the Buyer's witnesses that there might have been such a contract.

36.    The Bank's disclosure does not include any documents that show the limit of the amount that could be lent to any one borrower by a Department of the Bank. However, there were such limits: that was the evidence of Mrs Natalya Kovtun, an accountant and the Deputy Head of the Bank's Currency Operations Department in Kiev who worked at the Nikolaev branch of SCICB and then the Bank from 1984 until she moved to Kiev in 1994. Although her answers about this (given through an interpreter) were a little obscure, she said that the Bank had a limit upon the amount that a Department might lend to any one borrower, and this is confirmed by a "protocol" approved by the Board of the Bank and dated 15 July 1994 that provided for an increase in the limits of lending that might be made at Departmental level. Certainly Mrs. Kovtun said that it was not unusual for information about loans made at Departmental level to be reported to the Governing Board of the Bank, and permission for a loan was sometimes required. Although there is no evidence about the level at which the limits were set at the relevant times, the loans to the Yard were so large that they must have required authorisation from Head Office.

37.    It seems that the Bank knew at the highest level about the loans to the Yard. For example, on 23 August 1996, Mr. Khomich wrote to the Deputy Chairman of the

Board of the Bank referring to the Yard's serious financial difficulties and asking about the possibility of the Bank providing a guarantee for advance payments made to it by customers. The Deputy Chairman replied asking for further information.

38.    In its pleading the Bank says that as a "corporate entity" it became aware of the Contract only in July 2006 when the Buyer made its claim, and that it was previously unaware of any specific contract between the Yard and the Group or its terms; and that it knew only that the Group had placed a large shipbuilding order with the Yard, because this was general public knowledge.    The Bank also denies that it provided any loan or credit facility to the Yard "for the identified purpose of undertaking the construction of the Laskiridis vessels" or where that was one of the identified purposes.    I conclude, however, that the refrigerated vessels referred to in the loan agreements of 21 December 1992 and 6 April 1993 were those ordered by the Group. Moreover the Yard described one loan in a letter to Mr. Khomich dated 5 August 1994 as a "purpose loan against building the reefers".    In another letter to him dated 19 September 1994 it referred to and asked for a loan against the "export scheme of building refrigerated freighters", and the letter also referred to money received to "complete the ongoing orders 1141 to 1145".    Further, it is clear from the letter of 15 November 1995 that Mr. Khomich as Head of the Nikolaev Department was aware of the Contract and its terms.    In any case, the Bank was lending money to support the construction of the vessels and intended the loans to be so used, and I cannot accept that the Nikolaev Department of the Bank would have known only that the Yard was building reefer vessels in general terms and nothing more about the Yard's purpose in building them or for whom they were being built.    I do not believe that the Department would have lent such large sums without knowing at least that much about its customer's business.

39.    The Buyer submits that the Bank's Head Office too is likely to have known not only about the loans to the Yard but also the purpose for which they were made: that is to say, that it knew about the orders that the Group had placed because of the Yard's borrowings and not simply as a matter of public knowledge.    I accept this submission.    After all, the Bank was receiving through the Deutsche Bank account held by the Nikolaev Department substantial amounts of valuable foreign currency. I cannot believe that the Head Office was not interested in and aware of the source of these receipts, or that the Nikolaev Department would not have reported this information to Head Office.    In any case, it is likely, given the size of the loans made to the Yard, that the Bank's Head Office knew that their purpose was to support the Yard in building ships for the Group.    Even though the credit was, at least to some extent, supported by the National Bank of Ukraine, the Bank was administering the loans and, as it appears, assumed the risk of considerable exposure, and I cannot believe that the Head Office did not know why they were being made and therefore knew that the Group had placed the shipbuilding orders with the Yard.

40.    Despite support from the Bank, the Yard was in financial difficulties.    On 14 January 1994 it informed the Group that it could not obtain the funds necessary to build the vessels, and specifically that it could not pay for equipment and materials for them. It therefore asked that the Group consider allocating "the amount of about USD 1m for 1994 from the funds that are defined by the Contracts as money to be paid by the Buyer directly to various suppliers of imported equipment and to use this amount during the year for the purpose of settling our urgent invoices for purchasing the

materials and equipment for reefers in Ukraine, replenishing our circulating assets in minimum (basically for payment for gas, electric power and other vitally important supplies) as well as payment of salary to the workers". The Yard said that in return it would "pay the equivalent amounts in USD for imported ship equipment according to corresponding contracts with the suppliers from the instalments that we will receive from you as Buyers at definite stages". Mr. Laskaridis agreed to this request in a letter dated 24 January 1994, although he recognised that the Group was "running a considerable risk involving the funds as advanced payments" and referred to a meeting at which the Yard's "proposal was found as contradicting the terms and conditions of the contracts concluded between us ...".

41.   Thereafter the Yard requested advance payments on a number of occasions. On 20 July 1995, the Group wrote complaining that the only idea that the Yard had to respond to its problems was that "Laskaridis must pay earlier than contractually obliged", and that it had already done this "far too many times" even though it went "directly against our contractual interest".     Nevertheless, the Yard continued to prevail upon the Group to assist in this way.     Payments were made and attributed to the Contract although nothing was due from the Buyer under it.

42.   On one occasion in September 1995 there was a curious barter type arrangement: a boat load of herring was provided to the Yard and the Group paid for it in that it treated the delivery as discharging a debt owing to it by the supplier of the herring. This was brought into account as a payment of US$1.56 million made by the Buyer in respect of hull no 1148.

43.   In around July 1997 the Yard was put into administrative bankruptcy, apparently a form of receivership, by an order of the Ukrainian court on the grounds of its insolvency. There has been little activity on the Yard's accounts with the Bank since 1997.

44.   The dealings between the Yard and the Group were structured on the basis that there were separate contracts between the Yard and a different company in the Group in respect of each vessel.   There was no "umbrella" contract between the Yard and the Group governing these separate contracts or providing a contractual link between them.   Correspondingly, Mr Skock was asked for and, in the case of some but not all of the contracts, issued discrete refund guarantees in respect of the Yard's obligations under individual contracts for the benefit of different companies in the Group.

45.   However, as a result of the Yard's financial difficulties and the request that the Bank made of the Group for funds to be advanced before they were contractually due, the regime whereby the different buying companies were to make payments in respect of a specific vessel according to the progress of that vessel and to pay for equipment for that vessel was compromised.   This was not only because the Yard asked for and received advance payments under individual contracts.   It was also because the Group and the Yard did not maintain the distinction between the separate contracts as far as payments made to the Yard and for equipment for the vessels were concerned.

46.   First, the Group made payments to the Yard for the purpose of constructing vessels other than hull no 1148 and brought them into account as payments under the Contract.   The Bank says and the Buyer does not dispute that they amounted to

something over US$5 million. For the most part they were made in 1997 and early 1998, but the first such payment was made in March 1995, and it exemplifies these payments: the Yard wrote to the Group asking for a remission of US$200,000 "In order to facilitate the construction of reefer vessels according to the Program of [the Group] in particular the completion of Hull 1145, and in view of the difficult situation with salaries of workers at the yard", and requesting that it be paid "from the budget of 1148". The Group paid and accounted for the payments as requested. I shall consider these payments further later in my judgment, but the fact that the sums were requested specifically to enable other hulls to be constructed shows how far the parties were departing from the contractual scheme that payments should relate to the progress in construction of the vessel which was the subject of the contract under which she was built.

47.  Secondly, sometimes the Yard asked the Buyer to pay suppliers of equipment for other hulls and the sums so paid would, similarly, be accounted for as payment against the contract price for hull no 1148. Payments of this kind were made in 1997 and early 1998. Again, the Buyer does not dispute the Bank's calculation that payments of this kind exceeded US$5 million.

48.  Thirdly, the Group and the Yard drew up agreements, which have been referred to as "protocols", by way of agreed accounts as to the state of the account under the contracts for each of the hulls under construction (and so between it and each of the purchasing companies, including the Buyer). They were signed by the Yard and Laskaridis Shipping Co Ltd, as agents.

49.  The first such protocol in evidence was dated 23 May 1997. It is introduced by the words, "Having taken all mutual accounts for Hulls nos 1146-1150 and having taken into consideration all payments effected so far, it was mutually agreed between [the Yard] and "Laskaridis Shipping Co Ltd", the latter acting as agents to the owning companies of the above Hulls, that present balance for each Hull is as follows:...". With regard to hull no 1148, the protocol records that the balance "still due" to the Yard was US$11,313,167, and this was calculated by bringing into account as payments under the Contract some US$500,000 said to be "overpaid for Hull 1147" and some US$719,000 said to be on an "open account". Although the amount of US$11,313,167 was said to be "still due", this does not, it is clear, refer to payments that had accrued due by way of instalments under the Contract.

50.  A further protocol agreement was dated 10 April 1998. It was introduced by similar wording, but referred to hulls nos 1148 to 1152 (rather than hulls nos 1146 to 1150). It recorded in respect of hull no 1148 that payments paid amounted to US$18,998,782, representing an overpayment of US$598,782, that the overpayment had been transferred to the Yard's "Equipment Account" for hull no 1149, and accordingly "all due amounts have been paid and the balance has become zero".

51.  A protocol dated 2 June 2000, however, recorded an agreement that payments made on 3 March 1997 and 24 March 1998, which had been "previously allocated to the account of Hull no 1148", had been transferred to the account of hull no 1151, and that therefore there was now US$1,096,172 "due" to the Yard. A note signed by both parties and dated 5 June 2000 explained that this transfer to the account of hull no 1151 was "due to very long delay in completion of Hull No 1148", whereas hull no

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
Part 7    Pg 31 of 91

**MR JUSTICE ANDREW SMITH**
**Approved Judgment**

**A.46**

Sea Emerald
v
Prominvestbank

1151 was "under completion".    By a protocol dated 20 December 2000, it was agreed that further payments made in 1997 and "previously allocated to the account of Hull no 1148" had been transferred to the account of hull no 1151, and the balance "due" to the Yard had increased to US$1,740,823.

52.    The last protocol is dated 3 March 2004.    It recorded that hull no 1151 was delivered in January 2001, that there had been overpayments under the contracts for hulls nos 1151 and 1152 and that the balance of the accounts for the two hulls which were cancelled, nos 1149 and 1150, were nil.    The amounts of the overpayments for hulls nos 1151 and 1152 were therefore transferred to the credit of the Buyer in respect of what was to be paid under the Contract.    The protocol stated that consequently US$17,138,605 had been paid for hull no 1148, leaving a balance of US$1,261,395.

53.    Mr. Galanopoulos explained that these protocols were agreed because several vessels were being built by the Yard at the same time and payments were made to the Yard not only for materials and equipment but for other purposes as such energy bills and salaries.    On occasions, the contract price for a hull was fully paid before the hull was completed, and then "its account was reduced to zero and closed, and further payments were allocated to the next hull to be delivered".    Essentially, therefore, the parties were agreeing something in the nature of a settled account between them which, while presumably reflecting the total payments made by the Group to the Yard or to suppliers of equipment for the vessels, did not reflect and was not intended to reflect under which of the individual contracts payments were made.

54.    By an agreement dated 4 June 1997 (the "Joint Venture Agreement"), entered into with the encouragement of the Ukrainian government, a joint venture was formed to allow a Ukrainian company called Yugreftransflot Joint Stock Company ("Yugreftransflot") to have an interest in vessels being built at the Yard, hulls nos 1146 to 1152.    It gave a nominee company of Yugreftransflot called Status a 50% shareholding in Dynamic Commander SA, the holding company that owned the shipowning companies in the Group, including the Buyer.    The agreement contemplated that the Buyer and other shipowning companies should appoint Laskaridis Shipping Company Limited as project manager and representative to supervise the construction of the vessels, and although there is no direct evidence that these appointments were formally made, I infer that they were, but the fact remains that neither the Yard nor the Buyer was party to the Joint Venture Agreement itself.

55.    On 29 May 1998, the Group, Yugreftranslot, the Yard and various Ukrainian state bodies entered into an agreement which is referred to as the "Master Graphic".    It was stated to be without prejudice to the rights of the Group in respect of late delivery, and provided for revised delivery dates for the vessels which were still being built, hulls nos 1147-1152.    The date for delivery of hull no 1148 was revised to September 1999. The Master Graphic also provided for funding to be made available for the Yard by the Ukrainian state and for an increase of US$ 2 million in the price of hull no 1148, conditional upon a State refund guarantee being provided to the Buyer.    The agreement reflects the scale upon which money had been paid to the Yard before it was contractually due: hull no 1147 was shown to be 81% complete and hull no 1148 was only 20% complete, but the Yard had been paid fully for both.

56.     The Group entered into the Joint Venture Agreement and then into the Master Graphic arrangement in the hope that the Ukrainian Government would inject funds into the Yard.   In a Protocol of Discussion dated 17 July 1998 which referred to the Master Graphic and signed by the Ukrainian Minister of Industrial Policy, by the Governor of the Ukrainian National Bank and by Mr. Laskaridis, it was noted, "The Customer have reached agreement with Ministry of Industrial Policy, Fisheries Committee and Local Administration of Nikolaev on the requirements for the completion of the Refrigerated Ships Project …".     The Group continued to receive reassurances from the highest levels of the Government.   One example will suffice: as late as 24 February 2004 the Prime Minister of Ukraine wrote, "… please be assured that by joint efforts necessary measures will be taken to complete construction of the vessel Hull 1148 – for the successful completion of the Reefer Construction Program as a whole for the Joint Venture…".     However, according to Mr. Laskaridis and as I accept, the requisite government funding was not provided to the Yard.

57.     Nevertheless, 16 of the 19 ships were eventually delivered.  Of the four hulls that were the subject of contracts dated 9 December 1993, hull no 1147 was delivered on 12 December 1998.     As I have said, the contracts for hulls nos 1149 and 1150 were cancelled but the date (or dates) of cancellation is not clear from the evidence.     Hull no 1148 was not completed and has not been delivered.

58.     Early in 2006 the Group learned that the Ukrainian state had suspended financial support for the Yard.   On 11 July 2006 the Buyer, by its solicitor, wrote to the Yard that it was in default under Article XI of the Contract and that the Buyer had paid to the yard "US$17,138,605 together with a further advance of €99,000", and exercised its right to rescind the Contract.   On 14 July 2006 it made demand on the Bank under the Guarantee.  The Bank rejected the claim by letter dated 19 July 2006, stating that it had reasons to consider the Guarantee to be "a fraud".   Whatever precisely was meant by that, it is not suggested in these proceedings that Mr. Skock's signature on the Guarantee is a forgery.

59.     Arbitration proceedings were brought by the Buyer against the Yard.  The Yard did not participate in the reference, and on 29 November 2006 an interim final award was published to the effect that the Buyer was entitled to rescind the Contract and that the Yard was to reimburse the Buyer in the sum of US$17.258m and ordering an account and delivery up of the Vessel and all equipment.

60.     On 5 September 2006 the Bank brought proceedings in the Nikolaev Regional Economic Court against the Buyer and the Yard for a declaration that the Guarantee was invalid and not binding on it.   The Buyer challenged the jurisdiction of the Ukrainian court and brought these proceedings on 19 October 2006.  On 16 January 2007 the Nikolaev Regional Economic Court rejected the Buyer's challenge to its jurisdiction and upheld the Bank's claim that the Guarantee was invalid, concluding, among other things, that the Regional Administration of the Bank, and therefore Mr. Skock, had not been shown to have authority to enter into it.   The Buyer appealed unsuccessfully to the Economic Court of Appeal in Odessa, who concluded that there was no agreement with the Bank on which the Buyer could sue, although it appears that reasoning of the Appeal Court decision differed from the first instance judgment. The Buyer further contested this appeal ruling and on 26 July 2007 the High

Commercial Court of Ukraine held that, because the Guarantee provided that it was governed by English law and provided for service of proceedings in England, the claim was not subject to the jurisdiction of the commercial courts of the Ukraine. That decision was upheld on appeal to the Supreme Court of the Ukraine in a ruling of 20 September 2007.

61.    At one time the Bank argued that the decisions of the Ukrainian courts give rise to an issue estoppel but, in view of the decisions of higher courts, that is no longer contended. The reasoning of the Ukrainian courts is not particularly clear from the papers before me, but, in view of the way that the issues have been crystallised between the parties, that does not present any difficulty.

Authority

62.    The Bank contends that Mr. Skock was not authorised to enter into the Guarantee on its behalf. The Buyer raise three arguments in reply to this contention: (i) that Mr. Skock had actual authority; (ii) that his action was ratified by the Bank; and (iii) that he had ostensible authority.

Actual authority: the Provision

63.    The question whether Mr. Stock had actual authority to give the Guarantee is governed by Ukrainian law, and the parties exchanged reports from Ukrainian lawyers and had permission to adduce their evidence. However, in the end there was no disputed issue between the parties about Ukrainian law, and expert evidence about it was not adduced.

64.    The objects clause of the Bank's Articles of Association included that, "On the instructions of the government, the Bank will finance centralised capital investments for accounts of the state budget, and will also be entitled to carry out, with the assistance of the state budget, the preferential credit activity of state programmes". This clearly covered support for the Ukrainian shipbuilding industry. The General Meeting of the Bank's shareholders on 29 March 1996 was told that one of its aims was "to direct credit support on such priority areas of the industry as shipbuilding, aircraft construction, power generation, mechanical engineering, metallurgy and other industries".

65.    The Bank's Articles of Association provided by article 3(6) (according to the agreed translation) that the Bank should "open its branches and local offices within Ukraine and outside its borders in compliance with current law, and will vest with them rights and authority within the scope of the Bank's competence as per the Provision regarding branch offices".

66.    The Bank was entitled (by article 4) to carry on "foreign economic activity", and (by article 7) to "grant ...guarantees and other liabilities on behalf of third parties that envisage their fulfilment in monetary terms". Within the scope of authority granted to it by the General Meeting and subject to the control of the Council, the Management Board of the Bank was the executive body managing its day-to-day affairs. The Chairman of the Management Board was to manage the affairs of the Management

Board and (by article 7(9)) was entitled to act on behalf of the Bank without a power of attorney.    The Articles of Association contain no comparable provision authorising any other officer or employee of the Bank to act without a power of attorney.    It is common ground that therefore Mr Stock had actual authority to issue the Guarantee on behalf of the Bank only if (i) he was so authorised by the Provision to which article 3(6) refers ("the Provision"), or (ii) if he was authorised by a special permit together with a power of attorney.

67.    The Provision is entitled "Regulations on Regional Departments and Divisions of [the Bank]".    It was approved by the Decision of the Management Board on 18 February 1993.

i)    Article 2 set out the legal status of the Departments and Divisions.    Article 2(1) provided that Departments and Divisions are not legal entities but must carry out their activities on behalf of the Bank.    By Article 2(2) the Departments and Divisions were entrusted with certain functions without a special authorisation.    Those functions included the handling of banking transactions stipulated by the Provision, and entering into "civil and legal relations not prohibited by applicable law with the aim of acquiring property-related and personal non-property-related rights and obligations, including contractual relations connected with their business operations and the resolution of issues of social development".

ii)    Article 4 set out a detailed list of transactions that the Departments and Divisions might handle without a special permit, by virtue of Article 2.2.    The list did not include issuing guarantees, or any activity that covered issuing the Guarantee, or indeed which would have covered giving a comparable guarantee in Ukrainian currency.

iii)    Article 5 is entitled "Work with Foreign Currency, Foreign Economic Activities of Departments and Divisions".    Article 5.1 entrusted the Departments and Divisions with work in foreign currencies and foreign economic activities in accordance with the Law of Ukraine on Foreign Economic Activity and other applicable legislation and regulations.    Article 5(2) provided that Departments should have delegated to them in carrying out this type of activity rights to carry out operations in foreign currencies as specified in that article, including the right "to effect settlements connected with clients' export and import operations in foreign currencies in the form of a documentary letter of credit, collection of payments or bank transfer, and in other formats used in international banking practice".    The list of foreign currency transactions which Departments had delegated to them did not specifically include issuing guarantees.    Article 5(5), according to the agreed translation, reads as follows: "The right of signature of foreign economic agreements to be entered into by a department on behalf of the Bank shall be granted to the head of department, without a power of attorney, with subsequent notification of the Bank".

iv)    Article 7 is headed "Management of Departments and Divisions".    Departments were to be managed by a "head" and Divisions by a manager.    The Head of a Department was given authority to "carry out all legal actions in

the name of the Bank within the limits of the competence of the department without a special power of attorney".

68.    As I have said, Mr. Skock was the Head of the Nikolaev Department in January 1994. He was also a director of the Bank until his death, having been so appointed at the Bank's Founders Meeting in April 1992, but the Buyer does not rely upon his position as a director in support of its case that he had actual authority under the Provision. Its argument is that he had authority under article 5 of the Provision as Head of a Department, and the Buyer puts this argument forward on two alternative bases.

69.    First, it contended that article 5(5) conferred authority on Mr. Skock to enter into the Guarantee on behalf of the Bank.    It is said that, since by article 7 the Head of a Department was authorised to do all that the Department could do under article 5(2), article 5(5) is to be understood to some confer some additional authority.    Given this and given the extent of foreign economic activity and work involving foreign currencies that article 5(1) contemplated will be undertaken by Departments and Divisions, article 5(5) and in particular the expression "foreign economic agreements" are to be given a sufficiently wide interpretation to cover entering into the Guarantee.

70.    The difficulty with this argument is that it proves too much.    It would, on the face of it, mean that the Head of a Department was authorised to enter into any agreement at all involving a commitment of any size, provided only that it was one "involving foreign economic activity", subject to a requirement that the Bank be subsequently notified.    Such wide authority would be the more remarkable because the Head of a Department would not have had authority to enter into comparable guarantees or other agreements of a purely domestic nature.    It would be expected that an employee or other agent would have more limited authority with regard to business involving foreign currency than purely domestic business, the more so in view of the foreign exchange difficulties that the Ukraine was facing during this period.    I cannot accept that article 5.5 was intended to confer the authority for which the Buyer contends. (In so concluding, I do not overlook the evidence of Mr. Laskaridis and Mr. Galanopoulos about why the Guarantee and the refund guarantee in respect of hull no 1147 were limited in amount, and the suggestion of some limit placed upon Mr. Skock's or the Department's authority to issue guarantees of this kind. This provides no proper basis for giving article 5(5) a wider meaning than is justified by the wording of the Provision itself, or would not explain a wider authority for international than for domestic transactions.)

71.    The Buyer's alternative contention is as to the authority conferred upon Mr. Skock by the Provision is this: that article 7 conferred the requisite authority because the Department was entitled to enter into the Guarantee by article 5(2)(b), this being covered by the words authorising the Department to "effect settlements connected with clients' export and import operations in the form of … other formats used in international banking practice".    This expression, it is said, is broad enough to encompass issuing a refund guarantee, a document recognised by international banking practice, which is required as a pre-condition to the Bank's customer receiving foreign currency payments.

72.    I am unable to accept this argument, not only because it faces difficulties similar to the contention based upon article 5(5) but also because, to my mind, it is not justified

by the wording of article 5(2)(b).    The expression "other formats used in international banking practice" refers to methods of making payment comparable to the other methods specifically mentioned in article 5(2)(b): letters of credit, collection of payments and bank transfers.    A refund guarantee is not a method of making payment but a collateral contractual commitment.

73.    I therefore do not consider that the Provision conferred any relevant authority upon Mr Skock.    Although this forms no part in the reasoning that leads me to this conclusion, I am comforted in it because of the nature of the Guarantee.    As I shall explain, it was, at the least, not usual for Departments to issue guarantees of any kind at the relevant time.    I should have found it difficult to believe that the Provision is to be interpreted as authorising the Head of a Department to enter on behalf of the Bank into a commitment such as the Guarantee: a contingent commitment unlimited in time to pay a large amount of scarce foreign currency, and moreover one governed by a foreign law about which, as I conclude from the evidence of Mr Ovdienko and Mr Lavrinenko, Mr Skock took no advice.

Inferred actual authority

74.    As I have said, the Buyer acknowledges that, as a matter of Ukrainian law, if the Provision did not give Mr. Skock authority to issue the Guarantee, he would have been so authorised only if the Management Board of the Bank so decided and he held a relevant power of attorney.    It was not suggested in cross-examination to the Bank's witnesses, who included Mr R P Soversheny, the Head of the Division in the Bank's Legal Department that is responsible for dealing with this litigation, that documents of this kind had been suppressed by the Bank when making disclosure, but there is no direct documentary or other evidence that Mr. Skock had any such permission or held a power of attorney (although I do not overlook that the Bank did not call evidence from any member of its Management Board at the relevant time).    Nevertheless, the Buyer submits that it is to be inferred that Mr. Skock was authorised to issue the Guarantee.

75.    The Buyer invites this inference despite three considerations that, to my mind, need to be weighed against it.    First, it would have been unusual for a Ukrainian bank at the relevant time to confer authority to issue a guarantee by way of permission of the Management Board and a power of attorney.    The Bank's expert Ukrainian banking witness was Mr Sergii Iaremenko, an economist who had been involved in banking in Ukraine since 1978 and during the relevant period, between 1992 and 1995, was the Chairman of the Board of the State Export-Import Bank of the Ukraine in Kiev.    He explained that banks throughout the country had provisions similar to the Bank's (deriving from the state banks of the Soviet era) that defined what transactions could be conducted by branches, and that they did not authorise branches to issue guarantees. (Mr. Iaremenko drew no distinction between Departments and Divisions. Mr E Z Stepanov, the Buyer's expert in Ukrainian banking, told me that, as far as he remembered, at the relevant time only the Bank had regional Departments.)    Mr. Iaremenko also said that it was very rare for the head offices of banks to issue special permits for branches to issue guarantees: he pointed out that there was little point in a bank providing such special authorisation to the branch rather than to issue them from head office.

76.   The evidence of Mr Stepanov also makes it clear that it would have been unusual for the Bank to confer authority upon Mr. Skock in this way.   Mr. Stepanov went into banking in the early 1990s after working as an accountant in industry.  From 1992 to 1997, he was the Head of the Board of a Ukrainian bank called Nikkombank.   He said that it was rare in the early 1990s for a bank to confer authority on an official by a power of attorney.   It is of some interest that Mr. Khomich made loan agreements with the Yard which recited that he was making it under a power of attorney: the first such agreement that is in evidence is dated 27 February 1995.   (The mortgage agreement dated 15 June 1994 recited that Mr. Khomich made it "pursuant to …POA No ---- of ---", but the details of a power of attorney were not completed.)   The earlier loan agreements made by Mr. Skock in 1992 and 1993 do not recite that he was acting under a power of attorney, and neither, of course, do any of the guarantees.

77.   Secondly, the evidence of Mrs Kovtun was that she knew nothing of the refund guarantees issued by either SCICB or the Bank.  She said that, had they been properly issued, she would have known of them: she would have seen the Guarantee and the associated documentation because of her responsibility for making returns to which I shall refer.  She also said that she would, in any event, have heard mention of the refund guarantees from daily conversations within the Department: she explained that at least in the days of SCICB only some hundred people worked there.

78.   I do not overlook the criticisms of Mrs Kovtun's evidence made by Mr David Foxton QC, who represented in Buyer.   In particular, he submitted that her evidence was unreliable because she said that she was unaware in 1992 that a Greek shipowner had placed a large number of orders with the Yard.   This is said to be incredible given the amount of foreign currency that the order brought into the Nikolaev Department. I do find it hard to accept that in 1992 Mrs Kovtun did not know more about the orders placed by the Yard than she now acknowledges, but, whatever the explanation for this, I am unable to accept that this undermines the credibility or reliability of her evidence generally.   For the most part I found her answers in cross-examination clear and credible and I consider that she was trying to assist the court.

79.   Thirdly, the Bank has disclosed copies of none of the refund guarantees that the Buyer says Mr Skock issued to the Group and no documents relating to or referring to them. If proper procedures for issuing the refund guarantees were followed by Mr Skock, a significant number of documents would have been generated, as is shown by evidence of Mrs Kovtun which I accept. According to the Bank's procedures the customer's application for a guarantee should have been in writing, and the copies of it would have been sent to the currency division and the legal division for their consideration and observations.  The Bank's Head Office would also have reviewed the application and passed it to the Board for a decision whether to grant it.   If the Board did so, its decision would have been in writing and that decision document and the requisite power of attorney would have been sent to the Department and kept with the customer's application in a specific transaction file.   A copy of the guarantee, the decision and the power of attorney would also have been kept at Head Office.

80.   Moreover, if the Bank had issued a guarantee, it would have charged a fee and thereafter made an annual charge of 6% of the value of the guarantee for as long as it is valid. The Bank also would have taken security equivalent to at least the maximum liability of the Bank under the Guarantee, and documentation relating to the security

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
Part 7    Pg 38 of 91    **A.46**

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

would have been kept on the customer's file. The Bank has not produced any document reflecting such charges or such security.

81. After a guarantee had been issued, the potential liability of the Bank under it should have been reflected in returns made internally within the Bank. The procedure was that a monthly report was made to Head Office and this included the total value of outstanding guarantees that had been issued as at the accounting date. This information was also entered into an annual balance sheet to Head Office. The Head Office would in turn make a report to the National Bank of Ukraine. Mrs Kovtun explained that, being contingent liabilities, guarantee liabilities were not included in the balance sheet, but recorded in a designated account in accordance with a direction of the National Bank of Ukraine dated 1 January 1994.

82. Mrs Kovtun was involved in preparing these reports for the Nikolaev Department and was responsible for the entries dealing with guarantee liabilities: she did not report any potential liability under the Guarantee or the other refund guarantees because she did not know of them. The Bank has not disclosed the Nikolaev Department's reports to Head Office for 1994 or the off balance sheet records for that year. Those reports and records, Mrs Kovtun explained, would have been destroyed in accordance with its usual procedures after 10 years. However, in support of Mrs Kovtun's evidence, the Bank relied upon off balance sheet returns for the Nikolaev Department for later years, which should have reflected not only commitments entered into in the year to which they relate but also the Bank's overall outstanding contingent commitments from previous years. The return for 1996 shows that there was no contingent guarantee liability outstanding as at 1 January 1997 and the return for 1997 similarly shows no such liability.

83. The records of off balance sheet liability for guarantees for the whole Bank also are consistent with the picture given by Mrs Kovtun's evidence. As at 31 December 1994 the off balance sheet commitments for guarantees for the whole Bank were some 75 billion karbovanets, the equivalent of about US$715,000, and clearly the Guarantee was not included in that total. As at 1 January 2006 the total guarantee liability of the Bank was recorded as 459,319.11 hryvna, some US$90,000, and none of that related to the Yard. Further, according to Mrs Kovtun, the Bank's records showed as at 1 January 1998 a contingent liability of 4,122,734 hryvna (something less than the equivalent of US$1 million for the whole Bank in respect of guarantees), and that contingent liability was in respect of Ukrainian currency guarantees, none of which were issued by the Nikolaev Department. Some doubt was cast upon this last figure because the audited figures for the Bank as at 31 December 1997 included a figure in respect of liability for guarantees of 105 million hryvna - it is unclear whether this figure represented, for example, total contingent liability, or total unsecured guarantee liability, or was simply what the auditors estimated to be a proper provision in the accounts. Whatever the explanation for this, the overall pattern of the Bank's returns is that they gave figures in respect of contingent liability for guarantees that were much too small to cover the refund guarantees for the Group, or even just the Guarantee. (The Bank relied upon the fact that the returns for 1998 and subsequent years do not reflect security for refund guarantees given for the Yard as they would have done, according to Mrs Kovtun, if the guarantees had been properly issued and proper procedures followed. However, this point provides no convincing support for

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 7   Pg 39 of 91

**MR JUSTICE ANDREW SMITH**
Approved Judgment

A.46

Sea Emerald
v
Prominvestbank

the Bank's argument because, as the Buyer points out, the returns also do not reflect security provided by the Yard for its borrowing from the Bank. )

84.   The Bank therefore relies upon the fact that it has no documentation recording or reflecting the guarantees or any potential liability under them in order to support its contention that they were not properly issued and were not issued with its authority. The Buyer responds that this is of no real significance because the Bank has failed to make disclosure of many documents that it must have generated in relation to its dealings with the Yard and other relevant documents, despite being ordered by HHJ Mackie QC on 14 January 1998 to carry out a search for and make disclosure of specific documents: namely, files relating to the Yard held at the Nikolaev branch or its Head Office for the period 1994 to 1998 (which would, of course, include documents relating to loans made by or through the Nikolaev Department to the Yard), and documents relating to guarantees issued by the Nikolaev branch for the period 1993 to 1998.   The Bank disclosed no documents relating to guarantees and only a few documents relating to the loans made by the Bank to the Yard.

85.   As far as guarantees are concerned, the Bank's answer is simply that the Nikolaev branch issued none during the relevant period.   Mrs Kovtun gave evidence that no guarantees were issued by the Nikolaev branch at this time, and this is consistent with the returns for off balance sheet contingent liabilities to which I have referred.   It is also consistent with the evidence of Mrs Maryna Kozhukhariova, who is now the Director of the Bank's Currency Transactions Department and who worked at the Donestsk Department of SCICB and then the Bank between 1989 and 1998. She told me that the Donestsk region did not issue any guarantees before 1996. Mrs Kovtun accepted that another Department of the Bank had issued a guarantee for another Ukrainian shipyard, the Kerson Yard: but the date of this guarantee is not in evidence and it could have been issued some time after 1994.

86.   On the face of it, this seems surprising, the more so because the Nikolaev Department covered an industrial area and it might be expected that the Department would have needed to issue guarantees to support the business of its industrial customers. However, the evidence of Mr Iaremenko put this into its context.   He said that bank branches (again including in this expression Regional Departments) did not issue guarantees of the type under consideration in this case.   With regard specifically to foreign currency guarantees he explained that in the period 1992 to 1994 the majority of international payments went through the State Import-Export Bank of Ukraine.   In the early 1990s banks in the Ukraine lacked qualified personnel and developed procedures for foreign currency transactions, and concentrated their foreign currency transactions at the head offices because branch offices did not have the professional experience to carry out such transactions.   I found this evidence convincing.

87.   I need hardly add that none of this means that it would have been unusual for a customer who required a bank's assistance for a transaction involving foreign currency to approach a branch office and deal with a branch office.   It does not follow from this that the branch office would have the authority to carry out the transaction as opposed to transmit the request to head office and the head office's

decision to the customer, or that the branch office would usually carry out the transaction itself.

88.   Against this the Buyer relies upon some factual evidence of Mr. Stepanov.   He said that the Nikolaov Department were "actively involved in issuing commercial guarantees for business clients" because on one occasion he and Mr. Skock together issued guarantees on behalf of their banks for Okean Shipyard, a customer of both banks: one such guarantee was written to enable the yard to buy engines from Czech suppliers. He also said that he understood from the director of an alumina plant, who had held a position in Nikkombank, that the Bank issued guarantees to support the import of bauxite from Africa.

89.   I found it difficult to understand the precise nature of the commitments by the Bank that Mr. Stepanov was describing.   He apparently understood that they were given in respect of specific imports, and the arrangements that he described did not appear to be comparable to the sort of long-term commitment that the Guarantee entailed.   It suffices to say that I was not persuaded by this evidence that the general picture given by Mr. Iaremenko was misleading. In light of this and the evidence of Mrs Kovtun, I do not consider that it reflects significantly upon the Bank's disclosure that it did not disclose guarantees following the order of HHJ Mackie QC.

90.   The Bank has produced fewer documents relating to lending to the Yard than would be expected.   Some documents have been disclosed, but, for example, there are not, as I understand it, documents relating to the Yard's applications for loans and relating to the support for the loans from the Bank of Ukraine.

91.   The Bank's explanation for the paucity of documentation about its loans to the Yard was its policies for destroying documents after a number of years.   After all, the Buyer did not, as far as the evidence goes, mention the Guarantee (or any of the refund guarantees) to the Bank for more than 12 years after it was provided (and when it did so, the Bank promptly denied its authenticity).   This is not to say that the Group had forgotten about the refund guarantees.   For example, it alluded to them in 1997, when Mr. Laskaridis was in discussions with various Ukrainian government entities: it is apparent from a letter to Mr. Laskaridis from the Ministry of Industrial Policy that the failure of the Yard to provide guarantees in respect of hulls nos 1151 and 1152 was an "issue raised" by Mr. Laskaridis, and this is also listed as a "main issue" by Mr. Laskiridis in his notes for a meeting on 27 May 1997. But there is no suggestion that the Group contacted the Bank about guarantees (or anything else) before 2006, and the Buyer's complaint about the Bank's disclosure is to be assessed against this background.

92.   Mrs Kovtun explained that broadly the same policy relating to documentation was adopted in 1994 as today.   Day-to-day transactions on an account were filed by reference to the date of the transaction and such records are routinely archived shortly thereafter and destroyed some five years later. Files relating to a specific transaction – and refund guarantees and associated documentation would be put upon such a file – were archived only once the employee responsible for the transaction was sure that it was concluded and that the documents could properly be destroyed. In the case of a document such as the Guarantee, that would be only after it had expired. Mrs Kovtun explained that some documents relating to the bank's dealings with the Yard in the

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
**A.46**
MR JUSTICE ANDREW SMITH                Part 7    Pg 41 of 91
Approved Judgment

Sea Emerald
v
Prominvestbank

1990s might have survived because employees working on the transactions might have copied them and (for some reason or for no reason at all) not have disposed of them.

93.    This goes some way to explaining the Bank's failure to produce documentation relating to the loans to the Yard: for example, documents relating to the account with Deutsche Bank and, as mentioned above, off balance sheet records for years before 1996. However, on any view the destruction policy falls far short of providing a full and satisfactory explanation for the failure to produce documents relating to the consideration by the Bank's Head Office of the lending to the Yard if only because, the lending being unpaid, the relevant documentation should not have been destroyed. The position is the more obscure because the Bank's register of destroyed documents does not correspond with the evidence about the Bank's document destruction policies.

94.    However this may be, the explanation for the Bank not disclosing documents is not what is important for the Buyer's submission, and, as I have said, it was not put to the Bank's witnesses that documents were deliberately withheld.    Whatever the explanation, it provides the Buyer with a response to the Bank's contention that it is to be inferred that the Guarantee and the other refund guarantees were not issued in accordance with proper procedures because they are not to be found among the Bank's records.    I see force in that argument, but the fact remains that the contingent commitment was not reflected in the returns for off balance sheet liabilities.

95.    The Buyer submits that it is unlikely that Mr. Skock would have taken it upon himself to enter into commitments of this size unless he had authority to do so. After all, Mr. Skock had been a state employee and manager of the Nikolaev Regional Office of the SCICB, and become a member of the Board of the Bank.    This submission is supported by two further considerations.    First, as I conclude, Mr. Skock apparently ensured that he observed some limitations as to the maximum amount of the guarantees that he gave in January 1994.    This in itself suggests that he had in mind some restriction upon what he or the Department was permitted to do, or at the least upon what he believed he could properly do.    Secondly, as I find on the basis of Mrs Kovtun's evidence, the stamp used on the Guarantee next to Mr. Skock's signature was kept in a safe by the Chief Accountant and it was his responsibility to ensure that it was properly applied.    (Mr. David Foxton QC also referred to the other stamp at the top of the Guarantee giving the name of "Bank of Industry and Construction of the USSR, Nikolaev" and the evidence of Mrs Kovtun that that stamp was kept by one of the employees in the foreign currency department, but, since apparently that stamp was in any case applied in error, I do not attach any significance to that.)    Even if the refund guarantees should not properly have been given, it seems to me that this is unlikely that Mr. Skock kept what he was doing secret from everyone else in the Bank.

96.    I have concluded that Mr Khomich, as well as Mr Skock, knew of the terms of the contracts between the Group and the Yard.    The contracts referred to the requirement for a guarantee from the Bank (or its predecessor).    I cannot accept that Mr Khomich would not have noticed it or that he was or remained unaware of the refund guarantees that had been issued.    I have also concluded that the Bank's Head Office knew of the lending by the Bank and knew of the contracts placed by the Group with

the Yard.   It does not follow from this that the Bank's Head Office knew the terms of the contracts or the terms in them requiring refund guarantees, and I am not persuaded that there is a proper basis for concluding that it did.   Nor am I persuaded that anyone at the Bank's Head Office was aware of the refund guarantees. It might be said, I suppose, that this involves attributing to the Bank's Head Office incompetence in agreeing to such large loans to the Yard without sufficient information about the contracts that the Bank was supporting. However, there would seem to me a question about its competence if it accepted without demur the undated and open-ended refund guarantees. Moreover, even if some at the Head Office knew of them, the Buyer has not shown that the Bank's Chairman or its Management Board knew that the Guarantee and the other refund guarantees issued by Mr. Skock.

97.    I am persuaded by the Buyer, despite the lack of documentation about the refund guarantees and the fact that no contingent liability under them was reflected in returns made by the Department, that it is unlikely that Mr Skock entered into them without anyone else in the Bank being involved.   However, that is not enough to show that before the guarantees were given proper procedures were followed and the Bank had formally authorised Mr Skock to issue them by a decision of the Management Board and by providing a power of attorney.   After all, even if proper procedures required that the Department be authorised with similar formality to lend money in excess of its own borrower's limit (and there is no proper basis for assuming that similar formality was required), it does not follow that in its early years, the formal procedures were followed within the Bank.

98.    In my judgment there simply is not sufficient evidence to conclude that the Bank took the unusual course of conferring on Mr. Stock authority to enter into the refund guarantees (and in particular the Guarantee) and that it executed a power of attorney for that purpose.   I should have come to this conclusion in any event but it is, to my mind, supported by the evidence of Mrs Kovtun, including what she said about the returns made to Head Office of off balance sheet liabilities.   I accept her evidence that she knew nothing of the guarantees and that if she had known of them, she would have completed the returns differently.   I recognise that, given that Mr Skock was not acting secretly, it is in any event rather surprising that Mrs Kovtun did not hear about the guarantees, but it would be the more remarkable if formal procedures had been followed.

99.    This is not to attribute any improper motive to Mr. Stock.   The commitments were given when the Bank had no relevant written procedures in place and he might well have been unfamiliar with guarantees of this kind.   He might understandably have wished to support a customer who was earning important foreign currency.   As I understood Mrs Kovtun's evidence, this was a period when the Bank, and other banks in the Ukraine, were learning to develop new services required by their customers in the post-Soviet era.   When customers approached the Bank for a new service, the customer was not simply turned away, but the Bank would try to accommodate the customer's request, and might consult Head Office as to how it might do so.   None of this, however, assists the Buyer to establish that Mr. Stock had authority to give the Guarantee.

Ratification

100.    The Buyer argues that, if Mr. Skock did not have actual authority to enter into the Guarantee, the Bank ratified what he did, because it knew that he was giving this and other refund guarantees to the Group and did not disclaim them.    The question whether the Bank so ratified what Mr. Skock did is, as is common ground between the parties, to be determined according to English law, the governing law of the Guarantee.

101.    The Buyer's pleaded case with regard to ratification is that the Guarantee was "known to the [Bank] and/or the [Bank's head office]" and that the "Bank's silence and/or acquiescence in the [Buyer's] mistaken belief that the Guarantee was valid amounted to a ratification of the Guarantee".    It does not allege any positive act of ratification..

102.    The principles governing ratification by a purported principal of an act done in his name were considered by Waller J in <u>Suncorp Insurance and Finance v Milano Assicurazioni SPA</u>, [1995] 2 Lloyd's Rep 225 esp at p.234 and by Moore-Bick J in <u>Yona International Limited v La Reunion Francaise SA</u>, [1996] 2 Lloyd's Rep 84 esp at pp.103 and 106.    Ratification may be implied as well as express, and there is no requirement that it be communicated to either the agent or the person with whom the agent entered into the contract: it operates as a unilateral manifestation of will.    Mere acquiescence or inactivity may be sufficient to constitute ratification.    However, it involves a conscious decision to adopt an unauthorised act, and in order for there to be ratification:

    i)    The act of ratification must be that of the principal or of someone competent at the time of ratification to make the contract in question or to do the relevant act for the principal.

    ii)    The person ratifying the agent's conduct must know of all the material circumstances, unless he evinces an intention to ratify the contractual or other act regardless of them.

    iii)    In a case of ratification through silence and inactivity, it must be such as to manifest unequivocally an intention to adopt the act in question.

103.    In the <u>Yona International</u> case, Moore-Bick J said this (at p.106), which to my mind has some application to this case:

        "The essence of ratification is a decision by the principal to adopt the unauthorized act as his own, ... It does not therefore depend on communication with or representation to the third party and is thus in principle distinct from estoppel, but since the intention to ratify must be manifested in some way it will in practice often be communicated to and relied upon by the other party to the transaction. Ratification can no doubt be inferred without difficulty from silence or inactivity in cases where the principal, by failing to disown the transaction, allows a state of affairs to come about which is inconsistent with treating the transaction as unauthorized. That is probably no more than a form of ratification by conduct. Where there is nothing of that kind, however, the position is more difficult since silence or inaction may simply reflect an unwillingness or inability on the

part of the principal to commit himself. For that reason it will not usually be sufficient to evidence ratification, nor will it amount to an unequivocal representation sufficient to give rise to an estoppel."

104.   In order to establish that the Bank ratified Mr Skock's act in entering into the Guarantee, therefore, the Buyer would have to show that it was adopted by the Chairman of the Bank or by the Management Board of the Bank. I conclude that the Bank's Head Office in Kiev knew of the lending to the Bank and of the contracts between the Group and the Yard, but even assuming that this was known to the Chairman and the Management Board, it has not been shown that they knew of the terms of the contracts. Moreover, even that knowledge would not be sufficient to support a case that the Guarantee had been ratified. It would be necessary to show that the Chairman or Management Board knew of the Guarantee and, as it seems to me, to show either that they knew the terms of the Guarantee or at least to show that they were content to adopt the Guarantee whatever its terms. The Buyer has not shown that either the Chairman or the Management Board had such knowledge.

105.   For this reason, I reject the Buyer's argument that the Bank ratified Mr. Skock's act in entering into the Guarantee. However, even if I had concluded that anyone who was in a position to ratify the Guarantee on behalf of the Bank had the requisite knowledge, I do not consider that he or they manifested an intention to adopt it. This is not a case in which the purported principal remained silent in the context of continuing dealings or exchanges with the other contracting party. It seems to me that silence about the Guarantee is in the circumstances no less explicable by a belief that the Buyer was unlikely to call upon it, not least perhaps in light of Government assurances of support for the Yard and for the Group's contracts with it, and that it could only cause unnecessary difficulty to renounce the Guarantee than by a decision tacitly to adopt it. I do not discern an unequivocal manifestation of such a decision.

## Ostensible authority

106.   The question whether Mr Skock had ostensible authority to give the Guarantee is also governed by English law. The Buyer contends that the Bank held out the Nikolaev Department and Mr. Skock as its Head as having authority to enter into "such financial transactions as would ordinarily fall within the scope of the authority of the main regional office of a major commercial bank", or at least of a major commercial bank in the business of providing services to the shipbuilding industry; and that it relied upon that in "accepting the terms of the Guarantee". Thus, it says that this is one of those cases described by Lord Keith in Armagas Ltd v Mundogas SA, [1986] 1 AC 717 at p.777B: "...In the commonly encountered case, the ostensible authority is general in character, arising when the principal has placed the agent in the position which in the outside world is generally regarded as carrying authority to enter into transactions of the kind in question". The Buyer contends:

i)     That the provision of commercial guarantees was within the ordinary scope of the authority of the main regional office of a major commercial bank.

ii)    That the Guarantee was of an ordinary commercial type, at least in the context of a shipbuilding or comparable construction project.

iii)   That the Buyer itself or through the Yard relied upon the fact that the Bank, being a major commercial bank, had established the Nikolaev main regional office and appointed Mr. Skock as its head.

107.   Clearly the Bank conferred upon Mr. Skock some authority of the kind described by Lord Keith: it conferred upon him authority to provide some banking services and held him out as having authority to provide them to shipyards amongst other customers, but that states the authority that Mr. Skock had and was held out as having at too high a level of generality to assist in deciding whether the Bank held Mr. Skock out as having authority to enter into the Guarantee on its behalf.  It also seems to me to pitch the question at too general a level to ask whether he was held out as having authority to provide "guarantees" without stating what guarantees.   The relevant question is more specific: whether the Bank held him out as having authority to enter into a refund guarantee of the kind and in the amount of the Guarantee.  It does not assist the Buyer that in Ukraine legislation permitted guarantees to be given and that the Bank's charter provided for guarantees to be given.  Nor is the Buyer's case assisted by general observations about Mr. Skock being held in high regard in Nikolaev (such as Mr. Lavrinenko telling Mr. Soversheny, "when Skock was the director, he was king, God and lord in the city").   Nor does it assist the Buyer to point out that customers of the Bank were expected to deal with the Bank *through* the Departments and not the Head Office: that did not amount to the Bank holding the Department (or the Head of the Department) out to deal with customers in ways in which it (or he) was not authorised to deal: it has not been suggested that this was a case like First Energy (UK) Ltd. v Hungarian International Bank Ltd., [1993] 2 Lloyd's Rep 194 in which the bank manager was held out as having authority to *communicate* to the customer decisions of the bank's head office.

108.   It is therefore not sufficient for the Buyer to contend that it was within the ordinary scope of the authority of the main regional office of a major commercial bank, and so of Mr. Skock as head of the main regional office, to provide commercial gaurantees. It would be necessary, at the least, for the Buyer to show that it was within the ordinary scope of their authority to provide a refund guarantee to cover potential liability by the supplier to the customer for money paid to him.   The Buyer's case about the scope of the usual authority of a regional office and its head depends upon the expert evidence of Mr. Stepanov.  However, Mr. Stepanov did not give evidence that in his experience it was usual for the regional administration of banks in the Ukraine at the relevant time to issue refund guarantees such as the Guarantee.  He said that the regional offices of banks gave guarantees, without specifying the types of guarantees that he had in mind, except that he gave examples which were, as I understood his evidence, guarantees for the payment of the price of goods imported into the Ukraine.   It is true that he expressed the *opinion* that "the issuance of commercial guarantees of this kind was within the normal scope of activity of a main regional office of [the Bank]", but this was not, I think, evidence about his *experience* or *knowledge* of the usual scope of the authority of bank departments or bank officials.

109.   However, if there is any significant difference about this between the evidence of Mr. Stepanov and that of Mr. Iaremenko, then I prefer the more reasoned evidence of Mr. Iaremenko.   He said that the common form of Provision conferring authority upon regional offices of banks did not include general authority to provide guarantees, and

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
Part 7    Pg 46 of 91                                        **A.46**

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

there is no evidence that I accept either that it was usual for officials to be given specific authority to issue guarantees or that it was usual for officials at regional offices to give guarantees although they were not properly authorised to do so. In my judgment, the Buyer has not shown that it was within the ordinary scope of the authority of the main regional office of a major commercial bank to provide commercial guarantees.

110.    There is a further difficulty facing the Buyer's contention about ostensible authority. There is no evidence that it was in the scope of the usual authority of an official in Mr. Skock's position to enter into a contingent commitment as large as the Guarantee. Indeed, Mr. Stepanov acknowledged that no other bank would have had the resources to do so. His reasoning is that, since the Bank had greater resources than others, it was to be expected that an official of the Bank such as Mr. Skock would have had authority to enter into greater commitments than those in a comparable position in other banks. I do not find this reasoning compelling, but in any case, it does not amount to evidence as to the usual authority of bank departments or officials. Mr. Stepanov did not explain why the Bank's Department should be expected to issue a Guarantee for as much as US\$9.9 million. His evidence did not support a contention that the Bank, by appointing Mr. Skock to his position, held him out as having authority to issue the Guarantee.

111.    The Buyer put forward an alternative argument in support of its contention that the Bank held Mr. Skock out as having authority to issue the Guarantee on its behalf, arguing that, if the Bank knew that Mr. Skock had issued refund guarantees on behalf of SCICB, then by keeping him employed in a similar position within a similar structure, it represented that he had authority to act on behalf of the Bank as he had acted for SCICB. I reject this argument. The authority of Mr. Skock to enter into guarantees when he was employed by SCICB was, as far as it goes, no greater than his authority when employed by the Bank and there is no evidence that the Chairman or the Management Board or any other relevant official or organ of the Bank knew about SCICB guarantees. In any case, the Bank was a separate legal entity from SCICB and was not its successor in any formal legal sense. There is no sufficient evidence that its structure was the same. I do not accept that in appointing Mr. Skock to his position as Head of the Nikolaev Department the Bank represented that he had the authority to do all that he was authorised to do, or all that he had in fact done, when employed by the SCICB

112.    I therefore reject the Buyer's contention that the Bank held Mr. Skock out as having authority to issue the Guarantee or made any relevant representation about his authority to do so. I would also reject its case about ostensible authority because I do not accept that the Buyer relied upon any representation by the Bank as to Mr. Skock's authority, or indeed the Yard did so.

113.    I accept the evidence of Mr. Laskaridis that he saw the Guarantee with Mr. Skock's signature and the Bank's stamp, but I am not satisfied that Mr. Laskaridis knew the identify or the position of the signatory of the Guarantee. In his oral evidence Mr. Laskaridis said that he had been told that Mr. Skock was the head of SCICB ih Nikolaev, and of his standing there. I am unable to accept that evidence: it was not in his witness statement and he was unconvincing about the source of this information. He first said that it was from the Yard and later, when pressed about this, he said that

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
Part 7    Pg 47 of 91
**A.46**

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

it had been, or might have been, from the Group's technical people in Nikolaev. On the face of it, it is improbable that the technical staff would have discussed with the Group's president who signed the Guarantee. But even if Mr. Laskaridis was told this, I do not believe that he or anyone else in the Group accepted the Guarantee or acted in any other way in reliance upon Mr. Skock's position. In any case, this evidence was concerned with Mr. Skock's position when he was with SCICB, and not about his position in the Bank. During his evidence, Mr Laskiridis said that: "who this bank is and how it [sc. the refund guarantee] comes about is really not the job of the shipowner or the legal entity that order the ship". This, in my judgment, reflects the attitude of the Group to the refund guarantees, and its view that it was not for the Group to be concerned about how the guarantees came about or who issued them.

114.  The Buyer has an alternative argument that it is sufficient if the Yard relied upon Mr. Skock's position. (It is pleaded that Mr. Lavrinenko and Mr. Ovdienko so relied, but it was Mr. Lavrinenko, not Mr. Ovidenko, who obtained the Guarantee.) The Yard having obtained the Guarantee from Mr. Skock, it is contended that ostensible authority can be established where "the third party [the Buyer] reasonably believes that the actor [Mr. Skock] has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations": see the American Restatement, Third, at paras 2.03, 3.03. Let it be assumed that this properly states English law because Mr. Ali Malek QC, who represented the Bank, did not argue otherwise (but it is not uncontentious: see Bowstead & Reynolds on Agency (2006) 18th Ed paras 8-014 and 8-029). Nevertheless, I am unable to accept that Mr. Lavrinenko, or indeed anyone else acting for the Yard, said to the Buyer anything about Mr. Skock's position in the Bank. Nor is there any evidence that Mr. Lavrinenko (or Mr. Ovdienko) thought that Mr. Skock had the requisite authority or that explains on what basis he might so have thought. In his statement, Mr. Lavrinenko does mention that Mr. Skock had previously issued guarantees, but there is no sufficient evidence that he thought that as Head of the Nicolaev Department Mr. Skock was authorised to issue the Guarantee. The Buyer has simply not been able to present evidence to support this part of its case.

115.  I add that in reaching this conclusion I place no reliance upon the evidence of Mr. Soversheny that in an unrecorded telephone conversation in November 2007 Mr. Lavrinenko told him that, in the statement that he had given and upon which the Buyer relies, he had "guessed" that Mr. Skock did not have authority to issue a bank guarantee. This evidence of Mr. Soversheny was quite inconsistent with other conversations that he had with Mr. Lavrinenko that were recorded, and I conclude that the evidence of Mr. Soversheny about the conversation that was not recorded was untruthful.

Conclusion on authority

116.  I therefore conclude that Mr. Skock had neither actual nor ostensible authority to give the Guarantee and that the Bank did not ratify his issuing it. If I am right about this, the claim fails. However, I shall consider the other issues on the basis that I am wrong and the Guarantee is binding upon the Bank.

The Buyer's claim

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4    **A.46**
Part 7    Pg 48 of 91

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

117.    The claim for US$17,258,750.63 is put forward on the basis that it represents the sum of US$17,138,605 that is recorded in the protocol of 3 March 2004 as being paid under the Contract together with a payment of some US$120,000 made on 7 February 2006. That is to say, the claim brings into account (i) sums paid to suppliers of equipment as well as sums paid to the Yard; (ii) sums paid to the Yard in respect of hull no 1148 but not in accordance with when the Contract provided for payments to be made; (iii) sums paid in respect of other hulls or for equipment for other hulls; and (iv) adjustments to the account under the protocols.

118.    The only sum that fell contractually due to the Yard under the Contract was US$1.3 million payable within three months of the effective date of the Contract, that is to say by August 1994. US$1.2 million was paid on or shortly after 23 August 1994 as payment of the first instalment under the contract for hull no 1147. That payment was then, in October 1994, treated as having been made by way of part payment of the first instalment under the Contract, leaving US$100,000 to be paid. There is no evidence of any payment made specifically to discharge this, although in due course far more than a further US$100,000 was brought into account between the Group and the Yard under the Contract.

119.    It is agreed between the parties that in 1998 a further US$427,072 was paid to the Yard on the basis that the payment related to hull no 1148 and this was brought into account as a payment under the Contract. As far as payments to suppliers of equipment are concerned, it is agreed that US$165,377.75 was paid in respect of equipment for hull no 1148, and this was also brought into account as paid under the Contract. It is not clear whether other payments were made under the Contract, and had I reached other conclusions about the Bank's liability, I would have invited further submissions about this.

The contruction of the Guarantee

120.    The Bank raises a number of questions of construction of the Guarantee.

    i)      What is the meaning and effect of the provision for a "total maximum sum" of US$9,900,000?

    ii)     Is the expression "supplement, amendment, charge or modification" restricted to variations in the Contract such as contemplated by article V and article XX paragraph 3?

    iii)    Does the Guarantee cover all payments made to the Yard in respect of hull no. 1148 whether or not made when the Contract provided?

    iv)     Does the Guarantee cover all payments made to the Yard that the parties agreed to bring into account as having been paid under the Contract, even if not originally so paid?

    v)      Does the Guarantee cover payments to suppliers of equipment?

    vi)     If the answer to v) is that the Guarantee does cover payments to suppliers, does it cover only payments for equipment for hull no 1148?

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4 **A.46**
Part 7    Pg 49 of 91

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

vii)   If the answer to v) is that the Guarantee does cover payments to suppliers, does it cover payments that the parties agreed to bring into account as having been paid under the Contract, even if not originally so paid?

What is the meaning and effect of the provision for a "total maximum sum"?

121.   The Bank contends that its maximum liability under the Guarantee is US$9,900,000. At the start of the trial, the Buyer's contention was that the Guarantee was not so limited but (in the words of its Reply) "The maximum sum (exclusive of interest) recoverable under the Guarantee was … the sum actually paid to the Yard and/or to third party suppliers under the Contract". This contention was based upon the use of the disjunctive "or" in the sentence "we, … hereby irrevocably and unconditionally guarantee the payment to you by the Builder of the total maximum sum of USD – 9 900 000 (Nine Million Nine Hundred Thousand U.S.D) *or* any amount to be paid to the Builder as the first, second, third and fourth instalments under the Contract and any supplement, amendment, charge or modification made thereto".

122.   During the hearing the Buyer modified its position. First it said that, whatever the true meaning of the Guarantee, it could not maintain its pleaded contention because, even if it were correct as a matter of construction, the Buyer could meet it with an argument based upon estoppel by convention or rectification because of the evidence of Mr. Laskaridis as to the explanation for the Guarantee specifying a maximum amount. However, in his closing submissions Mr. Foxton accepted that as a matter of construction the maximum amount payable under the Guarantee is US$9.9 million, subject to a question about interest: whether the maximum amount of US$9.9 million is inclusive or exclusive of any contractual interest payable by the Yard.

123.   In view of my conclusions upon other issues of construction between the parties, my determination of this question does not affect the amount for which, in my judgment, the Bank would be liable under the Guarantee (even if I had upheld the Buyer's case about authority): the ceiling of US$9.9 million would not on any view be reached. However, it seems to me that the maximum amount of US$9.9 million is naturally understood to stipulate the maximum amount of the guaranteed payment that would fall to be made by the Yard in the event of rescission, whether it be payable by the Yard by way of principal or interest. After all, the second paragraph of the Guarantee links the interest element to the sum payable by way of instalments without indicating that it might be payable in addition to the maximum sum, and the obvious purpose of the maximum amount is to define an upper limit to the Bank's exposure. This purpose would be undermined by any other interpretation of the Guarantee, especially given the absence of any expiry date for the Guarantee (and so the possibility that the Buyer might be entitled to large sums by way of interest). Further, if the Guarantee be ambiguous in this regard, given that the Group (through the Yard) presented the form of the Guarantee to the Bank, the principle of construing contra proferentem reinforces my conclusion that the maximum amount includes any liability of the Yard for interest upon what is to be refunded. I consider that the only interest payable in addition to the sum of US$9.9 million (if that amount or more is payable by the Yard) would be statutory interest from the date that Bank's liability under the Guarantee accrued.

Is the expression "supplement, amendment, charge or modification" restricted to variations made in accordance with article V and article XX of the Contract?

124. The application of the Guarantee is expanded by the provision that it covers not only what is paid under the Contract but also what is paid under "any supplement, amendment, charge or modification made thereto"; and the Guarantee is stated to be "fully applicable to the Contract as so supplemented, amended, changed or modified". (I shall refer to these and similar expressions in the Guarantee as providing for "variations".) It is convenient next to deal with an argument of the Bank that the provisions of the Guarantee that contemplate variations have a limited application. As would be expected in a shipbuilding contract, article V of the Contract provided that there might be agreed changes or modifications to the Specifications and Plan for the vessel, and recognised that such alterations might lead to changes to the price among other things. Such changes were to be agreed in writing. The Bank submits that the variation provisions in the Guarantee apply only to modifications and changes to the Contract made under article V.

125. I am unable to accept that the variation provisions of the Guarantee are to be interpreted so narrowly. Article V of the Contract is headed "Modifications Changes and Extras", and its wording correspondingly refers to the Specifications and the Plan being "modified" and "changed". The variation provisions in the Guarantee additionally refer to any "supplement" and any "amendment" to the Contract, and they refer to variations to the Contract and not just to the Plans and Specifications. Thus, the wording of the Guarantee does not track that of article V and to my mind does not evince any intention to refer to it. This is the clearer because the Contract itself at article XX contemplates as it might be amended by agreement in writing. However, I cannot interpret the wide terminology of the variation provisions in the Guarantee as being limited even to agreements that are in writing. There is no such restriction in the wording of the Guarantee and no proper reason to introduce such a limitation by implication. (Of course, article XX might bear upon a question whether the parties to the contract intended to introduce a change or modification orally or by their conduct, and so to whether the Guarantee applied in such circumstances, but that is another matter.)

Does the Guarantee cover all payments made to the Yard in respect of hull no. 1148?

126. As I have said, the first instalment of US$1.3 fell due under the Contract, and no other payments to the Yard accrued due. (I leave aside for present purposes payments to suppliers of equipment.) The Bank does not dispute that the amount of the first instalment is covered by the Guarantee, if the Buyer is entitled to claim upon the Guarantee at all. There is an issue whether it covers other sums paid to the Yard. In my judgment it does not.

127. The Contract contemplated payment to the Yard of two further instalments, falling due according to the progress of the vessel. The Guarantee covers the payment of "any amount to be paid to the [Yard] as the first, second, third and fourth instalments under the Contract … and any supplement, amendment, charge or modification made thereto". The sums paid to the Yard from time to time before any payment was contractually due were not, to my mind, instalments within the meaning of the Guarantee. I shall have to consider later the significance of the reference to four

08-13555-mg    Doc 33774-7    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4
Part 7    Pg 51 of 91

A.46

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

instalments, but on any view the reference is to stage payments such as the Contract specified.

128. This leads to the questions whether the payments are covered because they were paid under a "supplement, amendment, charge or modification made thereto". I am unable to accept that they are.

129. First, the payments did not purport to be made under any agreed variation of the Contract. I have referred to the letters from Mr. Laskaridis dated 24 January 1994 and 20 July 1995 in which he stated that in agreeing to make early payments the Group was going beyond its contractual obligations. There are many other references in the documents to the advance payments being by way of "advances in excess of customers' contractual obligations". (The Bank cited De Nicholls v Saunders (1870) LR 5 CP 589, 594 in support of the submission that the juridical nature of these payments is that they are loans or advances. But whatever the legal analysis, it suffices that they are not covered by the wording of the Guarantee.)

130. Secondly, the Guarantee contemplates that the contractual instalments might be varied or supplemented. It would cover a case where the timing of an instalment was changed and, I think, where an instalment was specifically divided so that it was not all payable at the same time. However, I am unable to accept that the expression "any supplement, amendment, charge or modification [to the contractual instalments]" was intended to cover the position where, as here, the Buyer and the Yard abandoned the underlying scheme of payment to the Yard by way of instalments referable to the progress of the vessel.

131. The Buyer argues that it is nothing to the point that the reason that the Yard sought early payments from the Group was in order to meet commitments unconnected with hull no 1148. I agree that the purpose of the request for advance payments is not important. Nor is the reason that the Buyer acceded to the requests. But this does not mean that the early payments that the Buyer made were covered by the wording of a Guarantee.

Does the Guarantee cover all payments made to the Yard that the parties agreed to bring into account as having been paid under the Contract?

132. For similar reasons, I am unable to accept that the Guarantee, properly construed, is to be understood to cover sums which, although not paid to the Yard in respect of the Contract, were later brought into account, by agreement between the parties, in particular under the protocols. The Guarantee covers payments made under the Contract, and not under other shipbuilding contracts made between the Group and the Yard. To my mind it envisages that the Buyer will make payments distinctly by reference to the Contract, and that the Guarantee will cover payments under the Contract. In effect, by entering into the protocols, the Group (including the Buyer) was party to agreements that treated payments made under the various contracts between the Group and the Yard as interchangeable between them. I cannot accept that the Guarantee was intended to apply to what was recorded against the Contract under such accounting arrangements. It cannot be said that a claim made under the Guarantee on the basis of such arrangements is directed to what was paid "under the Contract", and I cannot accept that the expression "any supplement, amendment,

charge or modification made [to the contractual instalments]" was intended to cover such accounting arrangements as the protocols.

Does the Guarantee cover payments made to suppliers?

133.   For the reasons that I have explained, I do not consider that, upon the true construction of the Contract, in the event of it being rescinded the Yard was liable to refund any funds paid under it to suppliers of equipment for the vessel. Similarly, in my judgment, the Guarantee does not require the Bank to pay the amount of such payments in the event that the Buyer calls upon the Guarantee. A guarantee gives rise to a secondary obligation. An interpretation of the Guarantee that required the Bank to pay sums which the Yard was not liable to refund would involve interpreting it to that extent not truly as a guarantee but as a commitment by the Bank to a primary obligation. I do not consider that the Guarantee bears this interpretation. This view is reinforced, to my mind, because the Guarantee itself refers to payments to the Yard: it guarantees the payment of "any amount paid to the Builder" and in the second paragraph limits the Bank's liability to the sum of the instalments or any lesser sum agreed between the Buyer and the Yard and "actually paid by [the Buyer] as aforesaid".

134.   The Buyer advances two main arguments on this issue.  First, it relies upon the reference to "the first, second, third and fourth instalments under the Contract...", and submits that, since the Contract provided for only three instalments to be paid to the Yard, the fourth "instalment" must refer to the series of payments that the Contract contemplates will be made to those who supply equipment for the vessel that is to be imported into Ukraine.  I am not persuaded by this submission.  The word "instalment" is not an expression that naturally covers such payments, let alone all such payments cumulatively.  The explanation for the reference to a fourth instalment (like the comparable reference in the Contract) is no doubt that previous contracts for which refund guarantees had been issued had provided for four price instalments to be paid to the Yard.  If necessary, I would take the view that, although the parties to the earlier refund guarantees in respect of the 1992 contracts for hulls nos 1136-1143 were different from those to the Guarantee for hull no 1148, the earlier guarantees are a proper aid to construing it: they were given by Mr. Skock (who was the Bank's agent in issuing the Guarantee) to the Group (who acted throughout for the Buyer).  But even without that consideration, I would not interpret the "fourth instalment" as referring to the payments to be made to suppliers of equipment.

135.   The Buyer's second argument is that the "total maximum sum" of US$9.9 million would be unrealistically high unless the Guarantee is to be interpreted as covering the US$10 million that the Contract contemplates is to be paid for imported equipment. This is because the Contract provides that the third instalment paid to the Yard is to be paid "within 7 working days after signing the Acceptance Act and the Vessel is ready in all respects for delivery"; and that title to the vessel will pass to the Buyer upon delivery of the Acceptance Act.  Therefore, it is said, as far as payments to the Yard are concerned the Buyer is exposed only in respect of, and only required a guarantee for, the first two instalments, which were only US$2.88 million in total, and it is argued that the limit on the Guarantee was required because of potential liability arising from payments to the suppliers of equipment.

136.   The Buyer seeks to reinforce this argument by referring to the contract for hull no.
       1143 and the guarantee relating to it.   That contract contemplates that payments
       totalling US$3 million will be paid before delivery of the vessel and that the buyer of
       the vessel will pay US$3.5 million for equipment: US$6.5 million in all.  The limit on
       the guarantee is also US$6.5 million, and this, it is said, is because it is intended to
       cover the sums payable for equipment under the contract.   I am not persuaded by this
       argument.   It would (as I interpret the maximum amount provision) mean that the
       maximum total sum was calculated without recognising that interest would be payable
       by the Yard on what was to be refunded and there is no reason that I can discern that
       the parties should disregard this.      Further, this argument, as it appears to me,
       overlooks the wording of the guarantee in respect of the contract for hull no. 1143: it
       provides for a guarantee for the payment of US$6.5 million or "any amount to be paid
       to the Builder as the first, second and third instalments under the Contract…".  Under
       the contract for hull no. 1143, as I have said, three instalments were payable to the
       Yard before the vessel's completion and the signing of the Acceptance Act:
       instalments payable by reference to the signing of the contract, by reference to when
       the keel was laid, and by reference to when the vessel was launched.  It seems to me
       that those are the three instalments to which the guarantee refers, and payments to
       suppliers were not covered.

137.   I do not find convincing the Buyer's argument based upon the maximum amount
       payable under the Guarantee.   After all, the purpose of this provision is naturally
       understood to be to protect the Bank with a maximum exposure whatever the
       circumstances.  Given that the Guarantee contemplated that it should apply when "any
       supplement, amendment, change or modification" was made to the Contract, I do not
       find it surprising that it exceeded the potential exposure in the absence of such
       changes.   In particular it is not unnatural for the Guarantee to contemplate that
       payment of the final instalment to the Yard might be advanced.  As I have explained, I
       consider that the Guarantee would cover such an advanced instalment payment.

138.   In my judgment, therefore, the Guarantee is not to be interpreted as covering the
       amount paid by the Buyer to suppliers of equipment.

Does the Guarantee cover payments for equipment only where the equipment was for hull no
1148?

139.   If I am right that the Guarantee does not cover any payments to suppliers of
       equipment, it follows a fortiori that it does not cover payments for equipment supplied
       to vessels other than hull no 1148.   However, I should briefly express the view that I
       would have reached about this issue if I had decided that in principle payments to
       suppliers are covered by the Guarantee.   The Contract contemplated that the parties
       might stipulate that the suppliers of equipment other than that listed in enclosure no 1
       might be paid by the Buyer under the Contact, but it did not, as I interpret it,
       contemplate that the Contract should be varied so that the Buyer should pay under the
       Contract for equipment for other vessels.       Similarly, I cannot accept that if the
       Contract were varied so as to provide that under it the Buyer should buy equipment
       for other vessels bought by other companies in the Group (or, I suppose, outside the
       Group), the Guarantee was intended to payments under such varied obligations in the
       Contract.

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 7   Pg 54 of 91   A.46

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

## Does the Guarantee cover all payments to suppliers that the parties agreed to bring into account as having been paid under the Contract.

140.   For reasons that I have already expressed, in my judgment, even if in principle payments to suppliers are covered by the Guarantee, I am unable to accept that it covered payments for equipment brought into account under the Contract in the protocols.

## Conclusion on the Bank's liability under the Guarantee

141.   In my judgment, upon the true construction of the Guarantee the Bank would (if bound by it) have been liable only for US$1.3 million (plus interest).

## Discharge of the Guarantee

142.   The principle of English law that govern whether a guarantee is discharged, because the contracts or obligations that are guaranteed are varied or changed considered and explained by the Court of Appeal in Triodosbank NV v Dobbs,[2005] 2 Lloyd's Reports 588.   Thus, where the performance of a contractual obligation is guaranteed, any material variation to the underlying contract will discharge the guarantee unless the guarantor assents to it or the guarantee provides for it.   A variation is regarded as material for these purposes if it could prejudice the guarantor, regardless of whether it has not in fact done so and regardless of whether the likelihood of it doing so is remote.    As Chadwick LJ put it (at para 34), "It is important to keep in mind … that the guarantor is not to be taken to have agreed that his liability under the guarantee would be increased or made more onerous by a subsequent agreement made between the lender and the borrower [or, I would interpolate, any other obligor whose obligation is guaranteed and obligee] unless there are clear words in the guarantee which show that he did agree to be bound".    However, even where the subsequent agreement is one to which the guarantor has assented (under the terms of the guarantee itself or separately), it must be within the "general purview" of the original guarantee if the guarantor is to remain liable.   As I understand the judgment of Longmore LJ (esp. at para 18), that is a distinct requirement of law, not simply a matter of interpretation of the provision in the guarantee providing for a variation, but on the facts of this case, it does not matter whether the principle that the amended agreement must remain within the general purview of the original guarantee is a rule of substantial law or a principle of construction.   In the end, Longmore LJ allowed the defendant guarantor's appeal, observing (at para 20) that he "had effectively been held liable as if his guarantee were an "all monies" guarantee of all sums due from the Company (albeit with a limit), but that is not what he agreed".   So too in this case, in essence, the Bank objects that it should not be held to have guaranteed all monies that the Group, or the Group and the Yard, decided to treat as part of the price paid for hull no 1148 when it had given a guarantee (subject to a limit) that certain payments would be refunded.

143.   The thrust of the Bank's argument that the Guarantee was discharged because the contractual arrangements between the Buyer and the Yard were varied is that the Buyer and the Yard agreed to bring into account under the Contract payments that the Buyer did not originally agree to make under the Contract.   Thus, the Buyer paid advances to the Yard that were not by way of instalments of the price referable to the

08-13555-mg   Doc 33774-7   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4 **A.46**
Part 7   Pg 55 of 91

MR JUSTICE ANDREW SMITH
Approved Judgment

Sea Emerald
v
Prominvestbank

progress of the vessel; the Buyer paid for equipment for other vessels; and the Buyer agreed that the account of what was paid under the Contract would be settled without any intention to agree upon the amount that had in fact been paid under the Contract. However, if I am right in my interpretation of the Guarantee, these arrangements did not prejudice the Bank, and could not have done so.   In so far as the Buyer advanced sums to the Yard, paid for equipment for other vessels or agreed to bring into a settled account sums not paid under the Contract, the recovery of those sums from the Yard (even assuming that the Yard was liable to refund them upon rescission of the Contract) was not guaranteed.  For these reasons, the variations upon which the Bank relies as having discharged the Guarantee were not material, or potentially adverse to the Bank.  For this reason, I reject the Bank's defence of discharge.

144.   If the Guarantee is to be given a wider interpretation than I have given it and it covers the Buyer's claim, then different questions would arise.   The Bank might then have been prejudiced by the changes in the contractual arrangements between the Buyer and the Yard, and they would be material for the purpose of applying the principle governing whether the Guarantee was discharged.   Moreover, they would, I must suppose for the purpose of this argument, be covered by the Guarantee because they fell within the expression "any supplement, amendment, change or modification made" to the Contract and so the Bank is to be taken to have assented to them.   This leads to the question whether the Yard's obligation to refund the Buyer in respect of these sums falls within the general purview of the Guarantee, or, as Cresswell J expressed the concept in Melvin International SA v Poseidon Schiffahrt GmbH (The "Kalma"), [1999] 2 Lloyd's Rep 374 at p.378, the "commercial scope or range" of the Guarantee.

145.   In my judgment it would not.   The nature of the Guarantee, as I see it, is that it is in respect of instalments to be paid to the Yard under a contractual structure of payments for hull no 1148 made by reference to the progress in its construction.   It might be that, contrary to the conclusion that I have reached, it is also directed to payments for equipment for hull no 1148.   The Buyer makes its claim on the basis that the Guarantee covers payments that were not paid by way of an instalment of the price, still less an instalment reflecting the progress in constructing the vessel, and payments that the parties agreed to bring into account although not made under the Contract.   It seems to me that this falls beyond the general purview and commercial scope of the Guarantee when it was originally given.  Had I given the Guarantee the construction for which the Buyer contends, I would have concluded that it has been discharged.

146.   I should mention two other arguments that the Bank advanced in support of its contention that the Guarantee has been discharged, which I reject.  Indeed, I do not think that either was pressed by Mr. Malek in the Bank's final submissions.  The first is that the Guarantee is discharged because the parties agreed to defer the delivery date of the vessel.   In my judgment, this is covered by the expression "any supplement, amendment, change or modification made" to the Contract and I cannot accept that it discharged the Guarantee.

147.   Secondly, it was submitted that the Joint Venture Agreement discharged the Guarantee.  However, neither the Yard nor the Buyer was party to the Joint Venture Agreement and it did not affect the contract between them.   It is irrelevant whether it did or might have been to the prejudice of the Bank.  As it is put in Chitty on

Contracts 29th Ed (2004) at para 44-107, "... the Court of Appeal has affirmed that there is no general principle that "irregular" conduct on the part of the creditor, even if prejudicial to the surety, will discharge him.   Short of bad faith, misrepresentation or concealment amounting to misrepresentation, connivance with the default of the principal creditor, or variation of the terms of the contract to the possible prejudice of the surety, the creditor can act as he chooses".

Conclusion

148.    Accordingly:

    i)      I conclude that Mr. Skock had no authority (actual, ostensible or by ratification) to enter into the Guarantee on behalf of the Bank, and that the claim is to be dismissed.

    ii)     Had I reached a different conclusion about this, I would have held that the Bank is liable under the Guarantee for only US$1.3 million together with interest on that amount.

    iii)    I reject the defence of discharge, but only because I generally accept the Bank's submissions about the construction of the Guarantee.

being appropriate as a result of the rising damp from the internal walls and floor, giving rise in part to the defective joinery, if he did not also bear in mind the need to make a similar type of deduction in principle from his general assessment of damages for inconvenience. He has not said he has done so in terms. That is clear; but the submission was made clearly to him, and I am not prepared to infer that in as careful and as exhaustive a judgment as he produced he would have overlooked giving the appropriate weight to that submission. I think there is force in Mr Dowding's observation that the figure of £2,600, which is £1,300 a year, which in turn is approximately £26 a week, is unlikely to represent the rental value of Miss Tankersley-Sawyer's flat if it had been in a proper state of repair. She herself gave evidence that she expected to be able to dispose of the flat for approximately £40,000 when it had been put into a proper state; and, if that is its value, £26 a week does not represent what one would expect to be a fair return on the net capital. I accordingly for myself am not satisfied that he did not make an allowance when reaching his figures, and accordingly the appellant fails to satisfy me that the judge made any error in fixing the figures which appear in his judgment.

Accordingly, I would dismiss this appeal.

WATKINS LJ agreed and did not add anything.

The appeals were dismissed with costs, legal aid taxation was ordered in regard to the legally aided respondents.

# Queen's Bench Division

March 1 1984
(Before Mr Justice HUTCHISON)

SELOUS STREET PROPERTIES LTD v ORONEL FABRICS LTD AND OTHERS

Estates Gazette May 19 1984 and May 26 1984

(1984) 270 EG 643 & 743

**Landlord and tenant — Actions by landlords for arrears of rent and other relief against original lessees, assignees of lease and guarantors — Rights and liabilities as between original lessees and assignees — Position of guarantors — Important and wide-ranging decision — Plaintiffs were the lessors, first and second defendants the original lessees and guarantor, third defendants assignees in whom the lease was now vested, fourth defendant a guarantor of the third defendants' performance and also that of the fifth defendants, intermediate lessees — Dispute essentially as to whether some or all of the defendants were liable to pay increased rent claimed under a rent review clause in lease — There was also a contest as to the liabilities of the defendants *inter se* — Original lessees and their guarantor contested lessors' claim on the ground that the rent review had been carried out on a basis different from that to which original lessees had agreed — Lessors had agreed that certain structural alterations made by assignees in breach of covenant (installation of lavatories) should be allowed to remain as part of demised premises during the term — Hutchison J held on this issue, applying the principle of *Baynton v Morgan*, that even if these alterations significantly increased rental value for rent review purposes (which was not established) they did not discharge the liability of the original lessees — The position of the second defendant, the original lessees' guarantor, was different in principle, but the end result was the same — As a surety he would have been entitled to be discharged from liability, on the different rules applicable to a surety as compared with an original lessee, but in the present case there was a specific proviso in the guarantee clause which excluded his release — The remaining defendants, the present lessees by assignment, a guarantor and intermediate lessees, had all sought to escape liability to the plaintiff lessors by attacking**

the validity of the rent review procedure on various grounds, but these were all rejected by the judge

**It was in relation to claims by the original lessees and their guarantor against the other defendants that far-reaching questions of subrogation and indemnity arose — As far as concerned the original lessees' claim against the assignees in whom the lease was presently vested, the position was clear since *Moule v Garrett* established the latter's liability — The liability of the fifth defendants, intermediate lessees, was in fact secured by the assignment to the original lessees of a specific covenant of indemnity, but the judge also appeared to place this liability on a much wider basis, going beyond the limited scope of *Moule v Garrett* — On this view, derived from the speech of Lord Selborne LC in *Duncan Fox & Co v North and South Wales Bank* and from the judgment of Pennycuick J in *Re Downer Enterprises Ltd*, the rule in *Moule v Garrett* is a particular example of primary and secondary liability for the same debt — On this basis the judge found that the original lessees were entitled to claim indemnity from the fourth defendant, who was a guarantor of the obligations of the third and fifth defendants, and also (semble) from the fifth defendants, intermediate lessees who had parted with the term — The second defendant (the original lessees' guarantor) was entitled to be indemnified by the third and fourth defendants**

**Apart from the main issues decided, the judgment contains detailed analysis and comment on many points which frequently arise in regard to rent reviews and the legal position of assignees and sureties**

As explained at the beginning of the judgment, there were in fact three actions in which Selous Street Properties Ltd, lessors of Block 3, Centros House, Camden Street, London NW1, were the plaintiffs, but all the relief claimed was comprised in the second action in which the first defendants were Oronel Fabrics Ltd (the original lessees); the second defendant a Mr Morgan (guarantor of Oronel's obligations); the third defendants Cavatina (the present lessees by assignment); the fourth defendant was a Mr Karniol (guarantor of the obligations of the third and fifth defendants); and the fifth defendants were Sunbird (intermediate assignees who had assigned to Cavatina).

John Cherryman QC and A G Bompas (instructed by Cameron Markby) appeared on behalf of the plaintiffs; S Burnton QC and Jonathan Brock (instructed by Clifford Harris & Co) represented the first and second defendants; the fourth defendant appeared in person; the third and fifth defendants were not represented.

Giving judgment, HUTCHISON J said: There are before me what were until a moment ago two actions, now three actions, in which Selous Street Properties Ltd are plaintiffs. In the first, begun by writ dated July 31 1981, there were three defendants — Cavatina Holdings Ltd, Mr Karniol, and Sunbird Fashions Ltd. The plaintiffs in that action claimed against all three defendants in different capacities some £55,000 arrears of rent falling due under a lease dated June 1 1973 of property known as Block 3, Centro House, Camden Street, London NW1. By a second writ dated October 22 1982 the plaintiffs claimed against those three defendants (who were in the second writ named as the third, fourth and fifth defendants) and two additional defendants, Oronel Fabrics Ltd and Mr Morgan, arrears of rent said at the date of that writ to amount to some £85,000 together with other relief. In the course of the hearing, in circumstances to which I shall refer in more detail, the latter writ was amended so as to bring the claim for arrears of rent up to date. The statement of claim in the second action comprises all the relief which was claimed in the first, and, accordingly, I propose to say no more about the latter.

I must begin with a description of the parties and their relationship one to another.

The plaintiffs are the landlords of the premises I have already mentioned, and by a lease dated June 1 1973 those premises were demised by the plaintiffs to the first defendants, Oronel. Mr Morgan, the second defendant, was a party to that lease in the role of guarantor. A copy of the lease, to some of the detailed provisions of which I shall make reference shortly, is to be found in the agreed

*Selous Street Properties Ltd v Oronel Fabrics Ltd*                    **51**

A documents. For the present I mention only that the lease was for a term of 21 years from March 25 1973 at a rent of £20,000 per annum subject to rent reviews at 7 and 14 years and that assignment of the term was permitted with the consent of the landlord.

By a licence dated September 20 1973 to which the plaintiffs, Oronel and Highlight Sports Ltd were parties, Oronel were permitted to assign the residue of the term to Highlight and Highlight entered into direct covenants with the plaintiffs to pay the rent and observe the covenants in the lease. The assignment to Highlight bears the same date.

B By a further licence dated June 10 1976 the parties to which were the plaintiffs, Highlight, Sunbird and Mr Karniol, the plaintiffs permitted the assignment of the lease by Highlight to Sunbird. Sunbird covenanted to pay the rent and observe the covenants, and Mr Karniol made himself a surety for the performance by Sunbird of all its obligations under the lease. It is to be observed that there was no requirement that a demand should be made on Mr Karniol as a condition precedent to his liability. The assignment to Sunbird is dated June 10 1976.

By a further assignment dated September 27 1976 the parties to which were the plaintiffs, Sunbird, Cavatina and Mr Karniol, the plaintiffs permitted the assignment of the residue of the term by Sunbird to Cavatina. Mr Karniol and Sunbird jointly and severally guaranteed the performance by Cavatina of its obligations. The assignment from Sunbird to Cavatina bears the same date.

C There have been no further assignments, and accordingly the lease remains vested in Cavatina. While a large number of issues arise in this action, some of them of considerable complexity, it is not, I hope, an over-simplification to say that essentially what the contest between the parties is about is whether some or all of the defendants are liable to pay increased rent said by the plaintiffs to have accrued due by reason of a rent review after the seventh year of the term. It was, by the end of the hearing, common ground between the parties (a) that all the rent at the rate originally reserved had been paid and (b) that none of the increased rent, amounting to date to exactly £110,000, had been paid.

I have already indicated that in the course of the hearing the plaintiffs sought and obtained leave to amend the writ so as to bring D their claim for arrears of rent right up to date. This amendment was opposed by counsel for the first and second defendants and by Mr Karniol who, like the third and fifth defendants, was without legal representation at the hearing, but I granted leave notwithstanding that the amendment involved adding claims for rent which had only accrued due after the date the writ was issued. Mr Cherryman based his submission that such a course was a proper one on the decision of Sheen J in *Zia Star Shipping Co SA v Harley Augustsson (Invest) A/S*, reported in the *Financial Times* on December 12 1983. No other authorities were cited on this point, and since the present E action raises enough substantive legal issues as it is, I propose to say no more about my reasons for allowing the amendment than that I gratefully and readily followed Sheen J's decision — all the more readily, indeed, because first no one was able to suggest that any different factual or legal issues would arise in relation to those later claims for rent; second there is, as I have said, no dispute on the figures; and third the alternative course, namely for the plaintiffs to issue a fresh writ and for me to abridge time, dispense with pleadings, and bring it on for trial immediately, seemed unnecessarily cumbersome.

That decision to allow the amendment was reached before the report appeared in *The Times* on February 25 1984 of a decision of Neale J in the case of *Chu & Chow Maritime SA (Panama) v Bulk Sea Transport & Anor* in which Neale J, having had cited to him not only Sheen J's decision in *Zia Star* but other authorities, reached a contrary conclusion to that arrived at by Sheen J, a conclusion which, if I had reached the same conclusion in the present case, would have resulted in my refusing the amendment. With that decision in mind, Mr Bompas this morning made an application on behalf of the plaintiffs to follow what I have just described as the more cumbersome course of issuing a fresh writ — indeed, he had already issued a fresh writ — of consolidating it with the present two actions, dispensing with pleadings, abridging time, treating the pleadings as standing in the new action and therefore, as it were, providing a second string to his bow in case it should prove that Sheen J and I were wrong and Neale J was right and an amendment should not have been allowed. Mr Burnton made no submissions in opposition to that proposed course. Mr Karniol objected, but in my

G view the grounds which he sought to put forward were not substantial grounds, and I acceded to Mr Bompas's application largely for the reasons which I have already indicated as having led me to grant leave for the amendment in the first place. Accordingly, the present two actions are now augmented by a third action, which is to be treated for all purposes as being before the court and gets over the difficulty that the amendment that I allowed may not have been properly allowed.

I should add that, although the liability of Mr Morgan as guarantor does (unlike that of Sunbird and Mr Karniol) require a prior demand, it is common ground that the demand necessary to found a claim against him in respect of the rent to date was made prior to the amendment.

H Before turning to consider in rather more detail than I have yet done the terms of the lease, I ought to say a further word about the circumstances in which Mr Karniol and the two companies, Sunbird and Cavatina, came to be unrepresented. As can be seen from the pleadings, all three were in receipt of advice from solicitors and counsel, and I am told — and this was not disputed by Mr Karniol — that they continued to be represented until almost the eve of the hearing. Mr Karniol controls the two companies, and he told me in the course of argument (he did not give evidence) that he had dispensed with legal representation simply on economic grounds. In the result, Mr Karniol was able to represent himself, and in practice — and despite the technical difficulty which precluded his J representing the companies — what he had to say inevitably comprised some submissions on their behalf as well. Mr Karniol conducted his case with some skill and considerable charm. However, provided as he was with a defence which had been drafted on his and the companies' behalf and which raised a number of arguments of law and construction, he was inevitably at something of a disadvantage in developing the arguments embodied in that pleading.

I turn now to consider the lease in greater detail. I shall not at this stage mention all the provisions to which attention has been directed in the course of the hearing, because it is more convenient that I should refer to some of them only when dealing with specific arguments. However the following are the main provisions.

K The rent reserved was £20,000 per annum from July 23 1973 until March 24 1980 and thereafter "such rent or rents as shall be determined as hereinafter provided" — the reference being to cl 4 of the lease. There is also provision for the payment of what is called additional rent which consists of service charges, but, figures being agreed, nothing turns on this and I shall not refer to it again.

Cl 4 provides that the rent reserved "shall be reviewed at the expiration of the seventh and fourteenth years of the term calculated from the 25th day of March 1973 (the expiration of each year being referred to as a 'review date')". It further provides that from and after each review date the lessee shall pay to the lessor by way of rent the greatest of (1) the yearly rent of £20,000 or (2) the yearly rent following any previous review date or (3) what I L summarised by describing as the rent fixed by the review process. Since much of the argument has turned on the precise construction of this provision, I quote it in full:

(iii) such rent or rents which the Lessor and the Lessee shall on or before each Review Date agree in writing as being the current market rental value of the demised premises at the relevant Review Date (for the period up to the next succeeding Review Date) disregarding any effect on rent of the fact that the Lessee or the Lessee's predecessors in title shall have been in occupation of the demised premises and disregarding also any goodwill attached to the demised premises by reason of the carrying on thereat of the business of the Lessee (whether by the Lessee or by a predecessor of the Lessee in that business) but in default of agreement as aforesaid within six weeks such rent as shall be certified by a surveyor (to be agreed between the parties or failing M agreement to be appointed at the request of either party by the President for the time being of the Royal Institution of Chartered Surveyors) to be the current market rental value of the demised premises as aforesaid at the relevant Review Date. The decision of such Surveyor shall be final and binding upon both parties and his fees shall be borne equally by both parties and in so certifying such surveyor shall be considered to be acting as an expert and not as an arbitrator and accordingly the Arbitration Act 1950 and any Act amending or reenacting the same shall not apply.
(iv) in the event of the determination or the certification of the current market rental value of the demised premises as aforesaid not having been agreed prior to the relevant Review Date for any reason whatever then in respect of the period of time (hereinafter called "the Interval") beginning with the relevant Review Date and ending on the quarter day immediately following the date on which such agreement or certification shall have been

published the Lessee shall pay to the Lessor in the manner hereinbefore provided rent at the yearly rate payable immediately before the relevant Review Date PROVIDED THAT at the expiration of the interval there shall be due as a debt payable by the Lessee to the Lessor on demand a sum of money equal to the amount whereby the yearly rent following such agreement or certification shall exceed the yearly rent at the yearly rate aforesaid but duly apportioned on a daily basis in respect of the interval.

Among the tenants' covenants (cl 2) are the following: (1) to pay the rent reserved; to repair the interior of the premises including — and I quote — "in particular all sanitary and water fittings and apparatus . . . and all lessor's fixtures and fittings and additions thereto''; (7) to yield up the premises at the end of the term "with all fixtures therein, all additions and improvements made thereto in the meantime''; (8)(a) "not at any time during the term to cut, maim, or remove the main walls or timbers of the demised premises or any part thereof nor to make or permit to be made any alterations or additions to the demised premises . . . provided always that the lessee may with the prior written consent of the lessor and subject to reinstatement (if required) at the end of the term erect removable partitioning''.

Finally there is cl 5, which as I have already mentioned contains the guarantor's obligation. The clause is in two parts, and I cite both of them:

(a) THE Guarantor in consideration of the demise hereinbefore contained having been made at its request hereby covenants with the Lessor that the Lessee will pay the rents hereby reserved on the days and in manner aforesaid and will perform and observe all the Lessee's covenants hereinbefore contained and that in case of default in such payment of rent or in the performance or observance of such covenants as aforesaid the Guarantor will pay and make good to the Lessor on demand all losses damages costs and expenses thereby arising or incurred by the Lessor PROVIDED ALWAYS and it is hereby agreed that any neglect or forbearance of the Lessor in endeavouring to obtain payment of the rents hereby reserved when the same become payable or to enforce performance of the several covenants herein on the Lessee's part contained and any time which may be given to the Lessee by the Lessor shall not release or exonerate or in any way affect the liability of the Guarantor under this covenant.
(b) IN the event of the Lessee during the term entering into liquidation or becoming bankrupt and the Liquidator or trustee in bankruptcy disclaiming this Lease the Guarantor hereby covenants with the Lessor that it will accept from the Lessor a Lease of the demised premises for a term equal in duration to the residue remaining unexpired of the term hereby granted at the time of the grant of such Lease to the Guarantor such Lease to contain the like Lessee's and Lessor's covenants respectively and the like provisos and conditions in all respects (including the proviso for re-entry) as are herein contained PROVIDED ALWAYS that the Lessor within the period of three months after such disclaimer serves upon the Guarantor a notice in writing so to do.

Before I mention the process by which the rent came to be reviewed, there is one further document to which I must refer. It is a licence under seal dated June 9 1976 whereby the plaintiffs granted to Highlight the right to retain certain unauthorised alterations to the premises. It will be recalled that on June 10 1976, pursuant to a licence of that date, the premises were assigned by Highlight to Sunbird, and plainly the licence of June 9 1976 was executed the day before that assignment in order to regularise the position preparatory to its taking place. The unauthorised alterations, depicted — if that is the right word — on a plan consisted of the construction in breeze block on the landing of the second floor of some ladies' and gentlemen's toilets comprising two small compartments, the one containing a water closet and wash hand basin and the other a water closet, two urinals and a basin. A consideration of the evidence of Mr M J Sumner, a partner in Hirshfields, and of the documents in the correspondence shows that initially Highlight sought to obtain permission for — and indeed a contribution from the landlords towards the cost of — these toilets, but that in the summer of 1974 they went ahead and constructed them without such permission. The landlords through their agents, Hirshfields, protested, and at the end of September 1974 the matter was left on the basis of a letter from the landlords' agents conditionally noting the toilets but reserving the right to require their removal and the reinstatement of the premises at any time. It seems that it was only when the assignment to Sunbird was contemplated that the view was taken that some more formal recognition of the toilets was required. On April 29 1976, the landlords' agents indicated their clients' approval and suggested that a licence should be submitted to the lessees, and this was done.
The licence between the plaintiffs and Highlight is expressed to be

supplemental to the lease. It records in the third recital that the lessee has carried out certain alterations to the demised premises in contravention of the covenant against alterations and has requested the lessor to authorise the retention of such alterations. It then provides, in consideration of the covenants that follow, authorisation for such retention. Those covenants are, in summary, to complete the works in a manner which will not constitute a nuisance and to obtain all necessary statutory and other consents; to make good any damage caused to the demised premises by the execution of the works; to pay the fees of the lessor's surveyors in connection with approval, supervision and inspection and of the solicitors in connection with the licence; and by 2(g) at the expiration or sooner determination of the lease if required by the lessor and at the lessee's expense to reinstate the demised premises by removing the works and making good. It is further expressly provided that all the covenants in the lease shall apply to the premises as altered and that the proviso for re-entry in the lease is to be enforceable not only for breaches of covenant in the lease but also for any breach of covenants in the licence. As appears from para 9 of their amended defence and counterclaim and the further and better particulars thereto, the first and second defendants place considerable reliance upon the execution of this licence to retain the toilets, and it has, indeed, formed the principal plank of their defence. Before I deal with the arguments on which they rely, I must complete my summary of the facts of the case by describing the circumstances of the rent review, for it is upon those facts and the suggestion that the rent review was improperly conducted and does not bind them that the third, fourth and fifth defendants principally rely.

The evidence bearing on the issue of the revision of the rent is to be found first in correspondence and second in the oral evidence given by Mr P S P Rubenstein, an associate in Hirshfields (formerly Norman Hirshfield, Ryde & Browne), who was called on behalf of the plaintiffs. The summary that follows is based upon those documents and that evidence.
It will be remembered that the first review date was March 25 1980. On January 29 1980 Mr Rubenstein wrote to Cavatina giving notice of the plaintiffs' intention to exercise their right to have the rent reviewed. He asked Mr Karniol whether he was appointing an agent to act on his behalf, and Mr Karniol on the following day replied inviting all correspondence to be sent direct to him. On March 7 Mr Rubenstein put forward a figure of £66,000, which Mr Karniol on March 21, without himself advancing any alternative suggestion, rejected. On March 26 Mr Rubenstein wrote to the president of the Royal Institution of Chartered Surveyors stating that he had not yet been able to reach agreement with the lessee on the revised rent and inviting the president to forward the standard form for completion for the appointment of an independent surveyor; and on the same day he wrote to Mr Karniol informing him that in order to protect his clients' position he had made an application to the president for the appointment of an independent surveyor but did not intend to pursue it for the time being in the hope that it would be possible to agree terms.
On April 3 1980 the arbitrations officer of the Royal Institution, Mr Pimm, replied to Mr Rubenstein on a pro forma letter enclosing a form of application and asking that certain documents should be forwarded. He said that when that had occurred, the other party to the dispute would be informed of the application and copies of the form would be used to provide to members approached, in the process of deciding who should act, information as to the nature of the dispute. He concluded by saying that when a member had been chosen, a form of appointment signed by the president would be sent to him. On April 9 Mr Rubenstein wrote to Mr Karniol saying that his clients would not allow the matter to drag on indefinitely and that if he did not hear from Mr Karniol within seven days he would "be progressing the application for the appointment of an independent surveyor appointed by the President of the Royal Institution". On April 18 Mr Rubenstein returned the completed application form to Mr Pimm, who on April 24 wrote to Cavatina informing them that the application had been made for the appointment and concluding, "if however you do not agree that this appointment should be made, I must ask you to let me have your reasons within seven days".
This led Mr Karniol to telephone Mr Rubenstein on April 28, confirming his conversation with a letter of that date, to intimate that in his opinion Mr Rubenstein was being rather precipitate,

*Selous Street Properties Ltd v Oronel Fabrics Ltd*                53

because he, Mr Karniol, would like to try to resolve the matter by agreement and save costs. He put forward some rather tentative suggestions as to the new level of rent. Mr Rubenstein two days later responded, indicating that he too had every wish to agree the rent, pointing out that it took some time for an appointment by the president to be made and that there was still time for them to agree among themselves, and rejecting Mr Karniol's offer as inadequate. On May 2 he wrote to Mr Pimm, informing him that attempts were being made to resolve the matter by agreement, recording that the application had been made purely in order to protect the landlords' interests, and asking Mr Pimm to delay the appointment for the time being. It is to be observed that this letter was written three days before the expiration of a period of six weeks after the review date.

Further attempts at agreement came to nothing, and on June 6 1980 Mr Rubenstein wrote to Mr Pimm asking him to proceed with the appointment. He told Mr Karniol what he had done in a letter of the same date. On July 2 Mr Pimm wrote to both sides recording that the president had now appointed a surveyor to act and enclosing the notice of appointment which is dated June 27 1980 and named Mr Derek Roger Sayer.

On July 14 Mr Sayer wrote to both parties making proposals as to how the reference should be conducted, and thereafter both parties cooperated with him in the discussion and eventually the agreement of a timetable for submissions. At about this time Mr Karniol had appointed Robert, Irving & Burns to act on his behalf and the first letter from that firm is dated October 23. However, Mr Rubenstein's evidence (confirmed by an entry he made on the second page of the application form to the Royal Institution) is that he had gathered from earlier discussions with Mr Karniol that Robert, Irving were in the background and were advising or were likely to be called upon to advise Mr Karniol.

On November 6 1980 Rubenstein submitted to Mr Sayer his arguments as to the level at which the revised rent should be set. Robert, Irving's submissions are dated November 3 1980, and it is apparent that they were submitted at about the same time. Each party was shown submissions of the other and had an opportunity to make comments upon them.

On December 16 Mr Sayer wrote to both parties informing them that he had concluded his valuation and was in a position to issue a certificate, which he would do upon receipt from each of them of their share of his fees. On December 18 Mr Rubenstein forwarded the landlords' share. Mr R Serlin of Robert, Irving must have sent his clients' share at about the same time, because on December 22 1980 Mr Sayer wrote to both parties recording that he had received his fees and enclosing the certificate. It is common ground, having regard to the Christmas post and the Christmas holidays, that the certificate was not received by either party prior to the December quarter day.

Before summarising the arguments relied upon by the third to fifth defendants in relation to this rent review, I ought to deal with one matter of evidence which bears upon these matters. In the course of cross-examining Mr Rubenstein, Mr Karniol seemed to be suggesting that when he and Mr Rubenstein met during the course of the preparations for the rent review which I have just summarised, Mr Rubenstein was in effect tendering advice to Mr Karniol as to the procedural propriety of the events leading up to the review. Mr Karniol asserted that he did not have a copy of the lease at his office and that he was relying upon Mr Rubenstein's guidance. Mr Rubenstein conceded that he certainly approached discussions on the basis that it was common ground that there was a rent review clause in the lease and that the landlords' rights to such a review were being activated. But he said in terms that at no time did he mean to, nor did he ever, give advice to Mr Karniol as to how he should handle the rent review. He said that he was acting for his clients and for that reason took the initiative but that he did not give any advice to Mr Karniol or assure him as to the propriety or otherwise of what occurred.

As I have already mentioned, Mr Karniol did not give evidence, and both because of the absence of any evidence to contradict Mr Rubenstein's evidence and because I found his answers on this part of the case entirely convincing, I reject any suggestion that Mr Karniol was in any way misled or encouraged into some misapprehension as to the propriety of the procedural steps which had been taken preparatory to the securing of the rent review by Mr Sayer.

It will, I think, be convenient for me to deal straightaway with the

various arguments relating to the propriety or otherwise of the rent review which are raised by the defence of the third, fourth and fifth defendants and are relied upon by them. First they contend that on a true construction of cl 4 of the lease no step may be taken towards the appointment of the surveyor until six weeks have elapsed since the review date. They contend that the fact that the plaintiffs through Mr Rubenstein took such a step before the expiration of that period means that the purported appointment of the surveyor was invalid and of no effect. A second argument is that on the true construction of the lease, and in particular cl 4, no step should be taken towards the appointment of a surveyor until an attempt had been made by the plaintiffs and Cavatina to agree upon a surveyor. They assert — correctly — that there was no attempt to reach agreement as to the identity of a surveyor and again contend that in the result the purported appointment and the surveyor's certificate were invalid and of no effect.

In answer to the first of these points Mr Cherryman relies essentially on three arguments, all of which, in my view, are valid. First he says that as a matter of construction the words "within six weeks" in the thirteenth line of cl 4(b)(iii) of the lease are a reference to a period of six weeks *before* not *after* the review date. This follows, he submits, from the immediately preceding words, "as aforesaid". I read the whole phrase: "but in default of agreement as aforesaid within six weeks such rent as shall be certified by a surveyor . . ." The only thing, says Mr Cherryman, to which the words, "as aforesaid", can be referring is the words, "shall . . . agree", in the second line of the subclause. A more extensive quotation is necessary to get the context: "such rent or rents which the lessor and the lessee shall on or before each review date agree in writing as being the current market rental value . . . but in default of agreement as aforesaid within six weeks such rent as shall be certified by a surveyor".

Plainly, therefore, the six-week period is a period which must both begin and finish before the review date. That is not to say that it must begin no more than six weeks before the review date. It may begin when negotiations begin at any time before the review date, but it must expire before the review date. Accordingly, Mr Cherryman's first argument based on the construction of the clause succeeds, and the objection that a step was taken before the expiry of six weeks after the review date cannot succeed.

Mr Cherryman's second argument is that, even if the words, "within six weeks", refer to a period after the review date, it is impossible to construe the clause as a whole as prohibiting the taking of any *preparatory step*, which is what the defendants' pleaded case involves. On the hypothesis that there is a prohibition against doing something until six weeks have expired after the review date, it seems to me that the context plainly points to the prohibited event being the appointment of a surveyor and not the prudent preparatory steps towards getting one appointed. Otherwise, as Mr Cherryman pointed out, it would be necessary for the parties to refrain from doing anything until six weeks had elapsed and then to suffer the further delay that must necessarily elapse after the sending of an application before the appointment of a surveyor. As the recital of the dates earlier in this judgment shows, no appointment was made until well after the expiry of six weeks from the review date, and accordingly, even if I be wrong in construing "six weeks" as applying to a period before the review date, there was no infringement of the six-week provision.

Mr Cherryman's third answer is to contend that even if the plaintiffs had departed from the provisions of the clause in relation to time, these provisions are not mandatory but merely directory, and accordingly a failure to comply with them does not invalidate the appointment or the consequent notice. By way of introduction, he drew my attention to what is said in vol 27 of *Halsbury's Laws of England* at para 216 and also to the decision of the Court of Appeal in the case of *Dean and Chapter of the Church of the Holy Trinity in Chichester v Lennards Ltd* (1977) 35 P&CR 309*. That was a rent review case in which the relevant clause required that the notice should be one "stating the suggested new rent" and the notice in fact served by the landlords omitted to do so. It was held that the requirement that the written notice should state the suggested new rent was not of the essence of the contract but was merely part of the machinery for determining the new rent, that the landlords had given the tenant good notice that they wanted the rent to be raised to

---

* Editor's note: Also reported at (1977) 244 EG 807.

correspond with the new market value, and that accordingly the stipulation was merely directory and not mandatory. Reliance was placed on the provisions of section 25(7) of the Supreme Court of Judicature Act 1873, and it is interesting to note that the argument on behalf of the tenants was to the effect that statute had hitherto been applied only in regard to time and not in regard to anything else. That argument was rejected, but the fact that it was advanced suggests that the present is, if anything, a stronger case than the *Dean and Chapter of Chichester* case. I conclude without any hesitation in the present case that, assuming everything else in favour of the tenants, the provision as to six weeks in cl 4 is not of the essence but is directory merely and, accordingly, that failure strictly to comply with it does not in any sense invalidate the appointment and subsequent review.

Finally, assuming all those arguments to be wrong, Mr Cherryman relies upon estoppel or waiver. In a sentence he contends that the history which I have summarised earlier and the documents and other evidence from which it is derived show clearly that the landlords were being encouraged by Cavatina to accept the review process as being validly constituted. In my judgment that is so, for Cavatina and Mr Karniol were, with full knowledge of the date at which the first steps had been taken, co-operating in the subsequent procedures, even to the extent of taking up the review and paying the fees of Mr Sayer. Since the landlords, both in instructing their own experts and in paying their share of those fees, undoubtedly incurred a detriment, it seems to me that all the necessary elements of estoppel or waiver are present, and if I had concluded that the defendants' arguments were in other respects valid, I should have held that they were precluded from relying upon them by virtue of estoppel or waiver.

As to the alternative argument that the failure to attempt to agree upon a surveyor invalidates the clause, this involves construing the words "or failing agreement" in the fifteenth line as imposing a positive obligation to attempt to agree. Mr Cherryman relies on the authority of four cases as establishing that such words in such a context simply mean "if there is no agreement" and do not impose any obligation to attempt to agree. The cases are *Hogg v Vickers* 14 Butterworths Workmen's Compensation Cases 229; *Essoldo Ltd v Elcresta Ltd* (1971) 23 P&CR 1; *Wrenbridge Ltd v Harries (Southern Properties) Ltd* (1981) 260 ESTATES GAZETTE 1195; and *Laing Investment Co Ltd v G A Dunn & Co* (1981) 262 ESTATES GAZETTE 879. While it is doubtful whether the last of these cases is really an authority on the point, it seems to me that the first three are, and I content myself with a brief reference to the *Essoldo* case. That was a decision of Pennycuick V-C on a clause the material words of which were "and in default of such agreement as aforesaid to be determined by a surveyor to be appointed, etc", and at p 4 the learned judge said:

I think it is clear that the contention raised on behalf of the tenant is not well-founded. The provision for determination by a surveyor appointed by the President of the Institution is simply expressed to operate in default of agreement between the parties' surveyors before the specified date, and I do not see any reason to qualify the plain meaning of those words. Mr Balcombe, for the tenant, conceded that his construction involves writing in after the words, "in default of such agreement as aforesaid", the words, "after an attempt has been made to make it". I do not see any justification for writing in these or comparable words.

In my judgment there are no grounds for distinguishing the present from that case, and for that reason, and also in reliance on the first two authorities cited, I reject the defendants' argument.

By way of further answer to this point Mr Cherryman relied on the argument already considered that this provision is directory merely and not mandatory and on the same arguments of estoppel and waiver. For reasons which I have already indicated, I consider that, in relation to this contention as well, both those arguments are well founded. In the circumstances it is unnecessary again to rehearse my reasons.

I should mention an argument advanced by Mr Karniol in answer to the allegations of estoppel. I have already commented upon and rejected his assertion that he was in some way misled by Mr Rubenstein. The way in which he sought to meet the allegation of estoppel was to argue that, until October when his own surveyors were appointed, at no time did he have any professional advice or assistance. He said that he had not looked at the lease, which was not in his immediate possession, and that he had assumed that everything was regular so far as procedure was concerned. He contended that, when Robert, Irving & Burns were appointed, none of the earlier correspondence between himself and Mr Rubenstein was sent to Robert, Irving & Burns. He argues that Robert, Irving & Burns therefore presumably assumed that everything on the procedural side had been done regularly and says that it never occurred to him that there was anything wrong on that front until his solicitors had searched out the procedural faults on which he now relies.

These arguments involve treating Mr Karniol acting on his own behalf and as the representative of the third and fifth defendants on the one hand and his and their professional advisers on the other as being in some way completely separate from one another, whereas it seems to me that there is no justification for approaching the matter in this way. In any event, a copy of the lease was plainly available to Mr Karniol had he chosen to look at it, and having elected to act for himself rather than to employ professional advisers, it was incumbent upon him to acquaint himself with its terms. It is not, in my judgment, open to him to assert, in answer to a plea of estoppel based on conduct by him plainly consistent with a waiver by him of insistence on strict compliance with procedural requirements, that he had not, in fact, acquainted himself with what those procedural requirements were.

It is convenient that I should deal here with the only other point taken in the defence of the third, fourth and fifth defendants which survives. Included in the relief claimed by the plaintiffs is a claim for a declaration that if, contrary to the findings I have just made, the rent review was ineffective, then the plaintiffs are still entitled, pursuant to cl 4 of the lease, to have the rent reviewed with effect from March 25 1980. That allegation is countered by para 7 of the defence of the third, fourth and fifth defendants, which simply asserts that in the events which have happened and upon the true construction of the lease the plaintiffs are precluded from having the rent reviewed in respect of the seven-year period from March 25 1980. Mr Karniol advanced two arguments in support of this contention. The first was that whereas it might be that the plaintiffs would not be debarred from seeking a review now if they had never applied for one, the fact that they had applied and got the procedure wrong did debar them. The second was that in any event an application for a fresh review should have been made long ago, and had it been so made, the "damage" (I use his word) would have been minimised.

In answer to this submission, Mr Cherryman pointed out that the clause in the present case is not one which requires to be triggered by a notice and submits that the answer to the question whether the plaintiffs are entitled to have another attempt must plainly be yes, unless, on its true construction or by necessary implication, some essential time-limit has been imposed. He submits that in this case time is neither expressly nor by implication of the essence of any of the steps in the rent review clause; that there can be no question of estoppel, as the landlords have done nothing to induce the belief that they were not pursuing their right to a review; and that in any event the defendants have in no way been prejudiced by the delay but rather the reverse, since they have had the use of the money in the interim. Finally he points to the fact that the tenants could have initiated a rent review themselves.

In support of his first submission Mr Cherryman relies on the decision of the Court of Appeal in *Amherst v James Walker Goldsmiths and Silversmiths Ltd* [1983] Ch 305. That was a case in which the lease provided for a rent review to be initiated by the landlords serving a rent assessment notice on the tenants by December 25 1974. The landlords failed to serve a notice by that date, and in proceedings which they began in October 1978 it was held that time was not of the essence in regard to the initiation of the rent review. The landlords then in May 1979 served a notice assessing a revised rent on the tenants. The validity of that notice was disputed, and the landlords sought a declaration that they were entitled to have the rent determined notwithstanding the delay. On appeal to the Court of Appeal against the judge's finding that in the absence of prejudice to the tenants the delay, though unreasonable, did not prevent the landlords from relying on the rent review provisions, it was held that, time not being of the essence, mere delay, however lengthy, could not preclude the landlords from exercising their contractual right to invoke the rent review provisions. It was further held that, the time stipulation not being of the essence, there was no justification for implying in the lease any

*Selous Street Properties Ltd v Oronel Fabrics Ltd*    **55**

term to the effect that the landlords had to serve their notice within a reasonable time. At p 315 Oliver LJ said:

> But the landlord, in serving notice, is not invoking the aid of the court to perform the contract. He is exercising the right which the contract, as properly construed, confers upon him. If it is to be construed on the sense that time is of the essence, he has no right to serve the notice. If it is not, then the right subsists, unless the tenant can show either that the contract, or that part of the contract, has been abrogated or that the landlord has precluded himself from exercising it. He may do that by showing that the contract has been repudiated — for instance, where he has served a notice calling upon the landlord to exercise his right within a reasonable time or not at all and such notice is ignored — or that some event has happened which estops the landlord from relying on his right. But I know of no ground for saying that mere delay, however lengthy, destroys the contractual right. It may put the other party in a position where, by taking the proper steps, he may become entitled to treat himself as discharged from his obligation; but that does not occur automatically and from the mere passage of time. I know of no authority for the proposition that the effect of construing a time stipulation as not being of the essence is to substitute a fresh implied term that the contract shall be performed within a reasonable time and even if such a term is to be substituted the passage of a reasonable time would not automatically abrogate the contract.

Mr Cherryman also relied upon, and I have in mind, the passage in the judgment of Ackner LJ at p 318 from letter C.

Plainly, in my judgment, there is no question of time being of the essence in the present case. Despite Mr Karniol's reference to minimising the damage, no argument has been addressed to me nor can I see any ground for holding that the tenants' position has in any way been prejudiced by the delay — rather the reverse. It is, moreover, to be observed that on December 8 1981 the landlords' solicitors indicated to the solicitors then acting for the third, fourth and fifth defendants that they had instructions to put in train a fresh review, to which suggestion they received the reply that it was not accepted that they were entitled to do so. In my judgment the present case is covered by the decision in *Amherst v James Walker*, and I am prepared to grant the declaration sought; though, of course, it only becomes material if my conclusion as to the validity of the rent review in fact undertaken is erroneous.

Though Mr Karniol briefly mentioned certain other contentions, there is only one which I feel it necessary specifically to deal with. That is an argument which goes not to primary liability but to the amount of the claim against him, because it would affect the date from which the excess rent for the interval between March 1980 and the publication of the revised rent pursuant to the review fell due to be paid and accordingly it would have an impact upon interest. It is necessary to refer to subclause (iv) of cl 4 of the lease and in particular to the words, "in respect of the period of time (hereinafter called 'the interval') beginning with the relevant review date and ending on the quarter day immediately following the date on which such agreement or certification shall have been published, the lessee shall pay to the lessor", etc.

I have already held that actual notice of the amount of the revised rent did not reach Mr Karniol or the companies until after the December quarter day, but I have pointed to the fact that on December 16 Mr Sayer indicated to the parties that he had concluded his valuation and was in a position to issue a certificate and that some time prior to December 22 1980 he had in fact signed that certificate. In these circumstances the question is whether the certification of the reviewed rent was "published", as the plaintiffs assert, when certification had been made and the notice that it was available given to the parties or, as Mr Karniol contends, only when it was received by the parties.

Mr Cherryman drew attention to the fact that there are many words other than "published" which the parties could have used in this context. He contends that in choosing the word "published", the parties made it clear that what they intended was that the interval should come to an end on the date on which the parties received notice that the independent surveyor had determined the revised rent, whether or not they knew the amount at which he had determined it. He relies on two authorities, the first of which is *Bulk Transport Corporation v Sissy Steamship Co Ltd* [1979] 2 Lloyds Rep 289. In that case Parker J had to consider, among other things, the meaning of Order 73, r5 which provides that a motion to set aside or remit an arbitrator's award may be made at any time within six weeks after the award has been "made and published to the parties". Parker J considered the two reports of the case of *Brooke v Mitchell*, decided in 1840, and concluded that in the *Law*

*Journal* was to be preferred as the more accurate embodiment of the decision. At p 293 in the left-hand column, he cited a passage from the *Law Journal* report of the case to the effect that "publish" to the parties "means that it must be so finally settled and notified that they may make themselves acquainted with its contents and may move to set it aside if they think proper". He continued:

> At all events, whether I am right or wrong about that, the report in the *Law Journal* has been consistently acted upon and has been the basis of the textbooks ever since 1849, and it is, in my judgment, much too late to do anything about it. Considering, as I do, that the meaning of the case is plain and is rightly reported in the *Law Journal*, there is no question of doing anything about it.

He rejected the submission that time only began to run from the date of the receipt of copies of the award.

The other case upon which Mr Cherryman relied was *South Tottenham Land Securities Ltd v R A Millett (Shops) Ltd*, reported in *The Times* on June 20 1983.* In that case Woolf J held that the rent increased retrospectively by an arbitrator under a rent review clause became payable by a tenant on the rent day immediately following the arbitrator's determination, provided that the tenant knew that the arbitrator had determined the revised rent whether or not he knew the amount of the revised rent. An appeal against Woolf J's decision was dismissed, and the report of the judgment of O'Connor LJ in *The Times* on November 31 1983† makes it clear that Woolf J's conclusion as to the date of publication was specifically approved.

I see no reason for concluding that the word "published" in the review clause in the present case is used in any sense other than the well-established sense laid down in those two cases. If the parties had wished to provide that the interval should continue until they had been made aware of the amount of the rent determined by the arbitrator, it would have been very simple to say so. I consider that Mr Cherryman's submission, that in choosing the word, "published", they must have intended it to bear its well-known and long-established meaning in such a context, is well-founded.

In the light of these findings, what is the position so far as liability for increased rent is concerned of the third, fourth and fifth defendants? Cavatina, the present tenant by assignment, is plainly liable for the whole of the arrears — that is to say, the difference between the reviewed rent and the rent originally reserved for the sixteen quarters that have elapsed since March 1980, amounting in all to £110,000. Sunbird is similarly liable, both by reason of its direct covenant in the licence to assign and because it is a co-surety of the Cavatina lease. Mr Karniol is the surety for both companies and guarantees their performance of their direct covenants. The liability of all three must be calculated on the basis that the interval ended on the quarter day falling on December 25 1980.

I turn now to the position of the first and second defendants. The first thing to be said is that, while as a matter of prudence they made no admissions as to the circumstances or validity of the rent review, they did not in their defence make any positive allegations designed to impugn it nor have they done so in the course of the hearing. It follows that, in the light of the findings I have already made when considering the case against the third, fourth and fifth defendants, the position of the first and second defendants must be approached on the basis that the rent review was properly conducted and is effective. Neither Oronel nor Mr Morgan took any part in the review process nor were they even acquainted with the fact that it was occurring. It is, however, accepted on their behalf that those facts alone cannot provide any justification for a contention that they are not bound by the review. It is further accepted that, prima facie, Oronel as the original lessees remain liable on the covenants in the lease, including in particular the covenant to pay rent, notwithstanding the assignments which have resulted in the term's becoming vested in Cavatina and that Mr Morgan remains similarly liable as the guarantor of Oronel's obligations. What then are the defences on which the second defendants rely? I shall begin by considering Oronel.

In para 9 of their amended defence Oronel contend that the plaintiffs' claims against them are barred by a variation or variations of the lease occurring since the assignment by Oronel to Highlight. The variation relied on is said to be embodied in the

* Reported in full at 268 EG 703.
† Reported in full at 269 EG 630.

licence of June 9 1976. As I understand it, Mr Burnton's argument, expressed in its simplest form, proceeds as follows. First it is conceded that on a proper construction of the covenant to pay rent the original lessee, Oronel, agreed to be bound by an agreement or determination made between the landlord and an assignee without reference to Oronel. Second, it is, however, only on the basis that the rent review is that to which the original lessee agreed that he is bound by its result. As an illustration of this point, Mr Burnton gives the example of a lease which contains an absolute prohibition against change of user or alteration, notwithstanding which the landlord and an assignee agree to a dramatic change — perhaps from warehouse to office use — with a resultant dramatic increase in the rental value of the premises. He submits that a rent review conducted after the landlord had agreed to a variation of the lease to permit business user would not be such a rent review as that by which the original lessee had agreed to be bound. Third, what is all important, says Mr Burnton, is the agreement of the landlord to a variation. He concedes that a breach of covenant by the tenant, which may result in the premises being altered and their rental value increased, will not of itself relieve the original lessee from liability to pay the reviewed rent; but he says that since the original lessee's undertaking is subject only to such alterations as are permitted by the lease that he signs, agreement by the landlord to vary the terms of the lease by expressly assenting to some alteration in the user or construction of the premises not permitted by the original lease is fatal and discharges the original lease. He says that in this case the licence, both because it expressly authorises the retention until the end of the term of the toilets on the second floor and because in other respects it varies the lease by imposing on the lessee additional onerous terms, resulted in the rent review being conducted on a different basis from that agreed to by Oronel. I shall shortly consider whether, properly construed, the licence does provide the foundation for this argument, but for the present I shall assume that it does.

These submissions, though framed in terms somewhat similar to those that might be made on behalf of a guarantor, are expressed in language intended deliberately to distinguish them from those on which a guarantor could rely and on which Mr Morgan does rely in this case. The reason is that Mr Burnton is faced with the decision in the case of *Baynton v Morgan* (1888) 22 QBD 74. That case decided that the original lessee is not a surety and pointed out that none of the usual suretyship doctrines had ever been held to furnish a defence to an action against the original tenant for arrears of rent which occurred after he had assigned the term. It also decided that a subsequent tenant might deal with the property, at least by surrender, without discharging the liability of the original lessee. Mr Burnton, while reserving his position in case of appeal, accepted that for present purposes he must proceed on the basis that that decision, which of course is binding on me, precluded him from advancing any argument contrary to either of those propositions.

Mr Burnton contends, however, that *Baynton v Morgan* and the other two cases on which in this context Mr Cherryman relied, *Centrovincial Estates PLC v Bulk Storage Ltd* (1983) 268 ESTATES GAZETTE 59 and *Allied London Investments Ltd v Hambro Life Assurance Ltd* (1983) 269 ESTATES GAZETTE 41) can be distinguished from the present case. He contends that, whereas those three cases are cases where the argument was that there had been a total discharge, the present is the first case in which it has been contended that the lessee is bound by a variation which has increased his liabilities. Mr Burnton accordingly suggests that I am free to hold, notwithstanding *Baynton v Morgan*, in favour of the principle for which he contends, which is that the lessee cannot be bound by a rent review which has taken place on a basis which was not predicated by the terms of the original contract. He argues that it is a question of construction, looking at the content of the original covenant, as to what the lessee agreed to; and that if, as he suggests has occurred in the present case, there has been a rent review on a different basis, that cannot bind him. Before I consider Mr Cherryman's answers to those contentions, I ought to refer in more detail to the three cases I have mentioned.

In *Baynton v Morgan* the original lessee was sued on a covenant in the lease whereby he agreed to pay the rent. The term had been assigned and the first assignee, Evans, had before himself assigning to Morgan, surrendered a small part of the premises to the landlords. An official referee had determined that, assuming that there could be an apportionment of rent for the purposes of the

covenant, £4 out of the rent reserved of £50 was attributable to the portion surrendered. The original lessee appealed against a judgment in the county court for the amount of the apportioned rent. It was held that the liability of the defendant on the covenant was not extinguished by the surrender of part of the demised premises and that the original lessee was not in the position of a surety.

In a passage at p 78 Lord Esher MR, having concluded that the original lessee's obligation was not that of a surety, continued:

> Even if this were a contract of guarantee, I do not think the defendant could establish a defence on that ground. It is one of the conditions to which such a contract is by law subject that, if the terms of the contract as between the principal debtor and the creditor are altered without the knowledge or authority of the surety, the latter is released from liability on the guarantee. In this case I think that the terms of the lease, though altered without the knowledge of the lessee, were not altered without his authority, for I agree with the opinion expressed by A L Smith J in the court below — that is to say, that a lessee by assigning all his interest in the term to an assignee empowers the assignee, if he so desires, to surrender to the lessor all or any part of the demised premises. He gives to his assignee the powers which he might himself have exercised, and, as he himself might have surrendered part of the premises, he authorises his assignee to do so.

In his judgment at p 82 Lopes LJ said:

> The action is brought upon an express covenant by the lessee, couched in clear and unambiguous terms, for the payment of the rent reserved by the lease on the proper quarter days at all proper times during the term. The rule of law is that a lessee remains liable upon his express covenants, notwithstanding an assignment and acceptance by the landlord of rent from the assignee, and there is an implied promise on the part of each successive assignee to indemnify the lessee against breaches of the covenants of the lease in his own time.

It is, of course, true that in that case no question of a rent review arose, and the only alteration had been the surrender of part of the demised premises. However, the passages I have quoted in a case which has been recognised for almost a hundred years as a leading authority are in very wide terms, and the invitation to distinguish the case on grounds advanced by Mr Burnton would be more attractive if in the period that has elapsed since it was decided there were any cases to support the view that those wide statements of principle should be regarded as being confined to particular circumstances. As it is, the two recent authorities which I have already mentioned support the opposite view.

In *Centrovincial Estates* the defendant was the original lessee whose interest had subsequently been assigned. The lease was for a term of 21 years from December 1964 at an annual rent of £17,000 subject to a review clause taking effect at the expiry of the first 14 years, under which the rent could be reviewed either by agreement or by the determination of a surveyor acting as an expert. By an agreement in January 1979 the plaintiffs and the assignee agreed a revised rent of £40,000 per annum and in 1981, upon the assignee's failure to pay a quarter's rent, the plaintiffs sued the defendant. The defendant's contention was that its liability, if any, was confined to the amount of the rent originally reserved. The question for decision was posed by Harman J in the following terms: "Is the defendant, who had no knowledge of or connection with the agreement made, bound to pay rent at the rate fixed by that agreement?"

Two contentions were advanced on behalf of the defendant, one being an argument on the construction of the clause in that lease but the other a general contention that the original tenant was not bound by acts prejudicial to him done by the assignee of the term. Harman J, having rejected an argument that each successive assignee was an agent of the original lessee, said this:

> But if there is, as I hold, no agency enabling an assignee to bind the original tenant, what is the position? In my judgment the basic answer which any real property lawyer would give to a question about an assignee's power to deal with a tenancy interest is that each assignee is the owner of the whole estate and can deal with it so as to alter it or its terms. The estate so altered then binds the original tenant, because the assignee has been put into the shoes of the original tenant and can do all such acts as the original tenant could have done.

Harman J then goes on to point out that his formulation of the law is supported by the decision of the Court of Appeal in *Baynton v Morgan*.

In the case of *Allied London Investments Ltd* the plaintiff lessors sued the original lessees for arrears of rent occurring due after they

*Selous Street Properties Ltd v Oronel Fabrics Ltd*    57

**A** had assigned the term to another company. The defendants' defence was based on the fact that at some stage in the course of a complicated series of actions the plaintiffs had released unconditionally a surety who had joined in the assignment as guarantor of the assignees' obligations. The argument, put simply, was that the defendants too were in a position of a surety and that, accordingly, the release by the plaintiffs of a cosurety discharged them.

Walton J, in dismissing this argument, considered a large number of authorities and regarded as completely decisive the case of *Baynton v Morgan*. After extensive citation from that case he continued:

**B** So there is a decision of the Court of Appeal not only that the relationship is not that of suretyship but going much further and pointing out that down to that date there had been no case in which any of the usual suretyship doctrines had ever been held to furnish a defence to an action against the original tenant for arrears of rent which had occurred after he had assigned the term. The position is now very much reinforced, for equally, in the ensuing 95 years also there has been no such case.

Walton J then drew attention to the fact that *Baynton v Morgan* had been approved in the House of Lords, though perhaps on another aspect, in the case of *Matthey v Curling* [1922] 2 AC 180 and had received the express approval of Younger LJ in the Court of Appeal in that case. He cites a passage from the judgment of Younger LJ and then states his own conclusion as to the result of **C** these two cases in the following words:

These two cases, then, make it perfectly clear that when he is sued, as in the present case, on the covenants contained in the original lease, the original tenant's only possible defences are either (1) that he has performed the covenants or (2) that the relevant assignee has performed the covenants or (3) that there has been some operation conducted upon the lease — for example, surrender of the whole — which has put a complete end to the liability to pay rent. Short of one of these three defences, there is no defence. In particular, the defence sought to be set up in the present case that the original tenant is only in a position analogous to that of the surety has been deliberately rejected by the Court of Appeal and Younger LJ, so that there is no possibility of his relying upon any circumstance which might have discharged him if he had been truly in that position.

**D** In the light of these authorities, the conclusion I have reached is that, even assuming that the effect of the licence of June 9 1976 was to increase the burden on the original lessees, that is not a ground for distinguishing the present case from *Baynton v Morgan* or for holding that the original lessees are for that reason discharged from the continuing liability which it is conceded they are otherwise under for payment of rent. I have yet to consider whether the licence did have that effect, but on the assumption that it did, I regard myself as bound by the statements of principle contained in the judgments in *Baynton v Morgan* to hold that such an alteration does not in any way discharge the original lessee. That case applies, in my view, where the landlord agrees to variations of the lease and/or alterations of the premises of any kind, whether the lessee's **E** obligations are increased as a result or not. I adopt the formulation of principle in the judgment of Harman J which I have cited. Moreover, by way of further answer to the suggestion that the present case can be distinguished from *Baynton v Morgan,* because a surrender does not involve any increase in the actual or potential burden thrown upon the original lessee, Mr Cherryman points to the fact that a surrender of part of the premises does involve at least a potential extra burden to the original lessee, in that the effect of taking a surrender is to accelerate the liability for dilapidations at the end of the term, for which the lessee is liable.

Before I deal with Mr Cherryman's other answers to the defence relied upon by Oronel, it is, I think, necessary that I should describe in somewhat more detail than I have yet done precisely how it is that **F** it is contended on Oronel's behalf that the licence produces the increase in burdens, which, it is contended, releases Oronel from liability.

Mr Burnton began by pointing out that when it comes to assessing the new rent, regard must be had not only to the terms of the lease but also to the current state of the premises, including any improvements made upon them, whether by the landlords or the tenants, during the term. Mr Cherryman does not dispute these propositions, so I need not cite the authority on which Mr Burnton relies. What is said is, first that the provision of extra toilet accommodation on the second floor was an improvement to the premises; secondly, that it was an improvement which, assuming it was not precarious in the sense that the landlord could require its

**G** immediate removal, enhanced the rental value of the premises in the market; and third, that the conclusion of the licence authorising until the end of the term the retention of those toilets legitimised them and meant that, on conducting the rent review, their enhancing effect had to be taken into account. An alternative argument based upon the licence is that it is a licence that constitutes a variation of the lease by deed and, quite apart from the suggested effect which I have already described, that in doing so it imposes certain additional onerous obligations upon the lessee.

In dealing with these arguments, I intend to state my conclusions in relatively summary form, which I believe I can properly do even though the submissions which have been made in connection with them have occupied a good deal of time. My conclusions are as **H** follows.

First, there is no doubt that the construction of the toilets in the circumstances which I have already described constituted a breach of covenant.

Second, a consideration of the evidence of Mr Sumner and Mr Rubenstein, of the penultimate paragraph on p 2 of Robert, Irving & Burns' submission to Mr Sayer, and of the terms of a number of letters leads me to the conclusion that it is at least arguable that the rental value of the premises with the toilets would exceed their rental value without them. I have no evidence and no real means of judging whether their presence in fact made any appreciable difference to the rent at which Mr Sayer arrived on the review.

Third, this last conclusion is, however, subject to an important **J** qualification which I have already foreshadowed. Prior to the unauthorised execution of the licence, the toilets constituted an unauthorised alteration or addition to the premises and were, accordingly, precarious in the sense that the landlords might require the tenant immediately to remove them (see cl 2(8)(d) of the lease). It seems to me, therefore, that had the licence not been granted, any assessment of the rent on the rent review ought to have disregarded the presence of the toilets, at least as a factor enhancing the rental value of the premises. The licence, therefore, by legitimising the toilets in the sense that it precluded the landlords' requiring their removal until the end of the term, converted them from something which could not to something which conceivably could result in the fixing of a higher rent on the review. **K**

Fourth, while prima facie the proviso contained in cl 3(2) of the licence results in an increase in burdens falling on the lessee by varying the lease to make the proviso for re-entry exercisable not only for breach of the covenants contained in the lease but for breach of the covenants contained in the licence, it does not in truth impose any additional burden on the lessee. This is because in so far as the covenants in the licence do impose any additional obligations — and by no means all of them do — it is in my view legitimate to infer that all such additional obligations had for practical purposes already been complied with by the date of the execution of the licence.

In the light of these findings I must state my conclusions as to the additional arguments that Mr Cherryman advanced to defeat Mr **L** Burnton's submissions that Oronel were released by reason of the rent review's being conducted on a basis different from that agreed by the original lessee. It will be remembered that I have already indicated that I am unable to accept Mr Burnton's primary submission, since I have held that, even if the proper view is that the licence significantly increased the rental value of the premises, that does not discharge the original lessee. The arguments I am about to consider, therefore, are arguments to which Mr Cherryman need have recourse only if that primary conclusion be wrong.

I mention first an argument on which Mr Cherryman laid great stress, to the effect that by the time the licence was executed, the toilets were a *fait accompli* and that accordingly any increase in the **M** burden occurred by reason of the alteration and not by reason of the licence. In the light of the third of the four conclusions mentioned above, I feel unable to accept this submission, because it was only after and by reason of the execution of the licence that the presence of the toilets could properly constitute a factor in support of an argument for a higher rent on the review.

Secondly Mr Cherryman submits that the alterations sanctioned by the licence cannot have had any material effect on the level at which the rent was fixed at the review. I have already indicated that there is no evidence which would enable me to conclude whether they in fact had any effect, but I draw attention to the evidence in chief of Mr Rubenstein, who said that he did not consider that the

Landlord and Tenant — General

toilets on the second floor had any influence on the rental value of the premises, though this evidence has to be qualified by his admission in cross-examination that had those toilets not been there, Robert, Irving & Burns might have made a point that the toilet facilities were inadequate, but Mr Sumner's concession that if properly constructed (which he thought they were not) they might have been a worthwhile improvement, and by what is said in the correspondence to which I have already referred. Certainly there is no evidence on which I could conclude that the presence of the toilets, legitimised by the licence, did have any significant enhancing effect on the rental value.

In so far as I am entitled to reach a conclusion on the matter, in the absence of any cogent evidence, the conclusion to which I come without any real hesitation is that the presence of the toilets legitimised by the licence would not have had any significant effect on the level at which the rent was fixed on the review. I say this because of their relative insignificance as compared with the premises as a whole, the absence of any specific point being made about them in the submissions of the surveyors on either side, and the fact that even after the execution of the licence the landlord was still in a position to require their removal at the end of the term.

Mr Cherryman submits that, whatever may be the position in the case of a guarantor (a topic I shall discuss when I consider the claim against Mr Morgan), for a variation such as is here relied upon to discharge the original lessee who is not a guarantor, it must at the very least be a material variation. In my judgment, this submission is well-founded and accordingly, holding that any variation effected by the licence has not been shown to be a material variation, I uphold this second submission of Mr Cherryman's.

Thirdly, as I understand it, Mr Cherryman relies against Oronsi on an argument which he developed principally in answer to the contentions advanced on behalf of the guarantor, Mr Morgan. In effect, what this submission involves is that, although cl 2(8)(a) of the lease contains what appears to be an absolute prohibition against alterations (subject only to the proviso), if regard is had to the lease as a whole, it is clear that the parties contemplate that the landlords may give consent to alterations which do not fall within the proviso. In considering this submission, it is necessary for me to refer to some of the detailed provisions of the lease, some of which I have not yet mentioned.

In cl 2(5) is the tenant's repairing covenant, obliging the tenant to repair "the interior of the demised premises . . . and any additions therein". I have missed out some words, but it is plain as a matter of construction that "therein" refers back to the interior of the premises.

By cl 2(7) the tenant covenants that he will at the end of the term yield up "the demised premises . . . with all fixtures therein, all additions and improvements made thereto other than tenant's trade fixtures and fittings".

Cl 2(15) required the tenant "before installing any electrical wiring, fittings or other electrical equipment or any heating, ventilation or plumbing equipment in the demised premises to submit plans and specifications thereof for approval", the approval not to be unreasonably withheld.

Cl 2(25)(a) imposes on the tenant a liability to indemnify the landlord against liability of various sorts arising "in any way directly or indirectly out of the state of repair, condition or existence of any alteration to or to the use of the demised premises".

Cl 2(19)(b) is of particular importance. It provides that the tenant will "at his own expense . . . obtain all necessary permissions and approvals under the Acts or otherwise for any use to which the demised premises are put and also for any additions or alterations thereto . . . which may with the consent of the lessor be made . . . from time to time during the term".

Mr Cherryman submits that, when considering cl 2(8) which is the covenant prohibiting alterations to the premises, one has to have those provisions very much in mind.

Cl 2(8)(a) contains the prohibition against alterations or additions, with a proviso allowing the erection with the consent of the landlord of removable partitioning — and I pause to say that while at one stage Mr Cherryman argued that these breeze block toilets could be described as removable partitioning, he subsequently (and in my view rightly) conceded that they could not.

Cl 2(8)(b) provides that the tenant will not without the consent of the landlord apply for any planning permission relating to the premises or any part thereof.

Cl 2(8)(c) obliges the tenant to permit the landlord to enter for two specified purposes, first to see that no unauthorised alterations or additions have been made and second to see that authorised alterations and additions "are carried on in accordance with the consent given hereunder and the approval granted by the relevant planning authority".

Cl 2(8)(d) obliges the tenant at his own expense "to remove any such alteration or addition made without such previous consent by the lessor or in respect of which the approval of the relevant planning authority is withdrawn or lapses and at their own expense to comply with every order of such authority requiring the removal or demolition or such other work in connection with such alterations or additions".

Mr Cherryman's submission amounts to this: that notwithstanding the apparently absolute prohibition in cl 8(a) against any alterations or additions save removable partitions, the other provisions which I have just summarised make it plain that the parties to the lease contemplated that consent to alterations and additions generally might be sought from and granted by the landlord.

If one starts with cl 2(8)(a), there is the absolute prohibition against alterations or additions, save for removable partitioning. However, a consideration of cl 2(15) at once makes it clear that the installation by the tenant of electrical, heating, ventilation and plumbing equipment are all contemplated, subject to the landlord's approval; so since it can hardly be envisaged that these are matters which can be undertaken without the premises being added to or altered, it is plain that the prohibition in cl 2(8)(a) is subject to more exceptions than are contained in the proviso. Perhaps it can be said that the effect of cl 2(15) (and maybe also of cl 2(10), which I have not thought it necessary specifically to refer to) is notionally to extend the proviso to cover such additional matters as are there referred to.

If one then turns to cl 2(5) and cl 2(7), it seems to me that the references to "additions" and "additions and improvements" are explicable as referring to such additions and improvements as are expressly permitted by the proviso to cl 2(8)(a), 2(10), and 2(15). Taking cl 2 (5) and cl 2(7) alone, there is no compelling reason for construing them as indicating that the parties contemplated consent being sought and given to alterations and additions generally. The same can be said of cl 2(25)(a).

I next consider cl 2(19)(b). There can be no doubt that it contemplates the landlord's giving consent for alterations or additions for which planning permission or other forms of statutory approval are required. Once again, however, even if it be assumed that no sort of permission or approval would be necessary for removable partitioning, it might well be that alterations or additions of the sort permitted by cl 2(15) would involve planning permission or bylaw approval. Accordingly, as it seems to me, cl 2(19)(b) makes sense in the context of an absolute prohibition subject to a proviso notionally expanded to permit alterations or additions falling within cl 2(10) and cl 2(15).

There remain subclauses (b), (c) and (d) of cl 8 itself. The latter part of subclause (c) makes it clear that the reference to planning permission in (b) is not confined to user of the premises but comprises also alterations or additions for which planning permission is required. The latter part of the first sentence of subclause (d) does, it seems to me, necessarily import that (1) there may have been an application for planning permission made with the consent of the landlords; (2) that application may have been for works of alteration or addition to the premises; (3) the landlord may have given consent not only to the application for permission but to the alterations or additions themselves (for it would not be sensible to envisage the landlords consenting to an application for planning permission for works to the execution of which they were not prepared to consent); and (4) the works to which the landlord has consented are works the removal of which (upon the postulated withdrawal or lapse of planning consent) may involve "demolition work".

I agree with Mr Cherryman's submission that all of this can hardly have been inserted with reference to removable partitions, but I cannot accept the suggested corollary that it is only explicable on the basis that, notwithstanding the cl 2(8)(a) prohibition, the lease envisaged that the tenant might seek and the landlord grant consent to all sorts of alterations and additions. In my judgment these provisions, no less than the others I have discussed, are

*Selous Street Properties Ltd v Oronel Fabrics Ltd* 59

explicable on the basis of what I have called the notionally expanded proviso to cl 2(8)(a), expanded by cl 2(10) and cl 2(15) in particular. It seems to me that it may well have been contemplated that works of the sort referred to in cl 2(15) would, if they had to be removed upon the withdrawal or lapse of some permission or authority, involve a certain amount of demolition.

Accordingly, while making it clear that I, of course, accept that, however unqualified a prohibition against alterations or additions may be, it is always open to the landlord to agree to permit alterations, I cannot accept Mr Cherryman's alternative argument that the terms of the lease in the present case justify the conclusion that the parties envisaged that that would happen.

To summarise my conclusions in relation to Oronel, the original lessees, I hold that they remain liable on the covenant in cl 2(1) in the lease to pay "the rents hereby reserved" and that the liability subsists even if the amount of the rent fixed in the 1980 review was significantly higher than it would have been had the landlords not granted a licence for the retention of the two toilets constructed on the second floor. I further hold that there is no evidence on which I would be justified in concluding that the presence of the toilets, legitimised by the licence, had, in fact, any significant enhancing effect on the level of the rent fixed on the review and that none of the other provisions of the licence significantly increased the burdens falling on the lessees. For these reasons I reject the suggested defences relied upon by Oronel and hold them liable in respect of the arrears of rent amounting to £110,000.

I come next to the position of the guarantor, Mr Morgan. I have already set out the terms of both parts of cl 5 of the lease. It is under subclause (a) that his primary liability is said to arise, but by a late amendment the plaintiffs sought declaratory relief in relation to subclause (b).

The first thing to be said about Mr Morgan is that, unlike Oronel, he is a true surety and that all the rules applicable to the discharge of sureties apply to him. Since I have held Oronel liable, Mr Morgan as the guarantor of Oronel's liability is also liable unless he can rely on one of those rules as discharging him from his liability as guarantor.

Mr Burnton's submissions in support of the contention that Mr Morgan has been discharged can be briefly stated as follows. First the agreement between the plaintiffs and Highlight embodied in the licence of June 10 1976 did vary the terms of the lease. Second that variation was one which is not within the proviso to cl 5(a) of the lease. Third even if, as I have held, the variation did not result in any significant or material increase in the burdens falling upon the lessee, it is sufficient to discharge Mr Morgan that it was a variation of a kind capable of damaging the surety's interest, and in those circumstances the onus is on the creditor to establish either that it is manifestly for the benefit of the surety or that it is manifestly insignificant. If, as is submitted in the case here, the creditor has failed to establish either of those things, the guarantor is discharged.

Support for the principle for which Mr Burnton contends is to be found, first, in a passage in *Chitty on Contracts* (25th ed) at para 4442. It is there stated:

It is a well-established and strictly-applied principle that any variation in the terms of the agreement between the creditor and the debtor which could prejudice the surety will, unless he consents thereto, discharge him from liability, unless the contract for suretyship provides to the contrary. It is immaterial that the variation has not, in fact, prejudiced the surety or that the likelihood that it may do so is remote. If the variation could prejudice the surety, it alters the nature of the risk which he has undertaken, and he is entitled to decide whether he wishes to continue to be bound or not. But if it is self-evident that the variation could not prejudice the surety, he will not be discharged. The principle is applied very strictly so that even the most trifling variation may discharge the surety.

In the footnotes to each sentence of the passage I have quoted from *Chitty* reference is made to the case of *Holme v Brunskill* (1877) 3 QBD 495, the case on which Mr Burnton principally relied and to a consideration of which I now turn. In that case the plaintiff had leased some hill pasture and a flock of 700 sheep, and the defendant had given a bond to secure the redelivery of the flock at the end of the tenancy in good order and condition. During the term, by agreement between the landlord and the tenant, one field was surrendered and the rent reduced by £10. At the end of the tenancy the flock had been reduced in number and had deteriorated in quality and value, and the landlord sued the defendant surety upon his bond. At the trial before Denman J, the judge left to the

jury the question whether the variation had made any substantial or material difference in the relation between the parties, and the jury returned a verdict that it had not. On appeal the Court of Appeal by a majority held that the surety ought to have been asked to decide whether he would assent to the variation in the terms of the letting and, not having been asked, that he was discharged from liability and further held that the judge ought not to have left to the jury the question that he did, since the surety was the sole judge of whether it was reasonable that he should remain bound notwithstanding the variation.

In a passage beginning at the bottom of p 504, Cotton LJ, after rehearsing the argument advanced on behalf of the plaintiff to the effect that the finding of the jury must be treated as a finding that the alteration was immaterial and that a surety would not be discharged unless it was found as a fact that the alteration materially varied his liability or altered an express term or condition of the contract, went on as follows:

In my opinion this contention on behalf of the plaintiff cannot be sustained. No doubt, there is a distinction between the cases, which have turned on the creditor agreeing to give time to the principal debtor, and the other cases. Where a creditor does bind himself to give time to the principal debtor, he with an exception hereafter referred to, does deprive the surety of a right which he has, that is to say of the right at once to pay off the debt which he has guaranteed, and to sue the principal debtor, and without inquiry whether the surety has, by being deprived of this right, in fact suffered any loss, the Courts have held that he is discharged. The exception to which I have referred is, where the creditor on making the agreement with the principal debtor expressly reserves his right against the surety, but this reservation is held to preserve to the surety the right above referred to, of which he would be otherwise deprived. The cases as to discharge of a surety by an agreement made by the creditor, to give time to the principal debtor, are only an exemplification of the rule stated by Lord Loughborough in the case of *Rees v Berrington* . . . "It is the clearest and most evident equity not to carry on any transaction without the knowledge of him [the surety], who must necessarily have a concern in every transaction with the principal debtor. You cannot keep him bound and transact his affairs (for they are as much his as your own) without consulting him."

The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry often that the alteration is insubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantiated, or one which cannot be prejudicial to the surety, the Court will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he will be discharged. This is in accordance with what is stated to be the law by Amphlett LJ in *Croydon Gas Company v Dickenson*.

It is to be observed that Brett LJ dissented on the basis that the Court of Appeal were bound by the finding of the jury that the alteration was not material and that, since the only material alterations would release the surety, he was not released. The grounds of his dissent throw into the clearest relief the statement of principle accepted by the majority and embodied in the last paragraph of the above citation from the judgment of Cotton LJ.

Mr Burnton submits first that the licence, by legitimising the toilets on the second floor, could have had the effect of increasing the burden on the lessee by enhancing the rental value of the premises; second, that the licence itself, by imposing additional obligations, could have had that effect; third, that neither alteration falls within the proviso to cl 5(a) of the lease; and fourth, that since the liability for which the guarantor bound himself has therefore been altered in a way not provided for in the contract, the guarantor is discharged. As a supplementary argument he relies on the terms of cl 5(b) of the lease, asserting that the surety has a distinct interest in the question of whether or not there should be any alteration in the premises, because the effect of cl 5(b) is to oblige him, should there be a liquidation, to become a tenant of those very premises as altered. He is therefore, submits Mr Burnton, doubly concerned as to the burden of the covenants, because he may have to assume a prime liability.

Mr Cherryman argued that these contentions failed for five reasons. Some of them I have already considered in detail when dealing with the position of Oronel, but others I have not yet

touched upon. The first suggested answer was that the licence was not a variation of the principal contract at all, because the alterations preceded the licence and resulted in a *fait accompli* which the licence merely recognised. I have already rejected that argument, holding that the important thing the licence did was to legitimise the toilets, thereby converting them from something which could not to something which conceivably could result in the fixing of a higher rent on the review. I have also already dealt with the other limb of this argument by holding that the terms of the licence itself did not impose a significant extra burden on the lessee.

Mr Cherryman's second answer, which again I have already considered in detail when dealing with the position of Oronel, was the argument that the variations were expressly contemplated by the lease and thus authorised to be made. For reasons which I have given, I feel unable to accept this argument.

It is convenient next to deal with Mr Cherryman's fourth point, which was that to the extent that the landlords did agree to any alterations in the principal obligation, those alterations could not be material within the test laid down in *Holme v Brunskill*. There were two limbs to this argument. The first involved saying that the toilets were *de minimis* and that accordingly, in the words of Cotton LJ, it was self-evident that the alteration was unsubstantial and one which could not be prejudicial to the surety. The second limb of this argument was, in effect, a restatement of the first argument — namely, the contention that because the variations complained of occurred before the date of the licence and had already caused the premises to be changed, the effect of the licence was not materially to alter the obligations imposed by the lease. I have previously rejected the second limb of the argument, but I need to say something more about the first.

I have already stated two conclusions: the first, that the presence of the toilets, once they were legitimised by the licence, was something which could *arguably* have increased the rental value of the premises; the second, admittedly on very sparse evidence, that their presence, so legitimised, did not have that effect. It seems to me that the second of these conclusions is analogous to the jury's finding in *Holme v Brunskill* and that I ought not in the present context to place reliance upon it. The important finding in the light of that authority is the first, because here is an alteration in the contract between the creditor and the principal debtor which is not self-evidently unsubstantial, which is not one which cannot be prejudicial to the surety. If that conclusion be correct, then it seems to me that what happened was sufficient to discharge the surety, subject to the proviso.

Mr Cherryman had another argument which was related to those that I have just been considering but was nevertheless essentially different from them. The surety, he argued, is surety for the original lessee, and since the latter is bound by subsequent alterations of any kind, whether expressly authorised or contemplated by the lease or not, it must follow that the guarantor is similarly bound. The difficulty about this argument becomes more apparent if one considers it in the context of a hypothetical case in which, unlike the present, there has been no assignment of the term. In such a case, despite a prohibition in the lease against user save for the purpose of a warehouse, it is, of course, open to the landlord and the tenant to agree that the premises may be used for office purposes. Assume that the result of such an agreement would be to increase the rent threefold. If such an agreement were entered into without consultation with or assent of the guarantor, Mr Cherryman's argument would nevertheless, as I understand it, involve that the guarantor was not discharged, because I can see no valid distinction between such a hypothetical case and the case where the variation which makes the contract more onerous is agreed between the landlord and the subsequent assignee. What is crucial is the agreement by the principal debtor to the variation which makes the contract more onerous, and I can see no reason why any different rule should apply in landlord and tenant cases to that which applies to contracts generally. Indeed, if Mr Cherryman's argument were correct, it would be difficult to understand how *Holme v Brunskill* was decided in the guarantor's favour or how even a much more extreme case would be so decided.

I now return to Mr Cherryman's third point in answer to the arguments advanced in favour of Mr Morgan's being discharged — namely, his reliance on the terms of the proviso to cl 5(a). He points to the fact that the proviso mentions three things — neglect on the part of the lessor in endeavouring to obtain payment of rent or to

enforce the covenants in the lease, forbearance by the lessor in respect of the same matters, and the giving of time by the lessor to the lessee. He relies essentially on two contentions, the first of which is that forbearance must be taken to add something to neglect — the latter word importing merely passive acquiescence — but forbearance being apt to apply to a binding agreement. The second argument is that in the context of the proviso the words "any time which may be given" must envisage a contractual giving of time as opposed to mere inactivity or acquiescence and that in reality all that the licence amounted to was a binding agreement to give extra time for the removal of the toilets by postponing the landlord's right to require immediate removal until the end of the tenancy. I shall consider each of these arguments separately.

I reject the argument based on the word "forbearance" simply as a matter of construction of the proviso. This is because I read the two words "in endeavouring" as qualifying both of the clauses ("to obtain . . . and to enforce . . .") which follow. Thus what this part of the clause is saying is that any neglect or forbearance of the lessor in *endeavouring to* obtain payment of rent or in *endeavouring to* enforce performance of the covenants shall not release or exonerate the guarantor. I think that if it had been intended that the words "in endeavouring" should apply only to payment of rent, then the clause in relation to covenants would have read "in enforcing performance of the several covenants", rather than, as it does, "to enforce performance of the several covenants". If my construction be correct, then it is difficult to see how, even allowing that forbearance adds something to neglect, it can sensibly be said to envisage a binding agreement not to enforce the covenants. I should add, in any event, that I am not convinced by an argument that depends upon importing to the word "forbearance" some significantly different meaning to that connoted by the word "neglect", because it is common experience to find that legal documents, like the *Book of Common Prayer*, use two words to convey the same meaning.

I regard the argument based on the giving of time as a more formidable one. The starting point (see *Halsbury's Laws* (4th ed), vol 20, para 261 and *Rowlatt on Principle and Surety* (4th ed), pp 164-65) is that a surety claiming to be discharged because time has been given is discharged only if a binding agreement is made between the creditor and the principal debtor that time shall be given and that mere delay by the creditor in enforcing his rights does not discharge the surety, even in the absence of any proviso. Mr Cherryman argues, therefore, that what must be being referred to here is a contractual giving of time, because otherwise the provision would be otiose. He reinforces this argument by submitting that in the context the giving of time must mean something different from neglect or forbearance. In this connection, it is to be observed that the words "any time which may be given to the lessee by the lessor" are not qualified by a reference to obtaining payment of rent but appear in the proviso in a place which suggests that they are intended to be of quite general application.

Plainly there are two questions here: first whether the words I am considering are apt to apply to a binding agreement to give time, as opposed merely to a failure to enforce a time provision in the contract; and second whether, if they are, they can properly be applied to the licence in the present case. As to the first, I cannot help being influenced by the reflection that to reject Mr Cherryman's submission would involve that the proviso as a whole was redundant in the sense that it gave to the creditor no advantage that he would not have enjoyed even without it. Moreover, it seems to me that the words "any time which may be given", while they are not consistent only with, are nevertheless perfectly apt to apply to, a contractual giving of time. Accordingly, I uphold the first part of Mr Cherryman's submission based on this passage in the proviso.

As to the second point, it must be remembered that I have already considered and rejected arguments to the effect that, quite apart from the legitimising of the toilets, the licence imposed additional onerous obligations on the tenant by virtue of cl 3(2). In so far as it legitimised the toilets while imposing an obligation to remove them if required at the end of the tenancy, can it properly be said that all it was effectively doing was postponing until the latter date the time at which the landlord was entitled to call upon the tenants to remove them? It seems to me that it can and that, accordingly, Mr Cherryman's contention based upon the latter part of the proviso succeeds, with the result that Mr Morgan is not entitled to claim that he has been discharged by virtue of the licence.

Mr Cherryman's fifth answer was confined to the specific part of Mr Burnton's argument which relied on cl 5(b). As became apparent in the course of argument, this subclause presents very considerable difficulties, and I do not propose to lengthen an already long judgment by rehearsing them. I mention only as an instance that there was complete disagreement between counsel as to what the rent under such a new lease as the clause provides for would be, assuming the tenants' bankruptcy occurred after a rent review had taken place. For my own part it does not seem to me that the existence of subclause (b) really has any bearing on Mr Burnton's argument based on *Holme* v *Brunskill*. However, the fact that he relied upon it provoked the plaintiffs into a late and unopposed amendment to claim a declaration that even if Mr Morgan had been discharged from his cl 5(a) liability, he remained under the obligations imposed by cl 5(b).

Mr Cherryman's argument was to the effect that the latter subclause imposed an entirely independent obligation on Mr Morgan, in no way connected with his role as guarantor and accordingly he would not be subject to discharge by events which would discharge him from liability in the latter role. Mr Burnton, on the other hand, contends that the clause is plainly to be construed as ancillary to the guarantee obligations, pointing out that its purpose is to circumvent the rule in *Stacey* v *Hill* [1901] 1 QB 660, that a disclaimer of the lease by the trustee in bankruptcy of the original lessor discharges a surety for the rent. He argues that the law has always shown a considerable degree of indulgence towards sureties and that it would be inconsistent with this approach to hold that this obligation survives even if the guarantor is discharged from his primary obligation.

Somewhat surprisingly, there appears to be no authority on this point, though I was informed that a provision such as is found in subclause (b) is commonly inserted in leases for the purpose I have mentioned. In deciding which of the rival contentions is correct, I am very much influenced by the anomaly that would be involved in holding the surety to a subclause (b) obligation in a case where he had already been discharged from his primary liability as guarantor by some variation of the contractual terms. Even if it be accepted that the lease that he is obliged to take is a lease in the original form and not one burdened by the disadvantages occasioned by the variation that has released him as guarantor, it would seem to me manifestly unfair that the lessor, who by his actions has so altered the original contract as to release the surety, should then be entitled to call upon him in the event of the insolvency of the lessee to take a lease himself. The guarantor, it seems to me, is a party only because he is guarantor, and I uphold Mr Burnton's submission that subclause (b) is to be regarded as ancillary to the subclause (a) obligations of the guarantor and that the guarantor would, if discharged from liability *qua* guarantor, be discharged from any liability under subclause (b).

I summarise my conclusions in relation to Mr Morgan, therefore, by saying that in my judgment the proviso to cl 5(a) precludes his claiming to have been discharged by such variations to the principal contract as I have held were or could have been effected by the licence of June 10 1976.

I have now dealt with the primary liability of all five defendants, and it remains for me to consider those claims which have been advanced by the first and second defendants against the third, fourth and fifth defendants. I should mention at this stage that one of the most difficult issues between the first and second defendants and the plaintiffs — namely, the claim by the former for a declaration that, upon payment by them, they are entitled to be subrogated to the plaintiffs' rights of distress — has by agreement between the parties been postponed until after judgment, so that further consideration may be given by the first and second defendants to whether it is necessary for them to pursue that particular claim. That agreement, however, does not embrace the claims which the first and second defendants make directly against the third, fourth and fifth defendants in three contribution notices for indemnity or contribution in respect of sums that they may be liable to pay to the plaintiffs or the more conventional claims by the first and second defendants, upon satisfaction of the plaintiffs' claim to be subrogated to the plaintiffs' rights as against the other defendants. It is to those claims that I now turn, and it is convenient that I should deal with Oronel first, considering the validity of their claim against each of the defendants and then go on to consider the position of Mr Morgan, the guarantor of Oronel's liability.

*Oronel's claim against Cavatina.* Since all the arrears have accrued during the time when the lease was vested in Cavatina, the latest of the assignees, this is a straightforward claim. The case of *Moule* v *Garrett* (1872) LR 7 Exch 101 establishes that where the original lessee has been compelled to pay sums arising out of the default of the current assignee, the latter is obliged to indemnify him. It is to be observed, moreover, that in his judgment in *Baynton* v *Morgan* in a passage I have already cited Lopes LJ said:

The rule of law is that a lessee remains liable upon his express covenants, notwithstanding an assignment, and acceptance by the landlord of rent from the assignee, and there is an implied promise on the part of each successive assignee to indemnify the lessee against breaches of the covenants in the lease in his own time.

It seems to me plain, therefore, that Cavatina have no answer to a claim for indemnity advanced by Oronel.

*Oronel's claim against Sunbird.* By cl 2 of the deed of assignment of June 10 1976 Sunbird covenanted with Highlight that Sunbird would observe the covenants in the lease, including that requiring payment of rent. By an assignment dated February 22 1983, of which notice was given to Sunbird, Highlight by its liquidator assigned to Oronel the benefit of the covenants just referred to. Highlight itself is under a liability to Oronel by virtue of its covenant in the assignment between Oronel and Highlight. Accordingly, as it seems to me, Mr Burnton's submission that Sunbird is obliged to indemnify Oronel is well founded on that, if no other, ground.

I have been able to deal with the liability of both these defendants to Oronel without making reference to the broad general principle upon which Mr Burnton mainly relies in support of the claims advanced on behalf of the first two defendants against the subsequent defendants. That is the principle derived from the speech of Lord Selborne LC in *Duncan Fox & Co* v *North and South Wales Bank* (1880) 6 App Cas 1 at p 10. The passage is conveniently set out in the second case on which, in this context, Mr Burnton relied — namely, *Re Downer Enterprises Ltd* [1974] 1 WLR 1460. Both those cases were concerned with rights of subrogation, but underlying any such claim is a right to indemnify or at least contribution. At p 1468 in *Downer Enterprises*, Pennycuick J cited the passage in Lord Selborne's speech in which he described three kinds of cases, the third of which was:

those in which, without any contract of suretyship, there is a primary and a secondary liability of two persons for one and the same debt, the debt being as between the two, that of one of those persons only and not equally of both, so that the other, if he should be compelled to pay it, would be entitled to reimbursement from the person by whom (as between the two) it ought to have been paid.

Pennycuick J goes on:

Lord Selborne LC in that passage makes it perfectly clear that this right of reimbursement, which carries with it the right of subrogation, is not confined to the case of a guarantee but applies in any case where there is a primary and a secondary liability for the same debt.

Later he says:

Unless there is any more to it, it seems to me that the principle laid down in that case is plainly applicable to the present case: that is to say, Granada, Schick and the company were each of them liable to Prudential for the rent accruing after the commencement of the winding up. The company was unable to pay; Schick in fact paid, and that being so, Schick is entitled to recoupment from the company and is entitled to take over by subrogation whatever rights Prudential has against the company, including, it seems to me, the right to be paid in full in the winding up.

Mr Burnton submits, in my view rightly, that the effect of these cases is to establish a priority between the lessee and the assignee. He concedes that as against the lessor both are liable but says that *inter se* the assignee is primarily liable and that, accordingly, that liability may be enforced by the lessee apart from any contract between them by a claim for indemnity as well as by the exercise of rights of subrogation. He submits, accordingly, as I understand it, that *Moule* v *Garrett*, on the basis of which I have found Oronel entitled to an indemnity, is a particular example of the application of that general principle, and further that upon payment it is entitled to be subrogated to the plaintiffs' rights and securities. As I have already said, I am not considering at present the contention that among the rights to which it is entitled to be subrogated is that of distress. In the present context, the material submission is that an important security is the guarantee of Mr Karniol. Mr Burnton accepts that, by subrogation, Oronel cannot obtain more than the appropriate proportion of liability that should be borne by Mr

**A** Karniol as between himself and Oronel and further concedes that if they were true co-sureties, then Oronel would be entitled only to a proportionate contribution. He submits, however, that they are not true co-sureties, because Mr Karniol guarantees Cavatina's liability and Cavatina are obliged to indemnify, not to contribute.

Accordingly, considering the claim by Oronel against Mr Karniol, it seems to me that Mr Burnton is correct when he argues that as between the defendants the liability of Oronel is secondary not only to that of Cavatina but to that of Mr Karniol, the guarantor of Cavatina, without whose guarantee, as I find, the assignment to Cavatina would not have taken place; and that in **B** these circumstances Oronel are entitled to claim indemnity from Mr Karniol as well as from Cavatina and Sunbird and also upon payment to be subrogated to the plaintiffs' rights against Mr Karniol.

Finally, I have to consider the position of Mr Morgan. He is the guarantor of the liability of Oronel, whom I have held as between themselves and the third, fourth and fifth defendants to be a party of last resort entitled to the rights of indemnity and subrogation that I have described. Mr Burnton's submissions were very brief and amounted simply to this: that Mr Morgan's position against the other defendants cannot be any worse that that of Oronel, whose liability he guarantees. In so far as Mr Morgan as guarantor of Oronel's liability is obliged to pay, he is entitled to be subrogated to **C** the plaintiffs' rights to recover against those subsequent defendants. This entitlement alone would, it appears to me, afford Mr Morgan all the protection that he needs.

However, I understand Mr Burnton's general submission to be intended to support an argument that Mr Morgan, in his own right and without claiming rights of subrogation, is entitled to indemnity against one or more of the subsequent defendants. In fact, Mr Morgan makes no claim against Sunbird, but he does claim indemnity or contribution against Cavatina and Mr Karniol. Apart from his rights on payment to be subrogated to the rights of the plaintiffs, it appears to me that he, no less than Oronel, is as **D** between the defendants entitled to claim that his liability is secondary to that of Cavatina and Cavatina's guarantor, Mr Karniol, and that therefore, pursuant to the principle derived from *Duncan Fox & Co* and *Re Downer Enterprises*, he is entitled to be indemnified by each of those defendants.

I have now dealt with all the claims advanced in these actions, save that involving the first and second defendants' claim to be subrogated to the plaintiffs' right of distress. I can summarise the position as follows. First, the plaintiffs are entitled against all defendants to (a) the declaration claimed in A(1) that there was a valid rent review by Mr Sayer; (b) judgment for the arrears of rent amounting to £110,000; and (c) a declaration that if, contrary to my finding, the rent review was invalid, it is still open to them to apply for a fresh determination. If necessary, I shall hear argument as to the precise form of the orders and on the claim for interest.

**E** Second, the first and second defendants are entitled, on their amended counterclaim against the plaintiffs, to a declaration that they are upon satisfaction of the plaintiffs' claim entitled to be subrogated to the plaintiffs' ordinary rights against the third, fourth and fifth defendants. I use the term, "ordinary rights", as indicating those rights apart from any right to levy distress.

Third, the first and second defendants are entitled as against Cavatina and Mr Karniol to an indemnity against the plaintiffs' money claims, and the first defendants are entitled as against Sunbird to a similar indemnity.

**F**
# Chancery Division

February 24 1984
(Before Mr Justice WALTON)

ALLIED LONDON INVESTMENTS LTD v HAMBRO
LIFE ASSURANCE LTD

Estates Gazette June 9 1984
**(1984) 270 EG 948**

**Landlord and tenant — Dispute as to the period for which interest should be payable by original lessees on a sum** recovered against them by lessors — No provision in lease for **G** payment of interest on rent in arrear — Whether interest payable as from the date on which each payment of rent became due or only from the date of a letter sent by the lessors to the original lessees before action — Held, distinguishing *BP Exploration (Libya) Ltd v Hunt (No 2)*, that interest should be calculated as from the date when each payment of rent became due — The original lessees were bound by the covenant to pay rent by virtue of privity of contract throughout the term of the lease despite assignments — Although the commercial expectation is that the assignee **H** in whom the lease is vested will pay, the assignor does not get rid of one jot or tittle of his original liability

This proceeding became necessary because the parties, Allied London Investments Ltd, plaintiffs in the action, and Hambro Life Assurance Ltd, defendants, had been unable to agree on the period for which interest should be payable on a sum of £48,146.83 awarded to the plaintiffs by Walton J on July 29 1983 in respect of arrears of rent payable for a property at 82 Brook Street, London W1. The rate of interest, but not the period, had been agreed, the difference being £28,206.63 on the plaintiffs' basis and £9,023.24 on the defendants'. The calculation in either case went only to the **J** date of judgment, as thereafter any sums recoverable would bear interest in the usual way. The earlier decision of Walton J was reported at (1983) 269 EG 41.

Gavin Lightman (instructed by Wright & Webb, Syrett & Sons) appeared on behalf of the plaintiffs; Jonathan Gaunt (instructed by Nabarro Nathanson) represented the defendants.

Giving judgment, WALTON J said: I now have to deal with the question of interest payable on the sum of £48,146.83 recovered by the plaintiffs in this action pursuant to my judgment of July 29 1983. Because it was at that stage thought that the plaintiffs and the defendants might be able to sort out the position between themselves, the second part of the order directed that the defendants shall pay interest on the said sum but of such amount, rate and for such period as shall be decided by the court.

The parties have in fact been able to agree between themselves as **K** to the appropriate rate of interest, which I understand is 2½% over some mutually agreed base rate, but what they have not been able to agree about is the period for which the interest should be payable. The situation is that the lease was originally granted on January 27 1972 to the defendants of 82 Brook Street for a term which would have gone on until the year 2000 if it had not been brought to an end, as it was, earlier. On December 19 1973 the defendants assigned the lease, but having assigned the lease they still remain liable under their covenants contained in the original lease by virtue of privity of contract.

A section 146 notice was served on the assignee in 1979 and on **L** March 5 1979 the attention of the defendants was called to the fact that such a notice had been served, and the letter continued: "The enclosed documents are sent to you by way of information, but you will no doubt be aware that you remain liable under your covenants in the lease notwithstanding the assignment."

The letter before action was sent on March 5 1982 and was apparently received by the defendants three days later on March 8 1982. The writ was issued on April 14 1982 and judgment, as I have already indicated, was given on July 29 1983.

I have had the benefit of two extremely excellent arguments on both sides on this point and neither argument has omitted anything which ought to have been omitted, and, more pertinently and refreshingly, has not included anything which ought not to have **M** been included.

Mr Gaunt for the defendants makes the undoubtedly correct point that there is no provision in the lease for payment of interest upon rent in arrears, and he says that by seeking, as the plaintiffs do, to recover interest not from the date when they wrote their letter before action but in each case — and I say in each case because the total sum recovered is made up of a number of instalments of rent — from the date when the instalment of rent became payable, what in substance the plaintiffs are trying to do is to write into the original lease the provision which will now be found in most well-drawn leases to the effect that interest is to be paid upon rent in arrears.

A    Mr Gaunt drives home that point by pointing out, again perfectly correctly, that if in fact the defendants had paid the sum demanded at any time after receipt of the letter before action and before the date when the writ was issued, then it is perfectly clear pursuant to the provisions of section 35A of the Supreme Court Act 1981, under which I have power to award interest, that, there being no proceedings on foot when the sum was paid, there could be no question of the plaintiffs' recovering any interest.

I follow all that, but it does not seem to me that that is any way conclusive of the matter, because it is precisely because the lease does not contain the sort of provision in relation to interest that it would have been possible for the defendants to have escaped any

B    question of liability for the payment of interest by paying between the date of the letter before action and the date of the writ. The fact that it would have been possible for them to make payment then and thus avoid any question of interest points out very sharply and accurately the fact that that is not something, the payment of interest is not something, which is contained in the lease.

The ordinary rule, I take it, is one as to which there can be no doubt. That appears very clearly from the judgment of Robert Goff J in *BP Exploration Co (Libya) Ltd v Hunt (No 2)* [1982] 1 All ER 925. At pp 974D to 976C the learned judge deals very comprehensively with the question of the general rules in relation to the payment of interest. Although of course it is always a matter for judicial discretion, it is a discretion which has to be exercised on

C    judicial principles. He says at the bottom of p 975 that the basic principle is that interest will be awarded from the date of loss. That view of the matter was upheld by the Court of Appeal and also the House of Lords.

Basically, one starts from the proposition that unless there is some good reason to the contrary, interest should start to run at the date when each payment of rent became due. Is there any good reason to the contrary? What Mr Gaunt really fastens upon is this: when discussing cases which would form exceptions to the general rule, Robert Goff J had set out three cases. The first group of cases, the learned judge said, concerned the position of the defendant. The court may consider in the light of all the circumstances that his

D    position was such that it would not be just to make the defendant pay interest from the date of loss. It may do so if, for example, the circumstances were such that the defendant neither knew nor reasonably could have been expected to know that the plaintiff was likely to make a claim, and so was in no position either to tender payment or even to make provision for payment if the money should be found due. In such a case the court may in its discretion grant interest only from the date of the plaintiff's claim or even from such a date as would allow reasonable investigation of the claim.

Indeed, in the case of *BP Exploration v Hunt* that is exactly the course which the learned judge took. I do not think that Mr Gaunt's attempt to bring this case under that umbrella will really stand up, because here we have an original covenant by the defendant to pay

E    the rent. That is an original covenant which binds him by virtue of privity of contract throughout the term of lease, and indeed, as has been pointed out in a number of cases dealing with the question of what happens when the lease is assigned, the covenant is economically to the effect that: "Either I will pay you or the assignee will pay you." But it is not something which only comes into effect when the assignee fails to pay. Of course the expectation, commercially speaking, is that the assignee will pay, but the assignor does not by assignment get rid of one jot or tittle of his original liability.

Under those circumstances, it seems to me that it would be very curious indeed if the situation were that if the landlord were to sue the assignee he would undoubtedly be awarded interest from the

F    date when each instalment of rent fell due, but if on precisely and exactly the same covenant, but pursuing this time in privity of contract instead of privity of estate, he were only to be able to recover interest from the date when he intimated to the defendant that he was going to recover from him. It would be most curious that there should be the slightest difference in the liability of the assignee and the liability of the original covenantor seeing that in each case suit would be made upon precisely and exactly the same covenants.

But in the present case I think Mr Lightman, for the plaintiffs, is correct in pointing out that although of course the letter of March 5 1979, which was before any arrears of rent arose, does not, naturally, deal with them, what it does, if it does nothing else, is to

G    alert the defendants to the position under the lease and to remind them of their liability under the covenant.

Thereafter I would have thought that any prudent person in the position of the defendants would have known that there was a very considerable risk of his being called to account on his original liability under his covenants whether it was actually in respect of dilapidations pursuant to the notice under section 146 or otherwise, because in general a tenant who is capable of paying the rent, and intends to do so, will not put himself in a position where his landlord is able to serve a section 146 notice upon him.

So it seems to me that the matter is altogether different from the case of *BP Exploration v Hunt*, where Mr Hunt had no idea that BP either could or would bring an action against him until he received

H    the letter informing him of just that possibility. Here from the beginning, that is to say from the date of the grant of the lease on January 27 1972, the defendants must have been, if they had chosen to think about it, in a position where they knew that they might be liable to be sued upon their covenant if in fact it was not discharged on their behalf for them by the assignee.

It seems to me that this is a case where the general rule ought to apply. I am happy to say that the parties have in fact agreed the figures on the two alternative bases: on the basis claimed by the plaintiffs, £28,206.63, and on the basis of the defendants' submissions, £9,023.24. That interest goes down only to the date of the judgment because thereafter the sums recovered will bear interest in the usual way. So, I decide that the correct amount of

J    interest to which the plaintiffs are entitled is the sum claimed by them, £28,206.63.

# Court of Appeal

April 18 1984
(Before Lord Justice STEPHENSON, Lord Justice KERR and Lord Justice DILLON)

OFFICIAL CUSTODIAN OF CHARITIES AND OTHERS    K
v PARWAY ESTATES DEVELOPMENTS LTD

*Estates Gazette June 16 1984*
**(1984) 270 EG 1077**

**Landlord and tenant — Forfeiture, relief, waiver — Appeal by landlords against judge's grant of unconditional relief against forfeiture to tenants, a company which had gone into liquidation — Counterclaim by tenants based on landlords' alleged waiver of right to forfeit — Lease was a long lease held by respondents for development — The respondents' claim that the right to forfeit had been waived was based on a letter written by the appellants to the receivers appointed to receive    L income under the Law of Property Act 1925 and on a submission that publication in the *London Gazette* of information as to the winding up, in pursuance of section 9 of the European Communities Act 1972, constituted notice to all the world and therefore imputed knowledge to the appellants — It was argued that the acceptance of rent by the appellants with such knowledge constituted a waiver — Court of Appeal, agreeing with the judge in this respect, held that there had been no waiver — As regards relief against forfeiture, however, they held that the judge had no jurisdiction to grant relief to the respondents — Relief under section 146 of the Law of Property Act 1925 was ruled out    M because the application was made outside the year prescribed by subsection (10) and the respondents' leasehold interest was not sold within that year — The court rejected a submission that it had an inherent non-statutory jurisdiction to grant relief against forfeiture in the circumstances of this case — Appeal allowed**

This was an appeal by the landlords, the present trustees of the Campden Charities, and plaintiffs in an action before Mr Vivian Price QC, sitting as a deputy judge of the Chancery Division, against the judge's decision granting the respondents, Parway

*a*
*a*

# Shaw v Doleman

[2009] EWCA Civ 279

*b*

COURT OF APPEAL, CIVIL DIVISION

MUMMERY, STANLEY BURNTON AND ELIAS LJJ

5 MARCH, 1 APRIL 2009

*c*
*Winding up – Disclaimer of onerous property – Disclaimer of lease – Effect
on guarantor of tenant covenants – Assignment of lease to company –
Assignor guaranteeing company's future performance of tenant covenants –
Liability period of guarantee defined as period during which assignee bound
by tenant covenants – Company going into liquidation – Liquidator
disclaiming lease – Whether assignor's liability under guarantee ceasing on
disclaimer of lease – Whether assignor liable under guarantee for rent
arrears owed by company – Insolvency Act 1986, s 178(4).*

In 2004 the original tenant was granted a 10 year lease of shop premises at
an annual rent of £16,000. In 2005 she assigned the lease to a company and
entered into a guarantee agreement with the landlord under which she
guaranteed that for 'the period during which the Assignee is bound by the
tenant covenants of the lease' (the liability period) she would pay and make
good to the landlord on demand any losses, damages, costs and expenses
suffered or incurred by the landlord if the company failed to pay the rent
and perform and observe the tenant's covenants in the lease. Under the
Landlord and Tenant (Covenants) Act 1995 the effect of the assignment of
the lease was that the original tenant ceased to be liable under the tenant's
covenants. In 2007 the company fell into arrears with the rent, vacated the
premises and went into liquidation. The liquidator disclaimed the lease.
Under s 178(4)(a) of the Insolvency Act 1986 a disclaimer of onerous
property by a liquidator operated 'so as to determine, as from the date of
the disclaimer, the rights, interests and liabilities of the company in or in
respect of the property disclaimed'. However, s178(4)(b) provided that a
disclaimer did not 'affect the rights and liabilities of any other person'. The
landlord brought an action against the original tenant as guarantor seeking
to make her liable for the company's arrears of rent. The original tenant
contended that she was no longer bound by the guarantee because her
liability under the guarantee only existed during the liability period, which
expired when the company ceased to be bound by the covenants in the lease
as a result of the liquidator's disclaimer. The judge held that the 1995 Act
and the disclaimer of the lease by the liquidator of the assignee did not
affect the liability of the original tenant to the landlord as guarantor under
the guarantee. The original tenant appealed.

**Held** – The meaning and effect of the guarantee obligation, of which the
defined liability period was part, fell to be determined in the context of
s 178(4) of the 1986 Act. The effect of s178(4)(b) was that the termination
of the rights, interests and liabilities of the company in the property

disclaimed by the liquidator did not affect the rights or liabilities of the *a*
original tenant as guarantor. Accordingly, although the original tenant was
released from any liability as tenant when she assigned the residue of the
lease to the company, under s178(4)(b) she continued to be a person whose
rights and liabilities were not affected by the disclaimer and therefore
remained liable under the guarantee agreement notwithstanding the
liquidator's disclaimer of the lease. The effect of the liquidator's disclaimer *b*
was that the lease was terminated and the company ceased to be liable to
the landlord under the tenant covenants so far as its own obligations were
concerned, but it was still bound by the tenant covenants as though the
lease had not terminated so far as third party obligations, such as those of
the guarantor, were concerned, which meant that the liability period and the
guarantor's liability under the guarantee were not terminated. The appeal *c*
would therefore be dismissed. (See [36], [38], [40], [42]–[43], [46],
[50]–[51], [60], [62], below.)

    *Hindcastle Ltd v Barbara Attenborough Ltd* [1996] 2 BCLC 234 applied.

**Cases referred to in judgment**                                    *d*
*Basch v Stekel* [2001] L & TR 1, (2001) 81 P & CR DG1, CA.
*Hindcastle Ltd v Barbara Attenborough Ltd* [1996] 2 BCLC 234, [1996]
   1 All ER 737, [1997] AC 70, [1996] 2 WLR 262, HL; *affg* [1994]
   4 All ER 129, [1995] QB 95, [1994] 3 WLR 1100, CA.
*Stacey v Hill* [1901] 1 KB 660, CA.
                                                                      *e*

**Appeal**
Gabriella Anne Shaw appealed from the decision of Judge Barratt QC
sitting in the Chichester County Court on 20 August 2008 giving judgment
for the claimant, Hazel Doleman, for the amount of £16,921.87 on her
claim for arrears of rent and insurance in respect of retail premises at 15 *f*
Chapel Street, Petersfield, Hampshire. The facts are set out in the judgment.

*Philip Glen* (instructed by *Horsey Lightly Fynn*) for the appellant.
*Timothy Fancourt QC* and *Edward Peters* (instructed by *MacDonald
   Oates*) for the respondent.

                                        *g*
                                     *Cur adv vult*

1 April 2009. The following judgments were delivered.

**MUMMERY LJ.**                                                        *h*

INTRODUCTORY
    [1] This appeal is about the grant of a lease, the assignment of it to a
company, the tenant's guarantee of the assignee's performance of the tenant
covenants, the assignee's insolvency and the effect of the liquidator's
disclaimer of the lease on the guarantee liability to the landlord – in that
order. Like the leading authority *Hindcastle Ltd v Barbara
Attenborough Ltd* [1996] 2 BCLC 234 at 240, [1997] AC 70 at 83
(*Hindcastle*) this case 'arises out of the recession in the property market'
(per Lord Nicholls). There is now a new recession in the property market.

[2009] 2 BCLC

CA          Shaw v Doleman (Mummery LJ)          125

liabilities of the    a
ginal tenant was
ie residue of the
a person whose
r and therefore
ithstanding the       b
ator's disclaimer
d to be liable to
obligations were
s as though the
such as those of
y period and the     c
ted. The appeal
42]–[43], [46],

LC 234 applied.

,                      d

, CA.
.C 234, [1996]
[L; *affg* [1994]

e

ge Barratt QC
iving judgment
921.87 on her
premises at 15     f
i the judgment.

ellant.
y MacDonald

*Cur adv vult*    g

h

ient of it to a
: of the tenant
e liquidator's
lord – in that     i
  v  *Barbara*
.C 70 at 83
perty market'
perty market.

a    The dispute is where the loss lies on the insolvency of the corporate assignee. That is nothing new.

[2] Where does the loss lie when a liquidator disclaims a lease? Does it fall on the landlord or on the guarantor? In *Hindcastle* Lord Nicholls discussed the case where the landlord protected himself against the risk of the insolvency of the tenant or of the assignee by requiring a guarantee and looking to the guarantor, as well as to the original tenant, when the assignee does not comply with the tenant covenants ([1996] 2 BCLC 234 at 240–241, [1997] AC 70 at 83):

'When the rent payable under the lease is higher than the rental value of the property at the time of the tenant's default, the landlord's financial interests may be better served by looking to the guarantor than by taking possession of the property and re-letting it. Similarly, if the impecunious tenant is not the original tenant but a person to whom the lease has been assigned, the landlord may look to the original tenant for payment. When the lease was granted the original tenant covenanted with the landlord to pay the rent and to do so throughout the whole term of the lease. This included any increased rent payable under the rent review provisions. In these cases the loss falls on the guarantor or the original tenant, not the landlord.'

[3] In this case the landlord required the original tenant to enter into a guarantee of the performance of the tenant covenants by the corporate assignee. The landlord insisted on that requirement when granting the tenant a licence to assign the residue of the lease to the assignee company. The assignee company has gone into liquidation. The liquidator has disclaimed the lease. The landlord has sued the original tenant on the guarantee for the performance of the covenant to pay rent and other sums not paid by the assignee.

[4] In *Hindcastle* Lord Nicholls discussed the position in post-assignment cases and the steps taken by Parliament in legislation in 1995 to improve the lot of the original tenant ([1996] 2 BCLC 234 at 241, [1997] AC 70 at 83–84):

'Sometimes, in post-assignment cases, the landlord's protection may be achieved at an unreasonably high price to others. The insolvency may occur many years after the lease was granted, long after the original tenant parted with his interest in the lease. He paid the rent until he left, and then took on the responsibility of other premises. A person of modest means is understandably shocked when out of the blue he receives a rent demand from the landlord of the property he once leased. Unlike the landlord, he had no control over the identity of the assignees down the line. He had no opportunity to reject them as financially unsound. He is even more horrified when he discovers that the rent demanded exceeds the current rental value of the property.

Mounting public concern at this post-assignment state of affairs led to the enactment of the Landlord and Tenant (Covenants) Act 1995. In future, where a tenant lawfully assigns premises demised to him he will be released from the covenants falling to be complied with by the tenant of the premises.'

[5] The principal provisions of the Landlord and Tenant (Covenants)

Act 1995 (the 1995 Act) did not apply to tenancies granted before the Act *a* came into force on 1 January 1996. *Hindcastle* was concerned with such a tenancy. The lease in this case (which I will refer to as 'the lease') was granted on 5 May 2004. It is subject to the 1995 Act, so that the original tenant ceased, on the assignment of the lease, to be liable on the covenants qua tenant.

[6] Judge Barratt QC held that the terms of the 1995 Act and the *b* disclaimer of the lease by the liquidator of the assignee did not affect the liability of the tenant to the landlord under the guarantee. The judge entered judgment on 20 August 2008 for the landlord in the sum of £16,921.87 and costs. On 13 October 2008 Jacob LJ granted the tenant permission to appeal.

[7] This appeal turns on the construction of a document called 'the *c* Authorised Guarantee Agreement' (the guarantee agreement). It was made on 9 August 2005 when the original tenant, Ms Gabriella Shaw, assigned the lease to Ceramic Café Ltd (CCL). Section 178(4) of the Insolvency Act 1986 (the 1986 Act) relating to the consequences of the disclaimer of a lease in an insolvency and various provisions in the 1995 Act are part of the *d* legal picture.

[8] The court is grateful for the excellent arguments of each side on the construction issue, which is of some general interest and importance in the current condition of the property market.

*e*

BACKGROUND

[9] The lease of a small retail unit consisting of a ground floor lock-up shop and basement at 15 Chapel Street, Petersfield, Hampshire (the premises) to Ms Shaw was for a term of ten years from 12 March 2004 at an annual rent of £16,000, subject to review. The covenants covered *f* liability to pay insurance rent, costs incurred by the landlord in securing payment and interest on any moneys outstanding. There was a common form qualified covenant against alienation.

[10] On 9 August 2005 Ms Shaw entered into the guarantee agreement with the then landlord, Mrs Sarion Rees. She was the mother of the claimant/respondent, Mrs Doleman. The terms of the licence to assign *g* granted by Mrs Rees were that Ms Shaw would covenant with her in the form of the guarantee agreement set out in the 6th Schedule to the lease. The covenant was to be 'throughout the period during which the assignee is bound by the tenant covenants of the lease.' That language is reflected in the terms of the guarantee agreement itself.

[11] The guarantee agreement details can be left till later. I would, *h* however, note at this stage that the licence to assign also contained covenants by a Mr and Mrs Foster as 'Guarantor.' They guaranteed to Mrs Rees that CCL would pay the rents reserved by the lease and perform and observe the tenant covenants in the lease. That guarantee was expressed differently from the tenant's guarantee covenant in the guarantee agreement. *i* According to cl 6.1.2 'the Guarantor's' covenant was linked to the vesting in CCL of the term created by the lease. It was to remain in force 'for the Term whilst the lease remains vested in the assignee.'

[12] Mrs Doleman became entitled to the freehold reversion on her

*a*  mother's death in 2007 and she was registered as freehold proprietor of the premises.

[13] By 2007 CCL was in financial difficulties: it fell into arrears with the rent, had a judgment against it, vacated the premises and eventually went into liquidation on the making of a winding-up order on 22 August 2007.

*b*  The liquidator disclaimed the lease on 31 October 2007. There was then a dispute between the parties about liability for the rent and other payments under tenant covenants in the lease.

[14] Mrs Doleman sought to make Ms Shaw liable under the guarantee agreement. Ms Shaw contested liability. In brief, her defence was that her guarantee liability under the guarantee agreement terminated with the disclaimer, which terminated the lease. The 1995 Act released her from

*c*  liability as a tenant following the assignment of the residue of the lease to CCL. Her liability under the guarantee agreement is limited to the period during which CCL is bound by the covenants. She said that CCL ceased to be bound by the covenants in the lease on the disclaimer and termination of the lease.

[15] Mrs Doleman's case was that Ms Shaw's guarantee liability

*d*  continued by virtue of the express terms of the guarantee agreement construed in the context of the deeming effect of s 178(4) of the 1986 Act explained in *Hindcastle*. Ms Shaw had agreed with the landlord to pay the rents which remained unpaid by CCL. In accordance with the express terms of s 178(4)(b) (see below) her liability as guarantor was unaffected by the

*e*  liquidator's disclaimer.

[16] On 29 January 2008 Mrs Doleman began proceedings in the Chichester County Court for arrears of rent and of insurance rent, together with costs and fees and interest. The judge found for her.

[17] I turn to the detail of the guarantee agreement and of the legislation before summarising the judge's reasons and the criticisms of his judgment.

*f*

THE LEASE AND GUARANTEE AGREEMENT

[18] Under cl 5 of the lease the tenant covenanted to pay the rents, which included insurance rent and various costs and fees. Clause 5.11.3 permitted the landlord to require the tenant, on an assignment of the lease, to enter

*g*  into a guarantee in the form of the guarantee agreement in the terms set out in the 6th Schedule.

[19] Clause 3 of the guarantee agreement provided that—

> '3.1 The Guarantor guarantees to the Landlord that the Assignee will pay the rents reserved by, and perform and observe the tenant's

*h*  covenants in the lease and the Guarantor will pay and make good to the Landlord on demand any losses, damages, costs and expenses suffered or incurred by the Landlord if the Assignee fails to do so.'

[20] Under cl 3.2 of the guarantee agreement the guarantee in cl 3.3 remained in force for 'the Liability Period', which was defined in cl 1.4 as 'the period during which the Assignee is bound by the tenant covenants of

*i*  the lease.'

[21] Clause 5 of the guarantee agreement permitted the Landlord, 'if the lease is terminated by disclaimer,' to require the guarantor to take a new lease of the premises for the residue of the term and to assume the liability of the assignee, provided that notice was given to the guarantor within three

months after the date of termination. Mrs Doleman did not in fact take any *a*
steps to require Ms Shaw to take a lease of the premises in accordance with
the provisions of the guarantee agreement. The clause is, however, relied on
by Ms Shaw to support her contention that cl 5 rather than cl 3 of the
guarantee agreement was to apply in the event of a disclaimer.

[22] The key provisions of the guarantee agreement are probably in
common use. It was pointed out that Form 217 in 22(1) *Encyclopaedia of* *b*
*Forms and Precedents* (5th edn, 1996 re-issue) shows that the draftsman of
the guarantee agreement in this case either closely followed that precedent
or by coincidence produced a very similar draft moulded by the same
statutory materials.

*c*

THE LEGISLATION

[23] Section 178(4) of the 1986 Act (Power to disclaim onerous property)
states the effect of a disclaimer:

'A disclaimer under this section—(a) operates so as to determine, as
from the date of the disclaimer, the rights, interests and liabilities of the *d*
company in or in respect of the property disclaimed; but (b) does not,
except so far as is necessary for the purpose of releasing the company
from any liability, affect the rights and liabilities of any other person.'

[24] In *Hindcastle* the House of Lords construed those provisions. The
facts were that the landlord claimed arrears of rent due after the disclaimer *e*
of a 20-year lease in an insolvency from (a) the first assignee of a lease (CIT
Developments Ltd), which had placed itself in the same position as the
original tenant by covenanting with the landlord to pay the rent for the
reminder of the term of years; and (b) the surety (Mr Whitten, a director of
CIT) on his guarantee of the performance of the first assignee's obligations
for a period of ten years from the date of the lease. The original lessee *f*
(Hindcastle) was also sued, but had gone into liquidation and took no part
in the proceedings on appeal. The proceedings arose from the liquidator's
disclaimer of the lease in the liquidation of a company (Prest Ltd) to which
the first assignee had sold the lease. Both the defendant first assignee and
the surety argued that the disclaimer of the lease operated to terminate their
liability. *g*

[25] The House of Lords rejected their contention. It held that s 178(4)
meant that the disclaimer determined the lease and accelerated the reversion
as between the landlord and the assignee; but, as regards the liability of
third parties, including the original tenant under the pre-1995 law, as well
as the first assignee in the position of that tenant and the surety, the lease
was *deemed* to continue and their liability was not affected by the *h*
disclaimer. As Lord Nicholls said ([1996] 2 BCLC 234 at 245–246, [1997]
AC 70 at 88):

'... the best answer seems to be that the statute takes effect as a
deeming provision so far as other persons' preserved rights and
obligations are concerned. A deeming provision is a commonplace *i*
statutory technique. The statute provides that a disclaimer operates to
determine the interest of the tenant in the disclaimed property but not
so as to affect the rights or liabilities of any other person. Thus when
the lease is disclaimed it is determined and the reversion accelerated but

the rights and liabilities of others, such as guarantors and original tenants, are to remain *as though* the lease had continued and not been determined. In this way the determination of the lease is not permitted to affect the rights or liabilities of other persons. Statute has so provided.' (Lord Nicholls' emphasis.)

[26] In reaching the conclusion that the secondary liability of the surety is not affected by the disclaimer of the tenant's interest and the release of the principal liability, Lord Nicholls noted that the 1986 Act clearly contemplated that a person may be liable to perform the tenant's covenants, even after the lease has been disclaimed and that a vesting order may be made in favour of such a person under s 182(3). The interpretation of s 178(4) had to accommodate that conclusion.

[27] It is argued on behalf Mrs Doleman that s 178(4), as so construed, applies to a guarantor under a separate document, such as the guarantee agreement. Thus, in this case, immediately before the disclaimer Ms Shaw was liable under the guarantee agreement guarantee for the payment of rent to Mrs Doleman. That liability was not affected by the disclaimer, as it only determined the rights and liabilities of the assignee CCL. When considering the surety liabilities the deeming effect of s 178(4) is that Ms Shaw's liability under the guarantee agreement continued as though her liability under the lease were notionally still continuing. Otherwise her liability would be affected. That would run contrary to the express wording of s 178(4)(b).

[28] It is common ground that, in consequence of the 1995 Act, Ms Shaw was released from any liability qua tenant when she assigned the residue of the lease to CCL. As for the continuation of her liability under the guarantee agreement beyond the date of disclaimer, Ms Shaw contends that that depends on whether CCL was bound by the covenant to pay rent. She says that CCL was not so bound after the disclaimer. Its liability came to an end with the disclaimer by the liquidator. As CCL was no longer bound by the tenant covenants, 'the Liability Period' of her guarantee in the guarantee agreement came to an end and she was no longer bound by the guarantee agreement guarantee.

[29] The 1995 Act is material in two main respects: first, for the change in the law mentioned by Lord Nicholls in *Hindcastle* by releasing a tenant from covenants on the assignment of the premises demised to him under a tenancy (s 5); and, secondly, for providing that where, on an assignment, a tenant is to any extent released from a tenant covenant by virtue of the Act, nothing in the Act precludes the tenant from entering into an 'authorised guarantee agreement' with respect to the performance of that covenant by the assignee, though not by any person other than the assignee (s 16). The guarantee agreement is a creature of the 1995 Act. It constitutes an exception to the general principle that the original tenant is released from liability on the assignment of his interest. That liability is, however, a guarantee liability limited by the terms of the guarantee agreement into which the tenant may enter. The guarantee agreement cannot impose on him liability beyond any period of liability of the first assignee from him: s 16(2), (4).

THE JUDGMENT

[30] The judge found Mrs Doleman's case more convincing. He said:

130                Butterworths Company Law Cases        [2009] 2 BCLC

> '23 ... This authorised guarantee agreement was drawn up in the  *a*
> context of the decision of the House of Lords in relation to the
> construction of the Insolvency Act, particularly s 178(4) of that Act, in
> terms of the way and the extent and degree to which existing liabilities
> they continued by operation of law in the event that there was a
> disclaimer via liquidator of the original terms of the tenancy. That is the
> principle of law which I accept, as contended for by counsel for the  *b*
> claimant, applies; that is the statutory context within which this
> authorised guarantee agreement falls to be construed and applied, and
> the meaning, in my judgment, to be given to the liability period. It is to
> be understood to be subject to those principles and the operation of law
> as provided for in s 178(4) of the Insolvency Act.'
>                                                                          *c*

TENANT'S SUBMISSIONS ON APPEAL

[31] The essence of Ms Shaw's case on appeal is short and simple. Her
guarantee liability under the terms of the guarantee agreement was limited
to 'the Liability Period'. The judge misconstrued the definition of that
expression in cl 1.4 of the guarantee agreement. 'The Liability Period'  *d*
expired when CCL ceased to be bound by the covenants in the lease. CCL
ceased to be bound when the liquidator disclaimed the lease.
Section 178(4)(a) determined the liability of CCL under the lease. The
parties had chosen that as the contractual event which would bring 'the
Liability Period' to an end. There was no liability on Ms Shaw under the
guarantee terms of the guarantee agreement anymore than there was under  *e*
the tenant covenants in the lease.

[32] That result was submitted to be consistent with the other terms of
the guarantee agreement, in particular cl 5, with its machinery for what
should happen in the event of a disclaimer, namely a put-option to require
the original lessee to take a new lease. The option was not exercised in this
case.                                                                     *f*

[33] In brief, the natural and ordinary meaning of the guarantee
agreement provisions was neither expressly overridden nor impliedly
qualified by s 178(4) of the 1986 Act.

DISCUSSION AND CONCLUSIONS                                                 *g*

[34] The impact of the disclaimer on guarantee liability was settled by the
House of Lords in *Hindcastle*. The disclaimer terminated the lease and the
liability of the assignee company CCL, but that did not affect the liabilities
of any other person. Section 178(4)(b) stated that the rights and liabilities of
third parties, such as a guarantor, were not to be affected. The liabilities
remained, as though the lease had not come to an end, but had continued  *h*
after the disclaimer.

[35] That is the legal landscape in which the crucial question has to be
decided: has 'the Liability Period', as defined in cl 1.4 of the guarantee
agreement, come to an end? If it has not, Ms Shaw remained liable under
the guarantee agreement guarantee and Mrs Doleman was entitled to the
judgment under appeal.                                                     *i*

[36] The duration of 'the Liability Period' of Ms Shaw's guarantee under
the guarantee agreement was linked to whether CCL was bound by the
tenant covenants of the lease. On the disclaimer the determination, by
virtue of s 178(4)(a), of CCL's liability under the lease was subject to the

*up in the*
*on to the*
*hat Act, in*
*g liabilities*
*ere was a*
*That is the*
*sel for the*
*which this*
*plied, and*
*od. It is to*
*tion of law*

*imple. Her*
*vas limited*
*on of that*
*ty Period'*
*ease. CCL*
*the lease.*
*lease. The*
*bring 'the*
*under the*
*was under*

*r terms of*
*for what*
*to require*
*sed in this*

*guarantee*
*impliedly*

*led by the*
*se and the*
*liabilities*
*abilities of*
*liabilities*
*continued*

*has to be*
*guarantee*
*ible under*
*led to the*

*tee under*
*nd by the*
*ation, by*
*ect to the*

qualification in s 178(4)(b) that, except for the purpose of releasing CCL from liability, the disclaimer did not affect the liability of any other person. In my judgment, Ms Shaw was such a person with a guarantor liability. She remained liable as guarantor, if CCL was bound by the tenant covenants. It is clear from *Hindcastle* that, although the lease was determined and CCL ceased to be liable to Mrs Doleman under the tenant covenants, CCL was, so far as other parties such as Ms Shaw were concerned, still bound by the tenant covenants as though the lease had not determined. 'The Liability Period' of Ms Shaw's guarantee and her liability to Mrs Doleman has not therefore terminated.

[37] Mr Glen, in his submissions on behalf of Ms Shaw, stressed that the issue in this case was one of contractual construction (ie of the guarantee agreement), and, in particular, of its defined term 'the Liability Period'. The issue was not one of statutory construction (ie of s 178(4) of the 1986 Act) as in *Hindcastle*.

[38] In my judgment, however, a careful reading of the facts and detailed reasoning in *Hindcastle* demonstrates that the meaning and effect of the guarantee obligation, of which the defined 'The Liability Period' is part, falls to be determined in the context of s 178(4). In *Hindcastle* the obligation of the original tenant under the lease was to run 'during the continuance of the lease' and that of the surety was to run for ten years from the date of the lease. In order to determine whether the liability of the assignee of the lease and the liability of the surety were affected by the disclaimer the House of Lords had to determine the statutory effect of the disclaimer in accordance with both (a) and (b) of s 178(4). The House of Lords held that, although the lease was terminated so far as the insolvent assignee company was concerned, the liability of the third parties – the assignee and the surety – had to be determined as though the lease had not been terminated.

[39] The basis on which the House of Lords overruled the contrary decision of the Court of Appeal in *Stacey v Hill* [1901] 1 KB 660 is specially instructive. The Court of Appeal in that case held that the surety for the performance of the tenant covenants was released by the disclaimer. Lord Nicholls in *Hindcastle* said that it ought to have been held in *Stacey v Hill* that the surety was not released. Mr Fancourt pointed out that the period of the guarantee given by the surety in *Stacey v Hill* was that it was 'to remain in force concurrently with the lease for a period of five years ...' The Court of Appeal decided that the lease was determined from the date of the disclaimer, that the surety liability was also determined and that the action on the guarantee was not maintainable. In holding *Stacey v Hill* should be overruled Lord Nicholls explained that the disclaimer did not affect the obligations of a guarantor, or discharge the original tenant from his obligations, which, before the 1995 Act, were, for all practical purposes, a guarantee that the tenant for the time being will perform his obligations.

[40] It is necessary in the instant case, in order to answer the question under cl 1.4 of the guarantee agreement whether CCL is bound by the tenant covenants in a disclaimer situation, to determine the legal effect of the disclaimer. The statutory consequences are spelt out in s 178(4). It is impossible to determine the full meaning of 'the Liability Period' in cl 1.4 of the guarantee agreement without regard to the statutory provision which deals with the effect of disclaimer on liabilities for the performance of the

tenant covenants. The statutory provision supplies the answer to the   *a*
question whether CCL was still bound by the tenant covenants after the
disclaimer. It was not bound so far as its own obligations were concerned,
but it was treated as still bound, so far as third party obligations were
concerned. Surprising though it may be to Ms Shaw and others in a similar
situation, the guarantee liability to the landlord under the guarantee
agreement survived the disclaimer.   *b*

[41] That is the clear effect of the authorities on the consequences of
disclaimer. I do not think that the position is altered by other provisions in
the guarantee agreement or by the 1995 Act. Mr Glen relied on the
existence and terms of cl 5 of the guarantee agreement which refers to the
lease being 'terminated by disclaimer'. In my judgment, that does not mean
that the surety liability is terminated by disclaimer. Further, the landlord's   *c*
option of requiring the tenant/guarantor to enter into a new lease is neither
inconsistent with the continuation of the surety liability after the disclaimer
of the lease nor does it indicate that the parties intended the liability under
the guarantee to come to an end on disclaimer.

  *d*

RESULT

[42] Accordingly I would dismiss the appeal.

**STANLEY BURNTON LJ.**

[43] I agree.

[44] There was some debate before us whether the issue before the court   *e*
is one of the interpretation of the Authorised Guarantee Agreement or of
the interpretation and effect of s 178(4) of the Insolvency Act 1986. Of
course, both have to be construed. It is common ground that a guarantee
agreement may expressly provide for the liability of the guarantor to be
determined on a disclaimer by the liquidator of the tenant. That is not the
case here. If a guarantee may provide expressly for the determination of the   *f*
liability of the guarantor, it may also do so implicitly or by general words.

[45] In my judgment, however, the meaning of the guarantee agreement in
this case is clear. It is in part for this reason that it is unnecessary to
consider the appellant's contention that it is to be construed contra
proferentem. The real issue is as to the effect of s 178(4)(b). If its effect is   *g*
that in relation to the appellant as guarantor, the assignee is deemed to
continue to be bound by the tenant covenants of the lease, her liability
under the guarantee continues notwithstanding the disclaimer by the
liquidator of the assignee. If that is not its effect, her liability has come to an
end, because in fact by virtue of s 178(4)(a) the assignee has ceased to be so
bound.   *h*

[46] On this issue s 178(4)(b) is I think clear. The determination of the
rights, interests and liabilities of the company in the property disclaimed
does not affect the rights or liabilities of the guarantor. The appellant's case,
on analysis, is that the determination by the disclaimer of the liabilities of
the company (or, to use the words of the guarantee, the determination of
the period during which the assignee is bound by the tenant covenants in   *i*
the lease) has determined her liability. But that is precisely what is precluded
by s 178(4)(b).

[47] This result seems to me to be the result of the clear words of the
statute and of Lord Nicholl's explanation of its effect in *Hindcastle*, as cited

er to the    *a*
; after the
:oncerned,
ions were
1 a similar
guarantee    *b*

[uences of
>visions in
:d on the
fers to the
not mean
landlord's   *c*
is neither
disclaimer
.lity under

             *d*

the court    *e*
ient or of
1986. Of
guarantee
:tor to be
is not the   *f*
ion of the
·al words.
eement in
:essary to
:d contra
s effect is  *g*
eemed to
r liability
r by the
>me to an
1 to be so   *h*

on of the
.isclaimed
int's case,
bilities of
nation of
:enants in   *i*
precluded

ds of the
:, as cited

*a* by Mummery LJ in para 25 above. Chadwick LJ's exegesis in *Basch v Stekel*
[2001] L & TR 1, (2001) 81 P & CR DG1 is relevant:

> '22. Lord Nicholls explained in *Hindcastle v Barbara Attenborough*
> why the former practice [of including a put option in a guarantee] was
> unnecessary. He pointed out that the operation of s 178 of the
> *b* Insolvency Act 1986 is limited by the provisions in para (b) of sub-s (4).
> The disclaimer takes effect under the section only in so far as is
> necessary for the purpose of releasing the insolvent company from
> liability. The disclaimer does not affect the rights and liabilities of other
> persons, in particular persons such as a surety or an original tenant.
> Nevertheless, the tenancy, itself, does cease to exist as an estate in the
> *c* land demised by the lease. The relationship of landlord and tenant is
> preserved notionally for the purposes only of giving rise to an
> obligation on the surety or other third parties.'

It is because the relationship of landlord and tenant is preserved
notionally for the purpose of the liabilities of the appellant that *for that*
*d* *purpose* the assignee notionally continues to be bound by the tenant
covenants in the lease.

[48] True it is that s 178(4)(b), by referring to 'the rights and liabilities' of
a person such as a guarantor, refers on to the provisions of a guarantee in
order to ascertain what are those rights and liabilities. But if the guarantee
provides only that the liability of the guarantor comes to an end with the
*e* determination of 'the rights, interests and liabilities of the company in or in
respect of the property disclaimed', the liability of the guarantor continues,
because as against her the rights, interests and liabilities of the company in
or in respect of the property are deemed not to have determined. In
*Hindcastle*, the covenant of the second defendant, which had assigned the
*f* lease to the company in liquidation, with the lessor was as follows:

> 'that as from the date when the Lessee's estate and interest in the
> Lease shall be assigned to the assignee pursuant to the licence
> hereinbefore contained and thenceforth during the residue of the term
> created by the Lease the Assignee will pay the rents thereby reserved ...'
> (See the judgment of Millett LJ in the Court of Appeal at [1995]
> *g* 4 All ER 129 at 137, [1995] QB 95 at 106.)

The argument that the liability of the second defendant was determined
by the disclaimer of the lease because the term created by the lease then
came to an end failed. Similarly, the argument that the surety's liability,
which was to run 'during the continuance of the lease', had been terminated
*h* because disclaimer resulted in the termination of the lease, failed. This was
because, as against them, the effect of s 178(4)(b) was that the term and the
lease were deemed to continue. I see no distinction between the provisions
of these instruments and that of the guarantee agreement in the present
case.

[49] Like Mummery LJ, I see no inconsistency between this conclusion
*i* and the inclusion in the guarantee agreement of the put option in cl 5. In
any event, quite apart from the decision of the House of Lords in
*Hindcastle*, the decision of this court in *Basch v Stekel* is binding authority
that there is no such inconsistency.

[50] For these reasons, which are in substance the same as those given by

Mummery LJ and Elias LJ (whose judgments I have read in draft), I would   *a*
dismiss this appeal.

**ELIAS LJ.**
[51] This appeal raises a very short point. It is accepted that following
*Hindcastle Ltd v Barbara Attenborough Ltd* [1996] 2 BCLC 234, [1997]   *b*
AC 70, the effect of s 178(4) of the Insolvency Act is that whilst the tenant
(or an assignee) ceases to be liable for any of the tenant's covenants
following disclaimer, the guarantor remains liable on the guarantee. The
way in which this objective is achieved, lucidly explained by Lord Nicholls
in that case, is by deeming the tenant's obligations to continue in so far as
the guarantee agreement is concerned. The rights and liabilities of landlord   *c*
and guarantor continue as though the lease has continued. The effect of
s 178(4)(b) is that the rights and obligations under the guarantee agreement
remain as they were.
[52] Equally, however, the section is not intended to alter those rights and
liabilities. Accordingly, if the parties in terms state that the guarantee is to
terminate on disclaimer, effect must be given to that agreement. That would   *d*
be a clear example of a case where, even if it may be said that the
obligations of the tenant would be deemed to continue so far as the
guarantor is concerned, the guarantor has no continuing obligations with
respect to them. The guarantee no longer bites because the parties have said
that it should not.
[53] Mr Glen, counsel for the appellant guarantor, submits that this is in   *e*
essence the situation here. Clause 1.4 of the guarantee agreement provides
that the guarantor's obligations are limited to the period during which the
assignee is bound by the tenant covenants. It follows that the guarantor's
obligations cease once the assignee is no longer bound. One of the
circumstances which will cause the assignee to cease to be bound is when   *f*
the lease is disclaimed. Accordingly, the parties have chosen to draft the
contract in a way which causes the guarantee to cease on disclaimer. They
could have drafted it in numerous other ways which would have kept the
liability on foot notwithstanding the disclaimer, but they have not done so.
The court should give effect to the clear and simple words of the agreement.
The landlord accepts that as a result of the disclaimer the assignee is no   *g*
longer bound by the agreement and it necessarily follows that the guarantee
must fall away. It is not the legal effect of the disclaimer itself which brings
the guarantor's liability to an end, but the terms of the contract which
define the parties' rights and obligations.
[54] Furthermore, the landlord is able to protect himself on a disclaimer
by exercising his rights under the put option in cl 5 of the Agreement which   *h*
enables him to require the guarantor, if certain conditions are met, to enter
into a tenancy agreement. That is the way in which the parties have chosen
to deal with the consequences of a disclaimer. It is neither necessary nor just
to give an artificial meaning to cl 1.4 to extend the protection afforded to
the landlord in the event of a disclaimer.
[55] Mr Fancourt QC, counsel for the landlord, contends that in the   *i*
context of the guarantee agreement, the assignee must be deemed still to be
bound by the tenant's covenants even though he is not so bound in fact. The
guarantor is liable as though the assignee were bound. That is the effect of
s 178(4) as construed in the *Hindcastle* case [1996] 2 BCLC 234 at 245,

raft), I would  *a*

nat following
234, [1997]
lst the tenant
t's covenants
arantee. The
.ord Nicholls
. e in so far as
s of landlord
The effect of
ee agreement

se rights and
arantee is to
. That would
aid that the
) far as the
gations with
ies have said

hat this is in
ent provides
ig which the
: guarantor's
One of the
und is when
to draft the
laimer. They
ave kept the
not done so.
e agreement.
signee is no
ie guarantee
vhich brings
tract which

a disclaimer
ment which
iet, to enter
have chosen
ary nor just
afforded to

that in the
d still to be
in fact. The
he effect of
234 at 245,

*a* [1997] AC 70 at 88 by Lord Nicholls. It is of course open to the parties to limit the guarantor's liability so as to terminate on disclaimer, but very clear words are necessary to achieve that objective. Insolvency or bankruptcy are precisely the circumstances when the guarantee is likely to become operative.

*b* [56] When construing the guarantee agreement, the words used must be read in the context of the common law and statutory background with the consequence that the liabilities of the assignee are deemed to continue even though they do not continue in fact. The guarantee agreement must, therefore, be read on that premise. So when cl 1.4 provides that the liability period continues only whilst the assignee remains bound, this naturally means whilst he is deemed to be bound.

*c* [57] Mr Fancourt relies upon the terms of the guarantee agreement in the *Hindcastle* case itself, and the Court of Appeal decision which it overruled, *Stacey v Hill* [1901] 1 KB 660. In *Hindcastle* their Lordships held that the guarantor was bound by a clause which provided that the guarantee should run 'during the continuance of the lease.' Lord Nicholls expressly rejected a *d* construction argument (admittedly not in quite the form advanced here) to the effect that the obligations came to an end on disclaimer. Yet read literally, as Mr Glen would have the court read cl 1.4 in this case, the lease did not continue on disclaimer and therefore the guarantee should have ceased. That is not what their Lordships held.

*e* [58] In *Stacey v Hill* the surety undertook to guarantee 'so much rent as may be from time to time in arrear for twenty one days ...' The Court of Appeal held that this obligation came to an end on disclaimer on the grounds that the obligation only ran with the lease. Once that was determined the obligations of the guarantor came to an end. The House of Lords in *Hindcastle* overruled this decision. Lord Lloyd said in terms that the Court of Appeal in that case ought to have held that the surety was not *f* released ([1996] 2 BCLC 234 at 240, [1997] AC 70 at 83) and Lord Nicholls also held that the case should be overruled ([1996] 2 BCLC 234 at 253, [1997] AC 70 at 96).

*g* [59] Mr Fancourt submits that if the argument advanced by Mr Glen were correct, there could have been no continuing obligation on the surety in that case either. Following disclaimer, the tenant was under no obligation to pay any rent and therefore there was in fact no rent in arrears. However, liability could properly have been imposed – and their Lordships in *Hindcastle* said should have been imposed – on the basis that there was deemed to be a tenancy agreement still in place, and since the tenant had paid no rent, there were deemed to be arrears for which the guarantor was *h* liable. The reference to rent arrears included, in the context of this agreement, deemed rent arrears.

*i* [60] I have no hesitation in preferring the argument of Mr Fancourt. The effect of *Hindcastle* is that the lease is deemed to continue and the obligations of the assignee are deemed to remain in place. This fiction permeates the whole of the agreement. The assignee must be treated as if he were bound by the tenant's covenants even though he is not in fact so bound. He remains bound for the purposes of determining the rights and obligations arising out of the relationship between the landlord and the guarantor. Accordingly, a clause in the agreement which limits the term of the guarantee to the period during which the assignee is bound does not,

read in the context of s 178(4) as interpreted by their Lordships in *a*
*Hindcastle*, operate so as to terminate the guarantee on the basis that the
assignee is no longer bound in fact following the disclaimer. He is deemed
still to be bound. I agree with Mr Fancourt that liability in *Hindcastle* and
*Stacey* could only be imposed by carrying the deeming principle through to
the construction of the agreement itself. In *Hindcastle* the guarantor's
obligation ran 'during the continuation of the lease' which after disclaimer *b*
could only refer to the fictional or deemed lease. So here; the obligation
lasts whilst the assignee is bound, which must refer to his being deemed to
be bound. In substance Mr Glen's argument involves restoring the now
discredited approach adopted by the court in *Stacey v Hill*.

[61] Nor do I think that any different meaning should be given to the
meaning of cl 1.4 because of the existence of the put option in cl 5. That *c*
provides an additional remedy for the landlord. Until *Stacey v Hill* was
overruled it was apparently the way in which landlords sought to protect
themselves from the consequences of that decision. However, it is not
always a satisfactory way of protecting the landlord's interests. Once a new
tenancy agreement is made, any guarantee of the old tenant's or assignee's *d*
liabilities comes to an end. Moreover, the landlord may have good reason
for not wanting the guarantor to take over the tenancy agreement. It is also
pertinent to note that in *Hindcastle* itself the guarantor remained liable on
the lease notwithstanding the existence of a clause of a similar nature to cl
5.

[62] Accordingly, for these reasons I would dismiss the appeal. *e*

*Appeal dismissed.*

Gareth Williams   Barrister.

[2011] BPIR

# SOFAER v ANGLO IRISH ASSET FINANCE PLC
## [2011] EWHC 1480 (Ch)

Chancery Division

Lewison J

26 May 2011

*Individual voluntary arrangement – Voting – Decision of chair of creditors'
meeting to admit vote but marked as objected to – Whether chair obliged to
place a £1 value on such vote or admit for full amount*

*Individual voluntary arrangement – Voting rights of creditors – Whether
events occurring after meeting could affect voting rights of creditors at
meeting*

*Guarantees and indemnities – Nature of liability undertaken*

S was the director of a number of companies to which the bank had made loans. The
bank enjoyed security over the companies' assets as part of the lending arrangement. S
had given a guarantee and an indemnity to the bank in respect of its lending to those
companies. It was made clear in those documents that the liability of S was as a
primary obligor and not as a surety. A guarantee cap of £8.4m was imposed. On the
companies failing to repay their loans, the bank had, on 27 November 2009, served a
statutory demand for £8.3m plus interest against S and, after failing to have it set aside,
S proposed an individual voluntary arrangement (IVA) to his creditors. On 30
July 2010 the chair of the creditors' meeting (after taking advice from counsel)
permitted the bank to vote for the full amount now due (now £9.2m) but marked the
debt as 'objected to'. That enabled the bank to block the IVA. S appealed, but Chief
Registrar Baister rejected the appeal. S, who had since been made bankrupt, appealed
against that decision. It was not suggested that the right of appeal had vested in his
trustee in bankruptcy.

**Held** – appeal dismissed –

(1)   The amount due under the guarantee/indemnity was immediately payable and
for a liquidated sum. The guarantee/indemnity was drafted in such a way as to make S
primarily liable and not as a mere surety.

(2)   Even if the amount due to the bank was for an unliquidated sum, the chair was
not obliged to value it at only £1 if the evidence available suggested that it should be
given a higher value.

(3)   Realisations made by the receivers appointed to enforce the security over the
companies' property were unlikely to reduce the amount due under the guarantee to a
sum below the guarantee cap.

(4)   With regard to the argument based upon r 5.23 of the Insolvency Rules 1986,
that the bank's debt was secured and therefore should have been left out of the vote, it
should be noted that at the date of the meeting the bank enjoyed security over the
companies' property and not over the property of S. The fact that S acquired the equity
of redemption from the companies some 3½ months later was immaterial. Events
subsequent to the meeting could not effect the voting rights of creditors at that
meeting. *Fagg v Rushton* [2007] EWHC 657 (Ch) not followed. Moreover, the equity
of redemption represented what residual rights were left to the mortgagor after the
mortgagee had used his remedies to secure recovery – in effect, that would mean that
the mortgagee had no security over the equity of redemption.

(5)   If there were any claims to be made against the receivers then it would be for
the trustee in bankruptcy of S to pursue them. Such claims could not have affected
voting rights on the IVA.

**Statutory provisions considered**
Insolvency Act 1986, s 383(2)
Insolvency Rules 1986 (SI 1986/1925), rr 5.21(3), 5.23(3)

**Cases referred to in judgment**
*Fagg v Rushton* [2007] EWHC 657 (Ch), [2007] BPIR 1059, ChD
*McGuinness v Norwich and Peterborough Building Society* [2010] EWHC 2989 (Ch),
    [2011] 1 WLR 613, [2011] BPIR 213, [2011] 2 BCLC 154, ChD
*Mercury Tax Group Ltd (In Administration), Re; Her Majesty's Revenue and Customs
    v Maxwell and Klempka* [2010] EWCA Civ 1379, [2011] BPIR 480, CA
*Newlands (Seaford) Educational Trust (In Administration), Re; Chittenden and Others
    v Pepper and Others* [2006] EWHC 1511 (Ch), [2006] BPIR 1230, ChD
*Power v Petrus Estates Ltd and Others* [2008] EWHC 2607 (Ch), [2009] BPIR 141,
    [2009] 1 BCLC 250, ChD

*Christopher Boardman* for the appellant, S
*Richard Fisher* for the respondent, the bank

**LEWISON J:**
[1]    Faced with impending bankruptcy, Mr Charles Sofaer put forward proposals for an individual voluntary arrangement (IVA). The Anglo Irish Bank and related entities are Mr Sofaer's largest creditors by far.
[2]    Having taken advice from counsel, the chairman of the creditors' meeting considering the proposals for the IVA allowed the bank to vote for the whole of their claimed debt and marked it as 'objected to'. As a result, the proposals for the IVA were defeated. Mr Sofaer appealed against the chairman's decision, and Chief Registrar Baister struck out his appeal. With the Chief Registrar's permission, Mr Sofaer now appeals again. He has been adjudicated bankrupt since the Chief Registrar's decision, but it is not suggested that his right to appeal has vested in his trustee in bankruptcy.
[3]    Mr Sofaer's liability arises under a deed of guarantee and indemnity. The background to his entering into that deed was the making of secured loans by the bank to a number of companies of which Mr Sofaer was a director. The liability of those companies was defined in the deed as 'Liabilities'. Clause 2 of the deed, headed 'Guarantee and Indemnity', provided as follows:

'2.1    *Guarantee*
The Guarantor:

(a)    guarantees the payment and the discharge of the Liabilities; and
(b)    undertakes on demand to pay to the Lender any Liability which is not paid and to perform any Liability which is not performed when due to be paid or performed.

2.2    *Indemnity*
As an obligation independent of clause 2.1, the Guarantor jointly and severally agrees to indemnify each Beneficiary on demand against any loss suffered by each Beneficiary as a result of the Unenforceability of any Liability as against the Borrowers and/or any Liability not being discharged or performed by the Borrowers.

2.3   *Amount of Loss*

The amount of such loss will be:

> (a)    where the Liability arises from the payment obligation, the amount payable by the Borrowers or which would be so payable but for the Unenforceability of that Liability; or
>
> (b)    in any other case, the amount which is payable to the Lender by the Borrowers by way of damages for breach of that Liability or which would be so payable but for the Unenforceability of that Liability,

together with the cost to the Beneficiary of procuring or attempting to procure the performance of any such Liability.'

**[4]**    Clause 2.4 of the deed stated that the obligations of the guarantor were 'undertaken as primary obligor and not merely as surety'. Clause 3.1 stated that the deed took effect as a guarantee and indemnity in respect of the whole of the liabilities, but clause 3.3 capped Mr Sofaer's liability as £8.4m of the principal amount of the loan, together with interest and other specified sums.
**[5]**    Clause 6.1 of the deed provided:

> 'The Lender will not be obliged, before making a demand or taking any other steps to enforce its rights under this deed against the Guarantor:
>
> (a)    to make any demand for repayment, or take any action to recover any Liability;
> (b)    to take any proceedings or exhaust any claim, right or remedy against the Borrowers or any other person; or
> (c)    to take any action under or enforce any other Security held by it.'

**[6]**    Clause 8.1 of the deed provided that until the liabilities had been irrevocably paid and/or performed in full, the guarantor would not take or receive the benefit of any security from the borrowers; would not be subrogated to any rights of any of the beneficiaries; and would not:

> 'receive, claim or take the benefit of any payment from the Borrowers or any other surety or indemnifier for the Borrowers, or exercise any other right, claim or remedy in respect of any Liability.'

**[7]**    Clause 9.1(b) of the deed stated that, until the liabilities had been irrevocably paid or performed in full, the guarantor would not be entitled to the benefit of any other security.
**[8]**    Finally, clause 17.3 of the deed stated:

> 'A certificate by any Beneficiary as to any amount for the time being due to it by the Guarantor will be conclusive evidence of the amount so due in the absence of any manifest error.'

**[9]**    In the statutory demand the bank served on Mr Sofaer they asserted that the principal debtors had failed to make certain payments to the bank, with the consequence that the bank was entitled to declare the whole of the

loan due and payable. The amount claimed from Mr Sofaer was £8.347m plus interest. The additional interest brought the aggregate amount owing to £8.432m. The bank demanded that sum from Mr Sofaer on 27 November 2009 and certified that sum as due pursuant to clause 7.3 of the deed.

[10]    Mr Sofaer applied to set aside the statutory demand, but that application failed, so Mr Sofaer put forward the proposals for an IVA that I have mentioned. The bank, as I have said, wanted to vote against those proposals for the full amount of the sum owing, which by the time of the meeting had risen to £9.2m. At the meeting on 30 July 2010 the chairman allowed the bank to vote for that figure.

[11]    Mr Boardman, arguing Mr Sofaer's case on this appeal, says that the chairman was wrong to do so. He says either that the amount owing to the bank was a debt for an unliquidated amount or a debt whose value was not ascertained, or, alternatively, that the bank's claim was secured. If the first argument is right, then Mr Boardman says that the bank's debt should have been valued at £1 under r 5.21(3) of the Insolvency Rules 1986 (the 1986 Rules). If the second argument is correct, then the bank's vote should not have been counted at all because of r 5.23(3) of the 1986 Rules.

[12]    The first question therefore is: was the bank's debt a debt for a liquidated and ascertained amount? In *McGuinness v Norwich and Peterborough Building Society* [2010] EWHC 2989 (Ch), [2011] BPIR 213, Briggs J considered the nature of liabilities arising under contracts of guarantee and indemnity. While a pure guarantee (that is to say, a promise that someone else will comply with his obligations) may give rise to no more than a liability in damages, the contract of indemnity under which the so-called guarantor undertakes obligations as a principal debtor will normally give rise to a debt. In the present case that distinction is reinforced by the terms of the deed itself.

[13]    Clause 2.1(b) is a contract of indemnity. So is clause 2.2. Those liabilities were undertaken by Mr Sofaer as principal obligor and not in a secondary capacity. Clauses 2.3 and 17.3 quantify the amount of the liability in a way that is conclusive, save in the case of manifest error. No manifest error is alleged in the present case. It follows, in my judgment, that the bank's debt was a debt for a liquidated amount and that the amount of the debt, as at the date of the certificate, was ascertained as a result of the certificate. I therefore reject the first argument.

[14]    Mr Boardman points out that the amount for which the bank was admitted to vote was greater than the certified amount. In fact the bank put in a proof of debt before the meeting which refers to the increased amount which was accounted for by additional interest. However, the inclusion of additional interest in the amount for which the bank was admitted to vote can have made no difference to the outcome. Even if the bank had only been admitted to vote for the certified amount, the IVA proposals would still have been rejected. There was therefore no material irregularity or prejudice to Mr Sofaer, even if the chairman was wrong to admit the bank's claim in full.

[15]    Moreover, even if the debt had not been a liquidated and ascertained amount, I do not consider that it follows that the chairman was wrong in admitting the full, or at least the certified, amount for voting purposes. Rule 5.21(3) of the 1986 Rules does not say that an unliquidated debt must be

valued at £1: it says that it will be valued at £1 unless the chairman agrees to
put a higher value on it. In the present case, the chairman did agree to put a
higher value on it.

[16]    As Sir Andrew Morritt C pointed out in *Re Newlands (Seaford)
Educational Trust (In Administration); Chittenden and Others v Pepper and
Others* [2006] EWHC 1511 (Ch), [2006] BPIR 1230, at 1241, if the totality of
the evidence leads the chairman to the conclusion that he can safely attribute a
minimum value to the claim higher than £1 then he should do so. In the
present case it is, in my judgment, impossible to see how the chairman could
have attributed a value to the claimant's claim of less than the amount
certified under clause 17.3 of the deed. As I have said, if the chairman had
done that, the outcome of the vote would have been the same. Thus any
argument about the additional interest is academic because again there has
been no material irregularity and no prejudice to Mr Sofaer.

[17]    Mr Boardman had a subsidiary point on the quantum of the debt.
He said that receivers appointed by the bank may have made realisations by
selling properties belonging to the various companies, and that any such
realisations must go in reduction of the amount due under the guarantee. But
the amount recoverable from Mr Sofaer is capped at £8.4m plus interest;
whereas the liability of the companies was, according to the evidence at the
date of the meeting, in excess of £59m.

[18]    The statement of affairs of the borrower signed by Mr Sofaer himself
shows a very large deficiency well in excess of the cap – whether the value of
the properties is taken at their estimated realisable value, or their higher book
value. Moreover, where a creditor receives payment from the principal debtor,
then whether the payment goes in reduction of the guarantor's liability
depends on how that payment is appropriated. A debtor who makes a payment
to a creditor is entitled to appropriate the payment to a particular debt, but, if
he does not, then the appropriation may be made by the creditor.

[19]    In the present case, there is nothing to suggest that the realisations
made will reduce the amount owed by the companies to a sum below the limit
of the guarantee or that the companies have made any particular
appropriation. In addition, clause 3.1 of the deed made Mr Sofaer a guarantor
for the whole of the companies' debts and, as I have said, clause 8.1 precluded
him from taking the benefit of any repayment until the companies' liabilities
have been repaid in full. Thus Mr Sofaer, in effect, agreed that he would not
be entitled to the benefit of realisations until the companies had discharged
their debts. So this subsidiary point thus carries the appeal no further.

[20]    The second argument turns on r 5.23(3) of the 1986 Rules, which
provides that in a number of cases there is to be left out of account the
creditor's vote in respect of any claim or part of a claim. The relevant case is
'where the claim or part is secured'. The claim upon which the bank relies is
a claim against Mr Sofaer: not a claim against the companies. So the question
is whether the claim against Mr Sofaer is secured. Mr Fisher submits that
whether a claim is secured is to be decided by applying the definition of
'security' in s 383(2) of the Insolvency Act 1986 which provides:

> 'Subject to the next two subsections and any provision of the rules
> requiring the creditor to give up his security for the purposes of proving
> a debt, a debt is secured for the purposes of this Group of Parts to the

extent that the person to whom the debt is owed holds any security for the debt (whether a mortgage, charge, lien or other security) over any property of the person by whom the debt is owed.'

**[21]**    As Mr Fisher correctly points out, there are two components of this definition. The first is that the person to whom the debt is owed must hold security for that debt rather than some other debt; and the second is that the security must be over the property of the person who owes a debt.

**[22]**    If this definition is applied, then it is clear that, as at the date of the meeting, there was no security over any property of Mr Sofaer as opposed to property owned by the various companies. I did not understand Mr Boardman to challenge this. What he said was that some 3½ months after the meeting Mr Sofaer took an assignment of the equity of redemption in each of the companies' properties comprised within the bank's security, with the result that the bank's claim became secured.

**[23]**    In my judgment, there are three flaws in this argument. The first is that events subsequent to the meeting cannot affect the bank's entitlement to vote at the meeting itself. I decided this in *Power v Petrus Estates Ltd and Others* [2008] EWHC 2607, [2009] BPIR 141. In para [16] I said:

'In an appropriate case resolution of the issue may turn upon oral evidence and cross-examination: *Re Assico Engineering Ltd* [2002] BPIR 15. It is, however, important to be clear on what "the issue" is. As Blackburne J pointed out, the issue is whether, on balance, the claim against the company is established, and, if so, in what amount. Necessarily, the question whether the claim against the company is established will be judged as at the date of the meeting at which the chairman made the impugned decision.'

**[24]**    That paragraph was quoted and expressly approved by the Court of Appeal in *Re Mercury Tax Group Ltd (In Administration); Her Majesty's Revenue and Customs v Maxwell and Klempka* [2010] EWCA (Civ) 1379, [2011] BPIR 480 (*Her Majesty's Revenue and Customs v Maxwell*). In the following paragraph of my judgment in *Power v Petrus Estates Ltd* I said:

'In my judgment therefore, events subsequent to the meeting will not lead to an appeal against the chairman's decision being allowed.'

It is true that that particular paragraph was not expressly referred to by the Court of Appeal in *Her Majesty's Revenue and Customs v Maxwell*, but nothing in the judgment of the court in that case leads me to suppose that they expressed any disapproval of it.

**[25]**    The second flaw in the argument is that what Mr Sofaer acquired was the equity of redemption in the charged properties. The equity of redemption is in effect the residual rights of the mortgagor in the mortgaged property after the mortgage has been satisfied and after the mortgagee has exercised his remedies. The bank, almost by definition, has no security over the equity of redemption because that is what remains after the security has been given effect.

**[26]**    The third flaw is that, in my judgment, the acquisition of the equity of redemption did not alter the nature of the liabilities that were secured on the properties. If the liabilities secured on the properties were the companies' liabilities rather than Mr Sofaer's (as indeed they were), I do not see how a change of ownership of the property has enlarged the scope of the security.

**[27]**    I am conscious that in *Fagg v Rushton* [2007] EWHC 657 (Ch), [2007] BPIR 1059 Evans-Lombe J appears to have decided the contrary, but I regret to say that I do not understand the principle on which he based his decision and I decline to follow him. In addition, r 5.21(2) of the 1986 Rules makes it clear that the debt in respect of which a creditor is entitled to vote is the amount of the debt owed to him at a date which is either that of the meeting or an anterior date. Subsequent changes do not affect either the characterisation or the nature of the debt.

**[28]**    In my judgment, what goes for the amount of the debt also goes to its character and, in particular, whether it is or is not a secured debt. There must be a cut-off point for determining the validity of the vote at a meeting and that must be the date of the meeting itself. This seems to me to be entirely consistent with what the Master of the Rolls said in paras [51] and [52] of *Mercury Tax Group Ltd (In Administration), Re; Her Majesty's Revenue and Customs v Maxwell and Klempka* [2010] EWCA Civ 1379, [2011] BPIR 480.

**[29]**    Lastly, Mr Boardman said that Mr Sofaer's appeal should not be struck out because there might be claims he could make against the receivers. I cannot see how the existence or non-existence of such claims can or could have affected the vote. If there were any such claims, or if there are any such claims now, it will be for Mr Sofaer's trustee in bankruptcy to enforce them.

**[30]**    In my judgment, the Chief Registrar came to the right decision and the appeal must be dismissed.

Solicitors:    *Charles Russell LLP* for the appellant, S
               *Taylor Wessing LLP* for the respondent, the bank