A  any event. I will, before deciding whether or not to continue the order of Warner J. and the other matters raised before me, look at the Isle of Man documents and hear counsel's submissions on those matters.

*Order accordingly.*

B    *Solicitors: Hopkins & Wood; Paris & Co., Birmingham; Charles Russell Williams & James; Travers Smith Braithwaite.*

S. W.

C

_____

D    SPIRO v. GLENCROWN PROPERTIES LTD. and Another

[1990 S. No. 931]

1990  Nov. 21, 23; 27                                    Hoffmann J.

*Vendor and Purchaser—Contract in writing—Exercise of option—*
E    *Agreement creating option to purchase land—Agreement in two parts signed by parties and incorporating terms—Purchaser unilaterally exercising option—Whether contract for sale constituted by exercise of option or agreement granting option—Law of Property (Miscellaneous Provisions) Act 1989 (c. 34), s. 2*

By an agreement in writing the vendor granted to the purchaser an option to purchase a property exercisable the same day by
F    notice in writing to the vendor or his solicitor. The agreement was executed in two exchanged parts, each of which incorporated the agreed terms and was signed by or on behalf of each party respectively. The purchaser exercised the option by notice in writing within the stipulated time but failed to complete. In an action for breach of contract, the vendor obtained judgment in default of defence against the purchaser.

On the vendor's summons for judgment against the purchaser's
G    guarantor, and the purchaser's summons to set aside the judgment in default, the question being whether the agreement was effective as a contract for the sale of land within section 2 of the Law of Property (Miscellaneous Provisions) Act 1989[1]:—

*Held,* giving judgment for the vendor, that for the purposes of the Act of 1989 an option to buy land should be characterised as a contract for the sale of land conditional on the purchaser's
H    unilateral exercise of the option rather than as an irrevocable offer by the vendor depending on acceptance by the purchaser's notice in writing; that the plain purpose of section 2 of the Act of 1989

[1] Law of Property (Miscellaneous Provisions) Act 1989, s. 2: see post, pp. 540G–541A.

**Spiro v. Glencrown Properties Ltd.**                                        [1991]

was to prescribe the formalities for recording the consent of the    A
parties and its terms did not prevent the agreement creating the
option from being the relevant contract; and that that contract
complied with the statutory requirements and could not be set
aside as being unenforceable against the purchaser (post, pp. 541c–e,
544g–h, 546e–f).

> *In re Mulholland's Will Trusts* [1949] 1 All E.R. 460 applied.
> *Helby v. Matthews* [1895] A.C. 471, H.L.(E.) considered.
> *Beesly v. Hallwood Estates Ltd.* [1960] 1 W.L.R. 549 and    B
> *United Scientific Holdings Ltd. v. Burnley Borough Council* [1978]
> A.C. 904, H.L.(E.) distinguished.

The following cases are referred to in the judgment:

*Beesly v. Hallwood Estates Ltd.* [1960] 1 W.L.R. 549; [1960] 2 All E.R. 314
*Griffith v. Pelton* [1958] Ch. 205; [1957] 3 W.L.R. 522; [1957] 3 All E.R. 75,
   C.A.                                                                        C
*Helby v. Matthews* [1895] A.C. 471, H.L.(E.)
*K. (Enduring Powers of Attorney), In re* [1988] Ch. 310; [1988] 2 W.L.R. 781;
   [1988] 1 All E.R. 358
*Kennewell v. Dye* [1949] Ch. 517; [1949] 1 All E.R. 881
*Laybutt v. Amoco Australia Property Ltd.* (1974) 132 C.L.R. 57
*London and South Western Railway Co. v. Gomm* (1882) 20 Ch.D. 562, C.A.
*Mulholland's Will Trusts, In re* [1949] 1 All E.R. 460    D
*Richards v. Creighton Griffiths (Investments) Ltd.* (1972) 225 E.G. 2104
*Sainsbury (J.) Plc. v. O'Connor* [1990] S.T.C. 516
*United Scientific Holdings Ltd. v. Burnley Borough Council* [1978] A.C. 904;
   [1977] 2 W.L.R. 806; [1977] 2 All E.R. 62, H.L.(E.)
*Varty v. British South Africa Co.* [1965] Ch. 508; [1964] 3 W.L.R. 698; [1964]
   2 All E.R. 975, C.A.
*Weeding v. Weeding* (1861) 1 J. & H. 424    E

The following additional cases were cited in argument:

*Gardner v. Blaxill* [1960] 1 W.L.R. 752; [1960] 2 All E.R. 457
*Harvela Investments Ltd. v. Royal Trust Company of Canada (C.I.) Ltd.*
   [1986] A.C. 207; [1985] 3 W.L.R. 276; [1985] 2 All E.R. 966, H.L.(E.)
*Mountford v. Scott* [1975] Ch. 258; [1975] 2 W.L.R. 114; [1975] 1 All E.R.
   198, C.A.                                                                   F
*New Hart Builders Ltd. v. Brindley* [1975] Ch. 342; [1975] 2 W.L.R. 595;
   [1975] 1 All E.R. 1007
*Stromdale & Ball Ltd. v. Bruden* [1952] Ch. 223; [1952] 1 All E.R. 59
*Sudbrook Trading Estate Ltd. v. Eggleton* [1983] 1 A.C. 444; [1982] 3 W.L.R.
   315; [1982] 3 All E.R. 1, H.L.(E.)
*United Dominions Trust (Commercial) Ltd. v. Eagle Aircraft Services Ltd.*
   [1968] 1 W.L.R. 74; [1968] 1 All E.R. 104, C.A.    G

Action

On 2 March 1990, the plaintiff, Trevor David Spiro, in an action
against the first defendant, Glencrown Properties Ltd., for breach of a
contract for the sale of land, applied by summons for judgment under
R.S.C., Ord. 14 against the second defendant, Bennoy Berry, as guarantor,
for payment of all sums found or adjudged due to him by the first    H
defendant in the proceedings. On 1 May 1990, the plaintiff obtained
judgment in default of defence against the first defendant for damages to
be assessed. On 7 June 1990, the first defendant applied by summons to

A   have the judgment in the action set aside. On 27 November 1990, both summonses came before Hoffmann J., when the parties agreed to treat the hearing as the trial of the action.

The facts are stated in the judgment.

B   *Beverly-Ann Rogers* for the plaintiff. The agreement by which the purchaser was granted an option to buy the property recorded the consensus between the parties and was the relevant contract for the purposes of section 2 of the Law of Property (Miscellaneous Provisions) Act 1989. The agreement, in two parts signed by both parties, became effective as a contract for the purposes of section 2 when the purchaser gave notice within the required time that he was exercising the option and it became enforceable by the plaintiff. There was no need for any further C   signing by the plaintiff to make the agreement a valid enforceable contract. The notice of the taking up of the option converted the agreement between the parties into a concluded contract of purchase. The characterisations of options as conditional contracts or irrevocable offers must be considered in their context and do not preclude a finding that the material contract is the option agreement. The cases in which an option D   was analysed as an irrevocable offer were concerned (excepting *Beesly v. Hallwood Estates Ltd.* [1960] 1 W.L.R. 549) with the obligations of the parties pursuant to an option. The analysis of the nature of an option did not determine the issue in those cases. The dicta in *Beesly's* case was based on a misapprehension of the decision in *Helby v. Matthews* [1895] A.C. 471. The cases adopting the conditional contract analysis were concerned, as is the present case, with the nature of an option: see *Weeding v.* E   *Weeding* (1861) 1 J. & H. 424; *In re Mulholland's Will Trusts* [1949] 1 All E.R. 460; *Griffith v. Pelton* [1958] Ch. 205 and *Richards v. Creighton Griffiths (Investments) Ltd.* (1972) 225 E.G. 2104. There should be judgment against the second defendant as guarantor.

   *Michael Douglas* for the defendants. No valid contract came into existence when the option to purchase the property was granted. The F   option was merely an offer, albeit irrevocable, and there was no concluded contract until that offer was accepted by the notice exercising the option: *Helby v. Matthews* [1895] A.C. 471; *Beesly v. Hallwood Estates Ltd.* [1960] 1 W.L.R. 549; *Mountford v. Scott* [1975] Ch. 258; *United Dominions Trust (Commercial) Ltd. v. Eagle Aircraft Services Ltd.* [1968] 1 W.L.R. 74 and *Sainsbury (J.) Plc. v. O'Connor* [1990] S.T.C. 516. Alternatively the grant of the option gave rise only to a unilateral contract which was G   converted into a bilateral contract by the exercise of the option. That bilateral contract was the only relevant contract for the sale or disposition of an interest in land: *United Scientific Holdings Ltd. v. Burnley Borough Council* [1978] A.C. 904; *Sudbrook Trading Estates Ltd. v. Eggleton* [1983] 1 A.C. 444 and *Harvela Investments Ltd. v. Royal Trust Company of Canada (C.I.) Ltd.* [1986] A.C. 207. Whilst such an irrevocable offer or unilateral contract confers on the grantee of the option an equitable H   interest in land, it imposes no binding obligation on him and accordingly creates no contract subject to any condition. [Reference was made to *Laybutt v. Amoco Australia Property Ltd.* (1974) 132 C.L.R. 57; *Kennewell v. Dye* [1949] Ch. 517; *Griffith v. Pelton* [1958] Ch. 205; *Weeding v.*

Spiro v. Glencrown Properties Ltd.                          [1991]

A

*Weeding* (1861) 1 J. & H. 424 and *London and South Western Railway Co. v. Gomm* (1882) 20 Ch.D. 562.] An option can be a continuing offer by the vendor as part of a conditional contract, as distinguished from a mere offer to sell without obligation: *Varty v. British South Africa Co.* [1965] Ch. 508, 523; *In re K. (Enduring Powers of Attorney)* [1988] Ch. 310 and *J. Sainsbury Plc. v. O'Connor* [1990] S.T.C. 516.

B

The exercise of the option gives rise to a new contract. There is a unilateral right to bring into existence a new contract. [Reference was made to *Gardner v. Blaxill* [1960] 1 W.L.R. 752; *New Hart Builders Ltd. v. Brindley* [1975] Ch. 342 and *Stromdale & Ball Ltd. v. Bruden* [1952] Ch. 223.]

C

In order to satisfy section 2 of the Act of 1989, the contract, whether in one or two documents, has to be signed by both parties. Although the original agreement containing the option was signed by both parties, the notice exercising the option was not and thus the contract has not complied with the statutory requirements and is unenforceable. Therefore, the judgment against the first defendant as purchaser should be set aside and no judgment should be entered against the second defendant.

*Beverly-Ann Rogers* was not called upon to reply.

D

*Cur. adv. vult.*

27 November.   The following judgment was handed down.

E

HOFFMANN J.   This is an action for damages for breach of a contract to buy land. On 14 November 1989 the plaintiff granted an option to the first defendant ("the purchaser") to buy a property in Finchley for £745,000. The option was exercisable by notice in writing delivered to the vendor or his solicitors by 5 p.m. on the same day. The purchaser gave a notice exercising the option within the stipulated time. He failed to complete and the vendor, after serving a notice to complete and issuing a writ for specific performance, rescinded the contract. The second defendant, Mr. Berry, is guarantor of the purchaser's obligations. On 1 May 1990 the vendor obtained judgment in default of defence against the purchaser for damages to be assessed. There are now before me a summons by the vendor for judgment under R.S.C., Ord. 14 against Mr. Berry as guarantor and a summons by the purchaser to set aside the judgment against it. Since both summonses raise the same short point of law and there are no other issues in the case, the parties have agreed to treat this hearing as the trial of the action.

F

G

The only question for decision is whether the contract on which the vendor relies complied with the provisions of section 2 of the Law of Property (Miscellaneous Provisions) Act 1989, which came into force on 27 September 1989, some seven weeks before the grant and exercise of the option. It is a question which has produced a lively debate in conveyancing journals. The relevant provisions are as follows:

H

"(1) A contract for the sale or other disposition of an interest in land can only be made in writing and only by incorporating all the terms which the parties have expressly agreed in one document or, where contracts are exchanged, in each. (2) The terms may be incorporated in a document either by being set out in it or by reference to some other

A    document. (3) The document incorporating the terms or, where contracts are exchanged, one of the documents incorporating them (but not necessarily the same one) must be signed by or on behalf of each party to the contract."

If the "contract for the sale . . . of an interest in land" was for the purposes of section 2(1) the agreement by which the option was *granted*, there is no difficulty. The agreement was executed in two exchanged parts, B each of which incorporated all the terms which had been agreed and had been signed by or on behalf of the vendor and purchaser respectively. But the letter which *exercised* the option was of course signed only on behalf of the purchaser. If the contract was made by this document, it did not comply with section 2.

C    Apart from authority, it seems to me plain enough that section 2 was intended to apply to the agreement which created the option and not to the notice by which it was exercised. Section 2, which replaced section 40 of the Law of Property Act 1925, was intended to prevent disputes over whether the parties had entered into a binding agreement or over what terms they had agreed. It prescribes the formalities for recording their mutual consent. But only the grant of the option depends upon consent. The exercise of the D option is a unilateral act. It would destroy the very purpose of the option if the purchaser had to obtain the vendor's countersignature to the notice by which it was exercised. The only way in which the concept of an option to buy land could survive section 2 would be if the purchaser ensured that the vendor not only signed the agreement by which the option was granted but also at the same time provided him with a countersigned form to use if he decided to exercise it. There seems no conceivable reason why the legislature E should have required this additional formality.

The language of section 2 places no obstacle in the way of construing the grant of the option as the relevant contract. An option to buy land can properly be described as a contract for the sale of that land conditional on the exercise of the option. A number of eminent judges have so described it. In *Helby v. Matthews* [1895] A.C. 471, 482, which concerned the sale of a F piano on hire-purchase, Lord Macnaughten said:

> "The contract, as it seems to me, on the part of the dealer was a contract of hiring coupled with a conditional contract or undertaking to sell. On the part of the customer it was a contract of hiring only until the time came for making the last payment."

G    In *Griffith v. Pelton* [1958] Ch. 205, which raised the question of whether the benefit of an option was assignable, Jenkins L.J. said, at p. 225:

> "An option in gross for the purchase of land is a conditional contract for such purchase by the grantee of the option from the grantor, which the grantee is entitled to convert into a concluded contract of purchase, and to have carried to completion by the grantor, upon giving the prescribed notice and otherwise complying with the conditions upon H    which the option is made exercisable in any particular case."

In the context of section 2, it makes obvious sense to characterise it in this way. So far, therefore, the case seems to me to be clear.

The purchaser, however, submits that I am constrained by authority to    A
characterise an option as an irrevocable offer which does not become a
contract for the sale of land until it has been accepted by the notice which
exercises the option. It follows that the "contract for the sale . . . of an
interest in land" within the meaning of section 2 can only have been made
by the letter.

The first case on which the purchaser relies is *Helby v. Matthews* [1895]
A.C. 471, the very case in which, as I have said, Lord Macnaughten    B
characterised an option to purchase as a conditional contract to sell. Lord
Herschell L.C. and Lord Watson, however, expressed themselves rather
differently. Lord Herschell L.C. said, at p. 477:

> "when a person has, for valuable consideration, bound himself to sell to
> another on certain terms, if the other chooses to avail himself of the    C
> binding offer, he may, in popular language, be said to have agreed to
> sell, though an agreement to sell in this sense, which is in truth merely
> an offer which cannot be withdrawn, certainly does not connote an
> agreement to buy, and it is only in this sense that there can be said to
> have been an agreement to sell in the present case."

Lord Watson said, at pp. 479–480:    D

> "In order to constitute an agreement for sale and purchase, there must
> be two parties who are mutually bound by it. From a legal point of view
> the appellant was in exactly the same position as if he had made an offer
> to sell on certain terms, and had undertaken to keep it open for a definite
> period."
>                                                                E

It is, however, important to read these statements in the context in which
they were made. The question in *Helby v. Matthews* was whether, during
the currency of the hire, the hirer had "agreed to buy" the goods within the
meaning of the Factors Act 1889. The purpose of the Factors Act was to
give a buyer, who was in possession but had not yet acquired title, the power
to confer title upon a third party who took in good faith. It is not surprising
that the House of Lords decided that a person who had at the relevant time    F
no obligation to acquire or pay for the goods had not "agreed to buy" them
within the meaning of the Act. The language and purpose of the statute
requires one to look at the arrangement from the buyer's point of view. And
the essence of an option is that while the seller may be said to be conditionally
bound, the buyer is free. In the *Helby v. Matthews* context it was therefore
true to say that pending exercise of the option, the position of the buyer was    G
*as if* he had been made an offer which the seller could not withdraw.

But the concept of an offer is of course normally used as part of the
technique for ascertaining whether the parties have reached that mutual
consent which is a necessary element in the formation of a contract. In this
primary sense, it is of the essence of an offer that by itself it gives rise to no
legal obligations. It was for this reason that Diplock L.J. said in *Varty v.*    H
*British South Africa Co.* [1965] Ch. 508, 523:

> "To speak of an enforceable option as an 'irrevocable offer' is juristically
> a contradiction in terms, for the adjective 'irrevocable' connotes the

A    existence of an obligation on the part of the offeror, while the noun
'offer' connotes the absence of any obligation until the offer has been
accepted."

This does not mean that in Lord Diplock's opinion, Lord Herschell L.C. and
Lord Watson in *Helby v. Matthews* [1895] A.C. 471 were speaking nonsense.
They were not using "offer" in its primary sense but, as often happens in
B    legal reasoning, by way of metaphor or analogy. Such metaphors can be vivid
and illuminating but prove a trap for the unwary if pressed beyond their
original context. As I said recently in another connection in *In re K. (Enduring
Powers of Attorney)* [1988] Ch. 310, 314:

"there are dangers in reasoning from the metaphor as if it expressed a
literal truth rather than from the underlying principle which the metaphor
C    encapsulates."

Here the underlying principles are clear enough. The granting of the
option imposes no obligation on the purchaser and an obligation on
the vendor which is contingent on the exercise of the option. When the
option is exercised, vendor and purchaser come under obligations to perform
as if they had concluded an ordinary contract of sale. And the analogy of an
D    irrevocable offer is, as I have said, a useful way of describing the position of
the purchaser between the grant and exercise of the option. Thus in *J.
Sainsbury Plc. v. O'Connor* [1990] S.T.C. 516 Millett J. used it to explain
why the grantee of an option to buy shares did not become the beneficial
owner until he had exercised the option.

But the irrevocable offer metaphor has much less explanatory power in
E    relation to the position of the vendor. The effect of the "offer" which the
vendor has made is, from his point of view, so different from that of an offer
in its primary sense that the metaphor is of little assistance. Thus in the
famous passage in *London and South Western Railway Co. v. Gomm* (1882)
20 Ch.D. 562, 581, Sir George Jessel M.R. had no use for it in explaining
why the grant of an option to buy land confers an interest in the land upon
the grantee:
F
"The right to call for a conveyance of the land is an equitable interest or
an equitable estate. In the ordinary case of a contract for purchase there
is no doubt about this, and an option for repurchase is not different in
its nature. A person exercising the option has to do two things, he has
to give notice of his intention to purchase, and to pay the purchase
money; but as far as the man who is liable to convey is concerned, his
G    estate or interest is taken away from him without his consent, and the
right to take it away being vested in another, the covenant giving the
option must give that other an interest in the land."

The fact that the option binds the vendor contingently to convey was the
reason why an option agreement was held to fall within section 40 of the
Law of Property Act 1925: see *Richards v. Creighton Griffiths (Investments)
H    Ltd.* (1972) 225 E.G. 2104, where Plowman J. rejected a submission that it
was merely a contract not to withdraw an offer. Similarly in *Weeding v.
Weeding* (1861) 1 J. & H. 424, Page-Wood V.-C. held that the grant of
an option to buy land was sufficient to deem that land converted into

Hoffmann J.           **Spiro v. Glencrown Properties Ltd.**                    **[1991]**

personalty for the purposes of the grantor's will, even though the option          A
had not yet been exercised when he died. The Vice-Chancellor said, at
pp. 430–431:

> "I cannot agree with the argument that there is no contract. It is as
> much a conditional contract as if it depended on any other contingency
> than the exercise of an option by a third person, such as, for example,
> the failure of issue of a particular person."                                    B

Thus in explaining the vendor's position, the analogy to which the courts
usually appeal is that of a conditional contract. This analogy might also be
said to be imperfect, because one generally thinks of a conditional contract
as one in which the contingency does not lie within the sole power of one of
the parties to the contract. But this difference from the standard case of a
conditional contract does not destroy the value of the analogy in explaining
the *vendor's* position. So far as he is concerned, it makes no difference          C
whether or not the contingency is within the sole power of the purchaser.
The important point is that "his estate or interest is taken away from him
without his consent."

*Griffith v. Pelton* [1958] Ch. 205 was another case in which the irrevocable
offer analogy was unhelpful. The rule is that an offer in the primary sense
can be accepted only by the person to whom it is made. The offeree cannot          D
assign to someone else the right to accept an unaccepted offer. In explaining
why the benefit of an option *could* be assigned, so that someone other than
the grantee could accept it, Jenkins L.J., in the passage which I have already
cited, characterised the option as a conditional contract and said, at p. 225:

> "The conditional contract constituted by the grant of the option is a
> chose in action the benefit of which can (if the terms of the contract are
> such as to show that it is not merely personal to the grantor) be assigned    E
> by the grantee to anyone he chooses, subject to any restriction imposed
> by the contract as to the persons in whose favour assignment is
> permissible."

Similarly in the Australian decision of *Laybutt v. Amoco Australia Pty.
Ltd.* (1974) 132 C.L.R. 57, following *Kennewell v. Dye* [1949] Ch. 517, the
conditional contract analogy was used by Gibbs J. to explain why an option          F
could be enforced against the estate of the grantor, notwithstanding the rule
that an ordinary offer lapses on the death of the offeror.

The purchaser's argument requires me to say that "irrevocable offer" and
"conditional contract" are mutually inconsistent concepts and that I must
range myself under one or other banner and declare the other to be heretical.
I hope that I have demonstrated this to be a misconception about the nature         G
of legal reasoning. An option is not strictly speaking either an offer or a
conditional contract. It does not have *all* the incidents of the standard form
of either of these concepts. To that extent it is a relationship sui generis. But
there are ways in which it resembles each of them. Each analogy is in the
proper context a valid way of characterising the situation created by an
option. The question in this case is not whether one analogy is true and the
other false, but which is appropriate to be used in the construction of section    H
2 of the Law of Property (Miscellaneous Provisions) Act 1989.

There is only one case in which, as it seems to me, the adoption of the
irrevocable offer metaphor was allowed to dictate the result without regard

A   to the context. This was *Beesly v. Hallwood Estates Ltd.* [1960] 1 W.L.R. 549, 556 in which Buckley J. decided that an option was not a "contract . . . to convey or create a legal estate" within the meaning of that part of the definition of an estate contract in section 10(1) of the Land Charges Act 1925. He arrived at this conclusion on the ground that the option was not a contract to convey but only an irrevocable offer. It seems to me, with respect to Buckley J., that this was a misuse of the irrevocable offer metaphor. The

B   purpose of including estate contracts in the Land Charges Act 1925 was to enable a purchaser to obtain notice of contracts which created interests binding on the land. For this purpose, as Sir George Jessel M.R. pointed out in *London and South Western Railway Co. v. Gomm*, 20 Ch.D. 562, 581, there is no difference between an option and an ordinary contract of sale. In both cases the land is bound by an agreement which entitles a third party, either conditionally or unconditionally, to demand a conveyance. A purposive

C   construction of section 10(1) therefore requires that one characterise the option from the point of view of its effect on the land in the hands of the grantor. For this purpose, it is more appropriate to regard it as a conditional contract than an irrevocable offer. In fact Buckley J. was able to give effect to the manifest intention of Parliament because the definition of an estate contract went on to say "including a contract conferring . . . a valid option

D   of purchase." He was therefore able to hold that an option was an estate contract, but only by treating the word "including" as extending the meaning of the previous words. In my judgment this was unnecessary. The option would have been an estate contract even without the additional words.

    Mr. Douglas, for the purchaser, relied strongly on the decision of the House of Lords in *United Scientific Holdings Ltd. v. Burnley Borough Council*

E   [1978] A.C. 904 as authority for the universal application of the irrevocable offer characterisation. That case concerned the rule that the conditions for the exercise of an option, including any time stipulations, must be strictly complied with. The rule had been developed by analogy with the rule that an ordinary offer can be accepted only by strict compliance with the conditions which it lays down. The Court of Appeal had extended the analogy to a notice under a rent review clause in a lease. The House of Lords held that

F   this further extension was unjustifiable. Their Lordships distinguished the ordinary option to purchase or to extend the lease from the activation of a rent review clause. In the former case, Lord Simon of Glaisdale said, at pp. 945–946:

      "the parties, on the exercise of the option, are brought into a new legal relationship. It was argued . . . that the rent review clauses were also

G      such unilateral terms. I cannot agree. The operation of the rent review clauses does not at all change the relationship of the parties, which remains that of landlord and tenant throughout the currency of the lease whether or not the machinery of the rent review clauses is operated."

    The reasoning of the other Law Lords was similar. It was rightly submitted on behalf of the purchaser in this case that the House of Lords thereby

H   endorsed the irrevocable offer analogy for ordinary options. But the endorsement was in the context of the rule that there must be strict compliance with the conditions of acceptance. The case is no authority for extending its application in a different context.

546

Perhaps the most helpful case for present purposes is *In re Mulholland's*   A
*Will Trusts* [1949] 1 All E.R. 460. A testator had let premises to the
Westminster Bank on a lease which included an option to purchase. He
appointed the bank his executor and trustee and after his death the bank
exercised the option. It was argued for his widow and children that the bank
was precluded from exercising the option by the rule that a trustee cannot
contract with himself. Wynn-Parry J. was pressed with the irrevocable offer
metaphor, which, it was said, led inexorably to the conclusion that when the   B
bank exercised the option, it was indeed entering into a contract with itself.
But Wynn-Parry J. held that if one considered the purpose of the self-dealing
rule, which was to prevent a trustee from being subjected to a conflict of
interest and duty, the only relevant contract was the grant of the option. The
rule could only sensibly be applied to a consensual transaction. While for
some purposes it might be true to say that the exercise of the option brought   C
the contract into existence, there could be no rational ground for applying
the self-dealing rule to the unilateral exercise of a right granted before the
trusteeship came into existence. Wynn-Parry J. quoted, at p. 464, from Sir
George Jessel M.R. in *Gomm's* case, 20 Ch.D. 562, 582, and said:

> "As I understand that passage, it amounts to this, that, as regards this
> option, there was between the parties only one contract, namely, the   D
> contract constituted by the provisions in the lease which I have read
> creating the option. The notice exercising the option did not lead, in my
> opinion, to the creation of any fresh contractual relationship between
> the parties, making them for the first time vendors and purchasers, nor
> did it bring into existence any right in addition to the right conferred by
> the option."

The contrast between this passage and my citation from Lord Simon of   E
Glaisdale in *United Scientific Holdings* [1978] A.C. 904, 945, is a striking
illustration of how in different contexts the law can accommodate analogies
which appear to lead to diametrically opposing conclusions.

In my judgment there is nothing in the authorities which prevents me
from giving section 2 of the Act of 1989 the meaning which I consider to
have been the clear intention of the legislature. On the contrary, the purposive   F
approach taken in cases like *Mulholland* [1949] 1 All E.R. 460 encourages
me to adopt a similar approach to section 2. And the plain purpose of section
2 was, as I have said, to prescribe the formalities for recording the consent
of the parties. It follows that in my view the grant of the option was the only
"contract for the sale or other disposition of an interest in land" within the
meaning of the section and the contract duly complied with the statutory
requirements. There must be judgment for the plaintiff against both defend-   G
ants with costs.

*Order accordingly.*

*Solicitors: Denton Hall Burgin & Warrens; Paul Shrank & Co.*

K. N. B.   H

660                         QUEEN'S BENCH DIVISION.                    [1901]

C. A.                            [IN THE COURT OF APPEAL.]

1901
*March* 1.                        STACEY *v.* HILL.

*Bankruptcy—Landlord and Tenant—Disclaimer of Lease—Lease determined*
*as between Lessor and Lessee—Surety for Lessee—Bankruptcy Act,* 1883
*(46 & 47 Vict. c. 52), s. 55, sub-s. 2.*

> The defendant had guaranteed the payment of rent which might from
> time to time be in arrear for twenty-one days under a lease. There had
> not been any underlease or assignment of the lease. The lessee having
> become bankrupt, the trustee in bankruptcy disclaimed the lease. The
> lessor sued the defendant for an amount which he claimed as rent in arrear
> in respect of a period subsequent to the disclaimer :—
>
> *Held,* affirming the judgment of Phillimore J., that, the effect of s. 55,
> sub-s. 2, of the Bankruptcy Act, 1883, being that the lease was deter-
> mined from the date of the disclaimer as between the lessor and the lessee,
> the liability of the defendant for rent in futuro was also determined, and
> therefore the action was not maintainable.

APPEAL from the judgment of Phillimore J. in an action tried
by him without a jury.

The action was upon a guarantee.

On November 15, 1898, the plaintiff let to one Chapman the
premises, No. 34, High Street, Sheffield, for a term of five
years from December 25, 1898, at the yearly rent of 280*l.*,
payable quarterly. The defendant gave to the plaintiff a
guarantee with regard to payment of the rent in the following
terms : "In consideration of your granting the lease of the
premises, 34, High Street, Sheffield, to Mr. Thomas Chapman
of Hull, I hereby guarantee the payment of so much rent as
may be from time to time in arrear for twenty-one days to a
sum not exceeding 140*l.* ; this guarantee to remain in force
concurrently with the lease for a period of five years from the
25th day of December next." On November 3, 1899, a
receiving order was made against Chapman. He was subse-
quently adjudicated bankrupt and a trustee of his estate was
appointed. On February 15, 1900, the trustee disclaimed the
lease. There had not been any underlease or assignment of
the lease. The trustee sent the key of the premises to the

1 Q. B.                    QUEEN'S BENCH DIVISION.                    661

plaintiff's offices, and there was evidence that the plaintiff had

advertised them as being to let ; but, beyond those facts, there

was no evidence that the plaintiff had resumed possession of the

premises, and the learned judge found that he had not done so.

The defendant paid the quarter's rent due December 25, 1899,

and offered to pay 40*l*. 10*s*. as the proportionate part of the

next quarter's rent up to February 15, 1900, the date of the

disclaimer, but denied any further liability. The action was

thereupon brought by the plaintiff to recover a quarter's rent

from the defendant. The defendant paid into court the sum of

40*l*. 10*s*.

C. A.

1901

STACEY

*v.*

HILL.

The learned judge gave judgment for the defendant. (1)

*Sylvain Mayer*, for the plaintiff. The effect of s. 55, sub-s. 2,

of the Bankruptcy Act, 1883, is only that the lease is to be

treated as determined so far as concerns the liability of the

bankrupt and his property, and of the trustee, but it is not to

destroy the liability of a third person, such as the surety. The

case is really concluded by authority. Under the correspond-

ing provision of the Bankruptcy Act, 1869, there were no

express words, such as there are in the present enactment,

limiting the effect of the disclaimer to the bankrupt's liability,

and yet it was held in the decisions with regard to that Act,

that the lease was only to be deemed to be surrendered as

regards the bankrupt and not as regards other persons : *Harding*

v. *Preece* (2) ; *Hill* v. *East and West India Dock Co.* (3) ; *Ex*

*parte Walton, In re Levy.* (4) It is submitted that the present

enactment is only intended to have the same effect which the

decisions gave to the former enactment on the subject. If

the lease is only to be considered as determined quoad the

---

(1) Sect. 55, sub-s. 2, of the Bank-
ruptcy Act, 1883: "The disclaimer
shall operate to determine, as from
the date of disclaimer, the rights,
interests, and liabilities of the bank-
rupt and his property in or in respect of
the property disclaimed, and shall also
discharge the trustee from all personal
liability in respect of the property dis-
claimed as from the date when the

property vested in him, but shall not,
except so far as is necessary for the
purpose of releasing the bankrupt and
his property and the trustee from
liability, affect the rights or liabilities
of any other person."
  (2) (1882) 9 Q. B. D. 281.
  (3) (1884) 9 App. Cas. 448.
  (4) (1881) 17 Ch. D. 746.

C. A.  
1901  
───────  
STACEY  
v.  
HILL.

bankrupt and his property, then the liability of the surety continues : and he will be entitled to prove in the bankruptcy in respect of that liability.

*Montague Lush*, for the defendant. The words of the corresponding enactment of the Bankruptcy Act, 1869, are widely different from those of the enactment now in question, and in the cases referred to by the plaintiff's counsel the question was not the same as that which arises in the present case. In those cases persons other than the lessee were interested in the lease. The question whether a disclaimer by the trustee in bankruptcy of an assignee of the lease destroyed the liability of the lessee upon his covenant to pay rent or that of a surety for him is obviously altogether different from the question whether the surety for the lessee can remain liable when the lessee has ceased to be liable, and the lease has been determined as between the lessee and lessor. The effect of the disclaimer in such a case as this is that, no other person being interested in the term, it is determined altogether, and the lessor becomes immediately entitled to the demised premises, which revest in him in possession : see *In re Finley, Ex parte Clothworkers' Co.* (1) Under the words of s. 55, sub-s. 2, the term only remains in existence so far as may be necessary to preserve the rights of third persons, such as assignees or underlessees, if any, but, by the last part of the section, that saving of the rights of such persons is subject to exception so far as is necessary for the purpose of releasing the bankrupt and his property and the trustee from all liability. If the liability of the surety for rent in futuro continues, the indirect result must be that the liability of the bankrupt in respect of such rent will really continue, for the surety will be entitled to indemnity against him : see per Watkin Williams J. in *Harding* v. *Preece.* (2) It is submitted that it is impossible that the liability of the surety under such a guarantee as this for rent after the disclaimer can continue, when the principal debtor has ceased to be liable, and the rent really no longer exists. The lessor is entitled to the land, and he cannot be entitled at the same time to payment of the rent under the determined

(1) (1888) 21 Q. B. D. 475.            (2) 9 Q. B. D. 281.

1 Q. B.          QUEEN'S BENCH DIVISION.                    663

lease by the surety. The result of the contention for the
plaintiff would be to impose an altogether different contract on
the defendant from that which he in fact entered into. He
never contracted to be primarily liable for the rent, but only as
surety for the lessee. The terms of the guarantee carefully
guard against the liability now sought to be imposed on the
defendant, for it expressly states that he is to be liable for rent
in arrear for twenty-one days, which implies that the lessee has
made default in payment of rent due from him; and it is
further provided that the guarantee shall continue " concurrently
with the lease." The lessee cannot make default after the
disclaimer, for he is no longer liable, and the lease is at
an end.

*Sylvain Mayer*, in reply, referred to *Ex parte Llynvi Coal
and Iron Co., In re Hide.*(1)

A. L. SMITH M.R. This is an appeal from the judgment of
Phillimore J., who held that the effect of the disclaimer by the
trustee in bankruptcy of the lessee was to determine the term
as between the lessor and the lessee, and that therefore no rent
could subsequently accrue due under the lease from the lessee,
and consequently the defendant, as surety, could not be called
upon in respect of any such rent as being in arrear. The
question is, what is the effect of a disclaimer of the lease by the
trustee in bankruptcy of the lessee upon a guarantee such as
that given by the defendant? I do not propose to go through
the cases with reference to the Bankruptcy Act, 1869, because,
as the defendant's counsel pointed out, there is a wide difference
between the phraseology of that Act with regard to this subject
and that of the Act which we have to construe; and in my
opinion the question in this case is really concluded by the
judgment of this Court in *In re Finley, Ex parte Clothworkers'
Co.* (2) The Court had in that case to determine the meaning
in s. 55, sub-s. 2, of the Bankruptcy Act, 1883, of the words
" the disclaimer shall operate to determine, as from the date of
disclaimer, the rights, interests, and liabilities of the bankrupt,
and his property, in or in respect of the property disclaimed."

(1) (1871) L. R. 7 Ch. 28.          (2) 21 Q. B. D. 475.

C. A.

1901

STACEY
*v.*
HILL.

QUEEN'S BENCH DIVISION.    [1901]

C. A.

1901

STACEY
v.
HILL.

A. L. Smith
M.R.

Lindley L.J. said in delivering the judgment of the Court:
" Now the operation of those clauses in the simple case of a
lease is not very difficult to ascertain.  If there is nothing more
than a lease, and the lessee becomes bankrupt, the disclaimer
determines his interest in the lease under sub-s. 2.  He gets
rid of all his liabilities, and he loses all his rights by virtue of
the disclaimer.  There is no need of any provision for vesting
the property in the landlord, but the natural and legal effect
of sub-s. 2 is that the reversion will become accelerated."  In
other words, the effect of the sub-section is that in such a case
the lease is put an end to altogether as between the lessor and
the bankrupt lessee, the intention being that the bankrupt shall
be altogether freed from any obligation arising under or in
relation to it; and, consequently, no other person being
interested in the lease, it ceases to exist.  As the lease is deter-
mined, no rent can, subsequently to the disclaimer, become due
under it: the reversion on the term is in effect accelerated;
and the lessor gets back his property, and can let it to another
tenant, for aught I know, at a higher rent.  Then what is the
effect on the liability of the surety?  It is suggested that,
although no more rent can become due from the bankrupt
lessee, nevertheless the surety remains liable for rent subse-
quently accruing.  I do not think that is so.  The object of
s. 55, sub-s. 2, is that the bankrupt, and his estate, should be
entirely freed from liability for future rent in respect of the
lease; but, if the plaintiff's contention is correct, that object
would not be obtained.  I think the defendant's counsel was
right in the construction which he sought to put on the words
at the end of the sub-section, " except so far as is necessary for
the purpose of releasing the bankrupt and his property, and the
trustee from liability."  If the surety is liable to pay rent in
futuro on his guarantee, he would be entitled to indemnity
against the bankrupt or his property.  It is therefore necessary,
in order to release the bankrupt and his property from liability
under the lease subsequently to the disclaimer, that the words
at the end of the sub-section should be brought into play in
such a case.

Again the guarantee is on the face of it for payment of rent

" in arrear." But, how can rent be " in arrear " after the date
of the disclaimer, the lease being then at an end as against the
lessee ? There is another point which tells against the plaintiff,
although I do not rest my judgment upon it. It was argued
that the words " concurrently with the lease " were inserted to
meet a case like this. I do not feel sure, however, that that
was the intention with which those words were inserted. For
the reasons I have before given I think that this appeal should
be dismissed.

C. A.
1901

STACEY
v.
HILL.

A. L. Smith
M.R.

COLLINS L.J.  I am of the same opinion. The claim in this
case is against the defendant as a surety, and the condition
under which the defendant undertook liability was that there
should be rent in arrear under the lease for twenty-one days.
In order therefore to sustain his claim against the defendant,
the plaintiff must be able correctly to aver that rent was in
arrear from the lessee.  It appears to me that he was not in a
position truly to make that averment, for the sum claimed was
in respect of rent alleged to have accrued subsequently to
February 15, 1900, and on that date the trustee in bankruptcy
of the lessee disclaimed the lease. The effect of such a dis-
claimer in a case which is not complicated by the existence of
any assignment or underlease is stated in the passage read by
the Master of the Rolls from the judgment of Lindley L.J. in
the case of *In re Finley, Ex parte Clothworkers' Co.* (1)  The
effect of the disclaimer in such a case is stated by him to be
that the bankrupt lessee gets rid of all his liabilities, and loses
all his rights under the lease ; and there is no need of any pro-
vision to revest the property in the landlord, but the natural
and legal effect is that the reversion becomes accelerated. The
result being that the liability of the lessee for future rent under
the lease is determined, the obligation of the surety under his
guarantee in respect of such rent can never arise, because no
such rent can ever become in arrear. It seems to me that this
case stands entirely outside the cases cited to us, in which the
rights of the lessor against the original lessee survived. Here the
question is whether the obligation of a surety on this special

(1) 21 Q. B. D. 475.

QUEEN'S BENCH DIVISION.                  [1901]

C. A.
1901

STACEY
*v.*
HILL.

Collins L.J.

form of contract can survive, when the liability of the principal
debtor, the lessee, has been put an end to by statute. The
liabilities of a surety are in law dependent upon those of the
principal debtor, and I do not see how it can be said that in
such a case as this the liabilities of the latter are determined
without incidentally saying that those of the former are deter-
mined also. The lessor in this case is, upon the disclaimer,
entitled to resume possession of the premises. That being so,
how can he treat himself as a person to whom the lessee is still
tenant; and, unless he can do so, how can the surety be liable?
I do not see how the lessor can possibly be entitled to the
premises, and have the right to relet them, and yet retain the
liability of the defendant as surety for the bankrupt lessee.
Under the earlier bankruptcy law, before the power of dis-
claimer was introduced, the bankrupt remained liable: *Auriol*
v. *Mills* (1), and the surety, if compelled to pay the rent, could
have claimed repayment from him; so that the bankrupt was
not discharged. I think that what the Legislature intended
in such a case as this was that the lease should be determined
by the disclaimer as between the lessor and the lessee, and
therefore incidentally as regards the surety, with the result that
the bankrupt lessee is discharged and incidentally the surety
also: and the lessor, getting back his land, can let it to some
solvent tenant, and has a right to prove as against the bank-
rupt's estate for possible loss by reason of not being able to let
the land on such favourable terms. This is in accordance with
*Tuck* v. *Fyson* (2), decided under the Act of George IV., where
it was held that the surety remained liable *until* the delivery
up of the lease to the lessor under the then statute. If dis-
claimer under the present law operates in the language of
Lindley L.J. to "accelerate the reversion," the condition of
the surety's liability in this case must necessarily fail, and I
agree with my Lord as to the effect of the concluding clause.

ROMER L.J. I agree. I think that the case is governed by
the words "except so far as is necessary, &c.," at the end of
sub-s. 2 of s. 55 of the Bankruptcy Act, 1883. Bearing in

(1) (1790) 4 T. R. 94; 2 R. R. 341.          (2) (1829) 6 Bing. 321.

1 Q. B.          QUEEN'S BENCH DIVISION.                    667

mind the facts that in this case no person had any estate in the
demised premises except the lessor and the bankrupt lessee,
and that the liability alleged against the defendant is that of
a surety for the payment of rent due upon the lease, it appears
to me that the case comes within those words of the sub-
section; and that it is necessary, for the purpose of releasing
the bankrupt, and his property, and the trustee in bankruptcy
from future liability in respect of the lease, that the liability of
the defendant should be determined by the disclaimer.  The
section does not operate so as to cast upon third persons
liabilities different in kind from what they were under before
the disclaimer.  Here, if the appellant was right in his conten-
tion, the section would so operate.  For the defendant has
only agreed to be liable as surety for the payment of rent by a
lessee under a lease: and yet the appellant seeks to make him
liable to pay money, though there is no rent payable, no lease,
and no person in the position of lessee.

*Appeal dismissed.*

C. A.

1901

STACEY
*v.*
HILL.
———
Romer R.J.

  Solicitor for plaintiff: *H. A. Maude, for W. H. Stacey,
Sheffield.*
  Solicitors for defendant: *Pepper, Tangye & Co., for Pepper,
Tangye & Winterton, Birmingham.*

E. L.

The Solicitors' Journal
Friday, June 11, 1965

APPEARANCES: *Patrick Bennett* (*Vizard, Oldham, Crowder & Cash*, for *Wm. Furness & Son*, Manchester); *Norman Francis* (*Theodore Goddard & Co.*, for *Sydney Tapper Jones*, Cardiff).

Reported by L. NORMAN WILLIAMS, Esq., Barrister-at-Law

### Hire Purchase: 'Indemnity Form': Whether Indemnity or Guarantee: Test

\*STADIUM FINANCE CO., LTD. *v.* HELM AND ANOTHER

C.A.—Lord Denning, M.R., Davies and Russell, L.JJ.

25th May, 1965

Appeal from Slough County Court.

On 17th October, 1962, the plaintiffs, a hire-purchase finance company, let a second-hand motor car on hire purchase to a hirer, then an infant aged nineteen, on terms that he paid £30 down and £4 17s. 7d. a month. His mother signed a document described as an 'indemnity form' by which she undertook as follows: '(1) I will upon demand pay to you such sum or sums of money as may at any time from time to time have become payable by the customer but be unpaid by him. (2) I will indemnify and keep indemnified you your successors and assigns from all loss or damage suffered and all claims costs and expenses made against or incurred by you in any way arising out of or consequent upon your having entered into such agreement, whether arising out of a breach by the customer of any of the terms and conditions thereof or otherwise including any such loss or damage, etc., as aforesaid as may arise from the said agreement being (for whatever reason) unenforceable against the customer. (3) No relaxation or indulgence which you may from time to time or at any time extend to the customer shall in any way prejudice or act as a waiver of your strict rights against me hereunder'. The hirer paid the first instalment, but shortly after gave notice to terminate the agreement and returned the car. The finance company claimed against the hirer and his mother the amount to make the sum up to one-half of the hire-purchase price, i.e., £18 7s. 4d. At the hearing the finance company learned for the first time that the hirer was an infant but they pursued the claim against his mother, claiming that the document which she had signed was an indemnity. Judge Duveen held that it was a guarantee and dismissed the claim. The finance company appealed.

LORD DENNING, M.R., said that the test was whether, as between two people, one of the two was under a primary liability to perform the obligation, while the other's obligation was secondary only. If so, it was a contract of guarantee and not of indemnity. One always looked to see if there was a primary and a secondary obligation, or two primary obligations. Clause (1) of this document was a contract of guarantee. It was something which the customer ought to pay and had not paid. Clause (3) was also applicable to a guarantee. But the company relied on cl. (2) as an indemnity. His lordship did not think that these cases could be decided on a literal construction of these documents. Reading cl. (2) in relation to cll. (1) and (3), the whole burden of this document was that it was a guarantee, to come into force if the principal debtor defaulted and to the extent of his default. Indeed the very claim was made under cl. (1) for the amount not paid which the hirer should have paid. This being a guarantee as a whole, it was not enforceable against the guarantor, and the principal debtor was not liable because he was an infant.

DAVIES, L.J., concurred.

RUSSELL, L.J., also concurring, said that if finance companies wished to make sure that a primary liability was put on others, particularly to the full limit of the hire-purchase price, they must find some other and clearer form, bearing in mind that most people were not prepared to subject themselves to the nuisance of primary liability, and were not prepared to pay what the contract did not oblige the hirer himself to pay. Appeal dismissed.

APPEARANCES: *M. Anwyl-Davies* (*A. E. Samuels & Co.*).

Reported by Miss M. M. HILL, Barrister-at-Law

## CRIME

### Criminal Law: Sentence: Institutional Upbringing of Defendant: Opportunity of a Home: Whether Borstal Appropriate

\*R. *v.* TREGUNNA

C.C.A.—Sachs, Thomson and Browne, JJ.

10th May, 1965

Application for leave to appeal against sentence.

The applicant, who had numerous previous convictions, pleaded guilty to larceny and breaking and entering and was sentenced to borstal training. He had no knowledge of his parents, having lived in institutions for fifteen years. He applied for leave to appeal against sentence and at the hearing of the application a probation officer gave evidence that the applicant was engaged to a girl whose mother was prepared to assist them financially when they married.

SACHS, J., said that the applicant had spent some seven months in custody and had learned a lesson from it. From the evidence of the probation officer before the court he could, for the first time in his life, have the opportunity of being received into a home. The original sentence was not wrong in principle but, bearing in mind the facts, the court was prepared to substitute a sentence of probation for three years. Application allowed.

APPEARANCES: *Anthony Scrivener* (*Kingsley, Napley & Co.*).

Reported by WILLIAM PEPPER, Esq., Barrister-at-Law

### Criminal Law: Larceny: Larceny as a Bailee: Whether Finder a Bailee

THOMPSON *v.* NIXON

Q.B.D.—Lord Parker, C.J., Sachs and Browne, JJ.

14th May, 1965

Case stated by Cumberland Quarter Sessions.

The defendant found a large paper bag lying by the roadside. He stopped his car, got out and examined the bag. It contained rabbit feeding pellets worth 17s. 6d. He picked it up and drove off with it. At the time when he took it he believed that the owner could be discovered by taking reasonable steps. He was convicted by justices of larceny as a bailee of the pellets and appealed to quarter sessions. Quarter sessions found that some time after he had taken the bag, but they could not say how long after, the defendant had formed the intention of keeping the pellets and his intention had been fraudulent and without a claim of right. They dismissed the appeal and the defendant appealed.

SACHS, J., said that if the defendant was not the bailee of the rabbit pellets he was entitled to be acquitted since, except in the case of a bailee, the intention to steal had to be formed at the time of the taking. The issue was whether the word bailee included all those cases in which a man had those special rights and duties which arose when he was not the legal owner of goods or whether it only referred to the limited class of persons who had received goods from another person with an express or implied condition attached. In Halsbury's Laws of England, 3rd ed., vol. 2, at p. 99, it was stated that, although there was no obligation on a finder to take charge of a lost chattel, if he did so he constituted himself what in fact amounted to a bailee. Was that, however, sufficient to make him a bailee within the meaning

[2004] Vol. 2          LLOYD'S LAW REPORTS          429

C.A.]          **Static Control Components (Europe) Ltd. v. Egan**          PART 8

## COURT OF APPEAL

Apr. 1, 2004

STATIC CONTROL COMPONENTS (EUROPE)
LTD.
v.
EGAN

[2004] EWCA Civ 392

Before Lady Justice ARDEN and Mr. Justice
HOLMAN

**Contract — Guarantee — Construction — Whether
evidence of factual background can be used to alter
plain meaning of guarantee.**

For several years the claimants (Static Control) had
regularly supplied components to TBS Cygma plc
(TBS). The defendant (Mr. Egan) was a director of
TBS. Mr. Egan personally signed four successive guar-
antees under which he guaranteed payment to Static
Control of certain of the debts of TBS. The first
guarantee was signed on Feb. 16, 1998. It was
expressed to expire on Aug. 16, 1998 and contained a
limit of £75,000. The second was signed on Aug. 17,
1998. It was expressed to expire after six months and
again contained a limit of £75,000. The third guarantee
was signed on Sept. 25, 1998. It read:

To Static Control Components (Europe) Ltd.

[address]

Guarantee for supply of goods

IN CONSIDERATION of your having agreed at
my request to supply TBS [address] ("the trader")
with goods for his business, supply of component
parts ("trade goods")

NOW I Paul Egan of TBS Cygma plc AGREE
that:

1. I shall be responsible to you for the price of all
trade goods that you may supply to the trader but so
that my liability to you shall be in respect of the
whole debt but shall in no event exceed the sum of
£75,000.

2. This guarantee is a continuing guarantee and
security and my liability under it shall not be affected
by your giving time or any other indulgence to the
trader.

I RESERVE the right for myself or my personal
representatives by notice to revoke this guarantee at
any time as to all future dealing by the trader with
you after the date of such notice.

By Sept. 1, 1999 goods to the value of just over
£143,000 had been supplied but not paid for. Of that
sum, just over £68,000 was already overdue as at Sept.
1, 1999, and by Oct. 11, 1999 the debt would stand at
£143,000 less any amounts paid in the meantime.

Static Control wrote a letter dated Sept. 1, 1999
which required the "overdue balance" of £143,138 to
be cleared by six weekly payments of £23,856 made on

and between Sept. 6 and Oct. 11 inclusive. The letter
continued:

No product will be released until such times as
overdue balance has been settled in full . . . Failure
to adhere to the terms set out in this letter will result
in the enforcement of the personal guarantee and
legal proceedings being issued to recover the balance
plus costs and interest . . .

On Sept. 2, 1999 Mr. Andrew Jones, the audit
manager of TBS, attended a meeting at the premises of
Static Control. At that meeting it was made clear to Mr.
Jones that Static Control required an increase in the
personal guarantee from Mr. Egan from £75,000 to
£150,000. At that time goods to the value of a little over
£143,000 had been supplied and Static Control was
concerned as to the ability of TBS to make payment in
respect of goods already delivered.

At the meeting, Static Control and Mr. Jones, on
behalf of TBS, agreed that (i) further stock would be
supplied, subject to a limit of £12,000 per week; (ii) the
period of credit would be reduced to 45 days from date
of invoice; and (iii) there would be a schedule of
payments so as to reduce the overall level of credit and
debt.

On the same day, Sept. 2, 1999, Mr. Egan signed the
fourth guarantee, which was in identical terms to that of
Sept. 25, 1998, with the sole difference that maximum
liability was now £150,000 in place of £75,000.

In May, 2000 TBS was placed into administrative
receivership. At that time TBS owed Static Control
£111,883.82. The bulk of the outstanding debt related
to goods supplied before Sept. 2, 1999.

Mr. Egan contended that the guarantee signed on
Sept. 2, 1999 only bound him to be responsible for the
price of goods supplied after Sept. 2, 1999. If that was
correct, then the debt covered by the guarantee would
be just under £14,000.

At first instance the Judge held that the guarantee
bound Mr. Egan to pay debts arising before Sept. 2,
1999 and existing at that date, as well as debts from the
supply of goods after that date, and he gave judgment in
the full amount of £111,883.82.

Mr Egan appealed. He contended that the meaning of
the guarantee dated Sept. 2, 1999 was plain, and that the
words "you may supply" in the first limb of par. 1
could only refer to the future and were not apt to relate
to the price of goods already supplied. He submitted
that although evidence of the factual background to the
execution of the guarantee was admissible, it could not
be used to alter or qualify the plain meaning of the
guarantee on its face.

————*Held*, by C.A. (ARDEN, L.J. and HOLMAN, J.),
that (1) in principle, all contracts had to be construed in
the light of their factual background, that background
being ascertained on an objective basis; accordingly,
the fact that a document appeared to have a clear
meaning on its face did not prevent, or indeed excuse,
the Court from looking at the background; the Judge
had been correct to look at the background to the
signing of the guarantee (*see* par. 27);

(2) the effect of construing a document in the light of
the relevant factual background might be that it became

HOLMAN, J.]                    **Static Control Components (Europe) Ltd. v. Egan**                    [C.A.

clear, in the exceptional case, that the parties had made a mistake in the way in which they expressed themselves; that was particularly understandable in the case of a commercial contract made under pressure of time; when the Court interpreted a document, it was not bound to make the unreal assumption that the parties expressed themselves with accuracy or precision; the Court looked to the parties' common aim or intention in reducing an agreement in writing, and the evidence as to the background information might lead to the conclusion that the parties had failed to express themselves accurately (*see* par. 28);

(3) given the unqualified reference to "the whole debt" and the limitation to the figure of £150,000, which only made sense in the context of both the existing and future debt, the reasonable person in possession of all the information available to the parties at or before the time that the guarantee was signed would conclude that something had gone wrong with the wording of the first part of cl. 1 of the guarantee; he would conclude that the words "that you may supply to the trader" meant not only goods that Static Control might supply to TBS after the date of the guarantee but also any goods that it had already supplied to TBS; accordingly, even though the words "goods that you may supply to the trader" on their literal interpretation, without reference to the background meant only goods supplied to TBS after the date of the guarantee, on their true construction they clearly included also the goods that had already been supplied to the trader; the parties had made an obvious mistake; the appeal would be dismissed (*see* pars. 36 and 38);

————*Prenn v. Simmonds*, [1971] 1 W.L.R. 1381, *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 W.L.R. 896 applied.

———

The following cases were referred to in the judgments:

Bank of Credit and Commerce International S.A. v. Ali and Others, (H.L.) [2002] 1 A.C. 251;

Investors Compensation Scheme Ltd. v. West Bromwich Building Society, (H.L.) [1998] 1 W.L.R. 896;

Mannai Investment Ltd. v. Eagle Star Life Assurance Co. Ltd., (H.L.) [1997] A.C. 749;

Prenn v. Simmonds, (H.L.) [1971] 1 W.L.R. 1381;

Reardon Smith Line Ltd. v. Yngvar Hanson-Tangen, (H.L.) [1976] 1 W.L.R. 989;

Utica City National Bank v. Gunn, (1918) 118 N.E. 607.

———

This was an appeal by the defendant Paul James Egan from the decision of Mr. Recorder Hinchliffe, Q.C., sitting in the Oldham County Court, who had given judgment in favour of the claimants Static Control Components (Europe) Ltd. for £111,883.92 plus interest under a guarantee signed by the defendant.

Mr. Richard Lander (instructed by Messrs. Birchall Blackburn) for the defendant; Mr. Nigel Bird (instructed by Messrs. Barrett & Co.) for the claimants.

The further facts are stated in the judgment of Mr. Justice Holman.

Thursday, Apr. 1, 2004

———

**JUDGMENT**

**Mr. Justice HOLMAN:**

1. This is an appeal from a decision and order of Mr. Recorder Hinchliffe, Q.C. sitting in the Oldham County Court. He heard the evidence and argument in June, 2003 and circulated his written, reserved judgment in early July; but the order itself was made and dated Nov. 10, 2003. He held the appellant, Mr. Paul Egan, liable under a guarantee and gave judgment for the claimant in the sum of £111,883.82 plus interest. Mr. Egan now appeals with the permission of Lord Justice Tuckey.

*The facts and background*

2. The claimants are Static Control Components (Europe) Ltd. ("Static Control"). For several years they had regularly supplied components to TBS Cygma plc ("TBS"). The defendant, Paul Egan, was a director of TBS. Mr. Egan personally signed four successive guarantees under which he guaranteed payment to Static Control of certain of the debts of TBS. The first guarantee was signed on Feb. 16, 1998. It was expressed to expire on Aug. 16, 1998 and contained a limit of £75,000. The second was signed on Aug. 17, 1998. It was expressed to expire after six months and again contained a limit of £75,000. Both these guarantees were in very "home made" terms. The third guarantee was signed on Sept. 25, 1998 and was in terms drafted and proffered by Static Control. In fact, apart from the identity of the parties, it was in identical terms to a standard precedent, Form 3, on p. 358 of the Encyclopaedia of Forms and Precedents, vol. 17 (2), and must have been obtained directly or indirectly from that source. So far as is material, it read as follows:

To Static Control Components (Europe) Ltd.

C.A.]                **Static Control Components (Europe) Ltd. v. Egan**                [HOLMAN, J.

[address]

Guarantee for supply of goods

IN CONSIDERATION of your having agreed at my request to supply TBS [address] ("The Trader") with goods for his business, supply of component parts ("Trade Goods")

NOW I Paul Egan of TBS Cygma plc AGREE that:

1. I shall be responsible to you for the price of all trade goods that you may supply to the trader but so that my liability to you shall be in respect of the whole debt but shall in no event exceed the sum of £75,000.

2. This guarantee is a continuing guarantee and security and my liability under it shall not be affected by your giving time or any other indulgence to the Trader.

I RESERVE the right for myself or my personal representatives by notice to revoke this guarantee at any time as to all future dealing by the Trader with you after the date of such notice.

3. Pausing there, this guarantee contained no time limit although the right was reserved to revoke it at any time by notice, as to all dealing after the date of such notice.

4. By Sept. 1, 1999 goods to the value of just over £143,000 had been supplied but not paid for. Of that sum, just over £68,000 was already overdue as at Sept. 1, 1999, and by Oct. 11, 1999 the debt would stand at £143,000 less any amounts paid in the meantime.

5. Static Control were clearly very concerned about this situation. They wrote a letter dated Sept. 1, 1999 which required the "overdue balance" of £143,138 to be cleared by six weekly payments of £23,856 made on and between Sept. 6 and Oct. 11 inclusive. The letter continued:

No product will be released until such times as overdue balance has been settled in full . . . Failure to adhere to the terms set out in this letter will result in the enforcement of the personal guarantee and legal proceedings being issued to recover the balance plus costs and interest . . .

On Sept. 2, 1999 Mr. Andrew Jones, the audit manager of TBS, attended a meeting at the premises of Static Control. At par. 6 of his judgment the Recorder held that "There is no doubt, in my mind, that at that meeting it was made clear to Mr. Jones that the claimant required an increase in the personal guarantee from Mr. Paul Egan from £75,000 to £150,000. At that time goods to the value of a little over £143,000 had been supplied and the claimant was concerned as to the ability of TBS to make payment in respect of goods already delivered."

6. At the meeting, Static Control and Mr. Jones, on behalf of TBS, agreed that (i) further stock would be supplied, subject to a limit of £12,000 per week; (ii) the period of credit would be reduced to 45 days from date of invoice; and (iii) there would be a schedule of payments so as to reduce the overall level of credit and debt.

7. On the same day, Sept. 2, 1999, Mr. Egan signed the fourth guarantee. This was in identical terms to that of Sept. 25, 1998 and quoted at par. 2 above, with the sole but major difference that maximum liability was now £150,000 in place of £75,000.

8. In May, 2000 TBS was placed into administrative receivership. At that time TBS owed Static Control £111,883.82. There had been "substantial trade between the companies after Sept. 2, 1999" but "the vast majority of goods supplied and delivered to TBS after that date were in fact paid for" (*see* par. 2 of the judgment). In short, the bulk of the outstanding debt of £111,883 related to goods supplied *before* Sept. 2, 1999.

9. Mr. Egan contended, and contends, that the guarantee signed on Sept. 2, 1999 only bound him to be responsible for the price of goods supplied after that date. If this was correct, then "any debt covered by the guarantee is modest in the extreme" (judgment par. 2). Apparently, the amount would be just under £14,000. However, the Recorder held that the guarantee bound Mr. Egan to pay debts arising *before* and existing at that date, as well as debts from the supply of goods after that date. So he gave judgment, as I have said, in the full amount of £111,883.82.

*The argument and decision of the Recorder*

10. At trial and before us, Mr. Egan was most ably represented by Counsel, Mr. Richard Lander. In summary, he submits that a guarantee should be construed strictly; that the words of the document itself are clear; and that they should be given their true and natural meaning. He submits that the full extent of any liability is described and defined by the first limb of par. 1, namely "I shall be responsible to you for the price of all trade goods that you may supply to the trader". The words "you may supply" can only refer to the future and are not apt to relate to the price of goods already supplied. He submits that the remainder of par. 1, namely the words "but so that my liability to you shall be in respect of the whole debt but shall in no event exceed the sum of £150,000", are *all* words of limitation, particularly as they begin with the word "but" rather than "and". He points out that the whole guarantee is obviously taken, directly or indirectly, from the Encyclopaedia of Forms and Precedents and has shown us an explanation in the

HOLMAN, J.]                **Static Control Components (Europe) Ltd. v. Egan**                [C.A.

Encyclopaedia for the purpose of, and effect of, the words "shall be in respect of the whole debt" where they appear in par. 1. The explanation is that:

> If the guarantor guarantees only part of the debt and pays the creditor the amount for which he is liable, then if the debtor becomes bankrupt, the creditor can only prove in   the debtor's bankruptcy for the balance of the debt, but the guarantor can prove in the   same bankruptcy to recover the amount he has actually paid. However, in the case  of a guarantee of the whole debt, subject to a limit on the amount that can be recovered from the guarantor, the creditor can prove for the whole debt in the  bankruptcy of the debtor, even though the guarantor may have paid, and the  guarantor cannot prove in his own right until the creditor has received a dividend of 100p in the pound. A guarantee should therefore be so worded as to put the matter  beyond doubt". (See the Encyclopaedia, Form 3, footnote 2; Form 2, note 2 [3274];  and par. 20 [3094] on p. 329.)

As shorthand, I will call this "the subrogation point." A further account of the point may be found in Rowlatt on Principal and Surety (5th ed.) (1999), pars. 4–39 to 4–41.

11. At par. 17 of his judgment, the Recorder agreed that if the words "shall be in respect of the whole debt but" were omitted from par. 1, then he "would have no hesitation in finding that the guarantee was clear and unambiguous and was designed only to cover the supply of trade goods from Sept. 2, 1999". However, he considered that the guarantee including those words:

> could relate only to the debt created from that date, but equally, it could relate to  debt which existed at the time he entered the guarantee. I believe it is capable of  more than one meaning. Accordingly, in my judgment, I am entitled to look at the  surrounding circumstances in order to identify the scope and object of the guarantee. In my judgment it is necessary for the Court to construe the guarantee in such a way  as to reflect what may fairly be inferred to have been the objective intention and   understanding of the parties. (par. 21.)

The Recorder concluded that the guarantee was intended by both parties to extend, and did extend, to the whole trading debt both before and after Sept. 2, 1999.

*The relevant law*

12. Mr. Lander has drawn our attention, as he did that of the Recorder, to pars. 4.02 and 4.06 in Chapter 4, Construction, of Andrews and Millett: The Law of Guarantees (3rd ed.) (2000). These describe a general approach that contracts of suretyship "must be strictly construed so that no liability

is imposed on the surety which is not clearly and distinctly covered by the terms of the agreement". But par. 4.02 begins with the words "There is a substantial body of authority which indicates that contracts of suretyship are to be construed in the same way as any other contract." And later, " . . . the Court is entitled to look at the surrounding circumstances in order to identify the scope and object of the contract of suretyship, to the same extent that it would be entitled to look at the factual matrix as an aid to the construction of any other commercial agreement. A guarantee must be given a reasonable interpretation within the context in which it has been given." Further, the chapter begins with an Introduction, par. 4.01, which includes " . . .  a word of caution . . . one must never lose sight of the fact that ultimately what has to be determined is the intention of the parties to the contract in question. Thus factors such as the context in which a phrase occurs, the wording of other parts of the contract and the factual matrix, may result in identical or similar wordings being given completely different interpretations in two different guarantees."

13. In my view the principles described by Lord Hoffmann in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 W.L.R. 896 at 912H–913F apply to the construction or interpretation of this, or any other, guarantee. Mr. Lander placed some reliance upon the particular words under consideration in s. 3(b) of the claim form in *I.C.S. v. West Bromwich* in an attempt to limit the application of the "principles" to a case such as that, in which the relevant wording itself was (in the words of Lord Hoffmann) very strange and badly drafted. But in my view, application of the passage and principles at 912F–913E was not intended to be so limited, and is not and has not been treated as being so limited.

14. Lord Hoffmann said:

> The principles may be summarized as follows.
>
> (1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.
>
> (2) The background was famously referred to by Lord Wilberforce as the "matrix of fact." But this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document

[2004] Vol. 2    **LLOYD'S LAW REPORTS**    433

C.A.]    **Static Control Components (Europe) Ltd. v. Egan**    [HOLMAN, J.

would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification . . .

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax.

(5) The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said . . . "if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense".

*Interpretation of the guarantee*

15. I now turn to interpret the guarantee in this case, applying the principles of *I.C.S. v. West Bromwich.* The end question is: what meaning would it convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties at the time of the contract? That background knowledge or matrix of fact would include the following:

(i) There had been a long period of trading between the companies, underpinned since February, 1998 by successive guarantees by Mr. Egan.

(ii) As at Sept. 1, 1999 TBS were overdue in payments to the extent of £68,000 and the debt would rise by Oct. 11, to £143,000 less any amounts paid in the meantime.

(iii) By their letter of Sept. 1, 1999 Static Control had stated that they would not supply any further

goods until the overdue balance (defined in the letter as £143,138) had been paid in full.

(iv) Nevertheless, under the then-existing guarantee signed on Sept. 25, 1998 Static Control had security against Mr. Egan for the first £75,000 of that debt.

(v) The terms agreed with Mr. Jones at the meeting on Sept. 2, 1999 were such that both companies intended and contemplated that the debt referable to goods supplied after that date could not exceed about £72,000. The ceiling on stock to be supplied was £12,000 per week and the period of credit was to be reduced to about six weeks (45 days).

(vi) An undoubted effect of the guarantee signed on Sept. 2, 1999 (indeed its only difference from the previous one) is to increase the ceiling of liability from £75,000 to £150,000.

16. Informed by that background, any reasonable person would, in my view, reason as follows.

(i) Standing in isolation, the phrase "that you may supply to the trader" appears to relate to the future only.

(ii) But the words "my liability to you shall be in respect of the whole debt" are capable of referring to the existing as well as any further, future debt; and, indeed, if standing alone, naturally do so.

(iii) As at Sept. 2, 1999 Static Control already had a valid and binding guarantee for the first £75,000 of the pre-existing debt and there was no conceivable commercial reason why they should agree to forego the protection of that guarantee. It is true that under the new guarantee the ceiling was increasing to £150,000, but that increase would be of no expected benefit to them if the new guarantee related only to future sales, since credit on future sales was not expected to exceed about £72,000.

(iv) So, to increase the ceiling at the same time as limiting the guarantee to future sales makes no commercial sense. But there is obvious commercial sense in increasing the ceiling if the existing debt is already around £143,000 *and* (as was agreed with Mr. Jones on Sept. 2) future sales would continue.

(v) Although the form of words used is derived from the Encyclopaedia and explained there by the subrogation point, this does not prevent them from having a dual effect: both to cover the existing debt and to meet the subrogation point. (As already noted in par. 12 above, Andrews and Millett point out that identical words may even be given completely different interpretations in two different guarantees.)

(vi) As a matter of syntax, the use of the word "but" rather than "and" between "trader" and "so

that" may suggest limitation rather than enlarge-
ment of the opening phrase of par. 1. But if
syntactical analysis leads to that conclusion it flouts
business commonsense and must be made to
yield.

17. I agree with Mr. Lander that there is a tension
between the words "you may supply" in the first
limb and the reference to "the whole debt" in the
second. But viewed in this way, "something must
have gone wrong with the language". Any reason-
able person would consider that par. 1 as a whole
was intended to extend, and did extend, to both the
existing and the further future debt.

18. Mr. Lander submitted that if a guarantee in
these terms was signed at the start of a trading
relationship there would no pre-existing debt.
Accordingly the words "shall be in respect of the
whole debt" could not refer to a pre-existing debt
and could only be referable to, and explicable by,
the subrogation point. I agree, of course, that at the
start of a trading relationship there would be no pre-
existing debt and so in such a case the wording may
relate only to the subrogation point. But the argu-
ment misses the point that the words are capable of
more than one meaning or purpose. The factual
matrix of this case and this guarantee is that there
had been previous trading; there were previous
guarantees; and there was a pre-existing debt.

19. Mr. Lander submitted that to adopt the
construction that I have would be "creative" or
involve "rewriting" the guarantee, and would fail
to respect the approach of construing a guarantee
strictly. I cannot accept the submission. There has
been no creativity and no rewriting; but simply
ascertainment of the meaning of the document by
the objective approach described by the House of
Lords. That being the task, it may be that the
concept that a guarantee should be "strictly con-
strued" now adds nothing.

20. For these reasons I consider that the Recorder
was right to give judgment for the full amount (not
exceeding £150,000) still due from TBS to Static
Control and I would dismiss this appeal.

21. Since preparing this judgment I have read in
draft the judgment of my Lady, Lady Justice Arden,
with which I agree.

**Lady Justice ARDEN:**

22. I agree. I gratefully adopt Mr. Justice Hol-
man's statement of the facts and use his
abbreviations.

23. This case raises some important points of
principle on the interpretation of documents gen-
erally, and in particular guarantees, in the light of
their factual background. Mr. Richard Lander, for
the appellant, submits as his primary submission
that the meaning of the guarantee dated Sept. 2,
1999 is plain. He submits that Mr. Paul Egan, the

guarantor, promised to be responsible only "for
the price of all Trade Goods that you may supply
to the trader". The words "that you may supply to
the trader" are, he submits, plainly goods to be
supplied after the date of the guarantee. He accepts
that the factual background to the execution of the
guarantee is admissible, but, on his submission, it
cannot be used to alter or qualify the plain meaning
of the guarantee on its face.

24. The short answer to the last part of this
submission is that it is contrary to the decision of
the House of Lords in *Prenn v. Simmonds*, [1971] 1
W.L.R. 1381, and other cases. It is necessary to
explain, in more detail, why that is so. *Prenn v.
Simmonds* made it clear that, in the construction of
documents, "the factual background, known to both
parties at or before the time of the contract, includ-
ing evidence of the "genesis" and objectively the
"aim" of the transaction" is receivable in evidence
(p. 1385). Moreover, in that case, at p. 1384, Lord
Wilberforce, with whom the other members of the
House agreed, accepted the effect of such evidence
might be, in the words of Cardozo, J. in *Utica City
National Bank v. Gunn*, (1918) 118 N.E. 607 at 608,
to "stamp upon a contract a popular or looser
meaning" than the strict legal meaning, certainly
when to follow the latter would make the transac-
tion futile.

25. The facts of *Prenn v. Simmonds* illustrate the
role of the factual background on questions of
construction. The contract in question conferred on
Dr. Simmonds an option to purchase shares in the
company if the "profits" of the company available
for dividend on its ordinary stock in a particular
four year period were £300,000 or more. The
company's own profits in the relevant period were
below £300,000, but the condition was met if the
reference to the profits of the company was con-
strued as a reference to the consolidated profits of
the company and its subsidiaries. The purpose of
the agreement was to secure the services of Dr.
Simmonds. In return he was to be able to acquire an
equity interest in the company if he remained with
the company and the company earned sufficient
profits to enable it to redeem preference stock held
by its former holding company. For this purpose, a
payment of £294,716 had to be made out of the
company's own profits. The company was not a
trading company, but held the shares in a number of
subsidiary companies. If the reference to "profits"
of the company was only to its profits, the other
contracting party, Mr. Prenn, being the majority
shareholder in the company, could always effec-
tively prevent the company from procuring its
subsidiaries to pay any dividends to it. The House
of Lords held that the reference to "profits" was to
be construed as a reference to the consolidated
profits of the company and its subsidiaries so as to

[2004] Vol. 2                    LLOYD'S LAW REPORTS                    435

[C.A.]                    Static Control Components (Europe) Ltd. v. Egan                    [ARDEN, L.J.

achieve the aim of the transaction and to make the agreement accord with commercial sense. In addition, Lord Wilberforce added that the linguistic arguments pointed the same way.

26. The principle enunciated in *Prenn v. Simmonds* was developed by Lord Hoffmann in two more recent cases and applied to the situation where the interpretation of an instrument in the light of its factual background differed from its purely linguistic construction. In the first case, *Mannai Investment Ltd. v. Eagle Star Life Assurance Co. Ltd.*, [1997] A.C. 749, the House of Lords held that a notice to determine a lease could be construed with the benefit of knowledge of the terms of the lease. Even though it gave the wrong date, the notice would have been reasonably clear to a reasonable recipient with knowledge of the terms of the lease and thus it should be construed as referring to the correct date. At 779F, Lord Hoffmann said:

> In the case of commercial contracts, the restriction on the use of background has been quietly dropped. There are certain kinds of evidence, such as previous negotiations, expressed declarations of intent which for practical reasons which it is unnecessary to analyze, are inadmissible in aid of construction. They can be used only in an action for rectification. But apart from these exceptions, commercial contracts are construed in the light of all the background which could reasonably have been expected to have been available to the parties in order to understand what would objectively have been understood to be their intention: *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381, 1383. The facts that the words are capable of a literal interpretation is no obstacle to evidence which demonstrates what a reasonable person with knowledge of the background would have understood the parties to mean, even if this compels one to say that they used the wrong words. In this area we no longer confuse the meaning of words with the question of what meaning the use of the words was intended to convey.

27. This approach was elaborated by Lord Hoffmann in the *I.C.S.* case, particularly in the passage which Mr. Justice Holman has already set out. Lord Hoffmann's principle (1) in that passage makes it clear that there are not two possible constructions in any given situation, namely a purely linguistic one and one in the light of the factual background, but only one, the true interpretation. This is because the object of interpretation is to discover the meaning of the provision in question in its context. Those points are also made clear in the final sentence of the passage I have cited above from *Mannai Investment* and also in Lord Hoffmann's proposition (4) in the *I.C.S.* case. Thus, in principle, all contracts must be construed in the light of their factual background, that background being ascertained on an objective basis. Accordingly, the fact that a document appears to have a clear meaning on the face of it does not prevent, or indeed excuse, the Court from looking at the background. For these reasons, I would reject the appellant's primary submission and hold that the Recorder was correct in looking at the background to the signing of the guarantee.

28. Lord Hoffmann's principles (4) and (5) in the *I.C.S.* case, set out in the judgment of Mr. Justice Holman, also make the point that the effect of construing a document in the light of the relevant factual background may be that it becomes clear, in the exceptional case, that the parties have made a mistake in the way in which they have expressed themselves. This is particularly understandable in the case of a commercial contract made under pressure of time by business people. True, in the present case, they were using the precedent of the earlier guarantee dated Sept. 25, 1998, which was apparently drafted by Static Control's solicitors. (It was Static Control who adapted it, and it probably did so without any legal input.) When the Court interprets a document, it is not bound to make the unreal assumption that the parties expressed themselves with accuracy or precision. The Court looks to the parties' common aim or intention in reducing an agreement in writing and the evidence as to the background information may lead to the conclusion that the parties have failed to express themselves accurately.

29. When the principles in the *I.C.S.* case were first enunciated, there were fears that the Courts would on simple questions of the construction of deeds and documents be inundated with background material. Lord Hoffmann recognized this risk by emphasizing in *Bank of Credit and Commerce International S.A. v. Ali and Others*, [2002] 1 A.C. 251 at 269 that his reference to "absolutely anything" in his second proposition was to anything that a reasonable man would have regarded as relevant. Speaking for myself, I am not aware that the fears expressed as to the opening of floodgates have been realized. The powers of case management in the Civil Procedure Rules could obviously be used to keep evidence within its proper bounds. The important point is that the principles in the *I.C.S.* case lead to a more principled and fairer result by focusing on the meaning which the relevant background objectively assessed indicates that the parties intended. Lord Hoffmann prefaced his propositions in the *I.C.S.* case by saying that the result of the approach in *Prenn v. Simmonds* and the later case of *Reardon Smith Line Ltd. v. Yngvar Hanson-Tangen*, [1976] 1 W.L.R. 989:

> has been, subject to one important exception, to assimilate the way in which such documents

**LLOYD'S LAW REPORTS**    [2004] Vol. 2

ARDEN, L.J.]    **Static Control Components (Europe) Ltd. v. Egan**    [C.A.

are interpreted by judges to the common sense principles by which any serious utterance would be interpreted in ordinary life. Almost all the old intellectual baggage of "legal" interpretation has been discarded. (p. 912).

The important exception is set out in Lord Hoffmann's principle (3).

30. In the present case, the principal elements of the background are summarized in par. 15 of the judgment of Mr. Justice Holman. As he states elsewhere in his judgment, there had also been a meeting on Sept. 2, 1999 between representatives of the respondent and Mr. Jones, a representative of the appellant. At this meeting the parties agreed that Static Control would continue to supply product to TBS on terms that the existing guarantee for £75,000 given by Mr. Egan would be *increased* to £150,000, and that the existing debt would be repaid by agreed instalments. The credit limit was to be kept below £150,000 by the appellant taking stock of no more than £12,000 per week commencing from Sept. 6, 1999.

31. The Judge also found that Mr. Egan, who was not present at the meeting, also knew that the guarantee was to be increased, not simply substituted by a guarantee for future supplies only. However, I proceed on the basis that that particular fact would not have been known to a reasonable person in possession of all the information available to the parties at or before the time that the guarantee was signed (Lord Hoffmann's principle (1)). He would not necessarily know what Mr. Jones had told Mr. Egan. However, for the purpose of Lord Hoffmann's principle (1) he would in my judgment make the assumption that Mr. Jones would have correctly informed Mr. Egan of what was agreed at that meeting.

32. The reasonable person for the purpose of Lord Hoffmann's principle (1) would also know that there was an outstanding debt of £143,000 odd, then either immediately due or about to become immediately due, and that the limitation in the guarantee of £150,000 made no commercial sense except in the context of both the outstanding and future debt. He would also know that it was not the communicated or common intention of the parties that a guarantee should be given in substitution for the existing guarantee. That would effectively leave Static Control without any security for the existing debt. The agreement between the two companies was that the guarantee would have to be increased.

33. The reasonable person for the purpose of Lord Hoffmann's principle (1) would, therefore, approach the interpretation of the document with all that information in mind. The reasonable person is not required to have any specialist experience, and

so (in the absence of evidence that the parties themselves jointly addressed this point) in my judgment, he is not to be taken to know that the purpose of the words "so that my liability to you should be in respect of the whole debt" was so as to prevent the guarantor from sharing in any right of proof of the creditor in a liquidation of TBS until Static Control had been repaid in full. However, the reasonable person would see that the words "the whole debt" were unqualified. They are not limited to the debt in respect of the supply of future goods, though if there had been no pre-existing debt the words would naturally be so limited. The reasonable person would also know that the form of guarantee presented to Mr. Egan for signature was the same as the guarantee previously executed by him and limited to £75,000, with the figure of £75,000 removed and substituted by the figure of £150,000. He would draw the conclusion that the previous guarantee might have been used simply because it was a convenient precedent.

34. The reasonable person for the purpose of Lord Hoffmann's principle (1) would also know that, if the appellant's construction were right, it would have been sufficient if the guarantee were limited to £72,000 since that was the maximum amount that would be outstanding under the new terms of business. Mr. Richard Lander seeks to meet this point by submitting that the parties may have inserted the figure of £150,000 to give a margin in case matters should slide or there was a change in the limit. In my judgment, this is not a credible explanation. It would involve doubling the expected amount that would be outstanding at any one time for goods delivered after Sept. 2, 1999.

35. Mr. Lander submits that the terms offered at the meeting on Sept. 2, 1999 constitute matters of negotiation which are not relevant to interpretation of the guarantee. I would reject this submission since the terms were accepted by TBS and therefore were removed from the realm of mere negotiation into a concluded agreement between TBS and Static Control. Their agreement is part of the relevant background.

36. Given the unqualified reference to "the whole debt" and the limitation to the figure of £150,000, which only made sense in the context of both the existing and future debt, the reasonable person for the purpose of Lord Hoffmann's principle (1) would, in my judgment, conclude that something had gone wrong with the wording of the first part of cl. 1 of the guarantee. He would conclude that the words "that you may supply to the trader" meant not only goods that Static Control might supply to TBS after the date of the guarantee but also any goods that it had already supplied to TBS. Accordingly, even though the words "goods that you may supply to the trader" on their literal

C.A.]                **Static Control Components (Europe) Ltd. v. Egan**                [ARDEN, L.J.

interpretation, without reference to the background mean and mean only goods supplied to TBS after the date of the guarantee, in my judgment, on their true construction they clearly include also the goods that had already been supplied to the trader. The contrary construction would reduce Static Control's security for the unpaid indebtedness (not increase it as agreed), and this result would make no business sense. The parties have, like Mrs. Malaprop, made an obvious mistake. In summary, this case is therefore an illustration of Lord Hoffmann's principle (5) in the *I.C.S.* case.

37. At the start of his submissions, Mr. Lander made a submission which I ought to mention that the guarantee in this case should be construed contra proferentem, that is against Static Control who produced it for Mr. Egan to sign. That canon of construction can only apply if a document, properly interpreted, admits of doubt. Moreover, the issue here is not whether Static Control has put forward a form of guarantee which removes by unclear language incidents of a guarantee to which a guarantor would be entitled by operation of law. Nor is the provision in question one as to which there is no relevant background evidence. In this case, the issue is as to the scope of the guarantee. That issue can be resolved by referring to the relevant background evidence. Accordingly, this is a situation where, in my judgment, the rule of contra proferentem has no place and should be discarded. There is no reason of public policy why guarantees should not in general be construed in accordance with the principles of interpretation enunciated in *Prenn v. Simmonds* and the *I.C.S.* case.

38. In the circumstances, I too would dismiss this appeal.

466                    QUEEN'S BENCH DIVISION.              [1894]

[IN THE COURT OF APPEAL.]

SYNGE *v.* SYNGE.

*Husband and Wife—Contract in Consideration of Marriage—Promise to
leave House to intended Wife for Life—Promiser putting it out of his
Power to perform Promise—Immediate Right of Action—Claim of
Damages—Measure of Damages—Power of Court to make Declaration of
Right—Power to decree Conveyance after Death of Promiser.*

The defendant before, and as an inducement to, his marriage with the
plaintiff promised in writing, as part of the terms of the marriage, to leave a
house and land to her for her life. The plaintiff consented to the terms
proposed, and the marriage took place; but the defendant subsequently
conveyed the property by deed to a third person. In an action to recover
damages for breach of contract:—

*Held,* that as the defendant had put it out of his power to perform the con-
tract there had been a breach, in respect of which the plaintiff had an im-
mediate right of action to recover damages, and that the measure of such
damages was the value of the possible life estate to which the plaintiff would
be entitled if she survived the defendant:

*Held,* also, that where a proposal in writing to leave property by will,
made to induce a marriage, is accepted, and the marriage takes place on the
faith of it, if the proposal relates to a defined piece of real property the Court
has power to decree a conveyance of that property after the death of the
person making the proposal against all who claim under him as volunteers.

APPEAL from a judgment of Mathew, J., on further considera-
tion.

The claim in this action was on an ante-nuptial promise, made
by the defendant in consideration of marriage, to leave by will
to the plaintiff a certain house and land for her lifetime. It was
alleged that the defendant had conveyed his whole estate and
interest in the property to third persons, and thereby incapaci-
tated himself from keeping his promise; and the plaintiff claimed
a declaration that she was entitled to a life estate in the premises
commencing on the death of her husband, and that the convey-
ance thereof was subject to her life estate, and in the alternative
the plaintiff claimed damages for breach of agreement. The
agreement relied on was contained in a letter from the defendant
to the plaintiff written a short time before the marriage; but the
learned judge was of opinion that the result of the evidence was
that the letter did not amount to a contract, but only to an

pression of an intention on the part of the defendant to leave
the house and land to the plaintiff, and that she had so understood
it.   He accordingly gave judgment for the defendant.

The plaintiff appealed.

1893. Nov. 30.   *Bucknill, Q.C.,* and *Blake Odgers, Q.C.,* for the
plaintiff.   There was a binding contract to leave the property to
the plaintiff for her life, signed by the defendant and consented
to by the plaintiff, and on the faith of which the marriage took
place.   For breach of such a contract damages are recoverable:
*Needham* v. *Kirkman* (1); *Goilmere* v. *Battison* (2), sub nom.
*Goylmer* v. *Paddiston.* (3)

The defendant has put it out of his power to carry out his
promise, and there is therefore an immediate right of action to
recover damages for breach of contract: *Hochster* v. *De la
Tour* (4); *Short* v. *Stone* (5); *Ford* v. *Tiley* (6); *Frost* v.
*Knight.* (7)   [They also cited *Maddison* v. *Alderson.* (8)]

*Coleridge, Q.C.,* and *W. Howland Roberts,* for the defendant.
The learned judge was right in the view that there was no bind-
ing contract.   Even if there were a promise, it would be con-
ditional on survivorship, and it does not follow that there will be
a breach.   These considerations are opposed to the idea that
there is an immediate right of action, and there are no cases of
an action brought before the death of the promiser.   The form
of the question asked in *Needham* v. *Kirkman* (1) shews that
before the death of the promiser there could be no breach.   [They
cited also *In re Parkin.* (9)]

*Bucknill, Q.C.,* in reply.

1894. Jan. 17.   KAY, L.J., delivered the judgment of the
Court. (10)   The questions which arise in this case are these:—

1. Was there a binding contract?

2. Was it such a contract as could be enforced in equity, or
was there a remedy in damages for the breach of it?

C. A.
1894

SYNGE.
*v.*
SYNGE.

(1) 3 B. & A. 531.              (7) Law Rep. 7 Ex. 111.
(2) 1 Vern. 48.                (8) 8 App. Cas. 467.
(3) 2 Vent. 353.               (9) [1892] 3 Ch. 510.
(4) 2 E. & B. 678.             (10) Lord Esher, M.R., Lopes, L.J.,
(5) 8 Q. B. 358.           and Kay, L.J.
(6) 6 B. & C. 325.

468                    QUEEN'S BENCH DIVISION.            [1894]

C. A.
1894

SYNGE
v.
SYNGE.

Kay, L.J.

3. Has the time arrived at which such remedy can be asserted?

4. If the remedy be by way of damages, what amount of damages should be given?

The action was tried by a judge without a jury, so that all questions both of fact and law are open on this appeal.

It will be convenient to consider the questions in the order in which they are stated.

The alleged contract is contained in a letter of December 24, 1883, by the defendant to a lady whom he was desirous to marry, and is in these words:—

" You my love thoroughly understand the terms (and I daresay have told Mr. Woodruff on which we are to put a stop to all this bother by becoming one another) which are that I leave house and land to you for your lifetime. . . . True it is possible but highly improbable that I might come in for the title and should be much better off.  Should such a thing happen we could see what I ought and would do for you."

There seems to be no doubt that the house and land referred to were the house and a small piece of land at Ardfield in Devonshire, worth it is said about 60l. or 70l. a year, in which the defendant was then residing with two daughters by a former marriage.  The defendant was not then Sir R. Synge.  He succeeded to the title afterwards.  The lady who is the plaintiff had some property of her own of which Mr. Woodruff was trustee. He was not a solicitor.

The construction of the letter is plain.  It is a statement of the " terms " as to property on which the defendant proposed to marry the lady.  The marriage took place on January 5, 1884, ten days after the date of the letter.

It is argued that the plaintiff did not understand it to be a binding promise, and did not so treat it.  [The judgment then dealt with the evidence, and continued :—]

The learned judge who decided this case has held that the letter was not treated by the lady as a contract, although by the advice of Mr. Woodruff she preserved it.  The inference, however, that she accepted the terms and married on the faith of the promise in writing, seems to us irresistible.  We cannot, with

1 Q. B.         QUEEN'S BENCH DIVISION.                    469

deference to the learned judge, agree in his view that she treated
the letter as a mere statement of intention by which the intended
husband was not to be bound.   The law relating to proposals of
this kind before marriage was thus stated by Lord Lyndhurst, L.C.,
in *Hammersley* v. *De Biel* (1) : " The principle of law, at least of
equity, is this—that if a party holds out inducements to another
to celebrate a marriage, and holds them out deliberately and
plainly, and the other party consents, and celebrates the mar-
riage in consequence of them, if he had good reason to expect
that it was intended that he should have the benefit of the pro-
posal which was so held out, a Court of Equity will take care
that he is not disappointed, and will give effect to the proposal."

We are of opinion that the proposal of terms in this case was
made as an inducement to the lady to marry, that she consented
to the terms, and married the defendant on the faith that he
would keep his word, and that accordingly there was a binding
contract on the defendant's part to leave to his wife the house
and land at Ardfield for her life.

Then, secondly, what is the remedy ?  Marriage is a valuable
consideration for such a contract of the highest order, and where,
as here, the contract is in writing, so that there is no question
upon the Statute of Frauds, in the language already quoted, a
Court of Equity will take care that the party who marries on the
faith of such a proposal " is not disappointed, and will give effect
to the proposal."

In *Hammersley* v. *De Biel* (1) the proposal was made on behalf
of the intended wife's father, by his authority, and was reduced
into writing, and was to the effect that the father would pay
down 10,000*l.*, to be settled on the intended husband and wife
and their children, the husband to secure a jointure of 500*l.* a
year to the wife if she survived him ; and then followed the pro-
vision on which the question arose, by which the father " proposes
for the present to allow his daughter 200*l.* per annum for her
private use, . . . . and also intends to leave a further sum of
10,000*l.* in his will to Miss Thomson, to be settled on her and her
children."   After the father's death, without having made the
promised provision by will, the only child of the marriage—his

(1) 12 Cl. & F. 45, at p. 78.

C. A.

1894

SYNGE
*v.*
SYNGE.

Kay, L.J.

470                            QUEEN'S BENCH DIVISION.                    [1894]

C. A.        mother having died before her father—instituted a suit in equity
1894         against his grandfather's executors to recover 10,000l. out of his
─────        assets.    Lord Langdale, M.R., held that by acceptance the pro-
SYNGE        posal had "ripened into an agreement," and that the plaintiff
*v.*          was entitled to the relief he prayed—i.e., to the sum of 10,000l.,
SYNGE.       with interest at 4 per cent. from the end of one year after the
─────        father's death, on the footing of a legacy.   Lord Cottenham, L.C.,
Kay, L.J.    affirmed this decision, saying this (1): "I propose, first, to con-
             sider whether there was any such agreement previous to the
             marriage of the plaintiff's father and mother as was binding on
             the late Mr. Thomson to give an additional 10,000l. as the portion
             of his daughter.   If it be supposed to be necessary for this pur-
             pose to find a contract, such as usually accompanies transactions
             of importance in the pecuniary affairs of mankind, there may not
             be found in the memorandum, or in the other evidence in the
             cause, proof of any such contract; and this may have led to the
             defence set up by the defendants; but when the authorities on
             this subject are attended to, it will be found that no such formal
             contract is required."

             This was affirmed in the House of Lords by Lord Lynd-
             hurst, L.C., Lord Brougham, and Lord Campbell, without calling
             upon the respondents.   We have examined the case closely,
             because it is of the highest authority, not merely as a judgment
             of the House of Lords, but it was decided by some of the best
             equity lawyers of that time.   Lord St. Leonards has criticized the
             decision on the ground that the memorandum in that case might
             have been construed as a mere expression of an intention, not
             as a definite proposal which could by acceptance ripen into a
             contract: Sugden's Law of Property, p. 53.   But he does not
             intimate a doubt that the decision was right if the proposal was
             not merely of an intention which might be changed.   Therefore,
             a definite proposal in writing so as to satisfy the Statute of
             Frauds to leave property by will, made to induce a marriage,
             and accepted, and the marriage made on the faith of it, will be
             enforced in equity.

             Then, what is the remedy where the proposal relates to a
             defined piece of real property ?   We have no doubt of the power
                            (1) 12 Cl. & F. 45, at p. 62, n.

of the Court to decree a conveyance of that property after the
death of the person making the proposal against all who claim
under him as volunteers.

It is argued that Courts of Equity cannot compel a man to
make a will. But neither can they compel him to execute a
deed. They, however, can decree the heir or devisee in such a
case to convey the land to the widow for life, and under the
Trustee Acts can make a vesting order, or direct that someone
shall convey for him if he refuses. And under the like circum-
stances, the Court has power to make a declaration of the lady's
right.

But counsel do not press for such relief, or ask for a declara-
tion to bind the house and land. The relief they ask is damages
for breach of contract. It seems to be proved that the grantees
of the property under the deeds executed by Sir R. Synge took
without notice of the letter; they acquired, as we understand,
the legal estate by the grant. If there was any valuable con-
sideration moving from them, no relief in the nature of specific
performance could be given against them; and it is suggested
that the property, being partly leasehold, according to the de-
cision in *Price* v. *Jenkins* (1), there was such valuable considera-
tion. It is not necessary to examine this argument, as counsel
elect to ask for damages only.

Sir R. Synge had all his lifetime to perform this contract;
but, in order to perform it, he must in his lifetime make a dis-
position in favour of Lady Synge. If he died without having
done so, he would have broken his contract. The breach would
be omitting in his lifetime to make such a disposition. True, it
would only take effect at his death; but the breach must take
place in his lifetime, and as by the conveyance to his daughters
he put it absolutely out of his power to perform this contract.
Lady Synge, according to well-known decisions (*Hochster* v.
*De la Tour* (2); *Frost* v. *Knight* (3) ), had a right to treat that con-
veyance as an absolute breach of contract, and to sue at once for
damages; and as this Court has both legal and equitable juris-
diction, we are of opinion that such relief should be granted.

C. A.
1894

SYNGE
*v.*
SYNGE.

Kay, L.J.

(1) 5 Ch. D. 619.                    (2) 2 E. & B. 678.
            (3) Law Rep. 7 Ex. 111.

472                              QUEEN'S BENCH DIVISION.                          [1894]

C. A.          We have not before us the materials for assessing such damages.
1894       The amount must depend on the value of the possible life estate
SYNGE      which Lady Synge would be entitled to if she survived her
*v.*        husband.  Their comparative ages would, of course, be a chief
SYNGE.      factor in such a calculation.  There must be an inquiry as to the
Kay, L.J.  proper amount of damages.

               Sir R. Synge must pay the costs of the action here and in the
           Court below.

                                                        *Appeal allowed.*

               Solicitors for plaintiff: *Torr, Janeway, Gribble, Odie, & Sin-
           clair, for Eastley, Jarman, & Eastley, Torquay.*

               Solicitors for defendant: *Wood, Bigg, & Nash, for Kitson,
           Mackenzie, & Heat, Torquay.*

                                                                 A. M.

                               ————

1894              NIND *v.* NINETEENTH CENTURY BUILDING SOCIETY.
Jan. 13.

          *Landlord and Tenant—Breach of Covenant to Repair—Liability of Underlessee
             for Costs of Lessor's Solicitor and Surveyor—Conveyancing and Law of
             Property Act, 1881 (44 & 45 Vict. c. 41), s. 14, sub-ss. 1, 2—Conveyancing
             and Law of Property Act, 1892 (55 & 56 Vict. c. 13), s. 2, sub-s. 1; s. 4.*

              The expression " lessee " in s. 14 of the Conveyancing and Law of Property
          Act, 1881, and in s. 2, sub-s. 1, of the Conveyancing and Law of Property Act,
          1892, includes an underlessee of the whole of the premises comprised in the head
          lease, and the lessor is entitled to recover from such an underlessee the costs of
          solicitor and surveyor mentioned in the last-named section.
              *Burt* v. *Gray* ([1891] 2 Q. B. 98) distinguished.
              A lessee who, in obedience to a notice from his lessor under s. 14, sub-s. 1, of
          the Conveyancing and Law of Property Act, 1881, remedies the breach of cove-
          nant specified and makes the compensation demanded, and thereby renders
          unnecessary an application to the Court under sub-s. 2, for relief from forfeiture
          for such breach, " is relieved " under the provisions of that Act, within the
          meaning of s. 2, sub-s. 1, of the Conveyancing and Law of Property Act, 1892.

              APPEAL from the City of London Court.
              In the early part of 1884, the plaintiff's predecessor in title, by
          eleven several indentures of lease, demised eleven houses to
          different tenants for long terms of years.  Such leases contained
          covenants to repair, with the usual proviso for re-entry on breach.
          The interests of the several lessees became vested in one Henry
          Hall, who at the end of 1884 mortgaged the same by way of

omitted to mention in respect of the appellant Neville will be cancelled, A
it being inappropriate to the offence of which he is eventually found
guilty.

> *Appeals against conviction on counts 2,
> 4 and 5 allowed and convictions on
> those counts quashed.*
> *Appeals against conviction and sen-
> tence on count 3 dismissed.*
> *Recommendation for deportation of
> appellant Neville cancelled.*
> *Order against appellant company to
> pay costs of prosecution varied to
> £50.*

Solicitors: *Offenbach & Co.; Director of Public Prosecutions.*

L. N. W.

---

[COURT OF APPEAL]

# TOTAL OIL GREAT BRITAIN LTD. *v.* THOMPSON GARAGES (BIGGIN HILL) LTD.

[1971 T. No. 847]

1971 Oct. 6, 7                    Lord Denning M.R., Edmund Davies and
                                  Stephenson L.JJ.

*Landlord and Tenant—Covenant—Repudiation—Tied garage—
Lessees' agreement to take oil supplies from lessors—Lessors'
repudiation of covenant accepted by lessees—Effect on lease—
Whether tie covenant severable*

In 1969 the plaintiff oil company let a garage for 14 years
to a dealer. The lease, which became vested in the defen-
dants, contained a covenant that during its term all motor
fuel sold at the garage should be supplied by the plaintiffs.
It was provided that payment was to be upon delivery. Two
cheques for supplies were not met on presentation. After
difficulties over banker's drafts the plaintiffs by letter of
November 11, 1970, stipulated that orders for motor fuel at
the garage would only be accepted on receipt at their depôt
of banker's drafts to the correct values prior to dispatch and
delivery. The defendants got supplies from another oil
company. Following negotiations the plaintiffs by letter of
March 29, 1971, offered to resume delivery of supplies
"cash on delivery." The defendants continued getting sup-
plies elsewhere. On the plaintiffs' claim for an injunction
to restrain the defendants from buying supplies elsewhere the
defendants contended that they had accepted the plaintiffs'
repudiation of the agreement for the supply of motor fuel

**1 Q.B.**                    **Total Oil v. Thompson Garages (C.A.)**

A   which was therefore terminated.   Kilner Brown J. granted
the plaintiffs an interim injunction.

On the defendants' appeal: —

*Held*, dismissing the appeal, (1) that the lease and the tie
agreement formed one legal transaction which could not be
severed.

(2) That the plaintiffs' repudiation by their letter of
November 11, 1970, and its acceptance by the defendants
B   did not terminate the lease. Accordingly the plaintiffs, who
after their letter of March 29, 1971, were no longer in breach
of a term of the lease, were entitled to insist upon the tie
and to the injunction sought.

*Per curiam.* Just as frustration does not bring a lease
to an end (*per* Lord Russell of Killowen and Lord Goddard
in *Cricklewood Property and Investment Trust Ltd.* v.
*Leighton's Investment Trust Ltd.* [1945] A.C. 221, 233, 244),
C   neither does repudiation and acceptance (post, pp. 324B–C, H,
325D–E).

Decision of Kilner Brown J. affirmed.

The following cases are referred to in the judgments:

*Leighton's Investment Trust Ltd.* v. *Cricklewood Property and Invest-
ment Trust Ltd.* [1943] K.B. 493; [1943] 2 All E.R. 97, C.A.; (sub
D   nom. *Cricklewood Property and Investment Trust Ltd.* v. *Leighton's
Investment Trust Ltd.* [1945] A.C. 221; [1945] 1 All E.R. 252, H.L.(E.) ).
*Mersey Steel and Iron Co. Ltd.* v. *Naylor, Benzon & Co.* (1884) 9 App.Cas.
434, H.L.(E.).

The following additional cases were cited in argument:

*Cleveland Petroleum Co. Ltd.* v. *Dartstone Ltd.* [1969] 1 W.L.R. 116;
E   [1969] 1 All E.R. 201, C.A.
*Hampstead & Suburban Properties Ltd.* v. *Diomedous* [1969] 1 Ch. 248;
[1968] 3 W.L.R. 990; [1968] 3 All E.R. 545.
*Heyman* v. *Darwins Ltd.* [1942] A.C. 356; [1942] 1 All E.R. 337,
H.L.(E.).
*Manchester Corporation* v. *Connolly* [1970] Ch. 420; [1970] 2 W.L.R.
746; [1970] 1 All E.R. 961, C.A.

F
INTERLOCUTORY APPEAL from Kilner Brown J.

The plaintiffs, Total Oil Great Britain Ltd., by writ of April 30, 1971,
claimed against the defendants, Thompson Garages (Biggin Hill) Ltd.,
(1) an injunction to restrain them from selling, offering for sale or adver-
tising for sale motor fuels, other than motor fuels supplied by the plaintiffs,
at or from the premises known as Biggin Hill Garage, Keston, Kent, or in
G   any premises adjoining thereto or within 100 yards of Westerham Road,
Keston, in breach of an agreement in the form of a lease dated December
12, 1969; (2) possession of the premises; (3) damages for breach of the
agreement; (4) further or other relief; and (5) costs.

On July 6, 1971, Kilner Brown J. granted the plaintiffs an injunction
until judgment in the action or further order substantially in the terms sought
H   as from midnight on July 27, 1971, " except in circumstances where the
plaintiffs are hindered or prevented from supplying the defendants with part
or all of their requirements of motor fuel for any reason whatsoever beyond
the plaintiffs' control."

The defendants appealed. The grounds of appeal were, inter alia, that
the judge was wrong in law in holding that the agreement of December    A
12, 1969, was still subsisting and that there had been no repudiation of the
terms of that agreement by the plaintiffs which had been accepted by the
defendants; alternatively, in holding that if there had been repudiation of
that agreement by the plaintiffs and acceptance by the defendants it was
open to the plaintiffs to offer to perform that agreement by their letter of
March 29, 1971; alternatively, that the judge was wrong in granting the    B
plaintiffs an interim injunction when on the balance of convenience no
interim order should have been made since the plaintiffs would have had
an adequate remedy in damages if at the trial they were entitled to the
relief sought on a permanent basis.

The facts are stated in the judgment of Lord Denning M.R.

*Anthony Thompson* for the defendants. There was a repudiation by    C
the plaintiffs in November 1970. That is the kernel of the case, the issue
to be tried. If there was such a repudiation, that is the end of the matter
for it was clearly accepted by the defendants. You cannot have rescission
without restitutio in integrum. The issues here call for a full trial and not
for an interim injunction. The contract having been repudiated the
position is that the defendants as the tenants are entitled to compensation    D
in damages for (1) the money which they paid for the lease and (2) the
loss of the goodwill which they have built up.

If the contract is severable from the lease no complication arises. If
there has been repudiation of the supply contract, and acceptance of that
repudiation, the defendants are free of that contract and still have the
lease. There are no cases directly on the point. In *Cleveland Petroleum
Co. Ltd.* v. *Dartstone Ltd.* [1969] 1 W.L.R. 116 the defendants were    E
restrained by interim injunction from acting in breach of tie covenants,
but no question of repudiation arose there. The defendants have a duty
to mitigate the damages which they have suffered and by staying on under
the lease they are doing so.

*John Toulmin* for the plaintiffs. This type of case has been litigated in
a number of previous cases. An oil company owning a garage can grant a    F
lease to a tenant and can impose terms in the lease as to the supply of fuel.

No cases have been found where a lease has been terminated by
repudiation. For the modes of determination of tenancies, see *Halsbury's
Laws of England*, 3rd ed. (1958), Vol. 23 p. 664, para. 1387.

In *Cricklewood Property and Investment Trust Ltd.* v. *Leighton's In-
vestment Trust Ltd.* [1945] A.C. 221, Viscount Simon L.C. and Lord    G
Wright, at pp. 228 and 241, considered that the doctrine of frustration could
in certain circumstances apply to a lease; but Lord Russell of Killowen and
Lord Goddard, at pp. 233 and 244, 245, were of the opposite opinion:
that the doctrine could never apply to a lease. In the Court of Appeal
[1943] K.B. 493, 496, it was in effect accepted that the doctrine of frustra-
tion did not apply to a lease.    H

The doctrine of repudiation applies to a contract but not to a lease.
In any event there was no repudiation here.

[LORD DENNING M.R. What Lord Blackburn said in *Mersey Steel*

**1 Q.B.**        Total Oil v. Thompson Garages (C.A.)

*and Iron Co. Ltd.* v. *Naylor, Benzon & Co.* (1884) 9 App.Cas. 434,
**A**  442, is almost this case.]

A mere failure to deliver on time is not repudiation. In any event
the defendants' behaviour did not amount to acceptance of repudiation.

The defendants had adequate remedies. If the plaintiffs were in breach
of contract they could not rely on the provisions in the lease including the
requirements for petrol supplies [*Spurling (J.) Ltd.* v. *Bradshaw* [1956]
**B**  1 W.L.R. 461] and the defendants could (a) obtain a mandatory injunction
requiring the plaintiffs to supply in accordance with the lease or (b) obtain
supplies from elsewhere. Once the plaintiffs gave notice of willingness to
resume supplies on the terms laid down in the lease the defendants could
not continue to make contracts to obtain supplies from elsewhere.

If the terms of the contract are severed from the lease it will change the
pattern of trading of oil companies. The lease and the tie agreement
**C**  are interdependent covenants. The transaction must be viewed as a whole.

As to the granting of an interim injunction where this would dispose
of the whole matters in issue at the trial: see *Manchester Corporation* v.
*Connolly* [1970] Ch. 420. If it is impossible for the lease to be terminated
by an accepted repudiation and if the lease is not severable from the tie
agreement, the whole defence falls to the ground and the injunction should
**D**  be granted: *Manchester Corporation* v. *Connolly*. [Reference was also
made to *Hampstead & Suburban Properties Ltd.* v. *Diomedous* [1969] 1
Ch. 248.]

*Thompson* in reply. The plaintiffs have put the lease to an end: see
the indorsement of the writ. They issued a notice under section 146 of
the Law of Property Act 1925 on November 18, 1970, and then by their
writ claimed an injunction and possession.

**E**        As to repudiation, there was no suggestion in the *Hampstead* case [1969]
1 Ch. 248 that the lease had been repudiated. Repudiation alone does
not terminate a contract; repudiation and acceptance are necessary: see
*per* Viscount Simon L.C. in *Heyman* v. *Darwins Ltd.* [1942] A.C. 356,
361. In the instant case there is a prima facie repudiation and a prima
facie acceptance of that repudiation. It should not be open to the plain-
**F**  tiff to seek an injunction.

[*Toulmin.* The plaintiffs seek an injunction and not forfeiture.]

The facts are not fully known here, e.g., ought the defendants to
mitigate their damages by staying on in the premises? If there can be no
severance and it is all one transaction, although the defendants cannot stay
on in the premises indefinitely they are entitled to stay for a reasonable
period of time.
**G**

LORD DENNING M.R. This case raises an interesting point on a solus
agreement. Total Oil Great Britain Ltd., the plaintiffs, are an oil
company. They own a garage at Biggin Hill in Kent. In 1969 they let that
garage for 14 years, from May 1, 1969, to a dealer, Mr. Thompson: and it
became vested in Thompson Garages (Biggin Hill) Ltd., the defendants.
**H**  The lease was granted for a premium of £3,000, at a rent of £2,500 a year.
In the lease there was a tie to the oil company. The dealer agreed to take
all his supplies from the oil company and to pay them at standard prices.

Lord Denning M.R. · Total Oil v. Thompson Garages (C.A.)                [1972]

There was a provision for a rebate according to the quantities supplied. In the second schedule there was this clause:

A

> " 4. The dealer shall purchase motor fuel from Total for delivery in loads of not less than . . . 4,000 gallons each *and shall pay for them upon delivery* (unless otherwise agreed) at the relevant prices contained in Total's Wholesale Price Lists to Dealers in force at the date of each delivery."

B

That clause states plainly that payment was to be made on delivery. That means that, when the tanker came and delivered the petrol to the garage, the dealer would pay the driver in cash or give him a cheque. It appears that, on each delivery, a sum of £600 or more would be payable for each tanker load.

During the first year business was good. The dealer took more and more petrol from the oil company. But there was an unfortunate happening early in 1970. The dealer gave two cheques which were not met on presentation. In consequence, the oil company sought to impose new terms. Instead of cheques, they wanted banker's drafts to be given to them when the petrol was delivered at the garage. This gave rise to difficulties. It was not possible to calculate the exact amount of the draft until the fuel had been delivered. Sometimes the tanker had to wait while the calculation was made and the draft got from the bank. These difficulties were such that the oil company sought to impose even more stringent terms. The oil company made an entirely new stipulation as to payment. By a letter of November 11, 1970, they said:

C

D

> " . . . with effect from the delivery of the order you have placed for Friday, November 13, 1970, all future orders for motor fuels placed by yourselves for deliveries to the above garage will be accepted by the depôt, provisionally, and subject to—in each and every case—receipt by the depôt of a banker's draft to the correct value, prior to dispatch by the depôt of the order to Biggin Hill Garage."

E

That stipulation comes to this: when the dealer wanted a supply of petrol, he had to send to the company's depôt beforehand a banker's draft for the amount. Now, the depôt was at Purfleet, the other side of the Thames. It took an hour by car to get there from Biggin Hill. So the dealer would have to calculate the exact amount of petrol he wanted, send to the bank and get a banker's draft for the amount, then send the draft by car to Purfleet, before he could get a supply. That was difficult enough on weekdays, but much worse at weekends and holidays when the banks were shut.

F

G

The new stipulation was entirely at variance with the agreement. The agreement said " cash on delivery." The new stipulation said " banker's draft before delivery." In my opinion that new stipulation amounted to a repudiation of the contract. By it the oil company evinced an intention no longer to be bound by the agreement. It is just like the illustration given by Lord Blackburn in *Mersey Steel and Iron Co. Ltd.* v. *Naylor, Benzon & Co.* (1884) 9 App.Cas. 434, 442. He was speaking of *Withers* v. *Reynolds* (1831) 2 B. & Ad. 882 when one party said:

H

**1 Q.B.**          Total Oil v. Thompson Garages (C.A.)    Lord Denning M.R.

A      " You may bring your straw, but I will not pay you upon delivery as under the contract I ought to do.  I will always keep one bundle of straw in hand so as to have a check upon you."

Lord Blackburn said that that amounted to saying:  " I will not perform the contract ": and that thereupon the other side could say: " I will not go on with the contract."

B      In consequence of that repudiation, the dealer went elsewhere.  He got supplies from another oil company.  He had a good deal of justification for doing so.  He did quite well out of it.  Total Oil Great Britain Ltd. were disturbed by this turn of events.  There were negotiations.  Eventually a meeting was held in March 1971.  After it the oil company wrote this important letter of March 29, 1971:

C      " . . . we now write to advise you formally that pending resolution of the outstanding balance on your account we are prepared to resume deliveries to Biggin Hill Garage against our standard conditions of sale *which as you are aware are cash on delivery* . . . .

       " Will you please confirm by return that you are willing to purchase all your requirements of motor fuels and lubricants in accordance with the terms of your lease. . . . "

D
The Biggin Hill Garage did not accept this offer but went on getting supplies elsewhere.  In consequence, the oil company on April 30 issued the writ in this action.  They claimed an injunction to restrain the dealer from buying elsewhere.

       Mr. Thompson for the dealer says that the oil company have repudiated their contract by insisting on the new stipulation of payment before delivery.

E      He says that the dealer accepted that repudiation. He treated the agreement as at an end and got deliveries elsewhere.  Seeing that the repudiation was accepted, the oil company can no longer insist on the agreement being performed.

       The difficulty which faces Mr. Thompson, however—and he faces it quite frankly—is this.  The agreement is contained in the lease.  If the

F      lease is at an end, as well as the agreement; the dealer is in a parlous position.  He has got to go out.  That is the last thing he wants.  He wants to keep the lease.  So, Mr. Thompson has to say: Either the lease is separate from the agreement to supply oil; or, alternatively, he says that even if the lease is at an end, he can stay there in the garage for quite a long time.  He claims to stay until the trial of this action.  In either

G      case, he says that there should be no injunction against him.
       The judge did not accept the argument of Mr. Thompson.  He held that, at all events, after that offer of March 1971, the oil company were entitled to insist on the dealer taking all his supplies from the oil company; and he granted an interim injunction restraining the dealer from buying elsewhere; but he stayed it pending appeal to this court.  It has been stayed until now; and now we have got to decide it.

H      The first point is whether the lease is separate from the agreement for a tie.  In my opinion it is not.  The lease with the tie is one composite legal transaction.  It cannot be severed.  On the way it is worded, it does look as if the lease was one part: and the agreement for the supply of

**Lord Denning M.R.   Total Oil v. Thompson Garages (C.A.)   [1972]**

petrol (plus the tie) was the other part. But it is not right to look at the
wording alone. The transaction must be regarded as a whole. It is
obvious that the dealer would never have got the lease unless he agreed
to the tie. It is all one.   **A**

The second point is: what is the effect of the repudiation by the oil
company which was accepted by the dealer? Does it put an end to the
lease? I think not. A lease is a demise. It conveys an interest in land.
It does not come to an end like an ordinary contract on repudiation and
acceptance. There is no authority on the point, but there is one case
which points that way. It is *Leighton's Investment Trust Ltd.* v.
*Cricklewood Property and Investment Trust Ltd.* [1943] K.B. 493 sub
nom. *Cricklewood Property and Investment Trust Ltd.* v. *Leighton's
Investment Trust Ltd.* [1945] A.C. 221. Lord Russell of Killowen and
Lord Goddard, at pp. 234 and 244, were both of opinion that frustration
does not bring a lease to an end. Nor, I think, does repudiation and   **C**
acceptance.   **B**

The legal position is, I think, this: When the landlord, the oil
company, made a new stipulation as to payment—which he was not
entitled to make—the tenant could do one of two things. He could go
to the court and get an order for specific performance by the oil company
of this agreement to supply "cash on delivery"; or, alternatively, he   **D**
could go and buy elsewhere, as he did here, until the oil company mended
its ways. He could, no doubt, claim damages, too, if he suffered any.
But the lease did not come to an end.

The fundamental point is that the lease has not come to an end. It
is still in existence  And the law must recognise that fact. The crucial
question is: Can the landlord, the oil company—now insist on the tie?
So long as they were in breach themselves—so long as they were wrongly   **E**
insisting on the new stipulation—they could not insist on the tie. But I
think they had a locus poenitentiae. Seeing that the lease was in
existence, they were, I think, entitled to put themselves right. They were
entitled to say: "We realise we were wrong before; now we are
prepared to adhere to the terms of the supply on payment and the like;
and, therefore, the tie ought to hold." Once the lease is held to be still   **F**
in existence, there is no alternative to that course. The oil company must
do its part. The dealer must do his. The dealer has his remedy in
damages for any previous breaches by the oil company.

Finally, Mr. Thompson urged that this ought not to be dealt with on an
interlocutory application; because it would, in effect, be deciding the case
finally here and now. So be it. That often does happen on interlocutory
applications. We have before us all the information which is necessary to   **G**
decide it. It seems to me that, even though it may be deciding the case
now, we should so decide it.

I think the judge was right. I think an injunction should be granted
to prevent the dealer buying his supplies elsewhere. There has been plenty
of time since March and I think the injunction ought to operate soon.

**H**

EDMUND DAVIES L.J. I agree with the judgment which has just been
delivered by Lord Denning M.R. Indeed any other conclusion would lead
to the defendants being placed in a highly privileged position in relation

**1 Q.B.**    **Total Oil v. Thompson Garages (C.A.)**    **Edmund Davies L.J.**

A  to the lease. Mr. Thompson said he recognises that he would not be entitled to remain on in the demised premises for the full duration of the lease granted, but only, as he put it, "for a reasonable time." In the context of this case, I know not what that phrase means. We do know that six months have expired since the plaintiffs recognised their error and offered to restore the terms as to delivery on payment contained in the lease which is the subject-matter of the claim; and I see no reason, if Mr.

B  Thompson be right, why he should not remain in the premises for the remainder of the full term, freed from the original contractual restriction in relation to the purchase of and payment for petrol. The defendants were admitted to the premises solely upon the terms of the lease containing several components which are unseverable, in my judgment. They stand or fall together. Despite the repudiation by the plaintiffs of part of the lease and the defendants' acceptance thereof, I cannot accept

C  that, as to the latter's occupancy during the remainder of the 14-year term, they would be able to say, "We are entitled to remain in possession without regard being paid to where we obtain our petrol supplies." Nevertheless, if the defendants are right, that seems to be the inescapable conclusion. Its wholly unacceptable nature persuades me that, notwithstanding the lessors' original default, their offer to rectify the

D  position last March entitles them to the relief now claimed. I accordingly concur in the judgment delivered by Lord Denning M.R.

STEPHENSON L.J. I agree with both the judgments which have been given. This complex of lease and trading agreement has not been repudiated, although if the trading agreement could stand alone, it would clearly have been repudiated by the plaintiffs' insistence on an additional

E  term and that repudiation would equally clearly have been accepted by the defendants. If the defendants stay on, it may be that they need not comply with the terms of their agreement unless the plaintiffs comply too. But now that the plaintiffs have offered to go back to the original terms and not to insist on the additional term, the defendants can stay on only if they comply with their contractual promises, including that which obliges

F  them to take all their supplies from the plaintiffs. They cannot, as the judge said, blow hot and cold; and as long as the plaintiffs carry out their part of the agreement, the defendants must, in my judgment, be restrained from breaking their agreement in the terms of the injunction which the judge rightly granted.

*Appeal dismissed with costs.*
*No order as to costs in court below.*
G  *Enforcement of injunction suspended*
*for 14 days.*

Solicitors: *Anthony Leader & Co.; Denton, Hall & Burgin.*

A. H. B.

H

1 A.C.

A                              [HOUSE OF LORDS]


TRAFALGAR HOUSE CONSTRUCTION (REGIONS)
  LTD. .    .    .    .    .    .    .    .    .    . RESPONDENTS

AND

B   GENERAL SURETY & GUARANTEE CO. LTD.    .    APPELLANTS


1995   May 2, 3, 4;                    Lord Keith of Kinkel,  Lord Ackner,
       June 29                         Lord Jauncey of Tullichettle,
                            Lord Lloyd of Berwick and Lord Steyn


*Contract—Construction—Guarantee—Building subcontract—Joint bond*
C    *by subcontractor and surety for 10 per cent. of contract money—*
     *Bond to be null and void on proper performance or on surety*
     *satisfying damages—Whether guarantee*
  *Practice—Summary procedure under Order 14—Unconditional leave to*
     *defend—Defendant's entitlement to set off cross-claims—Whether*
     *claim triable for "some other reason"—R.S.C., Ord. 14, r. 3(1)*

        The main contractors for the construction of a new leisure
D    complex for a borough council entered into a subcontract
     for groundworks. Under the terms of the subcontract the
     subcontractor, jointly with the appellants, provided a bond for
     10 per cent. of the value of the subcontract on condition that "if the
     subcontractor shall duly perform and observe" all the terms of
     the subcontract "or if on default by the subcontractor the surety
     shall satisfy and discharge the damages sustained by the main
     contractor thereby" up to the amount of the bond then the
E    obligation would be null and void, but otherwise remained in full
     force. In September 1990 joint administrative receivers of the
     subcontractor confirmed that the subcontractor was unable to
     carry out the subcontract. The contractors completed the work
     themselves. In October 1991 they issued a writ claiming money
     pursuant to the bond from the appellants and sought summary
     judgment under R.S.C., Ord. 14[1]. In the affidavit evidence in
F    support of the summons the deponents stated their belief that
     there was no arguable defence to the claim; no information other
     than the heads of claim was provided and the appellants' right in
     law to set-off was challenged. The appellants' expert evidence
     challenged the contractors' heads of claim generally and
     demonstrated possible claims by the subcontractor. The judge
     refused leave to defend and gave judgment for the contractors,
     holding that as a matter of the express wording of the bond
G    liability to pay had arisen, that there was prima facie evidence
     that the subcontractor was in default, the damages sustained by
     the contractors had not been discharged by the appellants and
     their liability remained intact. The Court of Appeal dismissed the
     appellants' appeal.

        [1] R.S.C., Ord. 14, r. 3(1): "Unless on the hearing of an application under rule 1 either
H   the court dismisses the application or the defendant satisfies the court with respect to the
     claim, or the part of a claim, to which the application relates that there is an issue or
     question in dispute which ought to be tried or that there ought for some other reason to be
     a trial of that claim or part, the court may give such judgment for the plaintiff against that
     defendant on that claim or part as may be just having regard to the nature of the remedy or
     relief claimed."

Trafalgar House Ltd. v. General Surety Co. (H.L.(E.))            [1996]

On appeal by the appellants:—

*Held*, allowing the appeal and granting unconditional leave to defend, that on its proper construction the bond without the second part of the condition amounted to a guarantee and that the second part itself did not alter the effect of the remainder of the bond; that in order to establish liability under the bond proof of damage was required and mere assertion was insufficient; and that, therefore, the appellants were entitled to raise the questions of the sums due to the subcontractor and its cross-claims; that there was sufficient evidence to raise a triable issue in relation to the heads of claim; that, further, it would be just and reasonable for all matters of dispute under the bond to be determined at one and the same time; and that, accôrdingly, there was "some other reason" within the meaning of R.S.C., Ord. 14, r. 3(1) why the issues should go to trial (post, pp. 202F–G, 207D–G, 208F, 210C–D, F–211A).

*Trade Indemnity Co. Ltd. v. Workington Harbour and Dock Board* [1937] A.C. 1, H.L.(E.) and dictum of Lord Atkin in *Workington Harbour & Dock Board v. Trade Indemnity Co. Ltd. (No. 2)* [1938] 2 All E.R. 101, 105, H.L.(E.) applied.

*Calvert v. London Dock Co.* (1838) 2 Keen 638; *Lep Air Services Ltd. v. Rolloswin Investments Ltd.* [1973] A.C. 331, H.L.(E.) and *City of Glasgow District Council v. Excess Insurance Co. Ltd.*, 1986 S.L.T. 585 considered.

Decision of the Court of Appeal reversed.

The following cases are referred to in the opinion of Lord ·Jauncey of Tullichettle:

*Calvert v. London Dock Co.* (1838) 2 Keen 638

*City of Glasgow District Council v. Excess Insurance Co. Ltd.*, 1986 S.L.T. 585

*Esal (Commodities) Ltd. v. Oriental Credit Ltd.* [1985] 2 Lloyd's Rep. 546, C.A.

*Hyundai Shipbuilding & Heavy Industries Co. Ltd. v. Pournaras* [1978] 2 Lloyd's Rep. 502, C.A.

*Lep Air Services Ltd. v. Rolloswin Investments Ltd.* [1973] A.C. 331; [1972] 2 W.L.R. 1175; [1972] 2 All E.R. 393, H.L.(E.)

*Tins Industrial Co. Ltd. v. Kono Insurance Ltd.* (1987) 42 B.L.R. 110

*Trade Indemnity Co. Ltd. v. Workington Harbour and Dock Board* [1937] A.C. 1, H.L.(E.)

*Workington Harbour & Dock Board v. Trade Indemnity Co. Ltd. (No. 2)* [1938] 2 All E.R. 101, H.L.(E.)

The following additional cases were cited in argument:

*Indrisie v. General Credits Ltd.* [1985] V.R. 251

*Jobson v. Johnson* [1989] 1 W.L.R. 1026; [1989] 1 All E.R. 621, C.A.

*Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689; [1973] 3 W.L.R. 421; [1973] 3 All E.R. 195, H.L.(E.)

*National Westminster Bank Plc. v. Daniel* [1993] 1 W.L.R. 1453; [1994] 1 All E.R. 156, C.A.

*Nene Housing Society Ltd. v. National Westminster Bank Ltd.* (1980) 16 B.L.R. 22

*President of India v. Metcalfe Shipping Co. Ltd.* [1970] 1 Q.B. 289; [1969] 3 W.L.R. 1120; [1969] 3 All E.R. 1549, C.A.

*Royal Bank of Scotland Ltd. v. Dinwoodie*, 1987 S.L.T. 82

*Wardens and Commonalty of the Mystery of Mercers of the City of London v. New Hampshire Insurance Co.* [1992] 2 Lloyd's Rep. 365, C.A.

A    APPEAL from the Court of Appeal. '

This was an appeal by General Surety & Guarantee Co. Ltd., pursuant to leave granted on 23 June 1994 by the Appeal Committee of the House of Lords (Lord Goff of Chieveley, Lord Mustill and Lord Woolf) from a decision dated 22 February 1994 of the Court of Appeal (Sir Thomas Bingham M.R., Beldam and Saville L.JJ.) dismissing the appellants' appeal from an order of Mr. Recorder Brian Knight Q.C., sitting on

B    official referee's business. On 1 October 1991 the respondents, Trafalgar House Construction (Regions) Ltd., issued a writ claiming from the appellants £101,285 under a bond executed jointly by K.D. Chambers Ltd. ("Chambers") and the appellants with the respondents conditioned for the due performance by Chambers of a subcontract in writing dated 31 October 1989 made between the respondents and Chambers for the

C    execution of certain building works. Chambers failed to perform the contract. The respondents took out a summons under R.S.C., Ord. 14 seeking summary judgment. Mr. Recorder Knight Q.C. gave judgment for the respondents and refused the appellants leave to defend.

The facts are stated in the opinion of Lord Jauncey of Tullichettle.

D    *Gordon Pollock Q.C.* and *Richard Wilmot-Smith Q.C.* for the appellants. The bond was subject to the condition that it would be void if the sub-contractor fulfilled its obligations. Ever since *Calvert v. London Dock Co.* (1838) 2 Keen 638 such bonds have been regarded as guarantees. The use of the condition in commercial bonds is a long-standing and widespread practice: see *Hudson's Building and Engineering Contracts,* 11th ed. (1995), vol. 2, pp. 1499–1510; *Trade Indemnity Co. Ltd. v. Workington Harbour*

E    *and Dock Board* [1937] A.C. 1; *Workington Harbour & Dock Board v. Trade Indemnity Co. Ltd. (No. 2)* [1938] 2 All E.R. 101; *Nene Housing Society Ltd. v. National Westminster Bank Ltd.* (1980) 16 B.L.R. 22; *Tins Industrial Co. Ltd. v. Kono Insurance Ltd.* (1987) 42 B.L.R. 110; *City of Glasgow District Council v. Excess Insurance Co. Ltd.,* 1986 S.L.T. 585 and *Royal Bank of Scotland v. Dinwoodie,* 1987 S.L.T. 82. The language has an established meaning, which should not be changed. *Lep Air*

F    *Services Ltd. v. Rolloswin Investments Ltd.* [1973] A.C. 331 is distinguishable since there the guarantee was to "see to it" that the contract was performed. [Reference was also made to *Jobson v. Johnson* [1989] 1 W.L.R. 1026.] This type of bond is enforceable against the guarantor only where the beneficiary can prove damage caused by the contractor's non-performance of his obligations.

G    The bond, as a guarantee and a suretyship contract, is subject to equitable set off: *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689. The parties can exclude any incidents of the contract but they have to use clear language to do so: *Hyundai Shipbuilding & Heavy Industries Co. Ltd. v. Pournaras* [1978] 2 Lloyd's Rep. 502. Under the bond the appellants guaranteed the net liability of the subcontractor to the respondents. That liability can only be established

H    by going into the facts. Therefore, proceedings under R.S.C., Ord. 14 are inappropriate. The respondents' construction of "damages sustained by the main contractor thereby" will give rise to problems in the final accounting between the subcontractor and the respondents.

*Michael Beloff Q.C.* and *Susan 'Prevezer* for the respondents. The bond     A
provided for payment by the appellants to the respondents of a sum on
the occurrence of the contingency of non-performance or no proper
performance by the subcontractor under the subcontract. In construing
the bond one has to look at the language of the bond itself. No assistance
can be derived from bonds using similar but not the same language: see
*Wardens and Commonalty of the Mystery of Mercers of the City of London
v. New Hampshire Insurance Co.* [1992] 2 Lloyd's Rep. 365. The views     B
expressed on such bonds on earlier occasions are irrelevant: see *President
of India v. Metcalfe Shipping Co. Ltd.* [1970] 1 Q.B. 289, 308. There has
been a breach of the subcontract; a bona fide demand has been triggered;
and it is unnecessary to prove damage. The respondents can point to the
bond for their entitlement to be paid: see *Emden's Construction Law*, Re-
issue 37 (1995), pp. C294–295, paras. 758–759 and *Esal (Commodities)*     C
*Ltd. v. Oriental Credit Ltd.* [1985] 2 Lloyd's Rep. 546.

The bond was not a guarantee. The appellants were not entitled to
bring in a set-off or cross-claim: see *Keating on Building Contracts*, 5th ed.
(1991), pp. 253–254. There is no magic in the word "guarantee" or
"surety:" see *Lep Air Services Ltd. v. Rolloswin Investments Ltd.* [1973]
A.C. 331. *Trade Indemnity Co. Ltd. v. Workington Harbour and Dock
Board* [1937] A.C. 1 is distinguishable since the issue there was that there     D
had been a prior request for a guarantee. Alternatively, if the bond was a
guarantee, it did not automatically follow that the appellants' obligation
was subject to a set-off or cross-claim by the subcontractor against the
respondents. To arrive at the amount properly payable litigation between
various parties would be necessary: see *Indrisie v. General Credits Ltd.*
[1985] V.R. 251.     E

In proceedings under R.S.C., Ord. 14, the court has to look at the
whole situation and decide, on examination of the defendants' affidavit
evidence, whether there is a triable issue: see Ord. 14, rr. 2(1), 3, 4 and
*National Westminster Bank Plc. v. Daniel* [1993] 1 W.L.R. 1453. If it is
held to be proper to take into account sums due for work done, a cross-
claim or set-off, there is a triable issue otherwise not.

*Pollock Q.C.* replied.     F


Their Lordships took time for consideration.


29 June. LORD KEITH OF KINKEL. My Lords, for the reasons given
in the speech to be delivered by my noble and learned friend, Lord
Jauncey of Tullichettle, which I have read in draft and with which I agree,     G
I would allow this appeal.


LORD ACKNER. My Lords, I have had the advantage of reading in
draft the speech prepared by my noble and learned friend, Lord Jauncey
of Tullichettle. For the reasons he gives, I, too, would allow the appeal.


LORD JAUNCEY OF TULLICHETTLE. My Lords, this appeal concerns the     H
effect of a bond granted to a main contractor by a subcontractor who was
unable to complete the subcontract after administrative receivers had been
called in.

1 A.C.    **Trafalgar House Ltd. v. General Surety Co. (H.L.(E.))**    Lord Jauncey
of Tullichettle

A    On 31 October 1989 the respondents, in their former incarnation of Monk Building and Civil Engineering Ltd., who were the main contractors for the construction of a leisure complex for Maidstone Borough Council, entered into a subcontract with K.D. Chambers Ltd. ("Chambers") for the execution of the groundworks. In terms of the subcontract Chambers were required to provide a bond for the sum of £101,285, being 10 per cent. of the value of the subcontract. This they did jointly with the
B    appellants. In September 1990 administrative receivers appointed over Chambers confirmed that the latter could not complete the subcontract and thereafter the respondents completed the necessary works themselves. In October 1991 the respondents issued a writ against the appellants claiming £101,285 under the bond and on 9 February 1993 the official referee refused the appellants leave to defend and gave judgment under
C    R.S.C., Ord. 14 for the sum claimed in the writ. On 22 February 1994 the Court of Appeal (Sir Thomas Bingham M.R., Beldam and Saville L.JJ.) (unreported); Court of Appeal (Civil Division) Transcript No. 172 of 1994, dismissed the appellants' appeal and affirmed the judgment of the official referee.

The bond is in the following terms:

D    "BOND
"General Surety & Guarantee Co. Ltd.

"By this bond we K.D. Chambers Ltd. whose registered office is at 1 London Road Sittingbourne Kent (hereinafter called 'the subcontractor') and General Surety & Guarantee Co. Ltd. whose registered office is at Hawthorn Hall Hall Road Wilmslow Cheshire
E    SK9 5BZ (hereinafter called 'the surety') are held and firmly bound unto A. Monk Building and Civil Engineering Ltd. (hereinafter called 'the main contractor') in the sum of £101,285·00 (one hundred and one thousand two hundred and eighty five pounds) for the payment of which sum the subcontractor and the surety bind themselves their successors and assigns jointly and severally by these presents

"Sealed with our respective seals and dated this twenty seventh
F    day of November 1989
"Whereas:

"(1) The main contractor has entered with the Maidstone Borough Council for the construction of a leisure centre at Mote Park Maidstone Kent (hereinafter referred to as 'the main contract works')

"(2) The subcontractor by subcontract agreement evidenced by
G    subcontract order no. SC1839/C5495 dated 31 October 1989 made between the main contractor of the one part and the subcontractor of the other part has entered into a subcontract (hereinafter referred to as 'the said subcontract') for the construction and completion of the subcontract works (being part of the main contract works) as therein mentioned in conformity with the provisions of the said subcontract

"Now the condition of the above written bond is such that if the
H    subcontractor shall duly perform and observe all the terms provisions conditions and stipulations of the said subcontract on the subcontractor's part to be performed and observed according to the true purport intent and meaning thereof *or if on default by the*

A

*subcontractors the surety shall satisfy and discharge the damages
sustained by the main contractors thereby up to the amount of the above
written bond* then this obligation shall be null and void but otherwise
shall be and remain in full force and effect but no alteration in terms
of the said subcontract made by agreement between the main
contractor and the subcontractor or in the extent or nature of the
subcontract works to be constructed and completed thereunder and
no allowance of time by the main contractor under the said
subcontract nor any forbearance or forgiveness in or in respect of any
matter or thing concerning the said subcontract on the part of the
main contractor shall in any way release the surety from any liability
under the above written bond.

B

"Any proceedings against the surety to recover any claim
hereunder must be served within six months after 4 February 1991 or
such other date as may be certified by the Architect as the date of
practical completion of the main contract works.

C

"The common seal of . . ." (Emphasis added.)

In the Court of Appeal Saville L.J. reached the following conclusion.

1. That the bond was not a guarantee in the ordinary sense whereby
the guarantor agrees to "see to it" that the obligation of the principle
obliger will be performed (*Lep Air Services Ltd. v. Rolloswin Investments
Ltd.* [1973] A.C. 331) but imposed:

D

"upon the surety an independent obligation to pay the damages
sustained by the main contractors (up to the amount of the bond)
from a failure of the subcontractors to carry out the subcontract."

when called upon to do so by the respondents;

E

2. That the sum payable under the bond was the additional expenditure
incurred or to be incurred by the respondents as a result of the failure of
Chambers to perform and that in calculating this sum no account was to
be taken of debts and credits including the value of any set-offs and
counter claims due to or by the respective party; and

3. That the obligation under the bond was to pay what the respondents
asserted in good faith to be the amount of damages.

F

To summarise Saville L.J.'s conclusion, on a failure to perform by
Chambers the respondents were to be paid on demand a gross sum
representing the additional expenditure incurred by the respondents as a
result of Chambers's breach. In reaching this conclusion Saville L.J.
identified the commercial purpose of the bond as being to provide
immediate funds for the respondents in the event of failure of performance
by Chambers, a view shared by Beldam L.J. Sir Thomas Bingham M.R.
rejected the argument that the bond was a guarantee and, endorsing
Saville L.J.'s identification of its commercial purpose, concluded that the
gross sum of damages was payable on demand in good faith. Your
Lordships were informed that the respondents did not argue in the Court
of Appeal that a mere demand in good faith was sufficient to entitle them
to payment under the bond.

G

H

Two principal issues arise in this appeal namely, first whether the bond
is a guarantee with the consequent result that the appellants are entitled
to rely on defences which would be available to Chambers and second

A   whether the affidavits lodged by the appellants raise an issue which ought to be tried (the "triable issue"). For reasons which will become apparent it is appropriate to divide the first issue into two parts namely (1) whether the bond without the second part of the condition which I have italicised would be a guarantee (the "guarantee issue") and (2) if so, whether the addition of that second part alters the position (the "construction issue").

B   *The guarantee issue*

    In reaching the conclusion that the bond was not a guarantee in the ordinary sense of a "see to it" obligation Saville L.J. had regard to *Lep Air Services Ltd. v. Rolloswin Investments Ltd.* [1973] A.C. 331 wherein the guarantor personally guaranteed the performance by the principal debtor of its obligation to make regular instalment payments. There is, however, nothing in that case which suggests that a guarantee can only take the form of a "see to it" obligation and Lord Reid, at p. 345F, went no further than to say that "the authorities appear to recognise that at least most contracts of guarantee are of this nature."

    There is however other material far more germane to this issue than *Lep Air Services Ltd. v. Rolloswin Investments Ltd.* Bonds in similar form have existed for more than 150 years and have been treated by the parties thereto and by the courts as guarantees. Indeed the current standard I.C.E. Conditions of Contract contain a specimen bond in terms identical to those in the Chambers bond. In the first place the bond itself contains indications that it was intended to be a guarantee. The appellants are described as "the surety." There is a provision to the effect that no alteration in the terms of the subcontract should release the surety from liability. In the absence of such provision a surety would normally be released from his obligation by any subsequent material alteration to the contractual provisions agreed between the contractor and subcontractor. In the second place there is relevant authority. In *Calvert v. London Dock Co.* (1838) 2 Keen 638, 639 the bond was in the following terms:

F     "On the third of November 1829, *Streather,* and *Warburton,* and *Laycock,* as his sureties, executed to *James Warre,* as treasurer of the Company, their joint and several bond for the sum of 5000l., conditioned to be void, if *Streather* should well and truly observe, perform, and keep, the promises and agreements contained in the contract, which, on the part of *Streather* were and ought to be performed, according to the true intent and meaning of the contract."

G   On the failure of Streather to complete the contract, Calvert the personal representative of Laycock and Warburton sought an injunction against the company suing on the bond on the ground that the terms of Streather contract had been varied to the prejudice of the sureties. The sureties were successful and Lord Langdale M.R. made the injunction perpetual. Neither party sought to argue that the bond was other than a contract of Suretyship and both arguments proceeded upon the basis that it was.

    In *Trade Indemnity Co. Ltd. v. Workington Harbour and Dock Board* [1937] A.C. 1 ("the *Workington* case"), the Harbour Board required successful tenderers to procure a guarantee for the due performance of the

contract. The bond which the contractors obtained was, for all practical   A
purposes, in terms identical to the Chambers bond without the second
part of the condition as to satisfaction and discharge by the surety. On
the liquidation of the contractors the board sued the co-grantors of the
bond and the principal issue between the parties was whether the bond
was a contract of insurance or one of guarantee. Lord Atkin, in a passage
with which all other members of the Appellate Committee agreed said, at
p. 17:                                                                       B

> "On the other hand the contract demanded by the Dock Board was a
> guarantee; the defendants in the contract style themselves sureties; the
> contract appears in substance to be a contract to answer for the debt,
> default or miscarriage of another; and the express provisions
> negativing release of the 'surety' upon a variation of the contract or
> forbearance as to time indicate that the parties were thinking of the   C
> law as to guarantees. I entertain no doubt that this was a guarantee,
> and the rights of the parties should be regulated on that footing."

Later in his speech Lord Atkin, at p. 23, stated that the board required to
prove the damages flowing from the contractors' breach.

In *City of Glasgow District Council v. Excess Insurance Co. Ltd.*, 1986
S.L.T. 585, 589, the Lord Ordinary (Lord Ross) applied the above cited   D
dictum of Lord Atkin in reaching the conclusion that a bond in terms
virtually identical to the whole of the Chambers bond was a guarantee.
Once again the issue between the parties was whether the bond was a
cautionary obligation or a contract of insurance but on this occasion for
the purposes of limitation.

Mr. Beloff for the respondents, contended that the bond provided for   E
payment of a sum up to a stipulated maximum upon the occurrence of
the two contingencies referred to in the condition and further that it was
not a guarantee by the appellants which gave them the right to set-off
sums due from the respondents to Chambers or to rely on any form of
cross claims. He sought to distinguish the *Workington* case [1937] A.C. 1
upon three grounds, namely (1) that the issue therein was quite different
to that in the present appeal, (2) that there had been a prior request by   F
the Harbour Board for a guarantee, and (3) that there was in Lord Atkin's
speech nothing which positively supported the right of a guarantor to rely
on set-off or money due for work done. I do not consider that these are
distinctions of materiality. In both the *Workington* case and the *City of
Glasgow District Council* case, 1986 S.L.T. 585 the question of whether or
not the bond was a guarantee was the primary issue. In both cases it was   G
decided that it was and Lord Atkin and Lord Ross specifically stated that
the rights of the parties fell to be regulated on that basis. In the absence
of specific provisions it would follow that questions of money due for
work already done and claims of set-off against the respondents which
could have been relied upon by Chambers in defence to an action for
damages for breach of contract could properly be relied upon by the
appellants.                                                                  H

In recent years there has come into existence a creature described as
an "on demand bond" in terms of which the creditor is entitled to be paid
merely on making a demand for the amount of the bond. An example of

A  such a bond is to be found *Esal (Commodities) Ltd. v. Oriental Credit Ltd.* [1985] 2 Lloyd's Rep. 546:

> "We undertake to pay the said amount on your written demand in the event that the supplier fails to execute the contract in perfect performance . . ."

All that was required to activate it was a demand by the creditor stated
B  to be on the basis of the event specified in the bond.

In this case the Court of Appeal by determining that the appellants' liability under the bond arose on the failure of Chambers to complete the contract followed by a demand in good faith for the amount of the damages which they claim to have suffered were effectively treating it as a type of on demand bond. Mr. Beloff, not surprisingly, adopted as an alternative argument the reasoning of the Court of Appeal albeit not with
C  the greatest enthusiasm. However he maintained that he did not require to go so far as the Court of Appeal as he had amply vouched the damages which he had sustained. In this connection it is interesting to note that in *Tins Industrial Co. Ltd. v. Kono Insurance Ltd.* (1987) 42 B.L.R. 110 Hunter J.A. giving the judgment of the Court of Appeal of Hong Kong in a case concerning a bond in virtually identical terms to the Chambers
D  bond stated, at p. 121, that "a claimant under the bond has to prove first breach, and secondly damages."

My Lords I have no doubt that the Court of Appeal were in error in concluding that the bond was not a guarantee but was akin to an on demand bond. No distinction can, in my view, properly be drawn between the effect of this bond minus the second part of the condition and the bond considered by Lord Atkin in the *Workington* case [1937] A.C. 1, 17
E  and other bonds using this or similar wording which have for many years been generally treated as guarantees: *Hudson's Building and Engineering Contracts,* 11th ed. (1995), vol. 2, pp. 1499–1500, para. 17-007. Thus in a second action arising out of the bond in the *Workington* case, *Workington Harbour & Dock Board v. Trade Indemnity Co. Ltd. (No. 2)* [1938] 2 All E.R. 101, 105, Lord Atkin said:

F  > "My Lords, both actions were brought on the money bond."— That is the first and second actions.—"It is well established that in such an action the plaintiff has to establish damages occasioned by the breach or breaches of the conditions, and, if he succeeds, he recovers judgment on the whole amount of the bond, but can only issue execution for the amount of the damages proved."

G  This dictum makes it clear beyond doubt that proof of damage and not mere assertion thereof is required before liability under such a bond arises.

I have therefore no hesitation in concluding that the Chambers bond without the second part of the condition would amount to a guarantee and that the appellants would be entitled to raise all questions of sums due and cross-claims which would have been available to Chambers in an action against them for damages.

H

*The construction issue*

Mr. Beloff argued that the words "damages sustained by the main contractor thereby" had the effect of defining the appellants' obligation

solely by reference to the additional expenditure incurred by the    A
respondents without reference to any sums which would normally be set
against it in an action of damages against Chambers. Such a construction
would involve treating these general words as an express exclusion of the
normal legal incidents of suretyship. It would, as Mr. Pollock for the
appellants pointed out, also give rise to problems in the event of a final
accounting between Chambers and the respondents producing an overall
indebtedness by the latter to the former or a converse indebtedness less    B
than the sum paid by the appellants under the bond. Mr. Beloff's answer
to this difficulty was that the court might in appropriate circumstances
imply into the bond a condition of repayment by the respondents to the
appellants. A solution which does not appear to be particularly attractive.

There is no doubt that in a contract of guarantee parties may, if so
minded, exclude any one or more of the normal incidents of suretyship.
However if they choose to do so clear and unambiguous language must    C
be used to displace the normal legal consequences of the contract—
language such as was used in *Hyundai Shipbuilding & Heavy Industries Co.
Ltd. v. Pournaras* [1978] 2 Lloyd's Rep. 502, 503 where the letter of
guarantee provided:

> "the [defendant] hereby irrevocably and unconditionally guarantees
> the payment in accordance with the terms of the contract of all sums    D
> due or to become due by the buyer to you under the contract and in
> case the buyer is in default of any such payment the [defendant] will
> forthwith make the payment in default on behalf of the buyer . . ."

This was construed as enabling the shipowner to recover from the
guarantors of the buyers the amount due irrespective of the position
between yard and buyers: *per* Roskill L.J., at p. 508. The words relied
upon by the respondents however do not clearly displace those legal    E
consequences. Indeed the use of the word "damages" is far more consistent
with the compensation arrived at after taking into account all sums due
to or by Chambers and the appellants. If the parties had intended to
produce the result contended for by Mr. Beloff it would have been a
simple matter to use a form of words such as "the additional expenditure
incurred." Instead they have used words which if anything point away
from such a result.    F

I therefore conclude that the second part of the condition in no way
alters the effect to be given to the remainder of the bond from which it
follows that claims by Chambers of unpaid sums and set-off must be
taken into account in determining the extent of the appellants' obligation.

It may seem a somewhat unusual approach to the construction of a
composite contract, to consider it in separate parts but given the authority
of Lord Atkin's speech in the *Workington* case it seemed to me appropriate    G
to address first the major part of the bond corresponding to that which
Lord Atkin was considering and then to address the second part of the
condition in order to see whether it materially affected the bond as a
whole.

My Lords, it only remains to draw attention, as did Lord Atkin, to
the archaic nature of this bond. In the *Workington* case [1937] A.C. 1, 17,
he said:    H

> "I may be allowed to remark that it is difficult to understand why
> business men persist in entering upon considerable obligations in old-
> fashioned forms of contract which do not adequately express the true

A   transaction. The traditional form of marine policy is perhaps past praying for; but why insurance of credits or contracts, if insurance is intended, or guarantees of the same, if guarantees are intended, should not be expressed in appropriate language, passes comprehension. It is certainly not the fault of lawyers."

B   These words were echoed by Hunter J.A. in *Tins Industrial Co. Ltd. v. Kono Insurance Ltd.*, 42 B.L.R. 110, 120, when he remarked:

"It is lamentable that an 18th century English concept should be used in this jurisdiction to confuse everybody, as we think it has confused a lot of people in this case."

C   *Hudson's Building and Engineering Contracts*, 11th ed., pp. 1499–1500, para. 17-007 refers to the almost universal practice of commercial bondsmen in clothing a very simple obligation in the jargon of an 18th century English bond. Like Lord Atkin and Hunter J.A. I find great difficulty in understanding the desire of commercial men to embody so simple an obligation in a document which is quite unnecessarily lengthy, which obfuscates its true purpose and which is likely to give rise to
D   unnecessary arguments and litigation as to its meaning.

*Triable issue*

In giving judgment under R.S.C., Ord. 14, the official referee after stating that there was prima facie evidence to support the loss of £202,000 claimed by the respondents, continued:

E   "I am satisfied that this is an appropriate case for the court to give judgment under R.S.C., Ord. 14, on the basis that it is a clear cut matter and that there is no arguable defence. The reasons why I have come to this view can be stated shortly. As a matter of the express wording of the bond liability to pay has arisen. As I said, there is prima facie evidence before me that the subcontractor is in default
F   and that the damages sustained by the main contractor have not been discharged by the surety and therefore his liability remains intact. I am satisfied that the level of damages sustained by the main contractor exceeds the ceiling under the bond and I would not seek to reduce the amount. I am not going to order an inquiry into the level of the damages. That would be inconsistent with the commercial
G   purpose and intent of this bond."

Mr. Beloff argued that this finding was amply justified having regard to the terms of the appellants' affidavits and should not be disturbed. The particulars of the claim consist of the following heads of claim: (i) additional cost of completing the subcontract works; (ii) cost of clearing and cleaning the site following abandonment of the subcontract; (iii) cost
H   of rectifying and/or making good structural concrete; (iv) cost of rectifying and/or making good wave pool floor; (v) cost of rectifying and/or making good subcontract works; (vi) finance charges; and (vii) overhead costs.

An affidavit was sworn by the respondents' manager for the main    A
contract which stated his belief that there was no arguable defence to the
sum claimed (£101,285) but did not provide additional information in
relation to the seven heads of claim. An affidavit by the respondents'
solicitor challenged the appellants' right in law to set-off but added
nothing to the details of the heads of claim. The appellants produced
affidavits of, inter alios, their construction consultant and loss adjuster
and a quantity surveyor employed by the receivers of Chambers. The    B
former challenged in a general but unspecific way heads of claim (i), (ii)
and (v). He also referred to a draft final account prepared by the
respondents which showed a net figure due to Chambers of some £73,000
and to a possible sum of £50,000 due to Chambers in respect of claims for
disruption. The latter referred to having examined the respondents' draft
final account and compared it with applications and site measurements    C
previously prepared and submitted by Chambers as a result of which he
concluded that there would be a sum due to them by the respondents of
some £44,000.

Mr. Beloff conceded that, if in assessing the liability of the appellants
under the bond, it was proper to take into account unpaid sums due for
work done and cross-claims for set-off, there was, for the purposes of
Order 14, a triable issue on these matters. The effect of his primary    D
submission on this issue together with the above concession would
accordingly be that the appellants could not challenge the figure of
£101,285 and could only reduce their liability below it by establishing
claims by way of sums due for unpaid work and other set-offs.

Looking at the passage in the judgment which I have already narrated
it would appear that the official referee was only considering the evidence    E
in so far as it related to a simple defence to the heads of claim without
regard to any sums which might be due to the appellants. One can only
speculate whether he would have made the order had he directed his
attention to these matters as well. The affidavit evidence challenging the
figures in the heads of claim is not particularly strong but it must be
remembered that it was given in response to claims and a supporting    F
affidavit which gave little or no detail as to their constitution. In my view
there is just sufficient evidence to raise a triable issue in relation to the
heads of claim. That, however, is not the only consideration because there
must in any event be a trial in relation to the matters conceded by
Mr. Beloff and it seems to me that it would be both just and reasonable
that all matters of dispute under the bond should be determined at one
and the same time. Thus not only is there an issue in relation to the heads    G
of claim which ought to be tried but there is "some other reason" within
the meaning of Ord. 14, r. 3 why that issue should go to trial. I would
therefore allow the appeal and grant to the appellants unconditional leave
to defend.


LORD LLOYD OF BERWICK.   My Lords, I have had the advantage of    H
reading in draft the speech prepared by my noble and learned friend, Lord
Jauncey of Tullichettle. For the reasons he gives, I, too, would allow the
appeal.

1 A.C.          Trafalgar House Ltd. v. General Surety Co. (H.L.(E.))

A          LORD STEYN.   My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Jauncey of Tullichettle. For the reasons he gives, I, too, would allow the appeal.

*Appeal allowed with costs in House of Lords and Court of Appeal.*
*Costs in High Court costs in cause.*

B

*Solicitors: Halliwell Landau, Manchester; Legal Department, Trafalgar House Construction Ltd.*

A. R.

C

————————

D

[HOUSE OF LORDS]

MARC RICH & CO. A.G. and OTHERS   .   .   .   .   APPELLANTS

AND

BISHOP ROCK MARINE CO. LTD. and OTHERS   .   .   RESPONDENTS

E

1995   April 25, 26, 27;          Lord Keith of Kinkel, Lord Jauncey of
       May 1, 2;          Tullichettle, Lord Browne-Wilkinson, Lord Lloyd
       July 6          of Berwick and Lord Steyn

*Negligence—Duty of care to whom?—Classification society—Vessel developing cracks in hull—Classification society surveyor recommending vessel continue on voyage to discharge port after temporary repairs—Total loss of vessel and cargo—Cargo owners claiming against classification society—Whether classification society owing duty of care to cargo owners*

F

*Ships' Names—Nicholas H*

The first defendants' vessel loaded the plaintiffs' cargo under bills of lading incorporating the Hague Rules, in consequence of which the shipowners owed a non-delegable duty to the cargo owners to make the vessel seaworthy at the inception of the voyage. In mid-voyage the vessel was put into port because of a crack in her hull. A surveyor, acting on behalf of the third defendant classification society, in which the vessel was entered, carried out inspections of the vessel and recommended that, after repairs specified by him, the vessel should continue on her voyage. A few days after leaving port the vessel sank with the loss of the cargo. The cargo owners brought proceedings against the shipowners, the charterers and the classification society. The claim against the shipowners was settled. The action against the charterers was discontinued. The cargo owners sought to recover the balance of their loss from the classification society, alleging breach of a duty of care owed by the society to the cargo owners to take reasonable care in the surveys undertaken and the

G

H

## COURT OF APPEAL

15 April; 24 May 2005

————————

TRIODOSBANK NV
v
DOBBS

[2005] EWCA Civ 630

Before Lord Justice CHADWICK, Lord Justice
LONGMORE and Lord Justice NEUBERGER

**Banking — Guarantee — Summary judgment —
Defendant personally guaranteeing sums owing by
company "under or pursuant" to loan agreement —
Loan agreement subsequently "replaced" by new
loan agreements — Whether subsequent agreements
constituted variation discharging defendant from
liability — Whether defendant estopped by conven-
tion from denying liability under guarantee —
Whether bank entitled to summary judgment.**

On 26 April 1996 the defendant (Mr Dobbs) exe-
cuted a personal guarantee whereby he agreed to pay all
monies due and owing to the claimant Bank "under or
pursuant" to two loan agreements made with a com-
pany called Acorn Televillages Ltd. The purpose of
the loan was partly to refinance borrowing made by the
company from Allied Irish Bank and partly to complete
the first stage of a project to construct a "televillage" in
Crickhowell. The total amount of the loan (in two
separate contracts) was £900,000 and the limit of Mr
Dobbs's liability under the guarantee was £50,000.

On 4 November 1998 the Bank made two further
loan agreements agreeing to lend a total of £1.98
million to the company. Each of those agreements
stated that it "replaced" the earlier agreements.

On 10 September 1999, the 1998 loan agreements
were themselves "replaced" by a further loan agree-
ment between the company and the Bank (the 1999
facility). Under that facility the amount of the loan was
raised from the £1.98 million permitted by the 1998
loan agreements to a maximum of £2.6 million.

On 7 August 2000 the Bank made a formal demand
on the company for the repayment of the company
borrowing. In the event, the Bank was left with an
indebtedness of £80,622.79, and it decided to call on
Mr Dobbs to pay under the guarantee he had signed on
26 April 1996. The Bank made a demand on 25 June
2001 and started proceedings in the Bristol Mercantile
Court on 31 July 2001. On 26 May 2002 HHJ
Havelock-Allan QC gave summary judgment in the
Bank's favour, declaring (1) that his guarantee
extended to the borrowing under the facility agreement
of 10 September 1999, and (2) that Mr Dobbs was
estopped from denying that the guarantee so
extended.

Mr Dobbs appealed. He argued that his guarantee of
26 April 1996 only applied to sums due "under or
pursuant" to the loan agreements of 1996 and that once
those agreements were replaced by the 1998 agree-

ments and then by the 1999 facility, there could be no
further liability under the guarantee despite the fact that
the guarantee was expressly referred to in the later
agreements as being security for those loans.

The Bank argued that the essence of the 1999 facility
and the 1998 agreements was a "rescheduling of the
loan". Alternatively, by agreeing that the guarantee
should continue to stand as a security for the 1998 loans
and, then, the 1999 facility, Mr Dobbs was estopped by
convention from asserting that the company's indebted-
ness under the 1999 facility was not an indebtedness
pursuant to the 1996 agreements, as varied.

————————*Held*, by CA (CHADWICK, LONGMORE and
NEUBERGER LJJ), that (1) A material variation in the
contract between the creditor and the principal debtor
would discharge the guarantor, unless the variation was
one to which he assented or which was provided for in
the contract of guarantee. Any variation had to be
within the general purview of the original guarantee
(*see* paras 14 to 18);

————————*Trade Indemnity Co Ltd v Workington Har-
bour and Dock Board* [1937] AC 1, *The Nefeli* [1986]
1 Lloyd's Rep 339, *The Kalma* [1999] 2 Lloyd's Rep
374, *British Motor Trust Co Ltd v Hyams* (1934) 50
TLR 230 and *Samuels Finance Group Plc v Beechma-
nor Ltd* (1993) P&CR 282 considered.

(2) The question was whether the new 1999 facility
was an amendment or variation of the original loan
agreement which was within the purview of that origi-
nal loan agreement. The fact that the intermediate 1998
agreements were "replacements" of the 1996 agree-
ments was not conclusive since a replacement could be
contemplated by an original agreement or a replace-
ment might be so similar to the original agreement that
it could truly be said to be a variation of it. In the
present case the 1999 facility was substantially differ-
ent from the original two loan agreements and even if it
could be said to be a variation or amendment of the
original 1996 agreements, it was not a variation or
amendment within the purview of the 1996 agreements
(*see* para 19).

(3) As to estoppel by convention, it was essential that
there should be a common assumption. That required a
finding of fact that each party made that assumption. It
was also necessary to be clear what the assumption was.
It was insufficient to say that both parties assumed, in a
general sense, that the guarantee continued to apply.
What had to be shown was that both parties assumed
that the 1996 guarantee applied to the 1999 facility.
Even if it was clear that the Bank did so assume, Mr
Dobbs's evidence was to the contrary. For judgment to
be given on the basis of an estoppel by convention, the
court would have to disbelieve Mr Dobbs's assertions
in his witness statement. It was not appropriate to make
such a finding in summary proceedings and the judge
had been wrong to make an objective assessment of the
evidence without a trial (*see* paras 22 to 25).

(4) Accordingly, the appeal would be allowed. The
declaration made by the judge would be set aside,
leaving the Bank to proceed to trial on the question of
estoppel by convention if it was so minded (*see* para
27).

————————

The following cases were referred to in the judgment of Longmore LJ:

*British Motor Trust Co Ltd v Hyams* (1934) 50 TLR 230;

*Melvin International SA v Poseidon Schiffahrt GmbH (The Kalma)* [1999] 2 Lloyd's Rep 374;

*Polaris Steamship Co SA v A Tarriconf Inc (The Nefeli)* [1986] 1 Lloyd's Rep 339;

*Samuels Finance Group Plc v Beechmanor Ltd and Others* (CA) (1993) P&CR 282;

*Trade Indemnity Co Ltd v Workington Harbour and Dock Board* (HL) [1937] AC 1.

―――――――

This was the appeal of the defendant Mr Ashley Charles Dobbs from the decision of HHJ Havelock-Allan QC granting the claimant Triodosbank NV summary judgment requiring the defendant to honour a bank guarantee given by him on 26 April 1996.

Mr Dobbs appeared in person; Neil Levy, instructed by TLT Solicitors, for the claimant.

The further facts are stated in the judgment of Longmore LJ.

Judgment was reserved.

Tuesday 24 May 2005

―――――――

**JUDGMENT**

**Lord Justice LONGMORE:**

1. The main question raised by this appeal is whether and to what extent a guarantee by which it is agreed:

(a) that the guarantor will pay money due from the principal debtor "under or pursuant" to a specific loan agreement; and

(b) that the creditor can agree to any amendment or variation of the loan agreement without reference to the guarantor

applies so as to require the guarantor to pay sums due under subsequent agreements made between the creditor and the principal debtor. It is not a question on which there is much authority.

*Introduction*

2. The appeal is from a judgment of HHJ Havelock-Allan QC given as long ago as 26 March 2002 in which he gave summary judgment for the claimant Bank pursuant to a personal guarantee executed by Mr Dobbs on 26 April 1996 whereby Mr Dobbs agreed to pay all monies due and owing to the Bank "under or pursuant" to two loan agreements made on the same date with a company of which Mr Dobbs was director called Acorn Televillages Ltd. The purpose of the loan was partly to refinance borrowing made by the Company from Allied Irish Bank and partly to complete the first stage of a project to construct what is known as a "televillage" at Upper House Farm in the Powys village of Crickhowell. As its name implies, a televillage is a development linked to the internet and enabling residents of the village to work within a congenial environment rather than having to commute to a large town. The total amount of the loan (in two separate contracts) was £900,000 and the limit of Mr Dobbs's liability under the guarantee was £50,000. Other security was taken in the form of a first mortgage over the site, a floating charge over the Company's assets and an assignment of Mr Dobbs's life insurance policy.

3. By November 1998 the first phase of the project had been completed and the amount of the outstanding indebtedness to the Bank was about £800,000. The Bank then agreed that they would finance phase two of the project; the Bank then made two further loan agreements on 4 November 1998 agreeing to lend a total of £1,980,000 to the Company. The existing indebtedness continued but it was now covered by these 1998 loan agreements which had raised the borrowing limit to the amount mentioned. Each of these agreements says on its face that it "replaces" the earlier agreements. The period of the loan agreements was described as being until 31 October 1999 and in each case the security was described in the following terms:

1. Existing first legal mortgage dated 26 April 1996 over the freehold land and buildings known as Upper House Farm, Standard Street, Crickhowell, Powys, NP8 1BP registered at HM Land Registry with title Absolute No WA729178.

2. Existing floating charge over all the assets of the Borrower both present and future dated 26 April 1996 and registered at Companies House, 13 May 1996.

3. Existing guarantee of Ashley Charles Dobbs in the sum of £50,000 dated 26 April 1996.

4. Existing assignment of General Accident Life insurance policy No: 2709471LB providing cover of £610,000 and the life of Ashley Charles Dobbs Assignment dated 27 November 1995.

4. On 10 September 1999 the 1998 loan agreements were themselves, to use the same word, "replaced" by a further loan agreement between the Company and the Bank which has been referred to as "the 1999 facility". Under this facility the amount of the loan was raised from the £1.98 million permitted by the 1998 loan agreements to a maximum of £2.6 million. Clause 8 of the facility provided that the Bank should continue to have the

benefit of the mortgage over the site granted on 26 April 1996, the floating charge of the same date, the collateral mortgage of the life policy over the life of Mr Dobbs and the personal guarantee given by Mr Dobbs on 26 April 1996. In addition to this security, Mr Dobbs agreed to arrange for himself and his wife to execute a second mortgage over their own house in the Televillage (No 23) in order to secure Mr Dobbs's personal liability under the guarantee. On 19 September 1999 Mr and Mrs Dobbs did just that. When in March of 2000 Mr Dobbs and his wife moved to Polperro in Cornwall he granted a first charge on their new home replacing the earlier charge.

5. Apparently taking the view that the development was not a financial success, the Bank on 7 August 2000 made a formal demand on the Company for the repayment of the Company borrowing. The Bank appointed administrative receivers over the Company's assets on 20 October. In due course the site was sold for £2,100,000 leaving a shortfall on the indebtedness of £80,622.79. The Bank decided to call on Mr Dobbs to pay under the guarantee he had signed on 26 April 1996. They made a demand on 25 June 2001 and started proceedings in the Bristol Mercantile Court on 31 July 2001. On 26 May 2002 the judge gave summary judgment in their favour declaring:

(1) that the guarantee extended to the borrowing under the facility agreement of 10 September 1999; and also

(2) that Mr Dobbs was estopped from denying that the guarantee so extended.

He did not at that stage give judgment for any monetary sum because Mr Dobbs asserted that the Bank and the administrative receivers had mismanaged the receivership and that the Company's assets had been sold at an undervalue. Mr Dobbs also asserted that the Bank was in breach of its contractual obligations by withdrawing or terminating the loan facility in 2000. Those allegations were, in due course, exhaustively considered by Lewison J who on 19 April 2004 delivered a 303 paragraph judgment dismissing all Mr Dobbs's allegations save for two breaches of contract which led to nominal damages only. Mr Dobbs's application for permission to appeal was dismissed by Chadwick LJ on 17 December 2004. HHJ Havelock-Allan had, however, given Mr Dobbs permission to appeal against the declarations made by him but had stayed the future conduct of such appeal to await the outcome of the proceedings which later took place before Lewison J. That is the reason why this appeal was heard on 15 April 2005 more than three years after the judge's judgment.

6. The essence of Mr Dobbs's argument before the judge and before us has been that his guarantee of 26 April 1996 only applied to sums due "under or pursuant" to the loan agreements of 1996 and that once those agreements were replaced by the 1998 agreements and then by the 1999 facility agreement, there could be no further liability under the guarantee despite the fact that the guarantee was expressly referred to in the later agreements as being security for these loans.

*The documentation*

7. In order to understand this argument I need to set out the terms of the guarantee in a little more detail. The preamble to the guarantee provided:

WHEREAS

(A) Triodosbank NV has agreed to lend the respective sums of £400,000 and a sum not exceeding £500,000 to Acorn Televillages Limited (Limited company No 2786103), ("the Company") on the terms and conditions set out in two loan agreements numbered 96/782 and 96/783 ("the Loan Agreement") (which expression means both loan agreements together or either loan agreement as the context can permit) both dated . . . April 1996.

(B) The Guarantor, as required by the terms of the Loan Agreement, has now agreed to guarantee the liabilities of the Company under the Loan Agreement on the terms hereinafter appearing.

The guarantee itself was then contained in clause 2 of the guarantee document, the material parts of which were in these terms:

2.1 The guarantor irrevocably and unconditionally guarantees to the Bank that it will on demand pay to the Bank and discharge all monies and liabilities whether of principal, interest or otherwise, which now are or may at any time hereafter (and whether before, on or at any time after such demand) be due, owing or incurred by the Company to the Bank under or pursuant to the Loan Agreement, provided that the liability of the Guarantor under this Guarantee shall not exceed £50,000 plus such interest, charges and expenses as may be incurred by the Bank in connection with the Loan Agreement as from the date of demand being made of the Guarantor and as may be incurred by the Bank in enforcing this Guarantee.

Clauses 2.3 and 2.4 then provided:

2.3 The Guarantor's liability under clause 2.1 is not affected by an arrangement which the Bank may make with the Company or with another person which (but for this clause 2.3) might operate to diminish or discharge the liability of or otherwise provide a defence to a surety.

2.4 The Bank may at any time as it thinks fit and without reference to the Guarantor:

CA]                          **Triodosbank NV v Dobbs**                          [LONGMORE LJ

2.4.1 grant time for payment or grant any other indulgence or agree to any amendment, variation, waiver or release in respect of an obligation of the Company under the Loan Agreement;

2.4.4 compound with, accept compositions from and make other arrangements with the Company or a person or persons liable on other securities or guarantees held or to be held by the Bank.

8. The two initial 1996 loan agreements (96/782 and 96/783) themselves contained two provisions envisaging that some amendments to the terms of the loan agreements might be made in the future. First, the provision for interest was for 8.5 per cent variable which, however, was not to exceed Royal Bank of Scotland base rate from time to time in force plus a margin of 2.5 per cent. The second sentence of this provision was:

Triodosbank reserves the right to vary interest rates and will give a minimum of one month's notice of any increase.

The terms and conditions on the reverse provided *inter alia*:

9 The loan may be repaid in part at any time. Subsequent repayments will be rescheduled under a new loan agreement between the Bank and the Borrower.

These provisions make it clear that the loan agreement itself has terms which, if they are invoked by the Bank, will amount to amendments or variations of the loan agreement. Clause 2.4.1 of the guarantee, giving the Bank authority to agree amendments or variations with the borrower without reference to the Guarantor must at least encompass such amendments or variations. In my view it will encompass such amendments or variations even if a new agreement is formally executed which "replaces" the old agreement because the fact of a new agreement would then be a matter of form rather than substance. What is less clear is the extent to which clause 2.4.1 is intended to cover amendments or variations which are not expressly contemplated in the original agreement.

9. As a matter of principle there is no reason why the right of the Bank under clause 2.4.1 to agree amendments or variations to the loan agreement without reference to the guarantor should be confined to amendments or variations which are expressly contemplated by the agreement; the clause must mean that anything rightly termed a variation or an amendment is a matter which can be agreed without reference to the guarantor. The question is then whether what is said to be an amendment or variation is correctly so called. To my mind an agreement which truly "replaces" the original loan agreement would not rightly be called

an amendment or variation to the original agreement, since it will be a new agreement. This will be particularly true in the context of a guarantee which obliges the guarantor to pay sums falling due "under or pursuant to" a particular loan agreement. Once that loan agreement has been replaced by a second and different agreement, sums due under that new and different agreement cannot be sums due "under or pursuant to" an earlier agreement. For this purpose it does not matter whether the old agreement is discharged in the sense of the loan being fully repaid and a new agreement then made (in the technical sense of there being a novation) or whether there is a replacement agreement which is, for the future, treated as governing the parties' relationships. The new governing agreement is not the agreement "under or pursuant to" which there falls due the money which the guarantor has guaranteed to pay.

10. The reason why it is necessary, in the present case, to be moderately precise about all this is because the two 1998 loan agreements mirror the two 1996 loan agreements. The reason why there were two loan agreements in 1996 is that the purpose of the smaller loan of £400,000 (Agreement No 96/782) was stated to be to:

Refinance existing borrowing from the Allied Irish Bank

while the purpose of the larger loan which was not to exceed £500,000 (Agreement No 96/783) was stated to be to:

Finance the construction of 17 properties at the site known as Upper House Farm, Standard Street, Crickhowell, Powys.

The first of the 1998 loan agreements under which the Bank lent £380,000 (Agreement No 98/1056) provided:

Replaces Agreement No: 96/782

. . .

PURPOSE OF LOAN Rescheduling of existing borrowing under Agreement No: 96/782 between the Bank and the Borrower.

The second of the 1998 loan agreements under which the Bank lent "up to" £1,600,000 (Agreement No 98/1057) provided:

Replaces Agreement No: 96/783

. . .

PURPOSE OF LOAN Rescheduling of existing borrowing under Agreement No: 96/783 and the renovation of farm buildings and conversion to workspace together with the construction of 21 energy efficient homes at the site known as Upper House Farm, Standard Street, Crickhowell, Powys, NP8 1BP.

The above recitation of certain of the terms of the 1998 agreements shows that Agreement 98/1056 is

LONGMORE LJ]                  **Triodosbank NV v Dobbs**                        [CA

merely a rescheduling of existing indebtedness (something which the 1996 agreement which it replaced specifically envisaged might happen) whereas Agreement 98/1057 was not just a rescheduling but an agreement for a substantially higher sum for purposes different from and additional to the 1996 agreement which it replaced.

11. It seems to me, therefore, (technical though this may be) that the first of the 1998 agreements, even though it is said to "replace" its 1996 predecessor, is no more than an amendment to or variation of it, since the rescheduling was envisaged in it. The second 1998 agreement is, by contrast, considerably more than a mere amendment or variation of the corresponding 1996 agreement: not only does it "replace" the earlier agreement but it triples the sum lent and provides that it is for a considerably extended building contract. That is not a contract which, in my view, Mr Dobbs agreed to guarantee.

12. This conclusion is not, however, critical to the resolution of this appeal because there is yet a third (1999) agreement and the vital question for the court is whether the Company's liability under this further agreement is something which Mr Dobbs has guaranteed. This agreement is called a "facility agreement", is dated 10 September 1999 and describes the amount to be lent, under the head of Maximum Commitment, as:

£2,600,000 . . . or such higher amount as the Bank in its absolute discretion may determine.

This facility agreement was one of a series of agreements signed on the same day including (1) a deed of priorities made between the Bank, the Company and the building contractor whereby those parties agreed a ranking as between them of the proceeds of realisation of securities granted by the Company to the Bank and the contractor and (2) an "Agreement in relation to the Rescheduling of Debt and the Amendment of a Construction Contract". This latter agreement made a number of amendments to the terms of the construction contract as well as recording that the existing loan agreements had been "replaced" by "the New Loan Agreement" viz the September 1999 facility. The facility provided in clause 2 that it was to be used in paying costs associated with the Building Project for which purpose a Project Account was to be maintained (A/c no 02848300) in the books of the Bank. From that account was to be paid, among other amounts, sums due to the building contractors under the terms of both the original building contract and of the Re-scheduling and Amending Agreement as it was called in the facility agreement. This meant that the Company's indebtedness to the Bank included sums falling due and paid to the building contractors from the Project Account

under contracts to which Mr Dobbs's original guarantee could not, in my judgment, have been intended to apply.

13. The new facility agreement was, therefore, considerably more than an amendment or variation of either the original loan agreements of 1996 or, indeed, the later loan agreements of 1998. It must be a question whether clause 2.4.1 of the guarantee contemplates more than one amendment or variation as being permissible. Even if a replacement of the 1996 contracts by later similar loan agreements can be regarded as an amendment or variation within that clause, a further replacement might be said not to be within the clause. But, on any view of the matter, a replacement on terms so different from the original agreement in the way I have attempted to set out in the previous paragraph cannot be an "amendment or variation" of the initial contract.

*Authority*

14. It is, of course, the law that a material variation in the contract between the creditor and the principal debtor will discharge the guarantor, unless the variation is one to which he assented or which is provided for in the contract of guarantee. In his book (1898) on the Law of Principal and Surety, Mr Sidney Rowlatt (as he then was) said this:

. . . it is apprehended that assent, whether previous or subsequent to a variation, only renders the surety liable for the contract as varied, where it remains a contract within the general purview of the original guarantee . . . If a new contract is to be secured there must be a new guarantee.

This passage was retained in the second edition of the book (1926) edited by the son of (the by then) Rowlatt J with his father's encouragement and was adopted by Lord Atkin in his speech in *Trade Indemnity Co Ltd v Workington Harbour and Dock Board* [1937] AC 1, 21 with whom the other members of their Lordships' House concurred. The actual decision in that case was that a loan of £45,000 made by a building owner to a building contractor did not constitute an agreement " . . . for any alteration in or to" the building contract which the Company had guaranteed. In much the same way I do not think that a facility agreement, whereby it was agreed that the debtor's account with the creditor should be debited with sums due under the building contract to which the debtor was a party, can be said to be an amendment or variation to a contract of loan. Even if, however, it could be said that such an agreement was, in principle, such an amendment or variation, the question would still arise whether it was "within the general purview of the original guarantee". Lord Atkin's approval has been followed in the later cases of *The Nefeli*

[1986] 1 Lloyd's Rep 339, 345 *per* Bingham J and *Melvin International SA v Poseidon Schiffahrt GmbH (The Kalma)* [1999] 2 Lloyd's Rep 374, at page 378 *per* Cresswell J.

15. We were referred to *British Motor Trust Co Ltd v Hyams* (1934) 50 TLR 230 in which a Mr Lord acquired two motor coaches under two hire-purchase agreements from the claimants and persuaded his mother-in-law to guarantee his obligations by a contract indorsed on the agreements in the following terms:

> We . . . guarantee the due and punctual payment by the . . . hirer of all . . . moneys payable by him under the within written agreement . . . and we further agree that this guarantee shall not be avoided . . . by the owners and the hirer making any variation in the terms of the said agreement . . . provided that no variation shall make us liable for a greater maximum sum under this guarantee than that for which we are at present or may become liable under the present terms of the said agreement.

Mr Lord fell into arrears and the claimant, instead of resuming possession, made a new single agreement with him by which the two earlier agreements were consolidated and the vehicles were regarded as being hired together so that Mr Lord could not acquire property in any one vehicle unless he paid all instalments due on both vehicles. Branson J (to whom Rowlatt J's work does not seem to have been cited) described the clause permitting variation to be:

> so wide that it was almost impossible to put any limit to the power to vary

and added:

> It might be that the position of the debtor was so altered that he would be less able to repay the guarantor, but even such a change was not beyond the very wide power of variation contained in the guarantee.

16. I would not wish to doubt the correctness of this decision on its facts but I would make two observations. First, it is important to distinguish between a true variation of an existing obligation and the entering of what is in fact a different obligation even though it may purport to be no more than a variation. In that sense it is perfectly possible (and, indeed, right) to put a "limit to the power to vary". Secondly, the proviso to the guarantee ensured that in any event Mr Lord's mother-in-law was never going to be liable for more than whatever she would have been liable for under the guarantee in its unamended form. This is an even tighter proviso than a monetary limit such as that provided for in Mr Dobbs's guarantee. The tightness of the proviso would, no doubt, be one justification for giving a wide construction to the variation provision and enabling the new arrangement to be regarded as a variation of the old one.

17. The first of the above observations derives some support from *Samuels Finance Group Plc v Beechmanor Ltd and Others* (1993) P&CR 282 where Lloyd LJ said after setting out the first of the above citations of Branson J in *Hyams*:

> One can perhaps imagine changes falling short of a novation which would yet be so fundamental that they could not properly be described as a variation at all. I will not attempt to say where the line is to be drawn.

It is, indeed, not easy to draw a hard and fast line between permissible and impermissible variations but in the present case the obligations arising from the 1999 facility are so different from those arising under the original pair of loan agreements that I have no difficulty in saying that the line has been crossed. In the *Samuels Finance Group* case itself the variation was comparatively minor and could well have been said to be within the "purview" of the original contract.

18. Neither of the above authorities referred to the requirement that any variation (even if there is advance agreement to a variation of the underlying loan agreement) must be within the "purview" of the agreement, but the passage in *Rowlatt* remains in the 5th edition (1999) para 4–72 and, in my view, this requirement is still law.

19. In the light of all these authorities, the question that has to be answered is whether the new 1999 facility is an amendment or variation of the original loan agreement which is within the purview of that original loan agreement. The fact that the intermediate 1998 agreements were "replacements" of the 1996 agreements is not conclusive of that matter since a replacement could be contemplated by an original agreement (as the 1998 rescheduling was) or a replacement might be so similar to the original agreement that it can truly be said to be a variation of it, as in the *British Motor* case. In this case, however, the 1999 facility was substantially different from the original two loan agreements and even if it could be said to be, on one view, a variation or amendment of those original 1996 agreements, it is certainly not a variation or amendment within the purview of the 1996 agreements.

20. The judge came to a contrary conclusion influenced by Mr Levy's submissions that the essence of the facility and, indeed, the essence of the 1998 agreements was a "rescheduling of the loan" (see 25C of the transcript and the judge's later adoption of the term at 43F). In my judgment it was considerably more than that and, for that reason, I regret I cannot agree with him. Mr Dobbs has effectively been held liable as if his guarantee

were an "all monies" guarantee of all sums due from the Company (albeit with a limit), but that is not what he agreed.

21. That means it is necessary to consider the second way in which the Bank puts its case which is that, by agreeing that the guarantee should continue to stand as a security for the 1998 loans and, then, the 1999 facility, Mr Dobbs is estopped by convention from contending that the guarantee does not, on its true construction, extend to the 1999 facility or (to put the matter slightly differently) is estopped from asserting that the Company's indebtedness under the 1999 facility is not an indebtedness pursuant to the 1996 agreements, as varied.

*Estoppel by convention*

22. This is a difficult area of the law and a claimant who relies on the doctrine will be fortunate to obtain summary judgment. The judge has dealt with this aspect of the case in meticulous detail but, on balance, I do not feel that the Bank's claim is capable of being dealt with in a summary way. I would not quarrel with the statement of the law on the topic agreed by the parties and accepted by the judge. He expressed the first requirement of the doctrine as being that

the parties have made a common but mistaken assumption as to the meaning of an agreement or something very similar to such a mistaken assumption

save to observe that the words "very similar to such a mistaken assumption" show the uncertain ambit of the doctrine. The essential matter, however, is that there should be a common assumption. This necessarily requires a finding of fact that each party made that assumption. It is also necessary to be clear what the assumption is. It is insufficient to say, as Mr Levy does say, that both parties assumed, in a general sense, that the guarantee continued to apply. What he has to show is that both parties assumed that the 1996 guarantee applied to the 1999 facility.

23. As to this, even if one takes it as clear that the Bank did so assume, Mr Dobbs's evidence is to the contrary. He accepts in para 13 of his witness statement of 4 March 2002 that he thought he remained liable under the guarantee but he goes on to say in para 14:

However I can say that I did not understand or believe that, in so signing the loan agreements on behalf of the Company, I was thereby guaranteeing or even expressing any agreement or intention to guarantee the £2m 1998 loan or, subsequently, the £2.6m 1999 loan. The 1998 and 1999 facilities were very much larger than the 1996 facility of £900,000. I never agreed to

nor did I understand or believe that I remained liable for anything other than £50,000 of £900,000.

24. Mr Dobbs is there saying in express terms that he did not himself believe (or assume) that his guarantee applied to the 1999 facility. For judgment to be given on the basis of an estoppel by convention, the court would have to disbelieve this assertion and find that Mr Dobbs did, in fact, assume that the guarantee applied to the 1999 facility and thus that the Company's indebtedness under that facility was an indebtedness under or pursuant to the 1996 agreement. It may very well be that he did so assume but it is not appropriate to make such a finding in summary proceedings when he himself says the precise opposite.

25. The judge approached (43E–F) Mr Dobbs's evidence with caution and then made his own objective assessment, which led him to the conclusion that Mr Dobbs thought the guarantee was a continuing security for the Company's borrowing after it had been rescheduled in 1998 and 1999. Quite apart from the fact that the 1998 agreements and the 1999 facility were much more than a mere rescheduling of early borrowing, it was with respect not right to make an objective assessment of the evidence without a trial if Mr Dobbs's assertion as to his state of mind was not to be believed.

26. It may be useful to say that I agree with the judge that the estoppel is not being relied on by the Bank as a cause of action and that Mr Dobbs cannot rely on the Statute of Frauds. To that extent Mr Dobbs's defences rightly failed for the reasons given by the judge.

27. For the reasons I have given, however, I cannot agree with the judge's disposition of the matter in his judgment of 26 March 2002. I would set aside the declaration which he made and leave the Bank to proceed to trial on the question of estoppel by convention if they are so minded.

**Lord Justice NEUBERGER:**

28. I agree.

**Lord Justice CHADWICK:**

29. The first question for the judge was whether, as a matter of construction, the obligations of Acorn Televillages Ltd ("the Company") under the loan agreement dated 10 September 1999 ("the 1999 facility") were obligations for which Mr Dobbs was liable under the guarantee which he had executed on 26 April 1996. The judge answered that question in the affirmative. I agree with Longmore LJ that the judge was wrong to reach that conclusion.

30. The question turns on whether, as a matter of construction, the obligations of the Company under the 1999 facility were in respect of "monies and

CA]                                    **Triodosbank NV v Dobbs**                          [CHADWICK LJ

liabilities ... which ... may at any time hereafter ... be due, owing or incurred by the Company to the Bank under or pursuant to the Loan Agreement" (clause 2.1 of the 1996 guarantee) in circumstances in which (i) the Loan Agreement (in that context) means one or other (or both) of the two loan agreements numbered 96/782 and 96/783, (ii) the guarantee itself provided (at clause 2.4.1) that the Bank might, at any time and without reference to the guarantor, "agree to any amendment, variation, waiver or release in respect of an obligation of the Company under the Loan Agreement" and (iii) each of the two 1996 loan agreements contained an express provision (at condition 9) that the loan might be repaid in part at any time and that (if so) "Subsequent repayments will be rescheduled under a new loan agreement between the Bank and the Borrower".

31. As Longmore LJ has explained, the two 1996 loan agreements were "replaced" by new loan agreements made on 4 November 1998. Agreement 96/782 was replaced by an agreement numbered 98/1056; and agreement 96/783 was replaced by an agreement numbered 98/1057. The first of those new agreements (98/1056) was expressed to be made for the purpose of "rescheduling existing borrowing under agreement No 96/782 . . ."; and it was for an amount (£380,000) which represented the balance of the loan (£400,000) which had been the subject of agreement 96/782. The second of those new agreements (98/1057), on the other hand, was expressed to be made not only for the purpose of rescheduling existing borrowing under agreement 96/783 (£500,000) but also for what, as Longmore LJ has explained, was the second stage of the development project ("the renovation of farm buildings and conversion to workspace together with the construction of 21 energy efficient homes at the site known as Upper House Farm . . .") and was for an amount (£1,600,000) which was substantially greater than the existing borrowing under agreement 96/783.

32. I agree that the Company's obligations under the first of the new loan agreements made in November 1998 (98/1056) were obligations within the scope of the 1996 guarantee. That is because agreement 98/1056 — although "a new loan agreement" — can properly be regarded as an agreement which was made in order to reschedule "subsequent repayments" under agreement 96/782 following repayment in part of the loan made under that earlier agreement. The 1998 agreement falls squarely within condition 9 of the 1996 agreement. The 1998 agreement is plainly a variation or amendment "in respect of an obligation of the Company under the Loan Agreement" for the purposes of clause 2.4.1 of the 1996 guarantee; and,

on a true construction of the 1996 guarantee, the obligations under agreement 98/1056 are properly to be regarded as obligations "under or pursuant to" agreement 96/782 for the purposes of clause 2.1.

33. I agree, also, that the Company's obligations under the second of the new loan agreements made in November 1998 (98/1057) were not obligations within the scope of the 1996 guarantee. Agreement 98/1057 goes well beyond a rescheduling of the outstanding indebtedness under agreement 96/983. It was made for a purpose (phase 2 of the development) which went beyond the purpose of the original loan; and it was for an amount which included substantial "new money" (£1,100,000) in excess of the original loan (£500,000). It is, to my mind, impossible to regard agreement 98/1057 as an agreement of the nature contemplated by condition 9 of the earlier loan agreement; and it is impossible to regard agreement 98/1057 as an agreement which does no more than amend or vary "an obligation of the Company under [agreement 96/783]" for the purposes of clause 2.4.1 of the 1996 guarantee.

34. It is important to keep in mind that the underlying obligation of the guarantor under the 1996 guarantee — clause 2.1 — is in respect of monies and liabilities due, owing or incurred by the Company "under or pursuant to" the 1996 loan agreements. It is important to keep in mind, also, that the guarantor is not to be taken to have agreed that his liability under the guarantee would be increased or made more onerous by a subsequent agreement made between the lender and the borrower (to which he is not party) unless there are clear words in the guarantee which show that he did agree to be bound to a more onerous obligation in the future imposed without further reference to him. In the present case, clause 2.4.1 of the 1996 guarantee, read with clause 2.1, exposed the guarantor to the risk that his liability in respect of obligations of the Company under the 1996 agreement might be made more onerous by an amendment or variation *of those obligations*. Clause 2.4.1 did not expose him to the risk of liability in respect of additional obligations of the Company which were not properly to be regarded as an amendment or variation of existing obligations.

35. Although it may be said that agreement 98/1057 does amend or vary an obligation of the Company under agreement 96/783 — in so far as the later agreement reschedules repayment of the debt under the earlier agreement — the 1998 agreement imposes additional obligations which cannot be seen as an amendment or variation of any obligation in the 1996 agreement. In particular it imposes obligations to repay new monies lent for a

LLOYD'S LAW REPORTS

CHADWICK LJ]          **Triodosbank NV v Dobbs**          [CA

different purpose. It cannot be said that the obligations of the Company under agreement 98/1057 (taken together) are no more than an amendment or variation of the obligations in agreement 96/783. Liability as guarantor in respect of the obligations of the Company under agreement 98/1057 is substantially more onerous than liability as guarantor of the obligations under agreement 96/783. It is no answer to say that the guarantor's liability under the 1996 guarantee is limited to £50,000. The risk that the guarantor will be called upon to pay £50,000 — in circumstances where the loan is secured by fixed and floating charges over the borrower's assets (including the development site) — is substantially greater if the loan is £1.6 million than if the loan is £500,000.

36. It follows that, upon a true analysis, the position immediately before the 1998 agreements were replaced by the 1999 facility was that Mr Dobbs had remained liable on his 1996 guarantee in respect of the Company's obligations under agreement 98/1056; but that he was not liable as guarantor in respect of the Company's obligations under agreement 98/1057. The question then, as Longmore LJ has pointed out, is whether the Company's obligations under the 1999 facility can be treated as obligations "under or pursuant to" agreement 96/782 — accepting, for this purpose, that the obligations under agreement 98/1056 were themselves properly to be regarded as obligations under or pursuant to the earlier agreement.

37. The answer, in my view, is plainly "No". It is difficult to regard the 1999 facility as the rescheduling of debt due under agreements 96/782 or

98/1056. The facility agreement provides, in terms, for draw-down to be applied to repay the existing indebtedness. But, even if the 1999 facility could be said to vary or amend an existing obligation under the 1996 agreement in that respect, it is beyond argument that the 1999 facility imposes new and different obligations in respect of the "Maximum Commitment" (£2.6 million); obligations which cannot be said to be by way of variation or amendment of any obligation under or pursuant to the 1996 agreement. And there can be no doubt that the obligation of a guarantor in respect of the borrower's obligations under the 1999 facility agreement would be substantially more onerous that the obligation in respect of agreement 96/782.

38. That leaves for consideration the second question that was before the judge. Is Mr Dobbs estopped by convention from contending that, upon its true construction, the 1996 guarantee does not have the effect that the Company's indebtedness under the 1999 facility is within its scope? For the reasons set out by Longmore LJ that was not a question which could be determined on an application for summary judgment. Mr Dobbs's assertion that he never thought or assumed that his liability as guarantor extended beyond a total indebtedness of £900,000 should not have been dismissed, summarily, as incredible. He was entitled to a trial on that issue.

39. I agree that the appeal should be allowed; and that this court should make the order which Longmore LJ has proposed.

eal to such a
than 4.00 pm
ie same.
e and helpful

rke Barrister.

# TS & S Global Ltd v Fithian-Franks and others

[2007] EWHC 1401 (Ch)

CHANCERY DIVISION

DAVID RICHARDS J

16 MAY, 18 JUNE 2007

*Statutory demand – Guarantee – Demand – Whether demand required before guarantee liabilities became payable – Whether statutory demand could be demand under guarantee – Whether statutory demands ought not to have been set aside – Whether underlying debt disputed on substantial grounds – Insolvency Rules 1986, r 6.5(4)(d) – Insolvency Act 1986, s 268.*

The appellant company (TSS) contracted to assemble and supply to another company (Trak) a number of tracking devices and associated remote control fobs. The finished items were to be called off in batches by Trak. The contract required Trak to pay for unused components if it did not call off all the units. The respondents, Trak's shareholders, gave a guarantee in respect of unused components purchased by TSS to fulfil the contract up to a maximum of £130,000. Trak only called off two small batches and TSS delivered an invoice in respect of the unused components. TSS then served statutory demands on the respondent guarantors. The district judge set the demands aside on the grounds that a demand was required before the guarantee liabilities became payable and that the statutory demand could not itself be a demand under the guarantee. TSS appealed arguing that the guarantors' liability under the guarantee was immediately payable before service of the statutory demand, without the need for any prior demand for payment, because the guarantee provided that they were liable as primary obligors; or that the statutory demands could serve also as demands under the guarantee; or that the district judge should in any event have refused to set aside the statutory demands on the basis that the failure to serve a separate demand under the guarantee caused the guarantors no prejudice or injustice. The guarantors resisted the appeal, relying on the reasons given by the district judge, and also sought to uphold the order on the ground that no debt was due from Trak to TSS.

**Held** – (1) Even though the wording of the guarantee provided for a demand, a series of authorities established that a demand was unnecessary to make a present debt immediately payable, even if it was expressed to be payable on demand, unless it was a collateral debt. The respondent guarantors had covenanted to pay as principal debtors, and their position was to be equated with that of a primary debtor, who was under an immediate obligation to pay without the need for a demand even if the contract provided for payment on demand. Despite the use of the words 'on demand' in the guarantee, the guarantors' liability under the guarantee was

immediately payable by them, without the need for a demand, before  *a*
service of the statutory demands. *Bradford Old Bank Ltd v Sutcliffe* [1918]
2 KB 833, and *MS Fashions Ltd v Bank of Credit and Commerce
International SA* [1993] BCLC 1200, [1993] Ch 425 applied.

(2) The statutory demand did not also constitute a demand under the
guarantee. The statutory demand regime proceeded on the basis that the
debt in question was already immediately payable by the time that the  *b*
statutory demand was served. The purpose of a statutory demand was to
establish the presumption that the debtor was unable to pay his debts and
thereby entitle the creditor to present a bankruptcy petition. It was not
intended as a means of fulfilling contractual pre-conditions to making a
debt immediately payable.

(3) It would have been inappropriate to set aside the statutory demands  *c*
under r 6.5(4)(d) of the Insolvency Rules 1986 as premature. If the
statutory demands had been preceded by demands under the guarantee,
there could be no suggestion that the guarantors would have paid or
secured the debt or behaved in any way differently from their actual
reaction. They would still have refused to pay. Accordingly there was no  *d*
injustice to them which required to be cured by setting aside the demand.

(4) The existence of a debt from Trak to TSS, and hence the liability of
the guarantors, was not disputed on substantial grounds. There was no
substance in the submission that under the contract TSS was only to
purchase components when authorised to do so by Trak. The contract was
for a fixed number of devices and fobs coupled with a guarantee in respect  *e*
of the components to be ordered by TSS for those units. The order of the
district judge could not be upheld on that alternative ground and the appeal
was allowed.

**Cases referred to in judgment**

*Bank of Credit and Commerce International SA (No 8), Re* [1998] 1 BCLC  *f*
68, [1997] 4 All ER 568, [1998] AC 214, [1997] 3 WLR 909, HL.
*Bradford Old Bank Ltd v Sutcliffe* [1918] 2 KB 833, CA.
*Brown's Estate, Re* [1893] 2 Ch 300.
*Debtor (No 1 of 1987), Re a* [1989] 2 All ER 46, [1989] 1 WLR 271, CA.
*MS Fashions Ltd v Bank of Credit and Commerce International SA* [1993]
BCLC 1200, [1993] 3 All ER 769, [1993] Ch 425, [1993] 3 WLR  *g*
220, CA.
*Stimpson v Smith* [1999] 2 All ER 833, [1999] Ch 340, [1999] 2 WLR
1292, CA.

**Appeal**

TS & S Global Ltd (TSS) appealed against an order of District Judge  *h*
Robinson in the Scunthorpe County Court setting aside statutory demands
served under s 268 of the Insolvency Act 1986 on the respondent
guarantors, who were shareholders in Trak-2-U Ltd (Trak) and who by an
agreement in writing dated 21 November 2005 guaranteed the liabilities of
Trak under a supply contract with TSS.  *i*

*Stephen Robins* (instructed by *Wilkin Chapman Epton Blades*) for the
appellant.
*David Rose* (instructed by *Heptonstalls LLP*) for the respondents.

*Cur adv vult*

18 June 2007. The following judgment was delivered.

## DAVID RICHARDS J.

INTRODUCTION

[1] This is an appeal against an order of District Judge Robinson in the Scunthorpe County Court setting aside statutory demands served under s 268 of the Insolvency Act 1986. The appeal is brought with permission granted by the district judge.

[2] The statutory demands were served by TS & S Global Ltd (TS & S) on five individuals (the guarantors) who were shareholders in Trak-2-U Ltd (Trak) and who by an agreement in writing dated 21 November 2005 (the guarantee) guaranteed the liabilities of Trak under a supply contract with TS & S.

[3] The statutory demands were served on 22 December 2006 and 4 January 2007. The guarantors applied on 5 January 2007 to set aside the demands on grounds which effectively disputed any liability of Trak to TS & S under the supply contract. Of those grounds the guarantors now rely on only one, to which I will later refer. The skeleton argument of counsel for the guarantors, served the evening before the hearing before the district judge of their application to set aside the demands, raised for the first time a point arising under the guarantee. It was said, correctly, that there had been no demand under the guarantees served prior to service of the statutory demands. It was submitted that the liability under the guarantee was not immediately payable when the statutory demands were served, with the result that the demands could not be relied on for the purposes of establishing that the guarantors were unable to pay their debts under ss 267 and 268 of the Insolvency Act. This involved the submissions that (a) before the statutory demand could be served for the purposes of ss 267 and 268 the relevant debt had to be immediately payable, (b) under the guarantees a demand was required before the guarantee liabilities were immediately payable, (c) the statutory demand could not itself also be a demand under the guarantee and, therefore, (d) the statutory demands should be set aside under r 6.5(4) of the Insolvency Rules 1986. The district judge accepted these submissions, expressly or by necessary implication. His short extempore judgment was directed principally at the point that a statutory demand could not also be a demand under the guarantee.

[4] TS & S appeals against the order on the grounds, first, that the guarantors' liability under the guarantee was immediately payable before service of the statutory demand, without the need for any prior demand for payment. Although the guarantee requires the guarantors to pay on demand, it also provides that they are liable as primary obligors and TS & S relies on the decision of the Court of Appeal in *MS Fashions Ltd v Bank of Credit and Commerce International SA* [1993] BCLC 1200, [1993] Ch 425 to establish that a demand is not therefore necessary to make the liability under this guarantee immediately payable. Alternatively, the statutory demands could serve the two purposes of being demands under the guarantee and demands for the purposes of ss 267 and 268. Alternatively, even if those submissions were wrong, the failure to serve a

separate demand under the guarantee caused the guarantors no prejudice or   *a*
injustice, and the district judge should have refused to set aside the statutory
demand, applying the approach of the Court of Appeal in *Re a Debtor*
(*No 1 of 1987*) [1989] 2 All ER 46, [1989] 1 WLR 271.

[5] The guarantors resist the appeal, relying on the reason given by the
district judge and rejecting each of the submissions summarised above. They
also seek to uphold the order on one of the original grounds that no debt   *b*
was due from Trak to TS & S. This was not dealt with by the district judge
but it was not necessary for him to do so in view of his decision on the
guarantee point.

FACTS                                                                       *c*

[6] In 2004 TS & S was approached with a proposal that it should
assemble and supply to Trak a vehicle and marine tracking device, based on
a global positioning system, and associated remote control fobs. The devices
and fobs would be manufactured by TS & S to a specification provided by
a consultant engaged by Trak. The evidence indicates a concern on the part   *d*
of Trak that, because the product was new, it would wish to be satisfied
that it would operate to the anticipated standard. It also indicates a concern
on the part of TS & S that the proposal would require it to buy substantial
quantities of components for which it might not be paid if Trak, a new
company, either failed or did not place orders for the devices and fobs in
significant quantities.                                                     *e*

[7] Following negotiations, TS & S submitted a quotation to Trak on
21 November 2005. Paragraph 2.1 stated:

> 'Tracking device to be supplied in batches as follows:
> x 6
> x 94                                                                      *f*
> x 1,000 – to be called off in batches as requested by Trak-2-U
> Minimum number of units per batch x 200.
> All x 1,100 units to be called off within a 12 month period.'

The supply of the remote fobs was linked to the supply of the tracking
devices. Paragraph 2.1 continued:                                           *g*

> 'Please refer to time plan for further details as to the agreements for
> delivery dates of the above batches. The dates specified on the time plan
> are subject to the assumptions detailed on the plan.'

The guarantors rely on this part of para 2.1 in support of their submission
that there is a genuine dispute as to whether any amount is due from Trak   *h*
to TS & S and I will return to this point later. Unit costs are given on the
basis of 1,100 tracking devices and 700 remote fobs.

[8] Expected shipping dates were given for the first and second batches of
6 devices and 94 devices (by 16 December 2005 and 6 March 2006) and for
'an estimated batch of 1,000' (by 11 April 2006). These dates are stated to
be subject to a number of assumptions, including that all software supplied   *i*
by Trak performs as expected and that test process time does not exceed the
allocated time. TS & S would be entitled to invoice Trak upon completion
of each manufactured batch, payable within 30 days.

[9] Paragraph 3.3 of the quotation is as follows:

'3.3 Guarantee

Guarantee for material for 1,100 units was agreed on 21/11/2005. If finished product has been invoiced (which includes the material element) any outstanding amounts relating to material will be agreed on a pro rata basis.

For example:

x 500 units manufactured, invoiced and settled at £178.58 each.

If NO further units are manufactured, the outstanding material element (= 600/1100 x £130,000 = £70,909) will be due on 21/11/200 [sic], payable within 30 days.'

[10] The guarantee referred to in para 3.3 of the quotation was the guarantee relevant to this appeal. It is dated 21 November 2005 and made between the guarantors and TS & S. Clauses 1 and 2 provide as follows:

'1. Guarantee

In consideration of the Beneficiary agreeing to purchase components from their suppliers with a value up to a maximum of £130,000 (one hundred and thirty thousand pounds) ("the Facility") for manufacture of a product for trak 2 u limited (Company number 4206424) whose Registered Office is situated at 19 Leeds Road, Selby, North Yorkshire, YO8 4HX (the "Company") the guarantors, as primary obligors, hereby unconditionally and irrevocably guarantee to the Beneficiary, the due payment and discharge by the Company of such amount as is due and owing by the Company to the Beneficiary as at the first anniversary of the date hereof and which is attributable to the Facility (whether or not the Facility has been discharged prior to such date in whole or part by the Beneficiary), such payment to be made within 30 days of the first anniversary date hereof.

Demand

If the Company defaults in payment of the Facility in 1 above when due the guarantor shall pay to the Beneficiary on demand, without set off or other deduction, an amount equal to the amount so unpaid together with all reasonable costs and expenses incurred by the Beneficiary in implementing and enforcing the terms of this guarantee.

A demand shall be sufficiently served on the guarantor if made to it at its address set out above by letter, telex or facsimile and shall be effective on receipt.'

[11] By a letter dated 1 December 2005 to TS & S, Trak wrote:

'I refer to your email requesting a Purchase Order for the trak 2 u units which TS & S Global Ltd are manufacturing for us during 2006 and confirm below that order with you on behalf of this Company.

Trak 2 u limited – Purchase Order

Referring to the TS & S Global Limited proposals and terms dated 21 November 2005, I confirm the order for the manufacture of 1,100 tracking devices and 700 remote fobs at a cost each of £178.58 and £22.66 respectively, excluding £16,500 set up costs, but including boxing and all services up to the point of despatch to the end user from your premises during 2006.'

It is TS & S's case that by this letter Trak accepted the offer contained in the    *a*
quotation and placed a firm order for 1,100 tracking devices and 700
remote fobs.

[12] TS & S purchased the components required for 1,100 tracking
devices and 700 fobs. Trak drew down and TS & S supplied two batches
totalling 26 tracking devices and 9 fobs, but did not draw down any more.
Following attempts by TS & S between July and October 2006 to discover    *b*
whether Trak would draw down any further tracking devices or fobs, Trak
explained in a letter dated 6 October 2006 that it had encountered
significant difficulties in its marketing of the products.

[13] On 28 November 2006 TS & S delivered to Trak an invoice for
£122,249.56 (£104,042.16 plus VAT) in respect of the unused components.
It provided a full stock list and copies of the supplier's invoices and on    *c*
5 December 2006 two of the guarantors visited TS & S's premises to inspect
the components.

[14] Subject to the guarantors' argument that Trak had not authorised the
purchase by TS & S of the unused components, payment for the unused
components was due within 30 days after 21 November 2006 (para 3.3. of    *d*
the quotation). The liability of the guarantors arose, or could on demand
arise, after 21 December 2006. On 21 December 2006 Mr Fithian-Franks,
the managing director of Trak and one of the guarantors, e-mailed to TS &
S:

> 'Along with my fellow shareholders I am aware of the date and the    *e*
> guarantee between us and TS & S Ltd. I was hoping to be in a position
> to let you know that our prospective manufacturer was willing to take
> up the components you have for our products … Can I ask you to bear
> with us just a little longer so that we can resolve all outstanding matters
> between our companies amicably and with the least possible delay.'

[15] The statutory demands were dated 21 December 2006. They were    *f*
served on two guarantors on 22 December 2006 and on the others on
4 January 2007. The demands followed the form prescribed under the
Insolvency Rules, stating that:

> 'The creditor claims that you owe the sum of £104,042.18, full
> particulars of which are set out on page 2, and that it is payable    *g*
> immediately and, to the extent of the sum demanded, is unsecured.'

WAS A DEMAND UNDER THE GUARANTEE NECESSARY?

[16] If the submission for TS & S that no demand under the guarantee
was needed to make the amounts due from the guarantors immediately    *h*
payable is well-founded, the guarantors fail on the issues raised by them as
regards the guarantee and statutory demand, leaving only the issue as to
whether any debt was due from Trak to TS & S.

[17] The guarantors rely on the terms of cl 2 of the guarantee that 'the
guarantor shall pay to the beneficiary *on demand*' the amount unpaid by
Trak, coupled with cl 2.2 providing for the means of service. TS & S relies    *i*
on cl 1 which provides that the guarantors 'as primary obligors' guarantee
the due payment of the amount outstanding from Trak in respect of
components.

[18] A series of authorities leading up to the decision of the Court of

ntained in the  *a*
ices and 700

100 tracking
two batches
vn any more.
6 to discover  *b*
or fobs, Trak
encountered

n invoice for
components.
oices and on  *c*
ses to inspect

uthorised the
r the unused
(para 3.3. of  *d*
l on demand
:hian-Franks,
iled to TS &

date and the
in a position  *e*
illing to take
: you to bear
iding matters
ble delay.'

i. They were  *f*
ie others on
d under the

.042.18, full
t is payable  *g*
nsecured.'

ie guarantee
immediately  *h*
l by them as
: issue as to

tee that 'the
it unpaid by
'S & S relies  *i*
's' guarantee
l respect of

he Court of

*a*  Appeal in *Bradford Old Bank Ltd v Sutcliffe* [1918] 2 KB 833 established that a demand is unnecessary to make a present debt immediately payable, even if it is expressed to be payable on demand, unless it is a collateral debt. The position was stated by Chitty J in *Re Brown's Estate* [1893] 2 Ch 300 at 304–305:

*b*      '... it is plain that a distinction has been taken and maintained in law, the result of which is that where there is a present debt and a promise to pay on demand, the demand is not considered to be a condition precedent to the bringing of the action. But it is otherwise on a promise to pay a collateral sum on request, for then the request ought to be made before action brought.'

*c*

[19] The effect of these principles in a case where the covenant by a guarantor is given expressly as principal debtor or primary obligor, arose for consideration in *MS Fashions Ltd v Bank of Credit and Commerce International SA* [1993] BCLC 1200, [1993] Ch 425. The case concerned a *d*  variety of transactions between BCCI and three separate companies and their directors or others as sureties. In each case the sureties had deposited sums with BCCI as security for the amounts due from the companies to BCCI and in each case some of the agreements with the sureties either described them as 'principal debtor' or contained personal covenants by them as 'principal debtor'.

*e*  [20] It is helpful to refer to two of the transactions. As security for the borrowings of High Street Services Ltd and two associated companies, Mr Ahmed signed a document headed 'cash deposit security terms – third party' which entitled BCCI, at any time and without notice, to set off moneys deposited by Mr Ahmed against amounts due from the companies. In the same document Mr Ahmed also agreed to guarantee to pay to BCCI *f*  upon written demand all liabilities of the companies to BCCI and further declared 'as a separate and independent obligation hereunder' that the company's liabilities 'shall be recoverable by you from me as principal debtor and/or by way of indemnity and shall be repaid by me on demand made in writing by you or on your behalf whether or not demand has been *g*  made on the [company]'.

[21] As security for the borrowings of Impexbond Ltd, Mr Amir signed a letter of charge by which he charged the credit balances on certain of his accounts with BCCI and agreed that 'the liabilities hereunder shall be as that of principal debtor'. In contrast to the arrangement involving Mr Amir did not give an express personal covenant to be liable *h*  to BCCI but the letter was taken to have that effect in an amount not more than the amount of his deposits (see [1993] BCLC 1200 at 1206, [1993] Ch 425 at 431).

[22] A principal issue was whether BCCI's liability on the sureties' deposits should be set off under r 4.90 of the Insolvency Rules against their liabilities to BCCI as sureties. As the law then stood, there could be no *i*  set-off involving a contingent due debt to a company in liquidation unless and until the contingency occurred. BCCI argued that the sureties' liabilities were contingent on demands made by it, which it might well never make.

[23] The Court of Appeal, affirming the decision of Hoffmann LJ at first instance, held that as the sureties had covenanted to pay as principal

debtors, a demand was unnecessary and there should therefore be a set-off *a*
under r 4.90.

[24] Dillon LJ dealt with the issue at [1993] BCLC 1200 at 1216–1217,
[1993] Ch 425 at 431 at 447–448. He recorded BCCI's acceptance that the
liabilities of the companies to BCCI were at all times presently enforceable
without any need for a demand before the issue of a writ, even if expressed
to be repayable on demand. He referred to the line of authorities leading up *b*
to *Bradford Old Bank v Sutcliffe*. Having referred to the terms of the
arrangements with Mr Amir and Mr Ahmed, he continued:

> 'The effect of that must be to dispense with any need for a demand in
> the case of Mr Amir since he has made the companies' debts to BCCI
> his own debts and thus immediately payable out of the deposit without *c*
> demand. In the case of Mr Ahmed there must be immediate liability
> even though the word "demand" was used, because he accepted liability
> as a principal debtor and his deposit can be appropriated without
> further notice.'

*d*

[25] Mr Rose on behalf of the guarantors in this case submitted that *MS
Fashions Ltd v BCCI* was distinguishable because the issue was whether a
liability had arisen for the purposes of set-off under rule 4.90, not whether
a demand was necessary before the liability became immediately payable.

[26] In my judgement, the decision in *MS Fashions v BCCI* cannot be
distinguished on this basis. It is clear, I think, from the judgment of *e*
Dillon LJ that because Mr Amir and Mr Ahmed had covenanted to pay as
principal debtors, their position was equated with that of a primary debtor,
who is under an immediate obligation to pay without the need for a
demand even though the contract provides for payment on demand.
Dillon LJ was not saying that the equation existed for the purposes of
set-off only. That would have been inadequate to achieve a set-off; the *f*
sureties' obligation to make payment to BCCI would have remained
contingent on a demand by BCCI which might never be made and such an
obligation to the insolvent company could not be the subject of a set-off, as
the law then stood: see the comments of Lord Hoffmann in *Re Bank of
Credit and Commerce International SA (No 8)* [1998] 1 BCLC 68 at 74–75,
[1998] AC 214 at 224–225. That is no longer the case, following the *g*
substitution of a new rule 4.90 in 2005.

[27] A second submission by Mr Rose was that, while cl 1 of the
guarantee created an accrued as opposed to a contingent liability, cl 2 made
a demand a necessary pre-condition to the obligation to pay. Until a
demand was made, the debt was not therefore immediately payable and *h*
could not be the subject of a statutory demand. The difficulty with this
submission is that it is the proposition rejected in the line of authorities
culminating in *Bradford Old Bank v Sutcliffe*. I have some sympathy with
commercial parties to a guarantee in the present form who could reasonably
read cll 1 and 2 as having precisely the effect for which Mr Rose contends.
That result could perhaps be achieved by clear terms; all the authorities *i*
stress that the nature, extent and conditions of a surety's liability are a
question of construction of the contract. But, in the light of the authorities,
I do not consider that the words 'on demand' in cl 2.1 and the terms of
cl 2.2 are sufficient for this purpose. They are not substantially different

e be a set-off

t 1216–1217,
:ance that the
y enforceable
1 if expressed
ies leading up
terms of the

a demand in
ebts to BCCI
posit without
diate liability
:pted liability
ated without

itted that *MS*
as whether a
not whether
ely payable.
CI cannot be
judgment of
ted to pay as
mary debtor,
need for a
on demand.
purposes of
1 set-off; the
ve remained
and such an
f a set-off, as
*Re Bank of*
68 at 74–75,
ollowing the

cl 1 of the
ty, cl 2 made
pay. Until a
payable and
lty with this
f authorities
mpathy with
d reasonably
ise contends.
e authorities
ability are a
authorities,
the terms of
ally different

from the terms of Mr Ahmed's contract in *MS Fashions v BCCI*.

[28] Mr Rose relied on observations in the judgments of Peter Gibson LJ and Tuckey LJ in *Stimpson v Smith* [1999] 2 All ER 833, [1999] Ch 340. The issue in that case was whether a guarantor who had made a payment discharging the guarantee without a formal demand but following negotiations with the creditor, and in circumstances where otherwise the creditor would probably have made a demand, could claim contribution in equity from the co-guarantor. The court rejected the argument that contribution was not available where no demand had been made and the guarantee debt had not therefore become payable. It would appear that the guarantee did not contain a provision to the effect that the guarantors were liable as primary obligors. Tuckey LJ said [1999] 2 All ER 833 at 842–843, [1999] Ch 340 at 354:

'The point at issue is a short one. Does a surety have a right to contribution from a co-surety where the creditor has not made a formal demand for payment under the guarantee?

In order to answer this question I think it is important to distinguish between the legal rights of the creditor and surety which arise under the contract of guarantee and the equitable rights which exist between sureties in the absence of any contract between them. *Where the guarantee requires a formal demand to be made upon the surety, this is not a condition precedent to his liability under the contract. It simply marks the time from which that liability can be enforced. It is a provision in the contract for the surety's benefit which he may waive.* If he does so and pays an ascertained liability of the debtor which he has guaranteed, I can see no reason in logic or law why his waiver should affect his separate right to contribution from his co-surety.' (emphasis added)

Mr Rose relied on the italicised sentences in the above passage, but the reference there to 'liability' is to the contingent liability of the guarantor under the guarantee. It was a sufficient common liability to bring the equitable principle of contribution into play, if one guarantor waived the requirement for notice to be given by the creditor. It is not a reference to the liability which arises where a guarantor agrees as primary obligor to guarantee payment of a specific debt by a specific date.

[29] I therefore accept the submissions of Mr Robins for TS & S that the guarantors' liability under the guarantee was immediately payable by them, without the need for a demand, before service of the statutory demands. It follows that the further submissions made as to whether the statutory demand could be relied on, if a demand under the guarantee was required, do not arise. They were, however, fully argued and I shall state my conclusions on them.

COULD THE STATUTORY DEMAND STAND ALSO AS A DEMAND UNDER THE GUARANTEE?

[30] Mr Robins' first alternative submission was that a statutory demand could also constitute a demand under the guarantee, so that the debt became immediately payable on service of the demand. He pointed out that in s 267 of the Insolvency Act 1986 the words 'immediately payable' referred to the time at which the bankruptcy petition is presented. While he

did not suggest that a demand under s 268(1)(a), which deals with demands    *a*
for immediately payable debts, could be served in respect of a debt which
was not payable until a later date, the statutory demand will trigger the
payment obligation for a debt payable on demand and there would be no
doubt that the debt was immediately payable by the date of the petition.

[31] Mr Robins was able to point to instances which demonstrated that    *b*
the service of a separate demand under the guarantee would serve no real
purpose or be of any benefit to the guarantors. For example, a demand
under the guarantee could be sent by fax at 9 am and a statutory demand
served in the afternoon. It would have made no significant difference to the
course of events in this case.

[32] I can see considerable force in these submissions on the facts of this    *c*
case, but in my view s 268 of the Insolvency Act, the Insolvency Rules and
the terms of the prescribed form proceed on the basis that the debt in
question is already immediately payable by the time that the statutory
demand is served. The purpose of a statutory demand is to establish the
presumption that the debtor is unable to pay his debts and thereby entitle
the creditor to present a bankruptcy petition. It is not intended as a means    *d*
of fulfilling contractual pre-conditions to making a debt immediately
payable.

RULE 6.5(4)(D)

[33] It does not necessarily follow that the statutory demand should be set
aside. Mr Robins' second alternative submission was that, even if he had    *e*
failed on his previous submissions, the facts of this case made it
inappropriate to set aside the demand. Rule 6.5(4) provides that the court
may grant the application to set aside the demand on one of four grounds.
The first three are the existence of a cross claim or set-off in excess of the
demand, a dispute of the liability on substantial grounds, and security held
for the debt by the creditor. None of these is applicable on this point. The    *f*
last ground is if 'the court is satisfied, on other grounds, that the demand
ought to be set aside'. This was considered by the Court of Appeal in *Re a
Debtor (No 1 of 1987)* [1989] 2 All ER 46, [1989] 1 WLR 271. A statutory
demand was made using the wrong form, for an amount which was greater
than actually due and supported by calculations which were confusing and
wrong. The Court of Appeal, affirming the decisions below, refused to set    *g*
aside the demand. Nicholls LJ stated that, as the statutory effect of an
unsatisfied demand was to create a presumption of insolvency and entitle
the creditor to present a bankruptcy petition, the correct approach to the
exercise of the residual discretion under rule 6.5(4)(d) was as follows
([1989] 2 All ER 46 at 50, [1989] 1 WLR 271 at 276):
                                                                              *h*
'... the circumstances which normally will be required before a court
can be satisfied that the demand 'ought' to be set aside are
circumstances which would make it unjust for the statutory demand to
give rise to those consequences in the particular case. The court's
intervention is called for to prevent that injustice.'
                                                                              *i*
[34] Nicholls LJ expanded further on this approach ([1989] 2 All ER 46
at 52, [1989] 1 WLR 271 at 279):

'The court will exercise its discretion on whether or not to set aside a
statutory demand having regard to all the circumstances. That must

require the court to have regard to all the circumstances as they are at the time of the hearing before the court. There may be cases where the terms of the statutory demand are so confusing or misleading that, having regard to all the circumstances, justice requires that the demand should not be allowed to stand. There will be other cases where, despite such defects in the contents of the statutory demand, those defects have not prejudiced and will not prejudice the debtor in any way, and to set aside the demand in such a case would serve no useful purpose. For example, a debtor may be wholly unable to pay a debt which is immediately payable, either out of his own resources or with financial assistance from others. In such a case the only practical consequence of setting aside a statutory demand would be that the creditor would promptly serve a revised statutory demand, which also and inevitably would not be complied with. In such a case the need for a further statutory demand would serve only to increase costs. Such a course would not be in the interests of anyone.'

In the case before the court, Nicholls LJ found that the errors in the demand had not resulted in any prejudice to the debtor. There was nothing to suggest that if it had been correct the debtor would have paid or secured the debt.

[35] Those observations are applicable to the present case. If the statutory demand had been preceded by a demand under the guarantee, there can be no suggestion that the guarantor would have paid or secured the debt or behaved in any way differently from their actual reaction. They would still have refused to pay, on the grounds originally given by them. There is no injustice to them which requires to be cured by setting aside the demand.

[36] There is this difference from the facts of *Re a Debtor*. While the contents of the demand were correct in this case, it was served prematurely, in the absence of an earlier demand under the guarantee. In that sense, it was a demand which ought not to have been served. But the consequence is not that it is void as a statutory demand but that the court has the discretion to set it aside under r 6.5(4). Applying the approach stated by Nicholls LJ, I would have held that the facts of this case made it inappropriate to set aside the demand. There was no consideration by the district judge of this discretion in his judgment, so that on this appeal it would have arisen for exercise by this court.

DISPUTE AS TO DEBT DUE FROM TRAK TO TS & S

[37] The guarantors seek to uphold the district judge's order on one of the original grounds for their applications to set aside the statutory demands. This was not in the event considered by the district judge, but the parties were content that I should deal with it, rather than remitting it for consideration by the court below.

[38] The guarantors submit that the existence of any debt from Trak to TS & S, and hence of any liability of the guarantors, is disputed on substantial grounds. Accordingly, the statutory demands should in any event have been set aside under r 6.5(4)(b) of the Insolvency Rules. The submission is that under the contract TS & S were only to purchase components when authorised to do so by Trak. This was to allow field testing on initial items and confirmation that the units worked. TS & S

were authorised to purchase components for only a small number of units,  *a*
said to be 6 in November 2005 and 40 in June 2006. Reliance is placed on
a time plan prepared on 8 September 2005 which envisaged initial orders
for 10 and then 90 units, to be followed in each case by evaluations and
tests, with orders for volume production and for the necessary components
being placed some two or three months later. It was accepted that the actual
figures in this time plan were later varied, and the varied time plan has not  *b*
been produced in evidence, but it is said that it clearly shows the intentions
of the parties. Reliance was placed on those parts of TS & S's quotation
dated 21 November 2005 which refer to a time plan for further details as to
delivery dates and to the assumptions listed in para 2.4 regarding the
delivery dates in para 2.3.

[39] In my judgment, there is no substance in these submissions. First, the  *c*
purchase order placed by Trak in its letter dated 1 December 2005 was a
firm order for 1,100 tracking devices and 700 fobs. Secondly, TS & S's
quotation was for 1,100 tracking devices and associated fobs and was
coupled with the guarantee in respect of the components to be ordered by
TS & S for those units. The effect of the guarantee was spelt out in para 3.3  *d*
of the quotation. It was only delivery dates which were expressed to be
subject to adjustment. Thirdly, a reading of all the pre-contract
correspondence in evidence does not substantiate the alleged intention of
the parties, which could not in any case survive the terms of the quotation
and Trak's order.

[40] Accordingly, the order of the district judge cannot be upheld on this  *e*
alternative ground. I therefore allow the appeal.

*Appeal allowed.*

Kate O'Hanlon   Barrister.