**A.59**

[1978]

A

[HOUSE OF LORDS]

UNITED SCIENTIFIC HOLDINGS LTD.    .    .    .    RESPONDENTS

AND

BURNLEY BOROUGH COUNCIL    .    .    .    .    APPELLANTS

B

CHEAPSIDE LAND DEVELOPMENT CO LTD.

AND ANOTHER .    .    .    .    .    .    .    .    APPELLANTS

AND

MESSELS SERVICE CO.    .    .    .    .    .    RESPONDENTS

1977  Jan. 24, 25, 26, 27, 31;            Lord Diplock, Viscount Dilhorne,    C
      Feb. 1;                      Lord Simon of Glaisdale, Lord Salmon
      March 23                        and Lord Fraser of Tullybelton

> *Landlord and Tenant—Rent—Revision—Time limit in rent review*
> *clause—Construction—Whether time of essence of contract—*
> *Whether landlords entitled to equitable relief—Whether new*
> *rent payable retrospectively from the review date—Law of*
> *Property Act* 1925 (15 & 16 *Geo.* 5, *c.* 20), *s.* 41 [1]    D

In the absence of any contra-indications in the express words
of the lease or in the interrelation of the rent review clause
itself and other clauses or in the surrounding circumstances the
presumption is that the time-table specified in a rent review
clause for completion of the various steps for determining the
rent payable in respect of the period following the review date
is not of the essence of the contract (post, pp. 930F, 940E–F,    E
950F–G, 962F).

In the first of these two appeals, which were heard
together, the respondents leased adjoining properties from the
appellants for 99 years at a rent of £1,000 a year each. A rent
review clause provided that, inter alia, during the year pre-
ceding the second and each succeeding 10 year period the
parties should either agree or determine by arbitration the
sum total of the properties' current rack rent and that one    F
quarter of that sum, or £1,000, whichever was the greater,
would be the rent of each property for the next 10 years. The
first 10 year period ended on August 31, 1972, and by that date
the new rent had neither been agreed nor referred to arbitra-
tion and the respondents sought a declaration that, since time
was of the essence of the contract, the appellants had lost
their chance of increasing the rent for the second 10 year
period. Pennycuick V.-C. held that although the review clause    G
was expressed merely as a provision for the quantification of
additional rent, it constituted a unilateral right to increase the
rent vested in the appellants alone; that time was of the
essence of the contract and that, since the appellants had not
exercised that right promptly in accordance with the require-
ments of the review clause, the rent reserved for each property
would remain at £1,000 for the second 10 year period. On    H
appeal the Court of Appeal dismissed the appeal.

In the second appeal the respondents leased property from

[1] Law of Property Act 1925, s. 41: see post, pp. 926H—927A.

the appellants for a term of 21 years. For the first period of
seven years the rent was £117,340 a year. For the second and
third periods of seven years the respective rents were to be
determined in accordance with a rent review clause which
contained a definition of the " market rent " and defined the
" review date " as meaning, in respect of the second period,
April 8, 1975. The procedure laid down for determining the
market rent had to be initiated by a " lessor's notice " speci-
fying the proposed new rent. The notice had to be served
between 12 and six months before the review date. The
appellants gave the requisite notice in respect of the period
starting on April 8, 1975, within the time specified, but no
agreement was reached either as to the new rent or upon a
valuer to determine it. Accordingly, as provided by the lease
the appellants on June 25, 1975, applied for the appointment
of a valuer to the President of the R.I.C.S., who was unwilling
to comply with that request without a ruling by the court that
it was a valid and effective application since the rent review
clause stipulated that the valuer must notify both landlord and
tenant of his valuation not less than 14 days before the review
date. On a summons issued by the appellants, Graham J. held
(i) that the time for the service of a lessor's notice was of the
essence of the contract, but that that stipulation had been
complied with; (ii) that the time for applying for the appoint-
ment of a valuer was not of the essence; and (iii) that the
market rent as determined by the valuer if higher than
£117,340 a year, would be recoverable retrospectively to the
review date. On appeal, the Court of Appeal reversed that
decision.

On the appellants' appeals : —

*Held,* allowing both appeals, (1) that there was nothing in
either of the leases in question to displace the presumption that
strict adherence to the time-tables specified in their respective
rent review clauses was not of the essence of the contract, and
that therefore the new rents should be determined in accordance
with the procedures specified in the respective leases (post,
pp. 932c–D, 934c, 940E–F, 950F–G, 953E, 954A–B, 956B, 962F,
963D–F).

*Samuel Properties (Developments) Ltd.* v. *Hayek* [1972]
1 W.L.R. 1296, C.A. overruled.

Dictum of Lord Parker of Waddington in *Stickney* v.
*Keeble* [1915] A.C. 386, 417, H.L.(E.) considered.

Dictum of Templeman J. in *Mount Charlotte Investments
Ltd.* v. *Leek and Westbourne Building Society* [1976] 1 All
E.R. 890, 892 approved.

*Per* Lord Diplock and Lord Salmon. The best way of
eliminating all uncertainty in future rent review clauses is to
state expressly whether or not stipulations as to the time by
which any step provided for by the clause is to be taken
shall be treated as of the essence (post, pp. 936G–H, 947E–F).

(2) That the rents fixed by the valuations would be payable
retrospectively from the respective review dates (post, pp.
934G—935G, 940D, 947B–D, 956H—957A, 964B).

*C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1
W.L.R. 728, C.A. applied.

Observations on the development and fusion of the rules of
common law and equity since 1875 (post, pp. 924E—925B,
926H—927C, 936H—937A, 944E—945B, 957G—958A).

Decisions of the Court of Appeal in *United Scientific
Holdings Ltd.* v. *Burnley Borough Council* [1976] Ch. 128;
[1976] 2 W.L.R. 686; [1976] 2 All E.R. 220 and *Cheapside*

*Land Development Co. Ltd.* v. *Messels Service Co.,* May 21, 1976; Court of Appeal (Civil Division) Transcript No. 225 of 1976 (unreported) reversed.

The following cases are referred to in their Lordships' opinions:

*Accuba Ltd.* v. *Allied Shoe Repairs Ltd.* [1975] 1 W.L.R. 1559; [1975] 3 All E.R. 782.

*Bailey (C. H.) Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1 W.L.R. 728; [1974] 1 All E.R. 1003, C.A.

*Boone* v. *Eyre* (1779) 1 Hy.Bl. 273n. ·

*Cutter* v. *Powell* (1795) 2 Smith L.C. 1.

*Essoldo (Bingo) Ltd.'s Underlease, In re* (1971) 23 P. & C.R. 1.

*Farrell* v. *Alexander* [1977] A.C. 59; [1976] 3 W.L.R. 145; [1976] 2 All E.R. 721, H.L.(E.).

*Finch* v. *Underwood* (1876) 2 Ch.D. 310, C.A.

*Greater London Council* v. *Connolly* [1970] 2 Q.B. 100; [1970] 2 W.L.R. 658; [1970] 1 All E.R. 870, C.A.

*Gregson* v. *Riddle* (1784) (unreported); see 7 Ves.Jun. 268–269.

*Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.

*Hughes* v. *Metropolitan Railway Co.* (1877) 2 App.Cas. 439, H.L.(E.).

*Jackson* v. *Union Marine Insurance Co.* (1874) L.R. 10 C.P. 125.

*Kenilworth Industrial Sites Ltd.* v. *E. C. Little & Co. Ltd.* [1974] 1 W.L.R. 1069; [1974] 2 All E.R. 815; [1975] 1 W.L.R. 143; [1975] 1 All E.R. 53, C.A.

*Lennon* v. *Napper* (1802) 2 Sch. & Lef. 682.

*Martindale* v. *Smith* (1841) 1 Q.B. 389.

*Mount Charlotte Investments Ltd.* v. *Leek and Westbourne Building Society* [1976] 1 All E.R. 890.

*Parkin* v. *Thorold* (1852) 16 Beav. 59.

*Peeters* v. *Opie* (1671) 2 Wms.Saund. (1871 ed.) 742.

*Pordage* v. *Cole* (1669) 1 Wms.Saund. (1871 ed.) 548.

*Richards (C.) & Son Ltd.* v. *Karenita Ltd.* (1971) 221 E.G. 25.

*Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296; [1972] 3 All E.R. 473, C.A.

*Seton* v. *Slade* (1802) 7 Ves.Jun. 265.

*Smith* v. *Hamilton* [1951] Ch. 174; [1950] 2 All E.R. 928.

*Stickney* v. *Keeble* [1915] A.C. 386, H.L.(E.).

*Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1 Ltd.* (1974) 237 E.G. 343, C.A.

*United Dominions Trust (Commercial) Ltd.* v. *Eagle Aircraft Services Ltd.* [1968] 1 W.L.R. 74; [1968] 1 All E.R. 104, C.A.

*Voisey, Ex parte* (1882) 21 Ch.D. 442, Sir James Bacon and C.A.

*Wallis, Son & Wells* v. *Pratt & Haynes* [1910] 2 K.B. 1003, C.A.

*Walsh* v. *Lonsdale* (1882) 21 Ch.D. 9, Fry J. and C.A.

*Watts and Attorney-General for British Columbia* v. *Watts* [1908] A.C. 573, P.C.

*Weston* v. *Collins* (1865) 12 L.T. 4.

*Wickman Machine Tool Sales Ltd.* v. *L. Schuler A.G.* [1974] A.C. 235; [1973] 2 W.L.R. 683; [1973] 2 All E.R. 39, H.L.(E.).

The following additional cases were cited in argument:

*Aberfoyle Plantations Ltd.* v. *Cheng* [1960] A.C. 115; [1959] 3 W.L.R. 1011; [1959] 3 All E.R. 910, P.C.

A.C.                United Scientific v. Burnley Council (H.L.(E.) )

A    *Brimnes, The* [1975] Q.B. 929; [1974] 3 W.L.R. 613; [1974] 3 All E.R. 88, C.A.

*Courtney & Fairbairn Ltd.* v. *Tolaini Brothers (Hotels) Ltd.* [1975] 1 W.L.R. 297; [1975] 1 All E.R. 716, C.A.

*Cullimore* v. *Lyme Regis Corporation* [1962] 1 Q.B. 718; [1961] 3 W.L.R. 1340; [1961] 3 All E.R. 1008.

*Davstone (Holdings) Ltd.* v. *Al-Rifai* (1976) 32 P. & C.R. 18.

B    *Decro-Wall International S.A.* v. *Practitioners in Marketing Ltd.* [1971] 1 W.L.R. 361; [1971] 2 All E.R. 216, C.A.

*Dinham* v. *Bradford* (1869) L.R. 5 Ch.App. 519.

*Fousset* v. *27 Welbeck Street Ltd.* [1973] 25 P. & C.R. 277.

*Guaranty Trust Co. of New York* v. *Hannay & Co.* [1915] 2 K.B. 536, C.A.

*Hare* v. *Nicoll* [1966] 2 Q.B. 130; [1966] 2 W.L.R. 441; [1966] 1 All E.R. 285, C.A.

C    *Hartley* v. *Hymans* [1920] 3 K.B. 475.

*Hordern* v. *Hordern* [1910] A.C. 465, P.C.

*Imperial Life Assurance Co. of Canada* v. *Derwent Publications Ltd.* (1972) 227 E.G. 2241.

*Lock* v. *Bell* [1931] 1 Ch. 35.

*Ranelagh (Lord)* v. *Melton* (1864) 2 Dr. & Sm. 278.

*Reardon Smith Line Ltd.* v. *Ministry of Agriculture, Fisheries and Food* [1963] A.C. 691; [1963] 2 W.L.R. 439; [1963] 1 All E.R. 545, H.L.(E.).

D    *Reuter, Hufeland & Co.* v. *Sala & Co.* (1879) 4 C.P.D. 239, C.A.

*Roberts* v. *Berry* (1853) 3 De G.M. & G. 284.

*Salt* v. *Cooper* (1880) 16 Ch.D. 544, C.A.

*Sandwell Park Colliery Co., In re* [1929] 1 Ch. 277.

E    *Stewart* v. *Great Western Railway Co.* (1865) 2 De G.J. & Sm. 319.

*Tilley* v. *Thomas* (1867) L.R. 3 Ch.App. 61.

*Voisey, Ex parte* (1882) 21 Ch.D. 442, C.A.

*West Country Cleaners (Falmouth) Ltd.* v. *Saly* [1966] 1 W.L.R. 1485; [1966] 3 All E.R. 210, C.A.

*Williams* v. *Greatrex* [1957] 1 W.L.R. 31; [1956] 3 All E.R. 705, C.A.

F    APPEALS from the Court of Appeal.

UNITED SCIENTIFIC HOLDINGS LTD. *v.* BURNLEY BOROUGH COUNCIL.

This was an appeal by the appellants, Burnley Borough Council, from an order of the Court of Appeal (Buckley, Roskill and Browne L.JJ.) dated March 1, 1976, dismissing an appeal by the appellants from an order of Pennycuick V.-C. dated May 13, 1974.

G    The issues which arose on this appeal were:

(1) Whether the rules of equity as to stipulations as to time in a contract were applicable to a rent review clause in a lease; and, if so,

(2) Whether and in what circumstances according to the rules of equity, stipulations as to time in a rent review clause were deemed to be or to have become of the essence of the contract.

H    The facts are set out in their Lordships' opinions.

*H. E. Francis Q.C.* and *B. C. Maddocks* for the appellants.

*A. J. Balcombe Q.C.* and *Benjamin Levy* for the respondents.

CHEAPSIDE LAND DEVELOPMENT CO. LTD. *v.* MESSELS SERVICE CO.

A

This was an appeal by the appellants, Cheapside Land Development
Co. Ltd., from an order of the Court of Appeal (Stamp, Scarman and
Goff L.JJ.) dated May 21, 1976, allowing an appeal by the respondents,
Messels Service Co. from an order of Graham J. dated January 29, 1976.

The issues raised in this appeal were:

(1) Whether the rules of equity under which stipulations as to time
were in certain circumstances treated as not being of the essence of the       B
contract had any application to a contract in which compliance with such
a stipulation was expressed to be a condition precedent to the accrual
of a legal right.

(2) If those rules were capable of applying to such a contract, whether
and in what circumstances stipulations as to time in a rent review clause
contained in a lease of commercial premises were deemed to be of the            C
essence of the contract.

The facts are set out in their Lordships' opinions.

*N. Browne-Wilkinson Q.C., Michael Essayan Q.C.* and *N. T. Hague*
for the appellants.

*A. J. Balcombe Q.C.* and *E. G. Nugee* for the respondents.

D

The appellants in both appeals were heard first.

*H. E. Francis Q.C.* and *B. C. Maddocks* for Burnley Borough Council.
The question is what is the legal significance to be attributed to stipu-
lations as to time in rent review clauses and what effect should the courts
and arbitrators give to such clauses. There are only two courses open to
this House: (i) to adopt a literal construction of the clause, or (ii)        E
ascertain the substance and purpose of the clause and give it such effect
as will fulfil that purpose. Before 1873 courts of equity and courts of
common law construed contracts in the same manner. The Court of
Chancery, however, did not construe stipulations as to time in always
the same way as courts of common law, but it looked to the substance
and purpose of the clause. This doctrine was at first applied to mortgages
and then to contracts for the sale of land. The approach of equity was      F
clearly stated by Sir John Romilly M.R. in *Parkin* v. *Thorold* (1852) 16
Beav. 59, 65. This approach should be applied to the present case in view
of the fact that the rent review clause formed an important part of the con-
sideration for the lease. The appellants concede that this doctrine does
not apply in three types of cases: (i) Where there is an express stipulation
as to time in the contract; (ii) where the courts may infer from the nature
of the contract or the surrounding circumstances that the parties regard      G
time stipulations as of the essence of their bargains: mercantile contracts,
options to purchase freeholds or to renew a lease; (iii) where the appli-
cation of the equitable doctrine would cause injustice to the other party.
Apart from the above three categories the equitable doctrine applies to
all contracts by virtue of section 41 of the Law of Property Act 1925
which re-enacted section 25 (7) of the Supreme Court of Judicature Act      H
1873. For a statement of the position in equity: see *Halsbury's Laws of
England*, 4th ed., vol. 9 (1974), paras. 481, 482; *Chitty on Contracts*, 23rd
ed. (1968), vol. 1, para. 1140; *Snell's Principles of Equity*, 27th ed. (1973),

A.C.          United Scientific v. Burnley Council (H.L.(E.))

A   p. 595 and *Fry on Specific Performance*, 6th ed. (1921), pp. 500–502; paras. 1072, 1075 and 1079.   The statements in the textbooks are supported by *Roberts* v. *Berry* (1853) 3 De G.M. & G. 284, 290; *Tilley* v. *Thomas* (1867) L.R. 3 Ch.App. 61, 67, 69; *Lock* v. *Bell* [1931] 1 Ch. 35, 42, 44; *Stickney* v. *Keeble* [1915] A.C. 386, 400, 401, 403, 415.

The present case does not fall within any of the exceptions to the general rule.   Plainly exception (i) does not apply.   As to exception (ii),
B   there is nothing in the nature of the property which constrains the court to hold that the time requirement of the contract must be applied.   This is not a commercial contract.   Roskill L.J., below, placed great emphasis on cases relating to commercial contracts.   But a case such as *Williams* v. *Greatrex* [1957] 1 W.L.R. 31 which concerned the sale of building plots to a builder is not a mercantile or commercial contract for the purposes of this doctrine of equity as to time.   Moreover, in the present case clause 3
C   of the lease must be read with the schedule and the statement in clause 3 that the rent " during the residue of the said term " shall be " £1,000 plus any additional rent payable under the provisions contained in the schedule hereto " is an elliptical statement and is not correct.   The schedule is essential in determining the current rack rent.   The terms of the schedule are obligatory on both parties and if the parties cannot
D   agree the rent, it is to be determined by an arbitrator.

As to exception (iii) the judgment of the Court of Appeal seems to have attached great importance to two matters: (a) that the rent review clause was for the sole benefit of the landlord.   It is conceded that this was true in 1972 but this is not necessarily true for the future.   There may be deflation in the future.   In 1962, the date at which the clause must be construed, the parties were not to know whether there would
E   be inflation or deflation in the future.   (b) That it is of the very greatest importance to the tenant that he should know what the rent is at any particular time: see, for example, *per* Buckley L.J. [1976] Ch. 128, 142H–143B, and also *per* Roskill L.J. at p. 150D–G.   But the tenant has the remedy in his own hands.   He can refer the matter to arbitration.   The tenant did not do so in the present case because his solicitors
F   considered that the clause was void for uncertainty.

*C. Richards & Son Ltd.* v. *Karenita Ltd.* (1971) 221 E.G. 25 was plainly a case where time was of the essence because of the break clause.   By the rent review clause the tenant was enabled to discover what the rent would be if he continued with the tenancy.   *Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296 is plainly distinguishable, for the rent review was at the " option of the lessor."   As to *Kenilworth Indus-*
G   *trial Sites Ltd.* v. *E. C. Little & Co. Ltd.* [1975] 1 W.L.R. 143, the appellants have no quarrel with the actual decision in that case.   *Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1 Ltd.* (1974) 237 E.G. 343 is distinguishable, for the landlord had a unilateral right to review the rent.   It is a true option case and turns on the language of the particular clause.   Alternatively, it was wrongly decided.

H   The House is asked not to follow slavishly the language of clause 3 of the present lease but to look through the " veil " and ascertain what is the substance and purpose of this clause.   If this clause is looked at objectively no injustice is done to the tenant by enforcing the rent review

**United Scientific v. Burnley Council (H.L.(E.))**                    **[1978]**

provision. An essential element of this lease is the rent review clause.
Whatever be said about option clauses there is no option in the present    A
clause. The obligation to have a review of the rent is binding on both
parties. It is very pertinent to observe that if there had been no rent
review clause the tenant would not have been granted this lease which is
a very valuable right. *Accuba Ltd.* v. *Allied Shoe Repairs Ltd.* [1975]
1 W.L.R. 1559 is another example of the difference between essence and
machinery in construing a clause of this nature. It was rightly decided.    B
The observation of Templeman J. in *Mount Charlotte Investments Ltd.* v.
*Leek and Westbourne Building Society* [1976] 1 All E.R. 890, 892, that
" The analysis of the option rent review clause is a triumph for theory
over realism . . . The concept of the tenant granting the landlord an
option and conferring benefits on the landlord does not accord with
reality," is very pertinent and is adopted. The issue in that case was
different from that in the present, but from his observations in that case    C
it is plain that Templeman J. would have decided the present case as an
obligation case and not as an option case. Finally, the House is invited
to approve the decision in *C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.*
[1974] 1 W.L.R. 728 and hold that the new rent when ascertained should
be payable retrospectively as from the review date.

*Maddocks* following. (1) It is submitted that the rent review clause is    D
not a clause which operates with a " ratchet " effect. It is conceded that if
there is no review the rent falls to £1,000. It is said that this is in the land-
lord's favour, but if time is of the essence then this is most inequitable. For
example, suppose that the rent payable on August 1, 1992, is £10,000 and
that on August 1, 2002, the rack rent is £8,000, then if time is of the essence
and the landlord fails to ask for a review in time, the rent would fall to
£1,000, not £8,000! (2) The equitable doctrine should not be applied in    E
a case not relating to the completion of the contract but to a clause in a
continuing contract. There are strong reasons for applying it here where
the party bringing proceedings has obtained complete performance, that is,
he has been granted the lease which contains substantive continuing pro-
visions. (3) The statements in *Fry on Specific Performance*, 6th ed., paras.
1057, 1077, pages 502, 503, are adopted as part of the argument. (4)    F
Mercantile contracts are in quite a different category from the obligations
under consideration here. The tenant is aware of the basis on which the
rent is to be determined.

*N. Browne-Wilkinson Q.C., Michael Essayan Q.C.* and *N. T. Hague* for
Cheapside Land Development Co. Ltd. There are two questions: (1) The
basis of the equitable doctrine of time as of the essence of the contract. (2)
The relation of that doctrine to that of fundamental breach. Both doctrines    G
have now come very close to one another: see *Hongkong Fir Shipping Co.
Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26.

The first case to come before the Court of Appeal was *Samuel
Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296. In that
case the right to review was expressed as an " option " conferred on the
landlord and was linked with a right for the tenant to determine the    H
lease. The Court of Appeal held in the special circumstances of the case
that the time limit it specified for exercising the " option " was of the
essence of the contract. Thereafter the authorities developed on the basis

A.C.                    United Scientific v. Burnley Council (H.L.(E.))

A  of a distinction between (a) cases such as *Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1 Ltd.* (1974) 237 E.G. 343 and *Mount Charlotte Investments Ltd.* v. *Leek and Westbourne Building Society* [1976] 1 All E.R. 890 where the rent review clause was construed as conferring a beneficial option on the landlord to increase the rent, and time was held to be of the essence, and (b) cases such as *Kenilworth Industrial Sites Ltd.* v. *E. C. Little & Co. Ltd.* [1974] 1 W.L.R. 1069 where the rent review

B  clause was treated as mere machinery for determining the revised rent, and time was held not to be of the essence.

The dichotomy between "option" and "machinery" provisions was persuasively criticised by Templeman J. in *Mount Charlotte Investments Ltd.* v. *Leek and Westbourne Building Society* [1976] 1 All E.R. 890, 892. It nevertheless continued as the basis for determining whether or not time was of the essence in rent review clauses until the Court of Appeal in

C  the *United Scientific* case rejected the suggested dichotomy and held that time was generally to be considered to be of the essence in all rent review clauses, whether they were expressed in the form of an option or otherwise. The appellants' first contention is that the rule should be exactly the opposite, that is, in general, time is not to be considered of the essence in rent review clauses.

D  The use of the word "option" is a misnomer in the present type of case. This is an unfortunate concept which has come recently into this branch of law because of the use of the word "option" in the *Samuel Properties* case [1972] 1 W.L.R. 1296. It would have been better if in that case it had stated that the rent could be reviewed at the instance of the landlord.

In the Court of Appeal the appellants argued their case on the basis

E  that they were bound to accept, in view of previous decisions of that court, that (a) a rent review clause was akin to an option conferring a benefit on the landlord, and (b) time was of the essence as regards the exercise of such an option. The appellants nevertheless contended that by giving notice to the respondents by the letter dated September 5, 1974, pursuant to paragraph 3 (a) of Schedule 2 to the lease they had sufficiently

F  exercised the option, and that time was not of the essence as regards the taking of any subsequent steps, such as applying to the President of the R.I.C.S. for the appointment of a Fellow of the Institute to fix the revised rent.

Before this House the appellants' contentions are: (a) That a rent review clause neither is, nor is analogous to, an option and that accordingly the doctrine that time is not of the essence can apply thereto; (b)

G  That the general rule of equity that time is not of the essence normally applies to rent review clauses and applies in the present case; alternatively (c) that even if time was of the essence in relation to the setting in motion of the review process by notice, it is not of the essence of the later steps in the review.

As to (a), the equitable rule that stipulations as to time are not in

H  general deemed to be of the essence of the contract is now of general application: section 41 of the Law of Property Act 1925.

As was stated by the Court of Appeal in the present case, the doctrine that in equity time is not of the essence is founded on the principle that

United Scientific v. Burnley Council (H.L.(E.))                    [1978]

equity gives relief against the consequences of a failure to perform a contract within the time there specified unless it be inequitable to do so: equity looks to the substance not to the form. The doctrine does not depend upon the proper construction of the contract, or the intention or presumed intention of the parties, as appears to have been the view of Lord Salmon in *Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1 Ltd.,* 237 E.G. 343, 345, and that all the members of the Court of Appeal in the *United Scientific* case assumed (see *per* Buckley L.J. [1976] Ch. 128, 144F, 145B; *per* Roskill L.J. at pp. 146F, 148C; and *per* Browne L.J. at pp. 156D, 157D). It is emphasised that the equitable doctrine that time is not of the essence is not primarily based on the intention of the parties. Equity looked at the type of contract in question and asked could one perform the substance of the bargain between the parties. Nor is it a matter of construction. The question is: What effect is to be given to the language in the circumstances? See *Seton* v. *Slade* (1802) 7 Ves.Jun. 265; *Parkin* v. *Thorold,* 16 Beav. 59; *Roberts* v. *Berry,* 3 De G.M. & G. 284; *Tilley* v. *Thomas* (1867) L.R. 3 Ch.App. 61, 67, 69; *Stickney* v. *Keeble* [1915] A.C. 386, 400, 401, 403, 415, 416.

If equity does relieve one party from the consequence of his breach of a time provision (that is if time is not of the essence) equity enforces the contract notwithstanding the breach. It is for this reason that the doctrine of time not being of the essence has no application to failure to exercise in due time an option to make a contract: unless the option is duly exercised, there is no contract which equity can enforce. Equity does not make a contract for the parties: it enforces the substance of contracts the parties have made notwithstanding certain breaches. *United Dominions Trust (Commercial) Ltd.* v. *Eagle Aircraft Services Ltd.* [1968] 1 W.L.R. 74, 80, 82, makes plain that in the option situation strictly so called it is only in circumstances where a bilateral obligation arises that the courts can interfere. See also *In re Sandwell Park Colliery Co.* [1929] 1 Ch. 277, 281, *per* Maugham J.

It is incorrect to treat the operation of a rent review clause as equivalent to the creation of a new contract between the parties by the exercise of an option. The essence of a rent review clause is that it forms an integral part of the original contract between the landlord and the tenant, so that any revised rent becoming payable as a result of the rent review clause constitutes rent originally reserved by the lease. If this were not so, any determination of the revised rent would operate in contract only, such rent would not be recoverable by distress or as between the landlord and the tenant's successors in title.

It is incorrect to treat a rent review clause as being analogous to an option or as conferring a unilateral benefit or privilege on the landlord. The reality of the situation is that the landlord would never have allowed the tenant to obtain the security of tenure afforded by a term of years unless the tenant had agreed to a periodic review of rent so as to protect the landlord from the consequences of inflation. As Templeman J. said in *Mount Charlotte Investments Ltd.* v. *Leek and Westbourne Building Society* [1976] 1 All E.R. 890, 892H: "The concept of the tenant granting the landlord an option and conferring benefits on the landlord does

A    not accord with reality." This is a very powerful statement in support of the appellants' argument.

The terms of the rent review provisions in the present case are not capable of being construed as an option. *Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296 turned on the right to review the rent being expressly stated to be an " option " conferred on the landlord, and on this right being linked with a corresponding right for the
B    tenant to determine the lease. If and to the extent that that case sought to lay down any principle that a rent review clause is always treated as analogous to an option or that time is generally to be treated as of the essence of rent review clauses, that case was wrongly decided. [Reference was made to *Decro-Wall International S.A.* v. *Practitioners in Marketing Ltd.* [1971] 1 W.L.R. 361.]

C    As to (b), in the eyes of equity it would be inequitable to relieve a party from the consequences of his failure to perform a contractual term (that is, time is of the essence) if, (A) the parties have expressly agreed that time shall be of the essence (see *Jamshed Khodaram Irani* v. *Burjorji Dhunjibhai* (1915) 32 T.L.R. 156); or (B) the nature of the subject matter of the contract is such that one party is substantially prejudiced by the failure of the other to perform the term by the agreed time; or (C) other
D    circumstances render the granting of relief inequitable. As to (A), it is common ground that there was here no express agreement that time was to be of the essence in this case. As to (B) above, the Court of Appeal in the *United Scientific Holdings* case [1976] Ch. 128 placed reliance on the fact that the lease was a commercial document recording a transaction of a commercial nature. This fact does not support the conclusion that time must be considered as of the essence of the rent review
E    provision. Although time is treated as of the essence of some terms of some commercial contracts, there are many cases where time is not so treated. Three examples are (a) payment of money under mercantile contracts; (b) the date for completion of a building contract; and (c) the sale of land (even where the land is commercial property or development land or the like). Moreover, the cases referred to by the Court of Appeal
F    in relation to mercantile contracts are all concerned with the dates of performance, that is, the dates of delivery where it is claimed that time is of the essence.

There are in general no commercial reasons strong enough to render it essential that the revised rent should be determined by the rent review date (or other earliest date provided for its payment). While it is accepted that a failure to have the revised rent determined beforehand may some-
G    times be capable of being prejudicial to the tenant, such prejudice was unduly overstated by the Court of Appeal in *United Scientific Holdings* [1976] Ch. 128, 142H—143A, *per* Buckley L.J., and at p. 150D, *per* Roskill L.J., for the following reasons: (a) It *is* far from necessary that the revised rent should be determined beforehand. Commercial men frequently enter into leases with rent review clauses which expressly
H    provide for the retrospective ascertainment of the revised rent, or indeed which contain no time limits of any kind. ( Roskill L.J. in *United Scientific Holdings* [1976] Ch. 128, 146D was wrong in stating, " all these rent revision clauses contain in one form or another stipulations as to time

within which certain acts or matters are required to be done.")   (b) In
practice, the tenant will virtually always have taken beforehand the advice   A
of his own valuers, and will have a very good idea of what the revised
rent is likely to be, or at least of the bracket within which it will fall.
(c) A tenant who feels prejudiced can request a determination before the
rent review date; and after that date, he can make time of the essence by
serving a notice on the landlord.   (d) The revised rent when ascertained
will be payable retrospectively from the date when it first becomes pay-   B
able: see *C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1 W.L.R.
728, which was correctly decided.   (e) In the meantime, "The tenant
has benefited because he has not had to pay the increased rent, and
meanwhile he has had the use of the money, or, if he would have had
to borrow it, he has not had to pay interest on it": *per* Lord Denning
M.R. in *C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1 W.L.R.
728, 732F.                                                                     C

The adverse effects on the tenant of a late ascertainment of the
revised rent are not such as to prejudice him substantially.   Such adverse
effect is small in comparison to the very serious prejudice to the landlord
which results from his being deprived of the proper rent for the whole
of the rent review period.   In the present case there has never been any
suggestion that the tenants have been prejudiced by delay in ascertaining   D
the revised rent.

The substance of the transaction constituted by a lease which contains
the rent review clause is that the landlord has granted possession of
the land for a legal term of years in consideration of a rent which is
periodically to be adjusted to reflect the current market value of the land.
Where in such a case the landlord has by granting possession fulfilled
his part of the bargain, the court should not lightly deprive him of the   E
agreed consideration, namely the payment of a periodically adjustable
rent, against which performance has taken place.   (Compare *Dinham* v.
*Bradford* (1869) L.R. 5 Ch.App. 519, *Hordern* v. *Hordern* [1910] A.C. 465.)
Far from it being inequitable to permit the landlord to obtain the market
rent, it is inequitable to permit the tenant to enjoy the property at an
inadequate rent.   This follows from the fact of the continuing relation-   F
ship between the parties.   Thus in the present case in any event the
respondents will continue to occupy the premises.

The Court of Appeal stated that to enforce the rent review clause out
of time was to "confer on the landlord a wholly new contractual right."
But if the landlords are at this stage permitted to have the rent deter-
mined, the court is no more conferring a new contractual right than
when, at the suit of a party previously in default, it orders specific   G
performance of a contract for sale of land after the date of completion
fixed by the contract.

As to the rent review clause cases, *United Scientific Holdings* case [1976]
Ch. 128 does not accord with commercial common sense.   *C. Richards
& Son Ltd.* v. *Karenita Ltd.*, 221 E.G. 25 contained a break clause and
the decision is not disputed.   *Samuel Properties (Developments) Ltd.* v.   H
*Hayek* [1972] 1 W.L.R. 1296 was not wrongly decided but the decision
has been extended to cover situations which it was not intended to apply.
*Kenilworth Industrial Sites Ltd.* v. *E. C. Little & Co. Ltd.* [1974] 1 W.L.R.

**A.C.**        United Scientific v. Burnley Council (H.L.(E.))

A   1069 is manifestly good law. *Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1 Ltd.*, 237 E.G. 343, was wrongly decided. Further, it is distinguishable on its facts. The Court of Appeal based its decisions on concessions made by counsel. The lease contained a very confused review clause and therefore the court construed it against the landlord. *Accuba Ltd.* v. *Allied Shoe Repairs Ltd.* [1975] 1 W.L.R. 1559 is a decision based on the dichotomy between option and obligation. The decision was right

B   but the process through which the court was forced to go through in view of the authorities was unnecessary and wrong. *Mount Charlotte Investments Ltd.* v. *Leek and Westbourne Building Society* [1976] 1 All E.R. 890 was a most reluctant decision. Templeman J. voiced powerful objection to the way in which the law has developed. In the appellants' submission time is not of the essence but there may be special circumstances postulated in the rent review clause which makes time of the

C   essence, for example, a break clause. In the present case there is no reason for reading a provision that time is of the essence into clause 3 of the Second Schedule to this lease.

   If, contrary to the appellants' submission, time is to be treated as of the essence as regards the giving of notice under paragraph 3 (a) of Schedule 2 to the lease, it does not follow that time was of the essence

D   as regards the taking of any subsequent steps for the determination of the revised rent, such as applying to the President of the R.I.C.S. for the appointment of an expert to determine such rent, or the giving of the valuation of the expert to the parties. Once an "option" has been exercised, time is not of the essence of the contract thereby produced. Time was not of the essence as regards the provision in paragraph

E   3 (c) of Schedule 2 to the lease that the expert should give his valuation to the parties not less than fourteen days before the review date, because neither the appellants nor the respondents could by their own acts ensure that the expert complied with this time limit. Paragraph 3 (c) of Schedule 2 necessarily contemplates two acts because (as the Court of Appeal pointed out) " manifestly the request for a reference under that clause must precede

F   the notification of its result." It follows, as the Court of Appeal indeed recognised, that if time is of the essence of the later of these acts, time must also necessarily be considered to be of the essence of the first act. It is wrong to hold that time is of the essence of a time limit which is neither expressly stipulated in the contract nor capable of being fixed with certainty by necessary implication. In *Davstone (Holding) Ltd.* v. *Al-Rifai* (1976) 32 P. & C.R. 18, 30, Goulding J. correctly analysed the

G   process applicable in these cases.

   *A. J. Balcombe Q.C., Benjamin Levy* and *E. G. Nugee* for the respondents. If the language of the clauses in these two leases is considered without taking into consideration any doctrines of equity there can be but one answer to these appeals—there never was a due determination in these cases. The landlord's case in both these appeals depends upon an

H   invocation of the rules of equity, reliance being placed on the provisions of section 41 of the Law of Property Act 1925 which replaced section 25 (7) of the Supreme Court of Judicature Act 1873. In determining the effect of section 41 of the Act of 1925 it is necessary to consider earlier

**United Scientific v. Burnley Council (H.L.(E.))**          **[1978]**

decisions, in particular the statement of Lord Parker of Waddington in
*Stickney* v. *Keeble* [1915] A.C. 386, 417:                                         A

> " If since the Judicature Acts the court is asked to disregard a
> stipulation as to time in an action for common law relief, and it be
> established that equity would not under the then existing circum-
> stances have prior to the Act granted specific performance or
> restrained the action, the section can, in my opinion, have no appli-
> cation, otherwise the stipulation in question would not, as provided   B
> in the section, receive the same effect as it would prior to the Act have
> received in equity."

That is exactly the position here.  What the landlords are seeking is
increased rent and that is a common law claim.  The question therefore
is whether in exercising that common law right equity would have before
1875 interfered.  To the same effect are the observations of Maugham J.   C
in *Lock* v. *Bell* [1931] 1 Ch. 35, 43.  Stated shortly the proposition is
that at the present time no court will intervene in a case where equity
would not have intervened before 1875.  The principle here is that equity
will not assist a party to perfect an inchoate right.  Thus in the *United
Scientific Holdings* case all that the parties do is to agree to agree a rent.
But a court will not enforce an agreement to agree, nor is this the type of   D
case in which the court will grant specific performance.  It will not grant
specific performance to appoint an arbitrator.

It is emphasised that neither at the present time nor before 1875
was there scope for the intervention of equity in this type of case.  Here
what the landlords are seeking is the relief of equity to create a right,
but neither by way of forfeiture, distraint or trespass was there before
1875 scope for equity to intervene.  Here there are actions for declaratory   E
judgments but a declaratory judgment cannot create substantive rights.
As to declaratory relief, see *Guaranty Trust Co. of New York* v. *Hannay
& Co.* [1915] 2 K.B. 536, 557, 571.  [Reference was made to *Snell's
Principles of Equity,* 27th ed., p. 13.]

The right to increase the rent is in every case a unilateral right or
" if " right and there is no place for equitable intervention until all steps   F
have been taken to create a bilateral obligation at which date the increased
rent becomes payable.

Before 1875 equity could grant its own discretionary remedies, for
example, specific performance: see *Seton* v. *Slade,* 7 Ves.Jun. 265.  It
would also restrain a person from bringing an action at law by common
injunction or restrain a person from raising an inequitable defence: see
*Stewart* v. *Great Western Railway Co.* (1865) 2 De G.J. & Sm. 319.  What   G
equity could not do was to create a legal right where none existed at
law.  The first case to establish this doctrine was *Lord Ranelagh* v. *Melton*
(1864) 2 Dr. & Sm. 278.

It is emphasised that the principle for which the respondents contend
is: Where there is a unilateral contract it cannot be turned into a bilateral
contract unless and until all conditions precedent have been satisfied.   H
Reliance is placed on *Weston* v. *Collins* (1865) 12 L.T. 4, for the state-
ment of principle which is applicable here.  The statement of Maugham
J. in *In re Sandwell Park Colliery Co.* [1929] 1 Ch. 277, 282, that in a

A  conditional contract or a unilateral contract equitable doctrines as to time do not apply was approved in *Aberfoyle Plantations Ltd.* v. *Cheng* [1960] A.C. 115, 125, 126. The question then arises whether the above principle applies where there is a unilateral obligation or right contained in a bilateral contract.

Reliance is placed on *Hare* v. *Nicoll* [1966] 2 Q.B. 130 in support of two propositions: (i) Equity does not create legal rights; (ii) Even if

B  equity could intervene it would not do so in this type of case. [Reference was made to *West Country Cleaners (Falmouth) Ltd.* v. *Saly* [1966] 1 W.L.R. 1485.]

If the House were to state that in an option to renew, unless the strict requirements thereof are complied with it cannot be exercised, nevertheless in a rent review clause stipulations as to time need not be strictly

C  complied with, the House would be drawing unhappy and subtle distinctions where the same principles ought to be applied and the law ought to be certain. The observations of Diplock L.J. in *United Dominions Trust (Commercial) Ltd.* v. *Eagle Aircraft Services Ltd.* [1968] 1 W.L.R. 74, 84c et seq. are adopted.

In the *Cheapside* case, without all the sub-conditions in the rent review clause being satisfied the right to operate the clause does not arise.

D  In the *United Scientific* case, although the rent review clause is expressed as an obligation it is not one of the kind which equity will enforce. The concept of an agreement to agree is not one of which the courts will take cognisance: *Courtney & Fairbairn Ltd.* v. *Tolaini Brothers (Hotels) Ltd.* [1975] 1 W.L.R. 297. It is not part of the respondent's case that the principles of equity and common law were frozen in 1875. It is conceded that both common law and equity were free to develop after that date, but

E  it is the respondent's contention that the Judicature Acts effected a fusion of administration rather than of principles: see *Salt* v. *Cooper* (1880) 16 Ch.D. 544, 549, *per* Jessel M.R. and *Snell's Principles of Equity,* 27th ed., p. 17. Since 1874 the courts cannot apply equitable principles in cases where equity was never concerned before that date. As has been well said the two streams of jurisdiction though they run in the same channel do not

F  mingle their waters.

These are not cases where by notice the tenant can make time of the essence. The history of the doctrine of time being of the essence in relation to sales of land is to be found in *Stickney* v. *Keeble* [1915] A.C. 386, 418. None of what was stated in that case on that question is relevant here where there were no mutual obligations between the parties. In the case of the " if " type of obligation specific performance

G  could never be obtained by the other party serving a notice making time of the essence. Further, in the option cases strictly so called there is no room for a notice to make time of the essence for the party in question is under no necessity to exercise it. Moreover, even if the clause is in the form of a mutual obligation it is of its nature unilateral in character.

Even if there had been scope for equity to intervene nevertheless this

H  is a type of case, commercial in character, where equity would not intervene. In *Reuter, Hufeland & Co.* v. *Sala & Co.* (1879) 4 C.P.D. 239, 249, Cotton L.J. stated that it was dangerous to apply the equitable doctrine that time is not of the essence to a commercial contract. This

**United Scientific v. Burnley Council (H.L.(E.))**                    [1978]

was followed in *Hartley* v. *Hymans* [1920] 3 K.B. 475 and was extended    A
in *Lock* v. *Bell* [1931] 1 Ch. 35 and *Hare* v. *Nicoll* [1966] 2 Q.B. 130.
The Court of Appeal were right in the *Burnley* case in stating that in
general time is of the essence in cases of a commercial character.    The
courts will not declare otiose the careful time table drafted by the parties.
The judgments of the Court of Appeal in both the *United Scientific* and
*Cheapside* cases are adopted.    It is to be noted that they came before two
differently constituted Courts of Appeal.    B

*C. Richards & Son Ltd.* v. *Karenita Ltd.* (1971) 221 E.G. 25 was
an " if " type of clause and there was also a break clause.    *In re Essoldo
(Bingo) Ltd.'s Underlease* (1971) 23 P. & C.R. 1 was (a) an example of a
case where there were no time limits for " the pulling of the trigger ";
(b) Pennycuick V.-C. held that the rent was not payable retrospectively.
As to *Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R.
1296, the existence of a break clause was not fundamental to the decision    C
as has been contended by the present appellants: see pp. 1299H, 1300G,
1302B–D.    In *Imperial Life Assurance Co. of Canada* v. *Derwent Publica-
tions Ltd.* (1972) 227 E.G. 2241, 2245–2247, Whitford J. held that the
time schedule was to be observed.    That was not an " option " but an
automatic revision case.    There was an attempt at " a re-writing of the
bargain between the parties."    Those words apply to the present appellants.    D

As to *C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1 W.L.R.
728, the backdating of the rent was decided on the point that the contract
was commercial in character.    Lord Denning M.R. emphasised, at p. 732,
that the time and manner of the payment was to be ascertained according
to the true construction of the contract, and not by reference to outdated
relics of medieval law.    Rent review clauses are commercial contracts
binding parties strictly to their timing.    In *Kenilworth Industrial Sites Ltd.*    E
v. *E. C. Little & Co. Ltd.* [1974] 1 W.L.R. 1069 Megarry J. dealt with
the question of repugnancy and held that, where no rent was reserved
beyond the first five years of a lease, there was no question of the lease
being rent free from there on; that there was no repugnancy between the
review clause and the proviso thereto and that, since the clause was mere
machinery for fixing the rent for the second and subsequent periods of    F
five years, framed as an obligation and not as an option, the rule for
options requiring strict compliance with conditions did not apply.    In
*Fousset* v. *27 Welbeck Street Ltd.* (1973) 25 P. & C.R. 277, Pennycuick
V.-C.'s decision on the construction of the review clause is difficult to
reconcile with the subsequent decision in *Bailey's* case [1974] 1 W.L.R.
728, 730, 731, 732.    As to *Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1
Ltd.*, 237 E.G. 343, 345, the observations of Lord Salmon support the    G
respondent's argument.    The observance of time limits protects tenants
against a sudden demand for increased rent where the landlord has failed
to follow the prescribed time procedure.

In *Accuba Ltd.* v. *Allied Shoe Repairs Ltd.* [1975] 1 W.L.R. 1559
the fact that the landlord could obtain a review although he was 18
months out of time depended on two errors made by Goff J.: (i) He    H
relied on the *Essoldo* case, 23 P. & C.R. 1, but in that case there was no
time limit prescribed for the appointment of a surveyor; (ii) As Roskill
L.J. observed in the *United Scientific* case [1976] Ch. 128, 153 the judge

A.C.          **United Scientific v. Burnley Council (H.L.(E.))**

A   adopted a hard and fast distinction between " option " cases and
" obligation " cases and elevated that phrase of Megarry J., in *Kenilworth*
[1974] 1 W.L.R. 1069, entirely correct in its context, to a rule of law.
In *Mount Charlotte Investments Ltd.* v. *Leek & Westbourne Building
Society* [1976] 1 All E.R. 890, 892, Templeman J. was right to view with
disfavour the dichotomy which had grown up in the cases between option
and obligation rent revision clauses. As regards *Davstone Holdings Ltd.*
B   v. *Al-Rifai*, 32 P. & C.R. 18 the rent review clause there can be analysed
as a single condition precedent.

   In the *United Scientific* case [1976] Ch. 128 reliance is placed in
particular on the observations of Buckley L.J. at pp. 142H—143C,
144F—145B, of Roskill L.J. at pp. 146E—F, 149A—B, 150B—G, 151A—B, and of
Browne L.J. at pp. 155D—F, 156D—E.

C   Third parties can be affected by a rent review clause, in particular the
original lessee where there has been an assignment, and this affords
another reason why time limits should be strictly observed for there
could well be circumstances where an assignee might be forced into
bankruptcy. *Williams* v. *Greatrex* [1957] 1 W.L.R. 31 affords an object
lesson of what would happen if time was not of the essence in rent review
clauses.

D   If the above contentions be wrong then the question arises which
was not open in the courts below, namely, whether the rent review clause
can have retrospective effect. Rent is not simply a contractual agreement
for the payment of money: see *Halsbury's Laws of England*, 3rd ed.,
vol. 23 (1958), pp. 536, 538, paras. 1193, 1196. The possibility of distrain-
ing is the mark of rent and it has to be certain: *Ex parte Voisey* (1882) 21
Ch.D. 442, 455, 458. Until the rent has been determined by the arbitrator it
E   cannot be certain and therefore it cannot be rent in the strict sense and
therefore the rent review clause cannot be operated retrospectively. This
proposition is supported by *Greater London Council* v. *Connolly* [1970]
2 Q.B. 100, 108, 111, and the *Essoldo* case, 23 P. & C.R. 1, 4, 5. As to
*C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1 W.L.R. 728
there were no possible grounds for Lord Denning M.R. there distinguish-
F   ing as he did the *Greater London Council* case [1970] 2 Q.B. 100. The
idea that rent must be certain is with reference to rent reserved in leases
(terms for years): see *Foa's General Law of Landlord and Tenant*, 8th ed.
(1957), p. 101. . [Reference was also made to section 205 (1), (xxiii) of the
Law of Property Act 1925 and section 3 of the Law of Property Act
1969.]

   *Levy* following, in the *United Scientific* case. Leases of residential
G   property are not of a commercial nature in, view of legislation affecting
residential premises—the Rent Acts. It is leases of business premises
where the parties are at arm's length which are commercial in character.
On the question of time being of the essence, compare the time pro-
visions in the Landlord and Tenant Act 1954. [Reference was made to
*Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296,
H   1302B.]

   This rent review clause enables the landlord to obtain a benefit if
the market value of the property rises.

   *Nugee* following in the *Cheapside* case. The source of the statement

that since the Judicature Acts " the two streams of jurisdiction, though
they run in the same channel, run side by side and do not mingle their     A
waters," is *Ashburner's Principles of Equity,* 2nd ed. (1933), p. 18, repro-
ducing 1st ed. (1902) p. 23.  Reliance was placed on *Snell's Principles
of Equity,* 27th ed., p. 595, but the passage in question is confined
in its ambit by the opening words of para. 7.  Reference was also made
to *Fry on Specific Performance,* 6th ed., p. 500, para. 1072, again that
passage is limited in its ambit by the opening words of the chapter       B
in para. 1071, p. 500.  *Halsbury's Laws of England,* 4th ed., vol. 9,
para. 481, states the law too widely.  It is correctly stated in *Halsbury,*
3rd ed., vol. 8 (1954), para. 280, p. 164.  There is no justification for the
change in language in the 4th edition for there are no intervening cases
to entail any change in the statement of the law.  The passage in the
4th edition is directly contrary to what was stated by Lord Parker of
Waddington in *Stickney* v. *Keeble* [1915] A.C. 386, 417.  Apart from    C
the above statement in *Halsbury,* 4th ed., none of the textbooks states that
the equitable doctrine applies outside the field in which it was applied
before 1875.  The comment on the decision of the Court of Appeal in
the *Burnley* case to be found in 92 L.Q.R. 324 is adopted as part of this
argument.

As to the *Hongkong Fir* case [1962] 2 Q.B. 26, it cannot be applied   D
unless it can be shown to be a case of similar character which it is not.
Mr. Browne-Wilkinson Q.C. is attempting to apply to unilateral obligations
a principle hitherto only applicable to synallagmatic obligations.  The
present is a *United Dominions Trust* case [1968] 1 W.L.R. 74 and not
a *Hongkong Fir* case [1962] 2 Q.B. 26.  Lord Devlin's observations on
options in *Reardon Smith Line Ltd.* v. *Ministry of Agriculture, Fisheries
and Food* [1963] A.C. 691, 729–731, are prayed in aid as being applicable  E
to the present option.  It is a business option that the landlord had here
and its exercise must be communicated to the tenant within the time
prescribed.

It has not been disputed that section 41 of the Law of Property Act
1925 has to be construed in the same manner as section 25 (7) of the
Supreme Court of Judicature Act 1873 and therefore the principles laid   F
down by Lord Parker of Waddington in *Stickney* v. *Keeble* [1915] A.C.
386, 417, apply to section 41 of the Act of 1925.  It is to be noted that
the provisions of section 25 of the Judicature Act 1873 which relate to
property are to be found in the Law of Property Act 1925 whilst those
relating to the administration of justice appear in the Supreme Court of
Judicature (Consolidation) Act 1925.  The respondents' contention is not
that law and equity were frozen in 1875 but that equitable principles   G
will only be developed within the field to which they were applied before
1875.  The statements in *Halsbury's Laws of England,* 1st ed., vol. 7
(1909), p. 413 and 2nd ed., vol. 7, p. 192 are in the same language as is
to be found in *Halsbury,* 3rd ed., vol. 8, p. 164.  It is emphasised that
there is no reported decision which would support the change of language
to be found in *Halsbury,* 4th ed., vol. 9, para. 481.                   H

The principles adumbrated in *Cullimore* v. *Lyme Regis Corporation*
[1962] 1 Q.B. 718, 726 et. seq. are applicable to the arbitration pro-
vision in the rent review clause in the *Cheapside* case for (i) it is a power

A    and prima facie mandatory; (ii) if directory, there must be substantial compliance if the time provisions are to be overlooked.

Conveyancers would be placed in a very difficult position if the appellants' argument be accepted, for their task is to attain precision and to remove uncertainties. For precedents of rent review clause which were current at the date of the making of the *Cheapside* lease, see the *Encyclopaedia of Forms and Precedents*, 4th ed., vol. XI, pp. 300, 301,

B    paras. 8, 10, p. 617; vol. XII, pp. 747, 761, 841, 973. There was no shortage of precedents available if the parties had intended that the landlord should be entitled to an increased rent whether or not he obtained a valuation before March 25, 1975.

In a case where the rent started at £117,000, one should assume that the parties deliberately agreed upon the present clause for the protection of the tenant as a matter of hard commercial bargaining. If equity

C    could ever relieve against a failure to exercise a unilateral right in time, or the common law could ever treat such a failure as non-fundamental, this is the last type of case in which it should do so. Reliance is placed on *The Brimnes* [1975] Q.B. 929, 952, 958, 971, for the correct approach to the construction of the present leases. At the present time there are only two fields in which time is not of the essence, namely, mortgages

D    and contracts for the sale of land. In both there is well-tried machinery for making time of the essence, of a kind that would be quite inappropriate for a rent review clause, which is in its nature unilateral. At the moment conveyancers know where they stand on the drafting and interpretation of rent review clauses. It would cause great uncertainty in thousands of cases if the equitable doctrine was extended to them.

*Francis Q.C.* in reply. The appellants find great difficulty in sub-

E    mitting that the language of section 41 of the Law of Property Act 1925 is different from section 25 (7) of the Supreme Court of Judicature Act 1875, but it is not conceded that the equitable doctrine of time is not of the essence is confined to cases where equity granted specific performance nor does *Stickney* v. *Keeble* [1915] A.C. 386 so decide. See also *Fry on Specific Performance*, 6th ed., para. 1073.

F    Lord Parker of Waddington's observations in *Stickney* v. *Keeble* [1915] A.C. 396, 417, must be considered in relation to the very limited context of that decision. Lord Parker's observations were directed to the argument of the respondents in that case and in relation to a contract for the sale of land. Even at common law the time limit in this case would not be considered essential as going to the root of the matter. This is not in form or substance an option case.

G    *Browne-Wilkinson Q.C.* in reply. Mr. Francis Q.C.'s observations on *Stickney* v. *Keeble* are adopted. It is to be noted that the present respondents' contention based on *Stickney* v. *Keeble* has become wider and wider as the case has progressed.

The respondents are suggesting that if A agrees with B to do something within a specific time then if A defaults equity will intervene to

H    assist B. But equity will not assist if there is no default. Equity, and indeed, the common law, has been developing over the last hundred years and although the two streams since 1874 do not intermingle but flow in separate channels nevertheless they are not frozen.

**A.59**

As to *Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296, although there was a break clause in that lease Mr. Balcombe Q.C. is right in pointing out that it was not the determining feature in that case. It is suggested that the express words of the option were the grounds of the decision and if it goes wider than that then it was wrongly decided.

What sum is payable and when it is payable are questions of construction, but it is said that because the word " rent " is a term of art it cannot be made retrospective beyond the date of quantification. It is important therefore to discover the ambit of the decision in *C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1 W.L.R. 728, 731, 742, if Lord Denning M.R. is right in his approach to the question of construction. In modern law the word " rent " has two meanings: (i) It is a payment issuing out of land recoverable by distraint; (ii) A contractual monetary obligation payment of which is a condition of enjoying possession of the property in question. On the construction of the present clause the new rent is payable as from the review date. For the historical background: see *Foa's General Law of Landlord and Tenant,* 8th ed., pp. 100, 101, para. 163 and *Holdsworth, A History of English Law,* vol. VII, pp. 262–273. It is conceded that in order to recover the rent it had to be by way of distraint: see *Ex parte Voisey,* 21 Ch.D. 442. It is obvious in that case that one cannot recover by distraint something which has not been quantified. Non constat that one cannot recover a sum due by contract when subsequently quantified. The observations of Cotton L.J. in *Walsh* v. *Lonsdale* (1882) 21 Ch.D. 9, 16, are invoked as a parallel to the present case.

As to *Greater London Council* v. *Connolly* [1970] 2 Q.B. 100, 109, 112, it is important to discover what the Court of Appeal had to decide in that case. In the result it will be found that the Court of Appeal did not have to decide what was decided in the *Bailey* case [1974] 1 W.L.R. 728. The *Bailey* case is good law and should be adopted. The proper construction of a lease should not be fettered by a single concept of rent namely, the medieval concept.

*Balcombe Q.C.* in rejoinder. As to *Walsh* v. *Lonsdale,* 21 Ch.D. 9, see *Foa's General Law of Landlord and Tenant,* 8th ed., p. 485, para. 763.

To be a true lease there must be a rent for which there can be a distraint. The word " rent " is a term of art and must bear the same meaning throughout the lease.

Their Lordships took time for consideration.

*March 23, 1977.* LORD DIPLOCK. My Lords, during the last two decades since inflation, particularly in the property market, has been rife, it has been usual to include in leases for a term of years, except when the term is very short, a clause providing for the annual rent to be reviewed at fixed intervals during the term and for the market rent current at each review date if it be higher, to be substituted for the rent previously payable. The wording of such clauses varies; there are several different ones now included in the books of precedents; but a feature common to nearly all of them is that not only do they specify a procedure for the

A   determination of the revised rent by agreement between the parties or, failing that, by an independent valuer or arbitrator, but they also set out a time-table for taking some or all of the steps in that procedure which, if followed, would enable the revised rent to be settled not later than the review date.

The question in both of these appeals, which have been heard together, is whether a failure to keep strictly to the time-table laid down in the
B   review clause deprives the landlord of his right to have the rent reviewed and consequently of his right to receive an increased rent during the period that will elapse until the next review date.

On a number of occasions during the last five years the question whether time was of the essence in a whole variety of rent review clauses has come before the High Court and the Court of Appeal. Until the judg-
C   ments of the Court of Appeal in the instant cases the answers given seem to turn upon fine distinctions between the wording of particular clauses so as to classify them, either on the one hand as conferring upon the landlord a unilateral " option " for the exercise of which time was of the essence, or on the other as merely laying down the machinery for the performance of mutual " obligations " by the tenant as well as by the landlord, in which case time was not of the essence.

D   The suggested dichotomy between the so-called " option " clauses and " obligation " or " machinery " clauses was discarded in each of the instant appeals by Courts of Appeal of different composition. In the first appeal *United Scientific Holdings Ltd.* v. *Burnley Borough Council* [1976] Ch. 128, Buckley, Roskill and Browne L.JJ. in separate judgments held that the commercial character of the contract contained in a lease incorporating a rent review clause raised the presumption that the parties
E   intended time to be of the essence of the contract in respect of each step required to be taken by the landlord in order to obtain a determin-ation of any increased rent under a rent review clause. In the second appeal, Stamp, Scarman and Goff L.JJ. joined in a single judgment in which they also held that prima facie time was of the essence in a rent review clause, but that they preferred to do so not upon the ground of the
F   presumed intentions of the parties, but upon the ground that in its legal nature a rent review clause is a grant of a unilateral right to the landlord and that equity would not have granted relief to the grantee of such a right for failure to perform any of the conditions of the grant timeously.

It is not disputed that the parties to a lease may provide expressly that time is or time is not of the essence of the contract in respect of all or
G   any of the steps required to be taken by the landlord to obtain the determination of an increased rent, and that if they do so the court will give effect to their expressed intention. But many rent review cases that are now maturing do not contain express provision in these terms. What the Court of Appeal have decided is that the commercial nature of the contract and/or the legal nature of the right granted to the land-
H   lord by a rent review clause raises a presumption that time specified in such a clause for anything that needs to be done by him is of the essence; and that this presumption will prevail unless there are strong contra-indications in the actual wording of the clause. They found no sufficient

contra-indications in the rent review clauses which are in question in the
instant appeals.    A

My Lords, the reason why these two appeals have been heard together
in the House although the two rent review clauses that are in question
differ widely in their wording, is to obtain a ruling whether the pre-
sumption as to the construction and effect of rent review clauses is as
the Court of Appeal held it to be, or whether it is the contrary pre-
sumption, viz. that time is not of the essence. I propose accordingly to    B
deal first with that question as a matter of legal principle before turning
to the precise terms of the rent review clauses involved in the two appeals.

I shall have to examine rather more closely what are the legal con-
sequences of " time being of the essence " and time not being of the
essence; but I do not think that the question of principle involved in
these appeals can be solved by classifying the contract of tenancy as
being of a commercial character. In some stipulations in commercial    C
contracts as to the time when something must be done by one of the
parties or some event must occur, time is of the essence; in others it is
not. In commercial contracts for the sale of goods prima facie a stipu-
lated time of delivery is of the essence, but prima facie a stipulated time
of payment is not (Sale of Goods Act 1893, section 10 (1)); in a charter-
party a stipulated time of payment of hire is of the essence. Moreover    D
a contract of tenancy of business premises would not appear to be more
of a commercial character than a contract for sale of those premises.
Nevertheless, the latter provides a classic example of a contract in
which stipulations as to the time when the various steps to complete the
purchase are to be taken are not regarded as of the essence of the
contract.

In the arguments developed before this House the commercial    E
character of the contract of tenancy has played a relatively minor role.
Counsel for all the parties have sought to concentrate your Lordships'
attention upon the " rules of equity " and, in particular, upon the
auxiliary jurisdiction formerly exercised by the Court of Chancery to
grant relief against the strict enforcement in a court of law of a
contractual stipulation as to time.    F

My Lords, if by " rules of equity " is meant that body of substantive
and adjectival law that, prior to 1875, was administered by the Court of
Chancery but not by courts of common law, to speak of the rules of
equity as being part of the law of England in 1977 is about as meaningful
as to speak similarly of the Statutes of Uses or of Quia Emptores.
Historically all three have in their time played an important part in
the development of the corpus juris into what it is today; but to    G
perpetuate a dichotomy between rules of equity and rules of common
law which it was a major purpose of the Supreme Court of Judicature
Act 1873 to do away with, is, in my view, conducive to erroneous
conclusions as to the ways in which the law of England has developed
in the last hundred years.

Your Lordships have been referred to the vivid phrase traceable to    H
the first edition of *Ashburner, Principles of Equity* where, in speaking in
1902 of the effect of the Supreme Court of Judicature Act he says (p. 23)
" the two streams of jurisdiction " (sc. law and equity)—" though they

A run in the same channel, run side by side and do not mingle their waters." My Lords, by 1977 this metaphor has in my view become both mischievous and deceptive. The innate conservatism of English lawyers may have made them slow to recognise that by the Supreme Court of Judicature Act 1873 the two systems of substantive and adjectival law formerly administered by courts of law and Courts of Chancery (as well as those administered by courts of admiralty, probate and

B matrimonial causes), were fused. As at the confluence of the Rhône and Saône, it may be possible for a short distance to discern the source from which each part of the combined stream came, but there comes a point at which this ceases to be possible. If Professor Ashburner's fluvial metaphor is to be retained at all, the waters of the confluent streams of law and equity have surely mingled now.

C Section 25 of the Supreme Court of Judicature Act 1873 took occasion of the union of the several courts whose jurisdiction was thereby transferred to the High Court of Justice, to amend and declare the law to be thereafter administered in England as to several matters. Ten matters were particularly mentioned in subsections (1) to (10). Among them subsection (7) was as follows:

D    " Stipulations in contracts, as to time or otherwise, which would not before the passing of this Act have been deemed to be or to have become of the essence of such contracts in a Court of Equity, shall receive in all courts the same construction and effect as they would have heretofore received in equity."

Subsection (11) contained the final provision:

E    " Generally in all matters not hereinbefore particularly mentioned, in which there is any conflict or variance between the rules of equity and the rules of the common law with reference to the same matter, the rules of equity shall prevail."

The first thing to be observed about each of these subsections is that they are concerned with matters in which before the unifying Act came

F into force there had been a variance between the ways in which they were dealt with in courts of law and courts of equity respectively. Outside the field of mortgages and contracts for the sale of land, there were other kinds of contracts in which by 1875 some stipulations as to time were not treated in courts of law as being " conditions precedent "— which was then the common lawyer's way of saying that the particular stipulation as to time was not of the essence of the contract. For instance,

G that the time of payment in a contract for the sale of goods is not of the essence of the contract unless it is made so by express agreement, was well established in the courts of law 30 years before the Supreme Court of Judicature Act 1873 and 50 years before the Sale of Goods Act 1893: *Martindale* v. *Smith* (1841) 1 Q.B. 389. This was symptomatic of the growing tendency in the courts of common law to adopt a more

H rational classification of contractual stipulations and the consequences of their non-performance than that into which the rules of pleading peculiar to the old forms of action had led them. With the effect that courts of law gave to those stipulations as to time that they did not regard as being

of the essence of the contract, courts of equity before 1873 had no
occasion to interfere by way of equitable relief. Such stipulations were      A
unaffected by section 25 of the Supreme Court of Judicature Act 1873.
Nor did the coming into force of that Act bring to a sudden halt the
whole process of development of the substantive law of England that
had been so notable an achievement of the preceding decades. Yet that
is what it would have done as respects the law of contract if thereafter
whenever the effect of a contractual stipulation as to time or otherwise      B
was in question it were necessary to inquire whether or not a court of
equity would have granted relief against its treatment as a " condition
precedent " in a court of law before 1875.

The contention on behalf of the respondents that this is what your
Lordships ought to do placed great reliance upon some observations of
Lord Parker of Waddington in *Stickney* v. *Keeble* [1915] A.C. 386, 417
where in an action by a purchaser of land for the return of his deposit      C
Lord Parker of Waddington said:

> " If since the Judicature Acts the court is asked to disregard a
> stipulation as to time in an action for common law relief, and it be
> established that equity would not under the then existing circum-
> stances have prior to the Act granted specific performance or
> restrained the action, the section can, in my opinion, have no      D
> application, otherwise the stipulation in question would not, as
> provided in the section, receive the same effect as it would prior
> to the Act have received in equity."

Lord Parker of Waddington's observations were made in relation to
a contract for the sale of land of which the purchaser alleged, successfully
in the result, that the time by which the vendor had to make title had      E
become of the essence as the result of a notice served by the purchaser.
He claimed from the vendor the return of his deposit. The vendor resisted
this upon the ground that the time for completion specified in the
purchaser's notice was unreasonably short and accordingly had not
become of the essence of the contract. This meant that he was claiming
to be still entitled to insist upon the purchaser's completing the purchase.      F
Shortly after action brought, however, he had sold the property to a
third party and so disabled himself by the time of the hearing from
completing the contract with the purchaser. This would have disqualified
him from relief in the Court of Chancery before 1873 against the
purchaser's claim for the return of his deposit. What Lord Parker of
Waddington said was in answer to an argument for the vendor that the
effect of section 25 (7) was to require the court to look only to the      G
position at the date of the issue of the writ in the action and to ignore
anything that had happened afterwards. He was not dealing with the
general question of what stipulations as to time are to be regarded as
being of the essence of the contract.

In 1925 section 25 (7) of the Supreme Court of Judicature Act 1873
was replaced by section 41 of the Law of Property Act 1925. The wording      H
differs slightly:

> " Stipulations in a contract, as to time or otherwise, which according
> to rules of equity are not deemed to be or to have become of the

A    essence of the contract, are also construed and have effect at law in accordance with the same rules."

The Law of Property Act 1925 was a consolidation Act. It re-states the law as it had been declared in 1873 but substitutes a reference to "rules of equity" for the reference to a court of equity which had been abolished as a separate court more than 50 years before. I have already commented upon the danger of treating the use of this expression today as anything more than an indication of the source to which a current rule of the substantive or adjectival law of England can be traced. The change in wording in the substituted section does not in my view make any difference to its substance. It makes it clear that there should continue to be, as there had been since 1875, only one set of rules for judges to apply in determining whether a particular stipulation as to time or otherwise was of the essence of a contract. It places no ban upon further development of the rules by judicial decision.

My Lords, the rules of equity, to the extent that the Court of Chancery had developed them up to 1873 as a system distinct from rules of common law, did not regard stipulations in contracts as to the time by which various steps should be taken by the parties as being of the essence of the contract unless the express words of the contract, the nature of its subject matter or the surrounding circumstances made it inequitable not to treat the failure of one party to comply exactly with the stipulation as relieving the other party from the duty to perform his obligations under the contract. The Court of Chancery had reached this position in relation to contracts for the sale of land by the extension by Lord Eldon L.C. of the earlier doctrine that a stipulation as to the time of repayment by the mortgagor under a legal mortgage was not of the essence of the contract so as to entitle the mortgagee to refuse to reconvey the property if payment with interest was tendered after the stipulated date was passed: *Seton* v. *Slade* (1802) 7 Ves.Jun. 265.

Contemporaneously with this development of the rules of equity by the Court of Chancery, the courts of common law were in process of developing for themselves a not dissimilar rule in relation to stipulations as to time in other contracts, but were reaching their solution by a different route. They did so by a growing recognition of exceptions to the rule which had been fostered in the early part of the 18th century by the necessity for the plaintiff under the then current rules of pleading to aver performance or willingness or ability to perform all stipulations on his part in the precise words in which they were expressed in the contract. This rule treated all promises by each party to a contract as "conditions precedent" to all promises of the other: with the result that any departure from the promised manner of performance, however slight that departure might have been, discharged the other party from the obligation to continue to perform any of his own promises. The history of the development by common law courts of exceptions to this rule is traced in the judgments of the Court of Appeal in *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26 from its origin in *Boone* v. *Eyre*, 1 Hy.Bl. 723n. in 1779 to the judgment of Bramwell B. in *Jackson* v. *Union Marine Insurance Co. Ltd.* (1874) L.R.

A.59

**Lord Diplock      United Scientific v. Burnley Council (H.L.(E.) )      [1978]**

10 C.P. 125, 147 on the eve of the coming into force of the Supreme
Court of Judicature Act 1873.

    My Lords, I will not take up time in repeating here what I myself
said in the *Hongkong Fir* case, except to point out that by 1873:

    (1) Stipulations as to the time at which a party was to perform a
promise on his part were among the contractual stipulations which
were not regarded as " conditions precedent " if his failure to perform
that promise punctually did not deprive the other party of substantially
the whole benefit which it was intended that he should obtain from
the contract;

    (2) When the delay by one party in performing a particular promise
punctually had become so prolonged as to deprive the other party of
substantially the whole benefit which it was intended that he should
obtain from the contract it did discharge that other party from the
obligation to continue to perform any of his own promises which as
yet were unperformed;

    (3) Similar principles were applicable to determine whether the
parties' duties to one another to continue to perform their mutual
obligations were discharged by frustration of the adventure that was
the object of the contract. A party's ability to perform his promise
might depend upon the prior occurrence of an event which neither he
nor the other party had promised would occur. The question whether a
stipulation as to the time at which the event should occur was of the
essence of the contract depended upon whether even a brief postpone-
ment of it would deprive one or other of the parties of substantially
the whole benefit that it was intended that he should obtain from the
contract.

    In one respect the Court of Chancery had introduced a refinement
in the way it dealt with stipulations as to time in contracts for the sale
of land, which had no close counterpart in the rules that had by 1873
been adopted in the courts of common law. Once the time had elapsed
that was specified for the performance of an act in a stipulation as to
time which was not of the essence of the contract, the party entitled
to performance could give to the other party notice calling for
performance within a specified period: and provided that the period
was considered by the court to be reasonable, the notice had the effect
of making it of the essence of the contract that performance should
take place within that period. Hence the reference in the statutory
provisions that I have cited to time being deemed to " have become "
of the essence of the contract.

    Both in the Court of Chancery and in the courts of common law the
rules that have been developed about particular stipulations not being
of the essence of the contract or not being " conditions precedent "
applied to synallagmatic contracts only. They did not apply to unilateral
or " if contracts," of which the example most germane to the instant
appeals is an option. As pointed out by Lord Denning M.R. in *United
Dominions Trust (Commercial) Ltd.* v. *Eagle Aircraft Services Ltd.*
[1968] 1 W.L.R. 74, 81 where speaking of options to purchase real or
personal property or to renew a lease, he said:

A.C.          United Scientific v. Burnley Council (H.L.(E.) )          **Lord Diplock**

A
"In point of legal analysis, the grant of an option in such cases, is an irrevocable offer (being supported by consideration so that it cannot be revoked). In order to be turned into a binding contract, the offer must be accepted in exact compliance with its terms. The acceptance must correspond with the offer."

B
Exact compliance with the terms of the offer in an "if contract" had been required in courts of equity as well as in courts of common law: see *Weston* v. *Collins* (1865) 12 L.T. 4; *Finch* v. *Underwood* (1876) 2 Ch.D. 310. A rationale of the distinction which was drawn between the two kinds of contracts in courts of equity is that equity was concerned with the performance of contracts into which parties had already entered. It did not force any person to enter into a contract with another.

C
Again I will refrain from repeating the more elaborate juristic analysis of the distinction between the two types of contract that I attempted in the *United Dominions Trust* case [1968] 1 W.L.R. 74, 83–84. A more practical business explanation why stipulation as to the time by which an option to acquire an interest in property should be exercised by the grantee must be punctually observed, is that the

D
grantor, so long as the option remains open, thereby submits to being disabled from disposing of his proprietary interest to anyone other than the grantee, and this without any guarantee that it will be disposed of to the grantee. In accepting such a fetter upon his powers of disposition of his property, the grantor needs to know with certainty the moment when it has come to an end.

E
My Lords, although a lease is a synallagmatic contract it may also contain a clause granting to the tenant an option to obtain a renewal of the lease upon the expiration of the term thereby granted. Such a clause provides a classic instance of an option to acquire a leasehold interest in futuro, and it is well established that a stipulation as to the time at which notice to exercise the option must be given is of the essence of the option to renew. Although your Lordships have not been

F
referred to any direct authority upon the converse case of a "break clause" granting to the tenant an option to determine his interest in the property and his contractual relationship with the landlord prematurely at the end of a stated period of the full term of years granted by the lease, there is a practical business reason for treating time as of the essence of such a clause, which is similar to that applicable to an option to acquire property. The exercise of this option by the tenant

G
will have the effect of depriving the landlord of the existing source of income from his property and the evident purpose of the stipulation as to notice is to leave him free thereafter to enter into a contract with a new tenant for a tenancy commencing at the date of surrender provided for in the break clause.

The rent review clauses that have given rise to the two instant

H
appeals, as well as nearly all those which have been considered in the reported cases, if they result in any alteration of the rent previously payable can only have the effect of providing for the payment of a higher rent than would be payable by the tenant if the review clause

A.C. 1978—34

Lord Diplock      United Scientific v. Burnley Council (H.L.(E.) )          [1978]

had not been brought into operation. So the only party who can benefit
from a review of rent under these clauses is the landlord. It is accordingly    A
unlikely that the tenant would take the initiative in obtaining a review
of the rent, even where the clause contains provision for his doing so—as
it does in the second of the instant appeals.

   It was this concentration of initiative and benefit in the landlord that
led the Court of Appeal in the second appeal to regard the rent review
clause as conferring upon the landlord a unilateral right to bring into       B
existence a new contractual relationship between the parties. This they
regarded as sufficiently analogous to an option, to make time of the
essence of the occurrence of each one of the events in the time-table
laid down in a review clause for the determination of the new rent. For
my part, I consider the analogy to be misleading. The determination of
the new rent under the procedure stipulated in the rent review clause        C
neither brings into existence a fresh contract between the landlord and
the tenant nor does it put an end to one that had existed previously.
It is an event upon the occurrence of which the tenant has in his existing
contract already accepted an obligation to pay to the landlord the rent
so determined for the period to which the rent review relates. The
tenant's acceptance of that obligation was an inseverable part of
the whole consideration of the landlord's grant of a term of years of the     D
length agreed. Without it, in a period during which inflation was
anticipated, the landlord would either have been unwilling to grant a
lease for a longer period than up to the first review date or would have
demanded a higher rent to be paid throughout the term than that
payable before the first review date. By the time of each review of rent
the tenant will have already received a substantial part of the whole         E
benefit which it was intended that he should obtain in return for his
acceptance of the obligation to pay the higher rent for the succeeding
period.

   My Lords, I see no relevant difference between the obligation under-
taken by a tenant under a rent review clause in a lease and any other
obligation in a synallagmatic contract that is expressed to arise upon
the occurrence of a described event, where a postponement of that            F
event beyond the time stipulated in the contract is not so prolonged as
to deprive the obligor of substantially the whole benefit that it was
intended he should obtain by accepting the obligation.

   So upon the question of principle which these two appeals were
brought to settle, I would hold that in the absence of any contra-
indications in the express words of the lease or in the interrelation of     G
the rent review clause itself and other clauses or in the surrounding
circumstances the presumption is that the time-table specified in a rent
review clause for completion of the various steps for determining the
rent payable in respect of the period following the review date is not
of the essence of the contract.

   I then turn to the rent review clauses in the instant appeals.           H

(1) *United Scientific Holdings Ltd.* v. *Burnley Borough Council.*

The lease was a building lease for the term of 99 years from August

A.C.          United Scientific v. Burnley Council (H.L.(E.))          Lord Diplock

A 31, 1962. By the reddendum the tenant undertook to pay during the
first 10 years of the term and " thereafter during the residue of the said
term the yearly rent of One thousand pounds plus any additional rent
payable under the provisions contained in the schedule hereto." The
schedule was as follows:

B
" During the year immediately preceding the period of the second
10 years of the said term and during the year immediately preceding
each subsequent 10 year period of the said term and during the
year immediately preceding the last nine year period of the said
term (each of such periods being hereinafter referred to as a
' relevant period ') the corporation and the lessee shall agree or
failing agreement shall determine by arbitration the sum total of
the then current rack rent (which expression ' rack rent ' shall for
C the purposes of this schedule be deemed to mean the full annual
value of the property and of all buildings and erections thereon
and appurtenances thereto and including all improvements carried
out to the same calculated on the basis of all rates taxes repairs
and other outgoings being borne wholly by the occupier thereof)
reasonably to be expected on the open market for leases of the
property and all buildings and erections thereon and one quarter
D of the sum total so ascertained or One thousand pounds (whichever
is the greater) shall be the rate of rent reserved by this lease in
respect of the then next succeeding relevant period. All arbitrations
under or by virtue of this schedule shall be referred to the decision
of a single arbitrator to be agreed by the parties hereto or failing
their agreement thereon shall be referred to the decision of a
E person to be nominated by the President for the time being of the
Royal Institute of Chartered Surveyors and such reference shall
be deemed to be a submission to arbitration within the meaning of the
Arbitration Act 1950 or any statutory modification or re-enactment
thereof for the time being in force."

The only stipulation as to time is that the rent for each successive
F period of 10 years of the term commencing on August 25 is to be
determined (by agreement or failing agreement by arbitration) " during
the year immediately preceding " the 10 year period to which that rent
will relate.

If the new rent has not been determined by the stipulated date, what
is the benefit that it was intended the tenant should obtain from the
contract but of which he will have been deprived by its not being
G determined until later? The Court of Appeal took the view that it
was a detriment to the tenant not to know what his new rent was going
to be in advance of the date when it started to accrue, as he might not
be able to afford the additional rent and might feel compelled to assign
the residue of the term to someone else. For my part, I find this
unrealistic, if only because under this particular clause the tenant can
H initiate the review procedure himself and unless there is some unforeseen
delay on the part of the arbitrator, has it in his power to ensure that
the new rent is determined before the stipulated date. Apart from this,
delay in the determination of the new rent until after the first rent day

Lord Diplock    **United Scientific v. Burnley Council (H.L.(E.) )**                    [1978]

following the stipulated date works to the economic benefit of the tenant    A
since until the higher rent has been determined he has the use of the
money representing the difference between the former rent and the
new rent which he would otherwise have been compelled to pay.

The absence of any serious detriment to the tenant if the
determination of the new rent is postponed until some time after the
commencement of the 10 year period to which it will relate is to be
contrasted with the detriment to the landlord if strict adherence to the    B
date specified in the review clause is to be treated as of the essence of
the contract. If it were determined even slightly late the landlord would
lose his right to the additional rent for the whole period of 10 years
until the next review date.

So far from finding any contra-indications to displace the presumption
that strict adherence to the time-table specified in this rent review clause    C
is not of essence of the contract, the considerations that I have
mentioned appear to me to reinforce the presumption.

In these circumstances I do not find it necessary to say more about
the facts of the case. It is not disputed that if time was not of the
essence of the stipulations in the review clause the appellant landlord
is entitled to a declaration that upon the true construction of the lease
and in the events that have happened the annual rent reserved for the    D
10 year period starting on August 31, 1972, should be a rent determined
in accordance with the review clause.

I would accordingly allow this appeal and so declare.

(2) *Cheapside Land Development Co. Ltd.* v. *Messels Service Co.*

This was a lease for a term of 21 years from April 8, 1968. For the    E
first period of seven years the rent was £117,340 per annum payable in
arrear on the usual quarter days. For the second and third periods
of seven years the respective rents were to be determined in accordance
with the provisions of the second schedule to the lease.

The schedule contained a definition of " the market rent " and
defined the " review date " as meaning in respect of the second period
April 8, 1975. The provisions relating to the determination of the yearly    F
rent in respect of the second period were as follows:

" 2. In respect of (i) the second period of the said term the yearly
rent shall be the sum of One hundred and seventeen thousand
three hundred and forty pounds (£117,340) or a sum equal to the
market rent (if duly determined in the manner hereinafter set out)
whichever shall be the higher.    G

3. The market rent may be determined and notified to the lessees
in the manner following : (*a*) the proposed rent shall be specified
in a notice in writing (' the lessors' notice ') served by the lessors or
their surveyor on the lessees not more than 12 months nor less than
six months prior to the review date. (*b*) the lessees may within one
month after service of the lessors' notice of the proposed rent serve    H
on the lessors a counter-notice (' the lessees' notice ') either agreeing
the proposed rent or specifying the amount of rent which the lessees
consider to be the market rent for the period in question.    (*c*) in

A.C.                United Scientific v. Burnley Council (H.L.(E.))        Lord Diplock

A    default of service of the lessees' notice or in default of agreement
     as to the market rent to be payable for the period in question
     the rent shall be valued by a Fellow of the Royal Institution
     of Chartered Surveyors agreed between the lessors and the lessees
     or in default of agreement to be appointed not earlier than two
     months after service of the lessors' notice on the application of the
     lessors by the President for the time being of the said Institution
B    whose valuation shall be made as an expert and not as an arbitrator
     and shall be final and binding upon the lessors and the lessees and
     shall be given in writing to the lessors and the lessees not less than
     14 days before the review date."

     These provisions contain an elaborate time-table as to what is to be
done in various eventualities, not only by the landlord and tenant but
C  also by persons over whom neither has any control—the President of the
Royal Institution of Chartered Surveyors and whatever fellow of the
Institution may be appointed as valuer.
     The procedure for determining the market rent has to be initiated by
the landlord: by a " lessor's notice " specifying the rent which he pro-
poses. This must be served between 12 and six months before the review
D  date and constitutes an offer, irrevocable for one month during which the
tenant may accept the landlord's proposal or to make a counter-offer.
At least two months are to be allowed after service of the lessor's notice
for negotiating an agreement as to the rent or upon a F.R.I.C.S. to be
appointed to determine the rent as an expert valuer. If these negotiations
fail the landlord after the two months have elapsed may apply to the
President of the R.I.C.S. to appoint a valuer and the valuer must notify
E  both landlord and tenant of his valuation not less than 14 days before
the review date.
     In two respects under the terms of the review clause the progress of
the procedure for determining the new rent is, or may become, within
the exclusive control of the landlord. He alone can initiate the procedure;
and he alone can apply to the President of the R.I.C.S. if negotiations with
F  the tenant do not result in an agreement as to the rent or upon the
person who is to value it.
     The tenant's position under this clause thus differs from that of
the tenant under the rent review clause that is the subject of the first
appeal inasmuch as he has no right under his contract to initiate the
procedure or to apply for the appointment of a valuer if the landlord
himself fails to do so within the stipulated times. But this difference
C  has not in my view any significant practical consequences so far as
concerns any detriment to the tenant from the landlord's failure to do
either of these things within the stipulated times. If the tenant reckons
that the advantage of knowing before the review date exactly how much
higher his new rent will be outweighs the economic benefit of having the
use of the money representing the difference until the new rent has been
H  determined, he has the remedy in his own hands. Quite apart from the
fact that he can get a pretty good idea of what the market rent is from
his own surveyor or can himself offer to enter into negotiations with the
landlord before the stipulated time for serving a lessor's notice has

A   expired, so soon as that time has elapsed he can give to the landlord
notice specifying a period within which he requires the landlord to serve
a lessor's notice if he intends the market rent to be determined and
payable instead of the former rent for the ensuing seven years. The
period so specified, provided that it is reasonable, will become of the
essence of the contract. The fact that the tenant had previously pressed
the landlord to start negotiations before the end of the period specified
in the rent review clause for service of a lessor's notice or that the
B   determination of the rent before the review date was specially important
to him, would be relevant facts in determining whether the period
specified by the tenant was reasonable (*Stickney* v. *Keeble* [1915] A.C.
386 *per* Lord Parker of Waddington at pp. 418–419); and in view of the
ease with which the landlord could comply with the requirement a
notice fixing a very short period would no doubt suffice to make time
C   become of the essence.

So here again I find nothing to displace the presumption that strict
adherence to the time-table specified in the rent review clause is not of
the essence of the contract.

In fact, the landlords did give a lessor's notice in respect of the
period starting on April 8, 1975, within the times specified in the contract.
D   Negotiations between the parties followed; but no agreement was reached
either as to the new rent or upon a valuer to determine it. The only
delay that occurred was in the landlord's application to the President of
the R.I.C.S. to appoint a valuer. He did not apply until June 25, 1975.
In view of the previous decisions of the courts as to time being of the
essence in rent review clauses, the President of the R.I.C.S. was unwilling
to comply with this request without a ruling by the court that it was a
E   valid and effective application for the purposes of paragraph 3 (c) of
the relevant rent review clause. On June 27, 1975, the landlords issued an
originating summons claiming a declaration to this effect and a declaration
that the valuation of a fellow of the R.I.C.S. appointed pursuant to the
application would be valid and binding on the tenant notwithstanding that
it would not be given until after March 27, 1975, i.e. 14 days before the
F   review date.

Graham J. made declarations accordingly. He held, as I think
wrongly, that the time for service of a lessor's notice was of the essence
of the contract, but this stipulation had been complied with. The time
for applying to the President of the R.I.C.S. for the appointment of a
valuer he held, as I think rightly, was not of the essence.

G   *Date from which new rent payable*

The landlords also sought a declaration that the market rent as
determined by the valuer, if higher than £117,340 per annum, would be
recoverable with effect from April 8, 1975, i.e., restrospectively to the
review date.

H   Graham J. following the decision of the Court of Appeal in *C. H.
Bailey Ltd.* v. *Memorial Enterprises Ltd.* [1974] 1 W.L.R. 728 held
that the rent would be payable restrospectively. That case had overruled
a decision to the contrary given by Sir John Pennycuick V.-C. in *In re*

A  *Essoldo (Bingo) Ltd.'s Underlease* (1971) 23 P. & C.R. 1 upon the ground
that the legal nature of rent required that it should be certain at the time
when it accrued due, so that a payment for the use of land that was
fixed retrospectively could not be " rent."

My Lords, the mediaeval concept of rent as a service rendered by the
tenant to the landlord has been displaced by the modern concept of a
payment which a tenant is bound by his contract to pay to the landlord
B  for the use of his land. The mediaeval concept has, however, left as its
only surviving relic the ancient remedy of distress. To attract the remedy
of distress rent must be certain at the time that it falls due. *Ex parte
Voisey* (1882) 21 Ch.D. 442 was a case about the validity of a distress
for a fluctuating rent and what was said there about the necessity for
certainty in the amount payable was in relation to what may be
C  conveniently referred to as " distrainable rent " in order to distinguish
it from any other part of the rent (in its modern sense) that the tenant
has agreed to pay the landlord for the use of his land, but for which the
remedy of distress is not available. In the famous case of *Walsh* v.
*Lonsdale* reported in the same volume of the Law Reports (at p. 9) there
were two elements in the rent, one part fixed in advance and was
certain at the time that it accrued, the other part was fluctuating and
D  could not be ascertained until the end of the period in respect of which
it was payable. The actual decision of the Court of Appeal was that the
fixed part or minimum rent could be distrained for, but that the fluctuat-
ing part could not. It was taken for granted that the fluctuating amount
could be sued for once it had been ascertained.

My Lords, under the rent review clause in the instant case the market
E  rent as determined in accordance with the provisions of the clause if
higher than £117,340 per annum is expressed to be payable " in respect
of the second period," viz. the seven years starting on April 8, 1975.
Until the market rent has been ascertained the landlords can only
recover rent at the rate of £117,340 per annum, which corresponds to the
minimum rent in *Walsh* v. *Lonsdale.* It is only when the market rent
has been determined and turns out to be higher than £117,340 that the
F  landowner can recover on the rent day following such determination
the balance that has been accruing since April 8, 1975. Therein lies the
economic advantage to the tenant of delay in the determination of the
market rent to which I have previously referred.

The Court of Appeal reversed the order made by Graham J. For the
reasons I have given, I would restore his order and allow this appeal too.

G
*The previous cases*

It may be convenient to conclude by referring briefly to the more
important of the previous decisions which should be regarded as over-
ruled or as approved by your Lordships' decision in the two instant
appeals.

H  *Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R.
1296 may be regarded as the origin of the dichotomy between " option "
on the one hand and " obligation " or " machinery " on the other: the
word option having been used in the lease itself to describe the landlord's

right to require the rent to be reviewed. It should be treated as overruled.
There was a complication in that the rent review clause was associated
with a break clause which gave to the tenant the right to surrender the
residue of the term on any rent review day by giving prior notice. The
time-table in the rent review clause for the determination of the new rent
was obviously correlated with the time by which the tenant had to give
notice of his intention to surrender, so as to enable him to make his
decision whether or not to exercise that right in the knowledge of what the
new rent would be if he continued in possession after the review date. Had
that been all, as it had been in the previous and rightly decided case of
*C. Richards & Son Ltd.* v. *Karenita Ltd.* (1971) 221 E.G. 25, it would, I
think have been sufficient by necessary implication to make time of the
essence of the rent review clause because of its inter-relation with the
time by which notice was to be given under the break clause—a time
which, for reasons I have given earlier, I consider to be of the essence of
the contract.

In *Samuel Properties (Developments) Ltd.* v. *Hayek,* however, the
break clause itself contained a provision under which the period during
which the tenant could exercise his right to surrender would be extended
in the event of the reviewed rent not having been ascertained within
the time stipulated in the rent review clause. So the implication that
would otherwise have arisen from the association of the rent review
clause with a break clause was negatived.

*Kenilworth Industrial Sites Ltd.* v. *E. C. Little & Co. Ltd.* [1975] 1
W.L.R. 143 is an example of a rent review clause which was treated as
falling on the obligation or machinery side of the supposed dichotomy
so time was held not to be of the essence. The decision itself was right.
A similar decision was reached in *Accuba Ltd.* v. *Allied Shoe Repairs
Ltd.* [1975] 1 W.L.R. 1559 by classifying the stipulations as to time
as " mere machinery." Again the decision was right though the actual
reasoning in both these cases in so far as it was based on the supposed
dichotomy should no longer be considered as correct.

The remaining cases to which this House was referred in which time
has been held to be of the essence of a rent review clause which was not
associated with a break clause should be regarded as overruled.

I would express the hope that your Lordships' decisions in these
appeals will reduce the number of occasions on which it will be necessary
to have recourse to the courts in order to ascertain whether delay has
deprived the landlord of his right to have the rent reviewed under particular
rent review clauses. Delays are prone to occur when such clauses provide,
as most of them sensibly do, for negotiations to take place between the
parties before recourse to independent arbitration or valuation. However,
the best way of eliminating all uncertainty in future rent review clauses is
to state expressly whether or not stipulations as to the time by which
any step provided for by the clause is to be taken shall be treated as
being of the essence.

VISCOUNT DILHORNE. My Lords, I have had the advantage of reading
the speeches in draft of my noble and learned friends, Lord Diplock and

A.C.        United Scientific v. Burnley Council (H.L.(E.))    Viscount Dilhorne

A    Lord Simon of Glaisdale. I do not think that any useful purpose would
be served by my attempting the task they have accomplished so well of
tracing the historical development of the common law and equity before
and after 1873.

I agree with them in thinking that the effect of section 25 (7) of the
Supreme Court of Judicature Act 1873 was that from the time when
that Act came into force, stipulations as to time in contracts were to be
B    treated as they were in courts of equity; and in thinking that the scope of
that subsection was not narrowed by the observations of Lord Parker
of Waddington in *Stickney* v. *Keeble* [1915] A.C. 386, 417.

In *Parkin* v. *Thorold* (1852) 16 Beav. 59, 65 Sir John Romilly M.R.
said that under the doctrine of a court of equity:

"time is held to be of the essence of the contract . . . only in cases
C    of direct stipulation, or of necessary implication. The cases of
direct stipulation are, where the parties to the contract introduce a
clause expressly stating, that time is to be of the essence of the
contract. The implication that time was of the essence of the
contract is derived from the circumstances of the case . . . It is
needless to refer to the authorities, which are numerous, to support
these propositions."

D
Section 25 (7) of the Supreme Court Judicature Act 1873 was replaced
by section 41 of the Law of Property Act 1925 which was to the same
effect.

I agree too that the law in relation to such stipulations in contracts
is correctly stated in *Halsbury's Laws of England,* 4th ed., vol. 9 (1974),
para. 481: see also *Fry on Specific Performance*, 6th ed. (1921), p. 502.
E
In the *Burnley* appeal, Buckley L.J. was prepared to assume that
the equitable rules that time was not of the essence of the contract
unless that was expressly provided in the contract or the circumstances
and nature of the contract were such that that intention was to be
imputed to the parties, applied to all kinds of contracts; and Roskill L.J.
said [1976] Ch. 128, 147, that the right question to ask was whether:

F    "upon the true construction of the particular clause, did the parties
intend that the particular stipulations as to time must be strictly
adhered to or not; or if, as happens in so many cases, the parties
have not expressly dealt with this question, must there be imputed
to the parties an intention that the particular stipulations as to time
must be strictly adhered to or not? "

G    The Court of Appeal in that appeal held that such an intention was to
be imputed in relation to the time stipulation then under consideration.
The leases granted by the Burnley Corporation were for 99 years at a
minimum rent of £1,000 a year payable half yearly in arrear " plus any
additional rent payable under the provisions " in a schedule to one of
the two leases. That schedule provided that the rent should be reviewed
H    during the year preceding the second and every subsequent 10 year period
of the term and during the year preceding the final nine years. The
parties were to agree the then current rack rent, and in default of agree-
ment that was to be determined by arbitration. One quarter of the rack

rent or £1,000 whichever was the greater, was to be the rent under each
lease for the ensuing period.

A

The parties to these leases thus agreed that there should be rent
reviews at fixed intervals. Leases which so provide are in my opinion
to be distinguished from those which provide for a rent review only if
one is initiated by the lessor.

Importance appears to have been attached in the Court of Appeal
to a rent review only operating to the financial advantage of the lessor.
In fact in the *Burnley* case the rent review might operate to reduce the
rent for one 10 year period below that payable in the preceding 10
years if the current rack rent fell. But I do not think it true to say that
a rent review clause, if its operation can only lead to an increase in rent,
only operates to the financial advantage of the lessor. If he is not
prepared to agree to the inclusion of such a clause in the lease, a tenant
may find a landlord unwilling to let except at a higher rent than he
would demand if there was a review clause, in order to secure some
protection against the effect of inflation during the currency of the
lease. Indeed, in the absence of a review clause, the tenant may find a
landlord unwilling to let for the term he desires.

B

C

I do not myself think it of any significance in considering whether
time was of the essence in relation to a stipulation if a rent review
could only lead to an increase in rent, for I do not think that the
likely result of a rent review is any ground for imputing to the parties
an intention that time should be of the essence. In the *Burnley* case
the clause was clearly intended to secure that the ground rent should
be kept in line with the current rack rent and in the *Cheapside* case, that
the rent should be brought up to the current market rent. In neither
case could the lessor impose any rent he wished.

D

E

The Court of Appeal in the *Burnley* case thought that such an
intention was to be imputed on account of the commercial character
of the leases. My noble and learned friend Lord Diplock has demon-
strated that it does not suffice to attach that label to infer that time is
of the essence.

The parties in the *Burnley* case undoubtedly desired that the review
should be completed in the year preceding the commencement of a 10
year period and of the final nine years but I do not see any reason for
imputing to them an intention that time should be of the essence, an
intention that there should be no change in the rent for the next 10
years if the current rack rent was determined, it might be only a day,
after the expiry of that year. They would naturally seek to reach
agreement as to the current rack rent. Negotiations between them
might take some time. Failing agreement, they were to agree upon an
arbitrator. Failing agreement as to an arbitrator, they had to secure
the nomination of one by the President of the Royal Institution of
Chartered Surveyors and then there would be the arbitration. After
the hearing some time might elapse before the arbitrator made his
award. For circumstances beyond the lessors' control delivery of the
award might be delayed beyond the year. It is most unlikely in these
circumstances that the lessors, if they had been asked at the time the

F

G

H

A.C.         United Scientific v. Burnley Council (H.L.(E.))   Viscount Dilhorne

A   leases were entered into to agree that time should be of the essence, would ever have agreed to that and I see no reason for imputing to them an intention which no reasonable landlord would have had.

Importance was attached in the Court of Appeal to the tenant knowing, before the new period started, what was to be the rent for that period. I do not think that much, if any, importance should be attached to this for the tenant could easily find out what approximately
B   the current rack rent for the properties might be.

In my opinion the imputation of any such intention to the parties to a lease containing a review clause intended to operate at stated periods is unwarranted.

The *Cheapside* appeal is more complicated. There the lease provided that if there was to be a rent review, it had to be initiated by the lessors.
C   They had to serve a notice on the lessees stating the proposed rent " not more than 12 months nor less than six months prior to the review date," those dates being April 8, 1975, and April 8, 1982.

I do not consider it to be an incorrect use of the English language to say that under this lease the lessors had an option. But it was an option of a very different character from an option to purchase property. It was an option to initiate machinery not to secure or to extend an
D   interest in land, but merely to secure a variation of a term of the lease. For the reasons given by my noble and learned friend, Lord Simon of Glaisdale, it should not be equated with an option to purchase.

In this appeal the lessors gave a notice in accordance with the requirements of the lease and so in this appeal no question arises as to whether time was of the essence in relation to the giving of the
E   lessors' notice. Until that notice was given, the lessees would not know that there was to be a rent review. Until then they need not concern themselves about the current market rent nor need they incur expense in obtaining advice with regard thereto. If the parties when they entered into the lease had been asked whether they thought it essential that the lessors' notice should be given within the stipulated period, I think that
F   they would have answered in the affirmative. I recognise of course that this would mean that if the notice was served a day late, the consequences to the lessors would be serious but it lay entirely within the lessors' power to serve the notice within that period whereas it does not lie within their power to secure that a valuation made by a valuer was made within the time stipulated.

While, as I have said, the question whether time was of the essence
G   in relation to the lessors' notice does not have to be decided in this appeal, I differ from my colleagues in that I think that where a rent review has to be initiated by a lessor and is not automatic, then time is of the essence when it is provided that that notice initiating the review has to be given by a certain date.

Under the lease in the *Cheapside* case the lessees could serve a
H   counter notice on the lessors within one month after service of the lessors' notice. They did not do so. If the market rent was not agreed, it was to be valued by a fellow of the Royal Institution of Chartered Surveyors agreed on by the parties. If they did not agree on one, then

Viscount Dilhorne   **United Scientific v. Burnley Council (H.L.(E.))**   [1978]

one was to be appointed by the President of the Royal Institution of
Chartered Surveyors " not earlier than two months after service of the
lessors' notice on the application of the lessors." The clause did not
provide that the application had to be made before a certain date. The
schedule to the lease also provided that that valuation should be given
" to the lessors and the lessees not less than 14 days before the review
date."

The question for decision in this appeal is whether this time stipulation
was of the essence. There was no valuation not less than 14 days before
April 8, 1975, and it is now consequently contended that the rent cannot
be reviewed.

Again it is clear that both parties desired that the valuation should,
if they failed to agree the market rent, be received by them not less
than 14 days before any increased rent became payable but again I see
no reason for imputing to them the intention that if that did not happen,
no rent review should take place even if the valuation was received only
one day late with the consequence that for the next seven years the
lessees would continue to enjoy the occupation of the property at a
rent which might be considerably less than the market rent. In relation
to this stipulation in my opinion the claim that time was of the essence
fails.

I agree with what my noble and learned friend Lord Diplock has
said with regard to the dates from which the revised rents would be
payable and with his observations on the earlier cases.

For the reasons I have stated, in my opinion these appeals should be
allowed.

LORD SIMON OF GLAISDALE.

I.

My Lords, I have had the privilege of reading in draft the speech
delivered by my noble and learned friend on the Woolsack. I agree with
his arguments culminating in the propositions that, in general, in modern
English law time is prima facie not of the essence of a contract, and that
there is nothing in the two leases the subject of the instant appeals which
rebuts that presumption so as to make the stipulations as to time essential
to the operation of their rent review clauses.

The respective outlooks of the old common law and equity on
contractual stipulations as to time diverged owing to their different
historical developments. Where A sought in a court of common law
to enforce against B a promise which B had made to him, A had to
aver and prove that he had himself performed so far as he could (and,
as to the rest, was ready and willing to perform) his reciprocal obli-
gations: see notes to *Peeters* v. *Opie* (1671) 2 Wms.Saund. (1871 ed.), 742,
743, 744; *cf. Pordage* v. *Cole* (1669) 1 Wms.Saund. (1871 ed.) 548, 551,
552, 556; notes to *Cutter* v. *Powell* (1795) 2 Smith L.C. 1. It followed
that if A's reciprocal obligation was to be performed by a certain stipulated
time, A had to aver and prove that such stipulation as to time had been
observed. It was thus that it came to be held that at common law time
was (as the expression went) of the " essence " of a contract—in effect,

A.C.           **United Scientific v. Burnley Council (H.L.(E.))**           Lord Simon
of Glaisdale

A  timeous performance was a condition precedent to enforcement of
reciprocal obligations. So it was that Sir John Romilly M.R. came to
say in *Parkin* v. *Thorold* (1852) 16 Beav. 59, 65:

> "At law, time is always of the essence of the contract. When
> any time is fixed for the completion of it, the contract must be
> completed on the day specified, or an action will lie for the breach
> of it."

B
In point of fact, during the 19th century the attitude of the common
law courts as to time of performance became less rigid. Thus, in
*Martindale* v. *Smith* (1841) 1 Q.B. 389, 395, Lord Denman C.J. said: " In
a sale of chattels, time is not of the essence of the contract, unless it is
made so by express agreement. . . ." But this went further than the
development of the law justified or the peculiar facts of that case
C  necessitated. The true development of the common law as to the sale
of chattels did not go beyond its codification in section 10 (1) of the
Sale of Goods Act 1893:

> "Unless a different intention appears from the terms of the con-
> tract, stipulations as to time of payment are not deemed to be of
> the essence of a contract of sale. Whether any other stipulation
> as to time is of the essence of the contract or not depends on the
> terms of the contract."

D

(And even that provision must be read in the light of section 28 of the
Act, whereby payment and delivery are concurrent conditions.) So it
remains true that, as stated in *Halsbury's Laws of England,* 4th ed.,
vol. 9, para. 481, p. 337:

E
> "At common law stipulations as to time in a contract were as a
> general rule, and particularly in the case of contracts for the sale
> of land, considered to be of the essence of the contract, even if
> they were not expressed to be so, and were construed as conditions
> precedent; . . ."

F       The attitude of equity, on the other hand, was deeply influenced
by its handling of mortgages and sales of land. Up to the end of 1925
the normal method by which a mortgage of the fee simple was created
was for A, the mortgagor, to convey the legal fee simple to B, the
mortgagee, together with a covenant to repay the loan (the obtaining
of which was the object of the transaction) in, say, six months' time,
with a proviso that, if the loan were repaid at such date, B would
G  re-convey the legal estate. In the eyes of the common law B was the
owner of the legal estate from the date of the conveyance; and, failing
repayment within six months, became the absolute and indefeasible
owner. But it was a maxim of the Court of Chancery that " equity
looks to the intent rather than to the form." If A failed to repay B's
loan by the stipulated date, the Court of Chancery would examine the
H  transaction to see if it was really only what it purported to be—a sale
of property with a collateral option to re-purchase—or was in reality a
pledge of property to secure a loan. And, on ascertaining that it was
the latter, the Court of Chancery would compel B to re-convey the

land to A on his repaying the money within a reasonable time (though
late) with interest to the date of repayment. The stipulation as to time
was in consequence not regarded as an essential term.

:So again with equity's handling of sales of land. A contracted to
convey Blackacre to B, various dates leading to and including completion
being stipulated. It was another maxim of the Court of Chancery that
" equity regards that as done which ought to be done." The conveyance
ought to be completed in accordance with the contract. So the equit-
able estate in Blackacre passed from A to B on the making of the
contract, notwithstanding that the passing of the now bare legal estate
from A to B had to await completion of the conveyance. The Court
of Chancery then applied the other maxim about looking to the intent
rather than the form. The beneficial estate had already passed with
the making of the contract. It followed that the stipulated time for
completion of the conveyance was formal only. The Court of Chancery
would therefore decree specific performance of the conveyance not-
withstanding that various steps leading to completion had not been
observed timeously, provided that B had been guilty of no such delay
as to make it unreasonable for him to call on A to complete out of
time or that it would otherwise be unfair to A. Once again, the upshot
was that stipulations as to time of performance turned out to be
unessential in the eyes of equity.

The self-conscious differentiation in approach of the common law
and equity appears from a much-cited judgment of Lord Redesdale L.C.
in *Lennon* v. *Napper* (1802) 2 Sch. & Lef. 682, 684–685:

"Courts of equity have therefore enforced contracts specifically,
where no action for damages could be maintained; for at law, the
party plaintiff must have strictly performed his part, and the incon-
venience of insisting upon that in all cases, was sufficient to require
the interference of courts of equity. They dispense with that which
would make compliance with what the law requires oppressive: and
in various cases of such contracts, they are in the constant habit
of relieving the man who has acted fairly, though negligently. Thus
in the case of an estate sold by auction, there is a condition to forfeit
the deposit, if the purchase be not completed within a certain
time; yet the court is in the constant habit of relieving against the
lapse of time: and so in the case of mortgages, and, in many
instances, relief is given against mere lapse of time, where lapse of
time is not essential to the substance of the contract."

So strongly was the attitude of the Court of Chancery conditioned
by such transactions that Lord Thurlow could hold that in equity time
would not be of the essence of a contract even though expressly declared
to be so: *Gregson* v. *Riddle* (1784), cited in *Seton* v. *Slade* (1802) 7 Ves.
Jun. 265, 268, 269, where Lord Eldon L.C. was still prepared to leave
the point open (p. 275), though inclining to the view that express words
could make time of the essence (p. 270). Lord Eldon's view was to
prevail. Just as the courts of common law resiled from the extreme
position which was the logical conclusion of Serjeant Williams' doctrine

**A.C.**          **United Scientific v. Burnley Council (H.L.(E.))**          Lord Simon
of Glaisdale

A (with its effect that time was always of the essence of a contract), so the Court of Chancery abandoned Lord Thurlow's contrary extreme. The passage that I cited above from Sir John Romilly M.R. in *Parkin v. Thorold*, 16 Beav. 59, 65, after referring to Lord Thurlow's view as " exploded," concludes: ". . . time is held to be of the essence of the contract in equity, only in cases of direct stipulation, or of necessary implication."

B    So by 1873 the two systems had evolved into a situation whereby in the courts of common law stipulations as to time were prima facie regarded as of the essence of a contract, while in the Court of Chancery stipulations as to time were prima facie regarded as not essential. Thus, though the gap had narrowed, what Lord Eldon L.C. had said in the Court of Chancery in *Seton* v. *Slade* (at p. 273) was still true: " To say, time is regarded in this court, as at law, is quite impossible." No doubt

C further evolution would have taken place in each system, and they would probably have further converged. But before any such further development could take place, both systems had to be brought together (also with those applied in Doctors' Commons) in a single code to be administered in one Supreme Court of Judicature. This involved determining which system should prevail in those respects where they were

D at variance. Those that were in legislative contemplation were resolved in section 25 (1) to (10) of the Supreme Court of Judicature Act 1873. But it was envisaged (correctly as it proved) that there might be other respects not within the immediate contemplation of Parliament where the rules of common law and equity diverged. So subsection (11) provided:

E    " Generally in all matters not hereinbefore particularly mentioned, in which there is any conflict or variance between the rules of equity and the rules of the common law with reference to the same matter, the rules of equity shall prevail."

One of the contemplated differences between the rules of common law and equity was with regard to contractual stipulations as to time.

F That difference was resolved in favour of equity by section 25 (7), replaced by section 41 of the consolidating Law of Property Act 1925, which is the provision that falls for construction in the instant appeals (*Farrell* v. *Alexander* [1977] A.C. 59):

" Stipulations in a contract, as to time or otherwise, which according to rules of equity are not deemed to be or to have become

G of the essence of the contract, are also construed and have effect at law in accordance with the same rules."

This can only be interpreted by bearing in mind that the object of section 25 of the Supreme Court of Judicature Act 1873 was to reconcile the differences between common law and equity so that the two systems (together with the admiralty, testamentary and matrimonial) could form

H a single coherent code. This merely reinforces the plain and ordinary sense of the words. I cannot read section 41 of the Law of Property Act as meaning other than that, whenever contractual stipulations as to time fall for consideration in any court, they shall not be construed

as essential, except where equity would before 1875 have so construed them—i.e., only when the strict observance of the stipulated time for performance was a matter of express agreement or of necessary implication.

In my view the modern law in the case of contracts of all types is correctly summarised in *Halsbury's Laws of England*, 4th ed., vol. 9, para. 481, p. 338:

> " Time will not be considered to be of the essence unless: (1) the parties expressly stipulate that conditions as to time must be strictly complied with; or (2) the nature of the subject matter of the contract or the surrounding circumstances show that time should be considered to be of the essence; . . ."

I agree with the analysis made by my noble and learned friend on the Woolsack of *Stickney* v. *Keeble* [1915] A.C. 386; and that, correctly understood, there is nothing in that case which imposes any historically-founded complication or modification on the law as stated in *Halsbury*. Its true basis is that the law will not help a party to gain an advantage from a contract which he has himself put it of his own power to perform, unless his own expression of intention not to perform was in consequence of a fundamental breach by the other party (see p. 416). It was to the attempt to outflank this basic rule by arguing that under section 25 (7) of the Act of 1873 it was only necessary to consider the situation at the institution of the suit that the remarks of Lord Parker of Waddington on p. 417 were directed.

I would, however, venture to add the following comments:

(1) It is often useful to trace the history of a legal doctrine—indeed, I have myself, in deference to the learned arguments with which your Lordships have been favoured, tried to do so in the instant appeals. Such an historical exploration will frequently lead back into a time when common law and equity were separate systems administered in separate courts. But since 1875 there has been one fused system administered in one Supreme Court of Judicature and in one subordinate system of county courts. In 1690 a parliamentary Bill was introduced to give courts of common law power to issue writs of prohibition to prevent encroach-ment by the Court of Chancery on their own jurisdiction, and also to prevent any court of equity from entertaining a suit for which a proper remedy lay at common law (*Potter, An Historical Introduction to English Law and its Institutions*, 2nd ed. (1943), p. 143; 4th ed. (1958), p. 160). This attempt failing, the courts of common law and the Court of Chancery settled down to co-exist, rivalry decreasing and complications becoming gradually ironed out. In a number of respects the evolution of the one system was influenced by the other. This convergence and dovetailing was, I think, the first reason for tardiness in recognising how revolutionary was the change made by the Supreme Court of Judicature Act 1873 and how truly it brought about a " fusion " of common law and equity. A second reason was no doubt that the Supreme Court of Judicature continued for administrative convenience to sit in separate common law and Chancery Divisions. A third reason might have been that lawyers trained in

A    systems which look to precedent and thus foster conservatism tended
to minimise the change which had been made. But, after a century,
Professor Ashburner's vivid metaphor of two streams flowing into one
channel must have a different conclusion. It may take time before the
waters of two confluent streams are thoroughly intermixed; but a period
has to come when the process is complete. However, lest we might be
beguiled by metaphor, an actual instance ought to be cited. The doctrine

B    of equitable estoppel can be traced back to or near its equitable source in
*Hughes* v. *Metropolitan Railway Co.* (1877) 2 App.Cas. 439. But since
1945 the doctrine has permeated the whole of our law, not least that
part of it which would formerly have fallen within the purview of courts
of common law.

(2) Discussion of stipulations as to time has generally turned on the

C    historic distinction between time being or not being of the "essence"
of a contract; and that distinction, which is reflected in section 41, is
all that is required to dispose of these appeals. But the fused law has
continued to evolve since 1875; and it has developed a more sophisticated
approach to contractual terms: see *Wallis, Son & Wells* v. *Pratt & Haynes*
[1910] 2 K.B. 1003, 1012; *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki
Kisen Kaisha Ltd.* [1962] 2 Q.B. 26, especially the judgment of Diplock

D    L.J.; *Wickman Machine Tool Sales Ltd.* v. *L. Schuler A.G.* [1974] A.C.
235, 264–265. The law may well come to inquire whether a contractual
stipulation as to time is (a) so fundamental to the efficacy of the contract
that any breach discharges the other party from his contractual obliga-
tions ("essence"), or (b) such that a serious breach discharges the other
party, a less serious breach giving a right to damages (if any) (or interest),

E    or (c) such that no breach does more than give a right to damages
(if any) (or interest) ("non-essential"). If this sort of analysis falls
to be made, I see no reason why any type of contract should, because
of its nature, be excluded.

(3) The law does not purport to bring parties into a relationship of
contractual obligation which they themselves have failed to create. This

F    is the true ground of decision in those cases where a stipulation as to
time is contained in an option. An option is a type of unilateral contract.
When, as is usual, it is supported by consideration it constitutes an
irrevocable offer which turns into a bilateral contract by an acceptance in
strict compliance with its terms: see Lord Denning M.R. in *United
Dominions Trust (Commercial) Ltd.* v. *Eagle Aircraft Services Ltd.*
[1968] 1 W.L.R. 74, 81c. It is apt to be misleading to say that time is

G    of the essence of an option, since that may give the impression of a
bilateral contractual term. The legal reality is that this type of unilateral
contract never matures into a bilateral contract at all unless the option
is exercised in time. But, as Diplock L.J. pointed out in the *United
Dominions Trust* case (p. 84G), it is quite possible to have this sort of
unilateral obligation in an otherwise bilateral contract. An option in

H    a lease to terminate or to renew the tenancy or to purchase the reversion
will be such a term. In each such case the parties, on the exercise of
the option, are brought into a new legal relationship. It was argued on
behalf of the tenants in the instant appeals that the rent review clauses

Lord Simon
of Glaisdale          **United Scientific v. Burnley Council (H.L.(E.))**          [1978]

were also such unilateral terms. I cannot agree. The operation of the      A
rent review clauses does not at all change the relationship of the parties,
which remains that of landlord and tenant throughout the currency of
the lease whether or not the machinery of the rent review clauses is
operated. It was envisaged from the outset that the rent would be
reviewed during the currency of the leases: the clauses merely provided
machinery for determination of the new rent, which in more stable con-
ditions might have been stipulated in advance. Moreover, the clauses      B
went to the very basis of the consideration moving from the landlords: in
a period of inflation the latter would not have granted leases for such
long terms without inclusion of rent review clauses—and certainly the
initial rent would in each case have been much higher without those
clauses. To put it the other way round, the rent review clauses were
integral parts of the consideration moving from the tenants, whereby they      C
acquired a long term of years at an initial rent lower than it would
otherwise have been. Rent review clauses cannot be considered as
severable terms of unilateral obligation. However, where a rent review
clause is associated with a true option (a " break " clause, for example),
it is a strong indication that time is intended to be of the essence of the
rent review clause—if not absolutely, at least to the extent that the
tenant will reasonably expect to know what new rent he will have to      D
pay before the time comes for him to elect whether to terminate or
renew the tenancy (cf. *Samuel Properties (Developments) Ltd.* v. *Hayek*
[1972] 1 W.L.R. 1296). That situation stands in significant contrast
with those in the instant appeals.

(4) Time is often spoken of as being " made of the essence of the
contract by notice "—a concept which is reflected in the words " or to      E
have become " in section 41 of the Law of Property Act 1925. Never-
theless, the phrase is misleading. In equity, and now in the fused system,
performance had or has, in the absence of time being made of the
essence, to be within a reasonable time. What is reasonable time is a
question of fact to be determined in the light of all the circumstances.
After the lapse of a reasonable time the promisee could and can give      F
notice fixing a time for performance. This must itself be reasonable,
notwithstanding that ex hypothesi a reasonable time for performance has
already elapsed in the view of the promisee. The notice operates as
evidence that the promisee considers that a reasonable time for perform-
ance has elapsed by the date of the notice and as evidence of the date
by which the promisee now considers it reasonable for the contractual
obligation to be performed. The promisor is put upon notice of these      G
matters. It is only in this sense that time is made of the essence of a
contract in which it was previously non-essential. The promisee is really
saying, " Unless you perform by such-and-such a date, I shall treat your
failure as a repudiation of the contract." The court may still find that
the notice stipulating a date for performance was given prematurely,
and/or that the date fixed for performance was unreasonably soon in all      H
the circumstances. The fact that the parties have been in negotiation
will be a weighty factor in the court's determination. For the foregoing,
see *Smith* v. *Hamilton* [1951] Ch. 174. To say that " time can be made

A   of the essence of a contract by notice," except in the limited sense
indicated above, would be to permit one party to the contract unilaterally
by notice to introduce a new term into it.

(5) I agree with the analysis of the reported cases on rent review
clauses made by my noble and learned friend on the Woolsack and with
his conclusions upon them.

B   II.

I turn therefore to the second main issue in these appeals—namely,
how far a rent review clause activated out of the stipulated time can
operate retrospectively. In my view, rent today means the contractual
money payment made by a tenant to his landlord in consideration for
the use of the latter's land. I respectfully agree with the decision of
C   the Court of Appeal in *C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.*
[1974] 1 W.L.R. 728. Left to myself I would doubt the value of a
subsisting distinction between "contractual rent" and "distrainable
rent," and still more that "rent" can bear these different meanings,
with different legal consequences, in one and the same document. But
I recognise that the judgment of Cotton L.J. in *Walsh* v. *Lonsdale* (1882)
D   21 Ch.D. 9, 16, 17 (albeit tentative and interlocutory) is authority in
favour of the contrary view. It is not necessary to decide the point for
the purpose of the instant appeals. I therefore concur in the orders
proposed by my noble and learned friend on the Woolsack.

LORD SALMON. My Lords, these two appeals raise important questions
as to what principle should be applied in deciding whether provisions as
E   to time in rent revision clauses should or should not be construed as being
of the essence of the contract. Such clauses could easily be drafted so that
they state expressly whether time is or is not to be treated as of the
essence. So drafted they would present no difficulty. Unfortunately they
rarely are. They should be, for if they were, a great deal of expensive
litigation would be avoided. If, e.g., the parties to the present appeals
F   had expressly stated whether or not they intended the provisos as to
time in the rent revision clauses to be of the essence, there would have
been no litigation between them let alone litigation fought up to your
Lordships' House for the purpose of deciding what the rent revision
clauses mean.

I would add that a well-advised landlord is hardly likely to agree a
rent revision clause which laid down that its provisions as to time were
G   of the essence of the contract. Were he to do so, it would mean that
should he take any step later than the time specified in the clause then
however slight the delay and however little it affected the tenant, he
would lose the benefit of the clause for the next five, seven or ten years
whatever the intervals for revision might be. In such circumstances he
might be left with a rent for that period of perhaps a half or even a
H   third of the then fair market rent. It is much more likely that the land-
lord would insist on a clause such as the one in *Kenilworth Industrial
Sites Ltd.* v. *E. C. Little & Co. Ltd.* [1975] 1 W.L.R. 143 which provided
that a failure to comply strictly with the time limits contained in the

clause would not deprive the landlord of his right to have an increased    A
rent determined by arbitration unless he had been guilty of an unreasonable
delay which had prejudicially affected the tenant.

In a period of acute inflation, such as we have experienced for the
last 20 years or so, and may well continue to experience for many years
to come, what is a fair market rent at the date when a lease is granted
will probably become wholly uneconomic within a few years. Tenants
who are anxious for security of tenure require a term of reasonable    B
duration, often 21 years or more. Landlords, on the other hand, are
unwilling to grant such leases unless they contain rent revision clauses
which will enable the rent to be raised at regular intervals to what is
then the fair market rent of the property demised. Accordingly, it has
become the practice for all long leases to contain a rent revision clause
providing for a revision of the rent every so many years. Leases used to    C
provide for such a revision to be made every 10 years. Now the period
is normally every seven and not infrequently every five years. To my
mind, it is totally unrealistic to regard such clauses as conferring a
privilege upon the landlord or as imposing a burden upon the tenant.
Both the landlord and the tenant recognise the obvious, viz., that such
clauses are fair and reasonable for each of them. I do not agree with    D
what has been said in some of the authorities, namely, that a rent revision
clause is for the benefit of the landlord alone and not at all for the
benefit of the tenant. It is plainly for the benefit of both of them.
It is for the benefit of the tenant because without such a clause he would
never get the long lease which he requires; and under modern conditions,
it would be grossly unfair that he should. It is for the benefit of the    E
landlord because it ensures that for the duration of the lease he will
receive a fair rent instead of a rent far below the market value of the
property which he demises. Accordingly the landlord and the tenant by
agreement in their lease provide that at stated intervals during the term,
the rent should be brought up to what is then the fair market rent. The
revision clause itself lays down the administrative procedure or machinery
by which the fair market rent shall be ascertained. Sometimes this    F
procedure or machinery is quite simple as in *United Scientific Holdings Ltd.*
v. *Burnley Borough Council* (which I shall call the first appeal). Sometimes
it is somewhat complicated as in *Cheapside Land Development Co. Ltd.* v.
*Messels Service Co.* (which I will call the second appeal).

In the first appeal the lease was a building lease for a term of 99 years    G
from August 31, 1962. Being a building lease, the rent was fixed at one
quarter of the then rack rent being calculated at the rate of £900 a year
until August 31, 1972, and thereafter during the residue of the term at
the rate of £1,000 a year " plus any additional rent payable under the
provisions contained in the schedule hereto." The schedule was the rent
revision clause and provided, so far as relevant, that in the year
preceding the tenth year of the lease and every successive tenth year    H
the then current rack rent reasonably to be expected on the open
market should be agreed or, failing agreement, determined by arbitration
" and one quarter of the sum total so ascertained or £1,000 (whichever

A  is the greater) shall be the rate of rent reserved by (the) lease in respect
of the then next succeeding (10 years)."

I recognise that there is no provision for the rent to be revised
downwards and that this appears to be to the disadvantage of the tenant.
In practice, however, this is hardly a serious disadvantage for rents have
steadily increased over a very long period and show no signs of ceasing to
do so. It is, I think, hardly feasible that in the *Burnley Corporation* case
B  the fair market rent will ever fall below £1,000 a year.

Negotiations were opened by a letter of May 10, 1972, from the
estate agents for the tenants to the landlords saying that they had been
instructed to enter into negotiation to agree the new rent for the period
August 31, 1972, to August 31, 1982. It seems plain from this letter that
the tenants recognised that the rack rent reasonably to be expected on the
open market had risen and that it should be possible to agree what
C  the new rent should be for the coming 10 year period. The landlords'
representative then asked the estate agents to supply particulars of the
rents reserved by the underleases: this the estate agents agreed to do.
There were nine underleases at the time, producing a total rental of some
£12,500 a year but these particulars were never supplied to the landlords
although they were obviously of considerable importance in calculating
D  the new rent. On August 21, 1972, the tenants' solicitors wrote to the
landlords saying that the rent revision clause was " not susceptible of any
legally enforceable meaning and . . . void accordingly." Further
correspondence passed between the parties and finally, after August 31,
the tenants issued an originating summons to decide the question whether
from the period of August 31, 1972, until August 31, 1982, the rent
should remain at the figure at which it was fixed on August 31, 1962,
E  or should be increased to a quarter of the fair market rent notwithstanding
that this figure had not been agreed or determined by arbitration before
August 31, 1972.

Both parties had had an equal opportunity and indeed obligation of
ascertaining the fair market rent by referring the matter to arbitration
well before the date in question. Neither did so. It has been argued that
F  the rent revision clause was solely for the benefit of the landlord. For
the reasons stated earlier in this speech I cannot accept this argument.
Without the clause the tenant would never have obtained his 99 years'
building lease and I can see nothing unfair to the tenant or generous to
the landlord in providing that the one should pay and the other receive
the fair market rent for the property during the whole of the term for
which it was demised.
G  Equity and the common law were fused by the Supreme Court of
Judicature Act 1873. Section 25 (7) of that Act provides:

" Stipulations in contracts, as to time or otherwise, which would not
before the passing of this Act have been deemed to be or to have
become of the essence of such contracts in a Court of Equity, shall
receive in all courts the same construction and effect as they would
H  have heretofore received in equity."

This section is now replaced and re-enacted in different language by
section 41 of the Law of Property Act 1925.

**Lord Salmon       United Scientific v. Burnley Council (H.L.(E.))       [1978]**

The equitable principles governing the construction and effect of stipulations in contracts as to time are correctly set out in *Fry on Specific Performance*, 6th ed. (1921), p. 502, para. 1075:

> " Time is originally of the essence of the contract, in the view of a Court of Equity, whenever it appears to have been part of the real intention of the parties that it should be so, and not to have been inserted as a merely formal part of the contract. As this intention may either be separately expressed, or may be implied from the nature or structure of the contract, it follows that time may be originally of the essence of a contract, as to any one or more of its terms, either by virtue of an express condition in the contract itself making it so, or by reason of its being implied. . . ."

Under the lease dated August 31, 1962, both the landlords and the tenants were enabled and indeed obliged by the language of the rent revision clause to ensure that the rent for the period from August 31, 1972, to August 31, 1982, should be determined before August 31, 1972. Neither did so and I find it impossible to hold that the clause was intended by either party to imply that the time provision in that clause was of the essence of the contract. It was in my opinion merely administrative machinery for carrying out the parties' agreement that the rent should be revised so that it should correspond with the current open market rent.

I recognise that the lease relates to what could be fairly described as a commercial transaction. In commercial transactions, provisions as to time are usually but not always regarded as being of the essence of the contract. They are certainly so regarded where the subject matter of the contract is the acquisition of a wasting asset or of a perishable commodity or is something likely to change rapidly in value. In such cases if, e.g., the seller fails to deliver within the time specified in the contract, the buyer may well be seriously prejudiced. The time provision in a rent revision clause of the present kind, even in a lease concerning a commercial transaction, is however different in character and I regard it as not being of the essence of the contract unless it is made so expressly or by necessary implication. In the present case it is certainly not made so expressly nor, in my view, by implication. Nor is there anything to suggest that the tenant would be prejudiced by determination of the rent for the period from August 31, 1972, to August 31, 1982, being postponed until after August 31, 1972.

At first instance, Sir John Pennycuick V.-C. held that the rent revision clause was on the same footing as an option conferred on the landlord and that if the landlord failed to exercise his rights within the time specified in the option, he lost them. Sir John Pennycuick V.-C. relied strongly upon the judgment of Russell L.J. in *Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296, when he said, at p. 1302:

> " It was argued that there was a distinction (as to time limits) between options to determine, or to renew, or to acquire the

A.C.          United Scientific v. Burnley.Council (H.L.(E.) )          Lord Salmon

A   reversion, and a right such as the present. I do not see why this
should be so."

I am afraid that I do for the following reasons: Options to determine
or to renew are not agreements to determine or renew. They are no
more than irrevocable offers (kept open for good consideration) to do so
providing the tenant complies with certain conditions usually before a
certain date. If the tenant complies with the conditions in time he
B   thereby accepts the offer. The offer plus the acceptance constitutes a
fresh agreement determining or renewing the lease as the case may be
(see the *United Dominion Trust* case [1968] 1 W.L.R. 74, Lord Denning
M.R. at p. 81). The same is true, mutatis mutandis, of an option to
acquire the reversion. Neither equity nor the common law would ever
intervene to make a contract for the parties. Anything which falls
C   short of a complete acceptance of the offer is of no effect except
sometimes as a counter-offer.

I do not regard the leases in either of the present appeals, nor in
*Samuel Properties (Developments) Ltd* v. *Hayek* [1972] 1 W.L.R. 1296
(to which I shall return), as vesting any option in the landlord to have
the rent revised. In my opinion each lease constitutes, amongst other
D   things, an agreement between the parties that, at stated intervals, the
rents shall be revised so as to bring them into line with the then open
market rent. The rent revision clauses specify the machinery or guide-
lines for ascertaining the open market rent. These provisions as to
time are not, in my opinion, mandatory or inflexible; they are only
directory. Nevertheless any unreasonable delay caused by the landlords
and which is to the tenants' prejudice would prevent the rent being
E   revised after the review date.

As far as the first appeal is concerned, I do not understand how, on
the facts I have related the delay could properly be said to have been
caused by the landlords rather than by the tenants. The lease not only
enabled but put an obligation on the tenants as well as on the landlords
to have the rent ascertained by arbitration in default of agreement. In
F   these circumstances it hardly lies in the tenants' mouth to complain of
the delay. Nor is there any evidence that they have been prejudiced by
the delay for which they appear, if anything, to have been more
responsible than the landlords.

In *Samuel Properties (Developments) Ltd.* v. *Hayek* the rent revision
clause which laid down the procedure for having the open market
rental value ascertained at the end of the seventh and fourteenth years
G   of the term and the rent then being raised to that level, was dressed
up to look like an option. Indeed the word "option" appeared in the
clause. But, for the reasons I have already stated, I do not think that it
was a real option in the sense that any option to renew or determine
a lease is an option. The clause required the landlord to give notice
to the tenants six months prior to the expiry of the seventh year if
H   he required the rent to be raised to the open market rental value. If
within one month of the notice, the parties failed to agree the open
market rental value this figure was to be determined by a valuer
appointed by the President of the Royal Institution of Chartered

Surveyors. But the date by which this determination was to be made
was not specified. The landlord gave his notice about one month late. A
The Court of Appeal held that time was of the essence and that the
landlord was precluded from putting the rent revision clause into
operation. Clause 5 of the lease so far as relevant gave the tenant a
true option to determine the lease at the end of the seventh year of the
term by giving the landlords at least one quarter's notice in writing. This
break clause was obviously inserted to protect the tenant should he not B
wish to pay the increased rent during the next seven year period of the
term.

The proviso to the break clause strongly suggests however that the
time provisions relating to rent revision were not of the essence of the
contract. It reads:

"Provided always that if one quarter before the expiration of the C
first seven . . . years of the term . . . the reviewed rent . . .
shall not have been reviewed then the right of the lessee to terminate
as herein provided shall be extended until the expiration of one
month from the date of the notification of the reviewed rent to
the lessee."

There is nothing in the proviso nor in any other part of the lease to D
suggest that the new rent may not be determined by the valuer and
notification of this rent may not reach the lessee until after the
expiration of the first seven year period. In my view *Samuel Properties
(Developments) Ltd.* v. *Hayek* [1972] 1 W.L.R. 1296 was wrongly
decided and should be overruled.

In *Mount Charlotte Investments Ltd.* v. *Leek and Westbourne*
*Building Society* [1976] 1 All E.R. 890, 892 Templeman J. stated rightly E
that:

"The authorities disclose that there are at least two kinds of rent
revision clauses. The first kind has been analysed as 'an option to
the landlord to obtain a higher rent' and in that case if the landlord
does not comply with any time limits provided for the exercise of
the option then he wholly fails. The time limits are said to be F
mandatory. The second kind of clause has been analysed as
'creating an obligation on the landlords'—or sometimes the tenants
as well—' to take the steps necessary to determine what the rent is
going to be.' If in the obligation cases the time limits prescribed
by the document are not complied with, then the court construes
those time limits as being purely directory, and, provided that the G
tenant has not been prejudiced by any delay, then the rent is fixed
after the time limits have expired."

Buckley and Roskill L.JJ. in their judgments in the first appeal expressed
no enthusiasm for the dichotomy between so-called option and obligation
rent revision clauses. Indeed, they considered it to be unsound. I agree
with this view. They based their judgments upon wider grounds to H
which I shall return. They both however stated that they did not
dissent from the narrower ground upon which Pennycuick V.-C. decided
the case, namely that the rent revision clause " is for the benefit of the

A    landlord solely . . . (and is) on the same footing as an option." For the reasons I have already given I am unable to accept the grounds upon which Pennycuick V.-C. based his judgment.

After the passage from Templeman J.'s judgment which I have quoted, he added:

B    " The analysis of the option rent review clause is a triumph for theory over realism. . . . The concept of the tenant granting the landlord an option and conferring benefits on the landlord does not accord with reality."

Templeman J. was however obliged by authorities then binding on him to give judgment for the tenants—I think reluctantly. For the reasons which I have already given I entirely agree with and gratefully adopt C    his trenchant criticism of the analysis of the so-called option rent revision clause.

I also agree with Buckley L.J. when he says, [1976] Ch. 128, 145:

" In each class of case " [the so-called option cases and the obligation cases] " the circumstances and the nature of the contractual term should be considered in order to ascertain whether it is reasonable D    to impute to the parties an intention that time shall be of the essence, an important circumstance being the practical operation of the clause and its impact on the parties."

I am afraid, however, that for the reasons I have already stated, I cannot agree that the circumstances or nature of the contractual terms in the *Burnley* case support the implication that the parties intended E    to make time of the essence. I recognise that it would probably be convenient for both parties to know the amount of the revised rent before it comes into operation. In my view, however, this by itself is not enough to enable the respondents to succeed.

Buckley L.J. relied on my judgment in the Court of Appeal in *Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1 Ltd.* (1974) 237 E.G. 343. F    In that case the rent revision clause required the landlords, in the event of the revised rent not being agreed with the tenants, to apply not less than three months before the review date to the President of the Royal Institution of Chartered Surveyors to nominate an arbitrator to determine the revised rent. It does not appear from the report for how long the landlords delayed in making the application nor whether or to what extent the delay prejudiced the tenants. This was a case in G    which the landlords alone were to initiate the procedure for revising the rent and is perhaps more akin to the second than to the first appeal. However this may be, unless the facts in that case did reveal some unreasonably long delay which caused prejudice to the tenants then it was wrongly decided. I certainly do not think that any member of the court was purporting to lay down any principle to the effect H    that provisions as to time in rent revision clauses were generally to be considered as of the essence of the contract. If the *Stylo Shoes* case, 237 E.G. 343 is to be regarded as a so-called option case then the court was bound by its own decisions in *Samuel Properties (Developments) Ltd.*

**Lord Salmon**      **United Scientific v. Burnley Council (H.L.(E.))**      **[1978]**

v. *Hayek* [1972] 1 W.L.R. 1296 with which I do not agree and consider     A
should be overruled for the reasons which I have already indicated.

Most of what I have said applies as much to the *Cheapside Land
Development Co. Ltd.* appeal as it does to the *Burnley Corporation*
appeal but there are substantial differences between the two relating both
to their respective leases and facts. In the *Cheapside Land Development*
appeal (the second appeal), by a lease dated March 13, 1968, the
landlords demised to the tenants parts of a building known as Winchester    B
House, Old Broad Street, in the City of London for a term of 21 years
from April 8, 1968 at a yearly rent:

> "(a) In respect of the period of the said term commencing on
> April 8, 1968 . . . and ending on April 8, 1975, the yearly sum of
> £117,340 . . . (b) In respect of each of the following periods
> respectively of the said term, that is to say (i) the period     C
> commencing on April 8, 1975 and ending on April 8, 1982 . . . and
> (ii) the period commencing on April 8, 1982 and ending on April 8,
> 1989 . . . the respective rents to be determined in accordance with
> the provisions in the Second Schedule hereto."

The second schedule contains the rent revision provisions. Clause 1,
paragraph (a) defines "the market rent" and paragraph (b) defines     D
"the review date" as April 8, 1975 and April 8, 1982, for the second
and third periods respectively. Clauses 2 and 3 read:

> "2. In respect of (i) the second period of the said term the yearly rent
> shall be the sum of . . . (£117,340) or a sum equal to the market rent
> (if duly determined in the manner hereinafter set out) whichever
> shall be the higher. 3. The market rent may be determined and notified     E
> to the lessees in the manner following: (a) the proposed rent shall be
> specified in a notice in writing (' the lessors' notice ') served by the
> lessors . . . on the lessees not more than 12 months nor less than six
> months prior to the review date; (b) the lessees may within one month
> after service of the lessors' notice of the proposed rent serve on the
> lessors a counter notice (' the lessees' notice ') either agreeing the pro-
> posed rent or specifying the amount of rent which the lessees consider     F
> to be the market rent for the period in question; (c) in default of service
> of the lessees' notice or in default of agreement as to the market rent
> to be payable for the period in question the rent shall be valued by a
> Fellow of the Royal Institution of Chartered Surveyors agreed
> between the lessors and the lessees or in default of agreement to be
> appointed not earlier than two months after service of the lessors'     G
> notice on application of the lessors by the President . . . of the
> said Institution whose valuation shall be . . . final and binding
> upon the lessors and lessees and shall be given in writing to the
> lessors and the lessees not less than 14 days before the review date."

On September 5, 1974 (seven months before the review date), the
lessors served on the lessees their notice under clause 3 (a) of the second     H
schedule in which they proposed the annual sum of £800,000 as the
market rent for the period from April 8, 1975, to April 8, 1982. The
lessees did not serve any counter notice under clause 3 (b) of the second

A  schedule, but protracted negotiations took place between the parties
continuing after April 8, 1975, in an attempt, which proved unsuccessful,
to agree the market rent for the period in question. Finally on June 25,
1975, the lessors wrote to the Royal Institution of Chartered Surveyors
asking for the President to appoint a Fellow to determine the market
rent but pointing out that an issue likely to be litigated had arisen
between the parties as to whether the lessors were entitled to a review.

B  The President thought it better to wait until the issue had been resolved
before making any appointment.

On June 27, 1975, the lessors issued an originating summons which
claimed the following relief:

C      (1) A declaration that their application of June 25, 1975, to the
       President of the R.I.C.S. was a valid and effective application for
       the purposes of paragraph 3 (c) of the second schedule. (2) A
       declaration that a valuation by the fellow of the R.I.C.S. appointed
       pursuant to the application would be valid and binding as to the
       market rent for the second period notwithstanding that such
       valuation would not be given until after March 25, 1975 and
       (3) A declaration that such market rent (if higher than £117,000
       per annum) would be recoverable as rent with effect from April 8,

D      1975.

My Lords, the parties are bound by the lease to pay during the
period commencing on April 8, 1975, and ending on April 8, 1982, the
yearly rent of £117,340 or the market rent " if duly determined in
the manner hereinafter set out " (i.e. in the second schedule) " whichever
shall be the higher." I do not consider that an agreement between the

E  parties or a determination by a Fellow of the Royal Institution of
Chartered Surveyors as to the amount of the market rent adds any new
contractual term. It merely quantifies the rent which the lessees are
bound by the lease to pay during the period in question. The words " if
duly determined in the manner hereinafter set out " in my view do no
more than indicate the procedure to be followed in determining the

F  market rent. I cannot accept that if the time limits set out in the
procedural directions are not strictly adhered to, the lessors are
automatically deprived of their right to be paid the market rent. There
is certainly no express condition that unless the time scale is strictly
observed the lessors shall lose these rights. Nor is there anything from
which such a condition could be implied. Indeed all the implications
are to the contrary. We know that the lessors' notice was served seven

G  months before the review date and therefore complied with the provision
that it should be served not more than 12 months nor less than six months
before that date. Suppose it had been served a week or so longer than
the maximum or less than the minimum period, it is, to my mind,
incredible that the parties could have intended that this should deprive
the lessors of the market rent for the next seven year period. The same

H  is true about the provisions that in default of agreement between the
parties as to the market rent or as to which Fellow of the Royal Institution
of Chartered Surveyors should value it, a Fellow should be appointed
by the President of the Institution not earlier than two months after

**Lord Salmon**        **United Scientific v. Burnley Council (H.L.(E.))**        **[1978]**

service of the lessees' notice. Suppose the Fellow had been appointed seven
weeks after service of the lessors' notice, could this vitiate his valuation   A
and deprive the lessors of the market rent? Again, if the valuation was
made and given in writing to the lessors and lessees 12 days before the
review date when what I regard as the procedural directions in the
lease say that it should be given not less than 14 days before the review
date, could this deprive the lessors of the market rent for the next seven
years? The answer to these last two questions is obviously no. To hold   B
that time is of the essence of any of the provisions in the second schedule
would, in my respectful view, make complete nonsense of it.

I certainly agree that if the lessors had been guilty of unreasonable
delay which had caused prejudice or hardship to the lessees they would
have forfeited their rights to be paid the market rent from April 8,
1975, to April 8, 1982. But there is not a spark of evidence that the   C
lessees have suffered any prejudice or hardship on account of the
lessors not applying to the President of the R.I.C.S. to appoint a valuer
until June 25, 1975. On the contrary, the lessees will have had the use
of the difference between the market rent and £117,340 since April 1975.
Even if the value of the market rent is only half or even one quarter
of the sum indicated in the lessors' notice, at the prevailing rates of
interest the lessees should be substantially better off than if they had   D
had to pay out the market rent from the review date.

I therefore conclude that the lessors are entitled to have the market
rent determined by a fellow of the R.I.C.S. to be appointed by the
President of the Institution in accordance with the lessor's written request
of June 25, 1975. Under the terms of the lease, the market rent, if it
exceeds £117,340 a year, is clearly payable as from April 8, 1975. Until   E
the market rent is determined, the lessees will go on paying rent at the
rate of £117,340 a year. After its determination (if it exceeds the present
figure) the lessees will have to pay the balance which has been accruing
and of which they have enjoyed the benefit since April 8, 1975. It used
to be thought that rent was a special thing in English law. It could be
distrained for; it issued out of land and had to be certain at the time
when it became payable; and therefore it could not be ascertained or   F
determined retrospectively (see *In re Essoldo (Bingo) Ltd.'s Underlease*,
23 P. & C.R. 1). That case however was overruled by *C. H. Bailey Ltd.
v. Memorial Enterprises Ltd.* [1974] 1 W.L.R. 728. At p. 732 Lord
Denning M.R. quoted with approval from *Holdsworth, A History of
English Law*, vol. VII (1900), p. 262:

"... in modern law, rent is not conceived of as a thing, but rather as   G
a payment which a tenant is bound by his contract to make to his
landlord for the use of the land."

Lord Denning M.R. went on to say:

" The time and manner of the payment is to be ascertained according
to the true construction of the contract, and not by reference to
outdated relics of mediaeval law "   H

—a passage with which I entirely agree and gratefully adopt. Accordingly
I am of the opinion that the lessors were entitled to all the declarations

A  for which they asked and which were granted to them by Graham J. whose order was reversed in the Court of Appeal and should be restored.

My Lords, for these reasons I would allow both these appeals.

LORD FRASER OF TULLYBELTON. My Lords, these appeals raise the question of what is the legal significance to be attached to stipulations as to time in a rent review clause in a lease. The appeals were heard
B  together and the primary argument on both sides treated the question as one that was susceptible of a general answer, but it is proper to recall that the application of any general rule may always be excluded if the intention to do so is expressed or clearly implied. Rent review clauses take many forms, and it is not possible, even if it were desirable, to state any rule as to the effect of stipulations as to time that will apply to
C  all such clauses.

The Law of Property Act 1925, section 41, provides:

" Stipulation in a contract, as to time or otherwise, which accord- ing to rules of equity are not deemed to be or to have become of the essence of the contract, are also construed and have effect at law in accordance with the same rules."

D  That section appears to state that the rules of equity shall apply to stipulations in contracts of all sorts. I say " appears to " because it was strongly argued on the part of the respondents (the tenants) in both the instant appeals that only the uninstructed would accept the section at its face value, and that it ought to be read in a much more restricted sense, so as to limit its application to the circumstances in which the
E  rules of equity would have applied before the Supreme Court of Judi- cature Act 1873. In support of that argument reliance was placed on the speech of Lord Parker of Waddington in *Stickney* v. *Keeble* [1915] A.C. 386, 417–418, referring to section 25 (7) of the Supreme Court of Judicature Act 1873 which was the predecessor of section 41 of the Act of 1925. But I am satisfied that Lord Parker was not intending in
F  the passage referred to to limit the application of section 25 (7) in the way suggested; he was merely explaining his rejection of the argument which he summarised at p. 417.

My Lords, I am not qualified to explore the history of the two streams of English jurisdiction, legal and equitable, which formerly flowed in separate channels. But since the Supreme Court of Judicature Act 1873 they have at least shared the same channel, and I gratefully
G  adopt the reasons given by my noble and learned friends Lord Diplock and Lord Simon of Glaisdale for thinking that they have now merged into a single stream. Consequently rules of equity, so called because they are as a matter of history derived from equity are now simply part of the corpus of English law and as such they are free to develop like other parts of that law. Neither section 41 of the Law of Property Act
H  1925 nor section 27 (5) of the Supreme Court of Judicature Act 1873 contains any negative provision against the development or extension of equitable principles, and the effect of those sections is quite different from the incorporation into the law of a colony of the law of England

**A.59**

*as it stood at some specified date*—see for example *Watts and Attorney-General for British Columbia* v. *Watts* [1908] A.C. 573. I consider that section 41 should now be taken to mean what it appears to say and that the law is correctly summarised in the following passage from *Halsbury's Laws of England*, 4th ed., vol. 9, para. 481:

> "The modern law, in the case of contracts of all types, may be summarised as follows. Time will not be considered to be of the essence unless: (1) the parties expressly stipulate that conditions as to time must be strictly complied with; or (2) the nature of the subject matter of the contract or the surrounding circumstances show that time should be considered to be of the essence; or (3) a party who has been subject to unreasonable delay gives notice to the party in default making time of the essence."

See also *Chitty on Contracts*, 23rd ed. (1968), vol. I, paras. 1140–1141, and *Fry on Specific Performance*, 6th ed., para. 1073.

Clearly neither the first nor the third of these exceptions is applicable to either of the instant appeals. The question is whether the nature of the subject matter or the surrounding circumstances of rent review clauses as a class show that all or any stipulations as to time in such clauses normally fall within the second exception. Rent review clauses have only become common in comparatively recent years, certainly since the last war, and their main purpose is to protect the revenues of landlords from the effects of inflation. From the landlord's point of view a rent review clause is an important, almost indispensable, term of the contract if he is to agree to a lease for a long period, during which inflation may well continue. The clause is also in a less direct way of benefit to the tenant, because, without it, he would not normally be able to get the security of tenure which is afforded by a long lease, except perhaps by paying a rent which in the early years of the lease would be far above the current market level. The rent review clause has thus become a convenient device to facilitate the granting of long leases in an inflationary age, and its main purpose is the same whatever the exact machinery specified in a particular clause. I note in passing that in the *Cheapside* appeal the lease was for 21 years and in the *Burnley* appeal the lease was for 99 years. It will, I suppose, generally be convenient to both parties to have the amount of the rent which will be due from and after the review date ascertained before that date arrives, but if the rent can be fixed later with retrospective effect to the review date (as I think it can, for reasons to be stated below) then it will not normally be essential to have it ascertained before the review date. The substantial purpose of the clause will be satisfied if the reviewed rent is ascertained reasonably soon after the review date. At a time when rents are fluctuating it may be difficult to assess in advance what the market rent will be at a future date. Indeed, in strict theory such an assessment in advance cannot be more than a forecast. There may be therefore good practical reasons for leaving the ascertainment of the reviewed rent until after the review date.

It was argued on behalf of the respondents in both the instant appeals

A  that tenants would be seriously prejudiced if the new rent were not
ascertained before the review date because they would not know the
amount of their liability for the future. This argument carried con-
siderable weight with the Court of Appeal in the *Burnley* case. But I
think, with respect, that the prejudice likely to be caused to the tenant
by the rent not being ascertained until after the review date has been
exaggerated and that the likely prejudice to the landlord has been
B  understated. In time of inflation it is to be expected that the landlord
will call for a review on every occasion where he is entitled to do so,
especially if (as in both the instant appeals) a review cannot lead to the
rent being reduced below the level that would prevail if there were no
review. So far as the tenant is concerned, he will of course want to
know the amount of his liability but he will normally be able with the
C  aid of skilled advice to arrive at a reasonably close estimate of the current
market rent. So far as the landlord is concerned, he may be very seriously
prejudiced by delay in ascertaining the reviewed rent if, as is usual,
it is higher than the former rent, because he will be unable to collect
the reviewed rent until it has been ascertained, and any delay will keep
him out of his money representing the difference between it and the
former rent. Conversely the tenant will have the use of the money until
D  the reviewed rent has been ascertained. This is strikingly illustrated in
the *Cheapside* appeal where the landlord has claimed an increase of over
£480,000 per annum in the rent, and loss of interest on a sum of that order
even for a short time is obviously a serious matter.

As the substance of a review clause is, in my opinion, to provide
machinery for ascertaining the market rent from time to time, at the
E  intervals agreed in the interests of both parties, rather than to confer
a benefit on the landlord, it seems to me that stipulations as to time
ought not to be strictly enforced unless there is something in a particular
clause to indicate that time is of the essence in that case. Until the
decision in the *Burnley* case the reported cases fell into two classes. One
class consisted of those where the review clause was regarded as
F  machinery and where time limits were held to be merely directory. The
other class consisted of cases where the clause was in a form which
gave the landlord a unilateral right or option to call for a review, and in
that class time limits were held to be mandatory and inflexible. This
dichotomy created a danger of distinctions being drawn on narrow and
somewhat artificial grounds, as Buckley L.J. pointed out in *Burnley*
[1976] Ch. 128, 138E. The review clause in that case might well have
G  been regarded as falling within the former class, but the Court of Appeal
rejected any rigid division into two classes, and held that the time limits
in the clause ought, in accordance with what they regarded as the
probable intention of the parties, to be strictly enforced. The lease
there provided that after the end of the first 10 year period, which was
on August 31, 1972, the yearly rent should be " £1,000 plus any additional
rent payable under the provisions contained in the schedule hereto. . . ."
H  The schedule does not exactly fit that provision as it does not provide for
an additional rent but provides that the rent after the first 10 years shall
be either £1,000 or another figure whichever is the higher, but no point

**A.59**

was made of the difference between the lease and the schedule. The     A
schedule provides that " during the year immediately preceding " the
period of the second 10 years, and immediately preceding each subsequent
10 year period, the landlord and the tenant

> " shall agree or failing agreement shall determine by arbitration the
> sum total of the current rack rent . . . and " (it being a building lease)
> " one quarter of the sum total so ascertained or £1,000 (whichever
> is the greater) shall be the rate of rent reserved "     B

for the next 10 year period. There is provision for the arbitrator to be
nominated, failing agreement between the parties, by the President of
the Royal Institution of Chartered Surveyors and it is left open to either
party to request the President to make a nomination. If the stipulation
in the schedule requiring the rack rent to be ascertained " during the     C
year " is to be strictly enforced the result would be that if, owing to some
accident for which the landlord was not responsible or to the illness
or dilatoriness of the arbitrator, the rack rent had not been ascertained
until a month or even a day after the end of the year, the review would
be abortive and the former rent would continue in force for another 10
years. That result would seem to be inequitable and I do not believe that
the parties can have intended it, yet it would follow from the decision     D
of the Court of Appeal that time was of the essence, and that, because
the new rent had neither been agreed nor determined by arbitration
(nor even referred to arbitration) by the end of the tenth year, no
review could now be made. For the reasons I have stated I am unable
to agree with that decision.

A more difficult question is raised in cases where the clause is in a     E
form giving the landlord the sole right to initiate a review provided he
does so by a certain time. Provisions of this sort are conveniently des-
cribed as " triggering " provisions. A typical triggering provision is
found in the *Cheapside* case, in paragraph 3 (a) of the second schedule to
the lease. The lease was for 21 years from April 8, 1968, and it provided
for review dates on April 8, 1975, and April 8, 1982. Paragraph 2 of the     F
second schedule provides in effect that after each of the review dates
" the market rent (if duly determined in the manner hereinafter set out) "
shall be payable. Paragraph 3 of the schedule provides:

> " The market rent may be determined and notified to the lessees
> in the manner following: (a) the proposed rent shall be specified in
> a notice in writing (' the lessors' notice ') served by the lessors or
> their surveyor on the lessees not more than 12 months nor less than     G
> six months prior to the review date."

Failing agreement there was provision for arbitration. The words that
I have quoted, read literally, lay down two conditions precedent for the
market rent being payable, namely, (1) that the market rent shall have
been " duly determined " in the manner specified in the schedule and     H
(2) that the lessors shall have served the lessors' notice not less than
six months before the review date. In fact the lessors (appellants) did
serve the lessors' notice in the time so the second condition was satisfied,

A   but the first was not. After the lessors' notice had been served negotiations
between the parties followed. No counter notice was served by the lessees
but that was immaterial as the schedule provided that, in default of the
service of the lessees' notice or in default of agreement as to the market
rent, the market rent was to be valued by a Fellow of the R.I.C.S. to be
appointed by the President " on the application of the lessors." No time
limit for the application to the President or for the appointment of the
B   valuer was stated, but, as the valuation had to be made not less than 14
days before the review date, it was implied that the application and the
appointment must be made in reasonable time to enable that to be done.
In fact, the lessors did not apply to the President until more than two
months after the review date and the President declined to make the
appointment until its validity had been decided by the court. Hence
C   these proceedings.

The landlord's right to operate the trigger and his right to apply to the
President are both unilateral rights. The former might be described as an
option. The latter would not I think normally be so described but, in
my opinion, it is for the present purpose indistinguishable from the
former in that both are unilateral rights which the landlord is under no
obligation to exercise. It was argued on behalf of the tenants that the
D   rules of equity have never applied to options, that the landlord's rights
were options, and that the stipulations as to time must therefore be
strictly applied. That was the argument which had prevailed in the Court
of Appeal in *Samuel Properties (Developments) Ltd.* v. *Hayek* [1972] 1
W.L.R. 1296, 1302 where Russell L.J. said:

E   " . . . the right or privilege of exacting an additional rent was con-
ferred by the bargain between the parties as an express option which
would be effective if a condition precedent was complied with: it could
be equated with an offer by the lessee to pay an increased rent only in
certain circumstances which it lay in the power of the lessor unilater-
ally to bring about, which offer was not accepted in those terms. It was
F   argued that there was a distinction (as to time limits) between
options to determine, or to renew, or to acquire the reversion, and
a right such as the present. I do not see why this should be so."

In that case the word " option " was used in the lease (" the yearly
rent . . . shall be subject to review at the option of the lessors in the
seventh and fourteenth years . . ."). That argument is one which, in
my respectful opinion, concentrates too exclusively on the words of
G   the clause and pays insufficient attention to its substantial purpose. The
right to initiate a rent review, even if it is described as an option, is in
my opinion materially different from a true option, whether granted
by one clause in a larger contract or by a separate offer. Options to
purchase property or to renew a lease are both true options and their
important characteristic for the present purpose is that, if they are exer-
H   cised, they create a new contract between the parties. But when a rent
review clause is operated it merely varies one term in a continuing contract.
The term is one which the parties have agreed from the beginning is
to be variable and the review clause merely provides the machinery for

effecting the variation. Review clauses are also different in this respect
from a tenant's option to break a lease; that, if exercised, will put an
end to the contract and release both parties from their contractual
obligations. There is a good reason why time limits should be strictly
enforced in relation to an option to purchase or renew a lease, because
so long as it remains open the grantor is not free to dispose of his
property elsewhere, although the grantee is under no obligation to him.
Similarly where a tenant has an option to break his lease, he can break
it or not as he chooses, but the landlord is not free to let his property
to anyone else until the time for exercising the tenant's option has
expired. It is fair and reasonable, and in accordance with what I would
take to be the intention of the parties, that the time limit of the restriction
on the grantor should be strictly enforced. That however does not apply
in relation to a rent review clause in a continuing lease.

It was also argued on behalf of the tenants that the lessors in a case
such as *Cheapside* are not under any obligation to initiate a review and
that there is therefore no room for applying the equitable rule so as
to release them from the consequences of failure to perform an obligation.
But the equitable rule originated in relieving a mortgagor from the
consequence of failure to redeem his property by the stipulated date
although he had no obligation to do so. The mortgagor, like the
landlord here, had a unilateral right which might be described as an
option, yet he was able to rely on the equitable rule to relieve him from
the consequences of failure to exercise his right in time. There seems
no reason in principle why the landlord should not be able to do the
same and in my opinion he can. If a tenant felt himself prejudiced by the
landlord's delay in serving a triggering notice, it would be open to him
after the time for serving it had expired, to give notice prescribing a
further time within which the triggering notice must be served.
Provided that the further time was reasonable, he could thus make time
of the essence.

For these reasons I am of the opinion that the equitable rule against
treating time as of the essence of a contract is applicable to rent review
clauses unless there is some special reason for excluding its application
to a particular clause. The rule would of course be excluded if the
review clause expressly stated that time was to be of the essence. It
would also be excluded if the context clearly indicated that that was
the intention of the parties—as for instance where the tenant had a
right to break the lease by notice given by a specified date which was
later than the last date for serving the landlord's trigger notice. The
tenant's notice to terminate the contract would be one where the time
limit was mandatory, and the necessary implication is that the time
limit for giving the landlords notice of review must also be mandatory.
An example of such interlocked provisions is to be found in *C. Richards
& Son Ltd.* v. *Karenita Ltd.* (1971) 221 E.G. 25 where the decision
that time was of the essence of the landlord's notice could be supported
on this ground, although not, as I think, on the ground on which it was
actually rested. The case of *Samuel Properties (Developments) Ltd.* v.
*Hayek* [1972] 1 W.L.R. 1296 is not in this class because, although there

A    was a tenant's break clause, the time allowed to the tenant for giving notice was automatically extended until one month after the notification of the reviewed rent to the lessee.

Apart from the cases I have already mentioned there are three other reported cases to which I wish to refer briefly. *Stylo Shoes Ltd.* v. *Wetherall Bond Street W.1 Ltd.*, 237 E.G. 343 was a decision on a clause described by Salmon L.J. as very ill drafted and it should perhaps

B    be regarded as one limited to its own facts, but in so far as it proceeded upon the basis of the review clause giving an option to the landlord I am unable to agree with it. The decision in *Mount Charlotte Investments Ltd.* v. *Leek and Westbourne Building Society* [1976] 1 All E.R. 890 was reached with evident reluctance by Templeman J. only because he felt bound by authority to hold that time was of the essence and it

C    should in my opinion be treated as erroneous. I agree with the learned judge's observation at p. 892G that " the analysis of the option rent review clause is a triumph for theory over realism." In *Kenilworth Industrial Sites Ltd.* v. *E. C. Little & Co. Ltd.* [1974] 1 W.L.R. 1069 there was an express provision that any failure to give or receive the landlord's notice to agree the rent for the next five year period " shall not render void the right of the landlord hereunder to require the agreement or

D    determination as aforesaid of a new rent," and that was construed as applying to a failure to give notice within the time limit fixed by the lease. The decision that time was not of the essence seems to me, if I may say so, obviously right. But the case was probably the origin of the dichotomy, which I regard as unfortunate, between review clauses which confer an option and those which merely provide machinery, and I

E    would hope that that dichotomy will now be forgotten.

The result is that in my opinion the landlords in both the instant appeals are entitled to have the rents reviewed notwithstanding that the times for review have expired. If so, the question arises whether the rents fixed by the reviews, assuming that they are higher than the basic rents, will take effect retrospectively from the review dates in the

F    leases, that is from April 8, 1975, in *Cheapside* and from August 31, 1972, in *Burnley*, or only from the dates on which the new rents are ascertained. The main argument against retrospection was based upon the proposition that rent must be certain in amount at the time when it is payable, and that a payment which is uncertain because it depends on the result of an arbitration or valuation could not be rent: see *In re Essoldo (Bingo)*

G    *Ltd.'s Underlease*, 23 P. & C.R. 1 and *Greater London Council* v. *Connolly* [1970] 2 Q.B. 100. That proposition applies to rent in the strict sense, that is rent which can be recovered by distraining, but the word " rent " in modern usage can and often does mean simply a sum of money which the tenant has contracted to pay to the landlords for the use of the premises let: see *Foa's General Law of Landlord and Tenant*, 8th ed. (1957), p. 101:

H
"prima facie rent is the monetary compensation payable by the tenant in consideration for the grant, however it be described or allocated. It is submitted that nevertheless the landlord's common

law right to levy distress is confined to rent in its mediaeval or    A
strict sense."

The question in each case is to determine the sense in which the word
is used. If it is used not in the strict sense but in the sense merely of the
contractual sum due, then it need not be certain at the date on which
it becomes payable: *C. H. Bailey Ltd.* v. *Memorial Enterprises Ltd.*
[1974] 1 W.L.R. 728. In the present case where the rents are for large    B
commercial premises I see no reason why the prima facie meaning of rent
as contractual rent should not prevail as it seems unlikely that the
landlord had in view the use of distraint against the tenant. I would
therefore hold that the rents fixed by the valuation will be payable
retrospectively from the respective review dates.

I would allow both appeals. In *Burnley* I would answer questions
A (ii) and B (i) (a) in the affirmative. In *Cheapside* I would restore the    C
order of Graham J.

*Appeals allowed*

Solicitors in the first appeal: *Turner Peacock*; *Fremont & Co.*
Solicitors in the second appeal: *Stephenson Harwood & Tatham*;    D
*Travers Smith, Braithwaite & Co.*

J. A. G.

E

[HOUSE OF LORDS]

**ANDERSON** . . . . . . . . **APPELLANT**

AND

**DIRECTOR OF PUBLIC PROSECUTIONS** . . . **RESPONDENT**

F

[ON APPEAL FROM REG. *v.* ANDERSON (KEITH)]

1977 Nov. 14, 15            Ormrod L.J., Thompson and Jupp JJ.

1978 April 25;            Lord Wilberforce, Lord Diplock, Lord Salmon,
May 25                            Lord Fraser of Tullybelton and
Lord Keith of Kinkel    G

*Crime — Criminal bankruptcy order — Offences taken into con-
sideration—Minimum limit of loss or damage—Loss through
offences tried below limit — Other offences taken into con-
sideration — No consent by accused — Loss in respect of
" offences . . . which the court takes into consideration in deter-
mining . . . sentence "—Powers of Criminal Courts Act 1973*    H
*(c. 62), s. 39 (1) (2)*

By section 39 of the Powers of Criminal Courts Act 1973:
" (1) Where a person is convicted of an offence . . . and