*a*

# Vossloh Aktiengesellschaft v Alpha Trains (UK) Ltd

[2010] EWHC 2443 (Ch)

*b*

CHANCERY DIVISION

SIR WILLIAM BLACKBURNE SITTING AS A JUDGE OF THE HIGH COURT

30 JUNE, 5 OCTOBER 2010

*c*

*Guarantee – Construction – Nature of guarantor's obligation – Beneficiary demanding payment under guarantee – Basis on which guarantor required to make payment – Whether guarantee in nature of a demand bond.*

*d*  The claimant was the parent company of a number of companies including VL, which manufactured and supplied railway locomotives. The defendant was a member of the Angel Trains Group. The two groups had had dealings for a number of years. Various members of the Angel Trains Group purchased locomotives from VL under the terms of a master purchase agreement (the MPA). The claimant provided a number of parent company guarantees in *e*  respect of VL's obligations under the MPA. In particular, in September 2009, the parties executed a deed referred to as a 'Guarantee' under which the claimant was described as the 'Guarantor'. Members of the Angel Trains Group (and various other persons and entities under them) were described as the 'Beneficiary'. The defendant sought a payment under that guarantee in *f*  respect of 63 locomotives supplied to it by VL which it claimed were defective. The claimant took the view that none, or only a small part, of the money demanded was due under the guarantee, and proceedings ensued. An issue arose as to the basis on which, under the 2009 guarantee, the claimant could be required to make payment to a beneficiary. The claimant contended that its liability under the 2009 guarantee was triggered upon proof (whether by *g*  admission or by decision of a competent court of law) of a breach of contract by any one or more of the entities referred to in the guarantee as the 'Guaranteed Party'. That expression was defined as meaning two named members of the claimant group and 'each other member from time to time' of that group. The defendant argued that the claimant's liability under the guarantee was triggered by demand alone; by that it meant that the obligation *h*  undertaken by the claimant was in the nature of an 'on demand performance guarantee' or 'demand bond', in that it constituted an unconditional independent promise to pay on demand all amounts demanded.

**Held** – As the claimant was not a bank or in any way equivalent to a bank, and the 2009 guarantee had not been given in a banking or like context, there was *j*  a strong presumption that the payment obligations undertaken by the claimant did not constitute a demand bond. Viewing the instrument as a whole, that presumption had not been rebutted and therefore the guarantee was not in the nature of a demand bond. On its true construction, the guarantee was premised upon a failure of performance (including a failure of payment) under a relevant document (see [36], [53], [59], below).

**Notes**                                                                        *a*

For the construction of deeds and other instruments generally, see 13
*Halsbury's Laws* (4th edn) (2007 reissue) para 164.

**Cases referred to in judgment**

*Bache & Co (London) Ltd v Banque Vernes et Commerciale de Paris SA* [1973] 2
  Lloyd's Rep 437, CA.                                                           *b*

*Clement v Clement* [1995] CA Transcript 1336.

*Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2001] EWCA Civ 1806, [2002]
  1 All ER (Comm) 142.

*IIG Capital LLC v Van Der Merwe* [2008] EWCA Civ 542, [2008] 2 All ER (Comm)
  1173.                                                                          *c*

*Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] EWCA
  Civ 395, [2005] 2 All ER (Comm) 289, [2005] 1 WLR 2497.

*Moschi v Lep Air Services Ltd* [1972] 2 All ER 393, [1973] AC 331, [1972] 2 WLR
  1175, HL.

**Claim**                                                                        *d*

The claimant, Vossloh Aktiengesellschaft (VAG), sought declaratory relief
against Alpha Trains (UK) Ltd, which was sued in its own right and as
representative defendant on behalf of all beneficiaries under a guarantee dated
15 September 2009, following a demand made by Alpha under that guarantee.
The facts are set out in the judgment.
                                                                                 *e*

*Geraldine Andrews QC* and *James Willan* (instructed by *Trowers & Hamlins LLP*)
  for VAG.
*Stephanie Barwise QC* and *Jennifer Jones* (instructed by *DLA Piper UK LLP*) for
  Alpha.

                                                      *Judgment was reserved.*   *f*

5 October 2010. The following judgment was delivered.

**SIR WILLIAM BLACKBURNE.**
                                                                                 *g*
INTRODUCTION

[1] These proceedings are concerned with the true construction of an
agreement in writing executed as a deed and dated 15 September 2009. It is
between the claimant, Vossloh Aktiengesellschaft (VAG), and Angel Trains
International Ltd. The latter has since undergone a change of name to Alpha
Trains (UK) Ltd (Alpha). The agreement describes itself as a 'Guarantee'. I shall
refer to it as the '2009 guarantee'. VAG is described in it as the 'Guarantor', and  *h*
Alpha and its affiliates are collectively referred to as the 'Angel Trains Group'.
Members from time to time of that group 'and their respective agents, assigns,
directors, employees, officers, secondees and servants' are each described as a
'Beneficiary' with 'Beneficiaries' construed accordingly.

[2] The issue which I am asked to decide is the basis on which, under the   *j*
2009 guarantee, VAG can be required to make payment to a beneficiary.

[3] It is the contention of VAG, which has appeared by Geraldine
Andrews QC and James Willan, that its liability under the 2009 guarantee is
triggered upon proof (whether by admission or by decision of a competent
court of law) of a breach of contract by any one or more of those entities

*a*   referred to in it as the 'Guaranteed Party'. That expression is defined as meaning two named companies in the Vossloh group 'and each other member from time to time' of that group.

    [4] It is the contention of Alpha, which is sued in its own right and as representative defendant on behalf of all the beneficiaries under the 2009 guarantee and has appeared by Stephanie Barwise QC and Jennifer Jones,

*b*   that VAG's liability under it is triggered by a demand alone. By that is meant (as counsel described it in their skeleton argument) that the obligation undertaken by VAG is in the nature of an 'on demand performance guarantee' in that it constitutes an unconditional independent promise to pay on demand all amounts demanded.

*c*     [5] VAG was prompted to bring these proceedings with a view to determining the basis of its liability under the 2009 guarantee following the receipt by it of a letter of demand to VAG claiming in excess of €17m. That letter was replaced by a revised demand dated 22 February 2010 in the sum of €17,267,354. VAG contends that none, or at the most only a small part, of that sum is payable under the 2009 guarantee.

*d*

BACKGROUND

    [6] VAG is the parent company of the Vossloh group of companies which are leaders in the rail infrastructure and technology market. One of its subsidiaries is Vossloh Locomotives GmbH (VL) which manufactures and supplies

*e*   locomotives. It previously had another name.

    [7] Alpha, under its former name Angel Trains International Ltd, was a member of the Angel Trains group which was formerly owned by the Royal Bank of Scotland Group plc (RBS). On completion of the sale of the Angel Trains group by RBS in August 2008, its United Kingdom and international operations were separated and now function under separate

*f*   ownership and separate management. From December 2009 the international businesses began using the Alpha Trains name.

    [8] The commercial dealings between the Alpha group (as it is now called) and the Vossloh group relevant to these proceedings date back to 2000. On 13 September 2000 a company in the (then) Angel Trains group entered into a co-operation agreement with VAG to facilitate a mechanism for the sale of

*g*   locomotives by Vossloh group companies to Angel Trains group companies and to create an operations and maintenance services facility for the locomotives. This led to the establishment that same year of two companies owned, albeit in unequal shares, by the two groups. One of those two companies was called Locomotive Capital Ltd (LCL), 10% of whose shares

*h*   were held by the Vossloh group and the remaining 90% by the Angel Trains group. LCL in its turn had three wholly owned subsidiaries. One of them, referred to for short as LCUKL, was the purchasing party under a master purchase agreement (the MPA) (also known as the 'German MPA') dated 23 April 2001 and made with VL. Another of the subsidiaries was the purchasing party under other purchase agreements including, in particular, two

*j*   agreements referred to in evidence as the 'German agreements' and another which was referred to as the '2001 agreement'.

    [9] The MPA acted as a framework agreement pursuant to which LCUKL could purchase locomotives from VL from time to time by issuing 'Call-Off Notices' (CONs). The German agreements and the 2001 agreement operated in a similar manner.

[10] The other jointly-owned company was set up to provide the maintenance and services operation. This company was owned 10% by the Angel Trains group and the remaining 90% by the Vossloh group. A representative of the minority shareholder was appointed to the board of each of the two jointly-owned companies.

[11] From at least 2002 onwards, locomotives were purchased from VL by various members of the Angel Trains group issuing CONs under the MPA. The purchasers included group affiliates in Belgium, Germany, Switzerland and Luxembourg. The same happened under the German agreements and the 2001 agreement.

[12] Prior to the sale of the Angel Trains group in the summer of 2008, RBS, the ultimate parent of the group, used its own money to finance the purchase of locomotives pursuant to the MPA. The group purchased locomotives on a speculative basis before any third party customers had committed to acquiring them. Payment was in stages prior to the delivery of the locomotives and before therefore any income could be generated from them. By the end of 2002, the group was committed to the spending of €95m on purchasing locomotives from VL.

[13] In around late 2002, RBS, in the light of the level of its financial outlay and exposure, made it a condition of the grant of its approval to any further locomotive purchases from VL that VAG should provide a parent company guarantee of VL's obligations under the MPA. The first such guarantee was entered into on 5 March 2003. It was given in favour of LCUKL alone. This guarantee was replaced by a guarantee dated 15 September 2006 which extended the guarantee to the obligations of a VL affiliate in respect of an order for the purchase of locomotives in Spain. The 2006 guarantee also enabled other companies within the Angel Trains group to benefit from the guarantee and to make claims under it.

[14] In consequence of the sale and restructuring of the Alpha/Angel Trains group in the summer of 2008, the 2006 guarantee was replaced on 15 September 2009 by the further guarantee, namely the 2009 guarantee which is the subject of these proceedings.

[15] Alpha has complained that 63 G1206 cargo locomotives supplied to them by VL suffer from various defects in their engines and gearboxes. Fifty-two of the locomotives were supplied under CONs issued pursuant to the MPA. The remaining 11 were supplied under the German agreements and the 2001 agreement.

[16] A formal notice of dispute under cl 21 of the MPA was given by Alpha on 12 September 2008. This was followed by a pre-action protocol letter of claim dated 29 January 2010, which also related solely to the locomotives supplied pursuant to the MPA. It claimed losses in excess of €14m. On the same date, Alpha sent a letter of demand to VAG under the 2009 guarantee claiming losses in excess of €17m in respect of all 63 locomotives. This, as I have mentioned, was replaced by a revised demand dated 22 February 2010 in the sum of €17,267,354, which again related to all 63 locomotives. The bulk of that sum is made up of what Alpha estimates to be costs of repair.

[17] Alpha accepts that it has not yet expended any money on repair, or incurred a liability to pay anything approaching the amount demanded. It also admits that if it is paid the €17m and expends it, it cannot afford to pay the money back to VAG. Alpha says that it has purchased six new engines for its fleet at a cost of €1·8m because the bulk of the fleet is undergoing maintenance

*a*  or repair, and that it has compensated customers in the total sum of €687,554 for poor performance of the locomotives or for their withdrawal from service for longer than anticipated. Those two figures total €2,487,544.

[**18**] VAG does not accept that Alpha would be successful in recovering either of these heads of damage from VL or VAG even if it were to succeed in proving liability. Proceedings in respect of the 52 locomotives supplied

*b*  pursuant to the MPA have been issued against VL by LCUKL and other members of the Alpha group in the Technology and Construction Court. Both liability and quantum are in dispute. There will be detailed technical issues (involving expert evidence) on both sides. There has been an order for service of the particulars of claim in those proceedings by 6 August 2010.

*c*
THE LAW
[**19**] Before coming to the 2009 guarantee I set out my understanding of the relevant law, starting with some general observations. In the summary that follows I have drawn from the section headed 'In general' in Ch 44 (on suretyship) in vol 2 of *Chitty on Contracts* (30th edn, 2008), and from Ch 1 of

*d*  Andrews and Millett *Law of Guarantees* (5th edn, 2007). The propositions which I set out accord with my experience of the law in this area and, in any event, are extensively supported by authority in the footnotes to both books. I am mindful of the fact that Ms Andrews is the co-author of the second of those textbooks.

[**20**] Contracts of suretyship, of which the 2009 guarantee is an example, are

*e*  an area of law bedevilled by imprecise terminology and where therefore it is important not to confuse the label given by the parties to the surety's obligation (although the label may be indicative of what the parties intend) with the substance of that obligation. Because the parties are free to make any agreement they like, each case must depend upon the true construction of the actual words in which the surety's obligation is expressed. This involves

*f*  'construing the instrument in its factual and contractual context having regard to its commercial purpose', a task which the court approaches 'by looking at it as a whole without any preconceptions as to what it is': see Tuckey LJ in *Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2001] EWCA Civ 1806 at [11] and [15], [2002] 1 All ER (Comm) 142 at [11] and [15]. Further, as Ms Andrews observed, the court must endeavour to avoid a construction which renders a

*g*  clause otiose or duplicative.

[**21**] A contract of suretyship is in essence a contract by which one person, the surety, agrees to answer for some existing or future liability of another, the principal (or principal debtor), to a third party, the creditor, and by which the surety's liability is in addition to, and not in substitution for, the liability of

*h*  the principal. Even the use of the expressions 'creditor' and 'debtor' (as in 'principal debtor') can be misleading: the liability which is 'guaranteed' may consist of the performance of some obligation other than the payment of a debt, and it does not have to be a contractual liability.

[**22**] Contracts of suretyship fall into two main categories: contracts of guarantee and contracts of indemnity. Because they have many similar

*j*  characteristics, and similar rights and duties arise between the parties, it is not unusual to find the term 'guarantee' used loosely to describe what is in reality an indemnity.

[**23**] A contract of guarantee, in the true sense, is a contract whereby the surety (the guarantor) promises the creditor to be responsible for the due performance by the principal of his existing or future obligations to the

creditor if the principal fails to perform them or any of them. Depending on its    *a*
true construction, the obligation undertaken by the surety may be no more
than to discharge a liability, for example a particular debt, if the principal does
not discharge it so that if for any reason the principal ceases to be liable to pay
that debt (it may have been discharged and replaced by some other debt or
liability) the surety will not come under any liability to the creditor. The
surety's liability in such a case is conditional upon the principal's failure to pay    *b*
the particular debt so that if the condition is fulfilled the surety's liability will
sound in debt. In contrast to that is the more usual case (sometimes referred to
as a 'see to it' guarantee) where, on the true construction of the contract, the
surety undertakes that the principal will carry out his contract and will answer
for his default. In such a case, if for any reason the principal fails to act as    *c*
required by his contract he not only breaks his own contract, but he also puts
the surety in breach of his contract with the creditor, thereby entitling the
creditor to sue the surety, not for the unpaid debt, but for damages. The
damages are for the loss suffered by the creditor due to the principal having
failed to do what the surety undertook that he would do: see *Moschi v Lep Air
Services Ltd* [1972] 2 All ER 393 at 398, [1973] AC 331 at 344–345 (per    *d*
Lord Reid).

[24] An essential distinguishing feature of a true contract of guarantee—but
not its only one—is that the liability of the surety (ie the guarantor) is always
ancillary, or secondary, to that of the principal, who remains primarily liable to
the creditor. There is no liability on the guarantor unless and until the principal
has failed to perform his obligation. The guarantor is generally only liable to    *e*
the same extent that the principal is liable to the creditor. This has the
consequence that there is usually no liability on the part of the guarantor if the
underlying obligation is void or unenforceable, or if the obligation ceases to
exist (to which principle—the so-called principle of co-extensiveness—there
are, however, a number of exceptions). It will depend upon the terms of the    *f*
contract of suretyship whether a demand must be made on the principal or on
the guarantor (or on both) in order to trigger the guarantor's obligation to pay.
Many modern guarantees expressly negative the need for the creditor to make
a demand on the principal or on the guarantor or to take any other given step
before enforcing the guarantee.

[25] In contrast to the contract of guarantee is the contract of indemnity. In    *g*
one sense all contracts of guarantee (strictly so called) are contracts of
indemnity (as indeed are many contracts of insurance) since, in its widest
sense, an indemnity is an obligation imposed by operation of law or by
agreement of the parties. In the narrower sense in which, in the current
context, the expression occurs, a contract of indemnity denotes a contract
where the person who gives the indemnity undertakes his indemnity obligation    *h*
by way of security for the performance of an obligation by another. Its
essential distinguishing feature is that, unlike a contract of guarantee (strictly
so called), a primary liability falls upon the giver of the indemnity. Unless (as is
quite possible) he has undertaken his liability jointly with the principal, his
liability is wholly independent of any liability which may arise as between the    *j*
principal and the creditor. It will usually be implicit in such an arrangement
that as between the principal and the giver of the indemnity, the principal is to
be primarily liable, so that if the indemnifier has to pay first he has a right of
recourse against the principal. (It will not be so if, for example, the indemnifier
has not undertaken his indemnity obligation at the request of the principal.) It

*a*  is this feature which leads to the person giving the indemnity to be described as a 'surety' although, strictly, the contract of indemnity cannot itself be a contract of suretyship.

[**26**] The fact that the obligation to indemnify is primary and independent has the effect that the principle of co-extensiveness does not apply to a contract of indemnity. The indemnity not only shifts the burden of the principal's
*b*  insolvency on to the indemnifier but it also safeguards the creditor against the possibility that his underlying transaction with the principal is void or unenforceable. It also prevents the discharge of the principal or any variation or compromise of the creditor's claims against the principal from necessarily affecting the liability of the indemnifier under his contract with the creditor.
*c*  Otherwise, the rights and duties of the parties to a contract of indemnity are generally the same as those of the parties to a contract of guarantee.

[**27**] So much for some of the essential differences. Whether a particular contract of suretyship is of the one kind or the other or, indeed, a combination of the two turns on its true construction. A contract which contains a provision preserving liability in circumstances where a guarantor would otherwise be
*d*  discharged (for example, the granting of time by the creditor to the principal or a material variation of the underlying contract between the principal and the creditor, without (in either case) the guarantor's consent) will usually indicate that the contract is one of guarantee because such a provision would be unnecessary if the contract were one of indemnity. On the other hand, a provision stating that the surety is to be liable in circumstances where the
*e*  principal has ceased to be liable (for example, on the principal's release by the creditor) may be indicative either of a guarantee (because the provision would be unnecessary in the case of a contract of indemnity) or of an indemnity (because it makes clear that the liability of the surety was intended to continue regardless of the liability of the principal); see, for example, *Clement v Clement*
*f*  [1995] CA Transcript 1336 (20 October 1995, unreported). Context is important in deciding what the nature is of the obligation under consideration as even minor variations in language, plus a different context, can produce different results: see *IIG Capital LLC v Van Der Merwe* [2008] EWCA Civ 542 at [20], [2008] 2 All ER (Comm) 1173 at [20] (per Waller LJ). But if, in a contract of guarantee (strictly so called), the parties are minded to exclude any one or more of the
*g*  normal incidents of suretyship, 'clear and unambiguous language must be used to displace the normal legal consequences of the contract': see the *IIG Capital* case at [19] (per Waller LJ).

[**28**] This brings me to the so-called 'performance bond', sometimes known as a 'performance guarantee', often as a 'demand bond' or 'demand guarantee' or even as a 'first demand guarantee'. In the context of the present dispute I
*h*  prefer the expression 'demand bond'. In essence it is a particularly stringent contract of indemnity. It is a contractual undertaking by a person, usually a bank, to pay a specified amount of money to a third party on the occurrence of a stated event, usually the non-fulfilment of a contractual obligation by the principal to that third party. Sometimes the wording of the contract has the result that the liability of the person who has given the bond arises on mere
*j*  demand by the creditor, notwithstanding that it may be evident that the principal is not in any way in default or even that the creditor himself is in default under his contract with the principal. It all depends on the wording of the instrument. It is often a difficult question to determine whether, on its true construction, a particular contract which provides for payment on demand is a performance or demand bond (where the obligation to pay is triggered by a

demand alone or by a demand accompanied by the provision of specified   *a*
documents) or whether it is a guarantee (strictly so called) where the obligation
to pay is of the 'see to it' kind, ie conditional on proof by the creditor of
default by the principal.

[29] A good example of the need to distinguish between the two is provided
by the recent decision of the Court of Appeal in *Marubeni Hong Kong and South
China Ltd v Government of Mongolia* [2005] EWCA Civ 395, [2005] 2 All ER   *b*
(Comm) 289, [2005] 1 WLR 2497. In that case the claimant sold goods to a
Mongolian company for a price payable by instalments. The agreement
provided for a document described as a 'guarantee' to be issued in a specified
form by the Mongolian central bank on behalf of the defendant government.
In the event a letter in a modified form (the MMOF letter) signed on behalf of   *c*
the Mongolian Ministry of Finance was provided. It stated that in consideration
of the sale agreement—

'the undersigned Ministry of Finance of Mongolia unconditionally
pledges to pay to you upon your simple demand all amounts payable under
the Agreement if not paid when the same becomes due ... and further   *d*
pledges the full and timely performance and observance by the Buyer of all
the terms and conditions of the Agreement.'

An accompanying legal opinion from the Deputy Minister of Justice of
Mongolia referred to the 'guarantee' and expressed the opinion that the
'guarantor' had full power to enter into the 'guarantee'. The contract in the
letter was stated to be governed by English law and that disputes were subject   *e*
to the jurisdiction of the English court. Goods were supplied under the sale
agreement. Various payment rescheduling agreements were later entered into.
Following default by the purchaser of the goods to make payments due, one of
the questions which arose was whether the obligation of the Mongolian
Ministry of Finance had been discharged by the variations to the sale
agreement since, it was contended, this had occurred without its consent. The   *f*
contention assumed that the MMOF letter constituted a guarantee (strictly so
called) and not, as was contended by the claimant seller, a performance bond.
Cresswell J held that it was a guarantee and that the defendant government was
discharged by the variation to the sale agreement. The claimant appealed. The
appeal failed.

[30] In the Court of Appeal Carnwath LJ gave the leading judgment with   *g*
which the other two members of the court agreed. He felt able (at [23]) to
distinguish previous authorities, where the court had found there to be a
performance or demand bond, on the basis that performance or demand
bonds, however described, 'are a specialised form of irrevocable instrument,
developed by the banking world for its commercial customers' which the   *h*
courts had accepted as equivalent to irrevocable letters of credit. 'It cannot be
assumed', he continued, 'that cases relating to such banking instruments
provide any useful guidance when construing guarantees given outside the
banking context.' He stated (at [28]) that such cases 'provide no useful analogy
for interpreting a document which was not issued by a bank and which
contains no overt indication of an indication to create a performance bond or   *j*
anything analogous to it'. He pointed out that the MMOF letter was not a
banking instrument and that it was not described, either on its face or in the
supporting legal opinion, in terms appropriate to a demand bond or something
having similar legal effect. Accepting that the terminology used in the
transaction was not conclusive he stated nevertheless (at [30]) that, in a

*a*  transaction outside the banking context, the absence of such language created
'a strong presumption' against the existence of such an obligation. He went on
(at [31]) to consider whether there were sufficient indications in the wording of
the MMOF letter to displace the presumption. Notwithstanding the words
'unconditionally pledges' and 'simple demand' in the words of obligation in the
letter, he observed that the obligation was only to arise if 'the amounts payable
*b*  under the agreement (are) not paid when the same becomes due'. He said that
there was no reason not to give those words their ordinary meaning and
(at [32]) that the pledge of 'the full and timely performance and observance by
the buyer of all the terms and conditions of the agreement' reinforced that
sense. He noted that the letter contained a primary obligation in the form of an
*c*  indemnity against cost or damage resulting from the buyer's default but
considered that it did not qualify the ordinary meaning of the earlier part of
the letter.

[**31**] I should refer to one other authority to which my attention was drawn.
This was the *IIG Capital* case [2008] 2 All ER (Comm) 1173 (referred to briefly
above). It is an example of a transaction, outside the banking context, where
*d*  the presumption against the existence of a demand guarantee (or the like) was
successfully rebutted. Indeed, it was the only one of which Ms Andrews said
that she was aware.

[**32**] In that case the claimant, a New York entity, gave financial assistance to
a company of which Mr and Mrs Van Der Merwe were directors. Each of them
entered into a document described as a 'guarantee' which stated that the
*e*  guarantor 'as principal obligor and not merely as surety' agreed that 'it will
immediately upon demand unconditionally pay to the Lender the Guaranteed
moneys which have not been … paid'. The document provided that '[a]
certificate in writing signed by a duly authorised officer … stating the amount
at any particular time due and payable by the Guarantor … shall, save for
manifest error, be conclusive and binding on the Guarantor for the purposes
*f*  hereof'. Following a demand on the company which went unpaid the claimant
sent letters to the Van Der Merwes reciting the company's failure to pay and
certifying the amount due and payable by each of them under the guarantee. It
demanded payment within two days. The Van Der Merwes did not pay. The
question was whether, properly construed, the obligation which each of the
Van Der Merwes had undertaken was a demand bond or whether it gave rise to
*g*  guarantees strictly so called. The relevance of this was that under New York
law, which governed the loan agreement, there was on the evidence a defence
which would provide the borrower (the company of which the Van Der
Merwes were directors) with a complete answer to the claimant's demand on it
and would therefore (on the principle of co-extensiveness assuming the
*h*  obligation was no more than a guarantee strictly so called) provide the Van Der
Merwes with a defence as well. The Master gave summary judgment to the
claimant. The Van Der Merwes's appeal to Lewison J was dismissed. A further
appeal to the Court of Appeal was likewise unsuccessful.

[**33**] In the Court of Appeal, Waller LJ (with whom the other two members
of the court agreed) considered, in agreement with Lewison J, that the
*j*  obligation was in the nature of a demand bond or guarantee under which the
Van Der Merwes were primary debtors. Acknowledging that the issue turned
on the true construction of the agreement and that, following what had been
said in the *Marubeni Hong Kong and South China* case, there was, outside the
banking context, a strong presumption against instruments of this kind being
demand bonds unless there was clear wording to the contrary, Waller LJ was of

the view that the clear language of the operative clauses was effective to rebut   *a*
the presumption. He referred (at [21]) to the context in which the transaction
arose, namely 'a company run by the two shareholders borrowing money for a
business over which those shareholders have complete control'. He pointed out
(at [31]) that the guarantor (Mr or Mrs Van Der Merwe) had agreed 'as
principal obligor [and] not merely as surety' that he (or she) would           *b*
'immediately upon demand and unconditionally pay … the Guaranteed
Moneys' and that guaranteed moneys were defined as 'all moneys and
liabilities … which are now or may at any time be due, owing, payable, *or
expressed to be due, owing or payable, to the Lender from or by the Borrower …*'. He
also pointed to the clause stating that a certificate in due form stating the
amount due was, except for manifest error, conclusive and binding, noted that   *c*
there was no manifest error in the certificate served on the Van Der Merwes,
and, in agreement with Lewison J, considered that the presence of that
clause put the matter beyond doubt.

[34] The result of the foregoing brief survey is that, with the parties free to
agree whatever terms they choose, there is in this field of law a spectrum of
contractual possibilities ranging from the classic contract of guarantee, *d*
properly so called, at the one end, where the liability of the guarantor is
exclusively secondary and will be discharged if, for example, there is any
material variation to the underlying contract between principal and creditor, to
the performance or demand bond (or demand guarantee) at the other end,
where liability in the giver of the bond may be triggered by mere demand and
without proof of default by the principal (and indeed where it may be apparent   *e*
that the principal is not in default). There may be little to distinguish (and it
may not matter) whether the obligation undertaken is in the nature of a
guarantee (strictly so called) or an indemnity. Where it does matter, the
question is whether the liability to be enforced is secondary (or ancillary) to
that of the principal (however qualified that liability may be), in which case the
obligation is in the nature of a guarantee, or primary, in which case it will be in   *f*
the nature of an indemnity and, if the latter, may be enforceable merely on
demand (as with a performance or demand bond) or conditional on proof of
default by the principal or on satisfaction of some other event or requirement.
Where on the spectrum a particular case falls may call for a nice judgment on
the part of the court faced with the task of construing the instrument in
question. The instant case calls for just such a judgment.                       *g*

THE 2009 GUARANTEE
[35] The following are the material terms of the 2009 guarantee:

'1.1 Definitions                                                             *h*
In this Guarantee (including the recitals), except where the context
otherwise requires …
Angel Trains Group means Angel Trains and its Affiliates.
Beneficiary means each member of the Angel Trains Group from time
to time and their respective agents, assigns, directors, employees, officers,
secondees and servants. Beneficiaries shall be construed accordingly.         *j*
Call-Off Notice means together each German Call-Off Notice and
Spanish Call-Off Notice and includes a reference to any of them …
German Call-Off Notice means each contract for the sale and purchase
of, as applicable, locomotives and other items as contemplated by the
German MPA …

*a*      Guaranteed Party means [VL], Vossloh Espana S.A.U. and each other member from time to time of the Guarantor Group.

Guarantor Group means the Guarantor and its Affiliates ...

Parties means the parties to this Guarantee.

Relevant Document means each of

*b*      (a) the German MPA;

(b) each German Call-Off Notice;

(c) the Spanish MPA;

(d) each Spanish Call-Off Notice; and

any other agreement for the sale and purchase of locomotives and/or related items entered into between any member of the Angel Trains Group and any member of the Guarantor Group, from time to time.

*c*      and all notices, consents, certificates and other documents from time to time issued pursuant to or in connection with any of the above and all other agreements, letters and documents designated as such by the Parties and Relevant Documents shall be construed accordingly.

*d*      Secured Obligations means any and all present and future monies, liabilities and obligations (whether for the payment of money or otherwise and whether actual or contingent and whether owed jointly or severally or in any other capacity whatsoever) owed by any member of the Guarantor Group to a Beneficiary under or in connection with a Relevant Document. References to Secured Obligations shall include references to any part thereof.

*e*      Spanish Call-Off Notice means each contract for the sale and purchase of, as applicable, locomotives and other items as contemplated by the Spanish MPA ...

1.2 Interpretation

Except where the context otherwise requires, in this Guarantee ...

*f*      (j) references to the obligations guaranteed under this Guarantee shall include a reference to indemnified obligations ...

2. GUARANTEE AND INDEMNITY

2.1 In consideration of the Angel Trains Group placing orders under any Call-Off Notice the Guarantor hereby unconditionally and irrevocably as a continuing obligation and as principal debtor and not merely as surety, as a separate, continuing and primary obligation:

*g*      (a) guarantees to each Beneficiary the due and punctual observance and performance by each Guaranteed Party of each obligation owed by such Guaranteed Party to that Beneficiary contained in the Relevant Documents to which that Guaranteed Party is a party;

(b) guarantees to each Beneficiary the due and punctual payment by

*h*      each Guaranteed Party of all of its Secured Obligations;

(c) undertakes with each Beneficiary that whenever a Guaranteed Party does not pay any of the Secured Obligations as and when the same shall be expressed to be due, the Guarantor shall forthwith on demand pay such Secured Obligations which have not been paid at the time such demand is made,

*j*      (d) as a separate and independent stipulation, agrees that if any purported obligation or liability of the Guaranteed Party which would have been the subject of this Guarantee had it been valid and enforceable is not or ceases to be valid or enforceable against a Guaranteed Party on any ground whatsoever whether or not known to any Beneficiary, the Guarantor shall nevertheless be liable to the relevant Beneficiary in respect

of that purported obligation or liability as if the same were fully valid and   *a*
enforceable and the Guarantor was the principal debtor in respect thereof
and shall be paid or caused to be paid by the Guarantor under this
Guarantee upon demand; and

(e) as principal obligor and as a separate and independent obligation and
liability, indemnifies each Beneficiary against any losses suffered by it from
time to time in connection with or as a direct or indirect result of the   *b*
failure of a Guaranteed Party to duly and punctually perform its terms,
representations and warranties, conditions, covenants and obligations
contained in the Relevant Documents to which it is a party or failure to
duly and punctually pay the Secured Obligations or as a result of the whole
or any part of the Relevant Documents being or becoming void, voidable,   *c*
unenforceable or ineffective as against that Beneficiary for any reason
whatsoever, irrespective of whether such reason or any related fact
or circumstance was known or ought to have been known to that
Beneficiary ...

3. PAYMENTS

3.1 All sums payable hereunder shall be paid on demand to such bank   *d*
account as may be specified in any demand made by a Beneficiary
hereunder, in immediately available funds, free of any restriction or
condition and free and clear of and without any deduction or withholding,
whether for or on account of tax, by way of set-off or otherwise, except to
the extent required by law ...

4. CONTINUING GUARANTEE   *e*

This Guarantee shall be effective from the date hereof. The guarantee
constituted by this Guarantee shall be continuing and shall extend to the
ultimate balance of the Secured Obligations and to the performance in full
of all obligations guaranteed hereunder, regardless of any intermediate
payment or discharge in whole or in part or performance in part.   *f*

5. DISCHARGE AND RELEASE

5.1 The Guarantor may not terminate this Guarantee by notice to any
Beneficiary or otherwise ...

6. WAIVER OF DEFENCES

6.1 The liabilities and obligations of the Guarantor under this Guarantee
shall remain in force notwithstanding any act, omission, neglect, event or   *g*
matter whatsoever whether or not known to the Guarantor, any
Guaranteed Party or any Beneficiary (other than the irrevocable payment
of the Secured Obligations to a Beneficiary and the full performance of all
obligations guaranteed hereunder) and the foregoing shall apply, without
limitation, in relation to:

(a) anything which would have discharged the Guarantor (wholly or in   *h*
part) whether as surety, co-obligor or otherwise or which would have
afforded the Guarantor any legal or equitable defence;

(b) any winding up, dissolution, reconstruction or reorganisation, legal
limitation, disability, incapacity or lack of corporate power or authority or
other circumstances of, or any change in the constitution or corporate
identity or loss of corporate identity by, the Guaranteed Party or any other   *j*
person connected with Guaranteed Party or the Guarantor; and

(c) anything which renders the Guaranteed Party's obligations void,
invalid or unenforceable under the Relevant Documents and any defence

*a*   or counterclaim which the Guaranteed Party may be able to assert against a Beneficiary or affects a Beneficiary's ability to recover amounts from the Guaranteed Party.

6.2 Without limiting Clause 6.1, none of the liabilities or obligations of the Guarantor under this Guarantee shall be impaired by any Beneficiary:

*b*   (a) agreeing with a Guaranteed Party any amendment, variation, assignment, novation or departure (however substantial or material) of, to or from a Relevant Document so that any such amendment, variation, assignment, novation or departure (including any which may have been made before the signing of this Guarantee) shall, whatever its nature, be binding upon the Guarantor in all circumstances, notwithstanding that it may increase or otherwise affect the liability of the Guarantor;

*c*   (b) releasing or granting any time or any indulgence of any kind to the Guaranteed Party or any third party (including, without limitation, the waiver of any preconditions for drawing under, or of any breach of, any Relevant Document, or entering into any transaction or arrangements whatsoever with or in relation to a Guaranteed Party and/or any third party;

*d*   (c) taking, accepting, varying, dealing with, enforcing, abstaining from enforcing, surrendering or releasing any security, right of recourse, set off or combination or other right or interest held by a Beneficiary for the Secured Obligations and the other obligations guaranteed hereunder or in relation to any Relevant Document in such manner as it or they think fit;

*e*   (d) claiming, proving for, accepting or transferring any payment in respect of the Secured Obligations and the other obligations guaranteed hereunder in any composition by, or winding up of, a Guaranteed Party and/or any third party or abstaining from so claiming, proving for, accepting or transferring;

(e) any termination of a Relevant Document;

*f*   (f) any act or omission of a Guaranteed Party pursuant to any agreement with the Guarantor or otherwise; or

(g) any other circumstance, matter or thing which (in the absence of this provision) would or might have that effect, except a discharge or amendment of this Guarantee expressly made or agreed to by Angel Trains in writing.

*g*   6.3 The Guarantor hereby waives any right it may have of first requiring a Beneficiary to proceed against or enforce any other rights or security or claim payment from any person (including each Guaranteed Party) before claiming from the Guarantor under this Guarantee.

6.4 Subject to the terms of this Guarantee, and in particular this Clause 6, the Guarantor shall be entitled to raise such defences which are available to the Guaranteed Party under the Relevant Document only after the Guarantor has complied with Clause 2.1 of this Guarantee. However the Guarantor is not entitled to refuse payment or performance based on this right to reclaim.

7. DEMANDS

*j*   Demands under this Guarantee may be made from time to time, and the liabilities and obligations of the Guarantor under this Guarantee may be enforced, irrespective of

(a) whether any demands, steps or proceedings are being or have been made or taken against the Guaranteed Party and/or any third party; or

(b) whether or in what order any security to which a Beneficiary may be   *a*
entitled in respect of the Secured Obligations and the other obligations
guaranteed hereunder is enforced ...

11. MISCELLANEOUS PROVISIONS

11.1 This Guarantee is not personal to Angel Trains and may be assigned
by Angel Trains to any person, firm or company, provided that Angel
Trains shall notify the Guarantor in writing of such assignment,   *b*
whereupon the Guarantor shall be obliged to make any payment
demanded under this Guarantee to the person, firm or company specified
in such notice and such payment shall constitute a full and valid discharge
of the Guarantor in relation to that payment. The Guarantor is not entitled
to transfer, novate or assign any of its obligations under this Guarantee.   *c*

11.2 A certificate of a Beneficiary setting forth the amount of any
Secured Obligations not then paid by a Guaranteed Party shall be
conclusive evidence of such amount against the Guarantor in the absence
of any manifest error.

11.3 No failure or delay by a Beneficiary in exercising any right or
remedy provided by law under or pursuant to this Guarantee shall impair   *d*
that right or remedy or operate or be construed as a waiver or variation of
it or preclude its exercise at any subsequent time and no single or partial
exercise of that right or remedy shall preclude any other or further exercise
of it or the exercise of any other right or remedy ...

12. GOVERNING LAW AND JURISDICTION

12.1 This Guarantee is governed by and shall be construed in accordance   *e*
with, English law ...'

THE ARGUMENTS

[36] As VAG is not a bank or in any way equivalent to a bank and the 2009
guarantee was not given in a banking or like context, the jurisprudence
discussed above raises a strong presumption that the payment obligations   *f*
undertaken by VAG do not constitute a demand bond. What grounds then are
there in the context and wording of the document for rebutting that
presumption?

[37] Dealing first with context, Ms Barwise pointed to the following factors:
(1) express requirements in a memorandum of understanding entered into
between VAG, LCUKL and Angel Train Contracts Ltd on 11 February 2000 and   *g*
also in a co-operation agreement between Angel Trains Ltd (formerly Angel
Train Contracts Ltd) and VAG on 13 September 2000 to act in good faith
towards each other in the furtherance of their mutual business interests, (2) the
fact that the two groups jointly owned LCL which in turn owned LCUKL and
LCD (the locomotive purchasers under the MPA and the other agreements: see   *h*
[8], above), thereby demonstrating the extent to which the groups were bound
up in each other's activities and shared a community of interest, (3) the nature
of the MPA as a framework agreement with no limit either on the number of
locomotives to be purchased under it or on its duration, a circumstance
matched in the 2009 guarantee which states (by cl 4) that it is to 'extend to the
ultimate balance of the Secured Obligations' and (by cl 5.1) that VAG may not   *j*
terminate it in any way and (4) Alpha's requirement which it says it
communicated to VAG (although VAG disputes this) for a form of security
which could be realised promptly to protect it from exposure arising from
non-delivery of or defective locomotives. Ms Barwise did not suggest that these
factors in themselves showed an intention that the 2009 guarantee should

*a*  operate as a performance bond but submitted that they made it more likely that, if the wording of the 2009 guarantee justified such a construction, I should be the more willing to conclude that that is indeed what it is.

[**38**] Coming next to the wording of the 2009 guarantee Ms Barwise submitted that, properly understood, cll 2.1, 3.1, 6.3, 6.4, 7 and 11.2 show that *b* the document constitutes a demand bond. The opening words of cl 2.1 stating that VAG's contractual promises were entered into 'as a principal debtor and not merely as a surety, as a separate, continuing and primary obligation' show that all that follows in that clause are primary and not secondary obligations. Clause 3.1 states in terms that all that is payable under the instrument is to be 'paid on demand'. Clause 6.3, whereby VAG waives any right to require a *c* beneficiary to proceed against any other person before claiming against VAG, emphasises the immediacy and primacy of VAG's obligations. Likewise cl 6.4, stating in effect 'pay now, argue later'. This would be unnecessary in a true guarantee since, under a guarantee, the guarantor is always entitled to raise defences available to the principal. Clause 7, when read with cl 6.4, shows that the beneficiary is entitled to payment by VAG irrespective of whether it has *d* made a demand or proceeded against a third party. This is reinforced by cl 11.2 stating that the beneficiary's certificate of the amount due is to be 'conclusive evidence of such amount' save for manifest error.

[**39**] Taking these indications in the wording with the contractual context, the 2009 guarantee, she submitted, is correctly to be interpreted as a demand bond.
*e*
[**40**] Ms Andrews submitted that the key clause defining VAG's obligations is cl 2.1. Subclauses (a) and (b) of that clause are secondary obligations (and are expressed in the classic language of a guarantee); para (c) is probably also secondary in nature; paras (d) (almost certainly) and (e) (certainly) are primary obligations. But, whether or not the obligations are primary or secondary in *f* nature, the clause assumes that there has been default by the principal (ie VL) in performing the underlying MPA or in making a payment that is contractually due under it. Clause 2 cannot therefore be construed as giving rise to any liability to pay against a mere assertion of breach or a failure to pay money.

*g*  [**41**] Ms Andrews submitted that Ms Barwise could derive no assistance from the other clauses on which she relied. Clause 3.1 is no more than a standard form demand clause found in guarantees. It does not define the circumstances in which VAG's liability arises. Instead, its reference to 'All sums payable hereunder' points to the liability which arises, if at all, under cl 2.1. In a performance or demand bond, by contrast, the demand is critical because it is *h* that which triggers liability. Clause 3 does not seek to do this. Clause 6 contains provisions typically found in guarantees. The express reference in cl 6.4 to the guarantor having first to comply with cl 2.1 begs the question of what that compliance entails. So far from precluding VAG from raising any defence available to the guaranteed party, it merely defers the right to raise the defence until after compliance with cl 2; in so doing it preserves the co-extensiveness of *j* VAG's liability with that of the principal. That is the antithesis of a performance or demand bond. Clause 11.2 is a standard form 'conclusive evidence' clause which entitles the beneficiary referred to in the 2009 guarantee to certify the amount of any secured obligation which has not been discharged by the guaranteed party. The certificate goes to quantum not to liability.

DISCUSSION

[42] The first point to note is that under the 2009 guarantee the liability of the 'Guarantor' (as VAG is described) extends to what are termed 'Secured Obligations'. As appears from the definition of that expression set out above these are not confined to monetary obligations but include 'all present and future monies, liabilities and obligations (whether for the payment of money or otherwise ...)'. They may be owed by 'any member of the Guarantor Group to a Beneficiary'. 'Beneficiary' is defined as 'each member of the Angel Trains Group from time to time and their respective agents, assigns, directors, employees, officers, secondees and servants'. The obligations must arise 'under or in connection with any Relevant Document'. 'Relevant Document' is defined to mean each of (1) the MPA, (2) each so-called 'German Call-Off Notice' (ie each contract for the acquisition of a locomotive or other item as contemplated by the MPA), (3) the 'Spanish MPA' (ie a master purchase agreement dated 11 September 2006 for the acquisition of locomotives), (4) each so-called 'Spanish Call-Off Notice' (ie each contract for the acquisition of a locomotive or other item as contemplated by the Spanish MPA) and (5) 'any other agreement for the sale and purchase of locomotives and/or related items entered into between any member of the Angel Trains Group and any member of the Guarantor Group, from time to time'. The reach therefore of VAG's obligations under the 2009 guarantee is exceedingly extensive both in terms of those entitled to its benefit and the scope of the obligations caught by it.

[43] The next point to note is that by cl 1.2(j) references to obligations 'guaranteed' under the 2009 guarantee are to 'include a reference to indemnified obligations'. The contrast is between obligations that are 'guaranteed' by the instrument and those that are 'indemnified' by it and suggests therefore that 'guaranteed' as used in the instrument includes secondary liability so that it would be wrong to construe the 2009 guarantee as confined to indemnified obligations.

[44] Clause 2 which sets out VAG's obligations (it is headed 'Guarantee and Indemnity' and is plainly intended to state what those obligations are) is of critical importance. Subclauses (a) and (b) of cl 2.1 are, as Ms Andrews submitted, framed in the classic language of guarantee (ie of a secondary obligation triggered upon proof of a breach of obligation by the principal). Subclauses (d) and (e) are worded as primary obligations. Subclause (c), although not prefaced by the expression 'guarantee' (as sub-cll (a) and (b) are) has the appearance of a secondary obligation: it is premised upon a default in payment by 'a Guaranteed Party'. The obligation is to make good on demand any 'Secured Obligations' which have not been paid at the time such demand [ie demand of VAG] is made'.

[45] I do not consider that the opening words of cl 2 are effective to convert into purely primary obligations obligations which are otherwise secondary in nature. The words used are certainly capable of having that purpose and effect. But, if that had been their purpose, it is difficult to see why the clause then goes to the trouble of setting out subclauses which, as worded, have the appearance of secondary obligations. The opening words are more consistent with an intention to set out in what follows a mixture of primary and secondary obligations. This is achieved, as a matter of interpretation, by reading the opening words as if a comma appears after the words 'as a continuing obligation'. The subclauses that follow show all the signs of an intention to subject VAG to an obligation to answer for every kind of default

a  that could arise under or in connection with what is referred to in the definition of secured obligations as 'a Relevant Document'. The possibility of overlap and duplication does not matter provided that all possibilities are covered.

b  [46] But, as Ms Andrews observed, the critical question is whether, even if all that follows is by way of primary obligation, the liability thereby assumed by VAG is triggered merely by demand (or, as she put it, by *assertion*) on the part of someone who qualifies as a beneficiary or whether in addition it is necessary to demonstrate the existence of a breach or failure of obligation under or in respect of a relevant document. The wording of sub-cll (a) and (b) are difficult to read except as obligations premised upon a failure of observance or

c  performance of an underlying obligation (in the case of sub-cl (a)) or of punctual payment under an underlying obligation (in the case of sub-cl (b)) by a guaranteed party under a relevant document. It is not realistically possible, in my view, to read sub-cl (c) except as conditional on a failure of payment of an underlying debt by a guaranteed party and as intended therefore to subject VAG to an obligation in debt to make good that failure. Likewise sub-cl (e). It

d  assumes that the beneficiary has suffered loss 'in connection with or as a direct or indirect result of the failure of a Guaranteed Party to duly and punctually perform' a term etc contained in a relevant document or a failure 'to duly and punctually pay the Secured Obligations'. VAG's liability is premised upon a failure of performance of some underlying obligation. The intention is to make good the loss thereby suffered. It is premised upon the establishment of

e  that loss by the beneficiary.

[47] Clause 3.1 does not define the circumstances in which VAG's liability arises. Instead it assumes that there is a liability 'hereunder' (ie under the 2009 guarantee) to make a payment. The liability, if it exists, must arise from some other term of the instrument. I agree therefore with Ms Andrews that this

f  clause does not lend support to the case that Ms Barwise seeks to make. But then neither does it detract from it.

[48] That brings me to cl 6. Headed 'Waiver of Defences' cll 6.1–6.3 contain provisions I would expect to find in a guarantee strictly so called. In any event, Ms Barwise did not suggest that they give support to the existence of a performance bond. To my mind, the 'pay now, argue later' terms of cl 6.4 point

g  to the existence of a secondary rather than to a primary liability. The clause assumes that VAG may raise defences which the guaranteed party could have raised if the demand had been addressed to it. Its purpose is simply to postpone the exercise of that right by VAG until after the demand has been fully met. If VAG's liability were primary, let alone one triggered by a demand

h  alone, the fact that the guaranteed party has or may have a defence to the demand would be quite immaterial. I do not therefore consider that Ms Barwise can find support in this clause for the case that she advances. Nor do I accept her submission that its presence throws light on a proper understanding of the other clauses on which she relies.

j  [49] The same is true of cl 7 which is headed 'Demands'. It does no more than state that more than one demand may be made and that VAG's liability may be enforced whether or not the beneficiary has pursued to any extent its rights against the guaranteed party or in respect of any security it holds. In particular, I do not accept Ms Barwise's submission that, when taken with cl 6.4, cl 7 shows that, in order to establish liability in VAG, it is unnecessary for the beneficiary to establish any underlying liability in the guaranteed party.

[50] Clause 11.2 is a conclusive evidence provision of a kind commonly seen    a
in guarantees. As worded it is well capable of extending to the damages payable
for breach of a secured obligation and is not confined merely to liquidated
sums. It also assumes that there is a breach of the obligation. The question is
whether its reference to the certificate constituting 'conclusive evidence ...
against the Guarantor in the absence of any manifest error' goes to the
existence of the breach (ie liability) and not just to its monetary consequences    b
(ie quantum). Ms Barwise did not suggest that on its own the clause would
have the effect of converting the document into a demand bond but submitted
that, when taken with cll 2.1, 3, 6.3, 6.4 and 7, it should be taken as having that
result and, in effect, as extending to liability as well as to quantum. In my view
it is confined to the latter. Its reference is to a certificate 'setting forth the    c
*amount*' (my emphasis) of the secured obligation in question. I agree with
Ms Andrews that it does not have the effect (whether taken on its own or in
combination with the other clauses to which Ms Barwise referred) of
transforming this contract into a demand bond.

[51] In *Bache & Co (London) Ltd v Banque Vernes et Commerciale de Paris SA*
[1973] 2 Lloyd's Rep 437 (mentioned in the *IIG Capital* case) the conclusive    d
evidence clause provided that the notice of default should be 'as between [the
claimants and the defendants] conclusive evidence that [the defendants']
liability hereunder has accrued in respect of the amount claimed'. The Court
of Appeal in that case held that the clause was valid. In the *IIG Capital* case
[2008] 2 All ER (Comm) 1173 at [14] it was pointed out, in reference to a
passage in *The Modern Contract of Guarantee* (2003) (English edn) pp 299–300    e
(para 5–107) by O'Donovan and Phillips, that—

> '[t]he extraordinary effect of this type of clause, and the more usual
> conclusive evidence clause, in the context of a guarantee, however, is that a
> guarantee which is not phrased in terms of a performance bond payable
> simply on demand without proof of default becomes analogous to such a    f
> guarantee as a result of the inclusion of this clause.'

The same textbook also refers (in earlier passages) to such clauses being strictly
construed and to any ambiguity being resolved in favour of the guarantor.

[52] Adopting that strict approach it seems reasonably clear that cl 11.2 is not
to be construed as having the effect for which Ms Barwise contended. I do not
need to rely on any ambiguity in its expression to reach this conclusion.    g

CONCLUSION

[53] Viewing the instrument as a whole I do not consider that the
presumption against construing it as a demand bond has been rebutted.
Clause 2, which sets out what the obligations are which VAG has undertaken, is    h
premised upon the establishment of a failure of performance (including a
failure of payment) under a relevant document. None of the other provisions,
viewing them individually or in combination, alter that conclusion.

[54] That brings me back to context. I am not persuaded that any of the
points urged by Ms Barwise (and summarised at [37], above) should lead to a
different conclusion. Turning in particular to the second of Ms Barwise's    j
points, an acceptance that, at any rate until late 2004 (which is long prior to the
2009 guarantee), there was a measure of community of interest does not make
it more likely that VAG should be willing in 2009 to enter into a demand bond
than if the two groups had at all times been wholly at arm's length in their
dealings. In any event, as Ms Andrews pointed out, there are several factors

*a*   which point against VAG's obligations under the 2009 guarantee being in the nature of a demand bond. They include the fact that they are unlimited in amount and duration and can be the subject of multiple demands (VAG's only escape from liability being to bring about a termination of the underlying purchase agreements), the fact that there is no express right of recourse (which might have been expected if this were indeed a demand bond) to enable VAG,

*b*   having satisfied a demand, to effect any recovery from the person primarily liable, the fact that, as the very extensive definition of 'Beneficiary' shows, a demand can come from such a wide range of persons and the fact that the benefit of the instrument is expressed (by cl 11.1) to be assignable to any person.

*c*   [55] For completeness I should mention two further points made by Ms Barwise. The first, drawing on the width of definition of 'Beneficiary' and the fact that the underlying purchase agreements (the so-called relevant documents) involve overseas entities, is that the instrument was intended, as she put it, 'to be used internationally by Beneficiaries who might not understand the subtleties of English law in relation to guarantees/indemnities'

*d*   and that those underlying purchase agreements might well be subject to civil law jurisdictions and thus to good faith obligations, with references to 'demand' and the like being read literally. I am unable to give any weight to this argument. The instrument is expressed by cl 12.1 to be governed by and construed in accordance with English law. (So also, as it happens, is the MPA which is the principal underlying purchase agreement.) The parties must

*e*   therefore take English law as they find it. It cannot be right to give the instrument a meaning different from what English law fairly requires merely because one of the parties affected by it has been accustomed to a different system of law where the approach to contractual interpretation may be different.

*f*   [56] The other point raised by Ms Barwise concerned the fact that the instrument was preceded by two earlier instruments, namely the guarantee dated 15 September 2006, which itself superseded the earlier guarantee dated 5 March 2003 (see [13], above). Drawing on the evidence before the court that there was no substantial renegotiation of terms after the first of the guarantees was executed, she addressed submissions on the nature and effect of that

*g*   guarantee, pointing out that, by cl 2.1(b), VAG undertook to make payment to LCUKL 'upon first written demand by Locomotion Capital [ie LCUKL] without further proof or condition' and that by cl 13 it was agreed that '[a] certificate of Locomotion Capital setting forth the amount of any Guaranteed Amounts not then paid by the Contractor shall be conclusive evidence of such amount against the Guarantor in the absence of any manifest error'. Accepting

*h*   that those words do not appear in that precise form in the 2009 guarantee but pointing out that cl 2.1 of that instrument contains provisions similar to what were cll 2.1 and 3.1 of the 2003 guarantee she submitted that the 2003 guarantee gave rise to a demand bond and that, as there had been no renegotiation of its terms before execution of the later instruments, the 2003

*j*   guarantee shows what the parties were intending to achieve by the 2009 guarantee. As I understood it this was with a view to approaching the 2009 guarantee with a greater willingness to construe it as a demand bond.

[57] But, as Ms Andrews submitted in reply, there were changes in wording in the later instruments, not least in their scope, between the 2003 guarantee and the later instruments. The plain fact is, she said, that they are not the same.

[**58**] In my judgment, it is not a permissible approach to the construction of    a
an agreement to draw comfort from, let alone be guided by, an earlier and
different agreement which the later agreement has replaced, any more than it is
permissible to do so by reference to earlier drafts of the later agreement. The
terms of the earlier instrument might be material to rectification of the later
instrument, but I am not having to deal with any such question.
                                                                                    b
RESULT
    [**59**] I shall make the declaration sought.

ALPHA'S ALTERNATIVE CASE
    [**60**] Alpha contended that, if I should reach the conclusion that I have
concerning the nature of the 2009 guarantee, there was evidence that VL was    c
in breach of its obligations under the MPA in that, as Mr Althen, the legal
director of Alpha Trains (UK) Ltd, put it in para 39 of his first witness
statement—

        'the beneficiaries to the 2009 Guarantee have to date incurred the sum of
        €2,487,544 (broken down as follows: €1·8 million for the purchase of new    d
        engines and €687,554 arising from losses incurred by locomotive
        operators) which is recoverable under clause 6.1 of the MPA'

with the consequence that VAG is obliged to indemnify the beneficiaries in that
amount under cl 2.1(c) of the 2009 guarantee in any event (see [17], above).
Judgment in that sum was sought or, at the least, a declaration that VAG is    e
liable under the 2009 guarantee to pay that sum. I understood from this that
the beneficiaries (as they are described in the 2009 guarantee) had incurred
those amounts as a result of defects in the locomotives supplied under the
MPA, in part by replacing defective locomotives and in part as a consequence of
the defects in those locomotives.
    [**61**] I feel a difficulty about acceding to this alternative claim. As mentioned    f
at [18] above, LCUKL and other members of the Alpha group have issued
proceedings against VL (and possibly others—I am unaware of the precise
details) in the Technology and Construction Court for relief, including
damages, under the MPA. The proceedings arise out of the same matters that
form the basis of the alternative claim before me. Liability and quantum are in
dispute in those proceedings. Subject to any further argument that counsel    g
may wish to address on the point (the matter was only lightly touched on in
argument before me) the better course would be to see what happens in those
proceedings. If liability in VL (or in some other member of the Guarantor
Group as defined by the 2009 guarantee) is established (whether by decision of
the court or otherwise) then, as it seems to me, VAG's liability under the 2009
guarantee to effect an indemnity against that liability will arise (subject only to    h
demand). As I understand matters, however, that point has not yet been
reached.

*Order accordingly.*

                                                Aaron Turpin    Barrister.    j

**A** notices required to be served under the Act and that a notice under section 48 as opposed, for example, to those under section 5(1) or section 7(2) is not such a notice. Be that as it may, in my opinion, the notice under section 48 must be in writing, whether because of section 54 or because it is so required on the proper construction of section 48(1) itself. But in so far as the court held in the *Dallhold* case that it was necessary for the notice to state expressly that the address specified was that at which notices (including notices in proceedings) might be served, in my opinion, it went further than was necessary for the decision in that case and was *obiter*.

**B** By stating that the address of the solicitors was that at which the rent or money due under the statutory demands was to be paid, by implication it was not to be regarded as the address for any other purpose. There was, in other words, a limitation placed upon that address for the purposes for which it might be used, which did not include the service of notices.

For these reasons, in my judgment, the *Dallhold* case is distinguishable and should be confined to the construction of section 48 to the facts of that particular case. For these reasons, and for those given by Sir Ralph Gibson, I would dismiss this appeal.

**C** Also agreeing, RUSSELL LJ said: In my judgment, the words "by notice" appearing in section 48(1) of the 1987 Act must connote a writing. Had the draftsman intended that the address in England or Wales of the landlord could be furnished orally, the words "by notice" would not have been necessary. On the other hand, the section does not require that the notice should contain any indication that the address given is the address at which notices can be served by the tenant.

I agree that this requirement of the section can be satisfied by the use of the tests suggested by my lords, namely whether the circumstances of the individual case are such that a reasonable tenant must be taken to understand the purport and purpose of the notice.

**D** I confess that at one time I was troubled by *Dallhold Estates (UK) Pty Ltd v Lindsey Trading Properties Inc* to which reference has been made in the judgments of my lords. That decision of this court is binding upon us. But in the light of the analysis of the case by my lords, I am now satisfied that it presents no impediment to the decision which we reach in the instant case.

I, too, would dismiss this appeal.

*Appeal dismissed.*

**E**
# West Horndon Industrial Park Ltd *v* Phoenix Timber Group plc

CHANCERY DIVISION

March 1 1995

MR ROGER KAYE QC, sitting as a deputy judge of the division

Estates Gazette May 20 1995
**[1995] 20 EG 137**

**F** *Landlord and tenant — Lease containing covenant of guarantee — Licence to assign permitted lessor to enter and carry out external improvements — Whether covenant of guarantee disentitled guarantor from being released from obligation to pay rent*

By a lease dated June 25 1979, to which the defendant was guarantor, premises were demised for 20 years from March 25 1979 at an initial yearly rent of £22,500. The plaintiff owns the reversion. Under clause 10(1) of the lease the defendant covenants, *inter alia*, to pay the rent and perform the lessee's covenants during the term "notwithstanding . . . any other act or thing whereby but for this provision the Guarantor would have been released". By clause 3 of a

**G** licence to assign dated January 4 1990 the lessor was permitted to enter the premises to make external improvements and provide external cladding. The lessee having incurred some £129,750 arrears of rent, the plaintiff claimed the same under clause 10 of the lease from the defendant. The defendant contended that by clause 3 of the licence it had been released from its covenant of guarantee, because the licence imposed on the lessee (and therefore the guarantor) a burden additional to the lease, and that the concluding words of clause 10(1) did not prevent such release. The plaintiff appealed from the decision of the master dismissing its claim.

*Held*: The appeal was dismissed. **The intention of clause 10 of the lease was that the guarantor should guarantee the H performance of the covenants of the lease and not those which might be contained in some other document. The concluding words of clause 10(1) were concerned with events arising under the lease and did not cover additional burdens created by documents other than the lease.**

The following cases are referred to in this report.

*British Motor Trust Co Ltd v Hyams* (1934) 50 TLR 230
*Credit Lyonnais (Australia) Ltd v Darling* [1991] 5 ACSR 703
*R v Payne* (1866) LR 1 CCR 27

**J** This was an appeal from the decision of Master Moncaster, who had dismissed summons' issued by the plaintiff, West Horndon Industrial Park Ltd, under RSC Ords 14 and 14A claiming arrears of rent from the defendant, Phoenix Timber Group plc.

Anthony Radevsky (instructed by Talfourds, of Hornchurch) appeared for the plaintiff; David Neuberger QC and Charles Morrison (instructed by Bishop & Sewell) represented the defendant.

Giving judgment, MR ROGER KAYE QC said: By a lease dated June 25 1979 (the reversion of which is now vested in the plaintiff) and made between Tesna Properties Ltd, as landlord, Hardwood **K** Components (Horndon) Ltd, as tenant, and the defendant as guarantor, the landlord demised to the tenant premises at Unit 13, Industrial Park, West Horndon, Essex, for a term of 20 years from March 25 1979 at the yearly rent (subject to review) of £22,500 payable in advance on the usual quarter days.

The relevant provisions in the lease to which I should refer seem to me to be these.

By clause 4 of the lease, dealing with the rent review provisions, the reviewed rent is to disregard improvements carried out by the tenant. By clause 5(1), (2), (3), (19) and (23) the tenant covenanted to pay the rent, rates and other similar outgoings, insurance monies and **L** service charges, together with interest on any arrears as therein set out. By clause 5(5) and (6) the tenant was obliged to keep the whole of the demised premises in repair and to decorate inside and out. By clause 5(9) the tenant was not to assign the whole without consent. By clause 5(11) the tenant was to permit the landlord entry for the purposes of developing neighbouring property or the industrial park in accordance with clause 6(5). By clause 5(12) and (13) the tenant was to permit the landlord entry to inspect for any purpose and for the purposes of repair.

Clause 10 of the lease contained covenants by the defendant as guarantor and provides as follows:

**M** (1) That if the Tenant shall make any default at any time during the term (as hereinbefore defined) in payment of rent or in observing or performing any of the covenants or restrictions herein contained the Guarantor will pay the rent and observe or perform the covenants or restrictions in respect of which the Tenant shall be in default notwithstanding any time or indulgence granted by the Landlord to the Tenant or that this lease may have been assigned or that the Tenant may have ceased to exist or any other act or thing whereby but for this provision the Guarantor would have been released.

(2) That if this lease shall be disclaimed the Guarantor will if the Landlord shall by notice in writing within two months after such disclaimer so require take from the Landlord a lease of the demised premises for the residue of the term which would have remained had there been no disclaimer at the same rent and subject to the same covenants and restrictions as in this lease with the

A   exception of this clause such new lease to take effect from the date of the said disclaimer and in such case the Guarantor shall pay the costs of such new lease and execute and deliver to the Landlord a counterpart thereof.

From March 25 1989 the passing rent rose to £56,000 and the rent due for review on March 25 1994 has not yet been assessed.

It is common ground that the tenant was and is in default of his obligations under clause 5 to pay the rent and other charges since March 25 1992. The current arrears of rent as at the date of the writ in this case was some £129,750 odd, to which is added a claim of some £16,400 odd by way of interest. The plaintiff therefore contended and B   contends that the defendant guarantor is liable for these sums under clause 10 of the lease.

The defendant, however, contends that it is not so liable. Its defence arises in this way. The lease was first assigned by a company called Plasitfurn Ltd, who in turn assigned it to a company called Liebside Ltd pursuant to a licence to assign made on January 4 1990 between the then reversioner, Bartlett Land plc, Plasitfurn Ltd (the then lessee), Liebside Ltd (the proposed assignee), and a fourth party being the proposed assignee's guarantor. I shall refer to this document hereinafter as "the licence".

By clause 3 of the licence it was provided:

C   In consideration of the Lessor's consent hereinbefore obtained the Lessee hereby grants unto the Lessor the right at any time during the term created by the aforesaid Lease to enter upon the demised premises for the purpose of carrying out at the Lessor's own cost external improvements thereto being part of an estate improvement scheme including in particular but without prejudice to the foregoing external cladding to the walls of the demised premises provided always that in exercising such right the Lessor will make good any damage caused to the demised premises and cause as little inconvenience as possible to the Lessee its employees or agents and will carry out such improvements and cladding in a good and workmanlike manner.

It is also common ground that this clause conferred on the landlord D   a right of entry wider than the terms previously contained in the lease to which I have already referred. The defendant contends that the effect of this clause was to release its obligations as guarantor under clause 10 of the lease because, in effect, it amounted to imposing an additional burden on the tenant (and thereby on the surety) additional to those contained in the lease. I shall have to return to clause 3 of this licence in a moment.

The defendant having refused to pay the sums due, the plaintiff issued a writ on August 4 1994 claiming the arrears and a declaration that the defendant's covenants under clause 10 of the lease are enforceable throughout the term of the lease. The defendant served a E   defence denying liability, broadly for the reasons that I have mentioned. It is common ground that the issue between the parties is one of law, namely are the guarantor's liabilities under clause 10 preserved notwithstanding clause 3 of the licence? If the effect of the concluding words of clause 10(1) is not to release the defendant from its obligations as surety under the lease then the plaintiff must succeed. If the concluding words of clause 10(1) do not preserve the surety's liability then the defendant must win. In short, the issue between the parties concentrates upon the meaning or effect of the words in clause 10(1) "or any other act or thing whereby but for this provision the Guarantor would have been released".

F   On November 1 1994 the plaintiff issued a summons seeking summary judgment under Ords 14 and 14A, very properly raising these issues of construction. On January 6 1995 Master Moncaster resolved that issue in favour of the defendant and dismissed the action. The plaintiff now appeals and it is that appeal which is now before me.

This case has, if I may say so, been very well and very economically argued, but all the relevant points have I think been put. It is conceded, rightly in my view, that clause 3 of the licence viewed as at the date of the licence went wider than any provision contained in the lease, and therefore potentially affected the defendant guarantor so as to be sufficient *prima facie* to release it. This is, of course, but an application of the principle that, unless expressly provided for or expressly consented to by the surety, any material alteration, variation

G   or addition to the terms of the contract between the principal debtor and the creditor potentially prejudicial to the surety will discharge that surety. But, the plaintiff argues, as I have said, the effect of the concluding words of clause 10(1), namely that the guarantor will pay the rent and so forth notwithstanding "any other act or thing whereby but for this provision the Guarantor would have been released" is precisely the type of express provision which is sufficient to preserve the defendant's liability.

I have been helpfully referred to a number of authorities, but it is, in my view, always dangerous in cases of construction to place too much reliance on authoritative examples of words or phrases used in the documents in those cases. Ultimately, and somewhat tritely, each H   case of course depends upon its own facts and its own documents. The task of the court of course is to ascertain the intention of the parties at the time they entered into their written agreement and to ascertain that intention from the wording of the document viewed as a whole, concentrating of course on the words of particular relevance in the case. Essentially therefore the material words in this case, ie the concluding words of clause 10(1), to which I have already referred, must therefore be construed in the context in which they find themselves.

At the end of the day, in my judgment, the defendant is entitled to succeed, as it succeeded before the master, for the following reasons.   J

1. It is axiomatic that contracts of guarantee are to be construed according to ordinary canons of construction, but in cases of any doubt or uncertainty in favour of the surety.

2. It seems, however, plain to me on the true construction of clause 10 that what was contemplated or intended by the parties as reflected in clause 10(1) was that the guarantor should guarantee the rent and performance of the covenants or restrictions "herein contained", ie those contained in the lease and not those contained or imposed by any other additional, extraneous or subsequent document. It is noticeable that the licence did not on its face purport to vary the terms of the lease but simply imposed an additional clause to which the then tenant K   and proposed assignee agreed. The effect of clause 3 was, however, as was accepted, potentially to increase and add to the burdens imposed on the tenant by the lease in at least three ways: first, by increasing the potential rent payable on review because the improvements under clause 3 of the licence would not be disregarded under clause 4; second, in that the premiums of insurance payable by the tenant under clause 5 of the lease are potentially liable to be increased as a result of those improvements; and, third, by increasing the tenant's, and thereby the surety's, repairing obligations in consequence of the improvements. The plaintiff points out that no such burden has in fact occurred to date. That, as he rightly accepts, is irrelevant, however, to L   the present issue. The question is whether as at the date of the licence clause 3 had then — not subsequently — the effect of releasing or discharging the guarantor from its obligations under the lease.

3. Some support for this view seems also to emerge, to my mind, from clause 10(2). There the landlord is entitled to demand that the guarantor take a fresh lease if the current lease has been disclaimed. Such new lease is to be "subject to the same covenants and restrictions as in this lease with the exception of this clause". This subclause seems to me to imply two things: first, that in being compelled to take a new lease the guarantor is thereby intended to be released from any future obligations under the existing lease; second, that that new lease M   (that is instead of and in place of his discharged obligations under the existing lease) is to make the guarantor (that is now *qua* tenant) liable for the same covenants and restrictions as subsisted in the existing lease. So here too the guarantor could not be compelled to include in the new lease a term such as is contained in clause 3 of the licence.

4. Reasons 2 and 3 seem to me to lead inevitably to the conclusion that the parties to the original lease only intended that the guarantor's obligations should extend to those embraced by or contemplated by the terms of the original lease and not, for example, additional and wider burdens of the type imposed by clause 3 of the licence.

5. The concluding words of clause 10(1), which I am urged to give a wide interpretation were, however, in my judgment, intended to

A preserve the guarantor's liability to such obligations and no further. The words "any other act or thing" were therefore, in my judgment, not intended to cover the type of additional burden having the potential effect that clause 3 of the licence has in this case.

Clause 10(1) was therefore not, in my view, intended to be, nor is it, a complete *carte blanche* to entitle the landlord to extract every and any additional burden from the surety. If it were so intended that any such additional burden should be extractable from the surety then, in my judgment, it was necessary so to have provided either expressly or by some clearer implication than is afforded by those concluding words. I accept that they must be given some effect and clearly were

B intended to imply something additional to the mere giving of time or indulgence or assignment of the lease or the tenant ceasing to exist. But I think Mr David Neuberger QC is right when he submits that what was contemplated was that this should cover such cases as the landlord refusing rent in a case where he wrongly believes there to be a breach of covenant or where, say as a condition of an assignment, he has received security for the rent which he subsequently releases. No doubt there are also other examples such as forebearance or where the landlord has agreed for a time with the tenant that the tenant might suspend payment of the rent for reasons best known to the tenant or the landlord. I do not attempt an exhaustive category of cases intended

C to be covered by those general words at the end of clause 10(1). Suffice it to say that, in my judgment, they were not intended to cover and do not cover the additional burden imposed by clause 3 of the licence.

I note, for example, that the case of *British Motor Trust Co Ltd v Hyams* (1934) 50 TLR 230, to which I was helpfully referred, was a case where hire purchase payments were guaranteed by the defendant under two hire purchase agreements relating to two separate vehicles. In each of the agreements it was expressly provided that the guarantee should not be avoided by any variation in the terms of the agreement. Branson J held that the replacement of the old agreements with a new

D single consolidated agreement covering both vehicles was a variation contemplated by the original agreements and accordingly the guarantor was not released. There, there was clearly the type of express provision which is wholly absent from this case.

I was referred also to the decision of the Supreme Court of New South Wales in *Credit Lyonnais (Australia) Ltd v Darling* [1991] 5 ACSR 703. There the guarantor of a financial facility was not to be exonerated under the provisions of clause 8 of the guarantee, *inter alia*, by "any matter or thing which under the law relating to sureties would but for this provision have the effect of releasing the guarantor from his guarantee and indemnity or of discharing his guarantee and indemnity". The question was whether a subsequent variation in the

E financial arrangements which had been consented to on behalf of the sureties nevertheless had the effect of releasing the surety, and it was held by that court on this particular point that the effect of clause 8 was that the sureties were not released by that variation. But that seems to me to be a different case in a different context and a much clearer and a much more obvious example of the surety not being released. I note, for example, that the opening words of clause 8 in that case were specifically that: "this guarantee and indemnity shall be without prejudice to nor shall the guarantor be exonerated in whole or in part nor shall the rights or remedies of the creditor be in any way prejudiced or adversely affected by any of the matters following".

F Then one of the matters following was the words which I have already quoted from clause 8. Those words seem to me to appear in a much wider context and a much more different context than this case.

I was also referred to the case of *R v Payne* (1866) LR 1 CCR 27. There the relevant provision which was being construed was the Prison Act 1865, section 37, which forbade the conveyance into any prison with intent to facilitate the escape of a prisoner, of any "mask, dress or other disguise or of any letter or of any other article or thing". This case, as was *Credit Lyonnais*, was urged upon me as support for the wide width to give to the concluding words of clause 10(1) of the lease. In *Payne* it was held that a crowbar, notwithstanding that it was vitally different from a "mask, dress or other disguise or any

G letter", was nevertheless included within the concluding provisions, "any article or thing", of section 37. I have absolutely no doubt in my mind whatsoever that that was a just and right conclusion having regard to the obvious purpose for which section 37 of the Prison Act 1865 was passed. I do not think, however, it is necessarily of any assistance in the construction of the words "any other act or thing" in this particular case.

In the result I dismiss the appeal.

*Appeal dismissed.*

H

# Howard de Walden Estates Ltd *v* Pasta Place Ltd and others

CHANCERY DIVISION

May 19 1994

MORLAND J

Estates Gazette June 3 1995
**[1995] 22 EG 143**

J

*Landlord and tenant — Liability of sureties — Whether liability discharged by variation in the obligations of the lessee and assignees*

On November 24 1987 the plaintiff landlords granted two leases to the first defendant, Pasta Place Ltd, of premises for use as a delicatessen; the landlords forbid the sale of wines. The second, third and fourth defendants were sureties to the two leases; the surety covenants containing a proviso that their obligation should not be released by any deeds or documents given to the tenant supplemental to the leases. On February 9 1989 the first defendants assigned the

K leases to NB Ltd. On August 4 1989 the landlords permitted NB Ltd to serve Italian wine to persons consuming food at the premises, eight tables having earlier been permitted in the premises. On July 16 1990 the landlords granted a licence to use the premises as an off-licence and a licence to use the adjoining premises as a fire escape. NB Ltd went into administrative receivership on October 1990. The landlords who had obtained a judgment for arrears of rent against the first defendants on October 27 1992, which was not satisfied, claimed the arrears from the sureties. The sureties contended that they had been discharged from their liabilities because of the variation of the obligations of the lessee by the three licences granted by the landlords

L on August 4 1989 and on July 16 1990.

**Held: The landlords' claim was dismissed. In applying *Holme* v *Brunskill* (1878) 3 QBD 495, and in deciding whether alterations to the obligations of the lessee are substantial or prejudicial to the surety, the court must assess the alteration objectively. It is not for the court to decide whether in fact there has been material prejudice. The licence granted on August 4 1989 and the two granted on July 16 1990 would be likely to increase the rental value of the premises; the existence of the licences is a factor of potential commercial value, likely at least to a degree to influence a lessee in deciding what the rent would be that he would be**

M **prepared to pay. The sureties' liabilities were therefore discharged and were not saved by the proviso in the leases which envisaged a breach or apprehended breach of covenant.**

The following cases are referred to in this report.

*Holme* v *Brunskill* (1878) 3 QBD 495
*Selous Street Properties Ltd* v *Oronel Fabrics Ltd* [1984] 1 EGLR 50; [1984] EGD 360; (1984) 270 EG 643 & 743

This was the hearing of a claim by the plaintiffs, Howard de Walden Estates Ltd, for arrears of rent against the sureties of two leases of premises at 102 Marylebone High Street, London W1.

## WESTERN CREDIT, LTD. *v.* ALBERRY.

A

[COURT OF APPEAL (Sellers, Davies and Russell, L.JJ.), April 21, May 14, 1964.]

*Hire-Purchase—Guarantee—Indemnity—Distinguished—" Loss " sustained by
hire-purchase company as a result of the act, default or negligence of the hirer
—Termination by hirer, in accordance with terms of agreement, by paying,
altogether, fraction of hire-purchase price and returning car during period of
hire—Hire-purchase company's profit consequently smaller than if hirer had
hired for full period.*

B

A hire-purchase agreement was entered into by an adult, for whom his
father stood surety by signing the following, which was included in the
same document as the agreement: " Guarantee to Western Credit, Ltd.
In consideration of your having agreed at my request to enter into the
annexed agreement with the person named therein as hirer, I, the under-
signed, guarantee the payment by the said hirer to you of the instalments
in the said agreement agreed to be paid and the performance and observance
by the said hirer of the terms of the said agreement: and I will indemnify
you against any loss or damage which you may sustain as a result of the
act default or negligence of the said hirer (in connexion with or in any way
arising out of the said agreement). This guarantee shall not be terminated
or affected by my death or by you giving time or other indulgence to the
said hirer.  Signature of surety . . ." The hire-purchase agreement pro-
vided for a hiring of a car for four years, on payment of an initial payment
and monthly instalments totalling £848, with an option to purchase at the
end of the hire for £1 (making a total hire-purchase price of £849), but gave
the hirer the right to terminate earlier by returning the car and making
his total payments up to three quarters of the hire-purchase price.  The
hirer exercised this right.  As a result the hire-purchase company, even after
making allowance for the value of the returned car and a discount for the
hirer's early payment, received £93 6s. less than it would have done if the
hirer had elected to hire for the full four year period, and then to purchase.
The hire-purchase company claimed this sum from the surety as loss sustained
" as a result of the act . . . of the hirer ".

C

D

E

F

**Held:** the claim failed because the contract signed by the surety was a
guarantee of the due performance by the hirer of the hire-purchase agreement
not a contract of indemnity, and, as the hirer had duly performed his obliga-
tions, the hire-purchase company could not recover under the guarantee;
moreover there was no " loss " suffered by the hire-purchase company, for
the company had merely failed to obtain the profit that they would have
derived if the hirer had not elected to terminate the contract (see p. 940,
letter A, p. 941, letters E and H, and p. 942, letter A, post).

G

*Yeoman Credit, Ltd.* v. *Latter* ([1961] 2 All E.R. 294) distinguished.

Per SELLERS, L.J., and DAVIES, L.J.: a termination of the contract by the
hirer in accordance with his rights thereunder is not an " act " within the
meaning of the words " act default or negligence " (see p. 940, letter C,
and p. 941, letter A, post).

H

Appeal allowed.

[ As to the nature of a guarantee and of a contract of indemnity, see 18 HALS-
BURY'S LAWS (3rd Edn.) 411, para. 767, and 528, para. 973.

I

As to guarantees in relation to hire-purchase transactions, see 19 HALSBURY'S
LAWS (3rd Edn.) 525, para. 844.]

Cases referred to:
   *Coutts & Co.* v. *Browne-Lecky* ([1946] 2 All E.R. 207; [1947] K.B. 104; 115
      L.J.K.B. 508; 26 Digest (Repl.) 100, *683.*
   *Yeoman Credit, Ltd.* v. *Latter,* [1961] 2 All E.R. 294; [1961] 1 W.L.R. 828;
      3rd Digest Supp..

C.A.      WESTERN CREDIT, LTD. *v.* ALBERRY (SELLERS, L.J.)      939

**A**   Appeal.

The defendant, who had signed an agreement with the plaintiff finance company whereby he became a surety for the hirer under a hire-purchase agreement, appealed against the judgment of His Honour JUDGE FLINT, given at Worksop County Court on Nov. 19, 1963, for the finance company for £93 6s. against him under the agreement. The facts are stated in the judgment of SELLERS, L.J.

**B**   *G. Milner* for the defendant surety.

The plaintiff finance company did not appear and was not represented on the hearing of the appeal.

*Cur. adv. vult.*

May 14. The following judgments were read.

**C**   SELLERS, L.J.: This appeal by the defendant from the judgment of His Honour JUDGE FLINT was heard without the successful plaintiffs, a hire-purchase company, appearing to support the judgment in their favour. The court was properly informed in due time by the solicitors for the plaintiffs that their clients did not intend to take any steps in regard to the appeal, but no reason was given.

The defendant is the father of René Alberry, who on June 19, 1959, when

**D**   twenty-one years of age, entered into a hire-purchase agreement with Western Credit, Ltd., the plaintiffs, in respect of a Jaguar motor car, registration No. KUK814. This was a secondhand Mark VII saloon car for which the cash price was £650, of which the son made an initial payment of £100. The plaintiffs' hire-purchase costs were £198, which, plus a final payment of £1, made a total purchase price of £849 and the agreement was for payment of forty-eight instal-

**E**   ments of £15 11s. 8d. a month. In 1962 the son was minded to terminate the agreement. He had paid the instalments regularly when due and having paid a total of £534 14s. to the plaintiffs in addition to the £100 paid to the dealer he had paid as the learned judge found " every penny for which he was liable ". On Feb. 21, 1962, the son, as hirer, had returned the hired car to the plaintiffs and had terminated the contract in accordance with cl. 9 of its conditions. It

**F**   is clear that the son had committed no breach of contract, but on the contrary had properly brought it to an end in a manner for which the agreement itself provided. The plaintiffs claimed nevertheless a further £93 6s. from the defendant, being the whole of the purchase price unpaid by the son, after giving credit for the value of the car which he returned, less a discount for the earlier payment of the instalments and the learned judge has found in their favour.

**G**   On June 18, 1959, a day earlier than the date of the son's hiring agreement, the defendant, his father, had signed, in the presence of a witness, the lower portion of the document of hire, which is as follows:

" Guarantee to Western Credit, Ltd. In consideration of your having agreed at my request to enter into the annexed agreement with the person named therein as hirer, I, the undersigned, guarantee the payment by the

**H**   said hirer to you of the instalments in the said agreement agreed to be paid and the performance and observance by the said hirer of the terms of the said agreement: and I will indemnify you against any loss or damage which you may sustain as a result of the act default or negligence of the said hirer (in connexion with or in any way arising out of the said agreement). This guarantee shall not be terminated or affected by my death or by you giving

**I**   time or other indulgence to the said hirer."

At its commencement and at its termination " This guarantee . . ." treats the undertaking as a single obligation of guarantee. The obvious obligation of the surety (for the form requires the " signature of surety ") is to answer only for the failure of the hirer to carry out his part of the contract, the liability primarily falling on him.

The son is now admittedly under no outstanding liability to the plaintiffs and it would, in my opinion, require a very clear and unambiguous contract to impose

a further liability on a signatory to what might well be thought by anyone signing  A
such a document as this, to be a guarantee and nothing more.

The word " indemnity " is used but the sentence is descriptive in its context
of the kind of non-performance or non-observance which might arise under the
guarantee, following as it does the guarantee of the performance and observance
by the hirer under the agreement.   I cannot read it as an indemnity against any
loss or damage as a result of the termination of the contract by the hirer when  B
the contract of hire has been fully performed by him according to its tenor.
It would be a remarkable contract.   It would release the hirer completely and
leave the " surety " liable for the best possible performance of it in favour of the
finance company without any redress against the hirer.   If there were said to be
redress against the hirer then cl. 9 would be a snare, for the hirer's liability would,
in effect, not terminate but would continue to his surety who had paid it.  Further,  C
in the context " act default or negligence " the word " act " does not include
a termination of the contract in accordance with the hirer's rights under the
contract and a contract so terminated creates no " loss " in the sense of the clause.
A salesman does not make a loss merely because he sells at a price less than he
seeks to get.   The contract he makes is a less advantageous one than he desired.

It would seem that the judge would have taken the view of no liability, but for  D
*Yeoman Credit, Ltd.* v. *Latter* (1) and some of the observations in the judgments
there.   In my view that case in no way bound the learned judge and its reasoning
is not properly to be applied to the circumstances of the present case.   It con-
cerned the hire of a car to an infant, and, because of that fact and the unenforce-
ability of the infant's liability and probably of a guarantee of the bargain, it
was stipulated that an adult must sign a special form of indemnity.   The second  E
defendant, an adult, signed the special form which was described " Hire purchase
indemnity and undertaking " and the liability for loss and the basis thereof was
specifically set out.   The circumstances and the defined liability are so different
that the case in no way bears on the solution of the present provisions on which
the plaintiffs relied.

I would allow the appeal and enter judgment for the defendant with costs  F
here and below.

**DAVIES, L.J.:** When the hirer in February, 1962, exercised his right to
terminate the hire-purchase agreement which he had entered into in June, 1959,
he paid to the plaintiffs the full amount which under the agreement he had
contracted to pay to them in that event.   That meant, therefore, that he was
under no further liability to them; but it meant also that, although they had  G
recovered with interest the whole of the sum which they had originally paid to
the dealers for the car, they were short by £93 6s. of the profit which they would
have made had the hirer instead of terminating the agreement, continued the
hiring to the end of the contemplated four-year period.   That is the sum which
they claim to have lost and for which they recovered judgment against the  H
defendant.

The agreement between the parties has already been read by SELLERS, L.J.
The learned judge held that the first part of this agreement was a guarantee;
but he considered that he was bound by the decision of this court in *Yeoman
Credit, Ltd.* v. *Latter* (1) to hold that the latter part was an indemnity and so gave
judgment for the plaintiffs for the amount of their alleged loss.

In the present case the agreement is headed " Guarantee " and starts as such,  I
though that fact is not in any way decisive.   The second part commences " and
I will indemnify you ".   The final sentence reverts to the word " guarantee "
and expressly provides that it shall not be affected by the giving of time to the
hirer, a provision which would, of course, be apt in the case of a guarantee but
wholly inapt in the case of an indemnity.   Moreover it is difficult to appreciate
how the plaintiffs can be said to have suffered any loss when they have recovered

(1) [1961] 2 All E.R. 294.

A  from the hirer all that they were entitled to under the contract, and have merely been deprived of the further profit which they would have received but for his valid exercise of the right which they for good consideration had granted to him; and it is quite impossible to see how such an exercise of a contractual right can be brought within the words " act default or negligence of the hirer ". If the plaintiffs had intended that the defendant should in any event pay any

B  difference between the amount paid by the hirer and the full hire-purchase price, the agreement ought to have, and could have, expressly so provided.

*Yeoman Credit, Ltd.* v. *Latter* (2) was an entirely different case. There the hirer was an infant, and therefore the hire-purchase agreement was void. A guarantee of such an agreement would probably also have been void (*Coutts & Co.* v. *Browne-Lecky* (3)), though the point was left open. Perhaps for this reason

C  the " guarantee " form was not used but instead a form called " Hire-purchase indemnity and undertaking " expressed to be appropriate in the case of an infant hirer. Most important of all, the " loss resulting from or arising out of the agreement " which was the indemnity covered was expressly defined (4) as

" the total amount which the hirer would have had to pay under the agreement to enable him to exercise the option of purchasing the chattels plus
D    all expenses you may incur in the exercise or enforcement of your rights under the agreement . . . less the amount actually paid to you under the agreement by the hirer."

This definition was a clear formula by which the amount payable could be ascertained.

That case, therefore, was entirely different from the present one and, in my
E  judgment, has really no bearing on it.  In the circumstances I am of the opinion that the undertaking in the present case was a guarantee by the defendant of the due performance by the hirer of the agreement and that as the hirer had duly performed his obligations under the agreement and the plaintiffs had suffered no loss, they are not entitled to recover.

F      **RUSSELL, L.J.:** There was more than one way in which the hirer could perform his part of the bargain with the plaintiffs, the finance company.  The way that he chose, was, in accordance with cl. 9, to return the car to the plaintiffs in proper condition and pay the amount by which the payments already made fell short of three-quarters of the hire-purchase price.

At the foot of the document constituting the contract was printed the agree-
G  ment by the defendant now under consideration.  It was headed " *Guarantee to* Western Credit, Ltd." and below it was a space for signature labelled "Signature of *Surety* ".  It would indeed be surpising to find that signature of a clause so topped and tailed could involve the signer in any liability if the hirer complied faithfully with his obligations under his contract with the plaintiffs.  The body of the clause has already been read (5).    It is said that it compels the surety to
H  pay to the plaintiffs the whole balance of the hire-purchase price, less the value of the car, and less a discount for accelerated payment.

Construing this provision apart from authority I have no doubt that it is not to be regarded as other than a guarantee of due performance by the hirer.  The final sentence labels all that has gone before as " this guarantee " in a context which plainly shows that guarantee is meant.  I construe the part starting " and
I  I will indemnify " as expository of the liability involved in the guarantee, rather than as imposing a liability which, by embracing all the liability under the guarantee and more, renders the guarantee superfluous as a protection to the plaintiffs.  Moreover, to regard the clause as imposing in part a guarantee and in part an obligation to indemnify would involve the proposition that for part of his possible liability under the clause the surety would have a right over against the hirer, but not for the other part.  Or, if his right over was for the whole, the

(2) [1961] 2 All E.R. 294.                    (3) [1946] 2 All E.R. 207; [1947] K.B. 104.
(4) See [1961] 2 All E.R. at p. 297.              (5) See p. 939, letter H, ante.

result would be that at one remove the plaintiffs could impose a liability on the   A
hirer which the contract expressly enabled him to avoid.   Additionally I do not
think that in this contract it can properly be said that, when the plaintiffs have
received the full amount of profit which according to the terms of the contract
they were entitled to expect, should the hirer take a particular step open to him
according to those terms, they have sustained any loss or damage.   All that has
happened is that the plaintiffs have not received as great a profit as would have   B
been made had another permissible course been adopted by the hirer.

The county court judge, though reluctantly, felt himself bound, after reference
to the case in this court of *Yeoman Credit, Ltd.* v. *Latter* (6), to conclude that
the plaintiffs' claim was justified.   For some reason the plaintiffs have chosen
not to be represented before us to support that conclusion: it is not profitable
to speculate on the reason—whether it be overweening confidence, or utter   C
despair, or some other.   I do not consider that that case leads to that conclusion.
It was a totally different and very special case.   The hirer was to the knowledge
of all an infant; it was appreciated that the contract could not bind him for that
reason, and that completion of a guarantee form (which was provided at the foot
of the hire-purchase agreement but was not used) would probably for the same
reason be valueless.   At the foot of the agreement was a note saying " If the   D
hirer is under twenty-one an adult must sign a special form of indemnity ".   This
special form, which was signed, was headed " Hire-purchase indemnity and under-
taking ".   The obligation was " to indemnify you against any loss resulting from
or arising out of the agreement ".   Clause 2 expressly provided (7)

> " the amount of your loss for the purpose of this indemnity whether
> or not the agreement . . . shall have been terminated by any party thereto   E
> shall be the total amount which the hirer would have had to pay under the
> agreement to enable him to exercise the option of purchasing . . . plus all
> expenses you may incur . . . less the amount actually paid to you under the
> agreement by the hirer."

There was thus an express definition of " loss ", which would avoid the difficulty   F
of asserting a loss when due fulfilment of a contract resulted in profit, and
which made it perfectly plain that the liability of the second defendant was
not co-extensive with the liability (if any) of the hirer.   Moreover there was a
clause which made it clear that no absolute right of recourse to the hirer—such
as is implicit in a guarantee—was intended.

These matters show that that case was totally different from the present case,   G
and neither the decision nor any comments in the judgments are of any assistance
in deciding the present case.   In my judgment the appeal should be allowed.

*Appeal allowed.*

Solicitors: *Corbin, Greener and Cook*, agents for *E. P. Bastide & Son*, Staveley
(for the defendant, the surety).

[*Reported by* Henry Summerfield, Esq., *Barrister-at-Law.*]   H

I

———

It is a very familiar expression to everybody who knows the
forms and powers of granting leases.   It is in fact the purchase-
money which the tenant pays for the benefit which he gets under
the lease.   Is it possible by any means to give to either of these
items, which the plaintiff seeks to bring in, the meaning of the
word "premium"?   It seems to me that it is quite impossible.
The expenditure on the house is not in any sense a "premium,"
and still less is the value of the surrendered lease, as to which
it seems very doubtful whether the landlord ever got the benefit
of it at all.

C. A.

1915

KING
*v.*
CADOGAN
(EARL).

Warrington L.J.

On the whole, therefore, I think the appeal fails and the
Divisional Court was right.

*Appeal dismissed.*

Solicitors: *Crossman, Prichard & Co.; Lee & Pembertons.*

R. M.

———

## WILLIAMS *v.* LEWIS.

[1914 W. 2486.]

*Landlord and Tenant—Agricultural Land—Duty of Tenant to cultivate—
Breach—Measure of Damages.*

1915

*June* 23, 24,
26, 28 ;
*Oct.* 14.

The duty of a tenant of agricultural land as declared by the common
law and unaffected by express agreement is to cultivate the land in a
good and husbandlike manner according to the custom of the country.
     He is not further bound to deliver up the land at the end of the
tenancy in a clean and proper condition, properly tilled and manured ;
nor is he necessarily bound or entitled to leave the land in the same
condition as when he took it.
     In case of a breach of his duty the measure of damages is the injury
to the reversion occasioned by the breach.

TRIAL of action before Bray J.

The action was commenced at the Monmouthshire Summer
Assizes before the learned judge and a special jury.   In the
course of the hearing the jury were discharged and the case
proceeded before the learned judge alone.

494                          KING'S BENCH DIVISION.                    [1915]

1915

WILLIAMS
*v.*
LEWIS.

*S. R. C. Bosanquet,* for the plaintiff.

*Micklethwait,* for the defendant.

The facts and arguments sufficiently appear from the judgment.

Oct. 14.  BRAY J. read the following judgment :—This action was brought by the plaintiff, the landlord of a farm called the Twyn Farm in Llangibby, Monmouthshire, against the defendant, the late tenant of the farm, to recover damages for breach of his implied obligation arising out of the tenancy.  The tenancy agreement was not in writing, and, so far as appeared, there were no special terms.  The tenancy began in February, 1906, and ended in February, 1914.  Several points of law were raised as to the extent of the implied obligations, and as to the measure of damages for their breach.  As I was informed that it was desirable that there should be a decision on these points, I propose to deal with all of them, although some are not necessary for the decision of the case ; and for this reason I have thought it better that I should put my judgment into writing.

The first question is : What is the extent of the implied obligations of the tenant of a farm to his landlord ?  I think the law is correctly stated in vol. 1 of Lord Halsbury's Laws of England, title Agriculture, s. 505, thus : " The law implies an undertaking or covenant on the part of an agricultural tenant to cultivate the land in a husbandlike manner, unless there is a particular agreement dispensing with that engagement ; and the bare relation of landlord and tenant is a sufficient consideration for the tenant's promise to cultivate the land in a good and husbandlike manner according to the custom of the country."  Farming in accordance with this obligation I will for short call " proper farming," and the condition of the land when it has been so farmed for a lengthened period I will call " proper condition."  Sect. 507 says the custom of the country does not imply an immemorial or universal usage, but only the prevalent usage of the neighbourhood where the land lies which has subsisted for a reasonable length of time ; and s. 509 says evidence showing that a holding has been managed in accordance with the custom of the

**3 K. B.**          KING'S BENCH DIVISION.                     495

country is proof that it has been treated in a good and husband-
like manner.  It was not really disputed that the law was as so
laid down, but it was contended for the plaintiff that there was a
further obligation, namely, that the tenant should deliver up the
land at the termination of the tenancy in a clean and proper
condition, properly tilled and manured.  In my opinion, so far
as this imports some greater obligation than the first obligation,
it does not exist.   That the tenant must continue to farm
properly down to the termination of the tenancy is, of course,
true, but so long as he does this he has, in my opinion, performed
the whole of his obligation.  I will give an illustration to show
what I mean.  Suppose that at the beginning of the tenancy the
land is in an impoverished condition, that is, below proper
condition, and the tenant enters and farms properly, but yet the
land at the end of the tenancy has not got into proper condition.
This may well happen if the tenancy has been a short one, say
only two or three years.  In such a case there has been, in my
opinion, no breach of the obligation.  The contention of the
plaintiff would impose it, but the contention is wrong.  I ought
to add that in this case I find there was no custom imposing this
greater obligation.

   The next contention was one on the part of the defendant, not,
perhaps, much relied on by the defendant's counsel, but put
forward by the defendant himself and one of his witnesses, that
the tenant fulfilled his obligation if he left the land in the same
condition as when he took it.  First I am satisfied there is no
custom to that effect.  It was said there was a custom that the
tenant goes out as he comes in.  This has no reference to claims
for bad farming, it applies only to valuations of tenant right.
As an illustration it applies in such a case as this : If a tenant on
coming in pays for hay and straw at a fodder and dung price he
is only entitled to fodder and dung price on leaving.  The expert
called by the defendant admitted this.  So much for the custom.
In my opinion the contention is not sound in law.  It may well
be that a considerable course of proper farming will restore the
land to proper condition.  If so the landlord has a right to have
the land delivered up in proper condition.  In the same way, if
at the commencement of the tenancy the land is in better than

1915

WILLIAMS
*v.*
LEWIS.

Bray J.

496                           KING'S BENCH DIVISION.                    [1915]

1915

WILLIAMS
v.
LEWIS.
——
Bray J.

proper condition as the result of what is called high farming, the tenant is not, in my opinion, bound to keep the land in better than proper condition so long as he farms properly. Arising out of this there was a contention that if the tenant during the tenancy had raised the land to a better condition than it had been at the commencement, he might during the last year or two lower it to the former condition. That contention is, in my opinion, equally unsound; he must continue to farm properly to the end of his tenancy. He need not do more than that, but he must do that. I must guard myself by saying that this does not involve the proposition that if a tenant has at any time got the land into a condition better than proper condition he must always keep it so, but merely that he must not lower it by improper farming. For instance, if he has been putting a lot of dung on a field it might not be improper farming in the case of grass land to mow it two years running, or in the case of arable to have two crops of corn running. The truth is that, when the land is at the commencement of the tenancy in better or worse condition than proper condition, it is proper and usual for the landlord and tenant to come to a special arrangement, and when the land is impoverished, that is, below proper condition, the tenant requires a temporary or permanent reduction of rent, or other allowance.

The next contention on the part of the defendant was that this was what is called a bytake. The tenant had rented for a considerable time before he took Twyn Farm a neighbouring farm called the Tregrwg Farm from the same landlord, on which there were a house and the usual farm buildings. On Twyn Farm in question there was no house, nor any farm buildings, and it was said that if Tregrwg Farm was in better than proper condition that would make up for Twyn Farm being in worse than proper condition, and that the two farms must be considered as one farm. In my opinion this contention is not sound. First I find that there is no custom to that effect; the land must be treated fairly all round. No doubt it happens that the land most distant from the foldyard gets less dung, but then it should be mown less often and grazed more. No doubt also it will happen that at any particular period some

fields may be in rather better condition than others.  Of course
there must be some give and take, but that would not justify a
deliberate starving of the land without buildings, even though
the land with the buildings has been correspondingly enriched.
In this case the two tenancies were entirely separate.  They
were entered into at different times.  Notice might be given,
and was in fact given, to terminate one only, and Tregrwg was
held for another year after the expiration of the tenancy of Twyn
Farm.  In my opinion this contention fails in law as well as in
fact.

Lastly, there was a contention on the part of the defendant as
to the measure of damages in case there was a breach by the
tenant of his implied obligation through not having farmed
properly.  It was said that it was confined, so far as loss of
fertility was concerned, to the manurial value of hay or straw
improperly removed.  For the purpose of estimating tenant
right a table was published in the county giving manurial values
for hay and straw fed on the land, and it was said that that
table applied, and I could only give the manurial values shown
in the table for the hay and straw that had been improperly
removed.  No such custom was proved, and in my opinion that
is not the true measure of damages in all cases.  In some cases
when the only ground of complaint is that hay and straw have
been improperly sold or removed instead of feeding them on the
land, that may afford a good guide in assessing the damages, but, as
will be seen later, this was by no means the only complaint.  As
the evidence proved no custom as to the measure of damages, the
usual rule of law must, in my opinion, be followed in respect of
all the breaches, namely, that it is the injury to the reversion
occasioned by the breaches.  In practice in such a case as the
present it is the diminution in the rent that the landlord will
get on reletting, or the allowance he will have to make to the
incoming tenant.  When a tenant is making his bargain with
the landlord as to the rent he is to pay it is a common thing for
him if he sees that the land is below proper condition to say
that he must have it free of rent for a period, or at a smaller
rent for the whole or some part of the tenancy.  If a fair bargain
is made and a reduction of rent agreed to, that forms a fair

498                    KING'S BENCH DIVISION.            **[1915]**

1915       indication of the loss to the landlord occasioned by the breach.
WILLIAMS   That I find is what happened here.  Mr. Hannah, the incoming
*v.*       tenant, had agreed to take the farm some time before February,
LEWIS.     1914, but no rent had been definitely fixed.  Some time before
Bray J.    February, 1914, he complained to the plaintiff of the condition
           of the farm, and he asked to have it free of rent for twelve
months.  There was a good deal of negotiation between them,
and in fact he entered into possession in February, 1914, before
the negotiations were concluded.  The negotiations ultimately
resulted in an agreement that he should be compensated by
receiving the damages which the plaintiff might recover in the
present action.  This was, no doubt, an equitable arrangement,
but it does not help me because I have to assess the damages.
This agreement will not affect the damages.  The landlord will
recover no more and no less than he is entitled to in law.  I
have to solve the problem of arriving at what was the injury to
the reversion.  I think I have now dealt with all the questions
of principle, and will now consider whether there have been any,
and what, breaches by the defendant of his implied obligations,
and to assess the damages.

Now the plaintiff claimed that there were the following
breaches : First, that in respect of the whole of the grass land,
namely, about forty-eight acres, the defendant had during the
last year but one, namely, 1912, mowed forty-one acres, and
during the last year had mowed the whole forty-eight acres.
Next, that as regards one of the two arable fields, namely, a field
of eight acres, he had during the last two years had two crops of
oats in succession, and had also left it in very foul condition and
full of couch ; next, that he had neglected the hedges and
fences ; and, lastly, that he had neglected to properly clean out
the ditches and grips.  It was contended on the part of the
plaintiff that the defendant had done this deliberately in revenge
for having had his tenancy terminated by notice to quit.  The
defendant denied the breaches, and said that if there had been
any such breaches the land was in as good a condition as, or in a
better condition than, the land had been at the commencement
of his tenancy.

[The learned judge then discussed the facts in detail and found

**3 K. B.**        KING'S BENCH DIVISION.        499

that the defendant had committed various breaches of his obliga-    1915
tion.  Judgment was given for the plaintiff for 83*l.* 12*s.* 6*d.*]    WILLIAMS
                                        *v.*
                       *Judgment for plaintiff.*        LEWIS.

  Solicitors for plaintiff : *Kinch & Richardson, for Percy Laybourne & Co., Newport, Monmouthshire.*

  Solicitors for defendant: *Taylor, Rowley & Co., for E. Waddington, Usk.*

                                     W. H. G.

---

           [IN THE COURT OF APPEAL.]        C. A.

O'DRISCOLL AND ANOTHER *v.* MANCHESTER INSURANCE    1915
                COMMITTEE.            *June 24, 25,*
                  [1914 O. 175.]             *28, 30.*

*Practice—Attachment of Debts—" Debt "—Fees payable by National Insurance Committee to Panel Doctor—National Health Insurance (Administration of Medical Benefit) Regulations, 1912, arts. 39, 40, 42—National Health Insurance (Medical Benefit) Regulations (England), 1913, arts. 35, 37— National Insurance Act, 1911 (1 & 2 Geo. 5, c. 55)—Rules of the Supreme Court, 1883, Order XLV., r. 1—Issue as to Debt owing or accruing— Reference to Master to ascertain Amount—Appeal from Finding of Master.*

  An insurance committee, acting under the National Insurance Acts, 1911 and 1913, and the Regulations made thereunder, entered into agreements with the panel doctors of their district by which the whole amounts received by the committee from the National Insurance Commissioners were to be pooled and distributed among the panel doctors in accordance with a scale of fees ; the total amount available for medical benefit so received by the committee was to be the limit of their liability to the panel doctors ; and if the total pool was insufficient to meet all the proper charges of the panel doctors in accordance with the scale there was to be a pro rata reduction for each doctor, and on the other hand if it should be in excess of the amount required the balance was to be distributed among the panel doctors :—

  *Held,* that where a panel doctor has done work under his agreement with the insurance committee, and the committee have received funds in respect of medical benefit from the National Insurance Commissioners, there is a debt owing or accruing from the insurance committee to the panel doctor which may be attached under Order XLV., r. 1, notwithstanding that as a matter of calculation the exact share payable to him may not yet have been ascertained.

  Decision of Rowlatt J. [1915] 1 K. B. 811 affirmed.

  Where a garnishee issue is tried by a judge without a jury, and the

[COURT OF APPEAL.]

C. A.

1961
Mar. 22, 23, 24.
_____
Holroyd Pearce, Harman and Davies L.JJ.
_____

* YEOMAN CREDIT LTD. v. LATTER.

*Guarantee—Indemnity or guarantee—Hire-purchase agreement—Indemnity against loss—Infant's contract—Car—Default by infant—Adult's undertaking to reimburse finance company.*

*Practice—Preliminary point—Indecisive of substantial issue—Whether procedure appropriate.*

A finance company let a car on hire-purchase to an infant. An adult signed a form headed "Hire-purchase indemnity and "undertaking" in which the adult by clause 1 undertook to indemnify the finance company against any loss resulting or arising out of the hire-purchase agreement. The adult did not obtain full rights of subrogation under the undertaking but only those which the finance company chose to allow. By clause 2 the adult agreed to pay the finance company such amount as would make up the sums paid by the hirer to the total amount of hire payable under the agreement and the price of the option together with any expenses incurred by the finance company in enforcing the agreement. Clause 3 provided that if the car had come into the company's possession, they should either give the adult credit for any amount which they realised on sale or transfer the car to the adult after payment in full by him.

The infant defaulted. The finance company repossessed the car and sold it. They then claimed against the adult the amount due under the undertaking. On a preliminary point as to whether the document was a guarantee which, since it guaranteed a void contract, was itself void :—

*Held,* (Davies L.J. *dubitante*) that on its true construction, the undertaking was in truth a contract of indemnity and not a contract of guarantee, and, accordingly, the indemnity undertaking was prima facie enforceable (post, pp. 834–835, 836).

*Per* Harman L.J. It is only when a preliminary point will decide the substantial question at issue between the parties that a matter of law can usefully be raised as a preliminary point (post, p. 835).

APPEAL from Judge Gage sitting at Southend County Court.

The plaintiffs, Yeoman Credit Ltd., a finance company, by a hire-purchase agreement dated January 14, 1959, let a car on hire-purchase to the first defendant, Terry Brian Robert Latter, who was at that date an infant. As the hirer was under 21, an adult was required to sign a special form of indemnity, and the second defendant, Clifford Owen, signed a form headed "Hire-purchase "indemnity and undertaking."

The first defendant paid the initial payment of £55 10s. on the hire-purchase price of the car which was £668 18s. He paid no instalments and in May, 1959, the plaintiffs repossessed the car and sold it for £430. In September, 1959, the plaintiffs claimed £182 8s. from the second defendant the amount due under the indemnity. The second defendant failed to pay and the plaintiffs commenced proceedings. The county court judge

**A.64**

829

tried as a preliminary issue the questions, first, whether the hire-purchase agreement between the plaintiffs and the first defendant was void under the Infants Relief Act, 1874, and secondly, if so, whether the second defendant could be held liable to the plaintiffs under his agreement to indemnify them for any loss arising out of or resulting from that void agreement with the first defendant. On the first question the judge held that the hire-purchase agreement was not a contract for necessaries and was, therefore, void under section 1 of the Infants Relief Act, 1874. On the second question the judge held that the undertaking by the second defendant was a guarantee and therefore, following *Coutts & Co.* v. *Browne-Lecky*,[1] as the principal agreement was void, the guarantee was also void. The judge therefore decided the preliminary point in favour of the second defendant and gave judgment in his favour.

The plaintiffs appealed.

The relevant facts are more fully stated in the judgment of Holroyd Pearce L.J.

*Neil Lawson Q.C.* and *John Lloyd-Eley* for the plaintiffs.
*E. H. Laughton-Scott* for the second defendant.

The following cases, in addition to those referred to in the judgments, were cited in argument: *Macgregor* v. *Dover and Deal Railway Co.*;[2] *Eldridge and Morris* v. *Taylor*[3]; *Temperance Loan Fund Ltd.* v. *Rose*[4]; *Harris* v. *Huntbach*[5]; *Valentini* v. *Canali*[6]; *Birkmyr* v. *Darnell*[7]; *Gordon* v. *Martin*[8]; *Guild & Co.* v. *Conrad*[9]; *Harburg India Rubber Comb Co.* v. *Martin*[10]; *Chambers* v. *Manchester and Milford Railway Co.*[11]; *Nottingham Permanent Benefit Building Society* v. *Thurstan*[12]; *Reg.* v. *Wilson*[13]; *Read* v. *Anderson*.[14]

HOLROYD PEARCE L.J.   This is the plaintiffs' appeal from a judgment of Judge Gage at Southend County Court dismissing, on a preliminary point of law, the plaintiffs' claim for £182 8s. against the second defendant

The plaintiffs are a finance company. By a hire-purchase agreement dated January 14, 1959, they let a car on hire-purchase to the first defendant who was then, as all the parties were aware, an infant. Printed at the end of the hire-purchase agreement is a form of guarantee securing the performance of all

C. A.

1961

YEOMAN
CREDIT LTD.
*v.*
LATTER.

[1] [1947] K.B. 104; 62 T.L.R. 421; [1946] 2 All E.R. 207.
[2] (1852) 18 Q.B.(N.S.) 618.
[3] [1931] 2 K.B. 416; 47 T.L.R. 516.
[4] [1932] 2 K.B. 522, C.A.
[5] (1757) 1 Burr. 373.
[6] (1889) 24 Q.B.D. 166; 6 T.L.R. 75, D.C.
[7] (1704) 1 Salk. 27.

[8] (1731) Fitzg. 302.
[9] [1894] 2 Q.B. 885; 10 T.L.R. 549, C.A.
[10] [1902] 1 K.B. 778; 18 T.L.R. 428, C.A.
[11] (1864) 5 B. & S. 588.
[12] [1903] A.C. 6; 19 T.L.R. 54, H.L.
[13] (1879) 5 Q.B.D. 28, C.C.R.
[14] (1884) 13 Q.B.D. 779, C.A.

C. A.

1961

YEOMAN
CREDIT LTD.
*v.*
LATTER.

Holroyd
Pearce L.J.

the terms by the hirer, and upon his default accepting liability as if the guarantor had been the hirer. At the foot of the form are printed the words: "Note. If the hirer is under 21 an adult "must sign a special form of indemnity." Since the hirer was in this case under 21, the second defendant signed a more lengthy and complicated form headed: "Hire-purchase indemnity and "undertaking."

The hire-purchase price of the car was £668 18s. The initial payment of £55 10s. was paid. Forty-eight monthly instalments of £12 15s. 2d. were payable, but the hirer never paid any of them. In May, 1959, the plaintiffs repossessed the car and sold it for £430. In June, 1959, the hirer went on military service to Hongkong. In September, 1959, the plaintiffs demanded from the second defendant £182 8s., being the amount due under the indemnity. They then started these proceedings against him, claiming that sum. They also sued the hirer as first defendant, since by then he had reached his majority. But they never served him. The sum for which the first defendant would be liable under the terms of the hire-purchase agreement in the events that had happened was £278 19s., a sum which differs not only in amount, but also in its method of calculation from the liability of the second defendant under his indemnity. It is admitted that the hire-purchase agreement was not a contract for necessaries.

Before the Infants Relief Act, 1874, the contract would have been voidable, and the contract of indemnity would admittedly have been enforceable. But section 1 of that Act provides: "All "contracts, whether by specialty or by a simple contract, hence- "forth entered into by infants for the repayment of money lent "or to be lent, or for goods supplied or to be supplied (other than "contracts for necessaries), and all accounts stated with infants, "shall be absolutely void: Provided always, that this enactment "shall not invalidate any contract into which an infant may, by "any existing or future statute, or by the rules of common law or "equity, enter, except such as now by law are voidable." The hire-purchase agreement was, therefore, void under the Act.

In the county court it was argued by the second defendant as a preliminary point that the indemnity, though so called, was really a guarantee, and that since it guaranteed a void contract it was itself void on the reasoning and authority of Oliver J., who held in *Coutts & Co.* v. *Browne-Lecky* [1] that since a guarantee is by definition an obligation to answer for the debt, default or miscarriage of another, there cannot, in respect of a void contract, be any debt, default or miscarriage to answer for.

There are, therefore, two questions raised by this appeal. First, is the document in question a guarantee although styled an indemnity? And, if it is a guarantee, is it void? In its widest sense a contract of indemnity includes a contract of guarantee. But in the more precise sense used in various cases dealing with

[1] [1947] K.B. 104; 62 T.L.R. 421; [1946] 2 All E.R. 207.

**A.64**

831

C. A.

1961

YEOMAN
CREDIT LTD.
*v.*
LATTER.

Holroyd
Pearce L.J.

section 4 of the Statute of Frauds, 1677 (and used in the arguments in this case), a contract of indemnity differs from a guarantee. An indemnity is a contract by one party to keep the other harmless against loss, but a contract of guarantee is a contract to answer for the debt, default or miscarriage of another who is to be primarily liable to the promisee.

Mr. Laughton-Scott, for the second defendant, in an able argument, admits that if the so-called indemnity in this case is in truth a contract of indemnity, he cannot, on the authorities, claim that it was void. If, however, it is in essence a guarantee, then the judge was right in regarding himself as bound by *Coutts* v. *Browne-Lecky*,[2] and this court should hold likewise unless it takes the view (for which Mr. Lawson contends) that that case was wrongly decided. Mr. Lawson argues that it is out of accord with other authorities, and that we should accept the view taken in certain cases that the guarantor of a void contract may yet be liable, a view which is in accord with that taken by the civil law.

The document in question is headed and described as "Hire-"purchase indemnity and undertaking." It is clear from the wording of the document and the surrounding circumstances that it was intended to be something more than a mere guarantee. This tells in favour of its being in truth an indemnity. However, I agree with Mr. Laughton-Scott that we must have regard to its essential nature in order to decide whether or not it is really no more than a guarantee. Its ultimate object, of course, was to ensure that the plaintiffs received back with profit the money that they had laid out in the transaction; but that ultimate object is shared by guarantee and indemnity alike. It is the method by which that object is attained which decides the class to which the document belongs.

Its material words are as follows: "I undertake and agree "as follows: (1) To indemnify you against any loss resulting from "or arising out of the agreement and to pay to you the amount of "such loss on demand and whether or not at the time of demand "you shall have exercised all or any of your remedies in respect "of the hirer or the chattels but so that upon payment in full by "me of my liabilities hereunder I shall obtain such of your rights "as you may at your discretion assign to me." Thus, under paragraph 1 the second defendant does not obtain the full rights of subrogation to which a guarantor is by law entitled, but only such rights of subrogation as the plaintiffs may choose to allow. The second defendant does, however, under clause 3 (as will be seen) get valuable rights of a nature different from subrogation. Clause 2 reads: "The amount of your loss for the purpose of "this indemnity whether or not the agreement shall have been "terminated by any party thereto shall be the total amount "which the hirer would have had to pay under the agreement to "entitle him to exercise the option of purchasing the chattels

[2] [1947] K.B. 104.

C. A.

1961

YEOMAN
CREDIT LTD.
v.
LATTER.

Holroyd
Pearce L.J.

" plus all expenses you may incur in the exercise or enforcement
" of your rights under the agreement . . . less the amount
" actually paid to you under the agreement by the hirer." By
that clause the second defendant is assuring to the plaintiffs such
amount as will make up the sums paid by the hirer to the total
amount of hire payable under the agreement, and the price of the
option together with any expenses incurred by the plaintiffs in
enforcing the agreement. Clause 3 provides that if the car has
come into the plaintiffs' possession, they shall either give the
second defendant credit for any amount which the plaintiffs
realise on the sale of it, or shall, after payment in full by the
second defendant of the full sum due, transfer the car to
the second defendant so that he can sell it and keep the proceeds.

One may sum up the effect of the document in question as
this: It protects the plaintiffs against any loss they may suffer
since it assures to them the full sum of the hire-purchase price,
plus any costs incurred by them in enforcing the hire-purchase
agreement. Thus the rights of the second defendant (if called
upon to pay) are different from the rights of subrogation under
a guarantee, rights which would, in such a case as this, be
useless. Moreover, whereas the plaintiffs' rights against the hirer
and the second defendant would, under a normal guarantee, be
identical, the document in question gives to the plaintiffs wholly
different rights from those which they have against the hirer
under the hire-purchase agreement. In some circumstances the
plaintiffs' rights against the hirer may be higher than those
against the second defendant, and in some circumstances lower.

If, as happened in the present case, the plaintiffs seize the
car on default and sell it for a good price, the hirer's liability
will be greater than that of the second defendant. Against the
hirer the plaintiffs can claim under clause 7 of the hire-purchase
agreement such sum as will make up the sums already paid by
the hirer to half the purchase-price as agreed compensation for
depreciation; but they need not give any credit for the value or
proceeds of the car which they have seized. Against the second
defendant, however, they can claim the total hire-purchase price
plus expenses of enforcement, but they must give credit for the
whole proceeds of the car. Hence the substantial difference
between the respective sums claimed in this action against the
first and second defendants. This difference is caused solely by
the difference between the plaintiffs' rights under the indemnity
and the hire-purchase agreement.

If, however, the hirer had determined the agreement himself
when he had paid sums amounting to half the hire-purchase
price, and if the car had failed to fetch as much as half the
hire-purchase price, falling short of it by, say, £100 (which it
might have done) then the hirer would have had to pay nothing
under the hire-purchase agreement, while the second defendant
would have had to pay £100. Moreover, in the latter instance

C. A.

1961

YEOMAN
CREDIT LTD.
*v.*
LATTER.

Holroyd
Pearce L.J.

the hirer would have been guilty of no debt, default or miscarriage, yet the second defendant would have to pay £100 under the indemnity. Mr. Laughton-Scott argues that the mere fact that in occasional circumstances such a result may be produced does not destroy the essential nature of the agreement in question, which is to answer for the debt, default or miscarriage of another. Nevertheless, it raises a strong suspicion that that may not really be its essential nature.

Further, the agreement does not provide that the second defendant shall make good the particular defaults of the hirer. If the hirer fails to pay the instalments, no recourse can be had to the second defendant for those instalments. None of the actual obligations of the hirer can, if he defaults, be enforced against the second defendant. Only if the totality of the transaction produces either a loss, or a profit less than that which the total hire-purchase price would have yielded can the second defendant be asked to pay. And, if he is asked to pay, the fact that the hirer has made no default is no defence. For it is irrelevant to the calculations on which the second defendant's liability is based. And that liability may well arise from a lawful return of the car by the hirer coupled with a fall in the price of secondhand cars. The agreement is in truth (as clause 1 states) an indemnity against " any loss resulting from or arising out of " the agreement," and not a surety against loss resulting from particular breaches of the agreement.

All these considerations point strongly towards the agreement being what it claims to be, namely, an indemnity. The surrounding circumstances (so far as one can gather them in the absence of the evidence) also support that claim. The parties were, it would seem, all aware of the legal difficulty created by the hirer's infancy. Hence the necessity for this special form of indemnity. That circumstance, as well as the wording of the document, makes it improbable that the transaction was intended as a guarantee of particular obligations if, as appears, they were known not to be binding against the infant. These assumptions, however, may thereafter be shown by the evidence to be incorrect.

In the leading case of *Lakeman* v. *Mountstephen* [3] the plaintiff, a contractor, was failing to do certain sewage work because he was not sure that the Board of Health would pay for it; and the defendant, who wanted the work to be done, said: " Mount- " stephen, go and do the work, and I will see you paid." The House held that these words did not constitute a promise to pay the debt of another, and that they were rightly left to the jury as evidence of a primary obligation on the defendant. Lord Selborne said [4]: " There can be no suretyship unless there be a " principal debtor, who of course may be constituted in the course " of the transaction by matters ex post facto, and need not be so " at the time, but until there is a principal debtor there can be no " suretyship. Nor can a man guarantee anybody else's debt

[3] (1874) L.R. 7 H.L. 17, H.L.   [4] Ibid. 24, 25.

854    THE WEEKLY LAW REPORTS    MAY 12, 1961

C. A.

1961

YEOMAN
CREDIT LTD.
*v.*
LATTER.

Holroyd
Pearce L.J.

"unless there is a debt of some other person to be guaranteed "The tendency, therefore, of any view of this contract which "would place it in the position of a guarantee for a future "liability to be undertaken by the local board, would be abso- "lutely to defeat the whole purpose of the communication, which "was to remove a difficulty then pressing upon the mind of the "contractor, as to whether or not he had sufficient authority from "anyone to go on with the work; and the answer was given in "terms de praesenti for the express purpose of inducing him at "once to go on." In the present case the agreement is more consistent with a primary obligation on the second defendant to secure the plaintiffs against loss if the transaction should turn out unremunerative rather than a secondary obligation to make good the particular defaults of the hirer.

In *Wauthier* v. *Wilson* [5] a father and infant son signed a joint and several promissory note, the father joining as guarantor. Pickford J. had held that the debt against the infant was void, but that, nevertheless, a guarantor of it remained liable on the authority of a decision of Kay J. in *Yorkshire Railway Wagon Co.* v. *Maclure.* [6] The Court of Appeal [7] (without expressly dis-agreeing with the trial judge) preferred to take a different view. Farwell L.J. said [8]: " . . . if Mr. Newbolt's contention that this "was a case of a guarantee were to prevail it would follow that "these three parties deliberately sat down to enter into an "arrangement under which money was to be advanced on a "promissory note on which no one was liable at all, there being "no one liable as principal and therefore no one liable as "surety." And later Farwell L.J. said [9]: "That seemed to him "[the Lord Justice] to be the plain meaning of the transaction, "on the assumption that the plaintiff knew that the son was "under age; and it followed that, in his [his Lordship's] opinion, "the father acted as principal and incurred liability as principal."

I would take a somewhat similar view of the transaction in the present case in the absence of any evidence to the contrary. The second defendant was in effect saying to the plaintiffs: "Go "on with the transaction, and I will see you make your profit and "suffer no loss." No doubt it was hoped that the hirer would fulfil his obligations, although not legally bound by them. But the second defendant was not purporting to guarantee or make good any particular obligation of the hirer. Under the terms of his agreement he had no liability to do so. His liability was to see that the plaintiffs made their intended profit even though the hirer lawfully, without any default, terminated the hiring. He was underwriting the profitable success of the transaction, he was not insuring against contractual breaches of it by the hirer.

For those reasons, the agreement was not a contract of guaran-tee, but a contract of indemnity. It is, therefore, unnecessary

to decide whether the decision in *Coutts & Co.* v. *Browne-Lecky*[10] was rightly decided. That matter has been well argued on both sides, and is clearly not free from difficulty, but I need express no view upon it.

In my judgment the second defendant's preliminary point of law fails, and the case must go back to be heard on the facts.

C. A.

1961

YEOMAN
CREDIT LTD.
*v.*
LATTER.

HARMAN L.J.    I cannot help feeling that in this case the joint and well-meant persuasions of counsel led the county court judge up the garden path to this preliminary point of law. He was unwilling, as he said, to decide it, and in my judgment rightly so, for it is only when a preliminary point of law will decide the substantial question at issue between the parties either way it be decided that such an expedient can ever be really useful. The way in which the county court judge decided the point, of course, put an end to the suit; but this court taking a different view, the case will no resume its meandering course when by now it might well have finished if the straight road had been taken in the first place.

However that may be, I cannot but admire the courage with which the judge faced the real difficulties of the present situation. He preferred to let himself decide the question whether this contract was one of guarantee or indemnity. It seems to me a most barren controversy. It dates back, of course, to the Statute of Frauds, and has raised many hair-splitting distinctions of exactly that kind which brings the law into hatred, ridicule and contempt by the public. Nevertheless, this difficulty persists, and the decided cases on the subject are hardly to be reconciled.

Where all concerned know that the first promisor is an infant, so that as against him the promise cannot be enforced, the court should incline to construe the document signed by the adult (the second promisor) as an indemnity, for that must have been the intention of the promisee and the second promisor. Both know that the first promise has no legal validity; it may be that both hope that the first promisor will honour his engagement, but with the knowledge that he cannot be obliged to do so it must have been their intention that the promise of the adult promisor should have an independent validity. Otherwise the whole transaction is a sham. This is what led the Court of Appeal in *Wauthier* v. *Wilson*[11] to decide as it did. That case is inadequately reported, and we do not know the form of document involved. Pickford J.[12] at first instance treated the position of the father as that of guarantor, and was, therefore, troubled with the difficulties involved in the division of opinion apparent from the cases—*Swan* v. *Blair*[13] on the one side, and Kay J. in *Maclures'* case[14] and Lawrence J.'s decision in *Garrard*

---

[10] [1947] K.B. 104.        [13] (1835) 3 Cl. & F. 610, 635.
[11] 28 T.L.R. 239.           [14] 19 Ch.D. 478.
[12] 27 T.L.R. 582.

THE WEEKLY LAW REPORTS    MAY 12, 1961
836

C. A.

1961

YEOMAN
CREDIT LTD.
v.
LATTER.

Harman L.J.

v. *James*.[15] on the other. But the Court of Appeal cut the knot by holding that the father's promise was an independent contract enforceable without regard to the invalidity of that of the infant. If Oliver J. had felt free to take a like course in *Coutts & Co.* v. *Browne-Lecky*[16] he would not have been troubled with the same doubts as afflicted Pickford J.

Starting from this premise I approach the document between the plaintiffs and the second defendant in the present case, and I find that upon its true construction this is clearly a document of indemnity. It so styles itself. It was clearly meant so to be by the plaintiffs as the note at the foot of the hire-purchase form shows. Had it been otherwise, the ordinary guarantee included in the hire-purchase form itself would have been used. Apart from that, the object of the document appears on its face to be to protect the plaintiffs against loss—to see them harmless—rather than to make good the infant's liability; this might (indeed would in this case) have resulted in a profit to the plaintiffs as appears from the writ itself where a much larger sum is claimed against the infant than against the second defendant. My Lord has shown clearly that in other circumstances the second defendant's liability might have been heavier than the infant's and not have arisen out of his default. For if the latter, without making any default, had (as the hire-purchase contract expressly allowed him to do) put an end to the hiring by returning the car after paying half its price, he would have gone scot-free, while the second defendant would still be under liability for the balance of the hire-purchase price. This alone shows that the second defendant's contract was not one of guarantee for the infant, but of indemnity to the plaintiffs. Again, the second defendant lacked one of the essential rights of a guarantor, namely, that of subrogation given him by law against the principal debtor. Everyone, of course, was aware that the second defendant could not enforce any such right against the infant, whose promise was void.

Taking this view, as I do, of the second defendant's promise, I find it unnecessary to enter on the vexed question whether Oliver J.'s decision (which applies only to a guarantee properly so called) was right.

I would allow the appeal.

DAVIES L.J. All through this case I have found myself in considerable doubt as to the true meaning of the contract with which we are concerned, and, despite the powerful reasons that have been given in the opinions expressed by my Lords, I find myself still in that unhappy position. But as the case involves no question of general law but concerns merely the transaction recorded in this particular document, I think that probably the less I say about it the better. I content myself, therefore, by

15 [1925] 1 Ch. 616.        16 [1947] K.B. 104.

saying that I am still extremely concerned as to whether the real meaning of this document is not that it sets up machinery to secure to the finance company in any event the receipt of the full amount of the money due under the hire-purchase agreement (if any) plus any expenses incurred—whether or not the contract is terminated by the finance company under clause 4 of the agreement in the event therein provided, or whether or not it is terminated by the hirer at his option under clause 5; but that throughout the primary liability under the whole transaction taken together falls on the hirer. But my Lords have formed a firm view about it.

I will only add that I am wholly unconvinced in this case by the argument that was mentioned by Farwell L.J. in *Wauthier* v. *Wilson* [17] and is one of the arguments that have found favour with my Lords, namely, that all the parties to the transaction knew that the hirer here was an infant. For it is manifest on the facts of this case that, despite that fact, the finance company, both by correspondence and by the writ in this action, were pursuing the infant in order to try to recover moneys due under the agreement. That argument, therefore, does not prevail with me.

C. A.

1961
———
YEOMAN
CREDIT LTD.
*v.*
LATTER.
———
Davies L.J.
———

> *Appeal allowed.*
> *Action remitted to the Southend County Court for trial with intimation that this court is of opinion that the agreement dated January 14, 1959, between plaintiffs and second defendant is a contract of indemnity.*
> *Costs of appeal and proceedings in court below to be in the discretion of the county court judge.*

Solicitors: *Paisner & Co.; Drysdale, Lamb & Jackson.*

C. J. E.

[17] 28 T.L.R. 239.

---

[QUEEN'S BENCH DIVISION.]

\* REGINA *v.* LIVERPOOL LICENSING JUSTICES.
*Ex parte* TYNAN.

1961
*April 14.*

Lord Parker
C.J.,
Finnemore and
Salmon JJ.
———

*Licensing—Club—Supper hour extension—Supply of intoxicating liquor with meals—Bar and restaurant with bar—Restaurant bar sales ancillary to refreshment—Total receipts from sale of intoxicating liquor in excess of receipts for meals—Whether supply of intoxicating liquor ancillary to supply of refreshment—"Ancillary"—Licensing Act, 1953 (1 & 2 Eliz. 2, c. 46), s. 104 (1) (a).*

# Insolvency Act 1986

### CHAPTER 45

## ARRANGEMENT OF SECTIONS

### THE FIRST GROUP OF PARTS

### COMPANY INSOLVENCY; COMPANIES WINDING UP

### PART I

#### COMPANY VOLUNTARY ARRANGEMENTS

##### *The proposal*

Section
1. Those who may propose an arrangement.
2. Procedure where nominee is not the liquidator or administrator.
3. Summoning of meetings.

##### *Consideration and implementation of proposal*

4. Decisions of meetings.
5. Effect of approval.
6. Challenge of decisions.
7. Implementation of proposal.

### PART II

#### ADMINISTRATION ORDERS

##### *Making, etc. of administration order*

8. Power of court to make order.
9. Application for order.
10. Effect of application.
11. Effect of order.
12. Notification of order.

A

*Special managers*

**177.**—(1) Where a company has gone into liquidation or Power to
a provisional liquidator has been appointed, the court may, on appoint
an application under this section, appoint any person to be the special
special manager of the business or property of the company.    manager.

(2) The application may be made by the liquidator or pro-
visional liquidator in any case where it appears to him that the
nature of the business or property of the company, or the inter-
ests of the company's creditors or contributories or members
generally, require the appointment of another person to manage
the company's business or property.

(3) The special manager has such powers as may be entrusted
to him by the court.

(4) The court's power to entrust powers to the special manager
includes power to direct that any provision of this Act that has
effect in relation to the provisional liquidator or liquidator of a
company shall have the like effect in relation to the special
manager for the purposes of the carrying out by him of any of
the functions of the provisional liquidator or liquidator.

(5) The special manager shall—

  (a) give such security or, in Scotland, caution as may be
      prescribed ;

  (b) prepare and keep such accounts as may be prescribed ;
      and

  (c) produce those accounts in accordance with the rules
      to the Secretary of State or to such other persons as
      may be prescribed.

*Disclaimer (England and Wales only)*

**178.**—(1) This and the next two sections apply to a company Power to dis-
that is being wound up in England and Wales.    claim onerous
property.

(2) Subject as follows, the liquidator may, by the giving of the
prescribed notice, disclaim any onerous property and may do so
notwithstanding that he has taken possession of it, endeavoured
to sell it, or otherwise exercised rights of ownership in relation
to it.

(3) The following is onerous property for the purposes of this
section—

  (a) any unprofitable contract, and

  (b) any other property of the company which is unsaleable
      or not readily saleable or is such that it may give rise
      to a liability to pay money or perform any other
      onerous act.

PART IV

(4) A disclaimer under this section—

(*a*) operates so as to determine, as from the date of the disclaimer, the rights, interests and liabilities of the company in or in respect of the property disclaimed; but

(*b*) does not, except so far as is necessary for the purpose of releasing the company from any liability, affect the rights or liabilities of any other person.

(5) A notice of disclaimer shall not be given under this section in respect of any property if—

(*a*) a person interested in the property has applied in writing to the liquidator or one of his predecessors as liquidator requiring the liquidator or that predecessor to decide whether he will disclaim or not, and

(*b*) the period of 28 days beginning with the day on which that application was made, or such longer period as the court may allow, has expired without a notice of disclaimer having been given under this section in respect of that property.

(6) Any person sustaining loss or damage in consequence of the operation of a disclaimer under this section is deemed a creditor of the company to the extent of the loss or damage and accordingly may prove for the loss or damage in the winding up.

Disclaimer of leaseholds.

**179.**—(1) The disclaimer under section 178 of any property of a leasehold nature does not take effect unless a copy of the disclaimer has been served (so far as the liquidator is aware of their addresses) on every person claiming under the company as underlessee or mortgagee and either—

(*a*) no application under section 181 below is made with respect to that property before the end of the period of 14 days beginning with the day on which the last notice served under this subsection was served; or

(*b*) where such an application has been made, the court directs that the disclaimer shall take effect.

(2) Where the court gives a direction under subsection (1)(*b*) it may also, instead of or in addition to any order it makes under section 181, make such orders with respect to fixtures, tenant's improvements and other matters arising out of the lease as it thinks fit.

Land subject to rentcharge.

**180.**—(1) The following applies where, in consequence of the disclaimer under section 178 of any land subject to a rentcharge, that land vests by operation of law in the Crown or any other person (referred to in the next subsection as " the proprietor ").