(3)    Where an administrative receiver or receiver vacates office under sub-paragraph (1) or (2)--

(a)    his remuneration shall be charged on and paid out of any property of the company which was in his custody or under his control immediately before he vacated office, and

(b)    he need not take any further steps under section 40 or 59.

(4)    In the application of sub-paragraph (3)(a)--

(a)    "remuneration" includes expenses properly incurred and any indemnity to which the administrative receiver or receiver is entitled out of the assets of the company,

(b)    the charge imposed takes priority over security held by the person by whom or on whose behalf the administrative receiver or receiver was appointed, and

(c)    the provision for payment is subject to paragraph 43.

### *Moratorium on insolvency proceedings*

**42**

(1)    This paragraph applies to a company in administration.

(2)    No resolution may be passed for the winding up of the company.

(3)    No order may be made for the winding up of the company.

(4)    Sub-paragraph (3) does not apply to an order made on a petition presented under--

(a)    section 124A (public interest),

[(aa)    section 124B (SEs),] or

(b)    section 367 of the Financial Services and Markets Act 2000 (c 8) (petition by Financial Services Authority).

(5)    If a petition presented under a provision referred to in sub-paragraph (4) comes to the attention of the administrator, he shall apply to the court for directions under paragraph 63.

### *Moratorium on other legal process*

**43**

(1)    This paragraph applies to a company in administration.

(2)    No step may be taken to enforce security over the company's property except--

(a)    with the consent of the administrator, or

(b)    with the permission of the court.

(3)    No step may be taken to repossess goods in the company's possession under a hire-purchase agreement except--

(a)    with the consent of the administrator, or

(b)    with the permission of the court.

(4)    A landlord may not exercise a right of forfeiture by peaceable re-entry in relation to premises let to the company except--

    (a)    with the consent of the administrator, or

    (b)    with the permission of the court.

(5)    In Scotland, a landlord may not exercise a right of irritancy in relation to premises let to the company except--

    (a)    with the consent of the administrator, or

    (b)    with the permission of the court.

(6)    No legal process (including legal proceedings, execution, distress and diligence) may be instituted or continued against the company or property of the company except--

    (a)    with the consent of the administrator, or

    (b)    with the permission of the court.

[(6A)    An administrative receiver of the company may not be appointed.]

(7)    Where the court gives permission for a transaction under this paragraph it may impose a condition on or a requirement in connection with the transaction.

(8)    In this paragraph "landlord" includes a person to whom rent is payable.

### *Interim moratorium*

**44**

(1)    This paragraph applies where an administration application in respect of a company has been made and--

    (a)    the application has not yet been granted or dismissed, or

    (b)    the application has been granted but the administration order has not yet taken effect.

(2)    This paragraph also applies from the time when a copy of notice of intention to appoint an administrator under paragraph 14 is filed with the court until--

    (a)    the appointment of the administrator takes effect, or

    (b)    the period of five business days beginning with the date of filing expires without an administrator having been appointed.

(3)    Sub-paragraph (2) has effect in relation to a notice of intention to appoint only if it is in the prescribed form.

(4)    This paragraph also applies from the time when a copy of notice of intention to appoint an administrator is filed with the court under paragraph 27(1) until--

    (a)    the appointment of the administrator takes effect, or

    (b)    the period specified in paragraph 28(2) expires without an administrator having been appointed.

(5)    The provisions of paragraphs 42 and 43 shall apply (ignoring any reference to the consent of the



# Landlord and Tenant (Covenants) Act 1995

## CHAPTER 30

## ARRANGEMENT OF SECTIONS

*Preliminary*

Section
1.  Tenancies to which the Act applies.
2.  Covenants to which the Act applies.

*Transmission of covenants*

3.  Transmission of benefit and burden of covenants.
4.  Transmission of rights of re-entry.

*Release of covenants on assignment*

5.  Tenant released from covenants on assignment of tenancy.
6.  Landlord may be released from covenants on assignment of reversion.
7.  Former landlord may be released from covenants on assignment of reversion.
8.  Procedure for seeking release from a covenant under section 6 or 7.

*Apportionment of liability between assignor and assignee*

9.  Apportionment of liability under covenants binding both assignor and assignee of tenancy or reversion.
10. Procedure for making apportionment bind other party to lease.

*Excluded assignments*

11. Assignments in breach of covenant or by operation of law.

*Third party covenants*

12. Covenants with management companies etc.

*Joint liability under covenants*

13. Covenants binding two or more persons.

(b) the notice informed him of the possibility that that liability would be so determined, and

(c) within the period of three months beginning with the date of the determination, the landlord serves on him a further notice informing him that the landlord intends to recover that greater amount from him (plus interest, where payable).

(5) For the purposes of subsection (2) or (3) any fixed charge which has become due before the date on which this Act comes into force shall be treated as becoming due on that date; but neither of those subsections applies to any such charge if before that date proceedings have been instituted by the landlord for the recovery from the former tenant of any amount in respect of it.

(6) In this section—

"fixed charge", in relation to a tenancy, means—

(a) rent,

(b) any service charge as defined by section 18 of the Landlord and Tenant Act 1985 (the words "of a dwelling" being disregarded for this purpose), and     1985 c. 70.

(c) any amount payable under a tenant covenant of the tenancy providing for the payment of a liquidated sum in the event of a failure to comply with any such covenant;

"landlord", in relation to a fixed charge, includes any person who has a right to enforce payment of the charge.

**18.**—(1) This section applies where a person ("the former tenant") is as a result of an assignment no longer a tenant under a tenancy but—     Restriction of liability of former tenant or his guarantor where tenancy subsequently varied.

(a) (in the case of a new tenancy) he has under an authorised guarantee agreement guaranteed the performance by his assignee of any tenant covenant of the tenancy; or

(b) (in the case of any tenancy) he remains bound by such a covenant.

(2) The former tenant shall not be liable under the agreement or (as the case may be) the covenant to pay any amount in respect of the covenant to the extent that the amount is referable to any relevant variation of the tenant covenants of the tenancy effected after the assignment.

(3) Where a person ("the guarantor") has agreed to guarantee the performance by the former tenant of a tenant covenant of the tenancy, the guarantor (where his liability to do so is not wholly discharged by any such variation of the tenant covenants of the tenancy) shall not be liable under the agreement to pay any amount in respect of the covenant to the extent that the amount is referable to any such variation.

(4) For the purposes of this section a variation of the tenant covenants of a tenancy is a "relevant variation" if either—

(a) the landlord has, at the time of the variation, an absolute right to refuse to allow it; or

(b) the landlord would have had such a right if the variation had been sought by the former tenant immediately before the assignment by him but, between the time of that assignment and the time of the variation, the tenant covenants of the tenancy have been so varied as to deprive the landlord of such a right.

14          c. **30**        *Landlord and Tenant (Covenants) Act 1995*

(5) In determining whether the landlord has or would have had such a right at any particular time regard shall be had to all the circumstances (including the effect of any provision made by or under any enactment).

(6) Nothing in this section applies to any variation of the tenant covenants of a tenancy effected before the date on which this Act comes into force.

(7) In this section "variation" means a variation whether effected by deed or otherwise.

*Overriding leases*

Right of former tenant or his guarantor to overriding lease.

**19.**—(1) Where in respect of any tenancy ("the relevant tenancy") any person ("the claimant") makes full payment of an amount which he has been duly required to pay in accordance with section 17, together with any interest payable, he shall be entitled (subject to and in accordance with this section) to have the landlord under that tenancy grant him an overriding lease of the premises demised by the tenancy.

(2) For the purposes of this section "overriding lease" means a tenancy of the reversion expectant on the relevant tenancy which—

(a) is granted for a term equal to the remainder of the term of the relevant tenancy plus three days or the longest period (less than three days) that will not wholly displace the landlord's reversionary interest expectant on the relevant tenancy, as the case may require; and

(b) (subject to subsections (3) and (4) and to any modifications agreed to by the claimant and the landlord) otherwise contains the same covenants as the relevant tenancy, as they have effect immediately before the grant of the lease.

(3) An overriding lease shall not be required to reproduce any covenant of the relevant tenancy to the extent that the covenant is (in whatever terms) expressed to be a personal covenant between the landlord and the tenant under that tenancy.

(4) If any right, liability or other matter arising under a covenant of the relevant tenancy falls to be determined or otherwise operates (whether expressly or otherwise) by reference to the commencement of that tenancy—

(a) the corresponding covenant of the overriding lease shall be so framed that that right, liability or matter falls to be determined or otherwise operates by reference to the commencement of that tenancy; but

(b) the overriding lease shall not be required to reproduce any covenant of that tenancy to the extent that it has become spent by the time that that lease is granted.

(5) A claim to exercise the right to an overriding lease under this section is made by the claimant making a request for such a lease to the landlord; and any such request—

(a) must be made to the landlord in writing and specify the payment by virtue of which the claimant claims to be entitled to the lease ("the qualifying payment"); and

Volume 14, Issue 1



# LANDLORD & TENANT REVIEW

## In this issue

Editorial

### Articles

**Repairs: Where Have All the Claims Gone?**
*Jan Luba QC*

**When is a Variation not a Variation?**
*Marcus Barclay*

**When is Not a house a House**
*Jane Peet and Michael Callaghan*

**Dilapidations Representations**
*Keith Firn and Michael Watson*

### Case Commentary

**Another Hole in the Law?**
*Andrew Hindle*

**A Moment in Time to Calculate the Cap**
*Francesca Guiver*

### Questions and Answers

### Practitioner Page

**Practice Points: Dealing with Joint Parties**
*Sue Highmore and Prof. Mark Pawlowski*

### Book Reviews

### Case, Legislation and Article Digest

**SWEET & MAXWELL**

# INVITATION TO CONTRIBUTE

The Editorial Team welcomes contributions with a view to publication in the *Landlord & Tenant Review*, especially if you have been involved in a recent court decision and can provide a unique insight into the background to the case, or if you are aware of some new development in landlord and tenant law. We would also encourage you to make a contribution to our Practitioner and Precedent Pages, especially if you have an area of practice or legal drafting which you would like to share with our other readers.

As a rough guide, the usual length of articles and case commentaries is about 1,400–2,200 words. Ideally, contributions to the Practitioner Page or Precedent Page should be within a 1,800–2,600 word length. If your article is likely to be much longer or shorter than that, please speak to the General Editor.

Alternatively, you may wish to provide us with some feedback on any aspect we have recently covered in the *Review*, with a view to your comments being published. All feedback is welcomed, whether or not for publication, including suggestions for topics you would like to see covered in later editions.

Submissions for consideration, and feedback, should be sent by email to: M.Pawlowski@greenwich.ac.uk. If you have an idea for a submission, please feel free to discuss it with Mark Pawlowski on 020 8331 9463.



The UK's online legal information service

**Landlord & Tenant Review** is available online via
Westlaw UK's new and renowned interface delivering
unprecedented functionality and navigation.

**Westlaw UK Customer Support Team**
0800 028 2200
customer.service@westlaw.co.uk

---

The information contained in this journal is not intended to be a substitute for specific legal advice and readers should obtain advice from a qualified adviser in relation to individual transactions.
This journal should be cited as (2010) 14 L. & T. Rev.

**ISSN 1365 8018**

© 2010 Thomson Reuters (Legal) Limited and Contributors

Landlord and Tenant Review is published by Thomson Reuters (Legal) Limited (Registered in England & Wales, Company No 1679046. Registered Office and address for service: 100 Avenue Road, London, NW3 3PF) trading as Sweet & Maxwell.

For further information on our products and services, visit *www.sweetandmaxwell.co.uk*

Typeset by Laserwords Private Limited, Chennai, India.
Printed and bound in Great Britain by MPG Books Ltd, Bodmin, Cornwall.

No natural forests were destroyed to make this product; only farmed timber was used and replanted.

**SUBSCRIPTIONS AND ORDERS**
6 issues per annum
Annual subscription £272
Bound Volume Service £443
Sweet & Maxwell
Cheriton House
PO Box 2000
Andover
SP10 9AH
Tel: 0845 600 9355
Email: sweetandmaxwell.
customer.services@thomson.com

Thomson Reuters and the Thomson Reuters Logo are trademarks of Thomson Reuters. Sweet & Maxwell ® is a registered trademark of Thomson Reuters (Legal) Limited. Crown copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, or stored in any retrieval system of any nature without prior written permission, except for permitted fair dealing under the Copyright, Designs and Patents Act 1988, or in accordance with the terms of a licence issued by the Copyright Licensing Agency in respect of photocopying and/or reprographic reproduction. Application for permission for other use of copyright material including permission to reproduce extracts in other published works shall be made to the publishers. Full acknowledgement of author, publisher and source must be given.

# When is a Variation not a Variation?

## Marcus Barclay

Partner and Head of Real Estate Litigation, Olswang LLP

⚖ Guarantees; Guarantors; Leases; Variation

**The Court of Appeal re-iterated in *Triodos Bank NV v Dobbs* [2005] EWCA Civ 630 that a guarantor who has entered into an obligation which includes, what has become known as, an "anti-release" clause may still be released from liability for the contract as varied if it no longer remains a contract within the "general purview" of his original guarantee. This begs some difficult questions as to the point at which what purports to be a variation or amendment of an existing obligation becomes, instead, an additional obligation of a kind which the guarantor has not consented to guarantee.**

### Common law position

A surety under a contract of guarantee is liable for the obligations of his principal arising under the agreement which he agreed to guarantee. The concept of consent is critical. If the principal to an agreement changes that agreement without the surety's consent then, unless it is self-evident without a factual enquiry that the alteration is unsubstantial or one which cannot be prejudicial to the surety, it is for the surety to decide whether or not he consents to remaining liable notwithstanding the alteration. If he does not consent, then he is discharged: *Holme v Brunskill* [1877] 3 Q.B.D. 495.

A modern illustration of this principle is to be found in *West Horndon Industrial Park v Phoenix Timber* [1995] 20 E.G. 137 where the lease guaranteed by the defendant was assigned under a licence to assign to which he was not a party and which imposed extra burdens on the original tenant in respect of the rent payable on review, the potential insurance liability and the repairing obligations. Those variations were enough to release the defendant guarantor.

To meet this point, contracts of suretyship, including virtually all leases, now have an anti-release clause along the lines that the surety's liability will not be released by any variation, waiver or modification of any of the terms of the lease. There is a tendency to believe that the protection of an anti-release clause means that the landlord is free to agree any variation or variations it chooses without the need to obtain any further consent from the surety and that the surety will always remain liable under his contract of guarantee for the tenant's covenants as varied. That, however, is not the case.

The circumstances in which a surety may be released from liability when the original agreement under which he has consented to be liable has been varied or amended was the subject of review by the Court of Appeal in *Triodos*. The case is important for landlord and tenant lawyers because, although it was not a case arising under a lease, the principles of law reiterated by the Court of Appeal appear to be of general application to all contracts of guarantee.

### Facts in *Triodos*

In 1996, Mr Dobbs gave a personal guarantee to Triodos Bank (up to a maximum of £50,000) to pay all monies due and owing to the Bank "under or pursuant to" two loan agreements made with a company of which he was a director. The agreement included (in clause 2.4.1) a widely drafted right for the bank to: "agree to any amendment, variation, waiver or release in respect of an obligation of the Company under the Loan Agreement". In 1998, the loan agreements were replaced by two new agreements and, in 1999, the two 1998 agreements were, in turn, replaced by a single loan agreement which was for a different purpose and substantially increased the facility available to the company. Mr Dobbs knew the terms of all of these documents

but did not countersign the replacement loan agreements in 1998 or 1999. In 2000, the bank made formal demand on the company for repayment, appointed administrative receivers and called upon Mr Dobbs to pay the maximum sum he had guaranteed, namely, £50,000. Mr Dobbs' response was that his guarantee only applied to sums due "under or pursuant to" the 1996 loan agreement, not its replacements and that he was, therefore, released. The question for the court was whether the new agreements were, in substance (rather than form), variations of the original agreement or whether they created obligations which were so different that they could not properly be considered to be variations at all.

## Court of Appeal ruling

Longmore L.J. took as his starting point the following statement of the law in the first edition of *Rowlatt on Principal and Surety* (1898):

> "It is apprehended that assent, whether previous or subsequent to a variation, only renders the surety liable for the contract as varied, where it remains a contract within the general purview of the original guarantee ... If a new contract is to be secured there must be a new guarantee."

In his Lordship's view, the question as to whether or not a variation was within the "general purview" of the original agreement was a matter of construction, but he emphasised that the passage in *Rowlatt*, above (which is repeated verbatim in the 5th edn), is still good law. The fact that a guarantor has agreed to the inclusion of an anti-release clause is not the end of the matter. The question is whether the proper construction of the original agreement, including the anti-release clause, permits the actual variations which have taken place without the guarantor's further express consent. His Lordship referred, in particular, to the judgment of Branson J. in *British Motor Trust Co Ltd v Hyams* [1934] 50 T.L.R. 230. In that case, the anti-release clause provided that the guarantee would not be avoided by the principal "making any variation in the terms of the said agreement". This was similar to clause 2.4.1 of the agreement in *Triodos*. Branson J. considered that the clause permitting the variation was "so wide that it was almost impossible to put any limit to the power to vary". In other words, the clause effectively permitted *any* variation without releasing the guarantor. Commenting on this decision, Longmore L.J. observed that:

> "It is important to distinguish between the true variation of an existing obligation and the entering of what is, in fact, a different obligation even though it may purport to be no more than a variation. In that sense, it is perfectly possible (and, indeed, right) to put 'a limit to the power to vary'."

His Lordship drew support for this from the earlier decision in *Samuels Finance Group plc v Beachmanor Ltd* [1993] E.M.C.R. 282 where Lloyd L.J. said, after referring to the comments of Branson J. in the *Hyams* case, that he could imagine changes falling short of a novation, which would yet be so fundamental that they could not properly be described as a variation at all. He acknowledged that it was not easy to draw a hard-and-fast line between permissible and impermissible variations but felt that, on the facts of *Triodos*, the obligations under the 1999 Agreement were so different from those under the original agreement that it was clear the line had been crossed. He went on to comment that in neither the *Hyams* nor *Samuels* cases was there reference to the requirement "that any variation (even if there is advance agreement to a variation of the underlying loan agreement) must be within the 'purview' of the agreement but the passage in *Rowlett* remains in the 5th edition (1999), para.4-72 and, in my view, this requirement is still law".

Neuberger L.J. agreed with this approach but the third member of the Court of Appeal, namely, Chadwick L.J., seems to have gone further in wanting to limit the circumstances in which Mr Dobbs' obligations could be varied. According to Chadwick L.J., it was important to bear in mind that the guarantor had only agreed to guarantee liabilities incurred "under or pursuant to the 1996 Loan Agreement" and was not to be taken to have agreed that his liability under the guarantee:

> "... would be increased or made more onerous by a subsequent agreement ... (to which he is not a party) unless there are clear words in the guarantee which show that he did agree to be bound to a more onerous obligation in the future imposed without further reference to him."

Chadwick L.J.'s view of the effect of clause 2.4.1 was that it only exposed Mr Dobbs to the risk that his liability in respect of the obligations of the company under the 1996 agreement:

"... might be made more onerous by an amendment or variation of those obligations. Clause 2.4.1 did not expose him to the risk of liability in respect of additional obligations of the Company which were not properly to be regarded as an amendment or variation of existing obligations."

On one view, Chadwick L.J.'s analysis would seem to mean that virtually any "additional obligations" imposed as the result of a variation will fall outside the "general purview" of the original agreement unless there is clear wording in the guarantee provisions themselves to the effect that the guarantor accepts that additional obligations can be imposed which go beyond the strict amendment or variation of the existing obligations. This would seem to go too far and the better interpretation is probably that Chadwick L.J. was distinguishing between additional obligations which can properly be regarded as an amendment or variation of an existing obligation and those which cannot.

### Where does that leave us?

The position of a guarantor under a lease at common law would appear to be as follows:

- if the original lease does not include an anti-release provision, then any variation or modification to which he has not otherwise consented will give the guarantor the right to treat himself as released unless it is self-evident that it is unsubstantial or cannot be prejudicial to him;
- if there is an anti-release provision, then it will be a question of construction of that provision, and the original lease, as to what variations or modifications are permissible as being within the "general purview" of the original lease. The court will put a limit on the power to vary so as "to distinguish between the true variation of an existing obligation and the entering of what is in fact a different obligation even though it might purport to be no more than a variation";
- if the variation is not such as to constitute a surrender and re-grant but goes beyond the "general purview" of the original lease and the guarantor has not consented to it in some other way then the guarantor is entitled to treat himself as released; and
- if the variation is within the "general purview" of the original lease or the

guarantor has otherwise consented, then he is not released although his liability may be capped by s.18 of the Landlord and Tenant (Covenants) Act 1995.

### What amendments are within the "general purview" of the lease?

A typical anti-release clause will provide that the guarantor will not be released by "any variation, waiver, release or modification of any of the terms of this lease" or words to that effect. What amendments might be outside the "general purview" of such a clause and the lease, but not such as to constitute a surrender and re-grant? As Longmore L.J. said, this is essentially a matter of construction and it is not easy to draw a hard-and-fast line between permissible and impermissible variations, but here are a couple of examples to consider:

- a variation making the rent payable monthly in advance, instead of quarterly, in return for a change in the rent review pattern from every seven years to every five years; and
- the grant of permission to carry out structural alterations and to grant a sub-letting of part (both being prohibited by the lease) in return for a 15 per cent increase in the rent and the tenant's repairing obligations being varied so as to include the exterior of the premises.

Perhaps the first example falls on the right side of the line, the variations being variations of existing obligations. The second example, however, may well fall on the wrong side. The variations amount to the creation of potentially substantial additional obligations, including some arising out of things which the original lease expressly prohibits. The only way to avoid any risk of the surety being wholly discharged is to make him a party to any variation however great or small. Section 18 of the 1995 Act may mean, however, that his liability is still capped.

### Conclusion

The *Triodos* case is important not because it creates any new law but because the Court of Appeal has reiterated the importance of a fundamental principle which applies as much to guarantees of leases as it does to other forms of guarantee. The principle is that the surety is only liable to the extent that he has consented to be liable and that variations which go beyond what he has agreed will entitle him to

# ARTICLES

be released even if he has agreed, in advance, to a variation of the lease. That is the principle which underlies the "general purview" test. There may be a tendency for landlords and their legal advisers to believe that an anti-release clause gives them carte blanche to vary the lease without considering whether the variation is one to which the surety has, in fact, given its consent. The *Triodos* ruling makes it clear that is not the case.

*The law is stated as at December 1, 2009.*

# THE COMMON LAW LIBRARY

# CHITTY
# ON
# CONTRACTS

## THIRTY-FIRST EDITION

VOLUME I
**GENERAL PRINCIPLES**

SWEET & MAXWELL  THOMSON REUTERS

**24–020**                CHAP. 24—DISCHARGE BY BREACH

contract breaker has clearly shown an intention to abandon and altogether refuse to perform the contract.[143] It is the application of this test to the facts of individual cases which has proved to be less than straightforward. All of the circumstances must be taken into account insofar as they bear on an objective assessment of the intention of the contract breaker.[144] Thus, in an appropriate case, a court may have regard to the motive of the contract breaker where it reflects something of which the innocent party was, or a reasonable person in his position would have been, aware.[145] In the case where the breach takes the form of a notice which does not comply with the terms of the contract, a court is unlikely to find the breach to be repudiatory where the notice-giver had made a genuine mistake in issuing the deficient notice, the recipient of the notice was aware of the mistake and deliberately refrained from pointing out the mistake until after the notice-giver purported to terminate the contract in reliance upon the deficient notice.[146]

**24–021**    **Employer and employee.** In respect of an action for wrongful dismissal at common law, or proceedings for unfair dismissal under statute, the question what acts or omissions amount to or justify such dismissal is dealt within the chapter on employment in Vol.II of this work.[147]

**24–022**    **Anticipatory breach.**[148] If, before the time arrives at which a party is bound to perform a contract, he expresses an intention to break it, or acts in such a way as to lead a reasonable person to the conclusion that he does not intend to fulfil his part,[149] this constitutes an "anticipatory breach"[150] of the contract and entitles the other party to take one of two courses. He may "accept"[151] the renunciation, treat it as discharging him from further performance, and sue for damages forthwith, or he may wait till the time for performance arrives and then sue.[152] On the other hand, where the anticipatory breach takes a continuing form,[153] the fact

that the in
normally p
the party
termination

**Breach :**
*Tour*,[155] wh
for perform
for damage
*v Milling*[15]
M.R.:

"A renun
party befo
contract b
contract as
the contra
concerned
party may
declare tha
an action
renunciatio

It is neverth
contract, th
itself.[158] Th
may, in ant

---

[143] [2010] EWCA Civ 1168, [2011] 2 All E.R. (Comm) 223 at [61].
[144] [2010] EWCA Civ 1168, [2011] 2 All E.R. (Comm) 223 at [63].
[145] [2010] EWCA Civ 1168, [2011] 2 All E.R. (Comm) 223 at [63].
[146] [2010] EWCA Civ 1168, [2011] 2 All E.R. (Comm) 223 at [63]; *Oates v Hooper* [2010] EWCA Civ 1346, [2010] All E.R. (D) 284 (Nov).
[147] Vol.II, paras 39–179—39–188 (wrongful dismissal); Vol.II, paras 39–210—39–243 (unfair dismissal).
[148] See generally Q. Liu, *Anticipatory Breach* (2011) and Andrews, Clarke, Tettenborn and Virgo, *Contractual Duties: Performance, Breach, Termination and Remedies* (2012), Ch.7.
[149] *Forslind v Becheley-Crundall* (1922) S.C. 173 HL; *Universal Cargo Carriers Corp v Citati* [1957] 2 Q.B. 401; affirmed in part [1957] 1 W.L.R. 979 and reversed in part [1958] 2 Q.B. 254; *Greenaway Harrison Ltd v Wiles* [1994] I.R.L.R. 380; *Stocznia Gdanska SA v Latvian Shipping Co* [2001] 1 Lloyd's Rep. 537, 563; *Proctor & Gamble Ltd v Carrier Holdings Ltd* [2003] EWHC 83 (TCC), [2003] B.L.R. 255 at [35]; *Berkeley Community Villages Ltd v Pullen* [2007] EWHC 1330 (Ch), [2007] 3 E.G.L.R. 101 at [79].
[150] For a criticism of this expression, see *Bradley v H. Newsom Sons & Co* [1919] A.C. 16, 53; Dawson [1981] C.L.J. 83; Mustill, *Butterworth Lectures*, 1989–1990, p.1.
[151] See above, para.24–013.
[152] In *Berkeley Community Villages Ltd v Pullen* [2007] EWHC 1330 (Ch), [2007] 3 E.G.L.R. 101 at [83] Morgan J. left open the question whether, in the case where a claimant wishes not to bring the contract to an end, it is appropriate to grant an injunction to restrain a sale because it amounts to an anticipatory breach of a contingent future obligation.
[153] Not all anticipatory breaches are of a continuing nature: see, for example, *Howard v Pickford Tool Co Ltd* [1951] 1 K.B. 417.

[154] *Stocznia*
at [94]–[100].
[155] (1853) 2
L.R. 7 Ex. 11:
*Mihalis Ange*
[156] (1886) 1
*Melachrino v*
*Wright v Dea*
Lloyd's Rep.
appeal [1968
*Kamsing Kni*
*Millennium F*
43–430 et se
[157] (1886)
performance
criticised on
because whe
promisee do
(eds), *Conte*
178–182.
[158] *The M*
356.
[159] cf. *Fre*

ether refuse
f individual
circumstances
ment of the
court may
omething of
would have
otice which
to find the
mistake in
the mistake
the notice
le deficient

dismissal at
lestion what
the chapter

rty is bound
such a way
end to fulfil
and entitles
enunciation,
or damages
n sue.[152] On
n,[153] the fact

[2010] EWCA

39–243 (unfair

orn and Virgo,

s Corp v Citati
8] 2 Q.B. 254;
an Shipping Co
003] EWHC 83
l] EWHC 1330

9] A.C. 16, 53;

3 E.G.L.R. 101
not to bring the
t amounts to an

ward v Pickford

that the innocent party initially continued to press for performance does not normally preclude him from later electing to terminate the contract provided that the party in breach has persisted in his stance up to the moment of termination.[154]

**Breach accepted.** The first alternative was established by *Hochster v De la Tour*,[155] where a travelling courier sued his employer who wrote before the time for performance arrived that he would not require his services. The courier sued for damages at once and it was held that he was entitled to do so. In *Johnstone v Milling*[156] the effect of an anticipatory breach was thus stated by Lord Esher M.R.:          24–023

"A renunciation of a contract, or, in other words, a total refusal to perform it by one party before the time for performance arrives, does not, by itself, amount to a breach of contract but may be so acted upon and adopted by the other party as a rescission of the contract as to give an immediate right of action. Where one party assumes to renounce the contract, that is, by anticipation refuses to perform it, he thereby, so far as he is concerned, declares his intention then and there to rescind the contract . . . The other party may adopt such renunciation of the contract by so acting upon it as in effect to declare that he too treats the contract as at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation."[157]

It is nevertheless clear that, in cases of anticipatory breach by renunciation of the contract, the cause of action is not the future breach; it is the renunciation itself.[158] The doctrine is not based on the fiction that the eventual cause of action may, in anticipation, be treated as a cause of action.[159] So, if the anticipatory

---

[154] *Stocznia Gdanska SA v Latvian Shipping Co* [2002] EWCA Civ 889, [2002] 2 Lloyd's Rep. 436 at [94]–[100].

[155] (1853) 2 E. & B. 678; *Xenos v Danube, etc., Ry* (1863) 13 C.B.(N.S.) 825; *Frost v Knight* (1872) L.R. 7 Ex. 111; *Dominion Coal Co Ltd v Dominion Iron and Steel Co Ltd* (1909) 25 T.L.R. 309; *The Mihalis Angelos* [1971] 1 Q.B. 164.

[156] (1886) 16 QBD 460. For the measure of damages, see *Roper v Johnson* (1873) L.R. 8 C.P. 167; *Melachrino v Nickoll and Knight* [1920] 1 K.B. 693; *Millett v Van Heek & Co* [1921] 2 K.B. 369; *Wright v Dean* [1948] Ch. 686; *Sudan Import Co Ltd v Société Générale de Compensation* [1958] 1 Lloyd's Rep. 310; *Garnac Grain Co Inc v H.M.F. Faure and Fairclough Ltd* [1966] 1 Q.B. 650 (on appeal [1968] A.C. 1130); *The Mihalis Angelos* [1971] 1 Q.B. 164; *Tai Hing Cotton Mill Ltd v Kamsing Knitting Factory* [1979] A.C. 91; *Chiemgauer Membran und Zeltbau GmbH v The New Millennium Experience Co Ltd, The Times,* January 16, 2001; and Vol.II, paras 43–417 et seq. and 43–430 et seq.

[157] (1886) 16 QBD 460, 467. The proposition that a renunciation of the contract before the time for performance has arrived does not amount to a breach until it has been acted upon or adopted has been criticised on the ground that it is inconsistent with *Hochster v De la Tour* (1853) 2 E. & B. 678 and because whether or not there is a breach must depend on what the promisor does and not on what the promisee does thereafter: see Smith, "Anticipatory Breach of Contract" in Lomnicka and Morse (eds), *Contemporary Issues in Commercial Law: Essays in Honour of A.G. Guest,* pp.175, 178–182.

[158] *The Mihalis Angelos* [1971] 1 Q.B. 164; *Moschi v Lep Air Services Ltd* [1973] A.C. 331, 356.

[159] cf. *Frost v Knight* (1872) L.R. 7 Ex. 111, 114.

breach is accepted as a discharge of the contract, it is not open to the party in breach subsequently to tender performance within the time originally fixed.[160] Further, the innocent party can claim damages at once even though his right to future performance of the contract is then only contingent.[161]

24–024    If the breach is accepted, the innocent party is relieved from further performance of his obligations under the contract. He is likewise relieved from proving, in any action against the party in default, that he was ready and willing at the date of the renunciation to perform the contract in accordance with its terms.[162] It follows that it is not necessary to liability in such an action to show that, if the contract had not been renounced, the innocent party would not at the time fixed for performance have been able to perform it,[163] although proof of such inability to perform might possibly be material in the assessment of damages.[164]

24–025    **Breach not accepted.** The second alternative[165] is illustrated by *Avery v Bowden*.[166] In that case there was a contract by charterparty that a ship should sail to Odessa and there take a cargo from the charterer's agent, the cargo to be

---

[160] *Xenos v Danube, etc., Ry* (1863) 13 C.B.(N.S.) 825.

[161] *Frost v Knight* (1872) L.R. 7 Ex. 111; *Synge v Synge* [1894] 1 Q.B. 466. Damages will generally, but not inevitably, be assessed at the date of the breach of contract. Exceptionally, damages may be reduced where subsequent events, known to the court at the time of the hearing, have reduced the value of the contractual rights in respect of which the claim has been brought: *Golden Strait Corp v Nippon Yusen Kubishika Kaisha (The Golden Victory)* [2007] UKHL 12, [2007] 2 A.C. 353. See further below, para.26–086.

[162] *Braithwaite v Foreign Hardwood Co Ltd* [1905] 2 K.B. 543, 551, 554; *Cooper, Ewing & Co Ltd v Hamel and Horley Ltd* (1922) 13 Ll.L. Rep. 466, 590, 593; *Taylor v Oakes Roncoroni & Co* (1922) 38 T.L.R. 349, 517; *British and Beningtons Ltd v North Western Cachar Tea Co Ltd* [1923] A.C. 48, 66; *Continental Contractors Ltd v Medway Oil and Storage Co Ltd* (1925) 23 Ll.L. Rep. 55, 124, 128, 132; *Rightside Property Ltd v Gray* [1975] Ch. 72, 82; *Gill & Duffus SA v Berger & Co Inc* [1984] A.C. 382, 395–396; *Chiemgauer Membran und Zeltbau GmbH v The New Millennium Experience Co Ltd, The Times*, January 16, 2001; *Marplace (Number 512) Ltd v Chaffe Street (A Firm)* [2006] EWHC 1919, [2006] All E.R. (D) 413 (Jul) at [321]. cf. Dawson (1980) 96 L.Q.R. 239. See also Lloyd (1974) 37 M.L.R. 121.

[163] *Aliter*, if at the time of the renunciation, there was already a breach of contract (albeit unknown) on the part of the innocent party: *Cooper, Ewing & Co Ltd v Hamel and Horley Ltd* (1922) 13 Ll.L. Rep. 466; *British and Beningtons Ltd v North Western Cachar Tea Co Ltd* [1923] A.C. 48, 72. cf. *Gill & Duffus SA v Berger & Co Inc* [1984] A.C. 382. See also above, para.24–014. The position has also been held to be otherwise in the case where prior to the repudiatory breach the innocent party had demonstrated that it had no intention of performing its contractual obligations: *Acre 1127 Ltd v De Montfort Fine Art Ltd* [2011] EWCA Civ 87, [2011] All E.R. (D) 111 (Feb) at [51].

[164] *Braithwaite v Foreign Hardwood Co Ltd* [1905] 2 K.B. 543, 552; *Taylor v Oakes Roncoroni & Co* (1922) 38 T.L.R. 349; *British and Beningtons Ltd v North Western Cachar Tea Co Ltd* [1923] A.C. 48, 71, 72; *Continental Contractors Ltd v Medway Oil and Storage Co Ltd* (1925) 23 Ll.L. Rep. 55, 132, 133; *Esmail v Rosenthal & Sons Ltd* [1964] 2 Lloyd's Rep. 447, 466, [1965] 1 W.L.R. 1117; *The Mihalis Angelos* [1971] 1 Q.B. 164; *Gill & Duffus SA v Berger & Co Inc* [1984] A.C. 382, 392, 396, 397; *Chiemgauer Membran und Zeltbau GmbH v The New Millennium Experience Co Ltd, The Times*, January 16, 2001; *Acre 1127 Ltd v De Montfort Fine Art Ltd* [2011] EWCA Civ 87, [2011] All E.R. (D) 111 (Feb) at [52]. In *Singh v Sardar Investments Ltd* [2002] EWHC 380 (Ch) Patten J. stated (at [60]) that it was not necessary for him to express any views about the correctness or otherwise of the decision in *Chiemgauer*.

[165] *Michael v Hart & Co* [1902] 1 K.B. 482; *Braithwaite v Foreign Hardwood Co Ltd* [1905] 2 K.B. 543; *Sinason-Teicher Inter-American Grain Corp v Oilcakes and Oilseeds Trading Co Ltd* [1954] 1 W.L.R. 935, 944; affirmed, 1394.

[166] (1855) 5 E. & B. 714; (1856) 6 E. & B. 953.

THE COMMON LAW LIBRARY

W LIBRARY

ns

leadings

:e

:ence

1

# CHITTY
# ON
# CONTRACTS

## THIRTY-FIRST EDITION

VOLUME II

**SPECIFIC CONTRACTS**



SWEET & MAXWELL        THOMSON REUTERS

CONSTRUCTION OF THE CONTRACT                44–066

**Left column (partial/cut off):**

nstruction of contracts in
estioned whether they are
to construction:

facts known to or at least
is that of the language in
text, the language used is to
onable man would conclude
intentions".[306]

that the parties must, for

This approach to construc
guarantee[308] and, most
by the Supreme Court to
ee.[309] So, it has been held
ace as to who is to benefit
at extrinsic evidence to
ld convey to a reasonable
uld reasonably have been
Moreover, a contract of
ear mistake in its drafting,
a company, company A,
gations of its subsidiary,
of company C. However,
ly C but with company D,
oany C: company C was
up other than company D

02] EWCA Civ 691 at [54], per
th of Lord Wilberforce in *Prenn*
ssociated with the "principles of
npensation Scheme Ltd v West*
Lord Hoffmann. See also *Bank*
[2002] 1 A.C. 251 at [9]–[11];
.A.C. 1101 and see Vol.I, paras

*ilding Society* [1998] 1 W.L.R.
52, [2008] L. & T. R. 30 at [22]

] EWCA Civ 691 at [19]; *Static*
[2004] 2 Lloyd's Rep. 429 esp.
EWCA Civ 24, [2005] 1 Lloyd's
t Ltd [2010] EWHC 3072 (QB),
cial Services Ltd [2010] EWCA

44–009.

6] EWCA Civ 1233, [2006] 2
*Property Co Ltd (In Liquidation)*
e expressed on its terms to cover
ver loan by bank's subsidiary).

**Main column:**

had entered such an agreement. In these circumstances, it was held that the guarantee was given by company A in respect of company B's liabilities to *company D*: "something went wrong with the drafting of the [guarantee] letter. . . . To construe it literally would be a commercial nonsense".[312]

However, courts have at times sounded more cautious notes as to the implications of the modern approach to construction in the context of guarantees. In *Fairstate Ltd v General Enterprise & Management Ltd*[313] the court followed the modern approach to construction, considering that these principles meant that, in a suitable case "extrinsic evidence may be relied upon to identify the guarantor, the creditor, the principal debtor or the obligation to be guaranteed, where any of these have been inadequately or ambiguously described in the relevant document". But "the Court will be slow to deprive the defendant of a legitimate statutory defence [under the Statute of Frauds] on the basis of contested oral evidence alone".[314] In particular, as earlier noted, where a mistake has led to the omission of a material term from any writing, the contract may be unenforceable under the Statute of Frauds, unless the court is able to rectify the written instrument under normal rules.[315] In *Fairstate* itself, "the sheer length of the catalogue of corrections and additions that [the court] should have to make to the Guarantee Form in order to turn it into an effective guarantee for this transaction" preventing it from so doing; to do so would "be writing a new and different contract for the parties".[316] Moreover, in *Dumford Trading AG v OAO Atlantryb-flot*[317] the Court of Appeal considered that (apart from the doctrines of rectification or misnomer[318]), where an existing person is named as guarantor in the guarantee document, there is a danger that extrinsic evidence from the surrounding matrix of facts could create an ambiguity otherwise not present.[319] Where, therefore, company A in a group of companies was identified as guarantor by the document of guarantee, the court should not look at extrinsic evidence (such as the postal address given for this company) so as to construe this unambiguous reference as being to company B, a very similarly-named company in the same group.[320]                                                                44–065

**"Clear words" and "strict construction"** It has been suggested that "it may be that the concept that a guarantee should be 'strictly construed' now adds nothing" to the modern approach to interpretation,[321] but in *Liberty Mutual*                44–066

---

[312] [2004] EWHC 1526 (QB) at [74], per Christopher Moger Q.C. sitting as a deputy judge of the High Court; cf. *Fairstate Ltd v General Enterprise & Management Ltd* [2010] EWHC 3072 (QB), [2011] 2 All E.R. 497 (Comm) at [75] (number of corrections and additions prevented court from so construing it).

[313] [2010] EWHC 3072 (QB), [2011] 2 All E.R. 497 (Comm).

[314] [2010] EWHC 3072 (QB) at [76].

[315] Above, paras 44–054—44–055 and see above, Vol.I, paras 5–110 et seq. esp. at para.5–113 for the relationship between the modern approach to construction and rectification.

[316] [2010] EWHC 3072 (QB) at [82].

[317] [2005] EWCA Civ 24, [2005] 1 Lloyd's Rep. 289 (application for summary judgment under Pt 24 CPR).

[318] On which see Vol.I, paras 5–110 et seq. and 12–075 respectively.

[319] [2005] EWCA Civ 25, [2005] 1 Lloyd's Rep. 289 at [36].

[320] [2005] EWCA Civ 25, [2005] 1 Lloyd's Rep. 289 at [36].

[321] *Static Control Components (Europe) Ltd v Egan* [2004] EWCA Civ 392, [2004] 2 Lloyd's Rep. 429 at [19], per Holman J.

**44–066**                                          CHAP. 44—SURETYSHIP

*Insurance Co (UK) Ltd v HSBC Bank Plc*[322] the Court of Appeal took the view that the modern approach is not inconsistent with a maxim of construction which requires "clear words" to exclude or limit prevailing rules,[323] since "the reasonable man does not expect fundamental principles of law, equity and justice, such as rights of set-off or of subrogation to be excluded unless the contract clearly says so".[324]

**44–067**      **The role of "business common sense".** In *Kookmin Bank v Rainy Sky SA*[32?] Lord Clarke of Stone-cum-Ebony J.S.C. (with whom Lord Phillips of Worth Matravers P.S.C., Lords Mance, Kerr of Tonaghmore, and Wilson JJ.S.C. agreed) agreed with Lord Neuberger M.R. in *Pink Floyd Music Ltd v EMI Records Ltd*[32?] in considering that the *Investors Compensation* case and *Chartbrook Ltd v Persimmon Homes Ltd*[327] show that:

> "the ultimate aim of interpreting a provision in a contract, especially a commercial contract, is to determine what a reasonable person would have understood the parties to have mean . . . the relevant reasonable person is one who has all the background knowledge which would have reasonably have been available to the parties in the situation in which they were at the time of the contract."[328]

The particular issue before the Supreme Court was "the role to be played by considerations of business common sense in determining what the parties meant",[329] there being a contrast of approach in the Court of Appeal below.[330] In Lord Clarke's view, it is not necessary "to conclude that, unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning".[331] Rather, "[i]f there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other;"[332] but "[w]here the parties have used unambiguous language, the court must apply it".[333] The Supreme Court applied this approach to the construction of the advance payment bonds before it, with the result that, in the context, in the bank's "promise to pay . . . on your first written demand, all such sums due to [the buyer] under the [ship-building] Contract" the words "such sums" referred to refunds to which the buyer was entitled in the case of any insolvency event and not merely to "pre-delivery instalments" (as the banks had argued). For this purpose, the Court took into account the view of the experienced commercial

---

[322] [2002] EWCA Civ 691.
[323] *Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Co Ltd* [1996] 1 A.C. 199, 208.
[324] [2002] EWCA Civ 691 at [56], per Rix L.J., relying in particular on *Bank of Credit and Commerce International SA v Ali* [2001] UKHL 8, [2002] 1 A.C. 251 at [10] (Lord Bingham).
[325] [2011] UKSC 50, [2011] 1 W.L.R. 2900.
[326] [2010] EWCA Civ 1429, [2011] 1 W.L.R. 770 at [17].
[327] [2009] UKHL 38, [2009] 1 A.C. 1101, [21]–[26].
[328] [2011] UKSC 50 at [14], per the Lord Clarke of Stone-cum-Ebony J.S.C.
[329] [2011] UKSC 50 at [15], per the Lord Clarke of Stone-cum-Ebony J.S.C.
[330] cf. [2010] EWCA Civ 582 at [19] (Sir Simon Tuckey) and [35]–[44] (Patten L.J.).
[331] [2011] UKSC 50 at [20].
[332] [2011] UKSC 50 at [21].
[333] [2011] UKSC 50 at [23] quoting with approval *Society of Lloyd's v Robinson* [1999] 1 W.L.R. 756, 763, per Lord Steyn.

DISCHARGE OF SURETY                              44–099

construction of the contract, the surety has undertaken to pay a given sum on a given event, then he is liable to pay it on that event, and it is immaterial that the principal debtor could not be sued for it by the creditor.[483]

**Discharge of debtor through debtor's breach of contract.** Where the   44–098
debtor himself is guilty of a breach of contract in consequence of which the creditor elects to treat the contract as discharged, the possibility of the surety being discharged gives rise to considerable difficulty. It must first be seen whether the surety has guaranteed complete performance of the contract by the principal debtor. Prima facie the surety is treated as guaranteeing that the debtor will perform his contract; consequently, if the debtor is in breach so that the creditor exercises his rights to cancel the whole contract the debtor's liability is transmuted into a liability for damages, but the surety remains liable for the performance of that duty, as he is liable for the performance of the original duty.[484] As has been observed,

> "A repudiatory breach [by the debtor] will in the normal course of events lead to the termination of the repudiated contract (although of course it may not do so). It would be extraordinary if a performance guarantee was intended to cease to operate in exactly the situation in which its beneficiary most needs it—when the contract has failed because the principal has repudiated it".[485]

It is possible, though, that the surety may be held to have guaranteed only the debtor's primary obligations under the contract and not his secondary obligation (to pay damages) in the event of breach; in this event it seems that the surety would remain liable for his accrued liability in respect of the primary obligations.[486]

**Guarantees of payment by instalments.** More problems arise with contracts   44–099
involving payment in instalments, where payment is guaranteed by the surety. The creditor's right to claim payment of instalments, whether from the debtor or the surety, prima facie arises only where the events specified in the contract have occurred; thus, where the contract is prematurely terminated (whether for breach or any other reason) the debtor may never become liable for instalments thereafter due. In this event, the surety cannot be liable either. But the position is different as regards instalments which have accrued due. So where instalments under a shipbuilding contract have accrued due, the fact (if it is a fact) that the buyer's obligation to pay the instalments has been replaced by a general claim for damages as a result of the shipbuilder's exercise of his right to rescind or cancel the contract, will not deprive the shipbuilder of his accrued rights against the guarantor.[487] It is immaterial whether the shipbuilder issues proceedings against

---

[left margin fragments]

l this has been held
ntary arrangement
ainst the surety.[...]
al debtor in all the
he arrangement is
t itself.[473]

t. Where a person
ire contract and the
complete perform-
litor is guilty of a
btor is discharged,
While, therefore, a
ted by the debtor
ry breach will not
al" departure from
bodied" into the
rge occurs on the
breach of contract
es him a right to
self of this right by
al debtor is joined
some other valid
editor has already
ages[480] or that the
itigate the damage
an take advantage
es the position is
tee. If, on the true

at [82]; *Koutrouzas v*

l at [83].

*Blest v Brown* (1862)

explaining *Vavasseur*

*truction (Regions) Ltd*
39] 2 K.B. 869. There
*ruda* (1971) 92 W.N.
ch the Supreme Court
of set-off which the
*aria* [1993] 1 W.L.R.
s mortgagee).

*y Industries Co Ltd v*

*acilities Ltd v Lydlute*

---

[483] *Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Co Ltd* [1996] 1 A.C. 199.
[484] *Moschi v Lep Air Services Ltd* [1973] A.C. 331.
[485] *Manx Electricity Authority v JP Morgan Chase Bank* [2003] EWCA Civ 1324, (2003) 147 S.J.L.B. 1205 at [37], per Rix L.J. See similarly at [47], per Chadwick L.J.
[486] *Hyundai Heavy Industries Co Ltd v Papadopoulos* [1980] 1 W.L.R. 1129.
[487] *Hyundai Heavy Industries Co Ltd v Papadopoulos* [1980] 1 W.L.R. 1129.

the guarantor before[488] or after[489] he has rescinded or cancelled the contract. In fact it will be unusual for rescission or cancellation of the contract in such circumstances to deprive the shipbuilder of accrued rights to instalments from the principal debtor,[490] but it may do so in some circumstances,[491] and where this occurs there will now, it seems, be a major breach in the co-extensiveness principle.[492] The surety will remain liable for instalments, while the principal debtor's liability will be a liability for damages—which may, of course, in particular circumstances, be for sums significantly less. The surety's right to an indemnity from the principal debtor[493] will presumably remain unaffected by this breach of the co-extensiveness principle which means only that the suretyship contract will be treated as an indemnity rather than a guarantee for some limited purposes.

**44–100**  **Discharge of debtor as a result of surety's breach of contract.** Where a surety has given an undertaking to ensure that something occurs on which the debtor's liability is contingent, but fails to do so, any resulting lack of liability in the debtor does not prevent liability arising in the surety. Thus, in *Cerium Investments Ltd v Evans*,[494] a landlord had granted licences to the defendants to assign a lease and an underlease, the defendants covenanting as surety that the assignees would pay the rents and perform the covenants in the leases. The licences further provided that they should become "null and void" if the assignments were not registered with the landlords within a month. Assignments were made but not registered within this time by the assignees. The Court of Appeal upheld a claim by the landlords against the defendants as sureties in respect of arrears of rent not paid by the assignees, holding that the licences were initially effective and that on assignment the defendants as sureties became immediately contractually liable to the landlords in respect of any breach of covenant in the assignees, including their failure to register their assignments. Thus, the defendants could not rely on the subsequent nullity of the licence as a defence to a claim against them as sureties as this nullity was the consequence of their own wrongdoing in failing to ensure that the assignments were registered.

**44–101**  **Discharge of debtor by operation of law.** A guarantor is generally discharged if the debtor is discharged by operation of law. Thus, where a mortgagee forecloses and thereafter sells the mortgaged property, a guarantor of the mortgage debt is discharged by operation of law because the mortgage debt itself is discharged in these circumstances.[495] And where a finance company retook the goods from the hirer in breach of the provisions of the Hire-Purchase Act so that

---

[488] *Hyundai Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep. 502.
[489] *Papadopoulos* case [1980] 1 W.L.R. 1129.
[490] Rescission *ab initio* may have this effect, but cancellation will normally only operate prospectively: *Johnson v Agnew* [1980] A.C. 367, 393.
[491] See *Dies v British International Mining & Finance Corp* [1939] 1 K.B. 724, the correctness of which was assumed but not decided in the *Papadopoulos* case, see above. For some of the difficulties arising out of these cases, see Beatson (1981) 97 L.Q.R. 389.
[492] For the co-extensiveness principle, see above, para.44–068.
[493] See below, paras 44–123 et seq.
[494] (1991) 62 P. & C.R. 203.
[495] *Lloyds & Scottish Trust Ltd v Britten* (1982) 44 P. & C.R. 249.

Feature

**KEY POINTS**

≫ The classic formulation of the general equitable principle that a guarantor or surety can be discharged upon a variation of the principal contract which is not consented to by the surety was given by Cotton LJ in *Holme v Brunskill*.

≫ To evade the rigidity imposed by *Holme v Brunskill* various devices have been employed.

≫ The author suggests a more satisfactory solution to protect the guarantor which addresses the fundamental point of principle.

Author Alain Choo Choy

# Discharge of guarantees: the rule in *Holme v Brunskill* revisited

## THE GENERAL RULE

The classic formulation of the general equitable principle that a guarantor or surety can be discharged upon a variation of the principal contract which is not consented to by the surety was given by Cotton LJ in *Holme v Brunskill* (1878) 3 QBD 495 (at p 505):

In this article, the author considers the circumstances under English law in which a guarantor is discharged from liability when the obligations that have been guaranteed are varied between the creditor and the principal debtor without the guarantor's agreement. He identifies the excessive rigidity of the current law and suggests a different way forward.

'The true rule ... is, that if there is any agreement between the creditor and the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, ... if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the court will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by ... the materiality of the alteration or ... whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and ... if he has not so consented he will be discharged.'

The above principle is well established and has often been applied in recent times (for example, in *Credit Suisse v Borough Council of Allerdale* [1995] 1 Lloyd's Rep 315). Its operation extends to security given by the surety and is not limited to his personal liability (*Bolton v Salmon* [1891] 2 Ch 48). The rationale for the principle is, to a degree, eminently sensible. A surety, in general, agrees only to guarantee a specific actual or potential liability. If the principal liabilities change, the

risks change, and it cannot be said that the surety agreed to take those new risks if he was not consulted.

The principle only applies to a variation of the obligations guaranteed and is not therefore engaged by variations to the obligations in the main contract which are not covered by the guarantee. But notwithstanding this qualification, the effect of the rule as formulated by Cotton LJ in relation to guaranteed obligations arguably goes significantly further than is necessary for the protection of the guarantor. The onus is placed, rightly, on the creditor, but he must show that the variation to the principal contract is 'unsubstantial' or that it 'cannot be otherwise than beneficial to the surety' (or that it is 'not inevitably' for the benefit of the surety – see *Credit Suisse* at p 366), and all this without enquiry (or at any rate, without any detailed enquiry – since a general evaluation of the nature of the variation must be carried out in order to determine whether it meets the stated criteria).

Is such a stringent test necessary? There may be public policy considerations in encouraging creditors and principals to consult the surety upon every variation of the principal contract. But in practice it is unrealistic to expect that all the parties to such tripartite arrangements will know the law in such detail, and it may in fact work injustice if the parties vary the principal contract in good faith, but without consulting the surety, and are unable to prove what is needed to avoid the automatic discharge of the surety, even if the variations were not in fact detrimental to the surety.

The potential absurdity that can arise as a result of the rule is well illustrated by *Howard de Walden Estates Ltd v Pasta Place Ltd* [1995] 22 EG 143 in which the claimant landlord was unsuccessful against the second to fourth defendant guarantors of the first defendant lessee's rental obligations because of variations in the lease (not expressly consented to by the guarantors) entitling the first defendant to sell wine and use part of the premises as an off-licence. The defendant guarantors' argument that the variation of the lease could not be shown to be obviously unsubstantial or inevitably beneficial to them was upheld, and they were discharged from their obligations.

The strict application of the rule raises the spectre of unscrupulous sureties holding the creditor and the principal obligor to ransom. In the above case, imagine the position the sureties would have been in prior to the variation of the lease if they had been asked to consent to the variation and knew that their liability would disappear if they did not consent. The main parties to the lease may both have had an interest in varying it, indeed they may both have needed to vary it, but the sureties would have known that they could frustrate those plans by withholding their consent to the variation, regardless of their reasons for doing so. The sureties may even have tried to extract a price in return for their consent.

## EXTENSIONS OF TIME

There is a class of cases where the rigidity of the rule in *Holme v Brunskill* has even been surpassed, namely those involving

a binding agreement by the creditor to extend the time for performance by the principal of his obligations under the main contract. In those cases, the guarantor is released from liability irrespective of whether he may be prejudiced by the extension. In fact, according to Lord Eldon LC in *Samuell v Howarth* (1817) 3 Mer 272, the guarantor is released even if the grant of an extension of time is 'manifestly for the benefit of the surety'.

The justification for the rule has always had an air of unreality about it. Apparently, by altering the debtor's obligation to him, the creditor has deprived the guarantor of his equitable right to compel the debtor to perform his original obligation to the creditor, which was all that the guarantor had guaranteed. Whilst that is technically correct, other than in dusty treatises on equity, one cannot imagine that any surety would care about that right when he suffers no prejudice and would in fact normally regard an extension as beneficial.

That the rule in *Samuell v Howarth* is deserving of some criticism has not escaped the courts (though the case presently remains good law). In *Petty v Cooke* (1871) LR 6 QB 790 Blackburn J held (at p 795):

'I think it is impossible to read the principle laid down by Lord Eldon without thinking that it is based upon highly technical reasoning, however accurate it may be. It is clear that a creditor who gives time to the principal debtor without reserving his right against the surety, and alters the rights of the surety, discharges him; but that time given by a creditor, which in numberless cases does not injure the surety, should discharge him, is to my mind not justice, although established by the courts of equity ...'

However, in the later case of *Polak v Everett* (1876) 1 QBD 669, the same judge accepted, though reluctantly, that he was in no position to challenge the rule, justifying it on the basis that 'it is very undesirable that there should be any dispute or controversy about whether [the relevant variation to the main

contract] is for [the surety's] benefit or not' (see especially p 673-4).

## AVOIDING HOLME V BRUNSKILL
In order to evade the rigidity imposed by *Holme v Brunskill*, various devices have been employed. The first is the insertion of wording into the principal contract providing for a variation of its terms. Such a variation will not discharge the guarantor because the guarantee would have been specifically given in respect of the variable obligations of the principal contract. However, for this device to work, the guarantee itself must make clear that it is to cover whatever obligations may from time to time arise under the principal contract, rather than just those that arise under the principal contract as it stands at the time.

Another technique is to put certain clauses in the contract of guarantee itself. For instance, one could insert a clause providing that the liabilities of the guarantor shall be deemed to be those of the principal debtor or primary obligor. This technique was recognised in *Heald v O'Connor* [1971] 1 WLR 497, where Fisher J held that such a clause was 'the common form of provision to avoid the consequences of giving time or indulgence to the principal debtor'.

Likewise, a clause in the guarantee could provide that the guarantee shall not be affected by any variation of the principal contract. However, there are limits to what can properly be called a 'variation' for these purposes. In *Triodos Bank NV v Dobbs* [2005] EWCA Civ 630 the relevant distinction was drawn by Longmore LJ:

'[9] As a matter of principle there is no reason why the right ... to agree amendments or variations to the ... loan agreement without reference to the guarantor should be confined to amendments or variations which are expressly contemplated by the agreement; the clause must mean that anything rightly termed a variation or an amendment is a matter which can be agreed without reference to the guarantor. The question is then whether what is said to be an

amendment or variation is correctly so called. To my mind an agreement which truly "replaces" the original loan agreement would not rightly be called an amendment or variation to the original agreement, since it will be a new agreement.

[16] ... it is important to distinguish between a true variation of an existing obligation and the entering of what is in fact a different obligation even though it may purport to be no more than a variation. In that sense it is perfectly possible (and, indeed, right) to put a "limit to the power to vary" ...

[17] ... It is ... not easy to draw a hard and fast line between permissible and impermissible variations ...'

These partial solutions are better than nothing, but they do not address the fundamental point of principle and leave the creditor at the mercy of the courts, which tend to interpret clauses preserving a guarantor's liability in defined situations narrowly.

## A POTENTIAL SOLUTION: THE MYSTERY OF MERCERS
There is one general exception to the rule in *Holme v Brunskill*, which should, in principle, also apply to the 'extension of time' category of cases. In *The Mystery of Mercers of the City of London v New Hampshire Insurance Co* (unreported, 18 January 1991), Phillips J (as he then was) held that the application of the *Holme v Brunskill* rule depended upon the construction of the particular contract of guarantee in question, and distinguished between a guarantee which relates to a specific contract and one which does not (such as where the guarantee relates to a future course of dealing). After reviewing the case law on *Holme v Brunskill* the judge formulated the following principled distinction:

'In my judgment the cases demonstrate, that the construction of the contract of guarantee is of critical importance. It is vital to identify the precise

## Feature

*Biog box*
The author, Alain Choo Choy, is a practising barrister at One Essex Court, Chambers of Lord Grabiner QC, Temple, London, and specialises in commercial, banking and finance litigation. Email: achoochoy@oeclaw.co.uk

nature of the obligation or obligations guaranteed. In many cases the obligations will be those arising under a specific contract between debtor and creditor. This may be evident from the terms of the contract of guarantee itself, where specific reference is made to the contract giving rise to the obligations guaranteed, or from a consideration of the circumstances surrounding the conclusion of the contract of guarantee, where these show that a specific contract was the subject matter of the guarantee. In such circumstances the terms of the contract giving rise to the obligations guaranteed will be treated as embodied or incorporated in the contract of guarantee. The rule in *Holme v Brunskill* will then apply and any variation of the underlying contract which is not manifestly insubstantial or incapable of prejudicing the surety will discharge the surety from his obligations under the contract of guarantee.

Where, on the other hand, the guarantee is given in respect of obligations arising out of a contemplated course of dealing without reference, express or implied, to any specific contract it will be open to the creditor to vary the terms applying to the course of dealing so long as that course of dealing remains within the scope of the guarantee.'

That exception, limited though it is, is welcome. However, as with the contractual provisos mentioned above, it does not deal with the fundamental point of principle.

A more general, and satisfactory, solution was mooted when the case went to the Court of Appeal ([1992] 2 Lloyd's Rep 365). Phillips J's decision was reversed on the facts, but no criticism was made of the distinction he had drawn which is quoted above. Instead, Scott LJ (with whom Nolan LJ expressly agreed) displayed a willingness to go a good deal further in addressing *Holme v Brunskill* (see p 377):

'Substantial argument, both before Phillips J and in this court, was based

upon *Holme v Brunskill* … This case is generally taken to be authority for the proposition that a departure from the terms of the principal contract, agreed upon by creditor and debtor, but not by the surety, will discharge the surety from liability. Since there was no such departure in the present case … [i]t is not … necessary to consider how, if the facts had been otherwise, the rule in *Holme v Brunskill* would have applied in the present case. [Counsel] invites us to adopt the approach of certain United States authorities and to hold that, where the surety is a professional compensated surety, the discharge of the surety brought about by a variation of the principal contract should be *pro tanto* and not absolute. I was impressed by the commonsense of this transatlantic solution and by the undesirable rigidity of the rule of *Holme v Brunskill* in its application to compensated sureties. I was not convinced that binding authority stands in the way of the adoption of this sensible solution in this country, but it is not necessary for us to decide the point in the present case.'

The passage is clearly *obiter*, but is to be hoped that this approach be approved and adopted when the matter next arises for consideration. It is surely common sense that a surety will suffer no detriment as a result of a variation if he remains liable only for what was originally guaranteed. If that is right, there can be no injustice in not discharging the surety absolutely. And once this approach is accepted as right in principle, it is difficult to see why it should be limited to compensated sureties. Whilst non-compensated sureties may require a degree of protection that compensated sureties do not, there is no reason to apply different rules to the two categories if the rule that is applied in both cases adequately protects all sureties.

### THE WAY FORWARD

Drawing on the above, but going slightly further than Scott LJ, a possible way

forward would involve a two-stage inquiry. First, there should be an inquiry into whether the variation materially affects the position of the guarantor, the onus of proof being on the creditor. If the guarantor's position would not be materially affected by the variation that should be the end of the matter and the guarantor ought to remain liable. If the guarantor's position would be materially affected, the court should move on to the second stage of the inquiry, namely, examining whether the variation has increased the risks borne by the guarantor, the onus again being on the creditor to demonstrate that the variation does not have that effect. If it does not, that should be the end of the matter and the surety will remain liable. If it does, two possibilities arise.

The first is that the extra risk created by the variation can be identified and isolated (for example, if an insurance contract is varied so as to encompass a further, specific risk), in which case there is no difficulty and the surety's liability will simply not extend to that new risk. The second possibility is that the variation increases the general risk that the guarantee will be called upon. That would be harder to deal with under a flexible rule, and it may be more just in those circumstances to discharge the surety absolutely. But that difficulty does not negate the value of the suggested approach. It just means that in order to determine whether or not a guarantor should be discharged, the court will have to look slightly more closely at the contract in question, the variation, its likely effect, and the surrounding circumstances. The court is well equipped to do that and, even under *Holme v Brunskill* must in any event carry out some inquiry into the nature of the variation to determine whether it is obviously unsubstantial or inevitably to the benefit of the guarantor. A more detailed enquiry into the nature and effects of the variation in order to determine whether it is *in fact* unsubstantial or beneficial to the guarantor – as opposed to merely whether it is 'obviously' so – would be a small price to pay for the correction of an overly rigid 19th century doctrine.

# HALSBURY'S
# Laws of England

### FOURTH EDITION
### 2006 REISSUE

## Volume 27(1)

Volume 27(1) (2006 Reissue) contains the beginning of the title LANDLORD AND TENANT. This volume, together with Volume 27(2) (2006 Reissue) and Volume 27(3) (2006 Reissue) replace the 4th Edn (Reissue) Volume 27(1) and Volume 27(2), both of which may now be archived.

With the publication of Volume 27(1) (2006 Reissue), Volume 27(2) (2006 Reissue) and Volume 27(3) (2006 Reissue), a complete set of Halsbury's Laws of England now contains the following volumes (bold figures represent reissue volumes):

**1**(1) (2001 Reissue), **1**(2), **2**(1), **2**(2), **2**(3), **3**(1) (2005 Reissue), **3**(2) (2002 Reissue), **4**(1) (2002 Reissue), **4**(2) (2002 Reissue), **4**(3), **5**(1) (2004 Reissue), **5**(2) (2001 Reissue), **5**(3), **6** (2003 Reissue), **7**(1) (2004 Reissue), **7**(2) (2004 Reissue), **7**(3) (2004 Reissue), **7**(4) (2004 Reissue), **8**(1) (2003 Reissue), **8**(2), **8**(3), **9**(1), **9**(2) (2006 Reissue), **10**, **11**(1) (2006 Reissue), **11**(2) (2006 Reissue), **11**(3) (2006 Reissue), **11**(4) (2006 Reissue), **12**(1), **12**(2), **13**, **14**, **15**, **15**(1) (2006 Reissue), **15**(2) (2006 Reissue), **16**(1A), **16**(1B), **16**(2), **17**(1), **17**(2), **18**, **18**(1), **18**(2), **19**(1), **19**(2), **20**(1), **20**(2), **21** (2004 Reissue), **22** (2006 Reissue), **23**(1), **23**(2), **24**, **25** (2003 Reissue), **26** (2004 Reissue), **27**(1) (2006 Reissue), **27**(2) (2006 Reissue), **27**(3) (2006 Reissue), **28**, **29**(1), **29**(2), **29**(3), **30**(1), **30**(2), **31** (2003 Reissue), **32** (2005 Reissue), **33**, **34**, **35**, **36**(1), **36**(2), **37**, **38** (2006 Reissue), **39**(1), **39**(2), **40**(1), **40**(2), **41** (2005 Reissue), **42**, **43**(1), **43**(2), **44**(1), **44**(2), **45**(1) (2005 Reissue), **45**(2), **46**(1), **46**(2), **46**(3), **47** (2001 Reissue), **48** (2000 Reissue), **49**(1) (2005 Reissue), **49**(2) (2004 Reissue), **49**(3) (2004 Reissue), **50** (2005 Reissue), **51**, **52**, **53** (2006 Consolidated Table of Statutes, etc), **54**(1) (2007 Consolidated Table of Cases A–L), **54**(2) (2007 Consolidated Table of Cases M–Z), **55** (2006 Consolidated Index A–E), **56** (2006 Consolidated Index F–O), **57** (2006 Consolidated Index P–Z).

December 2006

# HALSBURY'S
# Laws of England

FOURTH EDITION
2006 REISSUE

LORD MACKAY OF CLASHFERN

Lord High Chancellor of Great Britain
1987–97

Volume 27(1)

2006



LexisNexis®
Butterworths

**Members of the LexisNexis Group worldwide**

| | |
|---|---|
| United Kingdom | LexisNexis Butterworths, a Division of Reed Elsevier (UK) Ltd, Halsbury House, 35 Chancery Lane, LONDON, WC2A 1EL, and RSH, 1–3 Baxter's Place, Leith Walk, EDINBURGH, EH1 3AF |
| Argentina | LexisNexis Argentina, Buenos Aires |
| Australia | LexisNexis Butterworths, Chatswood, New South Wales |
| Austria | LexisNexis Verlag ARD Orac GmbH & Co KG, Vienna |
| Benelux | LexisNexis Benelux, Amsterdam |
| Canada | LexisNexis Canada, Markham, Ontario |
| Chile | LexisNexis Chile Ltda, Santiago |
| China | LexisNexis China, Beijing and Shanghai |
| France | LexisNexis SA, Paris |
| Germany | LexisNexis Deutschland GmbH Munster |
| Hong Kong | LexisNexis Hong Kong, Hong Kong |
| India | LexisNexis India, New Delhi |
| Italy | Giuffrè Editore, Milan |
| Japan | LexisNexis Japan, Tokyo |
| Malaysia | Malayan Law Journal Sdn Bhd, Kuala Lumpur |
| Mexico | LexisNexis Mexico, Mexico |
| New Zealand | LexisNexis NZ ltd, Wellington |
| Poland | Wydawnictwo Prawnicze LexisNexis Sp, Warsaw |
| Singapore | LexisNexis Singapore, Singapore |
| South Africa | LexisNexis Butterworths, Durban |
| USA | LexisNexis, Dayton, Ohio |

| | |
|---|---|
| FIRST EDITION | *Published in 31 volumes between 1907 and 1917* |
| SECOND EDITION | *Published in 37 volumes between 1931 and 1942* |
| THIRD EDITION | *Published in 43 volumes between 1952 and 1964* |
| FOURTH EDITION | *Published in 56 volumes between 1973 and 1987, with reissues between 1988 and 2006* |

© Reed Elsevier (UK) Ltd 1981, 1994, 2006

All rights reserved. No part of this publication may be reproduced in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright owner except in accordance with the provisions of the Copyright, Designs and Patents Act 1988 or under the terms of a licence issued by the Copyright Licensing Agency Ltd, 90 Tottenham Court Road, London, England W1T 4LP. Applications for the copyright owner's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorised act in relation to a copyright work may result in both a civil claim for damages and criminal prosecution.

Crown copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland. Parliamentary copyright material is reproduced with the permission of the Controller of Her Majesty's Stationery Office on behalf of Parliament. Any European material in this work which has been reproduced from EUR–lex, the official European Communities legislation website, is European Communities copyright.

A CIP Catalogue record for this book is available from the British Library.

ISBN 10 (complete set, standard binding): 0406047766

ISBN 13 (complete set, standard binding): 9780406047762

ISBN 10: 1405 705 612

ISBN 13: 9781405705615

ISBN 1-4057-0561-2



Typeset by Letterpart Ltd, Reigate, Surrey

Printed and bound in Great Britain by William Clowes Limited, Beccles, Suffolk

Visit LexisNexis Butterworths at www.lexisnexis.co.uk

claim leaseholds vested in the
e landlord is reduced to the
on in respect of any arrears of
ator retained the lease for the
f the winding up[5].

by the liquidator, the landlord,
e in the winding up for any loss
may be set aside to meet future

sting property of the company in the
7(3) (2004 Reissue) para 575.
Reissue) para 577.
CY vol 7(3) (2004 Reissue) para 587.
4 Reissue) para 866 et seq. As to the
s election whether to disclaim, see the
NY AND PARTNERSHIP INSOLVENCY

*Yorkshire Iron Co* (1878) 7 ChD 661; *Re
and Engineering Co Ltd (No 3)* [1970]
prove only for a dividend in respect of
ther to retain the lease). See further
04 Reissue) para 759; cf *Re HH*
rent, as the lease was retained for the
f his application for leave to disclaim;
the landlord could prove only in the

04 Reissue) paras 759, 879. As to the
ment of the winding up see COMPANY
89–890; and as to forfeiture on winding
04 Reissue) para 891; and para 606 post.
ll ER 650, [1970] 1 WLR 702; *Re HH*
79] 1 All ER 641, [1979] 1 WLR 362.
Reissue) para 759.

# 14.  TERMINATING LEASES; RECOVERING POSSESSION

## (1)  IN GENERAL

**600.   Methods of determination.**   A lease may be determined only in one of certain recognised ways, that is to say by:

(1)  effluxion of time[1];
(2)  notice to quit[2];
(3)  exercise of an option to determine[3];
(4)  operation of a condition subsequent[4];
(5)  forfeiture[5];
(6)  surrender[6];
(7)  merger[7];
(8)  disclaimer[8];
(9)  application to the county court in the case of derelict land[9];
(10)  application to the magistrates' court in the case of deserted premises[10];
(11)  operation of the housing legislation[11];
(12)  enlargement under the Law of Property Act 1925[12];
(13)  exercise of the landlord's statutory power to determine the lease on the tenant's conviction for knowingly permitting the premises to be used as a brothel and failure thereafter to assign[13]; and
(14)  frustration, repudiation and acceptance[14].

Compulsory purchase does not itself extinguish a term, but rather transfers it to the acquiring authority whereupon it merges with the reversion also acquired; but the practical effect is that compulsory acquisition can be regarded as a further method whereby a lease may be determined[15]. Similarly, where a tenant exercises his right to acquire the freehold pursuant to the right to enfranchise[16], the lease under which he holds the property is normally merged, where there is no intervening interest, with the freehold so acquired and the lease is thereby determined.

The Law Commission has recommended the abolition of the current law of forfeiture and the creation of a new statutory procedure for the termination of fixed term commercial tenancies and residential tenancies of 21 years or more[17].

1   See paras 208, 239 ante.
2   See paras 213 et seq ante.
3   See paras 141–143 ante.
4   Like other interests in land, leases may be granted so as to determine upon the operation of a condition subsequent: see para 238 ante; and REAL PROPERTY vol 39(2) (Reissue) paras 97, 115.
5   See para 603 et seq post.
6   See para 630 et seq post.
7   See para 640–641 post.
8   See para 642 et seq post.
9   See para 648 post.
10   See para 649 post.
11   Leases of premises in respect of which a demolition order has become operative may be determined by order of a residential property tribunal: see the Housing Act 1985 s 317 (as amended); and HOUSING vol 22 (2006 Reissue) para 441. Closing orders have been replaced by prohibition orders under the Housing Act 2004; see s 20 et seq; and HOUSING vol 22 (2006 Reissue) para 387 et seq. As to the effect of a closing order on a tenancy see *Blake v Smith* [1921] 2 KB 685; *Ferguson v Pittman* 1958 SLT 18, Sh Ct.
12   See paras 1386–1388 post.
13   See para 22 ante.
14   See para 601 post.
15   Eg in the case of short tenancies where the tenant is required to give up possession: see COMPULSORY ACQUISITION OF LAND vol 8(1) (2003 Reissue) para 180 et seq.

16  Ie under the Leasehold Reform Act 1967 Pt I (ss 1–37) (as amended): see para 1389 et seq post. Cf the right to buy conferred by the Housing Act 1985 Pt V (ss 118–188) (as amended): see para 1795 et seq post.

17  See *Termination of Tenancies for Tenant Default* (Law Com no 303) (October 2006).

**601.    Frustration and repudiation.**    There is no principle of law that the contractual doctrine of frustration[1] can never apply so as to determine a lease[2]. The fact that an executed lease, as well as being a contract, conveys an estate in land is no bar in principle to the application of the doctrine[3]. Even so, the instances in which the doctrine can apply so as to determine a lease will be rare[4]. There is no reported English case where a lease has been ruled to have been frustrated[5]. A possible instance of the application of the doctrine would be where the subject matter of the lease had been destroyed, although such an occurrence may be rare in relation to a lease of land[6]. An agreement for a lease may be frustrated[7], as may a licence to use or occupy land[8].

Notwithstanding earlier dicta and views to the contrary[9], it is now clear that the contractual doctrine of repudiation and acceptance[10] applies to leases. Thus breaches of covenant by a landlord that are serious enough to amount to a repudiation of the terms of the contract embodied in the lease entitle the tenant to accept such repudiatory conduct and treat the lease as terminated[11].

1    The doctrine of frustration is a doctrine of law applicable to contracts generally. 'Frustration of a contract takes place when there supervenes an event (without default of either party and for which the contract makes no sufficient provision) which so significantly changes the nature (not merely the expense or onerousness) of the outstanding contractual rights and/or obligations from what the parties could reasonably have contemplated at the time of its execution that it would be unjust to hold them to the literal sense of its stipulations in the new circumstances; in such case the law declares both parties to be discharged from further performance': *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675 at 700, [1981] 1 All ER 161 at 175, HL, per Lord Simon of Glaisdale. As to frustration generally see CONTRACT vol 9(1) (Reissue) para 897 et seq.

2    *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, [1981] 1 All ER 161, HL. Prior to that decision there had been no binding decision of the House of Lords on the question. In *Cricklewood Property and Investment Trust Ltd v Leightons Investment Trust Ltd* [1945] AC 221, [1945] 1 All ER 252, HL, Viscount Simon LC and Lord Wright took the view that in principle the doctrine of frustration could apply to an executed lease, Lord Russell of Killowen and Lord Goddard were of the opposite view, and Lord Porter reserved his opinion on the point. All courts except the House of Lords were, however, bound by the decision in *Leightons Investment Trust Ltd v Cricklewood Property and Investment Trust Ltd* [1943] KB 493, [1943] 2 All ER 97, CA, to the effect that an executed lease could never be frustrated.

3    See *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675 at 700–701, [1981] 1 All ER 161 at 170–171, HL, per Lord Wilberforce.

4    *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675 at 692, [1981] 1 All ER 161 at 166–167, HL, where the difference of opinion which had previously arisen was said by Lord Hailsham of St Marylebone LC to be a difference between those who considered that the doctrine of frustration could never apply to a lease, and those who considered that it could apply but on the facts there would hardly ever be a case where the lease was frustrated.

5    In *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, [1981] 1 All ER 161, HL, warehouse premises which had been let for a term of ten years were deprived of the possibility of vehicular access, and thus of any use, for a period in excess of a year by a road closure; the proposition that these facts could amount to frustration was held not even to be a triable issue when it was raised as a defence in an action brought by the landlords for rent payable during the period of the road closure. Other decisions in which it has been held that a lease was not frustrated are *London and Northern Estates Co v Schlesinger* [1916] 1 KB 20 (tenant unable to reside on the premises because he was an enemy alien); *Whitehall Court Ltd v Ettlinger* [1920] 1 KB 680; *Redmond v Dainton* [1920] 2 KB 256 (bomb damage); *Matthey v Curling* [1922] 2 AC 180, HL (destruction by fire); *Swift v MacBean* [1942] 1 KB 375, [1942] 1 All ER 126 (government requisition of premises); *Eyre v Johnson* [1946] KB 481, [1946] 1 All ER 719 (refusal of a licence to repair under wartime regulations); *Denman v Brise* [1949] 1 KB 22, [1948] 2 All ER 141, CA (destruction by enemy action); *Bracknell Development Corpn v Greenlees Lennards Ltd* [1981] 2 EGLR 105, (1981) 260 Estates Gazette 500 (difficulty in fixing a full and fair market rent for the premises in question for 21 years).

mended): see para 1389 et seq post. Cf the
8–188) (as amended): see para 1795 et seq

3) (October 2006).

no principle of law that the
as to determine a lease[2]. The fact
veys an estate in land is no bar in
so, the instances in which the
are[4]. There is no reported English
rated[5]. A possible instance of the
ect matter of the lease had been
n relation to a lease of land[6]. An
nce to use or occupy land[8].

ntrary[9], it is now clear that the
applies to leases. Thus breaches of
unt to a repudiation of the terms
nant to accept such repudiatory

ntracts generally. 'Frustration of a contract
f either party and for which the contract
the nature (not merely the expense or
bligations from what the parties could
it would be unjust to hold them to
n case the law declares both parties to be
*Panalpina (Northern) Ltd* [1981] AC 675 at
Glaisdale. As to frustration generally see

[1981] 1 All ER 161, HL. Prior to that
f Lords on the question. In *Cricklewood*
945] AC 221, [1945] 1 All ER 252, HL,
inciple the doctrine of frustration could
Goddard were of the opposite view, and
ept the House of Lords were, however,
*klewood Property and Investment Trust Ltd*
executed lease could never be frustrated.

675 at 700–701, [1981] 1 All ER 161 at

675 at 692, [1981] 1 All ER 161 at
iously arisen was said by Lord Hailsham
nsidered that the doctrine of frustration
ould apply but on the facts there would

5, [1981] 1 All ER 161, HL, warehouse
ved of the possibility of vehicular access,
closure; the proposition that these facts
ue when it was raised as a defence in an
d of the road closure. Other decisions in
*lon and Northern Estates Co v Schlesinger*
use he was an enemy alien); *Whitehall*
0] 2 KB 256 (bomb damage); *Matthey v*
*ean* [1942] 1 KB 375, [1942] 1 All ER
KB 481, [1946] 1 All ER 719 (refusal of
949] 1 KB 22, [1948] 2 All ER 141, CA
*enlees Lennards Ltd* [1981] 2 EGLR 105,
market rent for the premises in question

---

The doctrine of frustration, or an analogous doctrine, is applicable to leases of land in other common law jurisdictions: see e g *Highway Properties Ltd v Kelly, Douglas & Co Ltd* (1971) 17 DLR (3d) 710, Can SC (cited in *National Carriers Ltd v Panalpina (Northern) Ltd* supra at 703 and at 172).

6    Instances sometimes advanced of the destruction of the demised premises are the destruction of a flat on the top floor of a building or the erosion of property on the top of a cliff. These possibilities were mentioned in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, [1981] 1 All ER 161, HL. In *Cricklewood Property and Investment Trust Ltd v Leightons Investment Trust Ltd* [1945] 1 All ER 252 at 256, HL, Viscount Simon LC, while following the view that a lease could in principle be frustrated, considered that it was only in limited cases such as where 'some vast convulsion of nature swallowed up the property altogether, or buried it in the depths of the sea' that a lease would actually end by frustration. In *National Carriers Ltd v Panalpina (Northern) Ltd* supra at 700 and at 175 Lord Simon of Glaisdale expressed the view that that put matters too catastrophically, even in the case of a long lease and that in the case of a short lease something other than such a natural disaster might in practice amount to a frustrating event. See also para 274 notes 6–7 ante.

7    *Rom Securities Ltd v Rogers (Holdings) Ltd* (1967) 205 Estates Gazette 427.

8    See e g *Krell v Henry* [1903] 2 KB 740, CA. The doctrine of frustration also applies to demise charters of ships: see CONTRACT vol 9(1) (Reissue) para 900.

9    In *Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] 1 QB 318, [1971] 3 All ER 1226, CA, Lord Denning MR stated that his view that repudiation and acceptance did not apply to leases was supported by the opinions of Lord Russell of Killowen and Lord Goddard in *Cricklewood Property and Investment Trust Ltd v Leightons Investment Trust Ltd* [1945] AC 221, [1945] 1 All ER 252, HL, that the doctrine of frustration did not apply to leases. Those opinions no longer represent the law following the decision in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, [1981] 1 All ER 161, HL.

10   As to the doctrine of repudiation and acceptance generally see CONTRACT vol 9(1) (Reissue) paras 997–1001.

11   Repudiation and acceptance may apply to leases where there is a letting of a furnished house with an implied condition that it is in a fit state for habitation at the commencement of the tenancy; and the tenant may repudiate the contract at once if the condition is not fulfilled: see para 426 ante. The doctrine also applies where there have been breaches of the covenant implied by the Landlord and Tenant Act 1985 s 11 (as amended) (see paras 416–417 ante) which vitiate the purpose of the contract: see *Hussein v Mehlman* [1992] 2 EGLR 86, county court. The judgment in this case applies the principle set out in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, [1981] 1 All ER 161, HL. That principle seems to be the unstated basis of the reasoning in *Chartered Trust plc v Davies* (1997) 76 P & CR 396, [1997] 2 EGLR 83, CA, and was applied explicitly in the High Court in *Nynehead Developments Ltd v RH Fibreboard Containers Ltd* [1999] 1 EGLR 7, [1999] 02 EG 139 (no repudiatory breach on the facts where despite deliberate, prolonged and surreptitious breaches of covenant relating to rights of use of a forecourt, the judge held that the breaches did not deprive the tenant of substantially the whole benefit of the lease). The principle was also accepted in *Petra Investments Ltd v Jeffrey Rogers plc* (2000) 81 P & CR 267, [2000] 3 EGLR 120 (alleged breaches related to failure to establish sophisticated shopping centre insufficient to found a repudiatory breach of contract).

**602.    Statutory limitation of rights to possession; in general.**    A landlord's right to claim that a lease has been determined and that he is entitled to possession may be postponed. Thus, where a tenancy of residential property protected by the Rent Act 1977 comes to an end, a new statutory tenancy may arise in favour of the tenant[1]. Protection is also given by the Housing Act 1988 upon the expiration of an assured tenancy[2] when a statutory periodic tenancy arises[3]. Where a tenancy of business premises reaches its contractual term date, the term continues by virtue of statute until a prescribed notice is served by the landlord on the tenant[4]. Where a tenant is performing a period of relevant service[5] with the forces of the Crown, a landlord is debarred from taking possession of any property or re-entering on any land without the leave of the court[6].

Even where the landlord is entitled to possession in that the lease has been determined in accordance with its contractual terms and the tenant does not enjoy any statutory protection, the landlord may still need the court's assistance in order to assert his right to possession[7].

Hill and Redman's Law of Landlord and Tenant/Division A General Law/Chapter 6 Rent/A The nature of rent/2 The nature of rent

## 2    The nature of rent

### [1541]

Rent is the recompense paid by the lessee to the lessor for the exclusive possession of corporeal hereditaments. It must be reserved on the demise[1] and historically has been regarded as issuing out of the lands demised[2].

---

[1]    See *Duke of Westminster v Store Properties Ltd [1944] Ch 129.*

[2]    Holdsworth History of English Law vol VII, p 262.

### [1542]

Although rent originally consisted of the performance of services to the landlord, in modern times it is conceived of as a payment which the tenant is bound by contract to make to the landlord[1]. However, rent in its correct sense even in modern times has four distinguishing qualities[2], being:

(a)    a periodical sum;
(b)    paid in return for the occupation of land;
(c)    issuing out of the land; and
(d)    for non-payment of which distress is leviable.

As is indicated above, rent need not consist of the payment of money: it may consist in the render of chattels[3] or in the performance of services[4] but it must be certain[5]. Although the landlord may reserve to himself as a rent part of the produce of the land (such as a corn rent[6]) or a rent assessed by reference to the profits from the land (for instance, a royalty assessed by reference to the quantity of minerals worked[7]) the lessor cannot reserve as a rent the right to use the demised land itself because reservation of the actual use of the land is repugnant to the grant for which the rent is payable[8].

---

[1]    Holdsworth History of English Law vol VII, p 262; *Property Holding Co Ltd v Clark [1948] 1 KB 630 at 648*; see also *C H Bailey Ltd v Memorial Enterprises Ltd [1974] 1 All ER 1003, [1974] 1 WLR 728*; *United Scientific Holdings Ltd v Burnley Borough Council [1978] AC 904*; *John Smith & Co (Edinburgh) Ltd v Hill and ors [2010] EWHC 1016 (Ch) at [22]-[23].*

[2]    *Escalus Properties Ltd v Robinson [1995] 2 EGLR 23 at 25, CA*, per Nourse LJ.

[3]    Co. Litt. 142a; *Pitcher v Tovey (1692) 4 Mod Rep 71*; *Lanyon v Carne (1669) 2 Saund 161*; see also *Montague v Browning [1954] 1 WLR 1039, CA* (in context of Rent Acts).

[4]    Co. Litt. 96A; *Vyvyan v Arthur (1823) 1 B & C 410* (taking corn to be ground in landlord's mill); *Doe d Tucker v Morse (1830) 1 B & Ad 365* (carrying coals); *Doe d Edney v Benham (1845) 7 QB 976* (cleaning a church); *Duke of Marlborough v Osborn (1864) 5 B & S 67* (work with horses and cart); *Montague v Browning [1954] 1 WLR 1039* (cleaning a synagogue).

[5]    See paras HR A[1549] ff.

[6]    *Master of St Cross Hospital v Lord Howard de Walden (1795) 6 Term Rep 338 at 343.*

[7]    *Coal Commission v Earl Fitzwilliam's Royalties Co [1942] Ch 365*; see also *R v Westbrooke; R v Everist (1847) 10 QB 178 at*

*203; Daniel v Gracie (1844) 6 QB 145; Edmonds v Eastwood (1858) 2 H & N 811; Barrs v Lea (1864) 33 LJ Ch 437.*

8    Co. Litt. 142a.


**[1543]**

Leases are contractual in their origin. In principle, the rights and obligations of the parties in respect of rent will be determined as a matter of the construction of the contract, just as payment obligations under any other contract[1]. Where, however, a tenant is in breach of his obligation to pay rent, the landlord is not obliged to 'mitigate' his losses by taking steps to terminate the lease. If the lease remains in force, the landlord is entitled to the rent and other sums falling due, but if the landlord elects to determine the tenancy, the landlord is not entitled to rent or damages for loss of future rent. Accordingly, in practice it cannot be considered unreasonable for a landlord to choose to allow the lease to continue and he will not be disentitled from receiving rent because of a failure to 'mitigate' his loss[2].


1    See HR A[1542] and *United Scientific Holdings Ltd v Burnley Borough Council [1978] AC 904.*

2    *Reichman v Beveridge [2006] EWCA 1659, [2007] 08 EG 138.*

# THE MODERN CONTRACT OF GUARANTEE

English Edition

## Dr James O'Donovan

*Professor of Law at the University of
Western Australia and as Special Counsel,
Lavan Legal, Perth, Western Australia*

**and**

## Dr John Phillips

*Professor of English Law
King's College, London
Barrister of the Middle Temple*

**SWEET & MAXWELL**

 THOMSON REUTERS

Published in 2010 by
Thomson Reuters (Legal) Limited (Registered in
England & Wales, Company No 1679046. Registered Office
and address for service. 100 Avenue Road, London NW3 3PF)
trading as Sweet & Maxwell.

Typeset by YHT Ltd, London.
Printed and bound in Great Britain by
TJ International, Padstow, Cornwall.

For further information on our products and services,
visit www.sweetandmaxwell.co.uk

ISBN 978 1 847 03569 1

Crown copyright material is reproduced with the permission
of the Controller of HMSO and the Queen's Printer for Scotland.

A CIP catalogue record for this book
is available from the British Library.

All rights reserved. No part of this publication may be reproduced or
transmitted in any form or by any means, or stored in any retrieval system
of any nature without prior written permission, except for permitted fair
dealing under the Copyright, Designs and Patents Act 1988, or in
accordance with the terms of a licence issued by the Copyright Licensing
Agency in respect of photocopying and/or reprographic reproduction.
Application for permission for other use of copyright material including
permission to reproduce extracts in other published works shall be made to
the publishers. Full acknowledgement of author, publisher and source must
be given.

Thomson Reuters and the Thomson Reuters Logo
are trademarks of Thomson Reuters.
Sweet & Maxwell ® is a registered trademark
of Thomson Reuters (Legal) Limited.

No natural forests were destroyed to make this product,
only farmed timer was used and re-planted

© 2010 John Phillips and James O'Donovan

40                                                            FORMATION AND VALIDITY

## (v) Subordination agreements

**1–88**     A subordination agreement is an agreement under which one creditor, whose debt ranks in priority to or equal with the debts of other creditors of the same debtor, agrees to postpone or defer payment of his debt until the other creditors have been paid. Such an agreement is valid even though it varies the *pari passu* principle inherent in insolvency legislation.[290]

**1–89**     A subordination agreement bears some similarity to a guarantee in that it provides creditors with some extra assurance that they will be paid because they are not competing with the subordinated creditor. But a subordination agreement is not a guarantee because it is not a binding promise to be responsible for the debt, default or miscarriage of another party.

**1–90**     The courts perform their most difficult exercise in differentiating between a primary and a secondary liability when they draw the distinction between a guarantee and an indemnity. The difficulties inherent in this exercise, which merits separate discussion,[291] are accentuated because an indemnity is often used to secure the due performance of another's obligations.

## 7. DISTINCTION BETWEEN GUARANTEE AND INDEMNITY

**1–91**     The performance of an obligation or the payment of a debt of another may be secured not by a guarantee, but by a contract of indemnity. The distinction between a contract of guarantee and a contract of indemnity[292] is that in a contract of indemnity a primary liability is assumed whether or not a third party makes default[293] whilst, as has been seen, in a contract of guarantee the surety assumes a secondary liability to the creditor for the default of another who remains primarily liable to the creditor.[294] The contract of indemnity, therefore, is "a contract by one party to keep the other harmless against loss"[295] and is not dependent on the continuing

---

[290] *Re Maxwell Communications Corp plc (No. 2)* [1994] 1 All E.R. 737 at 753–755; *Home v Chester & Fein Property Developments Pty Ltd* [1987] V.R. 913; *United States Trust Co of New York v Australia & New Zealand Banking Group Ltd* (1995) 13 A.C.L.C. 1225.

[291] See below, paras 1–91 to 1–110.

[292] "Indemnity" in this section is referred to in this narrow sense. In a wider sense, the term "indemnity" may embrace recompense for any loss or liability which one person has incurred, which may arise by contract (e.g. a contract of insurance) or by operation of law (e.g. an employer has a right of indemnity against an employee when held vicariously liable to a third party as a result of the employee's negligence: *Lister v Romford Ice & Cold Storage Co Ltd* [1957] A.C. 555). An example of a right of indemnity which may arise as a result of operation of the law in the context of the law of guarantees is the guarantor's right of indemnity from the principal: see below, Ch. 12.

[293] See, e.g. *Guild & Co v Conrad* [1894] 2 Q.B. 885 at 882.

[294] *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828 at 831; *Total Oil Products (Aust) Pty Ltd v Robinson* [1970] 1 N.S.W.R. 701; *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493 at 496–497; *Argo Caribbean Group Ltd v Lewis* [1976] 2 Lloyd's Rep. 289 at 296.

[295] *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828 at 830–831; *Total Oil Products (Aust) Pty Ltd v Robinson* [1970] 1 N.S.W.R. 701 at 703; *Davys v Buswell* [1913] 2 K.B. 47 at 53–55. An indemnity is an independent obligation to make good a loss: *Sutton & Co v Grey* [1894] Q.B. 285 at 288–289 per Lord Esher M.R.

greement under which one creditor,
l with the debts of other creditors of
r defer payment of his debt until the
n agreement is valid even though it
in insolvency legislation.[290]

ne similarity to a guarantee in that it
rance that they will be paid because
inated creditor. But a subordination
it is not a binding promise to be
carriage of another party.

lt exercise in differentiating between
n they draw the distinction between
ifficulties inherent in this exercise,
accentuated because an indemnity is
ce of another's obligations.

## N GUARANTEE AND
## NITY

the payment of a debt of another
t by a contract of indemnity. The
tee and a contract of indemnity[292] is
y liability is assumed whether or not
s has been seen, in a contract of
ry liability to the creditor for which
rily liable to the creditor.[294] The
contract by one party to keep the
not dependent on the continuing

[1994] 1 All E.R. 737 at 753–755; *Home v*
37] V.R. 913; *United States Trust Co of New*
*td* (1995) 13 A.C.L.C. 1225.

is narrow sense. In a wider sense, the term
or liability which one person has incurred,
nsurance) or by operation of law (e.g. an
oyee when held vicariously liable to a third
*ter v Romford Ice & Cold Storage Co Ltd*
y which may arise as a result of operation of
he guarantor's right of indemnity from the

at 882.

at 831; *Total Oil Products (Aust) Pty Ltd v*
*t Co Ltd v Clark* [1967] 2 Q.B. 493 at 496–
oyd's Rep. 289 at 296.

at 830–831; *Total Oil Products (Aust) Pty*
*vs v Buswell* [1913] 2 K.B. 47 at 53–55. An
d a loss: *Sutton & Co v Grey* [1894] Q.B. 285

liability of the principal debtor. The obligation has no reference in law to the debt of another.[296] In other words, an indemnity imposes a primary obligation which is independent of the continuing obligation of another.[297]

The distinction between the two types of contract is important for several reasons. First, the statutory provision which requires certain types of contracts to be evidenced in writing in general applies to guarantees and not to indemnities.[298] Secondly, as the guarantor's liability is usually treated as being co-extensive with that of the principal, the guarantor's liability will be affected by the discharge of the principal or by the fact that the principal contract is void or unenforceable, but an indemnifier's liability is less likely to be affected by these matters.[299] Thirdly, a guarantor has been held to be discharged from liability by certain types of conduct of the creditor. Such conduct will discharge an indemnifier in some, but not all, cases in which a guarantor is discharged.[300]

**1–92**

Although it is a question of construction in each case,[301] it may be relatively easy to determine whether a contract is one of indemnity rather than of guarantee. For example, in the context of an undertaking to a finance company entering into a hire-purchase contract, an undertaking in these terms will be construed as an indemnity:

**1–93**

"I agree to indemnify you against any loss you may suffer by reason of the fact that the hirer under the said agreement for any cause whatsoever does not pay the amounts which he would have paid if he completed his agreement by exercising the option to purchase. The loss is recoverable whether or not the hirer is in breach of the provisions of the agreement. Loss shall mean the difference between the total amount the hirer would have had to pay to acquire title to the goods under the hire-purchase agreement, plus your expenses, less payments received by you."[302]

---

[296] *Clipper Maritime Ltd v Shirlstar Container Transport Ltd* [1987] 1 Lloyd's Rep. 546 at 555; *Harburg India Rubber Comb Co v Martin* [1902] 1 K.B. 778 at 784.

[297] *Clement v Clement* (1996) 71 P. & C.R.D. 19.

[298] Guarantees are *prima facie* unenforceable if they do not satisfy the requirements of s.4 of the Statute of Frauds 1677. See below, paras 3–150 to 3–154. Not surprisingly, the need to distinguish guarantees from indemnities for the purposes of the Statute of Frauds "has raised many hair-splitting distinctions of exactly that kind which brings the law into hatred, ridicule and contempt by the public": *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828 at 835 *per* Harman L.J.

[299] See, e.g. *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828; *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493. Cf. *Bentworth Finance Ltd v Lubert* [1968] 1 Q.B. 680 (where there was no hire-purchase contract because there was an implied condition of the agreement that a log-book would be provided). See below, paras 5–175 and 6–103. But note *Citicorp Australia Ltd v Hendry* (1985) 4 N.S.W.L.R. 1.

[300] e.g. see below, paras 6–103, 7–68, and 8–104.

[301] *Moschi v Lep Air Services Ltd* [1973] A.C. 331 at 349; *Alfred McAlpine Construction Ltd v Unex Corp Ltd* (1994) 38 Com. L.R. 38.

[302] See a similar example in *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493. See also *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828, CA (an indemnity). Cf. *Western Credit Ltd v Alberry* [1964] 2 All E.R. 938, CA (a guarantee). Note that the position has been modified by the Minors' Contracts Act 1987.

**1–94**    An example of a guarantee in a similar context would be a promise to "guarantee the obligations of the hirer under the agreement".

**1–95**    Another example is *ANZ Banking Group Ltd v Beneficial Finance Corp Ltd*[303] where the Judicial Committee of the Privy Council decided that a "take-out" letter in the following terms was an indemnity, rather than a guarantee:

> . . . It is hereby agreed as follows:
>
> 1. In the event of the bank's liability in respect of the loan not being satisfied on or before the expiration of two (2) years (the expiration date) from the date hereof Beneficial undertakes upon receipt of ninety (90) days notice in writing from the bank to pay or otherwise make such arrangements (the take-out) as are satisfactory to the bank to discharge the liability to the bank under the said loan."

**1–96**    In doubtful cases, the courts will decide whether the contract is one of indemnity rather than a contract of guarantee by a careful perusal of all the provisions of the agreement to ascertain if the rights of the creditor against the party entering into the contract are different in extent from those available against the debtor.[304] Thus, the agreement will be construed as an indemnity if the contract, according to some of its clauses, operates to render the promisor liable in circumstances in which the principal is not in default,[305] or renders the promisor liable for a greater amount than the principal.[306] By reference to these criteria, a contract by which a dealer agrees to indemnify a finance company against losses arising from a consumer credit contract has been held to be an indemnity.[307]

**1–97**    Other factors may also indicate whether the contract is one of indemnity or guarantee. The fact that the words "guarantee" or "indemnity" appear in the instrument are indications of the intentions of the parties, especially if

---

[303] [1983] 1 N.S.W.L.R. 199. For further examples, see *Anglomar Shipping Co Ltd v Swan Hunter Shipbuilders Ltd* [1980] 2 Lloyd's Rep. 456; *Alfred McAlpine Construction Ltd v Unex Corp Ltd* (1994) 38 Con LR 63.

[304] This is the approach taken in *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828 at 830–833; *Argo Caribbean Group Ltd v Lewis* [1976] 2 Lloyd's Rep. 289 at 296; *Direct Acceptance Finance Ltd v Cumberland Furnishing Pty Ltd* [1965] N.S.W.R. 1504; *Total Oil Products (Aust) Pty Ltd v Robinson* [1970] 1 N.S.W.R. 701; *Cameo Motors Ltd v Portland Holdings Ltd* [1965] NZLR 109.

[305] *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828 at 832–833. *Direct Acceptance Finance Ltd v Cumberland Furnishing Pty Ltd* [1965] N.S.W.R. 1504 at 1509.

[306] *Direct Acceptance Finance Ltd v Cumberland Furnishing Pty Ltd* [1965] N.S.W.R. 1504 at 1509; *Argo Caribbean Group Ltd v Lewis* [1976] 2 Lloyd's Rep. 289 at 296.

[307] *Direct Acceptance Finance Ltd v Cumberland Furnishing Pty Ltd* [1965] N.S.W.R. 1504; *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493; *United Dominions Trust (Commercial) Ltd v Eagle Aircraft Services Ltd* [1968] 1 All E.R. 104, CA. Cf. *Unity Finance Ltd v Woodcock* [1963] 1 WLR 455, where it was held that, on similar wording, a recourse agreement was a guarantee. The case can probably be explained on the narrower ground that the creditors had repossessed the goods illegally and were seeking an indemnity from the consequences of their own illegal act: see this explanation in *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493. In *Direct Acceptance Finance Ltd v Cumberland Furnishing Pty Ltd* [1965] N.S.W.R. 1504, the N.S.W. Court of Appeal doubted *Unity Finance Ltd v Woodcock* [1963] 1 W.L.R. 455.

milar context would be a promise to
r under the agreement".

*Group Ltd v Beneficial Finance Corp*
of the Privy Council decided that a
rms was an indemnity, rather than a

ility in respect of the loan not being
ation of two (2) years (the expiration
eneficial undertakes upon receipt of
ng from the bank to pay or otherwise
ake-out) as are satisfactory to the bank
bank under the said loan."

decide whether the contract is one of
uarantee by a careful perusal of all the
ain if the rights of the creditor against
ct are different in extent from those
the agreement will be construed as an
g to some of its clauses, operates to
stances in which the principal is not in
liable for a greater amount than the
criteria, a contract by which a dealer
any against losses arising from a con-
to be an indemnity.[307]

hether the contract is one of indemnity
"guarantee" or "indemnity" appear in
e intentions of the parties, especially if

the expressions are repeated a number of times[308] or appear in the heading to the instrument,[309] but they are not decisive[310] and the essential nature of the agreement must always be considered.[311]

**1–98**  If the agreement contains a provision preserving the liability of the guarantor in the event of the creditor giving time to the principal to perform the principal obligation, this will suggest that the contract is one of guarantee because, if the contract were construed as an indemnity, there would be no need for such a provision since an indemnifier is not discharged by such conduct of the creditor.[312] Conversely, the contract may well be one of indemnity if the parties know that the principal contract is void (for example as a result of the principal's infancy), because if it were construed as a guarantee the transaction would be ineffective since there would be no valid principal obligation, and the parties could not have intended this result.[313]

**1–99**  The difficulty of determining whether the contract is one of guarantee or indemnity is reflected in modern forms of contract used to secure the obligation of another, some of which cannot easily be classified into these two separate categories. The most commonly found forms are as follows:

**1–100**  *(a) A simple guarantee*: Some guarantees merely contain one simple undertaking to guarantee the obligations of a named principal. The agreement contains no special clauses and is clearly a contract of guarantee according to traditional definitions. Surprisingly, this form is still used by some finance companies.

**1–101**  *(b) A guarantee containing clauses preserving the guarantor's liability in certain circumstances*: The form of this guarantee is the same as in para.(a) above, but it also contains clauses which preserve the liability of the guarantors in circumstances in which they would otherwise be discharged (for example, by the creditor varying the principal contract or impairing securities held for the enforcement of the principal obligation).[314] Even if the agreement contains a clause to the effect that the creditor may treat the

---

amples, see *Anglomar Shipping Co Ltd v Swan*
456; *Alfred McAlpine Construction Ltd v Unex*

edit Ltd v Latter [1961] 1 W.L.R. 828 at 830–833;
oyd's Rep. 289 at 296; *Direct Acceptance Finance*
N.S.W.R. 1504; *Total Oil Products (Aust) Pty Ltd*
otors Ltd v Portland Holdings Ltd [1965] NZLR

R. 828 at 832–833. *Direct Acceptance Finance Ltd v*
.R. 1504 at 1509.

land Furnishing Pty Ltd [1965] N.S.W.R. 1504 at
76] 2 Lloyd's Rep. 289 at 296.

rland Furnishing Pty Ltd [1965] N.S.W.R. 1504;
.B. 493; *United Dominions Trust (Commercial) Ltd*
.R. 104, CA. Cf. *Unity Finance Ltd v Woodcock*
on similar wording, a recourse agreement was a
ed on the narrower ground that the creditors had
king an indemnity from the consequences of their
ton Discount Co Ltd v Clark [1967] 2 Q.B. 493. In
d Furnishing Pty Ltd [1965] N.S.W.R. 1504, the
ance Ltd v Woodcock [1963] 1 W.L.R. 455.

[308] *Heald v O'Connor* [1971] 1 W.L.R. 497 at 503.
[309] *Goulston Discount Ltd v Clark* [1967] 2 Q.B. 493 at 498 per Danckwerts L.J. *Western Credit Ltd v Alberry* [1964] 2 All E.R. 938 at 940 per Davies L.J.; *Crown Lumber Co Ltd v Engel* (1961) 28 D.L.R. (2d) 762.
[310] *Total Oil Products (Aust) Pty Ltd v Robinson* [1970] 1 N.S.W.R. 701; *Western Credit Ltd v Alberry* [1964] 2 All ER 938 at 940 per Davies L.J.
[311] *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828 at 833.
[312] *Western Credit Ltd v Alberry* [1964] 2 All E.R. 938 at 940 *per* Davies L.J. *Western Dominion Investment Co v MacMillan* [1925] 2 DLR 442, affirmed in [1925] 4 D.L.R. 562, CA. But in *Associated British Ports v Ferryways NV* [2009] EWCA 189 at paras 11–12 it was said that the absence of the usual protective terms (for example, preserving the liability of the guarantor in the event of a variation of the principal contract) was not a reason in itself for concluding that the instrument was not a guarantee. The absence of such terms was of neutral effect in the construction of the contract. Additionally the fact that the agreement makes no provision for a demand being made on the principal debtor does not convert what would otherwise be a guarantee into an indemnity: *Chiswell Shipping Ltd v State Bank of India* [1987] 1 Lloyd's Rep. 165.
[313] *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828 (but see this factor criticised in a note in (1961) 24 M.L.R. 644 at 647–648.)
[314] See below, Chs 7 and 8.

guarantor "as a principal debtor" it will probably still be viewed as a contract of guarantee,[315] but this may not be the case if certain clauses specifically preserve the guarantor's liability in circumstances where the principal is no longer liable: see below, para.(c).

**1–102**    (c) *A guarantee which contains clauses preserving the liability of the guarantor in specified circumstances where the principal is no longer liable*: The form of this guarantee is the same as in para.(b) above, but it also contains clauses which, in specified and limited situations, preserve the liability of the guarantor in circumstances in which the principal will no longer be liable to the creditor. Examples are the preservation of the guarantor's liability where the principal is released by the creditor, and where the principal contract is void because of the principal's infancy. In the first of these examples, an assumption has been made that the contract remains properly classified as a guarantee,[316] whilst in the second it has been suggested that the contract is in fact one of indemnity.[317] In such situations, therefore, the question of categorisation is an open one.

**1–103**    Where the terms of the instrument confine the preservation of the guarantor's liability to one or at least a small number of situations in which the principal is no longer liable, it is difficult to conclude that the contract renders the creditor "harmless against loss" within the definition of an indemnity. Yet it cannot be said the contract is strictly a guarantee because liability may be incurred in these specific situations without the default of the principal. It may be that this type of contract should be regarded as a hybrid, generally being in the nature of a guarantee but containing elements of an indemnity. At least one authority has recognised this possibility.[318]

**1–104**    (d) *A guarantee containing a "principal debtor" clause*: A guarantee which contains clauses preserving the liability of the guarantor in certain circumstances when the principal is no longer liable (as in para. (c) above) will invariably also contain a "principal debtor" clause, whereby the creditor is "given liberty to act as though the guarantor were a principal debtor".[319] It is clear that the effect of such a clause, even standing alone, may be to preserve the guarantor's liability in circumstances in which he would otherwise be discharged, for example, where the creditor improperly releases a security[320] or grants the principal an extension of time to repay the debt.[321] Depending on its precise construction, the clause may also obviate the necessity for a demand to be made upon the guarantor before issuing

[315] *Heald v O'Connor* [1971] 1 W.L.R. 497 at 503; *General Produce Co v United Bank Ltd* [1979] 2 Lloyd's Rep. 255 at 259. See also below, para. 1–104 to 1–105.
[316] e.g. *Bank of Adelaide v Lorden* (1970) 45 A.L.J.R. 49, where the terminology of guarantee is used.
[317] *Alliance Acceptance Co Ltd v Hinton* (1964) 1 D.C.R. (NSW) 5. Note, however, that an alternative basis of this decision was that the clause operated as an estoppel against the guarantor.
[318] *General Surety & Guarantee Co Ltd v Francis Parker Ltd* (1977) 6 Build. L.R. 18 at 21.
[319] An example taken from *Fletcher Organisation Pty Ltd v Crocus Investments Pty Ltd* [1988] 2 Qd. R. 517.
[320] ibid.
[321] *Heald v O'Connor* [1971] 1 W.L.R. 497. See also *Brown Bros Motor Lease Canada Ltd v Ganapathi* (1983) 139 D.L.R. (3d) 227.

| ...ND VALIDITY | DEFINITION AND DISTINCTIONS | 45 |

...t will probably still be viewed as a
...y not be the case if certain clauses
...liability in circumstances where the
..., para.(c).

*...lauses preserving the liability of the
...here the principal is no longer liable:
...me as in para.(b) above, but it also
...d limited situations, preserve the lia-*
...s in which the principal will no longer
...e the preservation of the guarantor's
...sed by the creditor, and where the
...he principal's infancy. In the first of
...een made that the contract remains
...whilst in the second it has been sug-
...e of indemnity.[317] In such situations,
...n is an open one.

...confine the preservation of the guar-
...all number of situations in which the
...fficult to conclude that the contract
...st loss" within the definition of an
...ontract is strictly a guarantee because
...ific situations without the default of
... of contract should be regarded as a
... a guarantee but containing elements
...y has recognised this possibility.[318]

*...al debtor" clause:* A guarantee which
...y of the guarantor in certain circum-
...er liable (as in para. (c) above) will
...btor" clause, whereby the creditor is
...rantor were a principal debtor".[319] It
...se, even standing alone, may be to
... circumstances in which he would
...here the creditor improperly releases
...extension of time to repay the debt.[321]
...n, the clause may also obviate the
...upon the guarantor before issuing

*...General Produce Co v United Bank Ltd* [1979]
...1–104 to 1–105.

...U.R. 49, where the terminology of guarantee is

...1 D.C.R. (NSW) 5. Note, however, that an
...clause operated as an estoppel against the

*...Parker Ltd* (1977) 6 Build. L.R. 18 at 21.
*...Pty Ltd v Crocus Investments Pty Ltd* [1988] 2

...also *Brown Bros Motor Lease Canada Ltd* v

proceedings.[322] It may also be a relevant factor in reaching a conclusion that a particular instrument is an unconditional performance bond.[323]

The dominant view, however, is that the incorporation of a "principal debtor" clause does not convert what would otherwise be interpreted as a contract of guarantee into a contract of indemnity.[324] The effect of a "principal debtor" clause in particular contexts is considered elsewhere in the text.[325]    **1–105**

*(e) Simple indemnity*: Some forms of contract securing the obligation or the payment of a debt of another are clearly indemnities. An example is given earlier in this section.[325]    **1–106**

*(f) A combined "guarantee and indemnity"*: The contract securing the obligation or payment of another may be drafted in such a way that it expressly contains a promise to guarantee and a promise to indemnify. An example is an agreement in these terms:    **1–107**

"(1) I will upon demand pay to you such sum or sums of money as at any time or from time to time have become payable by the customer but be unpaid by her/him. (2) I will indemnify and keep indemnified you, your successors and assigns from all loss or damage suffered and all claims costs and expenses made against or incurred by you in any way arising out of or consequent upon your having entered into such agreement, whether arising out of a breach by the customer of any of the terms and conditions thereof or otherwise including any such loss or damage, etc. as aforesaid as may arise from the said agreement being (for whatever reason) unenforceable against the customer. (3) No relaxation or indulgence which you may from time to time or at any time extend to the customer shall in any way prejudice or act as a waiver of your strict rights against me hereunder."

[322] *Esso Petroleum Co Ltd v Alstonbridge Properties Ltd* [1975] 1 W.L.R. 1474 at 1478. Cf. *Re Taylor, Ex p. Century 21 Real Estate Corp* (1995) 130 A.L.R. 723, where Burchett J. emphasised that the issue was one of construction of the particular guarantee, and added "[N]o generalisation is possible."

[323] *Van Der Merwe v IIG Capital LLC* [2008] EWCA 542 at paras 31–32; *Maureen McLaughlin v Suspension & Interdict* [2009] C.S.O.H. 49.

[324] *Citicorp Australia Ltd v Hendry* (1985) 4 N.S.W.L.R. 1 at 20 per Clarke J. (at first instance); *Heald v O'Connor* [1971] 1 W.L.R. 497. See also *Clipper Maritime Ltd v Shirlstar Container Transport Ltd* [1987] 1 Lloyd's Rep. 546 at 555; *Brown Bros Motor Lease Canada Ltd v Ganapathi* (1983) 139 D.L.R. (3d) 227.; *Berghoff Trading Ltd v Swinbrook Developments Ltd* [2009] EWCA Civ 413 (where it was left open whether a principal debtor clause whereby the guarantors "[agreed] to pay as if they were the primary obliger" even had the effect of abrogating the relationship of suretyship between the guarantor and principal debtor (see this case discussed in more detail above at para.1–30); *Valstar v Silversmith* [2009] N.S.W.C.A. 80 at para.37 where the Court of Appeal doubted that the "principal debtor" clause in that case would in itself "have entitled the appellant to sue the respondents simply as principal debtors under the Mortgage, rather than as guarantors". Cf. *Fletcher Organisation Pty Ltd v Crocus Investments Pty Ltd* [1988] 2 Qd. R. 517 at 526–527, 536, where the effect of a principal debtor clause is equated with a specific variation of the contractual arrangements whereby the guarantor clearly assumes a primary liability.

[325] See below, paras 5–172; 7–36; 7–99; 8–98 to 8–99; and 10–121.

Doc 33774-11    Filed 01/10/13    Entered 01/10/13 14:0... Pg    C...

Part 11    Pg 40 of 59

46                                                FORMATION AND VALIDITY

**1–108**    In this situation the agreement has sometimes been construed simply as a guarantee, despite the inclusion of an indemnity provision. Thus in *Stadium Finance Co Ltd v Helm*,[326] the Court of Appeal held that an agreement containing the above clauses and headed "indemnity form" was in fact a guarantee, with the result that the contract was unenforceable against the guarantor when the principal contract was void due to the principal's infancy. Russell L.J. was of the view that, as most people were not prepared to subject themselves to the nuisance of primary liability, a clearer form must be adopted before the instrument could be construed as an indemnity.[327] The construction of a contract in this form as a guarantee is more likely if the obligation is only to attach in the event of the failure of the principal to discharge his obligations,[328] since this in indicative of a secondary liability.

**1–109**    Another possibility is to construe the agreement as two separate obligations of guarantee and indemnity and, indeed, this appears to be the usual approach.[329] However, even if the instrument is treated as embodying separate obligations, the interrelationship of the guarantee and the indemnity may well have a significant impact on the effectiveness of the provisions.[330] In particular, the fact that the substantial part of the document (apart from the indemnity clause) is drafted as a guarantee can, at least on one view, result in the indemnity provision being much less effective from the creditor's point of view.[331] An illustration is *Citicorp Australia Ltd v Hendry*,[332] where it was held that an indemnity provision did not preserve the obliger's liability when the sums payable pursuant to the principal contract were irrecoverable as being in the nature of a penalty. The indemnity clause (as well as the guarantee) had been drafted on the basis that there was an existing obligation of the principal to pay, which was not the case because the sums as a matter of law were at no stage recoverable from the principal.[333]

**1–110**    As the above analysis of common forms indicates, the distinction between a contract of guarantee and one of indemnity is often blurred, and it is

---

[326] (1965) 109 S.J. 471. This decision was quoted with approval in *Re: Taylor; Ex Parte Century 21 Real Estate Corporation* (1995) 130 A.L.R. 723, (cited more recently in *Valstar v Silversmith* [2009] N.S.W.C.A. 80 at para.36). *Cf.* however *Total Oil Products (Aust) Pty Ltd v Robinson* [1970] 1 N.S.W.R. 701 at 703–704, where it was held that a particular clause in a contract which was phrased in terms of a guarantee was a promise of indemnity.

[327] See also *Re Taylor, Ex p. Century 21 Real Estate Corp* (1995) 130 A.L.R. 723.

[328] *Re Taylor, Ex p. Century 21 Real Estate Corp* (unreported, Fed Ct of Australia, Burchett J. June 27, 1995) at 9–10.

[329] *Citicorp Australia Ltd v Hendry* (1985) 4 N.S.W.L.R. 1 at 20 *per* Clarke J. (at first instance). The matter was treated similarly on appeal (1985) 4 N.S.W.L.R. 1 at 36, where the instrument was referred to as a "guarantee/indemnity document". See also *James Hardie & Co Pty Ltd v Burrows* (unreported, Vic Sup Ct, July 5, 1991).

[330] *The "Barenbels"* [1985] 1 Lloyd's Rep. 528 at 532, although here the obligations were embodied in the same clause.

[331] In *Citicorp Australia Ltd v Hendry* (1985) 4 N.S.W.L.R. 1 at 20, Clarke J. in fact regarded "the agreement as a whole as an agreement of guarantee" and the indemnity as an "additional" liability.

[332] (1985) 4 N.S.W.L.R. 1.

[333] See below, para.5–173 and note, in particular, a different interpretation in *Gulf Bank KSC v Mitsubishi Heavy Industries Ltd* [1994] 2 Lloyd's Rep. 145 at 151.

sometimes been construed simply as a[n] indemnity provision. Thus in *Stadium* [Cour]t of Appeal held that an agreement [in wor]ded "indemnity form" was in fact a [co]ntract was unenforceable against the [... act] was void due to the principal's [... of] primary liability, a clearer form [... nt] could be construed as an indem[... t] in this form as a guarantee is more [... ch] in the event of the failure of the [...,][328] since this in indicative of a sec-

[... t]he agreement as two separate obliga- [..., ind]eed, this appears to be the usual [... nstrument] is treated as embodying [... hip o]f the guarantee and the indem- [... ct o]n the effectiveness of the provi- [... he su]bstantial part of the document [... r]afted as a guarantee can, at least on [... vi]sion being much less effective from [... ust]ration is *Citicorp Australia Ltd v* [... i]ndemnity provision did not preserve [... ]payable pursuant to the principal [... ] in the nature of a penalty. The [... nt]ee) had been drafted on the basis [... o]f the principal to pay, which was not [... o]f law were at no stage recoverable

[... r]ms indicates, the distinction between [... i]ndemnity is often blurred, and it is

always essential to give effect to the particular wording in each case, rather than attempt a rigid categorisation.[334] The authors in this work have, therefore, on many occasions looked at the law in regard to both types of contract. Indeed, as the modern forms of guarantee often contain elements of an indemnity this is why the authors have entitled the work *The Modern Contract of Guarantee*. Instances of the treatment of a contract of indemnity, or a guarantee which contains elements of indemnity, are found in Chapter 5 (where the principles of construction applicable to a contract of indemnity are analysed). Chapters 6–8 (where the effect of circumstances discharging the guarantor are considered also in relation to the indemnifier) and Chapters 10–12 (where the rights of an indemnifier are discussed).

## 8. DISTINCTION BETWEEN GUARANTEE AND WARRANTY

**1–111**   In common parlance, the terms "guarantee" and "warranty" are used interchangeably. There is some historical basis for this usage for it appears that the words were once the same, the letter "g" of the Norman-French being convertible with the "w" of the German and English, as in the names William and Guillaume.[335] In general, however, the term "guarantee" should be used to describe a collateral contract "by which one person is bound to another for the due fulfilment of a promise or engagement of a third party",[336] while the term "warranty" should be reserved for "a contract as to the title, quality or quantity of a thing sold"[337] or an undertaking that the title, quality or quantity of the subject matter of a contract is as it appears to be or as it has been represented. Unlike a guarantee, a warranty does not necessarily relate to the obligations of a third party, and generally will not do so.

**1–112**   The determination of whether or not the promise is a guarantee or, alternatively, a contractual warranty, should be approached in a common sense way, and having regard to the context in which the word "guarantee" or "warranty" is used in the agreement as a whole.[338] Nomenclature is not

---

[... ] with approval in *Re: Taylor; Ex Parte Century* [... ]3, (cited more recently in *Valstar v Silversmith* [... ] *Total Oil Products (Aust) Pty Ltd v Robinson* [... ]eld that a particular clause in a contract which [... ]ise of indemnity).
[... ]*tate Corp* (1995) 130 A.L.R. 723.
[... ] (unreported, Fed Ct of Australia, Burchett J.
[... ]W.L.R. 1 at 20 *per* Clarke J. (at first instance).
[... ]5) 4 N.S.W.L.R. 1 at 36, where the instrument [... ]ment". See also *James Hardie & Co Pty Ltd v*
[... ] at 532, although here the obligations were
[... ]N.S.W.L.R. 1 at 20, Clarke J. in fact regarded [... ]arantee" and the indemnity as an "additional"
[... ] a different interpretation in *Gulf Bank KSC v* [... ]Rep. 145 at 151.

[334] *Alfred McAlpine Construction Ltd v Unex Corp Ltd* (1994) 38 Con. L.R. 63.
[335] H.A. de Colyar, *A Treatise on the Law of Guarantees* (3rd edn, 1897), pp.1–2. The Old French noun "garantie" and verb "garantie" were derived from the Frankish word "garant", itself a derivation of an earlier form "warrant", meaning a warrant or supporter.
[336] *Parson's Law of Contracts* (5th ed.), Vol. ii, p.3, quoted in H.A. de Colyar, *A Treatise on the Law of Guarantees* (3rd edn, 1897), p.2.
[337] *ibid.* A retailer's obligation to effect repairs to goods sold is a warranty, not a guarantee: See, e.g. *Adams v Richardson & Starling Ltd* [1969] 1 W.L.R. 1645. Technically, a "warranty" is a subsidiary term of a contract which gives rise to a right to damages if the term is breached, but which does not give the injured party a right to treat the contract as at an end: *Oscar Chess Ltd v Williams* [1957] 1 All E.R. 325 at 328 *per* Denning L.J., CA.
[338] *Trajovski v RK Findlay Pty Ltd* [2008] N.S.W.S.C. 278 at para.106; *Quest 4 Finance Ltd v Maxfield* [2007] EWHC 2313 (QB) at para.25.

by the capacity in which the
uarantee? ........................    5–102
s used in the guarantee upon

...................................    5–105
"contingently owing" ......    5–107
l moneys" guarantee ........    5–112
es" ................................    5–121
n the guarantee relates to
mortgage" ....................    5–123
e principal transaction upon

...................................    5–124
ere is a discrepancy between
ncipal transaction ..........    5–125
e the principal transaction
sum to be payable on the

...................................    5–127
estoppel upon the scope of

...................................    5–129
pe of liability arises from a

...................................    5–136
ity ..............................    5–142
ned by the creditor against

...................................    5–142
rtificate ......................    5–145
evidence certificate ........    5–146
Where the Principal Con-

...................................    5–152

...................................    5–152

...................................    5–153

...................................    5–154
ultra vires transactions ......    5–157

...................................    5–159

...................................    5–162

...................................    5–167
rving the guarantor's liabi-
defective ....................    5–172

...................................    5–176

l scope of the guarantor's liability.
case so the chapter begins with an
struction applicable to contracts of
particular problems of construction
nt of the guarantor's liability and, in
h are commonly found in modern
cial difficulty of the extent of the
l contract is defective in some way

(that is, because it is void, voidable or unenforceable) is dealt with in
section 3.

# 1. GENERAL PRINCIPLES OF CONSTRUCTION AFFECTING THE SCOPE OF THE GUARANTOR'S LIABILITY

## (i) The general rule

Historically, the judicial approach to the construction of contracts of **5–01**
guarantee has been characterised by inconsistency. A number of different
methods of construction have been suggested, but principally the cases have
vacillated between two views.[1]

Historically, the courts have often stated that in cases of ambiguity the **5–02**
guarantee should strictly construed in favour of the guarantor,[2] that is,
contra proferens the creditor.[3] For example, in *Eastern Counties Building
Society v Russell*,[4] Hilbery J. said:

"Rather will the court in case of doubt lean in [the surety's] favour.
Neither equity nor law will put a construction on the document which
results in imposing on the surety any more than, on the strictest con-
struction of the instrument, he must be said expressly to have undertaken,
or so as to detract from the right given to the surety by the proviso
defining the circumstances in which the surety is to be held discharged."[5]

Sometimes this rule of construction had been expressed in more liberal
terms than that laid down by Hilbery J., with an emphasis on a "fair but
strict reading of the language of the guarantee"[6] rather than restricting the

---

[1] At one time, a third view was that the guarantee should be construed against the guarantor;
*Mayer v Isaac* (1840 6 M. 151 E.R. 554 at 557 ("the party who receives the instrument, and
parts with his goods on the faith of it should rather have a construction put upon it in his
favour"); *Jones v Mason* (1892) 13 L.R. (NSW) 157 at 162; *A.A. Davison Pty Ltd v Seabrook*
(1931) 37 A.L.R. 156.
[2] *Eastern Counties Building Society v Russell* [1947] 1 All E.R. 500 at 503 (and the cases therein
cited); *General Surety & Guarantee Co Ltd v Francis Parker Ltd* (1977) 6 Build. L.R. 18 at 21;
*Glyn v Hertel* (1818) 8 Taunt. 208; 129 E.R. 363: *Ankar Pty Ltd v National Westminster Finance
(Aust) Ltd* (1987) 162 C.L.R. 549; *Parker v Bayly* [1927] G.L.R. 265 at 267; *Mercantile Credits
Ltd v Harry* [1969] 2 N.S.W.R. 248 at 249; *Duncombe v Australia & New Zealand Bank Ltd*
[1970] Qd. R. 202 at 207; *Mercantile Credits Ltd v Buckeridge* [1980] W.A.R. 1 at 7; *Triaca v
Summaries Pty Ltd* [1971] V.R. 347 at 351.
[3] Assuming the usual case where the creditor has drafted the guarantee.
[4] [1947] 1 All E.R. 500.
[5] [1947] 1 All E.R. 500.
[6] *First National Finance Corp Ltd v Goodman* [1983] B.C.L.C. 203 at 213. See also *Ankar Pty Ltd
v National Westminster Finance (Aust) Ltd* (1987) 162 C.L.R. 549 at 561 and *Tam Wing Chuen v
Bank of Credit & Commerce Hong Kong Ltd* [1996] 2 B.C.L.C. 69, emphasising that the contra
proferentem rule only applied in ambiguous cases.

LIABILITY AND DISCHARGE

guarantor's obligation to that which "on the strictest construction of the instrument, he must be said to have expressly undertaken".

**5–03**     The second (and now generally accepted) approach treats a guarantee like any other mercantile document or commercial contract.[7] Thus the guarantee should be given a reasonable, business meaning and should not be construed so as to render the guarantee ineffective or illusory.[8] This means, as emphasised by the Court of Appeal in *Static Control Components (Europe) Ltd v Egan*,[9] that the principles of construction set out by Lord Hoffmann in *Investors Compensation Scheme Ltd v West Bromwich Building Society*[10] apply to all guarantees.[11]

**5–04**     One uncertainty is the present status of the historical rule that the guarantee must be construed strictly. In *Static Control Components (Europe) Ltd v Egan*,[12] Holman J. in the Court of Appeal considered that "it may be that the concept that a guarantee should be 'strictly construed' now adds nothing."[13] But there has been no clear judicial decision that it should be formally abandoned.[14] On one view, although the emphasis is on treating the guarantee as a commercial document, the strict rule of construction continues to exist as a "last resort".

**5–05**     Thus in *Estates Gazette Ltd v Benjamin Restaurants Ltd*[15] the Court of Appeal put it this way:

> "Lastly it was submitted on behalf of the defendants that if there is an ambiguity or doubt upon the meaning of the suretyship covenant I should construe it in favour of the defendants and against the plaintiffs. Certainly it is true that neither equity nor law will put a construction on a contract of guarantee which results in imposing on the surety any greater obligation than that which on the strictest construction of the instrument he must be said expressly to have undertaken: see *Eastern Counties Building*

---

[7] *Bacon v Chesney* (1816) 1 Stark. 192; 17 E.R. 443; *Stamford Spalding & Boston Banking Co v Ball* (1862) 4 De G. F. 310; *Straton v Rastall* (1788) 2 T.R. 366 at 370; 100 E.R. 197 at 199; *Hargrave v Smee* (1829) 6 Bing. 244 at 248; 130 E.R. 1274 at 1276; *Morten v Marshall* (1863) 3 H & C. 310; *S.H. Lock Discounts & Credits Pty Ltd v Miles* [1963] V.R. 656 at 658; *Reid Murray Holdings Ltd (in liq) v David Murray Holdings*, (1972) 5 S.A.S.R. 386 at 406; *Craig v Finance Consultants Pty Ltd* [1964] N.S.W.R. 1012.

[8] *Ibid.*

[9] [2004] EWCA Civ 392 at para.13, per Holman J. See also the approach of Arden L.J. at paras 22–38.

[10] [1998] 1 W.L.R. 896 (as set out below para.5–08).

[11] See also *Cattles Plc v Welcome Financial Services Ltd* [2009] EWHC 3027 at 21 (on appeal, [2010] EWCA Civ 599); *Vodafone Ltd v GNT Holdings (UK) Ltd* [2004] EWHC 1526 (QB) at para.72; *ING Lease (UK) Ltd v Harwood* [2007] EWHC 2292 (QB) (first Instance) at para.71.

[12] [2004] EWCA Civ 392.

[13] [2004] EWCA Civ 392 at para.19.

[14] In *Investec Bank (UK) Ltd v Zulman* [2009] EWHC 1590 (Comm) at para.59, it was regarded as an issue requiring resolution, which the Court did not have to address on the facts since the guarantee was clear and unambiguous.

[15] [1994] 1 W.L.R. 1528 at 1533, adopting the view of Millett J. in *Johnsey Estates Ltd v Webb* [1990] 19 E.G.L.R. 80 at 82. See similarly *Waydale Ltd v DHL Holdings (UK) Ltd (No.2)* 2001 S.L.T. 224 at 228 (strict rule of construction to be applied only where "ordinary rules of interpretation had been applied and failed to provide a solution"); *Tam Wing Chuen v Bank of Credit & Commerce Hong Kong Ltd* [1996] 2 B.C.C. 69; *De Vere Hotels Ltd v Aegon Insurance Co (UK) Ltd* (unreported October 15, 1997).

08-13555-mg    Filed 01/10/13    Entered 01/10/13 17:31:59    Appendix 4

Part 11    Pg 44 of 59

AND DISCHARGE

THE SCOPE OF THE GUARANTOR'S LIABILITY

283

C.7.ii

ch "on the strictest construction of the
e expressly undertaken".

cepted) approach treats a guarantee like
ommercial contract.[7] Thus the guarantee
ss meaning and should not be construed
effective or illusory.[8] This means, as
in *Static Control Components (Europe)*
nstruction set out by Lord Hoffmann in
d v West Bromwich Building Society*[10]

tus of the historical rule that the guar-
*tatic Control Components (Europe) Ltd*
Appeal considered that "it may be that
be 'strictly construed' now adds noth-
udicial decision that it should be for-
hough the emphasis is on treating the
t, the strict rule of construction con-

*jamin Restaurants Ltd*[15] the Court of

f of the defendants that if there is an
ng of the suretyship covenant I should
ts and against the plaintiffs. Certainly
will put a construction on a contract
sing on the surety any greater obliga-
st construction of the instrument he
rtaken: see *Eastern Counties Building*

43; *Stamford Spalding & Boston Banking Co v*
788) 2 T.R. 366 at 370; 100 E.R. 197 at 199;
E.R. 1274 at 1276; *Morten v Marshall* (1863) 3
*td v Miles* [1963] V.R. 656 at 658; *Reid Murray*
(1972) 5 S.A.S.R. 386 at 406; *Craig v Finance*

. See also the approach of Arden L.J. at paras

08).

*ces Ltd* [2009] EWHC 3027 at 21 (on appeal;
*ldings (UK) Ltd* [2004] EWHC 1526 (QB) at
EWHC 2292 (QB) (first Instance) at para.71;

HC 1590 (Comm) at para.59, it was regarded
did not have to address on the facts since the

w of Millett J. in *Johnsey Estates Ltd v Webb*
*Ltd v DHL Holdings (UK) Ltd (No.2)* 2001
be applied only where "ordinary rules of
ide a solution"); *Tam Wing Chuen v Bank of*
C. 69; *De Vere Hotels Ltd v Aegon Insurance*

*Society v Russell* [1947] 1 All E.R. 500. On the other hand, the words have
to be fairly construed in their context and in accordance with their proper
meaning without in any way favouring the guarantor, who is not placed in
any more favourable position in this regard than any other contracting
party. The so-called rule of construction is very much a matter of last
resort."

Similarly, in *Cattles Plc v Welcome Financial Services Ltd*,[16] it was empha-
sised that "the courts first task is to construe the document properly on
ordinary principles" but that the contra proferentem role has a "legitimate
role" if the document, properly construed, admits of doubt.

One particular situation where the strict rule of construction may remain    5–06
applicable is in respect of the interpretation of clauses (sometimes called
exclusion clauses) which are designed to preserve the liability of the guar-
antor when he would otherwise be discharged under the general law.[17] It is
true that in *Barclays Bank Plc v Kingston*[18] Stanley Burnton L.J. declined to
interpret exclusion clauses "with the hostility traditionally shown to exclusion
clauses", but, rather, the guarantee should be interpreted "as a whole as a
commercial document".[19] Yet previously, in *Liberty Mutual Insurance Co
(UK) Ltd v HSBC Bank Plc*[20] it had been emphasised that "strict words"
should be required to exclude or limit the general rules applicable to guar-
antees as "the reasonable man does not expect fundamental principles of
law, equity and justice to be excluded unless the contract clearly says so."[21]
The issue remains an open one.

It is considered that there is no need to preserve the strict rule of con-    5–07
struction either as a rule of "last resort" or in respect of the construction of
exclusion clauses. A preferable approach is that guarantees should be con-
strued according to the normal contractual principles set out in *Investors
Compensation Scheme Ltd v West Bromwich Building Society*,[22] which is
quite consistent with requiring the existence, nature and extent of the
guarantor's liability to be clearly indicated by the wording of the document.
Furthermore, the factual context (which *Investors Compensation Scheme Ltd
v West Bromwich Building Society*[23] directs the Court to take into account)
should include the nature of the guarantee, that is, whether it is a guarantee
given by a consumer, director, corporate entity or a professional surety
(such as an insurance company) for the payment of a fee. The status of the
guarantor is not generally acknowledged directly as meriting a different

---

[16] [2010] EWCA (Civ) 599 at para.43.
[17] E.g. variation of the principal contract, (see below, Ch.7) or the creditor impairing a security
held for the enforcement of the principal obligation (see below, Ch.8).
[18] [2006] 2 Lloyd's Rep. 59; [2006] EWHC 533 (QB).
[19] [2006] 2 Lloyd's Rep. 59; [2006] EWHC 533 (QB) at para 29.
[20] [2001] 2 Lloyd's Rep. 224.
[21] [2001] Lloyd's Rep Bank 224 at para.59.
[22] [1988] 1 W.L.R. 896.
[23] [1998] 1 W.L.R. 896 (set out below at para.5–05.)

approach to construction,[24] but nevertheless it should be regarded as relevant in terms of the factual matrix as part of the broad commercial context.[25]

**5–08**    The principles applicable to the construction of commercial contracts, as formulated by Lord Hoffmann in *Investors Compensation Scheme Ltd v West Bromwich Building Society*,[26] permit a broad-ranging inquiry, construing the contract in its factual matrix. It is useful to re-state them here:

"(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as the 'matrix of fact', but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars: the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties

---

[24] But this would not be contrary to *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 W.L.R. 896.

[25] See *Wittmann (UK) Ltd v Willdav Engineering SA* [2007] EWCA Civ 824 at para.31 where Buxton L.J. emphasises that "it is essential to remember that Wittmann was no ordinary guarantor". Similarly, *Barclays Bank Plc v Kingston* [2006] EWHC 533 (QB) at para.29 where Stanley Burnton L.J. interpreted the guarantee "as a whole as a commercial document" but also against "the background that it is a standard document prepared by the bank". See also *Mercers of City of London v New Hampshire Insurance Co* [1992] 2 Lloyd's Rep. 365 at 368 per Parker L.J.; *Tricontinental Corp Ltd v HDFI Ltd* [1990] 21 N.S.W.L.R. 689 at 684–695, per Kirby P., in respect of a compensated surety.

[26] [1998] 1 All E.R. 98 at 114–115. See also *Bank of Credit & Commerce International SA v Ali* [2002] 1 A.C. 251 (approving these principles). See also *Mannai v Eagle Star Assurance Co Ltd* [1997] A.C. 749; *Liberty Mutual Insurance Co (UK) Ltd v HSBC Bank plc* [2001] Lloyd's Rep. Bank 224.

08-13555-mg   Filed 01/10/13   Entered 01/10/13 17:31:59   Appendix 4
Part 11   Pg 46 of 59
THE SCOPE OF THE GUARANTOR'S LIABILITY       285

C.7.ii

TY AND DISCHARGE

nevertheless it should be regarded as relevant matrix as part of the broad commercial

he construction of commercial contracts, as in *Investors Compensation Scheme Ltd v*,[26] permit a broad-ranging inquiry, continued matrix. It is useful to re-state them here:

tainment of the meaning which the documentsonable person having all the background nably have been available to the parties in e at the time of the contract.

sly referred to by Lord Wilberforce as the is, if anything, an understated description nclude. Subject to the requirement that it ailable to the parties and to the exception es absolutely anything which would have nguage of the document would have been n.

he admissible background the previous l their declarations of subjective intent. ction for rectification. The law makes this cal policy and, in this respect only, legal way we would interpret utterances in of this exception in some respects sion on which to explore them.

nt (or any other utterance) would convey ne thing as the meaning of its words. The dictionaries and grammars: the meaning es using those words against the relevant have been understood to mean. The nable the reasonable man to choose f words which are ambiguous but even nary life) to conclude that the parties

must, for whatever reason, have used the wrong words or syntax: see *Mannai Investments Co Ltd v Eagle Star Life Assurance Co. Ltd* [1997] A.C. 749.

(5) The 'rule' that words should be given their 'natural and ordinary meaning' reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had. Lord Diplock made this point more vigorously when he said in *Antaios Cia Naviera SA v Salen Rederiema AB* [1985] A.C. 191 at 201 'if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense'."

As regards evidence of the "matrix of fact", such surrounding circumstances will include the genesis, background, context and commercial purposes of the transaction, and knowledge of the market in which the parties are operating.[27]

Although the terms of the guarantee and the identity of the parties are **5–09** required to be in writing pursuant to the Statute of Frauds[28] this does not preclude the admissibility of the background circumstances to explain the meaning of these terms[29] or precisely identify the parties to the guarantee.[30]

Prior negotiations may be of considerable assistance in determining the **5–10** scope of a guarantee, so that exclusion of these negotiations as part of the admissible background is important (see principle (3) above as set out by Lord Hoffmann). Indeed, the exclusionary rule has been the subject of both academic and judicial criticism.[31] Suffice to say here that the rule has been recently affirmed by the House of Lords in *Chartbrook Ltd v Persimmon*

---

ors Compensation Scheme Ltd v West Bromwich

ring SA [2007] EWCA Civ 824 at para.31 where to remember that Wittmann was no ordinary ngston [2006] EWHC 533 (QB) at para.29 where "as a whole as a commercial document" but also rd document prepared by the bank". See also nsurance Co [1992] 2 Lloyd's Rep. 365 at 368 per Ltd [1990] 21 N.S.W.L.R. 689 at 684–695, per

nk of Credit & Commerce International SA v All . See also Mannai v Eagle Star Assurance Co Ltd (UK) Ltd v HSBC Bank plc [2001] Lloyd's Rep

[27] *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 W.L.R. 989 at 995–996. Where there are executed guarantees forming part of the same transaction it has been said in Australia that the guarantees should normally be read as a whole and by reference to one another, at least to resolve any ambiguity (See *Middleton Nominees Pty Ltd v Westpac Banking Corp* [2008] F.C.A. 371 at para.51).
[28] 1677, 29 Car. II. c.3, s.4; see above, generally, Ch. 3.
[29] *Perrylease Ltd v Intercar AG* [1987] 2 All E.R. 373; see above, para.3–73. It will, of course, sometimes be a matter of difficulty as to whether the extrinsic evidence is being used to explain the terms of the guarantee or to introduce additional terms.
[30] *Rosser v Austral Wine & Spirit Co Pty Ltd* [1980] V.R. 313; see above, paras.3–63 to 3–68.
[31] See for example, D. McLauchon, *Contract Interpretation What Is It About?* (2009) 31 *Sydney Law Review* 5; Lord Nicholls of Birkenhead, "My Kingdom for a Horse: The Meaning of Words" (2005) 121 L.Q.R. 577; E. McKendrick, "Interpretation of Contracts and the Admissibility of Pre-Contractual Negotiations", *Singapore Academy of Law Journal* 17; G. McMeel, "Prior Negotiations and Subsequent Conduct-the Next Step Forward for Contractual Interpretation" (2003) L.Q.R. 119. See also Lawrence Collins L.J. in *Chartbrook Ltd v Persimmon Homes Ltd* [2008] 2 All E.R. (Comm) 387 at paras 105–131; *Yoshimoto v Canterbury Golf International Ltd* [2001] 1 N.Z.L.R. 523.

*Homes Ltd.*[32] As Lord Hoffmann emphasises, the principle needs to be carefully stated, which his Lordship did in these terms:[33]

> "The rule excludes evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It does not exclude the use of such evidence for other purposes: for example, to establish that a fact which may be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These are not exceptions to the rule. They operate outside it."

**5–11**    One substantive exception to the rule, however, is that extrinsic evidence may be examined in to order to ascertain whether the parties have in fact used the words in question in one sense only, so that they have in fact given their own "private dictionary" meaning to those words.[34] But in *Chartbrook Ltd v Persimmon Homes Ltd*[35] Lord Hoffmann limited that exception to where there was evidence of an "unconventional usage"[36] (that is, a real "private dictionary" meaning) and not simply where there was a choice between two perfectly conventional meanings of the words.[37]

**5–12**    For those involved in litigation in respect of the construction of a guarantee, there are two points arising from the formulation of the principle by Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* that require emphasis. The first is that (where appropriate) an alternative claim based upon estoppel by convention and/or rectification should be made, since evidence of prior negotiations for the purpose of determining what the contract means is then directly admissible. Secondly, evidence of prior negotiations in any event can be admitted in order to "establish a fact which may be relevant as background",[38] that is, to establish the factual matrix. This, of course, illustrates a significant problem and uncertainty with the exclusionary rule since in each case the Court must determine whether the evidence is being adduced for this permissible purpose or the impermissible purpose of "directly drawing inferences about what the contract meant." Opinions (and judges) may differ in their views and decisions can be identified where the admission or exclusion of prior negotiations (rightly or wrongly) has proved decisive.[39]

[32] [2009] UKHL 38.
[33] [2009] UKHL 38 at para.42.
[34] [2009] UKHL 38 at paras 43–47.
[35] [2009] UKHL 38.
[36] [2009] UKHL 38 at para.45 and stating that the admission of the evidence in *The Karen Oltmann* [1976] 2 Lloyd's Rep. 708 represented "an illegitimate extension" of the rule (at para.47).
[37] [2009] UKHL 38 at para.45.
[38] See the discussion below of *Caterpillar Financial Services Ltd v Goldcrest Plant and Groundworks Ltd* [2007] EWCA Civ 272; *Static Control Components (Europe) Ltd v Egon* [2004] EWCA Civ 392; *Vodafone Ltd v GNT Holdings (UK) Ltd* [2004] EWHC 1526 (QB); *Dumford Trading A.G. v OAO Atlantrybflot* [2005] EWCA Civ 24.
[39] [2009] UKHL 38 at para.42.

Doc 33774-11    Filed 01/10/13    Entered 01/10/13 17:31:59    App...

Part 11    Pg 48 of 59

LIABILITY AND DISCHARGE

C.7.m

Again, the guarantor will be discharged in respect of obligations arising subsequent to the date of termination,[300] but will remain liable in respect of obligations accuring prior to that date.[301] Thus if the principal sum, with interest, is immediately payable upon the principal debtor's default without the necessity for any demand or notice, and default occurs, the guarantor's liability for the whole sum will be unaffected by the principal subsequently terminating the principal contract on the basis of the creditor's repudiation.[302]

**6–126**    In this case, however, as the creditor is in breach of contract, the guarantor will be able to take advantage of the claim in damages that the principal has against the creditor at least provided that the principal is joined as a party to the proceedings.[303]

The dominant view is that a guarantor will not be discharged by a non-repudiatory breach of the principal contract by the creditor unless it can be shown that the relevant term of the principal contract has become a condition of the guarantee, and that there has been a departure from that condition.[304] But it has also been said that a non-repudiatory breach of the principal contract will discharge the guarantor if the breach is important in relation to the risk undertaken.[305]

## 5. DISCHARGE BY THE CREDITOR TERMINATING THE PRINCIPAL CONTRACT UPON THE PRINCIPAL'S BREACH

**6–127**    It is clear that if the creditor terminates the principal transaction according to its terms so as to discharge the principal from future liability, the guarantor of the transaction will be similarly relieved from liability. Thus if a lessor gives the lessee a notice to quit in accordance with the terms of the lease, the lessee and the guarantor of the lessee's obligations will be discharged from future liability for payment of the rent.[306] In respect of a

---

[300] *McDonald v Dennys Lascelles Ltd* (1933) 48 C.L.R. 457; *Elkhoury v Farrow Mortgage Services Pty Ltd (in liq)* (1993) 114 A.L.R. 541. Exceptionally, the guarantor will not be discharged because the principal's promise is independent of the creditor's obligations (e.g. a tenant's obligation to pay rent is independent of the landlord's covenant to repair): see *Chatfield v Elmstone Resthouse Ltd* [1975] 2 N.Z.L.R. 269 at 276.

[301] *Elkhoury v Farrow Mortgage Services Pty Ltd (in liq)* (1993) 114 A.L.R. 541.

[302] *Elkhoury* (1993) 114 A.L.R. 541.

[303] *Elkhoury* (1993) 114 A.L.R. 541, see below, paras 11–60 to 11–65.

[304] *National Westminster Bank plc v Riley* [1986] F.L.R. 213 at 223: see below, paras 7–25 and 8–19.

[305] *The Mystery of Mercers of the City of London v New Hampshire Insurance Co* [1992] 2 Lloyd's Rep. 365 at 370, 371. And see below, para.7–25.

[306] *Giddens v Dodd* (1856) 3 Drew 485; 61 E.R. 988; *Tayleur v Wildin* (1868) L.R. 3 Exch. 303; *Associated Dairies v Pierce* (1981) 259 E.G. 562; *Apus Properties Ltd v Douglas Farrow & Co Ltd* [1989] 2 E.G.L.R. 265. Note that the termination of the principal contract must be clear and equivocal, but once clear notice has been served it cannot be revived by reason of conduct which might be interpreted as being inconsistent with that notice: *Leofelis S.A. v Lonsdale Sports Ltd* [2008] EWCA Civ 640.

lease, however, the mere service of a writ claiming forfeiture and possession will not in itself terminate the lease,[307] so that the guarantor of the tenant's obligations will remain liable for accrued instalments of rent between the date of service and the lease being determined in some other way (for example, by transfer to the landlord).[308]

It might reasonably be supposed, however, that if the creditor elects to terminate the principal contract for a breach of contract by the principal in circumstances in which the principal continues to remain liable to the creditor in damages, the guarantor will continue to remain liable for such liabilities. This follows from the fact that the reason for the creditor obtaining the guarantee in the first place is to secure protection against the contingency of the principal's breach. However, it has been argued that, because the principal contract determines as a result of the creditor's acceptance of the debtor's breach in such circumstances, the consequence is that the obligation of the guarantor will also be extinguished. **6–128**

Important to an understanding of such an argument is the distinction **6–129** between two forms of guarantee. The distinction was first drawn by Lord Reid in *Moschi v Lep Air Services Ltd*[309]:

"With regard to making good to the creditor payments of instalments by the principal debtor there are at least two possible forms of agreement. A person might undertake no more than that if the principal debtor fails to pay any instalment he will pay it. That would be a conditional agreement. There would be no prestable obligation unless and until the debtor failed to pay. There would then on the debtor's failure arise an obligation to pay. If for any reason the debtor ceased to have any obligation to pay the instalment on the due date then he could not fail to pay it on that date. The condition attached to the undertaking would never be purified and the subsidiary obligation would never arise.

On the other hand, the guarantor's obligation might be of a different kind. He might undertake that the principal debtor will carry out his contract. Then if at any time and for any reason the principal debtor acts or fails to act as required by his contract, he not only breaks his own

---

*The left column margin contains the following partial text:*

pect of obligations arising
l remain liable in respect of
if the principal sum, with
pal debtor's default without
ault occurs, the guarantor's
the principal subsequently
basis of the creditor's

each of contract, the guar-
claim in damages that the
vided that the principal is

ot be discharged by a non-
the creditor unless it can be
ontract has become a con-
een a departure from that
n-repudiatory breach of the
f the breach is important in

**OR TERMINATING
N THE PRINCIPAL'S**

the principal transaction
ncipal from future liability,
rly relieved from liability,
n accordance with the terms
ee lessee's obligations will be
the rent.[306] In respect of a

57; *Elkhoury v Farrow Mortgage*
onally, the guarantor will not be
f the creditor's obligations (e.g. a
s covenant to repair): see *Chatfield*

993) 114 A.L.R. 541.

to 11–65.

223: see below, paras 7–25 and 8–

*Hampshire Insurance Co* [1992] 2

*v Wildin* (1868) L.R. 3 Exch. 303;
ies Ltd v Douglas Farrow & Co Ltd
ncipal contract must be clear and
evived by reason of conduct which
eofelis S.A. v Lonsdale Sports Ltd

---

[307] *Ivory Gate Ltd v Spetale* (1998) 77 P. & C.R. 141. See also *Meadows v Clerical Medical & General Life Assurance Society* [1981] Ch. 70. Note that a guarantor has no right to claim relief against forfeiture pursuant to the Law of Property Act 1925, s.146(4) unless he has an "estate or interest in property" (e.g. as equitable mortgagee). See *Re Good's Lease* [1954] 1 W.L.R. 309.
[308] As in *Ivory Gate Ltd v Spetale* (1999) 77 P. & C.R. 141. But note that the lease has what has been described as a "trance like existence" (*Meadows v Clerical Medical & General Life Assurance Society* [1981] Ch. 70 at 75). Thus if the defence or any claim for relief from forfeiture fails, the forfeiture will take effect retrospectively from the date of service of the writ. It follows that the guarantor's liability for accrued instalments of rent will cease at that date, although the guarantor (depending on the terms of the guarantee) will be liable in damages to the landlord. See the following discussion, below, paras 6–133 to 6–142.
[309] [1973] A.C. 331 at 344–345. See also *General Produce Co v United Bank Ltd* [1979] 2 Lloyd's Rep. 255 at 258; *Sunbird Plaza Ltd v Maloney* (1988) 166 C.L.R. 245 at 256; *Carlton Communications Plc v The Football League* [2002] EWHC 1650 (Comm.), paras 82–84; *John Remblance v Octagon Assets* [2009] EWCA Civ 58 at para.68

contract but he also puts the guarantor in breach of his contract of guarantee.''

6–130    An example of the first type of guarantee (hereafter called type (1)) would be an undertaking that ''in case the debtor is in default of payment I will forthwith make the payment on behalf of the debtor''.[310] A guarantee of ''the performance of all the terms and conditions of the contract'' would be an illustration of the second type (type (2)).[311] Sometimes the two forms of guarantee are combined. Thus in *NRG Vision Ltd v Churchfield Leasing Ltd*,[312] the guarantee was stated to be in respect of ''the payment by the customer of all sums due under the agreement[313] ... *and the due performance of all the customer's obligations thereunder''*.

6–131    If the guarantee is of type (1), the creditor's cause of action is in debt or for a money sum, the claim being for a liquidated amount.[314] In respect of a guarantee of type (2), the cause of action will generally be in damages for breach of contract, but, even in this case, an action for a liquidated sum will be appropriate if the amount claimed can be ascertained objectively by calculation.[315]

6–132    Bearing in mind the distinction between these types of guarantee, an examination is required of the effect of termination of the principal contract by the creditor on both accrued obligations and future obligations of the principal.

## (i) Termination and the effect on subsequent obligations

6–133    The leading authority on this issue is *Moschi v Lep Air Services Ltd*.[316] A guarantee was given to secure a debt payable by instalments. The guarantor ''personally guaranteed the performance by [the debtor] of its obligations to

[310] This is the second part of the guarantee in *Hyundai Heavy Industries Ltd v Papadopoulos* [1980] 1 W.L.R. 1129. See also the second part of the clause in *Sunbird Plaza Ltd v Maloney* (1988) 166 C.L.R. 245 (the payment of ''all moneys payable by ... the purchaser'') and the guarantee in *Keene v Devine* [1986] W.A.R. 217 (a guarantee ''to make good any default on the part of [the principal] in the payment of the loan and all interest'').

[311] In *Carlton Communications Plc v The Football League* [2002] EWHC 1650 (Comm) at paras 82–84, a guarantee stating that ''Ondigital and its shareholders will guarantee all funding to the Football League outlined in this document'' was viewed as a guarantee only of the second type. It is difficult to see, however, why the word ''guarantee'' cannot be regarded as a guarantee of both types, thus embracing a liability in debt as well as in damages (as described above, para.6–131).

[312] (1988) 4 B.C.C. 56. See also *Sunbird Plaza Ltd v Maloney* (1988) 166 C.L.R. 245; *Bank of China v Hawkins* (1991) 7 A.C.S.R. 262 at 265–266; on appeal: (1992) 26 N.S.W.L.R. 562, where Gleeson C.J. (at 570) considered clauses 1 and 2 of the guarantee to be within the first category ; *Luxor Holdings Pty Ltd v Glentham Pty Ltd* [2007] W.A.S.C.A. 209 at para.81.

[313] But it is suggested below that in any event this first part of the clause should embrace a liability for damages.

[314] As to the creditor's cause of action generally, see below. Ch. 10 esp. paras 10–191 to 10–202 *Sunbird Plaza Ltd v Maloney* (1988) 166 C.L.R. 245 at 255; *Bank of China v Hawkins* (1991) 7 A.C.S.R. 262 at 265–266; on appeal; (1992) 26 N.S.W.L.R. 562 at 569–570.

[315] *Spain v Union Steamship Co Ltd* (1923) 32 C.L.R. 138 at 142.

[316] [1973] A.C. 331.

the loss or damage.[337] Thus the indemnifier will be entitled to the benefit of any securities held by the creditor to seek reimbursement from the person primarily liable, and it should follow that the creditor must not impair or release those securities.[338] There is no specific authority on the extent of the creditor's equitable duty in the context of an indemnity, but, consistently, it should be the same as that imposed when the contract is one of guarantee,[339] and if impairment is shown the indemnifier should be discharged to the extent of the loss. This view is supported by Lord Selborne in *Duncan, Fox & Co v North & South Wales Bank*,[340] who states that the principles of equity will be applicable in "cases in which there is, strictly speaking, no contract of suretyship",[341] but a person secondarily liable has a right of reimbursement from a person primarily liable.

**8–105**      It is also possible for a term to be found in an indemnity whereby a particular security should not be released or impaired[342] in the same way as such a term can be found in a contract of guarantee. If there is a breach of such a condition, the indemnifier will be absolutely discharged.

## 5. DISCHARGE BY THE CREDITOR ACTING TO THE PREJUDICE OF THE GUARANTOR?

**8–106**      In *Black v Ottoman Bank*,[343] the Privy Council stated a general principle that a surety would be discharged if there has been "some positive act done by [the creditor] to the prejudice of the surety, or such degree of negligence, as in the language of Vice-Chancellor Wood in *Dawson v Lawes*,[344] 'to imply connivance and amount to fraud' "[345] Fraud, in this context, has been defined as conduct which is unfair to a surety.[346] Broadly construed, this general rule, especially the reference to "a positive act" by the creditor discharging the guarantor, is capable of radically extending the number of situations in which the creditor's actions may discharge the guarantor. It has been seen[347] that if the creditor impairs a security held for the enforcement of the principal obligation, the guarantor will be discharged, at least to the

---

[337] *Morris v Ford Motor Co Ltd* [1973] Q.B. 792.

[338] Although there is no specific authority to support this conclusion. In relation to an insurance policy, see *Goulston Discount Co Ltd v Sims* (1967) 111 S.J. 682.

[339] For a detailed discussion of the extent of the duty, see above, paras 8–49 to 8–82.

[340] (1880) 6 App. Cas. 1.

[341] (1880) 6 App. Cas. 1 at 13.

[342] e.g. *Guy-Pell v Foster* [1930] 2 Ch. 169.

[343] (1862) 15 Moo P.C.C. 472; 15 E.R. 573.

[344] (1854) 23 L.J. Ch. 434 at 441.

[345] (1862) 15 Moo P.C.C. 472 at 483; 15 E.R. 573 at 577. See also *Dawson v Lawes* (1854) 23 L.J. Ch. 434 at 441; *Mactaggart v Watson* (1835) 3 Cl. & Finn 525 at 543; *Mayor of Durham v Fowler* (1889) 22 Q.B.D. 394 at 420; *O'Day v Commercial Bank of Australia Ltd* (1933) 50 C.L.R. 200 at 223–224; *Australian Joint Stock Bank v Hogan* (1902) 2 S.R. (NSW) 7 at 11.

[346] *Mayor of Durham v Fowler* (1889) 22 Q.B.D. 394 at 419 *per* Denman J.

[347] See above, paras 8–46 to 8–89. See also *National Australia Bank Ltd v Drummond* (unreported, NSW Sup Ct, Giles J., July 7, 1995) (where a guarantor was not discharged simply because the bank granted another creditor priority over its mortgage).

will be entitled to the benefit of
reimbursement from the person
he creditor must not impair or
c authority on the extent of the
e indemnity, but, consistently, it
e contract is one of guarantee,[339]
r should be discharged to the
Lord Selborne in *Duncan, Fox &*
tes that the principles of equity
strictly speaking, no contract of
e has a right of reimbursement

d in an indemnity whereby a
impaired[342] in the same way as
arantee. If there is a breach of
olutely discharged.

### TOR ACTING TO THE
### UARANTOR?

ncil stated a general principle
s been "some positive act done
, or such degree of negligence,
n *Dawson v Lawes*,[344] 'to imply
d, in this context, has been
ety.[346] Broadly construed, this
positive act" by the creditor
ally extending the number of
discharge the guarantor. It has
ity held for the enforcement of
be discharged, at least to the

value of the security impaired. The guarantor will also be discharged if the creditor and principal agree to vary the principal obligation.[348] But although the application of these rules may be unclear in some situations, in general, the circumstances in which they apply are reasonably delineated. The rule enunciated in *Black v Ottoman Bank*, however, is potentially capable of applying to any action by the creditor which might prejudicially affect the guarantor, for example, a failure to insure,[349] a failure by the creditor to comply with relevant statutory requirements,[350] or the appointment of a receiver or liquidator in respect of the principal company when this is not the best course of action to preserve the assets and goodwill of the company.[351]

**8–107**    However, despite the apparent width of the principle it is difficult to find any clear examples in either England or Australia of the discharge of a guarantor on this basis. There are three classes of cases. The first is where one of the bases for the decision is that the creditor must not act to the prejudice of the guarantor, but the fact that the guarantor has been discharged can be explained adequately on other well-established grounds. The second is where the principle in *Black v Ottoman Bank* has apparently been recognised, but its application has been negated on the facts. Finally, there are cases which have cast doubt on the principle either by expressly disapproving of it or by refusing to apply or even analyse the principle even though the facts of the case might have justified its application.

**8–108**    As an example of the first class, in *General Steam-Navigation Co v Rolt*,[352] a guarantor for the due performance of a building contract was discharged when the contractor was paid sums before they became due under the principal contract. The basis of the decision was that the "prepayment must prejudice the surety in a case like this, inasmuch as it deprives him of the benefit of that which would be an inducement to the principal to perform the contract in due time".[353] Yet the agreement to allow the principal to be paid at an earlier date than that stipulated in the contract can also be viewed as a discharge of the guarantor as a result of a variation of the principal

conclusion. In relation to an insurance
.J. 682.
e above, paras 8–49 to 8–82.

ee also *Dawson v Lawes* (1854) 23 L.J.
25 at 543; *Mayor of Durham v Fowler*
*Australia Ltd* (1933) 50 C.L.R. 200 at
.R. (NSW) 7 at 11.
19 per Denman J.
tralia Bank Ltd v Drummond* (unre-
uarantor was not discharged simply
s mortgage).

[348] See above, Ch. 7.
[349] e.g. *Watts v Shuttleworth* (1861) 7 H. & N. 353; 158 E.R. 510 for a similar factual situation.
[350] e.g. *Unity Finance Ltd v Woodcock* [1963] 1 W.L.R. 455; *Traders Group Ltd v Garand* (1975) 65 D.L.R. (3d) 374.
[351] e.g. *Moase Produce Ltd v Royal Bank* (1987) 64 C.B.R. (NS) 191. See also the argument for the guarantors in *ANZ Banking Group Ltd v Carnegie* (unreported, Vic Sup Ct, June 16, 1987) at 45.
[352] (1858) 6 C.B. (NS) 550; 141 E.R. 572.
[353] (1858) 6 C.B. (NS) 550; 141 E.R. 572, at 597; at 590 per Crowder J, 595–597; 589 per Cockburn C.J. See also *Calvert v London Dock Co* (1838) 7 L.J. Ch. 90, where Lord Langdale treated the question as analogous to where the creditor deprives the guarantor of the benefit of a security on paying the debt; *Warre v Calvert* (1837) 7 Ad. & El. 143; 112 E.R. 425; *Board of Trustees for the Macklin School District of Saskatchewan v Saskatchewan Guarantee & Fidelity Co* [1919] 2 W.W.R. 396; *Thomas Fuller Construction Co* (1958) *Ltd v Continental Insurance Co* (1970) 36 D.L.R. (3d) 336.

contract.[354] Again, in *Unity Finance Ltd v Woodcock*,[355] the guarantor of a hire-purchase contract was discharged when a finance company repossessed the goods from the hirer in breach of the provisions of the Hire Purchase Act 1938. One of the reasons for the decision was that "the conduct of the owners has much prejudiced the position of the [guarantor]".[356] But this decision can also be viewed as an example of the discharge of the guarantor arising as a result of the determination of the principal contract by operation of the law, because the provisions of the Hire Purchase Act stated that a hire-purchase transaction shall determine if the goods are repossessed in contravention of the Act.[357]

**8–109**    The application of the principle in *Black v Ottoman Bank* has invariably been denied in cases falling within the second category, because the act of the creditor was held not to be a positive act but merely an act of negligence[358] or passive inactivity[359] on the creditor's part. Thus the guarantor of the honest and faithful discharge of an employee's duties was not discharged in circumstances where the employer acquiesced in the principal's irregular mode of accounting,[360] or where the employer failed to demand[361] or check[362] accounts held by the principal. Similarly, it has been held that the creditor does not prejudice the position of and discharge the guarantor when the creditor fails to sue for the principal debt once it becomes due[363] or, in the context of a guarantee of a contractor's obligations under a building contract, when the owner fails to supervise the work properly.[364] The application of the rule has also been rejected where the creditor is bona fide exercising his rights under the principal contract. McTiernan J. made this clear in *O'Day v Commercial Bank of Australia Ltd*,[365] where it was alleged that the creditor wrongfully exercised its powers under a debenture given for the enforcement of the principal obligation. His Honour took the view that action by a creditor against a debtor which has no other colour or character than action taken bona fide by the creditor in pursuit of remedies will not

---

[354] See this explanation in *Thomas Fuller Construction Co* (1958) *Ltd v Continental Insurance Co* (1970) 36 D.L.R. (3d) 336 at 355.
[355] [1963] 1 W.L.R. 455. As another example, see *National Bank of Nigeria Ltd v Awolesi* [1964] 1 W.L.R. 1311, discussed above, paras 6–44 to 6–47.
[356] [1963] 1 W.L.R. 455 at 461 per Lord Denning M.R.
[357] See above, paras 6–151 to 6–154.
[358] *Guardians of Mansfield Union v Wright* (1882) 9 Q.B.D. 683 at 688 per Jessel M.R.
[359] *Mayor of Durham v Fowler* (1889) 22 Q.B.D. 394 at 420 per Denman J.
[360] *Guardians of Mansfield Union* (1882) 9 Q.B.D. 683.
[361] *Guardians of Mansfield Union* (1882) 9 Q.B.D. 683.
[362] *Black v Ottoman Bank* (1862) 15 Moo P.C.C. 472; 15 E.R. 573.
[363] *Black* (1862) 15 Moo P.C.C. 472; 15 E.R. 573; *O'Day v Commercial Bank of Australia Ltd* (1933) 50 C.L.R. 200 at 224 per McTiernan J.
[364] *Kingston-Upon-Hull Corp v Harding* [1892] 2 Q.B. 494. *Cf.* however, *Stone v Geraldton Brewery Co* (1898) 1 W.A.L.R. 23 at 27, where it was held that a failure to re-enter the leased premises on the tenant's failure to pay the rent discharged the guarantor of the tenant's obligations under the lease. But there is no analysis of the principle underlying the decision.
[365] (1933) 50 C.L.R. 200.

*cock*,[355] the guarantor of a
nance company repossessed
as that "the conduct of the
ie [guarantor]".[356] But this

ion of the guarantor
icipal contract by operation
Purchase Act stated that a
e goods are repossessed in

*toman Bank* has invariably
ategory, because the act of
out merely an act of negli-
part. Thus the guarantor of
s duties was not discharged
in the principal's irregular
ied to demand[361] or check[362]
been held that the creditor
ge the guarantor when the
t becomes due[363] or, in the
ions under a building con-
k properly.[364] The applica-
the creditor is bona fide
t. McTiernan J. made this
*Ltd*,[365] where it was alleged
nder a debenture given for
Honour took the view that
o other colour or character
ursuit of remedies will not

8) *Ltd v Continental Insurance Co*

*k of Nigeria Ltd v Awolesi* [1964]

33 at 688 per Jessel M.R.
er Denman J.

. 573.

*ommercial Bank of Australia Ltd*

*Cf.* however, *Stone v Geraldton*
at a failure to re-enter the leased
e guarantor of the tenant's obli-
ple underlying the decision.

discharge a surety, even though such action may be taken under a mistake of law as to the creditor's rights.[366]

As to the final class of cases, Goff L.J. in the Court of Appeal in *Bank of India v Trans Commodity Merchants Ltd and Patel*[367] clearly stated that "irregular" or prejudicial conduct in a general sense on the part of a creditor will not discharge a surety. Furthermore, there are also the factual situations in which the rule in *Black v Ottoman Bank* has been ignored. A striking example is *Watts v Shuttleworth*,[368] which indicates a clear tendency on the part of the courts to avoid a precise formulation and application of the rule. There, the guarantor of a contractors' obligation under a building contract was held to be discharged when the creditor failed to insure the building as required by the principal contract. Williams J. treated the case as analogous to a variation of the principal contract whereby the principal is given time to perform his obligations, although on the facts there was no consensual variation[369] but only a simple breach of the principal contract by reason of the creditor's failure to insure. Williams J. specifically rejected a submission that the rule on which the case should be decided was analogous to the principle that the guarantor is discharged by the creditor impairing a security held for the enforcement of the principal obligation. Yet *Watts v Shuttleworth* could have been viewed as an example of the principle enunciated in *Black v Ottoman Bank*. At the very least, even though the failure to insure might not be regarded as a positive act on the part of the creditor within the ambit of the rule, the principle should have merited some discussion.[370]

In conclusion, in the authors' view, the weight of authority is contrary to the existence of a general rule that the guarantor will be discharged if the creditor acts in a prejudicial manner towards the guarantor. The possibility of the guarantor being discharged outside the established categories such as variation of the principal contract or the impairment of a security cannot, however, be dismissed. Even Goff L.J., who disapproved of the rule in *Bank of India v Trans Commodity Merchants Ltd and Patel* did "not wish to be thought to be shutting the door upon further development of the law in this

8–110

8–111

[366] (1933) 50 C.L.R. 200. at 224. *Cf.*, however, *Re Darwen and Pearce* [1927] 1 Ch. 176, where the creditor exercised his rights under the principal contract to forfeit shares. The guarantor was held to be discharged because the guarantor's rights had been interfered with. The proper explanation of this case, however, probably lies in the fact that the creditor was in breach of a term of the guarantee in forfeiting the shares see above, para.8–82.
[367] [1983] 2 Lloyd's Rep. 298 at 302, approving Bingham J. at first instance: [1982] 1 Lloyd's Rep. 506 at 515. See also *Socomex Ltd v Banque Bruxelles Lambert SA* [1996] Lloyd's Law Rep. 156 at 198; *Westpac Securities Ltd v Dickie* [1991] 1 N.Z.L.R. 657 at 663–665 and note that in *National Westminster Bank Plc v Riley* [1986] F.L.R. 213 it was held that a non-repudiatory breach of the principal contract will not discharge the guarantor.
[368] (1861) 7 H. & N. 353; 158 E.R. 510.
[369] It has already been suggested that for a variation of the principal contract to discharge the guarantor there must be a consensual agreement to alter the terms between creditor and principal: see above, paras 7–20 to 7–26.
[370] A similar example is *Price v Kirkham* (1864) 3 H. & C. 437; 159 E.R. 601, where the guarantor was not discharged even though the creditor was in breach of a clause of the principal contract (although not of the guarantee) in failing to notify the guarantor of late payments by the principal.

field by rigidly confining the circumstances in which a surety may be discharged to specified instances".[371] Furthermore, Goff L.J. appeared to accept[372] the view of Bingham J. at first instance that the guarantor will be discharged if the creditor "acts in bad faith towards him or is guilty of concealment amounting to misrepresentation or causes or connives at the default by the principal debtor in respect of which the guarantee is given."[373] This passage was also cited with approval in *National Westminster Bank v Joseph*[374] where, in an application to set aside a judgment in default of defence, it was held potentially applicable in circumstances where misleading statements by the creditor in previous judicial proceedings had (it was argued) led to the bankruptcy of the principal debtor.

**8–112**    It should also be said that in Canada the principle that the guarantor is discharged appears to have been accepted where the prejudicial conduct materially increases the risk to the guarantor.[375] In *Bank of Montreal v Wilder*,[376] the guarantor was held to be discharged where the creditor was in breach of a term of the principal contract agreeing to increase the line of credit to the principal and honour the cheques of the principal, with the result that the principal could not carry on business as a viable commercial operation. The risk to the guarantor was, therefore, increased. The court held that the guarantor was absolutely discharged. This is a strange result because where the creditor releases or impairs a security held for the enforcement of the principal obligation the guarantor is discharged to the extent of the loss. Perhaps the reason is that the rule that the guarantor is discharged by the prejudicial conduct of the creditor was viewed in *Black v Ottoman Bank*[377] as a principle "*at law and in equity*",[378] rather than simply being a principle developed by the courts of equity. Whatever the rationale, it is thought that if the guarantor is to be discharged in this manner the guarantor should only be discharged pro tanto in respect of any additional liability sustained by reason of the creditor's prejudicial conduct towards the principal.[379]

---

[371] [1983] 2 Lloyd's Rep. 298 at 302. See also *Socomex Ltd v Banque Bruxelles Lambert SA* [1996] 1 Lloyd's Rep. 156 at 198.

[372] [1983] 2 Lloyd's 298 at 302. See also *Westpac Securities Ltd v Dickie* [1991] 1 N.Z.L.R. 657 at at 663–665.

[373] [1982] 1 Lloyd's Rep. 506 at 509.

[374] [2005] EWHC 182 at para.22. See also *St Microelectronics NV v Condor Insurance Ltd* [2006] EWHC 977 (Comm) at para.51 where (in an application for summary judgment) it was held arguable that a threat by the creditor to breach its contract with the principal debtor could be regarded as prejudicial conduct discharging the guarantor. See above, para.7–26.

[375] *Bank of Montreal v Wilder* (1983) 149 D.L.R. (3d) 193; approved on appeal by the Supreme Court of Canada: (1987) 1 W.W.R. 289. See also *Rumely v Leighton* (1916) 10 W.W.R. 817; *Traders Group Ltd v Garand* (1975) 65 DLR (3d) 374. Cf. *Royal Bank of Canada v Goff* (1988) 66 O.R. (2d) 701, in which *Bank of Montreal v Wilder* was distinguished on the basis that no breach of the principal agreement directly guaranteed occurred.

[376] (1983) 149 D.L.R. (3d) 193 at 227–232.

[377] (1862) 15 Moo P.C.C. 472; 15 E.R. 573.

[378] (1862) 15 Moo P.C.C. 472; 15 E.R. 573 at 483; 577 (emphasis added).

[379] Seaton J.A. in *Bank of Montreal v Wilder* (1983) 149 D.L.R. (3d) 193 at 203 took the view that the guarantors should be discharged only to the extent of any prejudice. In all the other cases, this possibility is not referred to.

hich a surety may be dis-
, Goff L.J. appeared to
that the guarantor will be
wards him or is guilty of
causes or connives at the
the guarantee is given."[373]

*tional Westminster Bank v*
a judgment in default of
umstances where mislead-
al proceedings had (it was
btor.

ciple that the guarantor is
re the prejudicial conduct
[375] In *Bank of Montreal v*
l where the creditor was in
ing to increase the line of
of the principal, with the
ess as a viable commercial
fore, increased. The court
ed. This is a strange result
s a security held for the
antor is discharged to the
rule that the guarantor is
itor was viewed in *Black v*
uity",[378] rather than simply
cy. Whatever the rationale,
narged in this manner in
n respect of any additional
dicial conduct towards the

There is no real support for the view that an indemnifier will be discharged on the basis that the person entitled to the indemnity has acted to his prejudice. However, Lord Denning M.R. has suggested[380] that recovery will not be permitted under a contract of indemnity if the person indemnified has acted illegally, for example, where the contract of indemnity relates to losses sustained by the owner as a result of entering into a hire-purchase contract, and the owner wrongfully repossesses the goods.[381] It is also the case that contracts of indemnity are construed strictly in favour of the indemnifier so that the holder of the indemnity will not be able to recover in respect of his own negligence or in respect of deliberate breaches of contract unless the contract of indemnity clearly encompasses such losses.[382]

**8–113**

It is considered that neither a guarantor nor an indemnifier should be discharged on the basis of a prejudicial act by the creditor towards the principal. The rule is necessarily vague and uncertain, as the creditor would need to be extremely guarded in dealings with the principal, which may have unfortunate consequences. For example, the application of the principle would mean that the creditor would justifiably be wary of helping the principal overcome temporary financial difficulties by the supply of additional credit outside the limits of their original contract. If, despite this assistance, the principal's financial position still failed to improve, the creditor may be faced with the argument that this assistance had, in fact, caused a worsening of the principal's economic status, thus prejudicing the guarantor's interests and thereby discharging the guarantor. Despite these arguments, a creditor should include in the guarantee a provision preserving the guarantor's liability in the event of any prejudicial conduct towards the guarantor. Such clauses, if appropriately drafted, should be effective.[383]

**8–114**

---

*v Banque Bruxelles Lambert SA*

*v Dickie* [1991] 1 N.Z.L.R. 657 at

*NV v Condor Insurance Ltd* [2006]
summary judgment) it was held
ith the principal debtor could be
e above, para.7–26.
roved on appeal by the Supreme
*Leighton* (1916) 10 W.W.R. 817;
*l Bank of Canada v Goff* (1988) 66
ished on the basis that no breach

asis added).

R. (3d) 193 at 203 took the view
of any prejudice. In all the other

[380] *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493 at 497–498, interpreting the earlier decision of *Unity Finance Ltd v Woodcock* [1963] 1 W.L.R. 455. Although it was held to be a guarantee in the latter case, Lord Denning clearly thought that it was an indemnity. See also *Hodgson v Hodgson* (1837) 2 Keen 704 at 710–712; 48 E.R. 800 at 803 (indemnifier prejudiced by release of a debtor against whom she would have had a right of contribution).
[381] *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493 at 497–498, interpreting *Unity Finance Ltd v Woodcock* [1963] 1 W.L.R. 455.
[382] See above, para.5–16. See also *Lord Newborough v Schroder* (1849) 7 C.B. 342; 137 E.R. 136 (losses not recoverable if they arise from the creditor's own voluntary act).
[383] See, in Australia, *Australian Postal Corp v Oliver* [2006] V.S.C. 318 at para.97. A principal debtor clause may also be effective for this purpose: *McLoughlin, Petitioner* [2010] C.S.I.H. 24 at paras 34–38.

# WOODFALL

---

# LANDLORD
# AND
# TENANT



Sweet & Maxwell

pais does not extend to a tenancy for a
or not.¹ So a term of years cannot be
or the payment of rent to a third party.³
lly by denial of title.⁴

record extends to all tenancies.⁵ In one
nial of title to work a forfeiture where
on to a third party with a hostile claim⁶; but that case turned
ustained on that ground.⁷

lord is entitled to treat the lease as at
a periodic tenancy he need not serve
, there can be no necessity for notice
However, section 146 of the Law of
l of title and accordingly the relevant
ffected on this ground.¹⁰

he day on which the landlord claims
ords used by the tenant may lead to
lier than the time of the statement
tion with the landlord "had ceased
l of title some months before the
proceedings that an attornment to a
which possession was claimed is

waived in the same manner as the

---

Pasquali (1793) Peake 259.
21.
nman; *Warner v Sampson* [1959] 1 Q.B.
e v Spencer (1587) 3 Leon. 169.

n v Clarke (1809) Peake Add.Cas. 239;
Revett (1852) 18 L.T.O.S. 224.

h. 297; *Abidogun v Frolan Health Care*
oe d. Bennett v Long (1841) 9 C. & P.

---

**lief against forfeiture**

Relief against forfeiture for denial of title may be granted under section 146 of   **17.312**
the Law of Property Act 1925.¹

### SECTION 16   RESCISSION AND REPUDIATION

**Rescission**

Rescission of a lease for fraud, misrepresentation or mistake is considered in   **17.313**
paras 5.174 and following, above.

**Repudiation**

In England it has been held that a lease is not capable of determination by repudia-   **17.314**
tion and acceptance.² Part of the reasoning which led the court to this conclusion
was that a lease is not capable of determination by frustration, and that consequently
contractual remedies available in other cases do not apply. But it is now clear that,
in principle, a lease is capable of being frustrated.³ Thus the foundation of the
reasoning has been eroded.

Further, in other Commonwealth jurisdictions, it has been held that a lease may
be terminated by repudiation and acceptance. This is the law in Canada,⁴ and
Australia.⁵ It is considered that there is no reason in principle why the law should be
any different in England.⁶

In any event, it may be that the law of England has always been that a lease is
capable of determination by repudiation and acceptance.⁷ And it has been so held in
at least two recent cases, the latter in the Court of Appeal.⁸

Not every breach by a party to a lease will amount to a repudiation. A massive
failure to pay rent together with a stated inability to pay amounted to repudiatory

---

¹ *WG Clarke (Properties) Ltd v Dupre Properties Ltd* [1992] Ch. 297, not following *Warner v Sampson*;
*British Telecommunications plc v Department of the Environment*, Chancery Division, 29 October
1996, unreported and *Abidogun v Frolan Health Care* [2002] L. & T.R. 275.
² *Total Oil Great Britain v Thompson Garages (Biggin Hill)* [1972] 1 Q.B. 318, CA.
³ *National Carriers v Panalpina (Northern)* [1981] A.C. 675. And see paras 17.280 and following,
above.
⁴ *Highway Properties v Kelly Douglas & Co* (1968) 1 D.L.R. (3d) 626.
⁵ *Progressive Mailing House Pty v Tabali Pty* (1985) 157 C.L.R. 17; *Wood Factory Pty v Kiritos Pty*
[1985] 2 N.S.W.L.R. 105. See also *Ripka Pty v Maggiore Bakeries Pty* [1984] VR. 629; *Shevill v
Builders Licensing Board* (1982) 149 C.L.R. 620; *Gumland Property Holdings Pty Ltd v Duffy Bros
Fruit Market (Campbelltown) Pty Ltd* (2008) 244 A.L.R. 1. For the position in Scotland see Gloag's
*Law of Contract* (2nd edn.) at pp.605 to 606 and the cases there cited.
⁶ The Commonwealth decisions are supported by the preparedness of the English Courts in recent
years to apply the ordinary principles of contract to the law of landlord and tenant. See, for instance,
*CH Bailey v Memorial Enterprises* [1974] 1 W.L.R. 728 at 732C (rent), *British Anzani (Felixstowe)
Ltd v International Marine Management (UK) Ltd* [1980] Q.B. 137 (set off), *National Carriers v
Panalpina* [1981] A.C. 675 (frustration), *Land v Sykes* [1992] 1 E.G.L.R. 1 (objective test for crea-
tion of new tenancy by payment of rent) and *Billson v Residential Apartments Ltd (No.1)* [1992] 1
A.C. 494, per Lord Browne-Wilkinson.
⁷ Consider *Edwards v Etherington* (1825) Ry. & M. 268; *Collins v Barrow* (1831) M. & Rob. 112; *Izon
v Gorton* (1839) 5 Bing. N.C. 501; *Arden v Pullen* (1842) 10 M. & W. 321; *Smith v Marrable* (1843)
11 M. & W. 5; *Wilson v Finch Hatton* (1877) 2 Ex. D. 336. Some of these cases concerned contracts
for leases rather than leases by deed, and lettings of furnished accommodation, but it is not considered
that there is any difference in principle. The authorities are convincingly reviewed in *Hussein v Mehl-
man* [1992] 2 E.G.L.R. 87.
⁸ See *Hussein v Mehlman* [1992] 2 E.G.L.R. 87 and *Chartered Trust v Davies* [1997] 2 E.G.L.R. 83.
And c.f. *Nynehead Developments v Fireboard Containers* [1999] 1 E.G.L.R. 7 and *Petra Investments
v Jeffrey Rogers* [2000] 2 E.G.L.R. 120.

DETERMINATION OF THE TENANCY

breaches[1]; as did six months' arrears of rent coupled with breaches of many other covenants in the lease,[2] and serious breaches by the landlord of his implied repairing obligations.[3]

### Consequences of repudiation

**17.315**    In principle a repudiatory breach gives the party not in breach a choice whether or not to accept the repudiation. If the repudiation is accepted it discharges both parties from further performance of the lease. In that event either party may sue for loss occasioned by the termination of the contract. However, if a landlord accepts a repudiation by the tenant (assuming that a lease is capable of repudiation) he is not entitled to sue for damages representing the loss of future rent. But the landlord need not accept a repudiatory breach by the tenant and if he does not he is entitled to sue for rent quarter by quarter as it falls due.[4]

It would seem that a claim for damages would be subject to ordinary principles relating to the mitigation of damages.[5] However, a landlord is under no general duty to mitigate loss caused to a tenant or his surety by forfeiting a lease for breach of covenant.[6]

---

[1] *Ripka Pty v Maggiore Bakeries Pty*, above.

[2] *Progressive Mailing House Pty v Tabali Pty*, above.

[3] *Hussein v Mehlman*, above.

[4] *Reichman v Beveridge* [2007] 1 P. & C.R. 358, not following the Canadian and Australian cases of *Highway Properties v Kelly Douglas & Co* (1968) 1 D.L.R. (3d) 626; *Progressive Mailing House Pty v Tabali Pty* (1985) 157 C.L.R. 17. See also the Scottish cases of *Davie v Stark* (1876) 3 R. 1114 and *McKimmie's Trustees v Armour* (1899) 2 F. 156 and Gloag's *Law of Contract* (2nd edn.) pp.605–606.

[5] An apparent suggestion to the contrary was made in *Boyer v Warbey* [1953] 1 Q.B. 234, 247, although this may have been confined to the facts of that case. The suggestion that a duty to mitigate applies to a claim in debt (for rent) was made in *Vickers & Vickers v Stichtenoth Investments Pty* (1989) 52 S.A.S.R. 90, but this is unsound: *Reichman v Beveridge* [2007] 1 P. & C.R. 358

[6] *Norwich Union v Low Profile Fashions* [1992] 1 E.G.L.R. 86; *Bhogal v Cheema* [1999] L. & T.R. 59. The position may be different in Australia. See *Stone v Geralton Brewery Company* [1898] 1 W. A.L.R. 23 at 27 and *Phillips and O'Donovan on The Modern Contract of Guarantee* (2nd edn.).