HEARING DATE:  JANUARY 16, 2013 @ 10:00 A.M. (ET)
RESPONSE DEADLINE:  JANUARY 11, 2013 @ 5:00 P.M. (ET)
(BY AGREEMENT)

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin, Esq.
Ira M. Levee, Esq.
1251 Avenue of the Americas
New York, NY  10020
Tel:  (212) 262-6700
Fax:  (212) 262-7402

*Attorneys for Boilermakers-Blacksmith National Pension Trust Fund*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **LEHMAN BROTHERS HOLDINGS, INC.,** *et al.*, | Case No. 08-13555 (JMP) |
| | (Jointly Administered |
| **Debtors.** | Re: Doc. No. 33294 |

**BOILERMAKERS-BLACKSMITH NATIONAL PENSION
TRUST FUND'S RESPONSE TO REPLY IN FURTHER SUPPORT
OF DEBTORS' OBJECTION TO THE BOILERMAKERS CLAIMS REQUESTING
SUBORDINATION PURSUANT TO SECTION 510(b) OF THE BANKRUPTCY CODE**

The undersigned, counsel for Boilermakers-Blacksmith National Pension Trust Fund ("Boilermakers"), hereby submits this Response (the "Response") to the Debtors' *Reply in Further Support of the Debtors' Objection to the Boilermakers Claims Requesting Subordination Pursuant to Section 510(b) of the Bankruptcy Code* [Doc. No. 33294] (the "Reply") and states as follows:

**BACKGROUND**

1. On or prior to the claims bar date, Boilermakers timely filed, *inter alia*, fourteen (14) proofs of claim against Lehman Brothers Holdings, Inc. ("LBHI") for damages arising out

26060/2
01/11/2013 22926403.4

of its purchase, acquisition and/or ownership of certain certificates (the "Trust Certificates") issued by the Trusts[1] collateralized by payments made on certain mortgages held by the Trusts (the "LBHI Claims"). On November 16, 2010, Boilermakers amended the proofs of claim to reflect that they were claims also against debtor Structured Asset Securities Corporation (the "SASCO Claims") in connection with the fraud, misrepresentation and other tortious conduct by the Debtor entities in connection with the Trust Certificates.

2. On January 11, 2011, the Debtors filed their *Seventy-Seventh Omnibus Objection to Claims (Amended and Superseded Claims)* [Doc. No. 13893] seeking to disallow or expunge the LBHI Claims as having been amended or superseded by the respective SASCO Claims. On March 22, 2011, the Court entered an *Order Granting Debtors' Seventy-Seventh Omnibus Objection to Claims (Amended and Superseded Claims)* [Doc. No. 15237], expunging the LBHI Claims and identifying the respective SASCO Claims as the surviving claims. On April 18, 2011, three of the SASCO Claims (Claim Nos. 67210, 67213 and 67214) were withdrawn without prejudice.

3. Boilermakers was also a named plaintiff in the securities class action entitled *In re Lehman Brothers Mortgage-Backed Securities Litigation*, Case No. 08-CV-6762 (the "MBS Litigation"), previously pending in the United States District Court for the Southern District of New York (the "District Court"). The MBS Litigation was part of the consolidated securities class action entitled *In re Lehman Brothers Securities and ERISA Litigation*, Case No. 09-MD 2017 (LAK) (the "Consolidated Securities Litigation").

4. As such, Boilermakers was a member of the class (the "Class") of entities that purchased or otherwise acquired interests in certain Trusts, pursuant or traceable to two Registration Statements with accompanying Prospectuses filed with the Securities and Exchange

---

[1] Capitalized terms shall have the meanings ascribed to them in the Reply unless otherwise defined herein.

-2-

Commission. SASCO was the depositor for each offering. Lehman Brothers, Inc., a subsidiary of LBHI and the subject of a pending liquidation proceeding in this Court under the Securities Investor Protection Act, was an underwriter for each of the offerings. LBHI, either directly or through its subsidiaries, LBI and SASCO, orchestrated and controlled the securitization and underwriting process.

5.  The MBS Litigation alleged violations of Sections 11, 12 and 15 of the Securities Act of 1933 by the parties named in the Consolidated Securities Class Action Complaint (the "Consolidated Complaint") in the MBS Litigation. By virtue of the automatic stay (11 U.S.C. §362(a)), the Debtors (LBHI and SASCO), were not named as defendants in the MBS Litigation, despite their involvement in the wrongdoing alleged in the Consolidated Complaint.

6.  On August 22, 2011, the Debtors filed their *One Hundred Eighty-Third Omnibus Objection to Claims (No Liability CMBS Claims)* [Doc. No. 19407] (the "183rd Omnibus Objection") seeking to expunge, *inter alia*, the remaining SASCO Claims (Proofs of Claim Nos. 67201-67209, 67211-6712) and Proof of Claim No. 32209 filed by the Boilermakers against LBHI (collectively the "Boilermakers Proofs of Claim" or "Boilermakers Claims"), arguing that the Debtors have no liability to Boilermakers as a holder of the subject securities because the Debtors sold commercial mortgage loans to the Trusts who in turn issued the securities to Boilermakers (and others) collateralized by payments on the mortgage loans. According to the Debtors, they were not liable or responsible for any payment to Boilermakers. The Debtors argued that because Boilermakers was not a party to the Loan Sale Agreement by which the Debtors sold the commercial mortgage loans to the Trusts, there was no contractual relationship upon which the Boilermakers could assert a claim against the Debtors. Based upon these

statements, and no further evidence or statutory or case citation, the Debtors' requested that the Boilermakers Proofs of Claim be disallowed and expunged.

7.   On October 13, 2011, Boilermakers filed their response to the 183rd Omnibus Objection [Doc. No. 20824] (the "Boilermakers' 183rd Omnibus Response"), disputing the Debtors' conclusory legal and factual assertions and arguing that the Boilermakers Proofs of Claim should not be expunged because: (a) with respect to LBHI, LBHI orchestrated and controlled the entire securitization and underwriting process by which the Trust Certificates issued by the Trusts were made available and the Consolidated Complaint sets forth in detail the basis of the liability of LBHI to Boilermakers as a purchaser and holder of the underlying Trust Certificates; and (b) with respect to SASCO, which, as a corporation formed to act as a depositor for the transaction, acquired the mortgage assets from LBHI and made certain representations and warranties with respect to the loans collateralizing the Trust Certificates.  SASCO ultimately conveyed the mortgages to the Trusts.  As the depositor, SASCO has put-back liability (as described in each Trust Agreement for each Offering and summarized in each Prospectus/Prospectus Summary) for defective loans placed in the MBS pools.[2]  The hearing on the 183rd Omnibus Objection was ultimately continued without date.

8.   On January 13, 2012, the District Court approved [Dist. Ct. Doc. No. 183] a Stipulation of Settlement (the "Settlement") [Dist. Ct. Doc. No. 178] of the MBS Litigation with respect to certain of the offerings.  The Boilermakers Claims (except for claim number 67211) are not included among those subject to the Settlement and, therefore, have not been resolved.

---

[2]   Under the Securities Act, where, as here, the issuer of mortgage-backed securities is a Trust, the depositor, such as SASCO, is considered an issuer for purposes of liability under Section 11 of the Securities Act (15 U.S.C. §77(k)); *see also* 17 C.F.R. 230.191(a) (stating that the "depositor for the asset-backed securities acting solely in its capacity as depositor is the 'issuer' for purposes of the asset-backed securities of that issuing entity"). SEC Rule 191 is discussed in further detail *infra*. As demonstrated below, that is a far cry from deeming Section 510(b) of the Bankruptcy Code applicable to the Boilermakers Claims relating to Trust Certificates issued by non-debtor, non-affiliate Trusts specifically designed to be independent from the Debtors for purposes of the investment.

## THE CLAIM OBJECTION

9. The Debtors have now apparently abandoned their argument in the 183rd Omnibus Objection that the Trust Certificates and the underlying mortgage loans in question have no connection with the Debtors and that there was no relationship between the Trusts, the Debtors and Boilermakers upon which the Debtors could be held responsible to Boilermakers (*see* Reply, at ¶13). Instead, on December 21, 2012, the Debtors filed the Reply now seeking to subordinate the Boilermakers Claims pursuant to Section 510(b) of the Bankruptcy Code, primarily based on purported admissions made in the Boilermakers' 183rd Omnibus Response. In support of their Reply, Debtors, once again, offer no competent factual evidence or legal support for their position or for any viable claim objection and the current iteration of the 183rd Omnibus Objection should be overruled for the reasons detailed below. The Boilermakers Claims are not subject to subordination under Section 510(b) as they are not claims for damages arising from the purchase or sale of a *security of a debtor or an affiliate of a debtor* and the statements made in the Boilermaker' 183rd Omnibus Response do not constitute judicial admissions.

## ARGUMENT

10. It should be noted at the outset that Boilermakers does not dispute the Debtors' assertion that the Trust Certificates at issue purchased by Boilermakers from the Trusts are "securities" as defined in the Bankruptcy Code. Nor does Boilermakers dispute that its claims are for damages stemming from their purchase of the Trust Certificates issued by the Trusts. Rather, the issue before the Court is whether the Trust Certificates are securities "of a debtor or an affiliate of a debtor"[3] as required by Section 510(b) of the Bankruptcy Code. Boilermakers

---

[3] The Debtors do not (and cannot) take the position that the Trusts were affiliates of the Debtors as that term is defined in Section 101(2) of the Bankruptcy Code. Their argument is based solely on the contention that the Trust Certificates are securities of SASCO, a debtor, to justify subordination under Section 510(b) of the Bankruptcy Code.

has never conceded that legal issue and, indeed, vehemently disputes that claims relating to the purchase of the Trust Certificates from the Trusts are subject to subordination for all of the reasons set forth below.

>   *(a)   The Boilermakers Claims are not Based upon the Purchase of Securities "of the Debtors" and therefore are not Subject to Subordination under Section 510(b) of the Bankruptcy Code.*

11.     The Debtors' attempt to bring the Trust Certificates within the scope of securities of the Debtor for purposes of Section 510(b) is contrary to the plain language and clear legislative purpose of Section 510(b) of the Bankruptcy Code. The Debtors further completely misconstrue SEC Rule 191 (as explained below), which does not transform securities of a non-debtor and non-affiliate into securities of the Debtor for purposes of Section 510(b). The Debtors describe the mechanics of a CMBS transaction and attempt to downplay the Trusts' status as the issuing entity and elevate SASCO, as depositor and deemed an issuer under the federal securities laws and regulations only for SEC reporting and disclosure purposes, to be the issuing entity of the Trust Certificates so as to satisfy the "of the debtor" requirement of Section 510(b). The Trust Certificates are simply not securities of a Debtor and were never intended to be equity or debt instruments involving the Debtors or their assets. *In re Washington Mutual, Inc.*, 462 B.R. 137, 147 (Bankr. D. Del. 2011); *see also, In re SemCrude, L.P.*, 436 B.R. 317 (Bankr. D. Del. 2010)(limiting subordination under Section 510(b) to claims arising from the purchase or sale of securities of a debtor or an affiliate of a debtor).

12.     The fact is, and the Debtors do not and cannot take a contrary position, that the Trust Certificates are solely obligations of the Trusts to pass through mortgage payments from borrowers to the holders of the Trust Certificates. As the Debtors point out in their initial 183rd Omnibus Objection, Boilermakers has no contractual relationship and is not in privity with any Debtor. The Boilermakers Claims are asserted solely as a victim of fraud, misrepresentations

and/or other tortious conduct by the Debtors.  Boilermakers is not a holder or purchaser of securities of a Debtor attempting to side step the absolute priority rule so as to obtain a distribution on an equity investment in a Debtor entity that would otherwise not be entitled to a distribution.  Simply stated, the Trust Certificates are not part of any Debtors' capital structure, a point the Debtors make in their initial 183rd Omnibus Objection.  Indeed, when viewed in the context of the language (which does not mention the term "issuer") and purpose of Section 510(b), the Debtors may have been sponsors, depositors and underwriters with respect to the Trust Certificates, with their fingerprints all over the transactions, but the Trust Certificates are still not securities "of a Debtor" where Boilermakers is attempting to bootstrap a claim based upon an investment in a debtor entity with all the risks attendant to such an investment.  It is that bootstrapping that Section 510(b) is intended to prevent.

13.    In attempting to identify the roles of various entities and to characterize the Trust Certificates as securities "of a debtor," the Debtors further fail to provide Boilermakers or this Court with any of the documents relevant to the Trust Certificates.  Boilermakers believes that those documents, including the Offering Materials, should and would make clear that:[4]

(a)    the Trust Certificates do not represent any obligation of or equity interest in any of the Debtors;

(b)    the Trusts are identified as the issuing entity and the Trust Certificates only represent interests in the Trust and do not represent interests in any depositor (SASCO), sponsor and any of their affiliates; and

(c)    any bankruptcy risk associated with the purchase of the Trust Certificates involves the bankruptcy of the borrowers/mortgagors with respect to the underlying mortgages

---

[4] If the Court believes that the availability of those documents is critical to a determination of the issues raised by this claim objection, the hearing should be adjourned so as to allow discovery in that regard.

and not any bankruptcy of the Debtors. Indeed, at the core of the transaction was a structure intended to isolate the investors, such as Boilermakers, from a bankruptcy of the Debtors and isolate the Debtors from the Trusts and Trust Certificates.

14. The Debtors' seeming reliance on Judge Walrath's opinion in *Washington Mutual, supra*, for the proposition that to the extent a debtor is deemed an "issuer" in any context, Section 510(b) must apply to the security in question is a fundamentally flawed and facile interpretation of that Court's well-reasoned opinion.

15. As Judge Walrath explained in *Washington Mutual, supra*, the key question for purposes of Section 510(b) is whether a claimant holds an equity interest in a debtor that carried with it the inherent risks and potential rewards of ownership. *See Washington Mutual*, 462 B. R. at 147 (holding that "[t]he theory behind . . . section 510(b) is that it would be inequitable to elevate a shareholder's interest to the level of a creditor." Thus, Tranquility [the claimant in *Washington Mutual*], like Boilermakers here, "did not purchase a security of the Debtors and did not assume the risk (and potential rewards) that a shareholder of the Debtors assumed." Boilermakers, as purchasers of, or investors in, the Trust Certificates, did not acquire any ownership interest or investment in the Debtors.[5]

16. With respect to the risk assumed by investors, the analysis adopted by Judge Walrath in the *Washington Mutual* decision is instructive and equally applicable here:

---

[5] Indeed, the genesis of Section 510(b) was the law review article by John J. Slain and Homer Kripke, entitled *The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securities Holders and the Issuer's Creditors*, 48 N.Y.U.L. Rev. 261 (1973), where the authors discussed how defrauded equity security holders were being favored over general unsecured creditors by bootstrapping their claims. *Id.*, at 268-85. "Congress enacted §510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *In re Enron Corp.*, 341 B.R. 141, 158 (Bankr. S.D.N.Y.2006). However, that is not the case here where, as in *Washington Mutual, supra*, "[n]either the Debtors nor their affiliates are the issuers of the [Trust] Certificates." 462 B.R. 147. This fundamental distinction removes the Boilermakers Claims from the scope of Section 510(b) which was designed to prevent equity security holders from diluting funds available to general unsecured creditors.

> If Tranquility bought stock of WMI from WMI, it would be assuming the risks normally associated with that stock, including the risk that WMI could become insolvent. If WMI had committed fraud in that sale, Tranquility would have a claim for that fraud, but it would be inequitable to treat Tranquility like the other creditors if WMI becomes insolvent because Tranquility assumed that risk.
>
> The analysis changes, however, where Tranquility buys stock of another company, say Apple, from WMI. Tranquility is assuming the risks associated with owning stock in Apple, including that Apple may become insolvent, but not that WMI may become insolvent. If WMI defrauded Tranquility in the sale of Apple stock, therefore, Tranquility should be treated like any other creditor of WMI because tranquility never assumed the risk of a WMI shareholder.

*Washington Mutual*, 462 B.R. at 147.

17. Rather than receiving equity in or a debt instrument of LBHI or SASCO, investors who purchased the Trust Certificates purchased an ownership interest in an underlying pool of mortgages that was owned and held by one of the Trusts. These investors received monthly payments linked to the payments made on the underlying mortgage loans, which were part principal and part interest. These payments were referred to as "pay downs" as they reduced the principal amount of the Trust Certificate and provided an income payment from the investment unrelated to any of the Debtors. Furthermore, if the borrowers on the underlying mortgage loans defaulted on their payments and the collateral securing the mortgage loan was insufficient to cover the unpaid loan balances, then investors holding the Trust Certificates would not get paid all they were owed, and the value of the Trust Certificates would decline. Accordingly, the Boilermakers Claims are not and should not be subject to subordination under Section 510(b).

18. Investors in the Trust Certificates never assumed the risks and potential benefit of ownership or an investment in LBHI or SASCO – *i.e.,* the potential for unlimited profits and the risk of possible insolvency. Instead, they were entitled to an income stream as borrowers on the

mortgage loans, held by the Trusts as the issuing entity, paid off the principal and interest on the mortgages. There was no variable nature of their investment vis-à-vis the Debtors. Their investment in the Trust Certificates depended entirely upon the integrity and loan underwriting standards that were used to originate the underlying mortgage loans and any tort claims against the Debtors based upon conduct in connection with their involvement as sponsor, depositor and/or underwriter regarding the underlying loans are independent wrongs not associated with a security "of the Debtor."

19. The Debtors make much of the fact that federal securities regulations require the depositor in mortgage-backed securities transactions to perform regulatory functions and be deemed an issuer with respect to these functions as well as with respect to liability pursuant to Section 11 of the Securities Act of 1933 (*see* n.2, *supra*). However, the bootstrapping of claims of those who invest in a Chapter 11 debtor has nothing to do with securities regulations designed to make an entity responsible for regulatory filings and disclosures with respect to particular securities. As Judge Shannon noted in *SemCrude, supra*, a party "may indeed be an 'affiliate' as the term is used in common speech, or for purposes of state corporate law, and yet not be an affiliate for purposes of section 510(b)." 436 B.R. at 321.

20. The Debtors also fail to provide this Court with the full significance and relevance of SEC Rule 191,[6] which makes clear that the entity acting as a depositor, in its capacity as the depositor to the issuing entity, is a different "issuer" from that entity in respect of its *own* securities. For example, in an asset-backed securities transaction, where there is not an intermediate transfer of the pool assets from the sponsor to the issuing entity and the sponsor is a bank or other financial institution, the Rule does *not* mean that because the bank or financial institution is acting as a depositor, the asset-backed security is then a security issued by a bank or

---

[6] A copy of SEC Rule 191 can be found at www.sec.gov/rules/final/33-8518.pdf.

-10-

financial institution. *See* SEC Rule 191 (17 C.F.R. 230.191). Thus, while the Debtor as depositor may be called an "issuer" of CMBS for SEC reporting and disclosure purposes, it is not the issuing entity and the CMBS or Trust Certificates are not securities of the Debtor for purposes of Section 510(b) of the Bankruptcy Code.

21.    While the Debtors in their Reply attempt to draw a distinction between an "issuer" for SEC regulatory purposes and the "issuing entity," which they concede are the Trusts, they never take the next step of explaining how that distinction supports their subordination argument. The reason is obvious—SEC Rule 191 indicates that the distinction is that the securities are those of the issuing entity, not the depositor who assumes certain SEC reporting and disclosure obligations in connection with the offering. The fact that SEC Rule 191 may designate a "depositor" as an "issuer" for SEC reporting purposes, does not extend that meaning to Section 510(b) of the Bankruptcy Code. Thus, as SEC Rule 191 makes clear, "issuer" has different meanings for purposes of Section 510(b) of the Bankruptcy Code and for purposes of the federal securities laws

22.    There is nothing in SEC Rule 191 to support the Debtors' position that investors in the Trust Certificates acquired an equity (or any) interest in the Debtors, thereby subjecting their claims to Section 510(b). In fact, just the opposite is true. SEC Rule 191 indicates that investors in asset-backed securities such as the Trust Certificates are acquiring an ownership interest in the underlying collateral that is held by the "issuing trust." Moreover, while SEC Rule 191 does state that the "depositor" is technically treated as the "issuer" for SEC reporting and disclosure purposes, this in no way confers upon investors in the Trust Certificates an equity or ownership interest in the "depositor." The investors in the Trust Certificates have an indirect

-11-

ownership interest in the mortgages that are pooled together and held by the Trust, which are clearly not obligations of the Debtor or tied to the Debtors' financial circumstances.

23.    SEC Rule 191 emphasizes this important point – *i.e.,* that investors in asset-backed securities are acquiring an ownership interest in securities that are backed by a discrete pool of financial assets, which are held in trust for the benefit of the investors by special investment vehicles. For example:

- In the "Overview" Section to Rule 191, the SEC explains that: "**Asset-backed securities are securities that are backed by a discrete pool of self-liquidating financial assets**. Asset-backed securitization is a financing technique in which financial assets, in many cases themselves less liquid, are pooled and converted into instruments that may be offered and sold in the capital markets." *See* SEC Rule 191 (17 C.F.R. 230.191), at 9-10 (emphasis added).

- The "Overview" Section further provides: "In a basic securitization structure, an entity, often a financial institution and commonly known as a 'sponsor,' originates or otherwise acquires a pool of financial assets, such as mortgage loans, either directly or through an affiliate. **[The sponsor] then sells the financial assets, again either directly or through an affiliate, to a specially created investment vehicle that issues securities 'backed' or supported by those financial assets, which securities are 'asset-backed securities**." Id. at 10 (emphasis added).

- In the section describing the duties of the "issuing entity," Rule 191 provides: "**[T]he nature of the issuing entity and the transfer of the pool of assets is elemental to the concept of securitization. We are adopting our proposed definition of 'issuing entity' as the trust or other entity created at the direction of the sponsor or depositor that owns or holds the pool of assets and in whose name the asset-backed securities supported or serviced by the pool assets are issued**." Id. at 113-14 (emphasis added).

- Rule 191 also makes it clear that the "depositor" is considered the "issuer" for SEC **reporting purposes only**: "[W]e are adopting our proposed specification that the depositor is the 'issuer' for purposes of Exchange Act reporting regarding asset-backed securities." Id. at 20. The SEC explains that this designation is necessary because "Asset-backed securities and ABS issuers differ from corporate securities and operating companies." Id. at 11. Because the actual "issuing entity" is a passive investment vehicle, the "depositor" is the entity that is responsible for filing SEC disclosure documents and reports. Id. at 81-82.

- In addition, Rule 191 makes it clear that, although the "depositor" is acting as the "issuer" for SEC reporting purposes, **the securities themselves are "securities" of the "issuing entity"**: "We are clarifying that the depositor for the asset-backed securities, acting solely in its capacity as depositor to the issuing entity, is the 'issuer' for purposes of the asset-backed securities **of the issuing entity**." Id. at 81-82 (emphasis added).

- Tellingly, Rule 191 makes it clear that: "**[A] person acting as the depositor in its capacity as depositor to the issuing entity is a different 'issuer' from that person in respect of its own securities …** For example, in an ABS transaction where there is not an intermediate transfer of the pool assets from the sponsor to the issuing entity and the sponsor is a bank, **the rule does not mean that because the bank is acting as a depositor, the asset-backed security is then a "security issued … by a bank.**" Id. at 82 (emphasis added).

- Rule 191 further provides: "[T]he reporting history with respect to a particular class of asset-backed securities does not affect Form S-3 eligibility **with respect to the depositor's or sponsor's own securities**." Id. at 82 (emphasis added).

24. In sum, SEC Rule 191 supports the conclusion that the Boilermakers Claims should not be subordinated under Section 510(b). As previously stated, the operative question from the perspective of the application of Section 510(b) is whether investors in the Trust Certificates acquired any type of equity or ownership interest in the Debtor or one of its affiliates. Boilermakers clearly did not. The fact that SEC Rule 191 designates the "depositor" as the "issuer" for SEC reporting purposes does nothing to change this analysis. The Boilermakers Claims are not the type of claims that are subject to subordination under Section 510(b), and, accordingly, the 183rd Omnibus Objection must be overruled.

      *(b)*     *There was no Judicial Admission in the Boilermakers 183rd Omnibus Response that SASCO was an Issuer of the Trust Certificates for purposes of Section 510(b).*

25.    Debtors rely heavily (*see, e.g.,* Reply, at ¶¶ 5, 27) on Boilermakers' reference in the Boilermakers 183rd Omnibus Response to SASCO as an "issuer" of the Trust Certificates.[7] However, a "party may use a word in one context without necessarily intending its precise legal meaning in another context." *SemCrude*, 436 B.R. at 321; *see also Tin Pan Apple, Inc. v. Miller Brewing Co., Inc.*, 737 F. Supp. 826, 829 (S.D.N.Y. 1990)(noting that the legal meaning of "parody" differs subject to the context in which it is used). Indeed, as previously set forth, there is no dispute that for SEC reporting and disclosure purposes, the SEC regulations deem a depositor as having certain reporting and disclosure responsibilities of an issuer. Moreover, that status, from an SEC reporting and disclosure perspective, gives rise to the depositor's liability under the federal securities laws. *See* n. 2, *supra*. Boilermakers' use of that term, however, does not constitute an admission by Boilermakers that the Trust Certificates are in fact securities of the Debtors or affiliates of the Debtors for purposes of Section 510(b).

26.    Courts throughout this District and within the Second Circuit have consistently held that only judicial admissions made as statements of fact in a prior pleading are binding on a party. *Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006)(holding that "*[f]acts* admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation")(emphasis added) and cited by *Hoodho v. Holder*, 558 F.3d 185, 191 (2d Cir. 2009); *see also Bellafonte Re Inc. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985)(finding that an assertion of *fact* is a judicial admission that binds a party)(emphasis added); *Xerox Corp. v. Media Sciences, Inc.*, 660 F. Supp. 2d 535, 550 (S.D.N.Y. 2009), citing *Gibbs, supra*, and

---

[7]    It should be noted that Judge Walrath's decision in *Washington Mutual, supra*, was issued on December 20, 2011, and the Boilermakers 183rd Omnibus Response was filed on October 13, 2011, several months earlier and Boilermakers, therefore, did not have the benefit of Judge Walrath's decision at that time.

*Bellafonte, supra*; *Maurizio v. Goldsmith*, 84 F. Supp. 2d 455, 464 (S.D.N.Y. 2000)(stating that a "court can appropriately treat statements in briefs as binding judicial admissions of *fact* . . . [which] are 'formal concessions . . . that are binding upon the party making them,'" quoting *Guadagno v. Wallack Ader Levithan Assoc.*, 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997)(emphasis added).

27. However, such binding judicial admissions are limited to statements of fact and do not include legal theories or conclusions. "'[J]udicial admissions are restricted in scope to matters of fact . . . A legal conclusion – e.g., that a party was negligent or caused an injury [or, as here, that a debtor or an affiliate of a debtor was an issuer of securities for SEC reporting and disclosure purposes] – does not qualify [as] a judicial admission.'" *SemCrude*, 436 B.R. at 322, quoting *In re Pittsburgh Sports Assocs. Holding Co.,* 239 B.R. 75, 81 (Bankr. W.D. Pa. 1999), *vacated other grounds*, 199 Bankr. LEXIS 1872 (Bankr. W.D. Pa. 1999).

> 'A judicial admission is usually treated as absolutely binding, but such admissions go to matters of fact which, otherwise, would require evidentiary proof[.] *[T]he doctrine of judicial admissions has never been applied to counsel's statement of his conception of the legal theory of the case.* When counsel speaks of legal principles, as he conceives them and which he thinks applicable, he makes no judicial admission and sets up no estoppel which would prevent the court from applying to the facts disclosed by the proof, the proper legal principles as the Court understands them.'

*Craft v. Covey*, 2011 U.S. Dist. LEXIS 22182, *9 (D. Vt. Mar. 4, 2011) (emphasis added), quoting *U.S. ex rel Miller v. Bill Harbet Constr., Inc.*, 2007 U.S. Dist. LEXIS 17659, *1 (D.D.C., Mar. 14, 2007). Legal arguments are not assertions of facts and therefore are not judicial admissions.

28. Clearly, the designation of SASCO as an issuer of the Trust Certificates and the context in which that is legally relevant is a legal conclusion. Therefore, Boilermakers' use of "issuer" in an earlier pleading for purposes of the Debtor's liability under the federal securities

-15-

laws is not an admission that Section 510(b) applies to the Trust Certificates as securities "of a debtor" so as to subordinate the Boilermakers Claims.

29.  The Debtors cannot meet their burden with respect to the applicability of Section 510(b) and have failed to offer any evidentiary support for their position. The 183rd Omnibus Objection should therefore be overruled. However, to the extent the Bankruptcy Court does not overrule the 183rd Omnibus Objection based upon the existing pleadings and believes that further evidence and/or briefing is required, Boilermakers reserves the right to seek discovery and to request an evidentiary hearing pursuant to Bankruptcy Rule 9014(e) and Rule 9014-2 of the Local Rules of Bankruptcy Procedure to determine the merits of the Boilermakers Proofs of Claim, including subordination. Boilermakers further reserves its right to file a supplemental and/or amended response to the Reply should it become necessary.

## CONCLUSION

30.  Based upon the foregoing, the Boilermakers respectfully requests entry of an Order (i) overruling the 183rd Omnibus Objection (as supplemented by the Reply) and deeming the Boilermakers Claims general unsecured claims under the Debtors' confirmed Plan and (ii) granting such other and further relief as the Court deems just and proper.

Dated: January 11, 2013

LOWENSTEIN SANDLER LLP

By: */s/ Michael S. Etkin*
  Michael S. Etkin (ME 0570)
  Ira M. Levee (IL9958)
  1251 Avenue of the Americas
  New York, NY  10020
  Tel:  (212) 262-6700
  Fax:  (212) 262-7402

  65 Livingston Avenue
  Roseland, New Jersey 07068
  Tel:  (973) 597-2500
  Fax:  (973) 597-2400

-16-

and

Kurt S. Brack
HOLBROOK & OSBORN, P.A.
7400 West 110th St., Suite 600
Overland Park, Kansas  66210
Tel:  (913) 342-2500
Fax:  (913) 342-0603

*Attorneys for Boilermakers-Blacksmith*
*National Pension Trust Fund*