**HEARING DATE AND TIME: January 16, 2013, at 10:00 a.m. (Prevailing Eastern Time)**

SEWARD & KISSEL LLP
John R. Ashmead, Esq.
Ronald L. Cohen, Esq.
Justin L. Shearer, Esq.
One Battery Park Plaza
New York, New York  10004
Telephone:  (212) 574-1200
Facsimile:  (212) 480-8421

*Attorneys for Traxis Fund LP*
*and Traxis Emerging Market*
*Opportunities Fund LP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

## REPLY OF TRAXIS FUND LP AND TRAXIS EMERGING MARKET OPPORTUNITIES FUND LP TO RESPONSE OF PLAN ADMINISTRATOR TO MOTION OF TRAXIS FUND LP AND TRAXIS EMERGING MARKET OPPORTUNITIES FUND LP TO COMPEL DEBTORS TO REISSUE DISTRIBUTION CHECKS  FOR ALLOWED CLAIMS

TO THE HON. JAMES PECK, UNITED STATES BANKRUPTCY JUDGE:

Traxis Fund LP ("Traxis Fund") and Traxis Emerging Market Opportunities Fund

LP ("TEMOF" and together with Traxis Fund, "Traxis"), by and through its undersigned

counsel, hereby respectfully file this reply (the "Reply") to the response (the "Objection") filed

by Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator (the "Plan Administrator") to

Traxis' motion (the "Motion") for entry of an order pursuant to Section 105(a) of the United

States Bankruptcy Code and (a) Sections 347(b), 1142(b), and 1143 of the Bankruptcy Code and

Rule 3021 of the Federal Rules of Bankruptcy Procedure, or in the alternative, (b) Rules 9006(b)(2) and 9024 of the Federal Rules of Bankruptcy Procedure, compelling LBHI and Lehman Brothers Special Financing Inc. ("<u>LBSF</u>" and together with LBHI, the "<u>Debtors</u>") to reissue certain distribution checks payable to Traxis Fund and TEMOF in respect of their allowed claims against the Debtors.[1]

### **Preliminary Statement**

1.      Plans of reorganization often sensibly contain "unclaimed distributions" provisions that place a time limit on a creditor's ability to speak up and receive its unpaid distribution.  Such "boilerplate" provisions are designed to ensure finality by setting limits on an estate's or distribution agent's obligation to search for claimants and hold their distributions.  In other words, at some point, if a distribution is not claimed, the unclaimed distribution is forfeited, and the estate can be wound up and the case closed.  The motivation behind the provision is not forfeiture, but finality.

2.      Here, however, this provision of administrative convenience is being used, particularly in Traxis' case, as both a shield and a sword.  The Objection's own reference to, and concern for, a "significant creditor" that contacted the Plan Administrator to ensure the forfeiture provision's strict enforcement indicates that the provision is being used as a trap for the unwary to benefit others.  While using this type of provision as a shield – promoting and enabling finality – is defensible, using it as a sword – to "make a grab for Traxis' unreceived distributions – is not.

3.      The Court should not countenance this misguided and inequitable effort by the Plan Administrator, and, instead, should ensure that equity prevails by directing the Plan Administrator to deliver Traxis' Plan distributions.

---

[1]       Capitalized terms not defined herein shall have the meanings given thereto in the Motion.

## Relevant Background

4.      The facts relating to Traxis' allowed claims (the "Claims") and the instant dispute over its distributions are set forth in the Motion and will not be repeated herein at any length, except to supplement such facts as necessary for this Reply.

5.      On November 16, 2012, Traxis filed the Motion.

6.      On December 17, 2012, the Statement of Official Committee of Unsecured Creditors in Support of Motion of Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP to Compel Debtors to Reissue Distribution Checks for Allowed Claims [Docket No. 32863] (the "Committee Statement"), was filed.  The Official Committee of Unsecured Creditors (the "Committee") supports the relief sought by Traxis in the Motion, arguing that the Plan Administrator's use of Paragraph 8.9 of the Plan to deny payment of distributions to Traxis runs counter to the clear intent of the Bankruptcy Code and also that the relevant circumstances entitle Traxis to relief due to "excusable neglect."

7.      On January 9, 2013, the Plan Administrator filed the Objection [Docket No. 33722].

## Reply

I.      The Relief Sought in the Motion is Merited under Bankruptcy Code
        Sections 105(a), 347(b), 1142(b) and 1143 and Bankruptcy Rule 3021

8.      In the Objection, the Plan Administrator posits that, while Bankruptcy Code Sections 105(a) and 1142(b) and Bankruptcy Rule 3021 empower the Court to issue an order compelling distributions under the Plan, the relief sought by Traxis contravenes Paragraph 8.9 of the Plan, which addresses the forfeiture of unnegotiated distribution checks.  The Plan

Administrator fails to recognize, however, that Paragraph 8.9 of the Plan must presume that allowed claimants have had an actual opportunity to cash or seek the reissuance of distribution checks. This is a patent impossibility where a given creditor has not received that check or been given specific notice that a check was sent but not negotiated. In any event, the very short period in which a creditor can seek reissuance under the Plan makes it far less likely that a creditor will learn about the missing distribution in time to contact the Plan Administrator.

9.      At the time of the initial distributions, the Debtors' chapter 11 cases (the "Cases") were well into their fourth year. When compared to the duration of the Cases, the Plan's forfeiture provisions have a very short fuse. Traxis contends that it is unreasonable to expect that creditors (with the exception, perhaps, of claims purchasers) were monitoring the Cases with such rapt attention that they would know that (a) they did not receive a distribution check, and (b) needed to contact the Plan Administrator in short order to demand its reissuance or risk losing it. There was no individualized specific notice sent to Traxis to inform it that it was about to or had just received a distribution or that it had failed to negotiate a distribution check.

10.      The Plan Administrator also points to the fact that Sections 347(b) and 1143 of the Code do not set a mandatory five-year window for the redemption of distribution payments. While the cases exploring the application of Sections 347(b) and 1143 are not dispositive of whether it is advisable to shorten the Code's five-year time period to the extent that the Debtors did, the majority of the courts in those cited cases evince a clear preference for giving creditors ample time and every available opportunity to claim the distributions to which they are entitled. Additionally, these cases make clear that the purpose of Sections 347(b) and 1143 is to permit the closure of bankruptcy cases where holding funds for creditors *who have*

4

*effectively abandoned their right to distributions would cause the case to drag on ad infinitum.*

See TLI, Inc. v. Lynn (In re TLI, Inc.), 213 B.R. 946, 956 (N.D. Tex. 1997) ("[T] the Code's

policy of finality supports the court's conclusion. If cashing a check were not an act within the

meaning of §§ 347(b) and 1143, bankruptcy cases could potentially continue in perpetuity if

distribution checks were never cashed.").  Further, as noted in In re IBIS Corp.:

> Funds are unclaimed when the disbursement agent, which may be
> the reorganized debtor, has done everything he is required to do to
> distribute the funds, reasonable notice of the availability of the
> funds has been given to the intended recipient and the intended
> recipient has done nothing for a period of time sufficient to evince
> a lack of interest in the funds or an abandonment of his right to the
> funds.

In re IBIS Corp., 272  B.R. 883, 890 (Bankr. E.D. Va. 2001) (emphasis added).

11.    In short, the ability of a plan of reorganization to prescribe a shortened

period of time to claim unredeemed distributions is not intended to provide debtors with a

mechanism to lay a trap for the unwary to the detriment of creditors who have shown no desire to

abandon their rightful claims.  For a creditor's inaction to demonstrate an intent to abandon its

rights, that inaction should extend over a very long period of time and should include a failure to

respond to opportunities to claim the distribution. Id.

12.    As conceded in the Objection, in the only case cited in which a shorter

time period was prescribed by the relevant plan of reorganization, In re Sterling Fin. Servs. Of

Florida – 1, Inc., the forfeiture of a creditor's distribution was only permitted to occur after the

debtor gave the creditor *specific notice* of the need to take action in respect of the creditor's

distribution.  The Debtors included no such safeguards in the Plan to protect the rights of

creditors.  In re Sterling Fin. Servs. Of Florida – 1, Inc., 374 B.R. 327, 331-32 (Bankr. M.D. Fl.

2007).

II.    <u>Bankruptcy Rule 9006(b)</u>

    A.    <u>Reason for the Delay</u>

       13.    The Plan Administrator next argues that the Second Circuit, in considering the "excusable neglect" factors promulgated in <u>Pioneer Inv. Serv. Co. v. Brunswick Assocs. L.P.,</u> places particular emphasis on the factor relating to the reason for a given creditor's delay and whether the cause for such delay was within the reasonable control of the creditor. The Plan Administrator advances the argument that the "Court *must presume* that Traxis received the Initial Distribution and notice of all Plan Distributions and, consequently, that the failure to act in a timely manner was within Traxis' control." Objection, ¶ 29 (emphasis added).

       14.    In other words, the Plan Administrator offers the circular argument that Traxis did in fact receive the checks (relying on the "mailbox rule," discussed below) and therefore, because Traxis received the checks, it was within Traxis' control to make a timely demand. The futility of the Plan Administrator's argument and Paragraph 8.9 of the Plan is that they require, or at least seem to require, that a creditor actually receive the distribution to be in a position to make a claim for it. Of course, if the distribution were received, there would usually be no reason to make a claim for it. Alternatively, the Plan Administrator argues that other notices sent in connection with the Cases should have placed Traxis on notice to demand the reissuance of the Initial Distribution Checks, despite the fact that *none* of these notices referenced any *specific* past, pending or future distribution to Traxis.

      1.    <u>Plan Administrator Cannot Rely On The Mailbox Rule</u>

       15.    To bolster this argument, the Plan Administrator relies on the mailbox rule, asserting that proof that a "letter properly directed was placed in a post office creates a

presumption that it reached its destination in usual time and was actually received by the person

to whom it was addressed."  Objection, ¶ 30 (citing Hagner v. United States, 285 U.S. 427, 430

(1932)).  As "proof" that the Initial Distribution Checks were delivered to Traxis, the Plan

Administrator offers the Affidavit of Herb Baer Regarding Checks to Traxis Emerging Markets

Opportunities Fund LP and Traxis Fund LP [Docket No. 33716] (the "Baer Affidavit").  Mr.

Baer, offering no evidence of return receipts, let alone contemporaneous certificates of mailing,

mail tracking information, copies of the relevant mailings, or any other actual evidence that the

Initial Distribution Checks were properly mailed except for the naked assertion that they were

(which assertion is made eight months after the fact), maintains that the Initial Distribution

Checks were served to the former address of Traxis on April 17, 2012 by placing them in the

mail on that date.  Baer Aff. ¶ 4.

      16.    In the Second Circuit, the mailbox rule provides that proof that the

Debtors correctly mailed the Initial Distribution Checks creates a presumption of delivery

"rebuttable by contrary evidence . . . For example, the presumption of delivery can be

successfully rebutted with a sworn affidavit giving a detailed description of the mail procedures

followed at a company for all incoming mail supporting the conclusion that the mail was never

received."  Hogarth v. New York City Health and Hosps. Corp., No. 97 Civ. 0625 (DAB), 2000

U.S. Dist. LEXIS 4590 at *12, 13 (S.D.N.Y. 2000) (finding that defendant's sworn declarations

established facts showing that charge was never received); see also In re Robinson, 228 B.R. 75,

82 (Bankr. E.D.N.Y. 1998) ("Although the mere denial of receipt does not rebut the presumption

[of delivery], testimony denying receipt in combination with evidence of standardized

procedures for processing mail can be sufficient [to] rebut the presumption."); In re PT-1

<u>Comms., Inc.</u>, 412 B.R. 85 (Bankr. E.D.N.Y. 2009) (deposition testimony insufficient to establish standardized mail procedure did not rebut presumption of delivery).[2]

17.    Traxis maintains, and maintained at the time that the Initial Distribution Checks were purportedly mailed, consistent and rigorously implemented mail sorting practices. The mail procedures of Traxis are described at length in the Affidavit of Adam Jaffe in Support of the Reply of Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP to Response of Plan Administrator to Motion of Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP to Compel Debtors to Reissue Distribution Checks for Allowed Claims, filed concurrently with this Reply (the "<u>Jaffe Affidavit</u>").

2.    <u>The Initial Distribution Checks Were Not Received by Traxis</u>

18.     In view of the mail procedures described and sworn to in the Jaffe Affidavit, the evidentiary record is clear that Traxis did not receive the Initial Distribution Checks.  Therefore, the presumption of delivery of the checks is rebutted by the Jaffe Affidavit.

19.    As described in the Jaffe Affidavit, all incoming mail delivered to Traxis that is not addressed to another existing Traxis employee is, without exception, hand-delivered to Adam Jaffe, who reviews and, if necessary, acts upon all such correspondence.[3]  Jaff Aff. ¶¶ 10, 11.  Thus, had the Initial Distribution Checks been received by Traxis, Adam Jaffe would have

---

[2]      In <u>Robinson</u>  and <u>PT-1 Comms.</u>, the relevant debtors' presumption of delivery was created by production of documents confirming the mailings prepared <u>contemporaneously</u> with the alleged deliveries.  <u>See</u> <u>In re Robinson</u>, 228 B.R. 75 at 81  (debtor relied on court's certificate of mailing to create presumption of receipt); <u>In re PT-1 Comms., Inc.</u>, 412 B.R. 85 at 94 (finding that affidavit of service prepared three days after papers were served was sufficiently contemporaneous to the date of mailing to create presumption of delivery).  As noted above, Epiq has produced no proof of mailing that was prepared or generated at the time of the alleged delivery of the Initial Distribution Checks.

[3]      As noted in the Jaffe Affidavit, the name of a former employee of Traxis, Christopher Crawford, was included on the proof of claim forms affixed to the Claims.  As per Traxis' mail sorting protocol, any correspondence relating to the Claims that was addressed to Christopher Crawford would have been promptly given directly to Adam Jaffe.  Jaffe Aff. ¶¶ 10, 16.

immediately been made aware of their delivery, and Traxis would have cashed them. Jaff Aff. ¶ 16.

20.     Additional facts undercut the Plan Administrator's assertion that the Initial Distribution Checks were received by Traxis.  As noted in the Baer Affidavit, months after the four Initial Distribution Checks were allegedly sent to Traxis, on October 19, 2012, two additional checks were purportedly sent by Epiq to Traxis as part of the Debtors' second wave of distributions under the Plan (the "Second Distribution Checks").  According to the Baer Affidavit, unlike the four Initial Distribution Checks, the two Second Distribution checks were both returned to Epiq as undeliverable.  Baer Aff. ¶ 6.  The Plan Administrator has not asserted that the mailing of the Second Distribution Checks was materially different from that of the Initial Distribution Checks (except in amount and number).

21.     Traxis is unaware of why the United States Postal Service would deliver *all four* separately mailed distribution checks to Traxis (if one accepts the Plan Administrator's argument) in the first instance and subsequently return *two* identically addressed checks to Epiq during the second wave of distributions  As no changes were made with respect to Traxis' mail forwarding orders between the time of the issuance of the Initial Distribution Checks and the issuance of the Second Distribution Checks, Traxis submits that the most rational conclusion is that all six checks should have been effectively delivered or all six returned as undeliverable.

22.     Because there is no evidence that <u>any</u> checks were delivered to, let alone received by, Traxis at any point in time, and because Epiq has conceded that both of the Second Distribution Checks were returned as undeliverable, a logical conclusion would be that the Initial

Distribution Checks were returned as undeliverable as well, and it was in fact Epiq that has

somehow misplaced those four checks. [4]

 If the four Initial Distribution Checks were in fact returned to Epiq as undeliverable, Epiq had an

obligation to contact Traxis directly at that point.  As the Plan Administrator candidly admits, in

such circumstances, "the disbursement agent must exercise due diligence in attempting to locate

the creditor." Objection, ¶ 34 (citing In re IBIS Corp., 272 B.R. at 890).  In this instance,

however, Epiq did not reach out to Traxis until after the two Second Distribution Checks were

returned to Epiq as undeliverable.

> 3.    Other "Notices" Were Not Received and in Any Event
>        Would Not Have Constituted Notice of the Initial Distributions

23.    In an off-target attempt to further bolster the Plan Administrator's

argument on excusable neglect, the Baer Affidavit also maintains that, on July 2, 2012, Epiq

served on Seward & Kissel, on behalf of Traxis, two wire transfer solicitations relating to the

Claims (the "Solicitations").  Baer Aff. ¶ 5.  The Plan Administrator points out that the

Declaration of Adam Jaffe, filed as an exhibit to the Motion, makes no reference to the

Solicitations.  Objection, ¶ 31.  The reason that the Solicitations were not mentioned in the

Motion or the Jaffe Declaration is quite simple.  Seward & Kissel never received the

Solicitations and had no knowledge of them until after the Motion was filed.

24.    Even if Seward & Kissel had received the Solicitations, assuming that they

were remotely similar to the wire transfer solicitations that Seward & Kissel received on behalf

---

[4]    With respect to the Second Distribution Checks, it is also worth noting that Traxis requested the reissuance
of the Second Distribution Checks on October 23, 2012.  According to the Baer Affidavit, Epiq attempted to deliver
the two reissued Second Distribution Checks to Traxis' current address on November 28, 2012.  Traxis never
received them.  Jaffe Aff. ¶ 17.  Epiq claims that the reissued Second Distribution Checks were not returned as
undeliverable.  Baer Aff. ¶ 8.  As with the First Distribution Checks, the reissued Second Distribution Checks
mysteriously "disappeared."

of its other clients,[5] the Solicitations were *not* notices from the Debtors that distribution checks had been issued, that those checks had gone uncashed and/or that Traxis was in danger of forfeiture.  The Solicitations were merely form invitations, identical to those sent to countless other creditors, inviting Traxis to participate in a voluntary wire transfer program to the extent Traxis received future distributions from the Debtor.  It would require a huge inferential leap for Traxis or Seward & Kissel to receive the Solicitations and immediately assume that they were an indication that Traxis' distributions were in jeopardy.  Even if a rebuttable presumption could be maintained that Seward & Kissel received the Solicitations, they would not have constituted notice that a delivery attempt had been made with respect to the Initial Distribution Checks.

25.    With respect to the purported delivery of the Solicitations, the Plan Administrator cites the general rule that an attorney's notice or knowledge is imputed to his or her client.  Motion, Note 3.  While axiomatic, in this instance, application of that rule puts the cart before the horse.  Notice to an attorney cannot be imputed to the client where the attorney never received notice in the first instance.  Seward & Kissel never received the Solicitations, so even if the Solicitations could somehow be construed as putting Traxis, via Seward & Kissel, on notice that a distribution had been sent to them previously, such notice cannot be imputed to Traxis.

26.    The internal mail handling procedures of Seward & Kissel, including the handling of mail with respect to Lehman-related claims, are described in detail in the following affidavits: (a) the Affidavit of James Pastrana in Support of the Reply of Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP to Response of Plan Administrator to Motion of

---

[5]    The Debtors have not provided Traxis or Seward & Kissel with copies of the Solicitations, and the Plan Administrator did not include them as exhibits to the Objection.

Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP to Compel Debtors to

Reissue Distribution Checks for Allowed Claims (the "Pastrana Affidavit"); (b) the Affidavit of

Carolyn Frederick in Support of the Reply of Traxis Fund LP and Traxis Emerging Market

Opportunities Fund LP to Response of Plan Administrator to Motion of Traxis Fund LP and

Traxis Emerging Market Opportunities Fund LP to Compel Debtors to Reissue Distribution

Checks for Allowed Claims (the "Frederick Affidavit"); and (c) the Affidavit of Arlene Alves in

Support of the Reply of Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP to

Response of Plan Administrator to Motion of Traxis Fund LP and Traxis Emerging Market

Opportunities Fund LP to Compel Debtors to Reissue Distribution Checks for Allowed Claims

(the "Alves Affidavit"), all filed concurrently with this Reply.

27.     As provided by the sworn testimony of James Pastrana, Seward & Kissel

employs well-organized and consistently applied mail sorting procedures to ensure that any mail

addressed to Seward & Kissel reaches the attorney for whom it is intended, with sufficient

safeguards in place to ensure that mail is not lost, misdirected or discarded.  Pastrana Aff. ¶¶ 6-

14.  If the Solicitations in respect of the Claims of Traxis had actually been delivered to Seward

& Kissel, as the Plan Administrator maintains, the firm's Mail Services and Duplication

department personnel would have delivered them to Arlene Alves (a Seward & Kissel attorney),

she would have received them and promptly directed them to Carolyn Frederick (a Seward &

Kissel attorney), who would have reviewed the Solicitations and brought them to Traxis'

attention, consistent with the fashion in which she had forwarded several other virtually identical

wire solicitation letters (each via e-mail, along with a detailed explanation) to other clients who

hold claims against the Debtors. Alves Aff. ¶¶ 6-13, Frederick Aff. ¶¶  7-14.

28.    The sworn affidavits of Mr. Pastrana, Ms. Alves and Ms. Frederick collectively provide a detailed description of the mail procedures of Seward & Kissel, particularly with respect to the Claims.  Having adhered exactly to those procedures and having concluded that the Solicitations could not have been received by Seward & Kissel, Traxis has effectively rebutted the presumption of delivery of the Solicitations (although it submits that the Solicitations are irrelevant to the issue at hand in any event).

29.    As described above, Epiq was unable to effectuate delivery of the Initial Distribution Checks, and as a result, Traxis was not on notice that any distributions had been attempted in respect of the Claims and that it was subject to a deadline under the Plan's forfeiture provisions.  While the Plan creates a duty on the part of the Debtors to effectuate distributions to creditors with allowed claims, it does not create any duty on the part of creditors and counsel to repeatedly inquire about payment of claims that have already been assured as part of the Plan.  Thus, the reason for the delay in seeking reissuance of the Initial Distribution Checks was not within Traxis' control.

B.    Prejudice to the Chapter 11 Estates

30.    The Pioneer excusable neglect standards are typically addressed and applied to instances where creditors seek to file a claim after the applicable bar date.  Most of the cases cited by the Plan Administrator in connection with the "excusable neglect" standard, including Pioneer and its progeny, relate to such late-filed claims.  None relate to an administrative plan provision relating to unclaimed distributions, as is the case before the Court.  In cases such as those cited by the Debtors, the potential "floodgate" risk of allowing creditors to seek exceptions to claims deadlines is much greater, potentially resulting in uncertainty as to a

debtor's liability and the possible derailment of its reorganization efforts.  In the present case,

such concerns are largely inapplicable.

31.    For example, the Plan Administrator cites a previous decision of this Court

for the proposition that permitting exceptions will encourage other creditors to pursue similar

exceptions.  Objection, ¶ 36 (citing In re Lehman Brothers Holdings Inc., 433 B.R. 113, (Bankr.

S.D.N.Y. 2010)).  In that instance, this Court considered whether to deem certain late-filed

claims timely, an issue very different from the present circumstances.  In addition to being

factually distinct, the risk of prejudice to the Debtors' estate was much greater.  At the time, the

potential scope of the Debtors' liability was still unknown, and there was no way of predicting

how many claimants would subsequently request admission of late-filed claims, or what the

attendant liabilities would be.  Opening the metaphorical floodgates under those circumstances

would have created significant uncertainties, unduly burdened the estate and threatened the

Debtors' restructuring efforts.

32.    In cases such as this, where a plan of reorganization has already been

confirmed and the reorganization is substantially consummated, the scope of the debtor's

liability is largely known and has been taken into account in negotiating the plan, and the movant

is an acknowledged distributee under the plan, the inherent risk of harm to the estate or other

creditors is substantially less, and arguably non-existent.  The application of the "prejudice to the

estate" factor of Pioneer in this instance must acknowledge that distinction.  The Debtors know

precisely who the relevant claimants are, the exact amount of their claims and the amount of the

unpaid distributions.  More to the point, as is the case with Traxis and its Claims, these are

claims that have *already been allowed* and were scheduled for distribution under the Plan.

33.     The Plan Administrator asserts that "288 creditors failed to request that their initial Plan Distributions be reissued."  Objection, ¶ 36.  The Objection fails to detail, however, the circumstances under which those claimants failed to request reissuances and whether, and to what extent, creating a so-called "exception" for Traxis would create an opportunity for those creditors to request similar relief.  Moreover, the Plan Administrator misses the larger point, which is that nearly 300 creditors have failed to request reissuances of their distribution checks and may not even be aware that distributions were made in respect of their claims.  The issue that this figure raises has less to do with a hypothetical floodgate opening and more to do with factors that are preventing a large number of creditors from receiving the distributions to which they are entitled.  While a certain number of creditor may even be expected to sit on their rights in any large bankruptcy, this number may suggest that Epiq has not effectively delivered distribution checks to, or diligently followed up with, a significant number of creditors, and that the mechanistic application of the Plan's forfeiture provisions have resulted in a substantial and inequitable loss of creditor rights.

34.     In an odd attempt to justify and defend holding its ground here, the Plan Administrator refers to "one significant creditor" that contacted the Plan Administrator to ensure its rigid compliance with the Plan's forfeiture provisions.  Objection, ¶ 37.  It is troubling that the Plan Administrator seems to be more concerned with appeasing a single creditor, one that apparently anticipates other creditors' loss of their rightful distributions due to a technicality, than ensuring that those 288 legitimate creditors receive the funds that they are entitled to under the Plan.

C.      Length of Delay

35.     In weighing the length of Traxis' delay in seeking the reissuance of the
Initial Distribution Checks and the relief sought in the Motion, the Plan Administrator urges the
Court not to consider the eleven days between the actual deadline to request the reissuance of the
checks, but rather the full 180 days between the time of the purported issuance of the Initial
Distribution Checks and the deadline.  Objection, ¶ 39.  This request has no basis in law, and the
Plan Administrator offers no legal or logical reason why 180 days should be the metric in
considering the length of the delay, particularly given the serious notice problems described
herein.

36.     Second Circuit courts, in considering the Pioneer factors, have roundly
held that the length of the delay runs from the time of the deadline to the time that the creditor
attempts to assert its rights. See Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron
Corp.), 419 F.3d 115, 127 (2d Cir. 2005) (considering a delay of six months between the bar date
and the creditor's attempt to file a claim); Mich. Self-Insurers' Sec. Fund v. DPH Holdings, Corp.
(In re DPH Holdings, Inc.), 434 B.R. 77, 84 (S.D.N.Y. 2010) (considering a three-year delay
between the bar date and the filing of a claim).  No case supports starting the clock from the date
from the deadline begins to run.  The Plan Administrator's attempt to remeasure the "length of
delay" factor of Pioneer should be rejected.

III.    Bankruptcy Rule 9024 and Federal Rule 60

37.     The Plan Administrator argues that the Motion sets forth no basis for relief
under Federal Rule 60(b), maintaining that the Court, in determining whether Traxis is entitled to

16

such relief, "must consider the same law and facts described in [the Plan Administrator's Bankruptcy Rule 9006(b) argument] in its analysis."  Objection, ¶ 43.

38.    Traxis has already shown that its circumstances merit Rule 9006(b) relief under the excusable neglect standards promulgated by <u>Pioneer</u>.  If the Plan Administrator believes that this Court should view Traxis' ability to show that Rule 9006(b) relief is appropriate in this instance as the sole threshold for determining whether Rule 60(b) relief is also warranted, then Traxis has already demonstrated its entitlement to that relief.

IV.    <u>Statement of the Official Committee of Unsecured Creditors</u>

39.    The Plan Administrator states in its Objection that the Committee supported confirmation of the Plan, "inclusive of paragraph 8.9's mandatory forfeiture provision."  Objection, ¶ 44.  The Plan Administrator further notes that the Committee existed for implementation of the Plan only through the date of the initial distributions.  <u>Id.</u> ¶ 44.

40.    The Committee is ably represented by counsel and is able to respond on its own behalf in this matter.  However, the Plan Administrator's suggestion that the Committee approved of Paragraph 8.9 of the Plan at the time it was confirmed is fundamentally misleading.  There is a logical distinction between the bare language of Paragraph 8.9, which may or may not have received much, or any, attention during the Plan drafting process, and the inequitable way in which the Debtors are attempting to implement it.  If the Committee has seen fit to voice its concerns regarding the Debtors' actions with respect to Traxis' efforts to compel the reissuance of distributions on the Claims, there is a logical inference to be deduced that the Debtor's overzealous application of Paragraph 8.9 is inconsistent with what the Committee, which surely existed at the time in which the Plan was proposed and approved, envisioned during the drafting

of the Plan, at a time when the Committee was charged with protecting the rights of the Debtors'

unsecured creditors.

## Conclusion

The Plan Administrator seeks to use a poorly drafted boilerplate Plan provision,

intended by the Bankruptcy Code to be used solely as a tool of administrative convenience, as a

cudgel to deprive Traxis, and potentially many other creditors, of its rightful distributions.

Traxis had no way of knowing that delivery of its distributions had purportedly been attempted,

that an unjustifiably brief time to respond had begun to run under the Plan's forfeiture provision,

and that the Plan Administrator and at least one "significant creditor" were waiting for the

opportunity to recapture Traxis' rightful distributions.  Consequently, Traxis' inability to timely

request the reissuance of the Initial Distribution Checks is, at the very least, the result of

excusable neglect, and Traxis should not be penalized for circumstances beyond its control,

particularly where the delay is so incredibly short and the potential impact on other creditors and

the administration of the Debtors' estates so utterly negligible.

WHEREFORE, for all the foregoing reasons, Traxis respectfully requests that this

Court grant the relief sought in the Motion or such other, further and different relief to Traxis as

this Court deems just and proper.

New York, New York
January 14, 2013

SEWARD & KISSEL LLP


By:     /s/  John R. Ashmead
       John R. Ashmead, Esq.
       Ronald L. Cohen, Esq.
       Justin L. Shearer, Esq.

       One Battery Park Plaza
       New York, New York 10004

       Telephone:  (212) 574-1200
       Facsimile:   (212) 480-8421

*Attorneys for Traxis Fund LP and Traxis*
*Emerging Market Opportunities Fund LP*