**Exhibit A**

**PROOF OF CLAIM**

United States Bankruptcy Court/Southern District of New York

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| Lehman Brothers Holdings, Inc. | Case No. 08-13555 (JMP) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. [illegible]

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000030596

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Essex Equity Holdings USA, LLC
SEND NOTICES TO:
Michael S. Kim
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022

Telephone number: 212-488-1200     Email Address: Michael.Kim@kobrekim.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
  (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____     Email Address: _____

**1. Amount of Claim as of Date Case Filed:** $1,198,776,791.90 (estimated based on par value of illiquid securities, plus C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages)
(by filing this proof of claim, Essex Equity Holdings USA is not acknowledging that any insurance proceeds available to satisfy the claim are property of the estate that must be litigated or adjudicated through the estate)

☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** See attached.
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** 4743
  **3a. Debtor may have scheduled account as:** _____
  (See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe: _____
Value of Property: $_____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____   Basis for perfection: _____
Amount of Secured Claim: $_____   Amount Unsecured: $_____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED

SEP 22 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/18/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Scott H. Schley, Managing Director

## Itemized Statement of Interest for Essex Equity Holdings USA, LLC

The total amount of claim is calculated based on the par value of the illiquid securities, plus the C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages.

| | | |
|---|---|---|
| **Principal Amount of Claim** | = | 285,650,000.00 |
| **Interest (at 9%)** | = | 56,176,791.90 |
| **Treble Damages** | = | 856,950,000.00 |
| **TOTAL** | = | **1,198,776,791.90** |

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
**In re**                                                    :
                                                             :
**LEHMAN BROTHERS HOLDINGS INC., ET AL.** :    **Case No.  08-13555 (JMP)**
                                                             :
                              **Debtors.**                   :
---------------------------------------------------------------x

### SUPPLEMENTAL DOCUMENTATION TO PROOF OF CLAIM

1. Essex Equity Holdings USA, LLC, M. Brian Maher and Basil Maher (collectively known as "Essex") by and through their attorneys, Kobre & Kim LLP, submit the attached timely proof of claim.

2. Essex filed the attached Second Amended Statement of Claim with the Financial Industry Regulatory Authority ("FINRA") on May 2, 2008 (the "Statement of Claim"), initiating an arbitration proceeding. (A redacted copy of the Statement of Claim is attached hereto as Exhibit A.)

3. Essex's claims arise out of the "Client Agreement" (the "Agreement") entered into between Essex and Lehman Brothers, Inc. (A redacted copy of the Agreement is attached as Exhibit C to the attached Statement of Claim.)

4. The Agreement provides, *inter alia*, for "final and binding" arbitration in connection with "[a]ny controversy … arising out of or relating to any of [Essex's] accounts…[or] with respect to transactions of any kind" executed for Essex's account. *(Id.)*

5.    On September 15, 2008, a proceeding was commenced under Chapter 11 of the United States Bankruptcy Code with respect to Lehman Brothers Holding, Inc. ("LBHI"). Accordingly, all actions against LBHI were stayed.

## RELIEF REQUESTED

6.    Accordingly, Essex hereby reserves its rights to move the Court to lift the automatic stay to continue the FINRA arbitration in connection with the claims set forth in the attached Second Amended Statement of Claim so as to resolve any disputes regarding Debtor's liability, the amount of damages, the priority of this claim, or any and all other matter that the parties agreed were to be decided by arbitration.


Dated: September 22, 2009
       New York, New York

Respectfully submitted,

KOBRE & KIM LLP

Michael S. Kim
Michael.Kim@kobrekim.com
Robert W. Henoch
Robert.Henoch@kobrekim.com

800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220


*Attorneys for Essex Equity Holdings USA, LLC*

# Exhibit A

BEFORE THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | | |
|---|---|---|
| ESSEX EQUITY HOLDINGS USA, LLC (f/k/a MAHER TERMINALS HOLDINGS CORP.), M. BRIAN MAHER and BASIL MAHER, | : : : : | |
| Claimants, | : : | Case No. 08-00156 |
| v. | : : | **SECOND AMENDED** |
| LEHMAN BROTHERS INC., JEFFREY L. CHERNICK, PETER M. GAMBEE, WILLIAM C. GOURD, NEIL J. GREENSPAN, SANFORD A. HABER, and MARK J. STEVENSON | : : : : : | **STATEMENT OF CLAIM** |
| Respondents. | : : : : | |

Claimants Essex Equity Holdings USA, LLC ("Essex"), M. Brian Maher and Basil Maher (the "Mahers"), by and through their attorneys, Kobre & Kim LLP, for their statement of claim against Lehman Brothers Inc. ("Lehman"), Jeffrey L. Chernick ("Chernick"), Peter M. Gambee ("Gambee"), William C. Gourd ("Gourd"), Neil J. Greenspan ("Greenspan"), Sanford A. Haber ("Haber"), and Mark J. Stevenson ("Stevenson"), submit as follows:

**Introduction**

1.    Lehman's fraud, negligence and mismanagement of the Maher family's cash management account caused Claimants to lose the ability to access or invest approximately US $286 million of the family's money.

2.    In the Spring of 2007, Claimants sold their family business of 60 years and began searching for cash managers to manage the proceeds of the sale on a short-term

basis.  One of the prospective cash managers Claimants considered was Respondent Lehman.

3.      When Respondents proposed to Claimants their cash management brokerage services in June and early July 2007, Respondents told Claimants they would invest Claimants' money in safe, liquid, tax-exempt municipal or substantially similar securities.  Indeed, before Claimants entered into a cash management agreement with Respondents, Respondents sent Claimants' representative a proposed sample investment portfolio filled entirely with such safe, straightforward, municipal securities.  Claimants reasonably relied upon Respondents' statements that Respondents would purchase securities substantially similar to the securities listed in the sample portfolio that Respondents provided.

4.      Based on this proposed sample portfolio (as well as other statements and representations by Respondents described below), Claimants set up an account (the "Account" numbered ███████) and entered into a cash management agreement (the "Cash Management Agreement") with Lehman.  The Cash Management Agreement gave Lehman specific discretion to invest the funds in the Account consistent with a written investment policy (the "Investment Policy") that Claimants provided to Respondents.  The Investment Policy outlines the investment objectives for the Account and offers a list of "eligible instruments" in which Respondents were authorized to invest.

5.      However, once Claimants actually funded the Account in mid-July 2007, Respondents—without any authorization—immediately began using the funds to purchase securities that were radically different from what they told Claimants they would purchase.  In fact, Respondents purchased securities that were entirely unsuitable

and inappropriate given Claimants' Investment Policy and risk tolerance. The securities that Respondents purchased were risky, complex, highly-structured securities, virtually all of which fit into just three categories: securities issued by sellers of "credit default swap" agreements, securities issued by "contingent capital facilities" established for bond insurers, or securities issued by trusts established to fund "redundant reserves" for insurance companies

6.    The risky and complex nature of these securities is described in detail below. Further examination of them reveals that they were entirely unsuitable and inappropriate given Claimants' stated investment objectives, which were: first, to preserve the capital; second, to provide liquidity (i.e., to make sure Claimants would be able to *quickly and easily sell* the investments and *get their money back* whenever they wanted); and third, to capture a market rate of return consistent with the other parameters of Claimants' Investment Policy and with market conditions.

7.    Many, and potentially all, of these securities are private placement securities, which have not been registered with the Securities and Exchange Commission, and can be purchased and sold only through narrow exemptions to the Securities Act of 1933. The purchase of these securities was never contemplated or authorized by Claimants, since private placement securities are not included among the "eligible instruments" listed on the Investment Policy.

8.    Furthermore, Claimants were not even qualified to purchase many of these securities, since they do not meet the requirements for exemption provided by the Securities Act of 1933 and rules promulgated thereunder.

9.      In addition, upon information and belief, Lehman did not provide the private placement memoranda for any of the private placement securities purchased on Claimant's behalf until well after the securities were purchased and only after Claimants specifically requested the memoranda.  As a result, Claimants had no basis to object to the securities purchased on its behalf.

10.     Further, Lehman violated the issue concentration limits articulated in Claimants' Investment Policy, thereby undermining Claimants' need for diversification and liquidity.

11.     As explained in greater detail below, upon information and belief, Lehman used the Claimants' money entrusted to Lehman to purchase the securities in question to further its own financial interests, including to support the market for securities that were affiliated with Lehman in various ways.

12.     Within a matter of weeks, US $286 million of the securities that Respondents purchased—which were also in the form of "auction rate securities" (a type of security described below)—became illiquid, because the auctions associated with them began to fail.  Claimants became unable to sell these securities or otherwise get their money back and so lost the ability to access or invest US $286 million of their money.

13.     In leading Claimants to believe that they would invest their money in safe, liquid tax-exempt municipal or substantially similar securities but then instead using Claimants' money to purchase the risky, complex, highly-structured, securities described herein, Respondents are liable for having: (i) breached their contract with Claimants; (ii) breached their fiduciary duties owed to Claimants; (iii) invested Claimants' funds in numerous unsuitable securities; (iv) made unauthorized purchases on behalf of

Claimants; (v) made negligent misrepresentations and omissions to Claimants upon which Claimants relied; (vi) violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder; (vii) converted Claimants' possessory interest in the funds; (viii) negligently caused injury to Claimants; (ix) committed gross negligence; (x) failed to supervise their employees; (xi) violated Section 5 of the Securities Act of 1933; (xii) sold securities to Claimants without obtaining a required purchasers letter, thereby rendering the sales null and void and subject to rescission; (xiii) fraudulently induced Claimants to sign the Cash Management Agreement; and (xiv) made fraudulent misrepresentations and omissions to Claimants upon which Claimants relied.

### Parties

14.     Claimant Essex is a limited liability company co-owned by M. Brian Maher and Basil Maher.  Essex was formerly known as Maher Terminals Holdings Corporation.  Its assets – including the US $600 million which it placed in Respondents' short-term care – consist primarily of proceeds from the sale of the Maher family's business, which was completed in July 2007.

15.     Claimant M. Brian Maher, 61, has been employed in the marine terminal industry for more than thirty-five years.  He was the Chairman and Chief Executive Officer of Maher Terminals Holdings Corp. (and its operating subsidiaries) and is currently a Managing Director of Essex.

16.     Claimant Basil Maher, 56, is brother to M. Brian Maher and, likewise, is a veteran of the marine terminal industry.  He was the President and Chief Operating Officer of Maher Terminals Holdings Corp. (and its operating subsidiaries) and is currently a Managing Director of Essex.

17.    Respondent Lehman Brothers Inc. is a FINRA registered broker-dealer headquartered at 745 Seventh Avenue, New York, New York 10019.

18.    Respondent Jeffrey L. Chernick is a Portfolio Manager for the Cash Management Group at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Chernick supervised and managed the allocation of the Account and served as a point of contact for Claimants at Lehman.

19.    Respondent Peter C. Gambee is a Managing Director for Private Investment Management at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Gambee supervised the management of the Account and served as a point of contact for Claimants at Lehman.

20.    Respondent William C. Gourd is a Managing Director for Private Investment Management at Lehman. He is a FINRA registered broker. Mr. Gourd served as Claimants' point of contact at Lehman. Upon information and belief, he collected the Claimants' investment objectives, prepared Lehman's proposal for the investment of Claimants' assets, and supervised the management of the Account.

21.    Respondent Neil J. Greenspan is an Associate for the Cash Management Group at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Greenspan selected securities for purchase, executed trades for the Account, and served as a point of contact for Claimants at Lehman.

22.    Respondent Sanford A. Haber is a Senior Portfolio Manager for the Cash Management Group at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Haber supervised and managed the allocation of the Account and served as a point of contact for Claimants at Lehman.

23.     Upon information and belief, Respondent Mark J. Stevenson heads Private Investment Management at Lehman in New York City. He is a FINRA registered broker. Upon information and belief, Mr. Stevenson supervised the Private Investment Management group in New York City responsible for the Account.

### Jurisdiction and Hearing Location

24.     This matter is eligible for submission pursuant to Rule 12200 of the NASD Code of Arbitration for Customer Disputes. The Cash Management Brokerage Agreement signed by Respondents and Claimants requires that any and all claims relating to the discretionary Account maintained by Lehman be resolved through arbitration. It further provides that the NASD is an eligible forum for arbitration.

25.     At all times material herein, Lehman Brothers Inc. was and is a broker-dealer registered with FINRA and all individual respondents were and are members of FINRA.

26.     A proper hearing location for arbitration is New York, New York pursuant to Rule 12213 of the NASD Code. The place of business for Respondents is New York, New York.

### In the Course of Establishing the Account, Claimants Fully Communicated and Respondents Fully Understood That Claimants' Primary Investment Objectives Were To Preserve Capital and To Provide Liquidity

27.     In March 2007, Claimants M. Brian Maher and Basil Maher negotiated the sale of their family business, which had been in existence for over 60 years. This family business specialized in the operation of certain marine terminals.

28.    Upon the closing of the sale in July 2007, the proceeds of the sale were owned by Maher Terminals Holdings Corporation, the predecessor of Claimant Essex, a limited liability corporation that is co-owned by M. Brian and Basil Maher.

29.    As Claimants were anticipating the influx of cash as a consequence of the sale, they began evaluating options for investing and holding the proceeds of the sale on a short-term basis.  Claimants communicated to Respondents that they wanted safe, short-term, highly-liquid investments in which Claimants could temporarily place their cash while they evaluated long-term investment strategies.

30.    Between approximately late May and early June 2007, representatives for Claimants received a cash management proposal from Lehman.

31.    By email sent on or about June 19, 2007, William Gourd, Managing Director at Lehman Private Investment Management, forwarded a letter dated June 1, 2007 from Mr. Gourd and a "Proposed Tax-Exempt Investment Portfolio" for Claimants, reflecting Lehman's "proposal" for an account structured in accordance with Claimants' expressed investment objectives.  (*See* Exhibit A.)

32.    In the letter, Mr. Gourd describes "Lehman Brothers cash management services," which Mr. Gourd represented to include "portfolio monitoring" services.

33.    In his letter, Mr. Gourd also described the proposal as Lehman's "recommendations" for the investment in "short-term cash/fixed-income securities."  In this and other communications Mr. Gourd made clear Lehman understood that Claimants wanted safe, liquid, short-term investments.

34.    Mr. Gourd stated in this same letter that Lehman understood Claimants' investment objectives "to be safety of principal, liquidity and yield." Mr. Gourd thus made clear that Lehman understood Claimants' investment objectives.

35.    Mr. Gourd also stated in this letter, "[W]e understand that our proposal should be for a New Jersey domiciled family that is subject to the highest Federal tax bracket (and not subject to the Alternative Minimum Tax)" and "We also understand that the nature of the investments that we should be considering for these funds is to be of extremely high quality with a relatively short duration (initially 1–60 days)." Thus, Mr. Gourd made clear that Lehman understood the portfolio should consist primarily of short-term, safe, tax-exempt municipal or substantially similar securities.

36.    In this same letter, Mr. Gourd stated that the proposed portfolio contained "approximately 35% Tax-Exempt Variable Rate Demand Notes and 65% Tax-Exempt Auction Rate Securities." Thus, it is clear from this proposal that the mutual understanding between Claimants and Respondents was for the majority of the portfolio to be invested in short-term, tax-exempt municipal or substantially similar securities. Respondents represented to Claimants in this proposal and in other communications with Claimants that the portfolio would be so invested.

37.    On or about July 10, 2007, Claimants' written Investment Policy was forwarded to Lehman. (*See* Exhibit B.) Haber acknowledged receipt of the Investment Policy.

38.    The Investment Policy lists "A. Preserve capital" as the highest objective for the investment account, followed by "B. Provide sufficient liquidity to satisfy operating requirements, working capital purposes and strategic initiatives." Finally, it

lists "C. Capture a market rate of return *based on the company's investment policy parameters* and market conditions" (emphasis added). Thus, Claimants' objectives were again clearly articulated to Lehman.

39.     The Investment Policy also states, "No security in the account may have a final maturity of more than 3 months." This requirement clearly indicates that the investment account was to be short-term and highly-liquid.

40.     The Investment Policy further outlines requirements regarding "Issuer Concentration," including the requirement that Essex's funds be allocated to no more than 15% of the total issue size outstanding, at the time of purchase. (*See* Exhibit B.) This requirement promoted the highest investment objectives of safety and liquidity, by ensuring that the account was properly diversified and that Essex could exit and given position easily.

41.     The Investment Policy also offered a list of "Eligible Instruments" that were authorized to be purchased for the Essex Account. Private placements do *not* appear on this list.

42.     In approximately early July of 2007, the sale of the Mahers' family business closed. The proceeds from the sale were initially wired to JP Morgan Chase.

43.     In approximately mid-July of 2007, Claimants finalized their choice of cash managers to invest the proceeds of the sale into safe, highly-liquid, short-term investments for a brief period until Claimants developed a longer-term investment strategy. These institutions were Lehman and another FINRA registered broker-dealer, namely, UBS.

44.   On or about July 10, 2007, Claimants signed the Cash Management Agreement with Lehman. (*See* Exhibit C.) By approximately July 26, 2007, Claimants had wired a total of US $600 million to Lehman.

45.   Around this same time, Claimants also transferred other portions of the proceeds of the sale of the family business into discretionary cash management accounts at UBS.

### Respondents Invested the US $600 Million in Ways That Were Highly Inappropriate and Completely Contrary to the Parties' Understanding, Causing Claimants to Lose the Ability to Access or Invest Approximately US $286 Million

46.   When Respondents invested Claimants' US $600 million in mid through late July 2007, they invested it in ways that differed radically from (i) the sample investment portfolio that Lehman provided in June of 2007; and (ii) the investment objectives and priorities Claimants gave to Respondents. Indeed, the actual portfolio contradicted Respondents' representations and the mutual understanding between Claimants and Respondents that the portfolio would be invested primarily in safe, tax-exempt, short-term municipal or substantially similar securities. The actual portfolio also failed to meet the Mahers' highest priorities of preserving capital and liquidity. Further, it contained numerous securities that were *not* included among the "eligible assets" that were authorized to be purchased under the Investment Policy. Finally, it violated the issue concentration limits articulated in the investment policy.

47.   Based on the sample portfolio prepared for Claimants by Lehman (which is entirely tax-exempt), communications between the parties, and the Investment Policy, the mutual understanding of the parties was that the investment products purchased would be primarily, if not entirely, short term, tax-exempt, municipal or substantially

similar securities. Respondents represented that they would so invest Claimants' funds. Moreover, such an investment would be consistent with the Claimants' highest priorities of safety of principal and liquidity.

48.     Instead, however, as described further below, Respondents invested approximately *two-thirds* of the Account in risky, complex, highly-structured securities virtually all of which were issued by sellers of "credit default swap" agreements, "contingent capital facilities" established for bond insurers, or trusts established to fund "redundant reserves" for insurance companies. Furthermore, such securities were purportedly issued as private placement securities under exemptions to the registration requirements of the Securities Act of 1933 and are meant to be certain specific legal categories of investors defined by the Securities Act of 1933 and the rules promulgated thereunder. Respondents made no effort to determine that Claimants were qualified to purchase such securities, and in many if not all instances, upon information and belief, Claimants were *not* qualified to purchase such securities.

49.     By comparison, Claimants gave UBS the same investment objectives and instructions as those received by Respondents. In stark contrast to Respondents' actions, UBS invested Claimants' funds almost exclusively in short-term tax-exempt municipal or substantially similar securities.

50.     Furthermore, JP Morgan Chase, which managed the accounts to which the proceeds of the sale were initially wired, and from which the funds to be managed by Lehman and UBS were sent, also followed Claimants' investment objectives. Accordingly, JP Morgan Chase placed Claimants' funds in a municipal money market fund and not in any private placement securities. UBS and JP Morgan Chase followed

Claimants' guidance. Respondents did not. As a result, Claimants lost the ability to access or invest approximately US $286 million.

**The Complex and Highly-Structured Products that Lehman Purchased: (1) Violate the Investment Policy and Objectives; (2) Are Grossly Different Than What Lehman Promised It Would Purchase; (3) Are Unsuitable; and (4) Violate Claimants' Core Objectives of Low Risk and High Liquidity**

51.     Upon information and belief, virtually all of the complex, highly-structured products purchased by Respondents on Claimants' behalf fall into one of **three categories**:  they are issued either by sellers of "credit default swap" agreements, "contingent capital facilities" established for the benefit of bond insurers, or trusts established to fund "redundant reserves." These categories will be described in greater detail below.

52.     Claimants only came to learn of the structure of these securities described herein through review of the private placement memoranda associated with the securities, which memoranda describe significant and material details about the securities. However, Respondents never provided Claimants with the private placement memoranda at the time the securities were purchased or even inform Claimants that private placements had been purchased.  Respondents' disregard for their customer continued even after the securities failed and this dispute arose, as Respondents still did not provide any private placement memoranda to Claimants and only did so after Claimants specifically requested them.  Even then, Respondents failed to provide all of the private placement memoranda for the securities purchased on Claimants' behalf.  Consequently, Claimants did not have a basis for understanding the securities purchased by Respondents on its behalf.

53.    The complexity of these structures made it virtually impossible to evaluate the safety and creditworthiness of the assets backing the securities and the entities that issued them.  The fact that the securities in question are unregistered, private placement securities (as described further below), about which little to no information is filed publicly, further complicated the evaluation of the creditworthiness of each issue.  In their complexity and lack of public information, the securities purchased by Respondents differed radically from the municipal and substantially similar securities that Respondents told Claimants that they would purchase for the Account.

*Lehman Violated Claimants' Investment Objectives of Safety and Liquidity by Purchasing Securities Issued by Sellers of Credit Default Swap Agreements Tied to the Collapsing CDO Market*

54.    The first type of unsuitable securities purchased for the Account is issued by a seller of Credit Default Swap Agreements ("CDS").

55.    A CDS Agreement is a financial product in which one party (the CDS seller) receives a premium from another party (the CDS buyer) in exchange for agreeing to provide payment upon a credit event for a given bond, such as a default or a failure to pay interest.

56.    CDS agreements are purchased both by bondholders, who want to hedge against the risk of the bonds, and by speculators, who do not actually hold the bonds named in the CDS agreements, but who want to effectively take a short position on the bond (i.e., the speculators are betting that the bond will default or fail to pay interest).

57.    Since CDS agreements are essentially private contracts between two parties, and since the market for CDS agreements is almost entirely over-the-counter, the market for CDS agreements is largely unregulated.  As a result, the market for CDS

agreements is often referred to as a "shadow banking system," since it is has grown to be an extremely massive market, yet remains highly opaque.

58.    The structure of CDS agreements contributed to the massive growth of the CDS market.   Since CDS agreements can be purchased by speculators who do not actually hold the bond named in the agreement, the total amount that a CDS seller must pay out upon a given credit event often far exceeds the total value of the bond itself.  As a result, the market for CDS agreements has multiplied rapidly.   The *New York Times* reported on February 17, 2008 that the total market for credit default swaps had grown from US $900 billion in 2000 to US $45.5 trillion in notional value, which is roughly twice the size of the entire United States stock market.

59.    Given Claimants' expressed investment objectives of safety and liquidity, investments directly linked to such a vast and largely unregulated market were manifestly unsuitable.

60.    Furthermore, since a CDS seller's capacity to write CDS agreements on a given bond is not limited in any way by the total par value of the bond, CDS sellers can concentrate a massive amount of risk on a small group of bonds.

61.    One CDS seller whose securities Lehman purchased for the Account— "Athilon"—focused its business on writing CDS agreements on Collateralized Debt Obligations ("CDOs"), many of which were tied to subprime mortgages.

62.    The focus of Athilon's business on writing CDS agreements for CDOs is outlined in the private placement memorandum for the securities purchased by Lehman on behalf of Claimants.  Upon information and belief, this memorandum is normally provided to the purchaser of a security, to ensure that the purchaser understands the

security and its suitability as an investment.

63.    In the winter of 2006-2007, a number of events occurred that made it clear that there were significant problems with CDOs tied to subprime mortgages. In the fourth quarter of 2006, the housing market in the United States slowed for the first time in two years. On February 8, 2007, California's New Century Financial Corporation— the third largest subprime lender in the United States—announced that it expected a loss in the fourth quarter of 2006.

64.    Despite clear problems in the market for CDOs, however, Lehman, in July of 2007, purchased approximately US $22 million of securities issued by Athilon, thereby exposing Claimants to the significant risks of the CDO market.

65.    Furthermore, the CDS seller's obligation to pay holders of CDS agreements takes priority over its obligation to pay investors in the securities that it issues. Consequently, in the event of significant market problems that result in a large number bondholders exercising their CDS agreements, the safety and liquidity of investors in the CDS issued securities will be seriously threatened.

66.    Therefore, such securities were manifestly unsuitable to meet Claimants' investment objectives of preservation of capital and liquidity.

*Lehman Violated Claimants' Investment Objectives of Safety and Liquidity by Allocating a Massive Portion of the Account to Securities that are Heavily Exposed to the Troubled Bond Insurance Market*

67.    The second category of unsuitable securities purchased for the Account were issued by trusts set up as "contingent capital facilities."

68.    Contingent capital facilities are established by organizations, often insurance companies, to protect against catastrophic losses by means of a capital injection

that is agreed upon before any loss occurs.

69.     All of the securities purchased by Respondents on behalf of Claimants that fit into this category were issued by contingent capital facilities established for the benefit of bond insurers.    In purchasing these securities, therefore, Lehman concentrated a massive amount of risk in the bond insurance industry.

70.     The securities are structured as follows:    A bond insurer establishes a series of sub-trusts.    Each of these sub-trusts enters into a put agreement with the bond insurer, in which they are paid a premium for agreeing to a put option, which allows the bond insurer to require that the sub-trust purchase preferred stock in the bond insurer. The put option, in effect, sets up a line of credit for the bond insurer, allowing it to draw cash from the sub-trust when it so desires.

71.     Each of the sub-trusts then issues securities to raise funds with which it will purchase preferred stock in the bond insurer in the event that the put option is exercised.    Each of the sub-trusts also invests in "Eligible Assets."    It uses the proceeds from its investment in "Eligible Assets" and the put option premiums to make its interest payments to the investors in the securities that it issues.

72.     The sub-trusts are established by the bond insurer.    Furthermore, in the event that the put option is exercised, the investors in the sub-trusts will become owners of the preferred stock of the bond insurer.    Consequently, the credit rating of the securities issued by the sub-trust will reflect the credit rating of the bond insurer, and the safety and liquidity of the security is directly affected by problems with the bond insurer.

73.     Lehman allocated more than US $72 million of Claimants' funds to securities of this type.    Thus, more than US $72 million of Claimants' funds were directly

exposed to the risks of a single industry.

74.    The bond insurance industry, moreover, is highly-complex and opaque. Since a bond insurer's risk exposure derives from the risk exposure of every single bond that it insures, it is difficult to determine the safety and creditworthiness of a bond insurer. For this reason, tying such a massive portion of the Account to bond insurers was manifestly inappropriate and failed to meet Claimants' expressed investment objectives of safety and liquidity.

*Respondents Exacerbated Claimant's Extreme Exposure to the Risks of the Bond Insurance Industry by Purchasing a Significant Number of "Wrapped" Securities, Whose Credit Ratings Are Based Entirely on the Rating of the Bond Insurer that Insures Them, Rather than on the Strength of the Underlying Issuer*

75.    The **third category** of unsuitable securities purchased for the Account was issued by trusts established to fund "redundant reserves" for a life insurance company.

76.    This structure is the most complex of the three, and is set up so that in the event of default, investors in these securities have no recourse to the insurance company that actually benefits from the funds raised by the issuance of the securities. Instead, investors only have recourse to the bond insurers that guarantee payment on the securities (thereby "wrapping" the securities). Many of these bond insurers are the same bond insurers for which the second type of securities functions as a source of credit.

77.    This category of unsuitable securities in the Account is structured in the following way:

78.    An insurance company establishes a "captive" reinsurance company, whose sole purpose is to enter into a reinsurance contract with the parent company.

79.    This captive reinsurance company raises funds by selling surplus notes to special purpose vehicles known as "capital trusts." These notes are not insured.

80.    The capital trusts, in turn, raise funds by issuing securities to investors. These securities are insured by a bond insurer.

81.    The captive reinsurance company entrusts the funds that it received from selling surplus notes to the capital trusts, and that they, in turn, received from selling securities to investors, to a reinsurance credit trust, with which it enters into an asset management agreement.

82.    Such extraordinarily complex and highly-structured securities were never contemplated for Claimants' Account, and were manifestly unsuitable given Claimants' objectives of safety and liquidity.

83.    Furthermore, in the event that the securities default, investors do not have recourse beyond the capital trusts that issued their securities. Investors do not have recourse to the captive reinsurance company that established the capital trusts, or to the insurance company that established the captive reinsurance company. Consequently, the safety and liquidity of the securities are, again, dependent upon the creditworthiness of the bond insurer that insures the securities issued by the capital trusts, since the capital trusts themselves are purely financial entities that have no real, tangible underlying assets.

84.    Indeed, upon information and belief, many of the securities that fall within this third type do not have underlying ratings at all; instead, their credit-rating is reflective only of the bond insurance on the security.

85.    Furthermore, since Lehman purchased for Claimants' Account both securities issued by trusts established to provide credit to bond insurers (i.e., the second type of security described above), and securities insured by some of the same bond

insurers (i.e., the third type of security described herein), Claimants were exposed to bond insurers on both the credit and debit side of the bond insurance industry. In other words, Lehman set up the Account in such a way that Claimants were, by investing in certain securities, in effect lending funds to many of the very same bond insurers that guaranteed payment on certain other securities in Claimants' account.

86.    Indeed, as a result of this manifestly unsuitable and egregiously inappropriate allocation of Claimants' Account, of the approximately US $286 million in currently illiquid securities, approximately US $238 million became exposed to the risks of bond insurers. As such, these investments were grossly unsuitable to meet Claimants' investment objectives

*Respondents Purchased Unregistered Private Placement Securities on Behalf of*
*Claimants, in Violation of the Investment Policy and*
*Section 5 of the Securities Act of 1933*

87.    In addition to being risky, complex, highly-structured products, many securities that Respondents purchased for Claimants' Account were issued as "private placements" that were not registered with the Securities and Exchange Commission.

88.    The purchase of private placement securities was not authorized, since "private placements" were *not* included among the "eligible instruments" listed on the Investment Policy.

89.    Furthermore, Respondents' purchase of private placement securities was manifestly unsuitable given Claimants' express investment objective of liquidity. Since the securities in question have not been registered with the Securities and Exchange Commission, they can be resold only through narrow exemptions to the Securities Act of

1933. The restrictions placed on resale of these securities severely hinder the liquidity of the securities, making them clearly inappropriate for investors that require liquidity.

90.    Upon information and belief, the private placement securities purchased by Respondents for Claimants, without authorization and in violation of the Investment Policy, can be sold only to specific classes of purchasers, such as, among others, "Qualified Institutional Buyers," as required by Rule 144A, 17 C.F.R. § 230.144A.  (*See* Exhibit B.)

91.    Upon information and belief, at no point during the period in which Claimants opened the Account or during the period in which Respondents purchased private placement securities for the Account did Respondents *ask* Claimants whether they met the relevant requirements.  Nor did Respondents at any time acquire documentation from Claimants certifying their eligibility to purchase private placement securities.

92.    Additionally, upon information and belief, Respondents failed adequately to inform Claimants that the securities purchased on its behalf were private placement securities and could be purchased and resold only under narrow exemptions to the Securities Act of 1933.

93.    Indeed, upon information and belief, Respondents did not meet the requirements to be considered a Qualified Institutional Buyer.  Consequently, at least all securities purportedly sold to Claimants pursuant to Rule 144A constituted violations of the Securities Act of 1933.

94.    Under Rule 144A, unregistered securities may be sold to Qualified Institutional Buyers ("QIBs") or to a purchaser whom the seller reasonably believes is a QIB.

95.    To be a QIB, the purchaser must be an entity of a certain type and must own and invest on a discretionary basis at least US $100 million in securities of issuers that are not affiliated with the purchaser.  Upon information and belief, sellers of Rule 144A private placements typically establish the buyers' QIB status by acquiring a QIB letter.

96.    Upon information and belief, Claimant Essex did not meet the statutory requirements of a QIB in part because Claimant Essex did not own and invest on a discretionary basis at least US $100 million in securities.

97.    Further, upon information and belief, Respondents had no reasonable basis for believing that Claimant Essex was a QIB.  For example, Respondents never sought to obtain a QIB letter or other statement from Claimant Essex demonstrating Claimant Essex's eligibility to purchase restricted, unregistered securities, as Respondents were required to do.

98.    In any event, Lehman's improperly failing to ask Claimants whether they were eligible to purchase private placements was inexcusable.  For example, by contrast, in opening the cash management account at UBS, UBS affirmatively determined and recorded the fact that Claimants were not QIBs.

99.    Consequently, at least all sales of securities by Respondents to Claimants purportedly effected under Rule 144A constitute violations of Section 5 of the Securities Act, 15 U.S.C. § 77e.

100.    Under Section 12 of the Securities Act, 15 U.S.C. § 77l, Lehman is liable to Claimants for such sales to the extent they violated Section 5 of the Securities Act

101.    Furthermore, upon information and belief, the structure of the private placement securities purchased by Respondents on Claimants' behalf and the exemptions to the Securities Act of 1933 under which these securities must be purchased and sold are outlined in private placement memoranda.  Upon information and belief, broker-dealers typically provide these private placement memoranda to their clients, so that their clients can understand the structure of the securities and the exemptions to the Securities Act of 1933 under which they must be resold.

102.    Upon information and belief, "purchasers letters," to be executed by the prospective purchaser, are typically affixed to the private placement memoranda.  These purchasers letters acknowledge that the purchaser is aware that the securities have not and will not be registered under the Securities Act of 1933, that the purchaser is qualified to purchase the securities, and that purchaser will only resell the securities pursuant to an exemption to the Securities Act.

103.    Upon information and belief, some, and potentially all, of the private placement memoranda for the securities purchased by Respondents on Claimants' behalf state that the securities may be sold only to purchasers that have executed a purchasers letter.    Additionally, many of the private placement memoranda for the securities purchased by Respondents on Claimants' behalf state that the purchaser must review the private placement memoranda before executing the purchasers letter.

104.    Furthermore, many of the private placement memoranda and/or purchasers letters state that the signing of the purchasers letter is a necessary condition precedent to the sale and/or that if the purchasers letter is not signed by the purchaser, the sale will be null and void.

105.   Upon information and belief, Lehman did not provide private placement memoranda to Claimants at or shortly after purchasing private placement securities on their behalf, and never required that Claimants sign and return a purchasers' letter. More than a month after Lehman purchased private placement securities on Claimants' behalf, and only after Claimants specifically requested the memoranda after the auctions relating to the securities failed, did Lehman provide some, though not all, of the private placement memoranda for the securities.

106.   Furthermore, Lehman's sale of unregistered private placement securities to an entity that it did not determine and could not have reasonably believed was eligible to purchase such securities further demonstrates that such securities were never contemplated, authorized, or suitable for the Account, and that Lehman was not handling this account with due care.

107.   Lehman's inappropriate, unauthorized and unlawful sale of private placements caused Claimants to lose the ability to access or invest their approximately US $286 million.

*Claimants Lost the Ability to Access or Invest Their Approximately US $286 Million Because Lehman's Purchases Violated The Issue Concentration Limits Mandated by the Investment Policy*

108.   The Investment Policy expressly prohibited Lehman from purchasing more than 15% of any given issue size outstanding. (*See* Exhibit B.) This prohibition was designed to prevent over-concentration in any one issue and help ensure liquidity, a primary objective of the Claimants.

109.    Nevertheless, Respondents violated the issue concentration limits set by the Investment Policy for at least fourteen of Claimants' presently illiquid securities[1]. In some cases, Respondents purchased as much as 25% of the total size outstanding of certain issues.

110.    Lehman grossly violated Claimants' issue concentration limits thereby contributing to the illiquidity of Claimants' portfolio. Thus, it further caused Claimants to lose the ability to access or invest their approximately US $286 million.

**Respondents Continued to Grossly Mismanage the Account Even After Their
Initial Purchase of Inappropriate Investments,
Causing Claimants to Lose the Ability to Access or Invest
Their Approximately US $286 Million**

111.    In late July and early August 2007, several public announcements fueled widespread concerns about the safety of the bond insurance market, the creditworthiness of bond insurers, and the safety and liquidity of complex, highly-structured securities, such as those purchased by Respondents.

112.    On or about July 31, 2007, Fitch Ratings announced that it was placing 934 securities insured by the bond insurer Radian on Rating Watch Negative, indicating that they were likely to be downgraded in the near future. The securities that were downgraded were "wrapped securities," like a number of the securities in the Account.

113.    Since a bond insurer's business depends upon having a high rating, with which it can wrap the bonds it insures, the announcement that Radian was likely to be downgraded signaled significant problems with its business. Despite the clear material impact of this announcement on Claimants' portfolio, given their significant exposure to

---

[1] Upon information and belief, Respondents violated the issuer concentration limits in purchasing the following securities for Claimants' Account: Anchorage II, Anchorage IV, Athilon 05 A, Athilon 05 C, Ballantyne C, Grand Central 5, INC 2004-2, Northcastle IV, Northcastle V, Northcastle VII, Potomac 2004-IV, Primus Notes A, State St MMN CR and Sutton Capital II.

the bond insurance industry, Lehman failed to inform Claimants of their significant risk exposure.

114.    On or about August 6, 2007, Ram Holdings, Ltd., announced that it had suffered a 44.5% drop in market value, following a 25% drop in its second-quarter earnings. Ram Holdings is the parent company of Ram Re, a reinsurance company providing reinsurance exclusively to bond insurers.

115.    In the same announcement in which Ram Holdings announced its precipitous drop in earnings, Ram Holdings revealed that Blue Water Trust I, an auction rate security issued by a contingent capital facility established for the benefit of Ram Holdings and identical in structure to a significant portion of the securities purchased by Respondents in the Account, had suffered a "failed auction." Upon information and belief, Lehman served as advisor to Ram Holdings for the purpose of setting up Blue Water Trust I.

116.    As fiduciaries of Claimants, Respondents had a duty to act in Claimants' interests in the matters entrusted to them and to keep Claimants informed of changes in market conditions that affected the Account with respect to the matters that had been entrusted to them. Furthermore, Respondents had a continuing duty to ensure that they had invested Claimants' funds in authorized and suitable securities. In addition, Respondents continued to be responsible for investing Claimants' cash in a manner consistent with Claimants' investment principles.

117.    Despite the announcements described above and the widespread concerns that they prompted, Respondents failed to re-evaluate their own allocation of the Account, to limit Claimants' exposure to the troubled bond insurance market, or to

inform Claimants' of their significant risk exposure resulting from specific transactions that had been entrusted to the Claimants' discretion. Instead, in the first weeks of August, Respondents *reinvested* nearly US $168 million in the similar complex, highly-structured auction rate securities, which in any event were unauthorized and unsuitable upon their purchase in the first place.

118.    Despite the announcement of a failed auction relating to Blue Water Trust I (a security identical in structure to a large portion of Claimants' portfolio), Respondents nevertheless made no attempt to alter the allocation of the portfolio.

119.    On or about August 14, 2007, the first auction for a security held by Claimants failed, rendering Claimants unable to sell or move out of the security.

120.    Despite this failure, Respondents did not inform Claimants of their significant risk exposure. Instead, over the next four days, Respondents reinvested more than US $57 million in these same complex, highly-structured, taxable auction rate securities, even as they experienced three more failed auctions. Throughout this period, Respondents failed to inform Claimants of the failure of auctions for securities held in Claimants' Account, in clear violation of their duties to Claimants.

121.    On or about August 21, 2007, an individual assisting the Claimants became aware of the gross mismanagement of Claimants' Account. He wrote an e-mail to Gourd stating that the allocation of the majority of the portfolio in complex, highly-structured, taxable auction rate securities violated Claimants' investment objectives. He expressed concern about the creditworthiness and liquidity of the purchases, and noted that their complex structure rendered it impossible to evaluate the underlying collateral.

122.    The individual reiterated his complaints regarding the purchase of these securities in an e-mail sent on or about August 22, 2007.  He also noted that Lehman never acquired a QIB letter from Claimants.

123.    Upon  information  and  belief,  during  these  communications, representatives  of  Lehman  made  misrepresentations  and  omissions,  inaccurately characterizing  the  securities  purchased  by  Respondents  on  behalf  of  Claimants  as corporate securities.  In fact, the securities were not issued by straightforward brick-and-mortar entities like corporations, but were instead complex, highly-structured securities, virtually  all  of  which  were  issued  by  sellers  of  "credit  default  swap"  agreements, "contingent capital facilities" established for bond insurers, or trusts established to fund "redundant reserves" for insurance companies

124.    Following  the  communications  between  the  individual  referenced  above and Respondents on August 22, 2007, Lehman claimed that it had attempted to liquidate every auction rate security in the Account at the next auction.  Although Respondents liquidated a small portion of securities from Claimants' portfolio, they either did not or could not liquidate a majority of them despite the instruction to liquidate all auction rate securities positions, and the auctions associated with them failed and continue to fail.

**Lehman Purchased the Unsuitable Securities for the Account Because of Lehman's Relationship with the Issuers of the Securities and Lehman's Desire to Manipulate Auction Results to Prevent Failed Auctions**

125.    The  unsuitable  securities  that  Lehman  purchased  were  not  just  any security—they were securities to which Lehman was closely associated and stood to gain upon investing Claimants in them.

126.    Lehman served in three different capacities with respect to a significant number of the securities purchased for the Account. In many cases, Lehman served in more than one or all three of these capacities with respect to a security.

127.    Upon information and belief, Lehman served as the **structuring adviser** for many of the unsuitable securities in the Account, meaning that Lehman advised the issuers in the process of creating the securities.

128.    Upon information and belief, Lehman served as the **initial purchaser** for many of the unsuitable securities in the Account, meaning that Lehman purchased all of the newly-issued securities from the issuer in order to sell to other buyers.

129.    Upon information and belief, Lehman served as the **designated broker-dealer,** and in many cases the **sole designated broker-dealer**, for many of the unsuitable securities in the Account, meaning that Lehman was authorized by the issuer to solicit and accept bids for the auction.

130.    Upon information and belief, Lehman receives fees from issuers for serving as structuring advisor and/or initial purchaser and/or designated broker-dealer for their auction rate securities. Upon information and belief, Lehman's relationships with issuers provide it with an incentive to prevent auction failures.

131.    To understand the meaning of a "failed auction," and why Lehman would seek to prevent such an outcome, it is necessary to understand how "auction rate securities" work.

132.    In general, an auction rate security is a long-term bond whose interest rate is reset periodically (typically every 7, 28, or 35 days) by means of a Dutch auction process.

133.   In a Dutch auction, the auction agent for an auction rate security collects bids from investors and ranks the various bids according to the interest rate each individual investor is willing to accept.   The auction agent, based on these bid rates, determines the "clearing rate" for the auction, which is the lowest rate at which all of the securities of a given issue can be sold at par.

134.   If, however, an auction agent does not receive enough bids to buy securities at or below the maximum interest rate that the issuer of the securities is willing to pay, the auction agent cannot establish a clearing rate, and the auction "fails."   A failed auction prevents investors who own positions in a given issue from exiting their positions.   Even if such investors have submitted sell orders in the failed auction, they cannot sell, but must hold the securities.   In a failed auction the interest rate on the auction rate securities reverts to a pre-determined fail rate.

135.   A failed auction renders the securities illiquid for an indeterminate period of time, potentially for as long as the maturity period of the security, which can be as long as 30 years in the case of debt securities, and perpetual in the case of preferred stock.   A failed auction also typically raises serious concerns about the creditworthiness of the issuer.   Thus, failed auctions are typically self-perpetuating.   That is, once an auction fails, it is unlikely that it will subsequently succeed at a later auction in the absence of intervention (of which none is foreseeable here).

136.   Additionally, when an auction fails, the issuer must pay the pre-determined fail rate until the auction succeeds.   Consequently, issuers generally do not want the auctions for the securities that they issue to fail.

137.   Auction failures result from insufficient demand for the securities in question.  Upon information and belief, Lehman places bids on behalf of customers over whose accounts it exercises limited discretionary authority, in order to ensure sufficient demand to prevent auction failures.

138.   During the course of a meeting that the associate of Claimants had with Mr. Gourd sometime in late August 2007, the associate asked Mr. Gourd why, given the existing problems and concerns in the market, Lehman had re-invested Claimants' money in complex, highly-structured taxable securities.

139.   Mr. Gourd admitted that Lehman had done so in an attempt to provide enough demand for these securities to prevent the auctions from failing.    Upon information and belief, as explained above, Lehman served as the designated broker dealer or sole designated broker-dealer for many of these auctions.

140.   In other words, instead of acting in Claimants' interests by removing Claimants' funds from the complex, highly-structured, taxable securities (in which Respondents never should have invested in the first place), Respondents acted in their own interests, trying to use Claimants' funds to maintain a market for the securities, for many of which Lehman had served as structuring advisor, initial purchaser and/or designated broker-dealer.  Upon information and belief, these roles provided Lehman with an incentive to purchase these securities on their client's behalf to prevent failed auctions and maintain a liquid market for the securities, especially as soon as problems and concerns in the relevant markets emerged.

141.   Upon information and belief, the fact that Lehman purportedly could not or did not liquidate Claimants' positions in these securities without disrupting the market

and causing failed auctions indicates Respondents' over-concentration in these securities, in clear violation of the concentration limits outlined in the Investment Policy.

142.    Although Lehman's account opening documents purported to disclose that Lehman may engage in transactions from which Lehman may derive compensation, and although a document relating to Lehman's auction rate securities practices purports to disclose that Lehman may encourage bidders to place bids to prevent failed auctions, neither disclosure gives Lehman license to disregard the Claimants' interests and instructions, to purchase unauthorized securities on behalf of Claimants, or to enrich itself at the expense of the Claimants.

143.    Upon information and belief, a number of the securities purchased by Lehman on Claimants' behalf were sold directly from Lehman's own inventory through trades on the secondary market.

144.    Upon information and belief, Respondents purchased securities for Lehman's own inventory when Lehman knew the auctions would fail without broker-dealer intervention. Upon information and belief, Respondents then transferred the securities to Claimants through trades on the secondary market in between this auction and the following auction. Upon information and belief, Respondents sold Claimants securities it knew, based on the results of the previous auction, to be liquid only because of Lehman's intervention as broker-dealer. Upon information and belief, once the securities were in Claimants' Account and safely removed from Lehman's own balance sheet, Lehman would then at the following auction not submit a covering bid and allow the auction to fail and the security to become illiquid.

145.    Thus, upon information and belief, Respondents had used Claimants' money in an unsuccessful attempt to prop up auctions notwithstanding its knowledge that these complex, highly-structured, taxable securities posed a grave danger to the safety and liquidity of Claimants' Account.

146.    At present, approximately US $286 million of the US $600 million Claimants invested with Lehman is trapped in failed auctions, with no indication that liquidity will return to these securities.

147.    By contrast, Claimants' accounts at UBS, invested per Claimants' investment objectives and guidelines, maintained complete liquidity.

148.    As a result of the illiquidity of the complex, highly-structured, taxable securities purchased by Respondents, Claimants lost the ability to access or invest their approximately US $286 million.

### The Foreseeability of Market Conditions Is Not Relevant

149.    Importantly, Claimants' claims are not based on the fact that Respondents failed to predict market conditions or whether these particular auction rate securities would fail.    Rather, the whole point of Claimants' instructions had been to avoid potentially risky or over-concentrated situations which would be vulnerable to market events, whether predictable or not.    Respondents should never have invested so much of Claimants' funds in complex, highly-structured, private placement securities in the first place; these types of securities are unsuitable and constitute violations of the Investment Policy and the parties' mutual understanding.

**Punitive Damages Are Appropriate**

150.   In telling Claimants that they would invest their money in safe, liquid, tax-exempt municipal or substantially similar securities, and instead investing it for Lehman's own interests in risky, complex, highly-structured, taxable securities, which investments were unauthorized and unsuitable, Respondents' conduct was reprehensible and in blatant violation of law and policy. Their conduct, including their acts and failures to act, evidences recklessness and a callous disregard and indifference to Claimants' rights. Punitive damages are therefore warranted.

**First Count**
**Breach Of Contract**

151.   Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

152.   In opening the securities Account at issue, Claimants and Respondents executed a Cash Management Agreement. The Cash Management Agreement charged Respondents with the duty of ensuring that all investments, reinvestments and transactions were conducted in accordance with the investment guidelines issued by Claimants, including the Investment Policy.

153.   The Investment Policy expressly listed safety of principal and liquidity as objectives by which Respondents were to abide.

154.   The Investment Policy further listed "eligible instruments" in which Respondents were authorized to invest.

155.   Claimants performed per the terms of the Cash Management Agreement.

156.   Respondents breached the Cash Management Agreement contract by allocating the Account in a manner that clearly contradicted the mutual understanding

Page 34 of 52

between Respondents and Claimants at the opening of the Account and by investing the Account in securities that were not included among the "eligible instruments" listed on the Investment Policy.

157.    As a direct and proximate result of said breach of contract, Claimants have suffered and continue to suffer damages as alleged herein.

158.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Second Count
### Breach Of Fiduciary Duty

159.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

160.    By reason of the fact that Respondents managed and still manage the Account on a discretionary basis, Respondents owed a fiduciary duty to Claimants, including but not limited to: (1) the duty of loyalty; (2) the duty to act fairly and honestly; and (3) the duty to act in good faith and in the best interests of the Claimants. Respondents also owed a fiduciary duty to Claimants with respect to specific transactions and other acts, including discretionary acts, that Respondents engaged in with or on behalf of the Claimants.

161.    Respondents breached their fiduciary duty and failed to act in the best interests of Claimants by allocating the portfolio to securities which were contrary to the Claimants' stated objectives and by purchasing securities not included among the "eligible instruments" listed in the Investment Policy.  Respondents either knew, or should have known, that managing the portfolio in a manner contrary to the Investment policy, stated objectives, and the parties' mutual understanding required Respondents

formally to consult with Claimants on the risks of this investment strategy, something Respondents did not do.

162.     Respondents also breached their fiduciary duty and failed to act fairly and honestly with Claimants by failing to disclose material facts regarding the securities purchased.

163.     Finally, Respondents breached their fiduciary duty by failing to manage the Account properly, and by failing to respond to or disclose to Claimants changes in market conditions which materially affected Claimants' investments.

164.     As a direct and proximate result of said breach of fiduciary duty, Claimants have suffered and continue to suffer damages as alleged herein.

165.     Claimants reserve the right to expand upon or amend their account of damages suffered.

**Third Count**
**Unsuitability**

166.     Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

167.     A broker-dealer must have reasonable grounds for believing that a recommendation is suitable. The broker-dealer is required to practice due diligence in learning the essential facts relevant to every customer. Respondents had a duty to know and understand the financial position and investment objectives of Claimants. Included within this duty to know and understand, Respondents were also charged with the duty to clarify any instructions or objectives that seem ambiguous to the broker-dealer.

168.    Claimants expressly informed Respondents of their need for a diversified portfolio composed primarily of tax-exempt municipal securities.    Claimants further communicated their investment objectives of safety of principal and liquidity.

169.    Respondents knew or should have known that the securities purchased by Respondents did not meet the objectives set forth by Claimants.

170.    Respondents failed to disclose material information relating to the suitability of the securities.

171.    Claimants justifiably relied to their detriment on the Respondents' fraudulent conduct.

172.    As a direct and proximate result of said unsuitable purchases, Claimants have suffered and continue to suffer damages as alleged herein.

173.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Fourth Count
### Unauthorized Purchases

174.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

175.    Respondents had a responsibility to Claimants to purchase only those securities listed as "eligible instruments" on the Investment Policy and to manage the Account in accordance with investment objectives and risk tolerance of Claimants, as outlined in the Investment Policy.    Prior to effecting any trades contrary to stated "eligible instruments," investment objectives, and risk tolerance, Respondents were required to obtain from Claimants formal written authorization of a switch in investment strategy.

176.    Nevertheless, Respondents conducted transactions on behalf of Claimants for securities that were not included among the "eligible instruments" listed on the Investment Policy, and which were contrary to stated investment objectives, without seeking authorization.

177.    Having represented to Claimants that they would abide by the provisions of the Investment Policy and invest the Account primarily in short-term tax-exempt or substantially similar municipal securities, Respondents instead invested the majority of the Account in complex, highly-structured, taxable private placement securities. Respondents never sought or received authorization to purchase such securities.

178.    As a direct and proximate result of said unauthorized purchases, Claimants have suffered and continue to suffer damages as alleged herein.

179.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Fifth Count
### Negligent Misrepresentation

180.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

181.    Respondents and Claimants had a special relationship such that the Respondents owed a duty to Claimants not to negligently misrepresent material facts or fail to disclose material facts.  Among other things, Respondents and Claimants had privity of contract.

182.    Respondents represented to Claimants that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities.  Respondents were aware that Claimants would rely upon Lehman's letter and

sample portfolio and letter (*See* Exhibit A) and Claimants did in fact reasonably rely on Respondents' statements in deciding to invest US $600 million in cash with Respondents. The correspondence between the parties makes clear that Respondents understood that Claimants would rely on the sample portfolio in making their decision.

183.   Respondents' representation was false, as Respondents instead would invest Claimants funds in complex, highly structured, taxable securities, which Respondents omitted to inform Claimants.

184.   It is clear that the representation was false when made, as it was within a very short time thereafter, and immediately upon receipt of Claimants' funds, that Respondents invested in the complex, highly structured, taxable private placement securities, contrary to their representations. In any case, the representation became false sometime prior to Respondents' investment in such securities, and Respondents had a duty to disclose this fact to Claimants. They never did.

185.   Due to their relationship and otherwise, Respondents had a duty to disclose this information to Claimants. Respondents were aware the Claimants would use that representation and omission in investing their funds in the Account. Claimants relied upon that representation and omission. By their conduct, Respondents clearly understood that Claimants were relying upon that representation and omission.

186.   Respondents knew, or were at least negligent, grossly negligent, or reckless in not knowing, that the representation was false either when made or at least prior to their investment of Claimants' funds, by which time Respondents had a duty to disclose that the representation that they would be investing Claimants' funds in safe,

liquid, short term, tax-exempt municipal or substantially similar securities was no longer true.

187.    As a direct and proximate result of said negligent misrepresentations and omissions, Claimants have suffered and continue to suffer damages as alleged herein.

188.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Sixth Count
### Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act

189.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

190.    Respondents unlawfully employed devices, schemes, and/or artifices of fraud, omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and/or courses of business which operate and/or would operate as a fraud and deceit upon any person, in connection with the purchase or sale of the securities described herein.

191.    Respondents represented to Claimants that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities.

192.    Claimants reasonably relied upon that representation.

193.    Respondents' representation was false, as Respondents instead invested Claimants funds in complex, highly structured, taxable securities, which Respondents failed to inform Claimants. It is clear that the representation was false when made, as it was within a very short time thereafter, and immediately upon receipt of Claimants'

funds, that Respondents invested in the complex, highly structured, taxable private placement securities, contrary to their representations. In any case, the representation became false sometime prior to Respondents' investment in such securities, and Respondents had a duty to disclose this fact to Claimants. They never did.

194.    Respondents knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Claimants' funds, by which time Respondents had a duty to disclose that the representation that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities was no longer true.

195.    Respondents had a duty to disclose to Claimants that the representation was false. They never did so.

196.    Respondents undertook to monitor the portfolio and the market on behalf of the Claimants and represented thus,, while failing to disclose certain material facts that they had a duty to disclose. Respondents had a duty to disclose to Claimants certain material facts, including the fact that Respondents were investing Claimants' cash in complex, highly-structured securities, virtually all of which were issued by sellers of "credit default swap" agreements, "contingent capital facilities" established by bond insurers, and trusts established to fund "redundant reserves," and which violated Claimants' clearly articulated investment objectives of safety of principal and liquidity. Respondents also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimants' behalf. Respondents also had the duty to disclose the material fact that, upon information and belief, Respondents were using customer funds to support

auctions of Lehman products for its own benefit. Respondents failed to disclose and inform Claimants of such material facts. From these failures, it is manifest that Respondents intended to defraud Claimants and allow them to believe that securities were being purchased and had been purchased in accordance with their investment objectives.

197.    Claimants reasonably relied upon the fraudulent misrepresentations and omissions committed by Respondents.

198.    In addition to the above, Respondents intentionally or recklessly engaged in acts, practices and courses of business that operated as a fraud and deceit on Claimants in connection with the purchase or sale of securities as described herein.

199.    As a direct and proximate result of said fraudulent misrepresentations and omissions, as well as Respondents' acts, practices, and courses of business, Claimants have suffered and continue to suffer damages as alleged herein.

200.    Claimants reserve the right to expand upon or amend their account of damages suffered.

## Seventh Count
## Conversion

201.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

202.    Respondents have wrongfully converted approximately US $286 million of the US $600 million that Claimants invested in the Lehman account.

203.    Claimants own and have a right to possess the approximately US $286 million, as the funds belong to them.

204.    Respondents have deprived Claimants of their right to possess the approximately US $286 million by, having intentionally exercised dominion over those

funds, intentionally and without authorization investing them in unsuitable, complex, highly-structured, taxable securities, the associated auctions of which have now failed. Claimants cannot sell these securities and therefore cannot re-obtain possession of the approximately US $286 million in funds.

205.    Upon information and belief, Respondents have also deprived Claimants of their right to possess the funds by using them to prop-up auctions in danger of failing. Specifically, Respondents used Claimants' money in an attempt to ensure that certain auctions would clear.

206.    Respondents' actions constitute an unauthorized deprivation of Claimants' possessory rights in the approximately US $286 million and thus constitute a conversion of these funds.

207.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Eighth Count
### Negligence

208.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

209.    As Claimants' brokers and account managers, Respondents owed Claimants a duty of care.

210.    Respondents breached that duty of care by negligently purchasing securities on claimants' behalf that were unauthorized, unsuitable, unlawful, inappropriate and in violation of Claimants' Investment Policy and mutual understanding of the parties.

211.    Claimants have been injured and have sustained damages thereby as alleged herein.

212.    Respondents' negligence was the direct and proximate cause of Claimants' injuries and damages.

213.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Ninth Count
### Gross Negligence

214.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

215.    In injuring Claimants as described herein, Respondents not only acted carelessly, but they were so careless that it was equivalent to recklessness.

216.    Respondents' conduct evidences a reckless disregard for the rights of Claimants.

217.    As such, Respondents committed gross negligence.

218.    Claimants have been injured and have sustained damages thereby as alleged herein.

219.    Respondents' gross negligence was the direct and proximate cause of Claimants' injuries and damages.

220.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Tenth Count
### Failure To Supervise

221.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

222.    Respondents were responsible for supervising their employees who committed the various violations described herein.    Respondents failed to supervise reasonably to prevent said violations.    Respondents failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending purchases in Claimants' Account.    Had Respondents implemented and enforced protocols for the review of purchases made by its employees, Respondents would have been forced to further document the fact that unsuitable securities were purchased, that material facts were not disclosed, that fiduciary duties were breached, that securities regulations were violated, and that purchases were made in violation of Claimants' investment objectives.

223.    It is manifest that Respondents failed to maintain and enforce a proper system of internal supervision over team members.    Respondents failed to provide adequate instruction with regard to supervision of transactions in securities executed by its registered representatives.

224.    As a direct and proximate result of said failure to supervise, Claimants have suffered and continue to suffer damages as alleged herein.

225.    Claimants reserve the right to expand upon or amend their account of damages suffered.

**Eleventh Count**
**Violation of Section 5 of the Securities Act of 1933**

226.   Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

227.   Under Section 12(1) of the Securities Act of 1933, Respondents are liable to Claimants for the sale of unregistered securities in violation of Section 5.

228.   Respondents sold to Claimants securities that were not registered under Section 5 of the Securities Act of 1933.  Claimants were not qualified to purchase such unregistered securities.  Furthermore, Respondents had no reasonable basis for believing that Claimants were qualified to purchase such unregistered securities.   Thus, Respondents cannot rely on any available exemption provided for by the rules of the Securities and Exchange Commission by which unregistered securities may be sold or re-sold.  Accordingly, such sales of unregistered securities to Claimants, in the absence of any available exemption, constituted a violation of Section 5 and damaged Claimants as described above.

229.   Claimants reserve the right to expand upon or amend their account of damages suffered.

**Twelfth Count**
**Rescission**

230.   Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

231.   The private placement memoranda for many of the currently illiquid private placements in Claimants' Account state that the sale of the security to an investor who has not signed the purchasers' letter will be deemed null and void.  Other private

placement for the currently illiquid private placements in Claimants' Account state that the securities are to be sold only to purchasers that have executed a purchasers letter.

232.    Lehman's failure to acquire signed purchasers letters for the private placement securities purchased on Claimants' behalf represents a substantial and material breach of the conditions laid out in the private placement memoranda for the securities. Accordingly, the breach authorizes the rescission of the private placement security purchases which Respondents made for Claimants' Account.

233.    Furthermore, Lehman's purchase of unsuitable and unauthorized securities for Claimants' account, and the fraudulent misrepresentations and omissions made by Lehman to Claimants, represent substantial and material breaches of the conditions laid out in the Cash Management Agreement and Investment Policy. Accordingly, these breaches authorize the rescission of the purchases of all currently illiquid securities which Respondents made for Claimants' Account.

234.    Respondents' breaches of the conditions laid out in the purchasers letters, the Cash Management Agreement, and the Investment Policy have damaged Claimants as described above.

235.    Claimants reserve the right to expand upon or amend their account of damages suffered.

**Thirteenth Count**
**Fraudulent Inducement**

236.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

237.    In telling Claimants, in the letter dated June 1, 2007 and accompanying sample portfolio, sent to Claimants on June 19, 2007, that Respondents would invest the

Account entirely in municipal or substantially similar securities, Claimants made a representation of material fact. This representation was made for the purpose of inducing Claimants' reliance and causing Claimants to believe that Respondents would invest in accordance with their stated investment objectives.

238.   Claimants reasonably relied upon this representation.

239.   Shortly afterwards, Respondents invested the Account in a manner that is fundamentally different from the allocation represented in the letter and accompanying sample portfolio.   Since this misallocation of the Account occurred shortly after Respondents represented that they would allocate the Account in a completely different way, and since there is no evidence of any change in the mutually agreed upon plan for allocating the account or of any change in circumstances that prevented Respondents from following through with the mutually agreed upon plan, it is clear that Respondents had no intent to follow through with the plan at the time Respondents presented the plan to Claimants.   The representation that they would invest the Account entirely in municipal or substantially similar securities, therefore, was false at the time it was made.

240.   In representing that they would invest the Account in municipal or substantially similar securities without having any intent to perform on the promise at the time the promise was made, Respondents deceived Claimants into entrusting their funds to Respondents.

241.   As a direct and proximate result of said deception, Claimants have suffered and continue to suffer damages as alleged herein.

242.   Claimants reserve the right to expand upon or amend their account of damages suffered.

**Fourteenth Count**
**Fraud**

243.   Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

244.   Respondents represented to Claimants that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities.

245.   Claimants reasonably relied upon that representation.

246.   Respondents' representation was false, as Respondents instead invested Claimants funds in complex, highly structured, taxable securities, which Respondents failed to inform Claimants.  It is clear that the representation was false when made, as it was within a very short time thereafter, and immediately upon receipt of Claimants' funds, that Respondents invested in the complex, highly structured, taxable private placement securities, contrary to their representations.  In any case, the representation became false sometime prior to Respondents' investment in such securities, and Respondents had a duty to disclose this fact to Claimants.  They never did..

247.   Respondents knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Claimants' funds, by which time Respondents had a duty to disclose that the representation that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities was no longer true.

248.   Respondents had a duty to disclose to Claimants that the representation was false.  They never did so.

249.    Respondents undertook to monitor the portfolio and the market on behalf of the Claimants, while failing to disclose certain material facts that they had a duty to disclose.    Respondents had a duty to disclose to Claimants certain material facts, including the fact that Respondents were investing Claimants' cash in complex, highly-structured securities, virtually all of which were issued by sellers of "credit default swap" agreements, "contingent capital facilities" established by bond insurers, and trusts established to fund "redundant reserves," and which violated Claimants' clearly articulated investment objectives of safety of principal and liquidity.    Respondents also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimants' behalf.    Respondents also had the duty to disclose the material fact that, upon information and belief, Respondents were using customer funds to support auctions of Lehman products for its own benefit.    Respondents failed to disclose and inform Claimants of such material facts.    From these failures, it is manifest that Respondents intended to defraud Claimants and allow them to believe that securities were being purchased and had been purchased in accordance with their investment objectives.

250.    Claimants    reasonably    relied    on    Respondents'    fraudulent misrepresentations and omissions to continue to allow Respondents to exercise limited discretionary authority over Claimant's investment.

251.    As a direct and proximate result of said fraudulent misrepresentations and material omissions and Claimants' justifiable reliance on said misrepresentations and omissions, Claimants suffered and continue to suffer damages as alleged herein.

252.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Prayer for Relief

253.    WHEREFORE, Claimants request the following relief:

a. An order declaring that Respondents mismanaged Claimants' Account and violated the investment objectives and compelling Respondents to purchase from Claimants all US $285.65 million in illiquid securities at par plus accrued interest; and

b. An award against Respondent for:

   i. Damages in an amount to be determined at arbitration;

   ii. Punitive damages of triple the damages suffered;

   iii. Interest;

   iv. Reasonable attorneys' fees and costs of suit; and

   v. Such other relief as is just, fair, and equitable.

Dated: May 2, 2008                     Respectfully submitted,
       New York, New York
                                       KOBRE & KIM LLP


                                       _____
                                       Michael S. Kim
                                       Robert W. Henoch
                                       Leif T. Simonson

                                       800 Third Avenue
                                       New York, New York 10022
                                       Tel: 212.488.1200
                                       Fax: 212.488.1220

                                       *Attorneys for Essex Equity Holdings
                                       USA, LLC, M. Brian Maher and
                                       Basil Maher*

# EXHIBIT A

**From:** Gourd, Will [mailto:will.gourd@lehman.com]
**Sent:** Tuesday, June 19, 2007 4:21 PM
**To:** John Liu
**Subject:** RE: Cash Management Presentation

Here you go John.
Please let me know if there is anything else we can provide you as you go through this decision process.
Best,
Will

**From:** John Liu █████████████
**Sent:** Tuesday, June 19, 2007 4:10 PM
**To:** Gourd, Will
**Subject:** Cash Management Presentation

William,

Could you please forward me by email a copy of your Presentation?

Thanks,
John Liu
-----------------------------------------------------------
The information contained in this message may be privileged and
confidential and protected from disclosure.If the reader of this
message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this
communication in error, please notify us immediately by replying to
this message and deleting it from your computer. Thank you.
Greenhill & Co. LLC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended
only for the personal and confidential use of the designated recipient(s) named above. If
you are not the intended recipient of this message you are hereby notified that any
review, dissemination, distribution or copying of this message is strictly prohibited. This
communication is for information purposes only and should not be regarded as an offer to
sell or as a solicitation of an offer to buy any financial product, an official confirmation
of any transaction, or as an official statement of Lehman Brothers. Email transmission
cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this
information is complete or accurate and it should not be relied upon as such. All
information is subject to change without notice. -------- IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to be used and

cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.
--------------------------------------------------------------

The information contained in this message may be privileged and
confidential and protected from disclosure.If the reader of this
message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this
communication in error, please notify us immediately by replying to
this message and deleting it from your computer. Thank you.
Greenhill & Co. LLC.

WILLIAM C. GOURD
MANAGING DIRECTOR
PRIVATE INVESTMENT MANAGEMENT

June 1, 2007

Mr. John D. Liu



Dear John:

Thank you for the opportunity to present our recommendations for the investment of $400MM in short-term cash/fixed-income securities. From our conversation, we understand that our proposal should be for a New Jersey domiciled family that is subject to the highest Federal tax bracket (and not subject to the Alternative Minimum Tax). We also understand that the nature of the investments that we should be considering for these funds is to be of extremely high quality with a relatively short duration (initially 1–60 days).

The strategy that we would employ to invest these funds would be one that seeks to provide market prevailing yields through the purchase of high-credit-quality securities that have substantial liquidity. We note that prior to selecting specific issues and coming to a final proposal, we feel that it is important that the family consider what type of investments they might want to consider (or exclude) from such a portfolio, how far down the credit spectrum they might want to go and what concentration limits they wish to incorporate. In essence, we think that it is critical that we work together to draft some guidelines regarding the investment of these funds. With this letter, I have included a "Sample Investment Policy" that might be helpful as the family thinks about these issues. We have used this Investment Policy as a guide for the construction of the sample portfolio that we have included with this letter.

With the understanding that certain criteria need to be met as it relates to the family's objectives for these funds (which we understand to be safety of principal, liquidity and yield) we have included for consideration the use of Institutional Money Market Funds, U.S. Treasuries and Government Agency Securities, Tax-Free Auction Rate Securities, Variable Rate Demand Notes, Commercial Paper, Municipal Notes and Corporate Debt Obligations. From the rate sheet that I have included with this letter you can see those securities which offer the greatest after-tax yield along the short end of the curve (as they are highlighted in yellow). The resulting sample portfolio holds approximately 35% Tax Exempt Variable Rate Demand Notes and 65% Tax Exempt Auction Rate Securities. This sample portfolio is structured to produce an average after-tax yield of 3.64% (please note that these rates are effective as of 6/1/2007).

In reviewing the portfolio, you will notice that it is comprised of both New Jersey and "General Market" tax-exempt issues. Despite the fact that the after-tax yield of the New Jersey paper averages somewhere around 10 basis points more than what is being offered out of state, we feel it prudent to have funds invested in multiple states to provide greater diversification. We also note that short dated New Jersey issuance is scarce in supply in larger block positions and building out an entire NJ state specific portfolio

might take some time while at the same time it would go against our recommendation for portfolio diversification. The issues that we have selected are all rated by both Standard & Poor's and Moody's Investor Services and you will notice on the bottom of the proposal that the portfolio carries an average rating of AA.

Because we anticipate that the Fed will hold short term rates (Federal Funds Rate) at 5.25% for the balance of the year, we are recommending that most short duration portfolios be weighted with shorter-term investments (less than 90 days). Although some issues in our proposed portfolio have maturities that will take place over the next 3 months, the weighted average maturity of this portfolio is in the 30 day range which we believe should be able to accommodate what we understand to be the current liquidity needs of the family. The duration of this portfolio can certainly be adjusted to meet any change in needs but as you can see from the current rates, one is not being compensated in the current market environment for going out on the yield curve (AAA 7 day paper is yielding as much as AAA 30 day paper).

By way of background, the team that we use to advise our cash-management clients is a dedicated group of seven professionals whose sole and exclusive focus is on fixed-income portfolio management. Given their position within the firm (where they act as the liaison between our Cash Management Group and the Investment Bank), they have direct access to Lehman Brothers' proprietary fixed-income offerings. Every transaction that they make is monitored to assure compliance with the client's Investment Policy. This group will provide comprehensive (FASB-115 and GAAP compliant) month-end reporting which can be delivered electronically on the second business day following month-end and any additional audit-related inquires at month-end, quarter-end or intra-period will be addressed thoroughly and on a timely basis. Clients and their advisors also have 24-hour access to their portfolio positions through LehmanLive (where they may also access the Firm's research online).

There are no fees associated with Lehman Brothers cash management services. All investment, portfolio monitoring, safekeeping of securities, wire transfers and accounting services are completely free of charge. Our firm is compensated through 1) the bid/offer spread on issues purchased in the secondary market and 2) from the issuers of securities that are purchased in the primary market. The "advertised" yield as highlighted on the sample portfolio is the yield that the client receives.

John, I hope the information that I have provided you in this letter addresses most of the issues that you think the family might have regarding our investment management process. With this letter I have also included a little information about "Working with Lehman Brother' Private Investment Management Group" and our team in particular. In this presentation material we have included a list of several clients who have agreed to serve as references. While this information is being released with their acknowledgement I ask that it is held in confidence. You should feel free to reach out to any of these individuals but before doing so, I ask that you let me know of your intentions so that I might alert them of your call. I will attempt to follow up with you next week to address any questions you might have. In the meantime feel free to give me a call for any reason.

I look forward to speaking with you soon.

Sincerely,

# LEHMAN BROTHERS
*Where vision gets built*

## Proposed Tax-Exempt Investment Portfolio $400mm

### Rates as of 6/1/2007

| Quantity | Issuer | Rating | Maturity | Coupon | After Tax Yield |
|---|---|---|---|---|---|
| $20,000,000 | Chicago Water Authority | Aaa /AAA | 7 Days | 3.80% | 3.58% |
| $20,000,000 | Waco Texas Education | Aaa/ AAA | 7 Days | 3.80% | 3.58% |
| $20,000,000 | Detroit Michigan Water | Aaa/ AAA | 7 Days | 3.80% | 3.58% |
| $20,000,000 | Colorado Housing | Aaa /AAA | 7 Days | 3.80% | 3.58% |
| $20,000,000 | University of North Florida | Aa3 / AA- | 7 Days | 3.86% | 3.63% |
| $20,000,000 | NJ Housing Authority | Aa2 / AA | 7 Days | 3.80% | 3.80% |
| $20,000,000 | Virginia Port Authority | Aa3 / AA | 7 Days | 3.87% | 3.64% |
| $20,000,000 | Chicago Education | A2 / A+ | 7 Days | 3.90% | 3.67% |
| $20,000,000 | Georgetown University | Aaa /AAA | 35 Days | 3.80% | 3.58% |
| $20,000,000 | NJ Transportation Auth. | Aaa/ AAA | 35 Days | 3.75% | 3.75% |
| $20,000,000 | NJ University of Medicine | Aaa/ AAA | 35 Days | 3.60% | 3.60% |
| $20,000,000 | Orlando Hospital | Aa2 / AA | 35 Days | 3.84% | 3.62% |
| $20,000,000 | Tufts University | Aa3 / AA- | 35 Days | 3.85% | 3.63% |
| $20,000,000 | Wesleyan University | Aa3 / AA | 35 Days | 3.85% | 3.63% |
| $20,000,000 | Boston College | Aa3 / AA- | 35 Days | 3.90% | 3.67% |
| $20,000,000 | Georgia Power | A2 / A | 35 Days | 3.95% | 3.72% |
| $20,000,000 | Alabama Utilities | A2 / A | 35 Days | 3.95% | 3.72% |
| $20,000,000 | New York State Energy | Aaa/ AAA | 3 Month | 3.80% | 3.58% |
| $20,000,000 | Texas GO | Aa1 / AA | 3 Month | 3.82% | 3.60% |
| $20,000,000 | California GO | A1 / A+ | 3 Month | 3.82% | 3.60% |
| **Averages** | | Aa2 / AA Average Credit | 32 Day Average Maturity | 3.84% Average Yield | 3.64% After Tax Yield |

LEHMAN BROTHERS

Prepared by Sandy Haber & Neil Greenspan

# Sample Investment Policy

## I.   PURPOSE:

The purpose of this policy is to establish guidelines to be adhered to in investing the cash. The investment objectives must be met through:

A.   Preservation of Principal.

B.   Meeting all liquidity requirements.

C.   Providing a competitive rate of return.

## II.   DEALER QUALIFICATION:

Only investment entities which have total capital in excess of $1 billion and are members of SIPC (Securities Investor Protection Corporation) are authorized.  Dealers are to provide safekeeping services and are expected to provide comprehensive month-end reporting.

## III.   APPROVED SECURITIES: Approved Securities are limited to the following:

◆   Obligations of the US Treasury, obligations issued by US Agencies, and obligations guaranteed  by the US Government.

◆   Corporate Debt Obligations including but not limited to:  Commercial Paper, Corporate Bonds, Medium Term Notes, Eurobonds and Floating Rate Notes.  All securities must be issued in US Dollars.

◆   Certificates of Deposit, Time Deposits, Bankers Acceptances, Eurodollar Deposits, Money Market  Funds, Repurchase agreements.

◆   Auction Rate Securities (taxable, tax-free & tax-advantaged) whose liquidity is provided periodically via the Dutch Auction mechanism.

◆   Municipal Notes/Bonds, Variable Rate Demand Notes (VRDNs).

LEHMAN BROTHERS

1

# Sample Investment Policy

## IV. INVESTMENT CREDIT QUALITY:

All portfolio holdings are subject to the following minimum credit rating by at least one major rating agency: (Moody's, Standard & Poors, Fitch IBC).

- US Treasuries and Agencies - N/A.
- Corporate Debt - A1/P1 short term, A3/A- long term.
- CDs, BAs, Time Deposits – A3 or A-.
- Municipal Obligations - VMIG-1 or A.
- Auction Rate Securities – A3/A-.

## V. INVESTMENT MATURITIES:

- Maximum final maturity not to exceed 1 year (for Auction Rate Securities, the final maturity corresponds to the next reset date).
- Average life of the portfolio not to exceed 6 months.

## VI. CONCENTRATION LIMITS:

- US Treasuries & Agencies - no limit.
- Money Market Funds - no limit.
- No position in any individual issuer is to exceed 10% of the portfolio.
- No position shall exceed 20% of an outstanding tranche.

_____          _____
**Authorized Individual**                                    Date

## LEHMAN BROTHERS

2

# Investment Grade Ratings

| MOODY'S | S&P |
|---------|-----|
| Aaa | AAA |
| Aa1 | AA+ |
| Aa2 | AA |
| Aa3 | AA - |
| A1 | A+ |
| A2 | A |
| A3 | A - |
| Baa1 | BBB+ |
| Baa2 | BBB |
| Baa3 | BBB - |



*Confidential Presentation*

# Table of Contents

I.    Lehman Brothers Cash Management

II.   Lehman Brothers Qualifications

III.  Lehman Brothers Client Reporting Sample Pages

LEHMAN BROTHERS

# Lehman Brothers Cash Management

# Cash Management Solutions

**Lehman Brothers' Cash Management Group has a single focus on developing and implementing cash management services for individuals and institutions with the following objectives:**

◆ Capital Preservation

◆ Effective Liquidity Management

◆ Maximized Investment Performance across diversified products in various market environments

## Benefits Lehman Brothers' clients enjoy

◆ Dedicated team of professionals exclusively focused on providing corporate cash management services

◆ Assessment of investment goals and needs

◆ Development of written investment guidelines

◆ Consideration of tax implications

◆ Development and implementation of customized investment strategies

◆ Customized portfolio reports (FASB 115 compliant) delivered electronically on the first business day of clients' month-end close

◆ Direct access to Lehman Brothers proprietary fixed income products

◆ Industry-leading technology applications allowing online access to account activity and holdings as well as Lehman Brothers' Global Fixed Income and Equity Research

◆ Timely economic updates

◆ NO management fees, wire transfer fees or fees for safekeeping the securities

1

LEHMAN BROTHERS

# Why Lehman Brothers?

## Reasons to partner with Lehman Brothers, a leading fixed income and investment banking franchise for corporate cash solutions

◆ Firm recognition and momentum
  – Client-driven approach generates unique solutions
  – Partner with clients to help build their own unique vision and ideas

◆ Leading presence in asset management and in particular short-term fixed income asset management
  – Leading provider of Cash Management solutions
  – Highly experienced team of over 50 professionals, comprised of regional coverage and institutional asset management teams
  – Approximately $30 billion in money market assets managed [1]

◆ Leading player in fixed income markets
  – Insight on opportunities across the yield curve and market sectors
  – Perspective on peer group and new products and services

◆ Expertise in corporate cash management products
  – #1 Global Commercial Paper dealer [2]
  – Leading Auction Rate Securities dealer (Lehman arranged first ARS deal in 1984)
  – Top 2 U.S. Federal Agency underwriter [3]

◆ Ability to deliver capital to our clients
  – Top 5 U.S. Corporate bond underwriter [3]
  – Top 5 U.S. Equity underwriter [4]
  – Top 5 U.S. Municipal bond underwriter [3]

1.  *Represents total money market client assets, as of 9/30/05.*
2.  *Lehman Brothers, Bloomberg, CPWare, as of 9/04.*
3.  *Thompson Financial, as of 8/1/05.*
4.  *SDC, as of 11/15/04.*
*Note: Past performance is not indicative of future results.*

LEHMAN BROTHERS

2

# Lehman Brothers Cash Management

## Our Approach to the Investment Process



♦ Our approach is based on the following objectives

- Preservation of principal
- Strict adherence to investment guidelines
- Meeting liquidity needs
- Maximizing return

3



LEHMAN BROTHERS

# Lehman Brothers Qualifications

# Lehman Brothers Cash Management Qualifications

## Lehman Brothers provides clients with a broad range of cash management services



**Experienced Team**

- Highly experienced team of over 50 professionals, comprised of regional coverage and institutional asset management teams
- Extensive experience servicing corporate treasury and other cash management clients

**Assets Managed**

- Approximately $30 billion in short-term client assets as of 9/30/05
  - $17 billion of assets managed in institutional asset management accounts (Money Market Funds advisory and Separate Accounts)
  - $13 billion of client assets in corporate cash brokerage accounts

**Institutional Orientation**

- Focus on servicing both individual and corporate cash customers
- Over 400 cash clients
- Extensive institutional fund offering: Lehman Brothers Institutional Liquidity Fund complex (Cash, Prime, Treasury), Lehman Brothers Enhanced Cash Fund complex and other sub-advised funds
- Customized Separate Accounts

**Track Record**

- Taxable fund management team manages top decile ranked prime money fund in gross performance the YTD period ended 9/30/05 [1]
- Municipal fund management team manages several highly-ranked municipal funds, including general municipal and state specific funds

**Leading Fixed Income Franchise**

- #1 Global Commercial Paper dealer
- Leading Auction Rate Securities dealer (Lehman arranged first ARS deal in 1984)
- Top 2 U.S. Federal Agency underwriter







**Customer Service**

- Provide "high touch" institutional service
- Portfolio and holdings report available daily
- Web-based reporting capabilities
- Provide detailed in-person portfolio reviews
- Received unqualified SAS-70 Type II review

1.  *Source: iMoneyNet; out of 166 First Tier Institutional AAA-rated peer funds.*

4

## LEHMAN BROTHERS

# Selected Lehman Brothers Cash Management Clients

ActivCard · Agrium · Albany Molecular Research, Inc² · AmerisourceBergen · AMERIGROUP · American Eagle Outfitters · AMERICAN ELECTRIC POWER · APS · PANAGOS · ATHEROGENICS, INC. · beverly enterprises · CENTURYTEL · CENTILLIUM COMMUNICATIONS, INC. · CheckFree · COACH · Comverse · Continental Airlines · Cnitel · DIGITAL INSIGHT · DYNEGY · EDISON MISSION ENERGY · EnCana · esi · FANDANGO · GLOBALSANTAFE · Greenfield ONLINE · HALLIBURTON · Infospace · INSTINET · INTEGRA LIFESCIENCES · Interland · intersil · JAMDAT · KINDER MORGAN · KOHL'S · LAWSON · LSI LOGIC · MATTEL · MAXXAM · MAXIMUS · MEDATA · MERCURY INTERACTIVE · Overstock.com · PINNACLE ENTERTAINMENT · PINNACLE WEST CAPITAL CORPORATION · Qwest · Rent-A-Center · Reynolds & Reynolds · RSA SECURITY · Sprint · STAPLES · SYBASE · TARGET · TKT · Toll Brothers · TriQuint SEMICONDUCTOR · United Defense · United Rentals · Verity · VITESSE · VONAGE

Note: The above listed entities are not affiliates of Lehman Brothers Holdings Inc. or its subsidiaries.

## LEHMAN BROTHERS

5

# Lehman Brothers: Setting the Standard

## Institutional Investor
### RESEARCH



| | |
|---|---|
| 2005 | No. 1 |
| 2004 | No. 1 |
| 2003 | No. 1 |
| 2002 | No. 1 |
| 2001 | No. 1 |
| 2000 | No. 1 |
| 1999 | No. 3 |
| 1998 | No. 4 |
| 1997 | No. 2 |
| 1996 | No. 1 |
| 1995 | No. 2 |
| 1994 | No. 1 |
| 1993 | No. 1 |
| 1992 | No. 1 |
| 1991 | No. 1 |
| 1990 | No. 1 |



**IFR** 2004
INTERNATIONAL FINANCING REVIEW

*"Best U.S. Dollar Bond House"*

*"Best U.S. Securitization House"*

## EuroWeek
Review of the Year 2004

**"Most Innovative Bank"**

2005 Awards for Excellence



**EUROMONEY**

**"Best Investment Bank"**

"Best Debt House USA"  "Best Debt House in Italy"

"Best Debt Credit Derivatives House"

"Best Debt House North America"

"Best Debt House Netherlands"

## credit
2004 Awards

#1  Index Provider

#1  Portfolio
Analytics

## Institutional Investor
2004 Survey

#1 Overall U.S. Trading
*#1 in '03*

#1 Overall U.S. Sales Team

#1 European Index Provider
*#2 in '03*

## GREENWICHASSOCIATES™
2005 Survey  Focused financial intelligence

No. 1  Overall Quality and Franchise Strength
No. 1  Overall U.S. Market Share
No. 1  Overall Research Quality
No. 1  Overall Trading Quality
No. 1  Overall Sales Quality
No. 1  Market Penetration
No. 1  Electronic Trading

## LEHMAN BROTHERS



*1st Comprehensive*
*Series of China*  Xinhua Financial Network™
*Bond Indices – 2004*

**2005 Greenwich Associates / Global Custodian Prime Brokerage Survey**
#1 Best In Class Awards

#1  Securities Lending
#1  Capital Introduction
#1  Technology
#1  Operations*
#1  Multi-Strategy Funds*
#1  Single Strategy Funds
#1  International Funds
#1  Fund Size $100MM–$1Bn*

*\* Denotes a tie for first place.  Note: Past performance is not indicative of future results*

6

**LEHMAN BROTHERS**

# Preeminent Fixed Income Research

## Our Research capability sets us apart, ranked first for six consecutive years and in twelve of the last sixteen years

### Institutional Investor Overall Firm Rankings

| Rank | Firm | Total Positions 2005 | First Team Positions 2005 | First Team Positions 2004 |
|------|------|------|------|------|
| | Lehman Brothers | 39 | 12 | 14 |
| 2 | J.P. Morgan | 38 | 9 | 9 |
| 3 | CSFB | 28 | 11 | 7 |
| 4 | UBS | 21 | 9 | 8 |
| 5 | Bear Stearns & Co. | 20 | 7 | 7 |
| 6 | Merrill Lynch | 19 | 0 | 2 |
| 7 | Banc of America | 17 | 4 | 4 |
| 7 | Citigroup | 17 | 2 | 2 |
| 9 | Deutsche Bank | 10 | 3 | 2 |
| 10 | Morgan Stanley | 9 | 2 | 2 |

| Year | Lehman Rank |
|------|------|
| 2005 | No. 1 |
| 2004 | No. 1 |
| 2003 | No. 1 |
| 2002 | No. 1 |
| 2001 | No. 1 |
| 2000 | No. 1 |
| 1999 | No. 3 |
| 1998 | No. 4 |
| 1997 | No. 2 |
| 1996 | No. 1 |
| 1995 | No. 2 |
| 1994 | No. 1 |
| 1993 | No. 1 |
| 1992 | No. 1 |
| 1991 | No. 1 |
| 1990 | No. 1 |

### Lehman 2005 First Place Positions

**Institutional Investor  All-America Fixed-Income Research Team**

**Macro**
| | |
|---|---|
| Bond Market Indexes | Nicholas Gendron |
| Federal Agency Debt Strategy | Priya Misra |
| General Strategy | Jack Malvey |
| Investment-Grade Strategy | Joan Genirs |
| Municipals Strategy | Peter DeGroot |

**Investment Grade**
| | |
|---|---|
| Insurance | Thomas Walsh |
| Media & Entertainment | Scott Shiffman |
| Telecommunications Services | Scott Shiffman |

**High Yield**
| | |
|---|---|
| Energy | Erik Dybesland |
| Food & Beverages | Reza Vahabzadeh |
| Technology | Jeff Harlib |

**ABS / MBS**
| | |
|---|---|
| ABS Other | David Heike |
| MS/Adjustable-Rate Mortgages | Vikas Shilpiekandula |

*Note: Past performance is not indicative of future results*

## LEHMAN BROTHERS

7

# Leadership Breadth Across the Platform

## We hold top-tier market positions across major asset classes

### 8/1/2005 League Table Summary – Excluding Self-Funding (1)

| GLOBAL DEBT | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Citigroup | 303.3 | 8.7 |
| 2 Deutsche Bank AG | 232.9 | 6.7 |
| 3 Lehman Brothers | | 6.5 |
| 4 Morgan Stanley | 216.2 | 6.2 |
| 5 JP Morgan | 208.3 | 6.0 |

| US ASSET BACKED DEBT (incl. ABS/HE/CDOs) | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Lehman Brothers | | 9.1 |
| 2 Citigroup | 53.0 | 8.6 |
| 3 Merrill Lynch & Co Inc | 49.4 | 8.1 |
| 4 Morgan Stanley | 45.4 | 7.4 |
| 5 Deutsche Bank AG | 44.7 | 7.3 |

| EUROPEAN SECURITIZATIONS (incl. CDOs) | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Morgan Stanley | 17.9 | 9.3 |
| 2 Barclays Capital | 13.4 | 7.0 |
| 3 Citigroup | 13.0 | 6.8 |
| 4 Lehman Brothers | | 6.5 |
| 5 ABN AMRO | 11.9 | 6.2 |

| US INVESTMENT GRADE CORPORATES (LONG TERM) | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Citigroup | 63.3 | 16.0 |
| 2 JP Morgan | 42.2 | 10.6 |
| 3 Goldman Sachs & Co | 41.3 | 10.4 |
| 4 Banc of America Securities LLC | 34.1 | 8.6 |
| 5 Lehman Brothers | | |

| US ISSUERS: € & £ DENOMINATED ISSUANCE | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Lehman Brothers | | |
| 2 JP Morgan | 3.8 | 10.4 |
| 3 Citigroup | 3.1 | 8.3 |
| 4 Barclays Capital | 2.9 | 7.8 |
| 5 Merrill Lynch & Co Inc | 2.6 | 7.2 |

| US PREFERRED STOCK | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Lehman Brothers | | |
| 2 Goldman Sachs & Co | 1.7 | 10.2 |
| 3 JP Morgan | 1.6 | 9.6 |
| 4 Merrill Lynch & Co Inc | 1.5 | 9.1 |
| 5 Banc of America Securities LLC | 1.4 | 8.1 |

| US FEDERAL CREDIT AGENCIES (LONG TERM) | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Citigroup | 26.1 | 13.0 |
| 2 Lehman Brothers | | |
| 3 Deutsche Bank AG | 18.2 | 9.1 |
| 4 Merrill Lynch & Co Inc | 17.4 | 8.7 |
| 5 JP Morgan | 17.0 | 8.5 |

| US MORTGAGE BACKED DEBT | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Bear Stearns & Co Inc | 58.5 | 12.5 |
| 2 UBS | 49.5 | 10.6 |
| 3 Lehman Brothers | | |
| 4 Royal Bank of Scotland Group | 45.8 | 9.8 |
| 5 Banc of America Securities LLC | 37.7 | 8.0 |

| MUNICIPAL DEBT (Negotiated & Competitive) | Proc + OvrAlt. | Mkt sh |
|---|---|---|
| 1 Citigroup | 40.6 | 15.4 |
| 2 UBS | 30.8 | 11.7 |
| 3 Merrill Lynch & Co Inc | 17.6 | 6.7 |
| 4 Lehman Brothers | | |
| 5 Bear Stearns & Co Inc | 15.3 | 5.8 |

1. Long term denotes 18 months and longer. Full credit to book, equal if joint. Includes public and 144a securities. International Bonds excludes pfandbrief and self-led issues.
Source: Thompson Financial Inc. for all tables except for European Securitizations and Western Europe $ Denominated (sourced from Bondware)
Note: Proc + OvrAlt. is an abbreviation for Proceeds + Over Allotment and is denominated in Billions of Dollars. Note: Past performance is not indicative of future results.

## LEHMAN BROTHERS

8

# Leading Commercial Paper Franchise

## 2004 Greenwich Associates Survey

◆ Lehman Brothers is considered a top dealer among investors as evidenced by Lehman Brothers' performance in the Greenwich Survey

| Category | Estimated CP Market Share (16.7%) | Use Research to Add Value | Useful Direct Access to Traders | Most Competitive Dealer | Best at Structuring Asset Backed Commercial Paper |
|---|---|---|---|---|---|
| Ranking |  |  |  |  |  |
| What this Means | Lehman Brothers dominant market presence will provides issuers with the broadest view of the commercial paper market. Lehman Brothers diverse and prominent issuer base allows Lehman Brothers traders insight into market dynamics affecting all segments of the market. This knowledge is transferred to issuers in the most accurate pricing available | Lehman Brothers integrated approach of using Fixed Income Research Analysts to market commercial paper programs provides investors with accurate, insightful, and timely information. | Lehman Brothers traders are in constant dialogue with the investor community. This relationship allows Lehman Brothers traders to convey accurate and timely information issuers on investor demand and behaviour | Lehman Brothers provides the most aggressive markets for its issuers. Lehman Brothers provides issuers with the optimal liquidity available in the market. | Lehman Brothers is the #1 dealer for the fastest growing segment of the market. Lehman Brothers is on the cutting edge of providing financing solutions for both our Asset-Backed Commercial Paper clients as well as our corporate issuers |





9

LEHMAN BROTHERS



# A leader for Global Commercial Paper Programs

## Lehman Brothers is the #1 ranked Global Commercial Paper dealer [1]

### Global Ranking Based on Issuance Outstanding

| | Firm | Outstanding [2] |
|---|---|---|
| 1 | Lehman Brothers | $225 |
| 2 | Goldman Sachs | 212 |
| 3 | Merrill Lynch | 186 |
| 4 | JP Morgan Chase | 152 |
| 5 | Salomon Smith Barney | 89 |
| 6 | Morgan Stanley Dean Witter | 81 |
| 7 | Credit Suisse First Boston | 71 |
| 8 | Bank of America Securities | 70 |
| 9 | Deutsche Bank AG | 59 |
| 10 | Bank One Capital Markets, Inc. | 57 |
| 11 | UBS | 30 |

### Global Ranking Based on Number of Programs

| | Firm | Programmes |
|---|---|---|
| 1 | Goldman Sachs | 856 |
| 2 | Lehman Brothers | 851 |
| 3 | Citibank/ Salomon Smith Barney | 803 |
| 4 | Merrill Lynch | 695 |
| 5 | JP Morgan Securities | 500 |
| 6 | Deutsche Bank AG | 456 |
| 7 | UBS | 394 |
| 8 | Bank of America Securities | 385 |
| 9 | Credit Suisse First Boston | 327 |
| 10 | Morgan Stanley Dean Witter | 309 |
| 11 | Barclays Capital | 306 |

1. Source: Lehman Brothers, Bloomberg, CPWare, September 2004
2. USD in billion

**LEHMAN BROTHERS**

10

# Lehman Brothers Client Reporting Sample Pages

# Portfolio Reporting

- ◆ Comprehensive report delivered on the 1st business day following your monthly close which includes [1]
  - Cash Account Activity and Earnings Summary
  - Investment Classification (Taxable, Tax-free, DRD etc.)
  - Amortization Schedule (Premiums and Discounts)
  - Maturity Schedule (0–90 days, 90–180 days, over 180 days etc.)
  - Accrued Interest Summary (including pre-paid interest)
  - Breakdown of current period dividend/interest income
  - Positions are marked-to-market daily by two independent pricing agencies
- ◆ Electronic confirmations generated for each transaction
- ◆ Well-versed reporting specialists to answer questions
- ◆ Online access to account activity and holdings

**Custodian Services**

- ◆ Free safekeeping of securities
- ◆ Easily accessible account balance information
- ◆ Collection, reporting and distribution of interest and dividend income

**Research**

- ◆ Access to Lehman Brothers' proprietary fixed income and equity research, market indices etc.

1. Please note that the report could be customized to incorporate any additional accounting information you might need.

LEHMAN BROTHERS

11

Lehman Brothers

## Portfolio Summary - Settled Trades
### Security Type
*August 27, 2005 - September 26, 2005*
*30 Days in the Period*

| Tax Category / Security Type | Total Cost | Book Value | Market Value | Accrued Interest | Earned Interest | Interest Received | Amortization/ Accretion | Unrealized Gain/Loss | Avg. WAM | Avg. YTM | Pct. Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash** | | | | | | | | | | | |
| CASH AND SWEEP FUNDS | 770,939.10 | 770,939.10 | 770,939.10 | 5,297.91 | 10,731.83 | 5,433.92 | 0.00 | 0.00 | 1 | 2.468 | 0.4 |
| Totals Cash | 770,939.10 | 770,939.10 | 770,939.10 | 5,297.91 | 10,731.83 | 5,433.92 | 0.00 | 0.00 | 1 | 2.468 | 0.4 |
| **Taxable Securities** | | | | | | | | | | | |
| AUCTION RATE SECURITIES - TAXABLE | 6,025,000.00 | 6,025,000.00 | 6,025,000.00 | 55,731.25 | 22,593.75 | 0.00 | 0.00 | 0.00 | 1,018 | 4.500 | 3.5 |
| Totals Taxable Securities | 6,025,000.00 | 6,025,000.00 | 6,025,000.00 | 55,731.25 | 22,593.75 | 0.00 | 0.00 | 0.00 | 1,018 | 4.500 | 3.5 |
| **Tax-Exempt Securities** | | | | | | | | | | | |
| AUCTION RATE SECURITIES - TAX EXEMPT | 94,921,295.00 | 94,950,000.00 | 94,950,000.00 | 319,037.35 | 122,784.73 | 108,402.91 | 0.00 | 0.00 | 32 | 2.561 | 54.4 |
| Totals Tax-Exempt Securities | 94,921,295.00 | 94,950,000.00 | 94,950,000.00 | 319,037.35 | 122,784.73 | 108,402.91 | 0.00 | 0.00 | 32 | 2.562 | 54.4 |
| **Tax-Advantaged Securities** | | | | | | | | | | | |
| AUCTION RATE SECURITIES - TAX ADVANTAGED | 72,700,000.00 | 72,700,000.00 | 72,700,000.00 | 220,806.02 | 182,731.94 | 102,986.72 | 0.00 | 0.00 | 44 | 3.018 | 41.7 |
| Totals Tax-Advantaged Securities | 72,700,000.00 | 72,700,000.00 | 72,700,000.00 | 220,806.02 | 182,731.94 | 102,986.72 | 0.00 | 0.00 | 44 | 3.018 | 41.7 |
| **Grand Total** | 174,417,234.10 | 174,445,939.10 | 174,445,939.10 | 600,872.53 | 338,842.25 | 216,823.55 | 0.00 | 0.00 | 71 | 2.819 | 100.0 |

Realized Gain/Loss                                   0.00
Weighted Average YTM                               2.819
Weighted Average Tax-Equivalent YTM         4.050
Weighted Average Maturity (Days)                 71
Total Portfolio Value              175,046,811.63

1

12

LEHMAN BROTHERS

Lehman Brothers
## INTEREST ACCRUALS

*From 08-27-05 To 09-26-05*

| Security Symbol | Description | Beginning Accrued Interest | Purchased Interest | Sold Interest | Interest Received | Earned Interest | Ending Accrued Interest | Amortization/ Accretion |
|---|---|---|---|---|---|---|---|---|
| **AUCTION RATE SECURITIES - TAX EXEMPT** | | | | | | | | |
| 882716c8060 | Texas State Gie Sctrs-Ser B-1 | 83,288.89 | 0.00 | 0.00 | 0.00 | 13,266.67 | 106,555.56 | 0.00 |
| 106473d80060 | Colorado Hlth Fac Auth Rev Sxv | 0.00 | 0.00 | 0.00 | 0.00 | 585.00 | 585.00 | 0.00 |
| 254430na1060 | District Columbia Rev Savrs Ref | 6,027.40 | 0.00 | 0.00 | -19,178.08 | 16,569.86 | 3,419.18 | 0.00 |
| 520453sj0060 | Lawrenceburg Ind Pollutn Ctl R | 9,400.00 | 0.00 | 0.00 | -18,277.78 | 15,811.11 | 6,933.33 | 0.00 |
| 45200tx25060 | Illinois Hlth Fac Au Rv Savr R | 2,147.95 | 0.00 | 0.00 | 0.00 | 16,109.58 | 18,257.53 | 0.00 |
| 79765aa97060 | San Francisco Calif City & Rev | 0.00 | 33,133.33 | 0.00 | 0.00 | -17,266.66 | 15,866.67 | 0.00 |
| 649645fk5060 | New York State Energy Res & De | 15,831.11 | 0.00 | 0.00 | 0.00 | 18,266.67 | 34,097.78 | 0.00 |
| 12134dj3060 | Burke Cnty Ga Dev Auth Pollutn | 11,333.33 | 0.00 | 0.00 | -19,833.33 | 17,066.67 | 8,566.67 | 0.00 |
| 575831fe73060 | Massachusetts St Dev Fin Agy R | 12,020.55 | 0.00 | 0.00 | 0.00 | 8,013.70 | 20,034.25 | 0.00 |
| 92428cb24060 | Vermont Student Assistance Co | 0.00 | 49,687.67 | 0.00 | 0.00 | 9,863.01 | 59,550.68 | 0.00 |
| 13033ehm4060 | California Hsg Fin Agy Rev Sav | 11,387.67 | 0.00 | 0.00 | -19,910.96 | 14,234.58 | 25,622.25 | 0.00 |
| 575835qr7060 | Massachusetts St Health & Edl | 14,601.37 | 0.00 | 0.00 | 0.00 | 8,860.27 | 3,550.68 | 0.00 |
| 67752sqg5060 | Ohio St Air Quality Dev Auth A | 9,800.00 | 0.00 | 0.00 | -19,055.56 | 16,420.00 | 7,164.44 | 0.00 |
| 64123c309000 | Neuberger Berman Calif Inter M | 34,775.00 | 0.00 | 0.00 | -2,470.40 | -32,304.60 | 0.00 | 0.00 |
| 64124p309000 | Neuberger Berman Inter Fd Inc | 6,221.25 | 0.00 | 0.00 | -9,676.80 | 12,288.88 | 8,833.33 | 0.00 |
| | | 221,894.52 | 82,821.00 | 0.00 | -108,402.91 | 122,784.74 | 319,037.35 | 0.00 |
| **AUCTION RATE SECURITIES - TAXABLE** | | | | | | | | |
| 83413cqp4060 | County Of Solano Nta 7/9/2008 | 33,137.50 | 0.00 | 0.00 | 0.00 | 22,593.75 | 55,731.25 | 0.00 |
| | | 33,137.50 | 0.00 | 0.00 | 0.00 | 22,593.75 | 55,731.25 | 0.00 |
| **AUCTION RATE SECURITIES - TAX ADVANTAGED** | | | | | | | | |
| 30231ea05000 | Enron Project Investment Corp | 9,333.33 | 0.00 | 0.00 | -19,055.50 | 11,701.34 | 1,979.17 | 0.00 |
| 33848020500 | Preferred Income Pfd Fd Inc Mo | 1,860.00 | 0.00 | 0.00 | 0.00 | 18,600.00 | 20,460.00 | 0.00 |
| 33892020000000 | Fleet Funding Corp Money Mrkts | 30,341.11 | 0.00 | 0.00 | -31,632.16 | 19,366.61 | 18,075.56 | 0.00 |
| 36157wa23000 | Ge Capital Preferred Asset Cor | 3,333.33 | 0.00 | 0.00 | 0.00 | 20,000.00 | 23,333.33 | 0.00 |
| 36962278z000 | General Electric Capital Corp | 11,160.00 | 0.00 | 0.00 | 0.00 | 18,600.00 | 29,760.00 | 0.00 |
| 41013204000 | John Hancock Patriot Premium D | 23,128.50 | 0.00 | 0.00 | -25,184.48 | 15,954.42 | 13,898.44 | 0.00 |
| 41013a201000 | John Hancock Patriot Select Di | 6,942.22 | 0.00 | 0.00 | 0.00 | 18,933.34 | 25,875.56 | 0.00 |
| 52517y185000 | Lehman Bros Inc Cust Rcpts Bk | 8,350.00 | 0.00 | 0.00 | 0.00 | 13,916.67 | 22,266.67 | 0.00 |
| 52517y359000 | Lehman Bros Inc Cust Rcpts Bk | 19,519.17 | 0.00 | 0.00 | 0.00 | 9,925.00 | 29,444.17 | 0.00 |
| 52517y524000 | Lehman Bros Inc Cust Rcpts Bk | 401.11 | 0.00 | 0.00 | 0.00 | 6,016.67 | 6,417.78 | 0.00 |
| 52518q397000 | Lehman Bros Inc Cust Rcpts Pfd | 24,545.83 | 0.00 | 0.00 | -27,114.58 | 8,256.25 | 5,687.50 | 0.00 |

1

13

**LEHMAN BROTHERS**

Lehman Brothers

## Current Portfolio - Settled Trades
### Categorized By Holding Period
### All Positions
*August 27, 2005 - September 26, 2005*
*30 Days in the Period*

| Cusip / S&P / Moody (Security) | Quantity | Settle Date / Maturity Date / Interest From | Coupon Rate HP/DR / YTM | Total Cost / Premium Paid | Interest Paid In Period/ Outstanding | Accrued Interest | Earned Interest | Interest Received | Amort/Accrt / Accum. Amort/Accrt | Book Value / Market Value | Unrealized Gain/Loss | Pct. Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Multiple Lots in Position* | | | | | | | | | | | | |
| General Electric Capital Corp Variable Pfd Stk Ser Q | | | | | | | | | | | | |
| 2.790 Due <Perpetual> | 3,000,000 | 12/10/04 09/28/05 | 49 2.790 | 3,000,000.00 | 0.00 | 11,160.00 | 6,975.00 | 0.00 | 0.00 | 3,000,000.00 | | |
| 369022782  AA    Aa2 | | 08/31/05 | 2 2.790 | 0.00 | 0.00 | | | | 0.00 | 3,000,000.00 | 0.00 | 1.72 |
| General Electric Capital Corp Variable Pfd Stk Ser Q | | | | | | | | | | | | |
| 2.790 Due <Perpetual> | 2,000,000 | 01/26/05 09/28/05 | 49 2.790 | 2,000,000.00 | 0.00 | 7,440.00 | 4,650.00 | 0.00 | 0.00 | 2,000,000.00 | | |
| 369022782  AA    Aa2 | | 08/31/05 | 2 2.790 | 0.00 | 0.00 | | | | 0.00 | 2,000,000.00 | 0.00 | 1.15 |
| General Electric Capital Corp Variable Pfd Stk Ser Q | | | | | | | | | | | | |
| 2.790 Due <Perpetual> | 3,000,000 | 05/22/05 09/28/05 | 49 2.790 | 3,000,000.00 | 0.00 | 11,160.00 | 6,975.00 | 0.00 | 0.00 | 3,000,000.00 | | |
| 369022782  AA    Aa2 | | 08/31/05 | 2 2.790 | 0.00 | 0.00 | | | | 0.00 | 3,000,000.00 | 0.00 | 1.72 |
| *Subtotal Position* | 8,000,000 | | | 8,000,000.00 | 0.00 | 29,760.00 | 18,600.00 | 0.00 | 0.00 | 8,000,000.00 | | |
| | | | | 0.00 | 0.00 | | | | 0.00 | 8,000,000.00 | 0.00 | 4.59 |
| *Multiple Lots in Position* | | | | | | | | | | | | |
| Texas State Glo Sxvrs-Ser B-1 & B-2 | | | | | | | | | | | | |
| 2.740 Due 09-30-11 | 2,000,000 | 04/08/04 10/04/05 | 182 2.740 | 2,000,000.00 | 0.00 | 26,638.89 | 4,566.67 | 0.00 | 0.00 | 2,000,000.00 | | |
| 882716vx8  AA    Aa1 | | 04/05/05 | 8 2.740 | 0.00 | 0.00 | | | | 0.00 | 2,000,000.00 | 0.00 | 1.15 |
| Texas State Glo Sxvrs-Ser B-1 & B-2 | | | | | | | | | | | | |
| 2.740 Due 09-30-11 | 2,000,000 | 10/05/04 10/04/05 | 182 2.740 | 2,000,000.00 | 0.00 | 26,638.89 | 4,566.67 | 0.00 | 0.00 | 2,000,000.00 | | |
| 882716vx8  AA    Aa1 | | 04/05/05 | 8 2.740 | 0.00 | 0.00 | | | | 0.00 | 2,000,000.00 | 0.00 | 1.15 |
| Texas State Glo Sxvrs-Ser B-1 & B-2 | | | | | | | | | | | | |
| 2.740 Due 09-30-11 | 4,000,000 | 04/05/05 10/04/05 | 182 2.740 | 4,000,000.00 | 0.00 | 53,277.78 | 9,133.34 | 0.00 | 0.00 | 4,000,000.00 | | |
| 882716vx8  AA    Aa1 | | 04/05/05 | 8 2.740 | 0.00 | 0.00 | | | | 0.00 | 4,000,000.00 | 0.00 | 2.29 |
| *Subtotal Position* | 8,000,000 | | | 8,000,000.00 | 0.00 | 106,555.56 | 18,266.68 | 0.00 | 0.00 | 8,000,000.00 | | |
| | | | | 0.00 | 0.00 | | | | 0.00 | 8,000,000.00 | 0.00 | 4.59 |

2

14

# LEHMAN BROTHERS

Lehman Brothers

# Current Portfolio - Settled Trades
## Categorized By Holding Period
## All Positions
*August 27, 2005 - September 26, 2005*
*30 Days in the Period*

| Security | | | Quantity | Settle Date / Interest From | Maturity Date | HP / DR | Coupon Rate / YTM | Total Cost / Premium Paid | Interest Paid In Period/ Outstanding | Accrued Interest | Earned Interest | Interest Received | Amort/Accrt / Accum. Amort/Accrt | Book Value / Market Value | Unrealized Gain/Loss | Pct. Assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cusip | S&P | Moody | | | | | | | | | | | | | | |
| Ge Capital Preferred Asset Corp Money Market Ser M | | | | | | | | | | | | | | | | |
| 3.000 Due <Perpetual> | | | 3,000,000 | 03/29/05 | 10/18/05 | 48 | 3.000 | 3,000,000.00 | 0.00 | 8,750.00 | 7,500.00 | 0.00 | 0.00 | 3,000,000.00 | 0.00 | 1.72 |
| 36157m823 | AA | Aa3 | | 08/23/05 | | 14 | 3.000 | 0.00 | 0.00 | | | | 0.00 | 3,000,000.00 | | |
| *Subtotal Position* | | | *3,000,000* | | | | | *8,000,000.00* | *0.00* | *23,333.33* | *20,000.00* | *0.00* | *0.00* | *8,000,000.00* | *0.00* | *4.59* |
| | | | | | | | | *0.00* | *0.00* | | | | *0.00* | *8,000,000.00* | | |
| Vermont Student Assistance Corp Ed Ln Rev Var-Savs-Sr- Ser U | | | | | | | | | | | | | | | | |
| 2.500 Due 12-15-34 | | | 8,000,000 | 09/09/05 | 10/12/05 | 33 | 2.500 | 8,000,000.00 | -49,687.67 | 59,550.68 | 9,863.01 | 0.00 | 0.00 | 8,000,000.00 | 0.00 | 4.59 |
| 92428c84 | AAA | N.r. | | 06/15/05 | | 16 | 2.500 | 0.00 | -49,687.67 | | | | 0.00 | 8,000,000.00 | | |
| *Multiple Lots in Position* | | | | | | | | | | | | | | | | |
| Massachusetts St Dev Fin Agy Rev Savs-Bentley College | | | | | | | | | | | | | | | | |
| 1.950 Due 07-01-33 | | | 4,100,000 | 10/16/03 | 10/13/05 | 364 | 1.950 | 4,100,000.00 | 0.00 | 16,428.08 | 6,571.23 | 0.00 | 0.00 | 4,100,000.00 | 0.00 | 2.35 |
| 57583fv73 | AAA | Aaa | | 07/14/05 | | 17 | 1.950 | 0.00 | 0.00 | | | | 0.00 | 4,100,000.00 | | |
| Massachusetts St Dev Fin Agy Rev Savs-Bentley College | | | | | | | | | | | | | | | | |
| 1.950 Due 07-01-33 | | | 900,000 | 10/14/04 | 10/13/05 | 364 | 1.950 | 900,000.00 | 0.00 | 3,606.16 | 1,442.46 | 0.00 | 0.00 | 900,000.00 | 0.00 | 0.52 |
| 57583fv73 | AAA | Aaa | | 07/14/05 | | 17 | 1.950 | 0.00 | 0.00 | | | | 0.00 | 900,000.00 | | |
| *Subtotal Position* | | | *5,000,000* | | | | | *5,000,000.00* | *0.00* | *20,034.24* | *8,013.69* | *0.00* | *0.00* | *5,000,000.00* | *0.00* | *2.87* |
| | | | | | | | | *0.00* | *0.00* | | | | *0.00* | *5,000,000.00* | | |
| *Multiple Lots in Position* | | | | | | | | | | | | | | | | |
| Preferred Income Pfd Fd Inc Money Mkt Pfd Stk | | | | | | | | | | | | | | | | |
| 2.790 Due <Perpetual> | | | 5,000,000 | 12/23/04 | 10/13/05 | 49 | 2.790 | 5,000,000.00 | 0.00 | 12,787.50 | 11,625.00 | 0.00 | 0.00 | 5,000,000.00 | 0.00 | 2.87 |
| 338480205 | N.R. | Aa1 | | 08/25/05 | | 17 | 2.790 | 0.00 | 0.00 | | | | 0.00 | 5,000,000.00 | | |

15

# Cash Management

Income from municipal securities may be subject to state and local income taxes and to the Alternative Minimum Tax (AMT). This information does not constitute tax advice. Neither Lehman Brothers nor its employees render tax or legal advice. Investors should consult their own tax advisor or attorney with regard to their personal tax situation. Call features may exist which could affect yield; complete information will be provided upon request. Municipal securities offerings are subject to changes in price and or availability. For more information regarding a specific municipal security, please consult the Official Statement.

Portfolios that invest in very short-term securities provide taxable or tax-advantaged current income, pose little risk to principal and offer the ability to convert the investment into cash quickly. These investments may result in a lower yield than would be available from investments with a lower quality or longer term.

Treasury securities are backed by the full faith and credit of the United States Government as to the timely payment and principal and interest. A bond's value may fluctuate based on interest rates, market conditions, credit quality and other factors. You may have a gain or loss if you sell your bonds prior to majority. Of course, bonds are subject to the credit risk of the issuer.

CDs are FDIC insured as to principal and interest, and offer a fixed rate of return, while the return and principal value of other investments will fluctuate.

This document is for information purposes only and it should not be regarded as an offer to sell or as a solicitation of an offer to buy the securities or other instruments mentioned in it. No part of this document may be reproduced in any manner without the written permission of Lehman Brothers Inc. Information in this document has been obtained from various sources; we do not represent that this information is accurate or complete and it should not be relied upon as such. Opinions expressed herein are subject to change without notice. The products mentioned in this document may not be eligible for sale in some states or countries, nor suitable for all types of investors; their value and the income they produce may fluctuate and/or be adversely affected by exchange rates, interest rates, or other factors. Performance numbers are calculated using a time-weighted rate of return. The performance figures presented are net of investment manager fees. Additional information will be provided upon request.

Lehman Brothers Inc. and/or its affiliated companies may make a market or deal as principal in the securities mentioned in this document or in options or other derivatives based thereon. In addition, Lehman Brothers Inc., its affiliated companies, shareholders, directors, officers and/or employees, including persons involved in preparation or issuance of this material, may from time to time have long or short positions in such securities or in options, futures, or other derivative instruments based thereon. One or more directors, officers, and/or employees of Lehman Brothers Inc. or its affiliated companies may be a director of the issuer of the securities mentioned in this document. Lehman Brothers Inc. or its affiliated companies may have managed or comanaged a public offering of securities for any issuer mentioned in this document within the last three years. © 2006 Lehman Brothers Inc. All rights reserved. Member SIPC.

**LEHMAN BROTHERS**

16

## Rate Sheet

| | 1 Month | 3 Month | 6 Month | 1 Year |
|---|---|---|---|---|
| | Pre-Tax / After-Tax | Pre-Tax / After-Tax | Pre-Tax / After-Tax | Pre-Tax / After-Tax |
| Instl Prime Obligations Fd | 5.18 / 3.07 | 5.18 / 3.07 | | |
| Tax Free Money Market | 3.61 / 3.40 | 3.61 / 3.40 | | |
| Taxable SAVR (35 Day - 3 Month) | 5.20 / 3.08 | 5.23 / 3.09 | 5.23 / 3.09 | 5.23 / 3.09 |
| Tax Exempt VRDN (35 Day - 3 Month) | 3.80 / 3.58 | 3.82 / 3.60 | 3.80 / 3.60 | 3.80 / 3.60 |
| US Treasuries | 4.79 / 3.11 | 4.78 / 3.11 | 4.97 / 3.23 | 5.07 / 3.30 |
| US Gov't Agency Bullet | 5.29 / 3.44 | 5.35 / 3.48 | 5.33 / 3.46 | 5.30 / 3.45 |
| US Gov't Agency (NC 3mo) | -- | -- | 5.50 / 3.58 | 5.30 / 3.45 |
| AAA Corporates | -- | 5.40 / 3.20 | 5.40 / 3.20 | 5.35 / 3.17 |
| GM Municipals (<1yr =vrdn/1 yr = GM) | 3.82 / 3.60 | 3.82 / 3.60 | 3.82 / 3.60 | 3.65 / 3.65 |

After-tax yields assume Federal tax of 35% and 8.97% New Jersey state tax.

12/18/2007

08-13555-mg    Doc 33907-1    Filed 01/15/13    Entered 01/15/13 15:45:05    Exhibit A
Pg 90 of 134

| | 1 Month | 6 Month | 1 Year | 2 Year | 5 Year |
|---|---|---|---|---|---|
| | Pre-Tax / After-Tax | Pre-Tax / After-Tax | Pre-Tax / After-Tax | Pre-Tax / After-Tax | Pre-Tax / After-Tax |
| NY Muni Money Fd | 2.62 / 2.62 | | | | |
| Treasury Obligations Fd | 4.32 / 3.11 | | | | |
| Prime Obligations Fd | 4.43 / 2.65 | -- | -- | -- | -- |
| Tax Exempt SAVR (7Day) | 3.05 / 3.05 | | | | |
| Tax Exempt SAVR (35 Day) | 3.10 / 3.10 | -- | -- | -- | -- |
| US Treasuries | 4.40 / 3.17 | 4.68 / 3.37 | 4.65 / 3.35 | 4.60 / 3.31 | 4.53 / 3.26 |
| US Gov't Agencies (NC 3mo) | 4.39 / 3.16 | 4.65 / 3.35 | 4.75 / 3.42 | 4.85 / 3.49 | 4.90 / 3.53 |
| AAA Corporates | -- | 4.90 / 2.93 | 4.90 / 2.93 | 4.92 / 2.94 | 4.98 / 2.98 |
| NYC Municipals | -- | -- | 3.25 / 3.25 | 3.30 / 3.30 | 3.45 / 3.45 |
| Municipals GM | -- | -- | 3.30 / 3.04 | 3.36 / 3.09 | 3.54 / 3.26 |

After-tax yields assume combined NYC and AMT tax rate of 40.15%

# Our Team and Our Values

## Who We Are

Our team is comprised of 10 individuals; 6 professionals, 2 analysts and 2 assistants. The three senior partners each have over twenty years of experience in the business. The clients that we work with say that we bring to them an unparalleled level of wealth management expertise and service when addressing their needs.

## Underlying principles of what we do

- We are relationship-oriented, not transaction-oriented. We look at all interactions as setting the foundation for a longer-term relationship.
- Clients and their advisors expect communication, expertise and confidentiality and we deliver on their expectations.
- Our focus is on the big picture, and we are also detailed oriented. We take ownership of a client's issues and accountability is at the team level.

## Our approach to working with clients

Our approach is simple. We partner with our clients and their advisors and put them at the center of everything we do. We provide them with our best intellectual capital by maximizing all of the resources of the firm to help them achieve their objectives. We are relentless about advice, execution and service.

LEHMAN BROTHERS

1

**Wealth Advice**

# Our Approach to Wealth Management Advice

**Our team, including our legal and accounting professionals, work with you and your advisors, through a tailored process, to develop a plan to manage your risk and help preserve and enhance your wealth**

Wealth Advice

**Wealth Management Needs Analysis**

- Understand financial goals and objectives
- Understand wealth transfer needs
- Understand personal goals, including family situations, philanthropy
- Understand risks of special professional and personal situations

**Review Existing Plans**

- Review existing documents (wills, trusts, etc.) in connection with your advisors
- Assess concentrated assets and any special situations
  - Stock
  - Real Estate
  - Business
  - Art

**Make Recommendations**

- Determine wealth transfer plan
- Maximize return / risk trade-off
- Develop or update trust and tax vehicles
- Develop family communication and wealth education plan

**Implementation**

- Implement plan by leveraging your advisory team
  - Lehman Brothers Team
  - Attorneys
  - Accountants
  - Lehman Brothers Trust Company

**Ongoing Monitoring of the Environment**

- Monitor tax and estate law changes and communicate significant events to your Investment Representative
- Review and make adjustments to comprehensive wealth management plan in response to tax and estate law, personal and familial changes
- Ongoing family communication and wealth education assistance

*Note: Neither Lehman Brothers Inc. nor its employees provide tax or legal advice. Please consult with your accountant, tax advisor and/ or attorney for advice concerning your particular circumstances. Depending on the type of account that you have with Lehman Brothers Inc., the services discussed may combine the capabilities of the Wealth Advisory group of Lehman Brothers Inc. with the Lehman Brothers Trust Company N.A.*



LEHMAN BROTHERS

2

# An Efficient Wealth Management Plan

**After understanding your issues and discussing the options, we work with you and your advisors to create a tax-efficient wealth management plan that balances your financial and personal goals**

Wealth Advice

## Financial Goals

- Minimizing the implication of taxes during wealth transfer
- Minimizing the financial implication of your death
- Maximizing wealth transfer during your lifetime
- Ensuring your family owned business is passed to your children
- Tying investments to your overall objectives

## Creating Your Plan

- Maximize non-taxable transfers
- Establish trusts with specific parameters for your children
- Select executor(s) and trustee(s) who understand your goals and are capable of seeing them through after your death
- Establish communication and wealth education strategy for your family
- Establish philanthropy plan to minimize taxes and establish legacy
- Establish business succession plan to pass business successfully to the next generation

## Personal Goals

- Ensuring your family will be financially secure upon your death
- Ensuring your children are responsible adults
- Communicating with your children about wealth
- Providing for family with special needs
- Leaving a legacy in your community
- Fulfilling your charitable goals

### Your Wealth Management Plan

*Note: Neither Lehman Brothers Inc. nor its employees provide tax or legal advice. Please consult with your accountant, tax advisor and / or attorney for advice concerning your particular circumstances. Depending on the type of account that you have with Lehman Brothers Inc., the services discussed may combine the capabilities of the Wealth Advisory group of Lehman Brothers Inc. with the Lehman Brothers Trust Company, N.A.*

**LEHMAN BROTHERS**

3

# Portfolio Advice and Asset Management

# The Ingredients of Sound Portfolio Advice

Portfolio Advice and Asset Management

**Our Portfolio Advisory team includes specialists, economists, investment managers, analysts and third-party consultants who work together, guided by proven, research-based processes, to develop your comprehensive portfolio strategy**

Our Portfolio Advisory Process

Portfolio Needs Analysis

Customized Asset Allocation

Investment Selection & Implementation

Ongoing Investment Monitoring & Rebalancing

Innovative Research

4

LEHMAN BROTHERS

# Understanding Your Portfolio Needs

Portfolio Advice and Asset Management

In working with you to set the foundation for your comprehensive investment strategy,
we assess your risk tolerance and your investment objectives and constraints

## Qualitative Factors

- ◆ Investment Objectives
  - – Goals for current holdings
  - – Time horizon
  - – Ability to cover:
    - – Income, liquidity and family needs
    - – Major expenditures and upcoming financial events
    - – Planned giving
  - – Tax, trust and estate considerations
  - – Capital gains tax liabilities

- ◆ Risk Tolerance
  - – Tolerance for volatility and loss
  - – Expectations for performance

- ◆ Investment Constraints
  - – Significant exposure to a single company
  - – Ownership of private equity and real estate interests
  - – Select asset class, company or sector aversion

## Your Portfolio Needs Assessment

- ◆ Based on qualitative factors, we set parameters for your portfolio geared toward optimizing your asset allocation and portfolio strategy

Note: Neither Lehman Brothers Inc. nor its employees render tax or legal advice. Please consult your accountant, tax adviser and/or attorney for advice concerning your particular circumstances.

LEHMAN BROTHERS

5

# Creating a Customized Asset Allocation

Portfolio Advice and Asset Management

Our Portfolio Advisory team balances the results of your portfolio needs assessment with several quantitative factors to determine the optimal asset allocation for you

## Your Portfolio Needs Assessment

### Quantitative Factors

- Analyze concentrated assets including stock, illiquid and privately held assets
- Analyze option holdings and vesting schedules
- Analyze current investments
- Quantify historical and expected risk and return for each asset class
- Analyze asset class correlations

## Determine Optimal Allocation

- Optimize your asset allocation based on quantitative and qualitative inputs
- Execute optimization process to match your risk profile with a customized asset allocation
- Create a client centric implementation emphasizing wealth preservation in down markets
- Perform regression and correlation analysis for special investment situations
- Construct wealth simulations and event crisis stress tests
- Incorporate Asset Allocation Committee views on economic environment

## Your Optimal Asset Allocation

- Your optimal asset allocation helps guide portfolio investment selection and implementation

*Note: Neither Lehman Brothers Inc. nor its employees render tax or legal advice. Please consult your accountant, tax adviser and/or attorney for advice concerning your particular circumstances.*

LEHMAN BROTHERS

6

Portfolio Advice and Asset Management

# Investment Selection and Implementation

**Guided by your optimal asset allocation, we evaluate investment solutions on our platform to build a well-diversified portfolio designed to help you meet your objectives**

**Your Optimal Asset Allocation**

**Selecting Investments for Your Portfolio**

- Review optimal asset allocation against current portfolio to identify asset class and style gaps
- Analyze managers and products on platform to determine potential role in portfolio
- Select complementary managers and products that conform to parameters set by asset allocation
- Look outside the Firm or develop new solutions to meet specific needs not addressed by the platform
- Analyze manager holdings to mitigate investment overlap in portfolio
- Identify and plan for tax implications of portfolio realignment

**Your Recommended Portfolio**

- An optimal combination of investments and managers whose style and objectives are in line with your asset allocation

LEHMAN BROTHERS

7

# Open Architecture Traditional Asset Management

Portfolio Advice and Asset Management

## We offer customized traditional investment management based on tax situation, risk tolerance, liquidity needs and more



**Top-Rated Proprietary Solutions**

- ◆ **Neuberger Berman**
  - One of the oldest, most respected names in money management
  - Full spectrum of asset classes, investment styles and capitalization ranges
  - Managers average over 26 years of experience and, in many cases, are in the top quartile of their peer group
- ◆ **Fixed Income**
  - Specialists will create customized laddered portfolios for active management
- ◆ **Cash management**
  - We offer funds and customized portfolios
  - Manage global diversified investments intended to provide liquidity and at a low-fee
- ◆ **Specialty Investment Management**
  - To diversify traditional portfolios and increase risk-adjusted return
  - Includes Real Estate Investment Trusts, Master Limited Partnerships and Commodities



**Global Network of Non-Proprietary Solutions**

- ◆ **Access to a global network of exclusive, boutique managers**
  - Highly focused platform of world-class investment managers and selected unaffiliated managers
  - Unique access to a select group of limited availability managers representing a broad range of asset classes and strategies
  - Thorough manager selection process by our internal research group and an independent consultant to ensure an in-depth understanding of each manager and to provide objectivity
  - Selection criteria focus:
    - Best-in-class managers operating on a smaller scale with a focus on HNW clients
    - Managers who generate alpha and are not constrained by style box
    - Managers with strong fund management fundamentals and an impressive track record

*Note: The strategies and funds listed here carry different risks and rewards. Please consult your Lehman Brothers Investment Representative to determine which investments are right for you.*

## LEHMAN BROTHERS

8

# Alternative Investments

**Portfolio Advice and Asset Management**

**Depending on your objectives and risk tolerance, it may be appropriate to include alternative investments in your portfolio; we leverage the Firm's strength in alternative investment management to develop your portfolio of alternatives**

- ◆ Access to exclusive investment opportunities including private equity and real estate partnerships and hedge funds
- ◆ Diversification and downside protection in declining markets through noncorrelated returns
- ◆ Potential for an enhanced risk-return profile, featuring attractive returns with reduced volatility

- ◆ Active private equity investor since 1984 with $16.6 billion in committed capital since inception[1]
- ◆ 25% of committed capital is from Lehman Brothers and its employees, reflecting our aligned interest with clients
- ◆ Special expertise in a broad range of private equity asset classes, providing diversified exposure
- ◆ Wide range of affiliated and non-affiliated private equity funds of funds
- ◆ Proprietary deal flow provides access to exclusive investment opportunities

- ◆ The institutional and speculative nature of alternative investments means thorough due diligence is required before investing in alternative investments
- ◆ Lehman Brothers employs a research group who focus solely on alternative investments
- ◆ Before we recommend a third party alternative investment we take the following steps
  - – Background check on the company and all key people in the fund
  - – Legal review of all documents, the firm and the fund structure
  - – On-site review to ensure proper controls and independence
  - – Service provider diligence on funds administrator, prime broker and auditor
- ◆ This is a continuous process – all funds are evaluated on a regular cycle

---

1.  *As of 3/31/06.*
*Note: The strategies and funds listed here carry different risks and rewards. Please consult your Lehman Brothers Investment Representative to determine which investments are right for you.*

**LEHMAN BROTHERS**

9

# Opportunistic Investments

## Based on your needs and objectives we can create innovative solutions to take advantage of tactical opportunities



**Research-Driven Investments**

- ◆ Research-driven investments based on our top-rated equity and fixed income research
- ◆ We interpret and transform the volumes of financial information into meaningful investments that create value



**Concentrated Asset Liquidity Management**

- ◆ Opportunities to create liquidity and diversification with downside protection of your concentrated assets
- ◆ Including specialists to work with your advisors to address:
  - – Tax implications
  - – Restrictions
  - – Lock-up periods



**Diversification through Structured Investments**

- ◆ Structured equity and fixed income investments for opportunistic investors through private placements and publicly registered offerings
- ◆ Including investments to:
  - – Focus on a specific sector, index, country or single stock in a way not possible using cash markets
  - – Seek a higher yield alternative to common stock, with or without principal protection
  - – Seek to leverage equity market exposure with our without principal protection
  - – For yield enhancement and / or volatility reduction on a diversified portfolio

*Note: The strategies and funds listed here carry different risks and rewards. Please consult your Lehman Brothers Investment Representative to determine which investments are right for you. Neither Lehman Brothers Inc. nor its employees render tax or legal advice. Please consult your accountant, tax adviser and/or attorney for advice concerning your particular circumstances.*

**LEHMAN BROTHERS**

10

# Ongoing Investment Monitoring and Rebalancing

Portfolio Advice and Asset Management

**We monitor your portfolio and your situation, adjusting as necessary to keep the two in alignment. We also rigorously monitor our investment managers to ensure they adhere to their stated strategy and are meeting performance expectations**

### Ongoing Evaluation

♦ Factors we monitor:
  – Change in needs / situation
  – Portfolio deviates from expectations
  – Strategic change to manager or investment on platform
  – Asset Allocation Committee makes strategic asset allocation change

### Determine Effect on Portfolio

♦ How we assess those potential changes:
  – Revise portfolio strategy to address change in needs / situation
  – Analyze impact of portfolio performance deviation, investment platform changes and strategic asset allocation changes

### Next Steps

♦ Propose and discuss recommended changes to portfolio
♦ Evaluate alternate managers when one is removed from platform

LEHMAN BROTHERS

11

# EXHIBIT B

**From:** Catherine Wilkins
**Sent:** Tuesday, July 10, 2007 4:36 PM
**To:** John Liu
**Subject:** RE: Maher Investment Policy

---

**From:** John Liu
**Sent:** Tuesday, July 10, 2007 4:36 PM
**To:** Catherine Wilkins
**Subject:** RE: Maher Investment Policy

Can you email me a copy?  Thanks.

---

**From:** Catherine Wilkins
**Sent:** Tuesday, July 10, 2007 4:35 PM
**To:** John Liu
**Subject:** FW: Maher Investment Policy

Lehman received the investment policy.

---

**From:** Haber, Sandy [mailto:SHaber@lehman.com]
**Sent:** Tuesday, July 10, 2007 4:34 PM
**To:** Catherine Wilkins
**Subject:** RE: Maher Investment Policy

Catherine,

Thank you for sending this.

Kind Regards,
Sandy

---

**From:** Catherine Wilkins ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, July 10, 2007 4:11 PM
**To:** Haber, Sandy
**Subject:** FW: Maher Investment Policy

Dear Mr. Haber:

Attached please find a PDF of Maher's Investment Policy.

If you have any questions, please do not hesitate to contact John Liu or me.

Sincerely,
Catherine

---

Catherine M. Wilkins

Assistant to John D. Liu



------------------------------------------------------------
The information contained in this message may be privileged and
confidential and protected from disclosure.If the reader of this
message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this
communication in error, please notify us immediately by replying to
this message and deleting it from your computer. Thank you.
Greenhill & Co. LLC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended
only for the personal and confidential use of the designated recipient(s) named above. If
you are not the intended recipient of this message you are hereby notified that any
review, dissemination, distribution or copying of this message is strictly prohibited. This
communication is for information purposes only and should not be regarded as an offer to
sell or as a solicitation of an offer to buy any financial product, an official confirmation
of any transaction, or as an official statement of Lehman Brothers. Email transmission
cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this
information is complete or accurate and it should not be relied upon as such. All
information is subject to change without notice. -------- IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to be used and
cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.
------------------------------------------------------------
The information contained in this message may be privileged and
confidential and protected from disclosure.If the reader of this
message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this
communication in error, please notify us immediately by replying to
this message and deleting it from your computer. Thank you.
Greenhill & Co. LLC.

# MAHER TERMINALS HOLDINGS CORP.

1. **Purpose.** This corporate investment policy is designed to provide the operational guidelines for the management of the company's corporate cash assets.

2. **Objectives.**

    A. Preserve capital;

    B. Provide sufficient liquidity to satisfy operating requirements, working capital purposes and strategic initiatives;

    C. Capture a market rate of return based on the company's investment policy parameters and market conditions.

3. **Eligible Instruments.** Assets subject to this investment policy may be invested only in the following U.S. dollar denominated securities:

    - Money market mutual funds
    - Obligations of a U.S. Federal Agency or U.S. government sponsored enterprise
    - Auction Rate Certificates
    - Auction Preferred Stock
    - Commercial Paper
    - Obligations issued by the U.S. Treasury
    - Certificates of Deposit
    - Corporate Debt
    - Municipal Securities
    - Variable Rate Demand Obligations
    - Repurchase Transactions

4. **Final Maturity.** No security in the account may have a final maturity of more than 3 months. With respect to any Eligible Instrument that has an auction or put feature, the next auction, put or reset date, and not final maturity, should be used as the instrument's final maturity for all purposes hereunder including, but not limited to, application of the weighted average maturity restriction below.

5. **Weighted Average Maturity.** The account's weighted average maturity may not exceed 2 months.

6. **Credit Rating Minimums.** Account assets may be invested only in Eligible Instruments: (i) bearing a credit rating of AI/PI/FI or higher for short-term investments and; (ii) bearing a credit rating of AI/A+ or higher for longer-term investments.

7. **Issuer Concentration.** No more than 15% of the total portfolio per issuer [and/or] no more than 15% of the total issue size outstanding, at the time of purchase.

8. **Communication.** The investment provider will contact the Scott Schley and John Liu as soon as reasonably practicable upon the occurrence of any of the following events:

    A. A security held in the account is downgraded;

    B. A security held in the account is downgraded causing the credit quality to fall below the minimum standards stated in this Investment Policy.

9. ***Internal Controls.*** Scott Schley, General Counsel, and John Liu, Advisor, of the company are responsible for ensuring that the company's investment portfolio is properly accounted for at all times. This will include:

   A.  The establishment and maintenance of files for all accounts with broker-dealers or asset managers and related transaction confirmations and periodic account statements

   B.  The preparation of journal entries on a monthly basis to accrue investment income earned on investments, amortization of premiums or discounts, cash receipts and fund transfers

   C.  The reconciliation of all periodic account statements received from the organizations investing the company's cash, and from the company's custodian, to the general ledger

   D.  The notification to an investment provider in the event of any change in the company's investment policy objectives, authorized persons or income tax status

   E.  Confirming that an account at a broker-dealer or asset manager conforms to the terms of this investment policy statement and notifying the investment provider in the event of nonconformance

   Scott Schley, General Counsel, and John Liu, Advisor, are authorized to amend this IPS.

10. ***Other.*** List any other guidelines, limits or restrictions applicable to the account.

# EXHIBIT C

# LEHMAN BROTHERS

**Client Agreement
(Separate Tax Form Required)**

Before you sign this agreement, read it thoroughly and return this completed and signed agreement to your Investment Representative. Subsequently you will receive literature containing important information about your new account. Read the information carefully and retain it for future reference.

| Account Number | | | | | | | | T | C | IR | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Name (as shown on your IRS Form W-9 or W-8, if applicable)

*Maher Terminals Holdings Corp.*

Business Name (if different from above)

Mailing Address
*See Page 2*

Mailing Address (Continued)

---

**A.** **Name Disclosure.** *Please indicate your choice as to the release or withholding of your name, address and securities positions to issuing corporations.*

☐ YES, I do want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers Inc. ("Lehman").

☑ NO, I do not want my name, address and securities positions disclosed to any companies, upon their request, in which I own securities that are being held for me at Lehman Brothers Inc. ("Lehman").

---

**B.** **Cash Sweep (Please check one)**

☑ I Elect Cash Sweep

☐ I Do Not Elect Cash Sweep

If I Elect Cash Sweep by checking the appropriate box above, I agree and direct that available cash in my account will automatically be swept to Lehman Brothers Bank, FSB ("Lehman Bank") through the Lehman Bank Cash Deposit Account ("LBCDA"). I understand and agree that I may elect an available money market fund sweep for my account if I meet certain eligibility requirements. Eligibility requirements are set forth in the Lehman Brothers Cash Sweep Program Disclosure Statement that is being forwarded to me; I can also contact my Investment Representative. I understand and agree that it is my responsibility to monitor my account(s), including any linked account, to determine whether I meet the eligibility requirements for a money market fund sweep, and I must contact my Investment Representative to change my cash sweep from the LBCDA to an eligible money market fund.

If I am not eligible to have cash swept to the LBCDA and I Elect Cash Sweep, then I agree and direct that available cash in my account will sweep to a money market fund which I direct and for which I am eligible. Available money market funds are set forth in the Lehman Brothers Cash Sweep Program Disclosure Statement, or I can contact my Investment Representative.

If I Do Not Elect Cash Sweep by checking the appropriate box above (or I do not check either box), I understand and agree that available cash in my account will be a "free credit balance" and will not earn interest.

Please see Paragraph 12 of the account terms and conditions and the Lehman Brothers Cash Sweep Program Disclosure Statement for more information. Clients subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") please also see Paragraph 13 of the account terms and conditions.

---

**C.** **Joint Account With Rights of Survivorship.** If the account has more than one owner, this agreement establishes a Joint Account with Rights of Survivorship. To establish a Tenancy in Common instead, all account owners must execute a Joint Account Agreement As Tenants In Common (LB form 2103) in addition to this Client Agreement. Note: Texas residents must also execute a Texas Joint Account Supplement To Client Agreement (LB form 0171).

---

**D.** **Tax Information.** As applicable, please submit the appropriate IRS Form W-8 or W-9 (available from your Lehman Brothers representative or at www.irs.gov

---

If you find that you encounter any questions regarding the tax implications of your Lehman Brothers account, please consult with your tax adviser and/or attorney for advice considering your particular circumstances. Neither Lehman Brothers nor any of its affiliated companies renders tax advice or legal advice.

---

Form: 0004/0232,0131,0233,0134 ; Rev V1.1, 06/07
Name: Client Agreement (Ind. Cash/Ind. Margin/Jt. Cash/Jt. Margin)
© Lehman Brothers Inc., Member SIPC, All Rights Reserved

**Client Acknowledgment (Applies to all accounts)**

I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of this Agreement. If this is a joint account, we further acknowledge that we have read, understand and agree to the terms of this agreement contained in paragraph 20. *Note: Texas residents must execute a Texas Joint Account Supplement To Client Agreement (LB form 0171).* I (We) acknowledge that I (we) have received a copy of the agreement(s). The Client Agreement contains a pre-dispute arbitration clause on page 3 at Paragraph 21. I (We) have read the Agreement(s) and agree to the terms. Read and Acknowledged:

| Sign Here ▶ | 1. Account Owner's Signature | Date (MMM-DD-YYYY) 7/10/07 | Sign Here ▶ | 2. Account Owner's Signature | Date (MMM-DD-YYYY) 7/10/07 |
|---|---|---|---|---|---|
| Sign Here ▶ | 3. Account Owner's Signature | Date (MMM-DD-YYYY) | Sign Here ▶ | 4. Account Owner's Signature | Date (MMM-DD-YYYY) |

**Margin Account Supplement.** *Complete this section only if you accept the margin agreement described in paragraphs 29 through 32 of this agreement.*

In consideration of Lehman opening and maintaining one or more margin accounts on my behalf, I (we) hereby acknowledge that I (we) have read, understand and agree to the terms of a margin account contained in paragraphs 29 through 32 of this agreement. By signing this agreement, I (we) acknowledge that my (our) securities may be loaned to you or loaned out to others. If this is a joint margin account, all parties must sign. Read and Acknowledged:

| Sign Here ▶ | 1. Account Owner's Signature | Date (MMM-DD-YYYY) | Sign Here ▶ | 2. Account Owner's Signature | Date (MMM-DD-YYYY) |
|---|---|---|---|---|---|
| Sign Here ▶ | 3. Account Owner's Signature | Date (MMM-DD-YYYY) | Sign Here ▶ | 4. Account Owner's Signature | Date (MMM-DD-YYYY) |

All STATEMENTS, ETC TO be SENT TO following ADDRESSES:

M. BRIAN MAHER
MAHER TERMINALS Holdings CORP


BASIL MAHER
MAHER TERMINALS Holdings CORP.


Scott Schley
MAHER TERMINALS Holdings CORP.

Form: 0004/0232,0131,0233,0134 ; Rev V1.1, 06/07
Name: Client Agreement (Ind. Cash/Ind. Margin/Jt. Cash/Jt. Margin)
© Lehman Brothers Inc., Member SIPC, All Rights Reserved

**CLIENT DISCLOSURE.** This account agreement is for a brokerage account and not an advisory account. Lehman's interests may not always be the same as the Client's. Please ask Lehman questions to make sure Client understands his or her rights and Lehman's obligations to Client, including the extent of Lehman's obligations to disclose conflicts of interest and to act in Client's best interest. Lehman is paid both by Client and, sometimes, by people who compensate Lehman based on what Client buys. Therefore, Lehman's profits, and Lehman's salespersons' compensation, may vary by product and over time.

Furthermore, Client's account may be invested in investment products or services from which Lehman or Lehman's affiliates derive compensation and which Lehman may have an incentive to use instead of other similar investments. Client understands that Lehman and Lehman's affiliates act in various capacities with respect to such products, services, and funds and may receive fees for doing so. Lehman may compensate its employees who refer Client's account(s) to the firm. The sale of certain investment products and funds may result in an additional payment to the selling registered representative.

In consideration of Lehman accepting my account and agreeing to act as my registered representative, I agree to the following with respect to any of my accounts with you for extensions of credit and the purchase and sale of securities, options, and other property. This agreement shall not become effective until accepted by you. Throughout this agreement, "I," "me," "my," "we," and "us" refer to the client and all others who are legally obligated on my accounts. "You" and "your" refer to Lehman, its subsidiaries, parents and their officers, directors, agents and/or employees.

**1. MY REPRESENTATIONS.** I represent that I am of the age of majority according to the laws of my place of residence and that I am not an employee of any exchange or the National Association of Securities Dealers, Inc. ("NASD"), or of a member firm of any exchange of the NASD or of a bank, trust company, insurance company, registered investment company or registered investment advisory firm, unless I have notified you. If I become so employed, I will notify you promptly. I represent that no persons other than those signing this agreement have an interest or beneficial ownership in my account. I represent that the financial information and investment objectives provided to you are accurate in all material respects and that I will promptly inform you of any material changes in my financial or other circumstances, including investment objectives.

**2. DEFINITION OF "PROPERTY."** In this agreement the word "property" means securities of all kinds, certificates of deposit, commercial paper, monies, cash deposits, options, commodities and contracts for the future delivery of, or otherwise relating to, commodities or securities and all other property usually and customarily dealt in by brokerage firms.

**3. ORDERS, EXECUTIONS, DELIVERIES, SETTLEMENTS AND ORAL AUTHORIZATIONS.** In giving orders to sell, I will inform you which sales are "short" and which are "long" sales. A "short sale" means any sale of a security not owned by the seller or any sale that is consummated by delivery of a borrowed security. If the security is not in your possession at the time of the contract for sale, I will deliver it to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to my accounts. If you fail to receive payment for securities purchased you may, without prior demand or notice, sell all securities and other property held by you in any of my accounts and charge any resulting loss to my account. Unless otherwise agreed, you will, at your sole discretion and without prior notice, execute the order on the over- the-counter market or on any exchange in any location, including a foreign exchange where such security is traded, either as principal or agency basis.

**4. OPTION POSITIONS; MARGIN DEPOSITS.** I understand and agree to be bound by the Rules of the applicable Options Exchange or Association as well as the Options Clearing Corporation (OCC). I agree not to buy or sell any equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions, and risks, as set forth in the Characteristics and Risks of Standardized Options booklet and applicable supplements that you provide prior to such transactions. Clients' short options positions can be assigned at any time, including the day written, and are assigned on an automated random basis. Solely for purposes of entering late options positions, you may treat my account as a margin account; except that you may not pledge, rehedge, hypothecate or rehypothecate my property in your possession or control unless I execute the margin agreement herein. I agree not to exceed the position or exercise limits set by the options exchange, either acting alone or with others.

**5. NOTICE TO EXERCISE OPTIONS.** If I purchase any listed option, I will notify you of my intention to exercise such option no later than two hours before the expiration of the option (one hour in the case of an over-the-counter option). Failure to give such notice constitutes abandonment of the option, in which event it may, if profitable, be exercised for my account. Except as required by the Options Clearing Corporation Rules, you have no obligation to exercise any option absent my specific instructions. If, due to commissions expenses, exercising an option would not profit my account, the option may be permitted to expire or, at your discretion, sold or acquired by you for some equitable payment to me based on your expenses and risk, without liability or responsibility on your part to me.

**6. IMPARTIAL LOTTERY ALLOCATION SYSTEM; CALL FEATURES.** When you hold on my behalf bonds or preferred stocks in street or bearer form that are callable in part, I agree to participate in the impartial lottery allocation of called securities in accordance with New York Stock Exchange, Inc. ("NYSE") rules. When the call is favorable, no allocation will be made to an account in which you, your officers, or employees, have a financial interest until all other clients' positions in such securities are - satisfied on an impartial lottery basis. For debit securities there may exist call or other redemption features in addition to those disclosed on the trade confirmation. Debt securities subject to call or redemption features, such as sinking funds, may be redeemed in whole or in part before maturity or before the first scheduled call date. The existence of sinking funds, or other special mandatory redemption features, may not be disclosed on a trade confirmation. It is my obligation to review all prospectuses and offering statements I may receive, and to understand risks of extraordinary calls or early redemptions, which may affect yield. You are not obligated to notify me of published calls or notices relating to calls or redemptions, nor will you tender securities on my behalf.

**7. RESTRICTIONS ON TRADING; TERMINATION.** You may in your sole discretion prohibit or restrict trading or substitution of securities in any of my accounts and refuse to enter into any transaction with me. You have the right to terminate my accounts (including multiple owner accounts) at any time by notice to me.

**8. TRANSFER OF FUNDS.** By giving you instructions to transfer funds from my accounts to a bank or other entity, I agree to provide an accurate account number designating the account to receive such funds. I indemnify and hold you harmless from and against all liabilities arising from my providing an inaccurate account number.

**9. TRANSFER OF EXCESS FUNDS; EXCHANGE RATE FLUCTUATIONS.** You may transfer excess funds (also called "free credit balances") between my accounts (including commodity accounts) for any reason not in conflict with the Commodity Exchange Act or other applicable law. If you effect transactions for me requiring foreign currency, my accounts will be charged loss and credited profit resulting from exchange rate fluctuations.

**10. PRINCIPAL, INTEREST AND DIVIDEND PAYMENTS.** With respect to principal and interest payments on debt instruments, you may credit my accounts with principal and interest due on the payment dates and are entitled to recover payments from me if the same are not received by you from the trustee or payment agent. You may redeem any money market or cash deposit investment without notice, to satisfy debts arising in my accounts. Interest will not be paid on credit balances in any account(s) unless you specifically agree in writing. You are not required to remit interest or dividends to me on a daily basis.

**11. FEES AND CHARGES.** You may impose various service charges and other fees relating to my accounts as well as charge commissions and other fees for execution of transactions to buy and sell securities, options or other property. Such charges, commissions and fees may be changed from time to time without notice. Accounts that produce insufficient commission revenue for any calendar year may be subject to administrative fees, with advance notice. If I purchase securities on a cash basis and fail to pay by settlement date, I will pay a late charge as permitted by law. Any late charges you impose will be at the maximum interest rate set forth in your disclosure statement and may be charged from the settlement date to the payment date.

**12. LEHMAN BROTHERS CASH SWEEP PROGRAM.** Cash will be periodically generated in my account by the deposit of checks, sale of securities and other activity. I authorize Lehman to redeem or withdraw amounts from my cash sweep option to satisfy amounts owed in connection with my account, including the purchase of securities.

Deposits held at Lehman Bank are financially beneficial to Lehman and its affiliates. Interest rates paid on deposits are determined at the discretion of Lehman Bank based on economic and business conditions. Interest rates are tiered based on my relationship with Lehman or my deposit accounts at Lehman Bank, as well as any linked deposit accounts. Interest rates will be reasonable. Interest rates and interest rate tiers may change periodically. Clients with higher total deposits at Lehman Bank (and in some cases total higher assets at Lehman) generally receive a higher yield on their bank deposits - clients with lower total deposits at Lehman Bank and lower total assets at Lehman generally receive a lower yield on their bank deposits. Managed accounts (excluding IRA accounts and accounts subject to ERISA) may elect to sweep to either the LBCDA or an available money market fund. Managed accounts that sweep to the LBCDA will receive the highest tier interest rate regardless of balances at Lehman. The LBCDA with the highest tier interest rate is the only cash sweep option available for managed IRA accounts and managed ERISA accounts.

Cash in deposit accounts at Lehman Bank is insured by the Federal Deposit Insurance Corporation ("FDIC") up to applicable limits under FDIC rules. It is my responsibility to monitor the total amount of my deposits with Lehman Bank to determine whether my deposits exceed the FDIC insurance limits. The Securities Investor Protection Corporation (SIPC) does not cover cash on deposit at Lehman Bank. Money market fund shares in my account are covered by SIPC.

Additional information about the Lehman Brothers Cash Sweep Program, including eligibility requirements for money market funds, linking accounts for higher interest rates, FDIC insurance, SIPC coverage, the benefits to Lehman Bank of bank deposits and investment alternatives for cash balances is available from my Investment Representative and the Lehman Brothers Cash Sweep Program Disclosure Statement which I will receive in connection with the establishment of my account, and which is incorporated herein.

Lehman reserves the right to change or terminate its Cash Sweep Program. I agree that Lehman may change or offer different cash sweep arrangements, at its discretion, from time to time with prior notice.

**13. LEHMAN BROTHERS CASH SWEEP PROGRAM - CLIENTS SUBJECT TO ERISA OR SECTION 4975 OF THE INTERNAL REVENUE CODE.** In agreeing to the terms of the Lehman Brothers Cash Sweep Program (including if I Do Not Elect Cash Sweep) I have independently determined that my account will receive adequate consideration (including, if I am subject to Title I of ERISA or Section 4975 of the Code, within the meaning of Section 408(b)(17) of ERISA and Section 4975(f)(10) of the Code).

**14. ACCURACY OF REPORTS; COMMUNICATIONS.** I will contact the Client Services Department at 800.253.4626 or 212.526.5600 immediately to report any error, omissions or discrepancies found in my statement or confirmation of orders. Confirmation of orders and statements of my accounts shall be conclusive if not objected to in writing within ten days after mailing. I will send written inquiries to: Lehman Brothers Inc. Compliance Division 399 Park Ave, 6th floor New York, New York 10022-35. If I fail to receive a confirmation within ten days from the date of a transaction in my account, I will notify you immediately in writing. Until you receive written notice from me of a different address, communications mailed to me at the address specified by me shall be deemed to have been personally delivered to me and I waive all claims resulting from failure to receive such communications.

**15. SECURITY INTEREST.** As security for the payment or performance of all liabilities or indebtedness to Lehman Brothers or any of its affiliates now or hereafter existing (collectively, the "Lehman Brothers Entities") presently outstanding or to be incurred under this or any other agreement or otherwise, I grant the Lehman Brothers Entities a security interest in any and all property belonging to me or in which I may have an interest, held by any Lehman Brothers Entity or carried in any of my accounts with any Lehman Brothers Entity including individual, multiple owner or commodity accounts (collectively, the "collateral"). The collateral shall be subject to such security interest as collateral to discharge my obligations to the Lehman Brothers Entities, wherever or however arising and without regard to whether or not any Lehman Brothers Entity has made loans with respect to such collateral. The Lehman Brothers Entities are authorized to sell and/or purchase any and all property in any of my accounts or to liquidate open options, commodity futures or forward contracts or redeem money market or cash deposit investments in any of my accounts without notice in order to satisfy such obligations. In enforcing your security interest, the Lehman Brothers Entities shall have the discretion to determine the amount, order and manner of property to be sold and shall have all the rights and remedies available to secured parties under the New York Uniform Commercial Code (the "UCC"). Without your prior written consent, I will not cause or allow any of the collateral held in my accounts, whether now owned or hereafter acquired, to be or become subject to liens, security interests, mortgages or encumbrances of any nature other than your security interest.

Form: 0004/0232,0131,0233,0134 ; Rev V1.1, 06/07
Name: Client Agreement (Ind. Cash/Int. Margin/Jt. Cash/Jt. Margin)
© Lehman Brothers Inc., Member SIPC, All Rights Reserved

CLIENT DISCLOSURE. This account agreement is for a brokerage account and not an advisory account. Lehman's interests may not always be the same as the Client's. Please ask Lehman questions to make sure Client understands his or her rights and Lehman's obligations to Client, including the extent of Lehman's obligations to disclose conflicts of interest and to act in Client's best interest. Lehman is paid both by Client and, sometimes, by people who compensate Lehman based on what Client buys. Therefore, Lehman's profits, and Lehman's salespersons' compensation, may vary by product and over time.

Furthermore, Client's account may be invested in investment products or services from which Lehman or Lehman's affiliates derive compensation and which Lehman may have an incentive to use instead of other similar investments. Client understands that Lehman and Lehman's affiliates act in various capacities with respect to such products, services, and funds and may receive fees for doing so. Lehman may compensate its employees who refer Client's account(s) to the firm. The sale of certain investment products and funds may result in an additional payment to the selling registered representative.

16. LIQUIDATION OF COLLATERAL OR ACCOUNT. You may sell property in my accounts and cancel open orders for the purchase or sale of property without notice in the event of my death or whenever, in your discretion, it is necessary for your protection or in the event I fail to make payment(s) for loan balances as set forth in Paragraph 30. In such events you also may borrow or buy-in all property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you determine. No demands, calls, tenders or notices by you shall invalidate my waiver. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any remaining deficiency in my account(s).

17. USA PATRIOT ACT. To comply with the money laundering prevention provisions of the USA PATRIOT Act, you may request identification, documents, or other information from me or other sources. You may share this information with regulators or the government as necessary. Until required information or documentation is provided, you may not be able to open an account or effect any transactions for me.

18. POLITICALLY COVERED PERSONS. If applicable, I have disclosed to you my identity as, and my relationships and connections to, senior non-US political officials. This includes my immediate family, close associates, and any corporation, business, or other entity that has been formed by, or for the benefit of, a senior non-US political official.

19. CREDIT AND BUSINESS CONDUCT INFORMATION AND INVESTIGATION. I authorize you, at your discretion, to obtain reports and provide information to others concerning my credit standing and business conduct.

20. JOINT ACCOUNTS; DESIGNATION OF TENANCY. If this is a Joint Account, each of us shall have the authority on behalf of the account and generally to deal with you as if each of us alone were the account owner, without notice to all account owners. Notice to any account owner is deemed notice to all account owners. Each account owner shall be jointly and severally liable for this account. You are authorized, in your discretion, to require joint action by the joint tenants with respect to any matter concerning the joint account, including giving or cancellation of orders and withdrawal or transfer of monies, securities or other property. In the event of the death of any of us, the survivor(s) shall immediately give you written notice, and you may, before or after receiving notice, take actions, require papers, retain a portion of the account and/or restrict transactions in the account as you deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws of otherwise. It is our express intention to create an estate or account as joint tenants with rights of survivorship and not as tenants-in-common, unless a separate Tenancy-in-Common form is properly completed and submitted to you. In the event of the death of any of us, the entire interest in the joint account shall be vested in the survivor(s) on the same terms and conditions as theretofore held, without releasing the decedent's estate from liability, unless properly designated as a Tenancy-in-Common.

21. ARBITRATION.
THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT THE PARTIES AGREE AS FOLLOW:

- ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

- ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

- THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

- THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD.

- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

- THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

- THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

ANY CONTROVERSY: (1) ARISING OUT OF OR RELATING TO ANY OF MY ACCOUNTS WITH YOU, MAINTAINED INDIVIDUALLY OR JOINTLY WITH ANY OTHER PARTY, IN ANY CAPACITY; OR (2) WITH RESPECT TO TRANSACTIONS OF ANY KIND EXECUTED BY, THROUGH OR WITH YOU, YOUR OFFICERS, DIRECTORS, AGENTS AND/OR EMPLOYEES; OR (3) RELATING TO MY TRANSACTIONS OR ACCOUNTS WITH ANY OF YOUR PREDECESSOR FIRMS BY MERGER, ACQUISITION OR OTHER BUSINESS COMBINATION FROM THE INCEPTION OF SUCH ACCOUNT; OR (4) WITH RESPECT TO THIS AGREEMENT OR ANY OTHER AGREEMENTS ENTERED INTO WITH YOU RELATING TO MY ACCOUNTS, OR THE BREACH THEREOF, SHALL BE RESOLVED BY ARBITRATION CONDUCTED ONLY AT THE NYSE, NASD, OR AMEX OR ANY OTHER SELF-REGULATORY ORGANIZATION ("SRO") SUBJECT TO THE JURISDICTION OF THE SECURITIES

AND EXCHANGE COMMISSION AND PURSUANT TO THE ARBITRATION PROCEDURES THEN IN EFFECT AT ANY SUCH EXCHANGE OR SRO AS I ELECT. IF I DO NOT MAKE SUCH ELECTION BY REGISTERED MAIL ADDRESSED TO YOU AT YOUR MAIN OFFICE WITHIN 5 DAYS AFTER DEMAND BY YOU THAT I MAKE SUCH ELECTION, THEN YOU WILL HAVE THE RIGHT TO ELECT THE ARBITRATION TRIBUNAL OF YOUR CHOICE. JUDGMENT UPON ANY AWARD RENDERED BY THE ARBITRATORS MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION, OR WHO IS A MEMBER OF A PUTATIVE CLASS BUT WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION, UNTIL: (i) THE CLASS CERTIFICATION IS DENIED; (ii) THE CLASS ACTION IS DECERTIFIED OR (iii) SUCH PERSON IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN. THE FOREGOING AGREEMENT TO ARBITRATE DOES NOT ENTITLE ME TO OBTAIN ARBITRATION OF CLAIMS THAT WOULD BE BARRED BY THE RELEVANT STATUTES OF LIMITATIONS IF SUCH CLAIMS WERE BROUGHT IN A COURT OF COMPETENT JURISDICTION. IF AT THE TIME THAT A DEMAND FOR ARBITRATION IS MADE OR AN ELECTION OR NOTICE OF INTENTION TO ARBITRATE IS SERVED, THE CLAIMS SOUGHT TO BE ARBITRATED WOULD HAVE BEEN BARRED BY THE RELEVANT STATUTE OF LIMITATIONS ON OTHER TIME BAR, ANY PARTY TO THIS AGREEMENT MAY ASSERT THE LIMITATIONS AS A BAR TO THE ARBITRATION EITHER BEFORE THE ARBITRATORS OR BY APPLYING TO ANY COURT OF COMPETENT JURISDICTION. I EXPRESSLY AGREE THAT ANY ISSUES RELATING TO THE APPLICATION OF A STATUTE OF LIMITATIONS OR OTHER TIME BAR ARE REFERABLE TO SUCH COURT.

22. GOVERNING LAW AND APPLICABLE REGULATIONS. This agreement, including the arbitration provisions in paragraph 21, shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof. All transactions entered into under this agreement shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse, if any, where such transactions are executed by Lehman or its agents and to all applicable laws, rules, regulations of governmental authorities and SROs (collectively the "Rules"). Any reference to such Rules in this agreement shall not be construed to create a cause of action arising from any violation of such Rules. If any Rule is enacted that would be inconsistent with any of the provisions of this agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this agreement shall remain in full force and effect.

23. BINDING EFFECT; ASSIGNMENT. This agreement shall bind my heirs, executors, successors, administrators, assigns, committee and conservators ("successors"). In the event of my death, incompetency, or disability, whether or not successors of my estate and property shall have qualified or been appointed, you may continue to operate as though I were alive and competent and liquidate my account as described in Paragraph 16 without action to or demand upon my successors. This agreement shall inure to the benefit of your assigns and successors, by merger, consolidation or otherwise, and you may transfer my accounts to your successors and assigns at your discretion.

24. WAIVER NOT IMPLIED. Your failure to insist upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall not constitute or be considered a waiver of any of your rights.

25. AMENDMENTS; EFFECT ON PRIOR AGREEMENTS. I agree that you have the right to amend this agreement and any disclosures relating to this agreement or this account at any time by sending notice of the amendment to me. The amendment will be effective on the date contained in the notice. The signing of this agreement supersedes any prior agreement (except those governing transactions in my commodity accounts) made with you or any of your predecessors or assigns. To the extent this agreement is inconsistent with any other agreement governing my account, the provisions of this agreement shall govern.

26. FOREIGN SECURITIES. If my account contains securities issued by a foreign issuer, I acknowledge that you are acting solely as custodian with respect to such securities and have no obligation to provide me any proxies, annual statements or other disclosures from the issuer or to facilitate my participation in any rights offer or other transaction that the issuer conducts with or offers to holders of its securities.

27. NOTICES. You will endeavor to notify me in advance of any calls in my Margin Account. You will provide various other notices relating to activities in my account, unless this agreement provides otherwise. However, you reserve the right to take any appropriate action for my accounts permitted by this Agreement and/or required by law or regulation without prior notice. I acknowledge and consent that you may, from time to time, monitor and/or electronically record conversations between me/us and your employees or agents for quality assurance, employee training or the mutual protection of both of us. You may offer such recordings as evidence in any arbitration or other proceedings relating this agreement.

28. FORCE MAJEURE. Your performance under this agreement is excused in the event that a trade is prevented, delayed, or otherwise made impossible, due to an unforeseeable business-disrupting event of occurrence beyond your reasonable control, including, but not limited to: Acts of God, fire, epidemic, biohazard, or terrorism; civil commotion; acts of government or military; shortages or failures in transportation, telecommunications, labor, or energy; computer failures; hacking, or viruses; and natural or man-made disasters resulting in destruction of records.

Form: 0004/0232,0131,0233,0134 ; Rev V1.1, 06/07
Name: Client Agreement (Ind. Cash/Ind. Margin/JL Cash/JL Margin)
© Lehman Brothers Inc., Member SIPC, All Rights Reserved

MARGIN AGREEMENT; PARAGRAPHS 29 THROUGH 32 APPLY ONLY TO MARGIN ACCOUNTS.

29. MARGIN LOANS. From time to time you may, at your discretion, make loans to me to purchase, carry, or trade in securities ("Margins Loans"). Pursuant to Regulation T, Margin Loans will be made in a Margin Account. You will determine, in your discretion, the minimum and maximum amounts of any particular loan, regardless of the amount of collateral delivered to you and you may change such minimum and maximum amounts from time to time.

30. PAYMENT OF LOANS ON DEMAND. I will pay ON DEMAND any balance owing on my account(s), including interest, commissions, late charges and any collection costs, including attorneys' fees you may incur. You may demand full payment of the balance due in my account(s) plus interest charges at your sole option, at any time, whether or not demand is made for your protection. Loans are not for any specific term or duration but are due and payable at your discretion upon demand for payment. You may apply payments received for my account(s), including interest, dividends, premiums, principal or other payments, to balance(s) due in my account(s).

31. MAINTENANCE OF COLLATERAL. The securities or other instruments ("securities") in my Margin Account may be carried as general loans and may be pledged, hypothecated or otherwise used by you in a financing transaction (collectively "pledge(d)") separately or in common with other properties. I may not be entitled to vote the securities in my Margin Account during a period in which they have been pledged by you. In addition, while I will receive an amount equal to any dividends or other distributions in respect of such securities, the actual dividend or other distributions will be made to the entity to which the securities have been pledged. In connection with certain changes to Federal tax law effective January 1, 2004, this payment of "in-lieu of dividends" will be treated as ordinary income. Your pledge may secure your indebtedness equal to or greater than the amount I owe you. I will deposit additional collateral, as you may in your discretion require from time to time, in the form of cash or securities in accordance with the rules and regulations of the Federal Reserve Board, NYSE, American Stock Exchange, Inc. ("AMEX"), other national securities exchanges, associations or regulatory agencies under whose jurisdiction you are subject and your own minimum house margin maintenance requirements. If I no longer maintain a debit balance or indebtedness to you, you will fully segregate all securities in my account(s) in your safekeeping or control (directly or through a clearing house) and/or deliver them upon my request.

32. INTEREST CHARGES AND PAYMENTS. I will pay interest, to the extent not prohibited by the laws of the State of New York, upon amounts advanced and balances due in my account(s) in accordance with your current disclosure statement, hereby specifically incorporated. By entering into transactions with you after I receive your current disclosure statement, I acknowledge that I have read and agree to its terms for all past and future transactions in my account. Interest on all debit balances shall be payable ON DEMAND and that in the absence of demand, interest shall be due on the first business day of each interest period. My daily net debit balance includes any accrued interest I have not paid from prior interest periods. Thus, to the extent permitted by law, you may charge me compound interest. Payments of interest and principal and all other payments made by me under this agreement shall be made to your main office in New York. You may, in your discretion, not deem any check or other remittance to constitute payment until paid by the drawee and the funds representing such payments are available to you.

Form: 0004/0232,0131,0233,0134 ; Rev V1.1, 08/07
Name: Client Agreement (Ind. Cash/Ind. Margin/Jt. Cash/Jt. Margin)
© Lehman Brothers Inc., Member SIPC, All Rights Reserved

# LEHMAN BROTHERS
P.O. Box 2016
Jersey City, NJ 07303-2016

# Corporation Account  | CPI 0004 |

## Security Cash Accounts Only

## Full Authority

| ITS Cust. # | | | MTS Cust. # | | |
|---|---|---|---|---|---|
| TMS Cust. # Branch | | Account | | T | C | R |

Please read carefully, sign and return

To: Lehman Brothers Inc.

The undersigned Corporation  **Maher Terminals Holdings Corp.**
Corporation Name

by  **Basil Maher**                          Its President
Please Print

or duly authorized officer pursuant to the resolutions set forth on the back of this document, hereby authorizes you to open an account in the name of said Corporation; and represents that no one other than the Corporation has any interest in such account. The undersigned also encloses herewith your Client's Agreement duly executed on behalf of the Corporation and acknowledges receipt of a copy of the Client Agreement. The authorization shall continue in force until written notice of its revocation is delivered to you at the office servicing this account.

Dated  **July 10, 2007**

By  _____
Signature Required

Title  **President & COO**

I,  **Scott Schley**                          being the
Please Print

Secretary of  **Maher Terminals Holdings Corp**
Corporation Name

hereby certify that the resolutions set forth on page 2 of this document or the attached were duly adopted at a meeting of the Board of Directors of said Corporation, duly held on the **10th** day of **July**, 20 **07**  at which a quorum of said Board of Directors was present and acting throughout and that no action has been taken to rescind or amend said resolutions and that the same are now in full force and effect.

I further certify that each of the following has been duly elected and is now legally holding the office set opposite his or her name:

**M. Brian Maher, Chairman & CEO**        , President

**Basil Maher**                          , Vice-President & COO

**Vacant**                              , Treasurer

**Scott Schley, Sr. V.P., General Counsel** , Secretary

I further certify that the said Corporation is duly organized and existing and has the power to take the action called for by the resolutions annexed hereto.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the seal of said Corporation this  **10th**  day of **July**, 20 **07**

_____                  , Secretary
Signature Required

**✱ Executive Committee of the**

CERTIFIED COPY OF CERTAIN RESOLUTIONS ADOPTED BY THE BOARD OF DIRECTORS
WHEREBY THE ESTABLISHMENT AND MAINTENANCE OF SECURITY CASH ACCOUNTS HAVE BEEN AUTHORIZED

RESOLVED –
FIRST: That ~~the President or any Vice President of this Corporation,~~

*a* ChAIrmAn, PResiDen ANd GeNeRAl
_Please Print_

*of* CouNsel
_Please Print_

be, and they hereby are, and each of them hereby is authorized and empowered, for and on behalf of this Corporation (herein called the 'Corporation"), to establish and maintain one or more accounts with Lehman Brothers Inc. (herein called the "Brokers") for the purpose of purchasing, investing in, or otherwise acquiring, selling, possessing, transferring, exchanging, or otherwise disposing of, or turning to account of, or realizing upon, and generally dealing in and with any and all forms of securities including, but not by way of limitation, shares, stocks, bonds, debentures, notes, scrip, participation certificates, rights to subscribe, equity options, debt options, warrants, certificates of deposit, mortgages, choses in action, evidences of indebtedness, commercial paper, certificates of indebtedness and certificates of interest of any and every kind and nature whatsoever, secured or unsecured, whether represented by trust, participating and/or other certificates or otherwise; but such authorization shall not include the opening of marginal accounts or the making of short sales.

The fullest authority at all times with respect to any such commitment or with respect to any transaction deemed by any of the said officers and/or agents to be proper in connection therewith is hereby conferred, including authority (without limiting the generality of the foregoing) to give written or oral instructions to the Brokers with respect to said transactions; to bind and obligate the Corporation to and for the carrying out of any contract, arrangement, or transaction, which shall be entered into by any such officer and/or agent for and on behalf of the Corporation with or through the Brokers; to pay in cash or by checks and/or drafts drawn upon the funds of the Corporation such sums as may be necessary in connection with any of the said accounts; to deliver securities to, deposit funds with, the Brokers; to order the transfer or delivery of securities to any other person whatsoever, and/or to order the transfer of record of any securities to any name selected by any of the said officers or agents; to affix the corporate seal to any documents or agreements, or otherwise; to endorse any securities in order to pass title thereto; to direct the sale or exercise of any rights with respect to any securities; to sign for the Corporation all releases, power of attorney and/or other documents in connection with any such account, and to agree to any terms or conditions to control any such account; to direct the Brokers to surrender any securities to the proper agent or party for the purpose of effecting any exchange or conversion, or for the purpose of effecting any exchange or conversion, or for the purpose of deposit with any protective or similar committee, or otherwise; to accept delivery of any securities; to appoint any other person or persons to do any and all things which any of the said officers and/or agents is hereby empowered to do, and generally to do and take all action necessary in connection with the account, or considered desirable by such officer and/or agent with respect thereto.

*# ExecuTive CommiTTe of The*

SECOND: That the Brokers may deal with any and all of the persons directly or indirectly by the foregoing resolution empowered, as though they were dealing with the Corporation directly.

THIRD: That the Secretary of the Corporation be and he hereby is authorized, empowered and directed to certify, under the seal of the Corporation, or otherwise, to the Brokers:

    (a) a true copy of these resolutions;
    (b) specimen signatures of each and every person by the resolutions empowered;
    (c) a certificate (which, if required by the Brokers, shall be supported by an opinion of the general counsel of the Corporation, or other counsel satisfactory to the Brokers) that the Corporation is duly organized and existing, that its charter empowers it to transact the business by these resolutions defined, and that no limitation has been imposed upon such powers by the By-Laws otherwise.

FOURTH: That the Brokers may rely upon any certification given in accordance with these resolutions, as continuing fully effective unless and until the Brokers shall receive due written notice of a change in or the rescission of the authority so evidenced and the dispatch or receipt of any other form of notice shall not constitute a waiver of this provision, nor shall the fact that any person hereby empowered ceases to be an officer of the Corporation or becomes an officer under some other title in any way affect the powers hereby conferred. The failure to supply any specimen signature shall not invalidate any transaction if the transaction is in accordance with authority actually granted.

FIFTH: That in the event of any change in the officer or powers or persons hereby empowered, the Secretary shall certify such changes to the Brokers in writing in the manner hereinabove provided, which notification, when received, shall be adequate both to terminate the powers of the persons theretofore authorized, and to empower the persons thereby substituted.

SIXTH: That the foregoing resolutions and the certificates actually furnished to the Brokers by the Secretary of the Corporation pursuant thereof, be and they hereby are, made irrevocable until written notice of the revocation thereof shall have been received by the Brokers.

By     _(signature)_
                Signature Required

Date   July 10, 2007

Title   Sr. V.P., GeNerAl Counsel + SecreTAry

**SIGNATURE CARD**
For each corporate officer listed on page 1 or 2 of this form, a signature is required below:

| Name of Account |||
|---|---|---|
| *Maher Terminals Holdings Corp.* |||
| ITS Customer Number | MTS Customer Number | TMS Customer Number |

Taxpayer Identification Number
████████

☐ Sole Proprietorship   ☐ Partnership   ☑ Corporation   ☐ Non-Profit Organization   ☐ Others _____

✻ Signature *[signature]*
Print Name  *M. Brian Maher*      Title  *Chairman & CEO*

✻ Signature *[signature]*
Print Name  *Basil Maher*      Title  *President & COO*

Signature
Print Name      Title

Signature
Print Name      Title

Signature
Print Name      Title

Signature
Print Name      Title

**LEHMAN BROTHERS**
SIGNATURE CARD

LB 1/08

✻ 2 Signatures Required

# LEHMAN BROTHERS
P.O. Box 2016
Jersey City, NJ 07303-2016

# Corporation Account    CPI 0014
## Authorizing Trading in Securities and Commodities and Permitting Margin Transaction and Short Sales

| ITS Cust. # | | MTS Cust. # | | | |
|---|---|---|---|---|---|
| TMS Cust. # Branch | Account | | T | C | IR |

**Please read carefully, sign and return**

To: Lehman Brothers Inc.

The undersigned Corporation  _Maher Terminals Holdings Corp_
Corporation Name

by  _Basil Maher_  its President
Please Print

or duly authorized officer pursuant to the resolutions set forth on the back of this document, hereby authorizes you to open an account in the name of said Corporation; and represents that no one other than the Corporation has any interest in such account. The undersigned also encloses herewith your Client's Agreement with consent to loan of securities duly executed on behalf of the Corporation and acknowledges receipt of a copy of the Client Agreement. The authorization shall continue in force until written notice of its revocation is delivered to you at the office servicing this account.

Dated  _July 10, 2007_

By  _[signature]_
Signature Required

Title  _President + COO_

I,  _Scott Schley_  being the

Secretary of  _Maher Terminals Holdings Corp._
Corporation Name

hereby certify that the resolutions set forth on page 2 of this document or the attached were duly adopted at a meeting of the Board of Directors of said Corporation, duly held on the _____ day of _____, 20 ____ at which a quorum of said Board of Directors was present and acting throughout and that no action has been taken to rescind or amend said resolutions and that the same are now in full force and effect.

I further certify that each of the following has been duly elected and is now legally holding the office set opposite his or her name:

_M. Brian Maher , Chairman + CEO_ , President

_Basil Maher_ , Vice President + COO

_Vacant_ , Treasurer

_Scott Schley, Sr.V.P., Gobril Counsul + Secretary_

I further certify that the said Corporation is duly organized and existing and has the power to take the action called for by the resolutions annexed hereto.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the seal of said Corporation this  _10th_  day of  _July_ , 20 _07_

_[signature]_ , Secretary
Signature Required

_+ Executive Committee of the_

**CERTIFIED COPY OF CERTAIN RESOLUTIONS ADOPTED BY THE BOARD OF DIRECTORS
WHEREBY THE ESTABLISHMENT AND MAINTENANCE OF SECURITY CASH ACCOUNTS HAVE BEEN AUTHORIZED**

RESOLVED –

FIRST: ~~That the President or any Vice President of this Corporation,~~

or *CHAIRMAN, PRESIDENT + General Counsel*
<br>Please Print

or _____
<br>Please Print

be, and they hereby are, and each of them hereby is authorized and empowered, for and on behalf of this Corporation (herein called the "Corporation"), to establish and maintain one or more accounts with Lehman Brothers, Inc. (herein called the "Brokers") for the purpose of purchasing, investing in, or otherwise acquiring, selling (including short sales), possessing, transferring, exchanging, pledging or otherwise disposing of, or turning to account of, or realizing upon, and generally dealing in and with (a)* any and all forms of securities including, but not by way of limitation, shares, stocks, bonds, debentures, notes, scrip, participation certificates, rights to subscribe, equity options, debt options, warrants, certificates of deposit, mortgages, choses in action, evidence of indebtedness, commercial paper, certificates of indebtedness and certificates of interest of any and every kind and nature whatsoever, secured or unsecured, whether represented by trust, participating and/or other certificates or otherwise; and (b)* any and all commodities and/or contracts for the future delivery thereof, whether represented by trust, participating and/or other certificates or otherwise.

The fullest authority at all times with respect to any such commitment or with respect to any transaction deemed by any of the said officers and/or agents to be proper in connection therewith is hereby conferred, including authority (without limiting the generality of the foregoing) to give written or oral instructions to the Brokers with respect to said transactions; to borrow money and securities and if transactions in commodities are authorized hereby to borrow commodities and/or future contracts in commodities, and to borrow such money, securities, commodities and/or future contracts in commodities in from or through the Brokers, and to secure repayment thereof with the property of the Corporation; to bind and obligate the Corporation to and for the carrying out of any contract, arrangement, or transaction, which shall be entered into by any such officer and/or agent for and on behalf of the Corporation with or through the Brokers; to pay in cash or by checks and/or drafts drawn upon the funds of the Corporation such sums as may be necessary in connection with any of the said accounts; to deliver securities, contracts and/or commodity futures to the Brokers; to order the transfer or delivery thereof to any other person whatsoever; and to order the transfer of record of any securities, or contracts, or titles, to any name selected by any of the said officers or agents; to affix the corporate seal to any documents or order to pass title thereto; to direct the sale or exercise of any rights with respect to any securities; to sign for the Corporation all releases, power of attorney and/or other documents in connect with any such account; and to agree to any terms or conditions to control any such account; to direct the Brokers to surrender any securities to the proper agent or party for the purpose of effecting any exchange or conversion, or for the purpose of deposit with any protective or similar committee, or otherwise; to accept delivery of any securities, contracts and/or commodity futures; to appoint any other person or persons to do any and all things which any of the said officers and/or agents is hereby empowered to do, and generally to do and take all action necessary in connection with the account, or considered desirable by such officer and/or agent with respect thereto.

**Note: If either (a) or (b) in the first paragraph is not applicable please strike out the inapplicable part.

SECOND: That the Brokers may deal with any and all of the persons directly or indirectly by the foregoing resolution empowered, as though they were dealing with the Corporation directly.

THIRD: That the Secretary of the Corporation be and he hereby is authorized, empowered and directed to certify, under the seal of the Corporation, or otherwise, to the Brokers:

> (a) a true copy of these resolutions;
> (b) specimen signatures of each and every person by the resolutions empowered;
> (c) a certificate (which, if required by the Brokers, shall be supported by an opinion of the general counsel of the Corporation, or other counsel satisfactory to the Brokers) that the Corporation is duly organized and existing, that its charter empowers it to transact the business by these resolutions defined, and that no limitation has been imposed upon such powers by the By-Laws otherwise.

FOURTH: That the Brokers may rely upon any certification given in accordance with these resolutions, as continuing fully effective unless and until the Brokers shall receive due written notice of a change in or the rescission of the authority so evidenced and the dispatch or receipt of any other form of notice shall not constitute a waiver of this provision, nor shall the fact that any person hereby empowered ceases to be an officer of the Corporation or becomes an officer under some other title in any way affect the powers hereby conferred. The failure to supply any specimen signature shall not invalidate any transaction if the transaction is in accordance with authority actually granted.

FIFTH: That in the event of any change in the officer or powers or persons hereby empowered, the Secretary shall certify such changes to the Brokers in writing in the manner hereinabove provided, which notification, when received, shall be adequate both to terminate the powers of the persons theretofore authorized, and to empower the persons thereby substituted.

SIXTH: That the foregoing resolutions and the certificates actually furnished to the Brokers by the Secretary of the Corporation pursuant thereof, be and they hereby are, made irrevocable until written notice of the revocation thereof shall have been received by the Brokers.

By _____
<br>Signature Required

Date *July 10, 2007*

Title *Sr. V.P. General Counsel + Secretary*

+ *Executive Committee of the*

**SIGNATURE CARD**
For each corporate officer listed on page 1 or 2 of this form, a signature is required below:

| Name of Account |
| --- |
| Maher Terminals Holdings Corp |

| ITS Customer Number | MTS Customer Number | TMS Customer Number |
| --- | --- | --- |
| | | |

| Taxpayer Identification Number |
| --- |
| ▉▉▉▉▉▉▉ |

☐ Sole Proprietorship  ☐ Partnership  ☐ Corporation  ☐ Non-Profit Organization  ☐ Others _____

| | | |
| --- | --- | --- |
| * Signature *M. Brian Maher* | | |
| Print Name  M. BRIAN MAHER | Title | CHAIRMAN & CEO |
| * Signature | | |
| Print Name  BASIL MAHER | Title | PRESIDEN + COO |
| Signature | | |
| Print Name | Title | |
| Signature | | |
| Print Name | Title | |
| Signature | | |
| Print Name | Title | |
| Signature | | |
| Print Name | Title | |

**LEHMAN BROTHERS**
SIGNATURE CARD

LB 1/06

\* 2 SIGNATURES REQUIRED

# EXHIBIT D

**CASH MANAGEMENT BROKERAGE AGREEMENT AND LIMITED
DISCRETIONARY AUTHORIZATION**

> **IMPORTANT CLIENT DISCLOSURE:** Your account is a brokerage account and not an advisory account. Our interests may not always be the same as yours. Please ask us questions to make sure you understand your rights and our obligations to you, including the extent of our obligations to disclose conflicts of interest and to act in your best interest. We are paid both by you and, sometimes, by people who compensate us based on what you buy. Therefore, our profits, and our salespersons' compensation, may vary by product and over time. If you have any questions regarding the specific nature of your account or the obligations owed to you, please contact the business control group at 212-526-9966.

## CASH MANAGEMENT BROKERAGE AGREEMENT AND LIMITED DISCRETIONARY AUTHORIZATION

This Cash Management Brokerage Agreement and Limited Discretionary Authorization (the "Agreement"), dated as of _____, 2007, is entered into by and between Lehman Brothers Inc. ("Lehman Brothers") and _____ * _____ (the "Client") wherein the Client directs Lehman Brothers to handle the cash account referenced on Schedule I hereto pursuant to the instructions set forth in Schedule II (the "Account").   * Kphee Terminals Holdings Corp.

1.    **Investment Guidelines.** Lehman Brothers is to invest and reinvest the securities, cash and/or other investments held in the Account and to engage in such transactions as directed by the Client, provided; however, that all investments, reinvestments and transactions by Lehman Brothers shall at all times comply with the investment guidelines of Client attached hereto as Schedule II, which may be amended from time to time by the Client in writing. In connection with the handling of this account, Lehman Brothers is entitled to rely on the financial and other information provided by Client. Client agrees to inform Lehman Brothers promptly in writing of any material change in Client's circumstances or objectives which might affect the manner in which Client's assets should be invested and to provide Lehman Brothers with such other information as it shall reasonably request.

____✓____ Client understands that:

____✓____ Where the investment guidelines in Schedule II specifically state a limit or percentage of the Account to an issuer or security type, Lehman Brothers will interpret this to represent a parameter to be considered at the time of purchase only.

____✓____ Where the investment guidelines in Schedule II place a dollar limit to an issuer or security type, Lehman Brothers will not include accrued interest in this calculation. All securities will be valued at "par".

____✓____ Where the investment guidelines in Schedule II permit investments in securities that have perpetual interest rate reset features such as auction rate securities or floating rate notes, Lehman Brothers will calculate the maturity based on the rate reset period.

____✓____ For new debt issued by US Agencies, Lehman Brothers uses the "implied issuer ratings" as specific-issue ratings for these types of agency securities.

If the above discussion conforms with Client's interpretation of the Account's investment guidelines in Schedule II, please acknowledge by initialing in the space provided next to each item. If this is not the case, please contact your corporate cash manager.

2.      **Other Services.** Client will be furnished with confirmations of Account transactions and Account statements monthly. Client is responsible for reviewing statements and confirming and reporting any discrepancies to Lehman Brothers.

To the extent possible, Lehman Brothers will, at Client's option, maintain custody of the assets held in the Account, in which case it will, at no additional charge, credit the Account with dividends and interest paid on securities held in the Account and with principal paid on called or matured securities as and when received. If Lehman Brothers has custody of the assets, it will be responsible for the timely presentment of called bonds, but when assets are custodied elsewhere, Lehman Brothers will not be responsible for such redemptions. If the assets in the Account are custodied outside Lehman Brothers, Client shall instruct the custodian to provide Lehman Brothers with such periodic reports concerning the status of the Account as Lehman Brothers may reasonably request from time to time. The Client will not change the custodian without giving Lehman Brothers reasonable prior notice of its intention to do so together with the name and other relevant information with respect to the new custodian.

3.      **Discretionary Authorization.** Client hereby grants Lehman Brothers limited discretionary authorization, pursuant to and in accordance with Schedule II. Pursuant to such authorization, Lehman Brothers may and at Client's risk, purchase, sell, exchange, convert and otherwise trade in the securities and other investments in the Account, as well as arrange for delivery and payment in connection with the above, and act on behalf of the Client in all other matters necessary or incidental to the handling of the Account pursuant to and in accordance with Schedule II. Should Client appoint a custodian other than Lehman Brothers in connection with the Account, Client grants Lehman Brothers full authorization to issue such instructions to and engage in such transactions with custodian as may be appropriate in connection with the management of the Account.

This limited discretionary authorization is in addition to (and in no way limits or restricts) any rights which the parties hereto may have under any other agreement or agreements between the Client and Lehman Brothers.

The discretionary trading authorization is a continuing one and shall remain in full force and effect until terminated by Client or Lehman Brothers pursuant to the provisions of paragraph 10 of this Agreement. The termination of this authorization will constitute a termination of this Agreement. To terminate this authorization, the Client hereby agrees to submit a written notice addressed to Lehman Brothers at the address set forth on Schedule IV hereto, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

This agreement shall inure to the benefit of the parties hereto and their respective successor corporation(s) or assigns.

4.    **Execution Services.** Lehman Brothers will act as a broker/dealer or use an affiliate as broker/dealer, although unaffiliated broker/dealers may be used as well. In selecting broker/dealers for a particular transaction, Lehman Brothers may consider all relevant factors, including the execution capabilities required by the transaction, the importance of speed, efficiency or confidentiality, familiarity with sources from whom or to whom particular securities might be purchased or sold, as well as any other relevant matters. Lehman Brothers may select broker/dealers which provide it with research or other transaction-related services and such research and other services may be used for its own and for other client accounts to the extent permitted by law.

In that this is a brokerage account, Client acknowledges and agrees that the rules governing investment advisers are not applicable. Accordingly, Lehman Brothers may execute transactions in a principle or agency capacity based on its discretionary trading authority, subject to applicable rules governing a broker/dealer and in accordance with Schedule II. In no event will Lehman Brothers or its affiliates be obligated to effect any transaction for Client which it or they believe would violate any applicable state or federal law, rule or regulation, or of the regulations of any regulatory or self-regulatory body.

5.    **Conflicts of Interest.** Client understands that the Account may be invested in investment products or services, including sweep vehicles, from which Lehman Brothers or its affiliates derive compensation and which Lehman Brothers has an incentive to use instead of other similar investments which could be more or less beneficial for Client. Client further understands that Lehman Brothers and its affiliates act in various capacities with respect to such products and services and receive fees for doing so. This Agreement shall have no effect on the application to Client of the terms of products or services that the Client invests in from which Lehman Brothers or its affiliates derive compensation.

The Client understands that transactions may be effected with Lehman Brothers as principal or dealer, or through Lehman Brothers as agent or broker, and that any such purchase may involve securities in the distribution of which Lehman Brothers may have an interest as underwriter, member of selling group, or otherwise.

6.    **Valuation.** Any securities or investments in the Account shall be valued at amortized cost or in such other manner as Lehman Brothers reasonably determines reflects fair market value. To the extent possible, all valuations will be performed by an independent portfolio information service, and will be relied upon by Lehman Brothers. Any valuation shall not be deemed a guarantee of any kind whatsoever with respect to the value of the assets of the Account.

7.    **Client Authority.** No written notice shall affect, in any matter, Lehman Brothers' rights under this Agreement with respect to any obligation arising prior to actual receipt of such written notice. Client represents and warrants that at all times during the term of the Agreement, (i) this

Agreement has been duly authorized, executed and delivered by the Client and constitutes its valid and binding obligation, enforceable against the Client in accordance with its terms, (ii) no governmental authorizations, approvals, consents or filings are required in connection with the execution, delivery or performance of this Agreement by the Client, (iii) the execution, delivery and performance of this Agreement by the Client will not violate or result in any default under the Client's certificate of incorporation or by-laws (or equivalent constituent documents), or any provision of any plan or trust governing the assets in the Account, any contract or other agreement to which the Client is a party or by which it or its assets may be bound or any statute or any rule, regulation or order of any governmental agency of body, (iv) the list of signatures attached hereto as Schedule III constitutes the valid signatures of all persons authorized by the Client to take action with respect to the Account (or all such persons to whom Client has delegated fiduciary responsibility to take action with respect to the Account) and Lehman Brothers shall be entitled to rely conclusively on any document executed by any of them, and (v) the Client is not an investment company (as that term is defined in the Investment Advisers Act of 1940). If the Client is an organization, the organization has authorized and empowered each of the individual(s) listed hereto as Schedule III to act on behalf of the organization; to open one or more accounts; enter orders; make and receive payments of money; give instructions; register, deliver, and accept delivery of securities; enter into and execute agreements and do all things necessary or advisable to effect transactions in all matters and business relating to the account.

8.    **Duty of Care.** Lehman Brothers is acting in the capacity of a broker in handling the Account and as such will handle the Account of Client in accordance with the responsibilities as required by the federal securities laws and the rules imposed by the self regulatory organizations, including the New York Stock Exchange, the National Association of Securities Dealers, and in accordance with Schedule II. Neither Lehman Brothers nor any of its officers, directors or employees shall be responsible hereunder for any action, performed or omitted to be performed in good faith, or for any errors in judgment in managing the Account other than those caused by failure to comply with Schedule II, gross negligence or willful misconduct. Client acknowledges that Lehman Brothers does not warrant the rate of return on or the market value of the investments in the Account. Lehman Brothers and its officers, directors and employees shall not be responsible for any loss incurred by reason of any act or omission of any broker, dealer or custodian; provided, however, that Lehman Brothers will make reasonable efforts to require that brokers/dealers perform their obligations with respect to the Account.

9.    **Confidentiality.** All material and information supplied by Client to Lehman Brothers, including but not limited to information concerning Client's marketing plans, investment strategy, business methods and financial results, is confidential and proprietary to Client ("Confidential Information"). Lehman Brothers will not disclose, sell or in any way transfer Confidential Information to any third party, unless it received Client's prior written approval of each such use. Upon written request or upon the termination of this Agreement, Lehman Brothers shall return to Client all Confidential Information in Lehman Brothers possession or control. This paragraph 9 will survive termination of this Agreement.

10.    **Termination of Agreement.** This Agreement may be terminated at any time upon written notice by either party and termination will become effective upon receipt of such notice.

Cash Management Brokerage Agreement Page 5 of 12

Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination, including the provisions regarding arbitration which shall survive any expiration or termination. Upon the termination of this Agreement, Lehman Brothers shall be under no obligation whatsoever to recommend any action with regard to, or to liquidate, the securities or other investments in the Account. Lehman Brothers retains the right, however, to complete any transaction open as of the termination date and to retain amounts in the Account sufficient to effect such completion. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding the disposition of any assets held in the Account and Lehman Brothers shall comply with such instructions. Client is responsible for providing Lehman Brothers with the name of another custodian at the time the Agreement is terminated if Client chooses not to maintain custody of the Account with Lehman Brothers.

11.    Arbitration.

This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:

(a)  Arbitration Disclosures.

- All parties to this agreement are giving up their right to sue each other in court, including the right to trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.
- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.
- The arbitrators do not have to explain the reason(s) for their award.
- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.
- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

(b)    Arbitration Agreement.

Client and Lehman Brothers agree that all claims or controversies arising from or relating to the construction, performance or breach of this Agreement, or relating to any Account referenced herein, shall be resolved by arbitration conducted only at the New York Stock Exchange, Inc., National Association of Securities Dealers, Inc. or the American Stock Exchange, Inc., or any other self-regulatory organization or exchange of which Lehman Brothers or any affiliated broker/dealer is a member. Client may elect which of these arbitration forums shall hear the matter by sending a registered letter or telegram to:

Cash Management Brokerage Agreement Page 6 of 12

Lehman Brothers Inc., General Counsel's Office, 399 Park Avenue, New York 10022. If the Client fails to make such election before the expiration of ten (10) days after receipt of a written request from Lehman Brothers to make such election, Lehman Brothers shall have the right to choose the forum.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

The foregoing agreement to arbitrate does not entitle Client to obtain arbitration of claims that would be barred by the relevant statute of limitations, if such claims were brought in a court of competent jurisdiction. If at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any party to this Agreement may assert the limitations as a bar to the arbitration by applying to any court of competent jurisdiction, and Client expressly agrees that any issues relating to the application of a statute of limitations or other time bar are referable to such court. The failure to assert such bar by application to a court, however, shall not preclude its assertion before the arbitrators.

12.    **Miscellaneous**  In the event of any change in the identity or powers of persons authorized to act on the Client's behalf, the secretary or other designated officer of Client shall notify Lehman Brothers in writing which notification, when received, shall be adequate both to terminate the authorization of the persons previously authorized, and to authorize the persons thereby substituted.

Client agrees to promptly notify Lehman Brothers if it or any other persons or entities having a beneficial interest in the account are or become restricted, as such term is defined in the NASD's Rule 2790, from purchasing securities in certain public offerings.

Each of the parties hereto reserves the right to refuse to accept or renew this Agreement in its sole discretion and for any reason.

All paragraphs headings in this Agreement are for convenience of reference only, do not form part of this Agreement, and shall not affect in any way the meaning and interpretation of this Agreement.

Except for the election described in Section 11 hereof which shall be sent to the address set forth in such Section 11, all other written communication to Lehman Brothers from Client pursuant to this Agreement shall be sent to Lehman Brothers at the address set forth on Schedule IV hereto. All written communications to Client from Lehman Brothers shall be sent to the address set forth on Schedule IV hereto.

Neither party shall use the other party's name as a commercial reference to potential clients without the other party's prior written consent, which consent may be withheld at other party's sole discretion.

*[Remainder of this page has been intentionally left blank; signature page follows.]*

*[Client]* MAher Terminals Holdings Corp.

By: _____

Name: Basil Maher

Title: President & COO


Lehman Brothers Inc.

By: _____

Name: _____

Title: _____

Date: _____

**SCHEDULE I**

Account Name:

Account Number:

SCHEDULE II

INVESTMENT GUIDELINES

[MUST BE COMPLETED/PROVIDED BY THE CLIENT]

## SCHEDULE III

Persons Authorized to take Action on behalf of the Account:

| Signature | | | |
|---|---|---|---|
| *  M Brian Mahar | | | |
| Print Name M. BRiAN MAHER | Title CHAiRMAN & CEO | Date 7/10/07 | |
| Signature | | | |
| * | | | |
| Print Name BASil MAHER | Title PResideNt & COO | Date 7/10/07 | |
| Signature | | | |
| | | | |
| Print Name | Title | Date | |
| Signature | | | |
| | | | |
| Print Name | Title | Date | |

\* 2 SigNATURES REQUiReD

## SCHEDULE IV

### Addresses for Notices

If to Lehman Brothers, addressed to:

Lehman Brothers Inc.
[Branch Address}
Attn: [Sales Team]

       In copy to:    Lehman Brothers Inc.
                      [Branch Address]
                      Attn: Administrative Manager

If to Client, addressed to:

Scott Schley



M. Brian Maher



Basil Maher



**ADMIT ONE**

STAPLES

7370771

**H
A
N
D

D
E
L
I
V
E
R
Y**

**FILED / RECEIVED**

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

RECEIVED BY:

DATE

3:57

TIME