WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons
Ralph I. Miller

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re                                                          :        Chapter 11 Case No.
                                                               :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,                   :        08-13555 (JMP)
                                                               :
                         Debtors.                              :        (Jointly Administered)
                                                               :
---------------------------------------------------------------x

**NOTICE OF MOTION PURSUANT TO SECTION 8.4 OF**
**THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN**
**OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED**
**DEBTORS TO ESTIMATE THE AMOUNT OF PROOF OF CLAIM NUMBER 30598**
**FILED BY US AIRWAYS, INC. FOR PURPOSES OF ESTABLISHING RESERVES**

                    **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")

of Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan"), for approval, pursuant to Section 8.4 of the

Plan, to estimate the amount of proof of claim number 30598 filed by US Airways, Inc. for the

purposes of establishing reserves in connection with the Plan, all as more fully described in the

Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at

the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One

Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **January 30, 2013 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

           **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with General Order M-399 upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Ralph I. Miller, Esq., Robert J. Lemons, Esq., and Maurice Horwitz, Esq., attorneys for LBHI and certain of its affiliates; (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq., and Andrea B. Schwartz, Esq.; (iv) all parties who have requested notice in these chapter 11 cases; and (v) all parties with a particularized interest in the Motion, so as to be so filed and received no later than **January 23, 2013 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline").**

US_ACTIVE:\44149287\9\58399.0011

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: January 15, 2013
        New York, New York

/s/ Robert J. Lemons
Robert J. Lemons
Ralph I. Miller

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons
Ralph I. Miller

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                    Debtors.              :    (Jointly Administered)
                                          :
-----------------------------------------------------------------x
```

**LEHMAN BROTHERS HOLDINGS INC.'S MOTION PURSUANT TO
SECTION 8.4 OF THE MODIFIED THIRD AMENDED JOINT CHAPTER 11
PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED
DEBTORS TO ESTIMATE THE AMOUNT OF PROOF OF CLAIM NUMBER 30598
FILED BY US AIRWAYS, INC. FOR PURPOSES OF ESTABLISHING RESERVES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan"), files this motion and respectfully

represents:

**Preliminary Statement**

1.       Pending its resolution either by this Court or otherwise, estimation of the

US Airways Claim (defined below) for the purpose of establishing reserves under the Plan is

appropriate because, among other compelling reasons, while the claim was filed against LBHI in

the amount of approximately $564.7 million, an arbitration panel has subsequently awarded the claimant only $15 million for the same claim.

2.        On September 22, 2009, US Airways, Inc. ("US Airways") filed a claim against LBHI, Claim No. 30598 (the "US Airways Claim"), a copy of which is attached hereto as Exhibit A, asserting that it has a claim against LBHI in the approximate amount of $564.7 million stemming from certain auction rate securities ("ARS") that it purchased through former employees of Lehman Brothers Inc. ("LBI").  Pursuant to the One Hundred Eleventh Omnibus Objection to Claims (No Liability Claims) filed on March 14, 2011 [ECF No. 15012] ("Omni 111"), a copy of which is attached hereto as Exhibit B, LBHI asserted that it has no liability for the US Airways Claim because the claim arises from transactions between US Airways and persons and/or entities that are not debtors in the above-captioned chapter 11 cases, *i.e.*, LBI and the LBI Employees (defined below).  Thus, pursuant to section 1.46 of the Plan, the US Airways Claim is a Disputed Claim.

3.        In its response to Omni 111 filed on July 7, 2011 [ECF No. 18313] (the "Response"), a copy of which is attached hereto as Exhibit C, US Airways asserted, for the first time, that (i) LBHI is liable to US Airways based on veil-piercing theories of liability and (ii) LBHI is directly liable as a result of its participation in the decision-making concerning the ARS sold to US Airways.  (Response at 12-19.)  The Response also states that on December 23, 2009, US Airways commenced an arbitration proceeding (the "FINRA Arbitration") through the Financial Industry Regulation Authority ("FINRA") against four former employees of LBI for claims arising out of US Airways' purchase of ARS.  (*Id.* at 2.)

5

4.      On May 26, 2011, the arbitrators in the FINRA Arbitration issued a decision (the "FINRA Decision"), a copy of which is attached hereto as Exhibit D.[1]  According to the FINRA Decision, during the course of the FINRA Arbitration, US Airways revised its claim for damages down to approximately $91.2 million.  (FINRA Decision at 6.)  The FINRA Decision found that US Airways has sustained damages in the amount of $15 million on account of its ownership of the ARS and found three of the former employees of LBI (the "LBI Employees") jointly and severally liable for compensatory damages in that amount (the "Arbitration Award").  (*Id.*)

5.      On June 29, 2011, the LBI Employees filed a motion seeking relief from the automatic stay [ECF No. 18157] (the "D&O Insurance Motion"), a copy of which is attached hereto as Exhibit E, to allow payment of the Arbitration Award under the directors' and officers' liability insurance policies issued to LBHI and certain of its affiliates for claims made during the 2007-2008 policy period (collectively, the "D&O Policies").  Both LBHI and US Airways filed statements in support of the D&O Insurance Motion on July 13, 2011 [ECF No. 18468] and July 18, 2011 [ECF No. 18579], respectively, copies of which are attached hereto as Exhibits F and G.  On July 21, 2011, this Court entered an order granting the D&O Insurance Motion [ECF No. 18691], a copy of which is attached hereto as Exhibit H, permitting payment of the Arbitration Award out of the proceeds of the D&O Policies.

6.      Notwithstanding the findings of the FINRA Arbitration, the Arbitration Award, and this Court's authorization of payment of the Arbitration Award from the D&O Policies, US Airways continues to prosecute the US Airways Claim against LBHI in the full filed amount of $564.7 million.  LBHI is therefore required, under section 8.4 of the Plan, to reserve

---

[1]      The FINRA Decision was filed in these cases by the LBI Employees (defined below) on July 19, 2011 [ECF No. 18634] as Exhibit B to the D&O Insurance Motion (defined below).

US_ACTIVE:\44149287\9\58399.0011

for a claim of $564.7 million, despite the fact that the amount of damages suffered by US

Airways on account of its ownership of ARS is an issue that has been fully litigated and found to

be no greater than $15 million by the FINRA Arbitration.  Under the law of collateral estoppel in

the Second Circuit, however, the US Airways Claim cannot exceed, and LBHI should not be

required to reserve for a claim greater than, $15 million.

7.      This Court need not decide, however, whether or not collateral estoppel

applies to reduce LBHI's reserves on account of the US Airways Claim at this time.  Even if

collateral estoppel does not apply, US Airways has itself acknowledged that US Airways Claim

is significantly overstated by revising its claim for damages from at least $564.7 million to

approximately $91.2 million during the course of the FINRA Arbitration.  Further, as more fully

explained below, approximately 72% of the US Airways Claim relates to punitive damages to

which US Airways is likely not entitled under applicable case law, and approximately $25

million relates to interest, a portion of which may be unrecoverable under section 502(b) the

Bankruptcy Code (as defined below).  Thus, at a minimum, LBHI's reserve on account of the US

Airways Claim should be reduced to account for a claim no greater than $91.2 million.

8.      Although LBHI believes that the entirety of the US Airways Claim is

devoid of merit, LBHI has engaged in settlement discussions with US Airways.  Such

discussions have not been successful to date.  Although the Plan Administrator is hopeful that a

consensual resolution of the US Airways Claim may eventually be reached, in the meantime,

pursuant to section 8.4 of the Plan, LBHI is required to maintain significant reserves on account

of the full asserted amount of the US Airways Claim – *i.e.*, for a claim of approximately $564.7

million.  To facilitate LBHI's continued efforts towards a consensual resolution of the US

Airways Claim, LBHI has sought a consensual reduction of the US Airways Claim for reserve

7

purposes (as it has done with several other creditors, thereby achieving approximately $19 billion in consensual reserve reductions).  Agreement could not be reached with US Airways on terms for a consensual reduction.

9.      The reserves that LBHI is required to maintain on account of overstated claims such as the US Airways Claim materially impact the distributions that LBHI can make to its creditors.  Therefore, to avoid the need to maintain disproportionately large reserves on account of the US Airways Claim, LBHI requests, pursuant to section 8.4 of the Plan, that this Court estimate, solely for Plan reserve purposes, the amount of the US Airways Claim as $91.2 million in LBHI Class 7 (the "Estimated Reserve Amount") so that LBHI can effectuate the administration of its Plan, and address the US Airways Claim in an economical and efficient manner, without diminishing distributions and unfairly prejudicing LBHI's other creditors.

**Jurisdiction**

10.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334 and section 14.1 of the Plan.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Background**

11.     Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8

12.     On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.  Pursuant to the Plan, the Plan Administrator, among other things, is authorized to interpose and prosecute objections to claims filed against the chapter 11 estates of LBHI and its affiliates who commenced the Chapter 11 Cases (the "Chapter 11 Estates").

**The US Airways Claim**

13.     According to the US Airways Claim, US Airways had a cash management account and entered into a cash management agreement with LBI (the "Cash Management Agreement").  (US Airways Claim at Exhibit A, pp. 1, 8.)  In accordance with the Cash Management Agreement, US Airways funded its brokerage account at LBI.  Using these funds, at US Airways' request, LBI purchased various ARS.  US Airways asserts that the auctions associated with ARS subsequently failed, leaving US Airways unable to immediately access approximately $134.6 million of its cash.  (Response at 7.)

14.     On December 1, 2009, US Airways commenced the FINRA Arbitration against the LBI Employees, and asserted claims for unsuitability, unauthorized purchases, negligent misrepresentation, negligence, gross negligence, failure to supervise, and breach of fiduciary duty.  (FINRA Decision at 5-6.)  In the FINRA Arbitration, US Airways sought compensatory damages in an amount to be determined at arbitration, punitive damages of triple the compensatory damages, interest, and attorneys' fees and costs.  (*Id.* at 4-5.)  At the close of the FINRA Arbitration, US Airways revised its claim and sought, instead, compensatory damages in the amount of approximately $91.2 million.  (*Id.* at 5.)

15.     In connection with the FINRA Arbitration in which US Airways sought approximately $91.2 million in damages, US Airways also filed the US Airways Claim on

US_ACTIVE:\44149287\9\58399.0011

September 22, 2009.  Unlike in the FINRA Arbitration, however, US Airways asserts in the US

Airways Claim that it is owed approximately $564.7 million by LBHI.  In an attachment to the

US Airways Claim, US Airways sets forth the following calculation for the claim:

| | |
|---|---|
| Principal Amount of Claim: | $134,550,000.00 |
| Interest (at 9%): | $26,461,009.45 |
| Treble Damages: | $403,650,000.00 |
| **TOTAL:** | **$564,661,009.45** |

Thus, of the approximately $564.7 million claimed by US Airways in the US Airways Claim,

approximately 72% consists of punitive damages, and some portion of the US Airways Claim

likely relates to unrecoverable postpetition interest.

16.    The US Airways Claim does not specify a legal basis for holding LBHI

liable for damages allegedly incurred by US Airways in its transactions with LBI or the LBI

Employees.[2]  Seeing no basis for liability in the US Airways Claim, LBHI included the claim on

Omni 111.  In the Response, US Airways, for the first time, articulated its theory why LBHI may

be liable to US Airways in connection with the FINRA Arbitration.  In sum, although neither

LBHI nor any Lehman affiliate other than LBI was a party to the Cash Management Agreement

or responsible for US Airways' cash management account, US Airways argues that (i) LBHI is

liable to US Airways based on veil-piercing theories of liability, and (ii) LBHI is liable as a

result of its own conduct and participation in the decision-making concerning the ARS sold to

US Airways, including LBHI's alleged decision to cause LBI to "buy back" ARS from certain

LBI customers other than US Airways.  (Response at 12-19.)

---

[2]    In support of the US Airways Claim, US Airways attached to its proof of claim form a draft complaint (the
"Draft Complaint") that it appears US Airways had intended to file against LBI in a proceeding before FINRA.

17.     Ultimately, as stated above, the FINRA arbitrators issued the FINRA Decision, finding that as a result of its ownership of ARS, US Airways had sustained and is entitled to compensatory damages in an amount equal to $15 million, and finding three of the four LBI Employees jointly and severally liable for the Arbitration Award.  Thus, although LBHI denies that it has any liability on account of any transactions between US Airways and other non-debtors, pending the resolution of the US Airways Claim, LBHI should only be required to maintain reserves for a claim of $15 million based on the findings of the FINRA Decision; or, at most, for a claim of no greater than $91.2 million, based on the maximum damages actually asserted by US Airways in the FINRA Arbitration.

18.     Under the terms of the Plan, absent the relief requested herein or other agreement by US Airways, LBHI is required to reserve the Pro Rata Share (as defined in the Plan) of distributions for the US Airways Claim in the amount of $564.7 million.  In other words, LBHI is required to maintain reserves based on the full filed amount of the US Airways Claim, notwithstanding that (i) in the FINRA Arbitration, US Airways ultimately only sought approximately $91.2 million in damages, (ii) the FINRA Decision awarded US Airways only $15 million in compensatory damages, and (iii) this Court has modified the automatic stay to allow the full payment of the Arbitration Award from the D&O Policies.  The amount of such reserves diminishes the distributions that LBHI can make to creditors with Allowed Claims (as defined in the Plan).  To avoid this inequitable result, the Chapter 11 Estates included in Section 8.4 of the Plan a mechanism, described below, to estimate for Plan reserve purposes Disputed Claims such as the US Airways Claim in amounts that are reasonable and that will not unfairly prejudice other creditors.

US_ACTIVE:\44149287\9\58399.0011

## **Basis for Relief Requested**

19.     The Plan provides that the Court has authority to estimate, for reserve

purposes, claims that constitute Disputed Claims under the Plan.  Section 8.4 of the Plan permits

the Chapter 11 Estates to reserve for Disputed Claims in "the amount determined, to the extent

permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes

of fixing the amount to be retained for such Disputed Claim."  (Plan at § 8.4.)  In addition,

section 9.3 of the Plan provides that "the Plan Administrator may at any time request on behalf

of any Debtor that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed

Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules."  (*Id.* at § 9.3.)

The definition of Disputed Claim includes any claim "as to which a timely objection and/or

request for estimation has been interposed, which objection and/or request for estimation has not

been withdrawn or determined" by a final order.  (*Id.* at § 1.46.)  The US Airways Claim is

subject to Omni 111and is a Disputed Claim.  (*See id.*)

20.     This Court has previously held that pursuant to section 8.4 of the Plan,

"the Court will have the ability to estimate disputed claims using the procedures that are outlined

in [section] 502(c) [of the Bankruptcy Code] and related case law."  Hr'g Tr. 16:25-17:2, Jan. 26,

2012.  Estimation under these circumstances is proper under section 502(c) of the Bankruptcy

Code, which provides as follows:

> (c) There shall be estimated for purposes of allowance under
> this section –
>
> (1) any contingent or unliquidated claim, the fixing or
> liquidation of which, as the case may be, would unduly delay the
> administration of the case; or
>
> (2) any right to payment arising from a right to an equitable
> remedy for breach of performance.

12

11 U.S.C. § 502(c).  Other Courts have also recognized the ability to estimate disputed claims under section 502(c).  *See In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 724 (Bankr. E.D. Ky. 2004) (holding that a liquidating supervisor had the right under section 502(c) to seek estimation of disputed claims pursuant to a plan of reorganization); *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422-23 (Bankr. S.D.N.Y. 2003) (estimating the disputed unliquidated amount of an administrative claim under section 502(c)).

21.    Furthermore, the Court has broad authority under sections 1142(b) and 105(a) of the Bankruptcy Code over the property of the estate administered under the Plan and to issue any order necessary to implement the provisions of the Plan and the Bankruptcy Code.  *See* 11 U.S.C. § 1142(b) ("The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary to the consummation of the plan"); *id.* § 105(a) ("The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.").

### The US Airways Claim Should Be Estimated in the Estimated Reserve Amount

**A.    Collateral Estoppel (Issue Preclusion) Requires that the US Airways Claim Not Exceed $15 Million**

22.    Assuming, *arguendo*, that LBHI – as opposed to the LBI Employees or LBI – is liable to US Airways for damages relating to ARS (which it is not), US Airways is collaterally estopped from asserting that LBHI caused it damages in excess of $15 million.  In other words, even if US Airways has any claim at all against LBHI, such claim must be capped at $15 million because the FINRA Arbitration already determined that US Airways suffered only $15 million in damages related to its ownership of ARS.

13

23.    "The doctrine of collateral estoppel precludes a party from relitigating in a subsequent proceeding an issue of law or fact that has already been decided in a prior proceeding." *Boguslavsky v. Kaplan*, 159 F.3d 715, 719-20 (2d Cir. 1998).  A defendant may raise collateral estoppel even if the defendant was not a party to the prior proceeding. *Boguslavsky*, 159 F.3d at 719, n. 3.  Thus, "if a litigant has had an opportunity to fully and fairly litigate an issue and lost, third parties unrelated to the original action can bar the litigant from relitigating that same issue in a subsequent suit." *Austin v. Downs, Rachlin & Martin*, 114 Fed.Appx. 21, 22 (2d Cir. 2004).

24.    Collateral estoppel applies when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marvel Characters Inc., v. Simmons*, 310 F.3d 280, 288-89 (2d Cir. 2002) (applying the federal standard for collateral estoppel).[3]  The doctrine of collateral estoppel applies with equal force in the bankruptcy context. *See, e.g.*, *Kelleran v. Andrijevic*, 825 F.2d 692, 695 (2d Cir. 1987) ("Bankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction."); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 194-95 (Bankr. S.D.N.Y. 2012) ("[a] bankruptcy

---

[3]    Federal courts apply the federal standard for collateral estoppel when determining the preclusive effect of judgments concerning federal questions and the applicable state law standard for collateral estoppel when determining the preclusive effect of state law judgments. *See, e.g.*, *id.*; *Boguslavsky*, 159 F.3d at 719, n. 4.  The FINRA Arbitration involved claims under both New York, Arizona, and federal law.  There is no discernible difference, however, between New York, Arizona, and federal law with respect to the use of collateral estoppel.  *See Marvel*, 310 F.3d at 286 (noting that the federal standard for proving collateral estoppel is the same as the New York standard); *Campbell v. SZL Properties, Ltd.*, 204 Ariz. 221, 222, (Ct. App. 2003) (delineating a collateral estoppel standard, when collateral estoppel is used defensively, that is nearly identical to the federal standard).

US_ACTIVE:\44149287\9\58399.0011

court may not look behind a state court judgment to decide claims or issues resolved in the prior action…").

25.     The amount of damages incurred by US Airways as a result of its ownership of ARS represents an "identical issue" that was raised in a "previous proceeding." With respect to whether the FINRA Arbitration qualifies as a "previous proceeding," the Second Circuit has made clear that "collateral estoppel can be predicated on arbitration proceedings," even when the arbitration award has not been confirmed by a court. *Boguslavsky*, 159 F.3d 715, 720 (2d Cir. 1998) (citing *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267-68 (2d Cir. 1997) for the proposition that an unconfirmed arbitral proceeding may have collateral estoppel effect in federal court).  Likewise, case law is clear that quantifying the allowed amount of a claimant's claim in a bankruptcy case may constitute an "identical issue" for purposes of collateral estoppel where a previous proceeding has established the amount of such claimant's damages.  *See Borchers v. DBL Liquidating Trust (In re Drexel Burnham Lambert Group, Inc.)*, 161 B.R. 902, 909-10 (S.D.N.Y. 1993); *see also Roussos v. Michaelides*, 251 B.R. 86, 95 (B.A.P. 9th Cir 2000); *Maguire v. Gorruso (In re Gorruso)*, No. 03-1012, 2004 WL 169706, at *4 (Bankr. D.Vt. 2004).

26.     Even if US Airways were to argue that the amount of the US Airways Claim does not raise an "identical issue" as the FINRA Arbitration because the FINRA Arbitration considered the amount of damages caused by the LBI Employees and not the amount of damages caused by LBHI (*i.e.*, even if US Airways were to argue that the Arbitration Award does not reflect the full extent of US Airways' damages), this argument would be foreclosed by *Boguslavsky* and *STMicroelectronics* – two cases nearly identical to this dispute.  *See*

15

*Boguslavsky*, 159 F.3d at 721; *STMicroelectronics v. Credit Suisse Group*, 775 F.Supp.2d 525, 541 (E.D.N.Y. 2011).

27.      In both *Boguslavsky* and *STMicroelectronics*, the Court of Appeals for the Second Circuit and the Eastern District of New York, respectively, held that an arbitration panel's award of damages precluded relitigation of damages in subsequent cases against defendants that were not parties to the arbitration.  *Boguslavsky*, 159 F.3d at 717-19, 721; *STMicroelectronics*, 775 F.Supp.2d at 531-35, 541.  In both cases, the new defendants were the corporate parents of the defendants in the arbitrations, and plaintiffs asserted causes of action and theories of liability against these defendants that had not been raised in the arbitration. *Boguslavsky*, 159 F.3d at 717-19; *STMicroelectronics*, 775 F.Supp.2d at 531-35, 541.

28.      *STMicroelectronics* is particularly relevant in so far as the plaintiff alleged – just as US Airways does – that the defendant discriminated against it by failing to buy back certain of its illiquid ARS when the defendant had bought back such securities from its other customers, and that such discrimination caused plaintiff harm that was not accounted for in the arbitration award.  *STMicroelectronics*, 775 F.Supp.2d at 534.  Notwithstanding the assertion of additional claims against new defendants in both *Boguslavsky* and *STMicroelectronics*, both cases held that the claims asserted in the arbitration and the claims asserted in the district court related to the same injuries, and thus the issue of damages had already been decided. *Boguslavsky*, 159 F.3d at 721; *STMicroelectronics*, 775 F.Supp.2d at 541.

29.      As *Boguslavsky* and *STMicroelectronics* make clear, collateral estoppel precludes the relitigation of the amount of damages incurred by US Airways as a result of its ownership of the ARS.  Regardless of whether US Airways asserts additional claims or theories of liability against LBHI that were not asserted in the FINRA Arbitration, such claims and

theories relate to the same underlying injury stemming from the same ARS.  Quantifying this

injury represents an "identical issue" that "was raised in a previous proceeding," and thus the

first element of collateral estoppel has been met.  *See Boguslavsky*, 159 F.3d at 721;

*STMicroelectronics*, 775 F.Supp.2d at 541; *see also Drexel Burnham*, 161 B.R. at 909 ("If the

NASD arbitration panel improperly determined [claimant's] damages, [claimant's] remedy was

to move to vacate the Award…. She cannot relitigate the issue of her damages a second time.").

       30.     US Airways cannot credibly argue that the remaining elements of

collateral estoppel have not been met.  First, the FINRA Arbitration made a final determination

regarding the amount of damages incurred by US Airways, thus satisfying the requirement that

"the issue was actually litigated and decided."  *See Drexel Burnham*, 161 B.R. at 908-10.

Second, during the arbitration proceeding, which spanned 34 hearing sessions, US Airways was

represented by counsel and was provided an opportunity to present legal arguments and

introduce evidence, including witness testimony.  (FINRA Decision at 5-7.)  Accordingly, the

requirement that US Airways "had a full and fair opportunity to litigate the issue" has been met.

*See Boguslavsky*, 159 F.3d at 719, 721 (denying plaintiff the ability to relitigate damages, and

thereby rejecting plaintiff's contention that it "did not have a full and fair opportunity to litigate

the issues during the arbitration"); *Drexel Burnham*, 161 B.R. at 908-10.  Third, resolution of the

damages issue was necessary to support the Arbitration Award, and thus the last element of

collateral estoppel is met.  *See Boguslavsky*, 159 F.3d at 721; *Drexel Burnham*, 161 B.R. at 909.

       31.     Because collateral estoppel precludes US Airways from asserting that it

was damaged in excess of $15 million as a result of its ownership of ARS, the maximum amount

that US Airways may claim against LBHI in the US Airways Claim is $15 million.

**B.     Even if Collateral Estoppel Does Not Apply, The US Airways Claim Should Be Estimated in the Estimated Reserve Amount**

32.     Although US Airways is clearly estopped from asserting damages greater than $15 million, this Court need not determine whether collateral estoppel applies to the US Airways Claim at this time.  Even if collateral estoppel does not apply to the US Airways Claim (which it does), the US Airways Claim is grossly overstated and should be estimated in the Estimated Reserve Amount.  Although US Airways filed the US Airways Claim in the amount of approximately $564.7 million, as stated above, US Airways itself only asserted compensatory damages in the amount of $91.2 million during the FINRA Arbitration.  Indeed, US Airways has never even alleged that its actual damages with respect to the LBI Employees, LBI, or LBHI ever exceeded $134.6 million: rather, US Airways has only alleged that "the ARS investments became illiquid and US Airways could not access $134.6 million of the funds it had entrusted to Lehman Brothers."[4]  (Response at 7; Draft Complaint at ¶ 3.)

33.     Moreover, a panel of FINRA arbitrators specializing in securities disputes has determined that US Airways suffered only $15 million in damages as a result of its ownership of ARS.  Thus, even if collateral estoppel does not apply, the Arbitration Award, which was based on witness testimony as well as other evidence, is at least indicative of the amount of damages that US Airways would be able to prove against LBHI, (assuming US Airways has any claim at all against LBHI).  It is unlikely, however, that US Airways would be able to prove that LBHI's actions resulted in even as much as $15 million in damages because the LBI Employees – not LBHI – played the primary role in causing US Airways harm.  For

---

[4]     In its Response, US Airways admitted that even its request for $134.6 million is overstated when it noted that "it will offset from its claim any recoveries it receives [on its illiquid ARS], including sales on the secondary market (which have occurred) and amounts received on its FINRA Award, including from insurance proceeds." (Response at 9, n. 5.)  Nevertheless, LBHI has been forced to maintain reserves for the US Airways Claim based on the full filed amount of such claim.

18

example, US Airways' cash management brokerage account was managed by LBI – not LBHI – and LBHI was not a party to the Cash Management Agreement.  (US Airways Claim at Exhibit A.)  It was the LBI Employees, not LBHI employees, who purchased the ARS, allegedly in violation of US Airways' stated investment policy.  (*Id.*)  In light of the fact that the LBI Employees – and not LBHI – played the primary, if not exclusive, role in both the purchase of the ARS securities and the alleged "buyback program," US Airways would be unable to show that LBHI damaged US Airways to a greater extent than the LBI Employees.

34.     Furthermore, estimation of the US Airways Claim at the Estimated Reserve Amount is warranted because, as stated above, approximately 72% of the US Airways Claim is based upon punitive damages.  US Airways cannot recover punitive damages from LBHI in light of LBHI's bankruptcy.  "The purpose of punitive damages . . . is to punish tortfeasors and deter them from their wrongful conduct."  *In re Johns-Manville Corp.*, 68 B.R. 618, 627 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).  But in a bankruptcy setting where the recovery of punitive damages by some creditors depletes the recovery of other creditors, courts have regularly exercised their equitable power to disallow or subordinate punitive damage claims.  *See, e.g., In re Johns-Manville,* 68 B.R. at 627 (finding that "recovery of punitive damages . . . would . . . risk the depletion of [an asbesetos trust's] assets" to the benefit of some claimants but at the expense of other claimants, and holding that such a result "is inequitable on its face."); *In re A.H. Robins Co., Inc.,* 89 B.R. 555, 562 (E.D. Va. 1988) (holding that equity provides courts with the power to disallow punitive damages if allowance would frustrate the aims of the chapter 11 plan).  Awarding punitive damages to certain unsecured creditors in cases where all unsecured creditors are not receiving full satisfaction of their claims in effect forces

19

those impaired creditors to pay for the debtor's wrongful conduct. *See In re Johns-Manville Corp.,* 68 B.R. at 627-28 (stating "it is well within the authority of this court to disallow a claim for punitive damages…."). Punitive damages claims are particularly inappropriate in instances where, as here, the debtor is liquidating, as there is no deterrent purpose or effect. *See* 11 U.S.C. § 726(a)(4) (expressly subordinating punitive damages in chapter 7 cases).

35.    Bankruptcy law likewise restricts US Airways' ability to collect any portion of the approximately $25 million that relates to postpetition interest. 11 U.S.C. § 502(b)(2). Indeed, section 502(b)(2) of the Bankruptcy Code expressly disallows claims for interest that has not matured as of the petition date. *Id.*; *see also* COLLIER ON BANKRUPTCY 502.03[3][a] (16th ed. 2009) ("[S]ection 502(b)(2) prohibits payment of postpetition interest on prepetition unsecured claims….").

36.    Notwithstanding the likely applicability of the collateral estoppel doctrine to the US Airways Claim, the persuasive weight of the FINRA Decision with respect to damages and the low likelihood that US Airways could prove damages greater than $15 million against LBHI, LBHI is only seeking to estimate the US Airways Claim at an amount that comports with the maximum damages actually asserted by US Airways at the close of the FINRA hearings, after US Airways had its opportunity to prove its damages in the FINRA Arbitration. Accordingly, LBHI requests that this Court estimate the US Airways in the amount of $91.2 million – *i.e.*, the amount that US Airways ultimately asserted as its damages in the FINRA Arbitration – in LBHI Class 7.

37.    LBHI is not seeking to estimate the US Airways Claim at the Estimated Reserve Amount for purposes of allowance or distributions under the Plan, but only for reserve

US_ACTIVE:\44149287\9\58399.0011

purposes.  The proposed order preserves US Airways' right to continue to assert that the allowed amount of the US Airways Claim should be up to the filed amount.[5]

38.    For the reasons set forth in this Motion, LBHI hereby requests that the Court enter the proposed order annexed hereto.

### Notice

39.    No trustee has been appointed in the Chapter 11 Cases.  The Plan Administrator, in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [ECF No. 9635], has served notice of this Motion on (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) US Airways; and (vi) all parties who have requested notice in these chapter 11 cases.  The Plan Administrator submits that no other or further notice need be provided.

---

[5]    In addition, the estimation of the US Airways Claim does not preclude LBHI from continuing to dispute the validity, amount and priority of the US Airways Claim.  LBHI does not intend to allow the US Airways Claim at the Estimated Reserve Amount and reserves all rights to further object to the US Airways Claim on any basis whatsoever.

21

40.    No previous request for the relief sought herein has been made by LBHI

or the Plan Administrator to this or any other court.

WHEREFORE the Plan Administrator respectfully requests that the Court grant

the relief requested herein and such other and further relief as it deems just and proper.

Dated: New York, New York
      January 15, 2013

/s/ Robert J. Lemons
Robert J. Lemons
Ralph I. Miller

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

US_ACTIVE:\44149287\9\58399.0011

**Exhibit A**

US_ACTIVE:\44149287\9\58399.0011

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| Lehman Brothers Holdings, Inc. | Case No. 08-13555 (JMP) |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000030598

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

US Airways, Inc.
SEND NOTICES TO:
Michael S. Kim
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022

Telephone number: 212-488-1200    Email Address: Michael.Kim@kobrekim.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
(If known)

Filed on:_____

Name and address where payment should be sent (if different from above)

Telephone number:                    Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed: $ 564,661,009.45 (estimated based on par value of illiquid securities, plus C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages)
(by filing this claim, US Airways is not acknowledging that any insurance proceeds available to satisfy the claim are property of the estate that must be litigated or adjudicated through the estate)

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. Basis for Claim: See attached.
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: 8470
3a. Debtor may have scheduled account as:_____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe:_____
Value of Property: $_____    Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection:_____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____
(See instruction #6 on reverse side.)

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

FILED / RECEIVED

SEP 22 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

S. Bovee, Assoc. General Counsel

US AIRWAYS

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Susan Bovee

## Itemized Statement of Interest for US Airways, Inc.

The total amount of claim is calculated based on the par value of the illiquid securities, plus the C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages.

| | | |
|---|---|---|
| **Principal Amount of Claim** | = | 134,550,000.00 |
| **Interest (at 9%)** | = | 26,461,009.45 |
| **Treble Damages** | = | 403,650,000.00 |
| **TOTAL** | = | **564,661,009.45** |

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
In re                                       :
                                            :
LEHMAN BROTHERS HOLDINGS INC., ET AL. :         Case No.  08-13555 (JMP)
                                            :
                    Debtors.                :
----------------------------------------------------------------x
```

### SUPPLEMENTAL DOCUMENTATION TO PROOF OF CLAIM

1.      US Airways, Inc. ("US Airways") by and through its attorneys, Kobre &

Kim LLP, submits the attached timely proof of claim.

2.      The facts and circumstances of US Airways' claims are set forth in the

attached draft Statement of Claim (A redacted copy of the draft Statement of Claim is

attached hereto as Exhibit A.)

3.      These claims arise out of the "Cash Management Brokerage Agreement

and Limited Discretionary Authorization" (the "Agreement") entered into between US

Airways and Lehman Brothers, Inc. (A redacted copy of the Agreement is attached hereto

as Exhibit B.)

4.      The Agreement provides, *inter alia*, for "final and binding" arbitration in

connection with "all claims and controversies arising from or relating to the construction,

performance or breach of this Agreement, or relating to any Account referenced herein."

5.    On September 15, 2008, a proceeding was commenced under Chapter 11 of the United States Bankruptcy Code with respect to Lehman Brothers Holdings, Inc. ("LBHI"). Accordingly, all actions against LBHI were stayed.

## RELIEF REQUESTED

6.    US Airways hereby reserves its rights to move the Court to lift the automatic stay and institute a FINRA arbitration in connection with the claims set forth in the attached draft Statement of Claim so as to resolve any disputes regarding Debtor's liability, the amount of damages, the priority of this claim, or any and all other matters that the parties agreed were to be decided by arbitration.

7.    US Airways also hereby reserves its rights to amend the attached Statement of Claim between the present time and the time the automatic stay may be lifted.

Dated: September 22, 2009
         New York, New York

Respectfully submitted,

KOBRE & KIM LLP

*Robert W. Henoch*

Michael S. Kim
Michael.Kim@kobrekim.com
Robert W. Henoch
Robert.Henoch@kobrekim.com

800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

*Attorneys for US Airways, Inc.*

# Exhibit A

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

BEFORE THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY

———————————————————— x
                          :

US AIRWAYS, INC.,                                    :

                Claimant,              :       Case No. _____

          v.                          :

LEHMAN BROTHERS INC.,                          :

            Respondent.          :

                          :
———————————————————— x

Claimant US Airways, Inc. ("US Airways" or "Claimant"), by and through its

attorneys, Kobre & Kim LLP, for its statement of claim against Lehman Brothers Inc.

("Lehman" or "Respondent") submits as follows:

**Introduction**

1.     US Airways is a holding company whose primary business activity is the

operation of a major network air carrier through its wholly owned subsidiaries.  US

Airways is the fifth largest airline in the United States and is listed on the New York

Stock Exchange.  US Airways held a cash management brokerage account numbered

████████ (the "Account") with Respondent Lehman, which Claimant used to manage

short-term cash needed for Claimant's business operations.

2.     Upon information and belief, Respondent repeatedly recommended and

purchased numerous unsuitable securities for Claimant's Account.  These securities

(which will be described in greater detail below) are all complex, highly-structured, risky

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

securities (hereafter, "Complex Structured Securities") issued by just two untested and esoteric transactional structures, the first of which were issuers of "contingent capital facilities" established for bond insurers, and the second of which provides a source of no-recourse funding for a life insurance company's "redundant reserves," which provides securities holders such as Claimant with little, if any, recourse to the amounts invested. The securities were offered as auction rate securities, the functioning of which will be described in greater detail below.

3.     Beginning on or about August of 2007, the auctions associated with these Complex Structured Securities began to "fail." "Failed" auctions will be described in greater detail below, but in essence a failed auction means that an investor's money is trapped in the security, which the investor cannot sell. In the case of US Airways, Claimant is unable to sell all of the Complex Structured Securities in its Account, leaving Claimant indefinitely without access to approximately US $134.6 million of the funds it entrusted to Respondent.

4.     Respondent recommended these securities even though Respondent knew that the securities failed to satisfy the investment objectives that Claimant articulated in its Policies and Procedures Governing the Investment of Company Funds ("Investment Policy") that was provided to Respondent and reiterated by representatives of Claimant on numerous occasions in oral communications with Respondent. The primary goals of these investment objectives were to preserve Claimant's capital and to provide adequate liquidity to fund Claimant's business operations. The third goal of the Investment Policy was, "within the constraints of capital preservation and liquidity requirements . . . to

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

optimize after tax return on investments in instruments for which there exists an active market." (Exhibit A.)

5.      Furthermore, the securities that Respondent repeatedly recommended and purchased fall *outside* of all of the categories of "Eligible Investments" enumerated in the Investment Policy. (*Id.*) The list of "Eligible Investments" identifies in significant detail the categories of acceptable investments for US Airways' Account. (*Id.*) The auction rate securities recommended and purchased for US Airways' Account were not identified as eligible investments in the Investment Policy. Thus, by definition, these securities were unsuitable for Claimant's Account.

6.      As registered representatives of FINRA, Respondent had an obligation to recommend "suitable" securities in light of Claimant's investment objectives. Rather than acting in a manner consistent with its obligations under the FINRA rules and general standards of commercial practice, as discussed in further detail below, Respondent recommended and purchased securities for Claimant's Account that were wildly unsuitable in light of Claimant's investment objectives.

7.      Respondent consistently misled Claimant as to the nature of the securities that Respondent was recommending, and the extent of risk to which these securities exposed Claimant. Respondent repeatedly assured Claimant that the securities that Respondent was recommending for purchase for Claimant's Account comported with Claimant's Investment Policy, even though Respondent knew the securities did not.

8.      Respondent, moreover, recommended these Complex Structured Securities even though the securities are also unregistered private placement securities, and by this fact manifestly unsuitable given Claimant's Investment Policy and the

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

objectives that Claimant repeatedly articulated to Respondent.  Since unregistered private placement securities can only be sold pursuant to narrow exemptions to the Securities Act of 1933 (the "Act") and to a limited number of purchasers, their liquidity is severely hindered and they are significantly more exposed to market risk.  Such securities are, thus, clearly unsuitable for investors whose highest objectives are safety and liquidity.

9.     Upon information and belief, Respondent continued aggressively to recommend and purchase these manifestly unsuitable Complex Structured Securities to Claimant in spite of Respondent's awareness of the problems in the market for such securities.  Upon information and belief, Respondent advised Claimant to purchase these Complex Structured Securities in order to prop up auctions that Respondent knew or should have known were in imminent danger of failing and becoming illiquid, thereby advancing Respondent's interests to Claimant's detriment.

10.     Lehman sought to forestall such auction failures because Lehman is affiliated with the issuers of the securities in various ways, serving as the "structuring advisor," "initial purchaser," and/or "designated broker-dealer" for all of the currently illiquid securities held in Claimant's Account.  Upon information and belief, Lehman received fees from issuers for acting in all three of these capacities.

11.     In other words, Lehman, upon information and belief, recommended numerous manifestly unsuitable securities to Claimant in order to advance Lehman's own financial interests to the detriment of Claimant.

12.     By recommending the unsuitable Complex Structured Securities in order, upon information and belief, to prop up auctions it knew to be in imminent danger of failing, Respondent is liable for having:  (i) breached its contract with Claimant; (ii)

recommended numerous unsuitable securities to Claimant; (iii) made unauthorized purchases on Claimant's behalf; (iv) violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder; (v) made fraudulent misrepresentations to Claimant, on which Claimant reasonably relied; (vi) converted Claimant's possessory interest in the funds invested in the Complex Structured Securities; (vii) negligently caused injury to Claimant; (viii) committed gross negligence; (ix) failed to supervise its employees; and (x) sold securities to Claimant without obtaining a required Purchaser's Letter, thereby rendering the sales null and void.

### Parties

13.    Claimant US Airways is a holding company whose primary business activity is the operation of a major network air carrier through its wholly owned subsidiaries. Claimant is the fifth largest airline in the United States and is listed on the New York Stock Exchange. US Airways is headquartered in Phoenix, Arizona.

14.    Respondent Lehman Brothers Inc. is a FINRA registered broker-dealer formerly headquartered at 745 Seventh Avenue, New York, New York 10019. Lehman Brothers Inc. is currently the subject of liquidation proceedings pursuant to the Securities Investor Protection Act in *In re Lehman Brothers, Inc.*, 08-01420 (JMP) SIPA, pending in the United States Bankruptcy Court for the Southern District of New York.

### Jurisdiction and Hearing Location

15.    This matter is eligible for submission pursuant to Rule 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes.

16.    At all times material herein, Lehman Brothers was and is a broker-dealer registered with FINRA and Respondent is a member of FINRA. The Agreement between

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Respondents and Claimant provides, *inter alia*, for "final and binding" arbitration in connection with "all claims and controversies arising from or relating to the construction, performance or breach of this Agreement, or relating to any Account referenced herein." (Exhibit B.)

17.     The proper hearing location for this arbitration is Phoenix, Arizona, pursuant to Rule 12213 of the FINRA Code.   The place of business for Claimant is Phoenix, Arizona.

### In the Course of Establishing the Account, Claimant Fully Communicated and Respondent Fully Understood That Claimant's Objectives Were to Preserve Capital and to Provide Liquidity

18.     Upon information and belief, Claimant began transferring funds to Lehman in or about 2004, and Claimant began discussing the possibility of opening a cash management account with Lehman.   During these discussions, Claimant consistently and clearly communicated to Respondent that Claimant needed investments in its Account to be safe and liquid.   To confirm this mutual understanding of Claimant's investment needs upon opening its Account, Claimant sent to Respondent a copy of Claimant's Investment Policy.

19.     This Investment Policy articulates the objectives Respondent were required to follow when recommending securities for purchase, the same objectives previously communicated to Lehman.   (*See* Exhibit A.)   The Investment Policy stipulates that all purchases must conform to the following investment objectives: (a) to preserve capital;   (b) to provide adequate liquidity;   and (c) within the constraints of capital preservation and liquidity requirements, to optimize after tax return on investments for

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

20.    As is consistent with these investment objectives, the Investment Policy includes limitations on the types of securities Respondent were to recommend.  First, the Investment Policy states that no more than 5% of the Investment Portfolio may be invested in securities of any single issuer, with the exception of US government obligations, where no limit is imposed.  US Airways included this limitation to ensure that distress limited to a particular issuer would not significantly affect the liquidity and capital preservation of the portfolio.

21.    Second, the Investment Policy limits the categories of securities available for recommendation and purchase by Respondent.  The Investment Policy provides a comprehensive list of "Eligible Investments" for the Account, which notably includes "Tax-Exempt and Tax-Advantaged Securities" and a type of auction rate security known as "Dutch auction rate preferred stock."  This list of "Eligible Investments" does not reference any type of auction rate securities that are taxable (*i.e.*, *not* issued by municipal or municipal-sponsored entities).  Further, this list does not include securities issued in connection with contingent capital facilities or redundant reserves for life insurance companies, as were purchased for Claimant, nor any other type of private placement securities.

22.    The Investment Policy did not permit Respondent to recommend or purchase securities that varied from the Investment Policy's provisions.  Upon receipt of this Investment Policy, Respondent did not raise any questions, provide any revisions nor otherwise suggest that it would be unable to recommend suitable securities pursuant to

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

the Policy. With the Investment Policy reviewed by both parties, upon information and

belief, Claimant and Respondent executed a Client Agreement, which served to establish

US Airways' Cash Management Brokerage Account with Lehman.

*Respondent Repeated Recommendations and Purchases of the*
*Complex, Structured Securities Violated the Obligations of FINRA Members In*
*Connection with Recommending Only Suitable Securities*

23.     Respondent's recommendation and purchase of these Complex, Structured

Securities additionally violated the obligations of broker-dealers and registered

representatives as set forth in the FINRA Rules.

24.     Respondent has a well-defined obligation to recommend and purchase

only "suitable" securities for Claimant's Account. This obligation is "fundamental to fair

dealing and is intended to promote ethical sales practices and high standards of

professional conduct." FINRA Rule IM-2310-3. In light of these obligations, FINRA

members must have a "reasonable basis for recommending a particular security or

strategy" and "a reasonably ground[] for believing the recommendation is suitable for the

customer to whom it is made." FINRA Rule IM-2310-3. These suitability requirements

apply "regardless of the financial circumstances of the customer." The high standards

that apply to a member in connection with its suitability obligations are "not diminished

by the fact that the member [is] dealing with an institutional customer." IM-2310-3.

25.     Respondent had no basis—let alone a reasonable basis—for

recommending and purchasing the Complex Structured Securities for Claimant's

Accounts. US Airways had clearly expressed the categories of acceptable securities for

its Account, its investment objectives of liquidity and preservation of capital and the

requirement that there be an active market. Further, Claimant repeatedly expressed its

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

need that the investments in the Accounts be available for Claimant to use for working capital.   Rather than recommending and purchasing securities that satisfy these investment goals, Respondent abandoned its obligations under the FINRA rules and instead purchased securities that were demonstrably unsuitable.

### Respondent Recommended Complex Structured Securities That Were Highly Inappropriate and Completely Contrary to the Parties' Understanding Toward Safe and Liquid Investments

26.    From the inception of the account to the present, Respondent continually recommended to Claimant risky, complex, highly-structured securities ("Complex Structured Securities"), issued almost entirely by sellers of "contingent capital facilities" established for bond insurers and trusts established to fund "redundant reserves." Virtually all of these securities were also unregistered under the Securities Act of 1933 and could only be sold through narrow exemptions to securities regulations.

27.    These types of risky, complex, structured and unregistered auction rate securities were never contemplated by the Investment Policy and were unsuitable given Claimant's stated investment objectives of liquidity and preservation of principal.

28.    Upon information and belief, however, Respondent misled Claimant into believing that the Complex Structured Securities it recommended and purchased were the same as those authorized in the Investment Policy.  Respondent never provided Claimant with any statements – oral or written – regarding the true nature of the securities being recommended.

29.    Upon information and belief, the recommendation and purchase of these securities, instead of the safe, liquid investments requested by Claimant, was motivated by Lehman's relationships with the issuers of these risky, complex, highly-structured

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

securities, and by Lehman's awareness of turmoil in the market for these particular securities. Upon information and belief, Lehman recommended and purchased these securities and misled Claimant as to their true nature in an ultimately unsuccessful attempt to generate sufficient demand for the securities to prevent failed auctions.

30.     Respondent continued this deception regarding the true nature of the Complex Structured Securities throughout the lifetime of the account. Because of this deception, by late August 2007, the portfolio owned by Claimant was allotted almost entirely to risky, complex, highly-structured securities not in compliance with Claimant's investment objectives and the Investment Policy. In fact, throughout the month of August 2007, approximately $134.6 million worth of Complex Structured Securities were purchased for Claimant's Account.

*Respondent Recommended Securities Whose Highly Complex and Risky Transactional Structures, As Detailed Below, Made Them Clearly Unsuitable, Given Claimant's Core Objectives of Low Risk and High Liquidity*

31.     Upon information and belief, virtually all of the risky Complex Structured Securities purchased by Respondent on Claimant's behalf fall into one of two categories: they are issued either by sellers of "contingent capital facilities" established for the benefit of bond insurers or trusts established to fund "redundant reserves." These categories will be described in greater detail below.

32.     As explained herein, Respondent's repeated recommendations of these Complex Structured Securities, many of which are Lehman's own products, resulted in Claimant losing its ability to access or invest a substantial portion of its cash.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

*Lehman Violated Claimant's Investment Objectives of Safety and Liquidity by Allocating a Massive Portion of the US Airways' Account to Securities that are Heavily-Exposed to the Troubled Bond Insurance Market*

33.    The first category of unsuitable securities purchased for the US Airways' Account are issued by trusts set up as "contingent capital facilities" ("CCF Trusts").

34.    CCF Trusts are established by organizations, often insurance companies, to protect against catastrophic losses by means of a capital injection that is agreed upon before any loss occurs.

35.    All of the securities purchased for US Airways' Account that fit into this category are issued by CCF Trusts established for the benefit of bond insurers.  In purchasing these securities, therefore, Lehman concentrated a massive amount of risk in the bond insurance industry.

36.    The securities are structured as follows:  A bond insurer establishes a series of sub-trusts.  Each of these sub-trusts enters into a put agreement with the bond insurer, in which they are paid a premium for agreeing to a put option, which allows the bond insurer to require that the sub-trust purchase preferred stock in the bond insurer. The put option, in effect, sets up a line of credit for the bond insurer, allowing it to draw cash from the sub-trust when it so desires.

37.    Each of the sub-trusts then issues securities to raise funds with which it will purchase preferred stock in the bond insurer in the event that the put option is exercised.  Each of the sub-trusts also invests in "Eligible Assets."  It uses the proceeds from its investment in "Eligible Assets" and the put option premiums to make its interest payments to the investors in the securities that it issues.

38.    The sub-trusts are established by the bond insurer.  Furthermore, in the

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

event that the put option is exercised, the investors in the sub-trusts will become owners of the preferred stock of the bond insurer. Consequently, the credit rating of the securities issued by the sub-trust will reflect the credit rating of the bond insurer; the safety and liquidity of the security will be directly affected by problems with the bond insurer.

39.   Over the last decade, the bond insurance industry has expanded by adding to its traditional municipal bond insurance portfolio a new line of business: providing insurance for structured securities, including CDOs. This shift has exposed bond insurers to significantly more risk.

40.   Furthermore, since a bond insurer's risk exposure derives from the risk exposure of every single bond that it insures, it is difficult to determine the safety and creditworthiness of a bond insurer. For this reason, tying such a massive portion of the US Airways' Account to bond insurers was manifestly unsuitable and failed to meet Claimant's expressed investment objectives of safety and liquidity.

*Respondent Violated Claimant's Investment Objectives and Investment Policy by Recommending Unsuitable Complex Structured Securities that are Issued to Provide No-Recourse Funding for Life Insurance Companies, and Whose Credit Ratings Are Based Entirely on the Rating of the Bond Insurer That Insures Them, Rather than on the Strength of the Underlying Issuer*

41.   The second type of unsuitable security purchased for the US Airways Account is issued by trusts established to provide a life insurance company with "no-recourse" funding for "redundant reserves" required under actuary regulations.

42.   This category of unsuitable securities in Claimant's account is structured in the following way:

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

43.     An insurance company establishes a "captive" reinsurance company, whose sole purpose is to enter into a reinsurance contract with the parent company.

44.     This captive reinsurance company raises funds by selling surplus notes to special purpose vehicles known as "capital trusts." These notes are not insured.

45.     The capital trusts, in turn, raise funds by issuing securities to investors. These securities are insured by a bond insurer.

46.     The captive reinsurance company entrusts the funds that it receives from selling surplus notes to the capital trusts, and that they, in turn, receive from selling securities to investors, to a reinsurance credit trust, with which it enters into an asset management agreement.

47.     These securities are identified as "no-recourse" securitizations because investors do not have recourse to the entity that actually benefits from the issuance of the securities. In the event of default, Claimant would not have recourse beyond the capital trusts that issued the securities. Claimant would be unable to bring a claim against the captive reinsurance company that established the capital trusts, or against the life insurance company that established the captive reinsurance company. Consequently, the safety and liquidity of the securities in its account are dependent upon the creditworthiness of the bond insurer that insures the securities issued by the capital trusts.

48.     Indeed, upon information and belief, many of the securities that fall within this second type do not have underlying ratings at all; instead, their credit-rating is entirely a reflection of the bond insurance on the security. These securities are referred to as "wrapped securities," since they are wrapped by the credit rating of the bond insurer.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

49.     The unavailability of any recourse to the life insurance companies, combined with the dependence of these securities on the strength of the bond insurance industry, makes these "redundant reserves" securities purchased for Claimant unsuitable, given Claimant's stated need for liquidity and preservation of principal.

**After Having Inappropriately Invested Claimant In These Unsuitable Securities, Respondent Further Violated Claimant's Rights By Continuing To Reinvest It In These Same Securities Despite Clear Warning Signs of Trouble In the Bond Insurance Market**

50.     In late July and early August 2007, several public announcements fueled widespread concerns about the safety of the bond insurance market, the creditworthiness of bond insurers, and the safety and liquidity of highly-structured securities, such as those purchased by Respondent.

51.     Having already breached its duties to Claimant and violated Claimant's rights by purchasing the unsuitable securities, Respondent further breached its duties and violated Claimant's rights by continuing to re-invest in these unsuitable securities despite increasingly turbulent market conditions.

52.     On or about July 31, 2007, Fitch Ratings announced that it was placing the bond insurer Radian, as well as 934 securities insured by Radian, on Rating Watch Negative, indicating that they were likely to be downgraded in the near future.  The securities that were downgraded were "wrapped securities," like a number of the securities in US Airways' Account.  Then, on or about August 6, 2007, Ram Holdings, Ltd., the parent company of Ram Re, announced that it had suffered a 44.5% drop in market value, following a 25% drop in its second-quarter earnings.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

53.     Since a bond insurer's business depends upon having a high rating, with which it can wrap the bonds it insures, the announcement that Radian was likely to be downgraded signaled significant problems with its business.  Despite the clear material impact of this announcement on Claimant's portfolio, however, Lehman did not inform Claimant of any changes with respect to Radian or any other bond insurers, prior to the failure of securities in Claimant's Account.

54.     Additionally, upon information and belief, throughout the first half of August 2007, a wave of auction rate securities – for many of which Lehman served as designated broker-dealer – failed at auction.  Upon information and belief, the securities involved in this initial wave of failure were of similar complexity and structure to those held in Claimant's Account; in fact, many of them were also established to fund bond insurers and "redundant reserves" of life insurance companies.

55.     These failed auctions should have alerted Respondent to the heightened risk of failed auctions occurring in Claimant's own account.  As news of these initial failures became widespread, Respondents should have known investors would become concerned with the safety of Complex Structured Securities, causing demand for all Complex Structured Securities to decline and, thus, the likelihood of failed auctions for all Complex Structured Securities to grow.

56.     Despite the clear material impact of these failures, Lehman failed to inform Claimant of any illiquidity in similarly structured securities, even as the Claimant's securities began failing on or around August 21, 2007 and continued to fail throughout the rest of August 2007 into mid-September 2007.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

57.     As a fiduciary of Claimant in exercising the discretion entrusted to them, Respondent had a duty to act in Claimant's interests, and to keep Claimant informed of changes in market conditions that affected US Airways' Account with respect to the matters that had been entrusted to Respondent.     Furthermore, Respondent had a continuing duty to ensure that it had invested Claimant's funds in authorized and suitable securities.  In addition, Respondent continued to be responsible for investing Claimant's cash in a manner consistent with Claimant's investment principles.

58.     Despite these announcements and the widespread concerns about the safety of bond insurers that they prompted, Respondent failed to re-evaluate their own allocation of US Airways' Account, to limit Claimant's exposure to the troubled bond insurance market, or to inform Claimant of its significant risk exposure resulting from specific transactions that had been entrusted to Respondent's discretion.

59.     Respondent failed to inform Claimant of announcements signaling turmoil in the bond insurance industry and later in the market for Complex Structured Securities, despite these facts being material to the safety and security of Claimant's portfolio and, in particular, to securities owned by Claimant which were either issued by contingent capital facilities established by bond insurers or wrapped by bond insurers.  Instead, Respondent continued to reinvest Claimant's funds in the same unauthorized and unsuitable securities, which were unsuitable upon their purchase in the first place.

60.     As a result of Respondent's actions, Claimant has lost the ability to access or invest its approximately US $134.6 million.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

**Respondent Improperly Recommended Private Placement Securities, which Were
Unsuitable Given the Severe Restrictions on Their Liquidity, and the Purchase of
Which Violated Applicable Securities Laws**

61.     In addition to being unsuitable given their untested, novel, esoteric
structures, the Complex Structured Securities that Respondent recommended were
unsuitable because they were issued as "private placement" securities that have not been
registered with the Securities and Exchange Commission.

62.     Respondent either knew or should have known that these private
placement securities were unsuitable, since "private placements" were *not* included
among the high quality and marketable securities listed in the Investment Policy.

63.     Furthermore, the private placement securities that Respondent
recommended were clearly unsuitable in light of Claimant's express investment objective
of liquidity, as well as Claimant's requirement that all holdings in the portfolio, with the
exception of cash and cash equivalents (to which category the Complex Structured
Securities do not belong), must be "actively traded to minimize transaction costs and
facilitate accurate market valuation."

64.     Since the securities in question have not been registered with the
Securities and Exchange Commission, they can be resold only through narrow
exemptions to the Act. These exemptions severely hinder the liquidity and marketability
of the securities.

65.     Upon information and belief, Respondent understood that Claimant would
not agree to purchase these securities were Claimant fully informed of the severe
restrictions placed on their liquidity and marketability. Respondent consistently misled

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Claimant, failing to provide material relevant information regarding the limitations on the securities' resale.

66.    Furthermore, upon information and belief, Respondent failed to provide or require that Claimant execute "Purchaser's Letters," which are typically affixed to the Private Placement Memoranda.    These Purchaser's Letters acknowledge that the purchaser is aware that the securities have not been and will not be registered under the Act, that the Purchaser is qualified to purchase the securities, and that the Purchaser understands the limitations placed on the liquidity of the securities.

67.    Upon information and belief, some, and potentially all, of the Private Placement Memoranda for the securities purchased by Respondent on Claimant's behalf state that the securities may only be sold to purchasers that have executed a Purchaser's Letter.    Additionally, several Private Placement Memoranda for the securities purchased by Respondent on Claimant's behalf state that the Purchaser must review the Private Placement memoranda before executing the Purchaser's Letter.

68.    Not only did Respondent mislead Claimant and fail to disclose material information in the process of recommending these private placement securities, Respondent also violated securities regulations in purchasing the securities on Claimant's behalf.

**Upon Information and Belief, Respondent Repeatedly Recommended Numerous Unsuitable Complex Structured Securities Because Respondent Wanted to Prop Up Auctions it Knew to be in Imminent Danger of Failing**

69.    In recommending the unsuitable Complex Structured Securities immediately before such securities began to fail at auction, Lehman, upon information and belief, was "stuffing" the portfolio of its customers with securities with whose issuers

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Lehman was closely associated, in an ultimately unsuccessful attempt to prevent auction failures that Lehman recognized to be imminent.

70.     Lehman was closely associated with all of the unsuitable securities that it improperly recommended to Claimant, and this association, upon information and belief, provided Respondent with an incentive to "stuff" Claimant's Account with these unsuitable securities.

71.     Lehman served in three different capacities with respect to a significant number of the securities purchased for the Account. In many cases, Lehman served in more than one or all three of these capacities with respect to a security.

72.     Upon information and belief, Lehman served as the **structuring adviser** for many of the unsuitable securities in the Account, meaning that Lehman advised the issuers in the process of creating the securities.

73.     Upon information and belief, Lehman served as the **initial purchaser** for many of the unsuitable securities in the Account, meaning that Lehman purchased all of the newly-issued securities from the issuer in order to sell to other buyers.

74.     Upon information and belief, Lehman served as the **designated broker-dealer,** and in many cases the **sole designated broker-dealer**, for many of the unsuitable securities in the Account, meaning that Lehman was authorized by the issuer to solicit and accept bids for the auction.

75.     Each of these roles provided Lehman with a motive to prevent auction failures. To understand auction failures and why Lehman would seek to prevent such an outcome, it is necessary to describe the mechanics of the auction process in greater detail.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

76.     In general, an auction rate security is a long-term bond whose interest rate is reset periodically (typically every 7, 28, or 35 days) by means of a Dutch auction process.

77.     In a Dutch auction, the auction agent for an auction rate security collects bids from investors and ranks the various bids according to the interest rate each individual investor is willing to accept.  The auction agent, based on these bid rates, determines the "clearing rate" for the auction, which is the lowest rate at which all of the securities of a given issue can be sold at par.

78.     If, however, an auction agent does not receive enough bids to buy securities at or below the maximum interest rate that the issuer of the securities is willing to pay, the auction agent cannot establish a clearing rate, and the auction "fails."  A failed auction prevents investors who own positions in a given issue from exiting their positions.  Even if such investors have submitted sell orders in the failed auction, they cannot sell all of their securities, but must retain at least a portion of their positions.  In a failed auction the interest rate on the auction rate security reverts to a pre-determined fail rate.

79.     A failed auction renders the securities illiquid for an indeterminate period of time, potentially for as long as the maturity period of the security, which can be as long as 30 years in the case of debt securities, and perpetual in the case of preferred stock.  A failed auction also typically raises serious concerns about the creditworthiness of the issuer.  Thus, failed auctions are typically self-perpetuating.  That is, once an auction fails, it is unlikely that it will subsequently succeed at a later auction in the absence of intervention (of which none is foreseeable here).

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

80.    Additionally, when an auction fails, the issuer must pay the pre-determined fail rate until the auction succeeds.  Consequently, issuers generally do not want the auctions for the securities that they issue to fail.

81.    Auction failures result from insufficient demand for the securities in question.  Upon information and belief, Lehman received fees from issuers for serving as structuring advisor and/or initial purchaser and/or designated broker-dealer for their auction rate securities.  Upon information and belief, Lehman's relationships with issuers provided it with an incentive to prevent auction failures.

82.    Upon information and belief, Lehman routinely recommended that its customers purchase securities for which Lehman acted as structuring advisor, initial purchaser, and/or designated broker-dealer, in order to prevent failed auctions.

83.    Although a document relating to Lehman's auction rate securities practices purports to disclose that Lehman may encourage bidders to place bids to prevent failed auctions, this document does not give Lehman license to recommend securities that it knows to be highly unsuitable given the customer's clearly-articulated investment objectives, categories of eligible investments, and risk tolerance.  Lehman's purported disclosure does not give Lehman license to mislead its customers or fail to disclose material information, to place the interests of issuers above those of its brokerage customers, or to enrich itself at the expense of its customers.

84.    Upon information and belief, at the same time that Lehman was aggressively recommending the unsuitable Complex Structured Securities to Claimant, thereby propping up auctions Lehman knew to be in imminent danger of failing, Lehman was simultaneously reducing the amount of its own capital invested in the same Complex

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Structured Securities.  In effect, Lehman, upon information and belief, was swapping itself out of its positions in the Complex Structured Securities by aggressively marketing the same Complex Structured Securities to its customers, including Claimant.

85.    At present, as a result of Respondent egregious' misconduct in recommending unsuitable Complex Structured Securities that it knew to be in imminent danger of failing, Claimant has lost the ability to access or invest its approximately US $134.6 million.

## First Count
## Breach of Contract

86.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

87.    Upon opening the US Airways Account at issue, Claimant delivered an Investment Policy to Respondent on or about the time the Cash Management Account was opened.  Respondent was required to recommend securities that abided by the investment objectives set forth in the Investment Policy at the time of purchase.

88.    The Investment Policy expressly listed preservation of capital and providing adequate liquidity as objectives by which Respondent was to abide.

89.    Respondent was to manage the Account per the terms of the Investment Policy.

90.    Respondent breached the Cash Management Agreement contract by investing the US Airways Account in a manner that clearly contradicted the investment guidelines issued by Claimant including the Investment Policy and the mutual

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

understanding between Respondent and Claimant at the opening of the US Airways Account.

91.     As a direct and proximate result of said breach of contract, Claimant has suffered and continues to suffer damages as alleged herein.

92.     Claimant reserves the right to expand upon or amend its account of damages suffered.

### Second Count
### Unsuitability

93.     Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

94.     A broker-dealer must have reasonable grounds for believing that a recommendation is suitable.  The broker-dealer is required to practice due diligence in learning the essential facts relevant to every customer.  Respondent had a duty to know and understand the financial position and investment objectives of Claimant.  Included within this duty to know and understand, Respondent was also charged with the duty to clarify any instructions or objectives that seem ambiguous to the broker-dealer.

95.     Claimant expressly informed Respondent of its need for a diversified portfolio composed of safe, liquid securities.  Claimant communicated its investment objectives of safety of principal and liquidity.  Claimant further communicated to Respondent the categories of investments that Claimant regarded as suitable.

96.     A broker-dealer also has a duty to recommend securities only after studying them sufficiently to be informed of their nature and financial prognosis, and to disclose to customers the risks involved with purchasing any particular security.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

97.    Respondent knew or should have known that the securities recommended by Respondent did not meet the objectives set forth by Claimant, that the securities did not fall into the categories of eligible investments that Claimant communicated to Respondent, and that the securities were not suitable.

98.    Respondent failed to disclose material information relating to the suitability of the securities.

99.    Claimant justifiably relied to its detriment on Respondent's fraudulent conduct.

100.    As a direct and proximate result of said unsuitable purchases, Claimant has suffered and continues to suffer damages as alleged herein.

101.    Claimant reserves the right to expand upon or amend its account of damages suffered.

## Third Count
## Unauthorized Purchases

102.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

103.    Respondent had a responsibility to Claimant to manage the US Airways Account in accordance with investment objectives and risk tolerance of Claimant, as outlined in the Investment Policy.  Prior to effecting any trades or recommending any purchases contrary to stated investment objectives and risk tolerance, Respondent was required to obtain from Claimant formal written authorization of a switch in investment strategy and acceptance of a substantially greater amount of risk.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

104.   Nevertheless, Respondent conducted transactions on behalf of Claimant that were contrary to stated objectives without seeking formal written authorization of a change in investment strategy.

105.   Having represented to Claimant that it would abide by the provisions of the Investment Policy and invest the US Airways Account in safe, liquid securities, Respondent instead invested in complex, highly-structured, securities, all of which were issued by sellers of "contingent capital facilities" and trusts established as a source for no-recourse funding for the "redundant reserves" of an insurance company.   Lehman knew, or should have known, the purchase of said securities would pose severe risks to the safety of principal and liquidity as well as the diversification of the portfolio. Respondent did not receive formal written authorization from Claimant for such a radical change of the allocation of the US Airways Account.

106.   As a direct and proximate result of said unauthorized purchases, Claimant has suffered and continues to suffer damages as alleged herein.

107.   Claimant reserves the right to expand upon or amend its account of damages suffered.

## Fourth Count
### Violation of 10(b) and Rule 10b-5 of the Securities Exchange Act

108.   Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

109.   Respondent unlawfully employed devices, schemes, and/or artifices of fraud, omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts,

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

practices, and/or courses of business which operate and/or would operate as a fraud and deceit upon any person, in connection with the purchase or sale of the securities described herein.

110.    Respondent had a duty to disclose to Claimant certain material facts, including the fact that the securities Respondent was recommending were complex, highly-structured securities, virtually all of which were issued by trusts set up as "contingent capital facilities" and trusts established to fund "redundant reserves," and which violated Claimant's clearly-articulated investment objectives of safety of principal and liquidity.  Respondent also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimant's behalf.  Respondent also had the duty to disclose the material fact that, upon information and belief, Respondent was using customer funds to support auctions of Lehman products for its own benefit.  Respondent failed to disclose and inform Claimant of such material facts.  From these failures, it is manifest that Respondent intended to defraud Claimant and allow it to believe that the securities recommended were suitable investments.

111.    Claimant reasonably relied upon the fraudulent misrepresentations and omissions committed by Respondent.

112.    As a direct and proximate result of said fraudulent misrepresentations and omissions, Claimant has suffered and continues to suffer damages as alleged herein.

113.    Claimant reserves the right to expand upon or amend its account of damages suffered.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

### Fifth Count
### Fraudulent Misrepresentation

114.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

115.    Respondent purported to make representations to Claimant regarding the suitability of securities, while failing to disclose certain material facts that Respondent had a duty to disclose.  Respondent had a duty to disclose to Claimant certain material facts, including the fact that the securities Respondent recommended were complex, highly-structured securities, virtually all of which were issued by trusts set up as "contingent capital facilities" and trusts established to fund "redundant reserves," and which at the time violated Claimant's clearly articulated investment objectives of safety of principal and liquidity.  Respondent also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimant's behalf.  Respondent also had the duty to disclose the material fact that, upon information and belief, Respondent were using customer funds to support auctions of Lehman products for its own benefit.  Respondent failed to disclose and inform Claimant of such material facts.  From these failures, it is manifest that Respondent intended to defraud Claimant and allow it to believe that securities were being purchased and had been purchased in accordance with its investment objectives.

116.    Claimant reasonably relied on Respondent's fraudulent misrepresentations and omissions in authorizing Lehman to purchase the unsuitable securities on its behalf.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

117.    As a direct and proximate result of said fraudulent misrepresentations and material omissions and Claimant's justifiable reliance on said misrepresentations and omissions, Claimant suffered and continues to suffer damages as alleged herein.

118.    Claimant reserves the right to expand upon or amend its account of damages suffered.

### Sixth Count
### Conversion

119.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

120.    Respondent has wrongfully converted approximately US $134.6 million of the funds that Claimant invested in the US Airways.

121.    Claimant owns and has a right to possess the US $134.6 million, as the funds belong to Claimant.

122.    Respondent has deprived Claimant of its right to possess the US $134.6 million by, having intentionally exercised dominion over those funds, intentionally and without formal written authorization investing them in unsuitable, complex, highly-structured securities, virtually all of which were issued by trusts set up as "contingent capital facilities" and trusts established to fund "redundant reserves." Claimant cannot sell these securities and therefore cannot access or use the US $134.6 million in funds.

123.    Upon information and belief, Respondent has also deprived Claimant of its right to possess the funds by using them to prop-up auctions in danger of failing. Specifically, Respondent used Claimant's money in an ultimately unsuccessful attempt to ensure that certain auctions would clear.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

124.    Respondent's actions constitute an unauthorized deprivation of Claimant's possessory rights in the approximately US $134.6 million and thus constitute a conversion of these funds.

125.    Claimant reserves the right to expand upon or amend its account of damages suffered.

## Seventh Count
### Negligence

126.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

127.    As Claimant's broker, Respondent owed Claimant a duty to recommend securities only after studying them sufficiently to be informed as to their nature and financial prognosis, a duty to inform the Claimant of the risks involved in purchasing or selling the securities, and a duty not to misrepresent facts material to the transaction.

128.    Respondent breached these duties by negligently recommending securities that it either knew, or should have known, failed to satisfy Claimant's investment objectives.  Respondent breached these duties by negligently failing to inform Claimant of the severe risks to the safety and liquidity of the portfolio that these securities posed.

129.    Claimant has been injured and has sustained damages thereby as alleged herein.

130.    Respondent's negligence was the direct and proximate cause of Claimant's injuries and damages.

131.    Claimant reserves the right to expand upon or amend its account of damages suffered.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

## Eighth Count
## Gross Negligence

132.    Claimant incorporate by reference the foregoing paragraphs as if fully set forth herein.

133.    In injuring Claimant as described herein, Respondent not only acted carelessly but was so careless that it was equivalent to recklessness.

134.    Respondent's conduct evidences a reckless disregard for the rights of Claimant.

135.    As such, Respondent committed gross negligence.

136.    Claimant has been injured and has sustained damages thereby as alleged herein.

137.    Respondent's gross negligence was the direct and proximate cause of Claimant's injuries and damages.

138.    Claimant reserves the right to expand upon or amend its account of damages suffered.

## Ninth Count
## Failure to Supervise

139.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

140.    Lehman was responsible for supervising its employees who committed the various violations described herein.  Lehman failed to supervise reasonably to prevent said violations.   Lehman failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

purchases in the US Airways Account. Had Lehman implemented and enforced protocols for the review of purchases made by its employees, it would have known that unsuitable securities were recommended, that material misrepresentations and omissions were made, and that securities regulations were violated.

141.   It is manifest that Lehman failed to maintain and enforce a proper system of internal supervision over its employees. Lehman failed to provide adequate instruction with regard to recommendations made by its registered representatives.

142.   As a direct and proximate result of said failure to supervise, Claimant has suffered and continues to suffer damages as alleged herein.

143.   Claimant reserves the right to expand upon or amend its account of damages suffered.

### Tenth Count
### Rescission

144.   Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

145.   The Private Placement Memoranda for many of the currently illiquid private placements in US Airways' Account state that the sale of the security to an investor who has not signed the Purchaser's Letter will be deemed null and void.

146.   Lehman's failure to acquire signed Purchaser's Letters for the private placement securities purchased on Claimant's behalf represents a substantial and material breach of the conditions laid out in the Private Placement Memoranda for the securities. Accordingly, the breach authorizes the rescission of the private placement security purchases which Respondent made for the US Airways Account.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

147.    Furthermore, Lehman's recommendation of unsuitable and unauthorized securities for the US Airways' Account, and the fraudulent misrepresentations and omissions made by Lehman to Claimant, represent substantial and material breaches of the conditions laid out in the Investment Policy.  Accordingly, these breaches authorize the rescission of the purchases of all currently illiquid securities which Respondent made for the Account.

148.    Respondent's breaches of the conditions laid out in the Purchaser's Letters, and the Investment Policy have damaged Claimant as described above.

149.    Claimant reserves the right to expand upon or amend its account of damages suffered.

### Prayer for Relief

150.    WHEREFORE, Claimant requests the following relief:

a.  An order declaring that Respondent mismanaged Claimant's Account and violated the investment objectives and compelling Respondent to purchase from Claimant all currently illiquid securities, amounting to US $134.6 million, at par plus accrued interest; and

b.  An award against Respondent for:

i.  Damages in an amount to be determined at arbitration;

ii.  Punitive damages of triple the damages suffered for a total of US $492 million;

iii.  Interest;

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

    iv.  Reasonable attorneys' fees and costs of suit; and

    v.  Such other relief as is just, fair, and equitable.

Dated: January __, 2009
    New York, New York

Respectfully submitted,

KOBRE & KIM LLP

_____

Michael S. Kim
Robert W. Henoch
Ian N. Levy

800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

*Attorneys for US Airways, Inc.*

# EXHIBIT A

# US AIRWAYS GROUP, INC.
## POLICIES AND PROCEDURES GOVERNING THE
## INVESTMENT OF COMPANY FUNDS
### JUNE 13, 2007

**I.    INTRODUCTION**

The policies and procedures contained herein will govern the manner in which the funds of US Airways Group, Inc. (the "Company") and its subsidiaries as applicable are to be invested. Such policies and procedures have been approved by the Company's Finance Committee of the Board of Directors (the "Committee") and any amendments thereto require the approval of the Committee.

**II.    PURPOSE**

A.    In general, it is the purpose of this policies and procedures statement to outline the philosophy and attitude, which will guide the investment of Company Funds toward the desired investment goals. It is intended to be sufficiently specific to be meaningful, yet adequately flexible to be practical.

B.    More specifically, the policies and procedures are set forth for the following purposes:

1.    To establish a clear understanding of the objectives, policies and guidelines for investment of Company Funds.

2.    To provide guidance to any third party on the investment of Company Funds.

3.    To establish a basis for evaluating investment results.

**III.    DEFINITIONS**

A.    "Funds" represents the Company's investable unrestricted cash including "Restricted Funds" where the Company has control over the investments.

B.    "Investment Portfolio" is the aggregate of all cash investments. The Investment Portfolio will consist of two components, the "Liquidity Portfolio" and the "Return Portfolio".

C. "Liquidity Portfolio" will include Funds needed for current operating expenses and capital requirements and also invested according to all debt and other covenants. The stated value of the Liquidity Portfolio should be not less than $750 million, unless the total of Funds is less than $750 million.

D. "Return Portfolio" will include Funds available for longer-term investment. The amount available for investment in the Return Portfolio shall be Funds in excess of the Liquidity Portfolio.

E. "Restricted Funds" are those encumbered Funds which legally collateralize credit obligations of the Company. The Company should strive to have Restricted Funds invested in accordance with this policy. At times, Restricted Funds may be invested outside of this policy, as the Company may have no decision regarding the investment of these funds. The Senior Investment Committee shall be made aware of all instances in which Restricted Funds are invested outside of this policy.

## IV. INVESTMENT PORTFOLIO GOALS

A. To comply with all debt and other covenants.

B. To preserve capital.

C. To provide adequate liquidity.

D. Within the constraints of capital preservation and liquidity requirements, the goal is to optimize after tax return on investments in instruments for which there exists an active market.

## V. INVESTMENT PORTFOLIO POLICIES

A. The Chairman, Chief Executive Officer ("CEO"), the President, Chief Financial Officer ("CFO"), Controller or the Treasurer may act to implement the investment of Company Funds, including directing the purchase and/or sale of eligible securities within the established investment guidelines and to allocate funds to third parties (see V.C.). Any transactions exceeding $50 million require the approval of both the CFO and Controller or Treasurer.

B. On a day-to-day basis there may be a need to delegate investment authority to other employees of the Finance Department who are knowledgeable of the Investment Policy. Such authority is limited to $50 million. The delegation of authority will be set forth in writing and specifying the names of the other personnel to whom the authority to make investment decisions shall be delegated along with the dollar limit of the delegation. All requests to delegate investment authority must be approved by the CFO or CFO and Treasurer if the Treasurer is delegating authority. The delegation limits are as follows:

1. Managing Director - $50 million
2. Director - $40 million
3. Manager - $30 million
4. Analyst - $20 million

C. The Company may employ one or more third parties (typically broker/dealers) to assist in the investing of all or a portion of the Company's Funds. Such parties shall be granted discretion to purchase and sell eligible securities in accordance with this policies and procedures statement after discussion with management. The appointment of the third party, custodial entities and related allocation of funds require the approval of the CFO and the Treasurer, or if the position is vacant, one other member of the Senior Investment Committee. (See V.H.)

D. The Company expects to receive "best execution" on purchases and sales.

E. Upon the maturity of an investment, to the extent such Funds are not needed to meet current operating needs, principal and interest shall be reinvested immediately upon receipt so that there is no idle cash.

F. The approval of the CEO, the President, the CFO, the Controller or the Treasurer (or their designees) shall be required to authorize the transfer of Funds among the various Company commercial bank or investment accounts for purposes other than those required in the normal course of business, i.e., wire transfer payments, concentration of funds, movement between operating accounts, internally directed investments, etc.

3

G.  A Senior Investment Committee will be established to review the Investment Portfolio at least once a quarter. Such committee will be comprised of at least the CFO, the Controller, the Treasurer, the Managing Director Corporate Finance and the employee responsible for Corporate Audit.

## VI.  INVESTMENT PORTFOLIO GUIDELINES

A.  Funds needed for current operating expenses and capital requirements, known as the Liquidity Portfolio, must maintain a balance of $750 million and be invested according to all debt and other covenants, unless the total of Funds is less than $750 million in which all Funds should be categorized as part of the Liquidity Portfolio.

B.  Funds available for longer-term investment, known as the Return Portfolio, will consist of all funds in excess of $750 million.

The investment goals of the Liquidity Portfolio shall be:

1.  To comply with all debt and other covenants.

2.  To preserve capital by maintaining a target average duration over a market cycle of approximately one to three months and by maintaining a maximum duration of individual securities of < one year.

3.  To provide liquidity for operating expenses and capital requirements by maintaining a minimum of $200 million of the Liquidity Portfolio in securities with a duration of ≤30 days.

4.  To earn a total rate of return (net of fees and expenses) in excess of the return on the three-month Treasury Bills, plus any spread to be established by the Senior Investment Committee from time to time over a rolling twelve (12) month period or to earn a return in excess of the Government Institutional category on the iMoneyNet money fund report.

C. The investment goals of the Return Portfolio shall be:

    1. To preserve capital

    2. To earn a higher return than the Liquidity Portfolio by maintaining a target average duration determined periodically by the Senior Investment Committee with a maximum duration of individual securities of five (5) years.

    3. To earn a total rate of return (net of fees and expenses) established by the Senior Investment Committee based on current portfolio duration.

D. Any investment which would exceed the investment duration set forth above shall require Finance Committee approval.

E. All decisions regarding investment duration shall take into consideration expectations of future interest rate fluctuations.

F. Eligible Investments

    1. Direct obligations of the US Treasury such as Treasury Bills, Treasury Notes and Treasury Bonds.

    2. Securities issued or guaranteed by the US Government, its agencies or instrumentalities   Obligations issued by US Government agencies and instrumentalities include such obligations as Government National Mortgage Association pass-through certificates (supported by the full faith and credit of the United States); securities of Federal Home Loan Banks (supported by the right of the issuer to borrow from the Treasury); and Federal National Mortgage Association obligations (sponsored by the US Government and supported by the credit of the instrumentality).

3.   Certificates of Deposit ("CD's"), Time Deposits ("TD's") and Bankers' Acceptances ("BA's")    CD's are short-term negotiable obligations of commercial banks. TD's are non-negotiable deposits maintained in banking institutions for specified periods of time at stated interest rates. BA's are time drafts drawn on commercial banks, usually in connection with international transactions. CD, TD and BA investments are limited to those instruments issued by institutions with total assets in excess of $2 billion, and where the long term obligations are rated "A" or better by Moody's and "A" or better by Standard & Poor's and the short-term deposits are rated A-1 and P-1, respectively. The foregoing investment guidelines for CD's and TD's may be set aside to the extent that Company indebtedness with a commercial bank may be offset by any outstanding investments or other accounts with the same commercial bank.

4.   Commercial Paper    Short-term, unsecured, negotiable promissory note of a domestic or foreign company. Commercial paper must have a rating of A2 and/or P2 or better by any two Nationally Recognized Statistical Rating Organizations (NRSRO).

5.   Money Market Mutual Funds ("Money Funds")    No-load mutual funds which seek to maximize current income for shareholders consistent with the preservation of capital by investing in a diverse portfolio of high quality, short-term instruments. The funds strive to maintain a constant share price and offer daily purchase and redemption privileges. The ratings of the issue/issuer must have a long debt rating of "A" or better by any two NRSRO.

6.   Fixed and Floating Rate Corporate Debentures and Medium-Term Notes    Short to medium-term debt issuances of major corporations and financial institutions. The ratings of the issue/issuer must have a long term debt rating of "A" or better by any two NRSRO.

7.   Asset-backed Securities    Securities collateralized with consumer receivables, such as automobile loans, credit card receivables, or home equity loans, which are owned by the issuer, but placed with a trustee for the benefit of the investor. Asset-backed securities must be rated Aaa by Moody's Investor Services or AAA by S&P with a maximum final stated maturity of five (5) years.

8.   Mortgage Pass-Through Securities    Securities collateralized with residential mortgage loans, the principal and interest payments of which are distributed, or "passed-through" to the investor. Many of these securities are issued by agencies of the federal government, including GNMA and FHLMC. These securities must be issued by US government agencies with a maximum stated final maturity of five (5) years.

9.  <u>Collateralized Mortgage Obligations (CMOs)</u>   Classes of bonds which redistribute the cash flows of mortgage securities (and whole loans) to create securities which have different levels of prepayment risk, as compared to the underlying mortgage securities.   CMOs must be rated Aaa or AAA with stable cash flow characteristics and a duration of five (5) years or less under reasonable prepayment scenarios.

10.  <u>Tax-Exempt and Tax-Advantages Securities.</u>   Limited to issues rated MIG1, A1, P1, or AA, or higher.

   a.   <u>Tax-exempt commercial paper.</u>   Short-term commercial paper issued by tax-exempt entities.

   b.   <u>Variable rate demand obligations.</u>   Long-term obligations of tax-exempt entities which have variable interest rates, and which reset periodically based on a specified index and formula.   Because these obligations always have current market interest rates, they trade near their par value, and thus, are considered short-term instruments.

   c.   <u>Fixed rate, fixed maturity municipal notes,</u> including long-term notes with a "put" at the sole option of the investor.

   d.   "<u>Dutch auction</u>" rate preferred stock (including tax-exempt trusts) rated AA or higher.   These are preferred stock issues, the dividend rate of which is established periodically by means of a Dutch auction, wherein all investors receive the highest dividend rate which "clears" the market.   Under current tax law, portions of dividends received by the Company from investments in preferred stock are subject, under certain condition, to exclusion from income for purposes of calculation of corporate income tax.

      The dividends from preferred stock issued by tax-exempt trusts are 100% free from federal corporate income tax.

11.  Any and all investments are specifically limited to those types of investments noted above.

12.  All investments must be denominated in US dollars.

G.    Investment Concentration Limitations

    1.    Issuer limitation No more than 5% of the Investment Portfolio may be invested in securities of any single issuer, with the exception of the US government obligations, where no limit is imposed.

    2.    Money Market Mutual Funds No limits in the aggregate. However, the use of such funds are intended principally to invest residual amounts of "idle cash" and not as a principal investment vehicle unless the operating cash requirements as determined by the CFO or Treasurer warrants such investment. The Money Market Mutual Fund's policies and guidelines shall closely match those of the Company as outlined in this policies and procedures statement

    3.    Corporate notes, CMOs and asset-backed securities  Each of these categories is limited to a maximum of 30% of the portfolio.

## VII.  REPORTING AND REVIEWS

A.    Internal Reports

A summary listing of the Investment Portfolio shall be prepared by the Treasury Department and included in the Company's Investment Summary, including the following information:

- Name of financial institution, broker or investment Manager
- Name of custodial entity, if applicable
- Investment Vehicle
- Interest rate and/or yield
- Maturity date
- Investment term
- Other pertinent information (i.e., securities involving market value different than underlying cost)

B.    Transactions and Investment Portfolio Holdings

    1.    Monthly statements of holdings and account activity are required from all custodians. Reporting shall be on a calendar month end basis.

8

2. The Treasurer and the Managing Director Corporate Finance shall review the Company's holdings on a weekly basis.

C. Investment Portfolio Performance

1. Reported and reviewed quarterly by the Senior Investment Committee.

2. Evaluation of performance versus the stated objectives shall be performed by the Finance Committee of the Board of Directors at regularly scheduled Board of Directors meetings.

3. The Senior Investment Committee will review (performance, compliance, etc.) of all third parties assisting the Company in the investing of Funds on at least an annual basis.

## VIII. AMENDMENTS

This policies and procedures statement is subject to amendment or change from time-to-time by the Company. Any changes must be approved by the Finance Committee of the Board of Directors and communicated in writing.

9

# EXHIBIT B

**CASH MANAGEMENT BROKERAGE AGREEMENT AND LIMITED
DISCRETIONARY AUTHORIZATION**

IMPORTANT CLIENT DISCLOSURE:   Your account is a brokerage account and not an advisory account.  Our interests may not always be the same as yours.  Please ask us questions to make sure you understand your rights and our obligations to you, including the extent of our obligations to disclose conflicts of interest and to act in your best interest.  We are paid both by you and, sometimes, by people who compensate us based on what you buy.  Therefore, our profits, and our salespersons' compensation, may vary by product and over time.  If you have any questions regarding the specific nature of your account or the obligations owed to you, please contact the business control group at 212-526-9966.

## CASH MANAGEMENT BROKERAGE AGREEMENT AND LIMITED DISCRETIONARY AUTHORIZATION

This Cash Management Brokerage Agreement and Limited Discretionary Authorization (the "Agreement"), dated as of _____, is entered into by and between Lehman Brothers Inc. ("Lehman Brothers") and America West Airlines, Inc. (the "Client") wherein the Client directs  Lehman Brothers to handle the cash account referenced on Schedule I hereto pursuant to the instructions set forth in Schedule II (the "Account").

1.      **Investment Guidelines.**  Lehman Brothers is to invest and reinvest the securities, cash and/or other investments held in the Account and to engage in such transactions as directed by the Client, provided; however, that all investments, reinvestments and transactions by Lehman Brothers shall at all times comply with the investment guidelines of Client attached hereto as Schedule II, which may be amended from time to time by the Client in writing.  In connection with the handling of this account, Lehman Brothers is entitled to rely on the financial and other information provided by Client.  Client agrees to inform Lehman Brothers promptly in writing of any material change in Client's circumstances or objectives which might affect the manner in which Client's assets should be invested and to provide Lehman Brothers with such other information as it shall reasonably request.

_____  Client understands that:

_____  Where the investment guidelines in Schedule II specifically state a limit or percentage of the Account to an issuer or security type, Lehman Brothers will interpret this to represent a parameter to be considered at the time of purchase only.

_____  Where the investment guidelines in Schedule II place a dollar limit to an issuer or security type, Lehman Brothers will not include accrued interest in this calculation.  All securities will be valued at "par".

_____  Where the investment guidelines in Schedule II permit investments in securities that have perpetual interest rate reset features such as auction rate securities or floating rate notes, Lehman Brothers will calculate the maturity based on the rate reset period.

_____ For new debt issued by US Agencies, Lehman Brothers uses the "implied issuer ratings" as specific-issue ratings for these types of agency securities.

If the above discussion conforms with Client's interpretation of the Account's investment guidelines in Schedule II, please acknowledge by initialing in the space provided next to each item. If this is not the case, please contact your corporate cash manager.

2.    **Other Services.** Client will be furnished with confirmations of Account transactions and Account statements monthly. Client is responsible for reviewing statements and confirming and reporting any discrepancies to Lehman Brothers.

To the extent possible, Lehman Brothers will, at Client's option, maintain custody of the assets held in the Account, in which case it will, at no additional charge, credit the Account with dividends and interest paid on securities held in the Account and with principal paid on called or matured securities as and when received. If Lehman Brothers has custody of the assets, it will be responsible for the timely presentment of called bonds, but when assets are custodied elsewhere, Lehman Brothers will not be responsible for such redemptions. If the assets in the Account are custodied outside Lehman Brothers, Client shall instruct the custodian to provide Lehman Brothers with such periodic reports concerning the status of the Account as Lehman Brothers may reasonably request from time to time. The Client will not change the custodian without giving Lehman Brothers reasonable prior notice of its intention to do so together with the name and other relevant information with respect to the new custodian.

3.    **Discretionary Authorization.** Client hereby grants Lehman Brothers limited discretionary authorization, pursuant to and in accordance with Schedule II. Pursuant to such authorization, Lehman Brothers may and at Client's risk, purchase, sell, exchange, convert and otherwise trade in the securities and other investments in the Account, as well as arrange for delivery and payment in connection with the above, and act on behalf of the Client in all other matters necessary or incidental to the handling of the Account pursuant to and in accordance with Schedule II. Should Client appoint a custodian other than Lehman Brothers in connection with the Account, Client grants Lehman Brothers full authorization to issue such instructions to and engage in such transactions with custodian as may be appropriate in connection with the management of the Account.

This limited discretionary authorization is in addition to (and in no way limits or restricts) any rights which the parties hereto may have under any other agreement or agreements between the Client and Lehman Brothers.

The discretionary trading authorization is a continuing one and shall remain in full force and effect until terminated by Client or Lehman Brothers pursuant to the provisions of paragraph 10 of this Agreement. The termination of this authorization will constitute a termination of this Agreement. To terminate this authorization, the Client hereby agrees to submit a written notice addressed to Lehman Brothers at the address set forth on Schedule IV hereto, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

This agreement shall inure to the benefit of the parties hereto and their respective successor corporation(s) or assigns.

**4.    Execution Services.** Lehman Brothers will act as a broker/dealer or use an affiliate as broker/dealer, although unaffiliated broker/dealers may be used as well. In selecting broker/dealers for a particular transaction, Lehman Brothers may consider all relevant factors, including the execution capabilities required by the transaction, the importance of speed, efficiency or confidentiality, familiarity with sources from whom or to whom particular securities might be purchased or sold, as well as any other relevant matters. Lehman Brothers may select broker/dealers which provide it with research or other transaction-related services and such research and other services may be used for its own and for other client accounts to the extent permitted by law.

In that this is a brokerage account, Client acknowledges and agrees that the rules governing investment advisers are not applicable. Accordingly, Lehman Brothers may execute transactions in a principle or agency capacity based on its discretionary trading authority, subject to applicable rules governing a broker/dealer and in accordance with Schedule II. In no event will Lehman Brothers or its affiliates be obligated to effect any transaction for Client which it or they believe would violate any applicable state or federal law, rule or regulation, or of the regulations of any regulatory or self-regulatory body.

**5.    Conflicts of Interest.** Client understands that the Account may be invested in investment products or services, including sweep vehicles, from which Lehman Brothers or its affiliates derive compensation and which Lehman Brothers has an incentive to use instead of other similar investments which could be more or less beneficial for Client. Client further understands that Lehman Brothers and its affiliates act in various capacities with respect to such products and services and receive fees for doing so. This Agreement shall have no effect on the application to Client of the terms of products or services that the Client invests in from which Lehman Brothers or its affiliates derive compensation.

The Client understands that transactions may be effected with Lehman Brothers as principal or dealer, or through Lehman Brothers as agent or broker, and that any such purchase may involve securities in the distribution of which Lehman Brothers may have an interest as underwriter, member of selling group, or otherwise.

**6.    Valuation.** Any securities or investments in the Account shall be valued at amortized cost or in such other manner as Lehman Brothers reasonably determines reflects fair market value. To the extent possible, all valuations will be performed by an independent portfolio information service, and will be relied upon by Lehman Brothers. Any valuation shall not be deemed a guarantee of any kind whatsoever with respect to the value of the assets of the Account.

**7.    Client Authority.** No written notice shall affect, in any matter, Lehman Brothers' rights under this Agreement with respect to any obligation arising prior to actual receipt of such written notice. Client represents and warrants that at all times during the term of the Agreement, (i) this Agreement has been duly authorized, executed and delivered by the Client and constitutes its

valid and binding obligation, enforceable against the Client in accordance with its terms, (ii) no governmental authorizations, approvals, consents or filings are required in connection with the execution, delivery or performance of this Agreement by the Client, (iii) the execution, delivery and performance of this Agreement by the Client will not violate or result in any default under the Client's certificate of incorporation or by-laws (or equivalent constituent documents), or any provision of any plan or trust governing the assets in the Account, any contract or other agreement to which the Client is a party or by which it or its assets may be bound or any statute or any rule, regulation or order of any governmental agency of body, (iv) the list of signatures attached hereto as Schedule III constitutes the valid signatures of all persons authorized by the Client to take action with respect to the Account (or all such persons to whom Client has delegated fiduciary responsibility to take action with respect to the Account) and Lehman Brothers shall be entitled to rely conclusively on any document executed by any of them, and (v) the Client is not an investment company (as that term is defined in the Investment Advisers Act of 1940). If the Client is an organization, the organization has authorized and empowered each of the individual(s) listed hereto as Schedule III to act on behalf of the organization; to open one or more accounts; enter orders; make and receive payments of money; give instructions; register, deliver, and accept delivery of securities; enter into and execute agreements and do all things necessary or advisable to effect transactions in all matters and business relating to the account.

8.    **Duty of Care.**  Lehman Brothers is acting in the capacity of a broker in handling the Account and as such will handle the Account of Client in accordance with the responsibilities as required by the federal securities laws and the rules imposed by the self regulatory organizations, including the New York Stock Exchange, the National Association of Securities Dealers, and in accordance with Schedule II. Neither Lehman Brothers nor any of its officers, directors or employees shall be responsible hereunder for any action, performed or omitted to be performed in good faith, or for any errors in judgment in managing the Account other than those caused by failure to comply with Schedule II, gross negligence or willful misconduct. Client acknowledges that Lehman Brothers does not warrant the rate of return on or the market value of the investments in the Account. Lehman Brothers and its officers, directors and employees shall not be responsible for any loss incurred by reason of any act or omission of any broker, dealer or custodian; provided, however, that Lehman Brothers will make reasonable efforts to require that brokers/dealers perform their obligations with respect to the Account.

9.    **Confidentiality.**    All material and information supplied by Client to Lehman Brothers, including but not limited to information concerning Client's marketing plans, investment strategy, business methods and financial results, is confidential and proprietary to Client ("Confidential Information"). Lehman Brothers will not disclose, sell or in any way transfer Confidential Information to any third party, unless it received Client's prior written approval of each such use. Upon written request or upon the termination of this Agreement, Lehman Brothers shall return to Client all Confidential Information in Lehman Brothers possession or control. This paragraph 9 will survive termination of this Agreement.

10.    **Termination of Agreement.** This Agreement may be terminated at any time upon written notice by either party and termination will become effective upon receipt of such notice. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination, including the provisions

regarding arbitration which shall survive any expiration or termination. Upon the termination of this Agreement, Lehman Brothers shall be under no obligation whatsoever to recommend any action with regard to, or to liquidate, the securities or other investments in the Account. Lehman Brothers retains the right, however, to complete any transaction open as of the termination date and to retain amounts in the Account sufficient to effect such completion. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding the disposition of any assets held in the Account and Lehman Brothers shall comply with such instructions. Client is responsible for providing Lehman Brothers with the name of another custodian at the time the Agreement is terminated if Client chooses not to maintain custody of the Account with Lehman Brothers.

## 11. Arbitration.

**This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:**

**(a) Arbitration Disclosures.**

- **All parties to this agreement are giving up their right to sue each other in court, including the right to trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
- **Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.**
- **The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.**
- **The arbitrators do not have to explain the reason(s) for their award.**
- **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**
- **The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
- **The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.**

**(b)    Arbitration Agreement.**

Client and Lehman Brothers agree that all claims or controversies arising from or relating to the construction, performance or breach of this Agreement, or relating to any Account referenced herein, shall be resolved by arbitration conducted only at the New York Stock Exchange, Inc., National Association of Securities Dealers, Inc. or the American Stock Exchange, Inc., or any other self-regulatory organization or exchange of which Lehman Brothers or any affiliated broker/dealer is a member. Client may elect which of these arbitration forums shall hear the matter by sending a registered letter or telegram to: Lehman Brothers Inc., General Counsel's Office, 399 Park Avenue, New York 10022. If the Client fails to make such election before the expiration of ten (10) days after receipt of a

written request from Lehman Brothers to make such election, Lehman Brothers shall have the right to choose the forum.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

The foregoing agreement to arbitrate does not entitle Client to obtain arbitration of claims that would be barred by the relevant statute of limitations, if such claims were brought in a court of competent jurisdiction. If at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any party to this Agreement may assert the limitations as a bar to the arbitration by applying to any court of competent jurisdiction, and Client expressly agrees that any issues relating to the application of a statute of limitations or other time bar are referable to such court. The failure to assert such bar by application to a court, however, shall not preclude its assertion before the arbitrators.

12.     Miscellaneous  In the event of any change in the identity or powers of persons authorized to act on the Client's behalf, the secretary or other designated officer of Client shall notify Lehman Brothers in writing which notification, when received, shall be adequate both to terminate the authorization of the persons previously authorized, and to authorize the persons thereby substituted.

Client agrees to promptly notify Lehman Brothers if it or any other persons or entities having a beneficial interest in the account are or become restricted, as such term is defined in the NASD's Rule 2790, from purchasing securities in certain public offerings.

Each of the parties hereto reserves the right to refuse to accept or renew this Agreement in its sole discretion and for any reason.

All paragraphs headings in this Agreement are for convenience of reference only, do not form part of this Agreement, and shall not affect in any way the meaning and interpretation of this Agreement.

Except for the election described in Section 11 hereof which shall be sent to the address set forth in such Section 11, all other written communication to Lehman Brothers from Client pursuant to this Agreement shall be sent to Lehman Brothers at the address set forth on Schedule IV hereto. All written communications to Client from Lehman Brothers shall be sent to the address set forth on Schedule IV hereto.

Neither party shall use the other party's name as a commercial reference to potential clients without the other party's prior written consent, which consent may be withheld at other party's sole discretion.

*[Remainder of this page has been intentionally left blank; signature page follows.]*

America West Airlines, Inc.

By: _Thomas T. Weir_

Name: _Thomas T. Weir_

Title: _Vice President & Treasurer_

Lehman Brothers Inc.

By: _____

Name: _____

Title: _____

Date: _____

## SCHEDULE I

Account Name: America West Airlines, Inc.

Account Number:

**SCHEDULE II**

**INVESTMENT GUIDELINES**


**[MUST BE COMPLETED/PROVIDED BY THE CLIENT]**

**SCHEDULE III**

Persons Authorized to take Action on behalf of the Account:

| Signature | | |
|---|---|---|
| Print Name | Title | Date |
| Signature | | |
| Print Name | Title | Date |
| Signature | | |
| Print Name | Title | Date |
| Signature | | |
| Print Name | Title | Date |

## SCHEDULE IV

### Addresses for Notices

If to Lehman Brothers, addressed to:

Lehman Brothers Inc.
10250 Constellation Blvd.
25th Floor
Attn: Roland Hansalik
Los Angeles, CA 90067

In copy to: Lehman Brothers Inc.
10250 Constellation Blvd.
25th Floor
Attn: Melody Li
Los Angeles, CA 90067

If to Client, addressed to:
America West Airlines, Inc.
4000 E. Sky Harbor Blvd.
Mail Code CH-TRY
Phoenix, AZ 85034

**Exhibit B**

US_ACTIVE:\44149287\9\58399.0011

THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED
PROOFS OF CLAIM.  PARTIES RECEIVING THIS NOTICE OF DEBTORS' ONE
HUNDRED ELEVENTH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW
THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE
LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED
THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR
CLAIM(S).

IF YOU HAVE QUESTIONS, PLEASE CONTACT
DEBTORS' COUNSEL, ERIKA DEL NIDO, AT 212-310-8323.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
In re                                              :    Chapter 11 Case No.
                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,       :    08-13555 (JMP)
                                                   :
                          Debtors.                 :    (Jointly Administered)
-------------------------------------------------------------------x

NOTICE OF HEARING ON DEBTORS' ONE HUNDRED
ELEVENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)

PLEASE TAKE NOTICE that on March 14, 2011, Lehman Brothers Holdings

Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors in

possession (collectively, the "Debtors"), filed their one hundred eleventh omnibus objection to

claims (the "Debtors' One Hundred Eleventh Omnibus Objection to Claims"), and that a hearing

(the "Hearing") to consider the Debtors' One Hundred Eleventh Omnibus Objection to Claims

will be held before the Honorable James M. Peck, United States Bankruptcy Judge, in

Courtroom 601 of the United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, New York, New York 10004, on **April 28, 2011 at 10:00 AM (prevailing**

**Eastern Time),** or as soon thereafter as counsel may be heard.

              **PLEASE TAKE FURTHER NOTICE** that any responses to the Debtors' One

Hundred Eleventh Omnibus Objection to Claims must be in writing, shall conform to the Federal

Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed

with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which

can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing

system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable

Document Format (PDF), WordPerfect, or any other Windows-based word processing format

(with a hard copy delivered directly to Chambers), in accordance with General Order M-182

(which can be found at www.nysb.uscourts.gov), and served in accordance with General Order

M-399, and on (i) the chambers of the Honorable James M. Peck, One Bowling Green, New

York, New York 10004, Courtroom 601; (ii) attorneys for the Debtors, Weil, Gotshal & Manges

LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Shai Y. Waisman, Esq.); (iii) the

Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York,

New York 10004 (Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq. and Andrea B.

Schwartz, Esq.); and (iv) attorneys for the official committee of unsecured creditors appointed in

these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York,

New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.);

so as to be so filed and received by no later than **April 13, 2011 at 4:00 PM (prevailing Eastern**

**Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Debtors' One Hundred Eleventh Omnibus Objection to Claims or any

claim set forth thereon, the Debtors may, on or after the Response Deadline, submit to the

Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Debtors' One Hundred Eleventh Omnibus Objection to Claims, which order may be entered with

no further notice or opportunity to be heard offered to any party.

Dated: March 14, 2011
      New York, New York

                           /s/ Shai Y. Waisman              
                           Shai Y. Waisman

                           WEIL, GOTSHAL & MANGES LLP
                           767 Fifth Avenue
                           New York, New York 10153
                           Telephone: (212) 310-8000
                           Facsimile: (212) 310-8007

                           Attorneys for Debtors
                           and Debtors in Possession

HEARING DATE AND TIME: April 28, 2011 at 10:00 AM (Eastern Time)
RESPONSE DEADLINE: April 13, 2011 at 4:00 PM (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

---------------------------------------------------------------------x

**DEBTORS' ONE HUNDRED ELEVENTH**
**OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

---

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM. PARTIES RECEIVING THIS ONE HUNDRED ELEVENTH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT DEBTORS' COUNSEL, ERIKA DEL NIDO, AT 212-310-8323.**

---

US_ACTIVE:\43625496\04\58399.0008

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

      Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors in possession (collectively, the "Debtors"), respectfully represent as follows:

### Relief Requested

      1.    The Debtors file this omnibus objection to claims (the "One Hundred Eleventh Omnibus Objection to Claims"), pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's order approving procedures for the filing of omnibus objections to proofs of claim [Docket No. 6664] (the "Procedures Order"), seeking to disallow and expunge certain claims for which the Debtors have no liability.

      2.    The proofs of claim listed on Exhibit A annexed hereto (collectively, the "No Liability Claims") were filed against the Debtors based upon alleged wrongdoing by entities which are not Debtors in these chapter 11 cases and for which the Debtors are not liable. Many of the No Liability Claims are based on alleged liability of Lehman Brothers Inc. ("LBI"). LBI is an affiliate of the Debtors but is not a Debtor in these chapter 11 cases. The Debtors have no liability for the asserted obligations of LBI or any No Liability Claim.

### Jurisdiction

      3.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

      4.    Commencing on September 15, 2008 and periodically thereafter, (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors'

chapter 11 cases have been consolidated for procedural purposes only and are being jointly

administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

> 5.      On September 17, 2008, the United States Trustee for Region 2 (the "U.S.
Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of
the Bankruptcy Code (the "Creditors' Committee").

> 6.      On September 19, 2008, a proceeding was commenced under the
Securities Investor Protection Act of 1970 ("SIPA") with respect to LBI.  A trustee appointed
under SIPA (the "SIPC Trustee") is administering LBI's estate.

> 7.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as
examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January
20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the
Examiner.  The Examiner filed its report with the Court on March 11, 2010 pursuant to section
1106(b) of the Bankruptcy Code [Docket No. 7531].

> 8.      On January 14, 2010, the Court entered the Procedures Order, which
authorizes the Debtors, among other things, to file omnibus objections to up to 500 claims at a
time, on various grounds, including those set forth in Bankruptcy Rule 3007(d) and those
additional grounds set forth in the Procedures Order.

### The No Liability Claims Should Be Disallowed and Expunged

> 9.      Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a
claim may not be allowed to the extent that "such claim is unenforceable against the debtor and
property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  A proof

US_ACTIVE:\43625496\04\58399.0008

of claim is "deemed allowed, unless a party in interest objects." 11 U.S.C. § 502(a). If an

objection refuting at least one of the claim's essential allegations is asserted, the claimant has the

burden to demonstrate the validity of the claim. *See In re Oneida, Ltd.*, 400 B.R. 384, 389

(Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 Bankr.

LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524,

539 (Bankr. S.D.N.Y. 2000).

       10.    In their review of the claims filed on the claims register in these chapter 11

cases, the Debtors have identified the No Liability Claims as claims based upon the alleged

wrongdoing of non-Debtor parties and for which the Debtors are not liable. Many of the No

Liability Claims assert a claim against the Debtors related to pending litigations in which the

Debtors are not defendants. As such, no liability of the Debtors could possibly arise from such

proceedings. In particular, some of the No Liability Claims are based on pending litigation or

other legal proceedings with LBI. LBI is a separate legal entity and not a Debtor in these chapter

11 cases. The Debtors are not liable for any potential liability LBI may have as a result of such

legal proceedings. Pending litigation against LBI does not result in a claim against the Debtors.

The other No Liability Claims are based on causes of action for which only non-Debtor entities

are liable.

       11.    The liabilities asserted in the No Liability Claims are not claims against

LBHI or any other Debtor in these chapter 11 cases. Unless the No Liability Claims are

disallowed and expunged, parties who do not hold valid claims against the Debtors' estates may

nonetheless recover from the Debtors. The Debtors respectfully request the Court enter an order

disallowing and expunging the No Liability Claims in their entirety.

**Reservation of Rights**

12.     The Debtors reserve all rights to object on any basis to any No Liability Claim as to which the relief requested herein is not granted.

**Notice**

13.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this objection, in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures [Docket No. 9635], on:  (i) each claimant listed on Exhibit A; (ii) the U.S. Trustee; (iii) the attorneys for the Creditors' Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York; and (vii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

14.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: March 14, 2011
        New York, New York

                              /s/ Shai Y. Waisman
                              Shai Y. Waisman

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

5

# EXHIBIT A

IN RE: LEHMAN BROTHERS HOLDINGS, INC.  CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 111: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 1 | 4KIDS ENTERTAINMENT, INC. MICHAEL S. KIM KOBRE & KIM LLP 800 THIRD AVENUE NEW YORK, NY 10022 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 30599 | $132,320,785.05* | No Liability |
| 2 | ATHEROS COMMUNICATIONS, INC. C/O MICHAEL S. KIM KOBRE & KIM LLP 800 THIRD AVENUE NEW YORK, NY 10022 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 30595 | $137,356,780.67* | No Liability |
| 3 | BANCO INTERIOR DE S.A., THROUGH ALCICDES ROBERTO DE OLIVEIRA CHAVES, AS LIQUIDATOR OF BANCO INTERIOR DE SAO PAOLO, S.A RUA MAJOR EMIDIO DE CASTRO STREET, NUMBER 74 SAO JOSE DO RIO PRETO, SP 15014-420 BRAZIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 21949 | $14,000,000.00* | No Liability |
| 4 | BANK OF AMERICA SECURITIES LLC C/O FREDRIC SOSNICK & NED S. SCHODEK SHEARMAN & STERLING LLP 599 LEXINGTON AVENUE NEW YORK, NY 10022 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 20126 | $1,100,000.00* | No Liability |
| 5 | CERADYNE, INC. C/O SILVERMANACAMPORA LLP 100 JERICHO QUADRANGLE LLP ATTN: JAY S. HELLMAN JERICHO, NY 11753 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 07/15/2009 | 5358 | $100,000,000.00 | No Liability |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS, INC.  CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 111: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 6 | CLAIMANTS IN THE IN RE VIRGIN MOBILE USA IPO LITIG C/O KAHN SWICK & FOTI LLC 12 EAST 41 ST 12TH FLOOR NEW YORK, NY 10017 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/10/2009 | 11336 | Undetermined | No Liability |
| 7 | CORNELL COMPANIES INC. THOMAS R. AJAMIE AJAMIE LLP 711 LOUISIANA, SUITE 2150 HOUSTON, TX 77002 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 04/28/2009 | 3995 | $3,650,000.00* | No Liability |
| 8 | DEUTSCHE BANK SECURITIES, INC. C/O DEUTSCHE BANK AG, NY BRANCH ATTN: STEVEN M. HABER 60 WALL STREET, NYC60-3615 NEW YORK, NY 10005 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 23528 | Undetermined | No Liability |
| 9 | ESSEX EQUITY HOLDINGS USA, LLC ATTN: MICHAEL S. KIM KOBRE & KIM LLP 800 THIRD AVENUE NEW YORK, NY 10022 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 30596 | $1,198,776,791.90* | No Liability |
| 10 | JAS HOLDING CORPORATION 275 MADISON AVE. 36TH FLOOR NEW YORK, NY 10016 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/2009 | 27386 | $1,300,000.00* | No Liability |
| 11 | MOORE, CHARLES E. SCOTT R. LOVERNICK, ESQ. SCHWARTZ & CERA, LLP 44 MONTGOMERY STREET, SUITE 3850 SAN FRANCISCO, CA 94104 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 02/20/2009 | 3001 | $300,000.00 | No Liability |

IN RE: LEHMAN BROTHERS HOLDINGS, INC.  CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 111: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 12 | NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, ET. AL. C/O MICHAEL S. ETKIN AND S. JASON TEELE LOWENSTEIN SANDLER PC 65 LIVIGSTON AVENUE ROSELAND, NJ 07068 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 22020 | Undetermined | No Liability |
| 13 | RIVERSIDE HOLDINGS LLP 192 LEXINGTON AVENUE NEW YORK, NY 10016 | | Lehman No Case Asserted/All Cases Asserted | 09/22/2009 | 27384 | $6,945,592.00* | No Liability |
| 14 | SARDIS, JEFFREY 130 SAGAMORE DRIVE PLAINVIEW, NY 11803 | | Lehman No Case Asserted/All Cases Asserted | 09/22/2009 | 27409 | $1,200,000.00* | No Liability |
| 15 | SARDIS, JEFFREY & LAUREN SARDIS 130 SAGAMORE DRIVE PLAINVIEW, NY 11803 | | Lehman No Case Asserted/All Cases Asserted | 09/22/2009 | 26347 | $1,200,000.00* | No Liability |
| 16 | SEALED AIR CORPORATION ATTN: IRA LAKRITZ, LAW DEPARTMENT 200 RIVERFRONT BLVD. ELMWOOD PARK, NJ 07407-1033 | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 08/25/2009 | 9313 | $24,700,000.00 | No Liability |
| 17 | STATE OF NEW YORK, THE, THOMAS P. DINAPOLI, COMPTROLLER C/O MICHAEL S. ETKIN AND S. JASON TEELE LOWENSTEIN SANDLER PC 65 LIVIGSTON AVENUE ROSELAND, NJ 07068 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/21/2009 | 22019 | Undetermined | No Liability |

IN RE: LEHMAN BROTHERS HOLDINGS, INC.  CASE NO: 08-13555 (JMP)

### OMNIBUS OBJECTION 111: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 18 | US AIRWAYS, INC. C/O STEPTOE & JOHNSON LLP ATTN: STEVEN DAVIDSON ESQ & EMILY NESTLER ESQ 1330 CONNECTICUT AVENUE, NW WASHINGTON, DC 20036 | 08-13555 (JMP) | **Lehman Brothers Holdings Inc.** | 09/22/2009 | 30598 | $564,661,009.45* | No Liability |
| 19 | WEISS, ROGER J AND SUZANNE, AS CO-EXECUTORS OF THE ESTATE OF STEPHEN H WEISS ROGER J WEISS 181 HIGHLAND RD RYE, NY 10580 | | **Lehman No Case Asserted/All Cases Asserted** | 10/01/2009 | 35916 | $400,000.00* | No Liability |
| 20 | WESTERN DIGITAL CORP. C/O SILVERMANACAMPORA LLP 100 JERICHO QUADRANGLE, SUITE 300 ATTN: JAY S HELLMAN JERICHO, NY 11753 | 08-13555 (JMP) | **Lehman Brothers Holdings Inc.** | 07/15/2009 | 5357 | $91,000,000.00 | No Liability |
| | | | | | **TOTAL** | $2,278,910,959.07 | |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                         :        **Chapter 11 Case No.**
                                                             :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :        **08-13555 (JMP)**
                                                             :
                                  **Debtors.**        :        **(Jointly Administered)**
------------------------------------------------------------------x

**ORDER GRANTING DEBTORS' ONE HUNDRED**
**ELEVENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

Upon the one hundred eleventh omnibus objection to claims, dated March 14,

2011 (the "Debtors' One Hundred Eleventh Omnibus Objection to Claims"),[1] of Lehman

Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors in possession (collectively, the "Debtors"), pursuant to section 502 of title 11

of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of

Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus

objections to proofs of claim [Docket No. 6664], seeking disallowance and expungement of the

No Liability Claims on the basis that the Debtors have no liability for such claims, all as more

fully described in the Debtors' One Hundred Eleventh Omnibus Objection to Claims; and due

and proper notice of the Debtors' One Hundred Eleventh Omnibus Objection to Claims having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Debtors' One Hundred Eleventh

Omnibus Objection to Claims is in the best interests of the Debtors, their estates, creditors, and

all parties in interest and that the legal and factual bases set forth in the Debtors' One Hundred

---

[1] Terms not defined herein shall have the same meaning ascribed to them in the Debtors' One Hundred Eleventh
Omnibus Objection to Claims.

Eleventh Omnibus Objection to Claims establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Debtors' One Hundred Eleventh

Omnibus Objection to Claims is granted to the extent provided herein; and it is further

ORDERED that pursuant to section 502(b) of the Bankruptcy Code, the claims

listed on <u>Exhibit 1</u> are disallowed and expunged in their entirety with prejudice; and it is further

ORDERED that the Debtors' Court-appointed claims agent is authorized and

directed to reflect the No Liability Claims as disallowed and expunged pursuant to this Order;

and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.


Dated: _____, 2011
          New York, New York

2

**Exhibit C**

US_ACTIVE:\44149287\9\58399.0011

**Hearing Date and Time:  October 27, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Reply Date and Time:     October 26, 2011 at 10:00 a.m. (Prevailing Eastern Time)**

Steven K. Davidson (*pro hac vice* pending)
George R. Calhoun V (*pro hac vice* pending)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue
Washington, DC  20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

Evan Glassman
STEPTOE & JOHNSON LLP
750 Seventh Avenue
New York, New York 10019
Telephone:  (212) 506-3900
Facsimile: (212) 506-3950

*Attorneys for US Airways, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                       :
In re                                  :        Chapter 11 Case No.
                                       :
LEHMAN BROTHERS HOLDINGS INC., et al., :        08-13555 (JMP)
                                       :
Debtors.                               :        (Jointly Administered)
                                       :
                                       :
-------------------------------------------------------------x
```

**RESPONSE OF US AIRWAYS, INC. (PROOF OF CLAIM NO. 30598)**
**TO DEBTORS' ONE HUNDRED ELEVENTH OMNIBUS OBJECTION TO CLAIMS**
**("NO LIABILITY CLAIMS")**

US Airways, Inc. ("US Airways") (Proof of Claim ECF No. 30598), by and through its

undersigned counsel, hereby responds to and opposes the Debtors' One Hundred Eleventh

Omnibus Objection to Claims (No Liability Claims) (the "Objection") and states as follows:

# SUMMARY

Lehman Brothers Holdings Inc.'s ("LBHI") Objection does not specifically address US Airways' claim. Rather, LBHI generally contends that it is not liable because the claims it identifies allegedly relate to Lehman Brothers, Inc. ("LBI"), and not LBHI (collectively "Lehman Brothers"). LBHI also contends that it is not liable because US Airways' claims were asserted in separate litigation where LBHI was not named as a party. LBHI's arguments fail as a matter of law and fact.

A timely and properly filed proof of claim is presumptively valid unless the objecting party presents credible evidence to refute an essential allegation of the claim. LBHI fails to offer any *evidence* to overcome the presumption of validity. Indeed, LBHI is directly liable to US Airways as a result of its own wrongful conduct and is derivatively liable under the theories of enterprise liability, alter ego, and veil piercing. LBHI's Objection, thus, fails as a matter of law.

Moreover, the fact that US Airways did not name LBHI as a party in separate litigation – which it could not do as a matter of law because of the automatic stay – has no bearing on LBHI's liability. In December 2009, US Airways commenced a FINRA arbitration against four former employees of LBI for claims arising out of US Airways' purchase of ARS (the "FINRA Arbitration"). Because of the automatic stay, neither LBHI nor LBI was a party to the arbitration. On May 27, 2011, a three-member panel unanimously issued an award in US Airways' favor, finding three of the respondents jointly and severally liable for $15 million.

Even without the benefit of discovery, US Airways has substantial evidence concerning LBHI's liability for its direct actions, including, but not limited to, LBHI's participation in the actionable conduct, LBHI's dominion and control over LBI, LBHI's practice of treating all of

Lehman Brothers as one entity, and its failure to observe corporate formalities.[1]  US Airways submits that, after a reasonable opportunity for discovery, there will be additional evidentiary support to find LBHI liable to US Airways.  Accordingly, US Airways respectfully requests that the Court overrule LBHI's objection, authorize US Airways to take discovery, and, given the complexity of the issues involved, convert the Objection to an adversary proceeding.  *See* Fed. R. Bankr. P. 9014(c).

## BACKGROUND

This claim is based on LBHI's wholly-owned subsidiary LBI recommending to, and purchasing on behalf of, US Airways investments in highly-structured, non-traditional Auction Rate Securities ("ARS"), which were purchased from June 2006 through August 2007, and then LBHI's formation of an *ad hoc* committee to manage Lehman Brother's response to the failed auctions, including setting firm-wide policies, developing talking points for customers, interacting with customers, and ultimately devising a program to repurchase certain illiquid ARS from select customers.  LBHI, a Delaware corporation, was the holding company for hundreds of individual corporate entities, including LBI.  Through those subsidiaries, LBHI was "a global market-maker in all major equity and fixed income products" and principally engaged in the capital markets, investment banking and investment management.  *See* Lehman Bros. Holdings Inc., Annual Report, at 5 (Form 10-K) (Feb. 13, 2007).  LBHI described itself and its subsidiaries collectively as "Lehman" in its 10-K and other public disclosures.  *Id.*

---

[1] US Airways has also developed significant evidence from the FINRA arbitration.  US Airways may be precluded, however, from using that evidence in this proceeding due to a confidentiality agreement entered into by the parties to the FINRA proceeding.  US Airways anticipates that discovery would elicit the same information, and more, that would further support US Airways' Claim.

US Airways' corporate treasury department was charged with managing the company's cash by selecting safe investments that would preserve capital, maintain liquidity, and earn a reasonable yield.  Cash is critical to an airline.  US Airways must maintain large, liquid, quickly accessible cash balances to counteract volatile changes in, among other contingencies, fuel prices.  To meet this need, US Airways relied on professional brokers from what it thought to be the most reputable firms to invest its cash balances safely.  US Airways does not employ investment professionals.  Instead, it relied on professional brokers, including Lehman Brothers, to manage its cash.

US Airways entrusted Lehman Brothers with over $400 million to invest.  Lehman Brothers recommended to, and purchased for, US Airways $134 million of ARS.  ARS are long-term bonds whose interest rates are reset at regularly scheduled auctions typically held every 28 days, at which point a holder of the securities has the ability to liquidate its position – thus, these assets were regarded as if they were cash or cash equivalents.

LBHI, as the parent corporation, "managed and directed the affairs" of Lehman Brothers. *See, e.g.*, Examining the Causes of the Current Financial and Economic Crisis of the United States and of the Collapse of Lehman Brothers:  Hearing Before Fin. Crisis Inquiry Comm'n, 11 (2010) (statement of Harvey R. Miller, Senior Partner, Weil, Gotshal & Manges, LLP) ("As the parent corporation, LBHI managed and directed the affairs of the Lehman enterprise.").  By way of some examples, LBHI was a primary source of LBI's funding and managed the cash generated by the entire Lehman enterprise.  *Id.* at 12.  "Generally, all such cash was swept each night into concentration accounts at LBHI and each day LBHI disbursed cash to its various subsidiaries and affiliates, as needed."  *Id.*  The Lehman enterprise also had an integrated electronic accounting and reporting system.  *Id.*

4

Additionally, there was substantial overlap on the LBHI and LBI board of directors, with at least four individuals serving on both boards. Richard S. Fuld served as the Chairman of the Board of LBHI and Chairman of the Board and CEO of LBI from 1994 until 2008.[2] John Dewitt Macomber, Christopher Gent and John F. Akers each served as directors for both LBHI and LBI.[3] There was additional overlap in key management roles as well. For example, Thomas Russo was previously vice chairman of LBI and chief legal officer at LBHI.[4]

Significantly, Lehman Brothers managed comprehensive risk and capital requirements on a consolidated basis for the entire enterprise. As explained in its Form 10-K Annual Report for the fiscal year ending November 30, 2006:

> Capital Requirements
>
> LBI . . .and other subsidiaries of Holdings are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate. . . .
>
> In June 2004, the SEC approved a rule establishing a voluntary framework for comprehensive, group-wide risk management procedures and consolidated supervision of certain financial services holding companies. We applied for permission to operate under the rule and received approval effective December 1, 2005. The rule allows LBI to use an alternative method, based on internal models, to calculate net capital charges for market and derivative-related credit risk. Under this rule, Lehman Brothers is subject to group-wide supervision and examination by the SEC and *is subject to minimum capital requirements on a consolidated basis* generally consistent with the International Convergence of Capital Measurement and Capital Standards published by the Basel Committee on Banking Supervision. . . .

---

[2] *See* Davidson Decl. Ex. 3 (The Faces of the Lehman Crisis, Businessweek.com); Davidson Decl. Ex. 4 (Capital IQ service, Profile of Lehman Brothers Inc.).

[3] *See* Davidson Decl. Ex. 4 (Capital IQ service, Profile of Lehman Brothers Inc.).

[4] *See* Davidson Decl. Ex. 5 (Mindi Westhoff, *AIG Reports 6 Executive Appointments*, SNL Fin. LC, Feb. 3, 2010).

Lehman Bros. Holdings Inc., Annual Report, at 25 (Form 10-K) (Feb. 13, 2007) (emphasis added).

LBHI either knew, or should have known, that LBI's brokers recommended to, and purchased for, US Airways exotic, higher-risk, non-standard ARS. This exotic form of ARS comprised only 5% of the ARS market. These were higher-risk investments because the underlying "asset" securitized were the cash reserves of life insurance and mono-line bond insurance companies. In these complicated structures, which were never explained to US Airways, life insurance and bond insurance companies had the right, at their option, to claw back the cash reserves they had securitized, rendering the ARS illiquid, valueless, or both. These higher risk ARS were not suitable for any investor – like US Airways – interested in preserving principal and maintaining liquidity.

It was no coincidence that Lehman Brothers recommended these particular, higher-risk ARS investments for US Airways. The issuers of the ARS were Lehman Brothers' investment bank clients and Lehman Brothers obtained a handsome fee for issuing ARS on behalf of those clients. In order to continue to satisfy those investment bank clients, earn its fees, and continue to "make" the market for these securities, Lehman Brothers purchased the ARS itself by entering "support bids" at the auctions. On information and belief, LBHI knew that LBI was entering support bids, understood that the market would fail without that support, and approved of LBI's support bids. The byproduct of these purchases was that Lehman Brothers had a significant inventory of exotic ARS in its proprietary account.

But, Lehman Brothers did not want to maintain these higher risk products on its books. Instead, Lehman Brothers decided to transfer these higher risk ARS off of Lehman Brothers' balance sheet and into customer accounts, including US Airways' account, by encouraging

brokers to purchase these ARS for US Airways. This practice of transferring the toxic ARS from Lehman Brothers' to customers' accounts accelerated in the months shortly before the market collapsed. Thus, when Lehman Brothers invested US Airways in the higher risk ARS, the market was not actually liquid – it only appeared to be liquid because of Lehman Brothers' own support bids. When that support was withdrawn – a decision US Airways believes was made with LBHI's knowledge, involvement and assent – the auctions for ARS failed. Once the auctions failed, US Airways (and other investors) were unable to access their cash.

On information and belief, LBHI knew that LBI was sponsoring, structuring, marketing and recommending these exotic ARS to corporate treasury clients, which were unsuitable investments. LBHI knew that LBI created these securities on behalf of Lehman Brothers' investment banking clients, such as life insurance and mono-line insurance companies, with the stated purpose of structuring securities to transfer long-term complex insurance risks to money market investors without fully explaining those facts to such investors, such as US Airways. Indeed, the ARS were purposefully structured so that investors, like US Airways, received short-term yields rather than obtain interest rates that reflected the actual term (up to 30-50 years) and risk of the investment. LBHI either knew or should have known that LBI's brokers did not understand the products they were recommending to US Airways, lacked training, and violated FINRA rules and professional standards.

Beginning in August 2007, many of the auctions associated with ARS began to fail, including those owned by US Airways. As a result, the ARS investments became illiquid and US Airways could not access $134.6 million of the funds it had entrusted to Lehman Brothers. After the failures, LBHI became directly involved in dealing with the consequences of the auction failures. LBHI formed an *ad hoc* committee to manage Lehman Brother's response to

7

the failed auctions, including setting firm-wide policies, developing talking points for customers, interacting with customers, and other managerial steps.

The *ad hoc* committee, comprised of at least some if not all LBHI officers and directors, instituted among other policies, a program to repurchase certain illiquid ARS from select customers (the "Buyback Program").  On information and belief, LBHI officers and directors played an integral part, if not the exclusive role, in determining which customers illiquid ARS would be repurchased.  One of the key individuals involved in the Buyback Program was Kurt Locher, LBHI Vice President.  *See* Davidson Decl. Ex. 2, Lehman Brothers Board Meeting Agenda at 13 (May 11, 2007).  Mr. Locher gathered extensive information from LBI brokers about clients with illiquid auction rate securities.  Mr. Locher then, at minimum, provided that information to the *ad hoc* committee and, on information and belief, participated in the deliberations of the *ad hoc* committee.  US Airways contends that LBHI provided specific instructions to LBI as to which illiquid ARS should be repurchased.  LBI, then, at LBHI's direction, repurchased hundreds of millions of dollars of illiquid ARS from select customers.

The Buyback Program was discriminatory in that it repurchased failed ARS from some but not all customers.  Pursuant to FINRA rules and common law duties, Lehman Brothers was required to treat customers in a fair and equitable fashion as well as to disclose the criteria it used to select which customers could participate in the Buyback Program.  Instead, the *ad hoc* committee failed to satisfy these duties.

During the *ad hoc* committee's efforts to gather information from customers and interact with customers holding illiquid ARS, Mr. Locher, an officer of LBHI and member of the committee, had direct contact with US Airways.  On November 13, 2007, Mr. Locher was the primary spokesperson for Lehman Brothers on a conference call with US Airways concerning

the failed ARS.  No one from Lehman Brothers disclosed during that conference call that the firm was engaging in a Buyback Program or that the firm had decided to withdraw its support from the ARS market, which led to, and was the primary reason for, the auction failures.

On September 15, 2008, LBHI and many of its affiliates filed for insolvency protection under Chapter 11 of the U.S. Bankruptcy Code.  Shortly thereafter**,** LBI filed for protection under the Securities Investor Protection Act ("SIPA").  Both the LBHI bankruptcy and the LBI SIPA proceedings are being adjudicated by this Court.  On or about June 22, 2009, US Airways timely filed proof of claim No. 30598 in the amount of $564,661,009.45 against LBHI (the "Claim").[5]  US Airways filed a proof of claim against LBI as well.

Ordinarily, US Airways would have sued LBHI (and LBI) directly but was prevented from doing so by the automatic stay.  On December 10, 2009, US Airways commenced an arbitration under the auspices of FINRA against individual brokers and their supervisors, Roland Hansalik, Lars Jacobson, George Barclay Perry, and Joseph Arena, for claims arising out of US Airways' purchase of ARS (the "FINRA Arbitration").  Neither LBHI (nor LBI) was a party to the FINRA Arbitration.  On May 27, 2011, a three-member panel unanimously issued a final award in US Airways' favor, finding Hansalik, Perry, and Arena jointly and severally liable for $15 million in damages.  US Airways is continuing, and will continue to pursue LBHI (and LBI) on its claims against those entities until it receives a full recovery on its losses.

On or about March 14, 2011, LBHI filed its Objection contending, without support or evidence of any kind, that that the Claim should be disallowed because it is "based upon the

---

[5] US Airways' unliquidated claim was filed in the amount of $564,661,009.45.  US Airways will offset from its claim any recoveries it receives, including sales on the secondary market (which have occurred) and amounts received on its FINRA Award, including from insurance proceeds.

alleged wrongdoing of non-Debtor parties and for which the Debtors are not liable." Objection at 4 (filed Mar. 14, 2011), ECF No. 15012.[6] LBHI further argues that the US Airways Claim should be disallowed because it relates "to pending litigations in which the Debtors are not defendants." *Id.*

## ARGUMENT

### A.    LBHI Has Not Rebutted the Presumption of Validity

A timely and properly filed proof of claim is *prima facie* evidence of the validity and amount of the claim. *See* Fed. R. Bankr. P. 3001(t). The Debtors do not dispute that the Claim was properly and timely filed in accordance with the Bar Date Order and the Bankruptcy Rules. The Claim is, therefore, *prima facie* valid.

"To overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000) (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992)); *In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re DJK Residential LLC*, 416 B.R. 100, 105 (Bankr. S.D.N.Y. 2009) (objector must produce "sufficient evidence" of equal force to filed proof of claim).[7] If, and only if, the objecting party meets its burden of production, the burden then shifts back to the claimant. *In re Reilly*, 245 B.R. at 773; *In re Martinez*, 409 B.R. 35, 38 (Bankr. S.D.N.Y. 2009).

---

[6] The Objection makes this blanket contention with respect to each of the twenty-plus claims to which it applies. The Debtors did not assert any specific legal basis for their objection to Claim.

[7] *See also Riverbank, Inc. v. Make Meat Corp. (In re Make Meat Corp.)*, No. 98-4990, 1999 WL 178788, at *3 (S.D.N.Y. Mar. 31, 1999) ("[o]nce the claimant has established its prima facie case, the burden of going forward then shifts to the debtor to produce evidence sufficient to negate the prima facie validity of the filed claim") (citation omitted); *In re Woodmere Investors Ltd. P'ship,* 178 B.R. 346, 354-55 (Bankr. S.D.N.Y. 1995) (overruling debtor's objection to claim where debtor had not offered any evidence to support its contentions).

LBHI has not proffered *any* evidence to counter US Airways' Claim; accordingly, the Claim is presumptively valid and the burden has not shifted to US Airways. Rather than come forth with evidence, LBHI instead offers two reasons for why US Airways' Claim should be disallowed: (1) US Airways' Claim relates "to pending litigations in which the Debtors are not defendants," *see* Objection at 4; and (2) US Airways' Claim is "based upon the alleged wrongdoing of non-Debtor parties and for which the Debtors are not liable." *Id.* Neither contention is correct.

### 1.    LBHI was not Named as a Party in Separate Litigation Because of the Automatic Stay

LBHI asserts that because LBHI was not named as a party in the FINRA arbitration it is somehow not liable for US Airways' Claim. The fact that US Airways brought a case against individual non-debtors in the FINRA arbitration has no bearing on whether US Airways has a claim against LBHI. Indeed, when US Airways filed the FINRA arbitration, LBHI was a debtor under chapter 11.[8] Thus, as a matter of law, the automatic stay prevented US Airways from including LBHI in its claims against those individuals. *See* 11 U.S.C. § 362.

"It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants." *Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986). As the Second Circuit has noted, "[a] suit against a codefendant is not automatically stayed by the debtor's bankruptcy filing" and to stay a suit against a co-defendant would result in "'vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003) (declining to extend § 362(a) stay to debtor's co-defendant) (citation omitted). US

---

[8] Although US Airways attached the FINRA arbitration complaint to its proof of claim, that supporting document merely provided supporting evidence concerning the factual background of the Claim.

11

Airways pursued its claims precisely as permitted by the Code – it arbitrated against non-debtor individuals in a separate proceeding while its claims against LBHI were subject to the § 362 stay. The fact that the FINRA arbitration did not name LBHI (or that it is now completed) has no bearing on LBHI's liability, which US Airways is prosecuting through this proceeding.

2.    **LBHI is Directly Liable to US Airways as a Result of LBHI's Conduct**

Although LBHI failed to rebut the presumption of validity, US Airways will nonetheless address the substantive merits of its Claim.  As the Second Circuit explained, the purpose of the claim filing requirement is "to ensure that all those involved in the proceeding will be made aware of the claims against the debtor's estate and will have an opportunity to contest those claims."  *In re Chateaugay Corp.*, 94 F.3d 772, 777 (2d Cir. 1996) (quoting *Liona Corp. v. PCH Assocs.*, 949 F.2d 585, 605 (2d Cir. 1991)).   A proof of claim is analogous to initiating a civil action, *see* 9 Collier on Bankruptcy 3007:01(3) (Alan N. Resnick et al. eds, 16th ed. 2010) (citing *Nortex Trading Corp. v. Newfield*, 311 F.2d 163 (2d Cir. 1962)), and need only contain "a short and plain statement of the claim," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."    Fed. R. Civ. Pro. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   LBHI cannot claim any prejudice or surprise from US Airways' Claim.   The issues discussed herein are based on publically available information, including statements from LBHI and its agents.  The Claim satisfies the applicable standards and provides sufficient notice that LBHI is liable to US Airways for negligence, gross negligence, and negligent misrepresentation.

a.    **LBHI's Actions Constitute Negligence and Gross Negligence**

To establish that LBHI was negligent, US Airways must prove:  (1) that LBHI owed a legal duty to US Airways to use due care; (2) that LBHI breached this legal duty; and (3) that the breach was a proximate cause of; (4) plaintiff's injury.  *Solomon v. City of New York*, 489 N.E.

12

2d 1294, 1294-1295 (N.Y. 1985) (citation omitted).[9]    To establish gross negligence, LBHI's conduct must "evince[] a reckless disregard for the rights of others or 'smack[]' of intentional wrongdoing."  *Colnaghi, U.S.A. v. Jewelers Protection Servs.*, 611 N.E.2d 282, 284 (N.Y. App. Div. 1993) (citation omitted).   US Airways asserted this claim in its Proof of Claim.  *See* Davidson Decl. Ex. 1, Proof of Claim, Ex. A, Statement of Claim, ¶¶ 132-138.

As US Airways alleged in its Proof of Claim:  "Respondent has a well-defined obligation to recommend and purchase only 'suitable' securities for [US Airways'] Account.   This obligation is 'fundamental to fair dealing and is intended to promote ethical sales practices and high standards of professional conduct.'  FINRA Rule IM-2310-3."  *See* Davidson Decl. Ex. 1, Proof of Claim, Ex. A, Draft Statement of Claim, ¶ 24.   LBHI either knew, or should have known, that LBI's brokers recommended to, and purchased for, corporate cash customers (like US Airways) exotic, higher-risk, ARS, which comprised only 5% of the ARS market.   LBHI knew or should have known that LBI was sponsoring, structuring, marketing and recommending these unsuitable ARS to corporate treasury clients.   LBHI knew or should have known that LBI created these securities on behalf of Lehman Brothers' investment banking clients, with the stated purpose of structuring securities to transfer risk from these clients to money market investors.   Not only did LBHI fail to train Lehman Brothers' brokers to conduct a suitability

---

[9] Because New York is the forum state, New York choice of law rules shall apply. *Tanges v. Heidelberg N. Am., Inc.*, 710 N.E.2d 205, 252 (1999).  Under New York law, the law of the state that has the "greatest interest in regulating behavior in their borders" should apply for claims like negligence, gross negligence, breach of fiduciary duty, and negligent supervision. *See GlobalNet Financial.Com Inc., v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006).  New York has the greatest interest because LBHI's executive offices are located in New York and based on information and belief.   LBHI's direct involvement with the buyback program occurred in New York.  Therefore, substantive New York law applies to these claims.

analysis properly, but also LBHI failed to disclose, or ensure the disclosure of, the inherent risks involved with these products to customers, such as US Airways.

Moreover, LBHI breached its duty of fair dealing when it failed to buyback securities in an equitable fashion.   Under FIRNA Rule 2010,[10] members must observe high standards of commercial honor and just and equitable principles when conducting business with their customers.  LBHI became subject to this duty when it interjected itself into the ARS transactions. Thus, LBHI owed US Airways a duty of fair dealing, which it breached when it directed the buyback of illiquid ARS from only certain customers.   Under the FINRA Rules, the Buyback Program should have been conducted in an equitable fashion – on a pro rata basis, not favoring one customer over another.

The inequitable Buyback Program, which LBHI directed, recklessly disregarded the rights of US Airways, favoring instead the clients chosen by LBHI.   Upon information and belief, LBHI selectively bought back illiquid auction rate securities when it believed it was in its institutional interest in contravention of the FINRA Rules and LBHI's duty to other customers. Such conduct constitutes negligence and reckless disregard for the rights of US Airways.

> **b.     LBHI Negligently Misrepresented the Inherent Risk of the Investments and the Nature of the Buyback Program to US Airways**

LBHI made negligent misrepresentations to US Airways when it:  (1) failed to disclose the inherent risks involved with exotic ARS products to customers, or to ensure that such risks were disclosed, and (2) failed to disclose the nature of the Buyback Program and the criteria used in determining which securities it would repurchase.  US Airways must establish six elements to substantiate a claim of negligent misrepresentation:  (1) LBHI, in the course of business, gave incorrect information for the guidance of others in their business transactions; (2) LBHI

---

[10] Formerly NASD Rule 2110.

intended, or could reasonably foresee, that US Airways would rely on that information; (3) LBHI

failed to exercise reasonable care in obtaining or communicating that information; (4) US

Airways relied on that incorrect information; (5) US Airways' reliance was justified; and (6) US

Airways' reliance was a cause of their damages. *Taeger v. Catholic Family and Cmty Serv.*, 995

P.2d 721, 730 (Ariz. Ct. App. 1999).[11]

As US Airways alleged in its Claim, "Respondent purported to make representations to

Claimant regarding the suitability of securities, while failing to disclose certain material facts

that Respondent had a duty to disclose," *see* Davidson Decl. Ex. 1, Proof of Claim, Ex. A,

Statement of Claim,¶ 115, and "Respondent breached these duties by negligently failing to

inform Claimant of the severe risks to the safety and liquidity of the portfolio that these securities

posed." *Id.* ¶ 128.  LBHI never explained to US Airways that these higher-risk, exotic ARS were

created on behalf of Lehman Brothers' investment banking clients to transfer their long-term

complex-risks to money market investors, such as US Airways, nor did LBHI ensure that anyone

explained the true nature of these instruments to US Airways.  LBHI failed to exercise

reasonable care in communicating information that it knew, or should have known, about the

market conditions and inherent risks-of these instruments to US Airways.

LBHI also failed to disclose to US Airways that it was repurchasing securities from other

customers.  LBHI did not disclose all of the relevant criteria that it assessed to determine which

securities would be repurchased.  That misled US Airways, which, as a result, did not present the

case for repurchase of its security.  LBHI could have reasonably foreseen that US Airways would

---

[11] For negligent misrepresentation claims, New York courts have applied the law of the place where the injury occurred, which would be Arizona.  *BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 991 (S.D.N.Y. 2003).  Arizona law recognizes the tort of negligent misrepresentation as defined by the Restatement (Second) of Torts § 552.  *See St. Joseph's Hosp. v. Reserve Life Ins.*, 742 P.2d 808, 813-16 (Ariz. 1987).

15

rely upon their written and oral misrepresentations, including those that were made in the November 13, 2007 phone call between LBHI Officer, Kurt Locher, and US Airways. Mr. Locher did not inform US Airways that Lehman Brothers intended to, and was purchasing, illiquid ARS from some customers and not others. Had LBHI exercised due care in making such representations, it would have thoroughly disclosed that some customers' ARS were repurchased, and the relevant criteria that the committee used to determine such buybacks. US Airways justifiably relied on Mr. Locher's misrepresentations, and did not pursue presenting the necessary criteria to the committee for the Buyback Program, which in turn caused US Airways injury.

### B.    LBHI is Liable for LBI's Conduct

In addition to its own wrongful conduct, LBHI is also liable because Lehman Brothers was operated as one enterprise, LBHI is an *alter ego* of LBI, and/or because the corporate veil should otherwise be pierced. These theories are fact-specific and US Airways requires discovery in order to establish its claims. As US Airways alleged in its Proof of Claim:

> Lehman was responsible for supervising its employees who committed the various violations described herein. Lehman failed to supervise reasonably to prevent said violations. Lehman failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending purchases in the US Airways Account. Had Lehman implemented and enforced protocols for the review of purchases made by its employees, it would have known that unsuitable securities were recommended, that material misrepresentations and omissions were made, and that securities regulations were violated. It is manifest that Lehman failed to maintain and enforce a proper system of internal supervision over its employees. Lehman failed to provide adequate instruction with regard to recommendations made by its registered representatives.

Davidson Decl. Ex. 1, Proof of Claim, Ex. A, Statement of Claim, ¶¶ 140-41.

16

### 1.    LBHI Operated Lehman Brothers as a Single, Integrated Enterprise

LBHI operated Lehman Brothers as a single, integrated enterprise. Under such circumstances, it is appropriate for the Court to hold LBHI liable for US Airways' Claim. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 487 (3d Cir. 2001). "[I]t has long been acknowledged that parents may be 'directly' liable for their subsidiaries' actions when the 'alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management,' and the parent has interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership." *Pearson*, 247 F.3d at 487 (citing *United States v. Bestfoods*, 524 U.S. 51, 64 (1998)); *see also* William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193, 218 (1929)) ("direct intervention or intermeddling by the parent in the affairs of the subsidiary and more particularly in the transaction involved, to the disregard of the normal and orderly procedure of corporate control carried out through the election of the desired directors and officers of the subsidiary and the handling by them of the direction of its affairs, seems to have been determinative in some cases to holding the parent liable."). Given LBHI's control over the Lehman Brothers enterprise and that LBI is part of that enterprise, it is appropriate to hold LBHI liable.

### 2.    LBHI is the Alter Ego of LBI

Disregard of the corporate form is appropriate under the "alter ego" theory where: (1) it is required to reach an equitable result; and (2) the shareholder dominated the corporation. *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1084-1086 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991).[12]  A variety of factors are relevant to the alter ego analysis and no

---

[12] Under New York choice of law rules, the law of the state of incorporation determines when the corporate form will be disregarded. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.

single factor justifies disregarding the corporate entity. *Alberto v. Diversified Grp., Inc.*, 55 F.3d 201, 205 (5th Cir. 1995) (applying Delaware law) (citation omitted). A key element for liability, in the context of a parent-subsidiary relationship, is the amount of control that the parent exercises over the actions of its subsidiary. *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989) ("An alter ego relationship might also lie where a corporate parent exercises complete domination and control over the subsidiary."). Accordingly, since LBHI dominated and controlled LBI, the Court should treat LBHI as an alter ego of LBI for purposes of US Airways' Claim.

### 3.    The Court Should Pierce Lehman Brothers' Corporate Veil

Under Delaware law, courts consider a variety of factors in weighing whether to pierce the corporate veil, and no single factor justifies disregarding the corporate entity. Relevant factors include: gross undercapitalization, failure to observe the corporate formalities, non-functioning officers or similar circumstances indicating that the "subsidiary is merely the shadow of the parent." *Phoenix Canada Oil Co. Ltd v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988).[13] Determining that veil-piercing is appropriate is a "fact specific" inquiry, and courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8)

---

1995) (citation omitted). Because LBHI is incorporated in Delaware, Delaware law should apply to the issues of piercing the corporate veil and alter ego.

[13] Under New York law, a court may pierce the corporate veil where 1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and 2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *MAG Portfolio Consultant v. Merlin Biomed Group*, 268 F. 3d 58, 63-64 (2nd Cir. 2001) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).

whether the corporations are treated as independent profit centers;
(9) payment or guarantee of the corporation's debts by the
dominating entity, and (10) intermingling of property between the
entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).  Accordingly, the

Court should permit discovery so that US Airways can show that Lehman Brothers' veil should

be pierced.

The standards for veil piercing (and alter ego liability) are similar to those weighed by the

court when considering whether to consolidate the estate of the debtor with one or more co-

debtors.[14]  As the court is aware, there is presently pending a plan that proposes to consolidate

LBHI with a variety of its subsidiaries and affiliates.  *See, e.g.,* Disclosure Statement for the

Amended Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings, Inc.

and Certain of Its Affiliated Debtors Proposed by the Ad Hoc Group of Lehman Brothers

Creditors, at 11-30, (filed Apr. 27, 2011), ECF No. 16316 ("Consolidation Disclosure

Statement").   The evidence marshaled by those seeking consolidation similarly supports

disregarding the corporate form as to LBHI and LBI for purposes of US Airways' Claim.

### 4.    US Airways Has Substantial Evidence to Support These Theories of Liability and Requests Discovery To Develop Additional Support for These Fact Specific Inquiries

Because enterprise liability, veil-piercing, and alter ego issues are fact specific, courts

routinely grant discovery in connection with arguments that the corporate form should be

disregarded.  *See, e.g., First Bank of the Americas v. Motor Car Funding, Inc.,* 257 A.D.2d 287,

294 (N.Y. App. Div. 1999) (Discovery should be granted in support of veil piercing

---

[14] Substantive consolidation is appropriate where one of the following two factors exists:
(1) creditors transacted with affiliated entities as a single economic unit and did not rely on their
separate identity in extending credit or (2) the affairs of affiliated entities are so entangled that
consolidation will benefit all creditors of those entities.  *See Union Sav. Bank v. Augie/Restivo
Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).

allegation.).[15]  US Airways submits that based on the record developed thus far from publically

available information the Court could impose liability on LBHI.  US Airways further submits

that with discovery, there will be additional evidentiary support to find LBHI liable.[16]

Indeed, the Debtors themselves have acknowledged the substantial facts that weigh in

favor of enterprise liability, alter ego status and veil piercing.  *See* Consolidation Disclosure

Statement at 12 (citing Debtors' Disclosure Statement at 81).  The Debtors list in their Disclosure

Statement twelve factors that support these arguments and justify further discovery.  The

Debtors' Disclosure Statement provides as follows:

> (i) ***Lehman operated as if it were one company*** that was organized
> by business division, not necessarily by legal entity; (ii) ***LBHI's
> board of directors and executive committee had responsibility for
> Lehman's firm-wide strategy, risk, funding, liquidity, operations
> and products;*** (iii) Foreign Debtors and non-Debtor Affiliates were
> utilized to raise capital in foreign currencies to enable Lehman to
> manage the risk in movements in foreign currencies exchange
> rates; (iv) ***one investment committee existed for all Lehman's
> transactions***; (v) the Debtors shared administrative and back-office
> functions; (vi) ***certain Debtors had certain overlapping directors
> and officers;*** (vii) certain subsidiaries had no employees or
> physical premises, (viii) ***Lehman's cash-management systems
> were centralized and managed on a firm wide basis through
> LBHI;*** (ix) tax returns were filed with the IRS on a consolidated
> basis; (x) ***creditors generally transacted with Lehman as one
> economic enterprise and did not rely on the separate identity or
> credit of any single Affiliate***; (xi) creditors did not have access to
> financial statements of most of the Affiliates; and (xii) LBHI
> purportedly guaranteed all obligations of certain of its subsidiaries.

*Id*. (citing Debtors' Disclosure Statement at 82) (emphasis added).  Thus, LBHI concedes that it

operated Lehman Brothers as one company with overlapping directors and officers who decided

on a unified strategy, which was implemented through integrated systems.  Moreover, LBHI

---

[15] US Airways is presently barred from conducting discovery by the Claims Procedure Order, (filed Apr. 19, 2010), ECF No. 8474.

[16] In addition to the veil piercing and alter ego issues, US Airways will require discovery concerning substantive issues such as LBHI's role in the discriminatory Buyback Program.

understood that creditors – like US Airways – transacted with Lehman Brothers as one enterprise.

At the September 22, 2010 hearing before the Bankruptcy Court, Mr. Bryan Marsal, the Debtors' Chief Executive Officer, explained that "[t]he company, on the substantive consolidation side, was operated as one company . . . it really was not managed on a legal-entity basis." Status Conference Hr'g Tr. 45:1-45:3, Sep. 22, 2010, ECF No. 12227. Mr. Marsal continued, "[t]here was a centralized cash management system and, really, reliance - - there's no apparent - - as far as we can see, there's no good argument made for separate credit analysis. There was one entity that we saw from a financial credit analysis standpoint that people were looking to." *Id.* at 45:13-17. Justice Briggs, who oversees certain aspects of LBIE's insolvency proceedings, similarly found that "[t]he [Lehman Brothers] Group sought to present itself to the world, and to organize itself internally, as a single integrated business enterprise, rather than a collection of separate legal entities." *In re Lehman Bros. Int'l (Europe) (In Administration)*, [2010] EWHC 2914 (Ch) [49] (the "RASCALS Opinion").

US Airways experienced first-hand that Lehman operated as a single enterprise. After the ARS auctions failed, Mr. Locher, a LBHI officer or director, was the primary contact for Lehman Brothers on a conference call with US Airways to explain the enterprise's response. Of course, Mr. Locher failed to offer any constructive solutions all the while LBI was repurchasing securities from certain customers and not others at, on information and belief, LBHI's direction. Moreover, the main reason ARS auctions failed was because Lehman Brothers stopped issuing support bids. Lehman Brothers, as an enterprise, managed its risk and adequacy of capital on an enterprise basis. It disclosed this fact to the public, including creditors. Yet, when it came time to continue to support investments that Lehman Brothers had recommended to and purchased for

21

US Airways, it balked.  Under these circumstances, it is unfair, on the one hand, to satisfy capital requirements on an enterprise basis and then, on the other hand, rely on corporate formalities during insolvency to prevent creditors from accessing assets that reside with other entities.

Based on the foregoing, disregard of LBHI's separate corporate existence from LBI is appropriate with respect to the Claim.  At a minimum, US Airways should be given an opportunity to conduct meaningful discovery to validate its alter ego, veil piercing, and enterprise liability arguments.

## CONCLUSION

For the foregoing reasons, the Court should overrule the Objection to the Claim.  Should the Court allow the Objection to proceed, however, the Court should authorize US Airways to conduct discovery in support of its arguments.  Because the facts and issues involved in this matter are voluminous and complicated, US Airways submits that this matter is appropriately and best treated as an adversary proceeding. Fed. R. Bankr. P. 9014(c).

Accordingly, for the foregoing reasons, US Airways requests:  (a) that the Objection be denied, or, alternatively, (b) that US Airways be granted sufficient time for the conduct of discovery, and given the complexity of the issues, that the Court consider converting the Objection to an adversary proceeding.

Dated:   New York, New York
   July 7, 2011

Respectfully submitted,

**STEPTOE & JOHNSON LLP**

By:     /s/ EVAN GLASSMAN  
Steven K. Davidson (*pro hac vice* pending)
George R. Calhoun V (*pro hac vice* pending)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue
Washington, DC  20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

Evan Glassman
STEPTOE & JOHNSON LLP
750 Seventh Avenue
New York, New York 10019
Telephone:  (212) 506-3900
Facsimile: (212) 506-3950

*Attorneys for US Airways, Inc.*

**Exhibit D**

US_ACTIVE:\44149287\9\58399.0011

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Lisa G. Laukitis

-and-

555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
Philip E. Cook

*Attorneys for Roland Hansalik, George Barclay Perry*
*and Joseph Arena*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Lehman Brothers Holdings Inc., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | Jointly Administered |

### NOTICE OF FILING EXHIBIT B TO MOTION, PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW PAYMENT OF A JUDGMENT UNDER THE DIRECTORS AND OFFICERS INSURANCE POLICIES ISSUED TO THE DEBTORS

PLEASE TAKE NOTICE that, Roland Hansalik, George Barclay Perry and Joseph Arena are hereby filing Exhibit B to the Motion, Pursuant to Section 362 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure, for an Order Modifying the Automatic Stay to Allow Payment of a Judgment Under the Directors and Officers Insurance Policies Issued to the Debtors (Docket No. 18157) (the "Motion"), which was inadvertently omitted at the time the Motion was filed.

Dated: July 19, 2011                              /s/ Lisa G. Laukitis
New York, New York

Lisa G. Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306

Philip E. Cook
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, California  90071
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539

*Counsel for Insured Persons Roland Hansalik,*
*George Barclay Perry and Joseph Arena*

**EXHIBIT B**

# FINra

Financial Industry Regulatory Authority

VIA MAIL AND FACSIMILE

May 27, 2011

Philip E. Cook, Esq.
Jones Day
555 S Flower St., 50th Floor
Los Angeles, CA 90071

Subject:   FINRA Dispute Resolution Arbitration Number 09-06905
US Airways, Inc. v. Roland Hansalik, Lars Jacobson, George Barclay Perry and
Joseph Arena

Dear Mr. Cook:

In accordance with the Code of Arbitration Procedure I enclose the decision reached by the arbitrator(s) in the above-referenced matter.

### Responsibility to Pay Monetary Award

Pursuant to the Code of Arbitration Procedure[1] the responsible party must pay any monetary awards within 30 days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction. If an award is not paid within 30 days, the responsible party must pay post-judgment interest at the legal rate or as provided in the award by the arbitrator(s).

### Tracking Payment of Award

FINRA Dispute Resolution has implemented a system of monitoring and tracking compliance with arbitration awards by members and associated persons. We request prevailing claimants to notify us in writing when their awards have not been paid within 30 days of receipt of the award, and require member firms to certify in writing that they have complied with awards against them or their associated persons.

Written notification concerning award compliance or lack thereof must be directed to:

Avichai Badash
FINRA Dispute Resolution
One Liberty Plaza

---

[1] Customer Code Rule 12904
Industry Code Rule 13904
Old Code Rule 10330(h)

Investor protection. Market integrity.

Dispute Resolution
Northeast Regional Office

One Liberty Plaza
165 Broadway
27th Floor
New York, NY
10006-1404

t  212 858 4200
f  301 527 4873
www.finra.org

165 Broadway, 52nd Floor
New York, NY 10006
212-858-4325 (tel) 301-527-4739 (fax)

### Expedited Suspension Proceedings for Non-Payment of Awards

Members and associated persons who do not comply with an award in a timely manner are subject to expedited suspension proceedings as set forth in Rule 9554.

### Right to File Motion to Vacate Award

All awards are **final** and are not subject to review or appeal by the arbitration panel or by FINRA Dispute Resolution. Any party wishing to challenge the award must make a motion to vacate the award **in a federal or state court** of appropriate jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, or applicable state statute. There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute. Parties and counsel should consult federal and state statutes and case law to determine the appropriate court, standards, and time limitations in their individual circumstances. FINRA Dispute Resolution is not authorized to provide legal advice concerning a motion to vacate.

A motion to vacate, confirm, or modify an arbitration award is a matter only between the parties to the arbitration. FINRA Dispute Resolution is not a proper party to post-award motions and should not be named as a party to any post-award motion. However, for cases filed on or after April 12, 2004, if the award contains expungement relief, or if a party seeks expungement relief in court, there may be a duty to name FINRA as a party as provided in Rule 2080.

### Questions Concerning Award

Please direct any questions regarding this award to me. Please note that requests for disciplinary referrals as well as the panels' decisions on the requests, will not be reflected in awards. **The parties must not contact the arbitrators directly.**

### Forum Fees

You will receive under separate cover an invoice that reflects the fees assessed and any outstanding balance or refund due. **Fees are due and payable to FINRA Dispute Resolution upon receipt of the invoice and remitted to the address specified on the invoice.**

Any applicable refunds will also be sent under separate cover approximately 45 days after the case closes. Pursuant to the Code of Arbitration Procedure, "Any refunds of fees or costs incurred under the Code will be paid directly to the named parties, even if a non-party made payment on behalf of the named parties."[2]

All questions regarding payment of fees and refunds should be directed to FINRA Finance at (240) 386-5910.

### Arbitration Evaluation

---

[2] Customer Code Rule 12902(e)
Industry Code Rule 13902(e)

As a service organization, the primary goals of FINRA Dispute Resolution are the integrity of its process and the satisfaction of its clients. To ensure that we are meeting your needs and satisfying our commitment to you, **we need to hear from you.** If you have not already done so, please take the time to complete an evaluation of our services, the process, and the arbitrator(s) assigned to your case. For your convenience, we have now made it possible for you to evaluate our services using the Internet. Please direct your Web browser to http://www.finra.org/arbevaluation.

If you do not have Internet access, or have difficulty completing the evaluation form online, we will send a hard copy evaluation form to you. The completed evaluation form should be mailed in to the address indicated below. If you need a hard copy of the evaluation form, please contact the undersigned. Whenever possible, however, we encourage you to use the new online version, as it will help us to review your feedback in a more expeditious manner. Your feedback is a valuable and necessary component in our efforts to serve you better.

Very truly yours,

Bola Aguda
Case Administrator
Phone:   212-858-4200
Fax:      301-527-4904
NEProcessingCenter@finra.org


BA:adg:_C09A
idr: 05/24/2011


RECIPIENTS:
         Michael J. Baratz, Esq., US Airways, Inc.
         Steptoe & Johnson LLP, 1330 Connecticut Avenue NW, Washington, DC 20036

         Philip E. Cook, Esq., Roland Hansalik
         Jones Day, 555 S Flower St., 50th Floor, Los Angeles, CA 90071

         Philip E. Cook, Esq., George B. Perry
         Jones Day, 555 S Flower St., 50th Floor, Los Angeles, CA 90071

         Philip E. Cook, Esq., Lars P. Jacobson
         Jones Day, 555 S Flower St., 50th Floor, Los Angeles, CA 90071

         Philip E. Cook, Esq., Joseph L. Arena
         Jones Day, 555 S Flower St., 50th Floor, Los Angeles, CA 90071

## Award
## FINRA Dispute Resolution

In the Matter of the Arbitration Between:

US Airways, Inc. (Claimant) v. Roland Hansalik, Lars Jacobson, George Barclay Perry, and Joseph Arena (Respondents)

Case Number: 09-06905                    Hearing Site: New York, New York

Nature of the Dispute: Customer vs. Associated Persons.

### REPRESENTATION OF PARTIES

Claimant US Airways, Inc., hereinafter referred to as "Claimant": Stephen Davidson, Esq., and Michael J. Baratz, Esq., Steptoe & Johnson LLP, Washington, D.C.

Respondents Ronald Hansalik ("Hansalik"), Lars Jacobson ("Jacobson"), George Barclay Perry ("Perry"), and Joseph Arena ("Arena"), hereinafter collectively referred to as "Respondents": Phillip E. Cook, Esq., Jones Day, Los Angeles, CA.

### CASE INFORMATION

Amended Statement of Claim filed on or about: December 23, 2009.
Claimant signed the Submission Agreement: December 1, 2009.

Joint Statement of Answer filed by Respondents on or about: March 2, 2010.
Hansalik signed the Submission Agreement: March 1, 2010.
Jacobson signed the Submission Agreement: February 25, 2010.
Perry signed the Submission Agreement: February 25, 2010.
Arena signed the Submission Agreement: February 25, 2010.

### CASE SUMMARY

Claimant asserted the following causes of action: unsuitability, unauthorized purchases, negligent misrepresentation, negligence, gross negligence, failure to supervise, and breach of fiduciary duty. The causes of action relate to unspecified auction rate securities.

Unless specifically admitted in their Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

### RELIEF REQUESTED

In the Statement of Claim, Claimant requested compensatory damages in an amount to be determined at arbitration that includes all illiquid securities in Claimant's account at par, totaling $134.6 million, special and other money damages, including the difference between par and the market price secured upon redemption of any securities at issue in this matter, punitive damages in the amount of $403.8 million, interest at the rate of 9%

FINRA Dispute Resolution
Arbitration No. 09-06905
Award Page 2 of 5

per annum, attorneys' fees, costs, and such other relief as is just, fair, and equitable.

At the close of the hearing, Claimant requested compensatory damages in the amount of $91.235 million or lesser amounts based on alternative calculations and theories of damages.

Respondents requested that Claimant's claims be dismissed with prejudice, costs, attorneys' fees, and that this matter be expunged from their CRD records.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

Claimant initially filed a Statement of Claim on or about December 11, 2009. It filed an Amended Statement of Claim on or about December 23, 2009 replacing the original Statement of Claim. The original Statement of Claim was not served on the Respondents and not considered by the Panel.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Hansalik, Perry, and Arena are jointly and severally liable for and shall pay to Claimant compensatory damages in the amount of $15,000,000.00 (Fifteen Million dollars).

2. Claimant's claims against Jacobson are denied in their entirety.

3. Respondents' requests for expungement are denied.

4. Any and all relief not specifically addressed herein, including punitive damages, is denied.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution assessed a filing fee* for each claim:
    Initial claim filing fee                  = $1,800.00

*The filing fee is made up of a non-refundable and a refundable portion.

FINRA Dispute Resolution
Arbitration No. 09-06905
Award Page 3 of 5

## Discovery-Related Motion Fees

Fees apply for each decision rendered on a discovery-related motion.

One (1) Decision on discovery-related motion on the papers
with (1) one arbitrator @ $200.00                                                  = $  200.00

Claimant submitted (1) one discovery-related motion.
Total Discovery-Related Motion Fees                                            = $  200.00

1.  The Panel has assessed $100.00 of the discovery-related motion fees to
    Claimant.
2.  The Panel has assessed $100.00 of the discovery-related motion fees jointly and
    severally to Hansalik, Perry, and Arena.

## Hearing Session Fees and Assessments

The Panel has assessed hearing session fees for each session conducted. A session is
any meeting between the parties and the arbitrators, including a pre-hearing conference
with the arbitrators, that lasts four (4) hours or less. Fees associated with these
proceedings are:

| | | | |
|---|---|---|---|
| Four (4) Pre-hearing sessions with Panel @ $1,200.00 | | | =$ 4,800.00 |
| Pre-hearing conferences: | July, 27, 2010 | 1 session | |
| | February 9, 2011 | 1 session | |
| | February 18, 2011 | 1 session | |
| | March 1, 2011 | 1 session | |

| | | | |
|---|---|---|---|
| Thirty-four (34) Hearing sessions @ $1,200.00 | | | =$40,800.00 |
| Hearing Dates: | March 28, 2011 | 2 sessions | |
| | March 29, 2011 | 2 sessions | |
| | March 30, 2011 | 2 sessions | |
| | March 31, 2011 | 2 sessions | |
| | April1, 2011 | 2 sessions | |
| | April 4, 2011 | 2 sessions | |
| | April 5, 2011 | 2 sessions | |
| | April 6, 2011 | 2 sessions | |
| | April 28, 2011 | 2 sessions | |
| | April 29, 2011 | 2 sessions | |
| | May 2, 2011 | 2 sessions | |
| | May 3, 2011 | 2 sessions | |
| | May 4, 2011 | 2 sessions | |
| | May 5, 2011 | 2 sessions | |
| | May 6, 2011 | 2 sessions | |
| | May 10, 2011 | 2 sessions | |
| | May 11, 2011 | 2 sessions | |

Total Hearing Session Fees                                                        =$45,600.00

FINRA Dispute Resolution
Arbitration No. 09-06905
Award Page 4 of 5

1. The Panel has assessed $22,800.00 of the hearing session fees to Claimant.
2. The Panel has assessed $22,800.00 of the hearing session fees jointly and severally to Hansalik, Perry, and Arena.


All balances are payable to FINRA Dispute Resolution and are due upon receipt.

FINRA Dispute Resolution
Arbitration No. 09-06905
Award Page 5 of 5

## ARBITRATION PANEL

Marguerite B. Filson        –        Public Arbitrator, Presiding Chairperson
Maya Steinitz                –        Public Arbitrator
Sally J. Sancimino          –        Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

**Concurring Arbitrators' Signatures**

_____
Marguerite B. Filson
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Maya Steinitz
Public Arbitrator

5/26/2011
Signature Date

_____
Sally J. Sancimino
Non-Public Arbitrator

_____
Signature Date

May 27, 2011
_____
Date of Service (For FINRA Dispute Resolution use only)

FINRA Dispute Resolution
Arbitration No. 09-06905
Award Page 5 of 5

## ARBITRATION PANEL

Marguerite B. Filson   -   Public Arbitrator, Presiding Chairperson
Maya Steinitz   -   Public Arbitrator
Sally J. Sancimino   -   Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

**Concurring Arbitrators' Signatures**

_____
Marguerite B. Filson
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Maya Steinitz
Public Arbitrator

_____
Signature Date

_____
Sally J. Sancimino
Non-Public Arbitrator

5/26/11
_____
Signature Date

May 27, 2011
_____
Date of Service (For FINRA Dispute Resolution use only)

**FINRA**

Financial Industry Regulatory Authority

VIA MAIL AND FACSIMILE

May 27, 2011

Philip E. Cook, Esq.
Jones Day
555 S Flower St., 50th Floor
Los Angeles, CA 90071

Subject:   FINRA Dispute Resolution Arbitration Number 09-06905
           US Airways, Inc. v. Roland Hansalik, Lars Jacobson, George Barclay Perry and
           Joseph Arena

Dear Mr. Cook:

An arbitration Panel issued the enclosed award ordering you, or your client(s), to pay monetary
damages or provide other relief to a party in the above-referenced matter.

Please be aware that the Code of Arbitration Procedure[1] provides as follows:

> All monetary awards shall be paid within thirty (30) days of receipt unless a motion to
> vacate has been filed with a court of competent jurisdiction. An award shall bear interest
> from the date of the award: (1) if not paid within thirty (30) days of receipt, (2) if the award
> is the subject of a motion to vacate which is denied, or (3) as specified by the arbitrator(s)
> in the award. Interest shall be assessed at the legal rate, if any, then prevailing in the
> state where the award was rendered, or at a rate set by the arbitrator(s).

FINRA Dispute Resolution has implemented a system of monitoring and tracking compliance with
arbitration awards by members and associated persons. Therefore, we request prevailing
claimants to notify us in writing when their awards have not been paid within 30 days of receipt of
the award, and require member firms to certify in writing that they have complied with awards
against them or their associated persons.

**Members must notify FINRA Dispute Resolution in writing, within 30 days of receipt of the
award, whether or not they or their associated persons have complied with the award. The
30-day period ends on:** June 27, 2011 Associated persons who have changed employment
since the arbitration claim was filed are required to notify FINRA Dispute Resolution directly

---

[1]Customer Code Rule 12904(i)
 Industry Code Rule 13904(i)
 Old Code Rule 10330(h)

Investor protection. Market integrity.     Dispute Resolution        One Liberty Plaza    t 212 858 4200
                                           Northeast Regional Office   165 Broadway        f 301 527 4873
                                                                       27th Floor          www.finra.org
                                                                       New York, NY
                                                                       10006-1404

regarding the payment status of any awards against them. Please review Notice to Members 00-55 for more information on the notification requirement and the sanctions for noncompliance.

All awards are **final** and are not subject to review or appeal by the arbitration panel or by FINRA Dispute Resolution. Any party wishing to challenge the award must make a motion to vacate the award in **a federal or state court** of appropriate jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, or applicable state statute. There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute. Parties and counsel should consult federal and state statutes and case law to determine the appropriate court, standards, and time limitations in their individual circumstances. A motion to vacate, confirm, or modify an arbitration award is a matter only between the parties to the arbitration. FINRA Dispute Resolution is not a proper party to post-award motions and should not be named as a party to any post-award motion.

Please direct any questions regarding this award to me. **The parties must not contact the arbitrators directly.**

Please forward any questions or correspondence concerning the monitoring and tracking of arbitration awards and/or payment of awards to:

Avichai Badash
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway, 52nd floor
New York, NY, 10006

You may also contact him by telephone at 212-858-4325, fax at 301-527-4739, or e-mail at avichai.badash@finra.org.

Very truly yours,

Bola Aguda
Case Administrator
Phone:   212-858-4200
Fax:      301-527-4904
NEProcessingCenter@finra.org


BA:adg  LC09X
idr: 09/16/2009

CC:
    Michael J. Baratz, Esq., US Airways, Inc.
    Steptoe & Johnson LLP, 1330 Connecticut Avenue NW, Washington, DC 20036

RECIPIENTS:
    Philip E. Cook, Esq., George B. Perry
    Jones Day, 555 S Flower St., 50th Floor, Los Angeles, CA 90071

Philip E. Cook, Esq., Roland Hansalik
Jones Day, 555 S Flower St., 50th Floor, Los Angeles, CA 90071

Philip E. Cook, Esq., Joseph L. Arena
Jones Day, 555 S Flower St., 50th Floor, Los Angeles, CA 90071

**Exhibit E**

US_ACTIVE:\44149287\9\58399.0011

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:   (212) 755-7306
Lisa G. Laukitis

-and-

555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 489-3939
Facsimile:   (213) 243-2539
Philip E. Cook

*Attorneys for Roland Hansalik, George Barclay Perry
and Joseph Arena*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Lehman Brothers Holdings Inc., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | Jointly Administered |

**NOTICE OF MOTION, PURSUANT TO SECTION 362 OF
THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE, FOR AN ORDER
MODIFYING THE AUTOMATIC STAY TO ALLOW PAYMENT OF A
JUDGMENT UNDER THE DIRECTORS AND OFFICERS
INSURANCE POLICIES ISSUED TO THE DEBTORS**

PLEASE TAKE NOTICE that, pursuant to the attached Motion (the "Motion"), Roland

Hansalik, George Barclay Perry and Joseph Arena (collectively, the "Insured Persons") hereby

seek entry of an order, in substantially the form of the proposed order attached as Exhibit A to

the Motion, lifting the automatic stay in these cases, to the extent applicable and necessary, to

facilitate payment under certain of the directors and officers insurance policies issued to the

Debtors of an award entered against the Insured Persons by the Financial Industry Regulatory Authority.

PLEASE TAKE FURTHER NOTICE that a hearing on the relief requested in the Motion will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on July 20, 2011 at 10:00 a.m., prevailing eastern time (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon each of the following, so as to be filed and received by no later than July 13, 2011 at 4:00 p.m., prevailing eastern time (the "Objection Deadline"):  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York,  10004, Courtroom 601; (ii) counsel for the Insured Persons: Jones Day, 555 South Flower Street, 50th Floor, Los Angeles, California  90071, Attn: Philip E. Cook, and Jones Day, 222 East 41st Street, New York, New York  10017, Attn:  Lisa G. Laukitis and Lance E. Miller; (iii) counsel for the Debtor:  Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153, Attn:  Richard P. Krasnow; (iv) the Office of the United

2

States Trustee for the Southern District of New York:  33 Whitehall Street, 21st Floor, New York, New York  10004, Attn:  Tracy Hope Davis, Esq., Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., and Linda Riffkin, Esq.; (v) counsel for the Official Committee of Unsecured Creditors:  Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York  10005, Attn:  Dennis F. Dunne, Esq., Evan Fleck, Esq., and Dennis O'Donnell, Esq.; (vi) counsel for Zurich American Insurance Co.:  Bailey Cavalieri LLC, One Columbus, 10 West Broad Street, Suite 2100, Columbus, Ohio  43215-3422, Attn:  Thomas E. Geyer, Esq., and (vii) counsel for ACE Bermuda Insurance Ltd.:  Walker Wilcox Matousek LLP, 225 West Washington Street, Chicago, Illinois  60606, Attn:  James Huberty, Esq.

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested therein shall be deemed unopposed, and may be granted by the Bankruptcy Court without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing and failure to appear may result in relief being granted or denied upon default.

Dated:  June 29, 2011
New York, New York

_____*/s/ Lisa G. Laukitis*_____
Lisa G. Laukitis
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:     (212) 326-3939
Facsimile:     (212) 755-7306

Counsel for the Insured Persons

**Hearing Date and Time:  July 20, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  July 13, 2011 at 4:00 p.m. (Prevailing Eastern Time)**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:   (212) 755-7306
Lisa G. Laukitis

-and-

555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 489-3939
Facsimile:   (213) 243-2539
Philip E. Cook

*Attorneys for Roland Hansalik, George Barclay Perry*
*and Joseph Arena*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Lehman Brothers Holdings Inc., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | Jointly Administered |

**MOTION, PURSUANT TO SECTION 362 OF THE BANKRUPTCY
CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY
TO ALLOW PAYMENT OF A JUDGMENT UNDER THE DIRECTORS
AND OFFICERS INSURANCE POLICIES ISSUED TO THE DEBTORS**

**TO THE HONORABLE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE:**

Roland Hansalik, George Barclay Perry and Joseph Arena (collectively, the "Insured

Persons"), hereby seek an order, in substantially the form of the proposed order attached as

Exhibit A, lifting the automatic stay in these cases, to the extent applicable and necessary, to

facilitate payment under certain of the Debtors' insurance policies of an award entered against

the Insured Persons, as more specifically described below.  In support of this Motion, the Insured

Persons respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      In their capacity as former officers and employees of the Debtors, the Insured

Persons have been defending against a securities claim filed with the Financial Industry

Regulatory Authority ("FINRA") by former Lehman Brothers Inc. customer U.S. Airways, Inc.

("US Airways").  Neither the Debtors nor the D&O Insurers (as defined below) have disputed

that this FINRA Proceeding is covered by the D&O Policies (as defined below).  Indeed, on at

least four (4) prior occasions, this Court entered "comfort orders" lifting the automatic stay under

sections 362(a) and 362(d) of the Bankruptcy Code (to the extent it applies and such an order

was necessary) in order to allow payment under the D&O Policies of, *inter alia*, the Insured

Persons' defense costs (collectively, the "Comfort Orders").[1]  The Insured Persons are not the

only former directors, officers or employees facing securities claims initiated by former

customers of the Debtors, and the Court has already entered three separate Comfort Orders

---

[1]    *See Order Granting Debtors' Motion, Pursuant To Section 362 Of The Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Advancement Under Directors And Officers And Fiduciary Liability Insurance Policies* [Dkt. No. 3220] (authorizing payment of defense costs under the primary layer of the D&O Policies); *Order Granting Debtors' Motion, Pursuant To Section 362 Of The Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Advancement Under Directors And Officers Insurance Policy By Federal Insurance Company (Chubb)* [Dkt. No. 5906] (authorizing payment of defense costs under the second layer of the D&O Policies); *Order Granting Debtors' Motion, Pursuant To Section 362 Of The Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Advancement Under Directors And Officers Insurance Policies By Continental Casualty Company, Certain Underwriters At Lloyd's London And U.S. Specialty Insurance Company* [Dkt. No. 10945] (authorizing payment of defense costs under the third, fourth, and fifth layers of the D&O Policies); *Order Granting Debtors' Motion, Pursuant To Section 362 Of The Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Advancement Under (I) 2007-2008 Directors And Officers Insurance Policies By Zurich American Insurance Company, Ace Bermuda Insurance Ltd. And St. Paul Mercury Insurance Company, And (II) 2008-2009 Directors And Officers Insurance Policies By XL Specialty Insurance Company And Federal Insurance Company* [Dkt. No. 12896] (authorizing payment of defense costs under the sixth, seventh, and eighth layers of the D&O Policies).

authorizing payment of settlements under the D&O Policies to resolve claims similar to those

against the Insured Persons that are the subject of this Motion.[2]

2.      The FINRA arbitration panel has now entered an award against the Insured

Persons, jointly and severally, for $15 million (the "Award"), a copy of which is attached as

Exhibit B.

3.      The Insured Persons believe the Award is covered by the D&O Policies and

anticipate that the D&O Insurers will pay the Award upon entry of a further Comfort Order.  As

with the prior Comfort Orders issued by the Court, the Insured Persons seek to assure the D&O

Insurers (as defined below) whose policy proceeds are the subject of this Motion that they can

make payment of the Award under the D&O Policies without concern that, if and to the extent

that the automatic stay is otherwise applicable, they are violating the automatic stay.

4.      Granting the relief requested by this Motion is unlikely to have any adverse effect

on the Debtor's estate and creditors because, among other things, the interests of the Debtor in

the proceeds of the D&O Policies, if any, is expressly subordinate to the interest of the Insured

Persons.  Specifically, the applicable insurance policies provide that the Debtors have rights to

the insurance proceeds only after the insured individuals are fully reimbursed for any "Loss."

---

[2]      *See Order Granting Debtors' Motion, Pursuant To Section 362 Of The Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Settlement Payment Under Directors And Officers Insurance Policies* [Dkt. No. 6297] (authorizing, to the extent necessary, payment under the D&O Policies of a settlement resolving claims relating to a former client's purchase of auction-rate securities); *Order Granting Debtors' Motion, Pursuant To Section 362 Of The Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Settlement Payment Under Directors And Officers Insurance Policy* [Dkt. 12895] (authorizing, to the extent necessary, payment under the D&O Policies of settlements resolving claims pending before FINRA and the Second Circuit Court of Appeals for unsuitability and failure to supervise); *Order Granting Debtors' Motion, Pursuant To Section 362 Of The Bankruptcy Code And Bankruptcy Rules 9019 And 4001, For An Order (I) Modifying The Automatic Stay To Allow Settlement Payment Under Directors And Officers Insurance Policies And (II) Approving An Agreement And Release* [Dkt. No. 13929] (authorizing, to the extent necessary, payment under the D&O Policies of settlements resolving a FINRA proceeding for securities law violations relating to the purchase of auction rate securities).

## JURISDICTION

5.      This Court has jurisdiction to consider and determine the present Motion pursuant

to 28 U.S.C. § 1334.  If, and to the extent that, the automatic stay applies to the subject matter of

this Motion, this is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

6.      Lehman Brothers Holding Inc. and various of its subsidiaries (collectively, the

"Debtors") commenced these chapter 11 bankruptcy cases through the filing of voluntary

petitions for bankruptcy relief on September 15, 2008, and periodically thereafter (collectively,

the "Petition Dates").

### The D&O Insurance Policies

7.      As the Debtors have explained in previous motions for Comfort Orders, pursuant

to their advancement and indemnification obligations expressed in their by-laws and certificates

of incorporation, the Debtors purchased primary and excess directors and officers liability

insurance, which provides coverage for the Debtors' current and former officers, directors, and

employees in connection with civil, criminal, regulatory and other actions and investigations.

For claims made during the 2007-2008 policy period, the Debtors purchased a primary policy

and sixteen excess policies for total directors' and officers' liability insurance coverage of

$250 million (collectively, the "D&O Policies") from, among others (collectively, the "D&O

Insurers"):  (1) XL Specialty Insurance Company ("XL") (as the primary insurer with limits of

liability of $20 million); (2) Federal Insurance Company (first excess insurer with limits of

$15 million, providing coverage between $20 million and $35 million); (3) Continental Casualty

Company (second excess insurer with limits of $10 million, providing coverage between

$35 million and $45 million); (4) Certain Underwriters at Lloyd's London and London Market

Company (third excess insurer with limits of $10 million, providing coverage between

$45 million and $55 million); (5) U.S. Specialty Insurance Company (fourth excess insurer with

limits of $15 million, providing coverage between $55 million and $70 million); (6) Zurich

American Insurance Company ("Zurich") (fifth excess insurer with limits of $15 million,

providing coverage between $70 million and $85 million); and (7) ACE Bermuda Insurance Ltd.

("ACE Bermuda") (sixth excess insurer with limits of $25 million, providing coverage between

$85 million and $110 million).  The Insured Persons understand that the primary and first

through fourth excess layers of the D&O Policies have been exhausted, and that payments

currently are being made by the fifth excess insurer, Zurich.[3]

8.      The D&O Policies contain a "Priority of Payments Endorsement," which requires

that proceeds must first be used to pay loss incurred by directors and officers and other insured

individuals, before they can be used to pay loss incurred by the Debtors (the "Subordination

Clause").

The FINRA Proceedings

9.      On December 10, 2009, US Airways, a former customer of the Debtors,

commenced a FINRA Proceeding by filing a claim against the Insured Persons relating to the

purchase and sale of certain auction rate securities.  Following over 16 days of evidentiary

hearings and subsequent deliberation, a FINRA arbitration panel entered the Award against the

Insured Persons on May 27, 2011, which is final.[4]  In anticipation of this Motion, by agreement

dated June 23, 2011 between US Airways and the Insured Persons, the date by which payment of

---

[3]      Copies of the primary D&O Policy, together with the Zurich and ACE Bermuda policies
(among others), were attached to the *Debtors' Motion, Pursuant To Section 362 Of The
Bankruptcy Code, For An Order Modifying The Automatic Stay To Allow Advancement
Under (I) 2007-2008 Directors And Individual Defendants Insurance Policies By Zurich
American Insurance Company, Ace Bermuda Insurance Ltd. And St. Paul Mercury
Insurance Company, And (II) 2008-2009 Directors And Individual Defendants Insurance
Policies By XL Specialty Insurance Company And Federal Insurance Company* [Dkt.
No. 12369] (the "Zurich Comfort Motion"), and are incorporated herein by reference.

[4]      Pursuant to Rule 12904(b) of the FINRA Code of Arbitration Procedure, a FINRA award
is "final and not subject to review or appeal."

the Award must be made to US Airways in order to avoid the imposition of various sanctions

under FINRA rules has been extended from June 27, 2011 to August 3, 2011.[5]

10.    Since entry of the Comfort Orders, Zurich has paid the Insured Persons' defense

costs incurred in connection with the FINRA Proceeding.  Neither Zurich nor ACE Bermuda

have stated an intention to dispute coverage of the Award under the D&O Policies and it is the

Insured Persons' belief that they will make payment upon entry of a Comfort Order.

## RELIEF REQUESTED

11.    The Insured Persons hereby request the entry of an order, in substantially the form

attached hereto as <u>Exhibit A</u>, (i) lifting the automatic stay (to the extent it applies) in order to

facilitate and allow payment of the Award under the D&O Policies, and (ii) waiving the

requirements of Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure.[6]

## BASIS FOR THE RELIEF REQUESTED

12.    Through the Comfort Orders, the Court has already granted relief that is similar or

identical to that sought in this Motion.  The basis for those Comfort Orders, as stated by the

Debtors themselves (*e.g.*, Zurich Comfort Motion, ¶¶ 23-30 (proceeds of the D&O Policies are

not property of the estate)), applies equally here.

13.    Section 362(a)(3) of the Bankruptcy Code provides for an automatic stay of any

action seeking to obtain possession or exercise control over property of the bankruptcy estate.  11

---

[5]    All monetary awards are required to be paid within thirty (30) days unless a motion to vacate the award is filed.  Awards that are not paid within thirty days both (i) accrue interest, and (ii) may be grounds for expedited suspension proceedings for a respondent's trading license.  *See* FINRA Code of Arb. Pr. Rules 12904(j) and 9554(a).

[6]    Given that Zurich has been paying the Insured Persons' defense costs for the FINRA proceeding, and that neither Zurich nor ACE Bermuda have expressed any intention to dispute that the Award is covered under the Policies, the Insured Persons do not understand there to be any coverage dispute relating to the Award.  Nevertheless, to be clear, the Insured Persons are *not* seeking a determination by this Court that the Award must be paid under the D&O Policies.  To the extent the D&O Insurers may at some point dispute coverage, the relief requested herein will merely allow the parties to address that dispute in an appropriate forum under applicable non-bankruptcy law without any question that such action would violate the automatic stay.

U.S.C. § 362(a)(3). Although insurance policies maintained by a debtor generally are considered property of the estate and subject to the automatic stay, courts recognize that property of the estate does *not* include insurance *proceeds* which are payable solely to a third party (such as payments to officers and directors under an executive insurance policy). *See, e.g., In re Adelphia Communications Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003) (insurance proceeds not property of the estate in the absence of any suggestion that debtors were entitled to indemnification rights under the policy); *In re Allied Digital Techs., Corp.*, 306 B.R. 505, 510 (Bankr. D. Del. 2004) (proceeds of a directors' and officers' insurance policy not property of the estate where the debtor's indemnification rights were speculative and direct coverage under the policy was hypothetical); *In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) (insurance proceeds not property of the estate where the debtors did not have indemnification rights).

14.     Whether a debtor has tangible rights under an insurance policy, which could bring policy proceeds into the bankruptcy estate, depends largely on the "language and scope of the policy at issue." *Allied Digital*, 306 B.R. at 509. Here, the Subordination Clauses in the D&O Policies subordinates any potential rights of the Debtors to proceeds payable to other beneficiaries, including the Insured Persons.

15.     The Subordination Clauses are enforceable contractual provisions intended to benefit the Insured Persons. *See In re Enron Corp.*, Bankr. No. 01-16034 (Bankr. S.D.N.Y. Apr. 11, 2002) [Dkt. No. 3278] (holding that priority of payment provisions are enforceable contractual rights). Because the Debtors purchased the D&O Policies primarily to provide insurance coverage to their officers and directors, including the Insured Persons, any rights the Debtor may have in residual proceeds is speculative. Thus, the proceeds of the D&O Policies are not property of the estate and are not subject to the automatic stay.

16.     Even if the proceeds of the D&O Policies were to be determined to be property of the estate, cause exists under section 362(d)(1) of the Bankruptcy Code to modify the automatic stay to allow payment of the Award.  Lifting the automatic would not harm the estate because, under the Subordination Clause in the D&O Policies, any rights the Debtor might have to the proceeds of the D&O Policies are contractually subordinated to the Insured Persons' rights to such proceeds.

17.     In sum, the Insured Persons submit that the automatic stay in these cases does not apply to payment of the Award under the D&O Policies.  Alternatively, if this Court were to find that the Debtor has some interest in the proceeds of the D&O Policies, the Insured Persons submit that any such interest is nominal only and cause exists to lift the automatic stay pursuant to section 362(d) of the Bankruptcy Code to allow the D&O Insurers to pay the Award.

## WAIVER OF BANKRUPTCY RULE 4001(A)(3)

18.     In light of the impending deadline for the Insured Persons to satisfy the Award, the Insured Persons request that the order granting this Motion be made effective immediately.

## NOTICE

19.     No trustee has been appointed in these cases.  Concurrently with the filing of this Motion, pursuant to the *Second Amended Order Pursuant To Section 105(a) Of The Bankruptcy Code And Bankruptcy Rules 1015(c) And 9007 Implementing Certain Notice And Case Management Procedures* [Dkt. No. 9635], the Insured Persons are serving notice of this Motion on (1) counsel for the Debtors; (2) the United States Trustee; (3) counsel for the Official Committee of Unsecured Creditors; (4) the Securities and Exchange Commission; (5) the Internal Revenue Service; (6) the United States Attorney for the Southern District of New York; (7) all parties who have requested notice in these chapter 11 cases; and (8) counsel for each of

8

the D&O Insurers from whom payment for the Award is sought.  The Insured Persons submit

that no other or further notice is required.

WHEREFORE, the Insured Persons respectfully request that the Court grant the relief

requested herein and enter an order in substantially the form of the proposed order attached

hereto as Exhibit A.

Dated:  June 29, 2011  
New York, New York

          */s/ Lisa G. Laukitis*

Lisa G. Laukitis  
JONES DAY  
222 East 41st Street  
New York, New York 10017  
Telephone:     (212) 326-3939  
Facsimile:     (212) 755-7306

Counsel for the Insured Persons

**EXHIBIT A**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Lisa G. Laukitis

-and-

555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
Philip E. Cook

*Attorneys for Roland Hansalik, George Barclay Perry,*
*and Joseph Arena*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Lehman Brothers Holdings Inc., *et al.*,, | Case No. 08-13555 (JMP) |
| Debtors. | Jointly Administered |

**ORDER, PURSUANT TO SECTION 362 OF THE BANKRUPTCY
CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY
TO ALLOW PAYMENT OF A JUDGMENT UNDER THE DIRECTORS
AND OFFICERS INSURANCE POLICIES ISSUED TO THE DEBTORS**

Upon the motion, dated June 29, 2011 (the "Motion") of Roland Hansalik, George

Barclay Perry and Joseph Arena (collectively, the "Insured Persons"), pursuant to section 362(d)

of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001(a)(3) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order modifying the automatic

stay (to the extent applicable and necessary) to allow payment of an award entered by an

arbitration panel appointed by the Financial Industry Regulatory Authority against the Insured

Persons for $15.0 million (the "Award") under the directors' and officers' liability insurance

1

policies issued to the Debtors for claims made during the 2007-2008 policy period (collectively,

the "D&O Policies"); upon finding that the Court has jurisdiction to consider the Motion and

grant the relief requested therein pursuant to 28 U.S.C. §§ 157(b) and 1334; upon finding that

notice of the Motion was appropriate in all respects; upon consideration of the Motion and any

objections thereto, and just cause appearing;

**IT IS HEREBY ORDERED AS FOLLOWS**:

1.      The Motion is GRANTED;

2.      Pursuant to sections 105(a), 362(a), and 362(d) of the Bankruptcy Code, the

automatic stay, to the extent applicable, is hereby modified and/or lifted to allow the Insured

Persons to seek and obtain, and to allow the insurance carriers for the D&O Policies (including

without limitation Zurich American Insurance Company and ACE Bermuda Insurance Ltd.)

(collectively, the "D&O Insurers") to pay, without further order of the Court, the Award under

the D&O Policies.

3.      Nothing in this Order shall modify, alter or accelerate the rights and obligations of

the D&O Insurers, the Debtors, or the Insured Persons provided for under the terms and

conditions of the D&O Policies.

4.      Nothing in this Order shall constitute a determination that the proceeds of the

D&O Policies are property of the Debtors' estate, and the rights of all parties in interest to assert

that the proceeds of the D&O Policies are, or are not, property of the Debtors' estates are hereby

preserved.

5.      This Order shall be effective immediately; the fourteen-day stay provided under

Bankruptcy Rule 4001(a)(3) is hereby waived.

6.       This Court shall retain jurisdiction over all matters arising from or relating to

implementation of this Order.

Dated:  July __, 2011
New York, New York                          _____
                                            HONORABLE JAMES M. PECK
                                            UNITED STATES BANKRUPTCY JUDGE

NYI-4382304v3

**Exhibit F**

28

Hearing Date:  July 20, 2011 at 10:00 a.m.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                                    :    **Chapter 11 Case No.**
                                                                         :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
                                                                         :
                                    **Debtors.**                         :    **(Jointly Administered)**
------------------------------------------------------------------x

**STATEMENT OF LEHMAN BROTHERS HOLDINGS INC.**
**IN SUPPORT OF MOTION OF ROLAND HANSALIK, GEORGE**
**BARCLAY PERRY AND JOSEPH ARENA FOR AN ORDER MODIFYING**
**THE AUTOMATIC STAY TO ALLOW PAYMENT OF A JUDGMENT UNDER THE**
**DIRECTORS AND OFFICERS INSURANCE POLICIES ISSUED TO THE DEBTORS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively,

the "Debtors") in the above-captioned cases under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"), by and through its undersigned counsel, hereby files this

statement (the "Statement") in support of the motion, dated June 29, 2011 (the "Motion") of

Roland Hansalik, George Barclay Perry and Joseph Arena (collectively, the "Insured Persons"),

pursuant to section 362(d) of the Bankruptcy Code and rule 4001(a)(3) of the Federal Rules of

Bankruptcy Procedure, for an order modifying the automatic stay (to the extent applicable and

necessary) to allow payment of an award entered by an arbitration panel appointed by the

Financial Industry Regulatory Authority against the Insured Persons for $15 million (the

"Award") under the directors' and officers' liability insurance policies issued to the Debtors for

claims made during the 2007-2008 policy period (collectively, the "D&O Policies") [ECF No. 18157], respectfully represent:

## STATEMENT

1.      By the Motion, the Insured Persons seek relief from the automatic stay extant pursuant to section 362 of the Bankruptcy Code for the limited purpose of allowing, though not requiring, payment of the Award under the D&O Policies.  The Debtors have sought relief similar to the relief sought in the Motion on a number of occasions and have no objection to a modification of the automatic stay to the extent necessary to allow for said payment.

2.      The Debtors, however, do find it necessary to correct a misstatement contained in the Motion.  The misstatement, which occurs in paragraph 9 of the Motion, indicates that U.S. Airways, Inc. ("U.S. Air") was a customer of the Debtors.  The Debtors deny that  U.S. Air was a customer of, or has any valid and/or allowable claims against, any of the Debtors.

3.      Lastly, the Debtors have discussed with counsel for the Insured Parties certain issues regarding the form of the proposed order submitted with the Motion and counsel for the Insured Parties has agreed to submit a revised form of order addressing the Debtors' concerns.  The Debtors reserve their rights to supplement or amend this Statement in the event that a satisfactory revised form of order is not submitted to the Court.

WHEREFORE, subject to the foregoing, the Debtors have no objection to the

Court granting the relief requested in Motion and granting such other and further relief as is just.

Dated:  July 13, 2011
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Exhibit G**

US_ACTIVE:\44149287\9\58399.0011

Hearing Date and Time:  July 20, 2011 at 10:00 a.m. (Prevailing Eastern Time)

Steven K. Davidson (admitted pro hac vice)
George R. Calhoun V (admitted pro hac vice)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue
Washington, DC  20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

Evan Glassman
STEPTOE & JOHNSON LLP
750 Seventh Avenue
New York, New York 10019
Telephone:  (212) 506-3900
Facsimile: (212) 506-3950

*Attorneys for US Airways, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
|                                          | :  |                            |
| In re                                    | :  | Chapter 11 Case No.        |
|                                          | :  |                            |
| LEHMAN BROTHERS HOLDINGS INC., *et al*., | :  | 08-13555 (JMP)             |
|                                          | :  |                            |
| Debtors.                                 | :  | (Jointly Administered)     |
|                                          | :  |                            |
|                                          | :  |                            |
-------------------------------------------------------------x

### REPLY IN SUPPORT OF MOTION OF ROLAND HANSALIK, GEORGE BARCLAY PERRY AND JOSEPH ARENA FOR AN ORDER MODIFYING THE AUTOMATIC STAY TO ALLOW PAYMENT OF A JUDGMENT UNDER THE <u>DIRECTORS AND OFFICERS INSURANCE POLICIES ISSUED TO THE DEBTORS</u>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

US Airways, Inc. ("US Airways"), through counsel, hereby files this reply in support of

the motion of Roland Hansalik, George Barclay Perry and Joseph Arena (collectively, the

"Insured Persons"), pursuant to section 362(d) of the Bankruptcy Code and rule 4001(a)(3) of the

Federal Rules of Bankruptcy Procedure, for an order modifying the automatic stay (to the extent

1

applicable and necessary) to allow payment of an award entered by an arbitration panel

appointed by the Financial Industry Regulatory Authority ("FINRA") against the Insured

Persons for $15 million (the "Award") under the directors' and officers' liability insurance

policies issued to the Debtors for claims made during the 2007-2008 policy period (collectively,

the "D&O Policies"), dated June 29, 2011 (ECF No. 18157) (the "Motion").

By way of background and as is explained in more detail in the Motion at 2-3, US

Airways obtained the Award in the FINRA proceeding against the Insured Persons.  US

Airways, thus, supports the Motion for all of the reasons articulated therein and respectfully

requests entry of an order lifting the automatic stay (to the extent it applies) to allow payment of

the Award under the D&O Policies.  US Airways also supports the Insured Persons' request that

the Court waive the requirements of Rule 4001(a)(3) of the Federal Rules of Bankruptcy

Procedure.

US Airways, through counsel, will appear at the July 20, 2011 hearing to answer any

questions the Court may have.   For the foregoing reasons, US Airways respectfully requests that

the Court grant the Motion.


Dated:    New York, New York                    Respectfully submitted,
          July 18, 2011


                                                **STEPTOE & JOHNSON LLP**


                                                By:    /s/ EVAN GLASSMAN
                                                Steven K. Davidson (admitted *pro hac vice*)
                                                George R. Calhoun V (admitted *pro hac vice*)
                                                STEPTOE & JOHNSON LLP
                                                1330 Connecticut Avenue
                                                Washington, DC  20036
                                                Telephone:  (202) 429-3000
                                                Facsimile:  (202) 429-3902

2

Evan Glassman
STEPTOE & JOHNSON LLP
750 Seventh Avenue
New York, New York 10019
Telephone:  (212) 506-3900
Facsimile: (212) 506-3950

*Attorneys for US Airways, Inc.*

**Exhibit H**

US_ACTIVE:\44149287\9\58399.0011

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Lisa G. Laukitis

-and-

555 South Flower Street, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539
Philip E. Cook

*Attorneys for Roland Hansalik, George Barclay Perry,
and Joseph Arena*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **Lehman Brothers Holdings Inc.,** *et al.*, | ) | **Case No. 08-13555 (JMP)** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |
| | ) | |

**ORDER, PURSUANT TO SECTION 362 OF THE BANKRUPTCY
CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE, FOR AN ORDER MODIFYING THE AUTOMATIC STAY
TO ALLOW PAYMENT OF A JUDGMENT UNDER THE DIRECTORS
AND OFFICERS INSURANCE POLICIES ISSUED TO THE DEBTORS**

Upon the motion, dated June 29, 2011 (the "Motion") of Roland Hansalik, George

Barclay Perry and Joseph Arena (collectively, the "Insured Persons"), pursuant to section 362(d)

of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001(a)(3) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order modifying the automatic

stay (to the extent applicable and necessary) to allow payment of an award entered by an

arbitration panel appointed by the Financial Industry Regulatory Authority against the Insured

Persons for $15.0 million (the "Award") under the directors' and officers' liability insurance policies issued to the Debtors for claims made during the 2007-2008 policy period (collectively, the "D&O Policies"); upon finding that the Court has jurisdiction to consider the Motion and grant the relief requested therein pursuant to 28 U.S.C. §§ 157(b) and 1334; upon finding that notice of the Motion was appropriate in all respects; upon consideration of the Motion and any objections thereto, and just cause appearing;

## IT IS HEREBY ORDERED AS FOLLOWS:

1.     The Motion, as modified herein, is GRANTED;

2.     Pursuant to sections 105(a), 362(a), and 362(d) of the Bankruptcy Code, the automatic stay, to the extent applicable, is hereby modified and/or lifted to allow the Insured Persons to seek and obtain, and to allow the insurance carriers for the D&O Policies (including without limitation Zurich American Insurance Company and ACE Bermuda Insurance Ltd.) (collectively, the "D&O Insurers") to pay, without further order of the Court, the Award under the D&O Policies.

3.     Nothing in this Order shall modify, alter or accelerate the rights and obligations of the D&O Insurers, the Debtors, or the Insured Persons provided for under the terms and conditions of the D&O Policies.  All rights and defenses that the parties to the D&O Policies would otherwise have are reserved.

4.     Nothing in this Order shall constitute a determination that the proceeds of the D&O Policies are property of the Debtors' estate, and the rights of all parties in interest to assert that the proceeds of the D&O Policies are, or are not, property of the Debtors' estates are hereby preserved.

5.        Nothing contained herein may be deemed to be, or construed as, a determination

regarding:  (a) the existence of any connection or relationship between U.S. Airways, Inc. or any

of its affiliates (collectively, "US Airways") and any of the Debtors, (b) the validity or

enforceability of any claim or cause of action asserted by US Airways against any of the

Debtors, or (c) any other matter involving US Airways and the Debtors, and all rights of the

Debtors to object to, or otherwise contest, any claim or cause of action asserted by US Airways

against the Debtors for any reason are expressly reserved.

6.        This Order shall be effective immediately; the fourteen-day stay provided under

Bankruptcy Rule 4001(a)(3) is hereby waived.

7.        This Court shall retain jurisdiction over all matters arising from or relating to

implementation of this Order.


Dated: New York, New York
        July 21, 2011

                                    _____s/ James M. Peck_____
                                    HONORABLE JAMES M. PECK
                                    UNITED STATES BANKRUPTCY JUDGE

**<u>Proposed Order</u>**

US_ACTIVE:\44149287\9\58399.0011

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                  :
In re                                             :        Chapter 11 Case No.
                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,          :        08-13555 (JMP)
                                                  :
                        Debtors.                  :        (Jointly Administered)
                                                  :
------------------------------------------------------------------x

### ORDER PURSUANT TO SECTION 8.4 OF THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS TO ESTIMATE THE AMOUNT OF PROOF OF CLAIM NUMBER 30598 FILED BY US AIRWAYS, INC. FOR PURPOSES OF ESTABLISHING RESERVES

Upon the motion (the "Motion") dated January 15, 2013, of Lehman Brothers

Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan Administrator under the Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors (the "Plan"), for approval, pursuant to sections 8.4 of the Plan, and sections 105(a),

502(c), and 1142(b) of title 11 of the United States Code (the "Bankruptcy Code"), to estimate

the amount of the US Airways Claim[1] for the purposes of establishing reserves in connection

with the  Plan, as more fully described in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska,

C.J.); and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

United States Trustee for Region 2; (ii) the Securities and Exchange Commission; (iii) the

Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York;

(v) US Airways; and (vi) all other parties entitled to notice in accordance with the procedures set

forth in the second amended order entered on June 17, 2010 governing case management and

administrative procedures for these cases [ECF No. 9635]; and it appearing that no other or

further notice need be provided; and a hearing having been held to consider the relief requested

in the Motion; and the Court having found and determined that the relief sought in the Motion is

in the best interests of the Chapter 11 Estates, their creditors, and all parties in interest and that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the US Airways Claim is hereby estimated in the amount of

$91.2 million in LBHI Class 7 solely for purposes of determining the reserves to be set for the

US Airways Claim under the Plan; and it is further

ORDERED that the estimation of the US Airways Claim is not deemed to

determine or affect in any respect the allowed amount of the US Airways Claim for any purpose

other than establishing the reserve amount for the US Airways Claim under the Plan; and it is

further

ORDERED that the estimation of the US Airways Claim is without prejudice to

the rights of US Airways to assert that the allowed amount of the US Airways Claim should be

greater than the Estimated Reserve Amount; and it is further

ORDERED that the estimation of the US Airways Claim is without prejudice to

the rights defenses and objections of LBHI or the Plan Administrator (as defined in the Plan) to

2

the merits, amount and priority of the US Airways Claim and that by estimating the US Airways

Claim, all rights of LBHI and the Plan Administrator with respect to the US Airways Claim are

fully preserved; and it is further

        ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated:  New York, New York
        _____, 2013

 

                                _____
                                Honorable James M. Peck
                                United States Bankruptcy Judge

3

US_ACTIVE:\44149287\9\58399.0011