WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| In re                                       | : | Chapter 11 Case No.     |
|                                             | : |                         |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,| : | 08-13555 (JMP)          |
|                                             | : |                         |
| Debtors.                                    | : | (Jointly Administered)  |
------------------------------------------------------------------x

**REPLY TO RESPONSE OF SPANISH BROADCASTING
AND IN FURTHER SUPPORT OF THE THREE HUNDRED
TWENTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

    Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan") for the entities in the above-referenced chapter 11 cases (the "Chapter 11 Estates"), submits this reply (the "Reply") to the response (the "Response") filed by Spanish Broadcasting System Inc. ("Spanish Broadcasting") to the Three Hundred Twenty-Eighth Omnibus Objection to Claims (the "Objection") [ECF No. 29323], to Claim No. 67707 (the "Claim") filed against Lehman Commercial Paper Inc. ("LCPI"), and in further support of its Objection, respectfully represents:

US_ACTIVE:\44138905\15\58399.0011

## The Court Should Overrule the
## Response and Disallow and Expunge the Claim

1.  Spanish Broadcasting does not have any valid claims against LCPI, other than, perhaps, a *de minimis* claim for certain commitment fees. The Claim seeks over $55 million in damages, including the decline in Spanish Broadcasting's total invested capital and alleged losses in connection with a swap agreement. These claims allegedly arose following LCPI's failure to honor a $10 million draw request in connection with a $350 million credit agreement. Spanish Broadcasting has failed to establish any causal link between LCPI's alleged actions and the claimed damages. Even if causation could be established, the Credit Agreement[1] contains an enforceable waiver of consequential damages. And although direct damages may be available in the event a lender breaches an agreement to extend credit, such damages are limited to the incremental cost associated with obtaining a replacement loan. In *Avalon Const. Corp. v. Kirch Holding Co.*, 256 N.Y. 137, 142 (N.Y. 1931), the New York Court of Appeals has held that "[t]he utmost liability of a person who breaches his contract to loan money, in the absence of notice of special circumstances, is for the increased interest the other person was obliged to pay." (citation omitted). Although the Claim asserts Alleged Replacement Capital Damages, Spanish Broadcasting has not stated that it received or even sought a replacement loan and fails to address this element of the Claim in the Response. As such, Spanish Broadcasting has not established that it suffered any direct damages. The Court should disallow and expunge the Claim, except to the extent of $13,334, for the reasons set forth in the Objection and herein.

2.  The evidentiary hearing requested by Spanish Broadcasting as to whether the Alleged Capital Loss Damages and the Alleged Swap Termination Damages are direct or consequential damages is premature, at best. New York law clearly provides that the appropriate

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection.

measure of direct damages resulting from the breach of a contract to loan money is the cost of replacement financing. Because the Alleged Capital Loss Damages and the Alleged Swap Termination Damages are not the appropriate measure of damages and Spanish Broadcasting has failed to provide any evidence of causation between LCPI's failure to fund a loan commitment and such alleged losses, the Court should determine that such claims are unrecoverable as a matter of law, which would obviate an evidentiary hearing. Even if the Court determines that an evidentiary hearing is appropriate, any such hearing should not take place until after the Court determines whether the waiver of consequential damages is enforceable. Resolution of this threshold issue will inform the evidentiary hearing and the nature of the discovery undertaken in connection therewith. A determination by this Court as to the enforceability of the waiver of consequential damages would result in a more efficient and expeditious conclusion of this dispute, whether by litigation, mediation or negotiation.

**A. Spanish Broadcasting's Waiver of Consequential Damages Is Enforceable.**

3. Outside of a bankruptcy context, in the event of a breach by LCPI, Spanish Broadcasting would be bound by the waiver of consequential damages explicitly set forth in section 10.12(e) of the Credit Agreement, which provides that Spanish Broadcasting "irrevocably and unconditionally:"

> waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred in this Section any special, exemplary, punitive or consequential damages.

In *Tradex Europe SPRL v. Conair Corp.*, No. 1760, 2008 WL 1990464 (S.D.N.Y. May 7, 2008), the court held that a waiver of consequential damages in a consultancy agreement is enforceable and granted summary judgment in favor of defendant with respect to plaintiff's breach of

contract claim for consequential damages. The *Tradex* court summarized New York law, as follows:

> Under New York law, contractual provisions limiting a party's liability are generally enforceable. *See Metropolitan Life Ins. Co. v. Nobel Lowndes Int'l Inc.*, 643 N.E.2d 504, 507 (N.Y. 1994) ("A limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor.") (citing 5 Corbin, CORBIN ON CONTRACTS § 1068, at 386 (1964)). . .
>
> Where, as here, sophisticated parties, represented by counsel, have voluntarily entered into contracts containing limitation on liability provisions, a court may set aside the provisions only where defendant's conduct constitutes "egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts."

*Id.* at *3 (citations omitted); *see also Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F.Supp.2d 436, 456 (S.D.N.Y. 2003) (upholding waiver of consequential damages in contract governed by New York law); *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 318 (S.D.N.Y. 2002) (enforcing waiver of consequential damages in contract governed by New York law and finding that the parties "unambiguously provided the limit of recovery in the event of breach, and I may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery."); *Metro. Life Ins. Co. v. Nobel Lowndes Int'l Inc.*, 643 N.E.2d 504, 509 (N.Y.1994) (finding plaintiff assumed risk of consequential damages arising from defendant's repudiation of a health insurance contract that "was motivated exclusively by its own economic self-interest in divesting itself of a highly unprofitable business undertaking . . ."); *Metro. Capital Funding, LLC v. Nomura Credit & Capital, Inc.*, No. 603959-07, 2009 WL 416071 (N.Y. Sup. Ct. Feb. 9, 2009) (enforcing waiver of consequential damages and holding

4

that plaintiff could not recover consequential damages from counterparty even if it breached repurchase agreement).

4. In an effort to avoid the plain meaning of the Credit Agreement, Spanish Broadcasting incorrectly asserts that LCPI rejected the Credit Agreement and that rejection of the Credit Agreement vitiated the waiver of consequential damages. Spanish Broadcasting's argument is based on a faulty premise. In fact, the Credit Agreement was not rejected.

5. Section 11.1 of the Plan provides that "all executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date. . ." Spanish Broadcasting and LCPI entered into a payoff letter, effective February 7, 2012, that terminated the Credit Agreement. The termination of the Credit Agreement occurred before March 6, 2012, which was the Effective Date of the Plan. Consequently, the Credit Agreement was not rejected on the Effective Date.

6. Moreover, even if the Credit Agreement was rejected, the waiver of consequential damages provision would still be enforceable. There is a long and well-established line of cases holding that rejection of an executory contract does not nullify the entire contract. For example, in *In re Lavigne*, 114 F.3d 379 (2d Cir. 1997), the Court of Appeals for the Second Circuit held that a debtor could enforce a provision of a rejected executory contract that provided the debtor with a 60-day option to purchase additional insurance coverage. The Court held that "[w]hile rejection is treated as a breach, it does not completely terminate the contract." *Id.* at 386-87. The Court stated that rejection "frees the estate from the obligation to perform," but it "does not make the contract disappear." *Id*. at 387 (citations omitted). Inasmuch as the debtor could have cancelled the policy and obtained the tail coverage, the court determined

5

that "the rejection-breach, which simply cancelled the existing coverage, did not defeat the purpose of the contract." *Id.* at 388.

7. Similarly, in *Megafoods Stores, Inc. v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.)*, 60 F.3d 1031, 1034 (3rd Cir. 1995) a debtor-landlord rejected a lease that contained a damages clause that allowed the tenant to pay reduced rent upon a breach by the landlord. The court stated that "'[r]ejection does not alter the substantive rights of the parties to the lease,' and thus does not alter the continuing vitality of terms affecting the amount of rent . . ." *Id.* at 1034 (quoting *Chestnut Ridge Plaza Assocs., L.P. v. Fox Grocery Co. (In re Chestnut Ridge Plaza Assocs., L.P.)*, 156 B.R. 477, 483 (Bankr. W.D. Pa. 1993)). The court held: "Thus, although the rejection of the lease by the debtor-landlord relieves it of prospective obligations to perform under the lease, it does not relieve it of its obligation to accept the agreed upon reduced rent provided for under the terms of the lease." *Id.*

8. In *A&L Labs., Inc. v. Bou-Matic LLC*, 429 F.3d 775 (8th Cir. 2005), a debtor rejected a purchase agreement and a postpetition amendment to such agreement, which contained a damages clause that entitled the non-breaching party to certain licenses upon the debtor's breach. The court of appeals affirmed the district court's decision that rejection of the postpetition amendment constituted a breach, and thus the damages provision was enforceable against the debtor. *Id.* at 778-79. "Section 365(g) treats a rejection as a breach to ensure that the non-debtor will have a claim against the debtor. It does not determine the rights of parties regarding the contract." *Id.* at 779; *see also Sir Speedy, Inc. v. Morse*, 256 B.R. 657, 660 (D. Mass. 2000) (upholding a covenant not to compete after rejection because "the very purpose of the covenant is to govern the relationship between the parties after the demise of the underlying contract."); *Madison Foods, Inc. v. Fleming Cos., Inc. (In re Fleming Cos., Inc.),* 325 B.R. 687,

6

693 (Bankr. D. Del. 2005) (upholding an arbitration clause in a rejected executory contract because "[t]o allow a party to avoid arbitration by simply terminating the contract would render arbitration clauses illusory and meaningless . . ." (quoting *Southeastern Pennsylvania Transp. Auth. v. AWS Remediation, Inc.*, No. 03-695, 2003 WL 21994811, *3 (E.D. Pa. Aug. 18, 2003))).

9. As the foregoing authorities demonstrate, even if the Credit Agreement had been rejected, Spanish Broadcasting's waiver of consequential damages would remain enforceable. A rejection of the Credit Agreement might constitute a breach, but it does not alter the substantive rights of the parties to the Credit Agreement and does not alter the continuing efficacy of the waiver of consequential damages. The very purpose of the waiver of consequential damages is to govern the relationship between the parties in the event of a breach. To relieve Spanish Broadcasting from its waiver of consequential damages due to the alleged breach would render the waiver of consequential damages meaningless.

**B. The Available Remedies Do Not Fail of Their Essential Purpose.**

10. Spanish Broadcasting correctly concludes that if the damages it allegedly suffered are not direct damages and if consequential damages have been waived, then it is unable to recover on account of its alleged damages under the Credit Agreement. Response ¶ 27. Spanish Broadcasting then argues that because it may be unable to recover damages under the Credit Agreement, the Credit Agreement "fails of its essential purpose" and the consequential damages waiver must be rendered unenforceable. *Id.* ¶ 28.

11. The doctrine of "failure of essential purpose" is found in Article 2-719(2) of the Uniform Commercial Code, which is applicable to the sale of goods and not to the instant matter. The authorities cited in the Response fail to demonstrate that the doctrine of "failure of essential purpose" applies beyond the context of the sale of goods. Response ¶ 29.

7

12. Article 2-719(2) provides: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."[2] Even if this provision were applicable, the remedies available under the Credit Agreement are not "exclusive or limited." New York law establishes that the increased cost of replacement financing is recoverable by a borrower in the event a lender breaches an agreement to extend credit. *Avalon Const. Corp. v. Kirch Holding Co.*, 256 N.Y. 137 (N.Y. 1931). Spanish Broadcasting has not established that it experienced any of the direct damages recoverable under New York law. Spanish Broadcasting's failure to suffer damages and/or its failure to prove recoverable damages does not constitute a "failure of essential purpose."

**C. The Alleged Capital Loss Damages And The Alleged Swap Termination Damages Are, At Best, Consequential Damages That Have Been Waived.**

13. "In an action for breach of contract, a plaintiff may seek two distinct categories of damages: (1) 'general' or 'market' damages; and (2) 'special' or 'consequential' damages." *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000)). "A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'" *Id*. (citations omitted). "'Special' or 'consequential' damages, on the other hand, seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Id.* at 176; *see also Am. List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 42-43 (N.Y. 1989) (General damages are those which are the "natural and probable consequence of the breach," while special damages are "extraordinary in that they do not so directly flow from the breach.").

14. Courts have defined consequential damages as "damages not arising 'within the scope' of plaintiff's transactions with defendant, but resulting in a foreseeable way

---

[2] Notably, Article 2-719(3) explicitly permits waiver of consequential damages.

from losses incurred by plaintiff because of defendant's breach." *Enron Wind Energy Sys., LLC v. Marathon Elec. Mfg. Corp. (In re Enron Corp.)*, 367 B.R. 384, 408 (Bankr. S.D.N.Y. 2007) (quoting *R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.*, 945 F.2d 269, 274 (9th Cir. 1991)). "[A]s with all consequential damages, a plaintiff must prove that liability for the loss of the asset was within the contemplation of the parties at the time the contract was made, and the asset's value should be proven with reasonable certainty." *Schonfeld*, 218 F.3d at 177; *see also American List*, 75 N.Y.2d at 43 (Special damages are recoverable "only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made."). Moreover, special or consequential damages are not available where, as here, the parties specifically waived consequential damages. *See In re Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,* 643 N.E.2d 504 (N.Y. 1994) (enforcing a limitation of liability provision in a contract).

15. "The distinction between general and special contract damages is well defined but its application to specific contracts and controversies is usually more elusive." *See American List*, 75 N.Y.2d at 42. Whether damages are direct or consequential is dependent upon the type of contract that was breached.

16. In New York, the case law is clear that the proper measure of direct damages in the case of a breach of contract to pay money is the incremental cost of alternate financing and that all other types of damages are, at best, unrecoverable consequential damages. The New York Court of Appeals has held that "[t]he utmost liability of a person who breaches his contract to loan money, in the absence of notice of special circumstances, is for the increased interest the other person was obliged to pay." *Avalon Const. Corp. v. Kirch Holding Co.*, 256 N.Y. 137, 142 (N.Y. 1931) (citation omitted). In the event that a replacement loan is not

9

obtained at a higher interest rate, the borrower suffers no damage. *Id.* at 141-43 ("[A]ll authority supports the conclusion that a breach of contract to make a loan, standing by itself, involves no legal damage. . .The borrower may go into the market the next day after the breach, and get the money without incurring any loss, or he may not be able to get it without suffering a loss, in which case the measure of the damages is the loss he suffers.") (citation omitted); *see also Bond Street Knitters, Inc. v. Peninsula Nat'l Bank*, 266 A.D. 503, 504 (N.Y. App. Div. 1943).

17. Despite the case law set forth above to the contrary, Spanish Broadcasting argues that the Alleged Capital Loss Damages and the Alleged Swap Termination Damages are direct damages resulting from LCPI's failure to fund a draw request. In particular, Spanish Broadcasting argues that the Alleged Capital Loss Damages are "diminution in value damages," which are direct damages. *See* Response ¶ 17. The Response incorrectly assumes that diminution in the value of an asset — regardless of the subject matter of the contract — always constitutes a direct damage resulting from a breach of contract. The cases and authorities upon which Spanish Broadcasting relies have the same fatal flaw — they do not involve damages stemming from a lender's breach of an agreement to loan money for general corporate purposes.

18. In support of its argument that diminution of value of an asset constitutes direct damages, Spanish Broadcasting relies on *Latham Land I, LLC v. TGI Friday's, Inc.*, 96 A.D.3d 1327, 1332 (N.Y. App. Div. 2012), a case in which a lessor sought damages against a lessee that had breached a contract to build and operate a restaurant on the leased premises for a period of at least ten years. Following the lessee's breach, the lessor mitigated its damages by selling the land, without the benefit of the lease. The court held that the proper measure of damages was the difference between the value of the property with the lease in place, calculated using the contractual rent, and the value that the lessor received for the sale of the property,

10

without the lease in place. *Id.* at 1331.  In *Latham*, the court measured the "diminution in value damages" based on the subject matter of the breached contract, *i.e.*, the contract to build and operate a restaurant, and referred to the contractual terms of the breached lease to quantify such damages.  As a preliminary matter, *Latham* is distinguishable from the instant case because it did not involve a financing commitment.  Furthermore, whereas the measure of damages in *Latham* referred to the subject matter of the breached contract, *i.e.*, the leased property, the Alleged Capital Loss Damages are entirely unrelated to a failure to fund a draw request.  *T. Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329 (2d Cir. 2010), also cited in the Response, applies the Uniform Commercial Code to the damages that arose when a buyer was delivered defective steel pipe.  The court in *T. Co. Metals* held that an arbitrator did not act in "manifest disregard of the law" when it awarded diminution in value damages.  *Id.* at 341.  The nature of damages arising from the breach of a sale agreement is fundamentally different than the damages arising from the failure to extend credit. [3]

19.    Spanish Broadcasting also relies upon *Fed. Deposit Ins. Corp. v. Parkway Exec. Office Ctr.*, No. 96–121, 1998 WL 18204, at *6 (E.D. Pa. Jan. 9, 1998), an unreported case outside of this jurisdiction, in which the court denied a motion *in limine* to exclude certain evidence relating to the difference in the value of a building with and without a construction loan in place.  In *Parkway*, a lender under federal receivership repudiated the undisbursed balance of a construction loan.  Relevant to determination of the motion *in limine* was whether, under the Financial Institutions Reform and Recovery Act, the diminution in the building's value

---

[3] Spanish Broadcasting's preposterous effort to rely on an article authored by Glenn D. West and Sara G. Duran, *Reassessing the "Consequences" of Consequential Damage Waivers in Acquisition Agreements*, 63 Bus. Law. 777, 806 (May 2008) is futile.  The article provides drafting advice to corporate attorneys in the mergers and acquisitions context.  This article is not applicable to damages arising from the failure to extend credit and contains a much more extensive and complicated discussion than the sound bite cited by Spanish Broadcasting.

11

constituted actual direct compensatory damages. *Parkway* is inapposite because the loan in question was obtained for the specific purpose of funding construction of a building, so that the difference between the value of the mortgaged building with the loans in place and without the funding could be an appropriate measure of the direct damages. *Id.* at *1; *see also In re Miraj and Sons, Inc.*, 192 B.R. 297, 312 (Bankr. D. Mass. 1996) (holding that difference in value of condominium units with or without financing promised by bank was appropriate measure of damages). In contrast, Section 4.16(b) of the Credit Agreement provides that the proceeds of the revolving credit facility "shall be used for working capital purposes, capital needs and general corporate purposes of the Borrower and its Subsidiaries . . . ."

20. In this case, the Alleged Capital Loss Damage and the Alleged Swap Termination Damage are wholly unrelated to the working capital financing provided by LCPI to Spanish Broadcasting. Rather, the damages sought by Spanish Broadcasting resemble the claims made for consequential damages in cases involving the failure of banks to advance funds.

21. For example, in *Central Coordinates, Inc. v. Morgan Guar. Trust Co.*, 494 N.Y.S.2d 602 (N.Y. Sup. Ct. 1985), the court dismissed a claim for consequential damages arising from a bank's failure to transfer funds upon request for the purpose of exercising stock options prior to the option's expiration. The court delineated the difference between direct and consequential damages:

> A bank's failure to transfer funds as requested or in a reasonably prompt manner can result in direct or general damages (e.g. the loss of the funds themselves, the interest thereon and any fee paid for the failed transfer); or consequential or special damages, here, the profits alleged to have been lost with the loss of the [stock] option.

*Id.* at 806 (citations omitted); *see also Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir. 1985), *cert. den.* 459 U.S. 1017 (holding bank's failure to wire funds, resulting in the

12

cancellation of plaintiff's advantageous contract, did not render it liable to plaintiff for consequential damages). In *Abate v. Bushwick Savs. Bank*, 138 N.Y.2d 140, 143-44 (N.Y.C. Ct. 1955) a bank failed to honor a request for payment of funds held in a deposit account, and the failure led to the cancellation of plaintiff's real estate purchase contract, including a lost deposit and legal fees. The court held that recoverable damages were limited to the amount in the account plus interest and that plaintiff could not recover consequential damages. *Id.*

22. The only direct damages that Spanish Broadcasting can recover is the cost of replacement financing. Tellingly, Spanish Broadcasting has not stated in the Claim or in the Response that it ever obtained alternate financing to replace the $10 million that LCPI failed to fund. Indeed, upon information and belief, Spanish Broadcasting did not obtain any replacement financing. Instead, Spanish Broadcasting seeks to assert a claim for nearly $6 million in damages, based on the hypothetical possibility that it might have borrowed $10 million at a rate of interest of 32% to 36% per annum. Inasmuch as Spanish Broadcasting has failed to demonstrate that it suffered such damages, the Alleged Replacement Capital portion of the Claim should be expunged.

23. Spanish Broadcasting's reliance on the rule that "diminution of value" damages are direct damages is a simplification of the rule and does not demonstrate that loss of capital and damage arising from the alleged inability to terminate a swap agreement are compensable as direct damages for failure to fund a loan commitment. The circumstances surrounding the breach of the Credit Agreement do not warrant a departure from the established rule that provides that the interest rate differential is the only recoverable direct damage from breach of a loan commitment. Moreover, Spanish Broadcasting does not even attempt to demonstrate a causal link between the failure to fund and the Alleged Capital Loss Damage and

13

the Alleged Swap Termination Damage.  These portions of Spanish Broadcasting's Claim should likewise be expunged.

### D. Spanish Broadcasting Has Failed To Demonstrate That LCPI's Failure To Fund Caused Its Damages.

24. Even if the Court were to determine that the Capital Loss Damages and the Swap Termination Damages are recoverable, the burden would still be on Spanish Broadcasting to establish that LCPI's failure to fund caused such damages because, if an objection refuting at least one of the Claim's essential allegations is asserted, Spanish Broadcasting has the burden to demonstrate the validity of the Claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

25. Spanish Broadcasting's sole support for its $39.6 million Alleged Capital Loss Damages is an analysis prepared by Capstone Advisory Group (the "Capstone Analysis") that purportedly calculates "the market value of common equity, preferred equity, long-term debt, cash, and minority interest, versus the actual decline in [total invested capital] that [Spanish Broadcasting] experienced."  *See* Exhibit B to Claim.

26. There are many flaws in the Capstone Analysis, including the choice of comparable companies.  Moreover, the Capstone Analysis includes a comparison at two points in time, September 30, 2008 and December 31, 2008, does not explain the relevance of such dates, and fails to take into account the four years that have elapsed since then.[4]

---

[4] The Capstone Analysis provides that "[s]upporting documentation is voluminous.  [Spanish Broadcasting] will provide the information upon request."  The Plan Administrator requested the documentation and was not provided with it.  Rather, Spanish Broadcasting instructed the Plan Administrator simply to consult pages 3-11 of the Capstone Analysis.

14

27. In the event that the Court determines that Spanish Broadcasting is entitled to pursue its claim for the Alleged Capital Loss Damages, LCPI reserves the right to dispute the Capstone Analysis, to conduct discovery relating thereto, and to provide its own valuation evidence.

28. Spanish Broadcasting also asserts, without any proof, that LCPI's failure to fund caused $9,886,745 in Alleged Swap Termination Damages. Spanish Broadcasting has not provided any support for either the amount it paid under the swap or the amount it would have been required to pay if it had terminated the swap on October 3, 2008. Most glaring, Spanish Broadcasting has not provided any evidence that, but for the failure to fund, Spanish Broadcasting would have terminated the swap on October 3, 2008. Rather, with the benefit of 20/20 hindsight, Spanish Broadcasting asserts that it would have terminated the swap if it could have afforded to do so. Such purely speculative damages should not be allowed. Finally, Spanish Broadcasting states that it did not have the funds to terminate the swap in October 2008. Objection, ¶ 21. Spanish Broadcasting has not provided any proof of its financial wherewithal or lack thereof.

29. In the event that the Court determines that Spanish Broadcasting is entitled to pursue its claim for the Alleged Swap Termination Damages, LCPI reserves the right to dispute the magnitude of such damages and to conduct discovery with respect thereto.

**E. Spanish Broadcasting Is Not Entitled To Recover Fees.**

30. As set forth in the Objection, Spanish Broadcasting paid monthly fees to LCPI beginning in June 30, 2005 in the aggregate amount of approximately $168,333.00. Spanish Broadcasting seeks to recover the Alleged Fee Damages, which were earned and paid during a period in which LCPI was agent bank and was funding all of Spanish Broadcasting's draw requests.

15

31.     The authorities Spanish Broadcasting cites for the proposition that the Alleged Fee Damages are recoverable are distinguishable because, in such cases, the borrower did not receive a benefit from the fees paid.  In both *Hidalgo Props., Inc. v. Wachovia Mortgage Co.*, 617 F.2d 196, 198-99 (10th Cir. 1980) and *Coastland Corp. v. Third Nat'l Mortgage Co.,* 611 F.2d 969, 979 (4th Cir. 1979), the court ordered return of a commitment fee to the borrower when the lender failed to fund a standby loan commitment.  In *Nashville Lodging Co. v. Resolution Trust Corp.,* 59 F.3d 236, 245 (D.C. Cir. 1995) the court awarded fees as "reliance damages" for a repudiated refinancing commitment.  Both scenarios are distinguishable from a failure to fund a single draw request after performance had been delivered for over three years.

32.     To the extent that the Alleged Fee Damages relate to the period during which the failure to fund occurred, LCPI is amenable to allowing Spanish Broadcasting an unsecured claim.  Based upon the schedule provided in the Claim, that maximum amount of such fees is $13,334.

**Conclusion**

33. Spanish Broadcasting has failed to establish any valid claims against LCPI, other than a claim in the amount of $13,334. The remaining Claim should be expunged, and all relief requested in the Objection should be granted.

WHEREFORE the Plan Administrator respectfully requests that the Court overrule the Response and enter an order granting the relief requested in the Objection, as modified hereby, and such other and further relief as is just.

Dated: January 24, 2013
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates