**Hearing Date and Time: January 30, 2013 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re                                              :     Chapter 11 Case No.
                                                   :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,           :     08-13555 (JMP)
                                                   :
                            Debtors.               :     (Jointly Administered)
------------------------------------------------------------------x

REPLY TO CF MIDAS BALANCED GROWTH FUND'S SECOND
SUPPLEMENTAL RESPONSE TO THE DEBTORS' ONE HUNDRED
FORTY-THIRD OMNIBUS OBJECTION TO CLAIMS (LATE-FILED CLAIMS)

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

            Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator under the

*Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its*

*Affiliated Debtors* [ECF No. 22737] (the "Plan") for the entities in the above referenced chapter

11 cases (collectively, the "Chapter 11 Estates"), files this reply (the "Supplemental Reply") to

the second supplemental response (the "Supplemental Response") of CF Midas Balanced

Growth Fund (the "CF Fund") to the One Hundred Forty-Third Omnibus Objection to Claims

(Late-Filed Claims) (the "Objection") and respectfully represents as follows:[1]

---

[1]        This Supplemental Reply only addresses the Supplemental Response filed by the CF Fund in respect of
Claim No. 67153 (the "Late-Filed Claim"). At a hearing held on December 19, 2012, this Court requested
"relatively concise follow-up submissions by each of the claimant and the debtor" concerning the applicability of 11
U.S.C. § 502(j) to the Late-Filed Claim. *See* Dec. 19, 2012 Hr'g Tr. at 42:24-25, an excerpt of which is attached
hereto as Exhibit A. The Court stated further that it would "reserve any further comments with regard to the
fundamental question of excusable neglect" until the applicability of 11 U.S.C. § 502(j) had been addressed. *See*

## PRELIMINARY STATEMENT

1.      In June 2011, LBHI was faced with the daunting task of administering

more than 21,000 proofs of claim based on Lehman Program Securities (as defined in the Bar

Date Order)[2] asserting an aggregate amount of approximately $55 billion.  The claims were

based on approximately 5,000 securities with a notional amount of $40 billion issued by certain

of LBHI's foreign affiliates to thousands of investors around the globe and guaranteed by LBHI.

The swift determination of the allowed amounts of these claims, solely for voting and

distribution purposes, was critical to the formulation and ultimately, consensual confirmation of

the Plan – so critical, in fact, that certain creditors insisted that a condition precedent to the

confirmation of the Plan be this Court's approval, and LBHI's implementation, of a set of

procedures that would allow LBHI to propose allowed amounts for these claims and

consensually resolve any disputes relating thereto within a relatively short period of time (the

"LPS Procedures").  The LPS Procedures were intended to ease the administration of this

immense number of complex claims while neither affecting nor modifying in any way the

substantive rights of any claimant to dispute LBHI's proposed allowed claim amounts.

2.      On August 10, 2011, this Court entered an order approving the LPS

Procedures [ECF No. 19120] (the "LPS Procedures Order"), a copy of which is attached hereto

as Exhibit B.  In accordance with the LPS Procedures and the LPS Procedures Order, LBHI sent

notices of proposed allowed claim amounts (each, a "Structured Securities Notice") to each

holder of a claim based on a Lehman Program Security.  Pursuant to the order entered by this

Court on December 6, 2011 confirming the Plan [ECF No. 23023] (the "Confirmation Order"), a

---

Dec. 19, 2012 Hr'g Tr. at 43:6-9.  Accordingly, this Supplemental Reply is limited in scope to the applicability of 11
U.S.C. § 502(j) to the Late-Filed Claim.

[2]          Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

US_ACTIVE:\44181094\2\58399.0011

copy of which is attached hereto as Exhibit C, to the extent that holders of such claims agreed

with the proposed amount or did not respond by the established deadline, such claims became

Allowed (as defined by the Plan) in the amount set forth on the Structured Securities Notice, but

subject to certain significant exceptions – specifically:

> subject to the Debtors' right to object to Claims based on [Lehman Program
> Securities] on the grounds that such claims do not include
> a blocking number or include an invalid blocking number, are
> duplicative of other claims, have been amended and superseded, or
> otherwise do not comply with the provisions of the Bar Date Order
> is fully preserved.

(Confirmation Order at ¶ 71.)  Similarly, the LPS Procedures Order provides that LBHI may still

object to claims based on Lehman Program Securities "at any time, including, after such claims

have been allowed for the purposes of voting and distributions under the Plan," on various

grounds, including that the claims "do not comply with the provisions of the Bar Date Order."

(LPS Procedures Order at p.5.)  These exceptions were included in both the LPS Procedures

Order and the Confirmation Order because at the time that these orders were entered, LBHI had

not completed its review of all 21,000 proofs of claim based on Lehman Program Securities

other than to determine LBHI's proposed allowed amounts for voting and distribution purposes.

For this reason, it was critical that the LPS Procedures Order and Confirmation Order preserve

LBHI's ability to object to such claims on any other grounds.

3.      Both the LPS Procedures Order – which provided the basis for sending,

and is referenced in each of, the Structured Securities Notices – and the Confirmation Order

explicitly preserve LBHI's ability to prosecute the Objection notwithstanding the delivery of a

Structured Securities Notice to the CF Fund.  Notwithstanding the clear and unambiguous

language of *two* orders of this Court, the CF Fund persists in advancing the *non sequitur* that by

sending a Structured Securities Notice to the CF Fund, LBHI has withdrawn the Objection, that

the Objection has been "mooted," and that therefore, the CF Fund's Late-Filed Claim is "deemed allowed" by the absence of an objection.

4.     LBHI has never withdrawn the Objection.  On the contrary, pursuant to the LPS Procedures order and the Confirmation Order, LBHI's right to prosecute the Objection has been explicitly preserved even after LBHI sent the CF Fund a Structured Securities Notice. Furthermore, LBHI has continuously treated the Late-Filed Claim as a Disputed Claim (as defined by the Plan).  After the Structured Securities Notice was sent to the CF Fund, LBHI filed and served on the CF Fund *six* notices of adjournment of the Objection with respect to the Late-Filed Claim, on September 29, 2011 [ECF No. 20390]; December 14, 2011 [ECF No. 23392]; January 13, 2012 [ECF No. 24275]; February 16, 2012 [ECF No. 25473]; March 14, 2012 [26430]; and April 19, 2012 [ECF No. 27509].  Moreover, the CF Fund has made no indication that it has been prejudiced in any way by the receipt of a Structured Securities Notice while the Objection was pending.  The timeline below indicates that there has been no prejudice to the CF Fund:



5.     The CF Fund nevertheless inexplicably insists that its claim has somehow been "deemed allowed," and that therefore LBHI must now file a motion for reconsideration pursuant section 502(j) of the Bankruptcy Code.  Section 502(j), however, can only apply to claims that have been allowed or disallowed pursuant to a court order.  The Bankruptcy Rule that

US_ACTIVE:\44181094\2\58399.0011

implements section 502(j), Bankruptcy Rule 3008, provides that "a party may move for reconsideration of an order allowing or disallowing a claim against the estate." *See* Fed. R. Bankr. P. 3008. The only authority cited by the CF Fund in support of its argument that section 502(j) applies to "*claims…not to orders*" (Supplemental Response at ¶ 4) is *Yancey v. Citifinancial (In re Yancey),* 301 B.R. 861 (Bankr. W.D. Tenn. 2003) (discussed below); but this case does not stand for such a proposition at all, and in fact, only confirms that section 502(j) applies to claims that have been allowed or disallowed pursuant to an order. As the CF Fund concedes in the Supplemental Response, "there was no 'order' allowing CF Fund's claim." (Supplemental Response at n.2.) Section 502(j) is therefore inapplicable to Late-Filed Claim, which was filed more than one year after the Bar Date applicable to claims based on Lehman Program Securities and should therefore be expunged.

## UNDER THE PLAIN TERMS OF THE CONFIRMATION ORDER AND LPS PROCEDURES ORDER, THE LATE FILED CLAIM IS NOT "ALLOWED"

6.      The CF Fund has advanced no credible argument for why the clear language of the LPS Procedures Order or the Confirmation Order should not apply to its Late-Filed Claim, other than to state that it was not served with notice of the LPS Procedures Order, and that it would surely have objected to the language cited above. In other words, the CF Fund takes the preposterous position that the receipt of a Structured Securities Notice caused the Late-Filed Claim to be "allowed," but that it is not bound by the reservations of rights in the very same order that serves as the sole legal authority for sending and giving effect to the Structured Securities Notice and implementing the LPS Procedures. Either the LPS Procedures Order applies *in toto* to the CF Fund and the Late-Filed Claim, or it does not. If the former, then the reservation of rights in the order applies to the Late-Filed Claim; if the latter, then the Structured

5

Securities Notice sent to the CF Fund was void *ab initio*.  In either case, the Late-Filed Claim has not been "allowed" and LBHI's right to prosecute the Objection is fully preserved.

7.      Despite the CF Fund's grievances about notice, it in fact had ample notice of the LPS Procedures Order and 60 days from the receipt of the Structured Securities Notice to exempt itself from the effects of the order.  Under the terms of the LPS Procedures Order, if the CF Fund had delivered a written response disputing the Structured Securities Notice that it received within 60 days of receipt of the notice, then the motion seeking approval of the LPS Procedures Order would have been deemed an objection to the Late-Filed Claim.[3]  (LPS Procedures Order at p.4.)  Thus, the LPS Procedures Order preserved the substantive rights of all holders of claims based on Lehman Program Securities and effectively offered such claimants the ability to "opt out" of the LPS Procedures.  Because the CF Fund had the ability to opt out of the LPS Procedures, the CF Fund can show no prejudice arising from any failure to provide it with notice of the motion seeking entry of the LPS Procedures Order.

8.      But the CF Fund chose not to dispute the Structured Securities Notice that it received, which notice also referenced the LPS Procedures Order.  As such, the CF Fund was on notice of the LPS Procedures Order, had an opportunity to opt out and remain unaffected by such order, and chose not to do so.  Now, more than a year after it received a Structured Securities Notice, the CF Fund should not be afforded the opportunity to cherry-pick those aspects of the LPS Procedures Order that are appealing to it and exempt itself from the rest.

---

[3]      This objection to the amount of the Late-Filed Claim would have been in addition to the already pending Objection, which was based on the late filing of the Late-Filed Claim.

## UNDER THE PLAIN TERMS OF THE PLAN, THE LATE-FILED CLAIM IS BY DEFINITON "DISPUTED" AND NOT "ALLOWED"

9.      Moreover, it is impossible for the Late-Filed Claim to be an "Allowed"

claim within the meaning of the Plan and Confirmation Order.  Under the Plan,

> Allowed means, with reference to any Claim against the Debtors,
> (a) any Claim that has been listed by the Debtors in their
> Schedules.. as liquidated in amount and not disputed or contingent
> and for which no contrary proof of claim has been filed, (b) any
> Claim allowed hereunder, (c) any Claim that is not Disputed, (d)
> any Claim that is compromised, settled, or otherwise resolved
> pursuant to the authority granted to the Debtors pursuant to a Final
> Order of the Bankruptcy Court…or (e) any Claim that, if Disputed,
> has been Allowed by Final Order;…

(Plan at § 1.4.)  None of the above conditions is true with respect to the Late-Filed Claim.

Specifically, (a) the Late-Filed Claim was not listed on LBHI's Schedules, (b) the Late-Filed

Claim was not allowed pursuant to the Plan, (c) the Late-Filed Claim *is* Disputed (as explained

below), (d) the Late-Filed Claim has not been compromised or settled pursuant to a final order of

this Court, and (e) the Late-Filed Claim has not been Allowed by a final order of this Court.

10.      Further, even if LBHI *had* withdrawn the Objection (which it has not) by

sending a Structured Securities Notice to the CF Fund, absent an Order deeming the Late-Filed

Claim to be timely filed, the mere fact that the Late-Filed Claim was filed after the Bar Date

renders it, by definition, a Disputed Claim, because under the Plan,

> Disputed means, with reference to any Claim…(b) any Claim,
> proof of which was required to be filed by the Bar Date Order or
> another Final Order of the Bankruptcy Court in a form and manner
> proscribed in such order, but as to which a proof of Claim was not
> timely or properly filed."

(Plan at § 1.46.)  Because the Late-Filed Claim was filed on November 8, 2010, more than one

year after the Bar Date applicable to claims based on Lehman Program Securities, the Late-Filed

Claim "was not timely or properly filed" and is therefore a Disputed Claim, and – despite all the

US_ACTIVE:\44181094\2\58399.0011

CF Fund's creative sophistry – *not* an Allowed Claim, under the plain and unambiguous terms of the Plan, the Confirmation Order, and the LPS Procedures Order.

## SECTION 502(j) APPLIES ONLY
## TO ORDERS ALLOWING OR DISALLOWING CLAIMS

11.     Section 502(j) cannot be applied to the Late-Filed Claim because, as the CF Fund concedes, there has never been an order entered by this or any other court allowing the Late-Filed Claim.  Moreover, the CF Fund's argument that 502(j) "applies to *claims* that have been allowed or disallowed, and not to *orders* allowing or disallowing claims" (Supplemental Response at ¶ 4), cannot be reconciled with any of the Bankruptcy Rules that implement or refer to section 502(j) and is not supported by any case law or other authority cited by the CF Fund. As stated above, section 502(j) of the Bankruptcy Code is implemented by Bankruptcy Rule 3008.  *See, e.g.*, *In re Enron Corp.*, 2003 WL 1562202 at *11 (Bankr. S.D.N.Y. 2003) ("Section 502(j) is implemented by Rule 3008 of the Federal Rules of Bankruptcy Procedure"); *In re Harbor Fin. Group, Inc.*, 303 B.R. 124, 131 (Bankr. N.D. Tex. 2003) ("Bankruptcy Rule 3008 implements [Bankruptcy Code] § 502(j)"); *In re Wylie*, 349 B.R. 204, 209 (9th Cir. BAP 2006) ("Rule 3008 implements section 502(j)").  Bankruptcy Rule 3008 provides:

> A party in interest may move for reconsideration of an
> order allowing or disallowing a claim against the estate.

*See* FED. R. BANKR. P. 3008.  As noted by the CF Fund (Supplemental Response at ¶15), Bankruptcy Rule 9024 also applies to section 502(j), and provides that the one year limitation prescribed under Rule 60(c) of the Federal Rules of Civil Procedure does not apply to "an order allowing or disallowing a claim against the estate entered without contest."  *See* FED. R. BANKR. P. 9024.

US_ACTIVE:\44181094\2\58399.0011

12.     There is no Bankruptcy Rule that implements section 502(j) for the

purpose of reconsideration of a claim that is "deemed allowed" pursuant to section 502(a) of the

Bankruptcy Code, because the means of challenging such claims is to file an objection pursuant

to Bankruptcy Rule 3007.  *See* 11 U.S.C. § 502(a) ("A claim…is deemed allowed, unless a party

in interest…objects."); *see also* Fed. R. Bankr. Proc. 3007 ("[a]n objection to the allowance of a

claim shall be in writing and filed.").  The CF Fund cites no authority that would support the

argument that section 502(j) applies to claims that are "deemed allowed" by means other than an

order.  Although CF Fund cites to *Yancey* and argues that this case supports such a proposition,

the facts and holding of that case support no such conclusion.  In *Yancey*, the secured claim in

question had been allowed pursuant to an administrative order that is commonly entered in

chapter 13 cases in the Western District of Tennessee:

> …the chapter 13 trustee routinely examines proofs of claims after
> the bar date for filing has passed and submits an administrative
> order that allows those claims to which the trustee does not object.
> Such an order was submitted in this case and was entered on
> September 24, 2002, allowing twenty claims, including [the
> secured creditor's claim]….

*See In re Yancey*, 301 B.R. at 864.  The order in *Yancey* provided parties in interest 30 days to

file objections to the claims, after which they were allowed by such order.  *See id.*  Thus, the

court in *Yancey* in no way indicated that section 502(j) applied to a claim that had been allowed

"by operation of law" as the CF Fund suggests.  (Supplemental Response at ¶ 6.)  Quite the

contrary: the court in *Yancey* stated that section 502(j) could be applied to a previously entered

order allowing the claim of a secured creditor in that case.

13.     The CF Fund is not the first to have mischaracterized the holding in

*Yancey*; several creditors in *In re Chapter 13 Proceedings of Herrera*, 369 B.R. 395 (E.D. Wis.

2007) made the same argument.  Like the CF Fund, the creditors in *Herrera* cited *Yancey* in an

attempt to argue that, if a claim has been "deemed allowed" absent an objection, the debtor's

proper remedy is to seek reconsideration.  The district court disagreed with this reading of

*Yancey* and found, instead, that

> [*Yancey*] did not hold that a debtor must move for reconsideration
> pursuant to Rule 3008 for claims that were deemed allowed by 11
> U.S.C. § 502(a)…To the extent that the court discussed the rules, it
> recognized that Rule 3008 applies to reconsider *an order* allowing
> or disallowing a claim.

*See id.* at 400-01 (internal citations omitted).[4]

14.    In *Herrera*, the District Court for the Eastern District of Wisconsin heard

the consolidated appeals in several chapter 13 cases that shared the following characteristics:

> Chapter 13 plans were filed and confirmed by the bankruptcy
> court, creditors filed proofs of claim, Chapter 13 trustees filed a
> notice of intent to pay claims, the Chapter 13 debtors did not object
> to the creditors' claims within the time period outlined in the
> trustees' notices, the debtors (on behalf of their respective
> bankruptcy estates and other estates similarly situated) filed
> adversary proceedings seeking disgorgement of alleged
> overpayments made to the creditors, and the creditors filed motions
> to dismiss.

*In re Chapter 13 Proceedings of Herrera*, 369 B.R. at 398.  The chapter 13 cases were

consolidated for purposes of the motions to dismiss, and the bankruptcy court held that the

adversary proceedings were procedurally deficient and that the debtors were required to file

motions for reconsideration pursuant to Bankruptcy Rule 3008, because the claims had already

been "allowed."  *See id.*

---

[4]     Rather, according to the *Herrera* court, "*In re Yancey* addressed the issue of whether there is a private right
of action under a combination of Bankruptcy Code § 105(a) and Bankruptcy Rule 2016 that would permit the court
to hear and determine a putative class action complaint."  *Id.*

15.    On appeal, the district court reversed the bankruptcy court's holding,

stating that

> [b]y its own terms, Rule 3008 applies after the bankruptcy court
> issues "an order" allowing or disallowing a claim against the
> estate.  In the underlying bankruptcy cases, the creditors do not
> identify what orders the bankruptcy court should reconsider.  There
> are no such orders; rather, the claims were only deemed allowed
> pursuant to 11 U.S.C. § 502(a) because the debtors had not yet
> objected to the claims.

*Id.* at 399.  The district court explained, further, that

> [i]f a claim is deemed allowed upon filing and if, as the bankruptcy
> court held, the debtor must move for reconsideration pursuant to
> Rule 3008 after a claim is deemed allowed, the debtor must always
> object to a claim via a motion for reconsideration and may never
> object pursuant to Rule 3007.  Surely, this cannot be what the
> drafters of the rule intended.  Instead, a more viable construction of
> Rule 3008 that gives effect to both rules is that Rule 3008 applies
> only to claims allowed by a court order, not claims deemed
> allowed by 11 U.S.C. § 502(a).

*Id.* at 400 (citing *Matter of Henderson*, 577 F.2d 997, 1001 (5th Cir.1978) ("[T]here cannot be a

reconsideration of a claim which was allowed automatically without consideration.")).[5]

16.    For the same reasons, this Court should follow the *Herrera* court's

application of section 502(j) of the Bankruptcy Code and Bankruptcy Rule 3008, and reject the

CF Fund's fanciful argument that LBHI must now move for reconsideration of the Late-Filed

Claim – a claim that was not timely filed, has never been allowed, and remains subject to the

Objection.

---

[5]    Notably, the district court in *Herrera* was not influenced by the fact that the chapter 13 trustee had sent
notices of intent to pay the claims which, like the Structured Securities Notices sent by LBHI, set forth deadlines for
parties to object to the proposed allowed amounts, because such notices "are not court-set deadlines."  *See id.* at 400.

## RESERVATION OF RIGHTS

17.     In the event that the Court denies the Objection with respect to the Late-Filed Claim and/or grants the relief requested in the Supplemental Response and other responses to the Objection filed by the CF Fund, the Plan Administrator reserves the right to object to the validity and amount of any claims that may be filed by the CF Fund (collectively, the "Responses").  The Plan Administrator reserves the right to conduct discovery as to the Late-Filed Claim and any matters raised in the Responses and to supplement this filing as a result thereof.

## CONCLUSION

WHEREFORE, for the reasons set forth above, in the Objection, and in the *Omnibus Reply to Certain Responses to Debtors One Hundred Forty-Third and Three Hundred Twenty-Third Omnibus Objections to Claims (Late-Filed Claims)* filed on December 17, 2012 [ECF No. 32854], the Plan Administrator respectfully requests that the Court enter an order disallowing and expunging the Late-Filed Claim in its entirety and grant such other and further relief as the Court may deem just and appropriate.

Dated: January 28, 2012
        New York, New York

/s/ Robert J. Lemons
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Lehman Brothers Holdings
Inc. and Certain of its Affiliates

# EXHIBIT A

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-jmp

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS, INC.,

8

9           Debtors.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                   U.S. Bankruptcy Court

14                   One Bowling Green

15                   New York, New York

16

17                   December 19, 2012

18                   10:06 AM

19

20   B E F O R E :

21   HON JAMES M. PECK

22   U.S. BANKRUPTCY JUDGE

23

24

25

Page 20

1    claims are disallowed, both those two, LBSF and LBHI.

2              MR. TSAO:  Thank you, Your Honor.

3              MR. BRUENS:  Your Honor, may we be excused?

4              THE COURT:  Yes.

5              MR. BRUENS:  Thank you.

6              MR. HORWITZ:  Okay.  We think that the declarant

7    for the Midas Fund has been able to dial in.  So --

8              THE COURT:  Okay.

9              MR. HORWITZ:  -- we will proceed with --

10             THE COURT:  Let's confirm that.

11             Is there someone on the telephone acting on behalf

12   of CF Midas Balanced Growth Fund?

13             I don't hear any response.

14             MR. GEOGHAN:  No, Your Honor, I don't, either.  I

15   thought I heard the click that they were coming in.  There's

16   apparently a problem with the international calling on the

17   conference I.D. number they were provided.  They've been

18   trying to get in since about a quarter to 10:00.

19             THE COURT:  Do you want to take a short recess

20   while you try to clarify this, or do you want to proceed in

21   the absence of your declarant?

22             MR. GEOGHAN:  If the Court doesn't have questions

23   for my declarant, I think we could proceed in the absence of

24   the declarant.  If the Court believes there will be

25   questions, then I would ask the opportunity to wait a few

Page 21

1    minutes.

2            THE COURT:  I don't have any questions for the

3    declarant.  I've read the declaration.

4            MR. GEOGHAN:  Thank you, Your Honor.  Then, I

5    believe we can proceed.

6            THE COURT:  Let's do that.

7            MR. HORWITZ:  So the next matter is the one

8    hundred and forth-third omnibus objection to claims.  This

9    objection sought to disallow certain claims that were filed

10   after the bar date, LBHI's proceeding with respect to the

11   claim of CF Midas Balanced Growth Fund.  That is claim

12   67193.

13           The Midas Fund's claim is a Lehman Program

14   securities claim.  According to the declaration of Nigel

15   Boyland (ph) that was filed in support of the Midas Fund's

16   response, the Midas Fund holds a structured note issued by

17   Lehman Brothers Treasury Co., BV, the Dutch entity that

18   issued structured notes, which Mr. Boyland says was

19   guaranteed by LBHI.

20           Your Honor, the bar date for claims based on

21   Lehman Program securities, which includes structured notes

22   issued by LBT, was November 2nd, 2009.  The Midas Fund filed

23   its claim a full year after the bar date, on November 8th,

24   2010.  In its response, the Midas Fund argues that the Court

25   should allow the claim pursuant to bankruptcy rule

Page 22

1    9006(b)(1) on the grounds of excusable neglect.

2              Your Honor, the plan administrator has reviewed

3    the response filed by the Midas Fund and is unable to

4    discern any action that the Midas Fund took to determine

5    whether its asserted claim against LBHI was subject to the

6    bar date order.  From the response, it appears that the

7    Midas Fund relied upon notices that it received from the LBT

8    trustees presiding over the -- or administering the LBT

9    bankruptcy case in the Netherlands.

10             In fact, the Midas Fund states that the reason for

11   its delay of more than one year is that it relied on these

12   notices, which the Midas Fund claims led it to believe that

13   claims did not need to be filed against LBHI in respect of

14   LBT's structured notes.  I would point out, again,

15   Your Honor, that the Midas Fund, while it says very little

16   about itself in its papers, is clearly not an

17   unsophisticated party.  It certainly is not a pro se

18   individual, which as many claimants were who filed Lehman

19   Program securities claims.  There were approximately 25,000

20   claims filed against LBHI based on Lehman Program

21   securities, and many, if not most of them, were filed by or

22   on behalf of individuals.

23             Second, the Midas Fund doesn't attach to its reply

24   or to the accompanying declaration any of the notices that

25   it refers to, and, according to Mr. Boyland's declaration,

Page 23

1    the Midas Fund received three notices.  The third notice was

2    dated December 22nd, 2008 and stated that beneficial holders

3    of notes issued by LBT are not required to file claims with

4    the bankruptcy trustee, and the bankruptcy trustee aims to

5    coordinate with the LBHI process of filing claims by holders

6    of notes in respect of the LBHI guarantee in the chapter 11

7    proceedings.

8             Although a copy of this notice was not attached to

9    the Midas Fund's reply or to the declaration, I have copies

10   of the third notice.  I downloaded them from LBT's Web site,

11   lehmanbrotherstreasury.com.  I have copies that I can hand

12   to the Court and to counsel for the Midas Funds, if the

13   Court would like to look at them.

14            THE COURT:  Is there any objection to my taking a

15   look at these downloaded notices?

16            MR. GEOGHAN:  None, Your Honor.  Copies were

17   provided to counsel.  I have copies of all three notices

18   here, if the Court desires.

19            THE COURT:  Okay.  I'll take a look at them then.

20            Thank you.

21            MR. HORWITZ:  Your Honor, the last sentence that I

22   just read to the Court is from section 2.5 of the third

23   notice to holders of LBT notes.  The very next sentence,

24   after the one that I just read to the Court, says, "More

25   information on the insolvency proceedings of LBHI can be

Page 24

1    found on HGTP\chapter11.epiqsystems.com under Lehman

2    Brothers Holdings, Inc. Chapter 11.  As far as the

3    bankruptcy trustee is aware, as of the date of this notice,

4    no bar date has been set for the filing of claims in the

5    chapter 11 proceedings of LBHI."

6             "Noteholders are advised to regularly visit the

7    aforementioned Web site for updated information on LBHI.

8    Since the information that the bankruptcy trustee will

9    provide to noteholders is primarily limited to the

10   bankruptcy of LBT, the bankruptcy trustee will not issue a

11   notice if a bar date for the filing of claims is set in the

12   chapter 11 proceedings of LBHI."

13            Your Honor, this is the notice that the Midas Fund

14   read and reasonably relied upon or claims to have reasonably

15   relied upon.  The language in the third notice clearly

16   indicates that LBHI is subject to a separate chapter 11 case

17   and that the requirements for filing claims against LBHI are

18   distinct from the requirements in the LBT proceeding.  The

19   notice clearly warns creditors to monitor the Epiq Web site

20   for information regarding a separate bar date and separate

21   claims filing procedures in respect of guaranteed claims

22   against LBHI.

23            On October 1st, 2009, the LBT trustees actually

24   issued a fourth notice, which was posted on its Web site.  I

25   have copies of that notice as well.  Midas Fund does not say

Page 25

1   in its reply or in the declaration that it received this

2   notice, but this notice was available on the Internet, and

3   the LBT trustees say that they issued it to all holders of

4   LBT notes.  I would like to read from the first page of that

5   notice, and I can hand it up to the Court and to counsel for

6   the Midas Fund, if the Court's willing to hear that portion

7   of the notice.

8            THE COURT:  Do you have any objection?

9            MR. GEOGHAN:  Well, I don't believe so.  I'd

10  reserve any right.  I have yet to see the document.  My

11  client doesn't have a copy of it.  Presumably, it was

12  downloaded from the -- presumably, it's not an objectionable

13  document, though.

14           THE COURT:  I think, regardless of what's in your

15  pleadings or what your declarant says he knew at the time,

16  this is relevant to the question of information available at

17  certain points in time to interested holders of near or

18  medium-term notes, and so, I'll consider it for whatever

19  weight it may be entitled to in this argument.  It's unclear

20  to me that it's directly relevant, but I'm interested in

21  knowing what was generally out there in the public domain.

22           MR. GEOGHAN:  Thank you, Your Honor.

23           MR. HORWITZ:  And, Your Honor, the fourth notice

24  to creditors states on the very first page, "On July 2nd,

25  2009, the United States Bankruptcy Court for the Southern

Page 26

1   District of New York, having jurisdiction over the chapter

2   11 cases of Lehman Brothers Holdings, Inc., entered an order

3   establishing November 2nd, 2009 at 5:00 p.m. prevailing

4   Eastern time as the last date and time for each person or

5   entity to file a proof of claim based upon claims arising

6   out of certain securities issued by LBHI or any of their

7   affiliates, including LBT outside of the United States."

8           Your Honor, in addition to these notices, we cite

9   in our papers the quarterly reports that the LBT trustee

10  issues to holders of LBT structured notes, specifically the

11  third public report in which the LBT trustee goes so far as

12  to -- never to explain the difference between the claims

13  filing requirements of LBT's Dutch bankruptcy proceeding and

14  LBHI's chapter 11 case.  In addition to all of the

15  foregoing, as we state in our papers, notice of the

16  securities program bar date was published in 10 languages in

17  26 newspapers across 18 countries.  I could list them, but

18  I'll spare the Court that litany.

19          The program securities bar date notice was also

20  provided to Euroclear, Clear Stream, and similar clearing

21  systems as well as to the issuers of Lehman Program

22  securities, including LBT, with instructions to distribute

23  the notice to the holders of Lehman Program securities.

24  Your Honor, given, not only the widespread publication of

25  the program securities bar date notice, but also the

Page 27

1    repeated admonitions from the LBT trustees to their holders,

2    the plan administrator submits that the Midas Fund has

3    conducted -- has not conducted even a minimal amount of

4    diligence that it would have been required such that it

5    could have understood the difference between the two

6    proceedings and the application of the bar date order to its

7    asserted claim against LBHI.  As such, the plan

8    administrator submits that the Midas Fund has not made a

9    sufficient showing for finding of excusable neglect and that

10   its claim should be expunged.

11            THE COURT:  Okay.  Thank you.

12            MR. GEOGHAN:  Good morning, Your Honor.  Daniel

13   Geoghan, Young Conaway Stargatt & Taylor, here for CF Midas.

14   Thank you for taking the time this morning, Your Honor.

15            Your Honor, there is -- as much as I was going to

16   start with a long discussion of the background of how we got

17   here on the excusable -- with regard to the excusable

18   neglect issue, I think there's one pressing issue before we

19   get there.  This claim was allowed.  This claim was allowed

20   by the debtor.  On August 26th, 2011 -- and a copy of the

21   notice was provided to the Court in supplemental response,

22   this claim was allowed by the debtor.

23            THE COURT:  Well, I saw your supplemental

24   response, and I understand that's your argument.  I think

25   you're going to need to connect the dots on that argument,

Page 28

1    because I think that there's a distinction to be drawn

2    between a notice and an objection to the claim based upon

3    late filing.  If you want to argue waiver on the basis of a

4    notice, you can certainly make that argument, but you're

5    going to have to connect the dots in order to prevail on

6    that argument, because I'm not very sympathetic to it.

7              MR. GEOGHAN:  Well, Your Honor, I think there are

8    some dots that can be connected, including section 502(j) of

9    the bankruptcy code, which provides that, once a claim is

10   allowed, it can -- that allowance can't be overturned

11   without cause, and that language, that section does not

12   provide that an order is required.  That language simply

13   provides that once a claim is allowed.

14             The debtor clearly, by its own admission, has

15   allowed this claim, and I would differentiate, if I may,

16   from a claim that is listed in schedules as contingent,

17   unliquidated, or disputed, which could subsequently be

18   amended.  I would differentiate that, because here, we had

19   an actual allowance of the claim subsequent to the

20   initiation of a contested matter by the debtor, and I do

21   think that that is a distinguishing factor here, and again,

22   referring the Court to 502(j).  It does not require an order

23   saying that the claim was allowed.  It simply requires that

24   the claim be allowed.

25             Excuse me one second.  And I think that is very

Page 29

1    important, not only in the equitable sense in that my

2    client's claim was allowed by an admission by the debtor and

3    not a simple admission by a notice provided to us that

4    doesn't say anything about reserving the right to come back

5    and challenge us again.  Moreover, in an equitable and an

6    estoppel sense, my client can rely on that notice that their

7    claim is now allowed.

8           So I think that that fact differentiates my client

9    and the late-filed claim from other late-filed claims, which

10   is an important part of the process here, because it also

11   differentiates my client from the floodgates argument that

12   allowing this claim would have some tremendous effect on the

13   estate.  This claim has already been reserved for.  This

14   claim has already been accounted for.

15          It's been allowed.  It's calculated, I'd imagine,

16   into the distribution.  Now, obviously, those are the words

17   of counsel.  There would need to be some form -- I mean, if

18   we were going to go farther down that road as to whether or

19   not this claim was actually calculated into the distribution

20   calculation, obviously, we'd have to take some kind of

21   discovery, but that's -- this is an initial hearing and not

22   an evidentiary hearing, and I appreciate that, Your Honor.

23          In addition to the 502(j) argument, Your Honor,

24   obviously, I would want to make a record on the issues of

25   excusable neglect.  As was stated in the papers, Your Honor,

Page 30

1    my client received, through its corporate representative,

2    numerous notices, and clearly, there was a misunderstanding

3    among people as to what was going on with the notices.  It's

4    not clear that a copy of the bar date order was sent to my

5    client.  I didn't see their name on any affidavit, but, as

6    counsel pointed out, there was publication.  There are other

7    methods.

8           Also, I would point out, as to the fourth notice,

9    which we do not have a copy of, no evidence was presented

10   that my client -- that a copy of that was given to my

11   client, delivered, actual or constructively to my client.

12   So I don't know if anybody was aware of it, but certainly,

13   in October 2009, my client, through its representatives, was

14   taking steps to gather information related to its Lehman

15   claims, and it sought, through its representative.

16          This Bank of New York Mellon was the custody in

17   assets for CF Midas.  So there would have likely been

18   notification to Bank of New York Mellon more than CF Midas,

19   and CF Midas would have communicated back to Bank of New

20   York Mellon directing them what to do, and so forth, and

21   Bank of New York Mellon would have taken action, and my

22   client sought to provide information to Bank of New York

23   Mellon, and, not knowing it needed to provide information to

24   Lehman, Bank of New York Mellon -- excuse me -- informed it

25   that it had provided insufficient information or there was a

Page 31

1    problem with the information.

2            My client responded and said well, what

3    information could we need for a U.S. bankruptcy we hold

4    Dutch assets, and no response was given, and there fell the

5    problem, and, when my client realized they had a problem,

6    they had mistakenly not filed the claim, they immediately

7    took action to file that claim.

8            Your Honor, I think, importantly here, is again,

9    the fact that this claim is allowed, and why is that

10   important?  Your Honor, there is no prejudice to the debtor

11   or the creditors.  This claim has been allowed.

12           There is no prejudice with regard to

13   distributions.  The amount of the claim has already been

14   calculated in and reserved for, I would imagine.  There's no

15   interference with the claims review and reconciliation

16   process.  The claim has been allowed.

17           I believe that CF Midas would take the position

18   that the length of delay is not dispositive of the issues

19   here, because the claim has been allowed.  So, Your Honor, I

20   would say that there's been no suggestion that CF Midas

21   acted in bad faith at any time, so I don't believe that that

22   is an issue, and, as I stated earlier, the reason for the

23   delay -- CF Midas had received numerous notices.  It was

24   confused about what expectations people that -- what it may

25   have had to file, if anything.

1              It believed it was dealing with a Dutch entity.

2      It was not aware that it had to file something in a chapter

3      11 case in the U.S., and it believed, because it was

4      continuing to receive those notices, even after this October

5      2009 issue, that whatever was going on was still in progress

6      and that it wasn't an issue it needed to address, and that,

7      I believe, stands for why that there is excusable neglect

8      here for a late-filed claim, if the Court believes that

9      that's where we need to -- that we need to consider that,

10     but again, I would come back to the fact that this is an

11     allowed claim, and 502(j) does not require that there have

12     been an order entered.  This claim was allowed by the

13     debtors already.  Thank you, Your Honor.

14              THE COURT:  Does the debtor have a response?

15              MR. HORWITZ:  Your Honor, I actually have to

16     apologize.  I should have raised this initially so that the

17     Court could have had this in mind before listening to

18     counsel for Midas Fund's argument that the claim has been

19     allowed.

20              The order that approved the structured securities

21     valuation methodology process, the process of sending out

22     notices to creditors and resolving any disputes states on

23     page five -- I have a copy of this as well, which I can hand

24     up, if the Court wants to look at that --

25              THE COURT:  I'd like to see it.

Page 33

1            MR. HORWITZ:  -- as I read from it.

2            THE COURT:  Okay.

3            MR. HORWITZ:  If the Court will turn to page five

4     in the center, third -- ordered -- paragraph down, ordered

5     that, "Notwithstanding anything herein, the debtors reserve

6     the right to object to the structured securities claims at

7     any time, including after such claims have been allowed for

8     the purposes of voting and distributions under the plan on

9     the grounds that such claims do not include a blocking

10    number, include invalid blocking number, are duplicative of

11    other claims, have been amended or superseded, or otherwise

12    do not comply with the provisions of the bar date order."

13            Your Honor, LBHI needed this language in this

14    order because it had not at the time that these

15    methodologies and these procedures were being negotiated and

16    approved -- it had not had the time to review all 1,700 late

17    claims that had been filed in these cases and couldn't be

18    sure that, when sending valuation notices, that it wouldn't

19    be sending them to claims that have all kinds of procedural

20    defects, and so, it needed to reserve its right to object to

21    them on those grounds, and the plan administrator submits

22    that those rights were properly reserved and that any

23    objection to the Midas Fund claim on the grounds that it was

24    filed after the bar date has not been waived.

25            THE COURT:  It's true, however, that the notice

Page 34

1    that went out to CF Midas Balanced Growth Fund and

2    presumably to other holders of structured securities claims

3    did not include a specific reference to a reservation of

4    rights to object to the amount of the claim that was set

5    forth in that notice, to which -- do you want to verify

6    that?

7             MR. HORWITZ:  Yeah.

8             THE COURT:  Because I took a look at that notice

9    in the supplement filed by CF Midas, which is ECF No. 21186,

10   and the notice is an attachment to that document, and the

11   argument made in the supplement is that there was, in

12   effect, allowance by notice without reserve.

13            MR. HORWITZ:  Well, as to the reserve, Your Honor,

14   the plan administrator's reserving for all disputed claims,

15   as required by the plan in the amount filed or agreed to

16   with the parties or otherwise ordered by the Court.  There's

17   no question about that.  They certainly are doing, actually,

18   in excess of those amounts, to be conservative.  So a

19   reserve is established for all disputed claims, because

20   that's what's required by the plan.

21            The notice that was sent to claimants and which is

22   attached to the Midas Fund's reply does reference the order

23   that was entered, approving the procedures for sending these

24   notices and only says that the determination of the amount

25   of the portion of this claim is allowed -- or this is the

Page 35

1    allowed amount solely for purposes of voting and

2    distribution.  I'm sorry.  Not distributions.  Oh, I'm

3    sorry.  It says that the order provides for procedures for

4    the determination of allowed amounts for portions of -- for

5    the amount of portions or portions of claims based on

6    structured securities.  So it doesn't actually say that the

7    claim is allowed.  It's merely proposing an amount that

8    creditors had the opportunity to object to.

9                THE COURT:  Well, it's obviously in the claimant's

10   interest to be characterizing this as a method for allowing

11   a claim, and I've already expressed my skepticism with

12   regard to that, but we do need at least to gather the

13   documents in order to determine if this aspect of the

14   argument has merit.

15               MR. HORWITZ:  Well, Your Honor, the only other

16   part of the Midas Fund's argument that I could see having

17   any relevance is the estoppel argument, because the debtors

18   intentionally included this language in the order to

19   preserve their rights to maintain objections.  Even if they

20   sent these notices, and it's not clear to me what damage the

21   Midas Fund's incurred by relying on this notice if the plan

22   administrator's objection was never withdrawn and

23   distributions had never been made, all indicating --

24   especially distributions not being made in the past two

25   distributions, indicating that the plan administrator

Page 36

1    continues to treat this claim as a disputed claim.

2            The plan administrator also contacted counsel for

3    the Midas Funds months ago to schedule this contested

4    hearing.  Every aspect of the plan administrator's behavior

5    has been consistent with the treatment of this claim as a

6    disputed claim, as that term is defined under the plan.

7            So it's not clear -- beyond the receipt of this

8    notice, it's not clear what actions the Midas Fund may have

9    taken in reliance on receipt of that notice that in any way

10   damages its position now.  It's in the same position it

11   would have been in if we had had this hearing the very day

12   -- the day before it received this valuation notice.

13           THE COURT:  Okay.

14           Anything more?

15           MR. HORWITZ:  I just -- I'm sorry?

16           THE COURT:  Anything more?

17           MR. HORWITZ:  I just point out that the argument

18   that the Midas Fund received numerous notices only suggests

19   that the greater likelihood that the fund did actually

20   receive the fourth notice at least, which provided clear

21   notice of the bar date, but, even if the Midas Fund had just

22   read the third notice that it admits it received, it would

23   have had at least the tools necessary for a sophisticated

24   party to do the reasonable diligence to determine whether or

25   not the bar date order applied to its claims.

Page 37

1            As for the prejudice argument, Your Honor, we've

2    discussed this before many times and in colloquy in these

3    hearings.  The plan administrator does not object -- is not

4    objecting to late claims as a penny-saving exercise.  It is

5    an exercise undertaken with the goal of treating all

6    creditors fairly and equally.

7            So, while the amount of the claim may not

8    completely throw off the distributions in these cases, the

9    point is, as I said, 25,000 Lehman Program securities claims

10   were filed in these cases.  One thousand, seven hundred and

11   fifty claims were filed after the bar date.  Only 70 of

12   those claims remain unresolved in one way or another.

13           For the rest of them, claimants have either had

14   their claims expunged, or they have voluntarily withdrawn

15   their claims, or the plan administrator has reached some

16   kind of a resolution that it's comfortable with in terms of

17   meeting its fiduciary duties to its creditors.  The

18   prejudice here, as I've said before, is to all creditors in

19   these cases who either had their claims expunged because

20   they didn't comply with the bar date or took the steps

21   necessary to comply.  That's all I have.

22              THE COURT:  Okay.

23              Is there anything more?

24              MR. GEOGHAN:  Just two brief points, Your Honor.

25   Again, Daniel Geoghan, Young Conaway.

Page 38

```
 1                Your Honor, first with regard to the point made
 2      that, in August 2011, there was some 1,700 late-filed
 3      claims, and they were -- and Lehman was not in a position to
 4      go through all of them.  Your Honor, in August 2011, we were
 5      in active conversation with Weil -- excuse me, with Lehman's
 6      counsel with regard to these claims.  Our response had been
 7      filed in July.  This did not -- this was not us sitting by
 8      the wayside and this notice showing up.
 9                There was an active conversation, and, when it
10      showed up, we said, "Hey, wait a second.  You've allowed the
11      claim now.  Your objection is moot."
12                In regard to the notice, Your Honor aptly pointed
13      out that, one, it contains no reservation, and, two, it does
14      state that the claim is being allowed for voting and
15      distribution purposes.  I don't think it could be any more
16      unambiguous.
17                While I appreciate that there is a reservation in
18      the order, as pointed out by counsel, the reservation in the
19      order to object to claims at a later time for allowed claims
20      on other grounds, I'm not convinced of, necessarily, its
21      validity.  If I include a reservation in a proof of claim
22      stating I reserve the right to amend this claim and I change
23      the amount some place farther down the road, they still have
24      -- Lehman will still have the right to come back and object
25      to my amended claim as being untimely.
```

Page 39

1          I think that 502(j), as I said, Your Honor, is

2    quite clear, and it does not require an order, and I have

3    gone back to the case law, and I have not found -- and

4    possibly, someone else will, but I have not found a case

5    that states an order is required under 502(j) for a claim to

6    be allowed, and I believe that that's --

7          THE COURT:  But a timely proof of claim is

8    required for a claim to be allowed, or the claim has to be

9    scheduled.  Neither is the case here.  So how do you obtain

10   allowance by ambush, which is what you're really seeking to

11   argue?

12         MR. GEOGHAN:  Well, I disagree wholeheartedly,

13   Your Honor.  I don't believe this is allowance by ambush.

14   Aside from the fact that there have been numerous

15   conversations about this and email exchanges, it is --

16         THE COURT:  Well, but here's the issue, at least

17   as I see it.  In a more perfect world of drafting notices

18   and preserving all rights and defenses at the same time, the

19   notice would have included a conspicuous reservation of

20   rights.  It did not.

21         The question really is whether that matters.

22   You're suggesting that this is a gotcha moment in which an

23   inconsistent position is taken, and, as a result, you're

24   able to say, "Aha, we have an allowed claim because of the

25   notice."

1         I seriously question that, particularly in a

2    setting in which the order dealing with determining the

3    amounts for voting purposes with respect to structured

4    securities claims represented one of those major, difficult,

5    unprecedented issues being addressed in the run-up to the

6    confirmation hearing, and, from an administrative

7    perspective, I'm sure looking back on this, debtor's counsel

8    would wish that you're not in the position to make this

9    argument, but the question is whether the argument

10   ultimately has legal merit, and that's where you're going to

11   need to address.

12         MR. GEOGHAN:  Your Honor, and if I may just add

13   that I believe it does, obviously, have legal merit.  Again,

14   we --

15         THE COURT:  Well, it's a legal argument.  Whether

16   or not it's --

17         MR. GEOGHAN:  It's an argument.

18         THE COURT:  Whether or not it's an argument that

19   leads you into the promised land of an allowed claim is

20   another question.

21         MR. GEOGHAN:  Your Honor, as I stated there, we

22   were in conversation in the middle of this whole experience

23   between the claims objections, and they knew that the claim

24   objection was in place, and then, they allowed the claim.

25   Moreover, we went back to them immediately and said, "You've

Page 41

1    allowed our claim.  We believe your objection is moot."

2              Arguably, at any time thereafter, they could have

3    renewed their objection, put on a new objection.  They could

4    have taken some steps to preserve rights.  If that order --

5    if that notice is determined to act as an allowed claim as

6    of that date, arguably, they're beyond the statute of

7    limitations in 90024 to even seek at this point by cause to

8    reconsider the claim, and, Your Honor, if I may point the

9    Court to in re Tender Loving Care Health Services, Inc.

10             It's a Second Circuit case.  The cite is 562 F.3d

11   158.  It's not squarely on point, I'll admit, but it does

12   discuss the concept of a contested claim dispute that is

13   resolved with an allowed claim.  In that case, it was

14   resolved by an agreement of the parties, a stipulated claim,

15   that then later a trustee came back to seek to object to,

16   because the trustee realized the claim was miscalculated,

17   and the Court, the Second Circuit held in that case that it

18   was beyond the statute of limitations.

19             It's not on point, but I don't think it's that far

20   off point, either, Your Honor.  There, it's a contested

21   matter.  Here, there was an allowed claim, and now, 16

22   months later, after there have been numerous discussions and

23   I begged them to put this on in September and October,

24   begged them.  I filed a motion asking them to put this on,

25   and they refused.  It's now coming back up and becoming an

Page 42

1    issue.

2              Thank you, Your Honor, and I'm not sure what

3    Your Honor will do.  I am guessing maybe we require more

4    briefing at this time, but I await the Court's direction.

5              THE COURT:  Well, one of the things I'd like to

6    focus on -- and I think the pleadings as filed may require

7    some supplementation -- is the true impact on the claim of

8    CF Midas Balanced Growth Fund of the notice that we've been

9    discussing and the application, if any, of 502(j), which,

10   read literally, does not appear to directly apply to this

11   situation, since the language reads, quote, "A claim that

12   has been allowed or disallowed may be reconsidered for

13   cause."

14             That's just the first sentence, but

15   reconsideration speaks in terms of a deliberative process,

16   not an accidental one, and it is truly unclear to me as I

17   consider the argument that 502(j) applies at all, and it's

18   also unclear to me as a matter of the equities of the case a

19   phrase that appears also in 502(j), that it is in any

20   respect equitable for the debtor's position with respect to

21   a late-filed claim to be waived by virtue of a notice that

22   was issued on the strength of an order that included an

23   express reservation of rights, and so, I would be interested

24   in some relatively concise follow-up submissions by each of

25   the claimant and the debtor on a schedule that the two of

Page 43

1    you can agree to.

2              This being the holidays, I'm not going to impose

3    an immediate schedule on this, but let's see if we can have

4    those submissions in anticipation of a hearing to take place

5    either in January or February of next year and deal with

6    this question.  While that's pending, I'll reserve any

7    further comments with regard to the fundamental question of

8    excusable neglect, and we'll deal with that after addressing

9    this other question.

10             MR. GEOGHAN:  Thank you, Your Honor.

11             THE COURT:  Okay.

12             Now, we have Renata Thomas' claim.

13             MR. HORWITZ:  Yes, Your Honor.  This is the last

14   contested item on the agenda.  This is the debtor's three

15   hundred and seventy-second omnibus objection to claims also

16   seeking to disallow claims filed after the bar date.

17   Ms. Thomas filed her claim on December 7th, 2012 and was the

18   sole claimant responding to this objection.  I don't know if

19   she's present in the courtroom or on the phone today.

20             THE COURT:  Is Renata Thomas on the telephone?

21             I believe she resides in the U.K.

22             MR. HORWITZ:  I think that's correct.

23             THE COURT:  Is Renata Thomas in the courtroom?

24             The answer to both questions is negative, so let's

25   proceed in her absence.

EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
|  | : |  |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |

-------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a) AND 502(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 APPROVING PROCEDURES FOR THE DETERMINATION OF THE ALLOWED AMOUNT OF CLAIMS FILED BASED ON STRUCTURED SECURITIES <u>ISSUED OR GUARANTEED BY LEHMAN BROTHERS HOLDINGS INC.</u>

Upon the motion, dated June 29, 2011 (the "<u>Motion</u>"), of Lehman

Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors-in-possession (collectively, the "<u>Debtors</u>" and,

together with their non-debtor affiliates, "<u>Lehman</u>") pursuant to sections 105(a) and

502(b) of the Bankruptcy Code and Bankruptcy Rule 9019, for approval of procedures

determining the allowed amount of claims filed based on Structured Securities[1] issued or

guaranteed by LBHI , all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated

July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such
terms in the Motion.

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to (i) the U.S. Trustee; (ii) the

attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission;

(iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District

of New York; and (vi) all other parties entitled to notice in accordance with the

procedures set forth in the second amended order entered on June 17, 2010 governing

case management and administrative procedures for these cases [Docket No. 9635]; and a

hearing (the "Hearing") having been held on August 9, 2011 to consider the relief

requested in the Motion; and it being represented that the relief sought in the Motion is in

the best interests of LBHI, its estate and creditors, and all parties in interest and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

> ORDERED that the Motion is granted to the extent set forth herein; and it
is further

> ORDERED that, pursuant to sections 105(a) and 502(b) of the Bankruptcy
Code and Bankruptcy Rule 9019, the following procedures (the "Structured Securities

Claim Determination Procedures") are approved for the determination of the allowed

amount of the portion of the Structured Securities Claims included on Exhibit 1 attached

hereto (the "Structured Securities Claims") that are based on Structured Securities for the

purposes of voting and distributions under the Debtors' Plan (as such may be amended,

modified or supplemented) (the "Plan"):

(a)    <u>Notice of Proposed Allowed Claim Amount</u>:  On or prior to August 15, 2011, the Debtors shall publish on <u>www.lehman-docket.com</u> a list of each Structured Security Claim and the corresponding the Proposed Allowed Claim Amount calculated using the Structured Securities Valuation Methodology and a copy of the statement of the Creditors' Committee in response to the Motion (the "<u>Creditors' Committee Statement</u>").  In addition, on or prior to August 24, 2011, the Debtors shall send to each holder of a Structured Securities Claim included on the official claims register ("<u>Claims Register</u>") on August 1, 2011 a notice substantially in the form annexed as <u>Exhibit D</u> to the Motion (the "<u>Notice of Proposed Allowed Claim Amount</u>"), which shall include a reference to a copy of the Creditors' Committee Statement located on the Debtors' website, by overnight mail delivery, fax or email (where available) to each Claimant (and any known attorneys for such Claimant that have appeared in these cases) at the address set forth on the Proof of Claim or relevant claim transfer notice, as applicable.

(b)    <u>Claimant's Response to Proposed Allowed Claim Amount</u>: If any holder of a Structured Securities Claim disputes the Proposed Allowed Claim Amount, then such holder must deliver a written response (a "<u>Response</u>"), so that such Response is <u>actually received</u> no later than 60 days after the delivery of the Notice of Proposed Allowed Claim Amount (the "<u>Response Deadline</u>") to LBHI at 1271 Avenue of the Americas, New York, NY 10020 (Attn: Holly Clack and Tina Pederson), with copies to Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153 (Attn: Alfredo R. Perez, Esq. and Mark Bernstein, Esq.) and Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Evan R. Fleck, Esq. and Matthew Brod, Esq.); *provided* that the Debtors may in their reasonable discretion extend such Response Deadline with respect to any Structured Securities Claims.  Any such Response must specify the grounds for such dispute.  Notwithstanding the foregoing, to the extent any Claimant makes a reasonable request for information from the Debtors as to the claim filed by the Claimant, the Debtors agree to continue as they have been doing, to respond to such requests in good faith.

(c)    <u>Claim Allowance</u>.  To the extent that any Claimant does not timely deliver a Response as set forth above on or prior to the Response Deadline, (1) such Claimant will be deemed to have consented to the Proposed Allowed Claim Amount for the portion of their claim based on Structured Securities for purposes of voting and

distributions under the Plan and (2) Epiq Bankruptcy Solutions, LLC, as the Court-appointed claims agent (the "Claims Agent") shall be authorized to modify the Claims Register to reflect the Proposed Allowed Claim Amount and to reflect that for the portion of their claim based on Structured Securities such claim is deemed allowed in such amount for the purposes of voting and distributions under the Plan.

(d)    Claims ADR.  If the Debtors and a Claimant are unable to consensually resolve any timely delivered Response, the Motion shall be deemed to be an objection to such claim and the claim shall be deemed to be a "Contested Claim" as such term is defined in the *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures For Claims Against Debtors* [Docket No. 8474] (the "Claims ADR Order"), and the Debtors may commence the ADR Procedures or schedule a Merits Hearing (as such terms are defined in the Claims ADR Order) in accordance with the provisions of the Claims ADR Order.

and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the compromise of the amounts of the portion of the Structured Securities Claims based on Structured Securities at the Proposed Allowed Claim Amounts, or such other amount agreed to between the Debtors and the applicable Claimant are approved; and it is further

ORDERED that, providing the Notice of Proposed Allowed Claim Amount to each Claimant (and any attorneys that have appeared in this case on behalf of such Claimants) at the address set forth on the Structured Securities Claims or at such other or additional address as Claimants have requested in writing is fair, reasonable and proper notice to the Claimants regarding the Debtor's request to allow the Structured Securities Claims for the purposes of voting and distribution under the Plan; and it is further

4

ORDERED that the Debtors are authorized to take any and all steps necessary and appropriate to implement the Structured Securities Claim Determination Procedures; and it is further

ORDERED that the Structured Securities Claim Determination Procedures do not affect of modify the rights of any holder of a Structured Securities Claim under the terms of the Structured Securities or their rights to dispute or challenge the Proposed Allowed Claim Amount or to defend the previously asserted claim amount; and it is further

ORDERED that, notwithstanding anything herein, the Debtors reserve the right to object to the Structured Securities Claims at any time, including, after such claims have been allowed for the purposes of voting and distributions under the Plan, on the grounds that such claims do not include a blocking number or include an invalid blocking number, are duplicative of other claims, have been amended and superseded, or otherwise do not comply with the provisions of the Bar Date Order; and it is further

ORDERED, that the Debtors reserve the right to modify the Maximum Allowable Amount of each Structured Security or Proposed Allowed Claim Amounts in order to correct any manifest errors (including inconsistent application of these principles) in the application of the Structured Securities Valuation Methodologies; and it is further

ORDERED, that nothing contained herein shall preclude any party in interest from using the Proposed Allowed Claim Amount or such other amount at which a Structured Securities Claim may be deemed allowed pursuant to the Structured Securities Claim Valuation Procedures as the allowed amount of a Structured Securities Claim for

purposes of voting and distribution in connection with any alternative chapter 11 plan now pending before the Court or that may be subsequently filed in the Debtors' chapter 11 cases by any party in interest (it being understood that all parties reserve their rights with respect thereto); and it is further

ORDERED that within the (10) business days following the Response Deadline, the Debtors will file with the Court a notice identifying (i) each Structured Securities Claim and Structured Security, identified by the International Securities Identification Number, for which timely Responses were received by the Debtors and (ii) a list of Structured Securities Claims for which the Response Deadline has been extended; and it is further

ORDERED that notwithstanding anything contained herein, any portions of the Structured Securities Claims that are based on Structured Securities that are beneficially owned by an entity that is an affiliate of the Debtors shall not be subject to this Order or the procedures set forth herein in any respect and this Order shall not have any affect on the allowed amount of such portion of the Structured Securities Claims; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order and the relief granted herein.

Dated: New York, New York
       August 10, 2011

_s/ James M. Peck_
Honorable James M. Peck
United States Bankruptcy Judge

EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                          :
In re                                                     :    Chapter 11 Case No.
                                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                  :    08-13555 (JMP)
                                                          :
                           Debtors.                       :    (Jointly Administered)
                                                          :
------------------------------------------------------------------x

## ORDER CONFIRMING MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

Lehman Brothers Holdings Inc. and its affiliated debtors,[1] (collectively, the

"Debtors"), each having proposed and filed the Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and its Affiliated Debtors, dated August 31, 2011 (as subsequently

supplemented, amended or modified, including by the Plan Supplement, the "Plan")[2] and the

Disclosure Statement for the Plan, dated August 31, 2011 (as amended, the "Disclosure

Statement"); and the Court having entered the *Amended Order (I) Approving the Proposed*

*Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing,*

*(II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing,*

*and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint*

*Chapter 11 Plan*, dated September 1, 2011 [ECF No. 19631] (the "Disclosure Statement Order");

---

[1] The Debtors are: Lehman Brothers Holdings Inc., LB 745 LLC, PAMI Statler Arms LLC, Lehman Brothers Commodity Services Inc., Lehman Brothers Special Financing Inc., Lehman Brothers OTC Derivatives Inc., Lehman Brothers Derivatives Products Inc., Lehman Commercial Paper Inc., Lehman Brothers Commercial Corporation, Lehman Brothers Financial Products, Inc., Lehman Scottish Finance L.P., CES Aviation LLC, CES Aviation V LLC, CES Aviation IX LLC, East Dover Limited, Luxembourg Residential Properties Loan Finance S.a.r.l., BNC Mortgage LLC, Structured Asset Securities Corporation, LB Rose Ranch LLC, LB 2080 Kalakaua Owners LLC, Merit LLC, LB Somerset LLC, and LB Preferred Somerset LLC.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Exhibit A. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is defined in title 11 of the United States Code (the "Bankruptcy Code") or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

and the Disclosure Statement, the Plan and the Solicitation Packages (as defined below) having

been distributed to holders of Claims entitled to vote on the Plan as provided in the Disclosure

Statement Order; and due notice of (i) entry of the Disclosure Statement Order, (ii) the hearing

on confirmation of the Plan (the "<u>Confirmation Hearing</u>"), and (iii) the deadline for voting on,

and/or objecting to, the Plan having been provided to holders of Claims against and Equity

Interests in the Debtors and other parties in interest in accordance with the Disclosure Statement

Order, the Bankruptcy Code and the Bankruptcy Rules, as established by the affidavits of

service, mailing, and/or publication filed with the Court; and the following documents having

been filed in support of or in connection with the confirmation of the Plan:

(i)    Affidavit of Solicitation Mailing [ECF No. 20882] (the "<u>Notice</u>

<u>Affidavit</u>");

(ii)    Affidavits of Publication of Notice of (a) Approval of the Disclosure

Statement, (b) Establishing the Record Date, (c) Hearing on Confirmation of the Plan and

Procedures for Objecting to Confirmation of the Plan and (d) Procedures and Deadline for

Voting on Plan [ECF No. 21695] (the "<u>Publication Affidavits</u>");

(iii)    Declaration of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions,

LLC Regarding Voting and Tabulation of Ballots Cast on Debtors' Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated as of

November 29, 2011 [ECF No. 22743] (as supplemented on December 5, 2011 [ECF No. 22972],

the "<u>Voting Certification</u>");

(iv)    the Plan Supplement, dated October 25, 2011 and amendments thereto (the

"<u>Plan Supplement</u>") [ECF Nos. 21254, 21665, 22156, 22590, 22742, 22876, 22975 and 22980];

(v)    the Debtors' Memorandum of Law Pursuant to Section 1123(b)(3)(A) of

the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, In Support

of Plan Settlements, dated November 29, 2011 (the "Debtors' Memorandum of Law In Support

of the Global Settlement") [ECF No. 22749];

(vi)    the Debtors' Memorandum of Law in Support of Confirmation of Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors,

dated November 29, 2011 (the "Debtors' Memorandum of Law In Support of Confirmation")

[ECF No. 22747];

(vii)    the Declaration of John K. Suckow in Support of Confirmation of Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors,

dated November 29, 2011 [ECF No. 22759] (the "Suckow Declaration");

(vii)    the Declaration of Daniel J. Ehrmann in Support of Confirmation of Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors,

dated November 29, 2011 [ECF No. 22760] (the "Ehrmann Declaration");

(ix)    the Declaration of Steven J. Cohn in Support of Confirmation of Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors,

dated November 29, 2011 [ECF No. 22761] (the "Cohn Declaration");

(x)    the Debtors' Response to Objections to Confirmation, dated November 29,

2011 (the "Debtors' Response") [ECF No. 22751];

(xi)    the Statement of Official Committee of Unsecured Creditors (I) In Support

of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors and (II) In Response to Objections to Such Plan, dated as of November 29, 2011 [ECF

No. 22773];

(xii)    the statements of numerous other Creditors in support of confirmation of

the Plan; and

(xiii)    objections to confirmation of the Plan by certain parties;

3

and each of the objections having been resolved, overruled, or withdrawn at or prior to the

Confirmation Hearing; and the Court having held the Confirmation Hearing commencing on

December 6, 2011; and after full consideration of the record of the Chapter 11 Cases, including,

without limitation, motions, applications and orders in the Chapter 11 Cases, the foregoing

documents, and the evidence admitted and arguments of counsel made at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

DETERMINED, FOUND, ADJUDGED, AND DECREED:

## **FINDINGS OF FACT**

A.      <u>Findings of Fact</u>.  The findings set forth herein and in the record of the

Confirmation Hearing constitute the Court's findings of fact pursuant to Rule 52 of the Federal

Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the

extent any of the following findings of fact constitute conclusions of law, they are adopted as

such.

B.      <u>Separate Chapter 11 Plans for Each Debtor</u>.  Unless otherwise expressly

contemplated herein, any statement regarding the Plan or the satisfaction of any requirements by

the Plan or the Debtors, or approval of Plan, shall be deemed to apply separately to the chapter

11 plan of each of the Debtors.  Unless otherwise expressly contemplated herein, any statements

included herein referring to actions taken by the Debtors shall be deemed to mean actions taken

by each Debtor in connection with its Plan.

C.      <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2),</u>

<u>1334(a))</u>.  This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has exclusive jurisdiction

to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code

and should be confirmed.

        D.     <u>Commencement of Chapter 11 Cases</u>.  Commencing on September 15,

2008 and periodically thereafter (as applicable, the "<u>Commencement Date</u>"), LBHI and certain

of its Affiliates commenced with this Court voluntary cases under chapter 11 of the Bankruptcy

Code.  The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and

are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors

are authorized to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

        E.     <u>Judicial Notice</u>.  The Court takes judicial notice of the docket of the

Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent,

including, without limitation, all pleadings and other documents filed, all orders entered, and the

evidence and arguments made, proffered, or adduced at the hearings held before the Court during

the pendency of the Chapter 11 Cases, including, but not limited to, the hearing to consider the

adequacy of the Disclosure Statement.

        F.     <u>Burden of Proof</u>.  The Debtors have met their burden of proving the

elements of section 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

        G.     <u>Transmittal and Mailing of Materials; Notice</u>.  On, September 1, 2011, the

Court entered the Disclosure Statement Order, which, among others things, approved the

Disclosure Statement, finding the Disclosure Statement contained "adequate information" under

section 1125 of the Bankruptcy Code, established the procedures for the solicitation, voting, and

tabulation of votes on the Plan, and approved the form of ballots and master ballots (the

"<u>Ballots</u>").  The Disclosure Statement, the Plan, the Ballots, the Disclosure Statement Order, the

notice of the scheduling of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>"), and a

letter from the Creditors' Committee in support of the Plan (translated into five languages) (such

documents, collectively, the "Solicitation Package"), were transmitted and served in compliance

with the Disclosure Statement Order, the Bankruptcy Rules, and the Local Bankruptcy Rules for

the Southern District of New York (the "Local Rules"), and such transmittal and service, as

evidenced by the Notice Affidavit was adequate and sufficient. The Debtors' publication of the

Confirmation Hearing Notice in *The New York Times, The Wall Street Journal, the Financial*

*Times, The Times of London, the Sydney Morning Herald, the Tribune De Geneve, the DE*

*Telegraaf, the Apple Daily, the Tages Anzeiger, the Luxemburger Wort, the Corriere Del Ticino,*

*the Frankfurter Allgemeine Zeitung,* and *Yomiuri Shimbun*, as set forth in the Publication

Affidavits (i) complied with the Disclosure Statement Order, (ii) was adequate and sufficient

under the circumstances of these Chapter 11 Cases, (iii) provided adequate notice of the deadline

for objecting to confirmation of the Plan, and the date, time and location of the Confirmation

Hearing, and (iv) provided due process to all parties in interest in these Chapter 11 Cases. No

other or further notice is required.

      H.     Voting. Votes on the Plan were solicited after disclosure of "adequate

information" as defined in section 1125 of the Bankruptcy Code. As described in the Voting

Certification, votes to accept or reject the Plan have been solicited and tabulated fairly, in good

faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the

Disclosure Statement Order.

      I.     Plan Supplement. On October 25, 2011, the Debtors filed the Plan

Supplement, which included certain documents and agreements contemplated by the Plan,

including the forms of revised certificates of incorporation and by-laws, or similar documents,

for each Debtor other than Lehman Scottish Finance L.P. and East Dover Limited; the schedules

of executory contracts and unexpired leases to be assumed pursuant to the Plan; the Plan Trust

6

Agreement; the form of Debtor Allocation Agreement; copies of settlement agreements that are incorporated into the Plan pursuant to sections 6.5(b)(viii) and (j) of the Plan; an amendment to the Plan; an updated recovery and liquidation analysis for SASCO and LBCC; a schedule of Claims by Debtor-Controlled Entities against the Debtors; a reconciliation of the ownership of certain assets as between certain Debtors; and a list of Debtor-Controlled Entities that may be dissolved or merged in accordance with the Plan.  The Plan Supplement was amended on October 25, 2011, November 4, 2011, November 15, 2011, November 22, 2011, November 29, 2011, December 2, 2011 and December 5, 2011.  The Plan Supplement complies with the provisions of section 15.5 of the Plan.

       J.      <u>Modifications to the Plan</u>.  The Plan, and documents, amendments or supplements to the Plan included in the Plan Supplement and any amendments thereto, as modified by the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, filed on November 29, 2011 and December 5, 2011 (the "<u>Plan Modifications</u>"), shall constitute the Plan.

       K.      <u>Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

       L.      <u>Compliance with Bankruptcy Rule 3016(a)</u>.  The Plan is dated and identifies the entities submitting the Plan as proponents, thereby satisfying Bankruptcy Rule 3016(a).

       M.      <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In addition to Administrative Expense Claims and Priority Tax Claims which need not be designated, the Plan designates 16 Classes of Claims against LBHI, 8 Classes of Claims against each of LCPI and LBSF, 7 Classes of Claims against each of LBCS, LBCC and LOTC and 5 Classes of Claims

against each of the other Debtors, and one Class of Equity Interests for each Debtor.  As required

by section 1122(a) of the Bankruptcy Code, the Claims and Equity Interests placed in each Class

are substantially similar to other Claims and Equity Interests, as the case may be, in each such

Class.

(i)    Justification for Separate Classification.  Valid business, factual, and legal

reasons exist for separately classifying the various Classes of Claims and Equity Interests created

under the Plan.  The classification takes into account the nature of Claims and the differing legal

rights of the holders of such Claims.  The nature of Claims and legal rights of the holders differ

for (i) Claims asserted by Affiliates and third-party Creditors, (ii) direct Claims against a Debtor

and Guarantee Claims, (iii) Claims subject to contractual or statutory subordination, and (iv)

Claims entitled to be treated as senior obligations.  In addition, the classification of Claims

pursuant to the Plan takes into account the nature and risks of certain Claims in respect of the

Plan Issues.  These issues include: whether the equitable doctrine of substantive consolidation

may be applied to the Debtors and their Affiliates; the characterization of the intercompany

balances owed to LBHI by Subsidiary Debtors; the Allowed amounts of Affiliate Claims; the

ownership and rights of various Debtors and their Affiliates with respect to certain assets; the

allocation of costs and expenses of administration among the Debtors; and the post-effective date

governance of the Debtors (collectively, the "Plan Issues"). The relative risks and benefits of

potential litigation of the Plan Issues is a reasonable basis for the Plan to provide for separate

classification of such Claims.  If the Debtors and their Affiliates were substantively consolidated,

generally, all Claims based on LBHI's guarantees of the obligations of its Affiliates and all

Claims of Affiliates would be disregarded.  The different nature of Claims, the legal rights of the

holders of Claims and the recovery entitlements of Claims in the separate Classes, are a

reasonable basis for separately classifying Claims.

(ii)    <u>Contractual Subordination Agreements</u>.  The contractual terms of the

indentures pursuant to which LBHI issued Subordinated Notes provide that upon the bankruptcy

of LBHI, no payments will be made to holders of the Subordinated Notes until all obligations of

LBHI designated as "senior" in the indentures have been satisfied in full.  The Plan gives effect

to these provisions by separately classifying Claims based on their respective priority in relation

to the Subordinated Notes and the entitlement to receive amounts that would otherwise have

been distributed to holders of Claims based on the Subordinated Notes.

(iii)    <u>Convenience Claims and Convenience Guarantee Claims (11 U.S.C. §</u>

<u>1122(b))</u>.  The definition and classification of Convenience Claims and Convenience Guarantee

Claims are reasonable and necessary for administrative convenience.  The inclusion of

convenience Classes in the Plans of LBHI, LBCS, LBCC, LBSF, LCPI and LOTC will permit

those Debtors to make a single Distribution on account of Convenience Claims and Convenience

Guarantee Claims against such Debtors and avoid the administrative burden of tracking the

transfers of these Claims, repeating the calculations of the Distributions to holders of such

Claims, providing notices to holders of such Claims and preparing and mailing or wiring

Distributions to holders of such Claims on each Distribution Date.  The definitions of

Convenience Claims and Convenience Guarantee Claims, including the exclusions of Claims

based on public debt securities issued or guaranteed by LBHI or a Claim filed by a nominee on

behalf of one or more beneficial holders of Claims, is reasonable and necessary for

administrative convenience.

N.    <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  The Plan does

not include any Classes of Claims that are unimpaired under the Plan.  The Plan satisfies section

1123(a)(2) of the Bankruptcy Code.

9

O.    <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.  All

Classes of Claims are impaired under the Plan.  Articles III, IV and V of the Plan specify the

treatment for each Class of Claims, thereby satisfying section 1123(a)(3) of the Bankruptcy

Code.

P.    <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  The Plan provides for the

same treatment by the Debtors for each Claim or Equity Interest in each respective Class unless

the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of

such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

Q.    <u>Implementation of Plan (11 U.S.C. § 1123(a)(5))</u>.  The Plan, including the

various documents and agreements set forth in the Exhibits to the Plan and the Plan Supplement,

provide adequate and proper means for the Plan's implementation, including (i) the appointment

of a Plan Administrator with the duties and responsibilities set forth in Section 6.1(b) of the Plan

to administer and maximize the value of the Debtors' estates; (ii) the Global Settlement and

Bilateral Settlements incorporated into the Plan; (iii) the provisions governing Distributions

under the Plan; (iv) the procedures governing the allowance of Claims under the Plan; (v) the

dissolution or wind down of a Debtor or Debtor-Controlled Entity in accordance with applicable

law and consistent with the implementation of the Plan; and (vi) the liquidating trust vehicles

that may be created under the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy

Code. *See* Plan, Arts. VI-X.

R.    <u>Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.  To the extent

applicable, each Debtor's certificate of incorporation, bylaws or limited liability company

agreement, as applicable, shall be amended as of the Effective Date to contain a provision that

prohibits the issuance of nonvoting equity securities prohibited by section 1123(a)(6), thereby

satisfying section 1123(a)(6) of the Bankruptcy Code.

S.      Selection of Officers, Directors, or Trustees (11 U.S.C. § 1123(a)(7)).

Sections 7.2, 7.3 and 7.4 of the Plan provide for the manner in which the boards of directors of

each of the Debtors will be appointed following the Effective Date.  Such provisions are

consistent with the interests of Creditors, equity security holders, and public policy, thereby

satisfying section 1123(a)(7) of the Bankruptcy Code.  Prior to the Confirmation Hearing, the

Debtors have filed with the Court a list of the persons selected to serve on the board of directors

of LBHI following the Effective Date [ECF No. 22931].

T.      Additional Plan Provisions (11 U.S.C. § 1123(b)).  The provisions of the

Plan are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code,

thereby satisfying section 1123(b) of the Bankruptcy Code.  The failure to specifically address a

provision of the Bankruptcy Code in this Confirmation Order shall not diminish or impair the

effectiveness of this Confirmation Order.

U.      Assumption and Rejection (11 U.S.C. § 1123(b)(2)).  Article XI of the

Plan and the Plan Supplement (as amended) provide for the rejection of executory contracts and

unexpired leases of the Debtors as of the Effective Date, except for any executory contract or

unexpired lease (i) that has been assumed pursuant to an order of the Bankruptcy Court prior to

the Effective Date, (ii) as to which a motion for approval of the assumption of such executory

contract or unexpired lease has been filed and served prior to the Confirmation Date or (iii) that

is specifically designated as an executory contract or unexpired lease to be assumed in the Plan

Supplement, and any amendment thereto.  Pursuant to the notices sent out by the Debtors to each

party to a contract proposed to be assumed by the Debtors (each, a "Cure Notice"), the Debtors

provided notice of any defaults to be cured with respect to each contract to be assumed by the

Debtors.  Numerous parties filed objections to the assumption of their contracts; a hearing before

the Court on the assumption of such contracts has been scheduled for February 14, 2012 at 10:00

11

a.m.  In addition, the Debtors have agreed with certain other parties to defer without date

disputes regarding whether a particular contract is executory and, if executory, whether (i) the

obligations thereunder are severable and (ii) whether the contract will be assumed or rejected.

The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

V.       Settlement/Retention of Claims or Interests (11 U.S.C. § 1123(b)(3)).  The

Plan includes a settlement and compromise of the Plan Issues that is designed to achieve a fair

and efficient resolution of the Chapter 11 Cases.  Pursuant to Section 1123(b)(3) of the

Bankruptcy Code and Bankruptcy Rule 9019, the Plan constitutes a settlement of potential

litigation of the Plan Issues.  The terms of the Plan reflect an integrated and comprehensive

settlement that resolves the various Plan Issues through (i) the Plan Adjustment; (ii) Distributions

to LBHI on only 80% of the portion of its Claims against the Subsidiary Debtors relating to

intercompany funding; (iii) the reallocation of the first $100 million distributed to LBHI on

account of its Claims against LBSF and LCPI to holders of General Unsecured Claims in LBSF

Class 4A and LCPI Class 4A; (iv) the Distribution to holders of General Unsecured Claims in

LBSF Class 4A and Affiliate Claims in LBSF Class 5C of the first $70 million recovered by

LBSF on account of its assets in excess of $14.156 billion; (v) the Allowed amount of Claims

asserted by Designated Entities; (vi) the allowance of LBT's intercompany Claim against LBHI

in the amount of $34.548 billion; (vii) the allocation of costs and expenses incurred in the

administration of the estates pursuant to the Debtor Allocation Agreement; and (viii) the

principles included in the Structured Securities Valuation Methodologies (the "Global

Settlement").  Each component of the Global Settlement is an integral part thereof.  The Plan was

accepted by Creditors holding 95.00% of voting Claims in the aggregate amount of

approximately $400 billion.  The Creditors supporting the Global Settlement include the

Creditors' Committee, the Ad Hoc Group,[3] certain of the Non-Con Plan Proponents[4] and certain

Foreign Affiliates (as defined below), each of which is a sophisticated party and represented by

counsel that is recognized as being knowledgeable and experienced in the field of complex

chapter 11 cases. The Global Settlement is a result of good faith arms'-length negotiations. The

Global Settlement is consistent with section 1123(b)(3) of the Bankruptcy Code.

(i)    Substantive Consolidation.

a.    The Debtors and the Creditors' Committee have conducted

a thorough factual and legal analysis to determine whether the substantive consolidation of the

Debtors and their Affiliates is appropriate. The facts and analysis set forth in the Disclosure

Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, and the

Suckow Declaration, reflect that there are facts that support and facts that militate against the

substantive consolidation of the Debtors and their Affiliates based upon the law in this

jurisdiction. There is a possibility that if litigated to final judgment, a court may find that the

substantive consolidation of the Debtors and their affiliates, including their Foreign Affiliates, is

appropriate.

b.    The Global Settlement gives due consideration to the

strengths and weaknesses of potential arguments that have been made for and against substantive

---

[3] The Ad Hoc Group consists of California Public Employees' Retirement System, Canyon Capital Advisors LLC, City of Costa Mesa, City of Fremont, County of San Mateo, Fiduciary Counselors Inc., Fir Tree, Inc., Gruss Asset Management, L.P., Owl Creek Asset Management, L.P., on behalf of the funds it manages or advises, Paulson & Co. Inc., Perry Capital LLC, on behalf of one or more investment funds for which it or an affiliate acts as investment advisor or general partner, Taconic Capital Advisors L.P. and Vallejo Sanitation and Flood Control District.

[4] The Non-Con Plan Proponents are Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Credit Agricole CIB, Credit Suisse International, Cyrus Capital Partners, LP, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldentree Asset Management, LP, Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Morgan Stanley & Co. International plc., Morgan Stanley Capital Services Inc., Mount Kellett Capital Management, Oaktree Capital Management, L.P., The Royal Bank of Scotland plc, Serengeti Asset Management LP, Silver Point Capital, L.P., State Street Bank and Trust Company, and York Capital Management Global Advisors, LLC.

13

consolidation.  Litigation regarding substantive consolidation of the Debtors would require vast

amounts of discovery and investigation into the operations of Lehman prior to the

Commencement Date, would be extraordinarily complex and costly for all parties involved, and

would significantly delay Distributions to all Creditors.

                c.      The Plan Adjustment, which is a key element of the Global

Settlement, ensures that recoveries to all Creditors are within the range of possible litigated

outcomes and fall between the estimated Distributions to each Class if the Participating Debtors

and their affiliates were substantively consolidated or if the Participating Debtors had strict non-

consolidation plans.

           (ii)     <u>Characterization of Intercompany Claims</u>.

                a.      Prior to the Commencement Date, the Debtors and their

Affiliates entered into tens of thousands of transactions daily involving billions of dollars.  The

transactions were recorded on Lehman's general ledger.  The Debtors reviewed a sampling of the

transactions between Debtors and considered the relevant legal standards for the

recharacterization of indebtedness as equity interests.  Based on the facts and analysis set forth in

the Disclosure Statement, the Debtors' Memorandum of Law In Support of the Global

Settlement, and the Cohn Declaration, there is a risk that certain portions of the intercompany

balances owed to LBHI by the Subsidiary Debtors could be recharacterized as equity

contributions if such matter were litigated to final judgment.

                b.      The Global Settlement gives due consideration to the

strengths and weaknesses of potential arguments for and against the recharacterization of

intercompany balances.  Litigation regarding characterization of a vast number of intercompany

balances would be extremely time consuming and expensive, and would delay Distributions to

all Creditors.

14

c.     By providing that the Distribution that LBHI will receive is based only on a portion of its Claims against the Subsidiary Debtors, the Plan provides recoveries to all Creditors that are within the range of possible litigated outcomes.

(iii)     Amount of Intercompany Claims/ Ownership of Assets.

a.     As a result of the large number of intercompany transactions among the Debtors and their Affiliates prior to the Commencement Date, there are many intercompany receivables and payables between Debtors.  The Debtors and their advisors have reviewed some of the transactions and the transfer of assets among the Debtors and determined that it is in the best interests of all Debtors and their Creditors to agree to the intercompany Claims among the parties in the amounts set forth on the books and records, subject to certain adjustments, and not to pursue any avoidance actions.

b.     The Plan establishes the Allowed amount of Claims among the Debtors and Claims of the Debtor-Controlled Entities against the Debtors and provides that all other Claims or causes of action are irrevocably released and waived.  The terms of the Global Settlement give due consideration to the strengths and weaknesses of potential arguments regarding the Claims among such entities and the ownership of assets.  Litigation regarding the amount or validity of thousands of intercompany balances and ownership of the Debtors' assets would be extremely time consuming and expensive, and would delay Distributions to all Creditors.

c.     The settlement of all Claims among the Debtors in the amounts set forth on the books and records, subject to certain adjustments, is within the range of possible litigated outcomes.

(iv)   Settlements with Foreign Affiliates and Certain Third-Party Creditors
Incorporated in the Plan.

a.   Lehman was a worldwide enterprise prior to the

Commencement Date which included affiliates organized and doing business in many

international jurisdictions.  Following the Commencement Date, insolvency or liquidation

proceedings were commenced with respect to 80 of the Foreign Affiliates of the Debtors in 16

jurisdictions.  Due to the manner in which Lehman operated prior to the Commencement Date,

upon the fracturing of the Lehman enterprise, the Foreign Affiliates and the Debtors had

significant Claims against each other.

b.   The Debtors have entered into settlement agreements with

Lehman Brothers Bankhaus AG, Lehman Brothers Treasury Co. B.V., Lehman Brothers

Securities N.V., Lehman Brothers International (Europe) and the Lehman UK Entities, Lehman

Brothers (Luxembourg) Equity Finance S.A. (*en faillite*), Lehman Brothers (Luxembourg)

Equity Finance S.A. (in liquidation), the Hong Kong Lehman Entities In Liquidation, the

Lehman Singapore Entities, the Lehman Japan Entities (collectively, the "Foreign Affiliates"),

Deutsche Bundesbank ("Bundesbank"), Bundesverband deutscher Banken E.V. ("BdB"),

Entschädigungseinrichtung deutscher Banken GmbH ("EdB"), and Deutsche Bank and certain

holders of participations in Claim Nos. 59006 and 58233 (collectively, the "Bilateral

Settlements").  Each of the Bilateral Settlements with the Foreign Affiliates, BdB, EdB and

Bundesbank takes into account the various Plan Issues, specifically substantive consolidation,

and the validity and enforceability of asserted Guarantee Claims.  Many of the Foreign Affiliates

asserted Guarantee Claims against LBHI based upon certain corporate resolutions, pursuant to

which LBHI purportedly guaranteed the obligations of certain of its Affiliates.  LBHI has

reviewed such Claims and has challenged the enforceability of such Claims.

16

c.      The Bilateral Settlements, other than the agreement with

Deutsche Bank, take into account the fact that Claims of the affiliates and Guarantee Claims

would be disregarded if the Debtors and its affiliates were substantively consolidated and the risk

that certain Guarantee Claims may be unenforceable against LBHI, and, therefore, allow the

Claims of the Foreign Affiliates in amounts substantially less than the asserted amounts.

d.      The Bilateral Settlement with Deutsche Bank takes into

account the relative strengths of the arguments regarding the classification of certain Claims and

the interpretation of the applicable agreements in which such Claims were settled and Allowed.

e.      The Bilateral Settlements resulted in a reduction of Claims

asserted against the Debtors by more than $295 billion.

f.      Each of the Bilateral Settlements was negotiated in good

faith and at arm's length.

W.      Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).

The Debtors have complied with the applicable provisions of the Bankruptcy Code, except as

otherwise provided or permitted by orders of the Court.  The Debtors have complied with the

applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy

Rules, and the Disclosure Statement Order in transmitting the Solicitation Packages and related

documents and notices and in soliciting and tabulating votes on the Plan.

X.      Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).  The Debtors have

proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying

section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts

and record of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the

record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  The

Plan was proposed with the legitimate and honest purpose of maximizing the value of the

17

Debtors' estates and effectuating an orderly liquidation of the Debtors. The Plan was negotiated

at arm's length among representatives of the Debtors, the Creditors' Committee, the Ad Hoc

Group, certain of the Non-Con Plan Proponents, certain holders of notes issued by LBT and

guaranteed by LBHI, various Foreign Affiliates and other Creditors. More than 150 parties that

asserted approximately $450 billion in Claims have entered into Plan Support Agreements in

connection with the Plan.

    Y.  <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>.

All payments made or to be made by any of the Debtors for services or for costs and expenses in

connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter

11 Cases, have been approved by, or are subject to the approval of, the Court, thereby satisfying

section 1129(a)(4) of the Bankruptcy Code.

    Z.  <u>Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>. The Debtors

have complied with section 1129(a)(5) of the Bankruptcy Code. Sections 7.2 and 7.3 of the Plan

provide for the manner in which the board of directors of each of the Debtors will be selected.

The Debtors have filed with the Court a list of the directors selected by the Director Selection

Committee to serve on the board of directors of LBHI following the Effective Date. The

appointment to such offices of such persons is consistent with the interests of holders of Claims

against and Equity Interests in the Debtors and with public policy. The Plan, therefore, complies

with section 1129(a)(5) of the Bankruptcy Code.

    AA.  <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not provide for

any rate changes by the Debtors, and, therefore, section 1129(a)(6) of the Bankruptcy Code is

inapplicable in these Chapter 11 Cases.

    BB.  <u>Best Interests of Creditors (11 U.S.C. § 1129(a)(7))</u>. The Plan satisfies

section 1129(a)(7) of the Bankruptcy Code. The Disclosure Statement, the Plan Supplement, the

Cohn Declaration and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an impaired Claim or Equity Interest in each Debtor will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the applicable Debtor were hypothetically liquidated under chapter 7 of the Bankruptcy Code on such date. The assumptions and estimates in the liquidation analysis that are set forth in Exhibit 5 to the Disclosure Statement are reasonable in the context of these Chapter 11 Cases, including the assumption that the compromises and settlements incorporated in the Plan would also be consummated in a hypothetical chapter 7 liquidation. Conversion of the Chapter 11 Cases to chapter 7 would result in substantial additional delay and expense, as well as diminished asset value.

CC.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). Other than classes of Claims identified in the Voting Certification for which no votes were cast (the "Non-Voting Classes"), at each Debtor, all Classes in which Creditors were entitled to vote have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code. Under these circumstances and in light of the overwhelming support for the Plan, the Non-Voting Classes are deemed to have accepted the Plan. Claims in LBHI Class 10A, 10B, 10C and 11 (the "Deemed Rejecting Classes of Claims"), and Equity Interests in each of the Debtors are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Deemed Rejecting Classes of Claims and the Classes of Equity Interests in each Debtor, each Debtor's Plan is confirmable because each Plan satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes.

19

DD.    Treatment of Administrative Expenses, Priority Non-Tax Claims, and

Priority Tax Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Administrative Expense Claims

and Priority Non-Tax Claims pursuant to Sections 2.1 of the Plan satisfies the requirements of

sections 1129(a)(9)(A) and (B) of the Bankruptcy Code, and the treatment of Priority Tax Claims

pursuant to Section 2.3 of the Plan satisfies the requirements of section 1129(a)(9)(C) of the

Bankruptcy Code.  Each Debtor has sufficient Cash to pay Allowed Administrative Expense

Claims, Allowed Priority Non-Tax Claims, and Allowed Priority Tax Claims.

EE.    Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10)).  At least one

Class of Claims against each Debtor that is impaired under the Plan has accepted the Plan,

determined without including any acceptance of the Plan by any insider, thus satisfying the

requirements of section 1129(a)(10) of the Bankruptcy Code.

FF.    Feasibility (11 U.S.C. § 1129(a)(11)).  The Debtors' Memorandum of Law

in Support of Confirmation, the Disclosure Statement and the Suckow Declaration are persuasive

and credible evidence that each Debtor will have sufficient funds to continue to manage its assets

and make all payments required under the Plan.  Accordingly, the Plan satisfies the requirements

of section 1129(a)(11) of the Bankruptcy Code.

GG.    Payment of Fees (11 U.S.C. § 1129(a)(12)).  All fees payable under

section 1930 of title 28, United States Code, as determined by the Court, have been paid or will

be paid pursuant to Section 15.7 of the Plan.  Thus, the Plan satisfies the requirements of section

1129(a)(12) of the Bankruptcy Code.

HH.    Benefit Plans (11 U.S.C. § 1129(a)(13)).  Section 1123(a)(13) is

inapplicable to the Debtors.

II.    Inapplicable Sections of Section 1129 of the Bankruptcy Code.  Sections

1129(a)(14), 1129(a)(15), 1129(a)(16) and 1129(e) are inapplicable in the Debtors' Chapter 11

Cases.

JJ.    Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b)).

Based on the Disclosure Statement, the Debtors' Memorandum of Law In Support of the Global

Settlement, the Debtors' Memorandum of Law In Support of Confirmation of the Plan, the

Suckow Declaration, and the Debtors' Response, the Plan (i) does not discriminate unfairly, and

(ii) is fair and equitable as to LBHI Classes 10A, 10B, 10C and 11 and the Equity Interests in

each Debtor, which Classes were deemed to reject the Plan, as required by section 1129(b)(1) of

the Bankruptcy Code.

KK.    Only One Plan (11 U.S.C. § 1129(c)).  The Plan is the only plan being

prosecuted in these Chapter 11 Cases, thereby satisfying section 1129(c) of the Bankruptcy

Code.  The Ad Hoc Group and certain of the Non-Con Plan Proponents that signed plan support

agreements have agreed to support the Plan and hold their plans in abeyance and not prosecute or

seek confirmation of the Plan subject to certain termination rights set forth in the Stipulation and

Order, dated June 30, 2011 [ECF Nos. 18306 and 18686].  Neither the Ad Hoc Group nor the

Non-Con Plan Proponents have terminated the Stipulation and Order and both are supporting the

confirmation of the Plan.

LL.    Principal Purpose of the Plan (11 U.S.C. § 1129(d)).  The principal

purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5

of the Securities Act of 1933, thereby satisfying section 1129(d) of the Bankruptcy Code.

MM.    Good Faith Solicitation (11 U.S.C. § 1125(e)).  Based on the record before

the Court in these Chapter 11 Cases, the Debtors and their directors, officers, employees,

members, agents, advisors, attorneys and professionals, the Released Parties and the PSA

Creditors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy

Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy

Rules in connection with all their respective activities relating to the solicitation of acceptance or

rejection of the Plan and their participation in the activities described in section 1125 of the

Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the

Bankruptcy Code and the exculpation provisions set forth in Section 13.3 of the Plan.

      NN.    <u>Assumption and Rejection</u>.  Article XI of the Plan governing the

assumption and rejection of executory contracts and unexpired leases satisfies the requirements

of section 365(b) of the Bankruptcy Code.

      OO.    <u>Releases, Injunction and Exculpation</u>.  In the context of these unique

Chapter 11 Cases, each of the releases, and the injunction and exculpation provisions set forth in

the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a),

1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section

1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated

into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, their

estates, and their Creditors; (e) is important to the overall objectives of the Plan; and (f) is

consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the

Bankruptcy Code, and other applicable law.

      PP.    <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the

requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

      QQ.    <u>Objections</u>.  All parties have had a full and fair opportunity to litigate all

issues raised in the objections (excluding any timely filed objections that relate solely to

assumption of any executory contract), or which might have been raised, and the objections

(excluding any timely filed objections that relate solely to assumption of any executory contract) have been fully and fairly litigated.

RR.    Retention of Jurisdiction.  The Court is authorized to retain jurisdiction over the matters set forth in Article XIV of the Plan and section 1142 of the Bankruptcy Code, as well as any motions filed prior to the Effective Date requesting authorization to use, sell, or lease assets outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code.

## CONCLUSIONS OF LAW

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    Confirmation.  The Plan is approved and confirmed under section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement are authorized and approved.  The terms of the Plan, all Exhibits thereto, and the Plan Supplement are incorporated by reference into and are an integral part of the Plan and this Confirmation Order and are all approved.

2.    Objections.  All objections (excluding any timely filed objections that relate solely to assumption of any executory contract) that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits for the reasons set forth in the Response, the Debtors' Memorandum of Law In Support of Confirmation and the Debtors' Memorandum of Law In Support of the Global Settlement.

3.    Conclusions of Law.  The conclusions of law set forth herein and in the record of the Confirmation Hearing constitute the Court's conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052

and 9014.  To the extent any of the following conclusions of law constitute findings of fact, they

are adopted as such.

4.      <u>Modifications to the Plan</u>.  The Plan Modifications meet the requirements

of sections 1127(a) and (c) of the Bankruptcy Code and do not adversely change the treatment of

the Claim of any Creditor or the Equity Interest of any equity security holder within the meaning

of Bankruptcy Rule 3019, and, therefore, all holders of Claims against the Debtors who voted to

accept the Plan are hereby deemed to have accepted the Plan as amended by the Plan

Modifications, and no further solicitation or voting is required.  No holder of a Claim against the

Debtors who has voted to accept the Plan shall be permitted to change its acceptance or rejection

as a consequence of the Plan Modifications.

5.      <u>Solicitation and Notice</u>.  Notice of the Confirmation Hearing complied

with the terms of the Disclosure Statement Order, was appropriate and satisfactory based upon

the circumstances of the Debtors' Chapter 11 Cases, and was in compliance with the provisions

of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  The solicitation of votes on

the Plan complied with the solicitation procedures in the Disclosure Statement Order, was

appropriate and satisfactory under the circumstances of the Debtors' Chapter 11 Cases, and was

in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local

Rules.  Notice of the Plan Supplement and all related documents, was appropriate and

satisfactory under the circumstances of the Debtors' Chapter 11 Cases, and was in compliance

with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

6.      <u>Implementation</u>.  On and after the Effective Date, the Debtors, and the

Plan Administrator are authorized to (i) execute, deliver, file, or record such documents,

contracts, instruments, releases, and other agreements, including, without limitation, those

contained in the Plan Supplement, (ii) make any and all Distributions and transfers contemplated

pursuant to, and as provided for in, the Plan, and (iii) take such other actions as may be necessary

to effectuate, implement, and further evidence the terms and conditions of the Plan.

7.    <u>Plan Classification Controlling</u>.  The classification of Claims and Equity

Interests for purposes of the Distributions to be made under the Plan shall be governed solely by

the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the

Debtors' Creditors in connection with voting on the Plan (a) were set forth on the Ballots for

purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no way

affect, the actual classification of such Claims and Equity Interests under the Plan for

Distribution purposes, and (c) shall not be binding on the Debtors.

8.    <u>Binding Effect</u>.  The Plan and its provisions shall be binding on the

Debtors, any entity acquiring or receiving property or a Distribution under the Plan, and any

holder of a Claim against or Equity Interest in the Debtors, including all governmental entities,

whether or not the Claim or Equity Interest of such holder (a) is impaired under the Plan or (b)

has accepted the Plan.

**The Global Settlement**

9.    <u>Global Settlement Provisions</u>.  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the Global Settlement set forth in section 6.5 of the Plan, and each

component of the Global Settlement, are hereby approved pursuant to Bankruptcy Rule 9019 as

fair and reasonable and in the best interests of each of the Debtors, their estates and Creditors.

The settlement is within the range of reasonable results if the issues were litigated and falls

above the lowest point in the range of reasonableness.

**The Bilateral Settlements**

10.     The Plan constitutes a motion for approval of each of the Bilateral

Settlements pursuant to Bankruptcy Rule 9019.  The settlement agreements were included in the

Plan or the Plan Supplement, which provided adequate and sufficient notice to all Creditors.

11.     <u>Approval of Bankhaus Settlement.</u>  Based on the Debtors' Memorandum

of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration,

and the Disclosure Statement, the settlement between the Debtors and Lehman Brothers

Bankhaus AG ("<u>Bankhaus</u>") described in the Disclosure Statement and incorporated into the

Plan pursuant to Section 6.5(b)(ii) of the Plan (the "<u>Bankhaus Settlement Agreement</u>") is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the Bankhaus

Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to

perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy

Code, Bankhaus shall have Allowed Claims against the Debtors in the amounts set forth in the

Bankhaus Settlement Agreement.

12.     <u>Approval of LBT Settlement.</u>  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and Lehman Brothers Treasury Co.

B.V. ("<u>LBT</u>") described in the Disclosure Statement and incorporated into the Plan pursuant to

Section 6.5(b)(iii) of the Plan (the "<u>LBT Settlement Agreement</u>") is fair and reasonable and is in

the best interests of the Debtors and their Creditors and is hereby approved pursuant to

Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents, and papers and to take any and all

actions reasonably necessary or appropriate to consummate the LBT Settlement Agreement,

including waiving any conditions precedent to its effectiveness, and to perform any and all

obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, LBT shall

have Allowed Claims against the Debtors in the amounts set forth in the LBT Settlement

Agreement.

13.     Approval of Hong Kong Settlement.  Based on the Debtors' Memorandum

of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration,

and the Disclosure Statement, the settlement between the Debtors and the Hong Kong Lehman

Entities In Liquidation described in the Disclosure Statement and incorporated into the Plan

pursuant to Section 6.5(b)(v) of the Plan (the "Hong Kong Settlement Agreement") is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the Hong Kong

Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to

perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy

Code, the Hong Kong Lehman Entities shall have Allowed Claims against the Debtors in the

amounts set forth in the Hong Kong Settlement Agreement

14.     Approval of Singapore Settlement.  Based on the Debtors' Memorandum

of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration,

and the Disclosure Statement, the settlement between the Debtors and the Lehman Singapore

Entities described in the Disclosure Statement and incorporated into the Plan pursuant to

6.5(b)(vi) of the Plan (the "Singapore Settlement Agreement") is fair and reasonable and is in the

best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy

Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform

any and all obligations, instruments, documents, and papers and to take any and all actions

reasonably necessary or appropriate to consummate the Singapore Settlement Agreement,

including waiving any conditions precedent to its effectiveness, and to perform any and all

obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, Lehman

Singapore shall have Allowed Claims against the Debtors in the amounts set forth in the

Singapore Settlement Agreement.

          15.     <u>Approval of Lehman UK Entities Settlement.</u>  Based on the Debtors'

Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the

Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and the

Lehman UK Entities set forth in the agreement, dated October 24, 2011 included in the Plan

Supplement (the "<u>Lehman UK Entities Settlement Agreement</u>") and incorporated into the Plan

pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best interests of the Debtors

and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019. The Debtors are

duly authorized to execute, deliver, implement and fully perform any and all obligations,

instruments, documents, and papers and to take any and all actions reasonably necessary or

appropriate to consummate the Lehman UK Entities Settlement Agreement, including waiving

any conditions precedent to its effectiveness, and to perform any and all obligations

contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, the Lehman UK Entities

shall have Allowed Claims against the Debtors in the amounts set forth in the Lehman UK

Entities Settlement Agreement.

          16.     <u>Approval of LBJ Settlement.</u>  Based on the Debtors' Memorandum of Law

In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the

Disclosure Statement, the settlement between the Debtors and the Lehman Japan Entities set

forth in the agreement, dated as of October 24, 2011, included in the Plan Supplement (the "LBJ

Settlement Agreement") and incorporated into the Plan pursuant to Section 6.5(b)(vii), is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the LBJ Settlement

Agreement, including waiving any conditions precedent to its effectiveness, and to perform any

and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, the

Lehman Japan Entities shall have Allowed Claims against the Debtors in the amounts set forth in

the LBJ Settlement Agreement.

17.    Approval of LBSN Settlement.  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and the Lehman Brothers

Securities N.V. ("LBSN") set forth in the agreement, dated as of October 19, 2011, included in

the Plan Supplement (the "LBSN Settlement Agreement") and incorporated into the Plan

pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best interests of the Debtors

and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are

duly authorized to execute, deliver, implement and fully perform any and all obligations,

instruments, documents, and papers and to take any and all actions reasonably necessary or

appropriate to consummate the LBSN Settlement Agreement, including waiving any conditions

precedent to its effectiveness, and to perform any and all obligations contemplated therein.

Pursuant to section 502 of the Bankruptcy Code, LBSN shall have Allowed Claims against the

Debtors in the amounts set forth in the LBSN Settlement Agreement.

29

18.    <u>Approval of LB Lux Settlement.</u>  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and Lehman Brothers

(Luxembourg) Equity Finance S.A. (*en faillite*) ("<u>LB Lux</u>") set forth in the agreement, dated as

of October 25, 2011, included in the Plan Supplement (the "<u>LB Lux Settlement Agreement</u>") and

incorporated into the Plan pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best

interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule

9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and

all obligations, instruments, documents, and papers and to take any and all actions reasonably

necessary or appropriate to consummate the LB Lux Settlement Agreement, including waiving

any conditions precedent to its effectiveness, and to perform any and all obligations

contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, LB Lux shall have

Allowed Claims against the Debtors in the amounts set forth in the LB Lux Settlement

Agreement.

19.    <u>Approval of BdB Settlement.</u>  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and BdB set forth in the

agreement, dated as of September 30, 2011, included in the Plan Supplement (the "<u>BdB</u>

<u>Settlement Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the BdB Settlement

Agreement, including waiving any conditions precedent to its effectiveness, and to perform any

and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, BdB

shall have Allowed Claims against the Debtors in the amounts set forth in the BdB Settlement

Agreement.

20.  <u>Approval of EdB Settlement.</u>  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and EdB set forth in the agreement,

dated as of September 30, 2011, included in the Plan Supplement (the "<u>EdB Settlement</u>

<u>Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is fair and reasonable and

is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to

Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents, and papers and to take any and all

actions reasonably necessary or appropriate to consummate the EdB Settlement Agreement,

including waiving any conditions precedent to its effectiveness, and to perform any and all

obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, EdB shall

have Allowed Claims against the Debtors in the amounts set forth in the EdB Settlement

Agreement.

21.  <u>Approval of Bundesbank Settlement.</u>  Based on the Debtors'

Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the

Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and

Bundesbank set forth in the agreement, dated as of October 11, 2011, included in the Plan

Supplement (the "<u>Bundesbank Settlement Agreement</u>") and incorporated into the Plan pursuant

to Section 6.5(j), is fair and reasonable and is in the best interests of the Debtors and their

Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly

authorized to execute, deliver, implement and fully perform any and all obligations, instruments,

documents, and papers and to take any and all actions reasonably necessary or appropriate to

consummate the Bundesbank Settlement Agreement, including waiving any conditions precedent

to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to

section 502 of the Bankruptcy Code, Bundesbank shall have Allowed Claims against the Debtors

in the amounts set forth in the Bundesbank Settlement Agreement.

22.    <u>Approval of Deutsche Bank Settlement.</u>  Based on the Debtors'

Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the

Suckow Declaration, and the Disclosure Statement, the settlement between the LBHI, LCPI,

Deutsche Bank AG, Monarch Alternative Capital LP, Stone Lion Portfolio L.P., Permal Stone

Lion Fund Ltd., Centerbridge Credit Advisors LLC, and Anchorage Capital Group, L.L.C. set

forth in the agreement, dated as of November 23, 2011, included in the Plan Supplement (the

"<u>DB Claims Settlement Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is

fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby

approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute,

deliver, implement and fully perform any and all obligations, instruments, documents, and papers

and to take any and all actions reasonably necessary or appropriate to consummate the DB

Claims Settlement Agreement, including waiving any conditions precedent to its effectiveness,

and to perform any and all obligations contemplated therein.

23.    <u>Implementation of the Bilateral Settlements</u>.  The Debtors are authorized

to take all actions to implement the terms of each of the Bilateral Settlements.  The Debtors are

authorized to direct Epiq Bankruptcy Solutions, LLC, the court-appointed claims agent (the

"<u>Claims Agent</u>") to modify the official claims register (the "<u>Claims Register</u>") to reflect the

terms of the Bilateral Settlements.

24.    <u>Debtors' Claims Schedule</u>.  Pursuant to the Bar Date Order, the Debtors

were not required to file Claims against each other.  Pursuant to Section 6.5(b)(i) of the Plan,

Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Affiliate Claims of a Debtor

against another Debtor are Allowed in the applicable Classes in the net amounts set forth on

pages 1 and 2 of the Debtors' Claims Schedule.  Other than any Claims that arise out of the

Debtor Allocation Agreement, the amounts included on the Debtors' Claims Schedule shall be

the only prepetition Claims of the Debtors against each other that are Allowed.  The Claims

Agent is authorized to take all actions to reflect the Claims set forth in the Debtor Claims

Schedule on the Claims Register.

25.    <u>Schedule of Claims of Debtor-Controlled Entities</u>.  Pursuant to the Bar

Date Order, the Debtor-Controlled Entities were not required to file proofs of Claim against the

Debtors prior to the Bar Date.  The Schedule of Claims of Debtor-Controlled Entities included in

the Plan Supplement sets forth the prepetition Claims of the Debtor-Controlled Entities against

each of the Debtors that will be Allowed pursuant to the Plan upon the occurrence of the

Effective Date.  The Claims will be Allowed as Senior Affiliate Claims (LBHI Class 4A), Senior

Affiliate Guarantee Claims (LBHI Class 4B) and Affiliate Claims (LBHI Class 8) against LBHI

as set forth in the Schedule of Claims of Debtor-Controlled Entities and against each of the

Subsidiary Debtors in the Class of Claims of Affiliates Other Than Participating Debtors.

Except for Claims that may arise between the Debtors and the Debtor-Controlled Entities in

accordance with the Debtor Allocation Agreement or Claims for which a proof of Claim was

timely filed, (i) the amounts included on the Schedule of Claims of Debtor-Controlled Entities

shall be the only prepetition Claims of the Debtor-Controlled Entities that are Allowed against

the Debtors and (ii) to the extent any Debtor-Controlled Entity is not included on the Schedule of

Claims of Debtor-Controlled Entities, such Debtor-Controlled Entity shall not have any Allowed

prepetition Claims against the Debtors. Notwithstanding the foregoing, the Schedule of Claims

of Debtor-Controlled Entities provides that LB Re Financing No. 2 Limited shall have an

Allowed Claim against LBHI in LBHI Class 4A in the amount of $6,761,074,231, which amount

shall supersede in all respects the Claim filed by LB Re Financing No. 2 Limited against LBHI

(Claim No. 23568), which proof of Claim shall be disregarded for all purposes. In addition, the

Debtor-Controlled Entities Claims Schedule provides that LB Offshore Partners Ltd. shall have

an Allowed Claim against LBSF in LBSF Class 5C in the amount of $144,992. The Allowed

Claims set forth on this schedule shall supersede in all respects the claim filed by LB Offshore

Partners Ltd (Claim No. 27448). However, this shall not have any effect on Claim Nos. 24609

and 24611, which LB Offshore Partners Ltd. acquired from a third party. The Claims Agent is

authorized to take all actions to reflect the Claims set forth in the Debtor-Controlled Entities

Claims Schedule on the Claims Register.

26.    Debtor Allocation Agreement.  The Debtor Allocation Agreement, which

provides for the manner in which (a) expenses of the administration of the assets and liabilities of

the Debtors and certain of their affiliates, (b) the costs and benefits of Jointly Owned Litigation

Claims, (c) tax liabilities, refunds or readjustments for periods prior to, during and after the

Effective Date, will be allocated among the Debtors, is approved.  Pursuant to the Debtor

Allocation Agreement, LBSF shall have an Allowed Administrative Expense Claim against

LBHI in the amount of $300 million to be satisfied in accordance with Section 6.3 of the Plan.

The Debtors and the Plan Administrator are authorized to take all actions necessary to allocate

such costs and expenses in accordance with the Debtor Allocation Agreement.

27.    Resolution of Inter-Debtor Issues.  In order to "close" the various inter-

company repurchase transactions, remove encumbrances, and to simplify the accounting for the

estates, the Debtors are authorized to make the transfers set forth in the Exhibit 10 of the Plan

Supplement.  Except as set forth in the preceding sentence, all Claims and disputes among the

Debtors or a Debtor and any Debtor-Controlled Entity regarding the title or beneficial ownership

of assets are hereby resolved in favor of the Debtor or Debtor-Controlled Entity whom the

Debtors have determined have beneficial ownership of these assets.  All Avoidance Actions of

any Debtor against another Debtor or Debtor-Controlled Entity are fully and irrevocably

released.  All reservations of rights of any of the Debtors or affiliates of the Debtors or their

respective Creditors, to assert any arguments or challenge any transaction entered into by any

other Debtors contained in any order entered by this Court prior the date hereof or agreement

entered into by any Debtor or affiliate of any Debtor are fully and finally extinguished.

        28.    <u>Plan Trust Agreement</u>.  The Plan Trust Agreement, which provides that

the Plan Trust will hold the Plan Trust Stock, is approved.  The members of the Director

Selection Committee who are serving in such capacity as of the Effective Date, or their

replacements designated in accordance with the Court's Order Pursuant to Sections 105(a),

363(b), and 1142(b) of the Bankruptcy Code, Appointing the Director Selection Committee,

Approving Retention of Korn/Ferry International, and Authorizing Certain Related Relief [ECF

No. 22871], shall serve as the Plan Trustees and shall have the rights and obligations set forth in

section 7.4 of the Plan and the Plan Trust Agreement.

**<u>Executory Contracts and Unexpired Leases</u>**

        29.    Pursuant to Section 11.1 of the Plan, all prepetition executory contracts

and unexpired leases to which any of the Debtors are parties shall be deemed to be rejected

pursuant to section 365 of the Bankruptcy Code, except for any executory contract or unexpired

lease (a) that has been assumed pursuant to an order of the Court entered prior to the Effective

Date, (b) as to which a motion for approval of the assumption or rejection of such executory

contract or unexpired lease has been filed prior to the Confirmation Date, or (c) that is

specifically designated in the Plan Supplement as a contract or lease to be assumed by the

Debtor.

30.     Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the

assumption of each executory contract and unexpired lease designated in the Plan Supplement

other than any executory contracts set forth on Schedules 1 and 2 hereto, or that are the subject

of the objections listed on Schedules 1 and 2 hereto, is approved.  To the extent any provision of

an executory contract or unexpired lease to be assumed by any of the Debtors under the Plan

limits such Debtor's ability to assign such executory contract or unexpired lease, the

effectiveness of such provision is hereby limited or unenforceable to the full extent provided in

section 365(f) of the Bankruptcy Code.  The hearing regarding the Debtors' ability to assume, or

assume and assign, any executory contract or unexpired lease set forth on Schedule 1 hereto or

that is the subject of the objections listed on Schedule 1 hereto (the "February 14 Contracts")

shall be held by the Court **on February 14, 2011 at 10:00 a.m.**  The inclusion on the Plan

Supplement of the executory contracts set forth on Schedule 2 hereto (the "Deferred Contracts")

constitutes a motion for assumption of the executory contract or unexpired lease, which has been

adjourned without date and shall be scheduled by the Debtors, with leave from the Court, on a

date to be determined with at least 30 days notice to the counterparty, or as otherwise agreed.

All of the Debtors' rights with respect to the February 14 Contracts and the Deferred Contracts

are reserved.

31.     If the Court determines either before or after the Effective Date that the

cure amount or requirements for adequate assurance for any Deferred Contract is in excess of the

amount asserted by the Debtors, or if the Debtors determine not to proceed to assume any

Deferred Contract, the Debtors' rights are fully preserved to amend Exhibit 2 to the Plan

Supplement to remove the applicable contract(s), and upon such removal the applicable

contract(s) shall be deemed rejected as of the Effective Date in accordance with Section 11.1 of
the Plan.

32.    The filing and service of the Plan and the Plan Supplement, the service of
a notice of the cure amount, and the publication of the Confirmation Order is adequate notice of
the assumption of executory contracts and unexpired leases that are assumed pursuant to this
Order and the Plan (the "Assumed Contracts").

33.    Except as may otherwise be agreed to by the parties to a particular
contract, within thirty (30) days after the Effective Date, the applicable Debtor shall cure any and
all payment defaults under its respective Assumed Contracts in accordance with section 365(b)
of the Bankruptcy Code, by payment of the amount specified by the applicable Debtor in the
Cure Notice sent by the Debtor with respect to such Assumed Contract.  With respect to
February 14 Contracts and Deferred Contracts, disputed defaults that are required to be cured
shall be cured either within thirty (30) days of the entry of a Final Order determining the amount,
if any, of the Debtor's liability with respect thereto, or as may otherwise be agreed to by the
parties.  Notwithstanding any requirement in the Bankruptcy Code that executory contracts be
assumed or rejected on or prior to the Confirmation Date, the Debtors shall (i) be entitled to
assume any executory contract that the Court determines the Debtors are entitled to assume, or
(ii) reject any executory contract that either the Court determines the Debtors are not entitled to
assume, or that the Debtors elect to reject at any time prior to the hearing on February 14, 2011,
in which case, such assumption or rejection shall be effective as of the Effective Date.

34.    All counterparties to Assumed Contracts have been provided with
adequate assurance of future performance pursuant to section 365(f) of the Bankruptcy Code.

35.    The assumption of a prepetition executory contract shall not enhance any
contractual rights of a counterparty that were otherwise unenforceable under the Bankruptcy

Code immediately prior to the assumption or rejection of such contract; *provided, however,* that

the rights of all counterparties to assert that a contractual right was enforceable under the

Bankruptcy Code immediately prior to assumption or rejection and the Debtors' rights to dispute

any such assertions are fully preserved.

36.     With respect to the Assumed Contracts, any defaults on the part of the

Debtors that may arise because of a condition of the kind specified in section 365(b)(2) of the

Bankruptcy Code ("Ipso Facto Defaults") are not subject to the requirements under section

365(b)(1) of the Bankruptcy Code and no party shall be permitted to declare a default, terminate,

cease payment, delivery or any other performance under any executory contract, or any

agreement relating thereto, or otherwise modify any such executory contract, assert any Claim or

right to termination payment, or impose any penalty or otherwise take action against a Debtor as

a result of an Ipso Facto Default.

37.     Bar Date for Rejection Damage Claims.  Pursuant to Section 11.4 of the

Plan, if the rejection of an executory contract or unexpired lease by any of the Debtors pursuant

to Section 11.1 of the Plan results in damages to the other party or parties to such contract or

lease, if not evidenced by a previously filed proof of Claim, a Claim for such damages shall be

forever barred and shall not be enforceable against the Debtors, or any property to be distributed

under the Plan, unless a proof of Claim is filed with the Court and served upon the Debtors, on or

before the date that is forty-five (45) days after the later of (a) notice of entry of an order

approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the

Confirmation Order and occurrence of the Effective Date, and (c) notice of an amendment to the

Plan Supplement relating to such executory contract or unexpired lease.  All Claims filed against

the Debtors as a result of the rejection of an executory contract or unexpired lease must be filed

in accordance with the procedures for the filing of Claims set forth in the Bar Date Order,

including the requirements to complete the Derivatives Questionnaire and/or the Guarantee

Questionnaire, as applicable.  Service of the Confirmation Notice shall be sufficient notice to the

applicable counterparties to executory contracts and unexpired leases of the rejection of their

executory contracts and unexpired leases pursuant to the Plan and the deadlines and procedures

for filing and Claims against the Debtors resulting from such rejection.

38.    <u>Insurance Contracts</u>.  To the extent that any of the Debtors' insurance

policies and any agreements, documents or instruments with insurers relating thereto constitute

executory contracts, such contracts shall be deemed assumed under the Plan.

**Title to Assets**

39.    <u>Vesting of Assets</u>.  Pursuant to Section 13.1 of the Plan, except as

otherwise provided in the Plan, all property of each of the Debtor's estates shall vest in that

Debtor free and clear of all Claims, liens, encumbrances, charges and other interests.  From and

after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action,

including, without limitation, the operation of their businesses, the use, acquisition, sale, lease

and disposition of property, and the entry into transactions, agreements, understandings or

arrangements, whether or not in the ordinary course of business, and execute, deliver, implement,

and fully perform any and all obligations, instruments, documents and papers or otherwise in

connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the

Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or

provision of the Bankruptcy Code, except as explicitly provided in the Plan.

**Distributions and Reserves**

40. <u>Initial Distributions</u>. If the Debtors make the initial Distribution after January 31 but before March 30, 2012, then notwithstanding the provisions of Section 8.3 of the Plan, the Debtors shall not be required to make a Distribution on March 30, 2012 and the second Distribution will be made on September 30, 2012. All subsequent Distributions shall be made on the semi-annual dates set forth in Section 8.3 of the Plan.

41. <u>Effective Date Payments and Transfers by the Debtors</u>. Pursuant to Section 2.1 of the Plan, and subject to Sections 8.3 and 8.4 of the Plan, on the Effective Date, or as soon thereafter as is practicable, the Debtors shall remit to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable, Allowed Secured Claims Cash in an amount equal to the Allowed amount of such Claims.

42. <u>Reserve Requirements</u>. Pursuant to Section 8.4 of the Plan, the Debtors shall reserve an aggregate amount equal to the Pro Rata Share of the Distributions that would have been made to each holder of a Disputed Claim if such Disputed Claim were an Allowed Claim against such Debtor in an amount equal to the least of (a) the filed amount of such Disputed Claim as set forth on the Claims Register maintained by the Claims Agent, (b) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Court for purposes of fixing the amount to be retained for such Disputed Claim, and (c) such other amount as may have been agreed upon by the holder of such Disputed Claim and the Debtors or may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.

43. <u>No Reserve for Disallowed or Expunged Claims</u>. None of the Debtors shall be required to establish reserves for Claims that have been disallowed or expunged by order

of the Court in the absence of an order of the Court expressly directing the Debtor to establish a

reserve.

44.     <u>Distributions to Holders of Allowed Convenience Claims and Allowed</u>

<u>Convenience Guarantee Claims</u>.  A single Distribution to holders of Convenience Claims and

Convenience Guarantee Claims in the amounts set forth in the Plan shall satisfy such Claims in

full.  Such Creditors shall not have any further right to a Distribution from any Debtor in respect

of their Convenience Claims or Convenience Guarantee Claims.  Holders of Convenience

Claims subject to the *Order Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and*

*Bankruptcy Rule 9019 Approving Procedures for the Determination of the Allowed Amount of*

*Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers*

*Holdings Inc.* [ECF No. 19120] (the "<u>Structured Securities Procedures Order</u>") shall be bound by

this paragraph even if the Debtors determine subsequent to the date hereof that the value of a

structured security is greater than the amount previously proposed by the Debtors pursuant to the

Structured Securities Valuation Methodologies and Structured Securities Procedures Order.

45.     <u>Setoffs and Recoupment</u>.  Except as otherwise agreed by a Debtor,

including in the Plan, any Debtor may, but shall not be required to, setoff against or recoup from

any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims

of any nature whatsoever that the Debtor may have against the claimant; *provided, however*, that

the claimant shall be served with written notice of the proposed setoff or recoupment at least

twenty-eight (28) days prior to exercising any asserted setoff or recoupment right, and, if such

claimant serves a written objection to such asserted setoff or recoupment on or before twenty-

eight (28) days of receipt of such written notice, (i) the objection shall be deemed to initiate a

contested matter governed by, *inter alia*, Bankruptcy Rule 9014 and Local Rules 9014-1 and

9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with

41

such contested matter, and (iii) the Debtor shall not proceed with the asserted setoff or

recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such

objection but the Debtor may withhold such payment pending resolution of such objection;

*provided, further*, that neither the failure to setoff against or recoup from any Claim nor the

allowance of any Claim hereunder shall constitute a waiver or release by such Debtor of any

such Claim the Debtor may have against such claimant.

**Post-Effective Date Management of the Debtors**

      46.   <u>Boards of Directors</u>.  Following the Effective Date, the board of directors

of LBHI shall be: Frederick Arnold, Robert S. Gifford, Thomas A. Knott, Sean O. Mahoney,

David Pauker, Ronald K. Tanemura and Owen D. Thomas.

      47.   Following the Effective Date, the board of directors of LBSF and LCPI

shall each consist of three (3) individuals as follows: (i) an individual who is a concurrently

serving member of the LBHI board of directors who is selected by the LBHI board of directors;

(ii) an individual who is a concurrently serving member of the LBHI board of directors who is

selected by the LBHI board of directors and acceptable to the Opco Plan Proponents who are

PSA Creditors; and (iii) an individual who is selected by the individuals appointed pursuant to (i)

and (ii) of this section and who is independent from LBHI, the members of the Director

Selection Committee and, in the case of LBSF, LBSF, or in the case of LCPI, LCPI.  Pursuant to

the Plan, the boards of directors of each of the Subsidiary Debtors, other than LBSF and LCPI,

shall consist of one (1) director which shall be a member of the LBHI board of directors.  With

respect to a Subsidiary Debtor incorporated or formed under the laws of a jurisdiction outside of

the United States, if the laws of such foreign jurisdiction require the appointment of more than

one (1) director or manager to the board of directors or managers of such Subsidiary Debtor or of

a director or manager that is not an individual concurrently serving as a member of the LBHI

board of directors, such additional or alternative directors or managers shall be appointed by the

LBHI board of directors

48.     Post Effective Date Role of Creditors' Committee.  On the Effective Date,

the Creditors' Committee shall be dissolved for all purposes other than (i) implementation of the

Plan through the date of the initial Distribution in accordance with Section 8.3 of the Plan; (ii)

defending any appeals from this Confirmation Order until final disposition of such appeals; and

(iii) all matters relating to professional fees and the fee committee appointed in the Chapter 11

Cases for the period prior to the Effective Date.  Following the Effective Date, the litigation and

derivatives subcommittees of the Creditors' Committee may continue functioning for the limited

purposes of (i) resolving pending litigation and (ii) subject to approval of the post-Effective Date

board of directors of LBHI, other litigation and derivatives matters as to which, currently, the

subcommittees are involved, and which shall be recommended by the applicable subcommittee

and the Plan Administrator.  Other than with respect to the foregoing, the members of the

Creditors' Committee shall be released and discharged of and from all further authority, duties,

responsibilities, and obligations related to and arising from and in connection with the Chapter

11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants,

and other agents shall terminate.  The Debtors shall pay the reasonable fees and expenses of the

professionals retained by and shall reimburse the members of the remaining subcommittees for

reasonable disbursements incurred, including the reasonable fees of counsel, in connection with

the foregoing from and after the Effective Date.  If a member of a subcommittee becomes unable

to serve on a subcommittee or resigns after the Effective Date, the remaining members may

replace such member, continue to discharge the subcommittee's roles, or dissolve by a majority

vote of the remaining members.  Each of the subcommittees shall be deemed dissolved upon the

earliest to occur of (i) voluntary agreement of the members of the subcommittee, (ii) the

completion of the subcommittee's responsibilities, and (iii) the Closing Date.

49.    <u>Post-Effective Date Role of Fee Committee</u>.  The fee committee appointed

in the Chapter 11 Cases shall continue to exist after the Effective Date to perform its duties under

the Amended Fee Protocol approved by the Court [ECF No. 15998] in connection with all

applications for approval of professional fees incurred prior to the Effective Date, and all related

proceedings, including hearings on final fee applications.  The Debtors shall pay the reasonable

fees and expenses of the independent member and counsel retained by the fee committee in

connection with the foregoing from and after the Effective Date.

50.    <u>Post Effective Date Reporting</u>.  Beginning the first month-end and first

quarter-end following the Effective Date and until the Closing Date, the Plan Administrator shall

file with the Court reports consistent with the obligations set forth in section 15.6 of the Plan.

51.    <u>General Authorizations</u>.  The Plan Administrator on behalf of the Debtors

is authorized to execute, deliver, file, or record such contracts, instruments, releases, and other

agreements or documents and take such actions as may be necessary or appropriate to effectuate,

implement, and further evidence the terms and provisions of the Plan and any securities issued

pursuant to the Plan.  The  Debtors and their directors, officers, members, agents, and attorneys

are authorized and empowered to issue, execute, deliver, file, or record any agreement,

document, or security, including, without limitation, the documents contained in the Plan

Supplement and the Exhibits to the Plan, as modified, amended, and supplemented, in

substantially the form included therein, and to take any action necessary or appropriate to

implement, effectuate, and consummate the Plan in accordance with its terms, or take any or all

corporate actions authorized to be taken pursuant to the Plan, including merger of any of the

Debtors and the dissolution of each of the Debtors, and any release, amendment, or restatement

of any bylaws, certificates of incorporation, or other organizational documents of the Debtors,

whether or not specifically referred to in the Plan or the Plan Supplement, without further order

of the Court, and any or all such documents shall be accepted by each of the respective state

filing offices and recorded in accordance with applicable state law and shall become effective in

accordance with their terms and the provisions of state law.

**Releases, Discharge and Injunction**

52.     <u>Releases, Exculpations, and Injunctions</u>.  The release, exculpation, and

injunction provisions contained in the Plan are fair and equitable, are given for valuable

consideration, and are in the best interests of the Debtors and their estates, and such provisions

shall be effective and binding on all persons and entities.

53.     <u>Release and Exculpation</u>.  On and after the Effective Date, the Debtors and

all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the

Debtors (whether proof of such Claims or Equity Interests has been filed or not), along with their

respective present or former employees, agents, officers, directors or principals, shall be deemed

to have released (a) the Released Parties from, and none of the Released Parties shall have or

incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any

act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out

of, the Chapter 11 Cases, the negotiation, formulation, dissemination, confirmation,

consummation or administration of the Plan, property to be distributed under the Plan or any

other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure

Statement, the Plan Support Agreements or any contract, instrument, document or other

agreement related thereto and (b) the PSA Creditors from, and none of the PSA Creditors shall

have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability

for any act taken or omitted to be taken in connection with, or arising out of, the negotiation,

formulation, dissemination or confirmation, consummation or administration of the Plan, or any

other act or omission in connection with the Plan, the Disclosure Statement, the Plan Support

Agreements, including the filing of any alternative chapter 11 plan and any determination to not

pursue solicitation or confirmation of such alternative plan, or any contract, instrument,

document or other agreement related thereto; *provided, however*, that (i) other than as may be

otherwise provided in any releases included in settlement agreements between the Debtors and

the Foreign Affiliates, BdB, EdB and Bundesbank that are incorporated into the Plan, in no event

shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any

Released Party or PSA Creditor for any act taken or omitted to be taken prior to the

Commencement Date be released by the Plan, (ii) nothing herein or in the Plan shall affect or

release any obligation of the Debtors under the Plan, and (iii) nothing herein shall affect the

liability of any person that otherwise would result from any such act or omission to the extent

such act or omission is determined by a Final Order to have constituted willful misconduct or

gross negligence; *provided, further*, that nothing in this Plan shall limit the liability of the

professionals of the Debtors, the Creditors' Committee or the PSA Creditors to their respective

clients pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

      54.    <u>Term of Injunctions and Automatic Stay</u>.  Pursuant to Section 13.7 of the

Plan, unless otherwise expressly provided herein or in the Plan or in a Final Order of the Court,

all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105

or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall

remain in full force and effect until the Closing Date.

      55.    <u>Injunction</u>.  Pursuant to Section 13.5 of the Plan, except as expressly

provided in the Plan, herein, or a separate order of the Court or as agreed to by a Creditor and the

Plan Administrator (on behalf of a Debtor), all entities who have held, hold or may hold Claims

against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity

Interests has been filed or not) and other parties in interest, along with their respective present or

former employees, agents, officers, directors or principals, are permanently enjoined, on and

after the Effective Date, solely with respect to any Claims and Causes of Action that will be or

are extinguished or released pursuant to the Plan from (i) commencing, conducting, or

continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind

(including, without limitation, any proceeding in a judicial, arbitral, administrative or other

forum) against or affecting the Released Parties or the property of any of the Released Parties;

(ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment),

collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

judgment, award, decree, or order against the Released Parties or the property of any of the

Released Parties; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or

indirectly, any encumbrance of any kind against the Released Parties or the property of any of

the Released Parties; (iv) asserting any right of setoff, directly or indirectly, against any

obligation due the Released Parties or the property of any of the Released Parties, except as

contemplated or Allowed by the Plan; (v) acting or proceeding in any manner, in any place

whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking

any actions to interfere with the implementation or consummation of the Plan

　　　　56.　　_Discharge_.  Pursuant to Section 13.4 of the Plan, except as expressly

provided therein, upon the date that all Distributions under the Plan have been made, (a) each

holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity

Interest in a Debtor shall be deemed to have forever waived, released and discharged the

Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any

and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b)

47

all such holders shall be forever precluded and enjoined, pursuant to section 524 of the

Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated

Equity Interest in the Debtors.

57.     <u>No Waiver of Rights and Defenses</u>. Except as otherwise agreed, the

provisions of the Plan and this Confirmation Order shall not enjoin, impair, prejudice, have any

preclusive effect upon, or otherwise affect (A) the rights of any Creditor to (x) effectuate a

recoupment pursuant to common law or setoff pursuant to common law or otherwise in

accordance with (a) section 553 and (b) sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27),

555, 556, 559, 560 or 561 of the Bankruptcy Code (subject to the Debtors' rights to contest the

validity of such asserted right of setoff or recoupment or the applicability of any of the foregoing

sections of the Bankruptcy Code) or (y) continue to assert the validity of a setoff previously

taken by such Creditor or to seek authority from the Bankruptcy Court to exercise a right of

setoff or recoupment (subject in each case to the Debtors' right to contest the validity of any such

setoff or recoupment), or (B) any legal or equitable defense, including any defensive right of

setoff or recoupment, that has been, or may be, asserted by any entity in response to a Litigation

Claim, Avoidance Action of a Debtor or objections to Claims against a Debtor.

58.     <u>Indemnification Obligations</u>.  The obligations of each Debtor to

indemnify, defend, reimburse or limit the liability of (a) directors, officers and any other

employee who is held responsible for obligations of the Debtor incurred after the

Commencement Date who are directors, officers or employees of such Debtor or a Debtor-

Controlled Entity on or after the Commencement Date and (b) Released Parties, respectively,

against any Claims or Causes of Action as provided in the Debtor's articles of organization,

certificates of incorporation, bylaws, other organizational documents or applicable law, shall be

assumed by such Debtor and will remain in effect after the Effective Date.  Any such assumed

48

obligations owed in connection with an event occurring after the Commencement Date shall be paid as an Administrative Expense Claim under the Plan. Any such obligations owed in connection with an event occurring before the Commencement Date shall be treated as pre-petition Claims under the Plan. Nothing in the Plan shall in any way limit, modify, alter or amend the Debtor's limitation of liability of the Independent Directors set forth in Section 10.1 of the Restated Certificate of Incorporation of LBHI.

59.    <u>Special Provisions for United States Government</u>.

a.    As to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall: (i) discharge, release or otherwise preclude (A) any liability of the Debtors arising on or after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non appealable), (B) with respect to the Debtors, any liability that is not a Claim against a Debtor, (C) any valid right of setoff or recoupment, or (D) any liability of the Debtors arising under environmental or criminal laws as the owner or operator of property that such Debtor owns or operates after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non-appealable); or (ii) limit or expand the scope of the discharge to which the Debtors are entitled under the Bankruptcy Code. The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Effective Date, pursuing any police or regulatory action.

b.    Nothing in the Plan, Plan Trust Agreement, or this Confirmation Order shall provide to any person or entity (other than a Debtor) any exculpation, release, discharge, preclusion of, or injunction against (i) any liability or other obligation owed by such person or entity to the United States, its agencies or departments, or (ii) or any Claim, Cause of Action, or other right held by the United States, its agencies or departments.

49

c.      Nothing contained in the Plan or this Confirmation Order

shall be deemed to have determined, or to bind the United States with respect to the

determination of, the federal tax treatment of any item, distribution, person or entity, or the tax

liability of any person or entity, including but not limited to the Debtors and the Liquidating

Trust; *provided, however*, that the foregoing shall not affect the rights, claims, defenses and

obligations of the United States or the Debtors under the Plan or otherwise with respect to the

allowance, disallowance or treatment of Claims of the United States (including, without

limitation, under the Bar Date Order and any stipulations between the Internal Revenue Service

or United States and the Debtors), nor shall it affect any right of any Debtor or successor to a

Debtor to request a determination of tax liability pursuant to section 505(b) of the Bankruptcy

Code, or any defenses or objections of the United States with respect to a request for a

determination of taxes by any person or entity pursuant to section 505(b) of the Bankruptcy

Code.

**Miscellaneous**

60.      <u>Resolution of Potential Plan Objections</u>.  Each of the (i) Stipulation

Among Debtors and Fidelity National Title Insurance Company Resolving Disputes in

Connection with the Plan; and (ii) Stipulation and Agreement By and Among Fannie Mae,

Freddie Mac and the Debtors Regarding the Debtors' Third Amended Plan, are approved.

61.      <u>Agreement with LBF With Respect to Section 8.15</u>.  The Debtors and the

Plan Administrator shall not withhold pursuant to Section 8.15 of the Plan any Distribution to

any Non-Controlled Affiliate on the basis that the Non-Controlled Affiliate may use such

Distribution to satisfy a Claim of LBF against such Non-Controlled Affiliate.  The Debtors or the

Plan Administrator also shall not withhold pursuant to Section 8.15 of the Plan any Distributions

to LBF on account of any Allowed Claims of LBF on the basis that LBF may use such

Distribution to satisfy a claim of another Non-Controlled Affiliate against LBF.

       62.   <u>Certain Pending Securities Litigations</u>.

       a.   Nothing in the Plan or this Confirmation Order shall affect

the rights and obligations of the Debtors and of any party in interest as set forth in the Order

Discharging Examiner And Granting Related Relief [ECF No. 10169].

       b.   Nothing in the Plan or in this Confirmation Order shall

preclude any of (i) the Alameda County Employees' Retirement Association, Government of

Guam Retirement Fund, Northern Ireland Local Government Officers' Superannuation

Committee, City of Edinburgh Council as Administering Authority of the Lothian Pension Fund

and Operating Engineers Local 3 Trust Fund, the court-appointed lead plaintiffs (collectively, the

"<u>Securities Action Lead Plaintiffs</u>") or (ii) The Local 302 and 612 of the International Union of

Operating Engineers–Employers Construction Industry Retirement Trust (the "<u>MBS Action Lead

Plaintiffs</u>," and together with the Securities Action Lead Plaintiffs, the "<u>Lead Plaintiffs</u>"), lead

plaintiffs in *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-05523 (LAK),

and *In re Lehman Brothers Mortgage Backed Securities Litigation*, Case No. 08-6762 (LAK)

(the "<u>Securities Litigation</u>"), respectively, from seeking relief from the Court to pursue their

Claims against the Debtors solely to collect from any available insurance proceeds.  All rights of

the Debtors to object or respond to requests for such relief or assert any defenses are fully

preserved.

       c.   In the event that the pending settlements involving the Lead

Plaintiffs in the Securities Litigation are not approved by final order or judgment of the United

States District Court, Southern District of New York and do not become effective by their terms,

nothing in the Plan or this Confirmation Order shall preclude the Lead Plaintiffs from seeking

discovery from any of the Debtors, the Plan Administrator or the Liquidating Trustee in

accordance with the Federal Rules of Civil Procedure following the Effective Date. All rights of

the Debtors, the Plan Administrator or the Liquidating Trustee under the Federal Rules of Civil

Procedure to object or respond to requests or assert any defenses are fully preserved.

63.    <u>Alternative Dispute Resolution Procedures</u>.  The following Court Orders

shall continue to apply and be binding on all parties following the Effective Date through the

Closing Date: (a) *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014,*

*and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures*

*and Alternative Dispute Resolution Procedures for Claims Against Debtors* [ECF No. 8474]; (b)

*Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under*

*Derivatives Contracts* [ECF No. 5207]; (c) *Tier 2 Alternative Dispute Resolution Procedures*

*Order for Affirmative Claims of Debtors Under Derivatives Contracts for Amounts Not More*

*than $1 Million* [ECF No. 11649]; and (d) *Alternative Dispute Resolution Procedures Order for*

*Affirmative Claims of the Debtors Under Derivatives Transactions with Special Purpose Vehicle*

*Counterparties* [ECF No. 14789].

64.    <u>Claims Settlement Procedures</u>.  The following Court orders permitting the

Debtors to compromise and settle Claims against the Debtors shall continue to apply and be

binding on all parties following the Effective Date through the Closing Date:  (a) *Order Pursuant*

*to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or*

*Assumption and Assignment of Prepetition Derivative Contracts* [ECF No. 2257], and all

supplements to such order and (b) *Order Pursuant to Section 105(a) of the Bankruptcy Code and*

*Bankruptcy Rules 3007 and 9019(b) Approving Settlement Procedures* [ECF No. 7936].

65.    <u>Debtors' Right Under Bankruptcy Rule 2004</u>.  The Debtors' shall retain

following the Effective Date the same rights they had prior to the Effective Date under

Bankruptcy Rule 2004 and this Court's *Order Granting the Debtors Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities* [ECF No. 5910], shall remain in full force and effect following the Effective Date until the Closing Date.

66.    <u>Issuance of New Securities</u>.  The Plan Administrator, each Debtor or Debtor Controlled-Entity is authorized to (a) form and transfer certain assets of the Debtors and/or Debtor Controlled Entities to new (or utilize existing) entities, including, without limitation, one or more separately managed partnerships, REITs or other investment vehicles, to hold certain real estate or other assets of the Debtors and/or Debtor-Controlled Entities and, (b) issue New Securities for Distribution under the Plan.  In the event that the Plan Administrator issues New Securities, each holder of Allowed Claims or Equity Interests against a Debtor that contributed assets to the entity issuing New Securities shall receive the relevant New Securities as Distributions in accordance with the Plan.

67.    <u>Exemption from Securities Laws</u>.  The offering, issuance, or distribution of the New Securities in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code.

68.    <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, and any merger agreements, agreements of restructuring, disposition or acquisition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in

53

connection with any disposition or acquisition of assets contemplated by the Plan (including by a

Liquidating Trust) in each case whether as a result of sale, assignment, foreclosure or deed-in-

lieu of foreclosure, shall not be subject to any stamp, real estate transfer, mortgage recording, or

other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.

69.     <u>Governmental Approvals Not Required</u>.  Except as otherwise expressly

provided in this Confirmation Order, this Confirmation Order shall constitute all approvals and

consents required, if any, by the laws, rules, or regulations of any state or any other

governmental authority with respect to the implementation or consummation of the Plan and any

documents, instruments, or agreements, and any amendments or modifications thereto, and any

other acts referred to in or contemplated by the Plan, the Disclosure Statement, and any

documents, instruments, or agreements, and any amendments or modifications thereto.

70.     Each federal, state, commonwealth, local, foreign, or other governmental

agency is directed and authorized to accept the validity of (a) any and all documents, trust

agreements, mortgages, and instruments and (b) all actions of the Plan Administrator and those

acting on its behalf, that are necessary or appropriate to effectuate, implement, or consummate

the transactions contemplated by the Plan, this Confirmation Order, and the agreements created

or contemplated by the Plan, without payment of any recording tax, stamp tax, transfer tax, or

similar tax imposed by state or local law.

71.     <u>Structured Securities</u>.  As provided in the Structured Securities Procedures

Order, the Debtors are determining the Allowed amount of each Claim based on a Structured

Security in accordance with the Structured Securities Valuation Methodologies.  In accordance

with the Structured Securities Procedures Order, the Debtors sent notices of a proposed Allowed

Claim amount ("<u>Structured Securities Notices</u>") to each holder of a Claim based on a Structured

Security.  To the extent that holders of such Claims agreed with the proposed amount or did not

respond by the established deadline (as such may have been extended by the Debtors), such

Claim will be Allowed in the amount set forth on the Structured Securities Notice, subject to the

Debtors' right to object to Claims based on Structured Securities on the grounds that such claims

do not include a blocking number or include an invalid blocking number, are duplicative of other

claims, have been amended and superseded, or otherwise do not comply with the provisions of

the Bar Date Order is fully preserved; *provided* that, the Allowed amount of such Claims may be

increased to the extent that in connection with the resolution of a disputed Structured Securities

Notice, the Debtors determine that the value of a structured security is greater than the amount

previously proposed by the Debtors. As indicated in paragraph 44 hereof, holders of

Convenience Claims or Convenience Guarantee Claims shall not be entitled to any increase in

the Allowed amount of their Claims.

72.    <u>Final Fee Applications</u>.  Pursuant to Section 2.2 of the Plan, all entities

seeking an award by the Court of compensation for services rendered or reimbursement of

expenses incurred through and including the Effective Date under sections 327, 328, 330, 331,

503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their

respective final applications for allowance of compensation for services rendered and

reimbursement of expenses incurred by the date that is one hundred twenty (120) days after the

Effective Date, and (ii) shall be paid in full in such amounts as are Allowed by the Court (A) on

the date on which the order relating to any such application is entered, or as soon thereafter as

practicable, or (B) upon such other terms as may be mutually agreed upon between the claimant

and the Debtors.

73.    The Debtors are authorized to pay, in the ordinary course of business and

without the need for Court approval, the reasonable fees and expenses, incurred after the

Effective Date, of the professional persons employed by the Debtors and the Creditors'
Committee.

74. <u>Fees and Expenses of Indenture Trustees and Creditors' Committee</u>
<u>Members</u>.  The reasonable fees and expenses, including attorneys' fees, of (i) the indenture
trustees for the Senior Notes and the Subordinated Notes issued by LBHI and the (ii) individual
members of the Creditors' Committee shall be paid in accordance with Section 6.7 of the Plan
upon application to, and subject to approval of, the Bankruptcy Court, after reasonable notice to
and with opportunity to object for the United States Trustee and all parties in interest; *provided,*
that nothing in the Plan or this Confirmation Order shall affect any party in interest's right to
object to or defend any such application.  All objections to any such application are expressly
reserved, including, without limitation, any objections regarding the appropriate legal standard
for such applications, and any objections that payment of such fees is unauthorized under the
Bankruptcy Code and Bankruptcy Rules.

75. <u>Definition of Equity Interests</u>.  The definition of Equity Interest included
in the Plan is without prejudice to the Debtors' rights to object to, or seek to subordinate, any
Claim, and any Creditor's rights to defend against such action.

76. <u>Retention of Litigation Claims</u>.  Except as expressly provided in the Plan,
nothing contained in the Plan or herein shall be deemed to be a waiver or the relinquishment of
any rights, defenses or Litigation Claims that the Debtors may have or choose to assert on behalf
of their respective estates under any provision of the Bankruptcy Code or any applicable
nonbankruptcy law that the Debtors had prior to the Effective Date, including, without limitation,
(a) any and all Claims against any person or entity, to the extent such person or entity asserts a
crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the
Debtors, their officers, directors, or representatives, (b) any and all Claims or rights arising under

56

any tax sharing agreement among the Debtors and their Affiliates, (c) any and all Claims for

reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the

disposition of an Affiliate's assets; (d) any and all Avoidance Actions, and (e) any right of setoff

or other legal or equitable defense and remedies.  The Debtors shall have, retain, reserve, and

may assert all such rights, defenses or Litigation Claims after the Effective Date fully as if the

Chapter 11 Cases had not been commenced.

       77.   <u>Retention of Jurisdiction</u>. This Court may properly and, upon the Effective

Date shall, consistent with Article XIV of the Plan, retain exclusive jurisdiction over all matters

arising under or related to, the Chapter 11 Cases, including, without limitation, the matters set

forth in Article XIV of the Plan.

       78.   <u>Debtors' Rights of Subrogation</u>.

       a.   Except as otherwise agreed by the Debtors, to the extent

that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor,

including on account of any Distributions received by holders of Allowed Guarantee Claims that

are satisfied in full in accordance with Section 8.13(a) of the Plan, (i) such Creditor shall be

deemed to have consented to the subrogation of its right against any third-party, including,

without limitation, a Primary Obligor, that may be obligated to reimburse or indemnify the

Debtor for all or a portion of such Distribution, or (ii) the Debtor shall have all rights, title and

power as subrogee of the Creditor against any such third-party, including, without limitation, a

Primary Obligor, to the fullest extent permitted by applicable law.

       b.   Except as otherwise agreed by the Debtors, the Debtors'

rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment

or any similar right, including, without limitation, any right to setoff with respect to any of the

foregoing, against any entity, including, without limitation, a Primary Obligor, on account of

Distribution made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully
preserved to the fullest extent permitted by applicable law.

79.    The Debtors' rights to assert or prosecute Litigation Claims for
reimbursement, indemnification, recoupment or any other similar right, including, without
limitation, any right to setoff with respect to any of the foregoing, against any entity, including,
without limitation, a Primary Obligor, on account of Distributions made to the holders of
Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent
permitted by applicable law.

80.    <u>Trading Restrictions</u>.  The restrictions imposed by the *Order Pursuant to
Sections 105(a) and 362 of the Bankruptcy Code Approving Restrictions on Certain Transfers of
Interests in the Debtors' Estates and Establishing Notification Procedures Relating Thereto*
[ECF No. 1386], as the same may be amended from time to time, shall remain effective and
binding through the closing of LBHI's Chapter 11 Case.

81.    <u>Equity Interests in LBHI</u>.  On the Effective Date, the LBHI Stock shall be
canceled and one new share of LBHI common stock shall be issued to the Plan Trust which will
hold such share for the benefit of the holders of such former LBHI Stock consistent with their
former relative priority and economic entitlements; *provided, however*, that the Plan Trust may
not exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan.

82.    <u>Equity Interests in Subsidiary Debtors</u>.  On the Effective Date, the Equity
Interests in each of the Subsidiary Debtors shall be unaffected by the Plan, in which case the
Debtor holding such Equity Interests shall continue to hold such Equity Interests.

83.    <u>Nonoccurrence of Effective Date</u>.  In the event that the Effective Date
does not occur, then (a) the Plan, (b) the assumption or rejection of executory contracts or
unexpired leases pursuant to the Plan, (c) any document or agreement executed pursuant to the

Plan, and (d) any actions, releases, waivers, or injunctions authorized by this Confirmation Order

or any order in aid of consummation of the Plan shall be deemed null and void; *provided* that this

paragraph shall not have any affect on any provisions of the Bilateral Settlement agreements, if

any, that survive the termination of such agreements.  In such event, nothing contained in this

Confirmation Order, any order relating to consummation of the Plan, or the Plan, and no acts

taken in preparation for consummation of the Plan shall be (i) deemed to constitute a waiver or

release of any Claims or Equity Interests by or against the Debtors or any other person or

entities, to prejudice in any manner the rights of the Debtors or any person or entity in any

further proceedings involving the Debtors or otherwise, or to constitute an admission of any sort

by the Debtors or any other persons or entities as to any issue, or (ii) construed as a finding of

fact or conclusion of law in respect thereof.

84.    <u>Notice of Entry of Confirmation Order</u>.  On or before the thirtieth (30th)

Business Day following the date of entry of this Confirmation Order, the Debtors shall serve

notice of entry of this Confirmation Order (which, in the Debtors' discretion, may be combined

with the Notice of the Effective Date) pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and

3020(c) on all Creditors and interest holders, the United States Trustee, and other parties in

interest, by causing notice of entry of the Confirmation Order (the "<u>Notice of Confirmation</u>"), to

be delivered to such parties by first-class mail, postage prepaid.  The notice described herein is

adequate under the particular circumstances, and no other or further notice is necessary.  The

Debtors also shall cause the Notice of Confirmation to be published as promptly as practicable

after the entry of this Confirmation Order once in each of *the Financial Times*, *The Wall Street*

*Journal* (Global Edition – North America, Europe, and Asia), and *The New York Times*

(National).

85.    <u>Notice of Effective Date</u>.  Within five (5) Business Days following the occurrence of the Effective Date, the Plan Administrator shall file the notice of the occurrence of the Effective Date and shall serve a copy of same on the Master Service List, as defined in the *Second Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* [ECF No. 9635].

86.    <u>No Amendments to Proofs of Claim</u>.  After the Effective Date, other than a proof of Claim relating to an executory contract or unexpired lease that is rejected pursuant to the Plan, a proof of Claim relating to a prepetition Claim may not be filed or amended without the authority of the Court.

87.    <u>Barclays Sale Order</u>.  Nothing contained in the Plan, the Disclosure Statement or the Confirmation Order constitutes or shall be construed as any modification or amendment to the Barclays Sale Order and the rights and defenses of each of the Debtors, the SIPA Trustee (on behalf of LBI), Barclays Bank PLC and Barclays Capital Inc., with respect to any litigation, adversary proceeding, contested matter, claims adjudication, appeal or other dispute against the other are fully preserved, including, without limitation, any rights, defenses, counterclaims and/or cross-claims asserted in connection with or related to the Sale Order.

88.    <u>Payment of Statutory Fees</u>.  On the Effective Date and thereafter, the Plan Administrator and any Liquidating Trustee thereafter appointed, shall pay all fees incurred pursuant to Section 1930 of title 28, United States Code, together with interest, if any, pursuant to Section 3717 of title 31, United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under Chapter 7 of the Bankruptcy Code or a Final Order dismissing such Debtor's case is entered.

60

89.     <u>Effectiveness of Plan Provisions</u>.  Each term and provision of the Plan, as it may have been altered or interpreted by the Bankruptcy Code in accordance with section 15.13, is valid and enforceable pursuant to its terms.

90.     <u>Immediate Effectiveness</u>.  Any stay of this Order provided by any Bankruptcy Rule, including Bankruptcy Rule 3020(e) is hereby waived, and the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

91.     <u>Conflicts Between Order and Plan</u>.  To the extent of any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and provisions contained in this Confirmation Order shall govern.  The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of the Court.


Dated: New York, New York
       December 6, 2011


              _s/ James M. Peck_____
              HONORABLE JAMES M. PECK
              UNITED STATES BANKRUPTCY JUDGE