Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3

4   - - - - - - - - - - - - - - - x

5   In the Matter of:

6   LEHMAN BROTHERS HOLDINGS, INC.,        CAUSE NO.

7   et al,                                 08-13555(JMP)

8          Debtors.

9   - - - - - - - - - - - - - - - x

10   In re

11   LEHMAN BROTHERS, INC.,                CAUSE NO.

12          Debtor.                        08-01420(JMP)(SIPA)

13   - - - - - - - - - - - - - - - x

14

15                    U.S. Bankruptcy Court

16                    One Bowling Green

17                    New York, New York

18

19                    January 16, 2013

20                    10:03 AM

21

22   B E F O R E :

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  TB

Page 2

1    HEARING re Status Conferences:

2        1)    Joint Motion of Lehman Brothers Holdings, Inc. and

3    Litigation Subcommittee of Creditors committee to Extend

4    Stay of Avoidance Actions and Grant Certain Related Relief

5    (ECF No. 33322)

6        2)    LBHI's Objection to Proofs of Claim Number 14824

7    and 14826 (ECF No. 30055)

8        3)    Hearing to Consider Objections to Purported Claims

9    Transfers to Stichting Value Foundation (ECF No. 32646)

10       4)    Motion of Traxis Fund LP and Traxis Emerging

11   Market Opportunities Fund LP to Compel Debtors to Reissue

12   Distribution Checks for Allowed Claims (ECF No. 32163)

13

14   HEARING re Uncontested Matter:  First and Final Fee

15   Application of Epiq Bankruptcy Solutions, LLC, as

16   Solicitation and Voting Agent to the Debtors for Allowance

17   and Payment of Compensation for Professional Services

18   Rendered and For Reimbursement of Actual and Necessary

19   Expenses Incurred from September 1, 2011 through December 6,

20   2011 (ECF No. 27762)

21

22

23

24

25

1    HEARING re Adversary Proceedings:

2        1)   Walton, et al v Lehman Brothers, Inc., et al

3    (Adversary Case No. 12-01898), Motions to Dismiss

4        2)   FirstBank Puerto Rico v Barclays Capital, Inc.

5    (Adversary Proceeding No. 10-04103), Barclays Capital, Inc.

6    Motion for Summary Judgment; FirstBank Puerto Rico Motion

7    for Summary Judgment

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

Page 4

```
 1  A P P E A R A N C E S :

 2

 3  WEIL, GOTSHAL & MANGES LLP

 4       Attorneys for Lehman Brothers Holdings, Inc.

 5       767 Fifth Avenue

 6       New York, NY 10153

 7

 8  BY:   MAURICE HORWITZ, ESQ.

 9       GARRETT A. FAIL, ESQ.

10       JACQUELINE MARCUS, ESQ.

11

12  WEIL, GOTHAL & MANGES LLP

13       Attorneys for Lehman Brothers Holdings, Inc.

14       1300 Eye Street, N.W.

15       Suite 900

16       Washington, DC  20005

17

18  BY:   PETER D. ISAKOFF, ESQ.

19

20  SEWARD & KISSELL

21       Attorneys for Traxis Fund LP

22       One Battery Park Plaza

23       New York, NY  10004

24

25  BY:   JOHN ASHMEAD, ESQ.
```

Page 5

```
 1   HUGHES HUBBARD

 2         Attorneys for SIPA Trustee

 3         One Battery Park Plaza

 4         New York, NY  10004-1482

 5

 6   BY:   JEFFREY S. MARGOLIN, ESQ.

 7         BETSY PRICE, ESQ.

 8

 9   CLIFFORD CHANCE

10         Attorneys for Stichting the Iamex Value Foundation

11         31 West 52nd Street

12         New York, NY  10019

13

14   BY:   JENNIFER C. DEMARCO, ESQ.

15

16   SULLIVAN & CROMWELL, LLP

17         Attorneys for Canary Wharf Management, LTD., Heron

18         Quays (HQ2) T1 Limited, and Heron Quays (HQ2) T2

19         Limited

20         125 Broad Street

21         New York, NY  10004

22

23   BY:   DAVID B. TULCHIN, ESQ.

24         MARK DE LEEUW, ESQ.

25         JOHN J. JEROME, ESQ.
```

Page 6

```
 1  GIBSON DUNN

 2        Attorneys for Lehman Brothers Finance AO

 3        2100 McKinney Avenue

 4        Dallas, TX  75201-6912

 5

 6  BY:   ROBERT B. KRAKOW, ESQ.

 7

 8  STONE BONNER & ROCCO LLP

 9        Attorneys for Karolina Penard

10        260 Madison Avenue

11        17th Floor

12        New York, NY  10016

13

14  BY:   RALPH M. STONE, ESQ.

15

16  CLEARY GOTTLIEB STEEN & HAMILTON LLP

17        Attorneys for Barclays Capital, Inc.

18        One Liberty Plaza

19        New York, NY  10006

20

21  BY:   MATTHEW VANEK, ESQ.

22        BOAZ S. MORAG, ESQ.

23        MARK E. MCDONALD, ESQ.

24

25
```

Page 7

1   BRYAN CAVE LLP

2           Attorneys for Bank of America, N.A. and

3               Federal National Mortgage Association

4           1290 Avenue of the Americas

5           New York, NY  10104

6

7   BY:   THOMAS J. SCHELL, ESQ.

8

9   DICKSTEIN SHAPIRO, LLP

10          Attorneys for FirstBank Puerto Rico

11          1633 Broadway

12          New York, NY  10019

13

14  BY:   JEFFREY A. MITCHELL, ESQ.

15          JUDITH R. COHEN, ESQ.

16          STEPHANIE BIRBROWER GREER, ESQ.

17

18  MILBANK, TWEED, HADLEY & MCCLOY, LLP

19          Attorneys for Official Committee

20          One Chase Manhattan Plaza

21          New York, NY  10005

22

23  BY:   DENNIS C. O'DONNELL, ESQ.

24

25

```
 1

 2    TELEPHONIC APPEARANCES:

 3

 4    ANASTOLY BUSHLER, FARALLON CAPITAL MANAGEMENT

 5    ISSAC K. DEVYVER, REED SMITH, LLP

 6    CHAD J. HUSNICK, KIRKLAND & ELLIS, LLP

 7    PAUL S. JASPER, SCHNADER HARRISON SEGAL & LEWIS LLP

 8    ADRIENNE K. WALKER, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY

 9    MICHAEL NEUMEISTER, STUTMAN, TREISTER & GLATT

10    CHRISTINE PAJAK, STUTMAN, TREISTER & GLATT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LEHMAN BROTHERS HOLDINGS, INC.

Page 9

```
 1                P R O C E E D I N G S
 2            THE COURT:  Be seated, please, good morning.
 3            MS. MARCUS:  Good morning, Your Honor, Jacqueline
 4    Marcus from Weil Gotshal and Manges on behalf of Lehman
 5    Brothers Holdings, Inc., and its affiliated debtors.  We
 6    have a rather short agenda today, Your Honor.
 7            The first matter on the agenda relates to the joint
 8    motion of Lehman Brothers Holdings, Inc., and the litigation
 9    subcommittee of the creditor's committee to extend the stay
10    of avoidance actions.
11            As Your Honor is aware, we filed a motion to extend
12    the stay on December 21st.  At that time, we directed the
13    claims agent to serve all of the avoidance action defendants
14    in addition to the master service list.  The objection
15    deadline was January 9th, and no objections were filed by
16    the deadline.
17            On Friday, January 11th, it was brought to my
18    attention that some of the defendants in Adversary
19    Proceeding 3547 which has 265 defendants were not served by
20    the claims agent.
21            As set forth in the declaration that we filed
22    yesterday, we immediately directed the claims agent to serve
23    all of the defendants by overnight mail, while we pondered
24    what to do about the situation.
25            Shortly after that, we decided that it would be
```

Page 10

```
1    appropriate to adjourn today's hearing to the January 30th

2    hearing date, which we've cleared with your clerk, provided

3    that we could get a bridge order because the avoidance

4    action stay and the service deadline currently expire.  One

5    is January 18th and the other is January 20th.

6            So, Your Honor, with that, we request that the

7    hearing be adjourned until January 30th, and that the Court

8    enter a bridge order.  We did file a notice of adjournment

9    of the hearing yesterday, and in the notice of adjournment,

10   we indicated that the avoidance actions defendant in that

11   particular adversary proceeding would have until January

12   23rd to object to the relief that we're seeking.

13           THE COURT:  That all sounds fine to me.  It's

14   adjourned till the 30th and you'll get a bridge order.

15           MS. MARCUS:  Thank you, Your Honor.

16           The next matter on the agenda is a status

17   conference relating to the proof of claim filed Canary

18   Wharf, and my partner, Peter Isakoff will be handling that.

19           MR. ISAKOFF:  Good morning.

20           THE COURT:  Good morning.  I think there's some

21   attorneys wishing to come forward, so let's just wait a

22   moment.

23           MR. ISAKOFF:  May I proceed?

24           THE COURT:  Please.

25           MR. ISAKOFF:  We're here today because LBHI was the
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 11 of 148

Page 11

1    guarantor of a lease of one of its subsidiaries LBL in

2    London, quite a large building.  The claimants Canary Wharf

3    and affiliates were the landlord, and by stipulation that

4    was so ordered by Your Honor on September 1, 2011, they have

5    limited their claims to $780 million.

6         We filed an objection to the claims last summer.

7    They opposed them.  We filed a reply last week.  There are

8    quite a number of disputed issues of English law.  There are

9    opinions of Queen's counsel submitted by both sides, and one

10   of the issues we raise, if we were successful, would lead to

11   the expungement of the guaranteed claim in its entirety.

12   The others, to the extent that their claims survive would

13   involve a number of factual issues, in addition to English

14   law issues, and as to those, should the claim not be

15   expunged in its entirety, we would like to have fact and

16   expert discovery, both as to liability and damages.

17        We have started to try to talk about a procedure as

18   to how to move forward here, whether to have oral argument

19   on one or more issues before Your Honor, and then to the

20   extent that the claims survive, proceed the discovery or

21   exactly how to proceed.  Those conversations begun this

22   morning out in the hallway.  I think it's fair to say are

23   preliminary in nature.  Have not thus far resulted in

24   anything that we have to present to Your Honor as a way to

25   proceed.

1         And I guess my suggestion would be that we perhaps

2    set a date with some time for oral argument, and perhaps in

3    advance of that, have enough discussions such that perhaps

4    we can reach an agreement on precisely what issues to

5    present at that time, or whether we should simply go into

6    discovery, that kind of thing.

7         THE COURT:  I'm not entirely clear on what you

8    would be arguing on a preliminary basis, without the benefit

9    of discovery and a full factual record.

10        MR. ISAKOFF:  There is one issue as to which I

11   believe the facts are effectively undisputed, and that is as

12   part of the landlord's dealings with the tenant without our

13   knowledge where they entered into what we've called a

14   forfeiture letter, they reached an agreement with the

15   tenant, that they would abandon their administrative claim

16   for unpaid rent that had accrued to that point, in exchange

17   for a payment of one and a half million pounds, which in the

18   opinion of our Queen's counsel, resulted in the guarantee

19   against -- claim against us being entirely discharged.

20        That is effectively a question of English law,

21   which we could argue to Your Honor.  And if we were

22   successful, that would obviate the need for anything else in

23   the case.  But that's the one issue that really is

24   susceptible to that type of treatment.

25        THE COURT:  This is the first time that I can

Page 13

```
 1    recall that issues relating to LBL have been presented to

 2    me.  To the extent that there was an argument that the

 3    administrative claim of LBL was being affected, was that a

 4    claim in this proceeding, or was that a claim in the UK

 5    proceeding?

 6            MR. ISAKOFF:  That was a claim in the UK

 7    proceeding, I believe, Your Honor, that the landlord would

 8    have an administrative claim.  I believe it was -- I'm going

 9    on memory now, but about 30 million pounds for unpaid rent,

10    it might have been dollars, I'm not sure which it was, and

11    which was released as a priority claim, in exchange for a

12    payment of one and a half million pounds.  And obviously

13    that increased LBHI's liability under the guarantee, because

14    that administrative expense claim presumably could've been

15    paid in full in that proceeding.  And it's depending of our

16    QC that that visciated the guarantee entirely, because it

17    was done without our knowledge and consent.

18            THE COURT:  Okay.  Well, there are conflicting

19    opinions of counsel, so it's going to be difficult to decide

20    that without the benefit of context.  And perhaps without

21    the benefit of live witnesses.  But I'll hear what the

22    parties have to say about procedure.

23            MR. ISAKOFF:  Okay.

24            MR. TULCHIN:  Your Honor, good morning, Your Honor,

25    David Tulchin from Sullivan and Cromwell for Canary Wharf.
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 14 of 148

Page 14

1           In one respect I think we agree with counsel, and

2      that is that there are issues of English law that are

3      potentially determinative here, and to which no discovery is

4      necessary.  I have two suggestions about how to proceed,

5      Your Honor, if I might.  And we did try to -- we had a brief

6      discussion about this just a few moments ago in the hallway,

7      but were not able to reach any agreement at least thus far.

8           First, Your Honor, I do think it would make sense,

9      and here's where I think I agree, for the Court to resolve

10     English law questions at the outset.  Because potentially,

11     they are determinative.  I think it would be useful to the

12     Court to do so after you've heard from the two English

13     lawyers, the two Queen's counsel.  And I suggest that we

14     have a brief evidentiary hearing.  My guess is that it would

15     take a day and a half for the two lawyers to testify.  I

16     think it would be helpful for the Court in understanding the

17     contract and the issues of English law that have been

18     presented.

19          For example, Mr. Isakoff referred to his QC, his

20     opinion goes on for 43 pages.  It's 109 paragraphs, not all

21     of that, by any means, I think will be all that relevant to

22     the type of hearing that I'm proposing.  But there are some,

23     let's say, some little nooks and crannies of English law.

24     Our QC, whose name is Laurence Rabinowitz, of course, has

25     views that are quite different than Mr. Millett (ph).

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 15 of 148

Page 15

1          So before we have discovery, I think it would be

2     helpful to have, assuming the Court has the time, of course,

3     a brief evidentiary hearing.

4          And secondly, Your Honor, and this is I think more

5     in the way of a detail, but objections to the claim were

6     filed last August without the submission of any opinion from

7     an English barrister.  In fact, there was only a very scant

8     mention of English law in the papers that were filed on the

9     objection.

10          We responded in October with our papers, including

11    the opinion of Mr. Rabinowitz.  And it was only in reply

12    that they came forward with their Mr. Millett, who has

13    addressed lots of questions of English law in reply.  And I

14    wonder if we couldn't get leave from the Court to submit a

15    brief surreply since our QC, of course, did not have the

16    opportunity to address the issues of English law that are

17    now being stated to be determinative of at least the

18    preliminary stage of our claim.

19          And I would propose to submit a surreply, Your

20    Honor, at the Court's convenience, perhaps in three weeks if

21    that makes sense.

22          THE COURT:  I have insufficient information at this

23    point concerning the nature of the dispute between two

24    obviously eminent English barristers, concerning a point of

25    English law that may be familiar to justices of the high

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 16 of 148

Page 16

1    court, but that are to me, matters of foreign law.

2         It is unclear to me from what you've told me, and

3    frankly from what little I've read of this in preparing for

4    today's status conference, whether the disagreements

5    concerning the application of English law to this dispute

6    are disagreements based upon unsettled law, or good faith

7    disagreements as to the application of black letter law to

8    the leasing question, and to the damages related to the

9    claims being asserted.

10        I looked generally at the papers that you filed,

11   and believe this to be a complex matter unless it can be

12   disposed of as a threshold question of law, in which you're

13   entitled or not entitled to the damages you seek.

14        It occurs to me that rather than simply stating

15   yes, go ahead and file a surreply, that it would be sensible

16   for the parties to continue the discussions that started

17   this morning in the hallway.  And for you to continue to

18   meet and confer and to develop a well considered set of

19   prehearing procedures relating to the evidentiary hearing

20   that you propose.

21        It seems to me that some form of evidentiary

22   hearing would be desirable, certainly from my perspective,

23   since to read submissions is never quite as compelling, as

24   hearing someone with a particularly well-turned English

25   accent speak to me from the witness stand.

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 17 of 148

Page 17

```
 1            So my suggestion is that you should have an

 2    opportunity to respond, but I believe that that opportunity

 3    should be part of a broader understanding that the parties

 4    can reduce to writing, and I can so order relating to

 5    prehearing procedures.  I'll certainly make time for such a

 6    hearing.

 7            I would also suggest that during the course of

 8    developing this prehearing set of procedures, that the

 9    parties give some thought to submitting this issue to

10    arbitration or mediation.  Arbitration in London before

11    perhaps a retired justice of the high court, or mediation

12    involving someone who is, by disposition and background, an

13    expert in matters of this sort might be useful for you to

14    consider.

15            Additionally, it seems to me that the matters that

16    are to be presented here are susceptible potentially to

17    mediation, and that some thought be given to that.  I'm not

18    directing it, I'm not even recommending it.  I'm just saying

19    that some thought might be given to whether that makes sense

20    under these circumstances.

21            MR. TULCHIN:  Of course, Your Honor, happy to

22    consider that.  I think these are very good suggestions.

23            THE COURT:  And in developing a prehearing

24    stipulation, my suggestion is that you contact my chambers,

25    so that you can include several hearing dates.  If you think
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 18 of 148

Page 18

```
 1     it's a two-day hearing, let's have two days at a point in

 2     time where you would reasonably anticipate will be suitable

 3     for the occasion.

 4              Mr. Isakoff?

 5              MR. ISAKOFF:  Yes, Your Honor, if I might just for

 6     one moment.  This is a suggestion I heard for the first time

 7     this morning in the hall, to have a hearing where the two

 8     QCs testify.  And it seems to me that before you were to

 9     bring them over and to try to deal with the whole list of

10     issues that they've given opinions on, there are a number of

11     those as to which we would want to have a developed factual

12     record.  Not just on damages, but on issues going to

13     liability under various theories.

14              And it seems to us that discovery should precede

15     the kind of effort to bring the QCs over and have Your Honor

16     take up time with a hearing for one and a half to two days.

17              THE COURT:  I hear what you're saying, and I'm not

18     ready to say that you're right, but you might be.  And my

19     thought on this is that, that's a subject to be considered

20     when you meet and confer to discuss procedures.

21              Additionally, it seems to me that many of the

22     factual matters here are discernible, identifiable, and in

23     all likelihood susceptible to a stipulation of facts, rather

24     than the burdens of depositions or formal discovery.  And my

25     suggestion is that since the documents that relate to this,
```

Page 19

1    no doubt, have already been identified, and that the

2    individuals who know something about those, no doubt, are

3    known to the parties.  That some consideration be given to

4    developing a list of pertinent facts that I can then take

5    into consideration at the time of argument, with regard to

6    how those facts should be interpreted.

7            MR. ISAKOFF:  Your Honor, I -- in saying anything,

8    I am, this morning, I fully understand that Your Honor is in

9    no position to rule on any of these things.  I just did not

10   want to sit down and suggest that we were in agreement with

11   the things that were being said here.

12           In terms of developing a factual stipulation, in

13   fact, there are many things that we do not know that are

14   pertinent here.  And it very well may be we can come in with

15   a list of stipulated facts, after we've had a chance to find

16   out what's in the -- in our adversary's files.

17           MR. TULCHIN:  Your Honor, if I may.  I agree with

18   the Court that perhaps this is the sort of thing that we can

19   sit down and talk about.  I'm hopeful we can come to some

20   resolution about it.

21           There -- it may be that there are some facts, I'm

22   quite sure there are some factual issues that go only to the

23   question of damages.  And those, for example, it seems to

24   me, should be deferred until after an adjudication of these

25   English law questions.

Page 20

```
 1            Those would be -- those factual issues potentially
 2    could be the subject of a great deal of discovery I think.
 3    But there may be fact issues on liability issues, and
 4    liability questions, that we can agree, should be the
 5    subject of some limited discovery.  I'm happy to consider
 6    that.  And I think maybe Mr. Isakoff and I should --
 7            MR. ISAKOFF:  We'll talk.
 8            MR. TULCHIN:  -- meet about this and spend some
 9    time going through the Court's suggestions.
10            THE COURT:  We all agree, you should talk.
11            MR. ISAKOFF:  Thank you, Your Honor.
12            MR. TULCHIN:  Thank you, Your Honor.
13            THE COURT:  And my suggestion is just so we can
14    keep a watch on this, that this be an agenda item for the
15    February omnibus hearing calendar only if you are unable to
16    reach an understanding concerning procedures.
17            So that's basically a 30-day window to reach an
18    understanding.  And if you can't, to come in and explain
19    what the problems are.
20            MR. TULCHIN:  Very good, Your Honor.
21            THE COURT:  Okay.
22            MR. TULCHIN:  Thank you, sir.
23            THE COURT:  Thank you.
24            MR. ISAKOFF:  Your Honor, I've been handed the
25    agenda.  I'm told that the next one is a hearing to consider
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 21 of 148

Page 21

 1    objections to purported claims, transfers to Stichting The

 2    Iamex Value Foundation as to which Weil is not involved.

 3            THE COURT:  Okay.

 4            MS. DEMARCO:  Good morning, Jennifer DeMarco from

 5    Clifford Chance for the Stichting Iamex Value Foundation.

 6            This was originally scheduled as a hearing to

 7    consider the claims transfers for six claims transfers that

 8    were objected to.  My records now reflect that two of the

 9    parties have withdrawn their objections to the claim

10    transfers, and the four other claims transfers have been --

11    either the transfer has been withdrawn, or the claim has

12    been transferred back to the claimant.

13            THE COURT:  What's going on here?  I don't

14    understand it.

15            MS. DEMARCO:  Yeah, that's why we're here to tell

16    you the story.

17            Iamex is a Dutch foundation, it's regulated by the

18    Dutch Central Bank.  It works as -- in the asset management

19    field, is a group of funds.  It also works in transferring

20    distressed assets.  Through its clients, it learned that

21    there are fact forms and tax forms that were required to be

22    filed by October 14th, I believe.  I'm sorry, or the

23    claimants would lose their claims, and lose their rights to

24    distributions.

25            It was working with Epiq and Epiq advised it, there

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 22 of 148

Page 22

1    were very many individual holders of claims in Amsterdam --

2    I'm sorry, in The Netherlands, Germany and Switzerland that

3    didn't file the forms.  It came to Iamex's attention that

4    their asset managers were actually telling them that the

5    forms were not necessary.

6          Iamex reached out to each of the claimants that it

7    could to try to get them to file their claims.  They didn't

8    have enough time to do it.  So working with Epiq, who

9    supplied it with a list of claimants who did not file the

10   proper tax and OFAC (ph) forms.  And Iamex took the action

11   under Dutch law, and I'm going to butcher the Dutch law

12   here.  It's called Negation Justio or Zarkquernemen (ph) and

13   it's basically the ability of a party to go in and take

14   control of another party's assets for its benefit to protect

15   it.

16         So Iamex transferred these claims to a custodial

17   account that it had.  Got in touch with all of the claimants

18   saying, hey, you need to file your tax forms.  You need to

19   do your OFAC forms, and it could have the claims transferred

20   back to them.  Iamex under its Dutch regulatory provisions

21   is not capable of receiving distributions for these claims,

22   or keeping them.  They have to be tagged to customers.

23         So it did this action to preserve what were the

24   distributive rights of individual creditors in these three

25   countries.  It has reached out to -- and the total that it

Page 23

1    did under this Dutch principle was, I think, 117 claim

2    transfers.  It has reached out to each of the transferees

3    that it could.  As of today, 51 of the transferees are --

4    have blessed the transfers, and are filing their own forms,

5    are getting their information together, to preserve their

6    distribution rights.

7          They are having difficulty getting feedback from 50

8    -- I think it was the other 53, the 117 included the six

9    parties that were here today.

10          So they are getting in touch with all of the

11   claimants that are the subject to the transfers.  They will

12   either have powers of attorneys with respect to the

13   transfers, which aren't necessary under the Dutch law.  But

14   they'd like to do it for the reference anyway, but it's not

15   necessary.

16          All that's necessary under Dutch law is that the

17   parties don't object to the action that was taken on their

18   behalf.  It's Iamex's intention that as the parties get

19   their forms filled out, so that they have their

20   distributions protected, the claims will go back to the

21   claimants.  And to the extent that either a claimant doesn't

22   want this service, the claim will be transferred back to it.

23   And it won't have its tax and OFAC forms filed, and that's

24   just where they were as of October 14th.

25          But to the extent -- and to the extent that they

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 24 of 148

Page 24

 1    don't get responses from any claimants, their intent is to

 2    transfer the claims back to them in any event, far before

 3    there's the next distribution because, as I said, as a

 4    matter of their Dutch regulatory authority, they're not

 5    permitted to take the distributions without an identifying

 6    customer account.

 7            The next question you're going to ask is why.

 8            THE COURT:  Well --

 9            MS. DEMARCO:  Because I have to say it was the

10    question I asked.

11            THE COURT:  I'm somewhat perplexed by all this, in

12    that it seems as if these are not transfers for value, as

13    much as they're transfers for purposes of protecting real

14    parties in interest into a kind of regulatory purgatory.  In

15    which the claims are held not for distribution purposes, but

16    for regulatory compliance purposes, if I'm understanding

17    what you said.  Do I understand it correctly?

18            MS. DEMARCO:  I think I could add the for value

19    piece would be that Iamex -- it's more of a non-monetary

20    value in terms of reputation and marketing.

21            THE COURT:  Why am I concerned with this?  What --

22    why are we here?  What's the relief, if any, that would

23    ultimately be obtained as to any of these claims?  Because

24    it seems to me that once there's compliance, the claim goes

25    back to the original holder.  And if there isn't compliance,

Page 25

1    this entity that I don't fully understand, I-a-m-e-x, isn't

2    in a position to receive distributions.

3            So what does it do to the extent that there is a

4    failure to comply?

5            MS. DEMARCO:  To the extent that there's a failure

6    to comply from the claim holders, or the original claim

7    holders wish not to have Iamex services, then the claims

8    will be transferred back to the claim holders.

9            THE COURT:  So who was it that agreed in the first

10   instance to transfer a claim to Iamex or did it get

11   transferred by operation of law?

12           MS. DEMARCO:  Iamex made the transfer as an

13   independent party under this Dutch principle of Negotiarium

14   Justile (ph) which gives a third party the ability to take

15   custody and control of assets to protect those assets.

16           THE COURT:  And what empowers this action, and who

17   decides that the doctrine has been properly invoked in the

18   first instance?

19           MS. DEMARCO:  I'm not sure I can answer the second

20   part here today, and I'm not a Dutch lawyer, so I can only

21   give you my understanding of what the Dutch law is.  Is that

22   in terms of taking the action, the third party is the person

23   who decides to take the action, but has to take the action

24   for the benefit, and make a reasoned determination.

25           I would assume that the party whose property was

Page 26

1    affected by the action, always has the ability to challenge

2    the action as not being in its benefit, or not properly

3    authorized.

4         Here, we have six parties who took -- who

5    challenged that action, but none of the other parties have

6    challenged the action that was taken on their behalf.  And

7    the six parties who challenged the action, of those parties,

8    it turns out that Epiq when it provided all of this

9    information to Iamex didn't have the up to date information.

10   So for a few of those six, they actually had filled out

11   their forms, and their information was up to date, and Iamex

12   withdrew its claim transfer.

13        And for another one, I think it's Carolina

14   Bernhard, the claims transfer was withdrawn, her objection

15   was withdrawn, and she has filed all of her necessary tax

16   and OFAC forms.

17        THE COURT:  All right.  I still have this lingering

18   uncertainty as to why we're here.  What, if any, relief

19   would be afforded by the Court in connection with this Dutch

20   procedure?  It seems to me that it's either for the benefit

21   of the original holder, or the original holder objects and

22   gets it back and is not in compliance, but what if anything,

23   is the Court supposed to do other than be told about it?

24        MS. DEMARCO:  I don't believe we're asking the

25   Court to do anything with respect to it.  I believe that

Page 27

```
 1   this matter was put on because there were pending

 2   objections.  They were resolved, which mooted any relief

 3   before the Court.  But my understanding was that because of

 4   the situation, and the interesting facts surrounding it,

 5   that we were having a status conference to explain the

 6   situation.

 7           THE COURT:  Okay.  And let me just ask one more

 8   thing, and then I'll hear from debtor's counsel on this.

 9           In the event that an objection to the transfer is

10   not resolved consensually, my understanding is that Iamex

11   will simply return the appropriated claim back to the

12   original holder in any event; is that correct?

13           MS. DEMARCO:  That's correct.

14           THE COURT:  Okay.  So regardless of the disposition

15   of the objection, there's never anything for the Court to do

16   because there will never be an objection to rule on.

17           MS. DEMARCO:  That's correct.

18           THE COURT:  Okay.  It's all (indiscernible)

19   bizarre.

20           MS. DEMARCO:  That was my --

21           THE COURT:  At least from my perspective it is.

22           MR. FAIL:  Your Honor, Garrett --

23           THE COURT:  Mr. Fail?

24           MR. FAIL:  Thank you.  Your Honor, Garrett Fail,

25   Weil Gotshal for Lehman Brothers Holdings, Inc.  Just to
```

Page 28

```
 1    follow-up on that.  The reason that this was scheduled as a
 2    status conference was because the debtors and the claim
 3    agent noticed the number of claims transfers and the numbers
 4    of objections that were filed to the transfers of claims,
 5    followed by the withdrawals.  And without knowing the facts
 6    behind it, wanted to bring it to the attention of the Court.
 7    And we notified the Office of the U.S. Trustee, of what we
 8    perceived to be an irregularity in the trading of claims
 9    without permission of claim holders.
10         I have no reason to dispute or -- you know, we have
11    no facts or knowledge to dispute anything Ms. DeMarco has
12    said today.  And there was nothing before Your Honor to rule
13    on.  This was a status conference to clear the air I think.
14    And one of the claimants is actually here, one of the
15    claimants, the transferor is here, and he may wish to --
16         THE COURT:  Do you have anything to say, sir?
17         MR. STONE:  Yes, Your Honor.  I'm Ralph Stone, I
18    represent Carolina Bernhard.  She withdrew her objection
19    after Iamex withdrew its transfer.  So I'm really here as a
20    friend of the court.
21         I find the whole thing not just bizarre but
22    extremely suspicious.  I have no reason to question the
23    representations about Dutch law and the rest, but Carolina
24    Bernhard has not been wandering around Germany, no one
25    reached out to her.  The first notice that she received of a
```

Page 29

```
 1    transfer of her claim was a notice of a hearing to object,
 2    or of an opportunity to reject to the transfer, which
 3    attached among other things, these transfer documents that
 4    are assigned by Iamex, as both transferor and transferee,
 5    which just smacks of exceedingly strange.
 6             I was simply retained by German counsel to Ms.
 7    Bernhard to serve as a go between so that they could file
 8    their objection.  But anybody who hears of this does a
 9    little bit of Googling and looks at the docket, and sees
10    that Iamex has transferred in excess of a hundred claims,
11    and I'm told it's done out of the goodness of their hearts,
12    which I find rather hard to believe.
13             And so the reality is that these transfers are, if
14    you look through the list of them, they all involve largely
15    smaller claimants, people with a hundred thousand or tens of
16    thousands in claims, are individuals or small business
17    pension funds who were sold these late Lehman notes, which
18    were peddled to widows and orphans throughout Europe just
19    before collapse of the firm.
20             And these are the sorts of people for whom English
21    is not their first language.  They received these -- a
22    notice from the Court, which is Mr. Bernhard's instance, was
23    the first time she ever even got word that her claim had
24    been transferred.
25             It sounds to me like either a fraudulent transfer
```

Page 30

```
 1    process has been set up in a place that's basically outside
 2    the jurisdiction of this Court, or somebody has stumbled on
 3    a fantastic business plan.
 4          THE COURT:  Well, after that interjection, I
 5    suspect counsel will want to respond to, to establish the
 6    legitimacy of her client.
 7          MS. DEMARCO:  I certainly would, and I find it
 8    somewhat surprising since his client withdrew her objection.
 9    So I'm not sure the purpose of the speech since they
10    specifically --
11          THE COURT:  I think he wishes to point out that the
12    circumstances to an outside observe seems suspicious.
13          MS. DEMARCO:  I can understand that they appear how
14    they appear.  Iamex actually did mass mailings right after
15    it did this transfer.  It tried to get in touch with people
16    beforehand, but Epiq gave them the list so close to the
17    October 14 deadline that it was impossible to get in touch
18    with everyone and get their forms filed.
19          So this was what was viewed as, at the time, and I
20    probably viewed in retrospect, differently as an inexpensive
21    marketing effort to show customers in their home
22    jurisdiction that they take better care of their customers
23    than the asset managers, who had advised all of these
24    parties not to file these forms.
25          I think if they had seen at the time, that they
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 31 of 148

Page 31

1    would then have to hire someone to come to the U.S. and

2    defend the position, they probably wouldn't have spent the

3    resources doing it.  It's less of an inexpensive marketing

4    issue to do it then.  They did it free of charge.

5            THE COURT:  Let me ask a very basic question.  Is

6    there no fee associated with the transfer of the claim and

7    the transfer back?  Is it a completely free of charge

8    appropriation and then transferred back?

9            MS. DEMARCO:  Yes, it is.  Iamex Fund itself, and

10   this fund is in the business of a platform of purchasing and

11   selling distressed assets.  So to the extent any of the

12   claim holders want to pool their assets and sell them, which

13   is their choice, there would be a commission associated with

14   that.  However, that's not a requirement.

15           So this was really probably an ill conceived

16   marketing effort.

17           THE COURT:  I don't understand that

18   characterization.  What do you mean by an ill conceived

19   marketing effort?

20           MS. DEMARCO:  I mean that it was a marketing effort

21   that was -- that it was an action that was taken under Dutch

22   law, that was taken, as I'm advised, appropriately under

23   Dutch law with respect to the assets.  There's a cost

24   involved in doing all of this, and Iamex has now been

25   subject to the costs involved in it, including hiring

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 32 of 148

Page 32

```
 1   counsel and reimbursing certain parties who have had

 2   counsel, because they believed that it should be absolutely

 3   neutral to the claimants that they took this action.

 4          So in circumstances where there was a counsel who

 5   objected, they reimbursed the counsel.

 6          THE COURT:  Okay.  I -- the more I hear about this,

 7   the more confused I become, and at least in this respect.

 8   Did your client take this action under color of applicable

 9   Dutch law?  Because it is in the business of trying to

10   acquire claims and thereby generate commissions from the

11   sale of those claims?  Or did it do this because it is a

12   quasi fiduciary that was attempting to provide a benefit to

13   (indiscernible) finding claim holders who would not be able

14   under applicable law to receive distributions

15   (indiscernible) compliance with the various local

16   requirements of law?

17          MS. DEMARCO:  It's more the latter, Your Honor.

18   The Iamex Fund is part a family of funds which are asset

19   managers.  And as asset managers, they owe duties to their

20   customers.  They understood that there were these individual

21   parties, many of whom were elderly, many of whom are on

22   pensions that were being told they did not have to file

23   these forms to receive distributions.  And they believed

24   that they should provide a vehicle for which these pension

25   holders could.
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 33 of 148

Page 33

 1          We're not talking about large sums of money here

 2     that anybody would make any money through sales or the like.

 3     I think the aggregate of the six parties who objected was a

 4     claim of 1,072,000, the aggregate.  And in terms of the

 5     others, I think we're talking -- I think that the aggregate

 6     of the remaining is $10 million in face amount of claims.

 7          We're not talking -- and many of the holders are

 8     14,000, 20,000, 6,000, we're not talking about any kind of a

 9     commission that someone would take all of this action to do.

10     This was really about protecting individual claimants in

11     other countries who were being told that they didn't have to

12     file these forms.  And Iamex wanted to demonstrate that it

13     actually took care of its clients.

14          THE COURT:  Now, were these individuals clients, or

15     were they strangers?

16          MS. DEMARCO:  They were strangers.

17          THE COURT:  And they took this action under color

18     of law because they were advised by Dutch counsel that they

19     had the ability to act on behalf of parties who were not

20     customers, and with whom they had no relationship and no

21     duty to act, correct?

22          MS. DEMARCO:  Correct.

23          THE COURT:  That's pretty peculiar, but thanks for

24     the report.

25          MS. DEMARCO:  If it would make anyone feel more

Page 34

```
 1   comfortable, I'm happy to touch base on the status of the

 2   remaining claims over the next month, so that everyone can

 3   be assured that this isn't some sort of a scheme to --

 4        THE COURT:  I don't know that I need a further

 5   status report, as long as I have a representation from

 6   counsel that these claims will, in all respects, be returned

 7   without cost to the original claim holders, and that this

 8   is, in effect, an entity acting as a volunteer for the

 9   benefit of third parties, thereby assuming a responsibility

10   by virtue of volunteering to those third parties, and will,

11   in all respects, act in the benefit of those third parties

12   including returning the claims to those parties without

13   compliance with local regulatory authority or with it.

14   Whatever the claimant wishes.  As long as the claimant's

15   wishes are paramount, I don't need to hear about it.  But if

16   any party complains, I want more than just a status report,

17   I'll want an explanation in great detail, and I'll probably

18   want a representative of your client to explain.

19        MS. DEMARCO:  I understand.

20        THE COURT:  Okay.

21        MR. FAIL:  Thank you, Your Honor, Garrett Fail for

22   Weil Gotshal again.  The next item on the agenda is a motion

23   of Traxis Fund LP, and Traxis Emerging Market Opportunities

24   LP to compel the debtors to reissue distribution checks for

25   allowed claims.  Counsel for Traxis is here, and I propose
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 35 of 148

Page 35

1    that they go first.

2              THE COURT:  Okay.

3              MR. ASHMEAD:  Good morning, Your Honor, John

4    Ashmead of Seward & Kissell on behalf of the Traxis Funds.

5              Your Honor, I'm not exactly sure how you'd like to

6    proceed.  I will say that we have submitted affidavits.  The

7    plan administrator has submitted an affidavit.  We are happy

8    to proceed with oral argument.  We don't know that there's a

9    need for an evidentiary hearing, unless Your Honor would

10   like to have live witnesses here, although we don't think

11   that the matters covering the affidavit are of the type that

12   should require that, given that it's not about promises, or

13   understandings, or calculations, or damages.  It's simply

14   about what someone's mail procedures were.  And we're happy

15   to request our affidavits, and actually just go straight

16   forward to oral argument.

17             But before we go further, I'll leave that to Your

18   Honor and debtor's counsel.

19             THE COURT:  Well, you're going to have to explain

20   what you've just said because this was listed on the agenda

21   as going forward solely as a status conference.

22             MR. ASHMEAD:  Uh-huh.

23             THE COURT:  Rather than on the --

24             MR. ASHMEAD:  Uh-huh.

25             THE COURT:  -- merits.  You're now saying you're

Page 36

1    prepared to go forward on the merits.  I need to understand

2    what's going on.

3              MR. ASHMEAD:  Your Honor, we are prepared to go

4    forward on the merits.  There may have a miscommunication,

5    or lack of communication with Mr. Fail, but we were

6    surprised when we saw the agenda last night after hours when

7    I saw it, and it was listed as a status conference.  But

8    we're prepared to go, or if we need to put this out in the

9    near term, we hope would be the near term, we're prepared to

10   argue then or now.

11             THE COURT:  Let me hear from the debtor on this.

12             MR. FAIL:  Your Honor, this is an unfortunate

13   situation, and the plan administrator is sympathetic to

14   Traxis' situation.

15             This was listed as a status conference, because I

16   understood that we wouldn't be putting on witnesses in

17   support of the affidavits or cross-examining each other's

18   witnesses, to the extent that Traxis wants to proceed with

19   oral arguments, we're happy to respond, and the plan

20   administrator seeks Your Honor's direction in terms of how

21   to proceed, perhaps after the argument.

22             THE COURT:  Well, this sort of leads me to make a

23   general observation about the agenda.  As I think everyone

24   has come to recognize, given the volume of matters that have

25   arisen over the years in the Lehman case, the Court places

Page 37

```
 1    considerable reliance on the agenda process for our own

 2    preparation for hearings.

 3            And when a matter is listed as going forward solely

 4    as a status conference, that is a signal that while I will

 5    pay attention to the matter, I will not necessarily delve

 6    into it with the same depth and level of preparation as a

 7    matter which is going forward on the merits.

 8            I noted for example, that the next agenda item

 9    involving the final fee application of Epiq Bankruptcy

10    Solutions showed up as an agenda item last evening after

11    9:30.  And while it turns out to be not a controversial

12    matter, I nonetheless spent some time this morning taking a

13    look at that, and I would not otherwise have paid attention

14    to it.

15            So to the extent that there is some issues relating

16    to the monthly agenda, I'll simply make the general comment

17    that, I think maybe we need to pay closer attention to the

18    timing of both adding and withdrawing items from the agenda.

19    And also making sure that there's symmetry between the plan

20    administrator and parties in interest, as to whether matters

21    are going forward as a status conference, and what it means

22    for a matter to go forward as a status conference, or

23    whether they're going forward on the merits.

24            Now, that having been said, I know generally what

25    this motion is about, and I know generally what the issues
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 38 of 148

Page 38

 1    are.  To the extent that it is important that this proceed

 2    today, I can listen to argument on the merits.  But I think

 3    it might be better, assuming parties are not prejudiced by

 4    delay, if this were to be adjourned to the next omnibus

 5    hearing, when I'll have more of an opportunity to pay

 6    attention to the various affidavits that have been

 7    submitted.

 8            Because while I reviewed the papers, I did not

 9    review the evidentiary submissions.

10            MR. FAIL:  Thank you, Your Honor.  I apologize to

11    the Court and to Traxis and its counsel for the oversight

12    and for the misunderstanding.  There would be no prejudice

13    to Traxis in terms of receiving a distribution in the third

14    distribution should Your Honor be so inclined to rule in its

15    favor, and if this were to go forward, either of the

16    February omnibus hearings, or I think the January 30th

17    claims hearing is -- looks like it's a full calendar but I

18    defer to counsel for Traxis.

19            MR. ASHMEAD:  I'm sorry.  Since we're just having a

20    bit of discussion, I'll speak from this mic, Your Honor.

21            Look, I take Your Honor's comments and I want Your

22    Honor to be in the best position to rule on this, and to

23    make it as most efficient as possible, and not to abrupt or

24    change your calendar.  It's unfortunate that happened.  I

25    don't think there was mal intent, maybe a lack of

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 39 of 148

Page 39

1    communication, misunderstanding, and I accept Mr. Fail's

2    statements.

3           So on that, it is my client that spent a fortune to

4    defend what ultimately, you know, we're eating very much

5    into that amount that's at stake.  So we would like to get

6    this resolved as soon as possible.  We think we have a slam

7    dunk case.  I would like --

8           MR. FAIL:  If Your Honor is prepared to entertain

9    the argument, we're happy to respond today.

10           THE COURT:  Well, as I said, you can refer to the

11    affidavits in support of your position, but I haven't

12    reviewed those in advance.  I do know what the issues are.

13           MR. ASHMEAD:  Uh-huh.

14           THE COURT:  And if you want to argue them today,

15    that's fine, but I'm probably going to be in a position to

16    rule today anyway, because I will need to take some time to

17    review the affidavits.

18           My suggestion is that this be adjourned to either

19    the January 30th claims hearing, because this is claims

20    related, or to the next omnibus hearing.

21           MR. ASHMEAD:  Your Honor, that's what I was -- my

22    little speech, but that's what I was going to suggest, just

23    that we keep it on a tighter leash, and I'm just scrolling

24    through my calendar, and let me put on my peepers here.  We

25    would like to go forward, and we're going to take Your

Page 40

1    Honor's recommendation, and we understand the position Your

2    Honor is in.  And we would ask that it go forward on January

3    30th.

4              THE COURT:  Fine.  Even though I think we have a

5    full calendar, this will simply be one more item on that

6    full calendar.

7              MR. ASHMEAD:  Your Honor, is there a time?  Is that

8    a 10 a.m. standard calendar?

9              THE COURT:  Yes.

10             MR. ASHMEAD:  Okay.

11             MR. FAIL:  Thank you, Your Honor.

12             MR. ASHMEAD:  Thank you, Your Honor.

13             MR. FAIL:  The next item on the agenda is Epiq's

14   final fee application.  James Sullivan from Epiq is here in

15   the courtroom today, Your Honor.  There were no objections

16   and we contemplated and were in discussions with Epiq with

17   respect to whether or not to file a certificate of no

18   objection, that might account for the late addition.  We

19   realize that there were no certificates of no objections

20   filed for other fee applications.  So we wanted to give the

21   opportunity to go forward with the hearing.

22             THE COURT:  It's an uncontested application by

23   Epiq.  I've taken a look at it.  It seems fine to me, and

24   it's approved.

25             MR. FAIL:  Thank you, Your Honor.  With your

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 41 of 148

Page 41

1    permission, we'll submit an order with respect to the Epiq

2    matter to chambers following the hearing.

3              THE COURT:  Okay.  And --

4              MR. FAIL:  And we'll submit the bridge order

5    following directly to the hearing to your clerks.

6              THE COURT:  Fine.  I think that concludes the

7    morning calendar, and we'll resume at 2 o'clock this

8    afternoon, and I'll see you later.

9              MR. FAIL:  Thank you.

10             THE COURT:  Thank you.

11             MS. MARCUS:  Thank you, Your Honor.

12             (Recessed at 10:55 a.m.; reconvened at 2:03 p.m.)

13             THE COURT:  Be seated, please, good afternoon.

14             MR. MARGOLIN:  Good afternoon, Your Honor.  Jeffrey

15   Margolin for the SIPA Trustee.

16             Your Honor, the first matter on the agenda for this

17   afternoon is the trustee's and Bank of America's respective

18   motions to dismiss the Walton adversary proceeding.

19             For background, Your Honor, back on December 11th,

20   the trustee moved to dismiss the complaint as against LBI as

21   the complaint failed to plead the elements of a quiet title

22   action under Georgia law against LBI, and insufficient

23   service of process.

24             Motion to dismiss was served on Mr. Walton, counsel

25   for the plaintiffs, by the trustee's noticing agent via

Page 42

1    email and overnight delivery.  At the December 12th pretrial

2    conference, Your Honor may recall that you instructed the

3    trustee's counsel to take further measures, to advise Mr.

4    Walton of the outstanding motion to dismiss.

5          A certified letter and copy of the motion to

6    dismiss was sent to Mr. Walton promptly thereafter, and he

7    was emailed several times regarding the motion to dismiss,

8    the response deadline, and today's hearing as well.

9          My colleague, Betsy Pierce, who's in the courtroom

10   today spoke to Mr. Walton on December 20th, at which time

11   Mr. Walton again indicated that the plaintiffs would be

12   dismissing the complaint as to LBI.  We sent Mr. Walton the

13   email and draft stipulation of dismissal.  And again, after

14   repeated efforts, have not received any response.

15          THE COURT:  I'd like to hear a rendition of the

16   conversation that actually took place with Mr. Walton.  It's

17   still hearsay, but I'd like it not to be double hearsay.

18          MS. PIERCE:  Good afternoon, Your Honor, Betsy

19   Pierce.

20          Mr. Walton called my line directly inadvertently

21   thinking he was calling another counsel on another matter,

22   and when I refreshed his memory as to our relationship, and

23   then prompted him about the previous discussions we've had,

24   where he's indicated that he would be willing to dismiss

25   LBI, he then seemed to recall who I was, the matter, and

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 43 of 148

Page 43

1   said that he would still be willing to do that, and that he

2   would call me the next day.

3          And following up to that phone call, we provided

4   the stipulation of dismissal to Mr. Walton.  He never called

5   me back and never responded further.

6          THE COURT:  But he stated to you unequivocally, I

7   have no intention of pursuing LBI in the bankruptcy court

8   and you have my consent to dropping LBI as a party, is that

9   more or less what he said?

10          MS. PIERCE:  He definitely did not use as many

11   words, but he was -- he recalled the previous discussions

12   we'd had about dismissing LBI, and he agreed that he would

13   be willing to dismiss us from the suite.

14          THE COURT:  Can you, to the best of your

15   recollection, tell me the words he actually used.

16          MS. PIERCE:  The conversation was a little

17   convoluted, because he was not initially recalling who I was

18   in the matter.

19          THE COURT:  He called you by mistake.

20          MS. PIERCE:  Yes, correct.  But when I reminded him

21   that we'd spoken on previous occasions, specifically right

22   before the Thanksgiving holiday, and he had provided us with

23   documentation regarding -- further documentation in the

24   case, saying that he would be willing to release us.  When I

25   reminded him about this, he said, oh, yes, yes, that's

Page 44

1    right, I think we could probably go ahead with that, I'll

2    call you tomorrow and we'll discuss further.

3           THE COURT:  Was there any condition imposed, for

4    example, earlier papers filed by the trustee indicated a

5    willingness to execute documentation releasing all claims to

6    the property in Georgia?

7           MS. PIERCE:  That was the understanding that I had

8    of his expectation, of Mr. Walton's expectation.

9           THE COURT:  And is it your understanding that his

10   willingness to discontinue the litigation as to LBI was or

11   was not conditioned on the trustee issuing some kind of

12   release of all claims with respect to the real estate?

13          MS. PIERCE:  It's my understanding that that was

14   his understanding, based on the offer that we had initially

15   made in our first interactions with Mr. Walton, that we

16   would be willing to do that.

17          THE COURT:  Okay.  Thank you.

18          MS. PIERCE:  Thank you, Your Honor.

19          MR. MARGOLIN:  And, Your Honor, the draft

20   stipulation of dismissal did include that release, which we

21   sent to him, and never heard back from him regarding that.

22          As further described in the statement in further

23   support of the trustee's motion, as of this date, Your

24   Honor, the plaintiff have -- the plaintiffs have not filed

25   or served any pleading whatsoever regarding the motion to

Page 45

1    dismiss, requesting an extension of the response deadline,

2    or requesting an adjournment of today's hearing.

3            It appears to us that neither Mr. Walton nor his

4    clients are in the courtroom or on the telephone.

5            THE COURT:  Let's confirm that.  Is there anyone in

6    the courtroom, or is there anyone on the telephone

7    representing the Walton plaintiffs?

8            (No response)

9            THE COURT:  There's no response.  So I conclude

10   that they are not here either in person or by telephone.

11           MR. MARGOLIN:  Thank you, Your Honor.  Therefore,

12   for the reasons described today, and further set forth in

13   the motion and the trustee's supporting papers, we

14   respectfully request that the Court enter an order

15   dismissing the complaint in its entirety against LBI with

16   prejudice.

17           THE COURT:  The complaint is dismissed as to LBI.

18   And to the extent that Mr. Walton's agreement not to press

19   claims as to LBI was conditioned on there being a release by

20   the trustee, I'm going to request that such a release be

21   granted if it is requested.  But the dismissal is in no way

22   conditioned upon that.

23           MR. MARGOLIN:  Thank you, Your Honor.  We, of

24   course, would pursue that.  If it's all right with Your

25   Honor, we'll submit a proposed order to chambers.

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 46 of 148

Page 46

```
 1            THE COURT:  Yes, that's fine.  Now, we also have

 2    other parties.

 3            MR. MARGOLIN:  Thank you, Your Honor.

 4            MR. SCHELL:  Good afternoon, Your Honor.  Thomas

 5    Schell representing Bank of America, N.A. and Federal

 6    National Mortgage Association.

 7            Your Honor, we submitted a motion to dismiss on

 8    different grounds initially based on jurisdictional grounds,

 9    as well as alternative relief for abstention or transfer of

10    venue.  We served those by e-mail and First Class Mail, and

11    initially, and then subsequent -- pursuant to Your Honor's

12    request at the pretrial conference, we've subsequently

13    provided that several times again both by overnight mail and

14    electronic mail to --

15            THE COURT:  Did you have any contact, or did

16    anybody in your office have any contact with Mr. Walton?

17            MR. SCHELL:  I have not personally.  My associate,

18    Elizabeth Kukura had a telephone conference with him on one

19    occasion, I believe about extending the time to respond.

20    And I actually have -- we actually submitted a stipulation

21    extending time to respond to the complaint, which he did

22    respond to by email, indicating that he did not -- this is

23    October 31st, it was one or two days after Hurricane Sandy,

24    and he -- after he'd initially expressed a willingness to

25    extend the time by that email, he said he would not, and
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 47 of 148

Page 47

1   that he -- because at the -- there were eviction proceedings

2   going on in certain of the properties.  His complaint was --

3   you know, this complaint was filed after I think at least

4   one of the properties had undergone a non-judicial

5   foreclosure, and I believe maybe a sale.

6        But her conversation with him at that point was

7   only about just extending the time to respond to the

8   complaint.  And subsequently she'd reached out to him, but

9   had received no answer, and we've sent multiple emails to

10  him since, but we've received nothing in response, other

11  than that one email from the same email address that we'd be

12  using to provide multiple copies of these papers.

13       THE COURT:  Okay.

14       MR. SCHELL:  So, Your Honor, we actually

15  wholeheartedly agree with the SIPA Trustee with respect to

16  his argument, and motion to dismiss, and would ask that we

17  join in that as well and be dismissed for the same reasons.

18       We've also --

19       THE COURT:  What would the reasons be for a

20  dismissal as to your clients?

21       MR. SCHELL:  Well, Your Honor, as set forth in the

22  trustee's papers, they did not -- their allegations fail as

23  a matter of law, because they did not adequately provide the

24  plats and other -- you know, they did not satisfy the

25  provisions of the Georgia statutes.

Page 48

1          THE COURT:  Well, I think the situation as to your

2     clients may be different from the situation as to LBI.  And

3     I'll note that one of the alternative grounds for relief

4     that you seek is a transfer of the litigation to Georgia.

5          MR. SCHELL:  Yes, sir, although preferably we

6     would --

7          THE COURT:  I'm sure you'd much prefer for the case

8     to be dismissed.

9          MR. SCHELL:  And I think we have -- you know, our

10    jurisdictional basis is, you know, that -- we believe that's

11    a strong ground for dismissal on jurisdictional grounds at

12    least.

13         THE COURT:  One of my concerns here is that this is

14    close to a pro se litigation, even though Mr. Walton

15    apparently is a lawyer, but he's also plaintiff in the sense

16    that his economic interests are impacted.  Based upon the

17    pleadings, it does not appear to me that Mr. Walton is well

18    versed in bankruptcy practice.  And the decision to name LBI

19    represented the only jurisdictional nexus to the bankruptcy

20    court.  That decision appears to have been either a tactical

21    one or a mistake.  Either way, he has now elected not to

22    press claims as to LBI.

23         It is much less clear to me that he has chosen not

24    to press claims as to your clients.  And it's also less

25    clear to me that he may not actually have some claims as to

Page 49

1    your clients, I simply don't know the facts.

2         To the extent the dismissal would be based upon

3    inadequacy of pleading, I would much prefer that a court of

4    competent jurisdiction in Georgia make a decision as to the

5    adequacy of pleading.  And so my inclination is to transfer

6    venue of this case to the Northern District of Georgia, with

7    the understanding that it is, in all respects, without

8    prejudice to your rights to continue to press your motion to

9    dismiss, and also without prejudice to Mr. Walton's rights

10   to appear and be heard on the merits of that before a more

11   convenient forum.

12         MR. SCHELL:  I understand, Your Honor.  Could I

13   also ask if we also were never served, and there's no record

14   of -- at least we have no record of service, neither Bank of

15   America nor Fannie Mae, and there's no affidavit of service,

16   so on that ground I would ask that it be dismissed.

17         I just -- Your Honor, you know, I understand that

18   he is one of the plaintiffs, but he is an attorney, and the

19   -- you know, a summons was issued, he has not satisfied the

20   procedural prerequisites.  We would just ask if it be

21   dismissed on -- or if it be -- rather than be transferred,

22   that it be dismissed, if he's required -- you know, if he

23   wishes, he can reinitiate this proceeding in Georgia, but I

24   just think that would be a more appropriate way of

25   proceeding with him, rather than transferring it, where we

LEHMAN BROTHERS HOLDINGS, INC.

Page 50

```
 1    still haven't been served.  Because then we'll be forced to

 2    make a -- whatever motion to dismiss we'll make in that

 3    jurisdiction, we'll have to raise the fact we haven't been

 4    served, and there will be a procedural issue there.

 5              THE COURT:  I hear you and I understand your

 6    argument, but I am inclined to simply transfer the

 7    litigation in its present posture to a court of competent

 8    jurisdiction in Georgia, where a judge in the transferee

 9    jurisdiction can assess the adequacy of the pleadings, the

10    adequacy of service, and can deal with this on the merits,

11    as opposed to having a bankruptcy court in the Southern

12    District of New York, deal with what is, by its very nature,

13    a local issue.

14              MR. SCHELL:  I understand, Your Honor.

15              THE COURT:  So I'll entertain an appropriate order.

16              MR. SCHELL:  Thank you, Your Honor.  I'll -- may I

17    submit that later today?

18              THE COURT:  Yes.

19              MR. SCHELL:  Thank you.

20              MR. MARGOLIN:  Thank you, Your Honor.  May we be

21    excused?

22              THE COURT:  You may.

23              MR. MARGOLIN:  Thank you.  And I suppose others

24    will take your place in a moment.

25              (Pause)
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 51 of 148

Page 51

```
 1              MR. MITCHELL:  Your Honor, do you have a preference
 2      to sides of plaintiff and defendant?
 3              THE COURT:  You're going to have to choose your own
 4      sides.
 5              MR. MITCHELL:  Thank you.
 6              (Pause)
 7              THE COURT:  Do you have any agreements to the order
 8      of presentation?
 9              MR. MITCHELL:  Yes, Your Honor, we do.  FirstBank
10      will proceed first.
11              THE COURT:  Okay.  Let's proceed.
12              MR. MITCHELL:  Thank you, Your Honor.  Jeffrey
13      Mitchell from Dickstein Shapiro.  I'm here with Judy Cohen
14      and Stefanie Greer also of my office.
15              This case has been pending for quite a while.  It's
16      our first time in front of you really to discuss any
17      substance, and we're glad to finally have the opportunity to
18      do that.  We've disputed this case with Cleary for many
19      years, and now we finally have a chance to share with you,
20      as we have in the papers to talk about here, some of the
21      evidence that we've uncovered and learned about during
22      discovery, and to learn whether the way we interpret the
23      facts of this case are, in fact, reasonable and correct.
24              We have two different views arising from a common
25      set of facts.  I think we generally agree with Barclays as
```

Page 52

1     to what the facts are, it's what the impact of those facts

2     are in this particular case.

3          THE COURT:  Let me ask you an initial question, and

4     this is actually a question for both of you.  I note that

5     each side has retained experts, and that the experts

6     prepared reports.  To what extent is expert opinion relevant

7     to a decision for either side?  And if it is relevant, to

8     what extent should I be taking testimony in connection with

9     the pending motions?

10          MR. MITCHELL:  That's a good question.  There are

11     two aspects of the case, Your Honor, and as I walk through

12     it, you know, I think it'll become clear.  The first part of

13     the case, or the first part of our position is that the

14     FirstBank collateral, I'll refer to it as the FirstBank

15     collateral.  I understand that Barclays takes the position

16     it was no longer collateral in the hands of LBI.  But I'll

17     refer to it as the FirstBank collateral.

18          We claim the FirstBank collateral is not covered by

19     the asset purchase agreement and clarification letter.  And

20     therefore, was not a purchased asset.  If the Court agrees

21     with that interpretation of the operative documents, then

22     expert testimony is not particularly relevant to that

23     examination.

24          The second aspect of the challenge to title that

25     Barclays claims is whether or not the FirstBank collateral

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 53 of 148

Page 53

1   was an asset of the LBI estate.  I think the expert

2   testimony is important with respect to that issue.

3   Barclays' expert testified and admitted on examination that

4   FirstBank properly listed the collateral as its own asset,

5   on its own books and records, even after the repos that

6   we've learned about during discovery, the repos from LBSF to

7   LBI of that collateral.  And that in his opinion, it was

8   appropriate for that to be listed as its own asset, even

9   after those repos.

10          So I would think that that expert testimony for

11  Barclays' own expert, the admission of that is important.

12  And I think the testimony of our expert, who is one of the

13  foremost authorities on ISDA master agreements had never

14  seen a case like this.  And his testimony was that the idea

15  or notion that the use of collateral by repo of -- by an

16  affiliate repo to deprive the party that posted collateral

17  of its interest and rights in that collateral was never

18  contemplated by ISDA and the ISDA agreements.

19          And the circumstances presented in this case were

20  unique and a one-off.  And he has substantial experience and

21  capability of testifying to that.  He's a professor at the

22  University of Utah, and I think he's considered one of the

23  foremost authorities, he's published extensively on ISDA,

24  never saw it before, so his opinion about what should happen

25  here I think carries great weight because he has written

Page 54

1    about and contemplated many circumstances.  But never the

2    circumstance that occurred here.  It was beyond -- I forgot

3    the exact words he used, but it was beyond comprehension

4    what happened here.

5            The idea that one act, unknown to the party that

6    posts collateral, that internally, not an external repo of

7    your counterparty to some -- to the market, the third party,

8    but some secret unknown internal repo among affiliates, on

9    top of that, a repo to the party that's already the

10   custodian of the collateral, executed exclusively by

11   employees of the custodian on behalf of both parties,

12   without notice to anyone in the world, to Your Honor, to

13   anyone, that that was sufficient to deprive a party, the

14   post collateral of its rights in its own collateral.  And I

15   think that that would carry great weight.  And I think if we

16   get to that issue, I think expert testimony is important.

17           The expert provided by Barclays was not an ISDA

18   expert.  He was a -- and I think from the standpoint of the

19   two experts together, our expert was somebody who studies

20   and teaches and lectures on ISDA agreements.  Their expert

21   was a person from the industry, employed by a broker dealer,

22   also had never been -- also admitted, he never saw this

23   situation before, and I think you had both experts dealing

24   in a world of unknowns, and I think, you know, the expert

25   testimony with respect to that I would say, you know, we

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 55 of 148

Page 55

1    provided an expert who is the right expert for this

2    particular circumstance.

3              THE COURT:  Let me find out from counsel for

4    Barclays if he has any comment with regard to the use of

5    expert testimony in connection with the pending motions.

6              MR. MORAG:  Your Honor, Boaz Morag on Cleary on

7    behalf of Barclays.  We don't believe that expert testimony

8    is relevant to the motions or necessary for Your Honor to

9    consider.

10             The issue is one of contractual interpretation,

11   interpretation of Your Honor's sale order.  The expert that

12   -- the experts, frankly, really at bottom, are all

13   addressing legal issues.  The facts are not disputed as you

14   heard, and it's the legal consequences of those facts.

15             To some extent, Professor Johnson, their expert, is

16   offering you his legal opinion.  Our expert can't do that

17   because he's not a lawyer, but we don't rely on that.  We

18   don't think it's really relevant.  It's some background of

19   understanding of the industry, but it certainly shouldn't

20   detain you from considering this threshold issue, are these

21   purchased assets under the terms of the sale order.  And

22   frankly we think that's the end of the analysis that Your

23   Honor has to do.

24             We, in fact, proposed to FirstBank that we can --

25   we don't need experts in this case, and we should just

1    present to you the legal issues, and be able to truncate

2    some of this lengthy proceeding.  They decided they wanted

3    to get all the -- everything conceivable done first, so we

4    had to go out and get an expert.  But we don't think it's

5    relevant to this motion.

6            THE COURT:  Okay.  Thank you.

7            MR. MITCHELL:  Thank you, Your Honor.  So turning

8    to the argument.  You know, we're here in this court, this

9    is a diversity case originally brought by FirstBank in

10   district court as the Court knows.  In FirstBank's view, a

11   decision in this case will have no affect on the Lehman

12   estate.

13           The issue before the Court is whether the

14   collateral posted by FirstBank with LBSF to secure swaps,

15   obligations, was a quote, purchased asset, as defined in the

16   clarification letter between Barclays and LBI.

17           THE COURT:  Well, your very articulation of the

18   issue takes it into the jurisdiction of the bankruptcy court

19   because of the implication that that assertion has with

20   respect to the final sale order.

21           MR. MITCHELL:  And I think -- that's why we're

22   here.  I understand why we're here, and Barclays claims that

23   the -- it was a purchased asset, and therefore, bound by the

24   order entered by the Court.  But if the Court finds that it

25   was not a purchased asset as FirstBank alleges, that's the

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 57 of 148

Page 57

1    end of the case.

2           THE COURT:  Let me ask you a threshold question.

3    My understanding is that the parties have stipulated that

4    the appropriate cut off date for permissible hypothecation

5    of collateral under Section 6(c) of the ISDA master

6    agreement was September 15, 2008.

7           As I understand it, the repos that you challenge

8    between LBSF and LBI, that transferred the collateral from

9    LBSF to LBI, and that thereby enabled LBI to aggregate the

10   collateral with other assets in the New York Fed repo, which

11   was taken out by Barclays on September 18, and became the

12   subject of the sale order on September 19 and 20.

13          My understanding is, that the transfer from LBSF to

14   LBI in the first instance represented a permissible

15   hypothecation.  Do you agree with that?

16          MR. MITCHELL:  Whether there was a permissive use?

17   Yes, I would agree with that.  That would be the permissive

18   use.

19          THE COURT:  To the extent that that was the

20   permissive use, why does that not end your case right now?

21          MR. MITCHELL:  Well, first of all, that's the

22   second part of whether it's an asset of the estate.  I don't

23   think that gets to whether it's a purchased asset or not.  I

24   think the Court would agree that all assets owned by LBI

25   were not necessarily purchased assets.  Only assets that

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 58 of 148

Page 58

1    were assets, that were used in connection with or for

2    purposes of operating the business.

3            So whether or not it's owned by LBI is not the be

4    all and end all, I think that's the second analysis.  But I

5    can go to the second part first.  Why that would not change

6    things.

7            The use, and this also gets to the expert

8    testimony, but the use made of the collateral was open repo,

9    not time repo.  An open repo can be closed at any time.  The

10   undisputed evidence, from Barclays' own witnesses, is that

11   an open repo is the type of repo that enables the

12   repatriation of whatever was sent out back.

13           Also, a repo is not -- for Barclays to prevail that

14   the repo is the be all and end all, especially a repo like

15   this, and obviously we've challenged certain aspects of the

16   repo.  We -- during discovery, I -- there are things that we

17   learned about these repos that make the repos themselves not

18   necessarily something Barclays knew at the time, but the

19   repos themselves are highly questionable.

20           But putting aside, let's assume they're even not

21   questionable, it's not -- they're arm's length repos.  These

22   are open repos.  Meaning that the moment LBSF can no longer

23   use the collateral, the repo is over.

24           Now, we're talking about incestuous relationship

25   between the two parties.  The asset comes back to LBSF and

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 59 of 148

Page 59

1    now becomes collateral.  So from September 15 forward, which

2    I think is a critical -- we agree, that's a critical day.

3    From September 15th forward, those repos were finished.

4         Now, I -- you might say to me, why, how can I say

5    those repos were finished based on the evidence in this

6    record.  Well, we presented to the Court a series of emails

7    that clearly it's undisputed on this record that FirstBank

8    had no notice of these repos that LBSF made to LBI.  And

9    throughout its relationship with LBSF continued to receive

10   account statements.  And those account statements reflected

11   that the collateral was owned by FirstBank.

12        We also have the testimony that notwithstanding

13   those repos, FirstBank, from their own expert, properly

14   continued to list even after the repos, the assets as their

15   own asset on their own books and records, because collateral

16   doesn't belong to the party -- doesn't belong to the secured

17   party, it belongs to the party that posts it.

18        So at the time of the sale order hearing, there was

19   nothing in any document, record, LBSF wasn't even in

20   bankruptcy, to put FirstBank on any kind of notice, inquiry

21   or otherwise, that collateral in the hands of a non-bankrupt

22   party LBSF was even at issue in a bankruptcy case.

23        And shortly after FirstBank -- FirstBank goes on to

24   its website, it can't get in, Barclays has taken over, there

25   are communications that it has, including communications

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 60 of 148

Page 60

1    with Barclays, but FirstBank retains counsel, Clifford

2    Chance.  Clifford Chance reaches out to Weil Gotshal and

3    Hughes Hubbard.  Weil Gotshal, a party -- a counsel that

4    helped draft, the principal draftsperson -- draftsman of the

5    clarification letter; Hughes Hubbard, counsel for the

6    trustee, the record shows, and Mr. Morag is going to present

7    to you a demonstrative exhibit that goes through these

8    emails.

9         FirstBank reaches out to Hughes Hubbard and Weil.

10   Weil reaches out to Barclays.  Barclays, by former employees

11   of Lehman, responds to Weil.  And that response is later

12   transmitted to FirstBank after a series of behind the scenes

13   emails that the collateral is still at LBI being held

14   pursuant to the custody agreement.

15        That's not all.  Because we also know, Mr. Morag

16   has made a point of this in the papers, he says, these

17   employees -- the documents speak for themselves, they're

18   very clear, but clearly there's a reach-out, FirstBank wants

19   to find its collateral.  It's told it's being held by LBI.

20   Subsequent to that it negotiates with LBSF for months.  LBSF

21   for months over close-out figures, in order to obtain a

22   return of the collateral, and isn't told until June 2009

23   that LBSF or LBI no longer has the collateral.

24        But the most important fact, Your Honor, why these

25   repos were not repos that transferred title to LBI, is the

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 61 of 148

Page 61

```
 1    claim LBI files in the LBSF bankruptcy in January of 2009,

 2    which is -- Weil Gotshal, after all of these exchanges, it's

 3    stipulated Exhibit 15, which is the claim filed by LBI.  LBI

 4    files a claim -- LBSF files a claim in the LBI bankruptcy, I

 5    may have misspoken, LBSF files a claim in the LBI

 6    bankruptcy, page 3 of the claim.  "Claim for securities as

 7    of September 19, 2008; LBI owes me securities; Answer, Yes."

 8    And then there is a redaction.

 9            And then on page 7 of 23, unredacted, is a list of

10    each of the FirstBank CUSIPs.  And then subsequent to that,

11    if you go back further in the document, is a copy of an

12    amendment agreement, which is an agreement, the amendment

13    agreement that amends the custody agreement, pursuant to

14    which LBI held the FirstBank securities as collateral on

15    behalf of LBSF, and it lists FirstBank as one of the parties

16    for whom LBI was holding the securities for LBSF.

17            So Weil Gotshal after investigating the claim by

18    First Bank, after inquiring of Barclays, and looking at that

19    email exchange, in January of 2009, filed a claim in the --

20    LBSF, Weil Gotshal on behalf of LBSF files a claim in the

21    LBI bankruptcy, to recover FirstBank's securities.

22            If those securities were, in fact, an asset of LBI,

23    owned by LBI, everybody knew it, it was so abundantly clear,

24    Weil Gotshal certainly would've known.  Now, there are other

25    cases in front of Your Honor they cited in their papers,
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 62 of 148

Page 62

1     where at the same time, without a record, there were other

2     parties that said, my collateral, or my property ended up

3     sold.  Interestingly, Your Honor issued a decision, Weil

4     Gotshal did in other cases take the position that yes, the

5     collateral was, or the assets were mixed into the assets and

6     were sold, but not with respect to FirstBank.

7            FirstBank securities were the subject specifically

8     of the claim filed by Weil Gotshal on behalf of LBSF in the

9     LBI bankruptcy in January 2009, and that's after reaching

10    out to Barclays.  So I think the evidence is clear it was

11    not an asset of LBI.

12           THE COURT:  With respect to the argument you're

13    making, I'll simply note that experience has shown me that

14    just because a claim is filed in a certain way proves

15    nothing.  We had $1.2 trillion of claims filed in the LBHI

16    Chapter 11 cases, many of them have been disallowed and

17    expunged as a result of a process of omnibus claim

18    objections.  And in the LBI case, many of the claims made

19    have been the subject of adverse determinations made by the

20    trustee.

21           So the mere fact that a particular claim is made as

22    of a bar date proves nothing.

23           MR. MITCHELL:  I think there's a little more than

24    that, Your Honor, is I think along this --

25           THE COURT:  I'm simply giving you my --

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 63 of 148

Page 63

1              MR. MITCHELL:  I understand.

2              THE COURT:  -- color on what you just said.

3              MR. MITCHELL:  You know, I appreciate that.  What I

4       think, though, is you have to read all these communications.

5       It's not as if this is simply Weil Gotshal filing a claim

6       without inquiry.

7              What we've uncovered during discovery in this case,

8       it's evidence in the case, we're here on motions for summary

9       judgment.  We think it's clear that this evidence

10      establishes that we're entitled to this property back.

11             I think what this evidence, at a minimum

12      establishes, is that there would be a question of fact as to

13      the import of these communications.  What they would mean

14      and whether, in fact, this was an asset of the estate.

15             We think the documents are crystal clear, because

16      it's not just -- we know that as of the time the Court

17      conducted the sale hearing, there was nothing, nothing at

18      all to put FirstBank on any kind of notice, inquiry or

19      otherwise, that its collateral was anything other than

20      collateral, because LBSF was not in bankruptcy at the time.

21             So this was the LBI bankruptcy.  There was no

22      reason for FirstBank to have had any concern.  Subsequent to

23      that, FirstBank does -- no reason to believe there's a

24      problem, and FirstBank goes to the counsel for the parties,

25      the Lehman parties, the trustee, Weil Gotshal, and the net

Page 64

1    result of that is, nine months of negotiation with LBSF to

2    get the return of its collateral, to come up with close-out

3    figures and get its collateral back.  That's not consistent

4    with, it's on Schedule A, we purchased the asset, it's gone.

5              That's what Cleary -- that's what Barclays is

6    claiming in this case.  It's so abundantly clear that this

7    was a purchased asset, and everyone knew it.  Well, if

8    everyone would know it, why didn't everyone know it at that

9    point?

10             We have people -- we have, not just reaching out to

11   counsel for Lehman, but then reaching across to Barclays

12   itself by former employees of Lehman, who are doing this

13   investigation.  And they say, we hold your collateral.  You

14   know, we dispute what the word we means, but we hold your

15   collateral.  They're calling it collateral.  That's

16   communicated back to FirstBank.  And FirstBank relies on

17   that.

18             So, you know, with the benefit of four years to

19   think about it, come up with arguments, and be in front of

20   Your Honor here in 2013, arguing the case, if we go back in

21   time to 2008 without the benefit of any of this, FirstBank

22   is told the opposite of notice.  FirstBank is told your

23   collateral is here, we're negotiating to give it back to

24   you.

25             So when they ultimately don't get it back, it's

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 65 of 148

Page 65

1   certainly a reasonable response to say, how did that happen.

2   And the facts of this case support a conclusion that this

3   was never treated as an asset of LBI.  There are other

4   reasons, we can go through that.

5           I'd like to talk about the purchased asset

6   component, and maybe come back to this if I could for a

7   minute.

8           THE COURT:  Okay.

9           MR. MITCHELL:  Because if we talk about the

10  purchased asset component, this may not be the most

11  important part of the case.  It's an important part, but it

12  may not be the driving part of the case.  Because I don't

13  think this was a purchased asset either.  But there are --

14  there's undisputed evidence in the record that this was

15  never treated as a sale by LBI.  And Barclays would have

16  this Court believe that a repo is akin to an outright, no

17  holes barred, sale of assets.  It's not.

18          A repo is a two-part contract.  It's a sale with an

19  obligation to return.  Other than the Bevill Bresler case,

20  the cases are legioned, where it's the economic substance

21  and reality of the repo that governs.  Repos were treated

22  here, undisputed evidence, as a secured loan by LBI.  Why?

23  It's obvious why.  Because LBSF didn't own the collateral.

24  So LBI couldn't take the collateral in on its books and

25  records as its own asset, that would be stealing.

Page 66

1          So what it did is it used it.  It borrowed the

2     collateral and knew it had to give it back.  That's what

3     this repo was in effect, but it did it to itself, because it

4     was already custodian.

5          Now Barclays says, well, they weren't custodian,

6     they weren't appointed custodian.  That's not true.  We have

7     the securities account control agreement, which is Cohen

8     Exhibit 3.  The exhibit to Cohen Exhibit 3 specifically

9     lists FirstBank as a party that they're holding collateral

10    for.  It gives FirstBank an account number.  Then we have in

11    the claim filed by Weil Gotshal in the LBI bankruptcy on

12    behalf of LBS an amendment to that agreement which does the

13    same thing.

14         So basically what this Court would be saying, if

15    the Court would say that the use of the FirstBank collateral

16    before September 15th, 2008 by open repo, that that is an

17    outright sale by LBSF to LBI sufficient to deprive FirstBank

18    of its property rights of its own property, when that

19    outright sale on top of it was executed by the custodian by

20    its own employees on both sides, and then never treated that

21    way by LBSF's own employees or own counsel, subsequent to

22    that, that's just the evidence.  I'm not making the evidence

23    up, that's what the undisputed evidence is.

24         And while I agree we think the evidence is the

25    same, I think that's compelling evidence, that this was

Page 67

```
1     never an asset of LBI.  Certainly never an asset free and

2     clear.

3            Barclays concedes as well, repos are two part.  You

4     have a repo and a reverse.  It's not just a repo.  The

5     evidence undisputed, their own witness, that the assets were

6     reflected on LBI's books and records with an RR designation.

7     They were not reflected as free and clear.

8            They were held in something called a custodial

9     account.  Barclays says that doesn't mean anything, that's

10    only a title to the account, but that's what it was called.

11           So this is not something that was, as they would

12    argue to you, LBSF sold the collateral.  They didn't.  They

13    repo'd the collateral -- they didn't repo the collateral,

14    LBI employees executed a repo of the collateral, presumably

15    to use it in some fashion when they had the right to do

16    that.  That terminated.  And subsequent to that, there's no

17    consideration, there's nothing whatsoever in this record to

18    establish that that repo still existed after the 15th.

19           THE COURT:  Well, you said presumably to use it in

20    some fashion.  My understanding of the factor in which it

21    was used, is that it was packaged with other CUSIPs and

22    became part of the financing via by the New York Fed for the

23    operations of LBI during Lehman week.  And that Barclays

24    then stepped into the shoes of the New York Fed, and had all

25    of the rights that the New York Fed with respect to that
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 68 of 148

Page 68

1    collateral.  Isn't that correct?

2          MR. MITCHELL:  I would say, no, Your Honor.  I

3    don't think parties can deem the property of somebody else

4    to belong to them.  And I think what that would purport to

5    do, and there's cases on that.  I think we cited an IBM

6    case, with respect to assets of an estate.  Strangers can

7    deem all they want, but deeming doesn't make it so.  Either

8    it's an asset of the estate, or it's not an asset of the

9    estate.  And any use made of the collateral prior to the

10   ultimate disposition and a liquidation would be different

11   anyway.  Because that doesn't mean that it can't be put back

12   at LSF.

13         So -- and that's one of the things the expert

14   testified.  There is no concept under ISDAs that you can use

15   somebody's collateral and steal it.  There is the

16   countervailing, the right to use provision is

17   counterbalanced by the obligation to return provision.

18         So, you know, these are pledge agreements.  Many

19   pledge agreements are written in absolutes, as the Court I'm

20   sure knows.  And then when there's a default, the absolutes

21   become more absolute.  But here, there was no default, and

22   in this particular circumstance, there is no right to use --

23   the expert testimony is, there is no right to use collateral

24   in the secured party's own liquidation.  That's beyond

25   thought.  It's beyond anybody's writing.  It's never

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 69 of 148

Page 69

1    happened before, and if it's justified in this case, it will

2    be the first time it's ever happened.

3         And, you know, we've spent four years in this case,

4    if there was a case where it happened before, I'm sure it

5    would've been brought to the attention of Your Honor.  This

6    is the first time something like this has ever happened.

7         THE COURT:  Well, I don't know if this is the first

8    time that it's ever happened, or simply the first time that

9    it's gotten to the level of argument on a motion for summary

10   judgment.

11        MR. MITCHELL:  That's fair.

12        THE COURT:  But in the context of the Lehman

13   insolvency, it's my understanding that a great deal of

14   confusion occurred prior to and immediately following the

15   bankruptcy, that every counterparty pretty much in every

16   part of the planet, had an actual reason to be concerned as

17   to their collateral, regardless of whether their Lehman

18   affiliate had filed for bankruptcy on September 15 as of

19   September 15.  And took appropriate action to protect

20   themselves immediately, including early termination of

21   virtually every derivative transaction that existed,

22   regardless of the counterparty, and regardless of whether

23   that counterparty was or was not in bankruptcy at the time.

24        So I don't know if this is the only example.  I, in

25   fact, expect quite to the contrary.  There are countless

Page 70

```
 1     examples of institutions in the very same position as your

 2     client, that when scurrying about trying to locate their

 3     "collateral", and I find the fact that you received some

 4     communications via email or other sources of communication

 5     that provided missed ques as to the actual location of the

 6     collateral as being largely irrelevant.

 7              The question is, was there or was there not a right

 8     to sell.

 9              MR. MITCHELL:  Well, I think it's -- again, we're

10     jumping, not to quibble with the Court, but I mean, the you

11     received, it's Clifford Chance, counsel for FirstBank,

12     hardly an insubstantial practitioner in this court, and they

13     were in communication with the trustee, with the trustee's

14     counsel, with you know, Weil Gotshal, and you know, I can't

15     speak for why they chose to do what they did when they did

16     it, but they certainly were speaking to the right people,

17     and they were receiving the appropriate assurances and the

18     paper trail of the record is, that that is, in fact, the

19     assurances they received.

20              THE COURT:  Are you saying that incorrect

21     assurances trump the facts?  I don't think they do.

22              MR. MITCHELL:  No, I think that we have admissions.

23     I think that there are matters of evidence here, and

24     admissions of a party opponent, certainly it can't overcome

25     the summary -- on a summary judgment motion, where you have
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 71 of 148

Page 71

1    an admission, your own employees responding to an inquiry,

2    that's an appropriate inquiry, and that response is an

3    inquiry right or wrong, I mean, let's assume it's wrong, but

4    I don't know that it's wrong.  I don't think it's wrong

5    under the circumstances, but they make a response.  The

6    simple response was, and these are Barclays' employees, the

7    simple response is, we bought it, it's on Schedule A.

8    That's all they had to say.  They didn't say that.  They

9    never said that.  And that's not what was told to Weil

10   Gotshal.  And that's not what Weil Gotshal -- if Weil

11   Gotshal had been told that, is there any doubt Weil Gotshal

12   would not have filed a claim for return of the securities in

13   January?  That was a simple response.

14           By the end of October, early November 2008, if

15   that's the fact, then somebody should say that's the fact.

16   Counsel says, it was no longer, certainly Schedule A was

17   completed.  They didn't rely on Schedule A at the time of

18   the sale order, because it didn't exist yet.  And the

19   evidence that we adduced during discovery is Schedule A is

20   as much an inventory of what they received as it is, you

21   know, a statement of what it is they thought they were

22   buying.  But certainly by the end of -- they helped prepare

23   it.  By the end -- these are the people that helped prepare

24   it.

25           So by the end of October, beginning of November

LEHMAN BROTHERS HOLDINGS, INC.

Page 72

1    2008 when you are asked, where is FirstBank's -- I represent

2    FirstBank, I'm looking for my client's collateral.  That's

3    the communication they get.  That is transmitted to

4    Barclays.  Former employees of Lehman, now working for

5    Barclays respond to those inquiries, that results in not

6    only communication to us, but the LBSF, but LBSF filing

7    claim in the LBI bankruptcy for the return of our

8    securities.

9            If the answer to that question was they're on

10   Schedule A, and we own them, and it's a purchased asset,

11   then that should've been the response.  But instead, it set

12   in motion a series of other events.  And I believe, and I

13   submit to the Court that's what happened is, subsequent to

14   the those events, during the course of discovery, it --

15   other facts have now come to light that Barclays is trying

16   to now change history and go back to the beginning and say,

17   those things never happened.  They didn't believe they

18   bought it.  They didn't think it was a purchased asset.

19           Let me walk through the purchase -- let's walk

20   through the clarification letter for a second.  I think it

21   may help clarify some of this if I can.  Because I'd like to

22   walk the Court through it.

23           Reading Barclays' reply papers, I was taken by

24   this, we got a representation that they owned all the

25   purchased assets.  And, you know, purchased assets,

```
 1    purchased assets, purchased assets, capital P, capital A.

 2    And if you think about it, there's really a circular

 3    reference.  Because if it's not a purchased asset, then you

 4    didn't get a representation that LBI owned it.

 5            So I went back to the clarification letter because

 6    we've obviously argued to the Court in our papers that it's

 7    not a purchased asset for a variety of reasons.

 8            So if I could, Your Honor, Cohen Exhibit 12 is the

 9    clarification letter.  I'd just like to walk you through

10    that, because there's some interesting things in here.

11    And --

12            THE COURT:  Do you have copies of the exhibits or

13    do I need to look for this myself?

14            MR. MITCHELL:  Do you have an extra copy?

15            (Pause)

16            MR. MITCHELL:  I have a copy here.

17            THE COURT:  I have it, it's okay.

18            MR. MITCHELL:  Thank you, Your Honor.

19            THE COURT:  It's just -- it's a terribly thick

20    binder, that's all.

21            MR. MITCHELL:  I understand.  Obviously, it's an

22    important document.

23            Now, the structure of the clarification letter

24    struck me.  Because I think it's -- I don't know that

25    anybody's ever really quite studied it because, you know --
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 74 of 148

Page 74

1          THE COURT:  Believe me --

2          MR. MITCHELL:  -- I don't think we've ever quite

3     had a case like this.

4          THE COURT:  Believe me, people have studied the

5     clarification letter.

6          MR. MITCHELL:  Okay.  Well, I didn't -- I haven't

7     seen anybody quite pick up on this, so maybe I'm wrong, but

8     I will go through it.

9          The subparagraph A is like the lead paragraph in

10     paragraph 1, purchased assets.  That is the only paragraph

11     in the entire clarification letter that describes purchased

12     assets.  And, in fact, it's only A that's purchased assets.

13     After A, you move down to other things, including excluded

14     assets and others.  So really, it's really 1A is what the

15     purchased assets are.

16          Your Honor cited to that clause in the Evergreen

17     Solar case, you called it the broker dealer business.  But

18     what they call it here is the capital B, Business.  And the

19     "Business" is defined in the asset purchase agreement, and

20     it's limited to what you call the North American broker

21     dealer business, and I think it's stipulated that the

22     derivatives business of LBSF was not that.  They did not

23     acquire the business that was the business that LBSF did

24     with Barclays.  I don't think there's any dispute of that in

25     this case.  They don't argue that it was part of the

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 75 of 148

Page 75

1    business.

2         Now --

3         THE COURT:  You said the business that LBSF did

4    with Barclays.  Is that what you meant to say?

5         MR. MITCHELL:  I'm sorry, LBSF did with FirstBank,

6    the swaps agreements and ISDAs.  That's not the business

7    they acquired.

8         Now, it becomes more clear as you go through.  Now,

9    the provision that Barclays relies upon to claim title to

10   the FirstBank securities is little (ii) in the hole under A,

11   the securities -- and it is the clause that says, "The

12   securities owned by LBI and transferred to purchaser or its

13   affiliates under the Barclays' repurchase agreement as

14   defined below, as specified on Schedule A."

15        Barclays reads that provision as an absolute

16   provision, 100 percent absolute.  Except that's not the way

17   the agreement is drafted.  That agreement is a subparagraph

18   of A.  So you can't read out of that clause the necessity

19   that the assets being necessary, be used primarily in the

20   business or necessary for the operation of the business.

21   And because it says the word -- because it said "shall

22   include."  See, it ends with "shall include."

23        And then 1 through 5, that follow, the little 1

24   through 5 that follow as a structure are subordinate to A.

25   So you don't lose the idea that the assets have to be used

LEHMAN BROTHERS HOLDINGS, INC.

Page 76

1     in the business or be necessary for the operation of the

2     business.  And the business does not include the business

3     that FirstBank was doing with LBSF.

4             So even if LBI, even if the Court believes, or the

5     Court would conclude that the communications to FirstBank

6     that it was still collateral was a mistake, that it really

7     was owned by LBI, that's not the end.  Because this clause

8     says, even if it's on Schedule A, and even if it is owned by

9     LBI, they don't necessarily get it.  Because they didn't buy

10    everything.  But that's not all.

11            If you then go to C, 1(c) on page 2 of the

12    clarification letter, we then start to talk about excluded

13    assets.  So let's say we're not so clear on what purchased

14    assets are, and this is the clarification letter, right.  So

15    this is supposed to clarify things.

16            In the middle of the paragraph on excluded assets,

17    it says, "Excluded assets shall not include any and all

18    property of any customer or maintained by or on behalf of

19    LBI to secure the obligations of any customers, whose

20    accounts are being transferred to purchaser's part of

21    the --" capital B, "Business."

22            Well, that means that if you're taking the account,

23    then you take the collateral.  And as Your Honor, in the 60

24    -- in your own 60(b) decision wrote, in connection with the

25    dispute between Lehman and Barclays, your assumption as well

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 77 of 148

Page 77

1    as Judge Forest's assumption when she looked at the publicly

2    traded derivatives, is that if collateral transferred,

3    pursuant to this clause, then collateral transferred as

4    collateral.  That was the assumption.  Plain as day.

5            So now we have 1(a), has to be part of the

6    business, and not just the fact that it's on Schedule A and

7    owned by LBI is not enough, because they didn't buy

8    everything.  And now if that wasn't clear, here we have

9    excluded asset as any collateral that they don't take the

10   account of.  And they didn't take ours.  But that may not be

11   enough, right.

12           So let's go to paragraph 21.  And paragraph 21

13   says, as if the first two aren't clear enough, "Definition

14   of excluded contract.  As used in the agreement, the term

15   excluded contract shall include any ISDA master agreement,

16   and any master swap agreement, and any schedule thereto or

17   supplemented or amended thereto."

18           So they didn't take our contract for sure.  They

19   stipulate to that fact.  And our collateral was posted

20   pursuant to an annex to an ISDA master agreement.

21           So where are we here in terms of the claim that

22   this was a purchased asset, a fairly thin read.  And not

23   just a fairly thin read, inconsistent with what appears to

24   be the plain language of the clarification letter, in terms

25   of what was purchased, what was excluded, and separately

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 78 of 148

Page 78

1    inconsistent with what I say are evidentiary admissions

2    after the fact by Barclays' own people that they didn't buy

3    it.

4          The fact that Barclays during discovery learned

5    about the existence, we don't know by the way that they

6    weren't closed, but they learned about the existence of

7    repos that occurred before the collateral use cut-off date

8    doesn't mean that it was still collateral -- that it was

9    still open repo at that time, a) doesn't mean that.  But

10   separately, it's inconsistent with their own recitation of

11   the facts.  They didn't purchase it.  If it's not a

12   purchased asset, then the sale order doesn't cover it.

13         If that reading, and I dare say, that's fairly

14   straight forward contract interpretation.  There's no

15   question in A, that little 1 through 5 in the hole are

16   subordinate to A.  So A still applies.

17         Now, when we add to this that we reach out to Weil

18   Gotshal, who we understand was the primary draftsman of the

19   document, it's clear when Weil Gotshal files a claim on

20   behalf of LBSF in the LBI bankruptcy looking for a return of

21   the FirstBank collateral, Weil Gotshal didn't believe that

22   this was a purchased asset, or that Barclays had acquired

23   it.

24         So I think the Schedule A and the on Schedule A is

25   a bit of a red herring, because it doesn't make it a

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 79 of 148

Page 79

1    purchased asset.

2        We also made an argument in the papers that was

3    never responded to, which is, Your Honor said, and I agree

4    with Your Honor, there are things that come to light, don't

5    come to light, because it never is the subject of

6    litigation.  But the testimony in the case was that Barclays

7    -- Lehman was always using collateral.  I mean, they use --

8    you know, like you go to a bank, they don't keep your -- you

9    know, your money in a safe deposit box.  Banks use assets

10   that are deposited with them, that's standard practice in

11   the industry.

12       But there was -- there's nothing here to establish

13   that the use of the collateral being made at that time

14   continued subsequent to the 15th, because the evidence

15   doesn't show that it did.  It never continued from that

16   point.

17       So if we accept the fact that A controls, as a

18   matter of contract interpretation, and that all the -- and I

19   believe there are many decisions on this, Your Honor.  I

20   believe that Your Honor has said in a multitude of decisions

21   that you've described it as the North American business of

22   Lehman.  I mean, there's been a general description of what

23   that business is that was being acquired.  So there's been

24   -- and I think the Evergreen Solar case, as I read it, I

25   think the assumption that Your Honor was making in that,

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 80 of 148

Page 80

1    that the assets in that were part of that.

2            But what happens where the assets are on Schedule

3    A, but are not used in the business?  The clarification -- I

4    don't think that issue has ever been addressed by Your Honor

5    in any decision, number one.  And the plain language of the

6    clarification letter is, that it needs to have both

7    components of that.

8            We argued in our papers that what happened in

9    circumstances where the account was taken.  Since collateral

10   was always in use, it's fair to assume that other collateral

11   was used by Lehman on the Fed repo, and the Barclays'

12   repurchase agreement, but that Barclays otherwise acquired

13   the customer account.

14           I didn't see any case in which Barclays has ever

15   claimed that if we assumed the account, and we argue this in

16   our papers, where you assumed the account, that the

17   counterparty or customer has to post new collateral because

18   we own your collateral because it was being used.  It wasn't

19   interpreted that way.

20           If they assumed the account, if they assumed the

21   contract, then whatever was posted as collateral continued

22   to be collateral.  Why should it be then if you don't assume

23   the account, and if you don't assume the contract, that you

24   get to keep it because it was used in the Fed repo, or it's

25   used in the Barclays' repo?  That's not consistent.

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 81 of 148

Page 81

1        Now, there has been no analysis or discussion by

2   Barclays of that portion, and I dare say if you read the

3   papers submitted by Barclays, there are a lot of

4   generalities.  It's a stack of a lot of general statements

5   of law in a one off case.  But you don't see any discussion

6   of used in the business.  They're not arguing they're using

7   it in business.  They admit they did not, they admit they

8   did not take our contract, yet they keep our collateral

9   because of now, what is this thin read, never spoken, never

10  discussed until now, of the existence supposedly of these

11  repo continued after the 15th, which there's no evidence of

12  continuing even when it touches them.

13        Now, among the other things, Mr. Morag handed me

14  some papers I guess that he proposed in his argument to

15  share with Your Honor, one of them being some of those

16  emails to walk you through.  He doesn't include in his

17  exhibit the final response that Weil Gotshal made to

18  FirstBank, interestingly, leaves that one out.  He only

19  gives you the behind the scenes communications between Weil

20  Gotshal.  I didn't look to see if it was Hughes Hubbard,

21  too, but there was also Hughes Hubbard, but the

22  communications back and forth with Barclays.  He leaves out

23  Cohen Exhibit 22, which is what we were told.

24        And he certainly doesn't mention -- he certainly

25  leaves out the claim that the trustee filed in the LBI

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 82 of 148

Page 82

1    bankruptcy to get our collateral back.  He also mentions in

2    one of the list of documents he proposes to show you that

3    Schedule A was filed on September 29th, 2008 under seal.

4            At the time, I -- whether Your Honor -- I assume in

5    the fog of the day, people thinking that my collateral was

6    with LBSF and LBI's filing for bankruptcy that that's not --

7    and LBSF is not in bankruptcy, I guess if the Court -- you

8    know, the Court would have to presume that somebody would

9    have to do more.  But at the time of the filing of the -- of

10   Schedule A, it was filed under seal, and FirstBank was not

11   on any notice that its collateral was anything other than

12   collateral.

13           In fact, the public -- assuming it even saw, and

14   maybe it did, I don't know, but assuming it saw the

15   clarification letter, the only conclusion you could draw

16   from the clarification letter, is that ISDAs were not

17   included under paragraph 21.  So there was nothing in the

18   public record to put FirstBank on any notice, inquiry or

19   otherwise, that its collateral was in any way, shape, or

20   form at risk, and that it was anything other than

21   collateral.  And the proposition obviously generally is,

22   collateral does not belong to the debtor, it belongs to the

23   party that posts it.

24           And we jumped ahead, just a couple of points here

25   with respect to the idea of collateral.  If you -- if the

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 83 of 148

Page 83

 1    Court accepts the fact that as a matter of evidence in the

 2    case, there's an admission from the expert presented by

 3    Barclays that even though there was a repo from LBSF to LBI

 4    of the FirstBank collateral, unbeknownst to LBI, that did

 5    not change FirstBank's interest or right to claim ownership

 6    of that collateral.  They still appropriately reflected it

 7    on their books and records despite the repo.

 8           Now, that's -- if you have that fact, it's an

 9    undisputed fact, if that fact is out there, you can't on the

10    other side then say it belonged to LBI exclusively.  Which

11    it did not.

12           THE COURT:  Let's break in for a second with a

13    question about the nature of this collateral.  My

14    understanding is that this was book entry mortgage backed

15    security collateral identified by CUSIP numbers.  That the

16    CUSIP numbers in question were actually on Schedule A.

17           And that inquiry by your client as to Schedule A

18    would have led to the conclusion earlier on, that in fact,

19    the collateral was there.  But let's move past that.

20           The collateral itself is meaningless.  We're not

21    talking about a Rembrandt.  We're not talking about unique

22    collateral.  We're talking about something that's measured

23    in mark-to-market dollars.  Under those circumstances, where

24    the collateral is is meaningless.  What you have is a claim

25    against LBS.  No claim was made as I understand it against

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 84 of 148

Page 84

1   LBS.  I can't understand how that could have happened.

2          As far as I can tell, we're in this litigation as a

3   workaround for failure to pursue remedies that were

4   available in the bankruptcy.  Can you comment on that?

5          MR. MITCHELL:  Well, that's the argument that

6   Barclays makes, so obviously if the Court is addressing it

7   in that fashion, then I assume the Court is adopting

8   Barclays' interpretation of facts.

9          THE COURT:  I'm simply asking you to respond what

10   I've just said.  It's not the interpretation of the facts,

11   it's a question arising out of your constant use of the term

12   collateral, with the notion it has secondary meaning.

13          MR. MITCHELL:  Okay.

14          THE COURT:  And that ownership has meaning in the

15   context of default under an ISDA agreement.  I'd like you to

16   comment on that as well.

17          MR. MITCHELL:  Okay.  FirstBank was represented by

18   Clifford Chance, competent counsel.  The -- as a general

19   proposition, without getting into attorney/client privileged

20   information because I think you're treading upon areas, if I

21   would explain to you the entirety of the analysis that went

22   into why it was done the way it was done, that would be an

23   evasion of the attorney/client privilege.

24          As a general proposition, I would say to you that

25   if, in fact, this was collateral, then it's not an unsecured

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 85 of 148

Page 85

1    claim against LBSF.  It's property owned by FirstBank, and

2    an unsecured claim against LBSF would be inappropriate.

3           So if you -- if this is collateral, which we --

4    which the documents absolutely 100 percent, at some point it

5    was collateral, even Barclays concedes that, if it was

6    collateral, then an unsecured claim in the LBSF bankruptcy

7    was inappropriate.  Because FirstBank was not an unsecured

8    creditor in the LBSF bankruptcy.  It was owner and trying to

9    retrieve its own property.

10          If I go beyond that, I think I would be treading on

11   attorney/client privilege, but I think as a general --

12          THE COURT:  But this is a financial transaction.

13   This isn't a replevin action.  We're not seeking to recover

14   an artifact.  It's all about accommodating the parties to a

15   swap agreement that was in place for a very long time.  And

16   the pursing of "collateral" is simply an accommodation to

17   moderate risk for one party or the other.

18          MR. MITCHELL:  It's not an accommodation.

19          THE COURT:  So part of what I'm having some trouble

20   with here in your argument, is that your argument seems to

21   be predicated upon a fairly antiquated notion of

22   identifiable property, when in fact, this is little more

23   than a claim not properly perfected against LBSF as debtor.

24          MR. MITCHELL:  Well, Your Honor, in looking at the

25   Evergreen Solar decision --

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 86 of 148

Page 86

1        THE COURT:  I think that's an important decision to

2    look at too.

3        MR. MITCHELL:  Right.  One of the things that was

4    not cited in Evergreen Solar was the case of Fire Off

5    against Nationwide Mutual Insurance Company, and I presume

6    nobody brought that to the Court's attention.  It was a 2007

7    Court of Appeals decision.  It was on -- it was referred to

8    the Court of Appeals by the Second Circuit on a question

9    concerning collateral.  This is a quote from the case, from

10   the Court of Appeals.

11       So I'm not -- you know, we're on the diversity case

12   applying state law in federal court, and the notions of

13   conversion under state law are what apply.  And this is the

14   Court of Appeals.  This is a Court of Appeals decision

15   responding to the Second Circuit.  This is a quote on page

16   292 of the decision, which is 8 New York 3rd 283.

17       "The merger rule reflected the concept that

18   intangible property interests could be converted only by

19   exercising dominion over the paper document that represented

20   that interest," citing a case.  "Now, however, it is

21   customary that stock ownership exclusively exists in

22   electronic format.  Because shares of stock can be

23   transferred by mere computer entries, a thief can use a

24   computer to access a person's financial accounts, and

25   transfer the shares to an account controlled by the thief.

1          "Similarly, electronic documents and records stored

2     in a computer can also be converted by simply pressing the

3     delete button."  Citing a case.  "It would be a curious

4     jurisprudence that turned on the existence of a paper

5     document rather than an electronic one.  Torching a

6     company's file room would then be conversion, while hacking

7     into its main frame and deleting its data would not."

8     Emphasis omitted.

9          I think if there's any -- I don't think there's any

10    doubt under New York law that after the Fire Off case, these

11    electronic data entries of CUSIPs can be converted, and that

12    was among the issues addressed by the Court of Appeals.

13         I don't know that anybody cited that case to Your

14    Honor at the time of the Evergreen Solar decision.  I think

15    the Evergreen Solar decision is also distinguishable,

16    because the different between Evergreen Solar and our case

17    is, is there any question that our collateral has been

18    specifically identified over and over again on document

19    after document.  We provide a -- first, we provide the

20    CUSIPs, we get reported the CUSIPs.  The CUSIPs are in the

21    claim that LBI filed -- LBSF filed in the LBI bankruptcy.

22         Mr. Morag traced the use of each piece of

23    collateral back to inception, in and out, in and out in his

24    October 20th, 2011 letter.

25         THE COURT:  There's no dispute the CUSIPs are

Page 88

```
 1   absolutely critical to the analysis, and CUSIPs have been an
 2   absolutely critical element throughout the Lehman Brothers'
 3   bankruptcy cases.  Nor is there any issue with respect to
 4   the case that you cite, which I read in your papers, as to
 5   whether or not electronic data is equivalent to paper data
 6   for purposes of certain aspects of the law.  But none of
 7   that matters here.
 8          The issue is whether or not the property in
 9   question properly was hypothecated to LBI, properly used by
10   LBI, and actually acquired under the sale order by Barclays.
11   So, in a sense, while I'm certainly paying attention to
12   everything you're arguing to me, the central thesis of your
13   argument is this property was never LBI's to sell, was never
14   actually covered by the sale order, and was actually not
15   Barclays to purchase, even though it was on Schedule A
16   because it was identified collateral under the credit
17   support agreement or annex associated with your ISDA.
18          I believe that to be your central argument.
19          MR. MITCHELL:  That's the second argument.  That's
20   not the central argument.  The central argument is under
21   paragraph 1 of the clarification letter.  Whether or not it
22   was owned by LBI, it was not a purchased asset at all.
23          THE COURT:  Well, but --
24          MR. MITCHELL:  Because it wasn't used in the
25   business.
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 89 of 148

Page 89

 1              THE COURT:  But you're kind of reading out --

 2              MR. MITCHELL:  It's excluded.

 3              THE COURT:  It's a particular way that you're

 4     reading a document that says "purchased assets shall

 5     include:" and you're suggesting that that shall language is

 6     necessarily modified by the, when necessary for the

 7     operation of the business, or used primarily in the

 8     business.  Which is simply one way of reading imperfectly

 9     drafted language.

10              MR. MITCHELL:  Well then, I would say, Your Honor,

11     if Your Honor is -- if Your Honor at least -- I think the

12     structure of the paragraph is clear; however, at a minimum,

13     it's not clear what Barclays is saying.

14              THE COURT:  There isn't much that in life that's

15     really clear.  So especially when parties have been involved

16     in good faith litigation for years, where the facts are

17     largely stipulated, but the legal conclusions are

18     diametrically opposite.  It's not that helpful for me to say

19     that something is clear, when the reality is that there's a

20     good faith dispute as to what the right answer is.

21              MR. MITCHELL:  I agree with Your Honor on that.  So

22     what I would say to you is that either the Court can say the

23     contract is unambiguous, in which event the parole evidence

24     is irrelevant, it just says what it says.  Or we allow for

25     -- and by the way, we're a stranger to this contract.

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 90 of 148

Page 90

1        So whether or not we've been barred from presenting

2   parole evidence because it's not our contract, is also

3   another question under New York law.  But put that aside.

4   If it's not so clear, and I think the drafting of this, the

5   drafters, these are very smart people, I mean, they did

6   create subparagraphs here.  The --

7        THE COURT:  A lot of --

8        MR. MITCHELL:  Unclear would be then we'd turn to

9   some parole evidence.

10       THE COURT:  We can stipulate that a lot of really,

11   really, really smart people worked really, really, really

12   hard under extraordinary time pressure to deal with one of

13   the most complicated transactions that has ever been devised

14   in the history of modern finance, and was closed in Nano

15   seconds in relative terms.

16       And so there is no one author of this document.

17   The evidence is fairly clear to me that this was -- on the

18   part of a committee, and it was done in a hurry, and there

19   were lots of people, including some partners at Cleary

20   Gottlieb who took part in the drafting of this document.

21       So we look at it as the manifestation of intent at

22   the time.  And it's my job to construe it, and it's your job

23   to argue what it means.

24       MR. MITCHELL:  I understand.  And I think, Your

25   Honor, that intent can be shown by the conduct of the

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 91 of 148

Page 91

1    parties after the fact.  And what I would say to you, in

2    response to your question that nothing is clear, closest in

3    time to the crafting of that document is that email

4    exchange, and the filing of the claim in the LBSF -- in the

5    LBI bankruptcy, that would indicate that principals to this

6    agreement did not interpret this agreement to be

7    transferring the FirstBank property, the FirstBank

8    collateral to Barclays.  That's in October, November 2008,

9    January 2009.

10              These are parties that were -- they're part of that

11   group of people who did their best to come up with

12   something, and certainly they, who had possession of

13   Schedule A, they had -- they certainly had Schedule A, they

14   helped prepare it.  They didn't take the position that the

15   FirstBank collateral was a purchased asset.

16              Whether that was because it's not a purchased asset

17   under 1(a), or because it wasn't owned by LBI, I don't know.

18   We don't need to know.  What we need to know is, that that

19   was the position they took.  So that should help the Court

20   in interpreting what was intended by the parties, by this

21   language that is included in here.  And I have offered the

22   Court an interpretation of why it would be that it would be

23   interpreted that way.  It's a fair interpretation.

24              I know Your Honor, you know, we're looking at a

25   massive transaction that closed in a matter of days, the

LEHMAN BROTHERS HOLDINGS, INC.

Page 92

1    Court was under tremendous pressure, I appreciate all that,

2    I'm not arguing anything differently.  What I'm saying to

3    you is, I'm standing here on behalf of the FirstBank of

4    Puerto Rico.  FirstBank of Puerto Rico had $62 million as

5    collateral, always reported to it as collateral, that ended

6    up in the hands of Barclays.

7            If you look at that from 60,000 feet, now whether

8    or not Your Honor can say it's the right thing that

9    should've happened under the circumstances is a different

10   story.  But under the facts of this case, every piece of

11   paper that existed at the time, put it on absolutely no

12   notice that its collateral was even at risk, that it was the

13   subject of anything.  In fact, the communications were to

14   the contrary.

15           And lo and behold, we are in a world where their

16   ISDA was not accepted, they didn't assume the ISDA at

17   Barclays, but they keep $62 million of their collateral as a

18   purchased asset, and it's not even the business unit they

19   purchased.

20           I -- you know, from a matter of -- and I know the

21   law doesn't turn on fairness, but FirstBank had no ability

22   to protect itself.  Maybe -- and if we had even -- not

23   saying that we had notice or we could have had notice, but

24   FirstBank's $62 million question in that one week of what

25   was going on, when LBSF wasn't even in bankruptcy, would not

Page 93

1    have had a second's notice, because there were bigger things

2    the Court was dealing with.

3              So when the dust settled, and it certainly had

4    settled by the time FirstBank says where's my property, when

5    the dust settled, an inquiry is made to Barclays, where is

6    my property, or where is the property.  If it was on

7    Schedule A at that point, don't we have enough good lawyers

8    and smart lawyers working on this that they would've known

9    it by then?  Because the dust had settled a bit.

10             We allege in the complaint at the time, we didn't

11   know all the facts of the case.  We alleged in the

12   complaint, is it unreasonable to have assumed that a

13   transaction of this magnitude done on such short notice,

14   resulted in a massive dump of assets on Barclays that needed

15   to be sorted through.  Some things could have come over by

16   mistake, even Barclays' own expert admits mistakes happen.

17   Things could end up where they don't belong.

18             But as you start to sort through things, and you

19   start to put things into your computer systems, and you

20   start to determine what belongs where, do we own it or do we

21   not own it.  By November, shouldn't you at least know if you

22   bought something and it's on Schedule A?  How hard is that?

23   I mean 8,000 CUSIPs, so it's 8,000 CUSIPs, I mean, how many

24   transactions does Barclays do everyday?  They keep track of

25   more than 8,000 CUSIPs.  That was on the computer system in

Page 94

1    a matter of hours, I'm sure.  It was an electronic transfer.

2            So, you know, we aren't really talking about

3    something that's like this innocent little mistake.  I don't

4    -- the evidence is, on a summary judgment motion, the

5    evidence is that after having this material, they didn't

6    think it was a purchased asset, and nor did LBSF.  If it's

7    so clear it's a purchased asset, why isn't somebody saying

8    it?

9            So, Your Honor, I agree with Your Honor, you know,

10   and I've read the decisions.  You know, I'm sure you were

11   under -- I'm sure Your Honor was under incredible pressure

12   that week, you know, a week like any other.

13           THE COURT:  This is truly not about me.

14           MR. MITCHELL:  I understand that but --

15           THE COURT:  So whatever pressure I was under has

16   zero to do with the issues before me today.

17           MR. MITCHELL:  Well, I hear from the question of

18   Your Honor, and I'm just trying to address the notion that

19   everybody did their best.

20           THE COURT:  No, I'm not saying that at all.  I'm

21   responding in part to your assertion in effect using Weil

22   Gotshal as a catch all for what the debtor knew or what

23   certain parties knew at various times either leading up to

24   or following the drafting of the clarification letter.

25           It's fairly clear to me that the clarification

LEHMAN BROTHERS HOLDINGS, INC.

Page 95

```
 1    letter was the work of a committee, that a number of parties
 2    had a role in drafting it.  And it's also clear to me, and
 3    again, this has zero to do with anything that I did during
 4    Lehman week or thereafter, that parties were engaged in
 5    efforts to reconcile accounts.  And that that was a massive
 6    undertaking, having to do with transferred accounts to
 7    Barclays, but also tens of thousands of derivative
 8    counterparties, of which your client is but one.
 9            And so in that setting, the fact that there is
10    imprecision with respect to certain CUSIPs that you care
11    about, doesn't necessarily prove very much.
12            MR. MITCHELL:  Well, Your Honor, on a summary
13    judgment motion, I would say that at a minimum, it was raise
14    questions of fact as to who knew what and when, and whether
15    and to what extent those documents do constitute admissions,
16    and clearly the people who were preparing and drafting and
17    writing those documents were former Lehman employees,
18    there's no question about that, they were employed by
19    Barclays.  It's not just Weil.
20            I'm only using Weil as the spokesperson, but it was
21    Weil, it was Hughes Hubbard, it was Barclays.  Because it
22    was the group that responded ultimately by January on what
23    should happen.  And that's the record.  I'm not making the
24    record up, that's the record we've established in the case,
25    that's the record before the Court on the motion for summary
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 96 of 148

Page 96

```
 1    judgment.
 2           And I would say to the Court that even if the Court
 3    finds that there's imprecision, or if the Court finds
 4    there's imprecision in the clarification letter in
 5    connection with the drafting of the purchased assets
 6    provision, that those documents are -- you know, they're not
 7    documents that you could ignore on a motion for summary
 8    judgment.  Certainly you can't grant summary judgment to
 9    Barclays in light of those documents crafted by its own
10    people, it would raise a question of fact that would have to
11    await trial for a solution.
12           THE COURT:  But how --
13           MR. MITCHELL:  For a trier of fact to determine the
14    weight to be given.
15           THE COURT:  How do you reconcile the fact that, at
16    least as I understand it, Schedule A includes the CUSIPs in
17    question.  How do you reconcile Schedule A with inconsistent
18    statements that are simply wrong?
19           MR. MITCHELL:  Your Honor has pointed out, and we
20    agree that -- well, I would say to you that the time to use
21    FirstBank's collateral terminated, we all agree, on February
22    15th.  A use of our collateral is different than a sale and
23    liquidation.
24           So the prior use -- the fact that our collateral
25    was used on something is not necessarily and certainly
```

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 97 of 148

Page 97

1   before the bankruptcy, not necessarily inappropriate.  But

2   what we have here is, the way this deal was structured, it

3   was structured as a purchase.  The Barclays' repurchase

4   agreement was terminated, the termination letter with

5   respect to the Barclays' agreement was terminated, and we

6   ended with an out right asset sale, that that's what the

7   Court ultimately blesses.

8           And that's when I said to Your Honor, you can't

9   deem something to be the property of yourself, when it's not

10  yours, because the bankruptcy court doesn't have

11  jurisdiction over assets that are not assets of the debtor.

12          So the fact that Barclays and Lehman purported to

13  deem everything on Schedule A because it -- which didn't

14  exist at the time anyway, but we're going to deem everything

15  on Schedule A belongs to Barclays.  That doesn't bind a

16  stranger.  And it doesn't put the asset in front of Your

17  Honor.

18          So whether you use the asset in some other fashion

19  in a financing transaction at an earlier date, does not

20  authorize the disposition of that asset permanently and

21  forever in a liquidation transaction.  That's also one of

22  the things that our expert testified.

23          I know Your Honor's given me some time.  I just

24  want -- a couple of things.  I just want to talk to you just

25  briefly about the repo and why these repos, the LBSF, the

Page 98

1    LBI repo is not or should not be treated in this case as a

2    sale.

3            First, I already said to Your Honor, repos and

4    reverses go together.  Similar to accounts in collateral

5    like you talked about in the 60(b) decision, like Judge

6    Forest talked about in the 60(b) decision.  So it's not the

7    reverse.  The repo and reverse are collective and they're

8    maintained that way on LBI's books and records.

9            This is -- these are undisputed facts in the record

10   of this case.  LBI treated the repos with LBSF as secured

11   loans, not as a sale.  LBI never showed the FirstBank

12   collateral on its own books and records as its own asset.

13           Barclays' expert admitted had FirstBank properly

14   continued to list the FirstBank collateral as its own asset,

15   after the repos.  LBI's own books and records reflected that

16   it did not own the FirstBank collateral out right.  It used

17   an RR designation to reflect its duty to return it.

18           LBI was already custodian for the FirstBank

19   collateral, pursuant to a separate securities account

20   control agreement, and was therefore bound as LBSF's agent,

21   by whatever LBSF's obligations were to FirstBank.  Obviously

22   LBSF's right to use the collateral terminated on September

23   15th, and LBSF filed a claim in January to get it back.

24   Those are all facts inconsistent with full complete absolute

25   ownership of the FirstBank collateral by LBI.

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 99 of 148

Page 99

1         The Bankruptcy Code also has a safe harbor for

2    repos.  Repos are not subject to the bankruptcy stay.  They

3    can be closed despite a bankruptcy filing.  So even the

4    Bankruptcy Code envisions that repos are not full absolute

5    and unconditional transfers of title to a debtor.

6         The only thing there really is --

7         THE COURT:  I'm not sure what you just said is a

8    fair conclusion to be drawn from the existence of the safe

9    harbors in the Bankruptcy Code, but I'm just going to let it

10   go by.

11        MR. MITCHELL:  Well, Your Honor, I think it's fair

12   to say that if there is an attempt to close a repo

13   transaction -- if there's anything with respect to a repo

14   transaction after a bankruptcy filing, it at least comes

15   before the Court, and the Court would address those issues.

16   It's not something that would happen outside of the purview

17   of the bankruptcy court.  Here we know LBSF had no employees

18   of its own, no one acting through -- it acted only through

19   the employees of LBI.  The person responsible for the LBI --

20   LBSF side of the collateral was an LBI employee.  And he

21   testified that as soon as LBHI filed for bankruptcy, he was

22   told by management do nothing, to not return calls, to take

23   no action.

24        Certainly there's nothing in any record in the

25   bankruptcy case that I've seen, that anyone brought to your

Page 100

1    attention the fact that there were open repos between -- of

2    collateral of counterparties on contracts that were not

3    being assumed by Barclays.  That there were open repos of

4    collateral from LBSF to LBI.  Shouldn't the Court at least

5    have had an opportunity to decide how this should be

6    resolved, or what this -- you know, what all this meant?

7    Why didn't somebody bring that to your attention?  If they

8    couldn't do it right away, why didn't somebody bring it to

9    your attention right away?  Hey, we have this problem.

10            Instead, all this got swept under the rug.  In

11   fact, Your Honor even in the 60(b) decision said, you didn't

12   even see the clarification letter, and you never passed upon

13   the clarification letter.  So it's not even that the

14   language that they chose in the clarification letter is

15   language that the Court blessed.  But isn't it fair to say

16   that something like this, I mean, we're talking about $62

17   million of what is called collateral at some point, and is

18   identified by CUSIP from an innocent party, disappearing

19   into a $45 billion sale to Barclays, when they clearly and

20   expressly in many places say they're not going to do it.

21   That's not part of what the sale is about.

22            Briefly so -- and obviously we gave you -- we have

23   in the papers that these repos were not arm's length, and

24   why, I talked about that briefly.

25            THE COURT:  This argument has gone on for quite a

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 101 of 148

Page 101

1    while, and I think it's may be time to highlight any points

2    that you think you need to emphasize, and then we're going

3    to take a short break.

4              MR. MITCHELL:  Okay, Your Honor.  Yeah, that's what

5    I was going to do.  I was summing at this point, just

6    finding things that I want to -- that I haven't touched

7    upon.

8              We talked about the LBSF and that we're a stranger

9    to the clarification letter.  So binding us by what Barclays

10   and Lehman deem is not appropriate under the law.

11             I think the 60(b) decisions, both yours and Judge

12   Farr's clearly presume that the only collateral transferred

13   as a purchased asset was that securing publicly traded

14   securities, and that it transfers as collateral.  Both of

15   you say that.

16             There is no mention in any decision, nor do I see

17   from any decision that either you or Judge Farr might have

18   ever been aware of the fact, that there was even the

19   possibility that any collateral was separated from the

20   obligation it secured by some inner affiliate repo that's

21   unknown to the party that posts the collateral, and

22   therefore, loses its collateral, it's character's

23   collateral.

24             You know, that's something that if there was -- and

25   I daresay the Court -- I can't speak for the Court, but I

Page 102

```
 1    don't know that the Court was aware, that there had been

 2    circumstances where collateral was supposedly separated from

 3    its obligation by a LBSF to LBI repo and that event alone

 4    was enough to allow that to go.  But I've not seen any

 5    decision where that has ever been passed upon.

 6            Also there's stuff in the papers they talk -- we're

 7    not challenging the sale order.  It's not a 60(b) case.  Our

 8    position is that the sale order only confirmed the transfer

 9    of purchased assets, and these are not purchased assets.  So

10    I think that's -- I think the Court understands that's the

11    thrust of our decision.

12            The only mention of notice in our papers is that

13    you can't take -- obviously it's fundamental due process.

14    You can't take property without notice.  I don't think

15    there's any evidence in this record, or we had any notice

16    that our property was even at issue.

17            The IBM case that we cited to the Court with

18    respect to patents and the transfer of patents in the TM

19    case is one in which that issue is discussed.

20            In conclusion, I'd say in the records of this case,

21    Your Honor, at a minimum there are questions of fact that

22    require resolution at trial.  We think the only party that

23    could be entitled to summary judgment is FirstBank based

24    upon what we think is a clear interpretation of the

25    clarification letter.
```

Page 103

1          But in light of the evidence, close in time,

2     following the execution of the clarification letter, and the

3     entry of the sale order, it's clear that the principals to

4     that document did not consider the FirstBank collateral a

5     purchased asset.  And the weight to be given to that

6     evidence would be for a trier of fact if the Court finds

7     there's an ambiguity, and cannot determine from those

8     documents whether that's sufficient to grant summary

9     judgment for FirstBank.

10         But you can't simply do as Barclays asks and ignore

11    that evidence, because that evidence is in the record, it's

12    undisputed, and it's clear what happened for a period of

13    nine months after the fact, that FirstBank was told, your

14    collateral is at LBI, and LBSF negotiated with FirstBank for

15    return of that collateral, net of whatever the obligations

16    were party-to-party.

17         Thank you, Your Honor, for the time, and I'm

18    available for reply when we get to that.  Thank you.

19         THE COURT:  Okay.  Let's take a break returning at

20    a quarter to 4.

21         (Recessed at 3:34 p.m.; reconvened at 3:48 p.m.)

22         THE COURT:  Be seated, please.

23         MR. MORAG:  Good afternoon, Your Honor, again Boaz

24    Morag of Cleary Gottlieb for Barclays Capital.

25         I'd like to begin basically by explaining why these

Page 104

```
 1    20 positions are purchased assets, and why the sale order

 2    disposes of this matter.

 3            The one thing I think that I would want to point

 4    out though at the start is that Mr. Mitchell did not address

 5    at all our arguments under the UCC and Article 8.  As far as

 6    I can tell, even if there were an issue with respect to

 7    LBI's capacity to convey securities to Barclays, under

 8    Article 8 we're protected, and they really have no argument

 9    in their papers why that would not apply.

10            We gave value.  I can deal with that in more

11    detail.  The -- we took possession, we obtained control, and

12    there's no allegation whatsoever that Barclays had any

13    knowledge of FirstBank or FirstBank's relationship with LBSF

14    or FirstBank's interest in these securities at any time in

15    September of 2008, whatever time you want to think about it.

16            So that's just something to put out there.  But

17    with respect to the sale order, because that is the issue

18    that and the reason that Judge Daniels referred this case to

19    Your Honor, finding it a core matter because it requires

20    construction of the sale order.

21            The reason that these are purchased assets is very

22    clear.  Because by the time the clarification letter was

23    agreed and signed, and presented to this Court, the one

24    thing that the parties negotiating that letter agreed on was

25    that whatever the securities were that came over in the
```

LEHMAN BROTHERS HOLDINGS, INC.

Page 105

1    repo, that had happened three or four days later, those were

2    going to be purchased assets.  And that is evident from the

3    fact that that's what the clarification letter specifically

4    says.

5             And frankly, that's what Your Honor understood it

6    to mean, after having sat through the Rule 60 trial in

7    Evergreen Solar, where you said that the clarification

8    letter specifically provided that the rights and obligations

9    of the parties under the repo, referring to the September 18

10   Barclays' repo, including LBI's right to repurchase the

11   transferred securities would terminate, and all securities

12   held by Barclays under the repo would be deemed part of the

13   purchased assets.

14            And I can walk through the specifics in Mr.

15   Mitchell's reading of the language, the word includes and so

16   on, but there are other provisions that make this very

17   clear.  And you first -- Your Honor has already outlined in

18   your question, that you have the chronology down pat.  That

19   all of the repos to LBI occurred prior to September 15th.

20   That from the date of the repo, whatever it was, onward, LBI

21   used these securities, this is in the record in the letter

22   where we traced back the use of these CUSIPs everyday in the

23   relevant timeframe to finance its business.

24            It put them out on tri party repo when the

25   financial world was still lending money to LBI, it put it

Page 106

```
 1    out to the Fed when the Fed was the lender of last resort to

 2    LBI, and for the period of time when the Barclays' repo was

 3    open as a repo, Barclays was the one providing financing to

 4    LBI, which as Your Honor knows, part of the broker dealer's

 5    business is to obtain financing for its operations.

 6             So the first point is that this was used in the

 7    business of LBI.  The fact that we did not, Barclays did not

 8    assume and take over the over the counter derivatives

 9    business does not negate the fact that LBI used these

10    securities in its overall business that we did acquire.

11             Second, the word include is a defined term in the

12    APA.  It means without limitation and is not meant to be

13    exclusive.

14             And third and finally what Mr. Mitchell did not

15    address, was also paragraph 13 of the clarification letter,

16    which Your Honor cited in Evergreen Solar which again is

17    further corroboration effective at closing, all securities

18    and other assets held by purchaser under the September 18,

19    2008 repurchase arrangement among purchaser and/or its

20    affiliates and LBI, and/or its affiliates and the Bank of

21    New York as collateral agent, shall be deemed to constitute

22    part of the purchased assets in accordance with paragraph

23    1(a)(2) above.

24             So -- and as we pointed out, and nothing was said

25    about this, the original argument was that it was an
```

LEHMAN BROTHERS HOLDINGS, INC.

Page 107

1    expressly excluded asset, because of this idea that because

2    we weren't taking the over the counter derivatives business,

3    that meant that these securities were still being -- had

4    this indelible characteristic of collateral for the rest of

5    time.

6             And we pointed out that in the excluded asset

7    definition in 1(c) on page 2 of the clarification letter,

8    there is an express carve out of the definition of excluded

9    assets for anything obtained in the Barclays' repurchase

10   agreement.  This in the middle of the paragraph on page 2,

11   1(c).

12            So even if this would be otherwise related to over

13   the counter derivatives, TBA mortgage notes, similar asset

14   backed securities, these securities, everyone knew what they

15   were, they were on a list.  Those are not excluded assets,

16   and they are clearly purchased assets, so.

17            And the one issue that Judge Daniels had at the

18   time of the motion to dismiss was, I can't look at all of

19   these papers outside the pleadings, I just need to know was

20   it the intent of the parties that this be a transferred

21   asset or not.  And I think that is made clear by the

22   chronology Your Honor mentioned.

23            LBI repos them to the Fed.  On the 17th of

24   September, they give Barclays the list of the Fed repo

25   collateral, and says, this is what you're going to get.  God

Page 108

1    willing.

2          Barclays looks at it, says okay, fine, we'll do the

3    repo.  Barclays transmits $45 billion of cash, that's

4    stipulated.  It's stipulated that these were with the Fed.

5    They come across in that Fed repo on the 18th of September,

6    they get booked by Barclays, and they get booked with values

7    that there can be no question are appropriate, because

8    indeed that's the valuation that FirstBank relies on for

9    their highest intermediate damage number, whatever that is.

10         So then they come in on the date they're supposed

11   to come in the transaction where they're supposed to come

12   in, Barclays accepts them, it books them.  The clarification

13   letter then confirms the understanding that they will be

14   treated as purchased assets because frankly, that was the

15   one set of securities people could identify.  That was the

16   one thing that people knew exactly what it was, and the

17   quantities, and the CUSIPs at that point.

18         Schedule A is finalized.  As Your Honor knows, it's

19   8,500 CUSIPs, there's also a Schedule B of clearance box

20   assets that has to get finalized.  It is presented to the

21   Court under a motion jointly by the debtors and by Barclays

22   saying this is the clarification letter, it's binding on the

23   parties, this is on their understanding, and it includes

24   these schedules of purchased assets that we need to file

25   under seal, for reasons that Your Honor ultimately accepted,

Page 109

1    which was the commercial sensitivity of knowing that

2    Barclays may want to sell exactly these positions over the

3    next coming months.

4              So -- and we're beyond the issue of, you know, the

5    clarification letter.  In Evergreen Solar, you put it very

6    succinctly, although it was not formally approved, the Court

7    has determined its unenforceable nonetheless.

8              So that's really it.  These are clearly purchased

9    assets.  And let me say why I think we stop there.  We stop

10   there because Your Honor made findings in the sale order

11   that LBI had the power to convey these assets.  And Your

12   Honor also provided a remedy for parties like FirstBank who

13   claim an interest in the purchased assets.

14             Indeed, if you think about it, if the only assets

15   that LBI was supposed to be conveying in this transaction,

16   and under Section 363 of the Bankruptcy Code generally, are

17   those assets in which no one in the world could possibly

18   claim another interest, you wouldn't need the remedy that

19   was provided for therein, which was the claim to make

20   against the holder of the proceeds of those purchased

21   assets.

22             And if as you heard they still take the position

23   that this was never an asset of the estate, of any Lehman

24   estate, it was quote collateral, and that makes it something

25   different, that sounds like it would've been a pretty good

1    claim on the proceeds.  They've never made that claim

2    against LBI or LBHI who are holding those proceeds, and

3    they're jointly and severally liable by the way.

4         So the point is that that's why -- but the one

5    thing you also did is you enjoined this very lawsuit, which

6    is the subject of a motion for contempt that we're deferring

7    until after Your Honor resolves this motion, but -- so

8    that's the one thing that in light of the principles of

9    Section 363, in light of the findings that Barclays insisted

10   on as part of this transaction, they couldn't do.

11        You can't -- the title passed free and clear, the

12   order was not stayed, and the entire point is, at that

13   point, the risks of interests coming out of the woodwork on

14   a particular asset is with the party holding the proceeds

15   from that sale.

16        That is how the sale order and sales like this are

17   supposed to work.  It is not as FirstBank suggests, we get

18   to see the assets, have like 30 or 60 days to look at them,

19   check the providence, okay, these are not Picassos or

20   Rembrandts as Your Honor pointed out.

21        This is against the back drop of Article 8 of the

22   UCC, where specifically you're not required, and you're not

23   supposed to do diligence on your seller's chain of title.

24   Precisely because of the way the markets work, and the

25   decision made by the New York legislature, and every other

LEHMAN BROTHERS HOLDINGS, INC.

Page 111

1    legislature who's adopted Article 8 of the UCC, that we do

2    not -- that we have special rules for the sale of

3    transactions and securities.

4         So this was no situation where we set the assets,

5    look them over, send back some things that we don't like or

6    want, or we have questions about, maybe Lehman sends over

7    something else in exchange.  We paid for this, and now

8    they're asking us to pay twice, frankly.  I mean, there's no

9    other way around that.

10        And the other entity that paid for these assets,

11   and I do -- but that is why I think you can stop at the sale

12   order.  They've conceded the facts that these were repo'd by

13   LBI to the Fed and returned to LBI on the morning of

14   September 18.  That is what made it an asset of LBI, subject

15   and eligible to be included in the sale, subject to whatever

16   interests the world may have in those assets.

17        THE COURT:  Let me ask you a question about the cut

18   off date that everybody has stipulated to of September 15.

19   Does it matter that the CUSIPs in question were transferred

20   in to LBI in connection with the Fed repo, subsequent to

21   that cut off date?

22        MR. MORAG:  No, here's why.  The use of that can be

23   made of posted collateral by the secured party, LBSF was

24   very broad.  Your Honor has seen the quotation of Section

25   6(c) of this CSA in every one of the briefs.  They could

Page 112

1    sell it, rehypothecate it, repo it, do anything, including

2    totally lose control over any possible way of ever getting

3    it back.  Precisely because it's a fungible CUSIP that

4    wherever it is, you can go out and find another one exactly

5    like it in the same quantity.

6           So until February -- I'm sorry, and you did that,

7    too.  Until September 15th, LBSF was free to use these

8    CUSIPs and repos, and you heard the concession that those

9    uses were proper.

10          Now, what -- how does LBI get these CUSIPs.  First

11   of all, it's very important because it's important for Your

12   Honor to understand.

13          You heard highly questionable repos, they didn't

14   buy it, they borrowed it.  Okay.  Well, let's slow down.

15   These are repurchased transactions under the documentation

16   of the master repurchase agreement, which provided for a

17   cash payment.  We have produced and are in the record before

18   you, the confirms for every single one of these repos, which

19   are the same precise confirms that LBI would've used if

20   Goldman Sachs or one of the test case plaintiffs who are

21   coming up and have their own repurchase arrangements with

22   LBI, were repurchasing securities with LBI.

23          And indeed, if I may, Your Honor, we have just one

24   of the several -- oh, do you already have this?

25          THE COURT:  Do you want to hand that up?

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 113 of 148

Page 113

1                MR. MORAG:  And what the repos show is that this

2      was an ordinary course -- I mean, this is the transaction,

3      it's memorialized the same way every other way repo

4      transaction is memorialized as between LBSF and LBI, and as

5      between LBI and other repo counterparties.  And you're

6      looking at a confirm for trades that settled on July 8th,

7      and if you turn to page -- it's at the bottom of 16 in the

8      Bates stamp.

9                Do you see there a transaction blocked in yellow?

10               THE COURT:  What's the production number?

11               MR. MORAG:  016.

12               THE COURT:  Yes, I see it.

13               MR. MORAG:  Okay.  So this is -- this represents

14     all of LBI's repo activity with LBSF.  If you look at the

15     first page, which is 13, this is all of the transactions

16     between Lehman Brothers, Inc. and the LBSF collateral repo

17     account.  And it turns out that one of these many securities

18     is a FirstBank CUSIP.  And there is a repo like this, is

19     Exhibit 40 to my declaration, for every single one of these

20     highly questionable repos.

21               And this is the amount, the $3,737,000 that LBI

22     paid in cash that day, obviously all of the payments were

23     netted for one payment, but that is the amount in cash that

24     is -- it was credited to LBSF for selling this CUSIP.

25               And the other point, if you could look at page 28,

Page 114

```
 1    which is the last page of the extracted confirm, condition

 2    -- terms and condition 10, again, there are standard terms

 3    and condition.  "As payment shall be made in federal funds

 4    on the settlement date."

 5           Okay.  And in paragraph 20 at the bottom of that

 6    column, the second sentence, "If our capacity was as

 7    principal, we bought from or sold to you as dealer for our

 8    own account," and then it continues.  And this indicates as

 9    principal, we bought from you.

10           So LBI transferred values.  They don't ever suggest

11    were inappropriate, inadequate, unreasonable in exchange for

12    these CUSIPs.  And it adds up, if you add up all of these in

13    sums, it's $52 million, because not all of the $63 million

14    worth of securities were ever repo'd to LBI, and therefore,

15    never coming to Barclays.  That's an issue known as the

16    eight positions that we never received.

17           So LBI transfers cash to LBSF, Barclays transfers

18    cash to LBI.  That is what happened here, and frankly, on

19    the issue of all of these insinuations and allegations with

20    respect to these transactions, and people working for LBSF

21    were employees of LBI, they have to do better than that.

22    They need to come forward with evidence that would suggest

23    that documents that they've stipulated to their authenticity

24    and to their admissibility, which means that they're

25    admissible for the truth of the matter asserted, are somehow
```

Page 115

1    false and fraudulent.

2            Do you know how many -- yes, you do know how many

3    creditors and parties in interests would've not -- wanted to

4    know that all of these intercompany repos between LBSF and

5    LBI were sham transactions?  That has never been an

6    allegation made in the four years of this bankruptcy.  Like

7    it's never been an allegation raised that Barclays somehow

8    got something that they couldn't tell, and didn't properly

9    treat as customer property when it should -- and they

10   treated it as proprietary assets.

11           And the reason for that is, under the documentation

12   that we lay out in our brief, LBI taking it on a repo, I'm

13   not asking Your Honor, and you don't need to decide the

14   ultimate philosophical question, is it a sale, is it a

15   secured loan.  It has aspects of both, okay.

16           The documentation says that it's a transfer of

17   title, with a sale, with a right to repurchase, for

18   accounting reasons, for tax reasons, it may be treated as a

19   secured loan.  But the very acknowledgement that it was on

20   LBI's books and records under the heading RR, reverse repo,

21   means under the master repurchase agreement, explicitly that

22   LBI has the right to unrepo, to repo itself onward to get

23   cash for the security.

24           And that is true, even though if LBSF called up and

25   said, not just I want to terminate my open repo with you,

Page 116

1     but the MRA is very specific.  You -- LBI has no obligation

2     to return the security under LBSF tenders the repurchase

3     price, the cash, that it had received whatever months

4     before, weeks before, days before to get back the security.

5              So statements from Mr. Mitchell like these repos

6     were finished, it created the duty to return.  Well, that

7     duty only arises if LBSF were to tender cash.  And we've put

8     in evidence before the Court two different sources, the

9     trustee's analysis, preliminary analysis, an Alvarez and

10    Marsal report to the Court and to all the creditors, that as

11    of September 14, 2008, LBSF had all of $7 million of cash on

12    hand.

13             So the reason that it -- LBSF did not run out and

14    undo all of these repos is not because of collusion and some

15    sort of malfeasance between LBI and LBSF, because of the

16    reality that the whole entity was shutting down.  They were

17    not engaging in any new transactions, and certainly not --

18    well, you would think it appropriate to somehow favor one

19    similarly situated derivative counterparty over all others.

20    To take whatever cash they had and undo that one set of

21    repos for their benefit.

22             And indeed, on this point, if LBSF had access to

23    the world -- the repo market, other than through LBI, and

24    had repo'd these securities to Goldman Sachs, FirstBank

25    would still be in the same exact position it is today.  LBSF

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 117 of 148

Page 117

1    would never have had the cash, would not have had the cash

2    to get them back.  They would've had a claim on LBSF, their

3    contractual counterparty, they would've decided to forego

4    that claim.  Goldman Sachs would be sitting with securities

5    they hadn't paid for.  Barclays has done the exact same

6    thing.

7            There were some other statements, and I do want to

8    walk you through because I think it is important.  I don't

9    think it's legally relevant, and I'll tell you why.  All of

10   these emails and what was said and who was talking and in

11   what capacity.

12           The first thing I would say on that point, Your

13   Honor, is we would direct you to the legal standard, which

14   was again, not addressed.  It was asserted that everything

15   is an admission of a party opponent.  But in our papers, we

16   cited Judge Kaplan's decision in Faulkner versus National

17   Geographic.  And that case holds.

18           There was a situation where a contract was found to

19   be ambiguous, and therefore, parole evidence was properly

20   considered.  And one of the things that the plaintiff tried

21   to introduce was the deposition testimony of various people

22   at the National Geographic, the defendants, who opined that

23   in their view, plaintiff was right on the meaning of this

24   contract, and she probably should win.

25           And Judge Kaplan said that that was not admissible.

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 118 of 148

Page 118

1     Because it doesn't reflect the position of the parties who

2     negotiated this agreement.  It certainly wasn't

3     contemporaneous understanding expressed to the other side.

4     And in any large organization that is careful and diligent,

5     you're going to have a good faith understanding and some

6     people may take a different view.

7            But what really matters is the position that

8     National Geographic took, vis a vis the plaintiff directly,

9     and formally, and whether that reflects what the contract

10    really means.

11           So what you have here is a situation, and I'll get

12    -- I want to show you each email and walk you through them.

13    So FirstBank says, Barclays gets the securities as purchased

14    assets, agrees with Weil Gotshal, and let's just be clear,

15    we're talking about the same people who negotiated the

16    clarification letter, who submit the motion to Your Honor to

17    file it, to file the clarification letter and file Schedule

18    A and B under seal.

19           This reflects the parties' intent.  So it comes in

20    as a purchased asset.  No question at that point that

21    Barclays understands it can do with it, it's a proprietary

22    asset, that's what it purchased.  It doesn't have to hold it

23    for the benefit of anyone.  That's the whole point of the

24    proprietary assets.  So that was September 22nd, September

25    29.

Page 119

```
 1           Then these emails supposedly people decide, and

 2    you'll see why they don't in a minute, we hold this as

 3    collateral, it's not clear who we is, but whatever,

 4    collateral.  And then -- but then Barclays goes ahead and

 5    sells it and keeps the proceeds.

 6           This is not consistent.  The other thing I want to

 7    explain and I will get to it, and let me hand up the emails.

 8    I will say this now and I will say it again at the end.

 9    FirstBank never contacted anyone at Barclays with -- anyone

10    at Barclays period in, according to the record of everything

11    that's before you until September 2009, long after they had

12    learned from JPMorgan and others that Lehman, LBI had

13    rehypothecated these securities to Barclays.  Okay.

14           That's -- there is not one document in their

15    exhibits or in ours, that shows a communication from

16    FirstBank, a FirstBank representative to people at Barclays

17    directly asking them, by the way, do you know anything about

18    this, until we get the letter saying, we want our stuff

19    back, and then they didn't give us the list of what their

20    stuff is.

21           So the first email in this series is as they said,

22    David Sullivan and Clifford Chance to Weil Gotshal, I don't

23    think anyone really thought that Clifford Chance, they were

24    talking to Barclays and asking them this question, here are

25    LBSF statements, what can you tell us about this.  Find
```

Page 120

1    perfectly appropriate inquiry.

2          Fifteen minutes later, the next page, Weil Gotshal

3    doesn't reach out to Barclays, it reaches out to --

4    Barclays' legal department or Barclays' executives, it

5    reaches out to the very people who under the transition

6    services agreement and other arrangements made with the

7    Barclays -- with Barclays for the benefit of the Lehman

8    estate, there were going to be dedicated people to help the

9    estate deal with everything the estates had to deal with.

10          Can we check whether Lehman still has the

11    collateral described below?  The next one, that's simply

12    passing it off to a person who could look it up.

13          Email four, Allison, we hold the following

14    collateral, and what's significant about this list, is that

15    this is the exact print out from the Lehman records.  And,

16    of course, much was made of our expert's concession, if you

17    will, that he conceded that FirstBank was entitled to report

18    these securities on its books.

19          Well, that's a good thing, because otherwise

20    FirstBank would've been committing securities fraud for the

21    last four years, where they reported it as an asset on their

22    books.  They reported it as an asset on its books, because

23    they have a claim against someone to get it back.  We say

24    the claim is against LBSF, and that's why they have a right

25    to report it on its books.

LEHMAN BROTHERS HOLDINGS, INC.

Page 121

1          So then there's email number five is asking you if

2     this is -- who else's collateral this might be if it's

3     clarified.  And email six is uninformative.  And so email

4     seven, again, all within the same day, can I share this

5     information with counsel for FirstBank.

6          Email eight, this is the first -- this is a

7     question, do we know whether these positions are at LBI or

8     had they been rehypothecated.  Locke McMurry is an attorney.

9     had they been rehypothecated is important, because anyone

10    looking for possession would need to know that.  And he asks

11    the question.  He doesn't say, of course they had not,

12    they're sitting right here or whatever.

13         And then the response to that inquiry.  This would

14    be the collateral we know of, we do not know if it is still

15    in the possession of LBI.

16         Emails 10 and 11 talk about the procedures, and on

17    what capacity LBI at times held collateral for LBSF.  LBI

18    was the broker dealer.  If LBSF had received securities

19    collateral, somebody with the right plumbing, needed,

20    especially for Fed book entry securities, needed to be

21    involved in that process.

22         And now the Fiesta Resistance, the thing that was

23    touted as the statement that LBI still holds this

24    collateral.  I didn't include it because it wasn't part of

25    the same chain of emails.  This is Exhibit 22 to Ms. Cohen's

Page 122

1   declaration that supposedly is damning from Robert Lemmons

2   back to David Sullivan at Clifford Chance.  My understanding

3   is that Lehman Brothers, Inc. may have the collateral and in

4   the account for LBSF.

5           Your Honor, I can't tell you, and I've never been

6   able to figure out why someone didn't call Cleary or

7   Barclays' legal and ask about this.  But it is undisputed

8   that no one did until September 2009, and it's also

9   undisputed that no one gave, in fact, false information.

10  They thought it might be, but I don't know what you do with

11  may have the collateral.

12          Certainly no motion was made, or application to the

13  Court was made based on this email, saying, okay, so give it

14  back because it's not yours.

15          So, Your Honor, I think what you have here, and one

16  last thing on the function of LBI.  I mean, look, we are

17  just trying to defend our rights, not have to pay twice for

18  this $50 million of securities we actually received.  As to

19  the eight we never received, and there's not a scintilla of

20  evidence that we ever did.  I don't know why they are still

21  pushing that, but I think clearly on that, there can be no

22  issue of fact.

23          But -- and it's not our desire or job to defend LBI

24  and LBSF and everything they did was perfect and that's not

25  our issue.  But our issue is that they've not come forward

Page 123

```
 1    with the evidence that would be necessary to challenge any

 2    of these documents that purport to show what they show,

 3    which is a repo at a market price.

 4          Now, this issue about LBI was a custodian and

 5    should've known.  We've briefed that issue before you.

 6    There is no -- the ISDA that they signed, and the CSA that

 7    they signed didn't appoint a custodian.  It said not

 8    applicable.

 9          Even if LBI was acting in that capacity, New York

10    agency law is absolutely clear, acting as an agent does not

11    impose on you liability unless you clearly expressly

12    undertake such liability.  Indeed, the whole premise is, if

13    your agent messes up, the principal is liable.

14          So if agent is agent, LBI had done something if

15    these securities were kept in-house, that was not proper,

16    it's LBSF's liability, not LBI's.

17          So the fact that LBI was acting as a gratuitous

18    agent without compensation for the -- when these securities

19    were not out in the street, because as we showed in our

20    papers, virtually everyday of every year, since they were

21    posted, they were either rehypothecated to one of LBSF's

22    counterparties, or out on a repo to LBI.

23          So they -- LBI was never actually acting as

24    custodian for any lengths of time.  And the reason -- and

25    but having paid, so the first point is that they are not
```

LEHMAN BROTHERS HOLDINGS, INC.

Page 124

1    bound by any of the terms of the CSA, they can't be said to

2    be the same as LBSF.  You can't conflate the two, and decide

3    that they're bound by the restriction that if LBSF had these

4    securities, it could not have done anything with them come

5    the 15th of September, but it didn't.

6         Just as today, you know, Black Rock has some of the

7    other eight positions.  LBSF couldn't do anything about it

8    then because it didn't have the wherewithal to do anything

9    about it.

10        So the fact that LBI has gone out and paid cash in

11   repo transactions to receive these securities, is not

12   precluded in any way from having it been custodian, doesn't

13   bind it in any way to the terms of the CSA, and doesn't

14   require it to use some sort of clairvoyance in figuring out

15   well, I shouldn't -- you know, it says reverse repo, that

16   means my computer systems included as things that are

17   eligible to -- on repo.  But I should really try to figure

18   out where these come from, because maybe it will reduce some

19   claim in some bankruptcy if I don't use them.  That is not

20   the standard.

21        It's unfortunate for FirstBank it didn't happen,

22   but that's not the standard, and it doesn't make LBI liable,

23   and it certainly doesn't make Barclays liable.

24        Nobody came to LBI to close out the repo, so LBI

25   was free to use those securities, just like you've read in

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 125 of 148

Page 125

1    the papers in the test cases, and you will hear from that

2    testimony, all of those securities were repo'd to LBI, and

3    many of them were repo'd then to Barclays in the September

4    18 repo.  No one else in four years has come forward to

5    suggest that that somehow is improper.

6         Indeed, one of the very first matters you had after

7    the sale order was signed, was a creditor running in here

8    named Friedman Billings and Ramsey, if you recall it, on a

9    TRO, and an order to show cause.

10        THE COURT:  I recall it very well, and I remember

11   the argument was down in the auditorium.

12        MR. MORAG:  And they -- it was disposed of on the

13   ground that well, LBI had it under a repo, it was entitled

14   to sell it, and Friedman Billings Ramsey had to withdraw

15   their claim against LBI.

16        So we are here, not because this is terribly

17   unique, but because they're taking a unique view of the law.

18   But that is neither dispositive, nor critically important.

19   The point is that, Your Honor, there are other people --

20   there have been other people in similar circumstances, they

21   protect themselves by filing claims.

22        If they actually added consistent with what you

23   just heard their position to have been, this was never an

24   asset of the estate, that's a great claim on the security --

25   on the proceeds of the sale.  You know, this is not

LEHMAN BROTHERS HOLDINGS, INC.

Page 126

1    something you've never considered before.

2         You had an examiner appointed precisely out of

3    concerns about this issue.  There was nothing in the

4    examiner's report on this, or to suggest that there was any

5    issue with respect to LBI's transfer of securities.

6         So our point is, on that record, of what the Court

7    can take judicial notice of, what the Court has, as part of

8    the law of the case, which again is something that they

9    don't contest that we've argued in our brief, that the Rule

10   60 decision, the Evergreen Solar decision, the sale order

11   itself, that's law of the case.

12        And they -- and presentation is made to the Court

13   by fiduciaries, if you want to say they're false, if you've

14   got to do something more than just say they're false.  And

15   on a summary judgment record, it's not enough to defeat our

16   motion for summary judgment, for them to say, that they're

17   highly questionable repos.

18        The employees worked for both companies, or the one

19   company.  That's not sufficient.  And the other point I

20   would close with, Your Honor, is what we have here is a

21   situation that was anticipated fully in the finance

22   literature.  This is -- and this was before, both before the

23   Lehman bankruptcy and particularly -- but also after.

24        And this is -- we quoted this in our brief in

25   discussing why there is no conversion claim because what

Page 127

1    they have is simply a contractual right against LBSF.  And

2    this is from the Harding and Christian Johnson text,

3    Mastering the ISDA Collateral Documents, Second Edition,

4    2012.  "By agreeing to a rehypothecation, there is the

5    possibility that the secured party could become insolvent,

6    and therefore, be unable to return the posted collateral

7    after the pledgor has made its payment obligations.  The

8    pledgor could possibly end up having met its contractual

9    payment obligations under a transaction, yet not have the

10   collateral returned to it, because it was no longer in the

11   secured party's possession.  This is because a pledgor only

12   has a contractual right to the return of the collateral, if

13   it agrees to rehypothecation."

14          That's what FirstBank did.  And it knew how to not

15   agree to rehypothecation when it signed, at the same time, a

16   CSA with Bank of Montreal that specifically said, no rate of

17   rehypothecation.  This is -- and that's also precisely why

18   this notice issue is a red herring.  They did not get

19   notice.  They were not entitled to any notice.  LBSF had no

20   obligation under the standard form CSA that every bank on

21   the street uses, to notify FirstBank of a rehypothecation, a

22   repo, selling out right, whatever use might be made of

23   securities collateral.  There's no right to notice.  There's

24   no right to notice.

25          So what notice did they want to get?  From whom?

Page 128

1   So that's why there is no defect in the sale order.  That's

2   why the notice argument doesn't work with respect to the

3   binding effect of the sale order.  And that's why we think

4   -- I mean, once Judge Daniels said, these assets on the

5   referral motion to the Court, after he was able to consider

6   things outside of the four corners of the complaint, to look

7   at Schedule A, to look at the clarification letter, and

8   said, these assets were ostensibly transferred under the

9   sale order, so what rights Barclays had, and what rights

10  FirstBank has, if any, are governed by the agreement.

11         At that point, they needed to challenge the sale

12  order in a way that you would challenge a sale order.  Which

13  is a Rule 60 motion.  This is simply a collateral attack on

14  a sale order, and Your Honor, they knew everything they

15  needed to know to bring that motion in July 2009.

16         One of the exhibits that we had before you, and

17  I'll get you the number, one second, is the Senior Vice-

18  President of FirstBank telling everyone at FirstBank,

19  Barclays got these securities on September 18th.  And he

20  says that at a July 14, 2009 meeting.  One year cut off for

21  a Rule 60 motion was September 20th, 2009.  This is how you

22  would have to pursue this case.

23         I understand their argument is that they are --

24  that these are not purchased assets, but they're wrong on

25  that.  Just like Bank of America was wrong that they could

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 129 of 148

Page 129

1    set off against $500 million in debtor property, despite

2    their good faith belief and lawyers telling them that they

3    could presumably.

4            So that's --

5            THE COURT:  Thanks for validating that bankruptcy

6    court decision.

7            MR. MORAG:  Well, Your Honor, the point was that

8    they -- I'm not validating it.  The point was that they

9    found out that they were wrong.

10           THE COURT:  It was appealed and settled, but it's

11   final.

12           MR. MORAG:  It's the procedural posture is the

13   same.  They're finding out -- they will find out in the

14   context of this summary judgment motion if they are right or

15   wrong about their argument that it's not a purchased asset.

16           Unless you have any further questions, I'll sit

17   down.

18           THE COURT:  No, thank you very much.

19           Do you have anything further?

20           MR. MITCHELL:  I do, Your Honor.  That is the

21   nature of litigation, if there's a good faith dispute, you

22   bring a dispute, and it's resolved by a Court because you

23   don't necessarily have to take an adversary's word for it.

24           I think the September 15th issue is important.  I

25   want to point out something to the Court, you don't have to

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 130 of 148

Page 130

1    turn to it, but there's an interesting document.  Barclays

2    produced a document, they had a repurchase agreement with

3    Lehman dated December 19, 1996.  What's important is the use

4    provision, which was paragraph 8.

5         And in the Barclays' repurchase agreement with

6    Lehman, Barclays agreed, "nothing in this agreement shall

7    preclude buyer," being the repo buyer, "from engaging in

8    repurchased transactions with the purchase of securities or

9    otherwise," this is important, "selling, transferring,

10   pledging, or hypothecating the purchase of securities."

11   That's the Barclays/Lehman repo.

12        The master repo agreement between LBSF and LBI does

13   not include the word selling.  It says, "Nothing in this

14   agreement shall preclude buyer from engaging in repurchase

15   transactions with purchased securities or otherwise,

16   pledging or hypothecating the purchased securities."

17        So LBI holding the securities repo'd from LBSF,

18   pursuant to that repo agreement, did not have the right to

19   sell them.  They had the right to use them.

20        So as I said to the Court previously, there's a

21   difference between use and ultimate disposition.  So in the

22   hands of LBI pursuant to the plain language of the master

23   repurchase agreement, it did not have the right to sell

24   those securities.

25        THE COURT:  Let's just say for the sake of argument

LEHMAN BROTHERS HOLDINGS, INC.

Page 131

```
 1    that you're a hundred percent correct in your conclusion.

 2    Where does it take you?  Because the assets in question

 3    were, in fact, part of the Fed repo, were in fact sold to

 4    Barclays, Barclays in fact, holds those securities or has

 5    sold them or rehypothecated them, or done whatever they've

 6    done with them.  The value is assumed to be 50 plus million

 7    dollars.

 8             Where does it take you?  Because --

 9             MR. MITCHELL:  It takes -- I'm sorry.

10             THE COURT:  -- in the argument just made by counsel

11    for Barclays, it's in the clarification letter, it's

12    apparently part of the sale order.  And in what way does

13    your argument regarding permitted use improve your legal

14    position relative to the barriers you have to get through?

15             MR. MITCHELL:  First of all, the two bases for it

16    not being a purchased asset, if it's not -- if there's no

17    permitted -- if you can't use it at all after September

18    15th, if you can't use the collateral, and it's now back as

19    collateral --

20             THE COURT:  But you're kind of missing the

21    essential elements of the argument made in opposition to

22    your position, which is at the time in question, LBSF sits

23    with $7 million in cash, it's not able to perform even if it

24    could perform.  The assets have been hypothecated,

25    rehypothecated, transferred, call it what you will, LBI is
```

Page 132

1    using them, and using them as they have historically used

2    these assets to obtain financing.  And in Lehman week, that

3    financing was emergency financing offered by the New York

4    Fed.  Barclays takes out that position.  They have those

5    assets on Schedule A.  There's a lot of conflicting dialogue

6    as to where your collateral is, none of which seems to

7    matter as I'm evaluating this.

8         How do you prove, how do you establish that these

9    are not purchased assets?  And how does the argument you've

10   just made regarding limits on use advance your position?

11        MR. MITCHELL:  Your Honor, I'd said to you

12   previously, and I think the Court would agree, two strangers

13   cannot deem something that belongs to you to be subject to

14   another transaction.  If I were to agree with Mr. Morag, I

15   deem that, you know, something that is your property, we're

16   going to enter into a transaction, now I claim it is mine,

17   and we sell it.  That's in effect, you can't do that.

18        The only thing that purports to transfer title to

19   the FirstBank's securities, is the allegation that LBI and

20   Barclays in the clarification letter, purported to deem

21   everything on Schedule A to be an asset of LBI, and

22   therefore transferred.  That doesn't make it so.  The Court

23   has to examine whether in fact it's so.

24        The only basis for it to be so is the existence of

25   this, what we've had substantial evidence of, non-arm's

Page 133

1    length repo from LBSF to LBI.  Let's assume they even

2    transferred cash.  Of course, the --

3            THE COURT:  There's a confirm that shows cash was

4    transferred.

5            MR. MITCHELL:  This is a self-generated Lehman

6    confirm to itself.  So I don't know that the confirm

7    confirms anything, other than what somebody purported to put

8    on a piece of paper.  It doesn't show -- there's no bank

9    record that's been submitted to Your Honor showing that

10   actual cash transferred.  And --

11           THE COURT:  Are you suggesting as you stand here

12   that you have evidence that that's a sham transaction?

13           MR. MITCHELL:  No.  What I'm suggesting to you,

14   Your Honor, is I read the examiner's report, and the

15   examiner's report reflected billions of dollars of account

16   entries back and forth between LBSF and LBI.  Cash alone is

17   not the way these parties transacted business.

18           The notion that the cash balance is the only way to

19   look at this is not accurate.  And as I recall the

20   examiner's report, there were net cash -- net account out

21   flows from LBSF to LBI prior to June '08, and then there

22   were net -- the net account entries the other way.  So cash

23   doesn't mean dollars.  Cash, for purposes of what the Court

24   knows the record in this case to be, are account entries

25   back and forth.  So --

Page 134

```
 1          THE COURT:  The same way that your securities are
 2    account entries.
 3          MR. MITCHELL:  Well, no, that's -- Your Honor, the
 4    difference is when the right to use terminates, there
 5    doesn't have to be somebody at LBSF raising their hand and
 6    saying, I'm writing you a check to get securities back.  It
 7    simply is a reversal of the transaction.  And the record
 8    that exists after the fact is consistent with the notion
 9    that that's how that was treated after the fact by the
10    people who knew.
11          Now, to say, you know, Mr. Morag --
12          THE COURT:  How could you say that there's a record
13    consistent with reversal of the transaction, when in fact,
14    at closing Barclays had the CUSIPs?
15          MR. MITCHELL:  Well, Lehman had --
16          THE COURT:  They're on Schedule A.
17          MR. MITCHELL:  LBI -- but they were using the
18    CUSIPs.  Because they were using them.  They had a right to
19    use them.  Under --
20          THE COURT:  I'm having some trouble with your
21    argument, because you're using what may be completely
22    extraneous and irrelevant jottings in emails, as being
23    inconsistent with Schedule A, which in fact, existed and
24    included the CUSIPs.
25          MR. MITCHELL:  Okay.
```

1          THE COURT:  And, in fact, what happened

2    transactionally is that on September 18th, Barclays took

3    over the New York Fed repo and your CUSIPs were part of

4    that.  That's a fact.  And it's indisputable.  And how can

5    you possibly get around it?

6          MR. MITCHELL:  Well, first thing, Your Honor, my --

7    the ultimate transaction is an asset purchase, right.  At

8    the end of the day, it's an asset purchase.  The repos were

9    unwound.  The termination of the repo was unwound, and we

10   end up with an asset purchase.

11         So we're not talking about a default of a repo.

12   We're talking about an asset purchase confirmed by a

13   bankruptcy court sale order, that can confirm nothing more

14   than assets of the LBI estate.

15         THE COURT:  That's true.  But what actually

16   happened here and it was all happening very quickly, is that

17   the repo transaction took place on September 18th, the sale

18   hearing took place on September 19th into the early morning

19   hours of September 20th, and the transaction closed with a

20   clarification letter as of September 22, that Monday.  I'm

21   very familiar with the timeline.

22         I'm also familiar with Schedule A.  What I'm not

23   familiar with is how you can be using miscellaneous shards

24   of information to somehow contradict some obvious facts

25   which obviously doesn't work to your position, but the

Page 136

 1    assets are in Schedule A.

 2            You may say they never should have been on Schedule

 3    A, you may say that it was your property that was

 4    misappropriated in putting it in Schedule A.  You may say as

 5    a matter of law that LBI didn't have, at that time, the

 6    legal capacity to sell, and it shouldn't have been deemed

 7    purchased assets.  But this litigation isn't the way to get

 8    to that result.

 9            In fact, it's final.  And it's final because of the

10    sale order.  And it's final because of the 60(b) litigation.

11    And it's final because it's been going on for literally more

12    than four years.

13            And so this really does seem to be a collateral

14    attack against the purchaser that obtained in a sale order

15    appropriate language to protect it against this kind of

16    collateral attack.  And also, your client for whatever

17    reason, appears not to have taken appropriate steps to

18    protect itself either in this bankruptcy case or the related

19    SIPA proceeding involving LBI.  I can't imagine why it

20    didn't, but it didn't.

21            MR. MITCHELL:  It did, Your Honor.  That's not

22    true.

23            THE COURT:  What did it do?

24            MR. MITCHELL:  After -- let's go back and look at

25    -- you know, Mr. -- if you accept --

Page 137

```
 1              THE COURT:  Tell me what your client did to protect

 2    itself.

 3              MR. MITCHELL:  It filed a claim in the LBI -- after

 4    receiving all of this information, it filed a claim in the

 5    LBI bankruptcy case.

 6              THE COURT:  But its counterparty is LBSF.

 7              MR. MITCHELL:  But it discovered -- it learned that

 8    its property was at LBI.  We also now know that at the

 9    securities --

10              THE COURT:  Its property was at LBI for a Nano

11    second during this bankruptcy.  It moved on September 18.

12              MR. MITCHELL:  LBI was -- Your Honor, there is a --

13    first of all, all of this property was at LBI.  That's where

14    the property resided.  There was an account number for LBI.

15              THE COURT:  But it's counterparty was LBSF.  Its

16    claims belonged as against LBSF.  LBI may have been a

17    custodian, but the property wasn't there.

18              MR. MITCHELL:  Your Honor --

19              THE COURT:  The only kind of claim that could have

20    been made that would have been a meaningful claim would be a

21    customer claim.  But a customer claim against LBI would be

22    meaningless because there was no property to return.

23              MR. MITCHELL:  Well, Your Honor, I thought if there

24    was an issue here with respect to the transaction, I thought

25    there was an issue of a sale of assets from LBI to LBSF to
```

08-13555-mg    Doc 34434    Filed 01/25/13    Entered 02/05/13 16:27:03    Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 138 of 148

Page 138

1    LBI.

2            So the question Your Honor asked, what did your

3    client do.  What my client did, is my client did file a

4    claim in the LBI bankruptcy.  What happened subsequent to

5    that is the lawyer who filed the claim changed firms, filed

6    a notice of change of counsel.  When the claim was denied,

7    instead of sending the denial to the new firm, it went to

8    the old firm.  The lawyer wasn't at the old firm.  And

9    notice of that claim denial was never received by FirstBank

10   because it was sent by the trustee to the wrong place.

11   That's the subject of a separate motion before Your Honor.

12   But my client did try to protect itself in the bankruptcy

13   following all of the information that it was receiving, by

14   communicating with the trustee, and with Weil Gotshal.

15           So it was trying to protect itself.  Whether Your

16   Honor agrees with Barclays that its only possible way to go

17   was to file a claim in the LBSF bankruptcy, which I contend

18   to the Court is inconsistent with the claim that it's my

19   property.  We can disagree on that in terms of that issue --

20           THE COURT:  We can and do disagree on that.

21           MR. MITCHELL:  I understand.  Then you can --

22           THE COURT:  Virtually every other counterparty on

23   the planet filed claims in the LBHI and LBSF cases to the

24   extent that they arose out of ISDA agreements.

25           MR. MITCHELL:  So they became -- so parties who may

Page 139

1  have had a claim of right to collateral, 100 percent, become

2  unsecured creditors receiving less than a hundred cents on

3  the dollar because they voluntarily converted themselves

4  into unsecured claimants as opposed to claiming their own

5  property back.  But there are other ways to proceed in a

6  particular case.

7          I can only tell you that there is nothing improper

8  that I see, in the notion that certainly with the record

9  that was available to FirstBank, that it pursues a claim to

10 receive its collateral.  Because there's no doubt it was

11 collateral.

12         And what comes out in discovery in this case, only

13 in discovery in this case, is the existence of the repo.  I

14 do not see in any record in any case, any discussion of LBSF

15 to LBI repos of counterparty collateral.  I've never seen it

16 discussed.  I've never seen the import of that discussed.

17 The Court has never ruled upon it.  This would be the first

18 case in which the Court has done so.

19         We certainly have a right to have the Court rule on

20 something like that, what is the import of it and why.  We

21 have pointed to the Court reasons why it should not

22 necessarily be taken that way, but there is no res judicata

23 law of the case on the Court ruling, that these LBSF to LBI

24 repos about which the Court was unaware at the time it

25 issued the sale order, or the be all and end all of why it

Page 140

1    becomes property of the estate.  And whether, in fact, it is

2    so, notwithstanding the fact that LBI never treated these as

3    an outright sale, that LBI has the authority and right, even

4    though it books it as a secured loan to sell somebody else's

5    property as its own in a liquidation sale.  There's no

6    ruling on that in any case.  I've never seen a ruling on

7    that.

8            And as I say, Your Honor, you know, to call us to

9    task for challenging something that we -- there's no doubt

10   if you take a step back from this, this was collateral for

11   us.  Collateral for us is not a claim against LBSF.  Maybe

12   in the course of discovery in this case, facts are adduced

13   that the Court has never addressed, that we certainly think

14   are facts that should be addressed by the Court.

15           Maybe Your Honor agrees that the LBSF to LBI repo

16   changes everything, but this would be the first time you've

17   ever said that.  So from the standpoint of what this case is

18   and what this case was when we filed it, it was a claim that

19   we had collateral posted, that collateral was ours, it was

20   not part of the estate, and that is the law.  I'm not making

21   the law up, collateral doesn't belong to a debtor.  You

22   can't sell somebody else's property.  You can't deem it to

23   be yours.

24           With respect to what we did to protect ourselves.

25   Mr. Morag, his Exhibit 12 that read, you know, oh, they're

Page 141

1  writing to people, Locke McMurray at Barclays.com.  The

2  heading is collateral inquiry by FirstBank of Puerto Rico.

3  Answer, "LBI holds collateral for LBSF pursuant to the

4  attached control agreement, one for each affiliate.  Dan

5  might be able to tell us the exact title of the accounts,

6  but LBI acts exclusively for LBSF pursuant to this

7  agreement."

8          With respect to the FirstBank collateral, what does

9  FirstBank do?  It files a claim in the LBI bankruptcy.  So

10 it's inquiring what to do.  It's not true that we sat on

11 rights.

12          You know, you can make these grand statements, but

13 there is a record in this case.  Subsequent to all this,

14 LBSF negotiated with FirstBank for months.  They went back

15 and forth.  The record is before you on close-out figures to

16 give us our collateral back.

17          At the end of the process, the only communication

18 was, we don't have your collateral, not that Barclays has

19 your collateral.  FirstBank goes to JPMorgan, says where did

20 the collateral go, we'd like to know where the collateral

21 is.  JPMorgan doesn't say anything.  We file a 2004 motion

22 in August.  The 2004 motion is never heard, because finally

23 they say Barclays has it, and we make a demand of Barclays.

24          We didn't sit on our rights.  That's just not true.

25 So there's a record here, Your Honor.  At a minimum, this

Page 142

 1    should go to a jury or a trier of fact to decide this on the

 2    merits.  There are facts here.  This is -- the clarification

 3    letter is not an abundance of clarity.  What is clear is

 4    paragraph 21 says, ISDAs are not included.

 5            Our CSA is connected to an ISDA.  It's not an

 6    included asset.  It's an excluded asset.  It's plain as day.

 7    So to say we should have, based upon the record that

 8    existed, made a claim in the LBSF bankruptcy is self-

 9    serving.  It's not mitigation of damages.  It's none of the

10    thing.

11            Damages, mitigation of damages is when you do

12    something to exacerbate your damages.  I make it worse.  The

13    claim is, we had a -- let's say we even had a claim against

14    LBSF, we may have a variety of claims against different

15    parties.  But certainly our claim against LBI with what we

16    now know under the securities account control agreement, we

17    had an account with LBI, designated specifically to us.  But

18    we never had a chance to challenge that because they sent

19    the notice denying the claim to the wrong place.  That's the

20    subject of another motion before Your Honor.

21            THE COURT:  Your argument --

22            MR. MITCHELL:  So we did what --

23            THE COURT:  Your argument is passioned, but it does

24    not change the fact that most institutions in your position

25    having LBSF as its counterparty in fact filed claims in the

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 143 of 148

Page 143

 1    LBSF case, and received distributions I might add.

 2         So part of the problem here is self-imposed.  The

 3    choices that were made by your client and predecessor

 4    counsel are what they are, but in effect, you have boxed

 5    yourselves.  Because now your best argument is against a

 6    good faith purchaser for value.

 7         MR. MITCHELL:  If Your Honor concludes its

 8    purchased asset, then obviously -- then that changes the

 9    equation.  If it's not a purchased asset, then they're not a

10    good faith purchaser for value, the UCC doesn't apply.  And

11    the question is, is it a purchased asset, could it be a

12    purchased asset, and I daresay, Your Honor, that this case

13    presents to the Court facts that have never before, to my

14    knowledge, been presented to the Court in connection with

15    this proceeding.

16         Other cases are not -- you've not seen on a full

17    record the situation that's present here.  You haven't.  And

18    there's no ruling on anything that's consistent with this.

19    And we have a right.  It's not an affront to the system,

20    it's not an affront to the sale order, no affront is

21    intended, because the notion that collateral doesn't belong

22    to a debtor is hardly controversial.

23         So it would be an appropriate claim to say it's not

24    an asset of the debtor, therefore, you didn't acquire it,

25    Barclays is the appropriate defendant.  The facts here, at a

08-13555-mg   Doc 34434   Filed 01/25/13   Entered 02/05/13 16:27:03   Main Document
LEHMAN BROTHERS HOLDINGS, INC.
Pg 144 of 148

Page 144

1    minimum, are murky.  I mean, there's no -- to just

2    completely ignore the string of emails which are connected

3    to us because they're precipitated by our inquiry.  They

4    contain headings on emails that say FirstBank Puerto Rico,

5    and they precipitate after responses are given, action.  We

6    file a claim in the LBI bankruptcy.

7            LBSF files a claim on our behalf in the LBI

8    bankruptcy.  LBSF negotiates with us to return our

9    collateral.  What do all those facts mean?

10           In order to say -- Mr. Morag, to come up here and

11   say, this is absolutely abundantly crystal clear --

12           THE COURT:  That's what you said during your

13   argument.

14           MR. MITCHELL:  No, it's crystal -- I said it's

15   crystal clear that they can't say that for their side of the

16   case, because you can't explain all this away.  Why is no

17   one saying --

18           THE COURT:  You actually pointed --

19           MR. MITCHELL:  -- nobody knew it was on Schedule A?

20           THE COURT:  You actually pointed me to a paragraph

21   of the clarification letter and suggested that it was

22   crystal clear that this was not a purchased asset.

23           MR. MITCHELL:  Right.

24           THE COURT:  Both of you are engaged in what

25   litigators do all the time, taking what you now say is

Page 145

1    murky, and saying that it's clear, when it suits the

2    purposes of your argument.  The point is, and I'm not

3    pressing you or calling you to task, that you have an

4    extraordinarily weak position.  I'm taking it under

5    advisement.

6            MR. MITCHELL:  Thank you, Your Honor.

7    (Proceedings concluded at 4:51 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEHMAN BROTHERS HOLDINGS, INC.

Page 146

1                        I N D E X

2

3                      R U L I N G S

4

5    DESCRIPTION                                    PAGE

6    Status Conferences:

7        1)   Joint Motion of Lehman Brothers        10

8    Holdings, Inc. and Litigation Subcommittee of

9    Creditors committee to Extend Stay of Avoidance

10   Actions and Grant Certain Related Relief

11   (ECF No. 33322)

12       2)   LBHI's Objection to Proofs of Claim    15

13   Number 14824 and 14826 (ECF No. 30055)

14

15   Uncontested Matter:  First and Final Fee        40

16   Application of Epiq Bankruptcy Solutions, LLC,

17   as Solicitation and Voting Agent to the Debtors

18   for Allowance and Payment of Compensation for

19   Professional Services Rendered and For

20   Reimbursement of Actual and Necessary Expenses

21   Incurred from September 1, 2011 through

22   December 6, 2011 (ECF No. 27762)

23

24

25

Page 147

1                          I N D E X

2

3                      R U L I N G S, CONTD.

4

5   DESCRIPTION                                        PAGE

6   Adversary Proceedings:

7       1)    Walton, et al v Lehman Brothers,         45

8   Inc., et al (Adversary Case No. 12-01898),

9   Motions to Dismiss

10              a)    Motion of Bank of America, N.A.   48

11  and Federal National Mortgage Association to

12  Dismiss Adversary Proceeding (ECF No. 8)

13              b)    Memorandum of Law of Bank of      48

14  America, N.A. and Federal National Mortgage

15  Association in Support of Motion to Dismiss

16  (ECF No. 9)

17

18

19

20

21

22

23

24

25

Page 148

1                C E R T I F I C A T I O N

2

   I, Sheila G. Orms, certify that the foregoing is a correct

3   transcript from the official electronic sound recording of

4   the proceedings in the above-entitled matter.

5

6   Dated:  January 18, 2013

7

8

9   Signature of Approved Transcriber

10

11

   Veritext

12

   200 Old Country Road

13

   Suite 580

14

   Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25