# <u>EXHIBIT D</u>

*Execution Version*

PURCHASE AGREEMENT

related to

Partner Interests in Eagle Energy Partners I, L.P.

among

**EAGLE ENERGY MANAGEMENT, LLC**
**LEHMAN BROTHERS COMMODITY SERVICES INC.**
**LBMB FUND EAGLE ENERGY HOLDINGS LLC**
**LBMB PARTNERS EAGLE ENERGY HOLDINGS LLC**
**LBMB FUND (B) EAGLE ENERGY HOLDINGS LLC**
**LBMB CAPITAL PARTNERS V EAGLE ENERGY HOLDINGS LLC**
**LEHMAN BROTHERS HOLDINGS INC.**
(as Sellers)

and

**EDF TRADING NORTH AMERICA MANAGEMENT LLC**
**EDF TRADING NORTH AMERICA INC.**
(as Purchasers)

**DATED AS OF SEPTEMBER 26, 2008**

# TABLE OF CONTENTS

**Page**

ARTICLE I     PURCHASE AND SALE OF INTERESTS.................................................. 2
    Section 1.1     Purchased Interests.................................................. 2
    Section 1.2     Other Transactions.................................................. 2
    Section 1.3     Purchase of the Purchased LP Units ............................ 3
    Section 1.4     Purchase of the Purchased GP Units ............................ 3
    Section 1.5     Payment.................................................. 3

ARTICLE II     CLOSING .................................................. 3
    Section 2.1     Closing .................................................. 3
    Section 2.2     Deliveries by the Sellers at the Closing ........................ 3
    Section 2.3     Deliveries by the Purchasers at the Closing..................... 4

ARTICLE III     CONDITIONS TO CLOSING .................................................. 4
    Section 3.1     Conditions to each Party's Obligations........................... 4
    Section 3.2     Conditions to the Purchasers' Obligations...................... 5
    Section 3.3     Conditions to the Sellers' Obligations .......................... 7

ARTICLE IV     REPRESENTATIONS AND WARRANTIES REGARDING
         SELLERS.................................................. 7
    Section 4.1     Organization; Good Standing .................................. 7
    Section 4.2     Ownership.................................................. 7
    Section 4.3     Authorization .................................................. 8
    Section 4.4     Valid Transfer .................................................. 8
    Section 4.5     Compliance with Other Instruments .......................... 8

ARTICLE V     REPRESENTATIONS AND WARRANTIES REGARDING THE
         PARTNERSHIP.................................................. 8
    Section 5.1     Organization; Good Standing; Qualification ..................... 8
    Section 5.2     Capitalization; Ownership and Voting Rights ..................... 9
    Section 5.3     Material Contracts and Consents ................................ 9
    Section 5.4     Compliance With Other Instruments ............................ 11
    Section 5.5     Related Party Transactions .................................... 12
    Section 5.6     Registration Rights.................................................. 12
    Section 5.7     Certain Agreements of Officers and Employees ................. 12
    Section 5.8     Litigation.................................................. 13
    Section 5.9     Financial Statements and Related Matters ...................... 13
    Section 5.10     Insurance.................................................. 14
    Section 5.11     Compliance with Laws; Regulatory............................... 14
    Section 5.12     Environmental.................................................. 15
    Section 5.13     Market Based Rate Authority .................................. 15
    Section 5.14     Real Property .................................................. 16
    Section 5.15     Assets.................................................. 16
    Section 5.16     Intellectual Property and Software................................ 16
    Section 5.17     Employee Benefit Plans.......................................... 17

# TABLE OF CONTENTS
(continued)

**Page**

Section 5.18   Employment and Labor Matters ..................................................... 18
Section 5.19   PUHCA Regulation ..................................................................... 18
Section 5.20   Trading ....................................................................................... 18
Section 5.21   Brokers ....................................................................................... 18
Section 5.22   Restrictions on Business or Sale of Partnership ......................... 18
Section 5.23   Taxes .......................................................................................... 18

ARTICLE VI   REPRESENTATIONS AND WARRANTIES OF THE
                        PURCHASERS ................................................................... 20

Section 6.1   Organization; Good Standing ....................................................... 20
Section 6.2   Authorization ............................................................................... 20
Section 6.3   Litigation ..................................................................................... 20
Section 6.4   Brokers or Finders ....................................................................... 20
Section 6.5   Consents ....................................................................................... 20

ARTICLE VII   ADDITIONAL AGREEMENTS ................................................. 21

Section 7.1   Conduct of Business ..................................................................... 21
Section 7.2   Access to Information ................................................................... 24
Section 7.3   Further Assurances; Cooperation .................................................. 24
Section 7.4   Subject Consents and Approvals ................................................... 24
Section 7.5   Bankruptcy Court Filings ............................................................. 25
Section 7.6   Limited Partner Waiver and Consent ............................................ 25
Section 7.7   Member Waiver and Consent ........................................................ 25
Section 7.8   Public Announcements; Confidentiality ........................................ 25
Section 7.9   Fees and Expenses ....................................................................... 26
Section 7.10   Transfer Taxes ........................................................................... 26
Section 7.11   Insurance ................................................................................... 26
Section 7.12   Taxes ......................................................................................... 26
Section 7.13   Employee Matters ...................................................................... 29
Section 7.14   Sellers' Representative ............................................................... 30
Section 7.15   Purchasers' Representative .......................................................... 30
Section 7.16   Transition Services Agreement ................................................... 30
Section 7.17   Office Lease ............................................................................... 31
Section 7.18   Personal Property ....................................................................... 31
Section 7.19   Partnership Interests ................................................................... 31

ARTICLE VIII   SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION ................. 31

Section 8.1   Survival ....................................................................................... 31
Section 8.2   Agreement to Indemnify .............................................................. 31
Section 8.3   Limitation of Liability ................................................................. 32
Section 8.4   Conditions of Indemnification ..................................................... 32
Section 8.5   [Reserved] ................................................................................... 33
Section 8.6   Additional Limitations ................................................................. 33

# TABLE OF CONTENTS
(continued)

|  |  | **Page** |
| --- | --- | --- |
| Section 8.7 | Exclusive Remedy | 34 |
| Section 8.8 | Characterization of Payments | 34 |
| ARTICLE IX | TERMINATION | 34 |
| Section 9.1 | Termination | 34 |
| Section 9.2 | Procedure and Effect of Termination | 35 |
| ARTICLE X | MISCELLANEOUS | 36 |
| Section 10.1 | Notices | 36 |
| Section 10.2 | Entire Agreement | 37 |
| Section 10.3 | Binding Effect; Assignment; No Third Party Benefit | 37 |
| Section 10.4 | Severability | 37 |
| Section 10.5 | Governing Law | 38 |
| Section 10.6 | Construction | 38 |
| Section 10.7 | Injunctive Relief | 38 |
| Section 10.8 | Consent to Jurisdiction | 38 |
| Section 10.9 | Amendment | 39 |
| Section 10.10 | Waiver | 39 |
| Section 10.11 | Counterparts | 39 |

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "<u>Agreement</u>") is made and entered into this 26th day of September, 2008, by and among Lehman Brothers Holdings Inc. ("<u>LBHI</u>"), Eagle Energy Management, LLC (the "<u>GP Seller</u>"), Lehman Brothers Commodity Services Inc. ("<u>Commodity</u>"), LBMB Fund Eagle Energy Holdings LLC ("<u>Main Holdings</u>"), LBMB Partners Eagle Energy Holdings LLC ("<u>Institutional Holdings</u>"), LBMB Fund (B) Eagle Energy Holdings LLC ("<u>B Holdings</u>"), LBMB Capital Partners V Eagle Energy Holdings LLC ("<u>Employee Co-Invest Holdings</u>" and together with the GP Seller (in its capacity as a limited partner of the Partnership (as defined below)), Commodity, Main Holdings, Institutional Holdings and B Holdings, the "<u>LP Sellers</u>" and together with LBHI and the GP Seller (in its capacity as general partner of the Partnership), the "<u>Sellers</u>"), EDF TRADING NORTH AMERICA MANAGEMENT LLC (the "<u>GP Purchaser</u>") and EDF TRADING NORTH AMERICA INC. (the "<u>LP Purchaser</u>" and together with the GP Purchaser, the "<u>Purchasers</u>").

## WITNESSETH:

WHEREAS, Eagle Energy Partners I, L.P. is a Texas limited partnership (the "<u>Partnership</u>");

WHEREAS, Eagle Energy Management LLC, a Delaware limited liability company (the "<u>General Partner</u>"), is the general partner of the Partnership;

WHEREAS, <u>Exhibit A</u> sets forth the issued and outstanding limited partnership interests (the "<u>Limited Partnership Units</u>") in the Partnership as of the date hereof on a fully diluted basis;

WHEREAS, the Limited Partnership Units set forth in <u>Exhibit A</u> (the "<u>Purchased LP Units</u>") are, as of the date hereof, held by relevant LP Sellers as set forth in <u>Exhibit A</u>;

WHEREAS, <u>Exhibit B</u> sets forth the issued and outstanding general partnership interests (the "<u>General Partnership Units</u>" and together with the Limited Partnership Units, the "<u>Units</u>") in the Partnership as of the date hereof on a fully diluted basis;

WHEREAS, the General Partnership Units set forth in <u>Exhibit B</u> (the "<u>Purchased GP Units</u>" and together with the Purchased LP Units, the "<u>Purchased Interests</u>") are, as of the date hereof, held by GP Seller;

WHEREAS, upon the terms and subject to the conditions of this Agreement, at the Closing the Purchasers desire to purchase from the LP Sellers and GP Seller, and the LP Sellers and GP Seller desire to transfer and sell to the Purchasers, the Purchased Interests;

WHEREAS, the General Partner agrees to the transfer and sale of the Purchased LP Units, to the admission of the LP Purchaser as a Substituted Limited Partner (as defined in the Fourth Amended and Restated Agreement of Limited Partnership of the Partnership dated as of June 25, 2007, as amended to date (the "<u>Partnership Agreement</u>")) and to waive certain rights under the Partnership Agreement related to the transactions contemplated by this Agreement;

WHEREAS, the members of the General Partner agree to the transfer and sale of the Purchased GP Units, to the admission of the GP Purchaser as General Partner (as defined in the Partnership Agreement), and to waive certain rights under the Partnership Agreement related to the transactions contemplated by this Agreement;

WHEREAS, the Partnership owes LBHI $663,861,636 under an intercompany loan (the "Intercompany Loan"), which amount is inclusive of amounts owed to the Partnership by Sellers or Sellers' Affiliates in respect of (i) certain clearing account balances totaling $664,784, (ii) certain clearing accounts balances totaling $87,618,882, and (iii) $90,000,000 received by the Partnership from money control wash;

WHEREAS, Commodity owes the Partnership an intercompany receivable of $19,516,553 (the "Intercompany Receivable"), which the parties desire to settle in accordance with the terms and conditions of this Agreement;

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. 08-13555) (the "Bankruptcy Case"); and

WHEREAS, subject to the terms and conditions of this Agreement, LBHI desires to forgive, or cause to be forgiven, a portion of the Intercompany Loan and to sell, and LP Purchaser desires to purchase, the balance of the Intercompany Loan, pursuant to section 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as more specifically provided herein;

NOW, THEREFORE, for and in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF INTERESTS

Section 1.1    **Purchased Interests.**  At the Closing, the Purchasers shall pay the Sellers $100.00 in exchange for the Purchased Interests (the "Equity Payment").

Section 1.2    **Other Transactions.**

(a)    At least one day prior to the Closing Date, LBHI shall forgive, and, as applicable, cause its Affiliates to forgive (the "Debt Forgiveness"), $433,378,289 of the Intercompany Loan (the "Debt Forgiveness Amount"), which forgiveness shall be evidenced by a Forgiveness and Release of Indebtedness reasonably satisfactory to the Partnership and the Purchasers.

(b)    At the Closing, LP Purchaser shall pay LBHI $230,483,347 (the "Loan Purchase Amount" and together with the Equity Payment, the "Purchase Price") and LBHI shall assign, or

cause its Affiliates to assign, to the LP Purchaser all rights and interests in the Intercompany Loan, net of the Debt Forgiveness Amount.

(c)     At least one day prior to the Closing Date, all intercompany indebtedness between the Partnership, on the one hand, and the Sellers and their Affiliates, on the other hand, including the Intercompany Receivable, shall be deemed satisfied and paid in full for no additional consideration (any such indebtedness owed by the Partnership which is forgiven shall be included in the definition of Debt Forgiveness).

Section 1.3     **Purchase of the Purchased LP Units**.  At the Closing and on the terms and subject to the conditions set forth in this Agreement, each LP Seller shall transfer and sell to the LP Purchaser the Purchased LP Units set forth opposite each LP Seller's name on Exhibit A for the portion of the Equity Payment set forth opposite such LP Seller's name in Exhibit C, and the LP Purchasers shall purchase such Purchased LP Units.

Section 1.4     **Purchase of the Purchased GP Units**.  At the Closing and on the terms and subject to the conditions set forth in this Agreement, GP Seller shall transfer and sell to the GP Purchaser the Purchased GP Units set forth opposite GP Seller's name on Exhibit B for the portion of the Equity Payment set forth opposite GP Seller's name on Exhibit C.

Section 1.5     **Payment.**  The Purchasers shall pay the Sellers the Equity Payment and shall make payment of the Loan Purchase Amount by wire transfer to a bank account designated by the relevant Seller in writing at least five (5) Business Days prior to the Closing or by such other payment method as is mutually agreed between the relevant Purchaser and such Seller.  As used herein, "Business Day" means any day which is not a Saturday, Sunday or other day on which banks are authorized or required to be closed in the City of New York.

## ARTICLE II

## CLOSING

Section 2.1     **Closing**.  The transfer, purchase and sale of the Purchased Interests, and the consummation of the other transactions contemplated by this Agreement (the "Closing"), shall take place on the third Business Day immediately following the Business Day on which the last of the conditions set forth in Article III has been satisfied or waived, or such other time and date as the Sellers and the Purchasers shall mutually agree either orally or in writing.  The date on which the Closing actually occurs shall be referred to herein as the "Closing Date." None of the actions set forth in Sections 2.2 and 2.3 shall be effective unless and until all of such actions shall have been taken or appropriately waived; but if all such actions are taken or appropriately waived, then the Closing shall be effective as of 12:01 a.m. on the Closing Date.

Section 2.2     **Deliveries by the Sellers at the Closing**.  Subject to the terms and conditions hereof, at the Closing the Sellers will deliver, or cause to be delivered, the following to the Purchaser:

(a)     A certificate duly executed by a duly authorized officer of the General Partner, dated as of the Closing Date, certifying that the Sellers have satisfied the conditions to Closing set forth in Sections 3.2(a) and (b);

(b)      A certificate duly executed by each Seller dated as of the Closing Date and certifying the accuracy of representations and warranties contained in Article IV as it relates to such Seller and the Purchased Interests held by it;

(c)      An executed counterpart of the Transition Services Agreement (the "Transition Services Agreement"), dated as of the Closing Date, in form and substance reasonably acceptable to, and negotiated in good faith by, the Sellers and the Purchasers and which shall include the services and terms described in Section 7.16;

(d)      A copy of all other Seller Material Consents required to be obtained hereunder, all executed by each party whose consent is required thereunder;

(e)      A certificate of each Seller of such Seller's non-foreign status that complies with the requirements of Section 1445 of the Code and applicable Treasury Regulations;

(f)      Assignments of the Purchased Interests; and

(g)      All other documents, instruments and writings reasonably required by the Purchasers to be delivered at or prior to the Closing pursuant to this Agreement.

Section 2.3      **Deliveries by the Purchasers at the Closing**.  Subject to the terms and conditions hereof, at the Closing, the Purchasers will deliver the following to Sellers:

(a)      a certificate duly executed by a duly authorized officer of each Purchaser dated as of the Closing Date and certifying that such Purchaser has satisfied the conditions to Closing set forth in Sections 3.3(a) and 3.3(b);

(b)      the amounts required to be paid by Purchasers pursuant to Article I;

(c)      an executed counterpart of the Transition Services Agreement; and

(d)      all other documents, instruments and writings reasonably required by the Sellers to be delivered at or prior to the Closing pursuant to this Agreement.

# ARTICLE III

# CONDITIONS TO CLOSING

Section 3.1      **Conditions to each Party's Obligations**.  The obligations of the Purchasers and Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions:

(a)      Any authorizations required by the Federal Energy Regulatory Commission ("FERC") to consummate the transactions contemplated by this Agreement under Section 203 of the Federal Power Act (the "FERC Order") shall have been obtained.

(b)    Any waiting period applicable to the transactions contemplated by this Agreement under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), shall have terminated or expired.

(c)    [Reserved]

(d)    This Agreement is expressly subject to and contingent upon entry of the Approval Order (as defined herein) by the Bankruptcy Court, which shall contain at least clauses (a), (b) and (c) of Section 7.5 hereof.

(e)    There shall not be in effect any Law which would render the parties unable to consummate or perform the transactions contemplated hereby or make such transactions illegal or prohibit, restrict or delay such consummation or performance; and there shall not be in effect any injunction or other order issued by a court of competent jurisdiction restraining or prohibiting the consummation or performance of the transactions contemplated hereby.

Section 3.2    **Conditions to the Purchasers' Obligations**.    The obligations of the Purchasers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions, any or all of which may be waived in whole or in part by the Purchasers in their sole discretion:

(a)    The representations and warranties of each of the Sellers set forth in Article IV and Article V (without taking account of any materiality or material adverse effect qualification therein) shall be true and correct as of the date hereof and true and correct as of the Closing Date as if made at and as of such date, except for representations and warranties specifically made as of a specific date (which representations and warranties shall be true and correct as at such date) and except where any such failure to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (as defined below).

(b)    Each of the Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)    All Seller Material Consents shall have been received in a form and substance reasonably satisfactory to the Purchasers and their counsel.

(d)    All deliveries required to be delivered by the Sellers pursuant to Section 2.2 hereunder shall have been delivered at or prior to the Closing.

(e)    The parties have agreed upon a list of nine individuals (which list has been initialed by Charles L. Watson and the Purchasers), and retention agreements shall have been executed and delivered by (i) the two individuals designated on the list as "essential employees" and (ii) five of the remaining seven individuals on the list which retention agreements shall be in a form and on terms negotiated in good faith and agreed by the Purchasers and the relevant individual; *provided*, *however*, that the seven requisite retention agreements shall be executed and delivered by the date that is five (5) Business Days prior to the hearing date for approval of the Approval Order and if not so finalized then Purchaser shall be deemed to waive the condition in this Section 3.2(e) unless Purchaser's Representative provides written notice to Sellers before

the end of such fifth (5th) Business Day that Purchaser is terminating this Agreement for the failure of this condition in accordance with Section 9.1(e).

(f)     The Executive Committee and equityholders of the General Partner shall have approved the execution of this Agreement and the related transactions in accordance with the General Partner's Second Amended and Restated Operating Agreement, dated June 25, 2007 (the "Operating Agreement") and the appropriate management authority and equityholders shall have approved the execution of this Agreement and the related transactions in accordance with their constituent documents.

(g)     The General Partner, in its capacity as general partner of the Partnership, shall have approved this Agreement and the related transactions pursuant to Section 15(l) of the Partnership Agreement.

(h)     None of the Partnership or General Partner, which are collectively hereinafter referred to as the "Eagle Entities", shall have experienced any change in the Business, condition (financial or otherwise), affairs, properties, contracts, business relationships, assets or liabilities, individually or in the aggregate, that has had or is reasonably likely to have a material adverse effect on the Partnership, taken as a whole, but excluding, for these purposes, any change or circumstance resulting from (i) changes in general economic conditions, general movements in stock markets, and changes in credit markets in any country in which the Partnership conducts its Business other than those that have a materially disproportionate effect on the Partnership as compared to others in the industry, (ii) changes in conditions (whether political, legal or economic) generally affecting the industry in which the Partnership conducts its Business other than those that have a materially disproportionate effect on the Partnership as compared to others in the industry, (iii) the announcement of this Agreement, the consummation of the transactions contemplated hereby, or the compliance by any of the parties with the terms of this Agreement, or (iv) consequences resulting from LBHI filing a petition under Chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (a "Material Adverse Effect").

(i)     The Purchasers shall have received an unaudited consolidated balance sheet and related statement of earnings, partners' equity and cash flows of the Partnership for the month of September and each later completed calendar month ending thirty (30) days or more immediately prior to the Closing Date prepared in accordance with GAAP and on a basis consistent with the Financial Statements.

(j)     No officer, director, employee or consultant (or anyone acting in any similar capacity to any of the foregoing) of the Partnership or acting in or for the business of the Partnership (the "Business"), nor the Partnership itself (i) shall be under any investigation, or subject to any proceeding, by the Securities and Exchange Commission ("SEC"), FERC, or any other governmental or regulatory or self-regulatory body, or (ii) shall have entered into any settlement with, or be subject to any order (other than orders issued in connection with obtaining any permit, license or approval from any Governmental Entity) by, the SEC, FERC, or any other governmental or regulatory or self-regulatory body.

Section 3.3 **Conditions to the Sellers' Obligations**. The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or prior to the Closing (and shall remain satisfied at and as of the Closing) of the following conditions, any or all of which may be waived, in whole or in part, by the Sellers holding not less than a majority of the outstanding Purchased LP Units:

(a)     The representations and warranties of the Purchasers set forth in Article VI (without taking account of any materiality or material adverse effect qualification therein) shall be true and correct as of the date hereof and true and correct as of the Closing Date as if made at and as of such date, except for representations and warranties specifically made as of a specific date (which representations and warranties shall be true and correct as at such date) and except where any such failure to be true and correct would not reasonably be expected, individually or in the aggregate, to have in a material adverse effect on the ability of the Purchasers to consummate the transactions contemplated by this Agreement and any ancillary agreements to be executed by the Purchasers and delivered at the Closing.

(b)     The Purchasers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

(c)     All deliveries required to be delivered by the Purchasers pursuant to Section 2.3 hereunder shall have been delivered at or prior to the Closing.

(d)     Guaranty of EDF Trading, of even date herewith, is in full force and effect.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES REGARDING SELLERS

The Sellers represent and warrant, jointly and severally, to the Purchasers that:

Section 4.1     **Organization; Good Standing**.     If such Seller is a corporation, partnership or limited liability company, it has been duly formed and is validly existing and in good standing under the laws of the jurisdiction of its formation.

Section 4.2     **Ownership**.     Seller has good title to and holds of record and owns beneficially the Purchased Interests set forth opposite such Seller's name on Exhibit A (for the LP Sellers) or Exhibit B (for the GP Seller), as applicable, and such Seller's Purchased Interests are free of all Liens (as defined in Section 5.4(b)) other than Liens created under applicable state and federal securities laws.     Except as contemplated by this Agreement or the Partnership Agreement:

(i)     No Seller is a party or subject to any agreement or understanding relating to the acquisition, disposition or voting or giving of written consents with respect to any of the Purchased Interests owned by Seller or matter relating thereto; and

(ii)    No Seller has any obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any Units or other securities or any interest therein or to receive any distribution in respect thereof.

Section 4.3    **Authorization**.    Except for such authorization as is required by the Bankruptcy Court (as herein provided), each Seller has all requisite power and authority to execute and deliver this Agreement and to transfer and sell the Purchased Interests owned by such Seller as contemplated by this Agreement, and to carry out the provisions of this Agreement.  Except for the Approval Order and the actions contemplated in Sections 3.2(f)( and (g), all corporate, limited partnership or limited liability company, as applicable, action on the part of any Seller and, to the extent applicable, the holders of its equity interests, necessary for the authorization, execution and delivery of this Agreement by Seller, and the performance of all obligations of such Seller hereunder at the Closing and the authorization, issuance, transfer, sale and delivery of the Purchased Interests in accordance with this Agreement has been taken.  This Agreement has been duly and validly executed and delivered by each Seller and, assuming this Agreement has been duly authorized, executed and delivered by the other parties hereto, constitutes a valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

Section 4.4    **Valid Transfer**.    Upon transfer to the Purchasers of the Purchased Interests in accordance with the terms of this Agreement for the consideration expressed herein, each Seller will have transferred to the relevant Purchaser good title to the Purchased Interests owned by such Seller free of all Liens other than Liens created under applicable state and federal securities laws.

Section 4.5    **Compliance with Other Instruments**.    Except for the receipt of the Approval Order, the execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby will not (a) give rise to a right of any party to enjoin the transactions contemplated hereunder pursuant to the terms of any mortgage, indenture, contract, lease, agreement, instrument, judgment, decree, order or writ to which Seller is a party, by which Seller is bound or to which Seller or its assets are subject, or (b) result in the creation of Liens upon any of the Purchased Interests other than Liens created under applicable state and federal securities laws.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES REGARDING THE PARTNERSHIP

Subject at all times to the matters disclosed in the Schedules hereto, Sellers, jointly and severally, represent and warrant to the Purchasers as of the date hereof and as of the Closing Date that:

Section 5.1    **Organization; Good Standing; Qualification**.

(a)     The Partnership is duly organized, validly existing and in good standing under the laws of the State of Texas and has all partnership power and authority to carry on its Business as now conducted.

(b)     The Partnership is duly licensed or qualified to transact business as a foreign entity and is in good standing in each jurisdiction in which the nature of the business transacted by it or the character of the properties owned or leased by it requires such licensing or qualification, except where the failure to be so licensed or qualified would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.2     **Capitalization; Ownership and Voting Rights**.

(a)     Schedule 5.2(a) sets forth the number of partnership interests or other equity interests of the Partnership that are issued and outstanding as of the date of this Agreement and the owner of such interests.  All of such interests are validly issued, fully paid and non-assessable.  The Partnership has no subsidiaries.

(b)     Other than this Agreement, there is no outstanding option, warrant, right (contingent or other, including conversion, exchange, participation, right of first refusal, co-sale or preemptive rights) or agreement for the purchase or acquisition of any Units, any other interests in the Partnership, or any options, warrants or rights convertible into or exchangeable for any thereof.  Other than this Agreement, there is no commitment to issue, sell or transfer any Units or any interests in the Partnership, or subscriptions, warrants, options, convertible or exchangeable securities or other such rights relating to the Units, or to distribute to holders of its Units any evidence of indebtedness or asset.

(c)     Except as contemplated by this Agreement or the Partnership Agreement:

(i)     there are no restrictions under any contract to which the Partnership or any Seller is a party on the transfer of the Units other than those arising from applicable state and federal securities laws; and

(ii)     no person is entitled under any contract to which the Partnership or any Seller is a party to (A) any preemptive or similar right with respect to the issuance of any Units or any other interests in the Partnership, or (B) any rights with respect to the registration of any Units or any other interests in the Partnership.

Section 5.3     **Material Contracts and Consents**.

(a)     Schedule 5.3(a) sets forth a list of:

(i)     (A) all energy management agreements and asset management agreements, (B) all ISDA master agreements, (C) all natural gas storage and transportation agreements with annual revenues in excess of $100,000, (D) NAESB and EEI master agreements and any other material agreement or contract of a similar character or nature (1) under which annual revenues derived therefrom constitute, in the aggregate, at least 80% of all annual revenues of the Partnership and (2) representing at least 80% of the Partnership annual power or gas transactions (on a volumetric basis) and

(E) to the extent not listed in the foregoing (D), any NAESB and EEI master agreements and any other material agreement or contract of a similar character or nature (1) under which the Partnership derives revenues that are greater than 1% of annual revenues derived by the Partnership with respect to the type of revenues associated with such agreement or contract and (2) representing greater than 1% of the Partnership annual power or gas transactions (on a volumetric basis);

(ii)      all broker, distributor, dealer, franchise, agency, promotion, marketing consulting or similar contracts and agreements to which the Partnership is a party or by which any of the Partnership's assets are bound, except contracts that can be terminated without cause and without penalty by the Partnership with less than sixty-one (61) days advance written notice;

(iii)      all management contracts and contracts with independent contractors or consultants, and all employment agreements to which the Partnership is a party, by which any of the Partnership's assets are bound, or pursuant to which the Business is conducted, except contracts that can be terminated without cause and without penalty with less than sixty-one (61) days advance written notice and contracts which require annual payments (including base salary, bonuses and benefits) annually less than $100,000;

(iv)      all contracts and agreements under which the Partnership has incurred, assumed or guaranteed any outstanding indebtedness for borrowed money, whether as a borrower, lender or guarantor and all related security agreements or similar agreements granting Liens securing such indebtedness for borrowed money;

(v)      all contracts and agreements with any Governmental Entity to which the Partnership is a party, by which the Partnership's assets are bound, or pursuant to which the Business is conducted;

(vi)      all contracts and agreements that limit or purport to limit the ability of the Partnership or any of its respective Affiliates (as defined in this Section 5.3(a)) to compete in any line of business or with any Person or in any geographic area or during any period of time;

(vii)      any material license or other similar agreement involving the use of a Person's Intellectual Property in the Business or operations of the Partnership (other than off-the-shelf software licenses);

(viii)      any material agreement for computer hardware or maintenance, and any material agreement for information technology services or consulting, that is used by the Partnership in the conduct of its Business or operations;

(ix)      all agreements or contracts that grant, license, define, describe, impact or pertain to any of the Registered Intellectual Property, except contracts that can be terminated without cause and without penalty by the Partnership with less than ninety-one (91) days advance written notice;

(x)  all agreements between the Partnership, on the one hand, and any of the Sellers or any Affiliate of any Seller, on the other hand; and

(xi)  any agreement necessary for or used in the conduct of the Business that is entered into by or in the name of any Seller or any Affiliate of a Seller rather than the Partnership.

The contracts listed on Schedule 5.3(a) are collectively referred to as "Material Contracts." As used herein, the term "Affiliate" of, or a person "affiliated" with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

(b)  Schedule 5.3(b) sets forth a list of all consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings (collectively, "Consents") with the United States of America or any other nation, any state, province or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government (the "Governmental Entity") or any Person under any Material Contract that is required to be obtained on the part of the Partnership in connection with the transfer and delivery of the Purchased Interests at the Closing or the operation of the Business of the Partnership after the Closing in substantially the same manner as such Business was operated immediately prior to the Closing.  The Consents denoted with an asterisk (*) in Schedule 5.3(b) are referred to herein as the "Seller Material Consents."

(c)  Except as set forth on Schedule 5.3(c), the Sellers have provided or made available to the Purchasers copies of all Material Contracts and the Partnership (nor any Seller or Seller Affiliate with respect to the agreements referred to in Section 5.3(a)(xi)) is not in breach or default under any of the Material Contracts.  Except as set forth on Schedule 5.3(c), all Material Contracts are in full force and effect and, to the Seller's knowledge, the other parties to the Material Contracts are not in breach or default under any such Material Contract.

Section 5.4    **Compliance With Other Instruments**.

(a)  The Partnership is not in violation, breach or default of (i) any provision of its certificate of limited partnership or the Partnership Agreement, (ii) any judgment, decree, order, writ, statute, rule or regulation, license or permit of any Governmental Entity applicable to the Partnership, any of its assets, or the Business, (iii) any provision of any mortgage, indenture, evidence of indebtedness, or any other contract, lease, agreement or instrument to which such Partnership is a party or by which the Partnership, any of its assets, or the assets used in the Business, is bound (excluding any Material Contracts, which are addressed in Section 5.3), except, in the case of the foregoing (ii) and (iii), for any such violation, breach or default that would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(b)  The execution, delivery and performance of this Agreement and the transactions contemplated hereby will not result in the creation of any Liens upon any of the properties or assets of the Partnership or the Business.  For purposes of this Agreement, the term "Liens" shall mean any mortgages, pledges, security interests, liens, charges, claims, restrictions, easements or

other encumbrances of any nature, but excluding (i) liens for taxes not yet due and payable, (ii) liens imposed by Law and incurred in the ordinary course of business for obligations not yet due and payable, (iii) liens of landlords, carriers, warehousemen, laborers, materialmen and the like, (iv) liens created or represented by any escrow agreement with respect to source codes for software and similar items, (v) liens set forth in any Permit, (vi) liens imposed by any Governmental Entity under any zoning rule or Environmental Law (*provided* that such rule, regulation or law has not been violated), or (vii) liens arising in the ordinary course of business that would not individually or in the aggregate have a Material Adverse Effect.

(c)     Subject to obtaining the consents set forth in <u>Schedule 5.3(b)</u>, execution and delivery of this Agreement and the transactions contemplated hereby will not violate any judgment, decree, order, writ, statute, rule or regulation of any Governmental Entity applicable to the Partnership.

Section 5.5     **Related Party Transactions**.  No officer, employee, member or partner of the Partnership or the Business or member of such person's immediate family is indebted to the Partnership, nor is the Partnership indebted (or committed to make loans or extend or guarantee credit) to any of them, other than (a) for payment of salary for services rendered to the Partnership or the Business by such officers, employees, members or partners, and (b) reimbursement for reasonable expenses incurred by such officers, employees or partners on behalf of the Partnership or the Business.  Except as set forth in <u>Schedule 5.5</u>, none of such persons owns, directly or indirectly, a greater than 5% interest in, or is on the board of directors of, any firm, corporation or other entity with which the Partnership is affiliated or with which the Partnership has a business relationship in which during the last three years the Partnership has made payments or received payments in excess of $50,000 in any such year, or any firm, corporation or other entity that competes with the Partnership, except as permitted under the Partnership Agreement.  Except as set forth in <u>Schedule 5.5</u>, and except for the Partnership Agreement and the agreements contemplated hereby or thereby, no such officer, member or partner or any member of their immediate families is a party to or is, directly or indirectly, interested in any agreement, understanding or proposed transaction with the Partnership.

Section 5.6     **Registration Rights**.  The Partnership has not granted or agreed to grant to any person any registration rights relative to the registration of any of its securities under the Securities Act.

Section 5.7     **Certain Agreements of Officers and Employees**.  Except as set forth as <u>Schedule 5.7</u>, to Seller's knowledge, no officer, significant employee or consultant of the Partnership or the Business is, or is expected to be, in violation of any term of any employment contract, patent disclosure agreement, proprietary information agreement, noncompetition agreement, nonsolicitation agreement, confidentiality agreement or any other similar contract or agreement or any restrictive covenant or common law obligation, relating to the right of any such officer, employee, or consultant to be employed or engaged by the Partnership or in the Business because of the nature of the business conducted or to be conducted by the Partnership or relating to the use of trade secrets or proprietary information of others, and, to the Seller's knowledge, the employment or engagement of the officers, employees or consultants of the Partnership or the Business does not subject the Partnership to any liability with respect to any of the foregoing matters.

Section 5.8   **Litigation**.   There is no action, suit, proceeding, investigation pending or threatened in writing against the Partnership which could be reasonably expected (a) to have a Material Adverse Effect or (b) to adversely affect the validity of this Agreement or the transactions contemplated hereby or any action taken or to be taken pursuant hereto.   Except as set forth on <u>Schedule 5.8</u>, the directors, officers or members of senior management of the Partnership or the Business is not and has not been the subject of any regulatory action, suit, proceeding or investigation by any Governmental Entity, regulatory or self-regulatory body, or any regional transmission organization or similar body.

Section 5.9   **Financial Statements and Related Matters**.

(a)      Sellers have delivered to the Purchasers the audited consolidated balance sheet and the related statements of earnings, partners' equity and cash flows of the Partnership for the year ended March 31, 2007, certified by the relevant auditors to have been prepared in accordance with United States generally acceptable accounting principles ("<u>GAAP</u>"), and including all related notes and schedules (the "<u>2007 Audited Financial Statements</u>"), and unaudited consolidated balance sheet and related statement of earnings, partners' equity and cash flows of the Partnership for the month of April 2007 and each later completed calendar month ending thirty (30) days or more immediately prior to the date hereof (the "<u>Interim Financial Statements</u>" and together with the 2007 Audited Financial Statements, the "<u>Financial Statements</u>").  The Financial Statements were prepared in accordance with the books and records of the Partnership in accordance with GAAP, consistently applied throughout the periods indicated.   The Financial Statements have been prepared, and fairly present in all material respects the financial position, results of operations and cash flows of the Partnership for the periods presented, in accordance with GAAP applied on a consistent basis throughout the periods presented.  Except as set forth in the Interim Financial Statements or on <u>Schedule 5.9(a)</u>, since March 31, 2007, the Partnership has not incurred any liabilities or obligations (whether direct, indirect, accrued or contingent) that would be required to be reflected or reserved against in a consolidated balance sheet of the Partnership prepared in accordance with GAAP except for items incurred in the ordinary course of business since the date of the Interim Financial Statements.

(b)      Since March 31, 2007, there has been no Material Adverse Effect.

(c)      Subject to the matters disclosed on <u>Schedule 5.9(c)</u>, the Partnership has in place controls and procedures designed to ensure that financial and accounting information with respect to the Partnership is recorded, processed, summarized and reported on a timely basis.  True and correct copies (or written descriptions thereof) of such controls and procedures have been previously provided to the Purchasers.  Except as set forth on <u>Schedule 5.9(c)</u>, no change in the Partnership's internal controls over financial reporting that occurred since the Partnership's last audit has materially affected, or is reasonably likely to materially affect, the Partnership's internal control over financial reporting.  Except as set forth on <u>Schedule 5.9(c)</u>:

(i)      there are no significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting with respect to the Partnership identified by the auditors of the Partnership; and

(ii)    there is no fraud, whether or not material, with respect to the Partnership of which the Sellers have actual knowledge that involves management of the Partnership or other employees who have a significant role in Partnership's internal controls over financial reporting with respect to the Partnership occurring or discovered since January 1, 2005.

Section 5.10    **Insurance**.  Except as set forth on <u>Schedule 5.10</u>, the Partnership is fully insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are reasonably adequate and customary in the businesses in which it is engaged. Such policies are in full force and effect, and will be in full force and effect at the Closing, and all premiums due thereon have been paid.  All such policies are listed on <u>Schedule 5.10.</u>  The Partnership (or applicable policyholder) has complied in all material respects with the terms and provisions of such policies.  There is no claim pending under any such policy as to which coverage has been questioned, denied or disputed by the underwriter of such policy and the Partnership (or applicable policyholder) is otherwise in compliance with the terms of such policies.  The Partnership (or applicable policyholder) has not received notice of any threatened termination of any such policy or has within the last five years been refused any coverage sought or applied for.  To each Seller's knowledge, no event has occurred that would prevent the Partnership from renewing then existing coverage as and when such coverage expires or obtaining similar coverage from similar insurers.  All workers compensation claims relating to the Partnership or employees of the Business have been fully funded or reserved for on the Financial Statements.

Section 5.11    **Compliance with Laws; Regulatory**.

(a)    The Partnership and the Business is in compliance in all material respects with all Laws (as defined in this Section 5.11 (a)) applicable to it; *provided* that this Section 5.11 does not address Laws relating to taxes (which are covered by Section 5.23), Environmental Laws (which are governed by Section 5.12), the Federal Power Act (which is covered by Section 5.13), the Public Utility Holding Company Act of 2005 (which is covered by Section 5.19), and Laws relating to employment and labor matters (which are covered by Section 5.17 and Section 5.18). Except as set forth on <u>Schedule 5.11(a)</u>, the Partnership has made all regulatory filings required by Law in a timely manner.  As used herein, "<u>Laws</u>" mean all laws, statutes, rules, regulations, ordinances, and other pronouncements having the effect of law of any Governmental Entity.

(b)    The Partnership possesses all certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct its Business in material compliance with applicable Laws, and the Partnership has not received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.  As of the date of this Agreement, the Partnership is not subject to regulation under the laws of the State of Texas ("<u>Texas Utility Laws</u>") as a "public utility," an "electric utility," a "transmission and distribution utility" or "gas utility."  As of the date of this Agreement, the Partnership is not subject to regulation as a "first purchaser," "common purchaser," retail electric provider, aggregator, or power generator company under the laws of the State of Texas.  Except as set forth on <u>Schedule 5.11(b)</u>, no consents, authorizations, or approvals are required to be obtained from the Public Utility Commission of Texas under Texas Utility Laws prior to the consummation of the transactions contemplated by this Agreement.

Section 5.12   **Environmental**.

(a)      The Partnership and the Business (i) is in compliance in all material respects with any and all applicable foreign, federal, provincial, state and local laws and regulations relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), (ii) has received all permits, licenses or other approvals required of it under applicable Environmental Laws to conduct its respective businesses in compliance in all material respects with such Environmental Laws, and (iii) is in compliance in all material respects with all terms and conditions of any such permit, license or approval.

(b)      Except as set forth on Schedule 5.12(b), (i) there has been no release, spill, emission, deposit, discharge, disposal, leaching, presence or migration (collectively, "Release") (except for releases in accordance with valid environmental permits) of any "Hazardous Substances" (which term shall mean collectively, any of the following to the extent regulated under Environmental Laws:  contaminants; pollutants; toxic, radioactive or hazardous waste, chemicals, substances, materials and constituents; petroleum and petroleum products; polychlorinated biphenyls; medical waste; infectious waste; asbestos; and urea formaldehyde) into the air, soil, surface water, ground water or water at, on, under, above or from any of the properties owned or leased (excluding leases relating to office space and natural gas storage agreements) by the Partnership, which condition remains uncured, and which requires investigative or remedial action pursuant to any environmental laws and (ii) no soil, air, surface water, ground water or water contamination exists at any of the properties owned or leased (excluding leases relating to office space and natural gas storage agreements) by the Partnership or the Business.

(c)      Except as set forth on Schedule 5.12(c), within the last two (2) years, the Partnership has not received written notice of, and is not, to the Seller's knowledge, the subject of, any actions, causes of action, claims, investigations, demands or notices by any person alleging liability under or noncompliance with any Environmental Law.

Section 5.13   **Market Based Rate Authority**.  Except as set forth on Schedule 5.13, the Partnership, which is required to have on file with FERC rate schedules to make sales of electric energy, capacity, and ancillary services at market-based rates in compliance with the Federal Power Act ("FPA") (a) has market-based rate schedules that have been accepted for filing by FERC, which rate schedules are in full force and effect, (b) has received all blanket authorizations and waivers customarily granted by FERC to parties with market-based rate authorization, and (c) has been granted blanket authorization to issue securities pursuant to Section 204 of the FPA.  The Partnership with market-based rate authorization has complied with all applicable FERC rules and reporting obligations, except for matters for which non-compliance would not reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 5.13, each of the Transactions that is subject to rate regulation by a Governmental Entity is authorized to take place at market-based rates.  As used herein, "Transactions" means transactions for the purchase and sale of electric energy and capacity, other commodities and/or related products, including transactions providing for financial settlement.

Section 5.14  **Real Property**.  The Partnership is not the tenant of any real property interests, nor does it use any leased real property, except for the real property leased to the Partnership or the Business under the leases set forth on <u>Schedule 5.14</u> (the "<u>Real Property Leases</u>").  The Real Property Leases are in full force and effect, and the Partnership has paid all rent and other charges due, and complied in all material respects with all of its respective obligations, under the Real Property Leases.  Except for the Real Property Leases, the Partnership does not own or hold any interests in real property.

Section 5.15  **Assets**.  Except as set forth in <u>Schedule 5.15,</u> as of the Closing Date the Partnership will own and have good title to all material tangible personal property used in the conduct of its Business that are either (a) located at the Partnership's offices, or (b) used or held for use exclusively for use in the Business, free and clear of all Liens.  The material tangible personal property of the Partnership or used in the Business is in good operating condition and repair, ordinary wear and tear excepted.

Section 5.16  **Intellectual Property and Software**.

(a)    Except as set forth on <u>Schedule 5.16(a)</u>, the Partnership owns, or has a valid and subsisting license or right to use, all Intellectual Property, Software and Data used in, and material to, the operations and business of the Partnership as currently conducted.

(b)    <u>Schedule 5.16(b)</u> sets forth a complete and accurate list of all worldwide patents and patent applications, trademark registrations and copyright registrations, and applications for trademark and copyright registrations, in each case that are owned by the Partnership, any Seller or any of Affiliates of any Seller and used in the Business (the "<u>Registered Intellectual Property</u>").  All of the registrations and applications for registrations are valid and subsisting in good standing.  Except as set forth in <u>Schedule 5.16(b)</u>, (i) the Partnership has title to each item of the Registered Intellectual Property, free and clear of any Lien, (ii) no third party has asserted against the Partnership a claim that the Partnership or the Business is infringing the Intellectual Property of such third party, (iii) to Seller's knowledge, no basis for any such claim exists, (iv) to Seller's knowledge, none of the Intellectual Property used in the conduct of the Business of the Partnership infringes upon or otherwise violates the Intellectual Property rights of others, (v) none of the Registered Intellectual Property is subject to any outstanding order, decree or judgment of any Governmental Entity, and (vi) to Seller's knowledge, no third party is infringing the Intellectual Property owned by the Partnership or the Business.  To Seller's knowledge, all required fees to register and maintain the Registered Intellectual Property that are due have been paid, and none of the Registered Intellectual Property is the subject of any pending opposition proceedings, pending cancellation proceedings, pending interference proceedings or any other similar administrative challenge.

(c)    The Partnership has taken reasonable measures to protect and preserve the confidentiality of the trade secrets and confidential information of the Partnership.  Persons involved in the development and authoring of any Intellectual Property owned by the Partnership have executed agreements vesting or assigning the ownership rights of any Intellectual Property of such Persons in such Intellectual Property to the Partnership or have acted as an employee of the Partnership in the normal scope of his or her employment.  Third Parties with access to the

Intellectual Property have executed confidentiality agreements and have agreed not to disclose any Intellectual Property.

(d)    As used herein:

(i)    "Intellectual Property" means the following intellectual property, whether arising by statute or under common law:  (A) copyrights, registrations and applications for registration thereof, (B) trademarks, service marks, trade names, slogans, domain names, logos, trade dress, and registrations and applications for registrations thereof, (C) patents, as well as any reissued and reexamined patents and extensions corresponding to the patents, and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (D) trade secrets and confidential information, including data, ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable;

(ii)    "Software" means any instruction or set of instructions that is used (e.g., read, compiled, processed or manipulated) by, in or on any Equipment, including application programming interfaces, source code and object code versions of applications programs, operating system software, software tools, computer software languages and utilities software; in each case, in whatever form or media, including the tangible media upon which they are recorded or printed, together with all corrections, improvements, enhancements, modifications, updates and releases thereof prior to the Closing; and

(iii)    "Data" means all the available data in digital format that is used in the operations and business of the Partnership as currently conducted, including any Transaction data in digital format.

Section 5.17    **Employee Benefit Plans**.

(a)    The term "Benefit Plan" means each employment, consulting, non-competition, non-solicitation, deferred compensation, or executive compensation, incentive bonus or other bonus, employee pension, profit-sharing, savings, retirement, stock option, stock purchase, stock appreciation rights, equity, change of control, severance pay, life, health, disability or accident insurance plan, corporate- owned or key-man life insurance, or other material compensation or benefit plans, programs, arrangements, agreements or commitments, whether or not an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), maintained, sponsored or contributed to by the Partnership or with respect to which the Partnership may have any obligation or liability (contingent, secondary, joint and several, or otherwise) or which cover any Transferred Employee (as defined in Section 7.13(a)).

(b)    The Partnership does not sponsor or maintain any Benefit Plans, nor does it have any liability or obligations under any Benefit Plans.

(c)    Except as set forth in Schedule 5.17(c), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereunder, either alone or in combination with another event (whether contingent or otherwise), will (i) entitle any

Transferred Employee to any payment, job security or similar benefit, (ii) increase the amount of compensation due to any such employee in any material respect, (iii) accelerate the time of vesting of any compensation, stock incentive or other benefit, (iv) result in any "parachute payment" under section 280G of the Code whether or not such payment is considered to be reasonable compensation for services rendered, or (v) result in any release of any obligation of any Transferred Employee, from or to the Partnership.

Section 5.18   **Employment and Labor Matters**.

The Partnership has no employees, nor does it have any liabilities or obligations under any laws, rules, regulations, orders, rulings, decrees, judgments and awards relating to discrimination, payment of wages, overtime, immigration, affirmative action, fair labor standards and occupational health and safety, wrongful discharge or violation of the personal rights. No action, suit, complaint, charge, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity, brought by or on behalf of any (A) prospective or former employee or (B) labor organization or other representative of any prospective or former employees of the Partnership is pending or, to the Sellers' knowledge, threatened against the Partnership, or against any present or former director or manager. The Partnership is not subject to or otherwise bound by any material consent decree with, or citation by, any Governmental Entity.

Section 5.19   **PUHCA Regulation**.   The Partnership is not subject to regulation as a "public-utility company" within the meaning of the Public Utility Holding Company Act of 2005.

Section 5.20   **Trading**.   The risk management policies of the Partnership that are in force as of the date hereof are attached as Schedule 5.20.   The Partnership has established risk parameters, limits and guidelines in compliance with the risk management policies designed to restrict the level of risk that the Partnership is authorized to take with respect to the net position resulting from the physical and financial commodity transactions, exchange-traded futures and options transactions, over-the-counter transactions and derivatives thereof and similar transactions.

Section 5.21   **Brokers**.   No person has, or as a result of any action taken by the Partnership or any of its authorized agents will have, as a result of the transactions contemplated by this Agreement, any rights, interest or valid claim against or upon the Purchasers or the Partnership for any commission, fee or other compensation as a finder or broker or in any similar capacity.

Section 5.22   **Restrictions on Business or Sale of Partnership**.   Except as set forth on Schedule 5.22, the Partnership is not a party to (i) any agreement, contract or understanding which restricts its activities or (ii) any agreement, contract or understanding which restricts the activities of its limited partners, members or affiliates.

Section 5.23   **Taxes**.   Except as set forth in Schedule 5.23 of the Disclosure Schedule:

(a)      All material Tax Returns required to be filed by the Partnership have been duly and timely filed; each such Tax Return is in all material respects true, correct and complete; all Taxes that are due and payable by the Partnership (whether or not shown on a Tax Return) have

been timely paid in full; all Tax withholding, remittance and deposit requirements imposed on the Partnership have been satisfied in full in all material respects on a timely basis; and there are no Liens for Taxes on any of the assets of the Partnership other than Liens for Taxes not yet due.

(b)    There is no outstanding audit or dispute of or claim against the Partnership relating to Taxes (whether or not such audit, dispute or claim would result in Taxes due from the Partnership), and no Tax audit, adjustment, assessment or deficiency has been asserted or proposed against the Partnership. The Partnership has not waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to the filing of a Tax Return or a Tax assessment or deficiency. No written claim is pending by a taxing authority in a jurisdiction where the Partnership does not file Tax Returns that the Partnership is or may be subject to taxation in that jurisdiction. The Partnership does not have any liability for the Taxes of any other person by contract, under applicable law, as a transferee or successor, or otherwise.

(c)    The Partnership has been classified as a partnership for United States federal income tax purposes since its inception.

(d)    The Partnership has or will have in effect for the taxable year that includes the Closing Date a valid election under Section 754 of the Code.

(e)    None of the property of the Partnership is "tax-exempt use property" (within the meaning of Section 168(h) of the Code) or "tax-exempt bond financed property" (within the meaning of Section 168(g)(5) of the Code).

(f)    All of the property of the Partnership has been properly listed and described on the property tax rolls for the taxing units in which such property is located and no portion of such property constitutes omitted property for property Tax purposes.

(g)    The Partnership has not engaged in any transaction that would be reportable pursuant to Treasury Regulation Section 1.6011-4.

(h)    The Partnership claiming an exemption with respect to the payment of sales or similar Taxes is entitled under applicable law to such exemption..

(i)    As used herein:

(i)    "Tax" means any U.S. federal, state, provincial, local, or foreign tax, duty, levy or other assessment, including income, capital, goods and services, gross receipts, license, payroll, employment, withholding, excise, severance, stamp, occupation, premium, windfall profit, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever imposed by any Governmental Entity, including any interest, penalty or addition thereto.

(ii)    "Tax Return" means any return, declaration, report, claim for refund, or information return or statement (whether in tangible or electronic form) relating to Taxes,

including any schedule or attachment thereto, and including any amendment thereof, required to be filed with any Governmental Entity.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Purchaser hereby represents and warrants, jointly and severally, to the Sellers that:

Section 6.1    **Organization; Good Standing**.  The LP Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware and has all corporate power and authority to carry on its business as now conducted.  The GP Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of Delaware and has all limited liability company power and authority to carry on its business as now conducted.

Section 6.2    **Authorization**.  Each Purchaser has full power and authority to execute and deliver this Agreement and to carry out the provisions of this Agreement.  Any and all corporate or limited liability company action, as applicable, on the part of the Purchasers necessary for the authorization, execution and delivery of this Agreement and the performance of all obligations of the Purchasers hereunder at the Closing has been taken.  This Agreement has been duly and validly executed and delivered by the Purchasers and, assuming this Agreement has been duly authorized, executed and delivered by the other parties hereto, constitutes a valid and legally binding obligation of the Purchasers, enforceable against the Purchasers in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

Section 6.3    **Litigation**.  There is no action, suit, proceeding or investigation pending or, to the knowledge of the Purchasers, threatened against any Purchaser which could be reasonably expected to adversely affect the validity of this Agreement or the agreements contemplated hereby or any material action taken or to be taken pursuant hereto or thereto, nor, to the knowledge of the Purchasers, has there occurred any event nor does there exist any condition on the basis of which any such litigation, proceeding or investigation might properly be instituted.

Section 6.4    **Brokers or Finders**.  No person has, or as a result of any action taken by either Purchaser or any of their authorized agents will have, as a result of the transactions contemplated by this Agreement, any rights, interest or valid claim against or upon any Seller for any commission, fee or other compensation as a finder or broker or in any similar capacity.

Section 6.5    **Consents**.  Except for the matters referred to Section 3.1, neither the execution, delivery or performance of this Agreement nor the consummation by Purchasers of the transactions contemplated hereby will (a) require any filing or registration with, or notice or declaration to, or the obtaining of any permit, license, authorization, consent or approval of, any Governmental Entity or (b) require the consent of any Person under any agreement to which any

Purchaser is a party or by which any Purchaser or any of its assets is subject or by which any of them may be bound; excluding from the foregoing clauses (a) and (b) such requirements, notices, declarations, consents or approvals that would not adversely affect the ability of the Purchasers to consummate the transactions contemplated by this Agreement and thereafter perform its obligations thereunder.

## ARTICLE VII

## ADDITIONAL AGREEMENTS

Section 7.1    **Conduct of Business**.

(a)    Except as otherwise set forth in Schedule 7.1(a), as contemplated by this Agreement, as required under applicable Law or by any Governmental Entity, or to the extent that the Purchasers, acting through Robert Quick (the "Purchasers' Representative"), consents in writing, between the date hereof and the Closing, the Sellers shall (as applicable to the Business) and shall cause the Partnership to:

(i)    operate in the ordinary course of the Business, consistent with current practices, including the management of market risk with respect to asset optimization and hedging of portfolio risk consistent with current practices as of the date hereof (except to the extent otherwise provided in this Section 7.1(a)), comply with all material applicable Laws, rules and regulations relating to the Partnership and with the material provisions of the risk management policies disclosed in Schedule 5.20;

(ii)    use commercially reasonable efforts to preserve intact the Business and goodwill of the Partnership and their relationship with material customers and others having material business relationships with the Partnership;

(iii)    maintain the tangible properties and facilities of the Partnership and the Business in good working order and condition, ordinary wear and tear excepted;

(iv)    only open new accounts in compliance with all applicable federal laws, including the USA Patriot Act of 2001;

(v)    conduct all OTC trades in conformity with the standards set forth in Exhibit D;

(vi)    prepare and file all required tax returns with the appropriate Governmental Entity and pay all taxes due;

(vii)    use commercially reasonable efforts to obtain all Tax resale certificates relating to sales which occurred before the date hereof and obtain all Tax resale certificates relating to sales that occur after the date hereof; and

(viii)    promptly notify the Purchasers of any change or condition which might reasonably be expected to have a Material Adverse Effect.

(b)      Except as otherwise set forth in <u>Schedule 7.1(b)</u>, as contemplated by this Agreement, as required under applicable law or by any Governmental Entity, or to the extent that the Purchasers Representative consents in writing, between the date hereof and the Closing, the Sellers shall not (as applicable to the Business), and shall cause the Partnership not to:

(i)      modify, amend or voluntarily terminate, prior to the expiration date thereof, any Material Contracts;

(ii)      waive any material default by, or release, settle or compromise any material claim against, any other party thereto;

(iii)      amend the Partnership's organizational documents;

(iv)      incur additional credit exposures to any counterparty in excess of the higher of (1) its existing credit limits and (2) the relevant limits on guarantees provided by such counterparty's credit support providers;

(v)      assign to new counterparties credit limits greater than those previously approved in the Business;

(vi)      enter into any natural gas or power Energy Management Agreement except such agreements relating to the operation of electric generation facilities entered into in the ordinary course of business and consistent with past practice;

(vii)      enter into (1) any storage or transportation agreements with any party that is not a FERC-regulated pipeline with cost based tariffs or (2) except in the ordinary course of business consistent with past practice, any storage or transportation agreements with any party that is a FERC-regulated pipeline with cost based tariffs and that are for a term longer than two years;

(viii)      make any loan of cash to any Person other than loans associated with marketing and trading transactions;

(ix)      hire any new employee or engage any consultant or enter into any agreement or understanding with respect to any such hiring or engagement or enter into an employment agreement with a current employee, or renew, modify or amend the terms of any existing employment agreement or consulting agreement, in any such case that either (1) provides for annual compensation to such employee or consultant in excess of $300,000 or (2) provides for aggregate annual compensation to all such employees or consultants in excess of $1,500,000;

(x)      (A) increase, accelerate the vesting of, guarantee or fund, or agree to increase, accelerate the vesting of, guarantee or fund, the salary, remuneration, benefits, pension or other compensation of any director, officer, employee, service-provider or consultant of the Partnership or the Business or (or make any material increase or decrease in the number of such persons), (B) authorize, guarantee or pay any bonuses or other special payments to any current or former directors, officers, consultants or employees or (C) enter into, adopt, amend or terminate prematurely any Benefit Plan or

benefit plan or other arrangement or agreement that would have been a Benefit Plan were it effective as of the date of this Agreement;

(xi)     forgive any existing loans or the accrued interest thereon to current or former employees, directors or consultants of the Partnership or the Business;

(xii)     enter into any material leases of real property, except renewals of existing leases in the ordinary course of business;

(xiii)   incur, assume or guarantee any new indebtedness or issue any securities convertible or exchangeable for debt securities, other than as contemplated by the Credit Agreement;

(xiv)   acquire any material assets or properties;

(xv)    redeem, retire, purchase or otherwise acquire, directly or indirectly, any of their equity interests or declare, set aside or pay any distributions;

(xvi)   issue any equity interests or any instruments convertible into equity interests or effect a split or reclassification of any capital;

(xvii)  make any new capital expenditures in excess of $150,000 or which, in the aggregate, would exceed $500,000 other than those provided on Schedule 7.1;

(xviii) sell any assets, except in the ordinary course of business and consistent with past practices;

(xix)   materially change existing or adopt new systems relating to the operations or Business of the Partnership;

(xx)    Sellers and Sellers' Affiliates will not liquidate, access, sweep or obtain distributions from  any bank or similar account in the name of or for the benefit of the Partnership to which any such Seller or Affiliate of Seller otherwise has access; or

(xxi)   agree to do any of the foregoing.

Section 7.2 **Access to Information**.

(a) Between the date hereof and the Closing, each Seller will (as applicable to the Business) use its commercially reasonable efforts to cause the Partnership to, during ordinary business hours and upon reasonable notice and request, (i) afford the Purchasers and their representatives reasonable access to all books, records, offices and other facilities and properties of the Partnership and the Business; (ii) furnish the Purchasers with such financial and operating data and other information with respect to the Partnership and the Business, as either Purchaser may from time to time reasonably request (including, without limitation, daily profit and loss, and risk and position, reports); and (iii) make available to the Purchasers a copy of each material report, schedule or other document filed or received by them, including without limitation, documents filed with FERC or any other Governmental Entity having jurisdiction over the Partnership and the Business, as either Purchaser may from time to time reasonably request; *provided, however*, that (1) any such access or activities shall be conducted in such a manner as not to interfere unreasonably with the operation of the Partnership and (2) the Partnership shall not be required to supply the Purchasers with any information that the Partnership shall be legally prohibited to supply.

(b) After the Closing and until the completion of the Bankruptcy Case, and at Sellers' sole cost and expense, Purchasers shall afford Sellers and their representatives reasonable access to all books and records and personnel of the Partnership and the Business in respect of the period before the Closing and to the extent such access is necessary for purposes of the Bankruptcy Case.

Section 7.3 **Further Assurances; Cooperation**. Subject to the terms and conditions of this Agreement, each of the parties hereto will use its commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the issuance, transfer, purchase and sale of the Purchased Interests pursuant to this Agreement, including using commercially reasonable efforts to ensure satisfaction of the conditions precedent to each party's obligations hereunder. None of the parties hereto will, without the prior written consent of the other parties, take or fail to take any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the transactions contemplated by this Agreement. From time to time after the Closing, without further consideration, each party will, at its own expense, execute and deliver such documents to the other parties, and take such other actions, as the other parties may reasonably request in order to more effectively consummate the issuance, transfer, purchase and sale of the Purchased Interests hereunder and the other transactions contemplated by this Agreement.

Section 7.4 **Subject Consents and Approvals**.

(a) As promptly as reasonably practicable but in no event later than ten (10) Business Days after the date of this Agreement, the Sellers and the Purchasers, as applicable, shall use their commercially reasonable efforts to file with any Governmental Entity having jurisdiction over any of them, any filings required to be made with respect to the transactions contemplated by this Agreement, including but not limited to filings under the HSR Act and as may be necessary to obtain the FERC Order, and shall use commercially reasonable efforts to obtain at

the earliest practicable date all the required regulatory approvals. The parties shall respond promptly to any requests for additional information made by such Governmental Entities. The Purchasers will bear all costs of the preparation and filing of any such filings.

(b)     Each Seller and each Purchaser shall have the right to review in advance all filings to be made with any Governmental Entity in connection with the transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the date hereof, the Sellers and the Purchasers shall use their commercially reasonable efforts to obtain (and shall cooperate with each other in obtaining) all other consents required to be obtained in connection with the transactions contemplated hereby, including without limitation all Seller Material Consents.

Section 7.5     **Bankruptcy Court Filings**.     As promptly as reasonably practicable following the date hereof, LBHI shall file with the Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (the "Approval Motion") seeking entry of an order (the "Approval Order") of the Bankruptcy Court (a) approving the entry of LBHI into this Agreement and the transactions contemplated hereby to be performed by LBHI, (b) the Debt Forgiveness, (c) the debt assignment under <u>Section 1.2(b)</u> hereof, (d) satisfaction of the Intercompany Receivable under <u>Section 1.2(c)</u> hereof, and (e) conveyance of title free and clear of Liens of the Partnership Interests to the Purchasers, which motion shall be subject to the approval of Purchasers, which approval shall not be unreasonably withheld or delayed. Purchasers agree that they will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

Section 7.6     **Limited Partner Waiver and Consent**.     Each LP Seller acknowledges and agrees that by such LP Seller's execution of this Agreement, such LP Seller shall have concurrently granted a waiver and consent waiving any rights, whether under the Partnership Agreement or otherwise, to acquire any of the Purchased LP Units and consenting to the transactions contemplated by this Agreement and all actions taken or to be taken pursuant hereto.

Section 7.7     **Member Waiver and Consent**.     The GP Seller acknowledges and agrees that by its execution of this Agreement, the GP Seller shall have concurrently granted a waiver and consent waiving any rights, whether under the Operating Agreement, Partnership Agreement, or otherwise, to dispose of any of the Purchased Interests and consenting to the transactions contemplated by this Agreement and all actions taken or to be taken pursuant hereto.

Section 7.8     **Public Announcements; Confidentiality**.

(a)     The Sellers shall not, and the Sellers shall cause the Partnership not, to issue any press release or otherwise make a public statement regarding the transactions contemplated by this Agreement without the prior written consent of the Purchasers. The Purchasers will provide to the General Partner a copy of the initial press release proposed to be issued within a reasonable period of time prior to such issuance and consult with the Sellers' Representative, and

consider any of Sellers' comments in good faith, prior to issuing such press release with respect to the transactions contemplated by this Agreement; *provided, however*, that the Purchasers need not obtain the consent of the General Partner in the event that the issuance of the press release is required by law or any rules of the New York Stock Exchange.

(b)        Each of the parties hereto will hold, and will cause its consultants and advisors to hold, in confidence the terms of this Agreement and all documents and information furnished to it in connection with the transactions contemplated by this Agreement and use such information solely for purposes of performing its obligations under this Agreement.

Section 7.9    **Fees and Expenses**.    Except as otherwise expressly provided in this Agreement, all fees and expenses, including fees and expenses incurred in connection with this Agreement and the transactions contemplated herein, shall be paid by the party incurring such fee or expense.

Section 7.10    **Transfer Taxes**.    All transfer, sales, use, documentary, stamp and other similar Taxes payable in connection with the sale, transfer or other disposition of the Purchased Interests or otherwise in connection with the consummation of any of the transactions contemplated by this Agreement ("Transfer Taxes") shall be borne by the Purchasers.

Section 7.11    **Insurance**.    The Sellers shall (as applicable to the Business), and shall cause the Partnership to, maintain in effect all insurance policies covering the assets of the Partnership or the Business up to the Closing and shall use commercially reasonable efforts to obtain from insurers any waivers that are necessary in connection with the transactions contemplated in this Agreement, including, without limitation, any change of control provisions.

Section 7.12    **Taxes**.

(a)    Tax Returns Due On or Prior to Closing.    The General Partner shall cause the Partnership to prepare, and shall file or cause the Partnership to timely file all Tax Returns of the Partnership that are due on or prior to the Closing Date.    In addition, except for Closing Date Returns governed under Section 7.12(c), at least thirty (30) days prior to the due date for filing any federal, state, provincial or local income tax information returns due for the Partnership with respect to a Tax period ending on or before the Closing Date ("Pre-Closing Partnership Returns"), the Sellers' Representative shall provide the Purchasers with a copy of such Tax Return for review and comment together with access to such information and assistance as is reasonably necessary to undertake such review.    The Purchasers shall provide written comments to the Sellers' Representative at least fifteen (15) days prior to the due date of such Tax Returns. The Sellers' Representative shall make such revisions to such Tax Return as are reasonably requested by the Purchasers unless the Sellers' Representative reasonably determines (and notifies the Purchasers in writing at least ten (10) days prior to the due date of such Tax Returns (a "Material Tax Return Dispute Notification")) that the position requested by the Purchasers will materially increase the Sellers' or the Partnership's, liability for Taxes or that such position is inconsistent with past practices.    If the Sellers' Representative has timely provided a Material Tax Return Dispute Notification to the Purchasers, the Sellers' Representative and the Purchasers shall endeavor in good faith to reach a mutually acceptable resolution.    If the Sellers' Representative and the Purchasers are unable to reach a mutually acceptable resolution at least

seven (7) days prior to the due date for the Pre-Closing Partnership Return, the Sellers' Representative and the Purchasers shall submit the issue for resolution to the Accounting Referee. The decision of the Accounting Referee shall be binding on the Sellers' Representative and the Purchasers and the cost of such review shall be borne fifty percent (50%) by the Sellers and fifty percent (50%) by the Purchasers. The Sellers' Representative and the Partnership shall prepare all Tax Returns pursuant to this Section 7.12(a) consistent with past practices and shall not make any elections on such Tax Returns (including elections to change any accounting period) without the written consent of the Purchasers.

(b)     The General Partner shall timely pay, or cause the Partnership to timely pay, all Taxes due from the Partnership on or prior to the Closing Date.

(c)     Tax Returns For Periods Ending On The Closing Date. The Sellers shall prepare, or cause to be prepared, and shall timely file, or cause to be timely filed, all Income Tax Returns that are due after the Closing Date and relate to Tax Periods that end on the Closing Date (the "Closing Date Returns"). The parties hereto agree that the Debt Forgiveness occurred before the Closing and that any Tax consequences arising out of the Debt Forgiveness shall be reported on the Closing Date Returns and shall be solely allocable to the Sellers. The Sellers and the Purchasers shall cooperate in good faith in connection with the exchange of information necessary for the preparation of all such Closing Date Returns. At least thirty (30) days prior to the due date (including extensions) for the filing of any such Closing Date Return Sellers shall provide the Purchasers with a copy of such Tax Return for review and comment together with access to such information and assistance as is reasonably necessary to undertake such review. The Purchasers shall be entitled to provide written comments to Sellers at least fifteen (15) days prior to the due date for such Tax Return. Sellers shall make the reasonable revisions to such Tax Return as are requested by Purchasers

(d)     Tax Returns for Periods Ending After the Closing Date. Other than any Pre-Closing Partnership Returns and Closing Date Returns, the Purchasers shall prepare, or cause the Partnership to prepare, and shall timely file, or cause the Partnership to timely file, all Tax Returns that are due after the Closing Date for the Partnership with respect to any Pre-Closing Taxable Period or any Straddle Taxable Period ("Post-Closing Returns") and shall pay, or cause the Partnership to pay, any Tax shown as due from the Partnership on such Tax Returns. The Purchasers and the Partnership shall prepare all such Tax Returns consistent with past practices and shall not make any elections (including elections to change any accounting period) that could affect any Seller with respect to any Pre-closing Tax Period without the written consent of the Sellers' Representative, which consent shall not be unreasonably withheld or delayed. The Sellers' Representative and the Purchasers will cooperate in good faith in connection with the exchange of information necessary for the preparation of all such Post-Closing Returns.

(e)     Refunds and Credits. Any refunds or credits of Taxes of the Partnership for any taxable period shall be for the account of the Purchaser.

(f)     Cooperation on Tax Matters. After the Closing Date, each Seller shall make reasonably available to the Purchasers, and the Purchasers shall make reasonably available to the Sellers' Representative, all information, records, and documents within their respective possession or control and personnel relating to Tax liabilities or potential Tax liabilities of the

Partnership with respect to Pre-Closing Taxable Periods or Straddle Taxable Periods ("*Tax Records*") until the seventh anniversary of the Closing Date, or for such longer period as may be required by applicable law. After such time, each Purchaser and each Seller may discard or destroy, or cause to be discarded or destroyed, such Tax Records (except as they pertain to an audit proceeding described below). Each Seller shall afford the Purchasers' Representative and each Purchaser shall afford the Sellers' Representative, the right to take extracts therefrom and to make copies thereof to the extent reasonably necessary to permit the Purchasers or the Sellers to prepare Tax Returns, to conduct negotiations with Taxing Authorities, and to implement the provisions of, and to investigate any claims between, the parties arising under the Agreement.

    (g)    <u>Audit Proceedings</u>.

    (i)    Within ten (10) days after any Purchaser or the Partnership receives a notice ("<u>Audit Notice</u>") of an intention by any Taxing Authority to examine any Tax Return related to Pre-Closing Taxable Period or a Straddle Taxable Period, the Purchasers shall notify the Sellers' Representative of such Audit Notice.

    (ii)    If a Tax Contest relates to a Pre-Closing Taxable Period, the Sellers' Representative shall have the right, at the Sellers' expense, to control the conduct and resolution of such Tax Contest; *provided, however*, the Sellers' Representative may not settle any such Tax Contest without the written consent of the Purchasers (which consent shall not be unreasonably withheld or delayed). If the Sellers' Representative notifies the Purchasers' Representative that the Sellers' Representative does not intend to exercise their right to control any Tax Contest for which they have a right to control under this Section 7.12(g)(ii), the Purchasers, at their own expense, may control the conduct and resolution of such Tax Contest; *provided, however*, that the Purchasers may not settle any such Tax Contest without the written consent of the Sellers' Representative (which consent may not be unreasonably withheld or delayed).

    (iii)    If a Tax Contest relates to a Straddle Taxable Period, the Purchasers at their own expense shall have the right to control the conduct and resolution of such Tax Contest; *provided*, that the Sellers' Representative at the Sellers' expense shall have a right to participate and consult in any such Tax Contest and the Purchasers' Representative shall periodically notify the Sellers' Representative concerning the status of the Tax Contest; *provided further*, that the Purchasers may not settle any such Tax Contest without the written consent of the Sellers' Representative (which consent may not be unreasonably withheld or delayed). If the Purchasers notify the Sellers' Representative that the Purchasers do not intend to exercise its right to control any Tax Contest for which they have a right to control under this Section 7.11(g)(iii), the Sellers' Representative, at Sellers' own expense, may control the conduct and resolution of such Tax Contest; *provided, however*, the Sellers' Representative may not settle any such Tax Contest without the written consent of Purchasers' Representative (which consent shall not be unreasonably withheld or delayed).

    (iv)    Notwithstanding the foregoing in the event of the Tax Contest relating to a Pre-Closing Tax Period or a Straddle Period for which none of the Sellers, or any prior owner of an interest in the Partnership, could potentially incur any liability in the event of

an adverse outcome of such Tax Contest, Purchasers shall be entitled to control such Tax Contest.

(v)    With respect to a Tax Contest that is controlled by Seller, Seller shall (a) keep Purchasers reasonably informed of the conduct of the Tax Contest, (b) provide copies to the Purchasers of all material correspondence between Sellers and the Taxing authority and its agents and (c) to the degree practical, provide the Purchaser with drafts of any material correspondence to be sent to any Taxing authority or its agents in such contest, and consider in good faith any suggestions made by Purchasers.

(h)    Except as required by Laws, neither Purchaser nor the Partnership may amend any Tax Return for a Pre-Closing Period or a Straddle Taxable Period without the consent of the Sellers' Representative, which consent may not be unreasonably delayed or denied.

(i)    As used herein:

(i)    "Taxing Authority" means any Governmental Entity charged with the administration, prosecution, or collection of any Tax.

(ii)    "Tax Contest" means any audit, litigation or other administrative or judicial proceedings involving Taxes.

Section 7.13  **Employee Matters**.

(a)    Sellers agree, subject to any contractual limitations to which they are bound, to use their good faith best efforts to cooperate with Purchasers and assist Purchasers in identifying those Persons that are exclusively involved in the Business (the "Employees") and extending offers of employment thereto. Any Employee who accepts such offer of employment shall become an employee of the Partnership after the Closing Date (such Employees referred to herein as the "Transferred Employees"). Sellers agree to provide Purchasers with such employee census and other information in Sellers' possession or control as Purchasers may reasonably request to facilitate the establishment of Benefit Plans for the Transferred Employees.

(b)    Nothing herein shall operate or be construed (i) as requiring the Purchasers or the Partnership to continue the employment of any specific person or restrict or limit in any way the Purchasers or the Partnership from terminating the employment of any employee of the Partnership following Closing; (ii) to prevent the Purchasers or the Partnership from amending or terminating any Benefit Plan or other employee benefit or compensation plan at any time, in its sole discretion; or (iii) to be an amendment to any Benefit Plan or other employee benefit or compensation plan or prevent the Purchasers or the Partnership from amending or terminating any employee benefit plan at any time, in its sole discretion.

(c)    The covenants contained in this Section 7.13 are only for the benefit of the parties hereto and nothing set forth or referred to in this Section 7.13 shall be deemed to grant any rights or remedies upon any employee of the Partnership or any other Person or make any such employee or any other Person a third party beneficiary hereof.

Section 7.14  **Sellers' Representative**.  Without any further act of any of the Sellers, each of the Sellers hereby appoints LBHI as representative of each Seller (the "Sellers' Representative") and the Sellers' Representative hereby accepts its appointment and agrees to act as the representatives for the Sellers solely for purposes of all matters to which the Sellers' Representative is referred in this Agreement.  Each Seller understands, acknowledges and agrees that it shall be bound by all actions taken by the Sellers' Representative on such matters, and the Purchasers shall be entitled to deal exclusively with the Sellers' Representative on all such matters and shall be entitled to rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Seller by the Sellers' Representative with respect thereto, and on any other action taken or purported to be taken on behalf of any Seller by the Sellers' Representative with respect thereto, as fully binding upon such Seller.  Each Seller agrees to reimburse the Sellers' Representative for any expenses paid by the Sellers' Representative on behalf of the Sellers in respect of any expenses due and payable by the Sellers hereunder; *provided, however*, that a Seller's maximum liability for any such reimbursement amounts shall be equal to the product of such reimbursement amounts multiplied by a fraction, the numerator of which is the aggregate amount of the Purchase Price allocated to such Seller as set forth on the Exhibits to this Agreement and the denominator of which is the sum of all amounts of the Purchase Price allocated to the Sellers as set forth on such Exhibits.  The Sellers' Representative shall at all times act in its capacity as the Sellers' Representative in a manner that the Sellers' Representative believes to be in the best interest of the Sellers.  The Sellers' Representative shall not be liable for any act done or omitted hereunder as the Sellers' Representative except for gross negligence, bad faith or willful misconduct on the part of the Sellers' Representative.  This Section 7.14 shall survive the termination of this Agreement.

Section 7.15  **Purchasers' Representative**.  Without any further act of any of the Purchasers, each of the Purchasers hereby appoints the Purchasers' Representative as representative of each Purchaser and the Purchasers' Representative hereby accepts its appointment and agrees to act as the representatives for the Purchasers solely for purposes of all matters to which the Purchasers' Representative is referred in this Agreement.  Each Purchaser understands, acknowledges and agrees that it shall be bound by all actions taken by the Purchasers' Representative on such matters, and the Purchasers shall be entitled to deal exclusively with the Purchasers' Representative on all such matters and shall be entitled to rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Purchaser by the Purchasers' Representative with respect thereto, and on any other action taken or purported to be taken on behalf of any Purchaser by the Purchasers' Representative with respect thereto, as fully binding upon such Purchaser.  The Purchasers' Representative shall at all times act in its capacity as the Purchasers' Representative in a manner that the Purchasers' Representative believes to be in the best interest of the Purchasers.  The Purchasers' Representative shall not be liable for any act done or omitted hereunder as the Purchasers' Representative except for gross negligence, bad faith or willful misconduct on the part of the Purchasers' Representative.  This Section 7.15 shall survive the termination of this Agreement.

Section 7.16  **Transition Services Agreement.**  From the Closing Date to and including ninety (90) days following the Closing Date, Sellers or Sellers' Affiliates will provide, or cause to be provided, to the Partnership the services necessary to operate the Business in a manner

substantially similar to the services such Sellers or Sellers' Affiliates currently provide, and have consistently provided for the ninety (90) day period prior to the Closing Date, to the Partnership, including, without limitation, the following services: (a) payroll, administrative, human resources and information technology services; (b) access to the computer network server and email systems; (c) internet, phone line, cable, utility and other related services; and (d) employees and service providers in a quantity and quality substantially similar to those employed or contracted by Sellers' Affiliates prior to the date hereof, all as further described in the Transition Services Agreement. The services described in the Transition Services Agreement shall be provided to the Partnership at the reasonable direct cost thereof to the Sellers and Sellers' Affiliates, which cost shall be reimbursed to the Sellers in arrears on a monthly basis for services performed. Sellers and Sellers' Affiliates may outsource any of the services to be provided by any of them pursuant to the Transition Services Agreement.

Section 7.17 **Office Lease.** Prior to the Closing, LBHI shall cause the office lease for the Partnership' office located at 4700 W. Sam Houston Parkway, Houston, Texas in effect on the date hereof to be either (i) assigned to the Partnership, or (ii) sublet to the Partnership on a back-to back basis.

Section 7.18 **Personal Property.** Prior to the Closing, LBHI shall, and shall cause the Sellers, to transfer to the Partnership all right, title, and interest thereof in and to, and applicable leasehold interests in, any tangible personal property (a) used in the Business and located at the Partnership's offices in Houston, Texas, Chicago, Illinois, Atlanta, Georgia and Pittsburgh, Pennsylvania or (b) not located at such offices but otherwise exclusively used or held for use in the conduct of the Business.

Section 7.19 **Partnership Interests.** At the Closing, LBHI shall, and shall cause its subsidiaries to, transfer to the Purchasers all outstanding partnership interests in the Partnership in exchange for aggregate consideration equal to the Equity Payment which shall be payable pursuant to Section 1.5.

## ARTICLE VIII

## SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

Section 8.1 **Survival**. The representations and warranties made by the Sellers in this Agreement shall not survive the Closing, except that the representations and warranties made by the Sellers in Section 4.2 (Ownership), Section 4.3 (Authorization), and Section 4.4 (Valid Transfer) shall survive the Closing. The covenants and agreements made by the parties hereto in the last sentence of Section 7.3 (Further Assurances) shall survive the Closing until performed in accordance with their terms.

Section 8.2 **Agreement to Indemnify.** Subject to the terms and conditions of this Article VIII, the Sellers jointly and severally hereby agree to indemnify, defend and hold harmless the Purchasers and their successors and assigns, representatives and affiliates, and each of their respective directors, officers, partners, members, stockholders, managers, employees and agents (collectively, the "Purchaser Indemnitees") from and against all claims, actions or causes of action, assessments, demands, losses, damages, judgments, settlements, liabilities, costs and

expenses, including interest, penalties and reasonable attorneys' and accounting fees and
expenses of any nature whatsoever (collectively, "<u>Damages</u>") asserted against, imposed upon or
incurred directly by any Purchaser Indemnitees to the extent resulting from a breach by any
Seller of any representation or warranty of any Seller contained in Section 4.2 (Ownership),
Section 4.3 (Authorization), and Section 4.4 (Valid Transfer) or any Seller's failure to perform
its covenant in the last sentence of Section 7.3.

(a)     Subject to the terms and conditions of this Article VIII, the Purchasers hereby
agree to indemnify, defend and hold harmless each Seller, and its successors and assigns,
representatives and affiliates, and each of their directors, officers, partners, members,
stockholders, managers, employees and agents (collectively, the "<u>Seller Indemnitees</u>"), from and
against all Damages asserted against, imposed upon or incurred directly by any Seller
Indemnitees to the extent resulting from:

(i)     a breach by any Purchaser of any covenant or agreement of any Purchaser
contained in this Agreement; and

(ii)     a breach by any Purchaser of any representation or warranty of any
Purchaser contained in Article VI.

Section 8.3     **Limitation of Liability.**  The obligations and liabilities of the Sellers with
respect to claims under Section 8.2 hereof made by the Purchasers ("<u>Purchaser Claims</u>") shall
not exceed, in the aggregate, the Purchase Price.

Section 8.4     **Conditions of Indemnification**.  The obligations and liabilities of the
Sellers to indemnify the Purchaser Indemnitees with respect to Purchasers' Claims under Section
8.2 and of the Purchasers to indemnify the Seller Indemnitees under Section 8.2 hereof with
respect to claims by the Sellers ("<u>Sellers Claims</u>"), respectively, resulting from the assertion of
liability by third parties shall be subject to the following terms and conditions:

(a)     The indemnified party will give the indemnifying party prompt notice of any such
claim, and the indemnifying party may undertake the defense thereof by representatives of its
own choosing reasonably satisfactory to the indemnified party; *provided* that failure to provide
such notice will not relieve the indemnifying party of its obligations hereunder unless and to the
extent it is actually prejudiced by such failure to receive such notice.  If the indemnifying party,
within ten (10) days after notice of any such claim, does not elect to defend such claim, the
indemnified party will undertake the defense, compromise or settlement of such claim on behalf
of and for the account and risk of indemnifying party.

(b)     Anything in this Section 8.4 to the contrary notwithstanding, (i) an indemnified
party shall have the right, at its own cost and expense, to participate in the defense, compromise
or settlement of such claim (except if there exists an actual or potential conflict of interest
between the indemnified party and the indemnifying party (other than the rights to
indemnification hereunder)), (ii) the indemnifying party shall not, without the written consent of
the indemnified party, settle or compromise any claim or consent to the entry of any judgment
(A) which does not include as an unconditional term thereof the giving by the claimant or the
plaintiff to the indemnified party of a release from all liability in respect of such claim or (B) as a

result of which injunctive or other equitable relief would be imposed against the indemnified party, and (iii) the indemnified party shall have the right to control the defense or settlement of that portion of any claim which seeks an order, injunction or other equitable relief against the indemnified party which, if successful, could materially interfere with the business, operations, assets, financial condition or prospects of the indemnified party; *provided, however*, that in connection with the defense or settlement of the portion of such claim which seeks equitable relief, the indemnified party shall cooperate with the indemnifying party and use its commercially reasonable efforts to limit the liability of the indemnifying party for the damages portion of such claim.

Section 8.5    [Reserved]

Section 8.6    **Additional Limitations**.   The rights of the Seller Indemnitees and Purchaser Indemnitees to be indemnified under this Article VIII shall be subject to the following limitations:

(a)    No party hereunder shall be entitled to recover Damages under this Article VIII arising out of any breach of a representation or warranty contained in this Agreement to the extent that the purported indemnified party had "knowledge" (as defined in Section 10.6 with respect to such party) that the relevant representation or warranty was materially inaccurate when made.

(b)    No party shall be entitled to recover Damages (i) for punitive, exemplary or special damages of any nature, (ii) for indirect or consequential damages, including damages for lost profit, lost business opportunity or damage to business reputation, or (iii) relating to or arising out of any act or omission of the indemnified party after the date of Closing.

(c)    No party shall be entitled to recover Damages under this Article VIII to the extent such Damages arise out of any changes, after the Closing Date, in applicable Law, or the interpretations thereof.

(d)    [Reserved]

(e)    No indemnified party shall be entitled to recover Damages under this Article VIII to the extent such indemnified party has already recovered, or has the absolute right to recover, Damages from a third party, including pursuant to indemnification under any contract or any rights under any insurance policies held by or for the benefit of such indemnified party (including, for these purposes, any rights of the Partnership under any contract or insurance policy to which it is a party or by which it receives benefits).   The amount of Damages required to be paid to indemnify the Purchaser Indemnitees or Seller Indemnitees, as the case may be, pursuant to Section 8.2 shall be reduced to the extent of any amounts actually recovered by the party seeking indemnification after the Closing pursuant to the terms of insurance policies (if any) covering such claim or under any contract with a third party.   Without in any way limiting the generality of the foregoing, following the Closing the Purchasers shall cause the Partnership to use their commercially reasonable efforts to collect or recover any amounts available under such insurance coverage or from such other party.   In the event there is a subsequent contractual claim or insurance recovery by an indemnified party in respect of an indemnified matter after an

indemnifying party has made payment of any kind on such matter, such indemnified party shall promptly pay over the amount of such contract damages or insurance recovery.

(f)     [Reserved]

(g)     In addition to, and not in limitation of any other provision herein, each indemnified party will use its commercially reasonable efforts to mitigate any Damages with respect to which it may be entitled to seek indemnification pursuant to this Agreement, and no indemnified party shall be entitled to indemnification for Damages to the extent it can be demonstrated that such Damages would not have occurred but for the failure of the indemnified party to mitigate as herein provided.

(h)     If any indemnified party is indemnified for any Damages pursuant to this Agreement with respect to any claim by a third party, then the indemnifying party will be subrogated to all rights and remedies of such indemnified party against such third party and any other party (including, without limitation, any insurance policies maintained by the Partnership before or after the Closing), and the indemnified party will cooperate with and assist the indemnifying party in asserting all such rights and remedies against such parties (with the benefits of any recovery to be distributed to the indemnifying party).

(i)     In no event shall the Sellers be liable to the Purchasers under this Article VIII for indemnification that in any way relates to any past, present or future breach of contract between the Purchasers or any of their Affiliates, on the one hand, and the Partnership (other than this Agreement and the agreements contemplated hereby), on the other hand (it being understood that the parties thereto will only have such contractual rights as provided under the relevant contracts).

Section 8.7     **Exclusive Remedy**.  The remedies set forth in this Article VIII shall be the exclusive remedies of the parties for any breach of a representation, warranty or covenant (other than in the case and to the extent equitable relief is sought) contained in this Agreement or in any closing document executed and delivered pursuant to the provisions hereof.

Section 8.8     **Characterization of Payments**.  Any payment made to the Sellers and the Purchasers pursuant to this Article VIII shall be treated as an adjustment of the Purchase Price for all purposes, including Tax purposes, to the maximum extent permitted by law.

## ARTICLE IX

## TERMINATION

Section 9.1     **Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written consent of (i) the Sellers' Representative and (ii) the Purchasers' Representative;

(b)     by the Sellers' Representative, or the Purchasers' Representative if:  (i) any federal or state court of competent jurisdiction shall have issued an order, judgment or decree

permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby, and such order, judgment or decree shall have become final and nonappealable, (ii) any statute, rule, order or regulation shall have been enacted or issued by any Governmental Entity which, directly or indirectly, prohibits the consummation of the transactions contemplated hereby; (iii) the Closing contemplated hereby shall have not occurred on or before December 31, 2008 or such later date as the parties mutually agree upon (the "Termination Date"); *provided, however*, that the right to terminate this Agreement under clause (iii) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date, or (iv) the Approval Order shall not be obtained prior to November 30, 2008, provided that the right to terminate under this clause (iv) will not be available to the extent the matters set forth in clause (d) or (e) of Section 7.5 hereof are not part of the Approval Order; *provided, further*, that the Termination Date in clause (iii) shall automatically be extended for thirty (30) days or to such later date as the parties mutually agree if (A) the sole reason that the Closing contemplated hereby shall not have occurred is that either (1) the FERC Order shall not have been obtained, or (2) the waiting period refer to in the HSR Act applicable to the transactions contemplated hereby has not expired or is not terminated and (B) the parties determine that the FERC Order is reasonably likely to be obtained or the HSR waiting period is reasonably likely to expire or be terminated in such thirty (30) day period or any longer period mutually agreed by the parties;

(c)     by the Purchasers' Representative if there has been a violation or breach by any Seller of any covenant, representation or warranty contained in this Agreement that would cause any of the conditions set forth in Section 3.2 not to be satisfied, and such condition is either incapable of being satisfied prior to the Termination Date or such violation or breach is not cured within twenty (20) days after receipt by such Seller of written notice specifying particularly such violation or breach, and such violation or breach has not been waived by the Purchaser;

(d)     by the Sellers' Representative if there has been a violation or breach by the Purchasers of any covenant, representation or warranty contained in this Agreement which would cause any of the conditions set forth in Section 3.3 not to be satisfied, and such condition is either incapable of being satisfied prior to the Termination Date or such violation or breach is not cured within twenty (20) days after receipt by the Purchasers of written notice specifying particularly such violation or breach, and such violation or breach has not been waived by such Sellers; and

(e)     by the Purchaser's Representative pursuant to Section 3.2(e).

Section 9.2     **Procedure and Effect of Termination**.   In the event of termination of this Agreement by any or all of the parties pursuant to this Article IX, written notice thereof shall forthwith be given by the terminating party to the other parties, whereupon this Agreement shall forthwith become void and there shall be no liability or obligation on the part of any Seller or any Purchaser or their respective officers, directors, members or partners; *provided, however*, that such termination shall not relieve any party hereto of liability to the other parties hereto for a willful breach of this Agreement by such party prior to such termination and provided further, that the failure to obtain the Approval Order, after compliance with Section 7.5, shall not be deemed a breach of this Agreement.

# ARTICLE X

## MISCELLANEOUS

Section 10.1   **Notices.**  All notices required to be given hereunder shall be in writing and shall be deemed to be duly given if personally delivered, telecopied and confirmed, or mailed by certified mail, return receipt requested, or nationally recognized overnight delivery service with proof of receipt maintained, at the following address (or any other address that any such party may designate by written notice to the other parties):

If to the Sellers, the Sellers' Representative on behalf of the Sellers:

> Lehman Brothers Holdings  Inc.
> c/o Alvarez & Marsal North America, LLC
> 600 Lexington Avenue
> Attention:  Daniel J. Ehrmann, Managing Director
> Fax: 212-759-5532

With a copies to:

> Michael A. Saslaw
> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, Texas  75201
> 214-746-7777

> and

> John Allender
> Fulbright & Jaworski L.L.P.
> Fulbright Tower
> 1301 McKinney, Suite 5100
> Houston, Texas 77010
> Fax: 713-651-5246

If to the Purchasers:

> EDF Trading Limited
> Attn: Robert W. Quick, General Counsel
> 80 Victoria Street, Cardinal Place
> London SW 1E 5JL

With a copy to:

> Jeff Schlegel
> Jones Day
> 717 Texas, Suite 3300
> Houston, Texas 77002
> Fax: (832) 239-3600

Any such notice shall, if delivered personally, be deemed received upon delivery; shall, if delivered by telecopy (receipt confirmed), be deemed received on the first Business Day following confirmation; shall, if delivered by overnight delivery service, be deemed received the first Business Day after being sent; and shall, if delivered by mail, be deemed received upon the earlier of actual receipt thereof or five (5) Business Days after the date of deposit in the United States mail.

Section 10.2 **Entire Agreement**. This Agreement, together with any other writings referred to herein or delivered pursuant hereto, constitutes the entire agreement among the parties hereto and their respective affiliates with respect to the subject matter hereof and supersedes all prior contracts, agreements and understandings, whether written or oral, among the parties hereto and their respective affiliates with respect to the subject matter hereof.

Section 10.3 **Binding Effect; Assignment; No Third Party Benefit**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors, permitted assigns and legal representatives; and by their signatures hereto, each Seller and each Purchaser intends to and do hereby become bound. Except as provided in Section 8.2, nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person other than the parties hereto and their respective permitted successors, permitted assigns or legal representatives any legal or equitable right, remedy or claim under, in or in respect of this Agreement or any provision herein contained, except to the extent expressly provided in this Agreement.

Except as otherwise expressly provided in this Agreement, neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by (a) any Seller to any person without the prior written consent of the Purchasers, and (b) any Purchaser to any person, without the prior written consent of the Sellers owning at least ninety percent (90%) of the outstanding Purchased LP Units, which consent shall not be unreasonably withheld or delayed; *provided, however*, that any Purchaser may assign this Agreement without any Seller's consent to an affiliated company or wholly owned subsidiary.

Section 10.4 **Severability**. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement; *provided* that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the

maximum extent permitted by applicable law.  Furthermore, in lieu of (and to the extent of) each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

Section 10.5  **Governing Law**.    THIS  AGREEMENT  AND  THE  LEGAL RELATIONS  OF  THE  PARTIES  HERETO  WITH  RESPECT  TO  THIS  AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO RULES CONCERNING CONFLICTS OF LAWS.

Section 10.6  **Construction**.  Unless the context requires otherwise:  (a) pronouns in the masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, (b) the term "including" shall be construed to be expansive rather than limiting in nature and to mean "including, without limitation," (c) references to Articles and Sections refer to Articles and Sections of this Agreement; (d) the words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules attached hereto, and not to any particular subdivision unless expressly so limited, (e) references to Exhibits and Schedules are to the items identified separately in writing by the parties hereto as the described Exhibits and Schedules attached to this Agreement, each of which is hereby incorporated herein and made a part hereof for all purposes as if set forth in full herein, (f) the term "Seller's knowledge," "to Seller's knowledge" and variations thereof shall, except as used in Article IV, mean the knowledge, after due inquiry, of the persons set forth on Schedule 10.6(f), (g) the term "Purchaser's knowledge," "to Purchaser's knowledge" and variations thereof shall mean the actual (and not constructive) knowledge of persons set forth on Schedule 10.6(g) and (h) the phrase "the General Partner shall cause the Partnership" and variations thereof shall be interpreted to mean "the GP Sellers shall cause the General Partner to cause the Partnership." The descriptive headings used herein are inserted for convenience of reference only, do not constitute a part of this Agreement, and shall not affect in any manner the meaning or interpretation of this Agreement.

Section 10.7  **Injunctive Relief**.    The parties hereto acknowledge and agree that irreparable damage could occur in the event any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement, and shall be entitled to seek to enforce specifically the provisions of this Agreement, in any court of the United States or any state thereof having jurisdiction, in addition to any other remedy to which the parties may be entitled under this Agreement.

Section 10.8  **Consent to Jurisdiction**.

(a)    The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court, and appropriate appellate courts therefrom, over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby, and each party hereby irrevocably agrees that all claims in respect of such dispute or proceeding may be heard and

determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. This consent to jurisdiction is being given solely for purposes of this Agreement and is not intended to, and shall not confer consent to jurisdiction with respect to any other dispute in which a party to this Agreement may become involved.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action, or proceeding of the nature specified in subsection (a) above by the mailing of a copy thereof in the manner specified by the provisions of Section 10.1.

(c)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 10.9   **Amendment**.   This Agreement may be amended at any time, <u>provided</u> that any such amendment is in writing and, if entered into prior to the Closing, is approved by the Purchasers and the Sellers owning at least ninety percent (90%) of the outstanding Purchased LP Units, and, if entered into after the Closing, is approved by the Purchasers and Sellers who, immediately prior to the Closing, owned at least ninety percent (90%) of the outstanding Purchased LP Units.

Section 10.10   **Waiver**.   Any term or condition of this Agreement may be waived at any time by the Purchasers' Representative or the Sellers' Representative, as applicable; *provided* that any such waiver is in writing. A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to this Agreement is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to this Agreement.

Section 10.11   **Counterparts**.   This Agreement may be executed in any number of counterparts (including facsimile counterparts), all of which together shall constitute a single instrument. It shall not be necessary that any counterpart be signed by each of the parties hereto so long as each counterpart shall be signed and delivered by one or more of the of the parties hereto and so long as the other parties hereto shall sign and deliver at least one counterpart.

*[Rest of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLERS:**

EAGLE ENERGY MANAGEMENT, LLC

By: _____

   Daniel J. Ehrmann, Authorized Signatory

LEHMAN BROTHERS COMMODITY
SERVICES INC.

By: _____

   Daniel J. Ehrmann, Authorized Signatory

LBMB FUND EAGLE ENERGY
HOLDINGS LLC

By: _____

   Daniel J. Ehrmann, Authorized Signatory

LBMB PARTNERS EAGLE ENERGY
HOLDINGS LLC

By: _____

   Daniel J. Ehrmann, Authorized Signatory

LBMB FUND (B) EAGLE ENERGY
HOLDINGS LLC

By: _____

   Daniel J. Ehrmann, Authorized Signatory

LBMB CAPITAL PARTNERS V EAGLE
ENERGY HOLDINGS LLC

By: _____
    Daniel J. Ehrmann, Authorized Signatory


LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Daniel J. Ehrmann, Authorized Signatory


*Signature Page to Purchase Agreement*

0.

**PURCHASERS:**

EDF TRADING NORTH AMERICA
MANAGEMENT LLC

By: _John H. Rittenhouse_
Name: _John H. Rittenhouse_
Title: _President_

EDF TRADING NORTH AMERICA INC.

By: _____
Name: _____
Title: _____

*Signature Page to Purchase Agreement*

**PURCHASERS:**

EDF TRADING NORTH AMERICA
MANAGEMENT LLC

By: _____

Name: _____

Title: _____

EDF TRADING NORTH AMERICA INC.

By: _____

Name: Robert Quick

Title: President

*Signature Page to Purchase Agreement*

# **EXHIBIT E**



4700 W. Sam Houston Parkway N., Suite 250, Houston, TX 77041

**Personal and Confidential**

October 9, 2008

Jeremy Davis
1207 Chelshurst Way
Spring, TX 77379

Dear Jeremy,

      EDF Trading ("EDFT") has contracted to acquire all of the ownership interests in Eagle Energy Partners I, L.P. (the "Company"). In anticipation of that purchase, and with the expectation that the Company will be EDFT's primary platform for the North American physical and financial commodities business, the Company hereby makes you an offer of employment on the following terms and conditions (the "Agreement").

    1.    Titles, Duties and Location

      Your title will be Sr. VP Gas Marketing of the Company. You shall devote your full time, energy and skill to the performance of your duties, which will include duties customarily fitting within your job description. You agree to at all times act in the Company's best interests and exercise due diligence and reasonable care in the performance of your duties. Your principal place of employment at this time shall be in Houston, Texas.

    2.    Term

      (a)    Unless earlier terminated as provided for herein, the minimum duration of your employment will be from the period beginning on the closing date of the purchase by EDFT of the Company, until 28th February, 2010 (the "Primary Term"). Either party may terminate your employment by giving notice to the other party, in accordance with the conditions specified herein. Your employment with the Company will continue on an "at will" basis after the Primary Term.

      (b)    If your employment with the Company is terminated by you due to your voluntary resignation or by the Company for Cause (as defined herein), this Agreement shall terminate immediately (except for the provisions of Paragraph 4), and the Company shall have no further obligation to you except for the payment of amounts due before the date of such termination. For purposes of this Agreement, "Cause" is defined as (1) the occurrence of one of the following: (i) serious misconduct, dishonesty or disloyalty, directly related to the performance of duties for the Company, which results from a willful act or omission or from gross negligence, and which is materially or potentially materially injurious to the operations, financial condition or business reputation of the Company; (ii) your being convicted (or pleading

no contest) in any criminal proceeding that may have an adverse impact on the Company's
reputation and standing in the community; (iii) willful and continued failure to perform your
duties under this Agreement; or (iv) any other material breach of this Agreement by you, and
(2) such event, conduct or condition is not cured within thirty days after written notice is
delivered to you from the Company. For these purposes, no act or failure to act shall be
considered "willful" unless it is done, or omitted to be done, in bad faith without reasonable
belief that the action or omission was in the best interest of the Company. In the event corrective
action is not satisfactorily taken by you as described above, a final written notice of termination
shall be provided to you by the Company.

(c)    If your employment is terminated during the Primary Term of this
Agreement due to resignation following Constructive Termination (as defined herein) or for any
reason other than your voluntary resignation, death, disability, or discharge for Cause, this
Agreement shall terminate immediately (except for the provisions of Paragraph 4) and you shall
receive:

(i)    your Base Salary as described in Paragraph 3(a) for the remaining
Primary Term of this Agreement commencing on the date of your separation from service
as defined in Section 409A of the Internal Revenue Code of 1986, as amended (the
"Code"); and

(ii)    in lieu of further payments to you pursuant to Paragraph 3, the
Company shall pay you any unpaid Performance Bonus within 30 days of the date of
your termination, and any Retention Payments as scheduled and as described in
Paragraph 3(d).

(d)    For purposes of this Agreement, Constructive Termination shall be defined
as: (i) a material reduction in your Base Salary (as defined in Paragraph 3(a)) that is not made for
others at your same or similar level; (ii) a significant diminution in your responsibilities,
authority or scope of duties is effected and such diminution is made without your written consent
(without regard to whether or not any change is made to your title); (iii) if your principal place of
employment is moved further than 50 miles from 4700 W. Sam Houston Parkway North,
Houston, Texas; (iv) the Company materially breaches this Agreement; or (v) a Change in
Control of the Company (as defined herein) occurs. For purposes of this Agreement, a Change
in Control of the Company occurs only if neither Électricité de France SA, nor any affiliate
thereof, has voting control or the ability to direct management of the Company. Any resignation
by you as a result of assertion of a Constructive Termination shall be communicated by delivery
to the Company of thirty days' advance written notice of such Constructive Termination and the
grounds therefore, during which period the Company shall be entitled to cure or remedy the
matters set forth in such notice to your reasonable satisfaction, in which event a Constructive
Termination shall be deemed not to have occurred. Unless you withdraw such notice prior to the
expiration of such thirty day period, such resignation shall take effect upon the expiration of the
thirty days from the date of the delivery of such notice. Any other resignation by you shall be
communicated by thirty days' advance written notice.

(e)    If you die, or become disabled and cannot perform any of your duties and, as a result, you incur a separation from service, this Agreement shall terminate immediately (except for the provisions of Paragraph 4 in the event of disability), and you (or your estate) shall be entitled to the Base Salary (as defined in Paragraph 3(a)) payable to you hereunder for the lesser of the unexpired Term of this Agreement or for twelve months following the month in which you die or incur a separation from service due to disability, plus the sum of the amounts of any unpaid Performance Bonus as described in Paragraph 3(b) and Retention Payment as described in Paragraph 3(d).

(f)    If your employment is terminated after the Primary Term of this Agreement due to Constructive Termination, or for any reason other than your voluntary resignation, death, disability, or discharge for Cause, you shall be entitled to your Base Salary through the date of termination plus a pro-rata portion of the Retention Payment described in Paragraph 3(d) which is next due after the date of such termination, plus any amounts that may be due under any applicable severance plan of the Company.

3.    Compensation

(a)    You will be paid an annualized base salary of $200,000 ("Base Salary"), less applicable withholdings, payable in accordance with the Company's payroll guidelines. Increases may be made to your Base Salary at the discretion of the Company, based upon your individual performance.

(b)    You shall receive a performance bonus of $1,500,000, less applicable withholdings for the calendar year 2008, payable in February 2009 subject to still being employed by the Company and not under notice of resignation at the date of payment ("Performance Bonus").

(c)    For the bonus applicable to the calendar year 2009 and for future years, subject to you being in continued employment with the Company, you will be eligible to receive a discretionary bonus. Any bonus payment will be subject to the rules of the EDF Trading Eagle Bonus Plan ("Discretionary Bonus") as approved by the Company's Remuneration Committee from time to time.

(d)    Subject to still being in continued active employment & not under notice of resignation (except as described in Paragraphs 2(c)(ii), 2(e) and 2(f)) at the scheduled dates of payment for retention payments, you will be eligible to receive payments in August 2009 of $375,000, in August 2010 of $375,000, and in August 2011 of $500,000, less applicable withholdings.

(e)    You shall be entitled to participate in such other employee benefit plans as are generally available to employees of the Company at your level and receive such other perquisites as the Company in its sole discretion determines.

4.    Confidentiality, Non-Competition and Non-Solicitation

(a)    The Company agrees to provide you with Confidential Information (as defined below), which constitutes valuable and unique property of the Company.  In exchange

for the Company's promise to provide you with Confidential Information and the Company's actually providing you with such information, you agree that you will not, during the Non-Solicitation Period (as defined below), disclose to others, use, copy or permit to be copied, except pursuant to your duties on behalf of the Company or its successors, assigns or nominees, any Confidential Information (whether or not developed by you). As used in this Agreement, the term "Confidential Information" includes, without limitation, the Company's trade secrets, plans, strategies, potential acquisitions, costs, prices, systems for buying, selling and/or trading energy commodities, natural gas, natural gas liquids, crude oil, coal, and electricity, client lists, pricing policies, financial information, the names of and pertinent information regarding suppliers, computer programs, policy or procedure manuals, training and recruiting procedures, accounting procedures, the status and content of the Company's contracts with its suppliers or clients, or servicing methods and techniques at any time used, developed, or investigated by the Company, before or during your tenure of employment to the extent any of the foregoing (i) are not generally available to the public; and (ii) provide the Company with economic benefit or advantage. Notwithstanding the foregoing, you agree to maintain in confidence any of the Company's trade secrets, as long as such information retains trade secret status.

(b)    Upon termination of your employment, for whatever reason, you will deliver to the Company all of the Company's property and Confidential Information then in your possession, custody, or control; and any correspondence, memoranda, notes, records, client lists, computer systems, programs, or other documents and all copies that relate in any manner to the past, present, or anticipated business of the Company and are then in your possession, custody, or control.

(c)    To protect and safeguard the Company's trade secrets and Confidential Information and also the Company's goodwill with its suppliers and clients, during your employment and for a period of three months following the termination of your employment with the Company (during which three month period you will receive your Base Salary), and until 28th February, 2010 ("Non-Compete Period"), you will not directly or indirectly, (i) perform services for or be interested in (as owner, partner, shareholder, employee, director, agent, consultant or otherwise), any competitor of the Company; (ii) directly or indirectly solicit, call upon, canvass, or attempt to persuade, influence or induce, or assist any other person or entity in so persuading, influencing, or inducing any current or former customer of the Company, to cease doing business with the Company or to reduce the amount of business it does with the Company; (iii) directly or indirectly, provide the same or similar services to a competitor of the Company that you provided to the Company, in the geographic area in which you provided such services for the Company; or (iv) on behalf a competitor of the Company and in competition with the Company, directly or indirectly solicit, attempt to solicit, persuade, or attempt to persuade any customer of the Company for whom you performed services while employed with the Company or obtained Confidential Information about, to do business with such competitor. "Competitor of the Company" specifically includes you in your individual capacity. You agree that providing services to any competitor of the Company during the Non-Compete Period that are the same or similar to the services you provided to the Company will inevitably result in the unauthorized disclosure or use of Confidential Information. The parties agree that the restrictions contained in this Paragraph 4(c) shall not apply if your employment is terminated due to a Constructive Termination or for any other reason other than your voluntary resignation, death, disability or discharge for Cause.

(d)   To further protect and safeguard the Company's trade secrets and Confidential Information and also the Company's goodwill with its suppliers and clients, during your employment and for a period of twelve months following the termination of your employment with the Company ("Non-Solicitation Period"), you shall not induce or otherwise entice any employee or consultant of the Company to sever their employment with or relationship to the Company, nor shall you attempt to hire any of the Company's employees or consultants.

(e)   Any breach of the provisions of this Paragraph 4 by you shall be considered a material breach of this Agreement.

5.   Other Provisions

(a)   This Agreement will be governed by, construed and enforced in accordance with the laws of the State of Texas, excluding any conflicts of law, rule or principle that might otherwise refer to the substantive law of another jurisdiction.

(b)   Except as otherwise provided herein, the provisions of Paragraph 4 of this Agreement shall survive the termination of this Agreement.

(c)   Any notice or other communication required or permitted pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States mail, first class, postage prepaid and registered with return receipt requested, addressed to the intended recipient at his or its address set forth below and, in the case of a notice or other communication to the Company, direct to the attention of the Chief Executive Officer of the Company with a copy to the Director of Human Resources, or to such other address as the intended recipient may have theretofore furnished to the sender in writing in accordance herewith, except that until any notice of change of address is received, notices shall be sent to the following addresses:

|  |  |
|---|---|
| If to you: | If to the Company: |
| Jeremy Davis | Eagle Energy Partners I, L.P. |
| 1207 Chelshurst Way | 4700 W. Sam Houston Parkway North |
| Spring, TX 77379 | Suite 250 |
|  | Houston, Texas  77041 |
|  | Attention:  Chief Executive Officer |

(d)   If any one or more of the provisions or parts of a provision contained in this Agreement that shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision or part of a provision of this Agreement, but this Agreement shall be reformed and construed as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provisions or part thereof shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted by law.

If the foregoing reflects your full understanding of the agreement of the parties with respect to the subject matter thereto, please sign below.

EAGLE ENERGY PARTNERS I, L.P.

By: _____

Name:  Griff Jones, CEO

AGREED AND ACCEPTED this
__10__ day of __October__, 2008
and effective as of _____, 2008

Jeremy Davis