Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-jmp

4   Case No. 08-01420-jmp

5   - - - - - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7   LEHMAN BROTHERS HOLDINGS INC., ET AL,.

8           Debtors.

9   - - - - - - - - - - - - - - - - - - - - - - - - - -x

10  In the Matter of:

11  LEHMAN BROTHERS INC.

12              Debtor.

13  - - - - - - - - - - - - - - - - - - - - - - - - - -x

14  LBHI,

15              Plaintiff,

16          v.

17  JPMORGAN CHASE BANK, N.A.,

18              Defendant.

19  - - - - - - - - - - - - - - - - - - - - - - - - - -x

20

21              U.S. Bankruptcy Court

22              One Bowling Green

23              New York, New York

24

25

Page 2

1                     February 13, 2013

2                      10:04 AM

3

4    B E F O R E :

5    HON JAMES M. PECK

6    U.S. BANKRUPTCY JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    Hearing re:  LBHI's Objection to Proofs of Claim Number

2    14824 and 14826 [ECF No. 30055]

3

4    Hearing re:  Debtors' Sixty-Seventh Omnibus Objection to

5    Claims (Value Derivative Claims) [ECF No. 12533]

6

7    Hearing re:  Debtors' Eighty-Fourth Omnibus Objection to

8    Claims (Value Derivative Claims) [ECF No. 13955]

9

10   Hearing re:  Two Hundred Eighty-Second Omnibus Objection to

11   Claims (Late Filed Claims) [ECF No. 27374]

12

13   Hearing re:  Joint Motion of Lehman Brothers Holdings Inc.

14   and Litigation Subcommittee of Creditors' Committee to

15   Extent Stay to Avoidance Actions and Grant Certain Related

16   Relief [ECF No. 33322]

17

18   Hearing re:  One Hundred Eighty-Third Omnibus Objection to

19   Claims (No Liability CMBS Claims) [ECF No. 19407]

20

21   Hearing re:  One Hundred Forty-Third Omnibus Objection to

22   Claims (Late-Filed Claims) [ECF No. 16856]

23

24   Hearing re:  Three Hundred Twenty-Eighth Omnibus Objection

25   to Claims (No Liability claims) [ECF No. 29323]

Page 4

1    Hearing re:  LBHI v. JPMorgan Chase Bank, N.A. [Adversary

2    Proceeding No. 10-03266]

3

4    Hearing re:  Motion of Fidelity National Title Insurance

5    Company to Compel Compliance with Requirements of Title

6    Insurance Policies [ECF No. 11513]

7

8    Hearing re:  Motion of Traxis Fund LP and Traxis Emerging

9    Market Opportunities Fund LP to Compel Debtors to Reissue

10   Distribution Checks for Allowed Claims [ECF No. 32163]

11

12   Hearing re:  Cardinal Investment Sub I, L.P. and Oak Hill

13   Strategic Partners, L.P.'s Motion for Limited Intervention

14   in the Contested Matter Concerning the Trustee's

15   Determination of Certain Claims of Lehman Brothers Holdings

16   Inc. and Certain of Its Affiliates [LBI ECF No. 4634]

17

18   Hearing re:  Motion Pursuant to Federal Rule of Bankruptcy

19   Procedure 9019 for Entry of an Order Approving Settlement

20   Agreement [LBI ECF No. 5483]

21

22   Hearing re:  Trustee's Motion Pursuant to Section 105(a) of

23   the Bankruptcy Code and Bankruptcy Rules 3007 and 9016(b)

24   for Approval of General Creditor Claim (I) Objections

25   Procedures and (II) Settlement Procedures [LBI ECF no. 5392]

Page 5

1    Hearing re:  Motion of FirstBank Puerto Rico for (1)

2    Reconsideration, Pursuant to Section 502(j) of the

3    Bankruptcy Code and Bankruptcy Rule 9024, of the SIPA

4    Trustee's Denial of FirstBank's Customer claim, and (2)

5    Limited Intervention, Pursuant to Bankruptcy Rule 7024 and

6    Local Bankruptcy Rule 9014-1, in the Contested Matter

7    Concerning the Trustee's Determination of Certain Claims of

8    Lehman Brothers Holdings Inc. and Certain of Its Affiliates

9    [LBI ECF No. 5197]

10

11    Hearing re:  Motion of Elliott Management Corporation For an

12    Order, Pursuant to 15 U.S.C. §§ 78fff-1(B), 78fff-2(B) and

13    78fff-2(C)(1) and 11 U.S.C. § 105(A), (I) Determining the

14    Method of Distribution on Customer Claims and (II) Directing

15    an Initial Distribution on Allowed Customer Claims [LBI ECF

16    No. 5129]

17

18

19

20

21

22

23

24    Transcribed by:  Dawn South, Nicole Yawn, Sherri Breach,

25    Jamie M. Weeks

Page 6

```
 1    A P P E A R A N C E S :

 2    WEIL, GOTSHAL & MANGES LLP

 3         Attorney for the Debtors

 4         1300 Eye Street NW, Suite 900

 5         Washington, DC 20005-3314

 6

 7    BY:  PETER D. ISAKOFF, ESQ.

 8

 9    WEIL, GOTSHAL & MANGES LLP

10         Attorneys for the Debtors

11         767 Fifth Avenue

12         New York, NY 10153-0119

13

14    BY:  MAURICE HORWITZ, ESQ.

15         JACQUELNE MARCUS, ESQ.

16

17    KIRKLAND & ELLIS LLP

18         Attorney for the Debtors

19         601 Lexington Avenue

20         New York, NY 10022

21

22    BY:  JOSEPH SERINO, JR., ESQ.

23

24

25
```

Page 7

1    CURTIS, MALLET-PREVOST, COLT & HOSLE LLP

2         Attorneys for the Debtors

3         101 Park Avenue

4         New York, NY 10178-0061

5

6    BY:  JOSEPH D. PIZZURRO, ESQ.

7         MICHAEL MOSCATO, ESQ.

8

9    SULLIVAN & CROMWELL LLP

10         Attorneys for Canary Wharf

11         125 Broad Street

12         New York, NY 10004-2498

13

14   BY:  MARC DE LEEUW, ESQ.

15         JOHN J. JEROME, ESQ.

16         DAVID B. TULCHIN, ESQ.

17

18   BRICKER & ECKLER LLP

19         Attorney for Nationwide

20         100 South Third Street

21         Columbus, OH 43215-4291

22

23   BY:  QUINTIN F. LINDSMITH, ESQ.

24

25

Page 8

1  LOWENSTEIN SANDLER

2       Attorney for Boilermakers Pension Fund

3       65 Livingston Avenue

4       Roseland, NJ 07068

5

6  BY:  MICHAEL S. ETKIN, ESQ.

7

8  YOUNG CONAWAY STARGATT & TAYOR, LLP

9       Attorneys for CF Midas

10      Rockefeller Center

11      1270 Avenue of the Americas

12      Suite 2210

13      New York, NY 10020

14

15  BY:  DANIEL F.X. GEOGHAN, ESQ.

16      PATRICK JACKSON, ESQ.

17

18  KAYE SCHOLER LLP

19      Attorneys for Spanish Broadcasting

20      425 Park Avenue

21      New York, NY 10022-3596

22

23  BY:  MADLYN GLEICH PRIMOFF, ESQ.

24      JOSEPH OTCHIN, ESQ.

25

1   WACHTELL, LIPTON, ROSEN & KATZ

2        Attorneys for JPMorgan

3        51 West 52nd Street

4        New York, NY 10019-6150

5

6   BY:  MARC WOLINSKY, ESQ.

7        HAROLD S. NOVIKOFF, ESQ.

8        CHRISTOPHER S. SZCZERBAN, ESQ.

9

10  MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorney for the Official Committee

12        One Chase Manhattan Plaza

13        New York, NY 10005-1413

14

15  BY:  DENNIS C. O'DONNELL, ESQ.

16

17  HUGHES HUBBARD

18        Attorney for the SIPA Trustee

19        One Battery Park Plaza

20        New York, NY 10004-1482

21

22  BY:  JEFFREY S. MARGOLIN, ESQ.

23

24

25

Page 10

1   QUINN ENANUEL URQUHART & SULLIVAN, LLP

2        Attorney for the Creditors' Committee

3        51 Madison Avenue, 22nd Floor

4        New York, NY 10010

5

6   BY:  ANDREW J. ROSSMAN, ESQ.

7

8   WOLLMUTH MAHER & DEUTSCH LLP

9        500 Fifth Avenue

10       New York, NY 10110

11

12  BY:  ADAM M. BIALEK, ESQ.

13

14  WONG FLEMING

15       821 Alexander Rd., #150

16       Princeton Township, NJ 08540

17

18  BY:  JAMES HANEY, ESQ.

19

20  ALSO PRESENT:

21  DAVID WALSH

22

23  ALSO PRESENT TELEPHONICALLY:

24  JOY DORAN

25  PAUL S. JASPER

Page 11

1    MICHAEL NEUMEISTER

2    SARAH SCHINDLER-WILLIAMS

3    MICHAEL ZEKYRGIAS

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 P R O C E E D I N G S

 2           THE COURT:  Be seated, please.  Good morning.

 3    Who's our master of ceremonies today?

 4           MR. ISAKOFF:  Well, Your Honor, I'm not

 5    necessarily the master of ceremonies for the whole day, but

 6    I'm here for the first matter.

 7           Peter Isakoff of Weil, Gotshal representing LBHI

 8    in connection with the large claims filed by Canary Wharf

 9    entities that total $780 million, it's a status conference.

10    The claim numbers are 14824 and 14826.

11           We were last here -- last here on January 16th

12    where we had begun discussions concerning procedures and had

13    a status conference at that time where Your Honor asked that

14    we continue the discussions.

15           We have done so, and I'd like to report on that

16    and state where I think the parties are in disagreement,

17    which is unfortunately the case, but let me walk through a

18    little bit as to what happened and then we can see where we

19    can go from there.

20           THE COURT:  Okay.  I did take a look at the

21    submission that Canary Wharf filed of record so I have their

22    perspective.

23           MR. ISAKOFF:  And I'm here today to give you ours,

24    Your Honor.

25           THE COURT:  Fine.
```

Page 13

1          MR. ISAKOFF:  On January 23 we met by telephone

2     and they -- we concluded without any -- reminisced anything

3     except that they very much wanted us to specify what

4     discovery it was we were seeking, but we endeavored to do

5     that in a letter of January 29, which was part of the

6     submission given to Your Honor.

7          Basically what we said is that if we could agree

8     on the basic parameters of discovery we would agree that we

9     could do it in phases as they wished to postpone any

10    discovery relating solely to the amount of damages, if any,

11    at a later time, and then we outlined what would be the

12    categories in a document request that expressly would carve

13    out anything concerning the quantum of damages.

14          We did indicate that we had to reserve the right

15    to do any necessary follow up based on what we received,

16    that the tools of discovery would be unlimited in the sense

17    that maybe we'd want to do interrogatories, maybe we'd want

18    to do request for admissions.  We did not say contrary to

19    their submission that discovery would be unlimited, just

20    that the available tools would be the usual ones.

21          The document requests and production would be

22    followed by fact depositions and then expert reports and

23    depositions of them, including the Queen's counsel.  There

24    may not be any other experts, we don't know yet.

25          We said that ADR of some sort might be

Page 14

1    appropriate, but that we were unwilling at least prior to

2    discovery to determine what would be the appropriate ADR

3    procedure to follow.  In our view it may be that mediation

4    in particular would be very fruitful, but after we found out

5    what the factual record would be.

6            They responded on February 1 with an exceedingly

7    limited scope of discovery.  As we read it, and I'm sure

8    they'll correct me if I'm wrong, they promised to produce

9    proof that the Lehman subsidiary stopped paying rent at the

10   end of March 2010.  I don't believe we even asked for that

11   and I don't know that there'd be any contest about that.

12           There was an exchange of emails between counsel

13   for Canary Wharf and for LBHI on December of 2010, around

14   the time of the forfeiture letter, and they offered to

15   produce the exchange of all emails between counsel for the

16   parties, which we undoubtedly already have.  Then they

17   wanted to take depositions of the two counsel in the email

18   exchange, and that was at -- they submitted a short

19   stipulation of a few of the relevant facts.

20           And on the 5th we responded that, you know, given

21   the size of these claims and given the amounts in dispute

22   and the stakes for LBHI and its creditors, that we could not

23   agree to any such truncated discovery, that we --

24           THE COURT:  Can you explain that to me?  Because

25   one of the obvious areas of disagreement between the parties

Page 15

```
 1    at this stage is whether this is a big deal leading up to a

 2    limited evidentiary hearing in which two solicitors provide

 3    their opinions as to applicable English law or whether or

 4    not the is a targeted more limited deal in anticipation of

 5    that hearing.

 6               And what I gather is that the debtors' perspective

 7    is that there should be very broad discovery leading up to

 8    that hearing, and it is Canary Wharf's position, if I'm

 9    understanding it correctly, that they're inclined to be more

10    targeted.  Am I right on that?

11               MR. ISAKOFF:  I would disagree certainly with the

12    view that what they're looking for is something targeted.  I

13    think what they're doing is putting the target behind a

14    black box and not letting us into it.

15               I've just described the discovery that they say

16    they'd be willing to give us and it just is essentially

17    nothing.

18               What we are looking for -- and I can go through it

19    chapter and verse on this, Your Honor, go through the

20    categories in our January 29 letter and explain why we need

21    it --

22               THE COURT:  We can -- we can do that if necessary,

23    but maybe before we get to that it would be helpful to

24    understand what we're really talking about.

25               MR. ISAKOFF:  Okay.  And I will do that.
```

1          THE COURT:  Because it's my understanding that

2     we're dealing with what is in effect a bifurcated process in

3     which damage issues will be put to one side and in effect

4     it's a bifurcated trial as to liability with damages to

5     follow only if there is liability.  And as to the liability

6     phase the parties agree that the issue is totally driven by

7     how English law is interpreted here and how it applies to

8     the documents.

9          MR. ISAKOFF:  Well, I would amend that, Your

10     Honor, by saying that how it applies to the documents may

11     very well depend on a variety of facts, and I'd like to

12     explain a little bit why.

13          THE COURT:  Okay.

14          MR. ISAKOFF:  All right.

15          THE COURT:  But just if you'll bear with me.  What

16     I'm trying to figure out, and I think you're about to tell

17     me, is how broader-based discovery plays into that inasmuch

18     as my understanding is that the real legal issue is driven

19     by what some solicitors say, and in my simplistic way of

20     looking at this it's a little bit like expert discovery with

21     expert reports and depositions of the expert and with the

22     discovery being perhaps limited to what the experts relied

23     upon, took into consideration, and how they informed

24     themselves to the point that they're able to express an

25     opinion.

1    And it seems to me -- and I may be overly narrow

2    in my view and I may appear to be -- prepared to be

3    influenced by your comments -- but it seems to me that

4    that's what we're talking about here, and I think you're

5    thinking that this is a bigger deal.

6    MR. ISAKOFF:  Well, first of all what the QCs have

7    said is based upon what was available to them, and of course

8    at some time it would be appropriate to depose them and

9    perhaps have them testify before Your Honor as to their

10   opinions and what they base it on, but the record is not

11   closed, the record has not even begun to open, and there are

12   a number of things which I can go through here --

13   THE COURT:  Well, why don't you --

14   MR. ISAKOFF:  -- which could very well have been

15   influenced on what they --

16   THE COURT:  -- why don't you tell me what it is

17   that you think you need in order to prepare for this hearing

18   and I'll hear from Canary Wharf's counsel as to whether they

19   agree or disagree with that.

20   It's highly unusual in this case for experienced

21   and competent attorneys such as are involved here not to be

22   able to reconcile a discovery plan in anticipation of what I

23   think everybody recognizes is a hearing that has a narrow

24   focus or at least a liability only focus, which will be

25   driven by incredibly my interpretation of English law

Page 18

1    documents and my interpretation and application of English

2    law to those documents.  It's one of the reasons why I

3    thought London-based arbitration might not be a bad approach

4    here.

5                MR. ISAKOFF:  And perhaps one day once we've seen

6    what the record is and what's in their files we'll come to

7    the same conclusion, Your Honor, but let me just talk a

8    little bit about what's involved here and why it is we need

9    discovery.

10               First of all there are two basic groups of issues.

11   One issue concerns whether the settlement or the agreement

12   reached between Canary Wharf and LBL to effectively waive

13   Canary Wharf's administration expense claim of about

14   30 million pounds in exchange for a payment of one and a

15   half million pounds from LBL.  And the as between the two

16   QCs is whether or not (a), this is a guarantee, which is

17   what we said, or an indemnity, which is what they say, and

18   then whether this was a material alteration of the -- LBHI's

19   risk.

20               Their position is, well, the QCs don't rely on

21   parole evidence therefore why do you need it?

22               Now, we've sought, and we do this in our January

23   29 letter, the negotiation documents leading up to the lease

24   and the guarantee that's part of lease, that's Schedule 4,

25   including drafts, notes, and communications, and so forth.

1              And why are we seeking that parole evidence?

2       Because it may be that although we take the position that --

3       and our QC does -- that this guarantee is a guarantee not an

4       indemnity, and they take the position based on the contract

5       that it's an indemnity not a guarantee, that Your Honor may

6       feel that there's an ambiguity as to which parole evidence

7       would be admissible, similar to what we did in the Bank of

8       America case where we had -- you know, where the parole

9       evidence turns out to be very informative.  So that's those

10      categories, that's one and two.

11             Category three is documents that they contend

12      support or that they're going to use in support of their

13      claims.  That's just a question of, you know, getting notice

14      of what it is that they're planning on using.

15             Then we get into the JPMorgan transaction, and

16      that's a little bit different issue from the guarantee

17      versus indemnity.  Because if we're right that it's a

18      guarantee and we're right that this deal that they made

19      vitiated the guarantee completely then the case is over, but

20      we're not litigating it -- that claim first and then the

21      others, we're litigating them all at once.

22             And the next one really has to do with their claim

23      that an email exchange between one of my partners and

24      somebody at Sullivan & Cromwell was an anticipatory

25      repudiation of an obligation to take a substitute lease that

Page 20

1    an email exchange took place before the forfeiture, whereas

2    the lease document and the guarantee document.  Section 7 of

3    the guarantee says that one of two things happens.  If

4    there's a forfeiture, which there was on December 10th,

5    either LBHI is liable for rent until a new tenant comes in

6    -- which happened in this case 10 days later -- or 180 days,

7    whichever is earlier.  So we're saying we're only liable for

8    ten days rent beginning December 10th to December 20th.

9           They say but wait a minute, Richard Cransnell (ph)

10   that, well, we're not inclined to take the lease.  Okay?

11   But they hadn't tendered it and their -- and so they didn't

12   comply with the obligation.  In other words they could have

13   after forfeiture gone to LBHI and said, you take a

14   substitute lease.  They never did that.

15          They're relying on this email exchange.  And what

16   we're saying is the following.  There's something funny

17   going on.  Because this is a transaction for I believe it

18   was a million square feet of space between Canary Wharf and

19   JPMorgan.  We are told, although we have never seen it, that

20   there was a memorandum of understanding in August of 2010,

21   four months before this email exchange.  They never told us

22   about it, we've never seen it.  They didn't consult us

23   concerning the forfeiture letter transaction, they -- we

24   learned almost through the grapevine that there's some

25   transaction going on while we're in the midst of trying to

Page 21

1    do settlement discussions with them.  We don't learn about

2    it from them.  And they turn to us and say, well, if you

3    want to see the JPMorgan transaction you tell us that you're

4    not interested in taking the lease.

5            And why do they do that?  Is it is it because

6    JPMorgan insists that there be no delay?  Is it because they

7    don't want to have to comply with the automatic stay?  Is it

8    because if they tender the lease to us maybe we're going to

9    see with the JP Morgan transaction maybe we can do better

10   than simply declining it and take it and maybe do our own

11   deal?  We weren't given any of those opportunities.

12           What they did was that, you know, quickly put

13   pressure, if we want to see this transaction to say okay we

14   don't really want the lease and then try to use that to have

15   their cake and eat it to.  They do their transaction, they

16   try to stick us as if they had complied with the transaction

17   documents.

18           Now, we think we're entitled to see not just their

19   internal communications, which are probably privileged, but

20   we would like to see their communications between them and

21   JPMorgan and see whether this was a concerted strategy, at

22   least on Canary Wharf's part.  If so that may suggest that

23   the basis for their anticipatory repudiation is not in good

24   faith, that they're not entitled to some extraordinary

25   relief from not having complied with the agreement, which is

Page 22

```
 1   what they did.  They did not comply with it, and they're

 2   seeking to use this email exchange as a substitute.  And we

 3   think we're entitled to explore the answers to these

 4   questions.

 5           We don't think that it's a tremendous amount of

 6   discovery, we don't think it's wide-ranging.  How long it

 7   takes to do it is frankly dependent on them.  We would serve

 8   a discovery request if Your Honor permitted this week.  I

 9   suspect we're going to wind up here in disputes based upon

10   the positions that they've taken in their letters and Your

11   Honor may have to resolve them.

12           THE COURT:  You know how I love discovery

13   disputes.

14           MR. ISAKOFF:  I know you don't, Your Honor, and I

15   would love to avoid it, but where I'm being told that what

16   we'll give you is the exchanges that you already have

17   between counsel, you know, and no discovery concerning

18   things that I think the QCs would have to explain and take

19   into account in a more full way in doing an opinion that's

20   not preliminary but it's based upon an evidentiary record.

21   That's what we're looking for, Your Honor.

22           THE COURT:  Let me -- let me hear from counsel for

23   Canary Wharf, recognizing that I have a pretty good

24   understanding of their position as a result of what I read.

25   I now have a pretty good understanding of your position as a
```

Page 23

1   result of what you've said.

2             MR. ISAKOFF:  Thank you, Your Honor.

3             THE COURT:  And I have an inclination, which I'm

4   going to mention even before I hear from Canary Wharf's

5   counsel, which is this status report turns out to be more in

6   the nature of a discovery dispute already, and we have a

7   fairly full courtroom and we have a fairly congested morning

8   calendar as well as a 2 o'clock calendar.

9             It occurs to me that the parties still need to do

10  more work to -- excuse me -- narrow the issues, and --

11  excuse me -- I'm going to need to excuse myself and have

12  some water.  In fact that's what I'm going to do.  I'm going

13  to take a minute, nobody move, nobody get up.

14       (Laughter)

15            THE COURT:  I'm going to go in there, I'm going to

16  come back.

17       (Recess at 10:23 a.m.)

18            THE COURT:  I will pick up not exactly where I

19  left off.

20            It seems to me that more time needs to be spent

21  seeking accommodation with respect to scope.  To the extent

22  that you achieve that you should endeavor to develop an

23  agreed order.  To the extent you are unable to achieve that

24  we should have a discovery conference.  It does not need to

25  be on an omnibus hearing date, and it probably should be in

Page 24

1   chambers rather than just on the phone.  That will give the

2   parties an opportunity, to the extent they can't work things

3   out, to provide me with a clearer and more detailed

4   understanding as to just exactly why you can't get along on

5   this subject.

6           I understand from what you're saying, Mr. Isakoff,

7   that from Lehman's perspective you're not trying to expand

8   the scope but you are trying to understand more about

9   conduct and motivation.  I understand that from Canary

10  Wharf's perspective they view this as a fairly

11  straightforward question of applying law to facts.  I

12  suspect that's what the problem lies.

13          MR. ISAKOFF:  I suspect so too, Your Honor, and

14  certainly we would endeavor to try to reach agreement and to

15  limit discovery to whatever it is that we feel is essential.

16          THE COURT:  Okay.  I'm not trying to squelch

17  comments from Canary Wharf's counsel, so this is an

18  opportunity for counsel to be heard.

19          MR. LEEUW:  Thank you very much, Your Honor.  Marc

20  De Leeuw from Sullivan & Cromwell, counsel to Canary Wharf.

21          Your Honor, I appreciate your guidance at the end

22  of Mr. Isakoff's comments, and we'll obviously follow your

23  direction.

24          If I could I'd like to just give a little bit of

25  an overview of why I think -- I think Your Honor's

Page 25

1   observation of the issue that's separating the parties is

2   absolutely correct and then give us -- give just a little

3   bit of a general explanation of our position on this, which

4   I think Your Honor now understands from having read our

5   submission.

6              I think Your Honor's observation that what's going

7   on here for the liability phase, for the evidentiary hearing

8   where the two Queen's counsel would testify is absolutely

9   right.  It's really a question of interpretation of

10  documents, specifically agreements, the LBL agreement and

11  the indemnity agreement, which is attached to the lease, and

12  the application of English law principals to those

13  documents.  And in fact that's actually what the two Queen's

14  counsels did.  Both of them rendered opinions on liability

15  solely by reference to those documents and to those English

16  law principals.

17             THE COURT:  But here's the problem.  This would be

18  true even if we were dealing with the application of New

19  York law.  The fact that two reputable and well-informed

20  solicitors review the same documents and come to opposite

21  legal conclusions suggests that somebody is wrong, that

22  somebody is clearly wrong.  And that raises a question as to

23  how that could be.  And in a setting like that one might

24  need to drill down a little bit as to what led to those

25  curiously contrary positions.

Page 26

1           MR. LEEUW:  And, Your Honor, I think Your Honor

2   mentioned drilling down with respect to potentially

3   depositions of the two Queen's counsel.  That's really not I

4   think the primary debate between the parties here.  If

5   that's the issue of course we can speak about that question,

6   and I understand that, but the question about whether the

7   two solicitors have a difference of opinion about the law is

8   really -- you're right, no different than if Mr. Isakoff and

9   I had a disagreement about New York law.  We'd both be

10  putting in briefs, we'd both be citing different cases or

11  statutes or applies law to specify documents.  That wouldn't

12  mean that it's a question that needs discovery, it wouldn't

13  mean that somebody, Your Honor in this case, would be

14  deciding what is the right view of New York law in that

15  circumstance.  And that's really what we have.

16          To give just an example Mr. Isakoff said there's

17  really sort of two buckets here.  He said the first bucket

18  is whether there -- whether the releases in the agreement

19  between Canary Wharf and LBL discharges LBHI of its

20  obligations, and it says there's a whole bunch of buckets.

21  And then it says, well, maybe there's some discovery.

22          That's exactly the issue that when we were here

23  last month Mr. Isakoff stood up before Your Honor and Your

24  Honor said, what can we have an oral argument on without the

25  need for any discovery?  And Mr. Isakoff said explicitly,

Page 27

1    that issue, the issue that he just said a moment ago

2    requires discovery requires no discovery because the facts

3    are effectively undisputed, it is just an issue of English

4    law.  That's exactly what he said.  It's on page 12 of the

5    transcript.

6          Lehman has argued -- the debtors have argued that

7    these are issues -- that issue could be resolved by Your

8    Honor, but Your Honor, we're mindful of your guidance.

9          I think the real dispute between the parties

10   that's been framed in these letters is exactly what Your

11   Honor pointed out.  There's a narrow dispute here about the

12   application of documents to English law.

13          What we did in our submission was specify what are

14   the issue ins dispute.  We numbered them as three,

15   Mr. Isakoff had grouped two together, but three issues,

16   three issues of English law.  They're issues of English law

17   that can be resolved without any discovery.  Both Queen's

18   counsel have rendered their opinions on that by reference to

19   the documents and to English law, and neither one said in

20   any way, shape, or form that there were some facts that were

21   necessary, some more information that was necessary to

22   render an opinion on those three liability issues.

23          On the damages issues of course there may be facts

24   and there may be discovery, that's a different question.

25          And so what we tried to do both in our letter to

Page 28

1    Mr. Isakoff and in our submission was identify what those

2    three issues are and then specify what documents, what

3    discovery might be needed.  We don't think really any is

4    necessary, and I think given Mr. Isakoff's concession as to

5    the first point that really doesn't -- it's probably not

6    even disputed, then much of the discovery doesn't, if any,

7    needs to be done.  These are really questions of English

8    law.

9            So we think the real question is when you go

10   through each issue, and we've gone through the three issues

11   in our submission, each one is a matter of English law, each

12   one -- on each one the two Queen's counsels rendered their

13   opinion as a strict matter of English law, and then each one

14   of them say no further information is necessary.

15           So we think that's the issue that we should have a

16   liability phase hearing on.  And what we've suggested to

17   Your Honor is that we could do a relatively short period of

18   discovery, we suggested 60 days.  We could produce the

19   documents that are relevant to those very narrow issues in

20   which LBHI says its needs discovery on those three

21   identified issues, have depositions of the two people that

22   are the source of the anticipatory repudiation, and then

23   have submissions and a hearing with Your Honor.  And we had

24   suggested early June, Your Honor, but obviously it'll be

25   subject to Your Honor's schedule.

```
 1              THE COURT:  Okay.  I was hoping to suppress that
 2    whole argument, but I guess I failed.
 3              MR. LEEUW:  I apologize, Your Honor, for going too
 4    far.
 5              THE COURT:  And I was giving you the chance to
 6    express Your Honor because you gave me your whole argument.
 7    And what I was really encouraging was that a less polarized
 8    approach to the discovery dispute in the context of a meet
 9    and confer session focused upon some compromise would be
10    useful.  Because this isn't going to be all your way and
11    it's not going to be all Lehman's way, it's going to be my
12    way.
13              MR. LEEUW:  We understand that, Your Honor.
14              THE COURT:  And I would like my way to be
15    appropriate to allow me to have the benefit of a fully
16    informed record with respect to issues that the parties
17    themselves may be familiar with, but I'm not familiar with
18    at all except from what I've heard in the last couple
19    hearings.
20              The fact that we are dealing with a big ticket
21    dispute in reference to a trophy piece of London real estate
22    that has a storied history in bankruptcy, completely
23    unrelated to Lehman, makes me curious as to why the parties
24    are jockeying for a position preemptively with respect to
25    this.  So inquiring minds want to know.
```

1           That suggests that I will be more inclined in the

2    event of a dispute to be liberal rather than restrictive

3    with respect to discovery, so long as the discovery is in

4    fact relevant to the legal issues in dispute.

5           And so in that spirit I suggest that you proceed

6    to try to work this out with the understanding that if you

7    can't you shouldn't continue fruitlessly disagreeing with

8    one another, you should contact my chambers and schedule an

9    in-person settlement conference with respect to the

10   discovery.

11          I believe that it is premature to set a hearing

12   date until after we resolve what the discovery schedule will

13   look like.

14          Now, having said what I said, I would also like to

15   make clear, I do not want this discovery program to be

16   unduly extensive or burdensome.  I would like it to be

17   focused.

18          With that I think I've given you each a little bit

19   of something, and I hope you're successful in working this

20   out.

21          MR. ISAKOFF:  Your Honor, could I have just one

22   word?

23          THE COURT:  Sure.

24          MR. ISAKOFF:  The comment that the first issue

25   concerning whether it's a guarantee or an indemnity that I

Page 31

```
1    made some kind of concession that there are no relevant

2    discovery or facts to be discovered.  If we were to prevail

3    on the papers (indiscernible - 00:30:25) summary judgment I

4    would say, yes; however, as we've said in our reply papers

5    and as I thought I made clear, that if we were not

6    successful then we would need to take discovery.

7              Now maybe then in discussions we can decide that

8    with respect to that issue that perhaps discovery can be --

9    can await a ruling, and if Your Honor is concerned that the

10   issue is ambiguous and at that point might benefit from

11   parole evidence maybe we'd take discovery at that point.

12   It's not the efficient way to go, but it is a possibility.

13             THE COURT:  That's exactly how we proceeded in the

14   Bank of America litigation.  My recollection is that we were

15   having summary judgment argument and I determined that I

16   wanted to hear from witnesses.

17             MR. ISAKOFF:  Right.  And at that point -- by that

18   time discovery -- fact discovery was full and there had been

19   complete document discovery and extensive depositions of all

20   of the relevant witnesses, and that's, you know, obviously

21   on the focus matters here that we're looking for the

22   opportunity to develop the evidentiary record.

23             Thank you.

24             THE COURT:  Okay.  Nobody is going to win on the

25   basis of the discovery protocol.  You're going to win on the
```

Page 32

```
1    merits or lose on the merits.  So go forth and be

2    productive.

3         (Laughter)

4              MR. ISAKOFF:  Thank you, Your Honor.

5              MR. LEEUW:  Thank you, Your Honor.

6              MR. HORWITZ:  Good morning, Your Honor, Maurice

7    Horwitz, Weil, Gotshal & Manges on behalf of Lehman Brothers

8    Holdings Inc. and certain of its affiliates.

9              We have now three items that are uncontested on

10   this morning's agenda that we'll try to go through quickly

11   because it is a busy morning.

12             The first two items are related.  The debtors'

13   sixty-seventh omnibus objection to claims and the debtors'

14   eighty-fourth omnibus objection to claims.  Both were

15   objections seeking to reduce the amount of certain

16   derivative claims -- derivative-based claims filed against

17   the debtors.

18             Four claims -- as to four claims, two on the

19   sixty-seventh and two on the eighty-fourth omnibus objection

20   the responses filed by SPC Group, LLC have been resolved,

21   the allowed amounts that would be on the attached exhibit to

22   these two orders have been modified.  We have black lines of

23   those exhibits to provide to the Court and we have

24   supplemental orders that would allow these two objections

25   with respect to these four claims, which we would request
```

Page 33

1    entry of after this hearing.

2          THE COURT:  Okay.  It's unopposed, it's

3    consensual, and it's approved.

4          MR. HORWITZ:  The next item is the two hundred and

5    eighty-second omnibus objection to claims.  This claim was

6    -- this objection was filed with respect to claims that were

7    filed after the bar date in these cases.

8          One response to that objection, the response of

9    Piguet Galland & Cie has been resolved.  The claimant has

10   decided not to prosecute its response to the objection.

11   That claim was filed on March 16th, 2012, long after the bar

12   date, and the claimant has agreed to allow this order to be

13   terminated expunging claim number -- claim numbers 68053 and

14   68054.

15         We have a supplemental order to provide to the

16   Court.

17         THE COURT:  Fine.

18         MR. HORWITZ:  And now I'll turn the podium to my

19   colleague --

20         THE COURT:  Okay.

21         MR. HORWITZ:  -- Jacqueline Marcus.

22         THE COURT:  Just so the record is clear and I said

23   more than fine, the claim of this French enterprise that I

24   can't response, claim under 68053 and 68054 are expunged on

25   an uncontested basis.

1           MR. HORWITZ:  Thank you, Your Honor.

2           MS. MARCUS:  Good morning, Your Honor, Jacqueline

3    Marcus of Weil, Gotshal & Manges for the Lehman estates.

4           Item number 6 on the agenda is the joint motion of

5    Lehman Brothers Holdings Inc. and the litigation

6    subcommittee pursuant to Section 105 of the Bankruptcy Code

7    and Bankruptcy Rule 7004(a)(1) to extend the stay of the

8    avoidance actions and grant certain relief.

9           Pursuant to this motion, Your Honor, the debtors

10   seek an extension of the order staying avoidance actions

11   which would have expired on January 20th but for the entry

12   of a bridge order as well as a six-month extension of the

13   time for serving the second amended complaint upon the

14   defendants in the distributed action.

15          As the Court is aware there were in effect two

16   different objection deadlines with respect to this motion.

17   January 9th for those who were served with the motion in a

18   timely fashion, and January 23rd for the defendants in what

19   we refer to as the distributed action.

20          As reflected on the agenda only one objection to

21   the motion was filed by Nationwide Life Insurance Company

22   and Nationwide Mutual Life Insurance Company, both of which

23   are defendants in the distributed action.

24          As I have at each of the prior hearings seeking to

25   extend the stay I'd like to start by reporting on the

Page 35

1    benefits that the debts have realized from the ADR process

2    and the stay.

3            As indicated in the thirty-eighth status report

4    filed on January 16th by my partner, Peter Gruenberger, as a

5    result of mediation the debtors have achieved settlements of

6    238 ADR matters involving 333 counterparties generating in

7    excess of almost $1.4 billion for the estates.

8            By way of comparison that means that an additional

9    32 ADR matters with an additional 105 counterparties have

10   been resolved before we were last before you in July seeking

11   the prior extension.

12           Another measure of success is that 91 out of the

13   96 ADR matters that have reached the mediation stage have

14   been settled.  As indicated in Mr. Gruenberger's letter,

15   another five mediations are scheduled to commence between

16   today and mid April.

17           In addition, Your Honor, we have received

18   successes in the derivatives arena outside of the ADR

19   process.

20           Your Honor will recall that at prior hearings to

21   extend the stay, among the few objectors, were the

22   liquidators for LB Australia.  Most recently in July they

23   argued that the stay should not be permitted to expire --

24   should not be extended -- excuse me -- because the estates

25   were not making enough progress fast enough to justify the

Page 36

1    continuation of the stay.

2              At that time I reported to the Court that

3    settlement discussions were settled and we were hopeful that

4    those discussions would result in a consensual resolution.

5              As indicated in the motion and in our reply the

6    estates have reached a settlement with eight classes of

7    Belmont noteholders.  Those agreements have now been fully

8    executed and in the process of being fully implemented.

9    Thus the Court's decision in July to extend the stay

10   facilitated the resolution of one of the most contentious

11   disputes in these cases.

12             Another notable success accomplished since the

13   July hearing is the settlement entered into with Canadian

14   Imperil Bank of Commerce, pursuant to which LBSF realized a

15   recovery of $149.5 million and CIBC was dismissed from the

16   distributed action.

17             Outside of the derivatives arena since July we

18   have resolved through settlement or withdrawal 21 avoidance

19   actions and tolled avoidance claims against vendors and

20   other third parties.  There are 16 avoidance actions left to

21   be resolved as well as many potential defendants who are

22   parties to tolling agreements.

23             Most recently the avoidance action against

24   Standard Chartered has been settled by stipulation, an order

25   that was approved by the Court last week.  Under that

Page 37

```
 1   settlement LCPI has been paid more than $143 million.  The

 2   adversary proceeding will be dismissed in a matter of days.

 3           That outstanding result was accomplished based

 4   upon the filing of the complaint and the settlement

 5   discussions that resulted from the filing of the complaint.

 6   There was no formal discovery conducted, no motion practice,

 7   and no strain on the Court's resources.

 8           As we speak, Your Honor, we're finalizing another

 9   settlement with a party who's a subject to a tolling

10   agreement on another large matter and we expect to have that

11   done win the next few days.

12           In sum, Your Honor, there has been a substantial

13   amount of progress.

14           Your Honor will no doubt recall that back in July

15   you asked me to quote, "Provide some guidance as to the

16   likely duration of this process and when it comes to an

17   end."  That was at page 20 of the transcript.

18           THE COURT:  Sounds like something I might say.

19           MS. MARCUS:  I recall that I said it was very

20   difficult to predict.  I noted that Mr. Gruenberger's

21   monthly letters might be a good  barometer for whether the

22   ADR process is continuing to be effective, and I stated,

23   quote, "There will be a point at which Mr. Gruenberger's

24   monthly letters will show or won't show continued progress."

25           I expect that Your Honor will ask me the same
```

Page 38

1    question today.  As the foregoing status report demonstrates

2    we are still at a point where the continuation of the stay

3    is generating substantial proceeds for ultimate

4    distributions to creditors, therefore we have not yet

5    reached the point where the stay should be terminated.

6              The relief that the estates and litigation

7    subcommittee seek is warranted under Section 105 of the

8    Bankruptcy Code due to the number and complexity of the

9    avoidance actions, the lack of prejudice to any of the

10   avoidance action defendants, and the progress achieved to

11   date.

12             The debtors therefore seek a further six-month

13   extension of the stay to enable them to continue to build on

14   their successes and to resolve pending matters while

15   minimizing the time and expense expended by the Chapter 11

16   estates and the avoidance action defendants as well as the

17   burden on the Court that would result if the stay were to

18   expire.

19             Turning to the objection, Your Honor, the proposed

20   extension of the stay would affect several hundred parties,

21   yet the Nationwide parties have filed the only objection to

22   the motion.

23             The Nationwide objection does not contest the

24   extension of the service deadline, therefore I'll treat that

25   portion of the relief requested as unopposed.

1            The Nationwide parties request what they describe

2    as a limited carve out from the stay.  In effect, however,

3    they seek a determination that the stay doesn't apply to

4    them at all.  They seek to conduct discovery of the Chapter

5    11 estates that addresses an alleged statute of limitations

6    argument that they have in connection with the amendment of

7    the first amended complaint in the distributed action.  This

8    is not a minor procedural matter, Your Honor, it's an

9    important substantive issue.

10            The discovery that the Nationwide parties seek

11    will be expensive and time consuming and may lead to a

12    parade of other avoidance action defendants seeking to

13    commence discovery as well.

14            In addition the Nationwide parties seek

15    authorization to file a motion to dismiss after completion

16    of our discovery yet, another encroachment of a stay.

17            In some respects the objection is similar to the

18    objection filed by U.S. Bank to the prior request for an

19    extension of the stay.  At that time U.S. Bank sought a

20    determination from the Court regarding the applicable

21    default rate of interest.  The Court overruled the objection

22    and found as follows, quote:

23            "U.S. Bank seems to be making a substantive

24    request in the guise of an objection to the extension of the

25    stay.  What happens with interest is a matter to be decided

Page 40

1    at some point in the future either on a case by case basis

2    as a result of negotiated compromises that are not presently

3    before the Court or as a result of litigation that may one

4    day determine the appropriate rate of interest."

5              That was at the transcript at page 37.

6              The same is true of the statute of limitations

7    argument raised by the Nationwide parties.  This is not the

8    time or the appropriate procedural context in which to

9    determine those issues.

10             In determining whether to sustain the objection

11   the Court should take into account more than simply the

12   dispute between the estates and the Nationwide parties.

13   Instead it should take into account the impact that the

14   relief sought by the Nationwide parties would have on the

15   cases and the estate's ability to effectively resolve the

16   numerous pending as well as potential causes of action.

17             THE COURT:  Let me break in and ask you this

18   question though.

19             MS. MARCUS:  Sure.

20             THE COURT:  Because in a sense I'm glad Nationwide

21   brought this objection.  It allows us to more thoughtfully

22   assess what the stay is doing and the impact of the stay on

23   parties, some of who might just have decided not to bother

24   to raise any question about it.

25             The fact that Nationwide has Done this alone

Page 41

1    doesn't necessarily mean that Nationwide is by itself in

2    terms of feeling that the stay is potentially detrimental.

3         The question I have is this.  If there is a party

4    like Nationwide that believes mediation and ADR as to it

5    can't be useful because they have what they believe to be a

6    dispositive exit from the case, based upon the statute of

7    limitations or some other dispositive exit, is it unjust to

8    keep them in abeyance just because from a case management

9    perspective it is a good thing for the entire portfolio of

10   litigation to be stayed?

11        MS. MARCUS:  Well, I guess I would -- I know Your

12   Honor is a big proponent of the ADR process, and I guess I

13   would question whether --

14        THE COURT:  I am a huge proponent of the ADR

15   process.

16        MS. MARCUS:  Sorry for the understatement.  I

17   guess --

18        THE COURT:  I think the ADR process is one of the

19   most extraordinarily successful aspect of case

20   administration in this massive case, and the success

21   reported in Mr. Gruenberger's most recent letter that you

22   quoted from speaks for itself.

23        MS. MARCUS:  So I guess you've convinced me of the

24   importance of the mediation ADR process as well, Your Honor,

25   over the last four years.

Page 42

1         The fact that a party believes it cannot benefit

2    or that mediation can't be useful because they have a

3    dispositive exit I would expect that that argument would be

4    used and raised in the mediation itself so that that party

5    still has the forum in which to assert that claim, they're

6    simply asserting it to the mediator and trying to extract a

7    favorable settlement as a result of those arguments.

8         THE COURT:  I guess the difference is that for a

9    party that in good faith believes that the statute has run

10   and that as a result there is no legal basis to find any

11   liability would assert in mediation those defenses, but the

12   mediation process itself just by its very nature tends to

13   strongly encourage compromise of otherwise ridged legal

14   positions thereby resulting in -- not that it's a bad thing

15   for the debtor, it's a good thing for the debtor -- a

16   payment notwithstanding a firmly held view that for payment

17   should be made.

18        MS. MARCUS:  Right.  But when you take into

19   account the possibility of agreeing to some payment versus

20   the cost (indiscernible - 00:45:54) to proceeding with

21   litigation I don't think that the --

22        THE COURT:  Right.

23        MS. MARCUS:  -- counterparty --

24        THE COURT:  It's the avoided cross theory.

25        MS. MARCUS:  That's correct, Your Honor.

Page 43

1            In addition the Nationwide parties, while they --

2    I think the term they use in their objection was high

3    prejudice.  They didn't actually state in their objection

4    what that prejudice might be.

5            Our view is that there is no prejudice, that the

6    litigation is stayed as to all defendants, and therefore

7    there's no harm to the Nationwide parties that needs to be

8    addressed by the Court.

9            For all of the foregoing reason, Your Honor, we

10   request that the Court extend the stay, we have a form of

11   proposed order which differs slightly from the order that we

12   filed would the motion, because during the period since we

13   filed the motion two of the avoidance actions have actually

14   been dismissed, so we have -- the exhibit is somewhat

15   different.

16           THE COURT:  Okay.  I'll hear from Nationwide.

17           MR. LINDSMITH:  Good morning, Your Honor, my name

18   is Quintin Lindsmith, I'm with the firm of Bricker & Eckler

19   in Columbus, and I am mindful that we're the only party

20   that's objected, Your Honor, and I don't mean to come here

21   disrespectful of the process -- of the ADR process.

22           When I did come here last July for the hearing

23   where debtor argued for a six-month stay at that time they

24   told the Court they wanted a reasonable and modest extension

25   of the stay, and I heard the same words that counsel read

1   back of what His Honor said about the extension of the stay.

2   At that time they said the stay is to negotiate settlements.

3         Now, I'm here only in the adversary proceeding,

4   which is the distributed action, number 3547, and I have no

5   argument with any extended stay anywhere else in the case,

6   Your Honor, but I'm just focusing on that adversary

7   proceeding, and even more so just on my clients.

8         As I look at their pleadings they indicated in the

9   adversary proceeding, the distributed action, there have

10  been three settlements.  Now, I know one is a very big

11  settlement with Canadian Bank, but out of 263 defendants

12  that's three settlements, and they said last time we need

13  six months to start the settlement process and to finish the

14  execution of service of process.

15        Your Honor, they only asked for six more months,

16  but if they want six months to settlement with 263 parties

17  it's not six months, this is a stalking horse for another

18  year at least.

19        And I would submit to the Court that to allow a

20  stay of a case of this magnitude for three and a half years

21  is very unusual.  I won't say more than that, it's unusual,

22  Your Honor.

23        In my case, when we talk about we've been told by

24  Lehman that the target on our back is $16 million.  Now, I

25  know in the scheme of this bankruptcy that may not be a lot

Page 45

1    of money, but it is in Columbus and we're being sued for

2    $16 million.

3             The prejudice is they've been allowed to erect a

4    sword to our chest and we're not allowed to erect a shield.

5    That's the prejudice.  And the more this goes on the more we

6    only have a sword at us and no shield.

7             THE COURT:  I'm sorry, what was the prejudice?

8             MR. LINDSMITH:  That they can assert the claim

9    against us and we have no ability to assert any defenses to

10   it.

11            THE COURT:  Well, is there prejudice in a

12   jurisprudential sense if your rights to assert all of those

13   defenses are absolutely preserved then it's just a question

14   of when in the process of dealing with the litigation you're

15   able to assert those offenses?

16            Nobody's -- you're not paying anything, you're not

17   incurring any counsel fee, you're simply in the some would

18   say good position of where do you turn?

19            MR. LINDSMITH:  I guess I have two responses, Your

20   Honor.  One is I think there is meaning to the phrase

21   justice delayed is justice denied.

22            And secondly --

23            THE COURT:  I think that's true, for example, if

24   we're dealing with a murder trial, but this is -- this is an

25   avoidance action.

Page 46

1          I hear you, but I'm not sure that that -- that

2    strong argument quite fits.

3          MR. LINDSMITH:   The more traditional argument of

4    prejudice where there's this type of delay over a period of

5    time -- and really we're talking about events back in 2008

6    and in our case 2007, 2006 is -- if there is a need for

7    witnesses and where they are where are they?   I know there's

8    been a disbursement of Lehman employees and that could be.

9    That's an unknown prejudice I will tell the Court, but that

10   is always out there as a possibility that is a risk on us I

11   would submit more than an Lehman.

12          But if I could speak to, Your Honor, what we're

13   really asking for.   In our objection we said noteholder

14   defendants, that's only because quite frankly I thought

15   there would be other objecting parties, but if it's just as

16   to Nationwide we're asking for something very simple, which

17   is give us limited discovery that indicates how they knew we

18   were noteholders.   Give us to discovery as to how they know

19   we were noteholders, what records do they have indicating we

20   were noteholders, our purchase of interest in a note in

21   2006, a purchase of interest in a note in 2007, shouldn't be

22   that hard to produce.   This would indicate they knew who we

23   were and where we were.   And with that give us a shot at an

24   argument.   And it's a simple status of limitations argument.

25          They brief this argument in their motion for leave

Page 47

1     to amend the second amended complaint, they briefed it in 11

2     pages.  They've already gone through the analysis.  In that

3     case they argued why the amendment related back.  They

4     talked about the rules governing service and adding new

5     parties and why it relates back.  They've already analyzed

6     this.

7                    I recognize this is a big issue for them, but it's

8     not a complicated issue, it's a straightforward issue.

9                    THE COURT:  But it is an issue which if pressed by

10    you because you get a carve out from the stay becomes the

11    narrow end of the wedge that effectively destroys the

12    benefit of the stay because others will say, well,

13    Nationwide is taking discovery, we're in a very similar

14    position, we'd like to do the same thing, and before you

15    know it there's a whole crowd of people seeking what amounts

16    to exceptions that collectively would undermine the efficacy

17    of the stay.

18                    MR. LINDSMITH:  I would only suggest that the type

19    of discovery of give us the records that you know why we're

20    noteholders, even if you apply that to 100 other defendants

21    or 200 defendants -- and we're only talking about the

22    defendants that were named after the complaint was first

23    filed.  The original noteholder defendants, they're in

24    there, there's no issue there about the statute of

25    limitations.  We're talking about the ones that were added

Page 48

1   later, that's the category we're talking about.

2            THE COURT:  How many -- how many defendants were

3   added in the time period you're referencing?

4            MR. LINDSMITH:  I want to say about 150.

5            THE COURT:  That's a big number.

6            MR. LINDSMITH:  It's a big number, but as a

7   discrete category of discovery, if that's the only category

8   of discovery with the resources of Lehman, it would strike

9   me as something that's doable.

10           And I would submit to the Court my current

11  instruction from my client is they're not interested in

12  mediation or there won't be significant participation in

13  mediation without knowing whether they should even be at

14  this party because of the statute of limitations issue.

15           I don't know -- I can't speak for anybody else

16  because they're not here, but I guess I would only ask the

17  Court if -- I fully appreciate what's being balanced here in

18  the larger scheme of things and I appreciate that in the

19  larger scheme of things we're a relatively small player, but

20  I would only ask the Court that if the Court is inclined --

21  I want to take one last shot and ask at least we be allowed

22  discovery so we know what to prime up for when the stay is

23  lifted and just have that a little bit of discovery.  Give

24  us ten documents.  I mean I think that's all it is.

25           But if the Court is not inclined to do that

Page 49

1    because it's concerned about cracking the door open and

2    inviting other parties asking for the same thing then I

3    would ask that this truly be a six-month extension, not a

4    one-year extension, and even then if I could just have the

5    compromise that in six-months we be allowed to have what

6    we're requesting now, if not today.

7            I'm hoping for something where we can at least

8    start that threshold issue of whether we should even be in

9    this party, Your Honor, and that's all.

10           THE COURT:  Okay.  Thank you.

11           Ms. Marcus?

12           MS. MARCUS:  Yes.  Just a couple points, Your

13   Honor.

14           In terms of the prejudice in the objection the

15   Nationwide parties talk about the fact that Lehman was

16   permitted to take discovery yet it's not reciprocal because

17   they're not being allowed to take discovery.

18           I'll point out that the discovery that Lehman took

19   of the Nationwide parties was before they were added as

20   defendants to the complaint, and now that they have been

21   added as defendants there will be no discovery during the

22   pendency of the stay.  So the -- the imbalance alleged by

23   Nationwide really doesn't exist.

24           I think Your Honor's point about this being the

25   narrow edge of the wedge is I think what you said.

1              THE COURT:  That is what I said.

2              MS. MARCUS:  It reflects the debtors' view that if

3      the window is open even a little bit then we will be

4      involved in a major discovery process with numerous

5      defendants.

6              Yes, there are 265 defendants in this litigation,

7      I haven't really kept track of whether we only have three

8      settlements, but of course the debtors have to prioritize in

9      terms of the size of the potential claims, and they've been

10     devoting their energy first to the largest claims, but we

11     have every confidence in the world that over the next period

12     of time as the big claims get resolved we'll be getting down

13     to the smaller ones.

14             I'll also point out, Your Honor, that you've noted

15     on several occasions that the Bankruptcy Court has the

16     discretion to manage its docket and that's what's going on

17     here.

18             So in light of the fact that there really is no

19     prejudice we'd ask for a further six-month extension with no

20     strings attached.  I don't think it's appropriate for the

21     Court now to say and in six months we have to deliver the

22     discovery that's been requested, because I think it's more

23     appropriate for the Court to evaluate the situation if we

24     come back for another extension, which to be perfectly

25     frank, I expect that we will, and to see where we stand at

Page 51

1    that point.

2                THE COURT:  Thank you.

3                With each incremental extension of the stay for a

4    period of six months years go by, and I am increasingly

5    sensitive to the potential for incremental prejudice to all

6    of the defendants that are involved in all of the litigation

7    that is subject to the stay.

8                One of the problems in balancing actual prejudice

9    versus hypothetical prejudice is that actual prejudice

10   always wins.

11               And there is actual prejudice to the case

12   administration function associated with lifting the stay or

13   refusing to extend the stay prematurely.

14               The challenge here is that the stay applies to a

15   portfolio of litigation, the effect being that it applies to

16   each of the individual cases and each of the individual

17   defendants in those cases.  The stay is a blunt instrument,

18   but the impact of the stay is granular.

19               I am going to extend the stay for an additional

20   six months.  I do so recognizing that the stay has produced

21   and is continuing to produce dramatic benefits in case

22   administration, and I note that the settlements that have

23   been achieved demonstrate that the alternative dispute

24   resolution system is functioning at a high level; however,

25   this cannot go on indefinitely.

Page 52

1          At some point objecting parties will not need to

2     identify particularized prejudice as to them, because the

3     passage of time itself will serve that function.

4          As time passes memories fade and discovery

5     conducted next year may lead to a lot of answers that I hear

6     so frequently in depositions, quote, "I don't remember,"

7     close quote.

8          The stay is extended with the understanding that

9     at the next hearing, as if there is another hearing, the

10    burden to further extend the stay may be greater.

11          MS. MARCUS:  Thank you, Your Honor.

12          MR. LINDSMITH:  Thank you, Your Honor.

13          THE COURT:  Oh, and to be clear the objection of

14    Nationwide Life Insurance Company and Nationwide Mutual

15    Insurance Company is overruled.

16          MS. MARCUS:  Thank you, Your Honor.  The next

17    matter on the agenda, Your Honor, will be handled by Joseph

18    Serino of Kirkland & Ellis.

19        (Pause)

20          MR. SERINO:  May I begin, Your Honor?

21          THE COURT:  Sure.

22          MR. SERINO:  Good morning, Your Honor.  May it

23    please the Court.  My name is Joe Serino.  I'm here on

24    behalf of the debtors today in connection with their

25    application to subordinate Boilermakers' claims under 510(b)

Page 53

1    of the bankruptcy code.  Not here today to challenge the

2    allowance or the amount of those claims.  That will come at

3    a later time, if necessary.

4          I'd like to spend my time today focusing on three

5    points.  The first point is what I call a textural analysis

6    of section 510(b) demonstrating that the CMBS at issue here,

7    the collateralized mortgage-backed securities, are indeed

8    securities of the debtor, SASCO, as that phrase is used in

9    section 510(b).

10         The second point I'd like to make focuses on the

11   facts and circumstances of the actual CMBS transaction so

12   that we can make clear that the debtors actually did do the

13   heavy lifting here, not the trust, when it came to the CMBS

14   securities, and the final point, the third point, is a

15   rebuttal to Boilermakers' arguments regarding SEC rule 191

16   to show that that rule does not even address the issue of,

17   much less alter the conclusion that the CMBS are securities

18   of the debtor.  So let me begin with that textural analysis,

19   if I may, Your Honor.

20         The good news is the parties seem to agree on

21   quite a bit here, and the issue before this Court, I

22   believe, under 510(b) is a very narrow one.  In a nutshell,

23   it comes down to who is the issuer of the CMBS.  If it is a

24   debtor -- and it is.  It's SASCO -- then Boilermakers'

25   claims must be subordinated pursuant to 510(b), and I say

Page 54

1    that, Your Honor, because the parties agree that there are

2    three elements to a 510(b) mandatory subordination claim.

3            You have to have a security.  You have to have a

4    claim for damages arising out of the purchase or sale of

5    that security, and the security must be a security of the

6    debtor or its affiliate, and here, there is no dispute as to

7    the first two elements.  Boilermakers acknowledges that they

8    have a security.  They acknowledge their claim arises from

9    the purchase of that security.

10            The only question is whether Boilermakers' CMBS

11   are securities of the debtor, SASCO, as the debtors

12   maintain, or are they securities of the trust, as I think

13   Boilermakers is arguing, and the parties also agree,

14   Your Honor, that under applicable federal securities laws

15   and rules, the debtor, SASCO, as the depositor of the

16   collateral into the trust -- and we'll talk about this in a

17   bit -- is indeed the issuer.

18            I don't think there's any dispute about that in an

19   asset-backed securitized transaction like this that the

20   debtor for federal securities law purposes is the issuer,

21   and, in fact, in response to the debtor's initial argument

22   that Boilermakers' claims were dead on arrival for a lack of

23   privity between Boilermakers and the debtors, Boilermakers

24   itself invoked and relied on these very same federal

25   securities laws as its ticket of admission into these

Page 55

1   bankruptcy proceedings, and I quote.  At paragraph nine of

2   their response that they signed and filed with this Court on

3   October 13, 2011, Boilermakers said, quote, "Under the

4   Securities Act, whereas here the issuer of the securities is

5   merely a shell entity with no assets, the depositor, such as

6   SASCO, is considered the issuer and is liable under section

7   11 of the Securities Act."

8            So, in other words, in trying to talk themselves

9   out of a privity problem, they talked themselves into a

10  subordination problem, and, when they realized that -- when

11  they realized, well, common sense says a security must be a

12  security of its issuer, they pulled back a little bit, and

13  Boilermakers started to argue, well, these federal

14  securities laws identifying SASCO as an issuer of the CMBS

15  have very narrow application and have no place in these

16  bankruptcy proceedings or in the interpretation of 510(b),

17  yet they offered no support for that position.  In fact, I

18  think the authorities, the applicable authorities, cut the

19  other way, and there are lots of examples where courts

20  looked to federal securities laws in interpreting

21  securities-related bankruptcy statutes.

22           The most recent example -- we see it all the time

23  in the Madoff cases.  Judge Rakoff and others have routinely

24  looked at the federal securities laws in interpreting, for

25  example, the Safe Harbor of 546(e), but, even more

Page 56

1    importantly, Your Honor, I think --

2              THE COURT:  Don't get me started on that.

3              MR. SERINO:  I was afraid that was a sore subject,

4    but there was an interesting ruling yesterday, though, on

5    502(d) that came out from Judge Rakoff's chambers.  He

6    reversed himself.

7              So, just as importantly, Boilermakers' position, I

8    think, is inequitable.  They can't have it both ways.  They

9    can't be allowed to invoke these federal securities laws as

10   a sole basis to file their claim and to overcome their lack

11   of privity, on the one hand, and then, on the other hand

12   argue, well, these same federal securities laws should be

13   ignored when it comes to the --

14             THE COURT:  Well, --

15             MR. SERINO:  -- treatment of that claim.

16             THE COURT:  I don't mean to break into your

17   argument, but here's the conundrum.  As I understand it, the

18   securities that give rise to the damage claims are

19   securities that were issued by trusts, not by SASCO,

20   correct?

21             MR. SERINO:  No, Your Honor.

22             THE COURT:  Did SASCO -- we're not dealing with

23   trusts?

24             MR. SERINO:  We are dealing with trusts.  I took

25   issue with the notion that the trust issued the securities.

Page 57

1    I was taking issue with that notion.

2              THE COURT:  Well, the trust distributed the

3    securities, no?

4              MR. SERINO:  Not really, Your Honor, not really.

5    The trust -- I have a schematic, if I could hand up to the

6    Court, that I think may help with this.

7              THE COURT:  That may help.

8              MR. SERINO:  Based on a prospectus.  May I

9    approach?

10             THE COURT:  Yes, particularly since I said yes.

11             MR. SERINO:  Thank you, Your Honor.  I have one

12   for counsel as well.

13             I think under the applicable securities laws, the

14   trust is clearly called an issuing entity, no doubt about

15   that, and what happens here, Your Honor, if you look at the

16   prospectus --

17             THE COURT:  So are you quibbling with the

18   distinction between an issuer and an issuing entity?

19             MR. SERINO:  Correct, Your Honor.  I'm not

20   quibbling with it.  I am resting on that distinction.

21             There is a very much, under the federal securities

22   laws, a distinction between an issuer and an issuing entity,

23   and that's how Boilermakers was able to file the claim.  The

24   federal securities lawmakers say Boilermakers, if you buy

25   from a trust -- and they didn't do that here.  You'll see,

Page 58

1    but, if you buy from a trust and you think you've been a

2    victim of securities fraud, your remedy doesn't rest with

3    the trust.

4           You can look through it, and you can look to the

5    depositor as the issuer, because it is the depositor who is

6    the registrant of these securities.  It is the depositor who

7    owns the registration statement, the prospectuses and who

8    makes the misstatements or omissions, if any, and that is

9    the fundamental difference, and so, it would be anomalous to

10   have the federal securities laws say Boilermakers, if you

11   think you're a victim of a securities fraud, you can look

12   through this trust.  You can pierce it.  It's just a vessel.

13          You can pierce it and, at the same time, go after

14   the depositor, SASCO as the issuer and, at the same time,

15   deny that these securities you're suing on are securities of

16   SASCO.  That's the anomaly you would have if you buy

17   Boilermakers' argument, and what happens here, Your Honor,

18   is --

19          THE COURT:  Why don't you take me through the

20   chart?

21          MR. SERINO:  I will indeed.  So LBHI, who is the

22   debtor, originates mortgages or buys mortgages.  It pulls

23   them.  It then transfers them to SASCO, who is the

24   depositor/issuer.  That's what the federal laws say.  If

25   you're a depositor, you're the issuer.

Page 59

1              SASCO then takes the mortgage pools and gives them

2      to the trust.  They create a trust.  They deposit the

3      mortgage-pooled collateral into the trust.

4              The trust then gives certificates to SASCO.  SASCO

5      then registers the securities.  They file a registration

6      statement.  They do prospectuses, supplemental prospectuses,

7      offering memos, and they retain an underwriter, in this

8      case, LBI, who's in the SIPA proceeding, to interface with

9      the street and distribute the securities, sell the

10     securities.

11             LBI goes out to the Boilermakers of the world and

12     sells the securities.  The Boilermakers of the world pay LBI

13     for the securities.  LBI, as the underwriter, then strips

14     out its fees or its commission and gives the net offering

15     proceeds back to SASCO, where they stay.  That's SASCO's

16     payment for the mortgage pools.

17             So the certificates, Your Honor, never go from the

18     trust to the purchasers, to Boilermakers.  They go from the

19     trust to SASCO to LBI to Boilermakers.

20             The payments, the net offering proceeds for the

21     securities, never go from the purchaser, the Boilermakers of

22     the world, to the trust.  They go from Boilermakers to LBI

23     to SASCO, and, even the interest earned on the securities

24     doesn't come from the trust to Boilermakers.

25             It comes from a servicer or a master servicer to

Page 60

1    Boilermakers, and so, when you look at it this way,

2    Your Honor, that's what I meant by my second point.  The

3    trust is really simply a repository for the mortgage assets.

4    The debtors do everything else.

5            THE COURT:  Well, that may be, but there seem to

6    be some -- to me, some missing lines.  The net effect of the

7    transaction -- and I may be misunderstanding it -- is that

8    Boilermakers, as purchaser, ends up owning certificates in

9    the trusts.

10           MR. SERINO:  That's fair.

11           THE COURT:  Correct?

12           MR. SERINO:  That's fair, Your Honor.

13           THE COURT:  So the equity interests that it holds

14   are interests in a non-debtor.

15           MR. SERINO:  Well, if you're asking for comment on

16   that, Your Honor, I'm not sure I agree with that.

17           THE COURT:  Are you suggesting that the equity

18   interests are, in fact, debtor equity or debtor affiliate

19   equity?

20           MR. SERINO:  I think there is an argument that it

21   is debtor affiliated equity.  I think there's an argument --

22   I'm not making it now -- that the trusts are affiliates of

23   the debtor, because the trusts are subject to an operating

24   agreement between the debtors and the trust.  So I think

25   there's an argument that the trust could be an affiliate.

Page 61

1           I think the notion I was having some problem with

2     is the fact that these are debt securities, not equity

3     securities, and what Boilermakers actually has an interest

4     in is the pool of collateral that is owned by the trust, and

5     so, I guess I don't know if it's right to say they have an

6     equity interest in the trust.  I'm not saying that's wrong.

7     I'm just not certain that's right.  What I know I can say is

8     that Boilermakers has an interest in the pool of collateral

9     that is owned by the trust once the trust purchases that

10    collateral from SASCO.

11           THE COURT:  Now, what is the document that

12    evidences that interest?

13           MR. SERINO:  I believe it's their shares, their

14    certificates.

15           THE COURT:  Okay, and so, --

16           MR. SERINO:  And the offering documents would make

17    that clear as well.

18           THE COURT:  And we're talking about RMBS

19    securities?

20           MR. SERINO:  I think there's a combination here of

21    CMBS and RMBS.

22           THE COURT:  Okay.  We're talking mortgage-backed

23    securities that we're all familiar with?

24           MR. SERINO:  Correct.

25           THE COURT:  Those securities are not, however,

Page 62

1    equity interests in SASCO, are they?

2              MR. SERINO:  That's true, Your Honor.

3              THE COURT:  In what way is 510(b) implicated in a

4    setting in which Boilermakers does not have an equity

5    security in the debtor?

6              MR. SERINO:  I would say this, Your Honor.  Again,

7    I think the distinction between debt securities and equity

8    securities is a relevant one.  I think the cases that talk

9    about does the purchaser really have an equity interest in

10   the other entity really talks about equity securities where

11   it makes more sense than debt securities, where you're

12   dealing with claims, but, more importantly, Your Honor, if

13   you look at 510(b) -- and it's unambiguous, so we don't get

14   behind the statute or into its purpose or intent or the

15   legislative history -- there is no reference to having an

16   equity interest in the debtor.  You just need to have three

17   things.

18             You need to have a security.  You need to have a

19   claim arising from the purchase of that security, and it has

20   to be a security of the debtor, and our point is, when the

21   debtor is the issuer, when the debtor is the registrant,

22   when the debtor does the offering materials, you satisfy the

23   security of the debtor, and that's exactly, Your Honor, what

24   Judge Walrath did in the WaMu case.

25             We haven't found a lot of cases directly on point

Page 63

1    dealing with this question, but that's exactly what

2    Judge Walrath did when she was confronted with this issue of

3    whose securities are these.  She said -- she didn't ask

4    whether the security holder had an equity interest in an

5    entity.  She said, well, who's the issuer, because of the

6    debtor must at least mean or include who's the issuer of the

7    securities, and that's how she framed the dispositive

8    question under 510(b) regarding the phrase "of the debtor."

9         Now, unfortunately, she did not have before her

10   all of these federal securities laws and rules making clear

11   that, in an ABS transaction, the depositor is the issuer.

12   She didn't have that when she made her decision, but she

13   goes on in dicta to say I want to use a hypothetical where

14   one entity is selling Apple stock, and she makes clear that

15   the question is not merely who's doing the selling, but

16   whose securities are being sold, and Boilermakers places a

17   lot of reliance on that hypothetical, but I think that

18   hypothetical is actually a problem for Boilermakers'

19   position, because the debtors are analogous to Apple here.

20        Now, I can't say that the security holder has an

21   equity interest in the debtor, but I can say that, like

22   Apple, the debtors, not the trust or some downstream seller,

23   is the registrant of the securities being sold by others.  I

24   can say that, like Apple, the debtors and not some

25   downstream seller is the issuer of the securities being

Page 64

1    sold, and so, in other words, Your Honor, Boilermakers wants

2    to argue that it was the trust/issuing entity that did the

3    selling here, even though we've just been through a

4    schematic that says that's not really the case, but, if they

5    want to argue that, that still begs and leaves unanswered

6    the question under 510(b) whose securities were being sold.

7           Whose are they, and I think the federal securities

8    laws say they are the securities of the issuer.  They are

9    the securities of SASCO.

10          Now, Judge Bernstein had an interesting footnote

11   in in re: Granite partners.  If I may, Your Honor, approach?

12          THE COURT:  Yes.

13          MR. SERINO:  Footnote 18 of a 1997 decision.  So

14   it was not dealing with ABS, and it was dealing with the

15   "arising from" language under 510(b), not the other

16   securities language, but I think it applies with equal force

17   to the "of the debtor" phrase, and I think it applies to ABS

18   Securities.

19          First, talking about this distinction between

20   selling and issuers or an issuance-related claim,

21   Judge Bernstein said, "In addition, the Amerex (sic)

22   District Court apparently read section 510(b) as limited to

23   the issuance and sale of the security.  The statute does not

24   contain any such restriction, and it is not limited to

25   issuance-related claims," but then -- I think this is

Page 65

1    getting to where Your Honor was going.

2              Judge Bernstein goes on to explain why the

3    identity of the issuer is so important here, and he says,

4    "One who buys an outstanding share of stock on the open

5    market from a third party based upon false statements

6    uttered by the issuer holds a subordinated federal

7    securities fraud claim in the issuer's bankruptcy.  Although

8    the investor never deals with the issuer and does not allege

9    fraud in connection with the issuance of a security, his

10   claim would nonetheless fall within section 510(b)," and so,

11   that is the point here, Your Honor.

12             If the allegedly defective registration statement

13   and supplemental prospectuses in the offering materials of

14   SASCO are what give rise to Boilermakers' claim, then, just

15   like Bernstein recognized in in re: Granite Partners, that

16   means Boilermakers has a subordinated claim in SASCO's

17   bankruptcy.  If you're going to go after the issuer based on

18   the issuer's statement, your claim is subordinated in the

19   issuer's bankruptcy.  You don't have the claim against the

20   third party seller, and so, I would say, put differently,

21   Your Honor, if these CMBS are not the securities of the

22   issuer/registrant, SASCO, whose securities are they.  We

23   have to answer that question under 510(b).

24             The third point I wanted to make, Your Honor --

25   I'll skip the factual one, unless Your Honor has more

Page 66

1    questions about the factual one, but the point of that

2    factual analysis was to show that, contrary to Boilermakers'

3    representations, there was no effort to separate the debtors

4    from the certificates.  The debtors were intimately involved

5    in the distribution chain of the certificates.  The debtors

6    were intimately involved in the registration of the

7    securities, the sale of the securities, the service of the

8    securities.

9         The third point I wanted to make is based on some

10   submissions by Boilermakers, including a letter they

11   submitted to the Court before the last argument without

12   leave.  I think they're going to argue -- I may be wrong.  I

13   think they're going to argue that, even if these federal

14   securities laws do apply, one of those laws, SEC rule 191,

15   establishes, according to them, that the CMBS are securities

16   of the trust/issuing entity, not SASCO, the issuer.  I just

17   want to make two points in response to that argument,

18   Your Honor.

19        First, when SEC rule 191 talks about the depositor

20   being a different issuer from that same person acting as a

21   depositor for an issuing entity or for purposes of its own

22   securities -- it's a garbled rule, but that's what it talks

23   about -- it's not suggesting that the ABS, the asset-backed

24   securities, are not securities of their issuer.  That's just

25   counterintuitive, but it's certainly not suggesting that the

Page 67

1    ABS are securities of the trust.

2          Counsel is not going to be able to point you to

3    anything in SEC rule 191 or the comments that said the ABS

4    securities are securities of the trust.  The reason he's not

5    going to be able to do that is because it's not there and

6    because that's not the purpose of the rule.

7          That rule, 191, isn't there to figure out whose

8    securities they are.  The purpose of that rule is to tell

9    people that, when an issuer elects to issue securities

10   through an ABS trust structure rather than directly to the

11   public, they want to use a trust structure in between them

12   and the public -- when an issuer does that, what that rule

13   is saying -- you, issuer, are going to be subject to the

14   same exemption requirements under these federal rules.

15   You're not going to enjoy some exemption you may be entitled

16   to when you issue the securities directly.

17         That's the purpose of that rule.  It's not to

18   identify whose securities they are.  It's just saying, if

19   you choose to use a trust structure to issue securities,

20   you're going to have to go through the steps and get

21   whatever exemptions you may be entitled to using a trust

22   structure.  You're not going to be able to claim exemptions

23   you may be entitled to when you don't use a trust structure.

24   That's the purpose of the rule.  I didn't want the Court to

25   be confused by it.

Page 68

1          So, unless Your Honor has any further questions, I

2     am prepared to rest and would ask that the Court grant

3     debtor's petition to subordinate Boilermakers' claims

4     pursuant to 510(b).

5               THE COURT:  Okay.

6               Mr. Etkin?

7               MR. SERINO:  Thank you, Your Honor.

8               MR. ETKIN:  Good morning, Your Honor.  Michael

9     Etkin, Lowenstein Sandler, on behalf of the Boilermakers.

10          I think we do agree on one thing here, Your Honor,

11     with respect to the issue that's before the Court, and the

12     issue can be boiled down, pardon the pun, as to whether the

13     mortgage-backed securities, which I think the Court got

14     right -- they were issued by the trusts.  They were not

15     issued by SASCO, and I'll get to that in a moment.

16          Whether they're securities of the debtor or an

17     affiliate of the debtor, as set forth in 510(b), and, aside

18     from the language of 510(b) itself, which certainly doesn't

19     include the word issuer in its language in terms of the

20     applicability of 510(b), the character of the securities

21     themselves, which I'll discuss in a moment, and the SEC

22     rules -- we believe that the legislative history and the

23     stated purpose of 510(b), largely ignored by the debtor in

24     their papers, must also be taken into consideration.  That's

25     certainly what Judge Walrath did in connection with her

Page 69

1    opinion in Washington Mutual, and the bottom line there,

2    Your Honor, is that it's the concept of bootstrapping by an

3    investor who purchased equity or debt securities, and a lot

4    was said during counsel's argument that the distinction

5    between debt or equity securities is a significant one.  For

6    purposes of this issue, Your Honor, that's a distinction

7    without a difference.

8              They're not equity securities of SASCO.  I think

9    that's clear.  They're certainly not debt securities of

10   SASCO.  These mortgage-backed securities appear nowhere in

11   the capital structure of either LBHI or SASCO, despite the

12   fact that it's clear, as we've said in our papers, that

13   their fingerprints are all over this transaction, but that

14   isn't the standard by which 510(b) applies.

15             That's not the language of 510(b).  That's not how

16   it's been interpreted in the past.  So I think you have to

17   look at all of those issues in order to deal with the issue,

18   the singular that's before Your Honor today.

19             Now, the debtor advances two arguments in support

20   of their position, one that Boilermakers somehow admitted

21   that 510(b) applies by virtue of referring to SASCO as both

22   depositor and issuer in its prior response to the initial

23   claim objection and -- I'm sorry, Your Honor.  There's no

24   getting around that, Your Honor.

25             That's true, and there's no getting around rule

Page 70

1     191, which deems the depositor, in this case, SASCO, as the

2     issuer for reporting and disclosure purposes, because the

3     issuer does not have a board of directors.  It is a created

4     entity in connection wit this transaction, and the SEC, in

5     its wisdom, wanted to make sure that there was somebody

6     making disclosures and making filings that, at the end of

7     the day, would be responsible.

8              Now, that doesn't go to the issue of whether the

9     securities are securities of SASCO or not.  You have to look

10    at the security itself.  You have to look at the investment.

11    You have to look at the risk that purchasers were

12    undertaking in order to determine whether 510(b) should

13    apply, and I'll get to that.  I know we've covered it in our

14    papers, Your Honor, but I think, you know, it's important to

15    emphasize at least a couple of issues here.

16             Your Honor, let's talk about the certificates

17    themselves.  Now, counsel did hand out this schematic.  I

18    must tell you that I don't necessarily agree with it.  It's

19    the first that I've seen it, and, to the extent it's

20    intended for the evidence of the transaction, I don't think

21    there's any evidence before Your Honor to support the

22    position that they're attempting to take through this

23    schematic.

24             THE COURT:  It's simply to facilitate argument.

25    It's not evidence.

Page 71

1              MR. ETKIN:  Oh, I understand that, Your Honor.  I

2    understand that, Your Honor, and, for that purpose, I have

3    no objection.  I just want to point out that it's used to

4    reach a conclusion that's really not the supportable

5    conclusion with respect to this case and the issue before

6    Your Honor.

7              First of all, the certificates in question

8    represent, as the Court pointed out, interests in non-debtor

9    trusts and the mortgages that the trusts hold.  That's what

10   these certificates represent.  Those are the interests that

11   have been purchased by Boilermakers and others who purchased

12   these mortgage-backed securities.

13             The trusts, as you've heard, Your Honor, are the

14   issuing entity in connection with these securities, and

15   there's a distinction with a difference, which I'll get to

16   in a moment as well.  The certificates represent obligations

17   of the trust to pass through funds or payments received in

18   connection with the underlying mortgages.

19             Now, Your Honor, there was reference in the

20   debtor's first reply to an August 8th, 2006 registration

21   statement, although it wasn't attached to their papers.  For

22   purposes of the hearing today, I didn't pull all 1,800 pages

23   of it, Your Honor, for everyone's benefit, but I did pull

24   the first 80 pages of it, which have some relevant

25   statements in the registration statement itself, again, the

Page 72

1    one that was referred to in the debtor's papers.

2              If I may approach?  I've handed a copy to counsel

3    already.

4              THE COURT:  Yes, you may approach.

5              MR. ETKIN:  There are a couple of things in here

6    that are worth pointing out, and I won't take much time,

7    because it's only a few things.  If Your Honor turns to the

8    -- I guess what's indicated as the fourth page, it indicates

9    Structured Assets Securities Corp., and then, underneath it,

10   depositor, and then, it talks about, below that, what each

11   trust fund does, the trusts that we've been talking about,

12   and the first bullet point there is may periodically issue

13   asset-backed pass-through certificates or asset-backed notes

14   in each case in one or more series with one or more classes.

15             Hence, the conclusion that the trust is the issuer

16   of these securities or issues these securities or is the

17   issuing entity, and, if you look below that, there's a

18   reference to the securities with a colon next to it, and the

19   second bullet point there says that the securities will

20   evidence beneficial ownership of or be secured by the assets

21   in the related trust fund and will be paid only from the

22   trust fund assets described in the related prospectus

23   supplement.  Again, not the debtor's assets, not a security

24   of the debtor, and not based upon any investment in the

25   debtor and the financial success or failure of SASCO or any

Page 73

1    other debtor as an entity.

2            If you look at page six, Your Honor, the last full

3    paragraph, it talks about the depositor's only principal

4    obligations, and those are the representations and

5    warranties made by the depositor.  Those are its

6    obligations.

7            Just a few more to drive the point home,

8    Your Honor.  If you look at what's marked as page 40, it

9    talks about limited obligations and that the assets of the

10   trust fund -- and I'm quoting -- "are the sole source of

11   payments on the related securities.  The securities are not

12   the obligations of any other entity."  That's from the

13   registration statement.

14           Pardon me for one second, Your Honor.

15           Going further into the document, look at page 49.

16   Talks about the trust funds, and then, the first paragraph

17   underneath that, it says, "The securities will be non-

18   recourse obligations of" -- and I emphasize the word of --

19   "the trust funds, not of SASCO, not of any other debtor.

20           It's of the trust fund, and then, you go further,

21   that the holders may not proceed against any assets of the

22   depositor or its affiliates or assets of the trust fund not

23   pledged to secure the notes, and then, finally, Your Honor,

24   the depositor, on page 79, which is the next-to-last page,

25   is just identified as SASCO.  Nowhere is SASCO identified as

Page 74

1    the issuer.  SASCO being deemed an issuer is a function of

2    rule 191, which again, I will get to in a moment, and the

3    debtor's pretty much admit this point, Your Honor, or

4    concede this point.

5            When you look at their initial claim objection --

6    and I'm reading from paragraph two, and I'm quoting.  "The

7    no liability CMBS claims are all filed by holders of

8    securities that are issued by non-debtor securitization

9    trusts.  These securitization trusts purchase commercial

10   mortgage loans from the debtor and issued securities

11   collateralized by receipts of payment of interest or

12   principal on the loans.  The debtors did not issue the

13   securities to the security holders and are not liable for

14   any payments to the holders of such securities or any other

15   obligations of the trust."  I wholeheartedly agree with that

16   statement from the debtor's papers, Your Honor.

17           They go on to state, in paragraph 11 -- and I'm

18   quoting again.  "The security holders as holders of

19   securities issued by the trusts and pursuant to the

20   indentures, trust agreements, or other documents governing

21   the securities are creditors of the trusts only."  The

22   trusts are not obligations of any debtor, Your Honor.

23   They're not obligations of any affiliate.

24           I heard counsel allude to the affiliate argument

25   that they don't make in their papers.  The only argument

Page 75

1    that they make and that's before the Court today is the

2    argument that these certificates are securities of SASCO for

3    purposes of 510(b), and finally, Your Honor, the return on

4    investment is based solely on the performance of the

5    underlying loans owned by the trust.  It's not based on the

6    performance of any debtor entity.

7            The mortgages are not property of any debtor's

8    estate.  They're property of the trusts, and purchasers of

9    these securities are not taking a flier on whether any

10   debtor is going to perform well, not perform well, the

11   financial position of any debtor.  Their investment is

12   solely focused on whether these mortgages owned by the trust

13   perform or don't perform.

14           Now, what is the Boilermakers' relationship with

15   the debtors?  They have one relationship here and one

16   relationship only, Your Honor, and that relationship is that

17   of a tort with (sic) them.  There are section 11 claims

18   under the securities laws, again, alluded to by plaintiff's

19   counsel, because the SEC, again, in their wisdom, decided in

20   a transaction like that that someone else needs to make

21   representations and disclosures, and, to the extent that

22   they make misrepresentations or fail to disclose, they're

23   responsible.

24           That doesn't turn these certificates into

25   securities of that debtor entity.  Again, they are not, and

Page 76

1    there are other claims as well as a tort victim, obviously,

2    misrepresentation claims, et cetera.  Those are the claims

3    that are at issue here.

4              THE COURT:  What's the amount of those claims?

5              MR. ETKIN:  Your Honor, the amount of the claims

6    in total asserted that are the subject of this objection are

7    somewhere around $12 million plus, give or take.  I didn't

8    do the math.  I have the numbers for each of the claims.  I

9    neglected to add them up.  I apologize, but it's all in our

10   papers (sic).

11             Your Honor --

12             THE COURT:  And what's the basis for the claim?

13             MR. ETKIN:  The basis of the claim are

14   misrepresentations in connection with the information that

15   was provided by SASCO as depositor in connection with this

16   security.

17             THE COURT:  It sure does sound like a garden

18   variety securities claim, doesn't it?

19             MR. ETKIN:  It is a securities claim, but it's not

20   a securities claim involving a security of any debtor.  Yes,

21   we're not disputing that there's a securities claim element

22   to this at all.  We've admitted to that up front.  There are

23   also state law claims for misrepresentation and fraud here

24   as well, but those claims are based upon the conduct of

25   SASCO as depositor in connection with this transaction.

Page 77

1           THE COURT:  The challenge here is that we're

2     dealing with a highly structured transaction that is

3     susceptible of multiple characterizations, depending upon

4     which part of it you examine most closely, and we also have

5     the interface of securities law principles and bankruptcy

6     principles, and I suspect that at the time that this was all

7     being put together, there wasn't one brain that decided what

8     would be the right result in a situation like this.  As a

9     result, we're all making it up.

10          MR. ETKIN:  Well, this is a novel issue,

11    Your Honor, but I think there was one brain that decided, as

12    is the case in most mortgage=-backed securities transactions

13    and offerings that I've seen and is the case in this

14    registration statement, that there's an effort to place a

15    distance between the sponsor, the depositor, and the issuing

16    entity in terms of who has obligations and who doesn't and

17    what you're buying and what you're not buying and what

18    assets stand behind these securities and what assets don't,

19    and that's all over the registration statement, and it's

20    clear from the face of this transaction that there was an

21    intentional effort to create space between the debtors and

22    the issuing entity who issued these certificates, based upon

23    the mortgages that they owned, the pools of mortgages that

24    they owned.

25          I do want to point out one other thing in page 12

Page 78

1    of the debtor's reply that first raised the issue of 510(b),

2    because a statement was made, Your Honor, that there's

3    nowhere in the SEC regulations that we're talking about here

4    today that talks about these securities being securities of

5    the trusts.  Well, I beg to differ.

6            I'll get to some more examples in a moment,

7    Your Honor, but, if you look at paragraphs 31 and 32, where

8    they quote the language from the SEC rules, the language

9    they quote is that the depositor for the asset-backed

10   securities, acting solely in its capacity as depositor, to

11   the issuing entity is the issuer for purposes of asset-

12   backed securities of that issuing entity.  That's the

13   language.  Of that issuing entity, and similarly, with

14   respect to the exchange act (sic), same language.  The

15   depositor for the asset-backed securities, acting solely in

16   its capacity as depositor to the issuing entity is the

17   issuer for purposes of the asset-backed securities of that

18   issuing entity.  Now, that tracks precisely, Your Honor, the

19   language of 510(b) in terms of whether these securities are

20   securities of SASCO or securities of the issuing entity.

21           Let me get, for a few moments, Your Honor, into --

22           THE COURT:  But 510(b) doesn't use the term issuer

23   or issuing entity.

24           MR. ETKIN:  That's absolutely correct, Your Honor,

25   but we know who the issuing entity is.  That's the reason

Page 79

1   why I quote the language.  There's no dispute that the

2   issuing entity are the trusts.  So, if you just substitute

3   trusts for issuing entity, you come up with the inescapable

4   conclusion that even the SEC saw these as asset-backed

5   securities of the trusts, of the issuing entity.  That's the

6   reason I quote the language, and there is more evidence,

7   Your Honor, from the regulations themselves supporting

8   Boilermakers' position here today, and the letter that we

9   did send to Your Honor with the excerpts from the cite that

10   we provided in our papers were just an effort to make life

11   easier for the parties.  It wasn't anything new.  It was

12   just to put it front and center before Your Honor for

13   purposes of reviewing the issues and the papers before the

14   Court.

15          Again, if you look at the first page that we

16   provided Your Honor, a is the language that I just quoted,

17   and b is the language that makes the distinction between an

18   issuer for purposes of this rule and an issuer for purposes

19   of that person's or entity's own securities.  So it's clear

20   that the SEC even recognized that these securities are not

21   SASCO's or the depositor's own securities.

22          Then, we go to the second page that we provided

23   Your Honor, a comment on the rule, and I'll just, you know,

24   quote one piece of language here.  We are adopting -- this

25   is from the comments from the SEC.  "We are adopting new and

Page 80

1    amended rules and forms to address comprehensively the

2    registration disclosure and reporting requirements for

3    asset-backed securities under the Securities Act of 1933 and

4    the Securities Exchange Act of 1934."

5            Again, this flows with the inescapable point, from

6    our perspective, Your Honor, that deeming the depositor the

7    issuer is to deal with registration disclosure and reporting

8    requirements as it relates to the registration statement and

9    the issuance of the securities by the trusts.

10            The next thing I'll point to, Your Honor -- and I

11    think these are -- it's short, and I believe these are

12    important -- is what's marked at the bottom as page 10,

13    talking about the structure of asset-backed securities, and

14    again, I'm quoting.  "The structure of asset-backed

15    securities is intended, among other things" -- this is the

16    point you were talking about a moment ago, Your Honor -- "to

17    insulate ABS investors from the corporate credit risk of the

18    sponsor that originated or acquired the financial assets."

19            So these securities themselves are not, as 510(b)

20    describes in its legislative history, as Slain and Kripke

21    describe in their law review article which led to the

22    enactment of 510(b), as Judge Walrath talks about in her

23    opinion in WaMu -- this is not an example of Boilermakers or

24    any other purchaser buying an investment, whether it's a

25    debt or equity investment, in SASCO or in LBHI and taking

Page 81

1    the risk of whether either of those entities succeed or fail

2    economically, and then, when they fail and when the

3    securities purchaser, debt or equity, is dissatisfied, they

4    institute a fraud claim against one or both of those

5    entities attempting to bootstrap themselves up the ladder to

6    the status of unsecured creditor.  That's what 510(b) was

7    intended to deal with, and that just isn't present in this

8    case.

9            THE COURT:  But there is bootstrapping, because

10   you're making a claim against SASCO as issuer with respect

11   to securities that you are urging are remote from SASCO, and

12   the crossover is the problem.

13           MR. ETKIN:  Well, Your Honor, I understand the

14   Court's point, but where asserting claims against SASCO as

15   depositor by virtue of the role that it played in connection

16   with these certificates and the representations that it made

17   and the disclosures that it made.  These are tort claims

18   against SASCO based upon the role that it played in this

19   transaction.

20           Far be it for us to even suggest that a debtor

21   entity was not involved in connection with these securities

22   as sponsor or depositor.  Again, they were very much

23   involved in creating this type of security.

24           THE COURT:  But the securities are out there in

25   great quantity.  We, I think, recognize that they're unique

Page 82

1   creatures of Wall Street.  They are highly structured, and

2   it is the rare ordinary human being who understands them.

3           One of the problems here, though, is that you're,

4   in effect, trying to have it both ways.  You're asserting a

5   benefit associated with the highly structured nature of the

6   transaction while imposing a burden associated with SASCO's

7   role in having caused these securities to be issued in the

8   first place.

9           MR. ETKIN:  Your Honor, I don't think we're trying

10  to have it both ways, and, if one of the issues that the

11  Court is concerned about is the fact that there may be a

12  securities law violation here, even if there wasn't, there

13  would still be state law misrepresentation and fraud claims

14  and fraudulent misrepresentation claims to assert against

15  SASCO based upon its role in connection with this

16  transaction.

17          What you have to come back to, in our view, is

18  what 510(b) is intended to prevent, and it's not intended to

19  shield SASCO in connection with this transaction from its

20  own tortuous conduct in connection with this transaction,

21  where SASCO may be deemed an issuer for SEC reporting and

22  disclosure purposes, but these are equally clearly not

23  securities of SASCO and not securities of a debtor, and,

24  when you look at the mindset of the investor and the

25  information before the investor and all of the statements in

Page 83

```
1     the registration statement as to whose obligations these

2     are.  An investor is not purchasing these certificates based

3     upon the financial condition or the financial performance of

4     SASCO or a debtor, which would be the case if they were

5     purchasing equity or debt securities --

6               THE COURT:  Are these rated securities?

7               MR. ETKIN:  Your Honor, I believe they were rated

8     securities at the time, but I don't know exactly where they

9     stand today.

10              THE COURT:  So they were being purchased on the

11    strength of a rating?

12              MR. ETKIN:  Well, I think there has been some

13    litigation on that issue as well, Your Honor, and I think --

14              THE COURT:  We're not litigating that here.

15              MR. ETKIN:  I know, and I think, you know,

16    somebody put Standard & Poor's in the spotlight recently

17    with respect to some of that, but that's not why we're here.

18              THE COURT:  I understand your argument.

19              MR. ETKIN:  Let me just -- if I may, Your Honor.

20    I know I've been droning on for a while, but bear with me

21    for a couple more minutes.

22              THE COURT:  I think it's really only going to be a

23    couple of more minutes, because it's just about noon time,

24    and there are still people to be heard.

25              MR. ETKIN:  That's fine, Your Honor.  I'll be as
```

Page 84

1    quick as I possibly can.

2            I think page 11 -- again, I want to note for the

3    Court the comments of the SEC as to what these regulations

4    are for, which were Securities Act registration, disclosure

5    communications, and ongoing reporting requirements, again,

6    consistent with the position that we've taken.  If you look

7    at page 20, which we've provided with the Court, the

8    beginning of the second paragraph, where it states, "As with

9    the Securities Act, we are adopting our proposed

10   specification that the depositor is the issuer for purposes

11   of Exchange Act reporting regarding asset-backed

12   securities."  Not that the depositor is all of a sudden the

13   issuer of these securities for purposes of 510(b), and

14   finally, Your Honor --

15           THE COURT:  I understand your argument, Mr. Etkin.

16   You really have to wrap it up.

17           MR. ETKIN:  Thank you, Your Honor.

18           Your Honor, with that, I think our papers have

19   adequately stated the rest of the argument.  I'll defer with

20   respect to Your Honor's concerns about time.

21           There was a judicial admission argument in the

22   debtor's response that I think we've dealt with and

23   demonstrated that there was no admission here that 510(b)

24   applies to these securities, and, with that, I appreciate

25   the Court's time.

Page 85

1                THE COURT:  Okay.

2                Is there anything more?

3                MR. SERINO:  No reply, Your Honor, unless you have

4       questions for us.

5                THE COURT:  No.

6                This is taken under advisement.

7                MR. SERINO:  Thank you, Your Honor.

8                THE COURT:  I do have one question.  Assuming,

9       just for the sake of discussion, that I were to determine

10      that the claims are not to be subordinated under 510(b), I

11      assume that there are continuing objections to the claim

12      with respect to quantum causation and a variety of other

13      objections, correct?

14               MR. SERINO:  Absolutely, Your Honor.

15               THE COURT:  And, assuming that I were to determine

16      that the claims properly are to be subordinated under

17      510(b), I assume that, in practical terms, that would mean

18      no recovery?

19               MR. SERINO:  That is correct, Your Honor, and we

20      were candid about this in our papers.  This is not just a

21      $14 million issue.  We've got billions of these securities

22      out there, so there will be some trickle-down effect of

23      Your Honor's decision either way.

24               THE COURT:  I understand.  Thank you very much.

25               MR. SERINO:  Thank you, Your Honor.

Page 86

1           MR. ETKIN:  Thank you, Your Honor.

2           MR. HORWITZ:  Your Honor, Maurice Horwitz, Weil,

3    Gotshal & Manges, on behalf of Sullivan's, Inc. (ph).  The

4    next item on today's agenda is LBHI's objection to the claim

5    filed by CF Midas Balanced Growth Fund that is claim number

6    67193, which is included on the one hundred and forty-third

7    omnibus objection to claims.

8           The claim is based on LBHI's guarantee of a

9    structured note issued by Lehman Brother's Treasury Co. and

10   held by the Midas Fund.  LBHI objected to this claim,

11   because it was filed approximately one year after the bar

12   date applicable to Lehman Program Securities' claims.

13          The Midas Fund has argued that its claim should be

14   deemed timely filed on the grounds of excusable neglect, and

15   the plan administrator has argued that the Midas Fund has

16   failed to demonstrate grounds for such a finding.  A hearing

17   was held two months ago on December 19th, 2012, at which the

18   parties presented their arguments on the excusable neglect

19   issue.

20          In addition, counsel for the Midas Fund argued

21   that its claim has been allowed, not withstanding LBHI's

22   pending objection and that before this Court considers the

23   excusable neglect issue, it must determine whether section

24   502(j) of the bankruptcy code applies to the late filed

25   claim.  Section 502(j) provides that a claim that has been

Page 87

1    allowed or disallowed may be reconsidered for cause.

2            At the close of the hearing, Your Honor requested

3    that the parties submit concise supplemental briefing on

4    this discrete question and reserved judgment on the question

5    of excusable neglect until the applicability of section

6    502(j) had been determined.  The Midas Fund submitted its

7    supplemental brief with respect to the applicability of

8    section 502(j) on January 21st, 2013.  That is at ECF No.

9    34056, and the plan administrator filed its reply on

10   January 28th, 2013.  That is at ECF 34230.

11           Your Honor, the Midas Fund's claim is one of

12   approximately 21,000 proofs of claim that were filed against

13   LBHI based on LBHI's guarantee of Lehman Program Securities

14   as they're defined in the bar date order.  These were highly

15   -- these are highly complex instruments, and the

16   determination of allowed amounts for claims based on these

17   instruments is a very complex matter.  For certain of LBHI's

18   creditors who held substantial number of these securities,

19   it was essential that LBHI devise a way to consensually

20   resolve as many of these claims as possible pursuant to a

21   consistent valuation methodology.

22           In the summer of 2011, in connection with the many

23   settlements and compromises that led to the consensual

24   confirmation of the debtor's plan, LBHI proposed a set of

25   procedures that would enable LBHI to propose allowed amounts

Page 88

1    to these thousands of claim holders as efficiently as

2    possible and either agree or consensually resolve their

3    disputes as to those amounts without affecting those

4    claimants' substantive rights in any way.  The procedures

5    that were ultimately approved by this Court do just that,

6    and LBHI sent notices of proposed allowed amounts with

7    respect to those 21,000 claims, and claimants were given 60

8    days to object to the amounts proposed.  If no objection was

9    interposed, the claims would be allowed in the amounts

10   proposed.

11           Your Honor, this was clearly a mass mailing.  Its

12   purpose was to provide as many noteholders as possible with

13   the opportunity to opt in to LBHI's proposed valuation

14   methodology through quick and expedient procedures that also

15   preserved all of the claimants' substantive rights,

16   specifically the right to opt out of these procedures and to

17   opt out of the effect of the order that approved those

18   procedures.  This was a necessary exercise, and it led to

19   the -- it was one of the factors that led to the

20   confirmation -- the consensual confirmation of this plan.

21           Because of the unprecedented scope and nature of

22   this exercise, it was critical that the order approving

23   these procedures and the confirmation order preserve LBHI's

24   right to object to those claims on other grounds.  Many of

25   those grounds are procedural grounds, and they include that

Page 89

1    the claim was not properly or timely filed.  For this

2    reason, both the order approving those procedures and the

3    confirmation order clearly preserve LBHI's right to object

4    to those claims, even after a valuation notice has been

5    sent.

6            The Midas Fund's late filed claim is precisely

7    this type of claim.  That claim had been pending on the

8    debtor's one hundred and forty-third omnibus objection to

9    claims for months when LBHI sought approval of the program

10   securities procedures and after it sent its valuation

11   notices.

12           The Midas Fund received this notice and,

13   therefore, received notice of the existence of the order

14   approving those procedures, and it didn't object within the

15   60 days provided in that notice.  In other words, the Midas

16   Fund chose not to opt out of those procedures and the

17   effects of that order approving those procedures, including

18   the reservation of rights enabling the plan administrator to

19   prosecute this objection today.

20           Nevertheless, the Midas Fund has insisted on

21   arguing that, by receiving this notice, LBHI somehow

22   withdrew or mooted its objection and that its claim is now

23   deemed allowed because no objection is currently pending.

24   The fund has argued, in addition, that because of this, the

25   plan administrator must now move for reconsideration of the

Page 90

1    late filed claim pursuant to 502(j) of the bankruptcy code.

2            As we note in our supplemental papers and as this

3    Court noted at the prior hearing on this matter, section

4    502(j) does speak in terms of a deliberative process.  There

5    must have been some consideration for there to be a

6    reconsideration, and that consideration has to be one of the

7    Court.  The bankruptcy rule that implements section 502(j)

8    makes that very clear.

9            Rule 3008 of the federal rules of bankruptcy

10   procedure provide that a party and interest may move for

11   reconsideration of an order allowing or disallowing a claim

12   against the estate.  There is no procedural rule that would

13   implement section 502(j) for the purpose of challenging a

14   claim that is deemed allowed under section 502(a) because no

15   party has objected to that claim.  The proper means of

16   challenging such a claim is by filing an objection pursuant

17   to rule 3007.  That is why those two rules exist side-by-

18   side.

19           Now, the Midas Fund was afforded the opportunity

20   to submit to this Court its best authority that would

21   support an argument that section 502(j) should apply to the

22   late filed claim.  The only citation offered in the fund's

23   supplemental brief is to Yancy v. Citifinancial, 301 B.R.

24   861 from the Bankruptcy Court of the Western District of

25   Tennessee.  The Midas Fund argues in its brief that if

Page 91

1    section 502(j) applied only to orders and not to claims that

2    had been deemed allowed, then this would be contrary to the

3    reasoning in Yancy, but, as we state in our papers, the

4    holding in Yancy does not stand for that proposition at all.

5         Moreover, the facts in Yancy only go to reinforce

6    the plan administrator's argument that section 502(j), as

7    implemented through rule 3008, can only apply to the

8    reconsideration of an order.  The claim that was at issue in

9    Yancy was allowed pursuant to an administrative order such

10   that is common in Chapter 13 cases in the Western District

11   of Tennessee.  So, when the Court in Yancy held that the

12   debtor in that case should file a motion to reconsider the

13   claim of a secured creditor, it did so because that claim

14   had been allowed pursuant to an order entered in that case.

15   It was not a claim that was deemed allowed under section

16   502(a) of the bankruptcy code.

17        At least one district court has agreed with our

18   reading of Yancy.  We cite in our papers to the consolidated

19   appeal in re: Chapter 13 proceedings of Herrera 369 B.R. 395

20   from the Eastern District of Wisconsin, which the district

21   court disagreed with creditors attempting to cite Yancy for

22   the proposition that, if a claim has been deemed allowed, it

23   can only be challenged by way of a motion for

24   reconsideration.

25        In those cases, the facts were more similar to the

Page 92

1    facts in this case.  The claims at issue had not been

2    allowed by an order.  Instead, the Chapter 13 trustees in

3    those cases had sent notices indicating their intent to pay

4    certain secured claims.  No objections were interposed

5    within the timeframe set by those notices, and subsequently,

6    the debtors moved to dismiss -- the debtors moved -- I'm

7    sorry.  The debtors commenced out of state proceedings to

8    disgorge payments of those -- that the trustees had made to

9    those secured creditors.

10            When the defendants moved to dismiss those

11   adversary proceedings, the bankruptcy court ruled that the

12   debtors should have filed motions for reconsideration under

13   rule 3008.  On appeal, the district court reversed this

14   decision of the bankruptcy court and made a very clear

15   holding.  Reconsideration applies after the bankruptcy court

16   issues an order, not before.  The district court reasoned

17   that, if rule 3008 applies to claims that were merely deemed

18   allowed, the debtors would always be required to move for

19   reconsideration and would never be required or able to

20   object under rule 3007.

21            As the Midas Fund states in its own brief, there

22   is no order entered in these cases allowing the fund's late

23   filed claim.  Therefore, based on the arguments in our

24   papers and the cases cited by the plan administrator in its

25   supplemental reply, the plan administrator submits that

Page 93

```
 1    section 502(j) does not apply to the fund's late filed

 2    claim.

 3          The Midas Fund also, as a factual matter, cannot

 4    argue that its claim is deemed allowed under section 502(a)

 5    of the bankruptcy code, at least not under the terms of the

 6    plan that governs in these cases.  This claim was not timely

 7    filed.  Under the plan, an allowed claim is defined as a

 8    claim that is not disputed, and disputed means, among other

 9    things, with respect to a claim, the claim as to which a

10    proof of claim was not timely or properly filed.

11          So, under the terms of this plan, this is not an

12    allowed claim.  It is a disputed claim, even in the absence

13    of an objection by the plan administrator or LBHI.

14          Now, the fund has argued that, by sending the

15    notice, a valuation notice, LBHI somehow withdrew or mooted

16    its objection and rendered the late filed claim to be an

17    allowed claim, but, Your Honor, if this valuation notice had

18    had any legal impact at all, it was only pursuant to an

19    order entered by this Court, an order approving the

20    procedures for sending those notices and preserving LBHI's

21    right to prosecute this objection.

22          The fund argues that just the reservation of

23    rights should not apply and that, in effect, it should be

24    able to pick and choose provisions of that order that will

25    or will not apply to it.  Its justification for this
```

Page 94

1    argument is that it was never provided notice of the order,

2    but, in fact, every recipient of the valuation notice,

3    indulging the Midas Fund, had ample time to object and to

4    opt out of the effects of that order.

5           In fact, it had 60 days to object and opt out,

6    whereas, if they had only had notice of the motion to

7    approve the order, they would have had only 15 days.  The

8    Midas Fund chose not to opt out of the effect of that order.

9    The Midas Fund, therefore, has no basis for arguing that the

10   notice it received had the effect of barring or mooting

11   LBHI's objection.  Either the procedures order applies in

12   this case -- and, in which case, LBHI's right to prosecute

13   this objection has been preserved, or it does not apply, in

14   which case the valuation notice had no legal impact at all.

15          The objection has never been withdrawn by LBHI.

16   On the contrary, as we indicate in our reply, LBHI filed six

17   notices of adjournment of this objection after the

18   structured securities valuation notice was sent to the Midas

19   Fund.  The Midas Fund has not indicated in any way that it

20   was prejudiced by the receipt of this notice.  As stated at

21   the last hearing, it's not clear what the Midas Fund would

22   have done in detrimental reliance on this notice, and it is

23   not clear how the Midas Fund would have acted differently if

24   it had never received this notice.

25          For all of these reasons, Your Honor, the plan

Page 95

1    administrator submits that section 502(j) should not be

2    applied to the late filed claim and that the plan

3    administrator should be permitted to proceed with

4    prosecuting its objection to the late filed claim.

5              THE COURT:  Thank you.

6              MR. GEOGHAN:  Your Honor, David Geoghan, Young,

7    Conaway, Stargatt & Taylor.  I'm actually -- Mr. Patrick

8    Jackson, also an associate from my firm, is going to lead

9    the argument for us.

10             THE COURT:  All right.

11             MR. GEOGHAN:  Thank you, Your Honor.

12             MR. JACKSON:  Good afternoon, Your Honor.  Patrick

13   Jackson as Mr. Geoghan indicated from Young Conaway on

14   behalf of the CF Midas fund.

15             I think the way that -- that counsel has just teed

16   this up, I actually think it's pretty simple.  It boils down

17   to essentially three issues, but the first I would like to

18   tackle right away was that I agree that the purpose of our

19   brief was to put our best authority forward on this notion

20   that 502(j) applied and would require allowance of our claim

21   here.  And I definitely take issue with the assertion that

22   we didn't put good authority forward, or that the only

23   authority we put forward was a Chapter 13 case.

24             The primary authority and the best authority that

25   I put forward and the best authority that you can put

Page 96

1    forward is 502(j) of the code. The Bankruptcy Code, of

2    course, is primary authority for anything -- any plausible

3    interpretation that -- that it --

4              THE COURT:  Well, it doesn't --

5              MR. JACKSON:  -- will rest upon.

6              THE COURT:  -- apply here.

7              MR. JACKSON:  Section 502(j) of the code provides

8    --

9              THE COURT:  I just said it doesn't apply here.

10             MR. JACKSON:  It -- it applies, Your Honor.

11             THE COURT:  It doesn't apply here.

12             MR. JACKSON:  A claim that has been -- allowed or

13   disallowed --

14             THE COURT:  It only applies -- it can't apply to

15   trap in this instance.  I had this argument last time.  This

16   is a gotcha moment.  This is an attempt to exploit something

17   and misappropriate for your -- for your benefit.  It's

18   completely -- it's completely bogus.  Your argument makes no

19   sense.

20             So with that, what can you tell me to convince me

21   otherwise?

22             MR. JACKSON:  Well, I can tell you that at least

23   one Court's disagreed with that and one Court has ruled --

24             THE COURT:  There's no rule that has --

25             MR. JACKSON:  -- the cornerstone of this ruling --

Page 97

1          THE COURT:  -- ever -- there is -- there is no

2     Court that has ever had the opportunity to rule on a

3     situation like this.  There is no precedent that actually

4     applies here.  So you're right.  You have to look at the

5     Bankruptcy Code.  And if you look at the Bankruptcy Code I

6     would like your best argument as to how it actually applies

7     to this fact pattern.

8          MR. JACKSON:  Well, let's look at the rules, since

9     that's something that counsel has proposed as illustrative

10    of what 502(j) means.

11         Now counsel indicated that there is no bankruptcy

12    rule apart from Rule 3008 that could possibly implement

13    502(j) of the code, and because Rule 3008 explicitly refers

14    to an order, so the argument goes, then 502(j) must be

15    cabined by that and must be limited to orders.

16         Under the Bankruptcy Rules, that's not true.

17    Bankruptcy Rule 9024 by its express terms applies to

18    reconsideration requests as well.  9024 implicates --

19    imparts into the bankruptcy context Rule 60 of the Federal

20    Rules of Civil Procedure.  Rule 60, in turn, provides for

21    relief from final orders, judgments or proceedings.  That's

22    broader than orders.

23         Rule 9024, to the extent there's any doubt that

24    9024 and Rule 60 apply to reconsideration under 502(j), 9024

25    includes a caveat saying that Rule 60 applies in bankruptcy.

Page 98

```
 1    However, the timing limitation set forth in Rule 60 with

 2    respect to certain kind of reconsideration does not apply to

 3    the reconsideration of a claim -- the reconsideration of an

 4    order allowing a claim.

 5            So 9024 by its own terms also governs.

 6            Rule 3008 isn't the only thing that governs a

 7    502(j) reconsideration.  9024 and the timing considerations

 8    of Rule 60 apply, and there's case law certainly applying

 9    9024, and I believe some of it is cited in Lehman's briefs,

10    applying 9024 in the context, not precisely the context that

11    we have here, of course, but applying it.

12            So if -- if 502(j) is implicated, it's actually

13    implemented by two different rules of the Bankruptcy Code.

14            THE COURT:  Can we -- can we agree on something

15    now?  First of all, I didn't follow your argument very well.

16    You threw out a lot of numbers very fastly (sic), but we

17    didn't actually apply those rules and what they stand for to

18    the facts that are before the Court.

19            The circumstance before me, as I understand it, is

20    that your client relies upon a certain notice for the

21    proposition that by virtue of having received the notice

22    there was effectively a waiver of any late-filed claim

23    status applicable to your client's claim, and that that's

24    the gotcha moment.  You are, in effect, seeking to exploit

25    the fact that your client received a notification -- whether
```

Page 99

1    it did anything or not with respect to the notification

2    almost doesn't matter.  But you're treating that as

3    effectively reconsideration of the claim.  Do I understand

4    that right?

5            MR. JACKSON:  No.  I -- I think maybe I can

6    explain it better, Your Honor, if you would allow me to

7    explain the case that we cite that we believe --

8            THE COURT:  I don't want to hear --

9            MR. JACKSON:  -- is the only thing --

10           THE COURT:  -- about the case.

11           MR. JACKSON:  It's actually an analysis --

12           THE COURT:  I don't want to hear about the case.

13   I want to hear about this case.

14           MR. JACKSON:  Okay.

15           THE COURT:  I don't want to hear about the

16   precedents you've cited because I view it as largely

17   inapplicable.  I want to deal with the situation that's

18   completely one-off.  We're going to decide this question as

19   if there's no authority.  We're just dealing with the code

20   and the rules --

21           MR. JACKSON:  Okay.

22           THE COURT:  -- and the facts as they exist.

23           MR. JACKSON:  Understood, Your Honor.  And I

24   apologize.  I -- as I'll get to the -- the case actually

25   bears this out, but let me just skip the case.  Let's go to

Page 100

1    the --

2            THE COURT:  Don't even mention --

3            MR. JACKSON:  Tennessee --

4            THE COURT:  Don't even mention the case.

5            MR. JACKSON:  There was --

6            THE COURT:  I don't want to hear about any case

7    from Tennessee right now.

8            MR. JACKSON:  Okay.  There was a claim filed.

9    There was an objection -- the claim was deemed allowed until

10   an objection was filed.  There was an objection filed.

11   There was a response to the objection contesting the basis

12   of the objection asserting excusable neglect as a grounds

13   for late filing the claim.

14           While this process was playing itself out --

15           THE COURT:  And remind me, what was the excusable

16   neglect here?

17           MR. JACKSON:  There was some confusion on -- as to

18   the coordinating proceedings in Europe as to notices that

19   were received from the European administrator about the

20   necessity or non-necessity of filing a claim in the Lehman

21   case in America on behalf of the guarantees of these certain

22   securities.  So --

23           THE COURT:  A circumstance that I previously ruled

24   in other settings does not constitute excusable neglect.

25           MR. JACKSON:  And, Your Honor, we'll -- we'll rest

Page 101

1    on the papers on that point.

2           But while there was an objection, there was a

3    response.  There was a contested matter about my client's

4    claim.  At the same time as this contested matter was

5    pending, Lehman was putting forward its estimation or -- or

6    rather this liquidation protocol, under Rule 9019(b) and --

7    and in the context of that motion they said, we haven't had

8    time to review all of the claims that are potentially

9    subject to this protocol.  So with that in mind, we would

10   like to reserve rights.  They said that in the motion.  They

11   put in a reservation of rights in the order.  We weren't a

12   party to the motion, but that was the justification for it

13   at the time.

14           Now my client actually doesn't really fit that

15   bill in the sense that at the time Lehman sent out the claim

16   notices, pursuant to the 9019 order that was entered by the

17   Court, and notices that were approved in form by this Court

18   in the 9019 order, there was already a contested matter with

19   respect to our claim.  The notice that we received said,

20   there was an order entered by the Court under Rule 9019

21   allowing us to resolve amounts of claims pursuant to this

22   process.  Here's your claim.  If you don't agree with this

23   claim, here are the things you can do.  If you don't

24   disagree with this claim, you don't have to do anything and

25   your claim will be allowed for purposes of voting in

Page 102

1    distribution on the plan.

2            In receipt of that notice, we didn't disagree with

3    the amount so we didn't do anything.

4            THE COURT:  Now did you -- did -- did -- when I

5    say "you," did your client assume -- and do you know this

6    for a fact -- that as a result of receiving this notice that

7    went out to some 21,000 parties in order to deal with plan

8    voting and provisional allowance, that notwithstanding the

9    fact that there was a contested matter with respect to a

10   late-filed claim that that constituted a knowing waiver on

11   the part of Lehman with respect to all issues with respect

12   to your claim?

13           MR. JACKSON:  I don't think waiver is what I would

14   use to describe it.  I don't think we have described it as

15   that technically.  What I'm saying is that the claim was

16   allowed on October 21st --

17           THE COURT:  And -- and have -- and what is it --

18   what is it about the piece of paper that constituted

19   allowance of the claim?

20           MR. JACKSON:  Well, it was the combination of the

21   piece of paper with the Court's 9019 order.  The order said,

22   I'm hereby approving under 9019(b), I'm approving a class of

23   controversies that the debtor is allowed to resolve by means

24   of this notice process.  I'm approving the form of notice,

25   which says in it, if you don't disagree with the proposed

Page 103

1    amount, your claim will be allowed.

2              THE COURT:  But there was a reservation built into

3    the order.

4              MR. JACKSON:  Yeah.  And I think that's really

5    what this turns on, Your Honor, is what is the effect of a

6    reservation.  And my point is -- isn't really that there was

7    a waiver so much as procedurally, the way this played out,

8    there was a contested matter.  There was an order under 9019

9    resolving the claim.  The order was -- the effect of the

10   notice followed by my client's non-response to the notice in

11   conjunction with the procedure that Your Honor had approved

12   in the 9019 order resulted in the allowance of my client's

13   claim.

14             THE COURT:  Okay.  Now that I understand that

15   that's your position --

16             MR. JACKSON:  Right.

17             THE COURT:  -- look at 502(j) and tell me how that

18   applies to it.

19             MR. JACKSON:  It applies because there was a

20   process -- and I think Rule 9024 is helpful here and Rule 60

21   is helpful here.  There was a proceeding that was set in

22   motion by the debtors in the context of their motion under

23   9019(b) and the proceeding was actually, I guess you could

24   say three parts.  The Court approved conceptually the

25   debtors' resolution of a class of controversies subject, of

Page 104

1    course, to a reservation of rights in the order, which I can

2    talk about, but just I'll tell you what our argument is.

3            THE COURT:  But that resolution --

4            MR. JACKSON:  There was a notice --

5            THE COURT:  -- that resolution was not about claim

6    allowance.  That resolution was about numbers.  It was about

7    a formula to determine what the numbers would be for

8    purposes of plan voting and distribution.  It did not trump

9    the proof of claim process, the claim allowance process, or,

10   frankly, the claim objection process that we're in right now

11   and it included a full reservation of rights.

12           So I don't get your argument.

13           MR. JACKSON:  I guess it centers upon what is a

14   reservation of rights, Your Honor.

15           You can reserve a right that you have.  Our

16   position is, and -- and, you know, it -- I guess it's a

17   thumbs up or a thumbs down for Your Honor to either accept

18   it or not, is that if -- once a claim is allowed, then we're

19   in 502(j) territory.  Now there may be grounds to -- you

20   know, it -- it may well be that the objection could

21   constitute, provided that the other procedures were complied

22   with, that the objection could constitute grounds for

23   reconsideration.

24           But our -- our position is that once a claim is

25   allowed after its been contested, that was a proceeding that

Page 105

1    resulted in the allowance of a claim and a reservation of

2    rights can only reserve whatever right at that time that

3    Lehman had.  And our position is that that right that they

4    had was to seek reconsideration of the claim if any of the

5    circumstances that they outline in their motion came to be -

6    - that they hadn't had time to review at the time that they

7    sent out the claim allowance, that they later determined

8    that there were grounds to object, so be it -- but we're now

9    in a proceeding that's governed by 502(j) --

10                THE COURT:  Well, let's -- let's stop there for a

11   second.  It's your position that even though you had a late-

12   filed claim so it wasn't allowed.  It couldn't be at the

13   time of filing.  It was late, right?

14                MR. JACKSON:  Well, they're deemed allowed by the

15   code until an objection is filed, but Your Honor --

16                THE COURT:  Well, there's an objection.

17                MR. JACKSON:  -- in the plan --

18                THE COURT:  There's an objection.

19                MR. JACKSON:  There was an objection.

20                THE COURT:  There's an objection.

21                MR. JACKSON:  At the time it was filed it was

22   allowed.

23                THE COURT:  There's an objection.

24                MR. JACKSON:  Right.

25                THE COURT:  It's not --

Page 106

```
 1                    MR. JACKSON:  Right.

 2                    THE COURT:  It's not a problem until there's an

 3       objection.  But issue was joined, late-filed claim,

 4       objection.  What is the event that constitutes allowance of

 5       that claim?  Is it really the notice?

 6                    MR. JACKSON:  It's the notice which was issued

 7       pursuant to the 9019 order and the 9019 order says that if

 8       the claim is --

 9                    THE COURT:  But --

10                    MR. JACKSON:  -- allowed in accordance with this,

11       then the claims register will be adjusted and the claim is

12       allowed, subject to the reservation --

13                    THE COURT:  But --

14                    MR. JACKSON:  -- of rights.

15                    THE COURT:  But it's pretty clear, since I was

16       around at the time, that the purpose of this highly unusual

17       procedure -- for which there is absolutely no applicable

18       precedent out there, whether it's from Tennessee or the

19       Supreme Court, there is no applicable precedent that deals

20       with this particular fact pattern.  It has never happened

21       before and it may never happen again.

22                    The notice that went out was intended to deal with

23       the particular circumstances of Lehman Program Securities

24       and the valuation of these claims for purposes of voting and

25       distribution, if nobody objects.  It was about a formula
```

Page 107

1    that was being applied with the hope that that formula would

2    stick.  It wasn't about dealing with particularized claim

3    issues, and it included a reservation of rights to protect

4    against an argument being made just like this.

5           The reservation of rights in the order was

6    designed to prevent advocates from coming in and saying what

7    I said last time, gotcha.  You sent out a piece of paper

8    that somehow estops you from taking a position that my

9    client is invalid.  That never happened.  It never happened

10   because the origin of the notice was the order and the order

11   included a reservation of rights.

12          So it's in that setting that I'm having a great

13   deal of trouble understanding your 502(j) argument.  Is it

14   correct that 502(j) only applies here if I were to accept

15   the notion that the notice that we're talking about is an

16   instrument pursuant to which your claim, previously the

17   subject of a contested matter, was allowed?

18          MR. JACKSON:  I think that's fair, Your Honor.

19   And to clarify, it was never our intention to suggest that

20   the very base level deemed allowance under 502(a) that

21   happens the moment you file a proof of claim triggers the

22   reconsideration rubric.  That's not -- that's -- I

23   understand that's the Herrera case that was cited by Lehman.

24   That's what that Court concluded.  That's not what we're

25   arguing.  That's actually not what the Yancey court held.

1        But, yes.  That -- that's true.  We're -- we're

2   not saying that simply filing the proof of claim means that

3   there's a one-year limitation on, you know, when the -- a

4   claim objection has to be filed.  This is really related to

5   the precise circumstances of our claim, which is that there

6   was a fully teed up contested matter in place at the time

7   that then an action was taken by Lehman, which at least on

8   its face -- Your Honor, of course, is telling me that's not

9   what the intent was, but at least on the face of the notice

10  that we received said your claim is allowed for purposes of

11  voting and distribution, which coincidentally are the only

12  two purposes we care to -- that that's allowance as far as

13  we're concerned.  That's -- that's why we filed a claim.

14        So if there was -- there was no reservation in the

15  notice.  I could tell you anecdotally that this type of

16  procedure by which you kind of throw out a proposed

17  valuation mechanic and then hope that people subscribe to it

18  is done in other context.  It is rare, but we've done it in

19  the context of a plan, and for what it's worth when we did

20  it we -- the reservations that were built into it were also

21  included in the notice.  I mean, it was -- it was a little

22  strange that -- to learn after receiving the notice saying,

23  don't do anything and your claim will be allowed, you think

24  great, then to learn late -- you know, as we develop in

25  further briefing that there's a reservation of rights in the

1    order that was -- we weren't served with.

2            THE COURT:  Well, I -- I don't think you did

3    anything in reliance on the notice, but I want to ask you

4    this question.

5            Would you be asserting the same position today if

6    the notice included anywhere in it a reference to a

7    reservation of rights?

8            MR. JACKSON:  I guess the issue of what a

9    reservation means is -- would still be live?  The issue of

10   --

11           THE COURT:  Well, let's just say -- let's just say

12   the notice said, this notice is being sent out because we're

13   dealing with this massive case administration problem in

14   Lehman Brothers and the best way for us to do it is to send

15   out a notice that gives a variety of parties in interest,

16   including you if you receive this notice, notice of how we

17   plan to value your claims for purposes of distribution and

18   voting.  But recognize something -- it's bold -- recognize

19   something --

20       (Laughter)

21           THE COURT:  -- we reserve all of our rights with

22   respect to the ultimate allowance of your claim.  And by the

23   way, if you have at the moment that you receive this notice

24   that we're currently objecting to your claim, we really mean

25   it.

Page 110

1           Let's just say it said that.  Would you be able to

2     make the argument you're now making?

3           MR. JACKSON:  It would be different, Your Honor,

4     but I think even there it's -- again, in my experience, for

5     what it's worth, this type of process, if it was supposed to

6     be for the purpose of case administration estimating for

7     voting purposes would be a 3018 -- Rule 3018 and 502(c)

8     motion with reservations.  It was a little odd that it was

9     styled as a 9019 settlement of a class of controversies.

10          But Your Honor's point is taken.  I understand.

11    And to the extent that the contents of the notice and the

12    lack of the reservation of the rights in the notice is at

13    issue, that would change things.  But, really, the only

14    reason we raised that was because our general position on a

15    reservation of rights is that it can only reserve whatever

16    rights exist.  Our argument is that once a claim is allowed

17    the only right to challenge it that exists is under 502(j).

18          So even a provision of an order saying, the right

19    to object is reserved, is legally no different from

20    somebody, for example, in their answer to a complaint

21    reserving the right to assert additional affirmative

22    defenses.  That -- they have that right to the extent they

23    can otherwise satisfy the requirements for amending their

24    answer.

25          And it -- that's the proposition that I'm citing

Page 111

1    the notice for was that Lehman is suggesting that to the

2    extent they obtained affirmative relief in the form of this

3    reservation of rights, which I don't think is what it did,

4    that any affirmative relief would have had to go out on

5    notice to us.  So it's somewhat of a side show what the

6    contents of the notice were.  Our general position is that

7    once a claim is allowed, and this claim was allowed because

8    that's what the court order said, then you're in 502(j)

9    territory.

10           And, again, there -- we have a case that cites --

11   that supports this in a much different context, but in the

12   absence of anything and where we have warring Chapter 13

13   cases, we have one going our way.  They have one going their

14   way.

15           THE COURT:  Okay.  Thank you very much.

16           MR. JACKSON:  Thank you.

17           THE COURT:  Is there anything more?

18           I would like to commend both of the attorneys who

19   argued, and I think that counsel for CF Midas had a harder

20   argument to be sure.

21      (Laughter)

22           THE COURT:  I don't see 502(j) being implicated

23   here and I've -- I think I've made myself fairly clear in

24   colloquy.  I don't think it's implicated by, in effect, a

25   lying in wait strategy, which is what we have here.

Page 112

1          The notice might have been better in terms of

2    including a conspicuous reference to reserved rights.  But I

3    also distinctly remember the extraordinary pressure that all

4    parties were under during the period leading up to

5    confirmation in 2011.

6          The case administration and case management

7    challenges associated with the Lehman Brothers' plan process

8    really are unprecedented situations and it's one of the

9    reasons, I suppose, that I have resisted looking to Chapter

10   13 authority for guidance here.  That's not to say that

11   Chapter 13 authority can't be very good precedent in the

12   right case.

13         I view the situation as it developed that led to

14   the notice that is the subject of the current discussion to

15   be unprecedented.  And that's true even if you can identify

16   other situations where notices have gone out in a Chapter 11

17   context to deal with valuation type questions or numerical

18   questions when it comes to plan voting.

19         One of the reasons that this is unique, at least

20   as I recall the situation and participated in the process of

21   developing the protocol, we were dealing with countless

22   difficult to value highly structured securities.  In that

23   setting, there needed to be a mechanism for determining

24   relatively crisply whether particular holders would be able

25   to vote a claim in a particular amount.  It was in that

Page 113

1    setting that parties negotiated and ultimately agreed on a

2    methodology for determining how to value these structured

3    securities.

4            Putting that into words and providing tens of

5    thousands of claimants with adequate notice so they would

6    understand what had occurred and have an opportunity to make

7    a judgment whether to accept or opt out of the calculation,

8    that is what this was about.

9            I have jokingly described language that might have

10   been in the notice that would be a more conspicuous

11   reference to reserving rights in that notice.  But the

12   notice is simply a creature of the order that approved the

13   process.  The order included a conspicuous reservation of

14   rights.  It was clear that the debtor, by virtue of dealing

15   with claim amounts, was not at the same time giving up any

16   rights with respect to entitlement to assert a claim in the

17   first instance.  And that is what is critical and clear

18   here.

19           The notice did not constitute deemed allowance of

20   the claim or express allowance of the claim for purposes of

21   overriding existing objections such as the objection that

22   affected CF Midas, nor did it, for that matter, affect a

23   waiver or release or any other loss of rights on the part of

24   Lehman Brothers with respect to any other claim that was the

25   subject of the notice.

Page 114

1           Accordingly, I find the 502(j) argument

2    unavailing.  I appreciate the supplemental briefing and the

3    argument with respect to the issue, but now that the point

4    has been clarified, I don't find excusable neglect either

5    with respect to the CF Midas claims.  And you can refer to

6    an earlier decision of the Court that deals with claim

7    allowance issues for that proposition.

8           And now we'll move on to the next agenda item.

9           Thank you very much.

10          MR. GEOGHAN:  Thank you, Your Honor.

11          MS. MARCUS:  Jacqueline Marcus, again, Your Honor,

12   for Lehman Brothers Holdings, Inc., and its affiliated

13   debtors.

14          Before I get started, Your Honor, I am mindful of

15   the time.  This one is going to take a little bit of time.

16   We've prepared now twice for this hearing:  Once the day of

17   the power outage and, again, we definitely want to go

18   forward, but I don't know what Your Honor has in mind in

19   terms of lunch and the 2:00 --

20          THE COURT:  Can you give me --

21          MS. MARCUS:  -- calendar.

22          THE COURT:  Here -- can you give me a time

23   estimate?  Here's my problem.  I have a 2:00 involving the

24   JPMorgan Chase litigation, and I have a 3:15 telephonic

25   conference, and I have a class that I'm teaching this

Page 115

1    evening.  So this is not a great day for me.

2             I might suggest -- I don't know how long you're

3    going to be.  I would like an estimate.

4             MS. MARCUS:  Sure.

5             THE COURT:  But I might suggest that we could

6    perhaps break for lunch, come back -- because I am going to

7    need to break for lunch -- come back at say 1:15, which is a

8    half-hour from now, a very quick lunch, and then go from

9    1:15 to however long it takes and then the people who come

10   in for the 2:00 will be in the same position that you've

11   been in, in effect, waiting for me to deal with what's

12   before me.

13            MS. MARCUS:  That would be fine for us, Your

14   Honor.  I think -- I think my initial argument will be about

15   20 minutes.

16            THE COURT:  Let's take a half-hour recess and

17   return at 1:15.

18            MS. MARCUS:  Thank you, Your Honor.

19            THE COURT:  Thank you.

20       (Recess at 12:46 p.m.)

21            THE COURT:  Please be seated.

22            MS. MARCUS:  Good afternoon, Your Honor.

23   Jacqueline Marcus for the Lehman estates.

24            The next item on the agenda is Item Number 9, it's

25   the three-hundred-and-twenty-eighth omnibus objection to

Page 116

1    claims, ECF Number 23 -- 29323.

2              In the omnibus objection, Lehman Brothers

3    Holdings, Inc., as plan administrator, objected to the proof

4    of claim filed by Spanish Broadcasting System, Inc., Claim

5    Number 67707 in the amount of approximately $55.5 million

6    against Lehman Commercial Paper, Inc.  The Spanish

7    Broadcasting claim is the only unresolved claim under this

8    omnibus objection.

9              Spanish Broadcasting filed their response to the

10   objection dated September 13th, 2012, two declarations and

11   with the permission of the Court, a supplemental response.

12             As a threshold matter, Your Honor, Spanish

13   Broadcasting repeatedly points out that we filed a two-and-

14   a-half page to its claim and implies that this was somehow

15   improper.  As the Court is aware, we have filed nearly 400

16   omnibus claims objections in this case -- in these cases.

17   We have followed the same procedure here as in every other

18   omnibus where we file a brief objection and then depending

19   on the response received, we file a more fulsome response.

20             The facts surrounding the relationship between

21   LCPI and Spanish Broadcasting are fairly straightforward.

22   In June of 2005, Spanish Broadcasting entered into a $350

23   million credit agreement pursuant to which LCPI was both the

24   lender and the administrative agent.

25             On October 3rd, 2008, Spanish Broadcasting sought

Page 117

1    to draw down the $25 million revolver provided under the

2    credit agreement.  LCPI, as administrative agent,

3    facilitated the funding of the draw request, but did not

4    fund its proportionate share, which was $10 million.

5    Ultimately, the credit agreement was terminated by a payoff

6    letter dated February 7th, 2012, when replacement financing

7    was provided and all of the lenders under the facility were

8    paid off.

9           Spanish Broadcasting's claim asserts approximately

10   $55 million in damages arising from LCPI's breach of the

11   credit agreement comprised of the following components:

12          $39.6 million reflecting "the expected loss in

13   total invested capital versus the actual decline in TIC that

14   Spanish Broadcasting experienced;

15          "Approximately $9.9 million in settlement amounts

16   that Spanish Broadcasting was obligated to pay Lehman

17   Brothers Special Financing, Inc. under a swap which

18   allegedly exceeds the amount Spanish Broadcasting would have

19   been obligated to pay if it had terminated the swap on

20   October 3rd, 2008;

21          "Approximately $5.7 million representing Spanish

22   Broadcasting's costs to replace LCPI's 10 million unfunded

23   share of the revolver; and

24          "Approximately $273,000 in financing and unfunded

25   revolver fees paid to LCPI for its loan commitment."

Page 118

1              In its objection to the claim, LCPI made the

2    following arguments:

3              First, that the damages related to the alleged

4    decline in total invested capital and the swap termination

5    are consequential damages, the recovery of which is

6    precluded by the waiver of consequential damages contained

7    in Section 10.12 of the credit agreement.

8              Second, Spanish Broadcasting has not provided any

9    proof that it actually obtained replacement financing, let

10   alone that it incurred almost $6 million in incremental

11   costs.

12             And, third, that LCPI earned the commitment fees

13   and the financing fees as a result of its performance under

14   the terms of the credit agreement from June 2005 to

15   September 2008.

16             Under the claims procedures approved by the Court,

17   this hearing is in the nature of a sufficiency hearing.

18   However, the characterization of the hearing as a

19   sufficiency hearing does not prevent the Court from ruling

20   on several important legal issues.

21             First, Your Honor, Spanish Broadcasting has failed

22   to respond to LCPI's objection regarding the alleged

23   replacement capital damages in the amount of 5.7 million.

24   In its response, Spanish Broadcasting has actually listed

25   only three categories of damages, completely omitting any

Page 119

1    reference to the alleged replacement capital damages.  You

2    can look at the -- at the objection, paragraph 7, for that.

3            In the declaration of Joseph A. Garcia, filed on

4    January 29th, Mr. Garcia acknowledges in paragraph 11 that

5    financing -- that replacement financing was not, in fact,

6    obtained.  It appears, therefore, that what looked like

7    itemized damages set forth in the proof of claim for the

8    cost of replacement financing were not actual damages at

9    all.

10           Consequently, the Court should disallow the 5.7

11   million of the Spanish Broadcasting claim today.

12           The second issue, Your Honor, is that the waiver

13   of consequential damages is enforceable.  As set forth in

14   our reply, under New York law absent bankruptcy waivers of

15   consequential damages are generally enforceable.  It doesn't

16   appear that Spanish Broadcasting disputes that point.  So in

17   light of the time I certainly won't belabor that issue now.

18           In its objection, Spanish Broadcasting sought to

19   avoid the effect of the waiver by arguing that the credit

20   agreement was rejected and, therefore, the waiver of

21   consequential damages is effective -- is ineffective, excuse

22   me.

23           That argument now seems to be off the table as a

24   result of the debtors' explanation that the credit agreement

25   was not, in fact, rejected.  Now in its own gotcha moment,

Page 120

1    Spanish Broadcasting seeks to find another reason why the

2    clear language of the consequential damages waiver should

3    not be enforced.  Its latest argument is that the waiver did

4    not survive the termination of the credit agreement.

5            Now, Your Honor, think about what Spanish

6    Broadcasting is arguing here.  It's claiming that in

7    calculating the damages occasioned by a breach that

8    allegedly occurred in October of 2008 before the contract

9    was terminated, the Court may not take into account the

10   provisions of the credit agreement as it existed at that

11   time.  In essence, Spanish Broadcasting has argued that it

12   can rely on the terms of the contract to establish LCPI has

13   liability, but LCPI can't rely on the terms of the contract

14   to contest the magnitude of the damages.

15           Not only would such a result be inequitable and

16   incorrect, but it is also not supported by the cases cited

17   by Spanish Broadcasting in support of its position.

18   Specifically, in the Azcap (ph) case cited, Azcap was

19   seeking to establish that a contract term that limited the

20   amount of license fees that certain radio stations could

21   seek would apply with respect to the period subsequent to

22   the -- to the termination of the agreement.  Those are not

23   the facts here.

24           The Scientific Component case also cited by

25   Spanish Broadcasting is equally unavailing.  That case

Page 121

1    involved a review of a decision of an arbitration panel.

2    The terminated contract at issue had both an arbitration

3    clause and a waiver of consequential damages.  The

4    arbitration panel failed to give effect to the waiver of

5    consequential damages.  The District Court began its

6    decision by noting that, "An arbitration award is subject to

7    very limited review."  That's at page 5 of the SLIP (sic)

8    opinion.  The Court went on to hold, and I quote, "It is not

9    up to this Court to second guess the panel's interpretation

10   of the supply agreement, but only to determine if it had the

11   authority to do so.  Because of the broad arbitration

12   clause, the panel had the authority."  That's at page 9 of

13   the opinion.

14            For Spanish Broadcasting, therefore, to cite this

15   case as authority for the proposition that termination of

16   the credit agreement nullified the consequential damages

17   waiver is disingenuous at best.

18            More pertinent are the authorities that we've

19   found that stand for the opposite preposition.  And Your

20   Honor, to the extent you would like them, we have copies of

21   the decision for -- the decisions for you.

22            In Rensselaer (ph) Polytechnic Institute versus

23   Varian at 340 F. Appex. 747 (2nd Cir. 2009) is a case in

24   which the relevant contract had been terminated.  The

25   contract included a waiver of consequential damages.

Page 122

1    Despite the termination of the contract, the Second Circuit

2    remanded the matter back to the trial court for a

3    determination of whether the damages sought were direct or

4    consequential damages and, thus, whether they were

5    permissible under the contract.

6              In G.V. Trademark Investments, Ltd. versus Gemini

7    Shirtmakers, Inc. -- that's at 1999 Westlaw 61808 -- the

8    Southern District of New York held that the plaintiff did

9    not forfeit its rights to sue for money owed under a

10   contract even though there was no explicit provision for

11   survival of the provision providing for guaranteed payments.

12             In the landlord-tenant arena, the appellate

13   division in New York has held that a waiver of consequential

14   damages is enforceable despite the termination of a lease.

15   That was in 124 Intogo Corp. versus Roundabout Theater

16   Company.  I have the cite, but it looks like I transcribed

17   it wrong.  I can provide it later.

18             THE COURT:  Okay.

19             MS. MARCUS:  In addition, Your Honor, in the

20   WorldCom case in resolving a dispute involving a contract

21   governed by Arizona law, Judge Gonzalez granted the debtors'

22   motion for summary judgment and found that the contractual

23   limitation of liability clause was effective,

24   notwithstanding that the contract had been terminated.

25   That's at 368 B.R. 308.

Page 123

1           THE COURT:  Well, here's my understanding of

2    Spanish Broadcasting's argument on this point, and they can

3    obviously speak for themselves at the right time.

4           I think they take the position that because the

5    agreement that was executed at the time of termination

6    included a provision that certain specified terms of the

7    contract survived --

8           MS. MARCUS:  Uh-huh.

9           THE COURT:  -- and that this was not one of them,

10   that this may be one of those situations where, by virtue of

11   not specifically referencing the continuation in perpetuity

12   of the waiver of consequential damages that they can now

13   assert that they're in a better position now as a result of

14   termination than if the contract had been in effect.

15          MS. MARCUS:  That is what they're arguing, Your

16   Honor, or that's how I understand their argument as well.

17   And I actually -- your -- your question is timely because I

18   was going to get to another decision where the effect of a

19   survival clause I thought was -- it was very cogently

20   explained.  It was by the Bankruptcy Court in the District

21   of Columbia Circuit in a case called, In re: Ardent, Inc.,

22   305 BK 133.

23          There, there was a contractual provision that

24   provided the claimant would earn its full fee

25   notwithstanding termination of the agreement and the debtor

Page 124

1    argued, much like Spanish Broadcasting argues, that because

2    the provision wasn't covered by the survival provision it

3    had no effect after termination of the agreement.  And the

4    Court held as follows:

5            "The agreement elsewhere explicitly states that

6    certain obligations are to by the termination of the

7    agreement" -- I'm going to skip a little bit and continue

8    with the quote -- "However, this simply makes clear that the

9    parties remain subject to such obligations and are required

10   to perform them, including the party not in default who

11   generally is excused from future performance, but not as to

12   promises of confidentiality which implicitly survived

13   termination.

14           "It relates, in other words, to a matter,

15   confidentiality, whose survival the parties might want to

16   make explicit instead of implicit.  It does not purport to

17   address an issue of damages upon termination.  The wholly

18   different issue that the claim presents as to which there

19   would be no date -- doubt that damage claims survive,

20   including the claim for the unperformed promise of paying

21   the access fee."

22           That's at 305 B.R. 137.  And just to relate that

23   to our case, here there were provisions in that notice of

24   termination that were -- that's -- the notice of termination

25   indicated certain contractual provisions that survive in

Page 125

1    case there was any doubt about that.  But the fact that they

2    permitted or specifically excluded the claim from the

3    release has to mean that -- that Lehman had the ability to

4    defend itself from that claim.  Any other -- any other

5    interpretation really wouldn't make any sense.

6           The next issue, Your Honor, is that Spanish

7    Broadcasting contends that if the waiver is enforceable,

8    then the credit agreement would "fail of its essential

9    purpose."  Failure of essential purpose, Your Honor, is a

10   concept found in Article 2 of the Uniform Commercial Code

11   that has no applicability to the credit agreement.

12          Spanish Broadcasting points to Judge Gonzalez's

13   decision in Enron as support, but that case is markedly

14   different.  There, Judge Gonzalez held that because the

15   underlying contract was for a sale of good and because no

16   one contested the applicability of the UCC, he would apply

17   the UCC to the dispute.

18          Here, in contrast, there's no argument that the

19   credit agreement is governed by the UCC and, therefore, the

20   argument should be rejected.

21          Moreover, even if the principle were to apply,

22   there hasn't been a failure of essential purpose.  Spanish

23   Broadcasting had an ample remedy under the contract to sue

24   for direct damages.  What happened here, however, is that

25   Spanish Broadcasting did not suffer any legally cognizable

Page 126

1    damages.  There's no basis for the -- therefore, for the

2    Court to disregard the waiver of consequential damages here.

3            The next argument has to do with the nature of the

4    damages themselves and whether they are consequential or

5    direct damages.

6            As we've cited in our papers, New York Courts have

7    held that the measure of direct damages in the case of a

8    breach of a contract to loan money is the incremental cost

9    of any replacement financing, and we cite for that

10   proposition Avalon Construction Corp. versus Kirsch Holding,

11   256 N.Y. 137.

12           Spanish Broadcasting contends in its supplemental

13   papers that it is black letter law that the measure of

14   damages may be greater than the incremental cost of

15   replacement financing if no replacement financing is

16   available.

17           There are several problems with Spanish

18   Broadcasting's position:

19           First, the declaration of Joseph A. Garcia states,

20   not that no alternate financing was available, but that

21   "based on our understanding of the financial markets at the

22   time of the credit crisis and Lehman's bankruptcy filing, we

23   recognized that alternative" -- excuse me -- "that alternate

24   financing simply was not an option."  That's at paragraph

25   11.

Page 127

1              Second, the full quote from the authority cited by

2      Spanish Broadcasting for the black letter law provides as

3      follows:

4              "The better rule and the one generally followed

5      today is that for a breach of contract to lend money, the

6      borrower can obtain judgment for damages measured by the

7      resulting injury so far as the defendant had reason to

8      foresee such injury when the contract was made."  That's

9      Corbin on contracts, Section 59.3.

10             Similarly, the restatement second of contract

11     Section 351 provides, in pertinent part, "In most cases,

12     then, the lenders' liability will be limited to the

13     relatively small additional amount that it would ordinarily

14     cost to get a similar loan from another lender.  However, in

15     the less common situation in which the lender has reason to

16     foresee that the borrower will be unable to borrow elsewhere

17     or will be delayed in borrowing elsewhere, the lender may be

18     liable for much heavier damages."

19             There are two critical aspects to this exemption.

20     First, the lack of alternate financing must be foreseeable

21     and, second, foreseeability is measured at the time the

22     contract is entered into.  Thus, in order to avoid the

23     default rule, Spanish Broadcasting would have to show that

24     in June of 2005 when the credit agreement was entered into,

25     Lehman had reason to foresee that the credit markets would

Page 128

1    be frozen in October of 2008.  None of Spanish

2    Broadcasting's papers argue that Lehman knew or should have

3    known in June of 2005 that alternate financing would not be

4    available, and for obvious reasons.  No one foresaw the 2008

5    financial meltdown.

6         Thus, Spanish Broadcasting is precluded, even by

7    the authority that it cites, from asserting that it is

8    entitled to damages in excess of the cost of replacement

9    financing.

10        THE COURT:  Let me ask you a question.  And it

11    kind of follows from your last argument.

12        If there's a future event that is unforeseeable,

13    does the same rule apply, and how it -- how can you hold

14    Spanish Broadcasting to a strict test of damage calculation

15    when in 2005, as you point out, nobody could have foreseen

16    that the credit markets would end up frozen?  And I saw in

17    the Spanish Broadcasting papers a very enjoyable quote from

18    my Charter decision, which I appreciated, but I also

19    recognize that we're only talking about $10 million here.

20        So I have actually two questions:

21        One is, does a general collapse of the credit

22    markets represent a foreseeable event for purposes of

23    calculating damages associated with the failure to fund;

24    and, is it a factual question that needs to be more fully

25    developed to determine whether or not at the relevant time

Page 129

1    that LCPI failed to fund its $10 million share it was

2    impossible or impracticable or very difficult to replace

3    that financing?  And there may also be a related factual

4    question, because I don't know the answer to it based upon

5    my review of the papers, what diligent efforts did Spanish

6    Broadcasting actually undertake to try to obtain that

7    financing, and did it have other sources of liquidity

8    including from investors and related parties?

9              MS. MARCUS:   Okay.

10             In response to your first question, does the

11   general collapse of the credit markets represent a

12   foreseeable event for the calculation of damages, we submit

13   that the answer is no.  If we had foreseen what happened in

14   2008, it probably wouldn't have happened.  But --

15             THE COURT:  Precisely.

16             MS. MARCUS:  Right.  So the test is -- you know,

17   it's the combination, Your Honor, of the general rule on

18   what you can recover for breach of a contract to loan money

19   with the waiver of the consequential damages that creates

20   the problem.  And I might add even if consequential damages

21   were available, even consequential damages have to be

22   foreseeable.

23             But our position is that because the -- it wasn't

24   foreseeable, and not only wasn't it foreseeable, but I think

25   I'm answering your second question about the factual record,

Page 130

1    there's no allegation that it was foreseeable in 2005, which

2    is what the test is.  Those two factors mean that the more

3    extensive damages are not available to Spanish Broadcasting

4    and having waived consequential damages, they waived it and

5    they were sophisticated parties who negotiated an agreement

6    that included the waiver.  We believe that that should be

7    enforceable.

8              As to whether the factual record needs to be more

9    fully developed regarding whether it was, in fact,

10   impossible to replace the financing and what efforts were

11   undertaken, I don't believe that that -- those are relevant

12   unless the Court determines that our argument is incorrect

13   as to what the standard is.  And if that were the case, of

14   course we would reserve the right to develop that more --

15   expand the factual record.  But we don't think it's

16   necessary and we think the Court can make the determination

17   today based on what's in the record thus far.

18             The last component or the last issue, Your Honor,

19   has to do with the alleged fee damages.  There's no dispute

20   that -- and, obviously, this is the tail wagging the dog a

21   little bit.  There's no dispute that LCPI performed the

22   services as administrative agent and complied with all of

23   its obligations prior to October 3rd, 2008.  Nevertheless,

24   Spanish Broadcasting has asserted a claim for all of the

25   financing fees and unfunded revolver fees that it paid to

Page 131

1    LCPI during the term of the agreement.

2              While it may not be required as a matter of law,

3    LCPI is sympathetic to the fact that Spanish Broadcasting

4    doesn't want to pay fees for the period after which LCPI

5    defaulted on its funding obligation.  Therefore, in our

6    response we offered to allow Spanish Broadcasting a claim

7    for $13,334 which we calculate as the amount paid for the

8    periods of September 30 and October 4th.

9              Your Honor, as I indicated --

10             THE COURT:  As you -- as you say it, it doesn't

11   seem very generous.

12        (Laughter)

13             MS. MARCUS:  We're only looking out for the

14   interest of all creditors, Your Honor.

15             THE COURT:  I understand.  I have a question for

16   you about whether or not this is an outlier or whether or

17   not this is a fact pattern and set of arguments that may

18   flow through to other claimants in respect of unfunded

19   commitments during the period immediately following the

20   bankruptcy filing.

21             And I don't know if you can answer that, but I --

22   I'm interested in knowing whether the issues that are being

23   presented here are all by themselves or whether or not these

24   issues tie into other potential damage claims that may be

25   asserted against LCPI.

Page 132

1          MS. MARCUS:  Sure.  And I think I have the -- to

2     divide my response into two different debtors.

3          As to LCPI -- and Mr. Walsh is here, David Walsh,

4     from Alvarez & Marsal is here in court.  He's done most of

5     the work during the case on LCPI.

6          As to LCPI, this is the only failure to fund claim

7     that remains.  There had been others made.  Every single one

8     of them has been resolved.  So as to LCPI, this is an

9     outlier as you described it.

10         As to LBHI, and I think those funding issues arise

11    more in the real estate world, there have been a number of

12    creditors who have raised the issues.  I can think off the

13    top of my head of two claims that were in excess of $100

14    million that have been settled for drastically -- and I

15    can't emphasize that enough -- substantially less than $100

16    million where there were similar waivers of consequential

17    damages.

18         So it's an issue that I think on the LBHI side may

19    exist more than what's left on the LCPI side.

20         THE COURT:  Okay.

21         MS. MARCUS:  With that, Your Honor, I -- I reserve

22    the right to -- to respond to Spanish Broadcasting's

23    argument.  But as I indicated, if the Court were to

24    determine that the damages asserted are direct damages or

25    that the waiver of consequential damages is not enforceable,

Page 133

1    then LCPI reserves its right to assert a variety of

2    additional objections regarding causation, the actual and

3    reasonable amount of the damages, and mitigation issues.

4    But arguing about those things at this time doesn't seem to

5    be a prudent way to proceed.

6             THE COURT:  Fine.

7             MS. MARCUS:  Thank you.

8             THE COURT:  Thank you.

9             MS. PRIMOFF:  Good afternoon, Your Honor.  Madlyn

10   Primoff of Kaye Scholer for Spanish Broadcasting.

11            As Your Honor knows from our papers, Spanish

12   Broadcasting is the largest Hispanically-controlled public

13   media and entertainment company in the United States.

14   Lehman cites a lot of cases in its papers.  We cite a lot of

15   cases in our papers, and we've had dialogue today over some

16   other cases.

17            And the overwhelming majority of those cases are

18   not decided on a motion to dismiss.  They're decided on a

19   fully developed factual record either following a trial or

20   at summary judgment.

21            THE COURT:  What -- is it your position that the

22   waiver of consequential damages issue is a subject that

23   requires discovery, that needs to be amplified with

24   discovery, or is it a pure legal question?

25            MS. PRIMOFF:  I think the issue is plain on its

Page 134

1    face and that your Court -- that Your Honor could rule in --

2    in our favor on that issue today.  But I don't think Your

3    Honor needs to rule on that issue today because I think that

4    the measure of damages in -- in any -- we're entitled to

5    damages as a matter of law for their breach of the failure

6    to fund.

7            The forseeability of the damages, there's a

8    discrepancy in the case law that ultimately Your Honor will

9    need to decide whether the 2005 date that the credit

10   agreement was entered into is the operative time period or

11   whether the October 2008 breach is the operative time

12   period.  In either event we think -- we think it's

13   foreseeable in both instances, obviously, clearly more so in

14   October 2008.

15           And so either way we -- we assert that our damages

16   are direct damages which is a question of fact under the

17   governing legal authorities that has to be determined at

18   trial or on a properly developed summary judgment record in

19   any event.

20           THE COURT:  When you say direct damages, are you

21   saying that all of the damages that you assert in your claim

22   are direct damages or are you saying that some of the

23   damages are direct damages and some are consequential

24   damages that have not been waived?

25           MS. PRIMOFF:  And thank you for the question, Your

Page 135

1    Honor.

2              On the $5.7 million, I believe we previously

3    communicated to Lehman that we are withdrawing that element

4    of the claim.  So that's -- that's not -- that's not an

5    issue.

6              THE COURT:  That looks like progress to me

7    already.

8              MS. PRIMOFF:  Yes.

9              THE COURT:  That's good we had this hearing.

10             MS. PRIMOFF:  We're -- we're trying to be

11   constructive.

12             The total invested capital damages and the SWAP

13   termination damages, we assert that those are direct

14   damages.  If the Court were to disagree with us and say that

15   they're consequential damages, then our -- our position is

16   that the consequential damages waiver is of no force or

17   effect, so that -- so it -- it doesn't matter in the first

18   instance.  We think -- we think we get there either way,

19   whether they're direct or consequential.

20             THE COURT:  Okay.

21             MS. PRIMOFF:  I mean, there's -- there's expansive

22   case law on the distinction between -- and we've got this in

23   our papers -- on the distinction between diminution in value

24   damages with the -- which the case is, the Wyle (ph)

25   article, the UCC recognizes that diminution in value damages

Page 136

1    are direct damages, not consequential damages.  And Capstone

2    report -- I'm pointing at Mr. Heslen (ph) from Capstone.

3    The Capstone report next to our proof of claim establishes,

4    at least facially for purposes of this hearing, the

5    diminution in value damages.

6            I just want to make sure I address the questions

7    that Your Honor asked of Ms. Marcus.

8            We do believe that Your Honor could take judicial

9    notice based on what was going on in the credit markets at

10   the time about the inability, impossibility to obtain

11   financing.  We know that you heard lengthy proceedings over

12   that in Charter.  If Your Honor believes that that's an

13   issue for trial, you know, we're prepared to --

14           THE COURT:  Well, I think -- here's the issue with

15   respect to comparing your financial plight with the record

16   in Charter.

17           In Charter I was dealing with reinstatement of a

18   $12 billion credit facility and it was apparent, based on

19   the evidence, that it was not possible to replace a $12

20   billion credit facility at the time.

21           MS. PRIMOFF:  Uh-huh.

22           THE COURT:  Here, we're talking about a $10

23   million base of a loan that was not funded by Lehman at the

24   time of a draw request with respect to the entire revolver.

25           Now $10 million is a lot of money to a lot of

Page 137

1    people, but partly because of my experiences in these mega-

2    cases that I've been working on over the years, $10 million

3    has begun to seem like not a lot of money.  So one of the

4    questions becomes, was it really impossible to replace the

5    $10 million; what efforts were undertaken to replace the $10

6    million; could investors have provided the $10 million; and

7    was there any effort to obtain alternative financing from

8    other sources including hedgefunds, for example.

9              MS. PRIMOFF:  And I believe that we have

10   allegations to that effect in the declaration of Joseph

11   Garcia, the chief financial officer of the company.

12   Immediately following Lehman's breach of its obligation to

13   fund the $10 million, Spanish Broadcasting was downgraded by

14   both rating agencies.  The rating agencies explicitly cited

15   the failure to fund and Spanish Broadcasting's decreased

16   liquidity position is the reason for the downgrade.

17             So there are both subjective factors and objective

18   factors that would come into play in -- in answering this

19   question for Your Honor.

20             So, for example, objectively, Spanish

21   Broadcasting's leverage ratios in September 2008 and

22   December 2008 were 14.77 and 16.87, respectively.  You know,

23   we would put on expert testimony to demonstrate that, you

24   know, no financial institution would make even a $10 million

25   loan with leverage ratios of that -- of that magnitude.

1           And as to the other sources of liquidity, again,

2     Mr. Garcia's declaration shows that the purpose for the $25

3     million drawdown was to repay a loan of eighteen-and-a-half-

4     million-dollars that was maturing in January 2009 and, in

5     addition, to terminate its swap with Lehman which had

6     breakage costs of $6 million.

7           Because Lehman didn't fund the $10 million piece,

8     they had to -- Spanish Broadcasting had to use three-and-a-

9     half-million-dollars of its precious liquidity to repay the

10    eighteen-and-a-half-million-dollar obligation and that --

11    that three-and-a-half-million then was not available for

12    ordinary operations of the company, which caused the company

13    to suffer.

14           THE COURT:  What kind of shape is Spanish

15    Broadcasting in today?

16           MS. PRIMOFF:  It is in shaky -- it is -- it is --

17    what kind of shape is it in today?  It's a public company.

18    Its financials are publicly available.  If you look at

19    Debtwire, it's, you know, there from time to time.  It's on

20    some people's watch list, but it's operating.

21           THE COURT:  All right.  Well, this alleged loss

22    and total invested capital.  I'm hard pressed to understand

23    at what point we're measuring this and how you're able to

24    demonstrate causation, even if you're entitled to damages,

25    either as direct or consequential.

Page 139

1          MS. PRIMOFF:  What Capstone has done is it has

2     recognized that all similarly situated media and

3     entertainment companies at the time experienced a decline in

4     liquidity, performance, total invested capital.  And

5     essentially the Capstone report assumes that Spanish

6     Broadcasting should have performed the way its competitors

7     performed at the time, as a result of the credit crisis, the

8     recession, all of that.  But that's not what the numbers

9     show.

10          What the numbers show is that Spanish Broadcasting

11     performed worse than that because Spanish Broadcasting was

12     in a worse liquidity position than its competitors as a

13     result of Lehman's failure to fund the $10 million piece of

14     the revolver.

15          THE COURT:  Okay.

16          MS. PRIMOFF:  I think otherwise our points are set

17     forth in our papers, Your Honor, that we don't believe this

18     is susceptible to a motion to dismiss.  We believe that our

19     claims survive a motion to dismiss, both because we assert

20     direct damages and because the consequential damages waiver

21     is not enforceable, and ultimately, because the question of

22     direct versus consequential damages is a question of fact.

23          THE COURT:  Okay, thank you.  Is there anything

24     more?

25          MS. MARCUS:  A little bit, Your Honor.

Page 140

1          Your Honor, I certainly hadn't been aware that the

2   waiver of the $5.7 million claim had been communicated to

3   Lehman.  I don't know if it's been communicated, but I'm

4   happy for it, so we'll drop that.

5          THE COURT:  You've already had a good day in

6   Court.

7          MS. MARCUS:  Your Honor, with respect to the

8   diminution in value of damages as being direct damages, I

9   won't, you know, extend this hearing any longer than it

10  needs to be.  Suffice it to say that in our reply, we

11  distinguish those cases.  They're not cases in which the

12  contract at issue was a contract to loan money, and we

13  believe that the cases we cited regarding the appropriate

14  measure of damages are the appropriate ones to look at.

15         But I would like to comment partly in response to

16  Your Honor's questions regarding Spanish Broadcasting, and

17  the Capstone report, and the methodology because it's really

18  important and I think that by simply reading the declaration

19  of Mr. Garcia, the Court, if that's what you do, might have

20  the wrong impression.  Bear with me one second, I'm sorry.

21         Mr. Garcia's declaration in paragraph 5 provides

22  "as a result of Lehman's failure to fund, S&P and Moody's

23  both down graded Spanish Broadcasting.  In doing so, they

24  specifically cited Lehman's failure to fund as the reason

25  for the downgrade, as well as concerns about Spanish

Page 141

1     Broadcasting's liquidity position."

2              When reading of the two reports, which were

3     attached to Mr. Otchin's declaration, reflects that

4     Mr. Garcia's statement is only partially true.  Yes, Spanish

5     Broadcasting was downgraded by both agencies in mid-October.

6     I find it a little bit hard to believe that a downgrade

7     could happen that quickly if the failure to fund was

8     October 3rd, that they downgraded them on October 14th

9     simply for that reason.

10             Second, yes, both of them do mention LCPI's

11    failure to fund its $10 million commitment.  But the Moody's

12    -- the section of the Moody's report that refers to its

13    rating rationale doesn't even mention the failure to fund.

14    What it says instead is "Spanish Broadcasting's Caa1 rating

15    reflects high leverage and negative free cash flow risk

16    related to its 2006 launch of MegaTV, recent weaknesses and

17    operating performance of its radio segment, lack of scale,

18    and significant revenue concentration in the New York, Los

19    Angeles, and Miami markets."  There's more, but again, no

20    mention of the failure to fund.

21             The S&P report likewise cites a number of factors,

22    most prominent among them, Spanish Broadcasting's investment

23    in MegaTV.  In the outlook section of the report, S&P states

24    "an outlook revision to stable, which we view is unlikely

25    during the near term, would require the company to slow its

Page 142

1    rate of cash usage, and reign in its increasing leverage

2    through a debt reduction plan involving asset sales, or

3    through earlier than an anticipated, break-even results from

4    its MegaTV operations."  No mention is made of LCPI

5    financing its $10 million portion of the revolver.

6            So, when Ms. Primoff described the Capstone

7    methodology, Capstone assumed that Spanish Broadcasting is

8    just like everybody else in this industry.  I think that's a

9    faulty premise upon which to have done the analysis.  And

10   certainly if we get that far we will want to litigate over

11   that issue.

12           But, Your Honor, just in conclusion, we believe

13   that the waiver of consequential damages issue is something

14   that the Court can rule on today and should rule on today.

15   And in light of the waiver of consequential damages, and the

16   failure of Spanish Broadcasting to even allege that the

17   inability of replacement financing was foreseeable by Lehman

18   in June of 2005, we request that the Court expunge the

19   claim.  Thank you.

20           MS. PRIMOFF:  Just very briefly, Your Honor, just

21   to protect the record.

22           Looking at the two ratings reports, which are

23   attached as Exhibits C and D to Mr. Otchin's submission, the

24   Moody's report, Ms. Marcus is correct on rating -- what she

25   read from rating rationale, but the paragraph directly

Page 143

1   below, rating rationale specifically says in the second

2   sentence, the inability to draw down its full $25 million

3   revolver, combined with continued deterioration of industry

4   fundamentals is the reason for the draw.  And there's

5   similar language in Exhibit D, the S&P report under

6   liquidity, where in the first sentence there, it

7   specifically mentions the failure to fund Lehman's $10

8   million portion.

9            THE COURT:  Okay.  I can see why this is an

10  outlier.  The path to an allowed claim, whether they be

11  direct or consequential damages in connection with this

12  company that may well have been an outlier relative to its

13  peers at the time of the failure to fund suggests to me that

14  if, as in when, this ever gets to an evidentiary hearing,

15  Spanish Broadcasting will have an extraordinarily difficult

16  time proving causation, even if it has the right to.

17            The claims being asserted here are bloated,

18  excessive, and probably not allowable, but I'm not ruling on

19  that.  I'm providing indication of direction to counsel.

20  This matter should be settled, and should have been settled

21  a while ago.

22            I am not going to rule today on the waiver of

23  consequential damages, even though I might be able to.

24  Giving the benefit of the doubt fully to Spanish

25  Broadcasting, under a 12(b)(6) standard, they will get their

Page 144

1    day in court, or we'll deal with this on dispositive motions

2    after discovery.

3              I am frankly startled to be presented with an

4    almost $40 million claim, which is based upon an expert's

5    report.  That's not to say the report isn't correct.  That's

6    not to say the report may not be admissible.  But in the

7    fully contested setting, it may not be credible.

8              We'll see you another day.  And I suggest you take

9    to heart some of my remarks.

10             MS. MARCUS:  Thank you, Your Honor.  That

11   concludes the morning half of the agenda.

12             THE COURT:  Fine.  We're going to take a very

13   brief recess, five minutes, to allow those attorneys who

14   need to enter their appearances for the afternoon hearing to

15   do so.  So, we'll take five.

16             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

17        (Recess at 2:09 p.m.)

18             THE COURT:  Be seated, please.  I figure if I wait

19   long enough, somebody will talk.

20             MR. WOLINSKY:  Happy to oblige, Your Honor.  My

21   name is Marc Wolinsky from Wachtell Lipton for JP Morgan.

22   And we're here on a motion to compel an answer to an

23   interrogatory.

24             And it's, as you know, it's taken us a long time

25   to get here.  And I remember in one of the conferences, Your

Page 145

1    Honor admonished us that it better be important if you're

2    going to make a motion.  And we think it is important, and

3    that's why we've pursued this issue as long as we have.

4           As you know, Your Honor, the core allegation in

5    the complaint here, one of the core allegations is that JP

6    Morgan made an arbitrary, capricious, unreasonable,

7    unjustified request for collateral, focusing on the one on

8    September 11th.  That was their request for collateral that

9    was focused on the -- JP Morgan's perception of the risks in

10   the tri-party repo book.  And JP Morgan believed that it was

11   under-collateralized, asked for an additional $5 billion in

12   cash to collateralize its exposures, and from that request,

13   which is the subject of litigation, there's a claim for

14   direct damages and consequential damages.

15          So, we asked LBI -- LBHI to state whether or not

16   there was a contemporaneous basis, not after the fact, but

17   whether on September 11th, when the request was made,

18   whether there was a contemporaneous basis for a belief that

19   JP Morgan at that time was over-collateralized.

20          And after a lot of back and forth, in court and

21   out of court, we did get an answer and it came just a few

22   days before we were first scheduled to appear before you and

23   LBHI said in its response that prior to LBHI's bankruptcy

24   filing on September 15th, Lehman did not calculate the

25   amount by which JP Morgan was over-collateralized.  So,

Page 146

1    they're saying there was no contemporaneous calculation of

2    the amount of over-collateralization.  And as an element of

3    over-collateralization, you have the exposure versus the

4    collateral itself.

5            They said that they did not calculate the

6    collateral value of the securities that had been pledged.

7    By collateral value, I take it they mean a treasury's face

8    amount of a billion, I'll lend you 98 cents on the dollar

9    against your treasury.  They did not calculate the

10   collateral value of the securities that had been pledged to

11   JP Morgan.

12           But they did not leave it just at that.  And if

13   they had not left it just at that, we probably wouldn't be

14   here.  They went ahead and said something else.  They said

15   that while they did not value the securities for collateral

16   purposes, there was a contemporaneous view of, and the

17   phrase is Lehman market value.  They used the phrase Lehman

18   market value, and they've used the phrase Lehman price.

19   That's the word they used.  To which our follow up question

20   is, okay, what do you mean by market value, what do you mean

21   by price?

22           The view -- the Lehman market value and the price

23   that they refer to, and that they're seeking to rely on and

24   ultimately will seek to rely on at trial is identified in

25   two spreadsheets, a series of spreadsheets generated every

Page 147

1    day.  And they directed us to a specific, identifiable group

2    of spreadsheets that capture the Lehman market value on each

3    of the critical days.

4          One spreadsheet is called the ALCO report, which

5    is essentially a report of all of the assets that are

6    pledged in tri-party repo, RACERS Security, you've heard

7    about is on that list because RACERS was in the tri-party

8    repo book.  The entire $5 billion of RACERS, give or take,

9    is in that ALCO report day by day.

10          The second report that they refer this to is

11    called the free collateral report.  And in essence, the free

12    collateral report is what it sounds like.  It is a listing

13    of all of the collateral that is not otherwise pledged out

14    to third parties.  Now, it turns out that there's slightly a

15    misnomer there because some of the securities in the free

16    collateral report were actually pledged to JP Morgan.

17          So, the secured -- so you have the ALCO

18    securities --

19          THE COURT:  Actually pledged to JP Morgan in the

20    transactions that are at issue in this case?  Or actually

21    pledged to JP Morgan in the ordinary course from the

22    beginning of time?

23          MR. WOLINSKY:  What happened was, and the story is

24    that beginning in the summer, JP Morgan was questioning

25    whether it was adequately collateralized in the TPR pool,

Page 148

1    and there were discussions between the parties, and Lehman

2    voluntarily provide -- I think it's fair to say, they

3    voluntarily provided -- say, look JP Morgan, we understand

4    you're insecure --

5              THE COURT:  This is before August?

6              MR. WOLINSKY:  This is -- yes, before August.  We

7    call this the summer collateral.  And they pledged in excess

8    of $5 billion face amount of securities to JP Morgan in the

9    summer.  And that summer -- what we call the summer

10   collateral, is listed on the free collateral report.

11             THE COURT:  Okay.

12             MR. WOLINSKY:  Okay?  And to their credit -- to my

13   good friend's credit, they summarized the Lehman market

14   value of the securities that we were all most interested in,

15   in the Schedule A to the interrogatory response and if Your

16   Honor would like, I could hand that up.

17             THE COURT:  Okay.

18             MR. WOLINSKY:  So, this is the schedule that they

19   gave us.

20             Lehman market value per ALCO and free collateral

21   reports, and just to simplify things, if we could focus on

22   September 11th, which is the date on which the collateral

23   request was made, you see RACERS, ALCO, which means that

24   it's in the tri-party repo book.  And on September 11th, the

25   Lehman market value for RACERS is listed as $5 billion -- $5

Page 149

1   billion and 7.  The $7 million there, as I understand it, is

2   accrued interest on RACERS.  So, the Lehman market value and

3   the total face amount is $5 million -- $5 billion.  So,

4   they're -- on this schedule listing the Lehman market value

5   of RACERS as $5 billion plus accrued interest.

6           THE COURT:  I have a question just so that you can

7   orient me in the (indiscernible - 00:50:57).  This document

8   which is called Schedule A --

9           MR. WOLINSKY:  Right.

10          THE COURT:  Is this a schedule to another

11  document?

12          MR. WOLINSKY:  This is a schedule to the

13  interrogatory response.  And the information on the schedule

14  is drawn from the ALCO and free collateral reports.

15          THE COURT:  All right.  So, do I understand then

16  that Schedule A is the format for sharing certain

17  information with you in accordance with your interrogatory

18  request?

19          MR. WOLINSKY:  Exactly, yes.

20          THE COURT:  And presumably, the schedule was

21  prepared by counsel for Lehman?

22          MR. WOLINSKY:  Yes.

23          THE COURT:  And presumably also, the information

24  on this form has been taken from other original source

25  materials --

Page 150

1          MR. WOLINSKY:  From the ALCO and free collateral

2     reports, which are generated daily at Lehman.

3          THE COURT:  And do you also have access to ALCO

4     and free collateral reports as a result of discovery so that

5     you can, if you choose to, validate and verify?

6          MR. WOLINSKY:  Yes, we actually have.  These

7     numbers are drawn from the ALCO and free collateral reports.

8          THE COURT:  Fine.

9          MR. WOLINSKY:  No issue there.  Okay.

10          But going down the list, I'd just like to focus

11     you.  If you see the next one after RACERS is Fenway.

12     Fenway and RACERS actually have shared characteristics.

13     They were both treated as commercial paper and the ratings

14     of both RACERS and Fenway were dependent upon Lehman's own

15     credit rating.

16          So, Lehman was pledging a security, the value of

17     which was dependent upon Lehman's own credit rating.  The

18     credit rating went down, the value of these securities went

19     down.  So, Fenway is a second piece.

20          Now, Fenway as you see is in free collateral,

21     that's because Fenway could not be pledged to third parties

22     and couldn't be -- wouldn't be purchased by third parties.

23          So, going down the list, Verano, Pine, SASCO,

24     Spruce, Kingfisher, those are additional collateral --

25     additional securities by and large in free collateral, not

Page 151

1    pledged to third parties, actually pledged to JP Morgan.

2    And just Pine, for example, I think Your Honor in the 60(b)

3    case heard about Pine.

4              THE COURT:  Yes.

5              MR. WOLINSKY:  SASCO, Spruce.  Some of these

6    securities are what is known as the freedom series of

7    securities.  These are securities that immediately after

8    Bear Stearns went down the tubes, the Federal Reserve

9    created a program called the Primary Dealer Credit Facility,

10   which you're familiar with.  And the purpose of the PDCF was

11   to enable broker dealers to pledge securities at the fed

12   window.

13             Pine, Spruce, Verano, Kingfisher were securities

14   that were created for the purpose of pledging -- being able

15   to pledge the Fed.  They were never sold to third parties

16   and the testimony was they were never intended to be sold to

17   third parties.

18             So, as you move across the page, if you look at

19   the column September 11th just for ease, you see RACERS at 5

20   billion, that's full face; Fenway at 3 billion, full face;

21   Verano, Pine, SASCO, Spruce, Kingfisher all valued at or

22   extremely close to full face, plus accrued interest.  I

23   think if you look at the list, the only one that is

24   significantly discounted from face, actually none of them,

25   Kingfisher on our records is 900 and -- some of them -- in

Page 152

1    excess of face.  I don't think any of them are discounted

2    from face.  They're all face plus accrued interest.

3          So, what we have here on the schedule is what --

4    in response to our interrogatory response, these are what

5    they say are the Lehman market value of the securities.

6    But, Your Honor, this is the greatest hits list.  This is

7    the (indiscernible - 00:55:34).  These are the securities

8    that Lehman referred to internally as toxic.

9          These are the securities that their witnesses at

10   deposition said couldn't be sold.  There was no ready market

11   for, were never intended to be sold in certain -- in many

12   circumstances.  So, we went back to Lehman when we got this

13   schedule and we said --

14         THE COURT:  When did you get that schedule?

15         MR. WOLINSKY:  We got that schedule about --

16         UNIDENTIFIED SPEAKER:  January 7th.

17         MR. WOLINSKY:  -- January 7th.  January 9.  The

18   beginning of January.

19         And we said, great, thanks for the schedule.  We'd

20   just like to understand one thing, when you say Lehman

21   market value, are you saying that that is the value at which

22   those securities could be sold in the market at the time?

23   And if that's what your position is, if that was Lehman's,

24   not position, if that was Lehman's contemporaneous belief

25   that these securities could be sold in the market at that

Page 153

1    time, at those prices, we now understand the basis for your

2    claim that JP Morgan was over-collateralized.

3             There's about $13 billion of securities on that

4    schedule.  And if it's their position, and they're going to

5    prove at trial that yes, Lehman believed at the time that

6    those securities really were worth $13 billion and JP Morgan

7    was over-collateralized and didn't need the $5 billion

8    because that's what we thought this stuff was worth, that's

9    fine.  We know what the target is.

10            And they'll prove however they can that this stuff

11   really was $13 billion and we'll call a parade of Lehman

12   witnesses who will all say, we didn't know what it was

13   worth, it couldn't be sold.  And what will quickly happen,

14   Your Honor, is the reason why this case hasn't settled, is

15   because there's a significant disconnect between what we

16   think the security -- the collateral was worth, and

17   apparently what the other side thinks it was worth.

18            So, that was our simple question.  Tell us in an

19   interrogatory answer or with a 30(b)(6) witness what these

20   market values represent.  And this motion hasn't been

21   resolved because the other side has not been willing to

22   provide, to clarify what market value means in the context

23   of this document, or provide a 30(b)(6) witness to explain

24   what those numbers represent on the page.

25            The extent I do understand --

1          THE COURT:  Can we break in and just kind of

2     review --

3          MR. WOLINSKY:  Sure.

4          THE COURT:  -- where we are procedurally.  This

5     discovery dispute has had multiple phases.  And it seems to

6     me we are in a new phase now.  One phase involved your

7     firm's writing a letter suggesting a discovery conference in

8     connection with the failure to respond to a particular

9     interrogatory, having to do with the subject matter we've

10    been revealing.

11         MR. WOLINSKY:  Same subject matter, yes.

12         THE COURT:  And that was the first of multiple

13    conferences that took place, some on the telephone, some in

14    person in this courtroom off the record.  And during the

15    course of those discussions at my urging, the parties

16    endeavored to work out a stipulation that would resolve the

17    discovery dispute and make motion practice unnecessary.

18    Despite best efforts, that failed.  And despite a further

19    conference, that failed.  And you ended up filing a motion

20    to compel.  Last month, a response came in from Lehman that

21    included the Schedule A we have been talking about, correct?

22         So, here's my question about procedure and where

23    we are right now.  One way to view what I've just recited is

24    that your motion to compel may be moot by virtue of the fact

25    that Lehman answered the question.  Another way to look at

Page 155

1    it, which I guess is the way you're looking at it, is it's

2    hardly moot because you're not satisfied with the answer.

3    There may be another way to look at it, and what I want to

4    confirm is what are we doing now procedurally, what is it

5    that you seek, and what is the rule-based reason for seeking

6    it?

7            MR. WOLINSKY:  Okay.  Your Honor, yes, we're

8    unsatisfied with the answer.  But we also believe that this

9    is part and parcel of the original motion that we filed,

10   because the original motion we filed sought two things.  It

11   sought to confirm something that was stated off the record

12   on many occasions, Lehman did not do a contemporaneous

13   valuation of the collateral -- for collateral valuation

14   purposes.  So, we were seeking to get them to commit -- the

15   stip. that we were never able to get, we got in their

16   response to the interrogatory, the one that they filed at

17   the beginning of January.

18           But there was always a second prong of the motion.

19   Because in the course of our trying to negotiate the

20   stipulation, they said, but Lehman did have values for

21   securities as reflected in documents that we've produced to

22   you.  And we always went back to them and said, you can't

23   point us to a universe of 8 million documents and say, go

24   find the answer in the 8 million documents.

25           And in the course of the discussions about the

Page 156

1    stipulation, they started -- they were narrowing, and

2    narrowing, and narrowing the universe of documents that

3    we're referring to, but they always allowed themselves --

4    they always said this universe of documents, and anything

5    else we come to.

6          So, if you look back at our original motion, it

7    said two things.  It said, they should confirm in writing

8    unequivocally that they did not value the collateral for

9    collateral -- they did not calculate the extent to which JP

10   Morgan was over-collateralized at the time.  And you cannot

11   just rely on the universe of documents to say, but these are

12   what the values of the securities were.

13         So, what they did in their response to when they

14   filed at the beginning of January is they abandoned their

15   argument that we're going to look to a whole universe of

16   documents.  They were extremely specific about what values

17   that they were seeking to rely on.

18         But really following up on your point, Your Honor,

19   we remain unsatisfied with their response because they used

20   the word market value without defining it, without

21   explaining it.

22         THE COURT:  Now, here's where I become a little

23   persnickety.

24         In the ordinary course of discovery motion

25   practice in this Court, there is a strong reliance upon the

Page 157

1    cooperation of parties rather than defaulting to motion

2    practice.  And I recognize that you view what we're now

3    talking about as being subsumed within your original motion

4    to compel.

5           It is possible, however, for another observer, me,

6    for example, to conclude that this is in effect a different

7    motion, that you are now having received answers seeking

8    amplification, clarification, specification with respect to

9    the (indiscernible - 01:04:56) and presumably doing so

10   because this is all part of an attempt on your part to gain

11   a procedural advantage in anticipation of motion practice

12   later in the case.

13          One of my uncertainties here, and I know you said

14   at the outset that you were mindful of the fact that in

15   order for you to have full credibility as you stand in front

16   of the Court, there needs to be good cause to be taking all

17   of our time in reference to a discovery motion.

18          Recognizing that you don't have to agree with my

19   characterization that this might in fact be a new motion

20   which would only be made after you had met and conferred

21   with the other side had exhausted your efforts to work this

22   out without having to go to the Court and having gone to a

23   telephone conference, or other conference to get permission

24   to file a new motion, without going down that particular

25   path, I still need to know why this has become so critically

1   important to you and your important that we're still dealing

2   with it so much later in the process after you have Schedule

3   A.

4           Because Schedule A speaks to me, and I understand

5   what it means, and I think you do too.  You said so in your

6   remarks.  This has all been booked at full value, without

7   discount.

8           MR. WOLINSKY:  Your Honor, I don't want to

9   interrupt you.  May I speak?

10          THE COURT:  Sure.

11          MR. WOLINSKY:  Yeah.  If opposing counsel stands

12  up and says when they refer to this -- to market value on

13  this schedule as the value at which the securities could be

14  sold in the market at that time, and -- we'll sit down.  But

15  that is the important issue.  And I don't think you're going

16  to hear it from the other side.  But let me not preview

17  them.

18          THE COURT:  Well, but before anybody previews

19  anything, we're not talking about a different concept.  The

20  concept that we were talking about when we started this

21  process many months ago was that JP Morgan Chase was looking

22  for an answer to an interrogatory that, in substance, asked

23  the question did Lehman have its own valuations for the

24  securities in question.  That's my paraphrase.  Answer,

25  Schedule A.  JP Morgan's response, we're not satisfied.  We

Page 159

1    want to know what you mean by the term "Lehman market

2    value."  That's a different question, I think.

3                 MR. WOLINSKY:  Your Honor, we would not have been

4    -- we would not be standing here today if we hadn't engaged

5    with the other side over the past several weeks to pin down

6    that question.  But we did not get a commitment as to what

7    the answer to what Lehman market value means since we got

8    the schedule.

9                 THE COURT:  Right, you understand as a result of

10   this colloquy why I could conclude reasonably, I think, that

11   to be pressing motion practice with respect to what is meant

12   by the terms, or term Lehman market value for purposes of

13   this case, is a different question from did you do

14   valuations.  Answer, these are the valuations to the extent

15   we can call it that because that's the answers to the

16   interrogatory, but what meaning you can draw from that may

17   be more nuanced.  What are you really looking for?

18                 MR. WOLINSKY:  I'm looking for one of two things.

19   I'm looking for representation that when they used the

20   phrase market value, they mean it's the value at which the

21   securities could be sold in the market at that time, or it

22   means something else.  And if it means the something else,

23   we're trying to understand what the something else is.

24                 THE COURT:  Okay.  Can you tell me about the

25   efforts that you've engaged in -- to find an answer to that

Page 160

1    question and why it has not been possible to get that

2    question answered?

3              MR. WOLINSKY:  Sure.  Right after we got the

4    schedule, we called the other side and asked them to explain

5    it.  We didn't get an answer.  We served a 30(b)(6) notice

6    asking them to put up a witness to explain what the

7    schedules meant and what the market value term meant.  And

8    we've not -- we've been stiff armed on the 30(b)(6) notice.

9    We haven't been told no, and we haven't been told yes.

10   We've been told nothing, just that we'll get back to you.

11             THE COURT:  Presumably, regardless of the answer

12   to the question, what does the term "Lehman market value"

13   mean, the numbers aren't changing.  These numbers have been

14   presented to you.  So, to the extent that you were looking

15   for an answer to an interrogatory that solicited internal

16   marks at Lehman for the collateral that you're interested

17   in, you have that, don't you?

18             MR. WOLINSKY:  Well, our original request was not

19   for their marks.  Our original request was for collateral

20   value.

21             THE COURT:  Well, one of the --

22             MR. WOLINSKY:  Your Honor, collateral value -- you

23   can mark a security all you want, but that doesn't mean that

24   that's what it's worth, and that doesn't mean what a third

25   party would value it at for purposes of making a loan.

Page 161

1           THE COURT:  Well, we -- I think we end up in a

2    very subtle zone in which very few people can have an

3    intelligent conversation, because we get into a

4    philosophical discussion in a sense, or maybe a

5    macroeconomics discussion, or maybe it's a finance

6    discussion, or maybe it's a political discussion about how

7    do you characterize numbers that drive the U.S. economy.

8    And to what extent are those numbers real?  To what extent

9    are they fanciful?  To what extent are they conservative?

10   To what extent are they aggressive?  And I want to talk with

11   you all about this because I think that's where this

12   discovery seems to be heading, unless I'm missing something.

13          MR. WOLINSKY:  No, I think you actually have put

14   your finger on something very important.  And yes, it's a

15   philosophical, political, macroeconomic discussion, but in

16   this context, in the context of this lawsuit, it's a

17   commercial question, because every morning, as you know, JP

18   Morgan extended on the order of 100 to 120 billion dollars

19   of credit against securities like this, and these

20   themselves.  And every morning, JP Morgan had to ask itself,

21   am I comfortable extending that credit against this pool of

22   securities, knowing that at the end of the day, the

23   overnight investors might not come back, and Lehman might go

24   down the tubes, and I might wind up owning them.

25          And then the week that we're focusing on, that

Page 162

1    theoretical question, was starting to look like a very real

2    question.  In fact, it was a very real question because in

3    the week that we're talking about, the overnight investors

4    were pulling back.  They were pulling back not only for the

5    esoteric stuff, and when we finally get to trial, but

6    Fidelity and the PIMCOs of the world were pulling back on

7    treasuries.  They were not willing to enter into tri-party

8    repos with Lehman on treasuries because of the perceived

9    risk that Lehman would fail and the test, the way people

10   characterized it in their testimony was headline risk.  I

11   don't want to be the guy who's left holding Lehman -- a debt

12   to Lehman and wake up in the morning and see in the

13   headlines that Lehman is bankrupt.

14           So, the commercial -- look, we all know what was

15   going in the world leading up to Lehman's failure, and the

16   kinds of excesses that were common in the market place.  But

17   as Lehman was leading towards bankruptcy, and as the

18   headline risk moved up the charts, what JP Morgan did and

19   obviously we think was entitled to do, was look at this list

20   of securities and say very nice, you know, on a theoretical

21   grid, commercial paper usually trades at 98 cents on the

22   dollar, Lehman commercial paper 98 cents on the dollar.

23           We've marked SASCO at 100 cents on the dollar

24   through the summer, we've made noises about SASCO, maybe

25   it's not really worth 100 cents on the dollar.

Page 163

1              But on September 11th, when the storm clouds were

2      gathering and JP Morgan has to make a decision, am I going

3      to lend Lehman $100 billion tomorrow, that's no longer a

4      macroeconomic issue, that is a hard commercial decision, and

5      values, marks on a page are not really very relevant at that

6      point in time.  The relevant consideration at that point in

7      time is if you wind up owning it, are you going to be able

8      to sell it?  And if you can sell it at all, what price

9      you're going to get?

10             Which really leads into your 60(b) experience with

11     Pine.  What did Barclays think it was worth when they had --

12     they wound up with -- was kind of the -- not humorous

13     because it's a billion dollars, but Pine was, you know, kind

14     of circling around, literally like musical chairs, who's

15     going to get stuck holding Pine when the music stops.

16     Barclays got stuck holding Pine when the music stopped,

17     marked at a billion dollars, they looked at it and marked it

18     down to 40 cents on the dollar, 50 cents on the dollar.  And

19     that's the commercial question -- that's the commercial

20     issue that JP Morgan was facing on September 9, 10, 11 and

21     12 when these collateral requests were made.

22             And that's why, Your Honor, it is an interesting

23     theoretical question, but the answer that we're pushing for

24     is a very important commercial question.  What did Lehman

25     think these securities could be sold for?  And if they want

Page 164

1    to take -- put a witness on the stand and say this stuff was

2    worth 100 cents on the dollar, that was the market value as

3    everybody understands the term market value to mean what you

4    could sell it for, great.  We'll know what we're shooting

5    at.  But I don't think they're going to put that witness on

6    the stand.

7              THE COURT:  Well, you know, different things are

8    valued in different ways.  And I'm actually testifying next

9    week before a valuation task force that ABI has put together

10   because they asked me to, and I don't know what I'm going to

11   say.  But I know enough about the subject as a result of my

12   experiences both before I went on the bench, and

13   particularly since, to know that it is an endless debate.

14   So, we are not going to resolve in practical terms, the

15   issues that we're discussing, even if you get the answer to

16   the question, well, what do you mean by Lehman market value?

17   But presumably you're going to get some kind of tactical

18   advantage as a result of that answer because you'll be able

19   to do something with it in the litigation, which is why

20   we're here, I presume.  Correct?

21             MR. WOLINSKY:  It's part of the search for the

22   truth.  Yes.  I mean, to the extent --

23             THE COURT:  Well, I know it's --

24             MR. WOLINSKY:  -- that search for truth is --

25             THE COURT:  I know --

Page 165

1          MR. WOLINSKY:  -- tactical, yeah.  I would --

2          THE COURT:  I know -- I know --

3          MR. WOLINSKY:  I'll give you tactical.

4          THE COURT:  I know it's a search for the truth and

5     years ago when I was a young lawyer and I worked for a

6     senior litigator who was a fellow of the American College of

7     Trial Lawyers, he used to always tell me that this pursuit

8     was a search for the truth, and it is at the highest level.

9          But it's also a truth for tactical advantage when

10    you're representing a client.  I assume that's why we're

11    here.

12         MR. WOLINSKY:  Yes.

13         THE COURT:  Okay.  Why do you actually need this -

14    - the answer to this definition?

15         MR. WOLINSKY:  Because we would like to understand

16    what Lehman contemporaneously viewed the market value of

17    these securities to be.  If it's something --

18         THE COURT:  What you're --

19         MR. WOLINSKY:  -- other than what the prize could

20    be sold at -- what the security could be sold at, we would

21    like to know that as well for the tactical reason that Your

22    Honor has put your finger on, because we are going to take

23    the position, we're going to prove, very nice that you

24    marked it at 100 cents on the dollar and very nice that you

25    marked it on the basis of a level 3 analysis.  These are

Page 166

1    largely level 3 securities.  I know -- I under -- I'm sure

2    Your Honor knows that -- what I'm referring to.  And this

3    was based on modeled prices, based on analyses that are

4    three-step removed from market transactions.  And, by the

5    way, there are no market transactions.

6              And if they make that admission, which I fully

7    expect in -- if they're being candid they will make, yes, I

8    have a huge tactical advantage -- tactical -- I have a huge

9    advantage in the courtroom on facts because the Lehman --

10   the JPMorgan witnesses will turn around and say, very nice

11   that you valued the security on the basis of models derived

12   from securities that are three steps removed from this one.

13   But it couldn't be sold at those prices.  And by the way,

14   the people in the finance department at Lehman agreed.

15             THE COURT:  Now let me ask you something because I

16   assume that there is no issue as to the integrity of

17   Schedule A, namely it reflects information taken from Alco

18   and Free Collateral reports, and that if you go down each of

19   the date columns, September 11 with a bunch of numbers

20   listed under it, that is, in fact, information taken from

21   contemporaneous records at Lehman Brothers Holdings which

22   indicate how these various investments or assets were

23   marked.

24             MR. WOLINSKY:  Correct.

25             THE COURT:  You are looking for something else.

Page 167

1    You are looking for some acknowledgement in one form or

2    another that these numbers as listed do not reflect what

3    these opaque assets would yield if sold in the market at

4    that time.

5              MR. WOLINSKY:  Correct.

6              THE COURT:  Isn't that a different question from

7    the question that started the process, the process of

8    seeking discovery because the process that you undertook in

9    pressing for an answer to the interrogatory was, tell me if

10   there are contemporaneous values at Lehman with respect to

11   the collateral in question.  This is that answer and it

12   seems to me you just don't like it or you think it's

13   inadequate or incomplete or insufficient.

14             MR. WOLINSKY:  The latter.

15             THE COURT:  I think it's probably all those

16   things.

17             MR. WOLINSKY:  No.  The marks are the marks.

18             THE COURT:  Exactly.  Well, since the marks are

19   the marks, what more can you seek by way of documents?

20   What more can you seek other than the document that you may

21   want to see that doesn't exist, a document that might be

22   Schedule B that would say, Schedule A's numbers are

23   overstated to the tune of 25 percent, to make something up.

24             MR. WOLINSKY:  I doubt that document exists.

25             THE COURT:  Of course it doesn't.  I just made it

Page 168

```
 1   up.

 2           MR. WOLINSKY:  Right.

 3           THE COURT:  I'm talking about -- I'm talking about

 4   a land of storybook finance in which you have a major

 5   investment banking firm that has marks that reflect assets

 6   at their --

 7           MR. WOLINSKY:  You're having a hard --

 8           THE COURT:  -- full value and then -- and then --

 9   and then you're looking for what amounts to a mental

10   impression that some people had that those numbers were

11   overstated relative to fair market value.

12           MR. WOLINSKY:  No.  I'm not saying that they

13   overstated.

14           THE COURT:  You're not?

15           MR. WOLINSKY:  No.  I'm -- they -- they could be

16   perfect -- within the counting rules they could be perfectly

17   legitimate to class -- to list the security on the books and

18   records at face.  But that doesn't mean that they could be

19   sold at face.

20           THE COURT:  Isn't it a question for experts

21   retained by both Lehman and JPMorgan Chase to take a look at

22   Schedule A and to say what you just said, because isn't that

23   what this is about now?  You're looking for --

24           MR. WOLINSKY:  No.

25           THE COURT:  -- something that it seems to me
```

Page 169

```
1    probably does not exist.  You're looking for either a

2    document that says, we have other numbers, or a witness, a

3    30(b)(6) witness who you can ask questions about and you'll

4    say, could you sell -- could you sell racers for $5 billion

5    on September 11th.  I assume you'll ask that question.

6             MR. WOLINSKY:  And I assume the answer is going to

7    be no.

8             THE COURT:  Or I don't know.

9             MR. WOLINSKY:  Uh-huh.  Well, we did ask the

10   people who were supposed to know and they all said, I don't

11   know or no.  That was before we served the interrogatory

12   answer -- interrogatory.  And now -- see this is what's --

13   what's -- I don't want to say annoying, but this is why

14   we're pressing the issue because when we asked the people

15   who constructed racers, could racers be sold for $5 billion,

16   the answer was no.  There was no market for racers.  The

17   reason why it's there is because we couldn't sold --

18   couldn't sell it.

19            THE COURT:  Well, this is the actually fascinating

20   theoretical question.

21            MR. WOLINSKY:  There's nothing theoretical about

22   it.

23            THE COURT:  No.  This is a fascinating theoretical

24   question.

25            MR. WOLINSKY:  Then I'll -- then I'm happy to
```

Page 170

1    engage in it with you.

2              THE COURT:  If you have a valuable asset but there

3    is no market for it, does that mean that that asset has no

4    value?

5              MR. WOLINSKY:  Does that mean it has no collateral

6    value?  That's what the --

7              THE COURT:  No.

8              MR. WOLINSKY:  -- case is about.

9              THE COURT:  Well, of course the case is about

10   collateral value, but it's also about what all valuation

11   cases are about.  It's about perception and it's about

12   experts that look at all the data and come up with a made as

13   instructed opinion.  That's what happens.  That's what

14   happens in these cases.

15             MR. WOLINSKY:  Yes.

16             THE COURT:  Sorry, Hal.  I didn't -- I didn't mean

17   to make you cringe.

18             MR. WOLINSKY:  No.  No.  And that is going to

19   happen in this case.  You made Hal cringe?

20             THE COURT:  You didn't have to respond.  I just

21   saw -- I just saw your -- you were -- you looked --

22             MR. NOVIKOFF:  Yeah.  I --

23             THE COURT:  -- pained by my comment.

24             MR. NOVIKOFF:  I did because that's not the issue.

25   It's got to be decided in the context of what the securities

Page 171

1    were provided for, and that was collateral in a clearance

2    arrangement, and in that context the theoretical issues,

3    Your Honor, peel away.  The issue is simply, what could they

4    be sold for if JPMorgan needed to recover its clearing loss.

5            THE COURT:  You have already asked, as I

6    understand from this colloquy, any number of witnesses that

7    question and they answered the question either it couldn't

8    be -- I don't know, or it couldn't be sold for that.  There

9    is already, based upon the acknowledgements made during the

10   course of this argument, an ample record that answers the

11   question that you are seeking to have answered in a motion

12   to compel even though you didn't actually seek permission to

13   press this motion today.

14           So my question is, again, why are we doing this

15   except for tactical advantage?  I am finding this, the more

16   I discover about it as we're talking, increasingly difficult

17   to comprehend.  And it becomes increasingly, as you used the

18   term before, annoying.

19           What do you want from me?

20           MR. WOLINSKY:  Your Honor --

21           THE COURT:  I mean, why do you really want it?

22   Why do you want to press this now?

23           MR. WOLINSKY:  The why is very easy.  The way is

24   because we want to be able to prove that these values were

25   theoretical constructs that did not represent the prices at

Page 172

1    which the securities could be sold in the market at the

2    time.

3              THE COURT:  You already know that based upon what

4    you've told me.  You already have ample evidence from Lehman

5    witnesses that confirm they either don't know or don't think

6    that you can sell racers for $5 billion.  What more could

7    you possibly be asking for?

8              MR. WOLINSKY:  What more I could be asking for is

9    this:  When they try to put on, through a witness or an

10   expert, these schedules to say, well, these are the marks

11   and we -- you are entitled to -- everyone in the world was

12   entitled to rely on these books and records of Lehman as the

13   values -- the market value of the security, I would like to

14   be able to -- to have -- to cross-examine the witness who

15   puts -- tries to put the Alco and Free Collateral reports

16   into evidence, or the expert who is relying on them with

17   factual information about what the numbers on the Alco and

18   Free Collateral reports represent.

19             So let's step back and see how we got here, Your

20   Honor.  And I -- I -- I don't mean to be trying your

21   patience.  Honestly, I do not.  But let's play out how this

22   is going to go at trial.

23             A witness is going to take the stand and is going

24   to say here are the free collateral reports.  Here are the

25   Alco reports.  They're prepared in the ordinary course of

Page 173

1    business.  We had a -- we had a department at Lehman that

2    did nothing more than value the securities and the

3    portfolios on a daily basis.  These are the values, and

4    based on these values, JPMorgan was over collateralized.

5           All I want to do is be able to ask the witness who

6    puts on that document to testify about that document to say,

7    okay, those are the market values that were placed on the

8    securities.  Could you please explain to me how they were

9    derived; what did they represent.  And that's a very fair

10   question to ask the witness who is going to be putting these

11   documents into evidence at trial.  And it's a very fair

12   question to be asking an expert:  Did you know that these --

13   that the prices that you're relying upon are not based on

14   market data, are not based on actual trades.

15          THE COURT:  But don't you see that wasn't your

16   original interrogatory.  We're -- we're down a different

17   rabbit hole.

18          MR. WOLINSKY:  Your Honor, if you would like us to

19   start all over, we will.

20          THE COURT:  No.  I don't want you to waste --

21          MR. WOLINSKY:  I didn't think you did.

22          THE COURT:  I don't want you to waste time, but

23   I'm also very transparently concerned that there is a

24   litigation game being played here and it's been a long

25   process of discovery.  When this case was first commenced, I

Page 174

1    remember there was an initial pretrial conference and

2    somebody mentioned that there was a trial date set for, I

3    think, January of 2012.  It's now a year later and the trial

4    date is a year off still.

5            What disturbs me systemically about this case is

6    that it's enormously burdensome to the parties.  I think

7    it's burdensome to counsel.  And there are times when, since

8    I don't know it as well as you do, events like this begin to

9    seem like a form of water torture.  I don't understand why

10   this could not be worked out.  I don't understand why, even

11   though you said at the outset that you wouldn't be here

12   unless it was demonstrably important, that this is

13   demonstrably important in a setting in which you have

14   acknowledged in your argument that countless witnesses have

15   been asked certain questions about numbers just like this,

16   just formatted differently.

17           So with that I'm going to take a short break

18   because I have a 3:15 telephonic chambers conference and I'm

19   going to be back here in about 15 minutes I figure.

20           I realize it's a break in the middle of colloquy.

21   Think of it as an example of what happens when lights go out

22   in the dome.

23      (Laughter)

24           THE COURT:  We'll -- I don't think it's going to

25   effect the momentum.  We're just going to have an

Page 175

1   unscheduled time out.

2           Okay.

3           MR. WOLINSKY:  Thanks.

4           THE COURT:  See you in a bit.

5       (Recess at 3:11 p.m.)

6           THE COURT:  Be seated, please.

7           So I think when last we were talking with each

8   other I was pressing a little bit as to why we're here, why

9   we really need to be here.

10          MR. WOLINSKY:  Okay.  Should I pick up?

11          THE COURT:  Sure.

12          MR. WOLINSKY:  Okay.  Your Honor, I did want -- I

13  went back over the break, just to review how we got to where

14  we were, and I went -- went back to our original motion.

15          And we did flag in our original motion papers this

16  very issue.  Among the documents they cited us to in the --

17  in the original -- in the course of the give and take were

18  documents that listed these various securities at face, and

19  then we specifically challenged them in our opening brief,

20  but nothing in these documents or in LBHI's R&Os specifies

21  which, if any, of those values LBHI believed to be the

22  amount that JPMorgan could have realized if it sold the

23  collateral in 2008.

24          And specifically in the order that we originally

25  moved for, we asked them to specify the elements of their

Page 176

1    calculation of over collateralization.  So I -- I think it's

2    fair to say that market value is an element of the

3    calculation of over collateralization.  You have market

4    value, haircut, collateral value.

5              And that really goes -- picks up on the point that

6    Mr. Novikoff made before the break, which is that market

7    value in the context in which we're speaking has a real

8    meaning.  These are securities that in the event of a Lehman

9    failure were going to have to be sold, not in a theoretical

10   world, but to real people for real money.

11             So in that respect I think, Your Honor, this

12   motion -- I -- and I really do appreciate that there's --

13   we're trying to move this along and starting this whole

14   sequence over with another letter really wasn't going to be

15   very productive and that's why we proceeded the way we did

16   and we think we fairly did.

17             And on the question of whether we're being

18   tactical here --

19             THE COURT:  Sure you are.

20             MR. WOLINSKY:  Yes.  We're being tactical --

21             THE COURT:  Otherwise it wouldn't be --

22             MR. WOLINSKY:  -- to advance the interests of our

23   client to try and get information which we think we're

24   entitled to.

25             THE COURT:  Okay.

Page 177

1              MR. WOLINSKY:  And an evasive answer is tactical,

2      too.

3              THE COURT:  Well, maybe --

4              MR. WOLINSKY:  Try --

5              THE COURT:  -- maybe it's time to hear what they

6      have to say.

7              MR. WOLINSKY:  I'm happy to relinquish the podium.

8              THE COURT:  Fine.

9              MR. PIZZURO:  Thank you, Your Honor.

10             I was perhaps more interested than Your Honor to

11     hear Mr. Wolinsky's summation and also his trial strategy,

12     but it has very little to do with why we're here today on a

13     motion to compel an answer to an interrogatory that they've

14     already received.

15             The issue in the case, it's not what these numbers

16     reflect, what Lehman thought these securities could be sold

17     for at a fire sale immediately on the day of or after the

18     bankruptcy.  The issue is what JPMorgan though these were

19     worth.  When JPMorgan was acting as a tri-party repo agent

20     repoing these to the street for many months before the

21     bankruptcy repoing them to the tri-party agent after the

22     bankruptcy using these values, and I'm sure that the people

23     who were financing these before and after the bankruptcy,

24     including federal reserve bank, would be very interested to

25     know that JPMorgan apparently had no idea what these were

Page 178

1    worth in terms of collateral.

2         So Mr. Wolinsky isn't going to get his wish of

3    being able to cross-examine a witness that is going to be

4    relying on these documents and Lehman's numbers.  He's going

5    to be faced with cross-examining his own people who have to

6    answer the question of why did they believe they were over

7    collateralized; why did they represent these values to the

8    fed and to the street for so long before and after the

9    bankruptcy; and how can they now be complaining that they

10   were taken advantage of by Lehman.

11        But to get this case back to what we're supposed

12   to be discussing today, I think if Your Honor hears the

13   whole story, which we didn't hear, and I'm going to give Mr.

14   Wolinsky a little bit -- a little bit of a pass of this

15   personally because I don't think he was involved.

16        The history of this is true up to a point the way

17   it was recounted by Mr. Wolinsky.  What was left out was

18   that after the last time we were before Your Honor, which I

19   believe was the Tuesday after Thanksgiving, we had a

20   discussion of this and some other issues.  And the parties

21   did make another attempt to have a stipulation that would

22   resolve this issue.  We were unsuccessful.  We filed our

23   reply brief on December 14 and were ready to come into court

24   and argue this.  Counsel needed a postponement because of a

25   scheduling conflict.  That's fine.

Page 179

1          But in lieu of that postponement, yet again, we

2     had some more discussions in -- in an effort to resolve

3     this.  And if Your Honor cares to see them, I have the email

4     traffic here where we had a proposal from Wachtell and

5     Wachtell proposed a stipulation with an overage that they

6     said would resolve this entire dispute.

7          Would Your Honor --

8          THE COURT:  Yes.  I would be interested in seeing

9     it.

10          MR. PIZZURO:  So the first page, Your Honor, is

11     the proposal from Wachtell and what we've highlighted here

12     are the words that we had a problem with.  And so we

13     responded and we said, we'll give you exactly what you've

14     asked for, word for word verbatim, exactly what you've asked

15     for.  We would like your "should" in the first paragraph to

16     be a "would" and we would like your "marks" to be "pricing,"

17     and those are the only two changes that we would propose.

18     And we were told, not good enough.  You have to take it

19     verbatim or nothing.

20          And we were faced with that.  Based on the

21     assumption that we certainly couldn't get Wachtell or JPM to

22     enter into a stipulation that they opposed, we similarly

23     didn't think that they could move to compel us to give them

24     an interrogatory answer different from what we proposed.

25     And so the interrogatory answer is basically verbatim what

Page 180

1    they asked for in the stip with those two changes.

2           And the Schedule A was appended.  The Schedule A

3    provides the information that they asked for listed down

4    after this paragraph 3 and then the Bates numbers that they

5    -- and they asked us to refer to these documents.  That's

6    where these numbers come from.  That's where Schedule A

7    comes from.

8           So they got the representations that they asked

9    for verbatim.  They got the information that they asked for

10   verbatim.  They got it exactly from the documents that they

11   asked us to -- to curl the information from, and these were

12   documents that they had in hand.  And when we provided them

13   with that they said, for the first time, it's not good

14   enough and we want a 30(b)(6) witness who is going to

15   explain to us some of the information which is contained in

16   these documents and the schedule.

17          And we did not tell them no.  What we said to them

18   and what is the case today is we don't know whether we have

19   access to individuals who actually could answer the

20   questions that you put in your 30(b)(6) notice, which we got

21   on January 9.  We're trying to track those folks down.

22   They're in the wind.  They're no longer with the estate.

23   They don't work at A&M.  Some of them are I don't know

24   where, but we're making a good faith effort to see whether

25   or not we can actually comply with a 30(b)(6) request, and

Page 181

1    that is an ongoing process.

2            THE COURT:  Let me ask --

3            MR. PIZZURO:  That's --

4            THE COURT:  -- you this.  Assuming you are able to

5    identify an individual who is in a position to submit to a

6    30(b)(6) inquiry, you're willing to do that and you've

7    offered that to Wachtell?

8            MR. PIZZURO:  We're willing to offer a 30(b)(6)

9    witness.  I'm not sure -- and I want to be clear about one

10   thing.  The 30(b)(6) notice contains the questions or the

11   areas of questioning that are the second part of the

12   proposed order.  They don't have the questions that Mr.

13   Wolinsky was posing about, is this the market value; is this

14   what you thought it could be sold for in the market.

15           Those questions were never asked ever.  The first

16   time we've ever seen those questions was Friday afternoon,

17   7:00, when we got the proposed order together with their

18   reply brief.  So the 30(b)(6) notice is a different animal

19   from the questions that they are asking us now to be

20   compelled to answer.

21           THE COURT:  But let me understand something

22   because I have no visibility into the discovery process that

23   you've all been engaged in for such a long time.

24           Are there Lehman witnesses that have been deposed

25   -- it doesn't really matter how many, just some number of

Page 182

1   individuals, former Lehman employees -- who have been asked

2   about these values and have been asked whether or not, for

3   example, racers can -- could have been sold on September 11,

4   2008 for $5 billion?  Were people asked questions like that?

5          MR. PIZZURO:  The first time I -- I -- personally,

6   Your Honor, I don't know.  The first time that I heard that

7   representation was when Mr. Wolinsky made it.  He might be

8   right.  Frankly, I don't know so I can't verify that and I

9   can't deny it.

10          That -- that's the way I would have to answer that

11   question.

12          THE COURT:  Okay.  If I'm understanding what

13   you've just said correctly, I'm not sure why we're having

14   this argument because you've turned over Schedule A.  You've

15   answered the interrogatory, and you've indicated a

16   willingness -- you haven't committed to do it.  You've

17   indicated a willingness to locate a witness who can respond

18   to the areas of inquiry outlined in a 30(b)(6) notice,

19   correct?

20          MR. PIZZURO:  That's correct, Your Honor.

21          THE COURT:  So what do you think I'm being asked

22   to compel you to do?

23          MR. PIZZURO:  I have not got a clue, Your Honor,

24   other than what's contained in the proposed order, which is

25   a whole different set of questions from any questions we

Page 183

1    have been asked before.  I -- Your Honor, I -- I can't

2    answer the question or I can't make the argument any better

3    than the questions that Your Honor was putting to Mr.

4    Wolinsky where, frankly, I thought that you would --

5    somebody had gotten a hold of my notepad for the argument.

6            This is clearly not based on any need to get

7    discovery that's responsive to the interrogatory question

8    that they've proposed.  This is an attempt to have the

9    merits argued, to have some sort of tactical advantage.  Mr.

10   Wolinsky was up here.  As I said, he gave his summation.

11   It's okay.  It's -- it's nothing that we didn't expect to

12   hear.

13           And it's simply taking an opportunity to make what

14   they believe are their merits-based arguments, and if

15   they're trying to back Lehman into a corner to have somebody

16   make a statement which then will be said to be an admission

17   that we'll see on a 30(b) -- rather a 56 -- 56 statement or

18   summary judgment, you know, I think that's clearly what --

19   what they're looking for.

20           But what they have received is what they're

21   entitled to.  They've gotten all the information.

22   Everything more is, as Your Honor said, a matter of expert

23   testimony.  They're going to know and we've -- we've made

24   this clear.  We've made it clear from the first time we were

25   in front of Your Honor.  We don't have any documents that

Page 184

1    they don't have.  Our experts haven't seen any documents,

2    aren't relying on any documents that they don't have that

3    they're going to be surprised about.  There isn't any

4    attempt to have trial by ambush or expert by ambush or

5    anything else.  Everything is transparent.

6            And the rest of the argument here is really

7    merits.  If they're not satisfied, if they think that the

8    information with which they're provided isn't sufficient to

9    sustain the claim, that's the basis for a motion.  Be at it.

10   It will be decided.  But it -- this is not the appropriate

11   context for that kind of a dispute.

12           We shouldn't be here today, Your Honor.  You're

13   absolutely correct.  And if there is any further discovery

14   dispute, if they -- if we can't find somebody, or if we were

15   to have refused to provide the 30(b)(6), what they should

16   have done is they should have made a motion to compel or

17   sought permission for a motion to compel us to provide a

18   30(b)(6) witness.

19           But this interrogatory dispute is long gone.  They

20   told us what they wanted.  We gave them it verbatim, and yet

21   we're here this afternoon still arguing about this.  And I

22   don't know the answer, Your Honor, as to why we're here.  We

23   shouldn't be here.

24           THE COURT:  Well, okay.  Here's my immediate

25   reaction to this back and forth.

Page 185

1              It seems to me that the interrogatory that was the

2      subject of the original motion to compel has been answered.

3      The inquiry that is currently animating this argument may be

4      subsumed within the original request, but I actually don't

5      think it is.  I think it is, in effect, a -- a rip on the

6      original request to move in a slightly different direction,

7      even though the interrogatory has been answered.

8              Since discovery has not concluded, there's no

9      reason that the parties can't continue to pursue their

10     discovery rights until your stipulated period for fact

11     discovery has run its course.  And can you refresh my

12     recollection as to what that date is?  It has been extended

13     repeatedly.

14             MR. MOSCATO:  I think it's April 5.

15             MR. PIZZURO:  April 5.

16             MR. WOLINSKY:  Yes.  April 5.

17             THE COURT:  Okay.  So you have a couple of months,

18     well, seven weeks to complete discovery.

19             As far as I'm concerned, I'm denying this motion

20     to compel in its present form without prejudice.  My

21     understanding from counsel is that a 30(b)(6) witness which

22     is part of this inquiry is being identified.  Whether that

23     witness is ever actually identified remains to be seen.

24     Whether that witness ever actually testifies remains to be

25     seen.  Whether any further motion practice evolves as a

Page 186

1    result of this search for the truth remains to be seen.

2            And I think that for now, at least, I'll entertain

3    an agreed simple order that I can enter on the docket that

4    resolves this for today.  But I'm not granting any further

5    relief today.  Parties should simply work at this

6    themselves.

7            And I think what I would like to do is conclude

8    the hearing and then when we're off the record come back and

9    have maybe a ten-minute conference with everybody, just so I

10   have a better understanding as to what's going to happen

11   next.  Consider it a discovery management conference.

12           Okay.  We're adjourned and I'll come back in five

13   minutes.

14           MR. WOLINSKY:  Thank you, Your Honor.

15       (Whereupon, these proceedings concluded at 3:49 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                           I N D E X

 2

 3                           RULINGS

 4                                        Page        Line

 5    Debtors' Sixty-Seventh Omnibus Objection

 6    to Claims (Value Derivative Claims)      33          3

 7

 8    Debtors' Eighty-Fourth Omnibus Objection

 9    to Claims (Value Derivative Claims)      33          3

10

11    Two Hundred Eighty-Second Omnibus Objection

12    to Claims (Late Filed Claims)            33          24

13

14    Joint Motion of Lehman Brothers Holdings

15    Inc. and Litigation Subcommittee of

16    Creditors' Committee to Extent Stay to

17    Avoidance Actions and Grant Certain Related

18    Relief                                   51          19

19

20    One Hundred Forty-Third Omnibus Objection

21    to Claims (Late-Filed Claims)            114          1

22

23    LBHI v. JPMorgan Chase Bank, N.A.

24    [Adversary Proceeding No. 10-03266] Motion

25    to Compel Answer to Interrogatory and
```

Page 188

1    Motion Authorizing the Filing of an

2    Unredacted Version of the Motion to

3    Compel                                    185          19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 189

```
 1              C E R T I F I C A T I O N

 2    I, Dawn South,  Nicole Yawn, Sherri Breach and Jamie

 3    Gallagher, certify that the foregoing transcript is a true

 4    and accurate record of the proceedings.

 5

 6

 7

 8    AAERT Certified Electronic Transcriber CET**D-408

 9

10

11

      Nicole Yawn

12

13

14

15

      SHERRI L. BREACH

16

      AAERT Certified Electronic Reporter & Transcriber

17

      CERT*D -397

18

19

20

21    Veritext

22    200 Old Country Road

23    Suite 580

24    Mineola, NY 11501

25    Date:  February 14, 2013
```