Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555 (JMP)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS, INC., et al.,

8

9            Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12               United States Bankruptcy Court

13               One Bowling Green

14               New York, New York

15

16               February 28, 2013

17               10:06 a.m.

18

19  B E F O R E :

20  HON JAMES M. PECK

21  U.S. BANKRUPTCY JUDGE

22

23

24

25

Page 2

1    One Hundred Ninety-Eighth Omnibus Objection to Claims (Late-

2    Filed Claims) [ECF No. 19902]

3

4    Three Hundred Eighty-Eighth Omnibus Objection to Claims (No

5    Liability Claims) [ECF No. 34042]

6

7    Motion of Traxis Fund, LP and Traxis Emerging Market

8    Opportunities Fund, LP to Compel Debtors to Reissue

9    Distribution Checks for Allowed Claims [ECF No. 32163]

10

11   Debtors' Fortieth Omnibus Objection to Claims (Late-Filed

12   Claims) [ECF No. 11305]

13

14   Debtors' Ninety-Seventh Omnibus Objection to Claims

15   (Insufficient Documentation) [ECF No. 14492]

16

17   Debtors' One Hundred Twenty-Fifth Omnibus Objection to

18   Claims (Insufficient Documentation) [ECF No. 16079]

19

20   Debtors' One Hundred Thirty-Eighth Omnibus Objection to

21   Claims (No Liability Derivatives Claims) [ECF No. 16865]

22

23   Debtors' One Hundred Eighty-Second Omnibus Objection to

24   Claims (Valued Derivative Claims) [ECF No. 19398]

25

Page 3

1    Debtors' One Hundred Ninety-Eighth Omnibus Objection to

2    Claims [ECF No. 19902]

3

4    Three Hundred Sixtieth Omnibus Objection to Claims (Valued

5    Derivative Claims) [ECF No. 31316]

6

7    Three Hundred Seventy-Eighth Omnibus Objection to Claims (No

8    Liability Claims) [ECF No. 32651]

9

10   Three Hundred Eighty-Third Omnibus Objection to Claims (No

11   Liability Claims) [ECF No. 32890]

12

13   Three Hundred Eighty-Ninth Omnibus Objection to Claims

14   (Reduce and Allow Claims) [ECF No. 34043]

15

16   Debtors' Three Hundred Ninetieth Omnibus Objection to Claims

17   (Valued Derivative Claims) [ECF No. 34044]

18

19   Plan Administrators' Omnibus Objection to Claims Filed by

20   Deborah E. Focht [ECF No. 34303]

21

22   Claims Objection Hearing with Respect to Objection to Proofs

23   of Claim Nos. 29721 and 29748 [ECF No. 33647]

24

25

1    Debtors' Objection to Proof of Claim No. 66099 Filed by

2    Syncora Guarantee, Inc. [ECF No. 20087]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach

Page 5

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, LLP

3         Attorneys for Debtors

4         767 Fifth Avenue

5         New York, New York 10153

6

7    BY:  MAURICE HORWITZ, ESQ.

8

9    MILBANK, TWEED, HADLEY & MCCLOY, LLP

10        Attorneys for Creditors' Committee

11        1 Chase Manhattan Plaza

12        New York, New York 10005

13

14   BY:  LENA MANDEL, ESQ.

15        DENNIS O'DONNELL, ESQ. (TELEPHONIC)

16

17   SEWARD & KISSEL, LLP

18        Attorneys for Traxis

19        One Battery Park Plaza

20        New York, New York 10004

21

22   BY:  JOHN R. ASHMEAD, ESQ.

23        JUSTIN SHEARER, ESQ.

24

25

Page 6

```
 1                     P R O C E E D I N G S

 2              THE COURT:  Please be seated.

 3              Good morning.

 4              MR. HORWITZ:  Good morning, Your Honor.  Maurice

 5     Horwitz, Weil, Gotshal & Manges on behalf of Lehman Brothers

 6     Holdings, Inc. as plan administrator.

 7              We have two uncontested items to begin with on

 8     today's agenda.  The first is the debtors' one-hundred-and-

 9     ninety-eighth omnibus objection to claims.  This objection

10     sought to disallow certain claims that were filed after the

11     bar date for claims -- for filing claims in these cases.

12              The objection -- there was a response filed to

13     this objection by a claimant, Carol Bunevich, whose claim

14     was filed on July 29th, 2011.  Ms. Bunevich has decided not

15     to prosecute her response.  I don't see her counsel in the

16     courtroom today.  I don't know if he has dialed in by

17     telephone, but he advised me he did not expect to appear

18     today.

19              So the plan administrator requests that the Court

20     enter a supplemental order, which we will submit, expunging

21     this claim on an uncontested basis.

22              THE COURT:  It's expunged on an uncontested basis.

23              MR. HORWITZ:  Thank you.

24              The next item is the three-hundred-and-eighty-

25     eighth omnibus objection to claims.  There was one response
```

1   filed to this objection.  The objection has been adjourned

2   with respect to that one response; that's the response of

3   Jeremy Davis, ECF 34783.  His claim is Claim Number 4362.

4   We filed a notice of adjournment on February 22nd at ECF No.

5   35253.  I apologize that this notice of adjournment did not

6   appear on the adjourn section of the agenda.  It was our

7   oversight.  But the objection has been adjourned with

8   respect to that claimant and they were notified.

9            The other claimants on the objection did not

10  respond or did not object -- respond to the objection.

11  However, the order -- one claimant requested that the order

12  be modified with respect to one of the claims.  This

13  modification doesn't affect any of the other claims.  The

14  last -- the second to last ordered paragraph of the order

15  provides that no portion of any of the claims subject to the

16  objection are affected if they were -- if the objection

17  indicated that those -- that that portion was not subject to

18  the objection.  There is a -- each -- each of the claims --

19            THE COURT:  Do you know what you just said because

20  I don't?

21            MR. HORWITZ:  Let me rephrase.

22            THE COURT:  Okay.

23            MR. HORWITZ:  Certain portions of the claims that

24  were subject to this Omni 388 were not subject to the

25  objection.  They were excluded from the objection.

Page 8

1           THE COURT:  Okay.

2           MR. HORWITZ:  One of the claimant's requested that

3    the order clarify for the avoidance of doubt that with

4    respect to Claim Number 33633 that portion that is not

5    affected is the portion that is now owned by -- and I'm not

6    sure I'm pronouncing this correctly, but Callanish (sic)

7    Capital, LLC, Queensferry M, LLC and Credit Suisse Loan

8    Funding, LLC.

9           So that clarification has been added to the order.

10   It doesn't affect any of the other claims that are subject

11   to the objection.

12           THE COURT:  So long as counsel is satisfied with

13   the clarification and you have no objection, I'll be fine

14   with it.

15           MR. HORWITZ:  Okay.  We will submit an order.

16           THE COURT:  Okay.

17           MR. HORWITZ:  So now we will move to the contested

18   portion of the agenda, the motion of Traxis Fund, LP and

19   Traxis Emerging Market Opportunities Fund, LP to compel the

20   debtors to reissue distribution checks for allowed claims,

21   and I will turn the podium over to counsel for Traxis for

22   that.

23           THE COURT:  Fine.

24       (Pause)

25           MR. ASHMEAD:  Good morning, Your Honor.  John

Page 9

1    Ashmead of Seward & Kissel for Traxis.

2             Your Honor, I got home last night and my wife told

3    me my fourteen-year-old had a bacterial infection and all I

4    was thinking of is I hope I don't get sick tonight because

5    this hearing, as we -- this would be the third time and I

6    don't know what would happen.  The first time it was

7    incorrectly listed as a status conference; the second time

8    the Court had a electrical fire and Mr. Feld (ph) assured me

9    had nothing to do with that; and I said now all I need to be

10   is sick and then we don't go forward.  So --

11            THE COURT:  So how are you feeling today?

12            MR. ASHMEAD:  I'm -- I'm feeling just fine.

13            THE COURT:  Good.

14            MR. ASHMEAD:  So we're --

15            THE COURT:  And how is your daughter feeling?

16            MR. ASHMEAD:  My -- my son, he's -- he's fine.  A

17   little bronchitis, we think --

18            THE COURT:  Okay.

19            MR. ASHMEAD:  -- but he's alright.

20            So, Your Honor, in short form, this matter can be

21   described as -- as follows:

22            Traxis -- the Traxis Funds are original Lehman

23   creditors who had allowed claims.  They were legitimate

24   distributees under the plan.  In October, Epiq, the plan

25   administrator's claim agent and distribution agent reached

Page 10

```
 1    out directly to Traxis to basically say they had received

 2    some checks back as un -- undeliverable.  And during the

 3    course of those conversations -- this was a second set of

 4    distributions.  It became clear that this was a second set

 5    of distributions and that the first set had not been

 6    received by Traxis.

 7             So Traxis, they had some conversation -- I think a

 8    few back and forth with Epiq on a business to business basis

 9    and said, can you please re-cut them.  Ultimately, Epiq said

10    no, no, we can't.  There's a plan provision about unclaimed

11    distributions, and ten or eleven days ago that deadline

12    where you would have had to come to us expired so we can't

13    do anything about that.

14             My firm got involved.  We had some discussions

15    with the plan administrator's counsel.  We then had some

16    discussions with the creditors' committee who then had some

17    discussions with the plan administrator's counsel.  And the

18    long and the short of that is we ended up filing the motion

19    when it looked like that would -- would not go anywhere.

20             The high level concerns here are basically whether

21    or not the plan's unclaimed distribution provision applies

22    in this circumstance.  Related to that, of course, is

23    whether Traxis received the checks or should be deemed to

24    have received those initial distribution checks.  And then

25    related to that, if -- I guess if the provision applies to
```

1   these facts, whether or not withstanding that, Traxis should

2   be given some relief and -- from the provision and be able

3   to get its -- its distribution checks.

4           The parties have set out there arguments and

5   they've submitted affidavits of their positions and those

6   are before the Court.

7           So I would start with the plan provision, Section

8   8.9 of the plan, and it's called Time Bar to Cash Payment

9   Rights.  That provision reads: "Checks issued in respect of

10  allowed claims shall be null and void if not negotiated

11  within 90 days after the date of issuance thereof."

12          So the first part talks about checks being issued

13  and then if they're not negotiated within 90 days, they're

14  -- they're void.  It's sort of you go and you buy your new

15  home printer and you fill out the rebate form at Staples and

16  they'll send you a check, hopefully, in a few months.  And

17  it usually has a deadline and it's sort of, if you don't

18  cash it by then, you put it in a drawer, you're -- you're

19  done.

20          It then says that, "Request for reissuance of any

21  check shall be made to the plan administrator to who such

22  check was originally issued."  So the person that was issued

23  the check has to make the request.  And then it continues,

24  "Any claim in respect of that voided check must be made on

25  or before 90 days after expiration of the initial 90 days

Page 12

```
 1    after the check was issued.  Thereafter, it irrevocably

 2    reverts to the debtors."

 3              So, again, the check speaks -- the provision

 4    speaks to checks being issued and negotiated, and then if

 5    you don't do that, you're out.  So if you get the check and

 6    you sit on it, you put it in a drawer, you lose it behind

 7    your desk, put it in a stack of papers and you discover it

 8    too late, it's your -- clearly your problem.

 9              But in our view, if -- if -- if you don't have the

10    check, you can't negotiate it.  And in our view you

11    shouldn't be held to a timeline, and we don't think that's

12    how this provision should work if you haven't gotten the

13    check because you then don't even know when the timeline

14    started.

15              And our view would be if the -- if the intention

16    of the provision is that even if you don't get the check, as

17    long as Epiq cut the check, the clock begins to run, we

18    think it should just say that; that it's going to run from

19    the moment we cut a check, whether or not you get it.  It

20    does not say that.  It doesn't say that if your check is

21    sent you've got 90 days to negotiate it, whether or not you

22    get it, and no notices were sent to creditors saying, we

23    just sent you a check.

24              You know, if the provision applies more broadly

25    than we think the way it's being interpreted here by the
```

Page 13

1    plan administrator, we think it's ambiguous, at best, and

2    should be construed against the drafter, not against Traxis.

3    As a matter of practices, Your Honor I'm sure knows these

4    types of provisions are sort of boiler plate parts of plans.

5    They're important parts of plans so that you can have

6    finality.

7              THE COURT:  I'm sure it's part of the plan that

8    nobody spent a lot of time negotiating.

9              MR. ASHMEAD:  Yeah.

10             THE COURT:  It's just there.

11             MR. ASHMEAD:  That's -- that's right.  I've been

12   doing this 22 years and I've seen it a million times, been

13   in plans I've drafted or commented on.  It's not something

14   -- and I think the creditors' committee's reaction and their

15   support of us here is -- sort of speaks to that.  And that's

16   not a criticism of anyone.  That's just one of those many

17   pages of boiler plate --

18             THE COURT:  Let me just inquire --

19             MR. ASHMEAD:  -- in the plan.

20             THE COURT:  -- because I understand that Mr. Dunne

21   is participating by telephone.  I want to confirm that he's

22   on the phone.

23             MR. O'DONNELL:  Your Honor, it's actually Mr.

24   O'Donnell and I am on the phone.

25             THE COURT:  Oh, okay.  The wrong Dennis.  And are

Page 14

1   you the one who is in Reno?

2          MR. O'DONNELL:  I am actually in Las Vegas, Your

3   Honor.  I have a first day hearing on another matter.  But I

4   have Ms. Mandel -- Lena Mandel who is in the courtroom --

5          THE COURT:  I see her.

6          MR. O'DONNELL:  -- and she will be addressing the

7   motion.

8          THE COURT:  All right.  Fine.

9          Okay.  Please proceed.

10          MR. ASHMEAD:  Okay.  So I think there is some law

11   on the -- surrounding the area of unclaimed distributions,

12   and that law -- the case law on these types of provisions

13   are pretty consistent and basically saying, these provisions

14   are intended to allow for finality, for closure.  They're

15   not to restrict claim holders of their otherwise rightful

16   distributions, and those cases make fairly clear that

17   there's a strong bias that every effort be made to get a

18   distribution to a holder's hands before -- or that the

19   holder make clear they have no interest in it or they've

20   abandoned it before the distributions are taken away.

21          So, one, the creditor has to demonstrate a clear

22   intention to abandon; and, two, the distribution agent or

23   estate administrator has to have taken, you know, reasonable

24   -- at least reasonable steps to try to ensure that's the

25   case.

1          Here, Traxis made crystal clear it does not want

2     to abandon its distribution.  It acted with great speed the

3     moment it learned that there were prior distributions to --

4     to request that they be distributed.  Four to five months

5     before the first distribution they, as requested, as with

6     other claimants, had sent in tax forms and certifications

7     which had to be received so that they could receive the

8     distributions under the plan.

9          Here, the plan administrator nor its agent took

10    any steps to notify Traxis that four separate checks and

11    four separate mailings had not been cashed, only contacted

12    them after the second set had been returned as undeliverable

13    and, again, which was just, I think, eleven days after the

14    --

15          THE COURT:  Are you suggesting --

16          MR. ASHMEAD:  -- expiration date.

17          THE COURT:  Are you suggesting in that last

18    comment that there is a duty imposed on the plan

19    administrator to reach out and provide notice, or are you

20    just saying that that's a factor --

21          MR. ASHMEAD:  I --

22          THE COURT:  -- in the case?

23          MR. ASHMEAD:  I think it's a factor, but I think

24    if you read the case law on unclaimed distribution

25    provisions, it says, one, there's got to be a clear

Page 16

1   intention to abandon by the claimant, and the Courts may

2   arrive at different conclusions on that, depending on what

3   the facts are; and, two, the distribution agent or estate or

4   debtor must take, you know, reasonable efforts to ensure

5   that that's, in fact, the case.  And, here, you know,

6   there's nothing in the Bankruptcy Code which says -- or the

7   rules which says you have to take X, Y, Z steps.  It's sort

8   of a gloss from the case law.

9            Our view is if Traxis did not receive the checks,

10  and we'll get into that and those facts and details --

11           THE COURT:  Can we --

12           MR. ASHMEAD:  -- in a moment --

13           THE COURT:  Can we talk a little bit about that

14  because I -- I've looked at the various declarations in

15  connection with this, and is it a fair conclusion that

16  nobody really knows what happens -- what happened to these

17  checks; that they're just missing in action?

18           MR. ASHMEAD:  I think our client has -- does not

19  believe it ever received the checks because --

20           THE COURT:  But that's --

21           MR. ASHMEAD:  -- it has very specific --

22           THE COURT:  But we don't know that.  It's

23  impossible to know that.

24           MR. ASHMEAD:  I guess it's -- yes.  As -- as an

25  absolute, I guess it's impossible to know that, but they

Page 17

```
 1    have very specific procedures for how they handle mail,

 2    including if someone no longer works there who it goes to,

 3    how it gets dealt with.  And here we have an addition to

 4    that.  We know that a second set was returned as

 5    undeliverable.

 6           We also know that when they went to reissue the

 7    second set after speaking to my client to the correct

 8    address, that they -- that there were -- I don't -- that

 9    they tried that two or three times and the checks didn't get

10    there.  So there was a consistent pattern of problems.  And

11    the address is not like a house boat or something.  It's a

12    real location in Connecticut.

13           So I guess as an absolute, yes.  We -- we don't

14    know.  We know we have specific detailed mail handling and

15    sorting procedures.  They were followed.  They have always

16    been filed.  They've had no problems getting other mail, and

17    to their understanding they deny receipt because if it

18    followed this process, they would have gotten it.  And it's

19    not one piece of mail.

20           THE COURT:  It's four.

21           MR. ASHMEAD:  It's four separate pieces of mail.

22    I think that's not likely.  I hearken back to my comment on

23    the home printer from Staples because that happened to me.

24    I got that $90 rebate at the store --

25           THE COURT:  Did you lose it?
```

Page 18

1          MR. ASHMEAD:  -- and I filled it in, got the

2     check, put it in a -- on my home desk and found it, you

3     know, six months later in the corner and it said it expired

4     90 days.

5          THE COURT:  Have you brought a claim against

6     Staples?

7          MR. ASHMEAD:  No.

8        (Laughter)

9          THE COURT:  Okay.

10         MR. ASHMEAD:  But -- but four, I think it's a

11    little -- it's a little implausible.

12         So did Traxis receive the distribution checks?

13    We've touched on this a bit, but we do have an affidavit of

14    Adam Jaffie that makes clear that from Traxis' perspective

15    it did not receive four separate pieces of mail with four

16    separate checks containing initial distribution checks.  The

17    affidavit details their receipt handling and sorting

18    procedures.  Again, if someone no longer works there or it's

19    not addressed to someone, there's a specific process from

20    the office manager to Mr. Jaffie.  Nothing can be thrown

21    away without him opening it and seeing it.  That's their

22    process.

23         There was no certificate of service filed here by

24    Epiq, no contemporaneous certificate of service maintained

25    by them.  Even if it wasn't filed, they filed something

Page 19

1   eight months later by Mr. Baer (ph) with no indication that

2   Mr. Baer was directly involved in the mailing of these four

3   checks, although he's ultimately the supervisor, saying that

4   they were sent.

5           There's no question that the second set of

6   distribution checks were returned as undeliverable.  And as

7   noted, there were subsequent delivery problems on resending

8   the second set of distribution checks for reasons that are

9   unclear to anyone, but it's a fact there were problems

10  getting them there to the correct address --

11          THE COURT:  Do you have any --

12          MR. ASHMEAD:  -- and ultimately had to be sent --

13          THE COURT:  Do you have any --

14          MR. ASHMEAD:  -- by Fed Ex.

15          THE COURT:  Excuse me.  Just -- just one

16  additional question.

17          Do you have any indication that there was some

18  problem with the forwarding order --

19          MR. ASHMEAD:  None.

20          THE COURT:  -- with the post office?

21          MR. ASHMEAD:  They continue to get forwarding mail

22  to this time, and like many other businesses and millions of

23  individuals, rely on the U.S. Postal Service for their mail

24  forwarding and have had no problems.

25          And as noted, they had problems receiving mailings

1   from Epiq, even at the new address once Epiq was given the

2   new address.  Now I can't explain that, but it's just

3   something here in the ether in terms of it's not a question

4   of what the address is.

5          So -- in Traxis' view, they never got them.  It

6   shouldn't be held to these clocks running.  We think it is

7   possible that Epiq got the first set back as undeliverable

8   and maybe they lost them or maybe they never sent them.  We

9   -- we don't know.  We know that Epiq is not infallible.  I

10  think when we were here five or six weeks ago, which just

11  happened to be the day before that, the plan administrator

12  filed a declaration of Jacqueline Marcus (ph), Docket 33892,

13  with respect to the stay of avoidance actions where they

14  indicated that due to an administrative error on Epiq's

15  part, most of 339 defendants in certain adversary

16  proceedings had not been served with a recent motion.

17  People make mistakes.  It happens.

18          We also know that according to the plan

19  administrator's objection to our claim, that they note that

20  288 other creditors hadn't cashed their checks.  We don't

21  know what the underlying facts of -- of -- of -- are to

22  that.  We don't know whether it's that they just sat on

23  them, they received them or not, but there could be

24  problems.  We understand this is a big process.  We

25  understand there's millions of checks cut and lots of

Page 21

```
 1    creditors and it's four years after the case commenced.

 2    People move, things happen.  We understand that.

 3              THE COURT:  Well, let's think --

 4              MR. ASHMEAD:  But we exist.  We --

 5              THE COURT:  -- let's -- let's think a little bit

 6    about what this is really intended to deal with.

 7              Section 8.9 of the plan --

 8              MR. ASHMEAD:  Uh-huh.

 9              THE COURT:  -- as you note is designed for

10    finality.  There are 288 checks or pieces of mail that are

11    in the same category as this one.

12              MR. ASHMEAD:  Perhaps.  We --

13              THE COURT:  Perhaps.

14              MR. ASHMEAD:  -- don't know the details.

15              THE COURT:  We don't know.

16              MR. ASHMEAD:  Yeah.  Uh-huh.

17              THE COURT:  But in the ordinary course of

18    distributing checks to a huge universe of recipients,

19    presumably some people die, some people go out of business,

20    some people move and their forwarding address is not

21    provided to the post office or the forwarding order expires.

22              MR. ASHMEAD:  Uh-huh.

23              THE COURT:  So there are multiple reasons -- and I

24    probably haven't given you a complete list -- as to why

25    there may be this universe of undeliverable checks.
```

```
 1              The escheat or forfeiture aspects of this are
 2    common in plan and, frankly, desirable because the check has
 3    to go somewhere and, more importantly, what the check
 4    represents, which is a right to a distribution, needs to go
 5    somewhere.  It either goes to the claimant or it's returned
 6    to the estate for the benefit of the estate and its other
 7    creditors.
 8              So let's talk a little bit about this, not just in
 9    respect of the particulars that affect your client, but the
10    case administration aspect of it, which I presume is the
11    reason that we're having this fight.
12              I think that as a matter of pure equity, you're
13    entitled to this check.  You're entitled to the money.  You
14    should get the money.  The creditors' committee has
15    supported your position representing, I think, an important
16    moral pull in your direction.  And I'm sympathetic.
17              So with that having been said, what's your comment
18    in respect of what I have to think is the reason that we're
19    having this discussion in the first place in making a
20    special exception for you, since we actually don't know what
21    happened to the checks.
22              MR. ASHMEAD:  Uh-huh.  Your Honor, I -- I
23    appreciate your concern.  I appreciate your statements, and
24    I -- I guess my reaction to that would be as follows.
25              One, I think every case has to be examined on its
```

Page 23

1    facts, and I don't know what the facts are with the other

2    288, and maybe they're not exact.  We've not come in here

3    and said, you shouldn't have an escheat section.  We

4    understand it.  We understand they're important.  We

5    understand why they exist.  The question is, what are the

6    facts of this case which should take us outside that, and we

7    think that doesn't do away with the whole provision.  And I

8    don't know what the story is with those other parties.

9            We also know that this is not, to just expand a

10   little, a more typical case about a deadline which most

11   typically comes up with bar dates in establishing the pool

12   and negotiating a plan and knowing what you're doing.  This

13   is people -- these are claims that are allowed.  The plan is

14   set.  You know it well.  The distributions are being made.

15   I think you have to look at the facts, I guess, is what I

16   would say.

17           Also, have those parties moved?  I don't know if

18   they've moved.  I don't know if you -- if Your Honor could

19   sit here and say, you know that the moment we learned,

20   eleven days after the deadline, we asked immediately.  We

21   then engaged counsel.  We spoke to counsel.  And when a week

22   later we spoke to the committee and that didn't work, we

23   filed our motion.  We know what's important.  While we think

24   we shouldn't even have to get into a pioneer analysis, we

25   know that's important to show that we are acting with due

Page 24

1   speed because we don't want to delay these estates in the

2   further distribution to anyone else or have this done.

3            I don't know what these other parties have done.

4   I don't know.  Are there 288 motions filed on this?  Your

5   Honor might very well three months later -- because I think

6   we're three months later now -- view motions filed by these

7   people.  Well, why did you sit around for the last three

8   months?  You know, I think this even hit the press somewhere

9   or the local trade press.  People, you know, they've sat on

10  their rights.  And I don't know what their underlying facts

11  are.  I know what our underlying facts are here and I think

12  they're compelling.

13           Let me -- following -- because I -- this is a very

14  important, important point, and so I'll sort of jump off my

15  outline to -- because it seems like Your Honor has cut

16  through this, really.

17           You know, we are legitimate creditor, that's one.

18  Again, there's no question about establishing a pool of

19  claims or negotiating the plan.  We acted with diligence and

20  speed in trying to correct this and getting a motion on

21  file.  It's $175,000.  I mean, it's -- it's -- the client

22  has spent a lot of money to try to get that $175,000.

23           Deadline, the purportedly applicable deadline was

24  just eleven days earlier.  We've got an affidavit which

25  details very clearly what our process is.  It's not just we

Page 25

1    didn't get this, or I think the dog ate it, or I have a bad

2    mailman.  Here's what our process is here.  This is how it

3    works.  We didn't get it.

4              There's sort of other evidence, if you will, about

5    problems with other distributions, including the second

6    distribution which led to the call.  This -- the size of the

7    -- you know, the amounts in dispute here are small in

8    relation to the whole case.  Again, I don't know what the

9    other 288 are.

10             You know, we think that if you had to look who

11   should bear the burden here, we think that the plan

12   administrator is certainly in a better position and would

13   know whether checks were cashed or not.  I would imagine

14   they have some reporting and they generate a list, and they

15   would have been in a position, if they wanted to contact us.

16   After the second check they did.  We've acted in good faith.

17   We have the support of the committee.

18             We don't think the plan's provision is a bad

19   provision.  We think the question is, in the first instance,

20   whether it's invoked here, if we didn't get the checks.  And

21   we think on balance the greater evidence and the greater

22   inferences you can draw from everything that happened is

23   that they were not received.  And that's what Courts do when

24   they're reviewing like mailbox rule cases.  They sort of

25   look at everything and on balance how does it look.

Page 26

1          We know that the distribution agent is not

2     infallible.  That doesn't mean they're bad people.  It means

3     that there may have been a mistake here.  They may have

4     gotten the first back and then just didn't contact us.

5          So in the first instance we just don't think it

6     applies because we think it only should apply if you've

7     gotten the checks, and we didn't get the checks.  But if it

8     does, we think we should be given relief under the excusable

9     neglect standard or otherwise from -- from the provision for

10    all the reasons articulated.

11         Your Honor, I'm prepared to answer other

12    questions, to go into other issues that have been raised,

13    but you seem to have cut more to the heart of it.  So I did

14    as well.

15         THE COURT:  That's fine.  Thank you.

16         MR. ASHMEAD:  Okay.

17         THE COURT:  Yes.  I'll hear from the committee and

18    then I'll hear from the plan administrator.

19         MS. MANDEL:  Thank you, Your Honor.  Lena Mandel,

20    Milbank, Tweed, Hadley & McCloy on behalf of the creditors'

21    committee.

22         The committee, Your Honor, as -- as you know is

23    supporting the relief that the claimant is seeking.  We

24    clearly cannot speak to the fact whether the checks have

25    indeed been received or not, but assuming that they have

Page 27

1    been received, our position is that this situation is not

2    covered by the plan provision that we're discussing, Section

3    8.9.

4            As Your Honor correctly points, this is a boiler

5    plate provision that goes into every plan.  However, the

6    period of time up to which the property escheats varies from

7    plan to plan, and 90 days is really on the short side.  And

8    the committee, as the case fiduciary who took part in

9    negotiating the plan, agreed to this short period of time on

10   the assumption that it would only apply to claimants who sat

11   on their rights; who received the check and didn't do

12   anything.  And we thought it would be not unfair to

13   penalize, if you will, those people for taking no action.

14   However, to the extent the claimants never received the

15   check, there was no conduct that should penalize.

16           And --

17           THE COURT:  So is it your position -- and I know

18   that there's some disputes as to whether the committee even

19   has ongoing standing here, but let's just assume for a

20   moment that you do.  Is it your position that Section 8.9 of

21   the plan should be interpreted, even though the words aren't

22   within it, as applying to only claimants who have sat on

23   their rights as opposed to the multiplicity of circumstances

24   that may involve checks that, for whatever reason, are not

25   negotiated during the 90 day period?

```
1              MS. MANDEL:  Well, it's hard to imagine

2    negotiation -- I mean -- I'm sorry -- situation -- it -- it

3    would appear that there are only two types of potential

4    circumstances:  One, the claimants received the check and

5    for whatever reason never negotiated it; whether it sat on

6    their right or had a legitimate reason where it would then

7    -- would get into the pioneer factors for excusable neglect.

8              The second set of circumstances is they never

9    received the check, and we believe that the provision only

10   covers the first set of circumstances, whatever the reasons

11   were that the checks were not negotiated after they were

12   received.

13             THE COURT:  Well, if we think -- let's just kind

14   of think about this as a -- as a math problem.

15             The -- and I may not be even articulating the

16   problem the right way.  In how many ways is it possible for

17   a distribution check not to be negotiated?

18             One is it's possible that there's neglect on the

19   part of the plan administrator and its representatives in

20   making the distribution in the first place.

21             Another is it's possible that it's lost in the

22   mail.

23             Another is it's possible that it's lost on

24   receipt.

25             Another is that it's possible that it's actually
```

Page 29

1    received and the party that has received it does the same

2    thing that happened in the case of the Staples' check.  It

3    ends up in the drawer and is forgotten.

4              It's possible that it's delivered to somebody and

5    that somebody is supposed to negotiate the check and fails

6    to do that.

7              And there are probably other examples as well.  It

8    could have ended up in a paper shredder by mistake.

9              MS. MANDEL:  Certainly.

10             THE COURT:  But the plan provision in question is

11   open-ended to cover not only the circumstances I've

12   identified, but presumably additional circumstances.  It's

13   partly based upon a circumstance, a failure to negotiate a

14   payment, and it provides for what I think we can all

15   acknowledge is a fairly tight time frame for --

16             MS. MANDEL:  That's right.

17             THE COURT:  -- the distribution right to be

18   forfeited.  The committee went along with that.  So how does

19   the committee today seek to argue a construction issue that

20   is not clearly driven by the language of the plan itself?

21             MS. MANDEL:  We believe, Your Honor, that we can

22   speak to the intent behind the language that is obviously

23   ambiguous since we are here disagreeing on what it actually

24   means.

25             THE COURT:  Okay.

1          MS. MANDEL:  Thank you, Your Honor.

2          MR. HORWITZ:  Your Honor, Maurice Horwitz, Weil,

3     Gotshal & Manges on behalf of the plan administrator.

4          Your Honor, I'm going to start by quoting Garrett

5     Feil (ph) who was unable to attend today, but he started out

6     the hearing -- the last hearing that we had on this matter

7     by saying that this is an unfortunate situation.  I don't

8     know any other way to describe it, even for the plan

9     administrator, who is sympathetic to Traxis's position.

10         Your Honor, the plan administrator's primary

11    purpose, it's reason for being, really, is to carry out all

12    of the provisions of the plan and, among those provisions,

13    is Section 6.8(b)(2) which is to make distributions to

14    holders of allowed claims, such as and including Traxis.

15    And there is no question that the claims that are at issue

16    today were and are allowed claims.

17         But the plan administrator can only make

18    distributions in accordance with the plan.  And in the

19    present circumstances, Your Honor, the plan administrator

20    faces really two problems with that and with the facts

21    alleged by Traxis in their -- in their motion papers, their

22    reply, and the supporting affidavits.

23         The first is what we were just talking about, the

24    plain language of Section 8.9.  The plan administrator does

25    not see that provision as giving it any discretion.  In

Page 31

```
1    fact, if you read the provision, the plan administrator

2    isn't even mentioned.  It's not a subject of any action in

3    that provision:  "The voided check shall irrevocably revert

4    to the debtor and any claim in respect of such voided check

5    shall be discharged and forever" --

6              THE COURT:  So --

7              MR. HORWITZ:  -- "barred."

8              THE COURT:  So can I cut through this and give you

9    cover?  Let's just say that the reason that we're having

10   this contest over what you correctly describe as an

11   unfortunate situation involves strict construction of a plan

12   provision that I think we can all acknowledge represents a

13   boiler plate provision and does not, within its language,

14   say that it can be waived in the discretion of the plan

15   administrator.

16             But let's just say that we're doing this in order

17   to be purists in strictly applying language of the plan.

18   Would you agree that I have the authority with my pen to

19   simply override that in this case on any number of grounds,

20   including a finding of plain near like excusable neglect?

21             MR. HORWITZ:  I would agree that the Court does

22   have that authority to do so.

23             THE COURT:  In that case, that's what I'm doing,

24   and I'm going to grant the Traxis motion with the

25   understanding that everybody recognizes this as an
```

Page 32

1   unfortunate situation; that it is demonstrably inequitable

2   for Traxis not to be given replacement checks for the four

3   checks that were unaccountably lost from the initial

4   distribution; and that I'm doing this on the basis of the

5   excusable neglect argument, which is the alternative

6   argument made by Traxis and the argument which is adopted by

7   the committee in paragraph 4 of the committee's statement.

8           In doing so, I am not in any way altering the

9   provisions of the plan itself, nor am I interpreting Section

10  8.9 of the plan, which speaks for itself and which may be

11  strictly applied in other situations.  Accordingly, there is

12  no flood gates risk here as far as I'm concerned.

13          And that's my ruling.

14          MR. HORWITZ:  Thank you, Your Honor.

15          MR. ASHMEAD:  Thank you, Your Honor.  We will --

16          MR. O'DONNELL:  Thank you, Your Honor.

17          THE COURT:  -- speak with plan administrator

18  counsel to submit an order to the Court.

19          THE COURT:  That's -- that's fine.

20          MR. ASHMEAD:  Thank you, Your Honor.

21          THE COURT:  I heard somebody on the phone.

22          MR. ASHMEAD:  I think that Mr. O'Donnell saying --

23          THE COURT:  Mr. O'Donnell, what are you saying?

24          What is anybody else saying?

25          Hearing nothing further, we're adjourned.

Page 33

1           Thank you.

2           MS. MANDEL:   Thank you.

3           MR. HORWITZ:   Thank you.

4       (Whereupon, proceedings were concluded at 10:43 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 34

1                          I N D E X

2

3                           RULINGS

4    DESCRIPTION                            PAGE      LINE

5

6    One Hundred Ninety-Eighth Omnibus

7    Objection to Claims (Late-Filed Claims)

8    [ECF No. 19902]                          6          22

9

10   Three Hundred Eighty-Eighth Omnibus

11   Objection to Claims (No Liability Claims)

12   [ECF No. 34042]                          8          12

13

14   Motion of Traxis Fund, LP and Traxis

15   Emerging Market Opportunities Fund, LP

16   to Compel Debtors to Reissue Distribution

17   Checks for Allowed Claims [ECF No. 32163]  31        23

18

19   Debtors' Fortieth Omnibus Objection to

20   Claims (Late-Filed Claims) [ECF No. 11305]  --       --

21

22   Debtors' Ninety-Seventh Omnibus Objection

23   to Claims (Insufficient Documentation)

24   [ECF No. 14492]                          --         --

25

Page 35

```
 1                          I N D E X

 2

 3                          RULINGS

 4   DESCRIPTION                              PAGE      LINE

 5

 6   Debtors' One Hundred Twenty-Fifth Omnibus

 7   Objection to Claims (Insufficient

 8   Documentation) [ECF No. 16079]           --        --

 9

10   Debtors' One Hundred Thirty-Eighth Omnibus

11   Objection to Claims (No Liability

12   Derivatives Claims) [ECF No. 16865]      --        --

13

14   Debtors' One Hundred Eighty-Second Omnibus

15   Objection to Claims (Valued Derivative

16   Claims) [ECF No. 19398]                  --        --

17

18   Debtors' One Hundred Ninety-Eighth Omnibus

19   Objection to Claims [ECF No. 19902]      --        --

20

21   Three Hundred Sixtieth Omnibus Objection to

22   Claims (Valued Derivative Claims)

23   [ECF No. 31316]                          --        --

24

25
```

```
 1                        I N D E X

 2

 3                         RULINGS

 4   DESCRIPTION                              PAGE      LINE

 5

 6   Three Hundred Seventy-Eighth Omnibus

 7   Objection to Claims (No Liability Claims)

 8   [ECF No. 32651]                          --        --

 9

10   Three Hundred Eighty-Third Omnibus

11   Objection to Claims (No Liability Claims)

12   [ECF No. 32890]                          --        --

13

14   Three Hundred Eighty-Ninth Omnibus

15   Objection to Claims (Reduce and Allow

16   Claims) [ECF No. 34043]                  --        --

17

18   Debtors' Three Hundred Ninetieth Omnibus

19   Objection to Claims (Valued Derivative

20   Claims) [ECF No. 34044]                  --        --

21

22   Plan Administrators' Omnibus Objection to

23   Claims Filed by Deborah E. Focht

24   [ECF No. 34303]                          --        --

25
```

Page 37

```
 1                        I N D E X

 2

 3                        RULINGS

 4    DESCRIPTION                         PAGE     LINE

 5

 6    Claims Objection Hearing with Respect to

 7    Objection to Proofs of Claim Nos. 29721

 8    and 29748 [ECF No. 33647]            --       --

 9

10    Debtors' Objection to Proof of Claim

11    No. 66099 Filed by Syncora Guarantee, Inc.

12    [ECF No. 20087]                      --       --

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7

8

     SHERRI L. BREACH

9

     AAERT Certified Electronic Reporter & Transcriber

10

     CERT*D -397

11

12

13

     Veritext

14

     200 Old Country Road

15

     Suite 580

16

     Mineola, NY 11501

17

18

     Date:  March 4, 2013

19

20

21

22

23

24

25