# EXHIBIT A

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS, INC.,        CAUSE NO.

7    et al,                                 08-13555(JMP)

8            Debtors.

9    - - - - - - - - - - - - - - - - - x

10   In re

11   LEHMAN BROTHERS, INC.,                 CAUSE NO.

12           Debtor.                        08-01420(JMP)(SIPA)

13   - - - - - - - - - - - - - - - - - -x

14

15                   U.S. Bankruptcy Court

16                   One Bowling Green

17                   New York, New York

18

19                   November 14, 2012

20                   10:02 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  MATTHEW

Page 2

1    HEARING re Notice of Final Applications of Retained

2    Professionals for Final Allowance and Approval of

3    Compensation for Professional Services Rendered and

4    Reimbursement of Actual and Necessary Expenses Incurred from

5    September 15, 2008 to March 6, 2012 (ECF Nos. 31901)

6

7    HEARING re Plan Administrator's Cross-Motion to Compel

8    Giants Stadium LLC to comply with Rule 2004 Subpoenas and

9    Objection to Giants Stadium's Motion to Quash the Rule 2004

10   Subpoenas (ECF No. 31652)

11

12   HEARING re Motion to Quash a Subpoena filed by Bruce E.

13   Clark on behalf of Giants Stadium LLC (ECF No. 31339)

14

15   HEARING re Amended Motion of Giants Stadium LLC for Leave to

16   Conduct Discovery of the Debtors Pursuant to Federal Rule of

17   Bankruptcy Procedure 2004 (ECF No. 31105)

18

19   SIPA PROCEDURES

20   HEARING re Motion Pursuant to Federal Rule of Bankruptcy

21   Procedure 9019 for Entry of an Order Approving Settlement

22   Agreement Between the Trustee and Lehman Brothers Finance

23   AG, in Liquidation (a/k/a Lehman Brothers Finance SA, in

24   Liquidation)(LBI ECF No. 5362)

25

Page 3

1    HEARING re Trustee's Motion Pursuant to Section 105(a) of

2    the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b)

3    for Approval of General Creditor Claim (I) Objections

4    Procedures and (II) Settlement Procedures (LBI ECF No. 5392)

5

6    HEARING re Debtor's Three Hundred Fifty-Seventh Omnibus

7    Objection to Claims (Misclassified Claims (ECF No. 31048)

8

9    HEARING re Objection to Claim No. 17763 Filed by Laurel Cove

10   Development, LLC (ECF No. 29187)

11

12   HEARING re Three Hundred Twentieth Omnibus Objection to

13   Claims (No Liability Rose Ranch LLC Claims)(ECF No. 29292)

14

15   HEARING re Debtor's Three Hundred Twenty-Ninth Omnibus

16   Objection to Claims (Misclassified Claims)(ECF No. 29324)

17

18   HEARING re Motion for an Order Pursuant to Section 105(a) of

19   the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing

20   and Approving the Settlement with Lehman Brothers, Inc. (ECF

21   No. 43)

22

23   HEARING re Turnberry Centra Sub, LLC et al v Lehman Brothers

24   Holdings, Inc., et al (Adversary Case No. 09-01062)

25   Transcribed by:  Sheila Orms and William Garling

Page 4

1   A P P E A R A N C E S :

2

3   WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Lehman Brothers Holdings, Inc.

5          767 Fifth Avenue

6          New York, NY 10153

7

8   BY:   RICHARD W. SLACK, ESQ.

9          JACQUELINE MARCUS, ESQ.

10         KYLE ORTIZ, ESQ.

11         CANDACE ARTHUR, ESQ.

12

13  WEIL, GOTHAL & MANGES LLP

14         Attorneys for Lehman Brothers Holdings, Inc.

15         1395 Brickett Avenue

16         Suite 1200

17         Miami, FL   33131

18

19  BY:   EDWARD R. MCCARTHY, ESQ.

20

21

22

23

24

25

Page 5

1   PAUL WEISS RIPKIND WHARTON & GARRISON LLP

2        Attorneys for Houlihan Lokey Howard & Zukin Capital,

3          Inc.

4        1295 Avenue of the Americas

5        New York, NY  10019

6

7   BY:   ALAN W. KORNBERG, ESQ.

8        PHILLIP Q. WEINTRAUB, ESQ.

9

10  LATHAM & WATKINS LLP

11       Attorneys for Ernest & Young LLP

12       53rd at Third, 855 Third Avenue

13       New York, NY  10022

14

15  BY:   MICHAEL RIELA, ESQ.

16

17  CARMODY MACDONALD

18       Attorneys for Alvarez & Marsal

19       120 S. Central Avenue

20       Suite 1800

21       St. Louis, MO  63105-1705

22

23  BY:   GREGORY D. WILLARD, ESQ.

24

25

Page 6

```
 1   HUGHES HUBBARD

 2        Attorneys for SIPA Trustee

 3        One Battery Park Plaza

 4        New York, NY  10004-1482

 5

 6   BY:  JEFFREY S. MARGOLIN, ESQ.

 7        JEFFREY M. GREILSHEIMER, ESQ.

 8        MEAGHAN C. GRAGG, ESQ.

 9

10   GODFREY KAHN S.C.

11        Attorneys for Fee Committee

12        One East Main Street

13        Suite 500

14        Madison, WI  54701

15

16   BY:  KATHERINE STADLER, ESQ.

17        RICHARD GITLIN, ESQ.

18

19   SULLIVAN & CROMWELL, LLP

20        Attorneys for Giants Stadium

21        125 Broad Street

22        New York, NY  10004

23

24   BY:  THOMAS JOHN WRIGHT, ESQ.

25        BRUCE E. CLARK, ESQ.
```

Page 7

1    STAGG, TERENZI, CONFUSIONE & WAHNIK, LLP

2          Attorneys for Laurel Cove Development

3          401 Franklin Avenue

4          Suite 300

5          Garden City, NY   11530

6

7    BY:   CARA M. GOLDSTEIN, ESQ.

8

9    DECHERT, LLP

10         Attorneys for ???

11         1095 Avenue of the Americas

12         New York, NY   10036

13

14   BY:   NICOLE B. HERTHER-SPIRO, ESQ.

15

16   GIBSON DUNN

17         Attorneys for Lehman Brothers Finance AO

18         2100 McKinney Avenue

19         Dallas, TX   75201-6912

20

21   BY:   ROBERT B. KRAKOW, ESQ.

22

23

24

25

Page 8

1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

2       Attorneys for ???

3       One Liberty Plaza

4       New York, NY  10006

5

6   BY:   JOSH E. ANDERSON, ESQ.

7

8   MEISTER SEELIG & FEIN LLP

9       Attorneys for ???

10      2 Grand Central Tower

11      140 East 45h Street

12      19th Floor

13      New York, NY  10017

14

15  BY:   STEPHEN B. MEISTER, ESQ.

16

17  UNITED STATES DEPARTMENT OF JUSTICE

18      Attorney for the Office of the United States Trustee

19      76 Chapel Street, Suite 200

20      Albany, NY 12207

21

22  BY:  SUSAN GOLDEN, ESQ. (TELEPHONICALLY)

23

24  OTHERS PRESENT:

25  THERESA CARPENTER, BREGAL INVESTMENTS, INC.

Page 9

```
 1   TELEPHONIC APPEARANCES:

 2

 3   ANASTOLY BUSHLER, FARALLON CAPITAL MANAGEMENT

 4   JEFFREY H. DAVIDSON, STUTMAN, TRIESTER & GLATT

 5   NICK LANE, WITNESS, WEIL, GOTSHAL & MANGES LLP

 6   TRISTA S. LYONS, PRO SE

 7   MICHAEL NEUMEISTER, STUTMAN, TREISTER & GLATT

 8   MITCHELL SOCKETT, KING STREET CAPITAL MANAGEMENT, LLC

 9   KATHERINE A. TRADER, PAUL HASTINGS, LLP

10   JEFFREY H. DAVIDSON, STUTMAN, TREISTER & GLATT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            P R O C E E D I N G S

2            THE COURT:  Be seated, please.  Good morning.

3            MS. MARCUS:  Good morning, Your Honor, Jacqueline

4     Marcus from Weil Gotshal and Manges on behalf of Lehman

5     Brothers Holdings, Inc. as plan administrator.

6            We're here this morning, Your Honor, for the fifty-

7     fifth omnibus hearing, as well as the rescheduled claims

8     hearing that had previously been scheduled for October 31.

9     We're glad that the courthouse has reopened, and that things

10    are starting to get back to normal.

11           The first item on the agenda, Your Honor, is the

12    fee hearing related to uncontested fee applications.  Mr.

13    Gitlin will be handling that on behalf of the fee committee.

14           THE COURT:  Fine.  Mr. Gitlin, good morning.

15           MR. GITLIN:  Good morning, Your Honor.  Richard

16    Gitlin, chairman of the fee committee.

17           Your Honor, I'm very pleased to report to the Court

18    that the fee committee has reached a consensual agreement

19    with 25 of the 47 professionals, which is outlined in the

20    report that we submitted to the Court.

21           I would like to comment on the professionals, both

22    their work and their activity in working with the fee

23    committee, Your Honor.  This has been an extraordinary

24    effort on behalf of the professionals and the Court to make

25    this happen in three years, as successfully as it has been

Page 11

1    done.

2           And the professionals are to be complimented for

3    that.  But they're also to be complimented for the civility

4    and attention they gave to the fee committee, as the fee

5    committee raised issues and issues that had to be resolved.

6    And I will say these 25 professionals in all acted in that

7    fashion, and they should be commended for that, Your Honor.

8           So I would respectfully request Your Honor to

9    approve the 25 uncontested professional final fee

10   applications.  I would mention that the remaining 22 are

11   scheduled for November 29th.  We are in conversation with

12   all them.  We do have some sticky issues, we're still

13   dealing with, but we are hopeful that we'll be able to come

14   before the Court on the 29th with similar consensual

15   agreements.  Thank you.

16          THE COURT:  Thank you, Mr. Gitlin, and I'm hopeful

17   that you're successful with the remaining 22 myself.

18          I'd like to make a couple of comments.  First of

19   all, all of the 25 applications that are the subject of the

20   committee's report are approved, with the adjustments

21   reflected in the schedule to your report.  I also wanted to

22   say I found the committee's report to be remarkably well

23   prepared, nuisance in its treatment of the issues that were

24   addressed by the committee, and a model of the kind of work

25   that fee committees or fee examiners as they're sometimes

1    identified to be, can do in all significant cases.  It's a

2    superb precedent, and I commend you and your counsel in

3    preparing it.

4             Additionally, a true public service has been done

5    here by members of the committee in making the fee

6    application process in the largest bankruptcy case in

7    history one that even through today has been consensual and

8    without public controversy.  That is a particularly

9    remarkable accomplishment in consideration not only of the

10   size of the case, but the aggregate fee awards themselves.

11            Business publications including the Wall Street

12   Journal routinely have written about the burn rate in the

13   case and the aggregate fees in the case.  I think your

14   report very appropriately puts those expenses in context,

15   compliments the professionals for their good work, but also

16   compliments them for their flexibility and integrity in

17   dealing with the fee review process.

18            One of the more telling comments made in the report

19   is that the approximately $1.8 billion in approved

20   cumulative professional fees in the cases represents, and I

21   haven't done the math, but I accept what you said,

22   approximately three percent of distributions to unsecured

23   creditors.  In effect, the fees in this case represent on a

24   percentage basis a result that would be admirable in

25   virtually any bankruptcy case.

1        Under the circumstances, I am not only pleased to

2   approve the 25 applications that are the subject of today's

3   hearing, but to compliment you and the other members of the

4   fee committee for doing truly extraordinary work that

5   benefitted the Court, benefitted the professionals, but also

6   served the public interest in demonstrating that the

7   professionals in the case were held accountable, but were

8   held accountable in a manner that was sensitive to the needs

9   of the case, and to the issues that have been identified in

10  your report, which I commend you on again.

11       MR. GITLIN:  Well, Your Honor, thank you very much

12  for your comments.  But I must say that the report is a

13  reflection of the quality of the work that counsel has

14  provided in this case.  Godfrey and Kahn has been the

15  machinery behind the ability to deal effectively with these

16  fees, and the draftsmen of that report.  So I must extend

17  your compliments more to them, Your Honor, but I very much

18  appreciate your comments, Your Honor.

19       THE COURT:  Anyone who had a hand in drafting the

20  report deserves praise.

21       MR. GITLIN:  Thank you, Your Honor.

22       THE COURT:  All right, fine.

23       MR. KORNBERG:  Your Honor, Alan Kornberg of Paul

24  Weiss Rifkin and Garrison for Houlihan Lokey.  We have one

25  technical issue with respect to Houlihan's final fee

1    application, which is the subject of the fee examiner's

2    report.

3           Your Honor may recall that the deferred fees paid

4    to Houlihan are paid as and when distributions are made to

5    general unsecured creditors.  As we mentioned in our final

6    fee application, there need to be a procedure for payment of

7    those, and we have a form of order that we circulated, and I

8    believe is acceptable to the parties, that provides -- there

9    don't have to be further Court orders to approve those fees

10   when they're paid, as to when the distributions are made,

11   but there is a process by which Houlihan will send a fee

12   statement, the debtor, the U.S. Trustee, counsel for the

13   committee will have 30 days to verify that's correct.  If

14   there's a problem, we can talk about it.  If we can't

15   resolve it, we would then come back to the Court.

16          So we have a very simple form of order that

17   provides for that mechanism with respect to the deferred

18   fees.

19          THE COURT:  Okay.

20          MR. KORNBERG:  And I'd like to submit that to Your

21   Honor.

22          THE COURT:  That's fine.  Has that order been

23   reviewed by everyone who needs to see it and comment upon

24   it?

25          MR. KORNBERG:  It has been reviewed by folks in

Page 15

1    your office.

2              MS. MARCUS:  That was my question.

3              MR. KORNBERG:  And the fee committee and the U.S.

4    Trustee, and I believe -- okay, so we'll show it to Malank

5    (ph) and then submit it, Your Honor.

6              THE COURT:  Okay, fine.  I just -- since you

7    mentioned the U.S. Trustee, I just would like to note

8    something on the record.  We received a telephone call this

9    morning from Andrea Schwartz, who would have been here

10   today, but apparently suffered an accident on the way to

11   work in the subway, and has been taken to the hospital.

12             We believe this is not serious, but she wanted us

13   to know that her absence should not be viewed as an

14   indication that the U.S. Trustee did not take very seriously

15   the matters that were before the Court with respect to

16   professional fees.  I understand that Susan Golden from her

17   office is participating by telephone, just in case --

18             MS. GOLDEN:  Good morning, Your Honor.  This is

19   Susan Golden, I literally just dialed in and heard the last

20   part of what you just said.

21             THE COURT:  You missed the best part of the

22   hearing.  I just wanted to note that the comments that I

23   made with respect to the fee committee certainly apply to

24   the role of the U.S. Trustee as a member of that committee.

25   And we hope that Andrea Schwartz has not been seriously hurt

Page 16

1    and will be back in court soon.

2         MS. GOLDEN:  To our knowledge, you know, she just

3    has a minor injury, but she'll be okay.

4         THE COURT:  Okay.

5         MS. GOLDEN:  Thank you for inquiring.

6         THE COURT:  All right.  And then as far as the

7    Houlihan Lokey order is concerned, which became an

8    opportunity for that digression, it will be entered as an

9    agreed order.

10        MR. KORNBERG:  Thank you, Your Honor.

11        MR. GITLIN:  Thank you, Your Honor.

12        THE COURT:  And everyone who wishes to be excused

13   in connection with the fee issues that were just presented

14   may do so.

15        (Pause)

16        MS. MARCUS:  Your Honor, the first group of

17   contested matters on the agenda relates to the plan

18   administrator's disputes with Giants Stadium.  My partner,

19   Richard Slack will be handling those matters.

20        THE COURT:  Okay.  Let's wait for other counsel to

21   assemble.

22        MR. SLACK:  Thank you, Your Honor.

23        THE COURT:  Good morning.  Before we get into the

24   argument with respect to this discovery dispute, I'll take

25   appearances, and I'm also going to ask some questions that I

1      would like you to focus on in your presentation.

2              MR. SLACK:  Okay.  So, Your Honor, Richard Slack

3      from Weil Gotshal on behalf of the plan administrator and

4      Lehman.

5              MR. CLARK:  Good morning, Your Honor, Bruce Clark

6      from Sullivan and Cromwell for Giant Stadium.  With me is my

7      colleague Thomas Wright.

8              MR. WRIGHT:  Good morning, Your Honor.

9              THE COURT:  Good morning.  Okay.  It's my

10     recollection and the recollection has been reinforced by

11     reviewing the papers that we last had a discovery argument

12     in connection with 2004 discovery in September of last year,

13     approximately 14 months ago.

14              The papers that I have read provide different

15     perspectives of what has occurred over the last 14 months.

16     But to me one of the revelations is that the claim

17     originally held by Giant Stadium is now held by an entity

18     affiliated with Baupost called Goal Line, and that an

19     intermediate transferee was Bank of America.

20              To me this is a result of -- as a result of this

21     revelation to me this becomes one of the first examples

22     presented to me in this case, although I'm sure there are

23     many others that are invisible to me, of the phenomenon

24     discussed by scholars as the so-called empty creditor.

25              The creditor that appears to have real party in

Page 18

1    interest status in a bankruptcy case, but who has actually

2    divested itself of all or substantially all of the economics

3    associated with that creditor interest, and it may have

4    other disguised interests that impact that creditor's

5    motivation within the bankruptcy case.

6             Henry (indiscernible) a professor of law at the

7    University of Texas, who for a time had a senior position

8    with the SEC has written extensively on this subject.  And I

9    am personally not only familiar with it, but interested in

10   it.  I bring this up because one of my real concerns here is

11   that the papers disclose apparently heroic good faith

12   efforts to settle disputes between Giant Stadium on the one

13   hand, and Lehman on the other, but uncharacteristically this

14   is one of the few cases presented to me at least on the

15   current docket, I don't know what next year will bring, in

16   which parties that have sincerely attempted to resolve their

17   differences have failed in those efforts.

18             As I understand it, a mediator who is one of the

19   mediators quite skilled in dealing with derivative disputes

20   in the Lehman case participated in at least a one day

21   mediation session, and that that session ended with no

22   agreement, and that thereafter at some point, the parties

23   endeavored to try to restart discussions.  And the current

24   flap, if I can call it that, with respect to discovery is a

25   manifestation of the ongoing antagonism between the parties.

1    To me, at least, the discovery dispute represents deflected

2    antagonism and is subtext for what is really the ongoing

3    unresolved business issues among the parties.

4            I will note the obvious, this Court and every other

5    Court in the nation despises discovery disputes that cannot

6    be rationally resolved by experienced counsel, and here we

7    have experienced and skilled counsel on both sides.  The

8    papers are voluminous and include declarations, references

9    to the transcript from September of last year, and involve a

10   level of effort that to me seems disproportionate to the

11   issues that are in dispute.

12           And so I have the following questions.  First, what

13   is the explanation for the increase in the purported claim

14   amount from $301 million to $585 million?  How did that

15   happen, what's the justification for it, and has that been

16   the subject of negotiations between the parties?

17           Secondly, who is Lehman negotiating with when it

18   negotiates?  Are you negotiating with counsel for Giant

19   Stadium or counsel for Goal Line?

20           Third, why is historical counsel for Giant Stadium

21   still here purporting to act on behalf of an historical

22   creditor when, in fact, the real economics in whole or in

23   part, are elsewhere?  To what extent does this represent

24   independent judgment of Sullivan and Cromwell's client and

25   to what extent does it represent Sullivan and Cromwell, and

Page 20

1    I hate to use the term, as a puppet for other parties that

2    are driving this bus?

3            Those are my questions, and I want them answered

4    before we get into the merits of the discovery dispute,

5    which as I said, appears to me to be largely a strategyn

6    chosen by both sides to get into court.  I don't view it as

7    a real dispute.  I know you do, and you're going to have to

8    justify to me why this isn't one of the biggest wastes of

9    time since this case began.

10           MR. SLACK:  So, Your Honor, starting right with the

11   questions that you've asked.  I think it's fair to say that

12   the debtor that Lehman thinks that the claim amount that was

13   essentially doubled was done purely for negotiating

14   purposes.  In other words, only after this Court back in

15   September sent us back to mediate or essentially to try to

16   resolve it, the claim essentially doubled.

17           We haven't had a stitch of discovery on who made

18   that decision, why it was doubled, what the justification

19   is.  Obviously, they gave us a piece of paper, but unlike

20   the original 301 million, we haven't had any discovery

21   whatsoever under 2004 about that.

22           In terms of whether those matters were the subject

23   of negotiation, let me put it this way.  Obviously the

24   parties had discussion over the amount of the claim, and

25   there was discussion about the amounts of the claim.  I

1    don't think it's fair to say, however, that the debtor has

2    insight as to why it was done, what's the timing of it, what

3    the basis of it is.  We haven't had insight into any of

4    that.

5              THE COURT:  Well, let me just ask you a question,

6    and I don't want to know anything about the substance of the

7    negotiations that took place between the parties.  But isn't

8    the first question that somebody sitting down to the

9    negotiating table would ask given this fact pattern, how on

10   earth can you justify an increase from $301 million to $585

11   million, what's that about?  Isn't that the first question?

12   Perhaps not expressed in that way, but I think there would

13   be an element of huge exasperation built in the question.

14             MR. SLACK:  There is that exasperation, and I'm

15   sure those were the subject of discussions, and again, there

16   was a piece of paper that's filed.  There is an amended

17   claim that was filed.  So, I mean, to the extent that

18   there's an amended claim, we could look at it and say here's

19   what's in it.  But in terms of why it was done, who made

20   that decision, why didn't their original financial advisor,

21   Goldman, reach that amount, you know, two and a half years

22   earlier.

23             Again, we haven't had any kind of insight into any

24   of those kinds of questions, and those have not been

25   answered.  And, of course, that's one of the reasons that we

```
 1    wanted to continue the investigation.  So that's, I think,

 2    at least from our perspective, you may get another

 3    perspective the answer to number one.

 4            In terms of number two, at some point we were

 5    informed once Baupost, Goal Line acquired the interest that

 6    Sullivan and Cromwell was going to jointly represent Giant

 7    Stadium and Goal Line.  And so there have been

 8    representatives, you know, Sullivan and Cromwell's been

 9    involved, Baupost has been involved, and representatives

10    from Giant Stadium have been involved in the negotiations

11    throughout this period.

12            Now, that's not to say that every conversation

13    included representatives of all, but all parties at some

14    level have been involved in negotiations over the past year.

15            And I think that's -- I think that that somewhat

16    answers at least what we know about question three, which is

17    why is Sullivan and Cromwell still representing Giants.  My

18    understanding again is that they're jointly representing

19    Giants and Baupost and Goal Line in connection with this.

20            What I can say is again, we haven't had any

21    discovery into that sale.  We haven't seen the actual

22    transfer papers between Baupost, and I guess it's Bank of

23    America.  We did see the original papers between Giants and

24    Bank of America.  That's one of the things we asked for

25    again in our two thousand and --
```

Page 23

```
1              THE COURT:  Why is that even relevant at this

2     point?

3              MR. SLACK:  The only thing that potentially is

4     relevant is exactly I think the questions that you're

5     asking.  We need to understand when we're talking to

6     somebody, for example, who is the interest.  Who should we

7     be talking to Baupost or not.  And that was part of it.

8              The other thing is, Baupost and Giant Stadium were

9     on opposite sides of that deal.  I think we were entitled to

10    see what was disclosed during those negotiations, and we've

11    asked to see that.  And we -- they're not privileged, and we

12    should have access to it.

13             THE COURT:  Well, whether you should or should not

14    have access to it, I'm just going to make the general

15    observation that ordinarily when claims are transferred and

16    the Lehman case has been one of the largest unregulated

17    trading markets and distressed claims in the world during

18    the past four years.  There's a routine that I'm familiar

19    with not from being a Judge, but having been a practitioner,

20    and you're not likely to find very much of value in the back

21    and forth relating to that claim tread, at least as it

22    relates to the value for purposes of any objection you might

23    file.

24             These are trades between so-called big boys, and

25    everybody makes their own judgments as to the likelihood of
```

Page 24

1    success in future litigation with regard to the claim.  You

2    may or may not be ultimately entitled to obtain that

3    information, but even if you do, in my view, it's a big so

4    what.

5              MR. SLACK:  Might be.  Look, you know, what you're

6    saying obviously from experience makes sense.  What I would

7    say, Your Honor, is that this is a little bit unlike other

8    claims, in that it's obviously a very large one.  It's

9    obviously unliquidated.  It's obviously the main issues that

10   somebody looking to buy it are going to be asking themselves

11   are, at the end of the day, is it a receivable or is it a

12   payable, and if so, how much.

13             So I think, you know, it's a little bit different

14   than, you know, a claims market with liquidated claims.

15   But, you know, that's just the tiniest piece of what, you

16   know, we were seeking in our 2004.

17             So, Your Honor, would you like to hear the answers

18   to those questions from counsel, or would you like me to go

19   ahead with my argument?  I mean --

20             THE COURT:  I'd like to hear what counsel for Giant

21   Stadium has to say about the big picture questions that I

22   raised.  And one of the reasons why I'm focused on this is

23   that I am concerned about more than the discovery dispute

24   that has been presented to me, I'm frankly concerned as to

25   why we're having the dispute at all, and why this claim is

Page 25

1    different from other claims, so many of which have already

2    found their way into formal claims objections.

3              And I'm interested in that question, but before

4    getting to it, Mr. Slack, I'd like to hear comments from --

5              MR. SLACK:  Okay.

6              THE COURT:  -- counsel for Giant Stadium as to some

7    of the preliminary questions that I asked.

8              MR. SLACK:  Sure.

9              MR. CLARK:  Thank you, Your Honor.  Again, Bruce

10   Clark for Giant Stadium.

11             Trying to take your questions in order, as to the

12   increase in the amount of the claim, when the claim was

13   originally filed, it was filed with five, I believe there

14   were five caveats as to items that have yet to be

15   quantified.  And when the claim was revised at least two of

16   those items were the cause of the increase from 301 to 585

17   million.

18             One of them reflects the amount of a capital

19   charge, which the person stepping into the shoes of Lehman,

20   in our view, would've had to incur, in order to protect

21   themselves by way of reserves against the likelihood of a

22   further default.  And the other was a difference in the

23   credit charge.  That difference came about because the

24   original deal with Lehman involved raps by insurance

25   companies, either Figik (ph) or FSA, both of whom at the

Page 26

1    time of the transaction reviewed were rated as AAA credits

2    in the market.  And at the time of the putting out of the

3    proof of claim, the amended proof of claim, we quantified an

4    additional amount because those protections were gone.  And

5    the amount that one would have to pay to get the equivalent

6    protection was greatly increased.

7           And I am not, I've got to say, I'm not trying to

8    duck this, but I am not the person who has studied this in

9    the last month and really can give you a better answer.  But

10   that's my understanding of the two principal reasons that

11   the amount was increased between the first claim and the

12   second claim.

13           THE COURT:  Okay.

14           MR. CLARK:  As to --

15           THE COURT:  Has that information which you just

16   shared with me previously been shared with Lehman when --

17           MR. CLARK:  Yes.

18           THE COURT:  Okay.

19           MR. CLARK:  I mean, as Mr. Slack said, it's in the

20   -- a description of that much is in the amended proof of

21   claim, and neither Weil nor we particularly want to go --

22   and should go into the specifics of the conversations.  But

23   the conversations during the settlement talks centered on

24   this and a lot of other points.

25           I don't know if the question you asked why did you

Page 27

1    increase the 301 to 585 was the first question that came up.

2    But it certainly was a question that was explored.

3            THE COURT:  Assumingly if I were on the receiving

4    end of a claim like that, even if we were talking about

5    hundreds of dollars instead of millions of dollars, the

6    first question I would ask, how on earth could you be

7    claiming that much more.

8            MR. CLARK:  I think --

9            THE COURT:  How did this claim double?

10           MR. CLARK:  I think you're being more courteous

11   than the words I heard when the question was asked.

12           THE COURT:  Okay.  Well then --

13           MR. CLARK:  And clearly that was asked.

14           THE COURT:  Well, I'm in court so I have to be

15   courteous.

16           MR. CLARK:  Right.  But that -- I mean, my best

17   recollection is that was discussed.  As Mr. Slack said, a

18   lot of the conversations in these settlement talks took

19   place with different people from the interested parties at

20   different times, and neither of us was party to all of them

21   by any means.

22           THE COURT:  Okay.

23           MR. CLARK:  I'd be astonished if that was not

24   talked at length.

25           Second, who was Lehman negotiating with, I agree

Page 28

1    with what Mr. Slack said.  I think I just said the same

2    thing, but they were negotiating with people from Sullivan

3    and Cromwell.  We are representing both Baupost and Giant

4    Stadium.  They were all negotiating with people from Baupost

5    at the same time, and Giant Stadium people as well.  And

6    there were a variety of people on the Lehman side.  I mean,

7    there must have been 20 that I met at one time or another.

8           So it was a very active negotiation or series of

9    negotiations over that time period.

10          THE COURT:  One of my fundamental questions is

11   whether Giant Stadium has continuing economic interest in

12   this claim or is a so-called empty creditor.  Is it an empty

13   creditor?

14          MR. CLARK:  No, it's not.  The reason it's not is

15   because the sale papers between Giant Stadium and Bank of

16   America which the debtors do have, and which they did ask

17   questions about in the deposition, make it clear that Giant

18   Stadium has a contingent interest in the result of the

19   negotiation or resolution of the claim.  It depends on how

20   much is paid or how much is not paid.  They do have a

21   material interest one way or another.

22          THE COURT:  So as a kicker?

23          MR. CLARK:  It's either a kicker or a pay back or a

24   clawback, one or the other.

25          THE COURT:  Okay.

1          MR. CLARK:  Okay.  As to the question that came up

2     about the sale between Bank of America and Baupost, my

3     information on that is that Giant Stadium was not involved

4     in that.  That was a transaction between Bank of America and

5     Baupost.  They negotiated it.  And I don't believe we have

6     anything certainly anything material to either produce or to

7     disclose about it.  That is not a transaction that to my

8     knowledge, I just heard Mr. Slack say, they have information

9     about, but neither do we.

10          THE COURT:  All right.

11          MR. CLARK:  Have I addressed the preliminary

12     questions?  I thought I took the list down right.

13          THE COURT:  I think you have, although Mr. Slack

14     seems to want to interject at this point.  Do you want to

15     proceed with your main argument?

16          MR. SLACK:  Yeah, please, thank you, Your Honor.

17          THE COURT:  And understand there is this other

18     question which in effect wraps all the other questions.  Why

19     are we here with a discovery dispute as to a claim, that's

20     whether it's $301 million claim or a $585 million claim

21     appears at least in the Court's view to be more or less

22     indistinguishable from any number of other derivative type

23     claims in this bankruptcy case, and in effect, is a righted

24     question, are you gentlemen both serious about this dispute?

25          So much has gone into a 2004 examination request

Page 30

```
 1   and resisting that request and efforts to make it

 2   reciprocal, that it raises more questions in the Court's

 3   mind than it answers as to what's going on here.  Now, I

 4   want to know what's going on here.

 5          MR. SLACK:  Well, Your Honor, as I think you know

 6   from the docket, the debtor has taken 2004 discovery with

 7   respect to, you know, hundreds of counterparty, derivative

 8   counterparties and we haven't had these issues.  I mean, if

 9   you think about the number of years that I've been before

10   you on matters, if we've had a couple of discovery disputes,

11   that's a lot.

12          And so I think we have a record frankly of these

13   kinds of situations, and this just hasn't gone the way of

14   the other ones.  Because we have frankly been obstructed,

15   and we have a -- you know, we had a situation a year ago,

16   and that -- what happened a year ago in September is we had

17   another discovery dispute, and unfortunately, we had -- you

18   know, we listened to the Court tell us that frankly you

19   didn't like that discovery dispute.

20          THE COURT:  I'll be very consistent.  I'm not

21   likely to like any discovery dispute that you present to me.

22          MR. SLACK:  But what happened in that hearing is

23   important for today.  What happened in that hearing which

24   concerned a motion to compel Giant Stadium with respect to

25   privilege is Giant Stadium said, Your Honor, they won't talk
```

Page 31

1    to us about the merits.  They won't sit down with us and

2    talk.  And I said, Your Honor, I was concerned.  And my

3    concern was, we were in the middle of an investigation that

4    we had not finished, and we needed a little more time to get

5    it done, as long as we had cooperation.

6          And I said I didn't want a gotcha.  I didn't want

7    to sit down in negotiations, talk about our preliminary

8    views of the merits, and then have, and be faced with the

9    argument that Giant Stadium says, well, obviously you know

10   the merits, you've had discussions with us on the merits,

11   you don't need anymore 2004 discovery.  And I sought a

12   commitment from Giants that we wouldn't be faced with that

13   argument.

14         And the Court responded as follows, says, "You

15   don't even need that commitment because I'm going to give

16   you a gotcha from the bench, a no gotcha.  If you choose to

17   have a conversation that could lead to some kind of

18   productive business-like resolution to this, doing that will

19   not constitute a waiver of any of your discovery rights or

20   your rights to continue with your investigation as you see

21   fit."

22         Now, I'd point out that at that time when the Court

23   gave us the assurance that, yes, we could enter into the

24   negotiations, so to speak, talk about the merits even though

25   we hadn't finished, that we weren't going to be faced with

Page 32

1    exactly the argument we're being faced with today.  Giant

2    Stadium stayed silent.  They didn't raise their hand and

3    say, Your Honor, you can't do that, they're not entitled to

4    any discovery.  They didn't say any of that.  They stayed

5    silent.

6            THE COURT:  Well, I understand what happened.  I

7    actually remember it and my memory was further refreshed by

8    looking at the transcript.  And I know that there's a point

9    that you've emphasized in your papers, and you're

10   emphasizing it again now.

11           But it's 14 months later.  You've had some further

12   discovery, and you've had further business discussions, and

13   you've had a mediation session.  Without going into the

14   substance of what was discussed in the various sessions, it

15   appears to me at least, that inevitably there has been a

16   sharing of information in positions by the parties, or there

17   could not have been open and good faith negotiations.

18           So today, almost Thanksgiving 2012, you must know

19   much more about the claims and the defenses to those claims

20   than you knew 14 months ago.  It just seems to me impossible

21   that you are in effectively the same position today that you

22   were then.

23           So that's one concern I have relative to your

24   position.  Another that I have is that Giant Stadium argues

25   in effect without using this hackneyed expression, what's

```
 1    sauce for the goose is sauce for the gander.  If there's
 2    going to be discovery at this stage of the game, it should
 3    be reciprocal.  We shouldn't just be turning over 64,000
 4    pages if that's the right number of discovery only to be
 5    asked for more.  When does this "investigation" come to an
 6    end?  Is it serious?  Is it real?  And why are you not
 7    simply doing what you've done in other settings, file an
 8    objection?  We'll have a contested matter, we'll have
 9    reciprocal discovery, and the 2004 discovery that we're
10    arguing about is rendered moot.
11            MR. SLACK:  Well, there's a couple of pieces that I
12    want to answer first.  We haven't had any other discovery in
13    the last year.  Since that hearing, there has been no
14    discovery.  Now, there has been discussions, but I can tell
15    you that we have not had a stitch of additional discovery or
16    information in our investigation.
17            Our investigation has been frozen by both agreement
18    and by the Court effectively during that 14 months.  And --
19            THE COURT:  Let me interject and say that when --
20    you're using the term discovery, I think you're using it as
21    a term of art.  When I use the term discovery, I think I
22    have a broader sense of the term in mind.
23            Necessarily, you must be learning more than you
24    knew before simply by virtue of participating in
25    discussions, information is being shared.  Otherwise, you're
```

1    not having good faith negotiations.  Is it just pointless

2    posturing, or is there in fact some meaningful exchange of

3    information?

4              MR. SLACK:  I don't believe that -- and I'm not

5    going to try to, you know, parse through, but I can tell you

6    this.  I think the parties have had a number of intense

7    discussions on position.  I don't believe there's been a

8    further exchange of what I would call information,

9    underlying information about the matters that we want to

10   investigate.

11             And so, yes, there have been a number of exchanges

12   of position.  I don't want to -- I don't think it's

13   appropriate to go into that, but there hasn't been -- you

14   know, there hasn't been a sharing of additional information.

15   Effectively the investigation froze, and we said we would

16   have discussions with them on the merits based on what we

17   knew.  And I have to tell Your Honor, what happened here is

18   exactly what I was worried would happen.  And that is, we

19   would engage in good faith discussions on the merits, and

20   then be faced with an argument that said, okay, now you

21   can't have 2004 discovery to finish your investigation.

22             And I -- and that's compounded, Your Honor, because

23   not only did we get the Court's assurances, but Giant

24   Stadium actually made an agreement with us.  In other words,

25   you know, Baupost and Giant Stadium when they were

1    negotiating with us after the failed mediation we wanted to

2    continue our investigation then.  And they said, if you

3    engage in these principal to principal negotiations at that

4    point, we're not going to hold it against you.  We actually

5    had a written agreement.  It's Exhibit H to the Firestone

6    declaration.

7            And the agreement was, it says, Lehman's

8    "willingness to enter into settlement discussions does not

9    constitute any waiver of our rights and is without prejudice

10   to our ability to complete our investigation under

11   Bankruptcy Rule 2004."

12           I'm really at a loss, Your Honor, to understand how

13   the position that they're taking today isn't a direct breach

14   of that agreement, and frankly, the assurances that we

15   received from the Court should allow us to continue our

16   investigation as we see fit, because it hasn't continued at

17   all since then.

18           And, you know, and the question of when it's going

19   to end, if we had three to four months of cooperation from

20   Giant Stadium and the third parties, I think we would get --

21   you know, we would get there.  We haven't had that

22   cooperation, and it -- you know, all I can tell you is that

23   there are areas that we've laid out in our papers, and I'm

24   happy to go through, but there are areas that we still need,

25   you know, to investigate.  We said we wanted to investigate

Page 36

1   them back in September of 2011, and we wanted to complete it

2   then.  But it was based on the assurances from the Court,

3   based on the agreement from Giant Stadium that we actually

4   went forward with the discussions.

5           THE COURT:  Mr. Slack, let's circle back and

6   revisit particularly assurances from the Court that I recall

7   giving.  I'm not breaching any commitment made to you.  The

8   commitment related to a term that doesn't have legal

9   significance.  It's gotcha.  The idea was that participating

10  in settlement discussions would not be cause for you to end

11  up with forfeited rights of discovery.

12          I can say that for myself I never expected to be

13  talking about this with you more than a year later.  And one

14  of the things that to me appears to be a changed

15  circumstance, and we can discuss whether it changes any

16  outcomes, is that at least from the perspective of Giant

17  Stadium, there is the protection that this 2004

18  investigation is more tactical than real, and that you

19  really have at a business level already determined that

20  you're objecting to the claim.  So that you don't need the

21  further investigation to make a judgment as to whether this

22  is a claim you're going to say yes to.  You already know

23  you're saying no to it.

24          Given that setting, I think things may have

25  changed.

Page 37

```
 1              MR. SLACK:  Well, I have to tell you I don't think

 2     they've changed one bit, and I don't agree with that at all.

 3     And I -- I'm usually not so blunt with this Court, and I've

 4     appeared many times in front of it.

 5              THE COURT:  Well then you're getting used to it.

 6              MR. SLACK:  The fact is, is that we have exactly

 7     the same information that we had back when we started in

 8     September of 2011.  And what I was worried about was

 9     somebody taking exactly the tact that Giant Stadium said,

10     and frankly that Your Honor just took, which is that if we

11     -- you know, obviously our discussions on the merits had to

12     include discussing preliminary views.  And what I was

13     worried about is if we had discussions and we talked about

14     those views based on a partial investigation that someone

15     would say there's changed circumstances.

16              And the truth is, Your Honor, that's a gotcha,

17     because what we should've said is, Your Honor, then we'll

18     finish our investigation and then we'll talk.  Because there

19     are still critical areas that we haven't had the slightest

20     stich of information because we talked for example, we

21     didn't take any information from the NFL.

22              Now, we have a subpoena outstanding to the NFL,

23     that's been frozen as well per agreement, and they've agreed

24     to produce documents now.  There's Goldman Sachs.  Goldman

25     Sachs did all of this work on the valuation, and again
```

Page 38

1    that's been frozen while we've been in discussions.  There's

2    insurers.  The insurers here which insured the underlying

3    option rate securities, they had certain consent rights, and

4    they were actually -- there are e-mails and communications

5    with them, significant ones during the time frame of the

6    termination.  And again, we have a subpoena outstanding with

7    respect to that, and it's waiting this.

8          We haven't taken any discovery with respect to, and

9    as I mentioned before, the amended claim as to exactly when

10    that was made, and what the basis of that is.  And there are

11    serious issues with respect to one whether that claim should

12    be allowed to be amended at all, and then what it is.

13          So there are significant issues.  And again what

14    I'm concerned about here is that nothing has changed from

15    September of 2011 except that we engaged in real and

16    hopefully good faith discussions, where we did discuss our

17    preliminary views of the merits.  And based on those

18    preliminary views, and that's the only thing that's

19    happening, that's the only thing that's different, and

20    that's the only thing that's changed.  We are now faced with

21    we're not allowed to finish our investigation.

22          And I can tell you this, this is not tactical.

23    This is not tactical.  This is real.  We need the

24    information, and this is information we sought and wanted in

25    September of 2011 before the discussions.  It's not like it

Page 39

```
 1    was, you know, heaped on now.  They knew we wanted this

 2    information.  It's not tactical.  And other parties have

 3    allowed us to take this kind of 2004, and we haven't had the

 4    disputes.  They've cooperated, it's gone quickly.  And this

 5    would go quickly if we had cooperation from Giant Stadium

 6    and the third parties.

 7             With respect to the -- you know, Giant Stadium's

 8    motion to take 2004 --

 9             THE COURT:  Before we get to that, let me ask you

10    one more question.  In what respect, if at all, would Lehman

11    be prejudiced if you simply objected to the claim now, based

12    upon what you know, and proceeded to take discovery in a

13    contested matter, everything presumably that would be the

14    subject of the 2004 request would simply be the subject of

15    ordinary course discovery in that contested matter?

16             MR. SLACK:  What I can tell you is there has not

17    yet been a determination, that's one of the reasons that

18    this is a very complex, and I can tell you this, Your Honor,

19    honestly, that there has not yet been a determination by the

20    estate whether we are going to press that this is a

21    receivable to the estate or a payable.

22             There are very interesting issues.  I'm happy to go

23    into what they are.  But in that sense, this is very unlike

24    most of the claims, because in many of the claims, and in

25    many of the swap cases, we know it's either going to be a
```

Page 40

1    receivable and a payable.  And because of some of the issues

2    here, which are very complex, the estate has not yet made a

3    determination whether to press this as a receivable, and

4    actually bring this as an affirmative claim, or whether

5    simply to treat it as an objection to a claim.  And if we

6    object to the claim, again, what I can tell you honestly is

7    why we have preliminary views, there has been no

8    determination yet as a final matter, as what grounds we are

9    going to take, because again, there are many different

10   layers of this onion.

11           And I would say the following, Your Honor.  It may

12   be that somebody comes in and files a claim, and you've

13   probably seen this in your career.  They file an outrageous

14   claim, you know, they've got something that's $10 billion

15   they put in a claim.  Well, it may very well be that the

16   debtor knows it's not going to pay $10 billion, and it's

17   going to quote object to the claim.

18           I don't believe that cuts off 2004 discovery to

19   figure out and understand the bases for that claim, and to

20   figure out the bases for the objection.  And so whether or

21   not the estate -- you know, I can tell you this, the 600

22   million that they've put in their amended proof of claim is

23   more than the face amount of the underlying notes that were

24   being hedged.

25           So essentially they're taking the position that

1    they deserve in unwinding the hedge more than the underlying

2    face amount of the notes.  Now, I can tell Your Honor that

3    sounds to me facially unreasonable.  But that doesn't mean

4    that just because somebody files this wild claim and you're

5    going to say, hey, I know I'm not agreeing to 10 billion, it

6    doesn't mean you can't go and take 2004 discovery.

7          And the analogy on the other side, Your Honor, I

8    think is striking.  What 2004 allows you to do when you're

9    filing an affirmative claim is to understand the bases for

10   it.  It's not just enough to say, hey, I think at the end of

11   the day I'm going to file, you're allowed to go and

12   investigate, so you know the bases of your claim, so you

13   could actually bring a Rule 11 type claim on the affirmative

14   side.  Well, it works the same way on the claims side.

15         So I don't think the question here is are we likely

16   to object to, you know, the 600 million in claims.  I think

17   there's a really serious issue here as to whether this is a

18   receivable and a payable, and if so, what are the bases, and

19   I can tell Your Honor, there is no definitive view on that.

20   And we need to investigate in order to figure out whether

21   we're going to bring this as an adversary proceeding or

22   we're just going to object to the claim.

23         THE COURT:  Okay.

24         MR. SLACK:  I'm happy to talk about now the 2004

25   discovery.  I think I can be a little briefer.  Obviously I

Page 42

1    was asking some questions from the Court, and do this all at

2    once rather than --

3              THE COURT:  I'm treating this as one matter because

4    it has multiple parts.

5              MR. SLACK:  Let me then speak to the Giant's motion

6    to take 2004.

7              So what the Giants has essentially done has said,

8    because we, the debtor, want to take more discovery, they'd

9    like to take some discovery.  And the difference, of course,

10   is once they've filed the claim, the debtor here can make

11   two decisions.  We could say, we agree with some or all of

12   that claim, and if we do that, much of the discovery that

13   they're going to seek could very well be premature and

14   frankly ultimately useless.

15             And so what makes sense here is to let us finish

16   our investigation, figure out are we bringing this as an

17   adversary proceeding, are we going to object to the claim,

18   and if so, on what bases.  And then that will actually shape

19   the kind of discovery that ultimately if we're going to

20   object to it, that Giant Stadium will be able to get.  If

21   you allow it now, you have a potentially wasteful and

22   unnecessary set of discovery that's unneeded.

23             Second, Giant Stadium is really unable to swear, it

24   never tries.  Its own argument that it makes in opposition

25   to our 2004 with their request to take it, and of course,

1    we're in different situations.  They actually cite a case,

2    GHR Energy Corp for the proposition that a party may not use

3    2004 after it has determined to pursue a claim.  And, of

4    course, it has filed claims.  And what's -- they never try

5    to square these positions.  They never try to square the

6    idea that they are in a situation, because of course, they

7    do have all the information.  They never try to square the

8    -- you know, that they have filed the claim, its detail.

9             And so under their own case law and authority,

10    they're simply not entitled to get any at this point.

11             Third, even if it wasn't, you know, facially

12    deficient, their request for 2004, as a matter of, you know,

13    policy, this Court shouldn't allow it.  And that's because

14    there is a claims process when people file claims.  And this

15    happens, I assume, you see it much more than I do, is people

16    file claims, and yes, debtors take 2004 discovery.  And at

17    some point, debtors will object to those claims or not.  And

18    if they object, there's a full process, sometimes outlined

19    by the Court, sometimes not, to take discovery.  And that's

20    what should happen here.

21             And what Giant Stadium has essentially argued is

22    that they should jump that process, that the process that

23    applies to everybody else's claims shouldn't apply to

24    theirs.  And they even make, I think the incredible argument

25    that creditors are actually permitted to take 2004 discovery

1    after filing claims to bolster those claims.  Well, think

2    about that as a precedent for your cases.

3         If that were the case, you would expect to see I

4    think a number of cases where creditors do this all the

5    time.  I can tell you that if that were the law, I'd think

6    we have hundreds if not more creditors in this case trying

7    to seek discovery on their claims.

8         And Giants states two cases that I do want to

9    discuss because we haven't had a chance to do that in any

10   kind of reply for that idea.  The first is a Drexel Burnham

11   (ph) case back in 1991.  That's a case that my colleague,

12   Peter Grunberger (ph) participated in.  And in the Drexel

13   matter, one of the major creditors in that case was the FDIC

14   and there were also creditor's committees.

15        Well, at least one of those committees was taking

16   2004 pursuant to a stipulation.  And what the FDIC wanted,

17   which was a major creditor in Drexel, was it wanted access

18   to the discovery that was being done by the creditor's

19   committees on other issues.

20        And what the Court said is the FDIC because it was

21   such a major creditor could have that discovery even if it

22   would bolster its claim.  But what didn't happen in that

23   case is what Giant Stadium wants here, is that the FDIC was

24   allowed to put forth its own 2004 discovery on its claims.

25   That never happened.  What they want here did not happen in

1    the Drexel case at all.

2         The other case cited by Giant Stadium is a Texaco

3    case, another case that Weil appeared in, in which Texaco's

4    largest judgment creditor, Pennzoil sought 2004 discovery,

5    again relating to issues in the case because it was the

6    largest judgment creditor in Texaco.

7         And there was no request to take discovery

8    concerning a filed claim, because remember it was a judgment

9    creditor, it'd actually gone to trial on its claim.  And

10   that claim was not the subject of 2004 discovery.

11        So, you know, I think Giant Stadium is just simply

12   not correct on the law, that once you filed the claim as a

13   creditor, you can take 2004 discovery on that claim.

14   Certainly we see creditors in cases and creditor's

15   committees taking discovery, let's say there's third party

16   claims out there, the debtor's not pursuing, you certainly

17   see that kind of discovery.  But what you don't see is 2004

18   discovery allowed on particular claims filed by those

19   creditors.  And there's no case that they cite where that's

20   the case.

21        And again, if that was the case, it would really

22   blow up the claims process in a case like --

23        THE COURT:  Let me ask you this question, which

24   doesn't relate to precedent that may or may not be directly

25   relevant or instructive to the current dispute.  And instead

Page 46

```
 1   to focus on the current dispute.

 2           You have acknowledged in your argument that the

 3   underlying facts here are unusually complicated, and that

 4   your own client, which is certainly as sophisticated as any

 5   counter party has not yet concluded whether there is an

 6   affirmative claim here or a defense of claim if there are

 7   any defenses, for that matter.

 8           Although at the preliminary matter, you've

 9   acknowledged that given the change from 301 million to 585

10   million it is highly probable that some objection will be

11   made because you compared it with what might be called a

12   preposterously large claim.

13           But given the complexities that you have

14   acknowledged that underlie an analysis of claims and

15   defenses, is this not a somewhat exceptional circumstance in

16   which the typical discovery may be appropriate, and may not

17   lead to the adverse consequences that you've described of

18   hundreds of creditors coming in to seek what they're really

19   not entitled to discovery with respect to their claim?

20           MR. SLACK:  You'd only see it if you granted it.  I

21   think that the -- I think that you're likely --

22           THE COURT:  Well, I'm asking the question intending

23   to probe some of the issues here.

24           MR. SLACK:  No.  And I think it's -- I think you

25   would end up frankly being in the same situation as many
```

1    other creditors, because every creditor is going to say,

2    they're not going to know the facts, the underlying facts of

3    Giant Stadium, they're going to say, Your Honor, we have a

4    complex derivative.

5            What I can tell you is this, is that the

6    information that we need or the information that's really

7    relevant to the determination is all on their side.  Their

8    discovery is purely harassment.  In other words, what they

9    want from us is purely just a harassing set of discovery.

10   They have told us so many times, even in their papers, they

11   don't like one-sided discovery.  And that has stuck in their

12   crawl.  And so what they're trying to do is purely as a

13   harassing matter.

14           Think about what they did in this motion and I

15   think you can understand that they don't need a stitch of

16   discovery.  They filed this motion 18 months ago, and they

17   have adjourned it for 18 months in a row.  And it wasn't

18   until the settlement discussions ended and we pressed our

19   continuation of the investigation that all of a sudden they

20   say, oh, we need discovery.  And that's because the sole

21   purpose of it is to try to harass us.

22           The information with respect to the termination of

23   the transaction and what happened is all on the Giant

24   Stadium side, not on the debtor side.  And the information

25   that they want here is, at the end of the day, we don't know

Page 48

1    whether it's going to be irrelevant or not, but it may very

2    well be a waste of our resources to produce all of this

3    stuff now, when we haven't made a decision as to what our

4    defenses are actually going to be here.

5           Again, we have preliminary views or else we

6    wouldn't have been able to engage in the settlement talks.

7    But I can tell you that what's going on here is purely a

8    harassing set of 2004 requests.  And they are unnecessary

9    because at some point, if we object, Giant Stadium will have

10   a complete opportunity to take discovery.

11          Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you.  Mr. Clark.

13          MR. CLARK:  Good morning again, Your Honor.

14          You know, some of the points that you made in your

15   questions frankly fit rather well with the points I was

16   going to make to the Court.  First of all, on the gotcha

17   issue, we have not argued at all, and I'm not arguing today

18   that because Lehman entered into settlement negotiations and

19   we had a mediation and all of that, that they somehow waived

20   their rights.  That's not what we're saying, and I think

21   that's what Your Honor meant when you said there'd be no

22   gotcha.  And I'm equally sure, although I didn't raise it

23   because I didn't think it was necessary, there was no gotcha

24   for the Giants either.  I mean Giant Stadium was waiving any

25   rights because they went into a year or more of discussions

Page 49

1    at the same time.

2          But it is a fact that the debtors today are in a

3    different posture, and not just because of the passage of

4    time, although there has been a lot of time that has passed.

5    They just conceded, as I think the transcript will show,

6    that they're not going to do anything other than object to

7    the claim in one form or another.  They're going to object

8    to it, they're going to file an adversary proceeding to

9    collect on their view of what they have is right, but this

10   is going to become a contested matter in one form or

11   another.  It already really is.  And that's the problem.

12         In order to get this to the point where we think

13   the parties have a better chance to resolve this, if it has

14   to be through litigation, so be it, there has to be

15   discovery on both sides.  This last point about us wanting

16   documents from them because of harassment is completely

17   unjustified.

18         If you look at the paragraphs of documents that

19   we're describing the documents we're asking for, and you

20   read the transcript of Mr. Slack's deposition of Ms.

21   Prokopse (ph), everything we've asked for practically is in

22   there.  It's what's at issue in this case.  It's not as

23   though we're wasting our time putting together document

24   demands to make them file a motion.  We have no interest in

25   that whatsoever.

Page 50

```
 1            I think the key in this situation is your question,

 2     your point, that shouldn't at this point the obligations to

 3     produce information and to proceed be reciprocal.  And I

 4     think the answer to that has got to be yes.  And as an

 5     indication of the status that we're in, of the stage that

 6     we're at, I refer the Court to the new deposition subpoena,

 7     the second deposition subpoena, which is a 30(b)(6)

 8     deposition.  That is not an investigation tool.  That's a

 9     litigator's tool, to help resolve a dispute that is already

10     there.

11            They want us to educate Ms. Prokopse on all the

12     things that they say she didn't know about before, and on a

13     bunch of other topics.  And the reason they gave was to bind

14     her to that testimony, and to bind us to that testimony.

15     That's not investigation, that's litigation.  We're already

16     at that stage, and that's what they're asking for, and

17     that's why we think either of two things has to happen.

18            Number one, their current subpoenas for additional

19     documents, much of which is repetitive of what we already

20     gave them, and for this additional deposition should be

21     quashed, so that there is not this continuing façade of an

22     investigation.  They should not be allowed to simply say

23     it's preliminary.  They said that 14 times at least in the

24     papers that they submitted to the Court.

25            It's preliminary, therefore, it's likely to have a
```

1    white feather.  We can continue to do whatever we want to do

2    and it's one way.  There's no way that they have not made up

3    their mind that they're going to take action either to

4    object or to file an adversary proceeding.  Nobody in this

5    courtroom can believe that, I hope Your Honor doesn't.

6         So if the motion to quash is granted, then we're at

7    a point where they would have to meet forward, and either

8    object or file the adversary proceeding as far as I can see.

9    Our request for discovery under Rule 2004 is an alternative

10   if we're going to continue this 2004 process, we think we

11   should at least be allowed to begin to get the documents

12   from Lehman's files that bear on the same issues that they

13   have raised.

14        In another case mentioned, Mr. Slack mentioned the

15   FDIC application and Drexel Burnam.  In the Federated case,

16   the FDIC came in the same way, and they had major claims,

17   and they wanted to take discovery, I think it was of the

18   creditor's committee, and the Court permitted that.

19        And the Court said I'm going to permit it because

20   these are people who are just preparing their arsenals for

21   battle.  And the way they're going to get to a resolution at

22   the end of the day is if they both know as much as they can

23   about the other side's position.  So that's where we are.

24        We would like to be able to have this is in a

25   position where we can take discovery, they can take

1    discovery.  I think personally that that is the best way

2    we're likely to get to a resolution of this.  And I think

3    it's fair at this point.  The bankruptcy has been -- it's

4    over four years old.  We've been in some sort of contest

5    with the folks from Lehman for over two years.  It's simply

6    time to move on to the next stage, and that's why we're

7    objecting to their discovery and suggesting alternatives.

8            THE COURT:  All right.  Thank you.  Anything more,

9    Mr. Slack?

10           MR. SLACK:  Just a few -- a couple of minutes.

11           Your Honor, with respect to the 30(b)(6)

12   deposition, and I think it's important to understand that we

13   took a deposition of a particular person, Christine

14   Prokopse, who's the CFO of Giants and (indiscernible) Giants

15   Stadium, and there were many instances, and we've put it in

16   our papers where there were critical things that she didn't

17   know.  So we actually had a conversation with counsel for

18   Giants, where I said, look, we can take, you know, the

19   deposition of the other people who all happen to be more

20   senior.  They're the MARs (ph) and the TISH's (ph).  And we

21   said, what we're willing to do is we're willing to take,

22   because we just want the information, we're willing to take

23   a 30(b)(6), you can designate whoever you want, but then you

24   have the obligation to educate.

25           It is purely an investigative tool to find out the

Page 53

1    answers that we didn't get from that deposition.  It is not

2    a litigation tool, and we took this tact because we thought

3    it would be more palatable, though, perhaps we should just

4    go and take the depositions of the other senior people, that

5    was another way, you know, of getting potentially to that

6    information.  But it was purely seeking information and not

7    trying to, you know, go forward with any kind of litigation.

8            And other than that, Your Honor, I would say as

9    follows.  Is that when they say that they've never tried to

10   say this is a gotcha, all you have to do is read the first

11   line of their reply.  Where they say that debtor's cross

12   motion is premised on the unsustainable argument that

13   debtors have adopted only a preliminary position as to the

14   merits.  And then they say, "To the contrary, although

15   Giants Stadium is constrained from disclosing the substance

16   of settlement negotiations, it's clear the debtors have

17   determined to object to the claims."

18           What they're saying, Your Honor, I think is exactly

19   the gotcha.  It's exactly that because we entered into

20   settlement discussions which they had an agreement that we

21   could do and not give up our rights to 2004, and this Court

22   gave us assurances we would not, so.

23           THE COURT:  How are you giving up rights to 2004 if

24   those rights are conditioned in whole or in part on some

25   reciprocal discovery?

Page 54

1              MR. SLACK:  Well, two fold on the reciprocal

2     discovery.  I think that the idea of giving reciprocal

3     discovery for what is essentially a claims dispute doesn't

4     make any sense until there is a determination essentially in

5     the investigation.

6              And the reason for that is what I said, number one,

7     is that it might be wasteful, and number two, it sets a bad

8     precedent.  But I would ask a different question on top of

9     that.  Which is, what's the harm, assuming they're right,

10    that they're going to have a -- you know, an objection and

11    this -- you know, what's the harm in letting us finish our

12    investigation over the next three or four months, and then

13    if we file an objection, they'll get full discovery.

14             They need the discovery for the claims process, and

15    they'll have it, because Your Honor's going to make sure

16    that they have whatever they need.  But that's the way all

17    the other claims work, and that's the way this should.

18             And I would ask the Court one other thing, which is

19    to consider that they still have not answered the

20    inconsistency in their own position between their motion to

21    quash and their motion to take discovery.  Because if you

22    look at their argument, GRH and the other pages and pages

23    they raise, their own argument is that they're not entitled

24    to it once they file their claim, and they've never

25    addressed that inconsistency.  Thank you, Your Honor.

1          THE COURT:  Okay.  One more thing.

2          MR. CLARK:  Okay.  I'll address the inconsistency.

3     It's simply a situation of -- there are a number of courts

4     that have said you can have discovery even after you filed a

5     claim, so it's not inconsistent across the board.  The only

6     thing we're trying to do, the only thing we're trying to do

7     is to have some sort of a process that will let this resolve

8     itself sooner rather than later.

9          And the things that we've asked about are not just

10    -- they are not under the control of Giant Stadium.  We've

11    asked questions about how they evaluated and viewed the

12    termination process, about what if any steps they took, that

13    they were obligated to take under the papers, including

14    going out and getting quotes in the market, and doing a

15    number of other things.  These are all issues, they're all

16    documents that are directly tied to issues that are

17    presented in this case.

18         We think the best thing to do would be to go to the

19    next stage, whether there's an objection or an adversary

20    proceeding, and then you're right, all this discovery gets

21    resolved hopefully without Your Honor ever seeing us again

22    for that purpose.

23         But if we're going to have this continuing Rule

24    2004 discovery, then the only way it seems fair to us is to

25    have both sides have access to it.  And, you know, if you

Page 56

1    look at the -- I know Your Honor's familiar with all this,

2    so I'm not going to belabor it, but if you look at the

3    background, the Cameron case and all the other cases that

4    dealt with the origins of Rule 2004.  Originally it dealt

5    with a situation where a receiver came in, wasn't familiar

6    with the debtor, and had to have an expansive and quick,

7    quick review of the debtor's assets in order to protect

8    creditors.  That's what any number of the cases have said.

9         It is not an excuse to allow a debtor in the

10   circumstances present here to just continue with their

11   investigation because the investigation is preliminary and

12   not final, and it's final because it's preliminary.  That's

13   what they're saying.  It's a little circular, and I think we

14   ought to move on.  Thank you.

15         THE COURT:  Okay.  Well, thank you for your candor

16   in answering the Court's questions and in your

17   presentations.  I don't see this as a typical use of Rule

18   2004.  Nor do I see it as a case that will open the

19   proverbial floodgates of other discovery in part because Mr.

20   Slack in his presentation, candidly observed that at this

21   juncture, more than four years into the Lehman bankruptcy

22   case, his client really doesn't fully understand all

23   elements of claims arising out of this complicated auction

24   rate hedge.

25         And it's apparent that if they could determine now

Page 57

1     that they had an affirmative claim, they would assert it.

2     Lehman has not been shy about asserting such claims in the

3     past.  Additionally, it seems fairly obvious that if Lehman

4     had sufficient information available to it that would

5     support not just a shotgun approach objection but a specific

6     and tailored objection to the claim, it would file it.

7            Throughout this case, Lehman has been active in

8     filing and pursuing objections to claims, and in fact, part

9     of this morning's agenda relates to objections to claims.

10    And so I view this as an exceptional case.  And, in fact,

11    that was one of the reasons I asked a number of questions at

12    the outset to determine to what extent the issues that

13    related to this discovery dispute were exceptional and

14    unique, and to what extent this was just another example of

15    a derivatives dispute, this one happening to have the

16    negative gloss of active discovery disputes, as opposed to

17    active negotiations leading to a settlement.

18            I believe a continuing 2004 discovery under the

19    circumstances makes sense, although the fact that this is

20    occurring 14 months after our last discovery dispute is a

21    terribly negative fact.  One conclusion to be drawn from the

22    mere timing of this, is that this dispute is taking too long

23    to resolve, and that despite best efforts, reasonable people

24    are unable to get to yes, and they should.

25            And so I'm going to propose that counsel meet and

Page 58

1    confer in an effort to develop what I'll call a reciprocal

2    discovery protocol, and it is not necessarily limited to

3    2004.  I believe that one of the things that distinguishes

4    the dispute that I've heard a lot about this morning from

5    other disputes, is that there is no foreseeable outcome here

6    in which Lehman is not objecting, or bringing affirmative

7    claims relief.

8         This is not a situation in which Lehman is engaging

9    in a 2004 process to later shake hands, and say here's the

10   money.  I also believe even though everybody has denied this

11   that the 2004 dance that we're engaged in necessarily has

12   tactical aspects to it.  And so here's what I am directing.

13        Between now and the first of the year, I would like

14   the parties to develop and agreed discovery protocol that

15   will be applicable whether we're dealing with 2004 discovery

16   or claims related discovery.  It would be extraordinarily

17   wasteful for the discovery that's taken in 2004 to be

18   replicated again.  And in the case of Ms. Prokopse, that's

19   already happening.  Enough already.

20        I recognize that the 2004 sword is more properly

21   used by the debtor than by the creditor in this instance.

22   And so discovery from third parties and discovery from Giant

23   Stadium and discovery from Goal Line may be more appropriate

24   than discovery from the debtor.  But that does not mean that

25   some discovery from the debtor is not also to be part of

Page 59

1    this process.

2              One of the mysteries from the perspective of the

3    Court is that this third party discovery and discovery from

4    others is so critical from the debtor's perspective in being

5    able to formulate its own position with respect to the

6    claim.  But I accept the representations made that ongoing

7    2004 discovery is needed in order for the debtor to complete

8    its investigation to use its words.

9              I would ask the parties to report the results of

10   these efforts at the December omnibus hearing.  You don't

11   have to the point of an agreement, in fact, you could be to

12   the point of no agreement.  I'd like to know that, in which

13   case I will then be able to either rule or take this matter

14   under advisement, but I have I think provided sufficient

15   guidance here to suggest that what I consider to be an

16   appropriate result is reasonable discovery going in both

17   directions with the understanding that the need for that

18   discovery is more obviously greater for the debtor.  And

19   this is not an example of gotcha because I am indicating in

20   agreement that continued 2004 discovery is appropriate for

21   the debtor and the debtor's benefit.

22             I'm also noting the time's up in effect.  This has

23   to come to a conclusion.  And I don't expect there to be

24   another discovery dispute between the parties until there's

25   active litigation between you.  And I hope that doesn't

Page 60

1    occur at that point either.  So I'll hear from you next

2    time.

3                 MR. CLARK:  Your Honor, just a question of

4    clarification.  How does the January 1st deadline fit with

5    the next omnibus hearing?  I'm not --

6                 THE COURT:  I don't know.

7                 MR. CLARK:  Okay.

8                 THE COURT:  I'm just looking for a status report at

9    the next omnibus hearing.  And if it doesn't fit well for

10   the parties, it can always be put off, and then we can make

11   that a telephone conference.

12                MR. CLARK:  Thank you, Your Honor.

13                MS. MARCUS:  Your Honor, the December hearing is

14   December 19th.

15                THE COURT:  18th?

16                MS. MARCUS:  19th.

17                THE COURT:  That seems like a perfect date for a

18   status report.

19                MR. MARGOLIN:  The omnibus hearing is on December

20   12th, Your Honor.

21                THE COURT:  Why am I hearing different dates?

22                MS. MARCUS:  Sorry.  Sorry, Your Honor.  December

23   12th, sorry about that.

24                THE COURT:  December 12th is a perfect date, too.

25   Either one's fine.

Page 61

```
 1            MR. CLARK:  Thank you.

 2            MR. SLACK:  Thank you, Your Honor.

 3            MR. MARGOLIN:  Good morning, Your Honor.  Shall we

 4    wait until --

 5            THE COURT:  Why don't we just wait for those people

 6    that are leaving to exit.

 7            MR. CLARK:  Thank you.

 8            (Pause)

 9            MR. MARGOLIN:  Good morning, Your Honor, Jeffrey

10    Margolin, Hughes, Hubbard and Reed for the SIPA Trustee, Mr.

11    Giddens.  We have two uncontested matters on this morning's

12    agenda.  The first one is a settlement agreement proposed

13    with the LBF Chapter 15 debtor that is going to be handled

14    by my colleague, Mr. Greilsheimer, and then a portion of the

15    trustee's general creditor claim procedures motion which is

16    going to be handled by my colleague, Meghan Gragg.

17            THE COURT:  Okay.

18            MR. MARGOLIN:  Thank you.

19            MR. GREILSHEIMER:  Good morning, Your Honor, Jeff

20    Greilsheimer for the SIPA Trustee.

21            This is a global resolution of all of the claims

22    between LBI and Lehman Brothers Finance.  It was an

23    aggregate amount of about 6 billion that was submitted to

24    LBI by LBF.  We have resolved that allowing a claim of

25    approximately 190 million as a customer claim and 360
```

Page 62

1    million as a general creditor claim against the estate.  And

2    it is a complete resolution of everything that we have going

3    between the estates.  We believe it is well within the

4    trustee's discretion, and is an excellent result for the

5    estate.

6            If Your Honor doesn't have any questions, Mr.

7    Krakow on the Chapter 15 proceeding.

8            THE COURT:  I'll handle them together.  I've

9    reviewed the papers.  It seems like a very fair and balanced

10   approach, and there are no objections.  So this becomes as

11   close to a lay up as we get when we're dealing with $6

12   billion.

13           MR. KRAKOW:  Your Honor, Robert Krakow for LBF.

14   I'm not sure there's anything I need to add then.  This is a

15   very fair and substantially negotiated settlement that's the

16   combination of months of efforts by accountants and lawyers,

17   and ultimately the business people on both sides, so it is a

18   fair and reasonable settlement, as reflected by the fact

19   that there are no objections either with respect to the LBF

20   case or the LBI case.

21           THE COURT:  I'm very pleased with the outcome, and

22   I know that these things when they're finally resolved look

23   fairly plain and straight forward on the docket, especially

24   when they're uncontested, but that in dealing with the

25   disputes between these two estates over the years, I know

1                C E R T I F I C A T I O N

2

   I, Sheila G. Orms, certify that the foregoing is a correct

3   transcript from the official electronic sound recording of

4   the proceedings in the above-entitled matter.

5

6   Dated:  November 17, 2012

7

8

9   Signature of Approved Transcriber

10

   Veritext

11

   200 Old Country Road

12

   Suite 580

13

   Mineola, NY 11501

14

15

16

17

18

19

20

21

22

23

24

25