**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Turner P. Smith
L.P. Harrison 3rd
Andrew H. Seiden
Peter J. Behmke
101 Park Avenue
New York, New York 10178
*Counsel for Lehman Plaintiffs*
    -and-
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
*Special Counsel for Intervenor-Plaintiff*, Official Committee of
Unsecured Creditors of Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------- X
| | |
|---|---|
| In re: | : Chapter 11 |
| | : Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : |
| | : |
| Debtors. | : |

--------------------------------------------------------------------------- X

**LEHMAN PLAINTIFFS' AND COMMITTEE'S RESPONSE TO THE MOTION
TO CONSOLIDATE CONTESTED MATTER WITH ADVERSARY PROCEEDING**

    Plaintiffs Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers Commercial Corporation ("LBCC" and collectively with LBSF and LBCS, the "Lehman Subsidiaries"), and Lehman Brothers Holdings Inc. ("LBHI"; and together with the Lehman Subsidiaries, "Lehman") as debtors and debtors in possession, and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee"; and together with Lehman, "Plaintiffs") respectfully respond to the motion (the "Motion") by FYI Ltd., FFI Fund Ltd. and Olifant Fund, Ltd. (collectively, "Bracebridge") to consolidate their pending contested matter (relating to Lehman's objections to

their proofs of claim) with Plaintiffs' adversary proceeding (No. 12-01044, the "Adversary Proceeding") against Citibank, N.A., and certain of its affiliates (collectively, "Citi").

## PRELIMINARY STATEMENT

1. Plaintiffs do not oppose Bracebridge's limited intervention for the resolution of the Bracebridge claims relevant to this case. That intervention, however, does not warrant Bracebridge's requested consolidation of its entire claims litigation to the Adversary Proceeding.

2. Limited intervention is eminently reasonable because the one issue common to Bracebridge and the parties in the Adversary Proceeding is also the one issue that prevents further progress on a potential out-of-court resolution of Bracebridge's claims. That gating issue relates to whether a step-out transaction entered among LBSF, Citi and Bracebridge is valid and enforceable. Specifically, just before LBHI's bankruptcy filing, Citi and Bracebridge arranged a three way "step out" in which LBSF stepped out of its trades with Bracebridge, and Citi stepped into those positions. Simultaneously, the identical positions between Citi and LBSF were terminated. As a result, Citi and Bracebridge reduced their exposure to LBSF—at no cost.

3. Then, *after* LBHI filed for bankruptcy, Citi and Bracebridge tried to unilaterally void the three way step-out transaction and restore LBSF as their counterparty for the sole purpose of declaring a default and profiting on the termination of the resurrected transactions. They then included the purportedly-revived trades with LBSF in their claims in the bankruptcy along with exorbitant add-ons—seeking to benefit by a combined more than $57 million above the September 15 mid-market values of approximately $91 million. Even though the positions were completely offsetting, Citi claimed that LBSF owed Citi almost $110 million in losses from that termination, while Bracebridge claimed that it owed only approximately $52 million to LBSF. Had Citi honored the step-out transaction, it would have no basis to claim any

2

losses on those trades here. And had Bracebridge honored the step-out transaction, it would have been facing Citi in approximately $91 million live out-of-the-money trades as of September 15, 2008—rather than facing LBSF in terminated out-of-the money trades, which, by virtue of LBSF's defaulted status, Bracebridge saw the opportunity to include on its proofs of claims only $52 million owed to LBSF. Whether the step-out transaction is effective is one of the issues in the Adversary Proceeding.

4. A decision on that issue could also affect Bracebridge's claims in the bankruptcy. Precisely because this matter has not been decided, Lehman and Bracebridge have not been able to make progress on Bracebridge's claims.

5. But resolving that limited question does not also require resolving the more than 800 other terminated trades involved in Bracebridge's claims. Rather, a complete consolidation of those claims would inject a cornucopia of unrelated issues into what is already a very complex lawsuit with Citi. It will also increase Lehman's (and Bracebridge's) costs as the parties will be forced to take fact and expert discovery relating to all of Bracebridge's claims rather than just the step-out transaction.

6. By contrast, the only benefit to consolidation of all of the 800 other unrelated trades underlying Bracebridge's claims would be to allow Bracebridge to jump ahead of other creditors and have its claims litigated now. Bracebridge filed $262 million in claims against LBSF and LBHI, and it no doubt seeks an early resolution of those claims. Consolidation, to Bracebridge, would only be an end-run-around the Claims Procedures Order.

7. A more sensible alternative to plenary consolidation would be to permit Bracebridge to intervene solely to the extent the two actions overlap; *i.e.*, the step-out transaction. Bracebridge, Lehman and Citi could all engage in discovery on that issue, and

3

ultimately submit it to the Court for a determination as to whether the step-out transaction was effective. The Court's assistance in that regard would resolve Bracebridge and Lehman's threshold disagreement on how to value Bracebridge's claims. Following that determination, Bracebridge would no longer have a need to participate in the Adversary Proceeding, and Bracebridge and Lehman could re-commence their discussions in accordance with the Claims Procedure Order.

8. For these reasons, Plaintiffs respectfully request that the Court partially grant the Motion only to permit Bracebridge to intervene on the limited issue relating to the step-out transaction. The Motion should be denied in all other respects.

9. In addition, to the extent Bracebridge is permitted to intervene for the limited purpose described herein, Plaintiffs also respectfully request that the Court order Bracebridge to submit a pleading setting forth its claims or defenses in intervention in respect of the step-out transactions, as required under Federal Rule of Civil Procedure 24(c), as made applicable by Federal Rule of Bankruptcy Procedure 7024.

## BACKGROUND

10. Plaintiffs commenced the Adversary Proceeding against Citi on February 8, 2012. On November 16, 2012, Plaintiffs filed their Amended Complaint. Plaintiffs allege, among other things, that Citi artificially inflated the value of its claims arising under derivative agreements with the Lehman Subsidiaries by more than $2.2 billion. Citi did so by claiming phantom losses, failing to net countervailing trades and otherwise closing out the derivative portfolio in a commercially unreasonable way that bore no resemblance to reality. The Citi-Bracebridge step-out transaction was a prime example of that misconduct. By agreeing to novate a series of trades over to Bracebridge just *prior* to the LBHI chapter 11 filing, Citi successfully removed its

4

exposure to LBSF on those trades. But then, in a bizarre move designed to profit from Lehman's bankruptcy via the submission of inflated claims, immediately after LBHI filed, Citi and Bracebridge sought to undo the novation and restore LBSF as their counterparty.

11. As alleged in the Amended Complaint, on September 11, 2008, Citi sought to reduce its Lehman credit risk by entering into a three way step-out transaction with LBSF and Bracebridge. Am. Compl. ¶ 206. Citi and Bracebridge identified twenty-nine securitized products credit default swaps ("CDS") between Citi and LBSF and eighty-seven securitized products CDS between Bracebridge and LBSF that perfectly offset. *Id.* Because of that offset, LBSF could step out from the trades facing Bracebridge, and Citi could step into those positions, while at the same time the identical positions between LBSF and Citi could be terminated. *Id.* In this way, Bracebridge and Citi could each reduce exposure to LBSF while maintaining constant risk positions and without incurring any costs. *Id.*

12. On September 11, 2008, Bracebridge formally proposed that LBSF "step out" of the offsetting trades by simultaneously terminating its trades with Citi and novating its trades with Bracebridge to Citi, leaving Citi and Bracebridge facing each other directly. *Id.* Citi consented to the step-out that same day and, in accordance with industry custom and ISDA-recommended best practices, specified the transfer date: "t/d 9/11/2008." *Id.* at ¶ 207. Lehman also consented that same day. *Id.* As a result, the step out transaction was fully binding per the ISDA Novation Protocol II, to which all three parties adhered. *Id.* Accordingly, the night of September 11, Lehman processed each of the novations and terminations which comprised the step-out transaction. *Id.* Citi reaffirmed September 11 as the transfer date in an early morning email on Friday, September 12 and specified September 16 as the effective date for the transfer

5

of any associated collateral: "t/d 9/11/2008 eff/d 9/16/2008."[1] *Id.* Thus, as of September 11, Lehman had exited the trades, and Citi and Bracebridge faced each other directly. *Id.* Two business days later, on September 15, 2008, LBHI filed for chapter 11 protection.

13. Late that morning, Citi sent Lehman a Notice of Termination declaring that an Event of Default had occurred and that it was exercising its right to terminate all the transactions under the ISDA Master Agreement between LBSF and Citi, designating September 15, 2008, as the Early Termination Date. *Id.* at ¶ 208. Even though Citi had just succeeded in novating a number of its trades with LBSF to a solvent counterparty (Bracebridge) at zero cost, Citi immediately sought to unwind the step-out transaction and restore LBSF as a counterparty. *Id.* On September 15, the Managing Partner of Bracebridge Capital, LLC forwarded the email in which Lehman had consented to the step-out transaction to Citi with the following message:

> I am writing to confirm our conversation and to send you the note requested informing you that given that LBSF defaulted prior to the effective date of 9/16/08 for this trade collapse and that all aspects of the simultaneous assignment and termination were conditioned on Lehman being able to consummate the step out, please confirm that the trade collapse set forth in this email chain is null and void, i.e., Citi has not stepped in and all of the trades remain outstanding between LBSF and us, on the one hand, and between Citi and LBSF, on the other hand. I appreciate your verbal confirmation of this matter earlier and look forward to doing business together.

*Id.* at ¶ 209. Three hours later, Citi responded succinctly: "Citi Agrees." *Id.* at ¶ 210. At 6:51 p.m., Bracebridge forwarded the email chain to Lehman along with the below message:

> Given the failure to consummate the step-out transactions contemplated by this email chain, we are informing you that the entire collapse, i.e., the simultaneous assignment and termination set forth below involving Citi, is null and void and deemed not to have occurred. Accordingly, LBSF was from the original trade dates and remains through today's date counterparty to Olifant Fund Ltd, FYI Ltd

---

[1] An "effective date" simply refers to the due date for payment of any corresponding fees, *not* the date a novation becomes legally binding. *See* "Best Practice Statement: Processing Novations" published by the Process Working Group of the ISDA Operations Committee (May 4, 2004) available at http://www.isda.org/publications/ppdf/BestPracticeStatement.pdf at 2.

6

> and FFI Fund Ltd., respectively, with respect to the original transactions, with LBSF as buyer of protection and the Bracebridge funds as sellers of protection.
>
> Attached is written confirmation from Citi that the simultaneous assignment and termination are deemed null and void. Please confirm your acknowledgement.

*Id.* This resurrection of the trades, so that LBSF was restored as a Citi counterparty, was not permitted by the parties' ISDA Master Agreement. *Id.* ¶ 211.

14. Citi then included the purportedly resurrected trades with LBSF on its proofs of claims, charging LBSF exorbitant hypothetical charges for each trade, with Citi claiming its resulting losses were secured by the $2 billion deposit that Citi had extracted from LBHI three months before the bankruptcy to provide "comfort" in connection with FX trading services. *Id.* at ¶ 214. Because the trades no longer existed as of September 15—as a result of the step-out transaction—the amounts Citi charged on those trades should have been omitted from Citi's claims entirely. *Id.* Bracebridge similarly treated the step-out transaction as null and void in its proofs of claims. *Id.* at ¶ 215.

15. Yet, for these completely offsetting positions, Bracebridge claims that it owed approximately $52 million to LBSF while Citi claims that LBSF owed it close to $110 million.[2] *Id.* Although the trades underlying the step-out transaction no longer existed on September 15, LBSF calculated that the total termination value for those transactions would have been a little over $91 million as of that date if they had still been in effect. *Id.* This is the amount that should have been payable by Bracebridge to LBSF and by LBSF to Citi if the step-out transaction had not occurred. *Id.*

16. Notwithstanding the step-out transaction, Bracebridge included the terminated trades with LBSF involved in the step out in its proofs of claims. *Id.* Bracebridge's claims total

---

[2] *See* Appendix A hereto.

7

$262 million. *See* Mot. at ¶ 13. On April 18, 2011, Lehman filed its One Hundred and Thirty-Second Omnibus Claims Objection (D.E. 16177), in which it objected to Bracebridge's claims. On May 18, 2011, Bracebridge filed its response to the Omnibus Claims Objection. (D.E. 16925).

17. Bracebridge and Lehman are presently unable to proceed to mediation under the Claims Procedures Order for the simple reason that there is no agreement over which trades to mediate. Bracebridge has sought a global resolution of its claims, which presently include the trades underlying the step-out transaction. Whether those trades are rightfully included in Bracebridge's claims will turn on whether the step-out transaction was effective, an issue that is present in the Adversary Proceeding.

18. On July 31, 2012, the Committee issued a third-party subpoena to Bracebridge's investment manager, seeking documents relating to the step-out transaction. *See* Mot. at ¶ 20. Bracebridge refused to produce documents in response to the subpoena, asserting that it would not do so until Lehman agreed to engage in discovery with respect to all of Bracebridge's claims.

## ARGUMENT

19. Bracebridge seeks to consolidate its entire contested matter with the Adversary Proceeding pursuant to Federal Rule of Civil Procedure 42(a). Fed. R. Civ. P. 42(a); *see also* Fed. R. Bankr. P. 7042 (applying Federal Rule 42(a) in adversary proceedings).

20. While the Court "has broad discretion to determine whether consolidation … [is] appropriate," *In re MF Global Holdings, Ltd.*, 464 B.R. 619, 623 (Bankr. S.D.N.Y. 2012), Federal Rule of Civil Procedure 42(a) requires that the actions to be consolidated must involve common questions of law or fact. *See* Fed. R. Civ. P. 42(a); *In re Repetitive Stress Injury Litig.*,

8

11 F.3d 368, 373-74 (2d Cir. 1993) (finding abuse of discretion in consolidating actions where there was insufficient commonality of fact and law). The Court must also consider:

> whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*In re MF Global Holdings*, 464 B.R. at 623 (citing *Johnson v. Celotex Corp.,* 899 F.2d 1281, 1285 (2d Cir. 1990)). When cases involve some common issues (as here) but individual issues nonetheless predominate (also as here), consolidation should be denied. *Banacki v. Onewest Bank, FSB*, 276 F.RD. 567, 572 (E.D. Mich. 2011) (denying consolidation where individual issues "overshadowed" common questions). The party bringing a motion for consolidation (*e.g.*, Bracebridge) has the burden of showing commonality in the cases sought to be combined. *Fisch v. Consulate Gen. of Republic of Poland*, 2011 WL 3847398, at *1 (S.D.N.Y. Aug. 30, 2011).

21.     Here, Bracebridge asserts that its claims and the Adversary Proceeding raise many of the same facts and legal issues. *See* Mot. at ¶ 37. That assertion is incorrect. The two actions share only one commonality—the step-out transaction—to which Plaintiffs do not oppose Bracebridge's intervention. Setting aside the step-out transaction, consolidation would require Plaintiffs to litigate hundreds of trades that have nothing to do with the claims already in this case. Those trades would be on top of tens of thousands of trades that Plaintiffs are already litigating with Citi. Moreover, Bracebridge's assertion that there is commonality because Bracebridge's derivative trades are likely similar to Citi's derivative trades ignores the fact that the Adversary Proceeding is much more than Citi's claims litigation against the Estate; it also involves avoidance and common-law claims relating to a purported parent-level guaranty and

9

over $2.5 billion in cash that Citi extracted from Lehman before the bankruptcy, among other things.

22. Bracebridge also argues that there are common issues because most of its derivative claims involve RMBS derivative transactions. *Id.* at ¶ 36. Even so, that only shows that there is commonality *within* Bracebridge's claims. It does not show that Bracebridge's claims involve common issues with either Citi's derivative claims or Plaintiffs' avoidance claims in the Adversary Proceeding. Tellingly, apart from the step-out transaction, Bracebridge does not identify any issues common to those here, other than the fact that the claims would all involve derivative trades. But under that standard, there would be nothing to prevent consolidation of all the derivatives claims filed against the Estate by all of the remaining Lehman counterparties whose claims have not yet been resolved.

23. Because there are no common issues other than those relating to the step-out transaction, full consolidation will not result in substantial efficiencies. To the contrary, Lehman will have to engage in fact discovery regarding the remainder of the trades underlying Bracebridge's claims, which would be in addition to the considerable workload Lehman is already undertaking just with respect to Citi. This would result in Lehman having to collect documents it otherwise would not have to, depose Bracebridge witnesses that are unrelated to the step-out transaction, and, even if, as Bracebridge would have it, all of its witnesses on the step-out transaction would be the same on its other claims, Lehman would still have to depose those witnesses on topics unrelated to the Adversary Proceeding for a longer time than if it were deposing them on just the step-out transaction. Moreover, none of this considers the impact that consolidation might have on added expert discovery. Nor would consolidation conserve judicial resources as the Court will have to address issues unique to Bracebridge's claims.

24. By contrast, the only benefit to consolidation would be to allow Bracebridge to jump ahead of other creditors and have its claims litigated now. As Bracebridge's Motion makes clear, Bracebridge seeks consolidation so that it can take discovery against Lehman in respect of all its claims. This desire to take discovery against Lehman was also the same reason Bracebridge refused to respond to a valid third-party subpoena that the Committee served on it in the Adversary Proceeding. To Bracebridge, discovery from Lehman was a *quid pro quo* to Bracebridge complying with its third-party discovery obligations.

25. Surely, Bracebridge seeks as early a resolution to its claims as possible having filed $262 million in claims in the bankruptcy. But consolidation for that reason would only encourage other creditors to seek an end-run-around the Claims Procedure Order as well. That Order implemented Claims Hearing Procedures and ADR Procedures so that Lehman could manage its limited resources in addressing the cascade of claims filed against the Estate without resorting in each case to an adversarial litigation before this Court. *See* Order at 1 ("… and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest …"). Permitting Bracebridge to interject its claims here would thus result in unequal treatment among creditors.

26. Because questions relating to the step-out transaction remain a gating issue between Bracebridge and Lehman that prevents those parties from exploring a possible out-of-court resolution of the Bracebridge claims, a sensible alternative to complete consolidation would be to permit Bracebridge to intervene solely to the extent its claims overlap with the Adversary Proceeding, namely the step-out transaction. Bracebridge, Lehman and Citi could all engage in discovery on that limited issue, and ultimately submit it to the Court for a determination as to whether the step-out transaction was effective. Bracebridge and Lehman

11

could then resume discussions in accordance with the Claims Procedure Order. Allowing Bracebridge to intervene in this way is within the Court's discretion. *See* 8 James W. Moore et al., *Moore's Federal Practice* § 42.10 (3d ed. 2008) ("Discretion extends to the very form that consolidation takes."); *In re Air Crash Disaster at Detroit Metro. Airport*, 737 F. Supp. 391, 393-95 (E.D. Mich. 1989) (consolidating multiple actions for a limited purpose). But there is no justification for allowing Bracebridge to inject litigation of over 800 additional, unrelated trades into this case.

*  *  *

27. Finally, Bracebridge's Motion is deficient in one additional respect. Bracebridge brings the Motion pursuant to Federal Rule of Civil Procedure 24, among others. Rule 24(c) expressly requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). No such pleading accompanied the Motion. Thus, Plaintiffs' consent to Bracebridge's limited intervention as described here is predicated on Bracebridge complying with Rule 24(c) and submitting a pleading in respect of the step-out transaction. The Motion should not be partially granted as requested here unless Bracebridge is also ordered to comply with Rule 24(c).

## CONCLUSION

28. For these reasons, Plaintiffs respectfully request that the Court partially grant the Motion only to permit Bracebridge to intervene on the limited issue relating to the step-out transaction. The Motion should be denied in all other respects.

29. In addition, to the extent Bracebridge is so permitted to intervene, Plaintiffs also respectfully request that the Court order Bracebridge to submit a pleading setting forth its claims or defenses in intervention in respect of the step-out transactions, as required under Federal Rule of Civil Procedure 24(c), as made applicable by Federal Rule of Bankruptcy Procedure 7024.

Dated: March 8, 2013
New York, New York

Respectfully submitted,

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By: */s/ Turner P. Smith*
Turner P. Smith
L.P. Harrison 3rd
Andrew H. Seiden
Peter J. Behmke
101 Park Avenue
New York, New York 10178
(212) 696-6000

*Counsel for Lehman Plaintiffs*

**QUINN EMANUEL URQUHART &
 SULLIVAN, LLP**

By: */s/ Andrew J. Rossman*
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010

13

(212) 849-7000

*Special Counsel for Intervenor-Plaintiff,*
*Official Committee of Unsecured Creditors*
*of Lehman Brothers Holdings Inc.*