WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
Christopher J. Cox

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**NOTICE OF MOTION PURSUANT TO**
**RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF**
**THE BANKRUPTCY CODE FOR APPROVAL OF PARTIAL SETTLEMENT AGREEMENT RELATING**
**TO PEBBLE CREEK LCDO**
**2007-3, LTD. CREDIT DEFAULT SWAP AGREEMENT AND INDENTURE**

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated as of

March 8, 2013 (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI" or the "Plan

Administrator") as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and its Affiliated Debtors, on behalf of itself and Lehman

Brothers Special Financing Inc. ("LBSF"), pursuant to section 105(a) of title 11 of the United

States Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for authorization and

approval of the partial settlement among LBSF, LBHI, Pebble Creek LCDO 2007-3, Ltd., Pebble

Creek LCDO 2007-3, LLC, ABS Libor Fund, Ltd., and U.S. Bank National Association, as

Trustee (the "Trustee"), as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **April 24, 2013 at 10:00 a.m. (Prevailing Eastern**

**Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, and shall be filed

with the Bankruptcy Court electronically in accordance with General Order M-242 (which can

be found at *www.nysb.uscourts.gov*) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:

Jacqueline Marcus, Esq., and Sujan H. Trivedi, Esq., attorneys for the Plan Administrator; (iii)

the Office of the United States Trustee for Region 2 (the "U.S. Trustee"), 33 Whitehall Street,

21st Floor, New York, New York 10004, Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini,

Esq., and Andrea B. Schwartz, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1850 K

Street NW, Suite 1100, Washington, District of Columbia 20006, Attn: David S. Cohen, Esq.,

attorneys for the official committee of unsecured creditors appointed in these cases; and (v)

Chapman and Cutler LLP, 111 West Monroe Street, Chicago, Illinois 60603, Attn: Franklin H.

Top, III, Esq., and Scott A. Lewis, Esq., attorneys for U.S. Bank National Association, as

Trustee, so as to be so filed and received no later than **April 17, 2013 at 4:00 p.m. (prevailing**

**Eastern Time) (the "Objection Deadline").**

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: New York, New York
        March 8, 2013

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Christopher J. Cox
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

3

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
Christopher J. Cox

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
              Debtors.                    :    (Jointly Administered)
                                          :
-----------------------------------------------------------------x
```

## MOTION PURSUANT TO
## RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
## AND SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL
## OF PARTIAL SETTLEMENT AGREEMENT RELATING TO PEBBLE CREEK
## LCDO 2007-3, LTD. CREDIT DEFAULT SWAP AGREEMENT AND INDENTURE

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator") as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan"), on behalf of itself and Lehman Brothers

Special Financing Inc. ("LBSF" and, collectively with its non-debtor affiliates, "Lehman"),

submits this motion (the "Motion") and respectfully represents:

## Relief Requested

1.    By this Motion, pursuant to Rule 9019(a) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and section 105(a) of title 11 of the United

States Code (the "Bankruptcy Code"), the Plan Administrator on behalf of itself and LBSF seeks

approval of a partial settlement, the terms of which are reflected in a settlement agreement (the

"Settlement Agreement"), and requests that such approval be immediately effective and

enforceable.  The Settlement Agreement partially resolves certain disputes relating to a credit

default swap transaction (the "Transaction") described below and is among LBSF, LBHI, Pebble

Creek LCDO 2007-3, Ltd., as Issuer (the "Issuer"), Pebble Creek LCDO 2007-3, LLC, as Co-

Issuer (the "Co-Issuer"), ABS Libor Fund, Ltd. (the "Libor Fund") and U.S. Bank National

Association ("U.S. Bank" or the "Trustee"), solely in its capacity as trustee under an indenture,

dated July 19, 2007 (the "Indenture") (LBSF, LBHI, the Issuer, the Co-Issuer, the Libor Fund

and the Trustee are each a "Party" and collectively are referred to as the "Parties").

## Background

2.    Commencing on September 15, 2008, and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LBSF,

commenced with this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11

of the Bankruptcy Code.

3.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

2

4.    On September 17, 2009, the Court entered the *Alternative Dispute*

*Resolution Procedures Order for Affirmative Claims of Debtors under Derivatives Contracts*

[ECF No. 5207] (the "ADR Procedures Order").

5.    On March 3, 2011, the Court entered the *Alternative Dispute Resolution*

*Procedures Order for Affirmative Claims of the Debtors under Derivatives Transactions with*

*Special Purpose Vehicle Counterparties* [ECF No. 14789] (the "SPV ADR Procedures Order").

6.    On December 6, 2011, the Court approved and entered an order

confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.

## Jurisdiction

7.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## The Credit Default Swap Agreement and Indenture

8.    LBSF and the Issuer entered into the Transaction pursuant to a 1992 form

ISDA Master Agreement, dated as of July 19, 2007 (the "ISDA Master Agreement"), a schedule,

dated July 19, 2007 (the "Schedule"), and a confirmation, dated July 19, 2007 (the

"Confirmation").  LBHI executed a guarantee, dated as of July 19, 2007 (the "Guarantee" and,

together with the Master Agreement, Schedule, and Confirmation, the "Credit Default Swap

Agreement")[1] of LBSF's obligations under the ISDA Master Agreement, Schedule and

Confirmation.

9.    Under the Credit Default Swap Agreement, LBSF agreed to make periodic

payments to the Issuer in exchange for the Issuer's promise to make payments to LBSF in

---

[1] Copies of the Credit Default Swap Agreement and the Indenture are attached hereto as Exhibits
"A" and "B," respectively.  Capitalized terms not otherwise defined herein have the meaning
ascribed to them in the Credit Default Swap Agreement or Indenture, as applicable.

respect of losses incurred in respect of certain specified reference obligations. In effect, LBSF, as the "Swap Counterparty," purchased protection from the Issuer, which sold protection on the creditworthiness of the obligations referenced in the Credit Default Swap Agreement.

10.    The Issuer issued various classes of notes (the "<u>Notes</u>") under the Indenture and preference shares under a shares paying agency agreement (the "<u>Preference Shares</u>" and, together with the Notes, the "<u>Securities</u>"). The Notes were secured by a pool of collateral (the "<u>Collateral</u>") that also secured the Credit Default Swap Agreement. Through a series of note purchases, LBSF is now both a holder of certain of the notes and the Swap Counterparty under the Credit Default Swap Agreement (in such latter capacity, the "<u>Swap Counterparty</u>"). The Issuer pledged the Collateral to the Trustee for the benefit and security of the holders of the Notes (the "<u>Noteholders</u>"), which now include LBSF, and to LBSF, in its capacity as Swap Counterparty. The Trustee continues to hold the Collateral under the Indenture for the benefit of the holders of the Notes (including LBSF) and LBSF as Swap Counterparty.

11.    Under the Granting Clause of the Indenture, the Issuer granted to the Trustee, for the benefit and security of the secured parties, all of its right, title and interest, whether now owned or hereafter acquired, in, to and under, *inter alia*, the Issuer's rights under the Credit Default Swap Agreement, the Collateral, and substantially all other assets of the Issuer.

12.    Under the terms of the Indenture, the Trustee applies payment proceeds received generally in accordance with a "waterfall" provision. *See* Indenture § 11.1. Section 11.1(B)(i) clause "third" of the Indenture provides that a termination payment owed to LBSF as Swap Counterparty will be paid in advance of any distributions to Noteholders unless, *inter alia*, LBSF is the defaulting party under the Transaction. *See id.* § 11.1(B)(i). Under clause "second"

4

of Section 11.1(B)(xv), if, *inter alia*, LBSF is the defaulting party under the Transaction, the

termination payment owed to LBSF is paid after the Noteholders and before the holders of

Preference Shares. *See id.* § 11.1(B)(xiv). As a result, Section 11.1(B)(i) clause "third" and

Section 11.1(B)(xv) clause "second" of the Indenture (the "Waterfall Provisions") purport to

provide that LBSF will receive termination payments before any distributions are made to

Noteholders unless, *inter alia*, LBSF is the defaulting party under the Transaction.

## The Dispute

13.     Since the Commencement Date, neither LBSF as Swap Counterparty nor

the Trustee has paid any amounts that have become due under the Indenture and the Credit

Default Swap Agreement.  On November 28, 2008, the Issuer sent to LBSF a "Notice of Early

Termination" which terminated the Transaction as of November 28, 2008.   On November 25,

2008, the Trustee received a letter from LBSF's counsel advising, *inter alia*, that (a) any action

taken to exercise remedies with respect to the Notes would violate the automatic stay and,

therefore, any actions to make distributions to Noteholders would violate the stay, and (b) any

provision subordinating any termination payment due LBSF would be unenforceable.  As a result

of LBSF's dispute regarding, among other things, the enforceability of the Waterfall Provisions

(the "Payment Dispute"), neither party to the Credit Default Swap Agreement has paid any

amounts (including termination payments) that became due to the other party on or after

November 28, 2008.

14.     On April 20, 2010, LBSF commenced Derivatives ADR No. 157 by

serving an ADR Notice upon the Trustee and the Issuer pursuant to the ADR Procedures Order.

On June 4, 2010, the Trustee served an ADR Response upon LBSF as required by the ADR

Procedures Order.

15.    On September 14, 2010, LBSF filed a complaint against, among others, the Trustee and the Issuer. *See* Adversary Proceeding No. 10-03542-JMP (the "Litigation"). At issue in Derivatives ADR No. 157 and in the Litigation is the Payment Dispute, including questions as to the proper interpretation of the Credit Default Swap Agreement and the Indenture. The Litigation relates to the instant Payment Dispute among the Parties, as well as other similar disputes involving other issuers and trustees.

16.    In the Litigation, LBSF seeks a declaratory judgment that provisions purporting to modify LBSF's economic rights to a termination payment premised on the bankruptcy filing of either LBHI or LBSF constitute unenforceable *ipso facto* clauses that inappropriately modify a debtor's interest in property, in violation of sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code. LBSF also seeks a declaratory judgment that effectuation of the Waterfall Provisions violates the automatic stay under section 362(a)(3) of the Bankruptcy Code because it involves an improper exercise of control over property of LBSF's estate. *See generally Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31 (Bankr. S.D.N.Y. 2011); *Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010). In the alternative, LBSF seeks a declaratory judgment that, if the Waterfall Provisions ultimately are found to be enforceable in whole or in part, they constitute either (i) a preferential transfer of an interest of LBSF in property that may be avoided under section 547 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; (ii) a constructive fraudulent transfer of an interest of LBSF in property that may be avoided under section 548(a)(1)(B) of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the

6

benefit of LBSF's estate under section 551 of the Bankruptcy Code; or (iii) an unauthorized

postpetition transfer of property of LBSF's estate that may be avoided under section 549 of the

Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the

benefit of LBSF's estate under section 551 of the Bankruptcy Code.  The positions advanced by

LBSF in the Litigation are not those of the Trustee.

      17.    The Court issued the *Order Staying Avoidance Actions and Granting*

*Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule*

*7004(a)(1)*, dated October 20, 2010 [ECF No. 12199], thereby staying the Litigation, to give

parties to this and other similar actions time to attempt to resolve their disputes (the "Stay").  The

Court has extended the Stay numerous times, most recently pursuant to the *Order Extending Stay*

*of Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the*

*Bankruptcy Code and Bankruptcy Rule 7004(a)(1)*, dated February 13, 2013 [ECF No. 34697],

which extended the Stay until July 20, 2013.  Accordingly, as a result of the Stay, the Issuer and

the Trustee have not answered or otherwise moved for any relief in the Litigation.

      18.    On April 1, 2011, LBSF submitted an SPV Derivatives ADR Election

pursuant to which LBSF recommenced the ADR process under the SPV ADR Procedures Order.

The Trustee served an amended ADR Response on June 13, 2011, and LBSF served its ADR

Reply on July 5, 2011.  LBSF and the Trustee participated in mediation pursuant to the ADR

process on December 7, 2012.  At various junctures following the commencement of the

Litigation and through and including the mediation, LBSF and the Trustee have engaged in

settlement discussions.

      19.    Throughout the course of its settlement negotiations with LBSF and its

participation in the Litigation, the Trustee has made numerous attempts to contact Noteholders

7

and holders of Preference Shares for direction regarding the Payment Dispute and the application of proceeds from the sale of the Collateral.[2]  However, with limited exceptions, Noteholders and holders of Preference Shares have not adequately responded to the Trustee's communications. As a result, the Trustee has advised LBSF that it is prepared to enter into the Settlement Agreement, provided the Court approves of the terms of the Settlement Agreement pursuant to the terms of Bankruptcy Rule 9019.  Entry of an order by this Court, in the form annexed hereto, is a condition precedent to the effectiveness of the Settlement Agreement.

## The Settlement Agreement[3]

20.    The salient terms of the Settlement Agreement are as follows:

a. The Issuer and the Trustee shall take such actions as shall be necessary to cause certain assets held in respect of the Collateral to be redeemed or otherwise liquidated, and to cause the net proceeds thereof to be deposited with the Trustee (the "Investment Proceeds"), for further application as set forth below.

b. Notwithstanding any provision to the contrary in the Indenture, the Trustee shall distribute and apply the Investment Proceeds, as well as certain other amounts as set forth in the Settlement Agreement, as follows, and in the following order and priority:

1. Pay the outstanding fees and expenses of the Trustee.

2. Because this settlement is only partial and does not include all Noteholders, place into an interest-bearing account an

---

[2] The Parties will file an affidavit detailing the Trustee's attempts to contact Noteholders and holders of Preference Shares in advance of the hearing on this Motion.

[3] In keeping with the confidentiality provisions of the Parties' partial settlement, and due to LBHI's and LBSF's desire to keep the economic terms of the settlement confidential, the Settlement Agreement is not included as an exhibit to this Motion.  The Parties will provide the Settlement Agreement to the Court, the U.S. Trustee, and the Creditors' Committee. Noteholders and holders of Preference Shares must contact the Trustee for copies of the Settlement Agreement and, before receiving any such copies, such Noteholders or holders of Preference Shares will be required to execute an agreement binding them to the confidentiality restrictions of the parties' partial settlement, including paragraph 13 of the SPV ADR Procedures Order.

8

amount to be held in respect of a reserve, which the Trustee may use for fees and expenses as enumerated in the Settlement Agreement, which amount may be invested in Eligible Investments as defined in the Indenture (the "Reserve Amount").

3. Place, into an account with the Trustee, which may be invested in Eligible Investments as defined in the Indenture, an amount (the "Escrow Amount") to secure payment of the claims of the Noteholders other than LBSF.

4. Upon LBSF's delivery of its Notes to the Trustee as set forth in the Settlement Agreement, pay the remaining amount (the "Settlement Amount") to LBSF.

c. LBSF retains all rights as Noteholder or Swap Counterparty except as otherwise explicitly set forth in the Settlement Agreement.

d. To the extent that LBSF subsequently purchases Notes that it does not currently hold, commensurate *pro rata* amounts will be deducted from the Escrow Amount and paid to LBSF.

e. Distribution of any remaining Escrow Amount and any remaining Reserve Amount to LBSF will be subject to certain conditions set forth in the Settlement Agreement.

f. LBSF, solely in its capacity as Noteholder, agrees not to assert that it is entitled to be paid on a senior or *pari passu* basis with the Notes that it does not hold (but LBSF reserves the right to assert that it is entitled to be paid amounts owing under the Notes it owns on a junior basis to the Notes it does not own and in an amount not to exceed the lesser of (a) the unpaid amount of principal and interest due on the Notes that LBSF owns (after taking into account the Settlement Payment or applicable Subsequent Settlement Payment, as the case may be, to the extent any such payment is deemed to be a payment under the Notes that LBSF owns, as the case may be), or (b) the then remaining Escrow Amount).

g. LBSF and the Plan Administrator acknowledge and agree that they, and any agents and assigns thereof, as applicable, will only seek payment for damages and other relief, including interest thereon, with respect to or in connection with the Transaction (including, without limitation, any termination payment), the Notes, the Preference Shares, the Indenture and/or the Credit Default Swap Agreement in the adversary proceeding, *Lehman Brothers Special Financing Inc. v. U.S. Bank National Association,*

9

*et al.*, Adversary Proceeding No. 10-3542 (JMP), pending in the
United States Bankruptcy Court for the Southern District of New
York, in an aggregate amount not greater than the then remaining
Escrow Amount.

## The Partial Settlement Is in LBSF's Best Interests and Should Be Approved

21.     The Plan Administrator on behalf of itself and LBSF submits that the

Settlement Agreement is in LBSF's best interests and should be approved under Rule 9019 of the

Bankruptcy Rules.  Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after

notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R.

9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best

interests of the estate." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr.

S.D.N.Y. 1991).  The settlement need not result in the best possible outcome for the debtor, but

must not "fall beneath the lowest point in the range of reasonableness." *Id.*; *see also Cosoff v.

Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R.

133, 144 (Bankr. E.D.N.Y. 1997).

22.     Compromises are "a normal part of the process of reorganization." *Prot.

Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424

(1968) (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

Compromises may be effected separately during the reorganization proceedings or in the body of

the plan itself. *In re Drexel Burnham Lambert Group Inc.*, 138 B.R. at 758.  The decision to

approve a particular compromise lies within the sound discretion of the Court. *See Nellis v.

Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  The Court's discretion may be exercised "in light

of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R.

41, 46 (Bankr. S.D.N.Y. 1998).  A proposed compromise and settlement implicates the issue of

whether it is "fair and equitable, and in the best interest of the [debtor's] estate." *In re Best*

10

*Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted). The court must

apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the

probabilities of ultimate success should the claim be litigated." *Prot. Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. at 424.

      23.    Courts typically consider the following factors in determining whether a

settlement should be approved: (i) the probability of success in litigation, with due consideration

for the uncertainty in fact and law; (ii) the difficulties of collecting any litigated judgment;

(iii) the complexity and likely duration of the litigation and any attendant expense,

inconvenience, and delay; (iv) the proportion of creditors who do not object to, or who

affirmatively support, the proposed settlement; (v) the competence and experience of counsel

who support the settlement; (vi) the relative benefits to be received by members of any affected

class; (vii) the extent to which the settlement is truly the product of arm's-length bargaining and

not the product of fraud or collusion; and (viii) the debtor's informed judgment that the

settlement is fair and reasonable. *See Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc.*, 390 U.S. at 424; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y.

1998); *In re Best Prods. Co.*, 168 B.R. at 50.

      24.    While a court must "evaluate . . . all . . . factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *Cosoff v. Rodman (In re*

*W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), or conduct a full independent investigation.

*Drexel Burnham Lambert Group*, 134 B.R. at 496. Moreover, in reviewing a global

compromise, a court need not be aware of or decide the particulars of each individual claim

resolved by the settlement or "assess the minutia of each and every claim"; rather, a court "need

11

only canvass the issues and see whether the settlement falls 'below the lowest point in the range

of reasonableness.'" *Shugrue*, 165 B.R. at 123. As one court explained in assessing a global

settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its*

*entirety* is appropriate for the . . . estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust*

*Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d

Cir. 1993) (emphasis added).

25.      Here, the partial settlement will benefit LBSF and its creditors by allowing

LBSF to capture a substantial amount of the value of the Transaction and the Notes that it owns

for its estate. The partial settlement will not resolve the Payment Dispute: LBSF retains the right

to maintain its positions in respect of the Payment Dispute in the Litigation or elsewhere, subject

to the limitations as to the amount of its recovery set forth in the Settlement Agreement.

Regardless, in the Plan Administrator's informed business judgment, the compromises set forth

in the Settlement Agreement are "fair and equitable," are well within the "range of

reasonableness," and are in the best interests of LBSF's estate and its creditors. Accordingly, the

Plan Administrator requests that the Settlement Agreement be approved, effective immediately

upon entry of an order granting the relief requested herein.

### The Bankruptcy Court Has Authority Pursuant to
### Section 105(a) of the Bankruptcy Code to Approve the Settlement Agreement

26.      The Parties seek approval of the Settlement Agreement pursuant to section

105(a) of the Bankruptcy Code so that the Collateral may be liquidated and disposed of as set

forth in the Settlement Agreement. This Court has authority under the broad equitable powers of

the Bankruptcy Code, as set forth in section 105(a), to approve the Settlement Agreement.

Courts have used their equitable powers to permit deviations in trust agreements in order to

preserve and protect a trust or where circumstances exist that would defeat or substantially

12

impair the accomplishment of the purposes of the trust. *See, e.g., In re A.H. Robbins*, 880 F.2d

769, 776 (4th Cir. 1989) (noting that section 105(a) authorizes the court to "issue any order,

process or judgment that is necessary or appropriate to carry out the provisions" of the

Bankruptcy Code and finding that matters relating to the control and supervision of trusts are

within the equity jurisdiction of the court); *In re Joint Eastern and Southern Districts Asbestos

Litigation*, 878 F. Supp 473 (E.D.N.Y. & S.D.N.Y. 1995) and 129 B.R. 710 (E.D.N.Y. &

S.D.N.Y. 1991) (holding that section 105(a) authorizes the federal courts in bankruptcy cases to

approve a settlement modifying distributions, obligations, and payment procedures under a trust).

Similarly here, the Court has authority under section 105(a) of the Bankruptcy Code to direct the

Trustee to deviate from the terms of the Indenture, where strict adherence to the terms of the

Indenture would frustrate the Issuer's economic stakeholders from realizing the value of their

interests in the Collateral held under the Indenture by the Trustee for the benefit of the

Noteholders, including LBSF.

27.    This Court has granted relief in these chapter 11 cases, pursuant to section

105(a) of the Bankruptcy Code, similar to the relief requested in the Motion. The Trustee, as

indenture trustee under several other indentures, filed a motion, dated January 28, 2010 [ECF

No. 6811] (the "U.S. Bank Motion"), pursuant to section 105(a), for authorization, among other

things, for the disposition of the assets of the Lehman Brothers ABS Enhanced Libor Fund (the

"Feeder Fund") through the exchange of the units in the Feeder Fund for shares in the Lehman

Brothers ABS Enhanced Libor, Ltd. (the "Master Fund") and the transfer of the rights to manage

the Master Fund's portfolio to TCW Asset Management Company. On March 25, 2010, this

Court entered an order, pursuant to section 105(a) of the Bankruptcy Code, approving the U.S.

Bank Motion [Docket No. 7830]. Similarly, by order dated August 16, 2012 [ECF No. 30096],

13

the Court, *inter alia*, approved a settlement among LBSF and Gemstone CDO VI Ltd., Gemstone

CDO VI Corp., and Deutsche Bank Trust Company Americas, and authorized Deutsche Bank

Trust Company Americas, as trustee, to take certain action in order to effectuate the terms of the

settlement.

28.     The use of the Court's equitable authority is justified and appropriate.

First, LBSF is entitled to the Settlement Amount either in its capacity as Swap Counterparty or in

its capacity as Noteholder and, as a result, payment of the Settlement Amount to LBSF is

appropriate regardless of the outcome of the Payment Dispute.  Second, the Settlement

Agreement protects the interests of other Noteholders by providing for the reservation of the

Escrow Amount, which the Plan Administrator and LBSF believe is sufficient to pay the claims

of the Noteholders other than LBSF, and the Reserve Amount, which the Trustee may use for

fees and expenses as enumerated in the Settlement Agreement.  Third, regardless of the outcome

of the Payment Dispute, the payment rights of the holders of Preference Shares will be

subordinated to those of both the Noteholders and LBSF, as Swap Counterparty; as a result, the

holders of Preference Shares should be indifferent to the approval of the Settlement Agreement

because they will not receive a payment under the waterfall under any scenario.  Moreover, any

interested parties that may object to the terms of the Settlement Agreement will have the

opportunity to lodge an objection with and be heard by this Court.

### Notice

29.     No trustee has been appointed in these chapter 11 cases.  The Plan

Administrator has served notice of this Motion in accordance with the procedures set forth in the

second amended order entered on June 17, 2010, governing case management and administrative

procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee for Region 2; (ii) the

Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States

14

Attorney for the Southern District of New York; (v) the attorneys for the Trustee; and (vi) all

parties who have requested notice in the Chapter 11 Cases.  The Plan Administrator submits that

no other or further notice need be provided.

    30. No previous request for the relief sought herein has been made by the Plan

Administrator to this or any other court.

    WHEREFORE the Plan Administrator on behalf of itself and LBSF respectfully

requests that the Court grant the relief requested herein and such other and further relief as it

deems just and proper.

Dated: New York, New York
   March 8, 2013       /s/  Jacqueline Marcus
                Jacqueline Marcus
                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone: (212) 310-8000
                Facsimile: (212) 310-8007

                Christopher J. Cox
                WEIL, GOTSHAL & MANGES LLP
                201 Redwood Shores Parkway
                Redwood Shores, California 94065
                Telephone: (650) 802-3000
                Facsimile: (650) 802-3100

                *Attorneys for Lehman Brothers Holdings Inc.*
                *and Lehman Brothers Special Financing Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :    08-13555 (JMP)
                                          :
            Debtors.                      :    (Jointly Administered)
                                          :
----------------------------------------------------------------x

## ORDER PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE APPROVING PARTIAL SETTLEMENT AGREEMENT RELATING TO PEBBLE CREEK LCDO 2007-3, LTD. CREDIT DEFAULT SWAP AGREEMENT AND INDENTURE

Upon the motion, dated March 8, 2013 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI" or the "Plan Administrator") as Plan Administrator under the Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors, on behalf of itself and Lehman Brothers Special Financing Inc. ("LBSF"), pursuant to

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section

105(a) of title 11 of the United States Code (the "Bankruptcy Code") for approval of a partial

settlement agreement (the "Settlement Agreement") among LBSF, LBHI, Pebble Creek LCDO

2007-3, Ltd., Pebble Creek LCDO 2007-3, LLC, ABS Libor Fund, Ltd., and U.S. Bank National

Association, as Trustee (the "Trustee"), relating to a credit default swap agreement and an

indenture, all as more fully described in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and

the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided in accordance with the

procedures set forth in the amended order entered on June 17, 2010, governing case management

and administrative procedures for these cases [ECF No. 9635] on (i) the U.S. Trustee for Region

2; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the

United States Attorney for the Southern District of New York; (v) the attorneys for the Trustee;

and (vi) all parties who have requested notice in the Chapter 11 Cases, and it appearing that no

other or further notice need be provided; and a hearing (the "Hearing") having been held to

consider the relief requested in the Motion; and the Trustee having provided reasonable notice to

the Noteholders and the Preference Shareholders; and the Court having found and determined

that the relief sought in the Motion is in the best interests of LBSF, its estate, its creditors, and all

parties in interest and that the legal and factual bases set forth in the Motion establish just cause

for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it

is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement is

approved; and it is further

ORDERED that LBSF is authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents and papers and to take any and all

actions reasonably necessary or appropriate to consummate the Settlement Agreement and to

perform any and all obligations contemplated therein; and it is further

ORDERED that, pursuant to section 105(a) of the Bankruptcy Code, the Trustee

is authorized and directed to take such actions as it reasonably deems necessary or appropriate to

consummate the Settlement Agreement and to perform any and all obligations contemplated

2

therein, including without limitation to cause certain assets held in respect of the Collateral[1] to be

redeemed or otherwise liquidated, and to distribute and apply the proceeds therefrom, as well as

certain other amounts that have accrued on or are otherwise available with respect to assets of the

Issuer, as provided for in the Settlement Agreement; and it is further

ORDERED that this Order is final, binding and effective on the Debtors, all

current and future Holders of Notes and Preference Shares, as well as the Trustee and any

successor thereto.  The Debtors and U.S. National Bank Association, in its individual capacity

and as Trustee, and its current and former officers, directors, shareholders, employees, agents,

attorneys, successors and assigns, shall be and hereby are, fully exculpated and shall not have

liability to each other, the Debtors' estates, Noteholders or Holders of Preference Shares arising

out of, relating to, or in connection with the Motion, the Settlement Agreement and this Order,

except to the extent of any obligations set forth in the Settlement Agreement that have not been

performed; and it is further

ORDERED that the terms of this Order shall be immediately effective and

enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

3

Dated: New York, New York

_____, 2013


_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

(Multicurrency–Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of July 19, 2007

**LEHMAN BROTHERS**       and       **PEBBLE CREEK LCDO 2007-3, LTD.**
**SPECIAL FINANCING INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

    (ii)   *Liability*. If: —

        (1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

        (2)   X does not so deduct or withhold; and

        (3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(e), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.**    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

    (i)   *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)   *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)   *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)   *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)   *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

        **ISDA® 1992**

(b) · **Absence of Certain Events.** No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) **Absence of Litigation.** There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) **Accuracy of Specified Information.** All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e) **Payer Tax Representation.** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f) **Payee Tax Representations.** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a) **Furnish Specified Information.** It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b) **Maintain Authorisations.** It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c) **Comply with Laws.** It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d) **Tax Agreement.** It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e) **Payment of Stamp Tax.** Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)   *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)   *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)   *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)   *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

<div align="center">7</div>

<div align="right">**ISDA® 1992**</div>

**6.    Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   ***Effect of Designation.***

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)     Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)     ***Statement.*** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)     ***Payment Date.*** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off. —

(i)     ***Events of Default.*** If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

**ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events.* If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

9.    Miscellaneous

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

> (i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

> (ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                ISDA® 1992

***"Defaulting Party"*** has the meaning specified in Section 6(a).

***"Early Termination Date"*** means the date determined in accordance with Section 6(a) or 6(b)(iv).

***"Event of Default"*** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

***"Illegality"*** has the meaning specified in Section 5(b).

***"Indemnifiable Tax"*** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

***"law"*** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and ***"lawful"*** and ***"unlawful"*** will be construed accordingly.

***"Local Business Day"*** means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

***"Loss"*** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

***"Market Quotation"*** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

**ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

**ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS                           PEBBLE CREEK LCDO 2007-3, LTD. *(Name of*
SPECIAL FINANCING INC.                                                *Party)*
*(Name of Party)*

By: _____        By: _____
Name:                                      Name:
Title:                                     Title:
Date:                                      Date:



value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS
SPECIAL FINANCING INC.
.......................................................
(Name of Party)

PEBBLE CREEK LCDO 2007-3,
LTD.
.......................................................
(Name of Party)

By: .......................................................
    Name:
    Title:
    Date:

By: .......................................................
    Name:  Dianne Scott
    Title:  Director
    Date:

ISDA® 1992

This ISDA Document is protected by copyright law. No electronic copy may be copied, published, transmitted, transferred, sold, distributed or displayed, except in accordance with the Terms and Conditions agreed to by your firm.

(Multicurrency-Cross Border)

## SCHEDULE
to the Master Agreement
dated as of July 19, 2007
between
**LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),**
a corporation organized under
the laws of the State of Delaware
and
**PEBBLE CREEK LCDO 2007-3, LTD. ("Party B"),**
a segregated portfolio company with limited liability incorporated under
the laws of the Cayman Islands

*All terms capitalized used and not otherwise defined are given the meaning ascribed to them in the Indenture, dated as of July 19, 2007, among Party B, as Issuer, Pebble Creek LCDO 2007-3 LLC), as Co-Issuer and U.S. Bank Trust National Association, as Trustee (the "Indenture").*

**Part 1. Termination Provisions.**

In this Agreement:-

(a)  **"Specified Entity"** means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable. |
| Section 5(a)(vi) | Not Applicable. |
| Section 5(a)(vii) | Not Applicable. |
| Section 5(b)(iv) | Not Applicable. |

(b)  **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)  **Payments on Early Termination.** If an Early Termination Date is designated hereunder, Market Quotation and Second Method shall be used to calculate any termination payment owing by either party in respect of such Early Termination Date. If an Early Termination Date is designated and any termination payment is owed by Party B, such termination payment shall be paid on the first Payment Date on or after the Early Termination Date in accordance with the Priority of Payments set forth in the Indenture.

(d)  The following shall be specified as an **"Additional Termination Event"** pursuant to Section 5(b)(v):

(i)  **Event of Default Under the Indenture.** An event of default under the Indenture has occurred and is continuing and the Trustee has proceeded to liquidate the Collateral, or the Notes are redeemed on any Payment Date prior to the Termination Date, and in each

19

case such acceleration or redemption, as applicable, is no longer capable of being rescinded or revoked. For the purpose of this Additional Termination Event (1) subject to the last sentence of this Part 1(d)(i) the Affected Party shall be Party B, (2) all Transactions shall be Affected Transactions, and (3) any amount payable in respect of such event shall be payable on the immediately following Payment date. Party A shall be the Affected Party if the event of default was directly and exclusively caused by a Failure to Pay by Party A pursuant to this Agreement that was not cured by Party A.

(ii)    **Failure to Post Collateral by Party A.**  On any day, Party A fails to post the required Credit Swap Posted Amount and such failure is not cured for a period of 10 Business Days Party A shall be the Affected Party.  For the purpose of this Additional Termination Event, Party A shall be the Affected Party.

(iii)   **Supplemental Indentures without Party A's Prior Written Consent.**  Party B enters into a supplemental indenture or other modification to the Indenture without at least ten (10) Business Days' prior notice to Party A and the prior written consent of Party A. For the purpose of the foregoing Termination Event, Party B shall be the sole Affected Party.

(e)    The provisions of Section 5(a) (as modified by (c) above) and Section 5(b) (as modified by (d) above) will apply to Party A and to Party B as follows:-

| Section 5(a) | | Party A | Party B |
|---|---|---|---|
| (i)    | "Failure to Pay or Deliver" | Applicable. | Applicable. |
| (ii)   | "Breach of Agreement" | Applicable. | Not Applicable. |
| (iii)  | "Credit Support Default" | Applicable. | Not Applicable. |
| (iv)   | "Misrepresentation" | Applicable. | Not Applicable. |
| (v)    | "Default under Specified Transaction" | Not Applicable. | Not Applicable. |
| (vi)   | "Cross Default" | Not Applicable. | Not Applicable. |
| (vii)  | "Bankruptcy" | Applicable. | Applicable. |
| (viii) | "Merger Without Assumption" | Not Applicable. | Not Applicable. |

provided that clause (2) of the **"Bankruptcy"** provision of Section 5(a)(vii) will not apply to Party B.

| Section 5(b) | | Party A | Party B |
|---|---|---|---|
| (i)   | "Illegality" | Applicable. | Applicable. |
| (ii)  | "Tax Event" | Not Applicable. | Not Applicable. |
| (iii) | "Tax Event Upon Merger" | Not Applicable. | Not Applicable. |
| (iv)  | "Credit Event Upon Merger" | Not Applicable. | Not Applicable. |
| (v)   | "Additional Termination Event" | Applicable. | Applicable. |

(f)    **"Termination Currency"** means United States Dollars ("USD").

(g)    **Failure to Pay or Deliver.**  Section 5(a)(i) is hereby amended by deleting the words "on or before the third Local Business Day after notice of such failure is given to the party" and substituting therefor "in the case of any such failure by Party A, on or before the fifth Local Business Day after notice of such failure is given to Party A, or in the case of any such failure by Party B, on or before the third Local Business Day after notice of such failure is given to Party B."

20

Part 2. Tax Representations.

(A)    **Payer Tax Representations.**  For the purpose of Section 3(e) of this Agreement, Party A and Party B each make the following representations:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii), or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement, and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(B)    **Payee Tax Representations.**  For the purpose of Section 3(f) of this Agreement, Party A and Party B make the following representations:

(i)    The following representation applies to Party A:-

Party A is a corporation organized under the laws of the State of Delaware.

(ii)    The following representations apply to Party B:-

(A)    Party B is an exempted company with limited liability duly organized under the laws of the Cayman Islands, and is properly classified as a corporation for United States federal income tax purposes.

(B)    Party B is (i) a "non-U.S. branch of a foreign person" as that term is used in Section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations and (ii) a "foreign person" as that term is used in Section 1.6041-4(a)(4) of the United States Treasury Regulations.

(C)    Each payment received or to be received by Party B in connection with this Agreement will not be effectively connected with its conduct of a trade or business in the United States.

(D)    Tax Representations in Confirmations.  For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

Part 3. Agreement to Deliver Documents.

For the purpose of Section 4(a)(i) and Section 4(a)(ii) of this Agreement, Party A and Party B each agrees to deliver the following documents, as applicable:-

(a)    Tax forms, documents or certificates to be delivered are:

21

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered |
|---|---|---|
| Party B | A correct, complete and executed U.S. Internal Revenue Service Form W-8BEN (or any successor thereto), including appropriate attachments. | (i) Before the first Payment Date under this Agreement, (ii) before December 31 of each third succeeding calendar year, (iii) promptly upon reasonable demand by Party A, and (iv) promptly upon learning that any such Form previously provided by Party B has become obsolete or incorrect. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement. | No |
| Party A | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party A | A guarantee of Lehman Brothers Holdings Inc. ("Holdings") substantially in the form of Exhibit D to this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement. | No |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the Board of Directors or loan committee of Party B, certified by a secretary, or an assistant secretary of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party B to Party A) and, with respect to each Transaction not covered by a previously furnished Authorizing Resolution, within five Business Days of the Trade Date. | Yes |

22

| Party required to deliver document | Form, Document or Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A copy of all reports provided by Party B to the Noteholders or S&P under the Indenture. | On the date that any such report is required to be provided to either the Noteholders or S&P under the Indenture. | Yes |
| Party B | A certified copy of the Indenture and each amendment thereof. | Upon execution of this Agreement and on the date of each amendment thereof. | Yes |
| Party B | Copy of the letter of acceptance of Party B's Process Agent. | Upon execution of this Agreement. | No |

**Part 4. Miscellaneous.**

(a)     **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A:-

Address:     Lehman Brothers Special Financing Inc.
             c/o Lehman Brothers Inc.
             Collateralized Debt Obligation
             745 Seventh Avenue
             New York, New York 10019

Attention:   Documentation Manager

Telephone:   (212) 526-5410

Facsimile:   (212) 885-9476

For all purposes.

With copies to:

Address:     Lehman Brothers Inc.
             745 Seventh Avenue
             New York, New York 10019

Attention:   Structured Products Transaction Management Group

Telephone:   (212) 526-0806
Facsimile:   (212) 834-2732

23

Address for notices or communications to Party B:-

Address:       **PEBBLE CREEK LCDO 2007-3, LTD.**
               c/o Maples Finance Limited
               P.O. Box 1093GT
               Queensgate House
               South Church Street
               Grand Cayman, Cayman Islands


Attention:     The Directors

Facsimile No:  (345) 945-7100

For all purposes.

Address for notices or communications to Maples and Calder:

Address:       Maples and Calder
               P.O. Box 309 GT
               Ugland House
               South Church Street
               Grand Cayman, Cayman Islands
               British West Indies

Attention:     Dale Crowley

Telephone:     (345) 949-8066

Facsimile No:  (345) 949-8080

Address for notices or communications to Standard & Poor's Investments Services:

Address:       Standard & Poor's Ratings Services
               55 Water Street, 41st Floor
               New York, New York 10041-0003

(b)    **Process Agent.** For the purpose of Section 13(c) of this Agreement:-

       Party A appoints as its Process Agent:       Not Applicable.

Party B appoints as its Process Agent:      U.S. Bank Trust National Association
                                            100 Wall Street, Suite 1600
                                            New York, New York, 10005
                                            Attention: **PEBBLE CREEK LCDO 2007-3, LTD.**


(c)    **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:-

       Party A is not a Multibranch Party.

       Party B is not a Multibranch Party.

(e)    **Calculation Agent.**  The Calculation Agent is Party A.

(f)    **Credit Support Document.**  Details of any Credit Support Document:-

In the case of Party A, a guarantee (the "Swap Guarantee") of Party A's obligations hereunder substantially in the form of Exhibit D attached to this Schedule.  Any amendment, modification or waiver shall require, prior to its effectiveness, Rating Agency Confirmation from S&P with respect to such amendment, modification or waiver.

In the case of Party B, not applicable.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:  Holdings.

Credit Support Provider means in relation to Party B:  Not Applicable.

(h)    **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of New York including all matters of construction, validity and performance (including Sections 5-1401 and 5-1402 of the New York General Obligations Law but excluding all other choice-of-law and conflicts-of-law rules).

(i)    **Netting of Payments.**  Section 2(c)(ii) will not apply to all Transactions.

(j)    **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however, that (i) with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc. and (ii) with respect to Party B such definition shall mean any person or entity controlled directly or indirectly by Party B.

(k)    **Jurisdiction.**  Section 13(b) is hereby amended by:  (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and deleting the final paragraph thereof.

(l)    **Set-Off.**  Set-Off does not apply to either Party A or Party B.

**Part 5. Other Provisions.**

(a)    **Confirmation.**  Each Confirmation supplements, forms part of, and will be read and construed as one with the Agreement.  A form of Confirmation is set forth as Exhibit A hereto.

(b)    **Representations.**  Section 3 is hereby amended by adding the following additional subsections:

(i)    **No Agency.**  It is entering into this Agreement, each Transaction, and any other documentation relating to this Agreement or any Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(ii)    **Eligible Contract Participant.**  It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

(iii)    **No Reliance.**  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other

25

party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communications (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(iv) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(v) **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(c) **No Bankruptcy Petition.** Party A irrevocably and unconditionally agrees that it will not, prior to the date following the payment in full of all the Notes issued pursuant to the Indenture and the redemption of any Preference Shares, as applicable, and the expiration of all applicable preference periods under the laws of the United States, the Cayman Islands or any other jurisdiction relating to any such payment, acquiesce, petition or otherwise invoke or cause Party B to invoke the process of any governmental authority for the purpose of commencing or sustaining a case (whether voluntary or involuntary) against Party B under any bankruptcy, reorganization arrangement, insolvency, moratorium, liquidation or similar law or proceeding or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Party B or any substantial part of its property or ordering the winding-up or liquidation of the affairs of Party B; provided that this provision shall not restrict or prohibit Party A from joining any other person, including, without limitation, the Trustee, in any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings already commenced or other analogous proceedings already commenced under applicable laws.

(d) **Transfer.** Section 7 is hereby amended by: (i) adding the words "(which consent may not be unreasonably withheld)" after the words "consent" on the second line thereof, (ii) adding the words "(and notice of the transferee to)" after the word "of" on the third line thereof, and (iii) adding the words "(subject to providing written notice of the transferee to the other party)" after the word "transfer" on the fourth and seventh line thereof. No transfer or assignment by Party A or Party B of its rights and obligations hereunder may be made unless Rating Agency Confirmation is received from S&P with respect to such transfer. Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate such guarantee to be substantially the same as the guarantee of the obligations of the transferor then in effect (in which case the parties will provide notice to S&P).

(e) **Amendments to Section 9 of this Agreement.** Section 9(b) of this Agreement is hereby amended by adding the following after the word "system" in the last line thereof:

"; provided, however, notwithstanding anything to the contrary in Section 9(b) of this Agreement, that no amendment, modification or waiver in respect of this Agreement will be effective unless S&P shall receive prior written notice of all such amendments, modifications or waivers; provided, further, that each such amendment, modification or waiver shall require, prior to its effectiveness, Rating Agency Confirmation from S&P with respect to such amendments, modifications or waivers.

(f) **Definitions.** Reference is made to the 2000 ISDA Definitions (the "ISDA Definitions") published by the International Swaps and Derivatives Association, Inc., which are hereby incorporated by

26

reference. For these purposes, all references in the ISDA Definitions to a "Business Day" shall be deemed references to a Local Business Day under this Agreement. In the event of any inconsistency between the provisions of this Agreement and the ISDA Definitions the provisions of this Agreement shall prevail. Any definitions included or incorporated by reference in a Confirmation shall prevail over the provisions of this Agreement, and the ISDA Definitions, for the purpose of the relevant Transaction.

(g)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)    **Indenture.** Without the prior written consent of Party A, Party B will not enter into any indenture supplemental to the Indenture or any other instrument that would amend, modify or change the Indenture. Party B will furnish to Party A a copy of each proposed and each executed supplemental indenture to the Indenture and copies of any related Rating Agency Confirmation in accordance with the terms of the Indenture.

(i)    **Limited Recourse.** Notwithstanding anything in this Agreement or any Confirmation hereunder to the contrary, all amounts, payable or expressed to be payable by Party B on, under or in respect of its obligations and liabilities under this Agreement and any Confirmation hereunder shall be recoverable only from and to the extent of sums in respect of, or calculated by reference to, the Collateral that are received by Party B pursuant to the terms and conditions thereof and the proceeds of any realization of enforcement of any Collateral, subject in any case to the Priority of Payments set out in the Indenture. Upon final realization of such sums and proceeds, neither Party A nor any person acting on its behalf shall be entitled to take any further steps against Party B to recover any sums due but still unpaid and all claims in respect of such sums due but still unpaid shall be extinguished. No recourse shall be had for the payment of any amounts owing in respect of this Agreement against any officer, director, employee, stockholder, preference shareholder or incorporator of Party B.

(j)    **No Gross Up.** Notwithstanding anything to the contrary in the Agreement, including Section 2(d) of the Master Agreement, no Tax shall be an Indemnifiable Tax with respect to payments made by Party A and therefore Party A shall have no obligation to pay an additional amount otherwise required under Section 2(d)(i)(4) of the Master Agreement.

(k)    **Excise Tax Resulting From Change in Law.** All references in Section 2(d) to deduction or withholding for or on account of any Tax shall include the payment of any excise tax, including any excise tax imposed on Party A as a result of a Change in Tax Law, in respect of payments under this Agreement. For avoidance of doubt, in the event that any excise tax is imposed on Party A as a result of a Change in Tax Law, any payment to which Party B is otherwise entitled under this Agreement shall be reduced by the amount of the excise tax and the excise tax shall not be an Indemnifiable Tax.

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law, treaty, rule or regulation (or in the application or interpretation of any law, treaty, rule or regulation whether by official or informal means) that occurs on or after the date on which this Transaction is entered into."

(l)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

27

(m)    **Service of Process.**  The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(n)    **Accuracy of Specified Information.**  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person".

(o)    **Non-Confidential.**  Notwithstanding anything to the contrary contained in this Agreement, all persons may disclose to any and all persons, without limitations of any kind, the U.S. federal, state or local tax treatment of any Transaction, any fact that may be relevant to understanding the U.S. federal, state or local tax treatment of any Transaction, and all materials of any kind (including opinions or other tax analyses) relating to such U.S. federal, state or local tax treatment and that may be relevant to understanding such U.S. federal, state or local tax treatment, other than the name of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, and any pricing terms or other nonpublic business or financial information that is unrelated to the U.S. federal, state or local tax treatment of the Transaction to the taxpayer and is not relevant to understanding the U.S. federal, state or local tax treatment of the Transaction to the taxpayer.

(p)    **Additional Representations of Party B.**  Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

    (i)    **Approved Credit Swap Counterparty.**  Party A is a Credit Swap Counterparty under the Indenture.

    (ii)    **Secured Party.**  Party A is a Secured Party under the Indenture.

    (iii)    **Constitutional Documents.**  Party B is in compliance, in all material respects, with its constitutional documents (including, but not limited to, the Indenture, as amended from time-to-time, and any and all resolutions, investment policies, guidelines, procedures or restrictions), and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder.

    (iv)    **Third-Party Beneficiary.**  Party A shall be an express third-party beneficiary of the Indenture.

(q)    **No Violation or Conflict Representation.**  Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to, the Indenture, as amended, and any and all resolutions, investment policies, guidelines, procedures or restrictions)"; provided that such amendment shall be applicable only with respect to the Representations of Party B.

(r)    **Severability.**  If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement; provided, however, that this severability provision shall not be applicable if any provision of Section 2, 5, 6 or 13 (or any

28

definition or provision in Section 14 to the extent it relates to, or is used in or connection with any such Section) shall be held to be invalid or unenforceable.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
    Name:
    Title:


PEBBLE CREEK LCDO 2007-3, LTD.

By: _____
    Name:
    Title:

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
      Name:
      Title:

PEBBLE CREEK LCDO 2007-3, LTD.

By:_____
      Name: Dianne Scott
      Title:  Director

Schedule – Pebble Creek 2007-3

EXHIBIT A to Schedule

FORM OF CONFIRMATION

EXHIBIT B to Schedule

FORM OF OPINION OF COUNSEL FOR PARTY A

EXHIBIT C to Schedule

FORM OF OPINION OF COUNSEL FOR PARTY B

EXHIBIT D to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

EXECUTION COPY

<u>Confirmation</u>

DATE:      July 19, 2007

TO:        Pebble Creek LCDO 2007-3, Ltd.

FROM:      Lehman Brothers Special Financing Inc.

RE:        Credit Derivative Transaction

The purpose of this letter (this "Confirmation") is to confirm the terms and conditions of the Credit
Derivative Transaction entered into between Lehman Brothers Special Financing Inc. ("Party A") and
Pebble Creek LCDO 2007-3, Ltd. ("Party B") on the Trade Date specified below (the "Transaction"). This
Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

1.     The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as
       supplemented by the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions and
       the Additional Provisions for Physically Settled Default Swaps – Monoline Insurer as Reference
       Entity (published on January 21, 2005) (collectively, the "Credit Derivatives Definitions"), each as
       published by the International Swaps and Derivatives Association, Inc., are incorporated into this
       Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and
       this Confirmation, this Confirmation will govern. Capitalized terms used herein but not otherwise
       defined herein or in the Credit Derivatives Definitions shall have the meanings ascribed to such
       terms in the Indenture.

2.     This Confirmation supplements, forms a part of, and is subject to, the 1992 ISDA Master
       Agreement (Multicurrency – Cross Border) dated as of July 19, 2007, as amended and
       supplemented from time to time (the "Agreement"), between Party A and Party B. All provisions
       contained in the Agreement govern this Confirmation except as expressly modified below.

3.     Party A will enter into the Transaction and exercise its rights and perform its obligations
       hereunder solely on its own behalf and not as agent, fiduciary or in any other capacity on behalf of
       Party B, the holders of the Notes or any other person.

4.     Party A may or may not have a credit exposure to any Reference Entity.

5.     The parties agree and acknowledge that the Transaction to which this Confirmation relates
       contemplates more than one Reference Entity and multiple Credit Event Notices, and that,
       accordingly, there may be more than one Credit Event and more than one Cash Settlement
       Amount, and that the Credit Derivatives Definitions (and in particular the provisions which
       modify and relate to the "Termination Date") should, for the purposes of this Confirmation, be
       interpreted accordingly.

NY:2451755.5                                      A-1

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | July 19, 2007 |
| Effective Date: | July 19, 2007 |
| Scheduled Termination Date: | September 20, 2014 (adjusted in accordance with the Business Day Convention). |
| Deferred Maturity Date | December 22, 2014 (adjusted in accordance with the Business Day Convention). |
| Termination Date: | The earliest to occur of the (i) Optional Redemption Date (if applicable), the (ii) Early Termination Date (if applicable) and (iii) the Scheduled Termination Date; *provided, that,* if the Contingency Amount with respect to any Class of Notes is greater than zero on the Scheduled Termination Date, the Termination Date shall be the Deferred Maturity Date. |
| | Section 1.7 of the Credit Derivatives Definitions shall not apply in respect of this Transaction. |
| Notice Delivery Period: | Notwithstanding anything to the contrary contained in the Credit Derivatives Definitions, the Notice Delivery Period means the period from and including the Effective Date to and including the date that is fourteen (14) calendar days after the later of (i) the Scheduled Termination Date or (ii) the Grace Period Extension Date if the Reference Entity is one for which Grace Period Extension is specified as applicable in the matrix attached hereto as Annex A (the "Credit Event Matrix"). For the avoidance of doubt, if a Credit Event Notice is delivered specifying the occurrence of a Credit Event that has occurred after the Scheduled Termination Date, such Credit Event Notice must only specify a Credit Event due to a Failure to Pay and with respect to which a Potential Failure to Pay has occurred on or prior to the Scheduled Termination Date. |
| Optional Redemption Date: | The Payment Date on which the Notes are scheduled to be redeemed in accordance with Section 9.1 of the Indenture. |
| Floating Rate Payer: | Party B ("Seller") |
| Fixed Rate Payer: | Party A ("Buyer") |
| Calculation Agent: | Party A |
| Business Day: | London and New York. |
| Business Day Convention: | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Entity: | Each entity specified in the reference registry attached hereto as Annex B (the "Reference Registry"); *provided, however,* that any Successor to a Reference Entity shall be identified pursuant to Section 2.2 of the Credit Derivatives Definitions, as modified herein. |
| | Party A shall be responsible for maintaining the Reference Registry. |

The Reference Registry shall contain, as to each Reference Entity, the following information:

(i)     the name of such Reference Entity;

(ii)    the Reference Entity Calculation Amount;

(iii)   the Reference Spread applicable to such Reference Entity;

(iv)    the Designated Priority;

(v)     the jurisdiction applicable to such Reference Entity;

(vi)    the Moody's Default Probability applicable to such Reference Entity;

(vii)   the Applicable Recovery Rate; and

(viii)  the S&P Rating applicable to such Reference Entity.

The information contained in the Reference Registry has been obtained by Party A from the following third party sources: Bloomberg, the website maintained by the Securities and Exchange Commission and the websites maintained by S&P or Moody's. While the information obtained from such sources is believed to be accurate, neither Party A nor any of its affiliates makes any representation or warranty, expressed or implied, regarding the adequacy, correctness or completeness of the information obtained from such sources. If any of the information received from such sources is incorrect, (i) the corresponding information in the Reference Registry will likewise be incorrect, and (ii) the Reference Registry shall be amended (or deemed amended) to reflect the correct information. Under no such circumstance shall Party A be required to remove the relevant Reference Entity from the Reference Portfolio. Neither Party A nor any of its affiliates shall be liable to Party B, any holder of Notes or any other Person for any losses, costs, expenses or potential lost profits resulting from or related to any such incorrect information obtained from such sources.

| | |
|---|---|
| Reference Spread: | With respect to each Reference Entity, the percentage, expressed to two (2) decimal places, specified opposite such Reference Entity in the Reference Registry. |
| Reference Entity Calculation Amount: | With respect to each Reference Entity, the amount, expressed in U.S. dollars, specified as such in the Reference Registry on the relevant date of determination. |
| | The Reference Entity Calculation Amount for any Reference Entity as to which an Event Determination Date has occurred shall be zero on the day immediately following such date and thereafter. |
| | The Reference Entity Calculation Amount for any Reference Entity that Party A has removed shall be zero on the date specified as the effective date of such removal by Party A in the notice of such removal and thereafter. |
| Reference Portfolio: | All of the Reference Entities included in the Reference Registry on the relevant date of determination. |

**Fixed Payments:**

Fixed Amount:

The Fixed Amount shall be determined as follows: for each day during the Fixed Rate Payer Calculation Period the Calculation Agent shall calculate a Daily Fixed Amount and the Fixed Amount shall be the sum of all such Daily Fixed Amounts in respect of the relevant Fixed Rate Payer Calculation Period.

Daily Fixed Amount:

An amount determined by the Calculation Agent equal to the sum of each Contractual Asset Premium in respect of each Reference Entity on the relevant date of determination.

Contractual Asset Premium:

With respect to each Reference Entity, on the relevant date of determination, the product of (i) the Reference Entity Calculation Amount, as adjusted from time to time, and (ii) the Reference Spread divided by 360.

Fixed Rate Payer Payment Dates:

Two (2) Business Days immediately preceding (as and to the extent applicable and without duplication) (i) each Payment Date, and (ii) the Fixed Rate Payer Termination Date.

Fixed Rate Payer Period End Date:

Each date on which distributions are required to be made to the Noteholders under the Indenture and the Early Termination Date.

Fixed Rate Payer Calculation Period:

The meaning specified in Section 2.9 of the Credit Derivative Definitions; *provided that* notwithstanding anything to the contrary in Section 2.9 or Section 5.4 of the Credit Derivative Definitions, the final Fixed Rate Payer Calculation Period shall end on, but exclude, the Fixed Rate Payer Termination Date.

Section 2.10 of the Credit Derivatives Definitions shall not apply in respect of this Transaction.

Fixed Rate Payer Termination Date:

The earliest to occur of (i) the Scheduled Termination Date (ii) the Optional Redemption Date (if applicable) and (iii) the Early Termination Date (if applicable).

Collateral Requirements:

On the Effective Date, Party A shall post U.S.$ 103,944 with the Trustee (the **"Credit Swap Posted Amount"**).

In respect of each day during a Fixed Rate Payer Calculation Period, the Credit Swap Posted Amount shall be the sum of the Class B Posted Amount and U.S.$ 21,250, in each case determined on the first day of such Fixed Rate Payer Calculation Period.

The Class B Posted Amount (the **"Class B Posted Amount"**) is the product of (a) U.S.$ 82,694 and (b) a fraction, the numerator of which is the current Aggregate Outstanding Amount of the Class B Notes and the denominator of which is original principal amount of the Class B Notes on the Effective Date.

On any Fixed Rate Payer Payment Date upon which the amount of collateral posted with the Trustee exceeds the Credit Swap Posted Amount, as adjusted from time to time, the Trustee shall release such excess to Party A (any such Fixed Rate Payer Payment Date, a **"Partial Release Date"**).

The Credit Swap Posted Amount will be held by the Trustee on behalf of Party B until the Maturity Date (the "**Posted Amount Release Date**"). The Credit Swap Posted Amount shall be released to Party A on the relevant Posted Amount Release Date (in full) and on the Partial Release Date (in part). Interest earned on the Credit Swap Posted Amount will, if so requested by Party A, be released to Party A.

Neither Party B nor the Trustee may take any actions with respect to the Credit Swap Posted Amount (or any interest earned thereon) unless the Party A fails to pay to Party B any amounts owed to Party B under this Transaction (a "**Failure to Fund**"). Upon a Failure to Fund, Party B may exercise its remedies under this Confirmation, including liquidating the Credit Swap Posted Amount. Party B shall apply the proceeds of any such liquidation toward Interest Collections for distribution in accordance with the Priority of Payments; *provided that* any liquidation proceeds in excess of the amounts owed by Party A shall be paid by Party B to the Party A and shall not be available to make any payments in respect of the Notes.

**Floating Payment:**

Conditions to Settlement:

In respect of each Reference Entity:

  Credit Event Notice

  Notifying Party: Buyer

  Notice of Publicly Available Information: Applicable

For the avoidance of doubt, the parties agree that the "Conditions to Settlement" may be satisfied more than once in respect of this Transaction, but only once with respect to any Reference Entity.

The Conditions to Settlement with respect to a Reference Entity may be satisfied on any day during the period from (and including) the Closing Date through (and including) the end of the Notice Delivery Period.

Credit Events:

In respect of each Reference Entity, the Credit Events (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix. The Credit Events will be one or more of the following: (i) Bankruptcy, (ii) Failure to Pay and (iii) Restructuring (if applicable in the jurisdiction of the Reference Entity).

Obligation(s):

Obligation Category:

In respect of each Reference Entity, the Obligation Category (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix.

Obligation Characteristics:

In respect of each Reference Entity, the Obligation Characteristics (i) will be based on the jurisdiction specified in the Reference Registry opposite such Reference Entity, and (ii) will be specified for such jurisdiction in the Credit Event Matrix.

**Settlement Terms:**

Settlement Method:

Cash Settlement

| | |
|---|---|
| Final Price | 70.0000% |
| Settlement Currency: | The lawful currency of the United States of America ("USD" or "$" or "U.S.$"). |
| Cash Settlement Amount: | In respect of each Reference Entity for which a Credit Event has occurred and the Conditions to Settlement have been satisfied, an amount equal to the greater of (i) the product of (a) 100.0000% *minus* the Final Price and (b) the Reference Entity Calculation Amount with respect to such Reference Entity, and (ii) zero. For the avoidance of doubt, the Reference Entity Calculation Amount with respect to such Reference Entity for the purposes of the prior sentence shall be determined as of the Event Determination Date for such Credit Event. |
| Cash Settlement Date: | Five (5) Business Days following the related Event Determination Date. |
| | Party B shall pay Party A the Cash Settlement Amount on the earlier of (i) the related Cash Settlement Date and (ii) 2nd Business Day prior to the Maturity Date, subject to the next succeeding two sentences. |
| | On the 2nd Business Day prior to the Maturity Date, Party B shall pay to Party A an amount equal to the aggregate of the Cash Settlement Amounts (if any) that have been determined on or prior to such date but not yet paid. |
| | On the Deferred Maturity Date, Party B shall pay Party A an amount equal to the aggregate of the Cash Settlement Amounts that were determined after the 2nd Business Day prior to the Maturity Date (if any). |
| | The provisions of Section 7.2 of the Credit Derivatives Definitions shall not apply to this Transaction. |
| **Additional Payments:** | |
| Additional Payment: | On each Fixed Rate Payer Payment Date, Party A shall pay Party B an amount equal to the Periodic Realized Principal Loss. |
| Periodic Realized Principal Loss: | With respect to the Initial Specific Investment Instrument and a Fixed Rate Payer Payment Date, an amount equal to the greater of (i)(a) USD 52,340,000 *minus* (b) the sum of (A) current outstanding balance of the Initial Specific Investment Instrument, (B) the aggregate payments of principal received by the Issuer with respect to the Initial Specific Investment Instrument up to the current Fixed Rate Payer Payment Date, (C) the aggregate Periodic Realized Principal Loss up to the current Fixed Rate Payer Payment Date, and (D) USD 1,570,200 and (ii) zero; *provided that* if the sum of such amount determined above and the aggregate of the Periodic Realized Principal Loss payments made prior to such Fixed Rate Payer Payment Date, is greater than USD 2,355,300, then the Periodic Realized Principal Loss amount for the current Payment Date will be the greater of (a) USD 2,355,300 *minus* the aggregate Periodic Realized Principal Loss payments up to, but excluding, the current Fixed Rate Payer Payment Date and (b) zero. |
| **Additional Terms:** | |
| Modifications to Certain Defined Terms and Provisions | |

Related to Determinations of a Successor:

In respect of this Transaction:

(i) Sections 2.2(a)(i) and (ii) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for the entire Credit Derivative Transaction" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(ii) Sections 2.2(a)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the deletion of the words "for a New Credit Derivative Transaction determined in accordance with the provisions of Section 2.2(e)" at the end of those sections and their replacement with the words "with respect to that Reference Entity";

(iii) Section 2.2(d) of the Credit Derivatives Definitions shall be amended by:

(a) the deletion from sub-section (i) of the words "Credit Derivative Transaction" and their replacement with the words "Reference Entity";

(b) the insertion in subsection (iii) of the words "specified in relation to the relevant Reference Entity" after the words "the Reference Obligation"; and

(c) the deletion following sub-section (iii) of the words "Credit Derivative Transaction" and their replacement with the word "Successor";

(iv) Section 2.2(e) of the Credit Derivatives Definitions shall be replaced in its entirety by the following: "Where, pursuant to Section 2.2 (a) above, one or more Successors have been identified in relation to a particular Reference Entity:"

(a) each such Successor will be a Reference Entity (a "**Successor Reference Entity**") for the purposes of this Credit Derivative Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(b) the Reference Entity Calculation Amount in respect of each such Successor Reference Entity shall be the Reference Entity Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities."

Merger of Reference Entity and Seller:

Section 2.31 of the Credit Derivatives Definitions shall not apply in respect of this Transaction.

Certain provisions relating to modifications to the Reference Portfolio by Party A

Party A may elect to remove any Reference Entity for which no Credit Event has occurred, if, for 30 Business Days, there is no Obligation of such Reference Entity that both (i) is a Loan and (ii) satisfies the Syndicated Secured characteristic, in each case as determined by the Calculation Agent (each such removal a "Reference Entity Removal Event"). No termination payments shall under Section 6(e) or otherwise

be owed in respect to such removal. For the avoidance of doubt, upon the removal of any Reference Entity, such entity will cease to be a Reference Entity.

"Syndicated Secured" means any obligation, including any contingent obligation to pay or repay borrowed money resulting from the funding of an unfunded commitment, (i) that arises under a syndicated loan agreement and (ii) that, on the relevant day, trades as a loan of the Designated Priority under the then-current trading practices in the primary or secondary loan market, as the case may be, which will be determined without regard to (A) the value of the collateral pool securing such obligation, (B) whether or not such obligation is Subordinated to any other obligation of the Reference Entity or (C) any lien which is or may be granted on all or any portion of the collateral pool securing such obligation in a proceeding arising under Title 11 of the United States Code or any similar insolvency proceeding, or any adequate protection that is or may be granted for the lien in favor of holders of such obligation in such a proceeding. In the event that a Reference Entity provides a Qualifying Guarantee in respect of an obligation, only the Underlying Obligation must satisfy clause (i) of the definition of Syndicated Secured and the Qualifying Guarantee together with the Underlying Obligation must satisfy clause (ii) of the Syndicated Secured characteristic, in each case on the relevant date, in order for such Qualifying Guarantee to be an Obligation as to which the Syndicated Secured characteristic is satisfied.

Notwithstanding Section 2.2(f) of the Credit Derivatives Definitions, "Relevant Obligations" shall mean all Obligations of the Reference Entity constituting Loans that satisfy the Syndicated Secured characteristic (including any contingent obligation to pay or repay borrowed money resulting from the funding of an unfunded commitment in respect thereof) outstanding immediately prior to the date of the potential Succession Event, which shall be determined by the Calculation Agent. The determination by the Calculation Agent that such Obligations satisfy the Syndicated Secured characteristic shall be binding upon all parties absent manifest or obvious error.

**Amendment to Section 9.1 of the Credit Derivatives Definitions:**

Additional Representations:

Section 9.1 of the Credit Derivatives Definitions is hereby amended by adding the following additional representations to such Section:

"(c)   Buyer and Seller shall each be deemed to represent to the other party on the Trade Date that:

(i)   it is duly authorized to enter into this Transaction.

(ii)   it understands the risks of this Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom.

(iii)   it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into this Transaction is

appropriate for such party in light of its financial capabilities and objectives.

(iv)    it is acting for its own account and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction, it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice, or a recommendation to enter into the Transaction. It has not received from the other party any assurance or guarantee as to the expected results of the Transaction.

(v)    it is capable of evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(vi)    it is capable of assuming, and assumes, the financial and other risks of the Transaction.

(vii)    the other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

(viii)    it is acting as principal in respect of this Confirmation and the Transaction and not as agent or in any other capacity, fiduciary or otherwise.

(ix)    that upon due execution and delivery of this Confirmation, such Confirmation shall constitute its legal, valid and binding obligation, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or in law)."

NY: 24517555

**Additional Representations
and Agreements of the
Parties**

Section 9.1(b) of the Credit Derivatives Definitions is amended by deleting the word "and" from the end of Section 9.1(b)(iv), replacing the period at the end of Section 9.1(b)(v) with a semicolon and adding the following to the end of Section 9.1(b):

"(vi)    each party has determined to enter into such Credit Derivative Transaction notwithstanding any information described in Section 9.1(b)(iv) above of which the other party may have possession, and notwithstanding that the other party may be contractually prohibited from disclosing or offering to disclose such information to it by virtue of any credit agreement or other agreement with a Reference Entity, any Affiliate of a Reference Entity, any Underlying Obligor or any other person or entity having obligations relating to a Reference Entity or any Underlying Obligor or otherwise; and

(vii)    neither party shall have any liability to the other party (or its officers, directors, agents, partners, members, controlling entities or employees) and each party waives and releases any claims that it might have against the other party (or its officers, directors, agents, partners, members, controlling entities or employees) whether under applicable securities laws or otherwise, with respect to the nondisclosure of any information described in Section 9.1(b)(iv) above in connection with such Credit Derivative Transaction; provided, however, that such information does not and shall not affect the truth or accuracy of any representation made by such party herein or in the Confirmation for such Credit Derivative Transaction."

Reference is made to the Syndicated Secured Loan Credit Default Swap Standard Terms Supplement (the "Syndicated Secured Loan CDS Standard Terms Supplement") published on June 8, 2006 by the International Swaps and Derivatives Association, Inc., for purposes of this paragraph. The definitions contained in such Syndicated Secured Loan CDS Standard Terms Supplement are incorporated into this paragraph. Party B acknowledges that Party A or any of its affiliates may be, or may be affiliated with, a Specified Dealer and, as such, may be able to affect or influence the outcome of polls contemplated by the Syndicated Secured Loan CDS Standard Terms. Sections 9.1(b)(iii) and (iv) of the Credit Derivatives Definitions shall be amended by the insertion of ", each Specified Dealer" after the words "each party and its Affiliates" and immediately before the words "and the Calculation Agent" in the first line thereof, and Section 9.1(b)(iv) shall be amended by the insertion of ", any Specified Dealer" after the words "its Affiliates" in the seventh line thereof. Party B agrees and acknowledges that any determination of Party A under this Confirmation (whether in its role as the Calculation Agent or otherwise), including, without limitation, any determination with respect to the Syndicated Secured

characteristic of an Obligation, may differ the position taken by Party A or any of its affiliates under any poll contemplated by the Syndicated Secured Loan CDS Standard Terms and may also differ from the result of any such poll. Party B further agrees and acknowledges that the results of any such poll may influence determinations under, and thus, the value of, the Transaction to which this Confirmation relates. Party B agrees to waive any and all causes of action or other claims whatsoever that such party might have against Party A or any of its affiliates arising out of any such difference and any other matter related to its actions as a Specified Dealer, including, without limitation, arising out of or relating to any response or failure to respond to any poll contemplated by the Syndicated Secured Loan CDS Standard Terms.

Section 2.19(a)(ii) of the Credit Derivatives Definitions is amended by deleting the parenthetical "(excluding an obligation under a revolving credit arrangement for which there are no outstanding, unpaid drawings in respect of principal)".

Section 3.7 of the Credit Derivatives Definitions is amended by adding each of each of Debtwire.com and Standard & Poor's Leveraged Commentary & Data (LCD) as Public Sources.

| | |
|---|---|
| **Interpretation; No Need to Suffer a Loss:** | |
| Interpretation: | Each reference to the singular shall include the plural and vice versa. |
| No Need to Suffer a Loss: | Neither Party A nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by Party B with respect to this Transaction are not conditional on Party A (or any of its affiliates) sustaining or being exposed to a risk of loss. The payments to be made by Party B with respect to this Transaction are due from Party B whether or not Party A (or any of its affiliates) actually suffers a loss. |
| Additional Provisions: | See Annex C attached hereto for additional provisions that apply to this Transaction. |
| **Miscellaneous:** | |
| | To the extent that Party B fails to make a payment due to a failure of a holder of Class A Notes or Class B Notes, as applicable, to fund a draw down on the unfunded Class A Commitments or unfunded Class B Commitments, as applicable, and such holder of Class A Notes or Class B Notes, as applicable, is an affiliate of Party A, such failure by Party B shall not be an Event of Default under the Agreement. |
| | Party A hereby agrees that it shall perform its obligations set out in Sections 1, 2.7, 7.11, 9.1 and 10.4 with respect to the Indenture in its capacity as the Credit Swap Calculation Agent. |
| **Certain Additional Defined Terms:** | |
| Co-Issuer: | Pebble Creek LCDO 2007-3, LLC. |
| Indenture: | The agreement dated as of July 19, 2007 among the Issuer, the Co-Issuer and U.S. Bank National Association as Trustee. |

NY: 24517555

| | |
|---|---|
| New York Business Day: | A day on which commercial banks and foreign exchange markets settle payments in The City of New York. |
| Person: | An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof. |

**Notice and Account Details:**

Telephone and
Facsimile Numbers and
Contact Details for
Notices:

Party A:

Lehman Brothers Special Financing Inc.
Telephone Number:  (212) 526-9339/(212) 526-5410/(212) 526-1700
Facsimile Number:  (646) 758 2456
Attn:  James Lee

With a copy of all notices to:

Structured Products Transaction Management Group
Telephone Number:  (212) 526-0806
Facsimile Number:  (646) 834-2732

Party B:

Pebble Creek LCDO 2007-3, Ltd.,
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
Grand Cayman, Cayman Islands
Facsimile Number: (345) 945-7100
Attn:  The Directors

With a copy of all notices to:

U.S. Bank National Association, as Trustee
1 Federal Street, 3rd Floor
Mail Station EX-MA-FED
Boston, Massachusetts 02110
Telephone Number: 617-603-6552 / 6500
Facsimile Number: 617-603-6651
Attn:  Corporate Trust Services/CDO Administration

**Account Details:**

Payments to Party A

NY: 24517555

| | |
|---|---|
| Account for payments: | Lehman Brothers Inc. (SLHIUS3X)<br>with further credit to Lehman Brothers Special Financing<br>(SLHIUS3S)<br>The Chase Manhattan Bank, New York<br>A/C Lehman Brothers Special Financing<br>A/C # 066-143-543 |
| Payments to Party B | |
| Account for payments: | U.S. Bank National Association<br>Minneapolis, MN<br>ABA # 091000022<br>DDA Account # 1731-0332-1720<br>Account # 117285-202<br>Name:  Pebble Creek LCDO 2007-3, Ltd. Interest Collections Account |

NY: 24517555

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING
INC.

By:_____
    Name:
    Title:

Confirmed as of the date first written:
PEBBLE CREEK LCDO 2007-3, LTD.

By:_____
    Name:
    Title:

CDS Confirm - Pebble Creek 2007-3

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
  Name:
  Title:

Confirmed as of the date first written:
PEBBLE CREEK LCDO 2007-3, LTD.

By:_____
  Name:    Dianne Scott
  Title:    Director

LEHMAN BROTHERS

ANNEX A

**Credit Event Matrix**

| Jurisdiction | NORTH AMERICA | EUROPE |
|---|---|---|
| All Guarantees: | Not Applicable | Applicable |
| Credit Events: | Bankruptcy<br><br>Failure to Pay<br><br><br><br>Grace Period Extension:  Applicable | Bankruptcy<br><br>Failure to Pay<br><br>Restructuring<br><br>Grace Period Extension: Applicable |
| Obligation Category: | Borrowed Money | Borrowed Money |
| Obligation Characteristics: | None | None |

ANNEX B
REFERENCE REGISTRY

| Reference Entity | Reference Entity Calculation Amount | Designated Priority | Jurisdiction | Fixed Recovery Rate | Reference Spread | Moody's Default Probability Rating | S&P Rating |
|---|---|---|---|---|---|---|---|
| ABITIBI-CONSOLIDATED INC. | 6,000,000 | First Lien | North America | 70% | 3.00% | B2 | B |
| ADVANCED MICRO DEVICES, INC. | 7,000,000 | First Lien | North America | 70% | 2.50% | B1 | B |
| Affiliated Computer Services, Inc. | 4,500,000 | First Lien | North America | 70% | 1.50% | B1 | BB- |
| Alliance Imaging Inc. | 1,000,000 | First Lien | North America | 70% | 1.55% | B1 | B+ |
| Allied Waste North America, Inc. | 1,000,000 | First Lien | North America | 70% | 1.55% | B2 | B+ |
| ArvinMeritor, Inc. | 7,000,000 | First Lien | North America | 70% | 2.00% | Ba3 | BB- |
| Avis Budget Car Rental, LLC | 5,500,000 | First Lien | North America | 70% | 1.20% | Ba2 | BB+ |
| Blockbuster Inc. | 5,500,000 | First Lien | North America | 70% | 2.80% | B3 | B |
| Boise Cascade LLC | 2,500,000 | First Lien | North America | 70% | 1.10% | Ba3 | BB |
| BOMBARDIER INC. | 1,000,000 | First Lien | North America | 70% | 0.88% | Ba2 | BB |
| BOYD GAMING CORPORATION | 6,000,000 | First Lien | North America | 70% | 1.40% | Ba2 | BB |
| Brookstone Company, Inc. | 4,500,000 | First Lien | North America | 70% | 2.00% | B3 | B- |
| Building Materials Corporation of America | 6,000,000 | First Lien | North America | 70% | 2.10% | B2 | BB- |
| Burlington Coat Factory Warehouse, Inc | 3,000,000 | First Lien | North America | 70% | 2.55% | B2 | B |
| Capital Automotive L.P. | 5,000,000 | First Lien | North America | 70% | 1.00% | Ba3 | BB+ |
| Charter Communications Operating, LLC | 7,000,000 | First Lien | North America | 70% | 2.15% | Caa1 | B- |
| Claire's Stores Inc. | 4,500,000 | First Lien | North America | 70% | 2.65% | B3 | B |
| Clear Channel Communications Inc. | 5,000,000 | First Lien | North America | 70% | 1.95% | Ba1 | B |
| COOPER-STANDARD AUTOMOTIVE INC. | 6,000,000 | First Lien | North America | 70% | 2.00% | B2 | B |
| DILLARD'S, INC. | 5,500,000 | First Lien | North America | 70% | 1.75% | Ba3 | BB |
| DirecTV Holdings LLC | 6,000,000 | First Lien | North America | 70% | 1.10% | Ba2 | BB- |
| Dole Food Company, Inc. | 6,000,000 | First Lien | North America | 70% | 2.30% | B2 | B |
| Dresser Inc. | 1,000,000 | First Lien | North America | 70% | 1.80% | B2 | B |

| Reference Entity | Reference Entity Calculation Amount | Designated Priority | Jurisdiction | Fixed Recovery Rate | Reference Spread | Moody's Default Probability Rating | S&P Rating |
|---|---|---|---|---|---|---|---|
| Edgen Murray Corp | 7,000,000 | First Lien | North America | 70% | 2.00% | Caa2 | B- |
| ENVIROSOLUTIONS Inc. | 5,000,000 | First Lien | North America | 70% | 2.30% | B2 | B- |
| First Data Corp | 6,000,000 | First Lien | North America | 70% | 2.10% | A3 | BB |
| FKI PLC | 1,000,000 | First Lien | Europe | 70% | 0.85% | Ba2 | BB |
| Ford Motor Company | 7,000,000 | First Lien | North America | 70% | 2.60% | B3 | B |
| Freeport-McMoran Copper & Gold Inc. | 1,000,000 | First Lien | North America | 70% | 0.60% | Ba2 | BB+ |
| Freescale Semiconductor, Inc. | 7,000,000 | First Lien | North America | 70% | 2.30% | Ba3 | BB- |
| Frontier Drilling | 7,000,000 | First Lien | North America | 70% | 2.40% | B3 | B- |
| GENERAL GROWTH PROPERTIES, INC | 5,500,000 | First Lien | North America | 70% | 0.90% | Ba1 | BBB- |
| GENERAL MOTORS CORPORATION | 7,000,000 | First Lien | North America | 70% | 2.20% | B3 | B |
| Georgia Gulf Corporation | 1,000,000 | First Lien | North America | 70% | 2.10% | B1 | B+ |
| Georgia-Pacific Corporation | 1,000,000 | First Lien | North America | 70% | 1.40% | Ba3 | BB- |
| Grohe Holding GmbH | 6,000,000 | First Lien | Europe | 70% | 1.95% | B2 | B |
| Harrah's Operating Company Inc. | 5,000,000 | First Lien | North America | 70% | 1.55% | Ba1 | BB- |
| HCA Inc. | 5,500,000 | First Lien | North America | 70% | 1.80% | B2 | B+ |
| Huntsman International LLC | 1,000,000 | First Lien | North America | 70% | 1.30% | B1 | B+ |
| Idearc Inc. | 7,000,000 | First Lien | North America | 70% | 1.30% | Ba3 | BB |
| IKON Office Solutions, Inc. | 4,500,000 | First Lien | North America | 70% | 1.40% | Ba2 | BB |
| INEOS Holdings Limited | 7,000,000 | First Lien | Europe | 70% | 1.85% | B3 | B+ |
| John Maneely Co | 7,000,000 | First Lien | North America | 70% | 2.70% | B2 | B |
| K&F Industries, Inc. | 1,000,000 | First Lien | North America | 70% | 1.33% | Caa1 | CCC- |
| Kabel Deutschland Vertriebund Service GmbH & Co. KG | 6,000,000 | First Lien | Europe | 70% | 1.80% | Ba3 | B+ |
| Kerzner International Ltd. | 7,000,000 | First Lien | North America | 70% | 2.50% | Caa3 | CCC |
| LBREP/L SUNCAL MASTER I, LLC | 4,500,000 | First Lien | North America | 70% | 2.15% | Caa1 | B |
| LEAR CORPORATION | 7,000,000 | First Lien | North America | 70% | 2.40% | B2 | B |

| Reference Entity | Reference Entity Calculation Amount | Designated Priority | Jurisdiction | Fixed Recovery Rate | Reference Spread | Moody's Default Probability Rating | S&P Rating |
|---|---|---|---|---|---|---|---|
| LINENS 'N THINGS, INC. | 2,000,000 | First Lien | North America | 70% | 4.60% | B3 | B- |
| Magnum Coal Company | 4,500,000 | First Lien | North America | 70% | 2.40% | B3 | B- |
| Massey Energy Company | 7,000,000 | First Lien | North America | 70% | 2.20% | B1 | B+ |
| MCJUNKIN Corp | 1,000,000 | First Lien | North America | 70% | 1.45% | B2 | B+ |
| MEDIACOM LLC | 7,000,000 | First Lien | North America | 70% | 2.00% | B3 | B |
| Metro-Goldwyn-Mayer Inc. | 7,000,000 | First Lien | North America | 70% | 2.60% | Ba3 | |
| M-real Oyj | 2,500,000 | First Lien | Europe | 70% | 1.80% | B3 | B |
| NCO Group Inc. | 1,000,000 | First Lien | North America | 70% | 1.35% | B2 | B+ |
| Nordic Telephone Company Holding Apes | 1,000,000 | First Lien | Europe | 70% | 1.30% | Ba3 | BB- |
| Oshkosh Truck Corporation | 5,500,000 | First Lien | North America | 70% | 1.45% | Ba3 | BB |
| Penn National Gaming, Inc. | 5,500,000 | First Lien | North America | 70% | 1.40% | Ba3 | B+ |
| Ply Gem Industries Inc. | 7,000,000 | First Lien | North America | 70% | 2.45% | B2 | B |
| POLYONE CORPORATION | 3,840,000 | First Lien | North America | 70% | 2.10% | B2 | B+ |
| Rent-A-Center, Inc. | 5,500,000 | First Lien | North America | 70% | 1.10% | Ba3 | BB |
| Reynolds American Inc. | 4,500,000 | First Lien | North America | 70% | 0.65% | Ba1 | BB+ |
| Rite Aid Corporation | 7,000,000 | First Lien | North America | 70% | 2.50% | B3 | B |
| Saint Acquisition Corporation | 7,000,000 | First Lien | North America | 70% | 3.20% | B2 | B |
| Sally Holdings, LLC | 1,000,000 | First Lien | North America | 70% | 1.90% | B2 | B |
| Sanmina-SCI Corporation | 7,000,000 | First Lien | North America | 70% | 2.40% | Ba3 | B+ |
| Select Medical Corporation | 2,500,000 | First Lien | North America | 70% | 1.95% | B2 | B |
| Sinclair Broadcast Group Inc. | 1,000,000 | First Lien | North America | 70% | 1.15% | Ba3 | BB- |
| Smithfield Foods, Inc. | 1,000,000 | First Lien | North America | 70% | 1.05% | Ba2 | BB+ |
| Smurfit-Stone Container Enterprises, Inc. | 4,500,000 | First Lien | North America | 70% | 1.75% | B2 | B |
| Standard Aero Holdings, Inc. | 1,000,000 | First Lien | North America | 70% | 1.45% | B3 | B+ |
| Station Casinos, Inc. | 1,000,000 | First Lien | North America | 70% | 1.35% | B2 | B+ |

| Reference Entity | Reference Entity Calculation Amount | Designated Priority | Jurisdiction | Fixed Recovery Rate | Reference Spread | Moody's Default Probability Rating | S&P Rating |
|---|---|---|---|---|---|---|---|
| Stratus Technologies Inc. | 1,500,000 | First Lien | North America | 70% | 2.50% | Caa2 | B- |
| Telcordia Technologies, Inc. | 6,500,000 | First Lien | North America | 70% | 3.15% | B3 | B |
| The Williams Companies, Inc. | 1,000,000 | First Lien | North America | 70% | 0.55% | Ba1 | BBB- |
| TRAVELCENTERS OF AMERICA, INC. | 2,500,000 | First Lien | North America | 70% | 1.35% | B2 | BB- |
| Triumph HealthCare Second Holding, Inc. | 4,500,000 | First Lien | North America | 70% | 1.50% | B2 | B |
| TRW Automotive Inc. | 6,000,000 | First Lien | North America | 70% | 1.25% | Ba2 | BB+ |
| Unisys Corporation | 5,000,000 | First Lien | North America | 70% | 2.00% | B2 | B+ |
| Univision Communications Inc | 5,000,000 | First Lien | North America | 70% | 2.00% | B1 | B |
| US Investigations Services Inc. | 1,000,000 | First Lien | North America | 70% | 1.60% | B3 | B |
| US Shipping Partners LP | 5,000,000 | First Lien | North America | 70% | 1.80% | B2 | B+ |
| VICORP RESTAURANTS INC | 2,000,000 | First Lien | North America | 70% | 4.50% | B3 | B- |
| Virgin Media Investment Holdings Limited | 5,000,000 | First Lien | Europe | 70% | 1.75% | B3 | B+ |
| Visteon Corporation | 6,000,000 | First Lien | North America | 70% | 3.25% | B3 | B |
| VML US FINANCE LLC | 5,500,000 | First Lien | North America | 70% | 1.60% | B2 | BB- |
| West Corp | 5,500,000 | First Lien | North America | 70% | 1.85% | B2 | B+ |
| Windstream Corporation | 1,000,000 | First Lien | North America | 70% | 0.72% | Ba2 | BB+ |
| WMG Acquisition Corp. | 1,000,000 | First Lien | North America | 70% | 1.25% | B1 | B+ |

LEHMAN BROTHERS

ANNEX C

Additional Terms

(a)    **Additional Agreements.** Each party agrees as set out below for so long as either party has or may have any obligation under this Transaction:

(i)    The Seller acknowledges and agrees that this Transaction constitutes a credit default swap transaction and, accordingly, the Buyer may, following the occurrence of a Credit Event in respect of a Reference Entity and subject to the terms specified herein, demand and receive payment in full of the appropriate Cash Settlement Amount on the date such amount shall be payable without being required to make any prior demand or to take prior proceedings against the relevant Reference Entity or any other person which is a surety for or which has granted the Buyer any form of credit protection or credit insurance or entered into any credit default swap or similar transaction with the Buyer in respect of such Reference Entity. The Buyer shall be under no obligation to account to the Seller or to any of its affiliates for any payment or sums, if any, recovered from a Reference Entity or any third party.

(ii)    Each party, the Calculation Agent and their respective affiliates may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information in relation to any Reference Entity that is or may be material in the context of this Transaction and that may or may not be publicly available or known to the aforementioned persons. Apart from the obligations of the Calculation Agent set out in this Confirmation, this Transaction does not create any obligation on the part of any such person or its affiliates to disclose to the other party any such relationship or information (whether or not confidential).

(iii)    The parties agree that, in entering into this Transaction, neither the Buyer nor the Seller intends to enter into a contract of surety, guarantee, insurance, assurance or indemnity, and the parties' obligations hereunder are not conditional or dependent upon or subject to the Buyer having any title, ownership or interest (whether legal, equitable or economic) in any Reference Entity.

(iv)    The parties shall be obliged to perform this Transaction without regard to whether the Buyer or any affiliate of the Buyer has any credit exposure in respect of a Reference Entity. Neither the Buyer nor any of its affiliates need suffer any loss or provide evidence of any loss as a result of the occurrence of a Credit Event, and the payments to be made by the Seller under this Transaction are not conditional on the Buyer (or any of its affiliates) sustaining or being exposed to a risk of loss.

(v)    The Seller acquires no rights, either direct or indirect or by way of subrogation, against any Reference Entity as a result of entering into or performing its obligations under this Transaction.

(b)    **The Calculation Agent.**

(1)    The Calculation Agent shall be responsible for:

(i)    Determining a successor as Calculation Agent (if necessary) after agreement with the Seller;

(ii)    Determining a Successor to any Reference Entity in accordance with the Definitions;

(iii)    Obtaining Full Quotations in accordance with the Confirmation;

(iv)    Selecting Dealers where required in accordance with the Confirmation;

(v)    Determining Credit Swap Posted Amount, Realized Principal Losses, Periodic Realized Principal Losses, Cash Settlement Amounts and Final Prices;

(vi)    Determining any Adjustment Amount, any Adjustment Reference Entity, any relevant Deferred Maturity Date, the Contingency Amount, the Contingency Cash Settlement Amount, any relevant Redemption Date, any Redemption Price and Total Redemption Amount; and

(vii)    To the extent not provided for by sub-paragraphs (i) to (vi) above, making the calculations and determinations and giving the notices as set out and contemplated hereunder.

(2)    Whenever the Calculation Agent is required to act or to exercise judgment, it shall do so in good faith and in a commercially reasonable manner. Its calculations and determinations shall be binding in the absence of bad faith or manifest error.

(3)    Each party agrees that the Calculation Agent is not acting as a fiduciary for or as an advisor to either party in respect of its duties as Calculation Agent in connection with this Transaction.

(4)    In connection with any requests for quotations or estimates pursuant to the provisions set forth in this Confirmation under "Settlement Terms", the Calculation Agent: (a) may, but shall not be required to, inform the relevant Dealers of the Publicly Available Information in its possession regarding the occurrence and the nature of the relevant Credit Event; and (b) shall not disclose any information that would give rise to a contravention by the Buyer of its obligations under applicable secrecy laws.

(c)    **Additional Definitions**

(1)    "Designated Priority" has the meaning, with respect to each Reference Entity, as set forth in the Reference Registry.

# EXHIBIT B

EXECUTION COPY

PEBBLE CREEK LCDO 2007-3, LTD.,
Issuer

and

PEBBLE CREEK LCDO 2007-3, LLC,
Co-Issuer

and

U.S. BANK NATIONAL ASSOCIATION,
Trustee

INDENTURE

Dated as of July 19, 2007

COLLATERALIZED BOND OBLIGATIONS

30775-00052 NY:2469328.3

ARTICLE I        DEFINITIONS...................................................................... 3
    Section 1.1      Definitions...................................................................... 3
    Section 1.2      Assumptions as to the Underlying Asset ............................... 47
    Section 1.3      Rules of Construction ............................................................. 49
ARTICLE II       THE NOTES .......................................................................... 49
    Section 2.1      Forms Generally....................................................................... 49
    Section 2.2      Forms of Notes and Certificate of Authentication................. 49
    Section 2.3      Authorized Amount; Note Interest Rate; Stated
                     Maturity; Denominations ........................................................ 52
    Section 2.4      Execution, Authentication, Delivery and Dating................... 52
    Section 2.5      Registration, Registration of Transfer and Exchange ............ 54
    Section 2.6      Mutilated, Destroyed, Lost or Stolen Notes.......................... 71
    Section 2.7      Payment of Principal and Interest; Principal and Interest
                     Rights Preserved ................................................................. 72
    Section 2.8      Persons Deemed Owners ....................................................... 79
    Section 2.9      Cancellation .......................................................................... 79
    Section 2.10     Global Notes; Temporary Notes ............................................ 79
    Section 2.11     Deduction or withholding from payments on Notes;
                     Delivery of Tax Forms........................................................... 81
    Section 2.12     Notes Beneficially Owned by Persons Not QIB/QPs ............ 82
ARTICLE III      CONDITIONS PRECEDENT; CERTAIN PROVISIONS
                 RELATING TO COLLATERAL ............................................. 83
    Section 3.1      General Provisions ................................................................. 83
    Section 3.2      Security for the Notes ............................................................ 86
    Section 3.3      RESERVED ........................................................................... 86
    Section 3.4      Investment at the Direction of the Credit Swap
                     Counterparty and Delivery of the Underlying Asset and
                     Eligible Investments.............................................................. 87
    Section 3.5      RESERVED ........................................................................... 89
    Section 3.6      Representations Regarding Collateral..................................... 89
ARTICLE IV       SATISFACTION AND DISCHARGE.................................... 91
    Section 4.1      Satisfaction and Discharge of Indenture ................................ 91
    Section 4.2      Application of Trust Money.................................................... 93

30775-00052 NY:2469328.3

Section 4.3    Repayment of Monies Held by Paying Agent ....................... 93
ARTICLE V    REMEDIES.................................................................................... 93
Section 5.1    Events of Default .......................................................... 93
Section 5.2    Acceleration of Maturity; Rescission and Annulment........... 95
Section 5.3    Collection of Indebtedness and Suits for Enforcement
by Trustee.......................................................................... 97
Section 5.4    Remedies......................................................................... 99
Section 5.5    Optional Preservation of Collateral ..................................... 100
Section 5.6    Trustee May Enforce Claims Without Possession of
Notes ................................................................................. 102
Section 5.7    Application of Money Collected............................................ 102
Section 5.8    Limitation on Suits............................................................. 102
Section 5.9    Unconditional Rights of Noteholders to Receive
Principal and Interest ......................................................... 103
Section 5.10    Restoration of Rights and Remedies..................................... 104
Section 5.11    Rights and Remedies Cumulative.......................................... 104
Section 5.12    Delay or Omission Not Waiver................................................ 104
Section 5.13    Control by Holders of Notes.................................................. 105
Section 5.14    Waiver of Past Defaults ....................................................... 105
Section 5.15    Undertaking for Costs .......................................................... 106
Section 5.16    Waiver of Stay or Extension Laws ....................................... 106
Section 5.17    Sale of Collateral................................................................ 106
Section 5.18    Action on the Notes ............................................................ 107
ARTICLE VI    THE TRUSTEE ........................................................................ 107
Section 6.1    Certain Duties and Responsibilities ..................................... 107
Section 6.2    Notice of Default................................................................. 109
Section 6.3    Certain Rights of Trustee .................................................... 110
Section 6.4    Not Responsible for Recitals or Issuance of Notes............. 111
Section 6.5    May Hold Notes.................................................................. 112
Section 6.6    Money Held in Trust............................................................ 112
Section 6.7    Compensation and Reimbursement ..................................... 112
Section 6.8    Corporate Trustee Required; Eligibility................................ 114

Section 6.9      Resignation and Removal; Appointment of Successor........ 115

Section 6.10     Acceptance of Appointment by Successor ......................... 116

Section 6.11     Merger, Conversion, Consolidation or Succession to
                 Business of Trustee................................................................ 116

Section 6.12     Co Trustees and Separate Trustee........................................ 117

Section 6.13     Appointment of Trustees and Co-Trustees .......................... 118

Section 6.14     Certain Duties of Trustee Related to Delayed Payment
                 of Proceeds............................................................................ 121

Section 6.15     Representations and Warranties of the Trustee ................... 121

Section 6.16     Authenticating Agents .......................................................... 122

Section 6.17     Fiduciary for Holders of Notes Only, Agent for other
                 Secured Parties...................................................................... 123

Section 6.18     Withholding ........................................................................... 123

ARTICLE VII     COVENANTS ........................................................................ 123

Section 7.1      Payment of Principal and Interest......................................... 123

Section 7.2      Compliance With Laws.......................................................... 123

Section 7.3      Maintenance of Books and Records ..................................... 124

Section 7.4      Maintenance of Office or Agency.......................................... 124

Section 7.5      Money for Note Payments to be Held in Trust .................... 126

Section 7.6      Existence of Co-Issuers........................................................ 126

Section 7.7      Protection of Collateral ......................................................... 127

Section 7.8      Opinions as to Collateral....................................................... 129

Section 7.9      Performance of Obligations .................................................. 129

Section 7.10     Negative Covenants .............................................................. 133

Section 7.11     Statement as to Compliance................................................. 133

Section 7.12     Co-Issuers May Not Consolidate .......................................... 133

Section 7.13     [Reserved.]............................................................................. 133

Section 7.14     No Other Business ................................................................ 133

Section 7.15     [Reserved] ............................................................................. 134

Section 7.16     Confirmation of Rating; Annual Rating Review ................. 135

Section 7.17     Reporting................................................................................ 135

Section 7.18     Calculation Agent ................................................................. 135

Section 7.19    [Reserved] .................................................................. 136

Section 7.20    RESERVED .................................................................. 136

Section 7.21    CUSIP Numbers ........................................................... 136

Section 7.22    Bloomberg and other Third-Party Vendor Screens ............. 136

Section 7.23    Tax Forms ................................................................... 137

Section 7.24    Intended Tax Treatment ................................................ 138

Section 7.25    Preparation of Tax Statements ..................................... 138

Section 7.26    Withholding Obligations ............................................... 139

ARTICLE VIII     SUPPLEMENTAL INDENTURES ............................................. 139

Section 8.1    Supplemental Indentures without Consent of Holders ........ 139

Section 8.2    Supplemental Indentures with Consent of Holders ............. 142

Section 8.3    Execution of Supplemental Indentures ................................. 145

Section 8.4    Effect of Supplemental Indentures ...................................... 145

Section 8.5    Reference in Notes to Supplemental Indentures .................. 146

ARTICLE IX     REDEMPTION OF NOTES .................................................... 146

Section 9.1    Optional Redemption ...................................................... 146

Section 9.2    Notice to Trustee of Optional Redemption .......................... 148

Section 9.3    Notice of Optional Redemption or Maturity by the Co-Issuers ....................................................................... 148

Section 9.4    Notes Payable on Redemption Date ..................................... 149

Section 9.5    Certain Other Redemptions ............................................... 150

ARTICLE X     ACCOUNTS, ACCOUNTINGS AND RELEASES ....................... 150

Section 10.1    Collection of Money .......................................................... 150

Section 10.2    Collection Accounts; Custodial Account ............................ 151

Section 10.3    Payment Account .............................................................. 153

Section 10.4    Contingent Class A Funding Account; Class A CDS Reserve Account; Contingent Class B Funding Account; Class B CDS Reserve Account; Credit Swap Issuer Account; Specific Investment Proceeds Account; Maturity Date Account ....................................................... 154

Section 10.5    Reports by Trustee ............................................................ 162

Section 10.6    Accountings ..................................................................... 162

Section 10.7        Custodianship and Release of Collateral .............................. 167

Section 10.8        Reports by Independent Accountants .................................. 168

Section 10.9        No Event of Default ............................................................ 169

Section 10.10       Procedures Relating to the Establishment of Issuer
                    Accounts Controlled by the Trustee ..................................... 170

Section 10.11       Notices to the Noteholders ................................................. 170

ARTICLE XI        APPLICATION OF MONIES .......................................................... 171

Section 11.1        Disbursements of Monies from Payment Account .............. 171

Section 11.2        Trust Accounts .................................................................... 177

ARTICLE XII       [RESERVED] ................................................................................ 178

ARTICLE XIII      NOTEHOLDERS' RELATIONS ...................................................... 178

Section 13.1        Subordination ...................................................................... 178

Section 13.2        Standard of Conduct ........................................................... 180

ARTICLE XIV       MISCELLANEOUS ....................................................................... 180

Section 14.1        Form of Documents Delivered to Trustee ........................... 180

Section 14.2        Acts of Noteholders ............................................................ 181

Section 14.3        Notices ................................................................................. 182

Section 14.4        Notices to Holders; Waiver ................................................. 183

Section 14.5        Effect of Headings and Table of Contents ........................... 184

Section 14.6        Successors and Assigns ....................................................... 184

Section 14.7        Severability ......................................................................... 184

Section 14.8        Benefits of Indenture ........................................................... 184

Section 14.9        Governing Law .................................................................... 184

Section 14.10       Submission to Jurisdiction ................................................... 185

Section 14.11       Counterparts ........................................................................ 185

Section 14.12       Waiver of Jury Trial ............................................................ 185

Section 14.13       Limited Recourse ................................................................. 185

Section 14.14       Liability of Co-Issuers ........................................................ 186

EXHIBITS AND SCHEDULES

| Exhibit A-1 | Form of Certificated Class A Note – Rule 144A |
| Exhibit A-2 | Form of Certificated Class A Note – Regulation S |
| Exhibit A-3 | Form of Class A Note Purchase Agreement |
| Exhibit B-1 | Form of Certificated Class B Note – Rule 144A |
| Exhibit B-2 | Form of Certificated Class B Note – Regulation S |
| Exhibit B-3 | Form of Class B Note Purchase Agreement |
| Exhibit C 1 | Form of Rule 144A Global Class C Note |
| Exhibit C-2 | Form of Regulation S Global Class C Note |
| Exhibit C-3 | Form of Certificated Class C Note |
| Exhibit D-1 | Form of Rule 144A Global Class D Note |
| Exhibit D-2 | Form of Regulation S Global Class D Note |
| Exhibit D-3 | Form of Certificated Class D Note |
| Exhibit E-1 | Form of Rule 144A Global Class E Note |
| Exhibit E-2 | Form of Regulation S Global Class E Note |
| Exhibit E-3 | Form of Certificated Class E Note |
| Exhibit F | [Reserved] |
| Exhibit G | Form of Transfer Certificate for Transfers of Interests in Regulation S Global Notes to Persons Taking Delivery in the Form of an Interest in a Rule 144A Global Note |
| Exhibit H | Form of Transfer Certificate for Transfers of Interests in Rule 144A Global Notes to Interests in Regulation S Global Notes |
| Exhibit I-1 | Form of Transfer Certificate for Transfers of Interests in Certificated Class A Notes and Certificated Class B Note |
| Exhibit I-2 | Form of Transfer Certificate for Transfers of Interests in Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes |
| Exhibit I-3 | Form of Transfer Certificate for Transfers of Interests in Certificated Class C Notes Certificated Class D Notes or Certificated Class E Notes to Persons Taking Delivery in the Form of Interests in Rule 144A Global Notes or Interests in Regulation S Global Notes |
| Exhibit I-4 | Form of Transfer Certificate for Transfers of Interests in Rule 144A Global Notes or Regulation S Global Notes to Persons Taking Delivery in the Form of Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes |
| Exhibit J | [RESERVED] |
| Exhibit K | [RESERVED] |
| Exhibit L | Form of Opinions of Allen & Overy LLP |
| Exhibit M | Form of Opinion of Maples and Calder |
| Exhibit N | Form of Opinion of Nixon Peabody LLP |

| Schedule A | Master ISDA, Schedule and Confirmation with respect to the Credit Swap Agreement |
| Schedule B | Moody's Industry Category List |
| Schedule C | Determination of LIBOR Formula |
| Schedule D | S&P Industry Classification Groups |
| Schedule E | Diversity Score Table |

INDENTURE, dated as of July 19, 2007, among Pebble Creek LCDO 2007-3, Ltd., an exempted company incorporated under the laws of the Cayman Islands (the "Issuer"), Pebble Creek LCDO 2007-3, LLC, a limited liability company organized under the laws of the State of Delaware (the "Co-Issuer," and together with the Issuer, the "Co-Issuers"), and U.S. Bank National Association, a national banking association, as Trustee (the "Trustee").

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Secured Parties and the Trustee. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the terms of this Indenture have been done.

## GRANTING CLAUSE

The Issuer hereby Grants to the Trustee for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all securities, loans, investments and investment property, instruments, financial assets, general intangibles, payment intangibles, accounts, including, without limitation, deposit accounts, agreements and all other property (other than the Excepted Property) and assets of any type or nature in which the Issuer has an interest including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, including, without limitation,

(a)    the Underlying Asset listed as of the Closing Date in Schedule A to this Indenture and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto and any collateral granted to the Issuer thereunder, including any part of any such Underlying Asset which consists of general intangibles (as defined in the UCC) relating thereto, all payments made or to be made thereon or with respect thereto, and all Underlying Asset including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date, and all payments made or to be made thereon or with respect thereto;

(b)    the Issuer Accounts and any other accounts or subaccounts of the Issuer (other than the Preference Share Distribution Account), the Specific Investment Instrument, Eligible Investments purchased with funds on deposit therein and all funds or Financial Assets now or hereafter deposited therein and income from the investment of

funds therein, including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto;

(c)    the Class A Note Purchase Agreement, the Class B Note Purchase Agreement and the Securities Account Control Agreement, all payments thereunder and the Issuer's rights under each such agreement;

(d)    all money (as defined in the UCC) delivered to the Trustee (or its bailee); and

(e)    all Proceeds of any of the foregoing;

but excluding, in each case, (i) the Preference Share Distribution Account, Eligible Investments purchased with funds on deposit in or credited to such account, and all funds deposited in, Financial Assets and investment property credited to, and income from, the investment of funds in such accounts, including any part thereof which consists of general intangibles or investment property (each as defined in the UCC) relating thereto, (ii) the Administration Agreement and the Issuer's rights thereunder and (iii) the Excepted Property, including the account maintained by the Issuer in the Cayman Islands for the deposit of the paid up share capital of the Issuer's ordinary shares and amounts on deposit therein (clauses (a) through (e) above, with the exclusion of (i) through (iii) above, the "Collateral").

Such Grants are made, in trust, to secure the Secured Obligations equally and ratably without prejudice, priority or distinction between the Secured Obligations by reason of difference in time of issuance or incurrence or otherwise, except as expressly provided in this Indenture (including Section 2.7, Article XI and Article XIII), and to secure (i) the payment of all amounts due on the Secured Obligations in accordance with their terms and (ii) compliance with the provisions of this Indenture and each related document, all as provided herein and therein.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein, for the benefit of the Secured Parties. Upon the occurrence of any Event of Default hereunder, and in addition to any other rights available under this Indenture or any other Instruments included in the Collateral held, subject to Section 6.16 hereof, for the benefit and security of the Secured Parties or otherwise available at law or in equity but subject to the terms hereof, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law and the terms of this Indenture, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public and private sale.

The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof, and agrees to perform the duties herein in accordance with the provisions hereof such that, subject to Section 6.16 hereof, the interests of the Secured Parties may be adequately and effectively protected.

The Issuer hereby authorizes the filing of financing or continuation statements, and amendments thereto, in all jurisdictions and with all filing offices as the Trustee may determine, in its sole discretion, are necessary or advisable to perfect the security interests granted to the Trustee in connection herewith. Such financing statements may describe the collateral in the same manner as described in any security agreement or pledge agreement entered into by the parties in connection herewith or may contain an indication or description of collateral that describes such property in any other manner as the Trustee may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interests in the Collateral granted to the Trustee in connection herewith, including, without limitation, describing such property as "all assets" or "all personal property." Nothing herein shall be construed as imposing a duty upon the Trustee to determine whether any financing statement or continuation statement is needed or advisable, the jurisdictions or filing offices in which such filings should be made or to make such filings.

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions. Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and to the masculine, feminine and neuter genders of such terms. Whenever any reference is made to an amount the determination or calculation of which is governed by Section 1.2, the provisions of Section 1.2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of determination or calculation is expressly specified in the particular provision.

"Account": The meaning specified in Section 9-102(a)(2) of the UCC.

"Accountants' Certificate": A certificate of a firm of Independent certified public accountants of national reputation appointed by the Issuer pursuant to Section 10.8(a).

"accredited investor": The meaning specified under Rule 501(a) of Regulation D under the Securities Act.

"Act": The meaning specified in Section 14.2.

"Additional Payment":    The meaning specified in the Credit Swap Agreement.

"Adjustment Amount":  The meaning specified in Section 2.7(k).

"Adjustment Reference Entity":  The meaning specified in Section 2.7(k).

"Administration Agreement":  An agreement dated as of the Closing Date, by and between the Issuer and the Administrator relating to the administration of the Issuer.

"Administrative Expenses":  In the following order of priority, (i) amounts (including indemnities) due or accrued to the Trustee pursuant to Section 6.7 hereunder; (ii) amounts due or accrued to the Collateral Administrator under the Collateral Administration Agreement, (iii) amounts due or accrued to the Class A Note Agent under the Class A Note Purchase Agreement, (iv) amounts due or accrued to the Class B Note Agent under the Class B Note Purchase Agreement, (v) amounts due or accrued to the Shares Paying Agent hereunder or under the Shares Paying Agency Agreement; (vi) fees and expenses due or accrued by the Independent accountants, agents and counsel of the Issuer; (vii) fees and expenses due or accrued by each of the Rating Agencies for amendments, credit estimates and surveillance in connection with any rating of the Notes or the Underlying Asset; (viii) fees and expenses due or accrued by any other Person in respect of any governmental fee (including all filing, registration and annual return fees payable to the Cayman Islands government and registered office fees), charge or tax (other than withholding taxes); and (ix) fees and expenses due or accrued by any other Person as permitted under this Indenture (including any fees and expenses owed to the Administrator under the Administration Agreement and registered office fees) (the amounts referred in clauses (i) through (ix) above are collectively referred herein as "Fees and Expenses").

"Administrative Expense Cap":  On any Payment Date (other than the three Payment Dates immediately following the Closing Date), an amount not to exceed U.S.$85,000 per annum minus amounts applied in respect of Fees and Expenses during the immediately preceding Due Period for each of the three prior Payment Dates preceding such Payment Date and, in the case of the three Payment Dates immediately following the Closing Date, an amount not to exceed U.S.$21,250.

"Administrator":    Maples Finance Limited, a licensed trust company incorporated in the Cayman Islands.

"Affiliate" or "Affiliated":  With respect to a Person, (i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such Person or (ii) any other Person who is a director, member, officer, employee or general partner (a) of such Person, (b) of any subsidiary or parent company of such Person or (c) of any Person described in clause (i) above.  For the purposes of this

definition, control of a Person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of any such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. This definition shall exclude any other Special Purpose Vehicle to which the Administrator is or will be providing administrative services.

"Agent Members": Members of, or participants in, the Depositary.

"Aggregate Industry Equivalent Unit Score": As defined in the definition of the "Diversity Score" herein.

"Aggregate Outstanding Amount": When used with respect to (i) any or all of the Notes, except the Class A Notes and the Class B Notes, the aggregate principal amount of such Notes Outstanding on the date of determination; and (ii) any Preference Shares, the aggregate number of Preference Shares Outstanding on the date of determination. When used with respect to (x) the Class A Notes, the aggregate amount of draw downs made by the Class A Noteholders to the Issuer since the Closing Date, which draw downs remain unpaid on the relevant date of determination; (y) the Class B Notes, the aggregate amount of draw downs made by the Class B Noteholders to the Issuer since the Closing Date, which draw downs remain unpaid on the relevant date of determination; provided that, for purposes of calculating the Overcollateralization Ratios and determining whether Class A Noteholders or Class B Noteholders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder (except for a request, demand, authorization, direction, notice, consent or waiver after the Maturity Date), the Aggregate Outstanding Amount of the Class A Notes or Class B Notes, as applicable, shall be deemed to be the aggregate amount of the Class A Commitments or Class B Commitments, in each case whether funded or unfunded. Except as otherwise provided herein, the Aggregate Outstanding Amount of the Class D Notes shall include all Class D Deferred Interest attributed thereto and the Aggregate Outstanding Amount of the Class E Notes shall include all Class E Deferred Interest attributed thereto.

"Aggregate Principal Amount": When used with respect to (i) any or all of the Pledged Underlying Assets, Eligible Investments or Cash, the aggregate of the principal balances of such Pledged Underlying Assets, Eligible Investments or Cash on the date of determination, (ii) to the Underlying Asset, the aggregate Reference Entity Calculation Amount of all the Reference Entities as of the date of determination.

"Annual Report": The meaning specified in Section 10.12(b).

"Applicable Recovery Rate": With respect to any Reference Entity, means 70.00%.

"Assigned Moody's Rating": The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"Assumed Reinvestment Rate": With respect to any account or fund securing Notes as of any date of determination, the greater of (a) zero and (b) LIBOR determined as of the most recent LIBOR Determination Date minus 0.1% per annum.

"Authenticating Agent": With respect to the Notes or a Class of Notes, the Person designated by the Trustee to authenticate such Notes on behalf of the Trustee pursuant to Section 6.15.

"Authorized Officer": With respect to the Issuer or the Co-Issuer, any Officer or any other Person who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding upon, the Issuer or the Co-Issuer. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. With respect to the Class A Note Agent or Class B Note Agent any officer, employee or agent of such Class A Note Agent or Class B Note Agent, who is authorized to act for such Class A Note Agent, in matters relating to, and binding upon, such Class A Note Agent, with respect to the subject matter of the request, certificate or order in question. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Average Reference Entity Calculation Amount": As defined in the definition of "Diversity Score" herein.

"Balance": On any date, with respect to Cash or Eligible Investments in any account, the aggregate of (i) the current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) the principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) the purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"Bank": U.S. Bank National Association, a national banking association, in its individual capacity and not as Trustee.

"Bankruptcy Code": The United States bankruptcy code, as set forth in Title 11 of the United States Code, as amended, and/or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands.

"Board of Directors": With respect to the Issuer, the directors of the Issuer duly appointed by the shareholders of the Issuer or otherwise duly appointed from time to time and with respect to the Co-Issuer, the directors of the Co-Issuer duly

appointed by the stockholders of the Co-Issuer; <u>provided,</u> that, with respect to each of the Issuer and the Co-Issuer, there shall at all times be one director who is not Affiliated with any of the Managers.

"<u>Board Resolution</u>":  With respect to the Issuer, a resolution of the Board of Directors of the Issuer and with respect to the Co-Issuer, a resolution of the Board of Directors of the Co-Issuer.

"<u>Business Day</u>":  Any day on which commercial banks and foreign exchange markets settle payments in (i) each of New York City, New York, Boston, Massachusetts, the Cayman Islands (in relation only to any payments to be made to or through the Cayman Islands) and any other city in which the principal corporate trust office of the Trustee may from time to time be located, and (ii)(a) in the case of the final payment or distribution on any Note, the place of presentation of such Note, and (b) in the case of the final distribution on any Preference Shares, the place of presentation of such Preference Shares.

"<u>Calculation Agent</u>":  The meaning specified in <u>Section 7.18(a)</u>.

"<u>Cash</u>":  Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"<u>Cash Settlement Amount</u>":  The meaning specified in the Credit Swap Agreement.

"<u>Certificate of Authentication</u>":  The Trustee's or Authenticating Agent's certificate of authentication on any Note.

"<u>Certificated Class A Note</u>":  The meaning set forth in <u>Section 2.2(a)(iii)</u>.

"<u>Certificated Class B Note</u>":  The meaning set forth in <u>Section 2.2(a)(iv)</u>.

"<u>Certificated Class C Note</u>"  The meaning set forth in <u>Section 2.2(a)(vii)</u>.

"<u>Certificated Class D Note</u>"  The meaning set forth in <u>Section 2.2(a)(viii)</u>.

"<u>Certificated Class E Note</u>"  The meaning set forth in <u>Section 2.2(a)(ix)</u>.

"<u>Certificated Class C Note Subscription Agreement</u>":  An agreement among the Issuer and each Investor in the Certificated Class C Notes, as the same may be amended or supplemented and in effect from time to time.

"<u>Certificated Class D Note Subscription Agreement</u>":  An agreement among the Issuer and each Investor in the Certificated Class D Notes, as the same may be amended or supplemented and in effect from time to time.

"Certificated Class E Note Subscription Agreement": An agreement among the Issuer and each Investor in the Certificated Class E Notes, as the same may be amended or supplemented and in effect from time to time.

"Certificated Note" Each of the Certificated Class C Note, the Certificated Class D Note and the Certificate Class E Note.

"Certificated Security": The meaning specified in Section 8-102(a)(4) of the UCC.

"Chattel Paper": "Tangible Chattel Paper" and "Electronic Chattel Paper" as those terms are defined in the UCC.

"Class": Each of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Preference Shares.

"Class A CDS Reserve Account": The meaning specified in Section 10.4(b).

"Class A Commitments": The meaning assigned to such term in the Class A Note Purchase Agreement.

"Class A Commitment Fee": The commitment fee that accrues on that portion of the Class A Commitments that are undrawn as of the close of each Business Day (or, in the case of any day that is not a Business Day, on the preceding Business Day) at a rate per annum equal to 0.00% on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360 from and including the Closing Date until Maturity Date.

"Class A Commitment Portion": With respect to a Removed Reference Entity, means the lesser of (i) 70.00% of the Reference Entity Calculation Amount for such Removed Reference Entity and (ii) the amount necessary to reduce the undrawn Class A Commitments to zero.

"Class A Interest Distribution Amount": With respect to any Payment Date, the sum of:

> (i)    the aggregate amount of interest accrued at the Class A Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class A Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class A Notes or any prepayment thereof on any preceding Payment Date), and

(ii)     any Defaulted Interest in respect of the Class A Notes and accrued and unpaid interest on such Defaulted Interest;

provided that, from the Maturity Date to the Deferred Maturity Date, the funded portion of the Class A Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class A Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the funded Class A Notes accrued at a rate of LIBOR.

"Class A Note Agent":   U.S. Bank National Association, a national banking association, as agent on behalf of the Holders of the Class A Notes under the Class A Note Purchase Agreement.

"Class A Note Interest Rate":   The interest rate for the Class A Notes as set forth in Section 2.3.

"Class A Note Purchase Agreement":   An agreement dated as of the Closing Date, among the Issuer, Co-Issuer, Class A Note Agent and the Holders of the Class A Notes, as the same may be amended or supplemented and in effect from time to time.

"Class A Note Register:   The register maintained by the Class A Note Agent with respect to the Class A Notes pursuant to Section 2.5.

"Class A Notes":   The Class A Contingent Funding Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class A Trustee":   The meaning specified in Section 6.12.

"Class B CDS Reserve Account":   The meaning specified in Section 10.4(c).

"Class B Commitments":   The meaning assigned to such term in the Class B Note Purchase Agreement.

"Class B Commitment Fee":   The commitment fee that accrues on that portion of the Class B Commitments that are undrawn as of the close of each Business Day (or, in the case of any day that is not a Business Day, on the preceding Business Day) at a rate per annum equal to 0.45% on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360 from and including the Closing Date until Maturity Date.

"Class B Commitment Portion":  With respect to a Removed Reference Entity, means the lesser of (i) the Reference Entity Calculation Amount for such Removed Reference Entity minus the Class A Commitment Portion with respect to such Removed Reference Entity and (ii) the amount necessary to reduce the undrawn Class B Commitments to zero, in accordance with Section 10.4(f).

"Class B Interest Distribution Amount":  With respect to any Payment Date, the sum of:

       (i)     the aggregate amount of interest accrued at the Class B Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class B Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class B Notes or any prepayment thereof on any preceding Payment Date), and

       (ii)    any Defaulted Interest in respect of the Class B Notes and accrued and unpaid interest on such Defaulted Interest;

provided that, from the Maturity Date to the Deferred Maturity Date, the Class B Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the Aggregate Outstanding Amount of the Class B Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class B Notes accrued at a rate of LIBOR.

"Class B Note Agent":  U.S. Bank National Association, a national banking association, as agent on behalf of the Holders of the Class B Notes under the Class B Note Purchase Agreement.

"Class B Note Interest Rate":  The interest rate for the Class B Notes specified in Section 2.3.

"Class B Note Purchase Agreement":  An agreement dated as of the Closing Date, among the Issuer, Co-Issuer, Class B Note Agent and the Holders of the Class B Notes, as the same may be amended or supplemented and in effect from time to time.

"Class B Note Register:  The register maintained by the Class B Note Agent with respect to the Class B Notes pursuant to Section 2.5.

"Class B Notes":  The Class B Contingent Funding Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class B Trustee": The meaning specified in Section 6.12.

"Class C Coverage Tests": The Class C Overcollateralization Ratio Test and the Class C Interest Coverage Ratio Test.

"Class C Interest Coverage Ratio": As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

      (i)    the Net Collateral Interest Proceeds; by

      (ii)    with respect to the current Due Period, the sum of (a) scheduled interest on the Class A Notes, the accrued and unpaid Class A Commitment Fee, scheduled interest on the Class B Notes, the accrued and unpaid Class B Commitment Fee and scheduled interest on the Class C Notes with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the immediately succeeding Payment Date) and (b) any Defaulted Interest on the Class A Notes, any Defaulted Interest on the Class B Notes and any Defaulted Interest on the Class C Notes, and in each case, accrued and unpaid interest on such Defaulted Interest.

"Class C Interest Coverage Ratio Test": For so long as any Class C Notes remain Outstanding, a test that will be satisfied on any Measurement Date, if the Class C Interest Coverage Ratio is equal to or greater than 125.0%.

"Class C Interest Distribution Amount": With respect to any Payment Date, the sum of:

      (i)    the aggregate amount of interest accrued at the Class C Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class C Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class C Notes or any prepayment thereof on any preceding Payment Date), and

      (ii)    any Defaulted Interest in respect of the Class C Notes and accrued and unpaid interest on such Defaulted Interest;

provided that, from the Maturity Date to the Deferred Maturity Date, the Class C Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the Aggregate Outstanding Amount of the Class C Notes and the denominator of which is the Aggregate Outstanding

Amount of all Classes of Notes and (b) the interest amount on the Class C Notes accrued at a rate of LIBOR.

"Class C Note Interest Rate": The interest rate for the Class C Notes specified in Section 2.3.

"Class C Notes": The Class C Floating Rate Notes having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class C Overcollateralization Ratio": As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

      (a)      the Net Collateral Principal Balance as of such Measurement Date; by

      (b)      the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes (calculated using the aggregate amount of the Class A Commitments and the Class B Commitments whether funded or unfunded) and the Class C Notes as of such Measurement Date.

"Class C Overcollateralization Ratio Test": A test that will be satisfied as of any Measurement Date if the Class C Overcollateralization Ratio is equal to or greater than 105.00%.

"Class C Trustee": The meaning specified in Section 6.12.

"Class D Coverage Tests": The Class D Overcollateralization Ratio Test and the Class D Interest Coverage Ratio Test.

"Class D Deferred Interest": The meaning specified in Section 2.7(a).

"Class D Interest Coverage Ratio": As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

      (i)      the Net Collateral Interest Proceeds; by

      (ii)      with respect to the current Due Period, the sum of (a) scheduled interest on the Class A Notes, the accrued and unpaid Class A Commitment Fee, scheduled interest on the Class B Notes, the accrued and unpaid Class B Commitment Fee, scheduled interest on the Class C Notes and scheduled interest on the Class D Notes (not including Class D Deferred Interest from previous Payment Dates, but including interest on such Class D Deferred Interest) with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the immediately succeeding Payment Date) and (b) any Defaulted Interest on the Class A

Notes, any Defaulted Interest on the Class B Notes, any Defaulted Interest on the Class C Notes and any Defaulted Interest on the Class D Notes and, in each case, accrued and unpaid interest on such Defaulted Interest.

"Class D Interest Coverage Ratio Test": For so long as any Class D Notes remain Outstanding, a test that will be satisfied on any Measurement Date, if the Class D Interest Coverage Ratio is equal to or greater than 120.00%.

"Class D Interest Distribution Amount": With respect to any Payment Date, the sum of:

(i)    the aggregate amount of interest accrued at the Class D Note Interest Rate in effect during the related Interest Period immediately preceding such Payment Date on the Aggregate Outstanding Amount of the Class D Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class D Notes or any prepayment thereof on any preceding Payment Date), and

(ii)    any Class D Deferred Interest and, in the event that the Class A Notes, the Class B Notes and the Class C Notes are no longer Outstanding, any Defaulted Interest in respect of the Class D Notes and accrued and unpaid interest on such Defaulted Interest;

provided that, from the Maturity Date to the Deferred Maturity Date, the Class D Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is Aggregate Outstanding Amount of the Class D Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class D Notes accrued at a rate of LIBOR.

"Class D Note Interest Rate": The interest rate for the Class D Notes specified in Section 2.3.

"Class D Notes": The Class D Floating Rate Deferrable Notes, having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class D Overcollateralization Ratio": As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(a)    the Net Collateral Principal Balance as of such Measurement Date, by

(b)      the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes (calculated using the aggregate amount of the Class A Commitments and the Class B Commitments whether funded or unfunded), the Class C Notes and the Class D Notes (including any Class D Deferred Interest), in each case as of such Measurement Date.

"Class D Overcollateralization Ratio Test": A test that will be satisfied as of any subsequent Measurement Date if the Class D Overcollateralization Ratio is equal to or greater than 103.75%.

"Class D Trustee": The meaning specified in Section 6.12.

"Class E Coverage Tests": The Class E Overcollateralization Ratio Test and the Class E Interest Coverage Ratio Test.

"Class E Deferred Interest": The meaning specified in Section 2.7(a).

"Class E Interest Coverage Ratio": As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(i)      the Net Collateral Interest Proceeds; by

(ii)      with respect to the current Due Period, the sum of (a) scheduled interest on the Class A Notes, the accrued and unpaid Class A Commitment Fee, scheduled interest on the Class B Notes, the accrued and unpaid Class B Commitment Fee, scheduled interest on the Class C Notes, scheduled interest on the Class D Notes (not including Class D Deferred Interest from previous Payment Dates, but including interest on such Class D Deferred Interest) and scheduled interest on the Class E Notes (not including Class E Deferred Interest from previous Payment Dates, but including interest on such Class E Deferred Interest) with respect to such Measurement Date (or, if such Measurement Date is not a Payment Date, the immediately succeeding Payment Date) and (b) any Defaulted Interest on the Class A Notes, any Defaulted Interest on the Class B Notes, any Defaulted Interest on the Class C Notes, any Defaulted Interest on the Class D Notes and any Defaulted Interest on the Class E Notes and, in each case, accrued and unpaid interest on such Defaulted Interest.

"Class E Interest Coverage Ratio Test": For so long as any Class E Notes remain Outstanding, a test that will be satisfied on any Measurement Date, if the Class E Interest Coverage Ratio is equal to or greater than 110.00%.

"Class E Interest Distribution Amount": With respect to any Payment Date, the sum of:

(i)      the aggregate amount of interest accrued at the Class E Note Interest Rate in effect during the related Interest Period immediately preceding such

Payment Date on the Aggregate Outstanding Amount of the Class E Notes on the first day of such Interest Period (after giving effect to any redemption or other payment of principal of the Class E Notes or any prepayment thereof on any preceding Payment Date), and

(ii)    any Class E Deferred Interest and, in the event that the Class A Notes, the Class B Notes, the Class C Notes or Class D Notes are no longer Outstanding, any Defaulted Interest in respect of the Class E Notes and accrued and unpaid interest on such Defaulted Interest; provided that, from the Maturity Date to the Deferred Maturity Date, the Class E Notes shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is Aggregate Outstanding Amount of the Class E Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on the Class E Notes accrued at a rate of LIBOR.

"Class E Note Interest Rate":  The interest rate for the Class E Notes specified in Section 2.3.

"Class E Notes":  The Class E Floating Rate Deferrable Notes, having the applicable Note Interest Rate and Stated Maturity as set forth in Section 2.3.

"Class E Overcollateralization Ratio":  As of any Measurement Date, means the ratio (expressed as a percentage) obtained by dividing:

(a)    the Net Collateral Principal Balance as of such Measurement Date, by

(b)    the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes (calculated using the aggregate amount of the Class A Commitments and the Class B Commitments whether funded or unfunded), the Class C Notes, the Class D Notes (including any Class D Deferred Interest) and the Class E Notes (including any Class E Deferred Interest), in each case as of such Measurement Date.

"Class E Overcollateralization Ratio Test":  A test that will be satisfied as of any subsequent Measurement Date if the Class E Overcollateralization Ratio is equal to or greater than 102.75%.

"Class E Trustee":  The meaning specified in Section 6.12.

"Clearing Agency":  An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

·"Clearing Corporation": The meaning specified in Section 8-102(a)(5) of the UCC.

"Clearing Corporation Securities": Securities which are in the custody of or maintained on the books of a Clearing Corporation or a nominee subject to the control of a Clearing Corporation and, if they are Certificated Securities in registered form, properly endorsed to or registered in the name of the Clearing Corporation or such nominee.

"Clearstream": Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg.

"Closing Date": July 19, 2007.

"Closing Date Underlying Asset": The Underlying Asset acquired by the Issuer on the Closing Date and set forth in Schedule A hereto.

"Co-Issuer":  Pebble Creek LCDO 2007-3, LLC, a limited liability corporation organized under the laws of the State of Delaware, unless and until a successor Person shall have become the Co-Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Co-Issuer" shall mean such successor Person.

"Co-Issuers": The Issuer and the Co-Issuer.

"Code": The United States Internal Revenue Code of 1986, as amended.

"Collateral": As defined in the Granting Clause hereof.

"Collateral Administration Agreement": An agreement dated as of the Closing Date, among the Issuer and the Collateral Administrator, as the same may be amended or supplemented and in effect from time to time.

"Collateral Administrator": U.S. Bank National Association, a national banking association, in its capacity as such under the Collateral Administration Agreement, unless a successor Person shall have become the Collateral Administrator pursuant to the applicable provisions of the Collateral Administration Agreement, and thereafter "Collateral Administrator" shall mean such successor Person.

"Collateral Quality Measurements":  The initial Diversity Score (calculated as of the Closing Date), a Weighted Average Rating Factor (Moody's), an Applicable Recovery Rate and Weighted Average Spread.

"Collection Accounts": Collectively, the Principal Collection Account and the Interest Collection Account.

"Company Announcements Office":    The Company Announcements Office of the Irish Stock Exchange.

"Contingency Amount":    An amount equal to the sum of (i) the Contingency Cash Settlement Amount (if any) and (ii) the Adjustment Amount(s) (if any).

"Contingency Cash Settlement Amount":    An amount determined by the Credit Swap Calculation Agent in its sole discretion as being equal to the Cash Settlement Amounts that would be payable by the Issuer in respect of two (2) additional Reference Entities having the largest Reference Entity Calculation Amount as of the Maturity Date, assuming that a Credit Event had occurred with respect to each such Reference Entity and that the Conditions to Settlement had been satisfied on or prior to the Maturity Date.

"Contingent Class A Funding Account":    The trust account designated as the "Contingent Class A Funding Account" and established pursuant to Section 10.4.

"Contingent Class B Funding Account":    The trust account designated as the "Contingent Class B Funding Account" and established pursuant to Section 10.4.

"Controlling Class":    Each of the Class A Notes and the next-most senior Class of Notes Outstanding, each such Class voting separately, such that any reference to a Majority, Supermajority or other percentage of the Controlling Class shall mean a Majority, Supermajority or such other percentage of each of such two Classes, so long as any Class A Notes are Outstanding, and, once the Class A Notes are no longer Outstanding, the Class B Notes, so long as any Class B Notes are Outstanding and, thereafter, the Class C Notes, so long as any Class C Notes are Outstanding and, thereafter, the Class D Notes, so long as any Class D Notes are Outstanding and, thereafter, the Class E Notes, so long as any Class E Notes are Outstanding.

"Controlling Class Trustee":    The meaning specified in Section 6.12.

"Corporate Trust Office":    The principal corporate trust office of the Trustee, currently located at One Federal Street, Boston Massachusetts, Attention: Pebble Creek LCDO 2007-3, Ltd., or such other address as the Trustee may designate from time to time by notice to the Noteholders and the Issuer or the principal corporate trust office of any successor Trustee.

"Coverage Tests":    The Class C Overcollateralization Ratio Test, the Class C Interest Coverage Ratio Test, the Class D Overcollateralization Ratio Test, the Class D Interest Coverage Ratio Test, the Class E Overcollateralization Ratio Test and the Class E Interest Coverage Ratio Test. For purposes of the Coverage Tests, the calculation of any Coverage Test on any Measurement Date shall be made by giving effect to all payments

30775-00052 NY:2469328.3        17

payable pursuant to the Priority of Payments on the Payment Date following such Measurement Date.

"Credit Event": The meaning specified in the Credit Swap Agreement.

"Credit Swap Agreement": The 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated the Closing Date, between the Issuer and the Credit Swap Counterparty including the schedule thereto and the confirmation thereunder.

"Credit Swap Counterparty": Lehman Brothers Special Financing Inc., a wholly-owned and guaranteed subsidiary of Lehman Brothers Holdings Inc.

"Credit Swap Calculation Agent": Lehman Brothers Special Financing Inc., as calculation agent under the Credit Swap Agreement.

"Credit Swap Issuer Account": The trust account designated the "Credit Swap Posted Amount Account" and established by the Trustee pursuant to Section 10.4(e).

"Credit Swap Posted Amount": The meaning specified in the Credit Swap Agreement.

"Custodial Account": The trust account designated the "Custodial Account" and established pursuant to Section 10.2(h).

"Custodian": The meaning specified in Section 10.7.

"Default": Any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Defaulting Party": The meaning specified in 11.1(a)(B).

"Defaulted Interest": Any interest (other than Class D Deferred Interest and Class E Deferred Interest) due and payable in respect of any Note that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity and remains unpaid and, to the extent not duplicative in any context in which the term "Defaulted Interest" is used, any interest on such amounts; provided, that: for so long as any Class A Notes, Class B Notes, Class C Notes are Outstanding, any interest payable in respect of the Class D Notes that is not punctually paid or duly provided for on the applicable Payment Date will become Class D Deferred Interest rather than Defaulted Interest: provided further, that: for so long as any Class A Notes, Class B Notes, Class C Notes or Class D Notes are Outstanding, any interest payable in respect of the Class E Notes that is not punctually paid or duly provided for on the applicable Payment Date will become Class E Deferred Interest rather than Defaulted Interest.

"Deferred Maturity Date": December 22, 2014, or if such day is not a Business Day, the next Business Day.

"Deposit": Any Cash deposited with the Trustee by the Issuer on the Closing Date for inclusion as Collateral and deposited by the Trustee in the Collection Accounts on the Closing Date.

"Depositary": With respect to the Securities in a global form, The Depository Trust Company, its nominees, and their respective successors.

"Determination Date": The last day of each Due Period except if such day falls on the Deferred Maturity Date.

"Disposition Proceeds": Any proceeds received with respect to termination of the Underlying Asset and Eligible Investments, in each case, net of out-of-pocket expenses and disposition costs in connection with such sales.

"Distribution": Any payment of principal or interest or any dividend, premium or fee payment made on, or any other distribution in respect of, a security or obligation.

"Diversity Score": A single number that indicates Collateral concentration in terms of both issuer and industry concentration. The Diversity Score for the Reference Portfolio is calculated by summing each of the Industry Diversity Scores, which are calculated as follows:

    (i)    A "Reference Entity Calculation Amount" is calculated for each Reference Entity by summing the aggregate Reference Entity Calculation Amount for such Reference Entity under the Credit Swap Agreement.

    (ii)    An "Average Reference Entity Calculation Amount" is calculated by summing the Reference Entity Calculation Amounts and dividing such amount by the sum of the number of Reference Entities.

    (iii)    An "Equivalent Unit Score" is calculated for each Reference Entity as the lesser of (A) one and (B) the Reference Entity Calculation Amount for such issuer divided by the Average Reference Entity Calculation Amount.

    (iv)    An "Aggregate Industry Equivalent Unit Score" is then calculated for each of the Moody's Industry Categories listed on Schedule B hereto, by summing the Equivalent Unit Scores for each Reference Entity in each such Moody's Industry Category.

(v)    An "Industry Diversity Score" is then established by reference to the Diversity Score Table listed on Schedule E hereto for the related Aggregate Industry Equivalent Unit Score; provided, that if any Aggregate Industry Equivalent Unit Score falls between any two such scores then the applicable Industry Diversity Score will be the lower of the two Industry Diversity Scores in the Diversity Score Table.

"Dollar" or "$": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"Downgrade Draw": The meaning specified in each Note Purchase Agreement.

"Draw Period": The meaning specified in each Note Purchase Agreement.

"DTC List": The meaning specified in Section 2.2(d).

"DTC Notice": The meaning specified in Section 2.2(d).

"Due Date": Each date on which a Distribution is due on a Pledged Underlying Asset.

"Due Period": With respect to any Payment Date, the period commencing on (and including) the day immediately following one Business Day prior to the preceding Payment Date (or on the Closing Date, in the case of the Due Period relating to the first Payment Date) and ending on one Business Day prior to such Payment Date (or, in the case of the Due Period that is applicable to the final Payment Date, ending on such Payment Date).

"Early Termination Date": The meaning specified in the Credit Swap Agreement

"Eligible Investment": Any Dollar denominated investment that, at the time it, or evidence of it, is delivered to the Trustee or the Custodian in accordance with Section 3.4, is one or more of the following obligations or securities including, without limitation, investments for which the Trustee or an Affiliate of the Trustee provides services:

(i)    Cash;

(ii)    direct Registered debt obligations of, and Registered debt obligations the timely payment of principal of and interest on which is fully and expressly guaranteed by, the United States of America or any full faith and credit agency or instrumentality thereof;

(iii)    demand and time deposits in, trust accounts of, certificates of deposit of, bankers' acceptances payable within 183 days of issuance issued by, or federal funds sold by any United States federal or state depository institution or trust company, the commercial paper and/or debt obligations of which (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have been assigned a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P, in the case of long-term debt obligations, or "P-1" by Moody's and "A-1+" by S&P, in the case of commercial paper and short-term obligations; provided, that in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(iv)    unleveraged repurchase obligations with respect to (a) any security described in clause (ii) above or (b) any other security issued or guaranteed by an agency or instrumentality of the United States of America (in each case without regard to the stated maturity of such security), in either case entered into with a United States federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is "Aaa" by Moody's and "AAA" by S&P and whose short-term credit rating is not less than "P-1" by Moody's and "A-1+" by S&P at the time of such investment or contractual commitment providing for such investment; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(v)    Registered debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof and which has a credit rating of "Aaa" by Moody's and "AAA" by S&P at all times;

(vi)    commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance having at the time of such investment or contractual commitment providing for such investment a credit rating of not less than "P-1" by Moody's and "A-1+" by S&P; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(vii)    Reinvestment Agreements (so long as payments under any such Reinvestment Agreement are not subject to withholding taxes) issued

by any bank (if treated as a deposit by such bank) or Reinvestment Agreements issued in registered form (for purposes of the Code) after July 18, 1984 by any insurance company or other corporation or entity organized under the laws of the United States of America or any state thereof that has a credit rating at the time of such investment or contractual commitment providing for such investment of not less than "P-1" by Moody's and "A-1+" by S&P; provided, that if such security has a maturity of longer than 91 days, the issuer thereof must also, at all times, have a long-term credit rating of "Aaa" by Moody's and "AAA" by S&P;

(viii)    any securities issued by any offshore money market fund or similar investment vehicle having at all times a long-term credit rating of "AAA", "AAAf", "AAAm" or "AAAm-G" by S&P and a long-term credit rating of "Aaa"/"MR1+" by Moody's at all times;

(ix)    any other new category of investment provided that each Rating Agency has published guidance that such category qualifies as an eligible investment in CDOs and such category has not subsequently been reclassified; and

(x)    the Initial Specific Investment Instrument;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day immediately preceding the Payment Date next following the Due Period in which the date of investment occurs; provided, that Eligible Investments shall not include (a) any interest-only security, any security purchased at a price in excess of 100% of the par value thereof or any security whose repayment is subject to substantial non-credit related risk as determined in the sole judgment of the Credit Swap Calculation Agent on behalf of the Issuer, (b) any security whose rating assigned by S&P includes the subscript "p," "pi," "q," "r" or "t," (c) any security that is subject to an Offer, or (d) any mortgage-backed security; provided, further, each Eligible Investment must satisfy the following requirements: (a) the investment shall be treated as indebtedness that is not a United States real property interest for U.S. federal income tax purposes, or the Issuer has received advice from Allen & Overy LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters that the purchase of such investment shall not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes or otherwise cause the Issuer to be subject to U.S. federal, state or local income or franchise tax on a net income tax basis and (b) the investment shall not be subject to deduction or withholding for or on account of any withholding or similar tax, unless the payor is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required. To the extent that any Eligible Investment does not meet its rating requirement, the Trustee

shall, at the direction of the Credit Swap Counterparty, cause such Eligible Investment to be replaced. With respect to clause (vii) of this definition, the Issuer shall not enter into any Reinvestment Agreement without obtaining Rating Agency Confirmation from S&P.

The Eligible Investments may include one or more of the following: Lehman Brothers Prime Money Market Fund, the Lehman Brothers ABS Enhanced LIBOR Fund and Lehman Brothers Enhance Cash Fund (the "Funds"); provided that the Funds must satisfy the requirements of the definition of "Eligible Investments" at all times.

"Entitlement Order": The meaning specified in Section 8-102(a)(8) of the UCC.

"Equivalent Unit Score": As defined in the definition of "Industry Diversity Score" herein.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Euroclear": Euroclear Bank S.A./N.V., as operator of the Euroclear System.

"Event Determination Date": The meaning specified in the Credit Swap Agreement.

"Event of Default": The meaning specified in Section 5.1.

"Excepted Property": Means, with respect to the Issuer, the accounts established and maintained by the Issuer in the Cayman Islands into which (a) the U.S.$250 capital contributed to the Issuer in respect of the Issuer Ordinary Shares in accordance with the Issuer Charter, and (b) the U.S.$250 fee paid to the Issuer for agreeing to issue the Securities are deposited.

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exercise Amount": The meaning specified in the Credit Swap Agreement.

"Final Price": The meaning specified in the Credit Swap Agreement.

"Financial Asset": The meaning specified in Section 8-102(a)(9) of the UCC.

"Fixed Amount": The meaning specified in the Credit Swap Agreement.

"funded outstanding principal balance":  With respect to the Class A Notes and the Class B Notes means the outstanding principal balance thereof (and does not include undrawn Class A Commitments or Class B Commitments).

"funded portion":  With respect to the Class A Notes and the Class B Notes means the funded outstanding principal balance and with respect to the Class A Commitments and Class B Commitments means the portion of the funded outstanding principal balance equal to the amount of the Class A Commitments and Class B Commitments, as applicable, that have been drawn.

"Funding Entity":  The meaning specified in the Class A Note Purchase Agreement and the Class B Note Purchase Agreement.

"General Intangibles":  The meaning specified in Section 9-102(a)(42) of the UCC.

"Global Notes":  Notes issued in global form.

"Global Securities Legend":  The legend set forth on any Global Note.

"Grant":  To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of setoff against, deposit, set over or confirm.  A Grant of the Collateral, or of any other Instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of the Collateral, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Guarantor":  The meaning specified in the Class A Note Purchase Agreement and the Class B Note Purchase Agreement.

"Holder" or "Noteholder":  With respect to any Note, the Person in whose name such Note is registered in the Note Register.  "Holder" with respect to any Preference Share shall mean the Person in whose name such Preference Share is registered in the Share Register.

"Indenture":  This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"Independent": As to any Person, any other Person (including a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, (ii) is not connected with such Person as an officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions and (iii) is not Affiliated with a firm that fails to satisfy the criteria set forth in (i) and (ii). "Independent" when used with respect to any accountant may include an accountant who audits the books of any Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

Whenever any Independent Person's opinion or certificate is to be furnished to the Trustee, such opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning hereof.

"Industry Diversity Score": As defined in the definition of the "Diversity Score" herein.

"Initial Rating": (i) with respect to the Class B Notes, "Aaa" by Moody's and "AAA" by S&P, (ii) with respect to the Class C Notes, "A2" by Moody's and "A" by S&P; (iii) with respect to the Class D Notes, "Baa2" by Moody's and "BBB" by S&P and (iv) with respect to the Class E Notes, "Ba2" by Moody's and "BB" by S&P. To the extent that the Credit Swap Counterparty does not deposit the relevant Posted Amount with respect to a Class of Notes as required under the Credit Swap Agreement, the ratings of one or more of the Notes may be downgraded or withdrawn.

"Instruments": The meaning specified in Section 9-102(a)(47) of the UCC.

"Interest Collection Account": The trust account designated the "Interest Collection Account" and established pursuant to Section 10.2(a).

"Interest Distribution Amount": With respect to any Payment Date, the sum of the Class A Interest Distribution Amount, the Class B Interest Distribution Amount, the Class C Interest Distribution Amount, the Class D Interest Distribution Amount and the Class E Interest Distribution Amount for such Payment Date .

"Interest Period": With respect to the Notes (other than the Class A Notes or the Class B Notes) (i) in the case of the initial Interest Period, the period from, and including, the Closing Date to, but excluding, the first Payment Date; (ii) after the initial Interest Period, the period from, and including, the preceding Payment Date to, but excluding, the next succeeding Payment Date (or, in the case of the interest payment to be made on the Maturity Date of the Notes to but excluding the Maturity Date of the Notes) and (iii) thereafter, the period from, and including, Maturity Date to, but

excluding, the Deferred Maturity Date; provided that, for purposes of the Interest Period described in clause (iii), all the Notes (including the funded portion of the Class A Notes and the Class B Notes) outstanding shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding amount of such Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on such Class of Notes accrued at a rate of LIBOR; provided, further, that (a) so long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the portion of the Class A Notes or the Class B Notes that were funded as a result of the Downgrade Draw in an amount equal to the amount of earnings on the Eligible Investments which are held in the related sub-account of the Contingent Class A Funding Account or Contingent Class B Funding Account, as applicable, in connection with a Downgrade Draw on such Class A Notes, plus either: (i) 0.00% in the case of the Class A Notes or (ii) 0.45% in the case of the Class B Notes and (b) interest shall accrue on the portion of such: (i) Class A Notes that were funded other than as a result of such Downgrade Draw in an amount equal to LIBOR plus 0.00% or (ii) Class B Notes that were funded other than as a result of such Downgrade Draw in an amount equal to LIBOR plus 0.45%. Any Class A Notes or Class B Notes that remain outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest during such Interest Period as provided above with respect to the Notes outstanding during such Interest Period.

With respect to the Class A Notes and Class B Notes:

(i)    in the case of each initial Interest Period, the period from, and including, the first day, if any, on which any amounts are drawn under the Class A Notes or Class B Notes, as applicable, to, but excluding, the next following Payment Date;

(ii)    after the initial Interest Period, the period from, and including, the preceding Payment Date to, but excluding, the next succeeding Payment Date (or, in the case of the interest payment to be made on the Maturity Date of the Class A Notes and Class B Notes to, but excluding, the Maturity Date of the Class A Notes or the Class B Notes, as applicable); and

(iii)    thereafter, the period from, and including, Maturity Date to, but excluding, the Deferred Maturity Date.

"Interest Proceeds":  With respect to any Payment Date, include the following amounts (without duplication and excluding the Excepted Property and any proceeds thereof) to the extent received during the related Due Period: (a) all payments of interest and dividends received in Cash by the Issuer during the related Due Period on

the Eligible Investments (including the Specific Investment Instrument); (b) with respect to the Underlying Asset, the Fixed Amounts received by the Issuer thereunder; and (c) all amounts on deposit in the Credit Swap Issuer Account that are applied as Interest Proceeds as described in the Credit Swap Agreement.

"Investment Company Act": The United States Investment Company Act of 1940, as amended.

"Irish Paying Agent": Any Person authorized by the Co-Issuers to act in such capacity pursuant to the second paragraph of Section 7.4.

"Issuer": Pebble Creek LCDO 2007-3, Ltd., an exempted limited liability company incorporated under the laws of the Cayman Islands, unless and until a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"Issuer Accounts": The Payment Account, the Collection Accounts, the Custodial Account, the Specific Investment Proceeds Account, the Maturity Date Account, the Contingent Class A Funding Account, the Contingent Class B Funding Account, the Class A CDS Reserve Account, the Class B CDS Reserve Account and the Credit Swap Issuer Account.

"Issuer Charter": Articles of Association, adopted by the Issuer on July 11, 2007, of the Issuer, as the same may be further amended, supplemented or otherwise modified and in effect.

"Issuer Order" and "Issuer Request": A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer.

"Issuer Ordinary Shares": The ordinary shares, par value U.S.$1.00 per share, of the Issuer which have been issued by the Issuer and are outstanding from time to time.

"Issuer's Agent": U.S. Bank National Association, a national banking association.

"LIBOR": The meaning set forth in Schedule C attached hereto.

"LIBOR Determination Date": The meaning set forth in Schedule C attached hereto.

"Majority": With respect to the Notes or any Class thereof or the Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of such Notes of such Class or the Preference Shares.

"Managers": Lehman Brothers Inc. and Lehman Brothers International (Europe).

"Maturity Date": With respect to any Note, the date on which the unpaid principal of such Note becomes due and payable as therein or herein provided, whether on the Stated Maturity (determined without regard to the proviso) or by declaration of acceleration, call for redemption or otherwise.

"Maturity Date Amount": With respect to all Notes, the sum of (i) any Cash Settlement Amounts that have been determined but not yet paid and (ii) the Contingency Amount.

"Maturity Date Account" : The meaning specified in Section 10.4(g).

"Measurement Date": Any of the following: (i) the Closing Date and (ii) each Determination Date on or after the Closing Date; provided, that if any such date would fall on a day that is not a Business Day, the relevant Measurement Date will be the first following day that is a Business Day and (iii) with not less than two Business Days' written notice to each of the Co-Issuers and the Trustee, any other Business Day that any Rating Agency requests to be a Measurement Date.

"Money": The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report": The monthly report provided to the Trustee pursuant to Section 10.6(a).

"Moody's": Moody's Investors Service, Inc. and any successor or successors thereto.

"Moody's Industry Category": Any of the industry categories set forth in Schedule B hereto, including any additional categories that may be subsequently established by Moody's and provided by Moody's to the Credit Swap Counterparty and by the Credit Swap Counterparty or Moody's to the Trustee.

"Moody's Default Probability Rating": With respect to any Reference Entity, as of any date of determination, the ratings determined in accordance with the following in the following order of priority:

(1)     if the obligor has an assigned Probability of Default Rating, such rating; and

(2)     if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating of the Reference Entity, as applicable.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"Moody's Equivalent Senior Unsecured Rating":  With respect to any Reference Entity as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)    if the Reference Entity has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)    if the preceding clause does not apply, the Moody's "Issuer Rating" for the Reference Entity;

(c)    if the preceding clauses do not apply, but the Reference Entity has a subordinated obligation with an Assigned Moody's Rating, then:

(i)    if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than the Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the Assigned Moody's Rating;

(d)    if the preceding clauses do not apply, but the Reference Entity has a senior secured obligation with an Assigned Moody's Rating, then:

(i)    if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)    if the preceding clauses do not apply, but such Reference Entity has a Moody's Corporate Family Rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such Moody's Corporate Family Rating;

(f)    if the preceding clauses do not apply, but the Reference Entity has a senior unsecured obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating, if it is "BBB-" or higher, or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating, if it is "BB+" or lower;

(g)    if the preceding clauses do not apply, but the Reference Entity has a Long Term Foreign Currency Issuer Credit Rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating, if it is "BBB-" or higher, or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating, if it is "BB+" or lower;

(h)    if the preceding clauses do not apply, but the Reference Entity has a subordinated obligation (other than a bank loan) with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the rating assigned by Moody's shall be deemed to be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating, if it is "BBB-" or higher; or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating, if it is "BB+" or lower,

and, in either case, the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above;

(i)    if the preceding clauses do not apply, but the Reference Entity has a senior secured obligation with a monitored public rating from Standard & Poor's (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the rating assigned by Moody's shall be deemed to be:

(i)    one rating subcategory below the Moody's equivalent of such Standard & Poor's rating, if it is "BBB-" or higher; or

(ii)    two rating subcategories below the Moody's equivalent of such Standard & Poor's rating, if it is "BB+" or lower,

and, in either case, the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above;

(j)    if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating shall be "Caa1":

(i)    neither the Reference Entity nor any of its Affiliates is subject to reorganization or bankruptcy proceedings;

(ii)    no debt securities or obligations of the Reference Entity are in default;

(iii)    neither the Reference Entity nor any of its Affiliates has defaulted on any debt during the preceding two years;

(iv)    the Reference Entity has been in existence for the preceding five years;

(v)    the Reference Entity is current on any cumulative dividends;

(vi)    the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter;

(vii)    the Reference Entity had a net profit before tax in the past fiscal year and the most recent quarter; and

(viii)    the annual financial statements of such Reference Entity are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer.

(k)    if the preceding clauses do not apply and each of the following clauses (i) through (ii) do apply, the Moody's Equivalent Senior Unsecured Rating shall be Caa3:

(i)    neither the Reference Entity nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii)    no debt securities or obligations of the Reference Entity are in default

"Moody's Industry Category":  Any of the industry categories set forth in Schedule B hereto, including any additional categories that may be subsequently established by Moody's and provided by Moody's to the Credit Swap Counterparty and by the Credit Swap Counterparty or Moody's to the Trustee.

"Moody's Rating Factor":  With respect to each Reference Entity, the number set forth in the table below opposite the Moody's Default Probability Rating of such Reference Entity:

| Moody's Default Probability Rating | Moody's Rating Factor | Moody's Default Probability Rating | Moody's Rating Factor |
|---|---|---|---|
| "Aaa" | 1 | "Ba1" | 940 |
| "Aa1" | 10 | "Ba2" | 1350 |
| "Aa2" | 20 | "Ba3" | 1766 |
| "Aa3" | 40 | "B1" | 2220 |
| "A1" | 70 | "B2" | 2720 |
| "A2" | 120 | "B3" | 3490 |
| "A3" | 180 | "Caa1" | 4770 |
| "Baa1" | 260 | "Caa2" | 6500 |
| "Baa2" | 360 | "Caa3" | 8070 |
| "Baa3" | 610 | "Ca" or lower | 10000 |

"Net Collateral Interest Proceeds":  With respect to any Measurement Date, without duplication, the sum of (i) the interest payments received or scheduled to be received in Cash on any Eligible Investments (including the Specific Investment Instrument) held in the Collection Accounts during the related Due Period, (ii) Fixed Amounts received under the Credit Swap Agreement, (iii) any fees actually received by the Issuer during the related Due Period, as of such Measurement Date, that constitute Interest Proceeds, and (iv) amounts designated as Interest Proceeds pursuant to clause (c) of such definition and on deposit in the Interest Collection Account as of such Measurement Date; minus amounts payable pursuant to Section 11.1(a)(A)(i) through (iii).

"Net Collateral Principal Balance":  On any Measurement Date, without duplication, an amount equal to:

(i)    the sum of the Reference Entity Calculation Amount for every Reference Entity as to which no Credit Event has occurred; minus

(ii)    with respect to each Reference Entity other than a Reference Entity for which a Credit Event has occurred and a Final Price has been determined, the greater of (x)(a) the sum of the Reference Entity Calculation Amount for every Reference Entity minus (b)(i) the sum of the unfunded portion of the Class A Commitments and the unfunded portion of the Class B Commitments plus (ii) the principal balance of the Eligible Investments in the Specific Investment Proceeds Account, the Class A CDS Reserve Account, the Class B CDS Reserve Account, the Contingent Class A Funding Account, the Contingent Class B Funding Account and (y) zero

For purposes of clarification, in determining the "Net Collateral Principal Balance," the Underlying Asset as to which the Issuer has not granted the Trustee a first priority, perfected security interest will be deemed to have a principal balance of zero. For purposes of this calculation, once a Final Price has been determined with respect to a Reference Entity, its Reference Entity Calculation Amount shall be zero.

"Non-Permitted Holder": The meaning specified in Section 2.12(b).

"Note Interest Rate": With respect to the Notes of any Class, the annual rate at which interest accrues on the Notes of such Class, as specified in Section 2.3 and in such Notes.

"Note Purchase Agreements": Collectively, the Class A Note Purchase Agreement and the Class B Note Purchase Agreement.

"Note Register": The register maintained by the Trustee or any Note Registrar with respect to the Notes pursuant to Section 2.5.

"Note Registrar": The meaning specified in Section 2.5(a).

"Note Subscription Agreements": Collectively, the Certificated Class C Note Subscription Agreement and the Certificated Class D Note Subscription Agreement.

"Noteholder": The meaning specified in the definition of "Holders."

"Notes": Collectively, the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes authenticated and delivered under this Indenture.

"Offer": With respect to any security or debt obligation, (i) any offer by the issuer of such security or borrower with respect to such debt obligation or by any other Person made to all of the holders of such security or debt obligation to purchase or otherwise acquire such security or debt obligation (other than pursuant to any redemption in accordance with the terms of any related Reference Instrument or for the purpose of registering the security or debt obligation) or to exchange such security or debt obligation

for any other security, debt obligation, Cash or other property or (ii) any solicitation by the issuer of such security or borrower with respect to such debt obligation or any other Person to amend, modify or waive any provision of such security or debt obligation or any related Reference Instrument.

"Offering Memorandum": The offering memorandum dated as of July 17, 2007 relating to the Securities.

"Officer": With respect to the Issuer, the Co-Issuer or any other corporation, the Chairman of the Board of Directors, any Director, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity; with respect to any partnership, any general partner thereof; and with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"Officer's Certificate": With respect to any Person, a certificate signed by an Authorized Officer of such Person.

"Operative Agreements": This Indenture, the Class A Note Purchase Agreement and the Class B Note Purchase Agreement.

"Opinion of Counsel": A written opinion addressed to the Trustee and each of the Rating Agencies, in form and substance reasonably satisfactory to the Trustee and each of the Rating Agencies, of an attorney at law, which is reasonably experienced and knowledgeable in the subject matter of the opinion in question and admitted to practice (or a law firm with one or more partners admitted to practice) in the state of the United States of America or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands) the laws of which state or other jurisdiction govern the subject matter in respect of which the opinion is being solicited (provided, that if the State of Delaware has such jurisdiction, such attorney may be admitted to practice in any state of the United States of America or the District of Columbia), which attorney may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer and which attorney shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to the Trustee, and each of the Rating Agencies or shall state that the Trustee and each of the Rating Agencies shall be entitled to rely thereon.

"Overcollateralization Ratio Tests": Collectively, the Class C Overcollateralization Ratio Test, the Class D Overcollateralization Ratio Test and the Class E Overcollateralization Ratio Test.

"Overcollateralization    Ratios":        Collectively,    the    Class    C Overcollateralization Ratio, the Class D Overcollateralization Ratio and the Class E Overcollateralization Ratio.

"Outstanding":  With respect to a Class of Notes, all of the Notes or the Preference Shares, as of any date of determination, all of such Class of Notes, all of the Notes or all of the Preference Shares, as the case may be, theretofore authenticated and delivered under this Indenture or delivered under the Shares Paying Agency Agreement and then issued and registered in the Share Register of the Issuer as Outstanding, as the case may be, except:

(i)     Notes or Preference Shares theretofore cancelled by the Note Registrar or Share Registrar, as applicable, or delivered to the Note Registrar or Share Registrar, as applicable, for cancellation;

(ii)    Notes or Preference Shares or portions thereof for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent or deposited with the Share Registrar or Shares Paying Agent, as applicable, in trust for the Holders of such Notes or Preference Shares; provided, that, if such Notes or Preference Shares or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture and provision therefor reasonably satisfactory to the Trustee or Share Registrar, as applicable, has been made;

(iii)   Notes or Preference Shares in exchange for or in lieu of which other Notes or Preference Shares have been issued and, in the case of the Notes, authenticated and delivered pursuant to this Indenture and, in the case of the Preference Shares, delivered pursuant to the Shares Paying Agency Agreement, as the case may be, unless proof reasonably satisfactory to the Trustee or Share Registrar is presented that any such original Notes or the Preference Shares, respectively, are held by a Holder in due course; and

(iv)    Notes or Preference Shares alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes or Preference Shares have been issued as provided in Section 2.6 and in the Shares Paying Agency Agreement;

provided, that in determining whether the Holders of the requisite Aggregate Outstanding Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes and Preference Shares owned by the Issuer or the Co-Issuer shall be disregarded and deemed not to be Outstanding; provided, further, that, for the avoidance of doubt, the Class A Notes shall be deemed to be Outstanding unless and until the undrawn Class A Commitments have been reduced to zero (and there is no funded

30775-00052 NY:2469328.3      35

outstanding principal balance on the Class A Notes) and the Class B Notes shall be deemed to be Outstanding unless and until the undrawn Class B Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class B Notes).

"Paying Agent": Any Person authorized by the Co-Issuers to pay the principal of or interest on any Notes on behalf of the Co-Issuers, as specified in Section 7.4.

"Payment Account": The trust account established pursuant to Section 10.3.

"Payment Date": The 22nd day of each March, June, September and December of each year (or if any such date is not a Business Day, the immediately following Business Day), commencing on the Payment Date in September 2007.

"Payment Date Report": The meaning specified in Section 10.6(b).

"Payment Default": Any Event of Default specified in clauses (a), (b), (c), (g) or (h) of Section 5.1.

"Person": An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), bank, unincorporated association or government or any agency or political subdivision thereof or any other entity of similar nature.

"Periodic Realized Principal Loss": The meaning specified in the Credit Swap Agreement.

"Placement Agreement": An agreement dated as of the Closing Date, among the Issuer, Lehman Brothers Inc and Lehman Brothers International (Europe) as initial purchasers, as the same may be amended or supplemented and in effect from time to time.

"Plan": Any of the following: (a) employee benefit plan (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, (b) plan described in Section 4975(e)(1) of the Code, including individual retirement accounts or Keogh plans, subject to Section 4975 of the Code, (c) entity whose underlying assets include assets of a plan described in clause (a) or (b) by reason of such plan's investment in such entity, or (d) governmental or church plan that is subject to any federal, state or local law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

"Plan Asset Regulation": The United States Department of Labor Regulation 29 C.F.R. Section 2510.3-101.

"Pledged Underlying Assets":   On any date of determination, the Underlying Asset identified on Schedule A to this Indenture as of such date of determination and the Eligible Investments (including the Specific Investment Instrument) owned by the Issuer that have been Granted to the Trustee.

"Preference Share Distribution Account": The trust account designated as the "Preference Share Distribution Account" established by the Shares Paying Agent pursuant to the Shares Paying Agency Agreement.

"Preference Share Documents": The Issuer Charter, certain resolutions adopted by the Issuer's Board of Directors prior to the Closing Date and the Shares Paying Agency Agreement.

"Preference Share Redemption Date": The date on which the Preference Shares are actually redeemed (whether such redemption occurs on a Redemption Date, the Scheduled Preference Share Redemption Date or any other date).

"Preference Share Redemption Price": A Preference Share's pro rata allocation of any amounts remaining in the Preference Share Distribution Account on the Preference Share Redemption Date in accordance with the Priority of Payments.

"Preference Shares": As of any date of determination, the Preference Shares, par value U.S.$0.01 per share with a liquidation preference of U.S.$1,000 per share, issued by the Issuer and paid for as of such date.

"Principal Collection Account":   The trust account designated the "Principal Collection Account" and established pursuant to Section 10.2(a).

"Principal Proceeds": The following amounts (without duplication and excluding Excepted Property and any proceeds thereof) to the extent received in Cash during the related Due Period: (a) all payments of principal received in Cash by the Issuer during the related Due Period on the Eligible Investments and any termination fee paid by the Credit Swap Counterparty upon an early termination of the Underlying Asset; (b) any amounts remaining in the Specific Investment Proceeds Account, the Contingent Class A Funding Account, the Contingent Class B Funding Account, the Class A CDS Reserve Account and the Class B CDS Reserve Account that are transferred to the Payment Account for application as Principal Proceeds as described in Sections 10.4(a), (b), (g) and (i); (c) all other amounts received by the Issuer during the related Due Period which are not included in the definition of "Interest Proceeds"; (d) any Additional Payment by the Credit Swap Counterparty to the Issuer in respect of a Periodic Realized Principal Loss and (e) on the Deferred Maturity Date, all amounts in the Maturity Date Account that are applied as "Principal Proceeds."

"Priority of Payments": The meaning specified in Section 11.1(a).

"Proceeding": Any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds": (i) Any property (including but not limited to Cash and securities) received as a Distribution on the Collateral or any portion thereof, (ii) any property (including but not limited to Cash and securities) received in connection with the sale, liquidation, exchange or other disposition of the Collateral, or any portion thereof and (iii) all proceeds (as such term is defined in Section 9-102(a)(64) of the UCC) of the Collateral, or any portion thereof.

"Protected Purchaser": The meaning specified in Section 8-303 of the UCC.

"Purchase Agreement": The Purchase Agreement, dated as of the Closing Date, among the Co-Issuers and the Managers.

"QIB": A qualified institutional buyer as defined in Rule 144A.

"QIB/QP": Any Person that, at the time of its acquisition, purported acquisition or proposed acquisition of Notes, is both a QIB and a QP.

"QP" or "Qualified Purchaser": Any of (i) a "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act, (ii) a "knowledgeable employee" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act or (iii) a company owned by one or more "qualified purchasers" and/or "knowledgeable employees" with respect to the Issuer within the meaning of Rule 3c-5 under the Investment Company Act.

"Rating Agencies": Moody's and any successor or successors thereto and S&P and any successor or successors thereto, or, with respect to Underlying Asset generally, if at any time Moody's or any such successor or S&P or any such successor ceases to provide rating services generally, any other nationally recognized investment rating agency selected by the Issuer and reasonably satisfactory to a Majority of the Controlling Class. In the event that at any time the Rating Agencies do not include Moody's or S&P, references to rating categories of Moody's or S&P in this Indenture shall be deemed instead to be references to the equivalent categories of such other rating agency as of the most recent date on which such other rating agency and Moody's or S&P published ratings for the type of security in respect of which such alternative rating agency is used. References to Rating Agencies with respect to a Class of Notes shall apply only to Rating Agencies that assigned a rating (public or confidential) to such Class of Notes on the Closing Date.

"Rating Agency Confirmation": With respect to any action contemplated by the Issuer, receipt by the Issuer of written confirmation from each of the Rating Agencies (which must be in writing and, with respect to Moody's, signed by an officer of

Moody's) that the then-current rating assigned by such Rating Agency to any of the Notes will not, at that time, be reduced or withdrawn as a result of the taking of such action.

"Rating Criteria": Has the meaning assigned to such term in the Class A Note Purchase Agreement.

"Recovery Amount": With respect to a Reference Entity, the Reference Entity Calculation Amount for such Reference Entity minus the Cash Settlement Amount for such Reference Entity.

"Record Date": The date as of which the Holders of Notes entitled to receive a payment of principal or interest on the succeeding Payment Date (including a payment of a Redemption Price on the applicable Redemption Date) are determined, such date as to any Payment Date being the fifteenth day (whether or not a Business Day) preceding such Payment Date.

"Redemption Date": Any date specified for a redemption of Notes pursuant to Section 9.1 or if such date is not a Business Day, the next following Business Day.

"Redemption Date Statement": The meaning specified in Section 10.7(d).

"Redemption Price": When used with respect to any Note to be redeemed pursuant to Section 9.1 in the case of any redemption of outstanding principal, an amount equal to the Aggregate Outstanding Amount of such Note to be redeemed (including, with respect to the Class D Notes, any Class D Deferred Interest, and with respect to the Class E Notes, any Class E Deferred Interest and with respect to the Class A Notes and Class B Notes, any Class A Commitment Fees or any Class B Commitment Fees, as applicable) on the Redemption Date, plus accrued and unpaid interest (including any Defaulted Interest or interest on Defaulted Interest, Class D Deferred Interest, Class E Deferred Interest Class A Commitment Fees or Class B Commitment Fees, as applicable) thereon, through the Redemption Date.

"Reference Banks": The meaning specified in Schedule C attached hereto.

"Reference Entity": The meaning specified in the Credit Swap Agreement.

"Reference Entity Calculation Amount": The meaning specified in the Credit Swap Agreement.

"Reference Entity Removal Event": The meaning specified in the Credit Swap Agreement.

"Reference Instrument": The indenture, credit agreement or other agreement pursuant to which a security or debt obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such security or debt obligation or of which the holders of such security or debt obligation are the beneficiaries.

"Reference Portfolio": The meaning specified in the Credit Swap Agreement.

"Reference Registry": The registry maintained by the Credit Swap Counterparty pursuant to the Credit Swap Agreement.

"Registered Form": When used with respect to a Certificated Security, means a form in which: (a) the Security Certificate specifies a Person entitled to the Certificated Security; and (b) a transfer of the Certificated Security may be registered upon books maintained for that purpose by or on behalf of the issuer of such Certificated Security, or the Security Certificate so states.

"Regulation D": Regulation D under the Securities Act.

"Regulation S": Regulation S under the Securities Act.

"Regulation S Legend": The legend set forth on any Regulation S Global Note.

"Regulation S Global Notes": One or more permanent global notes for the Notes offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents pursuant to Regulation S and issued in definitive, fully registered form without interest coupons with the "Global Securities Legend" and the "Regulation S Legend" added to the form of the Notes as set forth in the applicable Exhibits hereto.

"Regulation U": Regulation U issued by the Board of Governors of the Federal Reserve System.

"Reinvestment Agreement": A guaranteed reinvestment agreement from a bank, insurance company or other corporation or entity; provided, however, that such agreement provides that it is terminable by the purchaser, without penalty, in the event that the rating assigned to such agreement by Moody's and S&P is at any time lower than the rating required pursuant to the terms of this Indenture to be assigned to such agreement in order to permit the purchase thereof.

"Remaining Portion": With respect to a Removed Reference Entity, means the Reference Entity Calculation Amount for such Removed Reference Entity minus the sum of (x) the Class A Commitment Portion with respect to such Removed

Reference Entity and (y) the Class B Commitment Portion with respect to such Removed Reference Entity.

"Removed Reference Entity": The meaning specified in 10.4(f).

"Requisite Ratings": means a long-term unsecured debt of no less than "Baa1" by Moody's and a short-term debt rating of "A-1" (or at least "A+" if there is no short-term rating) by S&P.

"Rule 144A": Rule 144A under the Securities Act.

"Rule 144A Global Notes": One or more permanent global notes for the Notes, in definitive, fully registered form in the form of, and with the applicable legends set forth in, Exhibits C-1, D-1, E-1 and F-1.

"Rule 144A Information": Such information as is specified pursuant to Section (d)(4) of Rule 144A (or any successor provision thereto).

"Rule 144A Securities Legend": The legend set forth on any Rule 144A Global Note.

"S&P": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor or successors thereto.

"Standard & Poor's Excel Default Model Input File": An electronic spreadsheet file to be provided to S&P, which file shall include the following information (to the extent such information is not confidential) with respect to each Reference Obligation: (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Reference Obligation, (c) the par value of such Reference Obligation, (d) the type of issue (including, by way of example, whether such Reference Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Reference Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in case of a Reference Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Reference Obligation which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Reference Obligation, (h) the stated maturity date of such Reference Obligation, (i) the S&P Rating of such Reference Obligation or the issuer thereof, as applicable, and the Credit Swap Counterparty (j) the priority category assigned by S&P to such Reference Obligation, if available, (k) such other information as the Trustee may determine to include in such file and (l) the principal balance in Cash and Eligible Investments.

"S&P Industry Classification Group": Any of the industry categories set forth in Schedule D hereto, including any such modifications that may be made thereto or such additional categories that may be subsequently established by S&P and provided by S&P to the Trustee.

"S&P Rating": The "S&P Rating" of a Reference Entity will be determined as follows:

(a)    if a long term issuer credit rating has been assigned by S&P to such Reference Entity, then the S&P Rating of such Reference Entity shall be such long term issuer credit rating; otherwise

(b)    if the S&P Rating cannot be determined by applying (a) above, but an insurer financial strength rating has been assigned by S&P to such Reference Entity, then the S&P Rating of such Reference Entity shall be such insurer financial strength rating; otherwise

(c)    if the S&P Rating cannot be determined by applying (a) and (b) above, but there is at least one security or obligation issued (or unconditionally, irrevocably and wholly guaranteed) by the Reference Entity and identified by the Credit Swap Calculation Agent has been assigned a rating by S&P, then the S&P Rating of such Reference Entity shall be determined as follows:

(i)    if such security or obligation has been assigned a senior unsecured rating by S&P, then the S&P Rating of such Reference Entity shall be such senior unsecured rating;

(ii)    if such security or obligation has been assigned a senior secured rating by S&P, then the S&P Rating of such Reference Entity shall be one subcategory below such senior secured rating; and

(iii)    if such security or obligation has been assigned a subordinated rating by S&P, then the S&P Rating of such Reference Entity shall be one subcategory above such subordinated rating if such rating is higher than "BB+", and shall be two subcategories above such rating if such rating is "BB+" or lower; otherwise.

(d)    if the S&P Rating cannot be determined by applying (a) through (c) above, but (1) if such Reference Entity is publicly rated by Moody's, then the S&P Rating of such Reference Entity shall be one subcategory below the S&P equivalent of the public rating assigned by Moody's if such Reference Entity is rated "Baa3" or higher by Moody's; and two subcategories below the S&P equivalent of the public rating assigned by Moody's if such Reference Entity is rated "Ba1" or lower by Moody's; provided, that, the aggregate of the Reference Entity Calculation Amount of the Reference Entities that may be deemed to have

an S&P Rating based on this clause (d) may not exceed 10%; and (2) if such Reference Entity is not publicly rated by Moody's but at least one security or obligation issued (or unconditionally, irrevocably and wholly guaranteed) by the Reference Entity and identified by the Issuer has been assigned a senior secured or senior unsecured or subordinated rating by Moody's, then the S&P equivalent of the public rating assigned to such obligation by Moody's, after taking into account the methodology set forth in subclause (c) and this subclause (d) shall be the S&P Rating of such Reference Entity; otherwise

(e)    if the S&P Rating cannot be determined by applying (a) through (d) above, then the Issuer may apply to S&P for a corporate credit estimate, which shall be its S&P Rating which shall be valid for 12 months from the date of issue and for which the Issuer needs to apply prior to or upon each anniversary of the issuance of such credit estimate; provided, that, pending receipt from S&P of such estimate, such Reference Entity shall have an S&P Rating of "CCC-" if the Credit Swap Calculation Agent believes that such estimate will be at least "CCC-"; provided, that the Reference Entity Calculation Amount in respect of the Reference Entities that may be deemed to have a S&P Rating based on this clause (e) shall not exceed 5% of the aggregate of the Reference Entity Calculation Amounts in respect of all Reference Entities.

Notwithstanding the foregoing, if the S&P rating or the Moody's rating used to determine the S&P Rating above is on watch for downgrade or upgrade by the respective Rating Agency, the S&P Rating will be determined by adjusting such rating down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

For purposes of determining the S&P Rating, the issuer credit rating of Reference Entities not incorporated in the U.S. shall be the long term foreign issuer credit rating.

"Schedule of the Reference Entities": The Reference Portfolio attached as Annex B to the Credit Swap Agreement (attached hereto as Schedule A).

"Scheduled Distribution": With respect to any Pledged Underlying Asset, for each Due Date, the Distribution scheduled on such Due Date, determined in accordance with the assumptions specified in Section 1.2 hereof.

"Scheduled Preference Share Redemption Date": September 22, 2014, or if such day is not a Business Day, the next Business Day.

"Scheduled Termination Date": The meaning specified in the Credit Swap Agreement.

"SEC": The United States Securities and Exchange Commission.

"Secured Obligations": Collectively, all of the indebtedness, liabilities and obligations owed from time to time by the Issuer to any of the Secured Parties whether for principal, interest, fees, costs, expenses or otherwise (including all amounts which would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code and the operation of Sections 502(b) and 506(b) thereof or any analogous provisions of any similar laws).

"Secured Parties": The Trustee, the Credit Swap Counterparty and the Holders of the Notes.

"Securities": Collectively, the Notes and the Preference Shares.

"Securities Account Control Agreement": An agreement dated the Closing Date by and among the Issuer, the Trustee and the Custodian.

"Securities Act": The U.S. Securities Act of 1933, as amended.

"Securities Intermediary": The Bank, acting in the capacity as a "securities intermediary," as defined in Section 8-102(a)(14) of the UCC.

"Security Certificate": A certificate representing a security.

"senior": When used with respect to one or more Classes of Notes, the Class with the earlier letter of the alphabet in its name, such that Class A Notes are senior to Class B Notes, Class B Notes are senior to Class C Notes and so forth.

"Security Entitlement": The meaning specified in Section 8-102(a)(17) of the UCC.

"Share Register": The meaning ascribed to such term in the Shares Paying Agency Agreement.

"Share Registrar": The meaning ascribed to such term in the Shares Paying Agency Agreement.

"Shares Paying Agency Agreement": The Shares Paying Agency Agreement, dated as of the Closing Date, between the Issuer and U.S. Bank National Association, as Shares Paying Agent with respect to the Preference Shares.

"Shares Paying Agent": U.S. Bank National Association, in its capacity as paying agent with respect to the Preference Shares under the Shares Paying Agency Agreement, and any successors in such capacity thereto.

"Similar Law": Any foreign, local, state or other federal law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

"Specific Investment Instrument": Means the Lehman Brothers ABS Enhanced LIBOR Fund (the "Initial Specific Investment Instrument") and any subsequent additions and/or replacements thereto purchased from Specific Investment Proceeds (as directed by Issuer Order). Any such instrument other than the Initial Specific Investment Instrument must be selected by Issuer Order and must (1) qualify as an Eligible Investment and (2) be selected by a Majority of the Preference Shares with the consent of (x) a Majority of each Class of Notes voting separately and (y) the Credit Swap Counterparty.

"Specific Investment Proceeds": Mean the net proceeds received from the issuance of all the Securities.

"Specific Investment Proceeds Account": Means the trust account designated as the "Specific Investment Proceeds Account" and established pursuant to Section 10.4(f).

"Special Purpose Vehicle": Any special purpose vehicle organized under the laws of a sovereign jurisdiction that is commonly used as the place of organization of special purpose vehicles (including, by way of example, the Cayman Islands, Bermuda, the Netherlands Antilles and the Channel Islands).

"Stated Maturity": With respect to any security or debt obligation, including a Security, the date specified in such security or debt obligation as the fixed date on which the final payment of principal or final distribution, as the case may be, of such security or debt obligation is due and payable or, if such date is not a Business Day, the next following Business Day; provided, however, with respect to the Notes, to the extent that the date of payment for a portion of the principal of the Notes is deferred to the Deferred Maturity Date in accordance with the provisions herein, the "Stated Maturity" of such deferred portion shall be the Deferred Maturity Date.

"Subordinate Interests": The rights of the Holders of the Class B Notes (in relation to the rights of the Class A Notes), the rights of the Holders of the Class C Notes (in relation to the rights of the Class A Notes and the Class B Notes), the rights of the Holders of the Class D Notes (in relation to the rights of the Class A Notes, the Class B Notes and the Class C Notes), the rights of the Holders of the Class E Notes (in relation to the rights of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes) and of the Issuer in and to the Collateral.

"Supermajority": With respect to the Notes, the Controlling Class or any other Class thereof or the Preference Shares, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Notes, the Controlling Class or of such Class, as the case may be.

"Total Redemption Amount": The meaning specified in Section 9.1(b)(i).

"Transaction Documents" means the Placement Agreement, the Purchase Agreement, the Note Purchase Agreements, the Share Paying Agency Agreement, the Collateral Administration Agreement, the Control Account Agreement, the Credit Swap Agreement and this Indenture.

"Transfer Agent":   The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"Treasury":   The U.S. Department of Treasury.

"Treasury Regulations":   means the U.S. Treasury regulations promulgated under the Code.

"Trust Officer":   When used with respect to the Trustee, the Shares Paying Agent and the Custodian, any officer within the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president, associate, or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"Trustee":   U.S. Bank National Association, a national banking association, solely in its capacity as trustee hereunder, unless a successor Person shall have become the Trustee pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean such successor Person.

"Trustee Fee":   Amounts due and payable to the Trustee on each Payment Date in accordance with Sections 6.7(a).

"UCC":   The Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"Uncertificated Security":   A security that is not represented by a certificate.

"Underlying Asset":   The Credit Swap Agreement attached hereto as Schedule A.

"Underlying Instruments":   The indenture and any credit agreement, assignment agreement, participation agreement, pooling and servicing agreement, trust agreement, instrument or other agreement pursuant to which a Pledged Underlying Asset has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Underlying Asset, or of which the Holders of such Pledged Underlying Asset are the beneficiaries, and any Instrument evidencing or

constituting such Pledged Underlying Asset (in the case of any Pledged Underlying Asset evidenced by or in the form of an Instrument).

"Unregistered Securities": Securities or debt obligations issued without registration under the Securities Act.

"U.S. Person": The meaning specified under Regulation S.

"U.S. Resident": A U.S. resident (as determined for purposes of the Investment Company Act).

"Weighted Average Rating Factor (Moody's)": The number obtained by (a) multiplying the Reference Entity Calculation Amount of each Reference Entity as to which a Credit Event has not occurred by its Moody's Rating Factor; (b) summing the products obtained in clause (a) for all such Reference Entities; (c) dividing the sum obtained in clause (b) by the aggregate Reference Entity Calculation Amount on such Measurement Date of all Reference Entities as to which a Credit Event has not occurred; and (d) rounding the result to the nearest whole number.

"Weighted Average Recovery Rate (Moody's)": 70%.

"Weighted Average Spread": The number obtained by (a) multiplying the Reference Entity Calculation Amount of each Reference Entity as to which a Credit Event has not occurred by its Reference Spread on any Measurement Date; (b) summing the products obtained in clause (a) for all such Reference Entities; (c) dividing the sum obtained in clause (b) by the aggregate Reference Entity Calculation Amount on such Measurement Date of all Reference Entities as to which a Credit Event has not occurred; and (d) rounding the result to 0.0001%.

"Withholding Tax Event": Will occur on any Payment Date, if as a result of any change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Collateral are reduced as a result of the imposition of withholding tax or the Issuer is otherwise subjected to tax such that the after tax income of the Issuer is reduced from what the income would have been had no withholding or other tax been imposed in an amount in excess of U.S.$1,000,000 within any twelve (12) month period, unless waived by Holders of a Majority of the Preference Shares.

Section 1.2    Assumptions as to the Underlying Asset.  (a) In connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Underlying Assets, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such assets and on any other amounts that may be received for deposit in the Collection Accounts, the provisions set forth in this Section 1.2 shall be applied.

(b)     All calculations with respect to Scheduled Distributions on the Pledged Underlying Assets shall be made on the basis of information as to the terms of each such Pledged Underlying Asset and upon report of payments, if any, received on such Pledged Underlying Asset that are furnished by or on behalf of the issuer of or obligor with respect to such Pledged Underlying Asset and, to the extent they are not manifestly in error, such information or report may be conclusively relied upon in making such calculations.

For each Due Period, the Scheduled Distribution on any Pledged Underlying Asset shall be the minimum amount, including coupon payments, accrued interest, scheduled principal payments, if any, by way of sinking fund payments which are assumed to be on a pro rata basis or other scheduled amortization of principal, return of principal, and redemption premium, if any, assuming that any index applicable to any payments on a Pledged Underlying Asset, that is subject to change is not changed, that, if paid as scheduled, will be available in the Collection Accounts at the end of the Due Period net of withholding or similar taxes to be withheld from such payments (but taking into account gross up payments in respect of such taxes).

(c)     Subject to the preceding sentence, each Scheduled Distribution receivable with respect to a Pledged Underlying Asset shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Interest Collection Account or the Principal Collection Account, as applicable, and, except as otherwise specified, to earn interest at the Assumed Reinvestment Rate.   All such funds shall be assumed to continue to earn interest until the date on which they are required to be available in the Collection Accounts for application, in accordance with the terms hereof, to payments of principal of or interest on the Notes or other amounts payable pursuant to this Indenture.

(d)     On any Measurement Date, for purposes of calculating the Class C Interest Coverage Ratio, the Class D Interest Coverage Ratio and the Class E Interest Coverage Ratio, the expected collateral interest income on the floating rate Eligible Investments and the expected interest payable on each Class of Notes will be calculated using the then-current interest rates applicable thereto as of such date

(e)     If any of the Overcollateralization Ratio Tests is not met on any Payment Date, in calculating the amount of Interest Proceeds that will be applied pursuant to the Priority of Payments to cause such Overcollateralization Ratio Test to be satisfied, it is assumed that Interest Proceeds that are used to redeem Notes (or make deposits that reduce the Class A Commitments or Class B Commitments) reduce the denominator of the ratios used in the Overcollateralization Ratio Test(s) and have no impact on the numerator of such ratios; however, in calculating the amount of Principal Proceeds that will be applied pursuant to the Priority of Payments to cause such Overcollateralization Ratio Test to be satisfied, it is assumed that Principal Proceeds that are used to redeem Notes (or make deposits that reduce the Class A Commitments or

Class B Commitments) reduce both the numerator (*i.e.*, the Net Collateral Principal Balance) and the denominator of the ratios used in such Overcollateralization Ratio Tests.

Section 1.3    Rules of Construction.    All references in this instrument to designated "Articles," "Sections," "subsections" and other subdivisions are to the designated Articles, Sections, subsections and other subdivisions of this instrument as originally executed.    The words "herein," "hereof," "hereunder," and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section, subsection or other subdivision.    The term "including" shall mean "including without limitation."

## ARTICLE II

## THE NOTES

Section 2.1    Forms Generally.    The Notes and the Certificates of Authentication shall be in substantially the forms required by this Article II, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may be consistent herewith, determined by the Authorized Officers of the Co-Issuers executing such Notes, as evidenced by their execution of such Notes.    Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

Section 2.2    Forms of Notes and Certificate of Authentication.    (a) The forms of the Notes, including the Certificate of Authentication, shall be as set forth as Exhibits A-1, A-2, B-1, B-2, B-3, C-1, C-2, C-3, D-1, D-2, D-3, E-1, E-2 and E-3, hereto, as applicable.

(i)    Notes (other than Class A Notes, Class B Notes, and any Class C Notes, Class D Notes and/or Class E Notes issued in the form of Certificated Class C Notes, Certificated Class D Notes and Certificated Class E Notes, as applicable) offered and sold to Persons that are both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S shall be issued in the form of Regulation S Global Notes, which shall be deposited with the Trustee, as custodian for the Depositary and registered in the name of the Depositary or the nominee of such Depositary for the respective accounts of Euroclear and Clearstream, duly executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided.    The aggregate principal amount of the Regulation S Global Notes of a Class may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(ii)    Notes (other than Class A Notes, Class B Notes, and any Class C Notes, Class D Notes and/or Class E Notes issued in the form of Certificated Class C Notes, Certificated Class D Notes and Certificated Class E Notes, as applicable) (offered and sold to Persons that are both (x) QIBs in reliance on Rule 144A and (y) Qualified Purchasers shall be issued initially in the form of a Rule 144A Global Note, which shall be deposited with the Trustee, as custodian for and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Co-Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Rule 144A Global Notes of a Class may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(iii)    <u>Certificated Class A Notes</u>. The Class A Notes offered and sold to Persons that are (1) both Qualified Purchasers and QIBs shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit A-1</u> attached hereto or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit A-2</u> attached hereto (together, the "<u>Certificated Class A Notes</u>").

(iv)    <u>Certificated Class B Notes</u>. The Class B Notes offered and sold to Persons that are (1) both Qualified Purchasers and QIBs shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit B-1</u> attached hereto or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S shall be issued only in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit B-2</u> attached hereto (together, the "<u>Certificated Class B Notes</u>").

(v)    [Reserved].

(vi)    [Reserved].

(vii)    <u>Certificated Class C Notes</u>. The Class C Notes may be issued in whole or in part, at the sole discretion of the Managers, in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit C-3</u> attached hereto (the "<u>Certificated Class C Notes</u>") and such Certificated Class C Notes shall be offered and sold to Persons that are (1) both Qualified Purchasers and either (x)"accredited investors" in reliance on

Rule 144A or (y) QIBs or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S.

(viii)  <u>Certificated Class D Notes</u>.  The Class D Notes may be issued in whole or in part, at the sole discretion of the Managers, in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in Exhibit D-3 attached hereto (the "Certificated Class D Notes") and such Certificated Class D Notes shall be offered and sold to Persons that are (1) both Qualified Purchasers and either (x) "accredited investors" in reliance on Rule 144A or (y) QIBs or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S.

(ix)  <u>Certificated Class E Notes</u>.  The Class E Notes may be issued in whole or in part, at the sole discretion of the Managers, in definitive, fully registered, certificated form without interest coupons, in the form of, and with the applicable legends set forth in <u>Exhibit D-3</u> attached hereto (the "<u>Certificated Class E Notes</u>") and such Certificated Class E Notes shall be offered and sold to Persons that are (1) both Qualified Purchasers and either (x) "accredited investors" in reliance on Rule 144A or (y) QIBs or (2) both non-U.S. Persons and non-U.S. Residents in reliance on Regulation S.

(b)  This <u>Section 2.2(b)</u> shall apply only to Global Notes deposited with or on behalf of the Depositary.

The Co-Issuers shall execute and the Trustee shall, in accordance with this <u>Section 2.2(b)</u>, authenticate and deliver initially one or more Global Notes per Class that (i) shall be registered in the name of the Depositary for such Global Note or Global Notes or the nominee of such Depositary and (ii) shall be delivered by the Trustee to such Depositary or pursuant to such Depositary's instructions or held by the Trustee, as custodian for the Depositary.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Depositary or under the Global Note, and the Depositary may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of such Global Note for all purposes whatsoever (except to the extent otherwise provided herein). Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(c)    Except as provided in <u>Section 2.10</u> and <u>Section 2.5(e)(iv)</u> hereof, owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of certificated notes.

(d)    The Issuer shall (i) request the Depositary to cause, and cooperate with the Depositary in causing, the Depositary's security description and delivery order to include a "3(c)(7) marker" and the Depositary's user manual to contain an accurate description of the restrictions on the holding and transfer of the Notes (other than Class A Notes, Class B Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and any Class E Notes issued in the form of Certificated Class E Notes, as applicable) due to the Issuer's reliance on the exclusion to registration provided by Section 3(c)(7) of the Investment Company Act, (ii) request that the Depositary cause, and cooperate with the Depositary in causing, the Depositary's Reference Directory to include each Class of Notes (other than Class A Notes, Class B Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and any Class E Notes issued in the form of Certificated Class E Notes, as applicable) (and the applicable CUSIP numbers for such Notes) in the listing of 3(c)(7) issues together with an attached description of the limitations as to the distribution, purchase, sale and holding of the Notes (other than Class A Notes, Class B Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and any Class E Notes issued in the form of Certificated Class E Notes, as applicable) and (iv) at least five Business Days prior to the date upon which the Annual Report shall be delivered by the Issuer, the Issuer shall obtain from DTC a list (the "<u>DTC List</u>") of all Agent Members that are holding an interest in the Notes (other than Class A Notes, Class B Notes, any Class C Notes issued in the form of Certificated Class C Notes, any Class D Notes issued in the form of Certificated Class D Notes and any Class E Notes issued in the form of Certificated Class E Notes, as applicable) as of such date.

Section 2.3    <u>Authorized Amount; Note Interest Rate; Stated Maturity; Denominations</u>. (a) Subject to the provisions set forth in this Section, the Aggregate Outstanding Amount of Notes that may be authenticated and delivered under this Indenture is limited to U.S.$372,000,000, except for (i) Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to <u>Section 2.5</u>, <u>2.6</u> or <u>8.5</u> of this Indenture (ii) Class D Deferred Interest and (iii) Class E Deferred Interest.

(b)    Such Notes shall be divided into five (5) classes having designations, initial aggregate principal amounts, Note Interest Rates and Stated Maturities as follows:

| Designation | Initial Aggregate Principal Amount | Note Interest Rate* | Stated Maturity | Deferred Maturity Date***** |
|---|---|---|---|---|
| Class A Notes | U.S.$274,500,000*** | LIBOR +0.00%**** | September 22, 2014** | December 22, 2014** |
| Class B Notes | U.S.$65,500,000*** | LIBOR +0.45%**** | September 22, 2014** | December 22, 2014** |
| Class C Notes | U.S.$12,000,000 | LIBOR +1.85% | September 22, 2014** | December 22, 2014** |
| Class D Notes | U.S.$12,000,000 | LIBOR +3.25% | September 22, 2014** | December 22, 2014** |
| Class E Notes | U.S.$8,000,000 | LIBOR +5.00% | September 22, 2014** | December 22, 2014** |

\*        LIBOR refers to LIBOR calculated for the applicable Interest Period.

\*\*      If September 22, 2014 or December 22, 2014 is not a Business Day, the Stated Maturity of the Notes will be the next succeeding Business Day.

\*\*\*    The initial aggregate principal amount of the Class A Notes and Class B Notes represents the amounts drawn by the Issuer on the Class A Commitments and the Class B Commitments, as applicable, on the Closing Date.

\*\*\*\*  The interest rates of the Class A Notes and Class B Notes represent the interest rate applicable to the funded amount of the Class A Notes, Class B Notes, as applicable, and any portion of the Class A Commitment Fee or Class B Commitment Fee that is not paid when due. Each draw will earn interest in accordance with the Class A Note Purchase Agreement and Class B Note Purchase Agreement, as applicable. So long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the portion of the Class A Notes or Class B Notes, as applicable, that were funded as a result of the Downgrade Draw in an amount equal to the amount of earnings on the Eligible Investments which are held in the related sub-account of the Contingent Class A Funding Account and the related sub-account of the Contingent Class B Funding Account, in connection with a Downgrade Draw plus (i) 0.00% in the case of the Class A Notes or (ii) 0.45% in the case of the Class B Notes.

        A commitment fee will accrue on the unfunded portion of the Class A Commitments at 0.00% per annum and on the unfunded portion of the Class B Commitments at 0.45% per annum.

\*\*\*\*\*  During the Interest Period from the Maturity date to the Deferred Maturity Date, all the Notes (including the funded portion of the Class A Notes and the Class B Notes) outstanding shall earn an interest amount equal to the lesser of (a) the actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding amount of such Notes and the denominator of which is the Aggregate Outstanding Amount of all Classes of Notes and (b) the interest amount on such Class of Notes accrued at a rate of LIBOR. Any Class A Notes or Class B Notes that remain outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest during such Interest Period as provided above.

        (c)    The Notes will be issued in minimum denominations of U.S.$250,000 and integral multiples of U.S.$1,000 in excess thereof. On the Closing Date, 28,000 Preference Shares will be issued pursuant to the Shares Paying Agency Agreement. Any Note or beneficial interests therein in excess of the applicable minimum denomination may, after the issuance thereof, cease or fail to be an integral multiple of the specified amount in excess thereof as a result of the repayment of principal pursuant to Section 11.1 or Section 11.2, including, with respect to the Class D Notes and the Class E Notes, due to the addition to the principal amount thereof of Class D Deferred Interest and Class E Deferred Interest (as the case may be).

        Section 2.4    Execution, Authentication, Delivery and Dating.  (a) The Notes shall be executed on behalf of the Co-Issuers by one of the Authorized Officers of the Co-Issuers. The signature of such Authorized Officer, as applicable, on the Notes may be manual or facsimile.

(b)    Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, as applicable, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of issuance of such Notes.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Notes executed by the Issuer and the Co-Issuer to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

(d)    Each Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)    Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations (as set forth in Section 2.3(c)) reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Notes so transferred, exchanged or replaced. In the event that any Note is divided into more than one Note in accordance with this Article II, the original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the original Aggregate Outstanding Amount of such subsequently issued Notes.

(f)    No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.5    Registration, Registration of Transfer and Exchange. (a) (i) The Issuer shall cause to be kept the "Note Register" in which, subject to such reasonable regulations as it may prescribe, the Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed as agent of the Issuer to act as "Note Registrar" for the purpose of registering and recording in the Note Register the Notes and transfers of such Notes as herein provided. Upon any resignation or removal of the Note Registrar, the Issuer shall promptly appoint a successor. The Note Registrar shall, upon request, provide any information it has concerning the Holders of the Class A Notes or Class B Notes to the Class A Note Agent or Class B Note Agent, as applicable.

(ii)     If a Person other than the Trustee is appointed by the Issuer as Note Registrar, the Issuer will give the Trustee prompt written notice of the appointment of a Note Registrar and of the location, and any change in the location, of the Note Registrar, and the Trustee shall have the right to inspect the Note Register at all reasonable times and to obtain copies thereof and the Trustee shall have the right to rely upon an Officer's Certificate executed on behalf of the Note Registrar by an Officer thereof as to the names and addresses of the Holders of the Notes and the principal amounts and numbers of such Notes.

(iii)     Subject to this <u>Section 2.5</u>, upon surrender for registration of transfer of any Notes at the office or agency of the Co-Issuers to be maintained as provided in Section 7.4, the surrendered Notes shall be canceled in accordance with the Trustee's standard policy and the Co-Issuers shall execute, and the Trustee or the Authenticating Agent, as the case may be, shall authenticate and deliver in the name of the designated transferee or transferees, one or more new Notes of any authorized denomination and of a like Aggregate Outstanding Amount.

(iv)     The Issuer will notify the Trustee in writing of any Note beneficially owned by or pledged to the Issuer or the Co-Issuer or any of their respective Affiliates promptly upon its knowledge of the acquisition thereof or the creation of such pledge.

(v)     At the option of the Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like Aggregate Outstanding Amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Note is surrendered for exchange, the Co-Issuers shall execute and the Trustee shall authenticate and deliver the Notes that the Noteholder making the exchange is entitled to receive.

(vi)     All Notes issued and authenticated upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

(vii)     A Note and the rights to payments evidenced thereby may be assigned or otherwise transferred in whole or in part pursuant to the terms of this <u>Section 2.5</u> only by the registration of such assignment and transfer of such Note on the Note Register (and each Note shall so expressly provide). Any assignment or transfer of all or part of such Note shall be registered on the Note Register only upon presentment or surrender for registration of transfer or exchange of the Note duly

30775-00052 NY:2469328.3     55

endorsed, or, in the case of the Notes, be accompanied by a written instrument of transfer in form satisfactory to, and as may be required by, the Note Registrar and the Co-Issuers, duly executed by the Holder thereof or his attorney duly authorized in writing.

(viii)    No service charge shall be made to a Holder for any exchange of Notes, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any exchange of Notes.

(ix)    The Issuer and the Co-Issuer shall not be required (i) to issue, register the transfer of or exchange any Note during a period beginning at the opening of business 15 days before any selection of Notes to be redeemed and ending at the close of business on the day of the first publication in the Company Announcements Office of the relevant notice of redemption or, if there is no publication, the mailing of the relevant notice of redemption, or (ii) to register the transfer of or exchange any Note so selected for redemption.

(b)    No Note may be sold or transferred (including by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws.

(c)    For so long as any of the Notes are Outstanding, the Issuer shall not permit the transfer of any Issuer Ordinary Shares and the Co-Issuer shall not transfer any shares of the Co-Issuer to U.S. Persons, and shall not permit the transfer of any such shares to any Person other than a Person which is a resident of the Cayman Islands if (i) such transfer is disadvantageous in any material respect to the Holders of the Notes, (ii) the Issuer fails to give written notice of such transfer to the Trustee, the Holders of the Notes or each of the Rating Agencies at least 20 Business Days prior to such transfer, or (iii) on or prior to the 15th Business Day following such notice the Trustee shall have received written notice from a Majority of the Controlling Class objecting to such transfer.

(d)    Upon final payment due on the Maturity Date of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust office or at the office of any Paying Agent (outside the United States if then required by applicable law in the case of a definitive Note issued in exchange for a beneficial interest in a Regulation S Global Note pursuant to Section 2.10) on or prior to such Maturity; provided, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.

(e)    Notwithstanding any provision to the contrary herein, so long as a Global Note remains Outstanding and is held by or on behalf of the Depositary, transfers of a Global Note, in whole or in part, shall only be made in accordance with <u>Section 2.2(b)</u> and this <u>Section 2.5(e)</u>.

(i)    <u>Transfers of Global Notes Generally</u>. Subject to clauses (ii) through (iv) of this <u>Section 2.5(e)</u>, transfers of a Global Note shall be limited to transfers of such Global Note in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(ii)    <u>Rule 144A Global Note to Regulation S Global Note</u>. If a Holder of a beneficial interest in a Rule 144A Global Note representing Class C Notes, Class D Notes or Class E Notes and deposited with the Depositary wishes at any time to exchange its interest in such Rule 144A Global Note for an interest in the corresponding Regulation S Global Note, or to transfer its interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Regulation S Global Note, such Holder, provided such Holder or, in the case of a transfer to another Person, such Person is not a U.S. Person or a U.S. Resident, may, subject to the immediately succeeding sentence and the rules and procedures of the Depositary, exchange or transfer or cause the exchange or transfer of such interest for an equivalent beneficial interest in the Regulation S Global Note. Upon receipt by the Trustee, as Note Registrar, of (A) instructions given in accordance with the Depositary's procedures from an Agent Member directing the Trustee to cause to be credited a beneficial interest in the Regulation S Global Note in an amount equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred, but not less than the minimum denomination applicable to the relevant Notes held through Regulation S Global Notes, (B) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and, in the case of a transfer or exchange pursuant to and in accordance with Regulation S, the Euroclear and Clearstream account to be credited with such increase and (C) a certificate in the form of <u>Exhibit H</u> attached hereto, given by the Holder of such beneficial interest (in the case of an exchange) or the transferee of such beneficial interest (in the case of a transfer) stating that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including in accordance with Rule 903 or 904 of Regulation S, the Trustee, as Note Registrar, shall instruct the Depositary to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Note by the aggregate principal amount of the

beneficial interest in the Rule 144A Global Note to be exchanged or transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note.

        (iii)    <u>Regulation S Global Note to Rule 144A Global Note</u>.  If a Holder of a beneficial interest in a Regulation S Global Note representing Class C Notes, Class D Notes or Class E Notes and deposited with the Depositary wishes at any time to exchange its interest in such Regulation S Global Note for an interest in a corresponding Rule 144A Global Note or to transfer its interest in such Regulation S Global Note to a Person who wishes to take delivery thereof in the form of an interest in the corresponding Rule 144A Global Note, such Holder may, subject to the immediately succeeding sentence and the rules and procedures of Euroclear and Clearstream or the Depositary, as the case may be, cause the exchange or transfer of such interest for an equivalent beneficial interest in the Rule 144A Global Note.  To the extent that the Trustee, as Note Registrar, has received (A) instructions from Euroclear and Clearstream or the Depositary, as the case may be, directing the Trustee, as Note Registrar, to cause to be credited a beneficial interest in the Rule 144A Global Note equal to the beneficial interest in the Regulation S Global Note to be exchanged or transferred but not less than the minimum denomination applicable to the relevant Notes held through Rule 144A Global Notes, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase, and (B) a certificate in the form of <u>Exhibit G</u> attached hereto given by the Holder of such beneficial interest and stating that, in the case of a transfer, the Person transferring such interest in the Regulation S Global Notes reasonably believes that the Person acquiring such interest in the Rule 144A Global Note is a QIB/QP and is obtaining such beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other relevant jurisdiction, or that, in the case of an exchange, the Holder is a QIB/QP, then Euroclear or Clearstream or the Trustee, as Note Registrar, as the case may be, will instruct the Depositary to reduce the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be transferred or exchanged, and the Trustee, as Note Registrar, shall instruct the Depositary, concurrently with such reduction, to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note.

(iv)    Exchange or Transfer of Interests in Rule 144A Global
Notes or Regulation S Global Notes for Certificated Class C Notes,
Certificated Class D Notes or Certificated Class E Notes. If a Holder of a
beneficial interest in a Rule 144A Global Note or Regulation S Global
Note representing Class C Notes, Class D Notes or Class E Notes and
deposited with the Depositary wishes at any time to exchange its interest
in such Rule 144A Global Note or Regulation S Global Note for a
Certificated Class C Note, Certificated Class D Note or Certificated Class
E Note, as applicable, such Holder may exchange or transfer its beneficial
interest in a Rule 144A Global Note or Regulation S Global Note
representing Class C Notes, Class D Notes or Class E Notes for a
Certificated Class C Note, Certificated Class D Note or Certificated Class
E Note, as applicable, as provided below. Upon receipt by the Trustee, as
Note Registrar of (A) instructions from Euroclear and Clearstream or the
Depositary or an Agent Member, as the case may be, directing the Trustee,
as Note Registrar, to reduce the principal amount of the beneficial interest
in the Rule 144A Global Note or Regulation S Global Note, as applicable,
such instructions to contain information regarding the participant account
with Euroclear and Clearstream or the Depositary and (B) a transfer
certificate in the form of Exhibit I-4 attached hereto delivered by the
proposed transferee of the Certificated Class C Note, Certificated Class D
Note or Certificated Class E Note, as applicable, containing certifications
as to certain Securities Act, Investment Company Act, U.S. tax and
ERISA matters, stating, among other things, that the exchange of such
interest has been made in compliance with the transfer restrictions
applicable to the Certificated Class C Note, Certificated Class D Note or
Certificated Class E Note, as applicable, including that the transfer or
exchange is being made in a transaction meeting the requirements of Rule
144A, Section 4(2) of the Securities Act or Regulation S, as applicable,
and in accordance with any applicable securities laws of any state of the
United States or any other relevant jurisdiction and that the beneficial
owner (in the case of an exchange) or the transferee of such beneficial
interest (in case of a transfer) is (A) both (1) a Qualified Purchaser and (2)
either a QIB or an "accredited investor" or (B) neither a U.S. Person nor a
U.S. Resident, as applicable, the Trustee, as Note Registrar shall, in
accordance with Section 2.9, record the transfer in the Note Register in
accordance with Section 2.5(a) and, upon execution by the Issuer, deliver
one or more Certificated Class C Note, Certificated Class D Note or
Certificated Class E Note, as applicable, in the number of the Notes
designated by the transferee (the aggregate of such principal amount of the
Notes being equal to the reduction in the principal amount of the Rule
144A Global Note or Regulation S Global Note, as applicable, being
transferred).    Any purported transfer in violation of the foregoing
requirements shall be null and void ab initio, and the Trustee shall not

30775-00052 NY:2469328.3        59

register any such purported transfer and shall not deliver such Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, as applicable.

(f)      So long as the Certificated Notes corresponding to the relevant Class of Notes remain Outstanding, transfers of such Certificated Notes shall only be made in accordance with this Section 2.5(f).

(i)      Transfer of Certificated Notes.  If a Holder of Certificated Notes wishes at any time to transfer such Certificated Note such Holder may transfer or cause the transfer of such interest for an equivalent amount of a Certificated Note of the same Class of Notes, in one or more Certificated Notes of the same Class of Notes, as provided below.  Upon receipt by the Trustee, as Note Registrar of (A) such Holder's Certificated Note, properly endorsed for assignment to the transferee and (B) a transfer certificate in the form of Exhibit I-1 attached hereto delivered by the proposed transferee of the such Certificated Class A Notes, Certificated Class B Notes, as applicable, or a transfer certificate in the form of Exhibit I-2 attached hereto delivered by the proposed transferee of such Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, as applicable, in each case, containing certifications as to certain Securities Act, Investment Company Act, U.S. tax and ERISA matters, stating, among other things, that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to Certificated Notes of the relevant Class of Notes, including that the transfer or exchange is being made in a transaction meeting the requirements of Rule 144A, or Regulation S (or, solely in the case of transfers or exchanges of Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, Regulation S, Rule 144A or Section 4(2) of the Securities Act), as applicable, and in accordance with any applicable securities laws of any state of the United States or any other relevant jurisdiction and that the beneficial owner (in the case of an exchange) or the transferee of such beneficial interest (in case of a transfer) is (A) both (1) a Qualified Purchaser and (2) a QIB (or, in the case of Exhibit I-2 relating to the Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, a QIB or an "accredited investor") or (B) neither a U.S. Person nor a U.S. Resident, as applicable, the Trustee, as Note Registrar shall cancel such Certificated Note corresponding to the relevant Class of Notes, in accordance with Section 2.9, record the transfer in the Note Register in accordance with Section 2.5(a) and, upon execution by the Issuer, deliver one or more Certificated Notes of the relevant Class of Notes in the number of the Notes designated by the transferee (the aggregate of such principal amount of the Notes being equal to the principal amount of the Notes represented by the

corresponding Certificated Note being transferred). Any purported transfer in violation of the foregoing requirements shall be null and void ab initio, and the Trustee shall not register any such purported transfer and shall not cancel such corresponding Certificated Note.

(ii)    Exchange of Certificated Notes. If a Holder of Certificated Notes, wishes at any time to exchange such Certificated Notes, for one or more Certificated Notes of the same Class of Notes, representing different stated principal amounts of such Notes, such Holder may exchange or cause the exchange of such Certificated Notes of the same Class of Notes, for corresponding Certificated Notes, bearing the same designation as the Certificated Notes, endorsed for exchange as provided below. Upon receipt by the Trustee, as Note Registrar of (A) such Holder's Certificated Notes, properly endorsed for such exchange and (B) written instructions from such Holder designating the portion of the Aggregate Outstanding Amount of the Notes to be exchanged, then the Trustee, as Note Registrar shall cancel such Certificated Notes, in accordance with Section 2.9, record the exchange in the Note Register in accordance with Section 2.5(a) and upon execution by the Issuer, deliver one or more Certificated Notes of the same Class of Notes, bearing the same designation as the Certificated Notes as applicable, endorsed for exchange, registered in the same names as the Certificated Notes, surrendered by such Holder, in different principal amount of the Certificated Notes, designated by such Holder

(iii)    Exchange or Transfer of Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes for Interests in Rule 144A Global Notes or Regulation S Global Notes. If a Holder of Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, wishes at any time to exchange such Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, for interests in either Rule 144A Global Notes or Regulation S Global Notes, or to transfer its interests in such Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, to a Person who wishes to take delivery thereof in the form of interests in either Rule 144A Global Notes or Regulation S Global Notes, such Holder may exchange or transfer such Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, for interests in either Rule 144A Global Notes or Regulation S Global Notes, or transfer such Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, to such Person, as provided below. Upon receipt by the Trustee, as Note Registrar, of (A) such Holder's Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, (B) instructions given in accordance with the Depositary's

procedures from an Agent Member or instructions from Euroclear and Clearstream or the Depositary, as the case may be, in each case directing the Trustee to cause to be credited a beneficial interest in the Regulation S Global Note or Rule 144A Global Note, as applicable, (C) a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary and, in the case of a transfer or exchange pursuant to and in accordance with Regulation S, the Euroclear and Clearstream account to be credited with such increase, (D) written instructions from such Holder designating the portion of the Aggregate Outstanding Amount of the Notes to be exchanged or transferred, and (E) a transfer certificate in the form of Exhibit I-3 attached hereto delivered by the proposed transferee of the Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, the Trustee, as Note Registrar, shall cancel such Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, in accordance with Section 2.9, record the exchange in the Note Register in accordance with Section 2.5(a) and, upon execution by the Issuer, instruct the Depositary to increase the principal amount of the Rule 144A Global Note or the Regulation S Global Note, as applicable, by the aggregate principal amount of the Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, to be exchanged or transferred. Any purported transfer in violation of the foregoing requirements shall be null and void ab initio, and the Trustee shall not register any such purported transfer and shall not cancel such Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable.

(g)    Other Exchanges.  In the event that a Global Note is exchanged for Notes in definitive registered form without interest coupons, pursuant to Section 2.10 hereof, such Notes may be exchanged for one another only in accordance with such procedures and restrictions as are substantially consistent with the provisions above (including certification requirements intended to ensure that such transfers comply with Rule 144A or another exemption from the registration requirements of the Securities Act, or are to non-U.S. Persons and non-U.S. Residents, or otherwise comply with Regulation S, as the case may be) and as may be from time to time adopted by the Co-Issuers and the Trustee.

(h)    Transfer of Interests in the Global Notes.    Notwithstanding anything herein to the contrary, transfers of interests in a Global Note may be made (a) by book-entry transfer of beneficial interests within the relevant Clearing Agency or (b)(i) in the case of transfers of interests in a Rule 144A Global Note, in accordance with Sections 2.5(e)(ii), (e)(iii), (e)(iv) or (f)(iii) hereof or (ii) in the case of transfers of interests in a Regulation S Global Note, in accordance with Sections 2.5(e)(ii), (e)(iii), (e)(iv) or (f)(iii) hereof; provided, that, in the case of any such transfer of interests

pursuant to clause (a) or (b) above, such transfer is made in accordance with <u>subsection (i)</u> below.

       (i)    <u>Restrictions on Transfers</u>.    (A) Transfers of interests in a Regulation S Global Note to a U.S. Person or a U.S. Resident (other than transfers or exchanges to persons taking delivery in the form of Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes pursuant to <u>Section 2.5(e)(iv)</u>) shall be made by delivery of an interest in a Rule 144A Global Note and shall be limited to transfers made pursuant to the provisions of <u>Section 2.5(e)</u> or <u>(f)</u>, as applicable. Beneficial interests in a Regulation S Global Note may only be held through Euroclear and Clearstream.

       (B)    Any transfer of an interest in a Rule 144A Global Note to a U.S. Person or a U.S. Resident that is not a QIB/QP, shall be null and void <u>ab initio</u> and shall not be given effect for any purpose hereunder, and the Trustee shall hold any funds conveyed by the intended transferee of such interest in such Rule 144A Global Note in trust for the transferor and shall promptly re-convey such funds to such Person in accordance with the written instructions thereof delivered to the Trustee at its address listed in <u>Section 14.3</u>.

       (j)    Each owner of a Note (other than a Class A Note or a Class B Note) in the form of a beneficial interest in a Rule 144A Global Note will be deemed to have represented and agreed with the Issuer, as follows:

       (i)    The Holder is purchasing the Note for its own account or one or more accounts with respect to which it exercises sole investment discretion, in minimum denominations of U.S.$250,000 and in integral multiples of U.S.$1,000 in excess thereof, and both it and each such account (if any) (A) is a QIB/QP, (B) is not a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than U.S.$25,000,000 in securities of issuers that are not Affiliated to it, (C) is not a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan, (D) was not formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial holder of the Holder is a QP) and (E) shall provide written notice to any transferee that any transferee taking delivery of the Note in the form of an interest in a Rule 144A Global Note must satisfy the foregoing qualifications.

(ii)    The Holder agrees on its own behalf and on behalf of any account for which it is holding the Note to offer, sell or otherwise transfer such Note (or a beneficial interest therein) only (A) in the required minimum denomination, and (B) (1) in the United States, only in the form of an interest in a Rule 144A Global Note to a QP, that the Holder reasonably believes is a QIB, purchasing for its own account or one or more accounts, each of which is a QP that the Holder reasonably believes is a QIB, in accordance with Rule 144A, and none of which are (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis not less than U.S.$25,000,000 in securities of issuers that are not Affiliated to it, (y) a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan or (z) formed for the purpose of investing in the Issuer or the Co-Issuer (except where each beneficial Holder is a QP) or (2) outside the United States in the form of an interest in a Regulation S Global Note to a Person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act. The Holder understands and agrees that neither a U.S. Person nor a U.S. Resident may hold an interest in a Note in the form of a Regulation S Global Note at any time. The Holder agrees to provide notice of such transfer restrictions to any subsequent transferee.

(iii)    The Holder understands that any Holder of Notes who is a U.S. Person or a U.S. Resident who is determined not to have been a QIB/QP at the time of acquisition of the Note (or interest therein) is required to sell such interest to a Person that is a QIB/QP or to a Person that is neither a U.S. Person nor a U.S. Resident in a transaction meeting the requirements of Regulation S.

(iv)    The Holder understands that the Notes have not been approved or disapproved by the SEC or any other governmental authority or agency of any jurisdiction, nor has the SEC or any other governmental authority or agency passed upon the accuracy or adequacy of the Offering Memorandum. Any representation to the contrary is a criminal offense.

(v)    The Holder agrees that no Class C Note, Class D Note or Class E Note (other than Class C Notes, Class D Notes or Class E Notes issued in the form of Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable) or any interest therein may be sold, pledged or otherwise transferred in a denomination of less

than U.S.$250,000, and in integral multiples of U.S.$1,000 in excess thereof.

(vi)    The Holder (A) has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risks (including for tax, legal, regulatory, accounting and other financial purposes) of its prospective investment in the Notes, (B) is financially able to bear such risk, (C) in making such investment is not relying on the advice or recommendations of the Managers, the Co-Issuers, the Trustee or any of their respective Affiliates (or any representative of any of the foregoing), (D) has determined that an investment in the Notes is suitable and appropriate for it, (E) has received, and has had an adequate opportunity to review the contents of, the Offering Memorandum and (F) has access to such financial and other information concerning the Co-Issuers and the Notes as it has deemed necessary to make its own independent decision to purchase such Notes, including the opportunity, at a reasonable time prior to its purchase of such Notes, to ask questions and receive answers concerning the Co-Issuers and the terms and conditions of the offering of the Notes.

(vii)    The Holder understands that there is no market for the Notes and that no assurance can be given as to the liquidity of any trading market for the Notes and that it is unlikely that a trading market for the Notes will develop. It further understands that, although the Managers may from time to time make a market in the Notes, the Managers are under no obligation to do so and, following the commencement of any market-making, may discontinue the same at any time. Accordingly, the Holder must be prepared to hold the Notes for an indefinite period of time or until their maturity.

(viii)    The Holder agrees that no sale, pledge or other transfer of a Note (or any interest therein) may be made if such transfer would have the effect of requiring either of the Co-Issuers or the pool of assets owned by the Issuer to register as an investment company under the Investment Company Act.

(ix)    The Holder represents and warrants that, in the case of any Notes held, either (A) it is not, and is not acquiring and holding such Notes on behalf of a Plan or a governmental, foreign or church plan that is subject to any Similar Law or (B) its acquisition and holding of such Notes will not constitute or otherwise result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, a violation of any Similar Law). The Holder of Notes shall further indemnify and hold

harmless the Issuer, the Trustee and the Managers and their respective affiliates from any cost, damage or loss incurred by them as a result of the inaccuracy or breach of the foregoing representations, warranties and agreements in this paragraph (ix). Any purported transfer of Notes to a purchaser that does not comply with the requirements of this paragraph (ix) shall be null and void ab initio. The Holder of Notes makes the representations and warranties in this paragraph (ix) on each day that it holds Notes.

(x)    The Holder agrees that (A) any sale, pledge or other transfer of a Note (or any interest therein) made in violation of the transfer restrictions contained in this Indenture, or made based upon any false or inaccurate representation made by the Holder or a transferee to the Co-Issuers, will be void and of no force or effect and (B) none of the Co-Issuers, the Trustee or the Note Registrar has any obligation to recognize any sale, pledge or other transfer of a Note (or any interest therein) made in violation of any such transfer restriction or made based upon any such false or inaccurate representation.

(xi)    The Holder is not a member of the public in the Cayman Islands.

(xii)    The Rule 144A Global Notes will bear the applicable legends set forth in Exhibits B-1, C-1, D-1 and E-1 hereto.

(xiii)    If the Holder is not a natural Person, the Holder has the power and authority to enter into each agreement required to be executed and delivered by or on behalf of the Holder in connection with its purchase of Notes and to perform its obligations thereunder and consummate the transactions contemplated thereby, and the Person signing any such documents on behalf of the Holder has been duly authorized to execute and deliver such documents and each other document required to be executed and delivered by the Holder in connection with its purchase of Notes. If the Holder is an individual, the Holder has all requisite legal capacity to acquire and hold the Notes and to execute, deliver and comply with the terms of each of the documents required to be executed and delivered by the Holder in connection with the subscription for the Notes. Such execution, delivery and compliance by the Holder does not conflict with, or constitute a default under, any instruments governing the Holder, any applicable law, regulation or order, or any material agreement to which the Holder is a party or by which the Holder is bound.

(xiv)    If the Holder's permanent address is located in the United States, the Holder was offered the Notes in the state of such Holder's

permanent address and intends that the securities law of that state govern the Holder's subscription for the Notes.

(xv)   The Holder and each beneficial owner of an interest in the Notes understands that as a condition to the payment of principal of and interest on any Note without, or at a reduced rate of, withholding or backup withholding tax in any jurisdiction, the Co-Issuer, the Trustee and/or any Paying Agent shall require any certification reasonably acceptable to the Issuer (as instructed in writing by or on behalf of the Issuer) for the Issuer to determine its duties and liabilities with respect to any taxes or other charges that the Issuer may be required to pay, deduct or withhold from payments in respect of such Note or the holder of such Note under any present or future law or regulation of the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification shall include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). The Trustee may also require any certification reasonably acceptable to the Issuer (as instructed in writing by or on behalf of the Issuer) which is necessary for the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each holder of a Note agrees to provide any certification requested pursuant to this paragraph within a reasonable time period after such request is initially made and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(xvi)   Each Holder and beneficial owner by acquiring Notes or an interest in any Note hereby agrees to treat the Notes as described in the "—Certain U.S. Federal Income Tax Considerations" section of the Offering Memorandum for all U.S. federal income tax purposes and shall take no action inconsistent with such treatment unless required by law.

(xvii)  The Holder acknowledges that the Co-Issuers, the Managers, the Trustee, the Share Paying Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by it in

30775-00052 NY:2469328.3   67

connection with its purchase of the Notes are no longer accurate, the Holder will promptly notify the Co-Issuers and the Managers.

(k)    Each Holder of a beneficial interest in a Regulation S Global Note representing any Note will be deemed to have represented and agreed with the Issuer as set forth in subclauses (ii) through (iv), subclauses (vi) through (xi) and subclauses (xiii) through (xvii) in clause (j) above. Each Holder of a beneficial interest in a Regulation S Global Note will also be deemed or required (as applicable) to represent, warrant and agree as follows:

(i)    The Holder is neither a U.S. Person nor a U.S. Resident purchasing for its own account or one or more accounts, each of which is neither a U.S. Person nor a U.S. Resident, and as to each of which the Holder exercises sole investment discretion, and is aware that the sale of the Notes to it is being made in reliance on the exemption from registration provided by Regulation S.

(ii)    The Holder agrees that no Regulation S Global Note (or any interest therein) may be sold, pledged or otherwise transferred in a denomination of less than U.S.$250,000, and in integral multiples of U.S.$1,000 in excess thereof.

(iii)    The Regulation S Global Notes will bear the legends set forth in the applicable form of note contained in Exhibits B-2, C 2, D-2 and E-2, hereto.

(iv)    The Holder understands and agrees that before a Note in the form of an interest in a Regulation S Global Note may be offered, sold, pledged or otherwise transferred to a transferee that takes delivery in the form of a Rule 144A Global Note, the transferee shall be required to provide the Trustee with a transfer certificate in the form attached hereto as Exhibit G to the effect that the transferee is a QIB/QP, which is acquiring the interest in the Note in the form of a Rule 144A Global Note in a transaction meeting the requirements of Rule 144A, and in accordance with any applicable securities laws of any state of the United States or any other relevant jurisdiction.

(l)    Each initial purchaser and transferee of a Class A Note or of a Class B Note, or of a Class C Note, or of a Class D Note or of a Class E Note, issued in the form of a Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, as applicable, will represent and agree that:

(i)    Each initial purchaser of a Class A Note or Class B Note, as applicable, will be required to deliver a Class A Note Purchase Agreement or Class B Note Purchase Agreement, each initial purchaser of

a Certificated Class C Note, Certificated Class D Note or Certificated Class E Note will be required to deliver a Certificated Class C Note Subscription Agreement, Certificated Class D Note Subscription Agreement or Certificated Class E Note Subscription Agreement, as applicable, each subsequent transferee of a Class A Note or Class B Note, as applicable, will be required to deliver to the Issuer a certificate substantially in the form of Exhibit I-1 hereto, and each subsequent transferee of a Class C Note, Class D Note or Class E Note issued in the form of a Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, as applicable, will be required to deliver to the Issuer a certificate substantially in the form of Exhibit I-2 hereto, certifying, in each case, that such initial purchaser or transferee, as applicable, (i) is either (x) both a Qualified Institutional Buyer (or, solely in the case of a purchaser or transferee of a Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, either a Qualified Institutional Buyer or an "accredited investor") and a Qualified Purchaser, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is both a Qualified Institutional Buyer (or, solely in the case of a purchaser or transferee of a Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, either a Qualified Institutional Buyer or an "accredited investor") and a Qualified Purchaser, pursuant to and in accordance with Rule 144A or (y) neither a U.S. Person nor a U.S. Resident, purchasing for its own account or one or more accounts with respect to which it exercises sole investment discretion, each of which is neither a U.S. Person nor a U.S. Resident, in an offshore transaction in accordance with Regulation S and (ii) is in compliance with all applicable securities laws, ERISA restrictions and tax laws. With respect to any initial purchaser of a Class A Note or Class B Note, the related Guarantor or Funding Entity, if any, will also be required to satisfy the related Rating Criteria. Any transfer of a Class A Note or Class B Note during the related Draw Period will require that (i) the transferee, the related Guarantor or Funding Entity, if any, satisfies the Rating Criteria and (ii) the initial purchaser and each transferee executes and delivers a Class A Note Purchase Agreement or Class B Note Purchase Agreement, as applicable.

(ii)    Each initial purchaser or transferee of a Certificated Note must provide, if requested, any additional information that may be required to substantiate its status as (i) a Qualified Institutional Buyer (or, solely in the case of a purchaser or transferee of a Certificated Class C Note, Certificated Class D Note or Certificated Class E Note, either a Qualified Institutional Buyer or an "accredited investor") and as a Qualified Purchaser or (ii) neither a U.S. Person nor a U.S. Resident, as applicable, and to determine compliance with ERISA or to otherwise

determine its eligibility to purchase a Certificated Note of the relevant Class of Notes; and

(iii)   Any transfer of the Certificated Notes corresponding to the relevant Class of Notes in violation of the foregoing restrictions will be void <u>ab initio</u> and will be disregarded by the Trustee.

(m)   Each Person who becomes a Holder of a Certificated Note corresponding to the relevant Class of Notes (whether pursuant to <u>Section 2.5(f)</u> or otherwise) will be required to represent and warrant (in the transfer certificate in the form of <u>Exhibit I-1</u>, <u>Exhibit I-2</u> or <u>Exhibit I-3</u> attached hereto, as applicable) that either (A) it is not, and is not acquiring and holding the Certificated Note, on behalf of a Plan or a governmental, foreign or church plan that is subject to any Similar Law or (B) its acquisition and holding of the Certificated Note will not constitute or otherwise result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, a violation of any Similar Law). The Holder of each Certificated Note, shall further indemnify and hold harmless the Issuer, the Trustee, the Class A Note Agent or the Class B Note Agent, as applicable, and the Managers and their respective affiliates from any cost, damage or loss incurred by them as a result of the inaccuracy or breach of the foregoing representations, warranties and agreements in this paragraph (m). Any purported transfer of Certificated Note to a purchaser that does not comply with the requirements of this paragraph (m) shall be null and void <u>ab initio</u>. The Holder of the each Certificated Note, makes the representations and warranties in this paragraph (m) on each day that it holds any such Certificated Note.

(n)   Notwithstanding a request made to remove the Rule 144A Securities Legend or Regulation S Legend from any of the Notes, such Notes shall bear the applicable legend, and the applicable legend shall not be removed unless there is delivered to the Co-Issuers and the Trustee such satisfactory evidence, which may include an Opinion of Counsel satisfactory to the Co-Issuers, as may be reasonably required by the Co-Issuers to the effect that neither the applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A, Regulation S or Section 4(2) of the Securities Act, as applicable, and the Investment Company Act.   Upon provision of such satisfactory evidence, the Trustee, at the direction of the Co-Issuers, shall authenticate and deliver such Notes that do not bear such legend.

(o)   Any purported transfer of a Note not in accordance with this <u>Section 2.5</u> shall be null and void <u>ab initio</u>, shall be disregarded by the Trustee and shall not be given effect for any purpose hereunder.

(p)   Nothing in this <u>Section 2.5</u> shall be construed to limit any contractual restrictions on transfers of Notes or interests therein that may apply to any Person.

(q)    Notwithstanding anything contained in this Indenture · to the contrary, neither the Trustee, the Class A Note Agent, Class B Note Agent nor the Note Registrar (nor any other Transfer Agent) shall be responsible or liable for compliance with applicable federal or state securities law (including, without limitation, the Securities Act or Rule 144A or Regulation S promulgated thereunder), the Investment Company Act, ERISA or the Code (or any applicable regulations thereunder); provided, however, that if a specified transfer certificate or Opinion of Counsel is required by the express terms of this Section 2.5 to be delivered to the Trustee or Note Registrar prior to registration of transfer of a Security, the Trustee and/or Note Registrar, as applicable, · shall be under a duty to receive such certificate or Opinion of Counsel and to examine the same to determine whether it conforms on its face to the requirements hereof (and the Trustee or Note Registrar, as the case may be, shall promptly notify the party delivering the same if it determines that such certificate or Opinion of Counsel does not so conform).

Section 2.6    Mutilated, Destroyed, Lost or Stolen Notes. (a) If (i) any mutilated Note is surrendered to a Transfer·Agent, or if there shall be delivered to the Co-Issuers, the Trustee and the relevant Transfer Agent evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Co-Issuers, the Trustee and such Transfer Agent such security or indemnity as may be required by them to save each of them and any agent of any of them harmless, then, in the absence of notice to the Co-Issuers, the Trustee or such Transfer Agent that such Note has been acquired by a Protected Purchaser, the Co-Issuers shall execute and, upon Issuer Request, the Trustee shall authenticate and deliver, in lieu of any such mutilated, destroyed, lost or stolen Note, a new Note of same tenor and principal amount and bearing a number not contemporaneously outstanding.

(b)    If, after delivery of such new Note, a Protected Purchaser of the predecessor Note presents for payment, transfer or exchange such predecessor Note, the Issuer, the Co-Issuer, the Transfer Agent and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer, the Co-Issuer, the Trustee and the Transfer Agent in connection therewith.

(c)    In case any such mutilated, destroyed, lost or stolen Note has become due and payable, the Co-Issuers in their discretion may, instead of issuing a new Note pay such Note without requiring surrender thereof except that any mutilated Note shall be surrendered.

(d)    Upon the issuance of any new Note under this Section 2.6, the Issuer, the Co-Issuer, the Trustee or a Transfer Agent may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation

thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(e)     Every new Note issued pursuant to this Section 2.6 in lieu of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Co-Issuers, and such new Note shall be entitled, subject to the second paragraph of this Section 2.6, to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

(f)     The provisions of this Section 2.6 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.7     Payment of Principal and Interest; Principal and Interest Rights Preserved.  (a) Each Class of Notes shall accrue interest during each Interest Period at the applicable Note Interest Rate specified in Section 2.3 on the Aggregate Outstanding Amount of such Class of Notes (determined in each case, other than with respect to the Class A Notes or the Class B Notes, as of the first day of each Interest Period and after giving effect to any payment of principal or deferral of interest occurring on such day) from the Closing Date and will be payable in arrears on each Payment Date, and on the Stated Maturity, commencing on the Payment Date in September 2007 and will be computed in the manner set forth in Section 2.7(f).  Interest on the Notes shall be due and payable on each Payment Date (commencing on the Payment Date in September 2007) immediately following the related Interest Period and on the Stated Maturity of the Notes.  Interest shall accrue on the Aggregate Outstanding Amount of the Class A Notes and Class B Notes (determined on a weighted daily average basis for each Interest Period after giving effect to any payment of principal or any draw downs made with respect to the Class A Noteholders or Class B Noteholders, as applicable, on any day during the Interest Period), which represents the funded portion of the Class A Commitments or Class B Commitments, as applicable.  The Class A Commitments and the Class B Commitments shall be funded in accordance with the provisions of the Class A Note Purchase Agreement or the Class B Note Purchase Agreement, as applicable.  The Class A Commitment Fee and Class B Commitment Fee shall accrue on the portion of the Class A Commitments or Class B Commitment, as applicable, which is unfunded as of the Closing Date.  The Class A Commitment Fee and Class B Commitment Fee shall be payable in arrears on each Payment Date and, if not so paid, interest shall accrue on the unpaid portion of the Class A Commitment Fee at the Class A Note Interest Rate and the unpaid portion of the Class B Commitment Fee at the Class B Note Interest Rate.  Interest on the Notes shall be due and payable on each Payment Date (commencing on the Payment Date in September 2007) immediately following the related Interest Period and on the Stated Maturity; provided, however, that:

(i)     Failure to pay on a pro rata basis (x) interest accrued on the Class A Notes or (y) the Class A Commitment Fee in each case on any

Payment Date, will result in an Event of Default, as specified in Section 5.1 hereof. Additional interest will accrue on any Defaulted Interest with respect to the Class A Notes at the Class A Note Interest Rate (including any interest on such Defaulted Interest).

(ii)    Payment of interest on the Class B Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), Class A Commitment Fee and other amounts in accordance with the Priority of Payments.  Failure to pay (x) interest accrued on the Class B Notes or (y) the Class B Commitment Fee, in each case, on any Payment Date, will result in an Event of Default, as specified in Section 5.1 hereof.  Additional interest will accrue on any Defaulted Interest with respect to the Class B Notes, including the Class B Commitment Fee, at the Class B Note Interest Rate (including any interest on such Defaulted Interest).

(iii)    Payment of interest on the Class C Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class A Commitment Fee, the interest due and payable on the Class B Notes (including Defaulted Interest, if any and interest on all such Defaulted Interest), the Class B Commitment Fee and other amounts in accordance with the Priority of Payments. Failure to pay interest accrued on the Class C Notes, on any Payment Date, will result in an Event of Default, as specified in Section 5.1 hereof. Additional interest will accrue on any Defaulted Interest with respect to the Class C Notes at the Class C Note Interest Rate (including any interest on such Defaulted Interest).

(iv)    Payment of interest on the Class D Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class A Commitment Fee, the interest due and payable on the Class B Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class B Commitment Fee, the interest due and payable on the Class C Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest) and other amounts in accordance with the Priority of Payments. So long as any Class A Notes, Class B Notes or Class C Notes are Outstanding or any Class A Commitment Fee or Class B Commitment Fee remains unpaid, any interest due and accrued on the Class D Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date (such interest, including as of any date interest accrued as

30775-00052 NY:2469328.3    73

provided in the next sentence on such interest not paid on prior Payment Dates, "Class D Deferred Interest") shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available and permitted to be used for payment of such interest in accordance with the Priority of Payments. Class D Deferred Interest accrued to any Payment Date shall bear interest at the Class D Note Interest Rate, as applicable, and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.

(v)     Payment of interest on the Class E Notes is subordinated to the payment on each Payment Date of the interest due and payable on the Class A Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class A Commitment Fee, the interest due and payable on the Class B Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest), the Class B Commitment Fee, the interest due and payable on the Class C Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest) , the interest due and payable on the Class D Notes (including Defaulted Interest, if any, and interest on such Defaulted Interest) and other amounts in accordance with the Priority of Payments. So long as any Class A Notes, Class B Notes, Class C Notes or Class D Notes are Outstanding or any Class A Commitment Fee or Class B Commitment Fee remains unpaid, any interest due and accrued on the Class E Notes which is not available to be paid as a result of the operation of the Priority of Payments on any Payment Date (such interest, including as of any date interest accrued as provided in the next sentence on such interest not paid on prior Payment Dates, "Class E Deferred Interest") shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available and permitted to be used for payment of such interest in accordance with the Priority of Payments. Class E Deferred Interest accrued to any Payment Date shall bear interest at the Class E Note Interest Rate, as applicable, and shall be payable on the first Payment Date on which funds are permitted to be used for such purpose in accordance with the Priority of Payments.

(b)     The principal of each Note shall be due and payable on the Stated Maturity thereof, as applicable, unless the unpaid principal of such Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption, failure of the Coverage Tests, a Reference Entity Removal Event or otherwise; provided, however, that unless otherwise set forth in subclause (iv) or (v) of this Section 2.7(b) or provided herein with respect to redemptions:

(i)    the payments of principal of the Class B Notes may only occur on or after the date that the principal of the Class A Notes have been paid in full and the Class A Commitments have been reduced to zero, and is subordinated to the payment on each Payment Date of the principal due and payable on the Class A Notes, the interest due and payable on the Class A Notes, and other amounts in accordance with the Priority of Payments (and the failure to pay the principal of the Class B Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default);

(ii)    the payments of principal of the Class C Notes may only occur on or after the date that the principal of the Class A Notes and the Class B Notes has been paid in full and both the Class A Commitments and the Class B Commitments have been reduced to zero, and is subordinated to the payment on each Payment Date of the principal due and payable on the Class A Notes and the Class B Notes, the interest due and payable on the Class A Notes and the Class B Notes and other amounts in accordance with the Priority of Payments (and the failure to pay the principal of the Class C Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default);

(iii)    the payment of principal of the Class D Notes (other than with respect to clause (vi) below) may only occur on or after the date that the principal of the Class A Notes, the Class B Notes and the Class C Notes has been paid in full and both the Class A Commitments and the Class B Commitments have been reduced to zero, and is subordinated; other than with respect to the payment of Class D Deferred Interest out of Interest Proceeds as contemplated by Section 11.1(A)(a)(xii), to the payment on each Payment Date of the principal due and payable on the Class A Notes, the Class B Notes and the Class C Notes, the interest due and payable on the Class A Notes, the Class B Notes and the Class C Notes and other amounts in accordance with the Priority of Payments (and the failure to pay the principal amount of the Class D Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default);

(iv)    the payment of principal of the Class E Notes (other than with respect to clause (vii) below) may only occur on or after the date that the principal of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes has been paid in full and both the Class A Commitments and the Class B Commitments have been reduced to zero,

30775-00052 NY:2469328.3    75

and is subordinated, other than with respect to the payment of Class E Deferred Interest out of Interest Proceeds, as contemplated by Section 11.1(A)(a)(xv) to the payment on each Payment Date of the principal due and payable on the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, the interest due and payable on the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and other amounts in accordance with the Priority of Payments (and the failure to pay the principal amount of the Class E Notes on any Payment Date prior to their Stated Maturity if funds are not available therefor in accordance with the Priority of Payments shall not be considered an Event of Default);

(v) with respect to satisfying the Coverage Tests (other than the Class D Coverage Tests and the Class E Coverage Tests) and a Reference Entity Removal Event, the payment of principal on the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes will occur and the Class B Commitments will be reduced to zero, prior to the date the Class A Notes have been paid in full and the Class A Commitments have been reduced to zero;

(vi) with respect to satisfying the Class D Coverage Tests, the payment of the Class D Notes will occur prior to the date the Class A Notes, the Class B Notes and the Class C Notes have been paid in full and the Class A Commitments and the Class B Commitments have been reduced to zero.

(vii) with respect to satisfying the Class E Coverage Tests, the payment of the Class E Notes will occur prior to the date the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes have been paid in full and the Class A Commitments and the Class B Commitments have been reduced to zero.

(c) Interest due on any Payment Date on the Notes, the Class A Commitment Fee, the Class B Commitment Fee and principal paid on any Payment Date on the Notes (including any Redemption Price paid on the applicable Redemption Date) shall be payable by the Paying Agent by Dollar check drawn on a bank in the United States of America or by wire transfer in immediately available funds and, if individual definitive Notes are issued, and so long as any Notes are listed on the Irish Stock Exchange and the rules of such exchange shall so require the Co-Issuers will have a paying agent for such Notes that are so listed in Ireland and payments on such Notes may be effected through such Irish Paying Agent. In the event that the Irish Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Company Announcements Office. In the case of a check, such check shall be mailed to the Person entitled thereto at his address as it appears on the Note Register and, in the case of a wire transfer, such wire transfer shall be sent in accordance

with written instructions provided by such Person. Upon final payment due on the Maturity of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office or at the office of any Paying Agent (outside of the United States if then required by applicable law in the case of a definitive Note issued in exchange for a beneficial interest in the Regulation S Global Note) on or prior to such Maturity; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Co-Issuers or the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender. In the case where any final payment of principal and interest is to be made on any Note (other than on the Stated Maturity thereof) the Co-Issuers or, upon Issuer Request, the Trustee, in the name and at the expense of the Co-Issuers shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail to the Persons entitled thereto at their addresses appearing on the Note Register, a notice which shall state the date on which such payment will be made, the amount of such payment per U.S.$100,000 principal amount of Notes and shall specify the place where such Notes may be presented and surrendered for such payment.

(d)     Subject to the provisions of Sections 2.7(a) and (b) and Section 13.1 hereof, the Holders of Notes as of the Record Date in respect of a Payment Date shall be entitled to the interest accrued and payable in accordance with the Priority of Payments and principal payable in accordance with the Priority of Payments on such Payment Date. All such payments that are mailed or wired and returned to the Corporate Trust Office of the Trustee or at the office of any Paying Agent shall be held for payment as herein provided at the office or agency of the Co-Issuers to be maintained as provided in Section 7.4.

(e)     Interest on any Note which is payable, and is punctually paid or duly provided for, on any Payment Date shall be paid to the Person in whose name that Note (or one or more predecessor Notes) is registered at the close of business on the Record Date for such interest. Payments of principal to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of such Class registered in the name of each such Holder on such Record Date bears to the Aggregate Outstanding Amount of all Notes of such Class on such Record Date.

(f)     Interest on the Notes (and interest on any Defaulted Interest, Class D Deferred Interest and the Class E Deferred Interest) shall be computed on the basis of the actual number of days elapsed during the applicable Interest Period (including any adjustment to the number of days in an Interest Period as a result of the related Payment Date and/or the preceding Payment Date being moved from a day that is not a Business Day to the immediately succeeding Business Day) divided by 360. Both the Class A Commitment Fee and the Class B Commitment Fee will be calculated on the basis of a

360-day year and the actual number of days elapsed during each Interest Period, including any adjustment to the number of days in an Interest Period as a result of the related Payment Date and/or the preceding Payment Date being moved from a day that is not a Business Day to the immediately succeeding Business Day.

(g)    All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date, Redemption Date or any other date shall be binding upon all future Holders of such Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.

(h)    The Notes and all obligations owed to the Trustee hereunder will be limited recourse debt obligations of the Issuer and non-recourse debt obligations of the Co-Issuer, in each case secured as described herein. Once the Collateral have been realized and the proceeds thereof applied in accordance with the Priority of Payments, the Co-Issuers shall have no further obligations hereunder and any outstanding obligations shall be extinguished. No recourse shall be had for the payment of any amount owing in respect of the Notes or under this Indenture against any officer, director, employee, shareholder or incorporator of the Co-Issuers or any successors or assigns thereof for any amounts payable under the Notes or this Indenture. It is understood that the foregoing provisions of this paragraph (h) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture, and the same shall continue until paid or discharged. It is further understood that the foregoing provisions of this paragraph (h) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person.

(i)    Subject to the foregoing provisions of this Section 2.7, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights of unpaid interest and principal that were carried by such other Note.

(j)    Notwithstanding any of the foregoing provisions (except for Section 2.7(h)) with respect to payments of principal of and interest on the Notes, if the Notes have become or been declared due and payable following an Event of Default and such acceleration of Maturity and its consequences have not been rescinded and annulled and the provisions of Section 5.5 are not applicable, then payments of principal of and interest on all of such Notes shall be made as specified in Section 13.1.

(k)    With respect to the Maturity Date, in the event that a Potential Failure to Pay has occurred with respect to a Reference Entity included in the Reference Portfolio for the Credit Swap Agreement on or prior to the Maturity Date and such Potential Failure to Pay has not been cured on or prior to the Maturity Date (an "Adjustment Reference Entity"), then an Adjustment Amount shall be determined by the Credit Swap Calculation Agent as of the date upon which the Potential Failure to Pay is determined to have occurred by calculating in accordance with the terms of the Credit Swap Agreement (i) a hypothetical Reference Entity Loss Amount for the relevant Adjustment Reference Entity based on a Final Price of zero, and (ii) a hypothetical Cash Settlement Amount for such Adjustment Reference Entity. The "Adjustment Amount" on the date upon which the Potential Failure to Pay is determined, shall be an amount equal to the greater of (i) such hypothetical Cash Settlement Amount, and (ii) zero.

Section 2.8    Persons Deemed Owners.    The Issuer, the Co-Issuer, the Trustee and any agent of the Co-Issuers or the Trustee may treat the Person in whose name any Note is registered as the owner of such Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal and interest on such Note and on any other date for all other purposes whatsoever (whether or not such payment is overdue), and neither the Co-Issuers nor the Trustee nor any agent of the Co-Issuers or the Trustee shall be affected by notice to the contrary; provided, further, that the Depositary, or its nominee, shall be deemed the owner of the Global Notes, and owners of beneficial interests in Global Notes will not be considered the owners of any Notes for the purpose of receiving notices.

Section 2.9    Cancellation.    All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it.  No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 2.9, except as expressly permitted by this Indenture.  All cancelled Notes held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy unless the Issuer and the Co-Issuer shall direct by an Issuer Order that they be returned to the Issuer as notified to the Trustee prior to such Note's cancellation and/or destruction.

Section 2.10    Global Notes; Temporary Notes.    (a) A Global Note deposited with the Depositary pursuant to Section 2.2 shall be transferred to the beneficial Holders thereof only if such transfer complies with Section 2.5 of this Indenture and either (i) the Depositary notifies the Co-Issuers that it is unwilling or unable to continue as Depositary for such Global Note or if at any time such Depositary ceases to be a Clearing Agency and a successor depositary is not appointed by the Co-Issuers within 90 days of such notice, or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or any Paying Agent

obtains actual knowledge that it is or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required if the Notes were in definitive form.

(b)    Any Global Note that is transferable to the beneficial Holders thereof pursuant to this Section 2.10 shall be surrendered by the Depositary to the Corporate Trust Office or its office or agent located in the Borough of Manhattan, The City of New York, to be so transferred, in whole or from time to time in part, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Notes of authorized denominations. Any portion of a Rule 144A Global Note or a Regulation S Global Note transferred pursuant to this Section 2.10 shall be executed, authenticated and delivered in denominations of U.S.$250,000 and any integral multiple of U.S.$1,000 in excess thereof, registered in such names as the Depositary shall direct. Any Note delivered by the Trustee or its agent in exchange for an interest in a Rule 144A Global Note shall, except as otherwise provided by Section 2.5(k), bear the Rule 144A Securities Legend set forth in the applicable Exhibit. Any Note delivered in exchange for an interest in a Regulation S Global Note shall, except as otherwise provided by Section 2.5(k), bear the Regulation S Legend set forth in the applicable Exhibit.

(c)    Subject to the provisions of paragraph (b) of this Section 2.10, the registered Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d)    Upon receipt of notice from the Depositary of the occurrence of either of the events specified in paragraph (a) of this Section 2.10, the Issuer shall use its best efforts to make arrangements with the Depositary for the exchange of interests in the Global Notes for individual definitive Notes and cause the requested individual definitive Notes to be executed and delivered to the Note Registrar in sufficient quantities and authenticated by or on behalf of the Trustee for delivery to Noteholders.

(e)    Pending the preparation of definitive certificates for such Class of Notes pursuant to this Section 2.10, the Co-Issuers may execute, and upon Issuer Order the Trustee shall authenticate and deliver, temporary certificates for such Class of Notes that are printed, lithographed, typewritten, mimeographed or otherwise reproduced, in any authorized denomination, substantially of the tenor of the definitive certificates in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the Officers executing such temporary certificates may determine, as conclusively evidenced by their execution of such certificates.

(f)    If temporary certificates for a Class of Notes are issued, the Co-Issuers will cause such Notes to be prepared without unreasonable delay. The definitive certificates shall be printed, lithographed or engraved, or provided by any combination

thereof, or in any other manner permitted by the rules and regulations of any applicable securities exchange, all as determined by the Officers executing such definitive certificates. After the preparation of definitive certificates, the temporary certificates shall be exchangeable for definitive certificates upon surrender of the temporary certificates at the office or agency maintained by the Co-Issuers for such purpose, without charge to the Holder. Upon surrender for cancellation of any one or more temporary certificates, the Co-Issuers shall execute, and the Trustee shall authenticate and deliver, in exchange therefor the same aggregate principal amount of definitive certificates of authorized denominations. Until so exchanged, the temporary certificates shall in all respects be entitled to the same benefits under this Indenture as definitive certificates.

(g)     Persons exchanging interests in a Global Note for individual definitive Notes will be required to provide to the Trustee, through the Depositary, (i) written instructions and other information required by the Issuer and the Trustee to complete, execute and deliver such individual definitive Notes, (ii) in the case of an exchange of an interest in a Rule 144A Global Note, such certification as to QIB/QP status as the Issuer shall require, and (iii) in the case of an exchange of an interest in a Regulation S Global Note, such certification as to non-U.S. Person and non-U.S. Resident status as the Issuer shall require. In all cases, individual definitive Notes delivered in exchange for any Global Note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by the Depositary.

Section 2.11    <u>Deduction or Withholding from Payments on Notes; Delivery of Tax Forms</u>. (a) If the Issuer becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, payments to any Holder for any present or future tax, duty, assessment, or governmental charge, then (i) the Issuer shall give prompt written notice of the requirement to the Trustee and the Holders (which shall include certification of the amount so deducted, withheld, charged, or assessed) and (ii) the Trustee or other Paying Agent, as applicable, shall reduce the amount payable in respect of the Notes by the amount required to be deducted, withheld, charged, or assessed from payments on the Notes on any Payment Date. The Issuer shall not be obligated to pay any additional amounts to the Holders as a result of any such deduction, withholding, charge, or assessment.

(b)     The Paying Agent may require any certification acceptable to the Issuer which is necessary for the Issuer to qualify for a reduced rate of withholding or backup withholding in any jurisdiction from or through which the Issuer receives payments on its assets, or to make payments of principal and interest on the Notes without withholding or backup withholding. The Issuer shall require each Holder to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments. Such certification shall include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY

(Certification of Foreign Intermediary Status), IRS Form W 9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms).

(c)     The Trustee hereby provides notice to each Holder that the failure of such Holder to provide the Trustee with appropriate tax certifications will result in amounts being withheld from payments to such Holder under the Indenture (provided that amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer).

Section 2.12    Notes Beneficially Owned by Persons Not QIB/QPs/AI. (a) Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any Notes to a Person that is either a U.S. Person or a U.S. Resident and that is not a QIB/QP (or, solely in the case of the Class C Notes, the Class D Notes and the Class E Notes issued in the form of Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, both a Qualified Purchaser and an "accredited investor"), shall be null and void ab initio and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee shall have notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)     If any Person that is either a U.S. Person or a U.S. Resident that is not a QIB/QP (or, solely in the case of the Class C Notes, the Class D Notes and the Class E Notes issued in the form of Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, both a Qualified Purchaser and an "accredited investor") at the time it acquires a Note or a beneficial interest therein shall become the beneficial holder of any Note (any such person, a "Non-Permitted Holder"), the Issuer shall, promptly after discovery that such Person is a Non-Permitted Holder by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted Holder demanding that such Non-Permitted Holder transfer its interest to a Person that is not a Non-Permitted Holder within 30 days of the date of such notice. If such Non-Permitted Holder fails to transfer its Notes or interest therein, the Issuer shall have the right, without further notice to the Non-Permitted Holder, to sell such Notes or interest in Notes to a purchaser selected by the Issuer that is not a Non-Permitted Holder on such terms as the Issuer may choose. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting one or more bids from one or more brokers or other market professionals that regularly deal in securities similar to the Notes, and selling such Notes to the highest such bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the Non-Permitted Holder and each other Person in the chain of title from the Holder to the Non-Permitted Holder, by its acceptance of an interest in the Notes, agrees to cooperate with the Issuer and the Trustee to effect such transfers. The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted

to the Non-Permitted Holder. The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and neither the Issuer nor the Trustee shall be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of such discretion.

## ARTICLE III

## CONDITIONS PRECEDENT; CERTAIN PROVISIONS RELATING TO COLLATERAL

Section 3.1    General Provisions.  The Notes to be issued on the Closing Date may be executed by the Co-Issuers, and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Request, upon compliance with Section 3.2 and upon receipt by the Trustee of the following:

(a)    (i)    an Officer's Certificate of the Issuer evidencing the authorization of the execution and delivery of, among other documents, this Indenture, the Credit Swap Agreement, the Shares Paying Agency Agreement, the Class A Note Purchase Agreement, the Class B Note Purchase Agreement, the Placement Agreement, the Administration Agreement, Collateral Administration Agreement, the Securities Account Control Agreement, the Purchase Agreement and the execution, authentication and delivery of the Notes and the execution and delivery of the Preference Shares, and specifying the Stated Maturity, the principal amount and Note Interest Rate of each Class to be authenticated and delivered; and

(ii)    an Officer's Certificate of the Co-Issuer (A) evidencing the authorization by Board Resolution of the execution and delivery of this Indenture, the Purchase Agreement, the Class A Note Purchase Agreement, the Class B Note Purchase Agreement and the execution, authentication and delivery of the Notes, and specifying the Stated Maturity, the principal amount and Note Interest Rate, as applicable, of the Notes, to be authenticated and delivered; and (B) certifying that (1) the attached copy of the Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    (i)    either (A) an Officer's Certificate of the Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes and the Preference Shares or (B) an Opinion of Counsel of the

Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of such Notes and Preference Shares except as may have been given for the purposes of the foregoing; provided, that the opinions of Allen & Overy LLP attached as Exhibit L hereto and Maples and Calder attached as Exhibit M hereto in respect of such matters shall satisfy this clause (i)(B); and

> (ii)    either (A) an Officer's Certificate of the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel that the Trustee is entitled to rely thereon and that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes, or (B) an Opinion of Counsel of the Co-Issuer that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Notes except as may have been given for the purposes of the foregoing; provided, that the opinion of Allen & Overy LLP attached as Exhibit L hereto in respect of such matters shall satisfy this clause (ii)(B);

> (c)    opinions of Allen & Overy LLP, counsel to the Co-Issuers, dated the Closing Date, substantially in the form of Exhibit L;

> (d)    an opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit M;

> (e)    [Reserved];

> (f)    an Officer's Certificate stating that the Issuer is not in default under this Indenture and that the issuance of the Notes and the Preference Shares will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Preference Share Documents, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; and that all conditions precedent provided in this Indenture and the Preference Share Documents relating to the authentication and delivery of the Notes and the issuance of the Preference Shares applied for have been complied with;

> (g)    an Officer's Certificate stating that the Co-Issuer is not in default under this Indenture and that the issuance of the Notes will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the Certificate of Formation or the Limited Liability Company Agreement of the Co-Issuer, any indenture or other agreement or instrument to which the Co-Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Co-Issuer is a party or by which it may be bound or to which it may be subject;

and that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with;

(h)    an Accountants' Certificate satisfactory to the Issuer (i) confirming the information with respect to each Reference Entity set forth on the Schedule of the Reference Entities attached hereto as Schedule A; and (ii) specifying the procedures undertaken by them to review data and compute the Collateral Quality Measurements;

(i)    true and correct copies of letters signed by each of the Rating Agencies confirming that each of the Class B Notes have been rated "Aaa" by Moody's and "AAA' by S&P, that the Class C Notes have been rated at least "A2" by Moody's and at least "A" by S&P, that the Class D Notes have been rated at least "Baa2" by Moody's and at least "BBB" by S&P, that the Class E Notes have been rated at least "Ba2" by Moody's and at least "BB" by S&P and that such ratings are in full force and effect on the Closing Date;

(j)    an executed copy of the Shares Paying Agency Agreement;

(k)    an executed copy of the Class A Note Purchase Agreement;

(l)    an executed copy of the Class B Note Purchase Agreement;

(m)    executed copy of the Note Subscription Agreements (if any);

(n)    an executed copy of the Securities Account Control Agreement;

(o)    an executed copy of the Administration Agreement;

(p)    an executed copy of the Purchase Agreement;

(q)    an executed copy of the Collateral Administration Agreement;

(r)    an executed copy of the Placement Agreement;

(s)    a certificate from the Cayman Islands Government stating that the Issuer will be exempt from certain Cayman Islands taxes, in form and substance reasonably satisfactory to the Trustee; and

(t)    such other documents as the Trustee may reasonably require (provided, that nothing in this clause shall imply or impose a duty on the Trustee to so require).

Section 3.2    Security for the Notes. Notes to be issued on the Closing Date may be executed by the Co-Issuers and delivered to the Trustee for authentication, and thereupon the same shall be authenticated and delivered to the Issuer by the Trustee

upon Issuer Order and upon delivery by the Issuer to the Trustee, and receipt by the Trustee, of the following:

(a)    Grant of the Underlying Asset.    Fully executed copies of this Indenture, and copies of each other instrument or document, fully executed (as applicable), necessary to consummate and perfect the Grant set forth in the Granting Clauses of this Indenture.

(b)    Certificate of the Issuer.    The delivery to the Trustee of a certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, with respect to the assets pledged to the Trustee for inclusion in the Collateral on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer is the owner of such asset free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Closing Date and except for those Granted pursuant to this Indenture;

(ii)    the Issuer has acquired its ownership in such asset in good faith, and in the exercise of the Issuer's judgment, without notice of any adverse claim (as such term is defined in UCC Section 8-102(a)(1)), except as described in paragraph (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such asset (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    the information set forth with respect to such Underlying Asset in the Schedule of the Reference Entities is correct;

(v)    the Underlying Asset included on Schedule A satisfy the requirements of the definition of Underlying Asset and, together with any Deposit, Section 3.2(a);

(vi)    the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such asset to the Trustee; and

(vii)    upon the effectiveness of the Grant by the Issuer to the Trustee pursuant to the Granting Clauses of this Indenture, the Trustee has a first priority perfected security interest in the Collateral.

(c)    Issuer Accounts.    Evidence of the establishment of the Issuer Accounts.

(d)    Issuer Order.  An Issuer Order or Issuer Request directing the Trustee to authenticate the Notes and a written request from the Co-Issuer directing the Trustee to authenticate the Notes, in both cases in the amounts and registered in the names set forth therein.

(e)    Rating Letters.  An Officer's Certificate of the Issuer to the effect that attached thereto are true and correct copies of letters signed by Moody's and S&P confirming that the Class B Notes have been rated "Aaa" and "AAA" by Moody's and S&P, respectively, that the Class C Notes have been rated at least "A2" and "A" by Moody's and S&P, respectively, that the Class D Notes have been rated at least "Baa2" and "BBB" by Moody's and S&P, respectively and that the Class E Notes have been rated at least "Ba2" and "BB" by Moody's and S&P, respectively.

Section 3.3    RESERVED.

Section 3.4    Investment at the Direction of the Credit Swap Counterparty and Delivery of the Underlying Asset and Eligible Investments.  (a) (i) The Trustee shall take delivery and hold all Certificated Securities and Instruments in physical form at the office or agency of a custodian, which may be the Trustee or a person appointed by the Trustee, located in the State of New York (together with any successor, the "Custodian"), subject to its right to relocate such jurisdiction pursuant to and in accordance with Section 7.7(b).  The Trustee shall act or the Custodian shall be appointed to act, as a Securities Intermediary with respect to the Issuer Accounts.  The Custodian, and any successor Custodian, shall satisfy the criteria set forth in Section 10.7.

(ii) .    The Trustee shall in accordance with the instructions given to the Trustee by the Credit Swap Counterparty cause amounts on deposit in the Accounts to be invested in Eligible Investments.  Each time that the Trustee shall cause the acquisition of any Eligible Investments, the Trustee shall cause the transfer of such Eligible Investments to the Custodian to be held in the Issuer Accounts for the benefit of the Trustee in accordance with the terms of this Indenture.  Notwithstanding the foregoing, the Trustee may cause any Eligible Investment to be transferred to the Custodian for the benefit of the Trustee or to the Trustee by such other method for which an Opinion of Counsel specifies will result in a valid, perfected, first priority security interest in favor of the Trustee in each Eligible Investment.  The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.  The security interest of the Trustee shall nevertheless come into existence and continue in the Eligible Investments so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Eligible Investments.  The Issuer shall also take any and all other actions necessary to create in favor of the Trustee a valid, perfected, first

priority security interest in each Eligible Investments Granted to the Trustee under laws and regulations (including Articles 8 and 9 of the UCC) in effect from time to time.

(b)    Except as provided in paragraph (a) above, in the case of any Underlying Asset or Eligible Investment, to be transferred to the Securities Intermediary for the benefit of the Trustee, the Issuer shall deliver such Underlying Asset or Eligible Investment in accordance with one ore more of the following clauses as applicable:

(i)    in the case of a Security Entitlement that is held through a Securities Intermediary and as to which the Entitlement Holder is the Issuer, obtaining the agreement of such Securities Intermediary that it will comply with Entitlement Orders originated by the Trustee without further consent by the Issuer and taking no action to cause such agreement to cease to be effective and (2) in the case of any other Security Entitlement, directing the Trustee to become the Entitlement Holder of such Security Entitlement;

(ii)    in the case of an Uncertificated Security registered in the name of the Issuer, obtaining the agreement of the issuer of such Uncertificated Security that such issuer will comply with Instructions originated by the Trustee without further consent by the Issuer and causing such agreement to remain in effect or (2) in the case of any other Uncertificated Security, directing the Trustee to become the registered owner of such Uncertificated Security in accordance with the law of the jurisdiction of organization of the issuer thereof and causing such registration to remain effective;

(iii)    in the case of an Instrument or a Certificated Security represented by a Security Certificate in Registered Form specially indorsed to the Trustee by an effective indorsement, delivering such Instrument or Security Certificate to the Custodian in the State of New York and causing the Custodian to maintain (on behalf of the Trustee) continuous possession of such Instrument or Security Certificate in the State of New York; and

(iv)    in the case of general intangibles by filing a financing statement in the District of Columbia describing all assets of the Issuer, or all general intangibles of the Issuer or such general intangible.

(c)    with respect to any item of Collateral, such other actions that the opinion described in Exhibit L pertaining to security interest matters describes as effective to perfect a security interest in such item of Collateral.

(d)    The Issuer shall cause a UCC financing statement describing the Collateral by use of the words "all personal property" and naming the Issuer as debtor and the Trustee as secured party to be filed by or on behalf of the Issuer in the applicable jurisdiction, which is the District of Columbia, within ten (10) Business Days of the Closing Date.  The Issuer shall take all actions necessary to maintain the effectiveness of such financing statement and shall notify the Trustee in writing 30 days prior to any change in the Issuer's name, identity, corporate structure, jurisdiction of incorporation or jurisdiction of its chief executive office.  The Issuer hereby authorizes the Trustee to, and the Trustee shall, file any other financing statement, amendment, assignment or continuation statement that the Trustee shall have been specifically advised in writing by an Opinion of Counsel delivered pursuant to Section 7.8 is necessary or advisable in connection with the security interest granted hereunder, including without limitation, financing statements describing the Collateral as "all personal property."  The Issuer shall not authorize the filing of any financing statements naming it as debtor other than financing statements in favor of the Trustee.

(e)    In addition to those steps specified in paragraphs (b), (c) and (d) above, the Issuer shall take all steps necessary or advisable under the laws of the Cayman Islands to protect the security interest of the Trustee including the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands.

Section 3.5    RESERVED.

Section 3.6    Representations Regarding Collateral.  The Issuer, as of the date hereof (and, as of the date of each purchase of an Underlying Asset or Eligible Investment, only with respect to such Underlying Asset or Eligible Investment), represents and warrants to the following:

(a)    This Indenture creates a valid and continuing security interest (as defined in the UCC) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Issuer.

(b)    The Issuer owns and has good and marketable title to the Collateral free and clear of any lien, claim or encumbrance of any Person.

(c)    The Issuer has caused or will have caused, within ten days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Collateral granted to the Trustee hereunder.

(d)    Other than the security interest granted to the Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral.  The Issuer has not authorized the filing of and

is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated. The Issuer is not aware of any judgment, pension benefit guaranty or tax lien filings against the Issuer.

(e)     All original executed copies of each mortgage note, promissory note or other writing constituting an "instrument" (as defined in the UCC) that constitute or evidence the Collateral have been delivered to the Custodian.

(f)     None of the "instruments" (as defined in the UCC) that constitute or evidence the Collateral has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee.

(g)     The Issuer has received all consents and approvals required by the terms of the Collateral to the transfer to the Trustee of its interest and rights in the Collateral hereunder.

(h)     The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the Securities Intermediary has agreed to comply with all instructions originated by the Trustee relating to the Issuer Accounts without further consent by the Issuer.

(i)     No Issuer Account is in the name of any Person other than the Issuer. The Issuer has not consented to the Securities Intermediary of any Issuer Account to comply with entitlement orders or other instructions of any Person other than the Trustee.

(j)     All of the Collateral consisting of "security entitlements" (within the meaning of the UCC) has been credited to an Issuer Account. The Securities Intermediary for each of the Issuer Accounts has agreed to treat all assets credited to the Issuer Accounts as "financial assets" (within the meaning of the UCC).

(k)     The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary has agreed to comply with all entitlement orders and other instructions originated by the Trustee relating to the Issuer Accounts without further consent by the Issuer.

(l)     Each of the Issuer Accounts is a "securities account" (within the meaning of the UCC).

(m)     The Collateral consists of (i) securities entitlements, (ii) securities accounts, (iii) promissory notes or other writings constituting "instruments" (within the meaning of the UCC), (iv) "accounts" within the meaning of the UCC) or (v) "general intangibles" (within the meaning of the UCC).

(n)     Each of the foregoing representations shall, as applicable, be deemed repeated each time new assets become part of the Collateral.

(o)     The security interest of the Trustee in the Collateral shall, until payment in full of the indebtedness secured hereunder and termination of this Indenture, be a first-priority perfected security interest.

(p)     Notwithstanding any other provision of this Indenture or any other related transaction document, the representations in this Section 3.6 (i) shall be continuing, and remain in full force and effect until such time as all obligations under this Indenture and the Notes have been finally and fully paid and performed, and (ii) may not be amended or waived without receipt of Rating Agency Confirmation from S&P.

## ARTICLE IV

## SATISFACTION AND DISCHARGE

Section 4.1    Satisfaction and Discharge of Indenture.  This Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Holders to receive payments of principal thereof and interest thereon as provided herein, (iv) the rights, indemnities and immunities of the Trustee hereunder, and (v) the rights of Holders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them, and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a)     either

(i)     (x) all Notes theretofore authenticated and delivered (other than (A) Notes which have been mutilated, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.6 and (B) Notes for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust as provided in Section 7.5) and (y) all Preference Shares have been redeemed; or

(ii)    all Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, (B) will become due and payable at their Stated Maturity within one year or (C) are to be called for redemption (together with any Preference Shares Outstanding) within one year pursuant to Section 9.1 under an arrangement reasonably satisfactory to the Trustee and there has been given notice of redemption by the Issuer and the Co-Issuer pursuant to Section 9.3 and, in the case of (A), (B) or (C) the Issuer or the Co-Issuer has irrevocably deposited or caused to be

deposited with the Trustee in an account which account shall be maintained for the benefit of the Holders of the Notes, in trust for such purpose, Cash or non-callable direct obligations of the United States of America, provided, that (x) the obligations are Eligible Investments, in an amount sufficient, as verified by a firm of certified public accountants which are nationally recognized, to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of such deposit (in the case of Notes which have become due and payable), or to the Stated Maturity or the Redemption Date, as the case may be, and shall have Granted to the Trustee a valid perfected security interest in such Eligible Investment that is of first priority, free of any adverse claim or legal equivalent thereof, as applicable, and shall have furnished an Opinion of Counsel with respect thereto and (y) the obligations constitute all of the Eligible Investments owned by the Issuer, the Issuer owns no Underlying Asset and all such obligations mature no later than the date on which the Preference Shares are to be redeemed; provided, further, that this subsection (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

(b)     the Co-Issuers have paid or caused to be paid all other sums payable hereunder by the Co-Issuers;

(c)     the Co-Issuers have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent relating to the satisfaction and discharge of this Indenture have been complied with; and

(d)     (i) the conditions of clauses (a), (b) and (c) have been met as to the Notes;

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee and, if applicable, the Holders, as the case may be, under Sections 2.5, 2.6, 2.7, 4.2, 5.4(d), 5.9, 5.18, 6.1, 6.3, 6.4, 6.6, 6.7, 6.8, 7.1, 7.4 and 7.5, Article XIII and Article XIV hereof shall survive the satisfaction and discharge of this Indenture.

Section 4.2    Application of Trust Money. All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust and applied by it in accordance with the provisions of the Notes and this Indenture, including the Priority of Payments and Section 11.2, to the payment of the principal, interest and either directly or through any Paying Agent, as the Trustee may determine, to the Person entitled thereto of the principal and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required herein or required by law.

30775-00052 NY:2469328.3      92

Section 4.3    Repayment of Monies Held by Paying Agent.    In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.5 hereof and in accordance with the Priority of Payments and thereupon such Paying Agent shall be released from all further liability with respect to such monies.

## ARTICLE V

## REMEDIES

Section 5.1    Events of Default.    "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default in the payment, when due and payable, of the Class A Commitment Fee, interest in respect of the Class A Notes, the Class B Commitment Fee, interest in respect of the Class B Notes, interest in respect of the Class C Notes or, if there are no Class A Commitments, Class B Commitments, Class B Notes or Class C Notes Outstanding, a default in the payment, when due and payable, of interest in respect of the Class D Notes or, if there are no Class A Commitments, Class B Commitments, Class B Notes, Class C Notes Outstanding or Class D Notes Outstanding, a default in the payment, when due and payable, of interest in respect of the Class E Notes and, in each such case, the continuation of such default for three (3) or more Business Days (or, if such default results solely from an administrative error, five (5) or more Business Days);

(b)    a default in the payment of principal of any Note at its Stated Maturity or on any Redemption Date;

(c)    failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments or Section 11.2 (other than as specified in Section 5.1(a) or (b)) and continuation of such failure for a period of (3) three or more Business Days (or in the case of a payment default resulting solely from an administrative error or omission by the Trustee, the Administrator or a Paying Agent, seven (7) or more Business Days, as evidenced by an Officer's Certificate of the Issuer);

(d)    if on any Measurement Date the ratio (expressed as a percentage) obtained by dividing the Net Collateral Principal Balance as of such Measurement Date, by the aggregate outstanding principal amount of the Class A Notes as of such Measurement Date, is less than 102.0%;

(e)    a circumstance in which either of the Co-Issuers or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(f)    a default in the performance, or breach, of any other covenant or other agreement of the Issuer or the Co-Issuer under this Indenture, or any representation or warranty of the Issuer or the Co-Issuer made in this Indenture or in any certificate or writing delivered pursuant thereto or in connection therewith failing to be correct in any material respect when made, which default, breach or failure could have a material adverse effect on the Holders of the Notes, and the continuation of such default, breach or failure for a period of 30 or more days after any of the Issuer and the Co-Issuer has actual knowledge thereof or after written notice thereof to the Issuer by the Trustee or to the Issuer and the Trustee by a Majority of the Controlling Class specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(g)    the entry of a decree or order by a court having competent jurisdiction adjudging either of the Co-Issuers as bankrupt or insolvent or granting an order for relief or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or ordering the winding up or liquidation of its affairs; or an involuntary case or Proceeding shall be commenced against either of the Co-Issuers seeking any of the foregoing and such case or Proceeding shall continue in effect for a period of 60 consecutive days;

(h)    the institution by either of the Co-Issuers of Proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency Proceedings against it, or the filing by either of the Co-Issuers of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code, the bankruptcy and insolvency laws of the Cayman Islands or any other applicable law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, Trustee or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action;

(i)    one or more final judgments being rendered against the Issuer or the Co-Issuer which exceed, in the aggregate, U.S.$10,000,000 (after excluding any portion of the judgment that is payable by a party other than the Issuer or Co-Issuer pursuant to an insurance policy or other agreement) and which remain unstayed,

undischarged and unsatisfied for 30 or more days after such judgment(s) becomes nonappealable, unless adequate funds have been reserved or set aside for the payment thereof; or

        (j)     the occurrence of an Early Termination Date under the Credit Swap Agreement.

        Upon the occurrence of or knowledge of the occurrence of an Event of Default, each of (i) the Co-Issuers, (ii) the Trustee and (iii) the Credit Swap Counterparty shall notify each other, and the Trustee on behalf of the Co-Issuers shall promptly notify the Noteholders, each Paying Agent, the Shares Paying Agent, the Depositary and each of the Rating Agencies in writing.

        Section 5.2    Acceleration of Maturity; Rescission and Annulment. (a) If an Event of Default occurs and is continuing (other than an Event of Default specified in Section 5.1(g) or 5.1(h)), (i) a Supermajority of the Controlling Class or (ii) the Trustee may, and at the written direction of such Holders, shall, by notice to the Issuer, the Credit Swap Counterparty and, in the case of notice by such Holders, also to the Trustee (which shall provide notice to the Holders of all of the Outstanding Notes) declare the principal of all the Notes to be immediately due and payable, and upon any such declaration such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall become immediately due and payable. If an Event of Default specified in Section 5.1(g) or 5.1(h) occurs, all unpaid principal, together with all accrued and unpaid interest thereon, of all the Notes, and other amounts payable hereunder, shall automatically become due and payable without any declaration or other act on the part of the Trustee or any Holder of Notes.

        (b)    At any time after such a declaration of acceleration of Maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article V, a Supermajority of the Controlling Class, by written notice to the Co-Issuers and the Trustee, may rescind and annul such declaration and its consequences if:

        (i)    the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay, and shall pay (in each case, other than amounts due solely as a result of such declaration):

        (A)    all overdue installments of interest on and principal of the Notes;

        (B)    with respect to the Class D Notes, to the extent that payment of such interest is lawful, interest upon any Class D Deferred Interest;

(C)    with respect to the Class E Notes, to the extent that payment of such interest is lawful, interest upon any Class E Deferred Interest;

(D)    to the extent that payment of such interest is lawful, interest upon Defaulted Interest on the Notes at the applicable Note Interest Rates;

(E)    all accrued and unpaid taxes, government fees and charges and Administrative Expenses and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel; and

(F)    all amounts then due and payable to the Credit Swap Counterparty;

(ii)    the Credit Swap Agreement has not been terminated; provided however, the Credit Swap Agreement may not be terminated as long as the declaration of acceleration can be rescinded; and

(iii)    the Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of Notes that have become due solely by such acceleration, have been cured and a Supermajority of the Controlling Class, by written notice to the Trustee, have agreed with such determination or waived as provided in Section 5.14.

At any such time as the Trustee shall rescind and annul such declaration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of Section 5.5; provided that, if such preservation of the Collateral is rescinded pursuant to Section 5.5, the Notes may be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission and annulment of a declaration of acceleration pursuant to this Section 5.2(b).

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee. The Co-Issuers covenant that if a Default shall occur in respect of the payment of any principal of any Class A Note, or the payment of principal of any Class B Note, or the payment of principal of any Class C Note (but only after the Class A Notes and Class B Notes and all interest accrued thereon, have been paid in full), or the payment of principal of any Class D Note (but only after the Class A Notes, the Class B Notes and the Class C Notes and all interest accrued thereon, have been paid in full), or the payment

of principal of any Class E Note (but only after the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and all interest accrued thereon, have been paid in full), or the payment of interest on any Note, the Co-Issuers will, upon demand of the Trustee or any affected Holder of Notes, pay to the Trustee, for the benefit of the Holder of such Note, the whole amount then due and payable on such Note for principal and interest, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the applicable Note Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Holder of Notes and their respective agents and counsel.

If the Co-Issuers fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as Trustee of an express trust, may after written notice to the Holders of the Notes and shall upon the written direction of a Supermajority of the Controlling Class institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Co-Issuers and collect the monies adjudged or decreed to be payable in the manner provided by law out of the Collateral.

If an Event of Default occurs and is continuing, the Trustee may in its discretion after written notice to the Holders of the Notes and shall upon the written direction of a Supermajority of the Controlling Class (subject to Section 6.3(e)) proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings, in its own name as Trustee of an express trust, as the Trustee shall deem most effectual (if no direction by a Supermajority of the Controlling Class is received by the Trustee) or as the Trustee may be directed in writing by a Supermajority of the Controlling Class to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

In case there shall be pending Proceedings relative to the Issuer or the Co-Issuer under the Bankruptcy Code, the bankruptcy or insolvency laws of the Cayman Islands or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer or the Co-Issuer, or the creditors or property of the Issuer, the Co-Issuer or such other obligor, the Trustee, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(a)    to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of each of the Notes and to file such other papers or documents and take such other action (including sitting on a committee of creditors) as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and the Holders of Notes allowed in any Proceedings relative to the Issuer or the Co-Issuer or to the creditors or property of the Issuer or the Co-Issuer;

(b)    unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or a Person performing similar functions in comparable Proceedings; and

(c)    to collect and receive any monies or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Holders of Notes and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Holders of Notes to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Holders of Notes, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of its negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

In any Proceedings brought by the Trustee on behalf of the Holders of Notes (and any such Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders of Notes.

Section 5.4    Remedies.  (a) If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Co-Issuers agree that the Trustee may (and shall, upon written direction by a Supermajority of the Controlling Class, subject to Section 6.3(e)), to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral monies adjudged due;

(ii)    sell all or a portion of the Collateral or rights of interest therein, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17 hereof;

(iii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder; and

(v)    to the extent not inconsistent with clauses (i) through (iv), exercise any other rights and remedies that may be available at law or in equity;

provided, however, that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 unless either of the conditions specified in Section 5.5(a) is met or the preservation of the Collateral by the Trustee is prohibited by applicable law.

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the Proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal and interest on any Class of Notes, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)    If an Event of Default as described in Section 5.1(f) hereof shall have occurred and be continuing the Trustee may, and, at the written direction of not less than a Supermajority of the Controlling Class shall (subject to Section 6.3(e)), institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from such Proceeding.

(c)    Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, any Secured Party may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability; and any purchaser at any such sale may, in paying the purchase money, turn in any of the Notes in lieu of Cash equal to the amount which shall, upon distribution

of the net proceeds of such sale, be payable on the Notes so turned in by such Holder (taking into account the Class of such Notes, the Priority of Payments and Article XIII). Said Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after proper notation has been made thereon to show partial payment.

Upon any sale, whether made under the power of sale hereby given or by virtue of judicial proceedings, the receipt of the Trustee, or of the officer making a sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase money, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall bind the Co-Issuers, the Trustee and the Secured Parties, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)      Notwithstanding any other provision of this Indenture, the Trustee, in its own capacity, or on behalf of any Holder of Notes, may not, prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws.  Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day (or longer) period in (A) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

Section 5.5      Optional Preservation of Collateral.   (a) If an Event of Default shall have occurred and be continuing and an acceleration has been declared, the Trustee shall retain the Collateral intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts hereunder and release funds and make deposits thereto in accordance with the provisions of Article X, Article XI and Article XIII unless:

(i)      the Trustee determines in accordance with paragraph (c) below that the anticipated net proceeds of a sale or liquidation of the Collateral (after deducting the expenses of such sale or liquidation including reasonable expenses of the Trustee incurred in connection

therewith) would be sufficient to pay in full the sum of (A) the principal and accrued interest (including any Defaulted Interest and with respect to the Class D Notes and Class E Notes, the Class D Deferred Interest and the Class E Deferred Interest) with respect to all the Outstanding Notes and all Administrative Expenses; and (B) Cash Settlement Amounts, if any, and other amounts owed to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty upon a termination of the Credit Swap Agreement); and the Holders of a Supermajority of the Controlling Class, agree with such determination; or

(ii)    the Holders of a Supermajority of the Aggregate Outstanding Amount of (x) each Class of Notes voting as separate Classes or (y) in the case of an Event of Default described in clause (a) or clause (b) in Section 5.1 a Supermajority of the Controlling Class (and, in each case, the Credit Swap Counterparty, unless the Credit Swap Counterparty will be paid in full the amounts due and unpaid to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty upon a termination of the Credit Swap Agreement)) direct the Trustee to sell the Collateral subject to the terms and conditions set forth below.

The Trustee shall give written notice of its determination not to retain the Collateral to the Issuer with a copy to the Co-Issuer. So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)    Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions set forth in Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral if prohibited by applicable law or if the Trustee is directed to liquidate the Collateral pursuant to Section 5.5(a)(ii).

(c)    In determining whether the condition specified in Section 5.5(a)(i) is satisfied, the Trustee will request a quotation from the Credit Swap Counterparty for the price to be paid by or to the Issuer upon termination of the Credit Swap Agreement and may solicit quotations from potential transferees of the Credit Swap Agreement. Any amount to be paid by the Issuer will be expressed as a negative number and any amount to be paid to the Issuer will be expressed as a positive number. The Credit Swap Agreement may only be transferred with the consent of the Credit Swap Counterparty.

(d)    The Trustee shall promptly deliver to the Holders of the Notes a report stating the results of any determination required pursuant to Section 5.5(a)(i). The Trustee shall make the determinations required by Section 5.5(a)(i) within 30 days after an Event of Default and at the written request of a Supermajority the Controlling Class

and the Credit Swap Counterparty at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i) provided, however, that if any such request is made more frequently than once per fiscal quarter, the requesting party shall be responsible for payment of any associated expenses incurred by the Trustee. In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an Independent certified public accountant of national reputation confirming the mathematical accuracy of the computations of the Trustee. In determining whether the Holders of the requisite Aggregate Outstanding Amount of any Class of Notes have given any direction or notice pursuant to Section 5.5(a), a Holder of Notes of any Class that is also a Holder of Notes of any other Class, or any Affiliate of any such Holder of another Class of Notes shall be counted as a Holder of each of such Classes of Notes for all purposes.

(e)    Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which such sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant thereto (such last permitted date being determined based upon the anticipated proceeds of such sale or liquidation, as described in Section 5.5(a)(i)), unless a new determination is made in accordance with such Section 5.5(a)(i) and the Collateral are sold or liquidated prior to the last sale date permitted in accordance with such new determination.

Section 5.6    Trustee May Enforce Claims Without Possession of Notes. All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as Trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements in compensation of the Trustee, each predecessor Trustee and its agents and attorneys in counsel, shall be applied as set forth in Section 5.7 hereof.

Section 5.7    Application of Money Collected. The application of any money collected by the Trustee pursuant to this Article V and any money that may then be held or thereafter received by the Trustee hereunder shall be applied subject to, and in accordance with, Section 11.1, Section 11.2 and Section 13.1.

Section 5.8    Limitation on Suits. No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or Trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b)    except as otherwise provided in Section 5.9, the Holders of at least 25% of the Aggregate Outstanding Amount of any Class of Notes have made a written

request upon the Trustee to institute such proceedings in its own name as Trustee and have offered the Trustee indemnity reasonably satisfactory to it;

(c)    such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(e)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by a Supermajority of the Controlling Class;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class, or to obtain or to seek to obtain priority or preference over any other Holders of the Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class. In addition, any action taken by any one or more Holders of Notes shall be subject to the restrictions of Sections 2.7(h) and 5.4(d).

In the event the Trustee shall receive conflicting or inconsistent requests and indemnity pursuant to this Section from two or more groups of Holders of the Controlling Class, each representing less than a Supermajority or Majority, as applicable, the Trustee shall take the action requested by the Holders of the largest percentage of the Controlling Class, subject to Article VI hereof.

Section 5.9    Unconditional Rights of Noteholders to Receive Principal and Interest.    (a) Notwithstanding any other provision in this Indenture (other than Section 2.7(h) or Section 5.4(d)), the Holders of any Class A Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest and Class A Commitment Fee on such Class A Note, as such principal and interest and commitment fee becomes due and payable in accordance with the Priority of Payments or Section 13.1 and, subject to the provisions of Section 5.8, to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

(b)    Notwithstanding any other provision in this Indenture (other than Section 2.7(h) or Section 5.4(d)), the Holder of any Class B Note, Class C Note, Class D Note and Class E Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Class B Note, Class C Note and Class D Note, as the case may be, and in the case of the Class B Notes, the Class B Commitment Fee, as such principal, interest and commitment fee become due and payable in accordance with Section 13.1 and the Priority of Payments. Holders of Class

B Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder. Holders of Class C Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note or Class B Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder. Holders of Class D Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note, Class B Note or Class C Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder. Holders of Class E Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Note, Class B Note, Class C Note or Class D Note remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder.

Section 5.10    Restoration of Rights and Remedies.  If the Trustee or any Holder of Notes has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder of Notes, then and in every such case the Co-Issuers, the Trustee and the Holder of Notes shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Holder of Notes shall continue as though no such Proceeding had been instituted.

Section 5.11    Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to the Trustee or to any Holder of Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.12    Delay or Omission Not Waiver.  No delay or omission of the Trustee or of any Holder of Notes to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V or by law to the Trustee or to the Holders of Notes may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders of Notes.

Section 5.13    Control by Holders of Notes.  The Holders of a Supermajority of (x) each of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, voting as separate Classes or (y) in the case of an

Event of Default described in subclause 5.1(a) or (b) above, the Controlling Class will have the right to direct the Trustee in the conduct of any proceedings for any remedy available to the Trustee; provided, that:

(a)      such direction shall not be in conflict with any rule of law or with this Indenture;

(b)      the Trustee may take any other action deemed proper by it that is not inconsistent with such direction; provided, however, that, subject to Section 6.1, it need not take any action that it determines might involve it in liability;

(c)      the Trustee shall have been provided with indemnity satisfactory to it; and

(d)      any direction to the Trustee to undertake a sale of the Collateral shall be by the Holders of Notes secured thereby representing the percentage of the Aggregate Outstanding Amount of such Notes specified in Section 5.4 or 5.5, as applicable.

Section 5.14  Waiver of Past Defaults.  Prior to the time a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this Article V, the Holders of a Supermajority of the Controlling Class may on behalf of the Holders of all the Notes waive any past Default and its consequences, except a Default:

(a)      constituting a Payment Default (except any such default consisting of non-payment of amounts that have become due and payable solely by virtue of an acceleration that has been rescinded or defaults that have subsequently been remedied by the payment of principal and/or interest); or

(b)      in respect of a covenant or provision hereof that under Section 8.2 cannot be modified or amended without the consent of the Holder of each Outstanding Note materially adversely affected thereby; or

(c)      an Event of Default specified in Section 5.1(g) or 5.1(h).

In the case of any such waiver, the Co-Issuers, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.  The Trustee shall promptly give notice of any such waiver to the Credit Swap Counterparty and to each of the Rating Agencies.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Section 5.15   <u>Undertaking for Costs</u>.   All parties to this Indenture agree, and each Holder of any Notes by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this <u>Section 5.15</u> shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder of Notes, or group of Holders of Notes, holding in the aggregate more than 10% of the Aggregate Outstanding Amount of the Controlling Class or, if the Class A Notes are Outstanding, holding in the aggregate either 10% of the Aggregate Outstanding Amount of the Class A Notes or 10% of the Aggregate Outstanding Amount of the next-most senior Class of Notes, or to any suit instituted by any Holder of Notes for the enforcement of the payment of the principal of or interest on any Class A Notes or Class B Notes (or after the Class B Notes have been paid in full, any Class C Note) (or after the Class C Notes have been paid in full, any Class D Note) (or after the Class D Notes have been paid in full, any Class E Note) on or after the Stated Maturity expressed in such Note (or, in the case of redemption, on or after the applicable Redemption Date).

Section 5.16   <u>Waiver of Stay or Extension Laws</u>.   The Co-Issuers covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants, the performance of or any remedies under this Indenture; and the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.17   <u>Sale of Collateral</u>.   (a) The power to effect any sale of any portion of the Collateral pursuant to <u>Sections 5.4</u> and <u>5.5</u> shall not be exhausted by any one or more sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired (subject to <u>Section 5.5(e)</u> in the case of sales pursuant to <u>Section 5.5</u>) until the entire Collateral shall have been sold or all amounts secured by the Collateral shall have been paid.   The Trustee may upon notice to the Noteholders, and shall, upon direction of a Supermajority of the Controlling Class, from time to time postpone any sale by public announcement made at the time and place of such sale.   The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any sale; <u>provided</u>, that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such sale from the proceeds thereof notwithstanding the provisions of <u>Section 6.7</u> hereof.

(b)    The Trustee may bid for and acquire any portion of the Collateral in connection with a public sale thereof. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Collateral consists of Unregistered Securities, the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of a Supermajority of the Controlling Class, seek a no-action position from the SEC or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities.

(d)    The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority to inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.18    Action on the Notes.    The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Holders of the Notes shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer.

## ARTICLE VI

## THE TRUSTEE

Section 6.1    Certain Duties and Responsibilities.    (a) Except during the continuance of an Event of Default known to the Trustee:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, further, that in the case of any such certificates or opinions

which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate or opinion does not conform. If a corrected form shall not have been delivered to the Trustee within fifteen (15) days after such notice from the Trustee, the Trustee shall so notify the Holders of Notes and the Shares Paying Agent.

(b)     In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from a Supermajority of the Controlling Class (or, as permitted under this Indenture, by the Issuer, including, without limitation, pursuant to Sections 7.9 and 10.9 hereof), exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)     this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1;

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Co-Issuers or the Credit Swap Counterparty and/or the Holders of a Majority (or such larger percentage as may be required by the terms hereof) of the Controlling Class or any other required Classes relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability or expenses in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk, liability or expenses is not reasonably assured to it unless such risk, liability or expenses relates to its ordinary services, including giving notices under Article V, under this Indenture.

(d)      For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Section 5.1(d) through 5.1(i), or any Default described in Sections 5.1(e) through 5.1(i) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and such notice references the Notes generally, the Issuer, the Co-Issuer, the Collateral or this Indenture. For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or a Default, such reference shall be construed to refer only to such an Event of Default or Default of which the Trustee is deemed to have notice as described in this Section 6.1.

(e)      Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1 and Section 6.3.

Section 6.2    Notice of Default.  Promptly (and in no event later than two Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit by mail to each of the Rating Agencies, for so long as any Notes are Outstanding, to the Credit Swap Counterparty, to the Shares Paying Agent and to all Holders of Notes, as their names and addresses appear on the Note Register and, upon written request therefor from a holder of a beneficial interest in any Global Note, to such holder (or its designee), notice of all Defaults hereunder actually known to a Trust Officer of the Trustee, unless such Default shall have been cured or waived, in which case notice that a Default has occurred and that it has been cured or waived shall be promptly provided to the Credit Swap Counterparty and each Rating Agency. Notwithstanding the foregoing, the Trustee may withhold from Holders notice of any continuing Default or Event of Default (except a Default or Event of Default relating to the payment of principal, premium, if any, or interest) if the Trustee determines that withholding notice is in the interest of the Holders.

Section 6.3    Certain Rights of Trustee.  Except as otherwise provided in Section 6.1:

(a)      the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document, including the Payment Date Report, reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)      any request or direction of the Issuer or the Co-Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)     whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)     as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)     the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless such Noteholders shall have offered to the Trustee security or indemnity satisfactory to it against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or documents, but the Trustee, in its discretion, may and, upon the written direction of a Majority of the Controlling Class and the Credit Swap Counterparty, shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed and on reasonable prior notice to the Co-Issuers, to examine the books and records relating to the Notes and the Collateral and the premises of the Co-Issuers personally or by agent or attorney during the Co-Issuers' normal business hours; provided, that the Trustee shall, and shall cause its agents to, hold in confidence all such information, except (i) to the extent disclosure may be required by law or by any regulatory or administrative authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder; provided, further, that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors in connection with the performance of its responsibilities hereunder;

(g)     the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys, provided, that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent appointed or attorney appointed, with due care by it hereunder;

(h)    the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of an Event of Default subject to <u>Section 6.1(b)</u> hereof, prudently believes to be authorized or within its rights or powers hereunder;

(i)    the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(j)    the Trustee shall not be responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depositary, any Transfer Agent (other than the Bank acting in that capacity), Securities Intermediary (other than the Bank acting in such capacity), Clearstream, Euroclear, any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Bank acting in that capacity);

(k)    in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as a subagent of the Trustee or for any third Person or dealing as principal for its own account.  If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments hereunder; and

(l)    in the event that the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent or Securities Intermediary hereunder, the rights, protections, immunities and indemnities afforded to the Trustee pursuant to this <u>Article VI</u> shall also be afforded to the Bank acting in such capacities.

Section 6.4    <u>Not Responsible for Recitals or Issuance of Notes</u>.   The recitals contained herein and in the Notes, other than the Certificate of Authentication thereon with respect to the Trustee, shall be taken as the statements of the Issuer and the Co-Issuer, as applicable, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Notes.  The Trustee shall not be accountable for the use or application by the Co-Issuers or the Proceeds thereof or any money paid to the Co-Issuers pursuant to the provisions hereof.

Section 6.5    <u>May Hold Notes</u>.   The Trustee, any Paying Agent, any Note Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates, with the same rights it would have if it were not Trustee, Paying Agent, any Note Registrar or such other agent.

In order to comply with its duties under, and to the extent required by, the USA Patriot Act of 2001, the Trustee shall obtain and verify certain information and

documentation from the other parties to this Indenture including, but not limited to, each such party's name, address and other identifying information.

Section 6.6    Money Held in Trust.    Money held by the Trustee hereunder shall be held in trust to the extent required herein. The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

Section 6.7    Compensation and Reimbursement.    (a) The Issuer agrees (in accordance with the Priority of Payments hereunder):

(i)    to pay the Trustee on the Closing Date reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a Trustee of an express trust) and thereafter the Trustee shall receive no further compensation for its services hereunder;

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 5.17 or 10.10, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith) and expenses related to the maintenance and administration of the Collateral;

(iii)    to indemnify the Trustee and its officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense (including reasonable attorney's fees and expenses) incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.13 hereof.

This Section 6.7(a) shall survive the termination of this Indenture and the earlier removal or resignation of the Trustee.

(b)    The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from moneys on deposit in the Payment Account for the Notes pursuant to Section 11.1.

(c)    The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day (or, if longer, the applicable preference period) after the payment in full of all of the Notes issued under this Indenture.

(d)    The amounts payable to the Trustee on any Payment Date pursuant to Section 6.7(a) (if any) or which may be deducted by the Trustee pursuant to Section 6.7(b) shall only be made in accordance with the Priority of Payments. For the avoidance of doubt, any amount payable to the Trustee pursuant to Section 6.7(a) and not paid on any Payment Date pursuant to this paragraph shall remain outstanding and shall be payable on the next Payment Date (subject to the limitations of this paragraph).

The fees payable to the Trustee shall be computed on the basis of the actual number of days elapsed in the applicable calculation period divided by 360, and fees applicable to periods shorter or longer than a calendar quarterly period shall be prorated based on the number of days within such period. The Trustee shall apply amounts pursuant to Section 5.7 and Section 11.1(a)(A) or (B) only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default. Subject to Section 6.9, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder and hereby agrees not to cause the filing of a petition in bankruptcy against the Co-Issuers for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day (or, if longer, the applicable preference period) after the payment in full of all Notes issued under this Indenture. No direction by a Majority of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

If, on any date when a fee shall be payable to the Trustee pursuant to this Indenture, insufficient funds are available for the payment thereof, any portion of a fee not so paid shall be deferred and payable, together with compensatory interest thereon (at a rate not to exceed the federal funds rate), on such later date on which a fee shall be payable and sufficient funds are available therefor.

(e)    The Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or

sub-custodian with respect to certain of the Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments. Such compensation is not payable or reimbursable under Section 6.7 of this Indenture.

Section 6.8    Corporate Trustee Required; Eligibility. There shall at all times be a Trustee hereunder which shall be a corporation, banking association or trust company organized and doing business under the laws of the United States of America or of any state thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000 and the Requisite Ratings and provided further that is such institution is rated "Baa1" by Moody's such institution shall not be on credit watch for possible downgrade by Moody's and having an office within the United States. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.8, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

Section 6.9    Resignation and Removal; Appointment of Successor. (a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10. The indemnification in favor of the Trustee in Section 6.7 hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal).

(b)    The Trustee may resign at any time by giving 30 days' prior written notice thereof to the Co-Issuers, the Noteholders, the Shares Paying Agent, the Credit Swap Counterparty and each of the Rating Agencies.

(c)    The Trustee may be removed at any time by Act of the Holders of a Majority of the Notes voting together as a single class, or may be removed at any time when an Event of Default shall have occurred and be continuing, by Act of a Majority of the Controlling Class, delivered to the Trustee, the Credit Swap Counterparty and to the Co-Issuers.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.8 and shall fail to resign after written request therefor by the Co-Issuers or by any Holder; or

(ii)     the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation;

then, in any such case (subject to Section 6.9(a)), (A) the Co-Issuers, by Issuer Order, may remove the Trustee, or (B) subject to Section 5.15, any Holder may, on behalf of himself or herself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     Upon (i) receiving any notice of resignation of the Trustee, (ii) any determination that the Trustee be removed, or (iii) any vacancy in the position of Trustee, then the Co-Issuers shall promptly appoint a successor Trustee or Trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer or Co-Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor Trustee or Trustees and the Credit Swap Counterparty, provided, that such successor Trustee shall be appointed only upon the prior written consent of a Majority of the Controlling Class and Credit Swap Counterparty.  If the Co-Issuers shall fail to appoint a successor Trustee within 30 days after such notice of resignation, determination of removal or the occurrence of a vacancy, a successor Trustee may be appointed by Act of a Majority of the Controlling Class and upon receipt of the Credit Swap Counterparty's consent.  If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 60 days after the giving of such notice of resignation, determination of removal or the occurrence of a vacancy, then the Trustee to be replaced, or any Noteholder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee.  Notwithstanding the foregoing, at any time that an Event of Default shall have occurred and be continuing, a Majority of the Controlling Class shall have, in lieu of the Co-Issuers, the Co-Issuers' rights to appoint a successor Trustee, such rights to be exercised by notice delivered to the Issuer and the retiring Trustee.  Any successor Trustee shall, forthwith upon its acceptance of such appointment in accordance with Section 6.10, become the successor Trustee and supersede any retiring Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to each of the Rating Agencies, the Shares Paying Agent, the Credit Swap Counterparty and the Noteholders as their names and addresses appear in the Note Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail any such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Co-Issuers.

Section 6.10    Acceptance of Appointment by Successor. Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Co-Issuers and the retiring Trustee an instrument accepting such appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Co-Issuers, the Credit Swap Counterparty or a Majority of the Controlling Class or the successor Trustee, such retiring Trustee shall, upon payment of its charges then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.7(d). Upon request of any such successor Trustee, the Co-Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

Section 6.11    Merger, Conversion, Consolidation or Succession to Business of Trustee. Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee (which for purposes of this Section 6.11 shall be deemed to be the Trustee) shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation shall be otherwise qualified and eligible under this Article VI, without the execution or filing of any paper or any further act on the part of any of the parties hereto. In case any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12    Co Trustees and Separate Trustee. At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee (which for purposes of this Section 6.12 shall be deemed to be the Trustee) shall have power to appoint a co-Trustee, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12. In addition, (a) a Majority of the Class A Notes shall have the power upon notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (a), a "Class A Trustee") jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the

right to do, subject to the other provisions of this Section 6.12; provided, however, that in cases of appointment of a Class A Trustee, the Trustee (referred to herein as the "Controlling Class Trustee" in such case) shall have possession of the Collateral in accordance with this Indenture; (b) in cases of conflicts between the Class A Notes on the one hand and the Class B Notes on the other hand, as determined by a Majority of the Class B Notes, a Majority of the Class B Notes shall have the power upon notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (b), a "Class B Trustee") jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12; provided, however, that in cases of appointment of a Class B Trustee, the Trustee (referred to herein as the "Controlling Class Trustee" in such case) shall have possession of the Collateral in accordance with this Indenture; (c) in cases of conflicts between the Class A Notes and Class B Notes on the one hand and the Class C Notes on the other hand, as determined by a Majority of the Class C Notes, a Majority of the Class C Notes shall have the power upon notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (c), a "Class C Trustee"), jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12; provided, however, that in cases of appointment of a Class C Trustee, the Trustee (referred to herein as the "Controlling Class Trustee" in such case) shall have possession of the Collateral in accordance with this Indenture; (d) in cases of conflicts between the Class A Notes, Class B Notes and Class C Notes on the one hand and the Class D Notes on the other hand, as determined by a Majority of the Class D Notes, a Majority of the Class D Notes shall have the power upon notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (d), a "Class D Trustee"), jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12; provided, however, that in cases of appointment of a Class D Trustee, the Trustee (referred to herein as the "Controlling Class Trustee" in such case) shall have possession of the Collateral in accordance with this Indenture; or (e) in cases of conflicts between the Class A Notes, Class B Notes, Class C Notes and Class D Notes on the one hand and the Class E Notes on the other hand, as determined by a Majority of the Class E Notes, a Majority of the Class E Notes shall have the power upon notice to the Trustee, S&P and the Issuer signed by them to appoint, one or more Persons to act as co-Trustee (herein, in the case of an appointment under clause (d), a "Class E Trustee"), jointly with the Trustee of all or any part of the

Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.4 herein and to make such claims and enforce such rights of action on behalf of the Holders of the Notes as such Holders themselves may have the right to do, subject to the other provisions of this Section 6.12; provided, however, that in cases of appointment of a Class E Trustee, the Trustee (referred to herein as the "Controlling Class Trustee" in such case) shall have possession of the Collateral in accordance with this Indenture.

Section 6.13    Appointment of Trustees and Co-Trustees.    The Co-Issuers shall (to the maximum extent permitted by law) join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-Trustee, Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee, as the case may be.    If the Co-Issuers do not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee or, in case an Event of Default has occurred and is continuing and a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee is to be appointed, a Majority of the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes, as applicable, shall have power to make such appointment. The Trustee shall provide S&P with notice of any such appointment.

(a)    Should any written instrument from the Co-Issuers be required by any co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee so appointed for more fully confirming to such co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Co-Issuers.    The Co-Issuers agree to pay (but only from and to the extent of the Collateral, after payment in full of the amounts payable pursuant to clauses (i) through (xiv) of Section 11.1(a)(A)) for any reasonable fees and expenses in connection with such appointment.

(b)    Every co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(i)    the Notes shall be authenticated and delivered by, and all rights, powers, duties and obligations hereunder in respect of the custody of securities, Cash and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by, the Trustee (or the Controlling Class Trustee, as the case may be);

(ii)    the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee shall be conferred or imposed upon and exercised or performed (A) by the Trustee or by the Trustee and

such co-Trustee jointly in the case of the appointment of a co-Trustee and (B) by the Controlling Class Trustee in the case of the appointment of a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee as shall be provided in the instrument appointing such co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Controlling Class Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a co-Trustee;

(iii)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-Trustee (except a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee) appointed under this Section 6.13, and in case an Event of Default has occurred and is continuing, the Trustee shall have the power to accept the resignation of, or remove, any such co-Trustee (except a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee) without the concurrence of the Co-Issuers. In the case of a Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee, a Majority of the Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes, respectively, shall have power to accept the resignation of or remove any such Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee. Upon the written request of a Majority of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes, the Co-Issuers and the Trustee shall join with a Majority of such Notes in the execution, delivery and performance of all instruments and agreements necessary or proper to effectuate such resignation or removal. A successor to any co-Trustee, Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee so resigned or removed may be appointed in the manner provided in this Section 6.13. On the date on which the Class A Notes have been paid in full, any Class A Trustee that has been appointed and is then serving pursuant to this Section 6.13 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class A Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class A Notes. On the date on which the Class B Notes have been paid in full, any Class B Trustee that has been appointed and is then serving pursuant to this Section 6.13 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class B Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class B Notes. On the date on which the Class C Notes have been

30775-00052 NY:2469328.3    119

paid in full, any Class C Trustee that has been appointed and is then serving pursuant to this Section 6.13 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class C Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class C Notes.  On the date on which the Class D Notes have been paid in full, any Class D Trustee that has been appointed and is then serving pursuant to this Section 6.13 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class D Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class D Notes.  On the date on which the Class E Notes have been paid in full, any Class E Trustee that has been appointed and is then serving pursuant to this Section 6.13 shall resign and the Trustee shall have the power to accept the resignation of, or to remove, such Class E Trustee, effective immediately, without the concurrence of the Co-Issuers or the Holders of the Class E Notes;

(iv)    no co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any Controlling Class Trustee hereunder;

(v)    the Trustee or the Controlling Class Trustee, as the case may be, shall not be liable by reason of any act or omission of a co-Trustee or Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee; and

(vi)    except in the case of conflicts between Classes, any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-Trustee and Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee.  In the case of conflicts between Classes, any Act of Noteholders delivered to the Controlling Class Trustee shall be effective upon such delivery in accordance with this Indenture.  The Controlling Class Trustee shall mail a copy thereof to any Class A Trustee, Class B Trustee, Class C Trustee, Class D Trustee or Class E Trustee appointed pursuant to this Section 6.13.

Section 6.14    Certain Duties of Trustee Related to Delayed Payment of Proceeds.  In the event that in any month the Trustee shall not have received a payment with respect to any Pledged Underlying Asset on its Due Date, (a) the Trustee shall promptly notify the Issuer in writing and (b) unless within three Business Days (or the end of the applicable grace period for such payment, if longer) after such notice such payment shall have been received by the Trustee, or the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(d)), shall have made provision for such payment reasonably satisfactory to the Trustee in accordance with Section 10.2(d), the

Trustee shall request the issuer of such Pledged Underlying Asset, the trustee under the related Reference Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. In the event that such payment is not made within such time period, the Trustee, subject to the provisions of clause (iv) of Section 6.1(c), shall take such action as the Issuer shall reasonably direct in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. In no event shall the Trustee be required to advance its own funds. Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Underlying Asset received after the Due Date thereof to the extent the Issuer previously made provisions for such payment reasonably satisfactory to the Trustee in accordance with this Section 6.14 and such payment shall not be deemed part of the Collateral.

Section 6.15  Representations and Warranties of the Trustee.  The Trustee represents and warrants that: (a) the Trustee is a national banking association with trust powers, duly and validly existing under the laws of the United States of America, with corporate power and authority to execute, deliver and perform its obligations under this Indenture, and is duly eligible and qualified to act as Trustee under this Indenture; (b) this Indenture has been duly authorized, executed and delivered by the Trustee and constitutes the valid and binding obligation of the Trustee, enforceable against it in accordance with its terms except (i) as limited by bankruptcy, fraudulent conveyance, fraudulent transfer, insolvency, reorganization, liquidation, receivership, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general equitable principles, regardless of whether considered in a proceeding in equity or at law, and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought; and (c) neither the execution or delivery by the Trustee of this Indenture nor performance by the Trustee of its obligations under this Indenture requires the consent or approval of, the giving notice to or the registration or filing with, any governmental authority or agency under any existing law of the State of New York governing the banking or trust powers of the Trustee; (d) there is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Trustee, threatened that, if determined adversely to the Trustee, would have a material adverse effect upon the performance by the Trustee of its duties under, or on the validity or enforceability of, this Indenture; and (e) the Trustee is not in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Trustee, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Indenture or the performance by the Trustee of its duties hereunder.

Section 6.16  Authenticating Agents.  (a) Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with issuances, transfers and exchanges under Sections 2.4, 2.5 and 2.6, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Notes.  For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.16 shall be deemed to be the authentication of Notes by the Trustee.

(b)    Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any paper or any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

(c)    Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Co-Issuers.  The Trustee may at any time terminate the agency of any ·Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Co-Issuers.  Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Co-Issuers if the resigning or terminated Authenticating Agent was originally appointed at the request of the Issuer or Co-Issuer.

(d)    · The Trustee agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating thereto as an Administrative Expense, subject to and in accordance with Section 11.1.  The provisions of Sections 2.9, 6.4 and 6.5 shall be applicable to any Authenticating Agent.

Section 6.17  Fiduciary for Holders of Notes Only, Agent for other Secured Parties.  With respect to the security interests created hereunder, the pledge of any item of Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties; in furtherance of the foregoing, the possession by the Trustee of any item of Collateral or other assets of the Issuer, the endorsement to or registration of any item of Collateral or other assets of the Issuer and the control by the Trustee (including control over Financial Assets held in the Issuer Accounts) are all undertaken by the Trustee in its capacity as representative of such Holders and agent for the other Secured Parties, and the Trustee shall have no fiduciary duty to the other Secured Parties; provided, that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

Section 6.18    Withholding. If any amount is required to be deducted or withheld from any payment to any Noteholder, such amount shall reduce the amount otherwise distributable to such Noteholder. The Trustee is hereby authorized to withhold or deduct from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally required to be withheld or deducted (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and legally withholding payment of such tax, pending the outcome of such proceedings).    The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to such Noteholder at the time it is deducted or withheld by the Issuer or the Trustee, as applicable, and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.18. If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

## ARTICLE VII

## COVENANTS

Section 7.1    Payment of Principal and Interest.    The Co-Issuers will duly and punctually pay the principal of and interest on such Notes in accordance with the terms thereof and this Indenture.

Section 7.2    Compliance With Laws.    The Co-Issuers will comply in all material respects with applicable laws, rules, regulations, writs, judgments, injunctions, decrees, awards and orders with respect to them, their business and their properties.

Section 7.3    Maintenance of Books and Records.    The Co-Issuers shall maintain and implement administrative and operating procedures reasonably necessary in the performance of their obligations hereunder and the Issuer shall keep and maintain at all times, or cause to be kept and maintained at all times in its registered office in the Cayman Islands, all documents, books, records, accounts and other information as are required under the laws of the Cayman Islands.

Section 7.4    Maintenance of Office or Agency.    (a) The Co-Issuers hereby appoint the Trustee as a Paying Agent for the payment of principal and interest on the Notes and the Co-Issuers hereby confirm they have appointed U.S. Bank Trust National Association, 100 Wall Street, Suite 1600, New York, New York, 10005, Attention: Pebble Creek LCDO 2007-3, Ltd, as the Co-Issuers' Agent where notices and demands to or upon the Co-Issuers in respect of the Notes, this Indenture or any other

Transaction Document may be delivered. Notes may be surrendered for registration of transfer or exchange.

(b)    The Issuer may at any time and from time to time vary or terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; provided, however, that the Issuer will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served and subject to any laws or regulations applicable thereto; provided, further, that no Paying Agent shall be appointed in a jurisdiction which subjects payments on the Notes to withholding tax; provided, further, that so long as any Notes are listed on the Irish Stock Exchange and such stock exchange shall so require, the Co-Issuers shall maintain a Paying Agent in Ireland. In the event that the Irish Paying Agent is replaced at any time during such period, notice of the appointment of any replacement will be given to the Company Announcements Office of the Irish Stock Exchange. The Co-Issuers shall at all times maintain a Note Register. The Co-Issuers shall give prompt written notice to the Trustee, each of the Rating Agencies and the Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

(c)    If at any time the Co-Issuers shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York, or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made (subject to the limitations described in the preceding paragraph) at and notices and demands may be served on the Co-Issuers, and Notes may be presented and surrendered for payment to the appropriate Paying Agent at its designated office and the Co-Issuers hereby appoint the same as their agent to receive such respective presentations, surrenders, notices and demands.

Section 7.5    Money for Note Payments to be Held in Trust.    (a) All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Co-Issuers.

(b)    When the Co-Issuers shall have a Paying Agent that is not also the Note Registrar, they shall furnish, or cause the Note Registrar to furnish, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Paying Agent may reasonably request, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each such Holder.

(c)    Whenever the Co-Issuers shall have a Paying Agent other than the Trustee, they shall, on or before the Business Day next preceding each Payment Date or Redemption Date, as the case may be, direct the Trustee to deposit on such Payment Date with such Paying Agent, if necessary, an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Payment Account), such sum to be held in trust for the benefit of the Persons entitled

thereto and (unless such Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any moneys deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which such deposit was made shall be paid over by such Paying Agent to the Trustee for application in accordance with Article X.

(d)    The initial Paying Agents shall be as set forth in Section 7.4. Any additional or successor Paying Agents shall be appointed by Issuer Order with written notice thereof to the Trustee; provided, however, that such additional or successor Paying Agent must either (i) have a rating of at least "Aa2" or its equivalent by Moody's and at least "AA" by S&P, (ii) agree not to hold any funds pursuant to this Indenture overnight, or (iii) be an entity the appointment of which as Paying Agent will not, at that time, result in a downgrade, withdrawal or qualification of the ratings on the Notes. The Co-Issuers shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee (and if the Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.5, that such Paying Agent will:

(A)    allocate all sums received for payment to the Holders of Notes for which it acts as Paying Agent on each Payment Date and Redemption Date among such Holders in the proportion specified in the applicable report or statement in accordance herewith, in each case to the extent permitted by applicable law;

(B)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(C)    if such Paying Agent is not the Trustee, immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards set forth above required to be met by a Paying Agent at the time of its appointment; and

(D)    if such Paying Agent is not the Trustee, at any time during the continuance of any Event of Default,

upon the written request of the Trustee, forthwith pay to the
Trustee all sums so held in trust by such Paying Agent.

The Co-Issuers may at any time, for the purpose of obtaining the
satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer
Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-
Issuers or such Paying Agent, such sums to be held by the Trustee upon the same trusts as
those upon which such sums were held by the Co-Issuers or such Paying Agent; and,
upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be
released from all further liability with respect to such money.

Any money deposited with a Paying Agent and not previously returned
that remains unclaimed for twenty Business Days shall be returned to the Trustee.
Except as otherwise required by applicable law, any money deposited with the Trustee or
any Paying Agent in trust for the payment of the principal of or interest on any Note and
remaining unclaimed for two years after such principal or interest has become due and
payable shall be paid to the Co-Issuers and the Holder of such Note shall thereafter, as an
unsecured general creditor, look only to the Issuer or the Co-Issuer, and all liability of the
Trustee or such Paying Agent with respect to such trust money (but only to the extent of
the amounts so paid to the Co-Issuers) shall thereupon cease. The Trustee or such Paying
Agent, before being required to make any such release of payment, may, but shall not be
required to, adopt and employ, at the expense of the Co-Issuers, any reasonable means of
notification of such release of payment, including, but not limited to, mailing notice of
such release to Holders whose Notes have been called but have not been surrendered for
redemption or whose right to or interest in monies due and payable but not claimed is
determinable from the records of any Paying Agent, at the last address of record of each
such Holder.

Section 7.6    Existence of Co-Issuers.  (a) Each of the Issuer and the Co-
Issuer shall (to the maximum extent permitted by law) take all reasonable steps to
maintain its identity as a separate legal entity from that of its stockholders. Each of the
Issuer and the Co-Issuer shall keep its principal place of business at the address specified
in Section 14.3. Each of the Issuer and the Co-Issuer shall keep separate books and
records and will not commingle its respective funds with those of any other Person. The
Issuer and the Co-Issuer shall keep in full force and effect their rights and franchises as a
company incorporated under the laws of the Cayman Islands and a corporation organized
under the laws of the State of Delaware, respectively, shall comply with the provisions of
their respective organizational documents, and shall obtain and preserve their
qualification to do business as foreign corporations in each jurisdiction in which such
qualifications are or shall be necessary to protect the validity and enforceability of this
Indenture, the Notes or any of the Collateral; provided, however, that, subject to Cayman
Islands law, the Issuer shall be entitled to change its jurisdiction of incorporation from the
Cayman Islands to any other jurisdiction reasonably selected by the Issuer and approved
by the holder of the Issuer Ordinary Shares so long as (a) the Issuer determines that such

change is not disadvantageous in any material respect to the Issuer or Holders of Notes or Preference Shares, (b) written notice of such change shall have been given by the Co-Issuers to the Trustee, the Holders, the Shares Paying Agent, the Credit Swap Counterparty and each of the Rating Agencies at least 30 Business Days prior to such change of jurisdiction and (c) on or prior to the 15th Business Day following such notice the Trustee shall not have received written notice from a Majority of the Controlling Class objecting to such change.

(b)     The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and stockholders', or other similar, meetings) are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries other than the Co-Issuer, (ii) the Co-Issuer shall not have any subsidiaries and (iii) the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective directors), (B) engage in any transaction with any shareholder (other than the issuance of the Preference Shares) that would constitute a conflict of interest (provided, that the Administration Agreement and Collateral Administration Agreement shall not be deemed to be such a transaction that would constitute a conflict of interest) or (C) pay dividends other than in accordance with the provisions of this Indenture.

Section 7.7    Protection of Collateral.    (a) The Issuer shall execute and deliver from time to time all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)     Grant more effectively all or any portion of the Collateral;

(ii)     maintain or preserve the lien (and the priority thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)     perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iv)     enforce any of the Pledged Underlying Assets or other instruments or property included in the Collateral;

(v)     preserve and defend title to the Collateral and the rights therein of the Trustee and the Secured Parties in the Collateral against the claims of all Persons and parties; or

(vi)    (A) pay or cause to be paid any and all taxes levied or assessed upon the Issuer or in respect of all or any part of the Collateral and timely file all tax returns and information statements as required and to provide to each beneficial owner of Notes any information that the beneficial owner reasonably requests in order for the beneficial owner to comply with its federal state, or local tax and information returns and reporting obligations and (B) if required to prevent the withholding or imposition of United States income tax, deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form or other appropriate United States tax forms as may be required, to each issuer, counterparty or paying agent with respect to (as applicable) an item included in the Collateral at the time such item included in the Collateral is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

The Issuer hereby designates the Trustee as its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required pursuant to this Section 7.7; provided, that such appointment shall not impose upon the Trustee any of the obligations of the Issuer under this Section 7.7. The Trustee may, from time to time, and shall, at the written direction of the Issuer, execute, and the Issuer shall cause to be filed financing statements and continuation statements (it being understood that the Trustee shall be entitled to rely upon an Opinion of Counsel, including without limitation an Opinion of Counsel delivered in accordance with Sections 3.1(c) and 7.8, as to the need to file such financing statements and continuation statements, the dates by which such filings are required to be made and the jurisdictions in which such filings are required to be made).

(b)    The Trustee shall not (i) except in accordance with Section 10.8(b), (c) or (d), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an instrument, certificate or other writing (A) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.8 hereof (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(c), if no Opinion of Counsel has yet been delivered pursuant to Section 7.8 hereof) or (B) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

Section 7.8    Opinions as to Collateral.  On or before the Payment Date in September of each calendar year, commencing in September 2008, the Issuer shall furnish or cause to be delivered to the Trustee, the Credit Swap Counterparty and each of the Rating Agencies, an Opinion of Counsel stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains in effect and that no further action (other than as specified in such opinion) needs to be taken (under then current law) to ensure the continued effectiveness and perfection of such lien over the next year.

Section 7.9    Performance of Obligations.  (a) If an Event of Default or a Default shall have occurred, the Co-Issuers shall not take any action, and will use their best efforts not to permit any action to be taken by others, that would release any Person from any of such Person's covenants or obligations under any Reference Instrument.

(b)    The Co-Issuers may contract with other Persons, including the Trustee and the Collateral Administrator, for the performance of actions and obligations to be performed by the Co-Issuers hereunder by such Persons.  Notwithstanding any such arrangement, the Co-Issuers shall remain primarily liable with respect thereto.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Co-Issuers; and the Co-Issuers will punctually perform, and use their best efforts to cause such Persons to perform all of their obligations and agreements.

(c)    The Co-Issuers agree to comply in all material respects with all requirements applicable to them set forth in any Opinion of Counsel obtained pursuant to any provision of this Indenture including satisfaction of any event identified in any Opinion of Counsel as a prerequisite for the obtaining or maintaining by the Trustee of a perfected security interest in any Underlying Asset, Eligible Investment or other Collateral that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable.

Section 7.10   Negative Covenants.  (a) The Issuer will not:

(i)    sell, transfer, assign, participate, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (by security interest, lien (statutory or otherwise), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise) (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

(ii)   incur or assume or guarantee any indebtedness or any contingent obligations, other than the Notes, this Indenture and the other agreements and transactions expressly contemplated hereby and thereby;

(iii)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted hereby, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (including any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever or otherwise, other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Collateral, or any part thereof, any interest therein or the Proceeds thereof except as may be expressly permitted hereby, or (C) take any action that would cause the lien of this Indenture not to constitute a valid perfected security interest in the Collateral that is of first priority, free of any adverse claim or the legal equivalent thereof, as applicable, except as may be expressly permitted hereby (or in connection with a disposition of Collateral required hereby);

(iv)    make or incur any capital expenditures, except as reasonably required to perform its functions in accordance with the terms of this Indenture;

(v)    become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends with respect to the Issuer Ordinary Shares;

(vi)    enter into any transaction with any Affiliate or any Holder of a Note or a Preference Share other than (A) the transactions contemplated by the Collateral Administration Agreement, (B) relating to the offering and sale of the Notes or the Preference Shares, or (C) transactions on terms no less favorable than those obtainable in an arm's-length transaction with a wholly unaffiliated Person;

(vii)    maintain any bank accounts other than the Issuer Accounts and the Issuer's bank account in the Cayman Islands;

(viii)    (A) change its name without first delivering to the Trustee notice thereof and an Opinion of Counsel that such name change will not adversely affect the Trustee's lien or the interest hereunder of the Secured Parties or the Trustee or (B) conduct business under an assumed name;

(ix)    have any subsidiaries other than the Co-Issuer and any subsidiaries necessitated by a change of jurisdiction pursuant to Section 7.6;

(x)     permit the transfer of any of its ordinary shares to a U.S. Person or a U.S. Resident;

(xi)    establish a branch, agency, office or place of business in the United States, or take any action or engage in any activity (directly or through any other agent) which would subject it to United States federal, state, or local income tax;

(xii)   fail to pay any tax, assessment, charge or fee with respect to the Collateral, or fail to defend any action, if such failure to pay or defend may adversely affect the priority or enforceability of the lien over the Collateral created by this Indenture;

(xiii)  the Issuer will not solicit, advertise or publish the Issuer's ability to enter into credit derivatives;

(xiv)   the Issuer will not register as or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as a bank, insurance company or finance company;

(xv)    the Issuer will not be treated as a bank, insurance company or finance company for purposes of: (i) any tax, securities law or other filing or submission made to any governmental authority, (ii) any application made to a rating agency or (iii) qualification for any exemption from tax, securities law or any other legal requirements;

(xvi)   the Issuer will not hold itself out to the public as a bank, insurance company or finance company;

(xvii)  the Issuer will not elect to be treated as other than a corporation for U.S. federal income tax purposes;

(xviii) issue and sell additional Preference Shares;

(xix)   enter into any agreements unless such agreements contain "non-petition" and "limited recourse" provisions, except that the Issuer may enter into any agreements involving the purchase and sale of the Underlying Asset having customary purchase or sale terms and documented with customary loan trading documentation not containing such provisions (provided that, for the avoidance of doubt, any synthetic securities entered into by the Issuer must contain such provisions);

(xx)    amend the "limited recourse" or "non-petition" provisions in any agreement to which the Issuer is a party without obtaining a Rating

Agency Confirmation with respect to such amendment or enter into any waiver in respect of any of the foregoing agreements without providing prior written notice to each Rating Agency, the Credit Swap Counterparty and the Trustee;

(xxi)   fail to maintain at least one Independent director (independent from the Credit Swap Counterparty); or

(xxii)   amend its constitutional documents without Rating Agency Confirmation.

(b)   The Co-Issuer will not:

(i)   claim any credit on, or make any deduction from, the principal or interest payable in respect of the Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

(ii)   (A) incur, assume or guarantee or become directly or indirectly liable with respect to any indebtedness or any contingent obligations (including swap agreements, cap agreements, reimbursement obligations, repurchase obligations or the like), other than pursuant to the Notes, this Indenture and the other agreements and transactions expressly contemplated hereby and thereby, (B) issue any additional securities or (C) issue any additional shares of stock;

(iii)   make or incur any capital expenditures;

(iv)   become liable in any way, whether directly or by assignment or as a guarantor or other surety, for the obligations of the lessee under any lease, hire any employees or pay any dividends to its stockholders;

(v)   enter into any transaction with any Affiliate or any Holder of a Note other than the transactions relating to the offering and sale of the Notes;

(vi)   maintain any bank accounts; other than any account established in the Cayman Islands pursuant to the Administration Agreement;

(vii)   have any subsidiaries;

(viii)    amend its constitutional documents without Rating Agency Confirmation; or

(ix)    permit the transfer of any of its shares of capital stock to a U.S. Person or a U.S. Resident.

(c)    Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral or enter into or engage in any business with respect to any part of the Collateral except as expressly permitted or required by this Indenture.

Section 7.11    <u>Statement as to Compliance</u>.    On or before five (5) Business Days after the Payment Date in September of each year beginning in September 2008, the Issuer shall deliver to the Trustee (to be forwarded to each of the Rating Agencies) an Officer's Certificate stating, as to each signer thereof, that having made reasonable inquiries of the Credit Swap Calculation Agent, to the best of the knowledge, information and belief of the Issuer, there did not exist, as at a date not more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (if any), any Default or, if such Default did then exist or had existed, specifying the same and the nature and status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture or, if such is not the case, specifying those obligations with which it has not complied.    Within two (2) Business Days of the Issuer obtaining actual knowledge of the occurrence of a Default under this Indenture, the Issuer shall deliver to the Managers, the Credit Swap Counterparty and the Trustee (to be forwarded to the Rating Agencies), notice of such Default.

Section 7.12    <u>Co-Issuers May Not Consolidate</u>.    The Co-Issuers shall not consolidate or merge with or into any other Person or convey or transfer their properties and assets substantially as an entirety to any Person.

Section 7.13    [Reserved.]

Section 7.14    <u>No Other Business</u>.    The Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture, issuing and selling the Preference Shares pursuant to the Issuer Charter, entering into the Shares Paying Agency Agreement, the Administration Agreement, the Class A Note Purchase Agreement, the Class B Note Purchase Agreement, the Certificated Class C Note Subscription Agreement(s)(if any), the Certificated Class D Note Subscription Agreement(s)(if any), the Certificated Class E Note Subscription Agreement(s)(if any), the Purchase Agreement, the Placement Agreement, the Securities Account Control Agreement and the Credit Swap Agreement and acquiring, owning, holding, selling, pledging, contracting for the management of and otherwise dealing with the Underlying Asset and other Collateral in connection therewith, entering into any financing arrangement with respect to Closing Date Underlying Asset and such other activities which are necessary, required or advisable to accomplish the foregoing, <u>provided</u>,

however, that the Issuer shall be permitted to enter into any additional agreements other than agreements incidental to this Indenture not expressly prohibited by Section 7.10(a) and to enter into any amendment, modification, or waiver of existing agreements or such additional agreements, in each case without the consent of any one or more Classes of Holders, the Credit Swap Counterparty and Rating Agency Confirmation; provided, that the Issuer determines that such amendment, modification or waiver would not, upon or after becoming effective, materially adversely affect the rights or interests of such Class or Classes of Holders. The Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and such other activities which are necessary, required or advisable to accomplish the foregoing. The Issuer and the Co-Issuer will not amend their Memorandum and Articles of Association or Certificate of Incorporation, respectively, without Rating Agency Confirmation and the prior written consent of the Credit Swap Counterparty and a Supermajority of the Controlling Class, if such amendment would result in the rating of the Class A Notes or Class B Notes being reduced or withdrawn, a Supermajority of the Class C Notes if such amendment would result in the rating of any of the Notes being reduced or withdrawn, a Supermajority of the Class D Notes if such amendment would result in the rating of any of the Notes being reduced or withdrawn, a Supermajority of the Class E Notes if such amendment would result in the rating of any of the Notes being reduced or withdrawn and will not otherwise amend their Memorandum and Articles of Association or Certificate of Incorporation, respectively, without the consent of any one or more Classes of Noteholders unless (i) the Issuer determines that such amendment would not, upon or after becoming effective, materially adversely affect the rights or interests of such Class or Classes of Noteholders, (ii) the Issuer gives ten (10) days' prior written notice to the Noteholders of such amendment, and (iii) with respect to any such Class of Notes, Holders of a Majority of such Class do not provide written notice to the Issuer that, notwithstanding the determination of the Issuer, the Persons providing notice have reasonably determined that such amendment would, upon or after becoming effective, materially adversely affect such Class (the failure of any such Majority to provide such notice to the Issuer within ten (10) days of receipt of notice of such amendment from the Issuer being conclusively deemed to constitute hereunder consent to and approval of such amendment).

Section 7.15    RESERVED.

Section 7.16    Confirmation of Rating; Annual Rating Review. So long as any of the Notes remain Outstanding, on or before the Payment Date in September, in each year commencing in September 2008, the Co-Issuers shall obtain and pay for an annual review of the rating of such Notes from each of the Rating Agencies and request updates on any estimated ratings of Underlying Asset assigned pursuant to the definition of Moody's Default Probability Rating and clause (e) of the definition of S&P Rating. Such estimated ratings shall not be disclosed by the Co-Issuers to any third party other than the Trustee, it being understood that the Trustee may provide such estimated ratings to the Collateral Administrator or Credit Swap Counterparty and the Issuer's accountants,

in each case, in their capacity as the agent of the Issuer, subject to the Trustee receiving the undertaking of such parties that they shall treat such estimated ratings confidentially and not distribute any such estimated ratings to any third party without the express written consent of Moody's. The Co-Issuers shall promptly notify the Credit Swap Counterparty and the Trustee in writing (which shall promptly notify the Noteholders) if at any time the rating of any of such Classes of Notes has been, or it is known by the Co-Issuers that such a rating will be, changed or withdrawn.

Section 7.17    Reporting.    At any time when either of the Co-Issuers is not subject to Section 13 or 15(d) of the Exchange Act and is not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder of or a holder of a beneficial interest in, a Note, the Co-Issuers shall promptly furnish or cause to be furnished Rule 144A Information to such Holder or beneficial holder, to a prospective purchaser of such Note designated by such Holder or beneficial holder, to another designee of such Holder or beneficial holder or to the Trustee for delivery to such Holder or beneficial holder or a prospective purchaser designated by such Holder or beneficial holder or such other designee of such beneficial holder, as the case may be, in order to permit compliance by such Holder or beneficial holder with Rule 144A in connection with the resale of such Note by such Holder or beneficial holder.

Section 7.18    Calculation Agent.    (a) The Co-Issuers hereby agree that for so long as any of the Notes remain Outstanding there will at all times be a calculation agent appointed to calculate LIBOR in respect of each Interest Period in accordance with the terms of Schedule C hereto (the "Calculation Agent"). The Calculation Agent appointed by the Co-Issuers must be a leading bank engaged in transactions in Eurodollar deposits in the international Eurodollar market which bank does not control, is not controlled by and is not under common control with, the Co-Issuers or any of their respective Affiliates and which bank, or Affiliate of such bank, has an established place of business in London, England. The Calculation Agent may be removed by the Co-Issuers at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers, or if the Calculation Agent fails to determine any of the information required to be communicated, as described in subsection (b), in respect of any Interest Period, the Co-Issuers will promptly appoint the London or Ireland office of another leading bank meeting the qualifications set forth above to act as Calculation Agent. The Calculation Agent may not resign its duties without a successor having been duly appointed. The Co-Issuers have initially appointed the Trustee as Calculation Agent for purposes of determining LIBOR for each Interest Period. For so long as any of the Notes are listed on the Irish Stock Exchange and the rules of such exchange so require, the Issuer will publish notice of the appointment, termination or change in the office of such Calculation Agent to the Company Announcements Office.

(b)    The Calculation Agent shall be required to agree that, as soon as practicable after 11:00 a.m., London time, on each LIBOR Determination Date (as defined in Schedule C hereto), but in no event later than 11:00 a.m., London time, on the

Business Day immediately following such LIBOR Determination Date, the Calculation Agent will calculate the interest rate applicable to each Class of Notes for the following Interest Period, and will as soon as practicable but in no event later than 11:00 a.m., London time, on the day following such LIBOR Determination Date, communicate such rates, and the amount of interest payable on the next Payment Date in respect of each Class of Notes, with a principal amount of U.S.$1,000 (rounded to the nearest cent, with half a cent being rounded upwards), to the Co-Issuers, the Credit Swap Counterparty, the Trustee, Euroclear, Clearstream, the Managers, DTC and each Paying Agent. For so long as any of the Notes are listed on the Irish Stock Exchange and the rules of such Exchange so require, such information will be given to the Company Announcements Office as soon as practicable, but in no event later than the fourth Business Day following such LIBOR Determination Date. In the absence of manifest error, the LIBOR Determination by the Calculation Agent shall be binding upon all parties.

(c)    The Calculation Agent shall be required to specify to the Co-Issuers the quotations upon which each Note Interest Rate is based, and in any event the Calculation Agent shall notify the Co-Issuers before 7:00 p.m. (New York City time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining each of the Note Interest Rates and the amount of interest payable in respect of each Class of Notes for the related Interest Period or (ii) it has not determined and is not in the process of determining each of the Note Interest Rates and the amount of interest payable in respect of each Class of Notes for the related Interest Period, together with its reasons therefor.

Section 7.19    RESERVED.

Section 7.20    RESERVED.

Section 7.21    CUSIP Numbers. The Issuer shall (i) request of S&P, and shall cooperate with S&P to ensure that all CUSIP numbers identifying the Notes shall have a "fixed field" attached thereto that contains "3c7" and "144A" indicators and (ii) take steps to cause the underwriters to require that all "confirms" of trades of the Securities contain CUSIP numbers with such "fixed field" identifiers.

Section 7.22    Bloomberg and other Third-Party Vendor Screens. The Issuer shall cause the Bloomberg screen or screens containing information about the Securities to include the following language: (i) the "Note Box" on the bottom of "Security Display" page describing the Securities shall state: "Placed Under 144A/3(c)(7)," (ii) the "Security Display" page shall have the flashing red indicator "See Other Available Information," and (iii) the indicator shall link to the "Additional Security Information" page, which shall state that the securities "are being offered in reliance on the exemption from registration under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act") to Persons who are both (x) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (y) qualified purchasers (as defined under Section 3(c)(7) under the Investment Company Act of 1940)." The Issuer

shall require that any other third-party vendor screens containing information about the Securities include substantially similar language to clauses (i) through (iii) above. For so long as the Rule 144A Global Notes are registered in the name of DTC or its nominee, the Co-Issuers will instruct DTC to take these or similar steps with respect to the Rule 144A Global Notes: (i) the DTC 20-character security descriptor and 48-character additional descriptor will indicate with marker "3c7" that sales are limited to QIBs and Qualified Purchasers; (ii) where the DTC deliver order ticket sent to purchasers by DTC after settlement is physical, will have the 20-character security descriptor printed on it, and where the DTC deliver order ticket is electronic, it will have a "3c7" indicator and a related user manual for participants, which will contain a description of the relevant restriction; and (iii) DTC will send an "Important Notice" outlining the 3(c)(7) restrictions applicable to the Rule 144A Global Notes to all DTC participants in connection with the initial offering of Notes by the Co-Issuers.

Section 7.23   <u>Tax Forms</u>.  (a) Each Holder shall timely furnish the Issuer or its agents any U.S. federal income tax form or certification (such as IRS Form W-8BEN (Certification of Foreign Status as Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) (or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments. Each Holder agrees to provide any certification or information that is reasonably requested by the Issuer (a) to permit the Issuer to make payments to it without, or at a reduced rate of, withholding, (b) to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets, or (c) to enable the Issuer or its agents to satisfy reporting and other obligations under the Code and Treasury Regulations.

(b)   As a condition to the payment of principal of and interest on any Note without, or at a reduced rate of, withholding or backup withholding tax in any jurisdiction, the Trustee and/or any Paying Agent shall require any certification reasonably acceptable to the Issuer for the Issuer to determine its duties and liabilities with respect to any taxes or other charges that the Issuer may be required to pay, deduct or withhold from payments in respect of such Note or the holder of such Note under any present or future law or regulation of the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification shall include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct

of a U.S. Trade or Business) or any successors to such IRS forms). The Trustee may also require any certification reasonably acceptable to the Issuer (as instructed in writing by or on behalf of the Issuer) which is necessary for the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each Holder agrees to provide any certification requested pursuant to this paragraph within a reasonable time period after such request is initially made and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

Section 7.24    Intended Tax Treatment.    The Issuer intends, and each beneficial owner of Notes hereby agrees to treat the Notes as described in the "—Certain U.S. Federal Income Tax Considerations" section of the Offering Memorandum for all U.S. federal income tax purposes and shall take no action inconsistent with such treatment unless required by law.

Section 7.25    Preparation of Tax Statements.    (a) The Issuer shall hire accountants and the accountants shall cause to be prepared and filed (and, where applicable, delivered to Holders) for each taxable year of the Issuer the federal, state and local income tax returns and reports as required under the Code and Treasury Regulations, if any, which the Issuer is required to file (and, where applicable, deliver), and copies of which returns and reports shall be available for inspection and examination by each Holder and their respective representatives and shall provide to each beneficial owner of Notes any information that the beneficial owner reasonably requests in order for the beneficial owner to comply with its federal state, or local tax and information returns and reporting obligations.

(b)    The Issuer shall provide to any Holder, upon written request (i) all information that a U.S. shareholder making a "qualified electing fund" ("QEF") election (as defined in the Code) is required to obtain for U.S. federal income tax purposes, and (ii) a "PFIC Annual Information Statement" as described in Treasury Regulation §1.1295-1(g) (or any successor Treasury Regulation or IRS release or notice), including all representations and statements required by such statement, and shall take any other steps necessary to facilitate a QEF election by such U.S. shareholder.

(c)    The Issuer shall provide, upon the request of any Holder, any information that such Holder reasonably requests to assist such Holder with regard to any filing requirements such Holder may have as a result of the Issuer being classified as a "controlled foreign corporation" for U.S. federal income tax purposes.

Section 7.26    Withholding Obligations.    Notwithstanding any provision herein to the contrary, the Issuer, or, upon receipt of written instruction from or on behalf of the Issuer specifying the action to be taken at the expense of the Issuer, the Trustee on behalf of the Issuer, may take any and all actions that may be necessary or appropriate to insure that the Issuer satisfies any and all withholding and tax payment obligations under Code Sections 1441, 1445, 1446 or any other provision of the Code or other applicable

law. Without limiting the generality of the foregoing, the Issuer may withhold any amount that it or any advisor retained by the Issuer on its behalf determines is required to be withheld from any amounts otherwise distributable to any holder of a Note.

## ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1    Supplemental Indentures without Consent of Holders. Without the consent of the Noteholders or the Holders of the Preference Shares but only with the prior written consent of the Credit Swap Counterparty, the Co-Issuers, with respect to the Notes, and the Issuer, with respect to the Preference Shares, and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form reasonably satisfactory to the Trustee (x) if such supplemental indenture would have no material adverse effect on any of the Holders of the Notes or the Preference Shares (as evidenced by an Opinion of Counsel, which may be based on an Officers' Certificate of the Issuer or Co-Issuers, as applicable regarding the material adverse affect of such supplemental indenture on any Holder of the Notes or the Preference Shares), or (y) for any of the following purposes:

(a)    to evidence the succession of another Person to the Issuer or the Co-Issuer, and the assumption by any such successor Person of the covenants of the Issuer or the Co-Issuer contained herein and in the Notes;

(b)    to add to the covenants of the Co-Issuers or the Trustee, for the benefit of the Holders of the Notes, or to surrender any right or power herein conferred upon the Issuer or the Co-Issuer;

(c)    to convey, transfer, assign, mortgage or pledge any additional property to or with the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Notes;

(d)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one Trustee, pursuant to the requirements of Section 6.9, 6.10 or 6.12 hereof;

(e)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or to correct, amplify or otherwise improve any pledge, assignment or conveyance to the Trustee of any property subject or required to be subjected to the lien of this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations), or to cause any additional property to be subject to the lien of this Indenture;

(f)     to take any action necessary or helpful to prevent the Issuer from becoming subject to any withholding or other taxes, fees, or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States income tax on a net income basis;

(g)     to enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification or waiver if the Issuer determines that such amendment, modification or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interests of Holders of any Class of Notes or the Holders of the Preference Shares;

(h)     to modify the restrictions on and procedures for resales and other transfers of the Notes to reflect any changes in applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(i)     to correct any defect or ambiguity or clarify any provision in this Indenture or resolve any inconsistency between the provisions of the Offering Memorandum and this Indenture;

(j)     to accommodate the settlement of the Notes in book entry form through the facilities of DTC, Euroclear or Clearstream or otherwise;

(k)     to make amendments required pursuant to applicable law; or

(l)     to authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes required or advisable in connection with the listing of any Class of Notes (other than the Class A Notes and the Class B Notes) on the Irish Stock Exchange or any other stock exchange, and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes in connection therewith.

Notwithstanding the foregoing, the Co-Issuers and the Trustee may also enter into supplemental indentures without obtaining the consent of the Noteholders, the Credit Swap Counterparty or any other party in order to conform the Indenture to any amendments, modifications or supplements to the Class A Note Purchase Agreement or Class B Note Purchase Agreement, with respect to the posting of collateral and other arrangements to be made in the event of the downgrade of any Class A Noteholder or Class B Noteholder, as applicable, subject in each case to the consent of the holders of a majority of the Preference Shares and receipt by the Issuer of a Rating Agency Confirmation.

The Issuer and the Trustee shall not amend the Indenture or enter into any supplemental indenture unless the Trustee has received advice from Allen & Overy LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters that the proposed supplemental indenture would not cause the Issuer to be engaged in a U.S. trade or business or otherwise subject to U.S. federal income tax on a net income basis and would not adversely affect the tax treatment of the Issuer or the tax consequences to the holders of any Class of Notes as described in the Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations" to any material extent or otherwise cause any of the statements described in the Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations" to be inaccurate or incorrect to any material extent.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.1, the Trustee, at the expense of the Co-Issuers, shall, for so long as any Class of Notes are Outstanding and rated by the Rating Agencies, mail to each of the Rating Agencies, a copy of such proposed supplemental indenture. No such proposed supplemental indenture may be executed without obtaining a Rating Agency Confirmation from S&P with respect to such supplemental indenture.

Not later than 10 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.1, the Trustee, at the expense of the Co-Issuers, shall mail to each Noteholder and each Preference Shareholder, the Credit Swap Counterparty and the Shares Paying Agent a copy of any proposed supplemental indenture and written notice reciting in substance the following provisions: unless within 10 Business Days after such mailing the Trustee shall have received written notice from Holders representing a Majority of a Class or from any Preference Shareholder or the Credit Swap Counterparty stating that such Holders or the Credit Swap Counterparty, as the case may be, reasonably consider their interests to be materially adversely affected by the proposed supplemental indenture, the Holders of any Notes or Preference Shares or the or the Credit Swap Counterparty, as applicable, will be deemed to not be materially adversely affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes or Preference Shares, and the Credit Swap Counterparty whether theretofore or thereafter authenticated and delivered; the Trustee shall not be liable for any determination that such persons shall not be materially adversely affected by the proposed supplemental indenture and shall be entitled to conclusively rely upon an Opinion of Counsel delivered to the Trustee as described in Sections 8.2 and 8.3 hereof.

So long as any of the Notes are listed on the Irish Stock Exchange, the Trustee shall notify the Irish Stock Exchange of any supplemental indenture adopted pursuant to this Section 8.1.

Section 8.2    Supplemental Indentures with Consent of Holders.    With the consent of the Holders of not less than a Majority of each Class of Notes materially and adversely affected thereby and the consent of the Credit Swap Counterparty, the Trustee and the Co-Issuers may enter into a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, this Indenture or modify in any manner the rights of the Holders of the Notes of such Class, provided, that pursuant to the Preference Share Documents, the Issuer has agreed that it will not enter into any supplemental indenture that materially and adversely affects the Holders of the Preference Shares without the consent of a Majority of the Holders of the Preference Shares.  The Trustee may exclusively rely on an Opinion of Counsel (which opinion may be based on an Officer's Certificate of the Co-Issuers, as applicable, regarding the material adverse affect of such supplemental indenture on any Holders of the Notes or Preference Shares) as to whether or not any Class of Securities would be materially and adversely affected by such change.  Such determination shall be conclusive and binding on all present and future Holders of the Securities.

Notwithstanding the foregoing, the Trustee may not enter into any supplemental indenture without the written consent of the Credit Swap Counterparty and the Holders of each Outstanding Note of each Class materially and adversely affected thereby and the Issuer may not enter into any such supplemental indenture without the consent of the Holders of each Outstanding Preference Share materially and adversely affected thereby if such supplemental indenture:

(a)    changes the Stated Maturity of or the due date of any installment of interest on any Note the date on which any dividend or any final distribution on the Preference Shares is payable, reduces the principal amount of any Note or the rate of interest thereon, or the rate at which interest accrues or the manner in which deferred interest accrues, or the redemption price with respect thereto, or changes the earliest date on which any Note may be redeemed, changes the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Note or to the payment of dividends or any final distribution on the Preference Shares or change any place where, or the coin or currency in which, any Note or the principal thereof or interest thereon is payable or where the payment of dividends or any final distribution on the Preference Shares is payable, or impairs the right to institute suit for the enforcement of any such payment on any Note on or after the Stated Maturity thereof (or, in the case of redemption, on or after the applicable Redemption Date);

(b)    (1) reduces the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this

Indenture or certain defaults thereunder or their consequences or (2) reduces the percentage of the Preference Shares the Holders of which are required to consent to the authorization of any such supplemental indenture or for any waiver of compliance with the provisions of this Indenture of which such waiver is permitted by the Holders of the Preference Shares or any other action under this Indenture that requires the consent of the Holders of the Preference Shares;

(c)   impairs or adversely affects the Collateral except as otherwise permitted in this Indenture;

(d)   permits the creation of any lien ranking prior to or on parity with the lien of this Indenture with respect to any part of the Collateral or terminates the lien of this Indenture on any property at any time subject hereto or deprive any Secured Party of the security afforded by the lien of this Indenture;

(e)   reduces the percentage of the Aggregate Outstanding Amount, the consent of the Holders of which is required to request that the Trustee preserve the Collateral or to rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(f)   modifies any of the provisions of this Section 8.2, except to increase the percentage of Outstanding Notes or Preference Shares whose Holders' consent is required for any such action or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note or Preference Share adversely affected thereby;

(g)   modifies the Priority of Payments;

(h)   modifies any of the provisions of this Indenture or the Preference Share Documents in such a manner as to affect the calculation of the amount of any payment of interest or principal due on any Note or any amount payable to the Shares Paying Agent for payment to the Holders of the Preference Shares on any Payment Date or on the Preference Share Redemption Date, or to affect the right of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained in this Indenture or to affect the rights of the Holders of the Preference Shares to the benefit of any provisions for the redemption of the Preference Shares contained in the Shares Paying Agency Agreement or to affect the rights of the Secured Parties to the benefit of any provisions for the redemption of such Notes contained herein, or changes the extent to which any such payments are received by;

(i)   amends any provision of this Indenture or any other agreement entered into by the Issuer with respect to the transactions contemplated hereby relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing with respect to the Issuer or the Co-

Issuer of a petition or answer or consent seeking reorganization, arrangement, moratorium or liquidation proceedings, or other proceedings under the Bankruptcy Code or any similar laws, or the consent of the Issuer or the Co-Issuer to the filing of any such petition or the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or any substantial part of its property, respectively; or

(j)        amends any provision of this Indenture or any other agreement entered into by the Issuer with respect to the transactions contemplated hereby that provides that the obligations of the Co-Issuers or the Issuer, as the case may be, are limited recourse obligations of the Co-Issuers or the Issuer, respectively, payable solely from the Collateral in accordance with the terms of this Indenture.

Not later than 10 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall, for so long as the Notes are Outstanding and rated by the Rating Agencies, mail to each of the Rating Agencies, the Credit Swap Counterparty, the Noteholders and the Shares Paying Agent (for distribution to the Preference Shareholders) a copy of such proposed supplemental indenture. Unless the Trustee receives consent of the Holders of 100% of the Aggregate Outstanding Amount of Notes of each Class whose rating would be materially adversely affected, the Trustee shall receive a Rating Agency Confirmation regarding the rating of each Class of Notes prior to entering into any supplemental indenture.

It shall not be necessary for any Act of Noteholders or Holders of Preference Shares under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

If (i) each holder of a Class of Notes or each holder of Preference Share is required to consent to the execution of a supplemental indenture, (ii) any entity certifies in writing to the Trustee and the Issuer that it is prohibited from delivering such consent (the Trustee and Issuer shall be fully protected in relying on such certification), (iii) all other holders of such Class of Notes or all other holders of Preference Shares (as applicable) consent to the execution of such supplemental indenture, and (iv) such entity indicates to the Trustee and the Issuer that it does not object to the execution of such supplemental indenture, then for purposes of this Indenture such entity shall be deemed to have consented to the execution of such supplemental indenture.

Notice of any such supplemental indenture adopted hereunder will be provided to each Rating Agency, the Credit Swap Counterparty, the Irish Stock Exchange (for so long as any Notes are listed thereon), the Trustee and the Holders of the Securities (not less than ten (10) days prior to the effectiveness thereof). Promptly after the execution by the Co-Issuers, the Class A Note Agent, the Class B Note Agent and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the

30775-00052 NY:2469328.3        144

expense of the Co-Issuers, shall mail to the Holders of the Notes, the Credit Swap Counterparty, the Irish Stock Exchange, the Shares Paying Agent and, so long as the Notes are Outstanding and rated by the Rating Agencies, each of the Rating Agencies a copy thereof. Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 8.3    Execution of Supplemental Indentures. In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3 hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution and delivery of such supplemental indenture is in compliance with this Indenture and that all conditions precedent thereto have been satisfied. Any such Opinion of Counsel may be based on an Officer's Certificate of the Issuer or the Co-Issuer, as applicable, regarding the material adverse affect of such supplemental indenture on any Holder of the Notes or the Preference Shares. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. Notwithstanding the foregoing, the Trustee may not enter into any supplemental indenture pursuant to this Article VIII without the prior written consent of the Credit Swap Counterparty, if the Credit Swap Counterparty has notified the Trustee upon receipt of a copy of the proposed supplemental indenture that the proposed amendment would have a material adverse effect on the Credit Swap Counterparty. Such consent, if granted, shall be evidenced by a written consent of the Credit Swap Counterparty delivered to the Trustee no fewer than ten (10) Business Days following delivery of the supplemental indenture to the Credit Swap Counterparty.

Section 8.4    Effect of Supplemental Indentures. Upon the execution of any supplemental indenture under this Article VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder and every Holder of Preference Shares shall be bound thereby.

Section 8.5    Reference in Notes to Supplemental Indentures. Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article VIII may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Co-Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Co-Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

## ARTICLE IX

## REDEMPTION OF NOTES

Section 9.1    Optional Redemption.    (a) On any Payment Date, (i) the Notes shall be redeemable in whole but not in part upon the occurrence of a Withholding Tax Event if the Issuer is so notified in writing by the Shares Paying Agent upon receipt by the Shares Paying Agent of written consent or written direction of a Majority of the Preference Shares pursuant to the Shares Paying Agency Agreement, and (ii) occurring on or after the December 2009 Payment Date, the Notes shall be redeemable in whole but not in part by the Co-Issuers if so directed by the Shares Paying Agent, at least 30 Business Days (or such later date as agreed upon by the Trustee and the Credit Swap Counterparty) prior to the scheduled Redemption Date, subject to the Credit Swap Agreement having been transferred or terminated and all payments having been made to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty or any payment that is owed or will be owed to a transferee of the Credit Swap Agreement, in each case, upon a termination or transfer of the Credit Swap Agreement), upon written direction of a Majority of Preference Shares pursuant to the Shares Paying Agency Agreement. For the avoidance of doubt, only the Holders of Preference Shares shall be able to direct the Issuer to redeem the Notes in connection with an optional redemption pursuant to this Article IX. Amounts on deposit in the Preference Share Distribution Account will not be available to effect an optional redemption (although such amounts will continue to be payable to the Holders of the Preference Shares, as permitted by Cayman Islands law). Notwithstanding the foregoing, payments of the applicable Redemption Price shall only be made in accordance with the Priority of Payments.

(b)    The Notes shall not be redeemed pursuant to Section 9.1(a) unless:

(i)    at least seven Business Days before the scheduled Redemption Date, the Issuer or the Credit Swap Calculation Agent, acting on behalf of the Issuer, shall have furnished to the Trustee evidence, in form reasonably satisfactory to the Trustee, that the Issuer, has entered into a binding agreement or agreements (including a confirmation of sale) with a financial institution or institutions whose short-term unsecured debt obligations have a credit rating of "P-1" or at least "Aa3" from Moody's and at least "A-1" from S&P to purchase or, in the case of the Credit Swap Agreement, terminate, not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds, all or part of the Underlying Asset at a price at least equal to an amount sufficient, together with the proceeds from the Eligible Investments maturing on or prior to the scheduled Redemption Date and (without duplication) any Cash to be applied to such redemption and (without duplication) the aggregate amount of the expected proceeds from

the termination of the Underlying Asset and sale of the Eligible Investments not later than the Business Day immediately preceding the scheduled Redemption Date with respect to which the Issuer or the Credit Swap Calculation Agent, acting on behalf of the Issuer, has provided the certification to the Trustee described in clause (ii) below, to pay all administrative and other fees and expenses payable under the Priority of Payments prior to the payment in full of the Notes (including fees and expenses incurred by the Trustee in connection with such sale of the Underlying Asset and Eligible Investments), to pay all amounts owed to the Credit Swap Counterparty (including, without limitation, any termination payment that is owed or will be owed to the Credit Swap Counterparty or any payments that is owed or will be owed to a transferee of the Credit Swap Agreement, in each case, upon a termination or transfer of the Credit Swap Agreement) and to redeem such Notes on the scheduled Redemption Date at the applicable Redemption Price (the aggregate amount required to make all such payments and to effect such redemption, the "Total Redemption Amount"); or

(ii)    at least ten Business Days prior to the scheduled Redemption Date and prior to selling any Underlying Asset and/or Eligible Investments, the Issuer shall have certified to the Trustee, the Credit Swap Counterparty and to each of the Rating Agencies that the expected proceeds from such sale (calculated as provided in the next succeeding sentence) together with any other amounts available to be used for such optional redemption will be delivered to the Trustee not later than the Business Day immediately preceding the scheduled Redemption Date, in immediately available funds, and will equal or exceed the Total Redemption Amount.

The Trustee may request a quotation from the Credit Swap Counterparty for the price paid by or to the Issuer upon termination of the Credit Swap Agreement and may solicit quotations from potential transferees of the Credit Swap Agreement. Any amount paid by the Issuer will be expressed as a negative number and any amount to be paid to the Issuer will be expressed as a positive number.

(c)    In connection with an optional redemption pursuant to Section 9.1(a), the Trustee, acting on behalf of the Issuer and upon receipt of a notice referred to in Section 9.2, shall notify the Issuer and the Credit Swap Counterparty of such optional redemption and the Issuer, shall direct the Trustee in writing to terminate or transfer to another party, and the Trustee shall terminate or transfer to another party in the manner directed by the Issuer in writing, the Credit Swap Agreement and shall notify the Trustee of such optional redemption in accordance with Section 9.2 and upon any such sale the Trustee shall release such Underlying Asset pursuant to Section 10.8.

(d)    The Issuer shall set the Redemption Date and the Record Date with respect to such Redemption Date and give notice thereof to the Issuer and the Trustee pursuant to Section 9.2. Installments of interest and principal due on or prior to a Redemption Date which shall not have been paid or duly provided for shall be payable to the Holders of the Notes as of the relevant Record Dates. Upon receipt of the direction of the Holders of the applicable percentage of Preference Shares with respect to the redemption of the Notes pursuant to Section 9.1(a), the Co-Issuers shall deliver an Issuer Order to the Trustee directing the Trustee to make the payment to the Paying Agent of the applicable Redemption Price of all of the Notes to be redeemed from funds in the Issuer Accounts in accordance with the Priority of Payments. The Issuer shall deposit, or cause to be deposited, the funds required for an optional redemption in the Payment Account on or before the Business Day prior to the Redemption Date.

Section 9.2    Notice to Trustee of Optional Redemption. In the event of any redemption pursuant to Section 9.1, the Issuer shall, at least 30 days (but not more than 90 days) prior to the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee and the Trustee shall notify the Credit Swap Counterparty and each Rating Agency of such Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on such Redemption Date and the Redemption Price of such Notes in accordance with Section 9.1.

Section 9.3    Notice of Optional Redemption or Maturity by the Co-Issuers. Notice of redemption pursuant to Section 9.1 or the Maturity of any Class of Notes shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than ten (10) Business Days prior to the applicable Redemption Date or Maturity to each Rating Agency, to the Credit Swap Counterparty and to each Holder of Notes to be redeemed pursuant to Section 9.1, at such Holder's address in the Note Register.

All notices of redemption shall state:

(a)    the applicable Redemption Date and Record Date with respect thereto (which shall be a date after the date on which such notice is deemed to be given pursuant to Section 14.4);

(b)    the Redemption Price for each Class of Notes;

(c)    that all the Notes of the relevant Class are being paid in full and that interest on such Notes shall cease to accrue on the date specified in the notice;

(d)    the place or places where such Notes to be redeemed, are to be surrendered for payment of the Redemption Price which shall be the office or agency of the Issuer to be maintained as provided in Section 7.4; and

(e)    the latest possible date upon which such notice of redemption may be withdrawn.

The Co-Issuers shall have the option to withdraw the notice of redemption on or prior to the fourth Business Day prior to the scheduled Redemption Date by written notice to the Trustee, the Rating Agencies, the Credit Swap Counterparty and (in the case of a simultaneous redemption of the Preference Shares) the Shares Paying Agent only if (i) the Issuer shall be unable to deliver such sale agreement or agreements or certifications, as the case may be, in the form required under Section 9.1 of this Indenture or (ii) the Issuer receives written direction from the Holders of a Majority of the Preference Shares to withdraw the notice of redemption; provided, that the Issuer shall not permit the Credit Swap Agreement to be terminated until such period for withdrawal has expired. Notice of any such withdrawal shall be given by the Trustee to each Holder of Notes to be redeemed at such Holder's address appearing in the Note Register by overnight courier or if the address provided in the Note Register is insufficient for much purpose, by first-class mail), sent not later than the third Business Day prior to the scheduled Redemption Date. In addition, if and for so long as any Class of Notes is listed on the Irish Stock Exchange, the Trustee will send notice of any withdrawal of such notice to the Company Announcements Office not less than the third Business Day prior to such Redemption Date.

Notice of redemption shall be given by the Co-Issuers or, at the Co-Issuers' request, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of Notes selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

Section 9.4    Notes Payable on Redemption Date. Notice of redemption having been given as aforesaid, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless a default is made in the payment of the Redemption Price) such Notes (or the portion thereof to be redeemed) shall cease to bear interest. Upon final payment on a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date; provided, however, that if there is delivered to the Co-Issuers and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Note, then, in the absence of written notice to the Co-Issuers and the Trustee that the applicable Note has been acquired by a Protected Purchaser, such final payment shall be made without presentation or surrender.

If any Note called for optional redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding.

Section 9.5    Certain Other Redemptions.  On any Payment Date on which the Coverage Tests were not met on the immediately preceding Determination

30775-00052 NY:2469328.3    149

Date, principal payments of the Notes will be made as set forth in Section 11.1. The Redemption Price for each Note in any redemption of the Notes pursuant to this Section 9.5 will be equal to the Aggregate Outstanding Amount of such Note plus accrued interest thereon (including any Defaulted Interest and interest on Defaulted Interest and with respect to the Class D Notes, any Class D Deferred Interest and with respect to the Class E Notes, any Class E Deferred Interest.

If the principal and interest of any Class of Notes has been paid in full, if the Class A Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class A Notes) or if the Class B Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class B Notes) on any Payment Date as a result of the application of funds in accordance with this Section 9.5 or as otherwise provided herein, the Trustee. shall send written notice within five (5) business days to each Rating Agency that such Class of Notes is no longer Outstanding.

## ARTICLE X

### ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1  Collection of Money.  (a) Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all Money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Underlying Assets in accordance with the terms and conditions of such Pledged Underlying Assets. The Trustee shall segregate and hold all such Money and property received by it in trust pursuant to the Granting Clauses, for the Secured Parties.

(b)  In addition, any Account may include any number of subaccounts deemed necessary or appropriate by the Trustee for convenience in administering the Accounts. Each of the parties hereto hereby agrees that (i) each Account shall be deemed to be a "Securities Account" (as defined in Section 8-501 of the UCC), (ii) except as otherwise expressly provided herein, the Trustee will be exclusively entitled to exercise the rights that comprise each Financial Asset held in each Account, and (iii) the Trustee shall be permitted to establish any number of sub-accounts deemed necessary by the Trustee for convenience in administering each Issuer Account. Each of the parties hereto hereby agrees to cause the Securities Intermediary to agree with the parties hereto that (x) subject to Section 10.11(c), the Cash and other property is to be treated as a Financial Asset under Article 8 of the UCC and (y) the "securities intermediary's jurisdiction" (within the meaning of Section 8 110 of the UCC) for that purpose will be the State of New York. In no event may any Financial Asset held in any Issuer Account be registered in the name of, payable to the order of, or specially indorsed to, the Issuer unless such

Financial Asset has also been indorsed in blank or to the Securities Intermediary that holds such Financial Asset in such Issuer Account.

## Section 10.2    Collection Accounts; Custodial Account.

(a)    Collection Accounts. (i) The Trustee shall, on or prior to the Closing Date, establish at the Custodian two segregated, non-interest bearing trust accounts in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Interest Collection Account and the Principal Collection Account, which shall be held by the Custodian in trust for the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. The Trustee shall from time to time deposit (i) all Principal Proceeds of any Underlying Asset into the Principal Collection Account and (ii) all Interest Proceeds on any Underlying Asset into the Interest Collection Account. All monies deposited from time to time in the Principal Collection Account and Interest Collection Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided in subclauses (A) and (B) of Section 11.1(a) hereof. The Custodian, acting on behalf of the Trustee, shall give the Issuer prompt notice if a Trust Officer has actual knowledge that the Principal Collection Account or the Interest Collection Account or any funds on deposit in such Accounts, or otherwise to the credit of such Accounts, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Principal Collection Account or the Interest Collection Account other than in accordance with the Priority of Payments. At all times, the Principal Collection Account and the Interest Collection Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000.

(ii)    Except as otherwise expressly provided herein, the Trustee shall have no obligation to invest or reinvest any funds held in any accounts under this Article 10 in the absence of timely written direction and shall not be liable for the selection of investments or for investment losses incurred thereon.

(iii)    The Issuer may, but under no circumstances shall be required to, deposit or cause to be deposited from time to time such Monies in the Collection Accounts as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate that such Monies are to be treated as Principal Proceeds or Interest Proceeds hereunder at its discretion. All Monies deposited from time to time in the Collection Accounts pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided.

(iv)    All Distributions, any deposit required pursuant to Section 10.2(a)(iii) and any net proceeds from the sale or other disposition of an

Eligible Investment received by the Trustee shall be immediately deposited into the applicable Collection Account subject to Sections 10.2(a)(i) and (ii). By Issuer Order, the Issuer shall at all times direct the Trustee to, and, upon receipt of such Issuer Order, the Trustee shall, invest all funds received into the Collection Accounts during a Due Period, and amounts received in prior Due Periods and retained in the Collection Accounts, as so directed in Eligible Investments having stated maturities no later than the Business Day immediately preceding the next Payment Date.

(v)    If, prior to the occurrence of an Event of Default, the Issuer shall not have given any investment directions pursuant to Section 10.2(a)(iv), the Trustee shall seek instructions from the Credit Swap Counterparty within three (3) Business Days after transfer of such funds to the Collection Accounts. If the Trustee does not thereupon receive written instructions from the Credit Swap Counterparty within five (5) Business Days after transfer of such funds to a Collection Account, it shall invest and reinvest the funds held in such Collection Account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (iii) of the definition thereof maturing no later than the Business Day immediately preceding the next Payment Date. After the occurrence of an Event of Default, the Trustee shall invest and reinvest such Monies as fully as practicable in Eligible Investments of the type described in clause (iii) of the definition thereof maturing not later than the earlier of (i) 30 days after the date of such investment and (ii) the Business Day immediately preceding the next Payment Date. All interest and other income from such investments shall be deposited in the Collection Accounts, any gain realized from such investments shall be credited to the Collection Accounts, and any loss resulting from such investments shall be charged to the Collection Accounts. The Trustee shall not in any way be held liable by reason of any insufficiency of the Collection Accounts resulting from any loss relating to any such investment.

(vi)    The Trustee shall transfer to the Payment Account for application pursuant to Section 11.1(a) and in accordance with the calculations and the instruction contained in the Payment Date Report prepared by the Issuer pursuant to Section 10.6(b), on or prior to the Business Day prior to each Payment Date, any amounts then held in the Collection Accounts.

(b)    Custodial Account. The Trustee shall, on or prior to the Closing Date, establish at the Custodian a segregated, non-interest bearing trust account in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Custodial Account, which shall be held by the Custodian in trust for the benefit of the Trustee for

the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal and into which the Trustee shall from time to time deposit Collateral. At all times, the Custodial Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000. All Collateral deposited from time to time in the Custodial Account pursuant to this Indenture shall be held in trust by the Trustee and shall be applied to the purposes provided herein. The Custodian, acting on behalf of the Trustee, agrees to give the Issuer prompt notice if a Trust Officer has actual knowledge that the Custodial Account or any Collateral on deposit therein, or otherwise to the credit of the Custodial Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Custodial Account other than in accordance with the Priority of Payments.

(c)    The Trustee shall, at the direction of the Issuer, apply Interest Proceeds on dates other than Payment Dates to pay Administrative Expenses of the Co-Issuers, subject to the Administrative Expense Cap, if sufficient Interest Proceeds have theretofore been received to cover such payments. The Trustee shall also, at the direction of the Issuer, apply Principal Proceeds on dates, whether or not such dates are Payment Dates, including proceeds of the liquidation of the Specific Investment, and once the Specific Investment Instrument has been liquidated and its proceeds have been utilized, amounts on deposit in the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B Funding Account, the Class B CDS Reserve Account and the amount of any draw downs on the Class A Notes or Class B Notes, to make payments required to be made to the Credit Swap Counterparty or to fund the Maturity Date Account with the Maturity Date Amount. Withdrawals from the following accounts and draw downs on the Class A Notes and Class B Notes shall be made in accordance with the order specified in Section 10.4(h); provided that to the extent any of the Class A Notes or Class B Notes are drawn down as a result of a Downgrade Draw, and draw downs are to be made on any such Note, the amount of such draw down shall be withdrawn from the related sub-accounts of the Contingent Class A Funding Account or Contingent Class B Funding Account, as applicable. Withdrawals from the Reserve Accounts and draw downs on the Class B Notes and Class A Notes, as applicable, shall be made in order set forth in Section 10.4(h).

Section 10.3    Payment Account. The Trustee shall, on or prior to the Closing Date, establish at the Custodian a single segregated, non-interest bearing trust account in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Payment Account, which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. At all times, the Payment Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000. Except as provided in Section 11.1, the only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay the interest on and the principal of the Notes and make

distributions on the Preference Shares, in each case in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified therein, each in accordance with the Priority of Payments. Monies on deposit in the Payment Account shall remain uninvested. All monies deposited from time to time in the Payment Account pursuant to this Indenture shall be held in trust by the Trustee as part of the Collateral and shall be applied to the purposes provided herein. The Custodian, acting on behalf of the Trustee agrees to give the Issuer prompt notice if a Trust Officer has actual knowledge that the Payment Account or any funds on deposit therein, or otherwise to the credit of the Payment Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

Section 10.4    Contingent Class A Funding Account; Class A CDS Reserve Account; Contingent Class B Funding Account; Class B CDS Reserve Account; Credit Swap Issuer Account; Specific Investment Proceeds Account; Maturity Date Account.    (a) (i) The Issuer shall, on or prior to the Closing Date, establish at the Custodian a single segregated non-interest bearing trust account in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Contingent Class A Funding Account and shall be held by the Custodian in accordance with the Securities Account Control Agreement, and into which the Issuer shall from time to time make such deposits and withdrawals as are required pursuant to this Section 10.4. The Trustee shall establish sub-accounts as required for each purchaser of the Class A Notes. Any and all funds at any time on deposit in, or otherwise to the credit of, the Contingent Class A Funding Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Funds on deposit in, or otherwise to the credit of, the Contingent Class A Funding Account will be invested in Eligible Investments at the written direction of the related Class A Noteholder pending the application of such funds to cover draws on the applicable unfunded Class A Commitments. All interest and other income from such investments shall be deposited in the appropriate Collection Account. Any gain realized from such investments shall be credited to the appropriate Collection Account, and any loss resulting from such investments shall be charged to the appropriate Collection Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Contingent Class A Funding Account shall be pursuant to this Section 10.4. At all times, the Contingent Class A Funding Account shall remain at an institution with a combined capital and surplus in excess of U.S.$200,000,000; provided, that such institution shall have the Requisite Ratings and provided further that is such institution is rated "Baa1" by Moody's such institution shall not be on credit watch for possible downgrade by Moody's. The Trustee agrees to give the Co-Issuers prompt notice if a Trust Officer has actual knowledge that the Contingent Class A Funding Account or any funds on deposit therein, or otherwise to the credit of the Contingent Class A Funding Account shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or

beneficial interest in the Contingent Class A Funding Account other than in accordance with the provisions of this Indenture and the Securities Account Control Agreement.

(ii)    The required deposits into the Contingent Class A Funding Account are as follows: On any day on which a Downgrade Draw occurs pursuant to the Class A Note Purchase Agreement, the Class A Note Agent shall deposit proceeds from the Downgrade Draw to a related sub-account of the Contingent Class A Funding Account all in accordance with the Class A Note Purchase Agreement. For so long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the funded portion of the Class A Notes (if such funding is a result of a Downgrade Draw) in an amount equal to the actual amount of earnings on the Eligible Investments in the related sub-account of the Contingent Class A Funding Account in connection with a Downgrade Draw plus 0.00% of such funded portion per annum; provided, however, that interest shall accrue on the portion of the Class A Notes that were funded other than as a result of the Downgrade Draw at a rate per annum equal to LIBOR plus 0.00%. Any Class A Notes that remain outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest on the funded portion of the Class A Notes in an amount equal to the lesser of (a) actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class A Notes and the denominator of which is the aggregate outstanding amount of all Classes of Notes and (b) the interest amount on the funded Class A Notes accrued at a rate per annum of LIBOR. Funds shall be withdrawn and applied from the Contingent Class A Funding Account as provided in Section 10.4(h) below. Any funds deposited by a Class A Noteholder to the Contingent Class A Funding Account will be released to the Class A Noteholder upon the earliest to occur of (i) the assignment by the Class A Noteholder of its Class A Commitment to one or more eligible assignees and (ii) the date on which the Class A Noteholder or the related Guarantor or Funding Entity, if any, satisfies the Rating Criteria (in either case, as evidenced to the Trustee by a certificate of such Class B Noteholder, on which the Trustee may rely), but only to the extent that such funds are not required to be applied pursuant to Section 10.4(h) below.

(iii)    On the Maturity Date, all remaining amounts (after any withdrawals provided for Section 10.4(h) below) in the Contingent Class A Funding Account shall be transferred to the Payment Account for application as Principal Proceeds.

(b)     The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Class A CDS Reserve Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. At all times, the Class A CDS Reserve Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000. Amounts will be deposited into the Class A CDS Reserve Account to the extent of any excess proceeds with respect to any Advances made in respect of the Class A Notes, such excess proceeds shall be deposited into the Class A CDS Reserve Account. Amounts on deposit from time to time in the Class A CDS Reserve Account will be invested in the Specific Investment Instrument. Interest earnings on amounts on deposit in the Class A CDS Reserve Account will constitute Interest Proceeds and will be withdrawn and deposited into the Interest Collection Account. Deposits to the Class A CDS Reserve Account will permanently reduce the undrawn Class A Commitments by the amount of such deposit. The amounts on deposit in the Class A CDS Reserve Account shall be withdrawn and applied as required under Section 10.4(h) below. On the Maturity Date, all remaining amounts (after any withdrawals provided for Section 10.4(h) below) in the Class A CDS Reserve Account shall be transferred to the Payment Account for application as Principal Proceeds.

(c)     (i) The Issuer shall, on or prior to the Closing Date, establish at the Custodian a single, segregated non-interest bearing trust account in the name "Pebble Creek LCDO 2007-3, Ltd.," which shall be designated as the Contingent Class B Funding Account and shall be held by the Custodian in accordance with the Securities Account Control Agreement, and into which the Issuer shall from time to time make such deposits and withdrawals as are required pursuant to this Section 10.4. The Trustee shall establish sub-accounts as required for each purchaser of the Class B Notes. Any and all funds at any time on deposit in, or otherwise to the credit of, the Contingent Class B Funding Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Funds on deposit in, or otherwise to the credit of, the Contingent Class B Funding Account will be invested in Eligible Investments at the written direction of the related Class B Noteholder pending the application of such funds to cover draws on the applicable unfunded Class B Commitments. All interest and other income from such investments shall be deposited in the appropriate Collection Account. Any gain realized from such investments shall be credited to the appropriate Collection Account, and any loss resulting from such investments shall be charged to the appropriate Collection Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Contingent Class B Funding Account shall be pursuant to this Section 10.4. At all times, the Contingent Class B Funding Account shall remain at an institution with a combined capital and surplus in excess of U.S.$200,000,000; provided, that such institution shall have the Requisite Ratings and provided further that is such institution is rated "Baa1" by Moody's such institution shall not be on credit watch for possible downgrade by Moody's . The Trustee agrees to give the Co-Issuers prompt notice if a

Trust Officer has actual knowledge that the Contingent Class B Funding Account or any funds on deposit therein, or otherwise to the credit of the Contingent Class B Funding Account shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. The Co-Issuers shall not have any legal, equitable or beneficial interest in the Contingent Class B Funding Account other than in accordance with the provisions of this Indenture and the Securities Account Control Agreement.

(ii)    The required deposits into the Contingent Class B Funding Account are as follows: On any day on which a Downgrade Draw occurs pursuant to the Class B Note Purchase Agreement, the Class B Note Agent shall deposit proceeds from the Downgrade Draw to a related sub account of the Contingent Class B Funding Account all in accordance with the Class B Note Purchase Agreement. For so long as the conditions which caused a Downgrade Draw are in existence, interest shall accrue on the funded portion of the Class B Notes (if such funding is a result of a Downgrade Draw) in an amount equal to the actual amount of earnings on the Eligible Investments in the related sub account of the Contingent Class B Funding Account in connection with a Downgrade Draw plus 0.45% of such funded portion per annum; provided, however, that interest shall accrue on the portion of the Class B Notes that were funded other than as a result of the Downgrade Draw at a rate per annum equal to LIBOR plus 0.45%. Any Class B Notes that remain outstanding during the Interest Period commencing on the Maturity Date and ending on the Deferred Maturity Date shall accrue interest on the funded portion of the Class B Notes in an amount equal to the lesser of (a) actual earnings on the Eligible Investments in the Maturity Date Account (net of fees and expenses of the Co-Issuers that are senior to the interest payments of the Notes in accordance with the Priority of Payments) multiplied by a fraction, the numerator of which is the outstanding funded portion of the Class B Notes and the denominator of which is the aggregate outstanding amount of all Classes of Notes and (b) the interest amount on the funded Class B Notes accrued at a rate per annum of LIBOR. Funds shall be withdrawn and applied from the Contingent Class B Funding Account as provided in Section 10.4(h) below. Any funds deposited by a Class B Noteholder to the Contingent Class B Funding Account will be released to the Class B Noteholder upon the earliest to occur of (i) the assignment by the Class B Noteholder of its Class B Commitments to one or more eligible assignees and (ii) the date on which the Class B Noteholder or the related Guarantor or Funding Entity, if any, satisfies the Rating Criteria (in either case, as evidenced to the Trustee by a certificate of such Class B Noteholder, on which the Trustee may rely), but only to the extent that such funds are not required to be applied pursuant to Section 10.4(h) below.

(iii)    On the Maturity Date, all remaining amounts (after any withdrawals provided for Section 10.4(h) below) in the Contingent Class B Funding Account shall be transferred to the Payment Account for application as Principal Proceeds.

(d)    The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "Pebble Creek LCDO 2007-3, Ltd.," which shall be designated as the Class B CDS Reserve Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. At all times, the Class B CDS Reserve Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000. Amounts will be deposited into the Class B CDS Reserve Account (i) subject to and in accordance with the Priority of Payments upon the failure of any Coverage Test (as provided in Section 11.1) and (ii) to the extent of any excess proceeds (as identified and instructed to the Trustee by Issuer Order) with respect to any Advances made in respect of the Class B Notes, such excess proceeds shall be deposited into the Class B CDS Reserve Account. Amounts on deposit from time to time in the Class B CDS Reserve Account will be invested in the Specific Investment Instrument. Interest earnings on amounts on deposit in the Class B CDS Reserve Account will constitute Interest Proceeds and will be withdrawn and deposited into the Interest Collection Account. Deposits to the Class B CDS Reserve Account will permanently reduce the Class B Commitments by the amount of such deposit. The amounts on deposit Class B CDS Reserve Account shall be withdrawn and applied as required under Section 10.4(h) below. On the Maturity Date, all remaining amounts (after any withdrawals provided for Section 10.4(h) below) in the Class B CDS Reserve Account shall be transferred to the Payment Account for application as Principal Proceeds.

(e)    The Trustee shall establish a single, segregated trust account in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Credit Swap Issuer Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal in accordance with the Credit Swap Agreement. At all times, the Credit Swap Issuer Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000. The Credit Swap Posted Amount posted by the Credit Swap Counterparty shall be deposited into this account and any withdrawals from or deposits to this account shall be made in accordance with the Credit Swap Agreement.

(f)    (i)    The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Specific Investment Proceeds Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control

and sole right of withdrawal. At all times, the Specific Investment Proceeds Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000. The Trustee shall make withdrawals at any time to make payments due to the Credit Swap Counterparty under the Credit Swap Agreement.

          (ii)      Upon the occurrence of a Credit Event with respect to a Reference Entity, first, the excess proceeds of the Specific Investment Instrument held in the Specific Investment Proceeds Account shall be used to pay the Credit Swap Counterparty and second, the Specific Investment Instrument shall be liquidated to the extent necessary to pay the remainder of the Cash Settlement Amount for such Credit Event (rounded to the nearest $1) and such Cash Settlement Amount shall be paid to the Credit Swap Counterparty when due (regardless of whether such date is a Payment Date); provided, that if the amount so generated is insufficient to pay such Cash Settlement Amount in full to the Credit Swap Counterparty then withdrawals from the accounts and draw downs on the Class B Notes and Class A Notes, as applicable, shall be made in accordance with Section 10.4(h) to the extent necessary to pay such Cash Settlement Amount in full to the Credit Swap Counterparty and such Cash Settlement Amount shall be paid to the Credit Swap Counterparty when due (regardless of whether such date is a Payment Date). On or following the payment of the Cash Settlement Amount in full to the Credit Swap Counterparty, then on the next Payment Date the Recovery Amount shall be applied as follows: first, to reduce the Class A Commitments until reduced to zero, and second, once the Class A Commitments have been reduced to zero, to reduce the Class B Commitments until reduced to zero; provided, that to the extent that the Class A Commitments and the Class B Commitments are reduced to zero, the Specific Investment Proceeds Account and the Specific Investment Instrument shall be liquidated in an amount equal to the Reference Entity Calculation Amount (minus any portion of the Recovery Amount used to reduce such Class A Commitments and Class B Commitments to zero) for the relevant Reference Entity, and, for the avoidance of doubt, not in the amount indicated in the prior sentence, the Cash Settlement Amount shall be paid to the Credit Swap Counterparty when due (regardless of whether such date is a Payment Date) and the Recovery Amount (minus any portion of the Recovery Amount used to reduce such Class A Commitments to zero) shall be transferred to the Payment Account for application as Principal Proceeds; provided, further, that for purposes of this Section 10.4(f) Class A Commitments and Class B Commitments that were drawn as a result of a Downgrade Draw shall be deemed undrawn; provided, further, that to the extent that any Class A Commitments or Class B Commitments that are being reduced have previously been funded as a result of a Downgrade

Draw, the amount of such reduction shall be withdrawn from the applicable sub-account of the Contingent Class A Funding Account or the applicable sub-account of the Contingent Class B Funding Account and paid to the holder of the Class A Notes or Class B Notes to which such Class A Commitments or Class B Commitments (as applicable) are related.

(iii)     Upon the removal of a Reference Entity from the Reference Portfolio with respect to which a Credit Event has not occurred (any such Reference Entity, a "Removed Reference Entity"), on the next Payment Date (x) the Class A Commitment Portion shall be applied as follows:  to reduce the undrawn Class A Commitments until reduced to zero and (y) the Class B Commitment Portion shall be applied as follows:  to reduce the undrawn Class B Commitments until reduced to zero; provided, that to the extent that the Class B Commitments are reduced to zero, the Specific Investment Proceeds Account and the Specific Investment Instrument shall be liquidated in an amount equal to the Remaining Portion, and the proceeds of such Remaining Portion shall be transferred to the Payment Account for application as Principal Proceeds; provided, further, that to the extent that any Class A Commitments or Class B Commitments that are being reduced have previously been funded as a result of a Downgrade Draw, the amount of such reduction shall be withdrawn from the applicable sub-account of the Contingent Class A Funding Account or the applicable sub-account of the Contingent Class B Funding Account and paid to the holder of the Class A Notes or Class B Notes to which such Class A Commitments or Class B Commitments (as applicable) are related.

(iv)     Upon the occurrence of the Maturity Date, the Specific Investment Instrument shall be liquidated and its proceeds (together with any other proceeds on the Specific Investment Proceeds Account but, for the avoidance of doubt, after application required under clauses (ii) and (iii) above) shall be transferred to the Maturity Account to the extent needed to fund the Maturity Date Amount, if any, and thereafter to the Payment Account for application as Principal Proceeds.

(g)     The Trustee shall, upon delivery of an Issuer Order, establish at the Custodian a single, segregated trust account in the name "Pebble Creek LCDO 2007-3, Ltd." which shall be designated as the Maturity Date Account which shall be held by the Custodian in trust for the benefit of the Trustee for the benefit of the Secured Parties and over which the Trustee shall have exclusive control and sole right of withdrawal. At all times, the Maturity Date Account shall remain at an institution with the Requisite Ratings and with combined capital and surplus in excess of U.S.$200,000,000. Funds on deposit in, or otherwise to the credit of, the Maturity Date Account will be invested in Eligible

Investments at the written direction of the Credit Swap Calculation Agent. The Maturity Date Amount shall be deposited on the first Payment Date on or after the Maturity Date pursuant to Section 11.1(a)(B)(i). Such Maturity Date Amount shall be taken from Principal Proceeds (including proceeds of the liquidation of the Specific Investment Instrument), and, to the extent that Principal Proceeds are not sufficient to make deposits into the Maturity Date Account, the Issuer will make withdrawals or draw downs, as applicable, as provided in Section 10.4(h), in each case to the extent necessary to fund the Maturity Date Account with the Maturity Date Amount and deposit the proceeds of such Principal Proceeds, withdrawals and/or draw downs in the Maturity Date Account. Withdrawals from the Maturity Date Account shall be made to make payments pursuant to Section 11.1(a)(C) and Section 11.1(a)(D) as applicable.

(h)    To the extent that the Specific Investment Instrument has been fully liquidated and its proceeds have been utilized and payments are required to be made to the Credit Swap Counterparty or to fund the Maturity Date Account with the Maturity Date Amount, withdrawals from the following accounts and draw downs on the Class A Notes and Class B Notes shall be made in the following order: first (i) the Class B CDS Reserve Account, second (ii) the Class B Notes (up to the undrawn amount of the Class B Commitments), third (iii) the Class A CDS Reserve Account and fourth (iv) the Class A Notes (up to the undrawn amount of the Class A Commitments), in each case, until no funds remain in such account or up to the undrawn amount of the Class A Commitments, and solely to the extent necessary to pay the Credit Swap Counterparty, or to. fund the Maturity Date Account with the Maturity Date Amount; provided that the Class A Notes may be drawn down simultaneously with a request for a draw down on the Class B Notes that will cause the B Notes to be drawn to the full amount of the Class B Commitments and a withdrawal of any funds remaining in the accounts mentioned in clauses (i) and (iii) above, and provided further that to the extent any of the Class A Notes or Class B Notes are drawn down as a result of a Downgrade Draw, and draw downs are to be made on any such Note, the amount of such draw down shall be withdrawn from the related sub-accounts of the Contingent Class A Funding Account or Contingent Class B Funding Account, as applicable.

Section 10.5    Reports by Trustee. The Trustee shall supply in a timely fashion to the Issuer, S&P, Moody's, the Credit Swap Counterparty and the Shares Paying Agent any information regularly maintained by the Trustee that the Issuer or the Shares Paying Agent may from time to time request with respect to the Pledged Underlying Assets, the applicable Collection Account, the Payment Account, the Credit Swap Issuer Account, the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B Funding Account, the Class B CDS Reserve Account, the Custodial Account, the Maturity Date Account and the Specific Investment Proceeds Account reasonably needed to complete the Payment Date Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.6 or to permit the Shares Paying Agent to perform its obligations under the Shares Paying Agency Agreement.

The Trustee shall forward to the Credit Swap Counterparty, the Shares Paying Agent and to any Holder of a Note shown on the Note Register upon request therefor, copies of notices and other writings received by it from the issuer of any Underlying Asset or from any Clearing Agency with respect to any Underlying Asset advising the Holders of such security of any rights that the Holders might have with respect thereto (including, without limitation, notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer.

Section 10.6   Accountings.

(a)   Monthly Report.   Not later than the thirteenth Business Day of each month, excluding any month in which a Payment Date falls, commencing in September 2007, the Trustee shall compile and make available to each Rating Agency, the Managers, the Trustee, the Shares Paying Agent, the Credit Swap Counterparty, and, upon written request therefor, any beneficial holder of an interest in a Global Note, a monthly report (the "Monthly Report"). The Monthly Report shall contain the following information and instructions with respect to the Collateral, determined as of the fifth Business Day of such calendar month:

(1)   the aggregate Reference Entity Calculation Amount of the all Reference Entities as to which a Credit Event has not occurred;

(2)   the Balance of all Eligible Investments and Cash in each of the Collection Accounts, the Payment Account, the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B Funding Account, the Class B CDS Reserve Account, the Specific Investment Proceeds Account, the Credit Swap Issuer Account, the Custodial Account, the Maturity Date Account and the Preference Share Distribution Account;

(3)   the nature, source and amount of any proceeds in the Collection Accounts, including Interest Proceeds, Principal Proceeds and Disposition Proceeds, received since the date of determination of the last Monthly Report;

(4)   with respect to each Reference Entity, the Reference Spread, Reference Entity domicile, whether Restructuring is applicable, Moody's Default Probability Rating, S&P Rating, Moody's industry and industry code of each Reference Entity and S&P industry and industry code of each Reference Entity and Eligible Investment purchased with funds from the Collection Accounts;

(5)   a calculation in reasonable detail necessary to determine compliance with each Coverage Test and the levels required for each such test pursuant to this Indenture;

(6)      (v) the Diversity Score (calculated as of the Closing Date), (w) Weighted Average Spread, (x) Weighted Average Rating Factor (Moody's) and (z) Weighted Average Recovery Rate (Moody's);

(7)      the occurrence of any redemption of any or all Classes of Notes, if applicable, draw downs on the Class A Notes, draw downs on the Class B Notes, the Class A Note Commitment, the Class B Note Commitment and the Outstanding Amount of each Class of Notes;

(8)      the breach of any covenant, representation or warranty by any party to any Operative Agreement since the last report, as to which the Issuer has been notified in writing;

(9)      the termination or change of any party to any Operative Agreement, as to which the Issuer has been notified in writing;

(10)      the amendment or waiver of any Operative Agreement, as to which the Issuer has been notified in writing;

(11)      with respect to Credit Swap Agreement, any change in the notional balance thereof; and

(12)      with respect to the Reference Entities, separately stated, the aggregate Reference Entity Calculation Amount of all such Reference Entities divided by the aggregate Reference Entity Calculation Amount of all Reference Entities with a Moody's Default Probability Rating of "Aaa," "Aa1," "Aa2," "Aa3," "A1," "A2," "A3," "Baa1," "Baa2," "Baa3," "Ba1," "Ba2," "Ba3," "B1," "B2," "B3," "Caa1," "Caa2," "Caa3," "Ca" and "C" and Moody's Default Probability Ratings actions since the last report and action date;

(13)      with respect to the Reference Entities, separately stated, the aggregate Reference Entity Calculation Amount of all such Reference Entities divided by the aggregate Reference Entity Calculation Amount of all Reference Entities with a S&P Rating of "AAA," "AA+," "AA," "AA-," "A+," "A," "A-," "BBB+," "BBB," "BBB-," "BB+," "BB," "BB-," "B+," "B," "B-," "CCC+," "CCC," "CCC-," and "D" and S&P's Ratings actions since the last report and action date; and

(14)      copies of all Credit Event Notices delivered during such month and  a list of all Cash Settlement Amounts, Recovery Amount and Final Price paid during such month for Moody's industry classification; and

(15)    copies of all Credit Event Notices delivered during such month and a list of all Cash Settlement Amounts, Recovery Amount and Final Price paid during such month for S&P's industry classification.

In each Monthly Report, the non-public/implied S&P ratings shall be represented by an asterisk (*). The means by which any such non-public/implied rating was derived will not be disclosed in such report.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained therein to the information contained in its records with respect to the Collateral and shall, within three (3) Business Days after receipt of such Monthly Report, notify the Issuer, the Credit Swap Counterparty and the Rating Agencies if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral. In the event that any discrepancy exists, the Trustee and the Issuer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five (5) Business Days cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.

(b)    <u>Payment Date Accountings</u>.    The Trustee shall render an accounting ("<u>Payment Date Report</u>"), determined as of each Determination Date, and make such Payment Date Report available to each Rating Agency, the Credit Swap Counterparty, the Managers, the Trustee, the Shares Paying Agent, and, upon written request therefor, any beneficial holder of a Global Note or Certificated Note not later than the Business Day preceding the related Payment Date. The Payment Date Report shall contain the following information determined, unless otherwise specified below, as of the related Determination Date:

(1)    (A)    the Aggregate Outstanding Amount of the Notes of each Class and sub-Class, including as a percentage of the original Aggregate Outstanding Amount of the Notes of such Class on the Closing Date, (B) the amount of principal payments to be made on the Notes of each Class on the related Payment Date, (C) the amount of any Class D Deferred Interest (D) the amount of any Class E Deferred Interest, (E) the amount of Class A Commitments (whether funded or unfunded) which remain outstanding and (E) the amount of Class B Commitments (whether funded or unfunded) which remain outstanding;

(2)    the Interest Distribution Amount, if any, to be paid on related Payment Date in the aggregate and separately for the Class A Notes, the Class B Notes, the Class C Notes, the Class D

Notes and Class E Notes, Class A Commitments and Class B Commitments accrued with respect to the related Payment Date;

(3)    the Administrative Expenses payable on the next Payment Date on an itemized basis;

(4)    the amounts deposited in the Class A CDS Reserve Account and the Class B CDS Reserve Account;

(5)    for the Collection Accounts:

(A)    the Balance on deposit in the Collection Accounts at the end of the related Due Period;

(B)    the amounts payable from the Collection Accounts pursuant to Sections 11.1(a)(A) and 11.1(a)(B) on the next Payment Date; and

(C)    the Balance remaining in the Collection Accounts immediately after all payments and deposits to be made on such Payment Date;

(6)    the Balance on deposit in the Contingent Class A Funding Account, the Class A CDS Reserve Account, the Contingent Class B Funding Account, the Class B CDS Reserve Account, the Custodial Account, the Maturity Date Account, the Specific Proceeds Investment Account and the Credit Swap Issuer Account on such Payment Date;

(7)    the information required under Section 10.6(a) for such Determination Date;

(8)    the Class A Note Interest Rate, the Class B Note Interest Rate, the Class C Note Interest Rate, the Class D Note Interest Rate and the Class E Note Interest Rate, in each case for the Interest Period preceding the next Payment Date;

(9)    the amounts expected to be distributed from the Preference Share Distribution Account to the Holders of the Preference Shares;

(10)    (t) the Applicable Recovery Rate, (u) the Diversity Score (calculated as of the Closing Date), (v) Weighted Average Spread, (x) the Weighted Average Rating Factor (Moody's) and (z) Weighted Average Recovery Rate (Moody's); and

(11)    a list of all Reference Entities with respect to which Credit Event Notices have been delivered during such month and a list of all Cash Settlement Amounts, Recovery Amounts and Final Prices paid during such month in connection with each Reference Entity.

(12)    a list of all Removed Reference Entities effectively removed during such month and the effective date of such removal.

Each Payment Date Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such report in the manner specified, and in accordance with the priorities established in, Section 11.1(a).

The Payment Date Report shall state that it is for informational purposes only; that certain information included in the report is estimated, approximated or projected; and that the report is provided without any representations or warranties as to accuracy or completeness and none of the Issuer, the Co-Issuer, the Collateral Administrator, the Credit Swap Counterparty, the Managers or the Trustee shall have any liability for or arising out of the use of such estimates, approximations or projections.

(c)    <u>Annual Notice to Holders of Interests in Rule 144A Global Notes</u>. On or prior to the Payment Date occurring in December of each year (but not more than 10 Business Days prior to such Payment Date), commencing with the Payment Date occurring in December 2007, the Issuer shall deliver a notice in the form of <u>Exhibit C</u> to <u>Exhibit K</u> to each Agent Member holding a beneficial interest in any Rule 144A Global Note.

(d)    <u>Redemption Date Instructions</u>.   Not less than five (5) Business Days after receiving an Issuer Request requesting information regarding a redemption of the Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall provide the necessary information (to the extent it is available to the Trustee) to the Issuer and the Issuer shall compute the following information and provide such information in a statement (the "<u>Redemption Date Statement</u>") delivered to the Trustee and the Issuer:

(i)    the Aggregate Outstanding Amount of the Notes of the Class or Classes to be redeemed as of such Redemption Date;

(ii)    the amount of accrued interest due on such Notes as of the last day of the Interest Period immediately preceding such Redemption Date; and

(iii)   the amount in the Collection Accounts available for application to the redemption of such Notes.

(e)   The Trustee shall deliver or cause to be delivered to S&P as promptly as possible after the Closing Date the S&P Electronic Default Model Input File and an electronic file containing an amended Schedule of Reference Entities, in each case prepared as of such date (with a copy of such Schedule of the Reference Entities to Moody's), which schedule shall include, with respect to each Underlying Asset, the name of the Reference Entity, the CUSIP number, loan identification number or similar identifier (to the extent available), the S&P Rating, the S&P Priority Category and the Reference Entity Calculation Amount. In addition, the Issuer shall deliver or cause to be delivered to S&P (via email) on the same date as each Monthly Report is delivered, the S&P Electronic Default Model Input File and an electronic file containing an amended Schedule of Reference Entities, in each case prepared as of the date of such Monthly Report; provided, however, that if a Payment Date occurs during the month in which such Monthly Report is delivered, such files shall be prepared as of the Determination Date applicable to such Payment Date and shall be delivered the Business Day prior to such Payment Date.

(f)   If the Trustee shall not have received any accounting provided for in this Section 10.6 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Redemption Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Collateral Administrator on behalf of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be paid as an Administrative Expense pursuant to Section 11.1.

Section 10.7   Custodianship and Release of Collateral.   (a) The Trustee shall hold all Certificated Securities that are not Clearing Corporation Securities and other Underlying Asset existing in physical form at the office of the Custodian. Initially, such Custodian shall be the Bank. Any successor custodian shall be a state or national bank or trust company or an Affiliate of the Issuer, has capital and surplus of at least U.S.$200,000,000 and the Requisite Ratings. All Clearing Corporation Securities shall be held by the Depositary for the account of the Bank, as Trustee.

(b)   The Trustee shall deposit all distributions on (i) the Underlying Asset and any proceeds received from the disposition of the Underlying Asset and any amounts payable to the Issuer by Credit Swap Counterparty under the Credit Swap Agreement, to the extent that such distributions, proceeds or amounts constitute Interest Proceeds from the Underlying Asset, to the Interest Collection Account; and (ii) the Underlying Asset and any proceeds received from the disposition of any Underlying

30775-00052 NY:2469328.3   167

Asset, to the extent that such distributions or proceeds constitute Principal Proceeds from an Underlying Asset, to the Principal Collection Account (unless, in any of the foregoing cases, simultaneously reinvested in Eligible Investments or in the case of Principal Proceeds to make payments to the Credit Swap Counterparty).

(c)     The Trustee shall, upon receipt of an Issuer Order at such time as there are no Notes Outstanding and all obligations of the Co-Issuers hereunder have been satisfied, release the Collateral from the lien of this Indenture.

Section 10.8  Reports by Independent Accountants.  (a) At the Closing Date the Issuer shall appoint a firm of Independent certified public accountants of national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture. Upon any resignation by such firm, the Issuer shall promptly appoint by Issuer Order delivered to the Trustee and each of the Rating Agencies a successor thereto that shall also be a firm of Independent certified public accountants of recognized international reputation. If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee and the Rating Agencies of such failure in writing. If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation. The fees of such Independent certified public accountants and its successor shall be payable by the Issuer, as an Administrative Expense subject to Section 11.1.

(b)     On or before one Business Day prior to each Payment Date, the Issuer shall cause to be delivered to the Trustee, the Credit Swap Counterparty and each of the Rating Agencies a statement from a firm of Independent certified public accountants indicating (i) that such firm has reviewed the Payment Date Report for the upcoming Payment Date and, commencing with respect to the Payment Date occurring in September 2007, any Redemption Date Statements received since the last review and applicable information from the Trustee, (ii) that the calculations within those Payment Date Reports and Redemption Date Statements have been performed in accordance with the applicable provisions of this Indenture, (iii) the Aggregate Principal Amount of the Pledged Underlying Assets as of the immediately preceding Payment Date and (iv) whether the remaining Scheduled Distributions on the Underlying Asset and Eligible Investments constituting Principal Proceeds will be sufficient to pay the principal of the Notes by their Stated Maturity together with interest due thereon at the applicable Note Interest Rate; provided, however, that in the event of a conflict between such firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.8, the determination by such firm of Independent certified public accountants shall be conclusive. In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Issuer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Issuer, and the Trustee makes no independent inquiry or

investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

(c)    Any statement delivered to the Trustee pursuant to clause (b) above shall be delivered by the Trustee to the Shares Paying Agent and to any beneficial holder of a Global Note upon written request therefor, or to any Holder of Notes upon request therefor.

(d)    In addition to the information and reports specifically required to be provided to each of the Rating Agencies pursuant to the terms of this Indenture, the Issuer (at its expense) shall compile and provide to each of the Rating Agencies, all information or reports delivered to the Trustee hereunder, and such additional information as either of the Rating Agencies may from time to time reasonably request and the Issuer shall reasonably determine may be obtained and provided without unreasonable burden or expense. The Issuer or the Trustee, on behalf of the Issuer, shall notify S&P of any amendment, termination or modification of the Operative Agreements or party thereto.

Section 10.9    No Event of Default.  For so long as any Notes are listed on the Irish Stock Exchange and the rules of such exchange so require, on or before the Payment Date occurring in December of each year (commencing with the December 2007 Payment Date), the Issuer shall cause to be delivered to the Trustee a written statement confirming that no Event of Default has occurred during the preceding twelve-month period ending on the Business Day as of which such statement is delivered, or, if an Event of Default has occurred during such period, specifying such default.

Section 10.10  Procedures Relating to the Establishment of Issuer Accounts Controlled by the Trustee.  (a) Notwithstanding anything else contained herein, the Trustee agrees that with respect to each of the Issuer Accounts, it will require each Securities Intermediary establishing such Issuer Accounts to enter into an agreement whereby each such Securities Intermediary agrees that it will (i) comply with orders directing the transfer or redemption of any Financial Assets credited to such Issuer Accounts ("Entitlement Orders") relating to such Issuer Account issued by the Trustee without further consent by the Issuer; (ii) credit all the Underlying Asset or Eligible Investments to the applicable Issuer Account; (iii) treat each item of property credited to such Issuer Account as a Financial Asset subject to Section 10.11(c); (iv) not enter into any agreement with any other Person relating to any Issuer Account pursuant to which agreement it has agreed to comply with Entitlement Orders made by such Person; (v) not accept for credit to any Issuer Account any Underlying Asset or Eligible Investment which is registered in the name of, or payable to the order of, or specially indorsed to, any Person other than the Securities Intermediary unless it has been indorsed to such Securities Intermediary or is indorsed in blank; and (vi) waive any right of set-off unrelated to its fees for such Issuer Account.

(b)     The Issuer Accounts shall remain at all times with the Custodian or with a financial institution having the Requisite Ratings provided such financial institution has executed an agreement as identified in Section 10.11(a).

Section 10.11 <u>Notices to the Noteholders</u>.  (a) Each Monthly Report and each Payment Date Report sent to any Holder or beneficial Holder of a Note shall contain, or be accompanied by, the following notice:

The Notes may be beneficially owned only by Persons that (a)(i) are not U.S. Persons (within the meaning of Regulation S under the United States Securities Act of 1933, as amended (the "Securities Act")) or U.S. Residents (within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act")) and (ii) are U.S. Persons or U.S. Residents that are also (x) qualified purchasers (for purposes of Section 3(c)(7) of the Investment Company Act), and (y) qualified institutional buyers within the meaning of Rule 144A under the Securities Act (or, solely in the case of Holders of a Certificated Class C Note, a Certificated Class D Note or a Certificated Class E Note, either qualified institutional buyers within the meaning of Rule 144A under the Securities Act or "accredited investors" within the meaning of Rule 501(a) of Regulation D under the Securities Act) and (b) can make the representations set forth in Section 2.5(j), (k), (l) or (m), as applicable, of this Indenture and the legends of the applicable Notes.  Beneficial ownership interest in the Rule 144A Global Notes or Certificated Notes may be transferred only to a Person that, in the case of a transfer of Certificated Class A Notes meets the qualifications set forth in clause (a)(i) or (a)(ii) of the preceding sentence or, in the case of a transfer of Rule 144A Global Notes, Certificated Class C Notes, Certificated Class D Notes or Certificated Class E Notes, meets the qualifications set forth in clause (a)(ii) of the preceding sentence (or (a)(i) in the case of a Certificated Note) and, in each case, as applicable, that can make the representations referred to in clause (b) of the preceding sentence.  The Issuer has the right to compel any beneficial Holder of an interest in Rule 144A Global Notes or any Holder of a Certificated Note that does not meet the qualifications set forth in such clauses to sell its interest in such Notes, or may sell such interest on behalf of such owner, pursuant to Section 2.12 of this Indenture.

(b)     The Issuer shall deliver the Payment Date Report with respect to the Payment Date occurring in December of each year, commencing in December 2007, containing the foregoing notice (the "<u>Annual Report</u>") to each Agent Member appearing on the DTC List and shall request that such Agent Members deliver a copy of the Annual Report to each beneficial Holder of the Notes.

<div align="center">

**ARTICLE XI**

**APPLICATION OF MONIES**

</div>

Section 11.1 <u>Disbursements of Monies from Payment Account</u>.    (a) Notwithstanding any other provision in this Indenture, but subject to the other

subsections of this <u>Section 11.1</u> and <u>Section 13.1</u>, on each Payment Date, the Trustee shall disburse amounts transferred to the Payment Account from the Interest Collection Account and to the extent permitted hereunder, from the Principal Collection Account pursuant to <u>Section 10.2</u>, <u>Section 10.4</u>, in accordance with the following priorities (collectively, the "<u>Priority of Payments</u>"):

(A)    On each Payment Date, Interest Proceeds received during the related Due Period shall be applied as follows:

(i)    to the payment of taxes and registration and filing fees, if any, of the Co-Issuers;

(ii)    to the Administrative Expenses due and payable (if any) to the following parties in the following order: <u>first</u>, the Trustee pursuant to the Indenture; <u>second</u>, the Collateral Administrator pursuant to the Collateral Administration Agreement; <u>third</u>, the Class A Note Agent pursuant to the Class A Note Purchase Agreement; <u>fourth</u>, the Class B Note Agent pursuant to the Class B Note Purchase Agreement; and <u>fifth</u>, the Shares Paying Agent pursuant to the Shares Paying Agency Agreement, in each case, including any payments made in the period between Payment Dates, in an aggregate principal amount not to exceed the Administrative Expense Cap;

(iii)    to the payment or reimbursement of the accrued and unpaid fees and expenses of the Issuer in the order set forth in the definition of Administrative Expenses, in an amount up to the excess of (a) the Administrative Expense Cap, over (b) the amount paid pursuant to subclause (ii) of this <u>Section 11.1(A)</u> above (including any payments made in the period between Payment Dates);

(iv)    to the payment <u>pro rata</u> of (x) accrued and unpaid interest on the Class A Notes (including Defaulted Interest on the Class A Notes, if any, and interest on any such Defaulted Interest) in accordance with amounts then due and payable and (y) the Class A Commitment Fee and any interest on any Class A Commitment Fee that was not paid on prior Payment Dates;

(v)    to the payment, <u>pro rata</u> of (x) of accrued and unpaid interest on the Class B Notes (including Defaulted Interest on the Class B Notes, if any, and interest on any such Defaulted Interest) in accordance with amounts

then due and payable and (y) the Class B Commitment Fee and any interest accrued on any Class B Commitment Fee which was not paid on prior Payment Dates;

(vi)    [Reserved]

(vii)    to the payment of accrued and unpaid interest on the Class C Notes (including Defaulted Interest on the Class C Notes, if any, and interest on any such Defaulted Interest);

(viii)    [Reserved]

(ix)    if either of the Class C Coverage Tests is not satisfied on the related Determination Date, to the payment of principal (in whole or in part) of, first, to the payment of principal of the Class B Notes *pro rata* in accordance with the funded outstanding principal balance of the Class B Notes until the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class B Notes is reduced to zero), second, *pro rata*, in accordance with the unfunded Class B Commitments to make a deposit to the Class B CDS Reserve Account in an amount such that the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class B Commitments to zero) and third, to pay the principal of the Class C Notes in an amount such that the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the funded outstanding principal of the Class C Notes to zero);

(x)    to the payment of accrued and unpaid interest on the Class D Notes (including Defaulted Interest on the Class D Notes, if any, interest on any such Defaulted Interest and accrued and unpaid interest on Class D Deferred Interest, but excluding any such Class D Deferred Interest);

(xi)    to the payment of accrued and unpaid Class D Deferred Interest, if any;

(xii)    if either Class D Coverage Test is not satisfied on the related Determination Date, 100% of the

remaining Interest Proceeds to the payment of principal of
the Class D Notes to the extent necessary to cause each
such Class D Coverage Test to be satisfied, or until the
Class D Notes have been paid in full, whichever is the first
to occur;

(xiii)    to the payment of accrued and unpaid
interest on the Class E Notes (including Defaulted Interest
on the Class E Notes, if any, interest on any such Defaulted
Interest and accrued and unpaid interest on Class E
Deferred Interest, but excluding any such Class E Deferred
Interest);

(xiv)    to the payment of accrued and unpaid Class
E Deferred Interest, if any;

(xv)    if either Class E Coverage Test is not
satisfied on the related Determination Date, 100% of the
remaining Interest Proceeds to the payment of principal of
the Class E Notes to the extent necessary to cause each
such Class E Coverage Test to be satisfied, or until the
Class E Notes have been paid in full, whichever is the first
to occur;

(xvi)    to    the    payment    of    any    remaining
Administrative Expenses of the Co-Issuers (without regard
to the Administrative Expense Cap), in the order and to the
extent not paid under subclause (i), (ii) or (iii) above as a
result of the Administrative Expense Cap or otherwise;

(xvii)    all remaining Interest Proceeds for deposit to
the Preference Share Distribution Account for distribution
to the Holders of the Preference Shares, as a dividend
allocated thereon or as a final distribution in redemption
thereof, as applicable.

(B)    On each Payment Date and upon an acceleration
following an Event of Default, Principal Proceeds shall be applied
in the following order of priority:

(i)    first, to pay the Credit Swap Counterparty
any Cash Settlement Amounts owed by the Issuer (if any)
under the Credit Swap Agreement on the Scheduled
Termination Date, second, on or after the Maturity Date, to
make a deposit of the Maturity Date Amount into the

Maturity Date Account (to the extent that Principal Proceeds are not sufficient to make deposits into the Maturity Date Account, such deposits will be made in accordance with Section 10.4(h)) and third, unless the Credit Swap Counterparty is the sole affected party or a party causing the Event of Default (the "Defaulting Party"), to pay any termination payments owed to Credit Swap Counterparty;

(ii)    to the payment of the amounts specified in subclauses (i) through (iv) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(iii)    first, to the payment of principal of the Class A Notes until the funded outstanding principal balance of the Class A Notes has been paid in full and second, to make a deposit to the Class A CDS Reserve Account to reduce the Class A Commitments to zero;

(iv)    to the payment of the amounts specified in subclauses (v), (vii) and (ix) of clause (A) above (and in the same manner and order of priority, but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder);

(v)    if the Notes are to be redeemed on such Payment Date in connection with a Withholding Tax Event or an Optional Redemption, to the payment of the Total Redemption Amount (as defined herein), including the Redemption Price (without duplication of any payments received by any Class of Notes pursuant to clause (A) above or subclauses (i), (ii), (iii) and (iv) of this clause (B)) payable with respect to each Class of Notes, or (b) on any Payment Date on or after the Notes have been paid in full, if the Preference Shares are to be redeemed on such Payment Date in connection with an Optional Redemption, the remaining funds after payment of all amounts payable prior to the Preference Shares in accordance with the Priority of Payments will be deposited to the Preference Share Distribution Account for distribution to the Holders of the Preference Shares in redemption thereof;

(vi)     to the payment of the amounts specified in subclause (x) of clause (A) above, but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(vii)     to the payment of the amounts specified in subclause (xiii) of Clause (A) above, but only to the extent not paid in full after application of Interest Proceeds thereunder;

(viii)     <u>first</u>, to the payment of principal of the Class B Notes until the funded outstanding principal balance of the Class B Notes have been paid in full and <u>second</u>, to make a deposit to the Class B CDS Reserve Account up to the amount sufficient to reduce the Class B Commitments to zero;

(ix)     [Reserved]

(x)     to the payment of principal of the Class C Notes until the Aggregate Outstanding Amount of the Class C Notes has been reduced to zero;

(xi)     to the payment of the amounts specified in subclause (xi) of Clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(xii)     to the payment of principal of the Class D Notes until the Aggregate Outstanding Amount of the Class D Notes has been reduced to zero;

(xiii)     to the payment of the amounts specified in subclause (xiv) of Clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;

(xiv)     to the payment of principal of the Class E Notes until the Aggregate Outstanding Amount of the Class E Notes has been reduced to zero;

(xv)     <u>first</u>, to the payment of the amounts specified in subclause (xvi) of clause (A) above, but only to

the extent not paid in full after the application of Interest Proceeds provided for thereunder; and second, to the payment of any termination payments to the Credit Swap Counterparty if it is the sole affected party or a Defaulting Party; and

(xvi) all remaining Principal Proceeds for deposit to the Preference Share Distribution Account for distribution to the Holders of the Preference Shares allocated as a dividend thereon or as a final distribution in redemption thereof, as applicable.

For the avoidance of doubt, no Principal Proceeds will be applied to any Class of Notes in accordance with the Priority of Payments on any Payment Date if, after giving effect to such payment, any Overcollateralization Ratio Test of a more senior Class of Notes would have failed.

(C) On the Maturity Date, after calculation of the Maturity Date Amount, in order to determine which Classes of Notes have a Deferred Maturity Date, the following comparison is required where Principal Proceeds are applied: (X) assuming that the Maturity Date Amount is equal to the actual Maturity Date Amount, and (Y) assuming that the Maturity Date Amount is equal to zero. After a comparison of (X) and (Y), to the extent that certain Classes of Notes would remain due and unpaid under scenario (X) but would be paid in full or to a greater extent under scenario (Y), such Classes of Notes shall have a Deferred Maturity Date. The Deferred Maturity Date shall only apply to the portion of the principal balance that would be paid under scenario (Y) but would not be paid under scenario (X).

(D) On the Deferred Maturity Date, any remaining amounts in the Maturity Date Account, will be applied in the following order:

(i) to pay any amounts owed to the Credit Swap Counterparty to the extent not paid under subclause (i) of clause (B) above;

(ii) to pay interest and principal on any Class of Notes in order of seniority but only to the extent not paid in full after the application of Principal Proceeds under subclauses (ii), (iii), (iv), (vi), (vii), (ix), (x), (xi) (xii), (xiii) and (xvi), of clause (B) above;

(iii)    to the payment of the amounts specified in subclauses (xv) of clause (B) above (and in the same manner and order of priority); and

(iv)    all remaining amounts for deposit to the Maturity Date Account for distribution to the Holders of the Preference Shares allocated as a final distribution in redemption thereof.

Section 11.2    Trust Accounts. All Monies held by, or deposited with, the Trustee in the Collection Accounts or the Payment Account pursuant to the provisions of this Indenture and not invested in the Underlying Asset or Eligible Investments as herein provided, shall be deposited with the trust department of a financial institution with a combined capital and surplus of at least U.S.$200,000,000, to be held in trust for the benefit of the Secured Parties, and who possesses the Requisite Ratings, provided, that any successor to such financial institution with which Monies are deposited by the Trustee shall also have the Requisite Ratings (unless a Rating Agency Confirmation has been obtained with respect to any financial institution whose ratings are lower), and to the extent Monies deposited in a trust account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to the insurance functions thereof, and are not fully collateralized by direct obligations of the United States of America, such excess shall be invested in Eligible Investments as directed by the Issuer.

## ARTICLE XII

## [RESERVED]

## ARTICLE XIII

## NOTEHOLDERS' RELATIONS

Section 13.1    Subordination. (a) Anything in this Indenture or the Notes to the contrary notwithstanding, the Co-Issuers and the Holders of the Class B Notes agree for the benefit of the Holders of the Class A Notes that the rights of the Holders of the Class B Notes to payment by the Co-Issuers and in and to the Collateral, including any payment from the Proceeds of Collateral, shall be subordinate and junior to the Class A Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided. If any Event of Default (other than an Event of Default arising pursuant to Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee with respect to, as applicable, the Class A Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class B Notes. The Holders of the

30775-00052 NY:2469328.3    177

Class B Notes agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class B Notes or hereunder prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of principal of and interest (if any) on the Class A Notes.

(b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Co-Issuers and the Holders of the Class C Notes agree for the benefit of the Holders of the Class A Notes and Class B Notes that the rights of the Holders of the Class C Notes to payment by the Co-Issuers and in and to the Collateral including any payment from the Proceeds of Collateral, shall be subordinate and junior to the Class A Notes and Class B Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided. If any Event of Default (other than an Event of Default arising pursuant to Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee with respect to, as applicable, the Class A Notes and Class B Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class C Notes. The Holders of the Class C Notes agree, for the benefit of the Holders of the Class A Notes and Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class C Notes or hereunder prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of principal of and interest (if any) on the Class A Notes and Class B Notes.

(c)   . Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D Notes agree for the benefit of the Holders of the Class A Notes, Class B Notes and Class C Notes that the rights of the Holders of the Class D Notes to payment by the Issuer and in and to the Collateral, including any payment from Proceeds of Collateral, shall be subordinate and junior to the Class A Notes, Class B Notes and Class C Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided. If any Event of Default (other than an Event of Default arising pursuant to Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee (if any) with respect to, as applicable, the Class A Notes, Class B Notes and Class C Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class D Notes. The Holders of the Class D Notes agree, for the benefit of the Holders of the Class A Notes, Class B Notes and Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class D Notes or hereunder prior to the date which is one year and one day (or, if longer, the applicable

preference period) after the payment in full of principal of and interest on the Class A Notes, Class B Notes and Class C Notes.

(d)    Anything in this Indenture or the Notes to the contrary notwithstanding, the Issuer and the Holders of the Class E Notes agree for the benefit of the Holders of the Class A Notes, Class B Notes, Class C Notes and Class D Notes that the rights of the Holders of the Class E Notes to payment by the Issuer and in and to the Collateral, including any payment from Proceeds of Collateral, shall be subordinate and junior to the Class A Notes, Class B Notes, Class C Notes and Class D Notes, to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1 and hereinafter provided. If any Event of Default (other than an Event of Default arising pursuant to Section 5.1(d)) has occurred and has not been cured or waived and acceleration occurs in accordance with Article V or if a Payment Default has occurred and has not been cured or waived including as a result of an Event of Default specified in Section 5.1(g) or (h), principal of and interest on and commitment fee (if any) with respect to, as applicable, the Class A Notes, Class B Notes, Class C Notes and Class D Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class E Notes. The Holders of the Class E Notes agree, for the benefit of the Holders of the Class A Notes, Class B Notes, Class C Notes and Class D Notes, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due under the Class E Notes or hereunder prior to the date which is one year and one day (or, if longer, the applicable preference period) after the payment in full of principal of and interest on the Class A Notes, Class B Notes, Class C Notes and Class D Notes.

(e)    In the event that notwithstanding the provisions of this Indenture, any Holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of this Indenture, then, unless and until any of (v) the Class A Notes, (w) the Class B Notes, (x) the Class C Notes, (y) the Class D Notes or (z) the Class E Notes, as the case may be, shall have been paid in full in Cash in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Noteholders, in accordance with this Indenture; provided, however, that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(f)    The Issuer agrees with all Holders of Notes that the Issuer shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including this Section 13.1. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

Section 13.2   Standard of Conduct.   In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including Section 5.9, a Noteholder or Noteholders shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Noteholder, the Co-Issuers, or any other Person, except for any liability to which such Noteholder may be subject to the extent the same results from such Noteholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

## ARTICLE XIV

## MISCELLANEOUS

Section 14.1   Form of Documents Delivered to Trustee.   (a) In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(b)    Any certificate of an Authorized Officer of the Issuer or the Co-Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of the Issuer or the Co-Issuer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate of, or representations by, the Issuer, the Co-Issuer, or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer or such other Person, unless such Authorized Officer of the Issuer or the Co-Issuer or such counsel knows that the certificate or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate of, or representations by, an Authorized Officer of the Issuer or the Co-Issuer, stating that the information with respect to such matters is in the possession of the Issuer or the Co-Issuer, unless such counsel knows that the certificate or representations with respect to such matters are erroneous.

(c)    Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other

instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

(d)    Whenever in this Indenture it is <u>provided</u> that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer or the Co-Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Issuer's or the Co-Issuer's rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have knowledge of the occurrence and continuation of such Default or Event of Default as provided in <u>Section 6.1(d)</u>.

Section 14.2    <u>Acts of Noteholders</u>.    (a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of Notes or Preference Shares may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders or Holders of Preference Shares in person or by an agent duly appointed in writing, and, except as herein otherwise expressly <u>provided</u>, such action shall become effective when such instrument or instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Shares Paying Agent, in the case of the Holders of the Preference Shares), and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders or Holders of Preference Shares signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Co-Issuers, if made in the manner provided in this <u>Section 14.2</u>.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register and the number of Preference Shares and registered numbers of Preference Shares shall be proved by consultation with the Shares Paying Agent with respect to the information contained on the Share Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes or Preference Shares shall bind the Holder (and any transferee thereof) of such Note or Preference Share and of every Note or Preference Share issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee, or the Co-Issuers in reliance thereon, whether or not notation of such action is made upon such Note or Preference Share.

Section 14.3  Notices.  Except as otherwise expressly provided herein, any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with any of the parties indicated below shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery or by telecopy in legible form at the following addresses:

(a)  to the Trustee at U.S. Bank National Association, Corporate Trust Services, One Federal Street, Boston, MA 02110, Attention: Pebble Creek LCDO 2007-3, Ltd., or at any other address previously furnished in writing by the Trustee, telephone no. (617) 603-6500/6517;

(b)  to the Issuer c/o Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, telephone no. (345) 945-7100, Attention:  Directors, or at any other address previously furnished in writing by the Issuer with a copy to Maples and Calder, P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 949-8080, Attn:  Dale Crowley;

(c)  to the Co-Issuer at 850 Library Avenue, Suite 204, Newark, Delaware 19711, Attention: Donald J. Puglisi, or at any other address previously furnished in writing by the Co-Issuer;

(d)  to the Credit Swap Counterparty at Lehman Brothers Special Financing Inc., Transaction Management Group., 745 Seventh Avenue, New York, New York 10019, telephone no. (212) 526-7187, Attention: Erez Biala/Patrick Frayne, telecopy no. (212) 526-7672 or at any other address previously furnished in writing by the Credit Swap Counterparty;

(e)  to Moody's at Moody's Investors Service, 99 Church Street, New York, New York 10007, telecopy No. (212) 553-0355, Attention: Structured Finance Group, CBO/CLO Monitoring – Pebble Creek LCDO 2007-3, Ltd., or at any other address previously furnished in writing by Moody's (and with a copy via e-mail to "cdomonitoring@moodys.com"); and

(f)  to S&P at Standard & Poor's Ratings Services, 55 Water Street, 41st Floor, New York, New York 10041-0003, telephone No. 212-438-2506, facsimile No. 212-438-2664, Attention: Structured Finance Ratings, Asset-Backed Securities CBO/CLO Surveillance (and with a copy via e-mail to "cdo_surveillance@sandp.com").

Notwithstanding any provision to the contrary contained herein or in any agreement or instrument related hereto, any report, statement or other information required to be provided by the Trustee may be provided by providing access to the Trustee's website containing such information.

Section 14.4    <u>Notices to Holders; Waiver</u>.  Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of Notes or the Shares Paying Agent (for delivery to the Holders of the Preference Shares) of any event,

(a)    such notice shall be sufficiently given to Holders of Notes or the Shares Paying Agent if in writing and mailed, first-class postage prepaid, to each Holder of a Note and the Shares Paying Agent affected by such event, at the address of such Holder as it appears in the Note Register or at the address of the Shares Paying Agent supplied by the Shares Paying Agent to the Trustee, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such notice; and

(b)    such notice shall be in the English language.

Such notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Holders of the Notes any information or notice requested to be so delivered by at least 25% of the Holders of any Class of Notes and will deliver to the Shares Paying Agent any information or notice which the Shares Paying Agent certifies was requested to be so delivered by at least 25% of the Holders of the Preference Shares.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Note or the Shares Paying Agent shall affect the sufficiency of such notice with respect to other Holders of Notes or Preference Shares.  In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification to Holders of Notes or the Shares Paying Agent as shall be made with the approval of the Trustee shall constitute a sufficient notification to such Holders or the Shares Paying Agent for every purpose hereunder.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders or the Shares Paying Agent shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

If and for so long as any Class of Notes is listed on the Irish Stock Exchange and the rules of such exchange so require, notices to the Holders thereof shall also be given to the Company Announcements Office.

Section 14.5    <u>Effect of Headings and Table of Contents</u>.  The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 14.6    <u>Successors and Assigns</u>.  All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7    <u>Severability</u>.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8    <u>Benefits of Indenture</u>.  Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person (other than the Shares Paying Agent and the Holders of the Preference Shares, who shall be express third party beneficiaries of this Indenture), other than the parties hereto and their successors hereunder, the Credit Swap Counterparty and the Noteholders any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9    <u>Governing Law</u>.  THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 14.10    <u>Submission to Jurisdiction</u>.  THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE NOTES OR THIS INDENTURE, AND THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH FEDERAL OR NEW YORK STATE COURT.  THE CO-ISSUERS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.  THE CO-ISSUERS AND THE TRUSTEE IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO IT AT THE OFFICE OF THE ISSUER'S AGENT SET FORTH IN SECTION 7.4.  THE CO-ISSUERS AND THE TRUSTEE AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

Section 14.11    <u>Counterparts</u>.  This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 14.12 <u>Waiver of Jury Trial</u>.   THE TRUSTEE, THE NOTEHOLDERS AND EACH ISSUER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS INDENTURE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE PARTIES HERETO. EACH OF THE CO-ISSUERS, THE TRUSTEE, AND THE NOTEHOLDERS ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR SUCH PARTIES ENTERING INTO THIS INDENTURE.

Section 14.13 <u>Limited Recourse</u>.   Notwithstanding anything in this Indenture to the contrary, all amounts owed by the Issuer on, under or in respect of its obligations and liabilities under this Indenture shall be recoverable only from and to the extent of the Collateral in accordance with <u>Section 11.1</u> hereof and upon final realization of the Proceeds in accordance with <u>Section 11.1</u> hereof, the Issuer shall have no further liability and all claims in respect of any amounts owed but still unpaid shall be extinguished.  This <u>Section 14.13</u> shall survive the termination of this Indenture for any reason.

Section 14.14 <u>Liability of Co-Issuers</u>.   Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, inter alia, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other of the Co-Issuers.  In particular, neither of the Co-Issuers shall be entitled to or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers or shall have any claim in respect of any assets of the other of the Co-Issuers.

30775-00052 NY:2469328.3      185

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

PEBBLE CREEK LCDO 2007-3, LTD.,
  as Issuer

By: _____
    Name: Dianne Scott
    Title:  Director


PEBBLE CREEK LCDO 2007-3, LLC,
  as Co-Issuer

By: _____
    Name:
    Title:


U.S. BANK NATIONAL ASSOCIATION
  as Trustee

By: _____
    Name:
    Title:

Indenture – Pebble Creek 2007-3

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

PEBBLE CREEK LCDO 2007-3, LTD.,
as Issuer

By:_____
    Name:
    Title:

PEBBLE CREEK LCDO 2007-3, LLC,
as Co-Issuer

By:_____
    Name: Donald J. Puglisi
    Title: President

U.S. BANK NATIONAL ASSOCIATION
as Trustee

By:_____
    Name:
    Title:

Indenture — Pebble Creek 2007-3

IN WITNESS WHEREOF, we have set our hands as of the date first written above.

PEBBLE CREEK LCDO 2007-3, LTD.,
as Issuer

By:_____
    Name:
    Title:

PEBBLE CREEK LCDO 2007-3, LLC,
as Co-Issuer

By:_____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION
as Trustee

By: _____
    Name:  Donald F. Higgins
    Title:  Assistant Vice President

Indenture – Pebble Creek 2007-3