K&L GATES LLP  
John A. Bicks, Esq.  
Eunice Rim Hudson, Esq.  
599 Lexington Avenue  
New York, NY 10022  
(212) 536-3900  

Hearing Date: March 28, 2013 at 10:00 a.m. (Eastern)

*Attorneys for Tobacco Settlement Financing Corporation*

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
------------------------------------------------------------------x  
                                                                  :  
In re                                                             :    Chapter 11  
                                                                  :  
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                          :    Case No. 08-13555 (JMP)  
                                                                  :  
                                                                  :    (Jointly Administered)  
                        Debtors.                                  :  
                                                                  :  
------------------------------------------------------------------x  

### RESPONSE OF TOBACCO SETTLEMENT FINANCING CORPORATION TO DEBTORS' THREE HUNDRED NINETY-FOURTH OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)

Tobacco Settlement Financing Corporation ("TSFC"), by and through its undersigned counsel, K&L Gates LLP, hereby files this response (the "Response") to the Debtors' Three Hundred Ninety-Fourth Omnibus Objection to Claims (Valued Derivative Claims) filed on February 15, 2013 (Docket No. 34728) (the "Objection"), and in support thereof respectfully states as follows:

### INTRODUCTION

1. In the Objection, the above-captioned debtors (the "Debtors") seek to reduce each of TSFC's two proofs of claim from $135,085,150.43 to $19,376,731 (i.e. less than 15 percent of each claim's asserted amount) because the "amounts listed on the proofs of claim are greater than the fair, accurate, and reasonable values determined by the Plan Administrator after a

NY-1034352 v3

review of the claimant's supporting documentation and LBHI's and Lehman Brothers Special Financing Inc.'s books and records." See Objection ¶¶ 2, 14.

2.  The Debtors do not dispute that TSFC timely submitted its two proofs of claim, and related derivatives and guaranty questionnaires (collectively, the "Questionnaires"), before the bar dates established by this Court. Each of TSFC's proofs of claim set forth its aggregate loss of $135,085,150.43 under two reserve fund agreements with Lehman Brothers Special Financing Inc. ("LBSF"), the payment of which was unconditionally guaranteed by Lehman Brothers Holdings Inc. ("LBHI"; together with LBSF, "Lehman"). As a part of the Questionnaires associated with its claims, TSFC attached a detailed memorandum (the "SFG Memo") prepared by its financial advisor, SWAP Financial Group, LLC ("SFG") setting forth: (i) SFG's inability to obtain market quotations; (ii) SFG's use of loss methodology to value its claims against Lehman; and (iii) SFG's calculation of TSFC's losses under the reserve fund agreements. These calculations of the termination amounts owing to TSFC under the reserve fund agreements are "conclusive and binding" absent "manifest error." See June 2003 RFA § I and Dec. 2003 RFA § I (defined below).

3.  By contrast, in the Objection, Lehman has wholly failed to disclose the valuation methodology it used to support the suggested reduction of TSFC's asserted claim amounts by more than $115 million, let alone to demonstrate why TSFC's calculations of the termination amounts owed to it under the reserve fund agreements were in manifest error. Instead, in a footnote, the Objection refers to the *Declaration of Gary H. Mandelblatt in Support of Debtors' Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form* (Docket No. 4113) (the

"Mandelblatt Declaration") dated June 23, 2009, for a "comprehensive" discussion of the Debtors' valuation process. See Objection n.2. The Mandelbatt Declaration, however, is not at all instructive with respect to how Lehman actually valued TSFC's claims or arrived at the substantially reduced amounts for those claims that Lehman seeks in its Objection.

4.  Rather than set forth the details of the Debtors' valuation methodologies, the Mandelblatt Declaration merely sets forth a six-step process by which the Debtors unwind and settle derivatives contracts generally. Specifically, the Mandelblatt Declaration indicates that the Debtors "must value the Transactions, on the same date as the particular counterparty's Transactions were terminated and determine whether the Debtors' valuation matches the counterparty's valuation" and that "[s]uch valuation methods include obtaining market quotations, or using a 'loss' calculation." See Mandelblatt Decl. at ¶ 30. The Objection makes clear that the plan administrator relies completely on this "multi-step process to review claims filed against LBHI and LBSF and based on a Derivative Contract . . . in order to determine the fair, accurate and reasonable value of such claims, and proper classification of such claims, for purposes of settlement." See Objection ¶ 15.

5.  This multi-step process purportedly culminates with Lehman "[engaging] in, to the extent the holder is willing to so engage, lengthy negotiations with the holder of the Derivative Claim that are often very detailed and may extend over a period of months." See id.; see also, Mandelblatt Decl. at ¶¶ 18, 34 and Ex. A to the Mandleblatt Declaration. In the Objection, Lehman represents that despite "undertaking this lengthy process with respect to each of the Valued Derivatives Claims" and "[d]espite the Plan Administrator's efforts at negotiating the Proposed Settlement Amount, the Plan Administrator and the holders of the Valued Derivatives Claims have reached an impasse." See Objection ¶ 16. The Debtors may have

undertaken these steps with respect to other Valued Derivatives Claims, but no such negotiations or discussions took place with TSFC.

6. TSFC has at all times been willing and able to participate in settlement discussions with the Debtors in an effort to consensually resolve TSFC's claims, but despite initiating discovery with TSFC and its financial advisor almost two years ago, in which thousands of pages of documents were produced by both TSFC and its financial advisor to Lehman, the Debtors have never reached out to TSFC to initiate settlement discussions regarding the value of TSFC's claims or to negotiate any proposed termination amounts owing to TSFC under the reserve fund agreements. Instead, Lehman chose to file a vague and conclusory Objection which fails to set forth any support for its proposed substantial reductions of TSFC's claims.

7. Lehman has failed to meet its burden of introducing substantial evidence in opposition to TSFC's claims, which are *prima facie* valid and supported by TSFC's disclosed and detailed methodology. Moreover, TSFC's determination of the termination amounts owed to it under the reserve fund agreements are "conclusive and binding" on the parties absent manifest error. Thus, TSFC respectfully submits that the Objection must be overruled.

## BACKGROUND

### A.    TSFC's Reserve Fund Agreements with Lehman

8. Prior to the Rejection Date (defined below), TSFC, LBSF and Bank of New York ("BONY"), as trustee (the "Trustee"), were parties to that certain: (i) Reserve Fund Agreement dated as of June 19, 2003 (the "June 2003 RFA"); and (ii) Reserve Fund Agreement dated as of December 2, 2003 (the "Dec. 2003 RFA"; together with the June 2003 RFA, the "RFAs").[1]  See

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings attributable to them in the RFAs.

*Declaration of Alejandro J. Valella in Support of the Response of Tobacco Settlement Financing Corporation to the Debtors' Three Hundred Ninety-Fourth Omnibus Objection to Claims (Valued Derivative Claims)* (the "Valella Decl.")[2] at ¶¶ 6,7.  Prior to their rejection, both RFAs were scheduled to terminate one business day before June 1, 2023.  See Valella Decl. at ¶ 8.

9. The RFAs served as investment vehicles through which TSFC invested certain reserve funds (the "Reserve Funds") that served as a source of backup payment for debt service owed on tobacco settlement bonds issued by the TSFC in 2003.  See Valella Decl. at ¶ 5; *Declaration of Peter Shapiro in Support of Response of Tobacco Settlement Financing Corporation to Debtors' Three Hundred Ninety-Fourth Omnibus Objection to Claims (Valued Derivatives Claims)* (the "Shapiro Decl.")[3] at ¶ 7.  In broad terms, the RFAs enabled TSFC to invest the Reserve Funds by purchasing qualifying securities (the "Qualified Securities") from LBSF at purchase prices that are set to ensure that TSFC receives a 3.722% (the "June 2003 RFA Guaranteed Rate") guaranteed annual rate of return on its investments under the June 2003 RFA and a 4.687% (the "Dec. 2003 RFA Guaranteed Rate"; together with the June 2003 RFA Guaranteed Rate, the "Guaranteed Rates") guaranteed annual rate of return on its investments under the Dec. 2003 RFA.  See Valella Decl. at ¶ 9; Shapiro Decl. at ¶ 7.

10. Under the terms of the June 2003 RFA, LBSF would cause certain qualified dealers (each a "Qualified Dealer") to deliver certain Qualified Securities to the Trustee on certain set deposit dates (the "Deposit Dates"), following which the Trustee would immediately purchase such Qualified Securities by paying the Qualified Dealer an aggregate purchase price that was as close as possible to, but did not exceed, $170,669,179.00 (the "June 2003 Scheduled

---

[2] A copy of the Valella Declaration has been filed simultaneously with this Response.

[3] A copy of the Shapiro Declaration has been filed simultaneously with this Response.

Reserve Amount"). See Valella Decl. at ¶ 10. When such Qualified Securities matured, LBSF would again be required to cause Qualified Securities to be delivered to the Trustee on the next Deposit Date for a similar aggregate purchase price. Id. In exchange for the periodic purchase of Qualified Securities, LBSF was required to guarantee a rate of return to TSFC on the June 2003 Scheduled Reserve Amount equal to the June 2003 RFA Guaranteed Rate. Id.

11. Under the terms of the Dec. 2003 RFA, LBSF would cause a Qualified Dealer to deliver certain Qualified Securities to the Trustee on certain Deposit Dates, following which the Trustee would immediately purchase such Qualified Securities by paying the Qualified Dealer an aggregate purchase price that was as close as possible to, but did not exceed, $221,582,343.75 (the "Dec. 2003 Scheduled Reserve Amount"). See Valella Decl. at ¶ 11. When such Qualified Securities matured, LBSF would again be required to cause Qualified Securities to be delivered to the Trustee on the next Deposit Date for a similar aggregate purchase price. Id. In exchange for the periodic purchase of securities, LBSF was required to guarantee a rate of return to TSFC on the Dec. 2003 Scheduled Reserve Amount equal to the Dec. 2003 RFA Guaranteed Rate. Id.

12. LBHI unconditionally guaranteed the payment of all amounts owing by LBSF to TSFC under both RFAs. See Valella Decl. at ¶ 12; Shapiro Decl. ¶ 9.

### B. Lehman's Defaults Under the RFAs

13. Pursuant to Section 7.3(a) of both RFAs, a "Lehman Event of Default" occurs if LBSF fails to cause a Qualified Dealer to deliver Qualified Securities (a "Failure to Deliver") to the Trustee on any Deposit Date and such Failure to Deliver is not cured within five business days (the "Lehman Cure Period") after written notice of such Failure to Deliver is given to LBSF. See Valella Decl. at ¶ 13; Shapiro Decl. at ¶ 12.

14. LBSF failed to deliver Qualified Securities to the Trustee on November 28, 2008 and May 29, 2009 (the "Missed Delivery Dates") and each of these Failures to Deliver continued beyond the applicable Lehman Cure Period. See Valella Decl. at ¶ 15, 23; Shapiro Decl. ¶ 14.

15. Moreover, pursuant to the RFAs, additional Lehman Events of Default occur if: (i) either LBSF or LBHI becomes insolvent by, among other things, filing for bankruptcy, or (ii) LBHI's credit rating drops below "BBB-" or "Baa3" by S&P or Moody's, respectively (a "Credit Downgrade Default"). See Valella Decl. at ¶ 16; Shapiro Decl. ¶13.

16. If LBSF's defaulted due to Lehman's insolvency or a Credit Downgrade Default, TSFC could immediately terminate the RFAs by giving notice to Lehman, with a copy to the Trustee, and LBSF was required to promptly pay the Termination Amount owing under each RFA to TSFC. See Valella Decl. at ¶ 17.

17. On and after September 15, 2008, LBHI and certain of its subsidiaries filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

18. LBSF filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 3, 2008.

19. LBSF also failed to notify TSFC that, on or about September 15, 2008, the long term credit rating of LBHI had been downgraded below the minimum rating required under the RFAs by both S&P and Moody's. See Valella Decl. at ¶ 20.

**C.    The Replacement Securities**

20. Upon LBSF's failure to deliver Qualifying Securities, on November 28, 2008 and May 29, 2009, TSFC instructed the Trustee to invest the Reserve Funds in replacement securities (the "Replacement Securities") pursuant to the provisions of the RFAs. See Valella Decl. at

¶ 21.

21. The Replacement Securities for the June 2003 RFA had an annual yield of 3.125%, which was lower than the 3.722% June 2003 RFA Guaranteed Rate. Similarly, the Replacement Securities for the Dec. 2003 RFA had an annual yield of 3.125%, which was lower than the 4.687% Dec. 2003 RFA Guaranteed Rate. See Shapiro Decl. at ¶ 24.

22. As a result of LBSF's non-performance on the Missed Delivery Dates, TSFC lost $688,458.25 under both RFAs between December 2008 (following the Failure to Deliver on the first Missed Delivery Date) through the Rejection Date. See Shapiro Decl. at ¶ 24 and Ex. B.

D.  **TSFC's Default Notices**

23. By separate letters (the "Default Notices"), each dated September 14, 2009, TSFC notified LBSF of its defaults under Sections 7.3(a) and (d) of each RFA resulting from: (i) LBSF's Failure to Deliver Qualifying Securities on the Missed Delivery Dates and (ii) LBSF's bankruptcy filing on October 3, 2008. See Valella Decl. at ¶ 22.

24. LBSF did not cure its Failure to Deliver within five business days of TSFC's Default Notices. See Valella Decl. at ¶ 23.

E.  **TSFC's Calculation of the Termination Amounts Owing to it Under the RFAs**

25. Under Section 7.6(b) of both RFAs, if a Lehman Event of Default occurs due to Lehman becoming insolvent or a Credit Downgrade Default, TSFC can immediately terminate the RFAs by giving notice to LBSF. See Valella Decl. at ¶ 17.

26. Pursuant to Sections I and 7.3 of the RFAs, TSFC is the "Burdened Party" due to the occurrences of the Lehman Events of Default under Sections 7.3(a) and (d). See Valella Decl. at ¶ 24; Shapiro Decl. ¶ 15.Following such defaults, TSFC, as the Burdened Party, has the right to calculate the Termination Amounts. Id.

27. Section I of the RFAs defines the Termination Amount as:

> an amount, as determined by [TSFC] reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require [TSFC] to pay to the Dealer . . . or would pay to the [TSFC] . . . in consideration of such Dealer entering into an agreement with the [TSFC] . . . which would have the effect of preserving for the [TSFC] the economic equivalent of its investment rights under [the RFA] for the period commencing on the termination date of [the RFA] and terminating on the last Bond Payment Date set forth in Exhibit A. . .

See Valella Decl. at ¶ 25; Shapiro Decl. ¶16.

28. Despite reasonable efforts, SFG was unable to obtain any quotations from market dealers to replace the RFAs on TSFC's behalf. See Shapiro Decl. at ¶ 17.

29. Pursuant to Section I of the RFAs, if TSFC is unable to obtain three Dealer quotations to determine the Termination Amount due under each RFA, the Termination Amount is:

> the amount as reasonably determined in good faith by the [TSFC], to be [TSFC's] total losses and costs . . . in connection with the termination of [the RFA], including any loss of bargain, cost of funding or, at the election of [the TSFC] but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;
>
> provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). **Any determination of the Termination Amount by the Burdened Party shall be**

**conclusive and binding on the parties hereto absent manifest error**. . . (the "Total Loss")

(emphasis added). See Valella Decl. at ¶ 27; Shapiro Decl. at ¶ 18.

**F.     TSFC Timely Files Proofs of Claim for the Termination Amounts Owing Under the RFAs and the RFAs are Rejected by Order of this Court**

30.    On July 2, 2009, the Court entered a bar date order (the "Bar Date Order") requiring, among other things, that all claims against the Debtors be filed on or before September 22, 2009 at 5:00 p.m. (EDT) (the "Bar Date") and that Questionnaires for all derivatives and guaranty claims be uploaded to http://www.lehman-claims.com (the "Claims Website") on or before October 22, 2009 (the "Questionnaire Deadline").

31.    On September 18, 2009, TSFC filed Claim No. 18990 and Claim No. 18991 (together, the "Initial Claims") against LBSF and LBHI, respectively, for the Total Loss, which consisted of: (i) the estimated Termination Amounts owing by Lehman to TSFC under the RFAs plus (ii) the costs for LBSF's non-performance, pending rejection of the RFAs. See Valella Decl. at ¶ 28. Claim No. 18991 was based on LBHI's guaranty of amounts payable by LBSF to TSFC under the RFAs. See Valella Decl. at ¶ 29.

32.    On September 25, 2009, TSFC filed a motion requesting that the bankruptcy court compel Lehman to reject the RFAs (Docket No. 5277). See Valella Decl. at ¶ 30.

33.    On October 16, 2009 (the "Rejection Date"), this Court entered an Order Authorizing Rejection of Reserve Fund Agreements (Docket No. 5542) (the "Rejection Order") and the RFAs were rejected as of the Rejection Date. See Valella Decl. at ¶ 31.

34.    On October 19, 2009, TSFC amended Claim Nos. 18990 and 18991, by filing Claim Nos. 66853 and 66852 (together, the "Amended Claims") against LBSF and LBHI, respectively, each in the amount of $135,085,150.43 (the "Amended Claim Amount"), for the Total Loss owing by LBSF and LBHI, respectively, to TSFC under the RFAs as of the Rejection

Date.  See Valella Decl. at ¶ 32; Shapiro Decl. at ¶¶ 19 – 25.  Claim No. 66852 was based on LBHI's guaranty of amounts owing by LBSF to TSFC under the RFAs.  See Valella Decl. at ¶ 33.

35. On October 19, 2009, TSFC timely uploaded the required Questionnaires for the Amended Claims to the Claims Website.  See Valella Decl. at ¶ 35.  The Questionnaires were amended on October 21, 2009.  Id.

36. As a part of the Questionnaires for the Amended Claims, TSFC submitted a detailed memorandum prepared by its financial advisor, SFG, dated October 19, 2009, setting forth the calculation of TSFC's Total Loss under the RFAs as of the Rejection Date.  See Valella Decl. at ¶ 36; Shapiro Decl. ¶ 11.  The SFG Memo set forth TSFC's calculation of its Total Loss as of the Rejection Date.  See Valella Decl. at ¶ 36; Shapiro Decl. ¶ 11.

37. Of the total Amended Claim Amount, $47,876,724.30 was attributable to the Total Loss owing by Lehman to TSFC under the June 2003 RFA and $87,208,426.13 was attributable to the Total Loss owing by Lehman to TSFC under the Dec. 2003 RFA.  See Shapiro Decl. at ¶ 25; Valella Decl. at ¶ 34.

**G.   The Debtors Initiate Extensive Discovery Pursuant to Fed. R. Bankr. P. 2004**

38. On June 13, 2011, the Debtors served SFG with a subpoena pursuant to Fed. R. Bankr. P. 2004 requesting fourteen categories of documents relating to among other claims, TSFC's Amended Claims.  See Shapiro Decl. at ¶ 26.  To date, SFG has reviewed and produced, or alternatively withheld as privileged, in excess of 5,000 pages of documents to Lehman relating to TSFC's Amended Claims.  See Shapiro Decl. at ¶ 27.

39. On or about October 26, 2011, the Debtors served TSFC with a subpoena pursuant to Fed. R. Bankr. P. 2004 requesting twenty categories of documents relating to the Amended Claims and the calculation of the amounts asserted therein.  See Valella Decl. at ¶ 37.

To date, TSFC has made at least eight separate productions of documents to the Debtors totaling in excess of 9,000 pages of documents that were either produced or withheld as privileged. See Valella Decl. at ¶ 38.

40. On January 11, 2013, the Debtors also deposed one of SFG's former employees, James Vergara, regarding, among other things, the calculation of TSFC's Total Loss under the RFAs. See Shapiro Decl. at ¶ 28; see also, *Notice of Subpoena Issued Pursuant to Order Granting the Debtors Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities* (Docket No. 32025) filed on November 13, 2012.

### H. The Debtors Object to TSFC's Amended Claims

41. On February 15, 2013, the Debtors filed the Objection requesting that each of the Amended Claims be reduced from $135,085,150.43 to $19,376,731.00 (the "Requested Reduced Amount").

42. Despite the assertion that TSFC's Amended Claims should each be reduced to less than 15 percent of their asserted amounts, the Debtors offer no concrete reason for the sizeable requested reduction.

43. Instead, the Debtors simply assert that the Amended Claim Amounts are:

> greater than the fair, accurate, and reasonable values determined by the Plan Administrator after a review of the claimant's supporting documentation and LBHI's and Lehman Brothers Special Financing Inc.'s ("LBSF") books and records; and that the claim classifications, in certain instances, improperly assert secured, administrative expenses or priority claims

See Objection ¶ 2.

44. The Debtors also assert that "the Plan Administrator engages in, to the extent the holder is willing to so engage, lengthy negotiations with the holder of the Derivative Claim that

are often very detailed and may extend over a period of months" to arrive at the Requested Reduced Amount. See Objection ¶ 15. Further, the Debtors' indicate that "[d]espite the Plan Administrator's efforts at negotiating this [Requested Reduced Amount], the Plan Administrator and the holders of the Valued Derivatives Claims have reached an impasse." See Objection ¶ 16.

45. Despite the Debtors' misleading representation, at no point during or after the nearly two year discovery period, did the Debtors initiate any discussions with TSFC regarding any settlement of the Amended Claims or otherwise seek to negotiate an agreed amount for TSFC's Total Loss under the RFAs. See Valella Decl. at ¶ 39.

### RESPONSE TO THE DEBTORS' CLAIM OBJECTION

**A.    The Debtors Have Failed to Defeat the Prima Facie Validity of the Amended Claims**

46. The Debtors have failed to meet their burden of producing sufficient evidence to defeat the *prima facie* validity and amount of TSFC's Claim. A proof of claim "constitutes *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); see also, In re Reilly, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000); In re Guadalupe, 365 B.R. 17, 20 (D. Conn. 2007). To overcome this prima facie evidence, a party in interest objecting to the claim must produce substantial evidence in opposition to the claim. In re George R. Burrows, Inc., 156 F. 2d 640, 641 (2d Cir. 1946); In re Alper Holdings USA, No. 07-12149 (BRL), 2008 WL 160203 at *3 (Bankr. S.D.N.Y. Jan. 15, 2008).

47. It is only after the objecting party introduces substantial evidence in opposition to the claim that the burden of proof shifts back to the claimant to establish by a preponderance of the evidence that its claims should be allowed under applicable law. Burrows, 156 F. 2d at 641; Reilly, 245 B.R. at 773; Guadalupe, 365 B.R. at 20. It is often said that the objecting party must produce evidence equal in force to the *prima facie* case. In re Allegheny Int'l. Inc., 954 F.2d 167, 173 (3d Cir. 1992). At a minimum, however, the objecting Party must produce evidence

- 13 -

sufficient to refute at least one of the allegations that are essential to the claim's sufficiency. Reilly, 245 B.R. at 773; Guadalupe, 365 B.R. at 20; Allegheny, 954 F.2d at 173-74.

48. The Debtors have not disputed that TSFC timely filed its proof of claims by the Bar Date or that TSFC timely uploaded the related Questionnaires to the Claims Website by the Questionnaire Deadline, which is confirmed by the fact that the Debtors seek to *allow* the Amended Claims albeit in a reduced amount. See Objection ¶¶ 2, 16.

49. Moreover, in TSFC's Amended Claims, the attached SFG Memo and the corresponding Questionnaires, TSFC provided Lehman with a detailed description of the calculation of the Amended Claim Amounts based on loss methodology. In addition, TSFC has provided Lehman with substantial documentation relating to TSFC's Amended Claims throughout the lengthy Rule 2004 discovery process initiated by the Debtors almost two years ago.

50. By contrast, the Debtors have failed to sustain their burden of proof inasmuch as they merely make conclusory statements in their Objection that the Amended Claims must be reduced to the Requested Reduced Amounts without including any support or basis for such requested reduction. An objecting party cannot meet its high burden of proof to overcome the *prima facie* validity of a proof of claim by simply stating that the amount of the claim is improper. See In re Minbatiwalla, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010) (quoting 4 Collier on Bankruptcy 502.03[3][f] (rev. ed. 2007). If the objecting party does not "introduce[ ] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the validity and the amount of the claim." Id.

51. The Objection merely provides an exhibit with a list of claims for which the Debtors seek reduction and/or reclassification and asserts that the Requested Reduced Amounts

- 14 -

are the correct Termination Amounts based upon the Debtors' books and records and the Debtors' review of each claimant's valuation methodology. The Objection nowhere identifies a problem or error with TSFC's methodology in valuing the Total Loss owing to it by Lehman. Nor does the Objection specifically describe the methodology used by the Debtors to determine that the Amended Claim Amounts should be reduced.

52. The Debtors' failure to overcome the *prima facie* validity and amount of TSFC's Amended Claims is even more glaring after considering that the Debtors have previously been provided with substantial documentation relating to the Amended Claims by TSFC during a lengthy Rule 2004 discovery process initiated by the Debtors almost two years ago

53. The Debtors have not provided any evidence, let alone *substantial* evidence, to defeat the *prima facie* validity and amounts of the Amended Claims as filed and the Objection should therefore be overruled.

B. **The Debtors Have Failed to Show that TSFC Made a Manifest Error in Its Calculation of the Termination Amounts Owing to TSFC Under the RFAs**

54. Moreover, pursuant to the terms of the RFA, TSFC's calculation of the Termination Amounts owing by Lehman to TSFC under the RFAs are "conclusive and binding" absent manifest error. See Valella Decl. at ¶ 27.

55. The Debtors' unsubstantiated and conclusory statements as to why the Amended Claims should be reduced wholly fail to identify – much less demonstrate -- any manifest error in TSFC's determination of the Total Losses due to TSFC. The Objection neither states why the Debtors believe that TSFC's valuation methodology for its Total Losses under the RFA is incorrect nor explains how the Debtors valued the RFAs to arrive at the Requested Reduced Amounts so as to enable TSFC to provide any substantive response.

56. Because the Debtors have failed to demonstrate any manifest error in TSFC's calculation of the Total Losses owing to it under the RFAs, the Objection must be overruled.

WHEREFORE TSFC requests that the Court: (a) overrule the Objection as it relates to TSFC's Amended Claims, (b) allow Claim No. 66852 against LBHI in the amount of $135,085,150.43, (c) allow Claim No. 66853 against LBSF in the amount of $135,085,150.43, and (d) grant such other or further relief as this Court deems just and proper.

Dated: New York, New York  
       March 14, 2013

Respectfully submitted,

K&L GATES LLP

By: /s/ *John A. Bicks*  
    John A. Bicks, Esq.  
    Eunice Rim Hudson, Esq.  
599 Lexington Avenue  
New York, NY 10022  
(212) 536-3900 (telephone)  
(212) 536-3901 (facsimile)

*Attorneys for Tobacco Settlement Financing Corp.*