UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
: 
In re                                                             :   Chapter 11
                                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                          :   Case No. 08-13555 (JMP)
                                                                  :
                                                                  :   (Jointly Administered)
                              Debtors.                            :
                                                                  :
------------------------------------------------------------------x

**DECLARATION OF PETER SHAPIRO IN SUPPORT OF RESPONSE OF
TOBACCO SETTLEMENT FINANCING CORPORATION TO
DEBTORS' THREE HUNDRED NINETY-FOURTH
OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)**

I, Peter Shapiro, hereby declare pursuant to 28 U.S.C. § 1746:

1. I am the founder and Managing Director of Swap Financial Group, LLC ("SFG"), a New Jersey limited liability company formed in 1998 and located at 76 South Orange Avenue, South Orange, New Jersey 07079. SFG is one of the nation's leading independent advisors to issuers and end users of derivative products.

2. I have over twenty (20) years of experience as a senior financial markets professional in the areas of public finance and financial derivatives products. Among other things, I am the former head of Citibank's public finance group, where I supervised the first tender option bond program. I also began structuring tax-exempt swaps, caps, floors and collars early in the history of the derivatives market, including before the establishment of the SIFMA/BMA Index. A more detailed description of my background and professional experience is contained in the biography that is attached hereto as **Exhibit A**.

3. SFG was retained to assist the Tobacco Settlement Financing Corporation ("TSFC") to, among other things, value its claims against Lehman Brothers Special Financing

NY-1034710 v4

Inc. ("LBSF") and Lehman Brothers Holdings Inc. ("LBHI"; together with LBSF, "Lehman") and to assist with the preparation of appropriate proofs of claims[1] in the above-captioned bankruptcy cases.

4. In that capacity, SFG assisted TSFC in determining the "Termination Amounts" owed by LBSF to TSFC under that certain: (i) Reserve Fund Agreement dated as of June 19, 2003 (the "June 2003 RFA") by and among TSFC, as issuer, LBSF and the Bank of New York ("BONY"), as trustee (the "Trustee") and (ii) Reserve Fund Agreement dated as of December 2, 2003 (the "Dec. 2003 RFA" and together with the June 2003 RFA, the "RFAs")[2] by and among TSFC, LBSF and the Trustee.

5. In connection with SFG's valuation of the Termination Amounts owed by LBSF to TSFC under the RFAs, SFG reviewed: (i) the RFAs; (ii) the Indenture dated as of June 1, 2003 (the "June 2003 Indenture"), by and between TSFC and BONY, as trustee, pursuant to which TSFC issued certain Asset-Backed Revenue Bonds, Series 2003A (Stage Contingency Contract Secured) (the "Series 2003A Bonds"); and (iii) the Indenture dated as of December 1, 2003 (the "Dec. 2003 Indenture" and together with the June 2003 Indenture, the "Indentures") by and between TSFC and BONY, as Trustee, pursuant to which TSFC issued certain Asset-Backed Revenue Bonds, Series 2003B (State Contingency Contract Secured) (the "Series 2003B Bonds" and together with the Series 2003A Bonds, the "Bonds").

6. I am the individual at SFG who had ultimate responsibility for the calculation of the Termination Amounts asserted in TSFC's Claims against LBSF and LBHI and I am familiar

---

[1] TSFC's proofs of claim against LBSF and LBHI are represented by claim numbers 18990, 18991, as amended by claim numbers 66852 and 66853 (collectively, the "Claims")

[2] Capitalized terms used but not otherwise defined herein shall have the meanings attributed to them in the RFAs.

with the process and methodologies used by SFG in calculating the amounts, as well as the facts, set forth in this declaration. I am authorized to make this declaration on TSFC's behalf.

### A. The RFAs

7. The RFAs served as investment vehicles pursuant to which TSFC was able to invest certain reserve funds (the "Reserve Funds") that served as a source of backup payment for TSFC's debt service obligations under the Bonds. In broad terms, the RFAs enabled TSFC to invest the Reserve Funds by purchasing certain qualifying securities (the "Qualified Securities") from LBSF at purchase prices that are constructed to ensure that TSFC receives a 3.722% (the "June 2003 RFA Guaranteed Rate") guaranteed annual rate of return on its investments under the June 2003 RFA and a 4.687% (the "Dec. 2003 RFA Guaranteed Rate"; together with the June 2003 RFA Guaranteed Rate, the "Guaranteed Rates") guaranteed annual rate of return on its investments under the Dec. 2003 RFA.

8. The RFAs contain provisions for calculating Termination Amounts due from one party to another if, or when, the RFAs are terminated.

9. The payment of all amounts owing by LBSF to TSFC under the RFAs were unconditionally guaranteed by LBHI.

10. On October 16, 2009 (the "Rejection Date"), the RFAs were rejected by Order of the United States Bankruptcy Court for the Southern District of New York (the "Rejection Order").

11. At the request of TSFC, SFG prepared a Memorandum dated October 19, 2009 (the "SFG Memo") valuing the Termination Amounts owing by LBSF and LBHI to TSFC under the RFAs as of the Rejection Date. A copy of the SFG Memo is annexed hereto as **Exhibit B**.

- 3 -

B.  **LBSF's Defaults Under the RFAs**

12.  Pursuant to Section 7.3(a) of both RFAs, a "Lehman Event of Default" occurs if LBSF fails to cause a Qualified Dealer to deliver Qualified Securities (each, a "Failure to Deliver") to the Trustee on any Deposit Date and such Failure to Deliver is not cured within five (5) business days (the "Lehman Cure Period") after written notice of such Failure to Deliver is given to LBSF.

13.  Moreover, additional Lehman Events of Default occur under the RFAs if: (i) either LBSF or LBHI file for bankruptcy, or (i) LBHI's rating drops below "BBB-" or "Baa3" by S&P or Moody's, respectively.

14.  LBSF defaulted under the RFAs by: (i) failing to deliver Qualified Securities to the Trustee on November 28, 2008 and May 29, 2009 as required under Sections 2.1 and 2.2 of the RFAs, which failure continued beyond the applicable Lehman Cure Period; (ii) the downgrade of LBHI's long term senior unsecured debt ratings by both S&P and Moody's on or about September 15, 2008 to below the required minimum levels, and (iii) the filing of voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") by LBHI on September 15, 2008 and by LBSF on October 3, 2008.

C.  **The Calculation of the Termination Amounts Owing by LBSF to TSFC**

15.  Due to the occurrences of the Lehman Events of Default under Sections 7.3(a), (d) and (f), TSFC is the "Burdened Party" under the RFAs. As the Burdened Party, TSFC has the right to determine the Termination Amounts due to it under the RFAs and TSFC's determinations are conclusive absent manifest error. See June 2003 RFA § I and Dec. 2003 § I (definition of "Termination Amount").

16.  Section I of the RFAs define the Termination Amount as:

> an amount, as determined by [TSFC] reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require [TSFC] to pay to the Dealer . . . or would pay to the [TSFC] . . . in consideration of such Dealer entering into an agreement with the [TSFC] . . . which would have the effect of preserving for the [TSFC] the economic equivalent of its investment rights under [the RFA] for the period commencing on the termination date of [the RFA] and terminating on the last Bond Payment Date set forth in Exhibit A. . .

17. Under my supervision, SFG distributed a term sheet, execution copies of the RFAs and credit and financial information to fourteen (14) dealers in an effort to obtain quotations from dealers to replace the RFAs. Despite SFG's reasonable efforts to solicit such quotations, SFG was unable to obtain any quotations on TSFC's behalf.

18. Pursuant to Section I of the RFAs, if TSFC is unable to obtain three Dealer quotations to determine the Termination Amount due under each RFA, the Termination Amount is:

> the amount as reasonably determined in good faith by the [TSFC], to be [TSFC's] total losses and costs . . . in connection with the termination of [the RFA], including any loss of bargain, cost of funding or, at the election of [the TSFC] but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;
>
> provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). **Any determination of the Termination Amount by the Burdened Party shall be**

**conclusive and binding on the parties hereto absent manifest error. . .**

(the "Total Loss") (emphasis added).

19.     Since SFG was unable to obtain any quotations from dealers regarding the Termination Amounts owing to TSFC under the RFAs, SFG proceeded to calculate TSFC's Total Loss as of the Rejection Date.

20.     To calculate TSFC's Total Loss, SFG began by valuing the cash flows under the RFAs by using a similar interest rate swap in which LBSF would pay a fixed rate of 3.722% for the June 2003 RFA and 4.687% for the Dec. 2003 RFA and TSFC would pay floating rates under the respective RFAs.

21.     To determine the floating rates, SFG used a LIBOR base and made adjustments for: (i) the types of securities expected to be delivered by LBSF under the RFAs which, in this case, SFG determined would be commercial paper; (ii) the ongoing credit risk of the RFAs (the "Credit Charge"); and (iii) the profit or spread component that would be charged by another provider to replace the RFAs (the "Profit Charge"), if a replacement agreement could be found. The use of a LIBOR-plus spread analysis with an interest rate swap is the broadly accepted market methodology used to value agreements like the RFAs.

22.     SFG then incorporated the cost of non-performance into TSFC's calculation of Total Loss.

23.     Based upon SFG's analysis, SFG determined that: (i) a spread (the "CP Spread") to USD Three-Month LIBOR ("LIBOR") for commercial paper delivered under the RFAs of 0.256%, or 25 basis points greater than the spread of the Federal Reserve's H.15 Asset-Backed Commercial Paper Index to LIBOR; (ii) a Credit Charge of 2.427% or 0.50% greater (wider) than the spread of the Tobacco Settlement Financing Corporation (NJ) 5% bonds maturing in

June 2041 (CUSIP: 888808DF6) to the Bloomberg 30-Year General Purpose Revenue Bond Index (A-Rated) (486M30Y); and (iii) a Profit Charge of 0.25% for a dealer to provide a replacement RFA, would be appropriate.

24. Finally, LBSF's non-performance under the RFAs forced TSFC to invest in short-term Eligible Securities (the "Replacement Securities") yielding significantly lower rates than the Guaranteed Rates under the RFAs. The Replacement Securities for: (i) the June 2003 RFA had an annual yield of 3.125%, which was lower than the 3.722% June 2003 RFA Guaranteed Rate; and (ii) the Dec. 2003 RFA had an annual yield of 3.125%, which was lower than the 4.687% Dec. 2003 RFA Guaranteed Rate. Accordingly, SFG also factored in additional losses of: (i) $5,254,152,81 for the June 2003 RFA and (ii) $8,702,700.64 for the Dec. 2003 RFA, amounting to an aggregate cost of non-performance (the "Cost of Non-Performance") under the RFAs of $688,458.25.

25. Based on the foregoing CP Spread, Credit Charge, Profit Charge and Cost of Non-Performance, SFG calculated a Total Loss to TSFC of: (i) $47,822,847 under the June 2003 RFA and (ii) $87,154,549 under the Dec. 2003 RFA, for an aggregate Total Loss under both RFAs amounting to $135,085,150.43.

D.    **Lehman Initiates Discovery Relating to TSFC's Claims**

26. On June 13, 2011, the Debtors served SFG with a subpoena pursuant to Fed. R. Bankr. P. 2004 requesting fourteen (14) categories of documents relating to, among other claims, TSFC's Amended Claims.

27. To date, SFG has reviewed and produced, or alternatively withheld as privileged, an excess of 5,000 pages of documents to Lehman relating to TSFC's Amended Claims.

28. It is my understanding that, on January 11, 2013, the Debtors also deposed one of SFG's former employees, James Vergara, regarding the calculation of TSFC's Amended Claims.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2013

_____
Peter Shapiro