UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                                  :
In re                                                             :    Chapter 11
                                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                          :    Case No. 08-13555 (JMP)
                                                                  :
                                                                  :    (Jointly Administered)
                               Debtors.                           :
                                                                  :
------------------------------------------------------------------x

## DECLARATION OF ALEJANDRO J. VALELLA IN SUPPORT OF RESPONSE OF THE TOBACCO SETTLEMENT FINANCING CORPORATION TO DEBTORS' THREE HUNDRED NINETY-FOURTH OMNIBUS OBJECTION TO CLAIMS (VALUED DERIVATIVE CLAIMS)

I, Alejandro J. Valella, hereby declare pursuant to 28 U.S.C. § 1746:

1.  I am the Vice President and Deputy Counsel of the Tobacco Settlement Financing Corporation ("TSFC") and have served in this capacity since May 19, 2005. From October 1987 through May 19, 2005, I served as the Assistant Vice President and Deputy Counsel of State of New York Municipal Bond Bank Agency, which is the parent of TSFC. I also served as the Assistant Vice President and Deputy Counsel of TSFC from its creation in 2003 through May 19, 2005. I am authorized to make this declaration (the "Declaration") on TSFC's behalf.

A.  **TSFC's Reserve Fund Agreements with Lehman**

2.  TSFC is a public benefit corporation of the State of New York that was established in 2003 as a subsidiary of the State of New York Municipal Bond Bank Agency, separate and apart from the State of New York, to purchase all, or a portion of, New York State's share of tobacco settlement revenues received from settlement agreements entered into with various tobacco companies in or about 1998.

3.  The TSFC issued two series of Asset-Backed Revenue Bonds in 2003. TSFC's

NY-1034703 v2

$2,310,705,000.00 Asset-Backed Revenue Bonds, Series 2003A (State Contingency Contract Secured) (the "Series 2003A Bonds") were issued pursuant to that certain Indenture, dated as of June 1, 2003 (the "June 2003 Indenture") by and between TSFC, as issuer (the "Issuer") and the Bank of New York ("BONY"), as trustee (the "Trustee"). A true and correct copy of the June 2003 Indenture is attached hereto as **Exhibit A**.

4. TSFC's $2,240,415,000.00 Asset-Backed Revenue Bonds, Series 2003B (State Contingency Contract Secured) (the "Series 2003B Bonds" and together with the Series 2003A Bonds, the "Bonds") were issued pursuant to that certain Indenture, dated as of December 1, 2003 (the "Dec. 2003 Indenture" and together with the June 2003 Indenture, the "Indentures") by and between TSFC, as Issuer and BONY, as Trustee. A true and correct copy of the Dec. 2003 Indenture is attached hereto as **Exhibit B**.

5. Among other things, the Indentures required the Trustee to establish and maintain reserve funds (the "Reserve Funds") to serve as a source of backup payment for TSFC's debt service obligations on the Bonds. The Reserve Funds were established from the proceeds of the issuance of the Bonds in an amount equal to $227,545,572.00 for the Series 2003A Bonds and $221,582,344.00 for the Series 2003B Bonds.

6. On or about June 19, 2003, TSFC and the Trustee entered into a Reserve Fund Agreement, dated as of June 19, 2003 (the "June 2003 RFA") with Lehman Brothers Special Financing Inc. ("LBSF"). A true copy of the June 2003 RFA is attached hereto as **Exhibit C**.

7. On or about December 2, 2003, TSFC and the Trustee entered into a Reserve Fund Agreement, dated as of December 2, 2003 (the "Dec. 2003 RFA") with LBSF. A true copy of the Dec. 2003 RFA is attached hereto as **Exhibit D**.

8. Prior to their rejection, both RFAs were scheduled to terminate one business day

before June 1, 2023.

9. In broad terms, the RFAs enabled TSFC to invest the Reserve Funds by purchasing certain qualifying securities (the "Qualified Securities") from LBSF at purchase prices that are set to ensure that TSFC receives a 3.722% (the "June 2003 RFA Guaranteed Rate") guaranteed annual rate of return on its investments under the June 2003 RFA and a 4.687% (the "Dec. 2003 RFA Guaranteed Rate"; together with the June 2003 RFA Guaranteed Rate, the "Guaranteed Rates") guaranteed annual rate of return on its investments under the Dec. 2003 RFA.

10. Under the terms of the June 2003 RFA, LBSF would cause certain qualified dealers (each a "Qualified Dealer") to deliver certain Qualified Securities to the Trustee on certain set deposit dates (the "Deposit Dates"), following which the Trustee would immediately purchase such Qualified Securities by paying the Qualified Dealer an aggregate purchase price that was as close as possible to, but did not exceed, $170,669,179.00 (the "June 2003 Scheduled Reserve Amount"). When such Qualified Securities matured, LBSF would again be required to cause Qualified Securities to be delivered to the Trustee on the next Deposit Date for a similar aggregate purchase price. In exchange for the periodic purchase of Qualified Securities, LBSF was required to guarantee a rate of return to TSFC on the June 2003 Scheduled Reserve Amount equal to the June 2003 RFA Guaranteed Rate.

11. Under the terms of the Dec. 2003 RFA, LBSF would cause a Qualified Dealer to deliver certain Qualified Securities to the Trustee on certain Deposit Dates, following which the Trustee would immediately purchase such Qualified Securities by paying the Qualified Dealer an aggregate purchase price that was as close as possible to, but did not exceed, $221,582,343.75 (the "Dec. 2003 Scheduled Reserve Amount"). When such Qualified Securities matured, LBSF

would again be required to cause Qualified Securities to be delivered to the Trustee on the next Deposit Date for a similar aggregate purchase price. In exchange for the periodic purchase of securities, LBSF was required to guarantee a rate of return to TSFC on the Dec. 2003 Scheduled Reserve Amount equal to the Dec. 2003 RFA Guaranteed Rate.

12. Lehman Brothers Holdings, Inc. ("LBHI"; together with LBSF, "Lehman") unconditionally guaranteed the payment of all amounts owing by LBSF to TSFC under each RFA. A copy of LBHI's guaranty is set forth in Exhibit B to the respective RFAs.

**B.     LBSF's Defaults Under the RFAs**

13. Pursuant to Section 7.3(a) of both RFAs, a "Lehman Event of Default" occurs if LBSF fails to cause a Qualified Dealer to deliver Qualified Securities (a "Failure to Deliver") to the Trustee on any Deposit Date and such Failure to Deliver is not cured within five business days (the "Lehman Cure Period") after written notice of such Failure to Deliver is given to LBSF. See June 2003 RFA §7.3(a) and Dec. 2003 RFA §7.3(a).

14. The RFAs required LBSF to deliver Qualified Securities to the Trustee on, among other scheduled Deposit Dates, November 28, 2008 and May 29, 2009 (the "Missed Delivery Dates").

15. LBSF failed to Deliver Qualifying Securities to the Trustee on the Missed Delivery Dates.

16. Moreover, pursuant to the RFAs, additional Lehman Events of Default occur if: (i) either LBSF or LBHI becomes insolvent by, among other things, filing for bankruptcy, or (ii) LBHI's credit rating drops below "BBB-" or "Baa3" by S&P or Moody, respectively (a "Credit Downgrade Default") See June 2003 RFA §§ I, 7.3(d), 7.3(f) and Dec. 2003 RFA §§ I, 7.3(d), 7.3(f).

17. If LBSF defaulted due to Lehman's insolvency or a Credit Downgrade Default, TSFC could immediately terminate the RFAs by giving notice to Lehman, with a copy to the Trustee, and LBSF was required promptly to pay the Termination Amount owing under each RFA to TSFC. See June 2003 RFA §7.6(b) and Dec. 2003 RFA §7.6(b).

18. On and after September 15, 2008, LBHI and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

19. LBSF filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 3, 2008.

20. TSFC did not receive any notice from Lehman that, on or about September 15, 2008, the long term credit rating of LBHI had been downgraded below the minimum ratings required under the RFAs by both S&P and Moody's.

C. **The Replacement Securities**

21. Upon LBSF's failure to deliver Qualifying Securities to the Trustee on the Missed Delivery Dates, TSFC instructed the Trustee to invest the Reserve Funds in replacement securities (the "Replacement Securities") pursuant to the provisions of the RFAs. See June 2003 RFA §2.4 and Dec. 2003 RFA §2.4.

D. **TSFC's Default Notices to LBSF**

22. By separate letters (the "Default Notices"), each dated September 14, 2009, TSFC notified LBSF of its defaults under Sections 7.3(a) and (d) of each RFA resulting from: (i) LBSF's Failure to Deliver and (ii) LBSF's bankruptcy filing on October 3, 2008. True and correct copies of the Default Notices are annexed hereto as **Exhibit E**.

23. LBSF did not cure its failure to deliver securities within five business days of TSFC's notices.

### E. The Termination Amounts Owing by LBSF to TSFC Under the RFAs

24. Due to the occurrences of the Lehman Events of Default under Sections 7.3(a) and (d) of the RFAs, TSFC is the "Burdened Party" under the RFAs. See June 2003 RFA § I and Dec. 2003 RFA § I. As the Burdened Party, TSFC has the right to determine the Termination Amounts due to it under the RFAs and TSFC's determination is conclusive absent manifest error. See June 2003 RFA §§ I, 7.3 and Dec. 2003 RFA §§ I and 7.3.

25. Section I of the RFAs define the Termination Amount as:

> an amount, as determined by [TSFC] reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require [TSFC] to pay to the Dealer . . . or would pay to the [TSFC] . . . in consideration of such Dealer entering into an agreement with the [TSFC] . . . which would have the effect of preserving for the [TSFC] the economic equivalent of its investment rights under [the RFA] for the period commencing on the termination date of [the RFA] and terminating on the last Bond Payment Date set forth in Exhibit A. . .

26. TSFC's financial advisor, SWAP Financial Group LLC ("SFG"), was unable to obtain any quotations from market dealers to replace the RFAs despite reasonable efforts.

27. Under Section I of the RFAs, if TSFC is unable to obtain market quotations for the replacement of the RFAs, the Termination Amount is:

> the amount as reasonably determined in good faith by the [TSFC], to be [TSFC's] total losses and costs . . . in connection with the termination of [the RFA], including any loss of bargain, cost of funding or, at the election of [the TSFC] but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;
>
> provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount

otherwise due hereunder is not paid when due, the Termination Amount shall also include incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). **Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error**. . . (the "Total Loss")

(emphasis added).

**F.    TSFC Timely Files Proofs of Claim for the Termination Amounts Owing Under the RFAs and the RFAs are Rejected by Order of this Court**

28.    On September 18, 2009, TSFC timely filed Claim No. 18990 and Claim No. 18991 (together, the "Initial Claims") against LBSF and LBHI, respectively, for estimated Termination Amounts owing by Lehman to TSFC under the RFAs plus costs for LBSF's non-performance, pending rejection of the RFAs. True and correct copies of the Initial Claims are annexed hereto as **Exhibit F** and **Exhibit G**[1], respectively.

29.    Claim No. 18991 was based on LBHI's guaranty of amounts payable by LBSF to TSFC under the RFAs.

**G.    TSFC Obtains An Order Rejecting the RFAs**

30.    On September 25, 2009, TSFC filed a motion requesting that the bankruptcy court compel Lehman to reject the RFAs (Docket No. 5277).

31.    On October 16, 2009 (the "Rejection Date"), the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order Authorizing Rejection of Reserve Fund Agreements (Docket No. 5542) (the "Rejection Order") and the RFAs

---

[1] The full attachments to the Initial Claims have been omitted because: (i) they are voluminous and (ii) the majority of the attachments have already been attached as Exhibits A through D to this Declaration.

were rejected as of the Rejection Date. A true and correct copy of the Rejection Order is annexed hereto as **Exhibit H**.

### H. TSFC Amends Its Claims

32. On October 19, 2009, TSFC amended Claim Nos. 18990 and 18991, by filing Claim Nos. 66853 and 66852 (together, the "Amended Claims") against LBSF and LBHI, respectively, each in the amount of $135,085,150.43 (the "Amended Claim Amount"). The Amended Claims asserted the Total Loss owing by LBSF and LBHI, respectively, to TSFC under the RFAs as of the Rejection Date. True and correct copies of the Amended Claims are annexed hereto as **Exhibit I** and **Exhibit J**, respectively.

33. Claim No. 66852 was based on LBHI's guaranty of amounts owing by LBSF to TSFC under the RFAs.

34. Of the total Amended Claim Amount, $47,876,724.30 was attributable to the Total Loss owing by Lehman to TSFC under the June 2003 RFA and $87,208,426.13 was attributable to the Total Loss owing by Lehman to TSFC under the Dec. 2003 RFA.

35. On October 19, 2009, TSFC also timely uploaded the required derivatives and guarantee questionnaires (the "Questionnaires") to the claims website, http://www.lehman-claims.com. The Questionnaires were amended on October 21, 2009.

36. As a part of the Questionnaires for its Amended Claims, TSFC submitted a detailed memorandum prepared by its financial advisor, SFG, dated October 19, 2009, setting forth the calculation of TSFC's Total Loss under the RFAs as of the Rejection Date.

### I. Lehman Initiates Discovery with TSFC

37. On or about October 26, 2011, the Debtors served TSFC with a subpoena

pursuant to Fed. R. Bankr. P. 2004 requesting twenty categories of documents relating to the Amended Claims and the calculation of the amounts asserted therein.

38.  TSFC has made at least eight separate productions of documents to the Debtors totaling in excess of 9,000 pages of documents that were either produced to the Debtors or withheld as privileged.

39.  To date, the Debtors have not initiated any discussions with TSFC regarding any settlement of the Amended Claims or otherwise sought to negotiate an agreed amount for TSFC's Total Loss under the RFAs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 13, 2013

_____
Alejandro J. Valella, Esq.