# **<u>EXHIBIT C</u>**

**CWT Draft 6/18/03**

## RESERVE FUND AGREEMENT

     This Reserve Fund Agreement (this "Agreement"), dated as of June 19, 2003, by and among TOBACCO SETTLEMENT FINANCING CORPORATION, a public benefit corporation of the State of New York (the "Issuer"), THE BANK OF NEW YORK, a banking corporation duly organized and existing under the laws of the State of New York, as Trustee under the Indenture as defined herein (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

     As stated in the Tobacco Settlement Financing Corporation Act (the "Act") and required to be stated in a prominent place herein, neither any Bond (defined below) nor any "ancillary bond facility" (as defined in the Act), including this Agreement, shall constitute a debt or moral obligation of the State or a State supported obligation within the meaning of any constitutional or statutory provision or a pledge of the faith and credit of the State or the taxing power of the State, and the State shall not be liable to make any payments thereon nor shall any Bond or ancillary bond facility be payable out of any funds or assets other than Pledged Settlement Payments (as defined in the Indenture (defined below)) and other assets, if any, sold to the Issuer and other funds and assets of or available to the Issuer including those received from the State under the Contingency Contract (as defined in the Indenture) and pledged therefor under the Indenture.

### ARTICLE I

### DEFINITIONS

     For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

     "Act" has the meaning specified in the preamble.

     "Amended Agreement" has the meaning specified in Section 3.1(c)(ii) hereof.

     "Amended Cash Flows" has the meaning specified in Section 3.1(c)(ii) hereof.

     "Bond Payment Date" means with respect to each Deposit Date, the Business Day next preceding each date identified as a "Bond Payment Date" on Exhibit G.

     "Bonds" means the Issuer's $2,310,705,000 Asset-Backed Revenue Bonds, Series 2003A (State Contingency Contract Secured).

     "Burdened Party" means, (i) in the case of (A) an Issuer Event of Default or a Trustee Event of Default, (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, (C) pursuant to Section 9.10, or (D) a clean up call of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the offices of the State of New York or the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in New York, New York are authorized or required by law to close, (d) a day on which Eligible Securities which may be delivered hereunder are not subject to delivery in the City of New York but not as a result of a Market Disruption and (e) a day on which there shall be a Market Disruption but not beyond the end of the Market Disruption Period.

"Closing Date" means June 19, 2003.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith and consented to by the Issuer (such consent not to be unreasonably withheld) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit.

"Debt Service Payment" means to the extent that insufficient funds are otherwise available under the Indenture to make such payments (and excluding any payment which by the terms of the Indenture is scheduled to be paid from the Reserve Fund), interest and principal due on Outstanding Bonds. Capitalized terms used in this paragraph but not defined in this Agreement shall have the respective meanings ascribed to them in the Indenture.

"Default Rate" means a per annum rate equal to the lesser of (a) Federal Funds Rate plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means the Business Day next preceding each date identified as a "Deposit Date" on Exhibit G.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means the securities identified in Exhibit A.

"Federal Funds Rate" means for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Wall Street Journal on the Business Day next succeeding such day, provided that if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day.

"Fitch" means Fitch, Inc. and its successors and assigns.

NYLIB5 716140.6                                   -2-

"Guaranteed Interest" has the meaning specified in Section 7.3(a) hereof.

"Guaranteed Rate" means a rate per annum equal to 3.722% assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means any event due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, upon which it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incidental Expenses" has the meaning specified in Section 7.7(a) hereof.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Issuer of legislation which, if adopted as law, would render unlawful (i) the performance by the Issuer of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Issuer with any other material provision of this Agreement or (ii) the performance by the Issuer of any contingent or other obligation relating to this Agreement, (b) any assertion by the Issuer in any proceeding, forum or action to the effect that performance under this Agreement is unlawful or (c) the occurrence with respect to the Issuer of any event that constitutes an Illegality.

"Incorporated Provisions" has the meaning specified in Section 5.8(a) hereof.

"Indenture" means the Indenture, dated as of June 1, 2003, by and between the Issuer and the Trustee, as supplemented and amended from time to time in accordance with the terms thereof and hereof.

"Insolvent" means (i) either the Trustee, the Issuer, Lehman or LBH as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee, the Issuer, Lehman or LBH, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the

Trustee, the Issuer, Lehman or LBH, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 30 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 30 consecutive days.

"Issuer Cure Period" has the meaning specified in Section 7.2(a) hereof.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman, and which, as of the date of this Agreement, has long-term senior unsecured debt rated A2 by Moody's, A by Standard & Poor's and A+ by Fitch.

"LBH Downgrade" has the meaning specified in Section 2.7(a) hereof.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Lehman Party" has the meaning specified in Section 5.2 hereof.

"Loss Amount" has the meaning specified in Section 7.7(a) hereof.

"Market Disruption" means that an event or events have occurred (whether an act of war, civil disorder or other calamity affecting securities markets) that have the effect of causing the trading of securities in general and all of the Eligible Securities in particular to cease (other than private trading not deemed by Lehman to reflect a true competitive market).

"Market Disruption Period" means a period of continuous Market Disruption, but no longer than five (5) calendar days, or such longer period as shall be agreed to by the parties to this Agreement.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that Qualified Security, provided that the Market Value of any Qualified Security shall in no event exceed the lesser of the Maturity Amount thereof and the Purchase Price thereof.

"Maturity Amount" means, for the initial delivery of Qualified Securities, the amount invested under this Agreement plus the interest earnings at the earnings rate for the entire period from the initial Deposit Date until the next Deposit Date. The Maturity Amount, with respect to any Qualified Security, will include the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date. The Maturity Amount of all subsequent deliveries of Qualified Securities after the initial delivery shall be equal to the funds required for the purchase of such Qualified Securities.

"Moody's" means Moody's Investors Service, Inc. and its successors and assigns.

"Original Cash Flows" has the meaning specified in Section 3.1 hereof.

"Other Investment Agreement" has the meaning specified in Section 4.1(f)(v) hereof.

"Permitted Collateral" means (i) direct obligations of the United States Treasury including only notes, bonds, bills or certificates of indebtedness, (ii) federal agency (including, but not limited to, the Federal Home Loan Mortgage Corporation (FHLMC), the Federal Farm Credit System, Federal Home Loan Bank (FHLB) system and Federal National Mortgage Association (FNMA)) obligations or obligations fully and unconditionally guaranteed as to timely payment of principal and interest by the United States of America or any such federal agency.

"Purchase Price" means, (i) for any Eligible Security delivered hereunder other than pursuant to Section 2.3, that price for such Qualified Security, as set forth in the Delivery Notice, which will produce a rate of return on such Qualified Security for the period from (and including) the Deposit Date to (but excluding) the immediately succeeding Bond Payment Date equal to the Guaranteed Rate and (ii) for any Eligible Security delivered pursuant to Section 2.3, the Maturity Amount thereof.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 ,2.4, or 2.5(c), Eligible Securities which, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is (A) with respect to a delivery in connection with a Deposit Date, as close as possible to but does not exceed the related Scheduled Reserve Amount, (B) with respect to a delivery pursuant to Section 2.3, equal to the Maturity Amount of the relevant Qualified Securities which have so matured (or as applicable, the amount of a Coupon Payment) and (C) with respect to a delivery pursuant to Section 2.5(c), equal to the pro rata portion of the replenishment amount.

"Refunding Bonds" has the meaning specified in Section 3.1(c) hereof.

"Refunding Date" has the meaning specified in Section 3.1(c)(ii) hereof.

"Reserve Fund" means the account created pursuant to the Indenture and designated thereunder as the Debt Service Reserve Account.

"Reserve Fund Replenishment Notice" has the meaning specified in Section 2.5(b) hereof.

"Scheduled Reserve Amount" means, for each Deposit Date, the amounts shown on Exhibit G which, under the terms of the Indenture, will be a portion of the Debt Service Reserve Requirement (as defined in the Indenture) on such date, assuming that (i) no withdrawals from the Reserve Fund have been made to make a Debt Service Payment and (ii) no

Bonds will have been defeased or redeemed on or prior to such date except in connection with a scheduled sinking fund redemption.

"Shortfall Amount" has the meaning specified in Section 7.7(a) hereof.

"Standard & Poor's" means Standard & Poor's Rating Services, Inc., a division of The McGraw-Hill Companies, and its successors and assigns.

"Termination Amount" means an amount, as determined by the Burdened Party reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its investment rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement was not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

      (i)     if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

      (ii)     if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

      (iii)     if the Burdened Party is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by the Burdened Party, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such

termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by the Burdened Party shall be conclusive and binding on the parties hereto absent manifest error.

The Issuer's obligation to pay any Termination Amount shall be payable solely from amounts available to pay Junior Payments (as defined in the Indenture) under the Indenture.

"Terminated Portion" has the meaning specified in Section 3.1(a) hereof.

"Termination Date" means one Business Day prior to June 1, 2023.

"Trustee Cure Period" has the meaning specified in Section 7.1(a) hereof.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

## ARTICLE II

## PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities. (a) Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available in the Reserve Fund, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Section 2.2    Delivery; Payment.    (a) All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof or such other account designated by the Trustee in writing to Lehman from time to time, in such manner as at the time is generally acceptable for delivery of Qualified Securities and shall be sold free and clear of all liens, claims and encumbrances of Lehman or any Qualified Dealer or any third party. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)    (i) Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities. The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security and any other information contained in the Delivery Notice.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below,

pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any. Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3    Subsequent Deliveries. (a) If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (i) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (ii) have a Coupon Payment, Lehman shall have the right, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities; provided that such additional Qualified Securities shall be delivered to the Trustee so that the purchase price of such Qualified Securities shall equal the Maturity Amount (at a zero yield) and the Maturity Amount thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment). Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof. Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii) hereof.

(b)    Lehman shall have no right to substitute Qualified Securities for any Qualified Securities previously sold under this Agreement.

Section 2.4    Late Delivery; Failure to Deliver. (a) If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during Lehman Cure Period, the Trustee shall, on each such date, invest the related Scheduled Reserve Amount on an overnight basis in Eligible Investments (as defined in the Indenture) and if Lehman's failure continues beyond Lehman Cure Period, the Trustee, to the extent directed by the Issuer pursuant to the Indenture, shall use its best efforts to invest the related Scheduled Reserve Amount in Eligible Investments (as defined in the Indenture) with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    Except as provided in Sections 7.3 and 7.6 hereof, no failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Notice of Withdrawal from Reserve Fund; Replenishment.    (a) The Scheduled Reserve Amount shall be deemed amended with respect to this Agreement upon a withdrawal to make a Debt Service Payment or upon any replenishment of any such withdrawal.

(b)    If at any time the Trustee is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities) to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such notice specify (i) the amount or investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal; provided, however, that if the Trustee is required to make any withdrawal from the Reserve Fund pursuant to the terms of the Indenture, it shall withdraw amounts invested hereunder solely on a *pro rata* basis with all other funds credited to the Reserve Fund which are not subject to the terms of this Agreement (including, without limiting the foregoing, funds which are available pursuant to any Other Investment Agreements, any credit facility, liquidity facility or similar arrangement) and any securities on deposit in or otherwise credited to the Reserve Fund which are not subject to the terms of this Agreement, such that the ratio of the amount invested hereunder to the Debt Service Reserve Requirement (as defined in the Indenture) remains constant.

(c)    If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(b) hereof, within one (1) year of such withdrawal, (i) sufficient funds are deposited into the Reserve Fund to permit the purchase of Qualified Securities hereunder in the amount of such withdrawal or (ii) the Issuer has notified the Trustee in writing (with a copy to Lehman) that it intends, in compliance with the Indenture, to deposit sufficient funds in the Reserve Fund to replenish the Reserve Fund, then the Trustee shall, within two (2) Business Days of such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities (at the Guaranteed Rate) in the amount of the *pro rata* portion of the replenishment amount relating to the amount by which the Scheduled Reserve Amount was decreased pursuant to Section 2.5(b) above, such that the ratio of the amount invested hereunder to the Debt Service Reserve Requirement (as defined in the Indenture) remains constant and as stated in the Reserve Fund Replenishment Notice duly tendered by the Qualified Dealer in accordance with Section 2.2 hereof. In the event the Issuer fails to replenish the Reserve Fund within one (1) year of a withdrawal and in accordance with the requirements of the Indenture, Lehman will have the right to terminate that portion of the Reserve Fund withdrawn to make a Debt Service Payment or to include such replenishment amount hereunder, pursuant to such terms as the parties may agree.

Section 2.6    Direction by Issuer to Trustee.    The Issuer hereby irrevocably instructs the Trustee, and the Trustee agrees, to take the actions and to make the purchases required hereby in accordance with the duties imposed upon it pursuant to the Indenture.

Section 2.7    LBH Downgrade.    (a) If during the term of this Agreement (i) the short-term rating of LBH (or in the case of an assignment of this agreement by Lehman to a transferee, which transferee does not have a guarantor, the short-term rating of such transferee) is

withdrawn or downgraded below "A-2" by Standard & Poor's, "P-1" by Moody's or "F1" by Fitch (if rated by Fitch) or (ii) the long-term rating of LBH (or in the case an assignment of this agreement by Lehman to a transferee, which transferee does not have a guarantor, the long-term rating of such transferee) is withdrawn or downgraded below "A-" by Standard & Poor's, "A3" by Moody's or "A-" by Fitch (if rated by Fitch) (in any such case, a "LBH Downgrade"), Lehman shall provide notice to the Issuer and the Trustee within three (3) Business Days of such LBH Downgrade.

(b)    Upon receipt of the notice from Lehman of such LBH Downgrade, the Issuer shall have the right, but not the obligation, to require Lehman within five (5) Business Days of the occurrence of such LBH Downgrade:

(i)    assign and transfer this Agreement and its interests hereunder, at Lehman's expense, to a transferee, the long-term rating of which is at least "A2" by Moody's, "A-" by Standard and Poor's and "A" by Fitch (if rated by Fitch), or whose performance under the Agreement is guaranteed by a guarantor whose long-term rating is at least "A2" by Moody's, "A-" by Standard and Poor's and "A" by Fitch (if rated by Fitch), with the consent of the Trustee and the Issuer (such consent not to be unreasonably withheld or delayed); provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have obligations of Lehman hereunder guaranteed by an entity, the long-term rating of which is at least "A" by Standard & Poor's, "A" by Fitch (if rated by Fitch) and "A2" by Moody's by a guarantee in a form reasonably acceptable to the Issuer (such acceptance not to be unreasonably withheld or delayed); or

(iii)    deliver Permitted Collateral to the Trustee or third party custodian acceptable to the Trustee and the Issuer which collateral must be maintained at levels and upon such conditions as would be acceptable to Standard & Poor's and Fitch to maintain an "A" rating in an "A" rated structured financing and Moody's to maintain an "A2" rating in a "A2" rated structured financing (with a market value approach) which such collateral held by the Trustee or a third party custodian acceptable to the Issuer in a manner such that the Trustee shall have a perfected security interest. Lehman shall pay all reasonable fees and costs of such third party custodian.

## ARTICLE III

## DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding. (a) The Issuer may, by giving Lehman at least ten (10) Business Days prior notice, but without the consent of Lehman redeem, defease, repurchase, or refund all or a portion of the Bonds as provided in the Indenture; provided that if the Issuer takes any such action (other than in respect of any redemption, defeasance, repurchase or refunding which does not affect the Scheduled Reserve Amount) the Termination Amount shall be calculated with respect to the portion of the Scheduled Reserve Amount relating to the redeemed, defeased, repurchased or refunded Bonds (such portion, the "Terminated Portion") (i) if the Termination Amount (calculated as of the date of termination as set forth in

Section 3.1(b) hereof) is a positive number, the Issuer shall pay to Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Issuer. If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of written notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1, this Agreement shall terminate with respect to the Terminated Portion. The Issuer agrees that it shall not redeem, defease, refund or repurchase all or a portion of the Bonds unless either (i) the Issuer has sufficient funds available to pay any Termination Amount that may be due as provided herein or (ii) the Issuer has demonstrated to Lehman that the Issuer will have sufficient funds available to pay any Termination Amount within one (1) year of the date of termination and Lehman has consented to such termination (such consent not to be unreasonably withheld).

(c)    If pursuant to clause (a) above, this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds"), the Issuer may, by written notice to Lehman, request that Lehman continue this Agreement and have such Agreement apply to all or a portion of the cash flows relating to the Refunding Bonds. Lehman agrees that if it receives such request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least thirty (30) days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)    the Refunding Bonds are to be issued under the existing Indenture or such other indenture which is approved by Lehman and Lehman is otherwise satisfied with the bond documentation relating to the Refunding Bonds (including, but not limited to, provisions specifying a similar priority of revenue allocation as provided for in the Indenture);

(iv)    at the time such request is received and on the Refunding Date, no Issuer Event of Default or Trustee Event of Default has occurred and is continuing or would, with notice or the passage of time, result in such a default;

(v)    the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

(vi)    the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and payable from the same sources; and

(vii)    Lehman receives any opinions and other assurances and agreements it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If as determined on the Refunding Date, (a) the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than the Termination Amount to Lehman of its investment rights with respect to the Amended Cash Flows or (b) the Termination Amount that would be payable to the Issuer with respect to the Original Cash Flows would be less than the Termination Amount that would be payable to the Issuer with respect to the Amended Cash Flows, the Issuer shall on or before the Refunding Date pay to Lehman the amount of such difference; provided, however, that with respect to clause (b) above, Lehman may, at its option, elect to receive from the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount payable to the Issuer equal to the Termination Amount payable to the Issuer in respect of the Original Cash Flows.

If as determined on the Refunding Date, (a) the Termination Amount that would be payable to Lehman with respect to the Amended Cash Flows would be greater than the Termination Amount that would be payable to Lehman with respect to the Original Cash Flows or (b) the Termination Amount that would be payable to the Issuer with respect to the Original Cash Flows would be greater than the Termination Amount that would be payable to the Issuer with respect to the Amended Cash Flows, Lehman shall on or before the Refunding Date pay to the Issuer the amount of such difference; provided, however, that with respect to clause (a) above, Lehman may, at its option, elect to pay to the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount payable to Lehman equal to the Termination Amount payable to Lehman in respect of the Original Cash Flows.

If (a) the conditions described in paragraphs (i) thru (vii) above are satisfied, (b) there is no reduction in the Debt Service Reserve Requirement (as defined in the Indenture) and the funds invested under this Agreement, and (c) there are no other changes in the terms of the investment that would affect the value of this Agreement, no Termination Amount will be calculated or due.

For any calculation of Termination Amount pursuant to this Section 3.1, Lehman shall be deemed to be the Burdened Party.

Section 3.2    Mandatory Clean Up Call Redemption.    Upon at least ten (10) Business Days prior written notice to Lehman, the Issuer shall have the right to terminate this Agreement, in whole but not in part, in connection with a mandatory clean up call redemption of the Bonds (as provided for in Section 4.06(e) of the Indenture).    In connection with any such termination, Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one (1) Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one (1) Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman.    If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.    The Issuer's ability to terminate this Agreement pursuant to this Section 3.2, shall not be contingent on the current or expected future available funds of the Issuer.    If, following any redemption in accordance with this Section 3.2, there are no Bonds outstanding, the Issuer hereby covenants and warrants that so long as it shall have any obligations to Lehman hereunder, the Issuer shall take all necessary action to maintain the Indenture in full force and effect and shall observe, perform and fulfill each agreement and covenant contained in the Indenture as if Lehman were a named beneficiary thereof and shall pay any Termination Amount due hereunder to Lehman on or prior to the next date on which the Issuer receives payment of the Pledged Revenues (as defined in the Indenture).

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction of incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer and Lehman, to pay the Termination Amount in accordance herewith and, including, in the case of the Issuer or the Trustee, to enter into and perform its obligations under the Indenture);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter

or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Issuer and the Trustee, the Indenture), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)    in the case of the Issuer;

(i)    all Deposit Dates, Bond Payment Dates and Scheduled Reserve Amounts as indicated on <u>Exhibit G</u> of this Agreement are true and correct in all respects;

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Issuer or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Issuer);

(iii)    it is solvent and has, and expects to have after giving effect to this Agreement, sufficient funds to conduct its business and to pay its debts as they become due;

(iv)    it has not experienced any Incipient Illegality with respect to this Agreement;

(v)    it has not entered into any agreements providing for the forward delivery of Eligible Securities or for the investment of funds held under the Indenture except for the Debt Service Reserve Fund Agreement, dated as of June 19, 2003, by and among the Issuer, the Trustee, Morgan Stanley Capital Services Inc. and Morgan Stanley & Co. Incorporated (the "<u>Other Investment Agreement</u>");

(vi)    the Trustee is obligated to replenish the Reserve Fund through the application of funds on deposit in the Pledged Revenues Account (as defined in the Indenture) as provided in Section 4.03 of the Indenture; and

(vii)    (vii)    it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event which would have a material adverse effect on the Issuer's ability to perform under this Agreement.

(g)    in the case of Lehman, LBH, as of the date of this Agreement, has a long-term rating of A+ by Fitch, A2 by Moody's and A by Standard & Poor's.

## ARTICLE V

## COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants. Each of Lehman, the Issuer and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future (in the case of the Issuer, the Issuer shall have ninety (90) days to cure any failure to maintain this covenant);

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement (in the case of the Issuer, the Issuer shall have ninety (90) days to cure any failure to maintain this covenant);

(c)    if it is the Issuer or the Trustee, not enter into any amendment or modification of the Indenture which could materially impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Issuer's ability to issue additional bonds under the Indenture;

(d)    if it is the Issuer, during the term of this Agreement, deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) and, if it is the Trustee, deliver comparable documents with respect to the Trust Estate (as defined in the Indenture) as such are issued (in the case of the Issuer, the Issuer shall have ninety (90) days to cure any failure to maintain this covenant);

(e)    if it is the Issuer, take all necessary action to ensure the continued receipt by it of the Pledged Revenues (as defined in the Indenture) and application thereof; and

(f)    if it is the Issuer, it shall not replace this Agreement or withdraw any amounts held in the Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument.

Section 5.2    Role of Lehman; Independent Judgment. The Issuer acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary or financial or investment advisor to or agent or other representative of the Issuer, (ii) the Issuer has, to the extent it has deemed necessary, consulted

with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Issuer understands the terms, conditions and risks of this Agreement and is capable of assuming such risks, and (iii) the terms and conditions of this Agreement have been individually negotiated by it, Lehman and the Trustee and are the result of arms-length negotiations among Lehman, the Trustee and the Issuer.

Section 5.3    No Liability.    Each of the Issuer and the Trustee agrees that no Lehman Party shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys paid to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Issuer or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.    The Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation.  The Issuer understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Issuer has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.5    Termination Amount.    Each of the Issuer and the Trustee understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount may be due Lehman, the size of such Termination Amount and the party to whom such amount is owed will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated.  In certain market conditions the amount of any Termination Amount owed to Lehman by, as applicable, the Trustee or the Issuer could be substantial.  The Issuer's obligation to pay any Termination Amount shall be subordinate to the obligation to pay principal of and interest on the Bonds and shall be payable solely from amounts available to pay Junior Payments (as defined in the Indenture) under the Indenture.

Section 5.6    Fees and Commissions.    The Issuer acknowledges that Lehman has paid $347,000 as a broker's or arrangement fee to First Albany Corporation and $118,000 to the Issuer for deposit in the Operating Account established under the Indenture.

Section 5.7    No Petition.    Each of Lehman and the Trustee, by entering into this Agreement, hereby covenants and agrees that it will not, prior to the date which is one year and one day after the first date on which (a) there are no outstanding Bonds and (b) Lehman has certified that the Agreement has terminated and that there are no other or further payment obligations of the Issuer pursuant to the Agreement, acquiesce, petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining a lawsuit against the Issuer under any Federal or state bankruptcy,

insolvency or similar law or request (i) the appointment of a receiver, liquidator, assignee, trustee, custodian or other similar official for the Issuer or any substantial part of its property, or (ii) the winding up or liquidation of the affairs of the Issuer; provided that the foregoing shall not limit the right of Lehman to name the Issuer as a party in any other action or suit or in the exercise of any other remedy in respect of this Agreement.

Section 5.8    Incorporated Provisions.  (a) The Issuer agrees that the covenants and other agreements in Articles II, IV, V and VI of the Indenture but only such articles of the Indenture (the "Incorporated Provisions") are incorporated herein as fully as if set forth herein and Lehman were a named beneficiary thereof (including, without limitation, the right to consent to certain actions subject to consent under such aforementioned Articles).  The Issuer will observe, perform and fulfill each such agreement in the Indenture.  If the Indenture ceases to be in effect prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued under the Indenture) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of the Issuer under this Agreement have been fully satisfied.  Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of Lehman shall have no force and effect with respect to this Agreement if such amendment, supplement, modification or waiver would adversely affect the rights or obligations of Lehman hereunder.  Any amendment, supplement or modification for which such consent is obtained or for which such consent is not required shall be part of the Incorporated Provisions for purposes of this Agreement.

(b)    The Issuer shall be required to obtain the consent of Lehman to any amendment, supplement or modification of the Indenture that would adversely affect the rights or obligations of Lehman under this Agreement.  The Issuer shall provide Lehman with at least ten (10) days' prior written notice of any proposed amendment, supplement or modification of the Indenture whether or not the proposed amendment, supplement or modification will adversely affect the rights or obligations of Lehman under this Agreement.  If the Issuer fails to comply with any Incorporated Provision, the Issuer (and the Trustee, if the Trustee shall have actual knowledge of such failure) shall provide written notice of such failure to Lehman within three (3) Business Days thereof (one (1) Business Day in the case of a failure involving a payment).

## ARTICLE VI

## CLOSING CONDITIONS

Section 6.1    Closing Conditions.  On or prior to the Closing Date the following shall occur:

(a)    delivery to Lehman and the Issuer of an opinion of counsel to the Trustee, in the form of Exhibit B;

(b)    delivery to Lehman and the Trustee of an opinion of counsel to the Issuer, in the form of Exhibit D;

(c)    delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(d)    delivery to Lehman by the Issuer of a true and correct copy of the Indenture as in full force and effect on the date hereof;

(e)    delivery to the Trustee and the Issuer of an opinion of outside counsel to Lehman and LBH, in the form of Exhibit C, and a bankruptcy opinion of outside counsel to Lehman in form and substance satisfactory to the Issuer;

(f)    delivery to Lehman of a certified copy of any resolution or resolutions of the Issuer pursuant to which the Issuer is authorized to enter into this Agreement; and

(g)    delivery to the Issuer of a guarantee of LBH with respect to the obligations of Lehman hereunder, in the form of Exhibit F.

## ARTICLE VII

### DEFAULTS; TERMINATION

Section 7.1    Trustee Events of Default.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail for any reason to purchase, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement for any reason other than the Issuer has withdrawn (or causes the Trustee to withdraw) funds from the Reserve Fund to make a Debt Service Payment unless (a) such failure is cured within five (5) Business Days after written notice of such failure is given to the Trustee by Lehman (the "Trustee Cure Period"); provided, however, that to the extent that such failure results by reason of a Market Disruption, the Trustee Cure Period shall extend to the end of the Market Disruption Period and (b) the Issuer pays interest on the Purchase Price at the Default Rate from and including the date any such Qualified Securities were duly tendered to the Trustee to but excluding the date such Qualified Securities were actually purchased by the Trustee;

(b)    the Trustee shall default in the performance of any material covenant or obligation under this Agreement (other than as described in clause (a) above) and such default is not cured within ten (10) Business Days of notice thereof from Lehman or the Issuer;

(c)    any material representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(d)    the Trustee is at any time Insolvent and is not replaced within forty-five (45) days of notice and request by Lehman.

Section 7.2   Issuer Events of Default.  The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)    the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount for any reason other than the Issuer has withdrawn (or caused the Trustee to withdraw) funds from the Reserve Fund to make a Debt Service Payment, unless (a) such failure is cured within five (5) Business Days after written notice of such failure is given to the Issuer by Lehman (the "Issuer Cure Period"); provided, however, that to the extent that such failure results by reason of a Market Disruption, the Issuer Cure Period shall extend to the end of the Market Disruption Period and (b) the Issuer pays interest on the Purchase Price at the Default Rate from and including the date any such Qualified Securities were duly tendered to the Trustee to but excluding the date such Qualified Securities were actually purchased by the Trustee;

(b)    the Issuer shall default in the performance of any material covenant or obligation under this Agreement (other than as described in clause (a) above) and such default is not cured within ten (10) Business Days of notice thereof from Lehman or the Trustee;

(c)    any material representation or warranty of the Issuer contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made;

(d)    the Issuer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes Insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within thirty (30) days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within sixty (60) days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(e)    there shall be an investment of the Scheduled Reserve Amount which originally had been invested under this Agreement other than pursuant to this Agreement; provided that (i) investments purchased by the Trustee because of a late delivery by Lehman, or (ii) the investment of replenishment amounts if (x) within twelve (12) months of withdrawal but before investment as required under the Agreement or (y) after twelve (12) months of withdrawal and Lehman has elected not to invest such amounts, shall not constitute an Issuer Event of Default;

(f)    the Issuer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other parties to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Issuer;

(g)    a Trustee Event of Default has occurred for which the Trustee is not liable and the Trustee has not resigned or been replaced with a successor trustee reasonably acceptable to Lehman within forty-five (45) days of demand therefor pursuant to Section 7.4 hereof; or

(h)    a Termination Amount is owed to Lehman and the Issuer fails to request, within thirty (30) days an amount be deposited into the Operating Account (as defined in the Indenture) sufficient and available to pay the Termination Amount.

Section 7.3    Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities with a Purchase Price equal to the Scheduled Reserve Amount for such Deposit Date (or cash equivalent to the interest the Trustee would have earned on the available Reserve Fund amount currently invested in this Agreement had that amount been invested at the Guaranteed Rate (the "Guaranteed Interest")) and such failure is not cured within five (5) Business Days after written notice thereof to Lehman from the Trustee or the Issuer (the "Lehman Cure Period"); provided, however, that to the extent that such failure results from a Market Disruption, the Lehman Cure Period shall extend until the end of the Market Disruption Period;

(b)    Lehman shall default in the performance of any material covenant or obligation under this Agreement (other than as described in clause (a) above) and such default is not cured within ten (10) Business Days of notice thereof from the Issuer or the Trustee;

(c)    any material representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which is was made;

(d)    Lehman or LBH is at any time Insolvent;

(e)    Lehman or LBH, if Lehman's performance is guaranteed, consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of Lehman or LBH under the Agreement or the Guarantee as the case may be or by operation of law or pursuant to an agreement reasonably satisfactory to the Issuer, or (ii) the long-term senior unsecured debt rating of the resulting, surviving or transferee entity is below "A-" by S&P or "A3" by Moody's and the transferee entity does not cure the downgrade as described in Section 2.7 hereof; or

(f)    LBH's rating falls below "BBB-" or "Baa3" by S&P or Moody's, respectively.

Section 7.4    <u>Remedies Upon Occurrence of a Trustee Event of Default</u>.  Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or, if such Qualified Securities have not been purchased by the Trustee within five (5) Business Days, sell to any other purchaser, in a commercially reasonable manner, the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2 hereof, make written demand upon the Issuer for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    make demand upon the Issuer, with a copy to the Trustee, to replace the Trustee within forty-five (45) days with a replacement trustee that is reasonably acceptable to Lehman (such acceptance not to be unreasonably withheld or delayed); and/or

(c)    in the event the Trustee has not resigned or been replaced by the Issuer in accordance with a demand by Lehman pursuant to clause (b) above within forty-five (45) days of such demand, immediately terminate this Agreement by giving written notice thereof to the Trustee with a copy to the Issuer and, subject to Section 8.2 hereof, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount, and (ii) if the Termination Amount is a negative number, pay such Termination Amount to the Trustee for deposit to the credit of the Reserve Fund.

If the Termination Amount is payable pursuant to this Section 7.4, subject to Section 8.2 hereof, the party owing such amount shall promptly, but by no later than two (2) Business Days after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate.  Any amounts payable pursuant to Section 7.7 hereof shall be payable upon demand as provided therein.

Notwithstanding anything to the contrary herein, the Trustee shall not be directly liable for any damages to Lehman hereunder except to the extent, if any, that (i) the losses

incurred by Lehman upon a Trustee Event of Default are caused by the Trustee's negligence or willful misconduct or (ii) any representation or warranty of the Trustee contained in the Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made. The Issuer shall be liable hereunder for any amounts due to Lehman as a result of one of the preceding events described in clauses (i) and (ii) above.

Section 7.5    Remedies Upon Occurrence of Issuer Event of Default. Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser, in a commercially reasonable manner, the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving notice thereof to the Issuer with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount, and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Issuer.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than two (2) Business Days after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of a Lehman Event of Default. Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Scheduled Reserve Amount to purchase Permitted Investments in accordance with Section 2.4 hereof and, if this Agreement has not been terminated, make demand for the payment of its losses in connection therewith including any transaction costs and shortfall in interest earnings that would otherwise be due under this Agreement , calculated as provided in Section 7.7(b); and

(b)    if such default is a default under Section 7.3(a) and Lehman has failed to pay the Issuer's losses (as described in Section 7.7(b)) upon demand therefore or if such default is a default under Sections 7.3(b), (c), (d), (e) or (f) hereof, immediately terminate this Agreement by giving notice thereof to Lehman and the Issuer with a copy to the Trustee, whereupon the Trustee shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than two (2) Business Days after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later

than two (2) Business Days after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount until paid at the Default Rate.

If any Termination Amount is due from Lehman to the Issuer in accordance with paragraph (b) above following a termination of this Agreement, to exercise the rights and remedies of a secured party with respect to any or all collateral delivered by Lehman and, to the extent permitted by law, to sell any or all such collateral, in one lot or in separate parcels, for cash or on credit or for future delivery, at the option of the Trustee, at any public or private sale (in a commercially reasonable manner), and at such price or prices as the Trustee may deem appropriate, upon two (2) Business Days' prior written notice to Lehman of its intention to sell and of the time and place of sale. If the purchaser fails to take up and pay for the collateral so sold, such collateral may again be similarly sold. The Trustee may be the purchaser of any or all of the collateral sold and thereafter shall hold such collateral free from any right of redemption, stay or appraisal. All amounts over and above the amount owed to the Issuer realized upon any such sale by the Trustee shall be paid to Lehman within one (1) Business Day of such sale; provided, however, that in the sale of securities the Trustee shall not be entitled to purchase any of the collateral at any private sale for less than the market value of such securities.

Section 7.7 <u>Loss Amount if Failed or Late Purchase</u>. (a) Subject to Section 8.2 hereof, (i) if the Trustee fails to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (ii) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount for any reason other than a withdrawal from the Reserve Fund to make a Debt Service Payment, the Issuer shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum (the "<u>Loss Amount</u>") of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) subject to Section 7.3(a), the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "<u>Shortfall Amount</u>"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Issuer compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses including reasonable legal fees and expenses (the "<u>Incidental Expenses</u>") incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y). Notwithstanding the foregoing, if Lehman does not on any date cause the delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (x) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered but were not delivered due to such shortfall in the Reserve Fund exceeds the market value thereof (as reasonably determined by Lehman as of the date such tender was to be made), (y) interest on such amount at the Default Rate on such excess from the date of attempted delivery to the Trustee in accordance with this Agreement to but excluding the date on which the Issuer compensates Lehman for its losses and (z) any Incidental Expenses. All sales of Qualified Securities to a party other than the Trustee shall be made in a commercially

reasonable manner at the available market price. All calculations of Default Interest herein shall be calculated on the basis of daily compounding.

(b)    If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefor pursuant to Section 7.6(a) shall equal the Guaranteed Interest. In the event that Lehman has paid the Guaranteed Interest amount in connection with any Deposit Date, the Issuer shall pay to Lehman on the next succeeding Deposit Date an amount equal to the excess of the Guaranteed Interest so paid over the interest the Trustee actually earned by investing the related scheduled reserve amount in Qualified Securities on an overnight basis (or if the Trustee fails to invest such scheduled reserve amount in Eligible Investments (as defined in the Indenture) on an overnight basis, the amount of interest the Trustee would have earned on such scheduled reserve amount had the Trustee invested on an overnight basis).

Section 7.8    <u>Subordination</u>.    The parties hereto agree that all amounts payable by the Issuer to Lehman hereunder, including Termination Amounts and Loss Amounts, are payable on a basis subordinate to the Issuer's obligation to make Debt Service Payments and will be payable solely from and only to the extent amounts are available therefor in the Operating Account (as defined in the Indenture) and solely as a Junior Payment (as defined in the Indenture).

Section 7.9    <u>No Rights Against the Reserve Fund</u>.    Neither Lehman nor any Qualified Dealer shall have any right to any amounts or Qualified Securities held in the Reserve Fund. Lehman shall have no rights title or interest in or to any Qualified Securities, cash or other property held by the Trustee under the Indenture except for as provided in Section 7.13 hereof.

Section 7.10    <u>No Set-Off</u>.    Lehman agrees that any payments due by it hereunder shall not be set-off by any amounts otherwise due Lehman.

Section 7.11    <u>No Waiver; Remedies Cumulative</u>.    No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise. None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.

Section 7.12    <u>Limited Liability</u>.    Neither the Issuer, the Board of Directors of the Issuer, the State of New York, nor any person executing this Agreement on behalf of the Issuer shall be liable personally hereunder or be subject to any personal liability or accountability by reason of or for any claims resulting from entering into this Agreement. The obligations of the Issuer and the Trustee hereunder are limited to, and payable solely from, the funds available therefor under the Indenture.

Section 7.13    <u>Source of Funds</u>.    The Issuer agrees that all amounts payable to Lehman by the Issuer hereunder, including, without limitation, any Termination Amount, shall constitute Operating Expenses (as defined in the Indenture) and each of the parties hereto agrees

that such amounts shall be payable solely from and to the extent amounts are available in the Operating Account (as defined in the Indenture) to pay Junior Payments (as defined in the Indenture) in accordance with the terms of the Indenture.

## ARTICLE VIII

## THE TRUSTEE

Section 8.1    Acceptance by Trustee.    By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder expressly set forth herein and no implied duties or obligations shall be read into this Agreement against the Trustee. The Trustee is entering into this Agreement solely in its capacity as trustee under the Indenture in accordance with the terms thereof as directed by the Issuer.

Section 8.2    Liability of the Trustee; Consultation with Legal Counsel.    (a) The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(c) hereof.

(b)    The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

(c)    The Trustee shall be entitled to rely conclusively upon any certificate, notice or other document delivered to it hereunder by the Issuer or Lehman or any of its affiliates as provided herein, or any Qualified Dealer as to the truth, accuracy and validity thereof which is reasonably believed by the Trustee in good faith to have been signed by an authorized officer or signatory of such entity.

(d)    The Issuer by its execution and delivery of this Agreement irrevocably directs the Trustee to enter into this Agreement and acknowledges to the Trustee that execution and delivery of this Agreement and the investments provided for hereunder is permitted under the Indenture and further acknowledges that the indemnities provided to the Trustee by the Issuer under the Indenture shall be afforded to the Trustee by the Issuer in the execution and performance by the Trustee of this Agreement.

Section 8.3    Payment of Trustee Fees.    Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4   Trustee Cooperation.   (a) The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to the Indenture and this Agreement.

(b)   The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to make payments required by the Indenture.

Section 8.5   Successor Trustee.   If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Issuer shall appoint a successor Trustee pursuant to the terms of the Indenture.  The Issuer agrees that if the Trustee fails for any reason to perform its material duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Issuer shall, within forty-five (45) days, upon request of Lehman, pursuant to the terms of Section 7.4 hereof and to the extent permitted by the Indenture, appoint a successor trustee that is reasonably acceptable to Lehman (such acceptance not to be unreasonably withheld or delayed).

## ARTICLE IX

## MISCELLANEOUS

Section 9.1   Notices and Delivery Instructions.   All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attention:  Municipal Financial Products – Middle Office
Telephone:  212-526-2240
Fax:  646-758-2249

With a copy to:

Cadwalader, Wickersham & Taft LLP
100 Maiden Lane
New York, NY 10038
Attention:  Ira Schacter, Esq.
Telephone:  212-504-6035
Fax:  212-504-6666

To the Trustee:

The Bank of New York
733 McCartney Street
Easton, PA 18042
Attention: Deborah Todak, AVP
Telephone: 610-559-5189
Fax: 610-559-1299

And:

The Bank of New York
101 Barclay Street, 21W
New York, NY 10286
Attention: Pat Santivasci, SVP
Telephone: 212-815-5939
Fax: 212-815-3455

With a copy to:

Stadmauer Bailkin, LLP
850 Third Avenue, 19th Floor
New York, NY 10022
Attention: David J. Fernández, Esq.
Telephone: 212-822-2249
Fax: 212-980-9578


[DELIVERY INSTRUCTIONS FOR BOOK-ENTRY GOVERNMENT
OBLIGATIONS]

BK OF NYC/CUST
ABA #: 021000018
Cust. Acct. #: 359638
Acct. Name: Tob Set Fin Corp (NY)2003 A DS Res Fd.

[DELIVERY INSTRUCTIONS FOR DTC ELIGIBLE SECURITIES]

The Bank of New York
DTC #: 901
ID Agent Bank #: 26500
Cust. Acct. #: 359638
Acct. Name: Tob Set Fin Corp (NY)2003 A DS Res Fd.

[DELIVERY INSTRUCTIONS FOR FEDERAL FUNDS WIRE TRANSFERS]

The Bank of New York

ABA #: 021000018
GLA #: 111-565
Cust. Acct. #: 359638
Acct. Name: Tob Set Fin Corp (NY)2003 A DS Res Fd.

To the Issuer:

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, NY 10022
Attention: Jim Angley
Telephone: 212-688-4000, ext. 314
Fax: 212-872-0301
Issuer Tax I.D. #: 20-0026923

And:

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, NY 10022
Attention: Genevieve D'Agostino
Telephone: 212-688-4000, ext. 550
Fax: 212-872-0301
Issuer Tax I.D. #: 20-0026923

With a copy to:

Hawkins, Delafield & Wood
67 Wall Street
New York, NY 10005
Attention: Richard Van Dusen, Esq.
Telephone: 212-820-9630
Fax: 212-820-9603

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    Binding Effect; Transfer.  This Agreement shall be binding upon and inure to the benefit of the Trustee, the Issuer, Lehman and LBH and upon their respective permitted successors and transferees.  Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, (i) if this Agreement is guaranteed, without the written consent of the Issuer and the Trustee, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman by upon written notice to the Issuer and the Trustee of such transfer and the name of the transferee, and upon provision by LBH of sufficient evidence in the reasonable opinion of the Issuer that the guarantee delivered pursuant to Section 6.1(g) or a substantially similar guarantee shall extend to the transferee and delivery of the legal opinion as described in Section 6.1(e) or in such other form as is acceptable to the

Issuer and the Trustee and (ii) Lehman shall otherwise be able to transfer all or any portion of this Agreement only with the prior written consent of the Issuer and the Trustee (such consent not to be unreasonably withheld or delayed), receipt of a confirmation from each Rating Agency (as defined in the Indenture) and delivery of the legal opinions as described in Section 6.1(e) or in a form acceptable to the Issuer and the Trustee; provided that, in all such instances of transfer the transferee shall immediately assume all of the rights and obligations of Lehman hereunder. Neither the Issuer nor the Trustee may transfer this Agreement without the prior written consent of Lehman, except that the Trustee may transfer this Agreement to any trustee appointed under the Indenture.

Section 9.3    Limitation.    Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4    Severability.    If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.5    Amendments, Changes and Modifications.    This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.6    Counterparts.    This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.7    Termination.    Unless earlier terminated pursuant to Sections 3.1, 3.2, 7.4, 7.5, 7.6 or 9.10 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in Exhibit G and the date on which Lehman, the Trustee and the Issuer have satisfied all of their obligations hereunder.

Section 9.8    Entire Agreement.    This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 9.9    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Section 9.10    Optional Termination.    The Issuer shall have the right to terminate this Agreement, in whole or in part for any reason, upon at least ten (10) Business Days' prior written notice to Lehman, whereupon Lehman shall determine the Termination Amount with respect to the Termination Portion of the Scheduled Reserve Amount and (i) if the Termination

Amount is a negative number, Lehman shall promptly, but no later than one (1) Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one (1) Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. The Issuer agrees that it shall not exercise its right to terminate this Agreement pursuant to this Section 9.10 unless either (i) it shall have sufficient funds available to pay any Termination Amount that may be due in accordance herewith or (ii) the Issuer has demonstrated to Lehman that the Issuer will have sufficient funds available to pay any Termination Amount within one (1) year of the date of termination and Lehman has consented to such termination (such consent not to be unreasonably withheld).

Section 9.11    Submission to Jurisdiction; Waver of Trial by Jury. Lehman, the Trustee and the Issuer each hereby irrevocably submit to the non-exclusive jurisdiction of the Supreme Court for the State of New York, County of Albany, for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, at the election of the party initiating any such suit, action or other proceeding, which is brought by or against Lehman, the Trustee or the Issuer, and the parties each hereby irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined by any such court and each of Lehman, the Trustee and the Issuer acknowledges that it is subject to suit in such courts with respect to enforcement of its obligations hereunder. Each party to this Agreement waive, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any proceedings relating to this Agreement.

Section 9.12    Expenses. Except as provided herein or in connection with the enforcement of any of its rights hereunder and, in connection with such enforcement, Lehman's recovery of incidental costs and expenses (including but not limited to reasonable legal fees and expenses) following the occurrence of an Issuer Event of Default or a Trustee Event of Default, all expenses associated with Lehman's performance of the Agreement, including but not limited to Lehman's legal fees, custodial fees, and electronic funds transfer charges, are the responsibility of Lehman. If Lehman delivers Qualified Securities more than ten times in any calendar year, not including deliveries due to the replenishment of the funds associated with permitted withdrawals by the Trustee, Lehman agrees to reimburse the Issuer for any actual fees charged by the Trustee for reasonable and customary costs of the Trustee for such delivery. An estimate of the fee for delivery by the Trustee is $50.

IN WITNESS WHEREOF, the Issuer, the Trustee and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT FINANCING
CORPORATION, as issuer

By:_____
  Name:
  Title:

THE BANK OF NEW YORK, as trustee

By:_____
  Name:  Deborah Todak
  Title:  Assistant Vice President

LEHMAN BROTHERS SPECIAL
FINANCING INC.

By:_____
  Name:
  Title:

IN WITNESS WHEREOF, the Issuer, the Trustee and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT FINANCING
CORPORATION, as issuer

By:_____
    Name:
    Title:

THE BANK OF NEW YORK, as trustee

By:_____
    Name:  Deborah Todak
    Title:  Assistant Vice President

LEHMAN BROTHERS SPECIAL
FINANCING INC.

By: _T. Courtney_____
    Name:  T. Courtney Jenkins
    Title:    Vice President

<b><u>EXHIBIT A</u></b>

ELIGIBLE SECURITIES

"<u>Eligible Securities</u>" means:

(i)        Defeasance Collateral (defined below);

(ii)        non-callable direct obligations of the United States of America, non-callable and non-prepayable direct federal agency obligations the timely payment of principal of and interest on which are fully and unconditionally guaranteed by the United States of America;

(iii)        direct obligations of, or obligations guaranteed as to timely payment of principal and interest by Federal Home Loan Mortgage Corporation (FHLMC), Federal National Mortgage Association (FNMA), the Federal Farm Credit System , or Federal Home Loan Bank (FHLB) system; or

(iv)        commercial or finance company paper (including both non-interest-bearing discount obligations and interest bearing obligations payable on demand or on a specified date not more than 190 days after the date of issuance thereof) that is rated at least "F-1" by Fitch (if rated by Fitch) and "A-1" by Standard & Poor's (and, if longer than 100 days but no longer than 190 days, rated at least "A" and "A", respectively).

**Limitations on Eligible Securities**:

(i)        Eligible Securities are subject to the Concentration Limit (described below).  The Concentration Limit does not apply to Eligible Securities that are Defeasance Collateral.

(ii)        Commercial paper issued by a provider (or a guarantor of a provider) under an Other Investment Agreement will not be Eligible Securities.  The Concentration Limit described herein do not apply to the amount of Eligible Securities delivered by Lehman if Lehman is delivering its own commercial paper.  Instead, the Concentration Limit for the commercial paper of Lehman will be applied to the total Debt Service Reserve Requirement (as defined in the Indenture), not the amount of funds invested under this Agreement.  For example, if Lehman is providing 75% of the total Debt Service Reserve Requirement, the 35% Concentration Limit limits Lehman to only deliver 35% of the total Debt Service Reserve Requirement in the form of Lehman's commercial paper, not 35% of the 75% of the Debt Service Reserve Requirement Lehman is delivering.

"Defeasance Collateral" means money and, to the extent lawful for investment of funds of the Corporation, any of the following:

(i)    non-callable direct obligations of the United States of America, non-callable and non-prepayable direct federal agency obligations the timely payment of principal of and interest on which are fully and unconditionally guaranteed by the United States of America (which do not include obligations of FNMA or the FHLMC), non-callable direct obligations of the United States of America which have been stripped by the United States Treasury itself or by any Federal Reserve Bank (not including "CATS, TIGRS" and "TRS") and the interest components of REFCORP bonds for which the underlying bond is non-callable (or non-callable before the due date of such interest component) for which separation of principal and interest is made by request to the Federal Reserve Bank of New York in book-entry form, and shall exclude investments in mutual funds and unit investment trusts;

(ii)    non-callable obligations timely maturing and bearing interest (but only to the extent that the full faith and credit of the United States of America are pledged to the timely payment thereof);

(iii)    certificates rated in one of the two highest long-term rating categories by S&P and Fitch (if rated by Fitch) evidencing ownership of the right to the payment of the principal of and interest on obligations described in clause (ii), provided that such obligations are held in the custody of a bank or trust company satisfactory to the Trustee in a segregated trust account in the trust department separate from the general assets of such custodian;

(iv)    bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state (x) which are not callable at the option of the obligor or otherwise prior to maturity or as to which irrevocable notice has been given by the obligor to call such bonds or obligations on the date specified in the notice, (y) timely payment of which is fully secured by a fund consisting only of cash or obligations of the character described in clause (i), (ii) or (iii) which fund may be applied only to the payment when due of such bonds or other obligations and (z) rated "AAA" by S&P and in one of the two highest long-term rating categories by Fitch (if rated by Fitch); and

(v)    investment arrangements acceptable to the Issuer and rated in the highest long-term and short-term rating categories by each Rating Agency.

**Concentration Limit**.  To allow the Issuer to limit its potential exposure to a single credit, no more the 35% of the funds invested may be issued by a single entity. Therefore no more than 35% of the par amount of Eligible Securities delivered by Lehman and held by the Trustee at any time may be issued by a single issuer.

**EXHIBIT B**

[FORM OF OPINION OF COUNSEL TO TRUSTEE]

June 19, 2003

Tobacco Settlement Financing Corporation (State of New York)
641 Lexington Avenue
New York, New York 10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, New York 10019

Re: $2,310,705,000 Asset-Backed Revenue Bonds, Series 2003A (State Contingency Contract Secured)

Ladies and Gentlemen:

We have acted as counsel to The Bank of New York (the "Trustee") in connection with the execution and delivery by the Trustee of the Reserve Fund Agreement, dated as of June 19, 2003 (the "Agreement"), by and among the Trustee, Tobacco Settlement Financing Corporation (the "Issuer") and Lehman Brothers Special Financing Inc.. Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of New York.

Based upon the foregoing examination and review, we are of the opinion that:

(i) The Trustee has full legal right, power and authority to enter into the Agreement.

(ii) The Agreement has been duly authorized, executed and delivered by the Trustee.

(iii)   The Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(iv)   The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(v)   The Indenture is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon.  This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

STADTMAUER BAILKIN LLP

**EXHIBIT C**

[FORM OF OPINION OF COUNSEL TO LBSF/GUARANTOR]

June __, 2003

To the Addressees Listed on
The Attached Schedule A

Re:    Reserve Fund Agreement-Tobacco Settlement Financing Corporation, Asset-Backed
       Revenue Bonds, Series 2003A (State Contingency Contract Secured)

Ladies and Gentlemen:

        We have acted as special counsel to Lehman Brothers Special Financing Inc., a
corporation organized under the laws of Delaware ("LBSF") and Lehman Brothers Holdings
Inc., a Delaware corporation ("Guarantor") in connection with the execution and delivery by
LBSF of the Reserve Fund Agreement, dated as of June __, 2003 (the "Agreement"), among
LBSF, The Bank of New York, as Trustee (the "Trustee") and Tobacco Settlement Financing
Corporation ("TSFC") and by the Guarantor of the Guarantee, dated as of June __, 2003 (the
"Guarantee") delivered in connection with the Agreement.

        In connection with this opinion, we have examined an executed copy of each of
the Agreement and the Guarantee and such corporate documents and records of LBSF and of the
Guarantor, certificates of public officials and officers of LBSF and of the Guarantor, and such
other documents as we have deemed necessary or appropriate for the purposes of this opinion.
In such opinion, we have assumed the genuineness of all signatures, the authenticity of all
documents submitted to us as originals, the conformity to authentic original documents of all
documents submitted to us as certified, conformed or photostatic copies, and the due execution
and delivery, pursuant to due authorization, of the Agreement and of the Guarantee by each party
thereto.

        The opinions expressed herein are limited to matters concerning the federal laws
of the United States of America, the laws of the State of New York and the General Corporation
Law of the State of Delaware.  With respect to the opinions set forth in paragraphs 1 and 2
below, we have, with your consent, relied solely upon the opinion of counsel of LBSF and the
Guarantor, a copy of which is attached as Schedule B.

NYLIB5 716140.6

To the Addressees Listed on
The Attached Schedule A                    -4-                    June ___, 2003

Based upon the foregoing, we are of the opinion that:

1.    Each of LBSF and the Guarantor is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

2.    The execution, delivery and performance of the Agreement by LBSF and of the Guarantee by the Guarantor are within its respective corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provisions of it's respective articles of incorporation or by-laws.

3.    The Agreement, in the case of LBSF, and the Guarantee, in the case of the Guarantor, has been duly executed and delivered by it and constitutes its legally valid and binding obligation, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

We are admitted to practice in the State of New York, and except as expressly set forth above, this opinion is limited to the laws of the State of New York. The opinions expressed herein are limited to the laws and facts as presently in existence. We undertake no obligation to revise, supplement or update this opinion after the date hereof for any reason.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

Schedule A

The Bank of New York, as trustee
101 Barclay Street
New York, New York 10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York  10019

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York  10019

Schedule B

[Form of Opinion of Counsel of LBSF and the Guarantor]

June 19, 2003

The Bank of New York, as trustee
101 Barclay Street
New York, New York 10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York 10022

Re:    $2,310,705,000 Tobacco Settlement Financing Corporation Asset-Backed Revenue
       Bonds, Series 2003A (State Contingency Contract Secured)

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman")
and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with
matters pertaining to the execution and delivery by Lehman of the Reserve Fund Agreement
dated as of June 19, 2003 (the "Agreement') by and among Lehman, The Bank of New York, as
Trustee (the "Trustee") and Tobacco Settlement Financing Corporation (the "Issuer") and the
guarantee of the Guarantor (the "Guarantee") delivered in connection with the Agreement.
Capitalized terms used herein and not defined herein have the respective meanings given to them
in the Agreement.

In connection with the opinions expressed below, I have examined, or have had
examined on my behalf, a copy of the Agreement executed by Lehman, the Guarantee and such
other agreements, instruments, documents and records of Lehman and certificates and statements
by public officials and officers of Lehman and Guarantor as I have deemed necessary or
appropriate as a basis for the opinions hereinafter expressed.

Based upon the foregoing but subject to the assumptions, exceptions,
qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Each of Lehman and Guarantor is a corporation duly incorporated, validly
      existing and in good standing under the laws of the State of Delaware and
      each has the corporate power and authority to execute and deliver the
      Agreement, in the case of Lehman, and the Guarantee, in the case of
      Guarantor, and to perform its obligations thereunder.

2.    Each of the Agreement, in the case of Lehman, and the Guarantee, in the
      case of Guarantor, has been duly and validly authorized, executed and
      delivered and constitutes a legal, valid and binding obligation, enforceable
      against it in accordance with its terms.

3.    Lehman's and the Guarantor's execution and delivery of the Agreement and the Guarantee and the performance of its respective obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property (other than such conflicts, defaults or violations would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

4.    All consents, authorizations and approvals requisite for its execution, delivery and performance by Lehman of the Agreement and by the Guarantor of the Guarantee have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance (except for such consents, authorizations and approvals which the failure to obtain would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by the Trustee and the Issuer, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

**EXHIBIT D**

[FORM OF OPINION OF COUNSEL TO THE ISSUER]

[LETTERHEAD OF COUNSEL OF ISSUER]

June 19, 2003

The Bank of New York
101 Barclay Street, Floor 21W
New York, NY 10286

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York 10019

Re: [NAME OF BONDS]

Ladies and Gentlemen:

I have acted as counsel to the Tobacco Settlement Financing Corporation (the "Issuer") in connection with its execution and delivery of the Debt Service Reserve Fund Agreement, dated as of June 19, 2003 (the "Agreement"), by and among the Issuer, The Bank of New York (the "Trustee"), Lehman Brothers Special Financing Inc. (the "Provider") and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Financing Documents.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of New York (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)     The Issuer has full legal right, power and authority to enter into the Agreement and the Indenture and to authorize and direct the Trustee, pursuant to the Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

(ii)    The Agreement and the Indenture have been duly authorized, executed and delivered by the Issuer.

(iii)    Each of the Agreement and the Indenture is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(iv)    The Issuer's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of the Indenture or any other agreement, instrument, law, judgment, injunction or order applicable to it or any of its property.

(v)    All consents, authorizations and approvals requisite for the Issuer's execution, delivery and performance of this Agreement and the Indenture have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

(vi)    The Agreement is an Eligible Investment as defined in the Indenture.

(vii)    The Issuer is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement brought validly ex contractu in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(viii)    The Trustee is obligated to replenish the Reserve Fund solely through the application of available funds, if any, on deposit in the Pledged Revenues Account (as defined in the Indenture) as provided in Section 4.03(a)(4) of the Indenture.

I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

**EXHIBIT E**

## Lehman Brothers Special Financing Inc.
### Notice of Tender
### Under the [_____] Agreement
### Dated as of:  [_____]

To:          _____, as [Escrow
             Agent/Trustee]
             Attention:  _____
             Fax:  _____
             Phone:  _____

From:        Lehman Brothers Inc. ("LBI")
             Attention:  _____
             Fax:  _____
             Phone:  _____
Date:        [_____]
Re:          [_____]

| Date and Price | |
| --- | --- |
| Purchase Date: | [_____] |
| Specified Purchase Price: | [_____] |

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
| --- | --- | --- | --- | --- | --- | --- |
| [_____] | [_____] | [_____] | [_____] | [_____] | [_____] | [_____] |

**Delivery vs. Payment (Book Entry Delivery)**

On the Purchase Date, LBI will deliver Face value [_____]  [BILLS/NOTES] maturing [_____]
to:
             [_____]
             [_____]
             Re:
             [_____]

On the Purchase Date, LBI will receive [_____]
        Chase NYC/Lehman
        ABA: 021000021
        A/C #066206677

<u>**EXHIBIT F**</u>

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman") has entered into a Reserve Fund Agreement dated as of June 19, 2003 (the "Agreement") by and among Lehman, TOBACCO SETTLEMENT FINANCING CORPORATION (the "Issuer") and THE BANK OF NEW YORK, as Trustee (the "Trustee"). For value received, and in consideration of the financial accommodations accorded to Lehman by the Issuer under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally and irrevocably guarantees to the Issuer the due and punctual payment of all amounts payable by Lehman under the Agreement when and as Lehman's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Lehman to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by the Issuer, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable. In the event that any amounts paid by Lehman under the Agreement are rescinded or must otherwise be returned for any reason whatsoever, Guarantor shall remain liable hereunder in respect of such amounts as if such payment had not been made.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Lehman (other than as a result of the unenforceability thereof against the Issuer), the absence of any action to enforce Lehman's obligations under the Agreement, any waiver or consent by the Issuer with respect to any provisions thereof, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Lehman could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any default or potential default in respect of the Issuer, but only to the extent such right is provided to Lehman under the Agreement.

(d)     Guarantor shall be subrogated to all rights of the Issuer against Lehman in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Lehman under the Agreement, shall have been paid in full.

(e)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that the Issuer

exhaust any right to take any action against Lehman or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with the Issuer as those made by Lehman pursuant to <u>Section 4.1</u> of the Agreement, at the times set forth therein, except that references therein to "Lehman" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall remain in full force and effect and be binding upon Guarantor and its successors and permitted assigns and inure to the benefit of the Issuer and its successors and permitted assigns until all amounts payable by Lehman under the Agreement have been satisfied in full.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, at 745 Seventh Avenue, New York, NY 10019 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products at 745 Seventh Avenue, New York, NY 10019.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:_____
Name:
Title:

**EXHIBIT G**

| Deposit Date[*] | Bond Payment Date[*] | Scheduled Reserve Amount |
|---|---|---|
| 06/19/03 | 12/01/03 | $170,659,179.00 |
| 12/01/03 | 06/01/04 | $170,659,179.00 |
| 06/01/04 | 12/01/04 | $170,659,179.00 |
| 12/01/04 | 06/01/05 | $170,659,179.00 |
| 06/01/05 | 12/01/05 | $170,659,179.00 |
| 12/01/05 | 06/01/06 | $170,659,179.00 |
| 06/01/06 | 12/01/06 | $170,659,179.00 |
| 12/01/06 | 06/01/07 | $170,659,179.00 |
| 06/01/07 | 12/01/07 | $170,659,179.00 |
| 12/01/07 | 06/01/08 | $170,659,179.00 |
| 06/01/08 | 12/01/08 | $170,659,179.00 |
| 12/01/08 | 06/01/09 | $170,659,179.00 |
| 06/01/09 | 12/01/09 | $170,659,179.00 |
| 12/01/09 | 06/01/10 | $170,659,179.00 |
| 06/01/10 | 12/01/10 | $170,659,179.00 |
| 12/01/10 | 06/01/11 | $170,659,179.00 |
| 06/01/11 | 12/01/11 | $170,659,179.00 |
| 12/01/11 | 06/01/12 | $170,659,179.00 |
| 06/01/12 | 12/01/12 | $170,659,179.00 |
| 12/01/12 | 06/01/13 | $170,659,179.00 |
| 06/01/13 | 12/01/13 | $170,659,179.00 |
| 12/01/13 | 06/01/14 | $170,659,179.00 |
| 06/01/14 | 12/01/14 | $170,659,179.00 |
| 12/01/14 | 06/01/15 | $170,659,179.00 |
| 06/01/15 | 12/01/15 | $170,659,179.00 |
| 12/01/15 | 06/01/16 | $170,659,179.00 |
| 06/01/16 | 12/01/16 | $170,659,179.00 |
| 12/01/16 | 06/01/17 | $170,659,179.00 |
| 06/01/17 | 12/01/17 | $170,659,179.00 |
| 12/01/17 | 06/01/18 | $170,659,179.00 |
| 06/01/18 | 12/01/18 | $170,659,179.00 |
| 12/01/18 | 06/01/19 | $170,659,179.00 |
| 06/01/19 | 12/01/19 | $170,659,179.00 |
| 12/01/19 | 06/01/20 | $170,659,179.00 |
| 06/01/20 | 12/01/20 | $170,659,179.00 |
| 12/01/20 | 06/01/21 | $170,659,179.00 |
| 06/01/21 | 12/01/21 | $170,659,179.00 |

[*] Deposit Date or Bond Payment Date will be the Business Day immediately preceding such date.

| Deposit Date[*] | Bond Payment Date[*] | Scheduled Reserve Amount |
|---|---|---|
| 12/01/21 | 06/01/22 | $170,659,179.00 |
| 06/01/22 | 12/01/22 | $170,659,179.00 |
| 12/01/22 | 06/01/23 | $170,659,179.00 |

B

.

06/19/2003 10:34 FAX                                              ☑003
    06/18/2003    10:29    LEHMAN → 912125200176                  NO.590    ▨01

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman") has entered into a Reserve Fund Agreement dated as of June 19, 2003 (the "Agreement") by and among Lehman, TOBACCO SETTLEMENT FINANCING CORPORATION (the "Issuer") and THE BANK OF NEW YORK, as Trustee (the "Trustee"). For value received, and in consideration of the financial accommodations accorded to Lehman by the Issuer under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally and irrevocably guarantees to the Issuer the due and punctual payment of all amounts payable by Lehman under the Agreement when and as Lehman's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Lehman to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by the Issuer, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable. In the event that any amounts paid by Lehman under the Agreements are rescinded or must otherwise be returned for any reason whatsoever, the Guarantor shall remain liable hereunder in respect of such amounts as if such payment had not been made.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Lehman (other than as a result of the unenforceability thereof against the Issuer), the absence of any action to enforce Lehman's obligations under the Agreement, any waiver or consent by the Issuer with respect to any provisions thereof, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Lehman could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any default or potential default in respect of the Issuer, but only to the extent such right is provided to Lehman under the Agreement.

(d)    Guarantor shall be subrogated to all rights of the Issuer against Lehman in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Lehman under the Agreement, shall have been paid in full.

(e)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that the Issuer exhaust any right to take any action against Lehman or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with the Issuer as those made by Lehman pursuant to Section 4.1 of the Agreement, at the times set forth therein, except that references

06/19/2003 10:35 FAX                                                    @004
    06/18/2003    10:29    LEHMAN → 912125200176                 NO.598    P02

therein to "Lehman" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall remain in full force and effect and be binding upon the Guarantor and its successors and permitted assigns and inure to the benefit of the Corporation and its successors and permitted assigns until all amounts payable by Lehman under the Agreements have been satisfied in full.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Corporate Counsel, at 399 Park Avenue, New York, NY 10022 with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products at 745 Seventh Avenue, New York, NY 10019.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:

Title:          Oliver Budde
                Vice President

# C

# CADWALADER

### *Cadwalader, Wickersham & Taft LLP*

100 Maiden Lane
New York, NY 10038
Tel: 212 504-6000
Fax: 212 504-6666

New York
Charlotte
Washington
London

June 19, 2003

To the Addressees Listed on
The Attached Schedule A

Re:    Reserve Fund Agreement-Tobacco Settlement Financing Corporation, Asset-Backed
Revenue Bonds, Series 2003A (State Contingency Contract Secured)

Ladies and Gentlemen:

We have acted as special counsel to Lehman Brothers Special Financing Inc., a corporation organized under the laws of Delaware ("LBSF") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor") in connection with the execution and delivery by LBSF of the Reserve Fund Agreement, dated as of June 19, 2003 (the "Agreement"), among LBSF, The Bank of New York, as Trustee (the "Trustee") and Tobacco Settlement Financing Corporation ("TSFC") and by the Guarantor of the Guarantee, dated as of June 19, 2003 (the "Guarantee") delivered in connection with the Agreement.

In connection with this opinion, we have examined an executed copy of each of the Agreement and the Guarantee and such corporate documents and records of LBSF and of the Guarantor, certificates of public officials and officers of LBSF and of the Guarantor, and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies, and the due execution and delivery, pursuant to due authorization, of the Agreement and of the Guarantee by each party thereto.

The opinions expressed herein are limited to matters concerning the federal laws of the United States of America, the laws of the State of New York and the General Corporation Law of the State of Delaware. With respect to the opinions set forth in paragraphs 1 and 2 below, we have, with your consent, relied solely upon the opinion of counsel of LBSF and the Guarantor, a copy of which is attached as Schedule B.

NYLIB5 716190.2

To the Addressees Listed on
The Attached Schedule A                          -2-                          June 19, 2003

Based upon the foregoing, we are of the opinion that:

1.      Each of LBSF and the Guarantor is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

2.      The execution, delivery and performance of the Agreement by LBSF and of the Guarantee by the Guarantor are within its respective corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provisions of it's respective articles of incorporation or by-laws.

3.      The Agreement, in the case of LBSF, and the Guarantee, in the case of the Guarantor, has been duly executed and delivered by it and constitutes its legally valid and binding obligation, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

We are admitted to practice in the State of New York, and except as expressly set forth above, this opinion is limited to the laws of the State of New York. The opinions expressed herein are limited to the laws and facts as presently in existence. We undertake no obligation to revise, supplement or update this opinion after the date hereof for any reason.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

*Cadwalader, Wickersham & Taft*

Schedule A

The Bank of New York, as trustee
101 Barclay Street
New York, New York 10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York  10019

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York  10019

Schedule B

Opinion of Counsel of LBSF and the Guarantor

06/19/2003 10:36 FAX                                                                    ☐ 009
        06/18/2003    13:26    LEHMAN → 912125200384                                    NO. 804    P01

# LEHMAN BROTHERS

June 19, 2003

Tobacco Settlement Financing Corporation
New York, NY

The Bank of New York
New York, NY

Re:   $2,310,705,000  Tobacco  Settlement  Financing  Corporation  Asset-Backed  Revenue
      Bonds, Series 2003A (State Contingency Contract, Secured)

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the in connection with the execution and delivery by Lehman of the Reserve Fund Agreement dated as of November 5, 2002 (the "Agreement") by and among Lehman, The Bank of New York, as Trustee (the "Trustee") and Tobacco Settlement Financing Corporation (the "Issuer") and the guarantee of the Guarantor (the "Guarantee") delivered in connection with the Agreement. Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Agreement executed by Lehman, the Guarantee and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman and Guarantor as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Each of Lehman and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and each has the corporate power and authority to execute and deliver the Agreement, in the case of Lehman, and the Guarantee, in the case of Guarantor, and to perform its obligations thereunder.

2.    Each of the Agreement, in the case of Lehman, and the Guarantee, in the case of Guarantor, has been duly and validly authorized, executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with its terms.

3.    Lehman's and the Guarantor's execution and delivery of the Agreement and the Guarantee and the performance of its respective obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property (other than such conflicts, defaults or violations would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

LEHMAN BROTHERS
745 SEVENTH AVENUE  NEW YORK, NY 10019

06/19/2003 10:36 FAX                                                      ☑010
..    06/18/2003    13:26    LEHMAN → 912125200384                    NO. 804    P02

4.      All consents, authorizations and approvals requisite for its execution, delivery and performance by Lehman of the Agreement and by the Guarantor of the Guarantee have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance (except for such consents, authorizations and approvals which the failure to obtain would not have a material adverse effect on the ability of Lehman or the Guarantor to perform its respective obligations pursuant to the Agreement and the Guarantee).

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.      My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.      I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.      My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.      This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.      I have assumed with your permission (i) the genuineness of all signatures by the Trustee and the Issuer, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

# CADWALADER

### *Cadwalader, Wickersham & Taft LLP*

100 Maiden Lane
New York, NY 10038
Tel: 212 504-6000
Fax: 212 504-6666

New York
Charlotte
Washington
London

June 19, 2003

To the Addressees Listed on
The Attached Schedule A

> Re:    Reserve Fund Agreement-Tobacco Settlement Financing Corporation,
> Asset-Backed Revenue Bonds, Series 2003A (State Contingency Contract
> Secured)

Ladies and Gentlemen:

We have acted as special counsel to Lehman Brothers Special Financing Inc., a corporation organized under the laws of Delaware ("Lehman"), in connection with the Reserve Fund Agreement, dated as of June 19, 2003 (the "Agreement"), among Lehman, The Bank of New York, as Trustee (the "Trustee"), and Tobacco Settlement Financing Corporation (the "Issuer"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned thereto in the Agreement.

You have requested our opinion as to whether, under present reported decisional authority and statutes applicable to federal bankruptcy cases, if Lehman were to become a debtor in a case under the Bankruptcy Code[1], a federal bankruptcy court, which acted reasonably and correctly applied the law to the facts as set forth herein after full consideration of all relevant factors, would hold that (i) Eligible Securities transferred to the Trustee in accordance with the Agreement prior to the commencement of a bankruptcy case of Lehman and payments thereunder and proceeds thereof are not property of the estate of Lehman under Bankruptcy Code section 541(a)(1) and (ii) the automatic stay arising pursuant to Bankruptcy Code section 362(a) upon the commencement of a bankruptcy case of Lehman is not applicable to payments to the holders of the Bonds from proceeds of such Eligible Securities.

## FACTS AND ASSUMPTIONS

In rendering this opinion, we have examined and relied upon originals or copies, certified or otherwise identified to our satisfaction, of such certificates, corporate or other records, and other documents as we have deemed appropriate for the purpose of rendering this opinion. We have examined and relied upon, among other things, the Request for Bids for Debt

---

[1]    11 U.S.C. §§ 101 1330.

NYLIB5 716449.2

To the Addresses Listed on
The Attached Schedule A                    -2-                         June 19, 2003

Service Reserve Account Agreement, dated June 10, 2003 (the "RFB"), the Agreement, the Indenture (collectively, the "Applicable Documents") and the certificates, opinions, agreements and other documents (including exhibits thereto) delivered in connection with the Applicable Agreements.

We have assumed that no party to any of the Applicable Documents has entered into any agreement or understanding, either written or oral, inconsistent with the terms of any of the Applicable Documents or the assumptions or discussion in this opinion or that is otherwise related to the subject matter of the Agreement, or which otherwise pertains to the forward sale commitment of Lehman with respect to Eligible Securities to be purchased by the Trustee on the dates specified in the Agreement for purposes of investing funds in the Reserve Fund other than as expressly set forth in such documents or in this opinion.

The opinions expressed herein are based upon and subject to the assumed compliance by Lehman, the Trustee and the Issuer with the facts and assumptions set forth herein.

We have assumed and relied upon the genuineness and due authorization of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies, and the authenticity of the originals of all documents submitted to us as copies.

We have been advised of the following facts by Lehman. In rendering our opinion, we have relied upon the documents reviewed as described above and the certificate of an officer of Lehman in which such officer represents that the applicable facts set forth herein are accurate. We have not made any independent inquiry with regard to the accuracy of the matters stated in such certificate or in the documents reviewed. In rendering our opinion, we have assumed, without independent verification, that the facts and assumptions outlined below are correct.

The RFB indicated that the Issuer anticipated investing the funds available for deposit in the Reserve Fund for the Bonds, potentially in multiple separate forward purchase agreements with two or more separate providers to reduce the exposure to a single provider and to maximize the earnings to be derived from the funds invested. The Issuer requested bids, for an earnings rate on the funds invested under any such forward purchase agreement, where the term of such forward purchase agreement will be identical to the term of the Bonds, June 1, 2023 (although the Bonds are expected to all be paid by June 1, 2016), and where if a forward purchase agreement is terminated early because of the retirement of all of the Bonds due to a clean up call of the Bonds a termination amount would be determined and due from the applicable party. For each bid, the bidder was required to provide the earnings rate the bidder would agree to provide for the amount of funds invested, on the dates and for the periods specified in the RFB. Bids were due on June 10, 2003, and on June 10, 2003 Lehman was advised that it was the successful bidder with respect to a Scheduled Reserve Fund Amount ultimately determined to be $170,659,179.00 out of the total amount in the Reserve Fund to be invested, having bid a guaranteed earnings rate equal to 3.722% (the "Lehman Bid"). Morgan

To the Addresses Listed on
The Attached Schedule A                    -3-                        June 19, 2003

Stanley Capital Services Inc. was the successful bidder, pursuant to its bid (the "MSCS Bid"), with respect to the remainder of the funds in the Reserve Fund to be invested.

In furtherance of the Lehman Bid and the MSCS Bid, Lehman will enter into the Agreement with the Trustee and the Issuer, and MSCS will enter into a similar forward purchase agreement with the Trustee and the Issuer. Pursuant to the Agreement, Lehman will satisfy its forward commitment, in accordance with the Lehman Bid, with respect to the sale of Eligible Securities to the Trustee on the dates and for the periods, and otherwise upon the terms and conditions, specified in the Agreement. Lehman Brothers Holdings Inc. will guaranty the obligations of Lehman under the Agreement.

Pursuant to Section 2.1 of the Agreement, (i) Lehman shall cause a Qualified Dealer (which may or may not be an affiliate of Lehman) to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirement set forth in Section 2.2 of the Agreement, Qualified Securities selected by Lehman or the Qualified Dealer, and (ii) assuming that Lehman has caused such delivery to be made, the Trustee shall, out of funds available in the Reserve Fund, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable in accordance with Section 2.2 of the Agreement, an amount equal to the Purchase Price thereof.

Pursuant to Section 2.2 of the Agreement, (i) all Qualified Securities delivered shall be delivered to the Trustee to a specified account, in such manner as at the time is generally acceptable for delivery of Qualified Securities, (ii) all Qualified Securities shall be delivered to the Trustee on a "delivery versus payment" basis, (iii) Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities specifying, at a minimum, the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security, (iv) concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall (subject to clause (v) below) pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any, (v) Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee, and (B) to Lehman, the Differential, to a specified account, and (vi) all payments to be made by the Trustee in accordance with the foregoing shall be made in immediately available funds by means of a bank or Federal funds wire. As indicated in clause (i) of the preceding sentence, we assume that all actions that would be requisite to effecting the transfer of ownership to the Trustee of each Qualified Security delivered to the Trustee pursuant to the Agreement (including but not limited to re-registration of each such Qualified Security in the name of the Trustee) will be taken.

Section 2.3 of the Agreement deals with circumstances under which funds constituting a portion of the Scheduled Reserve Amount become available to the Trustee prior to a Bond Payment Date (for example, upon the maturity of a Qualified Security sold to the Trustee on the related Deposit Date) and, subject to certain conditions, Lehman is entitled to sell additional Qualified Securities to the Trustee in respect of such available funds. Any deliveries of Qualified Securities made pursuant to Section 2.3 shall conform to the requirements of

To the Addresses Listed on
The Attached Schedule A                    -4-                                June 19, 2003

Section 2.2 described above.  Section 2.3 expressly provides that Lehman shall have no right to substitute Qualified Securities for any Qualified Securities previously sold under the Agreement.

Section 2.4 of the Agreement deals with a failure by Lehman to cause a Qualified Dealer to deliver Qualified Securities when required, and a potential cure by Lehman by means of a late delivery.

Qualified Securities means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3, 2.4 or 2.5 (c) of the Agreement, Eligible Securities which, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is (A) with respect to a delivery in connection with a Deposit Date, as close as possible to but does not exceed the related Scheduled Reserve Amount, (B) with respect to a delivery pursuant to Section 2.3 of the Agreement, equal to the Maturity Amount of the relevant Qualified Securities which have so matured (or as applicable, the amount of a Coupon Payment) and (C) with respect to a delivery pursuant to Section 2.5(c) of the Agreement, equal to the pro rata portion of the replenishment amount.    Accordingly, all Eligible Securities which Lehman causes to be delivered to and purchased by the Trustee in accordance with the Agreement will mature while held by the Trustee.

Purchase Price means, (i) for any Eligible Security delivered under the Agreement other than pursuant to Section 2.3 thereof, that price for such Qualified Security, as set forth in the Delivery Notice, which will produce a rate of return on such Qualified Security for the period from (and including) the Deposit Date to (but excluding) the immediately succeeding Bond Payment Date equal to the Guaranteed Rate and (ii) for any Eligible Security delivered pursuant to Section 2.3, the Maturity Amount thereof.

The Differential, if any, in connection with any delivery of Qualified Securities, which will be paid by the Trustee to either the Qualified Dealer as agent for Lehman or directly to Lehman, as specified in the related Delivery Notice, means the amount, if any, by which the Purchase Price of any Qualified Security delivered under the Agreement exceeds the Market Value thereof.

Each delivery of a Qualified Security to the Trustee which Lehman causes to be made, together with the actions requisite to a transfer of ownership of such Qualified Security, and the simultaneous payment by the Trustee of the Purchase Price therefor, all in accordance with the Agreement, is referred to herein as a "Transfer".

Lehman, the Trustee and the Issuer intend that each Transfer be a sale from (or caused by) Lehman to, and a purchase by, the Trustee.  Lehman, the Trustee and the Issuer, as applicable, will treat each Transfer as a sale for accounting and tax purposes.

The Purchase Price for the Eligible Securities related to each Transfer reflect the good faith determination of Lehman and the Issuer, based on the Lehman Bid and the other bids submitted pursuant to the RFB, of the fair value of, and fair consideration for, such Eligible Securities delivered and purchased in satisfaction of the parties' rights and obligations under the Agreement, and is reasonably equivalent to the prices that the parties believe would be paid in

To the Addresses Listed on
The Attached Schedule A                    -5-                         June 19, 2003

other sales of such Eligible Securities between non-affiliated entities pursuant to forward purchase agreements comparable to the Agreement, as evidenced by the MSCS Bid and the other bids submitted pursuant to the RFB. No provision exists whereby such consideration for the Eligible Securities may be modified subsequent to each Transfer, and Lehman will have no obligation to repay such consideration, or interest thereon, to the Trustee.

Pursuant to the Agreement, Lehman will irrevocably transfer and relinquish (or will cause the irrevocable transfer and relinquishment of) all rights with respect to the Eligible Securities upon each Transfer thereof and, specifically, will have no right to sell, pledge or otherwise dispose of the Eligible Securities once transferred to the Trustee. The Trustee will be free to deal with all such Eligible Securities as its property. Pursuant to the Agreement, Lehman will transfer (or will cause the transfer of) the Eligible Securities without recourse and will have no obligation to deliver other property to the Trustee either in substitution for or in addition to the Eligible Securities in the event of a credit loss or decline in value of the Eligible Securities.

Neither Lehman nor any of its affiliates will own, hold or have any interest in the Eligible Securities subsequent to each Transfer thereof. The Trustee will no right or obligation to transfer any of the Eligible Securities back to Lehman. Lehman will not have any right or obligation to reacquire any of the Eligible Securities subsequent to each Transfer thereof. Consequently, with respect to each Transfer, Lehman will have transferred (or will have caused the transfer) of the benefits and risks of ownership of the Eligible Securities to the Trustee and, ultimately, to the holders of the Bonds.

Lehman will not transfer (or cause the transfer) of any of the Eligible Securities in contemplation of insolvency or with a design to prefer one or more creditors to the exclusion in whole or in part of others or with an intent to hinder, delay or defraud any of its creditors.

DISCUSSION

Were Lehman to become a debtor in a case under the Bankruptcy Code, the Eligible Securities transferred to the Trustee prior to the commencement of such case would not be property of the estate of Lehman or subject to the automatic stay arising upon the commencement of the bankruptcy case of Lehman if each Transfer constitutes a sale.

While courts ultimately look to the economic substance of a transaction to determine whether it constitutes a sale or a pledge, the judicial analysis has typically proceeded on a case-by-case basis. The cases have not developed a prescribed formula which can be applied in a mechanical fashion. Rather, as the Third Circuit explained in a leading case, courts "have examined the parties' practices, objectives, business activities and relationships and determined whether the transaction was a sale or a secured loan only after analysis of the evidence as to the true nature of the transaction." Major's Furniture Mart, Inc. v. Castle Credit Corporation, Inc., 602 F.2d 538, 545 (3d Cir. 1979). The determination of the "true nature" of a transaction is thus usually based on an analysis of the facts and circumstances present in the particular transaction, rather than on the application of consistently applied or well-established legal doctrines. In re Golden Plan of California, Inc., 829 F.2d 705, 709 (9th Cir. 1987). See also Sarf v. Leff (In re Candy Lane Corp.), 38 B.R. 571, 576 (Bankr. S.D.N.Y. 1984) (true sale

To the Addresses Listed on
The Attached Schedule A                    -6-                            June 19, 2003

determination should be "based upon an examination of the substance of the documents in the context of the surrounding transaction").

Moreover, the published cases generally involve relatively small-scale commercial transactions or consumer claims whose fact patterns are not closely analogous to the transaction at issue here. While cases have addressed other market transactions in Eligible Securities, we are not aware of any published decision that has addressed the "true sale" issue in the context of a transfer of assets to a trustee for purposes of investing funds in a reserve fund pursuant to an agreement such as the Agreement.

The reported decisions indicate that no single factor or combination of factors is dispositive and, due to the "facts and circumstances" nature of the analysis, are not conclusive as to the relative weight to be accorded to the factors that are present in this transaction. We also note that the cases are not uniform in their treatment of the factors considered. For example, six cases involving a similar fact pattern produced inconsistent results. In two cases, the original sale characterization of the transaction was upheld while four cases recharacterized a purported sale as a financing. Compare In re Lemons & Assocs., Inc., 67 B.R. 198 (Bankr. D. Nev. 1986) (transfer of mortgage loan participations treated as a sale notwithstanding that return to transferee not related to return on transferred asset and transferee's ability to put transferred assets back to transferor) and Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgt. Corp.), 67 B.R. 557 (D.N.J. 1986) (sale treatment for repurchase agreement upheld notwithstanding transfer of asset at arbitrary, not fair market prices, payment by transferee to transferor not related to value of transferred asset, obligation to reverse the transfer on a specified date and full recourse to transferor for default on underlying asset) with In re Coronet Capital Co., 142 B.R. 78 (Bankr. S.D.N.Y. 1992) (transfer of participation treated as financing arrangement; return to transferees not related to return on transferred assets); Fireman's Fund Ins. Cos. v. Grover (In re The Woodson Co.), 813 F.2d 266 (9th Cir. 1987) (same); Ables v. Major Funding Corp. (In re Major Funding Corp.), 82 B.R. 443 (Bankr. S.D. Tex. 1987) (same); and In re S.O.A.W. Enter., Inc., 32 B.R. 279 (Bankr. W.D. Tex. 1983) (same).[2] In addition, in certain decisions, transactions with facts which are also present in this transaction were characterized as loans, but we believe that those cases are distinguishable in the context of this transaction.

The existing case law thus does not provide consistently applied general principles with which to analyze all of the factors present in this transaction.

We do note that the courts accord respect to the stated intent of the parties and tend to defer to the structure selected by the parties, unless the structure of the transaction is clearly inconsistent with that stated intent, or unless giving effect to the structure of the transaction would result in an evasion of public policy or perpetrate an injustice on one of the

---

[2]    In Lemons, Major Funding, Coronet Capital, S.O.A.W. and Woodson, the debtors were mortgage brokers which had assigned interests in mortgage loans to various investors, including individuals. The transactions were documented and advertised to potential investors as sales, but the investors were promised a fixed return on their investment regardless of the rate on, or performance of, the assigned loan.

To the Addresses Listed on
The Attached Schedule A                    -7-                    June 19, 2003

parties.[3]    Several cases have expressly articulated this concept, stating that in transactions between sophisticated parties which have elements of both loan and sale, the stated intent of the parties is the "controlling consideration."  In re Bevill, Bresler & Schulman Asset Mgt. Corp., 67 B.R. at 597.  See also Goldstein v. Madison Nat'l Bank of Washington, D.C., 89 B.R. 274, 277 (D.D.C. 1988) (language of agreement demonstrating an intent to create an absolute assignment supported the finding of a sale despite the presence of countervailing factors); Lyon v. Ty-Wood Corp., 239 A.2d 819 (Super. Ct. Pa. 1967) (same).  But see In re The Woodson Co., 813 F.2d at 272 ("Simply calling transactions 'sales' does not make them so.  Labels cannot change the true nature of the underlying transactions"); In re Joseph Kanner Hat Co., 482 F.2d 937, 940 (2d Cir. 1973) ("courts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen"); In re Evergreen Valley Resort, Inc., 23 B.R. 659, 661 (Bankr. D. Me. 1982) ("the label attached to the transaction by the parties does not control").  In this regard, we note that the parties intend each Transfer to be a sale and will so treat each Transfer for accounting and tax purposes, and that there is no attempt to evade public policy or accomplish an objective which would be prohibited if a Transfer were a financing.

A comparison of the factors present in the Transfers with the factors generally considered by courts supports the conclusion that the Transfers constitute sales rather than pledges.

The economic substance of each Transfer is a sale.  We note, for example, that in each case there is a complete and irrevocable transfer of the rewards and risks of ownership of the Eligible Securities.  Lehman relinquishes (or causes the relinquishment of) all rights with respect to the Eligible Securities subject to each Transfer and, specifically, has no right to sell, pledge, or otherwise dispose of any of such Eligible Securities upon the consummation of each Transfer.  Any change in the value of the Eligible Securities, whether due to changes in interest rates or otherwise, would not be for the benefit or loss of Lehman.

In addition, we note that in each case Lehman (or the Qualified Dealer effecting delivery of the Eligible Securities in satisfaction of the parties' obligations under Article II of the Agreement) will receive the entire consideration for the applicable Eligible Securities at the time of each Transfer, and that such consideration represents the fair value for such Eligible Securities.  There will not be any post-closing adjustment of the Purchase Prices and Lehman does not have any right or obligation to transfer additional property to the Trustee.  In these circumstances, Lehman relinquishes (or causes the relinquishment of) the benefits and risks associated with ownership of the Eligible Securities.

---

[3]    In the similar context of sale-and-leaseback transactions involving realty, courts have required a "showing by clear and convincing evidence . . . that the transaction should be deemed a disguised financing transaction" before they will exercise their power to "look through form to substance in determining the true nature of a transaction."  In re Omne Partners II, 67 B.R. 793, 795 (Bankr. D.N.H. 1986) (quoting Fox v. Peck Iron & Metal Co., 25 B.R. 674, 688 (Bankr. S.D. Cal. 1981) and Pepper v. Litton, 308 U.S. 295, 304 (1939) (internal quotations omitted)).

To the Addresses Listed on
The Attached Schedule A                    -8-                         June 19, 2003

These factors, and the other aspects of the transaction, indicate that the Transfers constitute sales rather than pledges.

## CONCLUSION

Based on the foregoing facts, advice, representations, statements, and assumptions being correct at all relevant times, and based on the discussion and analysis above, it is our opinion that, under present reported decisional authority and statutes applicable to federal bankruptcy cases, and in a properly presented case, if Lehman were to become a debtor in a case under the Bankruptcy Code, a federal bankruptcy court, which acted reasonably and correctly applied the law to the facts as set forth herein after full consideration of all relevant factors, would hold that (i) the Eligible Securities transferred to the Trustee in accordance with the Agreement prior to the commencement of a bankruptcy case of Lehman and payments thereunder and proceeds thereof are not property of the estate of Lehman under Bankruptcy Code section 541(a)(1) and (ii) the automatic stay arising pursuant to Bankruptcy Code section 362(a) upon the commencement of a bankruptcy case of Lehman is not applicable to payments to the holders of the Bonds from proceeds of such Eligible Securities.

## QUALIFICATIONS

The foregoing opinion assumes that the facts, representations, statements, and assumptions set forth above will be those that exist at the time a federal bankruptcy court considers the issues.

While we believe that our opinion respecting sections 541 and 362 of the Bankruptcy Code is supported by sound analysis of existing law, we have found no statutes or reported judicial authority that discuss directly whether transfers such as the Transfers would be treated as sales or pledges and have found no reported judicial authority which has considered a transaction containing all the material facts and circumstances that are present in the Transfers. In rendering our opinion, we have thus relied on cases discussing certain of the facts and circumstances that are present in the Transfers and cases discussing more generally whether the transfer of an asset was a transfer of ownership or a transfer of a more limited interest. Accordingly, our opinion is not based on directly controlling precedent but rather on what we believe to be a sound analysis of existing authorities. Also, the analysis of Bankruptcy Code sections 541 and 362 and opinions thereon contained herein are based on general principles of law derived from a review of a significant body of case law and are not based on the laws of any particular state. Therefore, no opinion is rendered as to the laws of any jurisdiction other than the laws of the United States of America and we express no opinion as to the laws of any state or jurisdiction, other than the present laws of the state of New York as and to the extent we believe they may be applied or given effect by a federal bankruptcy court having jurisdiction of the bankruptcy proceeding of Lehman. Whether any particular transfer is a sale or a pledge will be generally a matter of state law and may be governed by the laws of a particular state. Most cases determining the matter in a context of a federal bankruptcy case, however, are decided on the basis of general principles of law and an analysis of the economic substance of the transaction.

To the Addresses Listed on
The Attached Schedule A                    -9-                    June 19, 2003

We express no opinion with respect to whether, if Lehman were to become a debtor in a case under the Bankruptcy Code, any Eligible Securities that are repurchased or otherwise acquired by Lehman (notwithstanding the provisions of the Agreement which do not contemplate or permit any such repurchase or acquisition) would be property of the estate of Lehman.

We express no opinion with respect to whether, if Lehman were to become a debtor in a case under the Bankruptcy Code, any of the Transfers would be avoided by the court as a fraudulent conveyance or based on other similar theories under the Bankruptcy Code or applicable state law.

We express no opinion as to the availability or effect of a preliminary injunction, temporary restraining order or other such temporary relief, or equitable remedies.

The opinions expressed above are limited to the present federal laws of the United States of America and the present laws of the state of New York as and to the extent we believe they may be applied or given effect by a federal court having jurisdiction over the bankruptcy proceeding of Lehman and to present judicial interpretations thereof.

The opinions expressed herein are not a guaranty as to what any particular court would actually hold, but an opinion as to the decision a court would reach if the issues are competently presented to it and the court followed existing precedent as to legal and equitable principles applicable in bankruptcy cases. In this regard, we note that legal opinions on bankruptcy law matters unavoidably have inherent limitations that generally do not exist in respect of other issues on which opinions to third parties are typically given. These inherent limitations exist primarily because of the pervasive equity powers of courts having jurisdiction over bankruptcy cases, the overriding goal of reorganization to which other legal rights and policies may be subordinated, the potential relevance to the exercise of judicial discretion of future arising facts and circumstances, and the nature of the bankruptcy process. The recipients of this opinion should take these limitations into account in analyzing the bankruptcy risks associated with the transactions described herein.

The opinions expressed above are given to you solely for your own benefit, are not binding on any court, and may not be quoted in whole or in part or otherwise referred to in any legal opinion, document, or other report to be furnished to another person or entity without our prior written consent.

Very truly yours,

Cadwalader Wickersham & Taft

NYLIB5 716449.2

Schedule A

The Bank of New York, as trustee
101 Barclay Street
New York, New York  10286

Tobacco Settlement Financing Corporation
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue
New York, New York  10019

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York  10019

06/19/2003 10:41 FAX                                                      ☒021
      06/18/2003    13:26    LEHMAN → 912125200384                      NO.903    D81

### LEHMAN BROTHERS SPECIAL FINANCING INC.
### OFFICER'S CERTIFICATE

In connection with the insolvency opinion dated June 19, 2003 (the "Opinion") to be delivered by Cadwalader, Wickersham & Taft LLP, in connection with the issuance of Tobacco Settlement Financing Corporation of the State of New York Asset-Backed Revenue Bonds, Series 2003A (State Contingency Contract Secured) and the Reserve Fund Agreement, dated as of June 19, 2003, among Lehman Brothers Special Financing Inc., The Bank of New York, as Trustee, and Tobacco Settlement Financing Corporation of the State of New York, the undersigned hereby certifies that, to the best of his or her knowledge after due inquiry and review of the Opinion:

1.    The undersigned understands that Cadwalader, Wickersham & Taft LLP is relying on this Certificate in connection with the execution and delivery of the Opinion.

2.    The facts and assumptions contained in the section of the Opinion entitled "Facts and Assumptions" insofar as they pertain to Lehman Brothers Special Financing Inc. are true and correct as of the date hereof.

3.    The undersigned has no reason to believe that any statement or fact expressed in the section of the Opinion entitled "Facts and Assumptions" is untrue, inaccurate or incomplete.

4.    I have been duly authorized to execute this Certificate on behalf of Lehman Brothers Special Financing Inc.

Dated:  June 19, 2003

LEHMAN BROTHERS SPECIAL
FINANCING INC.,

By: _____
Name:  T. Courtney Jenkins
Title:   Vice President

NYLIB1 672819.1



*Hawkins, Delafield & Wood*

*67 Wall Street, New York 10005*

June 19, 2003

The Bank of New York
101 Barclay Street, Floor 21W
New York, NY 10286

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, New York 10019

Re:    Tobacco Settlement Financing Corporation, Asset-Backed Revenue
       Bonds, Series 2003A (State Contingency Contract Secured)

Ladies and Gentlemen:

We have acted as counsel to the Tobacco Settlement Financing Corporation (the "Issuer") in connection with its execution and delivery of the Reserve Fund Agreement, dated as of June 19, 2003 (the "Agreement"), by and among the Issuer, The Bank of New York (the "Trustee"), and Lehman Brothers Special Financing Inc. (the "Provider") and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

The scope of this opinion is expressly limited to the matters set forth herein and we express no opinion with respect to the laws of any state other than the State of New York (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Issuer has full legal right, power and authority to enter into the Agreement and the Indenture and to authorize and direct the Trustee, pursuant to the

Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

(ii)    The Agreement and the Indenture have been duly authorized, executed and delivered by the Issuer.

(iii)    Each of the Agreement and the Indenture is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies and subject, as to enforceability, to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(iv)    The Issuer's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of the Indenture or any other agreement, instrument, law, judgment, injunction or order applicable to it or any of its property.

(v)    All consents, authorizations and approvals requisite for the Issuer's execution, delivery and performance of this Agreement and the Indenture have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

(vi)    The Agreement is an Eligible Investment as defined in the Indenture.

(vii)    The Issuer is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement brought validly ex contractu in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

(viii)    The Trustee is obligated to replenish the Reserve Fund solely through the application of available funds, if any, on deposit in the Pledged Revenues Account (as defined in the Indenture) as provided in Section 4.03(a)(4) of the Indenture.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

*Hawkins, Delafield + Wood*

427481.1 025621 OPN

# STADTMAUER BAILKIN LLP

## COUNSELORS AT LAW

850 THIRD AVENUE
NEW YORK, NY 10022

TELEPHONE: 212.751.8600
FACSIMILE: 212.980.9578

June 19, 2003

The Bank of New York
101 Barclay Street, Floor 21W
New York, New York 10286

Tobacco Settlement Financing Corporation of the State of New York
641 Lexington Avenue
New York, New York  10022

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, New York 10019

Re:   $2,400,000,000  Asset-Backed  Revenue  Bonds,  Series  2003A  (State  Contingency
Contract Secured)

Ladies and Gentlemen:

We have acted as counsel to The Bank of New York (the "Trustee") in connection with
the execution and delivery by the Trustee of the Reserve Fund Agreement, dated as of  June 19,
2003 (the "Agreement"), by and among the Trustee, Tobacco Settlement Financing Corporation
(the "Issuer") and Lehman Brothers Special Financing Inc..  Capitalized terms used herein and
not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the
Agreement and the Indenture.

In connection with the foregoing, we have also examined originals or copies satisfactory
to us of all such corporate records, agreements, certificates and other documents as we have
deemed relevant and necessary as a basis for the opinions hereinafter expressed.  In such
examination we have assumed the genuineness of all signatures, the authenticity of all
documents submitted to us as originals, and the conformity with the original documents of all
documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally
familiar with or qualified to express legal opinions based on the laws of any jurisdiction other
than the federal laws of the United States of America and the laws of the State of New York.

The Bank of New York
Tobacco Settlement Financing Corporation of the State of New York
Lehman Brothers Special Financing Inc.
June 19, 2003
Page 2.

Based upon the foregoing examination and review, we are of the opinion that:

(i)     The Trustee has full legal right, power and authority to enter into the Agreement.

(ii)    The Agreement has been duly authorized, executed and delivered by the Trustee.

(iii)   The Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(iv)    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(v)     The Indenture is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

STADTMAUER BAILKIN LLP

*Stadtmauer Bailkin LLP*