**HEARING DATE AND TIME:** May 30, 2013 at 10:00 a.m. (Eastern Time)
**RESPONSE DEADLINE:** April 25, 2013 at 4:00 p.m. (Eastern Time)

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

*Counsel for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
::
**In re**                                                  :   Chapter 11 Case No.
                                                           :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,               :   08-13555 (JMP)
                                                           :
                    Debtors.                               :   (Jointly Administered)
                                                           :
---------------------------------------------------------------x

**MOTION BY LEHMAN BROTHERS HOLDINGS INC. AND**
**LEHMAN COMMERCIAL PAPER INC. FOR AN ORDER**
**(I) DETERMINING THAT THE LCPI SETTLEMENT WAS ENTERED**
**INTO IN GOOD FAITH PURSUANT TO CALIFORNIA CODE OF**
**CIVIL PROCEDURE §§ 877 AND 877.6, AND, BASED ON SUCH**
**GOOD FAITH FINDING AND FOR OTHER REASONS, (II) DISALLOWING**
**AND EXPUNGING PROOFS OF CLAIM NUMBER 28845 AND 28846**

---

**THIS MOTION SEEKS,** *INTER ALIA*, **TO DISALLOW AND EXPUNGE**
**PROOFS OF CLAIM FILED BY LBREP LAKESIDE SC MASTER I, LLC**
**(CLAIM NOS. 28845 AND 28846).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS**
**HOLDINGS INC.'S COUNSEL, ARTHUR STEINBERG, AT 212-556-2158**

---

DMSLIBRARY01-20423745.2

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("**LBHI**"), as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "**Lehman Plan**") for the entities in the above-referenced chapter 11 cases, including LBHI and Lehman Commercial Paper Inc. ("**LCPI**," and with LBHI, "**Lehman**" or "**Debtors**"), as and for its motion ("**Motion**") for an order (i) determining that the LCPI Settlement (as defined herein) was entered into in good faith pursuant to Sections 877 and 877.6 of the California Code of Civil Procedure ("**CCCP**"), and, based on such good faith finding and for other reasons, (ii) disallowing and expunging (a) proof of claim number 28845 ("**LBHI Claim**") filed by LBREP Lakeside SC Master I, LLC ("**Claimant**") against LBHI, and (b) proof of claim number 28846 ("**LCPI Claim**," and with the LBHI Claim, the "**Claims**") filed by the Claimant against LCPI,[1] respectfully represent as follows:

**PRELIMINARY STATEMENT**

1. This Claims objection is the final chapter of the LCPI and LBREP/L-SunCal Master I, LLC ("**SunCal Parent**") saga.[2] The Claimant is the majority equity owner in SunCal Parent. In January 2006, at the height of the California real estate market, SunCal Parent borrowed $320 million from LCPI and other lenders (collectively, the "**Lenders**")[3], and used

---

[1] Except for a reference to LBHI or LCPI, as the case may be, the LBHI Claim and the LCPI Claim are identical. Copies of the Claims are annexed hereto, collectively, as Exhibit "A."

[2] Proceedings related to this controversy have been administered by this Court, and also by the Bankruptcy Court for the Central District of California ("**California Bankruptcy Court**") as part of the SunCal Debtors' (as defined herein) bankruptcy cases.

[3] The $320 million loan is comprised of a $235 million senior secured loan facility by LCPI and other lenders ("**First Lien Lenders**"), and an $85 million subordinated secured loan facility by LCPI and other lenders ("**Second Lien Lenders**").

approximately $130 million[4] of the loan proceeds to pay a dividend to the Claimant. The bankruptcy trustee for the SunCal Parent (**"SunCal Trustee"**) challenged this 2006 transaction as a fraudulent transfer. In a law suit to be brought against the First Lien Lenders, the SunCal Trustee sought to invalidate the claims and mortgages held by the First Lien Lenders. In a separate law suit against the Claimant and others, the SunCal Trustee sought to recover the dividend paid. Ultimately, the SunCal Trustee settled the litigation against the First Lien Lenders (**"LCPI Settlement"**), which was approved by this Court and the California Bankruptcy Court as being well within the range of reasonableness. Thereafter, the SunCal Trustee settled the law suit against the Claimant, which was approved by the California Bankruptcy Court.

2. Both the First Lien Lenders and the Claimant settled their litigations with the SunCal Trustee for a small percentage of the damages sought. However, because of the substantial deterioration in the value of the Properties that had been mortgaged to the First Lien Lenders, the First Lien Lenders lost approximately 75% of their loan principal (aggregate loss anticipated to be approximately $170 million). In sharp contrast, the Claimant retained the dividend it received from the Lenders' loan proceeds, plus a substantial profit.

3. The Claims are premised on the flimsy notion that LCPI and the Claimant are alleged joint tort feasors relating to the 2006 transaction, and that Lehman owes the Claimant, under a contribution or indemnification theory, for the alleged unspecified, "disproportionate" amount, paid by the Claimant to the SunCal Trustee. The Claimant has effectively conceded, based on its prior pleadings, that under California law the Claimant's alleged contribution or indemnification claim against LCPI is eliminated if this Court finds --as it

---

[4] The dividend paid to all equity holders (including the Claimant) was approximately $144 million.

should-- that the LCPI Settlement was entered into in "good faith within the meaning of Sections 877 and 877.6 of the CCCP. The standard that this Court (and the California Bankruptcy Court) already used to approve the LCPI Settlement is essentially the same[5] as the standard for making the requisite "good faith" finding under the CCCP.

4. Even if the LCPI Settlement had not yet been approved, it is clear that the LCPI Settlement was entered into in "good faith". In absolute dollars, the amount paid to the SunCal Trustee reflects that LCPI had the much stronger position regarding the *bona fides* of the 2006 transaction. Moreover, the Claimant got to keep, as a dividend, the loan proceeds advanced by the Lenders to SunCal Parent, which loans were substantially not repaid to the Lenders. These circumstances do not, under any stretch of the imagination, result in a contribution or indemnity claim by the Claimant against LCPI.

5. Prior to filing the Motion, LCPI requested that the Claimant withdraw its frivolous Claims. It refused to do so thus necessitating the filing of this Motion and the unnecessary incurrence of expenses associated therewith.

## JURISDICTION

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) -- the disallowance of claims filed against the Debtors.

## BACKGROUND

**A.   General Background**

7. Commencing on September 15, 2008 and periodically thereafter, Lehman filed with this Court voluntary petitions under Chapter 11 of the Bankruptcy Code.

---

[5] The bankruptcy settlement standard actually appears to be a stricter test than the "good faith" standard.

8.      On December 6, 2011, the Court entered an Order confirming the Lehman Plan [Docket No. 23023].

9.      On September 10 and 11, 2008, involuntary bankruptcy petitions were filed against SunCal Parent, and against LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC (collectively, the "**SunCal Subsidiaries**") in the California Bankruptcy Court.[6]

10.     Alfred H. Siegel, the SunCal Trustee, was appointed the Chapter 11 trustee of the SunCal Debtors' bankruptcy estates.

11.     On April 22, 2011, the California Bankruptcy Court entered an Order confirming the SunCal Trustee's Chapter 11 plan of reorganization ("**SunCal Plan**") for the SunCal Debtors, which went effective on May 6, 2011.

B.      **The History of the SunCal Debt**

12.     SunCal Parent was a holding company established to fund the real estate development projects owned by the SunCal Subsidiaries. Approximately ninety percent (90%) of the SunCal Parent is owned directly or indirectly by the Claimant and entities affiliated with it.[7] The remaining equity interests in the SunCal Parent are owned by SCC Ranch, which is an affiliate of SCC Inc. d/b/a SunCal Companies. The Claimant is the managing member of the SunCal Parent.

---

[6] The SunCal Parent and the SunCal Subsidiaries are referred to herein as the "**SunCal Debtors**".

[7] The Claimant is also an affiliate of Lehman Bros. Real Estate Partners, LP ("**LBREP**") Both LCPI and LBREP are affiliates of LBHI.

DMSLIBRARY01-20423745.2

5

13. SunCal Parent's primary asset was its interests in the SunCal Subsidiaries. SunCal Parent was the sole equity member of the SunCal Subsidaries, each of which, in turn, owned a real estate development project bearing a similar name (the "**Properties**").

14. Prior to the commencement of the SunCal bankruptcy cases, SunCal Parent, as borrower, entered into three secured credit agreements with LCPI, as agent for itself and other lenders (collectively, the "**Lien Credit Agreements**"). Pursuant to the First and Second Lien Credit Agreements, which were entered into in or around January 19, 2006, SunCal Parent borrowed a total of $320 million (collectively, the "**January 2006 Loans**"), as follows: (1) a revolving credit facility of $75 million and term loan facility of $160 million under the First Lien Credit Agreement entered into with the First Lien Lenders and (2) an $85 million term loan facility under the Second Lien Credit Agreement entered into with the Second Lien Lenders. The SunCal Parent's obligations under the First and Second Lien Credit Agreements were guaranteed by the SunCal Subsidiaries, and the guaranties were secured by first and second liens against the Properties. LCPI was a lender under the January 2006 Loans, and acted as the sole administrative agent.[8] LCPI (a) held approximately thirty percent (30%) of the debt outstanding under the First Lien Credit Agreement in its capacity as a First Lien Lender, and (b) held approximately fifteen percent (15%) of the debt outstanding under the Second Lien Credit Agreement in its capacity as a Second Lien Lender.

15. On February 6, 2007, a Third Lien Credit Agreement was entered into by SunCal Parent and certain lenders party thereto (collectively, the "**Third Lien Lenders**"), which provided for an additional $75 million term loan (the "**February 2007 Loan**"). The February

---

[8] Later, the Agent for the Second Lien Lenders ("**Second Lien Agent**") replaced LCPI as the administrative agent under the Second Lien Credit Agreement.

2007 Loan was also guaranteed by the SunCal Subsidiaries and secured by third priority liens against the Properties. Just as with the January 2006 Loans, LCPI was a lender and served as the administrative agent for the February 2007 Loan. LCPI held approximately sixty-five percent (65%) of the debt outstanding under the Third Lien Credit Agreement in its capacity as a Third Lien Lender.

C.     **The SunCal Trustee's Claims Against LCPI**

16.     In the SunCal Debtors' bankruptcy cases, the SunCal Trustee alleged that the SunCal Debtors' had claims against the Lenders ("**SunCal Estate Claims**"), including, among others, claims to avoid the security interests held by LCPI against the Properties as fraudulent transfers because a material portion of the First and Second Lien Loans were paid to the Claimant as a dividend.[9] LCPI disputed the SunCal Estate Claims. It argued, among other things, that even if you subtracted the $144 million dividend from the Loans, the balance of the Loans ($395 million minus $144 million or approximately $250 million), was clearly available for the SunCal Debtors with respect to the development of the Properties. LCPI contended that the fundamental driver of the Debtors negative economic circumstance wherein the values of the Properties had dramatically deteriorated was not the size of the Loans or the dividends paid, but the well publicized sudden and dramatic downturn in the California real estate market, which occurred after the Loans were made.

17.     At the time of the SunCal Debtors' bankruptcy, it was clear that the aggregate fair market value of the Properties was significantly less than the amount of the First Lien Loan (approximately $235 million); the Second and Third Lien Loans were completely

---

[9] The SunCal Trustee filed proofs of claim in the LCPI bankruptcy case asserting these claims which were withdrawn as part of the LCPI Settlement.

under water.  In addition, the SunCal Subsidiaries had approximately $60 million of additional "secured" debt, most of which was owed to mechanics lienors who claimed to have a lien senior to the First Lien Lenders on the Properties.

18. After his appointment, the SunCal Trustee used millions of dollars of the First Lien Lenders cash collateral to finance the maintenance of the Properties.  Although the First Lien Lenders sought to foreclose on the Properties, this action was challenged by the SunCal Trustee who raised the SunCal Estate Claims in response to the First Lien Lenders' motion to modify the automatic stay.

19. It ultimately became clear that litigating the claims between the First Lien Lenders and the SunCal Trustee would be expensive, and until such litigation was resolved, there would be a stalemate, spanning two different bankruptcy courts, as to how to deal with the Properties, with the First Lien Lenders' cash collateral being eroded in the process, and the First Lien Lenders taking the market risk of a further deterioration in the value of the Properties.

**D.    The Settlement Between LCPI and the SunCal Trustee**

20. In an effort to globally resolve the disputes between LCPI and the SunCal Trustee, LCPI and the SunCal Trustee entered into the LCPI Settlement[10] that resolved all of the SunCal Estate Claims.  Among other things, in exchange for the release of the SunCal Estate Claims, LCPI gave the SunCal Debtors' Estate the following consideration:

(i)  The SunCal Trustee received $5.5 million of the First Lien Lenders' cash collateral, plus 3.5% of the net proceeds received by the First Lien Lenders from the sale of the Properties.  The First Lien Lenders also waived claims to prior usage of their cash collateral by the SunCal Trustee.  Depending on how certain

---

[10] A copy of the LCPI Settlement is annexed hereto as Exhibit "B."

issues are resolved with the mechanics lienors, the 3.5% of the net sale proceeds component could be worth in the range of $1.5 million - $2.2 million.[11]

(ii) LCPI and the First Lien Lenders gave up a substantial portion of their interest in the Other Recoveries[12] by agreeing to a 50/50 sharing with the SunCal Estate. This 50/50 sharing reflected a "give-up" by the First Lien Lenders of up to 35% of the Other Recoveries.[13] The Dividend Action Settlement (as defined herein) resulted in a payment of $16 million, and a net recovery after payment of legal fees of approximately $12 million. A 35% give up of a $12 million net recovery is worth approximately $4 million.

21. On September 2, 2010, LCPI filed a motion ("**Settlement Motion**") with this Court seeking approval of the LCPI Settlement.[14] Responsive pleadings to the Settlement Motion were filed by the Second Lien Agent and the Claimant.[15]

22. The Claimant asserted that the LCPI Settlement should not be approved because the litigation to be brought against the Claimant had no merit, but if a court of competent jurisdiction decided otherwise, it wanted to preserve its alleged contribution/indemnity claim

---

[11] It is believed that the Claimant has a substantial ownership interest in the entities that purchased the Properties at the bankruptcy auction. Thus, Claimant was able to maintain ownership of the Properties for approximately $70 million (the auction purchase price for the Properties), and are no longer burdened by the over $400 million of secured debt which existed on the Properties as of the filing of the SunCal Debtors bankruptcy.

[12] Other Recoveries are essentially litigation recoveries (primarily the lawsuit brought against the Claimant and others for the Dividend received).

[13] To illustrate, with the benefit of enforcing the subordination agreements with the Second Lien Lenders and Third Lien Lenders, the First Lien Lenders effectively control approximately 85% of the claims against the SunCal Debtors and should be entitled to approximately 85% of the Other Recoveries. Since the LCPI Settlement provided for a 50/50 split of the Other Recoveries, there was a 35% "give up" (the difference between 85% and 50%) of the Other Recoveries by the First Lien Lenders.

[14] A copy of the motion (without exhibits) seeking approval of the LCPI Settlement is annexed hereto as Exhibit "C."

[15] Fidelity National Title Insurance Company ("**Fidelity**") also filed a responsive pleading to the Settlement Motion. Except for a misplaced concern, Fidelity supported the approval of the LCPI Settlement.

against LCPI.[16] By Order dated September 29, 2010 ("**September 29 Order**"), this Court overruled the objections (not otherwise resolved) and approved the LCPI Settlement.[17]

23. The SunCal Trustee then sought approval of the LCPI Settlement in the California Bankruptcy Court. The California Bankruptcy Court issued its oral ruling on the LCPI Settlement at a hearing held on December 22, 2010, at which time, the California Bankruptcy Court found as follows:

i. "I think that given the totality of the circumstances that the trustee has satisfied his burden to show that the amended term sheet is reasonable, fair and adequate again under the circumstances." Transcript of Hearing held on December 22, 2010 before the California Bankruptcy Court, at 17:12 - 17:16.[18]

ii. "There were objections concerning issues regarding California law, whether the settlement is in violation of any applicable California law. There was a reference to the proportionate liability. I reviewed that argument. I reviewed my notes regarding oral argument, and I did not find that argument persuasive or that it was really applicable under these circumstances." *Id.* at 18:8 - 18:14.

---

[16] At that time, LCPI decided not to ask this Court, as part of the approval of the LCPI Settlement for a "good faith" finding since, among other reasons (a) it knew that it could always ask this Court at a later time for a "good faith" finding as part of the claims objection process, (b) the Claimant had not yet been sued and, therefore, it was not clear whether there would ever be a contribution/indemnity claim against LCPI, and (c) the LCPI Settlement still needed to be approved by the California Bankruptcy Court and that approval was a condition precedent to sell the Properties, which was the primary source of repayment for the First Lien Lenders. As such, LCPI decided not to seek the good faith finding from this Court as part of the LCPI Settlement, but instead to wait until the LCPI Settlement was approved by the California Bankruptcy Court, the Properties were sold, and the dividend action brought by the SunCal Trustee against the Claimant was resolved. Even then, LCPI believed the Claimant would appreciate that in light of the relatively small settlement it paid, which was mostly covered by insurance, this was a frivolous claim and withdraw it voluntarily.

[17] A copy of the September 29 Order is annexed hereto as Exhibit "D."

[18] Excerpts of the December 22, 2010 transcript are annexed hereto as Exhibit "E."

24. Finding just cause for the relief requested, by Order dated January 27, 2011 ("**January 27 Order**"), the LCPI Settlement was approved by the California Bankruptcy Court.[19]

E. **The Settlement Between the Claimant and the SunCal Trustee**

25. As noted above, the SunCal Debtors incurred secured debt totaling $320 million pursuant to the First Lien Credit Agreement and Second Lien Credit Agreement.[20] In connection with this financing, SunCal Parent distributed, as a dividend, $144 million[21] of the $320 million in loan proceeds to the Claimant and its co-investors. According to the SunCal Trustee, the dividend included over $41 million in "profits."

26. On October 29, 2010, the SunCal Trustee filed an action ("**Dividend Action**") in the United States District Court for the Central District of California, seeking to recover the dividend from the Claimant and certain other defendants named therein. On January 5, 2011, the Dividend Action was transferred to the California Bankruptcy Court for all pre-trial proceedings.

27. The Claimant and the other defendants each filed motions to dismiss the SunCal Trustee's original complaint. In the interim, the California Bankruptcy Court ordered the Claimant and the other defendants in the Dividend Action to participate in discovery relating to, among other things, the payment of the dividend. After the SunCal Trustee filed an amended complaint, the Claimant and the other defendants filed new motions to dismiss, which the

---

[19] A copy of the January 27 Order is annexed hereto as Exhibit "F."

[20] The Lenders' Loans refinanced approximately $62 million of secured debt on the Properties. The Claimant's equity interest in the SunCal Parent was always junior to, among other things, this quantum of secured debt. To date, the Lenders have received less than this amount from the sale of the Properties.

[21] As noted, the Claimant and its related parties received approximately $130 million of the $144 million dividend.

SunCal Trustee opposed. Prior to the hearing on the motions to dismiss, after intensive mediation efforts, the SunCal Trustee, the Claimant and the other defendants were able to negotiate a settlement ("**Dividend Action Settlement**")[22] of the Dividend Action.

28. The Dividend Action Settlement essentially provided that the defendants (including the Claimant) were to collectively pay up to $16 million to settle the Dividend Action and certain other litigation (the "**Settlement Payment**"). The Claimant's share of the Settlement Payment was approximately $14 million, a material portion of which was to be paid by insurance.

29. The SunCal Trustee filed a motion seeking approval of the Dividend Action Settlement in the California Bankruptcy Court. In connection with this settlement, the SunCal Trustee also sought a good faith finding pursuant to Section 877.6 of the CCCP. The LBREP Defendants filed a Memorandum of Points and Authorities ("**LBREP Defendants Memo**")[23] in support of the SunCal Trustee's request for approval of the Dividend Action Settlement. In the LBREP Defendants Memo, the LBREP Defendants (i) continued to maintain that the SunCal Trustee's claims against them had no merit (p. 6), (ii) the settlement amount "reflects a fair apportionment of alleged liability" (p. 7), (iii) the Dividend Action Settlement "constitutes a good faith settlement as it reflects a 'ballpark' approximation both of the SunCal Trustee's total potential recovery and of the LBREP Defendants' alleged proportionate liability" (p. 7), and (iv) that "despite an initial request for over $144 million in damages, the SunCal Trustee himself has expressed substantial doubts about the probability of success on his claims and the Settlement payment reflects the risks associated with litigation" (p. 8).

---

[22] A copy of the Dividend Action Settlement is annexed hereto as Exhibit "G."

[23] A copy of the LBREP Defendants Memo is annexed hereto as Exhibit "H."

30. The LBREP Defendants Memo also noted that solvency certificates were obtained as part of the 2006 loan transaction, and the Properties were appraised at $977.5 million. *See* LBREP Defendants Memo, at p. 2. According to the Claimant (which LCPI agrees with), the SunCal Debtors' demise was not caused by the Loans or the dividend, but by a "catastrophic and unforeseen collapse of the California housing market." *Id.* at p. 2. The Claimant concludes that the dividend was "imminently reasonable," and the Debtors remained solvent with substantial equity after the dividend. *Id.* at p. 3.

31. On November 29, 2012, the California Bankruptcy Court entered an Order approving the Dividend Action Settlement, and found that it was entered into in good faith pursuant to Section 877.6 of the CCCP.

**F.    The Proofs of Claim**

32. On September 22, 2009 -- prior to the approval of the LCPI Settlement and the commencement of the Dividend Action -- the Claimant filed its Claims against Lehman, asserting alleged equitable indemnification and contribution claims in an unspecified amount stemming from any actions to be commenced against it based on its receipt of the dividend. Although never fully articulated, in essence, the Claimant's position is that a lender can somehow be liable to the equity owner of its borrower, for the return by the equity owner to the borrower, of a portion of the dividend paid to it. The Claimant has failed to provide any case law in support of this dubious legal theory.

33. As required under its Plan of Reorganization, Lehman originally established a claims reserve ("**Reserve**") of $280 million for the Claims. On February 28, 2013, the Court approved a stipulation reducing the Reserve to $20 million.

# ARGUMENT

## I.

### THE LCPI SETTLEMENT WAS ENTERED INTO IN GOOD FAITH PURSUANT TO SECTIONS 877 AND 877.6 OF THE CCCP

34. Since it already has been judicially determined that the Dividend Action Settlement was entered into in good faith, it readily flows from that conclusion that the LCPI Settlement was also entered into in good faith within the meaning of Sections 877 and 877.6 of the CCCP.

35. Essentially, a "good faith" finding obtained by a settling party (in this case -- LCPI) releases the settling party from all contribution/indemnity claims from other joint tortfeasors (*i.e.*, the Claimant).

36. A settling party in a federal action involving California claims may file a motion seeking a good faith settlement determination under Section 877.6 of the CCCP. *See AmeriPride Servs. Inc. v. Valley Indus. Servs., Inc.*, 2007 WL 1946635. at *3 (E.D. Cal. July 2, 2007) (citing Fed. Sav. & Loan Ins. Corp. v. Butler. 904 F.2d 505. 511 (9th Cir. 1990)).[24]

37. Public policy strongly favors settlement, particularly of complex disputes, such as the one between LCPI and the SunCal Trustee. *See Class Plaintiffs v. City of Seattle,* 955 F.2d 1268. 1276 (9th Cir. 1991). *cert. denied.* 506 U.S. 953 (1992). Moreover, California courts recognize that defendants are unlikely to settle if the settlement will not end the defendant's involvement in the litigation and will leave it vulnerable to further liability. *See, e.g., Bay Dev. LTD. v. Home Capital Corp.,* 50 Cal. 3d 1012 (1990). Accordingly, section 877.6 provides that "[a] determination by the court that the settlement was made in good faith shall bar any other

---

[24] The case law recitation is consistent with the Claimant's pleadings in the SunCal Debtors' bankruptcy in support of their good faith finding as part of the Dividend Action Settlement.

joint tortfeasor . . . from any further claims against the settling tortfeasor." Cal. Code Civ. P. § 877.6(c). *See also* Cal. Code Civ. P. § 877(b) ("Where a release . . . is given in good faith before . . . judgment to one or more of a number of tortfeasors claimed to be liable for the same tort . . . it shall have the following effect . . . [it] shall discharge the party to whom it is given from all liability for any contribution to any other parties.").

38. When addressing the "good faith" requirement, courts frequently apply the factors enumerated in *Tech-Bilt, Inc. v. Woodward Clyde & Assoc.*, 38 Cal. 2d 488 (1985), to determine if "good faith" exists. These factors, as explained in *Tech-Bilt*, are:

> [A] rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of nonsettling defendants. Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. '[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' *Id.* at 499, *quoting Torres v. Union Pacific R.R. Co.*, 157 Cal. App. 3d 499, 509 (1984).

*Id.* at 499 (*quoting Torres v. Union Pacific R.R. Co.*, 157 Cal. App. 3d 499, 509 (1984)).

39. The objecting party has the burden of proof that the proposed settlement lacks good faith. *See* Cal. Code Civ. P. § 877(6)(d). The objector must show that the settlement "is so far 'out of the ballpark' to [the factors discussed in *Tech-Bilt*] as to be inconsistent with the equitable objectives of the statute." *Tech-BiIt*, 38 Cal. 3d at 500.

40. The Claimant has previously argued that Cal. Code Civ. P. § 877(6) applies to it and Lehman. Significantly, the LCPI Settlement has been approved by two

Bankruptcy Courts, from the perspectives of both the proposed plaintiff (SunCal Trustee) and the proposed defendant (LCPI). As part of the approvals of the LCPI Settlement, each Bankruptcy Court found that the LCPI Settlement is well within the range of reasonableness. That finding, by definition, establishes the good faith finding referred to in the California statute. The standard for a good faith finding is arguably an even broader standard than the standard for approving a bankruptcy settlement. The language used in the "good faith" cases is whether the settlement is "grossly disproportionate" or so "far out of the ballpark" that the settlement should not be approved.

41.    Even if the Bankruptcy Courts had not already made a "reasonableness" finding, given the substantial consideration paid by LCPI to the SunCal Debtors' Estate in connection with the LCPI Settlement, the LCPI Settlement would be found to have been entered into in good faith. Assuming *arguendo*, that the First Lien Lenders and the Claimant were joint tortfeasors, using round numbers, LCPI and the First Lien Lenders would have paid the SunCal Trustee, at a minimum, $12 million under the LCPI Settlement.[25] The Claimant and its insurance carrier in the Dividend Action Settlement would have collectively paid the SunCal Trustee approximately $14 million.

42.    Viewed another way, the amount paid by the Claimant (without regard to insurance) was nothing more than a return of the interest it earned on the dividend retained (which itself represented a profit on the Claimant's original investment), assuming a rate of return of around 2%. By contrast, the First Lien Lenders lost over 75% of the principal amount of their loan, and, based on LCPI's position in the second and third lien loans, it lost an even

---

[25] This number is computed as follows: (a) $6 million use of cash collateral, (b) $4 million from the reduction in recovery percentage of Other Recoveries, and (c) $2 million from the sale proceeds.

greater percentage of its principal. In reality, the Claimant got to keep the money the First Lien Lenders advanced to the SunCal Parent (which was mostly not repaid).

43. As also noted, in connection with the motion seeking approval of the LCPI Settlement in this Court and the California Bankruptcy Court, the Claimant never stated that the LCPI Settlement was "grossly disproportionate" or "so far out of the ball park" that it should not be approved. Indeed, the California Bankruptcy Court found that the LCPI Settlement was "reasonable, fair and adequate . . . under the circumstances" from the perspective of the SunCal Debtors' Estates. The Claimant's reticence to say anything contrary to the reasonableness of the LCPI Settlement was due to the fact that its own legal position was consistent with that of LCPI; that being, the SunCal Trustee's claims arising out of the 2006 transaction lacked merit. Under these circumstances, it is axiomatic that the LCPI Settlement should be deemed a good faith resolution.

44. A good faith determination must be requested in order for the settling defendant to obtain the benefit of Section 877.6 of the CCCP. However, the "good faith" determination need not be requested at the same time as approval of the settlement. In *Greshko v. County of Los Angeles*, 239 Cal. Rptr. 846 (Cal. Ct. App. 1987), there was a five year delay after the settlement before a good faith determination was requested. The *Greshko* court noted that "Code of Civil Procedure section 877.6 provides no time limit after settlement within which a motion for determination of good faith of the settlement must be brought".

45. Based on the foregoing, the Court should conclude that the LCPI Settlement was entered into in good faith pursuant to Sections 877 and 877.6 of the CCCP.

DMSLIBRARY01-20423745.2

## II.

## THE CLAIMS SHOULD BE DISALLOWED AND
## EXPUNGED PURSUANT TO SECTIONS 877(b) AND 877.6(c) OF THE CCCP

46. A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). If an objection refuting at least one of the claim's essential allegations is asserted, the Claimant has the burden to demonstrate the validity of the claim. *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 Bankr. LEXIS 660, at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

47. The Claims should be disallowed and expunged because the LCPI Settlement was entered into in good faith pursuant to Sections 877 and 877.6 of the CCCP 877.6. As such, Lehman would be protected from claims asserted against it by other defendants, such as the Claimant, pursuant to (i) Section 877(b) of the CCCP, which provides that a release and/or covenant not to sue given in good faith (as was the case here in light of the LCPI Settlement) "shall discharge the party to whom it is given from all liability for any contribution to any other parties," and (ii) Section 877.6(c) of the CCCP, which provides that "[a] determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."

48. Accordingly, as the LCPI Settlement was entered into in good faith pursuant to Sections 877 and 877.6 of the CCCP, the Claims should be disallowed and expunged pursuant to Sections 877(b) and 877.6(c) of the CCCP.

49.     In all events, based on what the Claimant paid to the SunCal Trustee, and the quantum of the dividend retained by it, it has no cognizable indemnification or contribution claim against Lehman.

## RESERVATION OF RIGHTS

50.     Lehman reserves all of its rights to object on any other basis to the Claims as to which the relief requested herein is not granted.

## NOTICE

51.     Notice of this Motion has been provided to (i) the Office of the United States Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) counsel to the Claimant; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the Second Amended Order entered on June 17, 2010 [Docket No. 9635], governing case management and administrative procedures for these cases. Lehman submits that no other or further notice need be provided.

52.     No previous request for the relief sought herein has been made by Lehman to this or any other Court.

DMSLIBRARY01-20423745.2

WHEREFORE, Lehman respectfully requests that this Court: (i) enter an order substantially in the form attached hereto as Exhibit "I", granting the relief sought herein; and (ii) grant Lehman such other and further relief as the Court may deem just and proper.

Dated: March 25, 2013
      New York, New York

/s/ Arthur Steinberg
Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Counsel for Lehman Brothers Holdings Inc.*
*and Certain of Its Affiliates*