# EXHIBIT B

### BINDING AMENDED AND RESTATED TERM SHEET AMONG LCPI AS ADMINISTRATIVE AGENT FOR THE 1st LIEN LENDERS, LCPI AS THE 2ND LIEN LENDER, LCPI AS THE 3RD LIEN LENDER, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND THE CHAPTER 11 TRUSTEE

This Binding Amended And Restated Term Sheet dated as of August 18, 2010 (this "Term Sheet") is by and among ALFRED H. SIEGEL, solely in his capacity as the chapter 11 trustee (the "Trustee") of the administratively-consolidated estates of LBREP/L-SunCal Master I LLC ("Parent Debtor"), LBREP/L-SunCal McAllister Ranch LLC ("McAllister Ranch"), LBREP/L-SunCal McSweeny Farms LLC ("McSweeny Farms"), and LBREP/L-SunCal Summerwind Ranch LLC ("Summerwind Ranch"; with McAllister Ranch, McSweeny Farms and Summerwind Ranch being referred to collectively as the "Subsidiary Debtors," and together with the Parent Debtor, as the "Debtors") in their respective bankruptcy cases (the "SunCal Bankruptcy Cases") now pending in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court"); THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS of the Debtors (the "Creditors' Committee"); LEHMAN COMMERCIAL PAPER INC. ("LCPI"), in its capacity as administrative agent for the first-position secured lenders of the Debtors (the "1st Lien Lenders"); and is acknowledged and agreed as to certain provisions by one or more 1st Lien Lenders; by LCPI in its capacity as a second-position secured lender of the Debtors ("LCPI 2nd Lien Lender"); and by LCPI in its capacity as a third-position secured lender of the Debtors ("LCPI 3rd Lien Lender"), in order to reach interim agreement with respect to the distribution of certain funds, to establish certain parameters for a chapter 11 plan of reorganization for the Debtors and otherwise to establish the terms for globally resolving all disputes between the parties to this Term Sheet. Notwithstanding any references to the contrary contained herein, each and every reference in this Term Sheet to "Trustee" shall mean and refer to ALFRED H. SIEGEL solely and exclusively in his capacity as the chapter 11 trustee of the administratively-consolidated estates of the Debtors, and in no other capacity, and in no event whatsoever shall ALFRED H. SIEGEL have any personal liability of any kind, nature or amount as a result of this Term Sheet, including, without limitation, any performance, failure of performance, breach, default or other circumstance arising from or related to this Term Sheet, the implementation thereof, or the transactions contemplated herein.

That certain Binding Term Sheet Among LCPI As Administrative Agent For The 1st Lien Lenders, The Official Committee Of Unsecured Creditors, And The Chapter 11 Trustee, dated September 23, 2009 (the "Original Term Sheet"), is hereby superseded, amended, restated and replaced in its entirety by the terms hereof, and the Original Term Sheet is and shall be null and void and of no further binding force or effect.

## DEAL TERMS

### The Amended Compromise Motion

A.    1. The Trustee will seek approval of this compromise by filing an amended motion (the "Amended Compromise Motion") under Federal Bankruptcy Rule 9019 within ten (10) calendar days of the Trustee's actual receipt of a copy of this Term Sheet fully executed by all non-Trustee parties hereto. The Trustee shall file the Amended Compromise Motion in all of the SunCal Bankruptcy Cases and LCPI shall

1

concurrently file the Amended Compromise Motion in the LCPI bankruptcy case (the "LCPI Bankruptcy Case", and together with the SunCal Bankruptcy Cases, the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court", and together with the California Bankruptcy Court, the "Bankruptcy Courts") to obtain approval of this Term Sheet. The orders approving the Amended Compromise Motions (the "Compromise Orders") must be obtained, entered in the respective Bankruptcy Courts and become "Final Orders" (as defined in paragraph A(2) below), by no later than November 1, 2010, unless this date is extended by mutual agreement of the Trustee, LCPI and the Creditors' Committee. If the Compromise Orders have not become Final Orders on or before November 30, 2010, this Term Sheet, and the terms and provisions hereof and thereof shall become null and void and of no further force and effect, in which case the parties hereto shall have no further obligations hereunder or to each other with respect to the subject matter hereof. Immediately upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding on LCPI, the Trustee, the Creditors' Committee and each other party hereto (such date being referred to herein as the "Settlement Effective Date"). All parties hereto acknowledge that all other parties hereto intend to and will rely on the binding nature of this Term Sheet as of the Settlement Effective Date in moving forward with the Bankruptcy Cases. The terms of this Term Sheet will be incorporated into one or more plans of reorganization to be filed by the Trustee (the "Plan") in consultation with, or jointly with, the Creditors' Committee in the California Bankruptcy Court with respect to the SunCal Bankruptcy Cases. The Trustee and the Creditors' Committee shall work together in good faith with LCPI to ensure that the Plan is consistent with this Term Sheet. If LCPI believes that the Plan filed does not materially conform to this Term Sheet, then LCPI shall have the right to object to the Plan solely with respect to the alleged material nonconformity with the Term Sheet, and the Trustee and the Committee agree that the Plan shall be modified, consistent with any ruling of the Bankruptcy Courts to make it conform materially with the Term Sheet. The Plan shall be subject to LCPI's reasonable consent prior to filing, provided such consent shall not be withheld if the Plan is in a form and substance materially consistent with the Term Sheet.

2.   "Final Order" means an order or judgment of either of the Bankruptcy Courts entered on the Bankruptcy Court's docket where either: (a) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (b) if such an appeal or petition has been timely filed, there is no stay pending appeal or other injunction or court order in place which prohibits the enforcement of the Term Sheet.

3. Subject to the Settlement Effective Date, the Trustee and the Creditors' Committee shall stipulate to LCPI being granted immediate relief from the automatic stay for the sole and only purpose of allowing LCPI in its capacity as administrative agent for the 1st Lien Lenders to record a new notice of default on behalf of the 1st Lien Lenders with respect to the Parent Debtor and Subsidiary Debtors so as to allow LCPI to re-commence the period within which a foreclosure sale may be conducted

with respect to such first position lien. This stipulation shall not include relief from stay for any other or further foreclosure or enforcement actions such as, but not limited to, recording of a notice of sale or the holding of a trustee's sale.

### Allowance of Claim of LCPI; Claims Filed by 2nd and 3rd Lien Lenders

B.    Upon the Settlement Effective Date, the claim of the 1st Lien Lenders in the aggregate amount of $230,006,233.98 plus accrued and unpaid interest calculated through September 10, 2008 (the "Petition Date"), and accrued and unpaid legal fees shall be allowed in each of the SunCal Bankruptcy Cases; provided, however, the 1st Lien Lenders' allowed secured claims against the Subsidiary Debtors shall be in the amount of the 1st Lien Lenders' final credit bid under 11 U.S.C. Section 1123(a)(5)(d) pursuant to the Plan, as set forth in and adjusted in accordance with paragraphs E and F below (or, in the case of one or more successful bids by any third-party purchasers at the related sales pursuant to the Plan, the aggregate amount of such successful third-party bids), plus any amounts received by the 1st Lien Lenders as described in paragraph D below, and minus any amounts paid by the 1st Lien Lenders as described in paragraph H below. Any amount not deemed a portion of the 1st Lien Lenders' allowed secured claim shall be deemed an allowed unsecured claim against all of the Debtors as further described in paragraph F below. Proofs of claim have been filed in the Bankruptcy Cases by second position lenders (the "2nd Lien Lenders") and third position lenders (the "3rd Lien Lenders", with the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders being referred to collectively as the "Lenders"). The Lenders have alleged that their loans to the Parent Debtor are guaranteed by each of the Subsidiary Debtors. This Term Sheet is not intended to affect the rights, if any, of (a) the 2nd Lien Lenders other than LCPI 2nd Lien Lender, (b) the 3rd Lien Lenders other than LCPI 3rd Lien Lender, or (c) any other Person (as defined in the First Lien Credit Agreement dated January 19, 2006 (as amended) among LCPI, Parent Debtor, the 1st Lien Lenders, and certain other parties (the "First Lien Credit Agreement"), except to the extent that a Person is a party hereto, with such Person's rights being affected to the extent expressly provided herein).

### Distributions Upon Settlement Effective Date

C.    1. On the Settlement Effective Date, the Trustee will retain $3.5 million from those certain Parent Debtor funds previously held by First Bank & Trust and subsequently transferred to the Trustee for the benefit of the Debtors' estates, which funds are currently subject to the liens and rights of the 1st Lien Lenders (the "Development Account Funds"), for use by the Trustee in administration of the SunCal Bankruptcy Cases. The $3.5 million of the Development Account Funds retained by the Trustee pursuant to this Term Sheet for use by the Trustee in administration of the SunCal Bankruptcy Cases shall hereinafter be referred to as the "Administrative Funds". The Administrative Funds shall be immediately available to the Trustee to pay administrative claims owing in the SunCal Bankruptcy Cases. In addition, upon the effective date of the Plan, any portion of the Administrative Funds not used to pay administrative claims as provided in the previous sentence or used or reserved to pay post-confirmation fees and costs of professionals of the Debtors' estates and/or

quarterly fees payable to the Office of the United States Trustee and court costs shall
be available to make distributions to non-Lender creditors in respect of unsecured
claims. In addition to the $3.5 million in Administrative Funds, the Trustee shall also
retain $2.0 million of the Development Account Funds (the "Remaining Development
Funds"), which Remaining Development Funds may be used by the Trustee solely to
fund the ongoing current expenses of maintaining the real property owned by
McAllister Ranch, McSweeny Farms, and Summerwind Ranch (together, the
"Properties") pursuant to cash collateral orders of the California Bankruptcy Court in
a manner consistent with the budget attached as Exhibit "A" hereto (the "Approved
Budget"), subject to the budget variances allowed pursuant to Paragraph G below, or
otherwise for uses for which the Trustee obtains the 1st Lien Lenders' consent (not to
be unreasonably withheld) or which are approved by the California Bankruptcy Court
after notice to the 1st Lien Lenders. The Approved Budget shall include quarterly
fees payable to the Office of the United States Trustee and court costs. Any unused
Remaining Development Funds will be transferred to the 1st Lien Lenders within five
business days of the date that the Debtors no longer hold title to the Properties.

2.    The funds currently on deposit with the Yucaipa Valley Water District and to be
paid to the Trustee pursuant to that certain Settlement and Release Agreement (the
"Yucaipa Settlement") between the Trustee and Oak Valley Partners, L.P. (the
"Yucaipa Funds"), shall be split 50/50 between the 1st Lien Lenders and the Trustee.
The Trustee's 50% portion of the Yucaipa Funds shall be referred to herein as the
"Trustee's YFP"; and the 1st Lien Lenders' 50% portion of the Yucaipa funds shall be
referred to herein as the "1st Lien Lenders' YFP." Following the entry of an order
approving the Yucaipa Settlement by the California Bankruptcy Court (the "Yucaipa
Settlement Order") and the Trustee's receipt of the Yucaipa Funds, the Yucaipa Funds
shall be segregated by the Trustee from other funds in his possession relating to the
Debtors and held by the Trustee, subject to the asserted liens, claims, interests and
encumbrances of the 1st Lien Lenders. On the Settlement Effective Date, (a) the
1st Lien Lenders' YFP shall be paid to the 1st Lien Lenders free and clear of any
claims or interests of the Trustee, the Debtors, the Debtors' estates and any party
claiming by or through the Debtors, and (b) the asserted liens, claims, interests and
encumbrances of the 1st Lien Lenders in the Trustee's YFP shall be avoided and
preserved for the benefit of the Detbors' bankruptcy estates pursuant to 11 U.S.C. §§
544 and 551, and the the Trustee's YFP shall immediately be available for use by the
Trustee in the administration of the SunCal Bankruptcy Cases. The Trustee's YFP
shall constitute additional funds of the Trustee and shall be treated as additional
Administrative Funds (as Administrative Funds is defined in paragraph C).

Notwithstanding the foregoing, (a) if the Yucaipa Settlement is approved by the
California Bankruptcy Court and the Trustee receives possession of the Yucaipa
Funds but the Settlment Effective Date does not occur by the deadline set forth in
paragraph A(1) above , then the Yucaipa Funds shall be segregated by the Trustee
subject to the asserted liens, claims, interests and encumbrances of the 1st Lien
Lenders, which liens, claims, interests and encumbrances may be challenged by the
Trustee in accordance with applicable law and procedure and shall not be distributed
or used without further order of the California Bankruptcy Court obtained on proper

4

notice and hearing, and (b) if the Yucaipa Settlement is not approved by the California Bankruptcy Court, the respective rights of the parties to the Term Sheet to all the funds currently held by the Yucaipa Valley Water District shall be preserved. Notwithstanding the foregoing, nothing herein shall be deemed an admission regarding the existence or validity of any lien or right asserted by the 1st Lien Lenders in the funds currently held by the Yucaipa Valley Water District.

D.      Upon the Settlement Effective Date, the Trustee shall immediately transfer to the 1st Lien Lenders, free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, (a) all Development Account Funds less the aggregate $5.5 million in Administrative Funds and Remaining Development Funds to be retained by the Trustee pursuant to paragraph C above and (b) the 1st Lien Lenders' YFP (all of the funds to be transferred to the 1st Lien Lenders hereafter referred to as the "1st Lien Lenders Retained Settlement Funds").

## Sale Of Properties Under The Plan

E.      The 1st Lien Lenders acting collectively in concert shall be the initial bidder with respect to each of the Properties and, subject to paragraph F below, shall credit-bid their allowed secured claims with respect to each Property in accordance with the bidding procedures set forth in paragraphs F and P below, as such bidding procedures may be further drafted and agreed upon by the parties hereto in consultation with a real property broker acceptable to each of the parties hereto (the "Approved Broker") and otherwise approved by the California Bankruptcy Court to the extent required (together, the "Bidding Procedures"). Properties for which the 1st Lien Lenders are determined to be the winning bidders pursuant to, in accordance with, and as more particularly described in the Bidding Procedures (the "Winning Bidders"), and which are purchased by the 1st Lien Lenders by way of credit bid, shall be transferred to the 1st Lien Lenders subject to (i) the lien of the 1st Lien Lenders, (ii) Senior Liens (hereinafter defined), and (iii) liens, claims, encumbrances or interests that satisfy clause (b), (c) and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement (items described in this clause (iii), "Permitted Liens") Properties for which one or more third parties are determined to be the Winning Bidders shall be sold under the Plan pursuant to 11 U.S.C. Section 1123(a)(5)(d) free and clear of liens, claims, encumbrances or interests other than Permitted Liens.

F.      The initial credit bids by the 1st Lien Lenders shall be in an aggregate amount which shall be at least equal to $45 million (the "Aggregate Minimum Credit Bid Amount") and shall not exceed a maximum amount (the "Aggregate Maximum Credit Bid Amount"), with such Maximum Credit Bid Amount to be determined prior to the Settlement Effective Date by the 1st Lien Lenders in consultation with the Approved Broker. The Aggregate Minimum Credit Bid Amount and the Aggregate Maximum Credit Bid Amount shall be respectively allocated among the three Properties by the parties hereto in consultation with the Approved Broker prior to the Settlement Effective Date (the Aggregate Maximum Credit Bid Amount as so allocated in each case, the "Allocated Maximum Credit Bid Amount"). The 1st Lien Lenders shall be

5

entitled to increase their respective credit bid for each Property to an amount, to be determined prior to the Settlement Effective Date by the parties hereto in consultation with the Approved Broker, in excess of the highest competing bid for such Property, if any, up to the Allocated Maximum Credit Bid Amount with respect to such Property and up to the Aggregate Maximum Credit Bid Amount in the aggregate for all of the 1st Lien Lenders' credit bids with respect to the Properties (in each case with no set-offs, reductions or other defenses) in their discretion in accordance with the overbid procedures set forth herein. If one or more of the Properties are successfully bid upon by a qualified bidder (as the same may be more particularly described in the Bidding Procedures, each a "Qualified Bidder"), the Trustee may, subject to the right of the 1st Lien Lenders to submit a greater bid, sell such Property(ies) to such third party free and clear of all Liens (including the lien of the 1st Lien Lenders) other than Permitted Liens (hereinafter defined). Any Senior Liens and the lien of the 1st Lien Lenders shall each attach to any monies (other than the Trustee's Participation under paragraph R) received from the sale to a third party and such monies, net of any ordinary course sales costs and subject to the rights of any holders of Senior Liens, shall be paid to the 1st Lien Lenders. Payment of the Trustee's Participation to the Trustee shall only be made at such time when all Senior Lien claims have been resolved (through settlement, payment or otherwise) or Fidelity has accepted responsibility for all remaining Senior Liens. The 1st Lien Lenders shall have an allowed unsecured claim as set forth in paragraph B above. For the avoidance of doubt, in accordance with paragraph B above, the calculation of the 1st Lien Lenders' allowed unsecured claim shall take into account (1) the 1st Lien Lenders' aggregate credit bids for those Properties that were included in their winning bids pursuant to and in accordance with the Bidding Procedures (as the same may be more particularly described in the Bidding Procedures, each a "Winning Bid") minus any liabilities (including, without limitation, liabilities in respect of any Senior Liens) assumed by the 1st Lien Lenders in connection with the transfer of title to such Properties to the 1st Lien Lenders pursuant to such Winning Bids and (2) any proceeds received by the 1st Lien Lenders from the sale pursuant to the Plan of any of the Properties that were not included in the 1st Lien Lenders' Winning Bids to one or more third parties.

**Use of Remaining Development Funds; Trustee Loss Collateral**

G.    During the period from the Settlement Effective Date until the transfer of title of all of the Properties to the 1st Lien Lenders and/or to any third party(ies), either pursuant to the Plan or by way of a foreclosure by the 1st Lien Lenders (the "Trustee Maintenance Period"), the Trustee shall be authorized to pay all expenses incidental to the ownership, operation and maintenance of the Properties from the Remaining Development Funds in amounts not to exceed those on the Approved Budget (plus a variance of 10% on a line-item basis of the amounts set forth therein), without the further consent of the 1st Lien Lenders. Immediately upon the Settlement Effective Date, LCPI on behalf of and as agent for the 1st Lien Lenders shall deliver to the Trustee cash or one or more irrevocable letters of credit acceptable to the Trustee in his reasonable discretion (together, the "Trustee Loss Collateral") in the aggregate amount of $500,000 (in the case of cash, to be held in escrow and released solely in accordance with the terms and conditions of this Term Sheet). During the Trustee

Maintenance Period, in the event the Trustee incurs proven losses (not otherwise covered by insurance) based upon claims of simple negligence or strict liability in connection with his ownership, operation, maintenance and management of the Properties, but not in the event of any gross negligence or gross malfeasance on the part of the Trustee, the Trustee shall have the right to draw and recover from the Trustee Loss Collateral an amount not to exceed in the aggregate the lesser of (i) the amount of such losses multiplied by a fraction, the numerator of which is the amount of the 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders (including any unused Remaining Development Funds actually paid over to the 1st Lien Lenders pursuant to paragraph C above) and the denominator of which is the aforementioned amount plus $5.5 million[1], and (ii) the full amount of the Trustee Loss Collateral, and in the event such recovery from the Trustee Loss Collateral is insufficient to cover such losses, the Trustee shall have the right, but not the obligation, to apply Administrative Funds to cover such losses. Upon the earlier to occur of (i) a Termination Event or (ii) the effective date of the Plan, the Trustee shall deliver any remaining cash Trustee Loss Collateral to LCPI for the benefit of the 1st Lien Lenders. Further, LCPI on behalf of and as agent for the 1st Lien Lenders hereby fully and forever releases and discharges the Trustee both in his capacity as trustee and in his individual capacity with respect to any acts or omissions occurring or claims arising in any way related to the subject matter hereof or the Trustee's actions or duties with respect to the Debtors or the Properties prior to the conclusion of the Trustee Maintenance Period, except to the extent of any gross negligence or gross malfeasance on the part of the Trustee.

H.  To the extent that the Remaining Development Funds are inadequate to fund the Trustee's reasonable and necessary expenses with respect to the ownership, preservation and maintenance (but not development) of the Properties through and including January 31, 2011, the 1st Lien Lenders agree to pay for such reasonable and necessary expenses to the extent they are (i) consistent in nature and amount with expenses provided for in prior cash collateral budgets approved by the California Bankruptcy Court and (ii) in an aggregate amount not to exceed fifty percent (50%) of the amount of the 1st Lien Lenders Retained Settlement Funds actually received by the 1st Lien Lenders. These expenses shall be paid within ten (10) days following written request accompanied by reasonable back-up documentation by the Trustee to LCPI and LCPI's good faith determination that such expenses are reasonable and necessary; however, if there is a dispute as to the reasonableness or necessity of any of the expenses incurred by the Trustee, the California Bankruptcy Court shall retain jurisdiction to hear and determine the Trustee's motion to compel payment of such expenses. Pending payment of such expenses by the 1st Lien Lenders, the Trustee shall be authorized to use the Administrative Funds for the purposes set forth in this paragraph H.

---

[1] As an example only, in the case of an $800,000 loss, if the amount of 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders is $8.5 million, then the numerator will be $8.5 million, the denominator will be $14 million (i.e. $8.5 million plus $5.5 million), the resulting fraction will be 8.5/14 (= 0.6071428571) and the Trustee's recovery would be $485,714.29 ($800,000 multiplied by 0.6071428571) which is less than $500,000 (i.e., the full amount of the Trustee's Loss Collateral).

**Information Regarding Title Insurance Policy**

I.  LCPI has heretofore provided the Trustee with a complete copy of that certain Title Insurance Policy number 27-44-94-120334 (the "Title Insurance Policy") issued by Fidelity National Title Insurance Company ("Fidelity") for the benefit of LCPI as administrative agent for the 1st Lien Lenders for the Properties. Promptly upon execution of this Term Sheet LCPI will provide the Trustee with all documents and information reasonably related to the Title Insurance Policy and any and all claims made by the 1st Lien Lenders thereunder so as to allow the Trustee to comply with the requirements of paragraphs J and K below and otherwise to proceed with such matters to conclusion.

**Resolution of Senior Liens; Availability of Title Insurance**

J.  The Trustee shall reasonably cooperate with the 1st Lien Lenders in their efforts to determine whether any Liens are superior to the 1st Lien Lenders' lien in the applicable Properties and to determine the proper amount of any such superior Liens ("Senior Liens"); provided, however, the Trustee shall not be obligated to take any action that would cause the Trustee or the Debtors' bankruptcy estates to incur material cost or liability.

**Release**

K.  1. As of the Settlement Effective Date, (A) the Debtors' estates through the Trustee shall be deemed to have released the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders), and, subject to the second-to-last sentence of this paragraph K, their respective affiliated parties, officers, directors, employees, agents and attorneys, and (B) LCPI (in its individual capacity as a 1st Lien Lender and in its capacity as administrative agent for the 1st Lien Lenders but not in any other capacity) and the 1st Lien Lenders will be deemed to have released the Debtors' estates and the Trustee and the Trustee's agents and attorneys, in each case for and from all claims (as defined in Section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code) other than the allowance of the Lenders' claims as set forth in paragraph B above and the rights to receive distributions based on those allowed claims. Notwithstanding the foregoing and for the avoidance of doubt, the releases to be exchanged shall not include claims and causes of action against any third parties other than the 1st Lien Lenders and LCPI and their respective affiliated parties, officers, directors, employees, agents and attorneys acting in their capacities as lenders, agents, loan administrators or advisors thereto, and such releases specifically shall *not* include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"); SCC Acquisitions, Inc. ("SCC Inc."); SCC Acquisitions, LLC ("SCC LLC"); or SCC Ranch Ventures LLC (collectively with SCC Inc. and SCC LLC, "SCC") or any claims related to the acts of the owners of any of the Debtors including any transfers of funds by any of the owners of any of the Debtors. Notwithstanding anything above, nothing in this paragraph K shall be deemed a release of the respective parties' obligations under this Term Sheet. If the Settlement

Effective Date does not occur for any reason, the foregoing releases shall be of no force or effect.

2.  As to the matters released pursuant to paragraph K(1) above, the parties hereby expressly waive all rights under the provisions of Section 1542 of the Civil Code of the State of California and any similar rights in any state or territory or under any similar statute or regulation of the United States or any of its agencies.  Section 1542 of this California Civil Code reads as follows:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Each party waives and relinquishes any rights and benefits that any of them may have under California Civil Code Section 1542 pertaining to the subject of their releases set forth in paragraph K(1) above, and acknowledges that it is aware that it may hereafter discover facts in addition to or different from those which it now knows or believes to be true with respect to the matters released pursuant to paragraph K(1) above, but its intention hereby is to fully, finally and forever waive and release the claims released pursuant to paragraph K(1) above.  Each party represents, warrants and agrees that this waiver is a material term of this Term Sheet, without which neither party would have entered into this Term Sheet.

## Support of the Plan

L.   LCPI hereby agrees that, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan, which Disclosure Statement and other solicitation materials (i) implement this Term Sheet and (ii) are not otherwise materially inconsistent with such terms, it being recognized that this Term Sheet shall not constitute an agreement by LCPI to take any step or action that would violate any provision of applicable bankruptcy law or any other applicable laws, and to the extent any provision hereof shall be construed as constituting such a violation, such provision shall be deemed stricken herefrom and of no force and effect without liability to any of the parties, LCPI will, as promptly as practicable following the California Bankruptcy Court's approval of the Disclosure Statement and solicitation materials, present the Plan and related materials to the 1st Lien Lenders and recommend that the 1st Lien Lenders vote to accept the Plan, provided that to the extent the Plan contains additional terms and provisions unrelated to the substantive provisions of the Term Sheet, such additional terms and provisions are reasonably acceptable to LCPI and the 1st Lien Lenders.  Also, subject to the occurrence of the Settlement Effective Date, LCPI and those other 1st Lien Lenders who have signed this Term Sheet agree, prior to the occurrence of a Termination Event, not to vote in favor of any other plan that fails to incorporate the substantive provisions of this Term Sheet until such time (if any) as the provisions set forth in <u>paragraph T</u> below are in effect.

M.   All 1st Lien Lenders who are on the "steering committee" are parties to this Term Sheet.  All parties to this Term Sheet agree, prior to the occurrence of a Termination

Event, to support confirmation of the Plan provided the same is consistent in all material respects with the terms of this Term Sheet and does not contain material terms and provisions which have not been approved by LCPI and the "steering committee" of 1st Lien Lenders. Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet shall constitute a representation or warranty by LCPI that the 1st Lien Lenders will vote in favor of the Plan by the requisite majorities under the Bankruptcy Code to obtain acceptance of the Plan by the class of 1st Lien Lenders nor shall LCPI have any liability in respect of such voting by the 1st Lien Lenders (subject to LCPI's obligation to recommend approval as provided above).

N.    Nothing contained in this Term Sheet shall limit or interfere, in any way, with the ability of any 1st Lien Lender or member of the "steering committee" to transfer or assign its interests under the First Lien Credit Agreement. However, if such transferor or assignor has signed this Term Sheet, its transferees or assignees shall be bound by the provisions of this Term Sheet to the same extent such transferor or assignor was bound thereby. The transfer or assignment of all or part of such transferor's or assignor's interests under the First Lien Credit Agreement shall constitute a novation, whereby, such transferor or assignor shall automatically receive a release of its obligations under this Term Sheet by and to the same extent that its transferee or assignee is bound by the provisions of this Term Sheet.

**Key Plan Provisions**.

O.    The 1st Lien Lenders will be classified as a separate class under the Plan.

P.    The Plan will provide that the Trustee will sell the Properties (including without limitation any related personal property) pursuant to 11 U.S.C. Section 1123(a)(5)(d) and in accordance with the terms and conditions of this Term Sheet and the Bidding Procedures to the 1st Lien Lenders and/or one or more successful third party Qualified Bidders, as the case may be, free and clear of Liens other than (i) Permitted Liens in the case of a sale to a third party Qualified Bidder or (ii) Senior Liens, Permitted Liens and the Liens of the 1st Lien Lenders in the case of a sale to the 1st Lien Lenders pursuant to a credit bid.

Q.    1.    The Plan will provide that until such time as the earliest to occur of (a) all holders of allowed claims, other than the Lenders, have been paid in full the allowed amounts of their respective claims according to their respective legal priorities, (b) the Lenders have been paid the full amount of their allowed claims, or (c) this Term Sheet terminates in accordance with the terms hereof, any recovery of proceeds from any avoidance action, litigation (including, without limitation, litigation in respect of any claims of fraudulent conveyance), asset disposition (excluding the sale of the Properties), or other recovery by the Trustee prior to or after Plan confirmation (the "Other Recoveries"), after payment in full of all allowed administrative and other priority unsecured claims in all four of the SunCal Bankruptcy Cases (collectively, the "Unsecured Priority Claims"), shall be split 50/50 between the 1st Lien Lenders (based on the understanding of the parties hereto that, and only if, all such proceeds

10

would be distributed to the 1st Lien Lenders under the Intercreditor Agreement, defined below in this paragraph) and the holders of allowed claims other than the Lenders (the "Trade Creditors", which term excludes any and all claims by the Lenders). The portion of the Other Recoveries that is allocated to the Trade Creditors (the "Trade Creditor Allocation") shall be distributed to Trade Creditors pursuant to a confirmed administratively-consolidated chapter 11 plan on a pro rata basis among those Trade Creditors based on the allowed amount of their respective claims. Distributions to Trade Creditors shall be made out of a single fund consisting of Other Recoveries that shall be administered by an appropriate fiduciary. This division of Other Recoveries shall be enforceable in the Bankruptcy Courts and any court of competent jurisdiction notwithstanding (1) the effect or terms of any agreement among the Lenders; (2) that assets, claims or causes of action may be held or pursued on behalf of one or only some of the Debtors; and (3) that Parent Debtor has few if any creditors other than the Lenders. After all Trade Creditors of the Debtors' estates are paid in full, the balance of the funds in the Debtors' estates, if any, shall be distributed to the Lenders in accordance with their respective priorities but subject to that certain Amended and Restated Intercreditor Agreement among the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders dated as of February 6, 2007 (the "Intercreditor Agreement"). If the foregoing allocations are either altered without the consent of the parties hereto or not approved by one or both of the Bankruptcy Courts, then any allowed unsecured claim of the 1st Lien Lenders (the "Assigned 1st Lien Lenders' Claim") shall be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, but without representation or warranty and only for the purpose of effectuating the 50/50 distribution scheme provided for in this paragraph Q. To the extent that the Assigned 1st Lien Lenders' Claim does not provide the Debtors' estates with the equivalent of what they otherwise would have received under the 50/50 distribution scheme, then any allowed unsecured claim of (x) LCPI 2nd Lien Lender (the "Assigned LCPI 2nd Lien Lender's Claim") and (y) LCPI 3rd Lien Lender (the "Assigned LCPI 3rd Lien Lender's Claim", and collectively with the Assigned 1st Lien Lenders' Claim and the Assigned LCPI 2nd Lien Lender's Claim, the "Assigned Lenders' Claims") shall each be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, LCPI 2nd Lien Lender and LCPI 3rd Lien Lender, but without representation or warranty and only to the extent necessary to provide the Debtors' estates with the equivalent of what they otherwise would have received pursuant to this paragraph Q. The proceeds from the Assigned Lenders' Claims shall be distributed first, to all unpaid Unsecured Priority Claims and second, to all Trade Creditors on a pro rata basis. After all of the Unsecured Priority Claims (to the extent that same were not previously paid out of the Administrative Claims) and Trade Creditors are paid in full, the remaining proceeds from (i) the Assigned 1st Lien Lenders' Claim shall be paid to the 1st Lien Lenders, (ii) the Assigned LCPI 2nd Lien Lender's Claim shall be paid to the 2nd Lien Lenders, and (iii) the Assigned LCPI 3rd Lien Lender's Claim shall be paid to the 3rd Lien Lenders.

R.    In addition, the Trustee shall be entitled to, and shall recover and receive from the Proceeds (hereinafter defined) of dispositions of the Properties, the lesser of (1) the amount sufficient to pay in full the allowed amount of the claims of the holders of allowed claims other than the Lenders to the extent not previously paid, and (2) 3.5% of such Proceeds (the "Trustee's Participation"); provided that, at the time of any such subsequent disposition the holders of allowed claims other than the Lenders shall not have otherwise been paid the full allowed amount of their claims.    The Trustee's Participation in each portion of any Proceeds that consists of cash shall be immediately due and payable to the Trustee from the 1st Lien Lenders in cash upon the 1st Lien Lenders' receipt of such portion of the applicable Proceeds.    The Trustee's Participation shall be transferred to the Trustee free and clear of Lender liens for the sole benefit of all allowed non-Lender unsecured claims.    As used herein, "Proceeds" shall mean all cash and other property constituting proceeds of the disposition of each Property, including the proceeds from the sale of any of the Properties under paragraph E to a party other than the 1st Lien Lenders (but excluding any transfer of a Property to the 1st Lien Lenders pursuant to a credit bid) and including the proceeds from any disposition of the Property by the 1st Lien Lenders or any of their affiliates following their acquisition thereof pursuant to a credit bit, whether such proceeds are received in a single lump sum or on a piecemeal basis over time, less (a) customary and reasonable costs and expenses of the sale, and (b) cash and other property used to satisfy any Senior Liens not otherwise satisfied under the Title Insurance Policy or the Plan.    For the avoidance of doubt, in the case of such property actually received that consists of promissory notes, equity interests (direct or indirect) in any entities taking title to the Properties and/or other deferred or contingent payment arrangements or mechanisms, the Trustee shall be entitled to receive, at the time such promissory notes, equity interests and/or deferred or contingent payment arrangements or mechanisms are received or implemented by the 1st Lien Lenders or their applicable affiliates or principals, a profits participation or similar contractual right to receive the applicable amount representing the Trustee's Participation from all cash actually received by such entities taking title to each Property from the disposition of such Property and by the Lenders and their applicable affiliates and principals in respect of such promissory notes, which profits participation or similar right shall be provided for in the operating, partnership, or similar governing documents of such entities and in such promissory notes or other deferred or contingent payment documentation (as the case may be), in a form and substance reasonably acceptable to the Trustee with Trustee being a direct contracted beneficiary of such provisions with the legal right to contractually enforce same.    The California Bankruptcy Court shall retain jurisdiction with respect to the determination of the value of any component of each Proceeds.    Without limiting the foregoing, if the 1st Lien Lenders form a joint venture with, or borrow funds from, any party, including any 1st Lien Lender or affiliates of a 1st Lien Lender to obtain funding necessary to develop one or more of the Properties or to maintain and/or operate the Properties prior to any disposition, the funds required to repay such unaffiliated equity or debt, as the case may be, shall reduce dollar-for-dollar the Proceeds for the applicable Properties.    The 1st Lien Lenders agree to act in good faith to carry out the terms of this paragraph R and to effectuate this participation interest of the Trustee.

The 1st Lien Lenders will, at their sole expense, provide a report and accounting to the Trustee or the Trustee's successor-in-interest as soon as possible following receipt of Proceeds and shall provide semi-annual financial reports relating to the Properties. In addition, the 1st Lien Lenders will provide such documents and other information reasonably requested by the Trustee or the Trustee's successor in interest to monitor the 1st Lien Lenders' compliance with this paragraph R. LCPI shall provide the Trustee with information reasonably necessary to verify the amount of Proceeds. Finally, the Plan may contain such other reasonable provisions as may be required to effectuate the performance of the terms of this paragraph R.

S.    Intentionally omitted.

**Certain Rights and Releases Upon Termination Event**

T.    If a Final Order confirming the Plan shall not have been obtained by February 28, 2011 (or such later date as may be mutually agreed upon by the Trustee, LCPI and the Creditors' Committee, such later date in no event to be later than March 31, 2011) (a "Termination Event"), then:

    i.    The 1st Lien Lenders immediately will be granted relief from stay to foreclose on the Properties. The Bankruptcy Court will grant this relief upon the presentation of an order by LCPI, accompanied by a declaration signed by an authorized representative of LCPI, confirming that a Termination Event has occurred. No party in interest, including without limitation the Trustee and the Creditors' Committee, shall be entitled to or permitted (A) to challenge the presentation of or entry of the order granting LCPI relief from stay with respect to the Properties, except to the extent no Termination Event has in fact occurred or (B) to challenge or otherwise interfere with the foreclosure of the Properties. Upon the entry of such order, the Trustee shall cooperate with the 1st Lien Lenders' foreclosure actions.

    ii.    The Trustee shall retain the Administrative Funds and the Trustee's YFP free from the secured claims of the Lenders.

    iii.    The 1st Lien Lenders shall retain the 1st Lien Lenders Retained Settlement Funds and the Trustee shall immediately pay over to the 1st Lien Lenders (A) the unused portion of the Remaining Development Funds, and (B) the unused portion of the Trustee Loss Collateral, in each case free and clear of any claims or interests (including without limitation any right to recovery) of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors.

    iv.    Intentionally omitted.

    v.    LCPI and the 1st Lien Lenders shall in no event be deemed to have waived any right to object to the substantive consolidation of the Debtors' cases.

    vi.    Intentionally omitted.

13

vii. Except as provided in this paragraph T, this Term Sheet shall be of no further force or effect, including any obligation contained in paragraphs L and M.

## No Substantive Consolidation

U.    The parties hereto acknowledge and agree that neither any provision of this Term Sheet nor any of the transactions contemplated herein, including without limitation the contemplated terms and provisions of the Plan, do nor shall (i) effect substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors, (ii) suggest that any such substantive consolidation is or might be possible, or (iii) affect the right of the 1st Lien Lenders to object to the substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors. However, nothing here shall constitute a waiver of the rights of the parties to seek substantive consolidation of one or more of the Debtors if such is necessary or appropriate in the interests of creditors.

## Miscellaneous Provisions

V.    1.    Upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding upon the parties hereto and their respective heirs, representatives, transferees, successors and assigns. Notwithstanding the foregoing, this Term Sheet and the rights and obligations hereunder may not be assigned by a party hereto without the prior written consent of the other parties.

2.    LCPI will use reasonable efforts to obtain by September 30, 2010, an agreement from the 1st Lien Lenders tolling the statute of limitations within which the Trustee must file a complaint against the 1st Lien Lenders based on the operative facts alleged in the draft attached to his proof of claims previously filed in the LCPI chapter 11 case or to avoid the 1st Lien Lenders' asserted lien against the funds currently held by the Yucaipa Valley Water District until March 31, 2011.

3.    In the event of any dispute between the parties hereto arising out of the subject matter of this Term Sheet, the prevailing party in such action shall be entitled to have and to recover from the other party its reasonable attorneys' fees and other reasonable expenses (including expert witness fees) in connection with such action or proceeding in addition to its recoverable court costs.

4.    This Term Sheet shall be construed in accordance with the laws of the State of California in effect at the time of the execution of this Term Sheet except to the extent superseded by the laws of the United States. The parties hereto agree that the California Bankruptcy Court shall have jurisdiction to hear and to determine all matters, disputes and controversies related to this Term Sheet and the subject matter hereof, and each party hereby submits to the jurisdiction and venue of the California Bankruptcy Court with respect thereto. Notwithstanding the foregoing, if the California Bankruptcy Court will not accept jurisdiction or otherwise hear any such matter, then such matter shall be heard by the Orange County Superior Court for the

State of California, and each party hereby submits to the jurisdiction and venue of such court with respect thereto.

5. This Term Sheet contains the entire understanding between the parties relating to the transactions and matters contemplated hereby and all prior or contemporaneous agreements, term sheets, understandings, representations and statements, oral or written are merged herein and shall be of no further force or effect.

6. If any term, provision, condition or covenant of this Term Sheet or the application thereof to any party or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this Term Sheet, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Term Sheet shall be valid and enforceable to the fullest extent permitted by law.

7. Any alteration, change or modification of or to this Term Sheet, in order to become effective, shall be made by written modification hereof executed by all of the parties hereto.

8. This Term Sheet and any modifications, amendments or supplements thereto may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart.  The parties may also deliver executed copies of this Term Sheet to each other by facsimile or by electronic delivery (e.g., .pdf), which facsimile or electronic signatures shall be binding upon the parties as if they were originals.

9. The parties hereto each agree in good faith to undertake such further actions and deliver such further documentation as may be reasonably necessary in order to facilitate the transactions contemplated in this Term Sheet and to implement the terms hereof, provided that no party shall be obligated to incur expenses or liabilities in connection therewith which exceed those expenses and liabilities which they would otherwise incur complying with the express terms hereof.

[Signatures appear on the following page]

_____          Dated:_____

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee
of the administratively consolidated estates
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

[Signatures continue on the following page]

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

By: _____

Lennar Homes of California, Inc., solely in its capacity as chairperson

By:_____         Dated:_____

_____

[Signatures continue on the following page]

LEHMAN COMMERCIAL PAPER INC., as
administrative agent of the 1st Lien Lenders
to LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch


By:_____          Dated:_____
     Name:
     Title:  Its Authorized Signatory


[Signatures continue on the following page]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[_____]


By:_____          Dated:_____
        Name:
        Title:

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY
LCPI 3rd LIEN LENDER HEREIN:


LCPI 3rd LIEN LENDER:

[_____]


By:_____          Dated:_____
    Name:
    Title: